# 20 Civ. 06274 (LAK)

### United States District Court

#### *for the*

### Southern District of New York

_____

IN RE TRANSCARE CORPORATION, ET AL.

DEBTORS,

_____

PATRIARCH PARTNERS AGENCY SERVICES, LLC, ET AL.,

DEFENDANTS-APPELLANTS,

—against—

SALVATORE LAMONICA, AS CHAPTER 7 TRUSTEE OF THE JOINTLY-ADMINISTERED ESTATES OF TRANSCARE CORPORATION, ET AL.,

PLAINTIFF-APPELLEE.

_____

ON APPEAL FROM THE UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK (BERNSTEIN, J.)

IN RE: TRANSCARE CORPORATION, ET AL., CASE NO. 16-10407 (SMB)

LAMONICA V. TILTON, ET AL., ADV. PROC. NO. 18-1021 (SMB)

## BRIEF FOR THE APPELLANTS

Michael T. Mervis
Timothy Q. Karcher
Q. Jennifer Yang
**PROSKAUER ROSE LLP**
Eleven Times Square
New York, NY  10036-8299
Tel.: (212) 969-3000
Email: mmervis@proskauer.com
      tkarcher@proskauer.com
      jyang@proskauer.com

*Attorneys for Defendants-Appellants*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Civil Procedure 7.1(a) and Federal Rules of Bankruptcy Procedure 8012(b) and 8014(a)(1), the undersigned counsel for Appellants, all private nongovernmental parties, hereby certifies as follows:

Patriarch Partners Agency Services, LLC ("PPAS") has no parent company and no publicly held corporation owns 10% or more of PPAS.

The parent company of Transcendence Transit II, Inc. is Transcendence Transit, Inc.  No publicly held corporation owns 10% or more of Transcendence Transit, Inc.

Transcendence Transit, Inc. has no parent company and no publicly held corporation owns 10% or more of Transcendence Transit, Inc.

# TABLE OF CONTENTS

INTRODUCTION AND SUMMARY OF ARGUMENT ............................................................. 1

STATEMENT OF JURISDICTION ................................................................. 5

STATEMENT OF ISSUES ................................................................................... 6

STANDARD OF REVIEW ................................................................................. 6

STATEMENT OF THE CASE ............................................................................. 7

    A.    TransCare and its Creditors ............................................................. 7

    B.    TransCare's Financial Distress ......................................................... 9

    C.    The Restructuring Plan ................................................................. 12

    D.    TransCare's Continuing Financial Death Spiral ................................. 15

    E.    The Foreclosure ......................................................................... 16

    F.    Post-Foreclosure Events ............................................................... 17

    G.    The Bankruptcy Court's PFC .......................................................... 18

ARGUMENT ................................................................................................ 20

I.    The Bankruptcy Court Erred in Finding TransCare Foreclosed on the Subject Collateral with Actual Intent to Hinder, Delay, or Defraud Its Creditors ......................... 20

    A.    A Legitimate Supervening Purpose of the Restructuring Plan and Article 9 Foreclosure Was to *Benefit* TransCare's Creditors ................................ 21

    B.    The "Badges of Fraud" Do Not Support a Finding of Fraudulent Intent .............. 24

        1.    The Badges of Fraud the Bankruptcy Court Did Not Consider ................ 25

        2.    The Badges of Fraud the Bankruptcy Court Discussed but Got Wrong ................................................................................ 27

II.    The Bankruptcy Court Erred in Awarding $39.2 Million in Damages ........................... 33

    A.    TransCare Did Not Transfer a Going Concern ....................................... 34

    B.    Even if the Transferred Property Were a Going Concern, the Trustee Failed to Prove its Value ........................................................................ 38

CONCLUSION ............................................................................................. 40

## **TABLE OF AUTHORITIES**

**CASES**

*Allstate Fabricators Corp. v. Flagstaff Foodservice Corp. (In re Flagstaff Foodservice Corp.),*
    56 B.R. 899 (Bankr. S.D.N.Y. 1986) ..............................................................35, 37

*Andrew Velez Constr. Inc. v. Consol. Edison Co. of N.Y. Inc. (In re Andrew Velez Const., Inc.),*
    373 B.R. 262 (Bankr. S.D.N.Y. 2007) ....................................................................34

*Balaber-Strauss v. Town of Harrison (In re Murphy),*
    331 B.R. 107 (Bankr. S.D.N.Y. 2005) ....................................................................24

*Bruno Mach. Corp. v. Troy Die Cutting Co. (In re Bruno Mach. Corp.),*
    435 B.R. 819 (Bankr. N.D.N.Y. 2010) ...................................................................20

*Buchwald Cap. Advisors v. J. Peretz Morgan Chase Bank, N.A. (In re M. Fabrikant & Sons, Inc.),*
    480 B.R. 480 (S.D.N.Y. 2012), *aff'd,* 541 F. App'x 55 (2d Cir. 2013) ...................24

*Chemipal Ltd. v. Slim–Fast Nutritional Foods Int'l., Inc.,*
    350 F. Supp. 2d 582 (D. Del. 2004) .......................................................................40

*Citibank, N.A. v. Bombshell Taxi LLC (In re Hypnotic Taxi LLC),*
    543 B.R. 365 (Bankr. E.D.N.Y. 2016) ....................................................................25

*Daneman v. StanleyIn re Stanley,*
    384 B.R. 788 (Bankr. S.D. Ohio 2008) ...................................................................23

*Fryman v. Century Factors, Factor For New Wave (In re Art Shirt Ltd., Inc.),*
    93 B.R. 333 (E.D. Pa. 1988) ...................................................................................37

*Gelzer v. Bloom (In re M. Silverman Laces, Inc.),*
    404 B.R. 345 (Bankr. S.D.N.Y. 2009) ....................................................................35

*Gill v. Maddalena (In re Maddalena),*
    176 B.R. 551 (Bankr. C.D. Cal. 1995) ....................................................................34

*Gillman v. Sci. Rsch. Prods., Inc. (In re Mama D'Angelo, Inc.),*
    55 F.3d 552 (10th Cir. 1995) ..................................................................................36

*GMAM Inv. Funds Tr. I v. Globo Comunicacoes e Participacoes S.A. (In re Globo Comunicacoes e Participacoes S.A.),*
    317 B.R. 235 (S.D.N.Y. 2004) .........................................................6, 7, 8, 9, 10, 11

*Ien v. TransCare Corp. (In re TransCare Corp.)*,
  614 B.R. 187 (Bankr. S.D.N.Y. 2020) .......................................................1, 9, 21, 39

*In re Atlas Computs., Inc.*,
  2012 WL 3018256 (Bankr. N.D. Okla. July 24, 2012), *aff'd*, 2014 WL
  1267007 (N.D. Okla. Mar. 26, 2014) ........................................................................35

*Jacked Up, LLC v. Sara Lee Corp.*,
  291 F. Supp.3d 795 (N.D. Tex. 2018) .......................................................................39

*Kirschner v. Fitzsimons (In re Tribune Co. Fraudulent Conveyance Litig.)*,
  2017 WL 82391 (S.D.N.Y. Jan. 6, 2017) ...........................................25, 28, 29, 33

*Marine Midland Bank v. Murkoff*,
  120 A.D.2d 122 (2d Dep't 1986) .........................................................................34, 35

*McCord v. Ally Fin., Inc. (In re USA United Fleet, Inc.)*,
  559 B.R. 41 (Bankr. E.D.N.Y. 2016) .........................................................................20

*Mendelsohn v. Roalef (In re E.D.B. Constr. Corp.)*,
  2013 WL 6183849 (Bankr. E.D.N.Y. Nov. 26, 2013) ...........................................23, 33

*Miller & Rhoads Secured Creditors' Tr. v. Robert Abbey, Inc. (In re Miller &*
  *Rhoads, Inc.)*,
  146 B.R. 950 (Bankr. E.D. Va. 1992) ........................................................................35

*Mishkin v. Ensminger (In re Adler, Coleman Clearing Corp.)*,
  247 B.R. 51 (Bankr. S.D.N.Y. 1999) .........................................................................37

*Neuger v. Casgar (In re Randall Const., Inc.)*,
  20 B.R. 179 (N.D. Ohio 1981) .............................................................................36, 37

*Reis v. Hazelett Strip-Casting Corp.*,
  28 A.3d 442 (Del. Ch. 2011) ......................................................................................33

*Sarasota CCM, Inc. v. Kuncman (In re Kuncman)*,
  454 B.R. 276 (Bankr. E.D.N.Y. 2011), *aff'd sub nom. Sarasota CCM, Inc. v.*
  *Kuncman*, 466 B.R. 590 (E.D.N.Y. 2012) ................................................................23

*Schneider v. Barnard*,
  508 B.R. 533 (E.D.N.Y. 2014) ...................................................................................20

*Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*,
  568 B.R. 481 (Bankr. S.D.N.Y. 2017) .......................................................................34

*Sharp Int'l Corp. v. State St. Bank & Tr. Co. (In re Sharp Int'l Corp.)*,
  403 F.3d 43 (2d Cir. 2005) .........................................................................................20

iii

*Silverman v. Actrade Capital, Inc. (In re Actrade Fin. Techs., Ltd.),*
    337 B.R. 791 (Bankr. S.D.N.Y. 2005) ...................................................................25

*Transcendence Transit II, Inc., et al. and Local 1181–10601, et al.,*
    Case 29–CA–182049 (N.L.R.B. 2020) ................................................................18

*Tronox Inc. v. Anadarko Petroleum Corp. (In re Tronox Inc.),*
    429 B.R. 73 (Bankr. S.D.N.Y. 2010) ...................................................................34

*Weisfelner v. Blavatnik (In re Lyondell Chem. Co.),*
    567 B.R. 55 (Bankr. S.D.N.Y. 2017) ...................................................................20

*Weisfelner v. Hofmann (In re Lyondell Chem. Co.),*
    554 B.R. 635 (S.D.N.Y. 2016) ..............................................................................20

## STATUTES

11 U.S.C. § 502(d) ....................................................................................................19, 40

11 U.S.C. § 548(a)(1)(A) ...............................................................................6, 18, 19, 20

11 U.S.C. § 550(a) ...........................................................................................6, 19, 33, 34

28 U.S.C. § 157 .....................................................................................................................5

28 U.S.C. § 158(a) ...............................................................................................................6

28 U.S.C. § 158(a)(1) ...........................................................................................................5

New York Debtor and Creditor Law § 276 .......................................................6, 18, 19, 20

UCC Article 9 .................................................................2, 15, 16, 17, 18, 21, 26, 27

## OTHER AUTHORITIES

2019 N.Y. Sess. Laws Ch. 580 (A. 5622) (McKinney) ..........................................................6

Defendants-Appellants Patriarch Partners Agency Services, LLC ("PPAS"), Transcendence Transit, Inc. ("TTI"), and Transcendence Transit II, Inc. (together with TTI, "Transcendence"), respectfully submit this brief in support of their appeal from the judgment entered against them by the United States Bankruptcy Court for the Southern District of New York on July 15, 2020 (the "Judgment") (A2721) pursuant to the Post-Trial Findings of Fact and Conclusions of Law, dated July 6, 2020 ("PFC") (A2621). The Judgment found PPAS and Transcendence liable for actual fraudulent conveyance and awarded damages against them in the amount of $39.2 million. The Judgment should be reversed.

## INTRODUCTION AND SUMMARY OF ARGUMENT

On the last day of a six-day bench trial, directly after the close of the evidence, the following colloquy ensued between the bankruptcy court and counsel for the plaintiff, the chapter 7 Trustee (the "Trustee") for TransCare Corporation and its affiliates (collectively, "TransCare"), with regard to the Trustee's claim for actual fraudulent conveyance:

> THE COURT:  "[W]hat's the evidence that [Lynn Tilton, TransCare's indirect majority owner and sole director,] wasn't acting with an honest intention to reorganize or save [TransCare]?"
>
> MR. AMINI:  "I don't know that we would say that she wasn't acting with an honest intention to reorganize or save [TransCare]."

A2308-09 at 6:22-7:2.  After some further colloquy, and with the evidence fresh in mind, the bankruptcy court told the Trustee's counsel he was "going to be hard-pressed to convince [the court] that there's an intentional fraudulent transfer claim arising from the evidence of the trial." A2310-11 at 8:25-9:2.  Yet, 11 months later, the bankruptcy court issued its PFC that, in four and a half pages (of a hundred page opinion), inexplicably found the Trustee had proven that Tilton

1

acted with the intent to hinder, delay, or defraud TransCare's creditors, and awarded $39.2 million in damages against PPAS and Transcendence, plus fees.[1]

The Trustee's claim for actual fraudulent transfer arises from a foreclosure under Article 9 of the UCC by PPAS, as administrative agent for TransCare's senior secured term loan lenders, on certain TransCare property in which those lenders held a lien.  At the time of the foreclosure in February 2016, TransCare was in default on its obligations to the term loan lenders and PPAS had a contractual right to foreclose on their behalf.  The foreclosure was part of a restructuring plan that Tilton developed with the active participation of multiple stakeholders, including (i) TransCare's asset-based lender, Wells Fargo, N.A. ("Wells Fargo") and its outside counsel, (ii) several TransCare executives, (iii) TransCare's outside counsel, and (iv) TransCare's outside financial advisor.

For more than a year leading up to the foreclosure, TransCare had been suffering under the weight of deep financial distress and a series of liquidity crises.  During that time, Tilton acted to sustain a company on life support, including authorizing new money financing by certain of the term loan lenders she controlled and delivering emergency funding through her own personal investment vehicles.  Despite this, by February 2016, TransCare was (i) in default to the term loan lenders in amounts approximating $45 million, (ii) in default to Wells Fargo (to which it owed approximately $14 million), and (iii) operating day-to-day wholly at the mercy of Wells Fargo and its willingness to fund on a daily basis.

Under the restructuring plan, the senior secured term loan lenders would, through PPAS as administrative agent, foreclose on the TransCare property in which they held a lien, pursuant to

---

[1] Because Tilton controlled TransCare, the bankruptcy court imputed Tilton's knowledge and intent to TransCare.  *See* A2692 (PFC at 72 n. 32).

their contractual rights.  Two new corporate entities (later named "Transcendence") would be created and, with the infusion of new capital and resources to be provided by Tilton, would operate certain of TransCare's business lines.  Tilton, in consideration for her new money financing, would hold a 54.7% indirect equity interest in Transcendence, and the remaining 45.3% would be held by TransCare's term loan lenders.  Tilton testified without contradiction that she believed this was the term loan lenders' "best hope at collecting for the [term] loans that had been made."  A2210 at 119:2-6.  Tilton also testified, without contradiction, that she believed this plan would preserve jobs, allowing some 700 people employed by the deeply insolvent TransCare to work for Transcendence.  Trade creditors were also well positioned to benefit, since Transcendence would require the support of TransCare's vendors to operate.  As she conceived her plan, Wells Fargo would be repaid either by Tilton's purchase of the bank's first priority security interest in TransCare's accounts receivable or by Wells Fargo collecting those receivables itself.  Thus, Tilton considered the restructuring plan an elegant solution that would provide the greatest recovery possible to each of TransCare's three creditor groups (the term loan lenders, Wells Fargo, and its unsecured creditors (including, specifically, employees)), at a time when it was clear TransCare would otherwise be forced to close its doors and liquidate.  Only Wells Fargo had any chance of being repaid in a liquidation; the other creditors would receive no payments or benefits.  In short, the restructuring plan, including the challenged foreclosure, was developed with the intent to *benefit* TransCare's creditors, not hinder, delay, or defraud them.

Nowhere in its discussion of the actual fraudulent conveyance claim did the bankruptcy court mention these facts.  Instead, ignoring the only direct evidence of Tilton's intent (Tilton's testimony and contemporaneous correspondence), the bankruptcy court looked to certain "badges of fraud" as "circumstantial evidence of Tilton's fraudulent intent."  A2694-95 (PFC at 74-75).  In

3

doing so, it focused only on a handful of facts from which it inferred fraudulent intent, while ignoring other undisputed facts that clearly showed the intent of the foreclosure and restructuring plan was to benefit TransCare's creditors.  The bankruptcy court also failed to examine three of the six badges of fraud it identified in its PFC, all of which weigh against a finding of fraudulent intent.

Instead, the bankruptcy court's discussion focused heavily on Tilton's role on both sides of the transaction, resulting in unsupported inferences that her intentions were nefarious. However, the bankruptcy court failed to cite any authority holding that a lack of arms-length dealing, alone, is conclusive proof of fraudulent intent.  In placing such weight on Tilton's particular role, the court improperly conflated the claim for actual fraudulent conveyance with the Trustee's *separate claim* for breach of the fiduciary duty of loyalty.  Particularly given the starkly distinct burdens of proof for each of the two claims, this was error.

Even if the bankruptcy court's liability finding was justified (and it was not), its $39.2 million damages award was wholly erroneous.  Damages on a claim for actual fraudulent conveyance are intended to restore the estate to the condition it would have been in if the transfer had not occurred.  At the time of the transfer, TransCare had been on life support for a year. Operating at the mercy of an asset-based lender that had the option to cease funding at any time (and, indeed, had threatened to do so), TransCare would have shuttered its doors long before the foreclosure, but for emergency cash infusions from Tilton.  At the time of the foreclosure, TransCare was vastly overleveraged, in default under its secured loan agreements, rapidly losing customer contracts, and without sufficient cash to cover its operational costs, including payroll.  In fact, all of TransCare's business lines, including those Tilton hoped could continue operating as Transcendence, were shuttered within two days of the foreclosure.  Thus, if the challenged

4

foreclosure had not occurred, the transferred property, which was fully encumbered by tens of millions of dollars in secured debt, would have been worth mere liquidation value: value that the secured lenders, not the TransCare estate, would have recovered through liquidation.  Here, we know the liquidation value of the property because, not long after the foreclosure, it was consensually liquidated for net proceeds of $2 million—well below, and bearing no relationship to, the bankruptcy court's approximately $40 million valuation of this same property.

The bankruptcy court reached its damage award based on its conclusion that TransCare transferred a "going concern."  This is completely divorced from reality (and the record evidence).  On the date of the foreclosure, the transferred property was merely the fully-encumbered assets of a zombie company.  Although Tilton hoped some of those assets, when combined with her infusion of new cash and other resources, could operate as a going concern as Transcendence, the fact remains that at the time of the foreclosure (i) these business lines had insufficient cash on hand with which to operate, or pay vendors or payroll, and (ii) the corporations that held the transferred assets were borrowers owing (or guarantors on) nearly $60 million of defaulted senior secured debt.  To value those assets on a going concern basis was manifest error.[2]

## STATEMENT OF JURISDICTION

This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 158(a)(1) because the appeal is from a final judgment of a bankruptcy court entered in a case referred to the bankruptcy court under 28 U.S.C. § 157.  The bankruptcy court entered the Judgment on July 15, 2020 (A2721

---

[2] Even if the transferred assets should have been valued as a going concern, the damage award should still be reversed because it was based entirely on the fatally flawed and wildly speculative calculations of the Trustee's expert witness.

at Dkt. No. 141), and PPAS and Transcendence timely filed their Notice of Appeal on July 27, 2020 (A2723 at Dkt. No. 146).[3]

## STATEMENT OF ISSUES

1. Did the bankruptcy court err in ruling that the Trustee sustained his burden to prove TransCare transferred the Subject Collateral (defined below) with the intent to hinder, delay, or defraud TransCare's creditors under New York Debtor and Creditor Law ("NYDCL") § 276 and 11 U.S.C. § 548(a)(1)(A) (*see* A2696 (PFC at 76)?[4]

2. Did the bankruptcy court err in awarding the Trustee $39.2 million in damages, or any damages at all, pursuant to 11 U.S.C. § 550(a) (*see* A2721 ¶ 1; A2699 (PFC at 79))?

## STANDARD OF REVIEW

A district court functions as an appellate court in reviewing judgments by bankruptcy courts. *See* 28 U.S.C. § 158(a). A bankruptcy court's legal conclusions are reviewed *de novo* and its findings of fact for clear error. *GMAM Inv. Funds Tr. I v. Globo Comunicacoes e Participacoes S.A. (In re Globo Comunicacoes e Participacoes S.A.)*, 317 B.R. 235, 245 (S.D.N.Y. 2004). Mixed questions of fact and law are subject to de novo review. *Id.*

---

[3] Joining in that Notice of Appeal was Ark II CLO 2001-1 Limited ("Ark II"). Ark II appealed from that part of the Judgment which set aside Ark II's security interest in TransCare's assets. Although Ark II firmly believes the bankruptcy court's rulings were incorrect, given the reality that TransCare's estate will not be able to satisfy Ark II's claim regardless of its secured status, Ark II has opted not to pursue its appeal further.

[4] All references to the NYDCL herein refer to the version of the NYDCL in existence at the time of the foreclosure, which was repealed effective April 4, 2020 and replaced by the Uniform Voidable Transactions Act. *See* 2019 N.Y. Sess. Laws Ch. 580 (A. 5622) (McKinney).

## STATEMENT OF THE CASE

### A.    TransCare and its Creditors

TransCare provided ambulance services to hospitals and municipalities and paratransit services to the New York Metropolitan Transit Authority ("MTA").   A0333 at Stip. No. 1. Specifically, TransCare offered (a) ambulance services in (1) New York City, (2) Westchester County, NY, (3) Hudson Valley, NY, (4) Pittsburgh, and (5) Maryland; and (b) paratransit services under a contract with the MTA (the "MTA Contract").   *Id.*; A0330 at Stip. Nos. 29–30.

Tilton served as the sole director of TransCare.   A0326 at Stip. No. 2.   Ark II owned a 55.7% direct interest in TransCare, and Tilton owns 99% of Ark II.   A0327 at Stip. Nos. 6, 8.   Ark Investment Partners II, L.P. ("AIP"), a Tilton affiliate, owned 5.6% of TransCare.   A0327 at Stip. No. 9.   Credit Suisse Alternative Capital, Inc. ("Credit Suisse") owned, or managed, 26% of TransCare on behalf of five separate entities, and the remaining 12.7% was owned by various entities and individuals.   A4066; A0035.

TransCare's debt structure consisted of: (1) a term loan pursuant to a credit agreement (as amended, the "TLA") (A2833), and (2) an asset-based loan facility ("ABL") from Wells Fargo pursuant to a credit and security agreement (as amended, the "ABL Agreement") (A2914).   A0328 at Stip. No. 14.   TransCare Corporation and each of its subsidiaries were borrowers and/or guarantors of the term loan and the ABL.   A0328 at Stip. Nos. 13-14.

*The Term Loan*

The term loan lenders under the TLA were: (i) AIP, (ii) Zohar CDO 2003–1, Ltd., Zohar II 2005–1, Ltd., and Zohar III, Ltd. (collectively, the "Zohar Funds"), (iii) Credit Suisse, and (iv) First Dominion Funding I ("First Dominion" and, together with AIP, the Zohar Funds, and Credit Suisse, the "Term Loan Lenders").   A0327-28 at Stip. No. 10.   Tilton controlled and was the legal

owner of the Zohar Funds, which owned over 75% of the TLA debt, but they were funded by outside investors.  A2025-28 at 22:9-25; A2154 at 63:4–12; A4055; A1204 at 23:9-11.  AIP held approximately 7% of the debt.  A4055.  Credit Suisse acted as collateral manager for First Dominion, and Credit Suisse and First Dominion together held approximately 18% of the debt.  A2912; A1314 at 30:20–23; A4055.  PPAS served as administrative agent for the Term Loan Lenders under the TLA.  A2833.

Pursuant to an August 4, 2003 security agreement, executed by TransCare Corporation in favor of PPAS as administrative agent (the "PPAS Security Agreement"), the Term Loan Lenders held a blanket lien on all of TransCare's assets.  A3549 § 2; *see also* A0328 at Stip. No. 13.  Upon an Event of Default under the TLA, PPAS could foreclose on the Collateral (as defined in the PPAS Security Agreement) on behalf of the Term Loan Lenders.  A3562 § 8.  An Event of Default could be called by PPAS with the consent of just the Required Lenders (*i.e.* those Term Loan Lenders with credit exposure in the aggregate of more than 50%) or upon their request. A2896-97. Thus, the consent of *all* the Term Loan Lenders was not required for PPAS to call an Event of Default or foreclose on Collateral on their behalf.  *Id.*; A2012 at 9:8–11.  Under the terms of the TLA, TransCare's failure to make timely interest payments was an Event of Default.  A2894 § 10(a).

### *The Wells Fargo ABL Facility*

Pursuant to the ABL Agreement, Wells Fargo also held a security interest in all of TransCare's assets.  A2963-65; A2996-98 §§ 5.1, 9.7(b) & (d).  Wells Fargo and PPAS, on behalf of the Term Loan Lenders, entered into an intercreditor agreement dated October 13, 2006 (the "Wells Fargo/PPAS Intercreditor Agreement") (A3113), which gave (i) the Term Loan Lenders first priority liens on certain property, including equipment, inventory, and vehicles, and (ii) Wells

8

Fargo a first priority position in all of TransCare's other assets, including accounts receivable. A3118; A3141.

### B.     TransCare's Financial Distress

As the bankruptcy court found in a related lawsuit, in the year before the challenged foreclosure, "TransCare was on life support [] and depended on Tilton affiliates to cover shortfalls throughout 2015 and into 2016."[5]  This is illustrated by the following chronology:

Historically, TransCare drew on the Wells Fargo ABL to fund payroll.  A2132; A2137 at 41:2–12, 46:8–15.  However, on July 2, 2015, Wells Fargo suddenly implemented a $1.5 million reserve requirement, preventing TransCare from making payroll the next day.  A3184; A1370-71 at 86:21–87:5; A2132 at 41:3–16; A3631.  Tilton negotiated a resolution with Wells Fargo to unblock the reserve which involved, among other things, the Zohar Funds advancing $2 million in new funding to TransCare.  A2046-47 at 43:20–44:5; A3631; A4061.  Indeed, between February 2015 and January 2016, the Zohar Funds advanced over $7.2 million to provide emergency liquidity so TransCare could continue to operate.  A4061-62; A2066 at 63:4–12.

On October 14, 2015, Wells Fargo issued a Notice of Non-Renewal (the "Non-Renewal Notice"), stating that the ABL would expire on January 31, 2016, and that Wells Fargo "presently ha[d] no intention to extend or modify the term of such financing arrangements."  A3639.  The Non-Renewal Notice also stated that TransCare had to pay the outstanding balance in full by January 31, 2016.  *Id.*  This was impossible—TransCare had no available liquidity or access to liquidity sufficient to pay.  A1377 at 93:6–11; A2630 (PFC at 10).[6]

---

[5] *Ien v. TransCare Corp. (In re TransCare Corp.)* (*"Ien"*), 614 B.R. 187, 210 (Bankr. S.D.N.Y. 2020).

[6] The outstanding balance as of February 24, 2016 totaled approximately $14 million.  A0001.

Against this backdrop, beginning in December 2015, Tilton explored a potential sale of TransCare. A3244-45. As the bankruptcy court found, "Tilton wanted to get TransCare back to [what] it had historically earned, so she could sell it at a price that would cover both the ABL and the Term Loan." A2632 (PFC at 12). Wells Fargo was willing to continue funding the business through such a sale, but made clear its desire was "to exit this credit facility and [its] appetite to support the business outside a process that leads to an exit [was] extremely limited." A3651; A3270. By February 5, however, Tilton "made a good faith determination" that, "due in large part to the rapidly deteriorating condition of the company and the need for an immediate infusion of a substantial amount of cash that was not readily available," a sale process would not be viable and should not be pursued. A2662 (PFC at 43).

In early January 2016, Tilton retained Carl Marks Advisory Group ("CMAG"), a consulting firm that specializes in corporate restructuring, as a financial advisor. A3657; A2054 at 51:22–23. CMAG professionals served as TransCare's Chief Restructuring Officer and CFO. A1256 at 75:2–6; A1236 at 55:1–11. CMAG's analysis of TransCare's financial situation confirmed it was dire. On January 14, CMAG indicated that TransCare "require[d] a substantial amount of [new money] funding *if the business [was] going to survive*." A3861 (emphases added). CMAG added, "[t]hese are not wish list amounts . . ., *but absolutely necessary in order to keep the business as an ongoing enterprise*." *Id.* (emphases added). However, both Tilton and CMAG recognized that providing funding to TransCare at this point, without a plan to restructure, effectively amounted to "funding into a black hole." A3859; A2152 at 61:12–21.

On January 27, CMAG shared a presentation it prepared (the "CMAG Executive Summary"), which bluntly stated that "TransCare is now operating at an absolute breaking point." A3871. CMAG described (i) "strained and broken customer relationships" and that "[v]irtually

10

all key customers [were] pursuing or considering replacement options; (ii) the "strained and broken ambulance fleet"; (iii) "strained and broken vendor relationships"; and (iv) "strained and broken landlord relationships." *Id*; A3872.  CMAG reported that it had been "fighting daily fires and working to hold the business and organization together." A3878.  CMAG indicated that "time has run out" for TransCare, and "the decision [for Tilton] to risk significant [new] capital must be made before a turnaround can show meaningful positive results." *Id.*  CMAG "projected the need for an immediate pledge of financial support from [Tilton] in excess of $7.5 million . . . , of which $3.5 million was needed over the next two weeks." A2639 (PFC at 19).  As the bankruptcy court noted, however, Tilton had no legal obligation to fund TransCare personally. *Id*.  The CMAG Executive Summary emphasized the high risk associated with any additional investment in TransCare, and that "ultimate payback on the incremental investment . . . is uncertain." A3874.

In this same time period, TransCare needed to make payments on certain critical obligations, including to the New York State Insurance Fund ("NYSIF"), TransCare's workman's compensation insurance provider.  A3861.  TransCare did not have the funds to make these payments. A2710 (PFC at 90); A2153-56 at 62:2–65:1.  Although Tilton had no obligation to do so, on January 15, she approved a loan to TransCare from one of her personal investment vehicles, Ark II, in the amount of approximately $1.2 million to cover the insurance payments and prevent the company from going out of business that same day.  A3667; A2060-61 at 57:18–58:4; *see also* A2710 (PFC at 90).  By January 27, payments were still owed to NYSIF.  A3876.  To again avoid a shutdown, on January 29, Tilton authorized PPAS to release $690,168.24 to TransCare which was used, in part, to pay NYSIF.  A2061-62 at 58:21–59:8.  Ark II reimbursed PPAS for the advance.  A2097 at 6:3–6; A3460.

TransCare's situation continued to deteriorate.   On February 2, CMAG reiterated that TransCare's "cash situation is dire and not improving," and that TransCare "could not continue operations without a significant infusion of cash."  A3905; A3907.  CMAG emphasized, with respect to any further investment in TransCare: "As far as the return, you MUST look at it as what is the return on the new money as the old money is essentially only worth what a liquidation (closure or liquidation sale) would yield after [W]ells takes the AR [accounts receivable], which practically speaking is not much . . .."  A3907.  Indeed, the bankruptcy court found that by early February 2016, TransCare was "woefully insolvent, with negative net equity of nearly $40 million."  A2708 (PFC at 88).  The company's ability to continue operating was wholly dependent on Wells Fargo's willingness to continue funding from day-to-day.  *See e.g.,* A3792 (Tilton: "I told [Wells Fargo] we should both . . . figure out if there was a constructive way to work together that did not include daily stops on funding.").  At the time, in addition to the approximately $14 million TransCare owed to Wells Fargo, it was also in default under the TLA, with approximately $45 million outstanding.  A4055; A3545 ("Schedule 1"); A0001.

### C.     The Restructuring Plan

On February 9, Tilton spoke with Kurt Marsden, her main contact at Wells Fargo, to discuss whether there was a path forward for TransCare.  A3702; A2112 at 29:15–24.  In a follow-up email, Marsden asked that CMAG create a budget for three potential scenarios: "(1) a forced wind down; (2) an orderly wind down; and (3) the bankruptcy scenario discussed on our earlier call."  A3702; A2166-67 at 75:18–76:1.  The referenced "bankruptcy scenario" was the restructuring plan (described below (the "Restructuring Plan")) at issue on this appeal, which Tilton and Marsden first discussed that day.  A2168 at 77:10–13.  Wells Fargo did not express any interest in a scenario involving a sale of all or part of TransCare, or in a scenario where TransCare continued to operate

as a going concern.  This was hardly surprising given TransCare's financial situation and CMAG's conclusion that it was out of time and out of money.  The only contemplated alternative to the Restructuring Plan was the liquidation of all of TransCare.  *See also* A2170 at 79:1–10 (by February 9, Tilton thought the "only alternative" to the Restructuring Plan "was the liquidation of the company").  Indeed, that same day, Tilton suggested Wells Fargo "take the keys" to TransCare. A3701; A2166 at 75:8–17.

Under the Restructuring Plan, PPAS, on behalf of the Term Loan Lenders, would foreclose on certain property secured by their liens, pursuant to the Wells Fargo/PPAS Intercreditor Agreement, the TLA and the PPAS Security Agreement.  A2168 at 77:20–22; A2230 at 9:4–6. Two new corporate entities would be formed (*i.e.*, "NewCo") that would acquire these assets with the hope that, with the infusion of new resources, new capital from Tilton, and time, they would be able to operate certain business lines as a going concern.  A2046–47 at 43:20– 44:7.  NewCo would do business under the name Transcendence.  A2100 at 9:20–25.  Two of Tilton's investment vehicles would hold a 54.7% equity interest in NewCo[7], and the Term Loan Lenders would hold a 45.3% equity interest.  A4055.  Tilton, who engaged in a detailed analysis to calculate these equity splits (A4055; A2207–10 at 116:5-119:19; A2011–12 at 8:16-9:7), sought to provide this potential equity upside to the Term Loan Lenders as a possible source of future recovery on the balance of their secured loan to TransCare.  A2209–10 at 118:23–119:5.

Tilton viewed the Restructuring Plan as "an attempt to save 700 jobs and parts of this company."  A3417; *see also* A3413 (expressing her desire to "try to save some of our company

---

[7] 50% of Tilton's indirect equity interest was attributable to a $10 million new money investment by Tilton's investment vehicle Ark Angels III.  A4055; A2206–08 at 115:8–117:4; A2208 at 117:5–16; A2016 at 13:19–23; A2028 at 25:4–25.

and our people").  Tilton recognized that "the livelihoods of real people and their families [were] at stake" and that this plan would allow her to save jobs by moving employees to Transcendence, and thus "reduce[] the damages of [TransCare's inevitable] liquidation" of TransCare.  A3417; *see also* A3796.  In short, by this point Tilton believed that the Restructuring Plan was the only viable option that had the potential, with a new capital investment by her, to save certain TransCare assets from complete liquidation, preserve hundreds of jobs, and provide future recoveries to the Term Loan Lenders (who sat behind Wells Fargo for their recoveries).  A2218 at 127:5–16.

The Restructuring Plan was developed openly and with the active participation of multiple stakeholders, including (i) Wells Fargo and its outside counsel, (ii) CMAG, (iii) several TransCare executives, and (iv) TransCare's outside counsel.  *See, e.g.*, A4046; A4063–64; A3767; A3798. After first discussing the Restructuring Plan with Wells Fargo's Marsden on February 9, Tilton continued to engage in daily communications with Wells Fargo personnel about it.  A2070 at 67:10–16; A2178 at 87:7–8.  Those communications concerned, among other things, the preparation and exchange of financial models, the mechanics of the planned foreclosure, the potential purchase by Tilton of Wells Fargo's security interest in TransCare's accounts receivable, and the need for NewCo to bind insurance.  *See, e.g.*, A3790; A3389; A3398; A3417; A4057; A2172 at 81:7–15  (Tilton: "[W]e were working together on this project to try to figure out the most elegant solution for a company in crisis."); A2174–75 at 83:14–84:3  (Tilton: "[W]e were all looking at the exact same information to try to make the best decisions."); A2182 at 91:2–7. TransCare and Wells Fargo were represented by separate counsel who also communicated with each other throughout the two–week period preceding the foreclosure.  A3292; A3395; A1605 at 99:8–16; A1655–56 at 149:20–150:11.

14

The CMAG team assisted with the analysis of the Article 9 foreclosure and prepared financial models for the Restructuring Plan.  A3705 (CMAG emailing Greenberg "the current draft of the entities contemplated to be in the Article 9 transaction"); A1398–99 at 114:15–115:7; A4047; A1494 at 75:13–21.  CMAG and Wells Fargo personnel also interacted directly concerning the Restructuring Plan.  A1400 at 116:5–8.  TransCare management also participated.  *See, e.g.*, A4046; A1442 at 23:14–23; A1665 at 159:14–160:16.

### D. TransCare's Continuing Financial Death Spiral

At the time the Restructuring Plan was developed, TransCare was, financially, a zombie company.  It required liquidity to keep the lights on as the Restructuring Plan was refined, and continued to depend on Wells Fargo for funding on a day-to-day basis.  A2186 at 95:19–22; A2189 at 98:19–22; A2137 at 46:12–15; A3795; A2026 at 23:4–6 (Tilton: "The company was in a free fall with an ABL lender who was refusing to fund on a day-to-day basis."); A3793 (Tilton: "I told [W]ells . . . they should over advance today, so we have enough liquidity to properly make it to the weekend.").  Wells Fargo could choose to cease funding at any moment, which would force TransCare to close its doors immediately.  In fact, on February 18, Wells Fargo told Tilton it had decided to cease further funding.  A2185 at 94:23–24; *see also* A3388 (Tilton: "I also heard you are cutting the line as of today.  If that is the case, I will ask the lawyers to file for a Chapter 7.").  Without working capital from its ABL lender, TransCare could not make payroll or otherwise pay its bills and would have had to shut its doors immediately.  *See also* A2137 at 46:12–15; A3643.  Thus, Tilton sent her team, which had been working around the clock on the Restructuring Plan, home.[8]  Later that evening, Marsden informed Tilton that Wells Fargo had "chang[ed] [its] mind

---

[8] A2185–86 at 94:24–95:11.  (Tilton: "[I] had told everyone in the office that I wasn't sure that we would have operations the next day.  That included TransCare leaders who were in the office . . .

and wanted to work together to try to do a more graceful wind–down, as we had been previously discussing." A2186 at 95:3–11; *see also* A3792.  Nonetheless, the company was still operating at the mercy of the bank.

During this time, TransCare also struggled to maintain its already unstable customer base. A1403–04 at 119:23–120:4.  On February 19, TransCare lost its contracts with Bronx Lebanon, Montefiore Hospital, and the University of Maryland.  A3795; A2191 at 100:8–14.  Tilton feared that TransCare might continue to lose contracts, given the "rumor mill" that had started throughout the industry and various hospitals.  A2192 at 101:4–12, A2191 at 100:18–23.  As of February 24, TransCare had approximately fifty thousand dollars in cash on hand, and could not make payroll. *See* A1877 at 133:5–16; A1882 at 138:12-16; *see also* A2652 (PFC at 32); A3456.

### E.    The Foreclosure

On February 24, unable to make payroll, in default of its loan obligations to both its Term Loan Lenders and its ABL lender, and faced with the daily threat that Wells Fargo would cease funding operations, a number of TransCare entities filed chapter 7 bankruptcy petitions.  A0332-33 at Stip. No. 44; A1900 at 156:9–157:8, A1881–82 at 137:23–138:9, A1181–83 at 138:25–139:13.  The Trustee was appointed on February 25.  A0333 at Stip. No. 45.

Also on February 24, PPAS (as administrative agent for the Term Loan Lenders) and TransCare executed the documents for the Article 9 foreclosure.  A3446.  PPAS, as administrative agent, and the Zohar Funds and AIP (which comprised the Required Lenders under the TLA), issued a Notice of Default and Acceleration to TransCare.  *See* A2896-97; A4055; A3446.  PPAS, as administrative agent, the Zohar Funds, and AIP also issued a Notice of Acceptance of Subject

---

so, it was a very somber evening.  People had been working around the clock for weeks . . .  And so, I had sent everybody home[.]")

Collateral in Partial Satisfaction of Obligation to TransCare (the "Notice of Acceptance").  A3447; A3835.

The Notice of Acceptance covered certain personal property (defined as the "Subject Collateral") in which the Term Loan Lenders held a security interest.  A3839.  The Subject Collateral included all of TransCare's personal property, three contracts (including the MTA Contract), and the stock of three TransCare corporations.  *Id.*  It did not include the accounts receivable.  *Id.*  The Notice of Acceptance provided that PPAS, as administrative agent, accepted the Subject Collateral in satisfaction of $10 million of the outstanding TLA balance.  A3836.  This amount was significantly higher than the actual value of these assets.  *See infra* at 18.

Wells Fargo was informed of the Article 9 foreclosure.  A4063–64 (Tilton emailing Cindi Giglio of Curtis Mallet (TransCare's outside counsel) and asking "Is Wells aware of the foreclosure?" to which Ms. Giglio responded "Yes"); A2018 at 15:13–23; A2079 at 76:7–22; A1898 at 154:3–6.  The day after the foreclosure, the Trustee and several of his colleagues met with outside counsel for TransCare (Curtis Mallet), outside counsel for PPAS (Randy Creswell), Wells Fargo and its outside counsel (Otterbourg), and a CMAG representative at the offices of Curtis Mallet.  A1876–77 at 132:11–133:4.  At no point during the meeting did Wells Fargo claim it had not consented to the Article 9 foreclosure or assert the foreclosure violated Wells Fargo's rights.  A1898 at 154:2–6; A1899-900 at 155:23–156:1.

### F.    Post-Foreclosure Events

At trial, the Trustee acknowledged that as of February 25–26, TransCare lacked sufficient funding to continue operating *any* business lines as a going concern absent a voluntary cash infusion from Wells Fargo or one of Tilton's investment vehicles.  A1900-01 at 156:9–157:8.  TransCare could not meet payroll the day before the foreclosure, and employees were owed

17

approximately two weeks' worth of pay.  A1881–82 at 137:23–138:11; A3459; A2652 (PFC at 32).  Transcendence also could not operate absent an infusion of capital.  A2101–02 at 10:12-11:4; A2103 at 13:16–22.

Ultimately, Transcendence was unable to operate, regardless of whether it received an infusion of capital, in part because the Trustee blocked Transcendence from using a computer server that was necessary to operate at least one of the planned divisions.  A2029 at 26:3–12.  *See also Transcendence Transit II, Inc., et al. and Local 1181–10601, et al.,* Case 29–CA–182049, at 15 (N.L.R.B. 2020) ("Transcendence . . . was in fact not operating at any given time.").  Moreover, the Trustee questioned the validity of the foreclosure, which put the ownership of the foreclosed Subject Collateral in dispute.  A0016.  A substantial portion of this Subject Collateral was comprised of ambulances and EMS related equipment, and it quickly became clear that they would not be used by TransCare (or Transcendence) and should be sold.  A0016–17.  Thus, on March 10, 2016, the Trustee, PPAS, and TTI entered into a stipulation (the "PPS"), in which PPAS and Transcendence, in the spirit of compromise, consented to the Trustee's sale of the ambulances, EMS equipment, and other Subject Collateral.  A0014.  The net proceeds realized from the sales at public auction totaled $2 million.  A2687 (PFC at 67); A0037; A0186; A4138.

## G.    The Bankruptcy Court's PFC

The Trustee filed this lawsuit on February 22, 2018, alleging (among other things), a claim for actual fraudulent transfer against PPAS and Transcendence, under NYDCL § 276 and 11 U.S.C. § 548(a)(1)(A), based on the Article 9 foreclosure.  A0221.  Eleven months after the conclusion of a six-day bench trial held between July 22, 2019 and August 14, 2019, the bankruptcy court issued its PFC.  A2621.

With respect to the claim for actual fraudulent transfer, the bankruptcy court relied on certain "badges of fraud" as "circumstantial evidence of Tilton's fraudulent intent."  A2694 (PFC at 74).  In particular, in a brief discussion, the court found (i) Tilton sold the Subject Collateral "to herself" and retained control of the transferred assets (which, as discussed further below, is only partially accurate), (ii) the foreclosure was "outside of TransCare's ordinary course of business" (as is almost any foreclosure), (iii) the consideration was inadequate because TransCare transferred a going concern (which it did not), and (iv) the transaction was "conducted in haste and under a veil of secrecy" (which it was not).  A2693–94.  Notwithstanding the trial testimony and ample contemporaneous documentary evidence that the Restructuring Plan and foreclosure were intended to benefit TransCare's creditors, at a time when the only alternative was the liquidation of the company's assets, the bankruptcy court found that Tilton did not point to "significantly clear evidence of a legitimate supervening purpose" for the transfer.  A2696.

The bankruptcy court thus found that the Trustee "sustained his burden of proving that TransCare transferred the Subject Collateral to PPAS with the intent to hinder and delay TransCare's creditors," and avoided the strict foreclosure under NYDCL § 276 and 11 U.S.C. § 548(a)(1)(A).  The court awarded the Trustee $39.2 million in damages pursuant to 11 U.S.C. § 550(a) (an amount higher than what the Trustee sought to recover on this claim) against PPAS and Transcendence, despite that PPAS was simply an administrative agent, Transcendence never operated, and neither entity derived any benefit from the Subject Collateral.  The court also disallowed PPAS's claims under 11 U.S.C. § 502(d), and awarded the Trustee reasonable attorneys' fees.  A2696–700 (PFC 76–80).

19

## ARGUMENT

I.   **The Bankruptcy Court Erred in Finding TransCare Foreclosed on the Subject Collateral with Actual Intent to Hinder, Delay, or Defraud Its Creditors**

To prevail on his claim for actual fraudulent transfer under NYDCL § 276 or 11 U.S.C. § 548(a)(1)(A), the Trustee was required to demonstrate that TransCare made the transfer of the Subject Collateral "with actual intent to hinder, delay or defraud" its creditors.   11 U.S.C. § 548(a)(1)(A); NYDCL § 276; *see also Sharp Int'l Corp. v. State St. Bank & Tr. Co. (In re Sharp Int'l Corp.),* 403 F.3d 43, 56 (2d Cir. 2005).   "[F]raudulent intent is not presumed . . . and the plaintiff must prove it."   A2693 (PFC at 73) (citing *Weisfelner v. Hofmann (In re Lyondell Chem. Co.)*, 554 B.R. 635, 650 (S.D.N.Y. 2016)).   When claims under NYDCL § 276 and 11 U.S.C. § 548(a)(1)(A) are brought together, a plaintiff must prove the debtor's fraudulent intent by clear and convincing evidence. *Schneider v. Barnard*, 508 B.R. 533, 542 (E.D.N.Y. 2014); *Bruno Mach. Corp. v. Troy Die Cutting Co. (In re Bruno Mach. Corp.)*, 435 B.R. 819, 853 (Bankr. N.D.N.Y. 2010).[9]

Courts often rely on "badges of fraud" to help assess a transferor's intent.   *Sharp Int'l Corp.*, 403 F.3d. at 56.   However, the "badges of fraud should be viewed in the context of all of the facts and circumstances, and the existence of a badge of fraud should be considered in the context of the case and any probative evidence of innocent intent."   *McCord v. Ally Fin., Inc. (In re USA United Fleet, Inc.)*, 559 B.R. 41, 62 (Bankr. E.D.N.Y. 2016) (quotation omitted).   Moreover, where there is "significantly clear evidence of a legitimate supervening purpose," it

_____

[9] Some courts have applied a preponderance of the evidence standard to a fraudulent transfer claim brought only under 11 U.S.C. § 548(a)(1)(A). *Weisfelner v. Blavatnik (In re Lyondell Chem. Co.)*, 567 B.R. 55, 142 n.38 (Bankr. S.D.N.Y. 2017).   In any event, the Trustee failed to satisfy either standard in this case.

20

overcomes any inference of fraudulent intent arising from the badges of fraud.  A2694 (PFC at 74) (citing cases).

A.      A Legitimate Supervening Purpose of the Restructuring Plan and Article 9 Foreclosure Was to *Benefit* TransCare's Creditors

The bankruptcy court found, in one sentence and with no analysis, that Tilton had "not pointed to 'significantly clear evidence of a legitimate supervening purpose'" for the transfer of the Subject Collateral.  A2696 (PFC at 76).  In doing so, the court ignored the context for the Restructuring Plan and foreclosure, as well as all the direct evidence of their purpose, including contemporaneous documents and Tilton's own unrefuted testimony.  *See, e.g.*, A3413; A3417; A3796; A2047 at 44:2–4; A2169 at 78:5–6; A2172 at 81:7–15; A2210 at 119:2–6; A2218 at 127:5–16; A2308–09 at 6:22–7:2.

As the bankruptcy court found in other parts of its PFC and in the related *Ien* case, by the time of the foreclosure, TransCare was "woefully insolvent with negative net equity of nearly $40 million" (A2708 (PFC at 88)), was unable to borrow money from third parties (A2710 (PFC at 90)), and had been "on life support for nearly one year and depended on Tilton affiliates to cover shortfalls throughout 2015 and into 2016" (*Ien*, 614 B.R. at 210).  In the days leading up to the foreclosure, TransCare stood on the precipice of shutting its doors, depending entirely on continued voluntary funding from Wells Fargo and Tilton to make payroll, pay insurance, and provide emergency liquidity for operations.  *See supra* at 9-16.

It was against this backdrop that Tilton, working with Wells Fargo, CMAG, and TransCare's top executives, developed a plan designed to save jobs and allow many of TransCare's creditors a chance to recoup amounts owed to them.  *See supra* at 12-15.  Tilton believed the "only alternative" to the Restructuring Plan "was the liquidation of the company."  A2170 at 79:1–10.

Notably, by February 9, this plan was also the only potential scenario for TransCare that Wells Fargo, TransCare's only lifeline other than Tilton herself, expressed interest in that did not entail winding down the company completely. *See supra* at 12-13.

At trial, Tilton testified without contradiction about what she was trying to accomplish through the Restructuring Plan and foreclosure: it was an attempt to "save as many divisions as could be saved, and take as many employees with us [to Transcendence]" as possible. A2047 at 44:2-4; *see also* A3417 ("We are all scrambling here in an attempt to save 700 jobs and parts of this company"). In addition, the Term Loan Lenders, who had no hope of being repaid by TransCare, would receive equity in Transcendence and thus have a chance at recovering their losses through potential equity upside in the NewCo. *See supra* at 13. Tilton believed this plan was the "best hope at collecting for the [term] loans that had been made," which sat behind Wells Fargo's secured interest in the accounts receivable. A2047 at 44:2-4; A2210 at 119:2–6.[10]

Tilton's testimony about what the Restructuring Plan and foreclosure were intended to accomplish was unrefuted, and nowhere in its PFC did the bankruptcy court make a finding that Tilton's testimony was not credible. On the contrary, in other parts of the PFC the bankruptcy court *credited* Tilton's testimony in support of its findings. *See, e.g.*, A2663 (PFC at 43) (concluding Tilton made a "good faith determination" that TransCare was not saleable); A2689-91 (PFC at 69-71) (crediting Tilton's testimony showing her subjective belief that TransCare could comply with WARN requirements under the Restructuring Plan). In fact, when pressed about it by the bankruptcy court shortly after the close of the trial evidence, *even the Trustee's counsel* did not contend there was evidence that Tilton did not act with "an honest intention to reorganize or

---

[10] Trade creditors would also benefit since, for Transcendence to operate, it would require the support of TransCare's vendors.

save the company." A2308-09 at 6:22–7:2. This admission, and Tilton's unrefuted testimony supported by contemporaneous documentary evidence, alone warrant reversal. *Cf. Sarasota CCM, Inc. v. Kuncman (In re Kuncman)*, 454 B.R. 276, 285 (Bankr. E.D.N.Y. 2011), a*ff'd sub nom. Sarasota CCM, Inc. v. Kuncman*, 466 B.R. 590 (E.D.N.Y. 2012) (plaintiff failed to prove fraudulent intent with respect to § 523(a)(2)(A) claim where "[t]he Debtor testified that she never intended to deceive anyone," and "[t]he Plaintiff did not present any evidence to controvert this testimony nor did the Plaintiff challenge the Debtor's credibility"); *Daneman v. Stanley (In re Stanley)*, 384 B.R. 788, 803–04 (Bankr. S.D. Ohio 2008) (defendants "rebutted the presumption raised by the badges of fraud" under state law fraudulent conveyance claims where "the Trustee neither impeached them nor introduced any evidence discrediting their testimony").

The bankruptcy court's discussion of this claim focused heavily on Tilton's role on both sides of the transaction (roles that were disclosed to and known by all interested parties), and the unsupported assumption that she was attempting to accomplish something nefarious and self-serving. But alleged self-dealing is not itself dispositive evidence of an intent to hinder, delay, or defraud creditors. *See Mendelsohn v. Roalef (In re E.D.B. Constr. Corp.)*, 2013 WL 6183849, at *8 (Bankr. E.D.N.Y. Nov. 26, 2013) (no liability where "[t]he Trustee failed to prove the existence of any badges of fraud, aside from the fact that there was a close relationship between the Debtor and the Defendant, as the Defendant was an insider of the company"). And, as discussed further *infra* at 33, by relying so heavily on Tilton's role on both sides of the challenged transaction, the bankruptcy court improperly conflated the Trustee's claim for actual fraudulent conveyance with his separate and distinct claim for breach of the fiduciary duty of loyalty.

Notably, Tilton herself was, in effect, one of TransCare's creditors—AIP, one of the Term Loan Lenders, was Tilton's personal investment vehicle. A2112-3 at 21:25–22:6. Tilton also

controlled and was the legal owner of the Zohar Funds, which held over 75% of the TLA debt. A2154 at 63:4–12; A4055. Thus, to the extent Tilton's intent in formulating and executing the Restructuring Plan and foreclosure was "self-serving" in the sense that she sought to benefit the Term Loan Lenders (including AIP and the Zohar Funds), this is not prohibited by fraudulent conveyance law, and is in fact the very opposite of what fraudulent conveyance law seeks to prevent. *See Balaber-Strauss v. Town of Harrison (In re Murphy)*, 331 B.R. 107, 122, 125 (Bankr. S.D.N.Y. 2005) ("Section 548, as a fraudulent conveyance statute, is intended to protect creditors"). Conversely, to find that the strict foreclosure was intended to hinder, delay, or defraud the Term Loan Lenders would be to find that Tilton intended to hinder, delay, or defraud herself. This defies reason. *Cf. Buchwald Cap. Advisors v. J. Peretz Morgan Chase Bank, N.A. (In re M. Fabrikant & Sons, Inc.)*, 480 B.R. 480, 490 (S.D.N.Y. 2012), *aff'd,* 541 F. App'x 55 (2d Cir. 2013) (affirming dismissal of fraudulent conveyance claims where appellant put forth "tenuous theory" that certain banks "apparently were participating in a scheme to defraud themselves").

### B.    The "Badges of Fraud" Do Not Support a Finding of Fraudulent Intent

In any event, even if it were appropriate in this case to rely solely on the "badges of fraud" (which it is not because there was clear and unrefuted direct evidence of Tilton's intent, including contemporaneous documents), the bankruptcy court's analysis was incomplete and, ultimately, incorrect. The "badges of fraud" that courts commonly consider as circumstantial evidence of fraudulent intent include: (1) the lack or inadequacy of consideration; (2) the family, friendship, or close associate relationship between the parties; (3) the retention of possession, benefit, or use of the property in question; (4) the financial condition of the party sought to be charged both before and after the transaction in question; (5) the existence or cumulative effect of a pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or

24

pendency or threat of suits by creditors; (6) the general chronology of the event and transactions under inquiry; (7) a questionable transfer not in the usual course of business; and (8) the secrecy, haste, or unusualness of the transaction. *Silverman v. Actrade Capital, Inc. (In re Actrade Fin. Techs., Ltd.)*, 337 B.R. 791, 809 (Bankr. S.D.N.Y. 2005).

The bankruptcy court found "the numerous badges of fraud establish Tilton's fraudulent intent to delay and defraud TransCare's creditors." A2696 (PFC at 76). However, its analysis omitted discussion of some badges of fraud entirely and, as to those it did discuss, the court cited a handful of facts from which it inferred nefarious intent, while ignoring a wealth of evidence consistent with the broader context of TransCare's financial situation and the fact that the foreclosure and Restructuring Plan were intended to benefit creditors, including by saving jobs.

## 1.    The Badges of Fraud the Bankruptcy Court Did Not Consider

The bankruptcy court did not directly address three of the six "badges of fraud" it identified in its opinion: specifically, (1) the financial condition of the party sought to be charged both before and after the transaction in question; (2) the existence or cumulative effect of a pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; and (3) the general chronology of the event and transactions under inquiry. *See* A2693-94 (PFC at 73-74). Each of these weighs against a finding of fraudulent intent.

In assessing the financial condition of the party sought to be charged before and after the transaction in question, courts look at whether the challenged transfer rendered the debtor insolvent, and whether the debtor conveyed property that would otherwise be available to a judgment creditor. *See, e.g.*, *Kirschner v. Fitzsimons (In re Tribune Co. Fraudulent Conveyance Litig.)*, 2017 WL 82391, at *14 (S.D.N.Y.  Jan. 6, 2017); *Citibank, N.A. v. Bombshell Taxi LLC*

*(In re Hypnotic Taxi LLC)*, 543 B.R. 365, 376 (Bankr. E.D.N.Y. 2016).  Here, it is undisputed that TransCare was insolvent long before the Article 9 foreclosure took place.  *See supra* at 9-16.  The foreclosure, executed by PPAS on behalf of the Term Loan Lenders on property as to which they held a blanket lien, did not "render" TransCare insolvent.  Nor did it take from TransCare any property that would otherwise have been available to pay other creditors, since the only property transferred—the Subject Collateral—was completely encumbered by the Term Loan Lenders' and Wells Fargo's liens.[11]

Similarly, the general chronology of the events in question does not support a finding of fraudulent intent, and there is absolutely no evidence of a "pattern or series of transactions or course of conduct" to move TransCare's assets out of the reach of its creditors, despite a year of insolvency prior to the challenged foreclosure.  To the contrary, the only "pattern" or "course of conduct" was that of Tilton's efforts to keep the company from closing, including repeatedly authorizing new money funding by the Zohar Funds and providing emergency funding through her own investment vehicles.  *See supra* at 9-12.

---

[11] This is true regardless of whether the Subject Collateral was worth $10 million, as Tilton determined prior to the foreclosure, or $40 million, as the bankruptcy court found (*see* A2699 (PFC at 79)).  At the time of the foreclosure, TransCare's outstanding debt to the Term Loan Lenders, all of which was secured by the Subject Collateral, was approximately $45 million.  A4055; A3545 ("Schedule 1").  Thus, even if the Subject Collateral was worth $40 million, this would not be enough to clear even the secured debt to the Term Loan Lenders, much less the additional $14 million owed to Wells Fargo.  Moreover, while the Term Loan Lenders stood behind Wells Fargo with respect to some of the Subject Collateral, Wells Fargo was paid back in full.  A2670 (PFC at 50, n.23); A1903 at 159:16-24.  Wells Fargo was aware of and actively participated in the Restructuring Plan.  *See supra* at 12-13, 14-15.  Wells Fargo also knew about the foreclosure (both before and after it occurred), and did not at any point object or try to unwind it.  *See supra* at 12-13, 14-15, 17.

2.    The Badges of Fraud the Bankruptcy Court Discussed but Got Wrong

a.    "*the family, friendship or close associate relationship between the parties*"

The bankruptcy court found that "acting through entities she controlled, [Tilton] sold the Subject Collateral to herself." A2694-95 (PFC at 74-75). This is, at best, an oversimplification. The Subject Collateral was transferred from TransCare to PPAS through an Article 9 foreclosure, after TransCare defaulted under the TLA. Although Tilton owned PPAS, it was acting as the administrative agent for *all* the Term Loan Lenders. A2833. Only one of them was wholly funded by Tilton—AIP, which held 7% of the TLA debt. A4055. Although Tilton controlled the Zohar Funds, they were funded with investments by others. A1204 at 23:9-11. And as the bankruptcy court itself found, the other Term Loan Lenders were not affiliated with Tilton. A2625, A2640 (PFC at 5, 20). As part of the Restructuring Plan, Tilton allocated equity in Transcendence to each of the Term Loan Lenders. A4055; *see also supra* at 13. Thus, the transfer of the Subject Collateral from PPAS to Transcendence was also not only to Tilton.[12]

b.    "*a questionable transfer not in the usual course of business*"

The bankruptcy court noted that "the strict foreclosure was outside of TransCare's ordinary course of business." A2595 (PFC at 75). But *any* foreclosure is, by definition, outside of the usual course of business. In this case, it is undisputed that TransCare was in default under the TLA, and PPAS had a contractual right to foreclose on the Subject Collateral as administrative agent for the Term Loan Lenders. Thus there was nothing "questionable" about the transfer, and the bankruptcy court's finding that it was outside the ordinary course has only superficial consequence at most.

---

[12] The bankruptcy court also noted that the transfer was "at a price [Tilton] picked." A2695 (PFC at 75). As discussed below, however, the price was more than adequate and not indicative of fraudulent intent. *Infra* at 28. Whether Tilton or someone else picked the price is irrelevant for purposes of divining fraudulent intent.

*Cf. Kirschner*, 2017 WL 82391, at *15 ("Trustee's allegations are, at best, superficial indicators of fraudulent intent because they simply describe the basic features of any LBO, which, by its nature, is not a transaction that is made in the ordinary course of business").

> c. "*the lack or inadequacy of consideration*"

The bankruptcy court found "the consideration PPAS credited to the transaction was inadequate for the reasons stated in connection with the breach of fiduciary claim." A2695 (PFC at 75). This is incorrect for the simple reason that the court's 'fair price' analysis in its discussion of the breach of fiduciary duty claim erroneously assumed that the property transferred was a going concern. *See* A2673-74 (PFC at 53-54). As further detailed *infra* at 34-38, this is directly contrary to the evidence: at the time of the transfer neither TransCare nor any of its business lines (all of which were encumbered by close to $60 million in defaulted secured debt and had insufficient cash to operate) were a going concern. Rather, the Subject Collateral had only liquidation value. The liquidation value of the Subject Collateral was $2 million, considerably less than the $10 million PPAS credited to TransCare as consideration for these assets. *See supra* at 18. That consideration was more than adequate.

> d. "*the retention of possession, benefit or use of the property in question*"

The bankruptcy court found "Tilton retained control of the transferred assets through her majority interest in and control of PPAS as the foreclosing party and thereafter through Transcendence as PPAS's buyer." A2695 (PFC at 75). But had the Restructuring Plan worked, the possession, benefit and use of this property would also have been enjoyed by the Term Loan Lenders through their minority stake in the new business. *See supra* at 13-14; A4055. Furthermore, Tilton intended that unsecured creditors would also continue to benefit from the Subject Collateral: 700 TransCare employees would benefit through jobs at Transcendence.

A3417.  Certain trade creditors would also benefit since Transcendence would require the support of TransCare's vendors to operate.

The bankruptcy court went on to find that Tilton "purported to own the same interest in Transcendence as in TransCare . . . but her interest in Transcendence was free and clear of the Term Loan Lenders' lien which had been eliminated through the foreclosure and sale and TransCare's unsecured debt."  A2695 (PFC at 75).  But, here again, this was simply a product of the fact that the transfer of the Subject Collateral was effectuated in a foreclosure, a common remedy exercised by lenders, as a consequence of a default under the TLA.  To treat this as an indicator of fraudulent intent would mean that every foreclosure of a defaulting borrower's assets could subject all manner of foreclosing creditors to an actual fraudulent conveyance claim.  *Cf. Kirschner*, 2017 WL 82391, at *15 (citation omitted) ("The Court declines to infer fraudulent intent . . . merely from the fact that Tribune engaged in an LBO, which is 'obviously a common securities transaction.'  To accept the Trustee's argument would mean that every LBO that ends in a bankruptcy within two years of its effectuation would subject transferring shareholders to an actual fraudulent conveyance claim.").

Here it is critical to note the careful analysis Tilton completed in affirmatively allocating equity in Transcendence to the Term Loan Lenders.  *See* A4055; A2207-10 at 116:5-119:19; A2011-12 at 8:16-9:7.  At the time of the transfer, TransCare was "woefully insolvent with negative net equity of nearly $40 million" and on the verge of closing its doors.  A2708 (PFC at 88); *see also supra* at 9-16.  There was no chance it would be able to pay its outstanding debt to the Term Loan Lenders of approximately $45 million.  Under the Restructuring Plan, though, Tilton would own (indirectly) approximately the same amount of equity in Transcendence as she had in TransCare, and the rest of Transcendence's equity would be allocated to the Term Loan

29

Lenders, including those unrelated to Tilton. A0327 at Stip. Nos. 6, 8; A4055. She hoped that, through this equity upside in Transcendence, the Term Loan Lenders might recover their losses from the term loan that TransCare had no chance of repaying. *Supra* at 13-14, 21-22.

Such actions are completely contrary to the notion that Tilton intended to hinder, delay or defraud the Term Loan Lenders. If that were her intent, why would she have granted them *any* equity in Transcendence? If she intended to hinder, delay or defraud them, she would have simply awarded all the equity in Transcendence to herself, and thus been entirely "free and clear" of the Term Loan Lenders. But this is not what she did: they were to own a 45.3% equity interest.

As for TransCare's unsecured creditors, they had no hope of being able to reach the Subject Collateral, regardless of whether it was worth $10 million (the amount PPAS credited to TransCare) or $40 million (the amount the bankruptcy court concluded was the "value of the Subject Collateral at the time of the strict foreclosure" (A2697-98 (PFC at 77-78))), since TransCare's outstanding debt to the Term Loan Lenders (which was $45 million) exceeded both these amounts. *See supra* at 12. The unsecured creditors' claims were also subordinate to and stood behind Wells Fargo's secured debt of approximately $14 million as of February 2016. A0001. As noted, the Restructuring Plan was intended to give a recovery to unsecured creditors, including by creating jobs at Transcendence for TransCare employees. *See supra* at 13-14, 21-22.

      e.     *"the secrecy, haste, or unusualness of the transaction"*

Finally, the bankruptcy court found "the entire transaction was conducted in haste and under a veil of secrecy." A2695 (PFC at 75). The record flatly contradicts this finding. The Restructuring Plan, including the planned foreclosure, was developed with the active participation of multiple stakeholders, including (i) Wells Fargo, (ii) Wells Fargo's outside counsel, (ii) CMAG, (iii) several TransCare executives, and (iv) TransCare's outside counsel. *See supra* at 14-15. This

is the opposite of secrecy.  These entities—TransCare's lender, the lender's law firm, an industry-respected third-party financial advisor, and TransCare's law firm with ethical obligations and fiduciary duties to the company—did not all come together to secretly conspire with Tilton to commit fraud against TransCare's creditors.

The bankruptcy court ignored that these various players were aware of, did not object to, and, in fact, actively participated in the development of the Restructuring Plan (including the foreclosure), and instead relied on the following three points to find that the transaction was conducted "under a veil of secrecy": (1) the only TransCare personnel who knew of the plan were Glen Youngblood (Senior Vice President) and Peter Wolf (Chief Operating Officer), (2) the foreclosure documents were sent directly to Wolf instead of TransCare's outside counsel, Curtis Mallet, and (3) Tilton did not "forewarn" the Term Loan Lenders.  A2695 (PFC at 75).  None of these facts are probative of fraudulent intent.

First, as the bankruptcy court itself recognized, Tilton had a legitimate reason for not wanting a wider group of TransCare employees to learn about the Restructuring Plan prior to the foreclosure: "we didn't want [a] mass exodus," or else there would be no chance of Transcendence succeeding.  A2690 (PFC at 70); A2071 at 68:7-13; A3404.  This had nothing to do with intending to defraud TransCare's creditors.[13]

Second, Curtis Mallet was aware of the planned foreclosure, and there is no evidence it objected; to the contrary, it was involved in critical aspects of the Restructuring Plan, including

---

[13] The bankruptcy court was also wrong that the "only" TransCare personnel who knew of the Restructuring Plan were Youngblood and Wolf.  Each of the TransCare division heads was also aware of and worked directly on the plan, and NewCo models were shared with at least one other senior TransCare employee while the plan was being developed.  *See* A2171-72 at 80:18-81:4; A3798; A1400-01 at 116:9-117:20.

negotiations with Wells Fargo about the potential purchase of the receivables and carving out the proposed NewCo entities.  A3417; A3421; A3791.  That the foreclosure documents were sent directly to Wolf, rather than going through Curtis Mallet, is of no consequence.

Third, contractually PPAS was not required to "forewarn" Credit Suisse and First Dominion of the foreclosure (which was intended to benefit them, as well as the other Term Loan Lenders) under the terms of the PPAS Security Agreement and the TLA; only the consent of the Required Lenders was necessary.  *See supra* at 8.  Nor is there any evidence that Credit Suisse or First Dominion ever disputed or objected to the foreclosure.

Furthermore, while the transaction was planned and occurred relatively quickly, there was a legitimate reason for this.  Prior to February 5, Tilton had been exploring the possibility of a sale of TransCare pursuant to a marketing process over a period of time.  *See supra* at 10.  Tilton ultimately concluded (the bankruptcy court found that she did so in good faith) that a sale process would not be viable and should not be pursued on February 5, four days before first discussing the Restructuring Plan with Wells Fargo on February 9.  *Id.*  By this time, TransCare's day-to-day survival was wholly dependent on Wells Fargo's willingness to continue funding the company, and Tilton did not know each day whether TransCare would have funding to operate the next day. *Id.* at 12.  If TransCare was forced to close its doors and thereby lost its employees prior to the execution of a foreclosure, there could be no Transcendence.  It was for *that* reason she needed to act quickly.  The bankruptcy court ignored these facts, and instead simply assumed, without explanation, that the urgency with which the Restructuring Plan was executed was indicative of fraudulent intent.  *See* A2695 (PFC at 75).[14]

---

[14] The bankruptcy court stated that the execution of the Restructuring Plan was "delayed only by the time it took to procure insurance for Transcendence."  A2695 (PFC at 75).  This is not

*****

On balance, the badges of fraud weigh decidedly *against* a finding of fraudulent intent. *Kirschner*, 2017 WL 82391, at *13 (citation omitted) ("[T]he 'flip side of these badges of fraud is that their absence . . . would constitute evidence that there was no intent to defraud.'").  In fact, the *only* badge of fraud that could possibly go to the contrary is that Tilton was on both sides of the transaction.  This alone, however, does not prove an intent to hinder, delay, or defraud creditors. *See Mendelsohn*, 2013 WL 6183849, at *8.

Moreover, by giving this factor such undue weight, the bankruptcy court inappropriately conflated the Trustee's claim for actual fraudulent transfer with his separate claim for breach of the duty of loyalty.  The burden of proof in the duty of loyalty context is on the defendant and is a strict test that does not care about defendant's intent (*see Reis v. Hazelett Strip-Casting Corp*., 28 A.3d 442, 459 (Del. Ch. 2011)), whereas the burden of proof for a claim for actual fraudulent conveyance rests on the plaintiff, requires (in this case) clear and convincing evidence, and is centered *entirely* around the defendant's intent.  *See* A2665 (PFC at 45); *supra* at 20.  By importing notions of the duty of loyalty into its analysis of actual fraudulent conveyance, the bankruptcy court erred by effectively flipping the burden of proof and applying the wrong test.

## II.    The Bankruptcy Court Erred in Awarding $39.2 Million in Damages

Section 550(a) of the Bankruptcy Code provides that, to the extent a transfer is avoided under § 548, "the trustee may recover, for the benefit of the estate, the property transferred . . . [or] the value of the property." 11 U.S.C. § 550(a).  It is well established that "[t]he purpose of § 550(a) is to restore the estate to the condition it would have been in if the transfer had never occurred."

---

supported by the record but, in any event, the need to procure insurance is hardly indicative of any intent to defraud creditors.

*Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 568 B.R. 481, 486 (Bankr. S.D.N.Y. 2017). In other words, a court's analysis under § 550(a) must focus "not on what the transferee gained by the transaction, but rather on what the bankruptcy estate lost as a result of the transfer." *Gill v. Maddalena (In re Maddalena)*, 176 B.R. 551, 557 (Bankr. C.D. Cal. 1995).

"The creditor's remedy in a fraudulent conveyance action is limited to reaching the property which would have been available to satisfy the judgment had there been no conveyance." *Marine Midland Bank v. Murkoff*, 120 A.D.2d 122 (2d Dep't 1986). A trustee is "not entitled to double recovery, or a windfall . . . ." *Andrew Velez Constr. Inc. v. Consol. Edison Co. of N.Y. Inc. (In re Andrew Velez Const., Inc.)*, 373 B.R. 262, 275 (Bankr. S.D.N.Y. 2007). Given the remedial nature of the provision, punitive or exemplary damages may not be recovered under § 550. *Tronox Inc. v. Anadarko Petroleum Corp. (In re Tronox Inc.)*, 429 B.R. 73, 111 (Bankr. S.D.N.Y. 2010).

## A.      TransCare Did Not Transfer a Going Concern

Here, if the transfer of the Subject Collateral had not occurred, it would have been worth no more than liquidation value to TransCare. The undisputed evidence demonstrated that, as of the date of the transfer, TransCare had lost its ABL lender, was in default under both its secured loan agreements, was about a million dollars behind on payroll taxes, and did not have enough cash left to make payroll. *See* A3637; A3650; A3903; A1877 at 133:5-16; A2652 (PFC at 32); A3456. By this time Tilton had already determined (in good faith) that a sale of the entire company was not feasible, and neither Wells Fargo nor Tilton were willing (or obligated) to put additional money into the business to keep it operating as a going concern. *See supra* at 9-16. In short, at the time of the transfer, TransCare was dead on its feet and had no option but to close its doors (which is exactly what happened within two days of the foreclosure) and liquidate its assets. Thus, the liquidation value of the Subject Collateral is what "would have been available to satisfy the

judgment [of creditors] had there been no conveyance." *Marine Midland Bank*, 120 A.D.2d at 133.

Ignoring these facts and its own finding that TransCare was "woefully insolvent" (A2708 (PFC at 88)), the bankruptcy court found that TransCare transferred a "going concern" worth over $40 million. A2696-97 (PFC at 76-77).  This was clear error.

It is well established that "[g]oing concern value should not be used where the debtor is 'financially dead or mortally wounded.'"  *Allstate Fabricators Corp. v. Flagstaff Foodservice Corp. (In re Flagstaff Foodservice Corp.)*, 56 B.R. 899, 906 (Bankr. S.D.N.Y. 1986) (citation omitted).  Courts have recognized that a company is no longer a going concern where, for example, it is unable to meet critical obligations like payroll, payroll taxes, or rent; has substantial amounts of overdue payables; has millions of dollars in negative equity; lacks unencumbered assets to pledge for new credit; or is otherwise unable to cover its operational costs through its revenues and is dependent on new cash infusions.  *See, e.g., Gelzer v. Bloom (In re M. Silverman Laces, Inc.)*, 404 B.R. 345, 362 (Bankr. S.D.N.Y. 2009); *In re Atlas Computs., Inc.,* 2012 WL 3018256, at *8 (Bankr. N.D. Okla. July 24, 2012), *aff'd,* 2014 WL 1267007 (N.D. Okla. Mar. 26, 2014) (company not a going concern where "[a]ll that kept its doors open was  . . . perpetual infusion[s] of cash," without which it "would not have been able to make payroll, pay taxes, or continue operations."); *Miller & Rhoads Secured Creditors' Tr. v. Robert Abbey, Inc. (In re Miller & Rhoads, Inc.)*, 146 B.R. 950, 954 (Bankr. E.D. Va. 1992) (company with negative equity of $13 million not a going concern, "not financially viable," and "not salvageable"; company's "chances of reorganizing were nonexistent" without an "infusion of new equity capital of at least $30,000,000.00, which it never received").

By the time of the transfer, TransCare met all these indicia, and was well past the point of being at "death's door":

- In the months leading to the foreclosure, CMAG repeatedly emphasized that TransCare required a substantial amount of new funding "to keep the business as an ongoing enterprise." A3861; *see also* A3871 ("TransCare is now operating at an absolute breaking point"); *supra* at 10-12.

- TransCare was in default under the TLA and the ABL Agreement, with approximately $45 million owed to the Term Loan Lenders and approximately $14 million owed to Wells Fargo. *See supra* at 12. The TransCare subsidiaries that held the Subject Collateral were each guarantors for or borrowers of this almost $60 million in secured debt. A0328 at Stip. Nos. 13-14.

- TransCare did not have enough money to make payroll and could not have continued to operate any of the business lines (including those that Transcendence hoped to operate) without a substantial, voluntary cash infusion from Wells Fargo or one of Tilton's investment vehicles. *See* A1877 at 133:5-16; *see also* A2652; A3456; A1900-01 at 156:9–157:8 (Trustee confirming lack of funds to operate any business lines as of February 25-26).

- TransCare continuously struggled to make timely rent payments at nearly all its locations. *See* A3872.

- TransCare had severely "strained and broken vendor relationships" and "over $5 million in . . . payables" not related to rent, payroll, or insurance obligations overdue by "over 120 days." A3872; A3876. *See Neuger v. Casgar (In re Randall Const., Inc.)*, 20 B.R. 179, 184 (N.D. Ohio 1981) (company not a going concern due to "very precarious financial situation" where "[s]ubstantial amounts of payables were overdue more than 60 days," and $125,000 was owed to over 40 creditors).

- Both the Term Loan Lenders and Wells Fargo held security interests in all of TransCare's assets, so TransCare had no unencumbered assets to pledge for new credit. A3549 § 2; A2963-65, A2996-98 §§ 5.1, 9.7(b) & (d).

- TransCare was not only unable to cover operational costs through its revenues, it was wholly dependent on Wells Fargo to provide working capital funding on a day-to-day basis, as well as on Tilton to provide emergency liquidity so TransCare could continue to operate. *See supra* at 9-16. *See also Gillman v. Sci. Rsch. Prods., Inc. (In re Mama D'Angelo, Inc.)*, 55 F.3d 552, 556 (10th Cir. 1995) (debtor not a going concern where continued operations depended "solely on the basis of massive loans" from largest shareholder, rather than revenue or capital contributions).

- TransCare was losing critical revenue-generating contracts, including just days before the foreclosure. A3795; A2191 at 100:8–14; A2191 at 100:18–100:23; A2192 at 101:4–12.

36

- Just a few weeks before the foreclosure, CMAG expressly stated that the "old money" invested in TransCare was "essentially only worth what a liquidation [] would yield." A3904.

Thus, by February 24 (the date of the transfer), TransCare was "financially dead or mortally wounded." *Flagstaff*, 56 B.R. at 906. To treat TransCare—or *any* of its business lines—as a going concern on February 24 would be to turn a blind eye to its severe financial distress and "fictionalize its condition" by ascribing to it an imaginary value of a hypothetical company. *Neuger.*, 20 B.R. at 185 (using going concern value would "fictionalize" condition of company in a "precarious financial situation"); *Fryman v. Century Factors, Factor For New Wave (In re Art Shirt Ltd., Inc.)*, 93 B.R. 333, 341 (E.D. Pa. 1988) (treating debtor as going concern given "very unstable financial condition" and "dubious future at the time of the transfers" would "misrepresent the Debtor's financial position at the time of the transfers"). The mere fact that TransCare was "nominally in existence" at the time of the transfer "is not persuasive in valuing the company at a 'going concern' valuation." *Neuger*, 20 B.R. at 184. Rather, where a company is essentially on its "deathbed"—or worse, dead on its feet (as TransCare was by the time of the foreclosure)—the transferred property should be valued at liquidation value. *See Mishkin v. Ensminger (In re Adler, Coleman Clearing Corp.)*, 247 B.R. 51, 111 (Bankr. S.D.N.Y. 1999).

Here, we know the liquidation value of the Subject Collateral because, pursuant to the PPS, it was liquidated by the Trustee through a series of auctions. There is no allegation (let alone evidence) that the Subject Collateral was damaged or otherwise diminished in value as a result of the foreclosure. The estate thus realized the full liquidation value of the Subject Collateral through the post-petition sales—$2 million. *See supra* at 18.

The bankruptcy court's remedy—a judgment in the amount of $39.2 million—is utterly divorced from the reality of the condition the estate would have been in had the transfer never

occurred, and constitutes a massive windfall to the estate and impermissible penalty to PPAS and Transcendence.  What would have happened to TransCare, and the condition it would have been in if the transfer had not occurred, is *exactly what did happen*, with one difference: due to the PPS, the estate received $1.2 million in proceeds that it otherwise would have never received.[15]  Thus, even assuming PPAS's foreclosure on the Subject Collateral, pursuant to its and the Term Loan Lenders' rights under the TLA, constituted an actual fraudulent conveyance (which it did not), no damages resulted from this conveyance.  On the other side, neither PPAS (a mere administrative agent that served solely as a conduit in the foreclosure) nor Transcendence (which did not operate) benefitted from the transfer.  Indeed, the Subject Collateral was effectively 'returned' to the Trustee, who then sold the assets pursuant to a PPS in which the Trustee contended the foreclosure was not even valid.  *See* A0016.  The Judgment, which now requires PPAS and Transcendence to pay $39.2 million, bears no rational relationship to anything the estate lost or these entities gained in the real world.

### B.      Even if the Transferred Property Were a Going Concern, the Trustee Failed to Prove its Value

Even if it were appropriate to treat the transferred property as a going concern, the bankruptcy court's conclusion that it was worth over $40 million was still error.  The bankruptcy court reached this "valuation" by adopting the calculations of the Trustee's damages expert,

---

[15] Wells Fargo was repaid in full by the receivables and other collateral, and would have been satisfied in full whether the foreclosure occurred or not.  Virtually all of TransCare's remaining assets (those assets not pledged to Wells Fargo) were pledged *in full* to the Term Loan Lenders on account of their $45 million secured claim.  Following the liquidation of the assets, the Trustee recovered $2 million (of which $800,000 was given to PPAS pursuant to the PPS).  Had the foreclosure never occurred, *all* of the liquidation value of the Subject Collateral would have gone to the Term Loan Lenders in (partial) satisfaction of their fully secured claims.  There was no meaningful value left over for the estate or unsecured creditors.

Jonathan Arnold, in which he applied a 10.1x EBITDA multiplier to projected EBITDA for *Transcendence* of $4 million in 2016. A2678 (PFC at 58-59); A2684 (PFC at 64); A2697 (PFC at 77). Besides having nothing to do with the value of the Subject Collateral to *TransCare* if the transfer had never occurred, Arnold's number was wholly speculative and entitled to no weight.

As Arnold admitted at trial, his calculations were based not on *his own* opinion of value, but rather what Tilton and her affiliates "*believed* the EBITDA for 2016" would be for Transcendence, and "*their* analyses" of companies "*they believe[d]* were comparable." A1801 at 57:10-13; A1850-51 at 106:15-107:1 (emphasis added). Arnold himself did not give an opinion on what *he* believed was the value of the transferred property. A1850-51 at 106:15-107:1 ("I'm not putting my own value on TransCare"). This is crucial because the projections on which Arnold (and by extension the bankruptcy court) relied depended not only *on the infusion of new capital into Transcendence* (which was not available to TransCare), but also on the realization of a series of assumptions, and involved substantial risk. A2043 at 40:11–18; A2217 at 126:23-25; A3804; A3874. Arnold acknowledged this (A1789 at 45:8-11), yet made no effort to assess the reasonableness of the assumptions, or assess and adjust for this risk in his purely mathematical calculations. A1783-93 at 39:10–49:24; A1803-05 at 59:3–61:13; A1801 at 57:9–10; A1779 at 35:2– 14; A1830 at 86:2–8; A1832 at 88:3–6; A1783 at 39:10–49:24; A1808 at 64:4–17; A1816-17 at 72:17–73:24; A1813 at 69:15-23. As defendants-appellants' expert explained, an independent assessment of risk is critical because projections are *not* valuations; a valuation professional must assess the risk that projections will not be realized in reaching his or her valuation. A1942 at 25:5-15; A1985-86 at 68:13-69:16. Arnold's failure to do so rendered his calculations impermissibly speculative and legally meaningless. *See, e.g.*, *Jacked Up, LLC v. Sara Lee Corp.*, 291 F. Supp.3d 795, 803-805 (N.D. Tex. 2018) (granting defendant's motion to exclude

plaintiff's damages expert where, *inter alia*, expert relied on defendant's projections without independently determining whether they were valid or reasonable, and holding: "a company's financial projections are not automatically reliable, such that an expert may rely on the projections without further inquiry or explanation"); *Chemipal Ltd. v. Slim–Fast Nutritional Foods Int'l., Inc.*, 350 F. Supp. 2d 582, 589–591 (D. Del. 2004) (excluding expert testimony on lost profits where expert's opinion of lost sales was based on advertising firm's projections for which expert "did not conduct any independent analysis").

## **CONCLUSION**

For all of the foregoing reasons, this Court should reverse the Judgment of liability against PPAS and Transcendence for actual fraudulent transfer.  Alternatively, if the Court affirms the finding of liability, it should nonetheless reverse the bankruptcy court's award of damages against PPAS and Transcendence and reverse the bankruptcy court's order that PPAS's claims be disallowed under 11 U.S.C. § 502(d).


Dated: September 30, 2020          PROSKAUER ROSE LLP

By: */s/ Michael T. Mervis*
Michael T. Mervis
Timothy Q. Karcher
Q. Jennifer Yang
Eleven Times Square
New York, NY  10036–8299
Tel.: (212) 969–3000
Fax: (212) 969–2900
Email: mmervis@proskauer.com
    tkarcher@proskauer.com
    jyang@proskauer.com

*Attorneys for Patriarch Partners Agency Services, LLC, Transcendence Transit, Inc., and Transcendence Transit II, Inc.*