# 20 Civ. 06274 (LAK)

**United States District Court**

*for the*

**Southern District of New York**

———————————————

IN RE TRANSCARE CORPORATION, ET AL.

DEBTORS,

———————————————

PATRIARCH PARTNERS AGENCY SERVICES, LLC, ET AL.

DEFENDANTS-APPELLANTS,

—against—

SALVATORE LAMONICA, AS CHAPTER 7 TRUSTEE OF THE JOINTLY-
ADMINISTERED ESTATES OF TRANSCARE CORPORATION, ET AL.,

PLAINTIFF-APPELLEE.

———————————————

ON APPEAL FROM THE UNITED STATES BANKRUPTCY COURT FOR
THE SOUTHERN DISTRICT OF NEW YORK (BERNSTEIN, J.)

IN RE: TRANSCARE CORPORATION, ET AL., CASE NO. 16-10407 (SMB)

LAMONICA V. TILTON, ET AL., ADV. PROC. NO. 18-1021 (SMB)

**APPENDIX TO BRIEF FOR THE APPELLANTS**

# Volume II – A0186-A0320

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
In re:                                                    Chapter  7
                                                          Case No. 16-10407 (SMB)
        TRANSCARE CORPORATION, et al.,                    (Jointly Administered)

                Debtors.
-------------------------------------------------------------------X

AUCTIONEER'S REPORT OF COMMISSION AND EXPENSES
FOR THE AUCTION SALE OF THE ASSETS CONDUCTED ON JUNE 21, 2016

By Public Auction Sale conducted on June 21, 2016 at 39 Windsor Place, Central Islip, New York
full amount realized for the Debtor's Assets ........................................................................................ $318,625.00

Auctioneer's commission pursuant to retention order
(12.5% buyer's premium collected from the successful bidders)..........................................$39,828.13

Advertisement published in the New York Times on June 19, 2016 marketing
the June 21, 2016 auction............................................................................................... N.C.

Firetrader:  Advertisement published on March 29, 2016, and dedicated Email blast sent
on March 11, 2016 .......................................................................................................... N.C.

EMS World:  Dedicated Email blast on April 11, 2016 and Email Banner Ad on
March 30, 2016 ............................................................................................................... N.C.

EMS1:  Dedicated Email blast on April 12, 2016 and Email Banner Ad on April 11, 2016 .............. N.C.

Targeted social media marketing for each auction on Facebook® .................................................. N.C.

Advertisements posted on CommercialTruckTrader.com .................................................................. N.C.

Printing and mailing of 9,300 and the mailing of 7,997 auction specific postcards mailed to
highly targeted mailing list................................................................................................ N.C.

Additional distribution of 1,050 auction specific postcards at Maltz events prior to the auctions...... N.C.

Proportionate share of the printing of 9,500 and the mailing of 8,611 multi-auction full
color auction postcards by first class mail........................................................................... N.C

Printing of additional postcards to be handed out at Maltz events prior to the auctions .................. N.C

Creation of an auction specific webpage posted on MaltzAuctions.com .......................................... N.C.

Printing of auction catalogs and terms and conditions of sale for distribution at auction ................. N.C.

General social media marketing on Facebook® and Twitter®......................................................... N.C.

Search engine advertising on Google®...........................................................................................N.C.

Dedicated Email blast to targeted recipients.................................................................................. N.C.

Labor for David Constantino, Robert Gangi, Debra Donovan, Daniel Fisher, Keith Dill,
to lot and catalog assets for sale, auction day, and oversee removal of assets ............................... N.C.

Labor for David Constantino, Robert Gangi, and Debra Donovan to prepare and implement
print and internet advertisements, handle telephone calls/inquiries, motor vehicle searches

**A0186**

to obtain owner and lien holder information, obtain titles, prepare motor vehicle
sale documents and Trustee's bills of sale.  Labor for Richard B. Maltz to coordinate
and oversee all aspects of the labor and the implementation of the marketing
campaign which maximized exposure, and handle telephone calls/email inquiries ........................ N.C.

Posting of auction sale on auctioneer's website www.MaltzAuctions.com ..................................... N.C.

Weekly e-mail notification to more than 25,000 subscribers of the
www.MaltzAuctions.com email mailing list....................................................................................... N.C.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

In re:                                                          Chapter  7
                                                                Case No. 16-10407 (SMB)
            TRANSCARE CORPORATION, et al.,                      (Jointly Administered)

                        Debtors.
-----------------------------------------------------------------X

## REPORT OF PUBLIC AUCTION SALE

1.      In accordance with Local Bankruptcy Rule 6004-1(f) ("Local Rule"). Maltz Auctions, Inc. ("Maltz") submits this
        report of the public auction sale of the Debtor's vehicles and equipment, (the "Assets").

2.      On June 21, 2016 at 11:00 a.m., Maltz conducted the public auction of the Assets in accordance with an Order
        entered March 25, 2016 [Doc. No. 52] approving Maltz's employment as auctioneer for the Trustee. *Local Rule
        6004-1(f)(1)*.  The gross dollar amount of the sale of the Assets was $318,625.00, plus the 12.5% buyer's
        premium. *Local Rule 6004-1(f)(2)*.

3.      Itemized list of the Assets sold is annexed.  *Local Rule 6004-1(f)(3)*.

4.      Maltz seeks retention of compensation based upon the retention order of the buyer's premium collected in the
        amount of $39,828.13.  Maltz is not seeking reimbursement of expenses associated with this public auction
        sale.

5.      Maltz has a blanket insurance policy covering all sales conducted by Maltz. In connection with the sale of the
        Property, Maltz is not seeking reimbursement from the Debtor's estate. *Local Rule 6004-1(f)(5)*.

6.      All registered bidders executed Terms and Conditions of Sale prior to bidding on the Assets.  *Local Rule 6004-
        1(f)(10)*.

7.      Maltz advertised the auction sale of the Assets by: causing advertisements to be published in The New York
        Times, Firetrader, EMS World and EMS1, mailing and distributing full color auction flyers to potential interested
        parties, listing the Assets on auction web sites, telemarketing and utilizing search engine and social media
        marketing. *Local Rule 6004-1(f)(11)*.

8.      A listing of the Assets was posted on the Auctioneer's website prior to the sale. The inspection of the Assets
        were conducted on the day of the auction from 10:00 a.m. to 1:00 p.m. by all interested parties.  *Local Rule
        6004-1(f)(12)*.


Dated:    July 13, 2016
          Central Islip, New York

                                    By:    _____
                                           Richard B. Maltz, President
                                           Maltz Auctions, Inc.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------X

In re:                                                                    Chapter 7
                                                                          Case No. 16-10407 (SMB)
          TRANSCARE CORPORATION, et al.,                                  (Jointly Administered)

                    Debtors.

-------------------------------------------------------------------X

### AFFIDAVIT TO ACCOMPANY REPORT OF PUBLIC AUCTION SALE

STATE OF NEW YORK   )
                    ) ss.:
COUNTY OF SUFFOLK   )

RICHARD B. MALTZ, being duly sworn deposes and says:

1.  I am the President of Maltz Auctions, Inc. ("Maltz"). I submit this affidavit, pursuant to Local Bankruptcy Rule 6004-1(g) ("Local Rule"), in connection with Maltz's report of sale (the "Report") of the public auction sale of the Debtor's vehicles, and equipment (the "Assets").

2.  I make this affidavit of my personal knowledge based upon the handling of the public auction sale of the Assets by Maltz. I personally managed the auction sale process and have the most familiarity with the same.

3.  I am a licensed auctioneer in the State of New York. My DCA # is 1240836.

4.  Maltz has a place of business at 39 Windsor Place, Central Islip, New York 11722.

5.  Maltz conducted the auction sale of the Assets in accordance with the Order entered March 25, 2016 approving the employment of Maltz as the Trustee's auctioneer.

6.  The public auction sale of the Assets was conducted by Maltz on June 21, 2016 at 39 Windsor Place, Central Islip, New York.

7.  Maltz is not seeking reimbursement of labor and other expenses incurred on behalf of the estate.

8.  All monies collected by Maltz in connection with the sale of the Assets were remitted to the Trustee.

9.  I declare under penalty of perjury that the foregoing is true and correct.

Richard B. Maltz, President
Maltz Auctions, Inc.

Sworn to before me this
13th day of July, 2016

Debra A. Donovan
Notary Public, State of New York
No. 01DO6003880
Qualified in Suffolk County
Commission Expires March 9, 2018

**A0189**

TRANSCARE CORPORATION, et al.
Case # 16-10407-SMB

COMPUTATION OF AUCTIONEER'S COMMISSION PURSUANT TO RETENTION ORDER

Gross Sale Proceeds of the Public Auction Sale conducted on June April 20, 2016 ..................................................... $318,625.00

Auctioneer's commission pursuant to retention order
(12.5% buyer's premium collected from the successful bidders) .......................................... $39,828.13

A0190

Transcare Corporation et al
Case # 16-10407 SMB

**Adjustments to Sale of June 21, 2016:**

Total for the public auction sale of the assets sold on June 21, 2016 ........................................................................ $318,625.00

**THERE WERE NO DEFAULTS FROM THIS SALE**

# Auction Worksheet- Condensed

06/23/2016

| | |
|---|---|
| Auction Date | 06/21/2016 01:00 PM To 06/21/2016 04:00 PM |
| Auction Location: | Transcare Central Islip - 39 Windsor Place, Central Islip, New YOrk |

| Lot # | Qty | Description | Deposit | Selling Price | Bidder #: | Total |
|---|---|---|---|---|---|---|
| 1 | 1 | 2013 FORD E350 ... A85603 | | 20,500.00 | 66 | 20,500.00 |
| 2 | 1 | 2013 FORD E350 ... A89199 | | 20,000.00 | 35 | 20,000.00 |
| 3 | 1 | 2013 FORD E350 ... A28912 | | 21,500.00 | 35 | 21,500.00 |
| 4 | 1 | 2013 FORD E350 ... A79236 | | 17,500.00 | 6 | 17,500.00 |
| 5 | 1 | 2013 FORD E450 ... A96175 | | 20,500.00 | 66 | 20,500.00 |
| 6 | 1 | 2012 FORD E250 ... B20966 | | 16,500.00 | 6 | 16,500.00 |
| 7 | 1 | 2012 FORD E250 ... B20962 | | 15,000.00 | 11 | 15,000.00 |
| 8 | 1 | 2010 FORD E350 ... A01386 | | 11,500.00 | 5 | 11,500.00 |
| 9 | 1 | 2010 FORD E350 ... A69995 | | 7,000.00 | 66 | 7,000.00 |
| 10 | 1 | 2010 FORD E350 ... A38153 | | 7,000.00 | 66 | 7,000.00 |
| 11 | 1 | 2010 FORD E350 ... A23340 | | 1,700.00 | 66 | 1,700.00 |
| 12 | 1 | 2003 FORD E350 ... B14534 | | 1,500.00 | 4 | 1,500.00 |
| 13 | 1 | 2003 FORD E350 ... A37625 | | 1,500.00 | 4 | 1,500.00 |
| 14 | 1 | 2010 FORD E250 ... A99642 | | 7,000.00 | 17 | 7,000.00 |
| 15 | 1 | 2010 FORD E350 ... A06995 | | 2,700.00 | 12 | 2,700.00 |
| 16 | 1 | 2009 FORD E150 ... A93893 | | 10,000.00 | 10 | 10,000.00 |
| 17 | 1 | 2010 FORD E350 ... A18856 | | 6,500.00 | 12 | 6,500.00 |
| 18 | 1 | 2009 FORD E350 ... A66302 | | 7,000.00 | 12 | 7,000.00 |
| 19 | 1 | 2009 FORD E350 ... A88098 | | 7,000.00 | 12 | 7,000.00 |
| 20 | 1 | 2008 FORD E350 ... A95531 | | 7,000.00 | 12 | 7,000.00 |
| 21 | 1 | 2008 CHEVROLET 3500 ... 100804 | | 2,200.00 | 4 | 2,200.00 |
| 22 | 1 | 2002 FORD E350 ... B15836 | | 2,400.00 | 32 | 2,400.00 |
| 23 | 1 | 2009 FORD E350 ... A89654 | | 10,000.00 | 66 | 10,000.00 |
| 24 | 1 | 2009 FORD E350 ... A89655 | | 10,000.00 | 66 | 10,000.00 |
| 25 | 1 | 2009 FORD E350 ... A73707 | | 7,000.00 | 12 | 7,000.00 |
| 26 | 1 | 2009 FORD E350 ... A73706 | | 6,500.00 | 12 | 6,500.00 |
| 27 | 1 | 2003 FORD E350 ... B58042 | | 3,500.00 | 32 | 3,500.00 |
| 28 | 1 | 2003 FORD E350 ... A97231 | | 3,500.00 | 32 | 3,500.00 |
| 29 | 1 | 2010 FORD EXPLORER ... A36984 | | 6,500.00 | 61 | 6,500.00 |
| 30 | 1 | 2010 FORD EXPLORER ... A36982 | | 4,000.00 | 21 | 4,000.00 |
| 31 | 1 | 2010 FORD EXPLORER ... A36983 | | 4,200.00 | 64 | 4,200.00 |
| 32 | 1 | 2009 FORD EXPLORER ... A06977 | | 2,000.00 | 60 | 2,000.00 |
| 33 | 1 | 2008 FORD EXPLORER ... B11542 | | 5,500.00 | 61 | 5,500.00 |
| 34 | 1 | 2008 FORD EXPLORER ... B11541 | | 1,400.00 | 29 | 1,400.00 |
| 35 | 1 | 2002 FORD EXPLORER ... B05489 | | 800.00 | 4 | 800.00 |
| 36 | 1 | 2010 FORD ESCAPE ... C84618 | | 4,500.00 | 100 | 4,500.00 |
| 37 | 1 | 2009 FORD ESCAPE ... C24629 | | 3,000.00 | 61 | 3,000.00 |
| 38 | 1 | 2008 FORD ESCAPE ... B33211 | | 1,400.00 | 29 | 1,400.00 |
| 39 | 1 | 2007 FORD ESCAPE ... B25042 | | 1,400.00 | 21 | 1,400.00 |
| 40 | 1 | 2005 FORD ESCAPE ... E22019 | | 800.00 | 4 | 800.00 |
| 41 | 1 | 2002 FORD ESCAPE ... A34384 | | 800.00 | 4 | 800.00 |
| 42 | 1 | 2009 FORD FLEX ... A37424 | | 6,000.00 | 100 | 6,000.00 |
| 43 | 1 | 1996 DODGE RAM 1500 ... 116131 | | 1,600.00 | 4 | 1,600.00 |
| 44 | 1 | 2000 INTERNATIONAL 4700 FLATBED ... 320789 | | 14,000.00 | 68 | 14,000.00 |
| 45 | 1 | GENERAC GP8000E GENERATOR | | 600.00 | 21 | 600.00 |
| 46 | 1 | BRIGGS & STRATTON ELITE SERIES GENERATOR | | 400.00 | 21 | 400.00 |

# Auction Worksheet - Condensed

06/23/2016

| Lot # | Qty | Description | Deposit | Selling Price | Bidder #: | Total |
|-------|-----|-------------|---------|---------------|-----------|-------|
| 47 | 1 | BRIGGS & STRATTON STORM RESPONDER GENERATOR | | 450.00 | 21 | 450.00 |
| 48 | 1 | MI-T-M 3000 PSI PRESSURE WASHER | | 450.00 | 63 | 450.00 |
| 49 | 1 | MTD 5.5HP SNOWBLOWER | | 300.00 | 58 | 300.00 |
| 50 | 1 | TORO POWER MAX SNOWBLOWER | | 700.00 | 33 | 700.00 |
| 51 | 1 | HYSTER 25 TYPE E FORKLIFT & CHARGER ... 897776 | | 2,600.00 | 100 | 2,600.00 |
| 52 | 1 | Ferno Pro Flexx Stretcher | | 625.00 | 52 | 625.00 |
| 53 | 1 | Lot: Scoop, (2) Boards & Reeves Stretcher | | 200.00 | 13 | 200.00 |
| 54 | 1 | Lot: (2) Bags, KED & Soft Goods | | 400.00 | 29 | 400.00 |
| | | Totals: | .00 | | | 318,625.00 |

# miller

Miller Advertising Agency, Inc.  •  71 Fifth Avenue  •  New York, New York 10003  •  212-929-2200

## INVOICE

MALTZ AUCTIONS INC. - H434
39 Windsor Place
.
Central Islip, NY 11722

Client Number    022729
Invoice Number  821764 - 061
Invoice Date      06/20/16
Net 30    Page 2

Regarding
**TRANSCARE**

| Media | Description | Ad Number | Insert Dates | Ad Size | Times | Rate | Amount |
|-------|-------------|-----------|--------------|---------|-------|------|--------|
| NEW YORK TIMES | SALE JUNE 2> | R620006816 | 06/19 | 1.00 | 1 | 824.00 | 824.00 |
| | | | **NEW YORK TIMES TOTAL** | | | | **$824.00** |

**INVOICE TOTAL   $824.00**

S P G
6/24/16

Payments are to be made payable to: Miller Advertising Agency, Inc.

Internet : http://www.milleraa.com                                    EMail : narchibald@milleraa.com

A0194

Case 1:20-cv-06274-LAK Document 11-2 Filed 09/30/20 Page 11 of 136

# Invoice

**FIRE TRADER**

18111 W Buckhorn Dr
Goodyear, AZ 85338
623-474-6236  FAX: 623-474-6527

| Date | Invoice # |
|------|-----------|
| 3/29/2016 | 6702 |

**PAID**

| Bill To | Ship To |
|---------|---------|
| Maltz Auctions<br>39 Windsor Pl<br>Central Islap, NY 11722 | |

| P.O. Number | Terms | Rep | Ship | Via | F.O.B. | Project |
|-------------|-------|-----|------|-----|--------|---------|
| | | | 3/29/2016 | | | |

| Quantity | Item Code | Description | Price Each | Amount |
|----------|-----------|-------------|------------|--------|
| 1 | AD | 4/16 FIRE TRADER ADVERTISING | 0.00 | 0.00 |

| | Total | $0.00 |
|---|-------|-------|



Click anywhere in image to visit maltzauctions.com

# BANKRUPTCY
## TREMENDOUS INVENTORY
# AUCTION

*Complete Inventory of Multi-State Medical Transportation/EMS Business*




## 200+ AMBULANCES
(2002-2014 Type I, II & III's)

## 1,500+ Ventilators, Defibrillators, IV Pumps, Capnagraphs, Stretchers, LSUs, APR Masks & Much More!

## ONLINE BIDDING AVAILABLE!

*at Web TV Auction & Live Streaming*

# MaltzAuctions.com | 516.349.7022

*AUCTIONS...YOUR LIQUIDITY SOLUTION*

*Salvatore LaMonica, Chapter 7 Trustee • LaMonica Herbst & Maniscalco, LLP, Attorneys for the Chapter 7 Trustee*
Richard B. Maltz, Auctioner DCA# 1240836 · David A. Constantino, Auctioner DCA# 1424944

*Maltz: Retention Subject to Court Approval. Asset List Subject to Change.*

A0197

This order was Signed on 2016-03-15 11:54:28.443 by rmaltz@maltzauctions.com
Insertion order was paid online by credit card ending in 1005. $ 1500.00 will appear on your credit card as this publication or Cygnus Business Media
Confirmation #: 027-0315073396. This is your receipt, please print and save this receipt for your records.

# EMSW★RLD  

## Advertising Insertion Order

*This is an authorization to run advertising space as follows:*

**Created:** 2016-03-15 09:48:56.393
**Sales Rep:** Sandy.Domin@cygnus.com
**Order Source #:** Richard Maltz

### SouthComm

1233 Janesville Ave.
Fort Atkinson, WI 53538
P: 920 568 8325
F: 866 651 1956
www.cygnusb2b.com

**Bill To Advertiser**
**Advertiser:** Maltz Auctions
39 Windsor Place
Central Islip, NY 11722
**Phone:** (516) 349-7022
**Fax:**
**Website:** www.maltzauctions.com

**Billing Contacts:**

**Leads:**
**Production:**

### Web Products

| Materials Due | Start Date | Ad Description | Location @ Impressions | Rate | Adj Rate | Disc | Net |
|---|---|---|---|---|---|---|---|
| | 03/30/2016 | eNewsletter (300x250 Medium Rectangle) First Position | ROS | 690.00 | 400.00 | 42% | 400.00 |
| 03/30/2016 | 04/10/2016 | Web: E-Mail Blast (eMail Blast) | ROS | 1265.00 | 1100.00 | 13% | 1100.00 |
| **Total** | | | | **$1955.00** | **$1500.00** | **23%** | **$1500.00** |

**Billing:** One-time payment

### Invoice Schedule

| | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | **Total** |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **2016** | | | $1500.00 | | | | | | | | | | $1500.00 |

**Payment:** *All Advertising Is Prepay By Issue. Cygnus Business Media Will Process Your Payment As Each Issue Is Processed*
*Please fax the card information including name on the card, number, and Expiration to F: 866 651 1956 or contact your sales rep.*
*If Prepayment By Check: This Advertising Order Is Also Your Invoice. Please Send Check For First Insertion Immediately.*

**Special Instructions**
EMS/ Executive Director (2,439) President, Owner,
etc (1,916) Director, Manager, etc (970) EMS
Coordinator/Administrative, etc (2,388) Emergency
Manager, Commissioner, etc (316) EMS Committee
Member (217)

**Discounts Applied**

**Invoice Totals**
Rate Total: $1955.00
Adjusted Rate Total: $1500.00
Overall Discount: 23%
Net Total: $1500.00

**Production Instructions**
Dedicated eblast to 8,200 from Tap report...E-
newsletter First position

Click here to view a PDF of your order.
This order was Signed on 2016-03-15 11:54:28.443 by rmaltz@maltzauctions.com
Insertion order was paid online by credit card ending in 1005. $ 1500.00 will appear on your credit card as this publication or Cygnus Business Media
Confirmation #: 027-0315073396. This is your receipt, please print and save this receipt for your records.

**A0198**



Richard Maltz <rmaltz@maltzauctions.com>

## Transcare Bankruptcy Auction: 230+ Ambulance & 1,500+ EMS Support Devices
1 message

EMS World Special <ems@mail.emsworld.com>                    Mon, Apr 11, 2016 at 11:00 AM
Reply-To: EMS World Special <ems@mail.emsworld.com>
To: rmaltz@maltzauctions.com

Click here to view this email online.







ONLINE BIDDING
AVAILABLE!

Salvatore LaMonica, Chapter 7 Trustee  •  LaMonica Herbst & Maniscalco, LLP, Attorneys for the Chapter 7 Trustee

# MaltzAuctions.com  |  516.349.7022  |  AUCTIONS.. .Your Liquidity Solution

*Asset List Subject to Change.

This e-mail is being sent to rmaltz@maltzauctions.com.

Please add mail.emsworld.com to your address book or safe sender list to receive our emails in your inbox.

Unsubscribe | Manage Newsletter Subscriptions | Change E-mail | Forward to a Friend | Customer Service Center | Privacy Policy

If this e-mail was forwarded to you and you are interested in subscribing to our emails, please click here to sign-up.

If you have trouble with any of these methods, you can reach us toll-free at 800-547-7377.

EMS World
SouthComm Business Media, LLC
1233 Janesville Ave
Fort Atkinson, WI 53538

A0200



**PRAETORIAN DIGITAL**

200 Green Street
Suite 200
San Francisco, CA
94111

# Invoice

| Date | Invoice # |
|------|-----------|
| 4/11/2016 | 010132-6443 |

| Bill To |
|---------|
| Maltz Auctions<br>Richard Maltz<br>39 Windsor Place<br>Central Islip, NY 11722 |

| Due Date | Terms | P.O. No. |
|----------|-------|----------|
| 4/11/2016 | Due on receipt | |

| Description | Qty | Rate | Amount |
|-------------|-----|------|--------|
| Web Advertising- EMS1 Member eNewsletter Upper Insertion | 1 | 570.00 | 570.00 |

| | |
|---|---|
| Subtotal | $570.00 |
| Sales Tax  (7.5%) | $0.00 |
| Total | $570.00 |
| Payments/Credits | $0.00 |
| **Balance Due** | **$570.00** |

*Praetorian Digital is home to:*

  
  
 

Contact Information

Hilary Barham
Hilary.Barham@PraetorianDigital.com
P: (415) 992-4252
F: (415) 962-2018

Make checks payable to:  Praetorian Digital

*\* Please include invoice number on checks*
*to expedite processing*

A0201

4/12/2016   16-1040   David R. Maltz & Co., Inc. Mail - RE: TEST-Bankruptcy Auction: 230+ Ambulance & 1,500+ EMS Support Devices

Case 1:09-cv-06374-AK   Document 41-2   Filed 08/30/10   Page 18 of 136

Doc 258   Filed 08/23/16   Entered 08/23/16 12:55:37   Main Document
Pg 17 of 35



Richard Maltz <rmaltz@maltzauctions.com>

---

## RE: TEST-Bankruptcy Auction: 230+ Ambulance & 1,500+ EMS Support Devices

1 message

---

Monica Bragle <Monica.Bragle@praetoriandigital.com>                    Tue, Apr 12, 2016 at 1:02 PM
To: Richard Maltz <rmaltz@maltzauctions.com>

Richard,

Here is the final draft that was emailed out. Just sending for your records.

Regards,

Monica Bragle

Customer Success Manager

Praetorian Digital

415-962-8333

---

From: EMS1 Product Alert [mailto:ProductAlerts@EMS1.com]
Sent: Tuesday, April 12, 2016 12:01 PM
To: Monica Bragle
Subject: TEST-Bankruptcy Auction: 230+ Ambulance & 1,500+ EMS Support Devices

View this as a web page



If you do not wish to receive future EMS1 Product Alerts, please unsubscribe.
To change your email address, update your profile. © 2016: EMS1.com. All Rights Reserved.
200 Green Street, 2nd Floor, San Francisco, CA 94111

**A0203**

April 11, 2016  |  View as webpage



📱 Download the Mobile App

   

## TOP NEWS





**Paramedic treats suspect who shot at her cop husband**



**EMTs take over hazmat duties from FDNY paramedics**



**Cleveland EMS swears in first female EMS commissioner**

- **Patient dies after Ga. ambulance crash**: The heart patient went into cardiac arrest and died; officials said the patient didn't die as a result of the crash

- **Urban ATV riders show off confrontations with paramedics and cops on social networks**: Police chief says videoing traffic disruptions is 'fun' for riders and social media is partly to blame for increase in urban dirt bike riding

- **Paramedics and EMTs celebrated as unsung heroes**: The American Ambulance Association recognizes 103 EMS providers from 29 states as 'Stars of Life'

- **Solutions sought for ND EMS volunteer shortage**

- **Milwaukee hospitals end ambulance diversion policy**

- **Firefighters cut elderly man's lawn after he fell off mower**

- **Ambulance thief sentenced to 16 years for fatal crash**

- **EMT honored for saving unconscious woman**

- **5 killed, including 2 toddlers, in head-on Calif. crash**






## CLINICAL TOPICS

### ACS: What EMS providers need to know



By Arthur Hsieh, EMS1 Columnist
Paramedic 12-Lead ECG acquisition and interpretation drives decisions for pharmacological interventions and patient transport to PCI-capable centers.

What is ACS? >

## AMBULANCE DRIVER'S PERSPECTIVE

### Making friends with the ghosts



By Kelly Grayson, EMS1 Columnist
Realizing that no matter how skilled my hands or knowledgeable my head, what matters most to my patients is my heart.

Developing emotional resilience >

## PRODUCT NEWS

Blauer Seeks Product Testers for Elite "Lead Weartester" Program

Phoenix Fire Department Orders Demers MXP 150 Ambulances

More Product News

## FEATURED DEALS



Sting-Ease (Medicaine) Swabs for Summer Only $2.99 from V.E. Ralph!

More Featured Deals

EMS QUALITY

## Closing the loop on patient care



By Mike Rubin, EMS1 Columnist
Using hospital outcomes to evaluate field performance.

Field-level facts and figures ›

CAPNOACADEMY

Sponsored by    

## Pediatric anaphylaxis: How capnography can help



By Bob Sullivan, EMS1 Columnist
Waveform capnography can be used to detect respiratory and circulatory compromise from anaphylaxis in children and to guide treatment.

Overview ›

FREQUENT FLYERS

## Ambulance history with Capt. Salty



Modern day ambulances are even larger.

Read the comic ›

NOW ON PARAMEDICTV

## Drones and medical helicopter safety



12-lead ECG interpretation tips





👍 1,054   Joining EMS? Here's what you're really getting into...

👍 676   Off-duty paramedic rushes to aid injured police officer

👍 592   Paramedic physician: Is there such a thing?

👍 520   3 essentials to cure hangry medic syndrome

👍 518   Patient revived by Narcan attacks NY paramedic





EMS1 does not send unsolicited messages. You are receiving this email because you have signed up for EMS1 and subscribed to this newsletter. Visit our Customer Support page to report any email problems or subscribe to our other newsletters.



Campaign: 6/21 - Transcare

Search ▼    Filters ▼    Lifetime

Performance    Demographics    Placement

**142** Results: Website Clicks    **$0.36** Cost per Result    **2.88%** Result Rate

**142**
Results: Website Clicks

**3,150**

**$51.78**

Custom

Campaign ● On

Delivery

Objective

See Post (F)
See Instagram Post (F)

**Amount Spent Today**

**Total Schedule**

Jun 20, 2016 – Jun 21, 2016

Columns: Performance ▼    Breakdown ▼    Export ▼

| Ad Set Name | Delivery | | Results | Reach | Cost | Budget | Amount Spent | Schedule |
|---|---|---|---|---|---|---|---|---|
| 6/21 - Transcare 6/21 - Transcare | ● Recently Completed | | **142** Website Clicks | 3,150 People | $0.36 Per Website Click | $50.00 | $51.78 | Jun 20, 2016 – Jun 21, 2016 |
| Results from 1 Ad Set | | | **142** Website Clicks | 3,150 People | $0.36 Per Website Click | | $51.78 Total Spent | |

Ad Sets in this Campaign ▼    + Create Ad Set

Jun 20    Jun 21

150

100

50

0

$1.00
$0.50
$0.00

# Thank You!

This is to confirm the ad you just placed on line with CommercialTruckTrader.com. Please print the information below and keep for your records. You can log in and modify your ad once it appears online via My Trader

Modify your ad here:  www.commercialtrucktrader.com/myt/sign-in/
Your username is:  rmaltz@maltzauctions.com

**PRINT THIS PAGE**

### Ad Information and Invoice

| | |
|---|---|
| **Commercial Deluxe** | **$19.00** |
| Includes: | |
| Online Ad | |
| Add 1 Video | |
| □ Video can be added after checkout. | |
| Email Link | |
| Feature Photo Ad in Search | |
| Featured Photo Ad | |
| Premium Ad Placement in Search Results | |
| Sixteen Photos | |
| 16 Weeks | |

| | |
|---|---|
| **Total** | **$19.00** |

MaltzAuctions.com. $10000, 5163497022



**PLACE ANOTHER AD**

**SEARCH THIS SITE**

**PRINT THIS PAGE**

If you need help, please contact Customer Service 9:00am - 8:30pm EST Monday - Friday at customerservice@commercialtrucktrader.com
  Online Ad Information
  Ad ID Number:118433038
  Website:CommercialTruckTraderonline.com
  Package Name:Commercial Deluxe
  Features / Enhancements:Email Link, Featured Photo Ad, Feature Photo Ad in Search, Premium Ad Placement in Search Results, Add 1 Video, Sixteen Photos
  Appears:June 10, 2016
  Runs:16 weeks. You may renew your ad by using MyTrader or by contacting our Customer Service Department at customerservice@commercialtrucktrader.com

Click here to view your online ad
**Online Ad Description:**
2013 Ford E-SERIES BANKRUPTCY AUCTION: June 21st. 45+ Buses, Vans & SUVs. Price listed exclusively represents the suggested opening bid and not the price of the asset. Live On-Site Auction at 39 Windsor Place, Central Islip, NY 11722. Details at

## Advertising Agreement
10-Jun-16
This advertisment Agreement serves as written confirmation that Dominion Enterprises shall publish an advertisment for the sale of your vehicle. This advertisment will appear on our Internet website located at commercialtrucktrader.com, for 16 weeks.

You will be charged $19.00 for your ad. Thank you for choosing Dominion Enterprises for your advertisement needs. Please contact us with any questions which you may have at customerservice@commercialtrucktrader.com.

**Fraud Awareness Tips**
Our company strives to provide a safe, secure marketplace for our customers. However, the potential for fraud still exists. Your best protection is to be well-informed and here are some tips to help keep your transaction safe.

Email provides an anonymous way for someone to falsely represent Dominion Enterprise Websites. The best way to identify email fraud is to know that our company will never:

- Act as a broker or get involved in buyer-seller communications
- Send you an email regarding transactions on a vehicle posted on our site
- Offer or endorse any escrow services
- Offer a buyer protection program or transaction insurance
- Ask you to confirm account information.

As with any transaction, the best advice for avoiding fraud is to use good judgment. The following are indicators of fraudulent activity:

- A buyer is located overseas or is interested in buying your car sight-unseen.
- A buyer proposes a complicated payment plan such as sending a check greater than your asking price and requesting a check back for the difference.
- A buyer suggests using a third-party agent, such as an escrow service. You should always investigate any escrow service carefully.

To help us protect all of our valued customers, immediately report any suspicious emails to fraud@traderonline.com

**Need Help?** Email Customer Support. Our business hours are between 9:00am - 8:30pm EST Monday - Friday

Find a Dealer  |  Become a Commercial Truck TraderDealer  |  Browse Commercial Trucks  |  About Us  |  Send Us Feedback  |  Advertise with Us  |  Press Room
Help  |  Site Map  |  All About Commercial Trucks

Security Center  |  Advertiser Agreement  |  Privacy Policy  |  Terms of Use  |  Copyright

©2016 Dominion Enterprises All Rights Reserved.



Richard Maltz <rmaltz@maltzauctions.com>

---

## Bankruptcy Auction: 45+ Buses, Ambulances, SUV's & Vans - June 21st, Long Island, NY
1 message

**Maltz Auctions** <info@maltzauctions.com>                                  Fri, Jun 10, 2016 at 2:18 PM
Reply-To: info@maltzauctions.com
To: rmaltz@maltzauctions.com

Bankruptcy Auction: June 21st. 45+ Buses, Ambulances, SUV's & Vans

Thank you for your interest in the Transcare Bankruptcy Auctions.  We
thought you may like to know the final vehicle auction will take place on
Tuesday, June 21st at 39 Windsor Place, Central Islip, NY.  This auction will
consist of 45+ Buses, Vans, Ambulances & SUV's

For the complete asset listing please CLICK HERE.

Please do not hesitate to call our office with any questions.

Sincerely,

Richard Maltz
Maltz Auctions
 www.MaltzAuctions.com
516-349-7022


39 Windsor Place
Central Islip, NY 11722


See what's happening on our social sites




Maltz Auctions, 39 Windsor Place, Central Islip, NY 11722

SafeUnsubscribe™ {recipient's email}
Forward this email | Update Profile | About our service provider
Sent by info@maltzauctions.com in collaboration with

Constant Contact
Try it free today

---

**THIS IS A TEST EMAIL ONLY.**
This email was sent by the author for the sole purpose of testing a draft message. If you believe you have received the message in error, please contact the author by replying to this
message. Constant Contact takes reports of abuse very seriously. If you wish to report abuse, please forward this message to abuse@constantcontact.com.

Case 1:20-cv-06374-AK Document 11-2 Filed 09/30/20 Page 27 of 136

# INVOICE

| | |
|---|---|
| **Invoice:** | 76293 |
| **Invoice Date:** | 4/28/2016 |
| **Order Date:** | 4/2/2016 |
| **Job Number:** | 188948 |
| **Customer Number:** | 121132 |
| **Salesperson:** | Jeff Gilliam |
| **Purchase Order Number:** | Richard |

Maltz Auctions Inc
Attn: Richard B. Maltz CAI CES
39 Windsor Place
Central Islip  NY  11722

**Remit To:**
Indexx, Inc.
303 Haywood Road.
Greenville, SC  29607

| Quantity | Description | Price |
|---:|---|---:|
| 9,300 | Ambulance Mailer - 8.5x11 | 2,835.38 |
| | Design | 337.50 |
| 7,997 | Postage | 4,968.68 |
| | Freight charges for shipment to David R. Maltz & Co., Inc., Central Islip, NY. | 120.00 |
| | Quantity Ordered = 1100, Quantity Shipped = 1100. | |

| | |
|---|---:|
| Net Sales: | 3,172.88 |
| Freight - Non-Taxable: | 120.00 |
| **Invoice Total:** | 8,261.56 |
| Deposits: | 4,968.68 |
| **Net Total:** | 3,292.88 |

**We Appreciate You!!**

**Terms:**  Credit Card

---

To insure proper credit return this portion of the invoice with your remittance.

Maltz Auctions Inc
Attn: Richard B. Maltz CAI CES
39 Windsor Place
Central Islip  NY  11722

| | |
|---|---|
| **Invoice:** | 76293 |
| **Invoice Date:** | 4/28/2016 |
| **Job Number:** | 188948 |
| **Customer Number:** | 121132 |
| **Purchase Order Number:** | Richard |

**Invoice Amount Due:**   3,292.88

**NOTE: A fee of 18% per annum, will be charged on past due  balances.**
ANY QUESTIONS, PLEASE CALL (864) 234-1024 OR FAX (864) 234-7287

A0211



# BANKRUPTCY
# AUCTION

## APRIL 20TH – MAY 12TH

### Complete Inventory of Multi-State Medical Transportation/EMS Business

- Assets Sold Individually or in Small Groupings
- 230+ Type I, Type II & Type III Ambulances
- 45+ Invalid Coaches, Passenger Buses, Wheelchair Accessible Vans & Full Size Vans
- 25+ SUVs
- 1,500+ Ancillary Ambulance/EMS Support Equipment
  - ALS/BLS Kits
  - Capnographs
  - Defibrillators
  - IV Pumps
  - LSUs
  - Monitors
  - Stair Chairs
  - Stretchers
  - Ventilators
  - And Much More...
- Communication Devices
  - Mobile Data Terminals with Voice Radios
  - XT 5000 Motorola Portable Radios
  - Sonim Phones
  - I-Pad Minis
- Medications
  - See Web for Details
- Office Equipment
  - Servers & Computers
  - Office Furniture
- Miscellaneous
  - EMT Training Equipment
  - Mechanical Maintenance Equipment, Tools, & Parts
  - Medical Supplies
  - Telecom Equipment



U/s Bankruptcy Court SDNY • In Re: TRANSCARE CORPORATION, et al. • Case No. 16-10407 (SMB) Jointly Administered

MALTZAUCTIONS
AUCTIONEERS • APPRAISERS • REAL ESTATE BROKERS
AUCTIONS...Your Liquidity Solution®

Richard B. Maltz, Auctioneer DCA# 1240836
David A. Constantino, Auctioneer DCA# 1424944
Richard B. Maltz, Licensed Real Estate Broker

FIRST-CLASS
PRST. U.S. POSTAGE
PAID
GREENVILLE, SC
PERMIT No. 1460

SENSITIVE
DATED
MATERIAL



| AUCTION DATE | LOCATION | VIEWINGS |
|---|---|---|
| Wednesday, April 20th 11:00 am | 25 14th Street Brooklyn, NY | 9:00 am – 11:00 am Morning of Sale |
| Wednesday, May 4th 11:00 am | 718 S. Fulton Avenue Mt. Vernon, NY | 9:00 am – 11:00 am Morning of Sale |
| Friday, May 6th 11:00 am | 10 S. White Street Poughkeepsie, NY | 9:00 am – 11:00 am Morning of Sale |
| Wednesday, May 11th 11:00 am | 400 Seco Road Monroeville, PA | 9:00 am – 11:00 am Morning of Sale |
| Thursday, May 12th 11:00 am | 1125 Desoto Road Baltimore, MD | 9:00 am – 11:00 am Morning of Sale |
| TBA | 39 Windsor Place Central Islip, NY | 9:00 am – 10:30 am Morning of Sale |

**TERMS & CONDITIONS OF SALE:** Assets sold in "as-is" condition & free and clear of all liens. A 25% deposit in cash or certified funds is required from all bidders upon knockdown of bid. Any absentee or online bidders must post a deposit equal to 25% of maximum bid amounts at least 4 business days prior to auction. A 12.5% Buyer's Premium will be added to the Successful Bidder's high bid to determine the contract price to be paid by the Successful Bidder. The assets will be sold subject to the complete Terms & Conditions of Sale that are subject to court approval.

# MaltzAuctions.com | 516.349.7022 | AUCTIONS...YOUR LIQUIDITY SOLUTION®

The Assets are being sold "AS IS" "WHERE IS", "WITH ALL FAULTS", without any representations, covenants, guarantees or warranties of any kind or nature, and free and clear of any liens, claims, or encumbrances. By delivering their respective Deposits, all Bidders acknowledge that they have had the opportunity to review and inspect the Assets and will rely solely on their own independent investigations and inspections of the Assets in making their bids. Neither Maltz, the Trustee, the Attorney for the Trustee nor any of their collective representatives makes any representations or warranties with respect to the use or condition of the Assets. All Bidders acknowledge that they have conducted their own due diligence in connection with the Assets and are not relying on any information provided by Maltz, the Trustee, the Attorney for the Trustee, or their professionals. All prospective bidders are encouraged to conduct their own due diligence prior to participating in the Public Auction. Bid rigging is illegal and suspected violations will be reported to the Department of Justice for investigation and prosecution.

*Asset list subject to change.

A0213

**INVOICE**



|  |  |
|---|---|
| **Invoice:** | 75796 |
| **Invoice Date:** | 3/31/2016 |
| **Order Date:** | 3/22/2016 |
| **Job Number:** | 188465 |
| **Customer Number:** | 121132 |
| **Salesperson:** | Jeff Gilliam |
| **Purchase Order Number:** | Richard |
| **Payment Terms:** | Due in 30 days |

David R. Maltz & Co., Inc
Attn: Richard B. Maltz CAI CES
30 Windsor Place
Central Islip NY 11722

**Remit To:**
Indexx, Inc
303 Haywood Road
Greenville, SC 29607

| Quantity | Description | Price |
|---|---|---|
| 9,500 | April Multi Auction - 8.5 x 14<br>In Re: Transcare | $272.61 |
| 8,611 | Mailing | |

|  |  |
|---|---|
| Net Sales: | $272.61 |
| **Invoice Total:** | $272.61 |

We Appreciate You!!
Terms: Due in 30 days

---

To insure proper credit return this portion of the invoice with your remittance.

David R. Maltz & Co., Inc
Attn: Richard B. Maltz CAI CES
30 Windsor Place
Central Islip NY 11722

|  |  |
|---|---|
| **Invoice:** | 75796 |
| **Invoice Date:** | 3/31/2016 |
| **Job Number:** | 188465 |
| **Customer Number:** | 121132 |
| **Purchase Order Number:** | Richard |

**Invoice Amount Due:** 272.61

NOTE: A fee of 18% per annum, will be charged on past due balances.
ANY QUESTIONS. PLEASE CALL (864) 234-1024 OR FAX (864) 234-7287

**A0214**

BANKRUPTCY, ESTATE, LIQUIDATION & PUBLIC ADMINISTRATOR DIRECTED

# AUCTIONS

**March 30th through May 26th**

---

## THURSDAY, APRIL 14th AT 11:00 AM



**#16-243**

### GLEN COVE
**5,300+ SQ FT LUXURY OFFICE CONDO**
*Prime Location in Heart of Downtown*

IMMEDIATE SALE DIRECTED
**1 School St, Units 303A & 303B
Glen Cove, NY**

- Adjoins $50 Million Mixed-Use Development Site
- Prime Legal, Medical or Other Professional Use
- Ideally Located Under One Mile to North Shore University/Glen Cove Hospital & LIRR Station
- 12 Minutes from Long Island Expressway
- High-End/Finishes Throughout (Former Prestigious Law Office)
- Building Lobby Adjoins 4-Story Parking Garage
- Previously Listed at $938,000 ($175/Foot)
- *$345,000 Opening Bid ($64/Foot)*



**#16-244**

### BALDWIN
**6,500+ SQ FT BUILDING**
*Traffic Light Intersection*

BANKRUPTCY AUCTION • US Bankruptcy Court EDNY
In Re: Grandsun Realty LLC • Case # 12-73158-LAS
**720 Sunrise Hwy, Baldwin, NY**

- Prime Location at Intersection of Sunrise Highway & Grand Avenue
- Across from LIRR Baldwin Train Station
- 6,584 Sq Ft Building + 3,292 Sq Ft Basement
- Rooftop Billboard – Phenomenal Exposure

*Marc A. Pergament, Chapter 7 Trustee
Weinberg, Gross & Pergament LLP, Attorneys for the Chapter 7 Trustee*

---



**#16-245**

### MASSAPEQUA
**4,700+ SQ FT BUILDING**
*Traffic Light Intersection*

IMMEDIATE SALE DIRECTED
**550 Broadway, Massapequa, NY**

- Two Story Freestanding Office Building
- 4,770 Sq Ft Building + 1,193 Sq Ft Basement
- Interior Gutted After Recent Fire
- *$210,000 Opening Bid*

**#16-246**



### LATTINGTOWN
**TWO SPRAWLING ACRES**

PUBLIC ADMINISTRATOR DIRECTED AUCTION
In Re: The Estate of Alan Morreale
**18 Horse Hollow Rd, Lattingtown, NY**

- Two Acres – Flat/Rolling & Highly Usable
- Previously Improved with a 2,300 Sq Ft Home that has Suffered Extensive Fire Damage
- *$499,000 Opening Bid*

*Jeffrey E. DeLuca, Nassau County Public Administrator*

**#16-247**



### BAYSIDE
**TWO BEDROOM CO-OP**

BANKRUPTCY AUCTION • US Bankruptcy Court EDNY
In Re: Edward H. Brennan • Case # 14-70109-LAS
**73-47 217th St, Unit 364A1, Bayside, NY**

- Located Within the Windsor Oak Complex

*R. Kenneth Barnard, Chapter 7 Trustee
LaMonica, Herbst & Maniscalco, LLP, Attorneys for the Chapter 7 Trustee*

---

## TUESDAY, MAY 10th AT 1:00 PM



**#16-249**

### MANHATTAN
**92 KEY BOUTIQUE HOTEL**
*Partially Constructed*

BANKRUPTCY AUCTION • US Bankruptcy Court SDNY
In Re: D.A.B. Group LLC • Case # 14-12057 (SCC)
**139-141 Orchard St, Lower East Side
Manhattan, NY**

- 16 Story Steel Superstructure Complete
- Prime Location in Booming Market
- *SPECTACULAR CITY VIEWS*



*Ronald J. Friedman, Chapter 11 Trustee
Silverman Acampora LLP, Attorneys for the Chapter 11 Trustee*

---

## THURSDAY, MAY 26th AT 11:00 AM



**#16-251**

### BRONX
**16,600+ SQ FT CORNER BUILDING**

BANKRUPTCY AUCTION • US Bankruptcy Court SDNY
In Re: NARCO FREEDOM, INC. • Case # 16-10123-SMB
**2640-2652 Third Avenue, Bronx, NY**

- Located at Traffic Light Intersection
- Currently Utilized as Substance Abuse Inpatient Rehabilitation Center
- Elevator Building with Access to Each Floor

*Alan Nisselson, Chapter 7 Trustee
Windels Marx Lane & Mittendorf, LLP, Attorneys for the Chapter 7 Trustee*

---

## PERSONAL PROPERTY AUCTIONS



**#16-241**

### CENTRAL ISLIP
**JEWELRY, ART, COLLECTIBLES & MORE**
*Wednesday, March 30th*



**#16-242**

### LONG ISLAND CITY
**SCREEN PRINTING / DIE CUTTING PLANT**
*Thursday, April 7th*

USBC SDNY • In Re: A D Die Cutting & Finishing, Inc. • Case No: 816-78318-REG
Marc A. Pergament, Chapter 7 Trustee



**#16-248**

### LINDENHURST
**VEHICLES, EQUIPMENT & MORE**
*Saturday, May 7th*



**#16-252**

### NY, PA & MD
**200+ FULLY EQUIPPED AMBULANCES**
*Dates TBA*

USBC SDNY • In Re: Transcare Corp., et al. • Case # 16-10407 (SMB) Jointly Administered
Salvatore LaMonica, Chapter 7 Trustee

### CENTRAL ISLIP
**AUTO AUCTION**
**100-150 VEHICLES**
*April 5th & 19th, May 3rd & 17th*

---

# MaltzAuctions.com | 516.349.7022 | *AUCTIONS…YOUR LIQUIDITY SOLUTION*



BANKRUPTCY, ESTATE, LIQUIDATION & PUBLIC ADMINISTRATOR DIRECTED

# AUCTIONS

*March 30th through May 26th*

FIRST-CLASS
PRST. U.S. POSTAGE
PAID
GREENVILLE, SC
PERMIT No. 1460

FIRST-CLASS MAIL
SENSITIVE
DATED
MATERIAL

Richard B. Maltz, Auctioneer DCA# 1240836
David A. Constantino, Auctioneer DCA# 1424944
Richard B. Maltz, Licensed Real Estate Broker



GLEN COVE | BALDWIN | BRONX | MANHATTAN
LATTINGTOWN | CENTRAL ISLIP | MASSAPEQUA | BAYSIDE
QUEENS | NY, PA & MD | LINDENHURST | CENTRAL ISLIP | AUTO AUCTION

## 7 PROPERTIES THROUGHOUT NY
*&*
*200+ Ambulances, Jewelry, Collectibles, Screen Printing Equip & More*

**ATTENTION** All Lenders, Developers, Builders, Bankruptcy Trustees, Executors, Brokers & Motivated Property Owners...
*Would You Like a Definitive Date Your Property will Sell?*
*Call Today to Consign Your Real Estate in our*
**May 26th Multi-Property Event!**

**TERMS & CONDITIONS OF SALE:** Assets sold free & clear of all monetary liens. Please visit www.MaltzAuctions.com for complete terms and conditions of sale for each auction.

**BUYER BROKER PARTICIPATION:** Up to a 2% commission may be paid to any properly licensed Buyer Broker who registers a successful buyer in accordance with the buyer broker guidelines. Please visit www.MaltzAuctions.com for all properties offering Broker Participation.

### Wednesday, March 30th at 11:00 am | Registration begins at 9:00 am
Auction Location: Auctioneer's Gallery, 39 Windsor Place, Central Islip, NY 11722

| ID# | DESCRIPTION/LOCATION | VIEWINGS | DEPOSIT |
|---|---|---|---|
| #16-241 | Jewelry, Art, Vintage Toys, Collectibles & More | Wednesday, March 30th · 9:00 am – 11:00 am | 25% Cash/Cashier's Check |

### Thursday, April 7th at 11:00 am | Registration begins at 9:00 am
Auction Location: 47-00 33rd Street (Between 47th and 48th Avenues), Long Island City, NY 11101

| ID# | DESCRIPTION/LOCATION | VIEWINGS | DEPOSIT |
|---|---|---|---|
| #16-242 | Fully Equipped Screen Printing / Die Cutting Plant *47-00 33rd Street, Long Island City, NY 11101* | Thursday, April 7th · 9:00 am – 11:00 am | 25% Cash/Cashier's Check |

### Thursday, April 14th at 11:00 am | Registration begins at 10:00 am
Auction Location: NY LaGuardia Airport Marriott Hotel, 102-05 Ditmars Boulevard, East Elmhurst, NY 11369

| ID# | DESCRIPTION/LOCATION | VIEWINGS | DEPOSIT |
|---|---|---|---|
| #16-243 | 5,300+ Sq Ft Luxury Office Condo *1 School Street, Units 303A & 303B, Glen Cove, NY 11542* | Monday, April 4th · 12:00 noon – 2:00 pm / Monday, April 11th · 12:00 noon – 2:00 pm | $34,500 Cashier's Check |
| #16-244 | 6,500+ Sq Ft Building at Traffic Light Intersection *720 Sunrise Highway, Baldwin, NY 11510* | Monday, April 4th · 3:00 pm – 5:00 pm / Monday, April 11th · 3:00 pm – 5:00 pm | $40,000 Cashier's Check |
| #16-245 | 4,700+ Sq Ft Building at Traffic Light Intersection *550 Broadway, Massapequa, NY 11758* | Monday, April 4th · 12:00 noon – 2:00 pm / Monday, April 11th · 12:00 noon – 2:00 pm | $21,000 Cashier's Check |
| #16-246 | Two Sprawling Acres *18 Horse Hollow Road, Lattingtown, NY 11560* | Vacant Land | $50,000 Cashier's Check |
| #16-247 | Two Bedroom Co-Op *73-47 217th Street, Unit 364A1, Bayside, NY 11364* | Monday, April 4th · 9:00 am – 11:00 am / Monday, April 11th · 9:00 am – 11:00 am | $15,000 Cashier's Check |

### Saturday, May 7th at 9:00 am | Registration begins at 8:00 am
Auction Location: The Town Facility, 1025 North Indiana Avenue, Lindenhurst, NY 11757

| ID# | DESCRIPTION/LOCATION | VIEWINGS | DEPOSIT |
|---|---|---|---|
| #16-248 | Surplus & Abandoned – Vehicles, Equipment & More *1025 North Indiana Avenue, Lindenhurst, NY 11757* | Saturday, May 7th · 8:00 am – 9:00 am | 25% Cash/Cashier's Check |

### Tuesday, May 10th at 1:00 pm | Only Qualified Bidders as Defined in Auction Sale Procedures are Qualified to Participate
Auction Location: The Hotel on Rivington, 107 Rivington Street, New York, NY 10002

| ID# | DESCRIPTION/LOCATION | VIEWINGS | DEPOSIT |
|---|---|---|---|
| #16-249 | 92 Key Boutique Hotel - Partially Constructed *139-141 Orchard Street, Lower East Side, Manhattan, NY 10002* | Available by Appointment | $2,000,000 Cashier's Check |

### Thursday, May 26th at 11:00 am | Registration begins at 10:00 am.
Auction Location: NY LaGuardia Airport Marriott Hotel, 102-05 Ditmars Boulevard, East Elmhurst, NY 11369

| ID# | DESCRIPTION/LOCATION | VIEWINGS | DEPOSIT |
|---|---|---|---|
| #16-251 | 16,600+ Sq Ft Corner Building + Basement *2640-2652 Third Avenue, Bronx, NY 10454* | TBA | $200,000 Cashier's Check |

### Locations and Dates TBA
Advance Notice - See Web for Detailed Information

| ID# | DESCRIPTION/LOCATION | VIEWINGS | DEPOSIT |
|---|---|---|---|
| #16-252 | 200+ Fully Equipped Ambulances *Located Throughout NY, PA & MD* | TBA | 25% Cash/Cashier's Check |

### Plus 100-150 Bank Repossessed & Consignment Vehicles Sell Bi-Weekly in Central Islip, NY

## MaltzAuctions.com | 516.349.7022 | *AUCTIONS...YOUR LIQUIDITY SOLUTION*

*Maltz's Retention Subject to Court Approval. Asset List Subject to Change.*

These assets are sold on an "AS IS, WHERE IS" basis, and no warranty or representation, either expressed or implied, concerning the assets is made by the Trustees, Public Administrator, Attorneys, Auction Company or any of their Agents. The information contained herein was derived from sources deemed reliable, but is not guaranteed. Most of the information provided has been obtained from third party sources and has not been independently verified. It is the responsibility of the Buyer and/or Buyer's Broker to determine the accuracy of all measurements and specifications of the assets. Each potential bidder is responsible for conducting his or her own independent inspections, investigations, inquiries, and due diligence concerning the assets, including without limitation, environmental and physical condition of the assets. All prospective bidders are urged to conduct their own due diligence prior to participating in the Public Auction Sale. Bid rigging is illegal and suspected violations will be reported to the Department of Justice for investigation and prosecution.

A0216

| Auction Title | Sort Date | Location | Hits | Visits | Actions |
|---|---|---|---|---|---|
| 45+ EMS VEHICLES | 06/21/2016 01:00 PM | Central Islip, NY | 4041 | 4041 | • View<br>• Edit<br>• Copy<br>• Feature<br>• Publish<br>• Delete |
| GALLERY EVENT | 06/16/2016 06:00 PM | Central Islip, NY | 1181 | 1181 | • View<br>• Edit<br>• Copy<br>• Feature<br>• Publish<br>• Delete |
| 6 UNIT BUILDING | 06/16/2016 12:00 PM | Mastic Beach, NY | 6193 | 6193 | • View<br>• Edit<br>• Copy<br>• Feature<br>• Publish<br>• Delete |
| 4 BEDROOM HOME | 06/16/2016 11:30 AM | Babylon, NY | 9705 | 9705 | • View<br>• Edit<br>• Copy<br>• Feature<br>• Publish<br>• Delete |
| 100-150 VEHICLES | 06/14/2016 10:30 AM | Central Islip, NY | 6216 | 6216 | • View<br>• Edit<br>• Copy<br>• Feature<br>• Publish<br>• Delete |
| RETAIL REDEVELOPMENT SITE | 06/09/2016 10:00 AM | Cortlandt Manor, NY | 6272 | 6272 | • View<br>• Edit<br>• Copy<br>• Feature<br>• Publish |

**A0217**

7/8/2016 9:15 AM

:: Maltz Auctions

# 45+ EMS VEHICLES



45+ Ambulances, Buses, Vans & SUVs

## Schedule

**Live On-Site Auction:** 06/21/2016 at 01:00 PM EDT
**Location:** *39 Windsor Place*
*Central Islip, NY 11722*

## Details

**Bankruptcy Auction** – United States Bankruptcy Court Southern District of New York
In Re: TRANSCARE CORPORATION, et al., – Case # 16-10407 (SMB) Jointly Administered

### 45+ Ambulances, Buses, Vans & SUVs

Details:

- **45+ Wheelchair Accessible Buses & Vans, Type II & Type III Ambulances, SUVs & Flatbed**
- 16 Wheelchair Accessible Buses & Vans
-     (5) 2013's
-     (2) 2012's
-     (6) 2010's
-     (1) 2009
-     (2) 2003's
- 16 SUVs/Pickup & Passenger Vehicle
-     (3) 2010 Ford Explorer's
-     (1) 2009 Ford Explorer
-     (2) 2008 Ford Explorers
-     (2) 2002 Ford Explorer
-     (1) 2010 Ford Escape
-     (1) 2009 Ford Escape
-     (1) 2008 Ford Escape
-     (1) 2007 Ford Escape
-     (1) 2005 Ford Escape
-     (1) 2002 Ford Escape
-     (1) 2009 Ford Flex

- (1) 1997 Dodge Ram
- 6 Type III Ambulances
  - (1) 2010
  - (2) 2009's
  - (2) 2008's
  - (1) 2002
- 6 Type II Ambulances
  - (4) 2009's
  - (2) 2003's
- International Flatbed Rollback
- Pickup Truck with Plow
- Forklift
- Snowblowers
- Generators

**Viewing:** Tuesday, June 21st from 10:00 am - 1:00 pm. **Each vehicle will be started and turned off in consecutive lot number order, beginning at 10:00 am.**

**Auction Date & Time:** Tuesday, June 21st at 1:00 pm.

**Auction Location:** Auctioneer's Office, 39 Windsor Place, Central Islip, NY 11722.

**Terms & Conditions of Sale:** Assets sold in "as-is" condition & free and clear of all liens. A 25% deposit in cash or certified funds is required from all bidders upon knockdown of bid. Any absentee or online bidders must post a deposit equal to 25% of maximum bid amounts at least 4 business days prior to auction. The assets will be sold subject to the complete Terms & Conditions of Sale.

**Buyer's Premium:** A 12.5% Buyer's Premium will be added to the Successful Bidder's high bid to determine the contract price to be paid by the Successful Bidder.

**Salvatore LaMonica, Chapter 7 Trustee**
**LaMonica Herbst & Mansicalco, LLP, Attorneys for the Chapter 7 Trustee**
Richard B. Maltz, Auctioneer DCA# 1240836
David A. Constantino, Auctioneer DCA# 1424944
Richard B. Maltz, Licensed Real Estate Broker
Phone (516) 349-7022  Fax (516) 349-0105

The Trustee Reserves the right to withdraw any items for sale prior to the auction. Asset List Subject to Change.

The Assets are being sold **"AS IS" "WHERE IS"**, **"WITH ALL FAULTS"**, without any representations, covenants, guarantees or warranties of any kind or nature, and free and clear of any liens, claims, or encumbrances. By delivering their respective Deposits, all Bidders acknowledge that they have had the opportunity to review and inspect the Assets and will rely solely on their own independent investigations and inspections of the Assets in making their bids. Neither Maltz, the Trustee, the Attorney for the Trustee nor any of their collective representatives makes any representations or warrantees with respect to the use or condition of the Assets. All Bidders acknowledge that they have conducted their

**A0219**

own due diligence in connection with the Assets and are not relying on any information provided by Maltz, the Trustee, the Attorney for the Trustee, or their professionals. All prospective bidders are <u>urged</u> to conduct their own due diligence prior to participating in the Public Auction. Bid rigging is illegal and suspected violations will be reported to the Department of Justice for investigation and prosecution.

Powered by: AuctionServices.com

**A0220**

**STORCH AMINI PC**
2 Grand Central Tower
140 East 45th Street, 25th Floor
New York, NY 10017
Telephone: 212.490.4100
Steven G. Storch, Esq.
Bijan Amini, Esq.
Avery Samet, Esq.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------x

| | |
|---|---|
| In re: | Chapter 7 |
| | |
| TRANSCARE CORPORATION, et al. | |
| | Case No.: 16-10407 (SMB) |
| Debtors. | (Jointly Administered) |

---------------------------------------------------------x

| | |
|---|---|
| SALVATORE LAMONICA, as Chapter 7 | |
| Trustee for the Estates of TransCare | Adv. Proc. No. _____ |
| Corporation, et al., | |
| | |
| Plaintiff, | |
| | |
| v. | |
| | |
| LYNN TILTON, PATRIARCH | |
| PARTNERS AGENCY SERVICES, LLC, | |
| PATRIARCH PARTNERS, LLC, | |
| PATRIARCH PARTNERS MANAGEMENT | |
| GROUP, LLC, ARK II CLO 2001-1, | |
| LIMITED, ARK INVESTMENT PARTNERS | |
| II, L.P., LD INVESTMENTS, LLC, | |
| PATRIARCH PARTNERS II, LLC, | |
| PATRIARCH PARTNERS III, LLC, | |
| PATRIARCH PARTNERS VIII, LLC, | |
| PATRIARCH PARTNERS XIV, LLC, | |
| PATRIARCH PARTNERS XV, LLC, | |
| TRANSCENDENCE TRANSIT, INC., and | |
| TRANSCENDENCE TRANSIT II, INC. | |
| | |
| Defendants. | |

---------------------------------------------------------x

Salvatore LaMonica, as Chapter 7 Trustee (the "<u>Trustee</u>") of the jointly-administered estates of TransCare Corporation <u>et al.</u>[1] (collectively, "<u>TransCare</u>"), hereby alleges:

## INTRODUCTION

1.      Prior to its February 2016 bankruptcy filing, TransCare provided vital emergency medical transportation services to hospitals and communities throughout the Northeast. TransCare also operated disability transportation services for municipal authorities, such as the New York City Transit Authority (the "<u>MTA</u>").

2.      As the sole member of TransCare's board of directors, Lynn Tilton owed TransCare her undivided and unselfish loyalty.

3.      By 2015, after years of under-investment, TransCare lacked the financial ability to fund payroll, pay vendors or obtain insurance on its own.  To safely transport patients to hospitals, TransCare's employees were forced to pay fuel and tolls out of their own pocket. Faced with this financial crisis and budding public health emergency, TransCare's executives pleaded with Tilton to allow them to recapitalize the company.  They brought her potential purchasers who were ready, willing and able to pay TransCare millions of dollars, which was more than enough to fund TransCare's growth and stabilization plans.

4.      Tilton, ignoring her fiduciary duties, rejected these offers and instead sought to strip TransCare of its most profitable business units for the benefit of herself and her companies

---

[1] The jointly-administered estates are as follows:  TransCare Corporation, TransCare New York, Inc., TransCare ML, Inc., TC Ambulance Group, Inc., TransCare Management Services, Inc., TCBA Ambulance, Inc., TC Billing and Services Corporation, TransCare Westchester, Inc., TransCare Maryland, Inc., TC Ambulance North, Inc., TransCare Harford County, Inc., TransCare Pennsylvania, Inc., TC Ambulance Corporation, and TC Hudson Valley Ambulance Corp.

2

**A0222**

(referred to hereafter as "<u>Patriarch</u>" and together with Tilton, the "<u>Defendants</u>"),[2] including Patriarch Partners Agency Services LLC ("<u>PPAS</u>"), the administrative agent on a TransCare term loan owed primarily to other Tilton-owned and Tilton-controlled entities. While TransCare's executives were pleading for funds to make payroll, Patriarch executives under her direction were advising her on plans to seize the same TransCare assets that Tilton would not let TransCare sell.

5.      On the initial petition date of February 24, 2016, Tilton – working both sides of the transaction and against TransCare's interests – purported to have Patriarch entities "foreclose" on TransCare's most profitable units and transfer them to new companies controlled by her and which as a group were called Transcendence. Tilton's ill-conceived "foreclosure" plan revealed Tilton's motivation for her otherwise inexplicable directives forbidding TransCare to recognize value from its assets. It was so outrageous that it collapsed of its own accord within hours of going live. Even so, Patriarch employees under Tilton's command continued to plot to steal TransCare's assets under cover of night.

6.      As a result of this egregious conduct, TransCare suddenly collapsed, jeopardizing public safety and leaving it without any operating business units to sell for the benefit of its creditors. TransCare's employees, who worked for weeks without pay while Tilton tried to steal the company's assets, were left with large unpaid wage claims. This ruinous scenario was

---

[2] The term "Patriarch" refers to all of the defendants other than Tilton: Patriarch Partners Agency Services, LLC, Patriarch Partners, LLC, Patriarch Partners Management Group, LLC, Ark II CLO 2001-1, Limited, Ark Investment Partners II, L.P., LD Investments, LLC, Patriarch Partners II, LLC, Patriarch Partners III, LLC, Patriarch Partners VIII, LLC, Patriarch Partners XIV, LLC, Patriarch Partners XV, LLC, Transcendence Transit, Inc., and Transcendence Transit II, Inc. The relationships between these Patriarch entities will be described below.

3

**A0223**

exactly what TransCare's executives had warned Tilton would come to pass, but which Tilton ignored due to her own conflicts of interest.

7.      By this action, the Trustee seeks damages resulting from Tilton's breach of the duty of loyalty.  The Trustee also objects to Patriarch's claims and seeks to equitably subordinate them, or, in the alternative, seeks to obtain damages against Patriarch for abusing its position as lender or to recharacterize the purported loans to TransCare as equity investments.

## THE PARTIES

8.      Plaintiff is the Trustee for TransCare's jointly-administered estates: TransCare Corporation, TransCare New York, Inc., TransCare ML, Inc., TC Ambulance Group, Inc., TransCare Management Services, Inc., TCBA Ambulance, Inc., TC Billing and Services Corporation, TransCare Westchester, Inc., TransCare Maryland, Inc., TC Ambulance North, Inc., TransCare Harford County, Inc., TransCare Pennsylvania, Inc., TC Ambulance Corporation, and TC Hudson Valley Ambulance Corp.

9.      TransCare consisted of Delaware corporations – with the parent company being TransCare Corporation – and had its corporate headquarters in Brooklyn, New York.  TransCare provided essential public safety services, including 911 ambulance services, in New York, Pennsylvania and Maryland.  TransCare employed over 1,800 employees, including emergency medical technicians, drivers and mechanics.

10.     Lynn Tilton was the sole director of TransCare and in fact was referred to as the "Board."  She is also the sole owner, chief executive officer and principal/ manager of the Patriarch family of companies, including Patriarch Partners Agency Services LLC.  Tilton claims to be a resident of Florida.

4

11.     Patriarch Partners Agency Services LLC is a Delaware limited liability corporation headquartered in New York City, at 1 Liberty Street, 35th Floor.  PPAS is the administrative agent for multiple lenders – including Ark II CLO 2001-1, Limited and Ark Investment Partners II, L.P. – under the Credit Agreement with TransCare dated August 4, 2003, as amended (the "Credit Agreement").

12.     Patriarch Partners Management Group, LLC is a Delaware limited liability corporation headquartered in New York City, at 1 Liberty Street, 35th Floor.

13.     LD Investments, LLC is a Delaware limited liability corporation headquartered in New York City, at 1 Liberty Street, 35th Floor.  The sole members of LD Investments, LLC is Tilton.

14.     Patriarch Partners, LLC is a Delaware limited liability corporation headquartered in New York City, at 1 Liberty Street, 35th Floor.  The sole member of Patriarch Partners, LLC is LD Investments, LLC.   The website for Patriarch Partners, LLC describes itself as an "investment firm."

15.     Patriarch Partners II, LLC is a Delaware limited liability corporation headquartered in New York City, at 1 Liberty Street, 35th Floor.  The sole member of Patriarch Partners II, is LD Investments, LLC.

16.     Ark II CLO 2001-1, Limited is a Delaware limited liability corporation headquartered in New York City, at 1 Liberty Street, 35th Floor.  The sole shareholder and collateral manager of Ark II CLO 2001-1, Limited is Patriarch Partners II, LLC.  Ark II CLO 2001-1, Limited holds about a 55.7% stock interest in TransCare Corporation and is a lender under the Credit Agreement.

A0225

17.     Patriarch Partners III, LLC is a Delaware limited liability corporation headquartered in New York City, at 1 Liberty Street, 35th Floor.  The sole member of Patriarch Partners III, LLC is Tilton.

18.     Ark Investment Partners II, L.P. is a Delaware limited partnership headquartered in New York City, at 1 Liberty Street, 35th Floor.  Patriarch Partners III, LLC is a limited partner in Ark Investment Partners II, L.P. and holds a 99% stock interest in Ark Investment Partners II, L.P., along with serving as its investment advisor.  Ark Investment GP II, LLC is the general partner in Ark Investment Partners II, L.P.  Ark Investment Partners II, L.P. holds about a 5.57% stock interest in TransCare Corporation.

19.     Patriarch Partners VIII, LLC is a Delaware limited liability corporation headquartered in New York City, at 1 Liberty Street, 35th Floor.  At all times relevant hereto, Patriarch Partners VIII, LLC was the collateral manager for Zohar CDO 2001-1, Limited, a lender under the Credit Agreement.  Patriarch Partners VIII, LLC is indirectly owned and controlled by Tilton.

20.     Patriarch Partners XIV, LLC is a Delaware limited liability corporation headquartered in New York City, at 1 Liberty Street, 35th Floor.  At all times relevant hereto, Patriarch Partners VIII, LLC was the collateral manager for Zohar II 2005-1, Limited, a lender under the Credit Agreement.  Patriarch Partners XIV, LLC is indirectly owned and controlled by Tilton.

21.     Patriarch Partners XV, LLC is a Delaware limited liability corporation headquartered in New York City, at 1 Liberty Street, 35th Floor.  At all times relevant hereto, Patriarch Partners VIII, LLC was the collateral manager for Zohar III, Limited, a lender under the Credit Agreement.  Patriarch Partners XV, LLC is indirectly owned and controlled by Tilton.

6

22.     Transcendence Transit, Inc. is a Delaware corporation headquartered in New York City, at 1 Liberty Street, 35th Floor.  The sole director of Transcendence Transit, Inc. is Tilton.  As discussed below, Tilton directed valuable TransCare assets to be transferred to Transcendence Transit, Inc. and/ or Transcendence Transit II, Inc.

23.     Transcendence Transit II, Inc. is a Delaware corporation headquartered in New York City, at 1 Liberty Street, 35th Floor.  Transcendence Transit II, Inc. is a wholly-owned subsidiary of Transcendence Transit, Inc.  As discussed below, Tilton directed valuable TransCare assets to be transferred to Transcendence Transit, Inc. and/ or Transcendence Transit II, Inc.

## JURISDICTION AND VENUE

24.     This Court has jurisdiction over this proceeding pursuant to 28 U.S.C § 1334 because this action arises in or relates to a case under title 11 of the United States Code (the "Bankruptcy Code").  The Court also has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 as this action arises, in part, under the laws of the United States.

25.     This is a core proceeding as defined in 28 U.S.C. § 157(b)(2).

26.     To the extent any portions of this complaint are non-core, the Bankruptcy Court may hear the claims and issue findings of fact and conclusions of law and the Trustee consents to the Bankruptcy Court issuing a final order.

27.     Venue in this district is proper pursuant to 28 U.S.C. § 1409 because this action arises in or relates to a case under the Bankruptcy Code that is pending before this Court.

## BACKGROUND

28.     TransCare was incorporated in 1993.  In 2002, Tilton, through a wholly-owned fund, Ark II CLO 2001-1, Limited ("Ark II"), purchased approximately 51% of TransCare's

7

outstanding senior secured credit facility before TransCare filed its pre-negotiated bankruptcy. After filing bankruptcy in 2002, TransCare's pre-negotiated plan provided for it to emerge as reorganized entities in March 2003, to issue approximately 51% of the shares in the reorganized TransCare to entities owned by Tilton, and to replace the existing senior secured credit facility with new secured notes. The pre-negotiated plan provided for two entities owned by Tilton (defendants Ark II and Ark Investment Partners II L.P.) to receive approximately 51% of the new secured notes, with her entities having the ability to act on behalf of the entire $33.5 million in replacement senior secured debt to be issued.

29.     By a Credit Agreement dated August 4, 2003 (the "<u>Credit Agreement</u>"), TransCare – as now majority-owned by the Ark II and Ark Investment Partners II L.P. – issued debt obligations to those two entities (with a minority stake held by other pre-petition senior secured creditors). PPAS served as the administrative agent for the Credit Agreement. Pursuant to the Credit Agreement, TransCare granted PPAS a senior secured lien on all of its assets.

30.     Among other things, the Credit Agreement provided that PPAS could waive TransCare's payment of principal or interest. In fact, the sole person at Patriarch who could determine whether such a waiver would be granted was Tilton, the sole person in control of TransCare. Each month Patriarch employees, acting at Tilton's direction, instructed TransCare employees to make interest payments to PPAS based upon Patriarch's needs, not TransCare's. Tilton so favored Patriarch that she ordered TransCare to make payments that were otherwise needed for essential TransCare services such as payroll and ambulance maintenance. Patriarch employees controlled the calculation and timing of all interest payments. Tilton prohibited TransCare from refinancing the PPAS debt obligation. After obtaining control of the loan in

8

2003, TransCare paid PPAS around $3 to $4 million dollars a year, primarily at a rate of 12% interest stemming from the 2003 restructured debt obligations.

31.     Tilton controlled both PPAS/ Patriarch and TransCare at the time of the Credit Agreement and all amendments thereto, initially via her majority shareholder interest in TransCare and later pursuant to serving as the sole director.[3]  The contracts entered into between Patriarch and TransCare were not arm's-length transactions due to the control exercised by Tilton and Patriarch over TransCare, the lack of disinterested TransCare board directors, and the absence of counsel for TransCare separate from lawyers advising TransCare on Patriarch's behalf.

32.     To fund the operations of the company, TransCare entered into a revolving credit facility with Wells Fargo, N.A. dated October 13, 2006.  Pursuant to an October 13, 2006 intercreditor agreement between PPAS and Wells Fargo, Wells Fargo had a first lien on all of TransCare's assets and account receivables, including TransCare's right to receive payments from the MTA pursuant to Contract No. 07H9751, as amended (the "MTA Contract").  Under the MTA Contract, TransCare would provide paratransit services for the MTA's customers using vehicles leased from the MTA.  The MTA Contract constituted one of TransCare's most profitable business operations.

33.     PPAS took a first lien position only on TransCare's vehicles only (in addition to miscellaneous physical assets, such as computers).  PPAS agreed that it would not take any action to foreclose or otherwise enforce any lien as to which it was junior to Wells Fargo.

---

[P] Despite repeated requests from the Trustee, Patriarch has been unable to produce copies of any of the TransCare board resolutions, including the board resolution(s) providing for Tilton to become TransCare's sole director, and the Trustee cannot determine when exactly Tilton became the sole director.

9

34.     Patriarch operated wholly under Tilton's control and pursuant to her directives, particularly with respect to all of the acts and failures to act alleged herein.  At all relevant times, Patriarch operated as a wholly-integrated entity and – via Patriarch and her TransCare Board role – Tilton controlled TransCare and received benefits from her control of both TransCare and Patriarch.

Corporate Governance at TransCare

35.     Tilton exercised an extraordinarily high level of control and domination over the operations of TransCare.

36.     Pursuant to a July 2012 Written Consent of the Sole Director, Tilton issued an authority matrix prohibiting any TransCare officer from a wide range of activities, including, "disclos[ing] any financial or shareholder information of the Company or its subsidiaries to any third party[;]" entering into any contract not contemplated by the "Annual Plan," engaging legal counsel, and allowing only a "Designated Executive" to undertake certain limited functions. However, at least as of 2015, Tilton had not designated any Designated Executive and had not approved an Annual Plan.  As a result, all such powers remained only in the Board and, as TransCare employees well knew, was synonymous with Tilton.[4]

37.     Brian Stephen, a lawyer employed at Patriarch but claiming to represent TransCare's Board, gave further gloss to these restrictions.  For example, he explained to Glen Leland, TransCare's Chief Executive Officer, that Leland was prohibited from taking even preliminary steps to actions requiring Board approval.  Considering the breadth of those

---

[4] Tilton has advised the Trustee that as sole member of TransCare's board of directors she maintained no Board Minutes or Minute Book, but instead maintained all of TransCare's board resolutions in a special folder.  Tilton has been unable to produce this folder to the Trustee.

A0230

categories of actions, this instruction prohibited almost all independent action by TransCare's executives.

38.     Despite this level of control, Tilton barred TransCare's executives, including its Chief Executive Officer, from communicating directly with her.  Instead, she required them to communicate through her employees at Patriarch.  At the same time, she empowered her Patriarch employees to give direction to TransCare's executives.  During the period preceding TransCare's bankruptcy, those employees included Stephen, Jean-Luc Pelissier (an Executive Managing Director), Michael Greenberg (an analyst), Randy Jones (a Managing Director) and Scott Whalen (Patriarch's Chief Financial Officer and Tilton's son-in-law).  Stephen and Pelissier, in particular, enforced Tilton's desire to limit communications from Leland.  They told him that his reports were too negative and that negative comments could be discoverable in future litigation.

39.     Through this arrangement, Patriarch executives hired and fired employees, directed the payment or non-payment of vendors and gave direct orders to TransCare employees.  On multiple occasions, Patriarch employee Michael Greenberg executed amendments to the PPAS credit facility on behalf of *TransCare*, causing TransCare to incur additional indebtedness and liens to Patriarch under a variety of putative terms.  For all transactions with Patriarch and TransCare, Tilton executed the documents on behalf of Patriarch.  TransCare lacked independent counsel on any transaction with Patriarch.  In short, Tilton and Patriarch exercised complete dominion and control over TransCare.

Events Leading Up to 2015 Financial Crisis

40.     In 2012, 2013 and 2014, TransCare had net revenues of approximately $130 million and positive EBITDA.  However, TransCare's costs grew and it began losing lucrative

clients because of its inability to invest in new vehicles. TransCare's executives were advised that not paying bills on time and in full was the "Patriarch way." As a result, its account payables grew and critical vendors went unpaid. During the same years, TransCare paid over $11 million to PPAS for the loans. In 2012, PPAS modified the Credit Agreement to provide TransCare with an additional $2 million.

41.    TransCare's most profitable business unit was its MTA Contract to provide paratransit services. This unit historically generated revenues of approximately $22 million and EBITDA of $3.7 million. However, by early 2015, the MTA had indicated a reluctance to renew TransCare's contract – scheduled to expire in summer 2015 – due to TransCare's deteriorating financial condition. Among other things, TransCare was having problems obtaining replacement parts for MTA vehicles; even though the MTA compensated TransCare for such parts, TransCare had such poor credit that parts suppliers would not do business with it.

In Early 2015, Tilton Refuses to Allow TransCare to Sell Assets Even as It Lacked Cash to Fund Payroll and Operations

42.    By February 4, 2015, TransCare's financial situation had become so dire that its executives warned Tilton that the company lacked the cash to make payroll the following day. They further advised that the company faced a projected $6.7 million shortfall between February 4 and the end of March 2015. Moreover, TransCare's essential vendors, such as its EZ-Pass account, suspended service due to chronic non-payment. Without access to tolls, TransCare's emergency ambulances could not reach hospitals without the EMTs paying the tolls out of their own funds and having to wait in the longer cash lanes. TransCare's executives recommended either further investment by Patriarch in TransCare or an immediate and harsh reduction in headcount.

43.     On February 5, 2015, Leland advised Patriarch of "a new alternative to the emergency cash request and accelerated recovery plans we put forward to the you and the Board yesterday." Leland explained that National Express, "an international transit services leader" sought to purchase TransCare's MTA Contract with an offer estimated at $15 to $18 million.

44.     Leland explained that National Express "[has] been researching our situation and believe[s] that the hold up on our contract renewal is our unstable financial condition. They further noted that if we do not renew the contract, the likely action of the MTA would be to distribute our business to other small vendors, which eliminates their opportunity." Leland further explained National Express' valuation process which, based upon TransCare's paratransit financial metrics, would translate into a $17 to $18 million valuation for the paratransit business. Finally, Leland advised that National Express had offered an immediate payment of $1.7 million as a non-refundable deposit in an option to begin negotiations towards a final transaction.

45.     In response, Tilton called Leland herself. This was the only time that she ever contacted her CEO directly. Tilton berated the CEO for daring to explore a sale option and then hung up on him. Next, Stephen called the CEO to reiterate that the CEO had no authority to even discuss sale options of any assets with any company. Stephen also claimed that TransCare would not receive any of the potential sale proceeds because "Lynn has other debts." Finally, Pelissier called the CEO as well to reiterate that under no circumstances could he attempt to raise funds by exploring potential sales.

46.     Also in February 2015, RCA Ambulance Service also expressed interest in purchasing TransCare to Tilton and to TransCare. Tilton similarly refused to engage or to authorize TransCare's executives to consider RCA's offer.

47.     On February 18, 2015, Leland prepared a draft Stabilization Plan for Patriarch's review.   He noted that "TransCare is **not** a viable on-going concern without immediate investment and assertive course correction." (emphasis in original).  Once again, he noted that TransCare required an immediate infusion of cash just to remain in business.  Once again, he informed Patriarch that there was alternative to total collapse; TransCare could to sell the MTA business to obtain "$14 to $17M to use for immediate financing activities for remaining ambulance service business."

48.     He further explained that "We are working this week with clarity that the payroll for this work cannot be funded from internal cash flows or credit vehicles.  I continue the operations because I am certain the company recognizes its liability and therefore will pay employees.  But there comes a point where that can no longer be a valid assumption."

49.     Tilton still refused TransCare permission to explore the sale of any assets. Nevertheless, she was forced to authorize Patriarch to lend additional funds to TransCare in order to make payroll.

<u>In Summer 2015, Tilton Again Refuses to Sell Assets to Fund Payroll and Operations</u>

50.     In June 2015, TransCare's executives once again warned Tilton that the company risked missing payroll and needed to either recapitalize or sell assets immediately:

-   "TransCare continues to operate on a very thin line of cash and is only paying bills essential to its immediate operation."

-   "We propose to accelerate the business plan into Phase 2 with an immediate loan of $5M.  If Patriarch Partners is unable or unwilling to provide these funds, we request permission to seek alternative sources of financing."

-   "Under normal circumstances a company like TransCare with threats to on-going operations, would seek protection from creditors thru bankruptcy.  We are told that is not an option within the Patriarch portfolio, which leaves a *debt*

14

**A0234**

> *consolidation loan* to satisfy critical vendors, remain viable, refocus leadership on improved positioning and resolve reputation deficits."

- "If TransCare were to shut down suddenly because of loss of key suppliers and facilities, it faces a liability of as much as $15.45M in wages and benefits. About 70% of TransCare payroll is for New York employees which have a 90-day WARN act liability as compared to the 60-day standard in other markets."

51.     On June 5, 2015, TransCare's executives warned that they lacked the necessary funds to pay PPAS and make payroll and fund necessary disbursements. In response, Michael Greenberg of Patriarch told TransCare's CFO that Tilton, as sole member of TransCare's board of directors, was specifically ordering the payment of interest to PPAS despite TransCare's financial situation: "The Board directed that I advise you that interest must be paid today."

52.     After further pleading by TransCare's executives, Pelissier informed TransCare that "we have re-approached the subject of interest payment today with the board. TransCare must pay interest today as PPMG is not the only lender."[5]

53.     Later that evening, Leland again advised Patriarch:

> we are highly skeptical that TransCare can sustain its critical supply chain and insurance if it makes the required interest payment and continues to postpone back payroll tax deposits. … [W]ant to be certain the Board is fully advised that this action could force either a substantial loan, as we have requested, or force cessation of operations.

54.     On July 3, 2015, TransCare missed payroll after bouncing a check to pay for necessary insurance. Shortly thereafter, the New York Department of Health warned TransCare that failure to provide immediate assurances to fund payroll would cause the Department to issue

---

[5] PPMG is another Patriarch entity, Patriarch Partners Management Group, LLC. Patriarch did not typically differentiate between its various entities in its dealings with TransCare.

15

**A0235**

a Public Safety Emergency alert and direct the regional emergency medical services to seek alternative means of ensuring emergency ambulance services, effectively shutting TransCare out of its New York medical operations.

55.     On July 6 and 9, 2015, TransCare's CEO again raised the National Express offer with Patriarch: "TransCare is running out of fuel.  Literally.  All of our fuel accounts have been frozen, our EZ Pass toll is depleted and we do not have money to turn th[e] accounts back on. We consumed about $2k of employee personal funds and other cash on hand last night to sustain operations.  We are literally hours away from wide spread gasoline and EZ Pass outage. … We have been re approached by National Express which is interested in acquiring the MTA contract, as I have reported in the past…. Am I authorized to accept the deposit and continue operations?"

56.     On July 10, 2015, Leland informed Patriarch that he had received offers to buy all or parts of TransCare from two separate national ambulance companies in addition to National Express.

57.     Also on July 10, 2015, National Express delivered a signed Letter of Intent to TransCare offering to buy TransCare's MTA paratransit business for $6 to $7 million plus the assumption of $2 million in related liabilities.  Leland forwarded the offer to Patriarch.

58.     Minutes later, Tilton's son-in-law, Scott Whalen, denied Leland permission: "LOI is way premature.  We have yet to review the business strategy. … [T]his will have to be made clear to them that the business is not for sale at this time."

59.     On July 13, 2015, Whalen again wrote to Leland seeking to prevent any public acknowledgment that TransCare or portions of TransCare might be for sale: "I would hate to have the LOI hanging out there and for National Express to tell people they are 'buying TransCare' is the issue."

16

60.     Leland confirmed in writing: "to be clear … you want me to: … contact National Express and tell them 'TCP is not for sale' per Patriarch Partners."  Whalen confirmed, despite the dire straits that TransCare was in, that this was exactly what Patriarch and his mother-in-law Tilton were ordering.

61.     On July 8 and 16, 2015, Tilton caused Patriarch to lend over $1.3 million to TransCare to fund payroll, bounced checks and immediate needs.

TransCare's Financial Condition Deteriorates as Tilton Refuses Sale

62.     Tilton's refusal to recapitalize the company jeopardized TransCare's ability to perform its safety mission and eroded the operational capabilities which TransCare could have monetized in a sale to a third-party.  All the while, Tilton insisted that TransCare make its monthly interest payments to PPAS.

63.     For example, on July 14, 2015, the head of TransCare's paratransit division reported:

> We are in dire straits right now, as you are aware, with ordering parts, tires, doing employee finger printing, getting uniforms. [TransCare paratransit] shop has been cannibalizing parts from vehicles that are out waiting for engines to be shipped (we can't place orders since we have been shut off by CADI [TransCare's auto parts supplier])

64.     When Leland explained to Patriarch that the ambulances needed to be replaced every few years in order to run safe and profitably, Pelissier responded that he owned a private airplane that was fifty years old, such that the vehicle's age did not matter.

65.     On August 10, 2015, Leland warned Patriarch that operating the company on fumes was causing a breakdown in employee morale:

> Massive amount of employees have either resigned or given notice. Project Mgr., OPS mgr, disp mgr, 2 disp sups, 6 dispatchers, 20 drivers have resigned in last 10 days. Unsuccessful in recruiting due to our past delayed payroll problems (word is out on the street)

17

> – working on doing some in-house promotions on a trial basis just
> to fill open slots at lesser money.

66.     On October 7, 2015, Leland again pleaded with Patriarch that TransCare could

not afford to both continue operations and pay Patriarch:

> I understand that the Board has directed TransCare to issue the
> interest payment to Patriarch today.  This despite the fact that the
> company will not have adequate funds to make its payroll
> tomorrow.

67.     Patriarch instructed Leland to make interest payments to PPAS, while also

instructing Leland to (a) have employees pay for fuel themselves and (b) to cease paying

employee payroll taxes to the Internal Revenue Service.

68.     On December 8, 2015, Leland advised Patriarch that the head of TransCare's

MTA paratransit division was resigning due to frustration with the lack of resources.  Leland also

advised that National Express had again contacted him "to see if there is any interest in selling."

Leland recommended immediate discussions with National Express and to use the proceeds from

the sale (or solely the deposit) to fund a plan to save as much of the ambulance business as

possible.  At this point, Leland advised Patriarch that TransCare could receive $6 to $8 million

dollars from the sale.

69.     Stephen wrote back to Leland the next day, reminding him that he needed

approval from the Board prior to entering into any discussions.

70.     On December 16, 2015, Leland told Patriarch that "Nat'l Express Called a few

times yesterday. … They reiterate that the letter they sent before, offering to buy the TC

Paratransit contract, is 'still out there.'  I am awaiting direction.  My recommendation is to

immediately respond and negotiate a sale of the contract…. Waiting further does not seem to be

in best interest of company."

18

71.     On December 17, 2015, Leland told Patriarch that "to avoid a shutdown we should reopen selling the MTA contract to National Express."   Greenberg and Stephen told Leland that they were working on a number of issues but would pass it on.

<u>Patriarch's Plan</u>

72.     While TransCare was pleading to monetize its valuable asset so as to fund payroll and life-saving operations, Tilton was working on a plan to acquire that same asset for Patriarch.

73.     By December 16, 2015, Tilton had advised Wells Fargo that it had determined to sell TransCare.

74.     On December 18, 2015, Greenberg emailed Tilton his research on  and 
Greenberg reported that 
At this point, TransCare's MTA paratransit unit had revenues of more than $20 million and EBITDA of more than $2.2 million. Had Tilton allowed Patriarch to sell the paratransit business, these numbers would imply a valuation of between ▮ and ▮ million, vastly more than the amount needed to pay employees and recapitalize TransCare.  Greenberg also recounted how 

75.     In late December, Tilton and Patriarch submitted a proposal to Wells Fargo to sell TransCare's assets by September 2016.

76.     On January 9, 2016, Glenn Leland quit as CEO of TransCare.  On January 11, 2016, Tilton hired Carl Marks & Co., Inc. ("<u>Carl Marks</u>") to serve as restructuring advisors for TransCare and to report to Tilton.  During this period, TransCare's last remaining C-level officer

19

– its Chief Operating Officer – lacked authority to make any business decisions without Patriarch's approval.

77.    By a Credit Agreement dated January 15, 2016, Ark II committed to make $6.5 million available to TransCare Corporation for working capital and general corporate purposes (the "Ark Credit Agreement").  TransCare provided guarantees and liens to Ark II in connection with the Ark Credit Agreement.  Ark II was controlled by Tilton and operated as part of the integrated Patriarch entities.

78.    Ark II filed a proof of claim alleging that it had lent $1,862,925.77 to TransCare, but the Trustee's investigation has not uncovered proof that the funds were paid to TransCare and Patriarch has been unable to provide such proof to the Trustee, despite requests to do so.[6] Regardless, Ark II ultimately did not make the promised $6.5 million amount available to TransCare, and Patriarch and Tilton instead decided to take TransCare's most valuable assets for themselves and cause TransCare to file for bankruptcy in order to ensure that the assets would not be available to satisfy claims against TransCare's bankruptcy estates.

79.    On February 9, 2016, Pelissier contacted the MTA, representing that the owner of TransCare wished to transfer the MTA Contract to a different entity: "I am working with the ownership representative of TransCare."

---

[6] This proof of claim also states that Ark II received $800,000.00 in connection with the Trustee's sale of assets.  The Trustee paid out $800,000.01 to PPAS – not Ark II – pursuant to a court order dated March 25, 2016 [Dkt. No. 52].  PPAS failed to disclose to the Court or the Trustee that these funds would be forwarded to Ark II.  In fact, PPAS represented that it held "first-priority security interests" in the property to be sold and was entitled to "gift" part of its proceeds for the benefit of an employee wage claim fund on account of its lien position [Dkt. No. 49 at ¶¶ 9, 19].  Additionally, the March 25, 2016 stipulation agreed to by PPAS and the Trustee – and so-ordered by the Court – disclosed the existence of the intercreditor agreement between PPAS and Wells Fargo, while failing to disclose the intercreditor agreement between PPAS and Ark II or the existence of liens in Ark II's favor separate from those of PPAS [Dkt. No. 52-1 at Recitals, ¶ 4].

80.     On or about February 9, 2016, Tilton's personal lawyers at Skadden, Arps, Slate, Meagher & Flom LLP contacted the law firm of Curtis Mallet-Prevost, Colt & Mosle LLP ("Curtis Mallet") about the need to for an immediate Chapter 11 bankruptcy filing for TransCare. Curtis Mallet submitted a draft Chapter 11 engagement letter that day and TransCare executed it on February 10.  Brian Stephen served as the principal contact for TransCare for Curtis Mallet, advising Curtis Mallet on the assets, liabilities and strategy of TransCare's bankruptcy filing.

81.     On February 10, 2016, Tilton caused two new Delaware entities to be incorporated: Transcendence Transit, Inc., and a wholly-owned subsidiary Transcendence Transit II, Inc.

82.     The same day, Carl Marks, using ████████████████████████████████ provided Patriarch with ████████████████████████████████

████████████████████████       ████████████████████████

████████████████████████████

83.     Also on February 10, 2016, Greenberg told TransCare's Vice President, Glen Youngblood that ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████       Greenberg noted that ████████████████████

████████████████████████████████████████

84.     However, Patriarch was unable to simply "foreclose" on TransCare's ongoing business operations as one might repossess a vehicle or a piece of real estate.  Tilton needed to convince employees to switch employers, convince vendors and insurers to substitute Transcendence for TransCare, obtain governmental authority to provide critical safety services through a new corporation, and switch bank accounts, among numerous other complex

21

A0241

transactions. To effectuate this plan, Tilton held meetings at Patriarch's offices with TransCare's executives to model out which TransCare business units would be transferred to Transcendence and how, and the amount of revenue they could be expected to bring in for the new company. None of these actions were consistent with Tilton's duty of loyalty to TransCare. Tilton and Patriarch caused TransCare's employees to work on projects on Patriarch's behalf in support of the Transcendence plan rather than for TransCare's business operations.

85.     Patriarch endeavored to keep this plan secret even while it directed TransCare's remaining executives to prepare the transition, including talking points to sell the union and the MTA on the Transcendence plan. "Obviously, we cannot breath a word until we have the overall deal finalized. Until then it must be business as usual[,]" Randy Jones of Patriarch wrote on February 11, 2016 to TransCare's Vice President of Transit Services Thomas Fuchs and Chief Operating Officer Peter Wolf.

86.     On February 14, 2016, Pelissier, from a non-Patriarch email address, submitted a detailed plan to TransCare's executives to prepare to transfer TransCare's lucrative MTA paratransit business, as well as several other lucrative ambulance divisions.

87.     On February 18, 2016, TransCare signed an engagement agreement with Curtis Mallet to file a Chapter 7 bankruptcy case for all the TransCare entities. Stephen continued to serve as the main point of contact for Curtis Mallet in planning TransCare's bankruptcy, even as he was handling Patriarch's "foreclosure" of TransCare's assets.

88.     At the same time as Patriarch sought to obtain its assets, it declined to pay the payroll taxes for those employees. By February 24, 2016, TransCare owed approximately $1.148 million in payroll taxes for 2016, plus at least $172,000 in penalties and interest. Tilton allowed TransCare to operate without paying payroll taxes or reserving for them. For example,

22

**A0242**

on February 19, 2016, when Carl Marks advised Tilton that TransCare lacked the funds necessary to pay payroll, 401(k) obligations, and outstanding payroll taxes from earlier pay dates, as well as other critical expenses, Tilton chastised Carl Marks for seeking her direction and instead told Carl Marks to "make decisions on what needs to be paid."

89.     On February 24, 2016, Tilton directed TransCare to file for Chapter 7 bankruptcy protection.

90.     PPAS and Transcendence Transit, Inc. have represented in filings with the Bankruptcy Court for the Southern District of New York that PPAS effectuated an Article 9 "strict foreclosure" of certain of TransCare's assets, including its paratransit division.[7]  Despite numerous requests, Patriarch has been unable to produce a copy of any of the documents constituting or underlying this "foreclosure."

91.     The Trustee obtained a copy of a three-paragraph "Notice of Acceptance of Subject Collateral in Partial Satisfaction of Obligation" dated February 24, 2016 from a third party.[8]  This document was signed by Tilton for PPAS, Ark Investment GP II, L.P., Patriarch Partners VII, LLC, Patriarch Partners XIV, LLC, and Patriarch Partners XV, LLC.  The

---

[7] Tilton and various of her Patriarch entities (including Patriarch Partners, LLC, PPAS, Patriarch Partners III, LLC, Ark II, and Ark Investment Partners II, L.P.) have similarly represented in filings with the District Court for the Eastern District of New York that "TransCare's term loan lenders" foreclosed on the MTA Contract.  National Labor Relations Board v. Transcendence Transit II, Inc. et al., Case No. 1:17-mc-00913-SJ (E.D.N.Y.).

[8] This document was obtained from a third party as Patriarch was unable to produce it despite repeated requests from the Trustee.  Likewise, Patriarch still has not provided a copy of the February 24, 2016 Notice of Default, even though PPAS represented to the Court that the two documents exist [Dkt. No. 49 at ¶¶ 10, 11; see also Dkt. Nos. 521 at ¶ 8, 522 at ¶ 11].  Further, Transcendence Transit, Inc. represented to the Court and Stephen submitted a supporting affidavit affirming that February 24, 2016 Bill of Sale, Agreement to Pay and Transfer Statement documents between PPAS and Transcendence Transit, Inc. existed with respect to the Transcendence transaction [Dkt. Nos. 521 at ¶ 9, 522 at ¶ 12], but Patriarch has similarly failed to produce these documents.

23

document states that PPAS was accepting certain collateral – including the MTA Contract, but not the stock of the performing party thereunder, TransCare New York, Inc. – pursuant to Section 9-620 of the Uniform Commercial Code in satisfaction of $10,000,000 of the amounts owing under the Credit Agreement. However, the document does not specify what default(s) had occurred, provide notice to any of the other creditors secured by the collateral (namely, Wells Fargo Bank, N.A.), or explain the basis for the $10,000,000 valuation of the collateral (which Patriarch had internally stated related to ███████████████████ revenues). Further, Tilton controlled TransCare by serving as its sole director (including at the time of the "strict foreclosure"), and the signatory for TransCare on this document (Peter Wolf) testified at TransCare's 341 Meeting of Creditors that he was asked by Patriarch and/ or Tilton to sign backdated documents.

92.     Also on February 24, 2016, Tilton issued a number of board resolutions as the sole member of Transcendence's board of directors purporting to (i) exercise control over TransCare's assets, including borrowing an additional $10 million from Patriarch and granting Patriarch security interests in Transcendence's assets, and (ii) authorize Transcendence to enter into transactions transferring and assigning leases and contracts from TransCare to Transcendence.

93.     For example, on February 24, 2016, Tilton signed a written consent of the sole director of Transcendence Transit II, Inc. authorizing Transcendent Transit II to enter into an Assignment Agreement with TransCare New York, Inc., whereby TransCare New York, Inc. would assign its Access-A-Ride Transportation Service Agreement with the MTA to Transcendence Transit II. Tilton's written consent stated that "TransCare desires to transfer and assign the [MTA] Agreement." This statement is inconsistent with Patriarch's filings with the

24

Bankruptcy Court claiming that PPAS foreclosed on TransCare's MTA contract and took it from TransCare. The written consent also stated that "the MTA [defined as the New York City Transit Authority] has heretofore provided TransCare with its consent to the Assignment." This statement is inconsistent with the affidavit, made under penalty of perjury by Brian Stephen, stating that the MTA never approved the assignment: "Transcendence II could not operate without being assigned the Access-A-Ride contract, and NYC Transit never approved its transfer."[9]

94. According to Patriarch "insurmountable logistical issues" prevented it from continuing TransCare's paratransit and other business operations under the Transcendence label and that such issues "outmatched" Patriarch's "desire and commitment to continue without those business lines."

95. Late at night on February 25, Patriarch, and in particular Stephen (purportedly the lawyer for TransCare's board of directors), realized that the Transcendence plan would not succeed. At 10:53 p.m., despite the existence of the Bankruptcy Court's automatic stay, Brian Stephen emailed TransCare executives and directed them to steal assets from TransCare. "As a result, we need to try and secure as many assets (ambulances, equipment, etc.) as possible as quickly as we can. … I am not entirely sure where the most valuable assets are, but it makes sense to target those first – if those assets can be moved."

---

[9] As noted above, Tilton has failed to produce the "folder" containing TransCare's board resolutions. Nevertheless, the Trustee has discovered at least one TransCare board resolution corresponding to the Transcendence board resolutions: one authorizing TransCare to transfer and assign a medical equipment lease to Transcendence (again stating that "the Corporation desires to transfer and assign the Agreement.").

96.    Later that evening, Pelissier followed up on Stephen's directive, instructing the TransCare executives to transfer TransCare's account receivable server out of the debtor's warehouse.  Uncomfortable with this activity, TransCare's vice president refused and rejected Patriarch's offer to join Transcendence, instead properly alerting the Trustee to the ongoing unlawful activity.

## FIRST CLAIM FOR RELIEF

### Breach of the Fiduciary Duty of Loyalty and Good Faith

### (Against Lynn Tilton)

97.    The Trustee realleges and incorporates the allegations of the preceding paragraphs as if fully set forth herein.

98.    While she served as the sole board member of the Debtors, Tilton owed an undivided duty of loyalty and good faith to the Debtors.

99.    Tilton lacked independence because she also was the principal of TransCare's lenders PPAS and Ark II and the collateral managers (Patriarch Partners VIII, LLC, Patriarch Partners XIV, LLC and Patriarch Partners XV, LLC) for other lenders to TransCare.

100.    Tilton breached her duty of loyalty by actively impeding TransCare's attempts to monetize its assets and by instead working to strip TransCare of the same assets.  Tilton made decisions for the benefit of herself, Patriarch and her other companies, as opposed to the benefit of TransCare.

101.    Tilton knew or should have known of the requirements of the Worker Adjustment and Retraining Notification Act (the "WARN Act"), 29 U.S.C. § 2101 et seq. and the New York Worker Adjustment and Retraining Notification Act (the "NY WARN Act"), N.Y. Labor Law § 860 et seq.  Further, Tilton knew or should have known that her actions and/ or inaction would create potential liability under the WARN Act and the NY WARN Act.

102.    As a direct and proximate cause of Tilton's breaches of the duty of loyalty and good faith, TransCare's estates have suffered unpaid asserted claims (including employee claims, WARN Act claims, NY WARN Act claims, payroll taxes, and tax penalties and interest), the loss of proceeds from the potential sale offers, the employee wages for work performed for Patriarch and/ or Tilton (along with the associated payroll taxes), and the loss of ability to continue TransCare's business as a going concern, all in amount to be proven at trial, but believed to be more than $10 million, plus punitive damages.

## SECOND CLAIM FOR RELIEF

### Aiding and Abetting Breach of the Fiduciary Duty of Loyalty

**(Against Patriarch (Patriarch Partners Agency Services, LLC, Patriarch Partners, LLC, Patriarch Partners Management Group, LLC, Ark II CLO 2001-1, Limited, Ark Investment Partners II, L.P., LD Investments, LLC, Patriarch Partners II, LLC, Patriarch Partners III, LLC, Patriarch Partners VIII, LLC, Patriarch Partners XIV, LLC, Patriarch Partners XV, LLC, Transcendence Transit, Inc., and Transcendence Transit II, Inc.))**

103.    The Trustee realleges and incorporates the allegations of the preceding paragraphs as if fully set forth herein.

104.    Patriarch knowingly and in bad faith assisted Tilton's breaches of fiduciary duties of loyalty and good faith in connection with her acts to impede TransCare's attempts to monetize its assets, to strip TransCare of those same assets, and to make decisions for the benefit of herself, Patriarch and her other companies.  Patriarch sought to benefit itself – and did in fact benefit – from Tilton's breaches of her fiduciary duties.  Without such aid from Patriarch, Tilton's fiduciary breaches would not have occurred.

105.    As a direct and proximate cause of Patriarch's aiding and abetting of Tilton's breach of the duty of loyalty and good faith, TransCare's estates have suffered unpaid asserted

A0247

claims (including employee claims, WARN Act claims, and NY WARN Act claims, payroll taxes, and tax penalties and interest), the loss of proceeds from the potential sale offers, the employee wages for work performed for Patriarch and/ or Tilton (along with the associated payroll taxes), and the loss of ability to continue TransCare's business as a going concern, all in amount to be proven at trial, but believed to be more than $10 million, plus punitive damages.

## THIRD CLAIM FOR RELIEF

### Equitable Subordination of All Claims Asserted by Patriarch

**(Against Patriarch Partners Agency Services, LLC, Ark II CLO 2001-1, Limited, Patriarch Partners Management Group, LLC, and Patriarch Partners, LLC)**

106.    The Trustee realleges and incorporates the allegations of the preceding paragraphs as if fully set forth herein.

107.    The Trustee seeks to equitably subordinate all claims asserted by Patriarch against TransCare and its estates pursuant to Bankruptcy Code Sections 105(a) and 510(c) because Patriarch engaged in inequitable conduct, causing injury to the creditors of TransCare and conferring an unfair advantage on Patriarch.  Claims have been filed against TransCare and its estates by insiders PPAS, Ark II, Patriarch Partners Management Group, LLC, and Patriarch Partners, LLC, all of whom participated in and benefitted from the inequitable conduct. Equitable subordination here is consistent with the Bankruptcy Code.

108.    Patriarch and Tilton utilized Tilton's role as the Debtors' sole board member to direct the Debtors' conduct to the detriment of and in breach of Tilton's fiduciary obligations to TransCare and their estates.

109.    Patriarch's conduct injured TransCare's estates by, among other things, (i) preventing the Debtors from selling their assets, (ii) causing the Debtors to pay millions of dollars to PPAS while TransCare was insolvent, and (iii) attempting to strip TransCare of its

28

profitable assets – with the directed assistance of TransCare's employees – on the eve of its bankruptcy filings and even afterwards in violation of the automatic stay.

110.     In these circumstances, subordinating Patriarch's claims is consistent with the provisions of the Bankruptcy Code.

111.     Therefore, the Trustee requests that the claims asserted by Patriarch be subordinated below general unsecured claims and that the liens associated with such claims be transferred to TransCare's estates pursuant to Bankruptcy Code Section 510(c)(2).

## FOURTH CLAIM FOR RELIEF

## Recharacterization of All Claims Asserted by Patriarch

### (Against Patriarch Partners Agency Services, LLC and Ark II CLO 2001-1, Limited)

112.     The Trustee realleges and incorporates the allegations of the preceding paragraphs as if fully set forth herein.

113.     In the alternative to equitably subordinating Patriarch's claims, the Trustee seeks to recharacterize as equity all claims asserted against TransCare and its estates by PPAS and Ark II for funds purportedly loaned pursuant to Bankruptcy Code Sections 105(a) and 502(a).

114.     The purported funds advanced by PPAS and Ark II, purportedly as loans under the Credit Agreement or the Ark Credit Agreement, respectively, were – in fact and should be deemed to have been – capital contributions by PPAS and Ark II, and not debt.

115.     The circumstances of the purported funds advanced by PPAS and Ark II indicate that the parties did not intend to create an unconditional obligation for TransCare to repay such funds.  Among the *indicia* evidencing that such funds were capital/ equity investments – and not loans – are, without limitations, the following: (i) the TransCare was severely undercapitalized at all relevant times; (ii) PPAS and Ark II were insiders of TransCare when such funds were advanced; (iii) the repayment of the funds was dependent on the prospective financial success of

29

TransCare's business; (iv) Patriarch's equity and purported debt investments in TransCare were roughly proportional; (v) there was never any sinking fund established (or other accumulated funds set aside to repay the purported debts) established when such funds were advanced; (vi) TransCare's assets were wholly encumbered when such advances were made; (vii) the advances were subordinated to the claims of lender Wells Fargo Bank, N.A. with respect to TransCare's valuable contract rights and certain other intangible property; and (viii) Patriarch rejected consideration of offers for all or part of TransCare's assets in an attempt to arrogate the value of those assets for itself.

116.    Therefore, the Trustee requests that the claims asserted by PPAS and Ark II be deemed to be capital contributions rather than loans and disallowed as claims pursuant to Bankruptcy Code Section 502(b).  The Trustee further requests that the liens associated with such claims be transferred to TransCare's estates and/ or voided pursuant to Bankruptcy Code Sections 506(d) and 105(a).

**FIFTH CLAIM FOR RELIEF**

**<u>Objection to Claims, Liens and Security Interests</u>**

**(Against PPAS, Ark II CLO 2001-1, Limited, Patriarch Partners Management Group, LLC, and Patriarch Partners, LLC)**

117.    The Trustee realleges and incorporates the allegations of the preceding paragraphs as if fully set forth.

118.    The Trustee objects to any claims and liens asserted by Patriarch pursuant to Bankruptcy Code Section 502(d) and because they are subject to setoff.  Claims have been filed against TransCare and its estates by PPAS, Ark II, Patriarch Partners Management Group, LLC, and Patriarch Partners, LLC.

119.    The Trustee objects to the claims and liens asserted by PPAS and Ark II in so far as the agreements incurring those claims and liens were only executed by PPAS or Ark II and not by TransCare.

120.    Further, the Trustee objects to the claims and liens asserted by PPAS and Ark II on the grounds of insufficient documentary evidence as Patriarch has been unable to produce proof of the amount, ownership and funding for the underlying loans.

121.    Additionally, to the extent the claims and liens held by PPAS and Ark II are invalidated and/ or determined to be subject to setoff and/ or avoidance, the Trustee seeks (i) disgorgement of any funds paid by the Trustee post-petition to PPAS (including those funds forwarded by PPAS to Ark II pursuant to an arrangement not disclosed to the Trustee or the Court), (ii) retention of any and all funds in TransCare's estates that could be deemed subject to the liens of PPAS or Ark II with such liens preserved for the benefit of the estates and (iii) voiding of the liens of PPAS and Ark II and/ or transfer of such liens to TransCare's estates pursuant to Bankruptcy Code Sections 506(d), 105(a), 544(b), 550(a), and/ or 551.

## SIXTH CLAIM FOR RELIEF

### Lender Liability, Common Law Breach of Fiduciary Duty, and Common Law Assumption of Control

**(Against Patriarch (Patriarch Partners Agency Services, LLC, Patriarch Partners, LLC, Patriarch Partners Management Group, LLC, Ark II CLO 2001-1, Limited, Ark Investment Partners II, L.P., LD Investments, LLC, Patriarch Partners II, LLC, Patriarch Partners III, LLC, Patriarch Partners VIII, LLC, Patriarch Partners XIV, LLC, Patriarch Partners XV, LLC, Transcendence Transit, Inc., and Transcendence Transit II, Inc.))**

122.    The Trustee realleges and incorporates the allegations of the preceding paragraphs as if fully set forth herein.

A0251

123.    Patriarch was in complete domination of the finances, policy, and business practices of TransCare.  Tilton's role as the sole board member placed Patriarch in a position of trust and unusual advantage vis-à-vis TransCare.

124.    The domination of Patriarch over TransCare resulted in TransCare having no separate or independent mind, will or existence of its own.

125.    This control was used by Patriarch to cause TransCare to make transfers and decisions that rendered TransCare unable to pay employees and critical vendors (including vendors necessary for the maintenance of the TransCare's ambulance fleet), to engage in the failed Transcendence scheme, and to deny TransCare the ability to explore refinancing or asset sales.

126.    As a direct and proximate cause of Patriarch's wrongful acts, TransCare's estates have suffered unpaid claims (including employee claims, WARN Act claims, and NY WARN Act claims, payroll taxes, and tax penalties and interest), the loss of proceeds from the potential sale offers, the employee wages for work performed for Patriarch and/ or Tilton (along with the associated payroll taxes)), and the loss of ability to continue TransCare's business as a going concern, all in amount to be proven at trial, but believed to be more than $10 million, plus punitive damages.

### SEVENTH CLAIM FOR RELIEF

### Actual Fraudulent Transfer Under the Bankruptcy Code and New York Law

### (Against All Defendants)

127.    The Trustee realleges and incorporates the allegations of the preceding paragraphs as if fully set forth herein.

128.    On February 24, 2016, Patriarch and Tilton – via PPAS – purported to conduct a "strict foreclosure" of certain valuable assets of TransCare for their own benefit.  This "strict

foreclosure" was ineffective and commercially unreasonable, constituted an attempt to defraud TransCare and its creditors, and did in fact defraud TransCare and its creditors.

129.    To the extent the "strict foreclosure" was effective in transferring property from TransCare, Patriarch and Tilton caused the transfers to be made while Patriarch was insolvent and unable to pay millions owing to other vendors, including vendors critical to the maintenance of the TransCare's ambulance fleet.

130.    These transfers further caused TransCare not to be able to operate as a going concern, to the detriment of TransCare's estates.

131.    Therefore, to the extent Patriarch and Tilton's scheme was successful, the Trustee seeks to avoid these transfers of TransCare's property to the Defendants as actual fraudulent transfers pursuant to Bankruptcy Code Sections 548(a)(1)(A) and 544(b) and N.Y. Debtor & Creditor Law Section 276.

**EIGHTH CLAIM FOR RELIEF**

**<u>Recovery of Avoided Transfers</u>**

**(Against All Defendants)**

132.    The Trustee realleges and incorporates the allegations of the preceding paragraphs as if fully set forth.

133.    The Trustee is entitled to avoid any actual fraudulent transfers and/ or post-petition transfers pursuant to Sections 544, 548 and 549 of the Bankruptcy Code and/ or N.Y. Debtor & Creditor Law Section 276 (collectively, the "<u>Avoided Transfers</u>").

134.    All of the Defendants were the initial transferees of the Avoided Transfers, the immediate or mediate transferees of such initial transferees, or the entities for whose benefit the Avoided Transfers were made.

33

**A0253**

135.    Pursuant to Section 550(a) of the Bankruptcy Code, Plaintiffs are entitled to recover the Avoided Transfers for the benefit of the estates from all of the Defendants, plus interest thereon to the date of payment and the costs of this action.

## NINTH CLAIM FOR RELIEF

## <u>Violation of Automatic Stay</u>

### (Against All Defendants)

136.    The Trustee realleges and incorporates the allegations of the preceding paragraphs as if fully set forth.

137.    The conduct of the Defendants in their attempts to obtain the property of TransCare post-petition, including – without limitation – the negotiations to obtain the MTA contract, any efforts to consummate the "strict foreclosure," and any efforts to obtain property of TransCare's estates, constituted violations of the automatic stay provided for in Section 362(a) of the Bankruptcy Code.

138.    Therefore, any successful transfers of TransCare's property post-petition should be avoided, and all of the Defendants are guilty of civil contempt.

34

**WHEREFORE**, the Trustee respectfully requests that this Court enter judgment in the Trustee's favor against the Defendants to each claim for relief, in the amount requested by each claim for relief, plus attorneys' fees and costs, punitive damages, pre-judgment interest, where applicable, together such other and further relief as this Court deems just and proper.

Dated: New York, New York
        February 21, 2017

Respectfully submitted,

/s/ Steven Storch
Steven G. Storch
Bijan Amini
Avery Samet
STORCH AMINI PC
2 Grand Central Tower
140 East 45th Street, 25th Floor
New York, New York 10017
Tel: (212) 490-4100
Fax: (212) 497-4208
sstorch@storchamini.com
bamini@storchamini.com
asamet@storchamini.com

*Special Counsel to Chapter 7 Trustee Salvatore LaMonica*

A0255

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 7 |
| TRANSCARE CORPORATION, et al., | Case No. 16-10407-smb |
| Debtors.[1] | (Jointly Administered) |
| SALVATORE LAMONICA, as Chapter 7 Trustee for the Estates of TransCare Corporation, et al., | Adv. Pro. No. 18-1021-smb |
| Plaintiff, | **AMENDED COMPLAINT** |
| - against - | |
| LYNN TILTON, PATRIARCH PARTNERS AGENCY SERVICES, LLC, PATRIARCH PARTNERS, LLC, PATRIARCH PARTNERS MANAGEMENT GROUP, LLC, ARK II CLO 2001-1 LIMITED, TRANSCENDENCE TRANSIT, INC., and TRANSCENDENCE TRANSIT II, INC., Defendants. | |

Salvatore LaMonica, as Chapter 7 Trustee (the "Trustee") of the jointly-administered estates of the above-named Debtors (together, "TransCare"), hereby alleges:

**INTRODUCTION**

1.     Prior to its February 2016 bankruptcy filing, TransCare provided vital emergency medical transportation services to hospitals and communities throughout the Northeast.  TransCare also operated disability transportation services for municipal authorities, such as the New York City Transit Authority (the "MTA").

---

[1] The Debtors are:  TransCare Corporation, TransCare New York, Inc., TransCare ML, Inc., TC Ambulance Group, Inc., TransCare Management Services, Inc., TCBA Ambulance, Inc., TC Billing and Services Corporation, TransCare Westchester, Inc., TransCare Maryland, Inc., TC Ambulance North, Inc., TransCare Harford County, Inc., TransCare Pennsylvania, Inc., TC Ambulance Corporation, and TC Hudson Valley Ambulance Corp.

2.      As the sole member of TransCare's board of directors, Lynn Tilton owed TransCare her undivided and unselfish loyalty.

3.      By 2015, after years of under-investment, TransCare lacked the financial ability to fund payroll, pay vendors, or obtain insurance on its own. To safely transport patients to hospitals, TransCare's employees were forced to pay fuel and tolls out of their own pocket. Faced with this financial crisis and budding public health emergency, TransCare's executives pleaded with Tilton to allow them to recapitalize the company. They brought her potential purchasers who were ready, willing, and able to pay TransCare millions of dollars, which was more than enough to fund TransCare's growth and stabilization plans.

4.      Tilton, ignoring her fiduciary duties, rejected these offers and instead sought to strip TransCare of its most profitable business units for the benefit of herself and companies owned by her, including Patriarch Partners Agency Services, LLC ("PPAS"), the administrative agent on a TransCare term loan owed primarily to other Tilton-owned and Tilton-controlled entities. While TransCare's executives were pleading for funds to make payroll, Patriarch executives under her direction were advising her on plans to seize the same TransCare assets that Tilton would not let TransCare sell.

5.      On the initial petition date of February 24, 2016, Tilton – working both sides of the transaction and against TransCare's interests – purported to have companies owned and controlled by her "foreclose" on TransCare's most profitable units and transfer them to new companies owned and controlled by her and which as a group were called Transcendence. Tilton's ill-conceived "foreclosure" plan revealed Tilton's motivation for her otherwise inexplicable directives forbidding TransCare to recognize value from its assets. It was so outrageous that it collapsed of its own accord within hours of going live. Even so, Patriarch employees under Tilton's command continued to plot to steal TransCare's assets under cover of night.

2

6.      As a result of this egregious conduct, TransCare suddenly collapsed, jeopardizing public safety and leaving it without any operating business units to sell for the benefit of its creditors.  TransCare's employees, who worked for weeks without pay while Tilton tried to steal the company's assets, were left with large unpaid wage claims.  This ruinous scenario was exactly what TransCare's executives had warned Tilton would come to pass, but which Tilton ignored due to her own conflicts of interest.

7.      By this action, the Trustee seeks damages resulting from Tilton's breach of the duty of loyalty.  The Trustee also objects to claims and liens asserted by the companies controlled by Tilton, and seeks damages against certain of those entities for abusing their positions as lenders.

## THE PARTIES

8.      Plaintiff is the Trustee of the above-named Debtors, all Delaware corporations.  The parent entity, TransCare Corporation, was headquartered in Brooklyn, New York.  TransCare provided essential public safety services, including 911 ambulance services, in New York, Pennsylvania and Maryland.  TransCare employed over 1,800 employees, including emergency medical technicians, drivers, and mechanics.

9.      Lynn Tilton was the sole director of TransCare and in fact was referred to as the "Board."  She is also the principal, manager, and direct or indirect owner of the remaining Defendants, each of which are headquartered at the same office in New York City at 1 Liberty Street, 35th Floor.  Tilton claims to be a resident of Florida.

10.     Patriarch Partners Agency Services, LLC (referred to herein as PPAS) is a Delaware limited liability corporation headquartered in New York City, at 1 Liberty Street, 35th Floor.  PPAS served as the administrative agent under a Credit Agreement, dated as of August 4, 2003 (discussed in further detail below).  Tilton is the sole manager and owner of PPAS.

3

11.     Patriarch Partners, LLC ("Patriarch Partners") is a Delaware limited liability corporation headquartered in New York City, at 1 Liberty Street, 35th Floor.  Tilton is the sole manager of Patriarch Partners.  Tilton owns 100% of Patriarch Partners through her ownership of Patriarch Partners' sole member.  According to its website, Patriarch Partners describes itself as an "investment firm."

12.     Patriarch Partners Management Group, LLC ("PPMG") is a Delaware limited liability corporation headquartered in New York City, at 1 Liberty Street, 35th Floor.   Tilton is the sole manager and owner of PPMG.

13.     Ark II CLO 2001-1, Limited ("Ark II") is a Delaware limited liability corporation headquartered in New York City, at 1 Liberty Street, 35th Floor.  Ark II holds about a 55.7% stock interest in TransCare Corporation.  In February 2016, Ark II entered into the Ark II Credit Agreement with TransCare, dated as of January 15, 2016 (as discussed below).  Tilton owns 99% of Ark II, and the remaining 1% of Ark II is held in a trust for Tilton's daughter.

14.     Transcendence Transit, Inc. and Transcendence Transit II, Inc. are both Delaware corporations headquartered in New York City, at 1 Liberty Street, 35th Floor.  Tilton is the sole director of both entities, and Transcendence Transit, Inc. is the parent of Transcendence Transit II, Inc.

## JURISDICTION AND VENUE

15.     This Court has jurisdiction over this proceeding pursuant to 28 U.S.C § 1334 because this action arises in or relates to a case under title 11 of the United States Code (the "Bankruptcy Code").  The Court also has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 as this action arises, in part, under the laws of the United States.

16.     This is a core proceeding as defined in 28 U.S.C. § 157(b)(2).

4

Case 1:20-cv-06274-LAK    Document 11-2    Filed 09/29/20    Page 76 of 136

17.     To the extent any portions of this complaint are non-core, the Bankruptcy Court may hear the claims and issue findings of fact and conclusions of law and the Trustee consents to the Bankruptcy Court issuing a final order on the claims asserted herein.

18.     Venue in this district is proper pursuant to 28 U.S.C. § 1409 because this action arises in or relates to cases under the Bankruptcy Code that is pending before this Court.

## **BACKGROUND**

TransCare's Capital Structure

19.     TransCare was incorporated in 1993.

20.     TransCare filed prenegotiated chapter 11 bankruptcy cases in September 2002.

21.     Prior to the commencement of those cases, Ark II purchased approximately 51% of TransCare's outstanding senior secured debt.

22.     The chapter 11 plan ultimately confirmed in July 2003 provided for the issuance of approximately 51% of the shares in reorganized TransCare to Tilton-owned entities.  At all relevant times, Tilton exercised control over TransCare via her indirect ownership of said shares and later by serving as TransCare's sole director.[2]

23.     The chapter 11 plan also provided for $33.5 million in loans under a Credit Agreement, dated as of August 4, 2003, among TransCare Corporation, as borrower, PPAS, as administrative agent, and the lenders party thereto (as amended, the "PPAS Credit Agreement"), with 51% of the loans issued to two Tilton-controlled entities, Ark II and Ark Investment Partners II, L.P.

---

[2] Despite repeated requests from the Trustee, Defendants have not produced copies of all of the TransCare board resolutions, including the board resolution(s) providing for Tilton to become TransCare's sole director, and the Trustee cannot determine when exactly Tilton became the sole director.

5

24.     TransCare granted PPAS a senior secured lien on all of its assets by the Security Agreement executed by TransCare in favor of PPAS in connection with the PPAS Credit Agreement.

25.     To fund the operations of the company, TransCare entered into a revolving credit facility with Wells Fargo, N.A., as successor-by-merger with Wachovia Bank, N.A. ("Wells Fargo") dated October 13, 2006, pursuant to which TransCare granted Wells Fargo a blanket lien on substantially all of its assets.  At all relevant times, Tilton controlled PPAS, and the "Required Lenders" under the PPAS Credit Agreement (at all relevant times, virtually all lenders were Tilton affiliates).

26.     Pursuant to an Intercreditor Agreement, dated October 13, 2006, among Wells Fargo and PPAS, the parties agreed that Wells Fargo would have a first priority lien on all of TransCare's assets and account receivables, including TransCare's right to receive payments from the MTA pursuant to Contract No. 07H9751, as amended (the "MTA Contract"). The MTA Contract gave TransCare the right to provide paratransit services for MTA customers using vehicles leased from the MTA.  It was one of TransCare's most profitable business segments. Pursuant to the Intercreditor Agreement, PPAS retained a first priority lien only on TransCare's vehicles, and miscellaneous physical assets (*e.g.*, computers).  PPAS also agreed not to take any action to foreclose or otherwise enforce any lien as to which it was junior to Wells Fargo.

27.     At least as of 2014 and continuing through the Petition Date, the lenders under the PPAS Credit Agreement were:  Zohar CDO 2003-1, Ltd. ("Zohar I"), Zohar II 2005-1, Ltd. ("Zohar II"), Zohar III, Ltd. ("Zohar III"), Ark Investment Partners II, L.P. ("Ark Investment"),

Credit Suisse Alternative Capital LLC ("Credit Suisse"), and First Dominion Funding I ("First Dominion").[3]

Tilton's Ownership and Control Over the Lenders and the Company

28.    Tilton controlled both PPAS and TransCare at the time of the Credit Agreement and all amendments thereto, initially via her majority shareholder interest in TransCare and later pursuant to serving as the sole director.  The contracts entered into between PPAS/ PPMG/ Ark II and TransCare were not arm's-length transactions due to the control exercised by Tilton and Patriarch over TransCare, the lack of disinterested TransCare board directors, and the absence of counsel for TransCare separate from lawyers advising TransCare on Patriarch's behalf. Transactions between TransCare and the Tilton-controlled entities were handled by lawyers employed at Patriarch Partners located at 1 Liberty Plaza.

29.    PPAS, Patriarch Partners, PPMG, and Ark II operated wholly under Tilton's control and pursuant to her directives.  None of these entities had subsidiary officers or boards of directors and all executives reported directly to Tilton.  Employees of each entity all worked together out of the same office for the common goal of furthering Tilton's interests.  They all shared the same email domain and held themselves out to the world as "Patriarch Partners".  They shared documents and information between them, particularly concerning TransCare.  At various points, depending on the need or Ms. Tilton's directives, a multiplicity of employees at 1 Liberty Plaza worked on matters relating to TransCare without regard to which specific entity they were employed by.  Tilton exploited her dual control over said Defendants and TransCare for her personal benefit.

---

[3] In 2007, Zohar III took over Ark II's loan and Ark II ceased being a lender under the PPAS Credit Agreement.

7

30.     Additionally, at all points relevant hereto, Tilton controlled Zohar I, Zohar II and Zohar III as collateral manager, and controlled Ark Investment as the 99% owner (with 1% held in trust for her daughter). Credit Suisse controlled its own loan and also served as the collateral manager for First Dominion.

31.     Tilton prohibited TransCare from refinancing the PPAS debt. TransCare paid PPAS around $3-$4 million/ year in interest, which accrued under the PPAS Credit Agreement primarily at a rate of 12% per annum.

32.     Tilton exercised discretion over TransCare's payment of interest to PPAS in a number of different ways. First, the PPAS Credit Agreement permitted PPAS to waive Events of Default, including TransCare's failure to pay interest (Section 12.1). Tilton exercised this right on multiple occasions in 2015 when TransCare did not pay interest or paid less interest than due. Second, in November 2015, Tilton waived interest payments owing to Zohar I, Zohar II, Zohar III, and AIP by transforming roughly $110,000 due as interest into a 0% loan. Third, in September 2015, Tilton unilaterally reduced the amount of interest due on seven tranches owed to Zohar I, Zohar II, and Zohar III. Fourth, in December 2015 and January 2016, Tilton claims to have paid $200,000 to the lenders she controlled (Zohar and AIP) without paying the lenders controlled by Credit Suisse.

Corporate Governance at TransCare

33.     Tilton exercised an extraordinarily high level of control and domination over the operations of TransCare.

34.     Pursuant to a July 2012 Written Consent of the Sole Director, Tilton issued an authority matrix prohibiting any TransCare officer from a wide range of activities, including, "disclos[ing] any financial or shareholder information of the Company or its subsidiaries to any third party[,]" entering into any contract not contemplated by the "Annual Plan," engaging legal

8

A0263

counsel, and allowing only a "Designated Executive" to undertake certain limited functions. However, at least as of 2015, Tilton had not designated any Designated Executive and had not approved an Annual Plan. As a result, all such powers remained only in the Board and, as TransCare employees well knew, was synonymous with Tilton.

35.     Brian Stephen, a lawyer employed by Patriarch Partners but claiming to represent TransCare's Board, gave further gloss to these restrictions. For example, he explained to Glenn Leland, TransCare's newly appointed Chief Executive Officer, that Leland was prohibited from taking even preliminary steps to actions requiring Board approval. Considering the breadth of those categories of actions, this instruction prohibited almost all independent action by TransCare's executives.

36.     Despite this level of control, Tilton regularly barred TransCare's executives, including its Chief Executive Officer, from communicating directly with her. Instead, she required them to communicate through her Patriarch employees. At the same time, she empowered her Patriarch employees to give direction to TransCare's executives. During the period preceding TransCare's bankruptcy, those employees included Stephen, Jean-Luc Pelissier (Executive Managing Director at PPMG), Michael Greenberg (Analyst at Patriarch Partners), Randy Jones (Managing Director at Patriarch Partners) and Scott Whalen (Tilton's son-in-law, Credit Analyst at Patriarch Partners until 2014/2015, and thereafter Director at PPMG). Stephen and Pelissier, in particular, enforced Tilton's desire to limit communications from Leland. They told him that his reports were too negative and that negative comments could be discoverable in future litigation.

37.     Through this arrangement, Patriarch executives hired and fired employees, directed the payment or non-payment of vendors and gave direct orders to TransCare employees. On multiple occasions, Greenberg executed amendments to the PPAS Credit Agreement on behalf of *TransCare*, causing TransCare to incur additional indebtedness and liens to PPAS. For all

9

**A0264**

transactions between Tilton's companies (*e.g.*, PPAS, Ark II) and TransCare, Tilton executed the documents on behalf of the former and ordered TransCare executives as well as her employees at Patriarch Partners to execute the documents on behalf of TransCare. TransCare lacked independent counsel on any transaction with PPAS, PPMG, Patriarch Partners, or Ark II (or later the Transcendence entities). In short, Tilton and Patriarch exercised complete dominion and control over TransCare.

Events Leading Up to 2015 Financial Crisis

38.     In 2012, 2013, and 2014, TransCare had net revenues of approximately $130 million and positive EBITDA. However, TransCare's costs grew and it began losing lucrative clients because of its inability to invest in new vehicles. TransCare's executives were advised that not paying bills on time and in full was the "Patriarch way." As a result, its accounts payable grew and critical vendors went unpaid. During the same years, TransCare paid over $11 million to PPAS for the loans. In 2012, PPAS modified the Credit Agreement to provide TransCare with an additional $2 million.

39.     TransCare's most profitable business segment was the MTA Contract to provide paratransit services. This segment historically generated revenues of approximately $22 million and EBITDA of $3.7 million. However, by early 2015, the MTA indicated a reluctance to renew TransCare's contract – scheduled to expire in summer 2015 – due to TransCare's deteriorating financial condition. Among other things, TransCare was having problems obtaining replacement parts for MTA vehicles; even though the MTA paid TransCare for such parts, TransCare had such poor credit that parts suppliers would not do business with it.

10

<u>In Early 2015, Tilton Refuses to Allow TransCare to Sell Assets Even as It Lacked Cash to Fund
Payroll and Operations</u>

40.     By February 4, 2015, TransCare's financial situation had become so dire that its
executives warned Tilton that the company lacked the cash to make payroll the following day.
They further advised that the company faced a projected $6.7 million shortfall between February
4 and the end of March 2015.  Moreover, TransCare's essential vendors, such as EZ-Pass,
suspended service due to chronic non-payment.  Without the ability to pay for tolls using EZ-Pass,
TransCare's emergency ambulances could not reach hospitals without the EMTs paying the tolls
from their own funds after waiting in the slower cash lanes. TransCare executives recommended
either further investment in TransCare or an immediate and harsh reduction in headcount.

41.     On February 5, 2015, Leland advised Pelissier and Brad Schneider (Analyst at
Patriarch Partners) of "a new alternative to the emergency cash request and accelerated recovery
plans we put forward to you and the Board yesterday."  Leland explained that National Express,
"an international transit services leader," sought to purchase the MTA Contract with an offer
estimated at $15 to $18 million.

42.     Leland explained that National Express "[has] been researching our situation and
believe[s] that the hold up on our contract renewal is our unstable financial condition.  They further
noted that if we do not renew the contract, the likely action of the MTA would be to distribute our
business to other small vendors, which eliminates their opportunity."  Leland further explained
National Express' valuation process which, based upon TransCare's paratransit financial metrics,
would translate into a $17 to $18 million valuation for the paratransit business.  Finally, Leland
advised that National Express had offered an immediate payment of $1.7 million as a non-
refundable deposit in an option to begin negotiations towards a final transaction.

11

43.     In response, Tilton spoke with Leland herself.  This was the only time that she ever contacted her CEO directly.  Tilton berated the CEO for daring to explore a sale option.  Next, Stephen called the CEO to reiterate that the CEO had no authority to even discuss sale options of any assets with any company.  Stephen also claimed that TransCare would not receive any of the potential sale proceeds because "Lynn has other debts."  Finally, Pelissier called the CEO as well to reiterate that under no circumstances could he attempt to raise funds by exploring potential sales.

44.     Also in February 2015, RCA Ambulance Service also expressed interest in purchasing TransCare to Tilton and to TransCare.  Tilton similarly refused to engage or to authorize TransCare's executives to consider RCA's offer.

45.     On February 18, 2015, Leland prepared a draft Stabilization Plan for Tilton's review and sent it to Pelissier, Greenberg, and Schneider.  He noted that "TransCare is **not** a viable on-going concern without immediate investment and assertive course correction" (emphasis in original).  Once again, he noted that TransCare required an immediate infusion of cash just to remain in business.  Once again, he stated that there was alternative to total collapse; TransCare could sell the MTA business to obtain "$14 to $17M to use for immediate financing activities for remaining ambulance service business."

46.     Leland further explained that "[w]e are working this week with clarity that the payroll for this work cannot be funded from internal cash flows or credit vehicles.  I continue the operations because I am certain the company recognizes its liability and therefore will pay employees.  But there comes a point where that can no longer be a valid assumption."

47.     Tilton still refused TransCare permission to explore the sale of any assets.  Nevertheless, she authorized additional funding to TransCare in order to make payroll.

12

In Summer 2015, Tilton Again Refuses to Sell Assets to Fund Payroll and Operations

48.     In June 2015, TransCare's executives once again warned Tilton that the company

risked missing payroll and needed to either recapitalize or sell assets immediately:

> -   "TransCare continues to operate on a very thin line of cash and
>     is only paying bills essential to its immediate operation."
>
> -   "We propose to accelerate the business plan into Phase 2 with
>     an immediate loan of $5M.  If Patriarch Partners is unable or
>     unwilling to provide these funds, we request permission to seek
>     alternative sources of financing."
>
> -   "Under normal circumstances a company like TransCare with
>     threats to on-going operations, would seek protection from
>     creditors thru bankruptcy.  We are told that is not an option
>     within the Patriarch portfolio, which leaves a *debt consolidation
>     loan* to satisfy critical vendors, remain viable, refocus leadership
>     on improved positioning and resolve reputation deficits."
>
> -   "If TransCare were to shut down suddenly because of loss of key
>     suppliers and facilities, it faces a liability of as much as $15.45M
>     in wages and benefits.  About 70% of TransCare payroll is for
>     New York employees which have a 90-day WARN act liability
>     as compared to the 60-day standard in other markets."

49.     On June 5, 2015, TransCare's executives warned that they lacked the necessary

funds to pay PPAS and make payroll and fund necessary disbursements.  In response, Greenberg

told TransCare's CFO that Tilton, as TransCare's sole director, was specifically ordering the

payment of interest to PPAS despite TransCare's financial situation: "The Board directed that I

advise you that interest must be paid today."

50.     After further pleading by TransCare's executives, Pelissier informed TransCare

that "we have re-approached the subject of interest payment today with the board.  TransCare must

pay interest today as PPMG is not the only lender."[4]

---

[4] Patriarch executives did not typically differentiate between the various Patriarch entities when
dealing with TransCare.

51.　Later that evening, Leland again advised Pelissier and Greenberg:

> we are highly skeptical that TransCare can sustain its critical supply chain and insurance if it makes the required interest payment and continues to postpone back payroll tax deposits. … [W]ant to be certain the Board is fully advised that this action could force either a substantial loan, as we have requested, or force cessation of operations.

52.　On July 3, 2015, TransCare missed payroll after bouncing a check to pay for necessary insurance immediately following Wells Fargo's decision to suspend TransCare's credit line.　Wells Fargo had just discovered a $1.5 million discrepancy in TransCare's reported receivables reports, and sought Lynn Tilton to assure them the matter would be addressed.　Tilton's employees were, however, unable to contact Tilton.　Shortly thereafter, the New York Department of Health warned TransCare that failure to provide immediate assurances to fund payroll would cause the Department to issue a Public Safety Emergency alert and direct the regional emergency medical services to seek alternative means of ensuring emergency ambulance services, effectively shutting TransCare out of its New York medical operations.

53.　On July 6 and 9, 2015, TransCare's CEO again raised the National Express offer with Pelissier, Greenberg, Whalen, and Jones:

> TransCare is running out of fuel.　Literally.　All of our fuel accounts have been frozen, our EZ Pass toll is depleted and we do not have money to turn th[e] accounts back on.　We consumed about $2k of employee personal funds and other cash on hand last night to sustain operations.　We are literally hours away from wide spread gasoline and EZ Pass outage. … We have been re approached by National Express which is interested in acquiring the MTA contract, as I have reported in the past…. Am I authorized to accept the deposit and continue operations?

54.　On July 10, 2015, Leland informed Pelissier and Greenberg that he had received offers to buy all or parts of TransCare from two separate national ambulance companies in addition to National Express.

14

**A0269**

55.    Also on July 10, 2015, National Express delivered a signed Letter of Intent to TransCare offering to buy TransCare's MTA paratransit business for $6 to $7 million plus the assumption of $2 million in related liabilities.  Leland forwarded the offer to Pelissier, Whalen, and Greenberg.

56.    Minutes later, Tilton's son-in-law, Scott Whalen, denied Leland permission: "LOI is way premature.  We have yet to review the business strategy. … [T]his will have to be made clear to them that the business is not for sale at this time."

57.    On July 13, 2015, Whalen again wrote to Leland seeking to prevent any public acknowledgment that TransCare or portions of TransCare might be for sale: "I would hate to have the LOI hanging out there and for National Express to tell people they are 'buying TransCare' is the issue."

58.    Leland confirmed in writing: "to be clear … you want me to: … contact National Express and tell them 'TCP is not for sale' per Patriarch Partners."  Whalen confirmed, despite the dire straits that TransCare was in, that this was exactly what Patriarch Partners and his mother-in-law Tilton were ordering.

59.    On July 8 and 16, 2015, after agreeing with Wells Fargo to extend $2.5 million in new capital to TransCare in return for restoration of the Company's credit line, Tilton caused PPAS to lend over $1.3 million to TransCare to fund payroll, bounced checks, and immediate needs.

<u>TransCare's Financial Condition Deteriorates</u>

60.    Tilton's refusal to recapitalize the company jeopardized TransCare's ability to perform its safety mission and eroded the operational capabilities which TransCare could have monetized in a sale to a third-party.  All the while, Tilton insisted that TransCare make its monthly interest payments to PPAS.

15

**A0270**

61.    For example, on July 14, 2015, the head of TransCare's paratransit division reported:

> We are in dire straits right now, as you are aware, with ordering parts, tires, doing employee finger printing, getting uniforms. [TransCare paratransit] shop has been cannibalizing parts from vehicles that are out waiting for engines to be shipped (we can't place orders since we have been shut off by CADI [TransCare's auto parts supplier])

62.    When Leland explained to Patriarch that the ambulances needed to be replaced every few years in order to run safely and profitably, Pelissier responded that he owned a private airplane that was fifty years old, such that the vehicle's age did not matter.

63.    On August 10, 2015, Leland warned Pelissier, Greenberg, Stephen, Jones, and John Pothin (Managing Director at Patriarch Partners) that operating the company on fumes was causing a breakdown in employee morale:

> Massive amount of employees have either resigned or given notice. Project Mgr., OPS mgr, disp mgr, 2 disp sups, 6 dispatchers, 20 drivers have resigned in last 10 days. Unsuccessful in recruiting due to our past delayed payroll problems (word is out on the street) — working on doing some in-house promotions on a trial basis just to fill open slots at lesser money.

64.    On October 7, 2015, Leland again pleaded with Pelissier and Greenberg that TransCare could not afford to both continue operations and pay PPAS:

> I understand that the Board has directed TransCare to issue the interest payment to Patriarch today.  This despite the fact that the company will not have adequate funds to make its payroll tomorrow.

65.    Thereafter, Pelissier and Greenberg – acting as Tilton's representatives – instructed Leland to make interest payments to PPAS, having previously instructing Leland to (a) have employees pay for fuel themselves and (b) cease paying employee payroll taxes to the Internal Revenue Service.

16

66.     On December 8, 2015, Leland advised Pelissier and Greenberg that the head of TransCare's MTA paratransit division was resigning due to frustration with the lack of resources. Leland also advised that National Express had again contacted him "to see if there is any interest in selling." Leland recommended immediate discussions with National Express and to use the proceeds from the sale (or solely the deposit) to fund a plan to save as much of the ambulance business as possible. At this point, Leland advised Pelissier and Greenberg that TransCare could receive $6 to $8 million dollars from the sale.

67.     Stephen wrote back to Leland the next day, reminding him that he needed approval from the Board prior to entering into any discussions.

68.     On December 16, 2015, Leland told Pelissier, Greenberg, and Stephen:

> National Express Called a few times yesterday … They reiterate that the letter they sent before, offering to buy the TC Paratransit contract, is 'still out there.' I am awaiting direction. My recommendation is to immediately respond and negotiate a sale of the contract. … Waiting further does not seem to be in best interest of company.

69.     On December 17, 2015, Leland told Pelissier, Greenberg, and Stephen that "to avoid a shutdown we should reopen selling the MTA contract to National Express." Greenberg and Stephen told Leland that they were working on a number of issues but would pass it on.

Tilton's Plan to Acquire TransCare's Valuable Assets

70.     While TransCare was pleading to monetize its valuable assets so as to fund payroll and life-saving operations, Tilton was working on a plan to acquire that same assets to benefit herself.

71.     By December 16, 2015, Tilton had advised Wells Fargo that it had determined to sell TransCare. In further discussions with Wells Fargo, Tilton told them that she would present

17

A0272

an integrated plan pursuant to which the Company's principal assets would be sold as a going concern.

72.    On December 18, 2015, Greenberg emailed Tilton his research on recent comparable sales of ambulance companies and which investment firms could assist Patriarch in selling TransCare. Greenberg reported that similarly situated companies had sold for average multiple of 1.8 times revenue and 10.1 times EBITDA. At this point, TransCare's MTA paratransit unit had revenues of more than $20 million and EBITDA of more than $2.2 million. Had Tilton allowed TransCare to sell the paratransit business, these numbers would imply a valuation of between $22 and $36 million, vastly more than the amount needed to pay employees and recapitalize TransCare. Greenberg also recounted how Leland had received numerous offers from industry players to sell all or part of TransCare.

73.    In late December, Greenberg, with Tilton's approval, submitted a proposal to Wells Fargo to sell TransCare's assets by September 2016.

74.    On January 9, 2016, Leland quit as CEO of TransCare.

75.    On January 11, 2016, Tilton hired Carl Marks & Co., Inc. ("Carl Marks") to serve as restructuring advisors for TransCare and report to Tilton. During this period, TransCare's last remaining C-level officer—its Chief Operating Officer—lacked authority to make any business decisions without approval from Tilton or the Patriarch executives overseeing TransCare.

76.    On or about January 15, 2016, Tilton agreed to pay certain of TransCare's insurance creditors. Although the Defendants have been unable to produce records confirming all of these payments, e-mails produced by the Defendants suggest that PPAS paid approximately $.81 million on January 15, 2016 and the produced financial records show PPAS paid roughly $.69 million on January 29, 2016.

18

77. Tilton subsequently papered these advances as a loan from Ark II in an attempt, among other things, to improve her position vis-à-vis TransCare's other creditors, and to insulate this infusion from claims made by third parties, including some of the lenders under the PPAS Credit Agreement and to ensure that she would own the assets transferred to Transcendence Transit and Transcendence Transit II.

78. On January 29, 2016 Ark II filed a UCC Financing Statement with respect to TransCare with the Delaware Department of State.

79. On February 9, 2016, Pelissier contacted the MTA, representing that the owner of TransCare wished to transfer the MTA Contract to a different entity: "I am working with the ownership representative of TransCare."

80. Also, on or about February 9, 2016, Tilton's personal lawyers at Skadden, Arps, Slate, Meagher & Flom LLP contacted the law firm of Curtis Mallet-Prevost, Colt & Mosle LLP ("Curtis Mallet") about the need to for an immediate chapter 11 bankruptcy filing for TransCare. Curtis Mallet submitted a draft engagement letter that day to advise on an out-of-court restructuring or chapter 11 filing, and TransCare executed it on February 10. Brian Stephen served as the principal contact for TransCare for Curtis Mallet, advising Curtis Mallet on TransCare's assets/ liabilities and bankruptcy strategy.

81. On February 10, 2016, Tilton caused two new Delaware entities to be incorporated: Transcendence Transit, Inc., and a wholly-owned subsidiary thereof, Transcendence Transit II, Inc. Defendants cannot produce a stock register for Transcendence. Nevertheless, Tilton claims that Ark II owns approximately 55% of Transcendence and that Ark II has a senior claim to Transcendence's assets (as discussed below, even ahead of PPAS).

82. The same day, Carl Marks, ostensibly engaged by TransCare at Tilton's direction to analyze and evaluate TransCare's finances, if not to aid in restructuring it, used TransCare's

19

internal financial information to provide Greenberg with a P&L statement for the new entities based upon the projected assets of TransCare to be transferred. The P&Ls include projections of $22.7 million in revenue for TransCare's MTA paratransit division and $1.5 million of EBITDA.

83.    Also on February 10, 2016, Greenberg told TransCare's Vice President, Glen Youngblood, that the Transcendence Transit II entity would be taking over TransCare's MTA Contract with an estimated $25 million in revenue and its other paratransit operations with an estimated $31 million in revenue. Greenberg noted that the division operating under the MTA Contract currently ran 168 routes but previously ran as many as 228 routes.

84.    Also on February 10, 2016, Michael Greenberg, at Tilton's direction, provided TransCare with documents to sign related to a new credit facility with Ark II, all back-dated as of January 15, 2016:

   (1) a Credit Agreement, between Ark II, as lender, TransCare Corporation, as borrower, and additional TransCare entities, as guarantors (the "Ark II Credit Agreement");

   (2) a Security Agreement granting Ark II a blanket lien on all of TransCare's assets;

   (3) a Guaranty whereby the TransCare entities (other than TransCare Corporation, as borrower) entered into a separate Guaranty of obligations under the Ark II Credit Agreement; and

   (4) an Intercreditor Agreement between Ark II and PPAS ("2016 Intercreditor Agreement"), providing for the subordination of PPAS's lien and right to payment to Ark II's lien and right to payment (Section 2.2).

The 2016 Intercreditor Agreement was signed by Tilton as Manager of both Ark II and PPAS. Each of the foregoing agreements are dated "as of January 15, 2016."

85.    The Ark II Credit Agreement that Tilton ordered TransCare enter into authorized Ark II to make term loans totaling up to $6.5 million to TransCare Corporation, for working capital

20

and general corporate purposes. From the start that "loan" violated TransCare's and PPAS's covenants to the other lenders and equity holders of TransCare, and was illusory as well by its assertion of a $6.5 million loan when in fact no such amount was ever actually made available to TransCare.

86. Sometime between February 10 and February 11, 2016, TransCare executed the Ark II Credit Agreement.

87. On February 12, 2016, TransCare – at Greenberg's direction – executed direction letters back-dated to January 15 and January 29, 2016, retroactively directing Ark II to make the payments that PPAS had made on those dates.

88. Despite these preparations, Tilton was unable to simply "foreclose" on TransCare's ongoing business operations as one might repossess a vehicle or a piece of real estate. Tilton needed to convince employees to switch employers, convince vendors and insurers to substitute Transcendence for TransCare, obtain governmental authority to provide critical safety services through a new corporation, and switch bank accounts, among numerous other complex transactions. To effectuate this plan, Tilton held meetings at Patriarch's offices with TransCare's executives to model out which TransCare business units would be transferred to Transcendence and how, and the amount of revenue they could be expected to bring in for the new company. None of these actions were consistent with Tilton's duty of loyalty to TransCare. Tilton, with the assistance of her Patriarch executives, caused TransCare's employees to work on projects in support of the Transcendence plan rather than for TransCare's business operations.

89. Patriarch executives endeavored to keep this plan secret even while it directed TransCare's remaining executives to prepare the transition, including talking points to sell the union and the MTA on the Transcendence plan. "Obviously, we cannot breath a word until we have the overall deal finalized. Until then it must be business as usual[,]" Randy Jones of Patriarch

21

Partners wrote on February 11, 2016 to TransCare's Vice President of Transit Services Thomas Fuchs and Chief Operating Officer Peter Wolf, both of whom together with Youngblood were being promised positions in Tilton's new venture.

90. On February 14, 2016, Pelissier, from a non-Patriarch e-mail address, submitted a detailed plan to TransCare's executives to prepare to transfer TransCare's lucrative MTA paratransit business, as well as several other lucrative ambulance divisions.

91. On February 18, 2016, TransCare signed a revised engagement agreement with Curtis Mallet to file a Chapter 7 bankruptcy case for all the TransCare entities. Stephen continued to serve as the main point of contact for Curtis Mallet in planning TransCare's bankruptcy, even as he was handling PPAS's "foreclosure" of TransCare's assets.

92. At the same time as Tilton sought to obtain TransCare's assets, she declined to pay the payroll taxes for TransCare's employees. By February 24, 2016, TransCare owed approximately $1.148 million in payroll taxes for 2016, plus at least $172,000 in penalties and interest.[5] Tilton allowed TransCare to operate without paying payroll taxes or reserving for them. For example, on February 19, 2016, when Carl Marks advised Tilton that TransCare lacked the funds necessary to pay payroll, 401(k) obligations, and outstanding payroll taxes from earlier pay dates, as well as other critical expenses, Tilton chastised Carl Marks for seeking her direction and instead told Carl Marks to "make decisions on what needs to be paid."

93. TransCare had a contractual right to obtain funding for these ongoing obligations, but Tilton refused to request funding under the Ark II Credit Agreement. Rather, Tilton decided

---

[5] Proofs of claim filed by the Internal Revenue Service affirm that TransCare owed $1.474 million in payroll taxes plus $.826 million in penalties and $.124 million in interest.

22

to ignore her fiduciary obligations to TransCare (or the statutes requiring payment of those amounts) and focus on her efforts to strip TransCare's assets for herself.

94.    PPAS, Transcendence Transit, Inc., and Transcendence Transit II, Inc. have represented in filings with the Bankruptcy Court for the Southern District of New York that PPAS effectuated an Article 9 "strict foreclosure" of certain of TransCare's assets, including its paratransit division and its ambulances.[6]

95.    On February 24, 2016 at 12:07 a.m., Stephen e-mailed a three-paragraph "Notice of Acceptance of Subject Collateral in Partial Satisfaction of Obligation" dated February 24, 2016 to TransCare's Chief Operating Officer Peter Wolf.  There is no documentation showing when TransCare signed this document.[7]  This document was signed by Tilton for PPAS, Zohar I, Zohar II, Zohar III, and Ark Investment.  The document states that PPAS was accepting certain collateral – including (i) the MTA Contract, but not the stock of the performing party thereunder, TransCare New York, Inc., (ii) the stock of TransCare Pennsylvania, Inc., TC Hudson Valley Ambulance Corp., and TC Ambulance Corporation, (iii) two vendor contracts, and (iv) all of TransCare's personal property (excluding account receivables, non-enumerated contracts/ leases, and the stock of the other TransCare entities) – pursuant to section 9-620 of the Uniform Commercial Code in satisfaction of $10,000,000 owed under the PPAS Credit Agreement.

---

[6] Tilton and various of her entities (including Patriarch Partners, LLC, PPAS, Ark II, and Ark Investment) have similarly represented in filings with the District Court for the Eastern District of New York that "TransCare's term loan lenders" foreclosed on the MTA Contract.  National Labor Relations Board v. Transcendence Transit II, Inc. et al., Case No. 1:17-mc-00913-SJ (E.D.N.Y.).

[7] Defendants have not provided a document showing any communication of TransCare's acceptance of the February 24, 2016 "Notice of Acceptance of Subject Collateral in Partial Satisfaction of Obligation."  Further, Defendants have similarly failed to produce the documents showing the ownership of Transcendence Transit, Inc. and the allocation of the foreclosed assets to the outstanding loans.

23

96.     However, the document does not provide notice to any of the other creditors secured by the same collateral (*i.e.*, Wells Fargo), or explain the basis for the $10,000,000 valuation of the collateral (which Patriarch had internally stated related to tens of millions of dollars of annual revenues).  Further, Tilton controlled TransCare by serving as its sole director (including at the time of the "strict foreclosure"), and the signatory for TransCare on this document (Peter Wolf) testified at TransCare's Meeting of Creditors under Bankruptcy Code section 341 that he was asked by Patriarch and/ or Tilton to sign backdated documents.

97.     Also on February 24, 2016, Tilton issued a number of board resolutions as the sole member of Transcendence's board of directors purporting to (a) exercise control over TransCare's assets, including borrowing an additional $10 million from an entity owned and controlled by Tilton and granting PPAS security interests in Transcendence's assets, and (b) authorize Transcendence to enter into transactions transferring and assigning leases and contracts from TransCare to Transcendence.

98.     For example, on February 24, 2016, Tilton signed a written consent of the sole director of Transcendence Transit II, Inc. authorizing Transcendent Transit II to enter into an Assignment Agreement with TransCare New York, Inc., whereby TransCare New York, Inc. would assign its Access-A-Ride Transportation Service Agreement with the MTA to Transcendence Transit II.  Tilton's written consent stated that "TransCare desires to transfer and assign the [MTA] Agreement."  By contrast, PPAS', Transcendence Transit's, and Transcendence Transit II's filings with the Bankruptcy Court claimed that PPAS foreclosed on TransCare's MTA contract and took it from TransCare.  The written consent also stated that "the MTA has heretofore provided TransCare with its consent to the Assignment."  This statement is inconsistent with the affidavit, made under penalty of perjury by Brian Stephen, stating that the MTA never approved

24

Case 1:20-cv-05274-LAK   Document 11-2   Filed 09/30/20   Page 96 of 136

the assignment: "Transcendence II could not operate without being assigned the Access-A-Ride contract, and NYC Transit never approved its transfer."[8]

99.     In addition, pursuant to a Bill of Sale, Agreement to Pay and Transfer Statement dated February 24, 2016, TransCare's foreclosed assets and the stock of TransCare Pennsylvania, Inc., TC Hudson Valley Ambulance Corp., and TC Ambulance Corporation were transferred to Transcendence Transit, Inc.

100.    Although PPAS executed the foreclosure, Tilton took the position that Ark II was the senior secured lender in the foreclosed assets and distributed proceeds received on account of the same to Ark II and not to PPAS.

101.    In October 2017, Ark II filed proofs of claim against TransCare stating that as of the petition date it was owed $1,867,423.97 under the Ark II Credit Agreement, and also that the resulting claim is secured.  These proofs of claim also state that Ark II received $800,000.00 in connection with the Trustee's sale of assets, reducing the claimed amount to $1,077,966.97.

102.    The Trustee paid out $800,000.01 to PPAS – not Ark II – pursuant to a court order dated March 25, 2016 [Dkt. No. 52].  PPAS failed to disclose to the Court or the Trustee that these funds would be forwarded to Ark II.  In fact, PPAS represented that it held "first-priority security interests" in the property to be sold and was entitled to "gift" part of its proceeds for the benefit of an employee wage claim fund on account of its lien position [Dkt. No. 49 at ¶¶ 9, 19].  Additionally, the March 25, 2016 stipulation agreed to by PPAS and the Trustee – and so-ordered by the Court – disclosed the existence of the intercreditor agreement between PPAS and Wells Fargo, while

---

[8] The Trustee has discovered at least one TransCare board resolution corresponding to the Transcendence board resolutions:  one authorizing TransCare to transfer and assign a medical equipment lease to Transcendence (again stating that "the Corporation desires to transfer and assign the Agreement.").

failing to disclose the intercreditor agreement between PPAS and Ark II or the existence of liens in Ark II's favor separate from those of PPAS [Dkt. No. 52-1 at Recitals, ¶ 4].

The Bankruptcy Filing

103.    On February 24, 2016, Tilton directed 11 of the 14 TransCare entities to file for chapter 7 bankruptcy protection, excluding those three entities holding the assets she sought to obtain via the strict foreclosure (TransCare Pennsylvania, Inc., TC Hudson Valley Ambulance Corp., and TC Ambulance Corporation).

104.    According to PPAS, "insurmountable logistical issues" subsequently prevented it from continuing TransCare's paratransit and other business operations under the Transcendence label and that such issues "outmatched" PPAS's "desire and commitment to continue without those business lines."

105.    Late at night on February 25, Patriarch, and in particular Stephen (still purportedly the lawyer for TransCare's board of directors), realized that the Transcendence plan would not succeed.  At 10:53 p.m., despite the automatic stay having gone into effect the day before, Stephen e-mailed TransCare executives and directed them to steal assets from TransCare:  "As a result, we need to try and secure as many assets (ambulances, equipment, etc.) as possible as quickly as we can. … I am not entirely sure where the most valuable assets are, but it makes sense to target those first – if those assets can be moved."

106.    Later that evening, Pelissier followed up on Stephen's directive, instructing the TransCare executives to transfer TransCare's account receivables server out of the Debtors' warehouse.  Uncomfortable with this activity, TransCare's vice president refused and rejected Tilton's offer to join Transcendence, instead properly alerting the Trustee to the ongoing unlawful activity.

26

**A0281**

107.    At a meeting of interested parties, including the Trustee and a representative of PPAS on February 25, 2016, the Trustee was advised that PPAS had conducted a strict foreclosure of the paratransit, Pittsburgh, and Hudson Valley divisions and told that those divisions' assets were not part of the bankruptcy estates.  It was only long after ceasing their operations, on or about April 25, 2018, that Tilton caused those entities to also file for Chapter 7, and they were assigned to the Trustee.

## FIRST CLAIM FOR RELIEF

### Breach of Fiduciary Duty of Loyalty and Good Faith

#### (Against Lynn Tilton)

108.    The Trustee realleges and incorporates the allegations of the preceding paragraphs as if fully set forth herein.

109.    While she served as the sole board member of the Debtors, Tilton owed an undivided duty of loyalty and good faith to the Debtors.

110.    Tilton lacked independence because she also was the principal of TransCare's lenders PPAS and Ark II, the collateral manager for three of the lenders in the PPAS Credit Agreement, and the owner of Ark II.

111.    Tilton breached her duty of loyalty by actively impeding TransCare's attempts to monetize its assets and by instead working to strip TransCare of the same assets.  Tilton made decisions for the benefit of herself, PPAS, Ark II, and her other companies, as opposed to the benefit of TransCare.

112.    Tilton knew or should have known of the requirements of the Worker Adjustment and Retraining Notification Act (the "WARN Act"), 29 U.S.C. § 2101 et seq. and the New York Worker Adjustment and Retraining Notification Act (the "NY WARN Act"), N.Y. Labor Law §

27

860 et seq. Further, Tilton knew or should have known that her actions and/ or inaction would create potential liability under the WARN Act and the NY WARN Act.

113. As a direct and proximate cause of Tilton's breaches of the duty of loyalty and good faith, TransCare's estates have suffered: (a) unpaid asserted claims (including employee claims, WARN Act claims, NY WARN Act claims, and claims for payroll taxes, tax penalties, and interest); (b) loss of proceeds from the potential sale offers; (c) loss of employee wages for work performed by TransCare for PPAS, Ark II, Transcendence Transit, Transcendence Transit II, and/ or Tilton (along with the associated payroll taxes); and (d) loss of ability to continue TransCare's business as a going concern, all in amount to be proven at trial, but believed to be more than $10 million, plus punitive damages.

## SECOND CLAIM FOR RELIEF

## Aiding and Abetting Breach of Fiduciary Duty of Loyalty

## (Withdrawn)

## THIRD CLAIM FOR RELIEF

## Equitable Subordination of All Claims Asserted by Patriarch

## (Against Patriarch Partners Agency Services, LLC, Ark II CLO 2001-1, Limited, Patriarch Partners Management Group, LLC, and Patriarch Partners, LLC)

114. The Trustee realleges and incorporates the allegations of the preceding paragraphs as if fully set forth herein.

115. The Trustee seeks to equitably subordinate all claims asserted by PPAS, Ark II, PPMG, and Patriarch Partners against TransCare and its estates pursuant to Bankruptcy Code sections 105(a) and 510(c) because these Defendants engaged in inequitable conduct, causing injury to the creditors of TransCare and conferring an unfair advantage on these Defendants.

28

Claims have been filed against TransCare and its estates by insiders PPAS, Ark II, PPMG, and Patriarch Partners, LLC, all of whom participated in and benefitted from the inequitable conduct. Equitable subordination here is consistent with the Bankruptcy Code.

116.     Tilton, on behalf of these entities, utilized her role as the Debtors' sole board member to direct the Debtors' conduct to the detriment of and in breach of Tilton's fiduciary obligations to TransCare and their estates.

117.     The conduct of PPAS, Ark II, PPMG, and Patriarch Partners injured TransCare's estates by, among other things, (i) preventing the Debtors from selling their assets, (ii) causing the Debtors to pay millions of dollars to PPAS while TransCare was insolvent, and (iii) attempting to strip TransCare of its profitable assets – with the directed assistance of TransCare's employees – on the eve of its bankruptcy filings and even afterwards in violation of the automatic stay.

118.     In these circumstances, subordinating the claims of PPAS, Ark II, PPMG, and Patriarch Partners is consistent with the provisions of the Bankruptcy Code.

119.     Therefore, the Trustee requests that the claims asserted by PPAS, Ark II, PPMG, and Patriarch Partners be subordinated below general unsecured claims and that the liens associated with such claims be transferred to TransCare's estates pursuant to Bankruptcy Code section 510(c)(2).

**FOURTH CLAIM FOR RELIEF**

**Recharacterization of Debt as Equity**

**(Against Patriarch Partners Agency Services, LLC and Ark II CLO 2001-1, Limited)**

120.     The Trustee realleges and incorporates the allegations of the preceding paragraphs as if fully set forth herein.

121.     In the alternative to equitably subordinating PPAS', Ark II's, PPMG's, and Patriarch Partners' claims, the Trustee seeks to recharacterize as equity all claims asserted against

29

TransCare and its estates by PPAS and Ark II for funds purportedly loaned pursuant to Bankruptcy Code sections 105(a) and 502(a).

122.   The purported funds advanced by PPAS and Ark II that are documented as loans under the PPAS and Ark II Credit Agreements, respectively, were in fact and should be deemed to have been capital contributions or equity investments.

123.   The circumstances of the purported funds advanced by PPAS and Ark II indicate that the parties did not intend to create an unconditional obligation for TransCare to repay such funds.   Among the *indicia* evidencing that such funds were capital contributions/equity investments, not loans, include: (i) TransCare was severely undercapitalized at all relevant times; (ii) PPAS and Ark II were insiders of TransCare when such funds were advanced; (iii) repayment of the funds depended on the prospective financial success of TransCare; (iv) PPAS' and Ark II's equity and purported debt investments in TransCare were roughly proportional; (v) no sinking fund (or other accumulated funds set aside to repay the purported debts) was ever established when such funds were advanced; (vi) TransCare's assets were wholly encumbered when such advances were made; (vii) the advances were subordinated to the claims of lender Wells Fargo with respect to TransCare's valuable contract rights and certain other intangible property; and (viii) Patriarch rejected consideration of offers for all or part of TransCare's assets in an attempt to arrogate the value of those assets for itself.

124.   The Trustee seeks a judgment recharacterizing as equity PPAS's and Ark II's claims for amounts purportedly loaned under the 2003 and Ark II Credit Agreements, disallowing their respective claims pursuant to Bankruptcy Code section 502, and transferring their liens to TransCare's estates or voiding their respective liens under Bankruptcy Code section 506(d).

30

## FIFTH CLAIM FOR RELIEF

### Replaced – Objection to Claims, Liens and Security Interests

125.    The Fifth Claim for Relief objecting to claims, liens and security interests has been

replead within the Third, Fourth, Seventh, Tenth, Eleventh, and Fourteenth Claims for Relief.

## SIXTH CLAIM FOR RELIEF

### Lender Liability, Common Law Breach of Fiduciary Duty, and Common Law Assumption of Control

**(Against Patriarch Partners Agency Services, LLC, Patriarch Partners, LLC, Patriarch Partners Management Group, LLC, Ark II CLO 2001-1, Limited, Transcendence Transit, Inc., and Transcendence Transit II, Inc.)**

126.    The Trustee realleges and incorporates the allegations of the preceding paragraphs

as if fully set forth herein.

127.    Patriarch was in complete domination of the finances, policy, and business practices

of TransCare.  Tilton's role as sole director placed Patriarch in a position of trust and unusual

advantage vis-à-vis TransCare.

128.    Patriarch's domination over TransCare resulted in TransCare having no separate or

independent mind, will, or existence of its own.

129.    Patriarch exploited this control to cause TransCare to make transfers and decisions

that rendered TransCare unable to pay employees and critical vendors (including vendors

necessary for the maintenance of its ambulance fleet), to engage in the failed Transcendence

scheme, and to deny TransCare the ability to explore refinancing or asset sales.

130.    As a direct and proximate cause of Patriarch's wrongful acts, TransCare's estates

have suffered: (a) unpaid asserted claims (including employee claims, WARN Act claims, NY

WARN Act claims, and claims for payroll taxes, tax penalties, and interest); (b) loss of proceeds

from the potential sale offers; (c) loss of employee wages for work performed by TransCare for

PPAS, Ark II, Transcendence Transit, Transcendence Transit II, and/ or Tilton (along with the associated payroll taxes); and (d) loss of ability to continue TransCare's business as a going concern, all in amount to be proven at trial, but believed to be more than $10 million, plus punitive damages.

## SEVENTH CLAIM FOR RELIEF

### Actual Fraudulent Transfer; Recovery of Same; Claim Disallowance

### (Against Patriarch Partners Agency Services, LLC, Ark II CLO 2001-1, Limited, Transcendence Transit, Inc., and Transcendence Transit II, Inc.)

131.    The Trustee realleges and incorporates the allegations of the preceding paragraphs as if fully set forth herein.

132.    On February 24, 2016, Patriarch and Tilton – via PPAS – purported to conduct a "strict foreclosure" of certain valuable assets of TransCare for their own benefit.  This "strict foreclosure" was ineffective and commercially unreasonable, constituted an attempt to defraud TransCare and its creditors, and did in fact defraud TransCare and its creditors.

133.    The "strict foreclosure" purporting to transfer property from TransCare to (i) PPAS (as provided by the February 24, 2016 Notice of Acceptance of Subject Collateral), (ii) Transcendence Transit (provided by the February 24, 2016 Bill of Sale, Agreement to Pay and Transfer Statement), and (iii) Transcendence Transit II (provided by the February 24, 2016 Assignment Agreement), was ordered by Tilton and executed by Patriarch while TransCare was insolvent and unable to pay millions owing to other vendors, including vendors critical to the maintenance of the TransCare's ambulance fleet.  Tilton and Patriarch's acts in ordering and conducting the strict foreclosure materially damaged the subject assets, effectively destroying even the possibility of realizing the value all parties had agreed existed.

32

**A0287**

134.     These transfers further caused TransCare not to be able to operate as a going concern, to the detriment of TransCare's estates.

135.     Therefore, the Trustee seeks damaged suffered by TransCare for these fraudulent transfers of TransCare's property to PPAS, Transcendence Transit, or Transcendence Transit II as actual fraudulent transfers pursuant to Bankruptcy Code sections 548(a)(1)(A) and N.Y. Debtor & Creditor Law sections 276 and 276-a, made applicable by Bankruptcy Code section 544(b).

136.     Because the "strict foreclosure" substantially damaged the value of TransCare's assets, the Trustee seeks to recover their value immediately prior to the transfers pursuant to Bankruptcy Code section 550(a).

137.     As noted above, PPAS and Ark II have filed claims against TransCare.  The Trustee also seeks a judgment disallowing their respective claims, pursuant to Bankruptcy Code section 502(d), unless they have paid to the Trustee the amount for which they are determined to be liable under section 550(a).

## EIGHTH CLAIM FOR RELIEF

### Replaced – Recovery of Avoided Transfers

### (Against All Defendants)

138.     The Eighth Claim for Relief has been replead within the Seventh, Tenth, Eleventh, and Fourteenth Claims for Relief.

## NINTH CLAIM FOR RELIEF

### Violation of the Automatic Stay

### (Against All Defendants)

139.     The Trustee realleges and incorporates the allegations of the preceding paragraphs as if fully set forth.

A0288

140.    Defendants' conduct in attempting to obtain property of TransCare postpetition, including – without limitation – negotiations to obtain the MTA Contract, efforts to consummate the "strict foreclosure," and efforts to obtain estate property, constituted violations of the automatic stay provided for in section 362(a) of the Bankruptcy Code.

141.    The Defendants are guilty of civil contempt for the above transfers.

## TENTH CLAIM FOR RELIEF

### Preferential Transfer; Avoidance of Same; Preservation of Lien

### (Against Ark II CLO 2001-1, Limited)

142.    The Trustee realleges and incorporates the allegations of the preceding paragraphs as if fully set forth herein.

143.    Ark II asserts in its proofs of claim that it has a valid lien on substantially all of the Debtors' assets as of the petition date, and proceeds thereof, by virtue of the security interest granted to Ark II under the Security Agreement, dated as of January 15, 2016, and Ark II's filing of a UCC-1 Financing Statement on January 29, 2016.

144.    The Trustee seeks the avoidance of said lien, pursuant to Bankruptcy Code section 547(b).

145.    Each of the grant of a security interest to Ark II and Ark II's perfection of the same, constitutes a "transfer of an interest of the debtor in property ... to or for the benefit of a creditor" (Ark II), under section 547(b)(1).

146.    Said transfers were "for or on account of an antecedent debt owed by the debtor before such transfer was made" under section 547(b)(2).  Virtually all, if not all, of the transfers which are the subject of Ark II's proofs of claim, were made before the Ark II Credit Agreement was entered into; accordingly, if not recharacterized as an equity investment, the transfer to Ark II

34

**A0289**

of a lien on TransCare's property was on account of an antecedent unjust enrichment or other quasi-contract claim of Ark II.

147.    Said transfers were "made while the debtor was insolvent," under section 547(c)(3) and Bankruptcy Code section 101(32)(A).  The Debtors were also presumptively insolvent at the time of the subject transfers under section 547(f).

148.    The subject transfers were made within a month prior to the petition date, well within the preference period under section 547(b)(4)(A).

149.    The transfer of the lien would enable Ark II to be treated as a secured creditor, and therefore receive more than it would receive had the transfer not been made, under section 547(b)(5)(B).

150.    The Trustee requests a judgment avoiding Ark II's lien, pursuant to section 547. The Trustee also seeks relief under Bankruptcy Code section 551 with respect to the Ark II lien avoided; specifically, a judgment that said lien is preserved for the benefit of the Debtors' estates, and that the Trustee succeeds to the priority that Ark II's lien enjoyed over PPAS's lien, pursuant to Section 2.2 of the 2016 Intercreditor Agreement, which as noted above provides for the subordination of PPAS's lien and right to payment to Ark II's lien and right to payment.

151.    As noted above, Ark II has filed claims against TransCare.  The Trustee also seeks a judgment disallowing its claims, pursuant to Bankruptcy Code section 502(d), unless it has paid to the Trustee the amount for which it is determined to be liable under section 550(a).

### ELEVENTH CLAIM FOR RELIEF

### Constructive Fraudulent Transfer; Recovery of Same; Claim Disallowance

### (Against Patriarch Partners Agency Services, LLC and Ark II CLO 2001-1, Limited)

152.    The Trustee realleges and incorporates the allegations of the preceding paragraphs as if fully set forth herein.

153.   In 2015, Tilton and Patriarch caused TransCare to pay over $3.38 million as interest payments to PPAS under the PPAS Credit Agreement: (a) $269,399.96 on January 2, 2015; (b) $286,690.23 on January 30, 2015; (c) $39,000 on February 5, 2015; (d) $294,561.54 on March 4, 2015; (e) $56,306.41 on April 3, 2015; (f) $269,399.96 on April 6, 2015; (g) $326,672.04 on May 6, 2015; (h) $334,905.69 on June 8, 2015; (i) $225,811.02 on July 8, 2015; (j) $170,763.52 on August 3, 2015; (k) $164,040.67 on August 4, 2015; (*l*) $349,797.54 on September 4, 2015; (m) $291,565.72 on October 7, 2015; (n) $100,000 on October 30, 2015; and (o) $201,209.61 on November 4, 2015.

154.   In addition, on February 10, 2016, TransCare transferred a security interest to Ark II on account of purported antecedent debts.

155.   These payments were made at a time when TransCare was insolvent with unreasonably small capital and an awareness of its inability to pay its creditors.

156.   The payments to PPAS and the lien transfer to Ark II were not made in good faith and without receipt of fair consideration because PPAS, Ark II, and Tilton were insiders of TransCare.

157.   Additionally, the payments were made in part or wholly on account of loans which were actually equity contributions, and as a consequence, TransCare did not receive reasonably equivalent value in exchange for these payments.

158.   The Trustee seeks a judgment avoiding these transfers of TransCare's property to PPAS and Ark II as constructive fraudulent transfers pursuant to N.Y. Debtor & Creditor Law sections 273, 274, and 275, made applicable by Bankruptcy Code section 544(b).

159.   The Trustee also seeks a judgment recovering the same transfers, pursuant to Bankruptcy Code section 550(a).

160. As noted above, PPAS and Ark II have filed proofs of claim against TransCare. The Trustee also seeks a judgment disallowing these claims pursuant to Bankruptcy Code section 502(d), unless they have paid to the Trustee the amount for which they are determined to be liable under section 550(a).

## TWELFTH CLAIM FOR RELIEF

### Payment Subordination

### (Against Patriarch Partners Agency Services, LLC)

161. The Trustee realleges and incorporates the allegations of the preceding paragraphs as if fully set forth herein.

162. PPAS filed proofs of claim against TransCare stating that it is owed over $44 million under the PPAS Credit Agreement as of the petition date, and that the subject claims are secured.

163. As noted above, Section 2.2 of the 2016 Intercreditor Agreement provides for the subordination of PPAS's lien and right to payment to Ark II's lien and right to payment.

164. Specifically, Section 2.2 provides:

> Priority of Liens.  [T]he Liens upon the Ark Facility Priority Collateral of [Ark II] have and shall have priority over the Liens upon [said] Collateral of [PPAS] and such Liens of [PPAS] in the Ark Facility Priority Collateral are and shall be, in all respects, subject and subordinate to the Liens of [Ark II] in [said] Collateral.

> (a) Payments.  The proceeds of any Collateral shall be [distributed] in the following order of priorities:

> (i)   first, to the payment in full … of the expenses of the collection … of the Ark Facility Obligations [defined by reference to Ark II Credit Agreement]

> (ii)   second, to the payment in full … of the expenses of the collection of the … [PPAS] Obligations [similar definition]

> (iii)   third, to the payment in full … of all of the Ark Facility Obligations … and

37

(iv) <u>fourth</u>, to the payment in full … of all of the [PPAS] Obligations.

165.    "Payment in full," in turn, is defined as including "all interest accrued or accruing … after the commencement of an Insolvency Proceeding in accordance with and at the rate specified in the applicable agreement whether or not the claim for such interest is allowed."

166.    If Ark II's lien is successfully avoided, and the value of the same is preserved for the benefit of the Debtors' estates as a result under sections 547 and 551, then Ark II's claim is unsecured and afforded the same priority as Debtors' other unsecured claims under Bankruptcy Code section 726.

167.    The Trustee requests a judgment that PPAS is not entitled to any payment on account of its claims arising under the PPAS Credit agreement, by operation of Section 2.2(a) of the 2016 Intercreditor Agreement and Bankruptcy Code section 510(a), unless and until Ark II has been paid in full on account of its claim.

**THIRTEENTH CLAIM FOR RELIEF**

**<u>Limitation on Liens</u>**

**(Against Patriarch Partners Agency Services, LLC and Ark II CLO 2001-1, Limited)**

168.    The Trustee realleges and incorporates the allegations of the preceding paragraphs as if fully set forth herein.

169.    Pursuant to the Security Agreements executed by TransCare in favor of each of Ark II and PPAS, Ark II and PPAS were each granted a blanket security interest in all property TransCare then had or would thereafter acquire.

170.    The security interest covered proceeds, products, and offspring of each category or type of property identified in the Security Agreement (*e.g.*, chattel paper, equipment, etc.).

171.    Pursuant to Bankruptcy Code section 552(b), if a security interest extends to property of the debtor acquired prepetition and to proceeds, products, and offspring of the same,

38

then the security interest extends to such proceeds, products, and offspring acquired by the debtor's

estate postpetition, "except to the extent that the court ... after notice and a hearing and based on

the equities of the case, orders otherwise."

172.    Postpetition the Trustee sold substantially all of the Debtors' property in several

Bankruptcy Code section 363 sales.  Cash proceeds of said sales constitutes proceeds, products,

and offspring of Ark II's and PPAS's prepetition collateral under section 552(b).

173.    The Trustee seeks a judgment applying the "equities of the case" exception in

section 552(b) for reasons set forth herein, and concluding that Ark II's and PPAS's security

interests do not extend to cash proceeds of section 363 sales consummated in these cases.

### FOURTEENTH CLAIM FOR RELIEF

### Turnover of Estate Property; Avoidance of Postpetition Transfer

### (Against Patriarch Partners Agency Services, LLC and Ark II CLO 2001-1, Limited)

174.    The Trustee realleges and incorporates the allegations of the preceding paragraphs

as if fully set forth herein.

175.    By Order, entered March 25, 2016, the Court approved a carveout stipulation, dated

March 10, 2016, among the Trustee, PPAS, and Transcendence.

176.    The recitals to the agreement explained that a dispute existed between the Trustee,

on the one hand, and PPAS and Transcendence, on the other, concerning the validity of the alleged

strict foreclosure by PPAS and transfer of foreclosed property to Transcendence.

177.    By the stipulation, PPAS and Transcendence consented to the sale of the subject

property at auction, and the parties further agreed that their liens "if any" on said property would

attach to the sale proceeds.  The parties also agreed to the establishment of a carveout from the

sale proceeds in an amount needed to pay property preservation- and sale-related professional fees

A0294

and costs, and that 20% of net sale proceeds would be distributed to the Trustee and the 80% balance would be distributed to PPAS.

178.   The parties further agreed that nothing in the stipulation constitutes a waiver of the Trustee's right to challenge any party's claims, or interests in the property sold.

179.   PPAS was paid $800,000.01 on an interim basis, pursuant to the stipulation.

180.   Ark II later filed proofs of claim indicating that the same $800,000.01 was then transferred to Ark II.  PPAS never disclosed that these funds would be transferred from PPAS in connection with the negotiation of the March 10, 2016 stipulation or the approval of the March 25, 2016 court order.

181.   By this action, the Trustee has challenged PPAS's and Ark II's claims against TransCare, and liens on the subject property.

182.   In the event that the Trustee prevails on its causes of action challenging said claims and/ or liens, PPAS will not have had any entitlement to any portion of the sale proceeds on account of its alleged claim.

183.   Judgment should then be entered determining that PPAS owes a debt to the Trustee in the amount of $800,000.01, and directing the turnover of said funds to the Trustee, pursuant to Bankruptcy Code section 542(b).

184.   Judgment should also then be entered avoiding the postpetition transfer to PPAS of the $800,000.01, and directing the recovery of the same from PPAS and Ark II, pursuant to section 550(a).  Alternatively, judgment should be entered avoiding the postpetition transfer to Ark II of the $800,000.01 as a transfer not authorized by the Court's March 25, 2016 order, and directing recovery of the same from Ark II pursuant to section 550(a).

A0295

185.    Judgment should also then be entered disallowing PPAS's and Ark II's claims, pursuant to Bankruptcy Code section 502(d), unless they have paid to the Trustee the amount for which they are determined to be liable under section 550(a).

WHEREFORE, the Trustee respectfully requests that this Court enter judgment in the Trustee's favor against the Defendants to each claim for relief, in the amount requested by each claim for relief, plus attorneys' fees and costs, punitive damages, prejudgment interest, where applicable, together such other and further relief as this Court deems just and proper.

Dated: New York, New York          Respectfully submitted,
        November 28, 2018

                                    /s/ Bijan Amini
                                    Bijan Amini
                                    Steven G. Storch
                                    Avery Samet
                                    STORCH AMINI PC
                                    2 Grand Central Tower
                                    140 East 45th Street, 25th Floor
                                    New York, New York 10017
                                    Tel: (212) 490-4100
                                    Fax: (212) 497-4208
                                    bamini@storchamini.com
                                    sstorch@storchamini.com
                                    asamet@storchamini.com

                                    *Special Counsel to Plaintiff Salvatore LaMonica, as Chapter 7 Trustee*

A0296

**PROSKAUER ROSE LLP**
Michael T. Mervis
Timothy Q. Karcher
Eleven Times Square
New York, NY  10036-8299
Tel.: (212) 969-3000

Nicole A. Eichberger (*pro hac vice*)
650 Poydras Street
Suite 1800
New Orleans, LA 70130-6146
Tel.: (504) 310-2024

*Attorneys for Defendants*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| *In re* | Chapter 7 |
| **TRANSCARE CORPORATION, *et al.*,** | Case No. 16-10407 (SMB) |
| **Debtors.** | (Jointly Administered) |
| **SALVATORE LAMONICA, as Chapter 7 Trustee for the Estates of TransCare Corporation, <u>et al.</u>,** | Adv. Proc. No. 18-01021 |
| **Plaintiff,** | |
| v. | |
| **LYNN TILTON, <u>et al.</u>,** | |
| **Defendants.** | |

**DEFENDANTS' AMENDED ANSWER TO CHAPTER 7 TRUSTEE'S AMENDED**
**COMPLAINT**

Defendants Lynn Tilton, Patriarch Partners Agency Services, LLC ("<u>PPAS</u>"), Patriarch

Partners, LLC ("<u>Patriarch Partners</u>"), Patriarch Partners Management Group, LLC ("<u>PPMG</u>"),

Ark II CLO 2001-1, Limited ("<u>Ark II</u>"), Transcendence Transit, Inc. ("<u>Transcendence Transit</u>")

and Transcendence Transit II, Inc. (together with Transcendence Transit, "<u>Transcendence</u>"),[1] for their Amended Answer to the Amended Complaint ("<u>Complaint</u>") filed in the above-captioned adversary case by Salvatore LaMonica, as Chapter 7 Trustee ("<u>Trustee</u>") of the above-named Debtors (collectively, "<u>TransCare</u>"), state as follows:

1.      Admit the allegations in paragraph 1 of the Complaint.

2.      State that the allegations in paragraph 2 of the Complaint constitute legal conclusions to which no response is required.

3.      Deny the allegations in paragraph 3 of the Complaint.

4.      Respond to the allegations in paragraph 4 by: (a) admitting that Ms. Tilton is the owner of PPAS, (b) referring the Court to the referenced term loan for its terms, and (c) otherwise denying the allegations in paragraph 4 of the Complaint.

5.      Deny the allegations in paragraph 5 of the Complaint.

6.      Deny the allegations in paragraph 6 of the Complaint.

7.      State that the allegations in paragraph 7 of the Complaint are not directed to Defendants and do not require a response.  To the extent a response is required, Defendants deny the allegations in paragraph 7.

8.      Admit the allegations in the first sentence of paragraph 8 of the Complaint. Admit the allegations in the second and third sentences of paragraph 8 of the Complaint.  Deny knowledge or information sufficient to form a belief as to the truth of the allegations in the fourth sentence of paragraph 8 of the Complaint.

---

[1] As used herein, the term "Defendants" refers collectively to Ms. Tilton, PPAS, Patriarch Partners, PPMG, Ark II and Transcendence.  As used herein, the term "Entity Defendants" refers collectively to all Defendants except Ms. Tilton.

9.      Respond to the allegations in paragraph 9 of the Complaint by: (a) stating that PPAS, Patriarch Partners, PPMG and Ark II have a principal place of business at 1 Liberty Street, 35th Floor, New York, New York, (b) stating that Transcendence had no headquarters, and (c) otherwise admitting the allegations in paragraph 9.

10.     Respond to the allegations in paragraph 10 of the Complaint by: (a) referring the Court to the referenced Credit Agreement for its terms and denying anything inconsistent with those terms, (b) stating that PPAS has a principal place of business at 1 Liberty Street, 35th Floor, New York, New York, (c) denying that PPAS is a limited liability corporation, and (d) otherwise admitting the allegations in paragraph 10.

11.     Respond to the allegations in paragraph 11 of the Complaint by: (a) stating that Patriarch Partners has a principal place of business at 1 Liberty Street, 35th Floor, New York, New York (b) denying that Patriarch Partners is a limited liability corporation, and (c) otherwise admitting the allegations in paragraph 11.

12.     Respond to the allegations in paragraph 12 of the Complaint by: (a) stating that PPMG has a principal place of business at 1 Liberty Street, 35th Floor, (b) denying that PPMG is a limited liability corporation, and (c) otherwise admitting the allegations in paragraph 12.

13.     Respond to the allegations in paragraph 13 of the Complaint by: (a) admitting that Ark II holds about a 55.7% stock interest in TransCare with its principal place of business in New York City, (b) admitting that Ms. Tilton held 99% of the equity in Ark II, (c) referring the Court to the referenced Credit Agreement for its terms and denying anything inconsistent with those terms, and (d) otherwise denying the allegations in paragraph 13.

14.     Admit the allegations in paragraph 14 of the Complaint.

15.     State that the allegations in paragraph 15 of the Complaint constitute legal conclusions to which no response is required.

16.     State that the allegations in paragraph 16 of the Complaint constitute legal conclusions to which no response is required.  To the extent a response is required, Defendants deny the allegations in paragraph 16 of the Complaint.

17.     State that the allegations in paragraph 17 of the Complaint constitute legal conclusions to which no response is required, except deny knowledge or information sufficient to form a belief as to the Trustee's alleged consent.

18.     State that the allegations in paragraph 18 of the Complaint constitute legal conclusions to which no response is required.

19.     Admit the allegations in paragraph 19 of the Complaint.

20.     Admit the allegations in paragraph 20 of the Complaint.

21.     Admit the allegations in paragraph 21 of the Complaint.

22.     Respond to the allegations in paragraph 22 of the Complaint by: (a) referring the Court to the referenced chapter 11 plan for its terms, (b) stating that Tilton was the indirect owner of 51% of TransCare and its sole director during the period of time relevant to this adversary proceeding, and (c) otherwise denying the allegations in paragraph 22.

23.     Respond to the allegations in paragraph 23 of the Complaint by: (a) referring the Court to the referenced chapter 11 plan and referenced Credit Agreement for their respective terms and denying anything inconsistent with those terms, and (b) stating Ms. Tilton was the owner and manager of Ark Investment Partners II, L.P. ("AIP") and held 99% of the equity in Ark II.

4

24.     Respond to the allegations in paragraph 24 of the Complaint by referring the Court to the referenced Credit Agreement and Security Agreement for their terms and denying anything inconsistent with their terms.

25.     Respond to the allegations in the first sentence of paragraph 25 of the Complaint by referring the Court to applicable loan documents for their terms and denying anything inconsistent with their terms.  Deny the allegations in the second sentence of paragraph 25 of the Complaint, except state that during the period of time relevant to this adversary proceeding Ms. Tilton was the sole owner and manager of PPAS.

26.     Respond to the allegations in paragraph 26 of the Complaint by: (a) referring the Court to the referenced Intercreditor Agreement and MTA Contract for their respective terms and denying anything inconsistent with those terms and (b) admitting that, during the period of time relevant to this adversary proceeding, the business conducted under the MTA Contract was TransCare's most profitable one.

27.     Respond to the allegations in paragraph 27 of the Complaint by referring the Court to the referenced Credit Agreement and the amendments thereto and denying anything inconsistent with their terms.

28.     Respond to the allegations in paragraph 28 of the Complaint by referring the Court to the referenced Credit Agreement and other unspecified "contracts" for their respective terms and otherwise denying the allegations in paragraph 28.

29.     Deny the allegations in paragraph 29 of the Complaint.

30.     Respond to the allegations in the first sentence of paragraph 30 of the Complaint by stating that Ms. Tilton (a) owns and manages AIP and (b) owns, and until March 3, 2016 was the collateral manager for Zohar CDO 2003-1, Ltd. ("Zohar I"), Zohar II 2005-1, Ltd. ("Zohar

5

II") and Zohar III, Ltd. (together with Zohar I and Zohar II, the "Zohar Funds") through March 3, 2016.  Deny knowledge or information sufficient to form a belief as to the truth of the allegations in the second sentence of paragraph 30.

31.  Respond to the allegations in paragraph 31 of the Complaint by stating that TransCare made interest payments pursuant to the terms of the referenced Credit Agreement and otherwise denying the allegations in paragraph 31 of the Complaint.

32.  Respond to the allegations in paragraph 32 of the Complaint by referring the Court to the referenced Credit Agreement and any applicable amendments thereto for their respective terms and otherwise denying the allegations in paragraph 32.

33.  Deny the allegations in paragraph 33 of the Complaint.

34.  Respond to the allegations in paragraph 34 of the Complaint by: (a) referring the Court to the referenced authority matrix for its contents, (b) stating that during the period of time relevant to this adversary proceeding TransCare did not have a Designated Executive or an approved Annual Plan, and (c) otherwise denying the allegations in paragraph 34.

35.  Deny the allegations in paragraph 35 of the Complaint, except state that during the period of time relevant to this adversary proceeding Mr. Stephen was a lawyer employed by Patriarch Partners and, among other things, represented Ms. Tilton in her role as a director of TransCare.

36.  Deny the allegations in paragraph 36 of the Complaint.

37.  Deny the allegations in paragraph 37 of the Complaint.

38.  Respond to the allegations in paragraph 38 of the Complaint by referring the Court to the referenced modification of the Credit Agreement for its terms and otherwise denying the allegations in paragraph 38.

39.     Respond to the allegations in paragraph 39 of the Complaint by: (a) admitting that, during the period of time relevant to this adversary proceeding, TransCare's most profitable business segment was the paratransit business operated under the MTA Contract, and (b) otherwise denying knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 39.

40.     Respond to the allegations in paragraph 40 of the Complaint by admitting that in February 2015 TransCare's then-CEO, Glenn Leland, claimed that TransCare lacked funds sufficient to make payroll and sought additional lending to TransCare.  Defendants otherwise deny knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 40.

41.     Respond to the allegations in paragraph 41 of the Complaint by referring the Court to the quoted correspondence for its full contents.

42.     Respond to the allegations in paragraph 42 of the Complaint by referring the Court to the quoted correspondence for its full contents.

43.     Deny the allegations in paragraph 43 of the Complaint.

44.     Deny the allegations in paragraph 44 of the Complaint.

45.     Respond to the allegations in paragraph 45 of the Complaint by referring the Court to the referenced draft Stabilization Plan for its full contents.

46.     Respond to the allegations in paragraph 46 of the Complaint by referring the Court to the quoted correspondence for its full contents.

47.     Deny the allegations in paragraph 47 of the Complaint, except state that additional funds were loaned to TransCare by the Zohar Funds.

48.     Respond to the allegations in paragraph 48 of the Complaint by referring the Court to the quoted correspondence for its full contents and otherwise denying the allegations in paragraph 48.

49.     Respond to the allegations in paragraph 49 of the Complaint by referring the Court to the quoted correspondence for its full contents and otherwise denying the allegations in paragraph 49.

50.     Respond to the allegations in paragraph 50 of the Complaint by referring the Court to the quoted correspondence for its full contents and otherwise denying the allegations in paragraph 50 and footnote 4.

51.     Respond to the allegations in paragraph 51 of the Complaint by referring the Court to the quoted correspondence for its full contents.

52.     Deny the allegations in the first three sentences of paragraph 52 of the Complaint, except state that TransCare missed payroll on or about July 3, 2015 because Wells Fargo lowered TransCare's funding availability without warning because of purported issues with information provided to Wells Fargo by TransCare executives.  Deny knowledge or information sufficient to form a belief as to the truth of the allegations in the fourth sentence of paragraph 52.

53.     Respond to the allegations in paragraph 53 of the Complaint by referring the Court to the quoted correspondence for its full contents and otherwise denying the allegations in paragraph 53.

54.     Deny the allegations in paragraph 54 of the Complaint.

55.     Respond to the allegations in paragraph 55 of the Complaint by referring the Court to the referenced letter of intent for its full contents and otherwise denying the allegations in paragraph 55.

56.    Respond to the allegations in paragraph 56 of the Complaint by referring the Court to the referenced correspondence for its full contents and otherwise denying the allegations in paragraph 56.

57.    Respond to the allegations in paragraph 57 of the Complaint by referring the Court to the referenced correspondence for its full contents and otherwise denying the allegations in paragraph 57.

58.    Respond to the allegations in paragraph 58 of the Complaint by referring the Court to the referenced correspondence for its full contents and otherwise denying the allegations in paragraph 58.

59.    Deny the allegations in paragraph 59 of the Complaint, except state that additional funds were loaned to TransCare by the Zohar Funds.

60.    Deny the allegations in paragraph 60 of the Complaint.

61.    Respond to the allegations in paragraph 61 of the Complaint by referring the Court to the referenced correspondence for its full contents and otherwise denying the allegations in paragraph 61.

62.    Deny the allegations in paragraph 62 of the Complaint.

63.    Respond to the allegations in paragraph 63 of the Complaint by referring the Court to the referenced correspondence for its full contents and otherwise denying the allegations in paragraph 63.

64.    Respond to the allegations in paragraph 64 of the Complaint by referring the Court to the referenced correspondence for its full contents and otherwise denying the allegations in paragraph 64.

65.    Deny the allegations in paragraph 65 of the Complaint.

9

66.     Respond to the allegations in paragraph 66 of the Complaint by referring the Court to the referenced correspondence for its full contents.

67.     Respond to the allegations in paragraph 67 of the Complaint by referring the Court to the referenced correspondence for its full contents.

68.     Respond to the allegations in paragraph 68 of the Complaint by referring the Court to the referenced correspondence for its full contents.

69.     Respond to the allegations in paragraph 69 of the Complaint by referring the Court to the referenced correspondence for its full contents.

70.     Deny the allegations in paragraph 70 of the Complaint.

71.     Deny the allegations in paragraph 71 of the Complaint, except state that Ms. Tilton did explore the possibility of selling TransCare and communicated with Wells Fargo about it.

72.     Respond to the allegations in paragraph 72 of the Complaint by referring the Court to the referenced correspondence for its contents and otherwise denying the allegations in paragraph 72.

73.     Deny the allegations in paragraph 73 of the Complaint, except state that Ms. Tilton did explore the possibility of selling TransCare and communicated with Wells Fargo about it.

74.     Deny the allegations in paragraph 74 of the Complaint.

75.     Deny the allegations in paragraph 75 of the Complaint.

76.     Respond to the allegations in paragraph 76 of the Complaint by referring the Court to the referenced correspondence and financial records for their contents and otherwise denying the allegations in paragraph 76.

10

77.     Respond to the allegations in paragraph 77 of the Complaint by referring the Court to the Ark II Credit Agreement for its terms and otherwise denying the allegations in paragraph 77 of the Complaint.

78.     Admit the allegations in paragraph 78 of the Complaint.

79.     Respond to the allegations in paragraph 79 of the Complaint by referring the Court to the referenced correspondence for its full contents.

80.     Respond to the allegations in paragraph 80 of the Complaint by: (a) denying knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of paragraph 80, (b) admitting the allegations in the second sentence of paragraph 80, and (c) denying the allegations in the third sentence of paragraph 80.

81.     Admit the allegations in the first sentence of paragraph 81 of the Complaint. Deny the allegations in the second and third sentences of paragraph 81.

82.     Respond to the allegations in paragraph 82 of the Complaint by referring the Court to the referenced P&L statement for its contents and otherwise denying the allegations in paragraph 82.

83.     Respond to the allegations in paragraph 83 of the Complaint by referring the Court to the referenced correspondence for its full contents.

84.     Respond to the allegations in paragraph 84 of the Complaint by: (a) referring the Court to the (i) referenced correspondence for its full contents and (ii) documents related to the Ark II Credit Agreement for their respective terms, and (b) otherwise denying the allegations in paragraph 84 of the Complaint.

11

85.     Respond to the allegations in paragraph 85 of the Complaint by referring the Court to the referenced Credit Agreement and covenants for their terms and otherwise denying the allegations in paragraph 85.

86.     Admit the allegations in paragraph 86 of the Complaint.

87.     Respond to the allegations in paragraph 87 of the Complaint by: (a) stating that, on February 12, 2016, TransCare executed direction letters dated January 15 and January 29, 2016, and referring the Court to the referenced letters for their contents and (b) otherwise denying the allegations in paragraph 87.

88.     Deny the allegations in paragraph 88 of the Complaint.

89.     Respond to the allegations in paragraph 89 of the Complaint by referring the Court to the referenced correspondence for its full contents and otherwise denying the allegations in paragraph 89.

90.     Respond to the allegations in paragraph 90 of the Complaint by referring the Court to the referenced "plan" and correspondence sent by Mr. Pelissier from a non-Patriarch email address for their full contents and otherwise denying the allegations in paragraph 90.

91.     Deny the allegations in paragraph 91 of the Complaint.

92.     Respond to the allegations in paragraph 92 of the Complaint by: (a) referring the Court to the referenced correspondence for its full contents, (b) denying knowledge or information sufficient to form a belief as to the amount of payroll taxes TransCare owed by February 24, 2019, and (c) otherwise denying the allegations in paragraph 92.

93.     Deny the allegations in paragraph 93 of the Complaint.

94.     Respond to the allegations in paragraph 94 of the Complaint by referring the Court to the referenced court filings for their contents.

12

95.     Respond to the allegations in paragraph 95 of the Complaint by referring the Court to the referenced documents for their contents and otherwise denying the allegations in paragraph 95.

96.     Respond to the allegations in the first sentence of paragraph 96 of the Complaint by referring the Court to the "Notice of Acceptance of Subject Collateral in Partial Satisfaction of Obligation" for its contents.  Respond to the allegations in the second sentence of paragraph 96 of the Complaint by: (a) stating that during the period of time relevant to this adversary proceeding Ms. Tilton served as TransCare's sole director and (b) denying knowledge or information sufficient to form a belief as to the referenced testimony.

97.     Deny the allegations in paragraph 97 of the Complaint.

98.     Respond to the allegations in paragraph 98 of the Complaint by: (a) referring the Court to the referenced written consent and court filings for their respective contents, (b) denying knowledge or information sufficient to form a belief as to what the Trustee has allegedly discovered, and (c) otherwise denying the allegations in paragraph 98 of the Complaint.

99.     Respond to the allegations in paragraph 99 of the Complaint by referring the Court to the referenced document for its contents and denying that the assets identified in the referenced document were ever ultimately transferred to Transcendence Transit.

100.    Deny the allegations in paragraph 100 of the Complaint, except state that Ark II received proceeds from the post-petition sale of assets.

101.    Respond to the allegations in paragraph 101 of the Complaint by referring the Court to the referenced proofs of claim for their contents.

13

102.    Respond to the allegations in paragraph 102 by: (a) referring the Court to the referenced court filing for its contents, (b) stating that PPAS received $800,000.01 from the Trustee's post-petition sale of assets, and (c) otherwise denying the allegations in paragraph 102.

103.    Respond to the allegations in paragraph 103 of the Complaint by stating that Ms. Tilton authorized the referenced chapter 7 filings and otherwise denying the allegations in paragraph 103.

104.    Respond to the allegations in paragraph 104 of the Complaint by stating that the quoted language appears in the *Response of Patriarch Partners Agency Services, LLC to Motion for the Entry of an Order, Pursuant to 11 U.S.C. §§ 105 and 721, Authorizing the Chapter 7 Trustee to Operate the Debtors' Business and Pay Certain Operating Expenses of These Estates* [Dkt No. 11] and referring the Court to that filing for its contents.

105.    Respond to the allegations in paragraph 105 of the Complaint by referring the Court to the referenced correspondence from Mr. Stephen for its full contents and otherwise denying the allegations in paragraph 105.

106.    Respond to the allegations in paragraph 106 of the Complaint by referring the Court to the referenced correspondence from Mr. Pelissier for its full contents and otherwise denying the allegations in paragraph 106.

107.    Admit the allegations in the first sentence of paragraph 107 of the Complaint and deny the allegations in the second sentence of paragraph 107 of the Complaint.

108.    Ms. Tilton repeats her responses to the allegations in the prior paragraphs of the Complaint as if fully set forth herein.

109.    Ms. Tilton states that the allegations in paragraph 109 of the Complaint constitute legal conclusions for which no response is required.

14

110.    Ms. Tilton denies the allegations in paragraph 110 of the Complaint.

111.    Ms. Tilton denies the allegations in paragraph 111 of the Complaint.

112.    Ms. Tilton denies the allegations in paragraph 112 of the Complaint.

113.    Ms. Tilton denies the allegations in paragraph 113 of the Complaint.

114.    PPAS, Ark II, PPMG and Patriarch Partners repeat their responses to the allegations in the prior paragraphs of the Complaint as if fully set forth herein.

115.    PPAS, Ark II, PPMG and Patriarch Partners lack knowledge or information sufficient to form a belief as to what relief the Trustee purports to seek and otherwise deny the allegations in paragraph 115 of the Complaint.

116.    PPAS, Ark II, PPMG and Patriarch Partners deny the allegations in paragraph 116 of the Complaint.

117.    PPAS, Ark II, PPMG and Patriarch Partners deny the allegations in paragraph 117 of the Complaint.

118.    PPAS, Ark II, PPMG and Patriarch Partners deny the allegations in paragraph 118 of the Complaint.

119.    PPAS, Ark II, PPMG and Patriarch Partners lack knowledge or information sufficient to form a belief as to what relief the Trustee requests and otherwise deny the allegations in paragraph 119 of the Complaint.

120.    Ark II repeats its responses to the allegations in the prior paragraphs of the Complaint as if fully set forth herein.

121.    Ark II lacks knowledge or information sufficient to form a belief as to what relief the Trustee purports to seek and otherwise denies the allegations in paragraph 121 of the Complaint.

A0311

122. Ark II denies the allegations in paragraph 122 of the Complaint.

123. Ark II denies the allegations in paragraph 123 of the Complaint.

124. Ark II lacks knowledge or information sufficient to form a belief as to what relief the Trustee purports to seek and otherwise denies the allegations in paragraph 124 of the Complaint.

125. No response is required to paragraph 125 of the Complaint, as it contains no allegations.

126. The Entity Defendants repeat their responses to the allegations in the prior paragraphs of the Complaint as if fully set forth herein.

127. No response is required to the allegations in paragraph 127 of the Complaint because the Trustee's Sixth Claim for Relief has been dismissed.

128. No response is required to the allegations in paragraph 128 of the Complaint because the Trustee's Sixth Claim for Relief has been dismissed.

129. No response is required to the allegations in paragraph 129 of the Complaint because the Trustee's Sixth Claim for Relief has been dismissed.

130. No response is required to the allegations in paragraph 130 of the Complaint because the Trustee's Sixth Claim for Relief has been dismissed.

131. PPAS, Ark II and Transcendence repeat their responses to the allegations in the prior paragraphs of the Complaint as if fully set forth herein.

132. PPAS, Ark II and Transcendence deny the allegations in paragraph 132 of the Complaint.

133. PPAS, Ark II and Transcendence deny the allegations in paragraph 133 of the Complaint.

A0312

134.    PPAS, Ark II and Transcendence deny the allegations in paragraph 134 of the Complaint.

135.    PPAS, Ark II and Transcendence lack knowledge or information sufficient to form a belief as to what the Trustee purports to seek and otherwise deny the allegations in paragraph 135 of the Complaint.

136.    PPAS, Ark II and Transcendence lack knowledge or information sufficient to form a belief as to what the Trustee purports to seek and otherwise deny the allegations in paragraph 136 of the Complaint.

137.    PPAS, Ark II and Transcendence lack knowledge or information sufficient to form a belief as to what the Trustee purports to seek and otherwise deny the allegations in paragraph 137 of the Complaint.

138.    No response is required to paragraph 138 of the Complaint, as it contains no allegations.

139.    Defendants repeat their responses to the allegations in the prior paragraphs of the Complaint as if fully set forth herein.

140.    Defendants deny the allegations in paragraph 140 of the Complaint.

141.    Defendants deny the allegations in paragraph 141 of the Complaint.

142.    Ark II repeats its responses to the allegations in the prior paragraphs of the Complaint as if fully set forth herein.

143.    Ark II responds to the allegations in paragraph 143 of the Complaint by referring the Court to the referenced proof of claim.

144.    Ark II lacks knowledge or information sufficient to form a belief as to what the Trustee purports to seek and otherwise denies the allegations in paragraph 144 of the Complaint.

17

145.    Ark II states that the allegations in paragraph 145 of the Complaint constitute legal conclusions for which no response is required and otherwise denies the allegations in paragraph 145.

146.    Ark II states that the allegations in the first sentence of paragraph 146 of the Complaint constitute legal conclusions for which no response is required and otherwise denies the allegations in paragraph 146.

147.    Ark II states that the allegations in the second sentence of paragraph 147 of the Complaint constitute legal conclusions for which no response is required and that it otherwise lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 147.

148.    Ark II states that the allegations in paragraph 148 of the Complaint constitute legal conclusions for which no response is required, except Ark II states that the subject transfers occurred within ninety days of the petition date.

149.    Ark II states that the allegations in paragraph 149 of the Complaint constitute legal conclusions for which no response is required and otherwise denies the allegations in paragraph 149.

150.    Ark II responds to the allegations in paragraph 150 of the Complaint by: (a) stating that it lacks knowledge or information sufficient to form a belief as to what the Trustee purports to request, (b) referring the Court to the referenced 2016 Intercreditor Agreement for its terms, and (c) otherwise denying the allegations in paragraph 150 of the Complaint.

151.    Ark II responds to the allegations in paragraph 151 of the Complaint by: (a) admitting that it has filed claims against TransCare; (b) stating that it lacks knowledge or

18

A0314

information sufficient to form a belief as to what the Trustee purports to seek, and (c) otherwise denying the allegations in paragraph 151 of the Complaint.

152.    Ark II repeats its responses to the allegations in the prior paragraphs of the Complaint as if fully set forth herein.[2]

153.    Ark II states that no response is required of it to the allegations set forth in paragraph 153 of the Complaint since those allegations are not about or directed to Ark II.

154.    Ark II states that the allegations in paragraph 154 of the Complaint constitute legal conclusions for which no response is required and otherwise denies the allegations in paragraph 154.

155.    Ark II states that no response is required of it to the allegations set forth in paragraph 155 of the Complaint since those allegations are not about or directed to Ark II.

156.    Ark II states that the allegations in paragraph 156 of the Complaint constitute legal conclusions for which no response is required and otherwise denies the allegations in paragraph 156.

157.    Ark II states that no response is required of it to the allegations set forth in paragraph 157 of the Complaint since those allegations are not about or directed to Ark II.

158.    Ark II lacks knowledge or information sufficient to form a belief as to what the Trustee purports to seek and otherwise denies the allegations in paragraph 158 of the Complaint.

159.    Ark II lacks knowledge or information sufficient to form a belief as to what the Trustee purports to seek and otherwise denies the allegations in paragraph 159 of the Complaint.

160.    Ark II lacks knowledge or information sufficient to form a belief as to what the Trustee purports to seek and otherwise denies the allegations in paragraph 160 of the Complaint.

---

[2] The Trustee's Eleventh Claim for Relief has been dismissed as against PPAS.

161.    PPAS repeats its responses to the allegations in the prior paragraphs of the Complaint as if fully set forth herein.

162.    PPAS responds to the allegations in paragraph 162 of the Complaint by referring the Court to the referenced proofs of claim for their contents.

163.    PPAS responds to the allegations in paragraph 163 of the Complaint by referring the Court to the referenced Intercreditor Agreement for its terms.

164.    PPAS responds to the allegations in paragraph 164 of the Complaint by referring the Court to the referenced Intercreditor Agreement for its terms.

165.    PPAS responds to the allegations in paragraph 165 of the Complaint by referring the Court to the referenced Intercreditor Agreement for its terms.

166.    PPAS states that the allegations in paragraph 166 of the Complaint constitute legal conclusions for which no response is required and otherwise denies the allegations in paragraph 166.

167.    PPAS lacks knowledge or information sufficient to form a belief as to what the Trustee purports to request and otherwise denies the allegations in paragraph 167 of the Complaint.

168.    PPAS and Ark II repeat their responses to the allegations in the prior paragraphs of the Complaint as if fully set forth herein.

169.    PPAS and Ark II respond to the allegations in paragraph 169 of the Complaint by referring the Court to the referenced Security Agreements for their terms.

170.    PPAS and Ark II respond to the allegations in paragraph 170 of the Complaint by referring the Court to the referenced Security Agreements for their terms.

20

171.     PPAS and Ark II state that the allegations in paragraph 171 of the Complaint constitute legal conclusions for which no response is required and otherwise deny the allegations in paragraph 171.

172.     PPAS and Ark II, upon information and belief, admit the allegations in the first sentence of paragraph 172 of the Complaint.  PPAS and Ark II state that the allegations in the second sentence of paragraph 172 of the Complaint constitute legal conclusions for which no response is required and otherwise deny the allegations in the second sentence of paragraph 172.

173.     PPAS and Ark II lack knowledge or information sufficient to form a belief as to what the Trustee purports to seek and otherwise deny the allegations in paragraph 173 of the Complaint.

174.     PPAS and Ark II repeat their responses to the allegations in the prior paragraphs of the Complaint as if fully set forth herein.

175.     PPAS and Ark II respond to the allegations in paragraph 175 of the Complaint by referring the Court to the referenced court approved stipulation for its terms.

176.     PPAS and Ark II respond to the allegations in paragraph 176 of the Complaint by referring the Court to the referenced court approved stipulation for its terms.

177.     PPAS and Ark II respond to the allegations in paragraph 177 of the Complaint by referring the Court to the referenced court approved stipulation for its terms.

178.     PPAS and Ark II respond to the allegations in paragraph 178 of the Complaint by referring the Court to the referenced court approved stipulation for its terms.

179.     PPAS and Ark II admit that PPAS received the referenced payment and that said payment was made pursuant to the terms of the referenced stipulation.

180.    PPAS and Ark II respond to the allegations in paragraph 180 of the Complaint by referring the Court to the referenced proofs of claim for their contents and otherwise denying the allegations of paragraph 180 to the extent they imply any form of wrongdoing by PPAS or Ark II.

181.    Upon information and belief, PPAS and Ark II admit the allegations in paragraph 181 of the Complaint.

182.    PPAS and Ark II state that the allegations in paragraph 182 of the Complaint constitute legal conclusions for which no response is required and otherwise deny the allegations in paragraph 182.

183.    PPAS and Ark II deny the allegations in paragraph 183 of the Complaint.

184.    PPAS and Ark II deny the allegations in paragraph 184 of the Complaint.

185.    PPAS and Ark II deny the allegations in paragraph 185 of the Complaint.

**Affirmative Defenses**

Defendants assert their Affirmative Defenses to the Complaint as follows:

**First Affirmative Defense**

186.    The Complaint fails to state a claim upon which relief may be granted.

**Second Affirmative Defense**

187.    To the extent TransCare transferred any interest in property to or for the benefit of an alleged transferee during the preference period, such transfers were intended by TransCare and such transferee to be contemporaneous exchanges for new value given to TransCare, and the transfers were, in fact, substantially contemporaneous exchanges.  11 U.S.C. § 547(c)(1).

22

Case 1:20-cv-06274-LAK Document 11-2 Filed 09/30/20 Page 135 of 136

### Third Affirmative Defense

188.    The Trustee's fraudulent conveyance claims are barred, in whole or in part, because each applicable defendant took the challenged transfer for value and in good faith and the debtors received reasonably equivalent value in exchange for the alleged transfers or obligations incurred.   The transfers are thus not avoidable or recoverable as against each applicable defendant(s) under sections 548 and 550 of the Bankruptcy Code.

### Fourth Affirmative Defense

The Trustee's claims are barred, in whole or in part, because he lacks standing to bring them.

### Fifth Affirmative Defense

189.    The Trustee's claims are barred, in whole or in part, on the ground of mootness.

### Sixth Affirmative Defense

190.    The Trustee's claims are barred, in whole or in part, because the Debtors' estate would be unjustly enriched it if were permitted to obtain recovery in this action.

### Federal Rule of Bankruptcy Procedure 7012(b) Statement

To the extent the Trustee's claims are non-core, Defendants do not consent to the entry of final orders or judgment by the Bankruptcy Court with respect to such non-core claim or claims.

WHEREFORE, Defendants demand Judgment:

A.    Dismissing the Complaint with prejudice and in its entirety; and

B.    Awarding Defendants such other and further relief as may be just and proper.

A0319

Case 1:20-cv-06274-LAK  Document 11-2  Filed 09/30/20  Page 136 of 136

Dated: May 6, 2019               PROSKAUER ROSE LLP

By: *Michael T. Mervis*
        Michael T. Mervis
        Timothy Q. Karcher
        Eleven Times Square
        New York, NY  10036-8299
        Tel.: (212) 969-3000
        Fax: (212) 969-2900
        Email: mmervis@proskauer.com
                tkarcher@proskauer.com

        Nicole A. Eichberger (*pro hac vice*)
        650 Poydras Street
        Suite 1800
        New Orleans, LA 70130-6146
        Tel.: (504) 310-2024
        Fax: (504) 310-2022
        Email: neichberger@proskauer.com
        *Attorneys for Defendants*

24

**A0320**