# 20 Civ. 06274 (LAK)

**United States District Court**

*for the*

**Southern District of New York**

———————————————

IN RE TRANSCARE CORPORATION, ET AL.

DEBTORS,

———————————————

PATRIARCH PARTNERS AGENCY SERVICES, LLC, ET AL.

DEFENDANTS-APPELLANTS,

—against—

SALVATORE LAMONICA, AS CHAPTER 7 TRUSTEE OF THE JOINTLY-ADMINISTERED ESTATES OF TRANSCARE CORPORATION, ET AL.,

PLAINTIFF-APPELLEE.

———————————————

ON APPEAL FROM THE UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK (BERNSTEIN, J.)

IN RE: TRANSCARE CORPORATION, ET AL., CASE NO. 16-10407 (SMB)

LAMONICA V. TILTON, ET AL., ADV. PROC. NO. 18-1021 (SMB)

## APPENDIX TO BRIEF FOR THE APPELLANTS

## Volume III - A0321-A0522

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
--------------------------------------------------------------x
In re:                                         :
                                               :
                                               :
        TRANSCARE CORPORATION, et al.,         :      Chapter 7
                                               :      Case No. 16-10407 (SMB)
                                               :      (Jointly Administered)
                      Debtors.                 :
--------------------------------------------------------------x
SALVATORE LAMONICA, as Chapter 7               :
Trustee for the Estates of TransCare           :
Corporation, et al.,                           :
                                               :
                      Plaintiff,               :
                                               :      Adv. Proc. No. 18-1021 (SMB)
        - against -                            :
                                               :
LYNN TILTON, PATRIARCH PARTNERS                :      JOINT PRETRIAL ORDER
AGENCY SERVICES, LLC, PATRIARCH                :
PARTNERS, LLC, PATRIARCH PARTNERS              :
MANAGEMENT GROUP, LLC, ARK II CLO              :
2001-1 LIMITED, TRANSCENDENCE                  :
TRANSIT, INC., and TRANSCENDENCE               :
TRANSIT II, INC.,                              :
                                               :
                      Defendants.              :
                                               :
--------------------------------------------------------------x
```

The parties having conferred among themselves and with the Court pursuant to Fed. R.

Civ. P. 16, the following statements, directions and agreements are adopted as the Pretrial Order

herein.

I.      NATURE OF THE CASE

        A.  Plaintiff's Statement and Relief Sought

        This is a breach of fiduciary action against Lynn Tilton, the debtor's sole director, brought

by the Chapter 7 Trustee of TransCare Corporation and its wholly-owned subsidiary debtors

("TransCare" or "Debtors").  The Trustee also brings nine additional claims and claim objections

against six entities owned and controlled by Tilton:  PPAS, Ark II, Patriarch Partners, PPMG, Transcendence and Transcendence II (the "Entity Defendants" and, collectively with Ms. Tilton, "Defendants").[1]  Tilton engaged in self-dealing when confronted with TransCare's liquidity crisis in 2015 and early 2016:  instead of restructuring TransCare for the benefit of all stakeholders, she transferred TransCare's valuable assets to a new company, controlled by her, and sought to have the remainder liquidated in bankruptcy.  As a result, TransCare received less in liquidation sales than it should have had it been restructured appropriately.  Tilton used the Entity Defendants to facilitate the Transcendence transaction.  The Trustee seeks the following relief:

Tilton:                    Damages for breaching her fiduciary duty of loyalty and good faith (Claim 1) and sanctions for acts taken in violation of the automatic stay (Claim 9).  The Trustee seeks no less than approximately $17 million in damages based upon Tilton's own analysis as to the value of TransCare's assets when conducting the Transcendence transaction.

PPAS:                    Recovery of value of between $17.0 million and $33.4 million for assets fraudulently transferred via "strict foreclosure" (Claim 7), equitable subordination of claims (Claim 3), contractual payment subordination (Claim 12), equitable limitation on liens (Claim 13), turnover and avoidance of $800,000 postpetition transfer (claim 14), sanctions for acts taken in violation of the automatic stay (Claim 9) and disallowance of claims pursuant to 11 U.S.C. §502(d) (Claims 7, 11 and 14).

Ark II:                    Recovery of value of between $17.0 million and $33.4 million for assets fraudulently transferred via "strict foreclosure" (Claim 7), equitable subordination of claims (Claim 3), recharacterization of claims as equity (Claim 4), avoidance of grant of security interest

---

[1] The full names of the Entity Defendants are as follows: Patriarch Partners Agency Services, LLC, Ark II CLO 2001-1 Limited, Patriarch Partners, LLC, Patriarch Partners Management Group, LLC, Transcendence Transit, Inc. and Transcendence Transit II, Inc.

as preference or constructive fraudulent transfer and preservation of lien for the benefit of the estate (Claims 10 and 11), equitable limitation on liens (Claim 13), turnover and avoidance of $800,000 postpetition transfer (Claim 14), sanctions for acts taken in violation of the automatic stay (Claim 9) and disallowance of claims pursuant to 11 U.S.C. §502(d) (Claims 7, 10, 11 and 14).

Patriarch Partners:   Sanctions for acts taken in violation of the automatic stay (Claim 9).

PPMG:   Sanctions for acts taken in violation of the automatic stay (Claim 9).

Transcendence:   Recovery of value of between $17.0 million and $33.4 million for assets fraudulently transferred via "strict foreclosure" (Claim 7) and sanctions for acts taken in violation of the automatic stay (Claim 9).

Transcendence II:   Recovery of value of between $17.0 million and $33.4 million for assets fraudulently transferred via "strict foreclosure" (Claim 7) and sanctions for acts taken in violation of the automatic stay (Claim 9).

B. Defendants' Statement and Relief Sought

TransCare faced liquidity constraints throughout 2015 and early 2016. Throughout 2015, TransCare's management provided Ms. Tilton, TransCare's sole director, with turnaround or stabilization plans that required millions in capital investment or debt financing that (i) TransCare could not otherwise obtain and (ii) Ms. Tilton had no legal duty to provide. Ms. Tilton did not believe that any of these plans were likely to succeed. Nevertheless, during the time period relevant to this adversary proceeding, Ms. Tilton authorized the advancement of over $9 million

to TransCare through several investment vehicles she owned and controlled in order to continue TransCare as a going concern.

By December 2015, TransCare's relationship with Wells Fargo, TransCare's asset based lender, had deteriorated significantly. This was due, in large part, to Wells Fargo's stated concerns about the reliability of financial information produced by TransCare's management. At that time, the Wells Fargo Credit Facility (as defined below) was due to expire and Ms. Tilton had lost confidence in TransCare management's ability to effectuate a successful turnaround.

At that point Ms. Tilton considered several alternatives, including selling TransCare through a formal sale process. In February 2016, Ms. Tilton ultimately came up with a restructuring plan that she believed would save jobs and satisfy TransCare's obligations to Wells Fargo. The idea was to (a) separate TransCare's more profitable business lines from its unprofitable business lines (by causing the Term Loan Lenders to foreclose on those business lines), (b) operate the more profitable business lines through a "Newco" (*i.e.*, Transcendence) and (c) work with Wells Fargo to effectuate an orderly wind down of TransCare's unprofitable businesses in bankruptcy. This restructuring plan was discussed and negotiated with and among Ms. Tilton and her team, Wells Fargo, and their respective legal and financial advisors, among others, and was intended to be consensual. Unfortunately, Wells Fargo refused to extend the credit facility and TransCare filed for bankruptcy. Even then, Ms. Tilton still tried to save jobs for TransCare employees through the operation of Transcendence. However, interference by the Trustee caused that portion of the plan to fail and Transcendence never operated. Thus, while, on paper, the foreclosure about which the Trustee complains took place, the assets were never

A0324

ultimately transferred to Transcendence.  Indeed, Ms. Tilton was personally prepared to commit millions of dollars in additional financing for Transcendence, had the plan come to fruition.

No harm befell TransCare as a result of Ms. Tilton's conduct or the conduct of any of the Entity Defendants.  The Trustee's theory of damages rests on the underlying assumption that, but for Ms. Tilton and the Entity Defendants' conduct, TransCare would likely have achieved certain lofty values calculated by the Trustee's expert witness.  But it is entirely speculative and counterfactual that TransCare's assets would have been worth more but for the attempts to restructure through Transcendence.  To the contrary, the evidence will show that TransCare had no prospect or ability to continue as a going concern at the time the restructuring plan was developed and attempts were made to implement it.  The disputed foreclosure had no impact on TransCare or its value.

The claims asserted against the Entity Defendants are similarly meritless:  none of the Entity Defendants engaged in inequitable conduct or otherwise took action inconsistent with, or in contravention of, the Bankruptcy laws.  Because the Trustee cannot prove any of the claims for relief asserted in the Amended Complaint, judgment should be entered in favor of Defendants.

II.    BASIS FOR JURISDICTION, WHETHER THE CASE IS CORE OR NON-CORE,
       AND WHETHER THE BANKRUPTCY JUDGE MAY ENTER FINAL ORDERS OR
       JUDGMENT

This Court has jurisdiction over this proceeding pursuant to 28 U.S.C. § 1334 because this action arises in or relates to a case under title 11 of the United States Code (the "Bankruptcy Code") and pursuant to 28 U.S.C. § 1331 as it arises in part under the laws of the United States.

Plaintiff contends that this is a core proceeding as defined in 28 U.S.C. § 157(b)(2) and consents to the Bankruptcy Court issuing a final order on the claims asserted herein.  Plaintiff contends that Defendants have waived any objections to the jurisdiction of the Bankruptcy Court

A0325

pursuant to, among other things, Federal Rule of Bankruptcy Procedure 7012 and their filing of proofs of claim.

Defendants contend that the Amended Complaint contains both core and non-core claims. Defendants do not consent to the Bankruptcy Court issuing a final order on the non-core claims.

## III.   STIPULATED FACTS

### A.  The Parties[2]

1.      Plaintiff Salvatore LaMonica ("LaMonica" or "Trustee") is the chapter 7 trustee of the jointly-administered bankruptcy estates of TransCare Corporation and its wholly-owned subsidiaries[3].  TransCare was founded in 1993 and is incorporated under the laws of Delaware. TransCare provided paratransit services for both emergency and non-emergency patients and individuals with disabilities to healthcare facilities, municipalities and transit authorities in the mid-Atlantic region.  TransCare was headquartered at 1 Metrotech Center, Brooklyn, New York.

2.      Defendant Lynn Tilton was the sole director of TransCare.

3.      Defendant Patriarch Partners Agency Services, LLC ("PPAS") is a Delaware limited liability company with a principal place of business at 1 Liberty Street, 35th Floor, New York, New York.  Ms. Tilton is the sole manager and ultimate indirect owner of PPAS.

---

[2] Unless otherwise noted, the facts below relate to the time period from November 1, 2014 through February 24, 2016 (the "Relevant Time Period").

[3] TransCare New York, Inc., TransCare ML, Inc., TC Ambulance Group, Inc., TransCare Management Services, Inc., TCBA Ambulance, Inc., TC Billing and Services Corporation, TransCare Westchester, Inc., TransCare Maryland, Inc., TC Ambulance North, Inc., TransCare Harford County, Inc., TransCare Pennsylvania, Inc., TC Ambulance Corporation and TC Hudson Valley Ambulance Corp. (the "TransCare Subsidiaries").

6

4.      Defendant Patriarch Partners, LLC ("Patriarch Partners") is a Delaware limited liability company with a principal place of business at 1 Liberty Street, 35th Floor, New York, New York.  Ms. Tilton is the sole manager and ultimate indirect owner of Patriarch Partners.

5.      Defendant Patriarch Partners Management Group, LLC ("PPMG") is a Delaware limited liability company with a principal place of business at 1 Liberty Street, 35th Floor, New York, New York.  Ms. Tilton is the sole manager and ultimate indirect owner of PPMG.

6.      Defendant Ark II CLO 2001-1, Limited ("Ark II") is a Cayman Islands company with a principal place of business at 1 Liberty Street, 35th Floor, New York, New York.  Ark II owns a 55.7% direct interest in TransCare.  Ms. Tilton owns 99% of Ark II.

7.      Defendant Transcendence Transit, Inc. ("Transcendence Transit") and Transcendence Transit II, Inc. ("Transcendence II" and, together with Transcendence Transit, "Transcendence") are both Delaware corporations.  Transcendence has a mailing address at 1 Liberty Street, 35th Floor, New York, New York.  Ms. Tilton is the sole director of both entities, and Transcendence is the parent of Transcendence II.

## B.  TransCare's Ownership Structure

8.      Ark II owns 55.7% of TransCare's shares.

9.      Ark Investment Partners II, L.P. ("AIP") owns 5.6% of TransCare's shares.

## C.  TransCare's Debt Structure

PPAS Credit Agreement

10.     TransCare Corporation, as borrower, the Term Loan Lenders (as defined below), as lenders, and PPAS, as Administrative Agent, are parties to a Credit Agreement, dated as of August 4, 2003, and as amended (the "PPAS Credit Agreement").  During the Relevant Time Period, the lenders under the PPAS Credit Agreement were: (i) AIP, (ii) Zohar CDO 2003-1, Ltd.,

7

Zohar II 2005-1, Ltd., and Zohar III, Ltd. (collectively, the "Zohar Funds"); (iii) Credit Suisse

Alternative Capital, Inc. ("Credit Suisse"); and (iv) First Dominion Funding I ("First Dominion"

and, together with AIP, the Zohar Funds, and Credit Suisse, the "Term Loan Lenders").

11.     The PPAS Credit Agreement is governed by New York law.

12.     In connection with the PPAS Credit Agreement, TransCare Corporation executed

a Security Agreement, dated as of August 4, 2003, and as amended, supplemented or modified, in

favor of PPAS, as Administrative Agent for the Term Loan Lenders.

13.     In addition to the Security Agreement, the TransCare Subsidiaries also executed a

Subsidiaries' Guarantee, dated as of August 4, 2003, as amended, supplemented or modified, in

favor of PPAS, as Administrative Agent for the Term Loan Lenders.

The Wells Fargo Credit Facility

14.     TransCare Corporation, TransCare New York, Inc., TransCare Pennsylvania, Inc.,

TransCare Maryland, Inc., TransCare ML, Inc., TC Hudson Valley Ambulance Corp., TC Billing

and Services Corp., TC Ambulance Corporation, TransCare Management Services, Inc., TCBA

Ambulance, Inc., TransCare Westchester, Inc. and TransCare Harford County, Inc., as Borrowers

and TC Ambulance Group, Inc. and TC Ambulance North, Inc., as Guarantors, entered into a Loan

and Security Agreement with Wells Fargo N.A., as successor-by-merger with Wachovia Bank,

N.A. ("Wells Fargo"), dated October 13, 2006 (as amended, the "Wells Fargo Credit Facility").

The Wells Fargo Credit Facility is a syndicated asset-backed revolving credit facility.

15.     The Wells Fargo Credit Facility is governed by New York law.

16.     In connection with the Wells Fargo Credit Facility, Wells Fargo and PPAS, on

behalf of the Term Loan Lenders, entered into an Intercreditor Agreement, dated October 13, 2006

(the "2006 Intercreditor Agreement").

8

<u>The Ark II Credit Agreement</u>

17.     TransCare Corporation and Ark II entered into a Credit Agreement, dated as of January 15, 2016 (the "<u>Ark II Credit Agreement</u>").

18.     The Ark II Credit Agreement is governed by New York law.

19.     In connection with the Ark II Credit Agreement, TransCare Corporation executed a Security Agreement, dated as of January 15, 2016, in favor of Ark II (the "<u>Ark II Security Agreement</u>").

20.     In addition to the Ark II Security Agreement, the TransCare Subsidiaries also executed a Guaranty, dated as of January 15, 2016, in favor of Ark II (the "<u>Ark II Guaranty</u>").

21.     The Ark II Agreement, Ark II Security Agreement, and Ark II Guaranty were executed by Ark II and TransCare on or about February 10-11, 2016.

22.     In connection with the Ark II Credit Agreement, Ark II and PPAS entered into an intercreditor agreement, dated as of January 15, 2016 (the "2016 <u>Intercreditor Agreement</u>"), for which TransCare executed an acknowledgment.  The 2016 Intercreditor Agreement was executed on or about February 10-11, 2016.

23.     On January 29, 2016, Ark II filed separate UCC-1 financing statements with the Delaware Department of State for TransCare Corporation and the TransCare Subsidiaries.  Each UCC-1 financing statement provided that Ark II held a security interest in "All assets of the debtor . . ."

**D.  <u>TransCare's Operations and Events Leading to Bankruptcy</u>**

24.     Glenn Leland served as TransCare's Chief Executive Officer from on or about January 12, 2015 through on or about January 8, 2016.

9

**A0329**

25.    Mark Bonilla served as TransCare's Chief Financial Officer from on or about April 14, 2014 through on or about September 29, 2015.  After resigning in September 2015, Bonilla served as a consultant to TransCare through on or about January 8, 2016.

26.    Peter Wolf served as TransCare's Chief Operating Officer from on or about November 16, 2015 through on or about February 24, 2016.

27.    Throughout the Relevant Time Period, TransCare experienced difficulties in funding employee payroll and paying vendors.

28.    Throughout the Relevant Time Period, TransCare was delayed in transmitting monthly financial statements to its lenders.

29.    During the Relevant Time Period, TransCare provided paratransit services to the New York City Transit Authority (the "MTA").  These services were provided pursuant to Contract No. 07H9751T, dated February 27, 2009, between the MTA and TransCare New York, Inc., as amended (the "MTA Contract").  Under the MTA Contract, TransCare provided paratransit services for MTA customers using vehicles leased from the MTA.

30.    On July 13, 2015, TransCare New York, Inc. and the MTA executed Modification No. 7 to the MTA Contract ("Modification No. 7").  Pursuant to Modification No. 7, effective August 1, 2015, the MTA Contract was extended through October 31, 2019.

31.    On or about July 2, 2015, Wells Fargo informed TransCare that Wells Fargo was in an over-advanced position under the Wells Fargo Credit Facility.  Wells Fargo also informed TransCare management that it would not provide TransCare with funding for payroll for the week ending July 4, 2015.

32.    On July 3, 2015, TransCare missed payroll.

A0330

33. The Wells Fargo Credit Facility was set to renew on January 31, 2016 unless terminated by a date certain prior to that date.

34. On October 14, 2015, Wells Fargo issued a Notice of Non-Renewal to TransCare (the "Non-Renewal Notice"). The Non-Renewal Notice indicated that the Wells Fargo Credit Facility would expire on January 31, 2016.

35. On December 23, 2015, Wells Fargo transmitted a summary of proposed terms for a longer-term forbearance of the Wells Fargo Credit Facility to Jean-Luc Pelissier and Michael Greenberg. The proposed terms included the engagement by TransCare of a third-party financial advisor and a budget for TransCare.

36. On January 7, 2016, TransCare and Carl Marks Advisory Group LLC ("Carl Marks") entered into a consulting agreement.

37. On February 10, 2016, Transcendence Transit and Transcendence II were incorporated under the laws of Delaware.

38. By letter agreement dated February 10, 2016, TransCare engaged the law firm of Curtis, Mallet-Prevost, Colt & Mosle LLP ("Curtis Mallet") to advise on an out-of-court restructuring or in-court proceeding.

39. By letter agreement dated February 18, 2016, TransCare engaged Curtis Mallet to assist the Initial-Filed Debtors (as defined below) in commencing a filing under Chapter 7 of the Bankruptcy Code.

40. On the morning of February 24, 2016, PPAS, as Administrative Agent, the Zohar Funds and AIP issued a Notice of Default and Acceleration, dated February 24, 2016, to TransCare (the "Notice of Default").

11

41.     In connection with the Notice of Default, on the morning of February 24, 2016, PPAS, as Administrative Agent, the Zohar Funds and AIP issued a Notice of Acceptance of Subject Collateral in Partial Satisfaction of Obligation, dated February 24, 2016, to TransCare (the "Notice of Acceptance").  TransCare signed the Notice of Acceptance.

42.     The Notice of Acceptance covered certain personal property, including equipment, inventory, vehicles and certain contracts (defined as, the "Subject Collateral") in which PPAS, as Administrative Agent, the Zohar Funds and AIP held a security interest.

43.     On the morning of February 24, 2016, PPAS, as Administrative Agent, and Transcendence, entered into a Bill of Sale, Agreement to Pay and Transfer Statement, dated February 24, 2016.

**E.  TransCare's Bankruptcy Filings**

44.     TransCare Corporation and certain affiliated subsidiaries (the "Initial Debtors") filed voluntary Chapter 7 bankruptcy petitions in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") on the evening of February 24, 2016.

   a.   *In re TransCare Corp.* (16- bk-10407-smb)

   b.   *In re TransCare New York, Inc.* (16- bk-10408-smb)

   c.   *In re TransCare ML, Inc.* (16- bk-10409-smb)

   d.   *In re TC Ambulance Group, Inc.* (16- bk-10410-smb)

   e.   *In re TransCare Management Services, Inc.* (16- bk-10411-smb)

   f.   *In re TCBA Ambulance, Inc.* (16- bk-10412-smb)

   g.   *In re TC Billing and Services Corporation* (16- bk-10413-smb)

   h.   *In re TransCare Westchester, Inc.* (16- bk-10414-smb)

   i.   *In re TransCare Maryland, Inc.* (16- bk-10415-smb)

12

    j.    *In re TC Ambulance North, Inc.* (16- bk-10416-smb)

    k.    *In re TransCare Harford County, Inc.* (16- bk-10417-smb)

45.    On February 25, 2016, LaMonica was appointed as the interim Chapter 7 Trustee of the Initial Debtors' cases.

46.    On or about February 25, 2016, Ms. Tilton and Wells Fargo were unable to agree on terms for providing payroll funding to pay TransCare's employees for the week of February 19, 2016.

47.    On March 1, 2016, Shameeka Ien filed an adversary class action complaint captioned as *Ien v. TransCare Corp., et al.*, Adv. Proc. No. 16-1033 (the "<u>WARN Proceeding</u>") in the Bankruptcy Court against all of the TransCare entities, Tilton, Patriarch Partners, Ark II, AIP and Patriarch Partners III, LLC, asserting damages under the WARN Act and the N.Y. WARN Act (collectively, the "<u>WARN Acts</u>"),[4] along with unpaid wages, vacation time, and attorneys' fees and costs.

48.    On March 10, 2016, the Trustee, PPAS, and Transcendence Transit entered into a Stipulation Respecting the Sale of Certain Personal Property (the "<u>Personal Property Stipulation</u>"). The Personal Property Stipulation provided for the sale of certain property, including the "Subject Collateral" identified in the Notice of Acceptance discussed above, with the proceeds of such sale (net of the costs of sale) to be divided 20% for the benefit of TransCare's estates and 80% to PPAS, as Administrative Agent.

---

[4] Worker Adjustment and Retraining Notification Act, 29 U.S.C. §2101 <u>et</u> <u>seq.</u>; New York Worker Adjustment and Retraining Notification Act, N.Y. Labor Law §860 <u>et</u> <u>seq.</u>

A0333

49.     On March 25, 2016, the Bankruptcy Court entered an order approving the Personal Property Stipulation [Dkt. 52]. As a result of the Trustee's sale efforts, the Trustee distributed $800,000.01 to PPAS in accordance with the Personal Property Stipulation.

50.     TransCare Pennsylvania, Inc., TC Hudson Valley Ambulance Corp., and TC Ambulance Corporation (the "Later-Filed Debtors") filed voluntary Chapter 7 bankruptcy petitions in the Bankruptcy Court on April 25, 2016.

a.  *In re TransCare Pennsylvania, Inc.* (16- bk-11057-smb)

b.  *TC Hudson Valley Ambulance Corp.* (16- bk-11058-smb)

c.  *TC Ambulance Corporation* (16- bk-10410-smb)

51.     The Initial Debtors' and the Later-Filed Debtors' cases are being jointly-administered [Dkt. 17, Dkt. 189]. LaMonica serves as the Chapter 7 Trustee for both the Initial and Later-Filed Debtors.

52.     By letters dated June 14, 2016, Ms. Tilton resigned as director of TransCare.

53.     On October 9, 2017, Ark II filed proofs of claim against TransCare asserting a secured claim for $1,077,966.97 in connection with the Ark II Credit Agreement.[5]

54.     On October 9, 2017, PPAS, on behalf of itself and as the Administrative Agent for the Term Loan Lenders, filed proofs of claim against TransCare asserting a secured claim for $35,090,492.76 in connection with the PPAS Credit Agreement.[6]

---

[5] Claim No. 8 in Case No. 16-11058, Claim No. 8 in Case No. 16-10410, Claim No. 8 in Case No. 16-10416, Claim No. 8 in Case No. 16-10412, Claim No. 9 in Case No. 16-10411, Claim No. 11 in Case No. 16-10414, Claim No. 14 in Case No. 16-10417, Claim No. 14 in Case No. 16-10409, Claim No. 18 in Case No. 16-11047, Claim No. 23 in Case No. 16-10415, Claim No. 31 in Case No. 16-10413, Claim No. 75 in Case No. 16-10408, and Claim No. 18 in Case No. 16-11059.

[6] Claim No. 6 in Case No. 16-11058, Claim No. 6 in Case No. 16-10410, Claim No. 6 in Case No. 16-10416, Claim No. 6 in Case No. 16-10412, Claim No. 7 in Case No. 16-10411, Claim No. 9 in Case No. 16-10414, Claim No. 12 in Case No. 16-10417, Claim No. 12 in Case No. 16-10409,

14

**A0334**

55.     On October 9, 2017, Patriarch Partners filed a proof of claim against TransCare asserting an unsecured claim for $2,587.98 in advanced expenses.[7]

56.     On October 9, 2017, PPMG filed proofs of claim against TransCare asserting an unsecured claim for $2,038,515.87 in management fees.[8]

57.     The Internal Revenue Service (the "IRS") filed proofs of claim against TransCare.[9]

58.     On July 6, 2017, the state taxing authorities filed proofs of claim against TransCare.[10]

## IV.     PARTIES' CONTENTIONS

The pleadings are deemed amended to embrace the following, and only the following, contentions of the parties:

---

Claim No. 16 in Case No. 16-11057, Claim No. 21 in Case No. 16-10415, Claim No. 29 in Case No. 16-10413, Claim No. 73 in Case No. 16-10408 and Claim No. 16 in Case No. 16-11059.

[7] Claim No. 587 in Case No. 16-10407.

[8] Claim No. 7 in Case No. 16-11058, Claim No. 7 in Case No 16-10410, Claim No. 7 in Case No. 16-10416, Claim No. 7 in Case 16-10412, Claim No. 8 in Case No. 16-10411, Claim No. 10 in Case No. 16-10414, Claim No. 13 in Case No. 16-10417, Claim No. 7 in Case No 16-10410, Claim No. 17 in Case No. 16-11059, Claim No. 17 in Case No. 16-11057, Claim No. 22 in Case No. 16-10415, Claim No. 30 in Case No. 16-10413, Claim No. 74 in Case No. 16-10408 and Claim No. 13 in Case No. 16-10409.

[9] Claim No. 246 in Case No. 16-10407, Claim No. 31 in Case No. 10408, Claim No. 3 in Case No. 10409, Claim No. 3 in Case No. 10410, Claim No. 4 in Case No. 10411, Claim No. 3 in Case No. 10412, Claim No. 4 in Case No. 10413, Claim No. 5 in Case No. 10414, Claim No. 9 in Case No. 10415, Claim No. 3 in Case No, 10416, Claim No. 4 in Case Number 10417, Claim No. 1 in Case No. 11057, Claim No. 1 in Case No. 11058 and Claim No. 1 in Case No. 11059.

[10] Claim No. 58 in Case No. 16-10408, Claim No. 5 in Case No. 16-10413 and Claim No. 1 in Case No. 16-11059.

15

A. Plaintiff's Contentions

1. Contentions as to Background Facts

a. Contentions as to Ownership of Transcendence and Ark II

1.    There is no stock register for Transcendence.

2.    Tilton is the direct or indirect owner of Transcendence.

3.    Transcendence is owned approximately 55% by Ark II, per Tilton's deposition testimony.

4.    The remaining 1% of Ark II not directly owned by Tilton is controlled by Tilton for a family member.

b. Contentions as to TransCare's Equity Structure

5.    Hampshire TC Holdings LLC owned 8.6% of TransCare's shares.

6.    First Dominion owned 8.2% of TransCare's shares.

7.    Credit Suisse owned 6.8% of TransCare's shares.

8.    TransCare's remaining 20.7% of shares were owned by a variety of entities and individuals, with none of these other shareholders holding more than 3.5% of the shares.

c. Contentions as to TransCare's Business

9.    TransCare employed over 1,800 employees, including emergency medical technicians, drivers and mechanics.

10.   By 2015, TransCare owned a fleet of over 600 ambulances, buses, vans and paratransit vehicles and provided ambulance, paratransit and critical care transfer services in New York, Pennsylvania and Maryland, including 911/ EMS services, basic life support, advanced life support, critical care transport, ambulette and wheelchair van services, non-emergency response services and special venue transportation services.

16

11.    As of at least 2015, TransCare had five main business segments:

    a.   paratransit services provided to the New York City Transit Authority (the "<u>MTA</u>"),

    b.   911 services provided in New York City,

    c.   emergency, 911 and non-emergency transport services provided in Hudson Valley, New York,

    d.   emergency and non-emergency transport services provided in Pittsburg, Pennsylvania, and

    e.   emergency and non-emergency transport services provided in Maryland.

12.    The MTA Contract was TransCare's most profitable business segment.

13.    Within New York, TransCare provided services in accordance with seven Certificates of Need issued to TransCare by the New York State Department of Health (the "<u>CONs</u>").[11]

14.    In New York, ambulance operators are required to hold a CON for a specific market in order to provide ambulance services in that market.

15.    TransCare reported the following revenues from 2009 to October 2015: (i) $138.3 million in 2009, (ii) $152.1 million in 2010, (iii) $143.5 million in 2011, (iv) $137.7 million in

---

[11] The CONs are identified as follows: (i) No. 0164 issued to TransCare New York, Inc. d/b/a TransCare for Bronx, Kings, Nassau, New York, Queens, Richmond, Suffolk and Westchester counties; (ii) No. 0470 issued to TransCare Westchester, Inc. for Westchester county; (iii) No. 0508 issued to TC Ambulance Group, Inc., d/b/a Mount Sinai Beth Israel for Kings, Queens, Richmond, Bronx and New York counties; (iv) No. 0509 issued to TC Ambulance North, Inc., d/b/a TransCare for Bronx, New York, Queens, Kings and Richmond counties; (v) No. 510 issued to TC Ambulance Corp. d/b/a Metro EMS for Bronx, New York, Queens, Kings, Richmond and Westchester counties; (vi) No. 0574 issued to TCBA Ambulance, Inc., d/b/a St. Barnabas Hospital Emergency Services for Bronx, Kings, New York, Queens and Richmond counties; and (vii) No. 667 issued to TC Hudson Valley Corp. d/b/a TransCare for Rockland, Orange, Ulster, Sullivan, Dutchess, Putnam, Westchester and Delaware counties.

17

2012, (v) \$127.4 million in 2013, (vi) \$131.1 million in 2014 and (vii) \$118.9 million for the 12 months ending October 2015.

16.     TransCare reported the following EBITDA for 2009 to October 2015: (i) \$9.1 million in 2009, (ii) \$7.7 million in 2010, (iii) \$.9 million in 2011, (iv) \$8.9 million in 2012, (v) \$7.2 million in 2013, (vi) \$.5 million in 2014 and (vii) \$1.4 million for the 12 months ending October 2015.

17.     On June 29, 2015, Bonilla wrote to Leland that TransCare's Board had ordered the payment of interest that week despite his warning that doing so would place TransCare at high risk of being unable to make payroll, as shown by PX 67.

18.     On July 7, 2015, the Journal News in the New York City area published an article titled "TransCare Ambulance Service Facing 'Payroll Crisis'" stating that TransCare had missed payroll.

19.     On July 6, 2015, as shown by PX 68 Leland emailed a turnaround plan dated June 7, 2015 to Greenberg and Whalen, which stated:

    a.  "We propose … an immediate loan of \$5M.  If Patriarch Partners is unable or unwilling to provide these funds, we request permission to seek alternative sources of financing;"

    b.  "Under normal circumstances a company like TransCare with threats to on-going operations, would seek protection from creditors thru bankruptcy.  We are told that this is not an option in the Patriarch portfolio…;"

    c.  "Management has squeezed almost all the profit improvement possible from current operations;" and

18

Case 1:20-cv-06274-LAK   Document 11-3   Filed 09/30/20   Page 20 of 203

     d.   "In the absence of financing to accelerate plan execution, the only remaining options are bleak. If TransCare fails to find a way to continue operations and instead loses insurance, is evicted from critical facilities or otherwise forced to cease operations, the WARN act liability is approximately $19.4M."

20.     On about July 8, 2015, EZ-Pass – which provided a toll service allowing TransCare to operate its vehicles without delay through tolls – suspended service to TransCare due to chronic non-payment.

21.     Between November 13 and November 16, 2015, Greenberg, Pelissier, Leland and Bonilla prepared a presentation with fourth quarter 2015 and 2016 projected financials for TransCare for a November 16, 2015 meeting with Wells Fargo, as shown by PX 101.

22.     On November 16, 2015, Greenberg, Pelissier, Leland and Bonilla met with Wells Fargo to provide the presentation and discuss an extension of the December 31, 2015 maturity date of the Wells Fargo Credit Facility. On November 21, 2015, Leland reported on the meeting to Tilton, as shown by JX 52.

23.     Following the meeting with Wells Fargo, Leland, Bonilla, Pelissier and Greenberg continued revising the 2016 financial projections for TransCare.

24.     Throughout December 2015, Wells Fargo and Defendants engaged in discussions concerning Wells Fargo and TransCare entering into a longer-term forbearance with regard to the Wells Fargo Credit Facility.

25.     On December 11, 2016, Bonilla provided Greenberg with the updated 2016 financial projections for TransCare, as shown by PX 119.

2.    Contentions as to TransCare's Debt Structure

a.    The PPAS Credit Agreement

26.    Tilton owns and manages AIP.

27.    Tilton was the collateral manager for the Zohar Funds until March 3, 2016.

28.    Credit Suisse served as the collateral manager for First Dominion.

29.    AIP and the Zohar Funds together constituted the "Required Lenders", under Section 1.1 of the Credit Agreement.

30.    The PPAS Credit Agreement provided for varying rates of interest across eight tranches of debt.  The largest tranche, comprising 60% of the total debt, accrued interest at a rate of 12% per annum.

31.    In 2015, TransCare wired interest payments to PPAS under the PPAS Credit Agreement totaling $3,380,123.91.

32.    Under Section 10 (hanging paragraph) of the PPAS Credit Agreement, PPAS as Administrative Agent, upon the occurrence of an Event of Default, "with the consent of the Required Lenders … may … declare Loans hereunder … to be due and payable forthwith…."  PPAS was not required to accelerate the loans except "upon the request of the Required Lenders."

33.    Pursuant to Section 11.5 of the PPAS Credit Agreement, the Administrative Agent "may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default or Event of Default as it shall deem advisable in the best interests of the Lenders" unless the Administrative Agent has been "reasonably directed by the Required Lenders."

20

34.     Pursuant to Amendment No. 17 and Waiver dated June 2, 2011, the PPAS Credit
Agreement was amended to insert section 11.13, which provided, among other things, that "all
powers, rights and remedies hereunder may be exercised solely by the Administrative Agent, on
behalf of the Lenders in accordance with the terms hereof."

### b.  The Wells Fargo Credit Facility

35.     The Wells Fargo Credit Facility provided for a maximum credit availability of
$20,000,000.  Pursuant to section 2.1 of the agreement, funding would be provided on a revolving
basis with the amount of available funding determined by TransCare's borrowing base.

36.     TransCare granted Wells Fargo a blanket lien on its assets.

37.     Pursuant to section 2.2 of the 2006 Intercreditor Agreement, PPAS and Wells Fargo
agreed that (a) the PPAS Credit Agreement would have priority over the Wells Fargo Credit
Facility with respect to TransCare's: machinery; equipment; computer equipment; inventory; cars,
trucks, trailers, construction and earth moving equipment and other vehicles covered by a
certificate of title law, and the vehicles listed in Schedule IV to the PPAS Credit Agreement, along
with any tires and other appurtenances to the foregoing; capital stock with respect to the TransCare
subsidiary entities; intellectual property; and books, records, products and proceeds related to this
listed collateral; and (b) the Wells Fargo Credit Facility had priority over the PPAS Credit
Agreement with respect to TransCare's other property.

38.     Pursuant to section 2.10 of the 2006 Intercreditor Agreement, PPAS and Wells
Fargo agreed that the party "with a junior Lien on any Collateral … will not, director or indirectly,
(a) exercise any of its … rights or remedies upon a default or event of default … against such
Collateral, or (b) seek to foreclose or realize upon … its junior Lien on such Collateral …, or (c)

21

**A0341**

… take any other action that would interfere in any respect with the rights of the Creditor with the senior Lien in such Collateral."

39.　　The 2006 Intercreditor Agreement was signed on behalf of TransCare by Patrick Seiler, TransCare's then-Vice President.

40.　　On June 4, 2012, TransCare signed a Notice of Payment Assignment which stated that TransCare had granted Wells Fargo "a first priority security interest in all payments of moneys due or to become due" under the MTA Contract. The Notice of Payment Assignment states that it was negotiated by PPAS, Wells Fargo and the MTA.

<div align="center">c.　The Ark II Credit Agreement</div>

41.　　The Ark II Credit Agreement provided that Ark II could make term loans totaling up to $6.5 million to TransCare for working capital and general corporate purposes.

42.　　Ark II never funded the full $6.5 million amount.

43.　　Section 2.5(b) of the Ark II Credit Agreement stated that: "The Borrower [TransCare] shall obtain the written consent of the Lender [Ark II] prior to requesting any Loan. … Notwithstanding anything herein to the contrary, any Loan made by the Lender hereunder shall (x) only be made in its sole and absolute discretion of the Lender and (y) only be made if it is in accordance with a plan approved by the Lender."

44.　　Section 2 of the security agreement for the Ark II Credit Agreement (the "Ark II Security Agreement") purported to grant Ark II a blanket security interest in TransCare's assets.

45.　　The 2016 Intercreditor Agreement was signed by Tilton for both PPAS and Ark II, and was signed by TransCare by Peter Wolf, as shown by JX 69.

<div align="center">22</div>

46.    Section 2.2(a) of the 2016 Intercreditor Agreement contained a payment subordination provision providing that the proceeds of the collateral for the Ark II Credit Agreement and the PPAS Credit Agreement "shall" be applied in the following manner:

    a.    First, to the costs of collection and enforcement relating to the Ark II Credit Agreement or incurred by Ark II;

    b.    Second, to the costs of collection and enforcement relating to the PPAS Credit Agreement or incurred by PPAS;

    c.    Third, to the payment in full of the claims under the Ark II Credit Agreement, including interest accruing after the initiation of any insolvency proceeding; and

    d.    Fourth, to the payment in full of the claims under the PPAS Credit Agreement, including interest accruing after the initiation of any insolvency proceeding.

47.    By section 2.9(a) of the 2016 Intercreditor Agreement, PPAS and Ark II agreed that agreed that the party "with a junior Lien on any Collateral … will not, director or indirectly, (i) exercise any of its … rights or remedies upon a default or event of default … against such Collateral, (ii) seek to foreclose, enforce or realize upon … its junior Lien on such Collateral …, or (iii) … take any other action that would interfere in any respect with the rights of the party with the senior Lien in such Collateral."

### 3.    Contentions as to TransCare's Management Structure

48.    By a Written Consent of the Sole Director dated July 10, 2012, Tilton caused TransCare to adopt an authority matrix (the "Authority Matrix"), as shown by PX 3.

49.    The Authority Matrix listed various actions that could be taken by a "Designated Executive" and those that could only be taken by TransCare's Board.

A0343

50.    Pursuant to the Authority Matrix, various actions could only be taken by TransCare's Board, including:

    a.   Approving any annual or interim budget or operating plan;

    b.   Negotiating or committing to any potential sale of TransCare's assets;

    c.   Disclosing TransCare's financial information to third parties;

    d.   Obtaining debt financing;

    e.   Changing auditors;

    f.   Engaging legal counsel;

    g.   Hiring employees with salaries in excess of $100,000; and

    h.   Conducting any reduction in force that could reasonably be expected to require analysis under federal or state WARN laws.

51.    The Authority Matrix provided that various actions could only be taken if conducted pursuant to an "Annual Plan" approved by TransCare's Board, including:

    a.   Committing to any capital expenditures, non-real property leases, or licensing arrangements in excess of $50,000;

    b.   Entering into contracts or other commitments with customers; and

    c.   Entering into certain non-customer contracts that either require TransCare to borrow funds or have an annual revenues contract value or required capital expenditure commitment in excess of $250,000.

52.    The Authority Matrix provided that the actions listed did not constitute an exhaustive list of all actions for which the "Designated Executive" lacked authority to act.

53.    Under the Authority Matrix, if no "Designated Executive" had been appointed, TransCare's Board was required to approve any actions listed on the Authority Matrix.

24

**A0344**

54.     During the Relevant Time Period, TransCare had no "Designated Executive" or "Annual Plan" under the Authority Matrix.

55.     Glenn Leland testified that Patriarch Partners refused to grant permission for TransCare to seek alternative sources of financing, and Tilton did not authorize anyone else to do so on TransCare's behalf.

56.     Glenn Leland testified that on January 7, 2016, he met with Randy Jones, a managing director at Patriarch Partners, Jean-Luc Pelissier, a platform leader at PPMG and Michael Greenberg, a credit officer at Patriarch Partners, in order to resign as CEO.  His efforts to resign on that day were rejected.

57.     As testified to by Glenn Leland, on January 8, 2016, Randy Jones and John Pothin, director of Human Resources at Patriarch Partners, terminated Leland's employment and directed him to destroy his "computer records."

58.     TransCare did not have a Chief Executive Officer after January 8, 2016.

59.     TransCare did not have a Chief Financial Officer after September 29, 2016.

60.     Brian Stephen was an attorney and the Senior Director of Legal at Patriarch Partners.

61.     Brian Stephen testified that his role was to report to and support Tilton in her capacity as director of TransCare, manager of PPAS and PPMG, collateral manager, manager of Tilton's personal funds, and director of Transcendence.

62.     Brian Stephen had the following relationship with TransCare:

   a.   Stephen testified that the general practice at TransCare was for management to communicate all information and requests to Tilton through him.

A0345

b. Stephen testified that Leland did not have authority to hire an attorney for TransCare without Tilton's consent.

c. Jean-Luc Pelissier (described below) testified that Stephen functioned as the "guardian of the authority matrix."

d. Leland testified that Stephen was to review and comment on any contracts into which TransCare was to enter.

63. Stephen took the following acts relating to TransCare:

a. In an email dated February 5, 2015, Stephen informed Leland that, in the absence of a Designated Executive under the authority matrix, Leland was prohibited from taking preliminary steps towards actions requiring Tilton's approval, as shown by JX 11.

b. In an email dated February 5, 2015, Stephen informed Leland that any exploration of other financing sources must be acknowledged and approved by Tilton, as shown by JX 11.

c. In an email dated February 24, 2016 at 12:07am (PX 231), Stephen directed Wolf to sign a Notice of Acceptance of Collateral, procuring TransCare's consent to foreclose on (1) TransCare's the MTA contract, (2) the stock of three of TransCare's subsidiary companies, (3) two vendor contracts and (4) all of TransCare's vehicles and equipment.

d. In an email dated February 25, 2016 at 10:53pm, Stephen directed TransCare's executives to move "the most valuable assets" away from TransCare, as shown by PX 238.

64. Jean-Luc Pelissier was a platform leader at PPMG.

26

65. Per his deposition testimony, Pelissier's role included providing consulting advice and analytical operating skills for the management teams of certain of PPMG's portfolio companies, including TransCare.

66. Pelissier took the following acts relating to TransCare:

    a. Leland testified that in March of 2015, Pelissier prohibited him from communicating directly with Tilton under any circumstance.

    b. In an e-mail dated February 9, 2016, Pelissier contacted the MTA and represented that he was acting as TransCare's "ownership representative" and that TransCare wished to transfer the MTA Contract to a different entity, as shown by JX 71.

    c. In an email dated February 14, 2016, Pelissier provided detailed instructions to TransCare's executives to effectuate the transfer of TransCare's paratransit and several other of TransCare's divisions to Transcendence, as shown by PX 216.

    d. In an email dated February 25, 2016 at 11:23pm, Pelissier directed TransCare's executives to physically remove TransCare's accounts receivables server from TransCare's warehouse, as shown by PX 237.

67. Per his deposition testimony, Scott Whalen, Whalen is Tilton's son-in-law and a Director of Portfolio Management at PPMG.

68. Whalen testified that his role included overseeing TransCare's general financial health.

69. Whalen took the following act relating to TransCare: in an email dated July 13, 2015 Whalen instructed Leland to inform National Express that TransCare was not for sale after National Express submitted a letter of intent, as shown by JX 41.

70.    Per his deposition testimony, Michael Greenberg was a credit officer at Patriarch Partners.

71.    Greenberg testified that his role included financial analysis, strategic analysis, corporate strategy development, and operational and financial performance improvement for TransCare.

72.    Greenberg took the following acts relating to TransCare:

a.    On February 25, 2015, Greenberg executed Amendment 24 to the PPAS Credit Agreement on behalf of TransCare, as shown by PX 39, which provided for PPAS to enter into a Revolving Credit Commitment with TransCare of up to $1,100,000 to be funded by Zohar III, Limited.

b.    On March 5, 2015, Greenberg executed Amendment 25 to the PPAS Credit Agreement on behalf of TransCare, as shown by PX 47 , which provided for the Revolving Credit Commitment to be increased to $1,350,000 and for the Tranche F term loan to be reduced by $1 million.

c.    In an email dated October 7, 2015, Greenberg instructed Leland to issue the interest payment to Patriarch immediately, despite "the fact that the company will not have adequate funds to make payroll tomorrow," as shown by PX 93.

d.    Glenn Leland testified that Greenberg, together with Pellissier, "instructed the CFO and I not to pay bills, to extend out the accounts payable as long as the supplier would tolerate, and if the supplier pushed back and it created an operational issue, to switch suppliers, but not to pay the bills" and that "this was described as the Patriarch way."

28

A0348

e. Glenn Leland testified that Leland was directed to meet with Michael Greenberg on a regular basis for Greenberg to review and approve which of TransCare's vendors were to be paid and when.

f. On December 18, 2015, Greenberg emailed Tilton an historic comparables chart and a list of companies "regarding transactions for ambulance companies and Air Medical companies," as shown JX 55.

g. On December 24, 2015, Greenberg emailed Wells Fargo a timeline for the sale of TransCare's assets, as shown by JX 60.

h. On December 24, 2015, Greenberg emailed Tilton a follow-up overview of ambulance transactions which listed additional investment bankers with experience in ambulance transactions, as shown by JX 61.

i. Greenberg testified that he had prepared these documents as the result of a discussion with Wells Fargo in contemplation of funding the company for a potential sale.

j. In an email dated February 10, 2016, as shown by PX 197, Greenberg directed Wolf to execute loan documents back-dated to January 15, 2016 on behalf of Ark II, including (1) the Ark II Credit Agreement, (2) the 2016 Intercreditor Agreement, (3) the Ark II Security Agreement, and (4) the related guaranty.

### 4. Contentions As to Offers for TransCare

73.    Between February 2015 and February 2016, numerous parties extended expressions of interest or offers to purchase all or portions of TransCare. The offers ranged from $8 million to $80 million, although none of them could get past the initial stage because Tilton would not allow it.

29

74.    On February 5, 2015, Leland reported to Pelissier and Brad Schneider, a Director of Portfolio Management at Patriarch Partners, that he was "approached by National Express" to acquire TransCare's paratransit contract for $15 to $18 million, and that National Express was "confident they could provide a $1.7 million deposit on Monday, if we elect to move forward," as shown by PX 20.

75.    On February 10, 2015, Richmond County Ambulances Services ("RCA") sent Tilton an email "to inquire if you and the TransCare team had any interest in either a sale or management takeover to operate the company in NYC as well as outside of the NYC territory," as shown by PX 73.

76.    On March 7, 2015, Leland reported to Tilton that National Express is "interested in buying our MTA business and have suggested an immediate purchase of $14 to $18 million." He also reported that "National Express is prepared to make an immediate down payment this week" and is "willing to buy all the assets of TransCare," as shown by JX 29.

77.    On March 7, 2015, Leland reported to Tilton that RCA "are interested to buy TransCare and have sent an email proposing $60 to $80MM as valuation," as shown by JX 29.

78.    On July 8, 2015, American Medical Response ("AMR") called Leland to buy TransCare's Westchester operations or all of TransCare's assets for an 8x EBITDA multiple, as shown by PX 85 and as testified to by Leland.

79.    On July 8, 2015, RCA sent a follow-up email to Tilton "to inquire if you and the TransCare team had any interest in either a sale or management takeover to operate the company in NYC as well as outside of the NYC territory," as shown by PX 73.

A0350

80.    On July 8, 2015, as shown in PX 85, Leland reported to Whalen and Greenberg that RCA had called "expressing interest in buying the company" for a "suggested [multiple] on EBITDA of 8X".

81.    On July 10, 2015, National Express sent Leland Letter of Intent signed by its CEO David Duke offering to buy TransCare's paratransit contract and adult care shuttle business for $6 to $7 million, plus assumption of up to $2 million in liabilities, as shown in JX 40.

82.    On July 13, 2015, Vincent DeVito, a portfolio manager at PPMG, emailed Greenberg to inform him that he had "received a call from Alluence Capital Advisors, representing a UK transport Co, National Express with an interest in acquiring TC Paratransit piece of TransCare," as shown by PX 83.

83.    On July 22, 2015, Leland reported to Greenberg that Falck USA was "interested in buying all of TransCare," as shown by PX 85 and as testified to by Leland.

84.    On July 22, 2015, Leland reported to Greenberg that AMR had called him to express interest in "all of TransCare," as shown by PX 85 and as testified to by Leland.

85.    On December 8, 2015, Leland reported to Pelissier and Greenberg that National Express had "contacted me again this morning, to see if there is any interest in selling [the paratransit] contract," as shown by PX 113.

86.    On December 16, 2015, Leland reported to Greenberg, Stephen, Pelissier and Bonilla that National Express had called him "a few times" that day to reiterate that their offer to buy TransCare's paratransit contract was "still out there," as shown by PX 125.

87.    On January 26, 2016, Northwell Health communicated to Carl Landeck, a Carl Marks Advisory consultant to TransCare, that it would be interested in a future potential joint venture with TransCare, as shown by PX 173.

31

88.     On February 3, 2016, Tilton met with AMR to discuss their interest in acquiring TransCare, as shown by PX 191.

### 5.   Contentions as to the Transcendence Transaction

89.     Over the weekend of December 12-13, 2015, Tilton determined that "we would either need to sell, file for bankruptcy, unwind, or do some sort of transaction" with respect to TransCare, according to her deposition testimony.

90.     On December 13, 2015, Bonilla provided Greenberg with revised 2016 financial projections for TransCare and provided updated versions of those projections to Greenberg thereafter in December 2015, as shown by PX 119.

91.     By email dated December 16, 2015, Wells Fargo stated that it had learned Tilton intended to sell TransCare, as shown by PX 128.

92.     On December 17, 2015, Stephen and Greenberg called Wells Fargo's counsel and proposed to fund TransCare through the Wells Fargo Credit Facility, as shown by PX 131.  Their stated reasons for this proposal were to protect the funding from claims by the Zohar Funds and obtain the benefits of being part of the senior secured credit facility.

93.     Wells Fargo did not approve the request to fund TransCare through the Wells Fargo Credit Facility, as shown by PX 131.

94.     On December 17, 2015, Melissa Provost emailed Pelissier and Greenberg a summary of forbearance terms that had been "verbally agreed upon" that day in connection with a requested extension, as shown by PX 132.

95.     On December 18, 2015, as shown by JX 55, Greenberg emailed Tilton and Pelissier to provide them with "the list we have been able to compile regarding transactions for ambulance companies and Air Medical companies," stating that the average revenue multiple was 1.8x and

32

the average EBITDA multiple was 10.1x and attaching a file called "Historic Comps Chart" with the following companies:

     a.   Rural/Metro Corp., with a revenue multiple of 1.0x and an EBITDA multiple of $10.7x;

     b.   Tri-State Care Flight, with a revenue multiple of 2.7x;

     c.   Air Medical, with an EBITDA multiple of 10.0x;

     d.   Envision, with a revenue multiple of 1.3x and an EBITDA multiple of 11.3x; and

     e.   Air Methods, with a revenue multiple of 2.3x and an EBITDA multiple of 8.2

96.     Per Tilton's deposition testimony, on December 21, 2015, Pelissier and Greenberg met with Wells Fargo to discuss a possible six-month extension of the Wells Fargo Credit Facility to allow for a sale or restructuring.

97.     Pursuant to a Forbearance Agreement dated December 22, 2015, Wells Fargo and TransCare agreed to extend the maturity date of the Wells Fargo Credit Facility to January 8, 2016. The agreement was executed by Leland on behalf of TransCare, as shown by PX 135.

98.     On December 23, 2015 Wells Fargo informed Greenberg and Pelissier that it wanted a financial advisor for TransCare and a budget as part of any forbearance on the Wells Fargo Credit Facility, as shown by JX 59. According to its deposition testimony, Wells Fargo was willing to provide funding through to a sale of TransCare as long as it received a viable plan. Wells Fargo further testified that TransCare was severely undercapitalized and could not support the interest payments Tilton caused TransCare to pay to PPAS, and that Tilton refused Wells Fargo's repeated requests that Tilton cease causing TransCare to pay such amounts.

99.     On December 24, 2015, Greenberg communicated to Wells Fargo that Patriarch had accepted Wells Fargo's request for a financial advisor for TransCare. Greenberg also provided

a schedule by which TransCare would be sold by September 30, 2016, as shown by JX 60 and JX 61.

100.    On December 24, 2015, Greenberg updated Tilton on investment banks suitable to manage a sale of TransCare, reconfirmed the unsolicited calls from potential purchasers, resent the "Historic Comps Chart" file, and again stated that the average revenue multiple was 1.8x and the average EBITDA multiple was 10.1x, as shown by JX 61.

101.    On January 2, 2016, Bonilla emailed an updated version of TransCare's 2016 financial projections to Greenberg and Pelissier, as shown by PX 143.

102.    As Bonilla explained to Leland in an email dated the next day, "for six weeks they have delayed, asked for more data, and finally so much time elapsed we had to refresh all the numbers…," as shown by PX 146.

103.    On January 5, 2016, Greenberg sent Tilton an updated version of TransCare's 2016 financial projections, including projected revenue and EBITDA, "to address the parameters that we discussed yesterday," as shown by JX 67.

104.    On January 5, 2016, per Wells Fargo's deposition testimony, Wells Fargo agreed to cover an overdraft on TransCare's payroll account to help work towards a resolution for the sale of TransCare.

105.    On January 7, 2016, Greenberg sent Carl Landeck, a senior advisor at Carl Marks Advisors ("Carl Marks"), the email he sent to Tilton on January 5 concerning TransCare's 2016 financial projections,  including the "business model" itself.  (PX 158)

106.    By engagement letter dated January 11, 2016 and shown by JX 168, TransCare engaged Carl Marks as a consultant to TransCare Corporation.  The engagement letter provided

34

that Carl Marks "will report directly to TransCare's Board of Directors … or its authorized representatives" and "Perform normal duties of the position of TransCare CFO."

107.    On January 15, 2016, PPAS wired $1,172,757.53 to four different insurance companies, as shown by PX 167 and PX 168.

108.    On January 27, 2016, Carl Marks sent to Greenberg, Pelissier and Jones 2016 financial projections for TransCare along with "an account of the key assumptions, risks, opportunities and priorities currently underlying the plan", as shown in PX 175.

109.    On January 28, 2016, Greenberg prepared an updated version of the financial projections provided by Carl Marks on January 27, 2016 to present to Tilton, as shown by PX 179.

110.    On January 29, 2016, PPAS wired $690,168.24 to certain of TransCare's creditors, including $613,000 to the New York State Insurance Fund, as shown by PX 184.

111.    On February 3, 2016, Tilton resigned as collateral manager of the Zohar Funds effective March 3, 2016, according to her deposition testimony.

112.    On February 9, 2016, Pelissier emailed the MTA asking about re-issuing the MTA Contract to "a different legal entity" and explaining that he was working with "the ownership representative of TransCare and our bank…."   The MTA responded that they needed a few more days to determine a final position, but were "all in agreement or support this proposal." (JX 71).

113.    The following events took place on February 10, 2016:

   a.   Tilton caused Transcendence and Transcendence II to be incorporated under the laws of Delaware.

   b.   Tilton as sole director of Transcendence and Transcendence II issued written consents implementing authority matrices similar to that of TransCare.  (As per PX 200).

35

A0355

c. Tilton as sole director of Transcendence and Transcendence II appointed Glen Youngblood as its President, as shown by PX 200 (At this same time, Youngblood served as TransCare's Vice President of Performance Excellence.)

d. Greenberg told Youngblood that Transcendence II would be taking over the MTA Contract with an estimated $25 million in revenue and its other paratransit operations with an estimated $31 million in revenue. Greenberg noted that the division operating under the MTA Contract ran 168 routes but previously ran as many as 228 routes, as shown by JX 74.

e. Greenberg forwarded the same information to Lockton Insurance, as shown by PX 199.

f. Tilton authorized TransCare to engage Curtis Mallet as bankruptcy counsel.

g. Greenberg emailed Wolf, TransCare's then highest-ranking officer, with copies of the unsigned Ark II Credit Agreement dated January 15, 2016, related guaranty, Ark II Security Agreement dated January 15, 2016, and 2016 Intercreditor Agreement dated January 15, 2016, writing: "You never did get to execute these documents," as shown by PX 197.

114. On February 11, 2016, Stephen emailed the executed Ark II Credit Agreement, related guaranty, Ark II Security Agreement, and 2016 Intercreditor Agreement to Curtis Mallet.

115. Stephen served as the main TransCare contact for Curtis Mallet.

116. Per Tilton's deposition testimony, at the time of the execution of the Ark II Credit Agreement and the Ark II Security Agreement, she "was funding into a black hole" and "providing bridge funding to get accurate information and visibility … so I could figure out if there was a way forward for this company."

36

117.    Tilton told others she would providing all the new working capital for the new venture because the financial model for the new business made sense.

118.    TransCare never made – and Ark II never demanded – any payments to Ark II under the Ark II Credit Agreement.

119.    There was no sinking fund for the Ark II Credit Agreement and the agreement did not provide for one.

120.    On February 11, 2016, Stephen drafted the Notice of Acceptance for the strict foreclosure of TransCare's assets.  This document was not produced by the Defendants because Patriarch Partners is asserting a privilege over it, as shown in PX 289 (Defendants' Privilege Log).

121.    On February 11, 2016, Greenberg emailed Wolf and directed him to execute direction letters dated December 8, 2015 and January 5, 7, 15 and 29, 2016, as shown by PX 203.

122.    Wolf signed the direction letters dated January 15 and 29, 2016, but stated his refusal to sign the three others because "On those dates I had no authority," as shown in PX 203.

123.    The direction letters back-dated to January 15 and 29 directed Ark II to make the payments PPAS had made on January 15 and 29, 2016.

124.    On February 14, 2016, Pelissier sent a "Progress and Action List" to Patriarch and TransCare officials – including Tilton – setting forth various steps for TransCare's bankruptcy filings and the Transcendence transaction, which included "Issu[ing] Worker Adjustment and Training Notification ("WARN") notice to all Old Co employees," as shown by PX 206.

125.    On February 14, 2016, counsel for Patriarch Partners drafted a Transition Services Agreement, as shown by PX 213, which provided for TransCare's (1) MTA Contract, (2) telecommunications equipment and services, (3) insurance premiums, (4) EPCR equipment and

tablets and (4) five of Hudson Valley's ambulances to be transferred to Transcendence with the assistance of various TransCare personnel.

126.    On about February 15, 2016, counsel for Patriarch Partners Kevin Dell drafted a Transcendence Transit Credit Agreement in connection with the formation and organization of Transcendence.

127.    The Transcendence Transit Credit Agreement, as shown in JX 101, provided for Transcendence to borrow $10,000,000 at a rate of LIBOR plus 4% on a secured basis from Ark Angels III with PPAS serving as Administrative Agent.

128.    Per Tilton's deposition testimony, Ark Angels III was an entity controlled by her.

129.    On February 18, 2016, TransCare – excluding the Later-Filed Debtors – signed a revised engagement agreement with Curtis Mallet to advise on a chapter 7 filing, as shown by JX 78.

130.    On February 19, 2016, Carl Marks advised Tilton that TransCare lacked the funds necessary to pay payroll, 401(k) obligations and outstanding payroll taxes from earlier pay dates, as well as other critical expenses.  In response, Tilton told Carl Marks to "make decisions on what needs to be paid."  Tilton did not instruct TransCare or Carl Marks to pay the payroll taxes, as shown by JX 88.

131.    The IRS filed proofs of claim against TransCare asserting $1,474,273.02 in unpaid payroll taxes, $826,111.82 in penalties and $124,096.35 in interest, for a grand total of $2,424,481.19, largely relating to the 2016 tax year.

132.    On July 6, 2017, the state taxing authorities filed proofs of claim against TransCare for $34,665.71.

38

133.     On February 19, 2016, counsel for Wells Fargo emailed Tilton to inquire about the timing of sending WARN notices to TransCare employees prior to the foreclosure. In response, Tilton told Wells Fargo's counsel that "[n]otice cannot be given prior to a foreclosure on NEWCO or there will be no NEWCO," as shown by JX 88.

134.     On February 22, 2016, Pelissier emailed the MTA to request a meeting "on where we are with our plans for TransCare and the MTA, following up on our face to face meeting a few weeks ago." (JX 92).

135.     On February 23, 2016, PPAS sent $593,000 by wire transfer to the New York State Insurance Fund in connection with the purchase of a workers' compensation and employers' liability policy naming Transcendence Transit, Transcendence Transit II, and TransCare Hudson Valley as the insured parties, as shown by PX 226.

136.     On February 23, 2016, Pelissier emailed Tilton a summary of his trip to the Hudson Valley, where he had met with representations for each of TransCare's contracts in the region.

137.     By February 24, 2016 at 12:07 a.m., Tilton received confirmation from insurance broker Willis Towers Watson that workers' compensation and auto liability insurance policies had been bound, which was required for Transcendence to operate (according to her deposition testimony). Tilton testified that the receipt of the confirmation was the point at which she decided to proceed with the strict foreclosure by PPAS.

138.     On February 24, 2016 at 12:07 a.m., Stephen e-mailed the Notice of Default and a three-paragraph "Notice of Acceptance of Subject Collateral in Partial Satisfaction of Obligation" drafted by him and dated February 24, 2016 (the "Notice of Acceptance") to Wolf, as shown by PX 231. The Notice of Default was executed by Tilton on behalf of PPAS, the Zohar Funds, and AIP.

39

139.    The Notice of Acceptance was not sent to Wells Fargo, Credit Suisse, or any other creditor of TransCare.

140.    According to their deposition testimony, neither Wells Fargo nor Credit Suisse consented to the foreclosure.

141.    The Notice of Acceptance was signed by Tilton for PPAS, Zohar I, Zohar II, Zohar III and AIP.

142.    The Notice of Acceptance stated that PPAS was accepting the following collateral pursuant to section 9-620 of the Uniform Commercial Code in connection with the PPAS Credit Agreement: (i) the MTA Contract, but not the stock of the performing party thereunder, TransCare New York, Inc., (ii) the stock of the Later-Filed Debtors, (iii) the master lease agreement with First Financial, (iv) a vendor contract and (iv) all of TransCare's personal property, excluding account receivables, non-enumerated contracts/ leases and the stock of the other TransCare entities.

143.    The Notice of Acceptance represents that the acceptance of the collateral was made in satisfaction of $10,000,000 owing under the PPAS Credit Agreement.

144.    According to the proofs of claim filed by PPAS, the balance owing under the PPAS Credit Agreement was $34,771,873.10 "inclusive of a $10,000,000 credit as a result of a strict foreclosure carried out prepetition."

145.    Per Tilton's deposition testimony, the $10,000,000 credit was based off the book value of the assets transferred via the "strict foreclosure."

146.    Tilton did not engage a third-party appraiser to value the assets transferred via the "strict foreclosure."

147.    Per Tilton's deposition testimony, the $10,000,000 credit had not actually been provided and that the statement in PPAS' proofs of claim that the credit had been provided "was a decision made by the lawyers."

148.    Pursuant to a Bill of Sale, Agreement to Pay and Transfer Statement dated February 24, 2016 (the "Bill of Sale"), TransCare's assets described in the Notice of Acceptance were transferred to Transcendence, as shown by JX 102.

149.    On February 24, 2016, Tilton executed a written consent authorizing Transcendence II to enter into an Assignment Agreement with TransCare New York, Inc. providing for the MTA Contract to be assigned to Transcendence II.  The written consent stated that "the MTA has heretofore provided TransCare with its consent to the Assignment." (As shown by PX 240.

150.    On February 24, 2016, Greenberg provided Lockton, TransCare's insurance broker, with the 2016 projected financial information for Transcendence based upon their assets' expected performance, in connection with binding the insurance for Transcendence.  (PX 228)

### 6.    Contentions as to Post-Bankruptcy Filing Events

151.    At approximately 12:00 p.m. on February 25, 2016, Salvatore LaMonica as chapter 7 trustee met with Carl Marks, counsel for TransCare, PPAS and Wells Fargo, at Curtis Mallet's offices.  Among the topics discussed were whether and how the Trustee could keep TransCare's operations going.

152.    At that meeting, counsel for PPAS advised the Trustee that PPAS had conducted a strict foreclosure of the paratransit, Pittsburgh and Hudson Valley divisions and told that those divisions' assets were not part of the bankruptcy estates.

153.    After the meeting on the evening of February 25, 2016, the Trustee instructed TransCare's dispatcher to tell all of the ambulance drivers return the ambulances relating to the Initial Debtors to their dispatcher locations or a local firehouse.  As the employees returned with the ambulances, they were told that the business was shut down.  After that point, the employees stopped coming to work.

154.    At 10:53 p.m. on February 25, 2016, Stephen emailed TransCare's executives and directed them to move and secure for themselves as many as possible.  He told them, the "senior lenders for TransCare foreclosed on all of its assets and those assets were sold to Transcendence Transit." (PX 238).

155.    At 11:23 p.m. on February 25, 2016, Pelissier emailed a plan to Stephen, Greenberg, Jones, John Pothin (a Managing Director at Patriarch Partners) and Transcendence to take TransCare's server to allow for the continued operation of the MTA paratransit business segment and to provide for the continued operation of the Hudson Valley and Pittsburgh business segments.  (PX 237)

156.    At 11:37 p.m. on February 25, 2016, Stephen instructed Transcendence to inform its employees that those employees who "continue to work as scheduled" that: "If the TransCare bankruptcy estate does not make payroll for last week, Transcendence Transit will pick up that liability and pay Transcendence Transit employees for their last week of work for TransCare," as shown by JX 103.

157.    Later that night, Youngblood informed the Trustee's counsel of the seizure of assets at Stephen's direction, as shown by PX 241.  The Trustee's counsel informed Transcendence's President that the seizure of assets was inappropriate.

A0362

158.    At 2:19 a.m. on February 26, 2016, Youngblood quoted Stephen's representation made Stephen's February 25 email (above at paragraph 151) to the employees of Hudson Valley and Pittsburgh business segments via email, as shown by PX 240.

159.    At 3:26 a.m. on February 26, 2016, Youngblood resigned as President of Transcendence, as shown by PX 241.

160.    As of 8:20 a.m. on February 26, 2016, the Hudson Valley business segment operations were still ongoing, as shown by PX 242.

161.    At 9:15 a.m. on February 26, 2016, Greenberg promised to provide a letter to the Pennsylvania Department of Health regarding Transcendence's ownership structure so that the Pittsburgh business segment could be licensed, as shown by PX 243.  The letter was never provided.

162.    At 2:00 p.m. on February 26, 2016, PPAS' counsel called the Trustee's counsel to seek the Trustee's consent to the termination of the MTA Contract to allow for Transcendence II to enter into a new paratransit services agreement with the MTA, as shown by JX 105.

163.    At 2:00 p.m. on February 26, 2016, PPAS' counsel emailed the Trustee to ask him to consent to the termination of the MTA Contract, as shown by JX 105.

164.    At 2:09 p.m. on February 26, 2016, Stephen emailed the MTA for confirmation that Transcendence II can bill and receive payment for services while the process of issuing a new paratransit services contract to Transcendence II was completed, as shown by PX 244.

165.    At 5:07 p.m. on February 26, 2016, the Trustee provided his consent to the termination of the MTA Contract to PPAS' counsel with the proviso that the termination be without prejudice to the amounts owing to TransCare under the MTA Contract, as shown by JX 105.

43

**A0363**

166.    At 7:00 p.m. on February 26, 2016, Stephen emailed the MTA that Transcendence will be unable to provide services to the MTA because the employees had been told that operations were being discontinued, as shown by PX 245.

167.    On February 26, 2016, the Trustee sought authorization from the Bankruptcy Court to operate the Initial Debtors on an interim basis solely to wind down their operations.  On February 29, 2016, PPAS filed a response to the Trustee's motion [Dkt. 11].[12]  On March 25, 2016, the Bankruptcy Court entered an order granting the Trustee's request [Dkt. 51].

168.    On February 27, 2016, the Pittsburgh Operations were shut down, as shown by PX 247.

169.    On February 29, 2016, Credit Suisse was informed for the first time of TransCare's bankruptcy filings when Wolf told them of the filings, as shown by PX 249.  At deposition, Credit Suisse testified that it had no prior knowledge of the Transcendence transaction, the "strict foreclosure," or the $10,000,000 reduction of the obligations owing under the PPAS Credit Agreement

170.    On March 3, 2016, Stephen sent an email to the New York State Insurance Fund confirming the request to cancel the workers' compensation insurance for TransCare Hudson Valley, Inc., as shown by PX 253.

171.    PPAS filed numerous documents with the Bankruptcy Court attesting that the strict foreclosure had in fact occurred and that PPAS was entitled to the benefits of the same.

172.    On March 17, 2016, the Trustee filed a motion asking the Bankruptcy Court to approve the stipulation and authorize the sale of the CONs and certain of TransCare's personal property, to which PPAS filed a response.

---

[12] Unless otherwise noted, all citations to the docket are to the docket in Case No. 16-10407.

A0364

7.    Contentions as to the Postpetition Liquidation and Distribution of TransCare's Assets

173.    By orders entered July 7, 2016 [Dkt. 199, 200, 201, 202, 203, 204, 205], the Bankruptcy Court approved the following sales of the CONs pursuant to which TransCare operated its ambulances in New York (as further described below): (i) No. 164 for $3,900,000, (ii) No. 470 for $1,500,000, (iii) No. 508 for $1,200,000, (iv) No. 509 for $1,300,000, (v) No. 510 for $1,300,000, (vi) No. 574 for $1,150,000 and (vii) No. 667 for $1,900,000.  These amounts total to $12,250,000.

174.    The costs of selling the CONs are comprised of the following: (i) a $90,000 break-up fee owing to Maler Group, LLC [Dkt. 201], (ii) the Trustee's expenses of $204,840.25 [Dkt. 379 at Ex. C, p. 153] and (iii) TransCare's Patient Care Ombudsman's expenses of $28,820 [Dkt. 381].  Of the Trustee's expenses, $2,300 related to the sale of CON No. 667.

175.    By order entered March 25, 2016 [Dkt. 52], the Bankruptcy Court authorized certain of TransCare's personal property to be sold via public auction.  The public auctions of such personal property resulted in proceeds of $2,354,435.45 [Dkt. 257, 258].

176.    The costs of selling the personal property are comprised of the following: (i) the auctioneer's commissions of $294,304.45 [Dkt. 257, 258] and (ii) the Trustee's expenses of $149,269 [Dkt. 379 at Ex. C, p. 259].

177.    The sale of personal property included the public auction of property leased pursuant to the master lease with First Financial Corporate leasing, LLC d/b/a First Financial Healthcare Solutions ("First Financial"), and such sale obtained proceeds of $73,500 (of which $40,929.52 was paid to First Financial) [Dkt. 232].

178.    TransCare's account receivables were collected postpetition by Wells Fargo [Dkt. 51] and the Trustee [Dkt. 261].  These collections were as follows:

45

A0365

a.    $2,564,362.78 in account receivables collected directly by Wells Fargo or parties
other than TransCare (excluding collection costs);[13]

b.    $2,430,000 paid to the Trustee in connection with a settlement agreement with the
MTA and the Metropolitan Transportation Authority [Dkt. 311, 331];

c.    $175,003 pursuant to a settlement agreement with Bronx-Lebanon Hospital Center
[Dkt. 288];

d.    $420,000 pursuant to a settlement agreement with St. Barnabas Hospital [Dkt. 288];
and

e.    $88,000 paid to TransCare's estates in connection with a settlement agreement with
Montefiore Medical Center, Montefiore Mount Vernon Hospital and Montefiore
New Rochelle Hospital [Dkt. 329, 365].

179.    Pursuant to the Personal Property Stipulation, the Trustee paid out $600,000.01 to
PPAS on about July 14, 2016 and $200,000 to PPAS on an interim basis on about September 13,
2016.  The stipulation provided that "nothing herein shall be deemed to waive any and all claims
… which the Trustee and the Debtors' estates have, had, may ever have or may ever claim to have
against any third parties including, but not limited to, PPAS, [the lenders to the PPAS Credit
Agreement], and/or Transcendence…."

---

[13] This amount is calculated by subtracting the amounts paid to Wells Fargo from the Wells Fargo
loan balance of $13,383,573 as of February 24, 2016.  The Wells Fargo loan was paid in full, as
reflected by the proof of claim filed by Wells Fargo.  Postpetition, Wells Fargo was paid (i)
$595,003 in connection with the settlement agreements with Bronx-Lebanon Hospital Center and
St. Barnabas Hospital [Dkt. 288], (ii) $8,451,770.53 in connection with the sale of the CONs
[Docs. 367, 370] and (iii) $1,772,436.69 in connection with the sale of the CONs and the settlement
with the MTA and the Metropolitan Transportation Authority [Docs. 474, 329 at ¶¶24-26].  These
amounts total to $10,819,210.22, and $13,383,573 minus $10,819,210.22 is equal to
$2,564,362.78.

180.    The proofs of claim filed by Ark II on about October 7, 2017 state that the balance owing under the Ark II Credit Agreement was reduced by the foregoing $800,000 amount.

8.    Contentions as to TransCare's Legal Claims

a.    Contentions Common to all Claims

181.    At its core, this case concerns Lynn Tilton's actions, as the sole director of TransCare, once she determined to sell or reorganize TransCare. Beginning on or about December 12, 2015, and culminating in the transactions of February 24, 2016 —a 12:07 am foreclosure notice from PPAS, a transfer of TransCare's profitable businesses to Transcendence, Tilton's new company, and a Chapter 7 filing of TransCare's remaining businesses, all within 18 hours of each other — Tilton effectively sold and reorganized TransCare for her own benefit. Tilton personally conducted or directed these actions in her own self-interest and standing on all sides of the transaction. As such, the Transcendence transaction is subject to the entire fairness standard. Nevertheless, Tilton has offered no basis on which to conclude the transaction was either the product of fair dealing, or undertaken at a fair price.

182.    By executing the Transcendence transaction, Defendants deprived TransCare of the ability to monetize TransCare's assets as a going concern.  TransCare recovered less through liquidation sales than TransCare could have recovered had Defendants sold or restructured TransCare in a disinterested manner.

183.    Had TransCare's assets been sold as a going concern, either in whole or in part, TransCare would have recovered more for the assets than it received in liquidation.

A0367

b.   Contentions Specific to specific claims

184.   <u>Breach of Fiduciary Duty Against Lynn Tilton</u>

a.  Tilton owed fiduciary duties of loyalty and good faith to TransCare.

b.  *The Transcendence Transaction*

    i.  Because Tilton was on both sides of the Transcendence transaction, the transaction is subject to the entire fairness test under Delaware law.

    ii.  The Transcendence transaction was not the result of fair dealing and not at a fair price.

    iii.  Tilton breached her fiduciary duties to TransCare through the Transcendence transaction.

    iv.  As of result of the breach, TransCare suffered damages equal to the lost going concern value that otherwise could have been realized.

c.  *WARN Act/ Payroll Tax Liabilities*

    i.  Tilton had an obligation under the duty of loyalty and good faith not to cause TransCare to violate the law.

    ii.  Tilton was advised of TransCare's obligations under the WARN Acts and federal/ state payroll tax laws and took no steps to comply.

    iii.  To the extent TransCare is found liable for any violation of the WARN Act or failure to pay payroll taxes, any damages that flow therefore were caused by Tilton's breach.

A0368

185. <u>Actual Fraudulent Transfer Against PPAS, Ark II, Transcendence and Transcendence II</u>

    a. On February 24, 2016, Tilton caused the following property to be transferred to PPAS and then to Transcendence and Transcendence II: (i) the MTA Contract, (ii) the stock of the Later-Filed Debtors, (iii) the master lease agreement with First Financial, (iv) a vendor contract and (iv) all of TransCare's personal property.

    b. Tilton did so for the benefit of herself and her companies and with the actual intent to hinder, defraud or delay TransCare's then present and future creditors.

    c. The Trustee is entitled to recover the value of the transferred assets pursuant to Bankruptcy Code section 548(a)(1)(A) and New York Debtor & Creditor Law section 276, because the transfer deprived TransCare of the ability to monetize them as a going concern. The Trustee seeks the value of these assets on the date of the transfer, which Tilton herself valued at least $22 million, and which the Trustee's expert values at $23 to $39 million, less the approximate $6 million obtained by the Trustee for these assets in liquidation.

    d. As a result, PPAS' and Ark II's proofs of claim should be disallowed pursuant to Bankruptcy Code section 502(d) until said value is recovered.

    e. The Trustee incurred reasonable attorneys' fees avoiding and recovering the subject transfer and, accordingly, is entitled to recover such fees pursuant to New York Debtor & Creditor Law section 276-a.

49

186. <u>Equitable Subordination Against PPAS, Ark II, PPMG and Patriarch Partners</u>

    a. PPAS, Ark II, PPMG and Patriarch Partners exercised were insiders of TransCare by virtue of Tilton's common ownership or control of all of the foregoing entities.

    b. The Transcendence transaction consummated by PPAS, Ark II, PPMG and Patriarch Partners amounted to inequitable conduct towards TransCare and its creditors.

    c. Said conduct resulted in injuries to TransCare's creditors and sought to confer an unfair advantage on their common owner's behalf.

    d. Subordinating their claims advances the goals of bankruptcy.

    e. In particular, subordination of PPAS's claim to Ark II's claim is equitable because PPAS agreed to payment and structural subordination to Ark II in connection with the Transcendence transaction and Tilton's bankruptcy planning for TransCare.

    f. Equitable subordination is also appropriate due to Defendants' violations of the automatic stay.

    g. The proofs of claim asserted by PPAS, Ark II, PPMG and Patriarch Partners should be subordinated to unsecured creditors and any corresponding security interests should be transferred to TransCare's estates pursuant to Bankruptcy Code section 510(c). In addition, PPAS's claim should be subordinated to that of Ark II.

187. <u>Claims Against Ark II Secured Claim</u>

    a. The Trustee asserts three claims in the alternative seeking to avoid the Ark II security interest and preserve it for the benefit of the estate. Either (a) it should be re-characterized as an equity investment, because that was its actual intent, (b) to the extent not intended as equity, it should be avoided as a constructive fraudulent

<div align="center">50</div>

A0370

transfer because it was granted without consideration, or (c) to the extent there was consideration, it should be avoided as a preference because it was made on account of antecedent debt and enabled Ark II to recover more than it otherwise would have recovered.

b.  <u>Debt Recharacterization Against Ark II</u>

i.   Ark II did not anticipate that the Ark II Credit Agreement would be repaid from TransCare.

ii.  Ark II did not intend for the Ark II Credit Agreement to be a true loan.

iii. The correlation between Ark II's equity ownership amount in TransCare and in Transcendence indicates that the Ark II Credit Agreement was intended to be an equity contribution.

iv.  The Ark II Credit Agreement was an equity infusion in economic substance.

v.   The proofs of claim asserting rights to payment under the Ark II Credit Agreement should be disallowed under Bankruptcy Code section 502.

vi.  The purported security interest granted by the Ark II Credit Agreement should be preserved for the benefit of TransCare's estates pursuant to Bankruptcy Code sections 506(d) and 551.

c.  <u>Constructive Fraudulent Transfer Against Ark II</u>

i.   Ark II was an insider of TransCare.

ii.  Ark II gave nothing to TransCare in exchange for the grant of a security interest under the Ark II Security Agreement.

iii. The purported grant of the security interest via the Ark II Security Agreement was made at a time when TransCare was engaged and was about

51

to engage in business for which its remaining property constituted unreasonably small capital.

iv. The purported grant of the security interest via the Ark II Security Agreement was made at a time when TransCare intended and believe that it would incur debts beyond its ability to pay as they came due.

v. The purported grant of the security interest via the Ark II Security Agreement can be avoided pursuant to New York Debtor & Creditor Laws sections 273, 274, and/ or 275, with the lien preserved for the benefit of TransCare's estates pursuant to Bankruptcy Code section 551 and Ark II's proofs of claim disallowed pursuant to Bankruptcy Code section 502(d) until said lien is so transferred.

d. <u>Preferential Transfer Against Ark II</u>

i. To the extent Ark II actually advanced funds to TransCare's creditors on January 15 and 29, 2016 and, by doing so, obtained an unsecured claim against TransCare, then TransCare's grant of a security interest to Ark II on February 10 or 11, 2016, was made in respect of an antecedent debt.

ii. The grant was made within two weeks of the bankruptcy filing while TransCare was presumptively and actually insolvent.

iii. If the resulting lien were not avoided, Ark II would receive more than it would otherwise receive in a chapter 7 liquidation had the transfer not been made.

iv. Said grant can be avoided pursuant to Bankruptcy Code section 547, with the lien preserved for the benefit of TransCare's estates pursuant to

52

**A0372**

Bankruptcy Code section 551 and Ark II's proofs of claim disallowed pursuant to Bankruptcy Code section 502(d) until said lien is so transferred.

188.    <u>Automatic Stay Violation Against All Defendants</u>

    a.  The Defendants were aware of TransCare's February 24, 2016 bankruptcy filings.

    b.  After the bankruptcy filing, the Defendants, or individuals working on their behalf, actively interfered with the Trustee's ability to marshal estate property so that they could capture said value for the benefit of Tilton and her companies.

189.    <u>Contractual Payment Subordination Against PPAS</u>

    a.  Under section 2.2 of the 2016 Intercreditor Agreement and Bankruptcy Code section 510(a), PPAS is not entitled to receive distributions on account of its proofs of claim unless and until Ark II is paid in full on account of its proofs of claim.

    b.  The Trustee has standing to enforce this provision because TransCare was a party to the 2016 Intercreditor Agreement.  TransCare signed the agreement, undertook affirmative obligations pursuant to the agreement and the agreement was entered into for TransCare's purported benefit.  Any provision in the 2016 Intercreditor Agreement to the contrary is both unenforceable and at odds with the agreement itself.

190.    <u>Limitation on Liens Against PPAS and Ark II</u>

    a.  PPAS's and Ark II's inequitable conduct caused TransCare to liquidate to the detriment of its other creditors.  Therefore, the equities of the case exception in

A0373

Case 1:20-cv-05274-LAK   Document 11-3   Filed 09/30/20   Page 55 of 203

Section 552(b) applies, and their blanket liens should not extend to postpetition proceeds of their collateral.

191. <u>Turnover and Avoidance Against PPAS and Ark II</u>

    a. The Trustee paid $800,000.01 to PPAS out of amounts received by the Trustee's liquidation sales of estate assets, pursuant to the Personal Property Stipulation. PPAS transferred those funds to Ark II pursuant to the 2016 Intercreditor Agreement, to satisfy Ark II's claim against TransCare.

    b. PPAS failed to disclose that Ark II held a senior lien (or any lien) on the assets and failed to disclose that the $800,000.01 would be used to pay down Ark II's claim.

    c. The transfer of the $800,000.01 to Ark II was not authorized by a court order or the Bankruptcy Code, and can be avoided pursuant to Bankruptcy Code section 549.

    d. PPAS was not entitled to receive the $800,000.01 distribution from the Trustee for all of the reasons set forth herein and must return $800,000.01 to the Trustee. PPAS' proofs of claim must be disallowed pursuant to Bankruptcy Code section 502(d) until said amount is returned.

    e. Ark II was not entitled to receive the $800,000.01 distribution from the Trustee for all the reasons set forth herein and must return $800,000.01 to the Trustee. Ark II's

A0374

proofs of claim must be disallowed pursuant to Bankruptcy Code section 502(d) until said amount is returned.

f.   The transfer can be recovered pursuant to Bankruptcy Code section 550(a), with Ark II either the initial transferee (because PPAS was a mere conduit) or the subsequent transferee.

B.   Defendants' Contentions

1.   Defendants object to the "facts" set forth in sections IV.A.1-7 of the "Plaintiff's Contentions."   The "facts" are inappropriate to include in a pretrial order and consist largely of irrelevant, inadmissible and/or false statements.

2.   Claim 1 – Breach of Fiduciary Duty against Lynn Tilton

a.   The Trustee cannot prove Ms. Tilton breached her fiduciary duties of loyalty or good faith to TransCare.

b.   What the Trustee refers to in conclusory fashion as the "Transcendence transaction" is actually a conflation of multiple events that occurred over the course of a year.   The proposed restructuring of TransCare involving Transcendence was first developed in February 2016, only after Wells Fargo made clear that it was unwilling to continue to provide access to funding as the Debtors' asset-based lender.   Thus, events that occurred, and decisions that Ms. Tilton made, before February 2016 had nothing to do with the Transcendence plan.

c.   The Trustee will not be able to prove any breach of loyalty based on Ms. Tilton's decision not to pursue a sale of the paratransit business under MTA

55

**A0375**

Contract or other TransCare assets throughout 2015. There were a number of sound business reasons why a sale of the paratransit business made no sense, none of which implicated Ms. Tilton's personal interests. It is undisputed that the paratransit business was TransCare's most valuable business line and contributed the majority of TransCare's positive EBITDA. Had that business been sold, TransCare's EBITDA would have immediately turned negative, rendering the company unsustainable as a going concern. TransCare's management, and Mr. Leland in particular, did not account for this fact or provide any actionable plan for addressing it. Moreover, although Mr. Leland apparently assumed that proceeds from such a sale could be used by TransCare to fund the company's capital needs, per the plain terms of the Wells Fargo Credit Facility, PPAS Credit Agreement, and Ark II Credit Agreement, the proceeds could not be used for that purpose, but rather would have to be paid to TransCare's secured lenders to reduce TransCare's debt obligations. Likewise, the evidence will show that there were never any actionable offers to purchase TransCare's entire business and, in any case, Ms. Tilton's decision not to try to sell the company during 2015 given its unstable financial condition was entirely reasonable, as such a sale would not be value maximizing.

d. Ms. Tilton did not breach her fiduciary duties of loyalty or good faith to TransCare in proposing to Wells Fargo a restructuring of TransCare in February 2016, including actions taken in respect of the formation of Transcendence and the foreclosure of the Subject Collateral (as defined in

56

the Notice of Acceptance). There is no evidence that any of the steps she took were motivated by anything other than a desire to save the jobs of many TransCare employees while providing for an orderly wind down of TransCare's unprofitable business lines so that Wells Fargo could be made whole. The Subject Collateral was never ultimately transferred to Transcendence. Nor was it "stolen" or "kept" by PPAS or the Term Loan Lenders. Rather, through negotiations between counsel and a court-endorsed stipulation (described in greater detail below), some of the Subject Collateral was auctioned off by the Trustee during the course of these cases.

e.   Nor can the Trustee prove that any breach of the duty of loyalty by Ms. Tilton resulted in any WARN or tax liability to TransCare. As already explained, Ms. Tilton did not act disloyally and, regardless, nothing she did or did not do led to the failure of either TransCare as a going concern or her proposed plan to restructure the company. If anything, the evidence will show that she worked diligently to save jobs but, ultimately, was unable to do so without the cooperation of Wells Fargo and the Trustee

f.   Even if Ms. Tilton breached her fiduciary duties to TransCare (she did not), the Trustee will not be able to prove any damages to TransCare because the Trustee's expert's damages calculations are unreliable for many reasons, including that they rely on the counterfactual assumption that TransCare had a going concern value on his valuation dates that was higher than the liquidation value.

57

**A0377**

3. Claim 3 – Equitable Subordination against PPAS, Ark II, PPMG and Patriarch Partners

   a. PPAS, Ark II, PPMG, and Patriarch Partners (the "Defendant Creditors") are not insiders or fiduciaries of TransCare because they did not exercise day-to-day control over TransCare or otherwise control its finances.

   b. Moreover, the Trustee cannot prove any inequitable conduct by the Defendant Creditors, including any action taken by the Defendant Creditors in respect of the Ark II Credit Agreement.

   c. To the extent the conduct complained of by the Trustee had any impact, it would have been on one or more of the Term Loan Lenders or Wells Fargo. There was no injury to the estate itself. The Trustee lacks standing to assert a claim for equitable subordination based on any conduct of the Defendant Creditors that allegedly injured any of the Term Loan Lenders or Wells Fargo (which has been paid in full in any event), as the alleged injury would be particularized to them and not shared by the general body of creditors.

   d. The Trustee has the burden of showing both unfair advantage to the Defendant Creditors and harm to TransCare or its creditors as a whole. Here, the alleged conduct of the Defendant Creditors did not confer upon them an unfair advantage nor result in injuries to TransCare or TransCare's creditors.

   e. Subordinating the claims of the Defendant Creditors is inconsistent with the Bankruptcy Code.

   f. The proofs of claim filed by the Defendant Creditors should not be subordinated to general unsecured claims and any corresponding security

58

A0378

Case 1:20-cv-06274-LAK Document 11-3 Filed 09/30/20 Page 60 of 203

interests should not be transferred to TransCare's estates pursuant to 11 U.S.C. § 510(c) of the Bankruptcy Code.

4. Claim 4 – Debt Recharacterization against Ark II

a. Ark II advanced approximately $1.9 million to TransCare. Ark II and TransCare intended for the advances to be repaid. The funds were advanced pursuant to a valid loan agreement—the Ark II Credit Agreement—that contained a maturity date and provided for the repayment of principal as well as accrued interest.

b. The funds advanced by Ark II were secured through priority interests in Collateral (as defined in the Ark II Security Agreement). Ark II perfected its security interests in the Collateral through the filing of UCC statements.

c. The Ark II advances were used for working capital and general corporate purposes.

d. The funds Ark II advanced to TransCare were not made in proportion to its equity investment in TransCare. No other beneficial or record equity-holder of TransCare is alleged to have advanced the funds that are the subject of Ark II's proof of claim.

e. The Trustee cannot establish the vast majority of the eleven factors set forth in *In re AutoStyle Plastics, Inc.*, 269 F.3d 726 (6th Cir. 2001) in order to recharacterize the Ark II Credit Facility as equity. Accordingly, the proofs

59

of claim asserting rights to payment under the Ark II Credit Agreement should be allowed under 11 U.S.C. § 502 of the Bankruptcy Code.

5. Claim 7 – Actual Fraudulent Transfer against PPAS, Ark II, Transcendence, and Transcendence II

   a. The Trustee cannot prove the first element of a cause of action under 11 U.S.C. § 548(a)(1)(A) because none of the Subject Collateral (as defined in the Notice of Acceptance) was physically transferred to PPAS, Ark II, or Transcendence. To the extent there was a transfer of title on paper, no value was actually lost by TransCare. For the same reasons, the Trustee is not entitled to relief under § 276 of the New York Debtor Creditor Law ("DCL").

   b. If the Court were to determine that some or all of the Subject Collateral was transferred to PPAS, Ark II, or Transcendence, the Trustee cannot establish the actual fraudulent intent of the transferor/debtor required to avoid the transfers under 11 U.S.C. § 548(a)(1)(A) or § 276 of the DCL, made applicable through 11 U.S.C. § 544(b) of the Bankruptcy Code.

   c. If the Court were to determine that some or all of the Subject Collateral was transferred to PPAS, Ark II, or Transcendence and that such transfers are avoidable, recovery by the Trustee would constitute a windfall to the estate and a prohibited double recovery under 11 U.S.C. § 550(d) because the Subject Collateral was in the physical control of the Trustee and sold by him in connection with the Stipulation Approving the Sale of Certain Personal Property [Docket No. 52].

60

**A0380**

    d. In any case, no value was lost by TransCare as a result of the alleged transfers. The Subject Collateral was worth no less to the Debtors as a result of the foreclosure than it would have been absent the foreclosure.

    e. A claim for attorneys' fees under Section 276-a of the DCL must be based on a successful claim to recover a fraudulent transfer under Section 276 of the DCL. Because the Trustee will be unable to establish that he is entitled to recover anything, he cannot recover attorneys' fees under Section 276-a of the DCL.

6. Claim 9 – Automatic Stay Violation against all Defendants

    a. The Trustee is not entitled to a judgment holding the Defendants in contempt or the imposition of sanctions against Defendants because the Trustee cannot establish that the Debtors were injured by any purported violation of the automatic stay.

    b. None of the Subject Collateral lost value as a result of the alleged violation of the automatic stay.

    c. At all relevant times, the estate held, at best, only legal title to the Subject Collateral, which had been pledged as security to the Debtors' secured lenders.

    d. The order entered by the Court approving the Personal Property Stipulation [Docket No. 52] resulted in the sale of Subject Collateral and specified what the Trustee's rights would be in the event PPAS's foreclosure was ultimately found to be invalid, thus mooting any technical violation of the automatic stay.

A0381

7. Claim 10 – Preferential Transfer against Ark II

    a. The Trustee cannot avoid TransCare's grant of a security interest to Ark II (the "<u>Ark II Security Interests</u>") because the Trustee cannot demonstrate by a preponderance of the evidence that the Ark II Security Interests enabled Ark II to receive more than it would receive if Ark II received payment on the debt in a chapter 7 liquidation, rather than through the transfer. Under the Ark II Security Agreement, Ark II is fully secured with liens on all of the assets of the Debtors. Payments to a fully-secured creditor are not preferential because the creditor would receive the full value of its collateral in a chapter 7 liquidation.

    b. If the Court nonetheless considers the Trustee's preference claim, Ark II has a defense pursuant to 11 U.S.C. § 547(c)(1) in that (i) TransCare contemporaneously received new value from Ark II in exchange for the Ark II Security Interests; (ii) Ark II and TransCare intended for the exchange to be contemporaneous; and (iii) the exchange was substantially contemporaneous.

    c. The claim under 11 U.S.C. § 502(d) of the Bankruptcy Code should be dismissed because Ark II did not receive a transfer avoidable under 11 U.S.C. § 547 of the Bankruptcy Code.

8. Claim 11 – Constructive Fraudulent Transfer against Ark II

    a. TransCare granted Ark II a security interest in the Collateral (as defined in the Ark II Security Agreement) in exchange for cash advances totaling $1,862.925.77.

A0382

b. The Trustee cannot prove by a preponderance of the evidence that (i) Ark II did not give equivalent value in exchange for the Ark II Security Interests or (ii) Ark II did not receive the Ark II Security Interests in good faith.

c. Ark II is not an insider of TransCare because it did not exercise day-to-day control over TransCare or otherwise control its finances. In any event, Ark II's alleged status as an insider is irrelevant because the Ark II Security Interests secured a contemporaneous advance of funds, not a pre-existing debt.

d. The Ark II Security Interests cannot be avoided pursuant to 11 U.S.C. § 544 and §§ DCL 273 – 275.

9. Claim 12 – Payment Subordination against PPAS

a. The Trustee lacks standing to bring this claim on behalf of the TransCare estates under New York law because the claim seeks to enforce the terms of the 2016 Intercreditor Agreement and TransCare is not a party to the 2016 Intercreditor Agreement.

b. The Trustee lacks standing to bring this claim on behalf of the TransCare estate because under the plain terms of the 2016 Intercreditor Agreement, TransCare is not a third-party beneficiary of the 2016 Intercreditor Agreement. *See* 2016 Intercreditor Agreement, Section 3.13. Indeed, TransCare signed an acknowledgement to the 2016 Intercreditor Agreement

A0383

in which it expressly acknowledged, among other things, that it is not a beneficiary of that contract.

10. Claim 13 – Limitation on Liens against PPAS and Ark II

    a.  The equities of the case exception is not applicable and does not merit a judgment that the security interests of PPAS and Ark II do no reach to the post-petition proceeds of certain TransCare property. The equities of the case exception is to be applied narrowly to prevent a secured creditor from reaping a windfall from collateral that has appreciated in value as a result of the trustee's use of other estate assets. Here, there is no evidence that the Subject Collateral (which was sold pursuant to the terms of the Personal Property Stipulation) appreciated in value post-petition.

    b.  Even if the Trustee could establish some appreciation in value of the Subject Collateral (and he cannot), there is no evidence that the Trustee invested any unencumbered funds to enhance their value. Instead, pursuant to the terms of the Personal Property Stipulation, the costs and expenses incurred in selling the property were carved-out of and paid from the gross proceeds from the sale of those assets. Moreover, pursuant to the Personal Property Stipulation, 20% of the net proceeds from the sale were carved-out and paid to the Trustee for the benefit of the Debtors' estates.

11. Claim 14 – Turnover and Avoidance against PPAS and Ark II

    a.  Section 549 of the Bankruptcy Code is not applicable to the transfer of $800,000.01 in proceeds from the sale of the Subject Collateral (as such sale was authorized in the Personal Property Stipulation) from PPAS to Ark II

A0384

because the proceeds were no longer property of the estate after the Trustee
transferred them to PPAS.  Moreover, because the Trustee only held (at
best) legal title to, but not an equitable interest in, the Subject Collateral, the
estate's interest (if any) was limited to the legal title transferred to the
purchaser pursuant to the sale at auction.

b.  Because the proceeds from the sale in the hands of PPAS was not estate
property, they are not subject to avoidance under Section 549.

c.  The $800,000.01 in proceeds from the sale of the Subject Collateral are not
subject to turnover under Section 542(b) of the Bankruptcy Code as against
PPAS or Ark II because the proceeds do not constitute a "debt" within the
meaning of Section 542(b) (which applies only to the collection of a
matured debt, payable on demand or payable on order).

d.  Because the $800,000.01 in proceeds from the sale of the Subject Collateral
are not subject to turnover under Section 542(b) of the Bankruptcy Code as
against PPAS or Ark II, neither PPAS' or Ark II's proofs of claim can be
disallowed under Section 502(d) of the Bankruptcy Code.

e.  If the Court determines that the transfer is avoidable, the Trustee is limited
to a single recovery under 11 U.S.C. § 550(d).

## V.    ISSUES TO BE TRIED

The parties submit that the following issues are to be tried at trial:

1.  Claim 1 – Breach of Fiduciary Duty against Lynn Tilton

   a.  Did Ms. Tilton breach her duties of loyalty and good faith to TransCare under
   Delaware law?

65

b.  If the Court finds liability on the Trustee's breach of fiduciary duty claim against Ms. Tilton, did the breach result in damages to TransCare, and if so, in what amount?

2.  Claim 3 – Equitable Subordination against PPAS, Ark II, PPMG and Patriarch Partners

a.  Have PPAS, Ark II, PPMG or Patriarch Partners engaged in conduct such that it warrants subordination of any of their claims against the Debtors under 11 U.S.C. § 510(c)?

b.  If the claims of PPAS, Ark II, PPMG or Patriarch Partners are subject to subordination, to what extent should their proofs of claims be subordinated under 11 U.S.C. § 510(c)?

3.  Claim 4 – Debt Recharacterization against Ark II

a.  Should the Ark II Credit Agreement be recharacterized as an equity investment under the test set forth in *Bayer Corp. v. MascoTech, Inc.* (*In re AutoStyle Plastics, Inc.*), 269 F.3d 726 (6th Cir.2001)?

4.  Claim 7 – Actual Fraudulent Transfer against PPAS, Ark II, Transcendence and Transcendence II

a.  Was the Subject Collateral (as defined in the Notice of Acceptance) transferred to PPAS and Transcendence on or about February 24, 2016?

b.  To the extent the property was transferred, did TransCare act with actual fraudulent intent under 11 U.S.C. § 548(a)(1)(A) or under DCL § 276?

c.  May the Trustee recover the value of the property when transferred pursuant to 11 U.S.C. § 550(a) and, if so, in what amount?

d.  May the Trustee recover fees pursuant to Section 276-a of the DCL?

66

A0386

Case 1:20-cv-05274-LAK Document 11-3 Filed 09/30/20 Page 68 of 203

5.  Claim 9 – Automatic Stay Violation against all Defendants

 a.  Did the Defendants take action in violation of the automatic stay provisions of 11 U.S.C. § 362(a)?

 b.  If the Defendants took action in violation of 11 U.S.C. § 362(a), is the Trustee entitled to a judgment holding Defendants in contempt and/or an award of sanctions?

6.  Claim 10 – Preferential Transfer against Ark II

 a.  Has the Trustee proven that TransCare's grant of a security interest to Ark II is avoidable as a preferential transfer under 11 U.S.C. § 547(b)?

 b.  To the extent the Trustee proves that TransCare's grant of a security interest to Ark II is avoidable as a preferential transfer under 11 U.S.C. § 547(b), has Ark II established that the grant of a security interest is not avoidable on the grounds of the new value affirmative defense under 11 U.S.C. § 547(c)?

 c.  May the Trustee recover from Ark II the grant of a security interest to Ark II under 11 U.S.C. § 550(a) of the Bankruptcy Code?

7.  Claim 11 – Constructive Fraudulent Transfer against Ark II

 a.  Has the Trustee proven that TransCare's grant of a security interest to Ark II is avoidable as a constructive fraudulent transfer under DCL § 273, made applicable through 11 U.S.C. § 544(b) of the Bankruptcy Code?

 b.  May the Trustee recover from Ark II the grant of a security interest to Ark II under 11 U.S.C. § 550(a) of the Bankruptcy Code?

A0387

8. Claim 12 – Payment Subordination against PPAS

    a. Does the Trustee have standing to assert a claim of payment subordination against PPAS?

    b. To the extent the Trustee has standing to assert a claim of payment subordination against PPAS, is PPAS entitled to any distribution from the TransCare estates prior to payment in full of the proof of claim filed by Ark II?

9. Claim 13 – Limitation on Liens against PPAS and Ark II

    a. Should the pre-petition security interests of PPAS and Ark II extend to proceeds acquired by the TransCare estates after the commencement of cases under Section 552(b) of the Bankruptcy Code?

10. Claim 14 – Turnover and Avoidance against PPAS and Ark II

    a. Is the transfer of $800,000.01 in proceeds from the sale of the Subject Collateral pursuant to the Personal Property Stipulation avoidable under 11 U.S.C. § 549?

    b. If so, is the value of the transfer recoverable under 11 U.S.C. § 550(a) from either PPAS or Ark II?

    c. Are the proceeds from the sale of the Subject Collateral subject to turnover to the Trustee pursuant to Section 542(b) of the Bankruptcy Code?

VI.    **EXHIBIT LISTS; STIPULATIONS AND OBJECTIONS WITH RESPECT TO EXHIBITS**

Annexed as Exhibit A hereto is the list of the Trustee's exhibits, other than impeachment exhibits, with stipulations to admissibility or any objections to each exhibit, including the basis of all objections to each document. Any objections not set forth in this order will be considered waived absent good cause shown.

A0388

Annexed as Exhibit B hereto is the list of the Defendants' exhibits, other than impeachment exhibits, with stipulations to admissibility or any objections to each exhibit, including the basis of all objections to each document.  Any objections not set forth in this order will be considered waived absent good cause shown.

Annexed as Exhibit C hereto is the list of the parties' joint exhibits.

The parties continue to negotiate in good faith concerning stipulations to particular exhibits and will update the Court in advance of trial should they arrive at an agreement.

No exhibit not listed by Plaintiff or Defendants may be used at trial except (a) for cross-examination purposes or (b) if good cause for its exclusion from the pretrial order is shown.  Each side shall list all exhibits it intends to offer on its case in chief.  All exhibits shall be pre-marked with each exhibit bearing a unique number or letter (numbers for plaintiff and letters for defendant), with the prefix PX for Plaintiff's exhibits and DX for Defendants' exhibits.  Each party must supply a loose-leaf bound book of pre-marked exhibits separated by dividers and containing an index to the Court, his or her adversary and the witness stand at the commencement of the trial.

VII.    PLAINTIFF'S WITNESS LIST

Any witness who is not identified in accordance with this order shall not be permitted to testify on either party's case in chief absent good cause shown.  Each party shall list the witnesses it intends to call on its case in chief and, if a witness's testimony will be offered by deposition, shall designate by page and line numbers the portions of the deposition transcript it intends to offer.  Each party shall set forth any objections it has to deposition testimony designated by the other and the basis therefor. Each party reserves the right to call the witnesses identified by the other party.

69

A0389

The Plaintiff intends to call the following fact witnesses:

1. Michael Greenberg

2. Jean Luc Pelissier

3. Brian Stephen

4. Lynn Tilton

5. Scott Whalen

6. Carl Marks

7. Carl Landeck

8. Mark Claster

9. Glen Youngblood

10. Alexander Witkes

11. Glenn Leland

12. Mark Bonilla

13. Salvatore LaMonica

The Plaintiff intends to offer the following testimony by deposition:

1. John Husson, as designee of Wells Fargo

    a. See Exhibit D

2. Glenn Leland

    a. See Exhibit E

The Plaintiff objects to the inclusion of Lynn Harrison, Cindi Giglio, and Randy Creswell as witnesses pursuant to Federal Rules 26(a)(1)(A)(i), 26(e)(1) and 37(c).

VIII.    DEFENDANTS' WITNESS LIST

The Defendants intend to call the following fact witnesses:

1. Lynn Tilton

70

A0390

2.  Jean Luc Pelissier

3.  Brian Stephen

4.  Michael Greenberg

5.  Scott Whalen

6.  Glenn Leland

7.  John Husson

8.  Salvatore LaMonica

9.  Lynn Harrison

10. Cindi Giglio

11. Randy Creswell

The Defendants intend to offer the following testimony by deposition:

12. John Husson, as designee of Wells Fargo

    a.  See Exhibit F

13. Glenn Leland

    a.  See Exhibit G

    b.  Defendants agree that Plaintiff has the right to object and make counter-designations to Defendants' Designations of the Deposition of Glenn Leland.

## IX.   PLAINTIFF'S EXPERT WITNESS

Jonathan Arnold, expert report dated November 30, 2018. Dr. Arnold will testify concerning the value of TransCare.

## X.   DEFENDANTS' EXPERT WITNESSES

Jeffrey R. Dunn, expert report dated February 11, 2019. Mr. Dunn is expected to testify regarding the expert report submitted by Jonathan I. Arnold, Ph.D., including Mr. Dunn's

71

**A0391**

observations regarding the methodology, assumptions, and conclusions Dr. Arnold reached in his report.

Any expert witness who is not identified in accordance with this order shall not be permitted to testify on either party's case in chief absent good cause shown.

XI.    RELIEF SOUGHT

Plaintiff seeks the following relief with respect to each claim:

1.  Claim 1 – Breach of Fiduciary Duty against Lynn Tilton

    a.  Damages against Tilton in the amount of no less than approximately $17 million and as much as $67 million.

    b.  Damages against Tilton for TransCare's liability in the WARN Proceeding and relating to the unpaid payroll taxes.

2.  Claim 3 – Equitable Subordination against PPAS, Ark II, PPMG and Patriarch Partners

    a.  Subordination below general unsecured claims of claims asserted by PPAS, Ark II, PPMG and Patriarch Partners.

    b.  Transfer to TransCare's estates of liens associated with claims asserted by PPAS and Ark II.

3.  Claim 4 – Debt Recharacterization against Ark II

    a.  Recharacterization as equity of claim asserted by Ark II.

    b.  Disallowance of claim asserted by Ark II.

    c.  Preservation of lien asserted by Ark II for benefit of TransCare's estates.

A0392

4. Claim 7 – Actual Fraudulent Transfer against PPAS, Ark II, Transcendence and Transcendence II

    a. Damages against PPAS, Ark II, Transcendence and Transcendence II in the amount of between $17.0 million and $33.4 million – reflecting the value of the transferred assets immediately before the transfer, minus the value obtained by the Trustee for such assets postpetition – plus the Trustee's reasonable attorneys' fees and expenses.

    b. Disallowance of claims asserted by PPAS and Ark II.

5. Claim 9 – Automatic Stay Violation against all Defendants

    a. Sanctions against all Defendants.

6. Claim 10 – Preferential Transfer against Ark II

    a. Avoidance of security interest asserted by Ark II.

    b. Preservation and recovery of lien asserted by Ark II for benefit of TransCare's estates.

    c. Disallowance of claim asserted by Ark II.

7. Claim 11 – Constructive Fraudulent Transfer against Ark II

    a. Avoidance of security interest asserted by Ark II.

    b. Preservation and recovery of lien asserted by Ark II for benefit of TransCare's estates.

    c. Disallowance of claims asserted by Ark II.

8. Claim 12 – Payment Subordination against PPAS

    a. Judgment that PPAS's claims are junior to Ark II and not entitled to payment until Ark II has been paid in full in accordance with the 2016 Intercreditor Agreement.

A0393

9. Claim 13 – Limitation on Liens against PPAS and Ark II

    a. Judgment that security interests asserted by PPAS and Ark II do not extend to postpetition proceeds of estate assets.

10. Claim 14 – Turnover and Avoidance against PPAS and Ark II

    a. Avoidance and recovery of $800,000.01 from either Ark II or PPAS.

    b. Turnover of $800,000.01 from either Ark II or PPAS.

    c. Disallowance of claims asserted by PPAS and Ark II until such payment is made.

11. Pre- and post-judgment interest on all claims, and such other and further relief as this Court deems just and proper.

## XII.   ESTIMATED TIME OF TRIAL

Plaintiff estimates that it will take 20 hours to complete the presentation of his direct case, excluding deposition designations.

Defendants' estimate that it will take approximately 16 hours to complete the presentation of its case-in-defense, excluding deposition designations.

A0394

Dated:  May 3, 2019

<p style="margin-left:40%">

*s/ Avery Samet*

Bijan Amini, Esq.

Avery Samet, Esq.

Jaime B. Leggett, Esq.

STORCH AMINI PC

2 Grand Central Tower

140 East 45th Street, 25th Floor

New York, NY 10018

Main Line: (212) 490-4100

*Counsel for Plaintiff*


*s/ Michael T. Mervis*

Michael T. Mervis

Timothy Q. Karcher

PROSKAUER ROSE LLP

Eleven Times Square

New York, NY 10036

Main Line: (212) 969-3000


Nicole A. Eichberger (admitted *pro hac vice*)

PROSKAUER ROSE LLP

650 Poydras Street

Suite 1800

New Orleans, LA 70130

Main Line: (504) 310-2024

*Counsel for Defendants*

</p>

Dated:  **May 14th, 2019**


**IT IS SO ORDERED:**

<p style="margin-left:40%">

**/s/ STUART M. BERNSTEIN**

**STUART M. BERNSTEIN**

**United States Bankruptcy Judge**

</p>

A0395

# LAMONICA V. TILTON, ET AL.

# EXHIBIT A TO PROPOSED JOINT PRETRIAL ORDER

# TRUSTEE'S EXHIBIT LIST

Case 1-20-cv-06274-AKH Document 14-3 Filed 09/30/20 Page 73 of 203
18-01021-smb Doc 653-1 Filed 05/07/2019 Entered 05/07/2019 19:32:53 Exhibit A
Exhibit A - Trustee's Exhibit List   Pg 2 of 19

| PX No. | Vol. No. | JX No. | PX/DX (Deponent) | Document Date | Time | Description | Begin Bates Range | End Bates Range | Defendants' Objections | Plaintiffs' Objections |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | | | | 6/2/2011 | | Amendment No. 17 and Waiver to Credit Agreement of Transcare Corporation | PP-TRBK0001172 | PP-TRBK0001253 | Lacks Relevance (FRE 401, 402) | |
| 2 | | | | 6/4/2012 | | Notice of Payment Assignment | WF_TC_00001046 | WF_TC_00001057 | Lacks Relevance (FRE 401, 402) | |
| 3 | | | PX 138 (Tilton) | 7/10/2012 | | Authority Matrix - Transcare Corporation Written Consent of the Sole Director | TRANSCARE00024172 | TRANSCARE00024175 | Lacks Relevance (FRE 401, 402) | |
| 4 | | | | 1/30/2014 | | Transcare December 2013 Financials | CM_TC2018_0004132 | CM_TC2018_0004150 | Lacks foundation (FRE 602); Lacks authentication (FRE 901); Hearsay (FRE 802) | |
| 5 | | | | 2/28/2014 | | Transcare January 2014 Financials | TRANSCARE00004571 | TRANSCARE00004589 | Lacks foundation (FRE 602); Lacks authentication (FRE 901); Hearsay (FRE 802) | |
| 6 | | | | 4/2/2014 | 15:39 | Email from Albion Investors - FW: 2014 November Financial Statements - Patriarch; 2014 December Financial Statements - Patriarch | AL-00400 | AL-00441 | Lacks foundation (FRE 602); Lacks authentication (FRE 901); Hearsay (FRE 802) | |
| 7 | | | | 7/14/2014 | | Transcare March 2014 Financials | TRANSCARE00004609 | TRANSCARE00004627 | Lacks foundation (FRE 602); Lacks authentication (FRE 901); Hearsay (FRE 802) | |
| 8 | | | | 7/18/2014 | 13:53 | Email from Mark Bonilla to Lynn Tilton - RE: TransCare 2014 April Financial Statement Package | AL-00196 | AL-001215 | Lacks foundation (FRE 602); Lacks authentication (FRE 901); Hearsay (FRE 802) | |
| 9 | | | | 8/6/2014 | 14:13 | Email from Mark Bonilla to Lynn Tilton - RE: TransCare 2014 May Financial Statement Package | AL-00216 | AL-00235 | Lacks foundation (FRE 602); Lacks authentication (FRE 901); Hearsay (FRE 802) | |
| 10 | | | | 9/11/2014 | 13:38 | Email from Mark Bonilla to Lynn Tilton - RE: TransCare 2014 June Financial Statement Package | AL-00236 | AL-00255 | Lacks foundation (FRE 602); Lacks authentication (FRE 901); Hearsay (FRE 802) | |
| 11 | | | | 10/24/2014 | | Transcare August 2014 Financials | PP-TRBK0020769 | PP-TRBK0020787 | Lacks foundation (FRE 602); Lacks authentication (FRE 901); Hearsay (FRE 802) | |
| 12 | | | | 10/29/2014 | 14:16 | Email from Mark Bonilla to Lynn Tilton - RE: TransCare 2014 July & August Financial Statement Package | AL-00256 | AL-00294 | Lacks foundation (FRE 602); Lacks authentication (FRE 901); Hearsay (FRE 802) | |
| 13 | | | PX 001 (Whalen) | 11/11/2014 | 17:27 | Email from Whalen to Jim O'Connor - Meeting with Patriarch/RemCo next week | TRANSCARE00001061 | TRANSCARE00001061 | Lacks Relevance (FRE 401, 402) | |
| 14 | | | PX 083 (Pelissier) | 12/3/2014 | 13:36 | Email from Brad Schneider to Jean Luc Pelissier - RE: Cash Report for 12-02-2014 | TRANSCARE00001004 | TRANSCARE00001005 | | |
| 15 | | | | 12/26/2014 | | Glenn Leland Offer Letter from Lynn Tilton | TRANSCARE00074331 | TRANSCARE00074338 | | |
| 16 | | | | 12/31/2014 | 12:22 | Email from Mark Bonilla to Lynn Tilton - RE: TransCare Sept & Oct. Financial Statement Package | AL-00341 | AL-00379 | Lacks foundation (FRE 602); Lacks authentication (FRE 901); Hearsay (FRE 802) | |

| PX No. | Vol. No. | JX No. | PX/DX (Deponent) | Document Date | Time | Description | Begin Bates Range | End Bates Range | Defendants' Objections | Plaintiffs' Objections |
|---|---|---|---|---|---|---|---|---|---|---|
| 17 | | | | 1/5/2015 | 9:20 | Email from Mark Bonilla to Gerald Campbell - FW: Open Items List and Requests | TRANSCARE00062780 | TRANSCARE00062860 | Lacks relevance (FRE 401, 402); Hearsay (FRE 802); Lacks foundation (FRE 602); Lacks authentication (FRE 901) | |
| 18 | | | PX 50 (Greenberg) | 2/5/2015 | 9:07 | Email from Brian Stephen to Jean Luc Pelissier, Glenn Leland and Brad Schneider - Privileged and Confidential | PP-TRBK0087764 | PP-TRBK0087765 | | |
| 19 | | | PX 51 (Stephen) | 2/5/2015 | 9:41 | Email from Brian Stephen to Glenn Leland - RE: Payroll options | PP-TRBK0053852 | PP-TRBK0053859 | | |
| 20 | | | PX 86 (Pelissier) | 2/5/2015 | 11:48 | Email from Glenn Leland to Jean Luc Pelissier - New alternative to consider | TRANSCARE00195417 | TRANSCARE00195418 | | |
| 21 | | | | 2/5/2015 | 10:34 | Email from Brian Stephen to Glenn Leland, Jean Luc Pelissier (CBA); Cc'd Mark Bonilla, Jeff Ellis, Brad Schneider - RE: Privileged and Confidential | PP-TRBK0087751 | PP-TRBK0087755 | | |
| 22 | | | PX 87 (Pelissier) | 2/6/2015 | 9:52 | Email from Glenn Leland to Jean Luc Pelissier - Cash crisis continues | PP-TRBK0080994 | PP-TRBK0080995 | | |
| 23 | | | PX 53 (Stephen) | 2/6/2015 | 12:12 | Email from Glenn Leland to Jean Luc Pelissier - Re: Authorization to Terminate Contract | TRANSCARE00004285 | TRANSCARE00004287 | Lacks Relevance (FRE 401, 402) | |
| 24 | | | PX 109 (Tilton) | 2/7/2015 | 17:23 | Email from Glenn Leland to Lynn Tilton, et al - TransCare the week of January 31 thru February 6, 2015 | PP-TRBK0028569 | PP-TRBK0028575 | | |
| 25 | | | PX 189 (Leland) | 2/10/2015 | 16:06 | Email from Lynn Tilton to Glenn Leland - RE: RCA Ambulance Service NYC | PP-TRBK0033683 | PP-TRBK0033685 | | |
| 26 | | | | 2/10/2015 | 14:54 | Email from Mike Weinberger to Lynn Tilton - RCA Ambulance Service NYC | PP-TRBK0042693 | PP-TRBK0042693 | | |
| 27 | | | | 2/12/2015 | 23:59 | Email from Mike Weinberger to Mark Bonilla - Re: RCA Checks | TRANSCARE00004191 | TRANSCARE00004192 | Lacks foundation (FRE 602); Lacks authentication (FRE 901); Hearsay (FRE 802) | |
| 28 | | | PX 90 (Pelissier) | 2/14/2015 | 5:49 | Email from Glenn Leland to Jean Luc Pelissier | PP-TRBK0032614 | PP-TRBK0032617 | | |
| 29 | | | DX 216 (Leland) | 2/14/2015 | 17:23 | Email from Glenn Leland to Lynn Tilton; Cc'd Jean Luc Pelissier, Randy Jones, John Pothin, Brad Schneider, Mark Bonilla, Jim O'Connor, Jeff Ellis, Glen Youngblood | PP-TRBK0028569 | PP-TRBK0028575 | | |
| 30 | | | PX 191 (Leland) | 2/18/2015 | 8:50 | Email from Glenn Leland to Jean Luc Pelissier - Meeting | PP-TRBK0073294 | PP-TRBK0073295 | | |
| 31 | | | PX 27 (Greenberg) | 2/18/2015 | 9:51 | Email from Glenn Leland to Michael Greenberg, Mark Bonilla - TransCare Plan Feb 18.pptx | TRANSCARE00004065 | TRANSCARE00004067 | | |
| 32 | | | DX 218 (Leland) | 2/18/2015 | 14:14 | Email from Mark Bonilla to Mike Weinberger; Cc'd Glenn Leland - RE: TCA/Transcare | TRANSCARE00061423 | TRANSCARE00061424 | | |

| PX No. | Vol. No. | JX No. | PX/DX (Deponent) | Document Date | Time | Description | Begin Bates Range | End Bates Range | Defendants' Objections | Plaintiffs' Objections |
|---|---|---|---|---|---|---|---|---|---|---|
| 33 | | | PX 146 (Wells Fargo) | 2/19/2015 | 14:09 | Email from Michael Greenberg to Melissa Provost, Jean Luc Pelissier - Re: TransCare | WF_TC_00001654 | WF_TC_00001655 | Hearsay (FRE 802) | |
| 34 | | | | 2/20/2015 | | Transcare Memorandum from Mark Bonilla to Distribution - RE December 2014 Financials | PP-TRBK0028485 | PP-TRBK0028503 | Lacks foundation (FRE 602); Lacks authentication (FRE 901); Hearsay (FRE 802) | |
| 35 | | | DX 219 (Leland) | 2/20/2015 | 15:37 | Email from Mike Weinberger to Glenn Leland - RCA Ambulance Service | TRANSCARE00195974 | TRANSCARE00195974 | | |
| 36 | | | PX 56 (Stephen) | 2/22/2015 | 11:48 | Email from Michael Greenberg to Jean Luc Pelissier, Brian Stephen - Draft: TransCare - Overview of February 2015 Stabilization Plan | PP-TRBK0072563 | PP-TRBK0072661 | | |
| 37 | | | PX 148 (Wells Fargo) | 2/23/2015 | 10:56 | Email from John Husson to Wells Fargo execs - FW: TransCare Corporation - Proposed Internal Accounting Rating Change | WF00000920 | WF00000922 | Lacks foundation (FRE 602); Lacks authentication (FRE 901); Hearsay (FRE 802); | |
| 38 | | | PX 147 (Wells Fargo) | 2/23/2015 | | TransCare Stabilization Plan, February 23, 2015 | TRANS-R-00002727 | TRANS-R-00002728 | Lacks foundation (FRE 602); Lacks authentication (FRE 901); Prejudicial (FRE 403) | |
| 39 | | | PX 21 (Greenberg) | 2/26/2015 | | Amendment 24 to Credit Agreement of Transcare Corporation | | | | |
| 40 | | | PX 25 (Greenberg) | 2/26/2015 | 13:05 | Email from Jean Luc Pelissier to Michael Greenberg, et al - RE: TransCare | TRANSCARE00003818 | TRANSCARE00003819 | Lacks relevance (FRE 401, 402) | |
| 41 | | | PX 149 (Wells Fargo) | 2/27/2015 | 11:42 | Email from Michael Greenberg to Melissa Provost - TransCare - 13-week cash forecast | WF0000923 | WF0000923 | | |
| 42 | | | PX 150 (Wells Fargo) | 2/27/2015 | 14:02 | Email from John Husson to Wells Fargo execs - FW: TransCare - 13-week cash forecast | WF_TC_00001795 | WF_TC_00001795 | Lacks foundation (FRE 602); Lacks authentication (FRE 901); Hearsay (FRE 802) | |
| 43 | | | DX 223 (Leland) | 3/2/2015 | 14:24 | Email from Mike Weinberger to Glenn Leland - RCA proposal | TRANSCARE196659 | TRANSCARE196659 | | |
| 44 | | | | 3/3/2015 | 19:00 | Email from Mike Weinberger to Lynn Tilton - RCA Proposal | PP-TRBK0090486 | PP-TRBK0090487 | | |
| 45 | | | PX 26 (Greenberg) | 3/4/2015 | 13:12 | Email from Michael Greenberg to Glenn Leland, Jean Luc Pelissier | PP-TRBK0071729 | PP-TRBK0071730 | | |
| 46 | | | PX 192 (Leland) | 3/5/2015 | 10:26 | Email from Glenn Leland to Michael Greenberg, Jean Luc Pelissier, Mark Bonilla | PP-TRBK0071644 | PP-TRBK0071644 | | |
| 47 | | | PX 22 (Greenberg) | 3/5/2015 | | Amendment 25 to Credit Agreement of Transcare Corporation | | | | |
| 48 | | | PX 176 (Credit Suisse) | 3/11/2015 | 13:30 | Email from Michael Greenberg to Alexander T. Witkes RE: TransCare | PP-TRBK0098685 | PP-TRBK0098687 | | |
| 49 | | | | 3/31/2015 | 16:13 | Email from Mark Bonilla to Lynn Tilton - January 2015 Financials Transcare | AL-00380 | AL-00399 | Lacks foundation (FRE 602); Lacks authentication (FRE 901); Hearsay (FRE 802) | |
| 50 | | | PX 151 (Wells Fargo) | 4/1/2015 | 8:33 | Email from Michael Muller to Wells Fargo Execs - TransCare Corporation 2015-03 Exam Release | WF00000962 | WF00001008 | Lacks foundation (FRE 602); Lacks authentication (FRE 901); Hearsay (FRE 802) | |

Exhibit A - Trustee's Exhibit List

| PX No. | Vol. No. | JX No. | PX/DX (Deponent) | Document Date | Time | Description | Begin Bates Range | End Bates Range | Defendants' Objections | Plaintiffs' Objections |
|---|---|---|---|---|---|---|---|---|---|---|
| 51 | | | | 4/7/2015 | 10:42 | Email from Mike Weinberger to Mark Bonilla; Cc'd Glenn Leland - Re: RCA Outstanding | TRANSCARE00198138 | TRANSCARE00198140 | | |
| 52 | | | PX 28 (Greenberg) | 4/9/2015 | 7:37 | Email from Michael Greenberg to Glenn Leland, Jean Luc Pelissier - Re: Payroll issue notice | PP-TRBK0069459 | PP-TRBK0069460 | | |
| 53 | | | PX 29 (Greenberg) | 4/15/2015 | 7:23 | Email from Michael Greenberg to Melissa Provost - Fwd.: WFB (Transcare) -- Amendment No.11 | WF_TC_00002207 | WF_TC_00002208 | | |
| 54 | | | PX 152 (Wells Fargo) | 4/17/2015 | 13:15 | Email from Mark Bonilla to Mathhew Bredes - FW: Signed Executed Waiver Agreement with Wells Fargo Bank (TransCare) -- Amendment No.11 | TRANSCARE00038539 | TRANSCARE00038553 | | |
| 55 | | | | 4/17/2015 | 8:48 | Email from Mike Bonilla to Lynn Tilton, Jean Luc Pelissier, Alex Witkes, Tracey Rudd, Steve Blewitt, Charlie Gonzalez; Cc'd Glenn Leland, Michael Greenberg - RE: February 2015 Financials Transcare | AL-00485 | AL-00504 | Lacks foundation (FRE 602); Lacks authentication (FRE 901); Hearsay (FRE 802) | |
| 56 | | | PX 30 (Greenberg) | 5/6/2015 | 10:09 | Email from Jean Luc Pelissier to Michael Greenberg - Re: ADP | PP-TRBK0067980 | PP-TRBK0067981 | | |
| 57 | | | PX 58 (Stephen) | 5/6/2015 | 14:55 | Email from Brian Stephen to Michael Greenberg - FW: TransCare Default/Patriarch Partners | PP-TRBK0067941 | PP-TRBK0067942 | Lacks relevance (FRE 401, 402); Hearsay (FRE 802) | |
| 58 | | | | 5/6/2015 | | Transcare Memorandum from Mark Bonilla to Distribution - RE March 2015 Financials | CM_TC2018_0013895 | CM_TC2018_00138914 | Lacks foundation (FRE 602); Lacks authentication (FRE 901); Hearsay (FRE 802) | |
| 59 | | | PX 31 (Greenberg) | 5/7/2015 | 11:27 | Email from Michael Greenberg to Mark Bonilla - Weekly analysis | PP-TRBK0067900 | PP-TRBK0067900 | | |
| 60 | | | | 5/21/2015 | | Email from Mark Bonilla to Lynn Tilton, Jon Gregory, Michael P. Paone, Alex Witkes, Tracey Rudd, Steve Blewitt, Charlie Gonzalez; Cc'd jimo@transcare.com - TransCare February Financial Statement Package | AL-00176 | AL-00195 | Lacks foundation (FRE 602); Lacks authentication (FRE 901); Hearsay (FRE 802) | |
| 61 | | | | 5/22/2015 | | Transcare Memorandum from Mark Bonilla to Distribution - RE April 2015 Financials | CM_TC2018_0013875 | CM_TC2018_0013894 | Lacks foundation (FRE 602); Lacks authentication (FRE 901); Hearsay (FRE 802) | |
| 62 | | | PX 32 (Greenberg) | 5/27/2015 | 12:52 | Email from Mark Bonilla to Michael Greenberg - FW: Trancare: Outstanding Balances Statement | PP-TRBK0067175 | PP-TRBK0067176 | Lacks Relevance (FRE 401, 402) | |
| 63 | | | PX 193 (Leland) | 6/5/2015 | 14:56 | Email from Jean Luc Pelissier to Glenn Leland, Mark Bonilla - Interest payment | PP-TRBK0066627 | PP-TRBK0066627 | | |
| 64 | | | PX 195 (Leland) | 6/7/2015 | 20:06 | Email from Glenn Leland to Mark Bonilla - Re: Please review and advise | TRANSCARE00008485 | TRANSCARE00008488 | Hearsay (FRE 802) | |
| 65 | | | PX 33 (Greenberg) | 6/11/2015 | 10:41 | Email from Michael Greenberg to Jean Luc Pelissier - RE: TransCare | PP-TRBK0066183 | PP-TRBK0066184 | | |

Case 1-20-cv-06274-LAK Document 13-3 Filed 08/30/20 Page 82 of 203
18-10828 Claims Doc 653-1 Filed 09/05/19 Entered 09/05/19 14:30:53 Exhibit A
Exhibit A - Trustee's Exhibit List   Pg 6 of 19

| PX No. | Vol. No. | JX No. | PX/DX (Deponent) | Document Date | Time | Description | Begin Bates Range | End Bates Range | Defendants' Objections | Plaintiffs' Objections |
|---|---|---|---|---|---|---|---|---|---|---|
| 66 | | | | 6/26/2015 | | Transcare Memorandum from Mark Bonilla to Distribution - RE May 2015 Financials | CM_TC2018_0013955 | CM_TC2018_0013974 | Lacks foundation (FRE 602); Lacks authentication (FRE 901); Hearsay (FRE 802) | |
| 67 | | | | 6/29/2015 | 9:26 | Email from Glenn Leland to Mark Bonilla | TRANSCARE00070645 | TRANSCARE00070650 | Lacks foundation (FRE 602); Lacks authentication (FRE 901); Hearsay (FRE 802) | |
| 68 | | | PX 2 (Whalen) | 7/6/2015 | 12:34 | Email from Glenn Leland to Scott Whalen, Michael Greenberg - Accelerated business plan | PP-TRBK0031071 | PP-TRBK0031082 | | |
| 69 | | | DX 233 (Leland) | 7/6/2015 | 13:16 | Email from Glenn Leland to Thomas Fuchs; Cc'd Earl Kossuth, Rob Stuck, Mark Bonilla, Glen Youngblood - Re: Best field | TRANSCARE00070816 | TRANSCARE00070817 | Hearsay (FRE 802) | |
| 70 | | | PX 3 (Whalen) | 7/7/2015 | 10:54 | Email from Glenn Leland to Jean Pelissier - New York State | TRANSCARE00008230 | TRANSCARE00008230 | | |
| 71 | | | PX 4 (Whalen) | 7/7/2015 | 12:28 | Email from Glenn Leland to Jean Luc Pelissier - FW: Qaurrels fuel MD | PP-TRBK0084652 | PP-TRBK0084653 | | |
| 72 | | | | 7/7/2015 | | Amendment No. 27 To Credit Agreement Of Transcare Corporation | TRANSCARE00000395 | TRANSCARE00000409 | | |
| 73 | | | PX 142 (Tilton) | 7/8/2015 | 13:19 | Email from Mike Weinberger to Lynn Tilton - Ambulance acquisition | PP-TRBK0090478 | PP-TRBK0090478 | | |
| 74 | | | PX 196 (Leland) | 7/8/2015 | 21:52 | Email from Glenn Leland to Mark Bonilla - Fwd: Feedback | TRANSCARE00008090 | TRANSCARE00008091 | | |
| 75 | | | PX 34 (Greenberg) | 7/8/2015 | 15:36 | Email from Glenn Leland to Scott Whalen, Michael Greenberg - Re: Accelerated business plan | PP-TRBK00309969 | PP-TRBK00309972 | | |
| 76 | | | PX 196 (Leland) | 7/8/2015 | 21:52 | Email from Glenn Leland to Mark Bonilla - Fwd: Feedback | TRANSCARE00008090 | TRANSCARE00008091 | Lacks foundation (FRE 602); Lacks authentication (FRE 901); Hearsay (FRE 802) | |
| 77 | | | PX 154 (Wells Fargo) | 7/8/2015 | 22:53 | Email from Kurt Marsden to Jean Luc Pelissier and Wells Fargo execs - RE: Update regarding Transcare | WF_TC_00005101 | WF_TC_00005101 | | |
| 78 | | | PX 197 (Leland) | 7/9/2015 | 8:29 | Email from Glenn Leland to Jean Luc Pelissier, Michael Greenberg, Scott Whalen and Randy Jones - Shut down imminent | PP-TRBK0030955 | PP-TRBK0030956 | | |
| 79 | | | PX 153 (Wells Fargo) | 7/9/2015 | 17:09 | Email from John Husson to Michael Greenberg, Jean Luc Pelissier - Transcare proposed modifications | PP-TRBK0064573 | PP-TRBK0064573 | | |
| 80 | | | | 7/9/2015 | 19:46 | Email from Michael Greenberg to Jean Luc Pelissier; Cc'd Glenn Leland, Scott Whalen - Re: RCA offer to buy TransCare | PP-TRBK0033600 | PP-TRBK0033602 | | |
| 81 | | | PX 7 (Whalen) | 7/10/2015 | 19:56 | Email from Scott Whalen to Jean Luc Pelissier, Michael Greenberg, Mark Bonilla - Re: LOI for Transcare Transit | TRANSCARE00008011 | TRANSCARE00008014 | | |
| 82 | | | PX 59 (Stephen) | 7/13/2015 | 9:27 | Email from Glenn Leland to Brian Stephen, Michael Greenberg, Jean Luc Pelissier - Re: TransCare - update on a few of the questions | PP-TRBK0081595 | PP-TRBK0081597 | | |
| 83 | | | PX 35 (Greenberg) | 7/13/2015 | 11:42 | Email from Vincent Devito to Michael Greenberg - Transcare Inquiry | PP-TRBK0064341 | PP-TRBK0064341 | | |
| 84 | | | PX 198 (Leland) | 7/13/2015 | 12:06 | Email from Glenn Leland to Jean Luc Pelissier, Michael Greenberg, Mark Bonilla - Re: LOI for Transcare Transit | TRANSCARE00200943 | TRANSCARE00200949 | | |

Case 1-20-cr-00314-AK Document 13-3 Filed 09/30/20 Page 83 of 203
18-10813-smb Doc 653-1 Filed 05/05/21 Entered 05/05/21 14:32:53 Exhibit A
Exhibit A - Trustee's Exhibit List    Pg 7 of 19

| PX No. | Vol. No. | JX No. | PX/DX (Deponent) | Document Date | Time | Description | Begin Bates Range | End Bates Range | Defendants' Objections | Plaintiffs' Objections |
|---|---|---|---|---|---|---|---|---|---|---|
| 85 | | | PX 45 (Greenberg) | 7/22/2015 | 15:34 | Email from Glenn Leland to Michael Greenberg - Re: TransCare - discussion surrounding exit of Main Line | PP-TRBK0063069 | PP-TRBK0063077 | Lacks relevance (FRE 401, 402) | |
| 86 | | | | 8/4/2015 | | Transcare Memorandum from Mark Bonilla to Distribution - RE June 2015 Financials | CM_TC2018_0013935 | CM_TC2018_0013954 | Lacks foundation (FRE 602); Lacks authentication (FRE 901); Hearsay (FRE 802) | |
| 87 | | | PX 155 (Wells Fargo) | 9/16/2015 | 3:37 | Email from Kurt Marsden to Lynn Tilton - Transacted | PP-TRBK0042599 | PP-TRBK0042599 | | |
| 88 | | | PX 60 (Stephen) | 9/25/2015 | 15:41 | Email from Glenn Leland to Jean Luc Pelissier, et al - TransCare week of 9/25 | TRANSCARE00024917 | TRANSCARE00024919 | | |
| 89 | | | | 9/29/2015 | | Transcare Memorandum from Mark Bonilla to Distribution - RE July 2015 Financials | CM_TC2018_0013915 | CM_TC2018_0013934 | Lacks foundation (FRE 602); Lacks authentication (FRE 901); Hearsay (FRE 802) | |
| 90 | | | PX 156 (Wells Fargo) | 9/30/2015 | | Business Finance - WFCF Credit Modification Request | WF_TC_00000055 | WF_TC_00000075 | | |
| 91 | | | DX 242 (Leland) | 10/1/2015 | | Progress Update - October 2015 | | | Lacks foundation (FRE 602); Lacks authentication (FRE 901) | |
| 92 | | | PX 158 (Wells Fargo) | 10/2/2015 | 10:00 | Email from Michael Muller to Wells Fargo Execs - TransCare Corporation 2015-09 Exam Release | WF00001207 | WF00001262 | | |
| 93 | | | PX 36 (Greenberg) | 10/7/2015 | 7:26 | Email from Glenn Leland to Michael Greenberg - Re: Interest | PP-TRBK0079362 | PP-TRBK0079364 | | |
| 94 | | | DX 243 (Leland) | 10/8/2015 | 11:22 | Email from Mark Bonilla to Thomas Fuchs, Glenn Leland; Cc'd Earl Kossuth, Rob Stuck, John Stapleton, Glen Youngblood, John Foerst - RE: Interest | TRANSCARE00019285 | TRANSCARE00019287 | Lacks foundation (FRE 602); Lacks authentication (FRE 901); Hearsay (FRE 802) | |
| 95 | | | | 10/13/2015 | | Transcare Memorandum from Mark Bonilla to Distribution - RE August 2015 Financials | TRANSCARE00035020 | TRANSCARE00035038 | Lacks foundation (FRE 602); Lacks authentication (FRE 901); Hearsay (FRE 802) | |
| 96 | | | PX 201 (Leland) | 10/16/2015 | 10:39 | Email from Glenn Leland to Miles Jason, John Foerst, Thomas Charles - Re: of the 911 services in RE: NYSIF Policy #22683650 | TRANSCARE00207025 | TRANSCARE00207036 | Lacks relevance (FRE 401, 402); Lacks foundation (FRE 602); Lacks authentication (FRE 901); Hearsay (FRE 802); Prejudicial (FRE 403) | |
| 97 | | | PX 100 (Pelissier) | 10/16/2015 | 14:02 | Email from Glenn Leland to Jean Luc Pelissier, Michael Greenberg, Mark Bonilla and Randy Jones - Imminent shutdown | TRANSCARE00006275 | TRANSCARE00006275 | | |
| 98 | | | DX 241 (Leland) | 10/27/2015 | 3:47 | Email from Glenn Leland to Earl Kossuth; Thomas Fuchs; Rob Stuck; John Stapelton; John Foerst; CC'd Mark Bonilla, Glenn Youngblood - Re: TransCare Board Deck | TRANSCARE00006181 | TRANSCARE00006183 | | |
| 99 | | | | 10/27/2015 | 3:47 | Email from Glenn Leland to Earl Kossuth; Thomas Fuchs; Rob Stuck; John Stapelton; John Foerst; CC'd Mark Bonilla, Glenn Youngblood - Re: TransCare Board Deck | TRANSCARE00006181 | TRANSCARE00006184 | | |

Case 1-20-cv-06274-AK Document 13-1 Filed 09/20/20 Page 84 of 203 A
1:18-cv-13374 Document Doc 653-1 Filed 05/04/20 Entered 05/04/20 19:43:26:53 Exhibit A
Exhibit A - Trustee's Exhibit List    Pg 8 of 19

| PX No. | Vol. No. | JX No. | PX/DX (Deponent) | Document Date | Time | Description | Begin Bates Range | End Bates Range | Defendants' Objections | Plaintiffs' Objections |
|---|---|---|---|---|---|---|---|---|---|---|
| 100 | | | PX 202 (Leland) | 11/6/2015 | 11:13 | Email from Michael Greenberg to Glenn Leland, Mark Bonilla - RE: TransCare - revised plan presentation (proposed outline for your review) | PP-TRBK0075769 | PP-TRBK0075772 | | |
| 101 | | | PX 159 (Wells Fargo) | 11/16/2015 | | Wells Fargo Update - November 16, 2015 | TRANS-R-00003802 | | Lacks foundation (FRE 602); Lacks authentication (FRE 901); Hearsay (FRE 802) | |
| 102 | | | DX 229 (Leland) | 11/19/2015 | | Amendment No. 30 To Credit Agreement Of Transcare Corporation | PPTC00000261 | PPTC00000268 | | |
| 103 | | | PX 180 (Credit Suisse) | 11/19/2015 | | Amendment 30 to Credit Agreement of Transcare Corporation | PP-TRBK0000261 | PP-TRBK0000268 | | |
| 104 | | | PX 114 (Tilton) | 11/19/2015 | 14:57 | Email from Mark Bonilla to Lynn Tilton, et al - RE: September 2015 Board Package | TRANSCARE00035237 | TRANSCARE00035257 | Lacks foundation (FRE 602); Lacks authentication (FRE 901); Hearsay (FRE 802) | |
| 105 | | | | 11/19/2015 | | Email from Mark Bonilla to Lynn Tilton, Alex Witkes, Tracey Rudd, Steve Blewitt, Charlie Gonzales; Cc'd Glenn Leland, Michael Greenberg, Jean Luc Pelissier, Gerald Campbell - RE: September 2015 Board Package | AL-00695 | AL-00715 | Lacks foundation (FRE 602); Lacks authentication (FRE 901); Hearsay (FRE 802) | |
| 106 | | | | 12/1/2015 | 11:58 | Email from Mark Bonilla to Glenn; Cc'd Peter Wolf - 2nd Draft - Business Model | TRANSCARE00107866 | TRANSCARE00107868 | Lacks foundation (FRE 602); Lacks authentication (FRE 901); | |
| 107 | | | PX 203 (Leland) | 12/3/2015 | 6:34 | Email from Glenn Leland to Earl Kossuth - Re: Uncertainty | TRANSCARE00081232 | TRANSCARE00081233 | Lacks relevance (FRE 401, 402); Lacks foundation (FRE 602); Lacks authentication (FRE 901); Hearsay (FRE 802) | |
| 108 | | | DX 245 (Leland) | 12/3/2015 | 6:37 | Email from Earl Kossuth to Glenn Leland - Re: Uncertainty | TRANSCARE00081229 | TRANSCARE00081230 | Lacks relevance (FRE 401, 402); Lacks foundation (FRE 602); Lacks authentication (FRE 901); Hearsay (FRE 802) | |
| 109 | | | PX 204 (Leland) | 12/3/2015 | 12:08 | Email from Mark Bonilla to Glenn Leland, Peter Wolf - Final Revised 2016 Budget | TRANSCARE00107987 | TRANSCARE00107989 | Lacks relevance (FRE 401, 402); Lacks foundation (FRE 602); Lacks authentication (FRE 901) | |
| 110 | | | PX 160 (Wells Fargo) | 12/4/2015 | 12:25 | Email from Chuck Chiang to Melissa Provost and Wells Fargo Execs - TransCare Corporation 2015-12 PEQ | WF00001274 | WF00001278 | | |
| 111 | | | PX 205 (Leland) | 12/8/2015 | 9:41 | Email from Glenn Leland to Jean Luc Pelissier, Michael Greenberg - TCP | PP-TRBK0041352 | PP-TRBK0041352 | | |
| 112 | | | PX 37 (Greenberg) | 12/8/2015 | 12:53 | Email from Michael Greenberg to Glenn Leland, Mark Bonilla - RE: TransCare - guidance (Privileged and confidential) | PP-TRBK0050613 | PP-TRBK0050614 | | |
| 113 | | | PX 62 (Stephen) | 12/8/2015 | 21:50 | Email from Brian Stephen to Glenn Leland - Re: TCP | PP-TRBK0085050 | PP-TRBK0085052 | | |
| 114 | | | PX 61(Stephen) | 12/9/2015 | 8:47 | Email from Mark Bonilla to Jean Luc Pelissier, Michael Greenberg - RE: Transcare has a number of time critical payments over the next 10 days. | PP-TRBK0050573 | PP-TRBK0050582 | | |
| 115 | | | PX 38 (Greenberg) | 12/9/2015 | 15:51 | Email from Glenn Leland to Michael Greenberg - RE: Transcare - direction letter | PP-TRBK0045271 | PP-TRBK0045271 | Lacks relevance (FRE 401, 402); | |

| PX No. | Vol. No. | JX No. | PX/DX (Deponent) | Document Date | Time | Description | Begin Bates Range | End Bates Range | Defendants' Objections | Plaintiffs' Objections |
|---|---|---|---|---|---|---|---|---|---|---|
| 116 | | | PX 39 (Greenberg) | 12/9/2015 | 17:34 | Email from Michael Greenberg to Glenn Leland - Fwd: Transcare - direction letter | PP-TRBK0012532 | PP-TRBK0012539 | Lacks relevance (FRE 401, 402) | |
| 117 | | | DX 246 (Leland) | 12/11/2015 | 10:22 | Email from Glenn Leland to Michael Greenberg; Cc'd Jean Luc Pelissier, Mark Bonilla - RE: TransCare - new business | TRANSCARE00209968 | TRANSCARE00209968 | | |
| 118 | | | PX 207 (Leland) | 12/11/2015 | 16:44 | Email from Glenn Leland to Earl Kossuth; Thomas Fuchs; Rob Stuck; Barbara Santiago; Mark Bonilla; Peter Wolf; Glen Youngblood; Ally Bibi - Quick update - no call needed | TRANSCARE00072660 | TRANSCARE00072660 | Hearsay (FRE 802) | |
| 119 | | | | 12/11/2015 | 18:18 | Email from Mark Bonilla to Michael Greenberg - Up to Date Model | PP-TRBK0012490 | PP-TRBK0012491 | | |
| 120 | | | | 12/13/2015 | 15:15 | Email from Mark Bonilla to Glenn Leland, Peter Wolf, Michael Greenberg - Updated Business Model - Reflecting Changes Requested & Discussed | PP-TRBK0012469 | PP-TRBK0012470 | | |
| 121 | | | PX 115 (Tilton) | 12/14/2015 | 9:26 | Email from Mark Bonilla to Glenn Leland - Updated Slides Nov 16 presentation | TRANSCARE00005838 | TRANSCARE00005839 | Lacks foundation (FRE 602); Lacks authentication (FRE 901) | |
| 122 | | | DX 248 (Leland) | 12/14/2015 | 15:39 | Email from Glenn Leland to Michael Greenberg, Mark Bonilla - Re: Call today with JLP and myself | TRANSCARE00210183 | TRANSCARE00210184 | Hearsay (FRE 802) | |
| 123 | | | DX 249 (Leland) | 12/16/2015 | 10:06 | Email from Mark Bonilla to Michael Greenberg; Cc'd Glenn Leland - RE: Today | TRANSCARE00046126 | TRANSCARE00046127 | | |
| 124 | | | PX 208 (Leland) | 12/16/2015 | 11:41 | Email from Glenn Leland to Michael Greenberg, Brian Stephen, Jean Luc Pelissier, Mark Bonilla - National Express | PP-TRBK0035660 | PP-TRBK0035660 | | |
| 125 | | | PX 40 (Greenberg) | 12/16/2015 | 11:52 | Email from Michael Greenberg to Brian Stephen, Jean Luc Pelissier, Mark Bonilla - RE: National Express | TRANSCARE00005809 | TRANSCARE00005809 | | |
| 126 | | | PX 161 (Wells Fargo) | 12/16/2015 | 15:56 | Email from Daniel F. Fiorillo to Wells Fargo Execs - RE: Attorney client confidential information - TRANSCARE | WF_TC_00003373 | WF_TC_00003375 | Lacks relevance (FRE 401, 402); Hearsay (FRE 802) | |
| 127 | | | PX 209 (Leland) | 12/16/2015 | 16:54 | Email from Glenn Leland to Mark Bonilla, Gerald Campbell, Jean Luc Pelissier - Re: Wells Called - Pulled the Line | TRANSCARE00081368 | TRANSCARE00081370 | | |
| 128 | | | PX 110 (Tilton) | 12/16/2015 | 20:53 | Email from Kurt Marsden to Wells Fargo Execs - FW: Transcare | WF_TC_00006004 | WF_TC_00006005 | | |
| 129 | | | PX 210 (Leland) | 12/17/2015 | 9:25 | Email from Glenn Leland to Michael Greenberg, Mark Bonilla - Re: Tomorrow | PP-TRBK0035626 | PP-TRBK0035633 | | |
| 130 | | | | 12/17/2015 | 10:14 | Email from Mark Bonilla to Michael greenbreg, Glenn Leland - Added AP and current payments to model | TRANSCARE00005770 | TRANSCARE00005771 | | |
| 131 | | | PX 41 (Greenberg) | 12/17/2015 | 12:22 | Email from Daniel F. Fiorillo to Wells Fargo Execs - TransCare - call with Patriarch legal team | WF_TC_00003386 | WF_TC_00003386 | Lacks relevance (FRE 401, 402); Hearsay (FRE 802) | |

Case 1-20-cv-06274-AK Document 014-3 Filed 08/20/20 Page 86 of 203
18-10122-smb Doc 853-1 Filed 05/03/19 Entered 05/03/19 13:22:53 Exhibit A
Exhibit A - Trustee's Exhibit List    Pg 10 of 19

| PX No. | Vol. No. | JX No. | PX/DX (Deponent) | Document Date | Time | Description | Begin Bates Range | End Bates Range | Defendants' Objections | Plaintiffs' Objections |
|---|---|---|---|---|---|---|---|---|---|---|
| 132 | | | | 12/17/2015 | 16:43 | Email from Melissa Provost to Michael Greenberg and Jean Luc Pelissier, cc'd John Husson- TransCare Forebearance Terms Discussed | PP-TRBK0046849 | PP-TRBK0046851 | | |
| 133 | | | | 12/18/2015 | 8:58 | Email from Michael Greenberg to Melissa Provost - Re: TransCare - Forebearance Agreement | PP-TRBK75131 | PP-TRBK75132 | | |
| 134 | | | | 12/23/2015 | 17:58 | Email from Michael Greenberg to Vincent Devito; Cc'd Jean Luc Pelissier - FW: Longer Term Discussion Summary | PP-TRBK0004093 | PP-TRBK0004096 | | |
| 135 | | | | 12/22/2015 | 21:48 | Email from Mark Bonilla to Peter Wolf, Glenn Leland, Michael Greenberg - Fw: WFB (Transcare) -- Forbearance Agreement | TRANSCARE00045752 | TRANSCARE00045769 | | |
| 136 | | | DX 251 (Leland) | 12/28/2015 | 6:59 | Email from Michael Greenberg to Glenn Leland; Cc'd Mark Bonilla, Peter Wolf, Jean Luc Pelissier - Re: TransCare - follow up for the upcoming week | PPTC00020598 | PPTC00020601 | | |
| 137 | | | PX 211 (Leland) | 12/28/2015 | 6:58 | Email from Michael Greenberg to Glenn Leland, cc'd Mark Bonilla, Peter Wolf, Jean Luc Pelissier- Re: Transcare - follow up for the upcoming week | TRANSCARE00005639 | TRANSCARE00005641 | | |
| 138 | | | PX 163 (Wells Fargo) | 12/29/2015 | 11:25 | Email from John Husson to Michael Greenberg, cc'd Melissa Provost, Jean Luc Pelissier- RE: Transcare - WF discussion summary (from last Thursday and today) | PP-TRBK0022003 | PP-TRBK0022005 | | |
| 139 | | | | 12/30/2015 | | Email from Michael Greenberg to Carl Landeck and Jonathan Killion, cc'd Jean Luc Pelissier - TransCare - updates to 2016 preliminary plan based on yesterday's discussion | CM_TC2018_0003369 | CM_TC2018_0003376 | | |
| 140 | | | DX 252 (Leland) | 1/1/2016 | 10:17 | Email from Glenn Leland to Rob Stuck; Cc'd Earl Kossuth, Barbara Santiago, Thomas Fuchs, Peter Wolf, Mark Bonilla, Glen Youngblood - Re: AMR | TRANSCARE00005336 | TRANSCARE00005337 | Lacks relevance (FRE 401, 402); Hearsay (FRE 802) | |
| 141 | | | DX 265 (Leland) | 1/1/2016 | 16:22 | Email from Brian Stephen to Glenn Leland; Cc'd Randy Jones, Jean Luc Pelissier - Board Communication | PP-TRBK0087094 | PP-TRBK0087096 | | |
| 142 | | | PX 64 | 1/1/2016 | 9:25 | Email from Glenn Leland to Michael Greenberg, Jean Pelissier, Mark Bonilla, Brian Stephen, cc'd Peter Wolf, Jean Luc Pelissier, Randy Jones- Re: Wire | TRANSCARE00005363 | TRANSCARE00005369 | | |
| 143 | | | | 1/2/2016 | 21:26 | Email from Michael Greenberg to Jean Luc Pelissier - FW: Latest Model - it is 8:32PM I am on My Way Out Going Home | PP-TRBK0021793 | PP-TRBK0021796 | | |
| 144 | | | DX 253 (Leland) | 1/3/2016 | 9:39 | Email from Earl Kossuth to Glenn Leland - Re: Emergency update - Execs only | TRANSCARE00077397 | TRANSCARE00077398 | Lacks relevance (FRE 401, 402); Lacks foundation (FRE 602); Lacks authentication (FRE 901); Hearsay (FRE 802) | |
| 145 | | | DX 254 (Leland) | 1/3/2016 | 14:40 | Email from Glenn Leland to Glenn Youngblood - Re: Emergency Update - Execs only | TRANSCARE00194962 | TRANSCARE00194963 | Lacks foundation (FRE 602); Lacks authentication (FRE 901) | |
| 146 | | | PX 212 | 1/3/2016 | 21:56 | Email from Mark Bonilla to Glen Leland and Peter Wolf- Re: Thank you! | TRANSCARE00005261 | TRANSCARE00005262 | Lacks relevance (FRE 401, 402); Hearsay (FRE 802) | |

| PX No. | Vol. No. | JX No. | PX/DX (Deponent) | Document Date | Time | Description | Begin Bates Range | End Bates Range | Defendants' Objections | Plaintiffs' Objections |
|---|---|---|---|---|---|---|---|---|---|---|
| 147 | | | DX 255 (Leland) | 1/4/2016 | 13:19 | Email from Mark Bonilla to Glenn Leland , Peter Wolf, Michael Greenberg, Jean Luc Pelissier; Cc'd Gerald Campbell - Crash Plan - Critical Disbursements Week Ending 1/8/2016 and Shortfall ($1.950MM) without PPAS Interest ($477K) or ($2.427MM) | TRANSCARE00017158 | TRANSCARE00017161 | | |
| 148 | | | | 1/4/2016 | 13:19 | Email from Mark Bonilla to Glenn Leland , Peter Wolf, Michael Greenberg, Jean Luc Pelissier; Cc'd Gerald Campbell - Crash Plan - Critical Disbursements Week Ending 1/8/2016 and Shortfall ($1.950MM) without PPAS Interest ($477K) or ($2.427MM) | TRANSCARE00017158 | TRANSCARE00017164 | | |
| 149 | | | DX 256 (Leland) | 1/4/2016 | 16:43 | Email from Glenn Leland to Michael Greenberg, Mark Bonilla, Jean Luch Pelissier; Cc'd Randy Jones - Re: MTA update | TRANSCARE00195025 | TRANSCARE00195026 | | |
| 150 | | | DX 257 (Leland) | 1/5/2016 | 20:18 | Email from Glenn Leland to Randy Jones; Cc'd Jean Luc Pelissier, Michael Greenberg - Re: Letter to employees | PPTC00019492 | PPTC00019494 | Lacks relevance (FRE 401, 402) | |
| 151 | | | DX 258 (Leland) | 1/5/2016 | 18:24 | Email from Randy Jones to Glenn Leland - RE: Letter to employees | PPTC00013174 | PPTC00013175 | Lacks relevance (FRE 401, 402) | |
| 152 | | | PX 168 | 1/5/2016 | 11:35 | Email from Mark Bonilla to Melissa Provost, Larry Careaga, Glenn Leland, Peter Wolf, cc'd Michael Greenberg, Jean Luc Pelissier, John Husson- RE: ASSISTANCE NEEDED: Overdraft, Transcare, account x0948, in the amount of $230,402.09 | TRANSCARE00011696 | TRANSCARE00011698 | Lacks relevance (FRE 401, 402) | |
| 153 | | | PX 214 | 1/5/2016 | 17:15 | Email from Glenn Leland to Randy Jones- Re: Letter to employees | PP-TRBK0014253 | PP-TRBK0014257 | Lacks relevance (FRE 401, 402) | |
| 154 | | | PX 213 | 1/5/2016 | 20:16 | Email from Glenn Leland to Mark Bonilla and Peter Wolf- Fwd: Letter to employees | TRANSCARE00005140 | TRANSCARE00005141 | Lacks relevance (FRE 401, 402) | |
| 155 | | | PX 167 | 1/5/2016 | 10:20 | Email from Melissa Provost to Glenn Leland, Larry Careaga, Peter Wolf, cc'd Michael Greenberg, Jean Luc Pelissier, Mark Bonilla, John Husson- RE: ASSISTANCE NEEDED: Overdraft, Transcare, account x0948, in the amount of $230,402.09 | TRANSCARE00011702 | | Lacks relevance (FRE 401, 402) | |
| 156 | | | PX 166 | 1/5/2016 | 11:39 | Email from Michael Muller to Melissa Provost, John Husson, Chuck Chiang, cc'd Wells Fargo staff- Transcare Corporation 2015-12 Exam Release | WF00001279 | WF00001335 | | |
| 157 | | | DX 260 (Leland) | 1/7/2016 | | Letter from MTA New York City Transit to Glenn Leland | TRANSCARE00107384 | TRANSCARE00107385 | Lacks relevance (FRE 401, 402) | |
| 158 | | | | 1/7/2016 | 12:33 | Email from Michael Greenberg to Carl Landeck, Jonathon Killion; Cc'd Jean Luc Pelissier; Bcc'd Jonathon Killion - TransCare - updates to 2016 preliminary plan based on yesterday's discussion | CM_TC2018_0003369 | CM_TC2018_0003376 | | |
| 159 | | | DX 261 (Leland) | 1/8/2016 | 10:09 | Email from Lynn Tilton to Randy Jones; Cc'd Brian Stephen | PPTC00027867 | PPTC00027868 | | |
| 160 | | | | 1/8/2016 | 6:57 | Email from Glenn Leland to Randy Jones - My letter | PP-TRBK0019062 | PP-TRBK0019063 | | |
| 161 | | | | 1/8/2016 | | Email from Mark Bonilla to Casey Dibenedetto - Out of Office AutoReply: LIBOR Renewal - TCC9Z | TRANSCARE00043758 | TRANSCARE00043758 | Lacks relevance (FRE 401, 401) | |

18-10982-smb Doc 553-1 Filed 05/20/20 Entered 05/20/20 14:32:53 Exhibit A - Trustee's Exhibit List Pg 12 of 19

Case 1-20-cv-06574-AK Document 13-3 Filed 08/20/20 Page 88 of 203 Exhibit A
Exhibit A - Trustee's Exhibit List Pg 12 of 19

| PX No. | Vol. No. | JX No. | PX/DX (Deponent) | Document Date | Time | Description | Begin Bates Range | End Bates Range | Defendants' Objections | Plaintiffs' Objections |
|---|---|---|---|---|---|---|---|---|---|---|
| 162 | | | | 1/8/2016 | 19:55 | Email from Jean Luc Pelissier to Lynn Tilton - Privileged and Confidential :: Transcare Update | PP-TRBK0100708 | PP-TRBK0100726 | | |
| 163 | | | | 1/11/2016 | 9:54 | Email from Brian Stephen to Randy Jones, Jean Luc Pelissier, Michael Greenberg - Consulting Agreement | PP_TRBK0052000 | PP_TRBK0052013 | | |
| 164 | | | | 1/11/2016 | 16:30 | Email from Brian Stephen to Carl Marks - RE: CMAG Wiring Instructions | CM_TC2018_0000698 | CM_TC2018_0000710 | Lacks relevance (FRE 401, 402) | |
| 165 | | | PX 117 | 1/14/2016 | 4:44 | Email from Marc Pfefferle to Lynn Tilton, cc'd Mark Claster-RE: Carl Marks Advisors Status Update | CM_TC_0000925 | CM_TC_0000928 | | |
| 166 | | | PX 120 | 1/15/2016 | | Security Agreemenet among Transcare and Ark II | PP-TRBK0044756 | PP-TRBK0044770 | Lacks relevance (FRE 401, 402) | |
| 167 | | | | 1/15/2016 | 12:38 | Email from NYSIF to Brian Stephen - RE: TransCare | PP-TRBK0049959 | PP-TRBK0049964 | Lacks relevance (FRE 401, 402) | |
| 168 | | | | 1/15/2016 | 13:10 | Email from Michael Greenberg to Renee Dudley, Carlos Mercado | PP-TRBK0018276 | PP-TRBK0018277 | | |
| 169 | | | | 1/15/2016 | 14:53 | Email from Marc Pfefferle to Lynn Tilton, cc'd Patriarch and Carl Marks execs - Northwell update | CM_TC2018_0001053 | CM_TC2018_0001053 | | |
| 170 | | | PX 169 | 1/15/2016 | 17:04 | Email from Daniel Fiorillo to Michael Greenberg, cc'd Adam Katz, Laurence Forte, Robert Strack, John Husson, Melissa Provost, Jonathan Helfat, Chad Simon- RE: Transcare | PP-TRBK0014549 | PP-TRBK0014551 | | |
| 171 | | | | 1/19/2016 | 17:39 | Email from Marc Pfefferle to Lynn Tilton - Do you have time for an update call 8pm + or - this evening | CM_TC2018_0001259 | CM_TC2018_0001259 | Lacks relevance (FRE 401, 402) | |
| 172 | | | | 1/21/2016 | | Email from Glenn Youngblood to Jonathan Killion - Fleet thingie | CM_TC2018_0005038 | CM_TC2018_0005040 | | |
| 173 | | | | 1/26/2016 | 8:53 | Email from Marc Pfefferle to Jean Luc Pelissier, Randy Jones, Michael Greenberg - Plan for distributing presentation materials for your review | CM_TC2018_0001792 | CM_TC2018_0001792 | Lacks relevance (FRE 401, 402) | |
| 174 | | | PX 170 | 1/26/2016 | 9:21 | Email from Michael Greenberg to Melissa Provost and John Husson, cc'd Jean Luc Pelissier- RE: Follow up | PP-TRBK0022753 | PP-TRBK0022755 | | |
| 175 | | | | 1/27/2016 | 7:43 | Email from Marc Pfefferle to Jonathan Killion, Michael Greenberg, Jean Luc Pelissier, Randy Jones; Cc'd Mark Claster, Carl Landeck - Update Executive Summary for Lynn (pending additional updates including results of this mornings ST Barnaba meeting) | CM_TC2018_0002108 | CM_TC2018_0002124 | | |
| 176 | | | | 1/27/2016 | 8:11 | Email from Michael Greenberg to Marc Pfefferle, Jonathan Killion, Jean Luc Pelissier, Randy Jones; Cc'd Mark Claster, Carl Landeck- RE: Update Executive Summary for Lynn (pending additional updates including results of this mornings ST Barnaba meeting) | PP-TRBK0024842 | PP-TRBK0024843 | Lacks relevance (FRE 401, 402) | |

| PX No. | Vol. No. | JX No. | PX/DX (Deponent) | Document Date | Time | Description | Begin Bates Range | End Bates Range | Defendants' Objections | Plaintiffs' Objections |
|---|---|---|---|---|---|---|---|---|---|---|
| 177 | | | PX 171 | 1/27/2016 | 11:31 | Email from Michael Greenberg to Mark Pfefferle, J. Killion, C. Landeck, cc'd Adam Katz- Status of Wells Fargo discussions 01-16.pptx | CM_TC2018_0006179 | CM_TC2018_0006180 | | |
| 178 | | | | 1/28/2016 | 8:39 | Email from Michael Greenberg to Melissa A. Provost, clandeck@calmarks.com; Cc'd John E. Husson, Jean Luc Pelissier - RE: TransCare Budget/Meeting Update | WF_TC_00003874 | WF_TC_00003875 | Lacks relevance (FRE 401, 402) | |
| 179 | | | | 1/28/2016 | 13:04 | Email from Michael Greenberg to Michael Greenberg - Changes to cash flow forecast and business plan 01-28-16.pptx | PP-TRBK0013259 | PP-TRBK0013274 | | |
| 180 | | | | 1/28/2016 | 16:53 | Email from Marc Pfefferle to Northwell and Carl Marks - RE: TransCare Presentation | CM_TC2018_0002370 | CM_TC2018_0002372 | Lacks relevance (FRE 401, 402); Lacks authentication (FRE 901) | |
| 181 | | | | 1/28/2016 | | TransCare - 1 27 16 16v 4.xlsx | PP-TRBK0013273 | PP-TRBK0013273 | Lacks relevance (FRE 401, 402) | |
| 182 | | | | 1/28/2016 | | 13 Week Cash Flow Forecast - 1 27 16 v3.xlsx | PP-TRBK0013274 | PP-TRBK0013274 | Lacks relevance (FRE 401, 402) | |
| 183 | | | | 1/29/2016 | 17:13 | Email from Carlos Mercado to Michael Greenberg - RE: Transcare | PP-TRBK0008358 | PP-TRBK0008362 | | |
| 184 | | | PX 122 | 1/29/2016 | 18:24 | Email from Lynn Tilton to Renee Dudley- RE: Approval to release funds from PPAS-Transcare 1/29/2016 (additional 690K wire) Just for clarification | PP-TRBK0004196 | PP-TRBK0004199 | | |
| 185 | | | PX 46 | 2/3/2016 | 7:49 | Email from Marc Pfefferle to Michael Greenberg, cc'd Carl Landeck, Jean Luc Pelissier, Randy Jones, Mark Claster, Jonathan Killion, RE: Attachment to Funds Request 02-02-16.xlsx | CM_TC2018_0002542 | CM_TC2018_0002550 | Lacks relevance (FRE 401, 402) | |
| 186 | | | PX 181 | 2/3/2016 | 9:22 | Email from Michael Greenberg to Alexander Witkes, RE: Transcare | PP-TRBK0098677 | PP-TRBK0098679 | Lacks relevance (FRE 401, 402) | |
| 187 | | | PX 184 | 2/3/2016 | 7:11 | Email from Michael Greenberg to Marc Pfefferle, cc'd Carl Landeck, Jean Luc Pelissier, Randy Jones, Mark Claster, Jonathan Killion, Re: Attachment to Funds Request 02-02-16.xlsx | CM_TC2018_0002529 | CM_TC2018_0002541 | Lacks relevance (FRE 401, 402) | |
| 188 | | | PX 182 | 2/3/2016 | 10:25 | Email from Michael Greenberg to Alexander Witkes, cc'd Carl Landeck- Transcare- October Draft P&L | PP-TRBK0098675 | PP-TRBK0098676 | Lacks relevance (FRE 401, 402) | |
| 189 | | | PX 183 | 2/3/2016 | 12:39 | Email from Michael Greenberg to Alexander Witkes | PP-TRBK0019074 | | Lacks relevance (FRE 401, 402) | |
| 190 | | | | 2/3/2016 | 21:13 | Email from Mark Claster to Vincent DeVito - Re: Update | CM_TC2018_0002592 | CM_TC2018_0002595 | Lacks relevance (FRE 401, 402) Hearsay (FRE 802) | |
| 191 | | | PX 116 | 2/5/2016 | | Memorandum from Peter Wolf to Distribution- October 2015 Financials | PP-TRBK0004695 | PP-TRBK0004711 | Lacks foundation (FRE 602); Lacks authentication (FRE 901); Hearsay (FRE 802) | |
| 192 | | | | 2/7/2016 | 18:24 | Email from Lynn Tilton to Michael Greenberg; Cc'd Jean Luc Pelissier - RE: TransCare | PP-TRBK0022363 | PP-TRBK0022365 | | |
| 193 | | | | 2/10/2016 | 1:39 | Email from Carl Marks to Michael Greenberg - No Subject | CM_TC2018_0008556 | CM_TC2018_0008557 | | |
| 194 | | | | 2/10/2016 | | IRS Letter to Transcendence Transit Inc Assigned Employer Identification Number | PP-TRBK0015306 | PP-TRBK0015308 | | |
| 195 | | | | 2/10/2016 | | IRS Letter to Transcendence Transit Inc Assigned Employer Identification Number | PP-TRBK0015309 | PP-TRBK0015311 | | |

18-10280-smb Doc 853-1 Filed 05/04/20 Entered 05/04/20 19:32:53 Exhibit A
Case 1-20-cv-06274-AKH Document 13-1 Filed 09/30/20 Page 90 of 203
Exhibit A - Trustee's Exhibit List    Pg 14 of 19

| PX No. | Vol. No. | JX No. | PX/DX (Deponent) | Document Date | Time | Description | Begin Bates Range | End Bates Range | Defendants' Objections | Plaintiffs' Objections |
|---|---|---|---|---|---|---|---|---|---|---|
| 196 | | | | 2/10/2016 | 21:43 | Email from Michael Greenberg to Don Arrowood, Justin Ubbenga, Thomas Charles, Trevor Bolteon, Jason Miles; Cc'd Brian Stephen, clandeck@carlmarkadvisors.com, Jean Luc Pelissier, John Pothin - TransCare - insurance information requested | PP-TRBK0027756 | | | |
| 197 | | | PX 65 | 2/10/2016 | 13:54 | Email from Michael Greenberg to Peter Wolf, cc'd Brian Stephen, Peter Ruffini- FW: Ark/Transcare Docs | PP-TRBK0047307 | PP-TRBK0047373 | | |
| 198 | | | | 2/10/2016 | 17:33 | Email from Brian Stephen to Robert Siegel - D&O Information | PP-TRBK0096148 | PP-TRBK0096150 | | |
| 199 | | | | 2/10/2016 | 21:43 | Email from Michael Greenberg to Lockton Insurance - TransCare - insurance information requested | PP-TRBK0027756 | PP-TRBK0027791 | | |
| 200 | | | PX 66 | 2/10/2016 | | Written Consent of Sole Director | PP-TRBK0089880 | PP-TRBK0089884 | | |
| 201 | | | PX 123 | 2/12/2016 | 9:45 | Email from Carl Landeck to Lynn Tilton, cc'd Michael Greenberg, Jean Luc Pelissier, Randy Jones- RE: Transcare | PP-TRBK0046993 | PP-TRBK0046995 | | |
| 202 | | | PX 141 | 2/12/2016 | 11:19 | Email from Michael Greenberg to Melissa Provost, cc'd Peter Wolf, Carl Landeck- FW: Forebearance Agreement-Amendment 16 | PP-TRBK0005605 | PP-TRBK0005618 | | |
| 203 | | | | 2/12/2016 | 12:52 | Email from Peter Wolf to Michael Greenberg - RE: Transcare Direction Letters | PP-TRBK0092127 | PP-TRBK0092138 | Hearsay (FRE 802) | |
| 204 | | | | 2/12/2016 | 15:13 | Email from Glen Youngblood to Brian Stephen, Kevin Dell; Cc'd Jean Luc Pelissier, Michael Greenberg, peterw@transcare.coms - Transfer of operating certificates in New York | PP-TRBK0044399 | PP-TRBK00443101 | | |
| 205 | | | | 2/14/2016 | 17:18 | Email from Jean Luc Pelissier (CBA) to Randy Jones, John Pothin, Michael Greenberg, Peter Wolf, Glen Youngblood, Brian Stephen, Kevin Dell; Cc'd Lynn Tilton - Privileged and Confidential :: Transcare / Progress and action list / review tomorrow Monday. | PP-TRBK0091282 | PP-TRBK0091290 | | |
| 206 | | | PX 48 | 2/14/2016 | 17:18 | Email from Jean Luc Pelissier to Randy Jones, John Pothin, Michael Greenberg, Peter Wolf, Glen Youngblood, Brian Stephen, Kevin Dell, cc'd Lynn Tilton- Privileged and Confidential:: Transcare/Progress and action list/review tomorrow | PP-TRBK0091291 | PP-TRBK0091299 | | |
| 207 | | | PX 69 | 2/14/2016 | 14:01 | Email from Brian Stephen to Cindi Giglio- Budget | PP-TRBK0051756 | PP-TRBK0051757 | | |
| 208 | | | PX 124 | 2/15/2016 | 12:29 | Email from Lynn Tilton to Carl Landeck, cc'd Cindi Giglio, Lynn Harrison, Jonathan Killion, Marc Pfefferle, Randy Jones, Michael Greenberg, Jean Luc Pelissier- RE: Transcare Proposed DIP Budget | CM_TC2018_0008781 | CM_TC2018_0008782 | | |
| 209 | | | PX 106 | 2/16/2016 | 13:31 | Email from Carlos Mercado to Guillaume Fillebeen- Loan Daily Extracts-Transcare.xlsx | PP-TRBK0019088 | PP-TRBK0019089 | | |
| 210 | | | PX 18 | 2/16/2016 | 11:59 | Email from Scott Whalen to Bob Siegel- FW: Transcendence WC request | PP-TRBK0043128 | PP-TRBK0043173 | | |
| 211 | | | PX 11 | 2/16/2016 | 11:38 | Email from Scott Whalen to John Foerst, Glen Youngblood, cc'd Jean Luc Pelissier, Michael Greenberg- RE: Transcendence WC request | PP-TRBK0073855 | PP-TRBK0073856 | | |

Case 1:19-cv-06351-A-K Document 13-3 Filed 09/30/20 Page 91 of 203
18-01085-smb Doc 53-1 Filed 09/30/19 Entered 09/30/19 13:28:33 Exhibit A
Exhibit A - Trustee's Exhibit List    Pg 15 of 19

| PX No. | Vol. No. | JX No. | PX/DX (Deponent) | Document Date | Time | Description | Begin Bates Range | End Bates Range | Defendants' Objections | Plaintiffs' Objections |
|---|---|---|---|---|---|---|---|---|---|---|
| 212 | | | PX 19 (Whalen) | 2/16/2016 | 11:11 | Email from Glen Youngblood to Scott Whalen - RE: Transcendent WC Request | PP-TRBK0043099 | PP-TRBK0043101 | | |
| 213 | | | | 2/17/2016 | 12:31 | Email from Kevil Dell to Glen Youngblood - Latest version of TSA | PP-TRBK0044218 | PP-TRBK0044230 | | |
| 214 | | | PX 13 | 2/17/2016 | 18:26 | Email from Scott Whalen to Lynn Tilton- Transcv4.xlsx | PP-TRBK0028158 | PP-TRBK0028159 | | |
| 215 | | | PX 12 | 2/17/2016 | 17:05 | Email from Scott Whalen to Vikram Agrawal- Transcv2.xlsx | PP-TRBK0043124 | PP-TRBK0043125 | | |
| 216 | | | PX 70 | 2/17/2016 | 19:56 | Email from Cindi Giglio to Brian Stephen, cc'd Lynn Harrison- NewCo Documents - IMPORTANT | PP-TRBK0048020 | | | |
| 217 | | | PX 15 | 2/18/2016 | 20:57 | Email from Vikram Agrawal to Scott Whalen, Michael Greenberg, cc'd Jodie Frazier- Transcare NewCo Model- Final Draft | PP-TRBK0005178 | | | |
| 218 | | | PX 14 | 2/18/2016 | 9:18 | Email from Scott Whalen to Vikram Agrawal- FW: Transcare Model 2.17.16 vLT.xlsx | PP-TRBK0091134 | PP-TRBK0091135 | | |
| 219 | | | | 2/19/2016 | 17:20 | Email from Robert Strack to Carl Marks - RE: TransCare term sheet | CM_TC2018_0003189 | CM_TC2018_0003192 | | |
| 220 | | | | 2/22/2016 | 10:07 | Email from Jean Luc Pelissier to Charles Thomas - RE: Follow up Question regarding the Transcare contract | PP-TRBK0080845 | PP-TRBK0080846 | | |
| 221 | | | PX 72 (Stephen) | 2/22/2016 | 19:58 | Email from Cindi Giglio to Brian Stephen - Re: Privileged and Confidential - Transition Services Agreement | PP-TRBK0047786 | PP-TRBK0047787 | | |
| 222 | | | PX 17 (Whalen) | 2/22/2016 | 10:58 | Email from Scott Whalen to Jodie Frazer - FW: Models | PP-TRBK0091126 | PP-TRBK0091129 | | |
| 223 | | | | 2/23/2016 | | Transcendence Pro Forma 02-21-16.xlsx | PP-TRBK0004527 | PP-TRBK0004527 | | |
| 224 | | | | 2/23/2016 | 4:46 | Email from Glenn Youngblood to Michael Greenberg - First pass of AR | PP-TRBK0004573 | PP-TRBK0004574 | | |
| 225 | | | PX 134 (Tilton) | 2/23/2016 | 12:51 | Email from Lynn Tilton to Cindi Giglio - RE: TransCare | PP-TRBK0096546 | PP-TRBK0096548 | | |
| 226 | | | | 2/23/2016 | 20:29 | Email from Carlos Mercado to Lynn Tilton - NYSIF Wire - Transcendence | PP-TRBK0004100 | PP-TRBK0004100 | | |
| 227 | | | DX 262 (Leland) | 2/24/2016 | 14:06 | Email from Lynn Tilton to Cindi Giglio, Lynn P Harrison III; Cc'd Brian Stephen - FW: Transcare borrowings - Privileged and Confidential | PP-TRBK0047615 | PP-TRBK0047616 | | |
| 228 | | | | 2/24/2016 | 12:12 | Email from Michael Greenberg to Todd Trent; Cc'd John Foerst, John Pothin, Jean Luc Pelissier - RE: Transcendence | PP-TRBK0086219 | PP-TRBK0086222 | | |
| 229 | | | | 2/24/2016 | | Transcare New York, Inc, Written Consent of the Sole Director | TRANSCARE00231115 | TRANSCARE00231116 | | |
| 230 | | | PX 73 (Stephen) | 2/24/2016 | | Bill of Sale, Agreement to Pay and Transfer Statement | PP-TRBK0091202 | PP-TRBK0091207 | | |
| 231 | | | PX 71 (Stephen) | 2/24/2016 | 12:07 | Email from Brian Stephen to Peter Wolf - Please see attached | PP-TRBK0043305 | PP-TRBK0043314 | | |

Case 1-20-cv-06274-AK Document 113-1 Filed 09/30/24 Page 92 of 203
18-01038-smb Doc 53-1 Filed 05/07/19 Entered 05/07/19 12:53:53 Exhibit A
Exhibit A - Trustee's Exhibit List    Pg 16 of 19

| PX No. | Vol. No. | JX No. | PX/DX (Deponent) | Document Date | Time | Description | Begin Bates Range | End Bates Range | Defendants' Objections | Plaintiffs' Objections |
|---|---|---|---|---|---|---|---|---|---|---|
| 232 | | | PX 75 (Stephen) | 2/24/2016 | 14:06 | Email from Lynn Tilton to Cindi Giglio, Lynn P. Harrison - FW: Transcare borrowings - Privileged and Confidential | PP-TRBK0047615 | PP-TRBK0047616 | | |
| 233 | | | PX 49 (Greenberg) | 2/24/2016 | 16:49 | Email from Michael Greenberg to Miles Jason, et al - RE: Transcendence Transit II, Inc | PP-TRBK0026131 | PP-TRBK0026137 | | |
| 234 | | | PX 136 (Tilton) | 2/24/2016 | 13:29 | Email from Lynn Tilton to Cindi Giglio, et al - RE: Board Meeting | PP-TRBK0047662 | PP-TRBK0047664 | | |
| 235 | | | PX 78 (Stephen) | 2/25/2016 | 10:48 | Email from Brian Stephen to Robert Siegel, Michael Greenberg - RE: Insurance | PP-TRBK0098626 | PP-TRBK0098630 | | |
| 236 | | | | 2/25/2016 | 14:09 | Email from Brian Stephen to Kevin Dell, Randy Jones, John Pothin, Jean Luc Pelissier - FW: Transcendence Transit | PP-TRBK0043518 | PP-TRBK0043519 | | |
| 237 | | | PX 98 (Pelissier) | 2/25/2016 | 21:23 | Email from Jean Luc Pelissier to Brian Stephen, et al - Re: Securing Assets | PP-TRBK0076839 | PP-TRBK0076841 | | |
| 238 | | | PX 79 (Stephen) | 2/25/2016 | 22:53 | Email from Brian Stephen to Patriach Execs - Securing Assets | PP-TRBK0076712 | PP-TRBK0076713 | | |
| 239 | | | PX 80 (Stephen) | 2/25/2016 | 23:15 | Email from Brian Stephen to Patriach Execs - RE: Securing Assets | PP-TRBK0076705 | PP-TRBK0076707 | | |
| 240 | | | | 2/26/2016 | 2:36 | Email from Glen Youngblood to Brian Stephen - FW: IMPORTANT ANNOUNCEMENT to TransCare Hudson Valley and TransCare of Pennsylvnia employees | PP-TRBK0043493 | PP-TRBK0043494 | Lacks relevance (FRE 401, 402) | |
| 241 | | | PX 81 (Stephen) | 2/26/2016 | 3:26 | Email from Glen Youngblood to Patriarch Execs - Tomorrow and beyond | PP-TRBK0076698 | PP-TRBK0076699 | | |
| 242 | | | | 2/26/2016 | 8:20 | Email from Matt Nolan to Jean Luc Pelissier, Earl Kossuth, Glen Youngbloof, Michael Greenberg, Thomas Fuchs - RE: Broadcast: Cash forecast and liquidity requirements Meeting | PP-TRBK0076883 | PP-TRBK0076883 | Lacks relevance (FRE 401, 402) Hearsay (FRE 802) | |
| 243 | | | | 2/26/2016 | 9:15 | Email from Michael Greenberg to Earl Kossuth - Re: Pennsylvania Department of Health Licensure need *URGENT | PP-TRBK0076802 | PP-TRBK0076803 | Lacks relevance (FRE 401, 402) Hearsay (FRE 802) | |
| 244 | | | | 2/26/2016 | 11:34 | Email from Brian Stephen to Dian Morgenroth - Re: Transcendence Transit II, Inc./Paratransit Agreement | PP-TRBK0043520 | PP-TRBK0043522 | | |
| 245 | | | | 2/26/2016 | 19:01 | Email from Brian Stephen to Diane Morgenroth - Re: Transcendence Transit | PP-TRBK0043516 | PP-TRBK0043517 | | |
| 246 | | | DX 010 (LaMonica) | 2/26/2016 | 18:45 | Email from John Husson to Daniel Fiorillo, Laurence Forte; Cc'd Salvatore LaMonica, John Helfat, clandeck, Jonathon Killion, Robert Strack, Melissa Provost - RE: Proposed Email to Trustee | TRANSCARE00225061 | TRANSCARE00225062 | Lacks relevance (FRE 401, 402) | |
| 247 | | | | 2/27/2016 | 8:49 | Email from Jean Luc Pelissier to Earl Kossuth, et al. - Re: Closure | PP-TRBK0090324 | PP-TRBK0090325 | | |
| 248 | | | | 2/29/2016 | | Wells Fargo Loan Ledger Report | WF00001541 | WF00001562 | Lacks relevance (FRE 401, 402); Lacks foundation (FRE 602); Lacks authentication (FRE 901); Hearsay (FRE 802) | |
| 249 | | | PX 185 (Credit Suisse) | 2/29/2016 | 16:59 | Email from Michael Greenberg to Credit Suisse - RE: TransCare - Follow up | PP-TRBK0077100 | PP-TRBK0077103 | Lacks relevance (FRE 401, 402) | |

Case 1-20-cv-06374-AK Document 13-1 Filed 08/30/20 Page 93 of 203
18-10083-smb Doc 653-1 Filed 05/05/19 Entered 05/05/19 13:26:33 Exhibit A
Exhibit A - Trustee's Exhibit List    Pg 17 of 19

| PX No. | Vol. No. | JX No. | PX/DX (Deponent) | Document Date | Time | Description | Begin Bates Range | End Bates Range | Defendants' Objections | Plaintiffs' Objections |
|---|---|---|---|---|---|---|---|---|---|---|
| 250 | | | PX 140 (Tilton) | 2/29/2016 | | Zohar II Monthly US Bank Report | | | Lacks relevance (FRE 401, 402); Hearsay (FRE 802) | |
| 251 | | | | 2/29/2016 | | Letter from Lynn Tilton to Carl Marks Advisory Group | PP-TRBK0114335 | PP-TRBK0114338 | Lacks relevance (FRE 401, 402) | |
| 252 | | | | 2/29/2016 | | Dkt. 11 - PPAS Response to Motion for Entry of Order | | | Lacks relevance (FRE 401, 402) | |
| 253 | | | | 3/3/2016 | 19:13 | Email from Brian Stephen to William O'Brien, cc'd Eric Madoff, Sherwin Taylor, Randy Jones - RE: Cancellation Notice | PP-TRBK0089342 | PP-TRBK0089343 | Lacks relevance (FRE 401, 402) | |
| 254 | | | PX 157 (Wells Fargo) | 9/30/2016 | | Wells Fargo Loan Ledger Report | WF00001421 | WF00001442 | Lacks relevance (FRE 401, 402) | |
| 255 | | | | 3/17/2016 | | Dkt. 37 - Motion to Approve Stipulation and Request Authorization for the Sale of CONs and TransCare's Personal Property | | | Lacks relevance (FRE 401, 402) Hearsay (FRE 802) | |
| 256 | | | | 3/23/2016 | | Dkt. 49 - Patriarch's Response to Dkt. No. 37 | | | Lacks relevance (FRE 401, 402) | |
| 257 | | | | 3/25/2016 | | Dkt. 51 - Order Authorizing Chapter 7 Trustee to Operate the Debtor's Business and Pay Certain Operating Expenses | | | Lacks relevance (FRE 401, 402) Hearsay (FRE 802) | |
| 258 | | | | 3/25/2016 | | Dkt. 52 - Transcendence Sale Order | | | Lacks relevance (FRE 401, 402) Hearsay (FRE 802) | |
| 259 | | | | 7/7/2016 | | Dkt. 199 - Order Authorizing And Approving The Sale Of Ambulance Service Certificate No. 0508 T | | | Lacks relevance (FRE 401, 402) Hearsay (FRE 802) | |
| 260 | | | | 7/7/2016 | | Dkt. 200 - Order Authorizing And Approving The Sale Of Ambulance Service Certificate No. 0509 | | | Lacks relevance (FRE 401, 402) Hearsay (FRE 802) | |
| 261 | | | | 7/7/2016 | | Dkt. 201 - Order Authorizing And Approving The Sale Of Ambulance Service Certificate No. 0667 | | | Lacks relevance (FRE 401, 402) Hearsay (FRE 802) | |
| 262 | | | | 7/7/2016 | | Dkt. 202 - Order Authorizing And Approving The Sale Of Ambulance Service Certificate No. 0510 | | | Lacks relevance (FRE 401, 402) Hearsay (FRE 802) | |
| 263 | | | | 7/7/2016 | | Dkt. 203 - Order Authorizing And Approving The Sale Of Ambulance Service Certificate No. 0164 | | | Lacks relevance (FRE 401, 402) Hearsay (FRE 802) | |
| 264 | | | | 7/7/2016 | | Dkt. 204 - Order Authorizing And Approving The Sale Of Ambulance Service Certificate No. 0470 | | | Lacks relevance (FRE 401, 402) Hearsay (FRE 802) | |
| 265 | | | | 7/7/2016 | | Dkt. 205 - Order Authorizing And Approving The Sale Of Ambulance Service Certificate No. 0574 | | | Lacks relevance (FRE 401, 402) Hearsay (FRE 802) | |
| 266 | | | | 8/10/2016 | | Dkt. 232 - Consent Order Signed On 8/10/2016 Re: Respecting The Distribution Of Certain Sale Proceeds In Accordance With So Ordered Stipulation | | | Lacks relevance (FRE 401, 402) Hearsay (FRE 802) | |
| 267 | | | | 8/23/2016 | | Dkt. 257 - Auctioneer's Report of Sale for the Auction Sales Conducted on April 20, May 4, May 6, May 11 and May 12, 2016 | | | Lacks relevance (FRE 401, 402) Hearsay (FRE 802) | |
| 268 | | | | 8/23/2016 | | Dkt. 258 - Auctioneer's Report of Sale for the Auction Sale Conducted on June 21, 2016 | | | Lacks relevance (FRE 401, 402) Hearsay (FRE 802) | |

| PX No. | Vol. No. | JX No. | PX/DX (Deponent) | Document Date | Time | Description | Begin Bates Range | End Bates Range | Defendants' Objections | Plaintiffs' Objections |
|---|---|---|---|---|---|---|---|---|---|---|
| 269 | | | | 9/2/2016 | | Dkt. 261 - Amended Order Signed On 9/2/2016 Re: Further Extending Chapter 7 Trustees Authorization To Operate The Debtors Businesses And Pay Certain Operating Expenses Of These Estates | | | Lacks relevance (FRE 401, 402) Hearsay (FRE 802) | |
| 270 | | | PX 157 (Wells Fargo) | 9/30/2016 | | Wells Fargo Loan Ledger Report | WF00001421 | WF00001442 | | |
| 271 | | | | 10/18/2016 | | Dkt. 288 - Monthly Operating Report for the period ending September 30, 2016 | | | Lacks relevance (FRE 401, 402) Hearsay (FRE 802) | |
| 272 | | | | 11/11/2016 | | Dkt. 311 - Motion to Approve , Pursuant to Bankruptcy Rule 9019(a), the Stipulation by and between the Chapter 7 Trustee, on behalf of the Debtors' Estates, Wells Fargo Bank N.A. f/k/a Wachovia Bank and New York City Transit Authority | | | Lacks relevance (FRE 401, 402) Hearsay (FRE 802) | |
| 273 | | | | 12/6/2016 | | Dkt. 331 - Order, Signed On 12/6/2016 Re: Pursuant To Rule 9019 Of The Federal Rules Of Bankruptcy Procedure, Approving The Stipulation By And Between The Chapter 7 Trustee | | | Lacks relevance (FRE 401, 402) Hearsay (FRE 802) | |
| 274 | | | | 12/6/2016 | | Dkt. 329 - Motion to Approve the Mutual Release and Settlement Agreement by and between the Chapter 7 Trustee, on behalf of the Debtors' Estates, Wells Fargo Bank N.A. and Montefiore Medical Center, Montefiore | | | Lacks relevance (FRE 401, 402) Hearsay (FRE 802) | |
| 275 | | | | 1/11/2017 | | Dkt. 365 - Order Signed On 1/11/2017 Re: Pursuant To Federal Rule Of Bankruptcy Procedure 9019(A), Approving The Mutual Release And Settlement Agreement By And Between The Chapter 7 Trustee, On Behalf Of The Debtors Estates, Wells Fargo Bank, N.A., And Montefiore Medical Center, Montefiore Mount Vernon Hospital And Montefiore New Rochelle Hospital | | | Lacks relevance (FRE 401, 402) Hearsay (FRE 802) | |
| 276 | | | | 2/7/2017 | | Dkt. 379 - First Application for Interim Professional Compensation and Reimbursement of Expenses for LaMonica Herbst & Maniscalco, LLP, Trustee's Attorney, period: 2/25/2016 to 12/31/2016 | | | Lacks relevance (FRE 401, 402) Hearsay (FRE 802) | |

| PX No. | Vol. No. | JX No. | PX/DX (Deponent) | Document Date | Time | Description | Begin Bates Range | End Bates Range | Defendants' Objections | Plaintiffs' Objections |
|---|---|---|---|---|---|---|---|---|---|---|
| 277 | | | | 2/7/2017 | | Dkt. 381 - First Application for Interim Professional Compensation for Lucy L. Thomson, Ombudsman Health, period: 3/29/2016 to 1/17/2017 | | | Lacks relevance (FRE 401, 402) Hearsay (FRE 802) | |
| 278 | | | | 9/26/2018 | | Patriarch Partners Privilege Log | | | Lacks relevance (FRE 401, 402) Hearsay (FRE 802) | |
| 279 | | | | 4/29/2019 | | Defendants' Answer to Chapter 7 Trustee's Amended Complaint | | | | |

Case 1-20-cv-06374-LAK Document 14-3 Filed 09/30/20 Page 96 of 203

# LAMONICA V. TILTON, ET AL.

# EXHIBIT B TO PROPOSED JOINT PRETRIAL ORDER

# DEFENDANTS' EXHIBIT LIST

Exhibit B - Defendant's Exhibit List

| DX No. | Deposition Ex. No. | Document Date | Time | Description | Begin Bates Range | End Bates Range | Objections | Ruling |
|---|---|---|---|---|---|---|---|---|
| 1 | | 8/4/2003 | | Subsidiaries' Guarantee (PPAS Credit Agreement) | PP-TRBK0100068 | PP-TRBK0100076 | | |
| 2 | | 8/4/2003 | | Pledge Agreement (PPAS Credit Agreement) | PP-TRBK0100081 | PP-TRBK0100135 | | |
| 3 | | 8/4/2003 | | Security Agreement (PPAS Credit Agreement) | TRANSCARE00230120 | TRANSCARE00230190 | | |
| 4 | | 8/4/2004 | | Addendum to Security Agreement (PPAS Credit Agreement) | PP-TRBK0100142 | PP-TRBK0100152 | | |
| 5 | | 6/11/2008 | | PPAS UCC Financing Statement (TransCare New York, Inc.) dated 8/5/2003 | CURTIS_001537 | CURTIS_001541 | | |
| 6 | | 6/11/2008 | | PPAS UCC Financing Statement (TransCare Pennsylvania, Inc.) dated 8/5/2003 | CURTIS_001542 | CURTIS_001545 | | |
| 7 | | 6/11/2008 | | PPAS UCC Financing Statement (TransCare Westchester, Inc.) dated 8/5/2003 | CURTIS_001548 | CURTIS_001551 | | |
| 8 | | 6/11/2008 | | PPAS UCC Financing Statement (TransCare Corporation) dated 8/5/2003 | CURTIS_001503 | CURTIS_001507 | | |
| 9 | | 6/11/2008 | | PPAS UCC Financing Statement (TransCare Harford County, Inc.) dated 8/5/2003 | CURTIS_001510 | CURTIS_001513 | | |
| 10 | | 6/11/2008 | | PPAS UCC Financing Statement (TransCare Management Services, Inc.) dated 8/5/2003 | CURTIS_001518 | CURTIS_001521 | | |
| 11 | | 6/11/2008 | | PPAS UCC Financing Statement (TransCare Maryland, Inc.) dated 8/5/2003 | CURTIS_001514 | CURTIS_001517 | | |
| 12 | | 11/2/2012 | | Supplement to Subsidiaries' Guarantee (PPAS Credit Agreement) | PP-TRBK0100077 | PP-TRBK0100080 | | |
| 13 | | 12/17/2014 | 18:28 | Email from Glenn Leland to Lynn Tilton; copying Jean Luc Pelissier, Randy Jones, John Pothin - Re: Thank you for today | PP-TRBK0028825 | PP-TRBK0028825 | | |
| 14 | | 12/31/2014 | 12:26 | Email from Lynn Tilton to Randy Jones; Jean Luc Pelissier, Brian Stephen, John Pothin - RE: Official Offer Letter | PP-TRBK0054137 | PP-TRBK0054137 | | |
| 15 | | 2/3/2015 | 9:03 | Email from Glenn Leland to Brad Schneider; copying Jean Luc Pelissier - Re: Borrowing Base and Eligible Receivables Growth | PP-TRBK0028709 | PP-TRBK0028713 | | |
| 16 | | 2/5/2015 | 10:05 | Email from Brad Schneider to Lynn Tilton, Jean Luc Pelissier - RE: Availability | PP-TRBK0053844 | PP-TRBK0053845 | | |
| 17 | | 2/5/2015 | 11:53 | Email from Lynn Tilton to Brad Schneider; copying Jean Luc Pelissier - RE: Transcare | PP-TRBK0053830 | PP-TRBK0053832 | | |
| 18 | | 2/5/2015 | 14:36 | Email from Lynn Tilton to Brad Schneider; copying Jean Luc Pelissier - RE: Transcare Payroll and Interest | PP-TRBK0053826 | PP-TRBK0053826 | | |
| 19 | | 2/19/2015 | 23:26 | Email from Lynn Tilton to "kurt.marsden@wellsfargo.com" - Re: Transcare | PP-TRBK0042690 | PP-TRBK0042691 | | |
| 20 | | 2/20/2015 | 14:09 | Email from Jean Luc Pelissier to Lynn Tilton - RE: Transcare | PP-TRBK0053618 | PP-TRBK0053619 | | |

| DX No. | Deposition Ex. No. | Document Date | Time | Description | Begin Bates Range | End Bates Range | Objections | Ruling |
|---|---|---|---|---|---|---|---|---|
| 21 | | 2/22/2015 | 12:50 | Email from Michael Greenberg to Lynn Tilton; copying Jean Luc Pelissier, Brian Stephen, Lisette Silva - TransCare- Overview of February 2015 Stabilization Plan and attached documents | PP-TRBK0072425 | PP-TRBK0072510 | | |
| 22 | | 2/22/2015 | 13:32 | Email from Michael Greenberg to Lynn Tilton; copying Lisette Silva, Jean Luc Pelissier, Brian Stephen - Re: TransCare - Overview of February 2015 Stabilization Plan | PP-TRBK0072387 | PP-TRBK0072392 | | |
| 23 | | 2/22/2015 | 19:37 | Email from Michael Greenberg to Lynn Tilton; copying Jean Luc Pelissier, Brian Stephen - TransCare Situation - Management Root cause | PP-TRBK0109579 | PP-TRBK0109580 | | |
| 24 | | 2/26/2015 | 16:47 | Email from Larry Careaga to Mark Bonilla - RE: Patriarch Wire Details - DOD 02/26 | TRANSCARE00142997 | TRANSCARE00142999 | | |
| 25 | | 2/26/2015 | | Document entitled "TransCare Corporation Written Consent of Director Without a Meeting" | PP-TRBK0003594 | PP-TRBK0003597 | | |
| 26 | | 2/26/2015 | | Amendment No. 24 to Credit Agreement of TransCare Corporation | PP-TRBK0099588 | PP-TRBK0099599 | | |
| 27 | DX 223 (Leland) | 3/2/2015 | 14:24 | Email from Mike Weinberger to Glenn Leland - Re: RCA proposal | TRANSCARE00196659 | TRANSCARE00196659 | | |
| 28 | | 3/5/2015 | 16:36 | Email from Larry Careaga to Mark Bonilla - Patriarch Funds have been received | TRANSCARE00040331 | TRANSCARE00040331 | | |
| 29 | | 3/5/2015 | | Document entitled "TransCare Corporation Written Consent of Director Without a Meeting" | PP-TRBK0003640 | PP-TRBK0003643 | | |
| 30 | | 3/5/2015 | | Amendment 25 to Credit Agreement of TransCare Corporation | PP-TRBK0099600 | PP-TRBK0099609 | | |
| 31 | | 3/28/2015 | 8:33 | Email from Michael Greenberg to Lynn Tilton; copying Jean Luc Pelissier, Randy Jones, John Pothin - Re: TransCare - weekly update | PP-TRBK0070046 | PP-TRBK0070049 | | |
| 32 | | 4/9/2015 | 13:04 | Email from Larry Careaga to Mark Bonilla - Patriarch Funds - DOD 04/09/15 | TRANSCARE00014062 | TRANSCARE00014062 | | |
| 33 | | 4/9/2015 | | Document entitled "TransCare Corporation Written Consent of Director Without a Meeting" | PP-TRBK0098857 | PP-TRBK0098883 | | |
| 34 | | 4/10/2015 | 12:50 | Email from Mark Bonilla to Melissa Provost - FW: Patriarch Funds - DOD 04/10/15 | TRANSCARE00059061 | TRANSCARE00059062 | | |
| 35 | | 4/23/2015 | 10:34 | Email from Mark Bonilla to Melissa Provost - FW: Patriarch Funds - DOD 04/23/15 | TRANSCARE00030152 | TRANSCARE00030152 | | |
| 36 | | 6/7/2015 | 20:11 | Email from Michael Greenberg to Lynn Tilton; copying Jean Luc Pelissier - Re: TransCare weekly update | PP-TRBK0066516 | PP-TRBK0066518 | | |

18-10509-shl Doc 3552-2 Filed 05/07/21 Entered 05/07/21 19:36:53 Exhibit B
Exhibit B - Defendant's Exhibit List    Pg 4 of 16

Case 1-20-cv-06274-LAK   Document 13   Filed 08/30/20   Page 99 of 203
Defendant's Exhibit List

| DX No. | Deposition Ex. No. | Document Date | Time | Description | Begin Bates Range | End Bates Range | Objections | Ruling |
|---|---|---|---|---|---|---|---|---|
| 37 | | 6/27/2015 | 7:06 | Email from Michael Greenberg to Lynn Tilton; copying Jean Luc Pelissier, Randy Jones, John Pothin - Re: TransCare - weekly update | PP-TRBK0065645 | PP-TRBK0065647 | | |
| 38 | | 7/6/2015 | 16:13 | Email from Jean Luc Pelissier to Lynn Tilton; Scott Whalen; copying Michael Greenberg - RE: Transcare | PP-TRBK0065121 | PP-TRBK0065125 | | |
| 39 | | 7/6/2015 | 21:22 | Email from "laurence.forte@wellsfargo.com" to Lynn Tilton; copying "Kurt.Marsden@wellsfargo.com" - RE: Transcare | PP-TRBK0042651 | PP-TRBK0042654 | | |
| 40 | | 7/6/2015 | 21:24 | Email from Lynn Tilton to "laurence.forte@wellsfargo.com"; copying "Kurt.Marsden@wellsfargo.com" - RE: Transcare | PP-TRBK0042646 | PP-TRBK0042650 | | |
| 41 | | 7/7/2015 | 0:52 | Email from Lynn Tilton to "kurt.marsden@wellsfargo.com" - Re: Tomorrow | PP-TRBK0090479 | PP-TRBK0090480 | | |
| 42 | | 7/7/2015 | 16:43 | Email from Michael Greenberg to Lynn Tilton; copying Jean Luc Pelissier, Scott Whalen - Re: TransCare - Overview of current situation | PP-TRBK0008292 | PP-TRBK0008295 | | |
| 43 | | 7/8/2015 | 13:23 | Email from Lynn Tilton to "Kurt.Marsden@wellsfargo.com"; copying "robert.strack@wellsfargo.com" - Re: Front End/Back End Cash Calculations | PP-TRBK0042633 | PP-TRBK0042635 | | |
| 44 | | 7/8/2015 | 13:58 | Email from Lynn Tilton to "kurt.marsden@wellsfargo.com" - Re: Transcare | PP-TRBK0090477 | PP-TRBK0090477 | | |
| 45 | | 7/8/2015 | 16:20 | Email from Larry Careaga to "markb@transcare.com" - Patriarch Wire - DOD 07-08-15 | TRANSCARE00153332 | TRANSCARE00153332 | | |
| 46 | | 7/8/2015 | 16:45 | Email from Mark Bonilla to Michael Greenberg; copying Renee Dudley - FW: TransCare | PP-TRBK0030959 | PP-TRBK0030960 | | |
| 47 | | 7/8/2015 | | Letter from TransCare Corporation to Patriarch Partners Agency Services, LLC - Direction Letter for Payment of Certain Loan Proceeds (signed by Mark Bonilla, CFO of TransCare) | PP-TRBK0098922 | PP-TRBK0098927 | | |
| 48 | | 7/8/2015 | | Letter from TransCare Corporation to Patriarch Partners Agency Services, LLC - Direction Letter for Payment of Certain Loan Proceeds (signed by Lynn Tilton, on behalf of Zohar Funds, Ark Investment Partners II, LP, and Patriarch Partners Agency Services, LLC) | PP-TRBK0098928 | PP-TRBK0098933 | | |

| DX No. | Deposition Ex. No. | Document Date | Time | Description | Begin Bates Range | End Bates Range | Objections | Ruling |
|---|---|---|---|---|---|---|---|---|
| 49 | | 7/9/2015 | 9:28 | Email from Lynn Tilton to Jean Luc Pelissier; copying Michael Greenberg - Re: Wells :: Transcare matter update. | PP-TRBK0064628 | PP-TRBK0064629 | | |
| 50 | | 7/9/2015 | 19:50 | Email from Glenn Leland to Michael Greenberg; copying Jean Luc Pelissier, Scott Whalen - Re: RCA offer to buy TransCare | PP-TRBK0030905 | PP-TRBK0030908 | | |
| 51 | | 7/10/2015 | 20:00 | Email from Glenn Leland to Scott Whalen; copying Jean Luc Pelissier, Michael Greenberg, Mark Bonilla - Re: LOI for Transcare Transit | PP-TRBK0030745 | PP-TRBK0030749 | | |
| 52 | | 7/11/2015 | 7:06 | Email from Glenn Leland to Mark Bonilla - Re: LOI for Transcare Transit | TRANSCARE00008006 | TRANSCARE00008010 | | |
| 53 | | 7/11/2015 | 7:19 | Email from Glenn Leland to Scott Whalen; copying Jean Luc Pelissier, Michael Greenberg, Mark Bonilla - Re: LOI for Transcare Transit | PP-TRBK0030738 | PP-TRBK0030742 | | |
| 54 | | 7/11/2015 | 10:52 | Email from Mark Bonilla to Glenn Leland - Re: LOI for Transcare Transit | TRANSCARE00050391 | TRANSCARE00050395 | | |
| 55 | | 7/15/2015 | 0:54 | Email from Lynn Tilton to Randy Jones; Jean Luc Pelissier, Brian Stephen, John Pothin - Re: Transcare | PP-TRBK0053523 | PP-TRBK0053523 | | |
| 56 | | 7/15/2015 | 10:25 | Email from Glenn Leland to Scott Whalen - Re: Can you call? | PP-TRBK0043195 | PP-TRBK0043198 | | |
| 57 | | 7/15/2015 | 10:31 | Email from Glenn Leland to Scott Whalen - FW: Response to July 13 e-mail and attachment | PP-TRBK0043190 | PP-TRBK0043194 | | |
| 58 | | 7/15/2015 | 14:11 | Email from Lynn Tilton to "laurence.forte@wellsfargo.com"; copying "Kurt.Marsden@wellsfargo.com", "robert.strach@wellsfargo.com" - RE: Transcare | PP-TRBK0042630 | PP-TRBK0042631 | | |
| 59 | | 7/15/2015 | 14:17 | Email from Lynn Tilton to Laurence Forte; copying Kurt Marsden, Robert Strack - RE: Transcare | WF_TC_00005103 | WF_TC_00005104 | | |
| 60 | | 7/16/2015 | 8:48 | Email from Lynn Tilton to Kurt Marsden - Re: Please Do Not Forward | WF_TC_00000386 | WF_TC_00000392 | | |
| 61 | | 7/16/2015 | 13:05 | Email from Larry Careaga to Teresa Garney; copying Melissa Provost - RE: Incoming Wire From Patriarch to Meet Payroll $1,479,907 | TRANSCARE00155495 | TRANSCARE00155499 | | |
| 62 | | 7/16/2015 | 13:26 | Email from Lynn Tilton to "Kurt.Marsden@wellsfargo.com" - FW: TransCare - ePCR discussion | PP-TRBK0042609 | PP-TRBK0042609 | | |
| 63 | | 7/16/2015 | 14:00 | Email from Lynn Tilton to "Kurt.Marsden@wellsfargo.com" - RE: Transcare | PP-TRBK0042600 | PP-TRBK0042602 | | |

| DX No. | Deposition Ex. No. | Document Date | Time | Description | Begin Bates Range | End Bates Range | Objections | Ruling |
|---|---|---|---|---|---|---|---|---|
| 64 | | 7/16/2015 | 14:54 | Email from Lynn Tilton to Scott Whalen, Michael Greenberg; copying Jean Luc Pelissier, Brian Stephen - RE: TransCare - Availability Block (good news) | PP-TRBK0063506 | PP-TRBK0063508 | | |
| 65 | | 7/16/2015 | 18:42 | Email from Michael Greenberg to Lynn Tilton; copying Jean Luc Pelissier, Brian Stephen, Scott Whalen - Re: TransCare - ADP Update | PP-TRBK0087608 | PP-TRBK0087608 | | |
| 66 | | 7/16/2015 | | Letter from TransCare Corporation to Patriarch Partners Agency Services, LLC - Direction Letter for Payment of Certain Loan Proceeds (signed by Mark Bonilla, CFO of TransCare; Lynn Tilton on behalf of Zohar Funds, Ark Investment Partners II, LP, and Patriarch Partners Agency Services, LLC) | PP-TRBK0063354 | PP-TRBK0063359 | | |
| 67 | | 7/30/2015 | | New York City Transit Authority Contract Modification | PP-TRBK0004457 | PP-TRBK0004462 | | |
| 68 | | 8/4/2015 | 0:07 | Email from Lynn Tilton to "Kurt.Marsden@wellsfargo.com" - FW: TransCare - FYI - Envision Healthcare entered into definitive agreement to acquire Rural/Metro | PP-TRBK0090469 | PP-TRBK0090473 | | |
| 69 | | 8/4/2015 | 19:29 | Email from Lynn Tilton to Michael Greenberg; copying Jean Luc Pelissier - RE: TransCare (Friendly reminder) - seeking approval to provide cash flow forecast and forecasted financials (P&L, balance sheet) to Wells Fargo through year-end 2015 (requested by Wells Fargo as part of amendment drafting process) | PP-TRBK0062218 | PP-TRBK0062227 | | |
| 70 | | 9/3/2015 | 16:58 | Email from Lynn Tilton to Michael Greenberg; copying Jean Luc Pelissier; Financial and Investment Law - RE: TransCare - update based on information just received from Wells Fargo (through a conversation had with Wells Fargo) | PP-TRBK0060399 | PP-TRBK0060400 | Hearsay (FRE 802) | |
| 71 | | 9/16/2015 | 6:44 | Email from Michael Greenberg to Lynn Tilton; copying Jean Luc Pelissier re: Transacted | PP-TRBK0059612 | PP-TRBK0059613 | | |
| 72 | | 10/1/2015 | 19:02 | Email from Lynn Tilton to Randy Jones - RE: TransCare CFO | PP-TRBK0042862 | PP-TRBK0042864 | | |
| 73 | | 10/6/2015 | 9:47 | Email from Lynn Tilton to Michael Greenberg; copying Jean Luc Pelissier, Randy Jones, John Pothin - Re: TransCare - plan to visit TransCare this afternoon | PP-TRBK0058179 | PP-TRBK0058180 | | |

A0420

| DX No. | Deposition Ex. No. | Document Date | Time | Description | Begin Bates Range | End Bates Range | Objections | Ruling |
|---|---|---|---|---|---|---|---|---|
| 74 | | 10/8/2015 | 15:35 | Email from Teresa Garney to "markb@transcare.com", "melissa.provist@wellsfargo.com", "DailyBBC@transcare.com"; copying "LarryC@transcare.com" - RE: BBC 2015-10-07.xlsx | TRANSCARE00186871 | TRANSCARE00186874 | | |
| 75 | | 10/8/2015 | | Letter from TransCare Corporation to Patriarch Partners Agency Services, LLC - Direction Letter for Payment of Certain Loan Proceeds (signed by Gerald Campbell, Corporate Controller of TransCare; Lynn Tilton on behalf of Zohar Funds, Ark Investment Partners II, LP, and Patriarch Partners Agency Services, LLC) | PP-TRBK0108125 | PP-TRBK0108130 | | |
| 76 | | 10/14/2015 | 12:30 | Email from "melissa.provost@wellsfargo.com" to Glenn Leland; copying Mark Bonilla, Michael Greenberg - RE: Notice of Non-Renewal and attachment | TRANSCARE00006334 | TRANSCARE00006336 | | |
| 77 | | 10/16/2015 | | Letter from TransCare Corporation to Patriarch Partners Agency Services, LLC - Direction Letter for Payment of Certain Loan Proceeds (signed by Glenn Leland, CEO of TransCare; Lynn Tilton on behalf of Zohar Funds, Ark Investment Partners II, LP, and Patriarch Partners Agency Services, LLC) | PP-TRBK0056115 | PP-TRBK0056120 | | |
| 78 | | 10/29/2015 | 12:17 | Email from Michael Greenberg to Jean Luc Pelissier (CBA), Jean Luc Pelissier, Brian Stephen - RE: Draft: TransCare - Meeting Follow up | PP-TRBK0107559 | PP-TRBK0107561 | | |
| 79 | | 11/19/2015 | 19:13 | Email from Michael Greenberg to Makr Bonilla; copying Financial and Investment Law - Fwd: Transcare - Credit Agreement | PP-TRBK0092036 | PP-TRBK0092036 | | |
| 80 | | 11/19/2015 | | Amendment No. 30 to Credit Agreement of TransCare Corporation | PP-TRBK0099671 | PP-TRBK0099678 | | |
| 81 | | 12/8/2015 | 22:36 | Email from Glenn Leland to Michael Greenberg, Thomas Fuchs - Re: TCP | PP-TRBK0045311 | PP-TRBK0045313 | | |
| 82 | | 12/8/2015 | | Letter from TransCare Corporation to Patriarch Partners Agency Services, LLC - Direction Letter for Payment of Certain Loan Proceeds (unsigned) | TRANSCARE00231409 | TRANSCARE00231414 | Lacks foundation (FRE 602) | |
| 83 | | 12/9/2015 | 7:42 | Email from Glenn Leland to Brian Stephen; copying Michael Greenberg, Jean Luc Pelissier (CBA), Mark Bonilla, Randy Jones, John Pothin - Re: TCP | PP-TRBK0047198 | PP-TRBK0047200 | | |

Case 1:20-cv-06274-LAK Document 10-2 Filed 08/30/20 Page 103 of 203
18-10522-smb Doc 532-2 Filed 05/30/19 Entered 05/30/19 19:20:53 Exhibit B
Exhibit B - Defendant's Exhibit List    Pg 8 of 16

| DX No. | Deposition Ex. No. | Document Date | Time | Description | Begin Bates Range | End Bates Range | Objections | Ruling |
|---|---|---|---|---|---|---|---|---|
| 84 | | 12/11/2015 | 8:30 | Email from Lynn Tilton to Michael Greenberg, Jean Luc Pelissier - RE: Transcare | PP-TRBK0002070 | PP-TRBK00020702 | | |
| 85 | | 12/11/2015 | 9:08 | Email from Michael Greenberg to Lynn Tilton; copying Jean Luc Pelissier, Brian Stephen - RE: TransCare - today | PP-TRBK0107105 | PP-TRBK0107107 | | |
| 86 | | 12/11/2015 | 10:38 | Email form Michael Greenberg to Lynn Tilton; copying Jean Luc Pelissier, Brian Stephen - RE: TransCare - today | PP-TRBK0083461 | PP-TRBK0083463 | | |
| 87 | | 12/11/2015 | 11:46 | Email from Michael Greenberg to Lynn Tilton, Jean Luc Pelissier - RE: Transcare | PP-TRBK0002058 | PP-TRBK0002059 | | |
| 88 | | 12/11/2015 | 12:51 | Email from Lynn Tilton to Michael Greenberg; copying Jean Luc Pelissier, Brian Stephen - RE: TransCare - Analysis of BBC Reporting of Unbilled Subsidy Revenue Amounts (privileged and confidential) | PP-TRBK0109643 | PP-TRBK0109644 | | |
| 89 | | 12/11/2015 | 20:14 | Email from Michael Greenberg to Jean Luc Pelissier (CBA); copying Jean Luc Pelissier, Brian Stephen - Re: Draft: TransCare - Today's call with Wells Fargo | PP-TRBK0107075 | PP-TRBK0107079 | | |
| 90 | | 12/11/2015 | | Letter from TransCare Corporation to Patriarch Partners Agency Services, LLC - Direction Letter for Payment of Certain Loan Proceeds (signed by Glenn Leland, CEO of TransCare; Lynn Tilton on behalf of Zohar Funds, Ark Investment Partners II, LP, and Patriarch Partners Agency Services, LLC) | PP-TRBK0099430 | PP-TRBK0099435 | Lacks foundation (FRE 602) | |
| 91 | | 12/16/2015 | 14:38 | Email from Glenn Leland to Michael Greenberg - Fwd: Question | PP-TRBK0045246 | PP-TRBK0045248 | | |
| 92 | | 12/16/2015 | 22:46 | Email from Lynn Tilton to Michael Greenberg, Lynn Tilton; copying Jean Luc Pelissier, Brian Stephen, Randy Jones - RE: Transcare | PP-TRBK0075262 | PP-TRBK0075263 | | |
| 93 | | 12/17/2015 | 16:10 | Email from Larry Careaga to DailyBBC, "melissa.provost@wellsfargo.com", "Teresa.Garney@wellsfargo.com" - FW: BBC 2015-12-16.xlsx | TRANSCARE00138081 | TRANSCARE00138082 | | |
| 94 | | 12/17/2015 | 16:28 | Email from Lynn Tilton to Renee Dudley; copying Michael Greenberg - Re: Additional Request (Revised) - Friendly Reminder | PP-TRBK0001352 | PP-TRBK0001354 | | |
| 95 | | 12/17/2015 | | Letter from TransCare Corporation to Patriarch Partners Agency Services, LLC - Direction Letter for Payment of Certain Loan Proceeds (signed by Glenn Leland, CEO of TransCare) | PP-TRBK0098916 | PP-TRBK0098921 | | |
| 96 | | 12/18/2015 | 9:57 | Email from Lynn Tilton to Michael Greenberg - Re: Transcare | PP-TRBK0001414 | PP-TRBK0001414 | | |

| DX No. | Deposition Ex. No. | Document Date | Time | Description | Begin Bates Range | End Bates Range | Objections | Ruling |
|---|---|---|---|---|---|---|---|---|
| 97 | | 12/21/2015 | 19:24 | Email from Michael Greenberg to Lynn Tilton; copying Jean Luc Pelissier, Brian Stephen - TransCare - Summary of meeting with Wells Fargo | PP-TRBK0106826 | PP-TRBK0106827 | Hearsay (FRE 802) | |
| 98 | | 12/21/2015 | 22:33 | Email from "Kurt.Marsden@wellsfargo.com" to Lynn Tilton - RE: Transcare | PP-TRBK0018258 | PP-TRBK0018259 | | |
| 99 | | 12/23/2015 | 15:14 | Email from Michael Greenberg to Lynn Tilton; copying Jean Luc Pelissier, Randy Jones, John Pothin - Re: TransCare - seeking feedback on potential list of consultants | PP-TRBK0018108 | PP-TRBK0018109 | | |
| 100 | | 12/30/2015 | 17:26 | Email from Michael Greenberg to Lynn Tilton; copying Jean Luc Pelissier, Brian Stephen - TransCare - update on Wells Fargo discussions (privileged and confidential) | PP-TRBK0106767 | PP-TRBK0106768 | | |
| 101 | | 12/31/2015 | 10:58 | Email from Michael Greenberg to Lynn Tilton; copying Jean Luc Pelissier, Brian Stephen - RE: TransCare - Discussion of NYSIF and upcoming obligations and performance update (Privileged and confidential) | PP-TRBK0106646 | PP-TRBK0106649 | | |
| 102 | | 1/3/2016 | 9:19 | Email from Michael Greenberg to Brian Stephen - Fwd: Zurich | PP-TRBK0106614 | PP-TRBK0106615 | | |
| 103 | | 1/5/2016 | 15:19 | Email from Larry Careaga to "melissa.provost@wellsfargo.com", "Teresa.Garney@wellsfargo.com"; copying Glenn Leland, Mark Bonilla, Gerald Campbell - Patriarch Funds - DOD 01/05/2016 | TRANSCARE00024535 | TRANSCARE00024535 | | |
| 104 | | 1/5/2016 | | Letter from TransCare Corporation to Patriarch Partners Agency Services, LLC - Direction Letter for Payment of Certain Loan Proceeds (unsigned) | TRANSCARE00231415 | TRANSCARE00231420 | Lacks foundation (FRE 602) | |
| 105 | | 1/7/2016 | | Letter from TransCare Corporation to Patriarch Partners Agency Services, LLC - Direction Letter for Payment of Certain Loan Proceeds (unsigned) | TRANSCARE00231421 | TRANSCARE00231426 | Lacks foundation (FRE 602) | |
| 106 | | 1/7/2016 | | CMAG Consulting Agreement | PP-TRBK0043438 | PP-TRBK0043447 | | |
| 107 | | 1/11/2016 | 17:56 | Email from Randy Jones to Lynn Tilton - RE: Can you speak now? | PP-TRBK0018236 | PP-TRBK0018237 | | |
| 108 | | 1/12/2016 | 11:01 | Email from Randy Jones to Lynn Tilton - Re: Rob Stuck and Thom Fuchs CoC bonus guidance | PP-TRBK0023057 | PP-TRBK0023060 | | |
| 109 | | 1/13/2016 | 15:34 | Email from Lynn Tilton to Jean Luc Pelissier; copying Randy Jones, Michael Greenberg - RE: NYSIF - Settlement requirements. | PP-TRBK0017615 | PP-TRBK0017616 | | |
| 110 | | 1/13/2016 | 20:28 | Email from Lynn Tilton to "emadoff@nysif.com" - RE: Urgent--TransCare | PP-TRBK0018218 | PP-TRBK0018219 | | |

| DX No. | Deposition Ex. No. | Document Date | Time | Description | Begin Bates Range | End Bates Range | Objections | Ruling |
|---|---|---|---|---|---|---|---|---|
| 111 | | 1/15/2016 | 12:45 | Email from Lynn Tilton to Jean Luc Pelissier (CBA); copying Brian Stephen - RE: NYIF / Transcare : FYI only | PP-TRBK0106365 | PP-TRBK0106366 | | |
| 112 | | 1/15/2016 | 16:07 | Email from Ashley Gerczak to Carlos Mercado - RE: BB&T Wire - Approval Requested - Ark II Funding | PP-TRBK0015408 | PP-TRBK0015408 | | |
| 113 | | 1/15/2016 | 16:33 | Email from Lynn Tilton to Renee Dudley - RE: Approval to release funds from PPAS for Transcare and Spiegel ($1,181,475.53) today 1/15/2016 ** Friendly Reminder** | PP-TRBK0008416 | PP-TRBK0008416 | | |
| 114 | | 1/15/2016 | | Letter from TransCare Corporation to Ark II CLO 2001 1, LTD - Direction Letter for Payment of Certain Loan Proceeds (signed by Peter Wolf, COO of TransCare) | PP-TRBK0044689 | PP-TRBK0044693 | Lacks foundation (FRE 602) | |
| 115 | | 1/22/2016 | 17:27 | Email from Brian Stephen to Lynn Tilton; copying Jean Luc Pelissier, Michael Greenberg - **Privileged and Confidential: Approval Requested - TransCare Engagement of Counsel with attachments | PP-TRBK0112586 | PP-TRBK0112589 | | |
| 116 | | 1/22/2016 | 18:34 | Email from Lynn Tilton to Brian Stephen copying Jean Luc Pelissier, Michael Greenberg - RE: **Privileged and Confidential: Approval Requested - TransCare Engagement of Counsel | PP-TRBK0098840 | PP-TRBK0098848 | | |
| 117 | | 1/23/2016 | 8:44 | Email from Michael Greenberg to Lynn Tilton; copying Jean Luc Pelissier, Randy Jones, Brian Stephen - TransCare - weekly update (Privileged and confidential) | PP-TRBK0106129 | PP-TRBK0106131 | | |
| 118 | | 1/26/2016 | 13:24 | Email from Renee Dudley to Michael Greenberg - Transcare borrowings (a).xls and attachment | PP-TRBK0002170 | PP-TRBK0002171 | | |
| 119 | | 1/28/2016 | 15:54 | Email from Michael Greenberg to Lynn Ttilton; copying Jean Luc Pelissier, Renee Dudley,Adam Katz - Re: TransCare - purchase of 2 vehicles (previously discussed) | PP-TRBK0084251 | PP-TRBK0084254 | | |
| 120 | | 1/28/2016 | 15:55 | Email from Lynn Tilton to Michael Greenberg; copying Jean Luc Pelissier, Renee Dudley,Adam Katz - Re: TransCare - purchase of 2 vehicles (previously discussed) | PP-TRBK0002162 | PP-TRBK0002164 | | |
| 121 | | 1/29/2016 | 16:46 | Email from Lynn Tilton to Renee Dudley; copying Financial and Investment Law, Carlos Mercado - RE: Approval to Release funds from PPAS - TransCare 1/29/2016 (additional 690K wire) Amount Released ** Privileged and Confidential** | PP-TRBK0099192 | PP-TRBK0099194 | | |

Case 1:20-cv-06274-LAK Document 61-3 Filed 06/30/23 Page 106 of 203
18-10122-smb Doc 532-2 Filed 06/04/19 Entered 06/04/19 15:26:33 Exhibit B
Exhibit B - Defendant's Exhibit List    Pg 11 of 16

| DX No. | Deposition Ex. No. | Document Date | Time | Description | Begin Bates Range | End Bates Range | Objections | Ruling |
|---|---|---|---|---|---|---|---|---|
| 122 | | 1/29/2016 | | Letter from TransCare Corporation to Ark II CLO 2001 1, LTD - Direction Letter for Payment of Certain Loan Proceeds (signed by Peter Wolf, COO of TransCare) | PP-TRBK0043417 | PP-TRBK0043421 | Lacks foundation (FRE 602) | |
| 123 | | 2/4/2016 | 8:23 | Email from Lynn Tilton to Jean Luc Pelissier, Michael Greenberg, Brian Stephen, Randy Jones - RE: Privileged and Confidential | PP-TRBK0107343 | PP-TRBK0107344 | | |
| 124 | | 2/5/2016 | 17:13 | Email from Michael Greenberg to Jean Luc Pelissier, "clandeck@carlmarksadvisors.com", "jkillion@carlmarks.com"; copying Brian Stephen - Notes from the TransCare meeting | PP-TRBK0049900 | PP-TRBK0049900 | | |
| 125 | | 2/6/2016 | 12:37 | Email from Michael Greenberg to Brian Stephen; copying Jean Luc Pelissier, "clandeck@carlmarksadvisors.com", "jkillion@carlmarksadvisors.com" - Re: TransCare - Customers, Vendors 02-05-16 v1.xlsx | PP-TRBK0049899 | PP-TRBK0049899 | | |
| 126 | | 2/6/2016 | 17:36 | Email from Michael Greenberg to "clandeck@carlmarksadvisors.com" - RE: TC | PP-TRBK0013138 | PP-TRBK0013140 | | |
| 127 | | 2/7/2016 | 8:48 | Email from Michael Greenberg to Jean Luc Pelissier - TransCare with attachment | PP-TRBK0046297 | PP-TRBK0046323 | | |
| 128 | | 2/9/2016 | 19:15 | Email from Jean Luc Pelissier (CBA) to Lynn Tilton; copying Michael Greenberg - FW: Follow up on Question regarding the Transcare contract. | PP-TRBK0016163 | PP-TRBK0016163 | | |
| 129 | | 2/9/2016 | 20:45 | Email from "Kurt.Marsden@wellsfargo.com" to Lynn Tilton - RE: Transcare | PP-TRBK0018166 | PP-TRBK0018168 | | |
| 130 | | 2/9/2016 | 20:56 | Email from Lynn Tilton to "Kurt.Marsden@wellsfargo.com" - RE: Transcare | PP-TRBK0028275 | PP-TRBK0028278 | | |
| 131 | | 2/9/2016 | 23:26 | Email from "Kurt.Marsden@wellsfargo.com" to Lynn Tilton - RE: Transcare | PP-TRBK0028267 | PP-TRBK0028270 | | |
| 132 | | 2/10/2016 | 1:39 | Email from Jonathan Killion to Michael Greenberg; copying Carl Landeck - Article 9 Entities 2.10.16.xlsx and attachment | PP-TRBK0002317 | PP-TRBK0002318 | | |
| 133 | | 2/10/2016 | 14:26 | Email from Tendai Masaya to Carlos Mercado, Brian Stephen; copying "Accounting" - FW: TRANSCENDENCE TRANSIT II, INC. - Formation Documents with attachments | PP-TRBK0015288 | PP-TRBK0015295 | | |
| 134 | | 2/10/2016 | 15:39 | Email from Carlos Mercado to Alicia Staggers; copying Tendai Masaya - FW: Transcendence Transit, Inc. & Transcendence Transit II, Inc. EINs and attachments | PP-TRBK0015305 | PP-TRBK0015311 | | |

**A0425**

| DX No. | Deposition Ex. No. | Document Date | Time | Description | Begin Bates Range | End Bates Range | Objections | Ruling |
|---|---|---|---|---|---|---|---|---|
| 135 | | 2/10/2016 | 18:25 | Email from "robert.strack@wellsfargo.com" to Lynn Tilton, Michael Greenberg, Jean Luc Pelissier, Randy Jones; copying "Kurt.Marsden@wellsfargo.com", "laurence.forte@wellsfargo.com", "john.husson@wellsfargo.com", "melissa.provost@wellsfargo.com" - RE: Wells Fargo/TransCare - Financing Discussion Points | PP-TRBK0022332 | PP-TRBK0022334 | | |
| 136 | | 2/11/2016 | 17:14 | Email from Michael Greenberg to "jkillion@carlmarksadvisors.com"; copying Glen Youngblood and Jean Luc Pelissier - Go forward case and attachments | PP-TRBK0016055 | PP-TRBK0016056 | | |
| 137 | | 2/12/2016 | 6:30 | Email from Cindi Giglio to Brian Stephen - Re: Retainer | PP-TRBK0051817 | PP-TRBK0051819 | Hearsay (FRE 802) | |
| 138 | | 2/12/2016 | 6:52 | Email from Cindi Giglio to Brian Stephen; copying Harrison III, Lynn P., Peter Buenger - Re: Form of TSA | PP-TRBK0048829 | PP-TRBK0048848 | | |
| 139 | | 2/12/2016 | 18:47 | Email from Robert P. Strack to Michael A. Moore' copying Daniel F. Fiorillo - Re: TransCare - Budget | WF_Tilton_00007079 | WF_Tilton_00007083 | | |
| 140 | DX 173 (Husson - Wells Fargo) | 2/12/2016 | 21:53 | Email from Jonathan N. Helfat to Cindi Giglio, Lynn P. Harrison III, "clandeck@carlmarks.com", Jonathan Killion, Marc Pfefferle, Lynn Tilton, Jean Luc Pelissier, Randy Jones, Michael Greenberg, Daniel F. Fiorillo, "robert.strack@wellsfargo.com", "john.husson@wellsfargo.com", "melissa.provost@wellsfargo.com" - FW: TransCare | PP-TRBK0046279 | PP-TRBK0046280 | | |
| 141 | | 2/13/2016 | 12:30 | Email from Lynn Tilton to Jean Luc Pelissier (CBA); copying Michael Greenberg, Brian Stephen - RE: Privileged & Confidential :: Transcendence Go Forward Model | PP-TRBK0110746 | PP-TRBK0110751 | | |
| 142 | | 2/13/2016 | 17:34 | Email from Jonathan Killion to Michael Greenberg, Jean Luc Pelissier (CBA); copying Carl Landeck, Marc Pfefferle, Cindi Giglio, "ltauro@curtis.com", "pbuenger@curtis.com", "lharrison@curtis.com" - List of Questions | PP-TRBK0077401 | PP-TRBK0077403 | | |
| 143 | | 2/14/2016 | 17:18 | Email from Jean Luc Pelissier to Randy Jones, John Pothin, Michael Greenberg, Peter Wolf, Glen Youngblood, Brian Stephen, Kevin Dell; copying Lynn Tilton - Privileged and Confidential :: Transcare/Progress and action list / review tomorrow Monday. | PP-TRBK0097632 | PP-TRBK0097640 | | |

| DX No. | Deposition Ex. No. | Document Date | Time | Description | Begin Bates Range | End Bates Range | Objections | Ruling |
|---|---|---|---|---|---|---|---|---|
| 144 | | 2/15/2016 | 17:25 | Email from Cindi Giglio to Brian Stephen - FW: TransCare - Revised First Day Pleadings (Assumptions and Utilities) | PP-TRBK0048249 | PP-TRBK0048250 | | |
| 145 | | 2/16/2016 | 9:00 | Email from John E. Husson to Laurence S. Forte, Robert P. Strack, Jonathan N. Helfat, Daniel F. Fiorillo, Melissa A. Provost - RE: TransCare - Revised Budget | WF_Tilton_00000228 | WF_Tilton_00000232 | | |
| 146 | | 2/17/2016 | 11:43 | Email from Brian Stephen to John Pothin, Peter Wolf; copying Jean Luc Pelissier, Kevin Dell, Randy Jones - Re: TSA and planning input | PP-TRBK0086412 | PP-TRBK0086413 | | |
| 147 | DX 174 (Husson - Wells Fargo) | 2/17/2016 | 18:22 | Email from Lynn Tilton to "robert.strack@wellsfargo.com"; copying Jean Luc Pelissier, "kurt.marsden@wellsfargo.com", "laurence.forte@wellsfargo.com", "john.husson@wellsfargo.com", "melissa.provost@wellsfargo.com", Vincent Devito, Michael Greenberg - RE: 13 Week Cash Flow out of court (2).xlsx | PP-TRBK0091631 | PP-TRBK0091632 | | |
| 148 | | 2/18/2016 | 9:56 | Email from Lynn Tilton to Mark Claster, Carl Landeck, Jean Luc Pelissier (CBA); copying Marc Pfefferle, Jonathan Killion, Randy Jones - RE: Proposed Out of Court Wind down plan | PP-TRBK0046207 | PP-TRBK0046211 | | |
| 149 | | 2/18/2016 | 10:12 | Email from "robert.strack@wellsfargo.com" to Lynn Tilton; copying Jean Luc Pelissier, Vincent Devito, Michael Greenberg, "cgiglio@curtis.com", "lharrison@curtis.com", "Kurt.Marsden@wellsfargo.com", Brian Stepehen - RE: Privileged and Confidential | PP-TRBK0044607 | PP-TRBK0044609 | | |
| 150 | | 2/18/2016 | 23:05 | Email from Alicia Staggers to Lynn Tilton - Re: Transcare--Privileged and Confidential | PP-TRBK0052107 | PP-TRBK0052107 | | |
| 151 | | 2/19/2016 | 10:34 | Email from Cindi Giglio to Lynn Tilton; copying Lynn P. Harrison III, Brian Stephen - Re: Privileged and Confidential | PP-TRBK0047851 | PP-TRBK0047852 | Hearsay (FRE 802) | |
| 152 | DX 175 (Husson - Wells Fargo) | 2/19/2016 | 12:23 | Email from Robert P. Strack to Mark Claster, Marc Pfefferle; copying Carl Landeck, Jonathan Killion, Melissa A. Provost, John E. Husson - RE: 13 Week Cash Flow Forecast | WF_TC_00004343 | WF_TC_00004348 | | |
| 153 | | 2/19/2016 | 14:33 | Email from Lynn Tilton to "clandeck@carlmarks.com", Cindi Giglio; copying Lynn P. Harrison III, Brian Stephen, Jean Luc Pelissier, Peter Wolf - RE: Borrowing Base | PP-TRBK0051622 | PP-TRBK0051624 | | |
| 154 | | 2/19/2016 | 14:50 | Email from Randy Jones to Lynn Tilton - FW: Progress on Transcendence Transit | PP-TRBK0028128 | PP-TRBK0028129 | | |

| DX No. | Deposition Ex. No. | Document Date | Time | Description | Begin Bates Range | End Bates Range | Objections | Ruling |
|---|---|---|---|---|---|---|---|---|
| 155 | | 2/19/2016 | 15:05 | Email from Lynn Tilton to Lynn P. Harrison III; copying Brian Stephen, Cindi Giglio - RE: TransCare | PP-TRBK0047828 | PP-TRBK0047831 | | |
| 156 | | 2/19/2016 | 15:13 | Email from Lynn Tilton to Robert Strack; copying Kurt Marsden, Laurence Forte, John Husson, Randy Jones - RE: Transcare | WF_TC_00005282 | WF_TC_00005284 | | |
| 157 | | 2/19/2016 | 15:59 | Email from Lynn Tilton to Laurence Forte, Robert Strack; copying Kurt Marsden, Randy Jones, John Husson - RE: Transcare | WF_TC_00005291 | WF_TC_00005293 | | |
| 158 | | 2/19/2016 | 16:47 | Email from Lynn Tilton to Robert Strack, "jhelfat@otterbourg.com", "lharrison@curtis.com", Jean Luc Pelissier, Randy Jones, Michael Greenberg, Kurt Marsden, Laurence Forte, John Husson, Melissa Provost, Joel Brighton, Brian Stephen; copying "dfiorilo@otterbourg.com" - RE: TransCare | WF_TC_00004187 | WF_TC_00004190 | | |
| 159 | | 2/19/2016 | 17:19 | Email from Robert P. Strack to Carl Landeck, Mark Claster, Marc Pfefferle, Jonathan Killion, John E. Husson, Melissa A. Provost - RE: TransCare term sheet and attachment | WF_Tilton_00000276 | WF_Tilton_00000278 | | |
| 160 | | 2/19/2016 | 19:00 | Email from Brian Stephen to Lynn Tilton; copying Randy Jones - **Privileged and Confidential: Chrysalis Engagement Letter with attachments | PP-TRBK0105058 | PP-TRBK0105067 | | |
| 161 | | 2/20/2016 | 9:51 | Email from Lynn Tilton to Scott Whalen, Alicia Staggers - Fw: 13 Week Model Questions | PP-TRBK0052255 | PP-TRBK0052257 | | |
| 162 | | 2/20/2016 | 18:00 | Email from Michael Greenberg to Lynn Tilton; copying Jean Luc Pelissier, Scott Whalen, Jodie Frazier, Vikram Agrawal, Vincent Devito, Brian Stephen - Transcare - NewCo Models (Privileged and Confidential) with Native attachments | PP-TRBK0110451 | PP-TRBK0110472 | | |
| 163 | | 2/20/2016 | 20:05 | Email from Michael Greenberg to Lynn Tilton; copying Jean Luc Pelissier, Vincent Devito, Vikram Agrawal, Scott Whalen - RE: TransCare - question | PP-TRBK0044541 | PP-TRBK0044542 | | |

| DX No. | Deposition Ex. No. | Document Date | Time | Description | Begin Bates Range | End Bates Range | Objections | Ruling |
|---|---|---|---|---|---|---|---|---|
| 164 | | 2/22/2016 | 9:24 | Email from Daniel F. Fiorillo to Lynn Tilton, "robert.strack@wellsfargo.com", "john.husson@wellsfargo.com", "melissa.provost@wellsfargo.com", Michael Greenberg, Jean Luc Pelissier, Vincent Devito; copying "laurence.forte@wellsfargo.com", "Kurt.Marsden@wellsfargo.com", "cgiglio@curtis.com", Jonathan N. Helfat, "lharrison@curtis.com", Brian Stephen, "Michael.A.Moore@wellsfargo.com" - RE: 13 Week Model Questions | PP-TRBK0003859 | PP-TRBK0003864 | | |
| 165 | | 2/22/2016 | 14:59 | Email from Lynn Tilton to Cindi Giglio; copying Lynn P. Harrison III - RE: TransCare | PP-TRBK0052071 | PP-TRBK0052074 | | |
| 166 | | 2/22/2016 | 17:48 | Email from Vikram Agrawal to Lynn Tilton; copying Michael Greenberg, Jodie Frazier, Jean Luc Pelissier, Vincent Devito, Scott Whalen, Brian Stephen - RE: TransCare - Updated NewCo Model with Paratransit, PA, and HV - Privileged and Confidential with attachments | PP-TRBK0110485 | PP-TRBK0110490 | | |
| 167 | | 2/23/2016 | 8:47 | Email from Lynn Tilton to John Foerst - Re: | PP-TRBK0028087 | PP-TRBK0028090 | | |
| 168 | | 2/23/2016 | 9:27 | Email from Lynn Tilton to Jonathan N. Helfat, Cindi Giglio; copying Daniel F. Fiorillo, Jean Luc Pelissier, Michael Greenberg, Brian Stephen - RE: Privileged and Confidential | PP-TRBK0047782 | PP-TRBK0047784 | | |
| 169 | | 2/23/2016 | 12:00 | Email from Lynn Tilton to Jean Luc Pelissier (CBA) - RE: Town Meeting - More color--Privileged and Confidential | PP-TRBK0111883 | PP-TRBK0111886 | Hearsay (FRE 802) | |
| 170 | | 2/23/2016 | 15:49 | Email from Lynn Tilton to John Foerst, Todd Trent; copying Glen Youngblood, Michael Greenberg, Thomas Charles - RE: Loss run | PP-TRBK0004372 | PP-TRBK0004375 | | |
| 171 | | 2/23/2016 | 16:44 | Email from Cindi Giglio to Lynn Tilton; copying Lynn P. Harrison III, Brian Stephen - RE: Wells Counter | PP-TRBK0047694 | PP-TRBK0047695 | | |
| 172 | | 2/24/2016 | 14:45 | Email from Carlos Mercado to Lynn Tilton - Re: Transcare Debt | PP-TRBK0014825 | PP-TRBK0014826 | Lacks foundation (FRE 602); Lacks authentication (FRE 901); Hearsay (FRE 802) | |
| 173 | | 2/24/2016 | | Document entitled "Certificate of Resolutions" | CURTIS_004945 | CURTIS_004947 | | |
| 174 | | 2/24/2016 | | Letter to TransCare from PPAS Re: "Notice of Acceptance of Subject Collateral in Partial Satisfaction of Obligation" | PP-TRBK0091197 | PP-TRBK0091201 | | |
| 175 | | 2/25/2016 | 9:42 | Email from Brian Stephen to Lynn Tilton - Re: Urgent | PP-TRBK0043510 | PP-TRBK0043510 | | |

| DX No. | Deposition Ex. No. | Document Date | Time | Description | Begin Bates Range | End Bates Range | Objections | Ruling |
|---|---|---|---|---|---|---|---|---|
| 176 | | 2/26/2016 | 1:55 | Email from Brian Stephen to Earl Kossuth; copying Thomas Milea, Jean Luc Pelissier, Thomas Fuchs, Michael Greenberg, Randy Jones, John Pothin - Re: Securing Assets | PP-TRBK0076690 | PP-TRBK0076695 | | |
| 177 | | 2/26/2016 | 4:57 | Email from Randy Jones to Lynn Tilton - RE: Court appointed attorney for the trustee- Sal Lomonico (516) 398-9550 | PP-TRBK0090451 | PP-TRBK0090452 | | |
| 178 | | 2/26/2016 | 14:27 | Email from Lynn Tilton to Randy Jones - RE: MTA | PP-TRBK0042591 | PP-TRBK0042592 | | |
| 179 | | 2/26/2016 | 15:16 | Email from Cindi Giglio to Lynn Tilton, Lynn P. Harrison III - RE: MTA | PP-TRBK0090453 | PP-TRBK0090455 | | |
| 180 | DX 11 (LaMonica) | 6/21/2017 | | Transcript of Hearing re 341 Meeting, Case No. 16-10407-smb | | | | |
| 181 | PX 103 (Tilton) | 10/9/2017 | | Ark II Proof of Claim | | | | |
| 182 | PX 104 (Tilton) | 10/9/2017 | | PPAS Proof of Claim | | | | |
| 183 | PX 105 (Tilton) | 10/9/2017 | | Patriarch Partners Proof of Claim | | | | |
| 184 | | 10/9/2017 | | PPMG Proof of Claim | | | | |
| 185 | | | | PPAS Credit Agreement Commitment Spreadsheet | PP-TRBK0098716 | PP-TRBK0098726 | Lacks foundation (FRE 602); Lacks authentication (FRE 901); Hearsay (FRE 802) | |

# LAMONICA V. TILTON, ET AL.

# EXHIBIT C TO PROPOSED JOINT PRETRIAL ORDER

# PARTIES' JOINT EXHIBIT LIST

| JX No | Document Date | Time | Description | Begin Bates Range | End Bates Range |
|---|---|---|---|---|---|
| 1 | 8/4/2003 | | PPAS Credit Agreement | PP-TRBK0000027 | PP-TRBK00000107 |
| 2 | 10/13/2006 | | Wells Fargo Loan and Security Agreement | CURTIS_000736 | CURTIS_000934 |
| 3 | 10/13/2006 | | Wells Fargo 2006 Intercreditor Agreement | CURTIS_000001 | CURTIS_000032 |
| 4 | 11/18/2013 | | Amendment 23 to Credit Agreement of TransCare Corporation | PP-TRBK0049581 | PP-TRBK0049591 |
| 5 | 11/24/2014 | 13:56 | Email from Glenn Leland to "pelissier@cbagroupllc.com" - Re: Resume / Thank you. | PP-TRBK0042133 | PP-TRBK0042139 |
| 6 | 12/3/2014 | 13:36 | Email from Brad Schneider to Jean Luc Pelissier - RE: Cash Report for 12-02-2014 | TRANSCARE00001004 | TRANSCARE00001005 |
| 7 | 12/14/2014 | 21:12 | Email from Lynn Tilton to Jean Luc Pelissier - Transcare | PP-TRBK0087830 | PP-TRBK0087830 |
| 8 | 1/26/2015 | 12:52 | Email from Lynn Tilton to Glenn Leland; copying Jean Luc Pelissier, Randy Jones, Jim O'Connor, Mark Bonilla, Jeff Ellis - RE: TransCare Weekly Report - Supplemental | TRANSCARE00067400 | TRANSCARE00067402 |
| 9 | 2/4/2015 | 20:23 | Email from Glenn Leland to Jean Luc Pelissier, Brad Schneider - TransCare Cash Crisis | PP-TRBK0028616 | PP-TRBK0028633 |
| 10 | 2/4/2015 | 21:29 | Email from Jean Luc Pelissier to Lynn Tilton - Transcare :: Escalated situation & corrective proposal | PP-TRBK0028597 | PP-TRBK0028615 |
| 11 | 2/5/2015 | 10:34 | Email from Brian Stephen to Glenn Leland, Jean Luc Pelissier (CBA); copying Mark Bonilla, Jeff Ellis, Brad Schneider - RE: Privileged and Confidential | PP-TRBK0087751 | PP-TRBK0087755 |
| 12 | 2/6/2015 | 14:50 | Email from Glenn Leland to Jean Luc Pelissier, Brad Schneider, Mark Bonilla, Steve Berlin, Brian Stephen - Re: New alternative to consider | TRANSCARE00004259 | TRANSCARE00004262 |
| 13 | 2/7/2015 | 10:39 | Email from "pelissier@cbagroupllc.com" to Glenn Leland - Re: Interpretation of Authority | PP-TRBK0038492 | PP-TRBK0038493 |
| 14 | 2/10/2015 | 20:49 | Email from Glenn Leland to Mike Weinberger - Re: RCA Ambulance | TRANSCARE00195943 | TRANSCARE00195943 |
| 15 | 2/10/2015 | 23:13 | Email from Glenn Leland to Lynn Tilton; copying Brad Schneider, Jean Luc Pelissier - Re: RCA Ambulance Service NYC | PP-TRBK0028514 | PP-TRBK0028521 |
| 16 | 2/11/2015 | 12:37 | Email from Glenn Leland to Brian Stephen - Re: New Alternative to Consider | PP-TRBK0090199 | PP-TRBK0090203 |
| 17 | 2/13/2015 | 19:52 | Email from Brad Schneider to Michael Greenberg, Jean Luc Pelissier - Re: TransCare | PP-TRBK0080991 | PP-TRBK0080992 |
| 18 | 2/16/2015 | 9:06 | Email from Glenn Leland to Michael Greenberg, Mark Bonilla; copying Jean Luc Pelissier - Re: TRANSCARE BUSINESS MODEL 2015 Recovery.xlsx | PP-TRBK0088135 | PP-TRBK0088136 |
| 19 | 2/18/2015 | 10:31 | Email from Glenn Leland to Mark Bonilla - Re: RCA/Transcare | TRANSCARE00004063 | TRANSCARE00004063 |
| 20 | 2/18/2015 | 13:21 | Email from Mike Weinberger to Mark Bonilla - Re: RCA/Transcare | TRANSCARE00004048 | TRANSCARE00004049 |
| 21 | 2/18/2015 | 14:14 | Email from Mark Bonilla to Mike Weinberger; copying Glenn Leland - RE: RCA/Transcare | TRANSCARE00061423 | TRANSCARE00061424 |
| 22 | 2/19/2015 | 21:00 | Email from Michael Greenberg to Lynn Tilton; copying Jean Luc Pelissier - TransCare - update and request for a meeting with the company Monday/Tuesday next week (if possible) | PP-TRBK0042324 | PP-TRBK0042325 |
| 23 | 2/20/2015 | 15:37 | Email from Mike Weinberger to Glenn Leland - Re: RCA Ambulance Service | TRANSCARE00195974 | TRANSCARE00195974 |
| 24 | 2/21/2015 | 9:56 | Email from Thomas Fuchs to "Mike.Rushin@nationalexpresscorp.com" - TCP/ADC 2014 financials | TRANSCARE00219442 | TRANSCARE00219452 |
| 25 | 2/22/2015 | 14:34 | Email from Glenn Leland to Jean Luc Pelissier, et al - Re: TransCare the week of February 15 thru 20, 2015 | TRANSCARE00196217 | TRANSCARE00196219 |
| 26 | 2/25/2015 | 0:05 | Email from Glenn Leland to "Lynn.Tilton@PatriarchPartners.com"; copying Jean Luc Pelissier, Michael Greenberg, Glen Youngblood, Mark Bonilla, Jeff Ellis - Wells presentation (attaching Native file of "TransCare Presentation to Wells Fargo.pptx") | TRANSCARE00003889 | TRANSCARE00003890 |

| 27 | 3/5/2015 | 10:37 | Email from Thomas Fuchs to "Mike.Rushing@nationalexpresscorp.com" - TCP general contract provisions | TRANSCARE00221782 | TRANSCARE00221842 |
| 28 | 3/5/2015 | 13:35 | Email from Thomas Fuchs to "Mike.Rushing@nationalexpresscorp.com" - cash problems | TRANSCARE00221844 | TRANSCARE00221844 |
| 29 | 3/7/2015 | 14:05 | Email from Glenn Leland to Lynn Tilton; copying Jean Luc Pelissier, Michael Greenberg, Randy Jones, John Pothin, Brian Stephen, Mark Bonilla - Re: TransCare highlights March 1 to 7, 2015 | PP-TRBK0071446 | PP-TRBK0071450 |
| 30 | 4/20/2015 | 13:56 | Email from Glenn Leland to Mark Bonilla - Re: WFB (Transcare) -- Amendment No. 11 - Approval update? | TRANSCARE00023863 | TRANSCARE00023867 |
| 31 | 6/5/2015 | 15:00 | Email from Glenn Leland to Jean Luc Pelissier (CBA), Mark Bonilla; copying Michael Greenberg Re: Interest Payment | PP-TRBK0066623 | PP-TRBK0066624 |
| 32 | 6/7/2015 | 19:03 | Email from Glenn Leland to Lynn Tilton; copying Jean Luc Pelissier, Michael Greenberg, Randy Jones, John Pothin, Mark Bonilla, Earl Kossuth, Rob Stuck, Thomas Fuchs, Glen Youngblood - TransCare weekly update | PP-TRBK0031307 | PP-TRBK0031321 |
| 33 | 7/3/2015 | 9:30 | Email from Michael Greenberg to Lynn Tilton; Cc'd jean Luc Pelissier, Brian Stephen, Financial and Investment Law - TransCare - update (privileged and confidential) | TRANSCARE00007937 | TRANSCARE00007942 |
| 34 | 7/3/2015 | 15:17 | Email from Mark Bonilla to Jean Luc Pelissier, Michael Greenberg; copying Glenn Leland - RE: Transcare questions | TRANSCARE00051392 | TRANSCARE00051394 |
| 35 | 7/3/2015 | 18:21 | Email from Glenn Leland to Thomas Charles; copying Mark Bonilla, John Foerst - how was Snelling able to finance premium payments | TRANSCARE00200245 | TRANSCARE00200245 |
| 36 | 7/6/2015 | 9:32 | Email from Glenn Leland to Jean Luc Pelissier, Michael Greenberg; copying Mark Bonilla - Presentation (attaching Native file - "Bank and payroll crisis.pptx") | TRANSCARE00200369 | TRANSCARE00200370 |
| 37 | 7/7/2015 | | Amendment No. 27 to Credit Agreement of TransCare Corporation | PP-TRBK0049638 | PP-TRBK0049652 |
| 38 | 7/8/2015 | 15:40 | Email from Scott Whalen to Glenn Leland - RE: Accelerated business plan | PP-TRBK0064662 | PP-TRBK0064665 |
| 39 | 7/9/2015 | 19:55 | Email from Glenn Leland to Jean Luc Pelissier (CBA); copying Michael Greenberg, Jean Luc Pelissier, Scott Whalen - Re: RCA offer to buy TransCare | PP-TRBK0030896 | PP-TRBK0030899 |
| 40 | 7/10/2015 | 19:36 | Email from Glenn Leland to Jean Luc Pelissier, Michael Greenberg, Scott Whalen; copying Mark Bonilla - Fwd: LOI for Transcare Transit | PP-TRBK0030755 | PP-TRBK0030772 |
| 41 | 7/13/2015 | 12:11 | Email from Scott Whalen to Glenn Leland - Re: LOI for Transcare Transit | PP-TRBK0043220 | PP-TRBK0043231 |
| 42 | 7/15/2015 | 10:22 | Email from Glenn Leland to Scott Whalen - Re: Can you call? (attaching Native Spreadsheet - "MTA PRICE BREAKDOWN-reimbursements.xlsx") | PP-TRBK0043209 | PP-TRBK0043213 |
| 43 | 7/15/2015 | 10:34 | Email from Scott Whalen to Jean Luc Pelissier, Michael Greenberg - Fwd: Response to July 13 e-mail | PP-TRBK0042088 | PP-TRBK0042090 |
| 44 | 7/17/2015 | 9:26 | Email from Lynn Tilton to Glenn Leland; copying Jean Luc Pelissier, Michael Greenberg - RE: Thank you! | PP-TRBK0063389 | PP-TRBK0063391 |
| 45 | 8/10/2015 | 8:27 | Email from Glenn Leland to Jean Luc Pelissier, Michael Greenberg, Randy Jones, Brian Stephen, John Pothin; copying Mark Bonilla, Glen Youngblood, Earl Kossuth, Rob Stuck, Thomas Fuchs - TransCare Weekly update 8/9 | PP-TRBK0030457 | PP-TRBK0030482 |
| 46 | 8/20/2015 | 8:16 | Email from Jean Luc Pelissier to Mark Bonilla, Glenn Leland, Michael Greenberg; copying Brian Stephen - Fw: TransCare | PP-TRBK0053413 | PP-TRBK0053414 |
| 47 | 9/1/2015 | | Amendment No. 28 to Credit Agreement of TransCare Corporation | PP-TRBK0049653 | PP-TRBK0049661 |
| 48 | 10/27/2015 | 18:19 | Email from Michael Greenberg to Lynn Tilton, et al - TransCare - Overview of Board Update (ahead of meeting tomorrow at 2 p.m.) with attachment | PP-TRBK0083693 | PP-TRBK0083805 |

| 49 | 11/1/2015 | 11:24 | Email from Glenn Leland to "Lynn.Tilton@PatriarchPartners.com"; copying Jean Luc Pelissier, Michael Greenberg, Brian Stephen, Mark Bonilla, Glen Youngblood, Earl Kossuth, Rob Stuck, Thomas Fuchs, John Stapleton - Weekly Update - TransCare | TRANSCARE00006122 | TRANSCARE00006124 |
| 50 | 11/3/2015 | | Amendment No. 29 to Credit Agreement of TransCare Corporation | PP-TRBK0049662 | PP-TRBK0049674 |
| 51 | 11/14/2015 | 7:50 | Email from Michael Greenberg to Lynn Tilton; copying Jean Luc Pelissier, Rickie Chang - TransCare - presentation and budget model for TransCare's meeting with Wells Fargo at 2 p.m. on Monday, November 16th | PP-TRBK0098488 | PP-TRBK0098553 |
| 52 | 11/21/2015 | 13:53 | Email from Glenn Leland to "Lynn.Tilton@PatriarchPartners.com"; copying Jean Luc Pelissier, Michael Greenberg, Randy Jones, Brian Stephen, Peter Wolf, Mark Bonilla, Glen Youngblood, Earl Kossuth, Rob Stuck, Thomas Fuchs, Barbara Santiago - TransCare weekly update | PP-TRBK0083106 | PP-TRBK0083109 |
| 53 | 12/13/2015 | 21:34 | Email from Jean Luc Pelissier to Lynn Tilton - RE: TransCare - Yesterday's call with Wells Fargo | PP-TRBK0084006 | PP-TRBK0084011 |
| 54 | 12/14/2015 | 10:34 | Email from Brian Stephen to John Pothin - FW: Draft 2 - Wells | PP-TRBK0047196 | PP-TRBK0047197 |
| 55 | 12/18/2015 | 14:11 | Email from Michael Greenberg to Lynn Tilton - TransCare - ambulance transactions overview with Native attachment | PP-TRBK0041410 | PP-TRBK0041414 |
| 56 | 12/20/2015 | 12:10 | Email from Michael Greenberg to Lynn Tilton, cc'd Jean Luc Pelissier, Randy Jones, John Pothin, Brian Stephen- Transcare- weekly update (including trip update) | PP-TRBK0083457 | PP-TRBK0083458 |
| 57 | 12/21/2015 | 9:15 | Email from Michael Greenberg to Jean Luc Pelissier - Draft: Summary of meeting with Wells Fargo | PP-TRBK0046839 | PP-TRBK0046840 |
| 58 | 12/22/2015 | 9:12 | Email from Randy jones to Jean Luc Pelissier (CBA) - RE: Holiday Schedule | PP-TRBK0092453 | PP-TRBK0092455 |
| 59 | 12/23/2015 | 15:34 | Email from Melissa Provost to Michael Greenberg and Jean Luc Pelissier, copying John Husson- Longer Term Discussion Summary | PP-TRBK0075497 | PP-TRBK0075499 |
| 60 | 12/24/2015 | 10:05 | Email from John Husson to Michael Greenberg, Melissa Provost; copying Jean Luc Pelissier - RE: Transcare- Longer Term Discussion Summary | WF_TC_00000145 | WF_TC_00000148 |
| 61 | 12/24/2015 | 13:29 | Email from Michael Greenberg to Lynn Tilton; copying Jean Luc Pelissier, Vikram Agrawal - Transcare - ambulance transactions overview (follow up with additional investment bankers) with Native attachment | PP-TRBK0022044 | PP-TRBK0022049 |
| 62 | 12/29/2015 | 9:36 | Email from Brian Stepehn to Michael Greenberg; copying Jean Luc Pelissier | PP-TRBK0050155 | PP-TRBK0050157 |
| 63 | 12/29/2015 | 11:30 | Email from John Husson to Michael Greenberg, Melissa Provost, copying Jean Luc Pelissier - RE: Transcare-WF discussion summary (from last Thursday and today) | WF_TC_00000162 | WF_TC_00000165 |
| 64 | 12/30/2015 | 12:28 | Email from John Husson to Michael Greenberg and Melissa Provost- LOI and APA requirements | PP-TRBK0012096 | PP-TRBK0012096 |
| 65 | 12/31/2015 | 15:56 | Email from John Husson to Michael Greenberg, Melissa Provost; copying Jean Luc Pelissier - RE: Transcare- Timetable | WF_TC_00000215 | WF_TC_00000219 |
| 66 | 1/1/2016 | 16:22 | Email from Brian Stephen to Glenn Leland; copying Randy Jones, Jean Luc Pelissier - Board Communication | PP-TRBK0087094 | PP-TRBK0087096 |
| 67 | 1/5/2016 | 12:55 | Email from Michael Greenberg to Lynn Tilton - TransCare - updates to 2016 preliminary plan based on yesterday's discussion | PP-TRBK0106572 | PP-TRBK0106588 |
| 68 | 1/15/2016 | | Ark II Credit Agreement | CURTIS_000521 | CURTIS_000546 |
| 69 | 1/15/2016 | | Ark II Intercreditor Agreement | CURTIS_000721 | CURTIS_000735 |
| 70 | 1/28/2016 | 19:55 | Email from Lynn Tilton to Carlos Mercado- RE: Ark II Funding- Transcare Vehicles | PP-TRBK0008408 | PP-TRBK0008409 |
| 71 | 2/9/2016 | 12:59 | Email from Jean Luc Pelissier to Thomas Charles; copying Peter Wolf - Follow up on Question regarding the Transcare contracts | PP-TRBK0088190 | PP-TRBK0088190 |

| 72 | 2/9/2016 | 22:36 | Email from Lynn P. Harrison III to Brian Stephen; Cc'd Steven Reisman, Cindi Giglio, Peter J Buenger - RE: Hello Lynn | PP-TRBK0051881 | PP-TRBK0051883 |
| 73 | 2/10/2016 | 15:30 | Email from Carlos Mercado to "bob.siegel@willis.com"; copying Brian Stephen - D&O Policy | PP-TRBK0015312 | PP-TRBK0015312 |
| 74 | 2/10/2016 | 19:41 | Email from Michael Greenberg to Glen Youngblood - RE: TransCare | PP-TRBK0006471 | PP-TRBK0006472 |
| 75 | 2/10/2016 | | Certificate of Incorporation - Transcendence Transit II, Inc. | PP-TRBK0015289 | PP-TRBK0015290 |
| 76 | 2/10/2016 | | Organization Action in Writing of Incorporator - Transcendence Transit II, Inc. | PP-TRBK0015291 | PP-TRBK0015291 |
| 77 | 1/11/2016 | | Chapter 11 Curtis Mallet Engagement Agreement | PP-TRBK0051777 | PP-TRBK0051777 |
| 78 | 2/11/2016 | 19:05 | Email from Cindi Giglio to Brian Stephen; copying Steven Reisman, Lynn Harrison, Peter Buenge - Transcare- Update/Call this Evening | PP-TRBK0051841 | PP-TRBK0051842 |
| 79 | 2/11/2016 | 20:01 | Email from Brian Stephen to Peter J. Buenger - Additional Documents | PP-TRBK0048966 | PP-TRBK0049046 |
| 80 | 2/12/2016 | 0:00 | Email from Lynn Tilton to Scott Whalen; copying Brian Stephen, Carlos Mercado, Michael Greenbergn - RE: Highly Confidential | PP-TRBK0092227 | PP-TRBK0092228 |
| 81 | 2/13/2016 | 20:33 | Email from Michael Greenberg to Kevin Dell- FWD: Asset Register with attachment | PP-TRBK0003827 | PP-TRBK0003829 |
| 82 | 2/15/2016 | 21:49 | Email from Lynn Tilton to Cindi Giglio; copying Brian Stephen, Lynn Harrison - RE: Transcare-Revised Budget | PP-TRBK0048225 | PP-TRBK0048228 |
| 83 | 2/17/2016 | 14:13 | Email from Lynn Tilton to Robert Strack- Got your messages | PP-TRBK0052262 | PP-TRBK0052262 |
| 84 | 2/17/2016 | 14:23 | Email from Lynn Tilton to Robert Strack; copying Kurt Marsden, Laurence Forte - RE: Wells Fargo/Transcare- Financing Discussion Points | WF_TC_00000046 | WF_TC_00000054 |
| 85 | 2/17/2016 | 20:18 | Email from Jean Luc Pelissier to Lynn Tilton; copying Vincent Devito - OldCo revenue build up, Collections and Wind Down P&L model with attachment | PP-TRBK0004052 | PP-TRBK0004054 |
| 86 | 2/17/2016 | 23:56 | Email from Lynn Tilton to "robert.strack@wellsfargo.com"; copying Jean Luc Pelissier, Vincent Devito, Michael Greenberg, Cindi Giglio, Lynn P. Harrison III, "Kurt.Marsden@wellsfargo.com", Brian Stephen - Privileged and Confidential | PP-TRBK0044615 | PP-TRBK0044617 |
| 87 | 2/19/2016 | 10:53 | Email from Lynn Tilton to Lynn Harrison; copying Brian Stephen, Cindi Giglio - RE: Transcare | PP-TRBK0047843 | PP-TRBK0047845 |
| 88 | 2/19/2016 | 16:15 | Email from Lynn Tilton to Carl Landeck, Cindi Giglio; copying Lynn Harrison, Brian Stephen, Jean Luc Pelissier, Peter Wolf, Robert Strack, Kurt Marsden, Mark Claster - RE: Borrowing Base | PP-TRBK0051609 | PP-TRBK0051612 |
| 89 | 2/20/2016 | 10:22 | Email from Lynn Tilton to Alicia Staggers, Scott Whalen- FW: Relationship | PP-TRBK0028097 | PP-TRBK0028099 |
| 90 | 2/21/2016 | 10:32 | Email from Lynn Tilton to Cindi Giglio, Lynn Harrison, Brian Stephen- Privileged and Confidential | PP-TRBK0051536 | PP-TRBK0051536 |
| 91 | 2/22/2016 | 7:52 | Email from Robert Strack to Lynn Tilton, Wells Fargo execs - Re: 13 Week Model Questions | PP-TRBK0044475 | PP-TRBK0044480 |
| 92 | 2/22/2016 | 13:22 | Email from Jean Luc Pelissier to Thomas Charles, Don Arronwood - Auto insurance progress | PP-TRBK0081603 | PP-TRBK0081603 |
| 93 | 2/23/2016 | 9:51 | Email from Lynn Tilton to Jonathan Helfat, Cindi Giglio - RE: Privileged and Confidential | PP-TRBK0051379 | PP-TRBK0051382 |
| 94 | 2/23/2016 | 12:51 | Email from Lynn Tilton to Cindi Giglio; copying Lynn P. Harrison III - RE: TransCare | PP-TRBK0096546 | PP-TRBK0096548 |
| 95 | 2/23/2016 | 13:53 | Email from Brian Stephen to Cindi Ciglio, Lynn Harrison - Privileged and Confidential - TSA with attachment | PP-TRBK0043997 | PP-TRBK0044018 |
| 96 | 2/24/2016 | 12:07 | Email from Brian Stephen to Peter Wolf - Please see attached with attachments | PP-TRBK0043305 | PP-TRBK0043314 |
| 97 | 2/24/2016 | 13:29 | Email from Lynn Tilton to Cindi Giglio; copying Lynn P. Harrison III, Brian Stephen, Peter J. Buenger, "rcreswell@perkinsthompson.com" - RE: Board Meeting | PP-TRBK0047662 | PP-TRBK0047664 |
| 98 | 2/24/2016 | 13:55 | Email from Brian Stephen to Curtis Mallet - RE: TransCare Corporation - Chapter 7 Engagement Letter with attachment | PP-TRBK0047617 | PP-TRBK0047620 |

| 99 | 2/24/2016 | 14:06 | Email from Lynn Tilton to Cindi Giglio, Lynn P. Harrison ; copying Brian Stephen - FW: Transcare borrowings - Privileged and Confidential | PP-TRBK0047615 | PP-TRBK0047616 |
|----|-----------|-------|------|------|------|
| 100 | 2/24/2016 | 20:27 | Email from Brian Stephen to Jean Luc Pelissier, Michael Greenberg - RE: Request for Assignment | PP-TRBK0077166 | PP-TRBK0077206 |
| 101 | 2/24/2016 | | Credit Agreement among Transcendence Transit and PPAS | PP-TRBK0008674 | PP-TRBK0008742 |
| 102 | 2/24/2016 | | "Bill of Sale, Agreement to Pay and Transfer Statement" between PPAS and Transcendence Transit, Inc. | PP-TRBK0091202 | PP-TRBK0091207 |
| 103 | 2/25/2016 | 23:37 | Email from Brian Stephen to Matt Nolan, Jean Luc Pelissier (CBA); copying Glen Youngblood, Thomas Fuchs, Thomas Milea, Earl Kossuth, Jean Luc Pelissier, Michael Greenberg, Randy Jones, John Pothin - RE: Securing Assets | PP-TRBK0043500 | PP-TRBK0043504 |
| 104 | 2/26/2016 | 7:10 | Email from Salvatore LaMonica to Linda Riffkin - Re: Transcare | TRANSCARE00225051 | TRANSCARE00225051 |
| 105 | 2/26/2016 | 17:13 | Email from "rcreswell@perkinsthompson.com" to Salvatore LaMonica; copying Gary Herbst - RE: MTA Paratransit Contract | TRANSCARE00224900 | TRANSCARE00224901 |
| 106 | 2/26/2016 | 17:44 | Email from "rcreswell@perkinsthompson.com" to Salvatore LaMonica; copying Gary Herbst - RE: MTA Paratransit Contract | TRANSCARE00224902 | TRANSCARE00224903 |
| 107 | 2/26/2016 | 18:17 | Email from Salvatore LaMonica to "rcreswell@perkinsthompson.com"; copying Gary Herbst - Re: MTA Paratransit Contract | TRANSCARE00225016 | TRANSCARE00225017 |
| 108 | 2/26/2016 | 18:20 | Email from Gary Herbst to "rcreswell@perkinsthompson.com"; copying Salvatore LaMonica - Re: MTA Paratransit Contract | TRANSCARE00224904 | TRANSCARE00224905 |
| | | | | | |

# LAMONICA V. TILTON, ET AL.

# EXHIBIT D TO PROPOSED JOINT PRETRIAL ORDER

# TRUSTEE'S DESIGNATIONS TO J. HUSSON DEPOSITION

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| *In re* | Chapter 7 |
| **TRANSCARE CORPORATION**, *et al.*, | Case No. 16-10407 (SMB) |
| Debtors. | (Jointly Administered) |
| **SALVATORE LAMONICA, as Chapter 7 Trustee for the Estates of TransCare Corporation, et al.**, | |
| Plaintiff, | Adv. Proc. No. 18-01021 |
| v. | |
| **LYNN TILTON, et al.**, | |
| Defendants. | |

**TRUSTEE'S DESIGNATIONS OF THE**
**DEPOSITIONS OF JOHN HUSSON DATED NOVEMBER 12, 2018 AND**
**DEFENDANTS' OBJECTIONS AND CROSS-DESIGNATIONS**

ii

A0438

I.  *Ien v. TransCare Corp., et al.*, Adv. Proc. No. 16-1033, Rule 30(b)(6) Deposition
    Transcript[1]

|      | **DESIGNATIONS (PAGES/LINES)** | **OBJECTION(S)** | **CROSS DESIGNATIONS (PAGES/LINES)** |
|------|-------------------------------|------------------|--------------------------------------|
| 1.   | 8:22-9:3                      |                  |                                      |
| 2.   | 9:8-13:24                     |                  |                                      |
| 3.   | 16:25-18:25                   | 17:23-18:17: Lack of personal knowledge; Improper lay opinion

18:18-25: Hearsay |  |
| 4.   | 19:7-21:8                     | 19:10-23: Hearsay; Lack of foundation; Lack of personal knowledge

21:3-8: Lack of personal knowledge; Improper lay opinion |  |
| 5.   | 27:17-20                      |                  |                                      |
| 6.   | 28:22-29:8                    | Lack of relevance |                                     |
| 7.   | 32:13-36:20                   | 33:2-34:6: Lack of personal knowledge; Hearsay

36:17-20: Lack of personal knowledge; Improper lay opinion |  |
| 8.   | 39:11-18                      |                  |                                      |
| 9.   | 42:6-45:9                     | 42:12-23: Hearsay; Lack of personal knowledge

42:24-43:16: Hearsay; Lack of personal knowledge; Lack of relevance

44:3-44:23: Hearsay; Lack of personal knowledge; Lack of relevance |  |

---

[1] To the extent the Trustee withdraws any portion of the testimony designated herein, Defendants reserve all rights to supplement their designations with some or all of the withdrawn testimony.

2

| | DESIGNATIONS (PAGES/LINES) | OBJECTION(S) | CROSS DESIGNATIONS (PAGES/LINES) |
|---|---|---|---|
| | | 44:24-45:5: Lack of foundation; Lack of personal knowledge; Lack of relevance | |
| 10. | 48:15-51:6 | 50:8-14: Lack of relevance; Lack of foundation | |
| 11. | 53:23-54:12 | Lack of relevance | |
| 12. | 56:18-57:25 | 56:18-57:20: Lack of relevance 57:21-25: Lack of relevance; Lack of personal knowledge; Lack of foundation | |
| 13. | 58:2-60:8 | | |
| 14. | 63:16-65:16 | Lack of personal knowledge | |
| 15. | 66:19-71:6 | | |
| 16. | 71:15-18 | | |
| 17. | 72:5-73:24 | 73:2-21: Hearsay | |
| 18. | 84:7-86:3 | Lack of relevance | |
| 19. | 87:22-88:2 | Lack of relevance; Lack of personal knowledge | |
| 20. | 93:8-94:5 | Lack of relevance | |
| 21. | 95:17-97:8 | Lack of personal knowledge; Lack of relevance | |
| 22. | 98:22-99:4 | Lack of foundation; Lack of relevance | |
| 23. | 99:10-23 | Lack of relevance | |
| 24. | 100:12-101:18 | Lack of relevance | |
| 25. | 107:18-108:2 | | |
| 26. | 109:13-110:9 | | |
| 27. | 112:22-114:10 | Lack of relevance | |

3

| | **DESIGNATIONS (PAGES/LINES)** | **OBJECTION(S)** | **CROSS DESIGNATIONS (PAGES/LINES)** |
|---|---|---|---|
| 28. | 114:22-116:16 | 116:4-16: Lack of relevance | |
| 29. | 116:17-119:16 | Lack of relevance | |
| 30. | 120:21-122:7 | 120:21-121:11: Lack of relevance<br><br>121:12-122:7: Lack of relevance; Lack of foundation | |
| 31. | 123:9-22 | | |

II.    *Lamonica v. Tilton, et al.*, Adv. Proc. No. 18-1021, Rule 30(b)(6) Deposition Transcript

| | **DESIGNATIONS (PAGES/LINES)** | **OBJECTION(S)** | **CROSS DESIGNATIONS (PAGES/LINES)** |
|---|---|---|---|
| 1. | 10:25-11:25 | | |
| 2. | 12:2-14:5 | Lack of relevance | |
| 3. | 14:14-15:16 | | |
| 4. | 16:14-22:15 | 19:7-20:2: Improper lay opinion; Lack of foundation<br><br>20:14-21:5: Lack of relevance<br><br>21:6-22:15: Lack of foundation; Lack of personal knowledge; Lack of relevance | |
| 5. | 23:11-25:10 | | |
| 6. | 25:11-28:5 | | |
| 7. | 29:9-31:5 | Lack of foundation; Lack of personal knowledge | |
| 8. | 40:25-42:3 | | |
| 9. | 44:3-50:11 | 46:13-47:7: Lack of relevance<br><br>47:8-48:10: Lack of relevance; Lack of personal knowledge<br><br>48:11-50:11: Lack of | |

4

| | DESIGNATIONS (PAGES/LINES) | OBJECTION(S) | CROSS DESIGNATIONS (PAGES/LINES) |
|---|---|---|---|
| | | relevance | |
| 10. | 50:12-51:5 | | |
| 11. | 52:10-55:18 | | |
| 12. | 55:19-57:6 | | |
| 13. | 59:12-60:8 | | |
| 14. | 65:11-67:10 | Lack of relevance | |
| 15. | 67:22-68:4 | Lack of relevance | |
| 16. | 72:12-73:13 | | |
| 17. | 73:14-78:9 | 76:19-77:5: Improper lay opinion | |
| 18. | 78:24-79:6 | | |
| 19. | 80:3-17 | | |
| 20. | 82:3-83:8 | 82:23-83:5: Improper lay opinion | |
| 21. | 84:3-15 | | |
| 22. | 87:2-21 | Lack of relevance | |
| 23. | 88:4-25 | Lack of relevance; Hearsay | |
| 24. | 92:11-95:4 | 92:11-93:11: Lack of relevance<br><br>93:12-95:4: Lack of relevance; Hearsay | |
| 25. | 99:12-102:18 | Lack of relevance; Hearsay | |
| 26. | 111:8-113:22 | 113:3-22: Lack of relevance | |
| 27. | 114:4-12 | Lack of relevance; Hearsay | |
| 28. | 115:7-16 | | |
| 29. | 117:7-120:24 | | |
| 30. | 125:25-128:9 | | 128:10-22 |

5

|    | DESIGNATIONS (PAGES/LINES) | OBJECTION(S) | CROSS DESIGNATIONS (PAGES/LINES) |
|----|----------------------------|--------------|----------------------------------|
| 31. | 129:13-131:15 |  |  |
| 32. | 132:15-133:11 |  |  |

Dated:  May 14, 2019
       New York, New York

                     STORCH AMINI PC

                     By:  *s/ Avery Samet*
                        Bijan Amini
                        Avery Samet
                        Jaime B. Leggett
                        New York, NY 10017
                        Tel.:  (212) 490-4100
                        Fax:  (212) 490-4208
                        Email:  bamini@storchamini.com
                                  asamet@storchamini.com
                                  jleggett@storchamini.com
                        *Attorneys for Plaintiff*

Dated:  May 14, 2019
       New York, New York

                     PROSKAUER ROSE LLP

                     By:  *s/ Michael T. Mervis*
                        Michael T. Mervis
                        Timothy Q. Karcher
                        Eleven Times Square
                        New York, NY  10036-8299
                        Tel.: (212) 969-3000
                        Fax: (212) 969-2900
                        Email: mmervis@proskauer.com
                                  tkarcher@proskauer.com

                        Nicole A. Eichberger (*pro hac vice*)
                        650 Poydras Street
                        Suite 1800
                        New Orleans, LA 70130-6146
                        Tel.: (504) 310-2024
                        Fax: (504) 310-2022
                        Email: neichberger@proskauer.com
                        *Attorneys for Defendants*

# LAMONICA V. TILTON, ET AL.

# EXHIBIT E TO PROPOSED JOINT PRETRIAL ORDER

# TRUSTEE'S DESIGNATIONS TO G. LELAND DEPOSITION

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| *In re* | Chapter 7 |
| **TRANSCARE CORPORATION**, *et al.*, | Case No. 16-10407 (SMB) |
| Debtors. | (Jointly Administered) |
| **SALVATORE LAMONICA, as Chapter 7 Trustee for the Estates of TransCare Corporation, et al.,** | |
| Plaintiff, | Adv. Proc. No. 18-01021 |
| v. | |
| **LYNN TILTON, et al.,** | |
| Defendants. | |

**TRUSTEE'S DESIGNATIONS OF THE**
**DEPOSITIONS OF GLENN LELAND DATED NOVEMBER 27, 2018 AND JANUARY 3,**
**2019, AND DEFENDANTS' OBJECTIONS AND CROSS-DESIGNATIONS**

ii

I.      November 27, 2018 Deposition Transcript[1]

| | DESIGNATIONS (PAGES/LINES) | OBJECTION(S) | CROSS DESIGNATIONS (PAGES/LINES) |
|---|---|---|---|
| 1. | 10:3-41:10 | | |
| 2. | 46:6-47:5 | 46:19-47:5: Lack of relevance | |
| 3. | 47:9-48:20 | 47:9-12: Lack of relevance<br><br>47:22-48:2: Lack of relevance | |
| 4. | 49:5-50:6 | 49:12-15: Lack of relevance | |
| 5. | 50:17-22 | Lack of relevance | |
| 6. | 50:25-51:21 | Lack of relevance | |
| 7. | 52:10-16 | Lack of relevance | |
| 8. | 59:5-61:14 | 60:17-19: Lack of relevance | |
| 9. | 62:4-65:23 | 63:21-64:5: Lack of relevance | |
| 10. | 70:17-24 | | |
| 11. | 73:5-75:4 | | |
| 12. | 77:2-80:6 | Lack of relevance | |
| 13. | 80:20-83:25 | 80:20-82:9: Lack of relevance<br><br>83:13-25: Lack of relevance | |
| 14. | 84:9-24 | Lack of relevance | |
| 15. | 85:9-86:14 | | |
| 16. | 90:23-91:15 | | |
| 17. | 92:10-25 | | |
| 18. | 97:11-100:8 | 99:15-21: Hearsay | |
| 19. | 101:4-9 | | |
| 20. | 101:13-102:24 | | |

---

[1] To the extent the Trustee withdraws any portion of the testimony designated herein, Defendants reserve all rights to supplement their designations with part or all of the withdrawn testimony.

2

| | DESIGNATIONS (PAGES/LINES) | OBJECTION(S) | CROSS DESIGNATIONS (PAGES/LINES) |
|---|---|---|---|
| 21. | 103:15-104:24 | | |
| 22. | 105:25-106:7 | Lack of relevance | |
| 23. | 106:8-108:13 | 106:6-14: Lack of relevance<br>106:24-108:6: Lack of relevance | |
| 24. | 109:9-110:10 | Lack of relevance | |
| 25. | 113:8-19 | | |
| 26. | 115:22-24 | | |
| 27. | 116:4-7 | | |
| 28. | 120:6-121:4 | Lack of relevance | |
| 29. | 121:16-24 | | 121:5-15 |
| 30. | 125:24-126:14 | | 126:15-16 |
| 31. | 128:17-23 | | |
| 30. | 134:16-135:16 | Lack of relevance | |
| 31. | 136:3-138:11 | Lack of relevance | |
| 32. | 142:14-143:15 | Lack of relevance | |
| 33. | 143:16-145:17 | 144:4-12: Hearsay | |
| 34. | 148:24-150:24 | 150:10-24: Lack of relevance | |
| 35. | 152:6-153:21 | Lack of relevance | |
| 36. | 156:24-160:6 | Lack of relevance | |
| 37. | 160:15-162:5 | | |
| 38. | 163:16-21 | | |
| 39. | 164:16-166:25 | | 167:2-8 |
| 40. | 170:9-12 | | |
| 41. | 170:16-173:9 | | |

3

| | DESIGNATIONS (PAGES/LINES) | OBJECTION(S) | CROSS DESIGNATIONS (PAGES/LINES) |
|---|---|---|---|
| 42. | 173:24-175:13 | | |
| 43. | 176:3-7 | | |
| 44. | 178:2-179:12 | | 179:13-180:2 |
| 45. | 180:7-182:21 | 180:20-182:21: Lack of relevance | |
| 46. | 182:22-184:3 | | |
| 47. | 185:5-15 | | |
| 48. | 186:7-21 | | |
| 49. | 187:24-188:5 | | |
| 50. | 189:14-24 | | |
| 51. | 190:19-192:10 | | |
| 52. | 192:19-193:16 | | |
| 53. | 193:20-194:24 | | |
| 54. | 196:19-198:18 | 198:4-18: Lack of relevance | |
| 55. | 199:8-201:4 | | |
| 56. | 201:14-203:10 | | |
| 57. | 203:15-206:18 | | |
| 58. | 208:2-8 | | |
| 59. | 208:9-209:3 | | |
| 60. | 210:11-19 | | |
| 61. | 210:22-219:4 | | |
| 62. | 220:7-21 | | |
| 63. | 221:11-222:14 | | 222:15-20 |
| 64. | 223:6-224:20 | | |
| 65. | 225:21-227:13 | | |

4

| | DESIGNATIONS (PAGES/LINES) | OBJECTION(S) | CROSS DESIGNATIONS (PAGES/LINES) |
|---|---|---|---|
| 66. | 227:19-228:15 | | |
| 67. | 229:4-231:20 | 231:2-13: Hearsay | |
| 68. | 231:23-232:16 | | |
| 69. | 234:3-236:8 | | |
| 70. | 238:15-20 | | |
| 71. | 239:25-241:12 | | |
| 72. | 243:8-244:6 | | |
| 73. | 244:21-245:11 | | |
| 74. | 245:22-25 | | |
| 75. | 246:4-24 | | |
| 76. | 254:6-255:16 | | |
| 77. | 255:17-258:22 | 256:4-19: Lack of personal knowledge; Lack of foundation | |
| 78. | 260:22-261:21 | | 261:22-263:15<br>264:3-11<br>265:13-15<br>266:2-267:5 |
| 79. | 273:12-22 | Lack of relevance | |
| 80. | 274:3-10 | Lack of relevance | 275:10-276:9 |

II.     January 3, 2019 Deposition Transcript

| | TRUSTEE'S DESIGNATIONS (PAGES/LINES) | OBJECTION(S) | CROSS DESIGNATIONS (PAGES/LINES) |
|---|---|---|---|
| 1. | 341:21-343:5 | Lack of relevance | |
| 2. | 347:8-348:13 | | |
| 3. | 351:17-24 | | |

5

| | TRUSTEE'S DESIGNATIONS (PAGES/LINES) | OBJECTION(S) | CROSS DESIGNATIONS (PAGES/LINES) |
|---|---|---|---|
| 4. | 355:22-356:2 | | |
| 5. | 357:24-358:13 | | |
| 6. | 359:11-360:17 | | |
| 7. | 361:4-362:15 | | |
| 8. | 368:19-370:14 | | |
| 9. | 374:25-375:6 | | |
| 10. | 377:19-378:14 | | |
| 11. | 385:7-386:16 | | |
| 12. | 388:20-389:9 | | |
| 13. | 395:12-396:15 | | |
| 14. | 427:3-428:16 | | |
| 15. | 449:16-451:18 | | 451:19-452:7 |
| 155. | 458:12-15 | | |
| 16. | 463:8-466:13 | | |
| 17. | 473:12-474:2 | | |
| 18. | 476:14-477:6 | | 475:19-476:13 |
| 19. | 484:8-486:2 | | |
| 20. | 494:15-495:16 | | |
| 21. | 497:12-498:13 | | |
| 22. | 498:15-500:2 | | |
| 23. | 510:14-511:12 | | |
| 24. | 514:3-8 | | |
| 25. | 524:15-25 | | |
| 26. | 526:12-528:4 | | |

6

| | TRUSTEE'S DESIGNATIONS (PAGES/LINES) | OBJECTION(S) | CROSS DESIGNATIONS (PAGES/LINES) |
|---|---|---|---|
| 27. | 530:12-533:16 | 532:13-533:16: Hearsay | 533:17-535:13 |
| 28. | 547:13-549:9 | | |
| 29. | 550:20-23 | | |
| 30. | 566:23-567:13 | | |
| 31. | 579:9-17 | | |
| 32. | 580:12-25 | | |
| 33. | 582:5-17 | | |
| 34. | 583:9-584:25 | | |
| 35. | 585:13-588:18 | | 588:19-589:5 |
| 36. | 589:16-25 | Lack of relevance | |
| 37. | 595:3-596:2 | Lack of relevance | |
| 38. | 596:14-597:3 | Lack of relevance | |
| 39. | 597:9-599:10 | Lack of relevance | |
| 40. | 600:3-603:10 | Lack of relevance | |
| 41. | 604:4-15 | | |
| 42. | 615:4-11 | | |
| 43. | 615:23-620:10 | | 620:11-18 |
| 44. | 621:3-622:12 | | |
| 45. | 624:7-625:11 | Lack of relevance | |
| 46. | 627:13-628:25 | | |
| 47. | 629:2-631:11 | | |
| 48. | 634:8-23 | | |
| 49. | 635:16-637:22 | 635:16-636:2: Lack of foundation; Lack of personal knowledge | |

7

| TRUSTEE'S DESIGNATIONS (PAGES/LINES) | OBJECTION(S) | CROSS DESIGNATIONS (PAGES/LINES) |
|---|---|---|
| 50. | 644:2-647:5 | 644:2-25: Lack of relevance | |
| 51. | 647:9-650:24 | 648:3-16: Lack of relevance<br><br>648:17-22: Lack of relevance; Lack of foundation; Lack of personal knowledge<br><br>650:6-16: Lack of relevance | |
| 52. | 651:8-653:9 | | |
| 53. | 655:7-656:21 | | |
| 54. | 656:25-657:24 | | |
| 55. | 659:15-23 | Lack of relevance | |
| 56. | 661:17-663:6 | 661:17-662:8: Lack of relevance; FRE 403<br><br>662:9-21: Lack of relevance<br><br>662:22-663:6: Lack of relevance; FRE 403 | |
| 57. | 664:22-667:16 | 665:19-22: Hearsay<br><br>666:13-667:16: Lack of relevance | 685:6-686:19 |
| 58. | 667:20-668:5 | Lack of relevance | |
| 59. | 668:14-672:8 | 668:14-669:4: Lack of relevance<br><br>669:22-671:12: Lack of relevance<br><br>671:25-672:5: Lack of relevance | |
| 60. | 672:19-25 | | |
| 61. | 675:8-13 | | |
| 62. | 678:4-6 | Lack of relevance | |
| 63. | 686:3-16 | | |
| 64. | 694:12-17 | Lack of relevance | |
| 65. | 723:10-725:8 | Lack of relevance | |

A0452

| | **TRUSTEE'S DESIGNATIONS (PAGES/LINES)** | **OBJECTION(S)** | **CROSS DESIGNATIONS (PAGES/LINES)** |
|---|---|---|---|
| 66. | 725:9-726:10 | | |
| 67. | 728:8-730:11 | 728:8-729:15: Lack of relevance<br><br>729:16-18: Lack of relevance; Lack of foundation; Lack of personal knowledge | |

9

Dated:  May 14, 2019
       New York, New York

                                  STORCH AMINI PC

                            By:  *s/ Avery Samet*
                                  Bijan Amini
                                  Avery Samet
                                  Jaime B. Leggett
                                  New York, NY 10017
                                  Tel.:  (212) 490-4100
                                  Fax:  (212) 490-4208
                                  Email:  bamini@storchamini.com
                                          asamet@storchamini.com
                                          jleggett@storchamini.com
                                  *Attorneys for Plaintiff*

Dated:  May 14, 2019
       New York, New York

                                  PROSKAUER ROSE LLP

                            By:  *s/ Michael T. Mervis*
                                  Michael T. Mervis
                                  Timothy Q. Karcher
                                  Eleven Times Square
                                  New York, NY  10036-8299
                                  Tel.: (212) 969-3000
                                  Fax: (212) 969-2900
                                  Email: mmervis@proskauer.com
                                          tkarcher@proskauer.com

                                  Nicole A. Eichberger (*pro hac vice*)
                                  650 Poydras Street
                                  Suite 1800
                                  New Orleans, LA 70130-6146
                                  Tel.: (504) 310-2024
                                  Fax: (504) 310-2022
                                  Email: neichberger@proskauer.com
                                  *Attorneys for Defendants*

**A0454**

# LAMONICA V. TILTON, ET AL.

# EXHIBIT F TO PROPOSED JOINT PRETRIAL ORDER

# DEFENDANTS' DESIGNATIONS TO J. HUSSON DEPOSITION

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| *In re* | Chapter 7 |
| **TRANSCARE CORPORATION, *et al.*,** | Case No. 16-10407 (SMB) |
| **Debtors.** | (Jointly Administered) |
| **SALVATORE LAMONICA, as Chapter 7 Trustee for the Estates of TransCare Corporation, <u>et al.</u>,** | |
| **Plaintiff,** | Adv. Proc. No. 18-01021 |
| v. | |
| **LYNN TILTON, <u>et al.</u>,** | |
| **Defendants.** | |

### <u>DEFENDANTS' DESIGNATIONS OF THE
DEPOSITION OF JOHN HUSSON DATED NOVEMBER 12, 2018, OBJECTIONS AND
CROSS-DESIGNATIONS</u>

I.  *Lamonica v. Tilton, et al.*, Adv. Proc. No. 18-1021, Rule 30(b)(6) Deposition
    Transcript

|  | DEFENDANTS' DESIGNATIONS (PAGES/LINES) | OBJECTION(S) | CROSS DESIGNATIONS (PAGES/LINES) |
|---|---|---|---|
| 1. | 106:10 – 109:9 |  |  |

Dated:  May 3, 2019
         New York, New York

                                STORCH AMINI PC

                                By:  _s/ Avery Samet_____
                                     Bijan Amini
                                     Avery Samet
                                     Jaime B. Leggett
                                     New York, NY 10017
                                     Tel.:  (212) 490-4100
                                     Fax:  (212) 490-4208
                                     Email:  bamini@storchamini.com
                                             asamet@storchamini.com
                                             jleggett@storchamini.com
                                     _Attorneys for Plaintiff_

Dated:  May 3, 2019
         New York, New York

                                PROSKAUER ROSE LLP

                                By:  _s/ Michael T. Mervis_____
                                     Michael T. Mervis
                                     Timothy Q. Karcher
                                     Eleven Times Square
                                     New York, NY  10036-8299
                                     Tel.: (212) 969-3000
                                     Fax: (212) 969-2900
                                     Email: mmervis@proskauer.com
                                            tkarcher@proskauer.com

                                     Nicole A. Eichberger (_pro hac vice_)
                                     650 Poydras Street
                                     Suite 1800
                                     New Orleans, LA 70130-6146
                                     Tel.: (504) 310-2024
                                     Fax: (504) 310-2022
                                     Email: neichberger@proskauer.com
                                     _Attorneys for Defendants_

A0458

Case 1:20-cv-06274-AT    Document 11-2    Filed 09/30/20    Page 140 of 203

# LAMONICA V. TILTON, ET AL.

# EXHIBIT G TO PROPOSED JOINT PRETRIAL ORDER

# DEFENDANTS' DESIGNATIONS TO G. LELAND DEPOSITION

Case 1:20-cv-06274-AKH   Document 11-8   Filed 09/30/20   Page 141 of 203

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| *In re* | Chapter 7 |
| **TRANSCARE CORPORATION, *et al.*,** | Case No. 16-10407 (SMB) |
| Debtors. | (Jointly Administered) |
| **SALVATORE LAMONICA, as Chapter 7 Trustee for the Estates of TransCare Corporation, <u>et al.</u>,** | Adv. Proc. No. 18-01021 |
| Plaintiff, | |
| v. | |
| **LYNN TILTON, <u>et al.</u>,** | |
| Defendants. | |

**DEFENDANTS' DESIGNATIONS OF THE**
**DEPOSITION OF GLENN LELAND DATED JANUARY 3, 2019 AND TRUSTEE'S**
<u>**OBJECTIONS AND CROSS-DESIGNATIONS**</u>

A0460

| | **DEFENDANTS' DESIGNATIONS (PAGES/LINES)** | **OBJECTION(S)** | **CROSS DESIGNATIONS (PAGES/LINES)** | **OBJECTION(S) TO CROSS DESIGNATIONS (PAGES/LINES)** |
|---|---|---|---|---|
| 1. | 304:20-305:6 | | | |
| 2. | 309:17-311:19 | | | |
| 3. | 312:7-16 | | | |
| 4. | 312:24-315:11 | | 315:12-17 | |
| 5. | 315:22-316:25 | 314:22-315:5: Hearsay | 317:2-319:5; 575:21-576:24 | |
| 6. | 320:25-321:13 | | | |
| 7. | 326:16-328:3 | | 328:4-18 | |
| 8. | 353:9-355:9 | | 352:18-353:8 | |
| 9. | 362:16-366:14 | | | |
| 10. | 370:15-372:15 | 371:19-22: Foundation | | |
| 11. | 373:12-376:22 | | 376:23-377:18 | |
| 12. | 377:19-380:2 | | 380:3-7 | |
| 13. | 380:8-16 | | | |
| 14. | 386:7-387:11 | | | |
| 15. | 396:20-399:24 | | | |
| 16. | 401:14-22 | | | |
| 17. | 402:12-22 | | 402:23-403:13 | Hearsay |
| 18. | 405:3-406:20 | | | |
| 19. | 406:22-407:4 | | | |
| 20. | 408:13-25 | Foundation | | |
| 21. | 410:8-13 | | | |
| 22. | 411:6-19 | | 411:20-412:4 | |
| 23. | 414:12-21 | | | |

| | DEFENDANTS' DESIGNATIONS (PAGES/LINES) | OBJECTION(S) | CROSS DESIGNATIONS (PAGES/LINES) | OBJECTION(S) TO CROSS DESIGNATIONS (PAGES/LINES) |
|---|---|---|---|---|
| 24. | 415:10-417:25 | | | |
| 25. | 420:5-421:17 | | | |
| 26. | 428:19-432:4 | 429:6-11: Foundation | | |
| 27. | 433:13-14 | | | |
| 28. | 433:21-435:3 | | | |
| 29. | 435:23-437:10 | | 437:11-438:6 | Lack of relevance |
| 30. | 438:24-439:9 | | 439:10-17 | |
| 31. | 440:11-21 | | | |
| 32. | 445:18-19 | | | |
| 33. | 445:21-448:21 | | 448:22-24 | |
| 34. | 452:10-453:20 | | | |
| 35. | 458:12-462:15 | | | |
| 36. | 469:25-473:9 | | | |
| 37. | 473:12-13 | | | |
| 38. | 478:5-479:21 | | | |
| 39. | 487:24-490:14 | | 487:13-23 | |
| 40. | 490:15-20 | | | |
| 41. | 492:4-12 | | | |
| 42. | 505:13-19 | | | |
| 43. | 507:12-24 | | 507:25-508:7 | |
| 44. | 508:8-13 | | | |
| 45. | 511:3-513:3 | | | |
| 46. | 517:2-518:2 | | | |
| 47. | 518:15-21 | | | |

2

| | DEFENDANTS' DESIGNATIONS (PAGES/LINES) | OBJECTION(S) | CROSS DESIGNATIONS (PAGES/LINES) | OBJECTION(S) TO CROSS DESIGNATIONS (PAGES/LINES) |
|---|---|---|---|---|
| 48. | 520:25-521:9 | | | |
| 49. | 536:8-537:4 | | | |
| 50. | 537:13-15 | | | |
| 51. | 537:21-539:6 | | 537:17-20; 539:7-23 | |
| 52. | 540:8-21 | | | |
| 53. | 541:23-542:10 | | | |
| 54. | 542:21-544:2 | | | |
| 55. | 544:12-16 | | 544:3-11 | |
| 56. | 552:13-558:6 | 554:21-555:8: Hearsay | | |
| 57. | 558:17-559:2 | | | |
| 58. | 559:22-560:23 | | | |
| 59. | 561:2-562:19 | | | |
| 60. | 567:14-568:23 | | | |
| 61. | 568:25-569:11 | | | |
| 62. | 569:17-574:19 | | 585:7-12 | |
| 63. | 590:8-591:21 | | | |
| 64. | 602:15-603:10 | | 601:14-602:14 | |
| 65. | 678:12-25 | | | |
| 66. | 679:6-680:3 | | | |
| 67. | 686:20-691:13 | | | |
| 68. | 694:25-704:25 | | | |
| 69. | 712:6-714:8 | | | |
| 70. | 715:15-717:25 | | 718:7-15 | |
| 71. | 718:16-719:14 | | | |

3

Case 1:20-cv-06274-LAK   Document 11-8   Filed 09/30/20   Page 145 of 203

|     | DEFENDANTS' DESIGNATIONS (PAGES/LINES) | OBJECTION(S) | CROSS DESIGNATIONS (PAGES/LINES) | OBJECTION(S) TO CROSS DESIGNATIONS (PAGES/LINES) |
|-----|------|------|------|------|
| 71. | 721:11-722:23 |  | 721:7-10 |  |

4

Dated:  May 14, 2019
      New York, New York

                            PROSKAUER ROSE LLP

                            By:  *s/ Michael T. Mervis*
                                  Michael T. Mervis
                                  Timothy Q. Karcher
                                  Eleven Times Square
                                  New York, NY  10036-8299
                                  Tel.: (212) 969-3000
                                  Fax: (212) 969-2900
                                  Email: mmervis@proskauer.com
                                        tkarcher@proskauer.com

                                Nicole A. Eichberger (*pro hac vice*)
                                650 Poydras Street
                                Suite 1800
                                New Orleans, LA 70130-6146
                                Tel.: (504) 310-2024
                                Fax: (504) 310-2022
                                Email: neichberger@proskauer.com
                                *Attorneys for Defendants*

Dated:  May 14, 2019
      New York, New York

                            STORCH AMINI PC

                            By:  *s/ Avery Samet*
                                  Bijan Amini
                                  Avery Samet
                                  Jaime B. Leggett
                                  New York, NY 10017
                                Tel.:  (212) 490-4100
                                Fax:  (212) 490-4208
                                Email:  bamini@storchamini.com
                                      asamet@storchamini.com
                                      jleggett@storchamini.com
                                *Attorneys for Plaintiff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x

In re:                                               :
                                                     :
                                                     :
        TRANSCARE CORPORATION, et al.,               :        Chapter 7
                                                     :        Case No. 16-10407 (SMB)
                                                     :        (Jointly Administered)
                        Debtors.                     :
---------------------------------------------------------------x
SALVATORE LAMONICA, as Chapter 7                     :
Trustee for the Estates of TransCare                 :
Corporation, et al.,                                 :
                                                     :
                        Plaintiff,                   :
                                                     :        Adv. Proc. No. 18-1021 (SMB)
                - against -                           :
                                                     :
LYNN TILTON, PATRIARCH PARTNERS                      :
AGENCY SERVICES, LLC, PATRIARCH                      :
PARTNERS, LLC, PATRIARCH PARTNERS                   :
MANAGEMENT GROUP, LLC, ARK II CLO                    :
2001-1 LIMITED, TRANSCENDENCE                        :
TRANSIT, INC., and TRANSCENDENCE                     :
TRANSIT II, INC.,                                    :
                                                     :
                        Defendants.                  :
                                                     :
---------------------------------------------------------------x

### NOTICE OF DEFENDANTS' MOTION *IN LIMINE* TO EXCLUDE CERTAIN IRRELEVANT DOCUMENTS AND TESTIMONY RELATED TO CREDIT SUISSE

PLEASE TAKE NOTICE that pursuant to the accompanying Memorandum In Support of

Defendants' Motion *In Limine* To Exclude Certain Irrelevant Documents and Testimony Related

to Credit Suisse, and the Declaration of Michael T. Mervis and the exhibits annexed thereto,

Defendants, through their undersigned counsel, will move for entry of an Order excluding

Alexander Witkes, on behalf of Credit Suisse, from testifying at the trial of this case and excluding

certain documents, exhibits, or other evidence regarding Credit Suisse (the "Motion") pursuant to

Federal Rules of Evidence 401, 402, and 403 made applicable through Rule 9017 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), before the Honorable Stuart M. Bernstein, United States Bankruptcy Judge for the Southern District of New York (the "Bankruptcy Court"), One Bowling Green, Courtroom 723, New York, New York 10004-1408, on **July 22, 2019 at 10:00 a.m.**;

PLEASE TAKE FURTHER NOTICE that any responses or objections ("Objections") to the Motion must be in writing, shall conform to the Bankruptcy Rules and the Local Rules for the Southern District of New York, and shall be filed with the Bankruptcy Court (a) by registered users of the Bankruptcy Court's case filing system, electronically in accordance with General Order M–399 (which can be found at http://www.nysb.uscourts.gov), and (b) by all other parties in interest, on a CD-ROM, in text-searchable portable document format (PDF) (with a hard copy delivered directly to Chambers), in accordance with the customary practices of the Bankruptcy Court and General Order M–399, to the extent applicable, and served in accordance with General Order M-399 so as to be filed and received no later than **July 15, 2019 at 4:00 p.m.** (the "Objection Deadline").

PLEASE TAKE FURTHER NOTICE that if no Objections are timely filed and served, the Defendants may, on or after the Objection Deadline, submit to the Bankruptcy Court an order substantially in the form of the proposed **Exhibit A**, which order may be entered with no further notice or opportunity to be heard.

2

Dated: July 8, 2019
        New York, New York

PROSKAUER ROSE LLP

By: */s/ Michael T. Mervis*
        Michael T. Mervis
        Timothy Q. Karcher
        Eleven Times Square
        New York, NY  10036-8299
        Tel.: (212) 969-3000
        Fax: (212) 969-2900
        Email: mmervis@proskauer.com
                tkarcher@proskauer.com

        Nicole A. Eichberger
        (admitted *pro hac vice*)
        650 Poydras Street
        Suite 1800
        New Orleans, LA 70130-6146
        Tel.: (504) 310-2024
        Fax: (504) 310-2022
        Email: neichberger@proskauer.com

        *Attorneys for Defendants*

**Exhibit A**

Proposed Order

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x

In re:                             :

                                    :

                                    :

     TRANSCARE CORPORATION, <u>et al.</u>,    :     Chapter 7

                                    :     Case No. 16-10407 (SMB)

                                    :     (Jointly Administered)

                 Debtors.        :

------------------------------------------------------------x

SALVATORE LAMONICA, as Chapter 7    :

Trustee for the Estates of TransCare     :

Corporation, <u>et al.</u>,                :

                                    :

                 Plaintiff,      :

                                    :     Adv. Proc. No. 18-1021 (SMB)

           - against -        :

                                    :

LYNN TILTON, PATRIARCH PARTNERS   :

AGENCY SERVICES, LLC, PATRIARCH    :

PARTNERS, LLC, PATRIARCH PARTNERS  :

MANAGEMENT GROUP, LLC, ARK II CLO  :

2001-1 LIMITED, TRANSCENDENCE      :

TRANSIT, INC., and TRANSCENDENCE    :

TRANSIT II, INC.,               :

                                    :

                 Defendants.    :

                                    :

------------------------------------------------------------x

<div align="center">

**[PROPOSED] ORDER GRANTING DEFENDANTS'**
**MOTION *IN LIMINE* TO EXCLUDE CERTAIN IRRELEVANT**
<u>**DOCUMENTS AND TESTIMONY RELATED TO CREDIT SUISSE**</u>

</div>

     Upon Defendants' Motion *In Limine* To Exclude Certain Irrelevant Documents and

Testimony Related to Credit Suisse (the "<u>Motion</u>"); and the Court having considered the Motion

and the Plaintiff's Opposition to the Motion, and the arguments of counsel concerning the Motion

at a hearing before the Court on July 22, 2019; and after due deliberation thereon; and good and

sufficient cause appearing therefor;

IT IS HEREBY ORDERED THAT:

1.      The Motion is granted as set forth herein.

2.      The proposed testimony of Alexander Witkes, on behalf of Credit Suisse, is excluded from this case.

3.      Any documents, exhibits, or other evidence regarding Credit Suisse's: (i) knowledge of or consent to the Ark II Credit Facility and/or Intercreditor Agreement; (ii) knowledge of or consent to the OldCo/NewCo Restructuring, the Article 9 foreclosure, and the TransCare bankruptcy filings; and (iii) knowledge of or consent to amendments to the Term Loan Agreement in 2015 are excluded from this case.

4.      The Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation and/or enforcement of this Order.

DATED: _____, 2019
          New York, New York

_____
THE HONORABLE STUART M. BERNSTEIN
UNITED STATES BANKRUPTCY JUDGE

2

A0471

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------x
In re:                                              :
                                                    :
                                                    :
      TRANSCARE CORPORATION, <u>et al.</u>,          :       Chapter 7
                                                    :       Case No. 16-10407 (SMB)
                                                    :       (Jointly Administered)
                         Debtors.                   :
-------------------------------------------------------------x
SALVATORE LAMONICA, as Chapter 7                    :
Trustee for the Estates of TransCare                :
Corporation, <u>et al.</u>,                          :
                                                    :
                         Plaintiff,                 :
                                                    :       Adv. Proc. No. 18-1021 (SMB)
          - against -                               :
                                                    :
LYNN TILTON, PATRIARCH PARTNERS                     :
AGENCY SERVICES, LLC, PATRIARCH                     :
PARTNERS, LLC, PATRIARCH PARTNERS                   :
MANAGEMENT GROUP, LLC, ARK II CLO                   :
2001-1 LIMITED, TRANSCENDENCE                       :
TRANSIT, INC., and TRANSCENDENCE                    :
TRANSIT II, INC.,                                   :
                                                    :
                         Defendants.                :
                                                    :
-------------------------------------------------------------x

**DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR**
**MOTION *IN LIMINE* TO EXCLUDE CERTAIN IRRELEVANT**
<u>**DOCUMENTS AND TESTIMONY RELATED TO CREDIT SUISSE**</u>

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ....................................................................... 1

RELEVANT FACTS ....................................................................................... 2

ARGUMENT .................................................................................................. 4

I.    The Trustee Lacks Standing to Introduce Evidence Regarding Alleged Wrongdoing by PPAS against Credit Suisse Arising From the Ark II Credit Agreement, Rendering Such Evidence Irrelevant ............................................................... 6

II.   The Credit Suisse Evidence at Issue is Not Relevant to Any Issue to be Tried and Would Waste the Court's Time ..................................................................... 8

CONCLUSION ............................................................................................... 11

i

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Ag Venture Fin. Servs. v. Montagne (In re Montagne),*
    421 B.R. 65 (Bankr. D. Vt. 2009) ............................................................................6

*Allen v. Wright,*
    468 U.S. 737 (1984) .................................................................................................6

*Arlio v. Lively,*
    474 F.3d 46 (2d Cir. 2007) ...................................................................................5, 9

*Bird v. SKR Credit, Ltd. (In re DigitalBridge Holdings, Inc.),*
    Bankr. No. 10-34499, Adv. No. 12-2373, 2015 WL 5766761 (Bankr. D. Utah
    Sept. 30, 2015) .......................................................................................................7, 8

*Capitol Records, Inc. v. MP3tunes, LLC,*
    No. 07-9931(WHP), 2014 WL 503959 (S.D.N.Y. Jan. 29, 2014) ..........................5

*Dooley v. Columbia Presbyterian Med. Ctr.,*
    No. 06-5644(JCF), 2009 WL 2381331 (S.D.N.Y. July 29, 2009) ........................10

*In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.,*
    517 F. Supp. 2d 662 (S.D.N.Y. 2007) ......................................................................5

*In re Old Carco LLC,*
    500 B.R. 683 (Bankr. S.D.N.Y. 2013) ......................................................................6

*Luce v. United States,*
    469 U.S. 38 (1984) ...................................................................................................4

*Palmieri v. Defaria,*
    88 F.3d 136 (2d Cir. 1996) .......................................................................................5

*Pereira v. EisnerAmper LLP (In re Waterford Wedgwood USA, Inc.),*
    529 B.R. 599 (Bankr. S.D.N.Y. 2015) ......................................................................8

*Sec. Inv'r Prot. Corp. (In re Madoff Inv. Sec. LLC),*
    Adv. P. No. 08-01789(SMB), 2017 WL 2602332
    (Bankr. S.D.N.Y. June 15, 2017) ..............................................................................5

*Tronox Inc. v. Anadarko Petroleum Corp. (In re Tronox Inc.),*
    549 B.R. 21 (S.D.N.Y. 2016) ...............................................................................6-7

*U.S. Football League v. National Football League,*
    634 F. Supp. 1155 (S.D.N.Y. 1986) .......................................................................10

ii

*Warth v. Seldin*,
    422 U.S. 490 (1975)..................................................................................................6

**OTHER AUTHORITIES**

U.S. CONST. art. III, § 2, cl. 1 ...........................................................................................6

75 Am. Jur. 2d Trial § 98 (2007) ........................................................................................5

Fed. R. Evid. 401 ...................................................................................................1, 5, 10

Fed. R. Evid. 402 .........................................................................................................1, 5

Fed. R. Evid. 403 .............................................................................................1, 5, 10, 11

A0475

Defendants[1] respectfully submit this motion *in limine* pursuant to Federal Rules of Evidence 401, 402, and 403 for an order excluding Plaintiff Salvatore LaMonica ("Trustee") from introducing certain evidence at trial related to Credit Suisse, one of the Debtors' secured lenders.

## PRELIMINARY STATEMENT

1.      The Trustee has indicated in his so-called "contentions" in the Final Pre-Trial Order ("FPTO") [Dkt 85] that he intends to introduce evidence at the trial concerning Credit Suisse's lack of knowledge regarding the Ark II Intercreditor Agreement (as defined below), the Article 9 foreclosure (as discussed below) and related issues.  (FPTO ¶¶ 41–46, 139, 140, 169.)  The primary basis for these contentions is the deposition testimony of Alexander Witkes, an employee of Credit Suisse, who the Trustee has identified as one of his trial witnesses.  (*Id.* at 70.)

2.      Evidence of Credit Suisse's knowledge of or consent to Defendants' actions or inactions during the Relevant Time Period (as defined below) is legally irrelevant to the issues in this case.  Simply put, this case has nothing to do with the relationship between any of the Defendants and Credit Suisse.  Any hypothetical disagreements between any of the Defendants and Credit Suisse had no impact on the Debtors and are of no concern to the Trustee.  Further, even if this evidence had any conceivable relevance, it would be substantially outweighed by the risk that it would cause undue delay and waste time, and should be excluded under Federal Rule of Evidence 403.

---

[1] The Defendants in this adversary proceeding are:  Lynn Tilton, Patriarch Partners Agency Services, LLC ("PPAS"), Patriarch Partners, LLC, Patriarch Partners Management Group, LLC , Ark II CLO 2001-1, Limited ("Ark II"), Transcendence Transit, Inc. ("Transcendence Transit"), and Transcendence Transit II, Inc. (and together with Transcendence Transit, "Transcendence").

# RELEVANT FACTS

3.      Between November 2014 through February 2016 (the "Relevant Time Period"),
TransCare Corporation ("TransCare") had a secured term loan facility (the "Term Loan
Agreement") with a consortium of lenders, including (i) the Zohar Funds[2], (ii) Ark Investment
Partners II, L.P. ("AIP")), and (iii) Credit Suisse Alternative Capital, Inc., First Dominion Funding
I and First Dominion Funding II ("Credit Suisse," and together with AIP and the Zohar Funds, the
"Term Loan Lenders").  (Ex. 1; PP-TRBK0000027; see, e.g., Ex. 2, PP-TRBK0099600 at PP-
TRBK0099609.)  PPAS, a Tilton-controlled entity, was the administrative agent for the Term Loan
Lenders under the Term Loan Agreement.  (Ex. 3, Tilton Tr.[3] 18:8-19:22.)

4.      Throughout the Relevant Time Period, TransCare entered into a series of
amendments to the Term Loan Agreement pursuant to which the Zohar Funds advanced additional
funds to TransCare or otherwise reduced TransCare's obligations to the Zohar Funds under the
Term Loan Agreement.  (Ex. 2, PP-TRBK0099600; Ex. 4, PP-TRBK0099588; Ex. 5, PP-
TRBK0098857.)  Credit Suisse is not a signatory to those amendments.  (Id.)

5.      In January 2016, Tilton authorized and/or provided emergency funding for
TransCare.  The funding was provided by the Zohar Funds and through a new credit facility entered
into between TransCare and Ark II (Tilton's personal investment vehicle), pursuant to which Ark
II agreed to commit up to $6.5 million to TransCare (the "Ark II Credit Agreement").[4]  PPAS and

---

[2] The Zohar Funds consist of Zohar CDO 2003-1, Ltd., Zohar II 2005-1, Ltd., and Zohar III, Ltd.  See Declaration of
Michael T. Mervis in Support of Defendants' Motion In Limine to Exclude Certain Irrelevant Documents and
Testimony Related to Credit Suisse ("Mervis Decl.") at Ex. 2, PP-TRBK0099600 at PP-TRBK0099606, submitted
herewith.  Unless noted otherwise, all exhibits cited herein are annexed to the Mervis Declaration.

[3] "Tilton Tr." refers to the transcript of the deposition of Lynn Tilton taken on October 29, 2018.

[4] Ex. 6, TRANSCARE00231409; Ex. 7, PP-TRBK0099430; Ex. 8, TRANSCARE00138081; Ex. 9, PP-
TRBK0098916; Ex. 10, TRANSCARE00024535; Ex. 11, TRANSCARE00231415; Ex. 12, TRANSCARE00231421;
Ex. 13, PP-TRBK0047615-16; Ex. 14, PP-TRBK0049638; Ex. 15, PP-TRBK0048966, at PP-TRBK0048967-92.

A0477

Ark II also entered into an intercreditor agreement (the "Ark II Intercreditor Agreement"). (Ex. 15, PP-TRBK0048966 at PP-TRBK0049001-16.) Section 2.2 of the Ark II Intercreditor Agreement concerns the relative priority of liens as between PPAS (as agent for the Term Loan Lenders) and Ark II, and provides that Ark II's relative position in the Collateral (as defined therein) was senior to that of PPAS. (*Id.*)

6.      In February 2016, Tilton, with the assistance of TransCare's outside restructuring counsel, and in consultation with Wells Fargo and its restructuring counsel, developed a plan to restructure TransCare (the "OldCo/NewCo Restructuring"). Tilton's plan called for simultaneously: (i) forming new corporate entities (*i.e.*, Transcendence) to take over certain TransCare business lines through an Article 9 foreclosure sale, and (ii) winding down the other parts of TransCare (referred to as "OldCo") in a bankruptcy proceeding. (Ex. 3, Tilton Tr. 83:5-14, 236:14-239:10, 255:8-21; Ex. 16, Husson Tr.[5] 127:16-128:9.)

7.      Despite intense negotiations over many weeks, Tilton and Wells Fargo did not reach agreement on the funding of the wind-down of the OldCo businesses and Wells Fargo ceased lending to TransCare. On February 24, 2016, the paperwork for the Article 9 foreclosure by PPAS (as administrative agent) was executed. (Ex. 17, PP-TRBK0043305; Ex. 18, PP-TRBK0091197.) As part of the Article 9 foreclosure, PPAS, as administrative agent, the Zohar Funds and AIP issued a Notice of Acceptance of Subject Collateral in Partial Satisfaction of Obligation to TransCare (the "Notice of Acceptance"). (Ex. 18, PP-TRBK0091197.) The Notice of Acceptance provided that PPAS, as administrative agent, accepted the Subject Collateral (as defined in the Notice of Acceptance) in satisfaction of $10 million of the outstanding Term Loan Agreement

---

[5] "Husson Tr." refers to the transcript of the deposition of John Husson taken on November 12, 2018.

3

**A0478**

balance. (*Id.*)  Later on February 24, 2016, the majority of the TransCare entities filed chapter 7 bankruptcy petitions in this Court.[6]

8.      The Court entered an order on March 25, 2016 by which PPAS and Transcendence authorized the Trustee to sell at auction certain assets, including the Subject Collateral. (*In re TransCare Corporation*, 16-10407-smb, Dkt. No. 52.)  A portion of the auction sale proceeds were paid by the Trustee to PPAS.  Consistent with the terms of the Ark II Intercreditor Agreement, PPAS distributed its portion of the auction sale proceeds to Ark II.

9.      On November 15, 2018, the Trustee's counsel took the deposition of Alexander Witkes, a credit analysist at Credit Suisse.  During the deposition, Mr. Witkes was shown documents and provided testimony concerning Credit Suisse's purported lack of knowledge of, or consent to, the terms of the Ark II Credit Agreement and Ark II Intercreditor Agreement, the OldCo/NewCo Restructuring as well as various amendments to the Term Loan Agreement entered into during 2015.  Based on his contentions in the FPTO (¶¶ 41–46, 139, 140, 169), the Trustee apparently intends to introduce evidence on this subject and others relating to Credit Suisse at trial.

## ARGUMENT

10.      A federal court's inherent authority to manage the course of a trial encompasses the fundamental right to rule on pre-trial motions *in limine*.  *See Luce v. United States,* 469 U.S. 38, 41 n.4 (1984).  "The purpose of an *in limine* motion is 'to aid the trial process by enabling the Court to rule in advance of trial on the relevance of certain forecasted evidence, as to issues that

---

[6] *See In re TransCare Corp.* (16- bk-10407-smb); *In re TransCare New York, Inc.* (16- bk-10408-smb); *In re TransCare ML, Inc.* (16- bk-10409-smb); *In re TC Ambulance Group, Inc.* (16- bk-10410-smb); *In re TransCare Management Services, Inc.* (16- bk-10411-smb); *In re TCBA Ambulance, Inc.* (16- bk-10412-smb); *In re TC Billing and Services Corporation* (16- bk-10413-smb); *In re TransCare Westchester, Inc.* (16- bk-10414-smb); *In re TransCare Maryland, Inc.* (16- bk-10415-smb); *In re TC Ambulance North, Inc.* (16- bk-10416-smb); and *In re TransCare Harford County, Inc.* (16- bk-10417-smb).

4

are definitely set for trial, without lengthy argument at, or interruption of, the trial.'" *Palmieri v. Defaria,* 88 F.3d 136, 141 (2d Cir. 1996) (citation omitted).  Because a motion *in limine* may "narrow the issues, shorten the trial, and save costs for the litigants," courts encourage the use of motions *in limine* wherever appropriate.  *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*, 517 F. Supp. 2d 662, 667 n.18 (S.D.N.Y. 2007) (quoting 75 Am. Jur. 2d Trial § 98 (2007)).

11.     Under Federal Rule of Evidence 402, "irrelevant evidence is not admissible."  Fed. R. Evid. 402.  Rule 401 defines relevant evidence as evidence having any "tendency to make a fact more or less probable than it would be without the evidence."  Fed. R. Evid. 401.  "If an item of evidence tends to prove a fact that is of consequence to the determination of the action, it is relevant.  If it does not tend to prove a material fact, it is irrelevant.  A material fact is one that would affect the outcome of the suit under the governing law."  *Arlio v. Lively*, 474 F.3d 46, 52 (2d Cir. 2007) (citation omitted).

12.     Additionally, the Court "may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."  Fed. R. Evid. 403.  "The task of weighing these competing interests under Rule 403 belongs to the trial judge."  *Capitol Records, Inc. v. MP3tunes, LLC,* No. 07-9931(WHP), 2014 WL 503959, at *5 (S.D.N.Y. Jan. 29, 2014) (citation omitted); *see also Sec. Inv'r Prot. Corp. (In re Madoff Inv. Sec. LLC)*, Adv. P. No. 08-01789(SMB), 2017 WL 2602332, at *5 (Bankr. S.D.N.Y. June 15, 2017) (citation omitted) ("trial court[s] [have] the duty of balancing the trial's primary function of ascertaining the truth concerning the dispute between the parties against the needs of the courts to conserve their time and to protect witnesses from harassment or undue embarrassment at the hands of overzealous advocates.").

5

I.    **The Trustee Lacks Standing to Introduce Evidence Regarding Alleged Wrongdoing
by PPAS against Credit Suisse Arising From the Ark II Credit Agreement,
Rendering Such Evidence Irrelevant**

13.    Defendants anticipate that the Trustee will seek to introduce the above-described

evidence regarding Credit Suisse to support his claim to equitably subordinate the claims of PPAS

and Ark II.  Specifically, Defendants expect the Trustee will attempt to prove that PPAS acted in

derogation of Credit Suisse's contractual rights under the Term Loan Agreement by entering into

the Ark II Intercreditor Agreement and paying post-petition proceeds from auction sales of the

Subject Collateral to Ark II.  As a threshold matter, this evidence should be excluded because the

Trustee lacks standing to seek equitable subordination of Ark II or PPAS's claims based on this

alleged conduct.  Thus, the evidence is irrelevant to the Trustee's equitable subordination claim

and any time spent on it would be a waste.

14.    Similar to Article III standing, prudential standing is a "threshold determinant[] of

the propriety of judicial intervention," *Warth v. Seldin*, 422 U.S. 490, 518 (1975), and places a

limit "on the exercise of federal jurisdiction." *Allen v. Wright,* 468 U.S. 737, 751 (1984).  The

party invoking federal jurisdiction bears the burden of demonstrating prudential standing.  *In re*

*Old Carco LLC*, 500 B.R. 683, 690 (Bankr. S.D.N.Y. 2013) (Bernstein, J.).  To establish prudential

standing, a "plaintiff generally must assert [its] own legal rights and interests, and cannot rest [its]

claim to relief on the legal rights or interests of third parties."  U.S. CONST. art. III, § 2, cl. 1.  The

question of prudential standing may be raised at any stage of the proceedings.  *See Ag Venture Fin.*

*Servs. v. Montagne (In re Montagne)*, 421 B.R. 65, 79 (Bankr. D. Vt. 2009) ("Cases have held that

the question of prudential standing may be raised at any stage of the proceedings  . . . .").

15.    Courts considering standing in the context of equitable subordination claims have

determined that a claim belongs solely to an individual creditor, not a trustee for the debtor's estate,

where the harm suffered was "particularized."  *Tronox Inc. v. Anadarko Petroleum Corp. (In re*

6

*Tronox Inc.*), 549 B.R. 21, 42 (S.D.N.Y. 2016) ("[A] claim belongs to individual creditors—and not to a debtor's trustee—when the harm suffered was particularized to those creditors, rather than to all creditors as a whole[.]")

16.     The notion that the Trustee has standing to pursue subordination of claims based on injury to individual creditors has been squarely rejected. *See, e.g.*, *Bird v. SKR Credit, Ltd. (In re DigitalBridge Holdings, Inc.)*, Bankr. No. 10-34499, Adv. No. 12-2373, 2015 WL 5766761, at *16 (Bankr. D. Utah Sept. 30, 2015).   In *DigitalBridge*, DigitalBridge borrowed funds from a group of three equity holders (the "Equity Lenders").  *See id.* at *1.  DigitalBridge agreed to file the Equity Lenders' UCC financing statements, but erroneously filed the financing statements in the wrong state, leaving the Equity Lenders' interests unperfected (the "perfection issue").  *Id.* at *1–2.  DigitalBridge then entered into a credit agreement with SKR Credit ("SKR"), which properly perfected its security interest (thus giving it priority over the Equity Lenders). *Id.* at *2-3. The trustee sought to subordinate SKR's claim, arguing that it acted inequitably by obtaining a priority position when SKR had knowledge of the perfection issue at the time the SKR loan was made. *See id.* at *1–3, *15–16.

17.     The Bankruptcy Court rejected the subordination claim in relevant part because the trustee "lack[ed] standing in this case to the extent he [wa]s asserting another person's legal rights, namely those of the Equity Lenders concerning their claim for a particularized injury."  *Id.* at *16.  The court explained that while "a trustee [could] bring a general equitable subordination claim on behalf of the estate as a whole, and individual creditors can assert equitable subordination claims if they allege particularized injury, ***a trustee cannot assert an equitable subordination claim on behalf of individual creditors***."  *Id.*  (emphasis added).  Thus, because "[t]he Equity

7

Lenders' claim for equitable subordination [wa]s based on an alleged injury to three specific secured creditors," the trustee did not have standing to pursue that claim. *Id.*

18.     Here, the Trustee's theory seems to be that the Term Loan Lenders suffered an injury when Ark II jumped ahead of and primed them. This is precisely the type of particularized injury (*i.e.*, to, allegedly, the Term Loan Lenders and *only* the Term Loan Lenders) that the court considered in *DigitalBridge* and determined the trustee lacked standing to assert. And for good reason: the allocation of payment between different secured lenders has no impact on the debtors or the unsecured creditor body writ large. Credit Suisse is not a party to this litigation and the Trustee may not seek to enforce the alleged rights of a third party in this adversary proceeding. *See Pereira v. EisnerAmper LLP (In re Waterford Wedgwood USA, Inc.*), 529 B.R. 599, 603 (Bankr. S.D.N.Y. 2015) (explaining that, "[a]s a general matter . . . bankruptcy trustees do not have standing 'to sue third parties on behalf of the estate's creditor's but may only assert claims held by the bankrupt corporation itself.'").

## II.     The Credit Suisse Evidence at Issue is Not Relevant to Any Issue to be Tried and Would Waste the Court's Time

19.     At its core, this case concerns Tilton's purported breach of her fiduciary duty of loyalty to TransCare and its estates by pursuing an allegedly "self-dealing" restructuring plan rather than "monetizing" TransCare's assets or pursuing a different restructuring. (FPTO ¶¶ 181–83.) As previously noted, the Trustee's contentions in the Final Pre-Trial Order suggest that the Trustee intends to tie the following purported facts to this claim: (i) Credit Suisse had no prior knowledge of the OldCo/NewCo Restructuring, the Article 9 foreclosure, or the $10 million reduction of TransCare's obligations owing under the Term Loan Agreement; (ii) the Notice of Acceptance was not sent to Credit Suisse; and (iii) Credit Suisse had no prior knowledge of the TransCare chapter 7 petitions. (FPTO ¶¶ 139, 140, 169.)

20.     All of these facts are completely irrelevant to the breach of fiduciary duty claim.[7]

Here, as set forth in the Final Pre-Trial Order, the primary issue to be tried is as follows:  "Did Ms.

Tilton breach her duties of loyalty and good faith to *TransCare* under Delaware law?"  (FPTO at

65 (emphasis added).)  The impact of the OldCo/NewCo Restructuring *on Credit Suisse* is not at

issue in this proceeding.  Similarly, when Credit Suisse learned of the bankruptcy filings (and from

whom) is not "of consequence to the determination" of the fiduciary duty claim.  *Arlio*, 474 F.3 at

52.  To the extent this evidence could bear on anything, it would be a hypothetical dispute between

Credit Suisse and one or more of the Defendants.  Such a dispute is simply not before the Court

(or any Court) in this case, however.

21.     What's more, even if it were somehow relevant to determine whether, for example,

the OldCo/NewCo Restructuring was fair to Credit Suisse, the evidence the Trustee wants to

introduce would not tend to prove a fact "that would affect the outcome of the suit," and is thus

irrelevant.  *Arlio*, 474 F.3d at 52.  That is because, as the Trustee admits and as the relevant

agreements make plain, PPAS did not need Credit Suisse's consent to foreclose upon TransCare's

assets.  (FPTO ¶¶ 32–34.)  Moreover, the Trustee does not dispute that PPAS had the *sole* authority

to exercise and enforce the Term Loan Lenders' rights under the Term Loan Agreement.  (*Id.* at

¶ 34.)[8]  Accordingly, the evidence at issue merely demonstrates that PPAS took action consistent

with its rights and obligations under the controlling agreements.

---

[7] With respect to Count III (equitable subordination), as discussed previously, the Trustee has no standing to assert claims arising from hypothetical inter-lender disputes.  To the extent Credit Suisse was harmed by the OldCo/NewCo Restructuring (and it was not), such a claim does not belong to the Trustee.  *See* Section I, *supra*.  The Trustee has not proffered any evidence tying or attempting to tie Credit Suisse's knowledge of, or lack of consent to, the OldCo/NewCo Restructuring, or knowledge of the TransCare bankruptcy filings, to the other claims to be tried.

[8] The Trustee also previously argued at length in his Opposition to Defendants' Partial Motion to Dismiss the Amended Complaint that "PPAS — not the individual lenders . . . is the party that controls enforcement of the collective's rights under the PPAS Credit Agreement."  And the Trustee further recognized that, pursuant to Amendment No. 17, the "PPAS Credit Agreement expressly agreed that 'no lender shall have any right individually to realize upon any of the Collateral, it being understood and agreed that *all powers, rights and remedies hereunder may be exercised solely by*

9

22.     Defendants also anticipate that the Trustee will seek to introduce evidence concerning whether Credit Suisse was provided with or executed certain amendments to the Term Loan Agreement throughout 2015.  (*See, e.g.*, FPTO ¶ 72.)  The Trustee can offer no basis to conclude that this evidence is "of consequence in determining the action."  Fed. R. Evid. 401.  That is because it is not.  Whether the terms of the Term Loan Agreement required that Credit Suisse be provided with or execute particular amendments the Term Loan Agreement is irrelevant to the claims to be tried.[9]  Here too, a hypothetical dispute between one or more of the Defendants and Credit Suisse is not something to be heard in this adversary case.

23.     At the end of the day, it is obvious that the Trustee seeks to introduce evidence concerning PPAS's and Tilton's dealings with Credit Suisse to suggest Defendants violated or were indifferent to Credit Suisse's rights under the Term Loan Agreement and paint Defendants in a negative light.  This is precisely what Rule 403 is designed to prevent.  Critically, allowing the Trustee to introduce such evidence would cause the trial to "become dominated by a digressive element masquerading as probative evidence."  *U.S. Football League v. National Football League*, 634 F. Supp. 1155, 1181 (S.D.N.Y. 1986).  Indeed, Defendants "would be forced to simultaneously defend against two separate sets of claims, inviting a distracting 'mini trial' into the course of the main proceedings."  *Dooley v. Columbia Presbyterian Med. Ctr.*, No. 06-5644(JCF), 2009 WL 2381331, at *2 (S.D.N.Y. July 29, 2009).   Under these circumstances, whatever limited significance this evidence might arguably have is "substantially outweighed by a danger of . . .

---

*the Administrative Agent* [PPAS], on behalf of the Lenders in accordance with the terms hereof[.]' (emphasis added)." (*See* Dkt. 63, Trustee's Opp. to Defendants' Partial Motion to Dismiss, at 19–20.)

[9] In any event, the amendments entered into between TransCare, PPAS, and the Zohar Funds during 2015 did not affect Credit Suisse and, therefore, could be entered into without Credit Suisse's consent.  (Ex. 1, PP-TRBK0000027 at PP-TRBK0000096, § 12.1.)

10

confusing the issues, undue delay [and] wasting time," thus warranting exclusion. Fed. R. Evid. 403.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court grant their motion *in limine* to exclude the testimony of Alexander Witkes, on behalf of Credit Suisse, and any documents, exhibits, or other evidence regarding Credit Suisse's: (i) knowledge of or consent to the Ark II Credit Facility and/or Intercreditor Agreement; (ii) knowledge of or consent to the OldCo/NewCo Restructuring, the Article 9 foreclosure, and the TransCare bankruptcy filings; and (iii) knowledge of or consent to amendments to the Term Loan Agreement in 2015.

Dated: July 8, 2019                                        PROSKAUER ROSE LLP

By: */s/ Michael T. Mervis*
       Michael T. Mervis
       Timothy Q. Karcher
       Eleven Times Square
       New York, NY  10036-8299
       Tel.: (212) 969-3000
       Fax: (212) 969-2900
       Email: mmervis@proskauer.com
       tkarcher@proskauer.com

       Nicole A. Eichberger (*pro hac vice*)
       650 Poydras Street
       Suite 1800
       New Orleans, LA 70130-6146
       Tel.: (504) 310-2024
       Fax: (504) 310-2022
       Email: neichberger@proskauer.com

       *Attorneys for Defendants*

11

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x

In re:                                          :
                                                :
                                                :
     TRANSCARE CORPORATION, et al.,   :        Chapter 7
                                                :        Case No. 16-10407 (SMB)
                                                :        (Jointly Administered)
            Debtors.        :

---------------------------------------------------------------x

SALVATORE LAMONICA, as Chapter 7               :
Trustee for the Estates of TransCare           :
Corporation, et al.,                           :
                                                :
         Plaintiff,        :
                                                :        Adv. Proc. No. 18-1021 (SMB)
     - against -                     :
                                                :
LYNN TILTON, PATRIARCH PARTNERS                 :
AGENCY SERVICES, LLC, PATRIARCH                 :
PARTNERS, LLC, PATRIARCH PARTNERS               :
MANAGEMENT GROUP, LLC, ARK II CLO               :
2001-1 LIMITED, TRANSCENDENCE                   :
TRANSIT, INC., and TRANSCENDENCE                :
TRANSIT II, INC.,                               :
                                                :
         Defendants.        :
                                                :

---------------------------------------------------------------x

## DECLARATION OF MICHAEL T. MERVIS IN SUPPORT OF
## DEFENDANTS' MOTION *IN LIMINE* TO EXCLUDE CERTAIN
## IRRELEVANT DOCUMENTS AND TESTIMONY RELATED TO CREDIT SUISSE

Michael T. Mervis declares, pursuant to 28 U.S.C. § 1746 and under penalty of perjury, that the following is true and correct:

1.       I am a partner at the law firm Proskauer Rose LLP, counsel for Defendants in the above-captioned adversary case.  I submit this Declaration in support of Defendants' Motion *In Limine* to Exclude Certain Irrelevant Documents and Testimony Related to Credit Suisse (the "Motion") and, in particular, to place before the Court the exhibits that are described herein and annexed hereto.  Capitalized terms used but not defined herein have the meaning ascribed to them in the Memorandum in Support of the Motion, submitted herewith.

2.       Attached hereto as **Exhibit 1** is a true and correct copy of the Credit Agreement between TransCare Corporation and Patriarch Partners Agency Services, LLC, as Administrative Agent, dated August 4, 2003, bearing Bates number PP-TRBK0000027 through PP-TRBK0000107.

3.       Attached hereto as **Exhibit 2** is a true and correct copy of Amendment 25 to the Credit Agreement between TransCare Corporation and Patriarch Partners Agency Services, LLC, as Administrative Agent, dated March 5, 2015, bearing Bates number PP-TRBK0099600 through PP-TRBK0099609.

4.       Attached hereto as **Exhibit 3** is a true and correct copy of excerpts from the Deposition Transcript of Lynn Tilton taken on October 29, 2018, in the above-captioned adversary case.

5.       Attached hereto as **Exhibit 4** is a true and correct copy of Amendment 24 to the Credit Agreement between TransCare Corporation and Patriarch Partners Agency Services, LLC, as Administrative Agent, dated February 26, 2015, bearing Bates number PP-TRBK0099588 through PP-TRBK0099599.

2

6.      Attached hereto as **Exhibit 5** is a true and correct copy of the TransCare Written Consent of Sole Director Without a Meeting, dated April 9, 2015, bearing Bates number PP-TRBK0098857 through PP-TRBK0098858, attaching Amendment 26 to the Credit Agreement between TransCare Corporation and Patriarch Partners Agency Services, LLC, as Administrative Agent, dated April 9, 2015, bearing Bates number PP-TRBK0098859 through PP-TRBK0098883.

7.      Attached hereto as **Exhibit 6** is a true and correct copy of a Direction Letter for Payment of Certain Loan Proceeds, from TransCare Corporation to Patriarch Partners Agency Services, LLC, as Administrative Agent, dated December 8, 2015, bearing Bates number TRANSCARE00231409 through TRANSCARE00231414.

8.      Attached hereto as **Exhibit 7** is a true and correct copy of a Direction Letter for Payment of Certain Loan Proceeds, from TransCare Corporation to Patriarch Partners Agency Services, LLC, as Administrative Agent, dated December 11, 2015, bearing Bates number PP-TRBK0099430 through PP-TRBK0099435.

9.      Attached hereto as **Exhibit 8** is a true and correct copy of an email from Larry Careaga (of TransCare) to "Daily BBC," Melissa Provost and Teresa Garney (both of Wells Fargo), dated December 17, 2015, and accompanying chain, bearing Bates number TRANSCARE00138081 through TRANSCARE00138082.

10.     Attached hereto as **Exhibit 9** is a true and correct copy of a Direction Letter for Payment of Certain Loan Proceeds, from TransCare Corporation to Patriarch Partners Agency Services, LLC, as Administrative Agent, dated December 17, 2015, bearing Bates number PP-TRBK0098916 through PP-TRBK0098921.

11.     Attached hereto as **Exhibit 10** is a true and correct copy of an email from Larry Careaga to Melissa Provost and Teresa Garney, dated January 5, 2016, bearing Bates number

3

TRANSCARE00024535, attaching a document bearing Bates number TRANSCARE00024536 through TRANSCARE00024540.

12.     Attached hereto as **Exhibit 11** is a true and correct copy of a Direction Letter for Payment of Certain Loan Proceeds, from TransCare Corporation to Patriarch Partners Agency Services, LLC, as Administrative Agent, dated January 5, 2016, bearing Bates number TRANSCARE00231415 through TRANSCARE00231420.

13.     Attached hereto as **Exhibit 12** is a true and correct copy of a Direction Letter for Payment of Certain Loan Proceeds, from TransCare Corporation to Patriarch Partners Agency Services, LLC, as Administrative Agent, dated January 7, 2016, bearing Bates number TRANSCARE00231421 through TRANSCARE00231426.

14.     Attached hereto as **Exhibit 13** is a true and correct copy of an email from Lynn Tilton to Cindi Giglio (of Curtis, Mallet-Prevost, Colt & Mosle LLP, restructuring counsel for TransCare) and Lynn P. Harrison III (also of Curtis, Mallet-Prevost, Colt & Mosle LLP), dated February 24, 2016, bearing Bates number PP-TRBK0047615 through PP-TRBK0047616.

15.     Attached hereto as **Exhibit 14** is a true and correct copy of Amendment 27 to the Credit Agreement between TransCare Corporation and Patriarch Partners Agency Services, LLC, as Administrative Agent, dated July 7, 2015, bearing Bates number PP-TRBK0049638 through PP-TRBK0049652.

16.     Attached hereto as **Exhibit 15** is a true and correct copy of an email from Brian Stephen (of Patriarch Partners) to Peter J. Buenger (of Curtis, Mallet-Prevost, Colt & Mosle LLP), dated February 11, 2016, bearing Bates number PP-TRBK0048966, attaching documents bearing Bates number PPTRBK0048967 through PP-TRBK0049046.

4

17.     Attached hereto as **Exhibit 16** is a true and correct copy of excerpts from the Deposition Transcript of John Husson (of Wells Fargo) taken on November 12, 2018, in the above-captioned adversary case.

18.     Attached hereto as **Exhibit 17** is a true and correct copy of an email from Brian Stephen to Peter Wolf (of TransCare), dated February 24, 2016, bearing Bates number PP-TRBK0043305, attaching a document bearing Bates number PP-TRBK0043306 through PP-TRBK0043314.

19.     Attached hereto as **Exhibit 18** is a true and correct copy of a Notice of Acceptance of Subject Collateral in Partial Satisfaction of Obligation, dated February 24, 2016, bearing Bates number PP-TRBK0091197 through PP-TRBK0091201.

Executed this 8th day of July, 2019 in New York, New York.


*/s/ Michael T. Mervis*
Michael T. Mervis, Esq.

5

Case 1:20-cv-06274-AK  Document 101-3  Filed 09/30/20  Page 173 of 203

# EXHIBIT 1

EXECUTION COPY

CREDIT AGREEMENT

among

TRANSCARE CORPORATION,
Borrower,

The Several Lenders
from Time to Time Parties Hereto,

and

PATRIARCH PARTNERS AGENCY SERVICES, LLC,
as Administrative Agent

Dated as of August 4, 2003

\_0

**A0493**

Confidential

PP-TRBK0000027

## TABLE OF CONTENTS

Page

### SECTION 1. DEFINITIONS

| | | |
|---|---|---|
| 1.1 | Defined Terms. | 1 |
| 1.2 | Other Definitional Provisions | 20 |

### SECTION 2. AMOUNT AND TERMS OF TERM LOANS

| | | |
|---|---|---|
| 2.1 | Term Loans | 21 |
| 2.2 | Procedure for Term Loan Distribution | 21 |
| 2.3 | Repayment of Term Loans | 21 |

### SECTION 3. AMOUNT AND TERMS OF REVOLVING CREDIT COMMITMENTS

| | | |
|---|---|---|
| 3.1 | Revolving Credit Commitments | 22 |
| 3.2 | Procedure for Revolving Credit Borrowing | 22 |
| 3.3 | Commitment Fee, Facility Fee | 23 |
| 3.4 | Termination or Reduction of Revolving Credit Commitments | 23 |

### SECTION 4. [RESERVED]

### SECTION 5. GENERAL PROVISIONS APPLICABLE TO LOANS

| | | |
|---|---|---|
| 5.1 | Interest Rates and Payment Dates | 23 |
| 5.2 | Conversion and Continuation Options | 24 |
| 5.3 | Minimum Amounts of Tranches; Maximum Number of Tranches | 25 |
| 5.4 | Repayment of Loans; Evidence of Debt | 25 |
| 5.5 | Optional Prepayments | 25 |
| 5.6 | Mandatory Prepayments | 26 |
| 5.7 | Computation of Interest and Fees | 27 |
| 5.8 | Inability to Determine Interest Rate. | 27 |
| 5.9 | Pro Rata Treatment and Payments | 28 |
| 5.10 | Illegality | 29 |
| 5.11 | Requirements of Law | 29 |
| 5.12 | Taxes | 30 |
| 5.13 | Indemnity | 32 |
| 5.14 | Lending Offices; Change of Lending Office | 32 |
| 5.15 | Substitution of Lender | 32 |

### SECTION 6. REPRESENTATIONS AND WARRANTIES

| | | |
|---|---|---|
| 6.1 | Financial Condition | 33 |
| 6.2 | No Change | 34 |

\_0

-i-

Confidential

| 6.3 | Existence; Compliance with Law | 34 |
| 6.4 | Power; Authorization; Enforceable Obligations | 35 |
| 6.5 | No Legal Bar | 35 |
| 6.6 | No Material Litigation | 35 |
| 6.7 | No Default | 35 |
| 6.8 | Ownership of Property; Liens | 35 |
| 6.9 | Intellectual Property | 35 |
| 6.10 | No Burdensome Restrictions | 35 |
| 6.11 | Taxes | 35 |
| 6.12 | Federal Regulations | 35 |
| 6.13 | ERISA | 35 |
| 6.14 | Investment Company Act; Other Regulations | 35 |
| 6.15 | Subsidiaries | 36 |
| 6.16 | Security Documents | 36 |
| 6.17 | Accuracy and Completeness of Information | 36 |
| 6.18 | Labor Relations | 37 |
| 6.19 | Insurance | 37 |
| 6.20 | Solvency | 37 |
| 6.21 | Purpose of Loans | 37 |
| 6.22 | Environmental Matters | 38 |
| 6.23 | Regulation H | 39 |
| 6.24 | Key-Person Life Insurance Policies | 39 |
| 6.25 | Existing Indebtedness | 39 |
| 6.26 | Concerning Regulatory Matters | 39 |

## SECTION 7. CONDITIONS PRECEDENT

| 7.1 | Conditions to Initial Loans | 39 |
| 7.2 | Conditions to Each Loan | 42 |

## SECTION 8. AFFIRMATIVE COVENANTS

| 8.1 | Financial Statements | 43 |
| 8.2 | Certificates; Other Information | 44 |
| 8.3 | Payment of Obligations | 45 |
| 8.4 | Conduct of Business and Maintenance of Existence | 45 |
| 8.5 | Maintenance of Property; Insurance | 45 |
| 8.6 | Inspection of Property; Books and Records; Discussions | 46 |
| 8.7 | Notices | 46 |
| 8.8 | Environmental Laws | 47 |
| 8.9 | Periodic Audit of Accounts Receivable | 47 |
| 8.10 | Additional Collateral; Additional Subsidiary Guarantors | 47 |
| 8.11 | Vehicles | 48 |

## SECTION 9. NEGATIVE COVENANTS

| 9.1 | Financial Condition Covenants. | 48 |
| 9.2 | Limitation on Indebtedness | 49 |
| 9.3 | Limitation on Liens | 50 |
| 9.4 | Limitation on Guarantee Obligations | 51 |

\ 0

-ii-

**A0495**

| 9.5 | Limitation on Fundamental Changes | 51 |
|---|---|---|
| 9.6 | Limitation on Sale of Assets | 51 |
| 9.7 | Limitation on Dividends and Miscellaneous Payments. | 52 |
| 9.8 | Limitation on Capital Expenditures | 52 |
| 9.9 | Limitation on Investments, Loans and Advances | 52 |
| 9.10 | Limitation on Optional Payments and Modifications of Agreements | 52 |
| 9.11 | Limitation on Transactions with Affiliates | 53 |
| 9.12 | Limitation on Sales and Leasebacks | 53 |
| 9.13 | Limitation on Changes in Fiscal Year | 53 |
| 9.14 | Limitation on Negative Pledge Clauses | 53 |
| 9.15 | Limitation on Lines of Business | 54 |
| 9.16 | Governing Documents | 54 |
| 9.17 | Limitation on Payroll Accounts | 54 |

## SECTION 10. EVENTS OF DEFAULT

## SECTION 11. THE AGENT

| 11.1 | Appointment | 57 |
|---|---|---|
| 11.2 | Delegation of Duties | 57 |
| 11.3 | Exculpatory Provisions | 58 |
| 11.4 | Reliance by Administrative Agent | 59 |
| 11.5 | Notice of Default | 59 |
| 11.6 | Non-Reliance on Administrative Agent and Other Lenders | 60 |
| 11.7 | Indemnification | 60 |
| 11.8 | Administrative Agent in Its Individual Capacity | 61 |
| 11.9 | Successor Administrative Agent | 61 |
| 11.10 | Authorization to Release Liens | 62 |
| 11.11 | The Arranger; the Documentation Agents | 62 |
| 11.12 | The Administrative Agent and the Secured Parties | 62 |

## SECTION 12. MISCELLANEOUS

| 12.1 | Amendments and Waivers | 62 |
|---|---|---|
| 12.2 | Notices | 63 |
| 12.3 | No Waiver; Cumulative Remedies | 64 |
| 12.4 | Survival of Representations and Warranties | 64 |
| 12.5 | Payment of Expenses and Taxes | 64 |
| 12.6 | Successors and Assigns; Participations and Assignments | 64 |
| 12.7 | Adjustments; Set-off | 67 |
| 12.8 | Counterparts | 68 |
| 12.9 | Severability | 68 |
| 12.10 | Integration | 68 |
| 12.11 | GOVERNING LAW | 68 |
| 12.12 | Submission To Jurisdiction; Waivers | 68 |
| 12.13 | Acknowledgments | 68 |
| 12.14 | WAIVERS OF JURY TRIAL | 69 |
| 12.15 | Confidentiality | 69 |

\_0

-iii-

**A0496**

Confidential

PP-TRBK0000030

## SCHEDULES

| | | |
|---|---|---|
| Schedule 1.0 | | Lenders, Commitments, and Applicable Lending Offices |
| Schedule 1.1(a) | | Reorganization Charges; Investigation Expenses |
| Schedule 1.1(b) | | Leased Real Property |
| Schedule 1.1(c) | | Existing Specified Leases |
| Schedule 5.9(c) | | Funding and Payment Office |
| Schedule 6.1(a) | | Exceptions to Financial Statements |
| Schedule 6.1(c) | | Exceptions to Forecast |
| Schedule 6.3 | | Existence; Compliance with Law |
| Schedule 6.4 | | Consents and Filings |
| Schedule 6.5 | | Requirements of Law and Contractual Obligations |
| Schedule 6.6 | | Material Litigation |
| Schedule 6.15 | | Subsidiaries |
| Schedule 6.16 | | Filing Jurisdictions |
| Schedule 6.17(b) | | Projections |
| Schedule 6.18 | | Labor Relations |
| Schedule 6.19 | | Insurance |
| Schedule 6.22 | | Environmental Matters |
| Schedule 6.26 | | Investigations |
| Schedule 9.2 | | Existing Indebtedness |
| Schedule 9.3 | | Existing Liens |
| Schedule 9.4 | | Existing Guarantee Obligations |
| Schedule 9.11 | | Limitation on Transactions with Affiliates |
| Schedule 9.17 | | Payroll Account Amount |

\_0

-1-

**A0497**

Confidential

PP-TRBK0000031

EXHIBITS

| Exhibit A-1 | Form of Term Note |
| Exhibit A-2 | Form of Revolving Credit Note |
| Exhibit B | Form of Pledge Agreement |
| Exhibit C | Form of Security Agreement |
| Exhibit D | Form of Subsidiaries Guarantee |
| Exhibit E | Form of Non Bank Status Certificate |
| Exhibit F | Form of Closing Certificate |
| Exhibit G | Form of Opinion of Counsel to the Loan Parties |
| Exhibit H | Form of Landlord Agreement |
| Exhibit I | Form of Assignment and Acceptance |

ANNEX

| Annex I | Form of Notice of Borrowing |
| Annex II | Form of Continuation/Conversion Notice |

\_0

-2-

**A0498**

Confidential

PP-TRBK0000032

# CREDIT AGREEMENT

CREDIT AGREEMENT, dated as of August 4, 2003, among TRANSCARE CORPORATION, a Delaware corporation (the "Borrower"), the lenders from time to time parties to this Agreement (the "Lenders"), and PATRIARCH PARTNERS AGENCY SERVICES, LLC ("PPAS"), as administrative agent for the Lenders hereunder.

## RECITALS

WHEREAS, Old TransCare (as hereinafter defined) and certain of its subsidiaries are debtors in the Bankruptcy Cases (as hereinafter defined);

WHEREAS, pursuant to the Plan of Reorganization and Confirmation Order (as hereinafter defined), Old TransCare and its subsidiaries shall be reorganized as provided therein;

WHEREAS, as part of such reorganization, the Borrower has requested that the Lenders make available the credit provided for in this Agreement, and the Lenders are willing to make such credit available only on the terms, and subject to the conditions, set forth in this Agreement and the other Loan Documents (as hereinafter defined).

NOW, THEREFORE, in consideration of the premises and the mutual covenants herein contained, the parties hereto hereby agree as follows:

SECTION 1.   DEFINITIONS

1.1   Defined Terms..   As used in this Agreement, terms defined in the preamble or recitals hereto shall have the meanings set forth therein, and the following terms shall have the following meanings:

"Accounts": all of the Loan Parties' now owned or hereafter acquired or arising accounts as defined in the UCC, including any rights to payment for the sale or lease of goods or rendition of services, whether or not they have been earned by performance, including but not limited to the Loan Parties' Medicare/Medicaid Receivables, Private Pay/Co Pay Receivables, Institutional Receivables, and Third Party Receivables.

"Acquired Person": as to any Person, any other Person (i) at least 80% of the Capital Stock of which is owned by such Person and (ii) which is consolidated with such Person in accordance with GAAP.

"Acquisition": as to any Person, the acquisition by such Person of (a) Capital Stock of any other Person if, after giving effect to the acquisition of such Capital Stock, such other Person would be a Subsidiary, (b) all or substantially all of the assets of any other Person or (c) assets constituting one or more business units of any other Person.

"Adjusted Base Rate": in the case of a Term Loan which is a Base Rate Loan, the greater of (a) the Base Rate plus the Applicable Margin or (b) the Fixed Rate.

\_ 0

-1-

**A0499**

Confidential

PP-TRBK0000033

"Adjusted Eurodollar Rate": in the case of a Term Loan which is a Eurodollar Loan, the greater of (a) the Eurodollar Rate plus the Applicable Margin or (b) the Fixed Rate.

"Administrative Agent": PPAS, together with any successor Administrative Agent appointed pursuant to Section 11.9.

"Affiliate": as to any Person, any other Person (other than a Subsidiary) which, directly or indirectly, is in control of, is controlled by, or is under common control with, such Person. For purposes of this definition, "control" of a Person (including, with its correlative meanings, "controlled by" and "under common control with") means the power, directly or indirectly, either to (a) vote 10% or more of the securities having ordinary voting power for the election of directors of such Person or (b) direct or cause the direction of the management and policies of such Person, whether by contract or otherwise. Hampshire Persons and the Lenders shall only be deemed Affiliates of the Borrower and any other Loan Party for purposes of Section 9.11.

"Aggregate Outstanding RC Extensions of Credit": at any time, the aggregate of the Revolving Extensions of Credit of all Revolving Credit Lenders outstanding at such time.

"Agreement": this Credit Agreement, as amended, supplemented or otherwise modified from time to time.

"Applicable Lending Office": for each Lender and for each Type of Loan, the lending office of such Lender designated for such Type of Loan on Schedule 1.0 hereto (or any other lending office from time to time notified to the Administrative Agent by such Lender ) as the office at which its Loans of such Type are to be made and maintained.

"Applicable Margin": (a) for any Term Loan of any Type at any time during the periods set forth in the table below, the rate per annum set forth under the relevant column heading opposite the applicable period below:

| Period | Base Rate Loans | Eurodollar Loans |
|---|---|---|
| Closing Date to but excluding the first anniversary of the Closing Date | 3.25% | 4.50% |
| First anniversary of the Closing Date and thereafter | 4.75% | 6.00% |

and

(b) for any Revolving Credit Loan at any time, 4.50% in the case of Eurodollar Loans and 3.25% in the case of Base Rate Loans.

"Approved Fund": means (a) with respect to any Lender, any Bank CLO of such Lender, and (b) with respect to any Lender that is a fund that invests in commercial loans and similar extensions of credit, any other fund that invests in commercial loans and similar extensions of credit and is managed by the same investment advisor or collateral manager as such Lender or by an Affiliate or Subsidiary of such investment advisor or collateral manager.

\_0

-2-

**A0500**

PP-TRBK0000034

"Asset Sale": any sale, lease or other disposition of property or series of related sales, leases or other dispositions of property (excluding any such sale, leases or other disposition permitted by clauses (b), (c), (d), (e) and (f) of Section 9.6) which yields net proceeds in any fiscal year of the Borrower to the Borrower or any of its Subsidiaries (valued at the initial principal amount thereof in the case of non-cash proceeds consisting of notes or other debt securities and valued at fair market value in the case of other non-cash proceeds), together with the net proceeds of all other sales, leases or other dispositions of property during such fiscal year of the Borrower, in excess of an aggregate amount of \$250,000 per fiscal year of the Borrower.

"Assignee": as defined in Section 12.6(c).

"Assignment and Acceptance": as defined in Section 12.6(c).

"Available RC Commitment": as to any Lender at any time, an amount equal to the excess, if any, of (a) the amount of such Lender's Revolving Credit Commitment at such time over (b) such Lender's Revolving Extensions of Credit.

"Bank CLO": as to any Lender, any entity (whether a corporation, partnership, trust or otherwise) that is engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its business and is administered or managed by such Lender or an Affiliate or Subsidiary of such Lender.

"Bankruptcy Cases": the reorganization proceedings filed by Old TransCare and certain Subsidiaries thereof under chapter 11 of the Bankruptcy Code pursuant to voluntary petitions filed September 9, 2002, case no. 02-14385 (RDD).

"Bankruptcy Code": Title 11 of the United States Code, as amended (11 U.S.C. § 101 et seq.).

"Bankruptcy Court": the United States Bankruptcy Court for the Southern District of New York.

"Base Rate": for any day, the rate per annum equal to the greater of (a) the Prime Rate in effect on such day and (b) the Federal Funds Effective Rate in effect on such day plus ½ of 1%. For purposes hereof: "Prime Rate" shall mean the rate of interest publicly announced by Wachovia from time to time as its prime rate (the prime rate not being intended to be the lowest rate of interest charged by Wachovia in connection with extensions of credit to debtors).

"Base Rate Loans": Loans the rate of interest applicable to which is based upon the Adjusted Base Rate in the case of Term Loans or the Base Rate in the case of Revolving Credit Loans.

"Benefited Lender": as defined in Section 12.7(a).

"Board": the Board of Governors of the Federal Reserve System of the United States (or any successor).

"Borrower": as defined in the heading to this Agreement.

"Borrowing Date": any Business Day specified in a notice pursuant to Section 2.2 or 3.2 as a date on which the Borrower requests the Lenders to make Loans, hereunder.

\_ 0

-3-

**A0501**

PP-TRBK0000035

"Business": as defined in Section 6.22.

"Business Day": (i) for all purposes other than as covered by clause (ii) of this definition, a day other than a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by law to close, and, (ii) with respect to all notices and determinations in connection with, and payments of principal and interest on, Eurodollar Loans, any day which is a Business Day as described in clause (i) of this definition and which is also a day on which dealings in Dollar deposits are carried out in the interbank eurodollar market.

"Capital Stock": any and all shares, interests, participations or other equivalents (however designated) of capital stock of a corporation, any and all similar ownership interests in a Person (other than a corporation) and any and all warrants, rights or options to purchase any of the foregoing.

"Cash Equivalents": (a) securities with maturities of 90 days or less from the date of acquisition issued or fully guaranteed or insured by the United States Government or any agency thereof, (b) certificates of deposit and eurodollar time deposits with maturities of 90 days or less from the date of acquisition and overnight bank deposits of any Lender or of any commercial bank having capital and surplus in excess of $500,000,000, (c) repurchase obligations of any Lender or of any commercial bank satisfying the requirements of clause (b) of this definition, having a term of not more than seven days with respect to securities issued or fully guaranteed or insured by the United States Government, (d) commercial paper of a domestic issuer rated at least A-1 or the equivalent thereof by Standard and Poor's Ratings Group ("S&P") or P-1 or the equivalent thereof by Moody's Investors Service, Inc. ("Moody's") and in either case maturing within 90 days after the day of acquisition, (e) securities with maturities of 90 days or less from the date of acquisition issued or fully guaranteed by any state, commonwealth or territory of the United States, by any political subdivision or taxing authority of any such state, commonwealth or territory or by any foreign government, the securities of which state, commonwealth, territory, political subdivision, taxing authority or foreign government (as the case may be) are rated at least A by S&P or A by Moody's, (f) securities with maturities of 90 days or less from the date of acquisition backed by standby letters of credit issued by any Lender or any commercial bank satisfying the requirements of clause (b) of this definition or (g) shares of money market mutual or similar funds which invest exclusively in assets satisfying the requirements of clauses (a) through (f) of this definition.

"Certain Reinvestment Receipts": as defined in the proviso to the definition of "Reinvestment Notice".

"Class": as to any Loan, its classification as a Term Loan or Revolving Credit Loan.

"Closing Date": the date on which the conditions precedent set forth in Section 7.1 are satisfied or waived.

"Code": the Internal Revenue Code of 1986, as amended from time to time.

"Collateral": all property and interests in property of the Loan Parties, now owned or hereinafter acquired, upon which a Lien is purported to be created by any Security Document.

"Commitment": any Term Loan Commitment or Revolving Credit Commitment.

"Common Stock": the common stock, par value $0.01 per share, of the Borrower.

"Commonly Controlled Entity": an entity, whether or not incorporated, which is under common control with the Borrower within the meaning of Section 4001 of ERISA or is part of a group

\ 0

-4-

**A0502**

which includes the Borrower and which is treated as a single employer under Section 414(b) or (c) of the Code or, for purposes of the Code, Section 414(m) or (o) of the Code.

"Conduit Lender": any special purpose corporation organized and administered by any Lender for the purpose of making Loans otherwise required to be made by such Lender and designated by such Lender in a written instrument; provided, that the designation by any Lender of a Conduit Lender shall not relieve the designating Lender of any of its obligations to fund a Loan under this Agreement if, for any reason, its Conduit Lender fails to fund any such Loan, and the designating Lender (and not the Conduit Lender) shall have the sole right and responsibility to deliver all consents and waivers required or requested under this Agreement with respect to its Conduit Lender, and provided, further, that no Conduit Lender shall (a) be entitled to receive any greater amount pursuant to Section 5.11, 5.12, 5.13 or 12.5 than the designating Lender would have been entitled to receive in respect of the extensions of credit made by such Conduit Lender or (b) be deemed to have any Commitment.

"Confirmation Order": the final order of the Bankruptcy Court, dated July 15, 2003, confirming the Plan of Reorganization pursuant to Section 1129 of the Bankruptcy Code, a copy of which has been provided to each Lender, and such additional orders relating thereto or in aid of consummation thereof as are reasonably satisfactory to the Administrative Agent and each Lender, in each case as amended, supplemented, waived or otherwise modified in accordance with Section 9.10.

"Consolidated Capital Expenditures": for any period, each expenditure made by or committed to be made by the Borrower or any Subsidiary during such period that, in conformity with GAAP, shall be classified as a capital expenditure, regardless of the source of financing.

"Consolidated Current Assets": at a particular date, all amounts which would, in conformity with GAAP, be included under current assets on a consolidated balance sheet of the Borrower and its Subsidiaries as at such date; provided, however, that such amounts shall not include (a) any amounts for any Indebtedness owing by an Affiliate of the Borrower, unless such Indebtedness arose in connection with the sale of goods or other property in the ordinary course of business and would otherwise constitute current assets in conformity with GAAP, (b) any Capital Stock issued by a Subsidiary or Affiliate of the Borrower, or (c) the cash surrender value of any life insurance policy.

"Consolidated Current Liabilities": at a particular date, all amounts which would, in conformity with GAAP, be included under current liabilities on a consolidated balance sheet of the Borrower and its Subsidiaries as at such date.

"Consolidated EBITDA": for any period, the sum for such period, without duplication, of (a) Consolidated Net Income for such period, (b) the sum of provisions for such period for income taxes, interest expense, and depreciation and amortization expense used in determining such Consolidated Net Income, (c) amounts deducted in calculating Consolidated Net Income for such period in respect of non-cash expenses in accordance with GAAP, (d) to the extent deducted in the calculation of such Consolidated Net Income, reorganization charges incurred by the Loan Parties during the fiscal years of the Borrower ended December 31, 2002 and 2003 in connection with the Bankruptcy Cases and the Plan of Reorganization, of the type and in the maximum amounts for the periods set forth on Part A of Schedule 1.1(a), (e) to the extent deducted in the calculation of such Consolidated Net Income, noncash expenses deducted in such period in connection with stock options, the Management Agreement or the Stockholders Agreement, noncash charges in connection with the impairment of certain intangible assets pursuant to the application of Financial Accounting Standards Bulletin ("FASB") Nos. 141 and 142 (Impairment of Goodwill) and FASB Nos. 121 and 144 (Other Impairment of Intangibles), and subsequent revisions to or replacements for such Bulletins, and (f) to the extent deducted in the calculation of such Consolidated Net Income, costs and fees incurred in respect of the investigations

L 0

-5-

**A0503**

disclosed in Schedule 6.6 in the maximum amounts for the periods set forth on Part B of Schedule 1.1(a) all as determined on a consolidated basis in accordance with GAAP.

"Consolidated Fixed Charges": for any period, the sum of (i) the amounts deducted for the cash portion of Consolidated Interest Expense in determining Consolidated Net Income for such period, and (ii) the amount of scheduled payments of principal of Indebtedness after the Closing Date made by the Borrower and its Subsidiaries during such period (excluding all payments under Financing Leases during such period) as determined on a consolidated basis in accordance with GAAP.

"Consolidated Interest Expense": for any period, the amount which, in conformity with GAAP, would be set forth opposite the caption "interest expense" or any like caption (including without limitation, imputed interest included in payments under Financing Leases) on a consolidated income statement of the Borrower and the Subsidiaries for such period excluding the amortization of any original issue discount; provided that, for the first periods of one, two and three fiscal quarters of the Borrower ended following the Closing Date, Consolidated Interest Expense shall be calculated by multiplying the amount determined pursuant to this definition (excluding this proviso) for such one, two or three fiscal quarter period by a fraction, the numerator of which is four and the denominator is the number of fiscal quarters of the Borrower elapsed since the Closing Date as of the end of such period.

"Consolidated Lease Expense": for any period, the aggregate amount of fixed or contingent rentals payable by the Borrower and its Subsidiaries in respect of Financing Leases, determined on a consolidated basis in accordance with GAAP, for such period with respect to leases of real and personal property.

"Consolidated Net Income": for any period, the consolidated net income (or deficit) of the Borrower and the Subsidiaries for such period (taken as a cumulative whole), determined in accordance with GAAP; provided that there shall be excluded (a) the income (or deficit) of any Person accrued prior to the date it becomes a Subsidiary or is merged into or consolidated with the Borrower or any Subsidiary, (b) the income (or deficit) of any Person (other than a Subsidiary) in which the Borrower or any Subsidiary has an ownership interest, except to the extent that any such income has been actually received by the Borrower or such Subsidiary in the form of dividends or similar distributions, (c) the undistributed earnings of any Subsidiary to the extent that the declaration or payment of dividends or similar distributions by such Subsidiary is not at the time permitted by the terms of any Contractual Obligation or Requirement of Law applicable to such Subsidiary, (d) any restoration to income of any contingency reserve, except to the extent that provision for such reserve was made out of income accrued during such period, (e) any aggregate net gain or net loss during such period arising from the sale, exchange or other disposition of capital assets (such term to include all fixed assets, whether tangible or intangible, all inventory sold in conjunction with the disposition of fixed assets and all securities), (f) any write-up of any asset, (g) any net gain from the collection of the proceeds of life insurance policies, (h) any gain arising from the acquisition of any securities, or the extinguishment, under GAAP, of any Indebtedness, of the Borrower or any Subsidiary, (i) in the case of a successor to the Borrower by consolidation or merger or as a transferee of its assets, any earnings of the successor corporation prior to such consolidation, merger or transfer of assets, and (j) any deferred credit representing the excess of equity in any Subsidiary at the date of acquisition over the cost of the investment in such Subsidiary.

"Consolidated Senior Indebtedness": at any time, Consolidated Total Indebtedness at such time minus the aggregate outstanding principal amount of all Subordinated Indebtedness of the Borrower and its Subsidiaries at such time determined on a consolidated basis in accordance with GAAP.

"Consolidated Total Indebtedness": at any time, the aggregate principal amount (including, with respect to any Indebtedness originally issued at a discount, the accreted portion thereof)

L_ 0

-6-

**A0504**

of Indebtedness of Borrower and its Subsidiaries at such time, determined on a consolidated basis in accordance with GAAP, but excluding any Indebtedness in respect of issued but undrawn letters of credit.

"Continue", "Continuation" and "Continued" shall refer to the continuation of a Eurodollar Loan from one Interest Period to the next Interest Period.

"Contractual Obligation": as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"Convert", "Conversion" and "Converted" shall refer to a conversion of Base Rate Loans into Eurodollar Loans or of Eurodollar Loans into Base Rate Loans, which may be accompanied by the transfer by a Lender (at its sole discretion) of a Loan from one Applicable Lending Office to another.

"Co-Payment Obligation" with respect to an Account, the obligation of a Person for whom services were rendered to pay a portion of the cost of such services giving rise to such Account, including, without limitation, any amounts for which a Person for whom services were rendered is personally obligated to pay, including deductibles and co-insurance amounts.

"Credit Exposure": as to any Lender at any time, the sum of (a) its Revolving Credit Commitment (or, if the Revolving Credit Commitments shall have expired or been terminated, the aggregate unpaid principal amount of its Revolving Credit Loans) and (b) the unpaid principal amount of its Term Loans.

"Credit Exposure Percentage": as to any Lender at any time, the fraction (expressed as a percentage), the numerator of which is the Credit Exposure of such Lender at such time and the denominator of which is the aggregate Credit Exposures of all of the Lenders at such time.

"Default": any of the events specified in Section 10, whether or not any requirement for the giving of notice, the lapse of time, or both, or any other condition, has been satisfied.

"Deposit Account Control Agreement": as defined in the Security Agreement.

"DIP Credit Agreement": the Debtor in Possession Financing and Security Agreement, dated as of September 11, 2002, among Old TransCare, certain Subsidiaries of Old TransCare, the lenders parties thereto, and State Street Bank and Trust Company, as agent, as amended, supplemented or otherwise modified prior to the date hereof.

"DIP Loan Documents": the "Loan Documents", as defined in the DIP Credit Agreement.

"Disclosure Statement": means the Disclosure Statement that relates to the Plan of Reorganization and has been approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code, as such Disclosure Statement may be amended, modified, or supplemented (and all exhibits and schedules annexed thereto or referred to therein).

"Dollars" and "$": dollars in lawful currency of the United States of America.

"Eligible Assignee": means (a) a Lender or an affiliate of a Lender, (b) a commercial bank organized under the laws of the United States or any state and having total assets in excess of $500,000,000 or an affiliate of any such bank or (c) any other fund or financial institution or affiliate or

\_ 0

-7-

**A0505**

Approved Fund thereof that in the ordinary course of business extends credit or invests in extensions of credit of a type similar to the Loans and has total assets of at least $100,000,000.

"Environmental Laws": any and all foreign, Federal, state, local or municipal laws, rules, orders, regulations, statutes, ordinances, codes, decrees, requirements of any Governmental Authority or other Requirements of Law (including common law) regulating, relating to or imposing liability or standards of conduct concerning protection of human health or the environment, as now or may at any time hereafter be in effect.

"Equipment": as defined in the Security Agreement.

"ERISA": the Employee Retirement Income Security Act of 1974, as amended from time to time.

"Eurocurrency Reserve Requirements": for any day as applied to a Eurodollar Loan, the aggregate (without duplication) of the rates (expressed as a decimal fraction) of reserve requirements current on such day (including, without limitation, basic, supplemental, marginal and emergency reserves under any regulations of the Board or other Governmental Authority having jurisdiction with respect thereto), as now and from time to time hereafter in effect, dealing with reserve requirements prescribed for eurocurrency funding (currently referred to as "Eurocurrency Liabilities" in Regulation D of such Board) maintained by a member bank of the Federal Reserve System.

"Eurodollar Base Rate": with respect to each day during each Interest Period pertaining to a Eurodollar Loan, the rate per annum determined on the basis of the rate for deposits in Dollars for a period equal to such Interest Period commencing on the first day of such Interest Period appearing on Page 3750 of the Telerate screen (or any successor page) at approximately 11:00 a.m. (London time) two Business Days prior to the first day of such Interest Period. In the event that such rate does not appear on Page 3750 of the Telerate screen (or otherwise on such screen), the "Eurodollar Base Rate" shall be determined by reference to such other comparable publicly available service for displaying eurodollar rates as may be selected by the Administrative Agent or, in the absence of such availability, by reference to the rate at which the Administrative Agent is offered Dollar deposits at or about 11:00 A.M., New York City time, two Business Days prior to the beginning of such Interest Period in the interbank eurodollar market where its eurodollar and foreign currency and exchange operations are then being conducted for delivery on the first day of such Interest Period for the number of days comprised therein.

"Eurodollar Loans": Loans the rate of interest applicable to which is based upon the Adjusted Eurodollar Rate in the case of Term Loans or the Eurodollar Rate in the case of Revolving Credit Loans.

"Eurodollar Rate": with respect to each day during each Interest Period pertaining to a Eurodollar Loan, a rate per annum determined for such day in accordance with the following formula (rounded upwards to the nearest $1/100^{th}$ of 1%):

$$\frac{\text{Eurodollar Base Rate}}{1.00 - \text{Eurocurrency Reserve Requirements}}$$

"Event of Default": any of the events specified in Section 10; provided that any requirement for the giving of notice, the lapse of time, or both, or any other condition, has been satisfied.

"Excess Cash Flow": for each fiscal year of the Borrower beginning with the fiscal year ending December 31, 2003:

L 0

-8-

**A0506**

Confidential                                                                  PP-TRBK0000040

(a) Consolidated EBITDA for such fiscal year;

plus (b) the decrease (if any) in the amount of the excess of Consolidated Current Assets (excluding cash and cash equivalents) over Consolidated Current Liabilities at the end of such fiscal year compared to the amount of the excess of Consolidated Current Assets (excluding cash and cash equivalents) over Consolidated Current Liabilities at the end of the immediately preceding fiscal year of the Borrower;

minus (c) the sum of (i) the amount of all regularly scheduled payments of principal of the Term Loans and other permitted Indebtedness actually made by the Borrower and its Subsidiaries during such fiscal year and the amount of any voluntary prepayment of principal of the Term Loans made during such fiscal year, (ii) the amount of all interest payments actually made in cash during such fiscal year by the Borrower and its consolidated Subsidiaries, (iii) Consolidated Lease Expense for such fiscal year, (iv) the amount of cash capital expenditures actually made by the Borrower and its Subsidiaries during such fiscal year to the extent permitted by Section 9.8, (v) cash income taxes paid by the Borrower and its Subsidiaries during such fiscal year, and (vi) the increase (if any) in the amount of the excess of Consolidated Current Assets (excluding cash and cash equivalents) over Consolidated Current Liabilities at the end of such fiscal year compared to the amount of the excess of Consolidated Current Assets (excluding cash and cash equivalents) over Consolidated Current Liabilities at the end of the immediately preceding fiscal year of the Borrower.

"Existing Specified Leases": collectively, the Financing Leases referred to on Schedule 1.1(c) entered into to finance vehicles and/or equipment listed on Schedule 1.1(c).

"Extraordinary Receipt": any cash received by or paid to or for the account of any Person other than in the ordinary course of business in respect of tax refunds, pension plan reversions, proceeds of insurance (other than proceeds of Recovery Events), indemnity payments, purchase price adjustments received in connection with any purchase agreement (or other similar agreement) and payments in respect of judgments or settlements of claims, litigation or proceedings; provided, that Extraordinary Receipts shall not include cash receipts received from proceeds of indemnity payments or payments in respect of judgments or settlements of claims, litigation or proceedings to the extent that such proceeds, awards or payments are received by any Person in respect of any third party claim against or loss by such Person and promptly applied to pay (or to reimburse such Person for its prior payment of) such claim or loss and the costs and expenses of such Person with respect thereto and that any such third party being so reimbursed shall not be a Loan Party or a Subsidiary or Affiliate of a Loan Party.

"Facility": each of the Term Loan Facility and the Revolving Credit Facility.

"Federal Funds Effective Rate": for any day, the weighted average of the rates on overnight federal funds transactions with members of the Federal Reserve System arranged by federal funds brokers, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day which is a Business Day, the average of the quotations for the day of such transactions received by the Administrative Agent from three federal funds brokers of recognized standing selected by it.

"Financing Lease": any lease of property, real or personal, the obligations of the lessee in respect of which are required in accordance with GAAP to be capitalized on a balance sheet of the lessee.

L 0

-9-

**A0507**

Confidential                                                                    PP-TRBK0000041

"Fixed Rate": at any time during any period set forth below, the rate per annum set forth opposite such period below:

| Period | Rate |
|---|---|
| Closing Date through but excluding first anniversary of Closing Date | 8% |
| First anniversary of Closing Date to but excluding second anniversary of Closing Date | 10% |
| Second anniversary of Closing Date and thereafter | 12% |

"Fixed Rate Loans": Loans the rate of interest applicable to which is based upon the Fixed Rate.

"Funding and Payment Office": as defined in Section 5.9(c).

"GAAP": generally accepted accounting principles in the United States of America in effect from time to time.

"Governing Documents": as to any Person, its articles or certificate of incorporation and by-laws, its partnership agreement, its certificate of formation and operating agreement, and/or the other organizational or governing documents of such Person.

"Governmental Authority": any nation or government, any state or other political subdivision thereof and any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government.

"Guarantee Obligation": as to any Person (the "guaranteeing person"), any obligation of (a) the guaranteeing person or (b) another Person (including, without limitation, any bank under any letter of credit) to induce the creation of which the guaranteeing person has issued a reimbursement, counterindemnity or similar obligation, in either case guaranteeing or in effect guaranteeing any Indebtedness, leases, dividends or other obligations (the "primary obligations") of any other third Person (the "primary obligor") in any manner, whether directly or indirectly, including, without limitation, any obligation of the guaranteeing person, whether or not contingent, (i) to purchase any such primary obligation or any property constituting direct or indirect security therefor, (ii) to advance or supply funds (1) for the purchase or payment of any such primary obligation or (2) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, (iii) to purchase property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation or (iv) otherwise to assure or hold harmless the owner of any such primary obligation against loss in respect thereof; provided, however, that the term Guarantee Obligation shall not include endorsements of instruments for deposit or collection in the ordinary course of business. The terms "Guarantee" and "Guaranteed" used as a verb shall have a correlative meaning. The amount of any Guarantee Obligation of any guaranteeing person shall be deemed to be the lower of (a) an amount equal to the stated or determinable amount of the primary obligation in respect of which such Guarantee Obligation is made and (b) the maximum amount for which such guaranteeing person may be liable pursuant to the terms of the instrument embodying such Guarantee Obligation, unless such primary obligation and the maximum amount for which such guaranteeing person may be liable are not stated or

\_ 0

-10-

Confidential

determinable, in which case the amount of such Guarantee Obligation shall be such guaranteeing person's maximum reasonably anticipated liability in respect thereof as determined by the Borrower in good faith.

"Hampshire Management": Hampshire Management Company LLC.

"Hampshire Persons": collectively, Hampshire Management, ING Equity, Hampshire Media C Corp. II and Hampshire Media Partners II, L.P.

"Hedge Agreement": any interest rate or currency swap, cap or collar agreement or similar arrangement or foreign exchange contract entered into by the Borrower or any of its Subsidiaries providing for protection against fluctuations in interest rates or currency exchange rates or the exchange of nominal interest obligations, either generally or under specific contingencies.

"Immaterial Subsidiaries": Each of the Subsidiaries whose assets are less than $50,000 and whose annual revenues are less than $50,000; but only so long as the aggregate of all assets of all such Subsidiaries is less than $250,000 and the aggregate of all revenues of all such Subsidiaries is less than $250,000.

"Indebtedness": of any Person at any date, without duplication, (a) all indebtedness of such Person for borrowed money (whether by loan or the issuance and sale of debt securities) or for the deferred purchase price of property or services (other than current trade liabilities incurred in the ordinary course of business and payable in accordance with customary practices), (b) any other indebtedness of such Person which is evidenced by a note, bond, debenture or similar instrument, (c) all obligations of such Person under Financing Leases, (d) all obligations of such Person in respect of letters of credit in excess of any cash collateral securing such letters of credit as permitted under Section 9.2(h), acceptances or similar instruments issued or created for the account of such Person, (e) all Guarantee Obligations of such Person in respect of obligations of the kind referred to in clauses (a) through (d) above, (f) all liabilities secured by (or for which the holder of such obligations has an existing right, contingent or otherwise, to be secured by) any Lien on any property owned by such Person even though such Person has not assumed or otherwise become liable for the payment thereof, (g) for the purposes of Section 10 (f) only, all obligations of such Person in respect of Hedge Agreements, (h) the redemption price for any preferred stock to the extent of any redemption required prior to maturity of the Loans and (i) all obligations of such Person in respect of synthetic-leases, sale-leasebacks and securitization transactions. The amount of any Indebtedness under (x) clause (f) shall be equal to the lesser of (A) the stated amount of the relevant obligations and (B) the fair market value of the property subject to the relevant Lien and (y) clause (g) shall be the net amount, including any net termination payments, required to be paid to a counterparty rather than the notional amount of the applicable Hedge Agreement. "Indebtedness" of any Person shall not include any obligations, including interest or other charges, incurred by such Person to finance insurance premiums in the ordinary course of such Person's business.

"ING Equity": ING Equity Partners L.P. I.

"Insolvency": with respect to any Multiemployer Plan, the condition that such Plan is insolvent within the meaning of Section 4245 of ERISA.

"Insolvent": pertaining to a condition of Insolvency.

"Institutional Receivables": Accounts arising from the delivery of services by the Borrower or a Subsidiary for which the obligor is a hospital, nursing home or other institution, including without limitation, the Veteran's Hospital, the New York Board of Education, and the Veterans

L 0

-11-

Confidential

**A0509**

PP-TRBK0000043

Administration, and in any event excluding that portion of an account receivable constituting a Co-Payment Obligation.

"Interest Payment Date": (a) as to any Base Rate Loan or Fixed Rate Loan, the first Business Day of each month, (b) as to any Eurodollar Loan having an Interest Period of one month, the last day of such Interest Period, (c) as to any Eurodollar Loan having an Interest Period longer than one month, (i) each day which is one month, or a whole multiple thereof, after the first day of such Interest Period, and (ii) the last day of such Interest Period and (d) as to any Loan (other than any Revolving Credit Loan that is a Base Rate Loan), the date of any repayment or prepayment made in respect thereof.

"Interest Period": with respect to any Eurodollar Loan:

(a)      initially, the period commencing on the borrowing or Conversion date, as the case may be, with respect to such Eurodollar Loan and ending one, two, or three months thereafter, as selected by the Borrower in its notice of borrowing or notice of Conversion, as the case may be, given with respect thereto (in the form of Annex I) ; and

(b)      thereafter, each period commencing on the last day of the next preceding Interest Period applicable to such Eurodollar Loan and ending one, two, or three months thereafter, as selected by the Borrower by irrevocable notice (in the form of Annex I) to the Administrative Agent not less than three Business Days prior to the last day of the then current Interest Period with respect thereto;

provided that, all of the foregoing provisions relating to Interest Periods are subject to the following:

(1) if any Interest Period would otherwise end on a day that is not a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless the result of such extension would be to carry such Interest Period into another calendar month in which event such Interest Period shall end on the immediately preceding Business Day;

(2) any Interest Period with respect to any Revolving Credit Loan that would otherwise extend beyond the Revolving Credit Termination Date, shall end on the Revolving Credit Termination Date, and any Interest Period with respect to any Term Loan that would otherwise extend beyond the date final payment is due on the Term Loan shall end on such date of final payment, as the case may be;

(3) any Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall end on the last Business Day of a calendar month; and

(4) the Borrower shall select Interest Periods so as not to require a payment or prepayment of any Eurodollar Loan during an Interest Period for such Loan.

"Inventory": as defined in the Security Agreement.

"Lender": as defined in the preface.

"Leverage Ratio": at any time, the ratio of (a) Consolidated Senior Indebtedness as of such time to (b) Consolidated EBITDA for the twelve consecutive months most recently ended at or most recently prior to such time.

L 0

-12-

**A0510**

Confidential

PP-TRBK0000044

"Lien": any mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), charge or other security interest or any preference, priority or other security agreement or preferential arrangement of any kind or nature whatsoever (including, without limitation, any conditional sale or other title retention agreement and any Financing Lease having substantially the same economic effect as any of the foregoing), and the filing of any financing statement under the Uniform Commercial Code or comparable law of any jurisdiction in respect of any of the foregoing.

"Loan": any loan made by any Lender pursuant to this Agreement.

"Loan Documents": this Agreement, the Notes, the Applications, the Subsidiaries Guarantee and the Security Documents.

"Loan Parties": the Borrower and any Subsidiary of the Borrower which is or becomes a party to a Loan Document.

"Majority Facility Lenders": with respect to any Facility, the holders of more than 50% of the aggregate unpaid principal amount of the Term Loans or the Aggregate Outstanding RC Extensions of Credit, as the case may be, outstanding under such Facility (or, in the case of the Revolving Credit Facility, prior to any termination of the Revolving Credit Commitments, the holders of more than 50% of the aggregate Revolving Credit Commitments of all Revolving Credit Lenders).

"Management Agreement": the Management Consulting Services Agreement, dated as of August 4, 2003, among the Borrower and Hampshire Management, as amended, supplemented an otherwise modified from time to time as permitted under Section 9.10.

"Management Fees": the periodic fees payable to the Hampshire Persons pursuant to the Management Agreement.

"Material Adverse Effect": a material adverse effect on (a) the business, operations, property, condition (financial or otherwise) or prospects of the Borrower and its Subsidiaries taken as a whole or (b) the validity or enforceability of this Agreement or any of the other Loan Documents or the rights or remedies of the Administrative Agent or the Lenders hereunder or thereunder.

"Material Environmental Amount": as defined in Section 6.22(a).

"Materials of Environmental Concern": any gasoline or petroleum (including crude oil or any fraction thereof) or petroleum products or any hazardous or toxic substances, materials or wastes, defined or regulated as such in, or which form the basis of liability under, or under any Environmental Law, including, without limitation, asbestos, polychlorinated biphenyls and urea-formaldehyde insulation, medical waste, radioactive materials and electromagnetic fields.

"Medicare Controlled Account Agreement": as defined in the Security Agreement.

"Medicare/Medicaid Receivables": Accounts arising from the delivery of services by the Borrower or a Subsidiary of the Borrower that are billed to the Medicare Programs ("Medicare Receivables") or Medicaid Programs ("Medicaid Receivables"), and in any event excluding, at such time as the Borrower is advised that a portion thereof is a Co-Payment Obligation, that portion of an Account constituting a Co-Payment Obligation.

L 0

-13-

**A0511**

Confidential

PP-TRBK0000045

"Mortgage": each mortgage, if required, to be executed and delivered by the Loan Parties, form approved by the Administrative Agent and the Required Lenders, with respect to the real properties or interests in real property on which any Loan Party is required to grant a Lien and security interest to the Administrative Agent, for the ratable benefit of the Lenders, pursuant to Section 8.10, as the same may be amended, supplemented or otherwise modified from time to time.

"Mortgage Documents": collectively, the Mortgages and any landlord estoppels, landlord waivers, surveys, title insurance policies or other documents or instruments, required to be delivered in connection with a Mortgage.

"Multiemployer Plan": a Plan which is a "multiemployer plan" as defined in Section 4001(a)(3) of ERISA and which is subject to Title IV of ERISA.

"Net Cash Proceeds": with respect to any Asset Sale, Recovery Event or Extraordinary Receipt, as the case may be, the aggregate amount of cash received from time to time (whether as initial consideration or through payment or disposition of deferred consideration) by or on behalf of such Person for its own account in connection with any such transaction, after deducting therefrom only:

(a)       reasonable and customary brokerage commissions, underwriting fees and discounts, legal fees, finder's fees and other similar fees, costs and commissions that, in each case, are actually paid to a Person that is not a Subsidiary or Affiliate of any of the Loan Parties, any Hampshire Person, or any of their respective Subsidiaries or Affiliates;

(b)       the amount of taxes payable in connection with or as a result of such transaction that, in each case, are actually paid at the time of receipt of such cash to the applicable taxation authority or other Governmental Authority or, so long as such Person is not otherwise indemnified therefor, are reserved for in accordance with GAAP, as in effect at the time of receipt of such cash, based upon such Person's reasonable estimate of such taxes, and paid to the applicable taxation authority or other Governmental Authority within 180 days after the date of receipt of such cash or when due;

(c)       in the case of any Asset Sale or Recovery Event, the outstanding principal amount of, the premium or penalty, if any, on, and any accrued and unpaid interest on, any Indebtedness (other than Indebtedness under or in respect of the Loan Documents) that is secured by a Lien on the property and assets subject to such sale, lease, transfer or other disposition and is repaid under the terms of such Indebtedness as a result of such sale, lease, transfer or other disposition, in each case, to the extent that the amounts so deducted are actually paid within 180 days after the time of receipt of such cash to a Person that is not an Affiliate of any of the Loan Parties or any of their Affiliates; and

(d)       in the case of any Asset Sale, any portion of cash proceeds reserved in good faith for post-closing adjustments, indemnities and retained liabilities;

provided, that any and all amounts so deducted by any such Person pursuant to clauses (a) through (d) of this definition shall be properly attributable to such transaction or to the property or asset that is the subject thereof and provided, further, that if, at the time any of the taxes or obligations referred to in clause (b) or (d) are actually paid or otherwise satisfied, the reserve therefor exceeds the amount paid or otherwise satisfied, then the amount of such excess reserve shall constitute "Net Cash Proceeds" on and as of the date of such payment or other satisfaction for all purposes of this Agreement and, to the extent required under Section 5.6, the Borrower shall reduce the Commitments on such date in accordance with the terms of Section 5.6, and shall prepay the Loans outstanding on such date in accordance with the terms of Section 5.6, in an amount equal to the amount of such excess reserve.

\ 0

-14-

**A0512**

"New Lending Office": as defined in Section 5.12(c)(ii).

"Non-Bank Status Certificate": as defined in Section 5.11(b)(i)(B).

"Non-Excluded Taxes": as defined in Section 5.10.

"Notes": the collective reference to the Revolving Credit Notes and the Term Notes.

"Obligations": the unpaid principal amount of, and interest (including, without limitation, interest accruing after the maturity of the Loans and interest accruing after the filing of any petition in bankruptcy, or the commencement of any insolvency, reorganization or like proceeding, relating to the Borrower, whether or not a claim for post-filing or post-petition interest is allowed in such proceeding) on the Loans, and all other obligations and liabilities of the Loan Parties to the Administrative Agent and the Lenders, whether direct or indirect, absolute or contingent, due or to become due, or now existing or hereafter incurred, which may arise under, or out of or in connection with this Agreement, the Notes, the Subsidiaries Guarantee, the Security Documents, any other Loan Documents, any Hedge Agreement entered into with any Lender or any Affiliate or Subsidiary of any Lender, and any other document made, delivered or given in connection therewith or herewith, whether on account of principal, interest, reimbursement obligations, fees, indemnities, costs, expenses (including, without limitation, all fees and disbursements of counsel to the Administrative Agent or to the Lenders that are required to be paid by a Loan Party pursuant to the terms of the Loan Documents) or otherwise.

"Old TransCare": TransCare Corporation, a Delaware corporation, prior to the consummation of the reorganization contemplated by the Plan of Reorganization and the Confirmation Order.

"Participant": as defined in Section 12.6(b).

"Patriarch": collectively, (a) Patriarch Partners II, LLC, a Delaware limited liability company, as collateral manager for ARK II CLO 2001-1, Limited, and (b) Patriarch Partners III, LLC, a Delaware limited liability company, as investment advisor for ARK Investment Partners II L.P.

"Payroll Accounts": as defined in the Security Agreement.

"PBGC": the Pension Benefit Guaranty Corporation established pursuant to Subtitle A of Title IV of ERISA.

"Person": an individual, partnership, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, Governmental Authority or other entity of whatever nature.

"Plan": at a particular time, any employee benefit plan which is covered by ERISA and in respect of which the Borrower or a Commonly Controlled Entity is (or, if such plan were terminated at such time, would under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA.

"Plan of Reorganization": the Debtors' Third Amended Joint Consolidated Plan of Reorganization, dated June 18, 2003, proposed by Old TransCare and its Subsidiaries debtors in the Bankruptcy Cases in the form attached to the Disclosure Statement, as amended, supplemented or otherwise modified prior to the Closing Date and as thereafter further amended, supplemented or otherwise modified in accordance with Section 9.10.

\ 0

-15-

**A0513**

Confidential

PP-TRBK0000047

"Pledge Agreement": the Pledge Agreement, to be dated as of the date hereof, by the Borrower, TransCare Maryland, Inc. and TransCare New York, Inc., and any other subsidiary required to become parties thereto pursuant to Section 8.10, in favor of the Administrative Agent, substantially in the form of Exhibit B, as the same may be amended, supplemented or otherwise modified from time to time.

"Private Pay/Co-Pay Receivables": Accounts arising from the delivery of services by the Borrower or a Subsidiary of the Borrower (a) to the extent the obligor thereunder is not the United States pursuant to Medicare or Medicaid and (b) which are not Institutional Receivables or Third Party Insurance Receivables; provided that Private Pay/Co-Pay Receivables shall in any event include Co-Payment Obligations.

"Properties": as defined in Section 6.22.

"Qualified Counterparty": with respect to any Specified Hedge Agreement, any counterparty thereto that, at the time such Specified Hedge Agreement was entered into, was a Lender or an Affiliate or Subsidiary of a Lender.

"Recovery Event": any settlement of or payment in respect of any property or casualty insurance claim (including, without limitation, proceeds of business interruption insurance), any settlement of or payment from any fund for Persons affected by disasters or acts of terrorism or other similar events, or any condemnation proceeding relating to any asset of the Borrower or any of its Subsidiaries with a value, together with all other such settlements or payments during any fiscal year, in excess of $250,000 in any fiscal year of the Borrower.

"Register": as defined in Section 12.6(d).

"Regulation U": Regulation U of the Board as in effect from time to time.

"Reinvestment Deferred Amount": with respect to any Reinvestment Event, the aggregate Net Cash Proceeds received by the Borrower or any of its Subsidiaries in connection therewith which are not applied to prepay the Term Loans or reduce the Revolving Credit Commitments pursuant to Section 5.6(c) as a result of the delivery of a Reinvestment Notice.

"Reinvestment Event": any Asset Sale, Recovery Event or receipt of Extraordinary Receipts in respect of which the Borrower has delivered a Reinvestment Notice.

"Reinvestment Notice": a written notice executed by a Responsible Officer and delivered to the Administrative Agent, stating that no Event of Default has occurred and is continuing and that the Borrower (directly or indirectly through a Subsidiary Guarantor) intends and expects to use all or a specified portion of the Net Cash Proceeds of an Asset Sale, Recovery Event or Extraordinary Receipt to acquire assets (directly or through the purchase of the Capital Stock of a Person) pursuant to an acquisition of any assets or property useful in its business, provided, however, in the case of (x) any Recovery Event other than a payment in respect of any casualty loss or condemnation proceeding relating to the loss of a specific asset or (y) in the case of an Extraordinary Receipt (collectively, the proceeds of Recovery Events and Extraordinary Receipts described in clauses (x) and (y) of this proviso are referred to as "Certain Reinvestment Receipts"), the Borrower need only state that such Net Cash Proceeds will be used for working capital purposes or to cover financial losses resulting from the event or to so acquire assets useful in its business.

"Reinvestment Prepayment Amount": with respect to any Reinvestment Event, the Reinvestment Deferred Amount relating thereto less any amount expended prior to the relevant

\_0

-16-

**A0514**

Confidential
PP-TRBK0000048

Reinvestment Prepayment Date to acquire assets (directly or through the purchase of the Capital Stock of a Person pursuant to an acquisition of any assets or property) useful in the Borrower's or any of its Subsidiaries' business.

"Reinvestment Prepayment Date": with respect to any Reinvestment Event, the earlier of (a) the date occurring six months after such Reinvestment Event (or in the case of any Reinvestment Event arising out of a casualty insurance claim where the Borrower or any of its Subsidiaries is rebuilding, restoring, or replacing the property subject to such casualty, the date occurring twelve months after such Reinvestment Event), (b) the date on which the Borrower shall have determined not to, or shall have otherwise ceased to, acquire assets (directly or through the purchase of the Capital Stock of a Person pursuant to an acquisition of assets or property) useful in the Borrower's or any of its Subsidiaries' business with all or any portion of the relevant Reinvestment Deferred Amount or, in the case of Certain Reinvestment Receipts to use such Net Cash Proceeds for working capital purposes or to cover financial losses resulting from the event, and (c) in the case of Certain Reinvestment Receipts, twelve months.

"Reorganization": with respect to any Multiemployer Plan, the condition that such plan is in reorganization within the meaning of Section 4241 of ERISA.

"Reportable Event": any of the events set forth in Section 4043(b) of ERISA, other than those events as to which the thirty day notice period is waived under Sections .21, .22, .23, .26, .27 or .28 of PBGC Reg. § 4043.

"Required Lenders": at any time, Lenders the Credit Exposure Percentages of which aggregate more than 50%.

"Required Prepayment Lenders": the Majority Facility Lenders in respect of each Facility.

"Requirement of Law": as to any Person, the certificate of incorporation and by-laws or other organizational or Governing Documents of such Person, and any law, treaty, rule or regulation or determination of an arbitrator or a court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"Responsible Officer": the chief executive officer or the president of the Borrower, and, with respect to financial matters, the chief financial officer, president or vice president of the Borrower.

"Revolving Credit Commitment": as to any Lender, the obligation of such Lender to make Revolving Credit Loans to the Borrower pursuant to Section 3.1 in an aggregate principal and/or face amount at any one time outstanding not to exceed the amount set forth opposite such Lender's name on Schedule 1.0 under the caption "Revolving Credit Commitment" or, as the case may be, in the Assignment and Acceptance pursuant to which such Lender became a party hereto, as such amount may be changed from time to time in accordance with the provisions of this Agreement. The original aggregate amount of the Revolving Credit Commitment is $5,000,000.

"Revolving Credit Commitment Percentage": as to any Lender at any time, the percentage which such Lender's Revolving Credit Commitment then constitutes of the aggregate Revolving Credit Commitments (or, at any time after the Revolving Credit Commitments shall have expired or terminated, the percentage which the aggregate principal amount of such Lender's Revolving Credit Loans then outstanding constitutes of the aggregate principal amount of the Revolving Credit Loans then outstanding).

\_0

**A0515**

Confidential

PP-TRBK0000049

"Revolving Credit Commitment Period": the period from and including the date hereof to but not including the Revolving Credit Termination Date or such earlier date on which the Revolving Credit Commitments shall terminate as provided herein.

"Revolving Credit Facility": the Revolving Credit Commitments and the extensions of credit made thereunder.

"Revolving Credit Lender": any Lender who has a Revolving Credit Commitment.

"Revolving Credit Loans": as defined in Section 3.1.

"Revolving Credit Note": as defined in Section 5.4(e).

"Revolving Credit Termination Date": December 31, 2005.

"Revolving Extensions of Credit": as to any Revolving Credit Lender at any time, an amount equal to the aggregate principal amount of all Revolving Credit Loans made by such Revolving Credit Lender then outstanding.

"Security Agreement": the Security Agreement, to be dated as of the date hereof, to be executed and delivered by the Borrower and each Subsidiary in favor of the Administrative Agent, substantially in the form of Exhibit C, as the same may be amended, supplemented or otherwise modified from time to time.

"Security Documents": the collective reference to the Security Agreement, the Pledge Agreement, the Mortgages (if any), and all other security documents hereafter delivered to the Administrative Agent granting a Lien on any asset or assets of any Person to secure any of the Obligations or to secure any guarantee of any such Obligations.

"Single Employer Plan": any Plan which is covered by Title IV of ERISA, but which is not a Multiemployer Plan.

"Specified Hedge Agreement": any Hedge Agreement entered into by (a) the Borrower or any of its Subsidiaries and (b) any Person that, at the time such Hedge Agreement is entered into, is a Qualified Counterparty.

"Stock Equivalents": all securities convertible into or exchangeable for Capital Stock and all warrants, options or other rights to purchase or subscribe for any Capital Stock, whether or not presently convertible, exchangeable or exercisable.

"Stockholders' Agreement": the Stockholders Agreement, dated as of August 4, 2003, among the Borrower and the stockholders listed on the signature pages thereto, as amended, supplemented or otherwise modified from time to time in accordance with Section 9.10.

"Stock Option Plan": the Borrower's 2003 Stock Incentive Plan, as amended, supplemented or otherwise modified from time to time in accordance with Section 9.10, and the option or other award agreements issued thereunder.

"Subordinated Indebtedness": any Indebtedness of the Borrower or any of its Subsidiaries which is by its terms junior in right of payment to any other Indebtedness of the Borrower or any of its Subsidiaries on terms and conditions reasonably acceptable to the Required Lenders.

\_0

-18-

**A0516**

"Subsidiaries Guarantee" or the "Guarantee": the Guarantee, to be dated as of the date hereof, to be executed and delivered by each Subsidiary in favor of the Administrative Agent, substantially in the form of Exhibit D as the same may be amended, supplemented or otherwise modified from time to time.

"Subsidiary": as to any Person, a corporation, partnership or other entity of which shares of stock or other ownership interests having ordinary voting power (other than stock or such other ownership interests having such power only by reason of the happening of a contingency) to elect a majority of the board of directors or other managers of such corporation, partnership or other entity are at the time owned, or the management of which is otherwise controlled, directly or indirectly through one or more intermediaries, or both, by such Person. Unless otherwise qualified, all references to a "Subsidiary" or to "Subsidiaries" in this Agreement shall refer to a Subsidiary or Subsidiaries of the Borrower but shall exclude the Immaterial Subsidiaries.

"Subsidiary Guarantor": any Subsidiary party to the Subsidiaries Guarantee as a guarantor.

"Supplemental Agent": as defined in Section 11.2.

"TCNY": TransCare New York, Inc., a Delaware corporation.

"Term Loan": as defined in Section 2.1.

"Term Loan Commitment": as to each Lender, the obligation of such Lender, if any, to accept a Term Loan owing by the Borrower hereunder as part of its distribution under the Plan of Reorganization in connection with the Bankruptcy Cases in a principal amount equal to the amount set forth opposite such Lender's name on Schedule 1.0 under the caption "Term Loan Commitment", or, as the case may be, in the Assignment and Acceptance pursuant to which such Lender became a party hereto, as such amount may be changed from time to time in accordance with the provisions of this Agreement. The original aggregate amount of the Term Loan Commitments is $30,000,000.

"Term Loan Facility": the Term Loan Commitments and the Term Loans made thereunder.

"Term Loan Lender": any Lender who has a Term Loan Commitment.

"Term Loan Percentage": as to any Lender at any time, the percentage which such Lender's Term Loan Commitment then constitutes of the aggregate Term Loan Commitments (or, at any time after the Closing Date, the percentage which the principal amount of such Lender's Term Loan then outstanding constitutes of the aggregate principal amount of the Term Loans then outstanding); provided, that solely for purposes of calculating the amount of each installment of Term Loans (other than the last installment) payable to a Term Loan Lender pursuant to Section 2.2, such Term Loan Lender's Term Loan Percentage shall be calculated without giving effect to any portion of any prior mandatory or optional prepayment attributable to such Term Loan Lender's Term Loans which shall have been declined by such Term Loan Lender (or, in the case of any Term Loan Lender which shall have acquired its Term Loans by assignment from another Person, by such other Person).

"Term Note": as defined in Section 5.4(e).

$\llcorner$ 0

-19-

**A0517**

"Third Party Insurance Receivables": accounts receivable arising from the delivery of services by the Borrower or a Subsidiary for which the obligor is a managed care organization, and in any event excluding that portion of an account receivable constituting a Co-Payment Obligation.

"Tranche": the collective reference to Eurodollar Loans the then current Interest Periods with respect to all of which begin on the same date and end on the same later date (whether or not such Loans shall originally have been made on the same day).

"Transferee": as defined in Section 12.6(f).

"Type": as to any Loan, its nature as a Base Rate Loan or a Eurodollar Loan.

"UCC": the Uniform Commercial Code (or any successor statute), as in effect from time to time, of the State of New York or of any other state the laws of which are required as a result thereof to be applied in connection with the issue of perfection of security interests.

"Uniform Customs": the Uniform Customs and Practice for Documentary Credits (1993 Revision), International Chamber of Commerce Publication No. 500, as the same may be amended from time to time.

"Vehicle": as defined in the Security Agreement.

"Vehicle Triggering Event": as defined in Section 8.11 hereof.

"Wachovia": as defined in Section 11.2 hereof.

"Warrant Agreement": the Warrant Agreement to be entered into among the Borrower and the Persons parties thereto as holders pursuant to the Plan of Reorganization, as the same may be amended, supplemented or otherwise modified from time to time.

"Warrant Documents": collectively, the Warrant Agreement and the Warrants.

"Warrants": the Tranche A Warrants and Tranche B Warrants to purchase common stock of the Borrower issued pursuant to the Warrant Agreement.

1.2  Other Definitional Provisions. (a) Unless otherwise specified therein, all terms defined in this Agreement shall have the defined meanings when used in any Notes or any other Loan Documents or any certificate or other document made or delivered pursuant hereto.

(b)  As used herein and in any Notes, any other Loan Document and any certificate or other document made or delivered pursuant hereto, accounting terms relating to the Borrower and its Subsidiaries not defined in Section 1.1 and accounting terms partly defined in Section 1.1, to the extent not defined, shall have the respective meanings given to them under GAAP.

(c)  The words "hereof", "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and Section, Schedule and Exhibit references are to this Agreement unless otherwise specified.

(d)  The meanings given to terms defined herein shall be equally applicable to both the singular and plural forms of such terms.

\ 0

-20-

**A0518**

Confidential

SECTION 2.   AMOUNT AND TERMS OF TERM LOANS

2.1   Term Loans. Subject to the terms and conditions hereof, on the Closing Date and pursuant to the Plan of Reorganization and the Confirmation Order and as a portion of its distribution under the Plan of Reorganization, each Term Loan Lender shall receive ownership of a term loan (a "Term Loan") owing by the Borrower in an amount equal to the Term Loan Commitment of such Term Loan Lender then in effect. The Term Loans distributed on the Closing Date shall constitute the "New Notes" referred to in the Plan of Reorganization. The Term Loans may from time to time be (a) Eurodollar Loans, (b) Base Rate Loans or (c) a combination thereof, as determined by the Borrower and notified to the Administrative Agent in accordance with Section 5.2.

2.2   Procedure for Term Loan Distribution.   The Borrower shall give the Administrative Agent irrevocable notice (in the form of Annex I) (which notice must be received by the Administrative Agent prior to 10:00 a.m., New York City time, three Business Days prior to the Closing Date (and the Administrative Agent shall provide each Term Loan Lender with such notice prior to 3:00 p.m., New York City time, on such date), requesting that the Term Loan Lenders accept distribution of the Term Loans on the Closing Date pursuant to the Plan of Reorganization and specifying (i) the Closing Date, (ii) the aggregate principal amount of Term Loans, which shall not be less than the amount specified on Schedule 1.0, (iii) whether the Term Loans are to be initially Eurodollar Loans, Base Rate Loans or a combination thereof, and (iv) if the Term Loans are to be entirely or partly Eurodollar Loans, the amounts of such Type of Loan and the lengths of the initial Interest Periods therefor. Upon receipt of such notice the Administrative Agent shall promptly notify each Term Loan Lender thereof. Upon the satisfaction of the conditions precedent set forth in Sections 7.1 and 7.2 on the Closing Date, the Term Loans shall be deemed to have been distributed to the Term Loan Lenders in satisfaction of and in the principal amount of the Term Loan Lenders' respective Term Loan Commitments, and Administrative Agent shall record in the Register the name and address of each such Term Loan Lender and the principal amount of such Term Loan Lender's Term Loan, whereupon the Term Loans shall be obligations owing by the Borrower in accordance with the terms of, and shall be entitled to the benefits of, this Agreement and the other Loan Documents.

2.3   Repayment of Term Loans. The Borrower shall pay to the Administrative Agent, for the account of the Term Loan Lenders, the principal amount of the Term Loans in nine consecutive quarterly installments payable on the last day of March, June, September and December of each year, commencing on December 31, 2003, each of which shall be in an amount equal to the amount set forth below opposite such installment (and, upon receipt thereof, the Administrative Agent will distribute to each Term Loan Lender its Term Loan Percentage of each such payment):

| Installment | Principal Amount |
| --- | --- |
| December 31, 2003 | $125,000 |
| March 31, 2004 | $125,000 |
| June 30, 2004 | $125,000 |
| September 30, 2004 | $125,000 |
| December 31, 2004 | $250,000 |
| March 31, 2005 | $250,000 |
| June 30, 2005 | $250,000 |
| September 30, 2005 | $250,000 |

\_0

-21-

**A0519**

Confidential

December 31, 2005      $28,875,000 or the unpaid
balance

## SECTION 3.    AMOUNT AND TERMS OF REVOLVING CREDIT COMMITMENTS

3.1    Revolving Credit Commitments. (a) Subject to the terms and conditions hereof, each Revolving Credit Lender severally agrees to make revolving credit loans ("Revolving Credit Loans") to the Borrower from time to time during the Revolving Credit Commitment Period in an aggregate principal amount at any one time outstanding which does not exceed the amount of such Revolving Credit Lender's Revolving Credit Commitment then in effect, provided that, without the prior written consent of the Majority Facility Lenders in respect of the Revolving Credit Facility, no such Revolving Credit Loan shall be made if, after giving effect thereto, the aggregate Available RC Commitments of all the Revolving Credit Lenders would be less than $350,000. During the Revolving Credit Commitment Period the Borrower may use the Revolving Credit Commitments by borrowing, prepaying the Revolving Credit Loans in whole or in part, and reborrowing, all in accordance with the terms and conditions hereof.

(b)    The Revolving Credit Loans may from time to time be (i) Eurodollar Loans, (ii) Base Rate Loans or (iii) a combination thereof, as determined by the Borrower and notified to the Administrative Agent in accordance with Sections 2.3 and 5.2; provided, that no Revolving Credit Loan shall be made as a Eurodollar Loan after the day that is one month prior to the Revolving Credit Termination Date.

3.2    Procedure for Revolving Credit Borrowing. The Borrower may borrow under the Revolving Credit Commitments during the Revolving Credit Commitment Period on any Business Day in an aggregate principal amount not exceeding the aggregate Available RC Commitments, provided that the Borrower shall give the Administrative Agent irrevocable notice (in the form of Annex I) which notice must be received by the Administrative Agent prior to 10:00 a.m., New York City time, two Business Days prior to the requested Borrowing Date (and the Administrative Agent shall provide each Revolving Credit Lender with such notice prior to 3:00 p.m., New York City time, on such date), specifying (i) the amount to be borrowed, (ii) the requested Borrowing Date, (iii) whether the borrowing is to be of Eurodollar Loans, Base Rate Loans or a combination thereof and (iv) if the borrowing is to be entirely or partly of Eurodollar Loans, the amounts of such Type of Loan and the respective lengths of the initial Interest Periods therefor. Each borrowing under the Revolving Credit Commitments shall be in an amount equal to (x) in the case of Base Rate Loans, $100,000 or a whole multiple of $100,000 in excess thereof (or, if the then Available RC Commitments are less than $100,000 such lesser amount) and (y) in the case of Eurodollar Loans, $1,000,000 or a whole multiple of $100,000 in excess thereof, provided that the initial Revolving Credit Loans to be made on the Closing Date may be Base Rate Loans equal to the amount owing under the DIP Loan Documents, notwithstanding that such amount is different from the amount provided in clause (x) of this sentence. Upon receipt of any such notice from the Borrower, the Administrative Agent shall promptly notify each Revolving Credit Lender thereof. Each Revolving Credit Lender will make the amount of its pro rata share of each borrowing available to the Administrative Agent for the account of the Borrower at the office of the Administrative Agent specified in Section 12.2 prior to 11:00 a.m., New York City time, on the Borrowing Date requested by the Borrower in funds immediately available to the Administrative Agent. Such borrowing will then be made available to the Borrower by the Administrative Agent crediting the account of the Borrower on the books of such office with the aggregate of the amounts made available to the Administrative Agent by the Revolving Credit Lenders and in like funds as received by the Administrative Agent.

\_0

-22-

**A0520**

Confidential

PP-TRBK0000054

3.3     Commitment Fee, Facility Fee.    (a)   The Borrower agrees to pay to the Administrative Agent for the account of each Revolving Credit Lender a commitment fee for the period from and including the first day of the Revolving Credit Commitment Period to but not including the Revolving Credit Termination Date, computed at the rate of 0.625% per annum on the average daily amount of the Available RC Commitment of such Revolving Credit Lender during the period for which payment is made, payable quarterly in arrears on the first Business Day of each January, April, July and October and on the Revolving Credit Termination Date or such earlier date as the Revolving Credit Commitments shall terminate as provided herein, commencing on the first of such dates to occur after the date hereof.

(b)     The Borrower agrees to pay to the Administrative Agent for the account of each Revolving Credit Lender a facility fee for the period from and including the first day of the Revolving Credit Commitment Period to but not including the Revolving Credit Termination Date, computed at the rate of 2% per annum on the average daily amount of the Revolving Credit Commitment of such Revolving Credit Lender during the period for which payment is made, payable (i) for the first year following the Closing Date, in advance on the Closing Date, and (ii) thereafter, annually in advance on each anniversary of the Closing Date and on the Revolving Credit Termination Date or such earlier date as the Revolving Credit Commitments shall terminate as provided herein, commencing on the first of such dates to occur after first anniversary of the Closing Date.

3.4     Termination or Reduction of Revolving Credit Commitments.    The Borrower shall have the right, upon not less than three Business Days' notice to the Administrative Agent, to terminate the Revolving Credit Commitments or, from time to time, to reduce the amount of the Revolving Credit Commitments, provided that no such termination or reduction shall be permitted if, after giving effect thereto and to any prepayments of the Revolving Credit Loans made on the effective date thereof, the aggregate principal amount of the Revolving Credit Loans then outstanding would exceed the Revolving Credit Commitments then in effect.  Any such reduction shall be in an amount equal to $1,000,000 or a whole multiple thereof and shall reduce permanently the Revolving Credit Commitments then in effect.

SECTION 4.     [RESERVED]

SECTION 5.     GENERAL PROVISIONS APPLICABLE TO LOANS

5.1     Interest Rates and Payment Dates.    (a)   Each Term Loan which is a Eurodollar Loan shall bear interest for each day during each Interest Period with respect thereto at a rate per annum equal to the Adjusted Eurodollar Rate determined for such Interest Period.

(b)     Each Term Loan which is a Base Rate Loan shall bear interest at a rate per annum equal to the Adjusted Base Rate.

(c)     Each Revolving Credit Loan (i) which is a Eurodollar Loan shall bear interest for each day during each Interest Period with respect thereto at a rate per annum equal to the Eurodollar Rate as determined for such Interest Period plus the Applicable Margin and (ii) which is a Base Rate Loan shall bear interest at a rate per annum equal to the Base Rate plus the Applicable Margin.

(d)     At and time that any Event of Default has occurred and is continuing, the principal of the Loans and any interest, facility fee, commitment fee or other amount shall bear interest

L 0

-23-

**A0521**

Confidential                                                                                                    PP-TRBK0000055

at a rate per annum which is (x) in the case of principal, the rate that would otherwise be applicable thereto pursuant to the foregoing provisions of this Section plus 2% or (y) in the case of any such interest, facility fee, commitment fee or other amount, the rate described in paragraph (b) of this Section plus 2%, in each case from the date of such non-payment until such overdue principal, interest, commitment fee or other amount is paid in full (as well after as before judgment).

(e)     Interest shall be payable in arrears on each Interest Payment Date, provided that interest accruing pursuant to paragraph (d) of this Section shall be payable from time to time on demand.

5.2     Conversion and Continuation Options.  (a)  The Borrower may elect from time to time to Convert Eurodollar Loans to Base Rate Loans by giving the Administrative Agent at least two Business Days' prior irrevocable notice of such election (in the form of Annex II) (such notice specifying the amount and the date such Conversion is to be made), provided that any such Conversion of Eurodollar Loans may only be made on the last day of an Interest Period with respect thereto.  The Borrower may elect from time to time to Convert Base Rate Loans to Eurodollar Loans by giving the Administrative Agent at least three Business Days' prior irrevocable notice of such election.  Any such notice of Conversion to Eurodollar Loans shall specify the amount to be Converted, the date of such Conversion and the length of the initial Interest Period or Interest Periods therefor if a Base Rate Loan is to be converted to a Eurodollar Loan.  Upon receipt of any such notice the Administrative Agent shall promptly notify each Lender thereof.  All or any part of outstanding Eurodollar Loans and Base Rate Loans may be Converted as provided herein, provided that (i) no Loan may be Converted into a Eurodollar Loan when any Event of Default has occurred and is continuing, (ii) any such Conversion may only be made if, after giving effect thereto, Section 5.3 shall not have been contravened, and (iii) no Loan may be converted into a Eurodollar Loan after the date that is one month prior to the Revolving Credit Termination Date (in the case of Conversions of Revolving Credit Loans) or the date of the final installment of principal (in the case of Conversions of Term Loans).

(b)     Any Eurodollar Loans may be Continued as such upon the expiration of the then current Interest Period with respect thereto by the Borrower giving irrevocable notice to the Administrative Agent, in accordance with the applicable provisions of the term "Interest Period" set forth in Section 1.1, of the length of the next Interest Period to be applicable to such Loans, provided that no Eurodollar Loan may be Continued as such (i) when any Event of Default has occurred and is continuing, (ii) if, after giving effect thereto, Section 5.3 would be contravened or (iii) after the date that is one month prior to the Revolving Credit Termination Date (in the case of Continuations of Revolving Credit Loans) or the date of the final installment of principal (in the case of Continuations of Term Loans) and provided, further, that if the Borrower shall fail to give such notice or if such Continuation is not permitted such Loans shall be automatically converted to Base Rate Loans on the last day of such then expiring Interest Period.

5.3     Minimum Amounts of Tranches; Maximum Number of Tranches.  (a)  All borrowings, conversions and continuations of Loans hereunder and all selections of Interest Periods hereunder shall be in such amounts and be made pursuant to such elections so that, after giving effect thereto, the aggregate principal amount of the Loans comprising each Tranche shall be equal to $1,000,000 or a whole multiple of $100,000 in excess thereof.

(b)     No more than three (3) Tranches of Eurodollar Loans shall be outstanding at any one time.

∟0

-24-

**A0522**