# 20 Civ. 06274 (LAK)

**United States District Court**

*for the*

**Southern District of New York**

_____

IN RE TRANSCARE CORPORATION, ET AL.

DEBTORS,

_____

PATRIARCH PARTNERS AGENCY SERVICES, LLC, ET AL.

DEFENDANTS-APPELLANTS,

—against—

SALVATORE LAMONICA, AS CHAPTER 7 TRUSTEE OF THE JOINTLY-
ADMINISTERED ESTATES OF TRANSCARE CORPORATION, ET AL.,

PLAINTIFF-APPELLEE.

_____

ON APPEAL FROM THE UNITED STATES BANKRUPTCY COURT FOR
THE SOUTHERN DISTRICT OF NEW YORK (BERNSTEIN, J.)

IN RE: TRANSCARE CORPORATION, ET AL., CASE NO. 16-10407 (SMB)

LAMONICA V. TILTON, ET AL., ADV. PROC. NO. 18-1021 (SMB)

## APPENDIX TO BRIEF FOR THE APPELLANTS

# Volume IV - A0523-A0573

5.4    Repayment of Loans; Evidence of Debt.

(a)    The Borrower hereby unconditionally promises to pay to the Administrative Agent for the account of the appropriate Revolving Credit Lender or Term Loan Lender, as the case may be, (i) the then unpaid principal amount of each Revolving Credit Loan of such Revolving Credit Lender on the Revolving Credit Termination Date (or such earlier date on which the Loans become due and payable pursuant to Section 10), and (ii) the principal amount of the Term Loan of such Term Loan Lender in installments according to the amortization schedule set forth in Section 2.3 (or on such earlier date on which the Loans become due and payable pursuant to Section 10). The Borrower hereby further agrees to pay interest on the unpaid principal amount of the Loans from time to time outstanding from the date hereof until payment in full thereof at the rates per annum, and on the dates, set forth in Section 5.1.

(b)    Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing indebtedness of the Borrower to such Lender resulting from each Loan of such Lender from time to time, including the amounts of principal and interest payable and paid to such Lender from time to time under this Agreement.

(c)    The Administrative Agent, on behalf of the Borrower, shall maintain the Register pursuant to Section 12.6(c), and a subaccount therein for each Lender, in which shall be recorded (i) the amount of each Loan made hereunder and any Note evidencing such Loan, the Type thereof and each Interest Period applicable thereto, (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrower to each Lender hereunder and (iii) both the amount of any sum received by the Administrative Agent hereunder from the Borrower and each Lender's share thereof.

(d)    The entries made in the Register and the accounts of each Lender maintained pursuant to Section 5.4(b) shall, to the extent permitted by applicable law, be prima facie evidence of the existence and amounts of the obligations of the Borrower therein recorded (absent manifest error); provided, however, that the failure of any Lender or the Administrative Agent to maintain the Register or any such account, or any error therein, shall not in any manner affect the obligation of the Borrower to repay (with applicable interest) the Loans made to such Borrower by such Lender and other Obligations owing to such Lender in accordance with the terms of this Agreement.

(e)    The Borrower agrees that, upon the request to the Administrative Agent by any Lender, the Borrower will execute and deliver to such Lender a promissory note of the Borrower evidencing the Term Loan or Revolving Credit Loans, as the case may be, of such Lender, substantially in the forms of Exhibit A-1 or A-2, respectively, with appropriate insertions as to date and principal amount (a "Term Note" or "Revolving Credit Note", respectively).

5.5    Optional Prepayments.    The Borrower may on the last day of any Interest Period with respect thereto, in the case of Eurodollar Loans, or at any time and from time to time, in the case of Base Rate Loans, prepay the Loans, in whole or in part, without premium or penalty, upon irrevocable notice delivered to the Administrative Agent prior to 12:00 noon, New York City time, at least three Business Days prior thereto, in the case of Eurodollar Loans, or upon irrevocable notice delivered to the Administrative Agent, prior to 12:00 noon, New York City time, on the Business Day thereof, in the case of Base Rate Loans, specifying the date and amount of prepayment and whether the prepayment is of Eurodollar Loans, Base Rate Loans or a combination thereof, and, if of a combination thereof, the amount allocable to each. Upon receipt of any such notice the Administrative Agent shall promptly notify each Lender thereof. If any such notice is given, the amount specified in such notice shall be due and payable on the date specified therein, together with any amounts payable pursuant to Section 5.13 and, in the case

\ 0

-25-

Confidential

**A0523**

PP-TRBK0000057

of prepayments of the Term Loans only, accrued interest to such date on the amount prepaid. Partial prepayments of the Term Loans pursuant to this Section shall be applied to the installments of principal thereof in the inverse order of their scheduled maturities. Amounts prepaid on account of the Term Loans may not be reborrowed. Partial prepayments pursuant to this Section shall be in an aggregate principal amount of $100,000 or a whole multiple thereof.

      5.6    Mandatory Prepayments.   (a)  Subject to Section 5.13, if on any date the Aggregate Outstanding RC Extensions of Credit exceeds the aggregate Revolving Credit Commitments, the Borrower shall immediately prepay the Revolving Credit Loans in an amount equal to the amount of such excess.

      (b)    Unless the Required Prepayment Lenders shall otherwise agree, if on any date the Borrower or any of its Subsidiaries shall receive Net Cash Proceeds from any Asset Sale, Recovery Event or Extraordinary Receipts then, unless a Reinvestment Notice shall be delivered in respect thereof within thirty days thereafter, 100% of such Net Cash Proceeds shall be applied on such thirtieth day after receipt toward the prepayment of the Term Loans and the reduction of the Revolving Credit Commitments as set forth in Section 5.6(d); provided, that, notwithstanding the foregoing, (i) the aggregate Net Cash Proceeds of all Asset Sales that may be excluded from the foregoing requirement pursuant to one or more Reinvestment Notices shall not exceed $500,000 in any fiscal year of the Borrower, (ii) the aggregate Net Cash Proceeds of all Recovery Events consisting of proceeds of property or casualty insurance claims or condemnation proceedings that may be excluded from the foregoing requirement pursuant to one or more Reinvestment Notices shall not exceed $2,000,000 in any fiscal year of the Borrower, (iii) the aggregate Net Cash Proceeds of all Recovery Events consisting of proceeds of business interruption insurance claims that may be excluded from the foregoing requirement pursuant to one or more Reinvestment Notices shall not exceed $1,000,000 in any fiscal year of the Borrower, (iv) the aggregate Net Cash Proceeds of all Extraordinary Receipts that may be excluded from the foregoing requirement pursuant to one or more Reinvestment Notices shall not exceed $750,000 in any fiscal year of the Borrower, and (v) on each Reinvestment Prepayment Date, an amount equal to the Reinvestment Prepayment Amount with respect to the relevant Reinvestment Event shall be applied toward the prepayment of the Term Loans and the reduction of the Revolving Credit Commitments as set forth in Section 5.6(d).

      (c)    On or before the earlier of the date on which the financial statements referred to in Section 8.1(a) are required to be delivered in respect of a fiscal year of the Borrower, beginning with the fiscal year ending December 31, 2003, and the date on which such financial statements are actually delivered, the Borrower shall prepay the Term Loans in the amount of 60% of Excess Cash Flow for the fiscal year covered by such financial statements, together with accrued interest to such date on the amount prepaid.

      (d)    Amounts prepaid pursuant to this Section 5.6 (other than Section 5.6(a)) shall be applied first, to the installments of principal of the Term Loans until paid in full, and second, to the reduction of the Revolving Credit Commitments and the prepayment of the Revolving Credit Loans. Prepayments of installments of Term Loans shall be applied in the inverse order of maturity and such amounts so prepaid may not be reborrowed.

      (e)    Any prepayment of Loans and/or reduction of Commitments pursuant to this Section, and the rights of the Lenders in respect thereof, are subject to the provisions of Section 5.9.

\_0

-26-

**A0524**

Confidential

PP-TRBK0000058

5.7    Computation of Interest and Fees. (a) All commitment fees, facility fees and interest shall be calculated on the basis of a 360-day year for the actual days elapsed. The Administrative Agent shall as soon as practicable notify the Borrower and the Lenders of each determination of a Eurodollar Rate. Any change in the interest rate on a Loan resulting from a change in the Base Rate or the Eurocurrency Reserve Requirements shall become effective as of the opening of business on the day on which such change becomes effective. The Administrative Agent shall as soon as practicable notify the Borrower and the Lenders of the effective date and the amount of each such change in interest rate.

(b)    Each determination of an interest rate by the Administrative Agent pursuant to any provision of this Agreement shall be conclusive and binding on the Borrower and the Lenders in the absence of manifest error. The Administrative Agent shall, at the request of the Borrower, deliver to the Borrower a statement showing the quotations used by the Administrative Agent in determining any interest rate pursuant to Section 5.1(a) or (c).

5.8    Inability to Determine Interest Rate. If prior to the first day of any Interest Period:

(a)    the Administrative Agent shall have determined (which determination shall be conclusive and binding upon the Borrower) that, by reason of circumstances affecting the relevant market, adequate and reasonable means do not exist for ascertaining the Eurodollar Rate for such Interest Period, or

(b)    the Administrative Agent shall have received notice from the Majority Facility Lenders in respect of the relevant Facility that the Eurodollar Rate determined or to be determined for such Interest Period will not adequately and fairly reflect the cost to such Lenders (as conclusively certified by such Majority Facility Lenders) of making or maintaining their affected Loans during such Interest Period, the Administrative Agent shall give telecopy or telephonic notice thereof to the Borrower and the relevant Lenders as soon as practicable thereafter. If such notice is given (x) any Eurodollar Loans under the relevant Facility requested to be made on the first day of such Interest Period shall be made as Base Rate Loans, (y) any Base Rate Loans under the relevant Facility that were to have been Converted on the first day of such Interest Period to Eurodollar Loans shall be Continued as Base Rate Loans and (z) any outstanding Eurodollar Loans shall be Converted, on the first day of such Interest Period, to Base Rate Loans. Until such notice has been withdrawn by the Administrative Agent, no further Eurodollar Loans under the relevant Facility shall be made or Continued as such, nor shall the Borrower have the right to Convert Loans to Eurodollar Loans. The Administrative Agent shall withdraw (i) any such notice pursuant to clause (a) above if the Administrative Agent determines that the relevant circumstances have ceased to exist and (ii) any such notice pursuant to clause (b) above upon receipt of notice from the Majority Facility Lenders in respect of the relevant Facility that the relevant circumstances described in such clause (b) have ceased to exist.

5.9    Pro Rata Treatment and Payments. (a) Each borrowing by the Borrower from the Lenders hereunder, each payment by the Borrower on account of any commitment fee hereunder and any reduction of the Revolving Credit Commitments of the Lenders shall be made pro rata according to the respective Term Loan Percentages or Revolving Credit Commitment Percentages, as applicable, of the Lenders. Each payment (including each prepayment) by the Borrower on account of principal of and interest on the Term Loans or the Revolving Credit Loans shall be made pro rata according to the respective outstanding principal amounts of the Term Loans or the Revolving Credit Loans, as applicable, then held by the Lenders.

\ 0

**A0525**

Confidential

PP-TRBK0000059

(b)     Notwithstanding anything to the contrary in Section 5.6 or this Section, each Term Loan Lender may, at its option, decline all or any portion of any mandatory prepayment applicable to the Term Loans of such Lender; accordingly, with respect to the amount of any mandatory prepayment described in Section 5.6 that is allocated to the Term Loans (such amounts, the "Prepayment Amount") the Borrower will, in lieu of applying such amount to the prepayment of Term Loans as provided in Section 5.6(d), on the date specified in Section 5.6 for such prepayment, give the Administrative Agent telephonic notice (promptly confirmed in writing) of the aggregate amount required to be applied to prepay Term Loans and requesting that the Administrative Agent prepare and provide to each Term Loan Lender a notice (each, a "Prepayment Option Notice") as described below. As promptly as practicable after receiving such notice from the Borrower, the Administrative Agent will send to each Term Loan Lender a Prepayment Option Notice which shall include an offer by the Borrower to prepay on the date (each a "Prepayment Date") that is 10 Business Days after the date of the Prepayment Option Notice, the Term Loan of such Term Loan Lender by an amount equal to the portion of the Prepayment Amount indicated in such Lender's Prepayment Option Notice as being applicable to such Lender's Term Loans.  On the Prepayment Date, (i) the Borrower shall pay to the Administrative Agent the aggregate amount necessary to prepay that portion of the outstanding relevant Term Loans in respect of which Lenders have accepted full or partial prepayment as described above (such Lenders, the "Accepting Lenders") as notified by the Administrative Agent to the Borrower, and such amount shall be applied to reduce the Prepayment Amounts, as applicable, with respect to each Accepting Lender, and (ii) the Borrower shall be entitled to retain 100% of the portion of the Prepayment Amount not accepted by the Lenders.

(c)     All payments (including prepayments) to be made by the Borrower hereunder, whether on account of principal, interest, fees or otherwise, shall be made without set-off or counterclaim and shall be made prior to 12:00 noon, New York City time, on the due date thereof to the Administrative Agent, for the account of the Lenders, at the "Funding and Payment Office" specified in Schedule 5.9(c), in Dollars and in immediately available funds.  The Administrative Agent shall distribute such payments to the Lenders promptly upon receipt in like funds as received.  If any payment hereunder (other than payments on Eurodollar Loans) becomes due and payable on a day other than a Business Day, such payment shall be extended to the next succeeding Business Day.  If any payment on a Eurodollar Loan becomes due and payable on a day other than a Business Day, the maturity thereof shall be extended to the next succeeding Business Day unless the result of such extension would be to extend such payment into another calendar month in which event such payment shall be made on the immediately preceding Business Day.  In the case of any extension of any payment of principal pursuant to the preceding two sentences, interest thereon shall be payable at the then applicable rate during such extension.

(d)     Unless the Administrative Agent shall have been notified in writing by any Lender prior to a borrowing that such Lender will not make the amount that would constitute its share of such borrowing available to the Administrative Agent, the Administrative Agent may assume that such Lender is making such amount available to the Administrative Agent, and the Administrative Agent may, in reliance upon such assumption, make available to the Borrower a corresponding amount.  If such amount is not made available to the Administrative Agent by the required time on the Borrowing Date therefor, such Lender shall pay to the Administrative Agent, on demand, such amount with interest thereon at a rate equal to the daily average Federal Funds Effective Rate for the period until such Lender makes such amount immediately available to the Administrative Agent.  A certificate of the Administrative Agent submitted to any Lender with respect to any amounts owing under this Section shall be conclusive in the absence of manifest error.  If such Lender's share of such borrowing is not made available to the Administrative Agent by such Lender within three Business Days of such Borrowing Date, the Administrative Agent shall also be entitled to recover such amount with interest thereon at the rate per annum applicable to Base Rate Loans hereunder, on demand, from the Borrower.

\_ 0

-28-

**A0526**

5.10    Illegality.  Notwithstanding any other provision herein, if the adoption of or any change in any Requirement of Law or in the interpretation or application thereof shall make it unlawful for any Lender to make or maintain Eurodollar Loans as contemplated by this Agreement, (a) the commitment of such Lender hereunder to make Eurodollar Loans, Continue Eurodollar Loans as such and Convert Base Rate Loans to Eurodollar Loans shall forthwith be canceled and (b) such Lender's Loans then outstanding as Eurodollar Loans, if any, shall be Converted automatically to Base Rate Loans on the respective last days of the then current Interest Periods with respect to such Loans or within such earlier period as required by law.  If any such Conversion of a Eurodollar Loan occurs on a day which is not the last day of the then current Interest Period with respect thereto, the Borrower shall pay to such Lender such amounts, if any, as may be required pursuant to Section 5.13.

5.11    Requirements of Law.  (a)  If the adoption of or any change in any Requirement of Law or in the interpretation or application thereof or compliance by any Lender with any request or directive (whether or not having the force of law) from any central bank or other Governmental Authority made subsequent to the date hereof:

(i)    does or shall subject any Lender to any tax of any kind whatsoever with respect to this Agreement, any Note or any Eurodollar Loan made by it, or change the basis of taxation of payments to such Lender in respect thereof (except for Non-Excluded Taxes covered by Section 5.12 and changes in the rate of tax on the overall net income of such Lender);

(ii)    does or shall impose, modify or hold applicable any reserve, special deposit, compulsory loan or similar requirement against assets held by, deposits or other liabilities in or for the account of, advances, loans or other extensions of credit by, or any other acquisition of funds by, any office of such Lender which is not otherwise included in the determination of the Eurodollar Rate hereunder; or

(iii)    does shall impose on such Lender any other condition;

and the result of any of the foregoing is to increase the cost to such Lender, by an amount which such Lender deems to be material, of making, Converting into, Continuing or maintaining Eurodollar Loans or to reduce any amount receivable hereunder in respect thereof, then, in any such case, the Borrower shall promptly, after receiving notice as specified in subsection (c), pay such Lender such additional amount or amounts as will compensate such Lender for such increased cost or reduced amount receivable.  The Borrower shall not be required to pay any additional amounts to any Lender pursuant to this subsection (a) to the extent that the obligation to pay such additional amounts would not have arisen but for a failure by such Lender to comply with the provisions of Section 5.12(b) of this Agreement.

(b)    Any Lender claiming any additional amounts payable pursuant to this Section 5.11 or Section 5.12 shall use reasonable efforts (consistent with its internal policy and legal and regulatory restrictions and so long as, in its sole determination, such efforts would not be disadvantageous to it) to file any certificate or document reasonably requested in writing by the Borrower if the making of such a filing would avoid the need for or reduce the amount of any such additional amounts.

(c)    If a Lender or the Administrative Agent shall become aware that it is entitled to receive a refund in respect of taxes as to which it has been indemnified by the Borrower pursuant to Section 5.12 or this Section 5.11, it shall promptly notify the Borrower of the availability of such refund and shall, within thirty (30) days after receipt of a request by the Borrower apply for such refund.  If any

\_0

-29-

**A0527**

Lender or the Administrative Agent, as applicable, receives a refund in respect of any taxes to which it has been indemnified by the Borrower pursuant to Section 5.12 or this Section 5.11, it shall promptly pay such refund to the Borrower (to the extent of amounts that have been paid by the Borrower under Section 5.12 or this Section 5.11 with respect to such refund), provided that the Borrower, upon the request of such Lender or the Administrative Agent, as applicable, agrees to return such refund to such Lender or the Administrative Agent in the event such Lender or the Administrative Agent is required to repay such refund. The Borrower shall be responsible for any costs incurred by such Lender or the Administrative Agent in applying for any such refund and promptly reimburse such Lender or the Administrative Agent therefor on demand.

(d)   If any Lender shall have determined that the adoption of or any change in any Requirement of Law regarding capital adequacy or in the interpretation or application thereof or compliance by such Lender or any corporation controlling such Lender with any request or directive regarding capital adequacy (whether or not having the force of law) from any Governmental Authority made subsequent to the date hereof shall have the effect of reducing the rate of return on such Lender's or such corporation's capital as a consequence of its obligations hereunder to a level below that which such Lender or such corporation could have achieved but for such adoption, change or compliance (taking into consideration such Lender's or such corporation's policies with respect to capital adequacy) by an amount deemed by such Lender to be material, then from time to time, the Borrower shall promptly pay to such Lender such additional amount or amounts as will compensate such Lender for such reduction.

(e)   If any Lender becomes entitled to claim any additional amounts pursuant to this Section, it shall promptly notify the Borrower (with a copy to the Administrative Agent) of the event by reason of which it has become so entitled. A certificate as to any additional amounts payable pursuant to this Section submitted by such Lender to the Borrower (with a copy to the Administrative Agent) shall be conclusive in the absence of manifest error. The agreements in this Section shall survive the termination of this Agreement and the payment of the Loans and all other amounts payable hereunder.

5.12   Taxes. (a) All payments made by the Borrower under this Agreement and any Notes shall be made free and clear of, and without deduction or withholding for or on account of, any present or future income, stamp or other taxes, levies, imposts, duties, charges, fees, deductions or withholdings, now or hereafter imposed, levied, collected, withheld or assessed by any Governmental Authority, excluding net income taxes and franchise taxes imposed in lieu of net income taxes imposed on the Administrative Agent or any Lender as a result of a present or former connection between the Administrative Agent or such Lender and the jurisdiction of the Governmental Authority imposing such tax or any political subdivision or taxing authority thereof or therein (other than any such connection arising solely from the Administrative Agent or such Lender having executed, delivered or performed its obligations or received a payment under, or enforced, this Agreement or any other Loan Documents). If any such non-excluded taxes, levies, imposts, duties, charges, fees deductions or withholdings ("Non-Excluded Taxes") are required to be withheld from any amounts payable to the Administrative Agent or any Lender hereunder or under any Note, the amounts so payable to the Administrative Agent or such Lender shall be increased to the extent necessary to yield to the Administrative Agent or such Lender (after payment of all Non-Excluded Taxes) interest or any such other amounts payable hereunder at the rates or in the amounts specified in this Agreement, provided, however, that the Borrower shall not be required to increase any such amounts payable to any Lender that is not organized under the laws of the United States of America or a state thereof if such Lender fails to comply with the requirements of clause (c) of this Section. Whenever any Non-Excluded Taxes are payable by the Borrower, as promptly as possible thereafter the Borrower shall send to the Administrative Agent for its own account or for the account of such Lender, as the case may be, a certified copy of an original official receipt received by the Borrower showing payment thereof. If the Borrower fails to pay any Non-Excluded Taxes when due to

\_0

-30-

**A0528**

Confidential                                                                                   PP-TRBK0000062

the appropriate taxing authority or fails to remit to the Administrative Agent the required receipts or other required documentary evidence, the Borrower shall indemnify the Administrative Agent and the Lenders for any incremental taxes, interest or penalties that may become payable by the Administrative Agent or any Lender as a result of any such failure. The agreements in this Section shall survive the termination of this Agreement and the payment of the Loans and all other amounts payable hereunder.

(b)      In addition, the Borrower agrees to pay to the relevant Governmental Authority in accordance with applicable law any current or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies (including, without limitation, mortgage recording taxes and similar fees) imposed by any Governmental Authority that arise from any payment made hereunder or under any Note, or from the execution, delivery or registration of, or otherwise with respect to, this Agreement or any Note or any other Loan Document ("Other Taxes").

(c)      Each Lender (or Transferee) that is not a United States Person (as such term is defined in Section 7701(a)(30) of the Code (a "US Person")) for United States federal income tax purposes (a "Non-US Lender") shall deliver or caused to be delivered to the Borrower and the Administrative Agent the following properly completed and duly executed documents:

(i) two complete and executed (x) U.S. Internal Revenue Forms W-8BEN (or any successor form thereto) with respect to an income tax treaty providing for a zero rate of withholding tax on interest, or (y) U.S. Internal Revenue Service Forms W-8ECI (or any successor form thereto); or

(ii) two complete and executed U.S. Internal Revenue Service Forms W-8BEN (or any successor form thereto), including all appropriate attachments, documenting the status of the Lender (or Transferee) as a Non-U.S. Lender and (y) a certificate substantially in the form of Exhibit E (a "Non-Bank Status Certificate"); or

(iii) two complete and executed U.S. Internal Revenue Service Forms W-8IMY (or any successor form thereto) including all appropriate attachments, documenting the status of the Lender (or Transferee) as a Non-U.S. Lender; or

(iv) comparable statements in accordance with applicable U.S. law and regulations and amendments thereto which indicate that such Lender is not subject to withholding requirements.

Such documents shall be delivered by each Lender (or Transferee) on or before the date it becomes a party to this Agreement (or, in the case of a Transferee that is a participation holder, on or before the date such participation holder becomes a Transferee hereunder) and on or before the date, if any, such Lender (or Transferee) changes its applicable lending office by designating a different lending office (a "New Lending Office"). In addition, each Lender (or Transferee) shall deliver or cause to be delivered such Forms and/or Certificates promptly upon or before the expiration, obsolescence or invalidity of any document previously delivered by such Lender (or Transferee). Notwithstanding any other provision of this Section 5.12(c), a Lender (or Transferee) shall not be required to deliver any document pursuant to this Section 5.12(c) that such Lender (or Transferee) is not legally able to deliver.

(d)      The Borrower shall not be required to indemnify any Lender (or Transferee) or to pay any additional amounts to any Lender (or Transferee) in respect of any U.S. federal income or withholding tax pursuant to paragraph (a) or (c) above to the extent that

\ 0

-31-

**A0529**

Confidential

PP-TRBK0000063

(i) the obligation to withhold any amounts with respect to U.S. federal income tax existed on the date such Lender became a party to this Agreement (or, in the case of a Transferee that is a participation holder, on the date such participation holder became a Transferee hereunder) or, with respect to payments to a New Lending Office, the date such Lender (or Transferee) designated such New Lending Office, provided, however, that this clause (i) of this paragraph (d) shall not apply (x) to any Transferee or New Lending Office that becomes a Transferee or New Lending Office as a result of an assignment, participation, transfer or designation made at the request of the Borrower or (y) to the extent the indemnity payment or additional amounts any Lender (or Transferee), acting through a New Lending Office, would be entitled to receive (without regard to this paragraph (d)) do not exceed the indemnity payment or additional amounts that the person making the assignment, participation or transfer to such Lender (or Transferee) or making the designation of such New Lending Office, would have been entitled to receive in the absence of such assignment, participation, transfer or designation, or

(ii) the obligation to pay such indemnity payment or additional amounts would not have arisen but for a failure by such Lender (or Transferee) to comply with the provisions of paragraph (c) above.

(e) Nothing contained in this Section 5.12 shall require any Lender (or any Transferee) or the Administrative Agent to make available any of its tax returns or any other information that it deems to be confidential or proprietary.

5.13 Indemnity. The Borrower agrees to indemnify each Lender and to hold each Lender harmless from any actual loss or expense which such Lender may sustain or incur as a consequence of (a) default by the Borrower in making a borrowing of, Conversion into or Continuation of Eurodollar Loans after the Borrower has given a notice requesting the same in accordance with the provisions of this Agreement, (b) default by the Borrower in making any prepayment after the Borrower has given a notice thereof in accordance with the provisions of this Agreement or (c) the making of a prepayment of Eurodollar Loans on a day which is not the last day of an Interest Period with respect thereto. This covenant shall survive the termination of this Agreement and the payment of Loans and all other amounts payable hereunder.

5.14 Lending Offices; Change of Lending Office. (a) Loans of each Type made by any Lender shall be made and maintained at such Lender's Applicable Lending Office for Loans of such Type.

(b) Each Lender agrees that if it makes any demand for payment under Section 5.11 or 5.12(a), or if any adoption or change of the type described in Section 5.10 shall occur with respect to it, it will use reasonable efforts (consistent with its internal policy and legal and regulatory restrictions and so long as such efforts would not be disadvantageous to it, as determined in its sole discretion) to designate a different lending office if the making of such a designation would reduce or obviate the need for the Borrower to make payments under Section 5.11 or 5.12(a), or would eliminate or reduce the effect of any adoption or change described in Section 5.10.

5.15 Substitution of Lender. In the event the Borrower is, or would be, required to pay any additional amounts pursuant to subsections 5.11 or 5.12(a), the Borrower may, so long as no Event of Default has occurred and is continuing, require any Lender claiming such additional amounts, upon five Business Days' prior written notice from the Borrower to such Lender, to assign the entire Revolving Credit Commitment and Loans of such Lender to another bank or financial institution selected by the Borrower and, if such bank or financial institution is not then a Lender, reasonably satisfactory to

\ 0

-32-

Confidential

PP-TRBK0000064

the Administrative Agent. Any such assignment shall be effected in accordance with subsection 12.6 and, as a condition to such assignment, the Borrower shall pay all amounts due to the assigning Lender hereunder on the effective date of such assignment.

## SECTION 6.    REPRESENTATIONS AND WARRANTIES

To induce the Administrative Agent and the Lenders to enter into this Agreement and to make the Loans, the Borrower hereby represents and warrants to the Administrative Agent and each Lender that:

6.1    <u>Financial Condition</u>. (a) The consolidated balance sheet of Old TransCare and its consolidated Subsidiaries as at December 31, 2000 and the related consolidated statements of income, retained earnings, cash flows and changes in stockholders' equity for the fiscal year ended on such date, reported on by Arthur Andersen L.L.P., copies of which have heretofore been furnished to each Lender, are complete and correct and present fairly in all material respects the consolidated financial condition of Old TransCare and its consolidated Subsidiaries as at such date, and the consolidated results of their operations and their consolidated cash flows for the fiscal year then ended. The unaudited consolidated balance sheet of Old TransCare and its consolidated Subsidiaries as at December 31, 2001 and as at December 31, 2002  and the related unaudited consolidated statements of income, retained earnings, cash flow and changes in stockholders' equity for the fiscal year ended on such date, certified by a Responsible Officer, copies of which have heretofore been furnished to each Lender, are complete and correct and present fairly in all material respects the consolidated financial condition of Old TransCare and its consolidated Subsidiaries as at such date, and the consolidated results of their operations and their consolidated cash flows for the fiscal year then ended (subject to normal year-end audit adjustments). The interim unaudited consolidated balance sheet of Old TransCare and its consolidated Subsidiaries as at May 31, 2003 and the related unaudited consolidated statements of income, retained earnings, cash flow and changes in stockholders' equity for the period from January 1, 2003 through May 31, 2003, certified by a Responsible Officer, copies of which have heretofore been furnished to each Lender, are complete and correct and present fairly in all material respects the consolidated financial condition of Old TransCare and its consolidated Subsidiaries as at such date, and the consolidated results of their operations and their consolidated cash flows for such period. All such financial statements, including the related schedules and notes thereto, have been prepared in accordance with GAAP applied consistently throughout the periods involved (except as approved by such accountants or Responsible Officer, as the case may be, and as disclosed therein) or on Schedule 6.1(a) attached hereto.

(b)    The pro forma consolidated balance sheet of the Borrower and its consolidated Subsidiaries as at May 31, 2003, and the pro forma statements of income, retained earnings, cash flow and changes in stockholders' equity for the five-month period then ended (the "Pro Forma Financial Statements"), copies of which has heretofore been furnished to the Administrative Agent and each Lender, and the unaudited consolidated balance sheet and statements of income, retained earnings, cash flow and changes in stockholders' equity of the Borrower and its consolidated Subsidiaries as of such date and period, adjusted to give effect (as if such events had occurred on the first day of such period) to (i) the confirmation of the Plan of Reorganization and the consummation of the transactions contemplated by the Plan of Reorganization, (ii) the making of the Term Loans hereunder, (iii) the making of Revolving Credit Loans hereunder in an amount equal to the outstanding amounts owing under the DIP Loan Documents, and the application of the proceeds thereof to the repayment of all amounts owing under the DIP Loan Documents, (iv) all other transactions to be consummated on the Closing Date, and (v) the payment of all fees and expenses related to the foregoing transactions, as estimated in good faith as of the date of the balance sheet included in the Pro Forma Financial

\ 0

-33-

**A0531**

Confidential                                                                 PP-TRBK0000065

Statements. The Pro Forma Financial Statements present fairly in all material respects, on a pro forma basis, the consolidated financial condition of the Borrower and its consolidated Subsidiaries as at such date, and the consolidated results of their operations and their consolidated cash flows for the five-month period then ended, assuming the events described in the immediately preceding sentence had occurred on the first day of such period.

(c)     The operating forecast and cash flow projections of the Borrower, dated as of July 3, 2003, a copy of which have been furnished to the Lenders, have been prepared in good faith under the direction of a Responsible Officer of the Borrower, and in accordance with GAAP except that such forecast and projections do not include footnotes and other disclosures which may be required pursuant to GAAP, and except as set forth on Schedule 6.1(c), the operating forecast and cash flow projections were or are based on good faith estimates and assumptions believed to be reasonable at the time made, it being recognized by the Lenders that such projections as to future events are not to be viewed as facts and that actual results during the period or periods covered by any such projections may differ significantly from the projected results.

6.2     No Change. (i) There has been no development or event which has had or would have a Material Adverse Effect (x) if and to the extent the representation in this clause (i) is made or deemed made on or prior to the Closing Date, since May 31, 2003, except the commencement of the Bankruptcy Cases and the consummation of the transactions contemplated by the Plan of Reorganization or as disclosed in the Disclosure Statement or in the projections delivered to the Administrative Agent pursuant to Section 6.1(c), and (y) to the extent that the representation in this clause (i) is made or deemed made after the Closing Date, since the Closing Date (subject to any waiver or amendment pursuant to Section 12.1); and (ii) during the period from June 1, 2003 to the Closing Date, except as contemplated by the Plan of Reorganization or permitted by Section 9.7(a) hereof, no dividends or other distributions have been declared, paid or made upon the Capital Stock of the Borrower nor has any of the Capital Stock of the Borrower been redeemed, retired, purchased or otherwise acquired for value by the Borrower or any of its Subsidiaries.

6.3     Existence; Compliance with Law. Each of the Borrower and its Subsidiaries (a) is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization, (b) has the corporate power and authority, and the legal right, to own and operate its property, to lease the property it operates as lessee and to conduct the business in which it is currently engaged, (c) except as set forth on Schedule 6.3, is duly qualified as a foreign corporation and in good standing under the laws of each jurisdiction where its ownership, lease or operation of property or the conduct of its business requires such qualification and (d) except as set forth on Schedule 6.3, is in compliance with all Requirements of Law, except, in the case of the foregoing clauses (c) and (d), and to the extend not disclosed on Schedule 6.3, to the extent that the failure to comply therewith would not, in the aggregate, reasonably be expected to have a Material Adverse Effect.

6.4     Power; Authorization; Enforceable Obligations. Each of the Loan Parties has the corporate power and authority, and the legal right, to make, deliver and perform the Loan Documents to which it is a party and, in the case of the Borrower, to borrow hereunder and has taken all necessary corporate action to authorize, in the case of the Borrower, the borrowings on the terms and conditions of this Agreement and any Notes, and, in the case of all Loan Parties, to authorize the execution, delivery (other than by the Lenders with respect to themselves) and performance of the Loan Documents to which it is a party. Except as set forth on Schedule 6.4, no consent or authorization of, filing with, notice to or other act by or in respect of, any Governmental Authority or any other Person is required in connection with the borrowings hereunder or with the execution, delivery, performance, validity or enforceability of

\_ 0

-34-

**A0532**

Confidential                                                                                    PP-TRBK0000066

the Loan Documents to which the Borrower or any other Loan Party is a party. This Agreement has been, and each other Loan Document to which it is a party will be, duly executed and delivered on behalf of each Loan Party. This Agreement constitutes, and each other Loan Document to which it is a party when executed and delivered will constitute, a legal, valid and binding obligation of each Loan Party enforceable against such Loan Party in accordance with its terms, subject to the effects of bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and other similar laws relating to or affecting creditors' rights generally, general equitable principles (whether considered in a proceeding in equity or at law) and an implied covenant of good faith and fair dealing.

      6.5    <u>No Legal Bar</u>. Except as disclosed on Schedule 6.5, the execution, delivery and performance of the Loan Documents to which the Borrower or any other Loan Party is a party, the borrowings hereunder and the use of the proceeds thereof will not violate any Requirement of Law or Contractual Obligation of any Loan Party and will not result in, or require, the creation or imposition of any Lien on any of their respective properties or revenues pursuant to any such Requirement of Law or Contractual Obligation (other than Liens created by the Security Documents in favor of the Administrative Agent).

      6.6    <u>No Material Litigation</u>. Except as disclosed on Schedule 6.6, no litigation, investigation or proceeding of or before any arbitrator or Governmental Authority is pending or, to the knowledge of the Borrower, threatened by or against the Borrower or any Loan Party or against any of its or their respective properties or revenues (i) with respect to any of the Loan Documents or any of the transactions contemplated hereby or thereby, or (ii) which would have a Material Adverse Effect.

      6.7    <u>No Default</u>. After giving effect to the transactions contemplated by this Agreement, the Plan of Reorganization and the Confirmation Order to occur on the Closing Date, neither the Borrower nor any Loan Party is in default under or with respect to any of its Contractual Obligations in any respect which could have a Material Adverse Effect. After giving effect to the transactions contemplated by this Agreement, the Plan of Reorganization and the Confirmation Order, on the Closing Date, no Default or Event of Default has occurred and is continuing.

      6.8    <u>Ownership of Property; Liens</u>. Each of the Loan Parties has good and marketable title in fee simple to, or a valid leasehold interest in, all its real property, and good title to, or a valid leasehold interest in, all its other material property, and none of such property is subject to any Lien except as permitted by Section 9.3. The Loan Parties do not own any real property in fee simple as of this Closing Date. The properties listed on Schedule 1.1(b) constitute all the real property leased by any Loan Party as of the Closing Date.

      6.9    <u>Intellectual Property</u>. Each of the Loan Parties owns, or is licensed to use, all trademarks, tradenames, copyrights, technology, know-how and processes necessary for the conduct of its business as currently conducted except for those the failure to own or license which could not have a Material Adverse Effect (the "<u>Intellectual Property</u>"). No claim has been asserted and is pending by any Person challenging or questioning the use by the Loan Parties of any such Intellectual Property or the validity or effectiveness of any such Intellectual Property, nor does the Borrower know of any valid basis for any such claim, except for such claims and infringements that, in the aggregate, would not reasonably be expected to have a Material Adverse Effect. The use by the Loan Parties of any material Intellectual

\_0

-35-

Confidential

**A0533**

PP-TRBK0000067

Property of the Loan Parties does not infringe on the rights of any Person, except for such claims and infringements that, in the aggregate, would not reasonably be expected to have a Material Adverse Effect.

       6.10    <u>No Burdensome Restrictions</u>. No Requirement of Law or Contractual Obligation of the Borrower or any of the other Loan Parties has a Material Adverse Effect.

       6.11    <u>Taxes</u>. Except as otherwise contemplated by the Plan of Reorganization and the Confirmation Order, each of the Loan Parties has filed or caused to be filed all tax returns which, to the knowledge of the Borrower, are required to be filed and has paid all taxes shown to be due and payable on said returns or on any assessments made against it or any of its property and all other taxes, fees or other charges imposed on it or any of its property by any Governmental Authority (other than any the amount or validity of which are currently being contested in good faith by appropriate proceedings and with respect to which reserves in conformity with GAAP have been provided on the books of the relevant Loan Party); no tax Lien has been filed, and, to the knowledge of the Borrower, no claims are being asserted, with respect to any such tax, fee or other charge which, if adversely determined, would reasonably be expected to result in the repayment of $500,000 or more in the aggregate.

       6.12    <u>Federal Regulations</u>. No part of the proceeds of any Loans will be used for "purchasing" or "carrying" any "margin stock" within the respective meanings of each of the quoted terms under Regulation U of the Board as now and from time to time hereafter in effect, or for any purpose which violates, or which would be inconsistent with, the provisions of the regulations of such Board. If requested by any Lender or the Administrative Agent, the Borrower will furnish to the Administrative Agent and each Lender a statement to the foregoing effect in conformity with the requirements of FR Form G-3 or U-1 referred to in Regulation U, as the case may be.

       6.13    <u>ERISA</u>. Neither a Reportable Event nor an "accumulated funding deficiency" (within the meaning of Section 412 of the Code or Section 302 of ERISA) has occurred during the five-year period prior to the date on which this representation is made or deemed made with respect to any Single Employer Plan, and each Plan (other than a Multiemployer Plan or a multiemployer welfare plan maintained pursuant to a collective bargaining agreement) has complied in all material respects with the applicable provisions of ERISA and the Code. No termination of a Single Employer Plan has occurred (other than a termination described in Section 4041(b) of ERISA with respect to which the Borrower has incurred no liability (i) to the PBGC or (ii) in excess of $1,000,000), and no Lien in favor of the PBGC or a Plan has arisen, during such five-year period. Except to the extent that any such excess could not have a Material Adverse Effect, the present value of all accrued benefits under each Single Employer Plan (based on those assumptions used to fund such Plans) did not, as of the last annual valuation date prior to the date on which this representation is made or deemed made, exceed the value of the assets of such Plan allocable to such accrued benefits by more than $1,000,000. Neither the Borrower nor any Commonly Controlled Entity has had a complete or partial withdrawal from any Multiemployer Plan, and, to the knowledge of the Borrower, the Borrower would not become subject to any material liability under ERISA if the Borrower or any Commonly Controlled Entity were to withdraw completely from all Multiemployer Plans as of the valuation date most closely preceding the date on which this representation is made or deemed made. To the knowledge of the Borrower, no such Multiemployer Plan is in Reorganization or Insolvent. Except to the extent that any such excess could not have a Material Adverse Effect, the present value (determined using actuarial and other assumptions which are reasonable in respect of the benefits provided and the employees participating) of the liability of the Borrower and each Commonly Controlled Entity for post retirement benefits to be provided to their current and former

\_ 0

-36-

**A0534**

employees under Plans which are welfare benefit plans (as defined in Section 3(1) of ERISA) other than such liability disclosed in the financial statements of the Borrower does not, in the aggregate, exceed the assets under all such Plans allocable to such benefits by an annual amount in excess of $1,000,000.

          6.14    Investment Company Act; Other Regulations.    The Borrower is not an "investment company", within the meaning of the Investment Company Act of 1940, as amended (the "Investment Company Act"), and the execution, delivery and performance of the Loan Documents by the Borrower and the other Loan Parties will not violate the Investment Company Act. The Borrower is not subject to regulation under any Federal or State statute or regulation (other than Regulation X of the Board) which limits its ability to incur Indebtedness.

          6.15    Subsidiaries.    Schedule 6.15 sets forth the name of each direct or indirect Subsidiary of the Borrower, its form of organization, its jurisdiction of organization, the total number of issued and outstanding shares or other interests of Capital Stock thereof, the classes and number of issued and outstanding shares or other interests of Capital Stock of each such class, the name of each holder of Capital Stock thereof and the number of shares or other interests of such Capital Stock held by each such holder and the percentage of all outstanding shares or other interests of such class of Capital Stock held by such holders and Schedule 6.15 identifies all Immaterial Subsidiaries.

          6.16    Security Documents.    (a)    The provisions of each Security Document are effective to create in favor of the Administrative Agent, for the ratable benefit of the Lenders, a legal, valid and enforceable security interest in all right, title and interest of the Loan Party which is party thereto in the "Collateral" described therein.

          (b)    (i) When proper financing statements have been filed in the offices in the jurisdictions listed in Schedule 6.16, the Security Agreement shall constitute a fully perfected first Lien on, and security interest in, all right, title and interest of the Loan Parties in the "Collateral" described therein, which can be perfected by such filing (subject as to priority only to the Liens permitted by Section 9.3 and subject to Section 6.16(c)).

          (ii)    When certificates representing the Pledged Stock (as defined in the Pledge Agreement) are delivered to the Administrative Agent, together with stock powers endorsed in blank by a duly authorized officer of the pledgors thereof, and assuming continued possession by the Administrative Agent of the Pledged Stock, the Pledge Agreement shall constitute a fully perfected first Lien on, and security interest in, all right, title and interest of the pledgors parties thereto in the Pledged Stock.

          (c)    Neither the Borrower nor any other Loan Party owns any property, or has any interest in any property, that is not subject to a fully perfected first priority Lien (subject as to priority only to Liens permitted by Section 9.3) on, or security interest in, such property in favor of the Administrative Agent, other than (i) any such property having an aggregate fair market value at any one time not exceeding $500,000 and (ii) other property which is the subject of Liens permitted by Section 9.3 securing Indebtedness permitted under Sections 9.2(c) or 9.2(d) which prohibits the granting of any other Lien on such property.

          6.17    Accuracy and Completeness of Information. (a) All factual information, reports and other papers and data with respect to the Loan Parties (other than projections) furnished, and all factual statements and representations made in writing, to the Lenders by a Loan Party, or on behalf of a

\\_ 0

-37-

**A0535**

Loan Party, are, when taken together with all such other written factual information, reports and other papers and data previously so furnished and all such other written factual statements and representations previously so made (and, in any case excluding such information, reports, papers, factual statements and representations which have been superseded or replaced by subsequent such items), complete and correct in all material respects, to the extent necessary to give the Lenders true and accurate knowledge of the subject matter thereof in all material respects, and do not contain any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements contained therein not misleading in light of the circumstances in which the same were made.

   (b) The projections attached hereto as Schedule 6.17(b) are based on good faith estimates and assumptions believed to be reasonable at the time made, it being recognized by the Lenders that such projections as to future events are not to be viewed as facts and that actual results during the period or periods covered by any such projections may differ significantly from the projected results. All projections with respect to the Loan Parties which are furnished by or on behalf of a Loan Party to the Lenders after the Closing Date will be based on good faith estimates and assumptions believed to be reasonable at the time made, it being recognized by the Lenders that such projections as to future events are not to be viewed as facts and that actual results during the period or periods covered by any such projections may differ significantly from the projected results.

   6.18 Labor Relations. No Loan Party is engaged in any unfair labor practice which would reasonably be expected to have a Material Adverse Effect. Except as disclosed on Schedule 6.18, there is, other than would not reasonably be expected to have a Material Adverse Effect, (a) no unfair labor practice complaint pending or, to the knowledge of each Loan Party, threatened against a Loan Party before the National Labor Relations Board and no grievance or arbitration proceeding arising out of or under any collective bargaining agreement is so pending or threatened; (b) no strike, labor dispute, slowdown or stoppage pending or, to the best knowledge of each Loan Party, threatened against a Loan Party; and (c) no union representation question existing with respect to the employees of a Loan Party and no union organizing activities are taking place with respect to any thereof.

   6.19 Insurance. Each Loan Party has, with respect to its properties and business, insurance covering the risks, in the amounts, with the deductible or other retention amounts, and with the carriers, listed on Schedule 6.19, which insurance meets the requirements of Section 8.5 hereof.

   6.20 Solvency. On the Closing Date, after giving effect to the confirmation of the Plan of Reorganization by the Confirmation Order and the consummation of the transactions contemplated by the Plan of Reorganization and Confirmation Order and to the incurrence of all indebtedness and obligations being incurred on or prior to the Closing Date in connection herewith and therewith, (i) the amount of the "present fair saleable value" of the assets of the Borrower and its Subsidiaries taken as a whole will, as of such date, exceed the amount of all "liabilities of the Borrower and its Subsidiaries taken as a whole, contingent or otherwise", as of such date, as such quoted terms are determined in accordance with applicable federal and state laws governing determinations of the insolvency of debtors, (ii) the present fair saleable value of the assets of the Borrower and its Subsidiaries taken as a whole will, as of such date, be greater than the amount that will be required to pay the liabilities of the Borrower and its Subsidiaries taken as a whole on their debts as such debts become absolute and mature, (iii) the Borrower and its Subsidiaries taken as a whole will not have, as of such date, an unreasonably small amount of capital with which to conduct their businesses, and (iv) the Borrower and its Subsidiaries taken as a whole will be able to pay their debts as they mature. For purposes of this Section 6.20, "debt" means "liability on a claim", "claim" means any (x) right to payment, whether or not

\ 0

-38-

**A0536**

                 

such a right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured, and (y) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured or unmatured, disputed, undisputed, secured or unsecured.

   6.21 <u>Purpose of Loans</u>. Term Loans were distributed to the initial Term Loan Lenders hereunder on the Closing Date as part of the reorganization of the Borrower contemplated by the Plan of Reorganization and Confirmation Order. The proceeds of the Revolving Credit Loans shall be used on the Closing Date to repay all amounts owing under the DIP Loan Documents, and thereafter, for the working capital requirements from time to time of the Borrower in the ordinary course of business (including, without limitation, for cash collateral in connection with the issuances of letters of credit as permitted under Section 9.2(h)) and to pay fees and expenses incurred in connection herewith and in connection with the concurrent transactions referred to in Section 7.1 which are to be consummated on the Closing Date.

   6.22 <u>Environmental Matters</u>. Except as set forth on Schedule 6.22:

   (a) The facilities and properties that are owned, leased or operated by the Borrower or any Subsidiary (the "<u>Properties</u>") do not contain any Materials of Environmental Concern in amounts or concentrations which (i) constitute or constituted a violation of, or (ii) could give rise to liability under, any Environmental Law which could reasonably be expected to result in the payment of an amount payable by the Loan Parties in excess of $250,000 for remedial costs, compliance costs, compensatory damages, punitive damages, fines, penalties or any combination thereof (a "<u>Material Environmental Amount</u>").

   (b) To the knowledge of the Loan Parties, the Properties and all operations of the Loan Parties at the Properties are in material compliance with all applicable Environmental Laws, and there is no contamination at, under or about the Properties or violation of any Environmental Law with respect to the Properties resulting from any activities on the part of any Loan Party or the business operated by the Borrower and its Subsidiaries (the "<u>Business</u>") which could reasonably be expected to result in the payment of a Material Environmental Amount.

   (c) No Loan Party has not received any notice of violation, alleged violation, non-compliance, liability or potential liability regarding environmental matters or compliance with Environmental Laws with regard to any of the Properties or the Business other than would reasonably be expected not to have a Material Adverse Effect, nor does any Loan Party have knowledge that any such notice will be received or is being threatened.

   (d) Materials of Environmental Concern have not been transported or disposed of from the Properties in violation of, or in a manner or to a location which could give rise to liability under, any Environmental Law, nor have any Materials of Environmental Concern been generated, treated, stored or disposed of at, on or under any of the Properties in violation of, or in a manner that could give rise to liability under, any applicable Environmental Law, other than, in each case, would reasonably be expected not to result in the payment of a Material Environmental Amount.

   (e) No judicial proceeding or governmental or administrative action is pending or, to the knowledge of the Loan Parties, threatened, under any Environmental Law to which the Borrower

L 0

-39-

**A0537**

Confidential

or any Subsidiary is or will be named as a party with respect to the Properties or the Business, nor are there any consent decrees or other decrees, consent orders, administrative orders or other orders, binding upon the Loan Parties, outstanding under any Environmental Law with respect to the Properties or the Business, if the same require the payment of a Material Environmental Amount or if the failure to comply therewith could reasonably be expected to result in a payment of a Material Environmental Amount.

(f)    There has been no release or threat of release of Materials of Environmental Concern at or from the Properties, or arising from or related to the operations of the Borrower or any Subsidiary in connection with the Properties or otherwise in connection with the Business, in violation of or in amounts or in a manner that would give rise to the incurrence of a Material Environmental Amount under Environmental Laws.

6.23    Regulation H. No Mortgage encumbers improved real property owned by a Loan Party which is located in an area that has been identified by the Secretary of Housing and Urban Development as an area having special flood hazards and in which flood insurance has been made available under the National Flood Insurance Act of 1968.

6.24    Key-Person Life Insurance Policies. As of the Closing Date, neither the Borrower nor any Subsidiary has obtained any policy of "key-person" life insurance on any officer or director of the Borrower or any Subsidiary.

6.25    Existing Indebtedness. Immediately after giving effect to the Confirmation Order and the consummation of the Plan of Reorganization, the only Indebtedness of the Borrower and its Subsidiaries, other than the Loans, will be that listed on Schedule 9.2.

6.26    Concerning Regulatory Matters. (a) Each of the Borrower and each Subsidiary is, and for the last three years has been, in material compliance with all applicable federal and state laws, regulations, rules, and guidelines applicable to providers of medical transportation services, including, but not limited to, federal and state fraud and abuse laws, anti-kickback laws, self-referral laws, and/or laws, rules, regulations and guidelines relating to the filing of false claims or statements or unacceptable practices.

(b)    Each of the Borrower and each Subsidiary has all licenses and/or certifications that it needs to conduct its business in its present form if the failure to have such licenses and certificates could have a Material Adverse Effect, such licenses and/or certifications have not been terminated, suspended or revoked, and there are presently no termination, suspension or revocation proceedings, actual, pending, or threatened, in respect thereof.

(c)    Except as set forth on Schedule 6.26, neither the Borrower nor any Subsidiary is, and for the last three years has not been, the subject of any current, pending or, to its knowledge, threatened investigations, audits, consent decrees, settlements, or other extraordinary examinations or reviews by any federal or state agency or other government or administrative office, including, but not limited to, the Center for Medicare and Medicaid Services, the Office of the Inspector General, the Federal Bureau of Investigation, fiscal intermediaries, and state departments of health, social services, transportation, insurance, or any other state agency involved in the regulation of medical transportation

-40-

**A0538**

services or in the regulation of reimbursement received by companies providing medical transportation services through the Medicare and Medicaid programs.

### SECTION 7.    CONDITIONS PRECEDENT

     7.1    Conditions to Initial Loans. The agreement of each Lender to make its initial Loans is subject to the satisfaction, immediately prior to or concurrently with the making of such Loans on the Closing Date, of the following conditions precedent:

     (a)    Loan Documents. The Administrative Agent shall have received:

     (i)    this Agreement, executed and delivered by a duly authorized officer of the Borrower and the Lenders, with a counterpart for each Lender;

     (ii)    for the account of each Lender having a Term Loan Commitment which requests the same, a Term Loan Note of the Borrower conforming to the requirements hereof and executed by a duly authorized officer of the Borrower;

     (iii)    for the account of each Lender having a Revolving Credit Commitment which requests the same, a Revolving Credit Note of the Borrower conforming to the requirements hereof and executed by a duly authorized officer of the Borrower;

     (iv)    the Subsidiaries Guarantee, executed and delivered by a duly authorized officer of each of the parties thereto, with a counterpart or conformed copy for each Lender;

     (v)    the Security Agreement, executed and delivered by a duly authorized officer of the parties thereto, with a counterpart or a conformed copy for each Lender;

     (vi)    the Pledge Agreement, executed and delivered by a duly authorized officer of the Borrower, TransCare New York, Inc. and TransCare Maryland, Inc., with a counterpart or a conformed copy for each Lender;

     (vii)    to the extent required by the Security Agreement, a Medicare Controlled Account Agreement with respect to deposit accounts of the Loan Parties into which Medicare/Medicaid Receivables are deposited directly by such payors or by deposit of checks from such payors, executed and delivered by duly authorized officers of the parties thereto, with a counterpart or conformed copy for each Lender, on terms acceptable to the Borrower and Lenders; and

     (viii)    to the extent required by the Security Agreement, a Deposit Account Control Agreement, with respect to certain deposit accounts of the Loan Parties, executed and delivered by duly authorized officers of the parties thereto, with a counterpart or conformed copy for each Lender, on terms acceptable to the Borrower and Lenders.

     (b)    Related Agreements. The Administrative Agent and each Lender shall have received true and correct copies of each of the Disclosure Statement, the Plan of Reorganization, the Confirmation Order, the Management Agreement, the Stockholders' Agreement, the Stock Option Plan, the Warrant Documents, and such other documents or instruments as may be reasonably requested by the Administrative Agent, each duly executed and delivered by the respective parties thereto.

\0

-41-

**A0539**

Confidential

(c)    Plan of Reorganization; Concurrent Transactions.

(i)    The Plan of Reorganization shall have been confirmed by the entry of the Confirmation Order by the Bankruptcy Court;

(ii)    All of the conditions to the confirmation of the Plan of Reorganization and conditions to the effectiveness of confirmation of the Plan of Reorganization shall have been satisfied or waived;

(iii)    All amounts owing under the DIP Loan Documents shall have been, or shall be concurrently with the Closing Date, paid in full;

(iv)    The Common Stock shall have been issued and distributed as provided in the Plan of Reorganization. All Capital Stock and Stock Equivalents of Old TransCare shall no longer be outstanding as a result of the Plan of Reorganization and Confirmation Order.

(v)    All fees and expenses of the Lenders, the DIP Lenders and the Term Loan Lenders required to be paid by the Borrower, Old TransCare or any of their Subsidiaries in connection with the Bankruptcy Cases, the DIP Loan Documents, this Agreement or the transactions contemplated by the Plan of Reorganization, including without limitation, all professional fees and expenses of advisors to the Lenders, the DIP Lenders and the Term Loan Lenders, shall have been paid in full.

(vi)    The terms and conditions, and all documentation, of any Indebtedness and all equity securities of the Borrower or any of its Subsidiaries to be outstanding at or after the Closing Date, the certificate of incorporation and by-laws or other Governing Documents of all Loan Parties, the Management Agreement, the Stockholders' Agreement, the Stock Option Plan and the Warrant Documents, in each case after giving effect to the confirmation of the Plan of Reorganization pursuant to the Confirmation Order, shall be in form and substance consistent with the Plan of Reorganization and the Confirmation Order and otherwise satisfactory in form and substance to the Administrative Agent and the Lenders.

(d)    Governing Documents. The Administrative Agent shall have received, with a counterpart for each Lender, true and complete copies of the Governing Documents of each Loan Party, certified as of the Closing Date as complete and correct copies thereof by the Secretary or an Assistant Secretary of such Loan Party.

(e)    Corporate Proceedings of the Borrower. The Administrative Agent shall have received, with a counterpart for each Lender, a copy of the resolutions, in form and substance reasonably satisfactory to the Administrative Agent, of the Board of Directors of the Borrower authorizing (i) the execution, delivery and performance of this Agreement and the other Loan Documents to which it is a party, (ii) the borrowings contemplated hereunder and (iii) the granting by it of the Liens created pursuant to the Security Documents, certified by the Secretary or an Assistant Secretary of the Borrower as of the Closing Date, which certificate shall be in form and substance reasonably satisfactory to the Administrative Agent and shall state that the resolutions thereby certified have not been amended, modified, revoked or rescinded.

(f)    Borrower Incumbency Certificate. The Administrative Agent shall have received, with a counterpart for each Lender, a certificate of the Borrower, dated the Closing Date, as to the incumbency and signature of the officers of the Borrower executing any Loan Document reasonably satisfactory in form and substance to the Administrative Agent, executed by the Chairman, Chief

-42-

**A0540**

PP-TRBK0000074

Executive Officer, President or any Vice President and the Secretary or any Assistant Secretary of the Borrower.

      (g)   Corporate Proceedings of each Subsidiary Guarantor. The Administrative Agent shall have received, with a counterpart for each Lender, a copy of the resolutions, in form and substance reasonably satisfactory to the Administrative Agent, of the Board of Directors of each Subsidiary Guarantor, authorizing the execution, delivery and performance of the Loan Documents to which such Subsidiary Guarantor is a party, certified by the Secretary or an Assistant Secretary of such Subsidiary Guarantor as of the Closing Date, which certificate shall be in form and substance reasonably satisfactory to the Administrative Agent and shall state that the resolutions thereby certified have not been amended, modified, revoked or rescinded.

      (h)   Subsidiary Guarantor Incumbency Certificate. The Administrative Agent shall have received, with a counterpart for each Lender, a certificate of each Subsidiary Guarantor, dated the Closing Date, as to the incumbency and signature of the officers of such Subsidiary Guarantor executing any Loan Document reasonably satisfactory in form and substance to the Administrative Agent, executed by the Chairman, Chief Executive Officer, President or any Vice President and the Secretary or any Assistant Secretary of such Subsidiary Guarantor.

      (i)   Good Standing Certificates. The Administrative Agent shall have received, with a copy for each Lender, certificates dated as of a recent date from the Secretary of State or other appropriate authority, evidencing the good standing of the Borrower and each other Loan Party (i) in the jurisdiction of its organization and (ii) in each other jurisdiction where its ownership, lease or operation of property or the conduct of its business requires it to qualify as a foreign Person except, as to this subclause (ii), where the failure to so qualify could not have a Material Adverse Effect.

      (j)   Consents, Licenses and Approvals. The Administrative Agent shall have received, with a counterpart for each Lender, a certificate of a Responsible Officer of the Borrower stating that, assuming that the Lenders have made all required filings and received all required consents with respect to the ownership of Capital Stock of the Borrower, all consents, authorizations, licenses and filings referred to in Section 6.4 (except as otherwise indicated on Schedule 6.4) are in full force and effect, and each such consent, authorization and filing shall be in form and substance satisfactory to the Administrative Agent.

      (k)   Fees and Interest. The Administrative Agent shall have received (i) for the account of Patriarch, a structuring fee in an amount equal to $250,000, and (ii) for the account of each Lender, the facility fee for the first year following the Closing Date pursuant to Section 3.3(b)(i).

      (l)   Legal Opinions. The Administrative Agent shall have received, with a counterpart for each Lender, the executed legal opinion of Nixon Peabody, LLP, counsel to the Borrower and the other Loan Parties, substantially in the form of Exhibit G.

      (m)   Pledged Stock; Stock Powers; Pledged Interests. The Administrative Agent shall have received the certificates representing the shares of each Subsidiary of the Borrower pledged pursuant to the Pledge Agreement, together with an undated stock power for each such certificate executed in blank by a duly authorized officer of the pledgor thereof. Each such Subsidiary shall have delivered an acknowledgment of and consent to such Pledge Agreement, executed by a duly authorized officer of such Subsidiary, in substantially the form appended to such Pledge Agreement.

L 0

-43-

**A0541**

Confidential

PP-TRBK0000075

(n)    Actions to Perfect Liens. The Administrative Agent shall have received all financing statements on form UCC-1, necessary or, in the opinion of the Administrative Agent, desirable to perfect the Liens created by the Security Documents.

(o)    Landlord Agreements. The Administrative Agent shall have received, with respect to each parcel of real property leased by any Loan Party at which the books and records of billed accounts receivable are located, a landlord estoppel and collateral access agreement substantially in the form of Exhibit H or such other form as may be approved by the Administrative Agent (a "Landlord Agreement"), duly executed and delivered by the lessor of such parcel of real property.

(p)    Insurance. The Administrative Agent shall have received evidence in form and substance satisfactory to it that all of the requirements of Section 8.5 hereof shall have been satisfied.

7.2    Conditions to Each Loan. The agreement of each Lender to make any extension of credit requested to be made by it on any date after the Closing Date is subject to the satisfaction of the following conditions precedent:

(a)    Representations and Warranties. Each of the representations and warranties made by the Borrower and the other Loan Parties in or pursuant to the Loan Documents shall be true and correct in all material respects on and as of such date as if made on and as of such date (or, if any such representation or warranty is expressly stated to have been made as of a specific date, as of such specific date).

(b)    No Default. No Default or Event of Default shall have occurred and be continuing on such date (after giving effect to the transactions contemplated by this Agreement to occur on the Closing Date and to the consummation of the transactions contemplated by the Plan of Reorganization and Confirmation Order) or after giving effect to the Loans requested to be made on such date.

(c)    No Bankruptcy. There shall not have been commenced against the Borrower or any Subsidiary an involuntary case under the Bankruptcy Code or any other law referred to in Section 10(g)(i), or any case, proceeding or other action for the appointment of a receiver, liquidator, assignee, custodian, trustee, sequestrator (or similar official) of such Person or for any substantial part of its Property or for the winding up or liquidation of its affairs, and which involuntary case or other case, proceeding or other action shall not have been dismissed.

Each borrowing by the Borrower hereunder shall constitute a representation and warranty by the Borrower as of the date thereof that the conditions contained in this Section 7.2 have been satisfied or waived in accordance with Section 12.1 hereof.

SECTION 8.    AFFIRMATIVE COVENANTS

The Borrower hereby agrees that, so long as any of the Commitments remain in effect or any amount is owing to any Lender or the Administrative Agent hereunder or under any other Loan Document, the Borrower shall and (except in the case of delivery of financial information, reports and notices) shall cause each of its Subsidiaries to:

8.1    Financial Statements.    Furnish to the Administrative Agent, and the Administrative Agent will provide a copy to each Lender:

\_0

-44-

**A0542**

Confidential

PP-TRBK0000076

(a)      (i) as soon as available, but in any event within 120 days after the end of the 2003 fiscal year of the Borrower ending December 31, 2003, a copy of the consolidated balance sheet of the Borrower and its consolidated Subsidiaries as at the end of such year and the related consolidated statements of income, retained earnings, cash flow and changes in stockholders' equity for the period from August 4, 2003 to December 31, 2003, reported on without a "going concern" or like qualification or exception, or qualification arising out of the scope of the audit, by J.H. Cohn or other independent certified public accountants of nationally recognized standing reasonably acceptable to the Required Lenders, and an unaudited consolidated operating summary by business segment for such period; and

(ii) as soon as available, but in any event within 120 days after the end of each fiscal year of the Borrower, commencing with the fiscal year ending December 31, 2004, a copy of the consolidated balance sheet of the Borrower and its consolidated Subsidiaries as at the end of such year and the related consolidated statements of income, retained earnings, cash flow and changes in stockholders' equity for such year, setting forth in each case in comparative form the figures for the previous year, reported on without a "going concern" or like qualification or exception, or qualification arising out of the scope of the audit, by J.H. Cohn or other independent certified public accountants of nationally recognized standing reasonably acceptable to the Required Lenders, and an unaudited consolidated operating summary by business segment for such fiscal year; and

(b)      as soon as available, but in any event not later than 45 days after the end of each of the first three quarterly periods of each fiscal year of the Borrower commencing with the quarterly period ending September 30, 2003, the unaudited consolidated balance sheet of the Borrower and its consolidated Subsidiaries as at the end of such quarter and the related unaudited consolidated statements of income, retained earnings, cash flow and changes in stockholders' equity of the Borrower and its consolidated Subsidiaries for such quarter and the portion of the fiscal year through the end of such quarter, setting forth in each case in comparative form the figures for the previous year, and consolidated operating summary by business segments for such quarter, certified by a Responsible Officer as being fairly stated in all material respects (subject to normal year-end audit adjustments); and

(c)      as soon as available, but in any event not later than 30 days after the end of each calendar month commencing with the month ending July 31, 2003, the unaudited consolidated balance sheet of the Borrower and its consolidated Subsidiaries as at the end of such month and the related unaudited consolidated statements of income, retained earnings, cash flow and changes in stockholders' equity of the Borrower and its consolidated Subsidiaries for such month and the portion of the fiscal year through the end of such month, setting forth in each case in comparative form the figures for (i) the previous year and (ii) the projected and operating cash flow budgets for the current fiscal year, and consolidated operating summary by business segments for such month, certified by a Responsible Officer as being fairly stated in all material respects (subject to normal year-end audit adjustments);

all such financial statements shall be complete and correct in all material respects and shall be prepared in reasonable detail and in accordance with GAAP applied consistently throughout the periods reflected therein and with prior periods (except as approved by such accountants or officer, as the case may be, and disclosed therein).

8.2      Certificates; Other Information.  Furnish to each Lender:

(a)      concurrently with the delivery of the financial statements referred to in Section 8.1(a), a certificate of the independent certified public accountants reporting on such financial statements stating that in making the examination necessary therefor no knowledge was obtained of any

L 0

-45-

Confidential                                                                                              PP-TRBK0000077

Default or Event of Default not waived pursuant hereto, except as specified in such certificate, and a copy of any management letter prepared for the Borrower;

(b)    concurrently with the delivery of the financial statements referred to in Sections 8.1(a) and (b), a certificate of a Responsible Officer (i) stating that, to the best of such Officer's knowledge, the Borrower during such period has observed or performed all of its covenants and other agreements, and satisfied every condition, contained in this Agreement and the other Loan Documents to be observed, performed or satisfied by it, and that such Officer has obtained no knowledge of any existing Default or Event of Default not waived pursuant hereto except as specified in such certificate and (ii) showing in detail the calculations supporting such Officer's certification of the Borrower's compliance with the requirements of Section 9.1(a) through 9.1(e) for the applicable fiscal quarter;

(c)    not later than the last day of each fiscal year of the Borrower, a copy of the projections by the Borrower of the operating budget and cash flow budget of the Borrower and its Subsidiaries for the succeeding fiscal year, such projections to be accompanied by a certificate of a Responsible Officer to the effect that such projections have been prepared in good faith based upon reasonable assumptions;

(d)    within five days after the same are sent, copies of all financial statements and reports related in part or in whole to the financial performance of the Borrower which the Borrower sends to its stockholders, and within five days after the same are filed, copies of all financial statements and reports which the Borrower may make to, or file with, the Securities and Exchange Commission or any successor or analogous Governmental Authority;

(e)    during the month of January in each calendar year, valid certificates of insurance with respect to the insurance maintained by the Borrower and its Subsidiaries in accordance with Section 8.5 of this Agreement and such supplemental reports as the Administrative Agent may from time to time reasonably request; and

(f)    promptly, such additional financial and other information as any Lender may from time to time reasonably request.

8.3    Payment of Obligations. Pay, discharge or otherwise satisfy at or before maturity or before they become delinquent consistent with past practices, as the case may be, all its material obligations of whatever nature arising after the Closing Date, except where the amount or validity thereof is currently being contested in good faith by appropriate proceedings and reserves in conformity with GAAP with respect thereto have been provided on the books of the Borrower or its Subsidiaries, as the case may be.

8.4    Conduct of Business and Maintenance of Existence. Continue to engage in business relating to a line of business substantially similar to the line of business now conducted by it and preserve, renew and keep in full force and effect its corporate existence and take all reasonable action to maintain all rights, privileges and franchises necessary or desirable in the normal conduct of its business except as otherwise permitted pursuant to Section 9.5; comply with all Contractual Obligations and Requirements of Law except to the extent that failure to comply therewith could not, in the aggregate, have a Material Adverse Effect.

8.5    Maintenance of Property; Insurance. (a) Keep all property useful and necessary in its business in good working order and condition.

\_0

**A0544**

Confidential

PP-TRBK0000078

(b)     Maintain with financially sound and reputable insurance companies insurance on all its property in at least such amounts and against at least such risks (but including in any event public liability, product liability and business interruption) as are usually insured against in the same general area by companies engaged in the same or a similar business, which insurance shall name the Administrative Agent as lender loss payee (other than worker's compensation, public utility liability, employee benefits and welfare insurance) in the case of property or casualty insurance, and as an additional insured, in the case of liability insurance; and furnish to the Administrative Agent, upon written request, full information as to the insurance carried.

(c)     Maintain, with financially sound and reputable companies, insurance policies (i) insuring the Inventory, Equipment and Vehicles against loss by fire, explosion, theft and such other casualties as may be reasonably satisfactory to the Administrative Agent in amounts comparable to amounts of insurance coverage obtained by similar businesses of similar size acting prudently and (ii) insuring each Loan Party, the Administrative Agent and the Lenders against liability for personal injury and property damage relating to such Inventory, Equipment and Vehicles, such policies to be in such form and amounts and having such coverage as shall be comparable to forms, amounts and coverage, respectively, obtained by similar businesses of similar size acting prudently, with losses payable to any Loan Party, the Administrative Agent and the Lenders as their respective interests may appear or, in the case of liability insurance, showing the Administrative Agent and the Lenders as additional insured parties. All such insurance shall (i) provide that no cancellation, material reduction in amount or material change in coverage thereof shall be effective until at least 30 days after receipt by the Administrative Agent of written notice thereof, (ii) name the Administrative Agent and the Lenders as insured parties and loss payees, (iii) include a breach of warranty clause and (iv) be reasonably satisfactory in all other respects to the Administrative Agent.

8.6     Inspection of Property; Books and Records; Discussions. (a) Keep proper books of records and account in which full, true and correct entries in conformity with GAAP and all Requirements of Law shall be made of all dealings and transactions in relation to its business and activities; and permit representatives of any Lender to visit and inspect any of its properties and examine and (b) make abstracts from any of its books and records at any reasonable time and as often as may reasonably be desired and to discuss the business, operations, properties and financial and other condition of the Borrower and its Subsidiaries with officers and management employees of the Borrower and its Subsidiaries and with its independent certified public accountants.

8.7     Notices. In the case of an event described in subparagraph (a)(i), no later than five (5) Business Days following the date on which a Responsible Officer of a Loan Party has knowledge thereof, in the case of an event described in subparagraph (a)(ii), no later than two (2) Business Days following the date on which a Responsible Officer of a Loan Party has knowledge thereof, and in each other case, promptly and, in any event, within five days following the actual knowledge of a Responsible Officer of the Borrower of the occurrence thereof, give notice to the Administrative Agent and each Lender of:

(a)     the occurrence of any (i) Default or (ii) Event of Default;

(b)     any (i) default or event of default by Borrower or any Subsidiary under any Contractual Obligation of the Borrower or any of its Subsidiaries or (ii) litigation, investigation or proceeding which may exist at any time between the Borrower or any of its Subsidiaries and any Governmental Authority, which in either case, if not cured or if adversely determined, as the case may be, would reasonably be expected to have a Material Adverse Effect;

\ 0

-47-

**A0545**

(c)  any litigation or proceeding affecting the Borrower or any of its Subsidiaries in which the amount involved is $1,000,000 or more and not covered by insurance or in which injunctive or similar relief is sought;

(d)  the acquisition by any Loan Party of any property or interest in property (including, without limitation, real property) the purchase price of which exceeds $500,000, that is not subject to a perfected Lien in favor of the Administrative Agent pursuant to the Security Documents (except to the extent such property is subject to a Lien permitted by Section 9.3);

(e)  the occurrence of any transaction or occurrence referred to in Section 5.6(b), and the receipt of any Net Cash Proceeds which are then required to be applied to the repayment of Loans and reduction of Revolving Credit Commitments as specified in Section 5.6(b)) because no Reinvestment Notice has been or will be delivered;

(f)  the following events, as soon as possible and in any event within 30 days after the Borrower knows or has reason to know thereof: (i) the occurrence or expected occurrence of any Reportable Event with respect to any Single Employer Plan, a failure to make any required contribution or contributions to a Plan which individually exceeds $250,000 or in the aggregate exceed $1,000,000, the creation of any Lien in favor of the PBGC or a Plan or any withdrawal from, or the termination, Reorganization or Insolvency of, any Multiemployer Plan or (ii) the institution of proceedings or the taking of any other action by the PBGC or the Borrower or any Commonly Controlled Entity or any Multiemployer Plan with respect to the withdrawal from, or the termination, Reorganization or Insolvency of, any Multiemployer Plan; and

(g)  any development or event which could reasonably be expected to have a Material Adverse Effect, other than changes of law or other regulatory events affecting the healthcare services industry or medical transportation industry generally.

Each notice pursuant to this Section shall be accompanied by a statement of a Responsible Officer setting forth details of the occurrence referred to therein and stating what action the Borrower proposes to take with respect thereto.

8.8  Environmental Laws.  (a) Comply with and use commercially reasonable efforts to ensure compliance by all tenants and subtenants, if any, with all applicable Environmental Laws and obtain and comply with and maintain, and use commercially reasonable efforts to ensure that all tenants and subtenants obtain and comply with and maintain, any and all material licenses, approvals, notifications, registrations or permits required by applicable Environmental Laws, except to the extent that the failure to so comply would not reasonably be expected to have a Material Adverse Effect or result in a liability of the Loan Parties in a Material Environmental Amount.

(b)  Conduct and complete all investigations, studies, sampling and testing, and all remedial, removal and other actions required under Environmental Laws and promptly comply with all lawful orders and directives of all Governmental Authorities regarding Environmental Laws, except to the extent that the failure to so comply would not reasonably be expected to have a Material Adverse Effect or result in a liability of the Loan Parties in a Material Environmental Amount.

8.9  Periodic Audit of Accounts Receivable.  The Administrative Agent shall be entitled to perform a periodic due diligence inspection, test and review of the accounts receivable of the Borrower and its Subsidiaries on a mutually convenient Business Day twice during each calendar year at the expense of the Borrower and shall in each case be satisfied in all material respects with the results

\ 0

-48-

**A0546**

Confidential

thereof; provided, however, that upon the occurrence and during the continuation of an Event of Default, the Administrative Agent shall be entitled to perform such additional due diligence inspections, tests and review of such accounts receivable as any Lender shall deem necessary or advisable at the expense of the Borrower.

        8.10    Additional Collateral; Additional Subsidiary Guarantors. (a) In the event that the Borrower or any Subsidiary acquires any property or interest in property (including, without limitation, real property) other than property made subject to a Lien permitted under Section 9.3(g), that is not subject to a perfected Lien in favor of the Administrative Agent pursuant to the Security Documents, the Borrower shall, and shall cause the Subsidiary to, take such action (including, without limitation, the preparation and filing of mortgages or deeds of trust in form and substance satisfactory to the Administrative Agent) as the Administrative Agent shall request in order to create and/or perfect a Lien in favor of the Administrative Agent on such property.

        (b)    In the event that the Borrower has any Subsidiary (other than an Immaterial Subsidiary that is not a Subsidiary Guarantor), the Borrower shall give prior notice to the Administrative Agent thereof and execute a supplement to the Pledge Agreement (if applicable) and such Subsidiary shall execute a supplement to the Subsidiaries Guarantee, a supplement to the Security Agreement, in form and substance satisfactory to the Administrative Agent, pursuant to which such Subsidiary becomes a party thereto, and the Borrower and/or any Subsidiary which is a holder of any Capital Stock of such Subsidiary shall execute such pledge agreements, each in form and substance satisfactory to the Administrative Agent, and shall take such other action as shall be necessary or advisable (including, without limitation, the execution, delivery and recording of mortgages) in order to perfect the Liens granted by such Subsidiary in favor of the Administrative Agent for the benefit of the Lenders and to effect and perfect the pledge of all of the Capital Stock of such Subsidiary in favor of the Administrative Agent for the benefit of the Lenders. Such Subsidiary shall thereupon become a Subsidiary Guarantor for all purposes under the Loan Documents, including, without limitation, Section 8.10(a) of this Agreement, and such additional security agreements, security guarantees and/or pledge agreements shall become "Security Documents" hereunder. The Administrative Agent shall be entitled to receive legal opinions of one or more counsel to the Borrower and such Subsidiary addressing such of the following matters as the Administrative Agent or its counsel may reasonably request, including the enforceability of the Subsidiary Guaranty and the Security Agreement and any pledge agreements and mortgages to which such Subsidiary becomes a party and the pledge of the Capital Stock of such Subsidiary, and the creation, validity and perfection of the Liens so granted by such Subsidiary and the Borrower and/or other Subsidiaries to the Administrative Agent for the benefit of the Lenders.

        8.11    Vehicles. In the event that, at any time following the Closing Date, the aggregate value of Vehicles owned by the Borrower and its Subsidiaries which are not subject to lease or other third-party financing or Lien permitted hereunder is at least $500,000 (the "Vehicle Triggering Event"), the Borrower shall and cause each such Subsidiary to furnish to the Administrative Agent, no later than ninety (90) days following such Vehicle Triggering Event, certificates of title for each such Vehicle owned by the Borrower or any Subsidiary that is not subject to lease or other third-party financing or existing Lien permitted hereunder, together with fully-completed forms acceptable for presentation to the applicable state motor vehicle bureau or department, noting the lien of the Administrative Agent on each such certificate of title or otherwise perfecting the lien of the Administrative Agent on such Vehicle.

\_0

-49-

**A0547**

Confidential

PP-TRBK0000081

## SECTION 9.    NEGATIVE COVENANTS

The Borrower hereby agrees that, so long as any of the Revolving Credit Commitments remain in effect or any amount is owing to any Lender or the Administrative Agent hereunder or under any other Loan Document, the Borrower shall not, and (except with respect to Section 9.1) shall not permit any of its Subsidiaries to, directly or indirectly:

9.1    Financial Condition Covenants.

(a)    Leverage Ratio. Permit the Leverage Ratio at any time during any period set forth in the table below to be greater than the ratio set forth opposite such period below:

| Period | Ratio |
| --- | --- |
| Closing Date - 12/31/03 | 5.75 to 1.00 |
| 1/1/04 - 6/30/04 | 5.50 to 1.00 |
| 7/1/04 - 12/31/04 | 5.25 to 1.00 |
| 1/1/05 - 6/30/05 | 4.75 to 1.00 |
| 7/1/05 and thereafter | 4.50 to 1.00 |

(b)    Interest Coverage. Permit the ratio at the end of any fiscal quarter of the Borrower, commencing with the fiscal quarter ended March 31, 2003, of (i) Consolidated EBITDA for any period of twelve consecutive months ending on the last day of such fiscal quarter to (ii) the cash portion of Consolidated Interest Expense for such twelve-month period (calculated as provided in the definition of "Consolidated Interest Expense" in the case of the first three fiscal quarters ended after the Closing Date) to be less than the ratio set forth opposite such period in the table below:

| Period | Ratio |
| --- | --- |
| Closing Date - 06/30/04 | 1.75 to 1.00 |
| 7/1/04 - 12/31/04 | 2.00 to 1.00 |
| 1/1/05 and thereafter | 2.15 to 1.00 |

(c)    Fixed Charge Coverage. Permit the ratio at the end of any fiscal quarter of the Borrower ended during any period set forth in the table below of (i) Consolidated EBITDA for the twelve-month period ending on the last day of such fiscal quarter minus Consolidated Capital Expenditures during such twelve-month period to (ii) Consolidated Fixed Charges for such twelve-month period (calculated in the case of Consolidated Interest Expense as set forth in the definition of "Consolidated Interest Expense" with respect to the first three fiscal quarters following the Closing Date) to be less than the ratio set forth opposite such period in the table below:

| Period | Ratio |
| --- | --- |
| Closing Date - 12/31/03 | 0.85 to 1.00 |
| 1/1/04 - 6/30/04 | 0.90 to 1.00 |
| 7/1/04 - 12/31/04 | 0.95 to 1.00 |
| 1/1/05 and thereafter | 1.05 to 1.00 |

9.2    Limitation on Indebtedness.    Create, incur, assume or suffer to exist any Indebtedness, except:

(a)    Indebtedness of the Borrower under this Agreement;

\_ 0

-50-

**A0548**

Confidential    PP-TRBK0000082

    (b)  Indebtedness of the Borrower to any Subsidiary Guarantor and of any Subsidiary Guarantor to the Borrower or any other Subsidiary Guarantor;

    (c)  Indebtedness of the Borrower and any of its Subsidiaries incurred to finance the acquisition of fixed or capital assets in an aggregate principal amount not exceeding as to the Borrower and its Subsidiaries $7,500,000 at any time outstanding;

    (d)  Indebtedness outstanding on the date hereof and listed on Schedule 9.2;

    (e)  Indebtedness of the Borrower or any Subsidiary relating to performance, surety, statutory, appeal or other like bonds obtained in the ordinary course of business;

    (f)  Guarantee Obligations permitted under Section 9.4;

    (g)  additional unsecured Indebtedness of the Borrower in an aggregate principal amount not exceeding $500,000 at any one time outstanding; and

    (h)  letters of credit issued at the request of the Borrower or any Subsidiary Guarantor in a face amount not to exceed $500,000 in the aggregate at any one time.

    9.3  Limitation on Liens.  Create, incur, assume or suffer to exist any Lien upon any of its property, assets or revenues, whether now owned or hereafter acquired, except for:

    (a)  Liens for taxes not yet due or which are being contested in good faith by appropriate proceedings, provided that adequate reserves with respect thereto are maintained on the books of the Borrower or its Subsidiaries, as the case may be, in conformity with GAAP;

    (b)  carriers', warehousemen's, mechanics', materialmen's, repairmen's or other like Liens arising in the ordinary course of business which are not overdue for a period of more than 60 days or which are being contested in good faith by appropriate proceedings;

    (c)  pledges or deposits in connection with workers' compensation, unemployment insurance and other social security legislation and deposits securing liability to insurance carriers under insurance or self-insurance arrangements and Liens on insurance policies and proceeds thereof securing obligations for the payment of insurance premiums under insurance premium financing arrangements, provided that such Liens do not exceed $10,000,000 in the aggregate at any one time;

    (d)  deposits to secure the performance of bids, trade contracts (other than for borrowed money), leases, statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature incurred in the ordinary course of business;

    (e)  easements, rights-of-way, restrictions and other similar encumbrances incurred in the ordinary course of business which, in the aggregate, are not substantial in amount and which do not in any case materially detract from the value of any Loan Party's interest in the property subject thereto or materially interfere with the ordinary conduct of the business of the Borrower or such Subsidiary;

    (f)  Liens in existence on the date hereof listed on Schedule 9.3, securing Indebtedness permitted by Section 9.2(d), provided that no such Lien is spread to cover any additional property after the Closing Date and that the amount of Indebtedness secured thereby is not increased

\_ 0

-51-

**A0549**

    

except that, notwithstanding the foregoing, Liens in respect of the financing of Vehicles or equipment (and proceeds thereof) may secure other Indebtedness of the same Person (or its Affiliates) permitted by Section 9.2(c), which is incurred from time to time in connection with the financing of Vehicles or equipment (and proceeds thereof);

(g) Liens securing Indebtedness of the Borrower and its Subsidiaries permitted by Section 9.2(c) incurred to finance the acquisition of fixed or capital assets, provided that (i) such Liens shall be created substantially simultaneously with the acquisition of such fixed or capital assets, (ii) such Liens do not at any time encumber any property other than the property financed by such Indebtedness and proceeds thereof, and (iii) the principal amount of Indebtedness secured by any such Lien shall at no time exceed 100% of the original purchase price of such property at the time it was acquired except that, notwithstanding the foregoing clauses (i), (ii) and (iii), Liens in respect of the financing of Vehicles or equipment may encumber any or all Vehicles or equipment financed by a particular Person from time to time (and its Affiliates) and proceeds thereof;

(h) Liens (not otherwise permitted hereunder) which secure obligations not exceeding (as to the Borrower and all Subsidiaries) $500,000 in aggregate amount at any time outstanding;

(i) Liens created pursuant to the Security Documents; and

(j) Liens consisting of cash collateral obligations securing the issuance of letters of credit permitted under Section 9.2(h).

9.4 Limitation on Guarantee Obligations. Create, incur, assume or suffer to exist any Guarantee Obligation except (other than for Immaterial Subsidiaries):

(a) Guarantee Obligations in existence on the date hereof and listed on Schedule 9.4;

(b) Guarantee Obligations incurred after the date hereof in an aggregate amount not to exceed $500,000 at any one time outstanding;

(c) guarantees made by the Borrower of obligations of any of its Subsidiaries, and guarantees made by any Subsidiary of obligations of the Borrower or another Subsidiary, which obligations in each case are otherwise permitted or not prohibited under this Agreement; and

(d) the Subsidiaries Guarantee.

9.5 Limitation on Fundamental Changes. Enter into any merger, consolidation or amalgamation, or liquidate, wind up or dissolve itself (or suffer any liquidation or dissolution), or convey, sell, lease, assign, transfer or otherwise dispose of, all or substantially all of its property, business or assets, or make any material change in its present method of conducting business, except:

(a) any Subsidiary of the Borrower may be merged or consolidated with or into the Borrower (provided that the Borrower shall be the continuing or surviving corporation) or with or into any one or more wholly owned Subsidiaries of the Borrower (other than Immaterial Subsidiaries) (provided that the wholly owned Subsidiary or Subsidiaries shall be the continuing or surviving

\_ 0

-52-

**A0550**

Confidential

PP-TRBK0000084

corporation and if such Subsidiary is not a Subsidiary Guarantor, it shall become a Subsidiary Guarantor prior to or simultaneously with consummation of such transaction); and

(b)     any wholly owned Subsidiary may sell, lease, transfer or otherwise dispose of any or all of its assets (upon voluntary liquidation or otherwise) to the Borrower or any other wholly owned Subsidiary (other than Immaterial Subsidiaries) of the Borrower.

9.6     Limitation on Sale of Assets. Convey, sell, lease, assign, transfer or otherwise dispose of any of its property, business or assets (including, without limitation, receivables and leasehold interests), whether now owned or hereafter acquired, or, in the case of any Subsidiary, issue or sell any shares of such Subsidiary's Capital Stock to any Person other than the Borrower or any wholly owned Subsidiary, except (other than for Immaterial Subsidiaries):

(a)     the sale or other disposition in the ordinary course of business of obsolete or worn out property or any asset or property no longer used or useful in the business of the Borrower or any Subsidiary; provided that the Net Cash Proceeds of each such transaction are applied to the prepayment of the Loans to the extent required by Section 5.6(b);

(b)     the sale of inventory in the ordinary course of business;

(c)     the sale or discount without recourse of accounts receivable arising in the ordinary course of business in connection with the compromise or collection thereof;

(d)     as permitted by Section 9.5(a) or (b);

(e)     the sale of assets pursuant to sale-leaseback transactions permitted by Section 9.12;

(f)     the sale of assets by a Subsidiary Guarantor to a Subsidiary Guarantor; and

(g)     as required by the Plan of Reorganization and the Confirmation Order.

9.7     Limitation on Dividends and Miscellaneous Payments.

(a)     Declare or pay any dividend (other than dividends payable solely in common stock of the Borrower) on, or make any payment on account of, or set apart assets for a sinking or other analogous fund for, the purchase, redemption, defeasance, retirement or other acquisition of, any shares of any class of Capital Stock of the Borrower or any warrants or options to purchase any such Capital Stock, whether now or hereafter outstanding, or make any other distribution in respect thereof, either directly or indirectly, whether in cash or property or in obligations of the Borrower or any Subsidiary (any of the foregoing, a "Restricted Payment"), except for (i) Restricted Payments made solely in Stock Equivalents and (ii) so long as no Event of Default has occurred and is continuing, Restricted Payments required as provided in the Warrant Documents, (iii) except to the extent, if any, restricted pursuant to the terms of the Management Agreement during the continuance of an Event of Default, the issuance and exercise of options pursuant to the Management Agreement, and (iv) so long as no Default or Event of Default shall have occurred and be continuing or would result therefrom, the repurchase of Capital Stock by the Borrower as permitted by the Stock Option Plan or any option or award issued pursuant thereto or the exercise of any right of first refusal pursuant to the Stockholders Agreement.

\_ 0

-53-

**A0551**

(b)     Make any payments (i) with respect to the Management Fee except in accordance with the terms of the Management Agreement, and (ii) with respect to any management fee or deferred investment banking fee other than the Management Fee without the prior written consent of the Administrative Agent and the Required Lenders.

9.8     Limitation on Capital Expenditures.  Make or commit to make (by way of the acquisition of securities of a Person or otherwise) any expenditure in respect of the purchase or other acquisition of fixed or capital assets (excluding any such asset acquired in connection with normal replacement and maintenance programs properly charged to current operations) not exceeding, in the aggregate for the Borrower and its Subsidiaries during any fiscal year of the Borrower, $4,850,000; provided that any portion thereof not expended in such fiscal year may be carried over for expenditure in the next following fiscal year.

9.9     Limitation on Investments, Loans and Advances.  Make any advance, loan, extension of credit or capital contribution to, or purchase any stock, bonds, notes, debentures or other securities of or any assets constituting a business unit of, or make any other investment in, any Person, except:

(a)     extensions of trade credit in the ordinary course of business;

(b)     investments in Cash Equivalents;

(c)     loans and advances to employees of the Borrower or its Subsidiaries for travel, entertainment and relocation expenses in the ordinary course of business in an aggregate amount for the Borrower and its Subsidiaries not to exceed $150,000 at any one time outstanding, which loans and advances may not be forgiven; and

(d)     additional investments, loans and advances in an aggregate principal amount not exceeding $750,000 at any one time outstanding.

9.10     Limitation on Optional Payments and Modifications of Agreements.  (a) Except as contemplated by the Plan of Reorganization and Confirmation Order, make any optional payment or prepayment on or redemption or purchase of any Indebtedness (other than (i) the Loans and (ii) Indebtedness incurred to finance the acquisition of Vehicles or equipment to the extent such Indebtedness is so prepaid, redeemed or repurchased (A) from the proceeds of new Indebtedness permitted hereunder incurred to refinance the same, (B) from payments of casualty or property insurance, or (C) from other cash available to the Borrower in an aggregate amount not to exceed $500,000 per year), (b) amend, modify, waive or change, or consent or agree to or accept the benefit of any amendment, modification, waiver or change to any of the terms of any such Indebtedness (other than financings of Vehicles and equipment), the Stockholder's Agreement, the Management Agreement or any Warrant Documents (other than any such amendment, modification, waiver or change which (i) would not materially and adversely affect the Lenders or the Lenders' rights under the Loan Documents, (ii) would extend the maturity or reduce the amount of any payment of principal of any such Indebtedness, (iii) would reduce the rate or extend the date for payment of interest on any such Indebtedness, or (iv) would not make any of the affirmative or negative covenants or default provisions contained therein more restrictive to the Loan Parties than those contained therein on the Closing Date) or (c) amend, waive, supplement or otherwise modify, or agree to any amendment, waiver, supplement other modification to, the Plan of Reorganization or the Confirmation Order except as required by applicable law.

\_0

**A0552**

Confidential

PP-TRBK0000086

9.11 Limitation on Transactions with Affiliates. Except as set forth on Schedule 9.11 (but subject to Section 9.7(a)) and except for payments of the Management Fee permitted pursuant to Section 9.7(b) and except for the Management Agreement and the transactions contemplated by the Plan of Reorganization and Confirmation Order, including the issuance of options under the Stock Option Plan, the Warrant Documents, the Stockholders Agreement and Management Agreement, enter into any transaction, including, without limitation, any purchase, sale, lease or exchange of property or the rendering of any service, with any Affiliate unless such transaction is (a) otherwise permitted under this Agreement, (b) in the ordinary course of the Borrower's or such Subsidiary's business and (c) upon fair and reasonable terms no less favorable to the Borrower or such Subsidiary, as the case may be, than it would obtain in a comparable arm's length transaction with a Person which is not an Affiliate.

9.12 Limitation on Sales and Leasebacks. Enter into any arrangement with any Person providing for the leasing by the Borrower or any Subsidiary of real or personal property which has been or is to be sold or transferred by the Borrower or such Subsidiary to such Person or to any other Person to whom funds have been or are to be advanced by such Person on the security of such property or rental obligations of the Borrower or such Subsidiary, which arrangements exceed $250,000 in the aggregate.

9.13 Limitation on Changes in Fiscal Year. Permit the fiscal year of the Borrower to end on a day other than December 31.

9.14 Limitation on Negative Pledge Clauses. Enter into with any Person any agreement, other than (a) this Agreement, and (b) any industrial revenue bonds, purchase money mortgages, Financing Leases or other Indebtedness permitted by Section 9.2(c) or (d) of this Agreement (in which cases, any prohibition or limitation shall only be effective against the assets financed thereby except as otherwise permitted pursuant to Sections 9.3(f) and 9.3(g) hereof), which prohibits or limits the ability of the Borrower or any of its Subsidiaries to create, incur, assume or suffer to exist any Lien upon any of its property, assets or revenues, whether now owned or hereafter acquired other than agreements with Persons prohibiting any such lien or assets in which such Person has a prior security interest which is permitted by Section 9.3, provided that, except for restrictions limited to assets financed under the related agreement or as permitted by Section 9.3(c) or (d) hereof, such agreements do not prohibit or limit the ability of the Borrower or any of its Subsidiaries to incur the Liens created pursuant to the Security Documents.

9.15 Limitation on Lines of Business. Enter into any business, either directly or through any Subsidiary, except for those businesses in which the Borrower and its Subsidiaries are engaged in or which relate to a line of business substantially similar to the line of business engaged in by the Borrower or the Subsidiaries on the date of this Agreement.

9.16 Governing Documents. Amend its certificate of incorporation (except to increase the number of authorized shares of common stock), or other Governing Documents in a manner that would have a material adverse effect on the Lenders' rights under the Loan Documents or any Loan Party's ability to fulfill its obligations thereunder, without the prior written consent of the Required Lenders, which shall not be unreasonably withheld or delayed.

\ 0

-55-

**A0553**

Confidential

9.17    Limitation on Payroll Accounts.  (a) Permit the aggregate amount held in the Payroll Accounts at any time to exceed the amount set forth on Schedule 9.17; or (b) convert any deposit account into which Payroll Accounts are deposited maintained by any Loan Party into a Payroll Account, or permit the creation or substitution of any Payroll Account, or otherwise maintain any Payroll Accounts, other than those Payroll Accounts listed on Schedule VIII to the Security Agreement, unless the Borrower shall have given the Administrative Agent at least ten Business Days prior notice thereof; or (c) permit any Payroll Account to be used for any purpose other than those described in the definition of "Payroll Accounts" in the Security Agreement.

## SECTION 10.  EVENTS OF DEFAULT

If any of the following events shall occur and be continuing:

(a)    The Borrower shall fail to pay any principal of any Loan when due in accordance with the terms thereof or hereof; or the Borrower shall fail to pay any interest on any Loan within five Business Days after becoming due hereunder; or the Borrower shall fail to pay any other amount payable hereunder or under the other Loan Documents or the Fee Letter within five days after notice that any such interest or other amount is due in accordance with the terms thereof or hereof (an invoice for any such amount due to be deemed notice thereof for purposes of this provision); or

(b)    Any representation or warranty made or deemed made by the Borrower or any other Loan Party herein or in any other Loan Document or which is contained in any certificate, document or financial or other statement furnished by it at any time on or after the Closing Date under or in connection with this Agreement or any such other Loan Document shall prove to have been incorrect in any material respect on or as of the date made or deemed made; or

(c)    (i) The Borrower or any other Loan Party shall default in the observance or performance of any agreement contained in Section 8.7(a), Section 8.11 or Section 9 of this Agreement, Section 5 of the Security Agreement, or Section 5 of the Pledge Agreement, or (ii) the Borrower or any other Loan Party shall default in the observance or performance of Section 8.6(b), 8.9, or 8.10 of this Agreement, and such default shall continue unremedied for a period of two (2) Business Days after the receipt of notice from the Administrative Agent; or

(d)    The Borrower shall be in default with respect to Section 16, or Article III of the Borrower's Amended and Restated By-laws, Section 5(a) of the Management Agreement, or Section 8.1 of the Stockholders' Agreement; or

(e)    The Borrower or any other Loan Party shall default in the observance or performance of any other agreement contained in this Agreement or any other Loan Document (other than as provided in paragraphs (a) through (c) of this Section), and such default shall continue unremedied for a period of 30 days from the date that a Responsible Officer of the Borrower or such Loan Party has knowledge of such default; or

(f)    The Borrower or any of its Subsidiaries shall:

(i) default in any payment of principal of or interest on any Indebtedness (other than the Loans, Indebtedness under the Existing Specified Leases and Indebtedness under Financing Leases entered into to finance Vehicles or Equipment) or in the payment of any Guarantee Obligation with respect to such Indebtedness, beyond the period of grace, if any, provided in the instrument or agreement under which such Indebtedness or Guarantee Obligation

L 0

-56-

**A0554**

was created, if the aggregate amount of the Indebtedness and/or Guarantee Obligations in respect of which such default or defaults shall have occurred is at least $250,000; default in the observance or performance of any other agreement or condition relating to any such Indebtedness or Guarantee Obligation or contained in any instrument or agreement evidencing, securing or relating thereto beyond the period of grace, or any other event shall occur or condition exist, the effect of which default or other event or condition is to cause, or to permit the holder or holders of such Indebtedness or beneficiary or beneficiaries of such Guarantee Obligation (or a trustee or agent on behalf of such holder or holders or beneficiary or beneficiaries) to cause, with the giving of notice if required, such Indebtedness to become due prior to its stated maturity or such Guarantee Obligation to become payable, if the aggregate amount of the Indebtedness and/or Guarantee Obligations in respect of which such default or defaults or such other events referred to above in this clause (i) shall have occurred is at least $250,000; or

(ii) default in any payment of principal or interest on Indebtedness under any Financing Leases entered into finance Vehicles or Equipment (other than the Existing Specified Leases) or in the payment of any Guarantee Obligation with respect to such Indebtedness, beyond the period of grace, if any, provided in such Financing Lease or the instrument pursuant to which such Guarantee Obligation was created, if the aggregate amount of such Indebtedness and/or Guarantee Obligations in respect of which such default or defaults shall have occurred is at least $500,000; or default in the observance or performance of any other agreement or condition relating to any such Financing Lease or Guarantee Obligation or contained in any instrument or agreement evidencing, securing or relating thereto beyond the period of grace, if any, provided in such Financing Lease or instrument or agreement, or any other event shall occur or condition exist with respect to any such Financing Lease or Guarantee Obligation, and as a result of which, after the giving of any notice by the holder or holders of such Financing Lease or beneficiary or beneficiaries of such Guarantee Obligation (or a trustee or agent on behalf of such holder or holders or beneficiary or beneficiaries), such Financing Lease becomes or shall have become due prior to its stated maturity or such Guarantee Obligation to become payable, if the aggregate amount of the Indebtedness in respect of which such default or defaults or such other events referred to above in this clause (ii) shall have occurred is at least $500,000; or

(iii) default in any payment of principal or interest on Indebtedness under any Existing Specified Lease or in the payment of any Guarantee Obligation with respect to such Indebtedness, beyond the period of grace, if any, provided in such Existing Specified Lease or the instrument pursuant to which such Guarantee Obligation was created; or default in the observance or performance of any other agreement or condition relating to any such Existing Specified Lease or Guarantee Obligation or contained in any instrument or agreement evidencing, securing or relating thereto beyond the period of grace, if any, provided in such Existing Specified Lease or instrument or agreement, or any other event shall occur or condition exist with respect to any such Indebtedness or Guarantee Obligation, and as a result of which, after the giving of any notice by the holder or holders of such Indebtedness or beneficiary or beneficiaries of such Guarantee Obligation (or a trustee or agent on behalf of such holder or holders or beneficiary or beneficiaries), such Indebtedness becomes or shall have become due prior to its stated maturity or such Guarantee Obligation becomes payable prior to its stated maturity; provided that no Default Event of Default shall exist or shall be deemed to have existed under this clause (iii) with respect to any Existing Specified Lease if subsequent to any such default all such Indebtedness with respect to such Existing Specified Lease shall have been repaid in full; or

(g) (i) The Borrower or any of its Subsidiaries shall commence any case, proceeding or other action (A) under any existing or future law of any jurisdiction, domestic or foreign, relating to bankruptcy, insolvency, reorganization or relief of debtors, seeking to have an order for relief

\_0

-57-

**A0555**

entered with respect to it, or seeking to adjudicate it a bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, winding-up, liquidation, dissolution, composition or other relief with respect to it or its debts, or (B) seeking appointment of a receiver, trustee, custodian, conservator or other similar official for it or for all or any substantial part of its assets, or the Borrower or any of its Subsidiaries shall make a general assignment for the benefit of its creditors; or (ii) there shall be commenced against the Borrower or any of its Subsidiaries any case, proceeding or other action of a nature referred to in clause (i) above which (A) results in the entry of an order for relief or any such adjudication or appointment or (B) remains undismissed, undischarged or unbonded for a period of 60 days; or (iii) there shall be commenced against the Borrower or any of its Subsidiaries any case, proceeding or other action seeking issuance of a warrant of attachment, execution, distraint or similar process against all or any substantial part of its assets which results in the entry of an order for any such relief which shall not have been vacated, discharged, or stayed or bonded pending appeal within 60 days from the entry thereof; or (iv) the Borrower or any of its Subsidiaries shall take any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the acts set forth in clause (i), (ii), or (iii) above; or (v) the Borrower or any of its Subsidiaries shall generally not, or shall be unable to, or shall admit in writing its inability to, pay its debts as they become due; or

(h)     (i) Any Person shall engage in any "prohibited transaction" (as defined in Section 406 of ERISA or Section 4975 of the Code) involving any Plan, (ii) any "accumulated funding deficiency" (as defined in Section 302 of ERISA), whether or not waived, shall exist with respect to any Single Employer Plan or any Lien in favor of the PBGC or a Plan shall arise on the assets of the Borrower or any Commonly Controlled Entity, (iii) a Reportable Event shall occur with respect to, or proceedings shall commence to have a trustee appointed, or a trustee shall be appointed, to administer or to terminate, any Single Employer Plan, which Reportable Event or commencement of proceedings or appointment of a trustee is, in the reasonable opinion of the Required Lenders, likely to result in the termination of such Plan for purposes of Title IV of ERISA, (iv) any Single Employer Plan shall terminate for purposes of Title IV of ERISA, (v) the Borrower or any Commonly Controlled Entity shall, or in the reasonable opinion of the Required Lenders is likely to, incur any liability in connection with a withdrawal from, or the Insolvency or Reorganization of, a Multiemployer Plan or (vi) any other event or condition shall occur or exist with respect to a Plan; and in each case in clauses (i) through (vi) above, such event or condition, together with all other such events or conditions, if any, could have a Material Adverse Effect; or

(i)     One or more judgments or decrees shall be entered against the Borrower or any of its Subsidiaries involving in the aggregate a liability (not paid or fully covered by insurance) of $1,000,000 or more, and all such judgments or decrees shall not have been vacated, discharged, stayed or bonded pending appeal within 60 days from the entry thereof; or

(j)     (i) Any of the Security Documents shall cease, for any reason, to be in full force and effect, or the Borrower or any other Loan Party which is a party to any of the Security Documents shall so assert, or (ii) the Lien created by any of the Security Documents shall cease to be enforceable and of the same effect and priority purported to be created thereby; or

(k)     The Subsidiaries Guarantee shall cease, for any reason, to be in full force and effect or any Subsidiary Guarantor shall so assert;

then, and in any such event, (A) if such event is an Event of Default specified in clause (i) or (ii) of paragraph (g) of this Section with respect to the Borrower, automatically the Revolving Credit Commitments shall immediately terminate and the Loans hereunder (with accrued interest thereon) and all other amounts owing under this Agreement shall immediately become due and payable, and (B) if such event is any other Event of Default, either or both of the following actions may be taken: (i) with the

⎵ 0

-58-

**A0556**

Confidential
PP-TRBK0000090

consent of the Required Lenders, the Administrative Agent may, or upon the request of the Required
Lenders, the Administrative Agent shall, by notice to the Borrower declare the Commitments to be
terminated forthwith, whereupon the Commitments shall immediately terminate; and (ii) with the consent
of the Required Lenders, the Administrative Agent may, or upon the request of the Required Lenders, the
Administrative Agent shall, by notice to the Borrower, declare the Loans hereunder (with accrued interest
thereon) and all other amounts owing under this Agreement to be due and payable forthwith, whereupon
the same shall immediately become due and payable. Except as expressly provided above in this Section,
presentment, demand, protest and all other notices of any kind are hereby expressly waived.

### SECTION 11.   THE AGENT

11.1    Appointment.  Each Lender hereby irrevocably designates and appoints the
Administrative Agent as the agent of such Lender under this Agreement and the other Loan Documents,
and each such Lender irrevocably authorizes the Administrative Agent, in such capacity, to take such
action on its behalf under the provisions of this Agreement and the other Loan Documents and to exercise
such powers and perform such duties as are expressly delegated to the Administrative Agent by the terms
of this Agreement and the other Loan Documents, together with such other powers as are reasonably
incidental thereto.  Notwithstanding any provision to the contrary elsewhere in this Agreement, the
Administrative Agent shall not have any duties or responsibilities, except those expressly set forth herein,
or any fiduciary relationship with any Lender, and no implied covenants, functions, responsibilities,
duties, obligations or liabilities shall be read into this Agreement or any other Loan Document or
otherwise exist against the Administrative Agent.

11.2    Delegation of Duties.  The Administrative Agent may execute any of its duties
under this Agreement and the other Loan Documents by or through agents or attorneys-in-fact, or may
assign such duties to its wholly owned nominee without the consent of the Lenders, and shall be entitled
to advice of counsel concerning all matters pertaining to such duties. The Administrative Agent shall not
be responsible for the negligence or misconduct of any agents or attorneys-in-fact selected by it with
reasonable care.  It is recognized that it may be necessary or desirable that the Administrative Agent
appoint an additional individual or institution as a separate subagent, trustee, co-trustee, collateral agent
or collateral co-agent (any such additional individual or institution being referred to herein individually as
a "Supplemental Agent" and collectively as "Supplemental Agents").  The Administrative Agent hereby
appoints Wachovia Bank, National Association ("Wachovia") as a Supplemental Agent hereunder. The
Borrower, each Subsidiary Guarantor and each Lender agree to and acknowledge (i) the appointment of
Wachovia as Supplemental Agent herein, (ii) that the Supplemental Agent shall be entitled to the benefit
of the provisions of Section 12.5 of the Credit Agreement and this Section 11, including without
limitation the indemnification provisions of Section 11.7; provided, however, that a Supplemental Agent
shall only be entitled to payment of any allocated reasonable fees and expenses of in-house counsel
pursuant to Section 12.5, if such fees and expenses are authorized and approved by the Required Lenders
in writing, and (iii) all references to the Administrative Agent in this Agreement shall also be deemed
references to Supplemental Agent, as the context may require. In the event that the Administrative Agent
appoints a Supplemental Agent, (i) each and every right, power, privilege or duty expressed or intended
by this Agreement or any of the other Loan Documents to be exercised by or vested in or conveyed to the
Administrative Agent shall be exercisable by and vest in such Supplemental Agent to the extent,
necessary to enable such Supplemental Agent to exercise such rights, powers and privileges with respect
to its role as the Administrative Agent hereunder and to perform such duties with respect to its role as the
Administrative Agent hereunder and every covenant and obligation contained in the Loan Documents and
necessary to the exercise or performance thereof by such Supplemental Agent shall run to and be
enforceable by either the Administrative Agent or such Supplemental Agent; provided, however, that
each Supplemental Agent shall in no event be entitled to consent to any amendments or modifications or

$\cup$ 0

-59-

**A0557**

Confidential

PP-TRBK0000091

waive any terms hereunder other than amendments, modifications or waivers concerning this entire Section 11, Section 12.1 or Section 12.5, and (ii) the provisions of this Section 11 that refer to the Administrative Agent shall inure to the benefit of such Supplemental Agent and all references therein to the Administrative Agent shall be deemed to be references to the Administrative Agent and/or such Supplemental Agent, as the context may require. Should any instrument in writing from Borrower or any other Loan Party be required by any Supplemental Agent so appointed by the Administrative Agent for more fully and certainly vesting in and confirming to him or it such rights, powers, privileges and duties, Borrower shall, or shall cause such Loan Party to, execute, acknowledge and deliver any and all such instruments promptly upon request by the Administrative Agent. In case any Supplemental Agent, or a successor thereto, shall die, become incapable of acting, resign or be removed, all the rights, powers, privileges and duties of such Supplemental Agent, to the extent permitted by law, shall vest in and be exercised by the Administrative Agent until the appointment of a new Supplemental Agent.

           11.3    Exculpatory Provisions. Neither the Administrative Agent nor any of its officers, directors, employees, agents, attorneys-in-fact or affiliates shall be (i) liable for any action lawfully taken or omitted to be taken by it or such Person under or in connection with this Agreement or any other Loan Document (except to the extent that any of the foregoing are found by a final and nonappealable decision of a court of competent jurisdiction to have resulted from its or such Person's own gross negligence or willful misconduct) or (ii) responsible in any manner to any of the Lenders for any recitals, statements, representations or warranties made by the Borrower or any officer thereof contained in this Agreement or any other Loan Document or in any certificate, report, statement or other document referred to or provided for in, or received by the Administrative Agent under or in connection with, this Agreement or any other Loan Document or for the value, validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement or any other Loan Document or for any failure of the Borrower to perform its obligations hereunder or thereunder. The Administrative Agent shall not be under any obligation to any Lender to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Agreement or any other Loan Document, or to inspect the properties, books or records of any Loan Party. The Administrative Agent shall not be responsible for delays or failures in performance resulting from acts beyond its reasonable control. Such acts shall include but not be limited to acts of God, strikes, lockouts, riots, acts of war or terrorism, epidemics, nationalization, expropriation, currency restrictions, governmental regulations superimposed after the fact, fire, communications line failures, computer viruses, power failures, earthquakes or other disasters, but shall in no event include the financial condition or financial inability of the Administrative Agent.

           11.4    Reliance by Administrative Agent. The Administrative Agent shall be entitled to rely, and shall be fully protected in relying, upon any note, writing, resolution, notice, consent, certificate, affidavit, letter, cablegram, telegram, or telecopy message, statement, order or other document or conversation believed by it to be genuine and correct and to have been signed, sent or made by the proper Person or Persons and upon advice and statements of legal counsel (including, without limitation, counsel to the Borrower or any other Loan Party), independent accountants and other experts selected by the Administrative Agent. The Administrative Agent may deem and treat the payee of any Note as the owner thereof for all purposes unless a written notice of assignment, negotiation or transfer thereof shall have been filed with the Administrative Agent. The Administrative Agent shall be fully justified in failing or refusing to take any action under this Agreement or any other Loan Document which involve discretionary decision making, including without limitation those actions contemplated by Section 5.8(b) of this Agreement, unless it shall first receive such advice or concurrence of the Required Lenders as it deems appropriate or it shall first be indemnified to its satisfaction by the Lenders against any and all liability and expense which may be incurred by it by reason of taking or continuing to take any such action. The Administrative Agent shall in all cases be fully protected in acting, or in refraining from

\_0

-60-

**A0558**

Confidential

PP-TRBK0000092

acting, under this Agreement and the other Loan Documents in accordance with a request of the Required Lenders, and such request and any action taken or failure to act pursuant thereto shall be binding upon all the Lenders and all future holders of the Loans.

11.5 Notice of Default. The Administrative Agent shall not be deemed to have knowledge or notice of the occurrence of any Default or Event of Default hereunder except for defaults in the payment of principal, interest and fees required to be made to the Administrative Agent for the account of the Lenders, unless the Administrative Agent has received notice from a Lender or the Borrower referring to this Agreement, describing such Default or Event of Default and stating that such notice is a "notice of default". In the event that the Administrative Agent receives such a notice, the Administrative Agent shall give notice thereof to the Lenders. The Administrative Agent shall take such action with respect to such Default or Event of Default as shall be reasonably directed by the Required Lenders; provided that unless and until the Administrative Agent shall have received such directions, the Administrative Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default or Event of Default as it shall deem advisable in the best interests of the Lenders.

11.6 Non-Reliance on Administrative Agent and Other Lenders. Each Lender expressly acknowledges that neither the Administrative Agent nor any of its officers, directors, employees, agents, attorneys-in-fact or Affiliates has made any representations or warranties to it and that no act by the Administrative Agent hereinafter taken, including any review of the affairs of the Borrower or any other Loan Party, shall be deemed to constitute any representation or warranty by the Administrative Agent to any Lender. Each Lender represents to the Administrative Agent that it has, independently and without reliance upon the Administrative Agent or any other Lender, and based on such documents and information as it has deemed appropriate, made its own appraisal of and investigation into the business, operations, property, financial and other condition and creditworthiness of the Borrower and the other Loan Parties and made its own decision to make its Loans hereunder and enter into this Agreement. Each Lender also represents that it will, independently and without reliance upon the Administrative Agent or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit analysis, appraisals and decisions in taking or not taking action under this Agreement and the other Loan Documents, and to make such investigation as it deems necessary to inform itself as to the business, operations, property, financial and other condition and creditworthiness of the Borrower. Except for notices, reports and other documents expressly required to be furnished to the Lenders by the Administrative Agent hereunder or under the other Loan Documents, the Administrative Agent shall not have any duty or responsibility to provide any Lender with any credit or other information concerning the business, operations, property, condition (financial or otherwise), prospects or creditworthiness of the Borrower or any other Loan Party which may come into the possession of the Administrative Agent or any of its officers, directors, employees, agents, attorneys-in-fact or Affiliates.

11.7 Indemnification. The Lenders agree to indemnify the Administrative Agent in its capacity as such (to the extent not reimbursed by the Borrower and without limiting the obligation of the Borrower to do so), ratably according to their respective Credit Exposure Percentages in effect on the date on which indemnification is sought (or, if indemnification is sought after the date upon which the Commitments shall have terminated and the Loans shall have been paid in full, ratably in accordance with such Credit Exposure Percentages immediately prior to such date), from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses, or the reasonable and documented fees and disbursements of counsel (including the allocated fees and expenses of in-house

\_0

-61-

Confidential

counsel) or disbursements of any kind whatsoever which may at any time (including, without limitation, at any time following the payment of the Loans) be imposed on, incurred by or asserted against the Administrative Agent in any way relating to or arising out of, the Revolving Credit Commitments, this Agreement, any of the other Loan Documents or any documents contemplated by or referred to herein or therein or the transactions contemplated hereby or thereby or any action taken or omitted by the Administrative Agent under or in connection with any of the foregoing; provided that no Lender shall be liable for the payment of any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements which are found by a final and nonappealable decision of a court of competent jurisdiction to have resulted solely from the Administrative Agent's gross negligence or willful misconduct. The agreements in this Section shall survive the payment of the Loans and all other amounts payable hereunder. If any indemnity furnished to the Administrative Agent for any purpose shall, in the opinion of the Administrative Agent, be insufficient or become impaired, the Administrative Agent may request additional indemnity and cease, or not commence, to do the acts indemnified against until such additional indemnity is furnished.

           11.8    Administrative Agent in Its Individual Capacity. The Administrative Agent and its Affiliates may make loans to, accept deposits from and generally engage in any kind of business with the Borrower and the other Loan Parties as though the Administrative Agent were not the Administrative Agent hereunder and under the other Loan Documents. With respect to the Loans made by it, the Administrative Agent shall have the same rights and powers under this Agreement and the other Loan Documents as any Lender and may exercise the same as though it were not the Administrative Agent, and the terms "Lender" and "Lenders" shall include the Administrative Agent in its individual capacity.

           11.9    Successor Administrative Agent. (a) The Administrative Agent may resign at any time by giving not less than ten days prior written notice thereof to the Lenders and the Borrower. Upon any such resignation, the Required Lenders shall have the right to appoint a successor Administrative Agent; provided that, so long as no Default or Event of Default has occurred and is continuing, the Borrower shall have the right to consent to any such successor Administrative Agent, such consent not to be unreasonably withheld.

           (b)    If no successor Administrative Agent shall have been so appointed by the Required Lenders within thirty days after the resigning Administrative Agent's giving of notice of resignation, then the resigning Administrative Agent may appoint, on behalf of the Borrower and the Lenders, a successor Administrative Agent, which is acceptable to the Required Lenders. In the event that the Administrative Agent is unable to appoint a replacement successor within such thirty day period after using reasonable efforts, the Administrative Agent may nonetheless resign by delivering a written resignation to the Lenders and the Borrower; provided that in such circumstances, and unless and until a successor Administrative Agent is appointed, the Administrative Agent shall remain Administrative Agent solely for the purpose of serving as secured party of record with respect to the Collateral, its sole duty in that capacity shall be to take such ministerial actions as it shall be directed to take by the Required Lenders (including, without limitation, the execution and delivery of documents or instruments relating to the Collateral), and the Administrative Agent shall be entitled to reimbursement from the Borrower for its out-of-pocket costs and expenses and reasonable compensation from the Borrower for its services. If the Administrative Agent has resigned and no successor Administrative Agent has been appointed, subject to the preceding sentence, the Lenders shall perform the duties of the Administrative Agent hereunder, and the Borrower shall make all payments in respect of the Obligations to the applicable Lender and shall deal directly with the Lenders and the Lenders shall be entitled to exercise all the rights provided to Administrative Agent hereunder and all Lenders shall have

L 0

-62-

**A0560**

the rights, benefits, indemnities and exculpations and other limitations of liability to which Administrative Agent is entitled under Section 11 of this Agreement.

(c)     No successor Administrative Agent shall be deemed to be appointed hereunder until such successor Administrative Agent has accepted the appointment in writing. Upon the acceptance of any appointment as Administrative Agent hereunder by a successor Administrative Agent and upon the execution and filing of such financing statements, or amendments thereto, and such other instruments and notices, as may be necessary or desirable or as the Required Lenders may request, in order to continue the perfection of the Liens granted or purported to be granted under the Security Documents, such successor Administrative Agent shall succeed to and become vested with all the rights, powers, discretion, privileges and duties of the resigning Administrative Agent, and the resignation of the Administrative Agent shall then be effective for all purposes. Upon the effectiveness of the resignation of the Administrative Agent, the resigning Administrative Agent shall be discharged from its duties and obligations under the Loan Documents. After the effectiveness of the resignation of an Administrative Agent, the provisions of this Section 11 shall inure to its benefit as to any actions taken or omitted to be taken by it while it was acting as the Administrative Agent under this Agreement."

(d)     The Required Lenders may replace the Administrative Agent with a successor Administrative Agent, with or without cause, at any time by giving not less than 30 days prior written notice thereof to the Administrative Agent and the Borrower.

11.10   Authorization to Release Liens. The Administrative Agent is hereby irrevocably authorized by each of the Lenders to release any Lien covering any property of the Borrower or any of its Subsidiaries or any Loan Party that is the subject of a sale, lease, assignment or other disposition which is permitted by this Agreement or any other Loan Document or which has been consented to in accordance with Section 12.1.

11.11   The Arranger; the Documentation Agents.     Neither the Arranger nor the Documentation Agents, in their respective capacities as such, shall have any duties or responsibilities, and shall incur no liability, under this Agreement and the other Loan Documents.

11.12   The Administrative Agent and the Secured Parties.   Notwithstanding that the Administrative Agent is named in one or more of the Security Documents as agent for Qualified Counterparties as well as for the Lenders, each Lender agrees, on behalf of itself and any affiliate thereof that may at any time be a Qualified Counterparty under any Specified Hedge Agreement, that the Administrative Agent (i) shall have no duty or obligation whatsoever to any Qualified Counterparty under any Specified Hedge Agreement, and (ii) shall have no duty or obligation to any Qualified Counterparty under any Security Documents other than the obligation to deliver to such Qualified Counterparty its ratable share (as determined by the Administrative Agent) of any proceeds received by the Administrative Agent under the Security Documents upon the exercise by the Administrative Agent of its remedies thereunder.  Without limiting the generality of the foregoing, each Lender agrees, on behalf of itself and any affiliate thereof that may at any time be a Qualified Counterparty under any Specified Hedge Agreement, that (i) the Administrative Agent shall incur no liability to any Qualified Counterparty as a result of any release by the Administrative Agent of any Collateral or Subsidiary Guarantors under any Security Document or any other action or inaction by the Administrative Agent under any Security Document and (ii) the Administrative Agent shall be entitled to the same exculpations and protections, in respect of the Qualified Counterparties, as it is entitled to with respect to the Lenders pursuant to the other provisions of this Section 11 (other than Section 11.7), mutatis mutandis.

\_0

-63-

**A0561**

Confidential                                                                PP-TRBK0000095

## SECTION 12. MISCELLANEOUS

12.1 <u>Amendments and Waivers</u>. Neither this Agreement nor any other Loan Document, nor any terms hereof or thereof may be amended, supplemented or modified except in accordance with the provisions of this Section 12.1. The Required Lenders may, or, with the written consent of the Required Lenders (except with respect to modifications to the Guarantee and the Security Documents contemplated under Section 8.10), the Administrative Agent may, from time to time, (a) enter into with the Borrower written amendments, supplements or modifications hereto and to the other Loan Documents for the purpose of adding any provisions to this Agreement or the other Loan Documents or changing in any manner the rights of the Lenders or of the Borrower hereunder or thereunder or (b) waive, on such terms and conditions as the Required Lenders or the Administrative Agent, as the case may be, may specify in such instrument, any of the requirements of this Agreement or the other Loan Documents or any Default or Event of Default and its consequences; provided, however, that a Supplemental Agent's consent shall in no way be necessary for an amendment, modification or waiver to be declared effective and valid other than for amendments, modifications or waivers concerning Section 11, this Section 12.1 and Section 12.5; and provided, further, that no such waiver and no such amendment, supplement or modification shall (i) reduce the amount or extend the scheduled date of maturity of any Loan or of any installment thereof, or reduce the stated rate of any interest or fee payable hereunder or extend the scheduled date of any payment thereof, or increase the amount or extend the expiration date of any Lender's Revolving Credit Commitment, in each case without the consent of each Lender affected thereby, or (ii) amend, modify or waive any provision of this Section 12.1 or reduce the percentage specified in the definition of Required Lenders or Required Prepayment Lenders, or consent to the assignment or transfer by the Borrower of any of its rights and obligations under this Agreement and the other Loan Documents or release all or substantially all of the Collateral or release all or substantially all of the Subsidiary Guarantors from their obligations under the Guarantee, in each case without the written consent of each of the Lenders directly affected thereby, or (iii) amend, modify or waive any condition precedent to any extension of credit under the Revolving Credit Facility set forth in Section 7.2 (including, without limitation, in connection with any waiver of an existing Default or Event of Default) without the consent of the Majority Facility Lenders with respect to the Revolving Credit Facility, or (iv) reduce the percentage specified in the definition of Majority Facility Lenders with respect to any Facility without the written consent of all Lenders under such Facility, or (v) amend, modify or waive any provision of Section 5.9(b) without the consent of the Majority Facility Lenders of the Term Loan Facility and each Lender directly affected thereby, or amend, modify or waive any provision of Section 5.6(b), (c) or (d) without the consent of the Required Prepayment Lenders, or (vi) amend, modify or waive any provision of Section 11 without the written consent of the then Administrative Agent. Any such waiver and any such amendment, supplement or modification shall apply equally to each of the Lenders and shall be binding upon the Borrower, the Lenders, the Administrative Agent and all future holders of the Loans. In the case of any waiver, the Borrower, the Lenders and the Administrative Agent shall be restored to their former positions and rights hereunder and under the other Loan Documents, and any Default or Event of Default waived shall be deemed to be cured and not continuing; but no such waiver shall extend to any subsequent or other Default or Event of Default or impair any right consequent thereon.

12.2 <u>Notices</u>. All notices, requests and demands to or upon the respective parties hereto to be effective shall be in writing (including by facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made (a) in the case of delivery by hand, when delivered, (b) in the case of delivery by mail, five (5) days after being sent by certified or registered mail, return receipt requested, postage prepaid, or (c) in the case of delivery by facsimile transmission, when sent and receipt has been electronically confirmed, addressed as follows in the case of the Borrower and the Administrative Agent, and as set forth in Schedule 1.0 in the case of the other parties hereto, or to such other address as may be hereafter notified by the respective parties hereto:

\ 0

-64-

**A0562**

The Borrower:                    TransCare Corporation
                                 5811 Foster Avenue
                                 Brooklyn, New York 11234
                                 Attention: Chief Financial Officer
                                 Fax: (718) 968-0756
                                 Phone: (718) 763-8888, Ext. 353

The Administrative Agent:        Patriarch Partners Agency Services, LLC
                                 c/o Patriarch Partners, LLC
                                 112 South Tryon Street, Suite 700
                                 Charlotte, North Carolina 28284
                                 Attention: Lon Brown
                                 Fax: (704) 375-0358
                                 Phone: (704) 227-1205

                                 and to:

                                 Patriarch Partners Agency Services, LLC
                                 c/o Patriarch Partners, LLC
                                 40 Wall Street, 25th floor
                                 New York, New York 10005
                                 Attention: Lynn Tilton
                                 Fax: (212) 825-2038
                                 Phone: (212) 825-0550

The Supplemental Agent:          Wachovia Bank, National Association
                                 401 South Tryon Street
                                 12th floor, NC-1179
                                 Charlotte, North Carolina 28288
                                 Attention: Kevin Stephens
                                 Fax: (704) 715-~~3329~~3321

provided that any notice, request or demand to or upon the Administrative Agent or the Lenders pursuant to Section 2.2, 3.2, 3.4, 5.2 or 5.8(b) shall not be effective until received.

       12.3    No Waiver; Cumulative Remedies.  No failure to exercise and no delay in exercising, on the part of the Administrative Agent or any Lender, any right, remedy, power or privilege hereunder or under the other Loan Documents shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. The rights, remedies, powers and privileges herein provided are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law.

       12.4    Survival of Representations and Warranties.  All representations and warranties made hereunder, in the other Loan Documents and in any document, certificate or statement delivered

\_0

-65-

**A0563**

Confidential

PP-TRBK0000097

pursuant hereto or in connection herewith shall survive the execution and delivery of this Agreement and the making of the Loans hereunder.

        12.5    <u>Payment of Expenses and Taxes</u>. The Borrower agrees (a) to pay or reimburse the Administrative Agent for all its reasonable out-of-pocket costs and expenses incurred in connection with the development, preparation and execution of, and any amendment, supplement or modification to, this Agreement and the other Loan Documents and any other documents prepared in connection herewith or therewith, and the consummation and administration of the transactions contemplated hereby and thereby, including, without limitation, the reasonable and documented fees and disbursements of counsel to the Administrative Agent, (b) to pay or reimburse each Lender and the Administrative Agent for all its costs and expenses incurred in connection with the enforcement or preservation of any rights under this Agreement, the other Loan Documents and any such other documents entered into in connection with the Credit Agreement, including, without limitation, the reasonable and documented fees and disbursements of counsel (including the allocated reasonable fees and expenses of in-house counsel and reasonable travel expenses incurred by the Administrative Agent or the Lenders in preserving rights under this Agreement) to each Lender and of counsel to the Administrative Agent, (c) to pay, indemnify, and hold each Lender and the Administrative Agent harmless from, any and all recording and filing fees and any and all liabilities with respect to, or resulting from any delay on the part of the Borrower or any Subsidiary in paying, stamp, excise and other taxes, if any, which may be payable or determined to be payable in connection with the execution and delivery of, or consummation or administration of any of the transactions contemplated by, or any amendment, supplement or modification of, or any waiver or consent under or in respect of, this Agreement, the other Loan Documents and any such other documents, and (d) to pay, indemnify, and hold each Lender and the Administrative Agent and their respective officers, directors, employees, affiliates, agents and controlling persons (each, an "<u>Indemnitee</u>") harmless from and against any and all other liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever with respect to the execution, delivery, enforcement, performance and administration of this Agreement, the other Loan Documents, the confirmation of the Plan of Reorganization and the transactions contemplated thereby and by the Confirmation Order, or the use of the proceeds of the Loans in connection with the confirmation of the Plan of Reorganization and the transactions contemplated thereby and by the Confirmation Order, and any such other documents, including, without limitation, any of the foregoing relating to the violation of, noncompliance with or liability under, any Environmental Law applicable to the operations of the Borrower, any of its Subsidiaries or any of the Properties (all the foregoing in this clause (d), collectively, the "<u>indemnified liabilities</u>"), <u>provided</u>, that the Borrower shall have no obligation hereunder to any Indemnitee with respect to indemnified liabilities to the extent such indemnified liabilities (i) resulted from the gross negligence or willful misconduct of such Indemnitee, or (ii) arise from legal proceedings commenced against the Administrative Agent or any such Lender by any security holder or creditor thereof arising out of and based upon rights afforded any such security holder or creditor solely in its capacity as such. The agreements in this Section shall survive repayment of the Loans and all other amounts payable hereunder.

        12.6    <u>Successors and Assigns; Participations and Assignments</u>. (a) This Agreement shall be binding upon and inure to the benefit of the Borrower, the Lenders, the Administrative Agent and their respective successors and assigns, except that the Borrower may not assign or transfer any of its rights or obligations under this Agreement without the prior written consent of each Lender.

        (b)    Any Lender may, in accordance with applicable law, at any time sell to one or more banks, financial institutions or other entities ("<u>Participants</u>") participating interests in any Loan

\_0

-66-

**A0564**

Confidential

owing to such Lender, any Revolving Credit Commitment of such Lender or any other interest of such Lender hereunder and under the other Loan Documents. In the event of any such sale by a Lender of a participating interest to a Participant, such Lender's obligations under this Agreement to the other parties to this Agreement shall remain unchanged, such Lender shall remain solely responsible for the performance thereof, such Lender shall remain the holder of any such Loan for all purposes under this Agreement and the other Loan Documents, and the Borrower and the Administrative Agent shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement and the other Loan Documents. In no event shall any Participant under any such participation have any right to approve any amendment or waiver of any provision of any Loan Document, or any consent to any departure by any Loan Party therefrom, except to the extent that such amendment, waiver or consent would reduce the principal of, or the stated rate of interest on, the Loans or any fees payable hereunder or the extend the schedules date of payment thereof, or postpone the date of the final maturity of the Loans or release all or substantially all of the Collateral, in each case to the extent subject to such participation. The Borrower agrees that if amounts outstanding under this Agreement are due or unpaid, or shall have been declared or shall have become due and payable upon the occurrence of an Event of Default, each Participant shall, to the maximum extent permitted by applicable law, be deemed to have the right of setoff in respect of its participating interest in amounts owing under this Agreement to the same extent as if the amount of its participating interest were owing directly to it as a Lender under this Agreement, provided that, in purchasing such participating interest, such Participant shall be deemed to have agreed to share with the Lenders the proceeds thereof as provided in Section 12.7(a) as fully as if it were a Lender hereunder. The Borrower also agrees that each Participant shall be entitled to the benefits of, and bound by the obligations imposed on the Lender in, Sections 5.11, 5.12 and 5.13 with respect to its participation in the Revolving Credit Commitments and the Loans outstanding from time to time as if it was a Lender; provided that, in the case of Section 5.12, such Participant shall have complied with the requirements of said Section and provided, further, that no Participant shall be entitled to receive any greater amount pursuant to any such Section than the transferor Lender would have been entitled to receive in respect of the amount of the participation transferred by such transferor Lender to such Participant had no such transfer occurred.

(c)     Any Lender may, in accordance with applicable law, at any time and from time to time assign to any Lender or any affiliate or Approved Fund thereof or, with the consent of the Administrative Agent and, so long as no Default or Event of Default has occurred and is continuing, the Borrower (which in each case shall not be unreasonably withheld (reasonable grounds for withholding consent to include an assignee who would subject the Borrower to the payment of greater costs described in Sections 5.11, 5.12 and 5.13 than the Borrower is otherwise subject to paying)), to an additional bank, financial institution or other entity (other than the Borrower or any of its Affiliates) (an "Assignee") all or any part of its rights and obligations under this Agreement and the other Loan Documents pursuant to an Assignment and Acceptance, substantially in the form of Exhibit I, with appropriate completions and attaching the Assignee's relevant tax forms, administrative details and wiring instructions (an "Assignment and Acceptance"), executed by such Assignee, such assigning Lender (and, in the case of an Assignee that is not then a Lender or Approved Fund or an affiliate thereof, by the Administrative Agent and the Borrower so long as no Event of Default has occurred and is continuing) and delivered to the Administrative Agent for its acceptance and recording in the Register, provided that (i) no such assignment to an Assignee (other than any Lender or any affiliate or Approved Fund thereof) shall be in an aggregate principal amount of less than $1,000,000 (other than in the case of (a) an assignment of all of a Lender's interests under this Agreement or (b) an assignment to another Lender or an Affiliate of such Assignor), unless otherwise agreed by the Borrower and the Administrative Agent (such amount to be aggregated in respect of assignments by or to any Lender and the affiliates or Approved Funds thereof), (ii) if the Assignor is a Revolving Credit Lender, such assignor's rights and obligations with respect to its Revolving Credit Commitment or any part thereof shall be assigned to an Eligible Assignee, (iii) in the case of an assignment by a Lender to a Bank CLO

\_0

-67-

**A0565**

managed by such Lender or an affiliate of such Lender, unless such assignment to such Bank CLO has been consented to by the Borrower (such consent not to be unreasonably withheld or delayed), the assigning Lender shall retain the sole right to approve any amendment, waiver or other modification of this Agreement or any other Loan Document, provided that the Assignment and Acceptance between such Lender and such Bank CLO may provide that such Lender will not, without the consent of such Bank CLO, agree to any amendment, modification or waiver that requires the consent of each Lender directly affected thereby pursuant to Section 12.1, and (iv) each Assignee which is not a US Person shall comply with the provisions of Section 5.12(c) (and such Assignee shall not be entitled to the benefits of Section 5.12 unless such Assignee complies with such Section 5.12(c))). Upon such execution, delivery, acceptance and recording, from and after the effective date determined pursuant to such Assignment and Acceptance, (x) the Assignee thereunder shall be a party hereto and, to the extent provided in such Assignment and Acceptance, have the rights and obligations of a Lender hereunder with Commitments as set forth therein, and (y) the assigning Lender thereunder shall, to the extent provided in such Assignment and Acceptance, be released from its obligations under this Agreement (and, in the case of an Assignment and Acceptance covering all or the remaining portion of an assigning Lender's rights and obligations under this Agreement, such assigning Lender shall cease to be a party hereto). Unless requested by the Assignee and/or the assigning Lender, new Notes shall not be required to be executed and delivered by the Borrower, for any assignment which occurs at any time when any of the events described in Section 10(g) shall have occurred and be continuing. Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this Section 12.6 shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with clause (b) of this Section 12.6.

(d)     The Administrative Agent, on behalf of the Borrower, shall maintain at the address of the Administrative Agent referred to in Section 12.2 a copy of each Assignment and Acceptance delivered to it and a register (the "Register") for the recordation of the names and addresses of the Lenders and the Revolving Credit Commitments of, and principal amounts of the Loans owing to, each Lender from time to time. The entries in the Register shall be conclusive, in the absence of manifest error, and the Borrower, the Administrative Agent and the Lenders may (and, in the case of any Loan or other obligation hereunder not evidenced by a Note, shall) treat each Person whose name is recorded in the Register as the owner of a Loan or other obligation hereunder as the owner thereof for all purposes of this Agreement and the other Loan Documents, notwithstanding any notice to the contrary. Any assignment of any Loan or other obligation hereunder, whether or not evidenced by a Note, shall be effective only upon appropriate entries with respect thereto being made in the Register. The Register shall be available for inspection by the Borrower or any Lender at any reasonable time and from time to time upon reasonable prior notice.

(e)     Upon its receipt of an Assignment and Acceptance executed by an assigning Lender and an Assignee (and, in the case of an Assignee that is not then a Lender or an affiliate or Approved Fund thereof, by the Administrative Agent) together with payment to the Administrative Agent of a registration and processing fee of $3,500, the Administrative Agent shall (i) promptly accept such Assignment and Acceptance and (ii) on the effective date determined pursuant thereto record the information contained therein in the Register and give notice of such acceptance and recordation to the Lenders and the Borrower.

(f)     The Borrower authorizes each Lender to disclose to any potential Participant or Assignee (each, a "Transferee") and any prospective Transferee any and all financial information in such Lender's possession concerning the Borrower and its Affiliates which has been delivered to such Lender by or on behalf of the Borrower pursuant to this Agreement or which has been delivered to such Lender by or on behalf of the Borrower in connection with such Lender's credit evaluation of the

\ 0

-68-

**A0566**

Borrower and its Affiliates prior to becoming a party to this Agreement; provided that such Transferee agrees in advance to be bound by the provisions of Section 12.15 hereof.

(g)     For avoidance of doubt, the parties to this Agreement acknowledge that the provisions of this Section concerning assignments of Loans and Notes relate only to absolute assignments and that such provisions do not prohibit assignments creating security interests, including, without limitation, any pledge or assignment by a Lender of any Loan or Note to any Federal Reserve Bank in accordance with applicable law.

(h)     Notwithstanding the foregoing, any Conduit Lender may assign any or all of the Loans it may have funded hereunder to its designating Lender without the consent of the Borrower or the Administrative Agent and without regard to the limitations set forth in Section 12.6(c). Each of the Borrower, each Lender and the Administrative Agent hereby confirms that it will not institute against a Conduit Lender or join any other Person in instituting against a Conduit Lender any bankruptcy, reorganization, arrangement, insolvency or liquidation proceeding under any state bankruptcy or similar law, for one year and one day after the payment in full of the latest maturing commercial paper note issued by such Conduit Lender; provided, however, that each Lender designating any Conduit Lender hereby agrees to indemnify, save and hold harmless each other party hereto for any loss, cost, damage or expense arising out of its inability to institute such a proceeding against such Conduit Lender during such period of forbearance. In addition, notwithstanding the foregoing, any Conduit Lender may (i) with notice to, but without the prior written consent of, the Borrower and the Administrative Agent and without paying any processing fee therefor, assign all or a portion of its interests in any Loans to any financial institutions (consented to by the Borrower and Administrative Agent) providing liquidity and/or credit support to or for the account of such Conduit Lender to support the funding or maintenance of Loans by such Conduit Lender and (ii) disclose on a confidential basis any non-public information relating to its Loans to any rating agency, commercial paper dealer or provider of any surety, guarantee or credit or liquidity enhancement to such Conduit Lender. This clause (h) may not be amended without the written consent of any Conduit Lender directly affected thereby.

12.7     Adjustments; Set-off.

(a)     If any Lender (a "Benefited Lender") shall at any time receive any payment of all or part of its Loans, or interest thereon, or other obligations owing under the Loan Documents or receive any collateral in respect thereof (whether voluntarily or involuntarily, by set-off, pursuant to events or proceedings of the nature referred to in Section 10(g), or otherwise), in a greater proportion than any such payment to or collateral received by any other Lender, if any, in respect of such other Lender's Loans, or interest thereon or other obligations owing under the Loan Documents, such Benefited Lender shall purchase for cash from the other Lenders a participating interest in such portion of each such other Lender's Loan or other obligations owing under the Loan Documents, or shall provide such other Lenders with the benefits of any such collateral, or the proceeds thereof, as shall be necessary to cause such Benefited Lender to share the excess payment or benefits of such collateral or proceeds ratably with each of the Lenders; provided, however, that if all or any portion of such excess payment or benefits is thereafter recovered from such Benefited Lender, such purchase shall be rescinded, and the purchase price and benefits returned, to the extent of such recovery, but without interest. The Borrower agrees that each Lender so purchasing a portion of another Lender's Loan or other obligations owing under the Loan Documents may exercise all rights of payment (including, without limitation, but subject to the provisions of clause (b) of this Section 12.7, rights of set-off) with respect to such portion as fully as if such Lender were the direct holder of such portion.

-69-

**A0567**

Confidential                                                                                       PP-TRBK0000101

(b)    Upon the occurrence and during the continuance of an Event of Default, in addition to any rights and remedies of the Lenders provided by law, each Lender shall have the right, without prior notice to the Borrower, any such notice being expressly waived by the Borrower to the extent permitted by applicable law, upon any amount becoming due and payable by the Borrower hereunder (whether at the stated maturity, by acceleration or otherwise) to set-off and appropriate and apply against such amount any and all deposits (general or special, time or demand, provisional or final), in any currency, and any other credits, indebtedness or claims, in any currency, in each case whether direct or indirect, absolute or contingent, matured or unmatured, at any time held or owing by such Lender or any branch or agency thereof to or for the credit or the account of the Borrower; provided that none of the Lenders shall have any such right of set off, appropriation and application against any Payroll Accounts. Each Lender agrees promptly to notify the Borrower and the Administrative Agent after any such set-off and application made by such Lender, provided that the failure to give such notice shall not affect the validity of such set-off and application.

12.8    Counterparts. This Agreement may be executed by one or more of the parties to this Agreement on any number of separate counterparts (including by facsimile transmission of signature pages hereto), and all of said counterparts taken together shall be deemed to constitute one and the same instrument. A set of the copies of this Agreement signed by all the parties shall be lodged with the Borrower and the Administrative Agent.

12.9    Severability. Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

12.10    Integration. This Agreement and the other Loan Documents represent the agreement of the Borrower, the Administrative Agent and the Lenders with respect to the subject matter hereof, and there are no promises, undertakings, representations or warranties by the Administrative Agent or any Lender relative to subject matter hereof not expressly set forth or referred to herein or in the other Loan Documents.

12.11    GOVERNING LAW. THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.

12.12    Submission To Jurisdiction; Waivers. The Borrower hereby irrevocably and unconditionally:

(a)    submits for itself and its property in any legal action or proceeding relating to this Agreement and the other Loan Documents to which it is a party, or for recognition and enforcement of any judgment in respect thereof, to the non-exclusive general jurisdiction of the courts of the State of New York, the courts of the United States of America for the Southern District of New York, and appellate courts from any thereof;

L 0

-70-

**A0568**

Confidential

(b)    consents that any such action or proceeding may be brought in such courts and waives any objection that it may now or hereafter have to the venue of any such action or proceeding in any such court or that such action or proceeding was brought in an inconvenient court and agrees not to plead or claim the same;

(c)    agrees that service of process in any such action or proceeding may be effected by mailing a copy thereof by registered or certified mail (or any substantially similar form of mail), postage prepaid, to the Borrower at its address set forth in Section 12.2 or at such other address of which the Administrative Agent shall have been notified pursuant thereto;

(d)    agrees that nothing herein shall affect the right to effect service of process in any other manner permitted by law or shall limit the right to sue in any other jurisdiction; and

(e)    waives, to the maximum extent not prohibited by law, any right it may have to claim or recover in any legal action or proceeding referred to in this Section any special, exemplary, punitive or consequential damages.

12.13    Acknowledgments.  The Borrower hereby acknowledges that:

(a)    it has been advised by counsel in the negotiation, execution and delivery of this Agreement and the other Loan Documents;

(b)    neither the Administrative Agent nor any Lender has any fiduciary relationship with or duty to the Borrower arising out of or in connection with this Agreement or any of the other Loan Documents, and the relationship between the Borrower and the other Loan Parties, on one hand, and Administrative Agent and Lenders, on the other hand, in connection herewith or therewith is solely that of debtor and creditor; and

(c)    no joint venture is created hereby or by the other Loan Documents or otherwise exists by virtue of the transactions contemplated hereby among the Lenders or among the Borrower and the Lenders.

12.14    WAIVERS OF JURY TRIAL.  THE BORROWER, THE AGENT AND THE LENDERS HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT AND FOR ANY COUNTERCLAIM THEREIN.

12.15    Confidentiality.    Each Lender agrees to keep confidential all non-public information provided to it by the Borrower pursuant to this Agreement that is designated by the Borrower in writing as confidential; provided, that nothing herein shall prevent any Lender from disclosing any such information (i) to the Administrative Agent or any other Lender, (ii) to any proposed Transferee which agrees to comply with the provisions of this Section 12.15, (iii) to its employees, directors, agents, attorneys, accountants and other professional advisors, (iv) upon the request or demand of any examiner or other Governmental Authority having jurisdiction over such Lender, (v) in response to any order of any court or other Governmental Authority or as may otherwise be required pursuant to any Requirement of Law, (vi) which has been publicly disclosed other than in breach of this Agreement, or (vii) in connection with the exercise of any remedy hereunder.  Notwithstanding anything herein to the contrary, information subject to this Section 12.15 shall not include, and the Administrative Agent and each Lender may disclose without limitation of any kind, any information with respect to the "tax treatment" and "tax

\_0

-71-

**A0569**

Confidential

PP-TRBK0000103

structure" (in each case, within the meaning of Treasury Regulation Section 1.6011-4) of the transactions contemplated hereby and all materials of any kind (including opinions or other tax analyses) that are provided to the Administrative Agent or such Lender relating to such tax treatment and tax structure; provided that with respect to any document or similar item that in either case contains information concerning the tax treatment or tax structure of the transaction as well as other information, this sentence shall only apply to such portions of the document or similar item that relate to the tax treatment or tax structure of the Loans and transactions contemplated hereby.

[Signature Pages Follow]

\_0

-72-

**A0570**

Confidential

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their proper and duly authorized officers as of the day and year first above written.

TRANSCARE CORPORATION

By: _____
     Name:
     Title:

PATRIARCH PARTNERS AGENCY SERVICES, LLC
as Administrative Agent

By: _____
     Name:
     Title:

ARK II CLO 2001-1, LIMITED, as Lender

By:   PATRIARCH PARTNERS II, LLC, its
     Collateral Manager

By: _____
     Name:
     Title: Manager

ARK INVESTMENT PARTNERS II L.P., as Lender

By:   PATRIARCH PARTNERS III, LLC, its
     Investment ~~Advisor~~Adviser

By: _____
     Name:
     Title: Manager

L_0

**A0571**

Confidential

PP-TRBK0000105

FIRST DOMINION FUNDING I, as
a Lender

By:    Credit-Suisse Asset Management, LLC, its
Collateral Manager

By:    _____
Name:
Title:

FIRST DOMINION FUNDING II, as
a Lender

By:    Credit-Suisse Asset Management, LLC, its
Collateral Manager

By:    _____
Name:
Title:

\_0

**A0572**

Confidential

Document comparison done by DeltaView on Sunday, August 03, 2003 18:15:46

| Input: | |
|---|---|
| Document 1 | pcdocs://nycdoc_1/183322/5 |
| Document 2 | pcdocs://nycdoc_1/183322/6 |
| Rendering set | Standard |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 13 |
| Deletions | 11 |
| Moved from | 0 |
| Moved to | 0 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 24 |

\_0

**A0573**

Confidential