# 20 Civ. 06274 (LAK)

**United States District Court**

*for the*

**Southern District of New York**

——————————————————

IN RE TRANSCARE CORPORATION, ET AL.

DEBTORS,

——————————————————

PATRIARCH PARTNERS AGENCY SERVICES, LLC, ET AL.

DEFENDANTS-APPELLANTS,

—against—

SALVATORE LAMONICA, AS CHAPTER 7 TRUSTEE OF THE JOINTLY-
ADMINISTERED ESTATES OF TRANSCARE CORPORATION, ET AL.,

PLAINTIFF-APPELLEE.

——————————————————

ON APPEAL FROM THE UNITED STATES BANKRUPTCY COURT FOR
THE SOUTHERN DISTRICT OF NEW YORK (BERNSTEIN, J.)

IN RE: TRANSCARE CORPORATION, ET AL., CASE NO. 16-10407 (SMB)

LAMONICA V. TILTON, ET AL., ADV. PROC. NO. 18-1021 (SMB)

## APPENDIX TO BRIEF FOR THE APPELLANTS

# Volume VIII - A0782-A1023

Case 1:20-cv-06274-AK    Document 1-8    Filed 09/30/20    Page 2 of 243

# EXHIBIT 16

Page 1

1

2          UNITED STATES BANKRUPTCY COURT
3          SOUTHERN DISTRICT OF NEW YORK
4     --------------------------------X
5     In re:
6     TRANSCARE CORPORATION, et al,      Chapter 7
7               DEBTORS,
8     --------------------------------X   CASE NO:
      SALVATORE LAMONICA, as Chapter 7   16-10407
9     Trustee of the Estates of             (SMB)
      TransCare Corporation, et al.,
10
                     Plaintiff,          Jointly
11                                       Administered
              VS.
12
      LYNN TILTON, PATRIARCH PARTNERS
13    AGENCY SERVICES, LLC, PATRIARCH    Adv. Proc.
      PARTNERS, LLC, PATRIARCH PARTNERS  No. 18-1021
14    MANAGEMENT GROUP, LLC, ARK II CLO
      2001-1, LIMITED, ARK INVESTMENT
15    PARTNERS II, LP, LD INVESTMENTS,
      LLC, PATRIARCH PARTNERS II, LLC,
16    PATRIARCH PARTNERS III, LLC,
      PATRIARCH PARTNERS VIII, LLC,
17    PATRIARCH PARTNERS XIV, LLC,
      PATRIARCH PARTNERS XV, LLC,
18    TRANSCENDENCE TRANSIT, INC., and
      TRANSCENDENCE TRANSIT II, INC,
19
                     Defendants.
20    --------------------------------X
21        VIDEOTAPED DEPOSITION OF JOHN HUSSON
22           Monday, November 12, 2018
23              New York, New York
24    Reported by:
      AYLETTE GONZALEZ, RPR, CLR, CCR
25    JOB NO. 150938

Page 127

1            JOHN HUSSON (11/12/18)

2        A.    Yep, I was copied on it.

3        Q.    Okay.  Looking at Ms. Tilton's

4    e-mail, the one from 3:31 p.m., she says,

5    "This is the wind down plan on Core and 911."

6    And than she writes "It assumes that there is

7    a foreclosure sale on the other entities."  Do

8    you see that?

9        A.    Um-hum.

10        Q.    Do you know what for- -- "yes"?

11        A.    Yes, I do.  Yes.

12        Q.    Do you know what -- do you know

13    foreclosure sale she's referring to there?

14        A.    No.  I would -- I would assume that

15    the Article 9 is what she's referring to.

16        Q.    Okay.  And then it says "The

17    assumption is that you will collect all the

18    receivables as they come due from NEWCO."  Do

19    you see that?

20        A.    Yes.

21        Q.    And at the time, what did you

22    understand "NEWCO" to be?

23        A.    The entities that were going to go

24    over to NEWCO.

25        Q.    And go over in what -- through what

Page 128

1          JOHN HUSSON (11/12/18)

2    mechanism?

3          A.   They were going to reorganize a

4    company called -- they were going to foreclose

5    all the assets, Transcendence was going to buy

6    it, and they were going to reorganize around

7    Transcendence.  The other companies were going

8    to be left just to basically dissolve and

9    unwind.

10         Q.   Looking at Mr. Strack's response at

11   6:12 p.m., if you go down toward the bottom of

12   the e-mail, it's the second-to-last sentence,

13   it says, "We are having Otterbourg continue

14   their dialogue with Curtis regarding" -- and

15   it goes on.  Do you see that?

16         A.   Yeah.

17         Q.   Again, there's a reference to

18   "NEWCO."  To your understanding, were

19   Ms. Tilton and Mr. Strack talking about the

20   same thing when they referred to "NEWCO"?

21         A.   Yes, the question with -- yes,

22   absolutely.

23         Q.   And there's a -- he said --

24   Mr. Strack writes, "Is there any update on

25   procuring insurance for NEWCO?"

# EXHIBIT 17

| | |
|---|---|
| **From:** | Brian Stephen |
| **Sent:** | Wednesday, February 24, 2016 12:07 AM |
| **To:** | Peter Wolf |
| **Cc:** | Financial and Investment Law |
| **Subject:** | Please see attached |
| **Attachments:** | LGL-_20160223225130.PDF; Notice of Default and Acceleration (Executed) (02242016).pdf |

Please see attached documents.

Brian D. Stephen
Senior Director, Legal
Patriarch Partners, LLC
One Broadway
New York, NY 10004
646.723.7656 Office
212.825.2038
www.patriarchpartners.com



1



## PATRIARCH
### PARTNERS AGENCY
### SERVICES, LLC

One Broadway, 5ᵗʰ Floor
New York, NY 10004

### VIA EMAIL AND CERTIFIED MAIL, RETURN RECEIPT REQUESTED

February 24, 2016

TransCare Corporation
TC Ambulance Corporation
TC Ambulance Group, Inc.
TC Ambulance North, Inc.
TC Billing and Services Corp.
TC Hudson Valley Ambulance Corp.
TCBA Ambulance, Inc.
TransCare Harford County, Inc.
TransCare Management Services, Inc.
TransCare Maryland, Inc.
TransCare ML, Inc.
TransCare New York, Inc.
TransCare Pennsylvania, Inc.
TransCare Westchester, Inc.
One Metrotech Center
Brooklyn, New York 11201
Attention: Chief Operating Officer

Re:     Notice of Acceptance of Subject Collateral in Partial Satisfaction of Obligation

Ladies and Gentlemen:

Reference is made to (a) the Credit Agreement, dated as of August 4, 2003 (as modified to the date hereof, the "Credit Agreement"), among TransCare Corporation, a Delaware corporation ("TransCare"), the financial institutions and other investors from time to time party thereto as lenders ("Lenders"), and Patriarch Partners Agency Services, LLC, a Delaware limited liability company, as administrative agent ("Agent"); (b) the related Pledge Agreement dated as of August 4, 2003, made by TransCare, Trans Care Maryland, Inc., a Delaware corporation, and TransCare New York, Inc., a Delaware corporation, in favor of Agent; (c) the Security Agreement, dated as of August 4, 2003, made by TransCare and the Grantors that are signatories thereto in favor of Agent; and (d) the related Subsidiaries' Guarantee dated as of August 4, 2003 (as modified to the date hereof ) made by Guarantors that are signatories thereto in favor of Agent. Capitalized terms used but not defined herein are used as defined in the Credit Agreement.

{PI105589.2}

1

Confidential

PP-TRBK0043306

Each of the undersigned acknowledges the occurrence of an Event of Default as defined in the Credit Agreement. Pursuant to Section 9-620 of the Uniform Commercial Code, notice is hereby given of the Agent's acceptance of the subject collateral identified on Schedule A attached hereto in partial satisfaction of the undersigned entities' Obligations under the Credit Agreement (the "Subject Collateral"). The Subject Collateral is accepted by Agent in satisfaction of $10,000,000 of the Obligations, which represents a partial satisfaction of the Obligations.

If you are in agreement with the terms of this letter and agree to Agent's acceptance of the Subject Collateral in partial satisfaction of the undersigned entities' Obligations under the Credit Agreement in the amount set forth in the immediately preceding paragraph, please sign and date below.

*Signature pages follow.*

{P1105569.2}

2

PP-TRBK0043307

Very truly yours,



PATRIARCH PARTNERS AGENCY SERVICES, LLC,
as Administrative Agent

By: _____
    Lynn Tilton
    Manager

ZOHAR CDO 2003-1, LIMITED,
as Lender

By: Patriarch Partners VIII, LLC
Its Collateral Manager

By: _____
    Lynn Tilton
    Manager

ZOHAR II 2005-1, LIMITED
as Lender

By: Patriarch Partners XIV, LLC
Its Collateral Manager

By: _____
    Lynn Tilton
    Manager

ZOHAR III, LIMITED
as Lender

By: Patriarch Partners XV, LLC
Its Collateral Manager

By: _____
    Lynn Tilton
    Manager

ARK INVESTMENT PARTNERS II, L.P.,
as Lender

By: Ark Investment GP II, LLC,
Its General Partner

By: _____
    Lynn Tilton
    Manager

[P1165589.2]

3

PP-TRBK0043308

By signing below, each entity (together, the "Debtors") indicates its agreement with the terms of this letter and agrees to Agent's acceptance of the Subject Collateral identified in Schedule A in partial satisfaction of the entity's Obligations under the Credit Agreement in the amount set forth above.

Date: February ___, 2016

TransCare Corporation
TC Ambulance Corporation
TC Ambulance Group, Inc.
TC Ambulance North, Inc.
TC Billing and Services Corp.
TC Hudson Valley Ambulance Corp.
TCBA Ambulance, Inc.
TransCare Harford County, Inc.
TransCare Management Services, Inc.
TransCare Maryland, Inc.
TransCare ML, Inc.
TransCare New York, Inc.
TransCare Pennsylvania, Inc.
TransCare Westchester, Inc.

By: _____
Name:
Title:

{PH1059589.2}

4

Confidential

PP-TRBK0043309

A0791

## SCHEDULE A

## THE SUBJECT COLLATERAL

1. All of Debtors' personal property of every kind and description, wherever located, including, without limitation, Bank Accounts; Chattel Paper; Commercial Tort Claims; Copyrights; Copyright Licenses; Documents; Equipment (including, but not limited to, computer servers and related data); General Intangibles; Instruments; Inventory; Investment Property; Letter of Credit Rights; Patents; Patent Licenses; Trademarks; Trademark Licenses; Vehicles; and books and records pertaining to the Subject Collateral, as such terms are defined in the Security Agreement.

2. The following Contracts as such term is defined in the Security Agreement (may be subject to consent of assignment):
   a. Contract No. 07H97511 between New York City Transit Authority and TransCare New York, Inc.
   b. The equipment lease for Carefusion — LTV 1200 ventilators pursuant to Master Lease Agreement no. 062710-KB between First Financial Corporate Leasing, LLC (dba First Financial healthcare Solutions) and TransCare.
   c. emsCharts Service Agreement dated August 21, 2015 by and between TransCare Corporation and emsCharts, Inc.

3. All shares of capital stock listed on Table A, together with all stock certificates, options or rights of any nature whatsoever which have been issued or granted by any of the corporations identified on Table A as an Issuer, to the Pledgors in respect to the stock identified in Table A, but not any additional or other capital stock pledged for any other corporations that are not identified on Table A.

*Table A*

| Issuer | Pledgor | Class of Stock | Stock Certificate Number | Number of Shares |
|--------|---------|----------------|--------------------------|------------------|
| TransCare Pennsylvania, Inc. | TransCare Corporation | Common | 2 | 1,000 |
| TC Hudson Valley Ambulance Corp. | TransCare Corporation | Common | 2 | 100 |
| TC Ambulance Corporation | TransCare Corporation | Common | 2 | 1,000 |

4. All additions, accessions, substitutions, replacements, products and proceeds (whether cash or non-cash) of any of the foregoing, in whatever form, including, without limitation, proceeds of insurance.

PROVIDED, HOWEVER, that the Subject Collateral expressly does not include the following:
   A. Accounts as such term is defined in the Security Agreement.
   B. Any leasehold or other Contract interest, except as identified in Paragraph 2 of this Schedule.

[P}108589.2]

5

Confidential

PP-TRBK0043310

A0792



# PATRIARCH PARTNERS

One Broadway, 5ᵗʰ Floor
New York, NY 10004

February 24, 2016

VIA E-MAIL

To:     TransCare Corporation
        One Metrotech Center
        Brooklyn, New York 11201
        Attention: Chief Financial Officer

### NOTICE OF DEFAULT AND ACCELERATION

Ladies and Gentlemen:

Reference is made to the Credit Agreement, dated as of August 4, 2003 (as modified to the date hereof, the "Credit Agreement"), among TransCare Corporation, a Delaware corporation (the "Borrower" or "you"), the financial institutions and other investors from time to time party thereto as Lenders and Patriarch Partners Agency Services, LLC, a Delaware limited liability company, as administrative agent for such Lenders (in such capacity, the "Administrative Agent" or "we"). Capitalized terms used herein but not defined herein are used as defined in the Credit Agreement.

Your failure to pay interest when due under the Credit Agreement caused an Event of Default to occur under Section 10(a) of the Credit Agreement. Because of this and other Events of Default under the Credit Agreement, the Lenders hereby declare all of the Obligations to be due and payable forthwith, and all of the Commitments to be terminated. Therefore, on the date hereof, such Obligations have immediately become due and payable, such Commitments have terminated and any fees accrued under the Credit Agreement shall be immediately due and payable.

Although the Lenders have not provided notice described in Section 5.1(i) of the Credit Agreement at this stage, the Lenders reserve the right to provide such notice at any time after the date hereof to provide that interest shall accrue at the increased rate set forth in such Section 5.1(i).

The Lenders expressly reserves all rights, powers, privileges and remedies under or in respect of the Credit Agreement and applicable legal requirements with respect to any Default, Event of Default or any other term of any Loan Document. Any past or future Loans to Borrower shall not be considered an agreement, express or implied, on the part of the Lender to make or consider

Confidential

making additional Loans to Borrower or to consider modifying or waiving, or to modify or waive, any condition precedent, any Event of Default or any Default or any other term of any Loan Document. Nothing herein, in the course of dealing or in the discussions between any Credit Party and the Lender or any of its representatives, shall waive any Default or Event of Default or waive or modify any other provision of any Loan Document. No failure on the part of the Lender to exercise, and no delay in exercising, any right under the Credit Agreement shall operate as a waiver thereof; nor shall any single or partial exercise of any such right preclude any other or further exercise thereof or the exercise of any other right.

This letter is a Loan Document under the Credit Agreement and shall be governed by and construed in accordance with the law of the State of New York. The fact that any term or provision of this letter is held invalid, illegal or unenforceable as to any person in any situation in any jurisdiction shall not affect the validity, enforceability or legality of the remaining terms or provisions hereof or the validity, enforceability or legality of such offending term or provision in any other situation or jurisdiction or as applied to any person.

[SIGNATURE PAGES FOLLOW]

2

Very truly yours,

PATRIARCH PARTNERS AGENCY SERVICES, LLC,
    as Administrative Agent

By: _____
    Name: Lynn Tilton
    Title: Manager


ZOHAR CDO 2003-1, LIMITED,
    as Lender
By: Patriarch Partners VIII, LLC,
    its Collateral Manager

By: _____
    Name: Lynn Tilton
    Title: Manager


ZOHAR II 2005-1, LIMITED,
    as Lender
By: Patriarch Partners XIV, LLC,
    its Collateral Manager

By: _____
    Name: Lynn Tilton
    Title: Manager


ZOHAR III, LIMITED,
    as Lender
By: Patriarch Partners XV, LLC,
    its Collateral Manager

By: _____
    Name: Lynn Tilton
    Title: Manager


SIGNATURE PAGE TO NOTICE OF DEFAULT AND ACCELERATION FOR TRANSCARE CORPORATION

Confidential

PP-TRBK0043313

ARK INVESTMENT PARTNERS II, L.P.,
   as Lender
By: Ark Investment GP II, LLC,
   its General Partner

By: _____
   Name: Lynn Tilton
   Title: Manager

SIGNATURE PAGE TO NOTICE OF DEFAULT AND ACCELERATION FOR TRANSCARE CORPORATION

Confidential

PP-TRBK0043314

# EXHIBIT 18

A0797



## PATRIARCH
### PARTNERS AGENCY
### SERVICES, LLC

One Broadway, 5th Floor
New York, NY 10004

**VIA EMAIL AND CERTIFIED MAIL, RETURN RECEIPT REQUESTED**

February 24, 2016

TransCare Corporation
TC Ambulance Corporation
TC Ambulance Group, Inc.
TC Ambulance North, Inc.
TC Billing and Services Corp.
TC Hudson Valley Ambulance Corp.
TCBA Ambulance, Inc.
TransCare Harford County, Inc.
TransCare Management Services, Inc.
TransCare Maryland, Inc.
TransCare ML, Inc.
TransCare New York, Inc.
TransCare Pennsylvania, Inc.
TransCare Westchester, Inc.
One Metrotech Center
Brooklyn, New York 11201
Attention: Chief Operating Officer

Re:     Notice of Acceptance of Subject Collateral in Partial Satisfaction of Obligation

Ladies and Gentlemen:

Reference is made to (a) the Credit Agreement, dated as of August 4, 2003 (as modified to the date hereof, the "Credit Agreement"), among TransCare Corporation, a Delaware corporation ("TransCare"), the financial institutions and other investors from time to time party thereto as lenders ("Lenders"), and Patriarch Partners Agency Services, LLC, a Delaware limited liability company, as administrative agent ("Agent"); (b) the related Pledge Agreement dated as of August 4, 2003, made by TransCare, Trans Care Maryland, Inc., a Delaware corporation, and TransCare New York, Inc., a Delaware corporation, in favor of Agent; (c) the Security Agreement, dated as of August 4, 2003, made by TransCare and the Grantors that are signatories thereto in favor of Agent; and (d) the related Subsidiaries' Guarantee dated as of August 4, 2003 (as modified to the date hereof ) made by Guarantors that are signatories thereto in favor of Agent.  Capitalized terms used but not defined herein are used as defined in the Credit Agreement.

{P1105589.2}                                   1

Confidential                                                        PP-TRBK0091197

Each of the undersigned acknowledges the occurrence of an Event of Default as defined in the Credit Agreement. Pursuant to Section 9-620 of the Uniform Commercial Code, notice is hereby given of the Agent's acceptance of the subject collateral identified on Schedule A attached hereto in partial satisfaction of the undersigned entities' Obligations under the Credit Agreement (the "Subject Collateral"). The Subject Collateral is accepted by Agent in satisfaction of $10,000,000 of the Obligations, which represents a partial satisfaction of the Obligations.

If you are in agreement with the terms of this letter and agree to Agent's acceptance of the Subject Collateral in partial satisfaction of the undersigned entities' Obligations under the Credit Agreement in the amount set forth in the immediately preceding paragraph, please sign and date below.

*Signature pages follow.*

{P1105589.2}                                                        2

**A0799**

Confidential                                                  PP-TRBK0091198

Very truly yours,



PATRIARCH PARTNERS AGENCY SERVICES, LLC,
as Administrative Agent

By: _____
    Lynn Tilton
    Manager

ZOHAR CDO 2003-1, LIMITED,
as Lender

By: Patriarch Partners VIII, LLC
Its Collateral Manager

By: _____
    Lynn Tilton
    Manager

ZOHAR II 2005-1, LIMITED
as Lender

By: Patriarch Partners XIV, LLC
Its Collateral Manager

By: _____
    Lynn Tilton
    Manager

ZOHAR III, LIMITED
as Lender

By: Patriarch Partners XV, LLC
Its Collateral Manager

By: _____
    Lynn Tilton
    Manager

ARK INVESTMENT PARTNERS II, L.P.,
as Lender

By: Ark Investment GP II, LLC,
Its General Partner

By: _____
    Lynn Tilton
    Manager

{P1105589.2}

3

**A0800**

Confidential

PP-TRBK0091199

By signing below, each entity (together, the "Debtors") indicates its agreement with the terms of this letter and agrees to Agent's acceptance of the Subject Collateral identified in Schedule A in partial satisfaction of the entity's Obligations under the Credit Agreement in the amount set forth above:

Date:  February 24, 2016

TransCare Corporation
TC Ambulance Corporation
TC Ambulance Group, Inc.
TC Ambulance North, Inc.
TC Billing and Services Corp.
TC Hudson Valley Ambulance Corp.
TCBA Ambulance, Inc.
TransCare Harford County, Inc.
TransCare Management Services, Inc.
TransCare Maryland, Inc.
TransCare ML, Inc.
TransCare New York, Inc.
TransCare Pennsylvania, Inc.
TransCare Westchester, Inc.

By: _____
Name:   Peter N. Wolf
Title:   CVC

Confidential                                        PP-TRBK0091200

## SCHEDULE A

### THE SUBJECT COLLATERAL

1. All of Debtors' personal property of every kind and description, wherever located, including, without limitation, Bank Accounts; Chattel Paper; Commercial Tort Claims; Copyrights; Copyright Licenses; Documents; Equipment (including, but not limited to, computer servers and related data); General Intangibles; Instruments; Inventory; Investment Property; Letter of Credit Rights; Patents; Patent Licenses; Trademarks; Trademark Licenses; Vehicles; and books and records pertaining to the Subject Collateral, as such terms are defined in the Security Agreement.

2. The following Contracts as such term is defined in the Security Agreement (may be subject to consent of assignment):
   a. Contract No. 07H9751I between New York City Transit Authority and TransCare New York, Inc.
   b. The equipment lease for Carefusion – LTV 1200 ventilators pursuant to Master Lease Agreement no. 062710-KB between First Financial Corporate Leasing, LLC (dba First Financial healthcare Solutions) and TransCare.
   c. emsCharts Service Agreement dated August 21, 2015 by and between TransCare Corporation and emsCharts, Inc.

3. All shares of capital stock listed on Table A, together with all stock certificates, options or rights of any nature whatsoever which have been issued or granted by any of the corporations identified on Table A as an Issuer, to the Pledgors in respect to the stock identified in Table A, but not any additional or other capital stock pledged for any other corporations that are not identified on Table A.

*Table A*

| Issuer | Pledgor | Class of Stock | Stock Certificate Number | Number of Shares |
|---|---|---|---|---|
| TransCare Pennsylvania, Inc. | TransCare Corporation | Common | 2 | 1,000 |
| TC Hudson Valley Ambulance Corp. | TransCare Corporation | Common | 2 | 100 |
| TC Ambulance Corporation | TransCare Corporation | Common | 2 | 1,000 |

4. All additions, accessions, substitutions, replacements, products and proceeds (whether cash or non-cash) of any of the foregoing, in whatever form, including, without limitation, proceeds of insurance.

PROVIDED, HOWEVER, that the Subject Collateral expressly does not include the following:
   A. Accounts as such term is defined in the Security Agreement.
   B. Any leasehold or other Contract interest, except as identified in Paragraph 2 of this Schedule.

**A0802**

Confidential                                                                    PP-TRBK0091201

Case 1:20-cv-06274-LAK   Document 11-8   Filed 09/30/20   Page 23 of 242

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
----------------------------------------------------------x
In re:                                          :
                                                :
                                                :
        TRANSCARE CORPORATION, et al.,          :      Chapter 7
                                                :      Case No. 16-10407 (SMB)
                                                :      (Jointly Administered)
                           Debtors.             :
----------------------------------------------------------x
SALVATORE LAMONICA, as Chapter 7                :
Trustee for the Estates of TransCare            :
Corporation, et al.,                            :
                                                :
                           Plaintiff,           :
                                                :      Adv. Proc. No. 18-1021 (SMB)
               - against -                      :
                                                :
LYNN TILTON, PATRIARCH PARTNERS                 :
AGENCY SERVICES, LLC, PATRIARCH                 :
PARTNERS, LLC, PATRIARCH PARTNERS               :
MANAGEMENT GROUP, LLC, ARK II CLO               :
2001-1 LIMITED, TRANSCENDENCE                   :
TRANSIT, INC., and TRANSCENDENCE                :
TRANSIT II, INC.,                               :
                                                :
                           Defendants.          :
                                                :
----------------------------------------------------------x
```

**NOTICE OF DEFENDANTS' MOTION IN LIMINE TO EXCLUDE**
**THE TESTIMONY OF PLAINTIFF'S PURPORTED EXPERT JONATHAN I. ARNOLD**

PLEASE TAKE NOTICE that pursuant to the accompanying Memorandum In Support of

Defendants' Motion In Limine To Exclude The Testimony Of Jonathan I. Arnold, and the

Declaration of Michael T. Mervis and the exhibits annexed thereto, Defendants, through their

undersigned counsel, will move for entry of an Order excluding Plaintiff's purported expert

witness, Jonathan I. Arnold, from testifying at the trial of this case (the "Motion") pursuant to

Federal Rule of Evidence 702, made applicable through Rule 9017 of the Federal Rules of

1

Bankruptcy Procedure (the "Bankruptcy Rules"), before the Honorable Stuart M. Bernstein, United States Bankruptcy Judge for the Southern District of New York (the "Bankruptcy Court"), One Bowling Green, Courtroom 723, New York, New York 10004-1408, on **July 22, 2019 at 10:00 a.m.**;

PLEASE TAKE FURTHER NOTICE that any responses or objections ("Objections") to the Motion must be in writing, shall conform to the Bankruptcy Rules and the Local Rules for the Southern District of New York, and shall be filed with the Bankruptcy Court (a) by registered users of the Bankruptcy Court's case filing system, electronically in accordance with General Order M–399 (which can be found at http://www.nysb.uscourts.gov), and (b) by all other parties in interest, on a CD-ROM, in text-searchable portable document format (PDF) (with a hard copy delivered directly to Chambers), in accordance with the customary practices of the Bankruptcy Court and General Order M–399, to the extent applicable, and served in accordance with General Order M-399 so as to be filed and received no later than **July 15, 2019 at 4:00 p.m.** (the "Objection Deadline").

PLEASE TAKE FURTHER NOTICE that if no Objections are timely filed and served, the Defendants may, on or after the Objection Deadline, submit to the Bankruptcy Court an order substantially in the form of the proposed **Exhibit A**, which order may be entered with no further notice or opportunity to be heard.

Dated: July 8, 2019
New York, New York

2

PROSKAUER ROSE LLP

By: */s/ Michael T. Mervis*
        Michael T. Mervis
        Timothy Q. Karcher
        Eleven Times Square
        New York, NY  10036-8299
        Tel.: (212) 969-3000
        Fax: (212) 969-2900
        Email: mmervis@proskauer.com
               tkarcher@proskauer.com

Nicole A. Eichberger (admitted *pro hac vice*)
        650 Poydras Street
        Suite 1800
        New Orleans, LA 70130-6146
        Tel.: (504) 310-2024
        Fax: (504) 310-2022
        Email: neichberger@proskauer.com

        *Attorneys for Defendants*

3

A0805

**Exhibit A**

Proposed Order

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------x

In re:                                                         :
                                                               :
                                                               :
       TRANSCARE CORPORATION, et al.,          :     Chapter 7
                                                               :     Case No. 16-10407 (SMB)
                                                               :     (Jointly Administered)
            Debtors.                            :

-------------------------------------------------------------x

SALVATORE LAMONICA, as Chapter 7                               :
Trustee for the Estates of TransCare                           :
Corporation, et al.,                                           :
                                                               :
          Plaintiff,                          :
                                                               :     Adv. Proc. No. 18-1021 (SMB)
      - against -                                  :
                                                               :
LYNN TILTON, PATRIARCH PARTNERS                                :
AGENCY SERVICES, LLC, PATRIARCH                                :
PARTNERS, LLC, PATRIARCH PARTNERS                              :
MANAGEMENT GROUP, LLC, ARK II CLO                              :
2001-1 LIMITED, TRANSCENDENCE                                  :
TRANSIT, INC., and TRANSCENDENCE                               :
TRANSIT II, INC.,                                              :
                                                               :
         Defendants.                         :
                                                               :

-------------------------------------------------------------x

**[PROPOSED] ORDER GRANTING DEFENDANTS' MOTION IN LIMINE**
**TO EXCLUDE THE TESTIMONY OF PLAINTIFF'S PURPORTED EXPERT**
**JONATHAN I. ARNOLD**

      Upon Defendants' Motion in Limine to Exclude The Testimony of Plaintiff's Purported

Expert Jonathan I. Arnold (the "Motion") and the Declaration of Michael T. Mervis and the

exhibits annexed thereto; and the Court having considered the Motion and the Plaintiff's

Opposition to the Motion, and the arguments of counsel concerning the Motion at a hearing before

the Court on July 22, 2019; and after due deliberation thereon; and good and sufficient cause

appearing therefor;

**A0807**

IT IS HEREBY ORDERED THAT:

     1.      The Motion is granted as set forth herein.

     2.      The proposed expert testimony of Jonathan I. Arnold is excluded from this case.

     3.      The Court shall retain jurisdiction to hear and determine all matters arising from or

related to the implementation, interpretation and/or enforcement of this Order.


DATED: _____, 2019
        New York, New York



                                           _____
                                         THE HONORABLE STUART M. BERNSTEIN
                                         UNITED STATES BANKRUPTCY JUDGE

2

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x

| | | |
|---|---|---|
| In re: | : | |
| | : | |
| | : | |
| TRANSCARE CORPORATION, et al., | : | Chapter 7 |
| | : | Case No. 16-10407 (SMB) |
| | : | (Jointly Administered) |
| Debtors. | : | |

------------------------------------------------------------x

| | | |
|---|---|---|
| SALVATORE LAMONICA, as Chapter 7 | : | |
| Trustee for the Estates of TransCare | : | |
| Corporation, et al., | : | |
| | : | |
| Plaintiff, | : | |
| | : | Adv. Proc. No. 18-1021 (SMB) |
| - against - | : | |
| | : | |
| LYNN TILTON, PATRIARCH PARTNERS | : | |
| AGENCY SERVICES, LLC, PATRIARCH | : | |
| PARTNERS, LLC, PATRIARCH PARTNERS | : | |
| MANAGEMENT GROUP, LLC, ARK II CLO | : | |
| 2001-1 LIMITED, TRANSCENDENCE | : | |
| TRANSIT, INC., and TRANSCENDENCE | : | |
| TRANSIT II, INC., | : | |
| | : | |
| Defendants. | : | |
| | : | |

------------------------------------------------------------x

**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION IN LIMINE**
**TO EXCLUDE THE TESTIMONY OF PLAINTIFF'S PURPORTED EXPERT**
**JONATHAN I. ARNOLD**

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION .................................................................................................. 1

II.   ARNOLD'S REPORT .......................................................................................... 2

III.  ARGUMENT ......................................................................................................... 3

    A.    Arnold's Opinions Do Not Fit This Case. ................................................ 4

    B.    Arnold's Opinions Are Not Helpful to the Trier of Fact ........................ 7

        1.    Arnold's Descriptions of Operating Value and Liquidation Value are
            Unhelpful Summaries of Record Evidence................................. 7

        2.    Arnold's Use of Arithmetic to Calculate Operating Value and
            Liquidation Value is Not Based on Specialized Knowledge ................... 14

    CONCLUSION................................................................................................ 15

i

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Andrews v. Metro N. Commuter R.R.*,
    882 F.2d 705 (2d Cir. 1989)........................................................................4

*Chemipal Ltd. v. Slim-Fast Nutritional Food Int'l, Inc.*,
    350 F. Supp. 2d 582 (D. Del. 2004).......................................................11

*Daubert v. Merrell Dow Pharm., Inc.*,
    43 F.3d 1311 (9th Cir. 1995) ...................................................................4

*Daubert v. Merrell Dow Pharms., Inc.*,
    509 U.S. 579 (1993)...................................................................................3

*Finkelstein v. Liberty Digital, Inc.*,
    No. 19598, 2005 WL 1074364 (Del. Ch. Apr. 25, 2005) .........................4

*Forte v. Liquidnet Holdings, Inc.*,
    675 F. App'x 21 (2d Cir. 2017) .............................................................11

*Guillory v. Domtar Indus. Inc.*,
    95 F.3d 1320 (5th Cir. 1996) ...................................................................5

*In re Breitburn Energy Partners LP*,
    582 B.R. 321 (Bankr. S.D.N.Y. 2018)...................................................14

*In re Rezulin Prods. Liab. Litig.*,
    441 F. Supp. 2d 567 (S.D.N.Y. 2006).....................................................4

*Jedwab v. MGM Grand Hotels, Inc.*,
    509 A.2d 584 (Del. Ch. 1986)..................................................................7

*LinkCo, Inc. v. Fujitsu Ltd.*,
    No. 00-7242(SAS), 2002 WL 1585551 (S.D.N.Y. July 16, 2002)...........8

*Lippe v. Bairnco Corp.*,
    288 B.R. 678 (S.D.N.Y. 2003),
    *aff'd*, 99 F. App'x 274 (2d Cir. 2004)..............................................12, 14

*Media Sport & Arts s.r.l. v. Kinney Shoe Corp.*,
    No. 95-3901(PKL), 1999 WL 946354 (S.D.N.Y. Oct. 19, 1999)............8

ii

*Munoz v. Orr*,
    200 F.3d 291 (5th Cir. 2000) .................................................................................11

*Philips v. Ford Motor Co.*,
    No. 14-02989-LHK, 2016 WL 7428810 (N.D. Cal. Dec. 22, 2016),
    *aff'd*, 726 F. App'x 608 (9th Cir. 2018)..................................................................6

*Schwartz v. Fortune Magazine*,
    193 F.R.D. 144 (S.D.N.Y. 2000) ..........................................................................14

*Shapiro v. Art Leather, Inc. (In re Connolly N. Am., LLC)*,
    398 B.R. 564 (Bankr. E.D. Mich. 2008) ...............................................................14

*Sullivan v. Ford Motor Co.*,
    No. 97-593(RCC), 2000 WL 343777 (S.D.N.Y. Mar. 31, 2000) ............................4

*Thorpe v. CERBCO, Inc.*,
    No. 11713, 1993 WL 443406 (Del. Ch. Oct. 29, 1993)..........................................7

*United States v. Connolly*,
    No. 16 cr 370(CM), 2018 WL 5023785 (S.D.N.Y. Oct. 1, 2018) .........................10

*United States v. Mejia*,
    545 F.3d 179 (2d Cir. 2008)................................................................................7-8

*Vigil v. Burlington Northern & Santa Fe Ry.*,
    521 F. Supp. 2d 1185 (D.N.M. 2007) ...................................................................14

*We Shall Overcome Found. v. Richmond Org., Inc.*,
    No. 16-2725(DLC), 2017 WL 3981311 (S.D.N.Y. Sept. 8, 2017)...........................3

## OTHER AUTHORITIES

Fed. R. Evid. 702 ............................................................................................................3, 7

Defendants[1] move to exclude the purported expert witness proffered by Plaintiff Salvatore LaMonica (the "Trustee"), Jonathan I. Arnold.  For the foregoing reasons, the motion should be granted.

## I.    INTRODUCTION

1.    In his Expert Report,[2] Arnold purports to offer a "valuation" of TransCare Corporation and its affiliated entities ("TransCare" or the "Company") in January 2016 as well as a "valuation" of a portion of the Company in February 2016.  Arnold's proposed testimony on these subjects is inadmissible for two reasons.

2.    *First*, Arnold's opinions do not fit the claims in this case.  To that end, the Trustee alleges that Tilton breached her fiduciary duty of loyalty by failing to "monetize" TransCare while it was in the midst of a crippling liquidity crisis.  To estimate the value of what such a monetization might have realized, the relevant task is to value TransCare *as it existed*.  But that is not what Arnold does.  Instead, he offers a purported "valuation" of TransCare as if it were a hypothetical version of the Company after a radical transformation into a totally different business.  Notably, the Trustee does not allege (nor could he) that Tilton breached her duty of loyalty by not transforming TransCare into a completely different company.

3.    *Second*, Arnold's opinions do not help the Court as trier of fact.  Expert evidence is admissible only if it brings some specialized knowledge to the case beyond that of the non-expert factfinder.  Despite the length of the Report and the use of technical terms in it, Arnold's

---

[1] The Defendants in this adversary proceeding are:  Lynn Tilton, Patriarch Partners Agency Services, LLC, Patriarch Partners, LLC ("Patriarch Partners"), Patriarch Partners Management Group, LLC, Ark II CLO 2001-1, Limited, Transcendence Transit, Inc., and Transcendence Transit II, Inc.

[2] *See* Declaration of Michael T. Mervis in Support of Motion to Exclude Expert Evidence ("Mervis Decl.") (submitted herewith), Ex. 1, Expert Report of Jonathan I. Arnold dated Nov. 30, 2018 (the "Report").  References herein to "Arnold Tr." are to the transcript of Dr. Arnold's deposition, taken on March 11, 2019.  Cited excerpts from that transcript are annexed to the Mervis Decl. as Ex. 2.

opinions do no such thing. To arrive at TransCare's so-called "operating value," Arnold takes two pieces of evidence from the discovery record—TransCare's projected annual EBITDA from certain restructuring plans and some reported industry multiples—and performs simple arithmetic. The evidence Arnold used was preselected for him by the Trustee's counsel, and accepted by Arnold at face value without any investigation into its reasonableness or accuracy. Arnold accordingly provides no benefit to the Court, which can review the same record evidence, do the same simple math, and decide what weight (if any) to give the results.

## II. ARNOLD'S REPORT

4.    The Trustee retained Arnold to offer an opinion of the "implied value" of TransCare—that is, what TransCare could have sold for in an orderly asset or going-concern sale instead of through liquidation. Arnold purports to value the Company "at four points during January and February 2016." (Report ¶¶ 4–6.)

5.    Throughout January and February 2016, Tilton, Patriarch Partners personnel, TransCare executives, and/or Carl Marks Advisory Group, LLC ("CMAG") personnel created various potential restructuring plans for TransCare which contained, among other things, projected annual EBITDA under each plan (the "Projections"). They created the plans in connection with negotiations between TransCare and Wells Fargo N.A. ("Wells Fargo"), TransCare's asset-based-secured lender, to determine whether and on what terms Wells Fargo would agree to a long-term forbearance of Wells Fargo's rights under its loan agreement with TransCare.[3] The restructuring plans were dated January 7, January 27, January 28, and February 24, respectively.[4]

---

[3] (Mervis Decl. Ex 3, TRANSCARE00006334 ("Notice of Non-Renewal") at TRANSCARE-00006335–36; Ex. 4, PPTRBK0002058 at PP-TRBK0002059; Ex. 5, PP-TRBK0075262 at PP-TRBK0075263; Ex. 6, PP-TRBK0083461; Ex. 7, Tilton Tr. 162:24-165:8, 168:15-170:6.)

[4] The four plans, including their respective Projections, are annexed to the Mervis Decl. as Ex. 8 ("January 7 Projection"), Ex. 9 ("January 27 Projection"), Ex. 10 ("January 28 Projection"), and Ex. 11 ("February 24 Projection").

2

**A0814**

6.     The conclusions in the Report rely largely on the Projections and were derived from three simple steps:

- At step one, Arnold performed multiplication. Specifically, he multiplied the projected annual EBITDA from the Projections by an EBITDA multiple industry range he took from a discovery document that was given to him by the Trustee's counsel. The Report refers to the range of outputs from this multiplication exercise as TransCare's operating value ("Operating Value"). (Report §§ III to IV.) Based on his multiplication, Arnold "opines" that TransCare could have sold in January 2016 for between $35.3 and $86.5 million and in February 2016 for between $22.7 and $39.1 million. (Report ¶ 7.)

- At step two, Arnold performed addition. He totaled the amounts generated from the Trustee's post-petition sale of assets and collection of accounts receivable, which are reported on the main case docket. (Report at § V & Ex. 13.) Arnold "opined" that the total was $19.2 million (the "Liquidation Value"). (Report ¶¶ 74–77.)

- At step three, Arnold performed subtraction. He subtracted the Liquidation Value from the Operating Value and "opined" that by liquidating instead of selling TransCare lost $16.1 to $67.3 million in January 2016 and $17.0 to $33.4 million in February. (Report ¶ 7.)

## III.   ARGUMENT

7.     Under Federal Rule of Evidence 702, a qualified expert witness may provide opinion testimony only if: "(a) the expert's . . . specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. The Court acts as a "gatekeeper" to ensure the proffered expert opinion is both reliable and relevant. *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993). The Trustee must establish the admissibility of Arnold's expert testimony by a preponderance of the evidence. *We Shall Overcome Found. v. Richmond Org., Inc.*, No. 16-2725(DLC), 2017 WL 3981311, at *19 (S.D.N.Y. Sept. 8, 2017).

A0815

8.     The "touchstone" for admissibility is whether the expert testimony "is helpful to the trier of fact." *Sullivan v. Ford Motor Co.*, No. 97-593(RCC), 2000 WL 343777, at *6 (S.D.N.Y. Mar. 31, 2000). To be helpful, the testimony must "fit" the factual dispute—"in other words, it must be 'sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute.'" *In re Rezulin Prods. Liab. Litig.*, 441 F. Supp. 2d 567, 576 (S.D.N.Y. 2006) (citation omitted). Testimony is not helpful if it concerns matters within the knowledge or experience of the fact finder. *Andrews v. Metro N. Commuter R.R.*, 882 F.2d 705, 708 (2d Cir. 1989) ("For an expert's testimony to be admissible . . . it must be directed to matters within the witness' scientific, technical, or specialized knowledge and not to lay matters which a jury is capable of understanding and deciding without the expert's help.").

**A.     Arnold's Opinions Do Not Fit This Case.**

9.     Arnold's opinions are inadmissible because they do not fit this case. Courts "must" exclude expert evidence "unless they are convinced that it speaks clearly and directly to an issue in dispute in the case[.]" *Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1321 (9th Cir. 1995). Here, Arnold's opinions do not fit this case because they do not offer a valuation that is meaningful to this case.

10.     The Trustee contends that Tilton breached her fiduciary duty of loyalty by engaging in purported self-dealing instead of "monetizing" TransCare by selling it. (*See, e.g.*, Final Pre-Trial Order [Dkt. 83] ¶ 182 ("By executing the Transcendence transaction, Defendants deprived TransCare of the ability to monetize TransCare's assets as a going concern. TransCare recovered less through liquidation sales than TransCare could have recovered had Defendants sold or restructured TransCare in a disinterested manner.").) Given the framing of the Trustee's claim, the only (potentially) relevant question to ask is what the value of TransCare would have been *as it existed at the time*, but for the alleged self-dealing. *See Finkelstein v. Liberty Digital, Inc.*, No.

4

19598, 2005 WL 1074364, at \*17 (Del. Ch. Apr. 25, 2005) (excluding expert because "rather than addressing the operative reality of Liberty Digital, as required by law, [the expert] imagines an ideal world for Liberty Digital and values [its assets] on that basis"). *Cf. Guillory v. Domtar Indus. Inc.*, 95 F.3d 1320, 1331 (5th Cir. 1996) ("Expert evidence based on a fictitious set of facts is just as unreliable as evidence based upon no research at all.").

11.    But Arnold does not answer that question.  Although his Report purports to value TransCare "at four points during January and February 2016," Report ¶ 4, Arnold admitted at his deposition that he actually valued what TransCare *possibly could be,* not what it actually was.  (*See* Arnold Tr. 172:9–19 (emphasis added) ("I think that -- that TransCare as it was anticipated to be in the future was going to be *a decidedly different firm than it had been in the past.*  So while in some cases, recent history is . . . a good predictor of the future, I think that's not going to be the case here, *especially given the significant changes that . . . people were modeling* and believed were appropriate for the firm going forward.").  In other words, the Report proffers the "value" of a hypothetical, fully restructured, future TransCare; *not* of TransCare as it existed when the restructuring plans were created.

12.    Arnold had to concede that he valued a hypothetical TransCare because that was the purpose of the Projections.  The Projections, which were developed in January and February 2016 during negotiations between TransCare and Wells Fargo, attempt to calculate what TransCare *could be* worth in the future if fundamental changes were made to the Company.  (*See* ¶ 5, *supra*.)  The assumptions therein show that the Projections attempted to value TransCare after a significant revamp.  They assumed, for example, that TransCare would (i) buy dozens of additional vehicles, (ii) move the locations of vehicle facilities, (iii) fix broken customer and employee relationships; (iv) hire a new senior management team; (v) obtain millions of dollars in

capital investments; and (vi) convince Wells Fargo to continue as TransCare's primary lender. (Jan. 7 Projection at CM_TC2018_0003370; Jan. 27 Projection at CM_TC2018_0002111–12; Feb. 24 Projection at PP-TRBK0086219.)   For the Projections to be meaningful, Arnold acknowledged, each of these "significant" overhauls would "need to go right."  (Arnold Tr. 97:10–22, 172:16.)  As a result, the TransCare Arnold values—i.e., TransCare with new management, a new vehicle fleet, happy customers, content employees, cheaper maintenance facilities, millions in new capital, and an ongoing lender relationship—is not the TransCare for which Tilton served as Director in January and February 2016.[5]

13.     Rather, there is no dispute that the TransCare that actually existed in the winter of 2016 lacked these attributes.  To take just one example, by January 2016, Wells Fargo had already issued a Notice of Non-Renewal to TransCare stating that its credit agreement with TransCare would expire on January 31, 2016 and that Wells Fargo "presently ha[d] no intention to extend or modify the term of such financing arrangements." (Ex. 3, Notice of Non-Renewal at TRANSCARE-00006335–36.)  Wells Fargo executive Kurt Marsden had explained to Tilton that Wells Fargo had concerns about TransCare and its management team. (*See, e.g.*, Ex. 4, PPTRBK0002058 at PP-TRBK0002059; Ex. 5, PP-TRBK0075262 at PP-TRBK0075263; Ex. 6, PP-TRBK0083461.)  And Tilton had similarly lost confidence in the TransCare management team. (*See* Tilton Tr. at 164:24–165:8.)

14.     In this regard, it should be emphasized that the Trustee's duty of loyalty claim is not based on an alleged failure by Tilton to transform TransCare into a different business.  Indeed,

---

[5] This is not the first time Arnold's opinion failed to fit the plaintiff's theory of the case. *See Philips v. Ford Motor Co.*, No. 14-02989-LHK, 2016 WL 7428810, at *19–22 (N.D. Cal. Dec. 22, 2016) (excluding Arnold because he "does not provide a model of damages that conforms to Plaintiffs' legal theory," and finding it "ironic" that, "after stating what a proper damages model would look like, Dr. Arnold then offers an entirely different model"), *aff'd*, 726 F. App'x 608 (9th Cir. 2018).

6

the cases are clear that she had no obligation to finance such a transformation.  *See Jedwab v. MGM Grand Hotels, Inc.*, 509 A.2d 584, 598 (Del. Ch. 1986) ("[T]he law does not require more than fairness.  Specifically, it does not, absent a showing of culpability, require that directors or controlling shareholders sacrifice their own financial interest in the enterprise for the sake of the corporation . . . ."); *Thorpe v. CERBCO, Inc.*, No. 11713, 1993 WL 443406, at *7 (Del. Ch. Oct. 29, 1993). ("[C]ontrolling shareholders, while not allowed to use their control over corporate property or processes to exploit the minority, are not required to act altruistically towards them.").

15.      In sum, because Arnold values a hypothetical, fundamentally changed TransCare when he should have valued TransCare as it actually existed at times at which he purported to value the Company, his expert testimony should be excluded.

## B.      Arnold's Opinions Are Not Helpful to the Trier of Fact

16.      Even if Arnold's opinions fit the claims in this case, they are still inadmissible because they are not helpful to the trier of fact.  In his Report, Arnold opines on TransCare's "implied value," a figure consisting of two inputs:  TransCare's Operating Value and Liquidation Value.  (Report ¶ 4.)  In doing so, Arnold's "valuations rely on models and projections prepared by" TransCare, Patriarch Partners, and CMAG.  (*Id.*)  On its face, Arnold's Report does little more than describe the cherry-picked evidence he received from Trustee's counsel and accepted at face value without further investigation.  Arnold then uses basic arithmetic to arrive at his "values." This proposed testimony should be excluded for two reasons: first, it does not meet the helpfulness criteria of Rule 702; and second, it does not draw on any specialized knowledge or expertise.

### 1.      *Arnold's Descriptions of Operating Value and Liquidation Value are Unhelpful Summaries of Record Evidence.*

17.      An expert's testimony is admissible only if it concerns matters that a non-expert fact finder "is not capable of understanding on his or her own."  *United States v. Mejia*, 545 F.3d

179, 194 (2d Cir. 2008); *see id.* (citation omitted) ("A district court may commit manifest error by admitting expert testimony where the evidence impermissibly mirrors the testimony offered by fact witnesses, or the subject matter of the expert's testimony is not beyond the ken of the average [fact finder]."). Expert testimony is thus inadmissible if it merely reiterates fact evidence. Instead, it is "far more appropriate" to admit such evidence through the "testimony of fact witnesses" because "the expert witness's secondhand knowledge [is] unnecessary for the edification of the jury." *LinkCo, Inc. v. Fujitsu Ltd.*, No. 00-7242(SAS), 2002 WL 1585551, at *2 (S.D.N.Y. July 16, 2002) (alteration omitted) (citation omitted). *See also Media Sport & Arts s.r.l. v. Kinney Shoe Corp.*, No. 95-3901(PKL), 1999 WL 946354, at *3 (S.D.N.Y. Oct. 19, 1999) (where expert's testimony "is not based on personal knowledge, but instead on his review of documents and depositions produced by the parties," the expert's testimony "may not take the place of that of the individuals who actually negotiated the deal").

18.     As the Report explains, Arnold arrived at his Operating Value range by multiplying TransCare's projected annual EBITDA (projected as part of a restructuring plan) by a multiples range. (Report ¶¶ 43–60 & Exhs. 12a to 12d.) Yet these inputs were not devised by Arnold himself. The projected EBITDA figures were simply lifted from the Projections. (Report ¶¶ 47–60.) Arnold used the Projections without independently testing the inputs that underpinned them. Those Projections provided him with the first of two inputs—projected annual EBITDA of $6.9, $5.0, and $5.2 million on January 7, 27, and 28 respectively; and $3.2 million on February 24. (*See* Report ¶¶ 49, 55, 58, 60.)[6]

---

[6] To be clear, these EBITDA figures are *projected future* earnings, as per the restructuring plans. They are not TransCare's *actual* EBITDA at any point in time.

19.     The same is true for the EBITDA multiples.  Arnold purports to apply four methods: (i) comparable companies; (ii) precedent transactions; (iii) reliance on alleged prior expressions of interest in TransCare in 2015; and (iv) reliance on multiples purportedly identified by Tilton. (Report ¶¶ 66–70.)  But Arnold does not generate these methods on his own; he merely reiterated them as they were conducted by other people in 2015 and 2016:

- For a comparable-company approach, Arnold merely used two firms "identified by [Patriarch Partners'] Mr. Greenberg in [a] market comparable companies analysis" he provided to Tilton.  (Report ¶ 67.)

- For a precedent-transaction approach, Arnold "rel[ied] on the two transaction comparables and the EV/EBITDA multiples identified by Mr. Greenberg."  (Report ¶ 68.)

- For an expression-of-interest approach, Arnold "rel[ied] on the 8.0x EV/EBITDA offered by [TransCare competitor] RCA" in 2015.  (Report ¶ 70.)[7]

- For Tilton's alleged approach, Arnold "rel[ied] on" the EBIDTA multiple "identified by Ms. Tilton during her deposition."  (Report ¶ 69.)

20.     Arnold arrived at his "opinion" of Liquidation Value the same way; he combined sales of assets and collections of accounts receivable that were reflected in submissions in the main case docket and six documents produced in this litigation.  (*See* Ex. 13 to Report (listing sources for Liquidation Value).)   He performed no additional analysis or review of these sales or collections numbers, but simply gathered record evidence.

21.     Thus, Arnold's Report is essentially a book report; he blindly accepted data points, which were given to him by the Trustee's counsel or taken from the case docket, and performed arithmetic.  The Court, as finder of fact in this bench trial, is well-suited to review the Projections

---

[7] What Arnold describes as an "offer" was merely an unsolicited feeler inquiry made without the benefit of any diligence.  (Mervis Decl. Ex. 12, Leland I Tr. 113:20–114:11, 174:8–10; Ex. 13, PP-TRBK0071446 at PP-TRBK0071450; Ex. 14, PP-TRBK0030896 at PP-TRBK0030896–97; Ex. 15, PP-TRBK0030905; Ex. 16, Greenberg Tr. 229:23–230:18; Tilton Tr. 175:25–177:21, 320:21–321:15.)

and any evidence about them and determine what weight (if any) to give them. The same is the case with regard to the evidence from which Arnold took his multiples. Indeed, Bankruptcy Courts are ideally positioned to understand the Projections and multiples without a proffered expert. Depending on how the Trustee presents his case, this Court may have an opportunity to observe and question the fact witnesses who prepared the Projections and the plans in which they are contained—indeed, the Final Pre-Trial Order identifies as fact witnesses to be called by the Trustee individuals who authored or participated in the creation of the plans and Projections (*e.g.*, Michael Greenberg, Carl Landeck, Glenn Leland, and Mark Bonilla).[8]

22.     To be clear, it is not just Arnold's reliance on record evidence that is problematic; it is his failure to vet the reliability of what was given to him by counsel or apply any expertise. As Arnold admitted in his deposition, he blindly relied on Trustee's counsel to decide what evidence to review, what assumptions to accept, and what inconsistencies to let lie without further investigation. He focused on the four dates in January and February 2016, the foundation of his Report, because Trustee's counsel *told him to*, not because his expertise informed their significance. (*See, e.g.*, Arnold Tr. 43:22–24 ("The four dates I used are the four dates that were identified to me by counsel as being relevant."), 45:18–23 (explaining he used the Projections because that "was the time period that counsel asked me to focus on").) Similarly, when Arnold received the Projections from the Trustee's counsel, he did not independently verify the data or test the underlying assumptions therein. (*See, e.g.*, Arnold Tr. 78:23–86:4, 95:21–101:10 (testifying he took no efforts to investigate key assumptions in Jan. 7 Projection); Arnold Tr.

---

[8] Arnold has tried previously to testify about facts outside an expert's ken. In October 2018, Chief Judge McMahon criticized Arnold's attempt testify to what documents the opposing counsel produced in the case. *United States v. Connolly*, No. 16 Cr 370(CM), 2018 WL 5023785, at *1 (S.D.N.Y. Oct. 1, 2018) ("Dr. Arnold cannot testify about the Government's failure to provide discovery.").

10

Case 1:20-cv-06274-LAK Document 11-8 Filed 09/30/20 Page 43 of 242

115:15–118:6 (admitting he did not investigate Jan. 27 Projection because "that level of granularity was not something that I investigated and assessed and pressure tested. Rather, I'm using the numbers that are the outcome of [the authors'] informed judgment . . . Look, I reviewed this document, but I didn't undertake an analysis beyond that").)

23.    In short, he received this cherry-picked evidence, accepted it as accurate, and then did basic arithmetic. Arnold thus had no real idea how reliable or accurate the numbers were in the neat package of evidence he was given by counsel. That alone is grounds to reject Arnold's opinions. *See Forte v. Liquidnet Holdings, Inc.*, 675 F. App'x 21, 23–24 (2d Cir. 2017) ("[The plaintiff's expert] did not independently verify any of the data he used in the report—he simply input the numbers he was given by [counsel] and used them to calculate pay discrepancies. A failure to validate data by itself can constitute grounds for excluding an expert report."); *Munoz v. Orr*, 200 F.3d 291, 301–02 (5th Cir. 2000) (noting that expert's reliance on data provided by a plaintiff, without conducting independent verification, gives rise to "common-sense skepticism" of the expert's evaluation); *Chemipal Ltd. v. Slim-Fast Nutritional Food Int'l, Inc.*, 350 F. Supp. 2d 582, 589–91 (D. Del. 2004) (rejecting testimony where the expert "adopted" with "blind reliance" a marketing report "without reviewing its underpinnings" and performed no independent analysis to demonstrate the data's reliability).

24.    Had Arnold dug deeper, he would have discovered that his failure to investigate the pre-selected evidence was in error. For one, when pressed at his deposition, Arnold acknowledged that the January 7 Projection contained an internal inconsistency in one of its "major assumptions." (*See* Jan. 7 Projection at CM_TC2018_0003370.) In one place, the January 7 Projection based TransCare's potential restructuring on the assumed ability to buy 118 ambulances; in another it assumed the Company needed only 40 to 60. (*Compare id. with id.* at 0003376.) Arnold, however,

11

did nothing to investigate the difference or reconcile the numbers, even though he admitted that, for the projected EBITDA to be accurate, all of the assumptions "would have to go right." (Arnold Tr. 93:2–15, 97:10–17; 97:23–101:10.)

25. In another example, Arnold accepted two comparator companies "that Mr. Greenberg identified" in correspondence from December 2015. (Arnold Tr. 190:11–19, 194:4–13 (accepting the two companies selected by Greenberg without "do[ing] anything else" to find a comparator).) He admitted he "rel[ied] on Lynn Tilton and her executives' [including Greenberg's] view that these are the most comparable companies" and "did not independently vet" their views by reviewing for variables. (Arnold Tr. 200:4–201:17.) Arnold simply accepted Greenberg's comparators, and made no adjustments to the multiples they yielded, even though Arnold acknowledged the comparators differed from TransCare in material ways, including that they were financially stable whereas TransCare was "operating in the absolute breaking point." (Arnold Tr. 113:8–114:16; Jan. 27 Projection at CM_TC2018_0002111.) Arnold's indifference to such contradictory evidence renders his testimony inadmissible. *See Lippe v. Bairnco Corp.*, 288 B.R. 678, 693 (S.D.N.Y. 2003) (excluding valuation expert's testimony of comparator companies and noting "companies are not completely comparable merely because they are in the same industry, and often factors such as product and geographic markets, size, growth rates, profit margins, and other industry and economic considerations warrant adjustments"), *aff'd*, 99 F. App'x 274 (2d Cir. 2004).

26. Moreover, what minimal "diligence" Arnold conducted did not draw on his expertise, but on ordinary lay judgment. When asked, for example, why he relied upon the Projections, he gave simplistic answers: they were finalized reports instead of drafts; they were created by "senior people" at TransCare, Patriarch Partners, and CMAG; the authors appeared to

12

**A0824**

Case 1:20-cv-06274-AK    Document 11-8    Filed 09/30/20    Page 45 of 243

have "knowledge" of what they were writing about; and Wells Fargo reviewed them. (Arnold Tr. 47:14–48:2, 72:16–73:5, 109:8–111:8.) The same inferences could be reached by a non-expert fact finder with basic business knowledge. And Arnold admits that many of his judgment calls were "self-evident," meaning they require no specialized expertise. (*See* Arnold Tr. 86:5–91:20 (relying on a scenario in a plan containing a higher projected EBITDA over another scenario in the same plan containing lower one without comparing scenarios' feasibility, claiming "it's self-evident" that "management is going to choose the path of the scenario that is most valuable"), Arnold Tr. 200:4–10 (admitting he did not review annual EBITDA for comparison companies because it is "self-evident" that the EBITDA will be large given that the multiplier was large), Arnold Tr. 116:3–117:12 (admitting he did not investigate the Jan. 27 Projection because "they have a detailed deck here that describes their views; so it seems self-evident that they took a look at [the inputs]").)[9]

27.    At a minimum, these answers reveal Arnold's blind obedience to counsel's instructions without regard for the reliability of the results. (*See* Arnold Tr. 48:3–5 (admitting the Projections "are believed by counsel to have sufficient reliability to . . . inform the [valuation] process."), Arnold Tr. 158:3–8 (emphasis added) ("I was asked [by Trustee's counsel] to compute" the Operating Value "based on the numbers contained in the [February 24 Projection]. *It's up to others to make a conclusion as to its reliability*.").)

---

[9] Even a cursory review of the record shows that Arnold's "self-evident" facts are false. For example, Arnold claims it is "self-evident" that management would have chosen the scenario he used in the January 7 Projection because it has the highest projected EBITDA. But after reviewing that same Projection, CMAG rejected it because the "EBITDA numbers" seemed "significantly overstated." (*See* Mervis Decl. Ex. 17, CM_TC2018_0001031, at CM_TC2018_0001032.) For another example, Arnold assumes that the positive projected EBITDAs in the restructuring plans means "there was a consensus" that TransCare had value. (Report ¶ 46.) But Arnold later admitted he did not know if Tilton, Wells Fargo, or anyone for that matter agreed with the Projections. (*See, e.g.*, Arnold Tr. 110:19–111:20.)

### 2. *Arnold's Use of Arithmetic to Calculate Operating Value and Liquidation Value is Not Based on Specialized Knowledge*

28.     Arnold's only "independent" contribution to Operating Value and Liquidation Value was the performance of addition, subtraction, and multiplication. But an expert does not elevate fact evidence into expert evidence just by performing arithmetic.

29.     Simple arithmetical calculations are inadmissible expert evidence because they require no "scientific, technical, or other specialized knowledge" and do not "assist the trier of fact to understand the evidence or to determine a fact in issue." *Shapiro v. Art Leather, Inc. (In re Connolly N. Am., LLC)*, 398 B.R. 564, 576 (Bankr. E.D. Mich. 2008). Basic math calculations are within the fact finder's "common knowledge and experience." *Vigil v. Burlington Northern & Santa Fe Ry.*, 521 F. Supp. 2d 1185, 1205 (D.N.M. 2007). As such, courts routinely exclude such testimony because it is plainly unhelpful. *See Schwartz v. Fortune Magazine*, 193 F.R.D. 144, 147 (S.D.N.Y. 2000) (excluding testimony as unhelpful because it was "not generated based on any specialized knowledge, but rather involved basic calculations").

30.     It is particularly noteworthy that Arnold decided not to employ a discounted cash flow analysis to value TransCare. (Report ¶ 65.) In contrast to the basic arithmetic he actually performed, a discounted cash flow analysis would have required Arnold to exercise a level of specialized skill, knowledge and judgment beyond basic arithmetic. *See In re Breitburn Energy Partners LP*, 582 B.R. 321, 331 (Bankr. S.D.N.Y. 2018) (Bernstein, J.) (explaining that "forward-looking discounted cash flow analysis" requires "subjective" judgment because "[i]t involves predicting future revenues and expenses, and therefore requires assumptions regarding future prices and future costs"); *Lippe*, 288 B.R. at 689 (excluding expert for, *inter alia*, failing to use DCF method, noting "Many authorities recognize that the most reliable method for determining the value of a business is the discounted cash flow method.").

14

31.     Because the record contained all the relevant inputs Arnold used to calculate Operating Value and Liquidation Value, Arnold simply performed three straightforward calculations using arithmetic.  Such basic calculations require no more skill than the ability to use a calculator.

*****

32.     In sum, Arnold's opinions are doubly inadmissible.  He offers the wrong type of opinion for this case by valuing a hypothetical, future TransCare instead of TransCare as it existed in January and February 2016.  And the opinions he does offer involve summaries of cherry-picked evidence, basic math, and no actual expertise.  His opinions should be excluded.

**CONCLUSION**

Defendants respectfully request entry of the Proposed Order granting the relief requested herein and such other and further relief as is just.

Dated: July 8, 2019
       New York, New York

PROSKAUER ROSE LLP

By:  /s/ Michael T. Mervis
Michael T. Mervis
Timothy Q. Karcher
Eleven Times Square
New York, NY  10036-8299
Tel.: (212) 969-3000
Fax: (212) 969-2900
Email: mmervis@proskauer.com
        tkarcher@proskauer.com

Nicole A. Eichberger (admitted *pro hac vice*)
650 Poydras Street
Suite 1800
New Orleans, LA 70130-6146
Tel.: (504) 310-2024
Fax: (504) 310-2022
Email: neichberger@proskauer.com

15

**A0827**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

--------------------------------------------------------------x

In re:                                              :
                                                    :
                                                    :
        TRANSCARE CORPORATION, et al.,              :        Chapter 7
                                                    :        Case No. 16-10407 (SMB)
                                                    :        (Jointly Administered)
                Debtors.                            :
--------------------------------------------------------------x

SALVATORE LAMONICA, as Chapter 7                    :
Trustee for the Estates of TransCare                :
Corporation, et al.,                                :
                                                    :
                Plaintiff,                          :
                                                    :        Adv. Proc. No. 18-1021 (SMB)
        - against -                                 :
                                                    :
LYNN TILTON, PATRIARCH PARTNERS                     :
AGENCY SERVICES, LLC, PATRIARCH                     :
PARTNERS, LLC, PATRIARCH PARTNERS                   :
MANAGEMENT GROUP, LLC, ARK II CLO                   :
2001-1 LIMITED, TRANSCENDENCE                       :
TRANSIT, INC., and TRANSCENDENCE                    :
TRANSIT II, INC.,                                   :
                                                    :
                Defendants.                         :
                                                    :
--------------------------------------------------------------x

## DECLARATION OF MICHAEL T. MERVIS IN SUPPORT OF
## DEFENDANTS' MOTION IN LIMINE TO EXCLUDE THE TESTIMONY OF
## <u>PLAINTIFF'S PURPORTED EXPERT JONATHAN I. ARNOLD</u>

Michael T. Mervis declares, pursuant to 28 U.S.C. § 1746 and under penalty of perjury, that the following is true and correct:

1.      I am a partner at the law firm Proskauer Rose LLP, counsel for Defendants in the above-captioned adversary case.  I submit this Declaration in support of Defendants' Motion in Limine to Exclude the Testimony of Plaintiff's Purported Expert Jonathan I. Arnold (the "Motion"), and, in particular, to place before the Court the exhibits that are described herein and annexed hereto.  Capitalized terms used but not defined herein have the meaning ascribed to them in the Memorandum in Support of the Motion, submitted herewith.

2.      Attached hereto as **Exhibit 1** is a true and correct copy of the Expert Report of Jonathan I. Arnold dated November 30, 2018.

3.      Attached hereto as **Exhibit 2** is a true and correct copy of excerpts from the transcript of the March 11, 2019 deposition of Jonathan I. Arnold, taken in the above-captioned adversary case.

4.      Attached hereto as **Exhibit 3** is a true and correct copy of an email from Melissa Provost (of Wells Fargo) to Glenn Leland (then-CEO of TransCare), dated October 14, 2015, bearing Bates number TRANSCARE00006334, attaching a document bearing Bates number TRANSCARE00006335 through TRANSCARE00006336.

5.      Attached hereto as **Exhibit 4** is a true and correct copy of an email from Michael Greenberg (of Patriarch Partners) to Lynn Tilton and Jean Luc Pelissier (of Patriarch Partners Management Group, LLC), dated December 11, 2015, and accompanying chain, bearing Bates number PP-TRBK0002058 through PP-TRBK0002059.

2

Case 1:20-cv-06274-AK   Document 11-8   Filed 09/30/20   Page 50 of 242

6.      Attached hereto as **Exhibit 5** is a true and correct copy of an email from Lynn Tilton to Michael Greenberg and Lynn Tilton, dated December 16, 2015, and accompanying chain, bearing Bates number PP-TRBK0075262 through PP-TRBK0075263.

7.      Attached hereto as **Exhibit 6** is a true and correct copy of an email from Michael Greenberg to Lynn Tilton, dated December 11, 2015, and accompanying chain, bearing Bates number PP-TRBK0083461 through PP-TRBK0083463.

8.      Attached hereto as **Exhibit 7** is a true and correct copy of excerpts from the transcript of the of the October 29, 2018 deposition of Lynn Tilton, taken in the above-captioned adversary case.

9.      Attached hereto as **Exhibit 8** is a true and correct copy of an email from Michael Greenberg to Carl Landeck (of CMAG) and Jonathan Killion (of CMAG), dated January 7, 2016, bearing Bates number CM_TC2018_0003369 through CM_TC2018_0003373, attaching an Excel spreadsheet bearing Bates number CM_TC2018_0003376.

10.     Attached hereto as **Exhibit 9** is a true and correct copy of an email from Marc Pfefferle (of CMAG) to Jonathan Killion, Michael Greenberg, Jean Luc Pelissier, and Randy Jones (of Patriarch Partners), dated January 27, 2016, and accompanying chain, bearing Bates number CM_TC2018_0002108 through CM_TC2018_0002109, attaching a PowerPoint presentation bearing Bates number CM_TC2018_0002110 through CM_TC2018_0002124.

11.     Attached hereto as **Exhibit 10** is a true and correct copy of an email from Michael Greenberg to himself, dated January 28, 2016, bearing Bates number PP-TRBK0013259, attaching excel chart bearing Bates number PP-TRBK0013273.

12.     Attached hereto as **Exhibit 11** is a true and correct copy of an email from Michael Greenberg to Todd Trent (of Lockton Companies), dated February 24, 2016, bearing Bates number

3

PP-TRBK0086219 through PP-TRBK0086222, attaching excel chart bearing Bates number PP-TRBK0019229.

13.     Attached hereto as **Exhibit 12** is a true and correct copy of excerpts from the transcript of the November 27, 2018 deposition of Glenn Leland, taken in the above-captioned adversary case.

14.     Attached hereto as **Exhibit 13** is a true and correct copy of an email from Glenn Leland to Lynn Tilton, dated March 7, 2015, bearing Bates number PP-TRBK0071446 through PP-TRBK0071450.

15.     Attached hereto as **Exhibit 14** is a true and correct copy of an email from Glenn Leland to Jean Luc Pelissier, dated July 9, 2015, and accompanying chain, bearing Bates number PP-TRBK0030896 through PP-TRBK0030899.

16.     Attached hereto as **Exhibit 15** is a true and correct copy of an email from Glenn Leland to Michael Greenberg, dated July 9, 2015, and accompanying chain, bearing Bates number PP-TRBK0030905 through PP-TRBK0030908.

17.     Attached hereto as **Exhibit 16** is a true and correct copy of excerpts from the transcript of the October 10, 2018 deposition of Michael Greenberg, taken in the above-captioned adversary case.

18.     Attached hereto as **Exhibit 17** is a true and correct copy of an email from Lynn Tilton to Marc Pfefferle, dated January 14, 2016, and accompanying chain, bearing Bates number CM_TC2018_0001031 through CM_TC2018_0001035.

Executed this 8th day of July, 2019 in New York, New York.

*/s/ Michael T. Mervis*
Michael T. Mervis, Esq.

4

# EXHIBIT 1

A0832

# UNITED STATES BANKRUPTCY COURT

## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | ) |
| TRANSCARE CORPORATION, et al. | ) |
| Debtors, | ) |
| | ) |
| | ) |
| SALVATORE LAMONICA, as Chapter 7 | ) |
| Trustee for the Estates of TransCare | ) |
| Corporation, et al. | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) Chapter 7 |
| | ) Case No.: 16-10407 (SMB) |
| LYNN TILTON, | ) (Jointly Administered) |
| PATRIARCH PARTNERS AGENCY | ) |
| SERVICES, LLC, | ) |
| PATRIARCH PARTNERS, LLC, | ) |
| PATRIARCH PARTNERS | ) |
| MANAGEMENT GROUP, LLC, | ) |
| ARKII CLO 2001-1, LIMITED | ) |
| TRANSCENDENCE TRANSIT, INC. and | ) |
| TRANSCENDENCE TRANSIT II, INC. | ) |

## EXPERT REPORT OF JONATHAN I. ARNOLD, Ph.D.

### November 30, 2018

# CONTENTS

I.     INTRODUCTION ................................................................................................ 1

   A.   Qualifications .............................................................................................. 1

   B.   Assignment ................................................................................................. 2

   C.   Summary of Opinions ................................................................................ 3

II.    BACKGROUND ............................................................................................... 5

   A.   TransCare Corporation ............................................................................... 5

   B.   Other Relevant Parties ............................................................................... 7

        1.    Defendants ........................................................................................ 7

        a)    Lynn Tilton ....................................................................................... 7

        b)    Patriarch Defendant Entities ........................................................... 8

   C.   Events Prior to Liquidation Filing Date .................................................. 10

III.   TRANSCARE'S HISTORICAL AND PROJECTED FINANCIAL
       PERFORMANCE ........................................................................................... 17

   A.   Historical Financial Performance ............................................................ 17

   B.   Projected Financial Performance ............................................................. 19

        1.    January 7, 2016 Preliminary Plan ................................................... 20

        2.    January 27, 2016 Carl Marks Turnaround Plan .............................. 24

        3.    January 28, 2016 Executive Summary Updates by Mr. Greenberg to Carl Marks
              Turnaround Plan ............................................................................. 25

        4.    February 24, 2016 NewCo Model .................................................. 25

   C.   Capital Needs ............................................................................................ 26

IV.    OPERATING VALUES .................................................................................. 27

   A.   Introduction .............................................................................................. 27

   B.   Valuations Based on Industry Multiples Identified by Ms. Tilton .......... 30

   C.   Valuations Based on Potential Offers for Assets ..................................... 30

   D.   Ms. Tilton's Foreclosure and Buy-Out Transaction ................................ 31

   E.   Summary ................................................................................................... 31

V.     LIQUIDATION VALUE AFTER FEBRUARY 24, 2016 ............................. 32

VI.    DIFFERENCE BETWEEN OPERATING VALUES AND LIQUIDATION
       VALUE .......................................................................................................... 33

   A.   Measuring the Difference ........................................................................ 33

VII.   CONCLUSION ............................................................................................... 34

ii

# I.     INTRODUCTION

## A.     QUALIFICATIONS

1.     My name is Jonathan Arnold.  I am an employee of Chicago Economics Corp. and specialize in the application of economics to legal and regulatory disputes. Prior to my current position, I served as Chief Economist at the New York State Office of the Attorney General (the "OAG").  In this role, I served as senior policymaker on economics questions for the Attorney General -- covering Economic Justice, Criminal Justice, and Social Justice -- as well as (i) overseeing economic analyses of key matters, (ii) retaining and supervising outside expert witnesses, and (iii) integrating economic analysis with legal analysis at the OAG. I have also taught economics at a number of schools, including The University of Chicago (in both the Booth School of Business and the Department of Economics).

2.     I earned a Ph.D. in Economics and M.B.A. from the University of Chicago's Booth School of Business and a B.A. from the University of Chicago.  In addition, I am a Certified Public Accountant, registered in Illinois.

3.     During my professional career, I have conducted economic analyses on a variety of valuation, economics, and accounting topics and offered expert testimony in the form of live testimony in numerous court and arbitration proceedings, depositions, expert reports, and affidavits.  In my work, I regularly analyze questions relating to

1

valuation, and the calculation of damages. My *curriculum vitae*, attached as Appendix A, summarizes my qualifications and contains information relating to my previous employment, affiliations, testimony, and publications.[1]

### B.   ASSIGNMENT

4.      I have been asked by counsel for Salvatore LaMonica, acting in his capacity as Chapter 7 Trustee for the Estates of TransCare Corporation, et al. ("Plaintiff") to examine economic evidence and perform an analysis of the implied valuations of TransCare Corporation ("TransCare" or "Company") at four points during January and February 2016.[2]  The valuations rely on models and projections prepared by TransCare, employees of Patriarch Partners, LLC or affiliated companies ("Patriarch"), and TransCare advisor Carl Marks & Co. Inc. ("Carl Marks").  These dates are: (i) January 7, 2016; (ii) January 27, 2016; (iii) January 28, 2016; and (iv) February 24, 2016. January 7, 2016 is the day that Patriarch Director Michael Greenberg ("Mr. Greenberg") sent TransCare advisor Carl Marks his updates to the TransCare 2016 preliminary plan. January 27, 2016 is the day Carl Marks issued its "Turnaround Plan" for TransCare).

---

[1]    Chicago Economics Corp. is compensated for my time spent on this matter at a rate of $950 per hour.   I was assisted by Coherent Economics, LLC, which is compensated for time spent by its staff members working under my direction on this matter.   Compensation is not contingent on the outcome of this proceeding.

[2]    I understand that Mr. LaMonica, acting in his capacity as Chapter 7 Trustee for the Estates of TransCare Corporation, et al. ("Plaintiff") is claiming damages suffered by TransCare Corporation, et al. ("Debtors") as a result of, among other acts detailed in the amended complaint, Lynn Tilton's alleged breach of the duty of loyalty while acting as the sole member of TransCare's Board of Directors.  See Amended complaint, *In re TransCare Corporation, et. al* (Case No. 16-10407) on November 28, 2018 ("Complaint").

January 28, 2016 reflects the day of Mr. Greenberg's updates to the Turnaround Plan and
his "Executive Summary" to be shared with Lynn Tilton ("Ms. Tilton"). February 24, 2016
the latest date for which I have seen documents updating Patriarch's model.[3]

5.      I understand that, subsequent to February 24, 2016 (the "Liquidation Filing
Date"), the assets of TransCare were in fact liquidated, through the bankruptcy
liquidation process, for a total consideration of approximately $19.2 million (the
"Liquidation Value").

6.      My analysis included a review and analysis of certain documents, produced
in the course of this dispute, that provide insight into the historical performance and
forecasted outlook for TransCare.[4]  To estimate the value of TransCare, I use TransCare's
financial forecasts as prepared during January 2016 and February 2016.  I then use the
TransCare, Patriarch, and Carl Marks models, which I discuss in detail below, to assess
the implied valuation of TransCare if it had pursued an orderly asset sale or continued
operations as a going concern instead of entering into the forced Liquidation.  See Section
V for further discussion.

### C.    SUMMARY OF OPINIONS

7.      As a result of my analyses, I have reached the following opinions, which I

---

[3]    This is the last update to Patriarch's model as shared with insurance broker Lockton
Companies ("Lockton"). It assumes that the Paratransit, Hudson Valley, and Pittsburgh
business segments – termed "NewCo" – would transfer to the newly incorporated
Transcendence Transit, Inc. and that the remaining assets -- "OldCo" – would be liquidated
in a wind down.

[4]    I understand discovery in this case is ongoing and I may supplement this report to reflect
material new information that I become aware of.

3

EXPERT REPORT OF
JONATHAN I. ARNOLD, PH.D.
CONFIDENTIAL                                    IN RE: TRANSCARE CORPORATION, ET AL.

A0837

hold to a reasonable degree of certainty:

- The Operating Values (as defined below at paragraph 10) based on January 2016 projections for TransCare in its entirety ("WholeCo") range from $35.3 million to $86.5 million;

- The Operating Value based on February 2016 projections for selected assets ("NewCo") ranges from $22.7 million to $39.1 million;

- The difference between TransCare's Operating Values based on January 2016 projections for WholeCo and the Liquidation Value is between $16.1 million and $67.3 million; and

- The difference between TransCare's Operating Value based on February 2016 projections for NewCo and the Liquidation Value is between $17.0 million and $33.4 million.

8. In forming my opinions, I reviewed and considered the materials produced in this litigation as well as publicly available information. The materials I relied upon in forming my opinions are listed in Appendix B.

9. I analyzed historical and projected financial models, results, business plans, presentations and updates to TransCare's Board concerning TransCare that were created by TransCare, Carl Marks, and Patriarch employees. These materials have helped me to understand contemporaneous beliefs of the financial outlook of TransCare and its capital needs to continue as a going concern. Finally, I have performed valuations of TransCare as a going concern up to the Liquidation Filing Date ("Operating Values"). I compute the differences between each of TransCare's valuation as of the pre-Liquidation dates listed

4

EXPERT REPORT OF
JONATHAN I. ARNOLD, PH.D.
IN RE: TRANSCARE CORPORATION, ET AL.

above and the Liquidation Value.[5]

10.     The balance of this report is organized as follows:  In Section II, I review the documentary record showing TransCare's history, business model and organization, the relevant parties in this matter, and the events leading up to TransCare's Chapter 7 liquidation.  Section III contains TransCare's historical and projected financial performance at various points leading up to the Liquidation Filing Date.  In Section IV I describe the methodologies and inputs for my analyses of the Operating Values of TransCare.  In Section V, I describe the Liquidation Value of TransCare.  Section VI discusses the difference between the Operating Values and the Liquidation Value. Section VII contains a brief statement of my conclusions.

## II.     BACKGROUND

11.     In this section, I provide background information relevant to my economic analysis of the Operating Value of TransCare and summarize the different parties in this matter.

### A.     TRANSCARE CORPORATION

12.     TransCare was founded in 1993 to create a business of providing paratransit services for both emergency and non-emergency patients and individuals with

---

[5]     For Patriarch's February 24, 2016 "NewCo" model, which includes selected TransCare assets and is defined in detail below, I compute the difference between the implied valuation of NewCo and the Liquidation Value attributable to only those assets contemplated by Ms. Tilton and Patriarch to be part of NewCo.

5

EXPERT REPORT OF
JONATHAN I. ARNOLD, PH.D.
CONFIDENTIAL                                IN RE: TRANSCARE CORPORATION, ET AL.

A0839

disabilities.[6]  TransCare provided these services to both (i) healthcare facilities and (ii)

municipalities.[7]

13.    In September 2002, TransCare filed for Chapter 11 bankruptcy protection

with a pre-planned reorganization plan.  At that time, Ark II CLO 2001-1, Limited, which

I discuss below, was its lead lender through approximately $34.0 million in one secured

claim with interest.[8]  TransCare emerged from Chapter 11 bankruptcy in July 2003.[9]

14.    As of 2015, TransCare held itself out as a large healthcare transportation

service.[10]  By mid-2015, TransCare owned a fleet of over 600 ambulances, buses, vans and

---

[6]    TransCare (July 20, 2015). TransCare Announces Two Significant Milestones. $130 Million
       Contract Renewal with the New York City Transit Authority. New Amendment to its Lender
       Agreement. *BusinessWire*.

[7]    Specifically, "to acute care hospitals, skilled nursing or sub-acute care facilities, outpatient
       centers, clinics, medical specialty service facilities, long-term care facilities and transit
       authorities throughout the mid-Atlantic region." TransCare Corporation and Subsidiaries
       Consolidated Financial Statements Year Ended December 31, 2013 ("2013 Audited Financial
       Statements") (TRANSCARE00002782 – 801) at 9.  I understand these to be the last audited
       financial statements for TransCare.

[8]    Schedules of Assets and Liabilities entered on September 20, 2002 before the U.S. Bankruptcy
       Court of the Southern District of New York (Chapter 11 Case No. 02-14385 (RDD)).

[9]    Glover, L. (July 7, 2003). TransCare set to emerge from Ch. 11. *Pittsburgh Business Times*.

[10]   Specifically, "one of the largest privately-held providers of healthcare transportation services
       in the United States with operations in New York (including New York City, Long Island
       and Hudson Valley), Delaware Valley (including Philadelphia and Delaware), Baltimore and
       Pittsburgh." See, TransCare Announces Two Significant Milestones. $130 Million Contract
       Renewal with the New York City Transit Authority. New Amendment to its Lender
       Agreement. *BusinessWire* (July 20, 2015).  The article further notes that TransCare provides
       "a full range of medical services including: emergency ambulance services (911) in New York
       City and Hudson Valley, non-emergency and critical care ambulance services in all its
       markets, paratransit services in New York City (Access-A-Ride program), shuttle services for
       hospitals, nursing homes, adult day care and other health care facilities in all its markets, call
       center services for hospitals and clinics in all its markets."

EXPERT REPORT OF
JONATHAN I. ARNOLD, PH.D.
*IN RE: TRANSCARE CORPORATION, ET AL.*

CONFIDENTIAL

paratransit vehicles and employed 1,900 full and part-time employees.[11]

15.     During January and February 2016, TransCare, along with Patriarch and advisor Carl Marks, identified investment and internal organization needs with an emphasis on improving the size and quality of its fleet through vehicle purchases or leases in order to continue to operate as a going concern.[12]  Notwithstanding these efforts, TransCare filed for Chapter 7 bankruptcy liquidation on February 24, 2016.[13]

## B.     OTHER RELEVANT PARTIES

### 1.     Defendants

#### a)     Lynn Tilton

16.     At all times relevant to my analysis, Defendant Ms. Tilton was the sole member of the Board of Directors of TransCare.  A broad set of TransCare's executive decisions required Ms. Tilton's direct approval, including: (1) approving annual or interim operating plans and capital budgets; (2) forming joint ventures; (3) negotiating or

---

[11]  "TransCare Announces Two Significant Milestones. $130 Million Contract Renewal with the New York City Transit Authority. New Amendment to its Lender Agreement." *BusinessWire* (July 20, 2015)

[12]  E-mail from Mr. Greenberg to Carl Landeck and Jonathan Killion, dated January 7, 2016 (CM_TC2018_0003369 at CM_TC2018_0003369) and CM_TC2018_0003376 (collectively, "January 7, 2016 Preliminary Plan"); E–mail from Marc Pfefferle to Mr. Greenberg et al., dated January 27, 2016 and attached Carl Marks 2016 Plan Executive Summary dated January 27, 2016 (CM_TC2018_0002108–24) ("January 27, 2016 Carl Marks Turnaround Plan"); E-mail from Mr. Greenberg to himself dated January 28, 2016 (PP-TRBK0013259-74) and PP-TRBK0013273 (collectively, "January 28, 2016 Update to Carl Marks Turnaround Plan"); E-mail from Mr. Greenberg to Todd Trent, dated February 24, 2016 (PP-TRBK0086219 at PP-TRBK0086219), PP-TRBK0004527 and PP-TRBK0019229 (collectively "February 24, 2016 NewCo Model").

[13]  Complaint at para. 103; Noto, A. (February 25, 2016).  Private ambulance service backed by "Wonder Woman of Wall Street" files bankruptcy.  *New York Business Journal Online*.

7

EXPERT REPORT OF
JONATHAN I. ARNOLD, PH.D.
CONFIDENTIAL                                                         *IN RE: TRANSCARE CORPORATION, ET AL.*

committing to terms relating to the acquisition, disposition or sale of the entire company or any of its assets; (4) entering into contracts (including financing or loan contracts); (5) committing to any capital expenditure not contemplated in the approved annual plan; (6) writing off or disposing of inventory; (7) agreeing to make charitable contributions; (8) entering into related party transactions; (9) replacing auditors or tax preparers; (10) engaging counsel; (11) settling claims; (12) engaging consultants; (13) initiating, terminating, or changing employment contracts of the CEO and direct reports; (14) modifying sales incentives; (15) issuing or granting equity; (16) granting a lien or encumbering any company asset; (17) adding or removing Board members; (18) appointing directors or officers; and (19) disclosing financials or shareholder information of TransCare to any third parties.[14]

### b) Patriarch Defendant Entities

17.     Defendant Patriarch Partners Agency Services, LLC ("PPAS") was owned and managed by Ms. Tilton. PPAS keeps custodial relationships with and serves as the agent for the lender groups to the Patriarch portfolio companies.[15]

18.     Defendant Patriarch Partners Management Group, LLC was owned and managed by Ms. Tilton. It employed Patriarch employees who focused on managing and

---

[14]    Complaint at para. 9; TransCare Corporation Written Consent of the Sole Director ("TransCare Authority Matrix") dated July 10, 2012; E-mail from Mr. Stephen to Mr. Leland et al. dated February 5, 2015 (PP-TRBK0087751).

[15]    Deposition of Ms. Tilton dated October 29, 2018 ("Tilton Deposition") at p. 19.

EXPERT REPORT OF
JONATHAN I. ARNOLD, PH.D.
IN RE: TRANSCARE CORPORATION, ET AL.

CONFIDENTIAL

restructuring Patriarch's portfolio companies.[16]

19.    Defendant Patriarch Partners, LLC was founded by Ms. Tilton. Ms. Tilton is the company's Chief Executive Officer ("CEO").[17]

20.    Defendant Ark II CLO 2001-1, Ltd. ("Ark II") is solely owned by Ms. Tilton and functions both as an equity owner and lender to the Patriarch portfolio companies. Ms. Tilton describes Ark II, a lender to TransCare, as her personal investment account.[18]

21.    Defendants Transcendence Transit, Inc. and Transcendence Transit II, Inc. (collectively, "Transcendence" or "NewCo") were incorporated in the state of Delaware on February 10, 2016.[19] On February 24, 2016, Ms. Tilton, acting in her capacity as the sole Director of TransCare, signed a written consent to transfer and assign TransCare's Access-A-Ride transportation agreement with the New York City Transit Authority ("MTA Contract") to Transcendence Transit II, Inc.[20] Transcendence Transit Inc. was the holding company of Transcendence Transit II, Inc. and other selected operating subsidiaries.[21]

22.    Exhibit 1 illustrates the flow of management fees, interest payments, and

---

[16]    Tilton Deposition at pp. 16-17.

[17]    Tilton Deposition at p. 11.

[18]    Tilton Deposition at p. 19-20.

[19]    Certificate of Incorporation for Transcendence Transit, Inc., dated February 10, 2016 (PP-TRBK0015293); Certificate of Incorporation for Transcendence Transit II, Inc., dated February 10, 2016 (PP-TRBK0015289).

[20]    TransCare New York Inc., Written Consent of the Sole Director dated February 24, 2016 (TRANSCARE00231115-116).

[21]    E-mail from Mr. Greenberg to Don Arrowood et al. dated February 10, 2016 at 1 (PP-TRBK0027756 – PP-TRBK0027758).

9

equity and loan funds between TransCare, Tilton-controlled Patriarch entities and

investment funds, and outside equity and loan investors at all relevant times to my

analysis.

23.     Exhibit 2 illustrates Ms. Tilton's various roles within the Patriarch business

structure in the period relevant to my analysis, as identified in her deposition testimony.

### C.     EVENTS PRIOR TO LIQUIDATION FILING DATE

24.     On January 19, 2015, Glenn Leland ("Mr. Leland") was appointed as

TransCare's CEO.[22]    Shortly after assuming this position, he was provided with

TransCare's Authority Matrix, which stated that TransCare's Board (i.e., Ms. Tilton)

authorized the CEO to:

> approve, adopt, authorize, agree or enter into contracts, commitments, agreements
> and undertakings… on behalf of the Corporation, subject, however to obtaining
> approval and authorization… by the Designated Executive or the full Board…[23]

25.     Patriarch's Senior Director (Legal) Brian Stephen ("Mr. Stephen") informed

Mr. Leland that there was no Designated Executive.[24]    Instead, Mr. Stephen instructed

Mr. Leland that:

> [t]here is room to operate but it would probably be easier to discuss plans [with
> Ms. Tilton] as they arise since it is difficult to understand how [the Authority
> Matrix] works tougher [sic] in a vacuum.[25]

---

[22]    Mr. Leland Offer Letter (TRANSCARE00074331).

[23]    TransCare Authority Matrix at 1.

[24]    E-mail from Mr. Stephen to Mr. Leland et al. dated February 5, 2015 (PP-TRBK0087751)
stating "[t]he company does not have a Designated Executive as this time."

[25]    E-mail from Mr. Stephen to Mr. Leland et al. dated February 5, 2015 (PP-TRBK0087751).  In
citing an example of the type of executive decision that would require Ms. Tilton's approval,

26.     Among other things, Mr. Leland was tasked with assessing TransCare's

challenges and overseeing improvements to its operations.[26]  From January 19, 2015 until

his departure on or around January 7, 2016, Mr. Leland periodically provided operational

information and forecasts to representatives at Patriarch, typically in the form of "plans"

or "updates."  These plans, which are described further below, identify the challenges

facing TransCare, as well as management's view of (frequently urgent) capital needs

required to maintain and improve its operations.  They also contain forecasts concerning

relevant operating metrics for TransCare.

27.     During this period, Ms. Tilton or her representatives at Patriarch were

provided with updates on TransCare's performance and its central obstacles to improved

performance.  For example, on February 19, 2015, Mr. Greenberg shared an executive

update with Ms. Tilton describing that "[the] business ha[d] deteriorated over the past 7

months of 2014 from average monthly revenue and EBITDA for 1st 5 months of $11.0MM

and $450k, respectively."[27] He further explained that:

> [T]he primary difference [with 2013] is an increase in fleet compensation costs
> from 47% of revenue to 51% of revenue due primarily to challenges with the age
> of the fleet resulting in more time on task which increases the compensation to
> revenue ratio. The Transit business is intact and performed consistently in 2014 vs.
> 2013 but there is concern about the upcoming renewal due to the company's
> financial position and a lack of support from the procurement group. We want to

---

Mr. Stephen stated that: "[w]e are absolutely sure that Lynn would want to know and
approve the company's exploration of other financing sources…."

[26]    Mr. Leland Offer Letter (TRANSCARE00074331).

[27]    E-mail from Mr. Greenberg to Ms. Tilton dated February 19, 2015 (PP-TRBK0042324 – 25).

11

EXPERT REPORT OF
JONATHAN I. ARNOLD, PH.D.
CONFIDENTIAL                                                    IN RE: TRANSCARE CORPORATION, ET AL.

A0845

make you aware of the liquidity challenges but have told the management team
that we cannot meet until the plan is completed.[28]

28.     On January 25, 2015, Mr. Leland shared an update with Ms. Tilton
identifying the following challenges to TransCare's performance: (a) "strained" cash
flows, (b) depleted credit capacity on a revolving credit facility provided by Wells Fargo
(the "Wells Fargo ABL Facility"), which had been in breach of its covenants for a year, (c)
an unreliable fleet with only 60 percent of ambulances operable, leading to poor on-time
performance, (d) lost clients and reduced market share, (e) delayed vendor payments,
and (f) a "non-viable" recovery plan in place.[29]

29.     Throughout 2015, TransCare received several inquiries regarding a possible
sale of itself or some of its key assets. Exhibit 3 summarizes the indications of interest
received by TransCare between February and December 2015. For example, between
February and July 2015, RCA Emergency Medical Services' ("RCA") Chief Operating
Officer ("COO") Mike Weinberger ("Mr. Weinberger") separately contacted TransCare
Chief Financial Officer ("CFO") Mark Bonilla ("Mr. Bonilla"), Mr. Leland and Ms. Tilton
to inquire about purchasing either TransCare as a whole or specific assets, or entering
into an operational management agreement. RCA consistently expressed that, subject to
due diligence, "RCA is prepared to offer up to eight times the EBITDA."[30] Also, in

---

[28]     E-mail from Mr. Greenberg to Ms. Tilton dated February 19, 2015 (PP-TRBK0042324 – 25).

[29]     Plaintiff's Exhibit 84.

[30]     E-mail from Mr. Weinberger to Ms. Tilton dated February 10, 2015 (PP–TRBK0033683); E-
         mail from Mr. Weinberger to Mr. Leland dated February 20, 2015 (TRANSCARE00195974);
         E-mail from Mr. Weinberger to Mr. Bonilla and Mr. Leland dated February 18, 2015

EXPERT REPORT OF
JONATHAN I. ARNOLD, PH.D.
CONFIDENTIAL                                          IN RE: TRANSCARE CORPORATION, ET AL.

February, July and December 2015, National Express, LLC indicated an interest in

purchasing TransCare's MTA Contract.  See Exhibit 3.

30.     On September 29, 2015, Mr. Bonilla resigned as CFO from TransCare.[31]

31.     On January 7, 2016, Mr. Leland departed as CEO from TransCare.[32]

32.     After Mr. Leland's departure, TransCare had neither a designated CEO nor

CFO on its executive management team.

33.     As of January 15, 2016, Ms. Tilton committed a $6.5 million loan to

TransCare via her Ark II personal investment vehicle ("Ark II Agreement").[33] Carl Marks

prepared a TransCare turnaround plan on January 27, 2016, saying "[t]he message is a

difficult one, but I believe accurate."[34] This plan was prepared for and shared with Ms.

Tilton.[35]  The 2015 income statement from this plan indicates that TransCare generated

---

[31] (TRANSCARE00004048 - 49); E-mail from Mr. Weinberger to Ms. Tilton dated March 3, 2015 (PP-TRBK0090486 – 87); E-mail from Mr. Leland to Ms. Tilton dated March 7, 2015 (PP-TRBK0071446 – 50); E-mail exchange between Mr. Greenberg, Mr. Pelissier, Mr. Whalen, and Mr. Leland dated July 9, 2015 (PP-TRBK0033600 – 02).

[31] Mr. Bonilla's Out of Office AutoReply stating: "Please be aware that my consulting agreement ended with the company as of 2016, and that I have elected not to return to employment in my former role as CFO, which was terminated on 9/29/2015." (TRANSCARE00043758-9).

[32] E-mail from Mr. Leland to Randy Jones dated January 8, 2016 (PP-TRBK0019062-63).

[33] Credit Agreement of TransCare Corporation dated January 15, 2016 among TransCare Corporation and Ark II CLO 2001-1, Limited (CURTIS_000521 – 46).

[34] E-mail from Mr. Greenberg to Marc Pfefferle dated January 27, 2016 (PP-TRBK0024842-43).

[35] The e-mail from Melissa Provost to Mr. Greenberg dated January 28, 2016 (WF_TC_00003874) references a prior day's budget meeting with Ms. Tilton. Additionally, the e-mail from Mr. Greenberg to Marc Pfefferle dated January 27, 2016 (PP-TRBK0024842) indicates that the Carl Marks plan was intended for Ms. Tilton.

13

negative EBITDA for the months of October through December of 2015, a reversal of the strong gains (reflected by positive EBITDA) made in April through June of 2015.

34.     On February 7, 2016, Carl Marks Managing Director Carl Landeck ("Mr. Landeck") sent an e-mail to Ms. Tilton directly explaining the need for additional funding in the week to come.[36]  Mr. Stephen reached out to Curtis, Mallet-Prevost, Colt & Mosle LLP ("Curtis Mallet") on February 9, 2016 for assistance in filing Chapter 11 bankruptcy on behalf of TransCare.[37]  On February 15, 2016, in response to a proposed Debtor-In-Possession ("DIP") budget from Carl Marks, Ms. Tilton wrote that, "not I nor the Zohar funds will be providing any additional cash going into the bankruptcy unless it is rolled into the DIP as first cash out."[38]  A spreadsheet dated February 16, 2016 by Patriarch's Controller, Carlos Mercado, indicated that only approximately $1.9 million had been transferred to TransCare under the Ark II Agreement as of that date.[39]

35.     On February 10, 2016, Transcendence Transit, Inc. and Transcendence Transit II, Inc. were incorporated in Delaware.[40]  TransCare's Glen Youngblood ("Mr.

---

[36]  E-mail from Mr. Landeck to Ms. Tilton dated February 7, 2016 (PP-TRBK0022363-65).

[37]  E-mail from Lynn P. Harrison III to Mr. Stephen dated February 9, 2016 (PP-TRBK0051881-83).

[38]  E-mail from Ms. Tilton to Mr. Landeck dated February 15, 2016 (CM_TC2018_0008781-2).

[39]  Tilton Deposition Exhibit 106; PP-TRBK0019089.

[40]  Certificate of Incorporation for Transcendence Transit, Inc., dated February 10, 2016 (PP-TRBK0015293); Certificate of Incorporation for Transcendence Transit II, Inc., dated February 10, 2016 (PP-TRBK0015289).

14

EXPERT REPORT OF
JONATHAN I. ARNOLD, PH.D.
CONFIDENTIAL                          IN RE: TRANSCARE CORPORATION, ET AL.

A0848

Youngblood") was named "director" of both corporations the same day.[41] Messrs.

Youngblood and Greenberg discussed in emails that day that Transcendence Transit II,

Inc. would operate the Paratransit business segment and that Transcendence Transit, Inc.

would be comprised of Transcendence Transit II, Inc. and the Hudson Valley, Pittsburgh,

Maryland, and Westchester business segments.[42] Also on February 10, 2016, Patriarch

employees: (a) reached out to insurance broker Willis Towers Watson ("Willis") to add

the two new entities to Patriarch's global Directors and Officers ("D&O") liability

insurance policy; (b) applied for and obtained an Employer Identification Number from

the Internal Revenue Service for each entity; and (c) provided both Willis and Lockton

with "insurance information requested."[43] On February 14, 2016, Patriarch's Platform

Leader Jean Luc Pelissier ("Mr. Pelissier") sent a "[p]rogress and action list" to Patriarch

and TransCare officials, including Ms. Tilton, detailing what needed to be done in

connection with the bankruptcy and transition to the Transcendence entities, as well as

who needed to do it, and by what date it should be done. [44] The list had several items

---

[41] Organization Action in Writing of Incorporator for Transcendence Transit, Inc., dated February 10, 2016 (PP-TRBK0015295); Organization Action in Writing of Incorporator for Transcendence Transit II, Inc., dated February 10, 2016 (PP-TRBK0015291).

[42] E-mails between Mr. Youngblood and Mr. Greenberg, dated February 10, 2016 (PP-TRBK0006471).

[43] Email from Carlos Mercado to Willis (PP-TRBK0015312); Internal Revenue Service Notice addressed to Transcendence Transit, Inc., dated February 10, 2016 (PP-TRBK0015306); Internal Revenue Service Notice addressed to Transcendence Transit II, Inc., dated February 10, 2016 (PP-TRBK0015309); E-mail from Mr. Greenberg to Don Arrowood et al. dated February 10, 2016 at 1 (PP–TRBK0027756 – PP–TRBK0027758); E-mail from Mr. Greenberg to Robert Siegel et al. dated February 10, 2016 at 1 (PP–TRBK0027792 – PP–TRBK0027794).

[44] E-mail from Mr. Pelissier to Ms. Tilton al., dated February 14, 2016 (PP-TRBK0091282).

15

that were marked "TBD" with regards to ownership and completion date, including printing and distributing employee transfer letters, "[a]dvis[ing] the MTA unions and obtain[ing] support prior to employees [sic] transfers," holding employee communication meetings in OldCo and NewCo, and "[i]ssu[ing] Worker Adjustment and Training Notification ("WARN") notice to all Old Co employees."[45]

36.    If Ms. Tilton's efforts to transfer NewCo assets to Transcendence had proceeded as planned, NewCo assets would have been operated within Transcendence as a going concern (the "Foreclosure and Buy-Out Transaction").[46]  Exhibit 4 shows that the transaction contemplated: (i) rolling over $2.1 million in funding from Ark II from TransCare to Transcendence (including approximately $0.2 million in vehicle purchases to be owned by Ark II); (ii) infusing $10.0 million in new working capital from Ark II; (iii) a $10 million credit bid converting existing lenders' outstanding $43.6 million debt in TransCare into $10.0 million in Transcendence equity, implying consideration to existing lenders of approximately 23 cents on the dollar (that is, $10.0 million divided by $43.6 million).[47]  This contemplated transaction assumed a NewCo value of $22.1 million. See Exhibit 4.

37.    On February 24, 2016, Patriarch employees corresponded under the

---

[45]    E-mail between Mr. Pelissier et al., dated February 14, 2016 (PP-TRBK0091282).

[46]    Tilton Deposition at p. 79-81. Ms. Tilton stated that "That was the deal; $12 million of new money and $10 million of credit bid, the MTA contract, assets, Pennsylvania, and Hudson County [sic]."

[47]    Tilton Deposition at pp. 97-143 and Exhibit 106; PP-TRBK0019089.

EXPERT REPORT OF
JONATHAN I. ARNOLD, PH.D.
CONFIDENTIAL                                 *IN RE: TRANSCARE CORPORATION, ET AL.*

apparent assumption that the NewCo TransCare assets would be successfully transferred to the Transcendence entities, and Ms. Tilton approved of the assignment agreement transferring the MTA Service Agreement to Transcendence Transit II, Inc. on that day.[48] Nonetheless, on February 26, 2016, Carlos Mercado wrote to Chris Hill, Senior Vice President of Corporate Banking at BB&T, that Patriarch was "unsuccessful in the [their] efforts to establish a foundation for restructuring of the company as Transcendence Transit" and that "all work on [BB&T's] end with respect to the establishment of bank accounts...should cease immediately."[49]

## III. TRANSCARE'S HISTORICAL AND PROJECTED FINANCIAL PERFORMANCE

### A. HISTORICAL FINANCIAL PERFORMANCE

38.     TransCare generated annual net service revenue of between $118.9 million and $152.1 million from 2009 through the last twelve months ending October 2015.[50]  See Exhibit 5.  Average annual net service revenue was $135.6 million during this period. Net service revenue peaked at $152.1 million in 2010, and declined in the following years.  As Exhibit 5 shows, by October 2015 (the last available date for which TransCare provided consolidated financial statements), the net service revenue for the last twelve months was $118.9 million.

---

[48]    TransCare New York, Inc. Written Consent of the Sole Director, dated February 24, 2016.

[49]    E-mail between Carlos Mercado and Chris Hill, dated February 26, 2016 (PP-TRBK0089542).

[50]    I understand that TransCare did not obtain audited financial statements for fiscal years 2014 and thereafter.

17

EXPERT REPORT OF
JONATHAN I. ARNOLD, PH.D.
CONFIDENTIAL                    IN RE: TRANSCARE CORPORATION, ET AL.

A0851

39.     TransCare also reported and analyzed financial performance by region: New York Core, Transit, Maryland, Main Line, Pittsburgh, New York 911, and Hudson Valley. For the five months ending May 2015, TransCare's New York 911 segment reported $14.0 million (or 27.9 percent of total revenues), followed by Transit reporting $13.5 million in revenues (representing 27.0 percent of total revenues), and then by New York Core reporting $9.0 million (or 17.9 percent of total revenues).[51]

40.     TransCare reported historical average annual EBITDA of $5.1 million for the period 2009 to the last twelve months ending October 2015, with considerable year-to-year variability.  See Exhibit 6.  As the exhibit shows, TransCare's annual EBTIDA exceeded $7.0 million in the years 2009 (EBITDA of $9.1 million), 2010 (EBITDA of $7.7 million), 2012 (EBITDA of $8.9 million), and 2013 (EBITDA of $7.2 million).   Yet TransCare generated EBITDA of only $0.9 million in 2011, $0.5 million in 2014, and $1.4 million for the last twelve months ending October 2015.  See Exhibit 6.

41.     Exhibit 7 shows EBITDA over the last twelve months for each of the months from November 2014 through October 2015.  As the exhibit shows, TransCare's financial performance improved during the second half of 2015 through October 2015.  See Exhibit 7.

42.     At the region level for the five months ending May 2015, four segments were profitable: New York 911 (achieving $2.4 million EBITDA), Transit (achieving $1.7 million EBITDA), Hudson Valley ($0.9 million EBITDA), and Pittsburgh (achieving $0.2

---

[51]     E-mail from Mr. Greenberg to Ms. Tilton dated July 3, 2015 (TRANSCARE00007937).

18

CONFIDENTIAL

EXPERT REPORT OF
JONATHAN I. ARNOLD, PH.D.
IN RE: TRANSCARE CORPORATION, ET AL.

A0852

million EBITDA).  Corporate overhead reduced EBITDA by $2.3 million, resulting in
overall EBITDA of $1.0 for this five-month period.[52]

### B.    PROJECTED FINANCIAL PERFORMANCE

43.    The Preliminary Plan Mr. Greenberg shared with TransCare's financial
advisor, Carl Marks, incorporated long-term annual projections of revenue and EBITDA.
See Exhibits 8 and 9.  Patriarch representatives and Carl Marks also forecasted financial
models in January and February 2016 for the full year 2016.  Patriarch additionally created
models in February 2016 – the so-called "NewCo" models -- that contemplate
performance projections for only certain assets.  I have not seen documents in the
production indicating that TransCare continued to make its own forecasts from early
2016 through the Liquidation Filing Date.  After January 7, 2016, TransCare had neither
a CEO nor CFO.

44.    Because each of these parties – TransCare, Patriarch, and Carl Marks -- were
the most informed entities with respect to TransCare's performance and its outlook
assuming that it was provided with sufficient capital to operate as a going concern, I treat
their projections as the best available contemporaneous information concerning the
TransCare's prospects in the two months prior to the Chapter 7 filing.  See Exhibits 8 and
9.

45.    Exhibit 8 reports the projected annual EBITDA for the years 2016 through
2020 as presented in the January 7, 2016 Preliminary Plan and forecasts for full year 2016

---

[52]    E-mail from Mr. Greenberg to Ms. Tilton dated July 3, 2015 (TRANSCARE00007937).

19

CONFIDENTIAL

EXPERT REPORT OF
JONATHAN I. ARNOLD, PH.D.
IN RE: TRANSCARE CORPORATION, ET AL.

A0853

as presented in each of the plans or models prepared between January and February 2016
that I was able to identify in the production materials.  Exhibit 9 summarizes the plans'
projected annual revenues. Exhibits 8 and 9 only report the results of models or plans
that were contemporaneously shared with third parties. Exhibit 10 indicates the entities
that received the plans or models developed between January and February 2016 that I
consider in my valuation.

46.      While each plan or model varies in its underlying assumptions, the near-
uniform expectations that TransCare could improve its annual EBITDA by 2016 suggests
that there was a consensus (at least until February 2016) that TransCare had potential
value as a going concern.[53] I describe below the underlying assumptions and key
projected metrics provided in each plan/model.  I then apply these relevant projections
in Section IV when determining the implied value of TransCare under each plan/model
in the January 2016 to February 2016 period.

**1.      January 7, 2016 Preliminary Plan**

47.      On December 21, 2015, Messrs. Greenberg and Pelissier met with Wells

---

[53]     Wells Fargo representatives also stated their belief that TransCare was a viable company:

> [b]ecause the company was faltering, and it didn't have the capital investment it needed
> today to sustain itself. And from my perspective, the company was actually a descent [sic]
> company, had great employees, it had a wonderful, you know, market share, had a lot of
> routes, you know, routes that were – that could've been probably serving the biggest
> Metropolitan area in the United States. And, but the company just was undercapitalized.
> It needed new cars, ambulances, vehicles systems, [short-term] cash, and it needed owners
> that were going to really put a massive investment in the company.

Deposition of Mr. Husson dated November 12, 2018 ("Husson Deposition") at p. 45.

I also understand that Mr. Leland testified during his November 27, 2018 deposition (which
has not yet completed as of the date of this expert report) that if TransCare had been
sufficiently capitalized, it could have achieved value as a going concern.

Fargo's Loan Portfolio Manager John Husson ("Mr. Husson") and Senior VP/Regional Portfolio Manager Robert Strack ("Mr. Strack") to discuss a long-term agreement to extend the Wells Fargo ABL Facility. One of the components to reaching an agreement was a mutually acceptable budget. Mr. Greenberg reported to Ms. Tilton that "Wells Fargo would like to receive a budget [that] shows TransCare paying all expenses on a current basis" and that "Wells Fargo would want a third-party consultant" who "would report to the Board but Wells Fargo would have access to."[54] Subsequently, Wells Fargo's Vice President/Senior Relationship Manager Melissa Provost ("Ms. Provost") requested in an e-mail to Messrs. Greenberg and Pelissier "for the 'Budget' to be provided by December 30, 2015 and subsequently reviewed by the Financial Advisor."[55]

48.    Carl Marks Advisors was hired as a third-party consultant to TransCare Corporation on January 11, 2016.[56] On January 7, 2016, Mr. Greenberg sent Carl Marks an e-mail and attached model described as "updates to 2016 preliminary plan based on yesterday's discussion."[57] This is the earliest date in the document production I have reviewed that shows collaboration between Patriarch and Carl Marks to develop a TransCare budget to present to Wells Fargo.

---

[54]    E-mail from Mr. Greenberg to Mr. Pelissier dated December 21, 2015 (PP-TRBK0046839 at PP-TRBK0046839).

[55]    E-mail from Ms. Provost to Mr. Greenberg and Mr. Pelissier, dated December 23, 2015 (PP-TRBK0004093 at PP-TRBK0004093); Summary of Proposed Terms (PP-TRBK0004095 at PP-TRBK0004095).

[56]    Consulting Agreement (PP-TRBK0052000 at PP-TRBK0052001).

[57]    January 7, 2016 Preliminary Plan.

21

EXPERT REPORT OF
JONATHAN I. ARNOLD, PH.D.
CONFIDENTIAL                                    IN RE: TRANSCARE CORPORATION, ET AL.

A0855

49.     The January 7, 2016 Preliminary Plan projected EBITDA for the fiscal year 2016 of $6.9 million. The Plan outlined a "peak need of close to $4.5MM" in funding driven by: (i) $2.2 million in immediate requirements (including a $1 million New York State Insurance Fund ("NYSIF") payment and other obligations including payroll and payroll taxes); (ii) $1.3 million for a 25 percent down payment on 40 vehicles; (iii) $1.0 million in other accounts payables necessary to open back up parts supplies and maintain existing vehicles.[58]

50.     Further, the Plan provided key operating assumptions, in addition to those mentioned above, which included: (i) maintenance and payments of parts vendors in the first quarter; (ii) a facility move to South Bronx to improve efficiency and volume (by up to 30 percent); and (iii) additional MTA routes.[59]  The Plan assumed that the successful implementation of these initiatives would result in TransCare's gross margin percentage improving from 28.6 percent to 32.1 percent.[60]

51.     The January 7, 2016 plan is an iteration of the preliminary plan presented to Wells Fargo in November 2015 and further developed by TransCare management throughout December 2015.   These models, which were prepared by TransCare management working with Messrs. Greenberg and Pelissier, followed the same

---

[58]    January 7, 2016 Preliminary Plan.

[59]    January 7, 2016 Preliminary Plan.

[60]    January 7, 2016 Preliminary Plan.

CONFIDENTIAL

EXPERT REPORT OF
JONATHAN I. ARNOLD, PH.D.
IN RE: TRANSCARE CORPORATION, ET AL.

framework and format as the January 7, 2016 Preliminary Plan.[61]

52.     I note that the early December 2015 iterations that I have reviewed forecasted a significantly higher 2016 EBITDA of between $10.5 million and $11.5 million than the 2016 annual EBITDA forecasts found in any of the subsequent models that I consider in my valuation of TransCare.  See Exhibit 8.

53.     TransCare management attributed such differences in projected profitability between early December 2015 and early January 2016 to the "inaction by the Board," whose sole director remained Ms. Tilton.[62]   On January 3, 2016, Mr. Bonilla expressed:

> For 6 weeks [Messrs. Greenberg and Pelissier] have delayed, asked for more data, and finally so much time elapsed we had to refresh all the numbers and company has almost shut down due to cash shortfall of $4mm by 12/31. We handled all inquiries, but they always came back looking for different result [sic]. Now we have less than 24 hours at this juncture to get critical funds requested 45 days ago and what has happened beyond that is we lost more than $4mm in potential EBITDA in 2016.

---

[61]   For example, Mr. Bonilla circulated internal TransCare financial models on December 1, 2015 (TRANSCARE00107866-68) ("TransCare Business Model 2015 and 2016"), and December 3, 2015 (TRANSCARE00107987-989) ("Final Revised 2016 Budget"). Mr. Bonilla later included Messrs. Greenberg and Pelissier as recipients of these models. Mr. Bonilla also sent a model version on December 17, 2015 (TRANSCARE00005770-771) ("TransCare Business Model 2015 and 2016").  E-mail from Mr. Bonilla to Messrs. Leland, Wolf, and Greenberg dated December 13, 2015 and attached model (PP-TRBK0012469-70); Plaintiff's Exhibit 115 (Email from Mr. Bonilla to Mr. Leland dated December 14, 2015 with an attached presentation "TransCare Wells Fargo Nov 16.pptx").

[62]   E-mail from Mr. Bonilla to Messrs. Leland and Wolf dated January 3, 2016 (TRANSCARE00005261 - 262).

EXPERT REPORT OF
JONATHAN I. ARNOLD, PH.D.
*IN RE: TRANSCARE CORPORATION, ET AL.*

## 2.    January 27, 2016 Carl Marks Turnaround Plan

54.    On January 27, 2016, Carl Marks' Partner Marc Pfefferle ("Mr. Pfefferle") circulated a preliminary executive summary that highlighted TransCare being at "breaking point" and explained that Carl Marks had worked to "develop the most accurate financial picture of TransCare possible given the limitations of TransCare's accounting systems and financial reporting."[63]

55.    Mr. Pfefferle explained that "[t]o have a chance of a turnaround, TransCare needs an immediate incremental pledge of support from Patriarch totaling $7.5M+ excluding 2016 term interest" of which "$3.5M… is required over the next two weeks including $1M this week to cover critical or unavoidable obligations to keep the business running."[64]  This capital infusion would allow for TransCare to achieve "a Q4 EBITDA run rate of $2M+, which could support operations, capital lease payments and interest obligations on a go-forward basis" and 2016 EBITDA of $5.0 million.[65]

56.    While the presentation cautioned that "execution risk is high and therefore ultimate payback on the incremental investment is uncertain," it also highlighted that TransCare had "several key attributes that provide the opportunity for a successful turnaround" such as "…dedicated employees…, long standing customer relationships and historical reputation for service…, and [achievable] operational fixes and

---

[63]    January 27, 2016 Carl Marks Turnaround Plan at pp. 2 and 5.

[64]    January 27, 2016 Carl Marks Turnaround Plan at 5.

[65]    January 27, 2016 Carl Marks Turnaround Plan at 5 and 14.

24

infrastructure improvement over time with the right leadership and commitment to invest in the business."[66]

### 3. January 28, 2016 Executive Summary Updates by Mr. Greenberg to Carl Marks Turnaround Plan

57.   On January 28, 2016, Mr. Greenberg sent an updated version of the January 27, 2016 budget and accompanying executive summary that was intended to be shared with Ms. Tilton at a meeting that day.[67]

58.   The January 28, 2016 Executive Summary projects EBITDA for the fiscal year 2016 of $5.2 million (an improvement of $0.2 million over the January 27, 2016 Carl Marks plan due to slightly higher forecasted Transit revenue) assuming that TransCare would: (i) lease or acquire twenty Type II (non-emergency) vehicles; (ii) lease or acquire at least twenty-three Type III (911) vehicles (eleven or more for New York, eight for St. Barnabas, one for each of the other main accounts (Bronx-Lebanon, Montefiore, Mt Sinai), and one for the University of Maryland); and (iii) move its NY Core facility out of Hamilton by June 30, 2016.[68]

### 4. February 24, 2016 NewCo Model

59.   On February 24, 2016, Mr. Greenberg, sent a "TransCare NewCo Model" to

---

[66]   January 27, 2016 Carl Marks Turnaround Plan at 5 and 8.

[67]   E-mails between Messrs. Grenberg, Pfefferle, Killion, Pelissier and others dated January 27,2016 (PP-TRBK0024842); E-mails between Mr. Greenberg, Ms. Provost, Mr. Husson, Mr. Landeck, and Mr. Pelissier, dated January 28, 2016 (WF_TC_00003874).

[68]   January 28, 2016 Update to Carl Marks Turnaround Plan at 1.

25

EXPERT REPORT OF
JONATHAN I. ARNOLD, PH.D.
CONFIDENTIAL                    IN RE: TRANSCARE CORPORATION, ET AL.

A0859

Todd Trent ("Mr. Trent") of Lockton Companies, TransCare's insurance broker. Mr. Greenberg informed Mr. Trent that NewCo was Transcendence Transit, Inc.[69]

60.     The TransCare NewCo Model projects EBITDA for fiscal year 2016 of $3.2 million for only the Paratransit, Pennsylvania, and Hudson Valley divisions, excluding corporate overhead.[70]  The model also "includes purchase of 5 ambulances ($300k) in February" for the Pennsylvania division.[71]

### C.     CAPITAL NEEDS

61.     Exhibit 11 identifies TransCare's stated capital needs that, if fulfilled, would have supported the projected financial performance as identified in the business plans in January and February 2016. The exhibit illustrates that the requested capital was intended to be used in order of priority: first, for either covering immediate accounts payable obligations (including payroll, payroll taxes, insurance, and rent), and second to purchase or lease new vehicles to enable the growth that would achieve each plan's projected EBITDA.

---

[69]   E-mail from Mr. Greenberg to Mr. Trent, dated February 24, 2016 (PP-TRBK0086219 at PP-TRBK0086219).

[70]   February 24, 2016 NewCo Model. The model, which includes a "toggle" field to add or remove divisions from NewCo, shows that fiscal year 2016 EBITDA totals $5.2 million. This reflects the performance of the default NewCo entities along with the Maryland, White Plains/Westchester, and Montefiore/Bronx Lebanon (TC Ambulance Corporation) divisions.

[71]   February 24, 2016 NewCo Model.

26

EXPERT REPORT OF
JONATHAN I. ARNOLD, PH.D.
CONFIDENTIAL                              IN RE: TRANSCARE CORPORATION, ET AL.

## IV.    OPERATING VALUES

### A.    INTRODUCTION

62.     To determine the Operating Value of TransCare as of various dates between January and February 2016, I consider three widely used valuation methodologies: the discounted cash flow ("DCF") approach, the "Comparable Company", and the "Precedent Transaction" methods.[72]

63.     The value of a company is based upon the cash flows it is expected to generate in the future, along with the riskiness of realizing the expected cash flows. Forecasts of a firm's future cash flows reflect beliefs about the most current indicators of the firm's prospects. Because the future is uncertain – and that uncertainty increases the further one projects into the future – projections of an entity's nearest future performance are often easier to forecast. This is especially true in the case of TransCare because of its volatile recent historical performance, insufficient capital and certain adverse events (such as loss of contracts, payroll issues, and vehicle breakdowns) that affected its operations but which were expected to be addressed in the future. In each of the valuation methodologies that I consider, therefore, I emphasize forward-looking forecasts in assessing TransCare's Operating Value.

64.     The DCF method consists of valuing a firm by adding the present value of

---

[72]    I have implemented all of these models in the past, and all can be appropriate means of estimating valuations. Many academic and professional texts describe these models, including Rosenbaum, Joshua & Joshua Pearl, 2013, Investment Banking: Valuation, Leveraged Buyouts, and Mergers & Acquisitions (Wiley, Second Edition) ("Rosenbaum & Pearl 2013") at pp. 13, 83, and 125.

27

its projected free cash flows into perpetuity, discounted at a rate that reflects the riskiness of those cash flows. The inputs necessary to derive projected free cash flows include projections of expected financial performance (e.g., revenue growth rates, profit margins), expected investment and capital requirements (e.g., capital expenditures, net working capital, and associated depreciation and amortization), expected tax rates, and expected riskiness of the cash flows (e.g., discount rate or weighted average cost of capital).[73] None of these are present in the January 7, 2016 Preliminary Plan.

65.     The January 7, 2016 Preliminary Plan forecasts annual revenue and EBITDA for the years 2016 through 2020. See Exhibits 8 and 9. As Exhibits 8 and 9 show, it is the only financial model prepared in January and February 2016 that provides long-term annual revenue and EBITDA projections for years beyond 2016 that I consider in my valuation. While annual revenue and EBITDA forecasts are almost always a necessary component to perform an accurate DCF analysis, these inputs are not sufficient for me to apply the DCF method, which also requires forecasts of TransCare's annual expected free cash flows. In this case, TransCare's management and the creators of the January 7, 2016 Preliminary Plan did not prepare long-term projections or assumptions on capital expenditures, net working capital or associated depreciation and amortization.[74] In the absence of these forecasts, I do not have sufficient information to infer operating cash flow forecasts. Additionally, TransCare's recent state of financial distress, the historical

---

[73]    Rosenbaum & Pearl 2013 at p. 125.

[74]    January 7, 2016 Preliminary Plan.

CONFIDENTIAL

EXPERT REPORT OF
JONATHAN I. ARNOLD, PH.D.
*IN RE: TRANSCARE CORPORATION, ET AL.*

variability in its performance (as summarized in Exhibits 5 and 6), and its lack of recent audited financial statements prevent me from reliably estimating those inputs myself. For these reasons, I do not further develop the DCF method in my assessment of TransCare's Operating Value.

66.     I next turn to the Comparable Company and Precedent Transaction methods of estimating the value of TransCare. In both cases, I use forward-looking valuation metrics to estimate TransCare's Operating Value.

67.     In the Comparable Company methodology, the implied value of a firm is determined based on the trading prices of public companies that are similar to the subject firm.  The industry in which TransCare operates has two publicly traded peers during the relevant period:  Envision Healthcare Corporation and Air Methods Corporation.  I note that these firms were identified by Mr. Greenberg in his market comparable companies analysis, which he shared with Ms. Tilton, on December 18, 2015.[75]  In summarizing his analysis, Mr. Greenberg concluded that "EV to revenue multiple averages 1.8x and EV to LTM EBITDA averages 10.1x."[76]  The value of TransCare is determined by applying the comparable companies' Enterprise Value – to – Projected Earnings Before Interest, Taxes, Depreciation, and Amortization multiple ("EV /

---

[75]   E-mail from Mr. Greenberg to Ms. Tilton dated December 18, 2015 (PP-TRBK0041410) and attachment (PP-TRBK0041414). Mr. Greenberg also identified PHI, Inc. as a potential comparable but excluded it from his analysis since it "appears to be an outlier."  I further note that S&P Capital IQ does not report Forward EV/EBITDA multiples for PHI, Inc.

[76]   E-mail from Mr. Greenberg to Ms. Tilton dated December 18, 2015 (PP-TRBK0041410)

EXPERT REPORT OF
JONATHAN I. ARNOLD, PH.D.
CONFIDENTIAL                                          *IN RE: TRANSCARE CORPORATION, ET AL.*

Forward EBITDA Multiple") to TransCare's projected EBITDA.[77]

68.     When implementing the Precedent Transaction method, the implied value

of a firm is determined based on the multiples paid for comparable companies in prior

M&A transactions.[78]  I rely on the two transaction comparables and the EV / EBITDA

multiples identified by Mr. Greenberg and shared with Ms. Tilton on December 18, 2015:

(i) Envision Healthcare Corporation's acquisition of Rural/Metro Corporation, and (ii)

KKR & Co., Inc.'s acquisition of Air Medical Group Holdings.[79]

### B.    VALUATIONS BASED ON INDUSTRY MULTIPLES IDENTIFIED BY MS. TILTON

69.     In addition, I perform a valuation of TransCare relying on the 7.0x – 8.0x

EV / EBITDA industry multiples range identified by Ms. Tilton during her deposition.[80]

I note that Ms. Tilton's assumed multiples range is generally consistent with the multiples

range derived from the Comparable Company method, which provides support to my

conclusions on TransCare's Operating Value using that method.  See Exhibit 12.

### C.    VALUATIONS BASED ON POTENTIAL OFFERS FOR ASSETS

70.      I estimate a total enterprise value of TransCare relying on the 8.0x

---

[77]    Rosenbaum & Pearl 2013 at p. 13.

[78]    Rosenbaum & Pearl 2013 at p. 83.

[79]    E-mail from Mr. Greenberg to Ms. Tilton dated December 18, 2015 (PP-TRBK0041410) and
attachment (PP-TRBK0041414). Mr. Greenberg also identified the following transactions as
comparable but didn't report EV/EBITDA multiples for them: (i) Falck USA Holdings, Inc.'s
acquisition of Verihealth Inc.; (ii) Air Methods Corp.' acquisition of Tri-State CareFlight, LLC;
(iii) ProTransport-1, LLC's acquisition of Century Ambulance Service, Inc.; and (iv)
ProTransport-1, LLC's acquisition of PRN Ambulance, Inc. I further note that S&P Capital
IQ does not report EV/EBITDA multiples for the transaction comparables identified by Mr.
Greenberg.

[80]    Tilton Deposition at p. 119.

EXPERT REPORT OF
JONATHAN I. ARNOLD, PH.D.
*IN RE: TRANSCARE CORPORATION, ET AL.*

CONFIDENTIAL

EV/EBITDA offered by RCA for all or part of TransCare's assets on at least three dates in the course of 2015. I note that this multiple falls within the multiple ranges derived from the Comparable Company Approach and provides support to my conclusions on Operating Value. See Exhibit 12. I also note, however, that these preliminary offers were made without the benefit of due diligence.

### D.    MS. TILTON'S FORECLOSURE AND BUY-OUT TRANSACTION

71.    In the attempted Foreclosure and Buy-Out transaction, Ms. Tilton represented the interests of the acquirer, the target, and the majority of the lenders.   I note that her valuation of NewCo at $22.1 million is just below the low range of the Operating Value of NewCo that I estimate in this report.

### E.    SUMMARY

72.    Exhibit 12e provides a summary of the implied Operating Values that I derive using the methods described above and as reflected in Exhibits 12a through 12d. The exhibits show an implied Operating Value of between $22.7 million and $86.5 million using the Comparable Company and Precedent Transaction methods. As the exhibit shows, the implied Operating Values for WholeCo range from $35.3 million to $86.5 million and the implied Operating Values for NewCo range from $22.7 million to $39.1 million. The exhibit also shows a range of implied Operating Values of $39.7 million to $55.5 million for WholeCo and $25.6 million for NewCo based upon the expressions of interest. Exhibit 12e also shows a range of implied Operating Values based upon Ms. Tilton's industry multiples of $34.8 million to $55.5 million for WholeCo and $22.4 million

EXPERT REPORT OF
JONATHAN I. ARNOLD, PH.D.
*IN RE: TRANSCARE CORPORATION, ET AL.*

to \$25.6 million for NewCo.

73.     As described above, TransCare's management had apparently concluded
by January 3, 2016 that TransCare's reduced earnings outlook was due to "inaction" by
the Board (that is, Ms. Tilton).[81]  With time, that outlook only worsened: throughout
January 2016, each subsequent set of projections forecasts lower 2016 EBITDA.  This
reduced outlook reflects delays in the Board's actions concerning TransCare's urgent
(and overdue) financial obligations and capital requirements to survive as a going
concern.  I therefore view the range of Operating Values derived from January 7, 2016
Preliminary Plan as the most appropriate range of implied Operating Values.

## V.     LIQUIDATION VALUE AFTER FEBRUARY 24, 2016

74.     On February 24, 2016, TransCare entered Chapter 7 liquidation and
TransCare's assets were to be sold off collectively or individually in a forced manner, as
opposed to an orderly manner, and in a shorter time frame than would normally be
needed to achieve the Operating Value.

75.     I was instructed to estimate the Liquidation Values based on documents
provided to me by counsel from the Chapter 7 bankruptcy proceedings case docket.

76.     I understand that the Liquidation Value of TransCare as a whole is \$19.2
million ("WholeCo Liquidation Value") and results from the sum of the sale value (net of
sale and collection costs) of TransCare's assets: (i) \$11.7 million from the sale of

---

[81]  E-mail from Mr. Bonilla to Messrs. Leland and Wolf dated January 3, 2016
     (TRANSCARE00005261 - 262).

EXPERT REPORT OF
JONATHAN I. ARNOLD, PH.D.
CONFIDENTIAL                                    IN RE: TRANSCARE CORPORATION, ET AL.

Certificates of Need ("CONs"), (ii) $2.0 from the sale of equipment and physical assets sold, and (iii) $5.6 million from TransCare's accounts receivable collected. See Exhibit 13.

77.     I understand that the Liquidation Value of the assets included in NewCo is $5.7 million ("NewCo Liquidation Value") and results from the sum of the sale value (net of allocable sale and collection costs) of TransCare's assets as planned to be distributed to NewCo: (i) $1.9 million from the sale of the Certificate of Need no. 0667, (ii) $0.8 million equipment and physical assets, and (iii) $3.1 million from TransCare's accounts receivable collected. See Exhibit 13.

# VI.    DIFFERENCE BETWEEN OPERATING VALUES AND LIQUIDATION VALUE

## A.    MEASURING THE DIFFERENCE

78.     Counsel for the Plaintiff has asked me to calculate the difference between TransCare's Operating Values and Liquidation Value based on plans and models developed by TransCare, Patriarch, and Carl Marks at different points in time between January and February 2016. Exhibit 14 shows that the difference between Operating Values and Liquidation Value across assets to be operated or sold and across dates ranges from $16.1 million and $67.3 million.  When using the implied Operating Values based upon January 2016 projections for WholeCo, Exhibit 14 shows that the difference ranges from $16.1 million to $67.3 million.  When using the implied Operating Value based on February 2016 projections for NewCo, the Difference ranges from $17.0 million to $33.4 million.

33

CONFIDENTIAL

EXPERT REPORT OF
JONATHAN I. ARNOLD, PH.D.
IN RE: TRANSCARE CORPORATION, ET AL.

A0867

## VII.  CONCLUSION

79.    Based on the foregoing, it is my opinion that TransCare's Operating Values between January and February 2016 was between $22.7 million and $86.5 million prior to the Liquidation Filing Date.  The difference between the Operating Values and Liquidation Value of TransCare ranges from $16.1 million to $67.3 million.

80.    Further, when I break down the analysis for WholeCo and NewCo, I conclude that:

- The Operating Values based on January 2016 projections for the TransCare in its entire ("WholeCo") range from $35.3 million to $86.5 million;

- The Operating Value based on February 2016 projections for selected assets ("NewCo") ranges from $22.7 million to $39.1 million;

- The difference between TransCare's Operating Values based on January 2016 projections for WholeCo and the Liquidation Value is between $16.1 million and $67.3 million; and

- The difference between TransCare's Operating Value based on February 2016 projections for NewCo and the Liquidation Value is between $17.0 million and $33.4 million.

34

EXPERT REPORT OF
JONATHAN I. ARNOLD, PH.D.
IN RE: TRANSCARE CORPORATION, ET AL.

CONFIDENTIAL

November 30, 2018

Jonathan I. Arnold, Ph.D.

35

NOVEMBER 2018

## CURRICULUM VITAE

# Jonathan I. Arnold, Ph.D.

jonathan.arnold@chicagoecon.com

## EDUCATION:

Ph.D.    Business Economics, Graduate School of Business, The University of Chicago

M.B.A.  Finance and Accounting, The University of Chicago Graduate School of Business

B.A.      Economics, The University of Chicago

## PROFESSIONAL EXPERIENCE SINCE 1995:

2013 –          *Testifying Expert Economist*, Chicago Economics Corp.

2015 –          *Senior Consultant*, Coherent Economics

2013 -          *Senior Consultant*, Compass Lexecon.

2012 – 2013    *Chief Economist*, Office of the Attorney General, New York State

2006 – 2012    *Managing Principal*, Analysis Group, Inc.

1995 – 2006    *Principal*, Chicago Partners

## TESTIMONY – SINCE 2014:

- Rebuttal Expert Report in *Jo Ann Howard and Associates v. J. Douglas Cassity*, U.S. District Court Eastern District of Missouri, Case No. 09-CV-1252-ERW.  (November 2018)

- Expert Report in *U.S.A. v. Matthew Connolly and Gavin Black*, U.S. District Court, Southern District of New York, Case No. 01:16-CR-00370 (CM).  (September 2018)

- Deposition in *Jo Ann Howard and Associates v. J. Douglas Cassity*, U.S. District Court Eastern District of Missouri, Case No. 09-CV-1252-ERW.  (August 2018)

- Expert Report in *Jo Ann Howard and Associates v. J. Douglas Cassity*, U.S. District Court Eastern District of Missouri, Case No. 09-CV-1252-ERW.  (July 2018)

CONFIDENTIAL

- Deposition in *Eagle View Technologies v. Xactware Solutions*, U.S. District Court for the District of New Jersey, Civil Action No. 15-cv-07025.  (May 2018)

- Expert Report in *State of Washington v. LG Electronics*, Superior Court of King County, Washington, Case No. 12-2-15842-8.  (May 2018)

- Rebuttal Expert Report in *Eagle View Technologies v. Xactware Solutions*, U.S. District Court for the District of New Jersey, Civil Action No. 15-cv-07025.  (May 2018)

- Expert Report in *Eagle View Technologies v. Xactware Solutions*, U.S. District Court for the District of New Jersey, Civil Action No. 15-cv-07025.  (May 2018)

- Expert Report in *Eagle View Technologies v. Xactware Solutions*, U.S. District Court for the District of New Jersey, Civil Action No. 15-cv-07025.  (April 2018)

- Testimony *In the Matter of Certain Two-Way Radio Equipment and Systems, Related Software and Components Thereof*, United States International Trade Commission, Washington, D.C., Investigation No. 337-TA-1053.  (January 2018)

- Deposition *In the Matter of Certain Two-Way Radio Equipment and Systems, Related Software and Components Thereof*, United States International Trade Commission, Washington, D.C., Investigation No. 337-TA-1053.  (November 2017)

- Expert Report *In the Matter of Certain Two-Way Radio Equipment and Systems, Related Software and Components Thereof*, United States International Trade Commission, Washington, D.C., Investigation No. 337-TA-1053.  (October 2017)

- Deposition *In re Avaya*, U.S. Bankruptcy Court of the Southern District of New York, Ch. 11, Case No. 17-10089.  (October 2017)

- Expert Report *In re Avaya*, U.S. Bankruptcy Court of the Southern District of New York, Ch. 11, Case No. 17-10089.  (October 2017)

- Deposition in *Stark Master Fund Ltd. and Stark Global Opportunities Master Fund Ltd. v. Credit Suisse Securities*, U.S. District Court for the Eastern District of Wisconsin, No. 14-cv-689. (August 2017)

- Testimony in *The Financial Oversight and Management Board for Puerto Rico, as representative of The Commonwealth of Puerto Rico* (PROMESA Title III No. 17 BK 3283-LTS); in re: The Financial Oversight and Management Board for Puerto Rico, as representative of Puerto Rico Highways & Transportation Authority (PROMESA Title III, No. 17 BK 3567-LTS); Peaje Investments v. Puerto Rico Highways & Transportation Authority (Adv. Proc. No. 17-151-LTS in 17 BK 3567-LTS and Adv. Proc. No. 17-152-LTS in 17 BK 3283-LTS) (August 2017)

- Rebuttal Expert Report in *Stark Master Fund Ltd. and Stark Global Opportunities Master Fund Ltd. V. Credit Suisse Securities*, U.S. District Court of the Eastern District of Wisconsin, No. 14-cv-689.  (August 2017)

- Deposition in *The United States of America, ex rel., John H. Oberg v. Pennsylvania Higher Education Assistance Agency*, U.S. District court of the Easter District of Virginia, No. 1:07-cv-00960-CMH-JFA.  (August 2017)

- Deposition in *The Financial Oversight and Management Board for Puerto Rico, as representative of The Commonwealth of Puerto Rico* (PROMESA Title III No. 17 BK 3283-LTS); in re: The

CONFIDENTIAL

Financial Oversight and Management Board for Puerto Rico, as representative of Puerto Rico Highways & Transportation Authority (PROMESA Title III, No. 17 BK 3567-LTS); Peaje Investments v. Puerto Rico Highways & Transportation Authority (Adv. Proc. No. 17-151-LTS in 17 BK 3567-LTS and Adv. Proc. No. 17-152-LTS in 17 BK 3283-LTS) (July 2017)

- Declaration in *The Financial Oversight and Management Board for Puerto Rico, as representative of The Commonwealth of Puerto Rico* (PROMESA Title III No. 17 BK 3283-LTS); in re: The Financial Oversight and Management Board for Puerto Rico, as representative of Puerto Rico Highways & Transportation Authority (PROMESA Title III, No. 17 BK 3567-LTS); Peaje Investments v. Puerto Rico Highways & Transportation Authority (Adv. Proc. No. 17-151-LTS in 17 BK 3567-LTS and Adv. Proc. No. 17-152-LTS in 17 BK 3283-LTS) (July 2017)

- Expert Report in *Stark Master Fund Ltd. and Stark Global Opportunities Master Fund Ltd. V. Credit Suisse Securities*, U.S. District Court of the Eastern District of Wisconsin, No. 14-cv-689. (July 2017)

- Expert Report in *The United States of America, ex rel., John H. Oberg v. Pennsylvania Higher Education Assistance Agency,* U.S. District court of the Easter District of Virginia, No. 1:07-cv-00960-CMH-JFA. (June 2017)

- Deposition in *The State of Illinois v. Hitachi*, Circuit Court of Cook County, Illinois, County Department, Chancery Division, Case No. 2012-CH-35266. (April 2017)

- Hearing Testimony in *Arista Networks, Inc. v. Cisco Systems, Inc.*, International Trade Commission Washington, D.C., Investigation No. 337-TA-977. (April 2017)

- Deposition in *Arista Networks, Inc. v. Cisco Systems, Inc.*, International Trade Commission Washington, D.C., Investigation No. 337-TA-977. (February 2017)

- Second Supplemental Expert Report in *Arista Networks v. Cisco Systems*, International Trade Commission Washington, D.C., Investigation No. 337-TA-977. (February 2017)

- Supplemental Expert Report in *Arista Networks v. Cisco Systems*, International Trade Commission Washington, D.C., Investigation No. 337-TA-977. (February 2017)

- Expert Report in *Arista Networks v. Cisco Systems*, International Trade Commission Washington, D.C., Investigation No. 337-TA-977. (January 2017)

- Rebuttal Expert Report in *The State of Illinois v. Hitachi*, Circuit Court of Cook County, Illinois, County Department, Chancery Division, Case No. 2012-CH-35266. (January 2017)

- Court Testimony in a consolidated proceeding comprising *Brigade Leveraged Capital Structures Fund v. Alejandro Garcia-Padilla* (16-1610), *National Public Finance Guarantee v. Alejandro Garcia-Padilla* (16-2101), *Dionisio Trigo-Gonzalez v. Alejandro Garcia-Padilla* (16-2257), and *U.S. Bank Trust National Association v. The Commonwealth of Puerto Rico* (16-2510), U.S. District Court, District of Puerto Rico. (September 2016)

- Deposition in *MyFord Touch Consumer Litigation*, U.S. District Court, Northern District of California, San Francisco Division, Case No. 13-cv-3072-EMC. (September 2016)

- Responsive Damages Expert Report in *MyFord Touch Consumer Litigation*, U.S. District Court, Northern District of California, San Francisco Division, Case No. 13-cv-3072-EMC. (September 2016)

CONFIDENTIAL

- Expert Report in *The State of Illinois v. Hitachi*, Circuit Court of Cook County, Illinois, County Department, Chancery Division, Case No. 2012-CH-35266. (August 2016)

- Deposition in *Philips v. Ford*, U.S. District Court, Northern District of California, San Jose Division, Case No. 5:14-cv-02989-LHK. (August 2016)

- Trial Testimony in *Nortek Air Solutions v. Energy Labs*, U.S. District Court, Northern District of California, San Jose Division, Case No. 5:14-cv-02919-BLF. (August 2016)

- Damages Expert Report in *MyFord Touch Consumer Litigation*, U.S. District Court, Northern District of California, San Francisco Division, Case No. 13-cv-3072-EMC. (August 2016)

- Expert Report in *Philips v. Ford*, U.S. District Court, Northern District of California, San Jose Division, Case No. 5:14-cv-02989-LHK. (July 2016)

- Responsive Expert Report in *MyFord Touch Consumer Litigation*, U.S. District Court, Northern District of California, San Francisco Division, Case No. 13-cv-3072-EMC. (May 2016)

- Supplemental Declaration *Lena K. Thodos and David Miller v. Nicor*, Circuit Court of Cook County, Illinois County Department, Chancery Division, Case No. 11CH06556. (April 2016)

- Deposition in *Nortek Air Solutions v. Energy Labs*, U.S. District Court, Northern District of California, San Jose Division, Case No. 5:14-cv-02919-BLF (March 2016)

- Expert Report in *Nortek Air Solutions v. Energy Labs*, U.S. District Court, Northern District of California, San Jose Division, Case No. 5:14-cv-02919-BLF (February 2016)

- Deposition in *MyFord Touch Consumer Litigation*, U.S. District Court, Northern District of California, San Francisco Division, Case No. 13-cv-3072-EMC. (February 2016)

- Deposition in *Richard S. Stack, M.D. v. Abbott Laboratories*, U.S. District Court, Middle District of North Carolina, Case No. 1:12-CV-148. (January 2016)

- Expert Report in *MyFord Touch Consumer Litigation*, U.S. District Court, Northern District of California, San Francisco Division, Case No. 13-cv-3072-EMC. (January 2016)

- Deposition in *Lena K. Thodos and David Miller v. Nicor*, Circuit Court of Cook County, Illinois County Department, Chancery Division, Case No. 11CH06556. (December 2015)

- Expert Report in *Richard S. Stack, M.D. v. Abbott Laboratories*, U.S. District Court, Middle District of North Carolina, Case No. 1:12-CV-148. (December 2015)

- Declaration in *Russell Dover v. British Airways*, U.S. District Court, Eastern District of New York, Case No. 1:12-CV-05567. (November 2015)

- Declaration in *Lena K. Thodos and David Miller v. Nicor*, Circuit Court of Cook County, Illinois County Department, Chancery Division, Case No. 11CH06556. (October 2015)

- Deposition in *Jo Ann Howard and Associates v. J. Douglas Cassity*, U.S. District Court Eastern District of Missouri, Case No. 09-CV-1252-ERW. (October 2015)

- Supplemental Expert Report in *Russell Dover v. British Airways*, U.S. District Court, Eastern District of New York, Case No. 1:12-cv-05567. (September 2015)

- Deposition in *Russell Dover v. British Airways*, U.S. District Court, Eastern District of New York, Case No. 1:12-cv-05567. (August 2015)

- Rebuttal Expert Report in *Russell Dover v. British Airways*, U.S. District Court, Eastern District of New York, Case No. 1:12-cv-05567. (June 2015)

- Expert Report in *Russell Dover v. British Airways*, U.S. District Court, Eastern District of New York, Case No. 1:12-cv-05567. (May 2015)

- Expert Report in *Thomas & Betts International v. Burny*, U.S. District Court, Western District of Tennessee, Case No. 2:14-cv-2296-JPM-tmp. (April 2015)

- Testimony in *Jo Ann Howard and Associates v. J. Douglas Cassity*, U.S. District Court Eastern District of Missouri, Case No. 09-CV-1252-ERW. (March 2015)

- Deposition in *Jo Ann Howard and Associates v. J. Douglas Cassity*, U.S. District Court Eastern District of Missouri, Case No. 09-CV-1252-ERW. (February 2015)

- Deposition in *Jo Ann Howard and Associates v. J. Douglas Cassity*, U.S. District Court Eastern District of Missouri, Case No. 09-CV-1252-ERW. (January 2015)

- Expert Report in *Jo Ann Howard and Associates v. J. Douglas Cassity*, U.S. District Court Eastern District of Missouri, Case No. 09-CV-1252-ERW. (January 2015)

- Reply Declaration in *Cryolife, Inc. v. C.R. Bard*, U. S. District Court of the District of Delaware, Case No. CV-14-00559-SLR. (January 2015)

- Declaration in *Cryolife, Inc. v. C.R. Bard*, U. S. District Court of the District of Delaware, Case No. CV-14-00559-SLR. (September 2014)

- Expert Report in *Illinois Pension Litigation*, Circuit Court for the Seventh Judicial Circuit, Sangamon County Illinois, Case No. 2014-MR1. (August 2014)

- Deposition in *Jo Ann Howard and Associates v. J. Douglas Cassity*, U.S. District Court Eastern District of Missouri, Case No. 09-CV-1252-ERW. (August 2014)

- Expert Report in *Jo Ann Howard and Associates v. J. Douglas Cassity*, et al., U.S. District Court Eastern District of Missouri, Case No. 09-CV-1252-ERW. (July 2014)

- Testimony in *SolidFX v. Jeppesen Sanderson*, U.S. District Court, District of Colorado, Case No. 11-CV-1468. (April 2014)

**TEACHING EXPERIENCE:**

- **Columbia University and Duke University**
  *Guest Lecturer (2002 – 2004)*

- **The University of Chicago, Department of Economics and Graduate School of Business**
  *Lecturer (1998 – 1999)*

  Taught microeconomics (topics included price theory, industrial organization, capital theory, principles of labor economics, and durable goods economics)

- **Loyola University Chicago School of Law**

*Lecturer of Law (1997 – 1998)*

Taught antitrust economics

## PROFESSIONAL AFFILIATIONS:

American Economics Association

## OTHER:

Certified Public Accountant

CONFIDENTIAL

# MATERIALS RELIED UPON

**Legal Filings**

Schedules of Assets and Liabilities, In the United States Bankruptcy Court of the Southern District of New York, Case No 02-14385, September 20, 2002.

Amended Complaint In re TransCare Corporation, et al, In the United States Bankruptcy Court of the Southern District of New York, Case No 16-10407, November 28 2018.

Debtor TransCare Corporation's Amended List of Equity Security Holders and Statement of Corporate Ownership, In the United States Bankruptcy Court of the Southern District of New York, Case No 16-10407, May 9, 2016.

Defendants FSAR Holdings, Inc. Post-Trial Brief, In the Court of Chancery of the State of Delaware, public version filed July 3, 2017.

Defendants FSAR Holdings, Inc. Post-Trial Brief, In the Court of Chancery of the State of Delaware, C.A. No. 12946-VCS, public version filed July 3, 2017.

Defendants Lynn Tilton's Corrected Post-Trial Brief, In the Court of Chancery of the State of Delaware, C.A. No. 12946-VCS, public version filed July 5, 2017.

Memorandum Opinion re Zohar II 2005-1, Limited and Zohar III, Limited v. FSAR Holdings, Inc. et al., In the Court of Chancery of the State of Delaware, C.A. No. 12946-VCS, November 30, 2017.

Order, Pursuant to 11 U.S.C. §§ 105(a) and 721, Authorizing the Chapter 7 Trustee to Operate the Debtors' Business and Pay Certain Operating Expenses of These Estates, In the United States Bankruptcy Court of the Southern District of New York, Case No 16-10407, March 24, 2016.

Auctioneer's Report of Commission and Expenses for the Auction Sale of the Assets Conducted on June 21, 2016, In the United States Bankruptcy Court of the Southern District of New York, Case No 16-10407, August 23, 2016.

Auctioneer's Report of Commission and Expenses for the Auction Sale of the Assets Conducted on April 20th, May 4th, May 6th, May 11th, & May 12th, 2016, In the United States Bankruptcy Court of the Southern District of New York, Case No 16-10407, August 23, 2016.

Debtors TransCare Corporation, et al., Monthly Operating Statement for the Period Ended September 30, 2016, In the United States Bankruptcy Court of the Southern District of New York, Case No 16-10407, October 17, 2016.

Order Authorizing and Approving the Sale of Ambulance Service Certificate No. 0667 to Maler Group LLC, In the United States Bankruptcy Court of the Southern District of New York, Case No 16-10407, July 6, 2016.

Affirmation to Confirm the Results of the Sale of the Debtors' Ambulance Service Certificates Issued by the New York State Department of Health, In the United States

Bankruptcy Court of the Southern District of New York, Case No 16-10407, July 1, 2016.

Summary Sheet for First Interim Application of LaMonica Herbst & Maniscalco, LLP, Counsel to Salvatore LaMonica, as Chapter 7 Trustee, for Allowance of Interim Compensation and Reimbursement of Expenses, In the United States Bankruptcy Court of the Southern District of New York, Case No 16-10407, January 17, 2017.

Order Authorizing the Chapter 7 Trustee to Allocate the Expenses of the Public Auctions Between the Debtors' Estates and Reimburse the TransCare Corporation Estate for the Related Relief, In the United States Bankruptcy Court of the Southern District of New York, Case No 16-10407, April 4, 2017.

First Interim Fee Application of Lucy L. Thomson For Allowance of Compensation for Service Rendered as Patient Care Ombudsman, In the United States Bankruptcy Court of the Southern District of New York, Case No 16-10407, January 18, 2017.

Notice of Hearing on the Motion of Chapter 7 Trustee Seeking Entry of an Order Pursuant to the Federal Rule of Bankruptcy Procedure 9019(a), Approving the Mutual Release and Settlement Agreement By and Between the Chapter 7 Trustee, On Behalf of the Debtors' Estates, Wells Fargo Bank, N.A., and Montefiore Medical Center, Montefiore Mount Vernon Hospital and Montefiore New Rochelle Hospital, In the United States Bankruptcy Court of the Southern District of New York, Case No 16-10407, December 6, 2016.

Monthly Operating Statement for the Period Ended September 30, 2016, In the United States Bankruptcy Court of the Southern District of New York, Case No 16-10407, October 18, 2016

Monthly Operating Statement for the Period Ended November 30, 2016, In the United States Bankruptcy Court of the Southern District of New York, Case No 16-10407, January 18, 2017.

Monthly Operating Statement for the Period Ended December 31, 2016, In the United States Bankruptcy Court of the Southern District of New York, Case No 16-10407, January 17, 2017.

Monthly Operating Statement for the Period Ended March 31, 2017, In the United States Bankruptcy Court of the Southern District of New York, Case No 16-10407, May 16, 2017.

Monthly Operating Statement for the Period Ended February 29, 2016, In the United States Bankruptcy Court of the Southern District of New York, Case No 16-10407, April 26, 2016.

Monthly Operating Statement for the Period Ended March 31, 2016, In the United States Bankruptcy Court of the Southern District of New York, Case No 16-10407, April 26, 2016.

Monthly Operating Statement for the Period Ended April 30, 2016, In the United States Bankruptcy Court of the Southern District of New York, Case No 16-10407, June 1, 2016.

Monthly Operating Statement for the Period Ended May 31, 2016, In the United

2

CONFIDENTIAL

States Bankruptcy Court of the Southern District of New York, Case No 16-10407, July 7, 2016.

Monthly Operating Statement for the Period Ended June 30, 2016, In the United States Bankruptcy Court of the Southern District of New York, Case No 16-10407, August 19, 2016.

 Monthly Operating Statement for the Period Ended July 31, 2016, In the United States Bankruptcy Court of the Southern District of New York, Case No 16-10407, August 19, 2016.

Monthly Operating Statement for the Period Ended August 31, 2016, In the United States Bankruptcy Court of the Southern District of New York, Case No 16-10407, September 20, 2016.

Monthly Operating Statement for the Period Ended October 31, 2016, In the United States Bankruptcy Court of the Southern District of New York, Case No 16-10407, November 15, 2016.

Monthly Operating Statement for the Period Ended January 31, 2017, In the United States Bankruptcy Court of the Southern District of New York, Case No 16-10407, February 23, 2017.

Monthly Operating Statement for the Period Ended February 28, 2017, In the United States Bankruptcy Court of the Southern District of New York, Case No 16-10407, March 16, 2017.

Monthly Operating Statement for the Period Ended April 30, 2017, In the United States Bankruptcy Court of the Southern District of New York, Case No 16-10407, May 16, 2017.


**Depositions**

Deposition of Lynn Tilton, October 29, 2018

Deposition of John Husson, November 11, 2018

Deposition of Glenn Leland, November 27, 2018


**Academic Literature/Textbooks**

Rosenbaum, Joshua & Joshua Pearl, 2013, Investment Banking: Valuation, Leveraged Buyouts, and Mergers & Acquisitions (Wiley, Second Edition)


**Press Releases/News Articles**

"Ambulance Company speeds into Chapter 11." The Westchester County Business Journal, September 3, 2002.

"Private Ambulance Service Backed by 'Wonder Woman of Wall Street' Files Bankruptcy." New York Business Journal Online, February 25, 2016

3

"TransCare Announces Two Significant Milestones" BusinessWire, July 20, 2015,
available at  http://www.businesswire.com/news/home/20150720005828/en/,
accessed November 5, 2018.

"TransCare set to emerge from Ch. 11." Pittsburgh Business Times, July 7, 2003,
available at
https://www.bizjournals.com/pittsburgh/stories/2003/07/07/story6.html?sprint,
accessed November 5, 2018.


## Bates Stamped Documents

| | |
|---|---|
| AL-00176 | PP-TRBK0004095 |
| AL-00196 | PP-TRBK0004527 |
| AL-00216 | PP-TRBK0004695 |
| AL-00236 | PP-TRBK0004573 |
| AL-00256 | PP-TRBK0004574 |
| AL-00341 | PP-TRBK0006471 |
| AL-00400 | PP-TRBK0012469 |
| AL-00380 | PP-TRBK0013259 |
| AL-00485 | PP-TRBK0013273 |
| AL-00695 | PP-TRBK0013274 |
| CM_TC2018_0002108 | PP-TRBK0015289 |
| CM_TC2018_0002110 | PP-TRBK0015291 |
| CM_TC2018_0003369 | PP-TRBK0015293 |
| CM_TC2018_0003376 | PP-TRBK0015295 |
| CM_TC2018_0004132 | PP-TRBK0015306 |
| CM_TC2018_0005038 | PP-TRBK0015309 |
| CM_TC2018_0005039 | PP-TRBK0015312 |
| CM_TC2018_0008781 | PP-TRBK0019062 |
| CM_TC2018_0013875 | PP-TRBK0019088 |
| CM_TC2018_0013895 | PP-TRBK0019089 |
| CM_TC2018_0013915 | PP-TRBK0019229 |
| CM_TC2018_0013935 | PP-TRBK0020769 |
| CM_TC2018_0013955 | PP-TRBK0022363 |
| CURTIS_000521 | PP-TRBK0024842 |
| PP-TRBK0004093 | PP-TRBK0027756 |

4

| | |
|---|---|
| PP-TRBK0028485 | TRANSCARE00004048 |
| PP-TRBK0033600 | TRANSCARE00004191 |
| PP-TRBK0041410 | TRANSCARE00004259 |
| PP-TRBK0041414 | TRANSCARE00004571 |
| PP-TRBK0042324 | TRANSCARE00004609 |
| PP-TRBK0042693 | TRANSCARE00005261 |
| PP-TRBK0044399 | TRANSCARE00005770 |
| PP-TRBK0046839 | TRANSCARE00007937 |
| PP-TRBK0051881 | TRANSCARE00035020 |
| PP-TRBK0052000 | TRANSCARE00043758 |
| PP-TRBK0053856 | TRANSCARE00062780 |
| PP-TRBK0071446 | TRANSCARE00067400 |
| PP-TRBK0078085 | TRANSCARE00074331 |
| PP-TRBK0086219 | TRANSCARE00107866 |
| PP-TRBK0087751 | TRANSCARE00195974 |
| PP-TRBK0089542 | TRANSCARE00198138 |
| PP-TRBK0090486 | TRANSCARE00231115 |
| PP-TRBK0091282 | WF00001541 |
| TRANSCARE00000395 | WF_TC_00003874 |

All materials cited in this report and exhibits.

5

Case 1:20-cv-06274-LAK    Document 11-8    Filed 09/30/20    Page 101 of 243    Pg

EXHIBIT 1

**TransCare Corporation**
**Funds, Fees, and Interest Payments Flow to and from TransCare**
**Tilton-Controlled Entities and Outside Equity and Debt Holders**



**Notes:**
(1)  Includes Wells Fargo, NA; Credit Suisse Alternative Capital, Inc.; First Dominion Funding I
(2)  Includes Sigler & Company c/o First Dominion Funding I; Sigler & Co. Credit Suisse Alternative Capital; Sigler & Company as nominee for First Dominion Funding I; Sigler & Co. c/o CSAM Funding II; Sigler & Co. c/o CSAM Funding III; Sigler & Co. c/o Atrium CDO
(3)  Includes Patriarch Partners Agency Services, LLC; Patriarch Partners II, LLC; Patriarch Partners III, LLC; Patriarch Partners VIII, LLC; Patriarch Partners XIV, LLC; Patriarch Partners XV, LLC; LD Investments, LLC
(4)  "Zohar Funds" include Zohar CDO 2003-1, Limited; Zohar II 2005-1, Limited; Zohar III, Limited
(5)  Includes Ark II CLO 2001-1, Limited; Ark Investment Partners II, L.P; Ark Investment GP II, LLC
The Authority Matrix that governs the actions of TransCare's management states, "the Director [Tilton] hereby authorizes the Chief Executive Officer to approve, adopt, authorize, agree, or enter into contracts…on behalf of the Corporation, subject… to obtaining approval and authorization… by the Designated Executive or the full Board." According to the Complaint at 10, as of 2015 no Designated Executive had been appointed and the only Board member was Tilton. See Schedule A of TransCare Corporation Written Consent of the Sole Director dated July 10, 2012.

**Sources:**

Complaint at 4-10, 16, 19-21, 32; Exhibit A of Amendment No. 27 to Credit Agreement of TransCare Corporation dated July 7, 2015 among TransCare Corporation and Patriarch Partners Agency Services, LLC (TRANSCARE00000395); Credit Agreement of TransCare Corporation dated January 15, 2016 among TransCare Corporation and Ark II CLO 2001-1, Limited at 1; Memorandum Opinion In Zohar II 2005-1 Ltd., et al. v. FSAR Holdings Inc. et al., Case No. 12946-VCS before the Delaware Court of Chancery Filed on November 30, 2017 at 2-14; Defendant Lynn Tilton's Corrected Post-Trial Brief In Zohar II 2005-1 Ltd., et al. v. FSAR Holdings Inc. et al., Case No. 12946-VCS before the Delaware Court of Chancery Filed on July 5, 2017 at 31-32; Debtor TransCare Corporation's Amended List of Equity Security Holders and Statement of Corporate Ownership In re: TransCare Corporation, et al. Chapter 7 Case No. 16-10407 (SMB) before the United States Bankruptcy Court Southern District of New York Filed on May 9, 2016 at 1-2; Defendants FSAR Holdings, Inc., Glenoit Universal Ltd., and UI Acquisition Holding Co.'s Post-Trial Brief In Zohar II 2005-1 Ltd., et al. v. FSAR Holdings Inc. et al., Case No. 12946-VCS before the Delaware Court of Chancery Filed on July 3, 2017 at 12; Consolidated Financial Statements, TransCare Corporation and Subsidies, Year Ended December 31, 2013 at 15-20 (TRANSCARE00062780 at TRANSCARE00062797-802).

CONFIDENTIAL

EXHIBIT 2

**Ms. Tilton**
**Roles within the Patriarch Business Structure**



CONFIDENTIAL

A0883

**Source:** Tilton Deposition at 10-13, 17-26, 52, 61-65, 74.

**Notes:**

(1)  Includes Patriarch Partners VIII, LLC; Patriarch Partners XIV, LLC; Patriarch Partners XV, LLC. These entities ceased their roles as collateral managers in March 2016.

(2)  Includes Zohar CDO 2003-1, Limited; Zohar II 2005-1, Limited; Zohar III, Limited. Ms. Tilton is a noteholder in all three funds.

(3)  Includes Ark II CLO 2001-1, Limited; Ark Investment Partners II, L.P.

(4)  Includes MB Helicopters, Inc.; Dura Automotive Systems; Stila Cosmetics; and approximately 57 other companies. Ms. Tilton is a director of each company.

Patriarch Partners Management Group, LLC employees work on the operational side of the Portfolio Companies.

Zohar Holdings, LLC is owned 99% by Ms. Tilton and 1% by a trust for Ms. Tilton's daughter.

Ms. Tilton is the CEO of MB Helicopters, Dura Automotive Systems, Global Automotive Systems, and Stila Cosmetics.

CONFIDENTIAL

## TransCare Corporation
## Summary of Indications of Interest

| Date | Potential Acquiror | Interest | Valuation Multiple | Valuation Range |
|---|---|---|---|---|
| 02/05/15 | National Express | MTA Contract | None Specified. Potential offer based on $4MM EBITDA per year 5-year contract, discounted at 10%-15%. | $17.0mm to $18.0mm |
| 02/10/15 | RCA | "Sale or management takeover to operate the company in NYC as well as outside of the NYC territory." | None Specified | None Specified |
| 02/13/15 | RCA | "Sale of Transcare or operating management agreement takeover by RCA… In NYC as well as outside NYC." | None Specified | None Specified |
| 02/20/15 | RCA | "Part or all of Transcare Ambulance… We would also consider an operational management arrangement" | "Before getting into details on financials RCA is prepared to offer up to **eight times the EBITDA**" | None Specified |
| 03/03/15 | RCA | "Part or all of Transcare Ambulance… We would also consider an operational management arrangement" | "Before getting into details on financials RCA is prepared to offer up to **eight times the EBITDA**" | None Specified |
| 04/07/15 | RCA | Any assets | None Specified | None Specified |
| 07/08/15 | RCA | Whole Company | **EBITDA multiple of 8X** | $80mm to $96mm before debt |
| 07/08/15 | National Express | MTA Contract | None Specified | $6.0mm to $7.0mm plus assumption of up to $2.0mm of obligations |
| 10/11/15 | MONOC | "Service lines outside of the State of New York" | None Specified | None Specified |
| 12/16/15 | National Express | MTA Contract | None Specified | $6.0mm to $7.0mm plus assumption of up to $2.0mm of obligations |

**Sources:** E-mail from Mr. Leland to Mr. Pelissier, et al. dated February 6, 2015 (TRANSCARE00004259); LOI for Transcare Transit dated July 10, 2015 (PP-TRBK0012428-37); E-mail from Mr. Weinberger to Mr. Bonilla and Mr. Leland dated April 7, 2015 (TRANSCARE00198138); E-mail from Mr. Weinberger to Mr. Leland dated February 20, 2015 (TRANSCARE00195974); E-mail chain containing an e-mail from Mr. Weinberger to Mr. Leland dated July 8, 2015 (PP-TRBK0033600 - 02); E-mail from Mr. Weinberger to Ms. Tilton dated February 10, 2015 (PP-TRBK0033684); E-mail from Mr. Weinberger to Ms. Tilton dated March 3, 2015 (PP-TRBK0090486 - 87); E-mail from Mr. Weinberger to Mr. Bonilla dated February 13, 2015 (TRANSCARE00004191); E-mail from Mr. Hector to Messrs. Leland, Jones, and Greenberg dated October 11, 2015 (PP-TRBK0057441); E-mail from Mr. Leland to Mr. Greenberg dated December 16, 2015 (PP-TRBK0012426).

CONFIDENTIAL

Case 1:20-cv-06274-LAK   Document 11-8   Filed 09/08/20   Page 106 of 243   Pg

EXHIBIT 4

# TransCare Corporation
## Attempted Foreclosure & Buy-Out Transaction Details
## February 15, 2015
## In Millions

| ($ in millions) | | TransCare | | Pro Forma Transcendence / NewCo | | |
| --- | --- | --- | --- | --- | --- | --- |
| Source of Funded Capital | | $ Amount | Description | $ Amount | % of Total Capital | Description |
| **Payment Priority 1** | | | | | | |
| Ark II (Ms. Tilton's personal investment vehicle) | [A] | $2.1 | Includes $1.9 funded $6.5 Term Loan plus $0.20 in vehicles owned by Ms. Tilton and leased to TransCare | $12.1 | 54.7% | Includes $2.1 rolled over capital from TransCare to NewCo, and $10.0 of new working capital funding |
| **Payment Priority 2** | | | | | | |
| AIP (Ms. Tilton's personal investment vehicle) | [B] | $2.9 | Fully Funded Term Loan | $0.7 | 3.0% | Pro-rata portions of $10.0 credit bid equal to book value of NewCo assets excluding accounts receivable due to Wells Fargo |
| Zohar I | [C] | $3.5 | Fully Funded Term Loan | $0.8 | 3.6% | |
| Zohar II | [D] | $5.0 | Fully Funded Term Loans | $1.1 | 5.2% | |
| Zohar III | [E] | $24.6 | Fully Funded Term Loans | $5.6 | 25.6% | |
| Credit Suisse | [F] | $3.5 | Fully Funded Term Loan | $0.8 | 3.7% | |
| First Dominion | [G] | $4.0 | Fully Funded Term Loan | $0.9 | 4.2% | |
| **Subtotal** | **[H]** | **$43.6** | | **$10.0** | **45.3%** | Total credit bid |
| **Total** | **[I] = [A] + [H]** | **$45.7** | | **$22.1** | **100.0%** | |

**Notes:**
Displayed figures are rounded to the first decimal place.

[A], [B]: At all times relevant to my analysis, ARK II CLO 2001-1 Limited ("Ark II") and Ark Investment Partners II LLP ("AIP") constituted Ms. Tilton's personal investment vehicles. The Ark II $10.0 million in funding committed to NewCo included the accounts receivable due to Wells Fargo.

[C], [D], [E]: At all times relevant to my analysis, Ms. Tilton was the Zohar funds' sole equity owner and collateral manager.

[F], [G]: Outside lenders that rolled over their facilities in conjunction with TransCare's 2004 Chapter 11 bankruptcy emergence.

[H]: Priority 2 investors were to receive 23 cents on the dollar (equal to $10.0 million divided to $43.6 million) through the credit bid for TransCare loans in the foreclosure.

**Sources:** Tilton Deposition at pp. 19-21, 25-26, 52-54, 61-65, 97-142, Exhibit 106; PP-TRBK0019089 at tabs "Daily Extract" and "Sheet2 (2)".

CONFIDENTIAL

Case 1:20-cv-06274-LAK    Document 11-8    Filed 09/30/20    Page 107 of 243

EXHIBIT 5

## TransCare Corporation
## Historical Revenue
## 2009 - LTM October 2015
## In Millions



**Notes:** Values are presented as stated in the most recent audited financial statement for which a given year's Statement of Operations was provided. 2014 value is unaudited. 2015 value includes the last twelve months ("LTM") ended October 31, 2015 and reflects the last available actual results. Displayed figures are rounded to the first decimal place.
**Sources:** Transcare Corporation and Subsidiaries Consolidated Financial Statements for the Years Ended December 31, 2009-2013 (TRANSCARE00062780-860); TransCare Monthly Financial Memorandum for November 2014 (AL-00400 at AL-00410), TransCare Monthly Financial Memorandum for December 2014 (PP-TRBK0028485 at PP-TRBK0028494), TransCare Monthly Financial Memorandum for October 2015 (PP-TRBK0004695 at PP-TRBK0004704).

CONFIDENTIAL

A0887

EXHIBIT 6

## TransCare Corporation
## Historical EBITDA
## 2009 - LTM October 2015
## In Millions



**Notes:** Values are presented as stated in the most recent audited financial statement for which a given year's Statement of Operations was provided. 2014 value is unaudited. 2015 value includes the last twelve months ("LTM") ended October 31, 2015 and reflects the last available actual results. Displayed figures are rounded to the first decimal place.
**Sources:** Transcare Corporation and Subsidiaries Consolidated Financial Statements for the Years Ended December 31, 2009-2013 (TRANSCARE00062780-860); TransCare Monthly Financial Memorandum for November 2014 (AL-00400 at AL-00410), TransCare Monthly Financial Memorandum for December 2014 (PP-TRBK0028485 at PP-TRBK0028494), TransCare Monthly Financial Memorandum for October 2015 (PP-TRBK0004695 at PP-TRBK0004704).

CONFIDENTIAL

Case 1:20-cv-06274-LAK  Document 11-8  Filed 09/30/20  Page 109 of 243

EXHIBIT 7



**TransCare Corporation**
**LTM EBITDA**
**November 2014 - October 2015**
**In Millions**

CONFIDENTIAL

**A0889**

EXHIBIT 7

**Sources:** TransCare Monthly Financial Memorandum for December 2013 (CM_TC2018_0004132 at CM_TC2018_0004141), TransCare Monthly Financial Memorandum for January 2014 (TRANSCARE00004571 at TRANSCARE00004580), TransCare Monthly Financial Memorandum for February 2014 (AL-00176 at AL-00186), TransCare Monthly Financial Memorandum for March 2014 (TRANSCARE00004609 at TRANSCARE00004618), TransCare Monthly Financial Memorandum for April 2014 (AL-00196 at AL-00206), TransCare Monthly Financial Memorandum for May 2014 (AL-00216 at AL-00226), TransCare Monthly Financial Memorandum for June 2014 (AL-00236 at AL-00246), TransCare Monthly Financial Memorandum for July 2014 (AL-00256 at AL-00266), TransCare Monthly Financial Memorandum for August 2014 (PP-TRBK0020769 at PP-TRBK0020778), TransCare Monthly Financial Memorandum for September 2014 (AL-00341 at AL-00351), TransCare Monthly Financial Memorandum for October 2014 (PP-TRBK0028798 at PP-TRBK0028807), TransCare Monthly Financial Memorandum for November 2014 (AL-00400 at AL-00410), TransCare Monthly Financial Memorandum for December 2014 (PP-TRBK0028485 at PP-TRBK0028494), TransCare Monthly Financial Memorandum for January 2015 (AL-00380 at AL-00390), TransCare Monthly Financial Memorandum for February 2015 (AL-00485 at AL-00495), TransCare Monthly Financial Memorandum for March 2015 (CM_TC2018_0013895 at CM_TC2018_0013904), TransCare Monthly Financial Memorandum for April 2015 (CM_TC2018_0013875 at CM_TC2018_0013884), TransCare Monthly Financial Memorandum for May 2015 (CM_TC2018_0013955 at CM_TC2018_0013964), TransCare Monthly Financial Memorandum for June 2015 (CM_TC2018_0013935 at CM_TC2018_0013944), TransCare Monthly Financial Memorandum for July 2015 (CM_TC2018_0013915 at CM_TC2018_0013924), TransCare Monthly Financial Memorandum for August 2015 (TRANSCARE00035020 at TRANSCARE00035030), TransCare Monthly Financial Memorandum for September 2015 (AL-00695 at AL-00705), TransCare Monthly Financial Memorandum for October 2015 (PP-TRBK0004695 at PP-TRBK0004704).

CONFIDENTIAL

EXHIBIT 8

# TransCare Corporation
## Annual EBITDA Forecasts
## 2015 - 2020
## In Millions

| As Of Date | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | Source |
|---|---|---|---|---|---|---|---|
| 01/07/16 | $ 1.4 | $ 6.9 | $ 13.3 | $ 17.2 | $ 21.8 | $ 26.1 | January 7, 2016 Preliminary Plan |
| 01/27/16 | | $ 5.0 | | | | | January 27, 2016 Carl Marks Turnaround Plan |
| 01/28/16 | | $ 5.2 | | | | | January 28, 2016 Update to Carl Marks Turnaround Plan |
| 02/24/16 | | $ 3.2 | | | | | February 24, 2016 NewCo Model |

**Notes:** Projections as of 02/24/16 are for the three business lines to be included in NewCo: Pennsylvania, Hudson Valley, and Paratransit. Displayed figures are rounded to the first decimal place.

CONFIDENTIAL

Case 1:20-cv-06274-LAK Document 01-8 Filed 09/30/20 Page 112 of 243

EXHIBIT 9

# TransCare Corporation
## Annual Revenue Forecasts
### 2015 - 2020
### In Millions

| As Of Date | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | Source |
|---|---|---|---|---|---|---|---|
| 01/07/16 | $115.0 | $117.0 | $140.0 | $169.0 | $207.0 | $223.0 | January 7, 2016 Preliminary Plan |
| 01/27/16 | | $100.5 | | | | | January 27, 2016 Carl Marks Turnaround Plan |
| 01/28/16 | | $102.3 | | | | | January 28, 2016 Update to Carl Marks Turnaround Plan |
| 02/24/16 | | $ 37.2 | | | | | February 24, 2016 NewCo Model |

**Notes:** Projections as of 02/24/16 are for the three business lines to be included in NewCo: Pennsylvania, Hudson Valley, and Paratransit. Displayed figures are rounded to the first decimal place.

EXHIBIT 10

# TransCare Corporation
## Summary of Projections by Viewing Parties

| As Of Date | Patriarch | Carl Marks | Lockton | Source |
|---|---|---|---|---|
| 01/07/16 | YES | YES | | January 7, 2016 Preliminary Plan |
| 01/27/16 | YES | YES | | January 27, 2016 Carl Marks Turnaround Plan |
| 01/28/16 | YES | | | January 28, 2016 Update to Carl Marks Turnaround Plan |
| 02/24/16 | YES | | YES | February 24, 2016 NewCo Model |

CONFIDENTIAL

A0893

EXHIBIT 11



**Notes:** Amounts shown pertain to achieving projected 2016 year-end EBITDA. Intended use categories are shown by most to least critical from bottom to top, based on representations made in the plans and models. Accounts Payable includes payroll, payroll taxes, insurance, rent, and other. These figures do not include interest deferment. The 02/24/16 NewCo Model doesn't identify capital requests associated with achieving projected 2016 year-end EBITDA. Displayed figures are rounded to the first decimal place.
**Sources:** January 7, 2016 Preliminary Plan (CM_TC2018_0003369 at CM_TC2018_0003370-71); January 27, 2016 Carl Marks Turnaround Plan (CM_TC2018_002108 at CM_TC2018_002116); January 28, 2016 Update to Carl Marks Turnaround Plan (PP-TRBK0013274).

CONFIDENTIAL

A0894

# TransCare Corporation
## Implied Total Enterprise Value
## Comparable Company EV / Forward EBITDA Multiples Method
## In Millions

EXHIBIT 12a



**Notes:** In an analysis prepared for Ms. Tilton, Mr. Greenberg identified Envision Healthcare Corporation, Air Methods Corp., and PHI, Inc. as market comparables. Mr. Greenberg excluded PHI of the analysis because it "appear[ed] to be an outlier". This analysis is based on TEV/EBITDA multiples for Envision Healthcare Corporation and Air Methods Corporation as of each valuation date.
**Sources:** S&P Capital IQ, January 7, 2016 Preliminary Plan; January 27, 2016 Carl Marks Turnaround; January 28, 2016 Update to Carl Marks Turnaround; February 24, 2016 NewCo Model; PP-TRBK0041414.

CONFIDENTIAL

A0895

Case 1:20-cv-06274-LAK    Document 11-8    Filed 09/30/20    Page 116 of 243

EXHIBIT 12b

# TransCare Corporation
## Implied Total Enterprise Value
## Precedent Transaction EV / EBITDA Multiples Method
## In Millions



**Notes:** In an analysis prepared for Ms. Tilton, Mr. Greenberg identified two transaction comparables with available multiples: 1) July 2015 Envision Healthcare Corporation's acquisition of Rural/Metro Corporation, and 2) KKR & Co., Inc.'s acquisition of Air Medical Group Holdings. This analysis is based on TEV / LTM EBITDA multiples for the targets in the two acquisitions as identified by Mr. Greenberg.
**Sources:** January 7, 2016 Preliminary Plan; January 27, 2016 Carl Marks Turnaround Plan; January 28, 2016 Update to Carl Marks Turnaround Plan; February 24, 2016 NewCo Model; PP-TRBK0041414.

CONFIDENTIAL

Case 1:20-cv-06274-LAK   Document 11-8   Filed 09/30/20   Page 117 of 243

EXHIBIT 12c

# TransCare Corporation
## Implied Total Enterprise Value
## EV/EBITDA Multiple from Expressions of Interest
## In Millions



**Sources:** Exhibit 3; January 7, 2016 Preliminary Plan; January 27, 2016 Carl Marks Turnaround Plan; January 28, 2016 Update to Carl Marks Turnaround Plan; February 24, 2016 NewCo Model.

CONFIDENTIAL

**A0897**

EXHIBIT 12d



**TransCare Corporation**
**Implied Total Enterprise Value**
**EV/EBITDA Industry Multiples Identified by Ms. Tilton**
**In Millions**

**Sources:** January 7, 2016 Preliminary Plan (CM_TC2018_0003376); January 27, 2016 Carl Marks Turnaround Plan; January 28, 2016 Update to Carl Marks Turnaround Plan; February 24, 2016 NewCo Model; Tilton Deposition at p. 119.

CONFIDENTIAL

**A0898**

EXHIBIT 12e

**TransCare Corporation**
**Summary of Implied Total Enterprise Value Ranges**
**In Millions**

| EV / EBITDA Multiples Methodology | WholeCo | | | NewCo |
| --- | --- | --- | --- | --- |
| | 01/07/16 | 01/27/16 | 01/28/16 | 02/24/16 |
| Comparable Company Method | $50.1 - $86.5 | $35.3 - $60.6 | $36.2 - $62.6 | $22.7 - $39.1 |
| Precedent Transaction Method | $69.4 - $74.3 | $49.7 - $53.1 | $51.8 - $55.4 | $32 - $34.3 |
| **Range Based on Comparable Company and Precedent Transaction Methods** | | **$35.3 - $86.5** | | **$22.7 - $39.1** |
| | | | | |
| Expressions of Interest | $55.5 | $39.7 | $41.4 | $25.6 |
| Industry Multiple Range identified by Ms. Tilton | $48.6 - $55.5 | $34.8 - $39.7 | $36.2 - $41.4 | $22.4 - $25.6 |

**Note:** Displayed figures are rounded to the first decimal place.
**Sources:** Exhibits 12a - 12d.

CONFIDENTIAL

A0899

## TransCare Corporation
## Summary of Liquidation Value
## In Millions

| | | WholeCo | NewCo |
|---|---|---|---|
| Sale of Certificates of Need | [A.1] | $12.3 | $1.9 |
| Cost of Sale of Certificates of Need | [A.2] | $0.6 | $0.0 |
| **Net Proceeds from Sale of Certificates of Need** | **[A.3] = [A.1] - [A.2]** | **$11.7** | **$1.9** |
| | | | |
| Sale of Equipment and Physical Assets | [B.1] | $2.4 | $0.8 |
| Cost of Sale of Equipment and Physical Assets | [B.2] | $0.4 | $0.0 |
| **Net Proceeds from Sale of Equipment and Physical Assets** | **[B.3] = [B.1] - [B.2]** | **$2.0** | **$0.8** |
| | | | |
| Accounts Receivable Collected Post-Bankruptcy | [C.1] | $5.6 | $3.1 |
| Cost of Accounts Receivable Collection | [C.2] | $0.0 | $0.0 |
| **Net Proceeds from Accounts Receivable Collection** | **[C.3] = [C.1] - [C.2]** | **$5.6** | **$3.1** |
| | | | |
| **Total Liquidation Value** | **[D] = [A.3] + [B.3] + [C.3]** | **$19.2** | **$5.7** |

**Notes:**

Displayed figures are rounded to the first decimal place.

[A.1]: For WholeCo, the entire amount received from the sale of the Certificates of Need is included. For NewCo, only the amount received from the sale of Certificate of Need No. 0667 is included.

[A.2]: For WholeCo, I identified the following expenses: A payment of $90 thousand associated with a "Break-Up Fee" to Maler Group, LLC, a payment for Trustee's expenses of $205 thousand, a payment of $259 thousand for reimbursement of expenses associated with the public auctions of the Certificates of Need, and a payment of $29 thousand associated with the expenses of the Patient Care Ombudsman. For NewCo, I identified $2.3 thousand in Trustee's expenses associated with selling Certificate of Need No. 0667, the only one attributable to the NewCo assets.

[B.1]: The NewCo value includes auctions held on May 6, 2016 in Poughkeepsie, NY and May 11, 2016 in Monroeville, PA.

[B.2]: I was not able to identify costs associated with the sale of equipment and physical assets directly attributable to NewCo assets. I have therefore conservatively assigned a value of zero.

[C.1]: I understand Wells Fargo received approximately an additional $2.6 million in accounts receivable collected by parties other than the Estate. Per counsel's instruction, I estimate this additional amount to be equal to the difference of the Wells Fargo loan balance as of February 24, 2016 ($13.4 million) and all of the funds received by Wells Fargo from the Trustee associated with the sale of TransCare's assets ($10.8 million). Therefore, the total amount of accounts receivable attributable to WholeCo consists of the sum of 1) the $2.6 million estimated as explained above, 2) the $2.43 million settlement amount received from the New York City Transit Authority and its affiliate the Metropolitan Transportation Authority, and 3) the $595 thousand settlement with the Bronx-Lebanon Hospital Center and the St. Barnabas Hospital. I assume a 19.8% allocation for the Hudson Valley and Pittsburgh operations of TransCare out of the total amount of accounts receivable (excluding the MTA operations) based on the accounts receivables balances for NewCo and OldCo as of February 23, 2016.

[C.2]: I conservatively do not include any costs associated with collecting the accounts receivable.

CONFIDENTIAL

**Sources:**

Affirmation to Confirm the Results of the Sale of the Debtors' Ambulance Service Certificates Issued by the New York State Department of Health entered on July 1, 2016 before the U.S. Bankruptcy Court of the Southern District of New York (Chapter 7 Case No. 16-10407 (SMB)); Auctioneer's Report of Sale for the Auction Sales Conducted on April 20, May 4, May 6, May 11, and May 12, 2016 entered on August 23, 2016 submitted before the U.S. Bankruptcy Court of the Southern District of New York (Chapter 7 Case No. 16-10407 (SMB)); Auctioneer's Report of Sale for the Auction Sale Conducted on June 21, 2016 entered on August 23, 2016 submitted before the U.S. Bankruptcy Court of the Southern District of New York (Chapter 7 Case No. 16-10407 (SMB)); Monthly Operating Statement for the Period Ended September 30, 2016 entered on October 18, 2016 submitted before the U.S. Bankruptcy Court of the Southern District of New York (Chapter 7 Case No. 16-10407 (SMB)); Monthly Operating Statement for the Period Ended November 30, 2016 entered on January 18, 2017 submitted before the U.S. Bankruptcy Court of the Southern District of New York (Chapter 7 Case No. 16-10407 (SMB)); Monthly Operating Statement for the Period Ended December 31, 2016 entered on January 17, 2017 submitted before the U.S. Bankruptcy Court of the Southern District of New York (Chapter 7 Case No. 16-10407 (SMB)); Monthly Operating Statement for the Period Ended March 31, 2017 entered on May 16, 2017 submitted before the U.S. Bankruptcy Court of the Southern District of New York (Chapter 7 Case No. 16-10407 (SMB)); Monthly Operating Statement for the Period Ended February 29, 2016 entered on April 26, 2016 submitted before the U.S. Bankruptcy Court of the Southern District of New York (Chapter 7 Case No. 16-10407 (SMB)); Monthly Operating Statement for the Period Ended March 31, 2016 entered on April 26, 2016 submitted before the U.S. Bankruptcy Court of the Southern District of New York (Chapter 7 Case No. 16-10407 (SMB)); Monthly Operating Statement for the Period Ended April 30, 2016 entered on June 1, 2016 submitted before the U.S. Bankruptcy Court of the Southern District of New York (Chapter 7 Case No. 16-10407 (SMB)); Monthly Operating Statement for the Period Ended May 31, 2016 entered on July 7, 2016 submitted before the U.S. Bankruptcy Court of the Southern District of New York (Chapter 7 Case No. 16-10407 (SMB)); Monthly Operating Statement for the Period Ended June 30, 2016 entered on August 19, 2016 submitted before the U.S. Bankruptcy Court of the Southern District of New York (Chapter 7 Case No. 16-10407 (SMB)); Monthly Operating Statement for the Period Ended July 31, 2016 entered on August 19, 2016 submitted before the U.S. Bankruptcy Court of the Southern District of New York (Chapter 7 Case No. 16-10407 (SMB)); Monthly Operating Statement for the Period Ended August 31, 2016 entered on September 20, 2016 submitted before the U.S. Bankruptcy Court of the Southern District of New York (Chapter 7 Case No. 16-10407 (SMB)); Monthly Operating Statement for the Period Ended October 31, 2016 entered on November 15, 2016 submitted before the U.S. Bankruptcy Court of the Southern District of New York (Chapter 7 Case No. 16-10407 (SMB)); Monthly Operating Statement for the Period Ended January 31, 2017 entered on February 23, 2017 submitted before the U.S. Bankruptcy Court of the Southern District of New York (Chapter 7 Case No. 16-10407 (SMB)); Monthly Operating Statement for the Period Ended February 28, 2017 entered on March 16, 2017 submitted before the U.S. Bankruptcy Court of the Southern District of New York (Chapter 7 Case No. 16-10407 (SMB)); Monthly Operating Statement for the Period Ended April 30, 2017 entered on May 16, 2017 submitted before the U.S. Bankruptcy Court of the Southern District of New York (Chapter 7 Case No. 16-10407 (SMB)); Schedule 1 of Order Authorizing the Chapter 7 Trustee to Allocate the Expenses of the Public Auctions Between the Debtors' Estates and Reimburse the TransCare Corporation Estate and for Related Relief entered on April 5, 2017 submitted before the U.S. Bankruptcy Court of the Southern District of New York (Chapter 7 Case No. 16-10407 (SMB)); Schedule 2 of Order Authorizing the Chapter 7 Trustee to Allocate the Expenses of the Public Auctions Between the Debtors' Estates and Reimburse the TransCare Corporation Estate and for Related Relief entered on April 5, 2017 submitted before the U.S. Bankruptcy Court of the Southern District of New York (Chapter 7 Case No. 16-10407 (SMB)); Exhibit C of Summary Sheet for First Interim Application of Lamonica Herbst & Maniscalco, LLP, Counsel to Salvatore Lamonica, As Chapter 7 Trustee, for Allowance of Interim Compensation and Reimbursement of Expenses entered on February 7, 2017 submitted before the U.S. Bankruptcy Court of the Southern District of New York (Chapter 7 Case No. 16-10407 (SMB)); Order Authorizing and Approving the Sale of Ambulance Service Certificate No. 0667 to Maler Group LLC entered on July 7, 2016 submitted before the U.S. Bankruptcy Court of the Southern District of New York (Chapter 7 Case No. 16-10407 (SMB)); First Interim Fee Application of Lucy L. Thomson for Allowance of Compensation for Services Rendered as Patient Care Ombudsman entered on February 7, 2017 submitted before the U.S. Bankruptcy Court of the Southern District of New York (Chapter 7 Case No. 16-10407 (SMB)); Notice of Hearing on the Motion of Chapter 7 Trustee Seeking Entry of an Order, Pursuant to Federal Rule of Bankruptcy Procedure 9019(a), Approving the Mutual Release and Settlement Agreement By and Between the Chapter 7 Trustee, On Behalf of the Debtors' Estates, Wells Fargo Bank, N.A., and Montefiore Medical Center, Montefiore Mount Vernon Hospital and Montefiore New Rochelle Hospital entered on December 6, 2016 submitted before the U.S. Bankruptcy Court of the Southern District of New York (Chapter 7 Case No. 16-10407 (SMB)); CM_TC2018_0005038; CM_TC2018_0005039; PP-TRBK0078085; PP-TRBK0044399; PP-TRBK0004573; PP-TRBK0004574; WF00001541.

CONFIDENTIAL

Case 1:20-cv-06274-LAK   Document 11-8   Filed 09/30/20   Page 122 of 243   Pg

EXHIBIT 14

## TransCare Corporation
## Difference between Operating Value and Liquidation Value
## In Millions

|  |  | WholeCo | | NewCo | |
|---|---|---|---|---|---|
|  |  | **Min** | **Max** | **Min** | **Max** |
| **Operating Value** | [A] | $35.3 | $86.5 | $22.7 | $39.1 |
| **Liquidation Value** | [B] | $19.2 | $19.2 | $5.7 | $5.7 |
| **Difference** | **[C] = [A] - [B]** | **$16.1** | **$67.3** | **$17.0** | **$33.4** |

**Note:** Displayed figures are rounded to the first decimal place.

**Sources:**

[A]:  Exhibit 12.

[B]:  Exhibit 13.

CONFIDENTIAL

Case 1:20-cv-06274-LAK   Document 11-8   Filed 09/30/20   Page 123 of 243

# EXHIBIT 2

Jonathan Arnold - March 11, 2019

```
  1                UNITED STATES BANKRUPTCY COURT

  2              SOUTHERN DISTRICT OF NEW YORK

  3     ─────────────────────────────)
        In re                        )  Chapter 7
  4                                   )  Case No. 16-10407
        TRANSCARE CORPORATION, et     )  (SMB)
  5     al.,                          )  (Jointly
                                      )  Administered)
  6                      Debtors.     )
                                      )
  7     ─────────────────────────────)
                                      )
        SALVATORE LAMONICA, as        )
  8     Chapter 7 Trustee for the     )
        Estates of TransCare          )  Adv. Proc. No.
  9     Corporation, et al.,          )  18-01021
                                      )
 10                      Plaintiff,   )
                                      )
 11                      v.           )
                                      )
 12     LYNN TILTON, et al.,          )
                                      )
 13                      Defendants.  )
        ─────────────────────────────)
 14

 15

 16

 17           DEPOSITION OF JONATHAN ARNOLD

 18              New York, New York

 19           Monday, March 11, 2019

 20

 21

 22

 23

 24

 25     Reported by:  Tab Prewett, RPR, CSR, CLNR
```

GregoryEdwards, LLC  |  Worldwide Court Reporting
GregoryEdwards.com  |  866-4Team GE

Jonathan Arnold - March 11, 2019

1              JONATHAN ARNOLD

2              Were you asked -- well, let's

3    actually look at your report at page two.

4    Paragraph four, it says:

5              "I have been asked by counsel for

6    Salvatore Lamonica."

7              And then it goes on to describe

8    what you were asked to do.

9         A    Yes.

10        Q    Is it your testimony that you

11   considered the possibility of opining on value at

12   other points in time, but didn't have the data

13   necessary to do so?

14             MR. SAMET:  Objection.

15        A    No.

16        Q    Okay.  Is it correct that -- there

17   is no judgment in this question.  But is it

18   correct that the four dates that you used were

19   the four dates that were selected for you by

20   counsel?

21             MR. SAMET:  Objection.

22        A    The four dates I used are the four

23   dates that were identified to me by counsel as

24   being relevant.  I did, however, inquire and look

25   into whether there were any additional forward

Jonathan Arnold - March 11, 2019

```
1                    JONATHAN ARNOLD
2          Q    Right.  That wasn't -- I
3    understand, but that wasn't exactly my question.
4    Let me focus on this.
5               You testified a moment ago:
6               "I did, however, inquire and look
7    into whether there were any additional forward
8    projections that occurred during January and
9    February.  That should be part of the set that I
10   analyzed."
11              Do you recall that testimony?
12         A    Yes.
13         Q    And so what I'm asking you is, is
14   your -- your inquiries to counsel about
15   additional forward projections were limited in
16   time to January and February of 2016?
17         A    Yes.
18         Q    Was there a reason or reasons why
19   your inquiry about other forward-looking
20   projections was limited to those two months?
21              MR. SAMET:  Objection to the form.
22         A    Those -- that was the time period
23   that counsel asked me to focus on.
24         Q    And you -- do you have an
25   understanding as to why counsel asked you to
```

GregoryEdwards, LLC |  Worldwide Court Reporting
GregoryEdwards.com |  866-4Team GE

```
1                    JONATHAN ARNOLD
2      dates were identified to me by counsel to analyze
3      and express an opinion as to the value or range
4      of values that are supported by the projections
5      in the -- each of those four documents.
6           Q      And do you have any
7      understanding -- you may not.  But do you have an
8      understanding as to why those four dates were
9      identified to you by counsel?
10                 MR. SAMET:  Objection.
11          A      Yes.
12          Q      And what is that understanding?
13                 MR. SAMET:  Objection.
14          A      My understanding is that the
15     projections that were issued on these four dates
16     represent the final conclusion as to the -- on
17     the part of the authors of those four projections
18     as to the future performance of TransCare,
19     combined with the fact that the authors
20     themselves were senior people within the
21     TransCare, let's call it, ecosystem.
22                 They're not all TransCare
23     employees, of course.  Some of them are up the
24     ladder at firms above it or, alternatively, an
25     outside advisor that was approved of and
```

Case 1:20-cv-06274-LAK Document 101-8 Filed 09/30/20 Page 128 of 242

Jonathan Arnold - March 11, 2019

```
1                    JONATHAN ARNOLD

2      supported by TransCare's bankers.

3              So these analyses themselves, I

4      think, are believed by counsel to have sufficient

5      reliability to form -- to inform the process.

6         Q    I understand what you just said.  I

7      just want to draw a distinction between your

8      views and what was communicated to you by

9      counsel.

10             Do you -- do you have any

11     independent opinion about the relevance or not of

12     the four dates to any of the issues in this

13     lawsuit?

14             MR. SAMET:  Objection to form.

15        A    Would you repeat the question,

16     please.

17             MR. MERVIS:  Can you read it back?

18             (Reporter read back pending

19        question.)

20        A    Yes.

21        Q    And what opinion or opinions do you

22     have?

23             MR. SAMET:  Objection.

24        A    My view is that the specific dates

25     are not particularly relevant in the sense that,
```

Jonathan Arnold - March 11, 2019

Page 72

```
 1                    JONATHAN ARNOLD
 2    the January 7th date, the model that created
 3    those projections has 2015 financial data
 4    embedded in it?
 5         A      It reports numbers for 2015, and
 6    then it forecasts financial data for 2016 and
 7    onward.
 8         Q      In connection with the January 7th
 9    projections, did you form an opinion as to their
10    degree of reliability?
11                MR. SAMET:  Objection to the form.
12         A      Yes.
13         Q      Tell me what you did to form
14    that -- well, first of all, what opinion did you
15    form?
16         A      I formed the opinion that using the
17    data in the January 7th projections is a
18    reasonable starting point for inferring value as
19    of that date.
20         Q      And what did you -- what specific
21    work did you do to come to that opinion?
22                MR. SAMET:  Objection to the form.
23         A      I inquired as to the role and
24    knowledge of the authors of it, and also whether
25    it was circulated outside of the Tilton family of
```

Jonathan Arnold - March 11, 2019

```
1                    JONATHAN ARNOLD
2      companies.
3           Q     Anything else?
4           A     Not that I recall as I sit here,
5      no.
6           Q     You did review historical financial
7      information in connection with your work on this
8      case, correct?
9           A     I have, yes.
10          Q     Did you consider any of that
11     historical financial information in forming the
12     view about the reliability of the January 7, 2016
13     projections?
14                MR. SAMET:  Objection.
15          A     I considered whether there's a
16     connection between the two, yes.
17          Q     And what did you conclude in that
18     regard?
19          A     I concluded that the January 7,
20     2016 projection is evaluating the likely future
21     prospects for TransCare under a different regime,
22     namely resetting the priorities, rationalizing
23     the business, et cetera.  So it is a -- I think
24     it was expected -- my read is that it was
25     expected to be a different business, not just
```

18-01021-smb   Doc 107-2   Filed 07/08/19   Entered 07/08/19 22:14:28   Ex. 2   Pg
9 of 47

1               JONATHAN ARNOLD

2          A     Yes.

3          Q     If you go to the spreadsheet that's

4     I think the last attachment in that exhibit, you

5     will see there's a spreadsheet that has little

6     page numbers in the bottom right-hand corner?

7          A     Yes.

8          Q     If you could go to page 36.  And

9     you have -- you had this page available to you,

10    correct?

11         A     Yes.

12         Q     And if you look at the top column

13    and you go to November and December, that's 2015,

14    right?

15         A     Yes, it is.

16         Q     And it shows EBITDA declining to

17    472, negative 472 in November, and negative 552

18    in December?

19         A     Yes.

20         Q     And it also shows EBITDA margins

21    declining during those same two months, yes?

22         A     Yes, it does.

23         Q     Okay.  Let's go back to the E-Mail

24    portion of Exhibit D.

25               The $6.9 million projected EBITDA,

Jonathan Arnold - March 11, 2019

1                    JONATHAN ARNOLD

2        that -- the model incorporates a number of

3        assumptions, right?

4              A      It does.

5              Q      And if you go -- actually, I

6        misdirected you.  If you go to what I think is

7        the first spreadsheet -- actually, it's the same

8        one we were looking at with the page numbers.

9        And if you go to page four, which is -- has a

10       heading "Major Assumptions 2016."

11             A      Yes.

12             Q      And this is something that you

13       reviewed in connection with your work on this

14       case, the physical page?

15             A      Yeah.  I read the document, so I'm

16       sure I read it at some point along the way.

17             Q      And you understand what's

18       identified here to be at least some of the

19       assumptions that are built into the model that --

20       that spit out the $6.9 million projected EBITDA

21       for 2016?

22             A      That's my interpretation, yes.

23             Q      Let's look at some of the

24       assumptions.  You see the first bullet point

25       refers to the renewal of a credit agreement with

Jonathan Arnold - March 11, 2019

Page 80

```
 1                    JONATHAN ARNOLD

 2     Wells Fargo?

 3          A      Yes.

 4          Q      And did you -- what, if anything,

 5     do you know about the state of efforts to renew

 6     that agreement as of January 7th of 2016?

 7          A      I'm not sure I can answer that

 8     question as of January 7th.  But my general

 9     understanding is that there were discussions

10     between Wells Fargo and TransCare during that

11     month, January 2016.

12          Q      Okay.  And did you do any

13     investigation as to how likely folks on the

14     TransCare side of the relationship felt it was

15     that there would be a renewal at that time?

16               MR. SAMET:  Objection to form.

17          A      I don't recall seeing documents

18     that characterized their view.

19          Q      Okay.  If that -- if there had not

20     been success in renewing the Wells Fargo credit

21     agreement, do you know what dollar impact that

22     would have on the EBITDA projections generated by

23     the January 7th model?

24               MR. SAMET:  Objection.

25          A      I have not run those numbers, no.
```

Jonathan Arnold - March 11, 2019

Page 81

```
 1                    JONATHAN ARNOLD
 2         Q     Then I guess -- well, there are
 3    bullets and subbullets, so we'll go to the third
 4    bullet, which says:
 5               "New leases for a total of 118
 6    vehicles are planned."
 7               Do you see that?
 8         A     Yes.
 9         Q     And at the bottom, it -- actually,
10    the last subbullet there, in all caps, in bold,
11    it says:
12               "Model assumes company can obtain
13    credit and need down" -- I think that's -- should
14    say "down payment" -- "of 25 percent."
15               Do you see that?
16         A     Yes.
17         Q     What is your understanding, if any,
18    about efforts to obtain some or all of those 118
19    vehicles?
20               MR. SAMET:  Objection to the.
21         A     I don't know what efforts were
22    taken.
23         Q     And do you have an understanding as
24    to how creditworthy TransCare was in January of
25    2016?
```

**A0914**

Jonathan Arnold - March 11, 2019

Page 82

```
1                    JONATHAN ARNOLD
2                    MR. SAMET:  Objection to form.
3         A     I don't know what its rating would
4    be, or something specific like that, but it's
5    clear that it was in financial distress.
6         Q     And did you investigate how likely
7    it was that TransCare would have been able to
8    obtain the credit it needed to make -- to lease
9    the 118 vehicles?
10                   MR. SAMET:  Objection to form.
11        A     I did not, no.
12        Q     Is the number of vehicles that the
13   company would be able to lease, is that an
14   important input into Mr. Greenberg's model?
15        A     It is an input into his model.  I
16   think it's going to flow through to the revenue
17   that's going to get generated.
18        Q     Because the more ambulances they
19   have, the more revenue you can generate as a
20   general matter?
21                   MR. SAMET:  Objection to form.
22        A     Well, obviously, there's a limit.
23   If they've got 5,000 ambulances, they may not be
24   able to use the last one for anything.  But I
25   think the idea is that the ambulances that are
```

**A0915**

18-01021-smb   Doc 107-2   Filed 07/08/19   Entered 07/08/19 22:14:28   Ex. 2   Pg 14 of 47

```
1                      JONATHAN ARNOLD
2      set forth in this budget, that they would be
3      producing revenue coming right out of the gate.
4            Q      The money to lease the new
5      vehicles, where was that going to come from?
6            A      Well, there were several
7      possibilities that are laid out here.  I don't
8      have personal knowledge of where they were going
9      to come from; but the modeling was either through
10     some sort of letter of credit or, alternatively,
11     from an extension of the Wells Fargo facility,
12     assuming they were going to do it themselves as
13     opposed to sell the company to a third party.
14           Q      Okay.  I'm -- so in other words --
15     let me make sure I understand.
16                  You understand that the model
17     assumes an infusion of working capital into
18     TransCare, right?
19                  MR. SAMET:  Objection to form.
20           A      It does have a cash flow
21     requirement element to it -- a cash requirement
22     element to it, yes.
23           Q      And at least to generate the
24     $6.9 million EBITDA number, how much working
25     capital would -- does the model require be
```

Jonathan Arnold - March 11, 2019

1                          JONATHAN ARNOLD

2     infused into the company?

3                    MR. SAMET:  Objection to form.

4          A      This page of the spreadsheet

5     identifies a peak working capital need of

6     $7.8 million several months later.

7          Q      Okay.  All right.  This page being

8     the major assumptions?

9          A      Page four of the document ending in

10    Bates No. 3376, yes.

11         Q      Okay.  And so let me go back to my

12    initial question.

13                 What's your understanding of what

14    the source of that capital would be under this

15    model?

16         A      I don't know that one particular

17    source is identified, but one possibility is that

18    it would come from Ms. Tilton, I suppose.

19         Q      Okay.  Did you investigate the

20    extent to which Ms. Tilton had any legal

21    obligation to infuse capital into the TransCare

22    business at this time?

23         A      I did not undertake such an

24    investigation.

25         Q      Fair to say that the infusion of --

18-01021-smb   Doc 107-2   Filed 07/08/19   Entered 07/08/19 22:14:28   Ex. 2   Pg
16 of 47

1           JONATHAN ARNOLD

2    well, let's go to that bullet point, the second

3    bullet point, "peak working capital needed," by

4    3/2016 is 7.8 million.

5              Fair to say that, if that capital

6    could not be or was not obtained, then the model

7    wouldn't -- then under this model, you wouldn't

8    get $6.9 million in EBITDA for 2016?

9         A    That's the way I would read this

10   document, yes.

11        Q    Did you -- in connection with your

12   work in this case, did you do any investigation

13   as to the availability of -- for lease of the --

14   of vehicles of the type that are indicated in the

15   third big bullet on -- on the major assumptions

16   page?

17        A    No.

18        Q    So to your understanding, the model

19   assumes that they would be available for lease?

20        A    That's my interpretation of it,

21   yes.

22        Q    And if that turned out not to be

23   the case, that would have a negative impact in

24   terms of the positive EBITDA that the model would

25   generate?

Jonathan Arnold - March 11, 2019

Page 86

1                    JONATHAN ARNOLD

2        A     I haven't run the numbers, but I

3   would expect that it would have an adverse effect

4   on the EBITDA.

5        Q     If you could turn to the first page

6   of the spreadsheet, or page one of the

7   spreadsheet to Exhibit D.

8        A     Yes.

9        Q     This spreadsheet shows, actually,

10  multiple scenarios, right?

11       A     Yes.

12       Q     And you, in your report, you relied

13  on -- you used only one of them, right, which was

14  scenario 1A?

15       A     Yes.

16       Q     Fair to say that, under each of the

17  other scenarios, there's either no positive

18  EBITDA or negative EBITDA for 2016?

19       A     No.  Scenario 1B produces the same

20  EBITDA forecast as 1A.

21       Q     Right.

22       A     But the other scenarios, 2, 3, 4A

23  and 4B, result in negative EBITDA for 2016.

24       Q     Got it.

25             The difference between 1A and 1B is

Jonathan Arnold - March 11, 2019

1                    JONATHAN ARNOLD

2      that under 1A, 1A involves leasing of vehicles

3      with 25 percent down and 1B involves the purchase

4      of vehicles outright?

5            A      Yes.

6            Q      And if you look at scenarios 4A and

7      4B, those involve -- those both involve the

8      acquisition of 70 vehicles, right?

9            A      I think that's the way to read it.

10           Q      Right.  20 new and -- it's 20 plus

11     50, right?

12           A      Yeah.  It reads 20 new 911

13     vehicles, which is one type, and then AM 50 with

14     no characterization.  I think what you're doing

15     is inferring that those 50 is the other type of

16     vehicle, the vans and transport service vehicles,

17     which I believe is an appropriate interpretation.

18           Q      And under both of those scenarios,

19     the company is losing -- for 2016, losing more

20     than 8.2 million in EBITDA -- or negative EBITDA,

21     more than 8.2 million?

22           A      No, that's not the way to read it.

23     In both of those scenarios, the company is

24     producing negative 1.2 million in EBITDA, which

25     translates to a negative variance of 8.2 million

**A0920**

Jonathan Arnold - March 11, 2019

Page 88

```
 1                    JONATHAN ARNOLD
 2      compared with scenarios 1A and 1B.
 3           Q     You're right.  I apologize.
 4           A     I know you weren't trying to
 5      mislead me.
 6           Q     But I thank you for setting me
 7      straight.
 8                 So can you tell, at least from
 9      looking at this page, whether there's a
10      correlation between -- in the model, between the
11      number of vehicles acquired and profitability?
12                 MR. SAMET:  Objection to form.
13           A     Well, yes.  In this model, the
14      great -- the higher vehicle acquisition count
15      translates to higher EBITDA.
16           Q     And did do you anything to
17      investigate where the break-even point is as --
18      as the number of vehicles increased?
19           A     I did not, no.
20                 MR. SAMET:  Objection.
21                 (A break is taken.)
22      CONTINUED DIRECT EXAMINATION
23      BY MR. MERVIS:
24           Q     Dr. Arnold, just sticking with that
25      page with the different scenarios, did you
```

Jonathan Arnold - March 11, 2019

Page 89

1                    JONATHAN ARNOLD

2    investigate or -- withdrawn.

3              Do you have an understanding as to

4    why these different scenarios were run?

5         A    I do not see any explanation for

6    why they were run in any of the documents.

7         Q    And did you do anything to try to

8    investigate that?

9              MR. SAMET:  Objection to form.

10        A    I did not.

11        Q    Did you form any view as to the

12   likelihood of being able to achieve the

13   results -- sorry.

14             Did you form any view as to the

15   likelihood that TransCare could achieve any of

16   the results in the different models?

17             MR. SAMET:  Objection to form.

18        A    I did not look at -- evaluate that

19   question, no.

20        Q    The modeling work that was done

21   here, do you know what the purpose -- or sorry.

22   Do you know why it was being done?

23        A    I don't have personal knowledge as

24   to why it was being done, but I have an

25   understanding based on my read of the documents.

Jonathan Arnold - March 11, 2019

Page 90

1                    JONATHAN ARNOLD

2          Q     Okay.  What is that understanding?

3          A     My understanding is that, in the

4    discussions that TransCare had with Wells Fargo,

5    Wells Fargo expressed the view that it was

6    interested in seeing projections for TransCare's

7    operations into the future and that it would --

8    it expressed a desire to have a third party that

9    was going to report to the board, evaluate

10   TransCare's prospects, and that that third party

11   should also be available or offer some level of

12   transparency to Wells Fargo.

13         Q     The model that you applied -- well,

14   the projections that you used in performing your

15   implied valuations were the scenario one

16   projections; is that right?

17         A     Yes.

18         Q     Okay.  Did you distinguish between

19   A and B, or were you indifferent to that?

20         A     My read of the documents is that

21   scenario 1A is the operative scenario.  That's

22   the one that results in the cash requirements

23   that are set forth in the document.  The modeling

24   in the January 7th E-Mail is oriented around

25   lease payments, not on 100 percent capital

Jonathan Arnold - March 11, 2019

Page 91

```
1                    JONATHAN ARNOLD
2      purchases of the additional vehicles.  Therefore,
3      I -- my view is that this preliminary plan is
4      focused and presumes scenario 1A.
5           Q     Okay.  Was there a reason or were
6      there reasons why you didn't do an implied value
7      calculation for TransCare based on scenarios 2,
8      3, 4A or 4B?
9                MR. SAMET:  Objection to form.
10          A     Yes.
11          Q     And what was the reason or what
12     were the reasons?
13          A     The reason is that I'm presuming
14     that management is going to choose the path of
15     the scenario that is most valuable, and their
16     choice is between one path that produces positive
17     EBITDA and three alternate paths that produce
18     losses going forward, that it's self-evident that
19     the first scenario dominates the others, and that
20     is the one that would be chosen.
21          Q     Did you consider, though, whether
22     the return under scenario 1 was sufficient to
23     warrant the capital infusion that that scenario
24     required?
25                Did you think about that?
```

Jonathan Arnold - March 11, 2019

Page 93

```
 1                    JONATHAN ARNOLD
 2              So you -- in order -- in order for
 3   the source of the $7.8 million in capital that
 4   was required to execute on plan 1 -- to make a
 5   decision that it was worth making that
 6   investment, all of the assumptions that are baked
 7   into the model would have to go right; wouldn't
 8   they?
 9              MR. SAMET:  Objection to form.
10         A    On average, it would have to go
11   right.  You could have some areas that exceed
12   expectations and other areas that fall short of
13   expectations.  But taken as a whole, on net, you
14   have to -- one would have to meet the overall
15   EBITDA projection, sure.
16         Q    And in your experience, wouldn't a
17   prudent investor think about the likelihood of
18   that happening before they invested the capital
19   required?
20         A    Yes.
21         Q    Did you think about the likelihood
22   of that happening in scenario 1?
23              MR. SAMET:  Objection to form.
24         A    I did, yes.
25         Q    And what did you conclude?
```

A0925

Jonathan Arnold - March 11, 2019

Page 95

```
1                    JONATHAN ARNOLD
2      available under these various valuation
3      approaches and using that to infer a value of
4      TransCare on a going-forward basis.
5                    (Mr. Maniscalco exited the
6            proceedings.)
7         A      It doesn't have to be that it's
8      going to continue to be operated within the Lynn
9      Tilton family of companies.  It could be sold to
10     a third party.  But whoever the owner is going
11     forward, I'm presuming it's going to end up in
12     the hands of the person who is going to operate
13     it in an economically efficient, i.e.,
14     profitable, fashion.
15                   And the comparable company
16     multipliers or recent sales of similar companies
17     are the ways that one does that in cases like
18     this.
19        Q      Okay.  Like I said, we'll come back
20     to this.
21                   All right.  Let's go back to the
22     E-Mail, Mr. Greenberg's E-Mail.
23                   If you go to the second page of
24     the -- this is Exhibit D to your deposition.  But
25     if you go to the second page, he has a "key
```

Jonathan Arnold - March 11, 2019

| | | |
|---|---|---|
| 1 | | JONATHAN ARNOLD |
| 2 | assumptions" section. | |
| 3 | | Do you see that, sort of in the |
| 4 | middle of the page? | |
| 5 | A | Page two of the E-Mail? |
| 6 | Q | Yes, page two of the E-Mail. |
| 7 | A | I'm looking at the wrong documents. |
| 8 | Q | That's okay. |
| 9 | A | Yes, I have the "key assumptions" |
| 10 | paragraph in front of me. | |
| 11 | Q | Okay.  I'm going to ask you a bunch |
| 12 | of questions about this section, but why don't | |
| 13 | you -- actually, just take a moment to read it to | |
| 14 | yourself and refresh your recollection. | |
| 15 | A | Okay.  I've taken a look at it. |
| 16 | Q | You see that there's a bunch of |
| 17 | sort of clear circled bullet points? | |
| 18 | A | Yes. |
| 19 | Q | Okay.  The second-to-the-last |
| 20 | bullet point says: | |
| 21 | | "EBITDA improves from 1.4 million |
| 22 | to 1.9 million based on the reasons outlined | |
| 23 | above." | |
| 24 | | Do you see that? |
| 25 | | MR. SAMET:  6.9. |

Jonathan Arnold - March 11, 2019

Page 97

```
 1                   JONATHAN ARNOLD
 2        Q      Sorry.
 3               "6.9 million based on the reasons
 4     outlined above.
 5               Do you see that?
 6        A      Yes.
 7        Q      And the 1.4 million is a reference
 8     to TransCare's EBITDA for 2015?
 9        A      Yes.
10        Q      And is it fair to say that the
11     improvement to 6.9 million assumes that all of
12     the bullets above that line actually happen?
13     Right?
14        A      Yes.  But at the same -- or that to
15     the extent there's a positive variance in one
16     place, it's offset by a negative variance
17     somewhere else.
18        Q      Right.
19        A      On average, it's --
20        Q      There could be some variance, but
21     overall, things need to go right; is that fair?
22        A      Yes.
23        Q      Now, in his -- in Mr. Greenberg's
24     "key assumptions" section, how many new vehicles
25     or replacement vehicles is he saying are
```

Jonathan Arnold - March 11, 2019

```
1                    JONATHAN ARNOLD
2      required?
3            A      Well, in one bullet point, he
4      references 20 911 vehicles for New York City, and
5      20 nonemergency vehicles.
6            Q      Right.
7            A      There's another bullet that says
8      "inject 20 new ambulances into the 911 business."
9            Q      Um-hum.
10           A      Those are the references that I see
11     as I sit here.
12           Q      You think it's a fair reading that
13     he's talking about somewhere between 40 and 60
14     new vehicles?
15                  MR. SAMET:  Objection.
16           A      Yes.
17           Q      And that's different than the 118
18     that's identified in the spreadsheets; right?
19           A      It is, yes.
20           Q      And what, if anything, did you do
21     to investigate that difference and why it
22     existed?
23                  MR. SAMET:  Objection.
24           A      I did not reconcile the two numbers
25     with one another.
```

18-01021-smb   Doc 107-2   Filed 07/08/19   Entered 07/08/19 22:14:25   Ex. 2   Pg
28 of 47

1                    JONATHAN ARNOLD

2          Q     Well, no doubt in your mind,

3     though, is there, that in order -- that the model

4     that gets you to the 6.9 million, that model

5     assumes 118 new vehicles, yes?

6                    MR. SAMET:  Objection.

7          A     I can't say definitively one way or

8     the other.

9          Q     Why not?

10         A     I just haven't gone through the

11    document to reconcile those particular elements

12    of the calculation.

13         Q     Let me make sure I understand what

14    that means.

15                You had access to a live version of

16    the model, right, of the Excel spreadsheet?

17         A     Yes.

18         Q     And you could have, if you were so

19    inclined, attempted to determine whether, in

20    fact, it did assume that there were 118 new

21    vehicles projected?

22         A     I don't know whether I could have

23    or not.  I just don't know.

24         Q     Okay.  But in any event, you

25    didn't?

Jonathan Arnold - March 11, 2019

```
 1                        JONATHAN ARNOLD

 2          A       I didn't, yes.

 3          Q       And you didn't try to?

 4          A       I did not attempt to.

 5          Q       If you go down to the bottom of

 6    that first page -- sorry, the second page of

 7    Mr. Greenberg's E-Mail, he talks about a peak

 8    need of close to 4.5 million.

 9                  Do you see that?

10          A       Yes.

11          Q       And that's lower than the

12    7.8 million peak working capital needed

13    identified in the 2016 major assumptions model

14    page we looked at before, yes?

15          A       Yes.

16          Q       Do you know whether those two

17    figures are apples-to-apples?

18          A       You mean by 7.8 million versus

19    4.5 million?

20          Q       Yes.

21          A       It doesn't appear to be.

22          Q       It does not appear to be?

23          A       No.

24          Q       Why do you say that?

25          A       Because the numbers are different
```

Jonathan Arnold - March 11, 2019

1                    JONATHAN ARNOLD

2       and they're both referencing the cash needs.

3            Q       Right.  And did you -- so -- and

4       what, if anything, did you do to investigate the

5       difference between what Mr. Greenberg says at the

6       bottom of page two of his E-Mail and what it says

7       about peak needs on the "major assumptions" page

8       of the spreadsheet?

9            A       I did not investigate the cause of

10      the difference.

11           Q       In assessing -- sorry.

12                   In deciding that it was okay to use

13      the $6.9 million 2016 projection to come up with

14      an implied operating value for TransCare, was it

15      important to you what the amount of new working

16      capital was assumed to be in the model?

17                   MR. SAMET:  Objection.

18           A       Well, within limits.  Yes.  I mean,

19      you wouldn't want to spend $100 million in order

20      to make 6.9 million in EBITDA going forward.  But

21      whether it's 4 million or 5 million or 6 million

22      in a greater scheme of things is not going to

23      change the conclusion that the company -- that

24      the operating business of TransCare was valuable.

25                   It had and could have been sold for

Jonathan Arnold - March 11, 2019

1              JONATHAN ARNOLD

2    EBITDA for 2016?

3         A    It projects a somewhat lower EBITDA

4    than the January 27th model.

5         Q    Right.

6         A    And, in particular, I believe it's

7    $5.0 million.

8         Q    And what -- did you form any

9    opinion or opinions as to the reliability of that

10   projection for 2016?

11        A    Yes.

12        Q    And what opinion or opinions did

13   you form?

14        A    My view is that, based on the fact

15   that these projections were prepared by a third

16   party with the -- I think, as I understand it, it

17   was approved by Wells Fargo, or at least embraced

18   by Wells Fargo -- that on that basis this is a

19   reasonable set of numbers to use to infer a value

20   for TransCare.

21        Q    Let me just drill down a bit.

22             In other words, the $5 million

23   projection, you found to be reasonable for those

24   reasons that you just stated?

25        A    Yes.

GregoryEdwards, LLC |  Worldwide Court Reporting
GregoryEdwards.com | 866-4Team GE

**A0933**

Jonathan Arnold - March 11, 2019

```
1                    JONATHAN ARNOLD
2         Q     Okay.  Did you do anything else to
3    test the reasonableness of the $5 million
4    projection in the Carl Marks plan?
5              MR. SAMET:  Objection to form.
6         A     Well, I would say that related to
7    what we -- what I just testified to is the fact
8    that Wells Fargo was expressing interest in the
9    results of this analysis, as well as interest in
10   management collectively, going all the way up to
11   Ms. Tilton's assessment and reaction to it.
12             So it was -- it was an analysis
13   that was, based on those communications,
14   respected and of interest to Wells Fargo.  That
15   was who was the major lender.  So those are
16   reasons to think that -- the fact that they cared
17   about it in this way is another reason to believe
18   that these were legitimate calculations.
19        Q     Let's go back to the January 7th
20   model.
21             Do you know whether Ms. Tilton ever
22   formed a view as to the reasonableness of the
23   $6.9 million EBITDA projection?
24        A     I do not know.
25        Q     Do you know whether anyone with
```

Jonathan Arnold - March 11, 2019

```
1                    JONATHAN ARNOLD
2      authority at Wells Fargo formed a view as to the
3      reasonableness of that projection?
4            A     I do not.
5            Q     Do you know whether Wells Fargo
6      actually ever even sought January 7th projections
7      or the model that was used to create them?
8            A     I don't know one way or the other.
9            Q     In sticking with the Exhibit E to
10     your deposition, do you know whether Ms. Tilton
11     ever formed a view as to the reasonableness of
12     the $5 million projection in the Carl Marks plan?
13           A     I do not know whether she did or
14     not.
15           Q     Do you know whether Wells Fargo
16     ever formed a view as to the reasonableness of
17     the projection in the Wells -- sorry, in the Carl
18     Marks plan?
19           A     I don't know whether they did or
20     not.
21           Q     Do you have an understanding of --
22     at a high level, of the fundamentals of the Carl
23     Marks plan?
24           A     I don't understand the question.
25           Q     That's fair.  It wasn't the best
```

Jonathan Arnold - March 11, 2019

1                     JONATHAN ARNOLD

2          Q      Let's take a look at the -- there's

3     an E-Mail; and the attachment is, I think, a

4     PowerPoint deck, in Exhibit E.  Let's take a look

5     at some of the pages in the deck.  I don't --

6     well, we'll use Bates numbers because I don't

7     think there are page numbers.

8                 Let's go to the second page, which

9     ends with 2111.  It says "situation analysis."

10         A      Yes.

11         Q      So at the very top, I guess the

12    first line says:

13                "TransCare is now operating at the

14    absolute breaking point."

15                Do you see that?

16         A      Yes.

17         Q      And did you read that before you

18    signed your expert report?  Did you read that

19    line?

20         A      Yes.

21         Q      Did you take away any understanding

22    as to what the author meant by operating in the

23    "absolute breaking point"?

24         A      My understanding of what it means?

25         Q      And what was that?

Jonathan Arnold - March 11, 2019

```
1                    JONATHAN ARNOLD
2          A     My understanding is that in the
3    view of the author TransCare would not continue
4    without changes for much longer.
5          Q     Do you know whether that was the
6    case with respect to either of the comparable
7    companies that you used in your -- in calculating
8    your operating -- your implied operating values?
9          A     Yes.
10         Q     It was the case, or it wasn't?
11         A     Yes, I know whether it was the
12   case.  Sorry.
13         Q     That's fair.  And was it the
14   case -- was it or was it not the case for either
15   of them?
16         A     It was not the case for those two.
17         Q     So then, if you go down, there's a
18   next -- I guess the next heading, "Strained and
19   Broken Customer Relationships," and then it talks
20   about a "void" in senior management.  Do you see
21   that?
22         A     Yes.
23         Q     And it talks about a "lack of
24   credibility."  Do you see that?
25         A     Yes.
```

Jonathan Arnold - March 11, 2019

```
 1                    JONATHAN ARNOLD

 2          Q      And what was your understanding, if

 3    any, of Carl Marks' plans to fix those issues?

 4          A      I believe they had it in their head

 5    that one of the goals and objectives would be to

 6    stabilize and repair those issues.

 7          Q      No, I understand that.  But do you

 8    know whether they had in mind any particular

 9    actions that should be taken to fix those issues?

10          A      I don't recall them laying out

11    specific steps, no.

12          Q      Do you know whether, for example,

13    Carl Marks had suggested to Ms. Tilton any

14    interim or permanent CEO that could fill the

15    position vacated by Mr. Leland?

16          A      I don't recall that one way or the

17    other.

18          Q      Going down a little bit, there's

19    another subbullet that says:

20                 "Continuing cycle of worry."

21                 And then there's a number of

22    subbullets below that, the second of which says:

23                 "Aging fleet, reliability, length

24    of time, out of service, et cetera."

25                 Do you see that?
```

**A0938**

```
1                   JONATHAN ARNOLD
2          A     Yes.
3          Q     And what was the Carl Marks plan
4    for addressing that issue of the aging fleet?
5          A      It was to stabilize the fleet,
6    repair it.  There may have been a discussion
7    about buying new vehicles.  I don't -- oh, yeah,
8    that's right; they also had as part of their
9    action plan to rationalize some of the lines of
10   businesses and, i.e., get rid of them, and also
11   to add vehicles.
12         Q     Okay.  And under the Carl Marks
13   plan, how many vehicles would be added?
14         A     I don't know the number.
15         Q      Is that something that you sought
16   to investigate, how many vehicles Carl Marks
17   planned to add?
18         A      I may have known it at some point.
19   I can look through the documents and see whether
20   it is if you want me to.  But that level of
21   granularity was not something that I investigated
22   and assessed and pressure tested.  Rather, I'm
23   using the numbers that are the outcome of their
24   informed judgment.
25         Q      Well, right.  You were -- and just
```

Jonathan Arnold - March 11, 2019

```
 1                      JONATHAN ARNOLD
 2    so we're clear, you are making an assumption that
 3    they had an informed judgment, "they" being Carl
 4    Marks?
 5                  MR. SAMET:  Objection to form.
 6         A     I think perhaps you could say that.
 7    I mean, I don't have personal knowledge that they
 8    had an informed judgment.  But they have a
 9    detailed deck here that describes their views; so
10    it seems self-evident that they took a look at
11    this and made their assessment; and they're in
12    the business of doing this.
13         Q     How long had they been retained by
14    TransCare by the time this report came out?
15         A     I believe it was on the order of
16    two or three weeks.
17         Q     Okay.  Going to the next page of
18    the exhibit, the one that ends in Bates 2112,
19    there is a series of -- there's a heading on that
20    page called "Strained and Broken Landlord
21    Relationships"; and there's a bunch of different
22    locations that are identified below that.
23                  Do you see that?
24         A     Yes.
25         Q     What, if anything, did you know at
```

Jonathan Arnold - March 11, 2019

```
1                    JONATHAN ARNOLD
2      the time you signed your report about Carl Marks'
3      plan to repair those strained and broken landlord
4      relationships?
5            A     Look, I reviewed this document, but
6      I didn't undertake an analysis beyond that.
7            Q     So just so we're clear, so you saw
8      that there were these landlord problems; those
9      were identified, right?
10           A     Yes.
11           Q     You didn't -- you didn't
12     investigate whether Carl Marks had a solution to
13     the problems beyond whatever you read in this
14     deck, fair?
15                 MR. SAMET:  Objection to form.
16           A     That's correct.
17           Q     Go to the page that's -- that's, I
18     guess, the next two pages in.  It ends in 2114.
19           A     Yes.
20           Q     The very first bullet point,
21     this -- well, this refers to the limitations of
22     the company's accounting systems and financial
23     reporting.  We talked about that earlier?
24           A     Yes.
25           Q     Okay.  And during your work on --
```

Jonathan Arnold - March 11, 2019

```
1                  JONATHAN ARNOLD
2     have been beyond the scope of what I was asked to
3     do.  I was asked to compute what the operating
4     value of what the NewCo would be or what
5     reasonable range would have occurred based on the
6     numbers contained in this exhibit.  It's up to
7     others to make a conclusion as to its
8     reliability, and the validity is a matter of law.
9              But I can say that -- the one
10    additional piece I can add is that, as an
11    economist, the fact that Lynn Tilton and her team
12    attempted to execute on it, assuming that's
13    true -- I don't have personal knowledge that she
14    actually did.  If one accepts that as true, that
15    reveals to me, as an economist, that Ms. Tilton
16    and her team saw this as an economically viable
17    plan.
18        Q     Right.  I guess my question then
19    is, plan for what?  And that's the part that
20    you're saying you didn't investigate?
21              MR. SAMET:  Objection.
22        A     Well, there was -- as I -- no.  I
23    know what the plan is.  I just didn't look into
24    why it was created, which I think is a different
25    question.
```

```
1                    JONATHAN ARNOLD

2      January 7, 2016 model and the January 27, 2016

3      model the same?

4                    MR. SAMET:  Objection.

5           A     They are not the same.

6           Q     Did you make any effort to

7      determine the specific drivers that lead to the

8      lower projections in the -- for example, in the

9      January 27th and 28th models and compared to the

10     January 7th model?

11          A     I have not decomposed the change in

12     EBITDA into changes in assumptions or inputs or

13     expectations as I sit here, no.

14          Q     So when you say in paragraph 73:

15                "This reduced outlook reflects

16     delays in the board's actions concerning

17     TransCare's urgent," in parens, "and overdue

18     financial obligations and capital requirements to

19     survive as a going concern," what is the basis

20     for that statement?

21          A     I think the sentence could have

22     been worded a little bit more precisely.  And I

23     think it's fair to say that, if one accepts as

24     true Mr. Bonilla's conclusion that TransCare's

25     reduced earnings outlook was due to inaction by
```

A0943

1                    JONATHAN ARNOLD

2      the board and to the -- and to the extent that

3      continued inaction led to further reductions in

4      the earnings outlook that is reflected in the

5      January 27th and 28th projections -- because the

6      projections are not the second best view of the

7      world or the fifth best view of the world -- the

8      projections -- when one does projections, you're

9      asking:

10                    What's the best we can do?

11                    And there's an EBITDA number as of

12     January 7th, and then there are EBITDA numbers as

13     of January 27th and 28th.  And they're worse.

14          Q    Yes.

15          A    So if you believe that the company

16     was deteriorating and that delay was causing a

17     reduction in EBITDA, you can see it in the

18     sequence of EBITDA numbers that are coming out of

19     the company.

20          Q    Let's be clear.

21                    The sentence that I just read to

22     you, you apparently state that was the reason,

23     that in other words, some -- some supposed

24     inaction by Ms. Tilton is the reason why the

25     projections in the January 27 and January 28

Jonathan Arnold - March 11, 2019

```
 1                    JONATHAN ARNOLD
 2    case for -- well, withdrawn.
 3             Did you consider attempting --
 4    based on TransCare's historical financials,
 5    attempting to estimate the missing inputs
 6    yourself?
 7         A    No.
 8         Q    And why not?
 9         A    One reason is I think that -- that
10    TransCare as it was anticipated to be in the
11    future was going to be a decidedly different firm
12    than it had been in the past.
13             So while in some cases, recent
14    history is -- I use for a good predictor of the
15    future, I think that's not the case here,
16    especially given the significant changes that we
17    discussed earlier, that people were modeling and
18    believed were appropriate for the firm going
19    forward.
20             And, secondly, doing a cash flow
21    forecast is -- an intricate calculation with lots
22    of very specific inputs that I think were beyond
23    my ability to model in a way that would give me
24    confidence.
25         Q    Have you -- in any of your prior
```

GregoryEdwards, LLC |  Worldwide Court Reporting
GregoryEdwards.com | 866-4Team GE

**A0945**

Case 1:20-cv-06274-LAK  Document 91-8  Filed 09/30/20  Page 166 of 243

Jonathan Arnold - March 11, 2019

```
1                    JONATHAN ARNOLD
2         A     You're talking about precedent
3    transactions?
4         Q     No.  I guess this is the --
5    frankly, a part of your report that confused me.
6              What I'm -- am I right that there
7    is a difference between doing a precedent
8    transaction-based valuation and a comparable
9    company-based valuation?
10        A     Yes.
11        Q     In the comparable company-based
12   transaction, you're looking -- well, just give me
13   at a high level what that methodology is.
14        A     Well, I'm using the companies that
15   Mr. Greenberg identified as comparable, in
16   particular, Envision Healthcare Corporation and
17   Air Methods Corp.  Mr. Greenberg also mentioned a
18   third one called -- company called PHI that he
19   excludes because in his view it's an outlier.
20             So my comparable company analysis
21   of enterprise value to the forward EBITDA
22   multiple is based on the ratios for Envision
23   Healthcare Corporation and Air Methods Corp. as
24   of January 7th, 2016, January 27th, and
25   January 28th, also 2016, and then as to NewCo,
```

**A0946**

Jonathan Arnold - March 11, 2019

```
 1                    JONATHAN ARNOLD
 2    did you do to get comfortable that those were --
 3    well, withdrawn.  That's a bad question.
 4              How did you go about selecting the
 5    comparable companies?  How did you land on those
 6    two?
 7        A    Well, I did it by surveying the
 8    written record in this case to see which
 9    companies Ms. Tilton's senior people regarded as
10    comparable to TransCare.
11        Q    Okay.  And did you do anything else
12    that caused you to land on those two companies?
13        A    No.
14        Q    You've used the comparable company
15    method in other -- in valuing other companies?
16        A    Yes.
17        Q    And how many times have you based
18    your determination on which -- determination in
19    terms of selecting the comparables based solely
20    on the views of the subject that you're
21    investigating about what their comparables are?
22        A    Well, it's very common in my
23    experience to use a company's view as to its
24    competitors as a basis for preparing comparisons.
25    And, for example, it's common, maybe even
```

A0947

Case 1:20-cv-06274-LAK   Document 101-8   Filed 09/30/20   Page 168 of 242

Jonathan Arnold - March 11, 2019

| | |
|---|---|
| 1 | JONATHAN ARNOLD |
| 2 | Q    By a factor of what? |
| 3 | A    I don't know that. |
| 4 | Q    Did you look at the annual EBITDA |
| 5 | of the two businesses for 2015 and compare them |
| 6 | to TransCare? |
| 7 | A    I don't recall doing that.  But we |
| 8 | are calculating ratios, so obviously the -- I |
| 9 | guess it's pretty self-evident the EBITDA is |
| 10 | going to be larger as well. |
| 11 | Q    How about cap X budget -- or cap X |
| 12 | expenditures for 2015?  Did you look to compare |
| 13 | capital expenditures for the two companies that |
| 14 | you chose as comparables compared to TransCare? |
| 15 | A    I don't recall having done so. |
| 16 | Q    How about EBITDA margins?  Did you |
| 17 | make that comparison? |
| 18 | A    Not to my recollection. |
| 19 | Q    What did you do, if anything, to |
| 20 | compare the risk profile of your two comparable |
| 21 | companies to TransCare? |
| 22 | MR. SAMET:  Objection to form. |
| 23 | You can answer. |
| 24 | A    I did not undertake any analysis or |
| 25 | evaluation of the relative riskiness across these |

18-01021-smb   Doc 107-2   Filed 07/08/19   Entered 07/08/19 22:14:25   Ex. 2   Pg 47 of 47

```
1                    JONATHAN ARNOLD

2    companies.  But the typical approach and one that

3    I used here is having identified the most closely

4    comparable companies to apply the ratios from the

5    comps to the subject, because that process

6    results in obtaining as much controller

7    disparities in the riskiness as is possible using

8    this method.

9         Q     How do you know that Envision and

10   Air Methods were the two most closely comparable

11   companies to TransCare?

12        A     I am relying on Lynn Tilton's and

13   her executives' view that these are the most

14   comparable companies.

15        Q     You didn't independently make that?

16             MR. SAMET:  Objection to form.

17        A     I did not independently vet it.

18   However, I did subsequently look at all publicly

19   traded companies in the health care services

20   NAICS grouping and made some additional

21   calculations.

22        Q     In 2015, were -- was Air Methods or

23   Envision undercapitalized?

24        A     Not to my knowledge.

25        Q     Had either of them missed a payroll
```

A0949

# EXHIBIT 3

| | |
|---|---|
| **From:** | melissa.provost@wellsfargo.com |
| **To:** | Glenn Leland |
| **CC:** | Mark Bonilla; Michael Greenberg |
| **Sent:** | 10/14/2015 12:30:13 PM |
| **Subject:** | RE: Notice of Non-Renewal |
| **Attachments:** | TransCare Notice of Non-Renewal 10.14.15.pdf |

Melissa Provost

Vice President/Senior Relationship Manager
Wells Fargo Capital Finance

Business Finance | One Boston Place, 18th Floor | Boston, MA  02108-4407
MAC J9214-180
Tel (617) 854-4336 | Mobile (518) 578-8604 | eFax (855) 477-5033

melissa.provost@wellsfargo.com

```
This message (including any attachments) contains confidential information intended for a
specific individual and purpose, and is protected by law. If you are not the intended
recipient, you should delete this message and are hereby notified that any disclosure,
copying, or distribution of this message, or the taking of any action based on it, is
strictly prohibited.
```

---

**From:** Provost, Melissa A.
**Sent:** Wednesday, October 14, 2015 12:30 PM
**To:** Glenn Leland (GlennL@transcare.com)
**Cc:** Mark Bonilla (markb@transcare.com); 'Michael Greenberg'
**Subject:** Notice of Non-Renewal

As we discussed last week, attached please find our Notice of Non-Renewal under TransCare's Loan Agreement with Wells Fargo Bank.  An original will follow via Federal Express to yourself and Peter Ruffini at Patriarch as required.

Melissa Provost

Vice President/Senior Relationship Manager
Wells Fargo Capital Finance

Business Finance | One Boston Place, 18th Floor | Boston, MA  02108-4407
MAC J9214-180
Tel (617) 854-4336 | Mobile (518) 578-8604 | eFax (855) 477-5033

melissa.provost@wellsfargo.com

```
This message (including any attachments) contains confidential information intended for a
specific individual and purpose, and is protected by law. If you are not the intended
recipient, you should delete this message and are hereby notified that any disclosure,
copying, or distribution of this message, or the taking of any action based on it, is
strictly prohibited.
```

TRANSCARE00006334

**WELLS FARGO BANK, NATIONAL ASSOCIATION**
One Boston Place, 18th Floor
Boston, Massachusetts 02108

October 14, 2015

**VIA FEDERAL EXPRESS AND CERTIFIED**
**MAIL, RETURN RECEIPT REQUESTED**
TransCare Corporation
One Metrotech Center
Brooklyn, New York 11201
Attention: Mr. Glenn Leland

### Re: <u>Notice of Non-Renewal</u>

Ladies and Gentlemen:

Wells Fargo Bank, National Association, successor by merger to Wachovia Bank, National Association ("<u>Lender</u>"), has made and may make loans and advances and provide other financial accommodations to TransCare Corporation, a Delaware corporation ("<u>Parent</u>" or "<u>Administrative Borrower</u>"), TransCare New York, Inc., a Delaware corporation ("<u>TransCare NY</u>"), TransCare Pennsylvania, Inc., a Delaware corporation ("<u>TransCare PA</u>"), TransCare Maryland, Inc., a Delaware corporation ("<u>TransCare MD</u>"), TransCare ML, Inc., a Delaware corporation ("<u>TCML</u>"), TC Hudson Valley Ambulance Corp., a Delaware corporation ("<u>TC Hudson Valley</u>"), TC Billing and Services Corp., a Delaware corporation ("<u>TC Billing</u>"), TC Ambulance Corporation, a Delaware corporation ("<u>TC Corp</u>"), TransCare Management Services, Inc., a Delaware corporation ("<u>TC Management</u>"), TCBA Ambulance, Inc., a Delaware corporation ("<u>TCBA</u>"), TransCare Westchester, Inc., a Delaware corporation and ("<u>TransCare Westchester</u>"), TransCare Harford County, Inc., a Delaware corporation and ("<u>TransCare Harford</u>", and together with Parent, TransCare NY, TransCare PA, TransCare MD, TCML, TC Hudson Valley, TC Billing, TC Corp, TC Management, TCBA, and TransCare Westchester, each individually a "<u>Borrower</u>" and collectively, "<u>Borrowers</u>"), TC Ambulance Group, Inc., a Delaware corporation ("<u>TC Group</u>"), and TC Ambulance North, Inc., a Delaware corporation ("<u>TC North</u>" and together with TC Group, each individually a "<u>Guarantor</u>" and collectively, "<u>Guarantors</u>") pursuant to the Loan Agreement (as hereinafter defined), by and among Borrowers, Guarantors and Lender, as amended by Amendment No. 1 to Loan and Security Agreement, dated June 28, 2007, Amendment No. 2 to Loan and Security Agreement, dated October 24, 2007, Amendment No. 3 to Loan and Security Agreement, dated January 31, 2008, Amendment No. 4 to Loan and Security Agreement, dated August 13, 2008, Amendment No. 5 to Loan and Security Agreement, dated December 22, 2008, Amendment No. 6 to Loan and Security Agreement, dated September 18, 2009, Amendment No. 7 to Loan and Security Agreement, dated February 12, 2010, Amendment No. 8 to Loan and Security Agreement and Waiver, dated as of January 31, 2013, Amendment No. 9 to Loan and Security Agreement and Waiver, dated as of May 31, 2013; Amendment No. 10 to Loan and Security Agreement and Waiver, dated as of August 14, 2013; and Amendment No. 11 to Loan and Security Agreement and Waiver, dated as of April 23, 2015 (as the same now exists or may hereafter be further

3805096.3

**A0952**

TRANSCARE00006335

amended, modified, supplemented, extended, renewed, restated or replaced, the "<u>Loan Agreement</u>"), and the other agreements, documents and instruments referred to therein or at any time executed and/or delivered in connection therewith or related thereto (all of the foregoing, together with the Loan Agreement, as the same now exist or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced, being collectively referred to herein as the "<u>Financing Agreements</u>").  All capitalized terms used herein shall have the meaning assigned thereto in the Loan Agreement, unless otherwise defined herein.

Lender hereby formally notifies Borrowers and Guarantors that, in accordance with the terms of Section 12.1(a) of the Loan Agreement, the term of the Loan Agreement and the other Financing Agreements shall expire on January 31, 2016 and Lender presently has no intention to extend or modify the term of such financing arrangements.  Accordingly, Borrowers and Guarantors (as applicable) are required to repay to Lender, for itself and the benefit of Lenders, in full, all outstanding and unpaid Obligations and provide for the payment of contingent Obligations, all in accordance with the terms of Section 12.1(a) of the Loan Agreement, and shall arrange to execute and deliver such documentation as Lender deems necessary or appropriate in connection therewith.

Please be advised that nothing in this Notice amends, waives, or modifies the terms of the Financing Agreements.  Lender expressly reserves the right to exercise any or all of its rights and remedies under the Financing Agreements or otherwise, and nothing in this Notice or any delay on Lender's part in exercising any such rights or remedies, should be construed as a waiver of any such rights or remedies.

Very truly yours,

WELLS FARGO BANK, NATIONAL ASSOCIATION, successor by merger to Wachovia Bank, National Association

By: _____

Name: _MELISSA PROVST_____

Title: _Vice President_____

cc: Mr. Peter J. Ruffini
    Patriarch Partners, LLC
    One Broadway, 5th Floor
    New York, NY 10004
    (Via Federal Express Overnight Delivery)

3805096.3

**A0953**

TRANSCARE00006336

# EXHIBIT 4

Case 1:20-cv-06274-LAK Document 91-8 Filed 09/30/20 Page 175 of 243

| | |
|---|---|
| **From:** | Michael Greenberg |
| **Sent:** | Friday, December 11, 2015 11:46 AM |
| **To:** | Lynn Tilton; Jean Luc Pelissier |
| **Subject:** | RE: Transcare |

Understood.  I will let them know.


Michael S. Greenberg
Patriarch Partners
One Broadway, 5th Floor
New York, NY 10004
Direct: 646-723-7657
Fax:  212-825-2038
Email: michael.greenberg@patriarchpartners.com
www.patriarchpartners.com

---

**From:** Lynn Tilton
**Sent:** Friday, December 11, 2015 11:41 AM
**To:** Michael Greenberg; Jean Luc Pelissier
**Subject:** FW: Transcare

You should let them know that you are doing all you can to understand the near term issues to make a presentation to me.
You are also trying to drive the new businesses that drop to the bottom line with great alacrity.

---

**From:** Kurt.Marsden@wellsfargo.com [mailto:Kurt.Marsden@wellsfargo.com]
**Sent:** Friday, December 11, 2015 10:34 AM
**To:** Lynn Tilton
**Cc:** robert.strack@wellsfargo.com
**Subject:** RE: Transcare

Lynn,

Thank you.  I understand and appreciate your attention to this matter.  We can catch up early next week.

Regards,
Kurt

---

**From:** Lynn Tilton [mailto:Lynn.Tilton@PatriarchPartners.Com]
**Sent:** Friday, December 11, 2015 5:29 AM
**To:** Marsden, Kurt
**Cc:** Strack, Robert P.
**Subject:** RE: Transcare

1

**A0955**

Confidential

PP-TRBK0002058

Kurt,

I apologize for the delay in my response as I am traveling and was dealing with some other less than fun issues.

I am aware from Michael Greenberg that there are some issues that have arisen of which I was unaware challenging the company.

I did try to fund the shortfall yesterday for payroll but we missed the funding deadline and that will be done this morning.

I am not available today due to prior commitments nor am I fully apprised of these recent issues.  I will make certain that I am and will make myself available this weekend to catch up on issues and a plan.  I am in Arizona to finish up some contracts with the team and the Army this weekend and early next week.  But I will make certain I am on top of these issues and ready to provide the necessary feedback.

I apologize for the inconvenience.
Lynn

---

**From:** Kurt.Marsden@wellsfargo.com [mailto:Kurt.Marsden@wellsfargo.com]
**Sent:** Thursday, December 10, 2015 4:33 PM
**To:** Lynn Tilton
**Cc:** robert.strack@wellsfargo.com
**Subject:** Transcare

Lynn,

I'm reaching out to you today because I just learned that Transcare's liquidity is extremely tight and we are skeptical that the company will hit the plan that was shared with us a few months ago.  I understand from Bob Strack, who has joined us on a previous call, that we are working with the company to set up an all hands call tomorrow to discuss the liquidity situation.  Bob and his team are still working on the logistics, but if your schedule allows, we believe that your direct involvement would be helpful.  Depending on the time of the call, I will certainly do my best to join as well.  Please let us know if you are available and some times that work with your schedule.

I copied Bob on this email to help make the process of scheduling this call a little more efficient.

Best Regards,

Kurt R. Marsden

Group Head - Corporate Finance Group

Wells Fargo Capital Finance | 2450 Colorado Avenue, Suite 3000 West | Santa Monica, CA 90404
Tel 310-453-7345 | Cell 818-404-2581 | Fax 866-358-0779

kurt.marsden@wellsfargo.com

This message may contain confidential and/or priviledged information.  If you are not the addressee or authorized to receive this for the addressee, you must not use, copy, disclose, or take any action based on this message or any information herein.  If you have received this message in error, please advise the sender immediately by reply e-mail and delete this message.  Thank you for your cooperation.

2

**A0956**

Case 1:20-cv-06274-LAK    Document 11-8    Filed 09/30/20    Page 177 of 243

# EXHIBIT 5

| | |
|---|---|
| **From:** | Lynn Tilton <Lynn.Tilton@PatriarchPartners.Com> |
| **Sent:** | Wednesday, December 16, 2015 10:46 PM |
| **To:** | Michael Greenberg; Lynn Tilton |
| **Cc:** | Jean Luc Pelissier; Brian Stephen; Randy Jones |
| **Subject:** | RE: Transcare |

You need to call me.



*Lynn Tilton*
Chief Executive Officer
Patriarch Partners, LLC
One Broadway, 5th Floor
New York, NY 10004
212-825-6772
212-825-2038 – FAX
Lynn.Tilton@PatriarchPartners.com
Web: www.patriarchpartners.com

**From:** Michael Greenberg
**Sent:** Wednesday, December 16, 2015 9:45 PM
**To:** Lynn Tilton
**Cc:** Jean Luc Pelissier; Brian Stephen; Randy Jones
**Subject:** Re: Transcare

That was not my understanding from the discussion with John and Melissa today.  They had an issue with Mark over the past due payroll taxes and the past borrowing base issued and were asking for the past due payroll taxes to be cleared up in order to free up the line.

Michael

On Dec 16, 2015, at 9:39 PM, Lynn Tilton <Lynn.Tilton@PatriarchPartners.Com> wrote:

> I cannot believe how poorly this is being handled to send up here.  This is more even a bigger problem that will lead to disaster.  How could this be the outcome of your converdations.
>
>
> Lynn Tilton
> Chief Executive Officer
> Patriarch Partners, LLC
> One Broadway, 5th Floor
> New York, NY 10004

1

**A0958**

Confidential                                                                                              PP-TRBK0075262

212-825-6772
212-825-2038 FAX
Lynn.Tilton@PatriarchPartners.com
Web: www.patriarchpartners.com

**From:** Kurt.Marsden@wellsfargo.com
**Sent:** December 16, 2015 8:52 PM
**To:** Lynn.Tilton@PatriarchPartners.Com
**Subject:** Transcare

Lynn,

I understand that your team updated you on this situation over the weekend and you made a determination to sell Transcare. Additionally, I learned that the Patriarch team is working to determine how much money the company needs in order to reach the completion of a sale process, and considering injecting some capital. Both of these actions were viewed as positive developments from our perspective. Unfortunately, we discovered today that the company is significantly behind on payroll taxes to the tune of $1.2 million not the $400k that the CFO represented to my team earlier today. This discovery is highly concerning especially since we have been clear that this is an area of sensitivity for us, and it frankly appears that management has not been completely forthright. [Non-Responsive] [Non-Responsive] we are highly concerned about the company's ability to survive until a sale is completed. I appreciate that this is a difficult situation, but it feels like we are nearing the boiling point. It would be very helpful if we could get clarity on how much financial support Patriarch is considering providing, and how soon the company could have access to that money since the company appears to have immediate liquidity challenges. Additionally, it would be helpful to understand your thoughts on potentially running the sale through a bankruptcy process. To be clear, our desire is to exit this credit facility and our appetite to support the business outside a process that leads to an exit is extremely limited. In light of this fact pattern, we need to discuss this situation at your earliest convenience. I understand from your team that you are tied up today and tomorrow, but perhaps tomorrow, we can find a mutually agreeable window to talk.

Respectfully,

Kurt R. Marsden

Group Head - Corporate Finance Group

Wells Fargo Capital Finance | 2450 Colorado Avenue, Suite 3000 West | Santa Monica, CA 90404
Tel 310-453-7345 | Cell 818-404-2581 | Fax 866-358-0779

kurt.marsden@wellsfargo.com

This message may contain confidential and/or priviledged information. If you are not the addressee or authorized to receive this for the addressee, you must not use, copy, disclose, or take any action based on this message or any information herein. If you have received this message in error, please advise the sender immediately by reply e-mail and delete this message. Thank you for your cooperation.

**A0959**

Confidential                    PP-TRBK0075263

# EXHIBIT 6

| From: | Michael Greenberg <Michael.Greenberg@PatriarchPartners.com> |
|---|---|
| Sent: | Friday, December 11, 2015 10:38 AM |
| To: | Lynn Tilton |
| Cc: | Jean Luc Pelissier; Brian Stephen |
| Subject: | RE: TransCare - today |

We just confirmed that Mark has not provided the cash flow forecast to Wells Fargo.

They do not plan to provide a cash flow forecast without Board approval as they believe that Board Approval is required to send financial information and, in the past, the Board has approved.

We have tried to help them in reviewing their various demands over the next month.  Despite many efforts to convince the management team otherwise, the management team continues to believe they need more working capital to manage the ebbs and flows of the business.

We have been asking and waiting on data to confirm volume which they have said has stayed at around $9.0MM (but they have been reducing their revenue assumption in the cash flow forecast).

Mark's last cash flow forecast showed a $3.1MM deficit through the 2nd week of January (there was no need as of mid-November discussion other than for vehicle down payments).  A few items have changed as outlined below.

Part of the issue is the immovable Milea judgment in December ($888k), the need to maintain workers compensation insurance ($1.0MM in payments by year-end) and catch up on payroll taxes ($800k) (this will be a sensitive point for Wells Fargo once they discover that the company is behind on payroll taxes).

We have asked for a plan as to how they will address the delay in getting liquidity from the pre-bill.  We have also asked for A/R aging which we are waiting on.

Given that, I would prefer that Jean Luc and you sign off on anything they would provide to Wells Fargo at this point.

However, I will prep them with Jean Luc prior to the call.

Michael

Michael S. Greenberg
Patriarch Partners
One Broadway, 5th Floor
New York, NY 10004
Direct: 646-723-7657
Fax:  212-825-2038
Email: michael.greenberg@patriarchpartners.com
www.patriarchpartners.com

---

**From:** Lynn Tilton
**Sent:** Friday, December 11, 2015 8:58 AM
**To:** Michael Greenberg

1

**A0961**

Confidential                                                                                       PP-TRBK0083461

Case 1:20-cv-06274-LAK   Document 101-8   Filed 09/30/20   Page 182 of 243

**Cc:** Jean Luc Pelissier; Brian Stephen
**Subject:** RE: TransCare - today

I had thought this was a company call.

---

**From:** Michael Greenberg
**Sent:** Friday, December 11, 2015 8:51 AM
**To:** Lynn Tilton
**Cc:** Jean Luc Pelissier; Brian Stephen
**Subject:** RE: TransCare - today

The company is not on the call.  Wells Fargo only wanted to speak with Patriarch.  Jean Luc and I spoke last night.  I will de-brief with Jean Luc before the call.

I have previously spoken with John and Melissa where they voiced their concern about the upcoming payments and the investment they believe is required (I did not provide any feedback but listened).  The company has told them that there is a revised plan for 2016 but it needs to be discussed with the board.

It still needs some further refinement and we have requested a presentation with more background information and details.

Wells Fargo separately asked Mark for a cash flow forecast.  In the cash flow forecast, Mark is pushing certain of the NYSIF payments until after the end of this year to navigate the upcoming requirements.

Mark was working on this yesterday.

They are progressing on the new business options and have had ongoing discussions with their clients regarding those.  I will ask Glenn to provide a further update and include it as part of their presentation.

Michael

Michael S. Greenberg
Patriarch Partners
One Broadway, 5th Floor
New York, NY 10004
Direct: 646-723-7657
Fax:  212-825-2038
Email: michael.greenberg@patriarchpartners.com
www.patriarchpartners.com

---

**From:** Lynn Tilton
**Sent:** Friday, December 11, 2015 8:42 AM
**To:** Michael Greenberg
**Cc:** Jean Luc Pelissier; Brian Stephen
**Subject:** RE: TransCare - today

You better prepare the company for the call so that they do not put themselves out of business.
They are going to need to show a plan they can meet to address the liquidity concerns.
Where are they on the new business options?

2

Confidential                                                               PP-TRBK0083462

**From:** Michael Greenberg
**Sent:** Friday, December 11, 2015 8:21 AM
**To:** Lynn Tilton
**Cc:** Jean Luc Pelissier; Brian Stephen
**Subject:** TransCare - today

Lynn,

I will keep this brief given the prior updates.

- Mark is speaking with ADP early to make sure that they will process the Maryland and MTA payroll today ($290k) given their expectation of a payroll tax payment today ($450k) for this week's payroll.

- I asked Mark to check with ADP whether the direct deposits can possibly hit accounts today or tomorrow rather than Monday (no response back yet to the question).

- TransCare is 2 weeks behind (c. $850k) on payroll taxes (excludes the current week) (was 3 weeks but paid 1 of the past due payroll taxes this past Monday).
  - ADP has threatened multiple times not to process but Mark has been successful thus far in getting them to cooperate.

- Mark will advise me early about whether ADP is complying and by 11 a.m. of their borrowing base calculation for today.

- I confirmed with John Husson that Jean Luc and I are available for a 1 p.m. call today but that you are traveling and not available.

- Wells Fargo's auditor is still at TransCare. Mark mentioned to me last night that John called him about the BBC calculation yesterday. He said they did a review back to June and found certain instances (10) where TransCare was too aggressive in its daily calculation.

- We will keep you informed and provide you with an update after the Wells Fargo call.

Thank you,
Michael

Michael S. Greenberg
Patriarch Partners
One Broadway, 5th Floor
New York, NY 10004
Direct: 646-723-7657
Fax: 212-825-2038
Email: michael.greenberg@patriarchpartners.com
www.patriarchpartners.com

3

**A0963**

Confidential                                                        PP-TRBK0083463

Case 1:20-cv-06274-LAK Document 11-8 Filed 09/30/20 Page 184 of 243

# EXHIBIT 7

Confidential

Page 1

1

2          UNITED STATES BANKRUPTCY COURT
3           SOUTHERN DISTRICT OF NEW YORK
4      --------------------------------X     *
                                             *
       In re:                                *
                                             *
5      TRANSCARE CORPORATION, et al,         *      Chapter 7
                                             *
6               DEBTORS,                     *
       --------------------------------X     *      CASE NO:
7      SALVATORE LAMONICA, as Chapter 7      *      16-10407
       Trustee for the Estates of           *        (SMB)
8      TransCare Corporation, et al.,        *
                                             *
9                   PLAINTIFF,               *      Jointly
                                             *   Administered
10            vs                             *
                                             *
11     LYNN TILTON, PATRIARCH PARTNERS       *
       AGENCY SERVICES, LLC, PATRIARCH       *   Adv. Proc.
12     PARTNERS, LLC, PATRIARCH PARTNERS     *   No. 18-1021
       MANAGEMENT GROUP, LLC, ARK II CLO     *
13     2001-1, LIMITED, ARK INVESTMENT       *
       PARTNERS II, LP, LD INVESTMENTS,      *
14     LLC, PATRIARCH PARTNERS II, LLC,      *
       PATRIARCH PARTNERS III, LLC,          *
15     PATRIARCH PARTNERS VIII, LLC,         *
       PATRIARCH PARTNERS XIV, LLC,          *
16     PATRIARCH PARTNERS XV, LLC,           *
       TRANSCENDENCE TRANSIT, INC, and       *
17     TRANSCENDENCE TRANSIT II, INC,        *
                                             *
18              DEFENDANTS.                  *
       --------------------------------X     *
20
21             *** CONFIDENTIAL ***
22        Videotaped Deposition of LYNN TILTON
23               New York, New York
24            Monday, October 29, 2018
25

**A0965**

Page 162

1                    LYNN TILTON

2    from Michael Greenberg.

3              But when a company is doing

4    $6 million of EBITDA and three-and-a-half

5    million of it is coming from the MTA, you know,

6    that you're not going to run the company

7    without its EBITDA.  It wasn't rocket science,

8    it could be done at the back of the envelope.

9              MR. MERVIS:  Let's take a lunch

10        break?

11             THE WITNESS:  Yeah.

12             VIDEOGRAPHER:  The time is 1:30 p.m.

13        We are now off the record.

14             (Whereupon, the proceedings were

15        recessed for a lunch break and once again

16        resumed.)

17             VIDEOGRAPHER:  The time is now

18        2:16 p.m.  We are back on the record.

19             (Whereupon, Plaintiff Exhibit 110,

20        Marsden E-mail Chain Dated 12/16/15, Bates

21        Stamped WF_TC_00006004 to '005, 2-Pages

22        was marked for identification.)

23   BY MR. AMINI:

24        Q.   Did you get this e-mail from Kurt

25   Marsden on or about December 16, 2016?

Confidential

Page 163

1                    LYNN TILTON

2          A.    Yes.

3          Q.    Kurt Marsden is from Wells Fargo,

4    correct?

5          A.    Yes.

6          Q.    He was the person in charge of the

7    Transcare loan, as far as you understood?

8          A.    He was in charge of asset-based

9    lending.  He is a very seeming person; he would

10   be my counterpart at Wells.  He reports to

11   someone named Guy, but he's pretty much in

12   charge.

13         Q.    Let me ask you a question, I'm not

14   trying to be accusatory, we haven't been able

15   to find this e-mail in your production.

16               It may well be there.

17               This e-mail ordinarily would be in

18   your e-mails, you would keep such an e-mail,

19   correct?

20         A.    I would be shocked if you do not

21   have this in your production, because, yes,

22   there would have been an e-mail that was

23   searched, and I reviewed it as part of the

24   production, so I think you are mistaken.

25         Q.    Fair enough.  He states at the

Case 1:20-cv-06274-LAK   Document 101-8   Filed 09/30/20   Page 188 of 243
Confidential

Page 164

1               LYNN TILTON

2  beginning of this, this is on Wednesday,

3  December 16th, "I understand your team updated

4  you on your situation over the weekend and you

5  made a determination to sell Transcare."

6          Do you see that?

7      A.    Yes.

8      Q.    And he referring to the prior

9  weekend, going back to the weekend of

10  December 12th and 13th?

11      A.    That's what he writes.

12      Q.    Did you, in fact, make a

13  determination over the weekend or thereabouts

14  to sell?

15      A.    I made a determination that we could

16  not continue with the current management team,

17  and we would either need to sell, file for

18  bankruptcy, unwind, or do some sort of

19  transaction, because the current management

20  team could not continue to run this company

21  properly.

22      Q.    And that was going to be my next

23  question.

24          On what -- what was the

25  precipitating factor, if any, or factors, what

Page 165

1              LYNN TILTON

2   were the precipitating factors, if any, of your

3   decision, as he refers to it, to sell

4   Transcare?

5       A.    There were many factors leading up

6   to it, but most of it was my loss of confidence

7   of this team to provide information, accurate

8   information or run the company properly.

9       Q.    He makes a reference to the

10  situation is reminiscent of Galey.  What is he

11  talking about?

12      A.    Galey and Lord is another portfolio

13  company where they lost confidence in the

14  management team and the accuracy of the

15  information they were sending.

16      Q.    And what business was Galey and Lord

17  in?

18      A.    It was in the textile business.

19      Q.    Do you still own that company?

20      A.    No. We foreclosed on the assets of

21  that company, and it is an orderly liquidation.

22  When I say "we," PPAS foreclosed on behalf of

23  the lenders.

24      Q.    When did you do that, roughly?

25      A.    Sometime in 2016.

Confidential

Page 168

1              LYNN TILTON

2        Q.    I will show you what was previously

3   marked as Exhibit 42.

4              Who is Vikram Agrawal?

5        A.    He was a credit officer at Patriarch

6   Partners.

7        Q.    Was he junior to Mr. Greenberg?

8        A.    At the time, yes.

9        Q.    Is he still there?

10       A.    He just recently left.

11       Q.    Do you know where he went?

12       A.    He went to work for a private equity

13   firm in Dallas; I don't know the name of that

14   firm.

15       Q.    We saw earlier -- I mean, you can go

16   back to Exhibit 110, if you'd like, but this is

17   the Friday after Mr. Marsden indicates that

18   your team had told him that you made a

19   determination to sell Transcare?

20             MR. MERVIS:  Are you referring to

21        110?

22             MR. AMINI:  110, yeah.

23             THE WITNESS:  I made a determination

24        not to continue, as it was, one of the

25        options was selling, which is why I asked

Page 169

1                    LYNN TILTON

2        Mr. Greenberg to gather this information so

3        I could understand the marketplace much

4        better.

5    BY MR. AMINI:

6        Q.    And you had an opportunity to review

7    this, correct?

8        A.    Excuse me?

9        Q.    You reviewed this at time,

10   December 18, 2015?

11       A.    I don't know exactly if it was

12   December 18th, but I did receive the e-mail and

13   I did look at it.

14       Q.    Do you have any recollection of any

15   conclusions that you reached after reading

16   this?

17       A.    Just that there was a marketplace

18   and that these were the comparables and then we

19   had to figure out what Transcare actually

20   looked like, and what might be possible to be

21   sold, once we dug in ourselves and tried to

22   look at the numbers and contracts.

23            So this is when I began with my own

24   team to look into what Transcare really was,

25   because we were not getting honest information

Page 170

1              LYNN TILTON

2   from the -- from Glenn Leland or Mark Bonilla,

3   and we were going to do the work to see what

4   was saleable.

5              I was exploring that as an

6   alternative for certain.

7              (Whereupon, Plaintiff Exhibit 112,

8        Greenberg E-mail Chain Dated 12/20/15,

9        Bates Stamped PP-TRBK0083457 to '58,

10       2-Pages was marked for identification.)

11  BY MR. AMINI:

12       Q.    I am not going to ask you much, the

13  first couple of paragraphs, but if you need to

14  read the whole thing, you are welcome to read

15  it.

16       A.    Well, I mean...

17            MR. MERVIS:  Do what you need to do.

18       Q.    If I have a question that you need

19  to read, we can go back to it.  But I think it

20  will go faster if you let me ask.

21            Who is John Pothin?

22       A.    John Pothin was the head of human

23  resources at Patriarch Partners.

24       Q.    And as I understand it, Randy Jones

25  was also involved in the human resources?

Page 175

1             LYNN TILTON

2    reached out to any of these companies?

3        A.    I did not reach out.  The company

4    was the one who said they had unsolicited calls

5    and I asked them to put -- give me anything

6    they had in writing, because I believe Glenn

7    Leland made things up that was not forthright

8    or honest.

9        Q.    When did you come to that

10   conclusion?

11       A.    Probably I started to have my

12   concerns somewhere in July timeframe and

13   certainly it was confirmed in the

14   November/December timeframe when the numbers

15   were not honest and he could not backup the

16   things he was saying to me in his e-mails.

17       Q.    Did you -- I don't think I got an

18   answer to this:  Did you ever -- did you or

19   anybody on your behalf, reach out to any of

20   these people that were identified as having

21   made unsolicited calls?

22            MR. MERVIS:  Objection.

23            THE WITNESS:  I did answer, and I

24       said no.

25       Q.    Besides National Express, do you

Page 176

1                    LYNN TILTON

2    recall a company called RCA?

3         A.    Yes, I do.

4         Q.    And they reached out to you a couple

5    of times?

6         A.    They did.

7         Q.    And did you respond to them?

8         A.    I had the company respond to them.

9         Q.    Did you ever engage them?

10        A.    I don't know what that means.

11        Q.    They reached out to you because they

12   were interested in some kind of entering into

13   some kind of transaction with Transcare, did

14   they not?

15        A.    They had an interest in taking over

16   the management contract or they set up a

17   potential purchase, and I had Glenn reach out

18   to them and put anything in writing, but I was

19   not looking to change the management at the

20   time.

21              But if there was a price they were

22   willing to pay, if they knew what they were

23   actually buying, since it was bleeding and in

24   crisis, that he should get that in writing.

25        Q.    Other than asking Glenn Leland to

Page 177

1                    LYNN TILTON

2    reach out to them, did you instruct anyone else

3    to reach out to them?

4         A.    I don't believe so.

5         Q.    After asking Glenn Leland to reach

6    out to them, did you ever get a response?

7         A.    From Glenn Leland?

8         Q.    Well, let's start with Glenn Leland.

9         A.    Well, that was the only person I

10   asked to reach out so that would be the only

11   one I would get a response from.

12        Q.    Did you get a response from Glen?

13        A.    He did not get anything in writing.

14   They thought they were under the wrong

15   impression of how the company was going and he

16   said the only thing we could do is try to reach

17   out for a where is as is bid.

18             But you would have to have financial

19   information to a potential buyer; and since we

20   didn't have credible financial information, it

21   would have been a difficult thing to do.

22             (Whereupon, Plaintiff Exhibit 113,

23        Greenburg E-mail Chain, Dated 10/27/15,

24        Bates Stamped PP-TRBK0083693 to '805,

25        113-Pages was marked for identification.)

Page 320

                          LYNN TILTON

1

2   were not the owners.  But I also believed that

3   Glen was out trying to market pieces of the

4   company with himself rather than actually doing

5   the work and fixing the company.

6             But I asked him always to get me any

7   kind of bid in writing.

8        Q.    All right.  At any time did you go

9   out and market the company yourself?

10       A.    No, because I didn't have anything

11  to market it with at this time.  I was still

12  trying to get clean numbers up to

13  February 23rd, when we foreclosed.

14       Q.    Did Glen have authority to market

15  the company?

16       A.    No.

17       Q.    Without your approval?

18       A.    No.

19       Q.    Did you make that clear to him?

20       A.    Oh, I did, yes.

21       Q.    So is it fair to state that other

22  than you did -- let me back up for a second.

23  When you say you believed Glen was out there

24  marketing the company, that was your suspicion,

25  correct?

Confidential

Page 321

LYNN TILTON

1

2      A.     Well, since most of his updates,

3  rather than having numbers or talking about the

4  process, was talking about all the potential

5  ways of existing the company never on fixing

6  it.

7           And he was full of bluff, because

8  when I called him on it and had him go get

9  actual offers, he would back off and say, oh, I

10  guess we really can't get that number, because

11  we don't really have that EBITDA or maybe we

12  can get a where is or maybe 14 to 17 or maybe

13  six to seven million, so I would call him on

14  doing an analysis and doing actual numbers,

15  because none of it ever made sense.

16      Q.     Did you ever engage did you ever

17  direct him to engage with anybody other than if

18  he could go out and -- well withdrawn?

19      A.     I didn't ask him to go out.  When he

20  brought me things I asked him to do analysis or

21  get written bids in writing.

22      Q.     And the same would be true of

23  National Express, correct?

24      A.     Yes I asked him to get a written bid

25  and he did and it was six to $7 million, not

Case 1:20-cv-06274-LAK    Document 101-9    Filed 09/30/20    Page 198 of 243

# EXHIBIT 8

## TransCare – updates to 2016 preliminary plan based on yesterday's discussion

**From:**
Michael Greenberg <michael.greenberg@patriarchpartners.com>
**To:**
clandeck@cartmarksadvisors.com, jkillion@cartmarksadvisors.com
**Cc:**
Jean Luc Pelissier <jeanluc.pelissier@patriarchpartners.com>
**Bcc:**
jkillion@cartmarks.com
**Date:**
Thu, 07 Jan 2016 12:33:38 -0500
**Attachments:**
oledata.mso (4.16 MB); image001.wmz (13 kB); TRANSCARE BUSINESS MODEL 2015 and 2016 12-30-2015 v11-mag (version 1).xlsx (4.75 MB)

Carl/Jonathan,

This is the case that Jean Luc and I had worked on. Given the discussions with NYSIF ($1MM payment reduced to $225k payment), the cash flow forecast included a payment plan that is more aggressive than the most recent discussions.

As I mentioned, work needs to be done on building interactivity on A/P, A/R, ABL (WF revolver assumptions) and payment plans.

Michael

Jean Luc and I worked all night to arrive at a scenario to address the parameters that we discussed yesterday to support a sale process and minimize capital needed. This reports differs from prior reporting. As we discussed yesterday, it is more operationally driven.

We began by assessing the changes that have occurred in each of the divisions over the past few years and re-assessing the operational initiatives from 2015.

One of the most meaningful events was in mid-2014 the movement of NY non-emergency from midtown to Hamilton Brooklyn when a majority of the 911 and non-emergency customers are in upper Manhattan and north. This was one of the operational initiatives for 2015 but progress only made recently.

More specifically, the 2015 operational initiatives included the following:
- Eliminate Hamilton location and locate a location in Manhattan or South Bronx for NYC 911 and non-emergency (move vehicles closer to point of use);
- Eliminate non-profitable contracts including Board of Education and exit Main Line markets;
- Reduction in overhead;
- Build fleet management program for the ambulances (tracking reliability and repair KPI, continuous improvement and preventive maintenance); and
- Implement ePCR.

### Overview of 2014 and 2015 performance by division
Below is a summary chart by division and a description of each division which illustrates the change in performance in particular divisions over time. It was used as a foundation for making our model assumptions.

- **Transit (26% of revenue)**
  - The Transit contract was renewed in mid-2015 through October 2019 but the MTA moved away from a commercial contract to a municipal contract where it limited profitability.
  - The MTA also demanded a rebate of $225k per month beginning in October (for at least 9 months) due to an interim extension where they believed they were overcharged.
  - During the 3rd and 4th quarters of 2015, Transit lost routes due to challenged performance and concerns about the TransCare's stability due to the delayed payment of insurance bills and other obligations.
  - TransCare can look to address Transit's concerns through improved payments of vendors and looking at ways to address the MTA's request to separate the cash of the business.

- **NYC 911 (31% of revenue)** – This is the most profitable division. Fire Department handles dispatch. There are 50 vehicles under contract, those vehicles are at work 24hr/day 7 days/week and don't return to the base.
  - All of the main customers have issued ultimatums for new vehicles (20 new 911 vehicles are expected to be required at a minimum).
  - Set number of ambulances per hospital (cannot be added or subtracted).

- **NY Core (non-emergency) (20% of revenue)**
  - Mid-2014 loss of facility in midtown resulted in 30% loss in labor efficiency resulted in turning the division from $50k in EBITDA to $(150)k - $(250)k in EBITDA.
  - A location has been found in the South Bronx which will help labor efficiency significantly.
  - Note that several non-emergency customers (Montefiore, Mt. Sinai) are also 911 customers a key consideration to improving and keeping the business.

- **Maryland (6% of reveaue)**
  - University of Maryland is the primary customer.
  - It is a slightly below breakeven market but there is opportunity to increase rates to restore profitability.

- **Pittsburgh (6% of revenue)** – In Q4, due to having the oldest fleet, Pittsburgh has had 20 vehicles out of service. The performance has suffered as a result of vehicle out of service.

- **Hudson Valley (11% of revenue)** – Historically, a strong market with relatively good vehicles. More recently, it has had some challenges due to delayed vehicle maintenance.



| (amounts in thousands) | Year Ended 12/31/2014 | Year Ended 12/31/2015 | $ Change 2015 vs. 2014 | % Change 2015 vs. 2014 | Comments |
|---|---|---|---|---|---|
| New York Revenues Core (total) | 29,189 | 20,566 | (8,623) | -91.5% | Exit Board of Education for $1.2M, recless |
| Transit Revenues | 30,063 | 29,523 | (540) | -1.8% | Impact of rebate, lost routes later in yr. |
| Maryland Revenues | 8,691 | 6,652 | (2,039) | -22.9% | Lost share for fleet reliability |
| Main Line (incl. Subsidy) | 10,689 | 2,781 | (7,906) | -70.9% | Shut down |
| Pittsburgh Revenues (incl. Subsidy) | 7,868 | 6,928 | (1,040) | -13.1% | Cut nursing homes / Decline UPMC |
| NYC 911 Revenues (incl. Subsidy) | 32,309 | 35,554 | 3,245 | 677.0% | Sandy, Reclass |
| Hudson Valley (including Subsidy) | 11,661 | 12,238 | 577 | 7.3% | |
| All Revenues | 130,670 | 114,342 | (16,328) | -12.5% | |
| | | | | | |
| New York EBITDA Core | 117 | (1,682) | (1,800) | -1533.6% | |
| Transit EBITDA | 3,789 | 2,567 | (1,222) | -32.3% | |
| Maryland EBITDA | 238 | (472) | (708) | -300.0% | |
| Main Line EBITDA | (1,690) | (1,289) | 401 | -23.7% | |
| Pittsburgh EBITDA | 647 | 415 | (232) | -35.9% | |
| NY 911 EBITDA | 3,410 | 6,386 | 2957 | 86.7% | |
| Hudson Valley EBITDA | 812 | 1,837 | 1,025 | 128.2% | |
| Corp OH | (6,278) | (5,804) | 474 | -7.5% | |
| EBITDA | 488 | 1,365 | 877 | 179.8% | |
| % of revenue | 0.4% | 1.2% | | | |

## Latest Preliminary Budget

We discussed with management one more time a number of scenarios but agreed to disagree.

As a result, we worked independently to arrive at a scenario more consistent with the parameters discussed yesterday.

Key assumptions to latest preliminary budget:
- Currently there are 169 ambulances in service out of 245 (72 are out of service at any point of time or close to 30%).
  - From mid-year to December 2015, the number of in service vehicles declined by nearly 15.
  - It is unclear as to how much is attributable to delayed maintenance versus the need to replace vehicles (despite the average age of 7+ years).
- Maintenance and payments of parts vendors will be critical in Q1 to address vehicle performance.
- Replacement of 20 NYC 911 vehicles (critical to maintaining customers) and 20 non-emergency vehicles to reduce average age of fleet and address those in worst condition.
- Move from Hamilton facility to South Bronx as soon as possible to drive improved efficiency and volume (by up to 30%) of non-emergency and 911 business.
- Inject 20 new ambulances into the 911 business to save customers (assumes 25% down payment).
- MTA business will take 5 – 6 months to improve significantly due to a need to replace management and time required to get back routes.
- MTA has said that they will consider returning routes (currently around 210 vs. 280 – 300 previously) as they witness progress with vendors and consideration of their request to separate cash flow.
- The assumption is that each vehicle adds approximately $38k per month in revenue and $450k per year.

- Revenue increases from $115MM to $120MM, including $2MM in new services.
- Gross margin % improves from 28.6% to 32.1% due to greater efficiencies with improved maintenance, removal of MTA rebate in Q4, increased parts supply and the move from Hamilton to South Bronx.
- EBITDA improves from $1.4MM to $6.9MM based on the reasons outlined above.
- The maximum funding need during 2016 is $4.5MM but can be mitigated through any potential delays in vehicle leases.

Another alternative is to not replace the 20 non-emergency vehicles which would reduce the peak need by only $120K but there is concern that the decline in non-emergency volume will continue.

I have attached the model and shown the monthly P&L below along with 13-week cash forecast as an Exhibit below.

| $ in thousands | 2014 | YTD Sept. | Oct. | Nov. | Dec. | 2015 | Jan. | Feb. | Mar. | Q1 2016 | Q2 2016 | Q3 2016 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Revenue | $131,122 | $88,841 | $8,911 | $8,681 | $8,318 | $114,752 | $8,672 | $8,995 | $9,175 | $26,842 | $30,180 | $31,390 |
| Cost of Service | 93,567 | 62,562 | 6,596 | 6,536 | 6,239 | 81,933 | 6,249 | 6,347 | 6,305 | 18,901 | 20,436 | 21,021 |
| Gross Margin | 37,555 | 26,279 | 2,316 | 2,145 | 2,079 | 32,818 | 2,423 | 2,648 | 2,869 | 7,940 | 9,742 | 10,369 |
| Gross Margin % | 28.6% | 29.5% | 26.0% | 24.7% | 25.0% | 28.6% | 27.9% | 29.4% | 31.3% | 29.5% | 32.3% | 33.0% |
| Operating Expenses | 37,067 | 23,642 | 2,563 | 2,617 | 2,631 | 31,453 | 2,522 | 2,554 | 2,590 | 7,667 | 7,916 | 8,038 |
| Op. Exp. (% of revenue) | 28.3% | 26.6% | 28.8% | 30.1% | 31.6% | 27.4% | 29.1% | 28.4% | 28.2% | 28.8% | 26.2% | 25.6% |
| EBITDA (after mgmt. fees) | 488 | 2,636 | -247 | -472 | -552 | 1,365 | 99 | 94 | 279 | 273 | 1,826 | 2,330 |
| EBITDA Margin % | 1.3% | 3.0% | -2.8% | -5.4% | -6.6% | 1.2% | -1.1% | 1.0% | 3.0% | 1.0% | 6.1% | 7.4% |
| | | | | | | | | | | | | |
| Interest payments | (4,980) | (3,624) | (414) | (415) | (415) | (4,868) | (388) | (388) | (388) | (1,163) | (862) | (1,165) |
| Capital expenditures | - | -1 | - | - | - | 1 | - | 707 | 694 | 1,401 | '596 | 249 |
| Capital lease payments | (996) | (367) | (114) | (114) | (114) | (708) | (114) | (271) | (388) | (873) | (1,292) | (1,002) |
| Free Cash Flow | (5,488) | (1,354) | (775) | (1,001) | (1,081) | (4,210) | (601) | 42 | 196 | (364) | 1,668 | 412 |
| | | | | | | | | | | | | |
| **Summary Balance Sheet** | | | | | | | | | | | | |
| A/P (incl. PPAS/PPMG) | $15,174 | $12,882 | $13,104 | $13,988 | $13,298 | $13,298 | $:1,948 | $11,225 | $:0,284 | $:0,284 | $9,679 | $9,391 |
| Cumulative Change in A/P | 3,995 | - | 222 | 1,106 | 416 | 416 | (934) | (1,654) | (2,598) | (2,598) | (3,200) | (3,491) |
| | | | | | | | | | | | | |
| PPAS Current Loans | $36,266 | $40,895 | $40,895 | $40,895 | $40,895 | $40,895 | $40,895 | $40,895 | $40,895 | $40,895 | $40,895 | $40,895 |
| Proposed Loans | $0 | $0 | $750 | $750 | $2,028 | $2,028 | $6,207 | $6,507 | $6,507 | $6,507 | $6,507 | $6,507 |
| ABL | $17,722 | $17,714 | $17,204 | $16,690 | $17,468 | $17,468 | $16,935 | $17,337 | $:7,742 | $17,742 | $:8,928 | $19,002 |
| Total Debt | $53,988 | $58,610 | $58,650 | $58,535 | $60,391 | $60,391 | $64,038 | $64,740 | $65,144 | $65,144 | $66,330 | $66,405 |

The peak need of close to $4.5MM is driven by the following:
Immediate requirements (including $1MM NYSIF payment and other obligations this week incl. payroll, payroll taxes);    $2.2MM

CONFIDENTIAL

CM_TC2018_0003370

A0980

25% down payments on 20 911 and 20 non-emergency vehicles:     **$1.3MM**
Other A/P payments necessary to open back up parts supplies and maintain existing vehicles:     **$1.0MM**
Total     **$4.5MM**

The risk of not leasing the non-emergency vehicles only reduces the peak need by $120k but risks continued deterioration of the non-emergency business.

**For the sake of providing another scenario, we considered a more extreme case (Exit NY non-emergency and Maryland):**

- NY non-emergency is currently unprofitable.
- Corporate reductions are assumed and would be required in order to maintain profitability.
- Most importantly, peak need is $7.17MM including $2.8MM of old A/P to pay down.
- Revenue of $84.1MM, EBITDA of $4.0MM (EBITDA margin of 4.7%) including a profitable Q1.
- **Biggest risk: Potential loss of lucrative 911 business with Montefiore and Mt. Sinai.**

Please let us know when you would like to discuss.

Thank you,
Michael

---

## Exhibit I – 2016 Monthly Financials

### 2016 Monthly Income Statement

| INCOME STATEMENT | Budget Jan-16 | Budget Feb-16 | Budget Mar-16 | Budget Apr-16 | Budget May-16 | Budget Jun-16 | Budget Jul-16 | Budget Aug-16 | Budget Sep-16 | Budget Oct-16 |
|---|---|---|---|---|---|---|---|---|---|---|
| New Vehicles | 0 | 7 | 7 | 8 | 8 | 5 | 3 | 1 | 1 | 1 |
| In service vehicles | 173 | 180 | 187 | 195 | 203 | 208 | 209 | 210 | 231 | 212 |
| Average monthly revenue per | $35,000 | $35,000 | $36,500 | $39,000 | $39,000 | $38,500 | $38,000 | $38,000 | $38,000 | $38,000 |
| Ambulance Revenue | 6,747,000 | 7,928,000 | 7,196,500 | 7,605,000 | 7,917,000 | 8,908,000 | 7,942,000 | 7,980,000 | 8,019,000 | 8,056,000 |
| | | | | | | | | | | |
| **Revenue** | $8,647,000 | $8,929,000 | $9,095,500 | $9,605,000 | $9,907,000 | $10,205,000 | $10,242,000 | $10,250,000 | $10,316,000 | $10,356,000 |
| New Products & services | $25,000 | $75,000 | $75,000 | $150,000 | $150,000 | $150,000 | $200,000 | $225,000 | $225,000 | $225,000 |
| Net Revenue (All) | $8,672,000 | $8,995,000 | $9,174,500 | $9,755,000 | $10,067,000 | $10,355,000 | $10,442,000 | $10,505,000 | $10,543,000 | $10,581,000 |
| Drives Compensation & Related | $4,309,440 | $4,342,475 | $4,495,505 | $4,779,950 | $4,822,160 | $4,971,840 | $4,902,792 | $5,000,380 | $5,018,400 | $5,036,556 |
| Dispatch, Customer Service | $301,034 | $312,118 | $321,108 | $341,423 | $352,345 | $362,530 | $361,870 | $367,675 | $369,005 | $336,975 |
| Fleet Compensation | $308,796 | $320,109 | $315,169 | $330,092 | $331,081 | $340,706 | $340,092 | $347,286 | $342,509 | $345,734 |
| Week Compensation Cost | $260,160 | $269,050 | $273,235 | $292,650 | $302,010 | $310,740 | $310,260 | $324,687 | $332,719 | $324,957 |
| Maintenance Costs | $248,731 | $257,909 | $253,871 | $268,014 | $260,676 | $274,418 | $274,548 | $279,691 | $275,904 | $278,449 |
| Other Fees, Insurances | $234,366 | $242,985 | $259,190 | $251,106 | $251,255 | $256,550 | $258,765 | $263,515 | $258,950 | $262,347 |
| Fuel, Tolls & Parking Costs | $225,472 | $233,870 | $238,531 | $253,630 | $261,742 | $269,308 | $268,592 | $273,130 | $274,138 | $275,106 |
| Medical Supplies, Rentals & Repairs | $72,397 | $73,073 | $73,902 | $77,614 | $77,645 | $79,912 | $79,982 | $81,481 | $80,301 | $81,109 |
| Communications | $35,107 | $36,431 | $35,869 | $37,678 | $37,718 | $38,844 | $38,885 | $39,674 | $38,951 | $39,472 |
| All Other GOGS | $33,266 | $35,769 | $36,882 | $90,481 | $60,415 | $64,229 | $64,320 | $65,131 | $60,347 | $60,612 |
| **SUB TOTAL – COST OF SERVICE** | $6,249,249 | $6,346,671 | $6,306,268 | $6,690,730 | $6,776,646 | $6,971,068 | $6,921,304 | $7,047,014 | $7,067,204 | $7,046,347 |
| **SUB TOTAL – GROSS PROFIT** | $2,422,711 | $2,648,329 | $2,869,232 | $3,062,770 | $3,291,054 | $3,386,932 | $3,420,696 | $3,462,367 | $3,483,704 | $3,534,653 |
| | 27.9% | 29.4% | 31.3% | 31.4% | 32.7% | 32.7% | 33.1% | 33.3% | 33.1% | 33.4% |
| Administrative Staffing | $1,023,296 | $1,007,440 | $1,027,344 | $1,075,000 | $1,075,000 | $1,075,000 | $1,075,000 | $1,075,000 | $1,075,000 | $1,075,000 |
| Facility Costs | $318,085 | $337,636 | $321,923 | $337,482 | $326,361 | $342,654 | $342,549 | $345,329 | $352,049 | $343,809 |
| Insurance Auto/Liability | $234,144 | $242,865 | $247,712 | $250,090 | $250,000 | $250,000 | $250,000 | $250,000 | $250,000 | $250,000 |
| Professional Fees | $140,000 | $140,000 | $140,000 | $140,000 | $140,000 | $140,806 | $140,000 | $140,000 | $140,000 | $140,000 |
| All Other SG&A | $286,176 | $296,635 | $303,739 | $321,913 | $332,211 | $341,814 | $341,286 | $346,665 | $347,919 | $349,173 |
| Bad Debt | $320,320 | $339,700 | $350,470 | $487,750 | $503,350 | $517,900 | $517,100 | $523,250 | $527,130 | $529,050 |
| **TOTAL OPERATING EXPENSES** | $2,322,021 | $2,554,456 | $2,590,407 | $2,617,157 | $2,655,922 | $2,667,568 | $2,665,935 | $2,680,644 | $2,692,116 | $2,687,102 |
| | | | | | | | | | | |
| **EBITDA CURRENT BUSINESS** | ($99,310) | $93,873 | $278,826 | $430,613 | $636,033 | $729,364 | $754,760 | $781,922 | $793,583 | $847,550 |
| | -1.1% | 1.0% | 3.0% | 4.4% | 6.3% | 7.0% | 7.3% | 7.4% | 7.5% | 8.0% |
| Interest Expense & Cap Lease | $479,058 | $433,219 | $443,044 | $442,093 | $446,133 | $499,045 | $451,464 | $451,130 | $454,981 | $452,217 |
| Depreciation | $135,077 | $155,077 | $155,077 | $155,077 | $155,077 | $155,077 | $155,077 | $155,077 | $155,077 | $155,077 |
| All other | $4,950 | $6,010 | $5,532 | $5,600 | $6,729 | $5,200 | $6,230 | $6,540 | $6,540 | $6,540 |
| Income Tax | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| **NET INCOME with RECOVERY** | ($688,336) | ($500,443) | ($339,828) | ($152,157) | $47,474 | $130,042 | $141,969 | $169,573 | $179,990 | $233,716 |
| | 7.9% | -3.6% | -3.7% | -1.6% | 2.3% | 1.1% | 1.4% | 1.6% | 1.7% | 2.2% |

### 2016 Monthly Balance Sheet

|  | Budget Jan-16 | Budget Feb-16 | Budget Mar-16 | Budget Apr-16 | Budget May-16 | Budget Jun-16 | Budget Jul-16 | Budget Aug-16 | Budget Sep-16 |
|---|---|---|---|---|---|---|---|---|---|
| Cash | $100,000 | $100,000 | $100,000 | $100,000 | $100,000 | $100,000 | $100,000 | $100,000 | $100,000 |
| Accounts Receivable (Net of reserve) | $20,551,491 | $20,364,693 | $20,479,780 | $19,529,461 | $20,934,552 | $10,831,632 | $10,527,250 | $15,637,480 | $10,467,698 |
| Inventories | 1,200,000 | 995,550 | 992,250 | 1,213,000 | 1,313,000 | 1,524,156 | 1,375,830 | 1,575,836 | 1,875,606 |
| Prepaid Expenses | 250,000 | 250,000 | 250,000 | 250,000 | 299,000 | 250,000 | 290,000 | 280,000 | 350,000 |
| **Total Current Assets** | **$22,301,491** | **$21,710,043** | **$21,825,080** | **$21,394,461** | **$22,790,852** | **$21,703,778** | **$21,333,496** | **$20,503,315** | **$21,692,698** |
| PPE - Net | $3,104,488 | $3,901,245 | $3,395,286 | $3,436,740 | $3,256,777 | $6,591,310 | $6,914,768 | $6,870,617 | $6,350,341 |
| Goodwill | 13,547,506 | 13,547,506 | 13,547,506 | 13,547,506 | 13,547,506 | 13,547,509 | 13,547,506 | 13,547,506 | 13,547,506 |
| Other Assets | 6,205,085 | 6,205,085 | 6,205,085 | 6,205,085 | 6,205,085 | 6,205,085 | 6,205,085 | 6,205,085 | 6,205,085 |
| **TOTAL ASSETS** | **$45,045,565** | **$45,364,078** | **$44,372,957** | **$46,580,812** | **$46,509,250** | **$48,045,690** | **$47,922,953** | **$47,193,524** | **$48,285,132** |
| Accounts Payable | $11,547,502 | $11,527,502 | $10,203,502 | $10,677,802 | $9,873,273 | $9,878,750 | $9,541,962 | $9,446,143 | $9,391,281 |
| Accrued Expenses | 11,636,940 | 11,836,940 | 12,902,450 | 12,369,601 | 12,308,121 | 12,486,158 | 12,414,460 | 12,476,083 | 12,014,220 |
| Accrued Compensated Absences | 605,581 | 605,561 | 605,581 | 605,581 | 605,581 | 605,581 | 605,561 | 605,581 | 605,561 |
| Line of Credit Borrowing | 14,934,893 | 17,356,889 | 17,741,544 | 17,773,404 | 19,769,585 | 18,927,632 | 18,574,866 | 18,020,307 | 19,002,422 |
| **Current Liabilities** | **$31,344,913** | **$31,026,912** | **$31,534,077** | **$31,326,615** | **$32,759,362** | **$31,693,121** | **$31,176,569** | **$30,391,114** | **$31,413,506** |
| Term Loans | 40,895,483 | 40,895,483 | 40,895,483 | 40,895,483 | 40,895,483 | 40,895,483 | 40,895,483 | 40,895,483 | 40,895,483 |
| Capital Contribution | 9,207,239 | 6,507,239 | 6,507,239 | 8,507,239 | 8,507,239 | 8,507,239 | 8,507,239 | 8,507,239 | 8,507,239 |
| Capital Lease | 1,906,455 | 1,643,447 | 2,264,258 | 1,029,742 | 3,779,779 | 3,971,897 | 4,224,065 | 4,113,914 | 4,091,129 |
| Deferred Rent Payable | 815,152 | 815,152 | 815,152 | 815,152 | 815,152 | 815,152 | 815,152 | 815,152 | 815,152 |
| Deferred Tax Liability | 3,821,396 | 3,821,396 | 3,821,396 | 3,821,396 | 3,821,396 | 3,821,396 | 3,821,396 | 3,821,396 | 3,821,396 |
| **TOTAL LIABILITIES** | **63,093,676** | **64,705,629** | **85,837,656** | **86,307,647** | **88,578,611** | **87,708,998** | **87,440,204** | **86,544,295** | **87,453,917** |
| Equity (Deficit) | (\$58,045,109) | (\$39,345,550) | (\$39,464,678) | (\$39,819,835) | (\$39,769,361) | (\$39,659,319) | (\$39,517,350) | (\$39,348,773) | (\$39,168,785) |
| **TOTAL EQUITY** | **($38,815,108)** | **($39,345,550)** | **($39,464,678)** | **($39,836,835)** | **($39,769,361)** | **($39,649,679)** | **($39,517,350)** | **($39,448,773)** | **($39,368,765)** |
| **TOTAL LIABILITIES & EQUITY** | **$45,048,569** | **$45,364,078** | **$46,372,957** | **$46,550,812** | **$46,509,350** | **$48,049,679** | **$47,922,953** | **$47,395,523** | **$48,285,132** |

## 2016 Monthly Cash Flow Statement

| CASH FLOW STATEMENT | Budget Jan-16 | Budget Feb-16 | Budget Mar-16 | Budget Apr-16 | Budget May-16 | Budget Jun-16 | Budget Jul-16 | Budget Aug-16 | Budget Sep-16 | Budget Oct-16 |
|---|---|---|---|---|---|---|---|---|---|---|
| Net Income/(Loss) | ($889,386) | ($530,443) | ($119,128) | ($352,187) | $47,474 | $110,042 | $141,969 | $168,575 | $179,990 | $253 |
| Add back: Depn. & Amortization | 885,077 | 110,577 | 148,077 | 135,077 | 155,077 | 155,077 | 154,077 | 155,077 | 155,077 | 156 |
| Bad debts | 630,150 | 559,700 | 580,470 | 487,730 | 303,350 | 317,905 | 317,100 | 328,250 | 357,350 | 370 |
| Deferred Tax Expense | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Changes in operating assets & liabilities: |  |  |  |  |  |  |  |  |  |  |
| Decrease (Increase) in AR & Other | 836,930 | 186,799 | (713,037) | 950,269 | 1,405,425 | 1,103,280 | 303,962 | 880,180 | (830,219) | 118 |
| Decrease (Increase) in Inventory | 0 | 204,459 | 0 | (319,630) | 0 | 9,156 | 148,929 | (200,000) | (209,164) |  |
| Decrease (Increase) in Pre-Paid | 0 | 0 | 0 | 0 | 0 | 5 | 0 | 0 | 0 |  |
| Increase (Decrease) in AP & Other | (9,144,262) | (1,342,863) | (991,381) | 1,084,384 | (1,377,114) | (412,772) | (463,354) | (457,072) | 120,603 | (116) |
| **CASH FLOW FROM OPERATIONS** | **($8,580,269)** | **($726,870)** | **($420,180)** | **($863,273)** | **($2,077,233)** | **$1,264,152** | **$882,391** | **$1,142,041** | **($496,795)** | **$936** |
| Purchase of Property and Equipment | $0 | $700,955 | $693,841 | $858,479 | $223,011 | $334,334 | $305,450 | $57,157 | $59,779 | $45 |
| Lease New Fleet Vehicles | (73,600) | (326,941) | (339,659) | (334,626) | (369,983) | (378,466) | (387,542) | (270,331) | (272,778) | 1,173 |
| Proceeds from Disposal of Assets | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |  |
| **CASH FLOW FROM INVESTING** | **($73,600)** | **$389,917** | **$354,683** | **$403,949** | **$493,034** | **($343,933)** | **$962,085** | **($607,367)** | **($332,549)** | **($387)** |
| **CASH FLOW BEFORE FINANCING** | **($3,573,269)** | **($171,023)** | **($65,497)** | **($520,675)** | **($2,621,280)** | **$1,120,415** | **$750,309** | **$824,700** | **($709,344)** | **$655** |
| Proceeds /Repayment of Line of Credit | (\$534,989) | \$401,304 | \$404,636 | \$33,637 | \$1,999,183 | \$943,933 | \$352,706 | \$354,350 | (\$982,116) | (\$342) |
| Payments of Capital Lease Obligations | (73,000) | (326,241) | (220,153) | (354,326) | (369,983) | (378,466) | (387,542) | (270,331) | (272,778) | 271 |
| Proceeds /Pay down Capital |  |  |  |  |  |  |  |  |  |  |
| Proceeds from Term Loans | 4,179,259 | 300,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Deferred Financing Cost | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **CASH FLOW FROM FINANCING** | **$3,573,270** | **$374,952** | **$65,497** | **($320,569)** | **$1,629,200** | **($1,120,419)** | **($740,309)** | **($834,709)** | **$709,343** | **($629)** |
| BEGINNING CASH BALANCE | $100,001 | $100,000 | $100,000 | $100,000 | $100,000 | $100,000 | $100,000 | $100,000 | $100,000 | $100 |
| Net Change in Cash Balance | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **ENDING CASH BALANCE** | **$100,001** | **$100,000** | **$300,000** | **$100,001** | **$100,000** | **$100,000** | **$100,000** | **$100,000** | **$100,000** | **$100,** |

**Exhibit II – 13-week cash flow forecast**

CONFIDENTIAL

CM_TC2018_0003372

| TransCare Corporation 13 Week Cash Plan (000's Omitted) | Budget Week 1 1/1/16 | Budget Week 7 1/8/16 | Budget Week 3 1/15/16 | Budget Week 4 1/22/16 | Budget Week 5 1/29/16 | Budget Week 6 2/5/16 | Budget Week 7 2/12/16 | Budget Week 8 2/19/16 | Budget Week 9 2/26/16 | Budget Week 10 3/4/16 | Budget Week 11 3/11/16 | Budget Week 12 3/18/16 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **RECEIPTS** | | | | | | | | | | | | |
| Ambulance Receipts | $ 1,307 | $ 1,772 | $ 1,602 | $ 1,707 | $ 1,707 | $ 1,707 | $ 1,707 | $ 1,906 | $ 1,707 | $ 1,707 | $ 1,707 | $ 1,80 |
| Paratransit Receipts | $ - | $ - | $ 1,956 | $ - | $ - | $ 2,050 | $ - | $ - | $ - | $ - | $ 2,050 | $ - |
| **TOTAL RECEIPTS** | $ 1,307 | $ 1,772 | $ 3,558 | $ 1,707 | $ 1,707 | $ 3,757 | $ 1,707 | $ 1,906 | $ 1,707 | $ 1,707 | $ 3,757 | $ 1,80 |
| **DISBURSEMENTS** | | | | | | | | | | | | |
| Payroll | | | | | | | | | | | | |
| Wages and employer taxes | $ 696 | $ 2,266 | $ 1,725 | $ 1,365 | $ 1,365 | $ 1,365 | $ 1,365 | $ 1,365 | $ 1,365 | $ 1,365 | $ 1,365 | $ 1,36 |
| HIP & Voluntary Benefits | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| H.S.A. Ldng | | | | | | | | | | | | |
| LHC - Employee Medical | $ - | $ - | $ - | $ 30 | $ 370 | $ - | $ - | $ - | $ - | $ 370 | $ 370 | $ - |
| Total Benefits | $ 696 | $ 2,266 | $ 1,755 | $ 1,735 | $ 1,365 | $ 1,365 | $ 1,365 | $ 1,365 | $ 1,365 | $ 1,735 | $ 1,735 | $ 1,36 |
| **Total payroll & benefits** | $ 696 | $ 2,266 | $ 1,755 | $ 1,735 | $ 1,365 | $ 1,365 | $ 1,365 | $ 1,365 | $ 1,365 | $ 1,735 | $ 1,735 | $ 1,36 |
| Insurance | $ - | $ 1,253 | $ - | $ - | $ 357 | $ 504 | $ 280 | $ 200 | $ 357 | $ 347 | $ 257 | $ 10 |
| Debt Interest | $ 310 | $ 385 | $ - | $ - | $ - | $ 85 | $ 300 | $ - | $ - | $ 65 | $ 500 | $ - |
| Other disbursements | | | | | | | | | | | | |
| Rent | $ 443 | $ - | $ 135 | $ 135 | $ - | $ - | $ 50 | $ 150 | $ 56 | $ - | $ 100 | $ 28 |
| ACH Debits | $ 85 | $ 46 | $ 64 | $ 71 | $ 123 | $ 65 | $ 24 | $ 146 | $ 184 | $ 26 | $ 58 | $ 14 |
| Vehicle lease payments | $ 48 | $ 43 | $ - | $ - | $ 48 | $ - | $ - | $ - | $ 90 | $ - | $ - | $ - |
| Vehicle purchase dp | $ - | $ - | $ - | $ - | $ - | $ [1] | $ - | $ - | $ - | $ - | $ 240 | $ - |
| Accounts payable - other | $ 25 | $ - | $ 25 | $ 130 | $ 200 | $ 323 | $ 200 | $ 220 | $ 300 | $ 190 | $ 300 | $ 25 |
| Total other disbursements | $ 596 | $ 89 | $ 224 | $ 356 | $ 366 | $ 337 | $ 424 | $ 432 | $ 584 | $ 326 | $ 828 | $ 39 |
| **TOTAL DISBURSEMENTS** | $ 1,602 | $ 3,993 | $ 1,979 | $ 2,448 | $ 2,320 | $ 2,292 | $ 1,989 | $ 2,144 | $ 2,751 | $ 2,618 | $ 2,091 | $ 1,86 |
| **CHANGE IN CASH** | $ (293) | $ (2,221) | $ 1,579 | $ (741) | $ (613) | $ 1,554 | $ (282) | $ (238) | $ (1,044) | $ (911) | $ 1,666 | $ (5 |
| **NET AVAILABLE CASH** | $ 1 | $ (2,249) | $ (2,999) | $ (3,839) | $ (4,179) | $ (4,182) | $ (3,971) | $ (3,915) | $ (4,466) | $ (4,594) | $ (4,485) | $ (4,15 |
| Wachovia ABL balance | $ 14,811 | $ 13,409 | $ 15,287 | $ 15,257 | $ 15,287 | $ 15,510 | $ 15,284 | $ 15,077 | $ 15,743 | $ 15,951 | $ 15,951 | $ 15,95 |
| Trailing 69-day cash | $ 23,042 | $ 24,986 | $ 24,694 | $ 24,472 | $ 23,977 | $ 24,327 | $ 24,677 | $ 24,245 | $ 24,517 | $ 24,509 | $ 24,253 | $ 24,09 |
| Eligible AR | $ 15,848 | $ 15,807 | $ 15,512 | $ 18,242 | $ 16,568 | $ 16,682 | $ 16,171 | $ 16,273 | $ 16,200 | $ 16,184 | $ 16,444 | $ 16,44 |

Michael S. Greenberg
Patriarch Partners
One Broadway, 5th Floor
New York, NY 10004
Direct: 646-723-7657
Fax: 212-825-2038
Email: michael.greenberg@patriarchpartners.com
www.patriarchpartners.com

CONFIDENTIAL

CM_TC2018_0003373

A0983

This document has not been tiffed because it either (a) is being produced
natively or (b) is a file type that cannot be tiffed

CONFIDENTIAL

CM_TC2018_0003376

Summary Scenarios & Comparison

| Scenario Summary Four Options | As of 12/31/16 2016 Revenues | As of 12/31/16 2016 Gross Margin | GM % | As of 12/31/16 2016 EBITDA | As of 12/31/16 2016 New Vehicles | As of 12/31/16 2016 Total Fleet | As of 12/31/16 2016 Total Cash Used |
|---|---|---|---|---|---|---|---|
| Scenario (1)a. Core Business Model 25% DP | $ 120,280,500 | $38,648,553 | 32.1% | $6,940,945 | 40 | 148 | $ 2,951,634 |
| | | | | | | | |
| Scenario (1)b. Core Business Model - Purchase | $ 120,280,500 | $38,648,553 | 32.1% | $6,940,945 | 40 | 148 | $ 14,590,000 |
| Variance (1)b. to Core Model (1)a. Better or (Worse) | $  - | $0 | 0.0% | $0 | 0 | 0 | $ (11,638,366) |
| | | | | | | | |
| Scenario (2) - No New Vehicles | $ 72,205,076 | $ 17,761,330 | 24.6% | $ (12,142,711) | 0 | 108 | $  - |
| Variance (2) to Core Model (1)a. Better or (Worse) | $ (48,075,424) | ($20,887,223) | 24.6% | ($19,083,656) | (40) | (40) | $ 2,951,634 |
| | | | | | | | |
| Scenario (3) - Bare Minimum - 20 New 911 (Purchase) | $ 79,959,300 | $ 20,863,019 | 26.1% | $ (9,041,021) | 20 | 128 | $ $3,200,000 |
| Variance (3) to Core Model (1)a. Better or (Worse) | $ (40,321,200) | ($17,785,534) | 1.5% | ($15,981,967) | (20) | (20) | $ (248,366) |
| | | | | | | | |
| Scenario (4)a. 20 New 911 Vehicles & 50 - 25% DP | $ 99,344,861 | $ 28,617,244 | 28.8% | $ (1,286,797) | 70 | 178 | $ $2,799,134 |
| Variance (4)a. to Core Model (1)a. Better or (Worse) | $ (20,935,639) | ($10,031,309) | 27.3% | ($8,227,742) | 30 | 30 | $ 152,500 |
| | | | | | | | |
| Scenario (4)b. 20 New 911 Vehicles & 50 Purchase | $ 99,344,861 | $ 28,617,244 | 28.8% | $ (1,286,797) | 70 | 178 | $ $7,550,000 |
| Variance (4)b. to Core Model (1)a. Better or (Worse) | $ (20,935,639) | ($10,031,309) | 1.5% | ($8,227,742) | 30 | 30 | $ (4,598,366) |

CM_TC2018_0003376

Four Scenarios

| Scenario Summary of Options | Year End Dec-15 | Budget Jan-16 | Budget Feb-16 | Budget Mar-16 | Budget Apr-16 | Budget May-16 | Budget Jun-16 | Budget Jul-16 | Budget Aug-16 | Budget Sep-16 | Budget Oct-16 | Budget Nov-16 | Budget Dec-16 | Year Ended 12/31/2016 | Variance To Core Model |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Scenario (1)a. Core Business Model - 118 New Vehicles - 25% Down Payment** | | | | | | | | | | | | | | | |
| Quantity New Vehicles Funded | $ - | 0 | 7 | 7 | 8 | 6 | 5 | 1 | 1 | 1 | 1 | 1 | 0 | 40 | |
| Cash Used For Down Payment | $ - | $ - | $ 240,000 | $ 240,000 | $ 240,000 | $ 240,000 | $ 240,000 | $ 240,000 | $ 120,000 | $ 120,000 | $ 120,000 | $ 120,000 | $ 120,000 | $ 2,040,000 | |
| Cash Used For Principal & Interest | $ - | $ - | $ 17,241 | $ 34,483 | $ 54,597 | $ 74,712 | $ 85,488 | $ 96,982 | $ 99,856 | $ 102,729 | $ 105,603 | $ 108,476 | $ 131,465 | $ 911,834 | |
| Total Cash Used New Vehicles | $ - | $ - | $ 257,241 | $ 274,483 | $ 294,597 | $ 314,712 | $ 325,488 | $ 336,982 | $ 219,856 | $ 222,729 | $ 225,603 | $ 228,476 | $ 251,465 | $ 2,951,634 | |
| Total Vehicles In Service | 206 | 198 | 197 | 177 | 182 | 187 | 189 | 182 | 175 | 168 | 161 | 154 | 148 | 148 | |
| Revenue | $ 8,318,206 | $ 8,672,000 | $ 8,995,000 | $ 9,174,500 | $ 9,755,000 | $ 10,067,000 | $ 10,358,000 | $ 10,342,000 | $ 10,505,000 | $ 10,543,000 | $ 10,581,000 | $ 10,644,000 | $ 10,644,000 | $ 120,280,500 | |
| Gross Margin | $2,078,707 | $2,422,711 | $2,648,329 | $2,869,232 | $3,062,770 | $3,291,954 | $3,386,932 | $3,420,696 | $3,462,367 | $3,485,706 | $3,534,653 | $3,550,225 | $3,512,978 | $38,648,553 | |
| Percent GM | 25.0% | 27.9% | 29.4% | 31.3% | 31.4% | 32.7% | 32.7% | 33.1% | 33.0% | 33.1% | 33.4% | 33.4% | 33.0% | 32.1% | |
| EBITDA | ($551,978) | ($99,310) | $93,873 | $278,825 | $450,613 | $656,031 | $719,364 | $754,760 | $781,922 | $793,688 | $847,550 | $853,116 | $810,612 | $6,940,945 | |
| Accounts Payable | $13,297,502 | $11,947,502 | $11,227,502 | $10,283,502 | $10,077,832 | $9,876,275 | $9,678,750 | $9,581,962 | $9,486,143 | $9,391,281 | $9,297,368 | $9,204,395 | $9,112,351 | | |
| New Capital Contribution | 2,028,000 | 4,179,239 | 300,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | $ 4,479,239 | |
| Bank Loan Balance | 17,457,864 | 16,934,895 | 17,336,889 | 17,741,544 | 17,775,401 | 19,769,585 | 18,927,632 | 18,574,866 | 18,020,307 | 19,002,425 | 18,658,761 | 18,085,246 | 17,750,749 | | |
| **Scenario (1)b. Core Business Model - 118 New Vehicles - No Credit Purchase All** | | | | | | | | | | | | | | | |
| Quantity New Vehicles Funded | $ - | $ - | $ 7 | $ 7 | $ 8 | $ 8 | $ 5 | $ 1 | $ 1 | $ 1 | $ 1 | $ 1 | $ - | $ 40 | 0 |
| Cash Used For Down Payment | $ - | $ 5,790,000 | $ 800,000 | $ 800,000 | $ 800,000 | $ 800,000 | $ 800,000 | $ 800,000 | $ 800,000 | $ 800,000 | $ 800,000 | $ 800,000 | $ 800,000 | $ 14,590,000 | |
| Cash Used For Principal & Interest | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | - | |
| Total Cash Used New Vehicles | $ - | $ 5,790,000 | $ 800,000 | $ 800,000 | $ 800,000 | $ 800,000 | $ 800,000 | $ 800,000 | $ 800,000 | $ 800,000 | $ 800,000 | $ 800,000 | $ 800,000 | $ 14,590,000 | $ (11,638,366) |
| Total Vehicles In Service | $ 206 | $ 198 | $ 197 | $ 177 | $ 182 | $ 187 | $ 189 | $ 182 | $ 175 | $ 168 | $ 161 | $ 154 | $ 148 | $ 148 | 0 |
| Revenue | $ 8,318,206 | $ 8,672,000 | $ 8,995,000 | $ 9,174,500 | $ 9,755,000 | $ 10,067,000 | $ 10,358,000 | $ 10,342,000 | $ 10,505,000 | $ 10,543,000 | $ 10,581,000 | $ 10,644,000 | $ 10,644,000 | $ 120,280,500 | |
| Gross Margin | $2,078,707 | $2,422,711 | $2,648,329 | $2,869,232 | $3,062,770 | $3,291,954 | $3,386,932 | $3,420,696 | $3,462,367 | $3,485,706 | $3,534,653 | $3,550,225 | $3,512,978 | $38,648,553 | |
| Percent GM | 25.0% | 27.9% | 29.4% | 31.3% | 31.4% | 32.7% | 32.7% | 33.1% | 33.0% | 33.1% | 33.4% | 33.4% | 33.0% | 32.1% | |
| EBITDA | ($551,978) | ($99,310) | $93,873 | $278,825 | $450,613 | $656,031 | $719,364 | $754,760 | $781,922 | $793,688 | $847,550 | $853,116 | $810,612 | $6,940,945 | |
| Accounts Payable | $13,297,502 | $11,947,502 | $11,227,502 | $10,283,502 | $10,077,832 | $9,876,275 | $9,678,750 | $9,581,962 | $9,486,143 | $9,391,281 | $9,297,368 | $9,204,395 | $9,112,351 | | |
| New Capital Contribution | $2,028,000 | $4,179,239 | $300,000 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $ 4,479,239 | |
| Added Capital Contribution Needed (1)b | $0 | $ 1,610,761 | $ 500,000 | $ 800,000 | $ 800,000 | $ 800,000 | $ 800,000 | $ 800,000 | $ 800,000 | $ 800,000 | $ 800,000 | $ 800,000 | $ 800,000 | $ 10,110,761 | |
| Required New Capital | $2,028,000 | $5,790,000 | $800,000 | $800,000 | $800,000 | $800,000 | $800,000 | $800,000 | $800,000 | $800,000 | $800,000 | $800,000 | $800,000 | $14,590,000 | $ (11,638,366) |
| Bank Loan Balance | $17,457,864 | $16,934,895 | $17,336,889 | $17,741,544 | $17,775,401 | $19,769,585 | $18,927,632 | $18,574,866 | $18,020,307 | $19,002,425 | $18,658,761 | $18,085,246 | $17,750,749 | | |
| **Scenario (2) - No New Vehicles** | | | | | | | | | | | | | | | |
| Total Vehicles In Service | 206 | 198 | 190 | 183 | 160 | 157 | 154 | 146 | 138 | 130 | 122 | 114 | 108 | 108 | -40 |
| Revenue | $ 8,318,206 | $ 5,545,426 | $ 5,558,078 | $ 5,324,864 | $ 5,689,748 | $ 5,922,730 | $ 6,307,393 | $ 6,256,938 | $ 6,424,831 | $ 6,366,530 | $ 6,319,062 | $ 6,298,896 | $ 6,201,658 | $ 72,205,076 | $ (48,075,424) |
| Gross Margin | $2,078,707 | $935,535 | $934,839 | $892,545 | $1,079,707 | $1,236,858 | $1,694,948 | $1,671,306 | $1,817,828 | $1,909,447 | $1,900,761 | $1,880,524 | $1,807,030 | $ 17,761,330 | ($20,887,223) |
| Percent GM | 25.0% | 16.9% | 16.8% | 16.8% | 19.0% | 20.9% | 26.9% | 26.7% | 28.3% | 30.0% | 30.1% | 29.9% | 29.1% | 24.6% | |
| EBITDA | ($551,978) | ($1,482,829) | ($1,569,268) | ($1,541,351) | ($1,297,181) | ($1,156,172) | ($786,526) | ($823,393) | ($738,621) | ($669,357) | ($638,690) | ($662,027) | ($777,296) | $ (12,142,711) | ($19,083,656) |
| **Scenario (3) - Bare Minimum - Only 20 New 911 Vehicles (Purchase)** | | | | | | | | | | | | | | | |
| Quantity New Vehicles Funded | 0 | 20 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 20 | -20 |
| Cash Used For Down Payment | $0 | $ 3,200,000 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $ 3,200,000 | |
| Cash Used For Principal & Interest | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $ - | |
| Total Cash Used New Vehicles | $0 | $3,200,000 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $3,200,000 | $ (248,368) |
| Total Vehicles In Service | 206 | 218 | 190 | 183 | 160 | 157 | 154 | 146 | 138 | 130 | 122 | 114 | 108 | 128 | -20 |
| Revenue | $ 8,318,206 | $ 6,066,202 | $ 6,088,234 | $ 5,910,311 | $ 6,304,706 | $ 6,560,573 | $ 6,959,361 | $ 6,915,440 | $ 7,118,080 | $ 7,055,932 | $ 7,030,424 | $ 7,025,614 | $ 6,924,425 | $ 79,959,300 | $ (40,321,200) |
| Gross Margin | $ 2,078,707 | $1,143,845 | $1,146,902 | $1,126,724 | $1,325,690 | $1,491,996 | $1,955,735 | $1,935,107 | $2,098,128 | $2,189,207 | $2,185,298 | $2,171,331 | $2,096,057 | $ 20,863,019 | ($17,785,534) |
| Percent GM | 25.0% | 18.9% | 18.8% | 19.1% | 21.0% | 22.7% | 28.1% | 28.0% | 29.4% | 31.0% | 31.1% | 30.9% | 30.3% | 26.1% | |
| EBITDA | $ (551,978) | ($1,274,519) | ($1,357,205) | ($1,307,173) | ($1,051,197) | ($901,535) | ($525,739) | ($559,592) | ($481,321) | ($389,597) | ($354,153) | ($371,220) | ($488,270) | $ (9,041,021) | ($15,981,967) |
| **Scenario (4)a. 20 New 911 Vehicles and 50 Slightly Used - Credit Available 25% Down Payment** | | | | | | | | | | | | | | | |
| Quantity New Vehicles Funded | 0 | 20 | 50 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 70 | 30 |
| Cash Used For Down Payment | $0 | $ 800,000 | $ 1,087,500 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $ 1,887,500 | |
| Cash Used For Principal & Interest | $0 | $ - | $ 17,241 | $ 34,483 | $ 54,597 | $ 74,712 | $ 85,488 | $ 96,982 | $ 99,856 | $ 102,729 | $ 105,603 | $ 108,476 | $ 131,465 | $ 911,834 | |
| Total Cash Used New Vehicles | $0 | $800,000 | $1,104,741 | $34,483 | $54,597 | $74,712 | $85,488 | $96,982 | $99,856 | $102,729 | $105,603 | $108,476 | $131,465 | $2,799,134 | ($2,799,134) |
| Total Vehicles In Service | 206 | 218 | 240 | 233 | 230 | 227 | 224 | 216 | 208 | 200 | 192 | 184 | 178 | 178 | 30 |

Final Scenarios

| | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Revenue | $ 6,318,208 | $ 7,368,140 | $ 7,413,625 | $ 7,373,928 | $ 7,842,101 | $ 8,155,178 | $ 8,585,279 | $ 8,584,195 | $ 8,851,303 | $ 8,804,438 | $ 8,808,779 | $ 8,842,158 | $ 8,720,841 | $ 99,344,861 |
| Gross Margin | $ 2,078,707 | $1,664,620 | $1,677,058 | $1,712,170 | $1,940,948 | $2,129,838 | $2,607,702 | $2,594,659 | $2,768,377 | $2,888,606 | $2,896,640 | $2,898,349 | $2,818,623 | $ 28,617,244 |
| Percent GM | 25.0% | 22.6% | 22.6% | 23.2% | 24.7% | 26.1% | 30.4% | 30.3% | 31.5% | 32.8% | 32.9% | 32.8% | 32.3% | 28.8% |
| EBITDA | $ (551,976) | (753,744) | (927,049) | (721,726) | (436,236) | (263,195) | $126,228 | $99,910 | $251,928 | $309,865 | $357,189 | $355,797 | $234,297 | $ (1,266,707) |

**Scenario (4th, 20 New 311 Vehicles and 30 Slightly Used in No Credit - Purchase Only )**

| | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Quantity New Vehicles Funded | 0 | 20 | 50 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 70 |
| Cash Used For Down Payment | $0 | $ 3,200,000 | $ 4,350,000 | | | $50 | $50 | $50 | $50 | $50 | $50 | $50 | $50 | 7,550,000 |
| Cash Used For Principal & Interest | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | - |
| Total Cash Used New Vehicles | 50 | $3,200,000 | $4,350,000 | | | | | | | | | | | $7,550,000 |
| Total Vehicles In Service | 208 | 218 | 240 | 233 | 230 | 227 | 224 | 216 | 208 | 200 | 192 | 184 | 178 | 178 |

| | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Revenue | $ 6,318,208 | $ 7,368,140 | $ 7,413,625 | $ 7,373,928 | $ 7,842,101 | $ 8,155,178 | $ 8,589,279 | $ 8,584,195 | $ 8,851,303 | $ 8,804,438 | $ 8,808,779 | $ 8,842,158 | $ 8,720,841 | $ 99,344,861 |
| Gross Margin | $ 2,078,707 | $1,664,620 | $1,677,058 | $1,712,170 | $1,940,948 | $2,129,838 | $2,607,702 | $2,594,659 | $2,768,377 | $2,888,606 | $2,896,640 | $2,898,349 | $2,818,623 | $ 28,617,244 |
| Percent GM | 25.0% | 22.6% | 22.6% | 23.2% | 24.7% | 26.1% | 30.4% | 30.3% | 31.5% | 32.8% | 32.9% | 32.8% | 32.3% | 28.8% |
| EBITDA | $ (551,976) | (753,744) | (927,049) | (721,726) | (436,236) | (263,103) | $126,228 | $99,910 | $251,928 | $309,865 | $357,189 | $355,797 | $234,297 | $ (1,266,707) |

CM_TC2018_000378

Major Assumptions 2016

# BUDGET 2016

## 2016 Major Model Assumptions:

- Credit Agreement must be renewed with Wells Fargo beyond 1/31/2016 expiration date, provided Ownership puts in new funding by e

- Peak Working Capital Needed by 3/2016 is $7.8MM requiring critical funding by ownership, and necessary for extension of Credit A;
  - Funding of $4.4MM provided to company to lease 118 vehicles needed to stay operational & profitable
  - Funding of $2MM provided to pay down critical outstanding Accounts Payable to be able to operate without imminent threat of s
  - Net Funding After Interest is + $4.1MM, as Company pays PPAS interest of $3.7MM
  - The Model DOES NOT provide for funding improved Financial & Billing systems that need to be replaced

- New Leases for a Total of 118 Vehicles are Planned
  - 20 new Type 3 (911 related) leases in 2016.
  - 50 slightly used Type 2 will be leased in January 2016 to replace fleet and capture additional demand for our services
  - 48 Type 2 new vehicles  will be leased at 4 per month in 2016 January to December
  - MODEL ASSUMES COMPANY CAN OBTAIN CREDIT & NEED DPWN PAYMENT of 25%

- To get credit for New Leases will require 100% Letter of Credit plus DP of 30% until Wells Fargo Credit Agreement is signed proving con
  shut-down when current agreement expires on 1/31/2016. Other option is to BUY VEHICLES

4

CM_TC2018_0003376

5 Year Forecast

71.1%

$ 1,365
$ 29,040



Revenues



EBITDA

| | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|
| Ambulance Revenues | $ 85,000 | $ 69,900 | $ 98,000 | $ 100,000 | $ 105,000 | $ 90,000 |
| Ambulance EBITDA | $ 1,000 | $ 7,300 | $ 9,200 | $ 10,000 | $ 11,000 | $ 11,000 |
| Transit Revenues | $ 30,000 | $ 26,000 | $ 36,000 | $ 37,000 | $ 37,000 | $ 28,000 |
| Transit EBITDA | $ 3,000 | $ 3,000 | $ 3,500 | $ 3,700 | $ 3,700 | $ 3,800 |
| New / Mobile Revenues | $ - | $ 2,000 | $ 6,000 | $ 12,000 | $ 25,000 | $ 35,000 |
| New / Mobile EBITDA | $ - | $ 150 | $ 600 | $ 1,500 | $ 3,125 | $ 5,250 |
| New Markets Revenues | $ - | $ - | $ - | $ 20,000 | $ 40,000 | $ 60,000 |
| New Markets EBITDA | $ - | $ - | $ - | $ 2,000 | $ 4,000 | $ 6,000 |
| Combined Revenues | $ 115,000 | $ 117,000 | $ 140,000 | $ 169,000 | $ 207,000 | $ 223,000 |
| Combined EBITDA | $ 1,365 | $ 6,941 | $ 13,300 | $ 17,200 | $ 21,825 | $ 26,050 |

| Revenues | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | ALL |
|---|---|---|---|---|---|---|---|
| Ambulance | 85,900 | 69,900 | 98,000 | 100,000 | 105,000 | 90,000 | 547,800 |
| Transit | 30,000 | 26,000 | 96,000 | 37,000 | 37,000 | 58,000 | 294,000 |
| New / Mobile products | - | 2,000 | 6,000 | 12,000 | 25,000 | 35,000 | 80,000 |
| New Markets | - | - | - | 20,000 | 40,000 | 60,000 | 120,000 |
| Total | 115,900 | 117,900 | 140,000 | 169,000 | 207,000 | 223,000 | 971,800 |

| EBITDA | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | ALL |
|---|---|---|---|---|---|---|---|
| Ambulance | 1,000 | 7,308 | 9,200 | 10,000 | 11,000 | 11,000 | 49,508 |
| Transit | 3,000 | 3,000 | 3,500 | 3,700 | 3,700 | 3,800 | 20,700 |
| New / Mobile products | - | 150 | 600 | 1,500 | 3,125 | 5,250 | 10,625 |
| New Markets | - | - | - | 2,000 | 4,000 | 6,000 | 12,000 |
| Total | 4,000 | 10,458 | 13,300 | 17,200 | 21,825 | 26,050 | 92,825 |

CM_TC2018_0003376

Fleet Leasing Assumptions

# Fleet & Lease Assumptions in The Model:

## New Leases - Type 3 - Must Have to Keep 911 Business ASAP
1) Lease 20 New Type 3 911 Medix Vehicles Using Funds From Investor for 1st 4
   a) 4 New Type 3 in December
   b) 16 New Type 3 in 2016 calendar year
      i) 12 new leases at 2 per month in first six months - January thru June 2016
      i) 4 more over the second six months of July thru December 2016

| Type 3 Model - New Vehicles | Cost Per Vehicle | Quantity Leased 2015 | Quantity Leased 2016 | Total 2015 & 2016 |
|---|---|---|---|---|
| Vehicle Cost Type III (911) | $ 160,000 | 0 | 20 | $ 3,200,000 |
| Down Payment | 25% | | | |
| Amount Down - payment | $ 40,000 | | | $ 1,320,000 |
| Financed | $ 120,000 | | | $ 1,880,000 |
| Interest Rate | 7% | | | 7% |
| Annual Interest Payment | $ 5,219 | | | $ 104,371.74 |
| Annual Lease payment | $ 17,806 | | | $ 356,114.54 |
| Monthly Lease Period | 48 | | | 48 |
| ANNUAL CASH OUTFLOW | $ 89,024 | | | $ 1,780,488.28 |

## New Leases - Type 2 - Fund Over 2016
1) Lease 48 New Type 2 Vehicles
   a) Lease 4 New Type 2 Each Month Over 2016

| Type 2 Model - New Vehicles | Cost Per Vehicle | Quantity Leased 2015 | Quantity Leased 2016 | Total 2015 & 2016 |
|---|---|---|---|---|
| Vehicle Cost Type II | $ 120,000 | 0 | 20 | $ 2,880,000 |
| Down Payment | 25% | | | |
| Amount Down - payment | $ 30,000 | | | $ 720,000 |
| Financed | $ 90,000 | | | $ 2,160,000 |
| Interest Rate | 7% | | | 7% |
| Annual Interest Payment | | | | $ 102,185 |
| Annual Lease payment | | | | $ 348,962 |
| Monthly Lease Period | 48 | | | |
| ANNUAL CASH OUTFLOW | | | | $ 1,171,147 |

## New Leases - Type 2 - Slightly Used
1) Lease 50 Slighly Used Type 2 Vehicles
   a) 50 in December using funds from Investor

| Type 2 - Slightly Used Vehicles | Cost Per Vehicle | Quantity Leased 2015 | Quantity Leased 2016 | Total 2015 & 2016 |
|---|---|---|---|---|
| Vehicle Cost Type II | $ 87,000 | 0 | 50 | $ - |
| Down Payment | 25% | | | |
| Amount Down - payment | $ 21,750 | | | $ - |
| Financed | $ 65,250 | | | $ - |
| Interest Rate | 7% | | | 7% |
| Annual Interest Payment | | | | $ - |
| Annual Lease payment | | | | $ - |
| Monthly Lease Period | 48 | | | |
| ANNUAL CASH OUTFLOW | | | | $ - |

| NUMBER OF NEW LEASES BY YEAR | | | | |
| TOTAL NEW LEASES | | | | |

CM_TC2018_0003376

6

A0991

Cash By Day - FY 2016

| | D | AOL | AOM | AON | AOO | AOP | AOQ | AOR | AOS | AOT | AOU | AOV | AOW | AOX | AOY | AOZ | APA | APB | APC | APD |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2 | Weekly Cash (excl Transit) | | | $ 1,550 | | | | | | | $ 1,500 | | | | | | | $ 1,750 | | |
| 3 | 13-Week Average | | | $ 1,660 | | | | | | | $ 1,658 | | | | | | | $ 1,645 | | |
| 4 | | | | | | | | | | | | | | | | | | | | |
| 6 | | | | | | | | | | | | | | | | | | | | |
| 7 | TransCare Corporation | Mon | Tue | Wed | Thu | Fri | Sat | Sun | Mon | Tue | Wed | Thu | Fri | Sat | Sun | Mon | Tue | Wed | Thu | Fri |
| 8 | Daily Cash Plan | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 1 | 2 | 3 | 4 | 5 |
| 9 | | 07/06/15 | 07/07/15 | 07/08/15 | 07/09/15 | 07/10/15 | 07/11/15 | 07/12/15 | 07/13/15 | 07/14/15 | 07/15/15 | 07/16/15 | 07/17/15 | 07/18/15 | 07/19/15 | 07/20/15 | 07/21/15 | 07/22/15 | 07/23/15 | 07/24/15 |
| 10 | PLAN (Based on Release Date) | | | | | | | | | | | | | | | | | | | |
| 11 | Receipts | | | $ 650 | | | | | | | | | | | | | | | | |
| 12 | Daily sweep - lance | $ 500 | $ 93 | $ 704 | $ 127 | $ 127 | $ - | $ - | $ 550 | $ 250 | $ 150 | $ 275 | $ 275 | $ - | $ - | $ 350 | $ 350 | $ 350 | $ 350 | $ 350 |
| 13 | Daily sweep - paratransit | | | $ 2,523 | | | $ - | $ - | | | | $ 1,480 | | $ - | $ - | | | | | |
| 14 | TOTAL RECEIPTS | $ 500 | $ 93 | $ 3,876 | $ 127 | $ 127 | $ - | $ - | $ 550 | $ 250 | $ 150 | $ 1,755 | $ 275 | $ - | $ - | $ 350 | $ 350 | $ 350 | $ 350 | $ 350 |
| 15 | | | | | | | | | | | | | | | | | | | | |
| 16 | Disbursements | | | | | | | | | | | | | | | | | | | |
| 17 | Payroll | | | | | | | | | | | | | | | | | | | |
| 18 | Wages and employer taxes | | | $ 931 | $ 985 | | | | | | | $ 1,480 | | | | $ - | | | $ 1,450 | $ 500 |
| 19 | Montefiore | | | | | | | | | | | | | | | | | | | |
| 20 | Employee benefits | | | | | | | | | | | | | | | | | | | |
| 21 | Paid by check | | | | | | | | | | | 15 | | | | | | | 15 | |
| 22 | Wire | | | | $ 11 | $ 15 | | | | | | | $ 15 | | | | | $ 400 | | $ 15 |
| 23 | Total payroll | $ - | $ - | $ 931 | $ 996 | $ 15 | $ - | $ - | $ - | $ - | $ - | $ 1,495 | $ 15 | $ - | $ - | $ - | $ - | $ 400 | $ 1,465 | $ 515 |
| 24 | | | | | | | | | | | | | | | | | | | | |
| 25 | Insurance (Auto, WC, Liab) | | | | | | | | | | | | | | | | | | | |
| 26 | Type | | | | | | | | | | | | | | | | | | | |
| 27 | Paid by check | | | | | | | | | $ 27 | | 56 | $ 30 | | | | | | | |
| 28 | Wire | | | | | | | | $ 13 | | | | | | | | | | | |
| 29 | Total insurance payments | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 13 | $ 27 | $ - | $ 55 | $ 30 | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 30 | | | | | | | | | | | | | | | | | | | | |
| 31 | Debt interest | | | | | | | | | | | | | | | | | | | |
| 32 | Patriarch | | | $ 225 | | | | | | | | | | | | | | | | |
| 33 | Wells Fargo | | | | | | | | $ 35 | | | | | | | | | | | |
| 34 | Total debt interest | $ - | $ - | $ 225 | $ - | $ - | $ - | $ - | $ 35 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 35 | | | | | | | | | | | | | | | | | | | | |
| 36 | Other disbursements | | | | | | | | | | | | | | | | | | | |
| 37 | Comments | | | | | | | | | | | | | | | | | | | |
| 38 | Rent | | | | | | | | | | | | | | | | | | - | |
| 39 | Vehicle & Equipment lease payments | | | | | | | | | | | | | | | | | | | 13 |
| 40 | ACH Wires (auto debits- WEX, leases) | $ 2 | $ 28 | $ 2 | $ 18 | $ 18 | | | | | | | | | | $ 28 | $ 28 | $ 18 | $ 18 | $ 18 |
| 41 | Vehicle down payments | | | | | | | | | | | | | | | | | | | |
| 42 | AP-OH (vendor pp, util, small,exp, ck req & other recurring) | | | | | 11 | - | - | | | | | 50 | | | | 90 | | 50 | |
| 43 | Total other disbursements | $ 2 | $ 28 | $ 2 | $ 18 | $ 29 | $ - | $ - | $ - | $ - | $ - | $ - | $ 50 | $ - | $ - | $ 28 | $ 118 | $ 18 | $ 68 | $ 31 |
| 44 | | | | | | | | | | | | | | | | | | | | |
| 45 | TOTAL DISBURSEMENTS | $ 2 | $ 28 | $ 1,158 | $ 1,014 | $ 44 | $ - | $ - | $ 48 | $ 27 | $ - | $ 1,550 | $ 95 | $ - | $ - | $ 28 | $ 118 | $ 418 | $ 1,533 | $ 546 |
| 46 | | | | | | | | | | | | | | | | | | | | |
| 47 | CHANGE IN BOOK CASH | $ 498 | $ 65 | $ 2,718 | $ (887) | $ 83 | $ - | $ - | $ 502 | $ 223 | $ 150 | $ 205 | $ 180 | $ - | $ - | $ 322 | $ 233 | $ (68) | $ (1,183) | $ (196) |
| 48 | Weekly change in cash | | | | | 2,477 | | | | | | | 1,260 | | | | | | | (893) |
| 49 | END OF DAY AVAILABILITY——> | $ 879 | $ 1,369 | $ 1,332 | $ 419 | $ 5 | $ (832) | $ (832) | $ (374) | $ (75) | $ 208 | $ 455 | $ 2,200 | $ 2,530 | $ 2,880 | $ 3,042 | $ 3,344 | $ 3,299 | $ 2,068 | $ 1,800 |
| 127 | Calculation of BBC | | | | | | | | | | | | | | | | | | | |
| 128 | | | | | | | | | | | | | | | | | | | | |
| 129 | Trailing 60-day receipts (as of 1Feb13) | 20,449 | 20,942 | 9,006 | 23,622 | 23,383 | 20,911 | $ 20,881 | 20,641 | 20,891 | 20,758 | 22,369 | 22,160 | 21,882 | $ 21,022 | 21,870 | 22,220 | 21,798 | 21,968 | 21,926 |
| 130 | | | | | | | | | | | | | | | | | | | | |
| 131 | Beginning Eligible AR | 18,320 | 17,820 | 18,057 | 15,366 | 15,740 | 14,848 | $ 14,208 | 14,208 | 13,988 | 14,068 | 14,248 | 15,783 | 17,338 | $ 17,668 | 17,998 | 17,978 | 17,958 | 17,938 | 17,918 |
| 132 | Revenue | | $ 330 | $ 535 | $ 500 | | | | $ 330 | $ 330 | $ 330 | $ 330 | $ 330 | $ 330 | $ 330 | $ 330 | $ 330 | $ 330 | $ 330 | 330 |
| 133 | Payments (sweep that paid down loan) | (500) | (93) | 17,399 | (127) | (127) | - | $ - | (550) | (250) | (150) | 15,529 | (275) | | $ - | (350) | (350) | (350) | (350) | (350) |
| 134 | Plug (Wachovia AR & HSBC) | | | | | (105) | | | | | | | 1,500 | | | | | | | |
| 135 | Forecasted Changes in Billing | | | | | (660) | (640) | | | | | | | | | | | | | |
| 136 | Ending Eligible AR | $ 17,820 | $ 18,057 | $ 15,366 | $ 15,740 | $ 14,848 | $ 14,208 | $ 14,208 | $ 13,988 | $ 14,068 | $ 14,248 | $ 15,783 | $ 17,338 | $ 17,668 | $ 17,998 | $ 17,978 | $ 17,958 | $ 17,938 | $ 17,918 | $ 17,898 |
| 137 | | | | | | | | | | | | | | | | | | | | |
| 138 | Lesser of Trailing 60-day cash or eligible AR or $22,500 | $ 17,820 | $ 18,057 | $ 15,366 | $ 15,740 | $ 14,848 | $ 14,208 | $ | $ 13,988 | $ 14,068 | $ 14,248 | $ 15,783 | $ 17,338 | $ 17,668 | $ - | $ 17,978 | $ 17,958 | $ 17,938 | $ 17,918 | $ 17,898 |
| 139 | Eligibility variance | $ - | $ - | $ - | $ - | $ - | $ 640 | $ | $ - | $ - | $ - | $ - | $ - | $ | $ | $ - | $ - | $ - | $ - | $ - |
| 140 | | | | | | | | | | | | | | | | | | | | |
| 141 | | | | | | | | | | | | | | | | | | | | |
| 142 | Beginning Loan Balance | $ 17,341 | $ 16,841 | $ 16,749 | $ 14,034 | $ 14,921 | $ 14,840 | $ 14,840 | $ 14,840 | $ 14,362 | $ 14,138 | $ 14,040 | $ 15,328 | $ 15,138 | $ 15,138 | $ 15,138 | $ 14,896 | $ 14,574 | $ 14,732 | $ 15,850 |
| 143 | Receipts (paydown) | (500) | (93) | (3,876) | (127) | (127) | - | | (550) | (250) | (150) | - | (275) | - | - | - | (350) | (350) | (350) | (350) |
| 144 | Borrowings | - | - | 226 | 1,014 | 46 | - | | 72 | 26 | 52 | 1,563 | 85 | - | - | 108 | 28 | 508 | 1,468 | 588 |
| 145 | Ending Loan Balance | $ 16,841 | $ 16,748 | $ 14,034 | $ 14,921 | $ 14,840 | $ 14,840 | $ 14,840 | $ 14,362 | $ 14,138 | $ 14,040 | $ 15,328 | $ 15,138 | $ 15,138 | $ 15,138 | $ 14,896 | $ 14,574 | $ 14,732 | $ 15,850 | $ 16,088 |
| 146 | | | | | | | | | | | | | | | | | | | | |
| 147 | END OF DAY AVAILABILITY——> | $ 979 | $ 1,309 | $ 1,332 | $ 419 | $ 8 | $ (832) | $ | $ (374) | $ (75) | $ 208 | $ [illegible] | $ 2,200 | $ 2,530 | $ | $ 3,042 | $ 3,384 | $ 3,206 | $ 2,068 | $ 1,800 |

Cash By Day - FY 2016

| | D | APE | APF | APG | APH | API | APJ | APK | APL | APM | APN | APO | APP | APQ | APR | APS | APT |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2 | Weekly Cash (excl Transit) | | | | | 1,950 | | | | | | | 1,456 | | | | |
| 3 | 13-Week Average | | | | | 1,655 | | | | | | | 1,619 | | | | |
| 4 | | | | | | | | | | | | | | | | | |
| 6 | | | | | | | | | | | | | | | | | |
| 7 | TransCare Corporation | Sat | Sun | Mon | Tue | Wed | Thu | Fri | Sat | Sun | Mon | Tue | Wed | Thu | Fri | Sat | Sun |
| 8 | Daily Cash Plan | 6 | 7 | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| 9 | | 07/25/15 | 07/26/15 | 07/27/15 | 07/28/15 | 07/29/15 | 07/30/15 | 07/31/15 | 08/01/15 | 08/02/15 | 08/03/15 | 08/04/15 | 08/05/15 | 08/06/15 | 08/07/15 | 08/08/15 | 08/09/15 |
| 10 | PLAN (Based on Release Date) | | | | | | | | | | | | | | | | |
| 11 | Receipts | | | | | | | | | | | | | | | | |
| 12 | Daily sweep - lance | - | - | 350 | 350 | 350 | 550 | 350 | - | - | 313 | 184 | 414 | 320 | 225 | - | - |
| 13 | Daily sweep - paratransit | - | - | | | | | | - | - | | | 2,535 | | | - | - |
| 14 | TOTAL RECEIPTS | - | - | 350 | 350 | 350 | 550 | 350 | - | - | 313 | 184 | 2,949 | 320 | 225 | - | - |
| 15 | | | | | | | | | | | | | | | | | |
| 16 | Disbursements | | | | | | | | | | | | | | | | |
| 17 | Payroll | | | | | | | | | | | | | | | | |
| 18 | Wages and employer taxes | | | | | | 950 | 1,000 | | | | | | 900 | | | |
| 19 | Montefiore | | | | | | | | | | | | | | | | |
| 20 | Employee benefits | | | | | | Benefits run-out | [illegible] | | | | | | Benefits run-out | [illegible] | | |
| 21 | Paid by check | | | | | | 15 | | | | | | | 15 | | | |
| 22 | Wire | | | | | | | 15 | | | | | | | 15 | | |
| 23 | Total payroll | - | - | - | - | - | 965 | 1,015 | - | - | - | - | - | 915 | 15 | - | - |
| 24 | | | | | | | | | | | | | | | | | |
| 25 | Insurance (Auto, WC, Liab) | | | | | | | | | | | | | | | | |
| 26 | Type | | | Zurich DP | [illegible] | | [illegible] | NY WC - JULY | | | [illegible] | | | | | | |
| 27 | Paid by check | | | | | | | 650 | | | | | | | | | |
| 28 | Wire | | | 107 | 234 | | 158 | 130 | | | 13 | | | | | | |
| 29 | Total insurance payments | - | - | 107 | 234 | - | 158 | 780 | - | - | 13 | - | - | - | - | - | - |
| 30 | | | | | | | | | | | | | | | | | |
| 31 | Debt interest | | | | | | | | | | | | | | | | |
| 32 | Patriarch | | | | | | | | | | | 335 | | | | | |
| 33 | Wells Fargo | | | | | | | 85 | | | | | | | | | |
| 34 | Total debt interest | - | - | - | - | - | - | 85 | - | - | - | 335 | - | - | - | - | - |
| 35 | | | | | | | | | | | | | | | | | |
| 36 | Other disbursements | | | | | | | | | | | | | | | | |
| 37 | Comments | | | EZ PASS | | | | | | | [illegible] | | | | | | |
| 38 | Rent | | | | | | | | | | | | | | | | |
| 39 | Vehicle & Equipment lease payments | | | | 93 | | | | | | | | | | | | |
| 40 | ACH Wires (auto debits- WEX, leases) | | | 28 | 28 | 18 | 18 | 18 | | | 28 | 28 | 18 | 18 | 18 | | |
| 41 | Vehicle down payments | | | | | | | | | | | | | | | | |
| 42 | AP-OH (vendor pp, util, small exp, ck req & other recurring) | - | - | 47 | | 75 | | | - | - | | | | 55 | 15 | - | - |
| 43 | Total other disbursements | - | - | 75 | 121 | 93 | 18 | 18 | - | - | 28 | 28 | 18 | 73 | 33 | - | - |
| 44 | | | | | | | | | | | | | | | | | |
| 45 | TOTAL DISBURSEMENTS | - | - | 182 | 355 | 93 | 1,141 | 1,904 | - | - | 41 | 363 | 18 | 988 | 48 | - | - |
| 46 | | | | | | | | | | | | | | | | | |
| 47 | CHANGE IN BOOK CASH | - | - | 168 | (5) | 257 | (591) | (1,554) | - | - | 272 | (179) | 2,931 | (668) | 177 | - | - |
| 48 | Weekly change in cash | | | | | | | (1,724) | | | | | | | 2,533 | | |
| 49 | END OF DAY AVAILABILITY——> | 2,136 | 2,469 | 2,843 | 2,664 | 2,883 | 1,812 | 673 | 673 | 1,203 | 812 | 254 | 1,037 | 398 | 628 | 948 | 1,281 |
| 127 | Calculation of BBC | | | | | | | | | | | | | | | | |
| 128 | | | | | | | | | | | | | | | | | |
| 129 | Trailing 65-day receipts (as of 1Feb13) | 21,728 | 21,627 | 21,877 | 22,227 | 22,577 | 22,815 | 22,552 | 20,324 | 22,209 | 22,521 | 22,705 | 25,042 | 24,888 | 24,694 | 24,472 | 27,877 |
| 130 | | | | | | | | | | | | | | | | | |
| 131 | Beginning Eligible AR | 17,898 | 18,228 | 18,558 | 18,538 | 18,518 | 18,498 | 18,078 | 18,058 | 18,058 | 18,388 | 18,075 | 17,996 | 15,848 | 15,807 | 15,912 | 16,242 |
| 132 | Revenue | 330 | 330 | 330 | 330 | 330 | 130 | 330 | 943 | 330 | | 108 | 801 | 279 | 330 | 330 | 326 |
| 133 | Payments (sweep that paid down loan) | - | - | (350) | (350) | (350) | (550) | (350) | - | - | (313) | (184) | (2,949) | (320) | (225) | - | - |
| 134 | Plug (Wachovia AR & HSBC) | | | | | | | | (943) | | | | | | | | |
| 135 | Forecasted Changes in Billing | | | | | | | | | | | | | | | | |
| 136 | Ending Eligible AR | 18,228 | 18,058 | 18,538 | 18,518 | 18,498 | 18,078 | 18,058 | 18,058 | 18,388 | 18,075 | 17,996 | 15,848 | 15,807 | 15,912 | 16,242 | 16,568 |
| 137 | | | | | | | | | | | | | | | | | |
| 138 | Lesser of Trailing 65-day cash or eligible AR or $22,500 | 18,728 | | 18,538 | 18,518 | 18,498 | 18,078 | 18,058 | 18,058 | | 18,075 | 17,996 | 15,848 | 15,807 | 15,912 | 16,242 | |
| 139 | Eligibility variance | | | - | - | - | - | - | - | | - | - | - | - | - | | |
| 140 | | | | | | | | | | | | | | | | | |
| 141 | | | | | | | | | | | | | | | | | |
| 142 | Beginning Loan Balance | 18,098 | 18,098 | 16,088 | 15,895 | 15,854 | 15,615 | 16,268 | 17,185 | 17,185 | 17,185 | 17,563 | 17,742 | 14,811 | 15,409 | 15,287 | 15,287 |
| 143 | Receipts (paydown) | | | - | (350) | (350) | (550) | (350) | - | | (313) | (184) | (2,949) | (320) | (225) | | |
| 144 | Borrowings | - | - | 148 | 309 | 111 | 1,201 | 1,269 | - | - | 691 | 363 | 18 | 918 | 103 | - | |
| 145 | Ending Loan Balance | 18,098 | 18,098 | 15,895 | 15,854 | 15,615 | 16,268 | 17,185 | 17,185 | 17,185 | 17,563 | 17,742 | 14,811 | 15,409 | 15,287 | 15,287 | 15,287 |
| 146 | | | | | | | | | | | | | | | | | |
| 147 | END OF DAY AVAILABILITY——> | 2,136 | - | 2,843 | 2,664 | 2,887 | 1,812 | 673 | 673 | | 812 | 254 | 1,037 | 398 | 628 | 654 | |

CM_TC2018_0003376

A0993

Cash By Day - FY 2016

| | D | APU | APV | APW | APX | APY | APZ | AQA | AQB | AQC | AQD | AQE | AQF | AQG | AQH | AQI | AQJ |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2 | Weekly Cash (excl Transit) | | | $ 1,645 | | | | | | | $ 1,625 | | | | | | |
| 3 | 13-Week Average | | | $ 1,626 | | | | | | | $ 1,617 | | | | | | |
| 4 | | | | | | | | | | | | | | | | | |
| 6 | | | | | | | | | | | | | | | | | |
| 7 | TransCare Corporation | Mon | Tue | Wed | Thu | Fri | Sat | Sun | Mon | Tue | Wed | Thu | Fri | Sat | Sun | Mon | Tue |
| 8 | Daily Cash Plan | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 1 | 2 |
| 9 | | 08/10/15 | 08/11/15 | 08/12/15 | 08/13/15 | 08/14/15 | 08/15/15 | 08/16/15 | 08/17/15 | 08/18/15 | 08/19/15 | 08/20/15 | 08/21/15 | 08/22/15 | 08/23/15 | 08/24/15 | 08/25/15 |
| 10 | PLAN (Based on Kelliher Data) | | | | | | | | | | | | | | | | |
| 11 | Receipts | | | | | | | | | | | | | | | | |
| 12 | Daily sweep - lance | $ 350 | $ 350 | $ 175 | $ 420 | $ 350 | $ - | $ - | $ 350 | $ 350 | $ 175 | $ 375 | $ 375 | $ - | $ - | $ 350 | $ 125 |
| 13 | Daily sweep - paratransit | | | | | | $ - | $ - | | | | | | $ - | $ - | | |
| 14 | TOTAL RECEIPTS | $ 350 | $ 350 | $ 175 | $ 420 | $ 350 | $ - | $ - | $ 350 | $ 350 | $ 175 | $ 375 | $ 375 | $ - | $ - | $ 350 | $ 125 |
| 15 | | | | | | | | | | | | | | | | | |
| 16 | Disbursements | | | | | | | | | | | | | | | | |
| 17 | Payroll | | | | | | | | | | | | | | | | |
| 18 | Wages and employer taxes | $ 900 | | | $ 950 | 505 | | | | | | $ 925 | $ 235 | | | $ 270 | |
| 19 | Mordefure | | | | | | | | | | | | | | | | |
| 20 | Employee benefits | | | | [illegible] | [illegible] | | | | | | Benefits run out | [illegible] | | | | |
| 21 | Paid by check | | | | | $ 400 | | | | | | 15 | | | | | |
| 22 | Wire | | | | | $ 15 | | | | | | | $ 15 | | | | |
| 23 | Total payroll | $ 900 | $ - | $ - | $ 950 | $ 920 | $ - | $ - | $ - | $ - | $ - | $ 940 | $ 250 | $ - | $ - | $ 270 | $ - |
| 24 | | | | | | | | | | | | | | | | | |
| 25 | Insurance (Auto, WC, Liab) | | | | | | | | | | | | | | | | |
| 26 | Type | | | PA WC (4 of 12) | | | | | | | | | MI - WC (5 of 10) | | | | |
| 27 | Paid by check | | | 55 | | | | | | | | | 33 | | | | |
| 28 | Wire | | | | | | | | | | | | | | | | |
| 29 | Total insurance payments | $ - | $ - | $ 55 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 33 | $ - | $ - | $ - | $ - |
| 30 | | | | | | | | | | | | | | | | | |
| 31 | Debt interest | | | | | | | | | | | | | | | | |
| 32 | Patriarch | | | | | $ 20 | | | | | | | | | | | |
| 33 | Wells Fargo | $ 30 | | | | | | | | | | | | | | | |
| 34 | Total debt interest | $ 30 | $ - | $ - | $ - | $ 20 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 35 | | | | | | | | | | | | | | | | | |
| 36 | Other disbursements | | | | | [illegible] | | | | | | | | | | | [illegible] |
| 37 | Comments | [illegible] | | | | | | | [illegible] | | | | | | | [illegible] | |
| 38 | Rent | | | | | | | | | | | | | | | | |
| 39 | Vehicle & Equipment lease payments | | | 13 | | | | | | | | | 73 | | | | |
| 40 | ACH Wires (auto debits- WEX, leases) | $ 28 | $ 28 | $ 18 | $ 18 | $ 18 | | | $ 28 | $ 28 | $ 18 | $ 18 | $ 18 | | | $ 28 | $ 28 |
| 41 | Vehicle down payments | | | | | | | | | | | | | | | | |
| 42 | AP-OH (vendor pp, util, small exp, ck req & other recurring) | 47 | | 30 | | | - | - | | | | | 75 | - | - | | |
| 43 | Total other disbursements | $ 75 | $ 28 | $ 61 | $ 18 | $ 18 | $ - | $ - | $ 28 | $ 28 | $ 18 | $ 18 | $ 166 | $ - | $ - | $ 28 | $ 28 |
| 44 | | | | | | | | | | | | | | | | | |
| 45 | TOTAL DISBURSEMENTS | $ 605 | $ 28 | $ 136 | $ 968 | $ 958 | $ - | $ - | $ 28 | $ 28 | $ 18 | $ 958 | $ 449 | $ - | $ - | $ 298 | $ 28 |
| 46 | | | | | | | | | | | | | | | | | |
| 47 | CHANGE IN BOOK CASH | $ (255) | $ 323 | $ 39 | $ (548) | $ (608) | $ - | $ - | $ 322 | $ 323 | $ 157 | $ (583) | $ (74) | $ - | $ - | $ 52 | $ 98 |
| 48 | Weekly change in cash | | | | | (1,050) | | | 1,172 | 640 | 1,199 | 1,447 | 148 | | | | |
| 49 | END OF DAY AVAILABILITY ——> | $ 1,172 | $ 937 | $ 1,196 | $ 457 | $ 233 | $ 493 | $ 493 | $ 721 | $ 904 | $ 816 | $ 233 | $ 217 | $ 347 | $ 877 | $ 797 | $ 912 |
| 127 | Calculation of RFC | | | | | | | | | | | | | | | | |
| 128 | | | | | | | | | | | | | | | | | |
| 129 | Trailing 65-day receipts (as of 1Feb13) | 24,327 | 24,677 | 24,245 | 24,517 | 24,505 | 24,293 | $ 24,684 | 24,434 | 24,784 | 21,992 | 22,246 | 22,269 | 22,141 | $ 21,938 | 22,186 | 22,313 |
| 130 | | | | | | | | | | | | | | | | | |
| 131 | Beginning Eligible AR | 16,568 | 16,682 | 16,171 | 16,273 | 16,200 | 16,184 | $ 16,444 | 16,444 | 16,750 | 16,243 | 16,398 | 16,383 | 16,275 | $ 16,605 | 16,905 | 16,984 |
| 132 | Revenue | $ 484 | | $ 277 | $ 347 | $ 84 | $ 260 | | $ 656 | $ (157) | $ 330 | $ 360 | $ 267 | $ 330 | $ 330 | $ 398 | $ 162 |
| 133 | Payments (sweep that paid down loan) | 15,287 | (350) | (175) | (420) | (350) | - | $ - | (350) | (350) | (175) | (375) | (375) | | $ - | 16,058 | (125) |
| 134 | Plug (Wachovia AR & HSBC) | | (161) | | | | | | | | | | | | | | |
| 135 | Forecasted Changes in Billing | | | | | | | | | | | | | | | | |
| 136 | Ending Eligible AR | $ 16,682 | $ 16,171 | $ 16,273 | $ 16,200 | $ 16,184 | $ 16,444 | $ 16,444 | $ 16,750 | $ 16,243 | $ 16,398 | $ 16,383 | $ 16,275 | $ 16,605 | $ 16,935 | $ 16,984 | $ 17,021 |
| 137 | | | | | | | | | | | | | | | | | |
| 138 | Lesser of Trailing 65-day cash or eligible AR or $22,500 | $ 16,682 | $ 16,171 | $ 16,273 | $ 16,200 | $ 16,184 | $ 16,444 | $ - | $ 16,750 | $ 16,243 | $ 16,398 | $ 16,383 | $ 16,275 | $ 16,605 | $ - | $ 16,984 | $ 17,021 |
| 139 | Eligibility variance | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 140 | | | | | | | | | | | | | | | | | |
| 141 | | | | | | | | | | | | | | | | | |
| 142 | Beginning Loan Balance | $ 15,287 | $ 15,510 | $ 15,234 | $ 15,077 | $ 15,743 | $ 15,951 | $ 15,951 | $ 15,951 | $ 16,029 | $ 15,739 | $ 15,582 | $ 16,150 | $ 16,058 | $ 16,058 | $ 16,058 | $ 16,187 |
| 143 | Receipts (paydown) | (350) | (350) | (175) | (420) | (350) | - | - | (350) | (350) | (175) | (375) | (375) | - | - | (350) | (125) |
| 144 | Borrowings | 573 | 75 | 18 | 1,086 | 558 | - | - | 428 | 60 | 18 | 943 | 283 | - | - | 479 | 28 |
| 145 | Ending Loan Balance | $ 15,510 | $ 15,234 | $ 15,077 | $ 15,743 | $ 15,951 | $ 15,951 | $ 15,951 | $ 16,029 | $ 15,739 | $ 15,582 | $ 16,150 | $ 16,058 | $ 16,058 | $ 16,058 | $ 16,187 | $ 16,089 |
| 146 | | | | | | | | | | | | | | | | | |
| 147 | END OF DAY AVAILABILITY ——> | $ 1,172 | $ 937 | $ 1,196 | $ 457 | $ 233 | $ 493 | - | $ 721 | $ 904 | $ 816 | $ 233 | $ 217 | $ 347 | | $ 797 | $ 912 |

Cash By Day - FY 2016

| | D | AQK | AQL | AQM | AQN | AQO | AQP | AQQ | AQR | AQS | AQT | AQU | AQV | AQW | AQX | AQY | AQZ |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2 | Weekly Cash (excl Transit) | $ 1,500 | | | | | | | $ 1,665 | | | | | | | $ 2,026 | |
| 3 | 13-Week Average | $ 1,635 | | | | | | | $ 1,592 | | | | | | | $ 1,629 | |
| 4 | | | | | | | | | | | | | | | | | |
| 6 | | | | | | | | | | | | | | | | | |
| 7 | TransCare Corporation | Wed | Thu | Fri | Sat | Sun | Mon | Tue | Wed | Thu | Fri | Sat | Sun | Mon | Tue | Wed | Thu |
| 8 | Daily Cash Plan | 3 | 4 | 5 | 6 | 7 | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 1 | 2 | 3 | 4 |
| 9 | | 08/26/15 | 08/27/15 | 08/28/15 | 08/29/15 | 08/30/15 | 08/31/15 | 09/01/15 | 09/02/15 | 09/03/15 | 09/04/15 | 09/05/15 | 09/06/15 | 09/07/15 | 09/08/15 | 09/09/15 | 09/10/15 |
| 10 | PLAN (Based on Release Date) | | | | | | | | | | | | | | | | |
| 11 | Receipts | | | | | | | | | | | | | | | | |
| 12 | Daily sweep - tlnce | $ 125 | $ 550 | $ 350 | $ - | $ - | $ 475 | $ 350 | $ 350 | $ 250 | $ 240 | $ - | $ - | | $ 609 | $ 110 | $ 1,148 |
| 13 | Daily sweep - paratransit | | | | $ - | $ - | | | | | $ 2,443 | $ - | $ - | | | | |
| 14 | TOTAL RECEIPTS | $ 125 | $ 550 | $ 350 | $ - | $ - | $ 475 | $ 350 | $ 350 | $ 250 | $ 2,683 | $ - | $ - | $ - | $ 609 | $ 110 | $ 1,148 |
| 15 | | | | | | | | | | | | | | | | | |
| 16 | Disbursements | | | | | | | | | | | | | | | | |
| 17 | Payroll | | | | | | | | | | | | | | | | |
| 18 | Wages and employer taxes | | $ 920 | $ 500 | | | | | | $ 524 | $ 502 | | | | | | $ 564 |
| 19 | Montefiore | | | | | | | | | | | | | | | | |
| 20 | Employee benefits | | Benefits run-out | [illegible] | | | | | | Benefits run-out | | | | | | | Benefits run-out |
| 21 | Paid by check | | | 15 | | | | | | 15 | | | | | | | 15 |
| 22 | Wire | | | $ 15 | | | | | | | $ 15 | | | | | | |
| 23 | Total payroll | $ - | $ 920 | $ 530 | $ - | $ - | $ - | $ - | $ - | $ 539 | $ 517 | $ - | $ - | $ - | $ - | $ - | $ 579 |
| 24 | | | | | | | | | | | | | | | | | |
| 25 | Insurance (Auto, WC, Liab) | | | | | | | | | | | | | | | | |
| 26 | Type | | Zurich | | | | | | | | | | | | Zurich | | |
| 27 | Paid by check | | | | | | | | | | | | | | $ 157 | | |
| 28 | Wire | | $ 21 | | | | | | | | | | | | | | |
| 29 | Total insurance payments | $ - | $ 21 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 157 | $ - | $ - |
| 30 | | | | | | | | | | | | | | | | | |
| 31 | Debt interest | | | | | | | | | | | | | | | | |
| 32 | Patriarch | | | | | | | | | | $ 350 | | | | | | |
| 33 | Wells Fargo | | | | | | $ 65 | | | | | | | | | | |
| 34 | Total debt interest | $ - | $ - | $ - | $ - | $ - | $ 65 | $ - | $ - | $ - | $ 350 | $ - | $ - | $ - | $ - | $ - | $ - |
| 35 | | | | | | | | | | | | | | | | | |
| 36 | Other disbursements | | | | | | | | | | | | | | | | |
| 37 | Comments | | | | | | E2 PASS | | | | | | | E2 PASS | | | |
| 38 | Rent | | | | | | | | | | | | | | | | |
| 39 | Vehicle & Equipment lease payments | | | 86 | | | | | | | | | | | | | |
| 40 | ACH Wires (auto debits- WEX, leases) | $ 18 | $ 18 | $ 18 | | | $ 28 | $ 28 | $ 18 | $ 18 | $ 18 | | | $ 28 | $ 28 | $ 18 | $ 18 |
| 41 | Vehicle down payments | | | | | | | | | | | | | | | | |
| 42 | AP-CH (vendor pp, util, small exp, ck req & other recurring) | | | 25 | - | - | | | | | 22 | - | - | | 47 | 55 | 88 |
| 43 | Total other disbursements | $ 18 | $ 18 | $ 129 | $ - | $ - | $ 28 | $ 28 | $ 18 | $ 18 | $ 40 | $ - | $ - | $ 28 | $ 75 | $ 73 | $ 106 |
| 44 | | | | | | | | | | | | | | | | | |
| 45 | TOTAL DISBURSEMENTS | $ 18 | $ 939 | $ 659 | $ - | $ - | $ 113 | $ 28 | $ 18 | $ 957 | $ 907 | $ - | $ - | $ 28 | $ 232 | $ 73 | $ 1,685 |
| 46 | | | | | | | | | | | | | | | | | |
| 47 | CHANGE IN BOOK CASH | $ 107 | $ (409) | $ (309) | $ - | $ - | $ 362 | $ 323 | $ 332 | $ (707) | $ 1,776 | $ - | $ - | $ (28) | $ 378 | $ 46 | $ 83 |
| 48 | Weekly change in cash | | | (482) | | | | | | | 2,089 | | | | | | |
| 49 | END OF DAY AVAILABILITY——> | $ 1,298 | $ 533 | $ 107 | $ 107 | $ 107 | $ 273 | $ 668 | $ 940 | $ 339 | $ 103 | $ 243 | $ 483 | $ 862 | $ 895 | $ 1,181 | $ 492 |
| 127 | Calculation of EOC | | | | | | | | | | | | | | | | |
| 128 | | | | | | | | | | | | | | | | | |
| 129 | Trailing 65-day receipts (as of 1Feb13) | 22,017 | 22,412 | 22,407 | 22,191 | $ 21,698 | 22,373 | 22,723 | 22,631 | 22,752 | 25,080 | 24,598 | $ 24,377 | 24,271 | 24,880 | 24,499 | 25,554 |
| 130 | | | | | | | | | | | | | | | | | |
| 131 | Beginning Eligible AR | 17,021 | 17,280 | 16,924 | 16,767 | $ 16,767 | 16,767 | 16,611 | 16,904 | 16,624 | 16,715 | 14,696 | $ 14,636 | 15,056 | 15,605 | 15,113 | 15,345 |
| 132 | Revenue | $ 384 | $ 194 | $ 193 | | | $ 319 | $ 643 | $ 70 | $ 341 | $ 664 | $ 140 | $ 220 | $ 549 | $ 117 | $ 351 | $ 258 |
| 133 | Payments (sweep that paid down loan) | (125) | (550) | (350) | - | $ - | 16,660 | (350) | (350) | (250) | (2,683) | - | $ - | - | (609) | 14,218 | (1,148) |
| 134 | Plug (Wachovia AR & HSBC) | | | | | | | | | | | | | | | | |
| 135 | Forecasted Changes in Billing | | | | | | | | | | | | | | | | |
| 136 | Ending Eligible AR | $ 17,280 | $ 16,924 | $ 16,767 | $ 16,767 | $ 16,767 | $ 16,611 | $ 16,904 | $ 16,624 | $ 16,715 | $ 14,696 | $ 14,636 | $ 15,056 | $ 15,605 | $ 15,113 | $ 15,345 | $ 14,455 |
| 137 | | | | | | | | | | | | | | | | | |
| 138 | Lesser of Trailing 65-day cash or eligible AR or $22,500 | $ 17,280 | $ 16,924 | $ 16,767 | $ 16,767 | $ - | $ 16,611 | $ 16,904 | $ 16,624 | $ 16,715 | $ 14,696 | $ 14,696 | $ - | $ 15,605 | $ 15,113 | $ 15,345 | $ 14,455 |
| 139 | Eligibility variance | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 140 | | | | | | | | | | | | | | | | | |
| 141 | | | | | | | | | | | | | | | | | |
| 142 | Beginning Loan Balance | $ 16,069 | $ 15,962 | $ 16,391 | $ 16,660 | $ 16,660 | $ 16,660 | $ 16,338 | $ 16,016 | $ 15,684 | $ 16,376 | $ 14,593 | $ 14,593 | $ 14,593 | $ 14,643 | $ 14,218 | $ 14,164 |
| 143 | Receipts (paydown) | (125) | (550) | (350) | - | | (475) | (350) | (350) | (250) | (2,683) | - | - | - | (609) | (119) | (1,148) |
| 144 | Borrowings | 18 | 959 | 619 | - | - | 153 | 28 | 18 | 942 | 900 | - | - | 50 | 185 | 65 | 1,037 |
| 145 | Ending Loan Balance | $ 15,962 | $ 16,391 | $ 16,660 | $ 16,660 | $ 16,660 | $ 16,338 | $ 16,016 | $ 15,684 | $ 16,376 | $ 14,593 | $ 14,593 | $ 14,593 | $ 14,643 | $ 14,218 | $ 14,164 | $ 14,053 |
| 146 | | | | | | | | | | | | | | | | | |
| 147 | END OF DAY AVAILABILITY——> | $ 1,298 | $ 533 | $ 107 | $ 107 | $ | $ 273 | $ 668 | $ 940 | $ 339 | $ 103 | $ 243 | $ | $ 862 | $ 895 | $ 1,181 | $ 492 |

Cash By Day - FY 2016

| | D | ARA | ARB | ARC | ARD | ARE | ARF | ARG | ARH | ARI | ARJ | ARK | ARL | ARM | ARN | ARO | ARP |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2 | Weekly Cash (excl Transit) | | | | | | $ 1,674 | | | | | | | $ 1,123 | | | |
| 3 | 13-Week Average | | | | | | $ 1,655 | | | | | | | $ 1,631 | | | |
| 4 | | | | | | | | | | | | | | | | | |
| 6 | | | | | | | | | | | | | | | | | |
| 7 | TransCare Corporation | Fri | Sat | Sun | Mon | Tue | Wed | Thu | Fri | Sat | Sun | Mon | Tue | Wed | Thu | Fri | Sat |
| 8 | Daily Cash Plan | 5 | 6 | 7 | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 1 | 2 | 3 | 4 | 5 | 6 |
| 9 | | 09/11/15 | 09/12/15 | 09/13/15 | 09/14/15 | 09/15/15 | 09/16/15 | 09/17/15 | 09/18/15 | 09/19/15 | 09/20/15 | 09/21/15 | 09/22/15 | 09/23/15 | 09/24/15 | 09/25/15 | 09/26/15 |
| 10 | PLAN (Based on Release Date) | | | | | | | | | | | | | | | | |
| 11 | Receipts | | | | | | | | | | | | | | | | |
| 12 | Daily sweep - lance | $ 150 | $ - | $ - | $ 350 | $ 350 | $ 380 | $ 274 | $ 350 | $ - | $ - | $ 415 | $ 129 | $ 80 | $ 374 | $ 125 | $ - |
| 13 | Daily sweep - paratransit | | $ - | $ - | | $ - | | | | $ - | $ - | | $ - | | | | $ - |
| 14 | TOTAL RECEIPTS | $ 150 | $ - | $ - | $ 350 | $ 350 | $ 380 | $ 274 | $ 350 | $ - | $ - | $ 415 | $ 129 | $ 80 | $ 374 | $ 125 | $ - |
| 15 | | | | | | | | | | | | | | | | | |
| 16 | Disbursements | | | | | | | | | | | | | | | | |
| 17 | Payroll | | | | | | | | | | | | | | | | |
| 18 | Wages and employer taxes | $ 522 | | | | | | | | | | | | | | | |
| 19 | Montefiore | | | | | | | $ 960 | | | | $ 500 | | | $ 885 | | |
| 20 | Employee benefits | [illegible] | | | | | | Benefits run-out | [illegible] | | | | | | Benefits run-out | [illegible] | |
| 21 | Paid by check | | | | | | | | | | | | | | | | |
| 22 | Wire | $ 15 | | | | | | 15 | $ 400 | | | | | | | | |
| 23 | Total payroll | $ 537 | $ - | $ - | $ - | $ - | $ - | $ 975 | $ 15<br>$ 415 | $ - | $ - | $ 500 | $ - | $ - | $ 885 | $ 53<br>$ 53 | $ - |
| 24 | | | | | | | | | | | | | | | | | |
| 25 | Insurance (Auto, WC, Liab) | | | | | | NY WC - 6 of 12 + | | | | | | | | | | |
| 26 | Type | | | | MD - WC (5 of 10) | | NY WC Audit - 3 of | | | | | | | | | | |
| 27 | Paid by check | | | | | | PA WC (5 of 12) | | | | | | | | | | |
| 28 | Wire | | | | 30 | | 55 | | | | | | | | | | |
| 29 | Total insurance payments | $ - | $ - | $ - | $ 30 | $ - | $ 55 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 30 | | | | | | | | | | | | | | | | | |
| 31 | Debt interest | | | | | | | | | | | | | | | | |
| 32 | Patriarch | $ 5 | | | | | | | | | | | | | | | |
| 33 | Wells Fargo | | | | | | | | | | | | | | | | |
| 34 | Total debt interest | $ 5 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 35 | | | | | | | | | | | | | | | | | |
| 36 | Other disbursements | | | | | | | | | | | | | | | | |
| 37 | Comments | | | | [illegible] | | | | | | | [illegible] | | | | | |
| 38 | Rent | | | | | | | | 55 | | | | | | | | |
| 39 | Vehicle & Equipment lease payments | | | | 10 | | | | 73 | | | | | | 13 | 13 | |
| 40 | ACH Wires (auto debits- WEX, leases) | $ 18 | | | $ 28 | $ 28 | $ 18 | $ 18 | $ 18 | | | $ 28 | $ 28 | $ 18 | $ 18 | $ 18 | |
| 41 | Vehicle down payments | | | | | | | | | | | | | | | | |
| 42 | AP-OH (vendor pp. util. small exp. ck req & other recurring) | 61 | - | - | | | 25 | | 75 | | - | 100 | 25 | | | | - |
| 43 | Total other disbursements | $ 79 | $ - | $ - | $ 38 | $ 28 | $ 43 | $ 18 | $ 221 | $ - | $ - | $ 128 | $ 53 | $ 18 | $ 31 | $ 31 | $ - |
| 44 | | | | | | | | | | | | | | | | | |
| 45 | TOTAL DISBURSEMENTS | $ 621 | $ - | $ - | $ 68 | $ 28 | $ 98 | $ 993 | $ 636 | $ - | $ - | $ 628 | $ 53 | $ 18 | $ 916 | $ 84 | $ - |
| 46 | | | | | | | | | | | | | | | | | |
| 47 | CHANGE IN BOOK CASH | $ (471) | $ - | $ - | $ 282 | $ 323 | $ 252 | $ (719) | $ (286) | $ - | $ - | $ (213) | $ 77 | $ 62 | $ (542) | $ 41 | $ - |
| 48 | Weekly change in cash | (13) | | | | | | | (140) | | | | | | | (378) | |
| 49 | END OF DAY AVAILABILITY——> | $ 193 | $ 523 | $ 523 | $ 381 | $ 613 | $ 828 | $ 247 | $ 480 | $ 810 | $ 1,140 | $ 860 | $ 783 | $ 870 | $ 187 | $ 216 | $ 348 |
| 127 | Calculation of BBC | | | | | | | | | | | | | | | | |
| 128 | | | | | | | | | | | | | | | | | |
| 129 | Trailing 85-day receipts (as of 1Feb13) | 21,828 | 21,792 | $ 21,579 | 21,925 | 22,275 | 22,075 | 22,099 | 22,299 | 20,584 | $ 20,298 | 20,684 | 20,613 | 20,543 | 20,567 | 20,342 | 19,992 |
| 130 | | | | | | | | | | | | | | | | | |
| 131 | Beginning Eligible AR | 14,455 | 14,759 | $ 15,089 | 15,089 | 14,656 | 14,636 | 14,616 | 14,722 | 14,653 | $ 14,983 | 15,313 | 15,449 | 15,670 | 15,820 | 15,576 | 15,552 |
| 132 | Revenue | $ 204 | $ 330 | | $ (83) | $ 330 | $ 330 | $ 380 | $ 281 | $ 330 | $ 330 | $ 551 | $ 350 | $ 230 | $ 130 | $ 102 | $ 130 |
| 133 | Payments (sweep that paid down loan) | (150) | - | $ - | (350) | (350) | (350) | (274) | 14,475 | - | $ - | (415) | (129) | (80) | (374) | (125) | |
| 134 | Plug (Wachovia AR & HSBC) | | | | | | | | | | | | | | | | |
| 135 | Forecasted Changes in Billing | | | | | | | | | | | | | | | | |
| 136 | Ending Eligible AR | $ 14,759 | $ 15,089 | $ 15,089 | $ 14,656 | $ 14,636 | $ 14,616 | $ 14,722 | $ 14,653 | $ 14,983 | $ 15,313 | $ 15,449 | $ 15,670 | $ 15,820 | $ 15,576 | $ 15,553 | $ 15,682 |
| 137 | | | | | | | | | | | | | | | | | |
| 138 | Lesser of Trailing 85-day cash or eligible AR or $22,500 | $ 14,759 | $ 15,089 | $ - | $ 14,656 | $ 14,636 | $ 14,616 | $ 14,722 | $ 14,653 | $ 14,983 | $ - | $ 15,449 | $ 15,670 | $ 15,820 | $ 15,576 | $ 15,553 | $ 15,682 |
| 139 | Eligibility variance | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 140 | | | | | | | | | | | | | | | | | |
| 141 | | | | | | | | | | | | | | | | | |
| 142 | Beginning Loan Balance | $ 14,053 | $ 14,566 | $ 14,566 | $ 14,566 | $ 14,305 | $ 14,023 | $ 13,691 | $ 14,475 | $ 14,173 | $ 14,173 | $ 14,173 | $ 14,889 | $ 14,887 | $ 14,850 | $ 15,379 | $ 15,338 |
| 143 | Receipts (paydown) | (150) | - | - | (350) | (350) | (350) | (274) | (350) | - | - | (415) | (129) | (80) | (374) | (125) | - |
| 144 | Borrowings | 663 | - | - | 89 | 68 | 18 | 1,058 | 48 | - | - | 1,131 | 128 | 43 | 903 | 84 | - |
| 145 | Ending Loan Balance | $ 14,566 | $ 14,566 | $ 14,566 | $ 14,305 | $ 14,023 | $ 13,691 | $ 14,475 | $ 14,173 | $ 14,112 | $ 14,112 | $ 14,889 | $ 14,887 | $ 14,850 | $ 15,379 | $ 15,338 | $ 15,338 |
| 146 | | | | | | | | | | | | | | | | | |
| 147 | END OF DAY AVAILABILITY——> | $ 193 | $ 523 | $ - | $ 381 | $ 613 | $ 828 | $ 247 | $ 480 | $ 810 | $ - | $ 860 | $ 783 | $ 870 | $ 187 | $ 216 | $ 348 |

CM_TC2018_0003376

A0996

Cash By Day - FY 2016

| | D | ARQ | ARR | ARS | ART | ARU | ARV | ARW | ARX | ARY |
|---|---|---|---|---|---|---|---|---|---|---|
| 2 | Weekly Cash (excl Transit) | | | | 1,770 | | | | | |
| 3 | 13-Week Average | | | | 1,633 | | | | | |
| 4 | | | | | | | | | | |
| 6 | | | | | | | | | | |
| 7 | TransCare Corporation | Sun | Mon | Tue | Wed | Thu | Fri | Sat | Sun | Mon |
| 8 | Daily Cash Plan | 7 | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 1 |
| 9 | | 09/27/15 | 09/28/15 | 09/29/15 | 09/30/15 | 10/01/15 | 10/02/15 | 10/03/15 | 10/04/15 | 10/05/15 |
| 10 | PLAN (Based on Release Date) | | | | | | | | | |
| 11 | Receipts | | | | | | | | | |
| 12 | Daily sweep - lance | - | 100 | 385 | 215 | 350 | 720 | - | - | 350 |
| 13 | Daily sweep - paratransit | - | | - | | | | - | - | |
| 14 | TOTAL RECEIPTS | - | 100 | 385 | 215 | 350 | 720 | - | - | 350 |
| 15 | | | | | | | | | | |
| 16 | Disbursements | | | | | | | | | |
| 17 | Payroll | | | | | | | | | |
| 18 | Wages and employer taxes | | 438 | | | 881 | 84 | | | 404 |
| 19 | Montefiore | | | | | | | | | |
| 20 | Employee benefits | | | | | | | | | |
| 21 | Paid by check | | | | | | | | | |
| 22 | Wire | | | | | | | | | |
| 23 | Total payroll | - | 438 | - | - | 881 | 84 | - | - | 404 |
| 24 | | | | | | | | | | |
| 25 | Insurance (Auto, WC, Liab) | | | | | | | | | |
| 26 | Type | | IPFS (placeholder) | | | | | | | |
| 27 | Paid by check | | | | | | | | | |
| 28 | Wire | | 137 | | | | | | | |
| 29 | Total insurance payments | - | 137 | - | - | - | - | - | - | - |
| 30 | | | | | | | | | | |
| 31 | Debt interest | | | | | | | | | |
| 32 | Patriarch | | | | | | | | | |
| 33 | Wells Fargo | | | | 85 | 30 | | | | |
| 34 | Total debt interest | - | - | - | 85 | 30 | - | - | - | - |
| 35 | | | | | | | | | | |
| 36 | Other disbursements | | | | | | | | | |
| 37 | Comments | | EZ PASS | | | | | | | EZ PASS |
| 38 | Rent | | | | | | | | | |
| 39 | Vehicle & Equipment lease payments | | | | | | 38 | | | |
| 40 | ACH Wires (auto debits- WEX, leases) | | 28 | 28 | 18 | 18 | 18 | | | 28 |
| 41 | Vehicle down payments | | | | | | | | | |
| 42 | AP-OH (vendor pp, util, small,exp, ck req & other recurring) | - | | | | | 197 | - | - | |
| 43 | Total other disbursements | - | 28 | 28 | 18 | 18 | 251 | - | - | 28 |
| 44 | | | | | | | | | | |
| 45 | TOTAL DISBURSEMENTS | - | 603 | 28 | 103 | 929 | 315 | - | - | 432 |
| 46 | | | | | | | | | | |
| 47 | CHANGE in BOOK CASH | - | (503) | 358 | 112 | (579) | 403 | - | - | (62) |
| 48 | Weekly change in cash | | | | | | (208) | | | |
| 49 | END OF DAY AVAILABILITY——> | 548 | 229 | 487 | 764 | 8 | 26 | 336 | 330 | 60 |
| 127 | Calculation of DDC | | | | | | | | | |
| 128 | | | | | | | | | | |
| 129 | Trailing 65-day receipts (as of 1Feb13) | 19,842 | 19,742 | 20,127 | 19,892 | 19,892 | 20,302 | 19,812 | 19,402 | 19,812 |
| 130 | | | | | | | | | | |
| 131 | Beginning Eligible AR | 15,883 | 15,883 | 16,083 | 15,904 | 16,089 | 15,972 | 15,340 | 15,650 | 15,690 |
| 132 | Revenue | 200 | 300 | 206 | 400 | 233 | 94 | 310 | | 395 |
| 133 | Payments (sweep that paid down loan) | - | (100) | (385) | (215) | (350) | (720) | - | - | 15,326 |
| 134 | Plug (Wachovia AR & HSBC) | | | | | | | | | |
| 135 | Forecasted Changes in Billing | | | | | | | | | |
| 136 | Ending Eligible AR | 15,883 | 16,083 | 15,904 | 16,089 | 15,972 | 15,340 | 15,650 | 15,650 | 15,701 |
| 137 | | | | | | | | | | |
| 138 | Lesser of Trailing 65-day cash or eligible AR or $22,500 | - | 16,083 | 15,904 | 16,089 | 15,972 | 15,340 | 15,650 | | 15,701 |
| 139 | Eligibility variance | - | - | - | - | - | - | - | - | - |
| 140 | | | | | | | | | | |
| 141 | | | | | | | | | | |
| 142 | Beginning Loan Balance | 15,338 | 15,338 | 15,854 | 15,497 | 15,385 | 15,964 | 15,326 | 15,326 | 15,326 |
| 143 | Receipts (paydown) | - | (100) | (385) | (215) | (350) | (720) | - | - | (350) |
| 144 | Borrowings | - | 616 | 28 | 103 | 929 | 82 | - | - | 665 |
| 145 | Ending Loan Balance | 15,338 | 15,854 | 15,497 | 15,385 | 15,964 | 15,326 | 15,326 | 15,326 | 15,641 |
| 146 | | | | | | | | | | |
| 147 | END OF DAY AVAILABILITY——> | - | 229 | 487 | 764 | 8 | 26 | 330 | - | 60 |

| | D | ARZ | ASA | ASB | ASC | ASD | ASE | ASF | ASG | ASH | ASI |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 2 | Weekly Cash (excl Transit) | | 1,550 | | | | | | | 1,793 | |
| 3 | 13-Week Average | | 1,633 | | | | | | | 1,656 | |
| 4 | | | | | | | | | | | |
| 6 | | | | | | | | | | | |
| 7 | TransCare Corporation | Tue | Wed | Thu | Fri | Sat | Sun | Mon | Tue | Wed | Thu |
| 8 | Daily Cash Plan | 2 | 3 | 4 | 5 | 6 | 7 | 1 | 2 | 3 | 4 |
| 9 | | 10/06/15 | 10/07/15 | 10/08/15 | 10/09/15 | 10/10/15 | 10/11/15 | 10/12/15 | 10/13/15 | 10/14/15 | 10/15/15 |
| 10 | PLAN (Based on Release Date) | | | | | | | | | | |
| 11 | Receipts | | | | | | | | | | |
| 12 | Daily sweep - lance | 490 | 255 | 255 | 200 | - | - | | 359 | 430 | 531 |
| 13 | Daily sweep - paratransit | - | 250 | | | - | - | | - | | 2,073 |
| 14 | TOTAL RECEIPTS | 490 | 505 | 255 | 200 | - | - | - | 359 | 430 | 2,604 |
| 15 | | | | | | | | | | | |
| 16 | Disbursements | | | | | | | | | | |
| 17 | Payroll | | | | | | | | | | |
| 18 | Wages and employer taxes | | | 900 | 382 | | | | 114 | | 888 |
| 19 | Montefiore | Benefits cut-out | | | | | | | | | |
| 20 | Employee benefits | | | | | | | | | | |
| 21 | Paid by check | 15 | | 15 | 15 | | | | | 30 | 15 |
| 22 | Wire | 30 | 15 | | | | | | | | |
| 23 | Total payroll | 45 | 15 | 915 | 380 | - | - | - | 114 | 30 | 903 |
| 24 | | | | | | | | | | | |
| 25 | Insurance (Auto, WC, Liab) | | | | | | | | | | |
| 26 | Type | | | | Zurich | | | | | | |
| 27 | Paid by check | | | | | | | | | | |
| 28 | Wire | | | | 157 | | | | | | |
| 29 | Total insurance payments | - | - | - | 157 | - | - | - | - | - | - |
| 30 | | | | | | | | | | | |
| 31 | Debt interest | | | | | | | | | | |
| 32 | Patriarch | 295 | | | | | | | | | |
| 33 | Wells Fargo | | | | | | | | 31 | | |
| 34 | Total debt interest | 295 | - | - | - | - | - | - | 31 | - | - |
| 35 | | | | | | | | | | | |
| 36 | Other disbursements | | | | | | | | | | |
| 37 | Comments | | | | | | | | | | |
| 38 | Rent | | | | | | | | | | |
| 39 | Vehicle & Equipment lease payments | | | | | | | | | | |
| 40 | ACH Wires (auto debits- WEX, leases) | 28 | 18 | 18 | 18 | | | | | 53 | |
| 41 | Vehicle down payments | | | | | | | | | | |
| 42 | AP-OH (vendor pp, util, small,exp, ck req & other recurring) | 25 | | | 150 | - | - | 80 | 25 | | |
| 43 | Total other disbursements | 53 | 18 | 18 | 168 | - | - | 80 | 25 | 53 | - |
| 44 | | | | | | | | | | | |
| 45 | TOTAL DISBURSEMENTS | 393 | 33 | 933 | 705 | - | - | 80 | 170 | 83 | 903 |
| 46 | | | | | | | | | | | |
| 47 | CHANGE in BOOK CASH | 98 | 472 | (678) | (505) | - | - | (80) | 189 | 347 | 1,701 |
| 48 | Weekly change in cash | | | | (899) | | | | | | |
| 49 | END OF DAY AVAILABILITY——> | 188 | 695 | 207 | 66 | 246 | 346 | 611 | 820 | 717 | 136 |
| 127 | Calculation of DDC | | | | | | | | | | |
| 128 | | | | | | | | | | | |
| 129 | Trailing 65-day receipts (as of 1Feb13) | 20,302 | 20,494 | 20,565 | 17,816 | 17,898 | 17,271 | 17,271 | 17,830 | 17,710 | 19,964 |
| 130 | | | | | | | | | | | |
| 131 | Beginning Eligible AR | 15,701 | 15,691 | 15,766 | 15,941 | 16,305 | 16,485 | 16,585 | 16,865 | 16,740 | 16,682 |
| 132 | Revenue | 480 | 330 | 430 | 564 | 180 | 100 | 280 | 234 | 372 | 411 |
| 133 | Payments (sweep that paid down loan) | (490) | 15,753 | (255) | 15,734 | - | - | - | (359) | (430) | (2,604) |
| 134 | Plug (Wachovia AR & HSBC) | | | | | | | | | | |
| 135 | Forecasted Changes in Billing | | | | | | | | | | |
| 136 | Ending Eligible AR | 15,691 | 15,766 | 15,941 | 16,305 | 16,485 | 16,585 | 16,865 | 16,740 | 16,682 | 14,489 |
| 137 | | | | | | | | | | | |
| 138 | Lesser of Trailing 65-day cash or eligible AR or $22,500 | 15,691 | 15,766 | 15,941 | 16,305 | 16,485 | - | 16,865 | 16,740 | 16,682 | 14,489 |
| 139 | Eligibility variance | - | - | - | - | - | - | - | - | - | - |
| 140 | | | | | | | | | | | |
| 141 | | | | | | | | | | | |
| 142 | Beginning Loan Balance | 15,641 | 15,503 | 15,071 | 15,734 | 16,239 | 16,239 | 16,239 | 16,254 | 16,120 | 15,965 |
| 143 | Receipts (paydown) | (490) | (505) | (255) | (200) | - | - | - | (359) | (430) | (2,604) |
| 144 | Borrowings | 353 | 73 | 918 | 705 | - | - | 15 | 225 | 275 | 993 |
| 145 | Ending Loan Balance | 15,503 | 15,071 | 15,734 | 16,239 | 16,239 | 16,239 | 16,254 | 16,120 | 15,965 | 14,354 |
| 146 | | | | | | | | | | | |
| 147 | END OF DAY AVAILABILITY——> | 188 | 695 | 207 | 66 | 246 | - | 611 | 820 | 717 | 136 |

CM_TC2018_0003376

A0997

Cash By Day - FY 2016

| # | D | ASJ | ASK | ASL | ASM | ASN | ASO | ASP | ASQ | ASR |
|---|---|---|---|---|---|---|---|---|---|---|
| 2 | Weekly Cash (excl Transit) | | | | | | $ 1,530 | | | |
| 3 | 13-Week Average | | | | | | $ 1,639 | | | |
| 4 | | | | | | | | | | |
| 6 | | | | | | | | | | |
| 7 | TransCare Corporation | Fri | Sat | Sun | Mon | Tue | Wed | Thu | Fri | Sat |
| 8 | Daily Cash Plan | 5 | 6 | 7 | 1 | 2 | 3 | 4 | 5 | 6 |
| 9 | | 10/16/15 | 10/17/15 | 10/18/15 | 10/19/15 | 10/20/15 | 10/21/15 | 10/22/15 | 10/23/15 | 10/24/15 |
| 10 | PLAN (Based on Release Date) | | | | | | | | | |
| 11 | Receipts | | | | | | | | | |
| 12 | Daily sweep - lance | $ 475 | $ - | $ - | $ 359 | $ 150 | $ 350 | $ 399 | $ 272 | $ - |
| 13 | Daily sweep - paratransit | $ 500 | $ - | $ - | | $ - | | | | $ - |
| 14 | TOTAL RECEIPTS | $ 975 | $ - | $ - | $ 359 | $ 150 | $ 350 | $ 399 | $ 272 | $ - |
| 15 | | | | | | | | | | |
| 16 | Disbursements | | | | | | | | | |
| 17 | Payroll | | | | | | | | | |
| 18 | Wages and employer taxes | | | | $ 486 | | | $ 900 | | |
| 19 | Montefiore | | | | | | | | | |
| 20 | Employee benefits | | | | | | | | | |
| 21 | Paid by check | $ 400 | | | | | | 15 | | |
| 22 | Wire | | | | | | | | $ 30 | |
| 23 | Total payroll | $ 400 | $ - | $ - | $ 486 | $ - | $ - | $ 915 | $ 30 | $ - |
| 24 | | | | | | | | | | |
| 25 | Insurance (Auto, WC, Liab) | | | | | | | | IPFS (placeholder) Bunch | |
| 26 | Type | | | | | | | | | |
| 27 | Paid by check | | | | | | | | | |
| 28 | Wire | $ 750 | | | | | | | $ 300 | |
| 29 | Total insurance payments | $ 750 | $ - | $ - | $ - | $ - | $ - | $ - | $ 300 | $ - |
| 30 | | | | | | | | | | |
| 31 | Debt interest | | | | | | | | | |
| 32 | Patriarch | | | | | | | | | |
| 33 | Wells Fargo | | | | | | | | | |
| 34 | Total debt interest | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 35 | | | | | | | | | | |
| 36 | Other disbursements | | | | | | | | | |
| 37 | Comments | | | | | | | | | |
| 38 | Rent | | | | | | | | | |
| 39 | Vehicle & Equipment lease payments | | | | | | | | | |
| 40 | ACH Wires (auto debits- WEX, leases) | | | | $ 68 | $ 48 | | $ 18 | $ 18 | |
| 41 | Vehicle down payments | | | | | | | | | |
| 42 | AP-OH (vendor pp, util, small,exp, ck reg & other recurring) | | | | | | | | 150 | |
| 43 | Total other disbursements | $ - | $ - | $ - | $ 68 | $ 48 | $ - | $ 18 | $ 168 | $ - |
| 44 | | | | | | | | | | |
| 45 | TOTAL DISBURSEMENTS | $ 1,150 | $ - | $ - | $ 534 | $ 48 | $ - | $ 933 | $ 498 | $ - |
| 46 | | | | | | | | | | |
| 47 | CHANGE IN BOOK CASH | $ (175) | $ - | $ - | $ (175) | $ 102 | $ 350 | $ (534) | $ (226) | $ - |
| 48 | Weekly change in cash | 1,982 | | | | | | | (483) | |
| 49 | END OF DAY AVAILABILITY——> | $ (0) | $ 280 | $ 580 | $ 16 | $ 222 | $ 518 | $ 16 | $ 38 | $ 299 |
| 127 | Calculation of BBC | | | | | | | | | |
| 128 | | | | | | | | | | |
| 129 | Trailing 85-day receipts (as of 1Feb13) | 20,704 | 20,944 | $ 19,994 | 20,353 | 20,503 | 20,503 | 20,552 | 20,649 | 20,274 |
| 130 | | | | | | | | | | |
| 131 | Beginning Eligible AR | 14,469 | 14,699 | $ 14,978 | 15,259 | 15,284 | 15,394 | 15,340 | 15,351 | 15,470 |
| 132 | Revenue | $ 185 | $ 280 | $ 280 | $ 384 | $ 260 | $ 298 | $ 410 | $ 391 | $ 261 |
| 133 | Payments (sweep that paid down loan) | 14,854 | | $ - | (359) | (150) | (350) | (399) | (272) | - |
| 134 | Plug (Wachovia AR & HSBC) | | | | | | | | | |
| 135 | Forecasted Changes in Billing | | | | | | | | | |
| 136 | Ending Eligible AR | $ 14,699 | $ 14,978 | $ 15,258 | $ 15,284 | $ 15,394 | $ 15,340 | $ 15,351 | $ 15,470 | $ 15,731 |
| 137 | | | | | | | | | | |
| 138 | Lesser of Trailing 85-day cash or eligible AR or $22,500 | $ 14,699 | $ 14,978 | $ - | $ 15,284 | $ 15,394 | $ 15,340 | $ 15,351 | $ 15,470 | $ 15,731 |
| 139 | Eligibility variance | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 140 | | | | | | | | | | |
| 141 | | | | | | | | | | |
| 142 | Beginning Loan Balance | $ 14,354 | $ 14,699 | $ 14,699 | $ 14,699 | $ 15,274 | $ 15,172 | $ 14,822 | $ 15,341 | $ 15,432 |
| 143 | Receipts (paydown) | - | - | - | (359) | (150) | (350) | (399) | (272) | - |
| 144 | Borrowings | 820 | - | - | 934 | 48 | - | 918 | 363 | - |
| 145 | Ending Loan Balance | $ 14,699 | $ 14,699 | $ 14,699 | $ 15,274 | $ 15,172 | $ 14,822 | $ 15,341 | $ 15,432 | $ 15,432 |
| 146 | | | | | | | | | | |
| 147 | END OF DAY AVAILABILITY——> | $ (0) | $ 280 | $ - | $ 16 | $ 222 | $ 518 | $ 16 | $ 38 | $ 299 |

| # | D | ASS | AST | ASU | ASV | ASW | ASX | ASY | ASZ | ATA | ATB |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 2 | Weekly Cash (excl Transit) | | | | $ 1,675 | | | | | | |
| 3 | 13-Week Average | | | | $ 1,618 | | | | | | |
| 4 | | | | | | | | | | | |
| 6 | | | | | | | | | | | |
| 7 | TransCare Corporation | Sun | Mon | Tue | Wed | Thu | Fri | Sat | Sun | Mon | Tue |
| 8 | Daily Cash Plan | 7 | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 1 | 2 |
| 9 | | 10/25/15 | 10/26/15 | 10/27/15 | 10/28/15 | 10/29/15 | 10/30/15 | 10/31/15 | 11/01/15 | 11/02/15 | 11/03/15 |
| 10 | PLAN (Based on Release Date) | | | | | | | | | | |
| 11 | Receipts | | | | | | | | | | |
| 12 | Daily sweep - lance | $ - | $ 300 | $ 300 | $ 300 | $ 450 | $ 325 | $ - | $ - | $ 350 | $ 350 |
| 13 | Daily sweep - paratransit | $ - | | $ - | | | | $ - | $ - | | $ - |
| 14 | TOTAL RECEIPTS | $ - | $ 300 | $ 300 | $ 300 | $ 450 | $ 325 | $ - | $ - | $ 350 | $ 350 |
| 15 | | | | | | | | | | | |
| 16 | Disbursements | | | | | | | | | | |
| 17 | Payroll | | | | | | | | | | |
| 18 | Wages and employer taxes | | $ 498 | | | $ 867 | $ 57 | | | $ 409 | |
| 19 | Montefiore | | | | | | | | | | |
| 20 | Employee benefits | | | | | | | | | | |
| 21 | Paid by check | | | | | | | | | | |
| 22 | Wire | | $ 30 | | | | | | | | |
| 23 | Total payroll | $ - | $ 498 | $ - | $ - | $ 867 | $ 57 | $ - | $ - | $ 409 | $ - |
| 24 | | | | | | | | | | | |
| 25 | Insurance (Auto, WC, Liab) | | | | | | | | | | |
| 26 | Type | | | | | | | | | | |
| 27 | Paid by check | | | | | | MYSB | | | | |
| 28 | Wire | | | | | | 118 | | | | |
| 29 | Total insurance payments | $ - | $ - | $ - | $ - | $ - | $ 118 | $ - | $ - | $ - | $ - |
| 30 | | | | | | | | | | | |
| 31 | Debt interest | | | | | | | | | | |
| 32 | Patriarch | | | | | | | | | | |
| 33 | Wells Fargo | | | | | | $ 100 | | | | |
| 34 | Total debt interest | $ - | $ - | $ - | $ - | $ - | $ 100 | $ - | $ - | $ - | $ - |
| 35 | | | | | | | | | | | |
| 36 | Other disbursements | | | | | | | | | | |
| 37 | Comments | | | | | | | | | | |
| 38 | Rent | | | | | | | | | | |
| 39 | Vehicle & Equipment lease payments | | | | | | | | | | |
| 40 | ACH Wires (auto debits- WEX, leases) | | $ 35 | $ 28 | $ 46 | 13 | 40 | | | $ 3 | |
| 41 | Vehicle down payments | | | | | | | | | | |
| 42 | AP-OH (vendor pp, util, small,exp, ck reg & other recurring) | | | 75 | | | 40 | | | | |
| 43 | Total other disbursements | $ - | $ 35 | $ 103 | $ 46 | $ 13 | $ 86 | $ - | $ - | $ 3 | $ - |
| 44 | | | | | | | | | | | |
| 45 | TOTAL DISBURSEMENTS | $ - | $ 531 | $ 103 | $ 46 | $ 880 | $ 359 | $ - | $ - | $ 412 | $ - |
| 46 | | | | | | | | | | | |
| 47 | CHANGE IN BOOK CASH | $ - | $ (231) | $ 198 | $ 254 | $ (430) | $ (34) | $ - | $ - | $ (62) | $ 350 |
| 48 | Weekly change in cash | | | | | | (244) | | | | |
| 49 | END OF DAY AVAILABILITY——> | $ 609 | $ 268 | $ 440 | $ 621 | $ 8 | $ 60 | $ 240 | $ 340 | $ 6 | $ 304 |
| 127 | Calculation of BBC | | | | | | | | | | |
| 128 | | | | | | | | | | | |
| 129 | Trailing 85-day receipts (as of 1Feb13) | $ 19,999 | 20,199 | 20,409 | 20,449 | 20,774 | 20,974 | 20,424 | $ 20,614 | 20,424 | 20,774 |
| 130 | | | | | | | | | | | |
| 131 | Beginning Eligible AR | $ 15,731 | 15,941 | 16,021 | 15,981 | 15,983 | 15,785 | 15,763 | $ 15,943 | 16,043 | 15,927 |
| 132 | Revenue | $ 210 | $ 380 | $ 260 | $ 302 | $ 252 | $ 303 | $ 180 | $ 100 | $ 234 | $ 358 |
| 133 | Payments (sweep that paid down loan) | $ - | (300) | (300) | (300) | (450) | 15,779 | - | $ | (350) | (350) |
| 134 | Plug (Wachovia AR & HSBC) | | | | | | | | | | |
| 135 | Forecasted Changes in Billing | | | | | | | | | | |
| 136 | Ending Eligible AR | $ 15,941 | $ 16,021 | $ 15,981 | $ 15,983 | $ 15,785 | $ 15,763 | $ 15,943 | $ 16,043 | $ 15,927 | $ 15,935 |
| 137 | | | | | | | | | | | |
| 138 | Lesser of Trailing 85-day cash or eligible AR or $22,500 | $ - | $ 16,021 | $ 15,981 | $ 15,983 | $ 15,785 | $ 15,763 | $ 15,943 | $ - | $ 15,927 | $ 15,935 |
| 139 | Eligibility variance | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 140 | | | | | | | | | | | |
| 141 | | | | | | | | | | | |
| 142 | Beginning Loan Balance | $ 15,432 | $ 15,432 | $ 15,813 | $ 15,541 | $ 15,362 | $ 15,779 | $ 15,703 | $ 15,703 | $ 15,703 | $ 15,921 |
| 143 | Receipts (paydown) | | (300) | (300) | (300) | (450) | (325) | - | - | (350) | (350) |
| 144 | Borrowings | | 681 | 28 | 121 | 867 | 249 | | - | 568 | 60 |
| 145 | Ending Loan Balance | $ 15,432 | $ 15,813 | $ 15,541 | $ 15,362 | $ 15,779 | $ 15,703 | $ 15,703 | $ 15,703 | $ 15,921 | $ 15,631 |
| 146 | | | | | | | | | | | |
| 147 | END OF DAY AVAILABILITY——> | $ - | $ 268 | $ 440 | $ 621 | $ 8 | $ 60 | $ 240 | $ - | $ 6 | $ 304 |

A0998

CM_TC2016_0003376

Cash By Day - FY 2016

| | D | ATC | ATD | ATE | ATF | ATG | ATH | ATI | ATJ | ATK | ATL | ATM | ATN | ATO | ATP | ATQ | ATR | ATS | ATT | ATU |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2 | Weekly Cash (excl Transit) | $ 1,428 | | | | | | | $ 1,005 | | | | | | | $ 1,985 | | | | |
| 3 | 13-Week Average | $ 1,616 | | | | | | | $ 1,567 | | | | | | | $ 1,594 | | | | |
| 4 | | | | | | | | | | | | | | | | | | | | |
| 6 | | | | | | | | | | | | | | | | | | | | |
| 7 | TransCare Corporation | Wed | Thu | Fri | Sat | Sun | Mon | Tue | Wed | Thu | Fri | Sat | Sun | Mon | Tue | Wed | Thu | Fri | Sat | Sun |
| 8 | Daily Cash Plan | 3 | 4 | 5 | 6 | 7 | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| 9 | | 11/04/15 | 11/05/15 | 11/06/15 | 11/07/15 | 11/08/15 | 11/09/15 | 11/10/15 | 11/11/15 | 11/12/15 | 11/13/15 | 11/14/15 | 11/15/15 | 11/16/15 | 11/17/15 | 11/18/15 | 11/19/15 | 11/20/15 | 11/21/15 | 11/22/15 |
| 10 | PLAN (Based on Release Date) | | | | | | | | | | | | | | | | | | | |
| 11 | Receipts | | | | | | | | | | | | | | | | | | | |
| 12 | Daily sweep - labor | $ 240 | $ 163 | $ 325 | $ - | $ - | $ 355 | $ 158 | | $ 350 | $ 150 | $ - | $ - | $ 412 | $ 93 | $ 807 | $ 361 | $ 350 | $ - | $ - |
| 13 | Daily sweep - paratransit | | $ 2,023 | | $ - | $ - | | $ - | | | | $ - | $ - | | $ - | | | | $ - | $ - |
| 14 | TOTAL RECEIPTS | $ 240 | $ 2,186 | $ 325 | $ - | $ - | $ 355 | $ 158 | $ - | $ 350 | $ 150 | $ - | $ - | $ 412 | $ 93 | $ 807 | $ 361 | $ 350 | $ - | $ - |
| 15 | | | | | | | | | | | | | | | | | | | | |
| 16 | Disbursements | | | | | | | | | | | | | | | | | | | |
| 17 | Payroll | | | | | | | | | | | | | | | | | | | |
| 18 | Wages and employer taxes | | $ 874 | $ 64 | | | $ 411 | | | $ 861 | | | | | | | $ 860 | | | |
| 19 | Montefiore | | | | | | | | | | | | | | | | | | | |
| 20 | Employee benefits | | | | | | | | | | | | | | | | | | | |
| 21 | Paid by check | | | | | | | | | | | | | | | | 15 | | | |
| 22 | Wire | $ 20 | $ 67 | $ 52 | | | | | | | | | | | | | | $ 15 | | |
| 23 | Total payroll | $ 20 | $ 941 | $ 116 | $ - | $ - | $ 411 | $ - | $ - | $ 861 | $ - | $ - | $ - | $ - | $ - | $ - | $ 875 | $ 15 | $ - | $ - |
| 24 | | | | | | | | | | | | | | | | | | | | |
| 25 | Insurance (Auto, WC, Liab) | | Zurich | | | | | | | | | | | | | | | | | |
| 26 | Type | | | NYSIF | | | | | | | NYSIF | | | | | | NYSIF | | | |
| 27 | Paid by check | | | 116 | | | | | | | 200 | | | | | | 400 | | | |
| 28 | Wire | | $ 157 | | | | | | | | | | | | | | $ 60 | $ 136 | | |
| 29 | Total insurance payments | $ - | $ 157 | $ 116 | $ - | $ - | $ - | $ - | $ - | $ - | $ 200 | $ - | $ - | $ - | $ - | $ - | $ 460 | $ 136 | $ - | $ - |
| 30 | | | | | | | | | | | | | | | | | | | | |
| 31 | Debt interest | | | | | | | | | | | | | | | | | | | |
| 32 | Patriarch | $ 200 | | | | | | | | | | | | | | | | | | |
| 33 | Wells Fargo | | | | | | | | | $ 28 | | | | | | | | | | |
| 34 | Total debt interest | $ 200 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 28 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 35 | | | | | | | | | | | | | | | | | | | | |
| 36 | Other disbursements | | | | | | | | | | | | | | | | | | | |
| 37 | Comments | | | | | | EZ PASS | | | | | | | EZ PASS | | | | | | |
| 38 | Rent | | | | | | | | | | | | | | | | | | | |
| 39 | Vehicle & Equipment lease payments | | | | | | | | | | | | | | | | | 30 | | |
| 40 | ACH Wires (auto debits- WEX, leases) | | | | | | $ 87 | $ 60 | | $ 59 | | | | | | | $ 100 | $ 18 | | |
| 41 | Vehicle down payments | | | | | | | | | | | | | | | | | | | |
| 42 | AP-OH (vendor pp, util, small.exp, ck req & other recurring) | | | 160 | - | - | | | | | 50 | - | - | | | 25 | | 25 | - | - |
| 43 | Total other disbursements | $ - | $ - | $ 160 | $ - | $ - | $ 87 | $ 60 | $ - | $ 59 | $ 50 | $ - | $ - | $ - | $ - | $ 25 | $ 100 | $ 73 | $ - | $ - |
| 44 | | | | | | | | | | | | | | | | | | | | |
| 45 | TOTAL DISBURSEMENTS | $ 220 | $ 1,098 | $ 392 | $ - | $ - | $ 498 | $ 60 | $ - | $ 948 | $ 250 | $ - | $ - | $ - | $ - | $ 25 | $ 1,435 | $ 224 | $ - | $ - |
| 46 | | | | | | | | | | | | | | | | | | | | |
| 47 | CHANGE IN BOOK CASH | $ 20 | $ 1,088 | $ (67) | $ - | $ - | $ (143) | $ 98 | $ - | $ (598) | $ (100) | $ - | $ - | $ 412 | $ 93 | $ 782 | $ (1,074) | $ 126 | $ - | $ - |
| 48 | Weekly change in cash | | | 1,329 | | | | | | | (751) | | | | | | | 301 | | |
| 49 | END OF DAY AVAILABILITY——> | $ 555 | $ 68 | $ 199 | $ 394 | $ 394 | $ 343 | $ 261 | $ 588 | $ 4 | $ 175 | $ 370 | $ 633 | $ 281 | $ 575 | $ 803 | $ 253 | $ 693 | $ 973 | $ 1,279 |
| 127 | Calculation of BBC | | | | | | | | | | | | | | | | | | | |
| 128 | | | | | | | | | | | | | | | | | | | | |
| 129 | Trailing 65-day receipts (as of 1Feb13) | 20,539 | 22,375 | 22,350 | 22,166 | $ 22,166 | 19,772 | 19,922 | 19,922 | 19,663 | 19,694 | 18,540 | $ 18,396 | 18,808 | 18,873 | 19,330 | 19,331 | 19,331 | 19,697 | $ 18,797 |
| 130 | | | | | | | | | | | | | | | | | | | | |
| 131 | Beginning Eligible AR | 15,935 | 16,218 | 14,537 | 14,537 | $ 14,732 | 14,732 | 15,024 | 14,964 | 15,289 | 15,305 | 15,321 | $ 15,521 | 15,684 | 15,272 | 15,499 | 14,920 | 15,064 | 15,738 | 16,018 |
| 132 | Revenue | $ 523 | $ 565 | $ 380 | $ 195 | | $ 531 | $ 206 | $ 325 | $ 366 | $ 166 | $ 200 | $ 163 | | $ 292 | $ 228 | $ 495 | $ 1,024 | $ 280 | $ 303 |
| 133 | Payments (sweep that paid down loan) | (240) | (2,186) | (325) | - | $ - | (353) | (150) | - | (350) | (150) | - | $ - | (412) | (65) | (807) | (351) | (350) | - | $ - |
| 134 | Plug (Wachovia AR & HSBC) | | | | | | | | | | | | | | | | | | | |
| 135 | Forecasted Changes in Billing | | | | | | | | | | | | | | | | | | | |
| 136 | Ending Eligible AR | $ 16,218 | $ 14,597 | $ 14,537 | $ 14,732 | $ 14,732 | $ 15,024 | $ 14,964 | $ 15,289 | $ 15,305 | $ 15,321 | $ 15,521 | $ 15,684 | $ 15,272 | $ 15,499 | $ 14,920 | $ 15,064 | $ 15,738 | $ 16,018 | $ 16,321 |
| 137 | | | | | | | | | | | | | | | | | | | | |
| 138 | Lesser of Trailing 65-day cash or eligible AR or $22,500 | $ 16,218 | $ 14,597 | $ 14,537 | $ 14,732 | $ 14,732 | $ 15,024 | $ 14,964 | $ 15,289 | $ 15,305 | $ 15,321 | $ 15,521 | $ 15,684 | $ 15,272 | $ 15,499 | $ 14,920 | $ 15,064 | $ 15,738 | $ 16,018 | $ 16,321 |
| 139 | Eligibility variance | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 140 | | | | | | | | | | | | | | | | | | | | |
| 141 | | | | | | | | | | | | | | | | | | | | |
| 142 | Beginning Loan Balance | $ 15,631 | $ 15,623 | $ 14,541 | $ 14,338 | $ 14,338 | $ 14,338 | $ 14,781 | $ 14,703 | $ 14,703 | $ 15,301 | $ 15,151 | $ 15,151 | $ 15,151 | $ 14,989 | $ 14,924 | $ 14,117 | $ 14,811 | $ 15,045 | $ 15,045 |
| 143 | Receipts (paydown) | (240) | (2,186) | (325) | - | - | (353) | (150) | - | (350) | (150) | - | - | (412) | (65) | (807) | (351) | (350) | - | - |
| 144 | Borrowings | 232 | 1,104 | 122 | - | - | 796 | 72 | - | 948 | - | - | - | 250 | - | - | 1,045 | 584 | - | - |
| 145 | Ending Loan Balance | $ 15,623 | $ 14,541 | $ 14,338 | $ 14,338 | $ 14,338 | $ 14,781 | $ 14,703 | $ 14,703 | $ 15,301 | $ 15,151 | $ 15,151 | $ 15,151 | $ 14,989 | $ 14,924 | $ 14,117 | $ 14,811 | $ 15,045 | $ 15,045 | $ 15,045 |
| 146 | | | | | | | | | | | | | | | | | | | | |
| 147 | END OF DAY AVAILABILITY——> | $ 595 | $ 68 | $ 189 | $ 394 | $ 394 | $ 343 | $ 261 | $ 588 | $ 4 | $ 175 | $ 370 | $ 633 | $ 281 | $ 575 | $ 803 | $ 253 | $ 693 | $ 973 | $ 1,279 |

CM_TC2018_0003376

A0999

Cash By Day - FY 2016

| | D | ATV | ATW | ATX | ATY | ATZ | AUA | AUB | AUC | AUD | AUE | AUF | AUG | AUH | AUI | AUJ | AUK | AUL | AUM |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2 | Weekly Cash (excl Transit) | | | $ 1,220 | | | | | | | $ 1,336 | | | | | | | $ 1,690 | |
| 3 | 13-Week Average | | | $ 1,573 | | | | | | | $ 1,552 | | | | | | | $ 1,526 | |
| 4 | | | | | | | | | | | | | | | | | | | |
| 6 | | | | | | | | | | | | | | | | | | | |
| 7 | TransCare Corporation | Mon | Tue | Wed | Thu | Fri | Sat | Sun | Mon | Tue | Wed | Thu | Fri | Sat | Sun | Mon | Tue | Wed | Thu |
| 8 | Daily Cash Plan | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 1 | 2 | 3 | 4 |
| 9 | | 11/23/15 | 11/24/15 | 11/25/15 | 11/26/15 | 11/27/15 | 11/28/15 | 11/29/15 | 11/30/15 | 12/01/15 | 12/02/15 | 12/03/15 | 12/04/15 | 12/05/15 | 12/06/15 | 12/07/15 | 12/08/15 | 12/09/15 | 12/10/15 |
| 10 | PLAN (Based on [illegible] Date) | | | | | | | | | | | | | | | | | | |
| 11 | Receipts | | | | | | | | | | | | | | | | | | |
| 12 | Daily sweep - lance | $ 401 | $ 190 | $ 517 | | $ 112 | $ - | $ - | $ 313 | $ 109 | $ 209 | $ 380 | $ 385 | $ - | $ - | $ 486 | $ 301 | $ 209 | $ 544 |
| 13 | Daily sweep - paratransit | | $ - | | | | $ - | $ - | | $ - | | | | $ - | $ - | | $ - | | |
| 14 | TOTAL RECEIPTS | $ 401 | $ 190 | $ 517 | $ - | $ 112 | $ - | $ - | $ 313 | $ 109 | $ 209 | $ 380 | $ 385 | $ - | $ - | $ 486 | $ 301 | $ 209 | $ 544 |
| 15 | | | | | | | | | | | | | | | | | | | |
| 16 | Disbursements | | | | | | | | | | | | | | | | | | |
| 17 | Payroll | | | | | | | | | | | | | | | | | | |
| 18 | Wages and employer taxes | | | $ 870 | | | | | | | | $ 896 | $ 466 | | | $ 412 | | | $ 574 |
| 19 | Montefiore | | | | | | | | | | | | | | | | | | |
| 20 | Employee benefits | | | | Aetna | | | | | | | | | | | | | | |
| 21 | Paid by check | | | | $ 365 | | | | | | | 15 | | | | | | | |
| 22 | Wire | | | | | $ 15 | | | | | | | $ 15 | | | $ 60 | | | |
| 23 | Total payroll | $ - | $ - | $ 870 | $ 365 | $ 15 | $ - | $ - | $ - | $ - | $ - | $ 911 | $ 481 | $ - | $ - | $ 472 | $ - | $ - | $ 574 |
| 24 | | | | | | | | | | | | | | | | | | | |
| 25 | Insurance (Auto, WC, Liab) | | | | | | | | | | | | | | | | | | |
| 26 | Type | | | | | Zurich | | | | | | | | | | | | | |
| 27 | Paid by check | | | | | | | | | | | | | | | | | | |
| 28 | Wire | | | | | $ 157 | | | | | | | | | | | | | |
| 29 | Total insurance payments | $ - | $ - | $ - | $ - | $ 157 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 30 | | | | | | | | | | | | | | | | | | | |
| 31 | Debt interest | | | | | | | | | | | | | | | | | | |
| 32 | Patriarch | | | | | | | | | | | | | | | | | | |
| 33 | Wells Fargo | | | | | | | | | $ 65 | | | | | | | | | |
| 34 | Total debt interest | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 65 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 35 | | | | | | | | | | | | | | | | | | | |
| 36 | Other disbursements | | | | | | | | | | | | | | | | | | |
| 37 | Comments | [illegible] | | | | | | | [illegible] | | | | | | | [illegible] | | | |
| 38 | Rent | | | | | | | | | | | | | | | | | | |
| 39 | Vehicle & Equipment lease payments | | | | | 23 | | | 43 | | | | | | | | 158 | | |
| 40 | ACH Wires (auto debits- WEX, leases) | $ 28 | $ 28 | $ 18 | $ 3 | | | | $ 28 | $ 28 | $ 18 | $ 27 | $ 25 | | | $ 37 | $ 28 | $ 46 | |
| 41 | Vehicle down payments | | | | | | | | | | | | | | | | | | |
| 42 | AP-OH (vendor pp. util. small exp. ck req & other recurring) | | | | | 42 | - | - | | 50 | | | | - | - | | 52 | | |
| 43 | Total other disbursements | $ 28 | $ 28 | $ 18 | $ 3 | $ 65 | $ - | $ - | $ 71 | $ 78 | $ 18 | $ 27 | $ 25 | $ - | $ - | $ 37 | $ 238 | $ 46 | $ - |
| 44 | | | | | | | | | | | | | | | | | | | |
| 45 | TOTAL DISBURSEMENTS | $ 28 | $ 28 | $ 888 | $ 368 | $ 237 | $ - | $ - | $ 71 | $ 163 | $ 18 | $ 938 | $ 506 | $ - | $ - | $ 509 | $ 238 | $ 46 | $ 574 |
| 46 | | | | | | | | | | | | | | | | | | | |
| 47 | CHANGE IN BOOK CASH | $ 373 | $ 163 | $ (371) | $ (368) | $ (125) | $ - | $ - | $ 242 | $ (54) | $ 191 | $ (558) | $ (121) | $ - | $ - | $ (23) | $ 64 | $ 163 | $ (30) |
| 48 | Weekly change in cash | | | | | (329) | | | | | | | (306) | | | | | | |
| 49 | END OF DAY AVAILABILITY——> | $ 787 | $ 923 | $ 318 | $ 312 | $ 4 | $ 4 | $ 104 | $ 265 | $ 435 | $ 482 | $ 250 | $ 29 | $ 29 | $ 231 | $ 58 | $ 139 | $ 415 | $ 2 |
| 127 | Calculation of BBC | | | | | | | | | | | | | | | | | | |
| 128 | | | | | | | | | | | | | | | | | | | |
| 129 | Trailing 65-day receipts (as of 1Feb13) | 19,108 | 19,298 | 19,400 | 19,271 | 19,303 | 18,929 | 18,604 | 19,117 | 19,226 | 19,329 | 19,330 | 19,500 | 18,150 | 19,430 | 18,916 | 19,217 | 19,076 | 19,130 |
| 130 | | | | | | | | | | | | | | | | | | | |
| 131 | Beginning Eligible AR | 16,321 | 16,228 | 16,248 | 16,011 | 16,011 | 16,128 | $ 16,128 | 16,228 | 16,170 | 16,386 | 16,292 | 16,603 | 16,515 | $ [illegible] | 16,720 | 16,562 | 16,518 | 16,692 |
| 132 | Revenue | $ 308 | $ 210 | $ 280 | | $ 229 | | $ 100 | $ 255 | $ 325 | $ 115 | $ 601 | $ 297 | | $ 205 | $ 328 | $ 257 | $ 383 | $ 161 |
| 133 | Payments (sweep that paid down loan) | (401) | (190) | (517) | - | (112) | - | $ [illegible] | (313) | (109) | (209) | (380) | (385) | - | $ - | (486) | (301) | (209) | (544) |
| 134 | Plug (Wachovia AR & HSBC) | | | | | | | | | | | | | | | | | | |
| 135 | Forecasted Changes in Billing | | | | | | | | | | | | | | | | | | |
| 136 | Ending Eligible AR | $ 16,228 | $ 16,248 | $ 16,011 | $ 16,011 | $ 16,128 | $ 16,128 | $ 16,228 | $ 16,170 | $ 16,386 | $ 16,292 | $ 16,603 | $ 16,515 | $ 16,515 | $ 16,720 | $ 16,562 | $ 16,518 | $ 16,692 | $ 16,309 |
| 137 | | | | | | | | | | | | | | | | | | | |
| 138 | Lesser of Trailing 65-day cash or eligible AR or $22,500 | $ 16,228 | $ 16,248 | $ 16,011 | $ 16,011 | $ 16,128 | $ 16,128 | $ 16,228 | $ 16,170 | $ 16,386 | $ 16,292 | $ 16,603 | $ 16,515 | $ 16,515 | $ 16,720 | $ 16,562 | $ 16,518 | $ 16,692 | $ 16,309 |
| 139 | Eligibility variance | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 140 | | | | | | | | | | | | | | | | | | | |
| 141 | | | | | | | | | | | | | | | | | | | |
| 142 | Beginning Loan Balance | $ 15,045 | $ 15,441 | $ 15,325 | $ 15,696 | $ 15,699 | $ 16,124 | $ 16,124 | $ 16,124 | $ 15,904 | $ 15,951 | $ 15,810 | $ 16,353 | $ 16,489 | $ 16,489 | $ 16,489 | $ 16,512 | $ 16,388 | $ 16,277 |
| 143 | Receipts (paydown) | (401) | (190) | (517) | - | (112) | - | - | (313) | (109) | (209) | (380) | (385) | - | | (486) | (301) | (209) | (544) |
| 144 | Borrowings | 797 | 75 | 888 | 3 | 537 | - | - | 93 | 156 | 68 | 923 | 521 | - | - | 509 | 176 | 98 | 574 |
| 145 | Ending Loan Balance | $ 15,441 | $ 15,325 | $ 15,696 | $ 15,699 | $ 16,124 | $ 16,124 | $ 16,124 | $ 15,904 | $ 15,951 | $ 15,810 | $ 16,353 | $ 16,489 | $ 16,489 | $ 16,489 | $ 16,512 | $ 16,388 | $ 16,277 | $ 16,307 |
| 146 | | | | | | | | | | | | | | | | | | | |
| 147 | END OF DAY AVAILABILITY——> | $ 787 | $ 923 | $ 318 | $ 312 | $ 4 | $ 4 | $ 104 | $ 265 | $ 435 | $ 482 | $ 250 | $ 29 | $ 29 | $ 231 | $ 58 | $ 139 | $ 415 | $ 2 |

CM_TC2016_0003376

A1000

Cash By Day - FY 2016

| | D | AUN | AUO | AUP | AUQ | AUR | AUS | AUT | AUU | AUV | AUW | AUX | AUY | AUZ | AVA | AVB | AVC | AVD | AVE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2 | Weekly Cash (excl Transit) | | | | | | $ 1,760 | | | | | | | $ 1,020 | | | | | |
| 3 | 13-Week Average | | | | | | $ 1,533 | | | | | | | $ 1,525 | | | | | |
| 4 | | | | | | | | | | | | | | | | | | | |
| 6 | | | | | | | | | | | | | | | | | | | |
| 7 | TransCare Corporation | Fri | Sat | Sun | Mon | Tue | Wed | Thu | Fri | Sat | Sun | Mon | Tue | Wed | Thu | Fri | Sat | Sun | Mon |
| 8 | Daily Cash Plan | 5 | 6 | 7 | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 1 |
| 9 | | 12/11/15 | 12/12/15 | 12/13/15 | 12/14/15 | 12/15/15 | 12/16/15 | 12/17/15 | 12/18/15 | 12/19/15 | 12/20/15 | 12/21/15 | 12/22/15 | 12/23/15 | 12/24/15 | 12/25/15 | 12/26/15 | 12/27/15 | 12/28/15 |
| 10 | PLAN (Based on Release Date) | | | | | | | | | | | | | | | | | | |
| 11 | Receipts | | | | | | | | | | | | | | | | | | |
| 12 | Daily sweep - fance | $ 150 | $ - | $ - | $ 547 | $ 350 | $ 350 | $ 109 | $ 404 | $ - | $ - | $ 124 | $ 388 | $ 175 | $ 333 | | $ - | $ - | $ 392 |
| 13 | Daily sweep - paratransit | | $ - | $ - | | $ 1,965 | | | | $ - | $ - | | $ - | | | | $ - | $ - | |
| 14 | TOTAL RECEIPTS | $ 150 | $ - | $ - | $ 547 | $ 2,315 | $ 350 | $ 1,387 | $ 404 | $ - | $ - | $ 124 | $ 388 | $ 175 | $ 333 | $ - | $ - | $ - | $ 392 |
| 15 | | | | | | | | | | | | | | | | | | | |
| 16 | Disbursements | | | | | | | | | | | | | | | | | | |
| 17 | Payroll | | | | | | | | | | | | | | | | | | |
| 18 | Wages and employer taxes | $ 290 | | | $ 46 | | | $ 2,188 | $ 35 | | | $ 420 | | | $ 822 | | | | $ 546 |
| 19 | Montefiore | | | | | | | | | | | | | | | | | | |
| 20 | Employee benefits | | | | | | | | | | | | | | | | | | |
| 21 | Paid by check | | | | | | | | | | | | | | 15 | | | | |
| 22 | Wire | $ 15 | | | | | | $ 321 | $ 15 | | | | | | | | | | |
| 23 | Total payroll | $ 305 | $ - | $ - | $ 46 | $ - | $ - | $ 2,509 | $ 50 | $ - | $ - | $ 420 | $ - | $ - | $ 837 | $ - | $ - | $ - | $ 546 |
| 24 | | | | | | | | | | | | | | | | | | | |
| 25 | Insurance (Auto, WC, Liab) | | | | | | | | | | | | | | | | | | |
| 26 | Type | | | | | | | | | | | | | | IPFS (placeholder) | | | | |
| 27 | Paid by check | | | | | | | | | | | | | | $ 143 | | | | |
| 28 | Wire | | | | | | | | | | | | | | | | | | |
| 29 | Total insurance payments | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 143 | $ - | $ - | $ - | $ - |
| 30 | | | | | | | | | | | | | | | | | | | |
| 31 | Debt interest | | | | | | | | | | | | | | | | | | |
| 32 | Patriarch | | | | | | | | Legal | | | | | | | | | | |
| 33 | Wells Fargo | | | | | | | | $ 48 | | | | | | | | | | |
| 34 | Total debt interest | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 48 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 35 | | | | | | | | | | | | | | | | | | | |
| 36 | Other disbursements | | | | | | | | | | | | | | | | | | |
| 37 | Comments | | | | | | | | | | | | | | | | | | |
| 38 | Rent | | | | 444 | | | | | | | | | | | | | | |
| 39 | Vehicle & Equipment lease payments | | | | | | | | | | | | | | | | | | |
| 40 | ACH Wires (auto debits- WEX, leases) | $ 18 | | | $ 1 | $ 10 | $ 18 | $ 4 | $ 18 | | | $ 28 | $ 46 | | $ 8 | | | | $ 28 |
| 41 | Vehicle down payments | | | | | | | | | | | | | | | | | | |
| 42 | AP-OH (vendor pp, util, small.exp, ck req & other recurring) | 81 | - | - | | | 37 | 50 | | - | - | | | | | | - | - | |
| 43 | Total other disbursements | $ 59 | $ - | $ - | $ 445 | $ 10 | $ 55 | $ 54 | $ 18 | $ - | $ - | $ 28 | $ 46 | $ - | $ 8 | $ - | $ - | $ - | $ 28 |
| 44 | | | | | | | | | | | | | | | | | | | |
| 45 | TOTAL DISBURSEMENTS | $ 404 | $ - | $ - | $ 491 | $ 10 | $ 55 | $ 2,563 | $ 116 | $ - | $ - | $ 448 | $ 46 | $ - | $ 988 | $ - | $ - | $ - | $ 574 |
| 46 | | | | | | | | | | | | | | | | | | | |
| 47 | CHANGE IN BOOK CASH | $ (254) | $ - | $ - | $ 56 | $ 2,305 | $ 295 | $ (1,176) | $ 288 | $ - | $ - | $ (324) | $ 342 | $ 175 | $ (655) | $ - | $ - | $ - | $ (182) |
| 48 | Weekly change in cash | (81) | | | | | | | 1,768 | | | | | | | (482) | | | |
| 49 | END OF DAY AVAILABILITY——> | $ (8) | $ 200 | $ 357 | $ 115 | $ 516 | $ 1,086 | $ 94 | $ 138 | $ 138 | $ 138 | $ 320 | $ 500 | $ 810 | $ 97 | $ 82 | $ 182 | $ 282 | $ 19 |
| 127 | Calculation of BBC | | | | | | | | | | | | | | | | | | |
| 128 | | | | | | | | | | | | | | | | | | | |
| 129 | Trailing 63-day receipts (as of 1Feb13) | 18,775 | 18,920 | 18,320 | 18,867 | 21,182 | 21,532 | 22,560 | 22,534 | 19,930 | 19,955 | 19,079 | 19,467 | 19,263 | 19,486 | 19,116 | 18,717 | 18,845 | 18,837 |
| 130 | | | | | | | | | | | | | | | | | | | |
| 131 | Beginning Eligible AR | 16,309 | 16,480 | $ 16,680 | 16,837 | 16,620 | 14,716 | 14,954 | 15,125 | 14,931 | $ 14,931 | 14,931 | 15,437 | 15,275 | 15,410 | 15,337 | 15,337 | $ 15,437 | 15,537 |
| 132 | Revenue | $ 321 | $ 200 | $ 157 | $ 330 | $ 411 | $ 588 | $ 280 | $ 210 | | | $ 630 | $ 226 | $ 310 | $ 260 | | $ 100 | $ 100 | $ 311 |
| 133 | Payments (sweep that paid down loan) | (150) | - | $ | (547) | (2,315) | (350) | (109) | (404) | - | $ - | (124) | (388) | (175) | (333) | - | - | $ - | (392) |
| 134 | Plug (Wachovia AR & HSBC) | | | | | | | | | | | | | | | | | | |
| 135 | Forecasted Changes in Billing | | | | | | | | | | | | | | | | | | |
| 136 | Ending Eligible AR | $ 16,480 | $ 16,680 | $ 16,837 | $ 16,620 | $ 14,716 | $ 14,954 | $ 15,125 | $ 14,931 | $ 14,931 | $ 14,931 | $ 15,437 | $ 15,275 | $ 15,410 | $ 15,337 | $ 15,337 | $ 15,437 | $ 15,537 | $ 15,456 |
| 137 | | | | | | | | | | | | | | | | | | | |
| 138 | Lesser of Trailing 63-day cash or eligible AR or $22,500 | $ 16,480 | $ 16,680 | $ 16,837 | $ 16,620 | $ 14,716 | $ 14,954 | $ 15,125 | $ 14,931 | $ 14,931 | $ 14,931 | $ 15,437 | $ 15,275 | $ 15,410 | $ 15,337 | $ 15,337 | $ 15,437 | $ 15,537 | $ 15,456 |
| 139 | Eligibility variance | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| 140 | | | | | | | | | | | | | | | | | | | |
| 141 | | | | | | | | | | | | | | | | | | | |
| 142 | Beginning Loan Balance | $ 16,307 | $ 16,480 | $ 16,480 | $ 16,480 | $ 16,505 | $ 14,200 | $ 13,868 | $ 15,031 | $ 14,793 | $ 14,793 | $ 14,793 | $ 15,117 | $ 14,775 | $ 14,600 | $ 15,240 | $ 15,255 | $ 15,255 | $ 15,255 |
| 143 | Receipts (paydown) | (150) | - | - | (547) | (2,315) | (350) | (1,387) | (404) | - | - | (124) | (388) | (175) | (333) | - | - | | (392) |
| 144 | Borrowings | 323 | - | - | 572 | 10 | 18 | 2,550 | 166 | - | - | 448 | 46 | - | 973 | 15 | - | - | 574 |
| 145 | Ending Loan Balance | $ 16,480 | $ 16,480 | $ 16,480 | $ 16,505 | $ 14,200 | $ 13,868 | $ 15,031 | $ 14,793 | $ 14,793 | $ 14,793 | $ 15,117 | $ 14,775 | $ 14,600 | $ 15,240 | $ 15,255 | $ 15,255 | $ 15,255 | $ 15,437 |
| 146 | | | | | | | | | | | | | | | | | | | |
| 147 | END OF DAY AVAILABILITY——> | $ (8) | $ 200 | $ 357 | $ 115 | $ 516 | $ 1,086 | $ 94 | $ 138 | $ 138 | $ 138 | $ 320 | $ 500 | $ 810 | $ 97 | $ 82 | $ 182 | $ 282 | $ 19 |

CM_TC2018_0003376

Cash By Day - FY 2016

| D | | AVF | AVG | AVH | AVI | AVJ | AVK |
|---|---|---|---|---|---|---|---|
| Weekly Cash (incl Transit) | | | $ 1,507 | | | | |
| 13-Week Average | | | $ 1,483 | | | | |
| | | | | | | | |
| TransCare Corporation | | Tue | Wed | Thu | Fri | Sat | Sun |
| Daily Cash Plan | | 2 | 3 | 4 | 5 | 6 | 7 |
| | | 1/26/2015 | 12/30/2015 | 12/31/2015 | 1/1/2016 | 1/2/2016 | 1/3/2016 |
| Debit sweep - lance | | 374 | 141 | 402 | | | |
| Daily sweep - paratransit | | | | 400 | | | |
| TOTAL RECEIPTS | | 374 | 141 | | | | |
| Disbursements | | | | | | | |
| Payroll | | | | | | | |
| Wages and employer taxes | | | | 160 | | | |
| Remittance | | | | | | | |
| Employee benefits | | | | | | | |
| Paid by check | | | | | | | |
| Wire | | | | | | | |
| Total payroll | | | | 160 | | | |
| Insurance (Auto, WC, Liab) | | | | | | | |
| Part by check | | | | | | | |
| Wire | | | | | | | |
| Total insurance payments | | | | | | | |
| Debt interest | | | | | | | |
| Patrarch | | | | | | | |
| Wells Fargo | | | | | | | |
| Total debt interest | | | | | | | |
| Other disbursements | | | | | | | |
| Rent | | | | | | | |
| Vehicle & Equipment lease payments | | | | 142 | | | |
| ACH Wires | | | 51 | | | | |
| Vehicle down payments | | | | | | | |
| AP-Chri (vendor op. alt small exp. ck req 6 other recurring) | | 25 | | | | | |
| Total other disbursements | | 25 | 357 | 166 | | | |
| TOTAL DISBURSEMENTS | | 25 | 357 | 336 | | | 64 |
| CHANGE IN BOOK CASH | | 349 | (216) | 64 | | | |
| Weekly change in cash | | 169 | 17 | | | | 363 |
| END OF DAY AVAILABILITY | | | | | | | |
| Trailing 65-day receipts (as of 1Feb13) | | 19,211 | 19,211 | 19,054 | 18,754 | 19,247 | 18,977 |
| Beginning Eligible AR | | 15,406 | 15,232 | 18,162 | 18,338 | | 15,391 |
| Revenue | | 180 | 200 | 325 | | 100 | |
| Payments (sweep) that paid down loan) | | (374) | (180) | (143) | | | |
| Pug (Wexfware AP & MISC) | | | | | | | |
| Remaider Changes in Billing | | | | | | | |
| Ending Eligible AR | | 15,232 | 15,462 | 15,339 | 18,339 | 15,391 | 15,391 |
| Lesser of Trailing 65-day cash or eligible AR | | 15,232 | 15,462 | 15,339 | 15,339 | | 15,541 |
| Eligibility variance | | | | | | | |
| Beginning Loan Balance | | 15,437 | 15,063 | 15,145 | 15,338 | 15,338 | 15,338 |
| Receipts (paydown) | | (374) | (500) | (143) | | | |
| Drawings | | | 382 | 336 | | | |
| Ending Loan Balance | | 15,063 | 15,145 | 15,338 | 15,338 | 15,338 | 15,338 |
| END OF DAY AVAILABILITY | | | | | | | |

A1002

CM_TC2016_0003376

# SCHEDULE BY MONTH - FROM CAPX WORKSHEETS

See New Type 3 Worksheet
New Type 2 Worksheet
Used Type 2 Worksheet

| NEW TYPE 3 | | Plan Dec-15 | Budget Jan-16 | Budget Feb-16 | Budget Mar-16 | Budget Apr-16 | Budget May-16 | Budget Jun-16 | Budget Jul-16 | Budget Aug-16 | Budget Sep-16 | Budget Oct-16 | Budget Nov-16 | Budget Dec-16 | Year Ended 12/31/2016 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Number of New Leases Per Month | | | 0 | 3 | 3 | 4 | 4 | 1 | 1 | 1 | 1 | 1 | 1 | 0 | 20 |
| NEW -Vehicle Cost Type 3 | $ 160,000 | $ - | $ - | $ 480,000 | $ 480,000 | $ 640,000 | $ 640,000 | $ 160,000 | $ 160,000 | $ 160,000 | $ 160,000 | $ 160,000 | $ 160,000 | $ - | $ 3,200,000 |
| Down Payment | 25% | | | | | | | | | | | | | | |
| Amount DP | $ 40,000 | $ - | $ - | $ 120,000 | $ 120,000 | $ 120,000 | $ 120,000 | $ 120,000 | $ 120,000 | $ 120,000 | $ 120,000 | $ 120,000 | $ 120,000 | $ 120,000 | $ 1,320,000 |
| Financed | $ 120,000 | $ - | $ - | $ 360,000 | $ 360,000 | $ 360,000 | $ 360,000 | $ 360,000 | $ 360,000 | $ 360,000 | $ 360,000 | $ 360,000 | $ 360,000 | $ 360,000 | $ 3,960,000 |
| Interest Rate | 7% | | $ - | $ (2,100) | $ (4,162) | $ (6,886) | $ (9,558) | $ (9,904) | $ (10,415) | $ (10,912) | $ (11,394) | $ (11,863) | $ (12,318) | $ (14,859) | $ (104,372) |
| Lease payment Principal | $ - | | $ - | $ (6,521) | $ (13,079) | $ (21,850) | $ (30,671) | $ (32,481) | $ (34,844) | $ (37,220) | $ (39,611) | $ (42,016) | $ (44,434) | $ (53,388) | $ (356,115) |
| Monthly Lease Period | 48 | | | | | | | | | | | | | | |
| CASH OUTFLOW | Total | $ - | $ - | $ (128,621) | $(137,241) | $(148,735) | $(160,230) | $(162,385) | $(165,258) | $(168,132) | $(171,006) | $(173,879) | $(176,753) | $(188,247) | $ (1,780,486) |

| USED TYPE 2 | | Plan Dec-15 | Budget Jan-16 | Budget Feb-16 | Budget Mar-16 | Budget Apr-16 | Budget May-16 | Budget Jun-16 | Budget Jul-16 | Budget Aug-16 | Budget Sep-16 | Budget Oct-16 | Budget Nov-16 | Budget Dec-16 | Year Ended 12/31/2016 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Number of New Leases Per Month | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| SLIGHTLY USED-Vehicle Cost Type 2 | $ 87,000 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Down Payment | 25% | | | | | | | | | | | | | | |
| Amount DP | $ 21,750 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Financed | $ 65,250 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Interest Rate | 7% | | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Lease payment Principal | | | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Monthly Lease Period | 48 | | | | | | | | | | | | | | |
| CASH OUTFLOW | Total | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |

| NEW TYPE 2 | | Plan Dec-15 | Budget Jan-16 | Budget Feb-16 | Budget Mar-16 | Budget Apr-16 | Budget May-16 | Budget Jun-16 | Budget Jul-16 | Budget Aug-16 | Budget Sep-16 | Budget Oct-16 | Budget Nov-16 | Budget Dec-16 | Year Ended 12/31/2016 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Number of New Leases Per Month | | 0 | 0 | 4 | 4 | 4 | 4 | 4 | 0 | 0 | 0 | 0 | 0 | 0 | 20 |
| NEW -Vehicle Cost Type 2 | $ 120,000 | | $ - | $ 480,000 | $ 480,000 | $ 480,000 | $ 480,000 | $ 480,000 | $ 480,000 | $ - | $ - | $ - | $ - | $ - | $ 2,880,000 |
| Down Payment | 25% | | | | | | | | | | | | | | |
| Amount DP | $ 30,000 | | $ - | $ 120,000 | $ 120,000 | $ 120,000 | $ 120,000 | $ 120,000 | $ 120,000 | $ | $ | $ - | $ | $ | $ 720,000 |
| Financed | $ 90,000 | | $ - | $ 360,000 | $ 360,000 | $ 360,000 | $ 360,000 | $ 360,000 | $ 360,000 | $ - | $ - | $ - | $ - | $ - | $ 2,160,000 |
| Interest Rate | 7% | | $ - | $ (2,100) | $ (4,162) | $ (6,186) | $ (8,171) | $ (10,117) | $ (12,025) | $ (11,793) | $ (11,560) | $ (11,326) | $ (11,091) | $ (13,654) | $ (102,185) |
| Lease payment Principal | | | $ - | $ (6,521) | $ (13,079) | $ (19,676) | $ (26,312) | $ (32,986) | $ (39,699) | $ (39,930) | $ (40,163) | $ (40,398) | $ (40,633) | $ (49,565) | $ (348,962) |
| Monthly Lease Period | 48 | | | | | | | | | | | | | | |
| CASH OUTFLOW | Total | | $ - | $ (128,621) | $(137,241) | $(146,862) | $(164,483) | $(163,103) | $(171,724) | $ (51,724) | $ (51,724) | $ (51,724) | $ (51,724) | $ (63,218) | $ (1,171,147) |

| TO BALANCE SHEET BUSINESS MODEL BY MONTH | Plan Dec-15 | Budget Jan-16 | Budget Feb-16 | Budget Mar-16 | Budget Apr-16 | Budget May-16 | Budget Jun-16 | Budget Jul-16 | Budget Aug-16 | Budget Sep-16 | Budget Oct-16 | Budget Nov-16 | Budget Dec-16 | Year Ended 12/31/2016 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Additional Cap Leases | $ - | $ - | $ 960,000 | $ 960,000 | $1,120,000 | $1,120,000 | $ 640,000 | $ 640,000 | $ 160,000 | $ 160,000 | $ 160,000 | $ 160,000 | $ - | $ 6,080,000 |
| Principal & Down Payment | $ - | $ - | $ (253,041) | $ (266,159) | $ (281,526) | $ (296,983) | $ (305,466) | $ (314,542) | $ (197,151) | $ (199,774) | $ (202,413) | $ (205,068) | $ (222,952) | $ (2,745,077) |
| Interest New Leases | $ - | $ - | $ (4,200) | $ (8,324) | $ (13,071) | $ (17,729) | $ (20,022) | $ (22,440) | $ (22,705) | $ (22,955) | $ (23,190) | $ (23,409) | $ (28,513) | $ (206,557) |

CM_TC2018_0003376

# Transcare Standard Rates

**As of October 13, 2011**

**Transcare NY**
Companies: MET/MIC/LAB/LIC/EMS/WES

| Item | Rate |
|---|---|
| Ambulette | $89.25 |
| Ambulette Mileage | $4.20 |
| BLS Non-Emergency Ambulance | $472.50 |
| BLS Emergency Ambulance | $551.25 |
| BLS Emergency Ambulance(EMS) | $577.50 |
| BLS Mileage | $9.45 |
| ALS Non-Emergency Ambulance | $630.00 |
| ALS Emergency Ambulance | $708.75 |
| ALS Emergency Ambulance(EMS) | $787.50 |
| ALS Mileage | $9.45 |
| ALS 2 | $997.50 |
| Critical Care/SCT/Neonate | $1,050.00 |
| Critical Care Mileage | $9.45 |
| EKG | $150.00 |
| IV | $75.00 |
| Oxygen | $50.00 |
| Stretcher Van | $157.50 |
| Stretcher Van Mileage | $3.15 |

**As of October 13, 2011**

**Transcare PA**
Companies: PAB/PIC/SAB/SIC

| Item | Rate |
|---|---|
| Ambulette | $52.50 |
| Ambulette Mileage | $4.20 |
| BLS Non-Emergency Ambulance | $420.00 |
| BLS Emergency Ambulance | $551.25 |
| BLS Mileage | $8.40 |
| ALS Non-Emergency Ambulance | $551.25 |
| ALS Emergency Ambulance | $603.75 |
| ALS Mileage | $8.40 |
| ALS2 | $997.50 |
| Critical Care/SCT/Neonate | $1,417.50 |
| Critical Care Mileage | $8.40 |
| EKG | $150.00 |
| IV | $75.00 |
| Oxygen | $50.00 |

**As of October 13, 2011**

**Transcare MD**
Companies: BAB/BIC

| Item | Rate |
|---|---|
| Wheelchair Van (Ambulette) | $84.00 |
| Wheelchair Van Mileage | $3.15 |
| BLS Non-Emergency Ambulance | $420.00 |
| BLS Ambulance -ER | $551.25 |
| BLS Mileage | $10.50 |
| ALS Non-Emergency Ambulance | $656.25 |
| ALS Emergency Ambulance | $708.75 |
| ALS Mileage | $10.50 |
| ALS2 | $997.50 |
| Critical Care Transport/SCT/Neonat | $1,417.50 |
| Critical Care Mileage | $10.50 |
| EKG | $150.00 |
| IV | $75.00 |
| Oxygen | $50.00 |

**As of October 13, 2011**

**Transcare ML**
Companies: JAB/JIC

| Item | Rate |
|---|---|
| Wheelchair Van (Ambulette) | $73.50 |
| Wheelchair Van Mileage | $6.30 |
| BLS Non-Emergency Ambulance | $420.00 |
| BLS Emergency Ambulance | $551.25 |
| BLS Mileage | $9.45 |
| ALS Non-Emergency Ambulance | $840.00 |
| ALS Emergency Ambulance | $840.00 |
| ALS Mileage | $9.45 |
| ALS2 | $997.50 |
| Critical Care Transport/SCT/Neonate | $1,417.50 |
| Critical Care Mileage | $9.45 |
| EKG | $150.00 |
| IV | $75.00 |
| Oxygen | $50.00 |

CM_TC2018_0003376

A1004

New York 911 & Core By Customer

| NETWORK New York 911 EMS | 2015 VOLUME | 2015 TRIP REVENUE | 2015 SUBSIDY REV | 2015 NET REVENUE | 2015 COS | 2015 Gross Profit | 2015 GM% | 2015 %Rev | 2015 EBITDA |
|---|---|---|---|---|---|---|---|---|---|
| MT SINAI | 25,987 | $ 7,536,348 | $ 2,270,000 | $ 9,806,348 | $ 5,844,583 | $ 3,961,765 | 40.4% | 27.4% | $ 1,926,235 |
| MONTEFIORE | 23,472 | $ 6,807,024 | $ 2,755,129 | $ 9,562,153 | $ 5,852,038 | $ 3,710,115 | 38.8% | 26.7% | $ 1,878,269 |
| BRONX LEBANON | 19,374 | $ 5,618,496 | $ 1,770,004 | $ 7,388,500 | $ 4,668,263 | $ 2,720,236 | 36.8% | 20.6% | $ 1,451,304 |
| ST BARNABAS | 15,741 | $ 4,565,028 | $ 1,346,619 | $ 5,911,647 | $ 3,824,835 | $ 2,086,811 | 35.3% | 16.5% | $ 1,161,209 |
| NYU MEDICAL CENTER | 8,569 | $ 2,485,104 | $ 668,249 | $ 3,153,353 | $ 2,144,280 | $ 1,009,073 | 32.0% | 8.8% | $ 619,405 |
| Total All 911 Revenues | 93,145 | $ 27,012,000 | $ 8,810,000 | $ 35,822,000 | $ 22,334,000 | $ 13,488,000 | 37.7% | 100.0% | $ 7,036,423 |
| NETWORK New York Core | VOLUME | TRIP REVENUE | SUBSIDY REV | NET REVENUE | COS | Gross Profit | GM% | %Rev | EBITDA |
| MT SINAI | 44,012 | $ 13,203,724 | $ 485,000 | $ 13,688,724 | $ 10,230,543 | $ 3,458,181 | 25.3% | 64.0% | $ (711,842) |
| MONTEFIORE | 22,776 | $ 6,832,276 | $ 867,000 | $ 7,699,276 | $ 5,774,457 | $ 1,924,819 | 25.0% | 36.0% | $ (400,378) |
| Total All NY Core Revenues | 66,787 | $ 20,036,000 | $ 1,352,000 | $ 21,388,000 | $ 16,005,000 | $ 5,383,000 | 25.2% | 100.0% | $ (1,112,220) |
| Total New York 911 and Core | 159,931 | $ 47,048,000 | $ 10,162,000 | $ 57,210,000 | $ 38,339,000 | $ 18,871,000 | 33.0% | 100.0% | $ 5,924,203 |
| Growth 2016 vs. 2015 - All | | | | | | | | | |

| NETWORK New York 911 EMS | 2016 VOLUME | 2016 TRIP REVENUE | 2016 SUBSIDY REV | 2016 NET REVENUE | 2016 COS | 2016 Gross Profit | 2016 GM% | 2016 %Rev | 2016 EBITDA |
|---|---|---|---|---|---|---|---|---|---|
| MT SINAI | 26,563 | $ 7,703,384 | $ 2,724,107 | $ 10,427,491 | $ 5,963,583 | $ 4,463,908 | 40.4% | 27.4% | $ 2,073,125 |
| MONTEFIORE | 25,902 | $ 7,511,557 | $ 2,656,272 | $ 10,167,829 | $ 5,852,038 | $ 4,315,791 | 38.8% | 26.7% | $ 2,021,500 |
| BRONX LEBANON | 20,014 | $ 5,804,042 | $ 2,052,453 | $ 7,856,494 | $ 4,668,263 | $ 3,188,231 | 36.8% | 20.6% | $ 1,561,976 |
| ST BARNABAS | 16,013 | $ 4,643,899 | $ 1,642,197 | $ 6,286,096 | $ 3,824,835 | $ 2,461,261 | 35.3% | 16.5% | $ 1,249,760 |
| NYU MEDICAL CENTER | 8,542 | $ 2,477,119 | $ 875,970 | $ 3,353,089 | $ 2,144,280 | $ 1,208,809 | 32.0% | 8.8% | $ 666,639 |
| Total All 911 Revenues | 97,034 | $ 28,140,000 | $ 9,951,000 | $ 38,091,000 | $ 22,453,000 | $ 15,638,000 | 37.7% | 100.0% | #REF! |
| NETWORK New York Core | VOLUME | TRIP REVENUE | SUBSIDY REVENUE | NET REVENUE | COS | Gross Profit | GM% | %Rev | EBITDA |
| MT SINAI | 55,817 | $ 16,744,960 | $ 1,527,680 | $ 18,272,640 | $ 13,266,560 | $ 5,006,080 | 27.4% | 64.0% | $ 1,765,120 |
| MONTEFIORE | 31,397 | $ 9,419,040 | $ 859,320 | $ 10,278,360 | $ 7,462,440 | $ 2,815,920 | 27.4% | 36.0% | $ 992,880 |
| Total All NY Core Revenues | 87,213 | $ 26,164,000 | $ 2,387,000 | $ 28,551,000 | $ 20,729,000 | $ 7,822,000 | 27.4% | 100.0% | $ 2,758,000 |
| Total New York 911 and Core | 184,248 | $ 54,304,000 | $ 12,338,000 | $ 66,642,000 | $ 43,182,000 | $ 23,460,000 | 35.2% | 100.0% | #REF! |
| Growth 2016 vs. 2015 - All | 15.2% | 15.4% | 21.4% | 16.5% | 12.6% | 24.3% | | | #REF! |

CM_TC2018_0003376

**Region Rev-EBITDA By Month 2016**

| (amounts in thousands) | Year Ended 12/31/2014 | Actual Jan-15 | Actual Feb-15 | Actual Mar-15 | Actual Apr-15 | Actual May-15 | Actual Jun-15 | Actual Jul-15 | Actual Aug-15 | Actual Sep-15 | Plan Oct-15 | Plan Nov-15 | Plan Dec-15 | Year Ended 12/31/2015 | $ Change 15 vs. '14 | % Change 15 vs. '14 | Plan Jan-16 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **New York Revenues Core** | | | | | | | | | | | | | | | | | |
| NY Subsidy Core | 20,786 | 1,880 | 1,634 | 1,696 | 1,639 | 1,579 | 1,594 | 1,539 | 1,585 | 1,699 | 1,660 | 1,478 | 1,900 | 19,214 | (1,572) | -7.6% | 1,450 |
| Transit Revenues | 1,197 | 115 | 108 | 115 | 112 | 115 | 112 | 115 | 115 | 100 | 120 | 120 | 120 | 1,352 | 155 | 12.9% | 120 |
| Maryland Revenues | 30,053 | 2,511 | 2,533 | 2,855 | 2,803 | 2,294 | 2,778 | 2,648 | 2,421 | 2,380 | 2,000 | 1,900 | 1,900 | 29,523 | (540) | -1.8% | 1,900 |
| Main Line Revenues | 8,391 | 655 | 606 | 674 | 607 | 638 | 540 | 500 | 496 | 580 | 500 | 500 | 550 | 6,852 | (2,039) | -22.9% | 500 |
| Main Line Subsidy | 10,341 | 531 | 494 | 409 | 366 | 183 | 115 | 160 | 164 | 0 | 0 | 0 | 0 | 2,413 | (7,928) | -76.7% | 0 |
| Pittsburgh Revenues | 348 | 58 | 55 | 36 | 48 | 45 | 68 | 58 | 0 | 0 | 0 | 0 | 0 | 368 | 20 | 5.7% | 0 |
| Pittsburgh Subsidy | 7,250 | 612 | 560 | 535 | 540 | 515 | 500 | 490 | 489 | 515 | 480 | 480 | 480 | 6,202 | (1,048) | -14.5% | 480 |
| NY 911 Revenues | 618 | 51 | 52 | 52 | 54 | 54 | 54 | 54 | 51 | 51 | 51 | 51 | 51 | 626 | 8 | 1.3% | 51 |
| NY 911 Subsidy | 11,112 | 2,094 | 1,770 | 2,081 | 2,137 | 2,422 | 2,755 | 2,161 | 2,278 | 2,278 | 2,400 | 2,300 | 2,070 | 26,744 | (4,368) | -14.0% | 2,300 |
| Hudson Valley Revenues | 8,403 | 700 | 701 | 694 | 694 | 606 | 776 | 776 | 723 | 723 | 780 | 780 | 767 | 8,810 | 407 | 4.8% | 740 |
| Hudson Valley Subsidy | 8,052 | 855 | 768 | 777 | 764 | 818 | 816 | 752 | 726 | 860 | 720 | 820 | 820 | 9,496 | 544 | 6.1% | 820 |
| Billing Associates | 2,708 | 222 | 217 | 223 | 238 | 235 | 256 | 256 | 225 | 225 | 225 | 225 | 223 | 2,742 | 34 | 1.2% | 225 |
| | 452 | 41 | 36 | 42 | 39 | 36 | 26 | 27 | 29 | 35 | 35 | 27 | 35 | 410 | (42) | -9.4% | 27 |
| **All Revenues** | 131,122 | 10,325 | 9,534 | 10,180 | 10,042 | 10,130 | 10,570 | 9,536 | 9,287 | 9,437 | 8,911 | 8,685 | 8,318 | 114,752 | (16,370) | -12.5% | **8,648** |
| | | | | | | | | | | | | | | | | | **8,672** |
| | | | | | | | | | | | | | | | | | 54 |
| **New Mobile Products GM** | | | | | | | | | | | | | | | | | 15 |
| New York Gross Margin Core | 7,939 | 450 | 361 | 435 | 471 | 411 | 451 | 383 | 451 | 401 | 380 | 280 | 280 | 4,754 | (3,185) | -40.1% | 229 |
| Transit Gross Margin | 8,241 | 575 | 767 | 728 | 805 | 740 | 753 | 657 | 475 | 422 | 506 | 250 | 250 | 6,774 | (1,467) | -17.8% | 250 |
| Maryland Gross Margin | 2,249 | 75 | 82 | 142 | 99 | 77 | 18 | (56) | 29 | 113 | 12 | 25 | 25 | 661 | (1,588) | -70.6% | 15 |
| Main Line Gross Margin | 1,859 | (20) | 62 | (6) | 0 | (80) | (66) | 29 | 41 | (56) | 0 | 0 | 0 | (67) | (1,926) | -103.6% | 0 |
| Pittsburgh Gross Margin | 2,868 | 246 | 235 | 212 | 242 | 190 | 221 | 208 | 212 | 227 | 180 | 180 | 180 | 2,527 | (341) | -11.9% | 180 |
| NY 911 Gross Margin | 10,238 | 957 | 704 | 993 | 1,086 | 1,553 | 1,703 | 1,099 | 1,108 | 1,108 | 1,108 | 1,074 | 1,008 | 13,273 | 3,035 | 29.6% | 1,140 |
| Hudson Valley Gross Margin | 3,739 | 423 | 403 | 377 | 468 | 369 | 458 | 325 | 315 | 453 | 315 | 315 | 315 | 4,536 | 797 | 21.3% | 315 |
| Billing Associates | 439 | 42 | 36 | 42 | 39 | 35 | 26 | 27 | 29 | 21 | 21 | 21 | 21 | 360 | (79) | -18.0% | 20 |
| **Gross Margins** | 37,552 | 2,742 | 2,650 | 2,973 | 3,219 | 3,995 | 3,568 | 2,602 | 2,720 | 2,709 | 2,316 | 2,145 | 2,079 | 32,818 | (4,734) | -12.6% | 2,165 |
| % of revenue | 28.6% | 26.6% | 27.8% | 29.2% | 32.1% | 30.6% | 34.4% | 27.3% | 29.3% | 28.7% | 26.0% | 24.7% | 25.0% | 28.6% | (0) | -0.1% | 25.1% |
| **New Mobile Products EBITDA** | | | | | | | | | | | | | | **0** | | | **2** |
| New York EBITDA Core | 117 | (176) | (237) | (137) | (62) | (90) | (91) | (134) | 51 | (86) | (200) | (206) | (299) | (1,602) | (1,800) | -1533.5% | (160) |
| Transit EBITDA | 3,789 | 187 | 362 | 372 | 433 | 358 | 460 | 252 | 122 | 81 | 0 | 0 | 0 | 2,567 | (1,222) | -32.3% | 0 |
| Maryland EBITDA | 236 | (58) | (52) | 24 | (0) | (25) | (80) | (122) | (04) | 18 | (35) | (35) | (55) | (472) | (708) | -300.0% | (35) |
| Main Line EBITDA | (1,690) | (256) | (150) | (116) | (130) | (196) | (163) | (57) | (31) | (102) | 0 | 0 | 0 | (1,289) | 401 | 23.7% | 0 |
| Pittsburgh EBITDA | 647 | 36 | 36 | 38 | 59 | 43 | 48 | 41 | 47 | 52 | 0 | 0 | 0 | 415 | (232) | -35.9% | 23 |
| NY 911 EBITDA | 3,410 | 325 | 109 | 485 | 564 | 921 | 1,176 | 476 | 697 | 644 | 350 | 328 | 278 | 6,366 | 2,957 | 86.7% | 366 |
| Hudson Valley EBITDA | 812 | 177 | 169 | 175 | 239 | 170 | 228 | 56 | 86 | 227 | 150 | 50 | 50 | 1,837 | 1,025 | 126.2% | 100 |
| Corp OH | (6,278) | (530) | (502) | (361) | (408) | (440) | (403) | (440) | (315) | (566) | (467) | (509) | (500) | (5,804) | 474 | -7.5% | (500) |
| Billing Associates | (355) | (42) | (34) | (41) | (55) | (43) | (46) | (60) | (66) | (53) | (45) | (55) | (55) | (372) | (17) | 3.1% | (46) |
| **EBITDA** | 488 | (322) | (290) | 379 | 555 | 706 | 1,009 | 24 | 51 | 201 | (247) | (472) | (552) | 1,365 | 877 | 179.8% | (254) |
| % of revenue | 0.4% | -3.1% | -3.1% | 3.7% | 5.5% | 7.0% | 9.7% | 0.3% | 4.0% | 2.1% | -2.8% | -5.4% | -6.0% | 1.2% | | 0.0% | -2.9% |

CM_TC2018_0003376

A1006

22

Region Rev-EBITDA By Month 2016

| (amounts in thousands) | Plan Feb-16 | Plan Mar-16 | Plan Apr-16 | Plan May-16 | Plan Jun-16 | Plan Jul-16 | Plan Aug-16 | Plan Sep-16 | Plan Oct-16 | Plan Nov-16 | Plan Dec-16 | Plan 12/31/2016 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| New York Revenues Core | 1,438 | 1,541 | 1,507 | 1,833 | 2,081 | 2,024 | 2,267 | 2,235 | 2,208 | 2,315 | 2,195 | 23,218 |
| NY Subsidy Core | 120 | 120 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 2,160 |
| Transit Revenues | 1,900 | 1,900 | 2,000 | 2,000 | 2,200 | 2,200 | 2,300 | 2,300 | 2,300 | 2,300 | 2,300 | 25,600 |
| Maryland Revenues | 500 | 500 | 650 | 750 | 750 | 750 | 750 | 750 | 750 | 750 | 750 | 8,150 |
| Main Line Revenues | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Pittsburgh Revenues | 480 | 480 | 560 | 560 | 580 | 580 | 580 | 580 | 580 | 580 | 580 | 6,620 |
| Pittsburgh Subsidy | 51 | 51 | 51 | 51 | 51 | 51 | 51 | 51 | 51 | 51 | 51 | 612 |
| NY 911 Revenues | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,300 | 2,300 | 2,300 | 27,600 |
| NY 911 Subsidy | 740 | 740 | 740 | 740 | 740 | 740 | 740 | 740 | 740 | 740 | 740 | 8,880 |
| Hudson Valley Revenues | 820 | 820 | 820 | 842 | 842 | 842 | 842 | 842 | 842 | 842 | 842 | 10,016 |
| Hudson Valley Subsidy | 225 | 225 | 225 | 225 | 225 | 225 | 225 | 225 | 225 | 225 | 225 | 2,700 |
| Billing Associates | 27 | 27 | 35 | 35 | 35 | 35 | 35 | 33 | 35 | 35 | 35 | 398 |
| All Revenues | 8,686 | 8,779 | 9,318 | 9,686 | 10,154 | 10,147 | 10,515 | 10,483 | 10,516 | 10,588 | 10,465 | 117,954 |
|  | 8,995 | 9,175 | 9,755 | 10,087 | 10,358 | 10,342 | 10,505 | 10,543 | 10,581 | 10,644 | 10,644 | 120,281 |
| New Mobile Products GM | 45 | 45 | 90 | 90 | 90 | 120 | 135 | 135 | 135 | 150 | 150 | 1,200 |
| New York Gross Margin Core | 186 | 189 | 361 | 462 | 644 | 695 | 825 | 965 | 964 | 956 | 870 | 7,346 |
| Transit Gross Margin | 250 | 250 | 250 | 500 | 460 | 460 | 550 | 540 | 561 | 570 | 572 | 5,013 |
| Maryland Gross Margin | 15 | 50 | 90 | 90 | 120 | 93 | 99 | 120 | 120 | 120 | 120 | 1,043 |
| Main Line Gross Margin | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Pittsburgh Gross Margin | 180 | 180 | 180 | 240 | 260 | 240 | 240 | 240 | 240 | 240 | 240 | 2,660 |
| NY 911 Gross Margin | 1,140 | 1,140 | 1,140 | 1,140 | 1,240 | 1,200 | 1,194 | 1,140 | 1,140 | 1,140 | 1,140 | 13,894 |
| Hudson Valley Gross Margin | 350 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 4,666 |
| Billing Associates | 20 | 20 | 20 | 20 | 20 | 20 | 20 | 20 | 20 | 20 | 20 | 240 |
| Gross Margins | 2,186 | 2,274 | 2,531 | 2,742 | 3,234 | 3,228 | 3,454 | 3,560 | 3,580 | 3,590 | 3,512 | 36,062 |
| % of revenue | 25.2% | 25.9% | 27.2% | 28.3% | 31.8% | 31.8% | 32.8% | 34.0% | 34.0% | 34.0% | 33.6% | 30.6% |
| New Mobile Products EBITDA | 0 | 0 | 0 | 0 | 11 | 15 | 17 | 17 | 17 | 19 | 19 | 150 |
| New York EBITDA Core | (190) | (160) | 112 | 229 | 240 | 261 | 379 | 362 | 421 | 433 | 400 | 2,327 |
| Transit EBITDA | 0 | 0 | 0 | 0 | 104 | 125 | 125 | 125 | 125 | 125 | 125 | 854 |
| Maryland EBITDA | (35) | (35) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | (105) |
| Main Line EBITDA | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Pittsburgh EBITDA | 23 | 35 | 40 | 40 | 60 | 45 | 45 | 60 | 60 | 60 | 51 | 541 |
| NY 911 EBITDA | 326 | 368 | 384 | 452 | 700 | 680 | 695 | 780 | 760 | 780 | 699 | 7,010 |
| Hudson Valley EBITDA | 100 | 155 | 155 | 185 | 185 | 155 | 185 | 185 | 185 | 183 | 185 | 1,960 |
| Corp OH | (500) | (500) | (500) | (500) | (500) | (500) | (500) | (500) | (500) | (500) | (500) | (6,000) |
| Billing Associates | (40) | (40) | (40) | (40) | (40) | (40) | (45) | (40) | (45) | (40) | (50) | (578) |
| EBITDA | (318) | (190) | 154 | 349 | 752 | 733 | 898 | 981 | 1,040 | 1,054 | 928 | 6,159 |
| % of revenue | -3.7% | -1.8% | 1.7% | 3.6% | 7.4% | 7.2% | 8.5% | 9.4% | 9.9% | 10.0% | 8.9% | 5.2% |

A1007

CM_TC2018_0003376

Business Model By Month

| INCOME STATEMENT | Budget Jan-16 | Budget Feb-16 | Budget Mar-16 | Budget Apr-16 | Budget May-16 | Budget Jun-16 | Budget Jul-16 | Budget Aug-16 | Budget Sep-16 | Budget Oct-16 | Budget Nov-16 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| New Vehicles | 0 | 7 | 7 | 8 | 8 | 5 | 1 | 1 | 1 | 1 | 1 |
| In service vehicles | 173 | 180 | 187 | 195 | 203 | 208 | 209 | 210 | 211 | 212 | 213 |
| Average monthly revenue per v | $39,000 | $39,000 | $38,500 | $39,000 | $39,000 | $38,500 | $38,000 | $38,000 | $38,000 | $38,000 | $38,000 |
| Ambulance Revenue | 6,747,000 | 7,020,000 | 7,199,500 | 7,605,000 | 7,917,000 | 8,008,000 | 7,942,000 | 7,980,000 | 8,018,000 | 8,056,000 | 8,094,000 |
| Net Revenue (All) | $8,672,000 | $8,995,000 | $9,174,500 | $9,755,000 | $10,067,000 | $10,358,000 | $10,342,000 | $10,505,000 | $10,543,000 | $10,581,000 | $10,644,000 |
| Driver Compensation & Related | $4,569,440 | $4,542,475 | $4,495,505 | $4,779,950 | $4,832,160 | $4,971,840 | $4,922,792 | $5,000,380 | $5,018,468 | $5,036,556 | $5,066,544 |
| Dispatch, Customer Service | $301,034 | $312,118 | $321,108 | $341,425 | $352,345 | $362,530 | $361,970 | $367,675 | $369,005 | $336,975 | $339,720 |
| Fleet Compensation | $308,706 | $320,179 | $315,169 | $330,992 | $331,081 | $340,706 | $340,992 | $347,286 | $342,509 | $345,734 | $348,538 |
| Work Compensation Costs | $260,160 | $269,850 | $275,235 | $292,650 | $302,010 | $310,740 | $310,260 | $324,667 | $332,719 | $324,997 | $320,512 |
| Maintenance Costs | $248,751 | $257,909 | $253,871 | $266,614 | $266,676 | $274,418 | $274,646 | $279,691 | $275,904 | $278,449 | $280,717 |
| Other Fees, Insurances | $234,366 | $242,995 | $239,190 | $251,196 | $251,255 | $258,550 | $258,765 | $263,518 | $259,050 | $262,347 | $264,484 |
| Fuel, Tolls & Parking Costs | $225,472 | $233,870 | $238,537 | $253,630 | $261,742 | $269,308 | $268,892 | $273,130 | $274,118 | $275,106 | $276,744 |
| Medical Supplies, Rentals & Repairs | $72,397 | $75,075 | $73,902 | $77,614 | $77,645 | $79,912 | $79,982 | $81,481 | $80,303 | $81,109 | $81,758 |
| Communications | $35,107 | $36,431 | $35,869 | $37,678 | $37,718 | $38,844 | $38,885 | $39,674 | $38,951 | $39,472 | $39,765 |
| All Other COGS | $53,766 | $53,769 | $56,882 | $60,481 | $62,415 | $64,220 | $64,120 | $65,131 | $65,367 | $65,602 | $65,993 |
| SUB TOTAL - COST OF SERVICE | $6,249,289 | $6,346,671 | $6,305,268 | $6,692,230 | $6,775,046 | $6,971,068 | $6,921,504 | $7,042,633 | $7,057,294 | $7,046,347 | $7,093,775 |
| SUB TOTAL - GROSS PROFIT | $2,422,711 | $2,648,329 | $2,869,232 | $3,062,770 | $3,291,954 | $3,386,932 | $3,420,696 | $3,462,367 | $3,485,706 | $3,534,653 | $3,550,225 |
| % | 27.9% | 29.4% | 31.3% | 31.4% | 32.7% | 32.7% | 33.1% | 33.0% | 33.1% | 33.4% | 33.4% |
| Administrative Staffing | $1,023,296 | $1,007,440 | $1,027,544 | $1,075,000 | $1,075,000 | $1,075,000 | $1,075,000 | $1,075,000 | $1,075,000 | $1,075,000 | $1,075,000 |
| Facility Costs | 318,985 | 327,616 | 321,923 | 337,492 | 335,361 | 342,854 | 342,549 | 343,529 | 352,049 | 343,879 | 348,657 |
| Insurance Auto/Liability | 234,144 | 242,865 | 247,712 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 |
| Professional Fees | 140,000 | 140,000 | 140,000 | 140,000 | 140,000 | 140,000 | 140,000 | 140,000 | 140,000 | 140,000 | 140,000 |
| All Other SG&A | 286,176 | 296,835 | 302,759 | 321,915 | 332,211 | 341,814 | 341,286 | 346,665 | 347,919 | 340,173 | 351,252 |
| Bad Debt | 520,320 | 539,700 | 550,470 | 487,750 | 503,350 | 517,900 | 517,100 | 525,250 | 527,150 | 529,050 | 532,260 |
| TOTAL OPERATING EXPENSES | $2,522,021 | $2,554,456 | $2,590,407 | $2,612,157 | $2,635,922 | $2,667,568 | $2,665,935 | $2,680,444 | $2,692,188 | $2,687,102 | $2,697,109 |
| EBITDA CURRENT BUSINESS | ($99,310) | $93,873 | $278,825 | $450,613 | $656,031 | $719,364 | $754,760 | $781,922 | $793,588 | $847,550 | $883,116 |
| % | -1.1% | 1.0% | 3.0% | 4.6% | 6.5% | 6.9% | 7.3% | 7.4% | 7.5% | 8.0% | 8.0% |
| Interest Expense & Cap Lease | $429,018 | $433,219 | $437,344 | $442,093 | $446,751 | $449,045 | $451,464 | $451,730 | $451,981 | $452,437 | $452,457 |
| Depreciation | 155,077 | 155,077 | 155,077 | 155,077 | 155,077 | 155,077 | 155,077 | 155,077 | 155,077 | 155,077 | 155,077 |
| All other | 4,950 | 6,019 | 5,532 | 5,600 | 6,729 | 5,200 | 6,250 | 6,540 | 6,540 | 6,540 | 6,540 |
| Income Tax | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| NET INCOME with RECOVERY | ($688,356) | ($500,443) | ($319,128) | ($152,157) | $47,474 | $110,042 | $141,969 | $168,575 | $179,990 | $233,716 | $239,062 |
| % | -7.9% | -5.6% | -3.5% | -1.6% | 0.5% | 1.1% | 1.4% | 1.6% | 1.7% | 2.2% | 2.2% |

24

**Business Model By Month**

| INCOME STATEMENT | Budget Jan-16 | Budget Feb-16 | Budget Mar-16 | Budget Apr-16 | Budget May-16 | Budget Jun-16 | Budget Jul-16 | Budget Aug-16 | Budget Sep-16 | Budget Oct-16 | Budget Nov-16 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| New Vehicles | 0 | 7 | 7 | 8 | 8 | 5 | 1 | 1 | 1 | 1 | 1 |
| In service vehicles | 173 | 189 | 187 | 195 | 203 | 208 | 299 | 210 | 211 | 212 | 213 |
| Average monthly revenue per v | $39,000 | $39,000 | $38,500 | $39,000 | $39,000 | $38,500 | $38,500 | $38,500 | $38,500 | $38,000 | $38,000 |
| Ambulance Revenue | 6,747,000 | 7,020,000 | 7,199,500 | 7,605,000 | 7,917,000 | 8,008,000 | 7,942,000 | 7,980,000 | 8,018,000 | 8,056,000 | 8,094,000 |
| Cash | $100,000 | $100,000 | $100,000 | $100,000 | $100,000 | $100,000 | $100,000 | $100,000 | $100,000 | $100,000 | $100,000 |
| Accounts Receivable (Net of reserve) | $20,561,491 | $20,364,093 | $20,479,730 | $19,529,661 | $20,034,882 | $19,831,622 | $19,527,640 | $18,637,480 | $19,467,698 | $19,329,294 | $18,971,892 |
| Inventories | 1,200,000 | 995,350 | 995,350 | 1,535,900 | 1,515,900 | 1,524,156 | 1,375,836 | 1,375,836 | 1,875,000 | 1,875,000 | 1,875,000 |
| Prepaid Expenses | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 | 250,000 |
| Total Current Assets | $22,104,491 | $21,710,043 | $21,825,080 | $21,394,461 | $22,799,882 | $21,705,778 | $21,253,496 | $20,563,316 | $21,692,698 | $21,554,294 | $21,198,892 |
| PP&E (Net) | 53,104,486 | 53,901,445 | 54,595,286 | 55,413,760 | 56,256,777 | 56,591,310 | 56,916,708 | 56,879,517 | 56,819,843 | 56,707,429 | 56,752,562 |
| Goodwill | 13,547,506 | 13,547,506 | 13,547,506 | 13,547,506 | 13,547,506 | 13,547,506 | 13,547,506 | 13,547,506 | 13,547,506 | 13,547,506 | 13,547,506 |
| Other Assets | 6,205,085 | 6,205,085 | 6,205,085 | 6,205,085 | 6,205,085 | 6,205,085 | 6,205,085 | 6,205,085 | 6,205,085 | 6,205,085 | 6,205,085 |
| TOTAL ASSETS | $45,048,568 | $45,364,079 | $46,172,957 | $46,580,312 | $48,809,250 | $48,049,680 | $47,922,855 | $47,195,524 | $48,285,133 | $48,104,315 | $47,703,844 |
| Accounts Payable | $11,227,302 | $11,227,302 | $10,283,502 | $10,077,832 | $10,876,275 | $9,676,750 | $9,581,962 | $9,406,113 | $9,591,281 | $9,297,568 | $9,204,393 |
| Accrued Expenses | 1,856,940 | 1,856,940 | 2,503,450 | 2,569,801 | 2,568,121 | 2,486,158 | 2,414,460 | 2,479,683 | 2,614,220 | 2,752,617 | 2,897,701 |
| Accrued Compensated Absences | 605,581 | 605,581 | 605,581 | 605,581 | 605,581 | 605,581 | 605,581 | 605,581 | 605,581 | 605,581 | 605,581 |
| Line of Credit Borrowing | 16,034,895 | 17,336,089 | 17,741,544 | 17,775,401 | 19,769,585 | 18,027,632 | 18,374,866 | 18,020,307 | 19,012,423 | 18,656,761 | 16,985,246 |
| Current liabilities | $31,144,918 | $33,026,912 | $31,534,077 | $31,328,615 | $32,759,562 | $31,698,121 | $31,176,869 | $30,391,114 | $31,413,508 | $31,314,387 | $30,592,925 |
| Term Loans | | | | | | | | | | | |
| Capital Contribution | 40,895,483 | 40,895,483 | 40,895,483 | 40,895,483 | 40,895,483 | 40,895,483 | 40,895,483 | 40,895,483 | 40,895,483 | 40,895,483 | 40,895,483 |
| Capital Loan | 6,507,239 | 6,507,239 | 6,507,239 | 6,507,239 | 6,507,239 | 6,507,239 | 6,507,239 | 6,507,239 | 6,507,239 | 6,507,239 | 6,507,239 |
| Deferred Rent Payable | 1,049,488 | 1,043,447 | 2,264,288 | 3,029,762 | 3,770,779 | 3,771,607 | 4,224,065 | 4,113,914 | 4,001,139 | 3,885,726 | 3,767,658 |
| Deferred Tax Liability | 815,152 | 815,152 | 815,152 | 815,152 | 815,152 | 815,152 | 815,152 | 815,152 | 815,152 | 815,152 | 815,152 |
| TOTAL LIABILITIES | 3,821,396 | 3,821,396 | 3,821,396 | 3,821,396 | 3,821,396 | 3,821,396 | 3,821,396 | 3,821,396 | 3,821,396 | 3,821,396 | 3,821,396 |
| TOTAL LIABILITIES | 83,893,676 | 84,709,629 | 85,837,636 | 86,397,647 | 88,578,611 | 87,708,998 | 87,440,204 | 86,544,298 | 87,453,917 | 87,039,384 | 86,399,851 |
| Equity (Deficit) | (38,845,108) | (39,345,550) | (39,664,678) | (39,816,835) | (39,769,361) | (39,659,319) | (39,517,350) | (39,348,775) | (39,168,785) | (38,935,069) | (38,696,007) |
| TOTAL EQUITY | (38,845,108) | (39,345,550) | (39,664,678) | (39,816,835) | (39,769,361) | (39,659,319) | (39,517,350) | (39,348,775) | (39,168,785) | (38,935,069) | (38,696,007) |
| TOTAL LIABILITIES & EQUITY | 45,048,569 | 45,364,078 | 46,172,957 | 46,580,812 | 48,809,250 | 48,049,679 | 47,922,855 | 47,195,523 | 48,285,132 | 48,104,315 | 47,703,844 |
| Check: Assets - (Liab + Equity) = 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

| CASH FLOW STATEMENT | Budget Jan-16 | Budget Feb-16 | Budget Mar-16 | Budget Apr-16 | Budget May-16 | Budget Jun-16 | Budget Jul-16 | Budget Aug-16 | Budget Sep-16 | Budget Oct-16 | Budget Nov-16 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Net Income/(Loss) | (688,356) | (500,443) | (519,128) | (152,157) | 47,474 | 110,042 | 141,969 | 164,575 | 179,990 | 233,716 | 239,062 |
| Add back: Deprec. & Amortization | 155,077 | 155,077 | 155,077 | 155,077 | 155,077 | 155,077 | 155,077 | 164,575 | 155,077 | 155,077 | 155,077 |
| Bad debts | 520,320 | 539,700 | 550,470 | 487,750 | 503,581 | 517,000 | 517,100 | 528,250 | 527,150 | 529,950 | 532,200 |
| Deferred Tax Expense | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Changes in operating assets & liabilities | | | | | | | | | | | |
| Decrease/(Increase) in AR & Other | 636,950 | 186,799 | (115,037) | 950,269 | (1,405,421) | 1,103,260 | 103,962 | 890,180 | (850,219) | 130,404 | 355,403 |
| Decrease/(Increase) in Inventory | 11 | 204,650 | 0 | (519,650) | 0 | (9,156) | 148,320 | (200,000) | (299,104) | 0 | 0 |

CM_TC2018_0003376

Business Model By Month

| INCOME STATEMENT | Budget Jan-16 | Budget Feb-16 | Budget Mar-16 | Budget Apr-16 | Budget May-16 | Budget Jun-16 | Budget Jul-16 | Budget Aug-16 | Budget Sep-16 | Budget Oct-16 | Budget Nov-16 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| New Vehicles | 0 | 7 | 7 | 8 | 8 | 5 | 1 | 1 | 1 | 1 | 1 |
| In service vehicles | 173 | 180 | 187 | 195 | 203 | 208 | 209 | 210 | 211 | 212 | 213 |
| Average monthly revenue per v | $39,000 | $39,000 | $38,500 | $39,000 | $39,000 | $38,500 | $38,000 | $38,000 | $38,000 | $38,000 | $38,000 |
| Ambulance Revenue | 6,747,000 | 7,020,000 | 7,199,500 | 7,605,000 | 7,917,000 | 8,068,000 | 7,942,000 | 7,980,000 | 8,018,000 | 8,056,000 | 8,094,000 |
| Decrease/(Increase) in Pre-Paid | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Increase/(Decrease) in AP & Other | (4,144,201) | (1,542,653) | (691,561) | (1,084,564) | (1,377,714) | (612,772) | (464,034) | (407,072) | (129,628) | (119,345) | (107,024) |
| CASH FLOW FROM OPERATIONS | ($3,560,269) | ($5,756,870) | ($420,180) | ($163,275) | ($2,077,233) | $1,264,352 | $802,394 | $1,132,011 | ($396,795) | $936,903 | $1,174,718 |
| Purchase of Property and Equipment | $0 | $706,959 | $603,041 | $838,474 | 3,823,017 | $334,534 | $325,458 | ($537,151) | ($830,774) | ($342,413) | ($545,668) |
| Lease New Fleet Vehicles | (73,000) | (326,041) | (339,159) | (354,526) | (369,983) | (378,466) | (387,542) | (270,151) | (272,774) | (275,413) | (278,066) |
| Proceeds from Disposal of Assets | | | | | | | | | | | |
| CASH FLOW FROM INVESTING | ($73,000) | $380,917 | $354,683 | $483,948 | $453,034 | ($43,933) | ($862,085) | ($397,302) | ($312,549) | ($317,827) | ($323,135) |
| CASH FLOW BEFORE FINANCING | ($3,573,269) | ($375,953) | ($65,497) | $320,673 | ($1,624,200) | $1,220,419 | $740,309 | $824,709 | ($709,344) | $619,078 | $851,583 |
| Proceeds (Repay) of Line of Credit | ($532,309) | $401,994 | $404,656 | $33,857 | $1,394,183 | ($841,953) | ($552,766) | ($554,559) | $992,118 | ($343,665) | ($573,515) |
| Payments of Capital Lease Obligations | (73,000) | (326,041) | (330,159) | (354,526) | (369,983) | (378,466) | (387,542) | (270,151) | (272,774) | (275,413) | (278,066) |
| Proceeds (Pay down) Capital | | | | | | | | | | | |
| Proceeds from Term Loans | 4,179,239 | 300,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Deferred Financing Cost | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| CASH FLOW FROM FINANCING | $3,573,270 | $375,952 | $65,497 | ($320,669) | $1,624,200 | ($1,220,419) | ($740,309) | ($824,709) | $709,343 | ($619,078) | ($851,583) |
| BEGINNING CASH BALANCE | $100,001 | $100,000 | $100,000 | $100,000 | $100,000 | $100,000 | $100,000 | $100,000 | $100,000 | $100,000 | $100,000 |
| Net Change in Cash Balance | 0 | (0) | 0 | 4 | 0 | 0 | 0 | (0) | (0) | 0 | (0) |
| ENDING CASH BALANCE | $100,001 | $100,000 | $100,000 | $100,004 | $100,000 | $100,000 | $100,000 | $100,000 | $100,000 | $100,000 | $100,000 |

26

**Business Model By Month**

| INCOME STATEMENT | Budget Jan-16 | Budget Feb-16 | Budget Mar-16 | Budget Apr-16 | Budget May-16 | Budget Jun-16 | Budget Jul-16 | Budget Aug-16 | Budget Sep-16 | Budget Oct-16 | Budget Nov-16 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| New Vehicles | 0 | 7 | 7 | 8 | 8 | 5 | | | | | 1 |
| In service vehicles | 173 | 180 | 187 | 195 | 203 | 208 | 209 | 210 | 211 | 212 | 213 |
| Average monthly revenue per v | $39,000 | $39,000 | $38,500 | $39,000 | $39,000 | $38,500 | $38,000 | $38,000 | $38,000 | $38,000 | $38,000 |
| Ambulance Revenue | 6,747,000 | 7,020,000 | 7,199,500 | 7,605,000 | 7,917,000 | 8,008,000 | 7,942,000 | 7,980,000 | 8,018,000 | 8,056,000 | 8,094,000 |
| | | | | | | | | | | | |
| **Cost of Service components (% of Revenue)** | | | | | | | | | | | |
| Driver Compensation & Related | 52.0% | 50.5% | 49.0% | 49.0% | 48.0% | 48.0% | 47.6% | 47.6% | 47.6% | 47.6% | 47.6% |
| Dispatch, Customer Service | 3.5% | 3.5% | 3.5% | 3.5% | 3.5% | 3.5% | 3.5% | 3.5% | 3.5% | 3.2% | 3.2% |
| Fleet Compensation | 3.6% | 3.6% | 3.4% | 3.4% | 3.3% | 3.3% | 3.3% | 3.3% | 3.2% | 3.3% | 3.3% |
| Work Compensation Costs | 3.0% | 3.0% | 3.0% | 3.0% | 3.0% | 3.0% | 3.0% | 3.1% | 3.2% | 3.1% | 3.1% |
| Maintenance Costs | 2.9% | 2.9% | 2.8% | 2.7% | 2.6% | 2.6% | 2.7% | 2.7% | 2.6% | 2.6% | 2.6% |
| Other Fees, Insurance | 2.7% | 2.7% | 2.6% | 2.6% | 2.5% | 2.5% | 2.5% | 2.5% | 2.5% | 2.5% | 2.5% |
| Fuel, Tolls & Parking Costs | 2.6% | 2.6% | 2.6% | 2.6% | 2.6% | 2.6% | 2.6% | 2.6% | 2.6% | 2.6% | 2.6% |
| Medical Supplies, Rentals & Repairs | 0.8% | 0.8% | 0.8% | 0.8% | 0.8% | 0.8% | 0.8% | 0.8% | 0.8% | 0.8% | 0.8% |
| Communications | 0.4% | 0.4% | 0.4% | 0.4% | 0.4% | 0.4% | 0.4% | 0.4% | 0.4% | 0.4% | 0.4% |
| All Other GOGS | 0.6% | 0.6% | 0.6% | 0.6% | 0.6% | 0.6% | 0.6% | 0.6% | 0.6% | 0.6% | 0.6% |
| | | | | | | | | | | | |
| **SG&A components (% of Revenue)** | Budget Jan-16 | Budget Feb-16 | Budget Mar-16 | Budget Apr-16 | Budget May-16 | Budget Jun-16 | Budget Jul-16 | Budget Aug-16 | Budget Sep-16 | Budget Oct-16 | Budget Nov-16 |
| Administrative Staffing | 11.8% | 11.2% | 11.2% | 11.0% | 10.7% | 10.4% | 10.4% | 10.2% | 10.2% | 10.2% | 10.1% |
| Facility Costs | 3.7% | 3.6% | 3.8% | 3.8% | 3.3% | 3.3% | 3.3% | 3.3% | 3.3% | 3.2% | 3.3% |
| Insurance Auto/Liability | 2.7% | 2.7% | 2.7% | 2.6% | 2.5% | 2.4% | 2.4% | 2.4% | 2.4% | 2.4% | 2.3% |
| Professional Fees | 1.6% | 1.6% | 1.5% | 1.4% | 1.4% | 1.4% | 1.4% | 1.3% | 1.3% | 1.3% | 1.3% |
| All Other SG&A | 3.3% | 3.3% | 3.3% | 3.3% | 3.3% | 3.3% | 3.3% | 3.3% | 3.3% | 3.3% | 3.3% |
| Bad Debt | 5.2% | 5.2% | 5.2% | 5.0% | 5.0% | 5.0% | 5.0% | 5.0% | 5.0% | 5.0% | 5.0% |
| | | | | | | | | | | | |
| Term Loan - A | $26,070,964 | $26,070,964 | $26,070,964 | $26,070,964 | $26,070,964 | $26,070,964 | $26,070,964 | $26,070,964 | $26,070,964 | $26,070,964 | $26,070,964 |
| Term Loan - B | $3,500,000 | $3,500,000 | $3,500,000 | $3,500,000 | $3,500,000 | $3,500,000 | $3,500,000 | $3,500,000 | $3,500,000 | $3,500,000 | $3,500,000 |
| Term Loan - D | $2,961,053 | $2,961,053 | $2,961,053 | $2,961,053 | $2,961,053 | $2,961,053 | $2,961,053 | $2,961,053 | $2,961,053 | $2,961,053 | $2,961,053 |
| Term Loan - E | $850,000 | $850,000 | $850,000 | $850,000 | $850,000 | $850,000 | $850,000 | $850,000 | $850,000 | $850,000 | $850,000 |
| Term Loan - F | $3,417,120 | $3,417,120 | $3,417,120 | $3,417,120 | $3,417,120 | $3,417,120 | $3,417,120 | $3,417,120 | $3,417,120 | $3,417,120 | $3,417,120 |
| Total Opening Balance | $36,799,137 | $36,799,137 | $36,799,137 | $36,799,137 | $36,799,137 | $36,799,137 | $36,799,137 | $36,799,137 | $36,799,137 | $36,799,137 | $36,799,137 |
| Financing (Repayment/Borrowings) | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| | | | | | | | | | | | |
| **Additional Capital Contribution** | | | | | | | | | | | |
| Total Opening Balance | $0 | $3,646,269 | $3,646,269 | $3,701,994 | $4,050,925 | $735,847 | $6,045,108 | $735,847 | $6,045,108 | $735,847 | $7,027,226 |
| Financing (Repayment/Borrowings) | $3,646,269 | $701,994 | $404,656 | $33,853 | $1,994,183 | $0 | $0 | $0 | $982,118 | $0 | $0 |
| Ending Balance | $3,646,269 | $701,994 | $4,050,925 | $735,847 | $6,045,108 | $735,847 | $6,045,108 | $735,847 | $7,027,226 | $735,847 | $7,027,226 |

A1011

Business Model By Month

| INCOME STATEMENT | Budget Jan-16 | Budget Feb-16 | Budget Mar-16 | Budget Apr-16 | Budget May-16 | Budget Jun-16 | Budget Jul-16 | Budget Aug-16 | Budget Sep-16 | Budget Oct-16 | Budget Nov-16 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| New Vehicles | 0 | 180 | 187 | 195 | 203 | 208 | 209 | 210 | 211 | 212 | 213 |
| In service vehicles | 173 | | | | | | | | | | |
| Average monthly revenue per v | $39,000 | $39,000 | $38,500 | $39,000 | $39,000 | $38,500 | $38,000 | $38,000 | $38,000 | $38,000 | $38,000 |
| Ambulance Revenue | 6,747,000 | 7,020,000 | 7,199,500 | 7,605,000 | 7,917,000 | 8,008,000 | 7,942,000 | 7,980,000 | 8,018,000 | 8,056,000 | 8,094,000 |

| FUNDING INTEREST | Calculation Jan-16 | Calculation Feb-16 | Calculation Mar-16 | Calculation Apr-16 | Calculation May-16 | Calculation Jun-16 | Calculation Jul-16 | Calculation Aug-16 | Calculation Sep-16 | Calculation Oct-16 | Calculation Nov-16 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Average Balances** | | | | | | | | | | | |
| Term Loan - A | $26,070,964 | $26,070,964 | $26,070,964 | $26,070,964 | $26,070,964 | $26,070,964 | $26,070,964 | $26,070,964 | $26,070,964 | $26,070,964 | $26,070,964 |
| Term Loan - B | $3,500,000 | $3,500,000 | $3,500,000 | $3,500,000 | $3,500,000 | $3,500,000 | $3,500,000 | $3,500,000 | $3,500,000 | $3,500,000 | $3,500,000 |
| Term Loan - D | $2,961,053 | $2,961,053 | $2,961,053 | $2,961,053 | $2,961,053 | $2,961,053 | $2,961,053 | $2,961,053 | $2,961,053 | $2,961,053 | $2,961,053 |
| Term Loan - E | $850,000 | $850,000 | $850,000 | $850,000 | $850,000 | $850,000 | $850,000 | $850,000 | $850,000 | $850,000 | $850,000 |
| Term Loan - F | $2,350,000 | $2,350,000 | $2,350,000 | $2,350,000 | $2,350,000 | $2,350,000 | $2,350,000 | $2,350,000 | $2,350,000 | $2,350,000 | $2,350,000 |
| Term Loan - H | $110,243 | $110,243 | $110,243 | $110,243 | $110,243 | $110,243 | $110,243 | $110,243 | $110,243 | $110,243 | $110,243 |
| Additional Capital Contribution | $1,623,135 | $350,997 | $3,848,597 | $718,021 | $5,048,016 | $735,847 | $6,045,168 | $735,847 | $6,536,167 | $735,847 | $7,037,226 |
| ABL | $20,596,613 | $20,596,613 | $20,596,613 | $20,596,613 | $20,596,613 | $20,596,613 | $20,596,613 | $20,596,613 | $20,596,613 | $20,596,613 | $20,596,613 |
| **Interest Rate** | | | | | | | | | | | |
| Term Loan - A | 12.00% | 12.00% | 12.00% | 12.00% | 12.00% | 12.00% | 12.00% | 12.00% | 12.00% | 12.00% | 12.00% |
| Term Loan - B | 2.50% | 2.50% | 2.50% | 2.50% | 2.50% | 2.50% | 2.50% | 2.50% | 2.50% | 2.50% | 2.50% |
| Term Loan - D | 2.50% | 2.50% | 2.50% | 2.50% | 2.50% | 2.50% | 2.50% | 2.50% | 2.50% | 2.50% | 2.50% |
| Term Loan - E | 2.50% | 2.50% | 2.50% | 2.50% | 2.50% | 2.50% | 2.50% | 2.50% | 2.50% | 2.50% | 2.50% |
| Term Loan - F | 2.50% | 2.50% | 2.50% | 2.50% | 2.50% | 2.50% | 2.50% | 2.50% | 2.50% | 2.50% | 2.50% |
| Term Loan - H | 2.50% | 2.50% | 2.50% | 2.50% | 2.50% | 2.50% | 2.50% | 2.50% | 2.50% | 2.50% | 2.50% |
| Additional Capital Contribution | 2.50% | 2.50% | 2.50% | 2.50% | 2.50% | 2.50% | 2.50% | 2.50% | 2.50% | 2.50% | 2.50% |
| ABL | 6.00% | 6.00% | 6.00% | 6.00% | 6.00% | 6.00% | 6.00% | 6.00% | 6.00% | 6.00% | 6.00% |
| **Interest Expense** | | | | | | | | | | | |
| Term Loan - A | $260,710 | $260,710 | $260,710 | $260,710 | $260,710 | $260,710 | $260,710 | $260,710 | $260,710 | $260,710 | $260,710 |
| Term Loan - B | $7,292 | $7,292 | $7,292 | $7,292 | $7,292 | $7,292 | $7,292 | $7,292 | $7,292 | $7,292 | $7,292 |
| Term Loan - D | $6,169 | $6,169 | $6,169 | $6,169 | $6,169 | $6,169 | $6,169 | $6,169 | $6,169 | $6,169 | $6,169 |
| Term Loan - E | $1,771 | $1,771 | $1,771 | $1,771 | $1,771 | $1,771 | $1,771 | $1,771 | $1,771 | $1,771 | $1,771 |
| Term Loan - F | $4,896 | $4,896 | $4,896 | $4,896 | $4,896 | $4,896 | $4,896 | $4,896 | $4,896 | $4,896 | $4,896 |
| Additional Capital Contribution | $22,424 | $22,424 | $22,425 | $22,426 | $22,427 | $22,428 | $22,429 | $22,430 | $22,431 | $22,432 | $22,435 |
| ABL | $303,261 | $303,261 | $303,262 | $303,263 | $303,264 | $303,265 | $303,266 | $303,267 | $303,268 | $303,269 | $303,270 |

| CAPITAL LEASE SUMMARY | Budget Jan-16 | Budget Feb-16 | Budget Mar-16 | Budget Apr-16 | Budget May-16 | Budget Jun-16 | Budget Jul-16 | Budget Aug-16 | Budget Sep-16 | Budget Oct-16 | Budget Nov-16 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Existing Cap Lease Liability | $1,082,488 | $1,009,488 | $1,043,447 | $2,264,268 | $3,029,762 | $5,710,074 | $3,971,607 | $4,224,905 | $4,113,914 | $4,001,139 | $3,885,726 |
| Principal Payments on Opening Cap Leas | (73,000) | (73,000) | (73,000) | (73,000) | (73,000) | (73,000) | (73,000) | (73,000) | (73,000) | (73,000) | (73,000) |
| Additional Cap Leases | 0 | 960,000 | 960,000 | 1,120,000 | 1,120,000 | 640,000 | 640,000 | 160,000 | 160,000 | 160,000 | 160,000 |

CM_TC2018_0003376

A1012

26

Business Model By Month

| INCOME STATEMENT | Budget Jan-16 | Budget Feb-16 | Budget Mar-16 | Budget Apr-16 | Budget May-16 | Budget Jun-16 | Budget Jul-16 | Budget Aug-16 | Budget Sep-16 | Budget Oct-16 | Budget Nov-16 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| New Vehicles | 0 | 7 | 7 | 8 | 8 | 5 | 1 | 1 | 1 | 1 | 1 |
| In service vehicles | 173 | 180 | 187 | 195 | 203 | 208 | 209 | 210 | 211 | 212 | 213 |
| Average monthly revenue per v | $39,000 | $39,000 | $38,500 | $39,000 | $39,000 | $38,500 | $38,000 | $38,000 | $38,000 | $38,000 | $38,000 |
| Ambulance Revenue | 6,747,000 | 7,020,000 | 7,199,500 | 7,605,000 | 7,917,000 | 8,008,000 | 7,942,000 | 7,980,000 | 8,018,000 | 8,056,000 | 8,094,000 |
| Principal &Down Pay New Cap Leases | 0 | (253,041) | (266,150) | (281,526) | (296,083) | (305,466) | (314,542) | (197,151) | (199,774) | (202,413) | (205,068) |
| Ending Capital Leases Payable | $1,009,488 | $1,643,447 | $2,264,288 | $3,029,762 | $3,379,779 | $3,971,607 | $4,224,065 | $4,113,914 | $4,001,139 | $3,885,726 | $3,767,658 |
| Interest - Opening Capital Leases | ($40,759) | ($40,759) | ($40,759) | ($40,759) | ($40,759) | ($40,759) | ($40,759) | ($40,759) | ($40,759) | ($40,759) | ($40,759) |
| Interest - New Capital Leases | 0 | (4,200) | (8,324) | (13,071) | (17,729) | (20,022) | (22,440) | (22,705) | (22,955) | (23,190) | (23,409) |
| Interest Expense | ($40,759) | ($44,959) | ($49,083) | ($53,830) | ($58,488) | ($60,780) | ($63,199) | ($63,464) | ($63,714) | ($63,948) | ($64,168) |

29

CM_TC2018_0003376

| INCOME STATEMENT | Budget Dec-16 | Year Ended 12/31/2016 |
|---|---|---|
| New Vehicles | 0 | 0 |
| In service vehicles | 213 | 40 |
| Average monthly revenue per v | $38,000 | |
| Ambulance Revenue | 8,094,000 | |
| Net Revenue (All) | $10,644,000 | $120,280,500 |
| Driver Compensation & Related | $5,066,544 | $58,242,654 |
| Dispatch, Customer Service | $347,793 | $4,113,697 |
| Fleet Compensation | $356,838 | $4,028,820 |
| Work Compensation Costs | $334,481 | $3,667,281 |
| Maintenance Costs | $287,588 | $3,245,034 |
| Other Fees, Insurance | $270,769 | $3,057,384 |
| Fuel, Tolls & Parking Costs | $276,744 | $3,127,293 |
| Medical Supplies, Rentals & Repairs | $83,718 | $944,898 |
| Communications | $40,753 | $459,147 |
| All Other GO&S | $65,993 | $746,239 |
| SUB TOTAL - COST OF SERVICE | $7,131,022 | $81,631,947 |
| SUB TOTAL - GROSS PROFIT | $3,512,978 | $38,648,553 |
| % | 33.0% | 32.1% |
| Administrative Staffing | $1,075,680 | $12,733,280 |
| Facility Costs | 353,015 | $4,067,911 |
| Insurance Auto/Liability | 250,000 | $2,974,721 |
| Professional Fees | 140,999 | $1,680,000 |
| All Other SG&A | 151,252 | $3,969,257 |
| Bad Debt | 332,200 | 6,282,440 |
| TOTAL OPERATING EXPENSES | $2,702,367 | $31,707,608 |
| EBITDA CURRENT BUSINESS | $810,612 | $6,940,945 |
| % | 6.0% | 5.8% |
| Interest Expense & Cap Lease | $457,542 | $5,354,843 |
| Depreciation | 155,677 | $1,860,924 |
| All other | 6,540 | $72,980 |
| Income Tax | 0 | 0 |
| NET INCOME with RECOVERY | $191,453 | ($347,802) |
| % | 1.8% | -0.3% |

CM_TC2018_0003376

## INCOME STATEMENT

| INCOME STATEMENT | Budget Dec-16 | Year Ended 12/31/2016 |
|---|---|---|
| New Vehicles | 0 | 40 |
| In service vehicles | 213 | |
| Average monthly revenue per v | $38,690 | |
| Ambulance Revenue | 8,094,000 | |

| | Budget Dec-16 |
|---|---|
| Cash | $100,000 |
| Accounts Receivable (Net of reserve) | $16,726,075 |
| Inventory | 1,875,000 |
| Prepaid Expenses | 250,000 |
| Total Current Assets | $20,951,075 |
| PPE (Net) | $6,522,409 |
| Goodwill | 13,847,856 |
| Other Assets | 6,200,085 |
| TOTAL ASSETS | $47,233,076 |
| Accounts Payable | $9,112,351 |
| Accrued Expenses | $2,957,972 |
| Accrued Compensated Absences | 405,581 |
| Line of Credit Borrowing | 17,750,789 |
| Current liabilities | $30,226,653 |
| Term Loans | 40,895,483 |
| Capital Contribution | 6,507,239 |
| Capital Lease | 3,471,706 |
| Deferred Rent Payable | 815,152 |
| Deferred Tax Liability | 3,821,396 |
| TOTAL LIABILITIES | 85,737,629 |
| Equity (Deficit) | ($38,504,554) |
| TOTAL EQUITY | ($38,504,554) |
| TOTAL LIABILITIES & EQUITY | $47,233,075 |
| Check: Assets (Liab + Equity) = 0 | $0 |

## CASH FLOW STATEMENT

| CASH FLOW STATEMENT | Budget Dec-16 | Budget Year Ended 12/31/2016 |
|---|---|---|
| Net Income/(Loss) | $191,453 | ($347,802) |
| Add back: Deprec. & Amortization | 155,077 | $1,860,924 |
| Bad debts | 532,200 | $6,282,440 |
| Deferred Tax Expense | 0 | $0 |
| Changes in operating assets & liabilities | | |
| Decrease/(Increase) in AR & Other | 247,816 | $2,482,566 |
| Decrease/(Increase) in Inventory | 0 | ($675,000) |

CM_TC2018_0003376

A1015

Business Model By Month

| INCOME STATEMENT | Budget Dec-16 | Year Ended 12/31/2016 |
|---|---|---|
| New Vehicles | 0 | 40 |
| In service vehicles | 213 | |
| Average monthly revenue per v | $38,000 | |
| Ambulance Revenue | 8,094,000 | |
| Decrease/(Increase) in Pre-Paid | 0 | $0 |
| Increase/(Decrease) in A/P & Other | 22,807 | ($10,457,810) |
| CASH FLOW FROM OPERATIONS | $1,149,353 | ($854,990) |
| Purchase of Property and Equipment | ($222,952) | $3,334,923 |
| Lease New Fleet Vehicles | (295,952) | ($3,621,077) |
| Proceeds from Disposal of Assets | | |
| CASH FLOW FROM INVESTING | ($518,905) | ($236,153) |
| CASH FLOW BEFORE FINANCING | $630,449 | ($1,141,043) |
| Proceeds (Repay) of Line of Credit | ($334,497) | $282,885 |
| Payments of Capital Lease Obligations | (295,952) | ($3,621,077) |
| Proceeds (Pay down) Capital | | $0 |
| Proceeds from Term Loans | 0 | $4,479,239 |
| Deferred Financing Cost | | $0 |
| CASH FLOW FROM FINANCING | ($630,449) | $1,141,047 |
| BEGINNING CASH BALANCE | $100,000 | $100,001 |
| Net Change in Cash Balance | (0) | 3 |
| ENDING CASH BALANCE | $100,000 | $100,003 |

32

CM_TC2018_0003376

Business Model By Month

33

CM_TC2018_0003376

A1017

| INCOME STATEMENT | Budget Dec-16 | Year Ended 12/31/2016 |
|---|---|---|
| New Vehicles | 0 | 40 |
| In service vehicles | 213 | |
| Average monthly revenue per v | $38,000 | |
| Ambulance Revenue | 8,094,000 | |

| Cost of Service components (% of Revenue) | Budget Dec-16 | Budget Year Ended 12/31/2016 |
|---|---|---|
| Driver Compensation & Related | 47.6% | 48.4% |
| Dispatch, Customer Service | 3.3% | 3.4% |
| Fleet Compensation | 3.4% | 3.5% |
| Work Compensation Costs | 3.1% | 3.0% |
| Maintenance Costs | 2.7% | 2.7% |
| Other Fees, Insurances | 2.3% | 2.5% |
| Fuel, Tolls & Parking Costs | 2.6% | 2.6% |
| Medical Supplies, Rentals & Repairs | 0.8% | 0.8% |
| Communications | 0.4% | 0.4% |
| All Other COGS | 0.6% | 0.6% |

| SG&A components (% of Revenue) | Budget Dec-16 | Year Ended 12/31/2016 |
|---|---|---|
| Administrative Staffing | 10.1% | 10.6% |
| Facility Costs | 3.3% | 3.4% |
| Insurance Auto/Liability | 2.3% | 2.5% |
| Professional Fees | 1.3% | 1.4% |
| All Other SG&A | 3.3% | 3.3% |
| Bad Debt | 5.0% | 5.2% |

| | Budget Dec-16 | Year Ended 12/31/2016 |
|---|---|---|
| Term Loan - A | $26,070,964 | $26,070,964 |
| Term Loan - B | $3,500,000 | $3,500,000 |
| Term Loan - D | $2,961,053 | $2,961,053 |
| Term Loan - E | $850,000 | $850,000 |
| Term Loan - F | $3,417,120 | $3,417,120 |
| Total Opening Balance | $36,799,137 | $36,799,137 |
| Financing (Repayment)/Borrowings | $0 | $0 |
| | $36,799,137 | $36,799,137 |

| Additional Capital Contributions | | |
|---|---|---|
| Total Opening Balance | $735,847 | $7,027,226 |
| Financing (Repayment)/Borrowings | $0 | $4,762,120 |
| Ending Balance | $735,847 | $11,789,346 |

| INCOME STATEMENT | Budget Dec-16 | Year Ended 12/31/2016 |
|---|---|---|
| New Vehicles | 0 | |
| In service vehicles | 213 | 40 |
| Average monthly revenue per v | $38,000 | |
| Ambulance Revenue | 8,094,000 | |

| FUNDING INTEREST | Calculation Dec-16 | Calculation 12/31/2016 |
|---|---|---|
| **Average Balances** | | |
| Term Loan - A | $26,070,064 | $26,070,064 |
| Term Loan - B | $3,500,000 | $3,500,000 |
| Term Loan - D | $2,961,053 | $2,961,053 |
| Term Loan - E | $850,000 | $850,000 |
| Term Loan - F | $2,350,000 | $2,350,000 |
| Term Loan - H | $110,243 | $110,243 |
| Additional Capital Contribution | $735,847 | $9,408,286 |
| ABL | $20,596,613 | $20,596,613 |
| **Interest Rate** | | |
| Term Loan - A | 12.00% | 12.00% |
| Term Loan - B | 2.50% | 2.50% |
| Term Loan - D | 2.50% | 2.50% |
| Term Loan - E | 2.50% | 2.50% |
| Term Loan - F | 2.50% | 2.50% |
| Term Loan - H | 2.50% | 2.50% |
| Additional Capital Contribution | 2.50% | 2.50% |
| ABL | 6.00% | 6.00% |
| **Interest Expense** | | |
| Term Loan - A | $260,710 | $3,128,516 |
| Term Loan - B | $7,292 | $87,500 |
| Term Loan - D | $6,169 | $74,026 |
| Term Loan - E | $1,771 | $21,250 |
| Term Loan - F | $4,896 | $58,750 |
| Additional Capital Contribution | $22,434 | $260,140 |
| ABL | $103,271 | $3,639,182 |
| | $583,001 | $1,020,000 |

| CAPITAL LEASE SUMMARY | Budget Dec-16 | |
|---|---|---|
| Existing Cap Lease Liability | $3,767,658 | $1,082,488 |
| Principal Payments on Opening Cap Lease | (73,000) | (576,000) |
| Additional Cap Leases | 0 | $6,080,000 |

CM_TC2018_0003376

34

Business Model By Month

35

| INCOME STATEMENT | Budget Dec-16 | Year Ended 12/31/2016 |
|---|---|---|
| New Vehicles | 0 | 40 |
| In service vehicles | 213 | |
| Average monthly revenue per v | $38,000 | |
| Ambulance Revenue | 8,094,000 | |
| Principal &Down Pay New Cap Leases | (222,952) | (\$2,743,077) |
| Ending Capital Lease Payable | \$3,471,706 | \$3,541,411 |
| | | |
| Interest- Opening Capital Leases | (840,759) | (\$469,106) |
| Interest- New Capital Leases | (28,513) | (\$206,557) |
| Interest Expense | (\$69,271) | (\$675,664) |

CM_TC2018_0003376

A1019

Summary Table

| $ in thousands | 2014 | YTD Sept. | Oct. | Nov. | Dec. | 2015 | Jan. | Feb. | Mar. | Q1 2016 | Q2 2016 | Q3 2016 | Q4 2016 | 2016 | F/(U) $ Var. | F/(U) % Var. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Revenue | $131,122 | $88,841 | $8,911 | $8,681 | $8,318 | $114,752 | $8,672 | $8,995 | $9,175 | $26,842 | $30,180 | $31,390 | $31,869 | $120,281 | $5,529 | 4.8% |
| Cost of Service | 93,567 | 62,562 | 6,596 | 6,536 | 6,239 | 81,933 | 6,249 | 6,347 | 6,305 | 18,901 | 20,438 | 21,021 | 21,271 | 81,632 | 301 | 0.4% |
| Gross Margin | 37,555 | 26,279 | 2,316 | 2,145 | 2,079 | 32,818 | 2,423 | 2,648 | 2,869 | 7,940 | 9,742 | 10,369 | 10,598 | 38,649 | 5,227 | 15.9% |
| Gross Margin % | 28.6% | 29.6% | 26.0% | 24.7% | 25.0% | 28.6% | 27.9% | 29.4% | 31.3% | 29.6% | 32.3% | 33.0% | 33.3% | 32.1% | 3.5% | -0.8% |
| Operating Expenses | 37,067 | 23,642 | 2,563 | 2,617 | 2,631 | 31,453 | 2,522 | 2,554 | 2,590 | 7,667 | 7,916 | 8,038 | 8,087 | 31,708 | (255) | -0.8% |
| Op. Exp. (% of revenue) | 28.3% | 26.6% | 28.8% | 30.1% | 31.6% | 27.4% | 29.1% | 28.4% | 28.2% | 28.6% | 26.2% | 25.6% | 25.4% | 26.4% | -1.0% | |
| EBITDA (after mgmt. fees) | 488 | 2,636 | -247 | -472 | -552 | 1,365 | -99 | 94 | 279 | 273 | 1,826 | 2,330 | 2,511 | 6,941 | 5,575 | 408.3% |
| EBITDA Margin % | 1.3% | 3.0% | -2.8% | -5.4% | -6.6% | 1.2% | -1.1% | 1.0% | 3.0% | 1.0% | 6.1% | 7.4% | 7.9% | 5.8% | | 408.3% |
| Interest payments | (4,980) | (3,624) | (414) | (415) | (415) | (4,868) | (388) | (388) | (388) | (1,165) | (862) | (1,165) | (1,165) | (4,356) | (513) | 10.5% |
| Capital expenditures | - | 1 | - | - | - | 1 | - | 707 | 694 | 1,401 | 1,906 | 249 | (310) | 3,335 | (3,334) | -315408.3% |
| Capital lease payments | (996) | (367) | (114) | (114) | (114) | (708) | (114) | (371) | (388) | (873) | (1,292) | (1,002) | (1,047) | (4,214) | 3,506 | -95.1% |
| Free Cash Flow | (5,488) | (1,354) | (775) | (1,001) | (1,081) | (4,210) | (601) | 42 | 196 | (364) | 1,668 | 412 | (11) | 1,706 | 5,916 | -140.5% |
| **Summary Balance Sheet** | | | | | | | | | | | | | | | | |
| A/P (incl. PPAS/PPMG) | $15,174 | $12,882 | $13,104 | $13,988 | $13,298 | $13,298 | $11,948 | $11,228 | $10,284 | $10,284 | $9,679 | $9,391 | $9,112 | $9,112 | (4,185) | |
| Cumulative Change in A/P | 3,995 | - | 222 | 1,106 | 416 | 416 | (934) | (1,654) | (2,598) | (2,598) | (3,203) | (3,491) | (3,770) | (3,770) | | |
| PPAS Current Loans | $36,266 | $40,895 | $40,895 | $40,895 | $40,895 | $40,895 | $40,895 | $40,895 | $40,895 | $40,895 | $40,895 | $40,895 | $40,895 | $40,895 | - | |
| Proposed Loans | $0 | $0 | $750 | $750 | $2,028 | $2,028 | $6,207 | $6,507 | $6,507 | $6,507 | $6,507 | $6,507 | $6,507 | $6,507 | 4,479 | |
| ABL | $17,722 | $17,714 | $17,204 | $16,890 | $17,468 | $17,468 | $16,935 | $17,337 | $17,742 | $17,742 | $18,928 | $19,002 | $17,751 | $17,751 | 283 | |
| Total Debt | $53,988 | $58,610 | $58,850 | $58,535 | $60,391 | $60,391 | $64,038 | $64,740 | $65,144 | $65,144 | $66,330 | $66,405 | $65,153 | $65,153 | 4,762 | |

FYInc Stat 2015, 2016

| INCOME STATEMENT | AUDITED Year Ended ######### | Percent Rev | Actual Year Ended December 31, 2014 | Percent Rev | ESTIMATE December 31, 2015 | Percent Rev | $ Variance | % | BUDGET December 31, 2016 | Percent Rev | $ Variance | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Revenue Current Base | $136,186,424 | | $131,122,094 | | $114,751,777 | | -$16,370,317 | -12.5% | $118,280,500 | 98.3% | $3,528,723 | 3.1% |
| TOTAL REVENUES ALL | $136,186,424 | 100.0% | $131,122,094 | | $114,751,777 | 100.0% | -$16,370,317 | -12.5% | $120,280,500 | 100.0% | $5,528,723 | 4.8% |
| Direct Compensation | $63,440,141 | 46.6% | $64,522,178 | 49.2% | $58,659,176 | 51.1% | $3,863,002 | 9.1% | $58,242,654 | 50.8% | -$416,522 | -0.7% |
| Dispatch/Service Comp | 4,298,468 | 3.2% | 4,284,413 | 3.3% | 4,601,978 | 3.5% | $282,435 | 6.6% | 4,113,697 | 3.6% | $111,719 | 2.8% |
| Fleet Compensation | 3,852,104 | 2.8% | 4,420,558 | 3.4% | 4,319,033 | 3.8% | -$101,525 | 2.3% | 4,028,820 | 3.5% | -$290,213 | -6.7% |
| Work Compensation Costs | 4,683,202 | 3.4% | 6,195,305 | 4.7% | 3,388,227 | 3.0% | -$2,807,078 | -45.3% | 3,667,281 | 3.2% | $279,054 | 8.2% |
| Maintenance Costs (incl Real accidents) | 4,804,583 | 3.2% | 4,015,924 | 3.1% | 3,249,254 | 2.8% | -$766,570 | -19.1% | 3,245,034 | 2.8% | -$4,220 | -0.1% |
| Other Fees, Insurances | 2,923,729 | 2.1% | 3,335,573 | 2.5% | 3,220,273 | 2.8% | $115,300 | 3.5% | 3,057,384 | 2.7% | -$162,888 | -5.1% |
| Fuel, Tolls & Parking Costs | 4,738,719 | 3.5% | 4,469,241 | 3.4% | 3,027,178 | 2.6% | -$1,382,063 | -31.3% | 3,127,293 | 2.7% | $100,115 | 3.3% |
| Medical Supplies, Rentals/Repairs | 1,083,406 | 1.2% | 1,031,311 | 0.8% | 845,819 | 0.7% | -$185,492 | -18.0% | 944,808 | 0.8% | $99,079 | 11.7% |
| Communications | 562,382 | 0.4% | 557,646 | 0.4% | 505,068 | 0.4% | -$52,578 | -9.4% | 450,147 | 0.4% | -$45,921 | -9.1% |
| All Other COGS | 627,292 | 0.5% | 794,806 | 0.6% | 717,332 | 0.6% | -$77,474 | -9.7% | 745,739 | 0.6% | $28,408 | 4.0% |
| COST OF SERVICE CURRENT | $91,214,156 | 67.0% | $93,566,855 | 71.4% | $81,933,338 | 71.4% | -$11,633,517 | -12.4% | $81,631,947 | 69.0% | -$301,391 | -0.4% |
| GROSS PROFIT CURRENT | $44,972,268 33.0% | 33.0% | $37,555,239 28.6% | 28.6% | $32,818,439 28.6% | 28.6% | -$4,736,800 | -12.6% | $38,648,553 32.1% | 32.2% | $5,830,114 | 17.8% |
| Administrative Staffing ex. WC | $15,211,045 | 11.2% | $14,987,896 | 11.4% | $12,810,312 | 11.2% | -$2,157,584 | -14.4% | $12,733,280 | 10.6% | -$77,032 | -0.6% |
| Facility Costs (incl Real Esctate Tax) | 4,693,198 | 3.4% | 4,553,978 | 3.5% | 4,336,206 | 3.8% | -$217,772 | -4.8% | 4,067,911 | 3.4% | -$268,295 | -6.2% |
| Insurance - Auto & Liability | 3,120,207 | 2.3% | 3,215,959 | 2.5% | 2,903,017 | 2.5% | -$312,942 | -9.7% | 2,974,721 | 2.5% | $71,704 | 2.5% |
| Professional Fees | 2,202,487 | 1.6% | 2,151,721 | 1.6% | 1,663,898 | 1.4% | -$487,823 | -22.7% | 1,680,000 | 1.4% | $16,102 | 1.0% |
| All Other SG&A | 3,757,848 | 2.8% | 3,554,241 | 2.7% | 3,742,723 | 3.3% | $188,482 | 5.3% | 3,969,257 | 3.3% | $226,534 | 6.1% |
| Bad Debt | 8,741,435 | 6.4% | 6,622,981 | 6.0% | 5,996,806 | 5.2% | -$626,175 | 30.5% | 6,282,449 | 5.2% | $285,634 | 4.8% |
| TOTAL OPERATING EXPENSES | $37,726,220 | 27.7% | $37,066,776 | 28.3% | $31,452,962 | 27.4% | -$5,613,814 | -15.1% | $31,707,668 | 26.4% | $254,645 | 0.8% |
| EBITDA CURRENT BUSINESS | $7,246,048 | 5.3% | $488,463 | 0.4% | $1,365,477 | 1.2% | $877,013 | 179.5% | $6,940,945 | 5.8% | $5,575,469 | 408.3% |
| Interest Expense Debt PPAS | 3,012,000 | 2.9% | 3,012,000 | 3.0% | 3,027,106 | 3.5% | $115,106 | 2.9% | 3,660,000 | 3.0% | -$367,106 | -9.1% |
| Interest Expense Bank (Wells) | 840,000 | 0.0% | 840,000 | 0.6% | 875,242 | 0.8% | $35,242 | 4.2% | 1,020,000 | 0.8% | $144,758 | 16.5% |
| Interest & Lease Expense | 276,798 | 0.2% | 276,798 | 0.2% | 851,390 | 0.7% | $574,592 | 207.6% | 674,843 | 0.6% | -$176,547 | -20.7% |
| Depreciation & Amortization | 2,765,798 | 2.0% | 2,407,136 | 1.8% | 1,983,926 | 1.7% | -$424,310 | -17.6% | 1,860,924 | 1.5% | -$122,002 | -6.2% |
| All other | 63,815 | 0.0% | 154,505 | 0.1% | $64,533 | 0.1% | -$90,062 | 58.3% | $72,060 | 0.1% | $8,447 | 13.1% |
| Income Tax | $147,697 | 0.1% | 522,993 | 0.0% | $0 | 0.0% | -$22,993 | -100.0% | $0 | 0.0% | $0 | #DIV/0! |
| NET INCOME | ($757,970) | -0.6% | ($7,125,058) | -5.4% | ($6,435,720) | -5.6% | $689,339 | -9.7% | ($547,802) | -0.3% | $6,087,918 | -94.6% |

CM_TC2015_0003378

A1021

FY Bal. Sheet 2015, 2016

| BALANCE SHEET | Actual As of December 31, 2013 | Forecast As of December 31, 2014 | Plan As of December 31, 2015 | Budget As of December 31, 2016 |
|---|---|---|---|---|
| Cash | $330,511 | $218,984 | $100,000 | $100,000 |
| Accounts Receivable (Net) | 17,391,264 | 18,541,208 | $19,894,541 | $18,726,075 |
| Inventories | 1,326,894 | 1,346,561 | $1,200,000 | $1,875,000 |
| Prepaid Expenses | 1,329,883 | 476,065 | 250,000 | 250,000 |
| **Total Current Assets** | **$20,378,552** | **$20,582,818** | **$21,444,541** | **$20,951,075** |
| PPE (Net) | $5,325,933 | $4,869,331 | $3,194,486 | $6,529,409 |
| Goodwill | 13,547,506 | 13,547,506 | 13,547,506 | 13,547,506 |
| Other Assets | 6,377,936 | 6,280,701 | 6,205,085 | 6,205,085 |
| **TOTAL ASSETS** | **$45,629,927** | **$45,280,356** | **$44,391,618** | **$47,233,076** |
| Accounts Payable | $12,174,673 | $15,174,186 | $15,582,406 | $12,070,323 |
| Accrued compensated Absences | 1,668,055 | 1,686,715 | $855,581 | $405,581 |
| Line of Credit Borrowing | 14,534,110 | 17,722,256 | 17,467,864 | 17,750,749 |
| **Current liabilities** | **$28,376,838** | **$34,583,157** | **$33,905,851** | **$30,226,653** |
| Term Loans | $35,732,017 | $36,265,577 | $42,923,483 | $47,402,722 |
| Capital Lease | 1,969,135 | 1,988,223 | 1,082,488 | 3,471,706 |
| Deferred rent payable | 815,153 | 815,152 | 815,152 | 815,152 |
| Deferred tax liability | 3,821,396 | 3,821,396 | 3,821,396 | 3,821,396 |
| **TOTAL LIABILITIES** | **$70,714,539** | **$77,473,505** | **$82,548,370** | **$85,737,629** |
| Equity (Deficit) | ($25,084,612) | ($32,193,149) | ($38,156,752) | ($38,504,554) |
| **TOTAL SHAREHOLDERS EQUITY** | **($25,084,612)** | **($32,193,149)** | **($38,156,752)** | **($38,504,554)** |
| **TOTAL LIABILITIES & SHAREHOLDERS EQUITY** | **$45,629,927** | **$45,280,356** | **$44,391,618** | **$47,233,075** |

38

CM_TC2018_0003376

**FY Cash Flow 2015, 2016**

| CASH FLOW STATEMENT | AUDITED For the Year Ended December 31, 2013 | Forecast For the Year Ended December 31, 2014 | Plan For the Year Ended December 31, 2015 | Budget For the Year Ended December 31, 2016 |
|---|---|---|---|---|
| Net Income/(Loss) | ($757,820) | ($7,076,242) | ($6,759,805) | ($347,802) |
| Add back: Depreciation and Amortization | 2,766,570 | 2,405,476 | $1,923,906 | $1,060,924 |
| Bad debts | 8,741,435 | 8,656,129 | $5,996,806 | $6,282,440 |
| Deferred tax expense | 0 | (82,047) | $0 | $0 |
| Changes in operating assets & liabilities | | | | |
| Decrease/(Increase) in Accounts Receivable & Other Assets | (6,581,187) | (7,575,261) | ($3,433,679) | $2,482,366 |
| Decrease/(Increase) in Inventory | (98,599) | (19,667) | ($842,040) | ($673,000) |
| Decrease/(Increase) in Other Assets | (646,426) | 606,649 | $137,187 | $0 |
| Increase/(Decrease) in Accounts Payable | | | | |
| Accrued Expenses & Other Liabilities | 199,474 | 3,412,574 | ($2,399,755) | ($10,457,818) |
| CASH FLOW FROM OPERATIONS | $3,623,447 | $327,610 | ($6,366,780) | ($854,890) |
| Purchase PPE and CAPEX new Plant (Growth) | ($561,768) | ($579,412) | $0 | ($286,153) |
| Proceeds from disposal of assets | 101,573 | 0 | ($1,057) | $0 |
| CASH FLOW FROM INVESTING | ($460,195) | ($579,412) | ($1,057) | ($286,153) |
| CASH FLOW BEFORE FINANCING | $3,163,252 | ($251,802) | ($6,367,837) | ($1,141,043) |
| Proceeds from / (Repayment) of line of credit | ($1,745,801) | $482,589 | $2,281,492 | $262,885 |
| Payments of capital lease obligations | (1,525,351) | (998,071) | ($876,000) | ($3,621,077) |
| Proceeds from term loans (July Insurance Dpmnt) | 350,000 | 533,560 | $0 | $0 |
| Proceeds from new loans | 0 | | $4,872,902 | $4,479,239 |
| CASH FLOW FROM FINANCING | ($2,921,152) | $20,078 | $6,278,395 | $1,141,047 |
| BEGINNING CASH BALANCE | 588,411 | $330,511 | $189,442 | $100,001 |
| Net Change in Cash Balance | 242,100 | (231,724) | (89,442) | 2 |
| ENDING CASH BALANCE | $330,511 | $98,787 | $100,000 | $100,003 |

39

CM_TC2018_0003376

A1023