# 20 Civ. 06274 (LAK)

**United States District Court**

*for the*

**Southern District of New York**

_____

*IN RE TRANSCARE CORPORATION*, ET AL.

DEBTORS,

_____

PATRIARCH PARTNERS AGENCY SERVICES, LLC, ET AL.,

DEFENDANTS-APPELLANTS,

—against—

SALVATORE LAMONICA, AS CHAPTER 7 TRUSTEE OF THE JOINTLY-ADMINISTERED ESTATES OF TRANSCARE CORPORATION, ET AL.,

PLAINTIFF-APPELLEE.

_____

ON APPEAL FROM THE UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK (BERNSTEIN, J.)

IN RE: TRANSCARE CORPORATION, ET AL., CASE NO. 16-10407 (SMB)

LAMONICA V. TILTON, ET AL., ADV. PROC. NO. 18-1021 (SMB)

## APPENDIX TO BRIEF FOR THE APPELLANTS

# Volume X- A1129-A2345

# EXHIBIT 12

Page 1

1                    UNITED STATES BANKRUPTCY COURT
                      SOUTHERN DISTRICT OF NEW YORK
2
3       In Re:
4       TRANSCARE CORPORATION, et al.,
5                 Debtors,
        _____
6
7       SALVATORE LAMONICA, as Chapter 7      Chapter 7
        Trustee for the Estates of
8       TransCare Corporation, et al.,
9                 Plaintiff,
        v.                                    NO. 16-10407 (SMB)
10
        LYNN TILTON, PATRIARCH PARTNERS
11      AGENCY SERVICES, LLC, PATRIARCH
        PARTNERS, LLC, PATRIARCH PARTNERS     Adv. Proc.
12      MANAGEMENT GROUP, LLC, ARK II CLO     NO. 18-1021
        2001-1, LIMITED, ARK INVESTMENT
13      PARTNERS II, LP, LD INVESTMENTS,
        LLC, PATRIARCH PARTNERS II, LLC,
14      PATRIARCH PARTNERS III, LLC,
        PATRIARCH PARTNERS VIII, LLC,
15      PATRIARCH PARTNER XIV, LLC,
        PATRIARCH PARTNERS XV, LLC,
16      TRANSCEDENCE TRANSIT, INC. and
        TRANSCEDENCE TRANSIT II, INC.,
17
                  Defendants.
18      _____
19
20                    ***CONFIDENTIAL***
21           Videotaped Deposition of GLENN LELAND
22                        Volume I
23                  Knoxville, Tennessee
24                  November 27, 2018
25      Job No: 151750

Page 113

1                        GLENN LELAND

2              THE WITNESS:  Do you want the original?

3              MR. SAMET:  Just keep them in the pile for now.

4        I am going to want the originals.

5              MR. MERVIS:  What number?

6              MR. SAMET:  189.

7    BY MR. SAMET:

8        Q     Mr. Leland, review this document.  For the record

9    we've marked as Exhibit 189 an e-mail chain.  The top e-mail

10   in the chain is from Ms. Tilton to Mr. Leland, copying

11   others, dated February 10, 2015 at 4:06 p.m., has the Bates

12   range PP-TRBK0033683 to _685.

13             Same question as always:  Is this an e-mail chain

14   that you participated in?

15       A     It appears as such, February 10, 2015.

16       Q     When I say you participated on it, the first

17   e-mail on the chain is from Mr. Weinberger to Ms. Tilton.

18   You're not on that e-mail?

19       A     That's correct.

20       Q     All right.  So -- so what is this e-mail chain

21   about?

22       A     It appears that Mr. Weinberger, on behalf of RCA

23   Ambulance Services, reached out to Ms. Tilton -- it's not

24   clear in his e-mail, in my opinion, as to --

25             Oh, it says, "Interest in a sale or management

Page 114

1                                GLENN LELAND

2    takeover."

3              And so then Lynn forwarded this to me asking, do

4    you know these people?

5        Q    All right.  And you wrote -- it says what it

6    says, but you did know these people; correct?

7        A    I did not at the time.

8        Q    You didn't know them personally?

9        A    I didn't know them personally, no.

10       Q    Did TransCare have some dealings with them?

11       A    They are a competitor to TransCare.

12       Q    Okay.  You write that they are replacing you in a

13   highly unprofitable business?

14       A    Yes.  They -- RCA took over a particular contract

15   that we had with the Board of Education, which was our

16   single most unprofitable contract.

17       Q    By the way -- you might not know.

18             Do you recall if this is before or after you had

19   the in-person meeting with Ms. Tilton about the National

20   Express?

21       A    I don't.

22       Q    You asked to follow up with them to see what

23   they're contemplating?

24       A    She asked me, right --

25       Q    Why is it --

Confidential

Page 174

                    GLENN LELAND

1

2    A    So as you can see, I'm refreshing my memory here.

3         I told them we wouldn't be interested in

4    selling -- we wouldn't be interested in selling -- no one

5    would be interested in selling the good ones and keeping the

6    inferior ones, so it would have to be a strategy that would

7    fix all, and they were interested in buying the whole thing.

8         They suggested a multiple of eight and thought --

9    and they suggested that they thought the EBITDA was in the

10   10 to 12 range.

11        It was not at the time, as you've seen, and one

12   of the things where I did not correct that misnomer.

13   Q    Okay.  But they take it that -- the people

14   calling -- I assume these people also -- they're aware, to

15   your knowledge, of TransCare's cash crisis?

16   A    Yes.

17   Q    And in fact, as you've described, that's the

18   purpose of the calls that -- that you're getting on this

19   day?

20   A    They're -- what they're aware of at this point is

21   that the New York papers are reporting that TransCare has

22   missed its payroll, so that's what they know.  The rest is

23   their conjecture about what their perception is of

24   TransCare's stability, but they saw that as an indicator of

25   financial scarcity.

Case 1:20-cv-06274-LAK   Document 15-10   Filed 09/30/20   Page 7 of 1218

# EXHIBIT 13

| From: | Glenn Leland <glennl@transcare.com> |
|---|---|
| Sent: | Saturday, March 7, 2015 2:05 PM |
| To: | Lynn Tilton |
| Cc: | Jean Luc Pelissier; Michael Greenberg; Randy Jones; John Pothin; Brian Stephen; Mark Bonilla |
| Subject: | TransCare highlights March 1 to 7, 2015 |

Focus this week (and next several) is on execution of the stabilization plan and financing activities related to Wells Fargo, liquidity and on-going operations.

## Financing activities:

Emergency cash provided by Patriarch Partners (thank you!).

Unfortunately it was not received in time to fund payroll. ADP selected the TC ParaTransit payroll to hold for insufficient funds, despite our request to fund it first (all other payroll funded internally). We issued a statement to impacted employees. Depending on their bank, some employees received direct deposits on Saturday, but there are many who will not receive direct deposit until Monday. We have invited impacted employees to file an incident report if there are consequences of the delayed payroll, so we can assess the scale of impact and determine if any actions are viable.

Mark Bonilla and Michael Greenberg collaborated on cash flow analysis as well as information for Wells Fargo intended to result in a forbearance agreement this week. Expect a specific update Monday evening or Tuesday morning as we see what deposits are received in the first few days of the week.

There are several essential suppliers communicating escalation of supply chain or service interruption or eviction due to non-payment. Once again, expect an update to the cash flow for this upcoming week. The immediate threats this week in addition to our challenge with payroll until the stabilization plan effected are realized, are insurance and worker compensation. These coverages must be funded on 3/13 or TransCare faces irrevocable termination of coverage 3/15, and would cease to operate (auto insurance and workers compensation are required).

## Stabilization plan rollout:

We are making significant progress on execution of the stabilization plan. Highlights follow:

**Board of Education.** As planned the Board of Education contract ceased on March 1st and its operational assets were redeployed. This will have a significant impact on profitability.

The contract required 100% on time performance and represents about 60 transports per school day. So, we expected a decline in transport volume and deterioration in on time performance statistics this first week. In actuality, we experienced higher volume on other more profitable clients and essentially the same on time performance; which means our performance improved better than planned. We will begin to see these

1

EXHIBIT
226

PP-TRBK0071446

improvements in our operational dashboard next week (they are one week in arrears) and in the March financial reports.

**Reduction in Force.** Highlights of immediate actions executed this week:

*Corporate*

➢ VP Human Resources (Jeff Ellis) – off payroll effective 3/6 and to remain unfilled until stabilization is working

➢ VP Business Development – (Jim O'Connor replacement) –off payroll effective 2/20 and this will remain unfilled until stabilization plan is working

➢ Director Clinical Operations – budgeted position will not be filled

➢ 2 Billing positions – 1 eliminated as of 3/3; the other in approximately 2 weeks after transition of MD/ML billing to Corporate

➢ 1 financial analyst – budgeted position will not be filled

➢ 1 operations analyst – budgeted position will not be filled

*New York Operations*

➢ VP NYC Operations - budgeted position will not be filled

➢ Dispatch Manager – position eliminated and employee laid off effective 2/27

➢ ECC communications rep – position eliminated and employee laid off effective 3/2

➢ NYC 911 Logistics Runner - position eliminated and employee laid off effective 3/2

➢ NYC 911 Vehicle Mover - position eliminated and employee laid off effective 3/2

➢ ACR Scanner – position eliminated and employee laid off effective 3/3

➢ Unit hours eliminated as per plan. (This will phase in over next several weeks as we stabilize other changes, to preserve OTP to remaining customers)

*Main Line Operation*

➢ Regional Director Business Development – employee given 60 day WARN notice 3/2

➢ Director Operations - employee given 60 day WARN notice 3/2

➢ Base Manager - employee given 60 day WARN notice 3/2

➢ All employees given WARN notice 3/2

➢ 90-day contract termination issued to Main Line Health Systems. Working on accelerated transition.

2

PP-TRBK0071447

➢   Unit hours eliminated as per plan.  (This will phase in over next 60 to 90 days due to contract exit obligations)

*Maryland Operations*

➢   Billing Manager – position eliminated – notice given 3/2 – retaining employee 2 weeks for transition of operations to NY Billing

➢   Billers (7 positions) – all eliminated - notice given 3/2 – retaining employee 2 weeks for transition of operations to NY Billing

**Rollout communications.**  The management talking points (included in last week's report) were conveyed in person to management in Baltimore, Philadelphia and NYC Core, NYC EMS, TC ParaTransit and HQ.  Management and supervisors then orally communicating stabilization plan to all employees.  Message was well received and virtually all leaders commented that they are "on the bus".

Communications rollout (combined with client meetings) continues this upcoming week in the less impacted business units in Hudson Valley and Pittsburgh.

**Fleet reductions.**  Tom Fuchs has developed a fleet retirement and salvage plan.  31 vehicles were retired this week in NYC.  22 were retired in Maryland, Delaware and Pennsylvania. More will be retired this week.

Discussions are underway with several potential buyers of retired ambulances (minimal salvage value, but also looking for an efficient auto parts harvest process).  Arlene Menachem (KIN leasing) is considering accepting some vehicles as partial payment of overdue leases.

## Customer relations:

We continue to meet with customers to convey the stabilization plan impacts.  We have experienced an increase is transport volume during the first few days of the new plan, despite elimination of the large and unprofitable Board of Education contract.  Following are notable customer discussions:

**Metropolitan Transit Authority (MTA).**  The MTA has sent several follow up emails regarding the third party audit of FY2013.  We are awaiting the Wells Fargo forbearance agreement, and then a "comfort letter" to the auditor BDO.  Once that is completed, we will ask for approval of the Audit report, so we can get it to the MTA as soon as possible.

Inside sources at the MTA tell us that concerns of TransCare's financial stability are increasing within the MTA and the probability of contract renewal is declining.  Delays in the audit are the primary issue, but we also know that delayed payroll to our TC ParaTransit employees has been noted, and that several vendors and our landlord have complained directly to the MTA.  The situation is precarious.

MTA at the same time added several additional "vehicle service hours" to our service, which increase our February revenues about $200k over expectations.  However, we will not receive this payment until April, and observed an increase in labor cost to add the additional work.  This increases EBITDA, but of course has an adverse short-term working capital impact.

3

PP-TRBK0071448

**Mount Sinai.** Meeting with President and COO David Reich and several key staff members to discuss and resolve on time performance challenges. We conveyed our expectation of improved service thru the stabilization plan. Now will have bi-weekly performance progress updates. In the same Meeting Dr. Reich described the strategic focus of Mount Sinai as it adjusts to a new order following merger with two other major health systems. Hospital throughput and patient flow are top executive priorities (which make transportation reliability paramount). We also discussed several process flow innovations I introduced in Northern California, and there was great interest in further system redesign discussions. We agreed that the existing contract needs to change to reflect a new design and a new economic reality, and these design / contract revision discussions will begin in the next several weeks.

VP of ED and EMS, Dr. Carl Ramsay has asked for a meeting this upcoming Friday to review current NYC EMS operations. We anticipate criticism of scaled back quality improvement processes included in the November RIF. Insiders at Mount Sinai tell us that Dr. Ramsay is trying to gain support for taking over the EMS operation in-house, and this meeting will be an important relationship development discussion. I anticipate a set of QI commitments will come from the meeting.

**Main Line Health Systems.** Earl Kossuth and I met with our client and issued the 90-day contract termination notice. We discussed a more rapid exit strategy, which will require continued dialog.

**Manor Care SNF.** Earl Kossuth and I will meet with our Pittsburgh client to renegotiate service mix as well as rates.

## Key Performance Indicators (KPI):

Since KPI are a week in arrears, the changes in the stabilization plan are not yet reflected. So, to conserve time, I will not include the KPI this week, but instead will focus next week on the KPI and the impacts we are seeing from the stabilization plan, as well as the actions taken prior to the new stabilization plan.

## Other topics:

Two organizations continue to contact me to pursue acquisition of TransCare or its assets. I include this in this report because it is outside my authority to autonomously respond to these inquiries. I thought it best to convey these on-going options for your judgment:

**National Express.** You may recall this is a multi-national transit operation with market cap >$2B. They are interested in the MTA contract. They believe that concerns about TransCare's financial stability will result in non-renewal, and that eliminates any opportunity for them to enter the market. So, they are interested in buying our MTA business and have suggested an immediate purchase of $14 to 18MM (the contract has a viable assignment clause). National Express is prepared to make an immediate down payment this week (which could be used for both emergency cash needs and to accelerate the stabilization plan), if you so desire. National Express is also willing to buy all the assets of TransCare.

Obviously a loss of the MTA contract and its $3.5MM EBITDA would be a significant impact to on-going ambulance operations. But as you noted in a recent meeting, we are fighting for the life of our company and we might be more viable harvesting the value given the precarious nature of the contract renewal. My recommendation would be to wait until we see how the MTA responds to the BDO Audit, and what cash

4

PP-TRBK0071449

demands are realized mid-week. I recommend we remain prepared to capitalize on this opportunity as it may become our last and best alternative.

**Richmond County Ambulance (RCA).** This group emailed you directly several weeks ago, and then started communicating with me when they received no reply. They are interested to buy TransCare and have sent an email proposing $60 to $80MM as valuation.

My thought on this particular opportunity is that RCA must assume TransCare has EBITDA in the $10MM range. They mentioned on the phone they are using an 8X multiple for valuations (which is high for the industry, but not outside reality). So, I think this opportunity is not likely to succeed and recommend we either reject any further inquiry or ask them to make a formal "as is" offer for a stipulated amount which exceeds negative equity. Let me know how you would like me to respond to their inquiries.


Thanks,

Glenn Leland, MBA
Chief Executive Officer



One Metrotech Center, 20th Floor, Brooklyn, NY 11201
M: 917-635-2900
O: 718-510-8181
F: 347-689-7326

**S**afety | **T**eam-based | **A**ttentive | **R**espectful | **C**ustomer accountable | **A**ppropriate | **R**easonable | **E**thical

please consider the environment before printing this email

*********************************Confidentiality Note*********************************
This E-Mail message is intended to be received by persons entitled to receive the confidential information it may contain. Please do not Read, Copy, Forward or Save this message unless you are the intended recipient. If you have received this message in error, please Forward it back to the Sender and Delete it completely from your computer system.
*****


**TransCare Corporation Confidentiality Note** This E-mail message is intended to be received by persons entitled to receive the confidential information it may contain. Please do not Read, Copy, Forward or Save this message unless you are the intended recipient. If you have received this message in error, Please Forward it back to the Sender and Delete it completely from your computer system.


Checked: By Barracuda Spam and Virus Firewall


5

PP-TRBK0071450

Case 1:20-cv-062747-AK    Documents1910    Filed 09/30/20    Page 13 of 1218

# EXHIBIT 14

| | |
|---|---|
| **From:** | Glenn Leland |
| **Sent:** | Thursday, July 9, 2015 7:55 PM |
| **To:** | Jean Luc Pelissier (CBA) |
| **Cc:** | Michael Greenberg; Jean Luc Pelissier; Scott Whalen |
| **Subject:** | Re: RCA offer to buy TransCare |

Of course not. I would follow the accelerated business plan and take away our supplier threats to continued operation (especially after this week) tune up our infrastructure, start to grow again, and get into a new market or two. Then I would go to PE or one of the big strategics

Company could be worth as much as $200M if we fix its problems. That means more capital, but the ROI is remarkable

Sent from my iPhone

> On Jul 9, 2015, at 7:50 PM, "pelissier@cbagroupllc.com" <pelissier@cbagroupllc.com> wrote:
>
> So Glenn, do you think this would make sense ?  Compared with driving the business up , paying some debt and driving a better payout ?
>
> This is of course a rethorical question.
> Best regards, Jean Luc
>
> Sent via BlackBerry by AT&T
>
> -----Original Message-----
> From: Michael Greenberg <Michael.Greenberg@PatriarchPartners.com>
> Date: Thu, 9 Jul 2015 23:45:55
> To: Jean Luc Pelissier<JeanLuc.Pelissier@PatriarchPartners.com>
> Cc: Glenn Leland<GlennL@transcare.com>; Scott
> Whalen<Scott.Whalen@PatriarchPartners.com>
> Subject: Re: RCA offer to buy TransCare
>
> Should be about 55mm.  Changes depending on borrowing base.
>
> Sent from my iPhone
>
>
>> On Jul 9, 2015, at 7:44 PM, "Jean Luc Pelissier" <JeanLuc.Pelissier@PatriarchPartners.com> wrote:
>>
>> How much debt is there on Transcare ?
>>
>> Sent via BlackBerry by AT&T
>>
>> -----Original Message-----
>> From: Glenn Leland <GlennL@transcare.com>
>> Date: Thu, 9 Jul 2015 19:21:34
>> To: Jean Luc Pelissier<JeanLuc.Pelissier@PatriarchPartners.com>
>> Cc: Michael Greenberg<Michael.Greenberg@PatriarchPartners.com>; Scott

1



EXHIBIT
99
10/24/18

PP-TRBK0030896

\>> Whalen<Scott.Whalen@PatriarchPartners.com>
\>> Subject: Re: RCA offer to buy TransCare
\>>
\>> Ok.
\>>
\>> Just wanted to forward it along.
\>>
\>> They are a lot smaller than TransCare but claim to have resources to pay 8x or $80 to 96M (less debt). If that's true might be worth considering.
\>>
\>> Let me know if you want us to do anything.
\>>
\>>
\>>
\>> Sent from my iPhone
\>>
\>>> On Jul 9, 2015, at 4:57 PM, Jean Luc Pelissier <JeanLuc.Pelissier@PatriarchPartners.com> wrote:
\>>>
\>>> I believe that he sent a mail to Lynn yesterday with the same
\>>> message
\>>>
\>>> From: Glenn Leland [mailto:glennl@transcare.com]
\>>> Sent: Thursday, July 9, 2015 2:44 PM
\>>> To: Jean Luc Pelissier; Michael Greenberg
\>>> Subject: RCA offer to buy TransCare
\>>>
\>>> Here is a forward of a message from a group interested in buying
\>>> TransCare Thanks,
\>>>
\>>> Glenn Leland, MBA
\>>> Chief Executive Officer
\>>>
\>>>
\>>> One Metrotech Center, 20th Floor, Brooklyn, NY 11201
\>>> M: 917-635-2900
\>>> F: 347-689-7326
\>>>
\>>> Safety | Team-based | Attentive | Respectful | Customer accountable
\>>> | Appropriate | Reasonable | Ethical P please consider the
\>>> environment before printing this email
\>>>
\>>> *********************************Confidentiality
\>>> Note*************************************
\>>> This E-Mail message is intended to be received by persons entitled to receive the confidential information it may contain. Please do not Read, Copy, Forward or Save this message unless you are the intended recipient. If you have received this message in error, please Forward it back to the Sender and Delete it completely from your computer system.
\>>> *****
\>>>
\>>>
\>>> ------ Forwarded Message
\>>> From: Mike Weinberger <mweinberger@rcambulance.co>

2

**A1142**

PP-TRBK0030897

>>> Date: Wed, 8 Jul 2015 19:20:37 +0000
>>> To: "glennl@transcare.com" <glennl@transcare.com>
>>> Subject: follow up
>>>
>>> Good afternoon Mr. Leland,
>>>
>>> Please allow me to introduce myself. My name is Mike Weinberger and I am the Chief Operating Officer for RCA Ambulance Service. I'm sending this email as an intention to acquire either part or all of Transcare Ambulance. The group I am representing currently owns and operates four ambulance companies as well as multiple paratransit companies. Below are the following companies that were either a startup or an acquisition by the group I am representing.
>>>
>>> 1)    Richmond County Ambulance- Richmond County Ambulance was acquired in April of 2012 and has since gone from producing a five million dollar revenue to a revenue of seventeen million dollars.
>>> 2)    Emergency Ambulance Service- In the last several years since our group has taken over the management of EAS the company has gone from 13 million in revenue to 23 million in revenue.
>>> 3)    Lifestar- Lifestar was acquired by Emergency Ambulance Service in late 2014, our plan is to retain all current employees and to expand the company exponentially.
>>> 4)    Guardian EMS- Guardian EMS was started with a single ambulance and in only a few short years is operating over 40 ambulances as well as many paratransit vehicles bringing the revenue to over eight million annually.
>>> 5)    Sinai Van Service- Sinai Van Service was started with one ambulette and now operates over 200 vehicles across the five boroughs. Sinai produces an annual revenue of sixteen million.
>>>
>>> RCA is pro-growth and we are looking to expand not only in the NYC area but across the northeast. We are not an equity firm, we are looking to purchase and operate while keeping most if not all the current staff. Our group has relationships with multiple facilities in the Pennsylvania and Maryland areas. Before getting into details on financials RCA is prepared to offer 8 times the EBITDA. RCA can restructure and rejuvenate the business throughout the Northeast and if given the opportunity we will do so. We would also consider an operational arrangement.
>>>
>>> Thank you for taking the time in reading this and I look forward to hearing back from you at your earliest convenience.
>>>
>>> Best,
>>>
>>>
>>> Mike Weinberger
>>> Chief Operating Officer
>>> RCA Emergency Medical Services
>>> 1355 Castleton Ave
>>> Staten Island, NY 10310
>>> Office: 718-273-7703 Ext: 240
>>> Fax: 718-273-3898
>>> Cell: 516-434-0606
>>>
>>>
>>>
>>>
>>> ------ End of Forwarded Message
>>>
>>> TransCare Corporation Confidentiality Note This E-mail message is intended to be received by persons entitled to receive the confidential information it may contain.  Please do not Read, Copy, Forward or Save this message unless you

3

PP-TRBK0030898

are the intended recipient.  If you have received this message in error, Please Forward it back to the Sender and Delete it completely from your computer system.
>>>
>>> Checked: By Barracuda Spam and Virus Firewall
>>
>> TransCare Corporation Confidentiality Note This E-mail message is intended to be received by persons entitled to receive the confidential information it may contain.  Please do not Read, Copy, Forward or Save this message unless you are the intended recipient.  If you have received this message in error, Please Forward it back to the Sender and Delete it completely from your computer system.
>>
>> Checked: By Barracuda Spam and Virus Firewall

TransCare Corporation Confidentiality Note This E-mail message is intended to be received by persons entitled to receive the confidential information it may contain.  Please do not Read, Copy, Forward or Save this message unless you are the intended recipient.  If you have received this message in error, Please Forward it back to the Sender and Delete it completely from your computer system.

Checked: By Barracuda Spam and Virus Firewall

4

PP-TRBK0030899

# EXHIBIT 15

| | |
|---|---|
| **From:** | Glenn Leland |
| **Sent:** | Thursday, July 9, 2015 7:50 PM |
| **To:** | Michael Greenberg |
| **Cc:** | Jean Luc Pelissier; Scott Whalen |
| **Subject:** | Re: RCA offer to buy TransCare |

I used the earning they thought we have from my conversation (10 to 12M). Obviously our history is different and that is a touch better than our current run rate or budget. But it is well within our range in the accelerate business plan (ABP)

Debt on the ABP would grow to $63m

Sent from my iPhone

> On Jul 9, 2015, at 7:45 PM, Michael Greenberg <Michael.Greenberg@PatriarchPartners.com> wrote:
>
> Should be about 55mm.  Changes depending on borrowing base.
>
> Sent from my iPhone
>
>
>> On Jul 9, 2015, at 7:44 PM, "Jean Luc Pelissier" <JeanLuc.Pelissier@PatriarchPartners.com> wrote:
>>
>> How much debt is there on Transcare ?
>>
>> Sent via BlackBerry by AT&T
>>
>> -----Original Message-----
>> From: Glenn Leland <GlennL@transcare.com>
>> Date: Thu, 9 Jul 2015 19:21:34
>> To: Jean Luc Pelissier<JeanLuc.Pelissier@PatriarchPartners.com>
>> Cc: Michael Greenberg<Michael.Greenberg@PatriarchPartners.com>; Scott
>> Whalen<Scott.Whalen@PatriarchPartners.com>
>> Subject: Re: RCA offer to buy TransCare
>>
>> Ok.
>>
>> Just wanted to forward it along.
>>
>> They are a lot smaller than TransCare but claim to have resources to pay 8x or $80 to 96M (less debt). If that's true might be worth considering.
>>
>> Let me know if you want us to do anything.
>>
>>
>>
>> Sent from my iPhone
>>
>>> On Jul 9, 2015, at 4:57 PM, Jean Luc Pelissier <JeanLuc.Pelissier@PatriarchPartners.com> wrote:

1

**A1146**

PP-TRBK0030905

>>>
>>> I believe that he sent a mail to Lynn yesterday with the same
>>> message
>>>
>>> From: Glenn Leland [mailto:glennl@transcare.com]
>>> Sent: Thursday, July 9, 2015 2:44 PM
>>> To: Jean Luc Pelissier; Michael Greenberg
>>> Subject: RCA offer to buy TransCare
>>>
>>> Here is a forward of a message from a group interested in buying
>>> TransCare Thanks,
>>>
>>> Glenn Leland, MBA
>>> Chief Executive Officer
>>>
>>>
>>> One Metrotech Center, 20th Floor, Brooklyn, NY 11201
>>> M: 917-635-2900
>>> F:  347-689-7326
>>>
>>> Safety | Team-based | Attentive | Respectful | Customer accountable
>>> | Appropriate | Reasonable | Ethical P please consider the
>>> environment before printing this email
>>>
>>> ************************************Confidentiality
>>> Note*************************************
>>> This E-Mail message is intended to be received by persons entitled to receive the confidential information it may contain.  Please do not Read, Copy, Forward or Save this message unless you are the intended recipient.  If you have received this message in error, please Forward it back to the Sender and Delete it completely from your computer system.
>>> *****
>>>
>>>
>>> ------ Forwarded Message
>>> From: Mike Weinberger <mweinberger@rcambulance.co>
>>> Date: Wed, 8 Jul 2015 19:20:37 +0000
>>> To: "glennl@transcare.com" <glennl@transcare.com>
>>> Subject: follow up
>>>
>>> Good afternoon Mr. Leland,
>>>
>>> Please allow me to introduce myself. My name is Mike Weinberger and I am the Chief Operating Officer for RCA Ambulance Service. I'm sending this email as an intention to acquire either part or all of Transcare Ambulance. The group I am representing currently owns and operates four ambulance companies as well as multiple paratransit companies. Below are the following companies that were either a startup or an  acquisition by the group I am representing.
>>>
>>> 1)    Richmond County Ambulance- Richmond County Ambulance was acquired in April of 2012 and has since gone from producing a five million dollar revenue to a revenue of seventeen million dollars.
>>> 2)    Emergency Ambulance Service- In the last several years since our group has taken over the management of EAS the company has gone from 13 million in revenue to 23 million in revenue.

2

**A1147**

PP-TRBK0030906

>>> 3)    Lifestar- Lifestar was acquired by Emergency Ambulance Service in late 2014, our plan is to retain all current employees and to expand the company exponentially.

>>> 4)    Guardian EMS- Guardian EMS was started with a single ambulance and in only a few short years is operating over 40 ambulances as well as many paratransit vehicles bringing the revenue to over eight million annually.

>>> 5)    Sinai Van Service- Sinai Van Service was started with one ambulette and now operates over 200 vehicles across the five boroughs. Sinai produces an annual revenue of sixteen million.

>>>

>>> RCA is pro-growth and we are looking to expand not only in the NYC area but across the northeast. We are not an equity firm, we are looking to purchase and operate while keeping most if not all the current staff. Our group has relationships with multiple facilities in the Pennsylvania and Maryland areas. Before getting into details on financials RCA is prepared to offer 8 times the EBITDA. RCA can restructure and rejuvenate the business throughout the Northeast and if given the opportunity we will do so. We would also consider an operational arrangement.

>>>

>>> Thank you for taking the time in reading this and I look forward to hearing back from you at your earliest convenience.

>>>

>>> Best,

>>>

>>>

>>> Mike Weinberger

>>> Chief Operating Officer

>>> RCA Emergency Medical Services

>>> 1355 Castleton Ave

>>> Staten Island, NY 10310

>>> Office: 718-273-7703 Ext: 240

>>> Fax: 718-273-3898

>>> Cell: 516-434-0606

>>>

>>>

>>>

>>>

>>> ------ End of Forwarded Message

>>>

>>> TransCare Corporation Confidentiality Note This E-mail message is intended to be received by persons entitled to receive the confidential information it may contain.  Please do not Read, Copy, Forward or Save this message unless you are the intended recipient.  If you have received this message in error, Please Forward it back to the Sender and Delete it completely from your computer system.

>>>

>>> Checked: By Barracuda Spam and Virus Firewall

>>

>> TransCare Corporation Confidentiality Note This E-mail message is intended to be received by persons entitled to receive the confidential information it may contain.  Please do not Read, Copy, Forward or Save this message unless you are the intended recipient.  If you have received this message in error, Please Forward it back to the Sender and Delete it completely from your computer system.

>>

>> Checked: By Barracuda Spam and Virus Firewall

TransCare Corporation Confidentiality Note This E-mail message is intended to be received by persons entitled to receive the confidential information it may contain.  Please do not Read, Copy, Forward or Save this message unless you are the intended recipient.  If you have received this message in error, Please Forward it back to the Sender and Delete it completely from your computer system.

PP-TRBK0030907

Checked: By Barracuda Spam and Virus Firewall

4

**A1149**

PP-TRBK0030908

# EXHIBIT 16

Page 1

1          M. Greenberg - Confidential
2             UNITED STATES BANKRUPTCY COURT
3             SOUTHERN DISTRICT OF NEW YORK
    -------------------------------------------------x
4   In Re:
5   TRANSCARE CORPORATION, et al.        Case No.
                                         16-10407(SMB)
6             Debtors.
    -------------------------------------------------x
7   SALVATORE LAMONICA, as Chapter 7 Trustee for the Estates
    of TRANSCARE CORPORATION, et al.,
8
              Plaintiff,           Adv. Proc. No.
9                                  18-1021
          vs.
10
    LYNN TILTON, PATRIARCH PARTNERS AGENCY SERVICES, LLC,
11  PATRIARCH PARTNERS, LLC, PATRIARCH PARTNERS MANAGEMENT
    GROUP, LLC, ARK II CLO 2001-1, LIMITED, ARK INVESTMENT
12  PARTNERS II, L.P., LD INVESTMENTS, LLC, PATRIARCH PARTNERS
    II, LLC, PATRIARCH PARTNERS III, LLC, PATRIARCH PARTNERS
13  VIII, LLC, PATRIARCH PARTNERS XIV, LLC, PATRIARCH PARTNERS
    XV, LLC, TRANSCENDENCE TRANSIT, INC., and TRANSCENDENCE
14  TRANSIT II, INC.,
15            Defendants.
    -------------------------------------------------x
16        * * *  C O N F I D E N T I A L   * * *
17      CONFIDENTIAL VIDEOTAPED DEPOSITION OF
18              MICHAEL GREENBERG
19            New York, New York
20             October 10, 2018
21
22
23  Reported by:
24  THOMAS A. FERNICOLA, RPR
25  JOB NO. 149077

Page 229

1           M. Greenberg - Confidential

2    he could just help out in those discussions.

3        Q      Did you and Scott have any meetings

4    with management at the company TransCare?

5        A      No.  Phone calls but no meetings.

6        Q      Did you have a number of phone calls

7    with them?  One?  Two or more?  Do you recall?

8        A      Yes, definitely more than two.

9        Q      So at some point, Mr. Leland's

10   reporting to you that there's a crisis, and

11   there are customers and regulatory that are

12   asking questions based on the rampant rumors,

13   as he puts it; right?

14       A      Yes.

15       Q      And you already described that he

16   missed the payroll in July 2; right?

17       A      Yes.

18              MR. ROTBART:  I object to the form.

19       Q      You said the reason for that was

20   Wells Fargo's insistence on a million five

21   reserve?

22       A      Yes.

23       Q      What steps, if any, did you take at

24   this point to evaluate selling this company

25   off?

Page 230

1              M. Greenberg - Confidential

2        A      The challenge at that point in time,

3    and Glen alludes to it a little bit here,

4    where he says:

5              "They thought our EBITDA was in the

6    $10 to $12 million range.  I neither confirmed

7    nor denied.  Their trailing EBITDA at that

8    point in time was probably about neutral."

9              So, you know, my thinking in the

10   discussions is, you multiply zero times any

11   number and usually you're going to come out

12   with zero.

13             However, if, you know, you can make

14   an argument for where you believe the

15   company's potentially going, which is easier

16   with a startup than with a company that's more

17   mature, then maybe you can get some value of

18   the business.

19        MR. ROTBART:  One thing, you keep

20        saying missed payroll was July 2.  I think

21        it may be July 5.

22        MR. AMINI:  I stand corrected if

23        that's what it was.  I can't remember all

24        the dates.

25

# EXHIBIT 17

| From: | Lynn Tilton <Lynn.Tilton@PatriarchPartners.Com> |
| Sent: | Thursday, January 14, 2016 10:36 AM |
| To: | Marc Pfefferle <mpfefferle@carlmarks.com> |
| Cc: | Mark Claster <mclaster@carlmarks.com> |
| Subject: | RE: Carl Marks Advisors Status Update |

Most of the labor is direct labor.  Based on what you said to me, it means the mathematical models is flawed and we are continuing to pay people that are not actively creating revenues.



*Lynn Tilton*
Chief Executive Officer
Patriarch Partners, LLC
One Broadway, 5th Floor
New York, NY 10004
212-825-6772
212-825-2038 – FAX
Lynn.Tilton@PatriarchPartners.com
Web: www.patriarchpartners.com

**From:** Marc Pfefferle [mailto:mpfefferle@carlmarks.com]
**Sent:** Thursday, January 14, 2016 10:14 AM
**To:** Lynn Tilton
**Cc:** Mark Claster
**Subject:** RE: Carl Marks Advisors Status Update

Thanks and understand - one of first things we started looking at once we got into divisional reviews and saw the cash flows  - trying to get a good handle on expense cut opportunities.  For example, Baltimore is negative even after rate increase, but we need to do more work.


Sent from my Verizon Wireless 4G LTE smartphone


-------- Original message --------
From: Lynn Tilton <Lynn.Tilton@PatriarchPartners.Com>
Date: 01/14/2016 9:44 AM (GMT-05:00)
To: Marc Pfefferle <mpfefferle@carlmarks.com>
Cc: Mark Claster <mclaster@carlmarks.com>
Subject: RE: Carl Marks Advisors Status Update

I am struggling with the notion that payroll exceeds the revenues in the email that you sent. It would seem that one would immediately cut bodies to meet the lower revenue numbers.

CONFIDENTIAL

CM_TC2018_0001031



*Lynn Tilton*
Chief Executive Officer
Patriarch Partners, LLC
One Broadway, 5th Floor
New York, NY 10004
212-825-6772ers.
212-825-2038 – FAX
Lynn.Tilton@PatriarchPartners.com
Web: www.patriarchpartners.com

---

**From:** Marc Pfefferle [mailto:mpfefferle@carlmarks.com]
**Sent:** Thursday, January 14, 2016 7:44 AM
**To:** Lynn Tilton
**Cc:** Mark Claster
**Subject:** RE: Carl Marks Advisors Status Update

Lynn,

Thanks for your quick response.  This is what we have been concerned about since we got here – funding into a black hole so our focus has been on the size of the hole and once filled what the business can really generate.  Seems like there is a reason for the Company to exist, but the EBITDA numbers we were originally given are significantly overstated, so we are of course concerned about the economics.  We will have a more complete picture when Carl, Jon and Michael talk to Barbara today and Jon completes the forecast model with as much accuracy as possible given 4 days on the job fighting fires.

In addition to the points stated in my prior email, we have concerns that the move to Brooklyn operations to the Bronx will be disruptive (only question is how disruptive, in part based upon what eviction timeframe the court rules), but certainly a filing could delay the anticipated short term eviction.

We have a lot more work to do before our meeting tomorrow to give you as complete a picture as possible for decision making based on reality.

Thanks.

http://carlmarksadvis
ors.com/wp-
content/uploads/201
4/11/CMA_logo.png

**Marc L. Pfefferle**
Partner
212-909-8441 office
203-856-8400 cell
900 Third Avenue, 33rd Floor
New York, NY 10022

website | email | ✳ | ▦

*Driving success through change and growth*
**From:** Lynn Tilton [mailto:Lynn.Tilton@PatriarchPartners.Com]
**Sent:** Thursday, January 14, 2016 2:33 AM
**To:** Marc Pfefferle <mpfefferle@carlmarks.com>
**Cc:** Jean Luc Pelissier <JeanLuc.Pelissier@PatriarchPartners.com>; Randy Jones <Randy.Jones@PatriarchPartners.com>; Michael Greenberg <Michael.Greenberg@PatriarchPartners.com>; Mark Claster <mclaster@carlmarks.com>; Carl

Landeck <clandeck@carlmarks.com>; Jonathan Killion <jkillion@carlmarks.com>
**Subject:** RE: Carl Marks Advisors Status Update

Marc,
I am sorry if there was a misunderstanding on protocol. I am being asked to provide money and make decisions on the future of the company. I must have clarity and with immediacy on what is the situation. I need direct communication. Thank you for the email. I will read more carefully on the plane.

But it is essential that this business be able to generate more revenues than its cost of payroll or it is not a business that can be saved. I am not sure how it unraveled so quickly but it may just have gone too far.
I agree that we need to meet Friday. I do not want to keep funding into a black hole that cannot be filled or a company that cannot generate sufficient cash to cover its expenses.

It makes me sad but it is more important that I understand the reality before I fund more and more cash as I have to only fund losses over the last six months.
I have been a constant stop gap measure without a plan that drove the future.

I will read more carefully as I am rushing to pack and get to the airport. But bottom line is if we cannot find a way to create a business that has a future, with positive cash flow and the ability to pay its bills. Then sooner rather than later for me.

Lynn


 emailLogo


*Lynn Tilton*
Chief Executive Officer
Patriarch Partners, LLC
One Broadway, 5th Floor
New York, NY 10004
212-825-6772
212-825-2038 – FAX
Lynn.Tilton@PatriarchPartners.com
Web: www.patriarchpartners.com

---

**From:** Marc Pfefferle [mailto:mpfefferle@carlmarks.com]
**Sent:** Thursday, January 14, 2016 12:59 AM
**To:** Lynn Tilton
**Cc:** Jean Luc Pelissier; Randy Jones; Michael Greenberg; Mark Claster; Carl Landeck; Jonathan Killion; Marc Pfefferle
**Subject:** Carl Marks Advisors Status Update

Lynn,

Excuse us for not communicating earlier. We were under the impression that the protocol was to communicate through

---

CONFIDENTIAL
CM_TC2018_0001033

Jean-Luc, Randy and Michael, which the team has been doing regularly.  Here is our update which expands on the email that Randy sent to you around noon EST Wednesday.

Further, we would request time with you Friday morning at around 10am to present a more detailed update and review the financial model/plan which we have been working on, as well as provide you with our initial analysis of your request this evening for the cost of a BR filing versus the cost of bridging to a sale (which given the AP overhang might also be best done in the form of a 363 sale).

To begin with let us tell you what we have been doing since Monday:

Carl Landeck has been functioning as the CFO of TransCare ("TC").  His focus has been on:
- Getting up to speed on finance operations, processes and controls (and deficiencies of same)

- Understanding the true cash position, vendor situation, and what the immediate/next several months cash requirements of the Company are, emphasizing the daily/weekly forecast tools

- Understanding the borrowing base reporting requirements, data sources and formulas, and he now has working knowledge of revolver borrowing capacity

- Establishing communication link with Mellisa in Wells Boston office (on phone with Michael) and successfully preventing so far Wells implementing a block for payroll taxes and payroll float (both which could still happen if TC does not make upcoming payments)

- Getting immersed in ongoing vendor payment issues

- Along with Jon Killion, working with Michael Greenberg on financial and funding issues of the business

- He also participated in Monday meeting with NYSIP and Tuesday meeting led by Jean-Luc to introduce Carl Marks and get business updates

Jon Killion, who is a senior financial consultant, has been assisting Carl, attending described meetings above, and creating a more robust and flexible financial forecast model and plan. This model reflects input from the business update reviews Jon has been conducting with Michael and Carl.  So far, 3 of the 4 Division managers (including Transit) have spent a number of hours each discussing the current outlook for their operations.

As far as myself and Mark Claster, we have been overseeing the overall assignment scope and are providing restructuring guidance, recommendations and constituent negotiation support, so far investing more than a combined one day per week basis.  In addition to overseeing and guiding the work of Carl and Jon and working with the Patriarch TC team, to date we have spent several days actively participating in the NYSIP meeting and drafting of the response to Eric Madoff's subsequent email, participating in the management meeting at TC to discuss status of each Division, and advising on approach to various customers, and other business and cash flow issues. We have also had initial conversations with Wells and with their counsel Otterbourg about bringing money into the business on a "protected" basis, which the Patriarch team also has done. We recommend this be further pursued in the context of an overall plan.

After three days of work, we have reached some preliminary conclusions which unfortunately require a substantial amount of funding if the business is going to survive.  These are not wish list amounts that might have been asked of you in the past, but absolutely necessary in order to keep the business as an ongoing enterprise.

Carl's observation is that the business has recently been generating and was expected to continue generating approximately $1.5M-$1.6M base cash flow per week, plus the once a month ParaTransit/MTA cash flow (Note: even if cash flow is higher liquidity will remain a critical issue and with losses of customers or trip volume cash flow generation could fall below these levels). The monthly MTA and subsidy payments have already been received in January so our current baseline is $1.5M in cash collections generated in each of the next 3-4 weeks.  So far through Wed. this week, collections received this week are trending to the $1.2M-$1.3M level.

Against these levels of generated availability, weekly payroll and payroll tax amounts come to approximately $1.35M per week, leaving very little cash for other expenses in the coming 3-4 weeks.  Vendors have been stretched to the point

CM_TC2018_0001034

where some will no longer even work with TC on a COD basis. Some employees have been buying small $ parts on their own credit cards for a while now and all insurance companies have issued cancellation notices with effective dates in the next several business days.

As we see today, here are the most critical amounts that need to be paid, excluding term debt interest payments, in the context of an overall plan that we will discuss on Friday based upon the financial forecast that Jon and Carl have been working on.  However, we did want to point out the time urgency (this week) for several of these items:

- Funding of NYSIT payment plan (current cancellation date Tuesday January 19th, with Monday being a holiday)
- Friday payroll of $900K (anticipate Thurs/Friday availability will cover only $500K)
- Friday PR taxes of $465K plus PR taxes from last Friday of $465K (these are personal responsibility items for officers and also potentially Board members, and item Wells will almost certainly institute a block if not caught up)
- $335K Employee medical insurance to avoid cancellation by January 15
- $221K Auto insurance to avoid cancellation by January 15
- $143K Liability/Property Insurance to avoid cancellation by January 22
- $48K Santander and Signature Financial vehicle leases to avoid imminent repossession
- $50K NYS WC Class Action Defense (owe additional $75K) - imminent removal from coalition
- $77K Salisbury Settlement
- $73K Sez Foster Settlement
- $81K Milea – Brooklyn landlord in eviction proceedings
- $44K AT&T – Landline communications. Termination expected by January 31. Shut off Notice
- $10K Mordy attorney
- In addition, need to cover weekly fuel, rent, union dues, repairs & fleet maintenance and other business necessary operating expenses

As a final note, the situation with key staff in tenuous positions appears to include not only Rob Stuck, but we believe Barbara Santiago and likely others who are tired fighting a losing battle with customers and vendors and have lost most hope that a turnaround can be effected.  All efforts are being made to encourage these employees, but a quick and positive resolution is essential.

Thanks, the Carl Marks Advisors team looks forward to meeting with you Friday.

**Marc L. Pfefferle**
Partner
212-909-8441 office
203-856-8400 cell
900 Third Avenue, 33rd Floor
New York, NY 10022

website | email | | | | | |

*Driving success through change and growth*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------x
In re:                                           :
                                                 :
                                                 :
        TRANSCARE CORPORATION, et al.,           :        Chapter 7
                                                 :        Case No. 16-10407 (SMB)
                                                 :        (Jointly Administered)
                        Debtors.                 :
------------------------------------------------------------x
SALVATORE LAMONICA, as Chapter 7                 :
Trustee for the Estates of TransCare             :
Corporation, et al.,                             :
                                                 :
                        Plaintiff,               :
                                                 :        Adv. Proc. No. 18-1021 (SMB)
                - against -                       :
                                                 :
LYNN TILTON, PATRIARCH PARTNERS                  :
AGENCY SERVICES, LLC, PATRIARCH                  :
PARTNERS, LLC, PATRIARCH PARTNERS                :
MANAGEMENT GROUP, LLC, ARK II CLO                :
2001-1 LIMITED, TRANSCENDENCE                    :
TRANSIT, INC., and TRANSCENDENCE                 :
TRANSIT II, INC.,                                :
                                                 :
                        Defendants.              :
                                                 :
------------------------------------------------------------x

## DEFENDANTS' OPENING STATEMENT[1]

---

[1] The Defendants in this adversary proceeding are: Lynn Tilton, Patriarch Partners Agency Services, LLC ("PPAS"), Patriarch Partners, LLC ("Patriarch Partners"), Patriarch Partners Management Group, LLC ("PPMG"), Ark II CLO 2001-1, Limited ("Ark II"), Transcendence Transit, Inc. ("Transcendence Transit"), and Transcendence Transit II, Inc. ("Transcendence Transit II" and together with Transcendence Transit, "Transcendence").  As used herein, the term "Entity Defendants" refers collectively to all defendants except Tilton.

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

**I.**   Background ...................................................................................................4

**II.**   Count I (Breach of Fiduciary Duty of Loyalty and Good Faith) Fails .............................9

**III.**  Count IX (Stay Violation) and Count VII (Actual Fraudulent Transfer) Fail ..................15

**IV.**   Counts XIII (Limitation on Liens) and Count XIV (Turnover and Avoidance) Fail ........17

**V.**   Count III (Equitable Subordination) Fails .........................................................17

**VI.**   Counts IV, X, and XI Fail......................................................................................19

CONCLUSION...........................................................................................................20

i

Pursuant to this Court's July 10, 2019 Order [Dkt. 109], Defendants respectfully submit this Opening Statement.

1.      Defendant Lynn Tilton has a long and proven track record of rehabilitating companies in distress.  Unfortunately, not all turnarounds are successful.  TransCare Corporation and its wholly-owned subsidiaries (collectively, "TransCare" or the "Company") are an example of a business that, despite significant financial support and attention from Tilton, did not survive.  There are several reasons why, but none of them make Tilton or any of the Entity Defendants liable to TransCare.

2.      The Trustee claims that Tilton breached her duty of loyalty and good faith to TransCare.  Since this litigation began, the Trustee has advanced ever-evolving theories to support this claim.  At the core of these theories is the Trustee's spurious allegation that Tilton engaged in a premeditated scheme to "steal" TransCare's most valuable assets and put them in a new entity she would own and control.

3.      In his pleadings, the Trustee focused on third-party indications of interest in TransCare at various times during 2015 that Tilton chose not to pursue, implying that her decisions were motivated by a secret desire to later take for herself TransCare's most valuable assets.  In the Final Pre-Trial Order, the Trustee focused less on these indications of interest and primarily on Tilton's actions during February 2016,  contending that a corporate restructuring (including an Article 9 foreclosure by certain of TransCare's secured term lenders) was a "secret" asset theft scheme executed under the cover of darkness.

4.      As will become crystal clear during the course of the trial, there is simply no evidence supporting any of the theories peddled by the Trustee.  But there is compelling evidence demonstrating that Tilton (and all Defendants) at all times acted in good faith and did

1

not breach any of her fiduciary duties.  *First*, the evidence will show that Tilton's decision not to pursue third-party expressions of interest in TransCare's assets is (i) subject to the business judgment rule, because the undisputed timeline of events shows that the decision was not motivated by self-interest; and (ii) protected by the business judgment rule because the decision was well-informed and reasonable.

5.     *Second*, the evidence will show that the February 2016 restructuring at issue – which contemplated that certain assets would be foreclosed upon by PPAS, as agent for the Term Loan Lenders (defined below), and transferred to a new entity (the "OldCo/NewCo Restructuring") – was perfectly lawful.  Tilton developed the plan to try to save jobs and ensure that TransCare's asset-based lender, Wells Fargo, N.A. ("Wells Fargo"), would be repaid.  The plan was the product of fair dealing and was at a fair price.  The timing of the transaction was compelled by external forces – not any opportunism on Tilton's part.  The planning and negotiations were conducted openly with Wells Fargo with input from the parties' restructuring counsel and a third-party financial advisor that Wells Fargo required TransCare to hire.  TransCare executives were included in the restructuring discussions – nothing was done "in secret."

6.     The evidence will show that the price paid for the Subject Collateral (defined below) could not be unfair because, other than on paper, TransCare never lost control of the Subject Collateral.  Even assuming *arguendo*, that the price for a transaction that never materialized was relevant (and it is not), the price (a $10 million credit bid) was arrived at in a fair and thoughtful manner and was, in fact, fair to TransCare.  Critically, there is no evidence that TransCare lost value or suffered harm as a result of what was, in the end, a mere paper

2

transaction.

7.      In addition to the meritless fiduciary duty claim against Tilton, the Trustee asserts ten additional claims for relief predicated, in large measure, on allegations of inequitable conduct.  The facts adduced at trial will show that these claims are similarly meritless.

\*      \*      \*      \*      \*

8.      The Trustee's pleadings contain reckless accusations impugning Tilton's character and the character of those who worked closely with her.  They are particularly galling given that Tilton and her colleagues undertook *extraordinary* efforts to save TransCare during a time of distress.  In the two weeks leading up to TransCare's initial bankruptcy filings, Tilton and her team participated in an around-the-clock effort to attempt to save as many jobs as possible and wind down TransCare's relationship with Wells Fargo gracefully and gradually.[2]  What's more, in the year prior to TransCare's bankruptcy, Tilton loaned or authorized to be loaned to TransCare approximately $9 million to keep the Company alive, despite that she had no contractual or other legal obligation to do so.  Given the current condition of TransCare's estate, it is unlikely that any of that money will be recovered by Tilton.

9.      In short, far from engaging in wrongdoing, Tilton and her team (several members of which will testify at trial) invested untold money, time and resources to try to save the Company and the jobs it provided.  The Trustee's scurrilous contrary allegations are pure fiction.

---

[2] The evidence will also show that Tilton, aware of TransCare's obligations under the federal and state law WARN statutes (the "<u>WARN Acts</u>"), negotiated for an orderly 90-day wind-down of the "OldCo" business lines (which were not planned to continue operating) in a good faith effort to ensure TransCare complied with the WARN Acts.

3

## I.    Background

10.    TransCare was a medical transportation business.  From late 2014 to early 2016 (the "Relevant Time Period"), Tilton was its sole director and manager.  Employees of two of Tilton's companies, Patriarch Partners and PPMG, supported her in these roles.

11.    During the Relevant Time Period, Wells Fargo provided working capital funding under the terms of an asset-based loan agreement (the "Wells Fargo ABL Agreement"). TransCare also had a secured term-loan facility (the "Term Loan Agreement") with a consortium of term lenders (the "Term Loan Lenders"), some of which were affiliated with Tilton (including the Zohar Funds[3]) and others with no affiliation to Tilton (Credit Suisse and First Dominion). PPAS, a Tilton-controlled entity, was the administrative agent under the Term Loan Agreement.

12.    Pursuant to a security agreement with PPAS (the "PPAS Security Agreement"), TransCare granted PPAS, as administrative agent and for the benefit of the Term Loan Lenders, a senior secured lien on all of its assets.  PPAS's lien extended to the proceeds of any sale of the assets.  Pursuant to section 8 of the PPAS Security Agreement, PPAS was permitted to foreclose upon TransCare's assets upon an Event of Default (as defined in the Term Loan Agreement).

13.    By late 2014, TransCare faced liquidity constraints.  Due to concerns over then-management's performance, Tilton hired a new CEO, Glenn Leland, to lead TransCare's turnaround efforts.  By the start of 2015, TransCare was about six months behind in producing financial statements.  Moreover, as of February 2015, TransCare had no audited financial statements for 2013 or 2014.  Leland and other TransCare management created a stabilization

---

[3] The Zohar Funds consist of Zohar CDO 2003-1, Ltd., Zohar II 2005-1, Ltd., and Zohar III, Ltd.  During the Relevant Time Period, Patriarch Partners performed collateral manager duties, including monitoring and managing the loans made to TransCare by the Zohar Funds.  Tilton is the ultimate owner of the Zohar Funds.

4

plan that modestly improved TransCare's performance in the first half of 2015.

14.     From time to time during 2015, Tilton and Leland were contacted by other transportation companies, including competitors, about potentially purchasing some or all of TransCare's assets.  These were "blind" inquiries, as they were made by parties that had not performed any due diligence on TransCare.

15.     One company, National Express, inquired about purchasing the Company's paratransit business under its contract with the New York City Transit Authority (the "MTA Contract").  The paratransit business contributed most of the Company's EBITDA during the Relevant Time Period.  Pursuant to agreements with TransCare's secured lenders, any sale of the paratransit business would have required the consent of TransCare's secured lenders, including Wells Fargo, and the proceeds would have to be paid to those lenders to reduce TransCare's obligations to them.  They could not, without the consent of the secured lenders, be "reinvested" into the Company.

16.     Apparently unaware of this restriction on the use of proceeds from an asset sale, at various times in 2015 Leland recommended engaging with National Express to sell the paratransit business in order to provide cash to support other ongoing TransCare operations.[4] Tilton, however, understood that even if the secured lenders permitted such a transaction, TransCare would not survive stripped of its main source of revenue.  The paratransit business was at the time the economic heart of TransCare's business and provided the revenue necessary to support overall operations; with the heart removed the rest of the business would perish.  As a

_____

[4] The Trustee has designated dozens of excerpts from Leland's two-day deposition, most of which are irrelevant. The testimony of Defendants' live witnesses will show that Leland's testimony is not credible.

5

**A1166**

result, she declined to pursue National Express's indications of interest, or other indications of interest from TransCare's competitors. Instead, she decided to keep the Company intact, try to stabilize it, and then try to sell it "into strength" as a going concern.

17. Despite modest improvements in TransCare's performance in the first half of 2015, tension arose between TransCare and Wells Fargo. Importantly, in early July, Wells Fargo suddenly and without adequate notice restricted the amount of cash available to TransCare for working capital, causing the Company to miss payroll. The payroll miss had a negative impact on TransCare's subsequent financial performance. In October 2015, Wells Fargo issued a Notice of Non-Renewal to TransCare (the "Non-Renewal Notice"), under which the Wells Fargo Credit Agreement would expire in January 2016.

18. Tilton made efforts to repair the relationship with Wells Fargo. By mid-December 2015, Tilton, with the support of Wells Fargo, decided to explore a sale of TransCare through a marketed sale process. In the weeks that followed, Wells Fargo and Tilton negotiated the terms of a long-term forbearance to bridge to a sale of TransCare. Wells Fargo expressly conditioned this potential bridge funding on, among other things, the retention of a third-party financial advisor and the ability of that advisor to communicate directly with Wells Fargo.

19. As Wells Fargo required, TransCare hired Carl Marks Advisors Group ("CMAG") in early January 2016. CMAG reviewed or presented several restructuring plans to Tilton, none of which she approved or relied upon and all of which required her to contribute or loan millions of dollars in new working capital.

20. During this time, Tilton continued to authorize and provide emergency funding for TransCare. Loans were made by the Zohar Funds and pursuant to a new credit facility

6

entered into between TransCare and Ark II (Tilton's personal investment vehicle), in which Ark II agreed to commit up to $6.5 million to TransCare (the "Ark II Credit Agreement"). The business nonetheless continued to deteriorate, with customer defections occurring regularly.

21.    In February 2016, Tilton, with the assistance of TransCare's outside restructuring counsel, and in consultation with Wells Fargo, its restructuring counsel and CMAG, developed a plan to restructure TransCare: the OldCo/NewCo Restructuring. Tilton's plan called for simultaneously (i) forming new corporate entities (*i.e.*, Transcendence) to take over certain TransCare business lines through an Article 9 foreclosure sale, including the paratransit business under the MTA Contract, and (ii) winding down the other parts of TransCare in a bankruptcy proceeding over the course of 90 days. The restructuring was designed to repay all of TransCare's indebtedness to Wells Fargo and also save 700 jobs through the operation of the NewCo as a going concern. As part of this plan, Transcendence and the remaining TransCare (or "OldCo") business would enter into a Transition Services Agreement (the "TSA").

22.    Despite intense negotiations over many weeks, Tilton and Wells Fargo did not reach agreement on the funding of the wind-down of the OldCo businesses and Wells Fargo suddenly ceased lending to TransCare. On February 24, 2016, the paperwork for the Article 9 foreclosure by PPAS (as administrative agent) was executed.[5]

23.    As part of the Article 9 foreclosure, PPAS, as administrative agent, accepted certain TransCare assets (the "Subject Collateral") in satisfaction of $10 million owing under the Term Loan Agreement. Tilton valued the subject collateral at $10 million by (i) calculating the book value of the assets and (ii) cross-checking the book value against the total $22 million

---

[5] The evidence will show that, at that time, TransCare had ceased making interest payments as required under the Term Loan Agreement, which constituted an Event of Default (as defined therein).

acquisition price (*i.e.*, the $10 million credit bid plus $12 million in new funding (to be provided by one of Tilton's investment vehicles)), as a multiple of projected EBITDA, which Tilton estimated at about $2.5 - $2.75 million for 2016.[6]

24.    Later on February 24, 2016, the majority of the TransCare entities (the "Initial Debtors") filed chapter 7 petitions (the "Initial Petition Date").    Salvatore LaMonica ("LaMonica" or the "Trustee") was appointed chapter 7 trustee of the Initial Debtors' estates.

25.    On February 25, 2016, the parties, including LaMonica, engaged in discussions to determine whether and how the OldCo and NewCo business lines could continue to operate post-petition.  By day's end on February 25, PPAS and Wells Fargo were unable to reach agreement on whether and in what amount the respective secured lenders might provide payroll funding to OldCo employees.

26.    Efforts to get Transcendence up and running on February 25-26, 2016 also were frustrated, including by the Trustee, and Transcendence never took control of or operated the Subject Collateral.  Among other things, LaMonica's law partner directed the incoming president of Transcendence not to move a computer server from a TransCare building that was needed in order to operate the "NewCo" business.  As a result, NewCo was not able to operate at all.

27.    The Court entered an order on March 25, 2016 by which PPAS and Transcendence authorized the Trustee to sell at auction certain assets, including the Subject Collateral (the "Personal Property Stipulation").  The Personal Property Stipulation provided,

---

[6] Contrary to the Trustee's assertion (*see* Dkt 110 at 7), Tilton did not "value" the TransCare assets slated for Transcendence at $22 million.  The $22 million "value" was possible only with an investment of $12 million in new working capital to operate those assets as a going concern.  The evidence will show that on February 24, 2016, the assets that were foreclosed upon *had no going concern value*.  TransCare had no access to working capital and there is no evidence that anyone but Tilton would provide working capital.

8

*inter alia*, that PPAS's liens would attach to the net proceeds of sale in the same amount and priority as they existed on the Initial Petition Date.[7]  The auctioneer conducted auction sales which resulted in the ultimate distribution of about $800,000 to PPAS.  PPAS, in turn, paid that sum over to Ark II, an event that had no impact whatsoever on TransCare's estate.

## II.    Count I (Breach of Fiduciary Duty of Loyalty and Good Faith) Fails

28.    The Trustee's breach of loyalty and good faith claims are a moving target involving several possible theories.  Each theory is meritless; no matter which one the Trustee advances at trial, the evidence will not support it.

29.    ***Theory No. 1 Fails.***  The Trustee has alleged that Tilton's decision not to consider a sale of TransCare assets throughout 2015 was motivated by her desire to "take them for herself."  But he has no evidence of any such alleged plot and has the burden of overcoming the business judgment rule.

30.    Indeed, the timeline of events that Defendants will present at trial completely undermines his theory.  The Trustee focuses on suggestions by Leland between February and early December 2015 to pursue a sale of all or parts of TransCare.  The evidence will show that Tilton's proposal to Wells Fargo to restructure TransCare and operate certain of its businesses (including the paratransit business) through Transcendence was first conceived in February 2016, well *after* Leland suggested that assets be sold, and also *after* Wells Fargo made clear it was unwilling to continue as TransCare's ABL lender.

31.    The evidence will also show that Tilton contemplated pursuing a sale process for TransCare *after* she decided not to pursue the indications of interest Leland presented but *before*

---

[7] At Tilton's insistence, the Personal Property Stipulation provided that 20% of the sale proceeds would be carved out for the payment of employee wage claims.  (Personal Property Stipulation ¶ 3.)

9

conceiving the OldCo/NewCo Restructuring option. Specifically, she made this decision in mid-December 2015, with the support of Wells Fargo. It defies logic that, in December 2015, Tilton would have directed her team to conduct research for a potential sale process or negotiate the terms of a forbearance agreement with Wells Fargo to facilitate a sale process if Tilton was in the midst of pursuing a premeditated "scheme" to "steal" those same assets.

32. The evidence will also show that Tilton had good and valid reasons for not pursuing a sale of TransCare's assets, reasons that were unrelated to any personal interests. Regarding the MTA Contract, the paratransit operation was TransCare's most profitable business line, accounting for the lion's share of TransCare's EBITDA. Leland recommended the sale in spite of his belief that, in his own words, as a general business strategy, "selling the good parts of the business and keeping the bad parts of the business would not be wise." In contrast, Tilton understood the obvious consequence of losing such a large portion of TransCare's EBITDA—an immediate liquidation because the remaining Company would have been unable to pay its bills.

33. The Court will also hear evidence showing that Leland's stated reasons for wanting to pursue the sale were objectively wrong or based on concerns that never came to fruition. For example, although Leland apparently believed the sale proceeds could fund and stabilize the remaining TransCare business, TransCare's loan agreements with its secured lenders, including Wells Fargo, prohibited TransCare from selling any of its assets without lender consent. Even if the secured lenders consented to a sale, the proceeds would have to be paid to the secured lenders. In addition, Leland's fears in early 2015 that the MTA Contract might not be renewed were not realized, as the Contract was renewed in July 2015.

34. The evidence will also show that Tilton's decision not to explore "blind"

10

A1171

expressions of interest for the entire Company was a rational exercise of business judgment. For starters, due to a combination of factors, it would have been nearly impossible to sell TransCare at a reasonable price during the Relevant Time Period. The Court will learn that TransCare was publicly struggling when Tilton and Leland received these "feeler" inquiries. Leland described the situation as follows: "[A] lot of industry contacts started to express interest in TransCare's plight and ways to capitalize upon that." What's more, these "feelers" were made without the benefit of due diligence and, in the case of at least one party, premised on a serious misimpression of TransCare's earnings. Furthermore, even if it would have made business sense for TransCare to open its books to competitors, the evidence will show that there were no reliable or current financial statements to provide.

35.     ***Theory No. 2 Fails.*** The Trustee also theorizes that Tilton breached her fiduciary duties of loyalty and good faith by pursuing the OldCo/NewCo Restructuring. Because Tilton's actions in forming Transcendence and foreclosing on the Subject Collateral were the product of fair dealing and a fair price, the Trustee cannot prevail on this theory either.

36.     The evidence will show that the timing, negotiations and structure of the OldCo/NewCo Restructuring were fair and well-known to multiple parties. On timing, the cornerstone of the Trustee's claim is that Tilton "deprived TransCare of the ability to monetize TransCare's assets as a going concern" when she "execut[ed] the Transcendence transaction" in February 2016. (Final Pre-Trial Order ("FPTO") ¶ 182.) The Court will learn that by that time, however, *neither TransCare nor any subset of its assets could continue as a going concern absent millions of dollars in voluntary working capital financing.*

37.     The evidence will show the following:

11

- In October 2015, Wells Fargo had issued the Non-Renewal Notice, the Wells Fargo ABL Agreement was set to expire on January 31, 2016, and Wells Fargo had made clear to TransCare that it had no intention of continuing to fund the Company as a going concern.

- Wells Fargo would only commit to providing bridge funding to a sale if TransCare and Tilton acquiesced to several conditions, including, *inter alia*, her agreement to provide millions of dollars in immediate funding.[8]

- Although negotiations with Wells Fargo continued until right before these cases were filed and Tilton reasonably believed she would reach a forbearance agreement with Wells Fargo, TransCare lacked sufficient funds to continue operations and was dependent on Wells Fargo's willingness to continue to provide working capital.

- TransCare could not have attracted working capital from an outside lender in February 2016 because (i) TransCare's assets were already pledged in full to Wells Fargo and the Term Loan Lenders and (ii) any prospective lender would have been unable to perform adequate due diligence as TransCare did not have current unaudited financial statements and had no audited financial statements for 2014 or 2015.

38.     The evidence will also show that the OldCo/NewCo Restructuring was not developed in "secret." On the contrary, Tilton and her team engaged in an open and coordinated effort with CMAG, Wells Fargo and its counsel, and TransCare's management and the Company's restructuring counsel, to create a viable restructuring plan for TransCare. Wells Fargo encouraged these efforts, indicating to Tilton that it shared her desire to "find a joint solution to unwind more gracefully." CMAG also developed budgets for the NewCo business, analyzed financial aspects of the proposed Article 9 foreclosure, and assisted Tilton's team with the refinement of the NewCo models.[9] TransCare's restructuring counsel (Curtis Mallet) was engaged in a continued dialogue with counsel to Wells Fargo (Otterbourg) regarding the planned

---

[8] As a matter of law, Tilton had no fiduciary obligation to provide *any* money to TransCare, let alone the many millions of dollars necessary for it to continue operations. *See Thorpe v. CERBCO, Inc.*, No. 11713, 1993 WL 443406, at *7 (Del. Ch. Oct. 29, 1993).

[9] Under its retention agreement with TransCare, CMAG was (as Wells Fargo insisted) permitted to communicate directly with Wells Fargo. Following the filing of these chapter 7 cases, CMAG worked directly with Wells Fargo and the Trustee to collect TransCare's receivables.

12

carve-out of the NewCo assets.

39.     The evidence will also show that the OldCo/NewCo Restructuring was structured fairly.  As step one, PPAS (as administrative agent) would foreclose on and recover certain TransCare collateral (*i.e.*, the Subject Collateral) under UCC Article 9 and transfer those assets to Transcendence.[10]     Thereafter, Transcendence would, through Tilton's own voluntary financing, save jobs by operating new business lines with the Subject Collateral.  At the same time, TransCare's outstanding obligations to Wells Fargo would be satisfied through its continued collection of accounts receivable.  The OldCo business lines would be supported during the wind-down period through the TSA with Transcendence.

40.     Finally, the evidence will show that the OldCo/NewCo Restructuring turned out to be nothing more than a paper transaction.  The Court will see that although the paperwork for the Article 9 foreclosure was executed and TransCare was credited $10 million under the Term Loan Agreement, the Subject Collateral was never physically transferred.  Moreover, the Trustee was able to secure the Subject Collateral and liquidate or otherwise dispose of those assets pursuant to the Personal Property Stipulation.  Critically, the Trustee has no evidence that the foreclosure "devalued" the Subject Collateral.

41.     The Trustee also alleges the price paid for the Subject Collateral was not fair.  That is a red herring.  The price could not be unfair because the OldCo/NewCo Restructuring never materialized and TransCare never lost actual control of the Subject Collateral.  Regardless, the evidence will show that, even if the transaction had gone through, Tilton calculated the price fairly by performing a computation of book value and then cross-checking that $10 million

---

[10] Under the controlling loan agreements, PPAS, as administrative agent, had a right to foreclose on the Subject Collateral.  *See Odyssey Partners, L.P. v. Fleming Cos.*, 735 A.2d 386, 413–15 (Del. Ch. 1999).

13

amount with an assessment of prospective cash flow based on a multiple of EBITDA to ensure the amount made sense.

42.    ***Theory No. 3 Fails.***    The Trustee further theorizes that Tilton breached her fiduciary duties by not taking steps to comply with TransCare's obligations under the WARN Acts.  The evidence will show that Tilton was aware of and planned to account for TransCare's obligations under the WARN Acts at the time she was developing the OldCo/NewCo Restructuring.  The Court will learn that Tilton designed and negotiated with Wells Fargo an orderly wind-down for the OldCo business lines over the course of 90 days in an effort to ensure compliance with the WARN Acts.  TransCare was ultimately unable to issue WARN notices to all OldCo employees as initially planned due to the unforeseen halt in TransCare's operations when Wells Fargo ceased funding—not because Tilton adopted an "I don't care about the risks" attitude.

43.    ***No Evidence of Damages.***    The evidence will also show that the monetary damages the Trustee claims are impermissibly speculative and unsupported.  The Trustee argues that TransCare had a going-concern value on certain dates in January and February 2016 that was higher than the liquidation value.  But his purported expert's conclusions of "value" are speculative, unreliable, and based on cherry-picked evidence that the expert (Jonathan Arnold) received from Trustee's counsel and accepted at face value.

44.    Given the framing of the Trustee's claim (*i.e.*, that Tilton breached her fiduciary duty by engaging in self-dealing instead of "monetizing" TransCare by selling it (FPTO ¶ 182), the only (potentially) relevant question to ask is what the value of TransCare was *as it existed at the time* (in the winter of 2016), but for the alleged self-dealing.  However, Arnold proffers the

14

"value" of a hypothetical, fully restructured, future TransCare—*not* of TransCare as it existed when the restructuring plans he relies upon were created.

45.    Specifically, Arnold relies on two major assumptions that are not grounded in reality. *First*, he assumes that TransCare had immediate access to millions of dollars of additional capital. The evidence will show that TransCare was in no position by late 2015 to attract additional funding, let alone millions of dollars by January 2016, from any source other than Tilton. Indeed, CMAG recognized as much, as its proposed plans called for Tilton to provide the required funding. Putting aside that Tilton had no legal obligation to do so, the evidence will show that Tilton was understandably unwilling to provide such significant funding unless TransCare management or CMAG presented her with a reliable plan, which they never did.

46.    *Second*, Arnold assumes that TransCare would fully effectuate the turnaround that was contemplated in the restructuring plans selected for him by the Trustee's counsel.[11] The evidence will show that this assumption is not rational. For example, CMAG warned that "plan execution risk is high," TransCare had been losing money year after year since at least 2014, TransCare lacked reliable historical financial statements, and TransCare had been unable to successfully implement the three most recent turnaround plans it had adopted.

## III.    Count IX (Stay Violation) and Count VII (Actual Fraudulent Transfer) Fail

47.    The Trustee's claim for violation of the automatic stay is premised on the allegation that the Defendants interfered with the Trustee's ability to marshal estate property.

---

[11] The Trustee argues that Arnold was justified in relying on the restructuring plans his counsel gave to him because Tilton and Wells Fargo relied on them. But that is untrue; neither Tilton nor Wells Fargo relied on any of the three whole company plans Arnold used.

15

(FPTO ¶ 188.)  Because the Trustee has no evidence that Defendants did so or otherwise caused damages to TransCare's estates, he cannot prevail on Count IX of the Amended Complaint.

48.     The evidence will show that Defendants voluntarily worked with the Trustee to secure the Foreclosed Personal Property Assets so that they could be sold at auction.[12]  None of the Defendants refused to turn over any assets that were the subject of the Article 9 foreclosure.

49.     The Court will also learn that none of the Defendants' actions resulted in the physical transfer of any assets to another business or resulted in a loss of value of any estate property.  Following execution of the Article 9 documents, Defendants attempted, *but failed*, to secure assets *they believed in good faith had been part of the Article 9 foreclosure*, including a server, the MTA Contract, and other equipment and vehicles necessary for Transcendence's operations.[13]  In any case, as discussed in Section II, *supra*, there is no evidence the Subject Collateral was worth less to the Debtors due to the foreclosure than it would have been absent the foreclosure.

50.     The Trustee's actual fraudulent conveyance claim (Count VII) is also premised on the execution of the Article 9 paperwork.  The evidence will show that there is nothing for the Court to avoid or recover for the reasons already discussed: the Subject Collateral was never physically transferred, the foreclosure did not devalue the Subject Collateral and, consistent with the terms of the Personal Property Stipulation, PPAS and Transcendence cooperated with the Trustee so that the assets could be sold at auction.  20% of the net proceeds from the auction

---

[12] Foreclosed Personal Property Assets is defined in the Personal Property Stipulation as "certain of Debtors' personal property, including equipment, inventory, vehicles, and certain contracts" that PPAS accepted on behalf of the Term Loan Lenders and as set forth in the Article 9 paperwork.  (Personal Property Stipulation at 3.)
[13] The Trustee's complaint here is peculiar.  If, as the Trustee appears to contend, the Article 9 foreclosure was valid, these assets were not property of the Initial Debtors' estates and thus there could be no stay violation.

16

sales were carved-out and paid to the Trustee for the benefit of the Debtors' estates.[14]

## IV.  Counts XIII (Limitation on Liens) and Count XIV (Turnover and Avoidance) Fail

51.    In Count XIII, the Trustee alleges that PPAS's liens should not extend to post-petition proceeds of the Foreclosed Personal Property Assets because PPAS engaged in "inequitable conduct caus[ing] TransCare to liquidate to the detriment of its other creditors" (FPTO ¶ 190), and that the "equities of the case exception" thus applies.  The Trustee has no evidence to support his allegations.

52.    As a threshold matter, the evidence will show, and the Trustee concedes, that under the controlling loan agreements, PPAS's interest in TransCare's assets extends to proceeds of the underlying collateral.  (*See* Am. Compl. ¶ 172.)  Moreover, the Trustee has no evidence that the assets sold at auction, including the Foreclosed Personal Property Assets, increased in value after TransCare filed for bankruptcy or that, even if they did, the Trustee invested any unencumbered estate funds to enhance their value.

53.    The evidence will also show that that the sale proceeds the Trustee distributed to PPAS are not subject to turnover (Count XIV).  The distribution of auction sale proceeds from the Trustee to PPAS was authorized by the Personal Property Stipulation, which was approved by Order of this Court.  The proceeds are not (and never were) estate property.  TransCare held, at best, only bare legal title in the Subject Collateral (and any proceeds from the sale thereof) because the underlying assets were fully encumbered.

## V.  Count III (Equitable Subordination) Fails

54.    In Count III, the Trustee asks the Court to reorder the otherwise applicable

---

[14] Thus, assuming *arguendo* that there was a transfer to avoid, recovery by the Trustee would constitute an impermissible double recovery under 11 U.S.C. § 550(d).

17

priorities of Patriarch Partners, PPMG, PPAS, and Ark II by application of the principles of equitable subordination.  The Trustee alleges that these entities engaged in the following "inequitable conduct": (i) took actions in furtherance of the OldCo/NewCo Restructuring and in alleged violation of the automatic stay; (ii) prohibited TransCare from negotiating a sale of TransCare and/or its assets to third parties in 2015; and (iii) directed TransCare to make monthly interest payments to PPAS.

55.     As discussed, the evidence will show that the OldCo/NewCo Restructuring was entirely fair.  (*See* Section II, *supra.*)  The evidence will also show that neither Patriarch Partners nor PPMG would be enriched by the OldCo/NewCo Restructuring; they (i) were not equity holders in or lenders to either TransCare or Transcendence; and (ii) did not receive (and were not the intended recipients of) any of the Foreclosed Personal Property Assets.  The evidence will also show that, to the extent any effort by Patriarch Partners, PPMG, PPAS, or Ark II to secure any of the Foreclosed Personal Property Assets post-petition violated the automatic stay (and that is not the case), there was no injury to TransCare or its creditors.

56.     The Trustee also has no evidence that Patriarch Partners and PPMG acted inequitably in respect of Tilton's decision not to explore asset sales to third parties throughout 2015 (nor did they benefit from this decision).[15]  In any event, as discussed in Section II, *supra*, the evidence will show that Tilton's decision not to pursue these offers was neither unconscionable nor unfair.  On the contrary, it was entirely sensible.

57.     The Trustee also has no evidence that Patriarch Partners and PPMG acted inequitably by "directing" TransCare to make monthly interest payments to PPAS.  TransCare

---

[15] The Trustee does not contend, and has no evidence, that PPAS and Ark II took any action at all with respect to third-party expressions of interest.

18

was contractually obligated to make these payments under the Term Loan Agreement.  The evidence will show that employees of Patriarch Partners and PPMG, who were not parties to the Term Loan Agreement, simply reminded TransCare's management of those obligations or told management that PPAS would not (because it could not) waive them.  That is not inequitable behavior.[16]

58.    Finally, the case law makes clear that the purported inequitable conduct of PPAS and Ark II in respect of the Ark II Credit Agreement does not provide a basis for the Trustee to subordinate the claims of PPAS or Ark II because the Trustee lacks standing to pursue subordination of claims based on injury to individual creditors.[17]  The Trustee has no evidence that this alleged inequitable conduct harmed TransCare or the entire body of creditors.

## VI.    Counts IV, X, and XI Fail

59.    The Trustee "asserts three claims in the alternative seeking to avoid the Ark II security interest and preserve it for the benefit of the estate."  (FPTO ¶ 187.)  He cannot meet his burden on any of these claims.  First, because the Trustee has no evidence to support the vast majority of the *AutoStyle* factors, he cannot prevail on the recharacterization claim (Count IV).  Second, because the evidence will show that Ark II is fully secured with properly-perfected liens on all of the assets of the Debtors, the Trustee cannot prevail on his preference claim (Count X).[18]  Third, because the Trustee has no evidence to show Ark II did not provide reasonably

---

[16] To the extent the Trustee seeks to subordinate PPAS's claim based on PPAS's acceptance of interest payments and distribution of those payments to the Term Loan Lenders, this Court has already recognized that PPAS was required to accept and disburse those payments in accordance with the terms of the Term Loan Agreement.  Mar. 28, 2019 Hr'g Tr. 42:23-24, 43:9-44:10.

[17] *See* Dkt. 103 at 6-8.

[18] The evidence will also show that (i) Ark II provided "new value" by disbursing ~$1.9 million to TransCare in exchange for a secured obligation; (ii) Ark II and TransCare intended for the exchange to be contemporaneous; and (iii) the exchange was substantially contemporaneous.

19

equivalent value for the security interest or did not receive the security interest in good faith, he

cannot prevail on his fraudulent transfer claim (Count XII).[19]

## **CONCLUSION**

As will be demonstrated at trial, the Trustee's gratuitously inflammatory allegations,

which the Trustee must now prove, are devoid of legal or evidentiary support.  Accordingly,

Defendants respectfully request that the Court dismiss this meritless lawsuit in its entirety.

Dated: July 19, 2019                 PROSKAUER ROSE LLP

                              By: */s/ Michael T. Mervis*

                              Michael T. Mervis
                              Timothy Q. Karcher
                              Eleven Times Square
                              New York, NY  10036-8299
                              Tel.: (212) 969-3000
                              Email: mmervis@proskauer.com
                              tkarcher@proskauer.com

                              Nicole A. Eichberger (*pro hac vice*)
                              650 Poydras Street
                              Suite 1800
                              New Orleans, LA 70130-6146
                              Tel.: (504) 310-2024
                              Email: neichberger@proskauer.com

                              *Attorneys for Defendants*

---

[19] In Count XII (payment subordination against PPAS), the Trustee seeks to enforce the terms of the Ark II Intercreditor Agreement to determine the priority position of PPAS relative to Ark II.  (FPTO ¶ 189.)  As a matter of law, only a party or third-party beneficiary of a contract may enforce its terms.  The evidence will show that neither TransCare nor the Trustee is a party to or a third-party beneficiary of the Ark II Intercreditor Agreement.

20

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE:                        .      Chapter 7
                              .
TRANSCARE CORPORATION,        .
                              .      Case No. 16-10407-smb
                              .
                              .      New York, New York
                   Debtor.    .      Monday, July 22, 2019
. . . . . . . . . . . . . .   ..     10:04 a.m.
LAMONICA, et al,              .
                              .      Adv. Proc. 18-01021-smb
          v.                  .
                              .
TILTON, et al.                .
. . . . . . . . . . . . . .   ..


TRANSCRIPT OF TRIAL - A.M. SESSION
BEFORE THE HONORABLE STUART M. BERNSTEIN
UNITED STATES BANKRUPTCY JUDGE


APPEARANCES:

For the Plaintiff:        Bijan Amini, Esq.
                          Avery Samet, Esq.
                          STORCH AMINI, PC
                          Two Grand Central Tower
                          140 East 45th Street; 25th Floor
                          New York, New York 10017


Audio Operator:           Electronically Recorded
                          by Su, K. ECRO

Transcription Company:    Reliable
                          1007 N. Orange Street
                          Wilmington, Delaware 19801
                          (302)654-8080
                          Email:  gmatthews@reliable-co.com



Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

2

(Appearances Continued)

For Non-Debtor          Michael T. Mervis, Esq.
Defendants:             PROSKAUER ROSE, LLP
                        Eleven Times Square
                        New York, New York 10036

3

# I N D E X

| | PAGE |
|---|---|
| **WITNESS** | |
| MICHAEL GREENBERG | |
|    Direct Examination by Mr. Amini | 11 |

| **EXHIBIT** | | **ID.** | **EVD.** |
|---|---|---|---|
| PX-279 | Binder | -- | 13 |
| JX-55 | E-mail to Ms. Tilton | -- | 42 |
| JX-61 | E-mail to Ms. Tilton | -- | 53 |
| JX-56 | E-mail to Ms. Tilton | -- | 53 |
| DX-97 | Summary of meeting | -- | 56 |
| JX-60 | E-mail from Ms. Provost to Mr. Greenberg | -- | 58 |
| JX-137 | E-mail | -- | 60 |
| JX-100 | E-mail from Mr. Hudson to Mr. Greenberg | -- | 62 |
| JX-65 | E-mail from Mr. Hudson to Mr. Greenberg | -- | 63 |
| JX-67 | E-mail from Mr. Greenberg to Ms. Tilton | -- | 64 |
| PX-168 | Instruction from Mr. Greenberg | -- | 77 |
| PX-170 | E-mails | -- | 80 |
| PX-174 | E-mails | -- | 87 |
| PX-175 | E-mails | -- | 92 |
| PX-177 | E-mails | -- | 94 |
| PX-178 | E-mails | -- | 98 |
| PX-179 | E-mail | -- | 100 |

4

1          THE COURT:  Lamonica versus Tilton.  Is the plaintiff

2     ready?

3          MR. AMINI:  Plaintiff ready, Your Honor.

4          THE COURT:  Defendant ready?

5          MR. MERVIS:  Yes, Your Honor.

6          THE COURT:  All right.  I'll hear the motions in

7     limine first.

8          MR. MERVIS:  Your Honor, let me -- let me make a

9     suggestion first --

10         THE COURT:  Sure.

11         MR. MERVIS:  -- about the scheduling of one of those

12    motions because it pertains to something that happened last

13    night.  My suggestion would be to argue the motion about Dr.

14    Arnold (phonetic) tomorrow morning and I'll explain to you why.

15         Last night at eight o'clock was agreed by the

16    parties, there was an exchange of demonstrative exhibits.  We

17    got two exhibits.  One I don't really have an issue with.  The

18    other one is a 38 page set of slides that I would describe as a

19    combination of a supplemented expert report from Dr. Arnold and

20    a rebuttal report from Dr. Arnold.

21         I've had some time to digest it.  My expert hasn't

22    yet seen it, in fact, I don't know where my expert is today but

23    we're going to track him down.  So, I think, I can't tell you

24    whether what's in here affects or doesn't affect the motion,

25    but I do have an application that I would like to make tomorrow

**A1185**

1  morning about what they've done here. And I think it's just

2  sensible to argue the motion at the same time -- in limine

3  motion at the same time.

4          THE COURT: Any disagreement with that?

5          MR. AMINI: In terms of the timing? No, Your Honor.

6          THE COURT: Okay. All right. So, we'll leave that.

7  So, let's go to Credit Suisse.

8          MR. MERVIS: Yes, Your Honor. So, I think the issue

9  is fairly simple. The evidence that we're seeking to exclude

10 concerns the dealings between we'll call it we'll call it PPAS

11 and Ark II and Ms. Tilton and her representatives on the one

12 hand and Credit Suisse on the other hand. And basically what

13 you have is evidence about what was said or not said to Credit

14 Suisse which was one lender in a syndicate of lenders in a

15 secured term loan. And although that may or may not raise

16 issues between PPAS and Ark II on the one hand and Credit

17 Suisse on the other hand, the fact is that it had no impact on

18 the estate.

19          The only argument that's made in opposition to the

20 motion that it did have an impact on the estate is as follows:

21 The argument is that well, Ark II came in above the term loan

22 lenders and that pushed everyone down the waterfall. Well, two

23 things about that. One is, that would have been true even if

24 Credit Suisse had quote, known about it and consented about it.

25 The issue isn't what Credit Suisse knew or didn't know. It's

1  whether that loan should or not be sitting on top of the term

2  loan.

3          Now, they have claims for recharacterization and

4  equitable subordination and some other things -- I think

5  they're trying to strip the liens as a fraudulent conveyance

6  and a preference.  All of that, you know, we'll litigate here,

7  but what Credit Suisse knew and didn't know doesn't have

8  anything to do with those claims, right?

9          The issue here is how did that loan relate to the

10 estate.  How did Ark II and PPAS deal with the estate on that

11 loan.  But what was said or not said to Credit Suisse or those

12 negotiations and dealings just doesn't have anything to do with

13 this case.  And the Trustee doesn't even have standing,

14 frankly, to litigate the rights or not of Credit Suisse.

15         THE COURT:  Mr. Samet?

16         MR. SAMET:  Thank you, Your Honor, Avery Samet.  The

17 documents then, the testimony that I understand is sought to be

18 excluded are directly related to what Ms. Tilton's intent was

19 and Ms. Tilton's actions were.  For example, PX-189, You're

20 going to see shortly, Your Honor, is Ms. Tilton's credit

21 officer responsible for dealing with Credit Suisse admits to

22 Credit Suisse that the Ark II loan is not yet entered into and

23 not yet final.  We're going to use that to show that as of

24 February 3rd there wasn't a credit agreement with the estate.

25         For example, you're going to see evidence that Mr.

18-01021-smb Doc 62 Case 1:20-cv-06274-LAK Filed 07/29/19 Document 1-10 Entered 07/30/19 Filed 07/30/19 17:35:35 Page 64 of 1318 Main Document
Pg 7 of 103

7

1  Stephen told Credit Suisse that they weren't entitled to
2  800,000 because the foreclosure was actually consummated and
3  the assets were transferred outside of the TransCare estate.
4  That's relevant to what defendants are arguing as to what
5  happened or didn't happen.
6          So, we're not here to show whether Credit Suisse has
7  claims, we're here to show what the process was here and what
8  the parties' intents were and what the parties were saying
9  about this process at the time.
10         THE COURT:  Okay.  Thank you.  Look, I'm going to
11 deny your motion in limine.  Initially I question motions in
12 limine in bench trials anyway, but on this particular issue, I
13 originally thought that when I read your motion that they were
14 just trying to show that Tilton was a bad person.  And clearly
15 they can't use extrinsic evidence for that.
16         On the other hand, when I read the response, it
17 looked like they could argue that the January advances,
18 although legitimate loans, were not part of the Ark transaction
19 and, therefore, they're just general unsecured claims.  They
20 can strip the lien or they can disallow the secured claim that
21 Ark has filed and preserve that claim for the -- preserve the
22 lien for the benefit of the estate.
23         So, I'm going to permit that and I'll hear it.
24 Before we start, I'm afraid to touch your monitors here but can
25 you move them a little bit so I could see the witness.  We

1  don't want to disengage them from their outlets.

2          MR. MERVIS:  Your Honor, can I just ask -- or one

3  comment on your ruling?

4          THE COURT:  Right.

5          MR. MERVIS:  I'm not trying to change your mind, but

6  I --

7          THE COURT:  You're not going to, but go ahead.

8          MR. MERVIS:  Well, stranger things have happened, but

9  -- Your Honor, so, I understand what you said.  I think then

10 that, you know, and I'll just deal with it on a exhibit by

11 exhibit basis, but many of these exhibits are well post the,

12 you know, the loan.

13         THE COURT:  Yes, you may be right on the subsequent

14 stuff.  Then --

15         MR. MERVIS:  So --

16         THE COURT:  -- they can explain to me why it's

17 relevant.  I mean, whatever happened, happened on February 24th

18 or maybe --

19         MR. MERVIS:  Your Honor, I mean, I would argue that

20 whatever -- with respect to the issue Your Honor has raised,

21 the controlling date, I think, is -- I believe it's February

22 10th, which -- the date the --

23         THE COURT:  I don't remember, whatever --

24         MR. MERVIS:  But in any event, I just wanted to raise

25 that issue.  In other words, I get what you're saying.  I'm

9

1  simply saying on a document by document basis, things that

2  happened after the loan agreement's signed are, well -- we'll

3  see.

4           THE COURT:  I'm not so sure that it doesn't go up and

5  it's -- I mean the argument is it's just part of the scheme --

6  one of the arguments is it's part of a scheme for Tilton to

7  acquire control of the assets without the liabilities,

8  basically.  So --

9           MR. MERVIS:  The relevance of --

10          THE COURT:  I'll hear the evidence.  Call your first

11 witness.

12          MR. AMINI:  Your Honor, before we call the first

13 witness, there's two additional housekeeping matters.

14          THE COURT:  Okay.

15          MR. AMINI:  One, we have in the courtroom, I believe,

16 we've discussed this, the next witness after the first witness,

17 and in my experience we would -- I would like to exclude him

18 during the testimony.

19          THE COURT:  Who is that?

20          MR. AMINI:  Mr. Pellissier will follow Mr. Greenberg

21 and he's in the courtroom.

22          THE COURT:  Mr. Pellissier?

23          MR. Pellissier:  Yes?

24          THE COURT:  Yes, you'll have to wait outside.

25          MR. Pellissier:  Okay.

1          THE COURT:  There's a bench at the end of the hall,

2    if you brought something to read that's fine.  If you want to

3    go get a cup of coffee, that's fine also.

4          MR. AMINI:  And then with respect to the witness,

5    Your Honor, Mr. Mervis and I have spoken but once he's on

6    cross, do we know -- they'll be an instruction that he won't

7    speak to anyone about his testimony until you're done with

8    cross.  And the reason I ask is --

9          THE COURT:  The current witness?

10          MR. AMINI:  Yes.

11          THE COURT:  Won't he be out before lunch?

12          MR. AMINI:  Yes.

13          THE COURT:  My understanding is you're going to do

14    your direct and then he's going to do his cross and whatever

15    direct he would have on his direct case.

16          MR. AMINI:  That's right.

17          THE COURT:  Okay.  So, once the witness is done, he's

18    done and he can go home.

19          MR. MERVIS:  Two things, Your Honor.  I wasn't

20    planning to speak to him why he's on cross.  I don't know if

21    we'll be out of here by lunch -- we'll find out.  That was

22    certainly the sense I was getting last time we were here.

23          THE COURT:  Call your witness.

24          MR. AMINI:  Michael Greenberg.

25          And, Your Honor, having practiced with these

Greenberg - Direct/Amini                    11

 1  monitors, we determined that --
 2          THE COURT:  Hold on.  Raise your right hand, please.
 3              MICHAEL GREENBERG, WITNESS, SWORN
 4          THE COURT:  Okay.  Please take a seat.  Speak into
 5  the microphone.  You can pull it closer, and it's got a
 6  flexible neck so we can hear you.
 7          Now, what is your issue with the monitors?
 8          MR. AMINI:  Well, they're somewhat cumbersome.
 9          THE COURT:  So, move them.
10          MR. AMINI:  No, in terms of rolling the -- some of
11  these documents are rather large.  And we find that the
12  witnesses generally say to us in the depositions, you know, I
13  kind of need to see the whole thing.  So to make it easier, if
14  Your Honor is willing, we have for each witness just the
15  documents we're going to use --
16          THE COURT:  Yes, that's fine.
17          MR. AMINI:  -- in the order.  We have two copies for
18  the Court.
19          THE COURT:  You've convinced me.  Go ahead.
20          MR. MERVIS:  But I want to say I agree, Your Honor.
21          MR. AMINI:  I have two copies for the Court.
22          THE COURT:  All right.  Thank you.
23  DIRECT EXAMINATION
24  BY MR. AMINI:
25  Q    Good morning, Mr. Greenberg.

Greenberg - Direct/Amini                    12

1   A    Good morning.

2   Q    Mr. Greenberg, let's talk briefly about your background.

3   What do you do?

4   A    So, I'm currently a managing director at HCFP which is a

5   merchant bank.  So we have a number of different activities

6   including principal investing, investment banking and advisory.

7   Q    And what would you say your speciality is, if any?

8   A    I have experience across lending, capital markets and

9   limited experience in M&A.

10  Q    Let me show you what's been marked in this case as

11  plaintiff's Exhibit 279.  If you turn to your book, we have

12  your deposition transcript in the first sleeve, but then if you

13  look, we marked each of the exhibits.  Just go to the first

14  exhibit which is  --

15           THE COURT:  Are these coming in as evidence?

16           MR. AMINI:  I checked the objections list, Your

17  Honor, and if there's an objection, I intend to mention to Your

18  Honor before I ask about it if there is.  My understanding is

19  there's no objection to this exhibit.

20           MR. MERVIS:  Your Honor, I agree that we have --

21  we'll be able to do this, but I -- could I just ask for a copy

22  of the binder that the witness has?

23           MR. AMINI:  It's in there.

24           MR. MERVIS:  Oh, this is it?  Oh, great.  Thank you.

25  You know what?  It says Greenberg examination so that might

1    have tipped me off.  Thank you.

2              THE COURT:  All right.  So, what number is this --

3              MR. AMINI:  PX -- plaintiff's exhibit 279.

4              THE COURT:  279 -- so that's coming into evidence?

5              MR. AMINI:  Yes.  As I understand it, if there's no

6    objection by either side or it's a joint exhibit or it's their

7    exhibit, then just put it in front of the witness and move

8    forward.

9              THE COURT:  All right.  But I'd like to know.  Go

10   ahead.

11   Q    Mr. Greenberg, is that your -- is that a copy of your

12   LinkedIn page at one point or another?

13   A    Yes.

14   Q    And does it -- the first page of that -- does that

15   accurately describe your experience and specialties?

16   A    Yes.

17   Q    And your experience includes private equity investment

18   analysis and portfolio company management.  Is that right?

19   A    Yes.

20   Q    And you also have a fair amount of experience comparing

21   companies within a particular sect?

22   A    Yes.

23   Q    And you have experience in evaluating capital structure

24   alternatives of various companies?

25   A    Yes.

1  Q    As well as strategic business assessments?

2  A    Yes.

3  Q    And you in your career you've done a quite a bit of, I

4  think, monitoring company performance and presenting

5  conclusions to your employer about it, is that right?

6  A    Yes.

7  Q    All right.  And you have experience, extensive experience,

8  in valuations and modeling?

9  A    Yes.

10 Q    You worked as a credit officer, is I'm not mistaken.  Is

11 that the correct term at Ms. Tilton's organization?

12 A    Yes.  Credit officer and also at one point I became a

13 member of the portfolio management team.

14 Q    And when did that -- at what point did that come about?

15 A    I don't remember exactly, but probably within the last few

16 years.

17 Q    Two years that you were there?

18 A    Yeah.

19 Q    All right.  Let's get that out of the way.  You were there

20 from 2009 till March of 2016, if I'm not mistaken?

21 A    Yes.

22 Q    And in that second job you got, that was a promotion

23 within that last two years?

24 A    It was just a change in the characterization of the group.

25 Q    And as I understood, while you were there, these skills

1  that we were talking about, the got a lot stronger while you

2  were working for Ms. Tilton?

3  A    Yes.

4  Q    All right.  And you were an employee, just so I'm clear,

5  of Patriarch Partners, LLC, is that correct?

6  A    Yes.

7  Q    And one of your roles was to understand and assess the

8  business plans of the various portfolio companies that Ms.

9  Tilton managed?

10 A    Yes.

11 Q    Is that right?

12 A    That is.

13 Q    And you reported, if I'm not mistaken, also directly to

14 Ms. Tilton, at least in the last couple of years?

15 A    Yes.

16 Q    And you worked on the TransCare account between 2009 and

17 either 2012 or 2013, initially, is that correct?

18 A    That is correct.

19 Q    You were the credit officer assigned to it during those

20 years?

21 A    Yes.

22 Q    And then you left for a short period of time -- a year or

23 two -- and you came back to it in early 2015, is that right?

24 A    Well, I was still at the firm but I wasn't covering the

25 company at the time.

Greenberg - Direct/Amini                    16

1   Q    I'm sorry?  You were still at the firm --

2   A    I was still at the firm, but I wasn't covering the company

3   for that period of time.

4   Q    For the 2013, '14 period of time?

5   A    Yes.

6   Q    In '15 you came back?

7   A    In '15 I was asked to resume covering the company.

8   Q    Early '15 when Mr. Leland came on as the CEO?

9   A    Shortly after that, yeah, yes.

10  Q    And this company became one of your principal projects in

11  2015, is that correct?

12  A    Yes.

13  Q    All right.  A fair amount of your time was devoted to it,

14  is that correct?

15  A    Yes.

16  Q    And that's because the company had challenges in that

17  period of time?

18  A    Yes.

19  Q    Do you recall that around September of 2015, the company

20  CFO quit?

21  A    I recall him quitting.  I'm not sure I have the exact

22  month down, but I do recall him quitting.

23  Q    Take a look with me at DX-72, which will be the next

24  document in your -- and I assume, Your Honor, I don't need to

25  point out this is the defendant's exhibits, so I assume there's

Greenberg - Direct/Amini                    17

 1  no --

 2          THE COURT:  Are you offering them?

 3          MR. AMINI:  I'm sorry -- am I offering them?  Yes.

 4  That was a question I had for Your Honor.  There are a bunch of

 5  documents both sides have put in with no objection.  We have

 6  the joints ones --

 7          THE COURT:  Okay.  Just tell me if there's no

 8  objection.  That's all I want to know.

 9          MR. AMINI:  But do you --

10          THE COURT:  Before you read from a document, I just

11  want to know if it's coming into evidence.

12          MR. AMINI:  Do you need us to take you through it all

13  for each or can we agree with the other side that they're --

14          THE COURT:  Just tell me there's no objection and if

15  Mr. Mervis disagrees when he's up if you disagree you can let

16  me know.

17          MR. AMINI:  Thank you.

18  Q    Let me show you what was marked as defendant's Exhibit 72

19  in this matter.  Do you -- it's an e-mail -- it starts with an

20  e-mail from you to Ms. Tilton on October 1st 2015.  Do you see

21  it at the bottom there?

22  A    Yes.

23  Q    And it says Mark Banally resigned yesterday.

24  A    Oh, okay.  So, that's correct.

25  Q    And Mr. Banally was the company's chief financial officer,

Greenberg - Direct/Amini                    18

1  was he not?

2  A    Yes, he was.

3  Q    And just -- and is it fair to state that Ms. Tilton

4  instructed you, among others, to seek a replacement for him?

5  A    Yes.

6  Q    And did you ever engage a replacement between that period

7  of time and the filing on February 24th 2016?

8  A    We had an external consultant who one of their employees

9  was acting as a CFO at the company.

10 Q    That would have been the Carl Marks firm, correct?

11 A    Yes.

12 Q    And they came in in early --  we'll get to it but they

13 came in in early January.

14 A    January.

15 Q    And so you contracted with them so that one of their

16 employees would act in that role?

17 A    Yes.  And in the meantime there was a controller at

18 TransCare that was taking on additional duties as well.

19 Q    As a result of Mr. Banally's resignation, your duties on

20 this, call it credit or on this entity, increased, did it not?

21 A    Yes, it did.

22 Q    You had to take over many of the things that you had

23 relied upon him for previously, is that not correct?

24 A    Yes, more so.  Yes.

25 Q    Go with me, if you would, to defendants Exhibit 73 towards

**A1199**

```
 1  --
 2          MR. AMINI:  There's no objection, Your Honor.
 3          THE COURT:  No objection to the next?
 4          MR. MERVIS:  Correct, Judge.
 5          THE COURT:  Okay.  It's received.
 6  Q    This is an e-mail exchange, is it not, between you and Ms.
 7  Tilton on October 6th 2015?
 8  A    It is.
 9  Q    And you're letting her know in the first e-mail that
10  you're going over the TransCare to work with them on a number
11  of items?
12  A    Yes.
13  Q    The "Glenn" you refer to is Glenn Leland, the CEO at the
14  time?
15  A    Yes.
16  Q    And among other things you were going over there to work
17  with them on an update to the board and a Wells Fargo
18  presentation.  Do you see that as the last bullet point of your
19  e-mail?
20  A    Yes.
21  Q    By "board update," what is that?
22  A    The board update is an update -- an update to the board on
23  all facets of the business.  So, everything from operational
24  and financial.
25  Q    And how often did you get board updates in this time
```

Greenberg - Direct/Amini                    20

```
 1  period, relative to TransCare?
 2  A    It varied but there were times that it could be as much as
 3  once a day to more extensive board updates.  At a minimum,
 4  slightly more extensive once a week and even more extensive
 5  every two to four weeks.
 6  Q    And when you say "board," whom are you referring to?
 7  A    Lynn Tilton -- Ms. Tilton.
 8  Q    She was the only board, correct, at TransCare, the only
 9  person on the board?
10  A    Yes, at TransCare.
11  Q    The reference that we have in all these documents, the
12  "board" is always a reference to Ms. Tilton, isn't that
13  correct?
14          MR. MERVIS:  Objection, Your Honor.
15          MR. AMINI:  Withdrawn, Your Honor.  I --
16          THE COURT:  All right.  Ask another question.
17  Q    You reference a Wells Fargo presentation.  What's that?
18  A    Wells Fargo is looking for an update to the company's
19  business plan.
20  Q    And why did you understand they were looking for an update
21  to the company's business plan?
22  A    There was an upcoming maturity under the Wells Fargo ABL
23  and, as a result, they wanted to understand where the company
24  was at.
25  Q    And when you refer to the Wells Fargo ABL, what are you
```

1  referring to?

2  A    Wells Fargo's asset based line of credit with the company.

3  Q    That was, like, a revolving loan, was it not?

4  A    A -- yes and revolving asset -- asset based loan.

5  Q    Right.  Are you able to, sort of, in general terms explain

6  mechanically how the Wells Fargo loan worked?

7  A    Yes.  Based on the company's receivables, and well,

8  really, the trips that they do each day, they would generate

9  billing.  Based on that billing would create availability,

10  based on that availability, the company could draw down each

11  day against that availability.  It would be offset by

12  collections they may have that may, you know, that may in turn

13  reduce the availability.

14  Q    And do you recall that the maximum availability under the

15  loan, at least on paper, was about 20 million dollars?

16  A    Right around 20, I think it may have been slightly higher

17  than that, but right around.

18  Q    And you have a general recollection at this period of time

19  what the balance was, roughly?

20  A    I don't at this point.

21  Q    And is it fair to state -- did you understand that Wells

22  Fargo had a lien on all the company's assets?

23  A    Either a first priority lien or a second priority lien,

24  depending on the assets.

25  Q    And so in terms of the first versus second, let's talk

1  about that.  Wells -- was it fair to state that Wells Fargo

2  was, in general terms, the first lienholder?

3            MR. MERVIS:  Objection, Your Honor.

4            THE COURT:  What's the objection?

5            MR. MERVIS:  In general terms?  I think --

6            THE COURT:  I don't think that's a correct statement

7  or a correct question.

8            MR. MERVIS:  It's -- yeah, well, I didn't say that.

9  That is my objection.

10            THE COURT:  Why don't you ask him what they had a

11  first lien on and what they had a second lien on?  To the best

12  of his recollection.

13            MR. AMINI:  Thank you.  I'll adopt His Honor's

14  question, of course.

15  Q    What did they have a first lien on and what was the second

16  lien, and if you want to explain to the Court who had the

17  second lien?

18  A    Okay.  To the best of my recollection, they had -- Wells

19  Fargo had a first lien on AR and inventory and a second lien on

20  other assets including physical assets.

21  Q    And who had the first lien on physical assets?

22  A    The first lien on physical assets was held by the Zohar

23  Funds.

24  Q    And in general terms, when you say --

25  A    And other lenders.

Greenberg - Direct/Amini                23

1  Q    And other lenders.  Do you recall there were effectively

2  three Zohar Funds that had lent to this company?

3  A    Yes.

4  Q    And among other lenders there were a couple of Ark

5  lenders?  Do you recall that?

6  A    Yes.

7  Q    And the Ark lenders were Ms. Tilton's own companies?

8  A    Yes, that's my understanding.

9  Q    And the Zohar funds were money of other people that Ms.

10 Tilton's entities managed?

11 A    Yes.

12 Q    And then there was the third lender in the second tier was

13 Credit Suisse and First Dominion, do you recall that?

14 A    I do.

15 Q    Now, it -- going back to PX-73, there's a reference to

16 meeting -- in your e-mail of 9:44 a.m. -- which is your second

17 e-mail in this -- on the first page, you make a reference to

18 meeting with the controller to make sure that he can cover the

19 closing of the financials on a timely basis.  Do you see that?

20 A    Yes.

21 Q    And that was the controller that you had referred to

22 earlier?

23 A    Yes.

24 Q    And was he able to cover, in your experience at this time

25 and in the subsequent months, was he able to cover the closing

**A1204**

Greenberg - Direct/Amini                                    24

1  of the financials on a timely basis?

2  A    He was not.  He fell behind.

3  Q    And then your -- the first e-mail from Ms. Tilton tells --

4  do you see what she tells you?  She asks you to keep this under

5  control and get someone in the spot quick?

6  A    Yes.

7  Q    And you understand that was an instruction to you,

8  correct?

9  A    Instruction to me, in addition to all the other people on

10 the e-mail.

11 Q    Let's go over who they are.  Mr. Pelissier -- who was he?

12 A    He was -- I forget the exact title at the time but

13 effectively over portfolio management.  He was working across

14 different companies.  But given the number of companies, his

15 efforts typically were primarily focused on companies that

16 needed the most help.

17 Q    And his -- to your understanding, his speciality was

18 operations, correct?

19 A    Yes.

20 Q    Whereas your's was financial?

21 A    Yes.

22 Q    Randy Jones -- who was he?

23 A    Randy was the head of talent management and -- head of

24 talent management.

25         THE COURT:  I'm sorry.  I can't hear you.  You have

Greenberg - Direct/Amini                    25

1  to --

2  A    Oh, sorry, Randy Jones was the head of talent management.

3           THE COURT:  Talent management?

4           MR. AMINI:  Talent.

5  Q    And he would have been the guy you would have looked to

6  within the organization for hiring a replacement for Mr.

7  Banally?

8  A    Yes.

9  Q    And John Pothan (phonetic) -- who was he?

10 A    John Pothan was the head of HR.

11 Q    In your earlier e-mail, going back for a moment to PX-72,

12 the one in which you're discussing Mr. Banally's resignation,

13 you reference to Jean-Luc is seeing our top candidate, Peter

14 Wolf in the morning.  Who's he?

15 A    So, Peter Wolf was ultimately hired but he ended up

16 serving in a capacity as more of a COO than a CFO.  His

17 background lent itself better to that role.

18 Q    And Mr. Wolf ultimately became the chief operating officer

19 in title, correct?

20 A    Yes.

21 Q    And that's what he was hired as, isn't that correct?

22 A    Yes.

23 Q    Sometime after, shortly after this period, in October of

24 2015?

25 A    Yes.

1  Q    And then just to -- do you know who Mr. Pelissier's

2  employer was?  Was it Patriarch Partners Management Group?

3  A    Yes, that's my understanding.

4  Q    And Randy Jones and John Pothan, was it your understanding

5  they were engaged by Patriarch Partners LLC?

6  A    That is my understanding.

7  Q    Earlier we had discussed the report you were working on

8  for -- the update you were working on for Wells Fargo.  Do you

9  recall that?

10 A    Yes.

11 Q    Wells Fargo ultimately gave notice that it did not wish to

12 continue the ABL facility?

13 A    Yes, it did -- yes they did.

14 Q    Go to DX-76 in this --

15        MR. AMINI:  Again, there's no objection to this

16 document, Your Honor.

17        MR. MERVIS:  That's correct.

18 Q    And that is, in fact, the notice you received on or about

19 October 14th 2015 from Wells Fargo stating their intention to

20 terminate the ABL facility, correct?

21 A    Yes, it is.

22 Q    Mark Banally stayed on till early January, did he not, as

23 an outside consultant?

24 A    Yes, he did.

25 Q    And Glenn Leland was the CEO at the time of the company?

Greenberg - Direct/Amini                    27

```
 1  A    Yes, he was.
 2  Q    And Melissa Provost is the officer, one of the officers
 3  you were dealing with at Wells Fargo on this loan?
 4  A    Yes, she is.
 5  Q    So, what happened -- what did you do, if anything, in
 6  response to Wells Fargo's loan's determination?
 7  A    I would have at the time reported the information to the
 8  board and we, at that point, we were working toward, despite
 9  their notice, trying to convince Wells Fargo to continue
10  working with the company.
11  Q    And is that, in fact, not how you spent a good portion of
12  the next couple of months?
13  A    It was definitely, you know, quite high on the priority
14  list.
15  Q    From early October to well into January and February,
16  correct?
17  A    Yes.
18  Q    And the first portion of that period of time, as I
19  understand, the first couple of months was spent trying to
20  convince Wells Fargo to continue with the facility?
21  A    Yes.
22  Q    All right.  They were lenders, were they not, to a number
23  of other entities within Patriarch's portfolio to your
24  understanding, correct?
25  A    They were.
```

Greenberg - Direct/Amini                                28

1  Q    And the hope was that that relationship could be used to

2  convince them to stay in this, correct?

3  A    Yes, definitely part of it.

4  Q    But at the same time, you were tasked with working with

5  management at the company to present some kind of plan that

6  would be acceptable to them?

7  A    Yes.

8  Q    And is it fair to state you were taxed with that right

9  from the get-go when you got this notice of termination in

10 October 14th 2015?

11 A    Yes.

12 Q    And the people who worked very closely with you on this

13 were Mr. Pelissier and Brian Stephen?

14 A    More so Mr. Pelissier than Brian Stephen.

15 Q    Go with me --

16 A    But he would have been involved as well.

17 Q    Go with me, if you would, to PX-78.

18      MR. AMINI:  Again, there's no objection to this

19 document, at least not from the plaintiff.

20 Q    Is that - that's an e-mail exchange between you, Mr.

21 Pelissier and Mr. Stephen on or about October the 29th?

22      THE COURT:  Let me interject here.  You refer to

23 these e-mails and there's three or four sometimes as part of a

24 string and if you would refer to the e-mail the time it was

25 sent it would be easier to find so I know what you're talking

Greenberg - Direct/Amini                              29

1  about.

2  Q    So, going to the first e-mail in this chain, is that an e-

3  mail that you sent to Mr. Pelissier and Mr. Stephen on or about

4  October 29th 2015 at 11:07 a.m.?

5  A    Yes.

6  Q    All right.  And, again, these are -- and what is -- and

7  why did you sent them this e-mail?

8  A    I need to -- I just need to quickly read through.  So,

9  this is after a meeting -- typically, after a meeting we would

10  look at what follow-up items resulted from the meeting and I

11  would send an update to, not always, but most of the time, send

12  an update to people just elucidating what those update items

13  are and what things we need to, you know, that came out of the

14  meeting that still need to be accomplished.

15  Q    And the people you were talking about sending it to are

16  Glenn, Glenn and Mark, is that right?  I'm reading from your

17  first line.

18  A    Yes.

19  Q    That's Glenn Leland, Glenn Youngblood and Mark Banally, if

20  I'm not mistaken, correct?

21  A    That's correct.

22  Q    And who was Glenn Youngblood at that time?

23  A    Glenn Youngblood was -- I don't know his exact title at

24  that time, but he was heavily involved in the operations of the

25  business.

1  Q    And you wanted to give -- and when you said follow-up on
2  the meeting, what meeting?
3  A    I believe an internal meeting, but I'm not positive
4  without additional context.
5  Q    That was a meeting amongst yourself, Mr. Pelissier and Mr.
6  Stephen, correct?
7  A    I'm not positive.
8  Q    And these were the action items you wanted to give to
9  management at TransCare?
10  A    Yes.
11  Q    And among other things, the first item you're addressing
12  is this NYSIF?  That's New York State Insurance Fund, correct?
13  A    Yes.
14  Q    And do you recall that TransCare was delinquent on a
15  substantial amount to them?
16  A    Yes.
17  Q    In this time period?
18  A    Yes.
19  Q    Over a million dollars?
20  A    That's my recollection.
21  Q    Related mostly to payments that hadn't been made in 2014,
22  correct?
23  A    I don't recall the exact time and --
24  Q    All right.  Among other things under action items was a
25  reference to Wells Fargo, do you see that -- three down?

1  A     Yes.

2  Q     You wanted to ask them for two more weeks to finalize the

3  2016 plan, correct?

4  A     Yes.

5  Q     And that 2016 plan that you're referring to, what was

6  that?

7  A     That was a revised plan to be presented to the board for

8  board approval to be presented to Wells Fargo as part of a path

9  forward.

10 Q     And a revised plan to be presented to the board that

11 addressed what?

12 A     All aspects of the business and its -- and it can include

13 the need for funding as well.

14 Q     And this would have been a plan to the calendar year 2016

15 that you're referring to?

16 A     Yes.

17 Q     And then you would also use that same plan with Wells

18 Fargo for what purpose?

19 A     For the purpose of an agreement on an extension of the

20 facility.

21 Q     Go with me, if you would, to JX-51.

22       MR. AMINI:  Being a joint exhibit, there's no

23 objection to this, Your Honor.

24       THE COURT:  Okay.  Thank you.

25 Q     Is this an e-mail that you sent to Ms. Tilton, with a copy

**A1212**

Greenberg - Direct/Amini                           32

1  to Mr. Pelissier and Ricky Cheng (phonetic) on or about

2  November 14th 2015?

3  A    Yes, it is.

4  Q    And who is Mr. Cheng?  If you recall.

5  A    I don't recall.

6  Q    It's not that important.  You state in the first line,

7  attached is a revised presentation ahead of the meeting with

8  Wells Fargo on Monday, November 16th at 2 p.m.  Correct?

9  A    Yes.

10 Q    And is that revised presentation -- is this the plan that

11 we saw referenced to in the earlier document between yourself,

12 Mr. Pelissier and Mr. Stephen?

13        MR. MERVIS:  Objection, Your Honor.

14        THE COURT:  Overruled.

15 A    It was -- yes, it was generally referred to in the prior

16 e-mail.

17 Q    And this is what you referred to as a 2016 plan, correct?

18 You can flip through it.

19 A    Yes, that was the plan at that stage.

20 Q    And in order to present it to Wells Fargo, you need Ms.

21 Tilton's permission?

22 A    Yes.

23 Q    You wouldn't present such a plan to anybody on the outside

24 without her permission, isn't that correct?

25 A    That is correct.

1  Q    And is there some reason that no one from the company is

2  on this e-mail from TransCare itself?

3  A    There are -- there are times when -- when we would present

4  a plan a fair amount of time -- a fair number of times where we

5  would present a plan to the Board without cc'ing management to

6  have a dialogue with the Board without management's involvement

7  at that stage and then management would come in to speak with

8  the Board.

9         There were also cases -- in this particular case

10 there was also a period of time where Jean-Luc and I were

11 tasked with coming up with a plan that the Board could get

12 comfortable with based on our own assessment of the business.

13 Q    You had prepared prior plans for the company during the

14 course of 2015 before this one had you not?

15 A    Yes.  Well, along with the management team.  Along with

16 the management teams.

17 Q    And you -- and in presenting the key elements where you

18 down -- if you look down -- halfway down the page there's a

19 bullet item that starts underlying -- or underscored, key

20 elements of the presentation include.  Do you see that?

21 A    Yes.

22 Q    These are items that need Ms. Tilton's approval, are they

23 not?  In general.

24 A    Which particular items?

25 Q    Well, let's look at -- fair enough.  The first bullet

1  point, replacement of over 50 vehicles by the end of 2016.  You

2  would require her approval for that, would it not?

3  A    For that.  Yes.  Certain items you wouldn't.  They're more

4  operational.

5  Q    At this point your planned forecast was to have 117

6  million in revenue by year's end and four million of EBITDA.

7  I'm looking at the last bullet point in that sentence.  Is that

8  an accurate statement?

9  A    Which --

10 Q    The one that starts with forecast.  The last --

11 A    Oh, okay.

12 Q    -- bullet point out of the --

13 A    To complete 2015.  Yes.

14 Q    That was an accurate statement of your plan at that point.

15 A    At that point based on our estimate that was a accurate

16 representation of our expectation.

17 Q    And you also had -- well, looking down for the assumptions

18 for 2016 you also estimated revenue -- growth and revenue of

19 8.2 million or seven percent over 2015 to about 125 million.

20 Do you see that?

21 A    Yes.

22 Q    And you told Ms. Tilton that you believed that was a

23 conservative assumption.  Is that not right?

24 A    That's correct.

25 Q    And then the procedure would be that you would present t0

Greenberg - Direct/Amini                    35

1  her and in general terms you would meet with Ms. Tilton, you

2  and Mr. Pelissier, is that --

3  A    It varied.  In this particular case we would be meeting

4  with her.  In some cases -- in most cases it would be the

5  management team coming in to meet with Ms. Tilton.

6  Q    I want to just go through a few of the slides in the plan.

7  In particular the one that ends at Page -- it might be easier

8  to -- it's Page 4 of the slides, but it ends at 8510 on the

9  Bate stamp on the upper right-hand corner.  It's the corporate

10 organizational chart.

11 A    Oh.  Okay.  Yes.

12 Q    And was that the corporate organizational TransCare that

13 existed at the time?

14         THE COURT:  Which page are you referring to?

15         MR. AMINI:  I'm on the one that has the Bate stamp

16 number ending in 98510, Your Honor.

17         THE COURT:  Got it.

18 Q    Was that an accurate chart at the time?

19 A    Yes.

20 Q    Go with me a couple pages after that to the one that is

21 Page Number 6 ends with Bate stamp 98512, Your Honor.  The one

22 that starts dry profitability through customer rationalization.

23 Do you see that chart?  That slide I should call it.

24 A    Slide -- which slide number is that?

25 Q    It's 6.  Slide 6.  Do you have that one?

Greenberg - Direct/Amini                              36

1  A    Yes.

2  Q    At the top of it there are a couple of check marks.

3  Review EBITDA profitability for each contract, reviewed EBITDA

4  profitability for each region.  Does that indicate that you've

5  done that?  Is that one of the tasks you undertook?

6  A    This -- well, this is coming from the management team, but

7  it's saying that they have done that.

8  Q    And do you then review their work before presenting it to

9  Ms. Tilton?

10 A    Yes.

11 Q    Who in the management team was doing that for you at the

12 time?

13 A    The chronology -- the timing of everything gets a little

14 bit tricky, because, you know, I'm not sure.  Let's see.  So I

15 think Glenn was still in a consulting capacity.  Peter Wolf was

16 definitely there.  And Glenn Leland, I believe, was still

17 there, but, you know, the chronology gets a little bit tricky

18 because it's been some time.

19 Q    To set it up for you I believe Glenn Leland's termination

20 date is January 8th.

21 A    Okay.

22 Q    We'll come to document that will set it.  But I believe

23 he's not terminated.

24 A    Yeah.  So that's later even though it was shaded in that

25 chart.

Greenberg - Direct/Amini                    37

1  Q    So if Mr. Leland was still there do you know who was

2  reviewing these for you?

3  A    He would have along with Peter Wolf and Mark Banally in a

4  consulting capacity.

5  Q    There's also a reference on that page to the MTA contract

6  renewal for five years.  The one we were looking at.

7  A    Yes.

8  Q    If you go a few more pages to Slide 12 which is at Bate

9  stamp 98518, Your Honor.  This is a slide that addresses that

10 renewal, correct?

11 A    Yes.

12 Q    That was a pretty important thing at the time.

13 A    Yes.

14 Q    It was said to expire, as I recall, in -- it says right

15 -- in July of 2015.  Do you remember that?

16 A    Yes.

17 Q    And you were able to extend it by an additional four years

18 by agreement on July 13, 2015.  I'm reading from the overview,

19 the very first line.  Is that an accurate statement?

20 A    Yes.

21 Q    And then if you go down with me, one, two, three, the

22 fourth paragraph on that page there's a statement that says

23 there's almost no capital investment, the ROI is highly

24 desirable.  Do you see that?

25 A    Yes.

**A1218**

Greenberg - Direct/Amini                    38

1  Q    And the ROI is return on investment, correct?

2  A    It is.

3  Q    And your reference to there's almost no capital investment

4  is in reference to the fact that there's no need for the

5  company to own any vehicles.  The vehicles it drives under that

6  contract belong to the MTA.

7  A    Yes.  It's not my reference, it's the company's, but

8  that's accurate.

9  Q    And that's an accurate statement, correct?

10 A    Yes.

11 Q    And then you have the next statement is management has

12 made conservative estimates of revenue.  And then you have

13 these estimates below.  Do you see that?

14 A    Yes.  It's the company's reference, but I see it.

15 Q    I understand it's the company's reference.  You're about

16 to give this to Ms. Tilton, correct?

17 A    Yes.

18 Q    You agree with this, do you not?

19 A    Yeah.  I have to review it.  I have to make sure I'm

20 comfortable with it, and then present it.

21 Q    So you do in fact review it, get yourself comfortable with

22 it before presenting it to Ms. Tilton.

23 A    Yes.

24 Q    And you did that in connection with this as well, correct?

25 A    Yes.

**A1219**

1  Q    Let me just see if I have a couple more.  In the plan if

2  you go with me to Slide 19 those are your EBITDA projections.

3  Revenue and EBITDA projections for the coming year, correct?

4  The coming years '15 through 2020.

5  A    Those are --

6  Q    I'm sorry, those are management.

7  A    -- management's.  Yeah.

8  Q    And once again you and Mr. Pelissier have to review these

9  and get comfortable with them before giving them to Ms. Tilton,

10 isn't that your understanding?

11 A    That is.

12 Q    And you do that before giving any of these plans to Ms.

13 Tilton including this one, correct?

14 A    Yes.

15 Q    And then finally go with me to one more if you would.

16 Slide 29.  Those are the major assumptions for 2016 in this

17 plan, correct?

18 A    Yes.

19 Q    And again, you reviewed these assumptions as well and get

20 comfortable with them before giving them to Ms. Tilton.

21 A    Yes.

22 Q    In effect at this point you agree with management with

23 respect to this plan and these assumptions.

24 A    Yes.  Assuming the assumptions can be achieved I agree

25 with management on the plan.

**A1220**

1  Q    But you're also comfortable with the assumptions before

2  presenting them to Ms. Tilton, are you not?

3  A    Yes, we are.  Yes.

4  Q    What ultimately -- were you able ultimately to convince

5  Wells Fargo to extend the AVO?

6  A    We never -- never got to -- never got there.

7  Q    And does there come a time in about December of 2015 when

8  it was clear that you weren't going to get Wells Fargo's

9  approval?

10 A    I don't --

11 Q    Just simply extend it -- just to extend it for more than a

12 very short period of time.  Let's put it that way.

13 A    I'm not positive.  I'm not positive.

14 Q    Did there come a time where in response to Wells Fargo's

15 action Ms. Tilton determined or advised you that she had

16 determined to investigate the sale of the company?

17 A    Yes.

18 Q    And was that in or about December of 2015?

19 A    That sounds accurate.

20 Q    And what do you recall she told you?

21 A    It was a combination of Wells Fargo's desire for a sale of

22 the company, combined with arriving at an ideal scenario

23 surrounding a sale of the company.

24 Q    Now when you say arriving at an ideal scenario surrounding

25 the sale of the company what are you referencing?

1  A     That given the company's condition at that point in time

2  that there was a need to stabilize the business, and to have

3  -- to be on a more stable footing as part o a sale and then in

4  addition to go through the appropriate steps to market the

5  company.

6  Q     And what were you tasked with, if anything, in that

7  connection?

8  A     Of course I, you know, was stilled tasked with trying to

9  improve the business.  But then in addition to that we were

10 looking at potential investment banks to get a sense for, you

11 know, what investment banks were out there that could market

12 the company.  In addition also looking at transactions and

13 multiples in the market.

14 Q     And all of those were -- all of the things you just said

15 you were tasked to all three of those, were you not?

16 A     Yes.

17 Q     And who worked with you, if anyone, at Patriarch on those?

18 A     Vin DeVito had some involvement in terms of just thinking

19 of investment banks that potentially could be out there.  In

20 terms of analyzing comparable companies and comparable

21 transactions most of that I located on my own.  And Jean-Luc

22 would have reviewed the work that I was doing.

23 Q     Go over with me, if you would, to JX-55.  Again, being a

24 joint exhibit there are no objections to this, Your Honor.

25 A     JX --

**A1222**

Greenberg - Direct/Amini                    42

1  Q    55.  It'll be the next one in your book.

2  A    Oh, I have a JX-61.

3  Q    Do you not have a 55??

4  A    Then I have a --

5        MR. AMINI:  If I may approach, Your Honor.

6  A    Oh, here's the 55.

7  Q    Is it there?

8  A    I got it.

9  Q    You got it?  Mr. Greenberg, this is an e-mail, is it not,

10 that you sent to Ms. Tilton on December 18, 2015?

11 A    It is.

12 Q    It's subject TransCare Ambulance transactions overview.

13 Do you see that?

14 A    Yes.

15 Q    Ad what was the purpose of this e-mail?

16 A    The purpose -- the purpose was to get a general idea of

17 potential comparable transactions and comparable public

18 companies that existed within the same or ancillary industries.

19 Q    And Ms. Tilton had asked you to do this, correct?

20 A    Yes.

21 Q    And among other things you were also tasked with finding

22 investment bankers.

23 A    Yes.

24 Q    If you look at the second one, the second paragraph as I

25 mentioned earlier the primary two banks we were able to find

Greenberg - Direct/Amini                    43

1  the advice on ambulance transactions were Barclays and Deutsche

2  Bank.  Do you see that?

3  A    Which?  Oh, the top, the second.  Yes.

4  Q    You -- and then you have a reference also to Royal Bank of

5  Canada and Warburg Pincus in the following paragraph, correct?

6  A    Yes.

7  Q    When you say the primary two banks we were able to find

8  who's the we?

9  A    That's -- my recollection is that Vikrum Agrawal, well,

10 given that he's cc'd on this most likely helped me in locating

11 some of the information.

12 Q    And who is he?

13 A    He was an associate at Patriarch.

14 Q    And what was his role there, to your understanding?

15 A    He was -- he would assist different credit officers with

16 their companies.

17 Q    And in addition to looking at banks you indicated that you

18 looked at potential comparable transactions and comparable

19 public companies that existed within the same industry as

20 TransCare.

21 A    Yes.

22 Q    And you reported those results to Ms. Tilton as well,

23 correct?

24 A    Yes.

25 Q    And you did that in the, to call it -- can we call it the

1  exhibit that's attached to this, correct?

2  A    Yes.

3  Q    And this you may need to look at on the screen.  Maybe we

4  can get that up on the screen as well.  And these were -- the

5  companies that are listed on this chart were the ones that you

6  could locate.

7  A    Yes, the ones that I could locate.

8  Q    Take us through -- you have what's called transaction

9  comps and market comps at the top, do you see that?

10 A    That's better.

11 Q    The blue transactions comps, the pink -- oh well, you

12 don't have a colored --

13 A    It's hard in black and white.  But in color --

14 Q    It's in black and white on the --

15 A    -- in color it's much easier.

16         THE COURT:  Which of these charts are you looking at?

17 What's the Bates number?

18         MR. AMINI:  This is hard for me, Your Honor, because

19 it's pierced in such a way I don't see the Bates number.

20         MR. MERVIS:  It seems to be a native file, Your

21 Honor, so I think that's the issue.  But from what I could tell

22 it's the very last page in the exhibit.

23         MR. AMINI:  It is.  It's the very last printed page,

24 Your Honor.  We had intended to give Your Honor this size, my

25 legal --

Greenberg - Direct/Amini                                45

1          THE COURT:  That would be easier to read.

2          MR. AMINI:  My legal assistant is downstairs getting

3    the copies that were not brought up.

4          THE COURT:  Okay.

5          MR. AMINI:  If Your Honor would allow me I would give

6    you this copy that I have in my hand.

7          THE COURT:  I can read this one, I think.  If I can't

8    I'll let you know.  But, thank you.

9  Q    Well, let's do something else while Ms. (indiscernible) is

10   getting that document for a second.  We'll go back to the

11   e-mail.  You have a line, one, two, three, four, the fifth

12   paragraph down.  You state -- you tell Ms. Tilton Glenn has

13   indicated that he has received an unsolicited calls from, and

14   then you list a number of companies.  Do you see this?

15 A    Yes.

16 Q    What is Falk?  Who are Falk?  If you know.

17 A    I don't recall whether they're an operating company or a

18   private equity firm.  I think an operating company.

19 Q    AMR, do you know who they are?

20 A    Yes.

21 Q    What are they?

22 A    An operating company in the sector.

23 Q    In where?

24 A    In the sector.

25 Q    Richmond County Ambulance and Enhanced Equity?

**A1226**

Greenberg - Direct/Amini                    46

1  A    Richmond County is an operating company.  Enhanced Equity
2  is a private equity firm.
3  Q    And National Express, who are they?
4  A    An operating company.
5  Q    And the Glenn you're indicating here is Glenn Leland, is
6  it not?
7  A    Yes.
8  Q    And why were you telling her this?
9  A    When -- because this happened periodically throughout my
10 tenure.  When companies would receive calls from potential
11 interested parties I felt I had an obligation to let the Board
12 know.  So typically the management team would let the Board
13 know, in other cases I would let the Board know.
14 Q    Companies in your experience in that 2015 year where calls
15 were received they were generally, from your experience, they
16 came through Glenn Leland?
17 A    As it relates to -- yes, as it relates to TransCare.  Yes.
18 Q    To TransCare.  And he would report them to you, would he
19 not and Mr. Pelissier?
20 A    He -- yes, to both of us.
21 Q    And did you have an understanding he had no authority to
22 speak to those companies, he could only convey the message
23 isn't that right?
24 A    That's my understanding.
25 Q    In fact, he was specifically forbidden from speaking to

**A1227**

Greenberg - Direct/Amini                            47

 1  any of these companies, isn't that correct?

 2  A    Yes.

 3  Q    And he was certainly forbidden from sharing any

 4  information about TransCare with any of these companies, isn't

 5  that correct?

 6  A    Yes.  Well, the normal procedure is to get approval, in

 7  addition you'd need an NDA.  There are a number of steps that

 8  need to be taken.

 9  Q    In that connection in the year that you worked 2015 to

10  February of 2016 at no time was anybody given any authority to

11  even enter into an NDA, correct?

12  A    That's my recollection.

13  Q    And that authority could only come from what you refer to

14  as the Board or Ms. Tilton, correct?

15  A    Yes.

16  Q    And that goes as well not only for management of

17  TransCare, but that goes for you and Mr. Pelissier as well,

18  isn't that correct?

19  A    Yes.

20          MR. AMINI:  We were not able to find these copies.

21  We must have left them at the office.

22  Q    So if I could take you to the last exhibit in this.  It's

23  the last page of this exhibit.  And I will tell you that in the

24  version I have the transaction comps are in blue and the market

25  comps are in pink.  Explain, if you would, the difference

Greenberg - Direct/Amini                     48

1   between those two categories.

2   A    So transaction comps relate to transactions that have

3   occurred within the sector or related sectors.  Market comps

4   relate to public companies and where they're currently trading

5   in terms of their valuation.

6   Q    And in December of '18 were these the only comps that you

7   were able to find?

8   A    At that point in time, yes.

9   Q    All right.  Subsequently did you find other comps?

10  A    I found other transactions, but unfortunately they didn't

11  have complete information.

12  Q    And when you say they didn't have complete information

13  what do you mean?

14  A    In some transactions information is not disclosed.

15  Q    Go with me, if you would, to JX-61.

16       THE COURT:  Before we leave this exhibit would you

17  ask the witness what these various abbreviations are and what

18  the computations are?  Or are you going to do that with another

19  witness?

20       MR. AMINI:  No, I was not, Your Honor, but I will.  I

21  simply assumed that we all know them.

22  Q    All right.  Let's go through the last page of Exhibit 60 -

23  - I'm sorry 55.  Do you have that?

24  A    Yes.

25  Q    Why don't we -- under target these are the names of the

Greenberg - Direct/Amini                                    49

 1 companies that you were able to find, right?

 2 A    Yes.

 3 Q    And by a -- when you have a choir -- oh those are for the

 4 transaction comps.  Who was purchasing the target entity,

 5 correct?

 6 A    Yes.

 7 Q    And that gives you the names of those.  And then you have

 8 the date.  The date is the date of the transaction in question,

 9 correct?

10 A    The date of the closing.  Yes.

11 Q    And you have of course whether the transactions is

12 completed or announced on the next line.

13 A    Yes.  So in some cases the date refers to the announcement

14 date.

15 Q    Purchase price or EV dollars MM.  What are you referring

16 to there?

17 A    So if the information was available the purchase price

18 would typically be what -- they'll announce the company was

19 acquired for.  But sometimes if there's debt on the company and

20 cash on the company's balance sheet enterprise value is

21 purchase price of equity plus debt minus cash.

22 Q    And is there anyway from this chart we can tell which of

23 those two you're referring to on that line?  Like the 620

24 million for AMR's purchase of Rural Metro Corp., is that

25 purchase price or enterprise price?

1   A      In hindsight it could have been better elucidated.

2   Q      The next line revenue LTM MM, what's that in reference to?

3   A      That is -- so revenue -- it's the last 12 months of

4   revenue and it's indicating that it's in millions of dollars.

5   Q      And then the EV revenue multiple, what are you -- what's

6   that?

7   A      So that's the enterprise value of the business divided by

8   their last 12 months of revenue.

9   Q      And the next line, the EBITDA LTM MM?

10  A      Is the last 12 months of EBITDA.

11  Q      And the EV EBITDA multiple, what is that a reference to?

12  A      That's the enterprise value to the last 12 months of

13  EBITDA.

14  Q      And going down on the AMR one, the notes you have down

15  there you have a statement in vision expects -- is that 58

16  million pro forma EBITDA and 13 million synergies in last 12

17  months?  Do you see that reference?  Total of 25 million by

18  2017.  I'm looking under the rural metro one.

19  A      Oh, okay.  Yes.  That's -- that would have -- that's

20  indicating what in visions given guidance as an acquirer --

21  well, in vision, yeah, as an acquirer in visions given guidance

22  as the types of synergies and pro forma EBITDA that they can

23  achieve.

24  Q      And let me turn to the market comps now, the three

25  companies that you have up there.

Greenberg - Direct/Amini                          51

1  A     Yes.

2  Q     All right.  Under market value you have for purchase

3  price, what is that?  What does that purchase price or EV

4  dollars in millions, what does that reflect?  That number.  In

5  the first one it's, I think, in vision 6.699.

6  A     So that would reflect the market value of the equity plus

7  the outstanding debt minus the cash on the balance sheet.

8  Q     And the rest of the entries are the same as under the

9  transaction comps, correct?

10 A     Yes.

11 Q     You mention in your e-mail to Ms. Tilton that excluding

12 PHI appears to be an outlier, do you see that?

13 A     Yes.

14 Q     Why do you think it was an outlier?

15 A     My recollection is that they had some different lines of

16 business.

17 Q     Anything else?  Let me ask this, do you recall they were

18 principally an oil company?

19 A     Yes.  Now that you remind me.

20 Q     Is that why you believe you thought they were an outlier?

21 A     And then they had another business that was tangentially

22 in the sector, but yeah.

23 Q     Going back to your memo on the front you tell her the EV

24 or the enterprise value, is that right, EV stands for

25 enterprise value?

Greenberg - Direct/Amini                    52

1   A    Yes.

2   Q    So revenue multiple averages 1.8 times.  And EV to, is it

3   fair to say last 12 months EBITDA averages 10.1 times?

4   A    Yes.

5   Q    So the value where you're looking at is about 1.8 times

6   the total sales if you want to say revenue of those entities,

7   correct?

8   A    Yes.

9   Q    And EBITDA multiplier based on the processed data is about

10  10.1.

11  A    Yes.

12  Q    Let me take you to JX-61 the next document.  And this was

13  a week later you updated Ms. Tilton on the matters that you

14  were reporting to her in the prior e-mail, correct?

15  A    Yes.

16  Q    You were working on this project at that time around

17  Christmas of 2015.

18  A    Yes.

19  Q    And Mr. Agrawal was most likely working with you, correct?

20  A    Yes.

21  Q    Assisting you in this.

22  A    Yes.

23  Q    And this was in connection -- this was being done in

24  connection with a discussion with Wells Fargo about a plan to

25  fund the company towards a potential sale of the business.

Greenberg - Direct/Amini                    53

1  A    Yes.

2  Q    That's why you were looking at these numbers.

3  A    Yes.

4  Q    Tell me, if you would, what you recall about those

5  negotiations with Wells Fargo from this point.

6  A    At that point in time?

7  Q    Yes.

8  A    The key negotiation point was surrounding a time line to a

9  sale.  And Wells Fargo was pushing for a shorter time frame and

10 Patriarch was pushing for a longer time frame.

11 Q    Okay.  Go with me -- actually go with me to the next

12 Exhibit JX-56.  As it's a joint exhibit there are no

13 objections, Your Honor.

14           THE COURT:  What about the prior exhibit, 61?

15           MR. MERVIS:  It's joint, Your Honor, so --

16           THE COURT:  All right.  Anytime it's joint it's

17 received, is that --

18           MR. MERVIS:  Yes.

19 Q    Is that an e-mail that you sent to Ms. Tilton on or about

20 December 20, 2015?

21 A    That is.

22 Q    Is it fair to say at this point that this is the core

23 group at TransCare that is working on this project?  The ccs.

24 A    It's the core group -- it's the, I guess, yeah, the core

25 group at Patriarch that's working on TransCare.

Greenberg - Direct/Amini                    54

1  Q    I notice again there's no one from the company on this e-
2  mail.  Is there a reason for that?
3  A    We -- there were times when we had discussions with the
4  Board that the company was not part of.
5  Q    And you have -- this is your weekly update, do you see
6  that in the first line?  You refer to this as a weekly update.
7  A    Yes.
8  Q    Including trip update from Friday.  That would be your
9  trip to TransCare's offices, correct?
10 A    Yes.
11 Q    And you reference a meeting Monday at 2:30.  If you look
12 at the top you sent this e-mail on a Sunday, December 20th.
13 A    Okay.
14 Q    That meeting is that you're referencing a meeting the next
15 day at 2:30 in the afternoon, correct?
16 A    Yes.
17 Q    And the people you're referencing John, Melissa, Bob,
18 possibly Larry, those are the Wells Fargo folks, are they not?
19 A    Yes.
20 Q    And you reference time frame negotiation.  Lynn Tilton
21 wanted a six month time frame at that point, correct?
22 A    Yes.
23 Q    And there also was a discussion at that point about having
24 a third party CRO.  Do you see that?
25 A    Yes.

**A1235**

Greenberg - Direct/Amini                    55

 1  Q    Wells Fargo wanted an outside chief restructuring officer,

 2  did they not?

 3  A    Yes.

 4  Q    Somebody who would report to not only Ms. Tilton, but to

 5  them.

 6  A    Yes.

 7  Q    And that's ultimately what Carl Marks' role became.

 8  A    Yes, it is.

 9  Q    And in addition to appointing at least one of their people

10  as the outside CFO, correct?

11  A    Yes.

12  Q    Turn with me, if you would to -- you had that -- well, I

13  can ask this question generally.  You had that meeting with

14  Wells Fargo the next day, did you not?  Why don't we just do

15  this easily.  Why don't you go to --

16  A    I believe we did.

17  Q    Go to DX-97.  I don't believe there's any objection to

18  this document, Your Honor.

19          MR. MERVIS:  No objection.

20          THE COURT:  Proceed.

21  A    Okay.  Yes, it looks like we did.

22  Q    This is the summary from your meeting with John Husson and

23  Bob Starck, correct?

24  A    Yes.

25  Q    And those are two of Wells Fargo's employees.

Greenberg - Direct/Amini                    56

1   A    Yes.

2   Q    Look at with me, if you would, the key -- I want to make

3   sure I'm on the right document -- the key components.

4   A    Yes.

5   Q    The six months became nine months, do you see that?

6   A    Yes.

7   Q    That was as a result of some conversation you had with Ms.

8   Tilton, was it not, between your last memo on Sunday at 12:10

9   p.m. and the meeting on Monday at 2:30 in the afternoon, was it

10  not?

11  A    Yes, it would have been.

12  Q    She instructed you that instead of six months she wanted

13  nine months.

14  A    Either that or it was part of a discussion.  But I'm not -

15  - I don't remember exactly.

16  Q    But you wouldn't have gone in there and given the six

17  month time frame you refer to in your weekly update.  Where you

18  say we have received your guidance regarding a six month time

19  frame.  You wouldn't have changed that to nine months without

20  her approval, isn't that right?

21  A    Yeah, I would have -- yeah, I would have gotten her sign

22  off on that.

23  Q    Just wanted to make sure.  There was also a month some of

24  what I would call the deliverables and agreed upon budget.

25  Wells Fargo wanted a budget.

Greenberg - Direct/Amini                    57

1   A    Yes.

2   Q    And there was a discussion about a third party consultant

3   which ultimately became Carl Marks.

4   A    Yes.

5   Q    And you actually welcomed that result because you needed a

6   chief financial officer, didn't you?

7   A    We definitely needed oversight.  We definitely needed

8   someone in that capacity.

9   Q    But by the you in my question, and I apologize, because

10  usually it means defendants, but I meant you personally were in

11  favor of them coming in at this point and acting as chief

12  financial officer so that you would have somebody there with

13  that skill set, correct?

14  A    Well, the decision or the request for a third party

15  consultant was Wells' request.  And in terms of who to appoint

16  and the approval is Lynn's decision.  But generally the company

17  -- it was helpful to have additional support.

18  Q    Again, on this memo that we're looking at DX-97 is there

19  some reason nobody from the company's included on it?

20  A    It was meant to be just a communication with the Board.

21  Q    Go with me, if you would, to JX-60, Joint Exhibit 60 which

22  is the next document in your book.

23  A    Yes.

24  Q    The first e-mail in that chain --

25           MR. AMINI:  Again, it's a joint exhibit, Your Honor,

1  no objection.

2          THE COURT:  Received.

3  Q    The first e-mail in that book is from Melissa Provost to

4  you and Jean-Luc, do you see that?  Mr. Pelissier, I'm sorry.

5  Do you see that?

6  A    Yes.

7  Q    And she's writing to you as a followup to the meeting

8  we've been talking about, that Monday meeting.

9  A    She's providing that as a result of the meeting.

10 Q    And she's focused, is she not, at that point with you on a

11 budget.  She needs a budget for this plan in order to convince

12 her folks to extend the loan through the sale process.

13 A    Yes.

14 Q    And that's a constant refrain from Wells Fargo, is it not?

15 A    Yes, it is.

16 Q    Did you ever give them a budget?

17 A    I don't believe we ever got to that final budget.

18 Q    There's a -- and you respond with, among other things, a

19 series of sales milestones.  Do you see that?

20 A    Yes.

21 Q    And those were your -- that was your ask at the time.

22 A    That was.

23 Q    And this had been approved by Ms. Tilton at that time,

24 correct?

25 A    That's my recollection.

Greenberg - Direct/Amini                    59

1  Q    And the plan at that point was to get a budget to them by

2  January 15th, but it would have to be reviewed by the financial

3  advisor.

4  A    Yes.

5  Q    And the financial advisor you're referring to here

6  ultimately became Carl Marks.  It's the same as what we refer

7  to as a CRO, correct?

8  A    Yes.

9  Q    Just wasn't sure.

10 A    But one of Carl Marks' employees was acting as the CRO.

11 Q    All right.  Go with me now to PX-137.

12         MR. MERVIS:  There's no objection, Your Honor.

13         MR. AMINI:  That's right.  Yes.

14         THE COURT:  It's received.

15 Q    PX -- these are the people -- starting with your e-mail at

16 the bottom of this exhibit in the last one physically in the

17 chain, but the first one in time, this is an e-mail to now

18 Glenn Leland, Peter Wolf and Mark Benia who's still acting as

19 an outside consultant, correct?

20 A    The -- oh, there's an e-mail -- there's an e-mail from me

21 to them?

22 Q    On December 27th.

23         THE COURT:  What's the time of the e-mail?  What's

24 the time that the e-mail is sent there?

25 Q    19:49 DST.  Sunday, December 29th at 7:40 p.m.  Do you see

Greenberg - Direct/Amini                    60

1  that e-mail?

2  A    The Sunday, the 27th at 7:40.  Right.  Yeah.

3  Q    And you reference to them -- these are the people you're

4  still working with at the company.

5  A    Yes.

6  Q    We'll see this, but within a couple of weeks both Mr.

7  Leland and Mr. Banally are going to be gone.

8  A    Yes.

9  Q    And you state to them of course we are all aware -- we are

10 aware of all the outstanding obligations that the company has.

11 What are you referring to there?

12 A    The various companies and vendors that the company owes

13 money to.

14 Q    And you were aware of those -- you were keeping track of

15 those, were you not?

16 A    Along with the management team I was keeping track of

17 them.

18 Q    Right.  Those were in fact, you know, one of the hurdles

19 that you had to figure how to get over, correct?

20 A    Yes.

21 Q    And if you go with me to Mr. Banally's e-mail in response

22 that was written on December 27th at 10:35 p.m.  He tells you a

23 major assumption underlined the 2016 plan has been missed and

24 execution may be untenable at this date of 12/28.  Do you see

25 that?

**A1241**

Greenberg - Direct/Amini                61

 1  A     Yes.

 2  Q     And they haven't gotten any of the new vehicles among

 3  other things.

 4  A     Yes.

 5  Q     And those were part of the plan, were they not?

 6  A     They were.

 7  Q     The next e-mail is from Mr. Leland who asked you whether

 8  you have a date for a presentation to the Board.  Do you see

 9  that?

10  A     Yes.

11  Q     Again that would be Ms. Tilton, correct?

12  A     Yes.

13  Q     And he's concerned about that to your understanding

14  because of the circumstances that Mr. Banally's addressing.

15  A     Yes.

16  Q     And looking at your response on December 28th 2015, you

17  know, you say no date set.  A challenge as the Board is away

18  for at least a few weeks and company was just in to visit a

19  month ago.  What are you referring to there?

20  A     Referring to the fact that the company had been in

21  recently and there were a number of companies that competed for

22  time and that -- this is only based on reading it in an e-mail

23  -- that Ms. Tilton must have been away at that point.

24  Q     Go with me, if you would, to the next document I have

25  which is DX-100.

Greenberg - Direct/Amini                    62

```
 1          MR. MERVIS:  Defendant's exhibit, we have no
 2  objection, Your Honor.
 3          THE COURT:  It's received.
 4  Q    This is an e-mail you wrote to Ms. Tilton on or about
 5  December, 30th, correct?
 6  A    Yes.
 7  Q    And you're just updating her as is your custom at this
 8  point.
 9  A    Yes.
10  Q    And you mentioned to her the finalization of the budget is
11  a key component to the longer term agreement.  See that?  It's
12  under budget, the last sentence.
13  A    Yes.
14  Q    And that's what you understood with Wells Fargo, correct?
15  A    Oh, yes.
16  Q    And you were working on that at the time.
17  A    Yes.
18  Q    Who were you working with it on?
19  A    With Jean-Luc primarily.  With Jean-Luc Pelissier.
20  Q    And in terms of the discussions that you had mentioned
21  earlier the six months or the nine months Wells Fargo had come
22  around to seven months at this point.
23  A    Yes.
24  Q    And even that wasn't their final answer, was it?  They
25  were willing to go longer.  Do you recall that?
```

1  A     I don't recall specifically.

2  Q     And go with me, if you would, JX, Joint Exhibit 65.  And I

3  just want to do this one, I think, very briefly, just to show -

4  - this is -- the last e-mail in this chain which is the first

5  e-mail on the page from John Husson to you on 12/31, 2015 at

6  3:56:02 p.m.  Mr. Husson told you that they would extend the

7  outside date to August 15th.

8  A     Oh, okay.

9  Q     Right?

10 A     Yes.

11 Q     And you are now sitting here looking at that, does that

12 refresh your recollection --

13 A     Yes.

14 Q     -- that they were willing to go out that far?  See, in

15 your dealings with Wells Fargo did there come a point where

16 they said that they simply were not willing to deal?

17 A     No.  There were points in time where they became more

18 challenging to deal with, but no point did they say they were

19 not willing -- I don't recall a point where they said they were

20 not willing to deal at all.

21 Q     All right.  Let's go next to Joint Exhibit 67.  Did you

22 have a chance to look at that?

23 A     Yes.

24 Q     Is this an e-mail you wrote to Ms. Tilton on January 5th,

25 2016 at 12:55 p.m.?

Greenberg - Direct/Amini                    64

 1  A    Yes, it is.

 2  Q    And again, is there some reason nobody from the company's

 3  on this?

 4  A    It's meant as a privileged communication or communication

 5  to the Board just, you know, including just Patriarch on that

 6  particular e-mail.

 7  Q    You say John-Luc and I worked all night, this is on a

 8  Tuesday, to arrive at the scenario to address the parameters

 9  that we discussed yesterday.  Is that true, you and Mr.

10  Pelissier worked all night that night?

11  A    Yes.

12  Q    And the -- you have a reference to a prior discussion the

13  day before.  Would that have been a discussion with Ms. Tilton?

14  A    Yes.

15  Q    And it says to address the parameters that we discussed to

16  support a sale process and minimize capital needed.  Is that a

17  correct statement of the -- in general of what the discussion

18  was with Ms. Tilton the day before?

19  A    Yes.

20  Q    How do we support a sale process with the least amount of

21  capital, correct?

22  A    Yes.

23  Q    And then you go down to give her a summary, do you not, of

24  each division that operates in which you then use as a

25  foundation for making your assumptions, your model assumptions.

Greenberg - Direct/Amini                    65

1  A    Yes.

2  Q    Do you see that?  So it was transit -- transit is in

3  effect 26 percent of revenue at that point.

4  A    Yes.

5  Q    And by transit you're referring to the MTA contract that

6  we've talked about.

7  A    Yes.

8  Q    The one that had been extended in July for an additional

9  four years.

10  A    Yes.

11  Q    And then at the top of th next page you have NYC911.

12  That's the 911 ambulance service that TransCare ran within the

13  City of New York, correct?

14  A    Yes.

15  Q    And that you have -- you write here this is the most

16  profitable division.  Do you see that?

17  A    Yes.

18  Q    But it's also the most challenging because of its need for

19  new equipment, is it not?

20  A    Yes.

21  Q    This is the one that needs the most capital.

22  A    Yes, it is.

23  Q    And then you have the remaining.  What is New York Core

24  Non-emergency, just generally?  What was that?

25  A    It's New York customers transport, but it's -- but non-

Greenberg - Direct/Amini                    66

1  emergency vehicles rather than emergency vehicles.

2  Q    That's not an ambulance.  It's other kinds of vehicles.

3  Is that right?  Or is it that they take people in the ambulance

4  sometime, but it's not emergency?

5  A    It's yeah, I'm not positive.

6           THE COURT:  What's the difference between the first

7  three types of contracts or services that you're referring to,

8  transit NYC911 and New York Core?  I assume that NYC911 is when

9  someone is having a heart attack or something.

10          THE WITNESS:  Yeah.  Emergency.

11          THE COURT:  What are the other two?

12          THE WITNESS:  So then there are the non-emergency

13  vehicles within New York and then there's the transit which is

14  the contract with the MTA which includes all the vehicles for

15  disabled and --

16          THE COURT:  So what's the difference between that and

17  New York Core?

18          THE WITNESS:  New York Core, the --

19          THE COURT:  In terms of the type of services.

20          THE WITNESS:  New York Core the customer is typically

21  a hospital.  So, it could be transit between facilities within

22  a hospital, but it's going to be non-emergency transit.

23          THE COURT:  And the MTA contract?

24          THE WITNESS:  An MTA is the -- like the

25  (indiscernible) ride is a big part of it.

1       THE COURT:  Is that taking people to the doctor or

2  something like that?  I'm still not getting the difference

3  between -- I understand New York Core is a service provided to

4  hospitals basically to transport their patients.  And what is

5  the MTA service?

6       THE WITNESS:  So, it's a transport of disabled,

7  people challenging --

8       THE COURT:  From where to where?

9       THE WITNESS:  It could be -- my understanding is the

10 different -- it could be any type of locations that they need.

11      MR. AMINI:  Your Honor, if I may.

12 Q    MTA as I -- it's a service the City provides to its

13 residents.

14 A    Yes.

15 Q    And there are these mini-vans that they -- that have the

16 ability to lift wheelchairs and disabled people seamlessly into

17 them.

18 A    Yes.

19 Q    Correct?  And those are vehicles that are provided by the

20 MTA?

21 A    Yes.

22 Q    They are garaged in a facility on Foster Avenue, if I'm

23 not mistaken.

24 A    Yes.

25 Q    Maybe 1065 Foster Avenue in Brooklyn, is that where they

Greenberg - Direct/Amini                    68

1  were garaged?

2  A    I remember Foster Avenue.  Yes.

3  Q    All right.  And the contract with the MTA required that

4  TransCare service those vehicles and go to the locations that

5  the City directed to pick people up and move them from one

6  place -- dispatch them from one location to another home, to

7  doctor's appointments, things of that nature.

8  A    Yes.

9  Q    And who -- the dispatch was from the City of New York if

10 I'm not -- am I correct about that?

11 A    That's my recollection, yes.

12 Q    And then you had other more -- outside of the New York

13 City you had three basic other markets, Maryland, Pittsburgh,

14 and Hudson Valley, correct?

15 A    Yes.

16 Q    And those were, for the most part, ambulance services,

17 correct?

18 A    Yes.

19 Q    Going back to New York City 911 you have reference there

20 to although it's the most profitable all of the main customers

21 have issued ultimatums for new vehicles.  Was that right?

22 A    Yes.

23 Q    So, the average age of the fleet was quite ancient, was it

24 not?  Relative to this kind of service.  To your knowledge.

25 A    To my knowledge it was, yeah, it was an older aged fleet.

1  Q    It was challenging to just keep them on the road.

2  A    Yes.

3  Q    And many of them, you'll see at some point, were not on

4  the road, correct?

5  A    Yes.

6  Q    Then going to the bottom of this memo to Ms. Tilton you

7  have -- you have laid out for her the results, the actual

8  results if I understand it correctly by the various business

9  lines.

10  A    Yes.

11  Q    Both in terms of revenue on top and then in terms of the

12  EBITDA that is associated with that revenue underneath.

13  A    Yes.

14  Q    At this point your next statement after that is we

15  discussed with management one more time a number of scenarios,

16  but agreed to disagree.  Do you see that?

17  A    Yes.

18  Q    You and Mr. Pelissier were now working independently of

19  management.

20  A    Yes.

21  Q    And, in fact, that's the next thing you say.  As a result

22  we work independently to arrive at a scenario more consistent

23  with the parameters discussed yesterday.

24  A    Yes.

25  Q    You and Mr. Pelissier were now going to try to work a plan

Greenberg - Direct/Amini                          70

1   within the parameters of what Ms. Tilton was discussing with

2   you.

3   A    Yes.

4   Q    And you were following her directions.

5   A    We were.

6   Q    And there's -- I was going to mention it, but there's the

7   reference next to there are 169 in service out of 275.  72 are

8   close to 30 percent or out of service at any time.

9   A    Yes.

10  Q    Correct?  Despite -- and you refer to an average age of

11  seven plus years, correct?

12  A    Yes.

13  Q    You have, at the bottom of this, that the maximum funding

14  need during 2016 is four and a half million, but it can be

15  mitigated through any potential delays of vehicle leases.  Do

16  you see that?

17  A    Yes.

18  Q    And that was your plan -- yours and Mr. Pelissier's --

19  that was based on yours and Mr. Pelissier's plan at this point

20  in time.

21  A    Yes.

22  Q    And you go to the next page with me on Page 4 you explain

23  the peak need of close to four and a half million as driven by

24  the following.  Do you see that?

25  A    Yes.

Greenberg - Direct/Amini                                    71

1  Q    And the peak need is, you know, at the -- at its high

2  point you're going to need four and a half million bucks,

3  possibly.

4  A    Yes.

5  Q    For this plan.  And these are the things you need them

6  for, correct?

7  A    Yes.

8  Q    And you lay them out.  The first one is that New York

9  State Insurance Fund.  You have to pay them at least the

10 million bucks is the point, correct?

11 A    Yes.

12 Q    For them to continue providing insurance?

13 A    Yes.

14 Q    Which was critical to the operations, was it not?

15 A    Yes.

16 Q    In fact, in the ambulance business all insurance is

17 critical to its operations, is it not?

18 A    Definitely.

19 Q    And then you had other -- you know, you were behind in

20 payroll and payroll taxes in particular, correct?

21 A    (No audible response).

22 Q    And then 25 percent was for down payments on these 20 new

23 vehicles.

24 A    Yes.

25 Q    And the rest was just accounts payable payments mostly for

Greenberg - Direct/Amini                    72

1  parts and supplies which you parts supplier wasn't provided to

2  you because of past due payments?

3  A    Yes.

4  Q    And at this point in time, January 5th, 2016, this was the

5  plan that you were proposing to Ms. Tilton, was it not?

6  A    Yes.

7  Q    That you -- this is you Mr. Felicia (phonetic).

8  A    Yes.

9  Q    And the two of you were the principal people tasked with

10 providing such a plan?

11 A    Yes.

12 Q    The next document is DX-106, which -- to which we have no

13 objection.  And I only have it in there to refresh your

14 recollection as to the date on which Carl Marks Advisory Group

15 was engaged.

16 A    Okay.  Yes.

17 Q    They came in on January -- dated as of January 7th,

18 correct?

19 A    Yes.

20 Q    Right about then.  And as we discussed, they came in both

21 as chief restructuring officer, and one of their employees was

22 tasked with being the outside CFO.

23 A    Yes.

24 Q    This document was signed by Peter Wolf, that's the chief

25 operating officer, do you see that?

Greenberg - Direct/Amini                    73

1  A    Yes.

2  Q    I'm not sure if I -- but, at this point Mr. -- at this

3  time or very close in time to Carl Marks coming on board Mr.

4  Leland is -- as I understand it -- fired by Ms. Tilton.

5  A    I know it's right around that time frame.

6  Q    And Mr. Banally is fired or quits at the same time, do you

7  know which?

8  A    (No audible response).

9  Q    Let's leave at it this.

10 A    I believe he quit, but --

11 Q    Okay.  He left at that -- he left simultaneously.

12 A    -- yes.

13 Q    With Mr. Leland, correct?

14 A    Yes.

15 Q    And did you replace -- other than as we've discussed, the

16 CROs and this employee of Carl Marks, did you replace either

17 one of those individuals in the remaining time at this time?

18 A    No.  Others took on additional responsibility.

19 Q    Okay.  Who took on effectively the responsibilities of Mr.

20 Leland?

21 A    Both Glenn Youngblood (phonetic) and Peter Wolf took on

22 additional responsibility.

23 Q    Those -- if I wanted to identify the two most senior

24 executives of the company once Mr. Leland left, it would be Mr.

25 Youngblood and Mr. Wolf?

1 A    There were others that I can't recall their names

2 specifically.  They were more -- their responsibility was at

3 particular divisions.  But, I guess Earl Costa (phonetic) took

4 on a significant role as well.

5 Q    Who was Mr. Costa?

6 A    He had run one of the divisions.  At this point I don't

7 remember which division.

8 Q    Pittsburgh?

9 A    I think -- yeah, Pittsburgh.  So, he had run Pittsburgh.

10 And so, he was -- he had gotten -- he was more heavily involved

11 at the corporate level than Starkley (phonetic) had been.

12 Q    And he continued to run Pittsburgh, did he not?

13 A    Yes.

14 Q    But, for -- at the headquarters you would have been -- you

15 would have looked for -- in terms of senior executives at this

16 point the two that would have -- you would have looked to as

17 most senior were Mr. Wolf and Mr. Youngblood, is that correct?

18 A    Yes.

19        MR. MERVIS:  Just an objection, Your Honor.

20        THE COURT:  What's the objection.

21        MR. MERVIS:  The objection is that the way this

22 started off was other than the people at Carl Marks, and we've

23 lost that thread.  So, I'm not sure -- at this point I'm not

24 sure if he's including that as the headquarters, or not

25 including that as headquarters.

Greenberg - Direct/Amini                    75

1          MR. AMINI:  I'm not.  I'm excluding Carl Marks.

2     Q    We understand that an employee of Carl Marks effectively

3     acted as outside CFO, correct?

4     A    And CRO.

5     Q    And CRO -- same person?

6     A    Different person.

7     Q    Two of them.  And did they have operational roles at the

8     company?

9     A    They were involved in the operations of the business.  So,

10    they had --

11    Q    Outside of those two, the next two more senior executives

12    were Mr. Wolf and Mr. Youngblood, correct?

13    A    Yes.

14    Q    All right.  Go with me to J -- PX-158.

15         MR. AMINI:  And I believe there's no objection to

16    this document, Your Honor.

17    Q    Now, in this exhibit, Mr. Greenberg, you're sending the

18    work, the plan that we looked at before, that January 5th plan

19    that you and Mr. Felicia worked all night to prepare.  You're

20    sending it to the Carl Marks folks, are you not?

21    A    Yes.

22    Q    And you make a note -- in their e-mail of the 7th of

23    January, 2016 at 12:33 you make a note to Carl and Jonathan.

24    Carl is Carl Landeck at Carl Marks, correct?

25    A    Yes.

1   Q    He was which one of those people?

2   A    The CFO.

3   Q    The CFO.  And J. Killion, that's Jonathan Killion, and he

4   was also at Carl Marks?

5   A    He was at Carl Marks, yes.

6   Q    Was he -- did he have one of those two roles, or no?

7   A    No.  No, he was director at Carl Marks though.

8   Q    All right.  You're sending the plan with them, and you

9   make a note that, given the discussion with NYSIF, one million

10  payment reduced to 225K.  The cash forecast included a payment

11  plan that is more aggressive than the most recent discussions.

12  Do you see that?

13  A    Yes.

14  Q    In between the -- is it fair to state between the fifth of

15  January and the 7th of January, you had worked something out to

16  reduce that $1 million down to 225?

17  A    Yes.

18  Q    And that gave you at least some modicum of relief from

19  some of the challenges you were facing.

20  A    Yes.

21  Q    And that's what you were telling them at the time.

22  A    Yes.

23  Q    Why were you sending this to them?

24  A    The -- they -- well, any plan that we ultimately would go

25  to Wells for Wells review, Wells was also going to want to have

Greenberg - Direct/Amini                    77

1  -- they had mentioned in there -- in their amount they were

2  going to want to have Carl Marks on board with whatever plan

3  was arrive at.

4  Q    And I assume that Ms. Tilton gave you permission to send

5  this to Carl Marks, correct?

6  A    Yes.

7  Q    Right.  You wouldn't have sent it to Carl Marks without

8  her permission, correct?

9  A    No.

10  Q    And this plan also -- is it fair to state that you believe

11  this plan also went to Wells Fargo?

12  A    I don't think it went to Wells Fargo.

13  Q    I wasn't sure from your last answer.  All right.  Go with

14  me now to Plaintiff's Exhibit 168.  Going back for one minute

15  to the Carl Marks.  At this point you would expect Carl Marks

16  to go on to the company's premises and work with management

17  towards looking at these plans and assisting in the project to

18  stabilize the company and prepare it for a sale, correct?

19  A    Yes.

20  Q    All right.  Now, go with me to PX-168.

21        MR. AMINI:  Again, no objection to this document that

22  I'm aware of, Your Honor.

23        THE COURT:  All right, it's received.

24  Q    This is an instruction from you, is it not, to Renee

25  Dudley and Carlos Mercado (phonetic) about wires?

Greenberg - Direct/Amini                    78

1   A     Yes.

2   Q     Okay.  Just briefly, who are Ms. Dudley and Mr. Mercado?

3   A     Ms. Dudley worked at -- related to -- worked in the

4   administration of the facility, so loan administration.  And

5   Carlos Mercado was the controller at Patriarch.

6   Q     And you were asking them to make certain payments on a

7   count of TransCare, correct?

8   A     Yes.

9   Q     The auto insurance payment of 221,122, correct?

10  A     Yes.

11  Q     I don't know.  IPFS, is that another insurance payment?

12  A     Yes.

13  Q     And the Aetna payment, I assume, was also insurance,

14  right?

15  A     Yes.

16  Q     So, they're roughly -- I don't know -- roughly 699, almost

17  $700,000 in payments?

18  A     Yes.

19  Q     And do you recall there was also -- I don't have a

20  document for it, but do you recall there was also an NYSIF

21  payment roughly about that same time, so as on January 15th one

22  million 172 -- we'll see this number later -- was paid on

23  account of TransCare?

24  A     I'd have to see it to -- you know, to recall.

25  Q     Do you recall who made -- what entity made these payments?

Greenberg - Direct/Amini                    79

1  A    (No audible response).

2  Q    If you know.

3  A    My recollection is that it would have come from one of the

4  funds on behalf of the company.

5  Q    When you say one of the funds you're talking about one of

6  the Zohar Funds?

7  A    I'm not sure which fund.

8  Q    Well, besides the Zohar Funds, what other funds, Ark

9  Funds?

10 A    The Ark Funds, yeah, the other funds.  But, I don't -- I'm

11 not sure which fund had -- it's typically done through a

12 direction letter.

13 Q    A direction letter is what, the company asks for the

14 money?

15 A    A company provides direction as to where the money will

16 go, usually to speed delivery of it, or you know, usually to

17 speed the delivery of the money to the vendor, or just to send

18 -- basically send the money directly to the vendors.

19 Q    And this money would only have been paid with Ms. Tilton's

20 approval, correct?

21 A    Yes.

22 Q    She would have to give you the green light to make these

23 payments?

24 A    Yes.

25 Q    All right.  And at this point in time was it your

Greenberg - Direct/Amini                          80

1  understanding that you and Ms. Tilton were operating under --

2  to this point had been what we call the January 5th plan?

3  A    (No audible response).

4  Q    The one that you had worked all night with Mr. Felicia on

5  or something else?

6  A    If a plan -- there are plans that are worked on that are

7  -- that have not been approved by the Board.  So, as a result,

8  they remain unapproved plans.  So, we may still judge

9  ourselves, judge the company against the plans.  But, until

10 those plans become approved plans and budgets, they're not

11 referred to as a budget.  So, you're -- we were -- you were

12 operating at that point on a -- under an unimproved plan.  But,

13 each of the things that you would need to achieve, you also

14 needed to get Board approval for anywhere if they were

15 something that required Board approval.

16 Q    Can I take it from that answer -- and correct me if I'm

17 wrong, I'm not trying to put words in your mouth -- that, to

18 your recollection at this point, you didn't have an approved

19 plan, but you were working under the proposals that you were

20 discussing with both Ms. Tilton and now Carl Marks?

21 A    Yes.

22 Q    Go with me if you would to PX-170, which is the next

23 exhibit in your book.  This --

24        MR. AMINI:  Also, I am unawares of any objection to

25 it, Your Honor.

**A1261**

Greenberg - Direct/Amini                    81

1           THE COURT:  It's received.

2           MR. MERVIS:  Your Honor, hang on one second.  I

3  believe we do have an objection, but just -- I stand corrected.

4  We should have, but we didn't.  Oh, yeah, we don't have an

5  objection.

6           THE COURT:  It's received.

7  Q    Let's go to Plaintiff's Exhibit 170.  And in particular I

8  want to start with your e-mail of January 15, 2016 at 2:06

9  p.m., which is at the bottom of the first page, and runs to the

10  top of the second page.  Is that an e-mail that you wrote to

11  Lawrence Fort and Robert Starck, among others, on or about

12  January 15th?

13  A    Yes.

14  Q    Those -- Mr. Fort and Mr. Stack are at Wells Fargo,

15  correct?

16  A    Yes.

17  Q    And let's get this out of the way.  We've already

18  established Melissa Provost is also at Wells Fargo?

19  A    Yes.

20  Q    Why don't you just tell us Marc -- I'm going to screw this

21  up.

22  A    Pfefferle.

23  Q    I'll let you pronounce it.  Where is Marc?

24  A    At Carl Marks.

25  Q    All right.  You referenced new funding that needs to be

**A1262**

Greenberg - Direct/Amini                    82

 1  provided today to TransCare in the amount of up to 1.5 million.

 2  Do you see that?

 3  A    Oh, up to 6.5.

 4  Q    Well, it -- I'm reading from the first two lines.  "As we

 5  discussed earlier today, new funding needs to be provided to

 6  TransCare in the amount of up to 1.5 million, including

 7  resolving NYSIF termination issues in order to address critical

 8  insurance."  That's the immediate payments, correct?

 9  A    Yes.

10  Q    And that includes, does it not, the material we saw

11  earlier in the instruction that you gave Ms. Dudley and Mr.

12  Mercado at 1:10 p.m. on that day?

13  A    Yes.

14  Q    That's part of the 1.5 that we were talking about.  And

15  then you go on to say, as part of a first funding under a go-

16  forward business plan being developed of up to 6.5 million.  Do

17  you see that?

18  A    Yes.

19  Q    What are you referring to there?

20  A    My recollection is at the time we had had a general

21  discussion about a potential amount of funding, but it was

22  subject to an approved business plan.

23  Q    So, this 6.5 million was part of an approved business

24  plan, or proposed to the business plan, or something else?

25  A    It was -- based on what I'm reading here, it looks like it

Greenberg - Direct/Amini                    83

1  was part of a business plan that was being developed.

2  Q    You were letting them know, by the way, in the next

3  paragraph that Carl Marks has only been there for four days.

4  So, we don't really have the input that we wanted from them to

5  this point, we're -- they're still working on it, correct?

6  A    Yes.

7         THE COURT:  What's the relationship between the 4.5

8  million that you were talking about in Exhibit PX-67 and what

9  -- and the 6.5 million you're talking about in this exhibit?

10        THE WITNESS:  (No audible response).

11        THE COURT:  In other words, did you raise the 4.5

12  million to 6.5 million in terms of what you needed for funding?

13        THE WITNESS:  Yes, it had increased.

14 Q    And you were looking -- and with respect to this money

15 that you were putting in, you were looking for their agreement

16 on it, were you not?  You can go to the next page.  This is

17 where I'm going to take it.  You were looking for an agreement

18 from Wells Fargo concerning this funding.

19 A    Yes.

20 Q    If I understand, at this point in time Wells Fargo had a

21 lien on all the company's assets.  Whether it be a first lien

22 or a second lien, it had a lien on everything.

23 A    Yes.

24 Q    Was that not your understanding?

25 A    Yes, both first and second.

Greenberg - Direct/Amini                    84

1    Q    All right.  And then the --

2    A    Depending on the assets.

3    Q    -- and we call the group -- the other -- the second lien

4    on some assets, first lien on -- that second group, we call

5    them in this case the term loan lender.

6    A    Yes.

7    Q    They also had a lien on it, did they not?

8    A    Yes, first or second, yeah, depending on the assets.

9    Q    Right.  And there was an agreement between Wells Fargo and

10   the term loan lenders as to who had a first lien on which

11   assets -- that's between the two of them -- and who had a

12   second lien on which assets, to your understanding?

13   A    Yes.

14   Q    And so, Ms. Tilton was looking to slip -- and I don't mean

15   that in a pejorative way, but to put this money in between

16   those two liens.  In other words, she was looking to be junior

17   to Wells Fargo, but senior to the term loan lenders.

18   A    Yes.

19   Q    And you understood that in order to do that she needed

20   Wells Fargo's agreement?

21        MR. MERVIS:  And just I will note an objection, Your

22   Honor, I think that question does call for a legal conclusion.

23   And I guess if he's asking what he thought, you know, to the

24   extent that's relevant, but --

25        MR. AMINI:  I asked --

**A1265**

1              THE COURT:  It sounds like a factual question.

2              MR. MERVIS:  Yeah.

3              THE COURT:  She was looking to subordinate the loan

4    to Wells Fargo, but that priority of the term lenders.

5              MR. MERVIS:  Right.  That's not the question that's

6    pending though, Your Honor.  The question that's pending is

7    whether this witness believed that Wells Fargo's consent was

8    required.  I'm simply noting that ultimately is a legal issue.

9              MR. AMINI:  And you know what?

10             THE COURT:  It's asking for his understanding.  It's

11   --

12             MR. AMINI:  And you know what?

13             THE COURT:  Go ahead.

14             MR. AMINI:  Let me -- if I may, Your Honor, let me

15   rephrase that because --

16             THE COURT:  All right.

17             MR. AMINI:  -- I realize from that --

18             THE COURT:  That makes the objection academic.

19             MR. AMINI:  I may have not done this correctly.

20             THE COURT:  Go ahead.

21             MR. AMINI:  All right.  I missed something.

22   Q    Wells Fargo had a lien on all the assets.  We established

23   that.

24   A    Yes.

25   Q    You understood that.

1    A    Yes.

2    Q    Ms. Tilton, in addition to being -- wanting to be senior

3    to the term lenders, she wanted a first lien ahead of Wells

4    Fargo on the things that the term lenders had the first lien

5    on.  Isn't that what she wanted?  She wanted a first lien on

6    all the equipment if she was going to make this loan.

7    A    I'm just reading this one particular sentence that's

8    saying they'll share in a junior capacity to Wells in the Wells

9    Fargo ABL collateral, but senior to the existing term loan

10   debt.

11   Q    The Wells -- let's do this, let's break this down from

12   your e-mail.  The Wells Fargo ABL collateral package that

13   you're referring to, that's what you generally refer to as the

14   accounts receivable.

15   A    Yes.

16   Q    They had priority over that?

17   A    Yes.

18   Q    But, they also had a lien on everything else?

19   A    Yes.

20   Q    Okay.  The term lender loan collateral, that was all the

21   equipment?

22   A    Yes.

23   Q    They had all the equipment.  Ms. Tilton wanted to put this

24   money in.  And although she was prepared to be junior to the

25   accounts receivable, she wanted to be senior on the equipment?

 1  A     Yes, that's --

 2  Q     And in order to get senior on the equipment did you

 3  understand she needed Wells Fargo's permission?

 4         MR. MERVIS:  I have the same objection.

 5  A     That -- it wasn't my area of specialization.  But, in

 6  reading this particular bullet, it looks like I'm looking for

 7  -- I'm requesting their confirmation.  So, my -- based on

 8  reading that, it sounds like I was looking for them to confirm,

 9  but I can't say whether that -- you know, from a legal

10  perspective what was needed.

11  Q     Well, let me ask you this.  Did you write this e-mail

12  yourself?

13  A     I most likely had input from legal in PPAS.

14  Q     So, that would have been Mr. Stephen?

15  A     No.  Actually -- it would have been more likely Adam Katz.

16  Q     Did you ever get that confirmation from Wells Fargo?

17  A     My recollection is not.

18  Q     Did you get -- ever get any agreement from Wells Fargo

19  with respect to these -- well, let's call them loans for now --

20  that you're referring to on January 15th?

21  A     My recollection is we did not.

22  Q     Besides your testimony up to this point, do you have any

23  understanding of how that 4.5 million that His Honor referred

24  to became 6.5 million in this document?

25  A     Well, I'd need to look at the particulars to say.

Greenberg - Direct/Amini                                    88

1  Q    Go with me if you would now to PX-174.

2           MR. AMINI:  I don't believe there's any objection to

3  this document.

4           MR. MERVIS:  This is not an objection.

5           THE COURT:  All right, it's received.

6  Q    This is -- let's start with your e-mail on PX-174.  Your

7  first e-mail in this chain, which is on January 25th, 2016 at

8  8:14 p.m.  It's from you to Mr. Husson and Ms. Provost at Wells

9  Fargo, correct?

10 A    Yes.

11 Q    And the only person on it is Mr. -- the other copy is Mr.

12 Felicia?

13 A    Yes.

14 Q    And you're asking for a followup with them, and you're

15 asking -- do you know whether Ottoberg (phonetic) -- you

16 understood that Ottoberg at that point was Wells Fargo's

17 counsel, correct?

18 A    Yes.

19 Q    All right.  So, you're asking whether they had a chance to

20 address the no -- an inter-creditor agreement from Friday --

21 from the Friday, January 22nd funding.  Do you see that?

22 A    Yes.

23 Q    And we'll see later the January 22nd -- I don't want to

24 confuse you, so let's -- the January 22nd, by that was a

25 mistake you meant January 15th funding.

1  A    Oh.

2  Q    Okay.  It will come up in the next two e-mails, just so we

3  don't get confused here.  All right.  And your -- that note in

4  a creditor agreement is what you -- that refers to the funding,

5  the January 15th funding that Ms. Tilton wants to have a

6  certain priority, correct, that we discussed already?

7  A    Yes.

8  Q    All right.  And you also mentioned -- I don't want to lose

9  this -- that you were meeting with (indiscernible) on Wednesday

10 morning -- this is Monday -- on Wednesday morning the 27th.

11 And so, you want that information for that meeting, among other

12 things.

13 A    Yes.

14 Q    She then writes back to you at 9:20 a.m. that same day --

15 no, maybe it's the next day -- 9:20 a.m. the next day, January

16 26th.  Melissa Provost to you, all right, asking, can you

17 confirm you meaning the 1/15/16 funding, 1.5 million, versus

18 the 1/22 you referred to below.  Do you see that?

19 A    Yes.

20 Q    All right.  And then your response to that, all right, is

21 thank you, and you correct yourself, and you say, it was

22 actually 1/15, and the amount was 1.172.  Do you see that?

23 A    Yes.

24 Q    And did -- and was that a true statement to the best of

25 your knowledge at the time?

1  A    Yes.

2  Q    One point -- in addition to the monies we saw, another

3  money was paid I think actually to NYSIF, does that fit your

4  recollection?

5  A    I do remember a payment being made.

6  Q    All right.  And the total of those four payments came to

7  1.172 on January 15, 2016, do you recall that?

8  A    Yes.

9  Q    You still didn't have an agreement with -- a written

10 agreement with anybody with respect to that funding, did you?

11 A    No.

12 Q    You didn't have an agreement with Wells Fargo, correct?

13 A    Yes.

14 Q    And you didn't have an agreement with the term loan

15 lenders?

16 A    No.

17 Q    Now, in order to get an agreement with the term loan

18 lenders, you needed Ms. Tilton's agreement as the manager of

19 her own funds, correct?

20 A    That's my understanding.

21 Q    And you needed Ms. Tilton's agreement as the manage of the

22 Zohar Funds at that point?

23 A    (No audible response).

24 Q    All right.  When I say Ms. Tilton, she usually -- and I'm

25 not trying to leap-frog this.  She operates as the manage of

Greenberg - Direct/Amini                    91

1  the Zohar Funds through PPAS I think we call it, Patriarch

2  Partners Agency Services, correct?

3          MR. MERVIS:  Your Honor, I guess I have the same

4  objection.  If he's asking for his understanding --

5          MR. AMINI:  I am.

6          MR. MERVIS:  -- that's one thing.  But, the contracts

7  say what they say, so --

8          THE COURT:  Fair enough.

9          MR. AMINI:  I'll put the word understanding in there.

10 Q    So, is it your understanding that you needed Ms. Tilton's

11 agreement as the manager of the Patriarch Partners Agency

12 Services management responsibilities with respect to the Zohar

13 Funds, you understood you needed that, correct?

14 A    Yes.

15 Q    And you also understood that you needed Credit Suisse's

16 agreement as one of the lenders for itself and Dominion

17 (phonetic)?

18 A    That I -- that was less clear, yeah.  There were -- Mark

19 Pfefferle at Carl Marks had said you need -- you know, Credit

20 Suisse needs to sign off on this, but I didn't have an official

21 legal opinion either internally or externally.

22 Q    Fair enough.  And then to finish this exhibit for a

23 minute, you also said you have a meeting set up with Lynn

24 tomorrow -- now, at this point it's Tuesday, and the tomorrow

25 is the 27th -- to discuss the budget.  And you were going to

Greenberg - Direct/Amini                    92

1  revert back based on that meeting to the timing to provide the

2  budget, right?

3  A    Yes.

4  Q    Okay.  Wells Fargo was still looking for a budget for this

5  plan to stabilize and sell the company, and you were still

6  working on it?

7  A    Yes.

8  Q    Okay.  Let me go with you now to PX-175.

9         MR. AMINI:  Again, I don't believe there's any

10  objection to this document.

11        MR. MERVIS:  No, no objection.

12        THE COURT:  It's received.

13  Q    This is -- starting with the first e-mail in this chain at

14  the bottom, this is an e-mail -- Jonathan Killion, we already

15  identified him, he was one of the folks at Carl Marks, correct?

16  A    Yes.

17  Q    He was working on the TransCare project with you?

18  A    Yes.

19  Q    All right.  And he's sending to you and a number of other

20  people a draft of an executive summary that we -- that the

21  intent would be to use these slides as a basis for our meeting

22  tomorrow.  Did you understand that to be the meeting with Ms.

23  Tilton?

24  A    (No audible response).

25  Q    You know what, I'm going to back up for a second.  I

Greenberg - Direct/Amini                                93

1  apologize.

2          MR. AMINI:  I didn't realize that I started with the

3  second to the last e-mail, Your Honor.

4  Q    Let's start with the very last e-mail, which again, as e-

5  mails go, the very first e-mail in time in this chain, but the

6  last on the page.  And that was from Mr. Killion on January

7  26th at 12:44.  And he's saying to, Jean-Luc, and Randy Jones

8  -- who you previously identified as being at Patriarch Partners

9  -- a draft presentation that goes to the details of the FY

10  fiscal year '16 projections and key action items.  And then he

11  goes on to say, we're preparing an executive summary that will

12  discuss the key points.  Is that an e-mail you received from

13  him on or about that day, January 26th, 2016?

14  A    Yes, it is.

15  Q    And did you have an opportunity to review what he -- the

16  plan.  Do you recall whether you had an opportunity to review

17  the plan that he sent to you, the details?

18  A    Yes, I did.

19  Q    All right.  And did you have an opportunity to comment on

20  it at the time, if you recall?

21  A    (No audible response).

22  Q    Well, let me withdraw it.

23  A    It's a challenge to say whether I did, because he sent it

24  in the middle of the night.

25  Q    That's fair enough.  He then sends at 12:03 a.m. -- this

**A1274**

Greenberg - Direct/Amini                94

1    one he sends at 12:44 p.m. in the afternoon.  But, then at

2    12:03 a.m. he sends you the executive summary, which is

3    actually the thing that's attached, correct?  You did receive

4    that in the middle of the night, correct?

5    A    Yes.

6    Q    And if you look at the very last page of that executive

7    summary, it says Michael to complete status of Wells

8    discussions.

9    A    (No audible response).

10   Q    Right?

11          THE COURT:  Where are you reading from?

12          MR. AMINI:  I'm reading the very last page of J --

13   PX-175, Your Honor.  It has a Bates Stamp ending in 2124.  It

14   says -- it's a heading, it's a slide, and incomplete slide I

15   think, status of Wells Fargo discussions, Michael to complete.

16          THE COURT:  I see that.

17   A    I see that.

18   Q    And that, Michael to complete, was your task?

19   A    Yes.

20   Q    You were the one having conversations with Wells Fargo,

21   correct?

22   A    Yes.

23   Q    Okay.  And, in fact -- just to make sure I get everything

24   here, hold on.  In fact, if you look to the next exhibit, PX-

25   177.

Greenberg - Direct/Amini                    95

1    MR. AMINI:  To which there is also no objection, Your

2   Honor.

3    THE COURT:  It's received.

4   Q    That is an e-mail, is it not, that you sent to the Wells

5   Fargo person, and you CC'd Adam Katz, so he's that lawyer at

6   Patriarchy we talked about, correct?

7   A    (No audible response).

8   Q    Adding that slide for the presentation.

9   A    I sent this to -- you said Carl Marks?

10  Q    Yes, to Marc Pfefferle, J. Killion, C. Landeck, cc Adam

11  Katz, bcc J. Killion.

12  A    Yes.

13  Q    All right.  You've referenced a slight clarification of

14  Wells Fargo's position regarding a longer term forbearance

15  amended or an extension, correct?

16  A    Yes.

17  Q    All right.  And you have on the next page your notes or

18  your slide for this presentation of what the status of the

19  Wells Fargo discussions are.

20  A    (No audible response).

21  Q    Right?

22  A    Yes.

23  Q    And included in the very first bullet point is a note for

24  the new facility, along with supporting documents that has been

25  drafted and presented for your review, do you see that?

**A1276**

Greenberg - Direct/Amini                    96

1  A    Yes.

2  Q    This is a presentation for Lynn Tilton.  You're meeting

3  with her on that -- on the next day, right, on the 27th?

4  A    Yes.

5  Q    Actually on this day, right?

6       MR. MERVIS:  Objection, Your Honor.  Two questions

7  right in a row.

8       THE COURT:  Well, the -- is the presentation for your

9  next day meeting with Lynn Tilton?

10      THE WITNESS:  I believe so.

11      THE COURT:  Okay.

12 Q    And the note that you're presenting to her is the note for

13 that 1.172 million, that new facility that we've been

14 discussing.

15 A    I believe I'm saying there that it's been drafted and

16 presented for her review, but not that it's going to be

17 presented.

18 Q    Yes, you're going to present it for her review.

19 A    No, no.  I believe it was saying that the note for the

20 facility along with the supporting documents has been drafted

21 and presented for her review.  So, in the past-tense.

22 Q    And you're waiting for her approval, and you're now

23 looking at the second bullet point, right, once approved?  Is

24 that the basis for your testimony?

25 A    Yes.

**A1277**

Greenberg - Direct/Amini                    97

1  Q    So, you saw that, and that refreshed your recollection

2  that you're looking for her approval so that you can send the

3  document to Wells and the inter-creditor agreement amended so

4  that the new facility will be ahead of the term loan letters

5  and the ABL collateral?

6  A    Yes.

7  Q    That's what you're --

8            THE COURT:  This is the 1.17 million facility?

9            MR. AMINI:  I think it's 1.127, Your Honor.

10           THE COURT:  Oh, 1.127, not the 6.5 million we've

11  referenced?

12           THE WITNESS:  I think initially it's the 1.1 whatever

13  that number is.  And potentially up to 6.5 assuming everyone's

14  on board.

15           MR. AMINI:  I'll jump ahead so that we don't get

16  confused.

17  Q    The note itself covers the 1.127.

18  A    Yes.

19  Q    But, to your understanding, it's a note for up to $6.5

20  million?

21  A    (No audible response).

22  Q    I'll show it to you, I'm not --

23  A    Yeah, I'd have to see it.  But, it -- I remember the

24  facility of up to 6.5 and money that had already been given

25  out.  So, I don't know -- I don't remember exactly how it was

**A1278**

Greenberg - Direct/Amini                    98

1  documented.

2  Q    And just to cover this briefly, in the third paragraph of

3  your slide, the first bullet -- the first clear bullet point,

4  as opposed to filled in, is delivery of budget by a date

5  certain on the most recent request you have to Wells Fargo as

6  January 29th?

7  A    Yes.

8  Q    And that's because you and Carl Marks are meeting with Ms.

9  Tilton on January 27th with these budgets that you're working

10  on in the hopes that you'll get a green light to go forward

11  with those budgets and present them to Wells Fargo?

12  A    Yes.

13  Q    Did you get that green light at that meeting to your

14  recollection?

15  A    To my recollection, we did not.

16  Q    And do you recall why?

17  A    I don't recall exactly, because typically when we didn't

18  get the green light it could be multifaceted.

19  Q    Let's -- at the bottom of this you address the Credit

20  Suisse in the circumstance that we talked about earlier,

21  correct?

22  A    Yes.

23  Q    All right.  Let's go to PX-178.

24        MR. MERVIS:  This one has -- lacks relevance.

25  Objection, Your Honor.

Greenberg - Direct/Amini                    99

1    Just one moment, Your Honor.  I'll withdraw that

2    objection.

3         THE COURT:  Okay.  It's received.

4    Q    Ms. Provost -- in PX-178 Ms. Provost at Wells inquires on

5    the 28th, the day after the supposed meeting with Ms. Tilton,

6    can we talk today, get an update, how did things go with Ms.

7    Tilton yesterday, correct?

8    A    Yes.

9    Q    And your response to her is, we met yesterday, however,

10   the meetings are continuing today, and you'll continue to

11   provide updates, correct?

12   A    Yes.

13   Q    So, you were -- that meeting with Ms. Tilton on the 27th

14   went over to the 28th as well.

15   A    Yes.

16   Q    Is that right?

17   A    Yes.

18   Q    And this was the meeting that you don't recall getting a

19   final answer from her.

20   A    I don't recall getting one.

21   Q    Okay.  Do you recall any direction from her at that

22   meeting?

23   A    Only -- the only thing I recall is just specifically as it

24   relates to clarifying the collateral position, but I don't

25   recall anything additional.

Greenberg - Direct/Amini                    100

1  Q    And what did you mean by clarifying the collateral

2  position?

3  A    What was -- you know, as it was described in the previous

4  e-mail.

5  Q    Okay.  When you say the previous e-mail, you're referring

6  now to -- let me see if I have this -- your e-mail to -- the e-

7  mail to -- let me just refer to PX-170, the e-mail from you to

8  the Wells Fargo folks in terms of what it is that you wanted

9  from Wells.

10 A    Yes.

11 Q    So, you wanted to follow up on that?

12 A    Yes.

13 Q    All right.  Go with me to PX-179.

14       MR. AMINI:  Again, there's no objection that we're

15 aware of for this document, Your Honor.

16       THE COURT:  It's received.

17 Q    This is an e-mail to yourself on January 28th at 1:04,

18 correct?

19 A    Yes.

20 Q    And you're e-mailing yourself the plan that we -- that's

21 been in discussion with Ms. Tilton, correct?

22 A    Yes.

23 Q    And this is the status of the plan at that time?

24 A    Yes.

25 Q    And do you know what changes, if any, came out of that

Greenberg - Direct/Amini                    101

1   meeting relative to this plan?

2   A    (No audible response).

3   Q    That meeting on January 27th and 28th with Ms. Tilton?

4        MR. MERVIS:  I object to the form of the question,

5   Your Honor.  I think there's a foundational issue.

6   Specifically, that the plan -- that this plan is a derivation

7   of the one that --

8        THE COURT:  Well, do you recall any changes you made

9   to your plan after you met with Ms. Tilton on January 28th?

10       MR. AMINI:  27th and 28th, Your Honor.

11       MR. MERVIS:  Your Honor, my point's a little bit

12  different.  If I understand the testimony, the plan that was

13  being reviewed on that date was a Carl Marks plan, not the

14  witness' plan.  So, that's I think what's not clear here.

15       THE COURT:  My recollection is the plan was presented

16  to Ms. Tilton at the meeting.

17       THE WITNESS:  Mm-Mm-mm.

18       THE COURT:  Were there any changes from the plan that

19  was presented to Ms. Tilton at the meeting?

20       THE WITNESS:  Just based on the last bullet point of

21  assumptions, this is just based on what I'm reading here, it

22  looks like it's -- there is a change from the Carl Marks model.

23  Because I'm saying, this compares to the CMA model, which had

24  100 and a half of revenue, an EBITDA of two and a half.

25       THE COURT:  Do you have any recollection, independent

Greenberg - Direct/Amini                    102

1   of this document?

2            THE WITNESS:  Not independent of the document

3   specifically, because there's just a lot happening in a short

4   period of time.

5            THE COURT:  Ask another question.

6   Q    At this point in time, at the end of this meeting, what

7   plan, if any, are you proceeding with?

8   A    My recollection is that we had not arrived at a plan that

9   was approved.

10           THE COURT:  Now's a good time to take our morning

11   break.  Let's begin again at two o'clock sharp.  So, be back

12   before two o'clock.  We'll lock the courtroom if you want, so

13   you can leave your materials here.

14           MR. MERVIS:  Is it all right if we wait in here?

15           THE COURT:  Yes.

16           MR. MERVIS:  Thanks.  I won't ask for a key, we'll

17   just keep the door open.

18           MR. AMINI:  And I don't think it's needed.  I think

19   we were going to talk to Mr. --

20           THE COURT:  And don't discuss your testimony with

21   anyone during the break.  Thank you.

22           MR. AMINI:  Thank you, Your Honor.

23                        *  *  *  *  *

24

25

103

1              **C E R T I F I C A T I O N**

2           We, ALYCE STINE, KIMBERLY UPSHUR and ANDREA FOY,

3  court approved transcribers, certify that the foregoing is a

4  correct transcript from the official electronic sound recording

5  of the proceedings in the above-entitled matter, and to the

6  best of my ability.

7

8  /s/ Alyce Stine

9  ALYCE STINE

10

11  /s/ Kimberly Upshur

12  KIBERLY UPSHUR

13

14  /s/ Andrea Foy

15  ANDREA FOY

16  RELIABLE                DATE:  July 26, 2019

17

18

19

20

21

22

23

24

25

**A1284**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| IN RE: | . | Chapter 7 |
| | . | |
| TRANSCARE CORPORATION, | . | Case No. 16-10407-smb |
| | . | |
| | . | |
| | . | New York, New York |
| Debtor. | . | Monday, July 22, 2019 |
| . . . . . . . . . . . . . | . | 2:01 p.m. |
| LAMONICA, ET AL., | . | |
| | . | Adv. Proc. 18-01021-smb |
| V. | . | |
| | . | |
| TILTON, ET AL. | . | |
| . . . . . . . . . . . . . . | | |

TRANSCRIPT OF TRIAL - P.M. SESSION
BEFORE HONORABLE STUART M. BERNSTEIN
UNITED STATES BANKRUPTCY COURT JUDGE


For the Chapter 7 Trustee:  Salvatore LaMonica, Esq.
                            LAMONICA, HERBST & MANISCALCO, LLP
                            3305 Jerusalem Avenue
                            Wantagh, New York 11793

                            Bijan Amini, Esq.
                            Avery Samet, Esq.
                            Jamie B. Leggett, Esq.
                            STORCH AMINI, PC
                            Two Grand Central Tower
                            140 East 45th  Street, 25th Floor
                            New York, New York 10017




Audio Operator:             Electronically Recorded
                            by Shea, ECRO

Transcription Company:      Reliable
                            1007 N. Orange Street
                            Wilmington, Delaware 19801
                            (302)654-8080
                            Email:  gmatthews@reliable-co.com

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

APPEARANCES:   (Continued)

For the Non-Debtor
Defendants:                    Michael T. Mervis, Esq.
                               Timothy Q. Karcher, Esq.
                               Nicole (Nici) Eichberger, Esq.
                               Marissa Tillem, Esq.
                               PROSKAUER ROSE, LLP
                               Eleven Times Square
                               New York, New York 10036

3

## I N D E X

PAGE

**WITNESSES:**

MICHAEL GREENBERG
   Direct Examination by Mr. Amini            4
   Cross Examination by Mr. Mervis          79
   Redirect Examination by Mr. Amini     121

| **EXHIBITS:** | | **ID.** | **EVD.** |
|---|---|---|---|
| DX-120 | | 4 | |
| DX-121 | Emails | 7 | |
| DX-127 | Emails | 36 | |
| DX-163 | Emails | 116 | 121 |
| | | | |
| PX-83 | | | 74 |
| PX-185 | | 12 | 12 |
| PX-189 | | 7 | 7 |
| PX-193 | Emails | 40 | |
| PX-196 | Emails | 40 | 48 |
| PX-197 | Documents | 18 | 19 |
| PX-203 | Documents | 26 | 26 |
| PX-228 | Email | | 61 |
| PX-233 | Emails | | 65 |
| PX-243 | | | 69 |
| PX-249 | | 29 | |
| PX-286 | Emails | | 57 |
| | | | |
| JX-55 | | 14 | |
| JX-81 | Emails | | 51 |

1              (Proceedings commence at 2:01 p.m.)

2         (Call to order of the Court.)

3              THE COURT:  Please be seated.  Let's continue.

4              MR. AMINI:  Good afternoon, Your Honor.

5    CONTINUED DIRECT EXAMINATION BY MR. AMINI:

6    Q    Good afternoon, Mr. Greenberg.

7    A    Good afternoon.

8    Q    Mr. Greenberg, to put where we were in perspective, you

9    met with Carl Marks and Ms. Tilton, among others, on January 27

10   and 28 to discuss TransCare's prospects going forward.

11   Correct?

12   A    Yes.

13   Q    All right.  And go with me if you would then to DX-120.  I

14   won't go --

15             MR. AMINI:  I don't know, it's Defendant's exhibit,

16   Your Honor.  Plaintiffs have no objections.

17             THE COURT:  You don't have to say it with joint

18   exhibits, just Plaintiff's exhibit.

19             MR. AMINI:  This is a Defendant's exhibit.

20             THE COURT:  I assume the Defendants have no

21   objections to any of the Defendant's exhibits?

22             MR. MERVIS:  I think that's probably fair, Your

23   Honor.

24             THE COURT:  Okay.  So just --

25             MR. AMINI:  Then I'll --

1          THE COURT:   -- talk about Plaintiff's exhibits.

2          MR. AMINI:  Only the Plaintiff.  Thank you, Your

3   Honor.

4          MR. MERVIS:  Certainly no authenticity.

5          THE COURT:  Okay.

6   Q   I want to focus on your email on the first page of this

7   exhibit dated January 28, 2016 at 3:54 p.m. to Ms. Tilton.

8   A   Yes.

9   Q   You were advising her that there were two ambulances for

10  sale at 9,000 per vehicle which was a discount of I think 9,000

11  per vehicle.  Correct?

12  A   Yes, less than the list price by 9,000.

13  Q   Right.  And you said in addition they would need to

14  purchase the medical equipment as a typical all-in cost you

15  referred to as 150, so I assume from that probably $600,000 in

16  medical equipment per vehicle.  Correct?

17  A   Yes.

18  Q   And she gave you the approval for the vehicles on that

19  day, did she not?

20  A   Yes.

21  Q   And was that pursuant to anything that was discussed on

22  the 27th and 28th with her, or something else?

23  A   I think a combination of at the meeting and then after the

24  meeting.

25  Q   And what were you referring to after the meeting, what

1  were you referring?

2  A    Ongoing discussion about getting -- trying to get

3  vehicles, get information regarding the purchase of the

4  vehicles.

5  Q    At the heart of these plans was the purchase -- was --

6  well, at the heart of these plans was -- I'm sorry, let me

7  rephrase that.  An element of these plans, a critical element

8  of these plans was purchasing more vehicles.

9  A    Yes.

10  Q    In your email in the second paragraph, your email to her

11  at 3:54 p.m., in the seventh -- in the second paragraph you

12  actually have in parentheticals after the own and cost of 150K,

13  you have, As modeled in the business plan and cash flow

14  forecast.  Do you see that --

15  A    Yes.

16  Q    -- in parenthesis?

17  A    Uh-huh.

18  Q    Which business plan and cash flow forecast are you

19  referring to, if you know?

20  A    Other than the most recent I provided, I don't -- yeah, I

21  wouldn't know.

22  Q    Well, and the most recent would be at least one

23  combination of what you were discussing with her on the 27th

24  and 28th.

1 A    Yes.

2 Q    Fair enough.  Go with me if you would to DX, again, 121,

3 Defendant's Exhibit 121.  And particular your -- well, did you

4 have an understanding that these vehicles -- I'm going to focus

5 you on Ms. Tilton's email's of January 28 to Mr. Mercado on

6 which you are cc'd at 7:55 p.m. Did you have an understanding

7 that these two vehicles would be owned by ARK II and not by

8 TransCare?

9 A    I don't recall whether owned by ARK II versus funding

10 provided by ARK II.

11 Q    Funding provided by ARK II is they would have been

12 included in that loan we've been talking about, that $6-1/2

13 million loan.  Correct?

14 A    Yes.

15 Q    That's what you're referring to there.  And you don't have

16 a recollection as you sit here today whether they were part of

17 that loan or they were separately owned by ARK II.  Is that

18 correct?

19 A    Yes.

20 Q    Go with me if you would to PX-189.

21      MR. AMINI:  This one has the relevance objection,

22 Your Honor.

23      MR. MERVIS:  Given the Court's ruling and the date of

24 the email, we withdraw the objection.

Greenberg - Direct/Amini                                          8

1          THE COURT:  Okay.  It's received.

2          MR. AMINI:  Thank you, Your Honor.

3  Q    This is an email from you dated February 3, 2016 at 12:39

4  p.m. to Alexander T. Witkes.  Correct?

5  A    Yes.

6  Q    Mr. Witkes worked for Credit Suisse, did he not?

7  A    Yes.

8  Q    He was your contact on this credit, on TransCare, at

9  Credit Suisse.  Correct?

10 A    Yes.

11 Q    And he was your contact because Credit Suisse was one of

12 the term loan members.

13 A    Yes.

14 Q    You were sending him material concerning that $6-1/2

15 million loan, were you not?

16 A    Yes.

17 Q    All right.  And as of this date, February 3, 2016, you did

18 not actually have a formal term sheet, did you?

19 A    No.

20 Q    No, you and didn't have an agreement as of this date with

21 anyone either, did you?

22 A    No, not yet.

23 Q    All right.  And you were seeking his feedback and actually

24 his approval for this facility, were you not?

Greenberg - Direct/Amini                              9

1  A    It's not clear that I'm seeking approval, but it is clear
2  that I'm seeking feedback.
3  Q    All right.  Do you have a recollection of whether you were
4  seeking his approval or not?
5  A    My recollection is in my discussions with Lynn it was
6  never as like clear in the terms of if it's a formal approval
7  versus, you know, send that -- send the information to them,
8  see them if you can get them to sign off.
9  Q    And at this point in time the terms of any facility are
10 what you describe here in these bullet points in the third
11 paragraph of your email.  Correct?
12 A    Yes.
13 Q    So at this -- is it fair to state that by February 3 it
14 had been determined that the facility would be for up to $6-1/2
15 million with the ability for multiple draw downs.
16 A    Yes.
17 Q    And the ability for multiple draw downs means what?
18 A    That the company wouldn't take down the entire 6-1/2 at
19 the beginning, that they could draw down over time.
20 Q    And do you know what the conditions were under which the
21 company could draw down at this point?
22 A    Other than approval for each draw down, no.
23 Q    And when you say approval for each draw down, whom are you
24 referring to would have to get that approval?

Greenberg - Direct/Amini                    10

1  A    Ms. Tilton.

2  Q    And the idea was for one of Mr. Tilton's companies of

3  funds to enter into this loan agreement.  Correct?

4  A    (No audible response.)

5  Q    I'll draw you to the first bullet point, the facilities

6  between Patriarch Partners, LLC, an LLC affiliate in TransCare.

7  You see that?

8  A    Yes.

9  Q    And I'd like to know the -- I think we know it's between

10 ARK II and TransCare.

11 A    Yes.

12 Q    Correct?

13 A    Yes.

14 Q    And that's a fund that's owned completely by her.

15 A    Yes.

16 Q    To your knowledge or understanding.  Correct?

17 A    That's my understanding.

18 Q    Yes.  And then you have in this email a revised

19 intercreditor agreement that lists priority is as.  You see

20 that?

21 A    Yes.

22 Q    Do you have an understanding of what it was that it was

23 being revised from?

24 A    Yes.

Greenberg - Direct/Amini                    11

1  Q    What, what was it -- how was it being revised?

2  A    The -- so instead of -- the new facility was inserted

3  between Wells as it relates to what's referred to as Wells

4  priority collateral, between Wells and the old facility, the

5  term loan lenders, it was the new facility was inserted

6  between, so senior to the old facility term loan lenders and

7  subordinated to the Wells facility.  And then as it related to

8  the term loan collateral, the new facility ahead of the old

9  facility and ahead of Wells in a third position.

10 Q    And the old facility, what you're talking about, that's

11 the term loan lenders facility.  Correct?

12 A    Yes.

13 Q    And they have priority as I think we've already

14 established in the equipment.

15 A    Yes.

16 Q    And so under the new revised intercreditor agreement up to

17 is going to -- was going to leap frog them and have that

18 priority in the equipment.

19 A    Yes.

20 Q    And at this point in time did you have any agreement from

21 either Wells or the term loan lenders to your knowledge?

22 A    My recollection I did not have.

23 Q    By the way, in order to send this term sheet out you would

24 have had to have Ms. Tilton's approval.  Correct?

Greenberg - Direct/Amini                    12

1  A    Yes.

2  Q    You wouldn't send this out even without her approval.

3  Correct?

4  A    Yes.

5  Q    Go with me if you would -- let me ask you if you -- I had

6  forgot to ask you earlier, even before structuring the loan in

7  this manner Ms. Tilton had gone, had she not, or you, in fact,

8  had gone to Wells Fargo and asked whether you could fund this

9  round of loans through their ABL facility.

10 A    Yes.

11 Q    All right.  So you had -- in the first instance I think it

12 was -- we'll look at the exhibit, I think it was some time,

13 yes, in mid-December you had asked Wells, Can we lend this

14 money to TransCare *pari passu*, or on equal footing with you

15 through your facility.  Correct?

16 A    Yes.

17 Q    And they had said no.

18 A    Yes.

19 Q    Go with me to PX-185.

20      MR. AMINI:  Again, just going to drawn on documents

21 for which there's a relevance objection, Your Honor.

22      MR. MERVIS:  Again, given the date and the Court's

23 ruling I'm going to withdraw that objection.

24      THE COURT:  Okay.  It's received.

Greenberg - Direct/Amini                    13

1  Q    All right.  I'm interested in this document for two

2  reasons.  Let's start with your email -- no, I'm sorry.  Lot of

3  emails here.  Let's start with Mr. -- is it Furley

4  (phonetic) --

5  A    Feferley (phonetic).

6  Q     -- Feferley.  Mr. Feferley's email of February 2 at 11:48

7  p.m., which is on the third page of PX-185.

8  A    Yes.

9  Q    He has an email to you that says, Michael, what was the

10 result of the CF -- CSFB call?  Also, is there any update on

11 AMR?  Do you see that?

12 A    Yes.

13 Q    What's he referring to on the update on AMR?

14 A    At one point there had been a discussion about AMR

15 assisting operationally with TransCare in terms of the -- my

16 recollection is in terms of the maintenance and running of the

17 vehicles.

18 Q    In any particular one of the divisions?

19 A    I think it was -- my recollection is it was -- I'm not

20 positive.

21 Q    You had had interest, or TransCare had had interest from

22 AMR previous to this to your knowledge.  Isn't that right?

23        MR. MERVIS:  Objection to -- objection, Your Honor,

24 vague.

25        THE COURT:  Well, sustained.  What do you mean by

                    Greenberg - Direct/Amini                    14

 1  interest?

 2  Q    AMR had indicated some interest in purchasing all or part

 3  of TransCare prior to this time, had they not?

 4  A    I remember interest in general, I don't remember

 5  specifically on AMR.

 6  Q    Well, I can take you back to you memo I believe of

 7  December 18, if I'm not mistaken, to Ms. Tilton where you were

 8  doing the research on comparables and you indicated, did you

 9  not, to her, Yes, you're -- it's JX-55, your email to Ms.

10  Tilton of Friday, December 18 at 2:11 p.m. where you have a

11  paragraph that says, Glen has indicated that he has received

12  unsolicited calls from Faulk (phonetic) was the first one, and

13  then AMR was --

14  A    Okay.

15  Q     -- the second one.

16  A    Yes.

17  Q    Does that refresh your recollection?

18  A    Yes.

19  Q    But the company had heard from AMR before.

20  A    Yes.

21  Q    Do you remember that they had actually been specifically

22  interested in the Westchester business, do you have any

23  recollection of that?

24  A    That I didn't remember.

25  Q    What?

Greenberg - Direct/Amini                    15

1  A    That I don't remember.

2  Q    You don't remember.

3  A    Yeah.

4  Q    All right.  Let's go back to, if you would, PX-185.  The

5  question, Michael, what was the result of the CSFB call, do you

6  have an understanding of what he's asking you about there?

7  A    Yes.

8  Q    What is he asking you about?

9  A    The -- whether CSFB has signed off on -- or provided

10 feedback related to the terms of the new facility.

11 Q    Go with me now to your email in response at -- on February

12 3 at two -- at 7:11 a.m.  You see that?

13 A    Yes.

14 Q    And did you write that email to Mr. Feferley on or about

15 February 3 at 7:11 a.m.?

16 A    Yes.

17 Q    Under gaming items, what do you mean by gaming items?

18 A    Items that need to -- items that need to be cleared in

19 order to progress.

20 Q    You have CS was open to discussion.  Does that mean Credit

21 Suisse?

22 A    Yes.

23 Q    So they were open to a discussion about this facility.  Is

24 that what you're trying to say?

25 A    Yes.

Greenberg - Direct/Amini                    16

1  Q    And then later you say -- well, first you say they haven't

2  gotten any interest in the past three months, including

3  February.  Was that true at the time?

4  A    Yes.

5  Q    And they didn't have financials currently.  You have,

6  You'll keep pressing Jerry to at least finalize October.  So

7  October his financials hadn't been finalized at this point.

8  Correct?

9  A    Yes.

10 Q    Jerry is that comptroller you were talking about?

11 A    Yes.

12 Q    And the next sentence says, CS wants to see a plan that

13 shows they are better off by agreeing to subordinate their

14 position to the new facility.  You see that?

15 A    Yes.

16 Q    You understood that you were asking CS to subordinate its

17 position to the new facility, didn't you?

18 A    Yes.

19 Q    And did you give them such a plan?

20 A    I don't recall giving him a plan.

21 Q    Did you ever give him such a plan?

22 A    I don't think so.

23 Q    Why not?

24 A    Simply that I wasn't told to, that's the only thing I

25 can --

Greenberg - Direct/Amini                          17

1  Q    You then go on to the next paragraph to say, Lynn wants

2  the facility set so unclear any lending will happen without

3  this overcome.  (Current CS may be an issue unless resolved.)

4  What did you mean by that?

5  A    What -- oh, exactly -- oh, there we go.

6  Q    It's that paragraph that starts with, Lynn wants the

7  facility set, that sentence.

8  A    Okay.  So the -- yeah, the combination of -- at that point

9  in time the combination of an update on CS and their position

10 and an update on Wells's position at that point in time.  It

11 was important in terms of going forward.

12 Q    What is it that you said -- when you say it's unclear any

13 lending will happen without this overcome, what are you

14 talking -- you're talking about Wells and Credit Suisse?

15 A    No, lending from -- additional lending from ARK without

16 clarity on CS and Wells's position.

17 Q    So there wasn't going to -- your understanding at that

18 point there wasn't going to be any additional money from ARK

19 unless CS and Wells agreed.

20 A    It's possible that -- my recollection it's possible that

21 things would have moved forward without CS, but with Wells's

22 sign off.  That was my understanding at the time.

23 Q    You say in the next paragraph, Wells of course wants the

24 plan as well.

25 A    Yes.

**A1301**

1 Q    They're looking -- and by that you mean that they are also

2 looking for a plan that shows how this going forward is going

3 to work at TransCare.

4 A    Yes.

5 Q    And you hadn't given that to them yet either.  Correct?

6 A    Yes, based on --

7 Q    All right.  And then finally with respect to this document

8 you have, AMR call a little further up at 3:30 today.  Did you

9 participate in that call?

10 A    My recollection is that I was there but not a participant.

11 Q    Who were the participants?

12 A    I'm not positive.

13 Q    Did you have any other contact with AMR from point

14 forward?

15 A    I didn't personally.

16 Q    Did you have any meetings with AMR?

17 A    I didn't personally.

18 Q    Go with me now if you would to PX-190 -- give me one

19 second -- yes, 197.  Peter Ruffini is in-house at Patriarch

20 Partners.  Correct?

21 A    Yes.

22 Q    He's a lawyer.  Correct?

23 A    Yes.

24 Q    One of his responsibilities is drafting loan documents as

25 I understand it.  Is that your understanding too?

Greenberg - Direct/Amini                                    19

1  A    Yes.

2  Q    Mr. Ruffini sent you on or about February 10, 2016 at

3  11:33 a.m. he sent you the exhibits that are attached to

4  this -- that are listed in this email of his at, yeah, 11:33

5  a.m.  Correct?

6  A    Yes.

7  Q    That included a credit agreement, in other words a loan

8  agreement, security agreement, a guarantee and an intercreditor

9  agreement.  Correct?

10 A    Yes.  Uh-huh.  Yes.

11 Q    And, you know --

12        MR. AMINI:  By the way, I forgot, Your Honor, to -- I

13 forgot to say that PX-97 -- 197, I'm unaware of any objections.

14 My apologies.

15        MR. MERVIS:  No objection.

16        THE COURT:  It's received.

17 Q    These are -- and these exhibits are -- what he sent you

18 were attached.

19 A    What's that?

20 Q    Well, what he sent you -- he attached what he said he was

21 attaching.

22 A    Yes.

23 Q    You can flip through it if you need to.  But these were

24 those documents --

25 A    Yes.

**A1303**

Greenberg - Direct/Amini                              20

1  Q    -- that he referred to.  And in addition to all of those
2  documents, if you look at the very last page, there was what's
3  called an acknowledgment.
4  A    Yes.
5  Q    And you would -- as part of this agreement that you were
6  looking for TransCare to acknowledge the intercreditor
7  agreement.
8  A    Yes.
9  Q    Who represented TransCare in this transaction?
10 A    They did not -- to my recollection they did not have
11 representation.
12 Q    Did you negotiate this agreement with anybody at
13 TransCare?
14 A    No, no, we did not.  I don't remember doing it.
15 Q    You were sending these -- well, let's go back to your
16 email following Mr. Ruffini's email.  You sent an email to
17 Peter Wolf on February 10, 2016 at 12:03 p.m. did you not?
18 A    Yes.
19 Q    All right.  And Peter was now your COO.
20 A    Yes.
21 Q    Your Chief Operating Officer.  Correct?
22 A    Yes.
23 Q    Mr. Leland and Mr. Bonilla were gone.
24 A    Yes.
25 Q    And the cc's on it are -- okay, they wouldn't be

Greenberg - Direct/Amini                    21

1  identified.  Sorry.  And you say, The documents I had mentioned
2  for you to sign.
3  A    Yes.
4  Q    Could you see?  So you had at some point mentioned these
5  to him in passing or some -- at some meeting, or how, how did
6  you mention these.
7  A    I don't recall how.  It was either through email or by
8  phone, but --
9  Q    Okay.  And you set them on to him about a half an hour
10 after Mr. Ruffini sent them to you.  Correct?
11 A    Yes.
12 Q    Mr. Ruffini wanted you to get the company to sign them.
13 A    Yes.
14 Q    And so you were telling Mr. Wolf to sign it.
15 A    Yes.
16 Q    And did Ms. Tilton tell you to tell Mr. Wolf to sign it?
17 A    She had approved the documents and as a result of the
18 approval, that typically comes from legal, but the documents
19 need to be counter -- you know, need to be executed.
20 Q    And so -- and you sent them to him at 12:03, and then on
21 that same day, oh, about two hours later at 1:54 you sent a
22 follow-up to him that said, You never did get to execute these
23 documents.  You see that?
24 A    Yes.
25 Q    Did he ultimately execute these documents for you on

1  February 10?

2  A    I don't know which day, but I do -- my recollection is

3  that he did ultimately execute.

4  Q    Besides yourself, Mr. Ruffini and Mr. Steven and Mr. Wolf

5  did you share these documents at this time with anyone else?

6  A    Not -- I don't believe anyone else at that point.

7  Q    And you'd gotten Wells's approval for this at this point.

8  A    I'm not positive on that.  I'm not positive at that point.

9  Q    Did there come a point at which you got Wells's approval?

10 A    I don't believe so, but I'm not positive.

11 Q    Go with me if you would in the documents, I just want to

12 focus on a couple of things.  In the -- let me just see -- in

13 the credit agreement between TransCare and its subsidiaries and

14 ARK II with the lender, I'd like you to turn to Page 11 which

15 is -- it has the bates stamp at the bottom bearing 47343.

16 A    Okay.

17 Q    And in particular I want to look at 2.5(b).  Just to set

18 the table for a minute, you understood that this loan, this

19 covered the million one twenty-seven we've talked about.

20 A    Yes.

21 Q    And we'll see later there's some further amounts, but I'm

22 not trying to confuse the issue.  But I think the total amount

23 was on the order of a million eight ninety-two.  I'll show you

24 the exact numbers momentarily.  But the total for the whole

25 loan was, as we've discussed, 6-1/2 million, which you can see

Greenberg - Direct/Amini                          23

1 on the first page.  This is Page 11.  If you go back to Page 1

2 I think it says it right in the preamble.  Yes, whereas the

3 lender has agreed to make available 6-1/2 million, right in the

4 first warehouse box.  Correct?

5 A    Where is this?

6 Q    Page 1, it's the document that bears bates stamp 47333.

7 Or at the bottom, 47333.  That's just a bates stamp number.

8 Triple three.

9 A    Triple three.

10         THE COURT:  What are you directing his attention to?

11         MR. AMINI:  I'm directing his attention to the first

12 textual page of the credit agreement --

13         THE WITNESS:  I see it.

14         MR. AMINI:   -- on Page 47333.

15 Q    The first whereas, as requested, the lender make

16 available, and the lender has agreed to make available up to

17 $6-1/2 million, the commitment.

18 A    I see that.

19 Q    Right.

20 A    Yes.

21 Q    That was the number you agreed upon.

22 A    Yes.

23 Q    How did you come to 6-1/2, do you know?

24 A    I don't remember other than some part based off the plan,

25 some part based on discussion.

1  Q    I always -- my next question was, did you have an

2  understanding that this was in then current plan that the

3  company would need $6-1/2 million to get through that period

4  that you were discussing to stabilize itself?

5            MR. MERVIS:  Just objecting to form, Your Honor, the

6  use of the word plan because I think the witness --

7            THE COURT:  Well --

8            MR. MERVIS:   -- has said a number of different

9  things about --

10            THE COURT:  It's overruled.

11            MR. MERVIS:   -- the plan is what --

12            THE COURT:  There was first a $4.5 million plan, then

13  a 6.5 million plan, and I guess the question is, is this a $6.5

14  million plan.

15            MR. AMINI:  I'll accept that question.

16  Q    Is this a $6-1/2 million -- is this based on the $6-1/2

17  million plan?

18  A    It is based on -- what I'm not positive on is -- because I

19  also haven't seen it in the documentation, a plan that shows 6-

20  1/2 million specifically.  So it's possible that this allowed

21  for some other contingency as well.  So that's why it makes it

22  a more challenging question.

23  Q    And then go with me to the page -- Page 11 of this

24  document, which is -- bears bates stamp number 47343.  And in

25  particular under Borrowing Mechanics, you see that heading?

Greenberg - Direct/Amini                    25

1  A    Yes.

2  Q    And then 2.5(b), the first sentence, let me read it to

3  you.  The borrower shall obtain the written consent of the

4  lender prior to requesting any loan.  You see that?

5  A    That's at 6. --

6  Q    2.5(b).

7  A    2.5(b).

8  Q    So on Page 11 of the credit agreement.  Be careful, you

9  have the security agreement in there too.  It bears bates stamp

10 47343.  Use that, it's easier to follow.

11 A    That's easier.

12 Q    47343.  You see that?

13 A    Yes, I see it.

14 Q    All right.  I'm focusing you on, if I can, 2.5 and what --

15 that small B in the parentheses.

16 A    Yes.

17 Q    And in particular that first sentence --

18 A    Yes.

19 Q     -- The borrower shall obtain written consent of the

20 lender prior to requesting any loan.

21 A    Yes.

22 Q    So was it that they had -- well, what did you understand

23 the borrower had to to draw down on this loan?

24 A    Request approval from the -- request approval from the

25 lender prior to any draw down.

1  Q    Prior to even being able to ask for a draw down.  Correct?

2  A    That's what it says.  I don't know if that's the exact

3  ultimate mechanics.

4  Q    Did you have an understanding of how this was going to

5  work at the time?

6  A    My expectation at the time was that if the company wanted

7  to draw down under the loan, they had to get written consent

8  from the lender prior to drawing down on the loan.

9  Q    And when you say written consent from the lender, that

10 meant that they had to get written consent from Ms. Tilton.

11 A    Yes.

12 Q    Go with me if you would to PX-203.

13      MR. AMINI:  There's a hearsay objection to this

14 document, Your Honor.

15      MR. MERVIS:  I'll withdraw it.

16      THE COURT:  All right.  It's received.  Thank you.

17 Q    You had -- I don't know if we had this -- it came up

18 earlier, but direct letters.  You understand what direction

19 letters are.  Correct?

20 A    Yes.

21 Q    The company ordinarily when they draw down on loans sends

22 out a direction letter.

23 A    They don't always, but in more challenging situations the

24 company may use direction letters.

25 Q    And these were -- who do you know -- who's Arion Mathuray

Greenberg - Direct/Amini                              27

1  (phonetic)?  I'm looking at the last email in this chain, which

2  is actually the first email from a time stamp pinpoint of

3  February 2, 2016 at 5:37 p.m.

4  A     She worked in -- it was either loan administration -- I

5  think it was loan administration or maybe within structure

6  finance, I'm not positive which.

7  Q     She worked for Mr. Ruffini as best you know.

8  A     Yes.

9  Q     Correct?  Okay.  So she says here -- the direction letter,

10 she's sending them to you.  Correct?

11 A     Yes.

12 Q     And she's sending them to you so that you can forward them

13 on to Mr. Wolf so that Mr. Wolf will sign them.  Correct?

14 A     Yes.

15 Q     And you -- and that's, in fact, what you do.  Correct?

16 A     Yes.

17 Q     And he says that he's, okay, signing the January 5 and

18 January 29 one, but he doesn't want to sign the earlier ones

19 for December 8, January 5 or January 7 because he wasn't there,

20 or at least wasn't authorized as of those dates to act -- there

21 was a COO there, meaning Mr. Leland was there.

22 A     Yes.

23 Q     And go with me now to these authorization letters, and in

24 particular let's look at the -- Exhibit 8, let's start with the

25 January 15 one.  You see that direction letter of January 15,

1  2016?  It's the -- it's the next document after the emails.

2  A     Yes.

3  Q     It was signed by Mr. Wolf.  Correct?

4  A     Yes.

5  Q     All right.  And it attaches the draw downs, and these are

6  the amounts that it had previously been paid on January 15 --

7  A     Yes.

8  Q      -- 2016.

9  A     Yes.

10 Q     And if you add it up, it comes to the million one seventy-

11 two we've been talking about.  You can do it, but you'll

12 confirm that that's your understanding these were the payments

13 that comprised the million one seventy-two, the three we saw

14 earlier plus the $473,838.94 to NYSIF.

15 A     I added it up in my head, it looks -- it looks pretty

16 close.

17 Q     All right.  And then we have the second direction letter,

18 and that -- the Exhibit A to that is on the last page, and

19 these are the payments that went out on January 29, 2016, as

20 indicated by the direction letter itself.

21 A     Yes.

22 Q     And that is -- again, that comes to about $690,000.

23 A     Yes.

24 Q     So the combination of the two is one million eight sixty-

25 two.

Greenberg - Direct/Amini                    29

1    A    Yes.

2    Q    And that 690 comprised, again, a second payment to NYSIF

3    of 613,081 and the Salisbury settlement, 77,087.24.

4    A    Yes.

5    Q    And the Salisbury settlement was that one of the lease

6    landlord settlements, or something else?

7    A    (No audible response.)

8    Q    Well, which one?  Was that -- that was a settlement of a

9    lawsuit with TransCare --

10   A    Yeah --

11   Q     -- first of all.

12   A     -- that's my recollection.

13   Q    All right.  I noticed that if you add these two up, these

14   two direction letters, there's no reference to those to

15   ambulances.

16   A    No, not -- not --

17   Q    Do you have understanding of why not?

18   A    Only that at that time then the funding must not have come

19   through that facility.

20   Q    All right.  Go with me if you would to PX-249.

21        MR. AMINI:  This also, Your Honor, in the same drawn

22   has a relevance objection.

23        THE COURT:  And that is --

24        MR. MERVIS:  Yeah, Your Honor, on this one -- well,

25   it depends on -- portions of it pre-date the relevant date of

Greenberg - Direct/Amini                              30

 1 issue, which is February 24, so I think those -- I mean I don't
 2 think they're particularly relevant but I think in light of
 3 Your Honor's ruling those are fair game.  However, the last few
 4 in the chain I think are -- they post-date the transaction at
 5 issue here and I don't see how they're relevant.
 6         MR. AMINI:  Yeah, if Your Honor will allow me to take
 7 him through on the questions, I'll start with the first two
 8 that there are no objections to.
 9         THE COURT:  All right.  Well --
10         MR. AMINI:  And then Your Honor I hope will see the
11 relevance of the --
12         THE COURT:  I'll reserve decision, just let's see
13 where he's going with this.
14         MR. MERVIS:  Okay.  Thank you.
15 Q    So let's go through these emails *seriatim* starting with
16 the earliest one in time, which is the last one on the page
17 which is your email to Mr. Witkes of February 11, 2016 at 2:35
18 p.m.  Do you see that?
19 A    Yes.
20 Q    And again, Mr. Witkes is the Credit Suisse First Dominion
21 representative of the TransCare matter for that group of the
22 term loan lenders.
23 A    Yes.
24 Q    You had a reference to an earlier discussion with him
25 today.  Do you see that?

Greenberg - Direct/Amini                    31

1  A    On that day?

2  Q    Right.  As Jon-Luc and I discussed with you earlier today.

3  The two of you apparently spoke to him that day?

4  A    (No audible response.)

5  Q    Does it refresh your recollection that you did so?  It's

6  in your email.  That's the only reason I raise it.

7  A    Yes.

8  Q    Okay.  And you say, Due to the unwillingness to allow

9  additional funding to go in ahead of CSAM, TransCare is going

10 to have to file.  CSAM is Credit Suisse.  Right?  That's

11 what --

12 A    Asset Management.

13 Q    Asset Management.  So that's what you're referring to.

14 And so -- well, I'm sorry, I'm confused now.  I thought Mr.

15 Wolf signed those agreements on February 10.  What were you

16 referring to here then?

17 A    A separate discussion with Credit Suisse about their

18 willingness to subordinate their position.

19 Q    To the 6-1/2 million.

20 A    Yes.

21 Q    That's the only money we're talking about in this email.

22 Correct?

23 A    Yes.

24 Q    And so you're telling him because they refused to

25 subordinate TransCare is going to have to file, and by file you

Greenberg - Direct/Amini                    32

 1  mean file for bankruptcy.

 2  A    Yes.

 3  Q    And had that decision been made on February 11, 2016?

 4  A    I don't know for sure the exact timing.  Yeah, I'm not

 5  positive on the exact timing.

 6  Q    So it's fair to state that as you sit here today you don't

 7  know whether that decision was finally made as of that date or

 8  not.

 9  A    Yes.  Yes.

10  Q    That decision was only going to be made by one person.

11  Correct?

12  A    Yes.

13  Q    And that would be Ms. Tilton.

14  A    Yes.

15  Q    And then you go on in the next paragraph and then you say,

16  There are outstanding pass through given Credit Suisse's equity

17  interest, your share could be between 1- and $2 million.

18  Correct?

19  A    Yes, that's --

20  Q    And that's right, I had forgotten to establish that Credit

21  Suisse First Dominion also had a portion, not only of the term

22  loan but of the equity of TransCare.

23  A    Yes.

24  Q    This had all arisen, just by way of background, to your

25  understanding because TransCare had come out of a bankruptcy --

**A1316**

Greenberg - Direct/Amini                    33

1  I'm not going to hold you to it, approximately 2003 and Credit

2  Suisse had been a lender prior to then and it stayed in when

3  Ms. Tilton took control of the company.

4  A    That's my understanding.

5          THE COURT:  Sustained.  It's a long question.

6          MR. MERVIS:  Yeah, I was also going to say, Judge,

7  there are misarticulated facts, so it's all there.

8          THE COURT:  Okay.

9          MR. AMINI:  He gave me --

10          THE COURT:  Well, it's --

11          MR. MERVIS:  It's all yours.

12          THE COURT:   -- I'll sustain the objection.  It's a

13  wordy question.

14 Q    Who told you to send this email in February?

15 A    Ms. Tilton.

16 Q    Ms. Tilton told you.  Did she dictate it for you too?

17 A    My recollection is pretty close to dictating.

18 Q    Did you believe anything in this email yourself?

19          MR. AMINI:  Withdrawn.  Withdrawn.

20 Q    All right.  Mr. Witkes then the next day says -- asks you

21 to provide additional detail at what point did the company

22 cease to make its payroll and payroll tax payments and what is

23 the total balance of unpaid items.  Do you see that?

24 A    Yes.

25 Q    And your response is in your email of February 12 at 5:04

**A1317**

Greenberg - Direct/Amini                    34

1  p.m.

2  A    Yes.

3  Q    Did you write that email or would that -- was that one

4  dictated for you too?

5  A    My recollection is aspects of that are dictated.

6  Q    The 10 million that you're referring to, that's -- I

7  assume part of that is the million eight, or is it not, that

8  you have loaned -- that was loaned through ARK II, the

9  agreements we saw Mr. Wolf being asked to sign on February 10,

10 is that included in the 10 million?

11          MR. MERVIS:  Object to the form, Your Honor.

12          THE COURT:  Overruled.

13          THE WITNESS:  I believe so.

14 Q    And the rest was additional funding from the term loan

15 lenders.  Is that right?

16 A    Yes.  Yes.

17 Q    And those had come out of the various term loan lenders's

18 funds over the course of 2015.

19 A    Yes.

20 Q    Did you answer any of his specific questions that he had

21 in his February -- Mr. Witkes had in his February 12, 2016 4:24

22 p.m., when did the company -- he asked you specifically when

23 did the company cease making payroll and payroll tax payments.

24 Did you ever answer that question for him?

25 A    I don't believe so.

**A1318**

Greenberg - Direct/Amini                    35

1  Q    Did you ever answer the question of what are the total
2  balance of unpaid items?
3  A    I don't think so.
4  Q    No?
5  A    Yeah.
6  Q    Is there some reason you didn't?
7  A    My understanding is we were in the midst of a negotiation.
8  Q    With Credit Suisse?
9  A    With Credit Suisse.
10 Q    Well, when was the next time anybody had any contact with
11 Credit Suisse on that negotiation?
12 A    It looks like not till the 25th.
13 Q    Right.  The day after the filing of the bankruptcy.
14 Correct?
15 A    Yes.
16 Q    What do you recall about the negotiations between February
17 12 and February 25, in those 13 days?
18 A    We had not reached out to them, they had not reached out
19 to us.
20      MR. AMINI:  Your Honor, I'd like to go through the
21 remaining two emails at this point.
22      THE COURT:  Well, what's the relevance of the post-
23 petition activities other than your claim that the automatic
24 stay was violated, and I guess the argument that the $800,000
25 that went to PPAS should have come to the Debtor.

**A1319**

Greenberg - Direct/Amini                    36

1          MR. AMINI:  Partly that, partly actually in the more

2  overall picture we are burdened with fair process.  It's both

3  fair process and fair price, and process to me includes how you

4  treat your secured creditors.  Well, you know, at this point

5  the creditors are asking a lot of questions and not saying no.

6  And so it goes to --

7          THE COURT:  But the evidence is in that it was no

8  further discussions, negotiations between Credit Suisse and the

9  Debtor after December -- after February 12 and at the time of

10  filing.

11          MR. AMINI:  Understood, Your Honor, and I'll move on.

12          THE COURT:  Yeah, this is taking a long time to

13  establish that $6.5 million, or the advances were well before

14  there was an agreement --

15          MR. AMINI:  I will --

16          THE COURT:   -- to loan.

17          MR. AMINI:   -- move forward, Your Honor.

18          THE COURT:  Okay.

19  Q    I want to now take you to Defendant's Exhibit 127.

20          MR. AMINI:  Which is not in your books.  I apologize

21  for that, but it came in late.  So we'll --

22          THE COURT:  Do you have --

23          MR. AMINI:   -- have to deal with them this week.

24          THE COURT:  Okay.

25  Q    And in particular is this exhibit an email that you sent

Greenberg - Direct/Amini                          37

1  to Mr. Pelissier on or about February 7, 2016 at 8:48 a.m.?

2  A    Yes.

3  Q    And this is even before the ARK II loan papers are signed,

4  if you recall, this is not February 7, I'm going -- I tried to

5  do them chronologically but I don't want to mislead you.  I'm

6  going back three, four days at this point --

7  A    Okay.

8  Q    -- sort of --

9  A    Yes.

10 Q    -- because it was a slightly different topic.  All right.

11 And you're talking about some kind of discussion with Ms.

12 Tilton by the end of the day on February 8.  Correct?

13 A    Yes.

14 Q    And then you -- the next thing is you have a sentence that

15 says, I think we may need to think through with Glen

16 Youngblood, Earl -- that's Earl Kossuth, right --

17 A    Yes.

18 Q    -- and Pete -- Pete is Peter --

19 A    Peter Wolf.

20 Q    -- Wolf, how long would it effectuate a reduction in the

21 operation like the one being considered?

22 A    Yes.

23 Q    So now what are you talking about there, if you know?

24 A    I don't know specifically based on that one sentence.

25 Q    All right.  Go a little further with me to the next

Greenberg - Direct/Amini                    38

1  paragraph that says, Carl said that he would be sending a
2  revised 13-week forecast, excluding core New York City 9-1-1 by
3  noon today.  Carl is one of the -- Carl Marks people.  Correct?
4  A     Yeah.  Yes, Carl Landeck.
5  Q     All right.  And then Jonathan you have on the next
6  paragraph is reviewing a revised 2016 budget model with I was
7  working through yesterday.  Jonathan is also one of the --
8  Jonathan is Jonathan Killion.  Right?  At --
9  A     Yes.
10 Q     -- Carl Marks.  All right.  And you say he's preparing a
11 summary of expense structure by division, and is this the --
12 are these eight items, is it -- what is the point of these nine
13 items that follow that, if you know?  What are they being
14 undertaken in connection with?
15 A     So it's the assessment whether there are scenarios where
16 certain divisions are wound down and other divisions focused on
17 on a go-forward basis.
18 Q     Is it fair to say it's the beginning of the plan that
19 ultimately resulted in the filing for some of the entities and
20 the foreclosure on others?
21       MR. MERVIS:  You know my objection, Your Honor.  I
22 don't think that he's -- I don't think he's established the
23 foundation for the --
24       THE COURT:  Yeah, he --
25       MR. MERVIS:  -- how could he know that?

Greenberg - Direct/Amini                    39

1          THE COURT:    -- how do we know that he knows this?

2          MR. AMINI:  He's the only -- he and Mr. Pelissier --

3          THE COURT:  Well, why don't you ask him -- why don't

4   you establish a foundation that he was familiar with the plan

5   at this point by which some of the assets were going to be

6   liquidated and some were going to be operating or sold as its

7   own concern.

8          MR. MERVIS:  I'll accept that caution.

9   Q    Do you -- are you familiar any discussions about a plan at

10  this point in time, February 7 of 2016 in which some of the

11  assets are going to be wound down and others are going to be

12  foreclosed upon?

13  A    Yes, I'm -- at that point in time I was familiar with the

14  potential -- that there could be a potential plan that resulted

15  in that.

16  Q    And how did that come about?

17  A    Through multiple discussions over time but that's

18  really -- I can't per se pinpoint one specific discussion, but

19  over time we were looking at all different scenarios.

20  Q    And in this plan that you're -- that you were on a

21  discussion was Ms. Tilton involved in those discussions at this

22  point in time?

23          MR. MERVIS:  Your Honor, could I ask for -- when he

24  says -- well, I object, Your Honor, because I don't know what

25  at this point in time -- I think it needs to be said.

**A1323**

Greenberg - Direct/Amini                    40

1            THE COURT:  Well, it struck me as of the time of the
2    email.
3            MR. AMINI:  Yes, February 7.
4            MR. MERVIS:  I thought so, but it wasn't clear.
5            THE COURT:  Right.
6            MR. AMINI:  Right.  At this point in time meant
7    February 7.
8            MR. MERVIS:  Okay.  Thank you.
9            THE COURT:  Why don't you --
10           THE WITNESS:  I believe so.
11           THE COURT:   -- why don't repeat -- oh, okay.
12           THE WITNESS:  I believe so but the chronology can be
13   challenging in terms of timing.
14   Q    Let me just go back for a minute.  Your email at the
15   beginning of this exhibit said, We can be potentially ready for
16   the most part to discuss with Lynn by the end of the day
17   tomorrow.  Had you been given instructions by her to look at
18   such a plan and come back and discuss it with her?
19   A    Most likely yes, but I -- you know.
20   Q    Go with me if you would to PX-193.
21           MR. AMINI:  I don't believe there are any objections
22   to this exhibit, Your Honor.
23           THE COURT:  193?
24           MR. AMINI:  Yes.
25           MR. MERVIS:  No objection.

Greenberg - Direct/Amini                    41

1          THE COURT:  I'm looking for --

2          MR. AMINI:  It should be -- we didn't have 127 so it

3  should be between 130 and 196.  It may not have made it.

4          THE COURT:  I -- I don't --

5          MR. AMINI:  Don't have it?

6          THE COURT:  No.

7          MR. AMINI:  Okay.  This is another one that I -- may

8  have been late in getting into the notebook.  Maybe we can use

9  the screen for this one.

10         THE COURT:  And there's no objection?

11         MR. MERVIS:  No, not at all.

12         MR. AMINI:  Can you put up PX-193.

13         UNIDENTIFIED SPEAKER:  (indiscernible).

14         MR. AMINI:  It's on?  Oh, I didn't see it.  Sorry.

15 Q    Is this an email that you received from Mr. Killion at

16 Carl Marks on or about the 10th of February at it looks like

17 1:39 in the morning?

18 A    Yes.

19 Q    And he refers in the email to a current draft of the

20 entities contemplated to be in the Article 9 transaction.

21 A    Yes.

22 Q    Do you have any understanding of what that reference to an

23 Article 9 transaction is?

24 A    Yes.

25 Q    What is your understanding?

Greenberg - Direct/Amini                    42

1  A    Only on -- only it relates to foreclosure on certain

2  assets, but that's it.

3  Q    Going back to the earlier email, and I don't think we need

4  to, you had indicated on a February 7 email that you think you

5  can present to Lynn by end of day tomorrow, which you're on

6  February 8.  Is it fair to state that between February 7 and

7  February 10 Ms. Tilton instructed you to proceed with at least

8  investigating a plan which involved such a foreclosure?

9  A    Yes.

10 Q    Okay.  And at that point in time you were looking at

11 foreclosure on Maryland, Pittsburgh, Hudson Valley and

12 Paratransit at least.

13 A    Yes, it appears so.

14        MR. AMINI:  Max, do we have the P&L, it's the -- can

15 you look up the first page of it?

16 Q    And, Mr. Greenberg, this was the attachment to this

17 exhibit.  Obviously it has many -- if you can look at the

18 bottom of it, see, it says, P&L and then it has many separate

19 subparts?

20 A    Yes.

21 Q    You're welcome to ask to have any of them put up on the

22 screen should you want.  I'm just using the overall one, I had

23 no intention of going into the individual ones unless you ask

24 me or tell me you really need to do so.  But what -- is it fair

25 to state that at that point at least Jonathan Killion was

Greenberg - Direct/Amini                    43

1  trying to look at these individual divisions separately.  And I

2  can take you through each one of those P&Ls and this was -- and

3  presenting a summary of how a company might look if you

4  foreclosed on these entities.

5  A    Yes, it's a look at each individual division rolling up

6  into a consolidated P&L for those assets.  Oh, well, three --

7  all three -- all three financial statements for those assets.

8  Q    Go with me now if you would to PX-196.  Is this an email

9  that you sent on or about February 10, 2016 at 9:43 p.m.?

10 A    Yes.

11 Q    And just so to get this out, Don Arrowood, he's an outside

12 insurance broker, is he not?

13 A    Yes.

14 Q    He writes insurance for TransCare, or at least he's the

15 agent for TransCare, some of TransCare's insurance policies.

16 Is that fair?

17 A    Yes.

18 Q    He works at Lockton I think it is?

19 A    Yes.

20 Q    Is that right?  And Lockton is what, just so --

21 A    An insurance broker.

22 Q    And they're the people you work for when you're obtaining

23 at least a part of the insurance, the auto insurance for the

24 TransCare entities, Lockton.

25 A    That's who we do what with?

Greenberg - Direct/Amini                    44

1  Q    You use them to contract for insurance.

2  A    Yes.

3  Q    Auto insurance I believe is one of the items that comes

4  through them.  Correct?

5  A    Yes.

6  Q    And you were sending to this at this time to inquire about

7  insurance, were you not?

8  A    Yes.

9  Q    And you make a reference now in this email on February 10

10 that Transcendence Transit, Inc. is seeking coverage for

11 itself -- I'm looking at the second paragraph -- and a number

12 of subsidiaries, and you list the number of subsidiaries.  Do

13 you see that?

14 A    Yes.

15 Q    Transcendence Transit, Inc., that's a new company at this

16 point.

17 A    Yes.

18 Q    It's Ms. Tilton's -- at this point it's Ms. Tilton's

19 company.

20 A    That I'm not positive on.

21 Q    Is it fair to state you don't know who owned

22 Transcendence.

23 A    I'm not positive.

24 Q    Well, all right, is it fair to state that you've never

25 known who owned Transcendence?

**A1328**

Greenberg - Direct/Amini                            45

1  A    I may have at one point, but at this point I don't

2  remember.

3  Q    I'm really am not pressing you to say, I'm not positive,

4  but I don't know what -- you know, if you have some

5  understanding of who owned it.

6  A    I'm not -- yeah.  No, I don't remember specifically.

7  Q    And then there's a Transcendence 2.  Do you recall if that

8  was going to be a subsidiary of Transcendence?

9  A    That I recall.

10 Q    All right.  And that was created as a subsidiary because

11 you wanted to put the MTA contract in its own entity.  Is

12 that -- does that comport with your recollection?

13 A    That does, yeah.

14 Q    All right.  The MTA had prior to this time actually

15 approached TransCare about putting that contract in a separate

16 entity, had it not?

17 A    Yes.

18 Q    They -- and they wanted to do so because they were

19 concerned that monies that were being spent on the MTA contract

20 were being used by TransCare, the parent, to cover other

21 things, to cover other contracts instead of being devoted for

22 example to the repair of their vehicles.

23 A    Yes.

24 Q    And you were going to satisfy that concern by having a

25 Transcendence 2 just for their business.

**A1329**

Greenberg - Direct/Amini                    46

1  A    Yes.

2  Q    And then there are other entities, TransCare Pennsylvania

3  is actually TransCare's Pittsburgh operations.  Correct?

4  A    Yes.

5  Q    TransCare Maryland is actually TransCare's Maryland

6  operations.

7  A    Yes.

8  Q    TC Ambulance Corporation, do you recall what they had?

9  A    I'm not positive.

10 Q    TC Ambulance North?

11 A    Not positive on either of those.

12 Q    Was one of them Hudson Valley?  If you recall.

13 A    Possibly TC Ambulance North, but I'm not --

14 Q    In this plan Hudson Valley was going to be one of the new

15 companies.

16 A    Yes.

17 Q    And TransCare Westchester was also going to be one of the

18 new companies.

19 A    Yes.

20 Q    And you were asking him for new workers compensation

21 policies, RO liability policy, general liability professional

22 liability, excess liability and property RO physical damage

23 polices.

24 A    Yes.

25 Q    And at this point in time you gave him a description of

Greenberg - Direct/Amini                    47

1  these businesses.

2  A    Yes.

3  Q    And you understood that in order to write these policies

4  they would need a description of the businesses.

5  A    Yes.

6  Q    And the description is what follows at the bottom here

7  through the top of the next page.

8  A    Yes.

9  Q    And then finally you also provided him with a pro forma

10 financial summary estimate for the new entity.

11 A    Yes.

12 Q    And at this point, the new entity was going to have,

13 evidenced under this pro forma, approximately $48 million in

14 service revenue --

15 A    Yes.

16 Q    -- from all these divisions and approximately, for the

17 year 2016, forecast to have 3.761 million in EBITDA?

18 A    Yes.

19 Q    And these numbers were an outgrowth of the plan that you

20 were working with Carl Marks on at this point, correct?

21 A    An outgrowth of that, additional -- additionally with

22 other involvement over time internally.

23        MR. AMINI:  196.

24        THE COURT:  Yeah.

25        MR. AMINI:  Do I have to move it in?  Yeah, because I

Greenberg - Direct/Amini                    48

 1  don't know if Your Honor -- if I moved 196 in, but --

 2              THE COURT:  Any objection?

 3              MR. MERVIS:  No, Your Honor.

 4              THE COURT:  It's received.

 5          (Plaintiff's Exhibit 196 is admitted into evidence)

 6          (Participants confer)

 7  BY MR. AMINI:

 8  Q    Let me move now to JX-81, if you would, the next in your

 9  book.  Is this -- JX-81, I don't believe there's any -- oh,

10  it's joint exhibit.  Sorry.

11              THE COURT:  It's a joint exhibit.

12  BY MR. AMINI:

13  Q    On JX-81, at least beginning with your first email, you

14  attach what's called an asset register.  Do you see that?

15  A    Yes.

16  Q    And this is meant to be an asset register of all the

17  equipment at TransCare that you're contemplating foreclosing

18  on?

19  A    Yes.

20  Q    Did you understand at this point in time that you were

21  contemplating on foreclosing on this -- on these assets on

22  behalf of the term loan lenders or someone else?

23  A    I'm not sure.  I'm not sure on whose behalf.

24  Q    Where did you get the asset register from?

25  A    From -- the company provided a list of the -- well, no.

Greenberg - Direct/Amini                          49

1    We internally had a UCC filing that had a list of all the

2    assets that were filed under the UCC.

3    Q    So this is an asset register that Patriarch maintained?

4    A    I think it's a combination of information from the -- I

5    believe it's information from the company, actually, now

6    that --

7    Q    And this is supposed to list -- what is this supposed to

8    list, just if you understand?

9    A    All the -- like you had said, all the assets that are

10   being foreclosed upon.

11   Q    And were -- these numbers that are next to it, are these

12   the book values of these assets or market values or something

13   else?

14   A    My understanding is the book value.

15   Q    And do you have an understanding of what the total book

16   value, at least on the books and records of the company, these

17   assets comprise?

18   A    Not --

19        MR. MERVIS:  Objection, Your -- oh.  I guess my

20   objection's withdrawn.

21   BY MR. AMINI:

22   Q    Have you ever done a mathematical calculation to figure

23   out what the book value of these assets were?

24   A    I mean, I see a total at the end.

25        THE COURT:  Why don't you just tell us if you've done

Greenberg - Direct/Amini                    50

1  it.

2          MR. AMINI:  We haven't.  Well, we're -- it doesn't

3  add up to ten, is what we're trying to get at.  I mean, I'm

4  not -- I have nothing to hide.  I can't find the $10 million,

5  so I'm looking for it.

6          MR. MERVIS:  There's someone else who can talk to

7  that, Judge.

8  BY MR. AMINI:

9  Q    Do you have any understanding of whether the book value of

10 these assets were -- was $10 million?

11 A    In looking at the total at the end --

12 Q    Right.

13 A    -- it's showing 2.75 million.

14         THE COURT:  Where are you looking --

15         THE WITNESS:  The last page.

16         THE COURT:  -- Mr. Greenberg?  Oh, I see.  Okay.

17         MR. AMINI:  Your Honor, I'm not sure if the 2.75 is a

18 standalone number.  I just want --

19         THE COURT:  Well, you asked him, and that's --

20         MR. AMINI:  All right.

21         THE COURT:  He answered the question.

22         MR. AMINI:  I know.  It wouldn't be fair to ask him

23 either, because --

24         THE COURT:  All right.

25         MR. AMINI:  -- it -- he doesn't have the document in

Greenberg - Direct/Amini                    51

1   native form, which is --

2          THE COURT:  All right.  It sounds like we're talking

3   about a document that nobody knows, so --

4          MR. AMINI:  All right.

5          THE COURT:  -- let's talk about something else.

6          MR. AMINI:  Well, I would move the document in.  And

7   you'll have the natives from which people can map --

8          THE COURT:  Any objection?

9          MR. MERVIS:  None at all.

10         THE COURT:  It's received.

11      (Joint Exhibit 81 is admitted into evidence)

12  BY MR. AMINI:

13  Q   To your knowledge, was there ever an appraiser engaged to

14  appraise these assets?

15  A   To my knowledge, there was not.

16  Q   To your knowledge, was there any effort to make -- was

17  there any effort made to value these assets from anything other

18  than a book value on the company's books and records?

19         MR. MERVIS:  I have an objection, Your Honor, to the

20  form, because the question does not -- it may be implicit, but

21  the question is not asking for what purpose.  Any value for any

22  purpose, for a specific transaction?  I think there needs to be

23  some clarity.

24         THE COURT:  Well, was there any appraisal of these

25  assets prior to February 24 and, if so, when?

**A1335**

Greenberg - Direct/Amini                    52

 1           THE WITNESS:  To my recollection, there was not.
 2  BY MR. AMINI:
 3  Q    Let me take you to Exhibit -- Plaintiff's Exhibit 286.  Is
 4  this an email that you received from Mr. Pelissier on or about
 5  Saturday, February 13th at 12:04 p.m.?
 6  A    Yes.
 7  Q    And Mr. Pelissier says in the first paragraph, he says,
 8           "Lynn, I'm still on the phone with Michael, and I'm
 9           sending you the go-forward model.  We are still
10           working on the wind down.  I will drop you an email
11           to talk as soon as I am finished with my call with
12           Michael."
13       Do you see that?
14  A    Yes.
15  Q    Do you have an understanding of what he's talking about
16  when he says, "sending you the go-forward model"?
17  A    Yes.
18  Q    What is he sending there?
19  A    The -- so for the entities that were going to continue
20  forward with their business versus the entities that were going
21  to go through a gradual wind down, he's talking about the
22  entities that were going to be going forward on a long-term
23  basis.
24  Q    Is it -- these are the entities that we talked about
25  earlier that you were contemplating foreclosure on?

Greenberg - Direct/Amini                          53

 1  A    Yes.

 2  Q    And this model that he's sending here, this model contains

 3  the following markets and key assumptions on a go-forward

 4  basis.  That material that follows, is that actually your work?

 5  A    I don't actually have this exhibit.

 6  Q    You don't have 286 in your book?

 7  A    I don't see it.  So I was looking at it on the screen.

 8        MR. AMINI:  Can I -- Your Honor, it's a hard exhibit

 9  to look at on the screen.  May I give -- with your permission,

10  may I give him Mr. Samet's version, Michael?

11        MR. MERVIS:  Oh, sure.

12        MR. AMINI:  Yeah.  Your Honor, may I?

13        THE COURT:  Yes.

14     (Participants confer)

15        THE WITNESS:  Thank you.

16        THE COURT:  We're still, I think, at 286.

17        MR. AMINI:  We're still -- I'm looking at 286.

18  BY MR. AMINI:

19  Q    You know, you answered this already, but just to -- I

20  think, but just to be clear, this is the then existing model of

21  the assets that you would continue operating as a going

22  concern?

23  A    Yes.

24  Q    And did the -- what he's sending her is what you're

25  actually working on, physically working on at that point?

Greenberg - Direct/Amini                                    54

1  A    Myself and others had worked on it.

2  Q    And the others that are working on it at this point in

3  time?  I mean, he says, yeah, I'm on the phone with Michael.

4  That's why I'm asking.  Who else was working with you?

5  A    Vikram Aggarwal (phonetic) had done some work and -- yeah.

6  He, along with Scott Whalen, had done some work on the

7  go-forward model.

8  Q    And if you -- if you're looking at this document, the

9  description that you have underneath here in terms of the

10 various divisions, these were the then -- these were the

11 divisions then under consideration for foreclosure: Transit,

12 Hudson Valley, Pittsburgh, Maryland, Westchester, Bronx 911?

13 A    Yes.

14 Q    And following that, you have a series of key assumptions.

15 Do you see that?

16 A    Yes.

17 Q    With solid management team at divisional level and key

18 enhancements at the senior level being the first one, correct?

19 A    Yes.

20 Q    All right.  And then following those, you give -- you have

21 a bullet point: "Outcome of model is as follows"?

22 A    Yes.

23 Q    And you include a summary consolidated income statement

24 balance sheet and cash flow?

25 A    Yes.

Greenberg - Direct/Amini                          55

1  Q    At this point in time, is it fair to state that you

2  believed -- you and the people you were working on -- under

3  this model, the consolidated revenue of this entity in the

4  subsequent year, 2016, would be about 65 million?

5  A    Yes.

6  Q    Or the EBITDA of 5.1 million?

7  A    Yes.

8  Q    You also were assuming -- or you thought, based on this

9  model, that Wells Fargo's 8.2 million in accounts receivable

10 would be paid down in the first half of the year?

11 A    Yes.

12 Q    And so you would need a company -- looking at the next

13 bullet point, the company had an incremental funding need of

14 approximately $8 million due to initial investment and working

15 capital.  That was your plan, correct?

16 A    Yes.

17 Q    And you were going to fund that 8 million by a new ABL

18 line?  That was the plan, was it not?

19 A    Based on what I'm reading there, it looks like I was

20 saying it could be offset if a new ABL line is secured, that

21 that --

22 Q    All right.  Well, go with me, if you would, to the summary

23 cash flow statements for 2016.  I don't know if you have that

24 imprinted there.

25 A    Yes.

Greenberg - Direct/Amini                                   56

1  Q    But there's a -- towards the end of that document, there

2  are two categories: investing adjustments --

3  A    Uh-huh.

4  Q    -- followed by capital expenditures and total investing

5  adjustments and then financing adjustments.  Do you see that?

6  A    Yes.

7  Q    And under capital expenditures --

8             THE COURT:  What page are you looking at?

9             MR. AMINI:  I am on the page that ends in Bates stamp

10 105522.

11            THE COURT:  All right.

12 BY MR. AMINI:

13 Q    And if we're on capital expenditures, it would appear you

14 have virtually none.  Am I mistaken?

15 A    No.  That is --

16 Q    That's correct.

17 A    -- the case.

18 Q    Right.  And then under financing adjustments is where you

19 get the $8 million.  If you add up the incremental funding, you

20 come to a number at the end of seven-nine-nine-five-point-one,

21 or approximately $8 million, correct?

22 A    Yes.

23 Q    And in this plan, that is in fact the $8 million that

24 you're referring to in your email when you say -- in the third

25 bullet point under outcome of models where you say that the $8

Greenberg - Direct/Amini                          57

1 million can be offset if a new ABL line is secured?

2 A    Yes.

3 Q    That was the plan at that point?

4 A    Yes.

5 Q    And Ms. Tilton had approved the plan at that point, had

6 she not?

7 A    She was -- I don't know whether there was a formal

8 approval of the plan without seeing it.

9       (Participants confer)

10           MR. AMINI:  Your Honor --

11           THE COURT:  These are plaintiff's exhibits.

12           MR. AMINI:  Do I have to move the exhibit in?  I

13 mean, when I --

14           THE COURT:  Is there an objection?

15           MR. AMINI:  I think there was no objection.  And you

16 said at the beginning --

17           THE COURT:  Well, but I don't know that there's no

18 objection if it's plaintiff's exhibit.

19           MR. AMINI:  No, no.  I had mentioned the PX-286, but

20 they made no objection.  I'm sorry.

21           THE COURT:  It's received.

22       (Plaintiff's Exhibit 286 is admitted into evidence)

23       (Participants confer)

24 BY MR. AMINI:

25 Q    Let me take you now to JX-101.  It should be the next

Greenberg - Direct/Amini                                    58

1  exhibit in your book.

2  A    Yes.

3  Q    Is this an email that you sent -- well, let's start with

4  at the bottom, there's an email from Peter Rufini (phonetic) to

5  you.  No, I -- yes, to you and Arian Mathorin and -- at 3:51

6  p.m. on February 24th.  Do you see that?

7  A    Yes.

8  Q    And just to put it in context -- I mean, I -- we'll tie it

9  later, but the foreclosure actually occurs in the early hours

10 of February 24th, so the foreclosure has already occurred at

11 this point.

12 A    Oh.

13 Q    Okay?  So you email Glen Youngblood at this point,

14 correct?

15 A    Yes.

16 Q    And we'll establish this later in the case, but Glen

17 Youngblood -- do you have a recollection -- at this point, Glen

18 Youngblood is the president of Transcendence?

19 A    That's my recollection.  Yes.

20 Q    He remains an employee of TransCare as well at this point.

21 Is that not right?

22 A    I believe so, but without -- I have no way to corroborate

23 that.

24 Q    But definitely when Transcendence was created, you had an

25 understanding that Glen was going to be the president?

Greenberg - Direct/Amini                                59

1   A    Yes.

2            THE COURT:  Of both entities?

3   BY MR. AMINI:

4   Q    Of both Transcendence entities, Transcendence and

5   Transcendence II, correct?

6   A    That was my understanding.  Yes.

7   Q    And Ms. Tilton was going to be the sole director of both

8   entities?

9   A    That's my recollection.  Yes.

10  Q    And all material decisions were going to have to be

11  approved by her?

12  A    Yes.

13  Q    And you're telling him at 4 in the afternoon -- you're

14  asking him to send back a signed borrowing certificate, are you

15  not, which could show a $593,000 outstanding borrowing and an

16  additional 65,000 on that date?

17  A    Yes.

18  Q    You were spending 593,000, if I'm not mistaken, again on

19  New York State Insurance Fund payments?  Do you -- and do you

20  have a recollection of that?

21  A    Well, as of that date, it sounds like that was already

22  outstanding, the 593-, and they were borrowing that day 65,000.

23  Q    It says Foster (phonetic) payment.  Is that their lease on

24  the Foster facility for the MTA vehicles?

25  A    Yes.

Greenberg - Direct/Amini                    60

1  Q    All right.  So you were asking him to sign a borrowing

2  certificate for $65,000 towards that lease?  Yes?

3  A    Yes.

4  Q    And the 593- had previously been paid on accounts of

5  Transcendence to New York State Insurance Fund, correct?

6  A    I don't know -- I don't know for sure where the 593- had

7  gone.

8  Q    Okay.  But you had understood 593- had been spent in some

9  form on behalf --

10 A    In some form, yeah.

11 Q    -- of Transcendence?

12 A    And you were charging this amount through a $10 million

13 loan, which is attached, the credit agreement is attached here,

14 that was going to be -- go from -- and I got to find the name

15 of the lender.  I think the lender is -- who's the lender?  Oh,

16 the lender is -- that's right.  You have to go to the very last

17 page of this document to identify the lender, but the lender is

18 defined as Archangels II (phonetic)?

19         THE COURT:  It's three.

20         MR. AMINI:  Three.  I'm sorry.

21 BY MR. AMINI:

22 Q    Archangels III for this $10 million loan to Transcendence.

23 Was that your understanding?

24 A    Yes.

25 Q    All right.  So to set it up, Transcendence had been

**A1344**

Greenberg - Direct/Amini                    61

1  created.  $10 million was going to be loaned from Transcendence

2  to Arc III, and these were funds that were being taken down --

3          THE COURT:  You mean Arc III was going to loan the

4  money to Transcendence?

5          MR. AMINI:  Yes.  I'm sorry if I misspoke.

6  BY MR. AMINI:

7  Q    Arc III was going to lend 10 million, and these monies

8  were going to be charged to that loan?

9  A    Yes.

10 Q    All right.  And Arc III was another one of Ms. Tilton's

11 investment funds, to your knowledge?

12 A    To my knowledge, yes.

13 Q    Go with me, if you would, to PX-228.

14         MR. AMINI:  I don't believe there's an objection to

15 this document, Your Honor.

16         MR. MERVIS:  No objection.

17         THE COURT:  It's received.

18     (Plaintiff's Exhibit 228 is admitted into evidence)

19         MR. AMINI:  All right.  Do I -- I don't have to move

20 it in when you --

21         THE COURT:  It's received.

22         MR. AMINI:  Thank you.

23         THE COURT:  It's in evidence.

24         MR. AMINI:  Thank you, Your Honor.

25 BY MR. AMINI:

Greenberg - Direct/Amini                    62

1  Q    Mr. Greenberg, is this a email that you sent to Todd Trent

2  on or about February 24, 2016, at 12:12 p.m.?

3  A    Yes.

4  Q    Again, the -- to put it into context, the foreclosure had

5  occurred --

6  A    Yes.

7  Q    -- earlier that day.  And you are providing him with pro

8  forma financial information that he had requested according to

9  this email?

10 A    Yes.

11 Q    Mr. Trent, Todd Trent -- Mr. Trent is also one of

12 Lockton's insurance people?

13 A    That's my recollection.  We were speaking with different

14 potential insurers, but I believe he was with Lockton.

15 Q    And you were sending this information to him as part of

16 the attempt to get insurance for Transcendence?

17 A    Yes.

18 Q    And you were -- you -- this is -- at that -- by -- at that

19 point in time, on February 24th at 12:12, this is the pro forma

20 financial under which you are operating with respect to

21 Transcendence --

22 A    Yes.

23 Q    -- is that correct?

24 A    Yes.

25 Q    And this had been approved by Ms. Tilton, had it not?

**A1346**

Greenberg - Direct/Amini                               63

1   A    It had been -- in order to send it out, there was approval

2   to send out the financials -- the financial forecasts.

3   Q    Right.  She had given you approval to send this financial

4   forecast to the insurer --

5   A    Insurer.

6   Q    -- insurers.

7   A    Yes.

8   Q    You say here in your second sentence of the second

9   paragraph, "The purchase price and some revolver will

10  ultimately be added to the pro forma"?

11  A    Yes.

12  Q    "It will be approximately 10 million, but some of it will

13  be unfunded revolver."  Do you see that?

14  A    Yes.

15  Q    That was your understanding at the time --

16  A    That was.

17  Q    -- that the purchase price would be $10 million?  Yes?

18  A    Yes.

19  Q    But some part of it would be an unfunded revolver?

20  A    Yes.

21  Q    And the unfunded revolver you were referring to is what,

22  the Arc III loan or something else?

23  A    My recollection is the Arc III loan.  That's my

24  recollection.

25  Q    And if you look at the pro forma with me, the attached, it

Greenberg - Direct/Amini                    64

1   has a total operating revenue --

2              MR. AMINI:  This is on page, Your Honor, 86223.

3   BY MR. AMINI:

4   Q    The total operating revenue for 2016 is, at this point in

5   time, 37 million?

6   A    Yes.

7   Q    And by the way, that's only for ten-plus months of 2016,

8   right, because you're starting, and you're already in the

9   middle of February?

10  A    Yes.

11  Q    Or you're -- in fact, you're already at the end of

12  February?

13  A    Yes.

14  Q    All right.  So it's really a ten-month pro forma?

15  A    Yes.

16  Q    And the EBITDA that you were estimating at this point in

17  time for the year is 3.2 million?

18  A    Yes.

19  Q    And, you know, we went over it earlier.  I think there was

20  an earlier model that had 3.7.  Do you remember that as an

21  EBITDA number?

22  A    I remember right around there.

23  Q    And do you recall that between the earlier time in

24  February 24th, Maryland -- the University of Maryland canceled

25  the Maryland contract?

Greenberg - Direct/Amini                65

1  A    Yes.

2  Q    And that had to come off the pro forma?

3  A    Yes.

4  Q    And does that refresh your recollection that -- the reason

5  for the difference between the 37 and the 32 is that Maryland

6  was lost as a division?

7  A    That and possibly also just slight difference in timing in

8  terms of the beginning of the forecast.

9  Q    Okay.  If you go with me to Exhibit PX-233, the next

10 exhibit --

11          MR. AMINI:  Again, there's no objection to this

12 objection -- exhibit that I'm aware of, Your Honor.

13          MR. AMINI:  What's the number, please?

14          THE COURT:  233.

15          MR. AMINI:  233.

16          MR. MERVIS:  No objection.

17          THE COURT:  It's received.

18      (Plaintiff's Exhibit 233 is admitted into evidence)

19 BY MR. AMINI:

20 Q    Let me start with your email of February 23rd at 8:47 p.m.

21 which is on Bates stamp 26135.  This is an email to, if I'm

22 reading this string right -- Jason Miles, who's another one of

23 the insurance people at Lockton?

24 A    Yes.

25 Q    All right.  You're telling him that New Co. will not only

Greenberg - Direct/Amini                    66

1  have Pittsburgh, Hudson Valley vehicles -- because the MTA

2  vehicles are owned by the MTA under their physical damage

3  policy --

4  A    Yes.

5  Q    -- correct?  Those are the only three divisions you're

6  looking at, at this point?

7  A    Uh-huh.

8  Q    And at some point that day, you ask him -- and I'm looking

9  agin at your email of February 24th at 8:26 a.m., which is at

10 the bottom of page 3 of this exhibit which is -- bears Bates

11 stamp 26133.  It runs to the next thing.  You're asking him to

12 send over policies as soon as they have them?

13 A    8:26?

14 Q    It's the bottom of page 3 to the top of page 4.

15 A    Oh.

16 Q    Right?  There was some urgency --

17 A    Yes.

18 Q    -- that day?

19 A    Yes.

20 Q    There was urgency that day --

21 A    Yes, definitely.

22 Q    -- to these items.  Why?

23 A    We needed -- the company -- the new companies needed

24 insurance in order to operate.

25 Q    They didn't have them on the morning of February 24th?

**A1350**

Greenberg - Direct/Amini                    67

1  A    Yeah.  It doesn't appear that they had it yet.

2  Q    All right.  Mr. Miles, Jason Miles, writes you at about

3  12:08 p.m.  That's at the top of page 2 of this exhibit.  At

4  February 24th at 12:08 p.m., he gives you a list of four

5  entities he's proceeding with: Transcendence Transit,

6  Transcendence Transit II, TransCare Pennsylvania, and TC Hudson

7  Valley Ambulance Corp.  Do you see that?

8  A    Yes.

9  Q    And then you respond, and you add to that TC Ambulance

10 Corporation?

11 A    TC Hudson Valley Ambulance.  Yes.

12 Q    And also TC Ambulance.  I don't believe that that was in

13 his original list.  Do you know why you added that additional

14 one?

15         MR. MERVIS:  Sorry, counsel.  Where are we?

16         MR. AMINI:  We're on the --

17         THE COURT:  On the -- it's the first page.

18         MR. AMINI:  The first page of this exhibit, February

19 24, 2016 --

20         MR. MERVIS:  Thank you.

21         MR. AMINI:  -- at 11:59 a.m.  Michael Greenberg wrote

22 these are the entities that should be used, and I'm just asking

23 does he have an understanding of why he added the fifth item in

24 that list which does not appear in the four that are on

25 Mr. Miles'.

**A1351**

Greenberg - Direct/Amini                                    68

1          THE WITNESS:  Either it had -- the only thing I can

2   think of is either it had assets or operations that were going

3   to be part of New Co.

4          THE COURT:  What was the business of TC Ambulance,

5   Mr. Amini?

6          MR. AMINI:  TC -- I think they have one of the cons,

7   and they need that con to operate -- he doesn't remember this,

8   and I don't want to be testifying, but I think they have one of

9   the cons, and he doesn't have the -- he needs the con to

10  operate one of the two (*3:30:50 graphic regions?).

11         THE COURT:  All right.  So we don't know.

12  BY MR. AMINI:

13  Q    And then he -- Mr. Miles asks you, "What's the projected

14  revenue of the entities?"  And you respond in the last email in

15  the exchange with "37.2, but only based on ten months"?

16  A    Yes.

17  Q    And we saw that earlier in the pro forma?

18  A    Yes.

19  Q    Go with me now to PX-243.

20         MR. AMINI:  I don't have any objection to this one.

21  Oh, no.  I'm sorry.  I take that back.  Relevance, hearsay.

22  Lacks relevance, hearsay, is the objection that I see on this

23  document.

24         THE COURT:  Is there a particular reason?

25         MR. MERVIS:  Well, Your Honor --

Greenberg - Direct/Amini                    69

1          MR. AMINI:  Can I see if I can tie this in first
2   before the objection?  Maybe it'll make it a little easier.
3          THE COURT:  Well, let me hear what the objection is.
4          MR. MERVIS:  It sort of depends on -- yeah.  So I do
5   think -- I'm not sure which email -- I assume both.  So I do
6   think that Mr. -- I think it's Kossuth's email --
7          MR. AMINI:  Kossuth.
8          THE WITNESS:  Kossuth.
9          MR. MERVIS:  -- Kossuth -- is hearsay.  However, let
10  me just take a quick look at the email.
11         THE COURT:  It seems fairly innocuous at this point.
12         MR. MERVIS:  Oh, I don't disagree, but just one
13  second, Your Honor.  Yeah.  Well, I'll withdraw the objections.
14         THE COURT:  All right.  It's received.
15     (Plaintiff's Exhibit 243 is admitted into evidence)
16         MR. AMINI:  Thank you.
17  BY MR. AMINI:
18  Q    In that foreclosure -- let's go back to it.  Mr. Kossuth
19  was the guy running Pittsburgh?
20  A    Yes.
21  Q    All right.  And then that foreclosure that we looked at
22  earlier, we saw that you were actually insuring TransCare
23  Pennsylvania, Inc.  That was what we call the Pittsburgh
24  division --
25  A    Yes.

Greenberg - Direct/Amini                    70

1  Q     -- or you call the Pittsburgh division?  And you

2  foreclosed -- as you understood it, the foreclosure was on the

3  stock of that company, correct, TransCare Pennsylvania, Inc.?

4  Do you have an understanding of that?

5  A     I believe that there was foreclosure on stock and

6  assets --

7  Q     Okay.

8  A     -- but that's my only --

9  Q     Was it --

10  A     -- extent of my understanding.

11  Q     Was it your understanding that, as of the morning of

12  February 24th, Transcendence owned TC Pennsylvania, Inc. as a

13  wholly-owned subsidiary?

14  A     Yes, that's my understanding.

15  Q     Okay.  And so Mr. Kossuth was now reporting to you as a

16  representative of Transcendence, not -- is that not true?

17  A     He was reporting up within the management team at

18  TransCare, and the management team at TransCare would report

19  back to Patriarch.

20  Q     At this point, is it fair to state that the management

21  team on February 26th included Glen Youngblood?

22  A     Yes.

23  Q     And if you look at the CC, it says gleny@transcare.com.

24  Do you see that on your email?

25  A     Yes.

**A1354**

Greenberg - Direct/Amini                        71

1   Q    At this point, he's communicating through his TransCare,

2   but he's also at -- president of Transcendence, is he not?

3   A    He is.

4   Q    Okay.  And Mr. Kossuth is looking for the items that he

5   says he's going to need for the new ownership of this company,

6   correct?

7   A    Yes.

8   Q    And you're telling him you'll get a letter addressing that

9   by later that morning?

10  A    Yes.

11  Q    Did you ever send that letter?

12  A    I believe so, but -- or someone internally did.

13        MR. AMINI:  All right.  One moment, Your Honor.

14        (Participants confer)

15  BY MR. AMINI:

16  Q    Let me ask you to look at PX-255.  We have a --

17        THE COURT:  Before you start asking him about this,

18  this is a legal -- this is a motion.

19        MR. AMINI:  I understand that.  I really only want to

20  confirm that Mr. Greenberg signed the stipulation as an

21  officer -- authorized signatory of Transcendence, Your Honor --

22        THE COURT:  Where are we -- where --

23        MR. AMINI:  -- which you'll find on page 9 towards

24  the very end of this document on the signature pages.  There's

25  a stipulation that he entered into as the --

Greenberg - Direct/Amini                    72

1          THE COURT:  Oh, I see.

2          MR. AMINI:  It's really the document I want.  To be

3  complete, we'd put the whole thing in.

4          THE COURT:  All right.

5          MR. AMINI:  But the document is a stipulation

6  respecting the sale of certain personal property.  There is an

7  objection to this, the objection being relevance and hearsay.

8          MR. MERVIS:  Well, I'm sorry.  I'm a little confused

9  why he's -- you're looking at -- you want to -- the witness to

10  confirm that he signed it?

11          MR. AMINI:  Well, he signed a stipulation.  There are

12  representations in the stipulation.

13          MR. MERVIS:  I don't -- okay.  So --

14          MR. AMINI:  I can't -- I don't have anybody else who

15  signed it for Transcendence.

16          MR. MERVIS:  So, Your --

17          THE COURT:  Well, can't I take judicial notice of the

18  stipulation?

19          MR. MERVIS:  Yeah.

20          THE COURT:  It's filed with the motion.  Are you

21  asking whether he was an authorized signatory on behalf of

22  Transcendence at the time?

23          MR. AMINI:  I want to -- were you --

24          MR. MERVIS:  I have no problem --

25          MR. AMINI:  Can I ask him that --

**A1356**

Greenberg - Direct/Amini                    73

 1  BY MR. AMINI:

 2  Q    Are you -- were you the authorized signatory for

 3  Transcendence on this document?

 4  A    Oh, on that document?

 5  Q    Yes.

 6  A    On that document, yes.

 7  Q    And Ms. Tilton asked you to sign?

 8  A    Would have -- the board would have provided me with a

 9  resolution authorizing me to sign that.

10  Q    And the board -- by the board, you mean Ms. Tilton?

11  A    Yes.

12  Q    Okay.  And that -- and March was your last month at

13  Patriarch?

14  A    Yes, that's --

15       (Participants confer)

16           MR. AMINI:  All right.  One more document.  I'm

17  sorry.  PX-83.  I don't know if there are objections to it,

18  because it wasn't something I looked at before I got up here.

19  I'm sorry.

20           Michael, are there --

21           MR. MERVIS:  I'm assessing --

22           THE COURT:  Is this -- is PX-83 in your book?

23           MR. AMINI:  PX -- no, it's not.  No, Your Honor.

24           Can you put up PX-83?

25           There it is.  It's on the screen, Your Honor.

Greenberg - Direct/Amini                    74

1          THE COURT:  Okay.

2          MR. AMINI:  Okay.

3          THE COURT:  Any objection?

4          MR. MERVIS:  No, Your Honor.

5          THE COURT:  It's received.

6      (Plaintiff's Exhibit 83 is admitted into evidence)

7  BY MR. AMINI:

8  Q    Did you receive this email from Vincent DeVito (phonetic)

9  on or about July 13, 2015?

10 A    Yes, I did.

11 Q    All right.  And who is Mr. DeVito?

12 A    He was a fellow credit officer.

13 Q    And you discussed this internally once you got it, did you

14 not?

15 A    That -- I know we discussed it at one point in time.  I

16 don't know if that -- on that particular day.  But, typically,

17 if I received anything about interest, I would send that along.

18 Q    Now, in June of 2015, the company had actually managed

19 some kind of turnaround, had it not --

20 A    Yes.

21 Q    And it had shown that it had EBITDA of about a million

22 dollars for the month?

23 A    Yes.

24 Q    So you knew -- given what you knew about the sector at

25 that time, you thought if you could stabilize the company at

**A1358**

Greenberg - Direct/Amini                                    75

1  that level, it was worth eight to ten times EBITDA, so that

2  it's potential valuation would approach 80- to $100 million,

3  which was well in excess of any potential alternative like this

4  at the time.  Is that true or not?

5            MR. MERVIS:  It's a pretty long question.  Objection.

6            THE COURT:  I'm sorry.

7            MR. AMINI:  I'll break it down.

8            THE COURT:  Yeah.  Go ahead.  Rephrase it.

9  BY MR. AMINI:

10  Q    Let's break it down into pieces.  So you had a million

11  dollars of EBITDA for the month?

12  A    Yes.

13  Q    And in the context of looking at this kind of offer, you

14  were considering whether you could stabilize the company and

15  get more for it?

16  A    Yes.  We -- you know, this offer as it stands here --

17  Q    Uh-huh.

18  A    -- doesn't mention a dollar amount.  But, generally

19  speaking, once you demonstrate consistent results, you're

20  better positioned in making an argument for higher value.

21  Q    Knowing what you knew about the sector at the time, you

22  thought if you could stabilize the company at that level, it

23  was worth eight to ten times EBITDA, right?

24  A    We had looked at comparable companies in the sector, but

25  some of them were quite a bit larger, and those transactions

**A1359**

Greenberg - Direct/Amini                    76

 1  had occurred within that range.

 2      (Participants confer)

 3          MR. AMINI:  Your Honor, I'd like to play him from his

 4  deposition -- it's the last thing I want to do.  I'd like to

 5  play a question and answer at page 235, line 20.

 6          MR. MERVIS:  Your Honor, can we get copies of the

 7  transcript so we can see if this is actually --

 8          THE COURT:  It's the first exhibit.

 9          MR. AMINI:  It's the first exhibit in your book.

10          MR. MERVIS:  Oh, thank you.

11          MR. AMINI:  I'm very good about this, Michael.

12          MR. MERVIS:  Thank you.  I didn't know that.

13          THE COURT:  Even I knew that.

14          MR. MERVIS:  Well --

15          MR. AMINI:  So --

16          THE COURT:  What page are you referring --

17          MR. AMINI:  What I'm looking at --

18          THE COURT:  Is there a pending question?

19          MR. MERVIS:  Yeah.

20          THE COURT:  Maybe we don't need the deposition.

21          MR. MERVIS:  Maybe we don't need --

22          MR. AMINI:  I'm sorry?

23          THE COURT:  Maybe we don't need the deposition.  Ask

24  him a question.

25  BY MR. AMINI:

1  Q    Well, did you tell me at your deposition that you thought

2  that, from what you knew in the sector, that the company was

3  worth eight to ten times EBITDA?

4  A    I -- it would help if you showed me where.

5  Q    It's page --

6        THE COURT:  Okay.  Do you have something to refresh

7  his recollection?

8  BY MR. AMINI:

9  Q    It's page 236 of your deposition.  If you look at page

10 236, lines 2 to 16, that answer.  I'm just getting you to -- I

11 just would like you to affirm that you were -- you gave that

12 answer.  236 --

13 A    36 --

14 Q    -- lines 2 to 16.

15 A    Yes.

16 Q    You did?  Thank you.

17 A    I did.

18        MR. AMINI:  That's all I have, Your Honor.

19        THE COURT:  Okay.  Why don't we take a ten-minute

20 break before cross-examination.

21     (Recess taken at 3:42 p.m.)

22     (Proceedings resumed at 3:57 p.m.)

23        THE CLERK:  All rise.  Be seated.

24        THE COURT:  Go ahead, Mr. Mervis.

25        MR. MERVIS:  Thank you, Your Honor.  Can I just ask

78

1   one quick question of the Court --

2              THE COURT:  Sure.

3              MR. MERVIS:  -- vis-a-vis scheduling.  I don't know

4   how long the Court's planning to sit for the rest of the day.

5   You may recall that we had Mr. Pelissier here this morning

6   because we were kind of thinking we were going to short.  It

7   wasn't short.

8              THE COURT:  How long are you going to be the witness?

9              MR. MERVIS:  I'm a bad estimator, but I think about

10  an hour.  I'd like to get him out of here tonight.

11             THE COURT:  Yeah, that's probably going to be pretty

12  close to getting him out.  You know, you don't need to have

13  witnesses here or potential witnesses if you don't think you're

14  going to get to them.  There's no reason why they have to sit

15  --

16             MR. MERVIS:  Well, we --

17             THE COURT:  -- around all day.

18             MR. MERVIS:  -- agree, but we thought we were going

19  to get to him --

20             THE COURT:  Yeah.

21             MR. MERVIS:  -- because of what was said at the last

22  conference.  But anyway.  We'll let Mr. Pelissier go home?

23             THE COURT:  Yeah.  Why don't you tell Mr. Pelissier

24  he can go.

25             MR. AMINI:  And we're starting tomorrow morning as I

Greenberg - Cross/Mervis                    79

 1  understand it not at 10:00 but 10:30.
 2              THE COURT:  Ten.  I have a very short calendar.
 3              MR. AMINI:  Okay.
 4              THE COURT:  Go ahead.
 5              MR. MERVIS:  Thank you, Your Honor.
 6                          CROSS-EXAMINATION
 7  BY MR. MERVIS:
 8  Q    Okay.  Mr. Greenberg, I just want to -- I want to touch on
 9  one stray issue before we get to some other stuff.  You were
10  asked about -- by Mr. Amini about Mr. Bonilla, the CFO who I
11  think quit in October of 2015.  Do you remember that?
12  A    Yes.
13  Q    And I think we established this, but did he continue to
14  provide services in some form or fashion to the company after
15  that -- after he quit?
16  A    Yes, he did.
17  Q    I think under Mr. Amini's questioning, you mentioned that
18  after he quit, the company's financials were not up to date
19  during that time.  Is that right?
20  A    Yes.
21  Q    Now how about when you started, when you came on to the
22  project or onto TransCare in February of 2015?  How up to date
23  was the company with their financials at that point in time?
24  A    They were two to three months behind on closing
25  financials.

Greenberg - Cross/Mervis                    80

1          THE COURT:  Mr. Mervis, would you keep your voice up,

2  please?

3          MR. MERVIS:  Oh, I'm sorry, Your Honor.

4          THE COURT:  That's okay.

5  Q    And at the end in February, about how far behind was the

6  company to the best of your recollection?

7  A    Based on a few of the emails and my recollection, they

8  were still needed to close October as of February.

9  Q    And in terms of audited financial statements, to the best

10 of your memory, in February of 2016, what was the last audited

11 financial statement that the company had?

12 A    My recollection is 2013 was the last.

13 Q    I know we went through a little bit of your background.  I

14 just want to put a couple of things so the judge has a full

15 picture.  Just briefly, your educational history?

16 A    Yes.  I have a B.S. in finance from the University of

17 Florida, an MBA in finance and corporate accounting from the

18 University of Rochester and a CFA designation.

19 Q    Now, you're not longer with Patriarch Partners?

20 A    No longer.

21 Q    What was the circumstance under which you separated from

22 Patriarch Partners?

23 A    The -- the portfolio had been shrinking.  So there had

24 been -- had been cutbacks in terms of number of personnel.  And

25 I was part of a round of -- of cutbacks to the group.

**A1364**

Greenberg - Cross/Mervis                    81

1  Q    Approximately when would you move?

2  A    In that March time frame, but I don't know the exact date.

3  Q    March 16th?

4  A    Sixteen, yeah.

5        MR. MERVIS:  If we could pull up -- oh, do I have the

6  binders?  I have some smaller binders, Your Honor.

7        THE COURT:  Okay.

8        MR. MERVIS:  But, Roy, if you could pull up JX-29.

9  Your Honor, may Mr. (indiscernible) approach the witness?

10       THE COURT:  Yes.

11       MR. MERVIS:  And I'll approach the bench.

12       THE COURT:  Thank you.  Do you have an extra one for

13 my clerk?

14       MR. MERVIS:  We do.

15                      (Pause)

16 Q    Okay.  You'll see this is an email chain, Mr. Greenberg,

17 from Mr. Leland, not a chain actually, a report from Mr. Leland

18 by email.  And you're one of the recipients?

19 A    Yes.

20 Q    And just take a moment, not much time.  Just do you

21 recognize this report?

22 A    Yes.

23 Q    All right.  I would like you to turn to the fourth page of

24 the report which has a Bates number bearing -- ending in 1449.

25 If you'd take a look at that, and you'll see there there's a

**A1365**

Greenberg - Cross/Mervis                                                82

1  heading "National Express."  Could you just take a moment to

2  read that heading which goes on to the next page to yourself

3  and let me know when you've finished.

4                              (Pause)

5              THE WITNESS:  Okay.

6  Q    I believe you testified in response to Mr. Amini's

7  questions that Mr. Leland had been forbidden from speaking with

8  potential parties who were potentially interested in Transcare.

9  Do you have an understanding as to where Mr. Leland was able to

10  get the information that he is reporting here about National

11  Express?

12              MR. AMINI:  Objection, Your Honor.

13              THE COURT:  What's the objection?

14              MR. AMINI:  If it's phrased that way, that would be

15  hearsay.

16              MR. MERVIS:  I don't think so.

17              THE COURT:  Well, I'll overrule the objection.  A

18  large part of your case has been that Mr. Leland was precluded

19  from speaking to anybody.  It's not clear he was speaking to

20  anybody about this, but I'll overrule the objection.

21              MR. AMINI:  And just for the Court's benefit, my

22  question was, was Mr. Leland precluded from responding to

23  anybody, not fielding offers as they came in.

24              THE COURT:  Well, why don't we find out what happened

25  after he got this offer and he communicated it to Ms. Tilton

Greenberg - Cross/Mervis                          83

1   and among others, Mr. Leland.

2            MR. MERVIS:  And, actually, I'll withdraw that

3   question, Your Honor.  So --

4            THE COURT:  After all that, you're going to withdraw

5   the question.

6            MR. MERVIS:  No, no, I'm not withdrawing -- you know

7   what?  He may or may not.

8   Q    Do you know how Mr. Leland came to this information?

9   A    The only -- even at the time, the only logical explanation

10  was that he had some form of discussion.

11           THE COURT:  Sounds like speculation.

12           MR. MERVIS:  It does, so let me ask the next

13  question.

14  Q    Mr. Leland in the last paragraph on Page 4 makes a

15  recommendation right at the bottom.  Do you see that?  He says,

16  "My recommendation would be to wait until we see how the

17  (indiscernible) responds to the BDO audit."  Do you see that?

18  A    Yes.

19  Q    And at the time, would you agree or disagree with that

20  recommendation?

21  A    At the time, I would agree with that recommendation.

22  Q    Now, going to fifth page of the exhibit bearing a Bates

23  number that ends in 1450, there's a section called "Richmond

24  County Ambulance."  And I just want to focus your attention, if

25  you could just read the first paragraph and the first sentence

Greenberg - Cross/Mervis                    84

1  of the second paragraph and let me know when you're finished.

2       This is on the last page of the exhibit, Mr. Greenberg.

3                    (Pause)

4            THE WITNESS:  Yes.  Yeah.

5  Q    Do you see the part where he says that RCA must assume

6  TransCare has EBITDA in the ten-million-dollar range?

7  A    Yes.

8  Q    To your recollection, what was TransCare's EBITDA and on a

9  last 12-months-basis in March of 2015?

10 A    In the -- somewhere in the neutral to maybe slightly

11 positive level.

12 Q    What do you mean by neutral?

13 A    Neutral being zero.

14           MR. MERVIS:  Roy, if you could bring up showing up

15 Exhibit 40.

16 Q    Unfortunately, I don't have a hard copy of this one, but

17 do you have it on your screen?

18 A    Yes.

19 Q    Okay.

20           MR. MERVIS:  It's a joint exhibit, Your Honor, so I

21 think we have it in evidence.

22 Q    If you could just turn to the second and third pages of

23 the exhibit and just take a quick look and then to the

24 attachment just to see what you recognize.

25 A    Yes.

Greenberg - Cross/Mervis                            85

1  Q    And if you look at the -- well, first of all, what is the

2  attachment?  What do you recognize it to be?

3  A    A -- from National Express, an indication of -- of

4  interest.

5  Q    And just flipping back to the second page of the exhibit

6  which is -- it ends in Bates ending in 0756, the email

7  forwarding letter of intent, is anybody other than Mr. Leland

8  from the TransCare side of things shown as being a recipient?

9  A    Which?  This --

10 Q    The email from Mr. Russian.

11 A    Oh, from Mr. Russian?

12 Q    Yeah.

13 A    So it looks like only -- only Glenn.

14 Q    Now if you could go to the second page of the letter of

15 intent itself which has a Bates number ending in 0760, and just

16 take a moment to peruse the consideration portion -- sorry, the

17 overview portion of this page.

18                      (Pause)

19          THE WITNESS:  Yes.

20 Q    And what is your understanding of the consideration that

21 was being offered in this letter of intent?

22 A    Consideration in the range of six to seven million less --

23 less an amount the buyer determines is required to operate the

24 business for 60 days.  A portion is payable as initial

25 consideration, and then the balance is retained but they don't

**A1369**

1  specify -- National Express doesn't specify what the initial

2  consideration is versus the retention amount.  It also mentions

3  an assumption by the buyer of an overpayment obligation not to

4  exceed two million.  And it says an agreed-upon portion of the

5  consideration shall be allocated to a five-year non-compete

6  covenant.  So it's -- it's unclear as to how much consideration

7  would be received at the outset.

8  Q    Now, this email and the letter are dated July 10, 2015.  I

9  want to go back a few days in time and ask you to turn in your

10 binder and we'll put it up on the screen Joint Exhibit 33.

11         MR. MERVIS:  And, Your Honor, this again is a joint

12 exhibit, so presumptively in evidence.

13 Q    Mr. Greenberg, this is an email that you sent to Ms.

14 Tilton, correct?

15 A    Yes.

16 Q    All right.  I'd like you to read to yourself the first six

17 paragraphs.  They're relatively short.  And then I have a

18 couple of questions.

19                   (Pause)

20         THE WITNESS:  Okay.

21 Q    Thank you.  Now the sixth paragraph says, "As a result of

22 Wells Fargo's unwillingness to fund the ABL yesterday,

23 TransCare was not able to fund payroll yesterday of $950,000

24 but had to delay payroll until Monday."  Did that in fact

25 happen?

Greenberg - Cross/Mervis                               87

1   A    Yes.

2   Q    And the paragraph that preceded in your email, did you

3   accurately set forth your understanding of how that came to be,

4   in other words, how the payroll was missed?

5   A    Yes.

6   Q    Now, did this missed payroll, do you know whether this

7   advance attracted any publicity, either in the industry or the

8   press?

9   A    I know that -- that there was a publication in Westchester

10  that had picked up the payroll miss.  And just based on the --

11  just based on the -- the internet and sort of current, the way

12  media currently covers things, it was then picked up elsewhere

13  as well.

14  Q    And the actual date of the miss was July 2nd?

15  A    July -- July 2nd.

16  Q    Okay.  And the letter of intent that we just looked at,

17  Exhibit 40, that was July 10th?

18  A    Yes.

19  Q    All right.  Now how did TransCare's business fare in the

20  first few months that followed this payroll miss?

21  A    The business was -- the volumes -- the volumes were down.

22  And as a result of immediate cash flow and ultimately --

23  ultimately EBITDA was down from -- from the June level.

24  Q    And what had the trend been sort of just up to the payroll

25  miss?

Greenberg - Cross/Mervis                    88

1  A    It had been on an increasing trend with improvement each
2  -- each month.
3  Q    And then afterward?
4  A    It was going the other direction declining, declining each
5  month.
6  Q    Thank you.  If you could turn to Joint Exhibit 38 in your
7  binder.
8           MR. MERVIS:  And if, Roy, you could bring that up on
9  the screen.
10 Q    So, Mr. Greenberg, this is an email chain in which you are
11 a participant.  I'm only focused on the first page.  First of
12 all, you'll see a name at the top, Scott Whalen.  Do you see
13 that?
14 A    Yes.
15 Q    And I know it was briefly mentioned by Mr. Amini, but what
16 was Scott Whalen's function at the time?
17 A    He was -- he was also a credit officer in the same group
18 that I was in.
19 Q    At Patriarch Partners.
20 A    At Patriarch.
21 Q    Okay.  So, I want you to take a look at Mr. Leland's email
22 to you and Mr. Whalen on July 8 at 3:36.  And in particular, if
23 you could just read the second paragraph to yourself.
24                          (Pause)
25           THE WITNESS:  Yes, I've read it.

**A1372**

Greenberg - Cross/Mervis                                    89

1  Q    So, in that paragraph, you see where Mr. Leland says he

2  had a query from someone who he thought was seeking to cherry-

3  pick good assets?

4  A    Yes.

5  Q    And he writes, "I told them that no one would be

6  interested in selling the good business ones and keeping the

7  inferior ones."  Do you see that?

8  A    Yes.

9  Q    Did you agree with that sentiment?

10  A    At that point in time, yes.

11  Q    Now, let's take a look at Mr. Whalen's email at the top of

12  the page.  It says two things.  It says, first, "I think for

13  sure we should not communicate or indicate any interest in

14  divestitures at this time."  Do you see that?

15  A    Yes.

16  Q    And the date of his email is July 8, so six days after the

17  payroll miss?

18  A    Yes.

19  Q    And did you agree with his statement at the time?

20  A    Yes.

21  Q    Why?

22  A    We -- the business had been on a -- had been on an upward

23  trajectory, but at that point in time, we had just -- there had

24  just been a meaningful event.  So the -- the positioning of the

25  company wasn't -- was in -- it was in a vulnerable position.

Greenberg - Cross/Mervis                                90

1   Q    The meaningful event being what?

2   A    The missed payroll.

3   Q    Okay.  "Even rights lends more typical strategies to sell

4   into strength."  Do you see that?

5   A    Yes.

6   Q    And did you have the understanding of what he was talking

7   about with respect to Ms. Tilton's more typical strategy?

8   A    Yes.

9   Q    And what was your understanding?

10  A    My understanding was that a large number of the companies

11  that had previously been sold, a majority had been companies

12  that were performing well.

13  Q    At the time they were sold?

14  A    At the time they were sold.

15  Q    If you could turn, please, in the binder, to Joint Exhibit

16  44.

17        MR. MERVIS:  And Roy, if you could bring that up,

18  please.

19        This is also a joint exhibit, Your Honor, Joint

20  Exhibit 44.

21  Q    So, Mr. Greenberg, I want to focus your attention -- this

22  is a chain that you were on, yes?

23  A    Yeah.

24  Q    I want to focus your attention to an email from Mr. Leland

25  to Ms. Tilton July 17 at 7:07 a.m. and you were one of the two

Greenberg - Cross/Mervis                    91

1  people copied on it.  Do you see that?

2  A    Yes.

3  Q    And Mr. Leland begins the email, "Words alone could never

4  express my thanks for all you have done to save TransCare over

5  the years but especially these last 15 days.  We absolutely

6  could not have done this without you!"  Do you see that?

7  A    Yes.

8  Q    What was your understanding of what it was that Mr. Leland

9  was thinking her for?  What had she done?

10 A    At that point in time, we had -- we had reached an

11 agreement with Wells to have them release a reserve.  That

12 reserve that they had put in place provided additional funding

13 to the company and had paid -- paid some of the obligations

14 that had still been outstanding related to the payroll and then

15 helped to sort of try and move past that event.

16 Q    And then he goes on in the second paragraph to say, "Jean-

17 Luc and Michael were fantastic.  They are dedicated, creative,

18 and an expert in saving distressed companies.  You have an

19 amazing team, and these two worked their tails off to save

20 TransCare."

21     So without being overly modest, did you in fact work your

22 tail off to save TransCare at that point in time?

23 Q    Yes.  Jean-Luc and I did.

24     THE COURT:  Aren't these questions you should be

25 asking Leland?

**A1375**

Greenberg - Cross/Mervis                    92

1      MR. MERVIS:  Asking who?

2      THE COURT:  Leland.

3      MR. MERVIS:  Well, he's not coming to trial, Your

4  Honor, but yes.

5      THE COURT:  But you took his deposition, right?

6      MR. MERVIS:  Yes, I did.  Yes.

7      THE COURT:  Did you ask him about these emails?

8      MR. MERVIS:  I did, yes.  But I also -- well, in any

9  event.

10 Q    All right.  And were there other times during the course

11 of 2015 and 2016 where you felt that you were working your tail

12 off to save TransCare?

13 A    Definitely.

14 Q    Now, if you could go to DX-76 in the binder.

15     MR. MERVIS:  This is already in evidence, Your Honor.

16 I just want -- this is the notice of the non-renewal.

17 Q    And if you could turn to the third page of the exhibit

18 which ends -- which has a Bates number at the bottom ending in

19 6336.  And I just want to focus on the first -- well, I guess

20 it's the first full paragraph on the page, the one that begins,

21 "Lender hereby formally."

22 A    Yes.

23 Q    If you could just take a moment to read tat to yourself.

24                    (Pause)

25     THE WITNESS:  I've read it.

**A1376**

Greenberg - Cross/Mervis                          93

1  Q    Now, this notice of non-renewal, did you consider this --
2  this is now October, yes?
3  A    Yes.
4  Q    Did you consider this to be a consequential event?
5  A    Definitely.
6  Q    Why?
7  A    We -- TransCare didn't really -- it was going to be a
8  challenge to find an alternative lender.  TransCare's audited
9  financials were still due.  The company's financial position
10 had -- had declined since July.  And my understanding was the
11 funds did not have the availability to repay Wells.
12 Q    When you say the funds, you lost me there.
13 A    The Zohar funds or even potentially the -- any Ark funds.
14 Q    Let me -- oh, I understand what you're saying.  Let me ask
15 it a different way.  As of this time with the date of the
16 notice, how likely was it in your estimation that TransCare
17 would be able to repay the loan, the Wells Fargo loan in full
18 on January 31st of 2016?
19 A    Extremely unlikely.
20 Q    I think you said just a minute ago that it would have been
21 challenging to find a replacement asset-based lender.  Is that
22 right?
23 A    Yes.
24 Q    And what were some of the reasons for that?
25 A    The delayed financials would be the -- the delayed audited

Greenberg - Cross/Mervis                    94

1  financials would be the biggest.  The recent -- the recent up

2  and down performance, inconsistent performance, dated -- some

3  dated IT systems, the challenges they were experiencing with

4  the fleet.  There were a number of different reasons, but --

5  Q    If we could turn now -- I don't know if you -- yeah, you

6  still do have Mr. Amini's much thicker binder.  If you could

7  locate Joint Exhibit 51 in that binder.

8          MR. MERVIS:  And, Roy, if you could put it up on the

9  screen.

10 Q    Mr. Amini asked you a number of questions about this

11 document which I think we talked about as a -- or referred to

12 as a plan.

13 A    Yes.

14 Q    First off, did Ms. Tilton ever prove the plan embodied in

15 JX-51?

16 A    No.

17 Q    Now, I want to take a moment just to look at some of the

18 assumptions that the plan was based on.  So let me ask you on

19 the first page of the exhibit if you could go below the heading

20 "Key Elements of the Presentation Include" and go down to what

21 I think is the first sort of indented bullet points.  It says

22 "Replacement of over 50 vehicles" and it goes on.  Can you read

23 that to yourself, please?

24          (Pause)

25          THE WITNESS:  Yes.

Greenberg - Cross/Mervis                    95

1    Q    How far to your knowledge had the company gotten in

2    procuring 50 replacement vehicles at the time as of November

3    14th of 2015?

4    A    They hadn't begun.

5    Q    The next bullet point talks about rate increases with

6    existing customers.  Do you see that?

7    A    Yes.

8    Q    What does that refer to?

9    A    There was a plan to go to some certain customers to

10   request increases in the rates that are being charged.  Because

11   of the long-standing nature of a lot of relationships, some of

12   the contracts and some of the relationships had outdated

13   pricing.

14   Q    Meaning that you thought there was an opportunity to get

15   them to pay more?

16   A    Yeah.  And that was what I had heard from the company as

17   well.

18   Q    Okay.  And was that a sure thing?

19   A    Not -- not sure, but -- but they thought they could

20   achieve it.

21   Q    Okay.  If you could go down a few of these sub bullets,

22   you'll see there's a bullet that says "Product/Service Line

23   Extensions."  Do you see that?

24   A    Yes.

25   Q    And to your knowledge, how far had the company proceeded

Greenberg - Cross/Mervis                                    96

1  as of November 2015 in those potential new offerings?

2  A    It was thought about.  It had been discussed in general

3  with -- with customers but not -- not executed upon.

4  Q    If you could go to the second page, please.  If you go,

5  let's see, one, two, three, four five bullet points down,

6  there's a bullet that says, "Assumes credit agreement renewed

7  with Wells Fargo."  Do you see that?

8  A    Yes.

9  Q    And that was one of the key assumptions of this plan?

10 A    Yes.

11 Q    And was that a sure thing at this point in time?

12 A    No.

13 Q    Mr. Amini asked you for this exhibit -- well, actually,

14 I'll deal with it in a minute.  So we can go past this exhibit.

15 A

16 Q

17 A

18 Karen *4:39:13

19 A        Yes.

20 Q        And he talks about -- he says, Mike and -- Michael and

21 I are back from Wells.  What was that about?  By the way, do

22 you know whether Wells Fargo approved this plan?

23 A    No, I don't think they did.

24 Q    Now, actually staying with the exhibit, if you could go to

25 the -- there's a deck in the back that we looked at a few pages

Greenberg - Cross/Mervis                          97

1   of.  And if you could go to the page that's -- it's Slide No. 6

2   but it's the Bates number ends in 8512.  Just let me know when

3   you're there.

4   A    It says Page 6 or --

5   Q    Well, there's a 6 in the slide.

6            MR. MERVIS:  Your Honor, if I -- can I approach?

7            THE COURT:  Yes.

8            MR. MERVIS:  I'll be able to find it.

9            THE WITNESS:  There it is.

10           MR. MERVIS:  You got it?

11           THE WITNESS:  In here.

12           MR. MERVIS:  Now I have to go back and look at my

13   Bates number.

14   Q    Mr. Greenberg, on the bottom right-hand corner, just look

15   for the number 8512.

16   A    8512?

17   Q    Yeah.  Or if you have it on your monitor, you can look at

18   your monitor.  That will probably be easiest.

19   A    It's easier.

20   Q    All right.  So, it's up on your monitor.  So, I want to

21   draw your attention to the last -- to the checkmark on that

22   page which says, "MTA clawed back two million of profit made

23   during the extension period."  Do you see that?

24   A    Yes.

25   Q    Do you know what that refers to?

**A1381**

Greenberg - Cross/Mervis                               98

1  A    Yes.  The -- so when the contract was renewed, there was a

2  period -- it was after the official plan renewal date so there

3  was a period of a number of months that the -- that the

4  contract had been in limbo, had not been renewed.  So the MTA

5  had come back and said, well, we're renewing the contract but

6  given that the -- the new contract is less profitable, we want

7  to claw back profit for that interim period prior to extension.

8  Q    Did that have an impact on the profitability of that

9  business?

10 A    Definitely, yes.  Yeah, negative.

11 Q    If you go just six pages in to what is the slide that ends

12 in -- has a Bates number that ends in 8518.  It should says the

13 MTA renewal at the top.  I want to focus your attention on the

14 paragraph that begins, "MTA procurement imposed."  Do you see

15 that?  It's sort of the third paragraph there.

16 A    Oh, imposed.  Yes.

17 Q    Yeah, if you could read that paragraph to yourself and let

18 me know when you're finished.

19                          (Pause)

20          THE WITNESS:  Yes.

21 Q    Is that the same rebate issue we were just talking about?

22 A    Yes.

23 Q    All right.  IF you'd go now to JX-55 which should be the

24 next document in the big binder.  This is this comparables

25 exercise that you undertook.

Greenberg - Cross/Mervis                    99

1   A    Yes.

2   Q    Let's go to the last page of the exhibit.  Mr. Amini, you

3   know, sort of walked you through some of metrics of some of

4   these businesses.  First of all, to your understanding at the

5   time that you got this information, were any of these

6   businesses distressed?

7   A    No.

8   Q    And so one of the metrics that I think we talked about

9   earlier was EBITDA.  And you understand that the figures in --

10  do you understand the figures in those pages are the last 12

11  months or last trailing months EBITDA?  Last 12 months EBITDA.

12  A    The --

13  Q    Well, actually let me withdraw the question.  Let me ask

14  it a different way.  As of this point in time in December 2015,

15  approximately what was TransCare's EBITDA on a last 12-months

16  basis?

17  A    As of December 2015?

18  Q    Yeah.

19  A    Somewhere in one- to two-million range.

20  Q    And in terms of -- if you can remember it, in terms of

21  simply just gross revenues, where was the company at?

22  A    Around 120 million is my recollection.

23  Q    At the time that you were undertaking this exercise, was

24  it your understanding that Ms. Tilton intended to put the

25  company up for sale right away?

Greenberg - Cross/Mervis                    100

1  A    It was my understanding that over time, there was a plan

2  to -- yeah, they were looking at potentially to sell the

3  company.

4  Q    And when you say over time meaning -- well, I guess we got

5  into in some of the other exhibits.  But let me ask you this.

6  Marketing the company in December of 2015, would that to your

7  understanding be consistent with Ms. Tilton's "sell them to

8  strength" strategy?

9  A    No.  No, it would not.

10 Q    Why not?

11 A    Because the company since that July event had had

12 declining results.

13 Q    If you could go to DX-97 which is also in this binder.

14         MR. MERVIS:  If you could put it up.

15 Q    So this is December 21 of 2015.  Mr. Amini when he

16 questioned you about this document asked where were the

17 TransCare people on the -- you know, on the two in the front on

18 the (indiscernible).  And he asked you that question about some

19 other documents in the same time frame.  I'd like you to take a

20 look --

21         MR. MERVIS:  -- and we'll just pull this up, Your

22 Honor, because I don't have it in hard copy --

23

24 Q    -- at -- take a look at Joint Exhibit 53.

25         MR. MERVIS:  -- Now if you could, Roy, if you could

Greenberg - Cross/Mervis                101

1  go to the third page of the email, Bates number ending in

2  84008.

3  Q    Mr. Greenberg, I'd like you to briefly look at your email

4  to Ms. Tilton on December 12th at 9:13 a.m., not necessarily

5  the whole thing but just enough to get a sense of what it is

6  about and then let me know.

7                    (Pause)

8            THE WITNESS:  And just -- and just go to to the next

9  page or --

10           MR. MERVIS:  Oh, Roy, can you flip to the next page.

11           THE WITNESS:  Oh, I don't know.

12                    (Pause)

13           THE WITNESS:  And then just the one -- just see the

14  balance.

15           MR. MERVIS:  One more, Roy.  Thank you.

16           THE WITNESS:  Oh, that's it.

17                    (Pause)

18           THE WITNESS:  Okay.

19  Q    All right.  At a very high level, Mr. Greenberg, what was

20  the subject that you're reporting on here to Ms. Tilton?

21  A    Issues -- issues related to liquidity, the go-forward

22  plan, and there was an issue with the borrowing base that at

23  the time got Wells fairly concerned about the company, about

24  the reliability of information coming from the company.

25           MR. MERVIS:  Now, Roy, if you could go back to the

Greenberg - Cross/Mervis                    102

1 third page of the email, so Bates ending 4088.

2 Q    And, Mr. Greenberg, you'll see that there's an email

3 actually starts on the prior page, but there's an email to you

4 from Ms. Tilton.  It starts, "I want to know immediately."  Do

5 you see that?

6 A    Yes.

7 Q    Can you read that to yourself, please, and let me know

8 when you're done?

9                     (Pause)

10          THE WITNESS:  I've read it.

11 Q    Fair to say that Ms. Tilton wasn't particularly happy in

12 this email?

13 A    Oh, definitely not.

14 Q    Who was she upset with?

15 A    Glenn, Glenn in particular.

16 Q    Glenn Newman?

17 A    Yes.

18 Q    Okay.  And you'll see this second line to the bottom of

19 this email, Ms. Tilton writes, "Randy, you need to begin a

20 search for a new CEO."  Do you see that?

21 A    Yes.

22 Q    Who is Randy?

23 A    Randy was the -- is the head of talent management and he

24 conducted searches for CEOs and CFOs of portfolio companies.

25 Q    Is he part of the Patriarch team?

Greenberg - Cross/Mervis                    103

 1  A    Yes.

 2          MR. MERVIS:  Roy, if you could pull up Exhibit --

 3  Joint Exhibit 58, please.

 4          Again, I apologize I don't have a hard copy.

 5  Q    If you could go to the second page, please, and there's an

 6  email that starts -- it's from Mr. Pelissier at the bottom of

 7  that page at 6:33 p.m.  And do you see that email?

 8  A    Yes.

 9  Q    And he talks about -- he says, "Michael and I are back

10  from Wells."  What was that about?

11  A    Back from meeting with Wells.

12  Q    And were things at this point in time in kind of a chaotic

13  state in the office?

14  A    Yes, definitely.

15  Q    And he writes, "We had quite a bit of work to do to

16  establish a new agreement with them and particularly to finish

17  the plan and get it approved.  What is your schedule over the

18  remainder of the year?"

19          Do you see that?

20  A    Yes.

21  Q    And do you see that Mr. Leland responds, he's the next one

22  to respond.  He sends an email at -- well, I guess it's

23  military time, 18:38, and he says, "I'm heading to California

24  in the morning for the holidays, and return Sunday night."

25          Do you see that?

Greenberg - Cross/Mervis                    104

1  A    Yes.

2  Q    Great.  Now, let's go up to the next email on the page.

3  That one comes from Mr. Bonilla, and that one was sent, again,

4  using military time, at 20:08.  Take a minute just to read this

5  to yourself, and I'll ask you a couple of questions.

6  A    I've read -- I've read it.

7  Q    Now, Mr. Bonilla is talking about this situation, at least

8  in part the situation with the NYSIF.

9  A    Yes.

10 Q    And his email actually concludes, "Company will cease

11 operations due to non-payment by no later than 12/31/15."

12      Do you see that?

13 A    Yes.

14 Q    Now he also responds to Mr. Pelissier's question about his

15 schedule.  Do you see his response at the top of his email?

16 A    Yes.

17 Q    And for the record, out until Monday, 12/28, right?

18 A    Yes.

19 Q    So he was going to be gone a week.

20      Go to the first page, please.  You'll see that there's

21 then an email response from Mr. Pelissier.  He says, "This team

22 is quite incredible."

23      And then you respond and say, "Astounding."

24      Do you see that?

25 A    Yes.

Greenberg - Cross/Mervis                    105

1  Q    Why did you write that?

2  A    At a -- you know, at a critical juncture, both the CEO and

3  the acting CFO, or CFO/consultant, were going away.

4  Q    Ms. Tilton's unhappiness with Mr. Leland that we saw in

5  email and the exhibit we looked a little bit earlier, to your

6  knowledge, did that ever abate between the time of that email

7  and the time he was terminated?

8  A    No.

9  Q    All right.  If you could go -- let's go back to thin

10  binder, and if you could go to JX-67, please.

11      Mr. Amini asked you some questions about this document.  I

12  just have a few.  First of all, at the very beginning of the

13  email, you write, "Jean-Luc and I worked all night to arrive at

14  a scenario to adjust the parameters we discussed yesterday,"

15  and then it goes on.

16      Had you in fact worked through the night?

17  A    I think we, yeah -- I think we had.

18  Q    And I want you to go down to -- there's a -- on the same

19  page, the first page, there's a heading, or subheading,

20  "Transit," and the first bullet.  Do you see that?

21  A    Uh-huh.

22  Q    The first bullet under "Transit" says, "The Transit

23  contract was renewed in mid-2005 through October 2019, but the

24  MTA moved away from a commercial contract to a municipal

25  contract where it limited profitability."

Greenberg - Cross/Mervis                    106

1     Do you see that?

2  A    Yes.

3  Q    Do you have understanding as to what that means?

4  A    The original contract had -- was more of like a

5  traditional commercial contract where you provide -- you

6  provide services and repairs to vehicles and maintain your

7  vehicles and then, charge -- charge the MTA a particular price.

8       The more municipal contract was one where you -- where the

9  MTA had greater visibility into your costs, and as a result,

10 had -- had a greater ability to -- to question -- to question

11 cost and minimize markup.

12 Q    And the next bullet talks about this rebate issue that we

13 looked at in prior exhibits.  What relationship is there, if

14 any, between the rebate issue and the change of contract issue?

15 A    They're -- they're related.  So the -- so the requests of

16 a rebate dealt with that interim extension so they -- the

17 feeling was that because there had been that extension without

18 a new contract during that period, that interim period, they

19 were -- the MTA was entitled to a -- to a rebate covering that

20 period.

21 Q    The next bullet point says, "During the third and fourth

22 quarters of 2015, Transit lost groups due to challenge

23 performance and concerns."  It goes on.  Do you know what

24 that's about?

25 A    The -- so during the third and fourth quarter, Transit

Greenberg - Cross/Mervis                    107

1  had, due to challenges in their performance, challenges in

2  their repair of vehicles, some routes had been taken away and

3  given to competitors.

4  Q    And did that have an impact on the profitability of the

5  MTA business?

6  A    Yes, it did.

7  Q    A good one or a bad one?

8  A    A bad one.

9  Q    And if you could go to the -- now to the third page of

10 this exhibit, which has a Bates number ending in 6574.  And

11 there's sort of a key assumptions section, but I only want to

12 ask you about one thing which is one, two, three, four, five,

13 six bullet points down.  It says, "MTA business will take five

14 to six months to improve significantly due to a need to replace

15 management and the time to get back routes."

16      Do you see that?

17 A    Yes.

18 Q    The reference to "get back routes," what routes?

19 A    The routes that had been lost to competitors.

20 Q    Just one last question on this exhibit.  If you go to the

21 first page, go back to the first page, and you look at the

22 subject line, you'll see it says "preliminary plan."

23 A    Yes.

24 Q    And was the plan, in fact, preliminary?

25 A    Yes.

Greenberg - Cross/Mervis                      108

1  Q    Did Ms. Tilton approve of this plan?

2  A    No.

3  Q    To your knowledge, did Wells Fargo approve this plan?

4  A    To my knowledge, no.

5  Q    If you could turn now, please, to PX-158, which we saw

6  earlier today.

7       Just a few questions on this one.  First of all, the --

8  well, actually, just really two questions.  Did Ms. Tilton

9  approve this plan?

10 A    No.  Not at that stage.

11 Q    And to your knowledge, did Wells Fargo this plan?

12 A    To my knowledge, no.

13 Q    All right.  Please turn now to PX-175, which is also in

14 the skinny binder, and we looked at this earlier today, as

15 well.

16      So I have a number of questions for you about this

17 document, Mr. Greenberg.  But let me start -- well, to your

18 understanding, was this a complete plan or a draft plan?

19 A    This was a draft -- a draft plan to be submitted -- to be

20 submitted for approval.

21 Q    And by approval, you're referring to Ms. Tilton?

22 A    Yes.

23 Q    But also, was Wells Fargo's approval needed, too?

24 A    Ultimately, yes.

25 Q    Okay.  Now, I'd like you to go to the deck and go to the

Greenberg - Cross/Mervis                          109

1   second page of the deck which ends in -- which has a Bates

2   number ending in 2111.  Let me know when you're there.

3   A    Yep.

4   Q    This is called the, or this slide is titled "Situation

5   Analysis," and right below the initial observation about

6   operating at the absolute breaking point, the bullet below

7   there says, "Strained and broken customer relationships."

8        Do you see that?

9   A    Yes.

10  Q    And in your view, at this point in time, did the company

11  have strained and broken customer relationships?

12  A    Yes.

13  Q    If you go to the next page, 2112, there's a heading or a

14  chevron that says "Strained and broken ambulance fleet."

15       Do you see that?

16  A    Yes.

17  Q    And in your view, at this time, did the company have a

18  strained and broken ambulance fleet?

19  A    Yes.

20  Q    Going down a little further on the same page, it says

21  "Strained and broken vendor relationships."

22       Do you see that?

23  A    Yes.

24  Q    In your view, at this time, did the company have strained

25  and broken vendor relationships?

Greenberg - Cross/Mervis                    110

1  A    Yes.

2  Q    And then the last thing on that page, it says "Strained

3  and broken landlord relationships."

4       Do you see that?

5  A    Yes.

6  Q    And at this time, did the company have strained and broken

7  landlord relationships?

8  A    Yes.

9  Q    I'd like you to now turn two pages into the deck to the

10 page that has a Bates number ending 2114.

11 A    Yes.

12 Q    If you take a look at this sort of first bullet called a

13 chevron bullet point at the top, it says, "CMA."  First of all,

14 that's Carl Marks.

15 A    Carl Marks Advisors, yes.

16 Q    "CMA has worked diligently to develop the most accurate

17 financial picture of the company possible, given the

18 limitations of the company's accounting systems and financial

19 reporting."

20      Do you see that?

21 A    Yes.

22 Q    And did you have an understanding that such limitations

23 existed?

24 A    Yes.

25 Q    What were they?

Greenberg - Cross/Mervis                    111

1  A    They were running on an old -- my recollection, I may get

2  the acronym wrong, but I think it was an AS400 -- old

3  accounting system, old financial reporting system, and old,

4  just billing system, as well.  And all those things combined

5  resulted in meaningful challenges in closing their books.

6  Q    In the next bullet point, just read that to yourself, the

7  bullet point that says, "To have a chance of a turnaround," and

8  I'll have a question or two for you.

9  A    With the second bullet?

10 Q    Yeah.

11 A    That's it?

12 Q    The one that starts with, "To have a chance."

13 A    Yes.  I read that.

14 Q    Okay.

15      So there's a reference to an immediate incremental pledge

16 of support from Patriarch totaling $7.5 million plus.  Do you

17 see that?

18 A    Yep.

19 Q    What did you understand, or who did you understand

20 Patriarch to be?

21 A    Well, based on what I knew at the time, there was limited

22 availability under the Zohar funds so that that potentially was

23 going to mean Ms. Tilton, through Ark funds, providing

24 additional support.

25 Q    And this plan was calling for 7.5 million or more?

Greenberg - Cross/Mervis                112

1   A    Plus, and then it says, "excluding term interest."  So --
2   so now you're up quite a bit higher than seven and a half.
3   Q    Going a little further down the page, there's a chevron
4   that says, "Plan execution risk is high and therefore, ultimate
5   payback on the incremental investment is uncertain."
6        Do you see that?
7   A    Yes.
8   Q    Was it your understanding that this deck was eventually
9   going to be shown to Ms. Tilton?
10  A    Yes.
11  Q    Was it?
12  A    Yes.  Yes.
13  Q    Did Ms. Tilton approve this plan?
14  A    No.
15  Q    To your knowledge, did Carl Marks approve this plan?  No,
16  I'm sorry, not Carl Marks.  Wells Fargo?
17  A    Wells Fargo did not.
18  Q    Thank you.
19       All right.  If you could turn to PX-79, which I think we
20  looked at briefly with Mr. Amini, I have just a few questions.
21       First of all, this document, what would you call this
22  document?  What's sort of the best descriptor?
23  A    I mean, it looks like a draft of something that I sent to
24  myself, but -- and it looks like a -- an overview of really the
25  assumptions behind a financial -- a financial model.

Greenberg - Cross/Mervis          113

1  Q    Do you know whether Ms. Tilton ever saw this document?

2  A    Oh, and the cash flow forecast.  I don't know that she

3  ever saw this document.

4  Q    To your knowledge, did Wells Fargo ever see this document?

5  A    To my knowledge, no.

6  Q    I just want to focus your attention on one page which is

7  the -- it's slide two of the deck and it also has a Bates

8  number ending in 3261.

9       Do you see that?

10 A    Yes.

11 Q    There's a line item there for capital contribution about

12 three quarters of the way down the page.

13      Do you see that?

14 A    Yes.

15 Q    That's about a $7.3 million figure.  Is that right?

16 A    Yes.

17 Q    And what does that represent to your understanding?

18 A    The required additional capital, you know, debt -- you

19 know, debt or otherwise, required for the -- for the -- for

20 2016.

21 Q    So for the plan to work, it needed at least that much

22 funding?

23 A    Yes.

24 Q    Okay.  Now, I'd like you to turn to DX-132, please.

25 A    Oh, DX.  Then, the big --

Greenberg - Cross/Mervis                    114

1  Q    It's in the same -- same binder.

2  A    Same binder?

3  Q    Yeah.

4         THE COURT:  Is there any objection to this exhibit?

5         MR. MERVIS:  Well, the answer is no, but they can --

6  well, actually, it's in evidence.

7         MR. AMINI:  It's already in evidence.

8         MR. MERVIS:  He used it with the witness.

9         THE COURT:  Oh, all right.  If it's evidence,

10 already, good.

11        MR. MERVIS:  So even if there was, it's no more.

12 BY MR. MERVIS:

13 Q    All right.  You there?

14 A    Yep.

15 Q    Okay.  So I think we established earlier that here we have

16 Mr. Killion, he's from Carl Marks, yes?

17 A    Yes.

18 Q    And he's sending an email to you and then copying

19 Mr. Landeck from Carl Marks.

20 A    Yes.

21 Q    And this is February 10th, right?

22 A    Yep.

23 Q    And he's talking about -- well, he says, "attaches the

24 current draft that the entities contemplated to be in the

25 Article 9 transaction."

Greenberg - Cross/Mervis                115

1       Do you see that?

2   A    Yes.

3   Q    And what kind of work is he doing here around the

4   Article 9 transaction in this document?

5   A    He's modeling -- he's modeling out the financial forecast

6   for -- for the entities that would be part of the go-forward

7   company.

8   Q    Okay.  In the last paragraph, there's a discussion about

9   the need to fund $3.2 million.  Do you see that on the first

10  line there?

11  A    Yes.

12  Q    In the next sentence, it says, "Also, we would need to

13  layer in shared service costs."

14       Do you see that?

15  A    Yes.

16  Q    What did you understand that to mean?

17  A    That -- that related to in -- in Old Co., Old Co. would

18  have certain combination of -- there would be certain employees

19  in Old Co., certain employees in New Co., and some of the

20  employees in Old Co. would be providing services to New Co.,

21  and as a result, they would have to have some sort of a

22  shared -- a shared services agreement.

23  Q    And to your understanding, at least as of February 10th,

24  was it in fact contemplated that there would be a -- some sort

25  of a shared services agreement?

Greenberg - Cross/Mervis                    116

1  A    In my recollection, yes.

2  Q    Okay.

3       Please turn to DX-163, which is in the skinny binder.  Oh,

4  before I get there, Mr. Greenberg, just going back to the

5  February 10th date.  At around that time period, to your

6  knowledge, were Carl Marks and Wells Fargo personnel

7  interacting directly?

8  A    To my knowledge, they were.

9  Q    Now, so let's go to DX-163.  It's a fairly short email

10 chain.  Let's go to the earliest email in the chain, which is

11 from you to Ms. Tilton at 7:49 p.m., and it goes over to the

12 second page.

13      Do you see that?

14 A    Yes.

15 Q    And there's a reference to Glen, Barb, and Pete.  Do you

16 see that?

17 A    Yes.

18 Q    And who are Glen, Barb, and Pete.

19 A    So Glen is Glen Youngblood.  Barb, I forget Barb's last

20 name, but she was heavily involved with, I believe, the --

21           THE COURT:  Mr. Greenberg, would you speak into the

22 microphone, please?

23           THE WITNESS:  Oh, sorry.

24           So Glen was Glen Youngblood.  Barb was running one

25 of -- one of the divisions and had some of the relationships

**A1400**

Greenberg - Cross/Mervis                    117

1  with the hospitals.  So I believe she had some involvement on

2  the 911 side, as well as the non-emergency side.  And Pete is

3  Peter Wolf.

4  BY MR. MERVIS:

5  Q    Okay.  So these are TransCare people, right?

6  A    Yes.

7  Q    And you were asking her for permission to do what?

8  A    To -- to share the model with them.

9  Q    When you say "the model," what model?

10 A    This was the go-forward -- the go-forward model.

11 Q    Go-forward as in New Co.?

12 A    As in New Co.

13 Q    Okay.

14      And you'll see on the first page that -- well, you'll see

15 her response, right?

16      You can read it to yourself.

17 A    Yes.

18 Q    And to the best of your recollection, did you in fact then

19 send along the New Co. model to these folks at TransCare?

20 A    Yes.  To the best of my recollection, yes.

21 Q    You were asked some questions by Mr. Amini.  I'm probably

22 going to get the language a little bit wrong, but it was sort

23 of along the lines of Wells Fargo was always willing to deal.

24 Words to that effect.  Do you recall that?

25 A    Wells Fargo was always?

Greenberg - Cross/Mervis                 118

```
 1  Q    Was always willing to negotiate.
 2  A    Yes.
 3  Q    Did there come a time, Mr. Greenberg, when Wells Fargo
 4  stopped funding?
 5  A    Yes.  There was a point where the company needed payroll
 6  to be paid and the funds Patriarch had said, as manager of the
 7  funds, that they would not provide funding for it, and Wells
 8  Fargo did not fund either.
 9  Q    And about when was that?
10  A    I think in that same February time frame.
11  Q    Going back to the big binder.
12       MR. MERVIS:  And Your Honor, I just have a few more.
13  BY MR. MERVIS:
14  Q    Going back to the big binder, which is -- I want you to
15  turn if you would to PX-196.
16       MR. MERVIS:  And, Lori (phonetic), if you could put
17  it up on the big screen, please.
18  BY MR. MERVIS:
19  Q    And Mike, or Mr. Greenberg, you can probably look on the
20  screen.  It's easier.  You got it?
21       All right.  You were shown this by Mr. Amini.  I just want
22  to make -- I just want to clarify one thing.
23  A    Yes.
24  Q    About three quarters down the page, there's a section
25  about Transcendence Transit, right?  And then you give a
```

```
1   description.  And then right at the bottom of that page, it

2   says, "This division is estimated at 25 million."

3        Do you see that?

4   A    Yes.

5   Q    "25 million" in what?

6   A    Revenue.

7   Q    Could you go to PX-286 in the big binder?

8        You were asked some questions by Mr. Amini about this

9   document.

10       First of all, do you know whether the -- what's set forth

11  in this document was ever approved by Ms. Tilton?

12  A    I don't believe it was formally approved.

13  Q    And in fact, the -- I think we established this.  The

14  entities that are in this model, some of them dropped out after

15  this date.  Is that correct?

16  A    My recollection is that some -- that some did, but I don't

17  remember exactly which ones.

18  Q    Well, maybe I can help.  On the first page of the exhibit,

19  very bottom, Bronx 911, Montefiore 911, do you know whether

20  that was in the final Article 9 foreclosure?

21  A    Yeah, I think that was excluded from the go-forward in the

22  final plan based on what I had seen.

23  Q    During these days, and particularly in mid-February, say

24  from the 13th to the 24th, was the overall company's customer

25  base in a steady state?
```

Greenberg - Cross/Mervis                    120

1    A    No, it was --

2    Q    What was happening?

3    A    They're pretty consistently, saving -- trying to save

4    customers at the same time losing customers.

5    Q    Say the last week company's life, the 22nd of February to

6    the 26th, do you recall on average about how many hours a day

7    you worked?

8    A    Typically, you know, there were a lot of nights just that

9    I remember just getting home and sleeping three or four hours.

10   So a lot of hours.

11   Q    Can you turn to PX-83?

12        MR. MERVIS:  And if we could just -- Lori, if you

13   could just pull that up for me, please.

14        THE COURT:  Is that in the big binder or the small

15   binder?

16        MR. MERVIS:  The big binder, Your Honor.

17   BY MR. MERVIS:

18   Q    This is one of the last exhibits that Mr. Amini showed to

19   you.  In any event, this inquiry -- this is July 3rd -- sorry,

20   July 13, 2015.  So this was after the -- this was close to the

21   time but after the payroll mess.

22   A    Yes.

23        MR. MERVIS:  Your Honor, if I could get just a second

24   to check my notes.

25        I'm told, Your Honor, that I failed to move DX-163,

Greenberg - Redirect/Amini                    121

 1  so I'll do that now.  I don't believe there's an objection.

 2              THE COURT:  Any objection?

 3              MR. AMINI:  No, Your Honor.

 4              THE COURT:  DX-163 is received.

 5        (Defendant's Exhibit DX-163 admitted to evidence)

 6              MR. MERVIS:  Nothing further, Your Honor.

 7              THE COURT:  Redirect.

 8                    REDIRECT EXAMINATION

 9  BY MR. AMINI:

10  Q    I'd like you to take a quick look at JX-53.

11              THE COURT:  53?

12              MR. AMINI:  Yes.

13  BY MR. AMINI:

14  Q    Do you have that?

15  A    It's not in here, but I can see it on the screen.

16              MR. AMINI:  If you wouldn't mind putting up the

17  fourth page, whoever's got control over there, of that

18  document.

19              THE COURT:  What's the date of this email?

20              MR. AMINI:  It's December 13, 2015.

21              THE COURT:  Thank you.

22  BY MR. AMINI:

23  Q    This is the email about sharing information with Wells

24  Fargo.

25  A    Okay.

Greenberg - Redirect/Amini                    122

1  Q    Do you remember that?

2        There's a reference in that -- under the 2016 model of

3  proposed financials, there's a -- one, two, three, the fourth

4  bullet point down.  Mr. Mervis pointed you to this.  "Wells

5  Fargo appeared to be aware of the plan reflecting a $6.5

6  million request."

7  A    Yes.

8  Q    Do you see that?

9  A    Uh-Huh.

10 Q    What plan is that?

11 A    One of the -- one of the plans that had been presented to

12 the -- to the board.

13 Q    It was -- there was a plan at that point that you had

14 presented to the board with that number in it?

15 A    There was a plan, yes.

16 Q    You mention a number of negative reports -- or Mr. Mervis

17 ran through a number of negative reports about the company.  In

18 what you were doing, am I -- is it fair to assume that you

19 incorporated those negative reports into your plans?

20 A    Which -- which negative reports?

21 Q    Well, I mean, we can --

22 A    Oh, oh, in terms of the issues with the company?

23 Q    Yes.

24 A    Yes.

25 Q    Those were incorporated into the plans you were working

Greenberg - Redirect/Amini                123

1  on, correct?

2  A    Yes.

3  Q    Okay.

4       You mentioned that you thought it was -- that you thought

5  it was a challenge to find a replacement for the ABL letters.

6  A    Yes.

7  Q    Were you ever tasked with finding a replacement?

8  A    No.  No.

9  Q    Are you aware of anybody who was ever tasked with finding

10 a replacement ABL letter in the year 2015 up to and including

11 February 24, 2016?

12 A    I'm not aware of anyone.

13 Q    Did Ms. Tilton ever approve a plan for this company from

14 the period November 14, 2015, until the filing?  And I use that

15 date because that's JX-51.  I'm just -- I'm picking that

16 specific one that we talked about preparing.  To your

17 knowledge, did Ms. Tilton approve any plan from that date

18 forward?

19 A    To my knowledge, no.  There was no approved plan.

20 Q    And, I mean, Mr. Mervis asked you repeatedly whether Wells

21 Fargo approved the plan.  Well, Wells Fargo, to your knowledge,

22 couldn't approve a plan until Ms. Tilton approved a plan,

23 correct?

24 A    Yes.

25            THE COURT:  What was that date?

Greenberg - Redirect/Amini                    124

1          MR. AMINI:  I'm sorry?

2          THE COURT:  What was the date?  After what date?

3          MR. AMINI:  After November 14, 2015.

4 BY MR. AMINI:

5 Q    Did you ever -- to your knowledge, were any suitors

6 between when you started working in 2015, at the beginning of

7 '15 on this credit, until February 24, 2016, were any suitors

8 engaged by the company or Patriarch?

9 A    No, not fully engaged.

10 Q    Okay.  And was any valuation ever done of TransCare by

11 your group?

12 A    By my group?

13 Q    Yes.

14 A    Well, not -- not a specific valuation, no.

15          MR. AMINI:  I have nothing further.

16          THE COURT:  Okay.  Thank you.  You can step down.

17     (Witness dismissed)

18          THE COURT:  How many more witnesses do you have?

19          MR. AMINI:  I have Mr. Pelissier, I think, tomorrow

20 morning.  Mr. Stephen, we would hope to finish both of them

21 tomorrow.  And then, Mr. Samet and I have to talk, but we have

22 somebody from Credit Suisse coming Wednesday afternoon.

23          Given the testimony we've had so far, I think the two

24 of us might be in agreement that that's -- that there's no need

25 for that any longer.  But I do have on Wednesday --

125

1  Mr. LaMonica has 341 hearings in the morning, so I will switch

2  the order that we've told the other side, and put our expert on

3  in the morning on Wednesday and then Mr. LaMonica in the

4  afternoon.  That would be my hope.

5          THE COURT:  What do we need Mr. LaMonica for?  What

6  do we need his testimony to show?

7          MR. AMINI:  What do we need his testimony for?

8      (Laughter)

9          THE COURT:  What's he going to testify to?

10          MR. AMINI:  Well, there's a -- among other things,

11  there are the circumstances that arose on February 25th after

12  the filing --

13          THE COURT:  Okay.

14          MR. AMINI:  -- for which Ms. Tilton blames him for

15  certain failures, on top of which, and I was going to actually

16  ask Your Honor this.  There are a number of sales that occurred

17  during the bankruptcy and they, for whatever reason, refuse to

18  stipulate.  They're all docketed on the Court's docket.  I was

19  actually going to ask the Court if I could have Mr. LaMonica

20  come and say, look, every sale that occurred is in the docket.

21  We did it in the way I described to the Court, and these are

22  the numbers.  I can't recall them --

23          THE COURT:  Are these the sales of the certificates

24  of need?

25          MR. AMINI:  And the -- sales of the certificates of

126

1  need, the equipment, and the collection of the AR.  They're not

2  stipulating to the 19.2 million number we put up for what we

3  got in liquidation for all of that.

4        THE COURT:  And what's the reason for not

5  stipulating?

6        MR. MERVIS:  I don't think that's accurate, Your

7  Honor.  I think what the -- well, you know what?  I'm not -- I

8  have a solution to the problem.

9        THE COURT:  What's that?

10       MR. MERVIS:  All right.

11       So the Court can take judicial notice of those

12  filings and the numbers in those filings.  We don't dispute the

13  numbers in those filings, unless --

14       THE COURT:  So what's the issue?

15       MR. MERVIS:  There is no issue.  I can -- if you want

16  to get -- Your Honor --

17       THE COURT:  Is that being presented as the

18  liquidation value of the assets?

19       MR. MERVIS:  Correct.

20       MR. AMINI:  Yes.  I can give it to you.  It's

21  Paragraphs 173 to 180 of the facts that we had to put in our

22  separate section that they wouldn't stipulate to.  And each one

23  of them is corroborated by a docket number and papers that were

24  put before you.  I'm not proposing to even educate

25  Mr. LaMonica.  I was going to ask Your Honor if we could just

127

1   come in here and say, I checked it with my staff and it's
2   accurate.
3          THE COURT:  Well, if that's what he sold the assets
4   for.  Are those the same assets that were foreclosed on?  Or
5   were there additional assets, like the certificates of need and
6   things like that?
7          MR. AMINI:  There were some certificates of need that
8   were -- well, that's an interesting question.  But in terms of
9   the legality of it --
10         THE COURT:  Well, I assume you're presenting this to
11  show what the liquidation value of the company is.  But I'm
12  asking whether there are different assets that form the $19.2
13  million, or additional assets.
14         MR. AMINI:  We have two calculations.  We have a 19.2
15  million calculation for liquidating everything across the whole
16  company -- what we call Whole Co.  And then we have a separate
17  calculation of 5.1 -- 5.7 million which was calculated as
18  specific assets of the New Co. that were sold.  But even that,
19  we explain exactly where those numbers come from.  I don't know
20  that there's any --
21         THE COURT:  Well, the Old Co. is the assets that were
22  the subject of the strict foreclosure.  You've been using Old
23  Co. and New Co.  New Co. --
24         MR. AMINI:  New Co. was the assets --
25         THE COURT:  -- is Transcendence.

**A1411**

128

1        MR. AMINI:  New Co. was the -- we call it the strict

2 foreclosures.  The New Co. assets were strict foreclosure.

3        THE COURT:  Oh, and you're saying that was $5.7

4 million?

5        MR. AMINI:  That was 5.7 of the 19.2.  That was one

6 cog in that TC Ambulance Corp.  And then, all the equipment was

7 foreclosed on.  They had no ambulances as of February 24th in

8 TransCare.  All of them belonged to presumably Transcendence.

9        THE COURT:  Right.  I know.  Is there an issue in

10 terms of the relationship between the liquidation sales of 19.2

11 million and those assets that were the subject of the strict

12 foreclosure?

13       MR. MERVIS:  I don't think so, Your Honor, but I'd

14 want to -- but I do want to confirm that with my partner

15 overnight because that was not -- he was more involved in that

16 than I was.

17       THE COURT:  All right.

18       MR. MERVIS:  But, again, I don't see why we can't

19 come to a stipulation on this.  The circumstances that occurred

20 before this, you really don't want to hear about them, but I

21 think we can reach agreement.

22       THE COURT:  I assume you can streamline the testimony

23 of your witnesses tomorrow and we don't have to go through day

24 by day what was happening from July 2015 to February 2016?

25       MR. AMINI:  No, I actually think Your Honor will see

129

1   Mr. Greenberg was there to set the table.

2             THE COURT:  All right.

3             MR. AMINI:  There's nobody else being asked to set

4   the table.

5             THE COURT:  All right.  Good.

6             All right.  Then, I'll see you tomorrow.  We'll start

7   at ten o'clock.  I have a brief calendar.

8             MR. MERVIS:  So just so -- I want to be sure we're

9   all clear.  So tomorrow, we're going to hear from Mr. Pelissier

10  and Mr. Stephen, and then Wednesday, we're going to hear from

11  Mr. -- Dr. Arnold, assuming he's permitted to testify --

12            MR. AMINI:  In the morning.

13            MR. MERVIS:  -- and Mr. LaMonica.

14            MR. AMINI:  In the afternoon.

15            MR. MERVIS:  Okay.

16            THE COURT:  Is Mr. LaMonica around tomorrow because I

17  don't know if those two witnesses will take the whole day?

18            Are you around Mr. LaMonica, tomorrow?

19            MR. LAMONICA:  Yes.

20            THE COURT:  All right.  So we'll have him as the go-

21  to guy after Mr. Pelissier and Mr. Stephen.

22            MR. MERVIS:  I'll be ready for Mr. LaMonica, Your

23  Honor.

24            MR. AMINI:  And then we'll leave Mr. -- Dr. Arnold

25  for Wednesday morning.

130

```
1              THE COURT:  Okay.  All right.
2              MR. AMINI:  And we still have -- you know, I still
3  have my two hours with Ms. Tilton --
4              THE COURT:  Oh, yeah.  You were supposed to tell me
5  about her availability.
6              MR. MERVIS:  It changes hourly, Your Honor, but let
7  me --
8              THE COURT:  Well, let's fix it.
9              MR. MERVIS:  What's that?
10             THE COURT:  Let's fix a specific date.
11             MR. MERVIS:  Okay.  So, I believe what we have at
12 this point is -- so we have -- so this is no good, right?
13 Yeah.
14             So we have two consecutive days within the week of
15 August 12th.  So, in other words, either a Monday, Tuesday or a
16 Thursday, Friday.
17             THE COURT:  Monday, August 12th.  How's that?
18             MR. AMINI:  That works.  One moment, Your Honor,
19 just --
20             THE COURT:  All right.  I don't want to hear, though,
21 that between now and then she's made other arrangements for
22 August 12th.
23             MR. MERVIS:  Oh, all right.
24             Your Honor, can we do the 13th instead of the 12th,
25 or the 14th?
```

131

```
 1              THE COURT:  Let's do the 14th because I have a
 2   calendar the 13th.
 3              MR. AMINI:  So we changed it?  I'm sorry, I was
 4   asking a question about the 12th.
 5              THE COURT:  August 14th.
 6              MR. AMINI:  August 14th.
 7              THE COURT:  Ten o'clock.
 8              MR. MERVIS:  Done.
 9              MR. AMINI:  August 14th is the next -- will be the
10   day for Ms. Tilton?
11              THE COURT:  Yes.
12              MR. AMINI:  Okay.
13              THE COURT:  Okay.  So I'll see you tomorrow at ten
14   o'clock.  Just move your stuff over.  I have a brief calendar
15   tomorrow.
16              MR. AMINI:  May I ask a question before we break?
17              THE COURT:  Of course.  I hope it relates to this
18   case.
19              MR. AMINI:  Because this all kind of assumed that we
20   would end on August 14th, and I don't know that that's the
21   case.
22              THE COURT:  Why not?
23              MR. AMINI:  Well, they have an expert, Mr. Dunphy
24   (phonetic).
25              THE COURT:  Oh.
```

1    MR. AMINI:  And I don't know -- and they have a long

2 list of witnesses.  I have no idea whether they have any that

3 they want to put in.

4    MR. MERVIS:  So, right now, Your Honor, the plan.  I

5 have to tell you a little -- we haven't sketched it out yet.

6 But I think I'm going to have, you know, many hours with

7 Ms. Tilton, so I can't -- even though he's got his two hours.

8    THE COURT:  All right.  But she's got to be

9 available.  I don't want to hear that on the 14th, she's got to

10 leave for another month.

11    MR. MERVIS:  Let me just check with Ms. Shift

12 (phonetic).  One second, Your Honor.

13    THE COURT:  Because I want to finish this trial.

14    MR. MERVIS:  Understood.  Just let me check.  One

15 second.

16    If the Court could accommodate, block out the 15th

17 and the 16th, and then we won't have issues.

18    MR. AMINI:  So now, we're doing it the 15th and the

19 16th?

20    THE COURT:  No, no.  You say she's available, Monday

21 the 12th?

22    MR. MERVIS:  Yes.  So if we do the 12th and the

23 13th --

24    THE COURT:  Why don't we do the 12th, the 15th, and

25 the 16th.

133

```
 1              UNIDENTIFIED:  No, she's not.

 2              MR. MERVIS:  Oh, she's not.  I'm sorry.

 3              THE COURT:  Now, she's not available.

 4              MR. MERVIS:  No, she's not.  She was not.

 5              So the 13th.

 6              THE COURT:  Is she available the 14th?

 7              MR. MERVIS:  Yes.

 8              THE COURT:  All right.  We'll do the 14th, the 15th,

 9   and the 16th.  Well, what about the 13th?

10              MR. MERVIS:  13th and 14th.

11              THE COURT:  The 13th, 14th, and 15th, we're going to

12   finish her testimony.  Now, when we finish on Wednesday, if you

13   have any other witnesses, we're going to schedule them between

14   Wednesday and the day that Ms. Tilton is supposed to be here.

15              MR. MERVIS:  Sure.  And I think Your Honor, as

16   Mr. Amini said, we have an expert and we may have one other

17   witness.  We haven't decided.

18              THE COURT:  All right.

19              MR. MERVIS:  Thank you.

20              THE COURT:  We'll schedule that before the 13th of

21   August.

22              MR. MERVIS:  Thank you, Your Honor.

23              THE COURT:  And Ms. Tilton will be available --

24   Mr. Mervis, Ms. Tilton will be available the 13th, 14th, and

25   15th.
```

134

```
 1              MR. MERVIS:  Yes, Your Honor.

 2              THE COURT:  All right.  I don't know if we'll need

 3  that much time, but.

 4              MR. MERVIS:  Hopefully not.

 5              THE COURT:  Okay.  Very good.  Thank you, very much.

 6  See you tomorrow at 10:00.

 7         (Proceedings concluded at 5:22 p.m.)

 8                          *  *  *  *  *

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                    **C E R T I F I C A T I O N**

2              We, KAREN K. WATSON, DIPTI PATEL, LIESL SPRINGER,

3    TERRI STARKEY, court approved transcribers, certify that the

4    foregoing is a correct transcript from the official electronic

5    sound recording of the proceedings in the above-entitled

6    matter, and to the best of my ability.

7

8    /s/ Karen K. Watson

9    KAREN K. WATSON

10

11   /s/ Dipti Patel

12   DIPTI PATEL

13

14   /s/ Liesl Springer

15   LIESL SPRINGER

16

17   /s/ Terri Starkey

18   TERRI STARKEY

19   RELIABLE                          DATE:   July 26, 2019

20

21

22

23

24

25

1

<pre>
 1                    UNITED STATES BANKRUPTCY COURT
                      SOUTHERN DISTRICT OF NEW YORK
 2
     IN RE:                        .    Chapter 7
 3                                 .
     TRANSCARE CORPORATION,        .    Case No. 16-10407-smb
 4                                 .
                                   .
 5            Debtor.              .    New York, New York
   . . . . . . . . . . . . . . .   .    Tuesday, July 23, 2019
 6                                 .    10:09 a.m.
   LAMONICA                        .
 7                                 .
          v.                       .    Adv. Proc. 18-01021-smb
 8                                 .
   TILTON, et. al                  .
 9 . . . . . . . . . . . . . . .   .

10

11                    TRANSCRIPT OF TRIAL - A.M. SESSION
                 BEFORE THE HONORABLE STUART M. BERNSTEIN
12                  UNITED STATES BANKRUPTCY JUDGE

13
   APPEARANCES:
14
   For the Chapter 7 Trustee:   Andrew Wofse, Esquire
15                              LAMONICA, HERBST & MANISCALCO, LLP
                                3305 Jerusalem Avenue
16                              Wantagh, New York 11793

17 For Salvatore Leggett:       Avery Samet, Esq.
                                STORCH AMINI, PC
18                              Two Grand Central Tower
                                140 East 45th Street, 25th Floor
19                              New York, New York 1001

20 Audio Operator:              Electronically Recorded
                                by K. Shu
21
   Transcription Company:       Reliable
22                              1007 N. Orange Street
                                Wilmington, Delaware 19801
23                              (302)654-8080
                                Email:  gmatthews@reliable-co.com
24

25 Proceedings recorded by electronic sound recording, transcript
   produced by transcription service.
</pre>

```
 1   APPEARANCES (Cont'd):

 2   For The Non-Debtor          Marissa Tillem, Esquire
     Defendants:                 Michael Mervis, Esquire
 3                               PROSKAUER ROSE
                                 Eleven Times Square
 4                               New York, New York 10036

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

1                           INDEX

2

    TRIAL
3

4    PLAINTIFF'S WITNESS:

5        **JEAN-LUC PELISSIER**

6        Direct Examination by Mr. Samet              5

7        Cross-Examination by Ms. Tillem            53

8        Redirect Examination by Mr. Samet          81

9

10   EXHIBITS(s)                          I.D.    REC'D

11   PX206    Re: Article 9 Foreclosure            15

12   PX220    Email 2/22/16 Pelissier to Charles   29

13   DX169    Email 2/23/16                        31

14   PX280    Email 2/24 from Mr. Pelissier        35

15   PX237    Email 2/25                           39

16   PX247    Email 2/27                           45

17            Joint Exhibit 10                     58

18   D89      Email 12/11/15                       66

19   P132     Email from Melissa Probos 12/17/16   68

20   D123     Email from Lynn Tilton 2/4/16        72

21   D187     Email from Peter Wolf 1/13/16        78

22

23

24

25

1        (Proceedings commence at 10:02 a.m.)

2            THE COURT:  <u>Lamonica versus Tilton</u>.

3            MR. MERVIS:  Good morning, Your Honor.

4            THE COURT:  Good morning.

5            MR. MERVIS:  Okay.  Where are my notes.

6            THE COURT:  Do you want to deal with Mr. Arnold

7    now or do you want to continue the trial?

8            MR. MERVIS:  Your Honor, I leave that to your

9    discretion.  I don't think it matters.  As long as we do it

10   today, I don't think it makes a difference.

11           THE COURT:  All right, we'll have to do it today,

12   obviously.  All right, so why don't we continue.  Call your

13   next witness.

14           MR. MERVIS:  And, Your Honor, Ms. Tillem will be

15   handling this witness.

16           THE COURT:  All right.

17           MR. MERVIS:  Thank you.  Your Honor, the plaintiff

18   calls Mr. Pelissier to the stand.

19            JEAN-LUC PELISSIER, WITNESS, SWORN

20           THE COURT:  Please take a seat and speak into the

21   microphone.

22           THE WITNESS:  Thank you.

23           THE COURT:  Do you have a binder for this witness?

24           MR. SAMET:  We do.

25           THE COURT:  Okay.

**A1423**

```
 1              MR. SAMET:  May I approach, Your Honor?

 2              THE COURT:  Yes.  Thank you.

 3              Do you have an extra one for my clerk?  Okay.

 4   Thank you.

 5              MR. SAMET:  I apologize, Your Honor.  We don't

 6   have an extra one.

 7              THE COURT:  Okay.

 8          (Participants conferring)

 9                     DIRECT EXAMINATION

10   BY MR. SAMET:

11   Q    Good morning, Mr. Pelissier.

12   A    Good morning.

13   Q    Could you please state who you are for the record?

14   A    My name is Jean-Luc Pelissier.

15   Q    And where do you currently work?

16   A    I'm the CEO of Universal Instruments.  I work in

17   Binghamton, New York.

18   Q    And what kind of company is Universal Instruments?

19   A    It is a company that does automation equipment for the

20   assembly of electronic, so manufacturing (indiscernible),

21   electronic devices.

22   Q    And could you briefly state your educational

23   background?

24   A    I've an engineering degree in electronic and a PhD in

25   electronic.
```

1 Q     Mr. Pelissier, I understand you've been a CEO of

2 Universal Instruments since 2007?

3 A     Yes.

4 Q     And I understand that Lynn Tilton has been the sole

5 board member of that company since 2008, is that correct?

6 A     Yes.

7 Q     Okay.  And I also understand that on varying occasions,

8 Ms. Tilton has asked you to help her with regards to certain

9 of her portfolio's companies, is that correct?

10 A     Yes, she did.

11 Q     And, in particular, she asked you to assist her with

12 operational issues that those portfolio companies might be

13 having?

14 A     Yes, that's right.

15 Q     And my understanding, and I'll ask you if this is

16 yours, that she often asked you to assist with these

17 companies when the companies are experiencing operational

18 challenges?

19 A     Yes, that's right.

20 Q     Okay.  I further understand that initially Ms. Tilton

21 asked you to assist with portfolio companies as a consultant,

22 is that right?

23 A     Yes.

24 Q     And, at some point, you became an employee of PPMG?

25 A     Yes, I did.

1 | Q     And that was around 2014?

2 | A     It was in August or September of 2014, yes.

3 | Q     And as an employee of PPMG, you continued offering

4 | operational advice to Ms. Tilton's portfolio companies?

5 | A     I continued in my role of CEO of Universal Instruments

6 | and I was based in New York City and Lynn Tilton asked me to

7 | be involved with other companies at her request.

8 | Q     Okay.  When you were serving in this capacity, you

9 | would deal with management of the portfolio companies?

10 | A     Sorry?

11 | Q     You would deal with management of the portfolio

12 | companies directly?

13 | A     I would mostly interface with CEO's, CFO's, sometimes

14 | the first level management team.

15 | Q     Okay. And you also report directly to Ms. Tilton?

16 | A     And I would report directly to Ms. Tilton.

17 | Q     Okay.

18 |         MR. MERVIS:  Your Honor, I just noticed something.

19 | We don't have a court reporter.

20 |         THE COURT:  And they're discussing it -- I'm

21 | sorry.

22 |         MR. MERVIS:  We don't have a court reporter?

23 |         THE COURT:  No.

24 |         MR. MERVIS:  Wasn't he here when I came in?

25 |         THE COURT:  Oh, that, oh.

18-01 Case 1:20-cv-06274-LAK Document 224-1 Filed 07/29/19 Entered 07/30/19 15:18:51 Page 300 of 318 Main Document
Pg 8 of 86

8

```
 1              MR. MERVIS:  I didn't know -- I mean --
 2              THE COURT:  We have our court reporter.
 3              MR. MERVIS:  Yes, yes, yes.
 4              THE COURT:  By he way so there's no confusion, our
 5     transcript is the official transcript.
 6              MR. MERVIS:  Fair enough.  So, I -- listen, I
 7     don't think we need to delay the question.  I wasn't sure
 8     which -- you've answered my question which is the official.
 9              THE COURT:  All right. Okay.
10              Let's continue.
11     BY MR. AMET:
12     Q    I apologize.  But you report to Ms. Tilton, that's
13     where we went?
14     A    Yes, I do.
15     Q    Okay.  All right.  At some point, Ms. Tilton asked you
16     to become involved in TransCare, is that right?
17     A    Yes, she did.
18     Q    And you recall that was in approximately the latter
19     half of 2014?
20     A    I think end of Q3 or beginning of 2014.
21     Q    Okay.  She expressed to you that they were having
22     operational challenges at that point?
23     A    Yes, she did.
24     Q    And she asked you to get involved, in the same manner
25     you had gotten involved in previous companies?
```

```
 1  A     Yes.
 2  Q     All right.  Before I -- I believe your title at PPMG
 3  was Platform Leader, is that correct?
 4  A     Yes, I believe so.
 5  Q     All right.  At TransCare, I take it you attended board
 6  meetings, is that right?
 7  A     I attended some board meetings, yes.
 8  Q     Okay.  And I think you told me that the rule was that
 9  the board meetings would be attended by the credit officer,
10  you, if you were involved?
11  A     Yes.
12  Q     And the legal advisory for the board on that company,
13  is that fair?
14  A     Well, first, it would be attended by the management, so
15  CEO, CFO, the management team and then Ms. Tilton, of course,
16  myself if I was involved, the legal representative of the
17  company, and the credit officer.
18  Q     And the credit officer in this case was Mr. Greenberg?
19  A     There were -- you need to precise a timeframe?
20  Q     In 2015, do you recall if it was Mr. Greenberg?
21  A     I think Mr. Greenberg started sometime in the beginning
22  of 2015.
23  Q     Okay.  And the legal person was Mr. Stephens, is that
24  correct?
25  A     Yes.
```

**A1428**

1  Q    Are you familiar with something called the authority

2  matrix?

3  A    Yes, I am.

4  Q    And can you describe for the court what is the

5  authority matrix?

6  A    This is a number of documents that specifying to

7  management team when they do have to obtain approval from the

8  board or a designated executive to implement a particular

9  auction.

10  Q    This is an actual document that governs the authority

11  of the executives at the portfolio companies?

12  A    It is a document and it is governing the authority of

13  the management team, yes.

14  Q    And this is a document that more or less a standardized

15  across all these portfolio companies?

16  A    Yes, I do have one for my company, yes.

17  Q    And I understand that Mr. Stephen's role, or one of Mr.

18  Stephen's role, is he is the guardian of the authority

19  interest?

20  A    Yes, the best on -- responsible to (indiscernible)

21  authority matrix.  He's a CEO of the company and the best on

22  that board review.  The authority matrix before coming to the

23  board is the legal representatives.

24  Q    Okay.  And the case (indiscernible), that's Mr.

25  Stephens?

1   A       Yes.

2   Q       And, for example, I understand that under the authority

3   matrix, for example, the CEO is not allowed -- is not

4   authorized to talk to people about obtaining external

5   funding, is that correct?

6   A       It is not correct.

7   Q       Okay.  Do you recall being deposed in this matter, Mr.

8   Pelissier?

9   A       Yes.

10          MR. SAMET:  Your Honor, if it's all right with

11  you, we have the video loaded up or we can just continue with

12  the print deposition.

13          THE COURT:  All right.

14  BY MR. SAMET:

15  Q       If you turn to, the first in your binder should be a

16  copy of your deposition.  If you'll turn to page 112.

17          THE COURT:  I have the Brian Stephens' deposition

18  in my binder.

19          MR. SAMET:  I apologize, Your Honor.

20          Can I pass the witness?

21          THE COURT:  Why don't you just ask the witness --

22          MR. SAMET:  I'll just ask.

23          THE COURT:  It will be faster if you just ask him.

24  BY MR. SAMET:

25  Q       Mr. Pelissier, do you recall me asking you on page 112,

 1   line 14 of your deposition,

 2            "To your understanding and just to your

 3   understanding, was Mr. Leland authorized to talk to people

 4   about obtaining external funding?

 5            Answer:

 6            No.

 7            Question:

 8            What was the basis for that understanding?

 9            Answer:

10            The authority matrix."

11   A    I may be mistaken, but I don't think this is my

12   deposition.

13            UNIDENTIFIED SPEAKER:  He has Brian's.

14            MR. SAMET:  I apologize.

15            THE COURT:  Where is his written deposition?  His

16   written one?

17            MR. SAMET:  I have a copy here.

18            THE COURT:  Why don't you show it --

19            UNIDENTIFIED SPEAKER:  I think we have some

20   copies, as well, Your Honor.

21            THE COURT:  Do you recall being asked those

22   questions and giving that testimony?

23            THE WITNESS:  I believe so, yes.

24            THE COURT:  Okay.  Let's go.

25   BY MR. SAMET:

1   Q      Mr. Pelissier, do you recall -- let me fast forward

2   with you to December of 2015.  Do you recall calling

3   representatives of Wells Fargo and telling them that Ms.

4   Tilton had decided to sell TransCare?

5   A      I don't remember the timeframe exactly.

6   Q      If you'll turn, in your binder, to PX126.

7              MR. SAMET:  Your Honor, I'm not offering this into

8   evidence at this point.  It's going to come in through

9   another witness.  I only offer it to refresh the witness's

10  recollection.

11             THE COURT:  All right.

12  BY MR. SAMET:

13  Q      Please turn to page 3 of PX126.

14             THE COURT:  What's the bates number at the bottom?

15             MR. SAMET:  The bates number is 3375.

16  BY MR. SAMET:

17  Q      Mr. Pelissier, this is an email from Mr. Hussen

18  (phonetic) to other internal people at Wells Fargo dated

19  December 14, 2015 at 11:43; do you see that email?

20  A      Sorry.  It's an email from who to who?

21             THE COURT:  Let's stop.  Just read the email.  The

22  question is whether that email refreshes your recollection.

23  It's not asking whether you wrote it.

24             MR. SAMET:  That's correct.

25             THE COURT:  Let us know when you're done reading

1    that email.

2              Is this a disputed issue?

3              MS. TILLEM:  No.

4              THE COURT:  Well why are we spending time on this?

5              MR. SAMET:  This is percipient witness and it

6    wasn't stipulated to, Your Honor.  I'm happy to go.

7              THE COURT:  All right.  The question is you read

8    the email?

9              THE WITNESS:  Yes, I did read the --

10             THE COURT:  All right and the question is, having

11   read the email does that refresh your recollection that in

12   December 2015, Lynn Tilton told you that she had decided to

13   sell TransCare?

14             THE WITNESS:  Your Honor, I'm not sure that I have

15   the right email.  I'm not included on it.

16             THE COURT:  I understand.

17             THE COURT:  All I'm asking you having read it,

18   does that refresh your recollection of a conversation that

19   you had, supposedly had with Ms. Tilton in which she told you

20   that she had planned to sell TransCare?  Do you recall such a

21   conversation with Ms. Tilton?

22             THE WITNESS:  I had conversation but with Ms.

23   Tilton and at one point she did tell me that she was going to

24   sell TransCare.

25             THE COURT:  Okay.  Do you remember when that was?

 1              THE WITNESS:  I thought it was a little later, but

 2    I may be mistaken.

 3              THE COURT:  All right, it sounds like it doesn't

 4    refresh his recollection.

 5              MR. SAMET:  Thank you.

 6    BY MR. SAMET:

 7    Q     All right.

 8    A     But.  Sorry --

 9              THE COURT:  There's no question.  There's no

10    question.  Go ahead.

11    BY MR. SAMET:

12    Q    Mr. Pelissier, would you turn with me to Exhibit 206,

13    PX206.

14              MR. SAMET:  And, Your Honor, this I would to put

15    into evidence.  I don't believe there's an objection.

16              MS. TILLEM:  No objection, Your Honor.

17              THE COURT:  All right, it's received.

18         (Exhibit PX206 received into evidence)

19              THE COURT:  Go ahead.

20    BY MR. SAMET:

21    Q     Do you have Exhibit 206, Mr. Pelissier?

22    A     PX206.

23    Q     I'll give you a moment to review.  I will ask some

24    questions about the document.  Frist, let me know when you're

25    --

```
 1              THE COURT:  You know, it's a long email.  Can you
 2   direct his attention or ask him the question so he can focus?
 3              MR. SAMET:  I will direct your attention.
 4              THE COURT:  If he's going to sit here and read
 5   emails all morning, this is going to take forever.
 6   BY MR. SAMET:
 7   Q     All right, let me direct your attention.
 8         Mr. Pelissier, are you familiar with this email?
 9   A     Yes, I am.
10   Q     This is the foreclosure process plan, correct?
11   A     This is a plan for the entire company, so I don't know
12   if it's foreclosure only.
13   Q     All right.  Well, let me go through.  Who are the
14   people on this plan?  This is Mr. Jones?  We've gone over
15   him.  He's the head of Talent Management at Patriarch?
16   A     Yes, he is.
17   Q     Mr. Poppin, who is that?
18   A     He's the head of HR at Patriarch Partner.
19   Q     And Mr. Greenberg, we -- Mr. Wolf, he's the chief
20   operating officer of TransCare, is that correct, to your
21   knowledge?
22   A     Yes.
23   Q     Mr. Youngblood, he's the -- he's a senior vice
24   president at TransCare?
25   A     Yes.
```

```
 1   Q      He's going to become the CEO of Transcendence, is that

 2   correct?

 3   A      Yes.

 4   Q      All right.  Mr. Stephens we discussed.

 5          Mr. Dell, that's a lawyer at Patriarch?

 6   A      Yes.

 7   Q      Okay.  And I understand that Ms. Tilton authorized you

 8   to send this email out.

 9   A      Yes.

10   Q      All right, you are the operational expert and this

11   email contains a large number of operational items and who's

12   going to do them by what, correct?

13   A      Yes.

14   Q      All right. For example, if you'll go to the bottom of

15   the first page, there's two key milestones, do you see that?

16   A      Yes.

17   Q      So, the timing of the filing of the Article 9

18   foreclosure -- when it says Lynn tbd, that means that's going

19   to be decided by Ms. Tilton at a date to be determined,

20   correct?

21   A      Yes.

22   Q      And the same thing for the timing of the OldCo

23   bankruptcy?

24   A      Yes.

25   Q      All right.  If you go, for example, to the next page,
```

1   the hiring of bankruptcy counsels that -- when it says done,

2   that means it's already been done by this point?

3   A    Yes.

4   Q    And Curtis Mallet, they're going to represent the

5   debtor, TransCare, in the bankruptcy?

6   A    I don't remember.

7   Q    All right.  And Perkins Thompson, they're going to

8   represent PPAS in the bankruptcy?

9   A    I don't remember.

10  Q    Okay. Fair enough.

11       Let me go where it says, Article 9 foreclosure

12  documents and it says done; do you see that?

13  A    Yes.

14  Q    All right and those documents that's going to be -- oh,

15  I'm sorry.  That's going --

16  A    No, it's not.  Sorry.  I made a mistake.  It's not

17  done.

18  Q    It's supposed to be done February 11, in the email?

19  A    2/11, yes.

20  Q    All right.  And that's Brian Stephens and Peter Ruffini

21  (phonetic), correct?

22  A    I don't remember.  It probably Brian Stephens.  I don't

23  know if it's Peter Ruffini.

24  Q    Oh, it could be another Peter?

25  A    Yes.

1  Q      All right.  In bankruptcy filing documents, that's

2  Brian Stephens.  He's supposed to do that by the 14th,

3  correct?

4  A      Yes.

5  Q      All right.  Just skipping down, there's a section on

6  employee transfers and benefits and unions, do you see that

7  section?  It's at the bottom of page 2 --

8  A      Yes.

9  Q      It continues to page 3.

10  A      Yes.

11  Q      This section is about because you needed to

12  logistically transfer a large number of the TransCare

13  employees to the Transcendence entity, so they would become

14  employees of Transcendence, right?

15  A      Yes.

16  Q      All right, one of the tasks involved in that was to

17  issue warn notice to OldCo employees, do you see that, the

18  last --

19  A      Yes.

20  Q      All right and that's tbd; that had not been determined

21  when to do that as of this point?

22  A      Yes.

23  Q      All right, let me go.  The next section is on

24  insurance.

25  A      Yes.

1    Q      Now, these were important, right?

2    A      Sorry?

3    Q      Obtaining insurance was important, correct?

4    A      Yes.

5    Q      That was a gating item for the Transcendence plan?

6    A      Yes.

7    Q      Because you can't operate an ambulance company without

8    insurance.

9    A      Yes.

10   Q      Okay.  And the people -- well, as I understand this,

11   this is Michael Greenberg.  He's responsible for securing

12   this policy, for the new company, is that right?

13   A      Yes.

14   Q      Okay.  In the next section there's action plans on call

15   intake and dispatch, do you see that?

16   A      Yes.

17   Q      And for the court, what's CAD?

18   A      It's a process in which the (indiscernible) decide what

19   route to take to go from where they are to where they are to

20   pick up the clients.

21   Q      It's a computer mapping system, in effect, is it not?

22   A      It's a computer mapping system, yes.

23   Q      And flip with me to page 4 of this document.  As I

24   understand it, you're laying out the dispatch information for

25   each of the varying entities, correct?

```
 1   A     Yes.
 2   Q     All right and so, for example, Hudson Valley, that's
 3   the TransCare Hudson Valley division?
 4   A     Yes.
 5   Q     All right.  When you say that they're independent
 6   already, what you mean is that their call intake, CAD and
 7   dispatch system is -- they can do that without anything else
 8   from TransCare, correct?
 9   A     Yes.
10   Q     All right, they're ready to go on day one?
11   A     Yes.
12   Q     All right and the same thing for the MTA, correct?
13         Let me withdraw that.
14         The MTA is also ready to go on day one without any
15   further input for the call intake, CAD and dispatch, correct?
16   A     It was my understanding that the MTA needed something
17   on day one.  I don't remember exactly what.
18   Q     All right, but do you know what it needed something
19   for?
20   A     I don't remember.
21   Q     All right.  But, here, you say they have some sort of
22   proprietary solution, do you remember what that is?
23   A     I don't remember if it's for the billing or for the
24   CAD.  I don't remember that.
25   Q     All right.  Other than the thing that you don't
```

18-01... Case 1:20-cv-06224-LAK Filed 07/29/19 1 Entered 07/30/19 16:18:51 Page 314 of 1218 ... Main Document
Pg 22 of 86

22

1  remember, you did write in this that the MTA is in place

2  today.  No other need on day one, correct?

3  A     I wrote that here, yes.

4  Q     All right.  And then Pittsburgh, you wrote that

5  Pittsburg uses the AS400 based at OldCo Hamilton base.

6  A     Yes.

7  Q     Now the Hamilton base, OldCo, that's what's going to be

8  the legacy TransCare, correct?

9  A     Yes.

10  Q     All right and the Hamilton, that's TransCare -- that's

11  one of TransCare's facilities in Brooklyn?

12  A     Yes, I believe so.

13  Q     Okay.  And what is the AS400?

14  A     It's a computer.

15  Q     And what does it do?

16  A     What you asking to do?  In that case, it does CAD for

17  some of the division.  They do the billing and I'm sure it

18  was doing other things.

19  Q     Okay.  And here for Pittsburgh you're writing that the

20  Pittsburgh dispatch information is being roused through the

21  AS400 in Brooklyn, New York, is that right?

22  A     Yes.

23  Q     So, you're making a note here that you're still going

24  to need to have access to that even on day one.

25  A     Yes.

1  Q     And that's day one of the new company, whenever --

2  that's going to be determined by Ms. Tilton but day one is

3  whenever that new company starts?

4  A     Yes.

5  Q     Okay.  The next section, oh I see.  The next section,

6  let's just do this briefly, discusses billing, the operation

7  action items on making sure that the billing systems are

8  ready for the new company, is that right?

9  A     Yes.

10 Q     All right and you have a similar section on page 5 of

11 this email, Hudson Valley, MTA and Pittsburgh, do you see

12 that?

13 A     Yes.

14 Q     And as I understand when you say on day one what you

15 mean for each of these is that that's what -- those are the

16 tasks that are going to need to be accomplished so that those

17 entities can start billing on the first day of operations, is

18 that right?

19 A     Billing and yeah, on that section, yeah is billing.

20 Q     And JLP is yourself?

21 A     JLP is myself.

22 Q     And GY, that's Glenn Youngblood.

23 A     Yes.

24 Q     And 2/12 means it's -- you were aiming to get that done

25 by 2/12?

24

```
 1   A      Yes.

 2   Q      All right.  Flip with me to the next page, page 6 of

 3   this.  There's a reference to human resource systems and

 4   payroll software.  And I think I understand this, but I want

 5   to get your confirmation which is that in order to -- a

 6   previous section was transferring the employees.  But in

 7   order to actually make payroll, there's some logistics

 8   involved with that to run checks through a payroll system,

 9   correct?

10   A      Yes.

11   Q      You can't just print checks.  You have to have that set

12   up in advance?

13   A      Yes so, I think they were using ADP, so yes.

14   Q      When you say they were using ADP, you mean TransCare

15   had historically was using ADP?

16   A      Yes.

17   Q      And you were making a note here there needs to be

18   something set up for the new company to generate payroll

19   checks?

20   A      Yes.

21   Q      All right.  And, again, this is supposed to -- JLP and

22   GY that's yourself and Mr. Youngblood?

23   A      Yes.

24   Q      And 2/12 you're aiming to have that done by February

25   12th?
```

**A1443**

1  A      Yes.

2  Q      Okay.  Go with me finally to the last page of this,

3  page 8, you have a number of questions.  Oh, I see.  And in

4  fairness, you actually raised this in the question.

5         You said how do we make -- in the second bullet; how do

6  we make payroll?  What is the Process and who is

7  consolidated?  Do you see that?

8  A      Yes.

9  Q      So maybe that was not fully decided as of this time?

10 If you know.

11 A      Most likely that's why I'm asking the question.

12 Q      All right when you say do we need a service agreement,

13 what are you referring to?

14 A      I think -- I remember that the AS400 was going to

15 remain with TransCare and, therefore, the lawyer was drafting

16 a service agreement in which Transcendence after they won

17 would provide services to TransCare and TransCare would

18 provide services to Transcendence.

19 Q      Okay.  Thank you.

20        And then, last, there's a note here Brian looked at all

21 contracts in New York TransCare, do you see that?

22 A      I see.

23 Q      There's a list of -- that's Brian Stephen, correct?

24 A      Yes.

25 Q      He's reviewing the contracts?

```
 1   A      Yes.

 2   Q      And the purpose of that he -- in the action plan his

 3   job, if I understand it, he's going to review those contracts

 4   and to make sure they can be assigned to the new company

 5   going forward?

 6   A      It looks like it's what the little paragraph he's

 7   referring to yes.

 8   Q      Okay.  Thank you.  All right.

 9          Go with me, if you would, to JX71.

10          MR. SAMET:  I don't believe there are objections

11   to this document, Your Honor.

12          THE COURT:  Any objections -- oh, it's a joint

13   exhibit.

14          MR. SAMET:  Oh, it's a joint exhibit. Thank you.

15          THE COURT:  All the joint exhibits are in.

16          MR. SAMET:  Thank you, Your Honor.

17   BY MR. SAMET:

18   Q      Mr. Pelissier, Thomas Charles, who is Thomas Charles?

19   A      He was a person running the MTA Transit.

20   Q      He worked at the MTA Transit?

21   A      He worked at the MTA Transit.

22   Q      And he was the person responsible -- he was TransCare's

23   counterpart at the MTA for the MTA Paratransit contract?

24   A      Sorry.  He was?

25   Q      He was TransCare's counterpart at the MTA --
```

1  A      Yeah.

2  Q      -- for purposes of overseeing the MTA?

3  A      Yeah, he was the manager of the activity at MTA.

4  Q      And you have -- you were asking him whether it would be

5  possible to transfer the MTA contract to a new entity,

6  correct?

7  A      Yes.

8  Q      Okay.  Why don't we get this out of the way?

9         You had had some dealings with the MTA prior to this,

10  correct?

11  A      I think those were my dealings with the MTA.  It's for

12  --

13  Q      You had met with them at some point --

14  A      It's following a visit that I had with Peter Wolf and

15  Randy Jones and the issue that the MTA had they wanted a

16  segregation of firms, and we were looking at this to put in

17  place to segregate the firm.

18  Q      Right they were concerned that that -- they wanted the

19  paratransit division to be more segregated from the rest of

20  the other ambulance operations?

21  A      Yes.  They wanted that.

22  Q      And part of the Transcendence plan, if I understand it,

23  was that to help satisfy that concern, the paratransit

24  division would go into its own new entity called

25  Transcendence Transit II?

1    A     Yes.

2    Q     Okay.  Go with me, if you would, to JX92.  Actually, if

3    you don't mind, let's do PX220.  Go with me to PX220.

4    A     Sorry?

5    Q     Go to PX220, to make it easier.

6

7           MR. SAMET:  I don't believe there's any objections

8    to this document.

9           THE COURT:  I'm looking for it.

10          MS. TILLEM:  No objection, Your Honor.

11          THE COURT:  All right.  I still can't find it.

12    Oh, I have it.

13          It's received.

14      (Exhibit PX220 received into evidence)

15          MR. SAMET:  Thank you.

16    BY MR. SAMET:

17    Q    Now, Mr. Pelissier, this is February 22nd, 2016 and

18    you're emailing Mr. Charles again, correct?

19    A     Yes.  What is your question, please?

20    Q     You sent this email, correct?

21    A     Sorry?

22    Q     You sent this email?

23    A     Yes, I did send that to him.

24    Q     As I understand it as of February 22nd, between

25    February 9th and February 22nd you still didn't have a final

1  determination from the MTA as to whether they would give the

2  assignment?

3  A     I believe they said we are in discussion over this

4  (indiscernible).  They all in agreement of support of this

5  (indiscernible). So, I think we had the agreement, but they

6  needed to prepare from the task.

7  Q     You were hopeful that they had an agreement but you

8  didn't have a written agreement yet, did you?

9  A     Nope.

10  Q     Okay.  And who is Michael Cosgrove?

11  A     He's working for Charles Thompson.

12  Q     He also works for the MTA?

13  A     Yes.

14  Q     Okay.  Do you recall if he's in legal at the MTA?

15  A     No, he's not.

16  Q     Okay.  All right, go with me to JX92, please.  This is

17  also an email that you sent on February 22nd, correct?  Oh,

18  this is a (indiscernible).

19  A     Sorry?

20  Q     This is also an email you sent on February 22nd,

21  correct?

22  A     Yes.

23  Q     And now this Thomas Charles, this is a different Thomas

24  Charles, is that right?

25  A     Yes.

**A1448**

1  Q       All right this Thomas Charles here works on one of the

2  insurers, correct?

3  A       He worked for a broker of insurance.

4  Q       He works for Lockton.

5  A       For Lockton.

6  Q       And Mr. Arrowwood (phonetic) is a colleague of his?

7  A       Yes.

8  Q       And you're writing to him also because you're trying to

9  complete the binding of the insurance for the new company?

10 A       Well, I'm saying that we need a new insurance.

11 Q       You write to him, "This is our single point of failure

12 in the project."  Do you see that?

13 A       Yes.

14 Q       Was that true?

15 A       From my point of view.

16 Q       Okay.  And when you say it's a critical element in the

17 decision-making, you're referring to Ms. Tilton's decision-

18 making, correct?

19 A       Well if we cannot insure, we cannot operate.

20 Q       Okay.  Ms. Tilton needed this in order to make the

21 final decision to go forward with NewCo?

22 A       The company needed that to move forward, right.

23 Q       So that's a yes?

24 A       Yeah.

25 Q       Come with me if you would to DX169.

1          MR. SAMET:  Your Honor, this is a defendant

2    exhibit.  I will note that I checked beforehand.  We,

3    apparently, have a hearsay objection to this which I don't

4    think is relevant for this, but we can withdraw.

5          THE COURT:  Are you withdrawing your objection?

6          MR. SAMET:  Yes.

7          THE COURT:  Are you offering the document?

8          MR. SAMET:  Yes.

9          THE COURT:  Any objection?

10          MS. TILLEM:  No.

11          THE COURT:  Received.

12      (Exhibit DX169 received into evidence)

13   BY MR. SAMET:

14   Q    Mr. Pelissier, if you'll go with me to your email on

15   the third page at February 23rd, 2016 at 10:57 a.m.

16   A    I see the email.  Let me read it, please.

17   Q    Sure.

18   A    Yes, I have read it.

19   Q    All right, you spent a good portion of the day on the

20   23rd at TransCare's Hudson Valley headquarters, is that

21   right?

22   A    Yes, I do.

23   Q    And Hudson Valley that's one of the TransCare entities

24   that's going to go to NewCo?

25   A    Yes.

32

1    Q     All right and the purpose of your visit was to assure

2    the people there that the business would be supported going

3    in the future.

4    A     It was to visit some customer with the team.  The team

5    had asked us to visit some customer, so I had a company,

6    Peter Wolf, to go and do so.

7    Q     I see.  These are the customers that you're visiting

8    with them that day?

9    A     Yes.

10   Q     And you're assuring them that you can provide them

11   service, correct?

12   A     I'm not showing anything.  I'm just going with them.

13   Q     What was the purpose of these meetings?

14   A     They were meeting that were consent about TransCare so

15   Peter worked with that rest of concerns.

16   Q     What kind of concerns?

17   A     On page -- on the last page of the email, one of the

18   customer had (indiscernible) some concern about the payment

19   of the worker's compensation.

20   Q     You're talking about the concerns on page 4 that a

21   customer, here's the owner, could continue to suck the

22   division dry and nothing would change, is that what you're

23   referring to?

24   A     That's one, yeah.  That --

25   Q     And how did you address that concern?

33

```
 1  A      I don't address a concern.  I listen to the customers.
 2  Q      Okay.  And you were there, as a Patriarch
 3  representative?
 4  A      I was there, yeah.
 5  Q      Okay.  Ms. Tilton responded to you that to say that
 6  this -- if you see Ms. Tilton's response about your need to
 7  set them straight, do you see that, in the email right above
 8  yours, 1606.
 9  A      I've read the chain email.
10  Q      All right.  She's telling you that -- when she says we
11  are freeing ourselves from Wells, do you know what she's
12  referring to?
13  A      Sorry?
14  Q      When she says we are freeing ourselves from Wells, do
15  you know what she's referring to?
16  A      I think she want to indicate that moving forward, Wells
17  will not be part of the setup.
18  Q      That's moving forward after the Transcendence going
19  into effect?
20  A      Yes, I believe so.
21  Q      All right.  And that's what she wants you to set them
22  straight on?
23  A      I think she wants -- I mean the email is self-explicit.
24  I think she wants me to convey that the owner seeks as per
25  $10 million dollar of additional funding during the year to
```

1  alleviate the concern that the customer had.  And that,

2  unfortunately, Wells Fargo had been taking more and more

3  reserve along for year against those $10 million dollar that

4  were used as funding.

5  Q    That's what Ms. Tilton told you?

6  A    That's what she reads in here.

7  Q    All right, but you didn't deal with Wells Fargo, did

8  you?

9  A    Not directly, but I've been involved in discussion with

10  Wells Fargo, not necessarily this one, in particular.

11  Q    When Mr. Nowland, Matt Nowland, at this point, he's the

12  head of TransCare Hudson Valley?

13  A    Yes, I believe so.

14  Q    All right.  Flip with me if you would to PX280.

15         MR. SAMET:  Your Honor, I believe there is a

16  hearsay objection to this document.

17         MS. TILLEM:  Just give me a second to review,

18  please.  Your Honor, defendants withdraw their objection.

19         THE COURT:  Okay.  Received.

20      (Exhibit PX280 received into evidence)

21         MR. SAMET:  May I approach.  We've obtained an

22  extra.

23         THE COURT:  Yes, thank you very much.

24  BY MR. SAMET:

25  Q    All right, Mr. Pelissier, first let me address your

**A1453**

1    attention to the middle of the email on the page, the email

2    you sent on February 24th at 1:34 p.m.  Do you see that

3    email?

4    A    Yes, the one in the middle section, the one I sent,

5    right?

6    Q    Yes.

7    A    Yes.

8    Q    Yes.  All right and, again, now you're forwarding the

9    assignment papers from the MTA to the rest of the team, is

10   that right?

11   A    I am sending those assignment paper to Brian Stephen

12   and Michael Greenberg including the management of TransCare

13   and Randy Jones, yes.

14   Q    When you say the management of TransCare, you're

15   sending it to --

16   A    Peter Wolf.

17   Q    Peter Wolf and Thomas Fuchs, correct?

18   A    And Thomas Fuchs, yeah.

19   Q    And Thomas Fuchs, he's -- he is the head of the MTA

20   business of TransCare?

21   A    Yes.  At that time, I think he's back and run the MTB&S

22   (phonetic).

23   Q    Okay.  This is after the foreclosure has happened,

24   correct?

25   A    I don't know.  I don't remember the timing.

1   Q     Well, Mr. Fuchs writes to you, the word is out about

2   the foreclosure, do you see that?

3   A     I don't think the foreclosure has happened.

4   Q     You think Mr. Fuchs -- you did not tell him about the

5   foreclosure?

6   A     I was not -- no, I didn't.  I was not involved with the

7   foreclosure.

8   Q     Okay.  He's asking you if the vendors are going to get

9   paid given the foreclosure, do you see that?

10  A     Yes, I see.

11  Q     Has there been -- to your understanding they were going

12  to get paid by Lynn Tilton, correct?

13  A     Who was going to be paid by Lynn Tilton?

14  Q     The vendors to paratransit.

15  A     I don't know.

16  Q     All right.

17  A     It's about to be paid by the company.

18  Q     Well Ms. Tilton was going to fund the new company,

19  correct, to be it; that's your understanding, correct?

20         THE COURT:  Personally, fund it?

21  BY MR. SAMET:

22  A     I don't know what are you referring about?

23  Q     I'll show you here.

24  A     But are you talking about Transcendence or are you

25  talking about TransCare?

 1   Q      I'm talking about Transcendence, yes.  About the

 2   paratransit division at Transcendence.

 3   A      I don't remember that.

 4   Q      Let me show you your deposition, Mr. Pelissier, on page

 5   290.  And ask it to be pulled up on the screen.

 6          MR. SAMET:  Well, we can play it.  Maybe that's

 7   just easier.  Let's play it.  Let's play 290 on lines 23 to

 8   291 lines 9, please.

 9          THE COURT:  Why don't you just ask him if he was

10   asked the following question and gave the following response.

11   BY MR. SAMET:

12   Q      Were you asked this --

13          THE COURT:  Stop.

14          MR. SAMET:  Whatever is easier for Your Honor.

15          THE COURT:  Just use the transcript.  Ask him if

16   he was asked the question and he gave that answer.  He says,

17   no.  Read the question/answer.

18          MR. SAMET:  I will.

19   BY MR. SAMET:

20   Q      "Mr. Pelissier, do you recall that I asked you what was

21   your understanding who will pay the vendors at the

22   paratransit?

23          Answer:

24          Well, I understand they will get paid.  This is an

25   ongoing NewCo.  It will profitable in driving.  I would

1  expect that they would be running.

2       Question:

3       NewCo would pay them?

4       Yeah.

5       Question:

6       And where were they getting the funding?

7       Answer:

8       Lynn Tilton funded Newco."

9       Do you recall giving that testimony?

10 A    But the --

11          THE COURT:  Just the first question is do you

12 recall giving the testimony?

13          THE WITNESS:  Yes, I do.

14          THE COURT:  The next question?

15 BY MR. SAMET:

16 Q    Go with me, if you could, to PX237.

17      And, Mr. Pelissier, I'm asking you some questions about

18 the first email on the page, the last one in the chain,

19 February 25th at 11:23 p.m.; do you see that?

20 A    Yes.

21 Q    Now this -- you sent this email --

22          MR. SAMET:  Oh, I'm sorry, I don't believe there's

23 an objection to this.

24          MS. TILLEM:  There's no objection, Your Honor.

25          THE COURT:  And you're offering it?

```
 1                  MR. SAMET:  Yes, Your Honor.

 2                  THE COURT:  It's received.

 3           (Exhibit PX237 received into evidence)

 4   BY MR. SAMET:

 5   Q     All right, Mr. Pelissier, you sent this email 11:23

 6   p.m., correct?

 7   A     Yes.

 8   Q     Now this is the day after the bankruptcy filing,

 9   correct?

10   A     Again, I don't know exactly when the filing was done,

11   so.

12   Q     Can I ask you a question?  Did anyone tell you when

13   TransCare was filing to bankruptcy?

14   A     I don't think so or, at least, I don't remember so.

15   Q     Fair enough.  Fair enough.  You're on the operation

16   side, right?

17   A     Yes.

18   Q     Mr. Stephens is handling issues like bankruptcy

19   filings?

20   A     Absolutely.

21   Q     Okay.  All right. We just spoke the recipients on this

22   email, Mr. Nowland, he's the head of Hudson Valley, correct?

23   A     Yes.

24   Q     All right. And Mr. Youngblood he's the president of

25   Transcendence at this point?
```

1   A      I don't think Transcendence exist at this point, so.

2   Q      Okay.  He is going to be the president of

3   Transcendence?

4   A      It was the plan, yes.

5   Q      All right and Mr. Fuchs, he's the president of the MTA

6   division?

7   A      And, yes, the general manager in charge of the MTA

8   division.

9   Q      All right, Earl Kossuth, he's the head of the

10  Pittsburgh Division, correct?

11  A      Yes.

12  Q      And Mr. Mallet, if you know, he's the head of IT at

13  TransCare?

14  A      I believe so.

15  Q      Do you recall if he was going to Transcendence or not?

16  A      I don't remember.

17  Q      Okay.  And I understand you're sending this email at

18  night to pickup the AS400 server that night from it says the

19  Malaya building, do you see that?

20  A      Yes.

21  Q      All right and the Malaya building is another TransCare

22  facility where the AS400 server was housed?

23  A      Yes.

24  Q      All right. And so, this is consistent with your --

25  strike that.

1      Ms. Tilton brings you into help with operations of

2  challenged companies, correct?

3  A    Sorry?

4  Q    Ms. Tilton brings you in to help with the operations of

5  challenged companies, correct?

6  A    She brings me in as a consultant to the management

7  team.

8  Q    All right and your expertise is operations.

9  A    My expertise is operations.

10  Q    And you're helping these people with operations, you're

11  giving some assistance?

12  A    And helping those people with operation.

13  Q    Okay.  And if I understand the plan, you're saying

14  billing in Pennsylvania is going to be held for a couple of

15  days until the system is back in service, do you see that?

16  A    Yes.

17  Q    And I think we saw this earlier, but what you mean by

18  that is that the Pennsylvania -- the billing from

19  Pennsylvania they won't be able to get their bills until the

20  server is back up and running, right?  They needed that

21  server to generate their bills?

22  A    Yes.

23  Q    Okay.  And so, when you say the billing will be held,

24  you're saying that the ambulance will still run but the

25  billing not be able to get out for a couple of days.

1    A    The billing cannot be entered in the system.  When they

2    going to an ambulance that (indiscernible) paper and that

3    paper then gets entered into a computer system to execute the

4    billing, so --

5    Q    And that process will be delayed?

6    A    Will be delayed.  That's what I mean, yeah.

7    Q    And then by contrast, if I understand this correctly,

8    the AS400 won't have any impact on Hudson Valley because they

9    have an independent system?

10   A    Yes.

11   Q    All right.  And so, they can operate and generate bills

12   without delays?

13   A    For sure they can do the CAD.  I don't know if the

14   billing consolidation will then go.  I don't know.  I don't

15   know.

16   Q    And then you say, Earl, you will have to plan running

17   the next two days without CAD access, which I understand you

18   have a procedure for, do you see that?

19   A    Yes.

20   Q    And that you're giving direction to Earl Kossuth in

21   Pittsburgh for how he can run without this computer mapping

22   system.

23   A    Yes, I mean, yeah.

24   Q    Okay.

25   A    I mean he knows that.  It is possible.

1   Q      Okay.  Were you aware of a bankruptcy trustee having

2   been appointed at this point or no?

3   A      I don't know -- a little blurry nor of that night, but

4   I understand, at one point, that some decision collapsed and

5   the service agreement that had been defined between TransCare

6   and Transcendence could not work.  That's why that email

7   existed.

8   Q      I'm sorry.  Did you say -- what could not -- did you

9   say a service agreement?

10  A      Yes.

11  Q      Were you aware of a service agreement being entered

12  into?

13  A      We discussed it before.  There was supposed to be a

14  service agreement.

15  Q      There was supposed to be a service agreement?

16  A      Yes.

17  Q      Okay.

18          THE COURT:  Is that for the computers?

19          THE WITNESS:  Sorry?

20          THE COURT:  For the computer?

21          THE WITNESS:  For the computer.

22  BY MR. SAMET:

23  Q      Were you involved in the negotiation of that service

24  agreement?

25  A      No.

1 Q Were you involved in drafting that service agreement?

2 A No.

3 Q Okay. Do you have any further knowledge as to why this

4 plan collapsed, as you said?

5 A No.

6 Q Okay. You understood the AS400 ran both OldCo and

7 NewCo correct?

8 A Yes.

9 Q Go with me, if you would, to PX247.

10 MR. SAMET: Your Honor, I don't believe there is

11 an objection to this exhibit.

12 MS. TILLEM: No objection, Your Honor.

13 THE COURT: It's received.

14 (Exhibit PX247 received into evidence)

15 BY MR. SAMET:

16 Q Now Mr. Cobb this is on February 27th, do you see that,

17 Mr. Pelissier?

18 A Yes.

19 Q And Mr. Kossuth is the head of Pittsburgh, he's

20 reporting to you on the closure of Pittsburgh?

21 A Yes.

22 Q All right and then you thank him for completing in an

23 orderly fashion?

24 A Yes.

25 Q And, again, if I can direct you to the recipients of

1  this email.  Mr. Jones he's talent management at Patriarch?

2  A     Yes.

3  Q     All right and Mr. Greenberg, we know.  Mr. Nowland he's

4  the head of Hudson Valley?

5  A     Yes.

6  Q     And Mr. Fuchs, he's the head of Transcendence?  I'm

7  sorry.  He's the head of paratransit. He's the head of

8  paratransit.

9  A     At (indiscernible), yeah.

10 Q     Okay.  I take it from this email that shortly following

11 it, you had asked Mr. Kossuth to close the Pittsburgh

12 operation?

13 A     I don't remember that.

14 Q     Okay.  You don't remember one way or the other or you

15 don't remember doing that?  What did you mean?

16 A     I don't remember anything about one way or the other.

17 Q     Okay.  Mr. Pelissier, if you recall while you were

18 working with -- well, let me back up.

19       Do you recall who was the CEO of TransCare during 2015?

20 A     Yes, it was Glenn Leland.

21 Q     Okay.  And you worked closely with him?

22 A     Tried to.

23 Q     Okay.  Do you recall that at various points in 2015,

24 Mr. Leland brought you expressions of interest from parties

25 interested in purchasing some or all of TransCare?

1   A      Vaguely, yes.

2   Q      Okay.  Let me direct your attention to JX-39.  Do you

3   have it?

4   A      I have it.

5   Q      All right.  This is one of those examples where Mr.

6   Leland brought to you a potential expression of interest,

7   correct?

8   A      Sorry, let me read this.

9          (Witness reading, silently)

10  Q      Just let me know when you're ready.

11  A      Yes.

12  Q      All right.  And I understand what you're telling Mr.

13  Leland in this email -- well, strike that.

14         It was your opinion, was it not, that it would make

15  more sense to continue to stabilize the business, and fix its

16  problems, and then try to have the sale. Is that fair?

17  A      Well, to do business, if I am not mistaken, is to

18  invest in a company that's in trouble and then turn them

19  around.  So, I would expect the company to be turned around

20  before its being sold.

21  Q      Okay.  And I understand -- Mr. Leland writes you that

22  the company could be worth as much as 200 million if we fix

23  its problems.  Do you see it?

24  A      I see it, yes.

25  Q      And TransCare had a fair number of problems at that

1  point.  Did it not?

2  A     Fair is an understatement.

3  Q     Okay.  But you shared his opinion?  You shared his

4  opinion that if the problems were fixed TransCare would be as

5  worth as 200 million?

6  A     No.  Certainly not.

7  Q     Certainly not, is that what you said?

8  A     Yes.  Certainly not.

9  Q     All right.  I will direct you again to your deposition,

10  Mr. Pelissier.

11  A     Okay.

12  Q     Page 314, Line 5.  I am going to ask you if I asked you

13  these questions and if you gave these answers.

14       I asked you, question:

15       "Okay.  So, what are you discussing with Mr. Leland in

16  this chain?"

17       Answer:

18       "Well, he is discussing with me and he is telling me

19  that the company can be worth 200 million if you turn it

20  around."

21       Question:

22       "And you shared that opinion, did you not?"

23       Answer:

24       "I think it's a perfectly good company.  If I'm

25  correct, it can be very valuable and no problem."

1    Question:

2    "Right.  If it had fixed the problems and if it was run

3    correctly it could be that valuable, right?"

4    Answer:

5    "Yeah."

6    Did you give that testimony?

7  A    I did give that testimony, but you take it out of

8  context.

9  Q    Mr. Pelissier, your counsel will have an opportunity --

10  A    Okay.

11  Q    Mr. Pelissier, let me direct your attention to PX-111.

12        MR. SAMET:  I don't believe there are any

13  objections to this document, Your Honor.

14        THE COURT:  Any objection?

15        MS. TILLEM:  No objections, Your Honor.

16        THE COURT:  Proceed.

17  BY MR. SAMET:

18  Q    Mr. Pelissier, you received this email December 8th,

19  2015?

20  A    Yes, I did.

21  Q    And, actually, maybe this corrects something I think

22  you mentioned earlier.  Thomas Bukes [phonetic], you had

23  mentioned before that he was back with the company in

24  February. Is that right?

25  A    Yes.

```
 1   Q      And I see he had given an indication to resign as of
 2   early December.  Is that what you were referring to?
 3   A      Yeah.  Let me read the email, but, yes, he left and
 4   came back.
 5   Q      Are you aware of the circumstances under which he came
 6   back?
 7   A      Can you repeat your question?
 8   Q      Were you involved in him coming back to the company?
 9   A      I believe I talked to him, yes.
10   Q      Did you offer a signing bonus to return to the company?
11   A      I am not -- I don't have that authority and I would not
12   do that.
13   Q      What did you tell him to come back to the company?
14   A      I am not sure.  I don't think I am the one that
15   convinced him to come back to the company. I just talked to
16   him in the process.
17   Q      You just talked to him in the process?
18   A      Yes.
19   Q      Others were talking to him in the re-hiring process?
20   A      Yes.
21   Q      Okay.  If you look at this email Mr. Leland tells you
22   that National Express contacted him again this morning to see
23   if there was interest in selling the contract.  Do you see
24   that?
25   A      I understand that, yes.
```

1    Q      Did you authorize Mr. Leland to engage with National

2    Express?

3    A      I have zero authority in that domain.  There is an

4    authority matrix.  Mr. Leland was absolutely going to do

5    whatever he wanted in the context of his authority matrix.

6    Q      You understood he needed permission from Ms. Tilton to

7    engage in discussions to sell a major portion of TransCare's

8    business?

9    A      The exact wording is in the authority matrix.  He would

10   have to abide by the authority matrix.

11   Q      You understood he was asking -- he was reporting to you

12   as to whether he could engage with them?

13   A      (Indiscernible).  I am not authorized to authorize

14   anybody to do anything.

15   Q      Go with me to PX-124.

16          MR. SAMET:  Your Honor, I don't believe there are

17   any objections to this document.

18          THE COURT:  Any objections?

19          MS. TILLEM:  No objections, Your Honor.

20          THE COURT:  Proceed.

21   BY MR. SAMET:

22   Q    Mr. Pelissier, this is on December 16th.  Mr. Leland

23   reported to you, among others, that National Express called a

24   few more times.  Do you see that?

25   A      I see that.

1    Q    Do you have any reason to believe that is not true?

2    A    No.  I don't have any reason to believe that is not

3    true.

4    Q    Do you know if anyone answered his question whether he

5    could -- whether he is authorized to begin valuation

6    discussions?

7    A    I don't know. I think if he has done an authority

8    matrix request to Lynn Tilton and she approved it, he would

9    have the authorization.

10    Q    And did she give that authorization?

11    A    I don't know.

12    Q    You don't know.

13    I'm going to put up one more document.  Mr. Pelissier,

14    PX-130.  Flip with me to PX-130.

15    This is an email you received from Mr. Leland the

16    previous year, February 2015?

17    A    Yes.

18    Q    All right.  And Mr. Banella was the CFO at the time?

19    A    Yes, Mr. Banella.

20    Q    And Mr. Schneider, that's Mr. Greenberg's predecessor.

21    Is that right?

22    A    Yes, it is.

23    Q    All right.  So, this is likely around the time that Mr.

24    Greenberg --

25    A    Took over.

1   Q    Okay.  There was a cash crisis in February 2015?

2   A    There was a cash crisis every week.

3   Q    There was a cash crisis every week in 2015.  Is that

4  what you said?

5   A    Yes.

6   Q    Okay.  And Mr. Leland, he is reporting to you to shut-

7  down TransCare it requires coordination with the Public

8  Health Authorities.  Do you see that?

9   A    Yes, I see that.

10   Q    And you understood that, right, that TransCare, it

11  wasn't just selling widgets.  It was delivering 911 services

12  to municipalities, right?

13   A    I do understand that.

14   Q    And you understood that in order to cease providing

15  those services there had to be coordination with those public

16  health authorities, correct?

17   A    Yes.

18   Q    And did you understand this line that Mr. Leland wrote

19  you that once he calls those authorities, such as the New

20  York Department of Health, there's no turning back?  Did you

21  understand that?

22   A    Yes.

23          MR. SAMET:  Nothing further.

24          THE COURT:  Cross examination?

25                 CROSS EXAMINATION

1    BY MS. TILLEM:

2    Q     Good morning, Mr. Pelissier.

3    A     Good morning.

4    Q     A couple of minutes ago you told Mr. Samet that he was

5    taking your deposition testimony out of context that $200

6    million dollars would return on investment for TransCare.

7    A     Yes.

8    Q     Why did you say that?

9    A     Because you can't establish a value for a company like

10   that when the company is running out of cash every week and

11   is losing money on a monthly basis.  So, you know, it's a

12   particular element in which if you were doing everything

13   right and you take, you know, the year and you implement a

14   turnaround time plan then, you know, obviously, the company

15   would build value.

16   Q     I believe that email was dated July 9th, 2015.

17   A     Yes.

18   Q     As of July 9th, 2015 had Mr. Leland presented you with

19   the type of plan that could realize $200 million dollars in

20   return?

21   A     No.  No.  I have seen the numbers from Glenn Leland,

22   but have not seen one plan.

23   Q     So, Mr. Pelissier, Mr. Samet asked you some questions

24   about your background.  I have a couple of more.

25   A     Okay.

1   Q      So, you gave testimony that you are the CEO of

2   Universal Instruments.

3   A      Yes, I am.

4   Q      Do you recall that?

5   A      Yes.

6   Q      And that was -- you have been working at Universal

7   Instruments since about 2008?

8   A      I have been working since January 2007 and joined the

9   team in 2008.

10  Q      And that is as a platform leader at PPMG?

11  A      No.  That was as the CEO of Universal Instruments.  I

12  believe that Lynn Tilton asked me to become a platform leader

13  somewhere in 2011.

14  Q      And as a platform leader at PPMG, Mr. Pelissier, you

15  need certain suggestions and recommendations to the

16  management team of the portfolio companies.  Is that right?

17  A      Yes.  Initially, I was working with two or three

18  companies.  Then, Ms. Tilton asked me to move to New York

19  City to work with more companies while continuing to run by

20  business in Upstate New York.

21  Q      Was there any policy in which you were aware that

22  required the managment teams of the portfolio companies to

23  follow your recommendations?

24  A      No.

25  Q      To your knowledge did the management teams always

1  follow your recommendations?

2  A    No.  Some do and some don't.

3  Q    You described helping portfolio companies with certain

4  turnaround efforts, is that right?

5  A    Yes.

6  Q    Can you describe for the judge some examples of

7  turnaround efforts you have been involved in?

8  A    Prior to managing Universal Instrument I was involved

9  in a business of (indiscernible) Technology which we turned

10  around and took our first carve-out from the (indiscernible)

11  and then took a (indiscernible) actually.  So, that was a big

12  turnaround.

13       My second turnaround was with Universal Instruments.

14  When I took Universal Instruments, it had over $80 million

15  dollars of debt and was losing 14 million.  It had been

16  comfortable since the turnaround.  So, that is certainly good

17  experience here.

18  Q    Mr. Samet discussed with you your involvement in

19  TransCare.

20  A    Yes.

21  Q    And you became involved in TransCare in or about fall

22  of 2014, is that right?

23  A    Yes.

24  Q    Do you recall with whether you met with the TransCare

25  management team in late 2014?

1  A     Yes.  I spent probably close to a week over there with

2  all of the management to really understand, collect data

3  about the business, and where they were, and elaborate some

4  recommendations to the CEO, the CFO and the management team.

5  Yes.

6  Q     And what recommendations did you make to the management

7  team, if any, at that point?

8  A     One of the biggest issues of TransCare was they had

9  lost their parking garage in Manhattan.  Most of their

10 activity was in Manhattan and the North of Manhattan.  And by

11 moving in Brooklyn they added a considerable amount of

12 transit time for all of their team to go to work, if you

13 want, and then they couldn't really have that time to do the

14 (indiscernible).  So, they're first problem was really not to

15 have a location that was efficient for where they were

16 operating.  That was my first recommendation.  The company

17 started losing money at that point in time in the past.

18       The second recommendation was they had a problem to

19 keep the ambulance running.  I gave them a recommendation to

20 rebuild a very solid garage with competency in fleet

21 management and competency in repair and maintenance.  So,

22 that was my second recommendation.

23       Then, there were, at least, seven or eight other

24 recommendations which were more operational about driving,

25 the efficiency of the car and their team to regain profits.

1  Q     Okay.  Did the TransCare management end-up developing a

2  turnaround plan after you met with them?

3  A     Glenn Youngblood, at that point, did a turnaround plan

4  mostly on one element which was to increase the efficiency of

5  the vehicle, and measure how much they were used, and how

6  much they were failing to be able to understand which one

7  needed the repair and so on.  And he started to, based off my

8  knowledge, to that particular recommendation, but most of the

9  other ones no.

10 Q     You testified that you continued to work with TransCare

11 management throughout 2015 and into early 2016.  Is that

12 right?

13 A     Yes, I did.

14 Q     And one of those people was TransCare's CEO, Glenn

15 Leland?

16 A     Yes.

17 Q     Do you recall when Mr. Leland was hired?

18 A     I believe at the end of December, beginning of January

19 2015.

20 Q     2015, you said?

21 A     Yes, I believe so.  I became engaged in 2014.

22 Q     Yeah.

23 A     And the prior CEO left at the end of December and Glenn

24 --

25 Q     December 2014?

1  A     Yeah, 2014.  Glenn Leland started just after.

2  Q     What role, if any, did you play in hiring Mr. Leland?

3  A     I interviewed him.

4  Q     During that interview do you recall telling Mr. Leland

5  that TransCare was in growth mode?

6  A     No.  I could not.  I mean we hired a lot of people and

7  we have learned over time that is extremely important in

8  turnaround to prepare incoming management to really

9  understand the challenge of the company.  So, I would

10 certainly have not done that.

11 Q     Let's turn to JX-10.

12        MS. TILLEM:  So, Your Honor, Joint Exhibit.  There

13 is no objection from either side I presume.

14        THE COURT:  The joint exhibits are received.

15     (Joint Exhibit 10, received into evidence)

16 BY MS. TILLEM:

17 Q     Mr. Pelissier, did you send this email and attachment

18 to Ms. Tilton on February 4th, 2015?

19 A     Yes, I did.

20 Q     Let's take a look at the first paragraph of this email.

21 You write,

22     "I would rather not have to write this email.

23 Unfortunately, as reported in his last two weekly updates

24 Glenn Leland has uncovered a significantly more distressed

25 and deteriorating situation at TransCare then previously

1   understood."

2       Do you see that?

3   A    Yes.

4   Q    Mr. Pelissier, fair to say that you delivering bad news

5   to Ms. Tilton?

6   A    You mean in that email?

7   Q    Yeah.

8   A    Yes.

9   Q    Did you ever tell Mr. Leland that you preferred not to

10  deliver bad news to Ms. Tilton because you are afraid of

11  here?

12  A    No, I did not.

13  Q    Would you say you always reported things to Ms. Tilton

14  accurately and honestly?

15  A    As accurately as possible, yes.

16  Q    Let's look at Paragraph 2 of that first sentence,

17      "TransCare has not executed correctly and timely its

18  recovery plan defined in December"

19      Do you see that?

20  A    Yes.

21  Q    And the recovery plan you refer to in this email, is

22  this the same plan that TransCare managment had been

23  developing with your assistance in late 2014?

24  A    Yes.

25  Q    Turning to Paragraph 4, you say,

1      "Glenn and the team, helped by Brad, has been

2   formulating corrective actions."

3      Glenn there is a reference to Glenn Leland?

4   A    Yes.

5   Q    Who is Brad?

6   A    Brad Schneider.  He was the credit officer prior to

7   Michael Greenberg on the account.

8   Q    You go on to describe two paths to profitability; a

9   fast path and a slow path.  Do you see that?

10  A    Yes, I see that.

11  Q    What role, if any, did you play in developing these

12  corrected action plans?

13  A    Well, I reviewed the plan of the management team which,

14  in this case, was really a number of ideas and financial

15  model.  My definition of a plan is really a number of actions

16  that are going to transform a company or, you know, obtain

17  the goal of something actionable.  And there was really no

18  real thing actionable, but there were two ideas which those,

19  what they call, plan, which are two financial models.

20  Q    Do you recall whether this proposed plan at JX-10

21  addressed the concerns you mentioned earlier?  So, your

22  concern about the location of the parking facility?

23  A    No, they were not.

24  Q    At this point, and you shared with Mr. Leland your

25  suggestion about relocating the parking facility from

1  Brooklyn to a closer location?

2  A    I don't recall personally, but he reviewed all of my

3  observations that I made on the management team before.  So,

4  I'm sure he did.

5  Q    And do you recall whether this proposed plan addressed

6  your concerns about preventative maintenance for vehicles?

7  A    No, I didn't.

8  Q    At that point had you shared your suggestion with Mr.

9  Leland?

10  A    Through the same process, yes.

11  Q    Mr. Pelissier, to your knowledge, did TransCare have

12  difficulty paying certain of its vendors in 2015 and into

13  2016?

14  A    Yes.

15  Q    Who, to your understanding, was responsible for making

16  payment decisions at TransCare about which bills to pay and

17  when?

18  A    Glenn Leland and Mark Benalla [phonetic].  The CFO and

19  the CEO.

20  Q    Did you ever tell Mr. Benalla or Mr. Leland not to pay

21  certain bills?

22  A    No.

23  Q    At any point in 2015 or into 2016 did you suggest to

24  Mr. Leland that if TransCare didn't have any money he could

25  just forego paying bills?

```
 1  A    No.

 2  Q    At any point before December 2015 did Mr. Leland ever

 3  suggest to you that TransCare filed for bankruptcy?

 4  A    Sorry?

 5  Q    Did Mr. Leland, at any point in 2015, suggest to you

 6  that TransCare filed for bankruptcy?  Do you recall that?

 7  A    I think so.

 8  Q    Did you ever tell Mr. Leland that it was not possible

 9  for the portfolio companies Ms. Tilton owned and managed to

10  file for bankruptcy?

11  A    No.

12  Q    Mr. Pelissier, are you aware that TransCare was a party

13  to a term loan agreement with a syndicate of lenders?

14  A    Yes.

15  Q    Do you recall whether Mr. Leland ever asked to

16  TransCare's lenders under the term loan agreement were?

17  A    No.  He didn't ask me, no.

18  Q    Did you ever refuse to tell him who those lenders were?

19  A    It's in the credit agreement.  He simply could read the

20  credit agreement and have the lender.

21  Q    That's true, but did you ever refuse to tell him who

22  the lenders were?

23  A    No, of course not.

24  Q    Mr. Samet asked you about TransCare management

25  expressing interest in selling the MTA contract to a company
```

1    called National Express.  Do you remember that?

2    A    I remember.

3    Q    Let's pull up JX-12.

4         Mr. Pelissier, is this an email that you received on

5    February 6th, 2015 from Mr. Leland?

6    A    Yes, I did.

7    Q    Let's turn to Page 2 of the document ending in Bates

8    stamp 4260.  Mid-page there is an email from Glenn Leland on

9    February 5th, 2015 at 11:48.  Mr. Leland writes,

10        "There is a new alternative to the emergency cash

11   request and accelerated recovery plans we put forward to you

12   and the board yesterday."

13        And the new alternative Mr. Leland is referring to,

14   that's exploring a sale of the MTA contract to National

15   Express?

16   A    Yes.

17   Q    In the next paragraph he writes,

18        "Under this alternative we would sell our most valuable

19   asset for an estimate of $15 to $18 million dollars."

20   A    I see that.

21   Q    Do you think the estimate of $15 to $18 million dollars

22   for the MTA contract was a credible offer?

23   A    I think nobody can make an offer in this business world

24   without doing due diligence and understanding exactly what it

25   means.  So, no, I don't think that it's a legitimate number.

1   Q      How did you know that National Express had not

2   performed any due diligence at that point?

3   A      Because in that case I assumed that Mr. Leland would

4   have obtained authorization from Lynn Tilton to entertain an

5   offer, and would have signed a non-disclosure agreement which

6   would have also requested Lynn Tilton to approve the

7   authority matrix.  To the best of my knowledge that had not

8   happened.

9   Q      Let's take a look at the bottom of Page 1 of this

10  document into the top.  The last line, "Last, if we sell this

11  business."  Do you see on the bottom of Page 1 and it goes

12  onto the top of the second page?  Mr. Leland writes,

13         "Last, if we sell this business to generate cash, we

14  are proposing to use the proceeds for some of the short-term

15  cash we need between now and April, and focus the majority of

16  the proceeds to correct infrastructure deficiencies and

17  critical unpaid supply chain partners so we can execute a

18  modified recovery plan.  Obviously, that will require a

19  detailed business plan and approval."

20         Do you see that?

21  A      Yes.

22  Q      Did Mr. Leland ever provide you with a detailed

23  business plan referenced in this email?

24  A      No, he did not.

25  Q      Why not?  Do you know why not?

1   A    Probably because he didn't do it and he didn't obtain

2   approval.

3   Q    Did you ever tell Mr. Leland not to create a detailed

4   business plan showing what TransCare might look like without

5   the paratransit business?

6   A    No, I didn't.

7   Q    At any point in 2015 do you recall telling Mr. Leland

8   not to raise National Express's indication of interest in the

9   MTA contract to Ms. Tilton?

10   A    No.

11   Q    Speaking of selling TransCare did you ever tell Mr.

12   Leland that Ms. Tilton would not sell TransCare because it

13   might have some impact on a pending litigation?

14   A    No.

15   Q    At some point in the fall of 2015 did you become aware

16   that Wells Fargo did not intend to renew its ABL loan with

17   TransCare?

18   A    Yes.

19   Q    About when was that?

20   A    When we started to discuss forbearance agreement and

21   what it would take to renew their ABL.  The idea was expiring

22   at the end of January, beginning of February 2016.  So, we

23   were -- I think we were borrowing about $16 million dollar on

24   that ABL on average and we were concerned about, you know,

25   how that ABL would renew.

```
1    Q      Do you recall around that time whether Mr. Leland asked
2    you for permission to look for a replacement ABL lender in
3    the event Wells Fargo did not renew the loan?
4    A      I don't remember, no.
5    Q      Did you ever tell Mr. Leland that he could not look for
6    a new lender in the event the ABL was not renewed?
7    A      No, absolutely not.
8    Q      Let's go to Defendant's Exhibit 89.
9             MR. SAMET:  No objection.
10            THE COURT:  Okay.  It's received.
11        (Defendant Exhibit 89, received into evidence)
12   BY MS. TILLEM:
13   Q      Mr. Pelissier, is this an email chain you participated
14   in on December 11th, 2015?
15   A      Yes.
16   Q      The subject line of the email says, "Today's call with
17   Wells Fargo."  Do you see that?
18   A      Had you, in fact, participated in a discussion with
19   Wells Fargo on December 11th, 2015?
20   A      Yes.
21   Q      Let's turn to Page 2, about mid-way through the page
22   there is a header that says 2016 plan.
23   A      Yes.
24   Q      The first bullet says,
25            "Jean-Luc and I first saw the revised 2016 plan this
```

**A1485**

1  past Monday.  We will work to write something up on it as

2  management believes this plan is one they can manage."

3       What plan is Mr. Greenberg referring to here, if you

4  know?

5  A    I think it's a budget for 2016 that they want to

6  present to Wells Fargo.

7  Q    And when you say they, who do you mean?

8  A    The management team.

9  Q    About three bullets down Mr. Greenberg writes that he

10 advised John that the plan had not been presented or

11 discussed with Ms. Tilton.  Is John, John Hussan [phonetic]?

12 A    I believe so.

13 Q    Was it true that Ms. Tilton had not been presented the

14 company's plan yet at this point?

15 A    Most likely.

16 Q    Let's turn to Page 1 of this email.  I'm focused on

17 your email of 8:08 p.m. on December 11th.

18 A    Okay.

19 Q    You respond to Mr. Greenberg's email and write,

20      "I would not call what they showed us a 2016 plan.  A

21 model at best and/or proposed financials."

22      Do you see that?

23 A    Yes.

24 Q    Why was this not a plan?

25 A    Well, the same comment that I made earlier is people

1  create a financial model, called PNL, with a bunch of numbers

2  and that's showing that it's going to happen without having

3  an actionable set of deliverables to creating those

4  particular numbers on those lines. And that is what we saw

5  here multiple times in the case of TransCare is a financial

6  model with no basis for the execution of the underlying

7  assumptions.

8  Q    So, what, in your view, is needed to make this a plan?

9  A    Its need to extract every one of the assumptions in the

10 model and put in place an actionable set of actions that are

11 in the league to meeting that particular assumption. Like,

12 you are going to save money by there being new parking in

13 Manhattan. It needs to start by somebody assigning the task

14 of finding parking in Manhattan, for example.

15 Q    And at this point in December 11th, 2015 had efforts

16 been taken to secure a new parking lot?

17 A    No, it was just an example. No, what I am saying is

18 all of the underlying assumption had no actionable execution

19 path.

20 Q    Let's go to PX-132. This is plaintiff's exhibit. I

21 assume there is no objection.

22         THE COURT: Which, 132?

23         MS. TILLEM: PX-132.

24         THE COURT: It's received.

25      (Plaintiff Exhibit 132, received into evidence)

1  BY MS. TILLEM:

2  Q    Ms. Pelissier, is this an email you received from

3  Melissa Probos [phonetic] on December 17th, 2016?

4  A    Yes.

5  Q    Who is Melissa Probos?

6  A    She was the credit officer for the ABL line of lending

7  by Wells Fargo.  She was reporting to John Hussan.

8  Q    If you can turn to the third paragraph on Page 1.  Ms.

9  Probos listed a number of items that had come to Wells

10  Fargo's attention about TransCare.  Do you see that?

11  A    Yes.

12  Q    Can you please take a minute and read the paragraph to

13  yourself?

14      (Participant reading)

15  A    Yes.

16  Q    Do you have any reason to disagree with any of Ms.

17  Probos's representations in this paragraph?

18  A    No.  Even (indiscernible) we will not receive those

19  documents.

20  Q    Let's turn to JX-59.  Mr. Pelissier, is this is an

21  email and attachment you received from Melissa Probos on

22  December 23rd, 2015?

23  A    Yes.

24  Q    And if you could just briefly skim through the

25  attachment, I have a couple of questions.  I'm not going to

1  ask you anything about what's on the second page.

2  A     Okay.  Yes.  I read it.

3  Q     Mr. Pelissier, care to say that as of December 23rd,

4  2015 you were participating in discussions with Wells Fargo

5  about the bank providing bridge funding through a sale, a

6  potential for the bank providing bridge funding through a

7  sale?

8  A     Yeah.  That's what that document is.  It's a

9  (indiscernible) that Wells Fargo could agree to.

10  Q     Could you take a look at the second paragraph from the

11  bottom on the first page with a Bates stamp ending 75498?

12  A     Yes.

13  Q     The paragraph reads,

14        "Additional funding to be provided by Patriarch

15  Partners in an amount not less than TBD to help TransCare

16  finance certain expenses."

17        Do you see that?

18  A     Yes.

19  Q     Did you understand that Wells Fargo would not agree to

20  a longer-term forbearance without a further cash infusion

21  from one of Ms. Tilton's investment vehicles?

22  A     I believe that is what that sentence means.

23  Q     The amount of funding here is TBD.  Did Wells Fargo

24  later indicate to you about how much additional funding would

25  be required for the bank to agree to enter into a longer term

1   forbearance?

2   A      I think several numbers have been put forward.  I don't

3   remember exactly.

4   Q      Do you have a general sense of the amount?

5   A      I think at one point it was $6.5 million dollars.

6   Q      A couple million dollars at least.  Withdrawn.

7          Mr. Pelissier, Mr. Samet previously asked you about Ms.

8   Tilton's decision to restructure TransCare in early 2016.  Do

9   you recall that?

10  A      Yes.

11  Q      Turn to DX-123.

12         Mr. Pelissier, is this an email chain you participated

13  in on February 4th, 2016?

14  A      Yes.

15             MS. TILLEM:  Your Honor, there was no objection to

16  this exhibit.

17             THE COURT:  It's received.

18         (Defendant Exhibit 123, received into evidence)

19  BY MS. TILLEM:

20  Q      Looking at the top of Page 2, and you can see if you

21  look first at the bottom of Page 1 that this is an email from

22  Lynn Tilton to you and others on February 4th, 2016.

23  A      Yes.

24  Q      At the top of Page 2 Ms. Tilton writes,

25             "I really need a plan on Friday on a way to move

 1  forward or a shut-down plan on TransCare."

 2  A     Yes.

 3  Q     To your recollection had Ms. Tilton approved any plan

 4  of restructuring at this point?

 5  A     At that point, no.

 6  Q     You respond, on Page 1, 7:49 on February 4th --

 7  A     Yes.

 8  Q     "Michael and I will be at TransCare all day today to

 9  build alternative business scenarios for your review Friday."

10        Is Michael, Michael Greenberg?

11  A     Yes.

12  Q     What did you mean by alternative business scenario?

13  A     The intention was to read one last time all of the

14  business line of TransCare and understand which one was

15  profitable, which one was not.  Understand the situation with

16  the vehicle and propose a plan moving forward that would, you

17  know, make the company viable.

18  Q     Did you, in fact, work with Mr. Greenberg later that

19  day on alternative scenarios?

20  A     Yes.

21  Q     Do you recall where you met him?

22  A     If I met --

23  Q     Let me ask the question a little differently.  You

24  write,

25        "Michael and I will be at TransCare all day."

1  A       Yes.

2  Q       Do you recall meeting Mr. Greenberg at TransCare that

3  day?

4  A       Most likely, yeah.

5  Q       Did anyone else participate in your meeting?

6  A       All the management team of TransCare and people from

7  the Carl Marks team.

8  Q       Let's turn to DX-127.

9         Mr. Pelissier, is this an email and attachment you

10 received from Mr. Greenberg on February 7th, 2016?

11             MS. TILLEM:  And, Your Honor, DX-127 is already in

12 evidence.

13             THE COURT:  Okay.

14 BY MS. TILLEM:

15 Q    At the top of -- Mr. Pelissier, I am not sure if you

16 answered my question.  I'm sorry, I cut you off.  Did you

17 receive this email and attachment?

18 A       I did.

19 Q       Thank you.

20         At the top of the email Mr. Greenberg writes,

21         "I think we can potentially be ready, for the most

22 part, to discuss with Lynn by the end of the day tomorrow."

23         So, as of February 7th were you still working on the

24 alternative business scenarios you just described in DX-123?

25 A       Yes.

1   Q      To your recollection has Ms. Tilton approved any plan

2   of restructuring at this point?

3   A      No.

4   Q      Mr. Greenberg says,

5          "I think we may need to work through with Glenn

6   Youngblood, Earl and Pete how one would effectuate a

7   reduction in the operation like the one being considered."

8          Who is Earl in that sentence?

9   A      Glenn was the vice president of TransCare, Earl

10  managing Pittsburg, and Pete is the CEO of TransCare.

11  Q      The next line Mr. Greenberg writes,

12         "Carl said if you would be sending a revised thirteen

13  week forecast by noon today."

14         Who is Carl in that sentence?

15  A      Its Carl Endech [phonetic], he's the CFO that was

16  working for Carl Marks.

17  Q      The next line Mr. Greenberg writes,

18         "Jonathan is reviewing a revised 2016 budget model

19  which I was working through yesterday and he is preparing a

20  summary of the expense structure condition."

21         Who is Jonathan in that sentence?

22  A      He was working for Carl Marks.

23  Q      Let's turn to PX-206.  Mr. Samet asked you some

24  questions about this document earlier this morning.

25  A      Yes.

1   Q     Do you recall that?

2   A     Yes.

3   Q     About mid-page on Page 2 there is a section that says

4   banking and finance.

5   A     Yes.

6   Q     Fourth bullet down reads,

7         "Wells to visit and review proposed path and intent

8   support."

9         Next to that action item it says done.  Do you see

10  that?

11  A     Yes.

12  Q     Does done mean that this meeting happened?

13  A     Yes.  Either the meeting or the action had been taken.

14  Q     Do you recall whether you participated in the meeting

15  with Wells Fargo in or around this time?

16  A     I don't remember, most likely.

17  Q     Two bullets down the action item reads,

18        "Financial model and cash requirements."

19        And it looks like there is a C on the right-hand side

20  of the page, but what looks like it says Carl Marks to eleven

21  evening.  Is that right?

22  A     Yes.

23  Q     To your knowledge was Carl Marks preparing financial

24  models in connection with this Oldco/Newco restructuring?

25  A     Yes.

1   Q    And, Mr. Pelissier, just to be clear on the first page

2 of this email, first line, you write,

3      "I was on the phone with Lynn until a few minutes ago."

4      That is Ms. Tilton?

5 A    Yes.

6 Q    And you reviewed this list of deliverables with her?

7 A    Yes.

8 Q    Let's turn to Page 4, about mid-page there is a bullet

9 that says, Pittsburg.

10 A    Yes.

11 Q    And there is a reference to an AS-400. You gave some

12 testimony earlier today about the AS-400, is that right?

13 A    Yes.

14 Q    You write,

15      "On day one we will need to continue to have access to

16 AS-400 through service agreement."

17 A    Yes.

18 Q    Why was access to the AS-400 necessary on day one?

19 A    To do the (indiscernible) and distribution, the

20 watching of the ambulance.

21 Q    Let's turn to JX-85.

22 A    Sorry?

23 Q    JX-85.

24 A    Yes.

25 Q    Is this an email and attachment you sent to Ms. Tilton

1   on February 17th, 2016?

2   A     I'm reviewing it.  Yes.

3   Q     Who is Vincent Devito?

4   A     Sorry?

5   Q     On the copy line it says Vincent Devito?

6   A     Vincent Devito is another creditor at Patriarch

7   Partners.  And he was -- Lynn had asked him to get involved

8   in the process and review my financial model.  So, he did so.

9   Q     If I'm reading this document correctly this is an Oldco

10   wind-down model?

11   A     This is an Oldco wind-down model, yeah.

12   Q     This model contains a series of assumptions, right?

13   A     Yes.

14   Q     Who developed these assumptions?

15   A     I did.

16   Q     Did you have any discussions about these assumptions

17   with Ms. Tilton?

18   A     Yes, of course.  All of them.

19   Q     The second assumption you identified is all 911 and

20   core contracts terminates within ninety days.  Do you se

21   that?

22   A     Yes.

23   Q     To your knowledge why was the run-off period for the

24   contracts ninety days?

25   A     Because this is the one carrier that you need to have

1    to terminating employees.

2              MR. SAMET:  I'm sorry, Your Honor.  I just didn't

3    hear what the witness said.

4              THE WITNESS:  I said this is a one carrier that is

5    required for terminating employees.

6    BY MS. TILLEM:

7    Q    Mr. Samet asked you about certain communications you

8    had with the MTA in 2016.  Do you remember that?

9    A    Yes.

10   Q    And you gave testimony that you engaged in discussions

11   with the MTA about segregating funds generated from the

12   paratransit business, is that right?

13   A    Yes, I did.

14   Q    Let's turn to DX-187.

15             MS. TILLEM:  Your Honor, I don't believe there's

16   an objection to this document.

17             MR. SAMET:  No objection.

18             THE COURT:  It's received.

19        (Defendant Exhibit 187, received into evidence)

20   BY MS. TILLEM:

21   Q    Mr. Pelissier, about mid-page on DX-187, the email,

22   there is an email from Peter Wolf on which you are copied?

23   A    Yes.

24   Q    January 13th, 2016, do you see that?

25   A    Yes.

1  Q      Earlier you testified that you had met -- let's turn to

2  the letter.

3  A      Okay.

4  Q      On the first -- this is a letter from Peter Wolf to Mr.

5  Charles, is that right?

6  A      Yes, that's right.

7  Q      Mr. Wolf writes, in the first line of this letter,

8         "Thank you for the opportunity to meet with you and Mr.

9  Cosgrove [phonetic] yesterday afternoon.  Mr. Randy Jones,

10 Mr. Jean-Luc Pelissier and I are happy to have received

11 directly the benefit of your perspective on the relationship

12 between the Access Program and TransCare."

13 A      Yes.

14 Q      When you testified earlier that you had had a meeting

15 with the MTA in or around January 2016 or early 2016 is this

16 what you were referring to?

17 A      Yes, it is.

18 Q      Let's turn to PX-237.  Do you have it?

19 A      I have it.

20 Q      You gave some testimony about this email earlier today,

21 right?

22 A      Yes.

23 Q      The first line you say I just talked to Glenn.  Is that

24 a reference to Glenn Youngblood?

25 A      Yes, it is.

1  Q     And did you, in fact, speak to Mr. Youngblood before

2  you sent this email?

3  A     Yes, I did.

4  Q     I noticed that this email has a time stamp of 11:23

5  p.m.

6  A     Yes.

7  Q     Why couldn't this wait for the morning?  You're

8  describing here picking up the AS-400 server.  So, my

9  question is why did that have to be done at 11:23 that

10 evening?

11 A     Again, I think, if my understanding was right, is that

12 TransCare was going to stop operating immediately.  Then the

13 AS-400 would not be usable under the service agreement by

14 anybody and that would be a catastrophe for (indiscernible).

15 Q     Other than these operational considerations is there

16 any reason that you were developing a plan to move the AS-400

17 server at 11:23 p.m.?

18 A     Not really, no.

19       MS. TILLEM:  Your Honor, if I could just a minute

20 to confer with my colleagues.

21       THE COURT:  Yes.

22    (Participants confer)

23       MS. TILLEM:  No further questions, Your Honor.

24       THE COURT:  Redirect?

25       MR. SAMET:  One second.  Your Honor, two brief

81

 1   questions.

 2                    REDIRECT EXAMINATION

 3   BY MR. SAMET:

 4   Q    Mr. Pelissier, go with me to DX-89.  I think you looked

 5   at this on your --

 6   A    In your binder?

 7   Q    No, in Ms. Tillem's binder.

 8               THE COURT:  The smaller binder.

 9   BY MR. SAMET:

10   Q    DX-89.

11   A    Yes.

12   Q    Two questions.

13        First, in the top of your email you say,

14        "I would not call what they showed us a plan."

15        Do you see that, a 2016 plan?  Do you see that?

16   A    Yes.

17   Q    That was not that the financial models and projections

18   and reports that they were giving you were not operational

19   plans in your understanding?

20   A    The financial model not doing it and then run out of

21   cash.  So, yes.

22   Q    But they gave you those models.  You just didn't

23   consider them to be operational plans?

24   A    Yes.

25   Q    Ms. Tillem -- and that happened throughout 2015, did it

**A1500**

1  not?

2  A    Yes.

3  Q    Ms. Tillem showed you on the second page of this email

4  when she asked you some questions about a revised 2016 plan.

5  And I understood you to give some testimony on the detriments

6  of that plan.

7       My question for you is what plan are you talking about?

8  A    I believe this is a plan that Wells Fargo was asking to

9  continue lending in 2016.

10 Q    Is this -- I mean I don't know if you know because I

11 don't know, if this was the plan that was given to them in

12 November at the November meeting or some other plan?

13 A    I believe it's that plan, yeah.

14 Q    And you prepared that plan, did you not, with the

15 company?  The November plan.

16 A    I don't prepare anything.

17 Q    You didn't work with --

18 A    I review them, I opinion them, I give my feedback, I

19 check, you know, to see if they are correct and so on.  But

20 those are not my plans.

21 Q    Okay.  And you do -- when you go through that process

22 the purpose is that process is so when the plan is presented

23 by management to Lynn Tilton --

24 A    Yes.

25 Q    -- it's in the proper form?

1   A       That it is in the proper form, yes.

2   Q       Okay.  One last question.  Go with me to 206, it's in

3   both binders actually, but whichever binder you have in front

4   of you.  Ms. Tillem asked you a question about something on

5   the second page of the email.

6   A       Yes.

7   Q       She asked you, the indication Wells to visit and review

8   proposed path and intent, support, done.  Do you see that?

9            THE COURT:  Where is this email?

10           MR. SAMET:  206.

11           THE COURT:  I'm looking at 206, but --

12           MR. SAMET:  The second page is the bullet --

13  BY MR. SAMET:

14  Q       I just had a question about your testimony this.  Ms.

15  Tillem asked you if that was done and I thought you said that

16  you weren't sure if you were the one to do that or not.  Is

17  that what you said?

18           Withdrawn.  Let me ask it differently.

19           Were you the one -- did you visit with -- isn't it true

20  you didn't visit with Wells and discuss the foreclosure plan,

21  did you?

22  A       Oh, no.

23  Q       Okay.  So, to the extent that your running this here

24  someone else told you that, that this was done?

25  A       So, again, a lot of things happening.  The Oldco plan,

1   I don't know if that is the right timing, would be reviewed

2   on an ongoing basis between Lynn Tilton and Wells Fargo.

3   Q     When you say would be reviewed do you have knowledge

4   that it was reviewed by Ms. Tilton and Wells Fargo or you're

5   assuming that?

6   A     No. I mean I don't know if it's this one here in

7   particular, but was reviewed between Wells Fargo and Lynn

8   Tilton, yes.

9   Q     How do you know that?

10  A     Because I was in the room at all times.

11  Q     You were -- I apologize.  You were in the room with --

12  you were at a meeting with Ms. Tilton and Wells Fargo in a

13  room?

14  A     I was in a meeting with Lynn Tilton and Wells Fargo on

15  the phone.

16  Q     And Wells Fargo on the phone.  Were you discussing the

17  foreclosure?

18  A     Not the foreclosure, no.  The financial models.

19  Q     Financial models for the Oldco plan?

20  A     At one point I did.  I don't know if that is relating

21  to that.

22  Q     Do you know what that is relating to?

23  A     I don't know.

24        MR. SAMET:  No further questions.

25        THE COURT:  I have a question on the same exhibit.

**A1503**

1    If you turn to Page 8 of the exhibit there is a hearing

2    operations, questions and other actions.

3               THE WITNESS:  On which exhibit?

4               THE COURT:  Same exhibit we were talking about,

5    Page 8.

6               THE WITNESS:  Page 8?

7               THE COURT:  Yes.  The heading is operations,

8    questions and other actions.

9               THE WITNESS:  Yes.

10              THE COURT:  Drop down a few bullets the question

11   is,

12        "Who stays to manage Oldco during the Chapter 11

13   process?"

14              Do you see that?

15              THE WITNESS:  Yes.

16              THE COURT:  Were there discussions to file a

17   Chapter 11 petition in bankruptcy?

18              THE WITNESS:  I don't remember.  I was not really

19   part of those discussions, all of that legal aspect.

20              THE COURT:  Who raised this question?  Was it you

21   or someone else?

22              THE WITNESS:  I probably compiled the

23   questionnaire.  I don't know who raised the question.

24              THE COURT:  All right.  Thank you.  You can step

25   down.

86

1          THE WITNESS:  You're welcome.

2      (Witness excused)

3          THE COURT:  Its twelve o'clock.  Why don't we take

4  our break now and reconvene at 1:30.

5      (Proceedings concluded at 12:00 p.m.)

6

7

8

9

10                        CERTIFICATE

11

12      I certify that the foregoing is a correct transcript

13  from the electronic sound recording of the proceedings in the

14  above-entitled matter.

15
    /s/Mary Zajaczkowski_____          July 29, 2019
16  Mary Zajaczkowski, CET**D-531

17

18

19

20

21

22

23

24

25



# TRANSCRIPT of the Testimony of

**July 23, 2019**

**Case:** in re: TRANSCARE CORPORATION

in re: TRANSCARE CORPORATION

July 23, 2019

THE COURT:  Call your next

witness, please.

MR. AMINI:  Plaintiff calls

Brian Stephen.

B R I A N    S T E P H E N, called as a witness,

having been first duly sworn by Danielle

Grant, a Notary Public within and for

the State of New York, was examined and

testified as follows:

THE COURT:  Okay.  Please

speak into the microphone.

DIRECT EXAMINATION

BY MR. AMINI:

Q    Good afternoon, Mr. Stephen.

A    Good afternoon.

Q    Mr. Stephen, you are employed

by Patriarch Partners, LLC; is that correct?

THE COURT:  Do you have a

looseleaf for this one?

MR. AMINI:  I'm sorry, yes.

Q    Your title is senior director

of legal; am I correct about that?

A    Yes.

Q    You have had that title since

in re: TRANSCARE CORPORATION

```
                                                    Page 2
  1                         July 23, 2019

  2   at least 2015, correct?

  3            A     Yes.

  4            Q     You were employed the first

  5   time by Patriarch Partners in 2009; am I

  6   right about that?

  7            A     No.

  8            Q     What year did you join?

  9            A     October 2010.

 10            Q     October 2010.  So you have

 11   been continuously employed there since 2010?

 12            A     Yes.

 13                  THE COURT:  Would you speak

 14            into the microphone?  You can pull

 15            it closer.  Thank you.

 16            Q     And you report directly to

 17   Lynn Tilton?

 18            A     Yes.

 19            Q     And I forgot, you're an

 20   attorney, correct?

 21            A     Correct.

 22            Q     You're licensed to practice

 23   law in the State of New York, I assume?

 24            A     Yes.

 25            Q     And you have been licensed
```

in re: TRANSCARE CORPORATION

Page 3

```
 1                      July 23, 2019
 2   since at least October of 2010?
 3           A    Yes.
 4           Q    And as I understand it, your
 5   job is to support Lynn Tilton in a number of
 6   her different capacities at Patriarch
 7   Partners and elsewhere?
 8           A    Yes.
 9           Q    And that would include as the
10   manager and CEO of Patriarch Partners, LLC,
11   correct?
12           A    Correct.
13           Q    As the manager of Patriarch
14   Partners Agency Services LLC?
15           A    Correct.
16           Q    And so that we're clear, what
17   is Patriarch Partners -- what does Patriarch
18   Partners Agency Services LLC do?
19           A    It's an administrative agent
20   for certain loans.
21                THE COURT:  Would you keep
22           your voice up.
23           A    It is the administrative agent
24   for certain loans.
25           Q    It's the administrative agent
```

in re: TRANSCARE CORPORATION

Page 4

```
 1                   July 23, 2019
 2    for the Zohar loans with respect to
 3    TransCare, is it not?
 4           A    Correct -- actually, not at
 5    this point.
 6           Q    Not at this point?
 7           A    Oh, yeah, actually it still
 8    is.  Sorry.
 9           Q    Was it also the collateral
10    manager at some point or is there a different
11    entity that's a collateral manager?
12           A    Those are different entities.
13           Q    So at some point you also
14    supported her in her role as the CEO and
15    manager of the entities that were the
16    collateral managers of the term loan lenders
17    loans that they had, TransCare had?
18           A    For the Zohar loans, yes.
19           Q    And you indicated, I think,
20    from your answer that she isn't -- that
21    Patriarch doesn't perform that role any
22    longer, right?  It's no longer the collateral
23    manager?
24           A    I don't believe Patriarch
25    itself was ever collateral manager, but Lynn
```

in re: TRANSCARE CORPORATION

Page 5

1                      July 23, 2019
2    Tilton is not.
3              Q    Right.  She resigned from that
4    position in early March 2016?
5              THE COURT:  From which
6              position?
7              MR. AMINI:  As the collateral
8              manager of the collateral in this
9              case, in TransCare.
10             THE COURT:  Is there a
11             separate agreement for that because
12             I haven't seen that?
13             MR. AMINI:  The collateral
14             agreement?  I haven't either, Your
15             Honor.  If it's okay with the
16             court, we'll provide it.  I don't
17             know that it's in the agreed-upon
18             set.
19             THE COURT:  If you have not
20             seen it, how are you going to
21             provide it.
22             MR. AMINI:  It's probably in
23             the documents in the case, it just
24             didn't make it to the exhibits.
25             THE COURT:  Okay.

in re: TRANSCARE CORPORATION

Page 6

1                    July 23, 2019

2          Q    But she was the collateral

3    manager until early March 2016?

4          A    I believe that's correct.

5          Q    In early February, 2016, she

6    resigned as the collateral manager?

7          A    I don't remember.

8          Q    Effective March, correct?

9          A    No, I don't recall that.

10         Q    That's fine.  You also support

11   her as the director of the portfolio

12   companies?

13         A    Of certain portfolio

14   companies, yes.

15         Q    And including TransCare?

16         A    Yes.

17         Q    And when you say support her,

18   you're her counsel in her role as the sole

19   member of the board of TransCare?

20         A    I was, yes.

21         Q    And as I understand it, you

22   distinguish your role as counsel for her on

23   the board from any sort of role at the

24   company itself; isn't that right?

25         A    What is "the company"?

in re: TRANSCARE CORPORATION

Page 7

1                    July 23, 2019

2          Q    We're talking about TransCare.

3    From this point on, Mr. Stephen, I think I'll

4    be focused on TransCare.

5          A    Understood.  I did not support

6    TransCare as TransCare's lawyer.  I was

7    supporting Lynn Tilton not TransCare.

8          Q    Right.  And you supported Lynn

9    Tilton as board member -- the only board

10   member at TransCare?

11         A    Correct.

12         Q    And with respect to TransCare,

13   you also supported her as the collateral

14   manager, at least until March of 2016,

15   correct?

16         A    Likely correct.

17         Q    And at TransCare, you also

18   supported her as the asset -- as the term

19   loan lenders' administrative agent?

20         A    I provided counsel to Lynn in

21   a number of her different capacities, so it's

22   likely yes.

23         Q    And you also supported her, as

24   I understand it, in various personal matters.

25   I don't want to get into any of them, but

in re: TRANSCARE CORPORATION

Page 8

1                      July 23, 2019

2    that's one of your roles?

3              A    At times, yes.

4              Q    And, you know, as I understand

5    it, whenever you're acting in these various

6    roles, it's very clear to you in what

7    capacity you're doing that?

8              A    It's not always particularly

9    clear because I think the job requires

10   different skills and different needs at

11   different times.  So I don't have, for

12   instance, a different email address for

13   counsel to X or counsel to Y.  I pretty much

14   support Lynn with whatever she needs done.

15   So I may not necessarily distinguish between

16   all of the roles.  I've always been very

17   clear about distinguishing between my role at

18   Patriarch Partners and its affiliates and

19   TransCare.  It's a very different issue.  But

20   I don't necessarily distinguish between when

21   I do something for Patriarch Partners Agency

22   Services and Patriarch Partners Management

23   Group.  Often the task itself will dictate

24   what it is, but I don't necessarily make a

25   conscious decision.

in re: TRANSCARE CORPORATION

Page 9

```
 1                        July 23, 2019
 2             Q    It's always the task at hand
 3    that makes it clear what it is; is that not
 4    true?
 5             A    It's difficult to say, to be
 6    honest.
 7             Q    Do you support her in a lot of
 8    dual capacities?
 9             A    Probably, yes.
10             Q    You know, in your
11    deposition --
12                  THE COURT:  Where are we going
13             with this?
14                  MR. AMINI:  This is very
15             prefatory, but we're going to get
16             to a point where this gentleman is
17             in multiple roles in the February
18             time frame.  And I just want to
19             establish and lay the groundwork.
20             I'm almost done with this.  I had
21             one more thing I was going to get
22             to.
23                  MR. MERVIS:  I will say this,
24             Judge.  The trans -- the principal
25             transaction at issue in this case
```

in re: TRANSCARE CORPORATION

```
                                                  Page 10
  1                        July 23, 2019
  2              is disputed.  It's a related party
  3              transaction.  So I think the
  4              relevance is tenuous at best.
  5                   THE COURT:  Let's finish this
  6              and let's move on to the issues in
  7              this case.
  8                       MR. AMINI:  I am happy to do
  9              so if Your Honor would permit me, I
 10              just wanted to read two questions
 11              and answers from his deposition and
 12              then I will move on.
 13                       MR. MERVIS:  Can I just ask
 14              for the page and line number?
 15                       MR. AMINI:  Yes, Page 19,
 16              Lines 10 through 17.
 17              Q    I asked you at that time:
 18                   "QUESTION:  I was going to
 19      follow up on that example and say, are there
 20      examples where you support her in dual
 21      capacities?
 22                   Your answer:  "Possibly,
 23      nothing comes to mind.
 24                   "QUESTION:  So to the best of
 25      your recollection, it's always clear to you in
```

in re: TRANSCARE CORPORATION

Page 11

1                     July 23, 2019
2   what capacity you're supporting her by the
3   task at hand?
4               "ANSWER:  Yes."
5               Do you recall I asked you those
6   questions and you gave those answers?
7          A    I do.
8               MR. MERVIS:  Your Honor, just
9          in fairness, can I read the next
10         question and answer?
11              THE COURT:  Sure.
12              MR. MERVIS:  So the question
13         is:
14              "The tasks defines exactly what
15         it is you're doing for her?
16              The answer is:  "Typically
17         that's fair to say."
18              MR. AMINI:  Fair enough.
19              THE COURT:  Go ahead.  Ask
20         another question.
21   BY MR. AMINI:
22         Q    Now, at TransCare, you had the
23   sole responsibility of preparing and
24   reviewing board resolutions for Ms. Tilton?
25         A    That's not correct.

in re: TRANSCARE CORPORATION

Page 12

1                      July 23, 2019

2               THE COURT:  I'm sorry.  What

3          was your answer?

4               THE WITNESS:  That's not

5          correct.  I did not have the sole

6          responsibility for drafting those

7          resolutions.

8          Q    But did that role ultimately

9     fall on you, let's say, maintaining the

10    resolutions?

11         A    I maintained the resolutions

12    that I drafted.  I think other attorneys

13    drafted resolutions for other reasons and for

14    other purposes.  And I didn't go back and

15    find the resolutions and maintain those

16    resolutions for them, if that answers your

17    question.

18         Q    If other attorneys drafted

19    these resolution, they would be in the

20    corporate file related to TransCare, correct?

21         A    They should be someplace in

22    the file for TransCare, yes.

23         Q    And my understanding is that

24    you kept -- when I say "you" -- there was, at

25    Patriarch, some kind of file kept of all the

in re: TRANSCARE CORPORATION

Page 13

1                    July 23, 2019

2    corporate resolutions related to TransCare,

3    correct?

4              A    Correct.  They may have been

5    in different subfolders, but, yes, there

6    should be one repository for those documents.

7    That's correct.

8              Q    To the best of your

9    recollection, to the extent that there were

10   any related to this case in the time frame

11   from 2015 through 2016, they were produced in

12   this case, yes?

13             A    I have no reason to believe

14   they weren't.  I wasn't responsible for

15   providing of documents.  I don't know how to

16   answer that.

17             Q    So it wasn't one of your

18   responsibilities to maintain the corporate

19   documents?

20             A    I maintain the corporate

21   documents that I drafted.  I didn't maintain

22   all of the corporate documents for the

23   company.

24             Q    Fair enough.  Did anybody have

25   responsibility -- ultimate responsibility for

in re: TRANSCARE CORPORATION

Page 14

1                         July 23, 2019

2    maintaining the corporate documents to your

3    knowledge?

4              A    No, not specifically.  No.

5              Q    And my understanding is that

6    between 2015 and 2016, you were the principal

7    lawyer assigned to Ms. Tilton for purposes of

8    her role as the sole board member of

9    TransCare?

10             A    I was the principal lawyer for

11   certain affairs and activities, but not for

12   all.

13             Q    One moment.  In that time

14   period, as I understand it you may have

15   attended a single board meeting, correct?

16             A    I think in the depositions I

17   said I attended at least one meeting.

18             Q    You couldn't recall any

19   others, as I recall.

20             A    I think that's correct.

21             Q    Have you recalled any other

22   meetings since your deposition?

23             A    No, I haven't really thought

24   about it since the deposition.

25             Q    Let's go -- there was

in re: TRANSCARE CORPORATION

```
                                              Page 15
 1                    July 23, 2019
 2    testimony earlier today with Mr. Pelissier
 3    about an authority matrix.  If you wouldn't
 4    mind, could you look at PX 3?
 5              A    Yes.
 6                    MR. AMINI:  They've raised a
 7              relevance objection, Your Honor.
 8                    MR. MERVIS:  It's not
 9              relevant, but I'll withdraw it just
10              for the sake of moving things
11              along.
12                    THE COURT:  Are you offering
13              it?
14                    MR. AMINI:  I am, Your Honor.
15                    THE COURT:  Proceed.
16              Q    Can you identify PX 3 as, in
17    fact, the authority matrix that existed at
18    TransCare at the relevant time -- the
19    relevant time today is 2015, 2016.
20              A    I believe it is, yes.
21              Q    And this was the -- this is
22    the document by which the management at
23    TransCare is instructed as to what authority
24    they have and what authority they have to
25    look to others for?
```

in re: TRANSCARE CORPORATION

Page 16

```
 1                      July 23, 2019
 2           A    With respect to the items
 3    listed here, yes.
 4           Q    And it basically lays out
 5    which things they have to go to -- it says --
 6    if you look at Schedule A, those are the
 7    items we're talking about, right?
 8           A    Correct.
 9           Q    So if there is an annual
10    operating plan and capital budget, that has
11    to be approved by Ms. Tilton?
12           A    The full board, yes, correct,
13    for TransCare.  That would be her.
14           Q    And the full board at the time
15    period we're talking about is Ms. Tilton?
16           A    Yes.
17           Q    And if you wanted to negotiate
18    or otherwise commit to any terms relating to
19    an acquisition or disposition or sale of the
20    company or its assets, that would also
21    require Ms. Tilton approval?  I'm looking at
22    2.
23           A    Yes.
24           Q    And, 6, even if you want to
25    disclose any information to anybody, not just
```

in re: TRANSCARE CORPORATION

Page 17

```
 1                      July 23, 2019
 2   suitors -- disclosing any financial or
 3   shareholder information of the company to any
 4   third party also would require Ms. Tilton's
 5   approval?
 6            A     Correct.
 7            Q     And to your knowledge -- let
 8   me ask, engaging legal counsel, for example,
 9   on 21, that would also require Ms. Tilton's
10   approval?
11            A     Correct.
12            Q     And issuing a WARN notice, or
13   taking any conduct which would require
14   issuing a WARN notice -- this is Item 33 --
15   that also required Ms. Tilton's approval?
16            A     I'm sorry.  Can you restate
17   the question one more time?
18                  THE COURT:  This document is
19            in evidence.  Can I just read it?
20                  MR. AMINI:  I'll move on, Your
21            Honor.
22            Q     When Mr. Leland first came on
23   to the company as a chief executive, he was
24   not aware of the authority matrix.  Once he
25   was hired on and was an executive, do you
```

in re: TRANSCARE CORPORATION

Page 18

```
1                      July 23, 2019
2   recall that?
3           A    Do I recall he was unaware of
4   it?
5           Q    Well, do you recall that he
6   didn't know it existed?
7           A    I wanted to make sure I
8   understood the question.  Yes, I recall from
9   an email, that that seemed to be the case.
10          Q    Yes, that would be -- it's JX
11  11 in your book.
12          A    Yes.
13          Q    Starting with the last email
14  in that -- on that document, which is the
15  first one time wise, 5th of February, 2015,
16  Mr. Leland had reached out to Mr. Pelissier
17  about the problem that had arisen about
18  paying payroll as of early February, 2015.
19  And ultimately that string, you became
20  included on it.  Do you recall that?
21          A    I do.
22          Q    And Mr. Leland was talking
23  about reaching out to others to see if he
24  could seek funding for the company at the
25  time, and Mr. Pelissier responded to him that
```

in re: TRANSCARE CORPORATION

Page 19

1                    July 23, 2019

2   talking with anybody about funding would

3   require board approval.  More specifically,

4   you should go through the authority matrix

5   with Brad -- that's Brad Schneider.  We've

6   already established that -- and more

7   specifically Brian.  He was referring to you.

8   And you were already included on that email

9   that he sent.  Do you recall that?

10          A    I do.

11          Q    And you responded to him on

12   the 15th of -- on the 5th of February 2015 at

13   9:08 -- 9:07 a.m.  This is your response to

14   Glenn.  Do you see that at the top?

15          A    I do.

16          Q    You told him to keep in mind

17   that a number of minority shareholders,

18   somewhere around 48 percent, in the company.

19   And these are more constituencies to

20   consider.

21          Do you see that?

22          A    I do.

23          Q    Was that true at the time?

24          A    Yes, I believed it to be true,

25   yes.

in re: TRANSCARE CORPORATION

Page 20

1                    July 23, 2019

2            Q    And Glenn ultimately asked you

3    for the authority matrix.  Do you see that?

4            A    I do see that.

5            Q    And so you sent it to him, and

6    then Glenn Leland said:  Reading the

7    authority matrix, there is a provision -- we

8    don't need to get into the detail -- that

9    provides for a designated executive to take

10   some decisions as opposed to the board.  And

11   there's also some references -- we don't need

12   to go back through them -- that you can do

13   things as long -- even though the require

14   board approval -- as long as they are part of

15   a company annual plan.  And you can do those

16   things.  And Glenn reached out to you and

17   asked:  Am I the designated executive and is

18   there an annual plan at that time.  Do you

19   recall?

20           A    I see that from his --

21           Q    And your response was:  We

22   don't have an approved plan and there is no

23   designated executive.

24           A    Correct.

25           Q    And you also advised him in

in re: TRANSCARE CORPORATION

Page 21

1                       July 23, 2019
2    that third paragraph of the last email in the
3    string that you were absolutely sure that
4    although we might have authority to probe any
5    offers that -- that Lynn would have to
6    approve any escalation and any financing
7    sources, correct?
8             A    I wrote to him that Lynn would
9    want to know and approve the exploration of
10   other financial sources, correct.
11            Q    I want to move to a different
12   topic.  Move with me to PX -- give me one
13   moment, mine are out of order -- PX 200.
14                 MR. AMINI:  There is no
15                 objection to the document, Your
16                 Honor.
17                 THE COURT:  No objection; it's
18                 received.
19            A    It's not in my book.
20                 THE COURT:  It's 200.
21            A    Mine goes from 146 to 221.
22            Q    Yours will be right after PX
23   3.  That's the next one.  Do you have it?
24            A    I apologize.  I do have it.  I
25   see it.

in re: TRANSCARE CORPORATION

Page 22

1                    July 23, 2019

2            Q     You were responsible, in

3    February of 2016, for taking the steps in

4    which Transcendence came into existence?

5            A     That's correct.

6            Q     And this is one of the

7    resolutions, one of the first resolutions you

8    drafted in that respect?

9            A     I believe it was, yes.

10           Q     And so on February 10th, you

11   drafted a resolution that appointed Glen

12   Youngblood to be the president of

13   Transcendence II; is that right?

14           A     That's correct, yes.

15           Q     And, of course, you attached

16   also in the resolution -- you referred to and

17   attached the authority matrix that we saw

18   previously with respect to TransCare, the

19   same authority matrix with respect to

20   Transcendence?

21           A     Only one-page is here.  I am

22   assuming that's the one.

23           Q     We likely left off the second

24   page.  And you also -- if you go to DX 133,

25   you also incorporate -- you were responsible

in re: TRANSCARE CORPORATION

Page 23

1                    July 23, 2019
2    for undertaking the steps that would
3    incorporate the company under the state laws
4    of Delaware?
5              A    Correct.
6              Q    And the documents that are in
7    DX 133 are the result of those steps that you
8    took?
9              A    Some of them.  I'm not sure
10   about the very last page, which is an
11   organization by the incorporator naming Glen
12   Youngblood, director.  I'm not sure if it
13   capped out or not but the rest of the
14   documents seem to comply with Delaware,
15   yes -- I don't know if that's the resolution,
16   but it may not matter.
17             Q    That's fine.  To your
18   understanding, Ms. Tilton was going to be the
19   director of both Transcendence and
20   Transcendence II?
21             A    Yes.
22             Q    And that's what everybody
23   understood at the time, to the best of your
24   recollection?
25             A    I'm not sure who "everybody"

in re: TRANSCARE CORPORATION

Page 24

1                        July 23, 2019
2    is.
3              Q    Fair enough.
4              A    That's what I understood.
5              Q    That's what you understood.
6    It says in the certificate of corporation
7    that the corporations are authorized to
8    issue, in this case, 1,000 shares of common
9    stock.  Do you see that?
10             A    I do see that, yes.
11             Q    And no common stock was ever
12   issued to your knowledge, was it?
13             A    No.
14             Q    And no shares -- and in fact,
15   there's no share register to your knowledge?
16             A    No.
17             Q    And, in fact, as you sit here
18   today, you don't know who owns the shares of
19   these corporations, do you?
20             A    No, I think that we covered
21   that in the deposition.  And I'm not sure
22   who, under Delaware law, owns the corporation
23   when the shares haven't been issued.  That's
24   correct.
25             Q    To your knowledge, there are

in re: TRANSCARE CORPORATION

Page 25

1                        July 23, 2019

2    no records at Patriarch, any of these

3    Patriarch entities, that tell you who these

4    shares should go to for Transcendence or

5    Transcendence II?

6              A    No, not to my knowledge.

7              Q    Is it because you just didn't

8    get around to it at the time or something

9    else?

10             A    Actually, just on the last

11   answer, Transcendence II was to be owned by

12   Transcendence directly so that's a known

13   thing.  I just did not get around to issuing

14   the shares for this.  It just fell apart --

15             Q    To issuing shares for

16   Transcendence I, correct?

17             A    Yes.

18             Q    The parent.  And did you have

19   any instructions on who to give those shares

20   to?

21             A    No.

22             Q    So you didn't get around to

23   getting any instructions for who the shares

24   went to go to?

25             A    I did not.

in re: TRANSCARE CORPORATION

```
                                        Page 26
 1                    July 23, 2019
 2           Q    Did you have any understanding
 3    who would determine who got what shares?
 4           A    It was my understanding that
 5    Lynn would determine who got those shares.
 6           Q    Did she ever communicate to
 7    you who would get those shares?
 8           A    She did not.
 9           Q    Just so I'm -- to wrap this
10    little piece up, go with me to JX 73.  Upon
11    incorporation --
12           A    The email to Bob Siegel.
13           Q    Yes, Mr. Mercado's email to
14    Bob Siegel.  He's in finance, if I'm not
15    mistaken.  Am I right?  At Patriarch?
16           A    Correct.
17           Q    He cc'd you on it?
18           A    Correct.
19           Q    You got this email on or about
20    February 10, correct?
21           A    Apparently, yes.
22           Q    And part of the process of
23    incorporating Transcendence and Transcendence
24    II also included asking Patriarch's insurer
25    to put these entities into Patriarch's global
```

in re: TRANSCARE CORPORATION

Page 27

```
 1                    July 23, 2019
 2   directors and officers policy?
 3              A    I don't know if that's the
 4   case, whether this is Patriarch Partners,
 5   LLC's policy or whose policy it was.
 6   Whichever policy or policies it's referring
 7   to, yes.  Transcendence Transit and
 8   Transcendence Transit II would be added to
 9   that policy.  But I don't recall which policy
10   that would have been.  It may not make a
11   difference, but I don't recall.
12              Q    I want to move on, different
13   topic.  You were also responsible for hiring
14   bankruptcy counsel for TransCare, were you
15   not?
16              A    I was not responsible for
17   that, no.
18              Q    Well, you were the first
19   person to reach out to bankruptcy counsel,
20   were you not?
21              A    I was asked to contact
22   bankruptcy counsel by Lynn, but I was not
23   responsible for it.
24              Q    What were you doing, if you
25   weren't responsible?  You were just a
```

in re: TRANSCARE CORPORATION

Page 28

1                        July 23, 2019

2    messenger?

3              A    I don't even know what you

4    mean by "responsible," clearly I was the

5    messenger.  She asked me to engage counsel,

6    so I engaged counsel.

7              Q    Ms. Tilton asked you to engage

8    counsel, bankruptcy counsel?

9              A    She did.

10             Q    In February early February --

11   we're going to go to JX 72 next, Joint

12   Exhibit 72.  And you went out and looked at

13   some possible counsel to hire, right?  You

14   talked to more than one?

15             A    I don't remember if I did

16   speak to more than one.  But if I did speak

17   to more than one, I didn't make a choice

18   between the three.  I don't recall choosing

19   one over the other.  It may have been the

20   first one to call me back.

21             Q    Who chose -- if you know, who

22   chose bankruptcy counsel?

23             A    I was provided with referrals

24   from another law firm.  I don't remember

25   which law firm that was.  And I just made

in re: TRANSCARE CORPORATION

Page 29

1                          July 23, 2019

2   calls.  And they were the first one to get

3   back to me.  I don't remember exactly how it

4   happened.

5              Q     And they got back specifically

6   to you?

7              A     I believe they did, yes.

8              Q     And this is -- this is your

9   email, this February 9, 2016 email at 10:06

10  p.m.  This is an email that you sent to Lynn

11  Harrison at -- I think it's Curtis, Mallet,

12  correct?

13             A     Correct.  It says it's

14  forwarded.  Ultimately this went to Lynn

15  Harrison.  I don't know why it says

16  forwarded.  Yes.

17             Q     Is this not an email that you

18  wrote to Mr. Harrison on February 9, 2016?

19             A     I don't think I'm disputing

20  that, I'm just saying this was --

21             THE COURT:  Whether he hired

22        him first or he contacted him, we

23        established that.  Let's move on.

24             Q     It says here the third

25  paragraph, The company we would like to file

in re: TRANSCARE CORPORATION

Page 30

1                    July 23, 2019

2    is TransCare, which is a Delaware

3    corporation.

4              A    Second-line, yes.

5              Q    Right.  What were you filing?

6              A    I think the idea was to file a

7    Chapter 11 at that time.

8              Q    And you gave him a list of who

9    you wanted the Chapter 11 filed for?

10             A    Correct.

11             Q    And you excluded from that

12   list, did you not, Pennsylvania and Hudson

13   Valley?

14             A    Correct.  I'm not sure there

15   was another that was also included.

16             Q    I think it was TC Ambulance

17   corp. but I'm not sure of that either.

18   That's what it says here.  But to the best of

19   your recollection there were two or three

20   entities that were excluded?

21             A    Correct.

22             Q    And why did you exclude them?

23             A    Because of the time, the plan

24   was that the lenders would -- the secured

25   lenders would foreclose on certain TransCare

in re: TRANSCARE CORPORATION

1                        July 23, 2019

2    assets, and those assets would lead to start

3    another business, Transcendence Transit

4    business, and the remainder of TransCare

5    would be wound down, but it would still

6    continue to operate.

7              Q    And then you explain also to

8    Mr. Harrison the capital structure, or at

9    least the -- as it relates to loans or

10   lending in your email as well, do you not?

11   I'm starting with Wells Fargo is the

12   company's ABL lender.

13             A    Correct.

14             Q    And then under that you put:

15   The lenders under a term loan are funds

16   managed by Patriarch Partners, and you list

17   these four, Arc Investment, and the three

18   Zohars.

19             Do you see that?

20             A    I do.

21             Q    Arc is what we call Arc II in

22   this case, right?

23             A    No.

24             Q    It's -- Arc Investment

25   Partners II, L.P. is one of Ms. Tilton's

in re: TRANSCARE CORPORATION

Page 32

```
 1                      July 23, 2019
 2   funds?
 3           A     Correct.
 4           Q     And the Zohar are the ones
 5   that we have been talking about that were
 6   managed by -- as administrative --
 7   administered by PPAS, correct?
 8           A     Right.
 9           Q     Is there some reason you left
10   the Credit Suisse people off this list?
11           A     No reason at all.  It was just
12   a mistake.
13           Q     You just forgot them?
14           A     Yeah.  Since I provided them
15   with the credit agreement, it was just a
16   mistake.
17           Q     And is there some reason the
18   Arc II loan which came in right at this time,
19   the one covering the January 15 and the
20   January 29th loans, was there some reason
21   that was left off this list?
22           A     No.
23                 MR. MERVIS:  Objection --
24                 object to the question, Your Honor.
25                 THE COURT:  What is the
```

in re: TRANSCARE CORPORATION

Page 33

1                    July 23, 2019
2           objection?
3              MR. MERVIS:  I'll withdraw.
4              THE COURT:  Right.  You.
5              Can answer the question.
6           A    I don't know why they didn't
7    include it.  I didn't leave it off the list
8    for any particular reason.  I'm also not sure
9    if it was a big deal.  I don't know why it's
10   not there.
11          Q    And you -- and ultimately you
12   hired Curtis -- Curtis Mallet was, in fact,
13   hired by TransCare as counsel?
14          A    Yes.
15          Q    And to your knowledge, Lynn
16   Tilton made that decision?
17          A    Yes.
18          Q    Was anybody at the company
19   consulted on that, if you know, at TransCare?
20          A    No.
21          Q    And if you look up here, just
22   so we get the names -- in addition to
23   Mr. Harrison, Lynn Harrison, the other person
24   who principally worked on it was Cindi
25   Giglio?

in re: TRANSCARE CORPORATION

Page 34

1                   July 23, 2019

2            A    Giglio.

3            Q    Giglio.  And there is a Peter

4    Buenger?

5            A    Buenger.

6            Q    He is the associate on there;

7    is that fair?  Or you don't know?

8            A    I don't know.

9            Q    But you worked with both of

10   them as well?

11           A    Yes.

12           Q    And in the subsequent days you

13   worked with both of them, did you not, after

14   hiring them?

15           A    Mainly Lynn Harrison and Cindi

16   Giglio.

17           Q    And if you go with me to JX

18   77, that's the engagement letter, is it not?

19           A    Yes.

20           Q    And you -- you were

21   instrumental in getting the document,

22   reviewing it, getting it signed, and giving

23   it back, were you not?

24           A    I would have reviewed it and

25   said -- and let Lynn know the terms and

in re: TRANSCARE CORPORATION

Page 35

1                          July 23, 2019

2      summarize the terms for Lynn, yes.

3              Q      And you would have reached out

4      and got the company -- Peter Wolf signed it,

5      do you see that?

6              A      Yes, I see that.

7              Q      And you would have reached out

8      and gotten Mr. Wolf to sign it and send it

9      back, correct?

10             A      Probably.

11             Q      At this point, are you aware

12     of whether the Curtis Mallet firm had any

13     contact with management of TransCare or not?

14             A      At this point I was not aware

15     of any contact with TransCare.

16             Q      In fact, they reached out to

17     you on the following day and asked about

18     contact with management.  Let's just turn to

19     it.

20             A      Yeah, I think it's 78.

21             Q      JX 78.  You've got it.  This

22     is a -- this is an email between yourself and

23     Ms. -- I'm going to mispronounce --

24             A      Giglio.

25             Q      -- Ms. Giglio, on February 11,

in re: TRANSCARE CORPORATION

Page 36

1                      July 23, 2019

2    is it not?

3              A    Yes.

4              Q    And among other things

5    Ms. Giglio says, If we're going to prepare

6    Chapter 11 cases -- I'm looking now at the

7    second paragraph, all right?  While you have

8    been very helpful, it would be extremely

9    unorthodox to file without having an in-depth

10   understanding of the company and the

11   relationship with the people on the ground

12   that are working with the company on a daily

13   basis.  Can you please let us know who we can

14   reach out to tonight?

15             A    Correct.

16             Q    Did you do that?  Did you let

17   them know?

18             A    I don't recall.  At some point

19   there was contact with Curtis Mallet.  I

20   don't remember when that happened.  I just

21   don't remember.

22             Q    When you said there was

23   contact with Curtis Mallet, there was contact

24   between who?

25             A    I don't remember -- I don't

in re: TRANSCARE CORPORATION

Page 37

1                          July 23, 2019

2    know who at Curtis Mallet.

3              Q    And at this point, Curtis

4    Mallet was also in contact with Wells Fargo's

5    counsel.  Do you recall that?

6              A    From this email, correct.

7              Q    That's why we put it in front

8    of you.  The reference to:  We have received

9    a call from Otterbourg, right?  That's a

10   reference to whom you understood at that

11   point Wells Fargo had engaged in this

12   process?

13             A    Correct.

14             Q    And she says they have

15   concerns about filing a Chapter 11 case on

16   Monday, but they also seem amenable to

17   working with the company either in or out of

18   Chapter 11 provided they see an acceptable

19   budget and 13-week cash flow.

20             Do you see that?

21             A    I do.

22             Q    Did you understand that to be

23   the case at the time?

24             A    I would really not have

25   understood that outside of this email of

in re: TRANSCARE CORPORATION

Page 38

1                      July 23, 2019

2    what -- what Wells Fargo wanted.  I did not

3    know what Wells Fargo wanted before I got

4    this email.  After reading this email, I

5    thought that to be the case.

6              Q    Do you report this to anyone?

7              A    I don't recall.

8              Q    Did you report this to Ms.

9    Tilton?

10             A    I don't recall.

11             Q    As you sit here, do you have

12   any understanding how Otterbourg or Wells

13   Fargo would know about any Chapter 11?

14             A    As I understand it, there were

15   conversations between Lynn and folks at Wells

16   Fargo about a plan -- about the proposed

17   restructuring for the company.

18             Q    And did you see the request

19   for a budget and a 13-week cash flow?

20             A    I do see that.

21             Q    Did you communicate that to

22   anyone?

23             A    I don't know.

24             Q    Did you ever see a budget in

25   this context, the budget they wanted?

in re: TRANSCARE CORPORATION

Page 39

1                    July 23, 2019

2            A    I think there is an email of a

3    budget somewhere here, but, yes, I typically

4    would not look at budget emails but I

5    remember there being an email in the

6    deposition that attached the budget, so I

7    don't know if that's the budget she means.

8            Q    Do you recall any budget that

9    was sent to Wells Fargo?

10           A    That wouldn't necessarily have

11   come from me.

12           Q    I paused to skip something.

13   Go with me, if you would, to JX 79.  Is that

14   an email that you sent to Peter Buenger, I

15   guess, B-U-E-N-G-E-R, on or about February 11

16   at 8:01 p.m.?

17           A    Is it JX 79?

18           Q    Yes.  JX 70.  Skip PX 197.

19   We'll skip around a little bit, Mr. Stephen,

20   because we've covered a lot of this and we're

21   not going to go back over it.

22           A    I see it, yes.

23           Q    You got it?

24           A    Yes.

25           Q    Is that an email you sent to

in re: TRANSCARE CORPORATION

Page 40

1                    July 23, 2019

2    Peter Buenger on or about February 11?

3              A    Yes.

4              Q    And you were enclosing what we

5    call the Arc II loan agreement, were you not?

6              A    Yes.

7              Q    And Mr. Wolf had signed it at

8    that point.  You can see it at 49032, if you

9    want to see a signature.  Bates stamp 49032.

10   I think that's his signature.

11             A    Yes, I see a signature.  I

12   think, yeah.

13             Q    Do you know if this is the

14   first time you had a signed copy of this

15   agreement?

16             A    I don't know that I would have

17   necessarily have seen the signed copy of this

18   agreement.  We had lending lawyers that would

19   have drafted this agreement and prepared it.

20   So I may or may not have seen a signed copy

21   of the agreement before this time.

22             Q    We saw your earlier email on

23   February 9 in which you included some loan

24   information and this wasn't included.  Was it

25   not included because you didn't have it that

in re: TRANSCARE CORPORATION

Page 41

1                    July 23, 2019
2    day?
3              A    I don't know why I didn't
4    include it.  But since I also didn't include
5    Credit Suisse, I clearly missed a few things
6    in that email.
7              Q    About this point in time, is
8    it fair to state that you start working on
9    various documents related to the filing of
10   bankruptcy and foreclosure of certain assets
11   with respect to TransCare?
12             A    I think that is probably fair.
13             Q    You don't have a recollection
14   of it?
15             A    Yeah, I believe I did.  Your
16   question is so broad, I want to make sure I'm
17   not responding to the wrong question.  But,
18   yeah, I believe that's probably true.
19             Q    Well; let's talk about the
20   agreements.  There was a foreclosure, there
21   was a default notice, correct?
22             A    Correct.
23             Q    And there was, in connection
24   with the default notice, there was an
25   acceptance of the collateral and return for

in re: TRANSCARE CORPORATION

Page 42

1                         July 23, 2019

2    reducing the term lenders loan the company

3    was asked to acknowledge, correct?

4              A    That's correct.

5              Q    You were at this point in time

6    working on those, were you not?

7              A    I was not.

8              Q    And then there was a

9    transition -- we'll get to it in a minute --

10   you were going to start working on a

11   transition services agreement?

12             A    That I recall, yes.

13             Q    And that was going to be

14   between TransCare and the new entity,

15   Transcendence, to arrange for certain

16   services as between them once the foreclosure

17   and filing happened?

18             A    Correct.

19             Q    You know what, go with me to

20   PX 178 for a moment.

21                  MR. AMINI:  This is the

22             privilege log in this case, Your

23             Honor.  I want it for purposes of

24             establishing the timeline.  That's

25             my use for it.  It has notations of

in re: TRANSCARE CORPORATION

Page 43

1                    July 23, 2019

2              his name on certain documents on

3              certain dates.  That's got an

4              objection on hearsay and lacks

5              relevance.

6                   THE COURT:  I'm not sure what

7              the relevance is.  I don't know if

8              it's hearsay.  But what is that you

9              want to use this for?

10                  MR. AMINI:  I just want to

11             establish the timeline.  I just

12             want to establish that he was

13             working on these documents on

14             February 10th and 11th.

15                  THE COURT:  Why don't you ask

16             him?

17                  MR. AMINI:  I did, and he said

18             to me, "I don't really remember."

19             A    You didn't ask that question.

20    You asked if I worked on those.  And I think

21    at my deposition I said that they had

22    Patriarch Agency Services had counsel so that

23    counsel drafted those documents.  I think

24    that was what I said before.

25                  THE COURT:  There's no

in re: TRANSCARE CORPORATION

Page 44

1                       July 23, 2019

2              question pending, Mr. Stephen.

3                   THE WITNESS:  I'm sorry.

4                   THE COURT:  Why don't you ask

5              him to each particular document,

6              whether he worked on it or what he

7              did with it.

8         Q    Did you review PPAS' notice of

9    acceptance that was going to go with the

10   foreclosure?

11             A    Which document is that?

12             Q    It's called a notice of

13   acceptance.

14             A    No, I understand the name, but

15   which one is it?  The one I looked at, no, I

16   did not, so I want to be sure.

17                  THE COURT:  Do we have the

18             documents in this binder?

19                  MR. MERVIS:  They're joint

20             exhibits.

21                  THE COURT:  Show me the

22             document.

23                  MR. AMINI:  Here it is.  It's

24             JX 96.  It's more than halfway

25             through the book.  It's after 146.

in re: TRANSCARE CORPORATION

Page 45

1                    July 23, 2019

2              96, 221, 95.

3              A    I do see the notice of

4    acceptance.

5              Q    And that was sent out at --

6    you sent it out at 12:07 a.m.

7              A    Correct.

8              Q    On February 24th.

9              A    Correct.

10             Q    To Peter Wolf.

11             A    Correct.

12             Q    And my only question was --

13   then on -- were you looking at -- were you

14   drafting and looking at this two weeks

15   before, on February 11th?  And I'm reading

16   from the privilege log.  I'm not hiding

17   anything here.

18             A    I may have.  I know I spent

19   more time on Schedule A to the document.  So

20   to say I worked on the whole document is not

21   true or accurate.

22             Q    Scheduled A is the list of

23   items that are being foreclosed upon?

24             A    Correct.

25             Q    You worked more on that?

in re: TRANSCARE CORPORATION

Page 46

1                        July 23, 2019

2                A     Yes.  I worked more on that.

3                Q     As long as we're on JX 96,

4     prior to this date, February 24, 2016, at

5     12:07 a.m., any of these documents that you

6     worked on, did you share them with anybody at

7     TransCare?

8                A     Well, I didn't work on the

9     documents itself.  I'm not sure about the

10    schedule.  But I would not have shared

11    documents I didn't work on.  So I did not

12    share the notice with the company, no.

13               Q     Is it fair to state that this

14    email to Peter Wolf at 12:07 a.m. on February

15    24th is the first time you have any knowledge

16    that he's receiving such a document?

17               A     It's probably fair.  The first

18    time that I had personal knowledge of it,

19    yes.

20               Q     And do you have knowledge of

21    anybody else sending such a document to him

22    prior to that February 24th at 12:07 a.m.?

23               A     I do not know anyone else that

24    sent Peter a document.  No, I don't have

25    knowledge.

in re: TRANSCARE CORPORATION

Page 47

1                    July 23, 2019

2            Q    And had you told

3    Mr. Stephen -- had you told Mr. Wolf to be

4    expecting this document?

5            A    I don't remember.

6            Q    To your knowledge, had anybody

7    spoken to Mr. Wolf about this document before

8    you sent it to him?

9            A    I really don't remember.

10           Q    Did Mr. Wolf have counsel, to

11   your knowledge, with respect to this

12   document?  Again, they're actually two

13   documents.  Why don't we get the two

14   documents out of the way first.  You sent

15   him, on that morning at 12:07 a.m., you sent

16   him a notice of acceptance of subject

17   collateral or partial satisfaction of

18   obligation, correct?

19           A    Correct.

20           Q    And you wanted his

21   acknowledgment of the occurrence of default

22   and agreement with the terms of the letter

23   under which PPAS was going to accept the

24   subject collateral in satisfaction of $10

25   million of the term loan lenders' debt; is

in re: TRANSCARE CORPORATION

Page 48

1                         July 23, 2019

2    that correct?

3                A    That's not what my email says.

4    I did not ask him to sign it and return it.

5    I may have done it in a different

6    communication.  But I did not do that here.

7                Q    To your knowledge, who asked

8    him to sign this on that day?

9                A    I don't know.  It may have

10   been me.  I don't recall.

11               Q    The document you were sending

12   him was requested that he acknowledge such a

13   thing.  You understood that?  Did you know

14   what this document asked for when you sent it

15   to him?

16               A    Yes.

17               Q    And then you sent -- along

18   with that you sent -- that document has

19   attached to it as Schedule A the subject

20   collateral there is the document you said you

21   worked on, right?

22               A    Correct.

23               Q    So this you have personal

24   knowledge of, the subject collateral?

25               A    Correct.

in re: TRANSCARE CORPORATION

Page 49

1                        July 23, 2019

2               Q    And then you also sent a

3     notice of default and acceleration?

4               A    That was the tapped to the

5     email as well, yes.

6               Q    And you had it signed not only

7     by Patriarch Partners Agency Services, LLC,

8     but it was signed by Zohar, Zohar, Zohar, and

9     Arc II Investments?

10              A    I did not have it signed, but

11    it was signed by those entities.

12              Q    Ms. Tilton signed for all of

13    those?

14              A    Yes.

15              Q    Is there any reason Credit

16    Suisse and First Dominion are not on this

17    document?

18              A    Not that I know.

19              Q    And the same with -- let's go

20    back and do the same thing with the notice of

21    acceptance of subject collateral and partial

22    satisfaction.  Is there some reason Credit

23    Suisse and First Dominion are not on this

24    document?

25              A    I don't know.

in re: TRANSCARE CORPORATION

Page 50

                                July 23, 2019

1

2           Q    That $10 million that was

3    being credited for the collateral, did any of

4    that get attributed to Credit Suisse, First

5    Dominion's share of the term loans?

6           A    I don't know.

7           Q    Do you know who it got

8    credited to?

9           A    No, I would not have worked on

10   that.  So, no, I don't know.

11          Q    Do you know of any records

12   that actually show who it got credited to,

13   other than a claim filed in this court?

14          A    Outside of the claim, I don't

15   know of anything.  I don't know.

16          Q    Do you know how somebody filed

17   a claim without records to refer to?

18               MR. MERVIS:  Objection to the

19          form.

20               THE COURT:  He said he doesn't

21          know.  Don't ask him to speculate.

22          Ask him what he knows about.

23               MR. AMINI:  I'm sorry.

24          Q    Let me go back.  When you sent

25   this over to Mr. Wolf, there's nobody else on

in re: TRANSCARE CORPORATION

Page 51

1                        July 23, 2019

2    the email, right?

3              A    I sent a copy to Financial and

4    Investment Law, which is an email address for

5    lawyers within Patriarch Partners, LLC who

6    were responsible for the lending

7    relationship.

8              Q    Like Peter Ruffini?

9              A    Yes.  Or Adam Catz, yes.

10             Q    The two of them constitute

11   that, to the best of your knowledge?

12             A    There may have been a

13   paralegal there as well.  I'm not sure who

14   else was there with them at the time.

15             Q    The company had outside

16   counsel at that point, did it not?

17                  THE COURT:  Which company?

18                  MR. AMINI:  TransCare.

19             A    It had bankruptcy counsel,

20   yes.  With a copy to Curtis Mallet.  I didn't

21   send it to Curtis Mallet.

22             Q    Did you have authority from

23   the board to send this document?

24             A    I don't recall Lynn asking me

25   to send this document.  I don't recall that,

in re: TRANSCARE CORPORATION

Page 52

1                    July 23, 2019

2    no.

3            Q    Who asked you to send it?

4            A    I may have sent it to

5    Investment Financial Law since they weren't

6    in the office.  But I did not speak with Lynn

7    directly about that, no.

8            Q    Is there a resolution to your

9    knowledge that authorizes the entry into the

10   notice of acceptance of subject collateral

11   and partial satisfaction of obligation on

12   behalf of TransCare?

13           A    I don't believe so.  I didn't

14   draft it.

15           Q    But to your knowledge -- we

16   don't need to go back to the authority

17   matrix -- in order for Peter Wolf to sign

18   this, he would need the board's approval,

19   would he not?

20           A    Probably, yeah.  We would have

21   to look at the authority matrix specifically.

22           Q    As I understood it from your

23   deposition, you don't know why you actually

24   sent this to Mr. Wolf, do you?

25           A    No.

in re: TRANSCARE CORPORATION

Page 53

1                     July 23, 2019

2              Q    And you didn't know its

3     purpose at the time?

4              A    I know what the documents say,

5     yes.  I don't know why I was the first to

6     send it to him, but I know what the documents

7     say.

8              Q    You are aware of the fact that

9     Mr. Wolf ultimately signed the document, are

10    you not?

11             A    I am.

12             Q    He signed it on that day

13    before the bankruptcy was filed later that

14    evening?

15                  THE COURT:  Which document.

16                  MR. AMINI:  I'm sorry.  You're

17                  right, Your Honor.  Within JX 96 he

18                  signed the notice of acceptance of

19                  subject collateral and partial

20                  satisfaction of obligation.

21                  THE COURT:  Which page is the

22                  signature.

23                  MR. AMINI:  In this exhibit

24                  4336 and it goes to --

25                  THE COURT:  That's the

in re: TRANSCARE CORPORATION

Page 54

1                     July 23, 2019

2           signature where is the signature I

3           know the acknowledgment started I

4           don't see it.

5                MR. AMINI:  Your Honor I'm

6           sure I have it I don't know where

7           it is.

8                THE COURT:  I've seen it in

9           some other Mr. Sam it will find it

10          and tell us that so we can

11          establish that and be done.

12          Q   Go with me if you would at

13     this point, I want to make sure --

14               THE COURT:  Is this a copy of

15          the email of you sent to Mr. Wolf

16          with the acknowledgement?

17               THE WITNESS:  I'm sorry.

18          Somebody coughed.

19               THE COURT:  In other words,

20          was this a complete copy of what

21          you sent to Mr. Wolf.

22          A   I think it is, yes.

23          Q   Let's take a look the at

24     schedule A you did prepare the subject

25     collateral you worked on.  Which is

in re: TRANSCARE CORPORATION

Page 55

```
 1                        July 23, 2019
 2    Bates-stamped 43310?
 3             A    Yes.
 4             Q    This is the collateral that --
 5    this is the collateral that, ostensibly under
 6    this document, was being foreclosed on by the
 7    term loan members?
 8             A    Yes.
 9             Q    And the term loan lenders had
10    an agreement did they not with Wells Fargo
11    since Wells Fargo had a complete lean on
12    everything on which they had priority over
13    concern of the collateral, right?
14             A    I believe there is a
15    collateral lone between the determine loan.
16             Q    You're familiar with the
17    intercreditor agreement did you not?
18             A    I didn't work on it I know it
19    exists.
20             Q    You didn't refer to it when
21    you drafted this?
22             A    I mentioned that had counsel
23    so that's not something I would need to do.
24             Q    So you -- I'm just curious
25    when you worked on the subject collateral,
```

in re: TRANSCARE CORPORATION

Page 56

```
1                    July 23, 2019
2   the notice, were you -- you weren't looking
3   at it for substance you were looking at it
4   for something else?
5              A    I was advised beacons that he
6   will this was appropriate.
7              Q    Okay.  Do you know who
8   selected these items for inclusion on the
9   subject collateral?
10             A    I don't recall specifically,
11  no.
12             MR. AMINI:  Your Honor, I
13             would like to show him JX 3 it's
14             the intercreditor agreement that
15             book was too large.  DX 174 we'll
16             move into evidence it has Mr. Wolf
17             signature on it if you have no
18             objection, I can bring it on the?
19             THE COURT:  I seen the
20             agreement I was wouldn't why it
21             wasn't sent to Mr. Wolf.
22             MR. AMINI:  The acknowledgment
23             the signed -- his death is on 173.
24             THE COURT:  There's no
25             acknowledgment that I can see that
```

in re: TRANSCARE CORPORATION

Page 57

1              July 23, 2019

2          Mr. Stephen sent to Mr. Wolf.

3              MR. AMINI:  It's missing, I

4          actually didn't notice that Your

5          Honor I'm sorry.  If we can ask for

6          DX 174, I can put it on the screen

7          and ask a question.

8              THE COURT:  There's an

9          intercreditor a agreement.

10             MR. AMINI:  Can I show him a

11         copy.

12             THE COURT:  What's the

13         question is there objection is

14         there any objection to the

15         intercreditor agreement.

16             MR. MERVIS:  No I need to see

17         the agreement to make sure it's the

18         intercreditor agreement.

19             THE COURT:  Which is that

20         exhibit.

21             MR. AMINI:  JX 174.

22             MR. MERVIS:  No objection.

23             THE COURT:  JX 3 is in.

24             MR. AMINI:  Your Honor the

25         acknowledgment is in fact, included

in re: TRANSCARE CORPORATION

Page 58

1                    July 23, 2019

2            in.

3                    THE COURT:  It is where --

4            A    JX 96 you were looking at its

5    after all of Ms. Tilton's signatures.

6                    THE COURT:  On which document.

7            Q    It's 43308 if you look those

8    are her signatures, nine?

9                    THE COURT:  I saw a different

10           acknowledgment.

11           Q    This in fact I might as well

12   do it with the witness this it is what you

13   understood Mr. Wolf would be signing if he

14   agreed?

15           A    I believe so, yes.

16           Q    And if we can have an

17   agreement that PX 174 -- Defendants' Exhibit

18   174 is admitted because it has the signature

19   on it?

20                   THE COURT:  Any objection.

21           A    I'm for the confusion.  Now I

22   want to ask about the intercreditor

23   agreement.

24                   THE COURT:  What do you want

25           to.

in re: TRANSCARE CORPORATION

```
                                              Page 59

 1                       July 23, 2019

 2              Q    If it's familiar ever seen it

 3      and bluntly under which category does a tick

 4      thing?

 5              THE COURT:  Can't I read it

 6              and determine it?  I don't need him

 7              to tell me what the intercreditor

 8              agreement says.

 9              MR. AMINI:  I understand that.

10              But the intercreditor agreement has

11              a list of what the collateral is.

12              The term loan lender's collateral

13              is.  It's a list of I think 8 our

14              12 items on the back, and I would

15              like to know if he has any

16              knowledge of which one the MTA

17              contract falls under.  He may not.

18              THE COURT:  Actually, it's not

19              a physical asset.  It's not an

20              account.

21              MR. MERVIS:  If he knows, he

22              knows.

23              MR. AMINI:  I don't know who

24              else to ask.  I mean, I think --

25              THE COURT:  I don't --
```

in re: TRANSCARE CORPORATION

Page 60

1                    July 23, 2019

2              whatever it says, it says.  And

3              that's who's got the first lien on

4              it.  And if it doesn't say, how is

5              he supposed to know?

6                   MR. AMINI:  Your Honor, if

7              there is a provision in it -- doing

8              this in the abstract.

9                   THE COURT:  Who has the lien?

10             Is this the MTA contract?

11                  MR. AMINI:  Yes.

12                  THE COURT:  So what does the

13             intercreditor agreement say?

14                  MR. MERVIS:  I believe it's an

15             intangible, so I would need to look

16             at it.  I'll tell you this, I think

17             what the evident is going to show

18             is it was foreclosed upon to the

19             extent that the creditor had a

20             right to do so ultimately.

21             Ultimately it wasn't, I guess

22             that's the short answer because the

23             contract with the MTA requirements

24             assignment, and on my examination

25             you'll find out they didn't assign

in re: TRANSCARE CORPORATION

```
                                           Page 61
  1                     July 23, 2019
  2            it.
  3                 THE COURT:  Well, before we
  4            get to that, what is the
  5            relationship between the
  6            intercreditor agreement and what he
  7            has to testify to.  I want to move
  8            this along.
  9                 MR. AMINI:  There are seven
 10            items in the intercreditor
 11            agreement they're listed as term
 12            loan priority collateral.  I don't
 13            profess to be in a position to say
 14            as a matter of law the MTA doesn't
 15            fall.
 16                 THE COURT:  Was the argument
 17            that they were foreclosing on
 18            collateral that they a second lien
 19            on?  Is that what you're arguing?
 20                 MR. AMINI:  The argument is
 21            they're foreclosing on collateral
 22            that they had a second lien on that
 23            their agreement with Wells Fargo
 24            prohibited them from foreclosing
 25            on, and it goes to intent.  Because
```

in re: TRANSCARE CORPORATION

```
                                                 Page 62
   1                       July 23, 2019
   2               if they can't tell me what it falls
   3               under, then at least I have the
   4               implied argument that they were
   5               just ignoring it.  If they have a
   6               provision that they fell under,
   7               then they can tell me what it was.
   8                    THE COURT:  Did you consult
   9               the creditor, the inter-creditor
  10               agreement when you drafted or
  11               prepared the schedule.
  12                    THE WITNESS:  Counsel did.  I
  13               did not.
  14                    MR. AMINI:  All right.
  15               Q    I want to talk to you briefly
  16      about the transition services agreement.
  17      During the same time that you were working on
  18      Exhibit A, Schedule A, to the settlement,
  19      were you also working on a transition service
  20      agreement?
  21               A    Correct.
  22               Q    You asked the Curtis Mallet
  23      folks, did you not, to send you a sample of
  24      the transition services agreement?
  25               A    I did.
```

in re: TRANSCARE CORPORATION

Page 63

1                      July 23, 2019

2           Q    Do you recall that?

3           A    I do.

4           Q    And they sent you one,

5    correct?

6           A    Correct.

7           Q    And they sent you one right

8    around February 12; do you recall that?

9           A    I know I received it.  I don't

10   know the date, but I know I received it.

11          Q    Just take a quick look at DX

12   137 and 138.

13               And it's only simply to

14   establish that you asked for it on February 12

15   and Ms. Gilio sent you a sample on February

16   12.

17          A    I see that, yes.

18               MR. MERVIS:  I don't know if

19          he's offering.

20               MR. AMINI:  I am.

21               MR. MERVIS:  Then I don't

22          object.  I just wanted to make sure

23          they got the record.

24               MR. AMINI:  Thank you.

25               THE COURT:  It's your exhibit.

in re: TRANSCARE CORPORATION

```
                                                    Page 64
 1                       July 23, 2019
 2              It's received.
 3              Q    And you worked on that for
 4  some period of time, did you not?
 5              A    I did.
 6              Q    Okay.  Did you share that with
 7  anyone at the company?
 8              A    People from the company helped
 9  to develop the services that would be shared,
10  so yes.
11              Q    Did you share the agreement
12  itself, or did they just help you develop the
13  services?
14              A    I think they focused on the
15  services.
16              Q    Actually take a look at PX
17  213, if you would.
18                   MR. AMINI:  There's no
19              objection to this document.
20              Q    When you say people worked on
21  it, those people would have principally Glenn
22  Leland and Peter Wolf, would they not?
23              A    Yes.  This looks like my
24  colleague sent the agreement.
25              Q    And you were copied on this on
```

in re: TRANSCARE CORPORATION

Page 65

1                    July 23, 2019

2    February 17, correct?

3             A    Yes.  Correct.  The latest

4    version, I don't know that I received any

5    before this, but yes.

6             Q    And you were, at the time,

7    working on the transition services agreement

8    yourself, the document itself?

9             A    Along with my colleague, Kevin

10   Dell.

11            Q    And you were looking to -- you

12   know, your team -- Kevin Dell is another

13   lawyer at Trans -- I mean, at Patriarch

14   Partners?

15            A    At Patriarch Partners, LLC.

16            Q    He's in the legal department

17   with you?

18            A    Correct.

19            Q    All right.  And so you and he

20   were working on the transition services

21   agreement?

22            A    Correct.

23            Q    And you were asking Mr.

24   Youngblood and Mr. Wolf who were at TransCare

25   to help you, you know, identify which of the

in re: TRANSCARE CORPORATION

Page 66

1                       July 23, 2019

2      assets and how you were going to transfer

3      these to the new company?

4              A    Looks like Kevin was doing

5      that, yes.

6              Q    All right.  And that's the TA

7      paragraph that we're looking at in the middle

8      of this email, right?

9              A    I'm sorry.  What was the

10     question?

11             Q    When you say it looks like

12     Kevin was -- you're referring to the middle

13     paragraph of this email that we have marked

14     as PX 213.  The one that starts "for the

15     TSA"?

16             A    I see that.

17             Q    Right?  You understood the TSA

18     to be transition services agreement?

19             A    Yes.

20             Q    And so I understand this, the

21     idea was that the term loan lenders were

22     going to foreclose on all the assets,

23     correct?  Most of the assets of TransCare?

24             A    No.  I remember the account

25     receivable definitely being -- Wells being

in re: TRANSCARE CORPORATION

Page 67

1                      July 23, 2019

2    the first accounts receivable, and I'm not

3    sure what else Wells may have been first on,

4    cash and other items likes that, but the term

5    loan lenders are going to foreclose on the

6    collateral that they could foreclose on, yes.

7    But that's not everything.

8              Q    I was going to say everything

9    that you understood they had a right to

10   foreclose on, which they had priority over

11   Wells on?

12             A    That's not necessarily true.

13   Because if it's true that they got priority

14   to forclose on, then they foreclosed on the

15   other subsidiaries as well.  So the lenders

16   decided which collateral they would foreclose

17   on.

18             Q    They actually had the right to

19   foreclose on the stock of all the companies?

20             A    I'm assuming if they had a

21   right to foreclose on some, it was probably

22   all the same.

23             Q    And you understood that once

24   the term loan lenders owned -- foreclosed on

25   those assets, they were going to sell them to

in re: TRANSCARE CORPORATION

Page 68

1                    July 23, 2019

2  Transcendence?

3            A     Correct.

4            Q     And then Transcendence was

5  going to lease some portion of them back to

6  TransCare?

7            A     Under the transfer services

8  agreement?

9            Q     Exactly.

10           A     Yes.  Certain services were

11  going to go back and forth between the two

12  companies, correct.

13           Q     For example, you were going to

14  take all the ambulances, at least you were

15  going to take all the ambulances that fell

16  under the term loan lenders' collateral?

17           A     I'm not sure in preparing for

18  this I looked at the last draft of the

19  transit services agreement, and there seem to

20  be ambulances that TransCare was going to

21  lease to --

22           Q     Right.

23           A     Yeah, so I don't know if

24  that's all the ambulances.

25           Q     Fair enough.  But they were

in re: TRANSCARE CORPORATION

Page 69

1                    July 23, 2019

2   going to foreclose on a substantial number of

3   ambulances if you looked at this recently,

4   right?

5             A    Correct.

6             Q    And then in order for

7   TransCare to continue running its 911 visit,

8   the idea was once you put it in Chapter 7,

9   you were going to lease it back to them?

10            A    I'm not a bankruptcy lawyer,

11  but I think it was Chapter 11.  I think that

12  might make a difference, but I think that was

13  the plan, yes.

14            Q    And you were going to lease

15  them -- if you looked at it recently -- back

16  for about 200,000 a month?

17            A    That may be the number.  I

18  didn't focus on the actual number itself.  I

19  just looked at the items in there.

20            Q    Go with me to JX 95.

21            A    I see it.

22            Q    This is a draft transition

23  services agreement between TransCare and

24  Transcendence that you sent to Ms. Giglio --

25            A    Gilio.

in re: TRANSCARE CORPORATION

Page 70

1                    July 23, 2019

2            Q     -- on February 23rd at 1:53?

3            A     Correct.

4            Q     Is that correct?

5            A     That's correct.

6            Q     And to put in it time frame,

7    the filing of the bankruptcies, they

8    commenced the next day at about 4:00 p.m. if

9    you recall?

10           A     Yeah.

11           Q     Right?  And so you were

12   sending this -- now, you sent this to Ms.

13   Gilio before?

14           A     I don't know.  This doesn't

15   indicate one way or the other.  I just don't

16   recall.

17           Q     And you say in here it has not

18   been reviewed by or discussed with Lynn.  Do

19   you see that?

20           A     I do.

21           Q     So you're sending it to her,

22   but it hasn't been approved for -- for

23   execution, has it?

24           A     No.

25           Q     That would have to come from

in re: TRANSCARE CORPORATION

Page 71

1                    July 23, 2019

2    Ms. Tilton?

3              A     Correct.

4              Q     So you're sending her the

5    draft the day before the filing.  Why were

6    you sending her the draft?

7              A     I think I was asked to

8    concerning comments from her.

9              Q     And if you go to the very last

10   page, and leading up to it, you see a number

11   of ambulances.  I think one, Exhibit C, one,

12   two, three, four, five, six, seven, eight

13   pages of ambulances.  Those weren't --

14   there's some other vehicles, too, but for the

15   most part they look like ambulances.  Right?

16   These were the vehicles that were being

17   foreclosed upon?

18             A     I'm not sure if that would be

19   clear from this document, but I believe

20   that's probably the case, yes.

21             Q     You have Exhibit C in front of

22   you, right?

23             A     I do, but you asked a

24   different question.

25             Q     And they have all these VIN

in re: TRANSCARE CORPORATION

Page 72

1                    July 23, 2019

2    numbers, each of these, correct?

3              A    Correct.

4              Q    So these are all TransCare.

5    At this point in time, these are all

6    TransCare ambulances, correct, on February

7    23rd?

8              A    I believe so, yes.

9              Q    And then when Mr. Wolf signs

10   that acceptance, they become the term loan

11   lenders ambulances as the foreclosed

12   collateral, correct?

13             A    Correct.

14             Q    And then they're sold -- let's

15   get that out of they way.  They're sold that

16   same day, the 24th, before the filing to

17   Transcendence, are they not?

18             A    Yes.

19             Q    So they become Transcendence's

20   ambulances?

21             A    Correct.

22             Q    And this is a list of how much

23   you're going to charge a month for TransCare

24   to use them?

25             A    Yes.

in re: TRANSCARE CORPORATION

```
                                              Page 73
  1                    July 23, 2019
  2          Q    That's the total, right?
  3          A    Monthly charge, yes.
  4          Q    And the total amount is
  5   $195,446?
  6          A    Correct.
  7          Q    In addition, I want to point
  8   you to one thing, Exhibit B to this document,
  9   which it starts at Bates stamp 44009.
 10          A    Yes, I see that.
 11          Q    What's that?
 12          A    This looks like services that
 13   Transcendence was going to provide to
 14   TransCare.
 15          Q    All right.  So along with
 16   leasing in ambulances, they were -- at least
 17   based on this draft, they were going to
 18   provide these services as well under this
 19   agreement?
 20          A    I believe so, yes.
 21          Q    And this is the monthly cost,
 22   what you're going to charge, at least where
 23   there's a figure in there, that was the
 24   thinking at the time as to how much was going
 25   to be charged for these services, correct?
```

in re: TRANSCARE CORPORATION

Page 74

1                         July 23, 2019

2               A     Yes.  I believe that came from

3     the company.

4               Q     Who is Layana Serbineko (ph)?

5               A     I don't know.

6               Q     Is she a Patriarch employee?

7               A     She is not.

8               Q     For payroll, you were going to

9     charge TransCare 6,000 a month?

10              A     I think she was a TransCare

11    employee, and this may have been her salary

12    or pay.

13              Q     You were going to pay her

14    salary?

15              A     No.  I was not.  I think the

16    idea was TransCare would pay the

17    Transcendence for the use of its employee and

18    would probably pay her what she was making at

19    the time.

20              Q     So she would become a

21    Transcendence employee?

22              A     I think that was the idea,

23    yes.

24              Q     And then TransCare would pay

25    Transcendence 6,000 a month for her services

in re: TRANSCARE CORPORATION

Page 75

1                    July 23, 2019

2   because that's what she was earning at

3   TransCare?

4              A    It's just speculation, but I

5   believe it's true.

6              Q    I guess I ask the same

7   question with respect to the rest of these

8   people.  Do these people appear to be

9   TransCare employees as of February 23rd?

10             A    They were not Patriarch

11  Partners employees.  I believe they were

12  TransCare employees.

13             Q    So the expectation was that

14  they went along with the foreclosure, these

15  employees would be moved over to

16  Transcendence, and TransCare would pay their

17  monthly salaries for performing services for

18  TransCare?

19             A    Correct.

20             Q    All right.  Let's move on to

21  the MTA contract for a moment.  You were

22  involved, were you not -- hold on.  Let me

23  catch up.

24                  You were involved with the MTA

25  agreement during this period, were you not?

in re: TRANSCARE CORPORATION

Page 76

                           July 23, 2019

1

2          A     This period?

3          Q     February 12 to February 26.

4          A     More like -- during that

5    period, yes, but not February 12.  I believe

6    I didn't speak with MTA until the 24th or

7    25th.  I'm not sure, but it wasn't that

8    entire time.

9          Q     You were looking at the MTA

10   contract as early as February 12, weren't

11   you?

12         A     Correct.  But I wasn't

13   speaking with the MTA until much later.

14         Q     From what I've seen in the

15   records, you started talking with the MTA

16   after the filing of the bankruptcy --

17         A     Correct.

18         Q     -- is that correct?

19               You didn't have conversation

20   with them before?

21         A     I did not.

22         Q     But you also were involved in

23   transferring the contract from TransCare to

24   Transcendence, were you not?

25         A     I was involved in the

in re: TRANSCARE CORPORATION

Page 77

1                    July 23, 2019

2    attempted transfer, yes.

3              Q    And on that attempted -- well,

4    attempted transfer, let's break that out.

5              In the foreclosure document, JX

6    96, and the acceptance that went with it, the

7    collateral that's being moved, I can take you

8    back to it, but on the Schedule A is the MTA

9    contract?

10             A    But it still required to

11   consent with the MTA to transfer, yes, that

12   is listed as --

13             Q    You didn't have consent to

14   assignment?

15             A    Correct.  Yes.

16             Q    But as a result of the

17   foreclosure, you transferred it to

18   Transcendence?

19             A    I believe that was the

20   attempt.  I don't believe that happened.

21             Q    We'll keep it at that.  So

22   that was an attempted transfer?

23             A    Yes.

24             Q    So you were involved in the

25   attempted transfer on the morning of February

in re: TRANSCARE CORPORATION

```
                                              Page 78
   1                    July 23, 2019
   2   24th, and then go with me to PX 29.  Is this
   3   a resolution that you had responsibility for?
   4            A    Probably, yes.
   5            Q    And so this is the resolution
   6   under which Ms. Tilton, as the sole director,
   7   all right, consents, that's what it's called,
   8   written consent to the transfer of that
   9   contract; is that right?
  10            A    Correct.
  11            Q    And the court -- he says here,
  12   "whereas the corporation desires" -- I'm
  13   looking at the third paragraph, "desires to
  14   transfer and assign the agreement to
  15   Transcendence," correct?
  16            A    Correct.
  17            Q    So from your understanding Ms.
  18   Tilton had made a decision for TransCare to
  19   transfer this to -- transfer this document --
  20   transfer this contract to Transcendence?
  21            A    Correct.
  22            Q    Did you advise her on that?
  23   Just a yes or no.
  24            A    Probably, yeah.
  25            Q    To your knowledge, who at the
```

in re: TRANSCARE CORPORATION

```
                                              Page 79
 1                      July 23, 2019
 2   company other than Ms. Tilton and yourself,
 3   who -- had anyone at the company consulted on
 4   this?
 5              A    On what?
 6              Q    On this transfer and
 7   assignment?
 8                   MR. MERVIS:  You're talking
 9              about the actual authorization or
10              the --
11                   THE COURT:  I'm confused how
12              contract is assigning a contract
13              that was the subject of a
14              foreclosure.
15                   MR. MERVIS:  Me, too.  I'm
16              just trying to get to the question.
17                   THE COURT:  What was the
18              question?
19                   MR. AMINI:  The question is,
20              who else besides Ms. Tilton and him
21              is involved in consenting --  Was
22              anybody at the company consulting
23              on consenting to this?
24                   MR. MERVIS:  The
25              authorization?  That's the
```

in re: TRANSCARE CORPORATION

Page 80

1                    July 23, 2019

2              objection.

3                    THE COURT:  Consenting the

4              transfer itself or the execution of

5              the document.

6         Q    Consenting to the transfer

7    itself?

8         A    Yes.

9         Q    Who?

10        A    Tom Fuchs, Peter Wolf, and

11   Glen Youngblood, this was part of the plan

12   restructuring, so, yes, they were aware this

13   was intended to occur.

14        Q    Tom Fuchs, Mr. Pelissier

15   talked about him briefly, but he was the guy

16   at TransCare at this point who was running

17   the contract.

18        A    Correct.

19        Q    He had left the company and

20   then came back.  I don't know if you are

21   aware of that or not.

22        A    I recall he left and came

23   back.

24        Q    All right.  And he came back,

25   and he was going to be a Transcendence

in re: TRANSCARE CORPORATION

Page 81

```
 1                    July 23, 2019
 2   employee upon the foreclosure?
 3            A    Correct.
 4            Q    And Peter Youngblood, he was
 5   the executive vice president.  I don't know
 6   what his title was.  But he was -- after Mr.
 7   Wolf, he was the next most senior person at
 8   the company, correct?
 9            A    Glen Youngblood.
10            Q    He was already at this point
11   president of Trancendence?
12            A    Correct.
13            Q    And Peter Wolf, was Peter Wolf
14   offered a position at Transcendence?
15            A    I don't believe he was.
16            Q    This consent that you asked --
17   that was entered into, was any counsel for
18   the company other than -- was any counsel at
19   the company consulted on it?
20            A    No.  The "company" being
21   TransCare?
22            Q    Yes.
23            A    No.
24            Q    In fact, go with me to JX 100.
25   At some point in time, Mr. Pelissier was
```

in re: TRANSCARE CORPORATION

Page 82

```
 1                     July 23, 2019
 2   advised by -- if you recall -- do you recall
 3   at some point in time Mr. Pelissier received
 4   from the MTA a series of papers in connection
 5   with the request to transfer this contract;
 6   do you recall that?
 7            A    It looks like it from the
 8   email.
 9            Q    Yes.  And these are the papers
10   that he received.  Not as filled out, but he
11   got these from the MTA?
12            A    I believe so, yes.
13            Q    The responsibility
14   questionnaire, right?
15            A    Correct.
16            Q    As well as an agreement of
17   assignment, correct?
18            A    Correct.
19            Q    Is that agreement of
20   assignment an MTA document or something new?
21            A    This is an MTA document.
22            Q    And Mr. Pelissier then --
23   Mr. Pelissier sent these assignment papers
24   over to, among others, yourself,
25   Mr. Greenberg -- actually to yourself and Mr.
```

in re: TRANSCARE CORPORATION

Page 83

1                    July 23, 2019

2   Greenberg, CCs are to Tom Fuchs --

3            A    Correct.

4            Q    Correct?  And he was looking

5   for you to fill them out.

6            A    He was asking probably how

7   they should be answered, yes.

8            Q    And you filled out the certain

9   portions of it which we can see in this

10  exhibit, correct?

11           A    Correct.

12           Q    The handwriting not on the

13  assignment, the consent to assignment, but

14  the handwriting in the responsibility

15  questionnaire is yours?

16           A    Yes, that is mine, correct.

17           Q    And then you sent the rest of

18  it back to the team with "I completed as much

19  as I could, somebody else has to do the

20  financials"?

21           A    I did write that.

22           Q    And you did this on February

23  24 at 9:27 p.m.?

24           A    Correct.

25           Q    Attached in this package is an

in re: TRANSCARE CORPORATION

Page 84

1                          July 23, 2019

2    agreement of assignment, if you look the at

3    third and fourth pages?

4              A    168?

5              Q    JX 100 and its Bates stamped

6    77168.

7              A    Yes.

8              Q    And 77169?

9              A    Yes.

10             Q    And this is -- is this your

11   handwriting on this document other than the

12   signatures?

13             A    No.

14             Q    You didn't fill out any part

15   of this document?

16             A    No.

17             Q    All right.  But you had this

18   document when you emailed it to the team

19   saying I have done as much as I could?

20             A    Yes.

21             Q    So you got this agreement and

22   assignment from someplace?

23             A    Yes.

24             Q    You don't recall where?

25             A    I don't know whether this is

in re: TRANSCARE CORPORATION

Page 85

1                        July 23, 2019

2   attached to the form contract or not.

3   Depends what you're asking.  I don't know

4   whether this is the form that the MTA

5   provides.  I think the answer to your

6   question is yes I got this from someone.  I

7   don't remember who.

8              Q    All right.  And you included

9   it -- it was included in your email of

10  February 24 at 8:27 p.m.?

11             A    I had, yes.

12             Q    And you had no idea where you

13  got it?

14             MR. MERVIS:  Your Honor, I

15        don't --

16             THE COURT:  Sustained.  I

17        mean, let's move on with this.

18             MR. AMINI:  I want to -- I'm

19        sorry, Your Honor.

20             Q    Who represented the company in

21  connection with this document?  TransCare --

22             A    The company didn't have an

23  outside lawyer.

24             Q    You understood that the

25  document was obligating the company to

in re: TRANSCARE CORPORATION

Page 86

```
 1                    July 23, 2019
 2    certain things, did you not?
 3            A     The assignment agreement?
 4            Q     Yes.
 5            A     At the time I did, I'm sure,
 6    yes.
 7            Q     And you can see it on the
 8    second page under consent to assignment, the
 9    company is not released.  The company has to
10    pay guarantee full performance.  The
11    company's obligations to the New York City
12    Transit Authority remain in full force and
13    effect.  Yes?
14            A     Yes, I see that.
15            Q     Did you think to consult with
16    company counsel about it or not?
17            A     I did not.
18            Q     And then the signature that is
19    on here to put it out of the way, for the
20    assignee transition -- transit two, Inc. is
21    Mr. Youngblood?
22            A     Yes.
23            Q     At that moment of time, on
24    February 24th, do you know if he was still
25    employed by TransCare?
```

in re: TRANSCARE CORPORATION

Page 87

1                      July 23, 2019

2              A    I believe he was.  I don't

3    know.

4              Q    I want to move to PX 235 --

5    excuse me.

6                   MR. AMINI:  I skipped a

7              document, Your Honor.  I'm sorry.

8              Q    JX 102 which goes back one

9    from JX 100?

10             A    Yes, I see it.

11             Q    Are you familiar with this

12   document?

13             A    Yes, I know this document.

14             Q    This is the bill of sale --

15   this is after you foreclosed, this is the

16   sale of the collateral by PPAS as the

17   administrative agency under that credit

18   agreement to Transcendence Transit Inc.; is

19   that right?

20             A    Yes.

21             Q    And it says here, "The

22   consideration for the transfer of the subject

23   collateral" -- I'm reading from E under the

24   recitals.  It says, "The consideration for

25   the transfer of the subject matter of the

in re: TRANSCARE CORPORATION

Page 88

1                     July 23, 2019

2    purchaser shall be 10 million, such amount to

3    be financed by Arc Angels III, through a

4    purchase agreement under the terms of the

5    purchaser credit agreement as such term is

6    defined below, a portion of the amount is

7    outstanding with respect to the loans as of

8    the date hereon."  Do you see that?

9              A    I do see that.

10             Q    And parsing through that, this

11   is a $10 million credit that was being given

12   to the term loan lenders, correct?

13             A    Uh --

14             Q    I'm sorry.  I misspoke.  I

15   said that wrong.  This $10 million

16   corresponds to the $10 million being given to

17   TransCare for the collateral?

18             A    It's the same number, yes.

19             Q    And that amount is going to be

20   paid through financing by Arc Angels III, if

21   I'm reading this correct; is that right?

22             A    I believe that's correct.

23             Q    And Arc Angels III is what?

24             A    That's the vehicles.

25             Q    She was going to give a

in re: TRANSCARE CORPORATION

Page 89

1                    July 23, 2019

2    loan -- she was going to issue a loan that

3    was going to pay this $10 million?

4           A    I believe that was the

5    intention, yes.

6           Q    All right.  It says here, "A

7    portion of the amount outstanding with

8    respect to such loans as described -- I'm

9    trying to understand."  Was it your

10   understanding that the full 10 million was

11   going to be paid by that loan?

12          A    I didn't draft this, but that

13   was my understanding, but I didn't prepare

14   this document.

15          Q    And it says that that loan is

16   going to be governed by something called the

17   purchaser creditor agreement.  Do you see

18   that?

19          A    I do see that.

20          Q    Do you have an understanding

21   of what that is?

22          A    I think it's defined in this

23   document.

24          Q    It's on the next page in

25   section 3, yes.  Right?  Section 3 down in

in re: TRANSCARE CORPORATION

Page 90

1                     July 23, 2019

2    the middle there.  It says technically it

3    will paid.  There's a closing date

4    obligation.  And then it defines, "Such

5    closing shall be owing and be governed

6    exclusively by the credit agreement dated as

7    of the date  hereof by and between

8    administrative agent," that's PPAS, "and the

9    purchaser."  And that's Transcendence,

10   correct?

11              A    I believe that's true, yes.

12              Q    So there was going to be some

13   kind of an agreement between PPAS and

14   Transcendence at that point?

15              A    I believe that's the case,

16   yes.

17              Q    Have you ever seen an executed

18   version of the document?

19              A    I have not.

20              Q    Do you know if there is a

21   draft of such agreement?

22              A    There may be a draft.

23              THE COURT:  Do you know

24          whether $10 million was paid to

25          PPAS to TransCare by Transcendence?

in re: TRANSCARE CORPORATION

Page 91

1                         July 23, 2019

2              A    I do not.

3              Q    To your knowledge, was

4    anything paid by Transcendence to PPSA?

5              A    Not to my knowledge, no.

6              Q    Okay.  And where is it?  Okay.

7    To your knowledge, is there -- other than

8    that credit -- that draft agreement, is there

9    anything else that embodies this obligation?

10   Any other writing that embodies this

11   obligation that you're aware of?

12             A    Not that I'm aware of, no.

13             Q    Let me move on to PX 235.  Is

14   this an email -- well, PX 235, I think it

15   involves the matter of insurance for

16   Transcendence, does it not?

17             A    I believe so, yes.

18             Q    And looking at the very first

19   email of this chain, which is February 25th,

20   2016, between Mr. Greenberg and it refers to

21   Workers' Compensation policy, for example,

22   in, Pennsylvania, correct?

23             A    Yes.

24             Q    And ultimately the insurer was

25   looking for the ownership of Transcendence,

in re: TRANSCARE CORPORATION

Page 92

                              July 23, 2019
1
2    was it not?  That was your understanding,
3    correct?
4              A     There's something attached
5    that had incorrect information, yes.  I don't
6    what they were asking me to provide, but
7    whatever they provided was incorrect.
8              Q     You wrote on February 25th,
9    2016, at 10:43 that the ownership information
10   is inaccurate, correct?
11             A     That's correct.
12             Q     And you were talking about the
13   ownership of TransCare or Transcendence given
14   the email that follows, correct?
15             A     Correct.
16             Q     And so you said you didn't
17   have time at that point, but then a little
18   later you added yet another email that sought
19   to address the ownership issues, correct?
20             A     Correct.
21             Q     And you write that TransCare
22   has a ton of stockholders, right?  And you
23   list who the largest are for the people
24   you're sending an email to?
25             A     Correct.

in re: TRANSCARE CORPORATION

Page 93

1                    July 23, 2019
2           Q     Robber Segal is an insurance
3    person, correct?
4           A     He is.
5           Q     All right.  And these numbers
6    you have, Arc II and Arc Investments, those
7    are Lynn Tilton's entities, correct?
8           A     Correct.
9           Q     And they own 61 percent of
10   TransCare based on your records?
11          A     Yes.  Approximately, yes.
12          Q     And First Dominion from the
13   CSA which is Credit Suisse goes to an atrium
14   which is in the group.  That's the Credit
15   Suisse group, correct?
16          A     Correct.
17          Q     And they own 26 percent of
18   TransCare at that point, correct?
19          A     Based on my research, yes.
20          Q     That's right.  And your
21   research is based on the actual records that
22   are maintained at Patriarch's offices?
23          A     The records that I have, yes.
24          Q     Right.  You had records at the
25   office that actually showed these interests,

in re: TRANSCARE CORPORATION

                                                Page 94
 1                    July 23, 2019
 2   correct?
 3           A    Correct.
 4           Q    And then underneath it, you
 5   have Transcendence is as follows:  Arc II --
 6   which is Ms. Tilton's entity, correct?
 7           A    Correct.
 8           Q    -- 51 percent, and Zohar 3 is
 9   33.4 percent?
10           A    Correct.
11           Q    You had no records -- you have
12   no records to indicate that, correct?
13           A    No.  I don't know where I got
14   those numbers from, but they're fairly
15   specific, so I got them from someone.
16           Q    Right.  I was just going to
17   establish that.  As you sit here today, you
18   don't recall where those numbers came from?
19           A    No, I don't.
20           Q    And those were constantly
21   moving numbers, were they not?
22           A    Correct.
23           Q    There were other iterations of
24   them at different times?
25           A    Yes.

in re: TRANSCARE CORPORATION

Page 95

                              July 23, 2019

1

2          Q    And you don't know where that

3    ended up?

4          A    I do not.

5          Q    All right.  Let's talk a bit

6    about the MTA.  Your interaction with the MTA

7    beginning following the filing of the

8    bankruptcy on February 24, 2016.  You were at

9    some point engaged by the team to become the

10   person to interact with them on this

11   transfer, correct?

12         A    May have been Lynn, but, yeah,

13   at some point it became something for me to

14   do.

15         Q    Somebody instructed you to see

16   if you could facilitate the transfer with the

17   MTA?

18         A    Correct.

19         Q    And you reached out, if I'm

20   not mistaken, to Diane -- is it Morganroth?

21         A    Yes, Morganroth.

22         Q    Right.  She's the person at

23   the MTA that you were dealing with at that

24   point?

25         A    I think I -- I'm not sure if I

in re: TRANSCARE CORPORATION

Page 96

1                    July 23, 2019

2    reached out to her first or Tom Fuchs gave me

3    the business person and he put me in touch ,

4    I don't remember.

5             Q    Ultimately you ended up with

6    her and I think Thomas Charles?

7             A    Thomas Charles is the business

8    person.  So I'm not sure if I reached out to

9    him first or her first, I don't remember.

10            Q    All right.  Well, go with me

11   to PX 244.  There's an email -- the first

12   email, I think, in the chain is your email of

13   February 25th, 2016, at 9:56 p.m.?

14            A    I see that?  Yes.  8:49.  I'm

15   sorry, 8:49.

16            Q    Oh, I see.  I see.  I'm sorry.

17   I stand corrected.  You're absolutely right.

18   I'm looking at email.

19                 If you go to the second page of

20   this on February 25th at 8:49, correct?

21            A    Yes.

22            Q    You understood then this was a

23   day after the filing of the TransCare

24   entities that filed for Chapter 7, this is a

25   date following that filing?

in re: TRANSCARE CORPORATION

Page 97

1                          July 23, 2019

2                 A     Correct.   They filed the 24th

3     so, yes, that's correct.

4                 Q     Right.   And you're introducing

5     you to -- you're introducing them to the two

6     of them and want to -- and as you say in the

7     second paragraph, shed some much-needed light

8     on the events of the past few days, correct?

9                 A     I did write that, yes.

10                Q     And you explained to them that

11    at 12:01 a.m, actually six minutes earlier,

12    that you had foreclosed on the secured

13    lenders.   The term lenders had foreclosed on

14    certain of TransCare's assets?

15                A     Yes, I did.

16                Q     That was your 12:07 a.m.

17    notice that you're referring to?

18                A     Correct.

19                Q     So the next day you told them

20    that that was for foreclose purposes, right?

21                A     Different people, but yes.

22                Q     And then you said that the

23    term lenders had agreed to certain collateral

24    to accept certain collateral and that

25    included the Access-A-Ride Paratransit

in re: TRANSCARE CORPORATION

Page 98

1                    July 23, 2019

2    Transportation Service agreement which is the

3    agreement we're talking about in this case,

4    the MTA agreement?

5              A    Correct.

6              Q    All right.  And you took time

7    to say the agreement is a general intangible,

8    and under the applicable credit document, the

9    lenders were able to foreclose on it?

10             A    Yes.  So that answers the

11   question of how we thought we were able to

12   foreclose on it.  Yes.

13             Q    And where did you get that

14   information from?

15             A    Speaking to Randy, who was the

16   counsel for services --

17             Q    He's the Perkin's -- I think

18   Coie?

19             A    Coal.  I may have

20   mispronounced it.

21             Q    And Lynn --

22             A    Yes.

23             Q    Between him and Lynn --

24             A    Between him and Lynn, Yes.

25   She would have reviewed this email, yes.

in re: TRANSCARE CORPORATION

Page 99

1                        July 23, 2019

2            Q     Lynn would have reviewed this

3      email before you sent it?

4            A     Probably, yes.

5            Q     She would have approved it

6      before you could send it?

7            A     Probably, yes.

8            Q     Did her counsel at PPAS review

9      it before you sent it?

10           A     I don't know.  You mean Randy

11     Creswell?

12           Q     Yes.

13           A     I'm not sure.

14           Q     He was counsel for PPAS for

15     her, right?

16           A     Correct.

17           Q     That's the term lenders

18     administrative agent?

19           A     Correct.

20           Q     And he was working with Lynn

21     at the time?

22           A     Lynn Tilton, yes.

23           Q     And so other than hearing it

24     from the two of them, you took no steps to

25     actually verify this portion?  Where you say

in re: TRANSCARE CORPORATION

Page 100

1                    July 23, 2019

2    it's general, intangible, and this is --

3              A    I may have.  Things were

4    happening pretty quickly then, so I just

5    don't remember.  I may have.  I just don't

6    remember.

7              Q    And you say, "The lenders

8    foreclosed on it to try and protect MTA

9    paratransit's operations as well as the 390

10   TransCare employees who provide that

11   service."  Where did that come from?  Where

12   did that information --

13             A    The number of employees.

14             Q    And that it was done to try

15   and protect the MTA's paratransit operations,

16   who gave you that?

17             A    That was the purpose of the

18   restructuring.

19             Q    So you understood that at the

20   time?

21             A    Yes.

22             Q    All right.  And immediately

23   you then explain immediately after

24   foreclosure, they sold the foreclosure assets

25   to Transcendence Transit, Inc., which we saw,

in re: TRANSCARE CORPORATION

Page 101

1                   July 23, 2019

2    right?

3              A    Correct.

4              Q    And then you address -- in the

5    next paragraph, you address the MTA was

6    focused or interested in this particular

7    contract being housed within a single

8    corporate entity that could be monitored in

9    terms of its payments and expenditures?

10             A    Correct.

11             Q    And that's partly the reason

12   you were doing it this way?  You were

13   creating Transcendence II for that purpose?

14                  THE COURT:  Haven't we been

15             through this?

16                  MR. AMINI:  I just want to go

17             through this.  Your Honor, I would

18             like to go in terms of his

19             knowledge.

20             Q    You understood that?

21             A    I think so.  I wrote that so

22   it must.

23             Q    You told him they were both

24   form -- and then you tag -- and then the next

25   paragraph at the top of the next page, why

in re: TRANSCARE CORPORATION

Page 102

1                    July 23, 2019

2    don't you read that paragraph if you want to?

3              A    "All 390 drivers and other

4    TransCare employees necessary to

5    Transcendence Transit to continue to provide

6    service under the agreement were transferred

7    to Transcendence II at the time of the

8    foreclosure and now employees of

9    Transcendence Transit II complete with health

10   benefits and availability of direct deposit

11   of wages, which is no longer possible with

12   TransCare New York."

13             Q    Was that true?

14             A    It was not true.

15             Q    So that was an untrue

16   statement?

17             A    It was far more bullish.  Yes,

18   it was not true.

19             Q    And who, if anyone, told you

20   to make that statement?

21             A    It was probably included in

22   the draft that I sent to Lynn.  I don't know

23   that she specifically requested I include it

24   or not, but I don't remember.

25             Q    So this was as statement that

in re: TRANSCARE CORPORATION

Page 103

1                      July 23, 2019

2    you created on your own volition or somebody

3    told you this?

4            A    I'm saying I don't remember.

5    It may have been a combination of both, but I

6    wrote it, so it was my --

7            Q    What --

8            A    -- responsibility.

9            Q    What involvement did you have

10   with health benefits, for example, arranging

11   for the workers to have health benefits?  Any

12   up to this point?

13           A    Not specifically, no.  I think

14   some -- no, I didn't call the health

15   companies to try and set up insurance.  I

16   believe it was happening, but I didn't do

17   that, no.

18           Q    What involvement did you have

19   in setting up bank accounts for direct

20   deposit for these 390 drivers and other

21   TransCare employees?

22           A    Well, one thing we talked

23   about was setting up the bank accounts for

24   Transcendence Transit and Transcendence II,

25   so I was involved in the bank accounts, and I

in re: TRANSCARE CORPORATION

Page 104

1                    July 23, 2019

2    may have been copied on emails back-and-forth

3    to our controller, including the number of

4    people and the names of the people who were

5    supposed to be employed going forward, so I

6    would have been involved with that.

7            Q    So then it's fair to say you

8    knew what the truth was at this point?

9            A    I think that's fair.

10           Q    And so -- and you're telling

11   me there's nothing in this paragraph that's

12   true; isn't that right?

13           A    I don't know if I'm telling

14   you that.  I am saying that this paragraph is

15   not 100 percent accurate.  I should not have

16   written it this way.

17           Q    Well, you're saying now it's

18   100 percent not accurate --

19           A    No, I didn't.  I didn't.

20           Q    Well, then if it's not

21   100 percent not accurate, what in is it

22   accurate?

23           A    (No audible response.)

24           Q    All right.  Let's move on to

25   the third paragraph on this page.  With

in re: TRANSCARE CORPORATION

Page 105

1                        July 23, 2019

2    respect to the bankruptcy, you point out that

3    Chapter 7 was filed on the evening, and you

4    actually bold and italicize the word after

5    the foreclosure.  Do you see that?

6            A    I do see that.

7            Q    And then you go on and

8    underscore a portion to say "The bankruptcy

9    trustee does not have the power and authority

10   to unwind the foreclosure nor has he

11   expressed any misgivings or concerns about

12   the foreclosure."  Was that statement true to

13   the best of your understanding and knowledge

14   at that time?

15           A    I believe it was at that time.

16   I don't remember when I had a subsequent

17   conversation with Glenn Leland about the

18   trustees' concerns, but I just don't have the

19   dates in my head specifically, but I believe

20   it was true at the time.  I believe it was.

21           Q    Did it come to not be true

22   sometime between when you sent this at 8:49

23   on February 25th and late the evening of

24   February 26th, which was a Friday?

25           A    Yes.

in re: TRANSCARE CORPORATION

```
                                              Page 106
 1                       July 23, 2019
 2              Q    And it became untrue because
 3   of something Glen Youngblood told you?
 4              A    At least Glen Youngblood,
 5   maybe more.
 6              Q    All right.  Let's do the Glen
 7   Youngblood first, and then maybe we'll do the
 8   "maybe more."
 9              Is the Glen Youngblood piece
10   that you're telling me is where he tried in
11   the early hours of the morning of that Friday,
12   the 26th, where he tried to go into
13   Transcare's offices and remove a computer and
14   was told by the trustees' counsel that he
15   should not be doing so, that to remove the
16   AS 400 would be in violation of the automatic
17   stay.  Is that what you're referring to?
18              MR. MERVIS:  Your Honor, I
19              object to the form of the question.
20              MR. AMINI:  It's in the email,
21              Your Honor.  It's going to come up.
22              They're waiting to ask him about
23              it.
24              THE COURT:  Then maybe --
25              MR. AMINI:  Subject to tying
```

in re: TRANSCARE CORPORATION

Page 107

```
 1                     July 23, 2019
 2          it out later.
 3               MR. MERVIS:  Right now I'm
 4          just -- your question is way too
 5          long.
 6               MR. AMINI:  All right.
 7               THE COURT:  Is the question,
 8          how did he learn that the
 9          bankruptcy trustee, using the
10          sentence had misgivings or concerns
11          about the foreclosure?
12               MR. AMINI:  I'll adopt that
13          question, Your Honor.  Thank you.
14               THE WITNESS:  I think it was
15          from Glen Youngblood.
16               THE COURT:  What did he tell
17          you?
18               THE WITNESS:  He told me that
19          he asked Glen and others to
20          unsecure certain assets that were
21          necessary for Transcendence, and
22          Glen first calls in Gilio, I
23          believe, and she instructed him to
24          call the trustees' counsel -- or
25          the trustee rather, and he called
```

in re: TRANSCARE CORPORATION

Page 108

```
 1                     July 23, 2019
 2                the trustee and spoke with Gary
 3                Hurst and Gary told him that it
 4                would not be appropriate, and Glen
 5                Youngblood first called me and gave
 6                me that information, and then he
 7                said he would follow up with an
 8                email.  So that's when I definitely
 9                heard about it.  I'm not sure if
10                Randy Creswell told me anything
11                before that time.
12           Q    When did the strategy change
13      from filing a Chapter 11 to filing a Chapter
14      7?
15           A    It may have been the 24th, the
16      day that Curtis Mallet signed the new
17      engagement letter.  There was an issue of
18      Lynn Tilton and Wells Fargo weren't able to
19      reach agreement on the last payroll funding.
20      And that's when everything completely
21      switched and we ended up where we are.
22                MR. AMINI:  Your Honor, one
23                moment.  I just want to find that.
24                THE COURT:  Well, I saw it
25                previously about filing the Chapter
```

in re: TRANSCARE CORPORATION

                                              Page 109
 1                      July 23, 2019
 2              11.
 3                   MR. AMINI:  There's two.  He's
 4              absolutely correct.  There was a
 5              second engagement letter.  And I
 6              thought it was something I would
 7              sometime come across today, but I
 8              don't see it.  I don't see it.
 9                   MR. SAMET:  It's JX 98.
10                   MR. AMINI:  It's JX 98.
11                   THE COURT:  Is that in this
12              book?
13                   MR. AMINI:  It's not in the
14              book I gave you, Your Honor.  I'll
15              put it on the screen.
16              Q    Go to the second page if you
17         would.  Go back to the first page or the
18         email.  This is the first page.  Can we see
19         the whole page?  On February 24th at 12:10
20         p.m., Lynn Harrison wrote to, among others,
21         you, stating that he had been instructed by
22         you to send an engagement letter to Peter
23         Wolf's attention.
24              A    I see that.
25              Q    And if it met with Peter

in re: TRANSCARE CORPORATION

Page 110

1                       July 23, 2019
2    Wolf's approval, to sign and return a copy.
3    Do you see that?
4              A    I do see that.
5              Q    And then on that same day at
6    1:55 p.m., you sent him the attached executed
7    agreement.  All right.  Let's go to the
8    letter itself.  Max, next page.  Next page.
9    It's dated as of February 18.  Do you see
10   that?
11             A    I do see that.
12             Q    To the best of your knowledge,
13   it was executed and exchanged on the 24th?
14             A    To the best of my knowledge,
15   yes.
16             Q    And this is the letter that
17   they asked for, that Curtis Mallet asked for,
18   if they were going to actually file a Chapter
19   7?
20             A    Correct.
21             Q    And you see the Chapter 7
22   reference in the second paragraph?
23             A    I do.
24             MR. AMINI:  I'm just waiting,
25             Your Honor.

in re: TRANSCARE CORPORATION

Page 111

1                    July 23, 2019

2              THE COURT:  I read it.

3              MR. AMINI:  Can we go -- if

4         there's something on the last page.

5         I don't have it in front of me.  Do

6         you want Max to put up the last

7         page.

8         Q    That's the final page, and

9    Mr. Reeseman, I guess, or somebody on his

10   behalf signed it at Curtis Mallet, and you

11   obtained Mr. Wolf's -- by some means Mr.

12   Wolf's signature was obtained on this

13   document?

14             A    Correct.

15             Q    I want to go back to what we

16   were looking at just to close this out on PX

17   244, that letter that you -- that email that

18   you sent to Tom and Diane.  You're -- the

19   next-to-the-last paragraph on Page 3, you

20   stated that the Transcare's bankruptcy would

21   have no impact on Transcendence' ability to

22   provide uninterrupted service.  Do you see

23   that?

24             A    I do see that.

25             Q    And you were telling them,

in re: TRANSCARE CORPORATION

Page 112

1                    July 23, 2019

2      were you not, that in fact the Transcare

3      Transit Services that were actually being

4      performed on that day, February 25th, were

5      being performed by Transcendence?

6                  A    I didn't see that.

7                  Q    Yes?

8                  A    Yeah.

9                  Q    That the employees they were

10     seeing, taking out their buses and bringing

11     their buses back were all Transcendence

12     employees at this point?

13                 A    I think from this email, she

14     would have taken that, yes.

15                 Q    And then the next morning, in

16     the same email, working backwards, the next

17     morning, Friday at 11:34, you asked if you

18     could speak to Miss Margaret Roth about TC

19     Paratransit?

20                 A    Yes.

21                 Q    They were -- based on her

22     email, they were going to consider the

23     material that you had sent to them; they

24     would be in touch the next day?

25                 A    Correct.

in re: TRANSCARE CORPORATION

Page 113

1                          July 23, 2019

2              Q    Let's go to PX 236, the next

3    document.  So is it fair to say that score --

4    basically your email of 2:09 p.m. that day,

5    Friday, February 26, to Diane Morganroth with

6    a cc to Mr. Creswell at Perkins Thompson, is

7    it fair to state that you spoke with Miss

8    Morganroth and someone named Zach earlier

9    that day?

10             A    Yes.

11             Q    All right.  And then you go on

12   to say "I spoke with my principal."  Do you

13   see that?

14             A    Yes, I see that.

15             Q    And that person you were

16   talking about there is Ms. Tilton, correct?

17             A    Correct.

18             Q    And about some limitations

19   that they had, correct?

20             A    Yeah.

21             Q    But you were reporting to them

22   that you would be amenable to moving forward

23   and providing services as we work through the

24   MTA's process with appeal accommodations?

25             A    I see that.

in re: TRANSCARE CORPORATION

Page 114

1                   July 23, 2019

2              Q     And that's what you

3    communicated with them that day?

4              A     Correct.

5              Q     And you were authorized to

6    communicate that by Ms. Tilton, correct?

7                   THE COURT:  Are you offering

8              this document?

9                   MR. AMINI:  Yes.

10                  THE COURT:  Any objection.

11                  MR. MERVIS:  No, Your Honor.

12                  THE COURT:  Received.

13             Q     And then you lay out a series

14   of -- for lack of a better word -- conditions

15   or things that you need in order to move

16   forward.  Do you see that?

17             A     I do see that, yes.

18             Q     The first one is we'd like a

19   notice from the MTA to Transcare that it's

20   terminating its paratransit contract,

21   correct?

22             A     I see that.

23             Q     So now you foreclosed on it,

24   you've gotten signatures, and assigned it,

25   and you're asking suddenly -- did you ask

in re: TRANSCARE CORPORATION

Page 115

1                     July 23, 2019

2    them for this relief at any time before this

3    2:09 p.m. email on February 26?

4              A    I don't believe so.

5              Q    Do you have any understanding

6    of now why you needed MTA to cancel the

7    paratransit contract?

8              A    I think at some point, the

9    trustee -- it said something about how the

10   MTA accounts the contract, and we'll figure

11   it out later.  I don't mean to be evasive.  I

12   just don't remember, but the trustee was

13   involved in some way of how the transfer

14   might work, and one of those was that I think

15   the MTA terminated or the MTA asked to

16   terminate, I just don't really remember

17   exactly what happened.

18             Q    I had understood you to tell

19   the MTA the day before that the trustee had

20   absolutely no rights in this contract?

21             A    Right.  But this was the day

22   after.

23             Q    Is this -- is this request at

24   2:00 p.m. on Friday, February 26, 2016, does

25   it have anything to do with the rights to the

in re: TRANSCARE CORPORATION

1                    July 23, 2019

2    accounts receivable that Wells Fargo had in

3    this contract?

4            A    No.

5            Q    Were you aware of the fact --

6    you are aware, because you told me earlier --

7    that Wells Fargo had an assignment of the --

8    of the accounts receivable under this

9    contract?

10           A    Over all the TransCare account

11   receivables, yes.

12           Q    And in my own book, I have

13   something called -- I have PX 2, which is the

14   notice of payment and assignment.

15                MR. AMINI:  There was a

16                relevancy objection to it, I think,

17                Your Honor.  It's June 4, 2012.  I

18                just want it identified, and I

19                would like it in the record.  It's

20                not in your book.  I can give

21                you --

22                THE COURT:  What is it?

23                MR. AMINI:  It's notice of

24                payment assignment dated June 4,

25                2012, PX 002, and it's a series of

in re: TRANSCARE CORPORATION

```
                                           Page 117
 1                    July 23, 2019
 2           documents signed by Wells Fargo and
 3           the company, and I think -- yeah,
 4           TransCare, irrevocably assigning
 5           the accounts receivable from this
 6           specific contract to Wells Fargo.
 7                MR. MERVIS:  Your Honor, if we
 8           can have a relevance objection.  I
 9           don't understand the relevance in
10           this, Wells Fargo kept the
11           receivables.  I think he's going to
12           tell you he collected them.
13                THE COURT:  Tell me the
14           relevance.
15                MR. AMINI:  It's the moment
16           they realized an assignment won't
17           solve their problem.  Wells will
18           still be on their back.  Wells is
19           entitled --
20                THE COURT:  But Transcare is
21           Chapter 7, not operating no more.
22                MR. AMINI:  The assignment is
23           the proceeds of the -- TransCare
24           has irrevocably assigned the
25           proceeds from this contract.  They
```

in re: TRANSCARE CORPORATION

Page 118

1                    July 23, 2019

2          are assign --

3                THE COURT:  The proceeds or

4          the contract?

5                MR. AMINI:  No, the proceeds.

6          The accounts receivable.

7                THE COURT:  Where is that?

8                MR. AMINI:  It's in this

9          document, PX 002.

10               THE COURT:  Okay.  2012 based

11          on the accounts receivable to Wells

12          Fargo?

13               MR. AMINI:  And the -- yes.

14               THE COURT:  But this -- the

15          termination of the MTA contract has

16          nothing to do with the accounts

17          receivable.

18               MR. AMINI:  Well, if all

19          they're doing is assigning an

20          existing contract, we would argue

21          that Wells Fargo under the

22          assignment -- they take the

23          assignment as is.  Under the

24          assignment, Wells Fargo is still

25          the recipient.

in re: TRANSCARE CORPORATION

Page 119

```
 1                     July 23, 2019
 2               THE COURT:  That's why I ask
 3          the question whose got the security
 4          interest in the MTA contract.  I
 5          understand Wells Fargo has the
 6          first in the accounts receivable.
 7               MR. AMINI:  Well, the security
 8          interest we --
 9               THE COURT:  That's a question
10          under Article 9 reading the
11          security agreement.
12               MR. AMINI:  Yes.  That's a
13          question -- the intercreditor
14          agreement tells you what their --
15          anything that's not in that
16          exhibit, in the intercreditor
17          agreement under the term lenders --
18               THE COURT:  Somebody would
19          first have to go back, a security
20          interest in the MTA contract.  You
21          don't get security interest through
22          a intercreditor agreement.
23               MR. AMINI:  Each party -- in
24          the intercreditor agreement, each
25          party acknowledges.  Then bothy
```

in re: TRANSCARE CORPORATION

Page 120

```
 1                        July 23, 2019
 2              parties have security interest in
 3              all the companies' assets and have
 4              properly secured them in all of
 5              them.  So as between TransCare, the
 6              term lenders and -- as between
 7              Wells Fargo and the term lenders,
 8              they have blanket liens on
 9              everything.  And Wells Fargo has --
10              the term loan lenders have a first
11              priority in some -- in a list.
12                  THE COURT:  You know, I guess
13              my response to all this is I'll
14              have to read the documents if you
15              can make the argument that they
16              went behind Wells Fargo's back and
17              foreclosed on the collateral.
18                  MR. AMINI:  And all I'm asking
19              to do is get this document into the
20              record.
21                  THE COURT:  I'm going to
22              receive it.  Okay.
23                  MR. AMINI:  So I don't even
24              need to show it to him, if that's
25              okay, Your Honor.
```

in re: TRANSCARE CORPORATION

```
                                             Page 121
  1                        July 23, 2019
  2                   THE COURT:  What is it?
  3                   MR. AMINI:  PX 002.
  4             Q     Going back to PX 236, at the
  5   end of this email to Ms. Morganroth that you
  6   sent at 2:09 on the 26th, you say that you
  7   have to have an affirmative responses to your
  8   request by 5 p.m. today or you'll discontinue
  9   the MTA contract; isn't that right?
 10             A     That's what I wrote, yes.
 11             Q     All right.  And that's because
 12   Ms. Tilton had decided earlier in the day
 13   that she was going to set a firm deadline for
 14   a resolution of the MTA problem, correct?
 15             A     Correct.
 16             Q     And all -- and ultimately --
 17   go with me now to PX 245, and on that same
 18   day at 7:01 p.m.
 19                   THE COURT:  What was that?
 20                   MR. AMINI:  I'm sorry.  245.
 21                   There's no objection to it, Your
 22                   Honor.  PX 245.
 23                   THE COURT:  It's received.
 24             Q     That's an email you sent Ms.
 25   Morganroth -- a follow-up email that you sent
```

in re: TRANSCARE CORPORATION

Page 122

1                     July 23, 2019

2    to her at 7:01 p.m. that evening?

3              A     Correct.

4              Q     All right.  And you state that

5    I spoke with my principal again.  That's Ms.

6    Tilton, correct?

7              A     Correct.

8              Q     And we will not be able to

9    provide services under a short-term contract?

10             A     Did I write that?  Yes.

11             Q     Right.  So you were at that

12   point canceling the MTA contract, were you

13   not?

14                   MR. MERVIS:  I object, Your

15             Honor.

16                   THE COURT:  Sustained.  The

17             document says what it says.

18             Q     Up to that point in time, it

19   was your understanding, was it not, that the

20   employees assigned to the paratransit

21   contract were out there up to that Friday

22   night driving their buses, the para -- the

23   transit buses, delivering people around the

24   city, in accordance with that contract,

25   right?

in re: TRANSCARE CORPORATION

Page 123

```
 1                         July 23, 2019
 2              A    I didn't know what was
 3    happening to be honest.  That past week,
 4    everything was blurred together, and I have
 5    no idea what anyone was doing.  I know that
 6    Transcendence couldn't have done it.  But I
 7    didn't know what they were doing.
 8              Q    Well, you told Ms. Morganroth
 9    that you were taking -- the main issue is
10    that you heard the MTA had came around at 5
11    o'clock and started collecting its buses?
12              A    That's correct, yes.
13              Q    Go with me to DX 176.
14              MR. AMINI:  It's a defendant's
15              exhibit, Your Honor.
16              A    Yes.
17              Q    This is an email exchange.
18    Let's start with the one on February 26 at
19    12:46 a.m. from Mr. Milea to you, Matt Nolan,
20    and Jean Luc at 12:46 a.m.  It's on the
21    second page.
22              A    I see that, yes.
23              Q    He's giving you a quick update
24    on his efforts, correct?
25              A    Correct.
```

in re: TRANSCARE CORPORATION

```
                                          Page 124
  1                    July 23, 2019
  2              Q     And you respond to him,
  3   thanking him at 12:59 p.m., thanking him for
  4   his efforts.  And then you say:  We will have
  5   to try and deal with moving equipment
  6   tomorrow?
  7              A     Yes.
  8              Q     And you meant -- what did you
  9   mean by "moving equipment tomorrow"?
 10              A     The equipment that
 11   Transcendence Transit may have needed that
 12   was supposed to be foreclosed on, just the
 13   foreclosed equipment that was required for
 14   Transcendence Transit to operate.
 15              Q     That was still in TransCare's
 16   possession?
 17              A     Correct.
 18              Q     And then Mr. Kossuth (ph)
 19   writes you back at 1:46 saying he's taken
 20   certain measures, and he's going with a staff
 21   of eight members at 5 a.m. to -- 5 a.m. on
 22   Friday, the 26th, to retrieve the remaining
 23   Baltimore ambulances which are still
 24   drivable.
 25              A     I see that.
```

in re: TRANSCARE CORPORATION

Page 125

1                    July 23, 2019

2          Q    And taking them to Pittsburgh.

3    And you thank him for that effort and tell

4    him he's done for the night?

5          A    Correct.

6          Q    So at least to this extent,

7    you had some knowledge of --

8          A    But you asked a different

9    question.

10         Q    I'm asking --

11         A    No, you asked about MTA.  I

12   clearly knew what Earl was doing, but that's

13   not the question you asked.

14         Q    You only knew what he was

15   doing in Pittsburgh.  You didn't know what

16   any of the other employees were doing around

17   the other spots, correct?

18         A    I clearly knew what Tom know.

19   Tom was the only Tom there, because he told

20   me.  So I didn't know what was happening with

21   the MTA.

22         Q    Okay.  Let me then take you --

23   that's a good segue to go to JX 103.

24              THE COURT:  I don't have that

25              document in my book.

in re: TRANSCARE CORPORATION

```
                                              Page 126

 1                        July 23, 2019
 2                    MR. AMINI:  You don't have JX
 3           103?  I'm sorry.
 4                    (Discussion off the record.)
 5           Q    Let's start with the last
 6    email in this chain, which is the first one
 7    in time, February 25 at 10:53 p.m.
 8           A    Yes.
 9           Q    Is this an email that when you
10    say you wrote to everyone, we can look at the
11    response from Matt Nolan that says does this
12    impact Hudson Valley payroll, above that, to
13    see at least who it would appear you were
14    sending this to?
15           A    Correct.
16           Q    You were sending it to Mr.
17    Youngblood, Mr. Fuchs, Mr. Milea,
18    Mr. Kossuth, and then the rest of the people
19    on that email are Patriarch folks, right?
20           A    Correct.
21           Q    Youngblood we've established.
22    Fuchs was the guy running the MTA, right?
23           A    Correct.
24           Q    And then what was Milea
25    running?
```

in re: TRANSCARE CORPORATION

```
                                          Page 127
 1                    July 23, 2019
 2              A    I believe Milea may have been
 3    director of IT or something, IT services.
 4              Q    And Earl Kossuth I think we've
 5    had testimony was running Pittsburgh, you saw
 6    the email from that as well?
 7              A    From that email, yes, it was
 8    the case.
 9              Q    And you tell everybody that as
10    a result of -- as a result of a number of
11    circumstances, there's going to be no wind
12    down period.  Do you see that?
13              A    I do see that.
14              Q    So you knew as of late in the
15    evening, 11 o'clock on the 25th, that
16    TransCare, Old Co as we call it, was shutting
17    down?
18              A    Correct.  I believe -- at
19    least I knew there wasn't going to be a wind
20    down.
21              Q    And then you told everybody as
22    a result wanted to try to secure as many
23    ambulances, equipment as possible as quickly
24    as we can?
25              A    I see that, yes.
```

in re: TRANSCARE CORPORATION

Page 128

1                         July 23, 2019

2              Q     And then you say:  "I'm not

3     entirely sure where the most valuable assets

4     are, but it makes sense to target those

5     first"?

6              A     I see that.

7              Q     Why?

8              A     Because I didn't want someone

9     to look at paperclips when there was a server

10    that was necessary to operate Transcendence's

11    business.

12             Q     And Mr. Nolan responds to

13    you -- Mr. Nolan is up at Hudson Valley?  Is

14    that --

15             A     Yes.

16             Q     And he responds:  "Does this

17    affect the Hudson Valley payroll?"  Do you

18    see that?

19             A     I do see that.

20             Q     There was a payroll coming due

21    that day, the next day.  In fact, it's 10:59

22    p.m.  There was a payroll coming due within a

23    couple of ours on the 26th, was there not?

24             A     I believe that's why the

25    restructuring plan broke down was that

in re: TRANSCARE CORPORATION

Page 129

1                        July 23, 2019

2    particular payroll coming.

3               Q    Employees were owed for the

4    last two weeks at work, and that payroll was

5    going to be paid on that Friday?

6               A    I don't know how their pay

7    periods worked or how far back it goes.  I

8    don't remember whether it was the week prior

9    to this.  I don't know.

10              Q    In the next email which is --

11   now we're in the morning, the wee hours of

12   the 26th.

13              THE COURT:  My last email was

14         Mr. Nolan.

15              MR. AMINI:  The next one --

16         Mr. Nolan, and right above Mr.

17         Nolan, there is an email from Mr.

18         Stephen to all of the same people

19         February 26th at 04:14:35.  I was

20         looking at that.

21              THE COURT:  On Exhibit 103?

22              MR. AMINI:  It is exhibit 103,

23         yes.  Going backwards.  Yes.  I

24         have everyone, does it impact, and

25         then I have an email from Matt.

in re: TRANSCARE CORPORATION

Page 130

```
 1                   July 23, 2019
 2             It's Bates-stamped 43501 at the
 3             bottom of the page.
 4                   THE COURT:  Oh, I see.  I have
 5             it.
 6             Q    All right.  You ask is there
 7   any way we can reach out to EMS charts, the
 8   EBCR agreement, we need to get that moved
 9   ASAP.  Do you know what that is?
10             A    That was an agreement -- EBCR,
11   as I recall, was a software system that was
12   running ambulances to allow them to share
13   medical data.  So the movement there would be
14   to get that contract to the assignment.
15   There is no physical movement of that, as I
16   recall, what the EBCR was.
17             Q    And then there is an email
18   from Mr. Pelissier that we went over with
19   him.  That's the next one about moving the --
20   I think AS 400 server.
21             A    Yes.
22             Q    All right.  And Mr. Nolan
23   comes back again to the group at 11:25.  I
24   don't know how these emails work in terms of
25   time, but asked is the Hudson Valley payroll
```

in re: TRANSCARE CORPORATION

Page 131

1                        July 23, 2019

2     okay for tomorrow.

3                    A    I see that.

4                    THE COURT:  That's the day

5               before, that's what I was going

6               with the dates.

7                    MR. AMINI:  Yeah, I don't know

8               why they line up this way, Your

9               Honor.  I can tell you that's they

10              way they're produced.

11                   Q    If you move up, to a later

12    email -- that's probably two separate strings

13    that are mixed here.  I don't know.  But in

14    any event, you write this email to Matt Nolan

15    at 11:37 p.m. on February 25?

16                   A    I do.

17                   Q    And you tell him, "I have

18    information on the payroll," and you ask Glen

19    to please get this message out on the "NEW

20    CO" (ph) employees ASAP, correct?

21                   A    Correct.

22                   Q    Glen is Glen Youngblood?

23                   A    Correct.

24                   Q    And the new information you

25    have on the payroll you have from Ms. Tilton,

in re: TRANSCARE CORPORATION

Page 132

```
 1                      July 23, 2019
 2    do you not?
 3            A     Correct.
 4            Q     The statement that follows is
 5    a statement that Ms. Tilton authorized you to
 6    send?
 7            A     Correct.
 8            Q     And it basically says, "If
 9    TransCare can't pay last week's payroll,
10    Transcendence Transit will pick up that
11    liability and pay the employees for the last
12    week of work.  It may take a day or so to get
13    them into the system, but they will be paid."
14            A     That was at least part of what
15    she asked me to write.  That's why I have the
16    follow-up email is to include everything she
17    wanted.
18            Q     Two minutes later you had the
19    addition?
20            A     Yes.
21            Q     Did you BCC her on the first
22    one, and then she wrote you -- I'm just
23    asking, and she wrote you and said you forgot
24    to say in the good standing or you just
25    remember it after he said it?
```

in re: TRANSCARE CORPORATION

Page 133

```
 1                    July 23, 2019
 2          A    I doubt it.  I may have spoken
 3   with her as soon as soon as I hit send.  She
 4   reminded me.
 5          Q    So you follow-up with it and
 6   said, okay, two minutes later, "only
 7   employees in good standing"?
 8          A    Correct.
 9          Q    And you do understand that
10   that's what Glen Youngblood wanted?  He sent
11   that notice to some 300 employees?  Go with
12   me, if you would, to PX 240.
13               MR. AMINI:  This one has a
14          lacks relevance objection, Your
15          Honor.  PX 240.
16          A    I see it.
17               MR. MERVIS:  Relevance, we're
18          going two days past the
19          foreclosure.
20               THE COURT:  As I recall, one
21          of the arguments was the operation
22          was never effective, but it looks
23          like Transcendence was operating
24          for these two days.
25               MR. MERVIS:  Well, I guess,
```

in re: TRANSCARE CORPORATION

Page 134

1                    July 23, 2019

2            that's a legal question.

3                    THE COURT:  It suggests the

4            assets closed and operated for a

5            couple of days at least.

6                    MR. MERVIS:  Right.  And what

7            I'm saying is I think that's

8            ultimately -- I think there's two

9            questions there.  One is a legal

10           question as to whether or not it

11           was Transcendence.  But separately

12           the question that's relevant.  But

13           my specific objection is now we're

14           talking about communications in the

15           middle of the night two days after

16           the -- after this occurs.

17                   THE COURT:  I'm going to

18           overrule the objection.  It is

19           relevant, at least to the issue I

20           mentioned.  It may be relevant to

21           other issues, I don't know.

22           Q    And this Exhibit 240,

23    Plaintiff's Exhibit 240, Mr. Youngblood sends

24    you the notice that you sent to everybody

25    else.  We have assured from ownership that,

in re: TRANSCARE CORPORATION

```
                                           Page 135
  1                      July 23, 2019
  2   and then he quotes your email?
  3             A    Looks like it, yes.
  4             Q    And he forwards that along to
  5   you at 2:36 a.m. saying, sorry, I forgot to
  6   include you.  This was sent at 2:19?
  7   Correct?
  8             A    Correct.
  9             Q    And you received that?  You
 10   were aware of that at the time, correct?
 11             A    Correct.
 12             Q    Okay.  Let's move to PX 253?
 13   I didn't realize PX 2 was in my book.
 14                  THE COURT:  253.  Is it in the
 15             book?
 16                  MR. AMINI:  253.  There's no
 17             objection to this, Your Honor.
 18             Your book.  Can we just have put it
 19             up on the screen, please.
 20             Q    PX 253, this William O'Brien
 21   is at NYSIF, the New York State Insurance
 22   Fund.  It's on the screen.  It's not in your
 23   book.  I apologize.  Do you see this email
 24   from Mr. O'Brien?
 25             A    Yes.
```

in re: TRANSCARE CORPORATION

Page 136

1                    July 23, 2019

2             Q    Okay.  It refers to an

3    attachment we don't have.  I can show you the

4    next email, it's just a see attached.  The

5    next one after that, but there's nothing

6    after that.  But it refers to -- it requests

7    a cancel a certain policy with the New York

8    State Insurance Fund.  Do you see that?

9             A    Yes.

10            Q    And he's writing back and

11   telling you, okay, but that policy also

12   covers TS Hudson Valley Ambulance

13   Corporation.  Do you see that?

14            A    I see that, yes.

15            Q    Basically to cut through this

16   quickly, the NYSIF guy was saying "I see

17   you're canceling the Transcendence insurance

18   fund ones, but I let you also know that

19   policy covers the Hudson Valley operations,"

20   and you write him back and said, "We're going

21   to cancel that, too, and I will be sending a

22   letter to that effect."

23            A    Correct.

24                 MR. MERVIS:  Your Honor, can I

25            make a request.  It's been like

in re: TRANSCARE CORPORATION

                                              Page 137

  1                          July 23, 2019
  2               two-and-a-half hours.  Can we take
  3               a break.
  4                    MR. AMINI:  I'm two documents
  5               away.
  6                    MR. MERVIS:  Pardon?
  7                    MR. AMINI:  I'm two documents
  8               away from being finished.  I'm fine
  9               to take a break.
 10                    THE COURT:  Why don't we take
 11               a break until 4:00 o'clock.
 12                    MR. MERVIS:  Thank you.
 13               (Whereupon, at 3:47 p.m., a recess was
 14               taken to 4:11 p.m.)
 15               (The deposition resumed with all parties
 16               present.)
 17                    THE COURT:  Continue.
 18                    MR. AMINI:  Thank you, Your
 19               Honor.
 20               Q    Mr. Stephen, would you take a
 21          look at Exhibit 281.  Is that PX or --
 22                    MR. AMINI:  My copy doesn't
 23               have PX.
 24               A    PX?
 25               Q    Yes, it's the next to the last

in re: TRANSCARE CORPORATION

```
                                               Page 138
  1                    July 23, 2019
  2   one.
  3             A    I see it.
  4             Q    Is that an email that -- that
  5   email from Brian Stephen to Andrew Marshack
  6   (ph) and cc'd to Alexander, is that an email
  7   you sent on August 1st, 2017, at 9:11?
  8             A    Yes, it appears to be, yes.
  9             MR. MERVIS:  Your Honor.
 10             MR. AMINI:  I didn't move it.
 11        I'm not reading anything from it.
 12             Q    And is that the email that you
 13   received back from Mr. Witkis (ph) on or
 14   about August 1st, 2017, at 6:54 p.m.?
 15             A    I believe so, yes.
 16             Q    And to your knowledge did you
 17   ever reply to Mr. Witkis?
 18             MR. MERVIS:  Your Honor,
 19             that -- that question -- in order
 20             for that question to be put, I
 21             think the document has to come into
 22             evidence.  On any event, I object
 23             on relevance, Your Honor.
 24             THE COURT:  It's relevant to
 25             the trustees' claim to disallow the
```

in re: TRANSCARE CORPORATION

Page 139

1                     July 23, 2019
2           secured claim of Arc II and
3           preserve the lien for the estate.
4           In that event, whether it's through
5           a recharacterization or through the
6           argument that even if the January
7           advances were actually loans, it
8           had nothing to do with the Arc II
9           credit agreement.  The -- you know,
10          the trustee may be entitled to
11          recover the $800,000.
12               MR. MERVIS:  Okay.  That's --
13          I'm not going to argue that now,
14          Judge.
15               THE COURT:  Okay.
16               MR. MERVIS:  I think that's
17          wrong.  Even if there is a
18          recharacterization, I think that's
19          wrong.  But my point is simply
20          this, I'm harkening back to our
21          discussion yesterday.  This is now
22          so far removed from the events that
23          occurred.  In other words, you
24          know, I think what we talked about
25          yesterday was if it's in and around

in re: TRANSCARE CORPORATION

```
                                                    Page 140
     1                        July 23, 2019
     2            the time of the February 24th
     3            transaction, there's potential
     4            relevance, but this is so far after
     5            that.  This, I think, falls into
     6            the category of frankly who cares
     7            and what possible purpose does this
     8            have other than to say that Mr.
     9            Stephen was rude or deliberate or
    10            whatever with respect to the email.
    11                 THE COURT:  Which of the
    12            emails?
    13                 MR. AMINI:  Only the two last
    14            emails which will be on the first
    15            page, in addition to as, your
    16            Honor, pointed out the direct
    17            relevance to the $800,000 claim.
    18            There's actually in the second
    19            paragraph a statement by
    20            Mr. Stephen that the assets were
    21            foreclosed.  And all we hear on our
    22            end is, no, it wasn't, it was just
    23            an attempt.  So based on the
    24            foreclosure is how they're
    25            determining whether Credit Suisse
```

in re: TRANSCARE CORPORATION

```
                                        Page 141
   1                      July 23, 2019
   2          is going to get any money or not.
   3          So I don't see how they can argue
   4          to the Court that it was an
   5          attempted foreclose and they didn't
   6          actually do it, but they can tell
   7          Credit Suisse we did it, and that's
   8          why you're not getting we didn't.
   9              MR. MERVIS:  The question I
  10          objected to, Your Honor, was simply
  11          did he reply to the very last email
  12            --
  13              THE COURT:  Well, let's start
  14          with the document.  Is there an
  15          objection to the receipt of the
  16          document?
  17              MR. MERVIS:  Yeah, I --
  18              THE COURT:  I guess two emails
  19          on the first page.
  20              MR. AMINI:  The two emails on
  21          the first page, the rest is --
  22              MR. MERVIS:  Yes.  Yes, Your
  23          Honor.  I certainly object to the
  24          final email.  But, in other words,
  25          the one at the top, but yeah, for
```

in re: TRANSCARE CORPORATION

```
                                          Page 142
 1                    July 23, 2019
 2              the reasons I stated before, I do
 3              object to the emails on the bottom
 4              half of the --
 5                   THE COURT:  The one on the
 6              bottom is Mr. Witkis --
 7                   MR. AMINI:  I'm also
 8              interested in Mr. Witkis' second
 9              paragraph.  Can you confirm which
10              tranche of the term loan was
11              actually received in distribution.
12                   THE COURT:  That I think we
13              are getting far afield.  That's a
14              dispute between Credit Suisse and
15              this PPAS or other lenders that
16              receive benefit from that transfer.
17                   MR. AMINI:  I would argue to
18              Your Honor that given the first
19              email and Mr. Stephen's description
20              of how this money is that that's
21              very relevant to their -- to
22              whether a foreclosure occurred.
23              He's saying if you foreclosured on
24              me after, which tranche go to, and
25              he's not getting an answer.  I
```

in re: TRANSCARE CORPORATION

```
                                            Page 143
 1                    July 23, 2019
 2             would say that's very relevant.
 3                  THE COURT:  Where does
 4             Mr. Stephen email say it was a
 5             foreclosure?
 6                  MR. AMINI:  Yes.  In the
 7             second paragraph it says we
 8             received proceeds of 800 from the
 9             sale of certain property assets
10             formerly owned by TransCare and
11             it's subsidiaries, which assets
12             were foreclosed by the agent on
13             behalf of the senior lenders.  And
14             then Mr. Witkis says, okay, which
15             tranche got that money, which is
16             reasonable.
17                  THE COURT:  We know who got
18             the money from the proofs of claim.
19             Are the defendants contending there
20             was no foreclosure?
21                  MR. MERVIS:  No, Your Honor.
22             So here's what we're contending.
23             Look, there was certainly a belief
24             that there was a foreclosure.
25             Whether it was effective is a
```

in re: TRANSCARE CORPORATION

```
                                                      Page 144
     1                          July 23, 2019
     2              matter of Article 9 law -- to the
     3              extent that that matters to Your
     4              Honor, you'll decide.  What I'm
     5              saying is whether or not there was
     6              an effective foreclosure is
     7              actually not relevant to any claim
     8              of the case.  The actions that were
     9              taken may or may not be relevant.
    10              What I'm saying is as a legal
    11              matter --
    12                   THE COURT:  No, that's not
    13              true.  Because there's a fraudulent
    14              transfer claim that's predicated on
    15              that.
    16                   MR. MERVIS:  I'm sorry.  Which
    17              fraudulent transfer?
    18                   THE COURT:  There is an
    19              intentional fraudulent transfer
    20              claim.
    21                   MR. MERVIS:  On the -- yes.
    22              So there is a two-level analysis
    23              there in our view, Your Honor.  The
    24              first is was there an effective
    25              foreclosure, and again that -- we
```

in re: TRANSCARE CORPORATION

```
                                          Page 145
 1                    July 23, 2019
 2              haven't argued that in our paper
 3              one way or the other.  The second
 4              was were the assets ever actually
 5              transferred.
 6                   THE COURT:  It looks like
 7              Transcendence is operating --
 8                   MR. MERVIS:  I actually think
 9              that's not right, Your Honor, but I
10              understand you're looking at the
11              documents --
12                   THE COURT:  I've heard enough
13              of this.  I'll accept the emails
14              but I'm not going to get into -- I
15              think it's irrelevant a year and a
16              half after the fact whether Credit
17              Suisse has a claim against PPS or
18              anybody else.  We know what
19              happened to the money, whether or
20              not they stipulate to it, it's
21              right in the proof of claim.  PPS
22              foreclosed and the money was
23              credited to Arc II.
24                   MR. AMINI:  Just so it's
25              clear, I'm only arguing that their
```

in re: TRANSCARE CORPORATION

Page 146

1               July 23, 2019

2           response is at least to -- even if

3           minor, indicative of their intent

4           in terms of were they being upfront

5           with these people or were they not.

6           They're not being upfront with

7           their creditors, that goes to their

8           intent.  That's all I'm arguing.

9           They're an agent for the loans.

10          That was my point in asking did you

11          respond to the man's question.  I

12          think I know what the answer is.

13          It's a simple answer, and I'm done

14          with him.

15              THE COURT:  This is a year and

16          a half later.  We're not going to

17          get into a dispute between Credit

18          Suisse and PPAS.  You have

19          established through the evidence

20          mostly yesterday that while they're

21          asking Credit Suisse to consent to

22          a transaction which it refuses to

23          consent to, enters a similar

24          transaction.  It's Arc II.  I

25          understand that.

in re: TRANSCARE CORPORATION

```
                                                    Page 147
  1                          July 23, 2019
  2                   MR. AMINI:  Thank you.  I have
  3           no further questions.
  4                   THE COURT:  I'll receive the
  5           document for the purpose indicated.
  6                   MR. AMINI:  Understood.
  7           Mr. Samet reminds me, because he's
  8           watching, that I may not have moved
  9           244, 235, and 229 in the record.
 10                   THE COURT:  Can you say that
 11           again?
 12                   MR. AMINI:  244, 235, and 229.
 13                   THE COURT:  Any objection to
 14           244?
 15                   MR. MERVIS:  None to 244.
 16                   THE COURT:  Received.
 17                   MR. MERVIS:  None to 239;
 18                   MR. AMINI:  229.
 19                   MR. MERVIS:  No objection.
 20                   THE COURT:  What's the third
 21           one?
 22                   MR. AMINI:  235.
 23                   THE COURT:  Any objection?
 24                   MR. MERVIS:  No, Your Honor.
 25                   THE COURT:  It's received.
```

in re: TRANSCARE CORPORATION

```
                                           Page 148
  1                       July 23, 2019
  2                   MR. AMINI:  Your Honor, I'm
  3            not going to give you the binder.
  4            I think -- we only have one
  5            document.  We'll pull it up on the
  6            screen.  You want the binder?
  7   BY MR. MERVIS
  8            Q    All right.  Mr. Stephen, let's
  9   just talk for a minute about your background,
 10   and I'll give you a minute.
 11                   Where did you go to law school?
 12            A    University of Pennsylvania law
 13   school.
 14            Q    And after law school, you
 15   worked at a law firm?
 16            A    Yes.
 17            Q    And during the 2015, early
 18   2016 time frame, would you consider yourself
 19   to have been an expert in lending and finance
 20   law?
 21            A    No.
 22            Q    Would you consider yourself to
 23   have been an expert in Article 9 of the UCC?
 24            A    No.
 25            Q    I think this was established,
```

in re: TRANSCARE CORPORATION

Page 149

1                    July 23, 2019
2    but I just wanted to be very clear.  In
3    connection with the Article 9 transaction,
4    did PPAS have an outside lawyer?
5              A    Yes.
6              Q    And that person's name was
7    what?
8              A    Randy Creswell.
9              Q    And to your understanding did
10   Mr. Creswell have some experience in Article
11   9 foreclosure transactions?
12             A    Yes.  He worked with Patriarch
13   Partners in the past on similar transactions.
14             Q    Now, there was discussion
15   earlier about the fact that in February of
16   2016 Ms. Tilton and Wells Fargo were having
17   negotiations.  Do you recall talking about
18   that?
19             A    Yes.
20             Q    And to your knowledge, was
21   Wells Fargo represented by an outside law
22   firm in connection with those discussions?
23             A    Yes.
24             Q    What was the firm?
25             A    On the Otterbourg.  I'm not

in re: TRANSCARE CORPORATION

Page 150

1                    July 23, 2019

2    sure of the full name.

3                    THE COURT:  I think it's

4         Otterbourg.

5         Q    Do you recall the name of any

6    of the lawyers who worked on the account --

7    the matter?

8         A    I think at the end there was I

9    met Jonathan Helfap, and before that I think

10   it was perhaps Dan Fiorello, and I'm not sure

11   of the name.  It may have been someone else.

12        Q    Okay.  Now, I think we saw

13   that Curtis Mallet was originally retained to

14   serve as Chapter 11 counsel on February 9th,

15   is that -- does that comport with your

16   recollection?

17        A    The 9th or the 10th.

18        Q    Sometime after the 9th or the

19   10th, but before the 24th, did you attend a

20   meeting at Curtis Mallet with representatives

21   of Wells Fargo?

22        A    I believe they were on the

23   phone with Jonathan Helfap from Otterbourg,

24   and Charles Marks was there, and Lynn

25   Harrison for TransCare and Jean Luc

in re: TRANSCARE CORPORATION

1                    July 23, 2019

2    Pelissier.

3              Q    And was the meeting held in a

4    conference room?

5              A    Yes.

6              Q    Do you recall what the seating

7    arrangements were in terms of who sat where?

8              A    Yes.  Lynn Harrison, Jean Luc,

9    and I sat on one side of the table, and

10   everyone else was on the other side of the

11   table.

12             Q    And the everyone else included

13   the Carl Marks people?

14             A    It did.

15             Q    Those were TransCare's

16   financial advisors at the time?

17             A    Yes, they were.

18             Q    And during the course of that

19   meeting, was there discussion of the planned

20   Article 9 foreclosure?

21             A    I recall there was.  I don't

22   specifically recall what we discussed.  I

23   recall we discussed that.

24             Q    How are you so sure that that

25   was discussed if you can't recall the

in re: TRANSCARE CORPORATION

```
                                          Page 152
  1                    July 23, 2019
  2   details?
  3            A    That would have been the
  4   purpose of the meeting.
  5            Q    And you made reference
  6   earlier, I think, earlier when Mr. Amini was
  7   asking you questions as to a wind down of the
  8   Old Co business.  Again, to your
  9   recollection, was that discussed during the
 10   course of this meeting at Curtis Mallet?
 11            A    I believe it was, and I don't
 12   specifically recall.
 13                 MR. MERVIS:  Give me a moment,
 14         Your Honor.
 15                 THE COURT:  Um-hmm.
 16            Q    Oh, incidentally, before the
 17   Chapter 7 cases were filed, had you, in your
 18   legal career, been involved with a company
 19   that went into bankruptcy?
 20            A    No.
 21            Q    So this is the maiden voyage,
 22   so to speak?
 23            A    Yes.
 24            Q    So there was some testimony,
 25   and actually if you can pull it up, JX 100
```

in re: TRANSCARE CORPORATION

Page 153

                          July 23, 2019

1

2    just as a point of reference.  So there was

3    some testimony about these documents

4    concerning the assignment of the MTA

5    contract.  Do you recall that?

6              A    I do.

7              Q    And you can -- you don't have

8    to look at the attachments, but there were

9    sort of attachments that had been signed by

10   representatives of TransCare and

11   Transcendence?

12             A    Yes.

13             Q    And do you know whether the

14   MTA ever countersigned this contract?

15             A    It did not.

16             Q    Incidentally, there was some

17   questions that Mr. Amini asked you about -- I

18   think he used the words, so you canceled the

19   contract and you can't -- no, not the

20   contract.  Do you know whether the

21   contract -- do you know whether Transcendence

22   ever canceled the MTA contract?

23             A    It did not.

24             THE COURT:  Did the MTA ever

25        agree to  sign the contract for

in re: TRANSCARE CORPORATION

Page 154

```
 1                    July 23, 2019
 2           Transendence.
 3                 THE WITNESS:  No, they did
 4           not.
 5                 MR. MERVIS:  That was actually
 6           the question.
 7           Q    Okay.  Mr. Amini showed you an
 8   email.  I'm just going to show you a
 9   different version of it.
10                 MR. MERVIS:  Roy, if you can
11           pull up PX 238.
12           Q    So Mr. Amini asked you some
13   questions about this email, and I think you
14   gave testimony that what you were trying to
15   do here was get people to secure assets so
16   business would continue to run.
17                 Did you have any other concerns
18   that you were trying to address when you sent
19   this email?
20           A    Yes.  I received word from
21   Randy Creswell that Gary Hurst had told him
22   that ambulances were being left on the road,
23   and he was -- Gary -- I think expressed his
24   concern about that, but I heard from Randy
25   Creswell the ambulance were being left on the
```

in re: TRANSCARE CORPORATION

Page 155

1                         July 23, 2019

2    road and being abandoned.

3              Q    And why was that a concern?

4              A    I'm not an expert on this, but

5    I assume there was medical equipment in those

6    ambulances and syringes and syringes and

7    plasma, and I'm not sure what else they might

8    carry and perhaps narcotics and so I was

9    worried that -- I just want to try and make

10   sure we try and secure as many of those as

11   possible.

12             Q    Incidentally, when you sent

13   this email, did you have any thoughts of what

14   would be done with these assets if the people

15   you were asking to secure them were

16   successful?

17             A    No.  I think other than the AS

18   400 server, which I guess was too large to

19   move, that was the only thing I thought of

20   that Transcendence needed to operate, but

21   other than that, I didn't have a place for

22   them to put the ambulances.  I didn't have a

23   place to put the equipment.  I didn't have

24   anywhere to store these items, whatever

25   physical items they may have been.

in re: TRANSCARE CORPORATION

Page 156

1                    July 23, 2019

2            Q    And do you know where they

3    ultimately wound up?

4            A    Back in their bins.

5            Q    Okay.  Was there any plans to

6    take the ambulances and drive them out of the

7    country?

8            A    No, there was no plan to do

9    anything with the ambulances.

10           Q    If you can take a look at --

11   if pull up on the screen DX 176, which is in

12   evidence.

13                MR. MERVIS:  And, Roy, if you

14           can go to the second page, please.

15           Q    So we looked at this earlier,

16   and I just wanted to direct your attention to

17   the email from Mr. -- is it Milea?

18           A    Milea, yes.

19           Q    And he's writing to you, and

20   he's reporting -- it says, "Quick update on

21   the Hamilton base."  Do you see that?

22           A    I do.

23           Q    What is the Hamilton base?

24           A    I think that was one of the

25   TransCare locations from which the MTA

in re: TRANSCARE CORPORATION

Page 157

```
 1                       July 23, 2019
 2   services were provided.
 3             Q    And you so his report in the
 4   first paragraph, everything seems normal?
 5             A    Yes.
 6             Q    Okay.  Let's go up -- let's go
 7   to the first page now, and it's -- do you see
 8   that --
 9             MR. MERVIS:  Thank you, Roy.
10             Q    You say, "Tom, thank you for
11   your efforts.  We will have to deal with
12   moving the equipment tomorrow."  But then you
13   go on to say, "It's good to hear that the
14   ambulances are in the base.  We heard reports
15   they were being left in random places along
16   the streets, which does not seem all that
17   likely given the history of the employee base
18   and how seriously we know they take their
19   roles and the medication/equipment they
20   carry."  Do you see that?
21             A    I do.
22             Q    Were you -- was it, in fact,
23   good to hear that?
24             A    It was, yes.
25             Q    Was it a relief?
```

in re: TRANSCARE CORPORATION

```
                                              Page 158
 1                    July 23, 2019
 2              A    It was a relief.
 3                   MR. MERVIS:  Roy, pull up PX
 4              206, which is in evidence.  Your --
 5              I'm sorry.  Wrong number.  JX 96.
 6              Pull that up on the screen.  That's
 7              wrong, too.  Let me start again.
 8              Q    Mr. Amini asked you a number
 9    of questions about the extent to which the
10    folks who worked at TransCare were aware of
11    the transition services agreement and the
12    foreclosure.  Do you recall that?
13              A    I do.
14                   MR. MERVIS:  Okay.  Now, Roy,
15              can you pull up 206 in evidence.
16              Q    Now, we looked at this today
17    with Mr -- you know what, I'm pretty sure
18    this is in Mr. Amini's big binder.  You
19    looked at this today with Mr. Pelissier at
20    some length, so I'm not going to do this with
21    you, but let me just ask you, do you know
22    what this document is?
23              A    Yeah.  It's an update to Len
24    on the status of the -- of the plan, the
25    restructuring plan.
```

in re: TRANSCARE CORPORATION

Page 159

1                           July 23, 2019

2              Q    And if you go back up -- there

3      is a bunch of, if you just scroll through it,

4      you see there is a number of action items,

5      right?

6              A    Yes.

7              Q    And do some of those action

8      items refer to the planned article on

9      foreclosure?

10             A    I believe so.

11             MR. MERVIS:  And, Roy, if you

12             can scroll back up to the very top

13             of the exhibit, first page.

14             Q    You see the people who are in

15     the two-line, Mr. Stephen?

16             A    Yes.

17             Q    Do any of them work for

18     TransCare?

19             A    Peter Wolf and Glen

20     Youngblood, yes.

21             Q    And in preparing for the

22     Article 9 foreclosure, did you have

23     opportunity to interact with those gentlemen

24     about the foreclosure?

25             A    I did.

in re: TRANSCARE CORPORATION

Page 160

```
 1                    July 23, 2019
 2            Q     How frequently?
 3            A     Fairly frequently.  At some
 4   point in February, Glen was in the Patriarch
 5   Partners offices, helping, he and some of his
 6   colleagues pulled together some of the
 7   information for the transit services
 8   agreement.  All those amounts for payroll and
 9   other items were given to us by Glen, and I
10   won't necessarily say his team, but people
11   working with Glen from TransCare.
12            Q     Were you making any efforts to
13   hide information about the future plans of --
14   the NEW CO part of the plan for these
15   gentlemen?
16            A     No.
17            Q     Could you take a look --
18            MR. MERVIS:  And, Your Honor,
19            this is in the large binder that
20            Mr. Amini gave you.  I'm not sure I
21            can tell you where.  I'll try.
22            Can we pull up, please, PX 213.
23            Q     And you were shown this email
24   earlier.  This is to Mr. Youngblood, and
25   you're copied and Mr. Wolf are copied; is
```

in re: TRANSCARE CORPORATION

Page 161

1                         July 23, 2019

2    that correct?

3              A    Yes.

4              Q    And you see the reference

5    to -- in the second line to -- it says,

6    "Legally transferred to," all caps, "NEW CO"?

7              A    Yes.

8              Q    And what was the NEW CO a

9    reference to?

10             A    To Transcendence Transit.

11             Q    And to your understanding, had

12   that already been explained to Mr. Wolf and

13   Mr. Youngblood?

14             A    Yes.

15             Q    And then in the paragraph

16   below that, the second line says, "Vehicles

17   will help us determine the potential monthly

18   charge to Old Co?

19             A    I do.

20             Q    And what did Old Co stand for?

21             A    TransCare.

22             Q    And to your knowledge, had the

23   Old Co plan also been shared with Mr. Wolf

24   and Youngblood?

25             A    Yes.  I believe it's just one

in re: TRANSCARE CORPORATION

Page 162

```
 1                      July 23, 2019
 2   large plan.
 3                   MR. MERVIS:  Roy, if you can
 4           pull up -- actually, I take that --
 5           pull PX 234 please.  And if you
 6           could -- Roy, if you go to the
 7           second page, please -- and
 8           actually, sorry, go to the third
 9           page, please.  And if you could
10           just scroll up.  Great.
11           Q    The paragraph I want you to
12   focus on, Mr. Stephen, is the one that says
13   "all of the 390 drivers."
14           A    Yes.
15           Q    Now, Mr. Amini asked you if
16   that was untrue, and I think you agreed with
17   him, but you also said -- at least according
18   to the realtime I was looking at, "too
19   bullish".
20                Do you recall saying that?
21           A    Yes.
22           Q    What did you mean by "too
23   bullish"?
24           A    We were trying to show the MTA
25   that this would work, and I -- I wrote things
```

in re: TRANSCARE CORPORATION

Page 163

1                        July 23, 2019

2    here that I hoped would happen, but it didn't

3    happen, so obviously bullish is just not

4    true, either one, but this was an attempt to

5    try to get the MTA to consent to us.

6                   MR. MERVIS:  Roy, can you pull

7              up PX 213, please.  Oh, I'm sorry.

8              JX 103.  Your Honor, I think this

9              is towards the back of Mr. Amini's

10             binder.

11             Q    Mr. Amini asked you about the

12   first two paragraphs on the first page of

13   this exhibit -- the first two emails on the

14   first page of this exhibit.  Let's look the

15   at the one that you sent 11:37.

16                  So it says -- in the second

17   paragraph, it says, "If the TransCare

18   bankruptcy estate does not make payroll for

19   the last week, Transcendence Transit will pick

20   up that liability."

21                  Which company's payroll were

22   you referring to Transcendence offering to

23   pick up?

24             A    TransCare, a portion of

25   TransCare.

in re: TRANSCARE CORPORATION

Page 164

```
 1                      July 23, 2019
 2            Q    And was -- and then you
 3    modified it in the email at the top.  Was
 4    that, in fact, the plan, was it -- at the
 5    time that you sent this email?
 6            A    At the time I sent this, yes.
 7    That wasn't the original plan, but at the
 8    time I sent this, yes.
 9            Q    And ultimately -- well, to the
10    extent that the plan didn't pay out -- didn't
11    pan out, was that based on any
12    decision-making by you?
13            A    No.
14                 MR. MERVIS:  Your Honor, if I
15                 can have a moment.  I'm almost
16                 through.
17                      If you could pull up, please,
18                 Roy, DX 186.  There's no objection
19                 to this.
20                 MR. SAMET:  There's no
21                 objection.
22                 MR. MERVIS:  So we'll offer
23                 it, Your Honor.
24                 THE COURT:  186 is received.
25                 MR. MERVIS:  Roy, if you can
```

in re: TRANSCARE CORPORATION

Page 165

1              July 23, 2019

2              scroll down to the -- there you go.

3              There's an email from Mr. Leland to

4              Mr. Pelissier and Mr. Stephen.  You

5              see you're copied there.  Just take

6              a moment to look at this email, and

7              actually, Roy, if you could scroll

8              down a little more so the witness

9              can get the context.

10             Q    Do you recall -- there's a

11     discussion here about a problem the company

12     is having.  Do you recall what the subject

13     was?

14             A    I think this was the New York

15     State Insurance Fund, may have informed the

16     company they were going to cancel the policy

17     or at least they should have noticed the

18     policy was being canceled, that's within the

19     workers' comp policy they wouldn't be able to

20     operate.

21             Q    Okay.  And if you look at the

22     email on the very bottom of the first page

23     from Mr. Leland to Mr. Pelissier, the very

24     first sentence says, "I suspect Jeff would

25     advocate having legal counsel."  Do you see

in re: TRANSCARE CORPORATION

Page 166

1                         July 23, 2019

2    that?

3              A    I do.

4              Q    Do you know to who the Jeff is

5    that they're referring to?

6              A    I think from the email

7    directly below it was Jeffrey Ellis.  I don't

8    know for sure.

9              Q    Not 100 percent sure.  Who is

10   Jeff Ellis?

11             A    Jeff Ellis was the HR -- was

12   the VP of HR, I think.  Transit Corporation.

13                  MR. AMINI:  Your Honor, may I

14             just note my objection to the

15             relevance.  I don't know what

16             relevance this is to this case.

17                  MR. MERVIS:  Well, Your Honor,

18             the relevance is is I'm rebutting

19             testimony that you haven't seen yet

20             from Mr. Leland.  That's the

21             relevance.

22                  THE COURT:  All right.

23             Overruled.

24                  MR. MERVIS:  All right.  In

25             any event, Roy, if you could move

in re: TRANSCARE CORPORATION

Page 167

```
 1                    July 23, 2019
 2              up the page.
 3              Q    And you'll see there's an
 4    email from Mr. Pelissier, yourself, and Mr.
 5    Greenberg, and it says, "What is Glen trying
 6    to say?  Has anyone refused them anything
 7    regarding legal authorization to engage
 8    counsel."  Do you see that?
 9              A    I do.
10              Q    And then you'll see there's an
11    email from Mr. Greenberg where he starts, and
12    he says, "I was going to mention this as
13    well."  Do you see that?
14              A    Yes.
15              Q    All right.  Go to the top of
16    the page please.  You write, "No one refused
17    him counsel.  We repeatedly asked him to find
18    someone, and he constantly said he didn't
19    have any"; is that true?
20              A    Yes.
21              MR. MERVIS:  Your Honor, if I
22              can just consult with my
23              colleagues, I think I'm done.
24              Q    All right.  Just a couple.  I
25    need to clarify a couple things.  There was a
```

in re: TRANSCARE CORPORATION

Page 168

1                     July 23, 2019
2    lot of language at the beginning of your
3    examination, terms of art, and I just want to
4    make sure we're clear.
5                     There was reference to Ms.
6    Tilton being a collateral manager.  Do you
7    recall that?
8              A    I do.
9              Q    And to your understanding, she
10   was the collateral manager of what?
11             A    Of the Zohar Funds.
12             Q    Was she the collateral manager
13   of TransCare?
14             A    She was not.
15             Q    And there was some --
16             THE COURT:  TransCare or the
17             term lenders?
18             MR. MERVIS:  No, Your Honor --
19             well, I -- I don't know.  I think
20             it's already in evidence, Judge.
21             There was just so much confusion.
22             THE COURT:  She wouldn't be
23             the collateral manager for the
24             borrower?
25             MR. MERVIS:  That's correct.

in re: TRANSCARE CORPORATION

Page 169

1                    July 23, 2019

2              But I think that's how the

3              testimony came out, because the

4              question was -- well, that's how

5              the testimony came out, so I'm just

6              clearing it up.  She is not the

7              collateral manager.

8              Q    And in terms of PPAS's role as

9    an administrator -- again, with respect to

10   the TransCare term loan, administrator of

11   what --

12             A    The administrative agent, so

13   that TransCare would, for instance, pay --

14   its interest would be paid into Patriarch

15   Partners Agency Services and it would

16   distribute that interest to the various

17   lenders in proportion to their loans, their

18   outside loans.

19                  MR. MERVIS:  Thank you.  I

20             have nothing further, Your Honor.

21                  THE COURT:  Any direct.

22                  MR. AMINI:  Nothing Your

23             Honor.

24                  THE COURT:  When you attended

25             this meeting with Lynn Harrison,

in re: TRANSCARE CORPORATION

```
                                              Page 170
  1                    July 23, 2019
  2            Wells Fargo, and apparently
  3            Mr. Helfat was there?
  4                  THE WITNESS:  He was there.
  5                  THE COURT:  This was February
  6            what day?
  7                  THE WITNESS:  I don't know the
  8            date.  It would have been after
  9            Curtis Mallet was engaged, so
 10            sometime after February 10.
 11                  THE COURT:  Was there any
 12            discussion at the meeting about
 13            Wells Fargo funding TransCare in
 14            Chapter 11.
 15                  THE WITNESS:  To answer your
 16            question, I don't know if it's
 17            going back to that meeting.
 18                  THE COURT:  Was it discussed
 19            that that meeting?
 20                  THE WITNESS:  I don't know if
 21            we talked about it at that meeting.
 22            I think it was -- to answer your
 23            question, I don't know if we spoke
 24            it at that meeting.
 25                  THE COURT:  Did you discuss
```

in re: TRANSCARE CORPORATION

Page 171

```
 1                       July 23, 2019
 2              anything about funding?
 3                   THE WITNESS:  I did not.  I
 4              understand there were conversations
 5              with Wells Fargo about funding that
 6              but I don't know the specifics.
 7                   THE COURT:  All right.  You
 8              can step down.  Thank you.
 9                   MR. AMINI:  Your Honor,
10              relative to Your Honor's question,
11              can I ask --
12                   THE COURT:  To what I just
13              asked him?
14                   MR. AMINI:  Well, you just
15              asked him -- can I ask for DX 140
16              can be put up on the screen?  DX
17              not PX.  It's a a Defendants'
18              exhibit, Your Honor.
19                   REDIRECT EXAMINATION
20     BY MR. AMINI
21         Q    You had mentioned,
22     Mr. Stephen, did you not, that at this
23     meeting, Wells Fargo folks were all on the
24     telephone?
25              A    No.  I said I thought they
```

in re: TRANSCARE CORPORATION

Page 172

1                    July 23, 2019

2    were on the telephone.

3            Q    Right.  And so here's an

4    email, and one of the people on the phone was

5    Jonathan Helfat.  He was there?

6            A    He was there.

7            Q    Okay.  And so you think that

8    the Wells -- John Husson and Robert Strack,

9    were they on the phone to your recollection?

10           A    I think they were on the

11   phone.

12           Q    And is it -- you will see that

13   this is an email, and I understand you're not

14   on it, but are these, the people on this

15   email, that you recall participating in that

16   call?

17           A    In the meeting, Cindi Gilio

18   was not in the room, Lynn Harrison was, Carl

19   Landeck was, Jonathan Killion, he worked with

20   Carl Landeck, he was there.  Mark Pfefferle

21   was not there.  Lynn Tilton was not there.

22   Jean Luc was there.  Randy Jones was not

23   there.  Michael Greenberg was not there.

24   Daniel Fiorillo, Dan, I don't believe, was

25   there.  And I don't believe Robert Strack or

in re: TRANSCARE CORPORATION

Page 173

1                     July 23, 2019

2    John Husson were there.

3              Q    You had mentioned in your

4    earlier testimony about this meeting that it

5    occurred -- I thought you said it occurred

6    close in time to when the Curtis Mallet folks

7    had been engaged.

8              A    They had been engaged at that

9    point.

10             Q    Right.  And they were engaged

11   on -- I don't recall, but the 9th or the

12   10th.  As of the 10th, but I know there is

13   correspondence on the 9th?

14             A    I think it was the 10th.

15             Q    So this refers to -- let's

16   take this heading off:  Following up on our

17   conference call earlier today.  And this is

18   Friday, February 12th.  Does that help

19   refresh your recollection that this meeting

20   was, in fact, on that day?

21             A    I believe it was, yes.

22             MR. AMINI:  It's a Defendants'

23             exhibit.  I will move it in.

24             MR. MERVIS:  No objection

25             whatsoever.

in re: TRANSCARE CORPORATION

Page 174

1                    July 23, 2019

2              THE COURT:  It's received.

3              MR. AMINI:  Thank you, Your

4         Honor.

5              MR. MERVIS:  Your Honor, I

6         think -- I'm not sure how long you

7         were planning to sit tonight.  Now

8         would probably be a good time to

9         deal with Dr. Arnold.

10             THE COURT:  You talked about

11        the trustee's testimony.  Do we

12        need the trustee's testimony?

13             MR. AMINI:  We thought we

14        would need the trustee's testimony

15        with respect to the events of the

16        25th and the 26th, who was

17        operating -- He's going to come --

18        it's not a secret.

19             THE COURT:  Did we deal with

20        Dr. Arnold in the motion in limine?

21             Thank you.  You can step down.

22             THE WITNESS:  So, your Honor,

23        there's two issues.  There's two

24        issues that we would like to

25        discuss with the Court.  I'm sorry.

in re: TRANSCARE CORPORATION

```
                                                Page 175
  1                       July 23, 2019
  2              There's two issues that we want
  3         to raise.  We want to just offer the
  4         Daubert motion.  And there is a
  5         second  issue, which I previewed
  6         yesterday morning, which as we now
  7         have a new report, asked -- I want
  8         to put -- I want to ask for some
  9         guidance on it.
 10              Respect to the Daubert motion,
 11         Your Honor, Mr. Silagi, my
 12         colleague, put in a pro hac vice
 13         apparently last night.  I would be
 14         very happy if you could --
 15              THE COURT:  Did he pay $200?
 16              MR. SILAGI:  I did, Your
 17         Honor.
 18              THE COURT:  Are you a member
 19         of any bar?
 20              MR. SILAGI:  Yeah, new York.
 21              THE COURT:  But you're not a
 22         member of this court?
 23              MR. SILAGI:  No.  Pending.
 24              THE COURT:  Okay.
 25              MR. MERVIS:  He's Southern
```

in re: TRANSCARE CORPORATION

Page 176

1              July 23, 2019
2         District -- it's not in yet, but
3         he's ready to go on the motion.
4              THE COURT:  All right.  Motion
5         granted.
6              MR. MERVIS:  It's his job.
7              MR. SILAGI:  Your Honor, Alex
8         Silage, Proskauer Rose, on behalf
9         of the defendants.
10             Your Honor, we moved to exclude
11        Dr. Arnold for two reasons.  First,
12        his opinions don't fit the case;
13        and, second, they're not helpful to
14        the Court as the trier of fact.
15             First, to the fit issue, Your
16        Honor, the Trustee's claim is
17        essentially that Ms. Tilton failed
18        to monetize TransCare in January,
19        February of 2016.  The problem is
20        Dr. Arnold values TransCare as it
21        could be used with respect to
22        EBITDA.
23             Now, just to be clear, as a
24        general matter, there may not be an
25        issue with an expert who uses

in re: TRANSCARE CORPORATION

Page 177

1              July 23, 2019

2        prospective EBITDA, but the problem

3        is, is it that expert fails to test

4        any of the assumptions that underlie

5        that prospective EBITDA.  And that's

6        what Arnold did here.

7             So a helpful way to think of

8        this is to think of how the

9        trustees -- how the trustee intends

10       to use Dr. Arnold's evidence.

11       Essentially, the purpose is to show

12       what TransCare would have sold for

13       on the open market.  But if that's

14       the case, then you have to think

15       like a buyer.  But a buyer would ask

16       questions and would not assume

17       everything was all right.

18            So, for example, what Arnold

19       does is he fails to test any of the

20       assumptions and takes at face value

21       that the company would be able to

22       obtain the needed capital, that it

23       would be able to obtain the

24       vehicles.  He did no risk assessment

25       or analysis of the execution risk of

in re: TRANSCARE CORPORATION

```
                                         Page 178
 1                    July 23, 2019
 2              the project.  He simply accepted
 3              those issue without testing them.
 4                   So if you assume those things,
 5              you are not thinking like a buyer.
 6              And instead, what you're essentially
 7              left with is an expert who simply
 8              does math.  And that brings me to
 9              the second point, which is that the
10              testimony and the evidence from Dr.
11              Arnold also doesn't help this
12              Court's trier of fact.
13                   Essentially, if the analysis
14              that he does is to take, at face
15              value, the evidence that trustee's
16              counsel has provided for him and to
17              crunch those numbers and do basic
18              arithmetic, then that is, first,
19              something that this Court, as a
20              trier of fact, is certainly capable
21              of doing.  And second, this Court --
22                   THE COURT:  You give me too
23              much credit.
24                   MR. SILAGI:  Well, I'm still
25              young, but I assume you can -- I'll
```

in re: TRANSCARE CORPORATION

```
                                              Page 179
  1                     July 23, 2019
  2        stop at that line of questioning.
  3             MR. MERVIS:  That's wise.
  4             MR. SILAGI:  You know, to give
  5        the Court even more credit, the
  6        point is that you can do something
  7        that Dr. Arnold didn't do, which is
  8        you can actually look at the
  9        underlying evidence and actually
 10        make an assessment of the evidence
 11        and determine what weight, if any,
 12        to give to it.
 13             THE COURT:  You said "weight,"
 14        talking about admissibility.
 15             MR. SILAGI:  Well, I'm sorry.
 16        I mean, one, relevance; or two,
 17        whether it's reliable.
 18             So I think that at the end of
 19        the day, for those two reasons, Your
 20        Honor, the trustee's expert doesn't
 21        opine on anything that fits the case
 22        and doesn't provide any evidence
 23        that's helpful to this Court.  Thank
 24        you.
 25             THE COURT:  Thank you.
```

in re: TRANSCARE CORPORATION

Page 180

1                    July 23, 2019

2              MR. AMINI:  Your Honor, all I

3         heard was:  I don't like his

4         opinion, and we can attack it on

5         multiple levels.

6              He's saying he didn't test his

7         assumptions, which implicitly means

8         that in order to receive an expert

9         report, it has to be tested.  And

10        he's also said that all he's doing

11        is the math.

12             They can cross-examine him on

13        that and I can't tell you how he

14        tested it and what he did.  I mean,

15        it segues into the next part of what

16        they're complaining about, is that

17        we gave them slides concerning what

18        he's going to testify to because

19        it's easier to walk an expert

20        through with the slides, and we gave

21        them some of the rebuttal slides

22        because they brought in their

23        witness to say I didn't do any

24        testing, I didn't do any math

25        either, but I'm telling you if you

in re: TRANSCARE CORPORATION

Page 181

```
1                      July 23, 2019
2            did it the way I tell you to do it,
3            it would be different than what Mr.
4            Arnold got.  And so therein lies the
5            big dispute.
6                By the way, we're not suing, I
7            don't think, for failure to monetize
8            the assets.  I think that's really a
9            complete misstatement.  At this
10           point, given how this case has
11           evolved, Ms. Tilton took the assets
12           for herself, and we're suing under
13           Delaware law that she had to do that
14           in a fair process at a fair price.
15               One of the -- how we have set
16           up how people are going to
17           testify --
18               THE COURT:  We're getting
19           beyond the Arnold testimony at this
20           point.  I understand what your
21           claim is.  I read the pretrial
22           order, and it focuses on the
23           foreclosure.  The events of
24           February 24th, basically.
25               MR. AMINI:  That's right.
```

in re: TRANSCARE CORPORATION

```
                                              Page 182
 1                      July 23, 2019
 2                 THE COURT:  And although the
 3            case looked at some point like you
 4            were arguing in 2015, or whatever,
 5            that she should have gone through a
 6            marketing process, I don't
 7            understand that to be the claim.
 8                 MR. AMINI:  No, that's not the
 9            claim.  The claim is -- and
10            determined to sell it, she had an
11            obligation, under Delaware law, as
12            the board, to follow a fair
13            process, and she has the
14            obligation -- one of the things
15            about that Arnold is clear his she
16            has the obligation to establish a
17            fair price, and if she can't, then
18            Arnold becomes -- but since she's
19            the last witness, we're doing it --
20                 THE COURT:  You may be right.
21            Look, I'm going to overrule your
22            motion.  My sense of what Arnold
23            did to a large extent is he took
24            admissions from some of the
25            defendants and rolled that into a
```

in re: TRANSCARE CORPORATION

Page 183

```
 1                    July 23, 2019
 2        valuation.  Really, how he valued
 3        it goes to the weight, not the
 4        admissibility.  Because you can
 5        show that he didn't consider where
 6        the funds are going to come from,
 7        that, you know, he couldn't do a
 8        cash flow analysis because he
 9        didn't have that other element and
10        that this is not reliable.  You can
11        do all those things.  But that
12        really goes to the weight, not the
13        admissibility.
14             Let me hear what you have to
15        say about the slides.  I haven't
16        seen them.
17             MR. MERVIS:  Yes, so let me
18        pass it up, Your Honor.  And I'll
19        pass up the report, too, just in
20        case.
21             THE COURT:  Let me say, I
22        agree with Mr. Amini, that you have
23        to show the price was fair.  But
24        the trustee has to show what the
25        damages are, even if there was a
```

in re: TRANSCARE CORPORATION

Page 184

1          July 23, 2019

2          breach of fiduciary duty.

3               MR. MERVIS:  I think that's

4          exactly right, Your Honor, and I

5          think that's what we argued.

6               Your Honor, let me start at the

7          back.  That's where the issue is.

8          So if you start at --

9               THE COURT:  You know these are

10         upside down.

11              MR. MERVIS:  I think we've

12         done pretty well, Judge.  I

13         apologize.

14              MR. AMINI:  Here is a single

15         sided copy.

16              THE COURT:  Thank you very

17         much.

18              MR. MERVIS:  So if you look

19         at -- starting, Your Honor, at

20         Slide 29, let me explain to you

21         what I understand, Dr. Arnold to

22         have done here.

23              THE COURT:  Are there numbers?

24              MR. MERVIS:  Yeah, there are,

25         in the right-hand corner, Your

in re: TRANSCARE CORPORATION

Page 185

```
 1                    July 23, 2019
 2         Honor.
 3              THE COURT:  Okay.
 4              MR. MERVIS:  So -- so what
 5         I -- I'm not going to speak to --
 6         let me put it this way.  I think
 7         Mr. Amini would acknowledge that
 8         what is shown in Slides 29 through
 9         35 is in the nature of -- is in the
10         nature of rebuttal testimony.
11              Now, to start, we got this at 8
12         o'clock on Sunday night.  They've
13         had our expert's report for months
14         and months.  If they wanted to
15         tender rebuttal, or at least try to,
16         the time to do that is a long time
17         ago.
18              But let me -- let me tell you
19         what I think he's done here and why
20         if Your Honor doesn't exclude this,
21         at least we need time to deal with
22         it.  Because although I think
23         it's -- in some ways I want to
24         cross-examine him on it, but I don't
25         have enough information on it.
```

in re: TRANSCARE CORPORATION

Page 186

1                    July 23, 2019

2              So what he's done is he's --

3         he's responding, or he claims he's

4         responding to something that my

5         expert says.  That's not really so

6         but that's besides the point.  Hour

7         expert said this, the comparable

8         companies that you expert said this.

9         The comparable companies that you

10        selected, Dr. Arnold, were the ones

11        that Mr. Greenberg put on a piece of

12        paper, and valuation experts should

13        do more than that.  That's

14        Mr. Dunn's criticism.

15             So what Dr. Arnold appears to

16        have done here is he's gone and

17        found 69 companies that fit into

18        more and more of the criteria that

19        our expert notes TransCare had.  And

20        actually, as far as I can tell, it's

21        probably just one.  And so, just to

22        give you some examples, Your Honor,

23        of who is on this list, if you look

24        at No. 30 in the third row, you will

25        see that one of the supposed

in re: TRANSCARE CORPORATION

Page 187

1          July 23, 2019

2          comparables is here on consulting.

3          To pick another firm that Your Honor

4          may be familiar with, if you go a

5          couple of rows over, see No. 43,

6          Maverick Consulting (ph).  And so

7          that sort of speaks for itself.

8              But here's the problem.  I have

9          no idea what the work product is

10         behind this.  I have no idea why he

11         picked these companies.  I don't

12         know what their profiles are.  I

13         have not received anything that

14         indicates how these companies were

15         selected, why they were selected, or

16         what attributes he thinks they share

17         with TransCare.

18             So then what he's done, Your

19         Honor, and it's explained in Slide

20         31, but I think it's graphically

21         represented in Slide 32, is he says:

22         Well, look, if you take from these

23         69 some subset of, quote, smaller

24         companies, and you plug them and you

25         do an EBITDA multiple analysis, look

in re: TRANSCARE CORPORATION

Page 188

1                    July 23, 2019

2              at this range, right, and it goes --

3              I don't -- I have no idea which

4              companies are in the similar

5              companies range.  I have no idea

6              what companies are in any ranges.

7                   So, basically, argument is

8              twofold.  One, it's way too late to

9              be doing a rebuttal report.  There

10             was no provision for a rebuttal

11             report in the case management order.

12             And as I said, we've been -- you

13             know, they had our report forever.

14             And if they wanted to do this, they

15             could have done it a long time ago.

16                  Secondly, to the extent that

17             Your Honor would determine that this

18             is appropriate as a matter of

19             timing, we have been provided

20             woefully insufficient information to

21             cross examine because I do not know

22             why he selected any of these

23             companies and I have not had the

24             time to research them to prepare a

25             cross examination.

in re: TRANSCARE CORPORATION

Page 189

1          July 23, 2019

2                THE COURT:  Did you take his

3          deposition in response to his

4          original report?

5                MR. MERVIS:  Yes, Your Honor.

6                THE COURT:  So you want to

7          take his deposition; is that what

8          you want, before he testifies?

9                MR. MERVIS:  Well, no.  What I

10         would like -- No.  What I would

11         like you to do, Your Honor, is

12         exclude this from his testimony.

13         If you're not going to exclude

14         it -- and I think you should, for

15         the reasons that I said -- if

16         you're not going to do that, then,

17         yes, first I need his work product.

18         I need the work papers.  I need to

19         know how this all came together.

20         And then, yes, I would like to take

21         his deposition.

22                THE COURT:  Yes sir.

23                MR. AMINI:  You want to hear

24         from me?

25                THE COURT:  Are you done?

in re: TRANSCARE CORPORATION

```
                                                    Page 190
  1                         July 23, 2019
  2                    MR. MERVIS:  No, but I'll stop
  3              here.  I have a few other things
  4              but they're not as significant as
  5              this, so I think we can take it one
  6              at a time.
  7                    THE COURT:  Okay.
  8                    MR. AMINI:  It's absolutely
  9              rebuttal.  And I have other
 10              rebuttal slides that I haven't
 11              given him, but I gave him these
 12              slides because -- I assume when
 13              their expert goes on, I get an
 14              opportunity to challenge their
 15              expert's statements.  Their
 16              expert's testimony, their expert's
 17              report said that Mr. Arnold had
 18              done something incorrectly and that
 19              he had done it in a certain other
 20              way, he would have gotten a
 21              different result.
 22                    So we told him before his
 23              deposition that he should go out to
 24              it in the other way, and he did, and
 25              he said, Look, I get the exact same
```

in re: TRANSCARE CORPORATION

                                              Page 191

      1                    July 23, 2019

      2            result.  At the deposition, Mr.

      3            Mervis asked him:  Did you do

      4            anything -- other than relying on

      5            the Tilton people's stuff, did you

      6            do anything else?  He said yes.  I

      7            didn't independently vet theirs;

      8            however, I subsequently looked at

      9            all publicly-traded companies in the

     10            healthcare services, NICS Group, and

     11            made some additional calculations.

     12            Much to my surprise, no further

     13            questions were asked about that.

     14                 Now, because of the way we've

     15            set this trial up, Dr. Arnold is

     16            going to testify today, and my

     17            impression of Your Honor's order was

     18            that he's not coming back.  So when

     19            I put him on, I have got to respond

     20            to the things they said.  And this

     21            is --

     22                 THE COURT:  You can call him

     23            back and redirect him.

     24                 MR. AMINI:  In that case,

     25            then, I'll pull the slides and you

in re: TRANSCARE CORPORATION

```
 1                    July 23, 2019
 2            will decide whether or not I'll put
 3            him on the redirect case.  And
 4            he'll come back and I'll make sure
 5            he's here on the day that Mr. Dunn
 6            is here, and he can get on and you
 7            can decide whether this is -- he
 8            has notice of it so he can't --
 9              THE COURT:  I'll tell you what
10            my issue is.  It looks like it's a
11            supplementation of his original
12            expert report -- let me finish.
13              He goes out and he renders an
14            opinion regarding value based upon
15            the information that he got from
16            Patriarch.  Subsequently, he goes
17            out and gets more information, an
18            that's what the subject of his
19            report is.
20              MR. AMINI:  He doesn't change
21            his original opinion.
22              THE COURT:  I understand that.
23              MR. AMINI:  Or the basis for
24            his original opinion.
25              THE COURT:  It's a
```

in re: TRANSCARE CORPORATION

                                              Page 193

 1                    July 23, 2019

 2          supplementation of his report.

 3                 MR. AMINI:  He has not changed

 4          his original opinion and he has not

 5          moved from the four corners of his

 6          original report.  He says, My

 7          report is fine.  This --

 8                 THE COURT:  What do you need

 9          this for?

10                 MR. AMINI:  Because their

11          expert comes and says:  If you had

12          done it my way, you would have got

13          a different result, and I want to

14          respond to:  If we do -- we did it

15          your way.  This is the way you told

16          us to do it, and we get the same

17          result.

18                 By the way, I would point out

19          to Your Honor that if you ask -- I

20          could sit here -- I can stand up

21          here right now -- based on the

22          slides -- I made sure of this -- and

23          tell you exactly what he did.  Every

24          step is in these slides.  We didn't

25          eliminate -- there's nothing --

in re: TRANSCARE CORPORATION

Page 194

 1                    July 23, 2019

 2              THE COURT:  I'm not disputing

 3         that.  I'm disputing the timing and

 4         whether it's a supplementation of

 5         his expert report.  It seems to be

 6         something else.  He's done

 7         something else after the expert

 8         report because it was questioned.

 9              MR. AMINI:  Well, it's no

10         different that if one expert -- you

11         put an expert report, the other

12         expert comes with a long formula

13         and says:  Under this formula, you

14         are wrong.  You have to come and

15         say:  Well, I redid -- I did your

16         formula just the way you said to do

17         it, and it's not.  Now, wouldn't

18         you allow somebody to do that?

19              THE COURT:  Usually after the

20         reports are exchanged, that's when

21         the depositions take place.

22              MR. AMINI:  And we did.  And

23         they ask him had he done more work,

24         and he said he had, and they didn't

25         ask him any other questions about

in re: TRANSCARE CORPORATION

Page 195

1                    July 23, 2019

2              it.  And now I'm sitting there

3              going, If I sent some more

4              material, what's he going to do?

5              And then thinking about it, I knew

6              Mr. Dunn was probably not coming

7              this week, so I said, Look you're

8              coming, maybe the Judge will let

9              you back on.  Let's make sure he

10             has this because he's probably

11             coming when Lynn Tilton comes in

12             two or three weeks, and when that

13             happens, he's had time to look it

14             and say, No, I think Arnold's

15             wrong.  And I don't think Arnold --

16             the way Arnold did what I think I

17             said he should do, I think he did

18             it wrongly, or some other way to do

19             it.

20                  But he said:  You should go to

21             the overall universe of these

22             companies, and indicated which text

23             he would go to get that.  And that's

24             what this is.

25                  MR. AMINI:  Do you want to

in re: TRANSCARE CORPORATION

Page 196

1                          July 23, 2019

2              take his deposition regarding the

3              his rebuttal report, which normally

4              would come in before you start

5              taking depositions.

6                   MR. MERVIS:  Well, so, Your

7              Honor, I actually think the -- I

8              think that --

9                   THE COURT:  He's right.  You

10             can just, I suppose let in the

11             expert report and question him

12             about that.  And your expert will

13             come on and testify.

14                  MR. MERVIS:  And that's always

15             the case when you've got -- and

16             sometimes people have rebuttal

17             reports in the schedule and

18             sometimes they don't.  But I

19             actually think -- I actually think

20             this is the right answer.

21                  I think that Mr. Amini is not

22             accurately understanding what

23             Mr. Dunn's opinion is to which this

24             supposedly responds.  So the

25             redirect case makes a lot of sense

in re: TRANSCARE CORPORATION

```
                                            Page 197
 1                    July 23, 2019
 2              to me.  And, yes, I would like to
 3              take his deposition before hand.
 4              And I would like his work product,
 5              please.
 6                  MR. AMINI:  I assume he has
 7              his work product.  He's done some
 8              calculations.
 9                  MR. MERVIS:  Yeah, let me
10              explain what I mean.
11                  THE COURT:  When do you want
12              to take his deposition?
13                  (Discussion off the record.)
14                  THE COURT:  Where is he?
15                  MR. AMINI:  Illinois.  He
16              lives in Illinois.  Perhaps we can
17              do it by -- the expense to the
18              trustee we're concerned with.
19              Perhaps we can given him the
20              materials and perhaps he can deal
21              with this.  I would be in the room
22              with Mr --
23                  MR. MERVIS:  Your Honor, I
24              don't want to do it tomorrow.
25              We're going to be here.  But I'll
```

in re: TRANSCARE CORPORATION

Page 198

1                    July 23, 2019

2          schedule it.

3               THE COURT:  Well, let's figure

4          out who the witness are going to

5          be.  We have the trustee and who

6          else?

7               MR. MERVIS:  And Dr. Arnold.

8               MR. AMINI:  And we have

9          stipulated to the Credit Suisse.

10         We'll advise Your Honor they've

11         stipulated so we won't need to have

12         Credit Suisse testimony.

13              THE COURT:  Your proposal is

14         that he just give the testimony

15         based upon his report and not his

16         rebuttal?

17              MR. AMINI:  Yes, sir.

18              MR. MERVIS:  And then you hear

19         from my expert.  And if you

20         determine, after hearing my expert,

21         that this has relevancy to

22         anything, then I'll have a

23         deposition in my picket --

24              THE COURT:  Why not take his

25         deposition now?  In other words,

in re: TRANSCARE CORPORATION

```
                                             Page 199
   1                        July 23, 2019
   2           normally you would have the reports
   3           and then you take the deposition,
   4           right?  Just go out to Chicago,
   5           take his deposition.  He can still
   6           come in tomorrow to testify on
   7           direct, but then you can take his
   8           deposition on the rebuttal report.
   9                MR. MERVIS:  I'm not
  10           quarreling with Your Honor that I
  11           would take his deposition before my
  12           expert testifies.  All I'm
  13           saying -- I guess I get concerned
  14           about the work now -- all I'm
  15           saying is I would like a chance to
  16           get his work product.
  17                THE COURT:  I was being a
  18           little facetious when I said
  19           tomorrow.
  20                MR. MERVIS:  I understood.
  21           Well, I don't know, Your Honor, I
  22           heard the word --
  23                THE COURT:  He'll testify
  24           tomorrow based on the direct
  25           report -- based on his report.
```

in re: TRANSCARE CORPORATION

```
                                        Page 200
 1                      July 23, 2019
 2              MR. AMINI:  We'll remove those
 3         slides.
 4              (Discussion off the record.)
 5              MR. MERVIS:  Your Honor, so I
 6         just have two other issues.
 7              THE COURT:  So tomorrow, the
 8         trustee will testify --
 9              MR. AMINI:  341s in the
10         morning, so we'll do Mr. Arnold in
11         the morning, Dr. Arnold first.
12              THE COURT:  How long will you
13         be with him?
14              MR. AMINI:  I don't know.
15         I've got to run through about 28
16         slides with him -- about 25 slides.
17              THE COURT:  Have you looked at
18         the slides?
19              MR. MERVIS:  Yes, and I have a
20         few other issues, but they're much
21         smaller, which I will address in a
22         moment.
23              THE COURT:  Okay.  He'll give
24         his direct -- he'll give his
25         testimony in the morning, based on
```

in re: TRANSCARE CORPORATION

Page 201

                            July 23, 2019

1

2          his report, the trustee will

3          testify in the afternoon, and then

4          we'll fix the balance of the

5          schedule for his deposition and

6          also the continuation of the trial.

7              How many witnesses do you have?

8              MR. MERVIS:  Well, I have Ms.

9          Tilton --

10             THE COURT:  She's coming the

11         13th or the 14th?

12             MR. MERVIS:  Yeah.  Yeah.

13         Well, let me say this, Your Honor,

14         if I understood it correctly

15         yesterday, the court had basically

16         identified three dates that week,

17         right?  And I can't imagine --

18         look, her testimony is not going to

19         be short, but it's not going to be

20         three days.  So I think what I

21         would propose is that the

22         witnesses, would be Ms. Tilton.  My

23         expert is short.  I would say it's

24         not a long examination.  I have one

25         other witness that I'm thinking of

in re: TRANSCARE CORPORATION

Page 202

1                    July 23, 2019

2          calling that's probably  10-minute

3          examination, and that's it.

4              THE COURT:  Why can't we call

5          your 10-expert witness and your

6          expert before Ms. Tilton comes?  I

7          realize that's taking them out of

8          order.  He hasn't completed his

9          direct case.  But I kind of know

10         what Ms. Tilton is going to say at

11         this point.

12             MR. MERVIS:  I hope not, Juge.

13         That's why we have trials.  But I

14         --

15             THE COURT:  Yeah, but I've

16         decided two motions to dismiss in

17         this case, so I have a pretty good

18         idea what everybody is going to say

19         based on these emails.

20             MR. MERVIS:  Well, so let me

21         respond to that, Judge.  There are

22         a lot of emails you haven't seen.

23             THE COURT:  Okay.

24             MR. MERVIS:  There is a

25         chronological story here that you

in re: TRANSCARE CORPORATION

```
                                              Page 203
 1                        July 23, 2019
 2           have not seen.
 3                   THE COURT:  Okay.
 4                   MR. MERVIS:  You have seen
 5           bits and pieces but you haven't
 6           seen the whole thing.
 7                   THE COURT:  Fair enough.
 8           Let's do this, take Dr. Arnold in
 9           the morning, take the trustee in
10           the afternoon.  I would like to
11           take your expert and your 10-minute
12           witness between the end of the day
13           tomorrow and August 13 or 14th,
14           whatever the date was for Ms.
15           Tilton.
16                   MR. MERVIS:  That's fine, Your
17           Honor.  I know what my expert's
18           schedule is I'll come with that
19           tomorrow.  The problem with the
20           10-minute witness is I have to
21           subpoena the person, so I don't
22           know.  I have to check on
23           scheduling.
24                   THE COURT:  Who is that?
25                   MR. MERVIS:  I don't know yet,
```

in re: TRANSCARE CORPORATION

Page 204

1                   July 23, 2019

2           but it will be either Mr. Harrison

3           or Mr. Giglio.

4               THE COURT:  Someone from

5           Curtis Mallet?

6               MR. MERVIS:  From Curtis

7           Mallet.  That's correct.  And you

8           know lawyers' schedules.

9               THE COURT:  We'll just fix a

10          date, and then you can subpoena

11          them.

12              MR. MERVIS:  Unless Mr.

13          Harrison doesn't want to practice

14          in your court --

15              THE COURT:  Why don't you find

16          out their availability between now

17          and tomorrow with a phone call.

18              MR. MERVIS:  I will try.

19              MR. AMINI:  And in there we

20          are going to slip in, after he

21          testifies, another deposition of

22          Dr. Arnold?

23              THE COURT:  Well, he can take

24          his deposition during that gap

25          also, unless he'll be in New York.

in re: TRANSCARE CORPORATION

```
                                                    Page 205
  1                        July 23, 2019
  2                  After Ms. Tilton testifies,
  3            then you have your rebuttal case.
  4            And I guess you can call Dr. Arnold
  5            at that point.
  6                  MR. AMINI:  And that
  7            deposition will be on the slides 29
  8            through 36?
  9                  THE COURT:  It's on whatever
 10            he did in his rebuttal report to
 11            rebut.
 12                  MR. MERVIS:  Well, and I am a
 13            little concerned about these
 14            slides.  I haven't seen them.
 15                  THE COURT:  You'll have time.
 16                  MR. MERVIS:  No, no.  I
 17            understand.  Your Honor, can we
 18            just close the loop on this?  I
 19            think, Your Honor, there are some
 20            other things that are new here.
 21            I'll deal with them on the fly
 22            during the direct.  But I have one
 23            request.
 24                  At Page 16 of this slide deck,
 25            there is a reference to -- there is
```

in re: TRANSCARE CORPORATION

```
                                                    Page 206
     1                        July 23, 2019
     2              a literature site.
     3                   THE COURT:  Um-hmm.
     4                   MR. MERVIS:  And this site was
     5              not included in the original
     6              report.  I need a copy of this so I
     7              would ask trustee's counsel to get
     8              a copy and send it to us today, if
     9              he would do that.
    10                   THE COURT:  Not just the page
    11              reference?
    12                   MR. MERVIS:  No, the whole
    13              book.
    14                   MR. MERVIS:  It's page 335 so
    15              I assume --
    16                   MR. MERVIS:  I am hoping, Your
    17              Honor, that -- what I'm interested
    18              in is a chapter or subchapter
    19              otherwise, it's going to be -- if
    20              they can get it to us right away.
    21                   THE COURT:  Volume, book --
    22                   MR. AMINI:  Can we give him
    23              the chapter?  Well, I can't give it
    24              to him tonight.  That's my problem.
    25                   THE COURT:  Barnes Nobles is
```

in re: TRANSCARE CORPORATION

Page 207

1                    July 23, 2019
2         open late.
3              MR. MERVIS:  They have the
4         book. I don't.  I've been trying to
5         get it.
6              THE COURT:  Where is the book?
7              MR. AMINI:  Well, it's in
8         Chicago.
9              THE COURT:  Pardon?
10             MR. AMINI:  It's in Chicago.
11        The book itself -- the physical
12        book is in Chicago.
13             THE COURT:  Whilely published
14        it.
15             Just get him the book or buy it
16        on Amazon.
17             Dr. Arnold at 10:00 tomorrow
18        and Mr. Lamark will be after lunch.
19             THE COURT:  After his lunch or
20        mine?
21             MR. AMINI:  After yours of
22        course.  We may finish Dr. Arnold
23        by 11:30.
24             THE COURT:  We'll have a long
25        lunch break.

in re: TRANSCARE CORPORATION

Page 208

1              July 23, 2019

2              MR. MERVIS:  This is the

3       stipulation.  He's under subpoena

4       for tomorrow.  We've got 15 or 20

5       minutes with him from credit

6       Suisse.

7              MR. AMINI:  Wait.  I think we

8       can avoid calling him altogether

9       with two clean-up facts, if I can

10      read in the record.  I talked about

11      it very briefly with Mr. Mervis.

12      If I got it wrong, he'll let me

13      know.

14             Fact 1 is that Credit Suisse

15      doesn't have an interest in

16      Transcendence.

17             MR. MERVIS:  That's true.  So

18      stipulated.

19             MR. AMINI:  And Fact 2 is

20      Credit Suisse doesn't have any

21      knowledge of this $10 million

22      credit to their pro rata portion of

23      the loans.

24             THE COURT:  You mean the 10

25      million that was supposed to be

in re: TRANSCARE CORPORATION

```
                                              Page 209
 1                    July 23, 2019
 2          funded to pay for foreclosing
 3          creditors for the collateral?
 4              MR. AMINI:  Maybe I should say
 5          this.  I actually was thinking
 6          there was a 10 million in notice of
 7          acceptance.  There is a notice of
 8          acceptance collateral exchange for
 9          $10 million off of the term loan.
10          And then it is the same 10 million
11          that's going then be repaid to the
12          creditors in the bill of sale,
13          which I think is what Your Honor
14          was referring to.  And I would like
15          the fact that Credit Suisse has no
16          knowledge of the filing those 10
17          million.
18              MR. MERVIS:  Well, so I think
19          I can accommodate him.  I don't
20          know what their knowledge is today.
21          I also don't think --
22              THE COURT:  You mean as of --
23              MR. MERVIS:  As of February
24          24th and proximate to that date,
25          yes, they did not have knowledge.
```

in re: TRANSCARE CORPORATION

Page 210

1                     July 23, 2019

2                 MR. AMINI:  That satisfies me.

3                 THE COURT:  We're making

4           progress.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

in re: TRANSCARE CORPORATION

Page 211

| A | | | | |
|---|---|---|---|---|
| **a.m** 19:13 45:6 46:5,14,22 47:15 97:11,16 123:19,20 124:21,21 135:5 | 118:16 119:6 **accurate** 45:21 104:15,18,21 104:22 **accurately** 196:22 **acknowledge** 42:3 48:12 185:7 | 169:9,10 **admissibility** 179:14 183:4 183:13 **admissions** 182:24 **admitted** 58:18 **adopt** 107:12 **advances** 139:7 | 56:14,20 57:9 57:15,17,18 58:17,23 59:8 59:10 60:13 61:6,11,23 62:10,16,20,24 64:11,24 65:7 65:21 66:18 68:8,19 69:23 | **Amini** 1:4,14,21 5:7,13,22 9:14 10:8,15 11:18 11:21 15:6,14 17:20 21:14 42:21 43:10,17 44:23 50:23 51:18 53:16,23 54:5 56:12,22 |
| **abandoned** 155:2 **ability** 111:21 **ABL** 31:12 **able** 98:9,11 108:18 122:8 165:19 177:21 177:23 | **acknowledge...** 54:16 **acknowledges** 119:25 **acknowledgm...** 47:21 54:3 56:22,25 57:25 58:10 | **advise** 78:22 198:10 **advised** 20:25 56:5 82:2 **advisors** 151:16 **advocate** 165:25 **affairs** 14:11 **affect** 128:17 | 73:19 75:25 78:14 82:16,19 84:2,21 86:3 87:18 88:4,5 89:17 90:6,13 90:21 91:8 98:2,3,4,7 102:6 108:19 | 57:3,10,21,24 59:9,23 60:6 60:11 61:9,20 62:14 63:20,24 64:18 79:19 85:18 87:6 101:16 106:20 106:25 107:6 107:12 108:22 |
| **absolutely** 21:3 96:17 109:4 115:20 190:8 **abstract** 60:8 **acceleration** 49:3 | **acquisition** 16:19 **acting** 8:5 **action** 159:4,7 **actions** 144:8 **activities** 14:11 | **affiliates** 8:18 **affirmative** 121:7 **afield** 142:13 **afternoon** 1:15 1:16 201:3 203:10 | 110:7 119:11 119:14,17,22 119:24 130:8 130:10 139:9 158:11 160:8 **agreements** 41:20 | 109:3,10,13 110:24 111:3 114:9 116:15 116:23 117:15 117:22 118:5,8 118:13,18 |
| **accept** 47:23 97:24 145:13 **acceptable** 37:18 **acceptance** 41:25 44:9,13 45:4 47:16 49:21 52:10 53:18 72:10 77:6 209:7,8 | **actual** 69:18 79:9 93:21 **Adam** 51:9 **added** 27:8 92:18 **addition** 33:22 73:7 132:19 140:15 **additional** 191:11 | **agency** 3:14,18 8:21 43:22 49:7 87:17 169:15 **agent** 3:19,23,25 7:19 90:8 99:18 143:12 146:9 169:12 **ago** 185:17 188:15 | **ahead** 11:19 **Alex** 176:7 **Alexander** 138:6 **allow** 130:12 194:18 **altogether** 208:8 **Amazon** 207:16 **ambulance** 30:16 136:12 154:25 | 119:7,12,23 120:18,23 121:3,20 123:14 126:2 129:15,22 131:7 133:13 135:16 137:4,7 137:18,22 138:10 140:13 141:20 142:7 |
| **accepted** 178:2 **Access-A-Ride** 97:25 **accommodate** 209:19 **accommodati...** 113:24 **account** 59:20 66:24 116:10 150:6 | **address** 8:12 51:4 92:19 101:4,5 154:18 200:21 **administered** 32:7 **administrative** 3:19,23,25 | **agree** 153:25 183:22 **agreed** 58:14 97:23 162:16 **agreed-upon** 5:17 **agreement** 5:11 5:14 32:15 | **ambulances** 68:14,15,20,24 69:3 71:11,13 71:15 72:6,11 72:20 73:16 124:23 127:23 130:12 154:22 | 142:17 143:6 145:24 147:2,6 147:12,18,22 148:2 152:6 153:17 154:7 154:12 158:8 160:20 162:15 |
| **accounts** 67:2 103:19,23,25 115:10 116:2,8 117:5 118:6,11 | 7:19 32:6 87:17 90:8 99:18 169:12 **administrator** | 40:5,15,18,19 40:21 42:11 47:22 55:10,17 | 155:6,22 156:6 156:9 157:14 **amenable** 37:16 113:22 | 163:11 166:13 169:22 171:9 171:14,20 173:22 174:3 |

in re: TRANSCARE CORPORATION

174:13 180:2
181:25 182:8
183:22 184:14
185:7 189:23
190:8 191:24
192:20,23
193:3,10 194:9
194:22 195:25
196:21 197:6
197:15 198:8
198:17 200:2,9
200:14 204:19
205:6 206:22
207:7,10,21
208:7,19 209:4
210:2
**Amini's** 158:18
163:9
**amount** 73:4
88:2,6,19 89:7
**amounts** 160:8
**analysis** 144:22
177:25 178:13
183:8 187:25
**Andrew** 138:5
**Angels** 88:3,20
88:23
**annual** 16:9
20:15,18
**answer** 4:20
10:22 11:4,10
11:16 12:3
13:16 25:11
33:5 60:22
85:5 142:25
146:12,13
170:15,22
196:20
**answered** 83:7
**answers** 10:11
11:6 12:16
98:10
**anybody** 13:24
16:25 19:2
33:18 46:6,21

47:6 79:22
145:18
**apart** 25:14
**apologize** 21:24
135:23 184:13
**apparently**
26:21 170:2
175:13
**appeal** 113:24
**appear** 75:8
126:13
**appears** 138:8
186:15
**applicable** 98:8
**appointed** 22:11
**appropriate**
56:6 108:4
188:18
**approval** 16:21
17:5,10,15
19:3 20:14
52:18 110:2
**approve** 21:6,9
**approved** 16:11
20:22 70:22
99:5
**Approximately**
93:11
**Arc** 31:17,21,21
31:24 32:18
40:5 49:9 88:3
88:20,23 93:6
93:6 94:5
139:2,8 145:23
146:24
**argue** 118:20
139:13 141:3
142:17
**argued** 145:2
184:5
**arguing** 61:19
145:25 146:8
182:4
**argument** 61:16
61:20 62:4

120:15 139:6
188:7
**arguments**
133:21
**arisen** 18:17
**arithmetic**
178:18
**Arnold** 174:9,20
176:11,20
177:6,18
178:11 179:7
181:4,19
182:15,18,22
184:21 186:10
186:15 190:17
191:15 195:15
195:16 198:7
200:10,11
203:8 204:22
205:4 207:17
207:22
**Arnold's** 177:10
195:14
**arrange** 42:15
**arrangements**
151:7
**arranging**
103:10
**art** 168:3
**article** 119:10
144:2 148:23
149:3,10
151:20 159:8
159:22
**ASAP** 130:9
131:20
**asked** 10:17 11:5
20:2,17 27:21
28:5,7 35:17
42:3 43:20
48:7,14 52:3
62:22 63:14
71:7,23 81:16
107:19 110:17
110:17 112:17

115:15 125:8
125:11,13
130:25 132:15
153:17 154:12
158:8 162:15
163:11 167:17
171:13,15
175:7 191:3,13
**asking** 26:24
51:24 65:23
83:6 85:3 92:6
114:25 120:18
125:10 132:23
146:10,21
152:7 155:15
**assessment**
177:24 179:10
**asset** 7:18 59:19
**assets** 16:20 31:2
31:2 41:10
66:2,22,23
67:25 97:14
100:24 107:20
120:3 128:3
134:4 140:20
143:9,11 145:4
154:15 155:14
181:8,11
**assign** 60:25
78:14 118:2
**assigned** 14:7
114:24 117:24
122:20
**assignee** 86:20
**assigning** 79:12
117:4 118:19
**assignment**
60:24 77:14
79:7 82:17,20
82:23 83:13,13
84:2,22 86:3,8
116:7,14,24
117:16,22
118:22,23,24
130:14 153:4

**associate** 34:6
**assume** 2:23
155:5 177:16
178:4,25
190:12 197:6
206:15
**assuming** 22:22
67:20
**assumptions**
177:4,20 180:7
**assured** 134:25
**atrium** 93:13
**attached** 22:15
22:17 39:6
48:19 83:25
85:2 92:4
110:6 136:4
**attachment**
136:3
**attachments**
153:8,9
**attack** 180:4
**attempt** 77:20
140:23 163:4
**attempted** 77:2
77:3,4,22,25
141:5
**attend** 150:19
**attended** 14:15
14:17 169:24
**attention** 109:23
156:16
**attorney** 2:20
**attorneys** 12:12
12:18
**attributed** 50:4
**attributes**
187:16
**audible** 104:23
**August** 138:7,14
203:13
**authority** 15:3
15:17,23,24
17:24 19:4
20:3,7 21:4

in re: TRANSCARE CORPORATION

22:17,19 51:22
52:16,21 86:12
105:9
**authorization**
79:9,25 167:7
**authorized** 24:7
114:5 132:5
**authorizes** 52:9
**automatic**
106:16
**availability**
102:10 204:16
**avoid** 208:8
**aware** 17:24
35:11,14 53:8
80:12,21 91:11
91:12 116:5,6
135:10 158:10

**B**

**B** 1:6 73:8
**B-U-E-N-G-E...**
39:15
**back** 12:14
20:12 28:20
29:3,5 34:23
35:9 39:21
49:20 50:24
52:16 59:14
68:5,11 69:9
69:15 77:8
80:20,23,24
83:18 87:8
109:17 111:15
112:11 117:18
119:19 120:16
121:4 124:19
129:7 130:23
136:10,20
138:13 139:20
156:4 159:2,12
163:9 170:17
184:7 191:18
191:23 192:4
195:9

**back-and-forth**
104:2
**background**
148:9
**backwards**
112:16 129:23
**balance** 201:4
**Baltimore**
124:23
**bank** 103:19,23
103:25
**bankruptcies**
70:7
**bankruptcy**
27:14,19,22
28:8,22 41:10
51:19 53:13
69:10 76:16
95:8 105:2,8
107:9 111:20
152:19 163:18
**bar** 175:19
**Barnes** 206:25
**base** 156:21,23
157:14,17
**based** 73:17
93:10,19,21
112:21 118:10
140:23 164:11
192:14 193:21
198:15 199:24
199:25 200:25
202:19
**basic** 178:17
**basically** 16:4
113:4 132:8
136:15 181:24
188:7 201:15
**basis** 36:13
192:23
**Bates** 40:9 73:9
84:5
**Bates-stamped**
55:2 130:2
**BCC** 132:21

**beacons** 56:5
**beginning** 95:7
168:2
**behalf** 52:12
111:10 143:13
176:8
**belief** 143:23
**believe** 4:24 6:4
13:13 15:20
22:9 29:7
41:15,18 52:13
55:14 58:15
60:14 71:19
72:8 73:20
74:2 75:5,11
76:5 77:19,20
81:15 82:12
87:2 88:22
89:4 90:11,15
91:17 103:16
105:15,19,20
107:23 115:4
127:2,18
128:24 138:15
150:22 152:11
159:10 161:25
172:24,25
173:21
**believed** 19:24
**benefit** 142:16
**benefits** 102:10
103:10,11
**best** 10:4,24
13:8 23:23
30:18 51:11
105:13 110:12
110:14
**better** 114:14
**beyond** 181:19
**big** 33:9 158:18
181:5
**bill** 87:14 209:12
**binder** 44:18
148:3,6 158:18
160:19 163:10

**bins** 156:4
**bit** 39:19 95:5
**bits** 203:5
**blanket** 120:8
**bluntly** 59:3
**blurred** 123:4
**board** 6:19,23
7:9,9 11:24
14:8,15 16:12
16:14 19:3
20:10,14 51:23
182:12
**board's** 52:18
**Bob** 26:12,14
**bold** 105:4
**book** 18:11
21:19 44:25
56:15 109:12
109:14 116:12
116:20 125:25
135:13,15,18
135:23 206:13
206:21 207:4,6
207:11,12,15
**borrower**
168:24
**bothy** 119:25
**bottom** 130:3
142:3,6 165:22
**Brad** 19:5,5
**breach** 184:2
**break** 77:4
137:3,9,11
207:25
**Brian** 1:5 19:7
138:5
**briefly** 62:15
80:15 208:11
**bring** 56:18
**bringing** 112:10
**brings** 178:8
**broad** 41:16
**broke** 128:25
**brought** 180:22
**budget** 16:10

37:19 38:19,24
38:25 39:3,4,6
39:7,8
**Buenger** 34:4,5
39:14 40:2
**bullish** 102:17
162:19,23
163:3
**bunch** 159:3
**buses** 112:10,11
122:22,23
123:11
**business** 31:3,4
96:3,7 128:11
152:8 154:16
**buy** 207:15
**buyer** 177:15,15
178:5

**C**

**C** 71:11,21
**calculations**
191:11 197:8
**call** 1:2 28:20
31:21 37:9
40:5 103:14
107:24 127:16
172:16 173:17
191:22 202:4
204:17 205:4
**called** 1:6 44:12
78:7 89:16
107:25 108:5
116:13
**calling** 202:2
208:8
**calls** 1:4 29:2
107:22
**cancel** 115:6
136:7,21
165:16
**canceled** 153:18
153:22 165:18
**canceling**
122:12 136:17

in re: TRANSCARE CORPORATION

**capable** 178:20
**capacities** 3:6
  7:21 9:8 10:21
**capacity** 8:7
  11:2
**capital** 16:10
  31:8 177:22
**capped** 23:13
**caps** 161:6
**career** 152:18
**cares** 140:6
**Carl** 151:13
  172:18,20
**carry** 155:8
  157:20
**case** 5:9,23 9:25
  10:7 13:10,12
  18:9 24:8 27:4
  31:22 37:15,23
  38:5 42:22
  71:20 90:15
  98:3 127:8
  144:8 166:16
  176:12 177:14
  179:21 181:10
  182:3 183:20
  188:11 191:24
  192:3 196:15
  196:25 202:9
  202:17 205:3
**cases** 36:6
  152:17
**cash** 37:19 38:19
  67:4 183:8
**catch** 75:23
**category** 59:3
  140:6
**Catz** 51:9
**cc** 113:6
**cc'd** 26:17 138:6
**CCs** 83:2
**CEO** 3:10 4:14
**certain** 3:20,24
  6:13 14:11
  30:25 41:10

42:15 43:2,3
  68:10 83:8
  86:2 97:14,23
  97:24 107:20
  124:20 136:7
  143:9 190:19
**certainly** 141:23
  143:23 178:20
**certificate** 24:6
**chain** 91:19
  96:12 126:6
**challenge** 190:14
**chance** 199:15
**change** 108:12
  192:20
**changed** 193:3
**chapter** 30:7,9
  36:6 37:15,18
  38:13 69:8,11
  96:24 105:3
  108:13,13,25
  110:18,21
  117:21 150:14
  152:17 170:14
  206:18,23
**charge** 72:23
  73:3,22 74:9
  161:18
**charged** 73:25
**Charles** 96:6,7
  150:24
**charts** 130:7
**check** 203:22
**Chicago** 199:4
  207:8,10,12
**chief** 17:23
**choice** 28:17
**choosing** 28:18
**chose** 28:21,22
**chronological**
  202:25
**Cindi** 33:24
  34:15 172:17
**circumstances**
  127:11

**city** 86:11
  122:24
**claim** 50:13,14
  50:17 138:25
  139:2 140:17
  143:18 144:7
  144:14,20
  145:17,21
  176:16 181:21
  182:7,9,9
**claims** 186:3
**clarify** 167:25
**clean-up** 208:9
**clear** 3:16 8:6,9
  8:17 9:3 10:25
  71:19 145:25
  149:2 168:4
  176:23 182:15
**clearing** 169:6
**clearly** 28:4 41:5
  125:12,18
**close** 111:16
  173:6 205:18
**closed** 134:4
**closer** 2:15
**closing** 90:3,5
**Coal** 98:19
**Coie** 98:18
**collateral** 4:9,11
  4:16,22,25 5:7
  5:8,13 6:2,6
  7:13 41:25
  47:17,24 48:20
  48:24 49:21
  50:3 52:10
  53:19 54:25
  55:4,5,13,15
  55:25 56:9
  59:11,12 61:12
  61:18,21 67:6
  67:16 68:16
  72:12 77:7
  87:16,23 88:17
  97:23,24
  120:17 168:6

168:10,12,23
  169:7 209:3,8
**colleague** 64:24
  65:9 175:12
**colleagues** 160:6
  167:23
**collected** 117:12
**collecting**
  123:11
**combination**
  103:5
**come** 39:11
  70:25 100:11
  105:21 106:21
  109:7 138:21
  174:17 183:6
  192:4 194:14
  196:4,13 199:6
  203:18
**comes** 10:23
  130:23 193:11
  194:12 195:11
  202:6
**coming** 128:20
  128:22 129:2
  191:18 195:6,8
  195:11 201:10
**commenced**
  70:8
**comments** 71:8
**commit** 16:18
**common** 24:8,11
**communicate**
  26:6 38:21
  114:6
**communicated**
  114:3
**communication**
  48:6
**communicatio...**
  134:14
**comp** 165:19
**companies** 6:12
  6:14 67:19
  68:12 103:15

186:8,9,17
  187:11,14,24
  188:4,5,6,23
  191:9 195:22
**companies'**
  120:3
**company** 6:24
  6:25 13:23
  16:20 17:3,23
  18:24 19:18
  20:15 23:3
  29:25 33:18
  35:4 36:10,12
  37:17 38:17
  42:2 46:12
  51:15,17 64:7
  64:8 66:3 74:3
  79:2,3,22
  80:19 81:8,18
  81:19,20 85:20
  85:22,25 86:9
  86:9,16 117:3
  152:18 165:11
  165:16 177:21
**company's**
  31:12 86:11
  163:21
**comparable**
  186:7,9
**comparables**
  187:2
**Compensation**
  91:21
**complaining**
  180:16
**complete** 54:20
  55:11 102:9
  181:9
**completed** 83:18
  202:8
**completely**
  108:20
**comply** 23:14
**comport** 150:15
**computer**

in re: TRANSCARE CORPORATION

106:13
concern 55:13
   154:24 155:3
concerned
   197:18 199:13
   205:13
concerning 71:8
   153:4 180:17
concerns 37:15
   105:11,18
   107:10 154:17
conditions
   114:14
conduct 17:13
conference
   151:4 173:17
confirm 142:9
confused 79:11
confusion 58:21
   168:21
connection
   41:23 82:4
   85:21 149:3,22
conscious 8:25
consent 77:11
   77:13 78:8
   81:16 83:13
   86:8 146:21,23
   163:5
consenting
   79:21,23 80:3
   80:6
consents 78:7
consider 19:20
   112:22 148:18
   148:22 183:5
consideration
   87:22,24
constantly 94:20
   167:18
constituencies
   19:19
constitute 51:10
consult 62:8
   86:15 167:22

consulted 33:19
   79:3 81:19
consulting 79:22
   187:2,6
contact 27:21
   35:13,15,18
   36:19,23,23
   37:4
contacted 29:22
contending
   143:19,22
context 38:25
   165:9
continuation
   201:6
continue 31:6
   69:7 102:5
   137:17 154:16
continuously
   2:11
contract 59:17
   60:10,23 75:21
   76:10,23 77:9
   78:9,20 79:12
   79:12 80:17
   82:5 85:2
   101:7 114:20
   115:7,10,20
   116:3,9 117:6
   117:25 118:4
   118:15,20
   119:4,20 121:9
   122:9,12,21,24
   130:14 153:5
   153:14,19,20
   153:21,22,25
controller 104:3
conversation
   76:19 105:17
conversations
   38:15 171:4
copied 64:25
   104:2 160:25
   160:25 165:5
copy 40:14,17

40:20 51:3,20
   54:14,20 57:11
   110:2 137:22
   184:15 206:6,8
corner 184:25
corners 193:5
corp 30:17
corporate 12:20
   13:2,18,20,22
   14:2 101:8
corporation
   24:6,22 30:3
   78:12 136:13
   166:12
corporations
   24:7,19
correct 1:18,23
   2:2,20,21 3:11
   3:12,15 4:4 6:4
   6:8 7:11,15,16
   11:25 12:5,20
   13:3,4,7 14:15
   14:20 16:8,12
   17:6,11 20:24
   21:7,10 22:5
   22:14 23:5
   24:24 25:16
   26:16,18,20
   29:12,13 30:10
   30:14,21 31:13
   32:3,7 35:9
   36:15 37:6,13
   41:21,22 42:3
   42:4,18 45:7,9
   45:11,24 47:18
   47:19 48:2,22
   48:25 62:21
   63:5,6 65:2,3
   65:18,22 66:23
   68:3,12 69:5
   70:3,4,5 71:3
   72:2,3,6,12,13
   72:21 73:6,25
   75:19 76:12,17
   76:18 77:15

78:10,15,16,21
   80:18 81:3,8
   81:12 82:15,17
   82:18 83:3,4
   83:10,11,16,24
   88:12,21,22
   90:10 91:22
   92:3,10,11,14
   92:15,19,20,25
   93:3,7,8,15,16
   93:18 94:2,3,6
   94:7,10,12,22
   95:11,18 96:20
   97:2,3,8,18
   98:5 99:16,19
   101:3,10 109:4
   110:20 111:14
   112:25 113:16
   113:17,19
   114:4,6,21
   121:14,15
   122:3,6,7
   123:12,24,25
   124:17 125:5
   125:17 126:15
   126:20,23
   127:18 131:20
   131:21,23
   132:3,7 133:8
   135:7,8,10,11
   136:23 161:2
   168:25 204:7
corrected 96:17
correctly 201:14
correspondence
   173:13
corresponds
   88:16
cost 73:21
coughed 54:18
counsel 6:18,22
   7:20 8:13,13
   17:8 27:14,19
   27:22 28:5,6,8
   28:8,13,22

33:13 37:5
   43:22,23 47:10
   51:16,19 55:22
   62:12 81:17,18
   86:16 98:16
   99:8,14 106:14
   107:24 150:14
   165:25 167:8
   167:17 178:16
   206:7
countersigned
   153:14
country 156:7
couple 128:23
   134:5 167:24
   167:25 187:5
course 22:15
   151:18 152:10
   207:22
court 1:2,11,19
   2:13 3:21 5:5
   5:10,16,19,25
   9:12 10:5
   11:11,19 12:2
   15:12,15 17:18
   21:17,20 29:21
   32:25 33:4
   43:6,15,25
   44:4,17,21
   50:13,20 51:17
   53:15,21,25
   54:8,14,19
   56:19,24 57:8
   57:12,19,23
   58:3,6,9,20,24
   59:5,18,25
   60:9,12 61:3
   61:16 62:8
   63:25 78:11
   79:11,17 80:3
   85:16 90:23
   101:14 106:24
   107:7,16
   108:24 109:11
   111:2 114:7,10

in re: TRANSCARE CORPORATION

114:12 116:22
117:13,20
118:3,7,10,14
119:2,9,18
120:12,21
121:2,19,23
122:16 125:24
129:13,21
130:4 131:4
133:20 134:3
134:17 135:14
137:10,17
138:24 139:15
140:11 141:4
141:13,18
142:5,12 143:3
143:17 144:12
144:18 145:6
145:12 146:15
147:4,10,13,16
147:20,23,25
150:3 152:15
153:24 164:24
166:22 168:16
168:22 169:21
169:24 170:5
170:11,18,25
171:7,12 174:2
174:10,19,25
175:15,18,21
175:22,24
176:4,14
178:19,21,22
179:5,13,23,25
181:18 182:2
182:20 183:21
184:9,16,23
185:3 189:2,6
189:22,25
190:7 191:22
192:9,22,25
193:8 194:2,19
196:9 197:11
197:14 198:3
198:13,24

199:17,23
200:7,12,17,23
201:10,15
202:4,15,23
203:3,7,24
204:4,9,14,15
204:23 205:9
205:15 206:3
206:10,21,25
207:6,9,13,19
207:24 208:24
209:22 210:3
**Court's** 178:12
**covered** 24:20
  39:20
**covering** 32:19
**covers** 136:12,19
**created** 103:2
**creating** 101:13
**credit** 32:10,15
  41:5 49:15,22
  50:4 87:17
  88:5,11 90:6
  91:8 93:13,14
  98:8 139:9
  140:25 141:7
  142:14 145:16
  146:17,21
  178:23 179:5
  198:9,12 208:5
  208:14,20,22
  209:15
**credited** 50:3,8
  50:12 145:23
**creditor** 60:19
  62:9 89:17
**creditors** 146:7
  209:3,12
**Creswell** 99:11
  108:10 113:6
  149:8,10
  154:21,25
**criteria** 186:18
**criticism** 186:14
**cross** 188:21,25

**cross-examine**
  180:12 185:24
**crunch** 178:17
**CSA** 93:13
**curious** 55:24
**Curtis** 29:11
  33:12,12 35:12
  36:19,23 37:2
  37:3 51:20,21
  62:22 108:16
  110:17 111:10
  150:13,20
  152:10 170:9
  173:6 204:5,6
**cut** 136:15

─────────
**D**
**daily** 36:12
**damages** 183:25
**Dan** 150:10
  172:24
**Daniel** 172:24
**Danielle** 1:7
**data** 130:13
**date** 46:4 63:10
  88:8 90:3,7
  96:25 170:8
  203:14 204:10
  209:24
**dated** 90:6 110:9
  116:24
**dates** 43:3
  105:19 131:6
  201:16
**Daubert** 175:4
  175:10
**day** 35:17 41:2
  48:8 53:12
  70:8 71:5
  72:16 96:23
  97:19 108:16
  110:5 112:4,24
  113:4,9 114:3
  115:19,21
  121:12,18

128:21,21
131:4 132:12
170:6 173:20
179:19 192:5
203:12
**days** 34:12 97:8
  133:18,24
  134:5,15
  201:20
**deadline** 121:13
**deal** 33:9 124:5
  157:11 174:9
  174:19 185:21
  197:20 205:21
**dealing** 95:23
**death** 56:23
**debt** 47:25
**decide** 144:4
  192:2,7
**decided** 67:16
  121:12 202:16
**decision** 8:25
  33:16 78:18
**decision-maki...**
  164:12
**decisions** 20:10
**deck** 205:24
**default** 41:21,24
  47:21 49:3
**defendant's**
  123:14
**defendants**
  143:19 176:9
  182:25
**Defendants'**
  58:17 171:17
  173:22
**defined** 88:6
  89:22
**defines** 11:14
  90:4
**definitely** 66:25
  108:8
**Delaware** 23:4
  23:14 24:22

30:2 181:13
  182:11
**deliberate** 140:9
**delivering**
  122:23
**Dell** 65:10,12
**department**
  65:16
**Depends** 85:3
**deposit** 102:10
  103:20
**deposition** 9:11
  10:11 14:22,24
  24:21 39:6
  43:21 52:23
  137:15 189:3,7
  189:21 190:23
  191:2 196:2
  197:3,12
  198:23,25
  199:3,5,8,11
  201:5 204:21
  204:24 205:7
**depositions**
  14:16 194:21
  196:5
**described** 89:8
**description**
  142:19
**designated** 20:9
  20:17,23
**desires** 78:12,13
**detail** 20:8
**details** 152:2
**determine** 26:3
  26:5 55:15
  59:6 161:17
  179:11 188:17
  198:20
**determined**
  182:10
**determining**
  140:25
**develop** 64:9,12
**Diane** 95:20

in re: TRANSCARE CORPORATION

Page 217

111:18 113:5
**dictate** 8:23
**difference** 27:11
  69:12
**different** 3:6
  4:10,12 7:21
  8:10,10,11,12
  8:19 13:5
  21:11 27:12
  48:5 58:9
  71:24 94:24
  97:21 125:8
  154:9 181:3
  190:21 193:13
  194:10
**difficult** 9:5
**direct** 1:13
  102:10 103:19
  140:16 156:16
  169:21 199:7
  199:24 200:24
  202:9 205:22
**directly** 2:16
  25:12 52:7
  166:7
**director** 1:22
  6:11 23:12,19
  78:6 127:3
**directors** 27:2
**disallow** 138:25
**disclose** 16:25
**disclosing** 17:2
**discontinue**
  121:8
**discuss** 170:25
  174:25
**discussed** 70:18
  151:22,23,25
  152:9 170:18
**discussion** 126:4
  139:21 149:14
  151:19 165:11
  170:12 197:13
  200:4
**discussions**

149:22
**dismiss** 202:16
**disposition**
  16:19
**dispute** 142:14
  146:17 181:5
**disputed** 10:2
**disputing** 29:19
  194:2,3
**distinguish** 6:22
  8:15,20
**distinguishing**
  8:17
**distribute**
  169:16
**distribution**
  142:11
**District** 176:2
**document** 15:22
  17:18 18:14
  21:15 34:21
  44:5,11,22
  45:19,20 46:16
  46:21,24 47:4
  47:7,12 48:11
  48:14,18,20
  49:17,24 51:23
  51:25 53:9,15
  55:6 58:6
  64:19 65:8
  71:19 73:8
  77:5 78:19
  80:5 82:20,21
  84:11,15,18
  85:21,25 87:7
  87:12,13 89:14
  89:23 90:18
  98:8 111:13
  113:3 114:8
  118:9 120:19
  122:17 125:25
  138:21 141:14
  141:16 147:5
  148:5 158:22
**documents** 5:23

13:6,15,19,21
  13:22 14:2
  23:6,14 41:9
  43:2,13,23
  44:18 46:5,9
  46:11 47:13,14
  53:4,6 117:2
  120:14 137:4,7
  145:11 153:3
**doing** 8:7 11:15
  27:24 60:7
  66:4 101:12
  106:15 118:19
  123:5,7 125:12
  125:15,16
  178:21 180:10
  182:19 188:9
**Dominion** 49:16
  49:23 93:12
**Dominion's** 50:5
**doubt** 133:2
**Dr** 174:9,20
  176:11,20
  177:10 178:10
  179:7 184:21
  186:10,15
  191:15 198:7
  200:11 203:8
  204:22 205:4
  207:17,22
**draft** 52:14
  68:18 69:22
  71:5,6 73:17
  89:12 90:21,22
  91:8 102:22
**drafted** 12:12,13
  12:18 13:21
  22:8,11 40:19
  43:23 55:21
  62:10
**drafting** 12:6
  45:14
**drivable** 124:24
**drive** 156:6
**drivers** 102:3

103:20 162:13
**driving** 122:22
**dual** 9:8 10:20
**due** 128:20,22
**duly** 1:7
**Dunn** 192:5
  195:6
**Dunn's** 186:14
  196:23
**duty** 184:2
**DX** 22:24 23:7
  56:15 57:6
  63:11 123:13
  156:11 164:18
  171:15,16

───────────
**E**
───────────
**E** 1:6,6 87:23
**Earl** 125:12
  127:4
**earlier** 15:2
  40:22 97:11
  113:8 116:6
  121:12 149:15
  152:6,6 156:15
  160:24 173:4
  173:17
**early** 5:4 6:3,5
  18:18 28:10
  76:10 106:11
  148:17
**earning** 75:2
**easier** 180:19
**EBCR** 130:8,10
  130:16
**EBITDA** 176:22
  177:2,5 187:25
**effect** 86:13
  136:22
**effective** 6:8
  133:22 143:25
  144:6,24
**effort** 125:3
**efforts** 123:24
  124:4 157:11

160:12
**eight** 71:12
  124:21
**either** 5:14
  30:17 37:17
  163:4 180:25
  204:2
**element** 183:9
**eliminate** 193:25
**Ellis** 166:7,10,11
**email** 8:12 18:9
  18:13 19:8
  21:2 26:12,13
  26:19 29:9,9
  29:10,17 31:10
  35:22 37:6,25
  38:4,4 39:2,5
  39:14,25 40:22
  41:6 46:14
  48:3 49:5 51:2
  51:4 54:15
  66:8,13 82:8
  85:9 91:14,19
  92:14,18,24
  96:11,12,12,18
  98:25 99:3
  106:20 108:8
  109:18 111:17
  112:13,16,22
  113:4 115:3
  121:5,24,25
  123:17 126:6,9
  126:19 127:6,7
  129:10,13,17
  129:25 130:17
  131:12,14
  132:16 135:2
  135:23 136:4
  138:4,5,6,12
  140:10 141:11
  141:24 142:19
  143:4 154:8,13
  154:19 155:13
  156:17 160:23
  164:3,5 165:3

in re: TRANSCARE CORPORATION

165:6,22 166:6
167:4,11 172:4
172:13,15
**emailed** 84:18
**emails** 39:4
104:2 130:24
140:12,14
141:18,20
142:3 145:13
163:13 202:19
202:22
**embodies** 91:9
91:10
**employed** 1:17
2:4,11 86:25
104:5
**employee** 74:6
74:11,17,21
81:2 157:17
**employees** 75:9
75:11,12,15
100:10,13
102:4,8 103:21
112:9,12
122:20 125:16
129:3 131:20
132:11 133:7
133:11
**EMS** 130:7
**enclosing** 40:4
**ended** 95:3 96:5
108:21
**engage** 28:5,7
167:7
**engaged** 28:6
37:11 95:9
170:9 173:7,8
173:10
**engagement**
34:18 108:17
109:5,22
**engaging** 17:8
**entered** 81:17
**enters** 146:23
**entire** 76:8

**entirely** 128:3
**entities** 4:12,15
25:3 26:25
30:20 49:11
93:7 96:24
**entitled** 117:19
139:10
**entity** 4:11
42:14 94:6
101:8
**entry** 52:9
**equipment**
124:5,9,10,13
127:23 155:5
155:23 157:12
**escalation** 21:6
**essentially**
176:17 177:11
178:6,13
**establish** 9:19
43:11,12 54:11
63:14 94:17
182:16
**established** 19:6
29:23 126:21
146:19 148:25
**establishing**
42:24
**estate** 139:3
163:18
**evasive** 115:11
**evening** 53:14
105:3,23 122:2
127:15
**event** 131:14
138:22 139:4
166:25
**events** 97:8
139:22 174:15
181:23
**everybody** 23:22
23:25 127:9,21
134:24 202:18
**evidence** 17:19
56:16 138:22

146:19 156:12
158:4,15
168:20 177:10
178:10,15
179:9,10,22
**evident** 60:17
**evolved** 181:11
**exact** 190:25
**exactly** 11:14
29:3 68:9
115:17 184:4
193:23
**examination**
1:13 60:24
168:3 171:19
188:25 201:24
202:3
**examine** 188:21
**examined** 1:9
**example** 10:19
17:8 68:13
91:21 103:10
177:18
**examples** 10:20
186:22
**exchange** 123:17
209:8
**exchanged**
110:13 194:20
**exclude** 30:22
176:10 185:20
189:12,13
**excluded** 30:11
30:20
**exclusively** 90:6
**excuse** 87:5
**executed** 90:17
110:6,13
**execution** 70:23
80:4 177:25
**executive** 17:23
17:25 20:9,17
20:23 81:5
**exhibit** 28:12
53:23 57:20

58:17 62:18
63:25 71:11,21
73:8 83:10
119:16 123:15
129:21,22
134:22,23
137:21 159:13
163:13,14
171:18 173:23
**exhibits** 5:24
44:20
**existed** 15:17
18:6
**existence** 22:4
**existing** 118:20
**exists** 55:19
**expectation**
75:13
**expecting** 47:4
**expenditures**
101:9
**expense** 197:17
**experience**
149:10
**expert** 148:19,23
155:4 176:25
177:3 178:7
179:20 180:8
180:19 186:5,7
186:8,19
190:13 192:12
193:11 194:5,7
194:10,11,12
196:11,12
198:19,20
199:12 201:23
202:6 203:11
**expert's** 185:13
190:15,16,16
203:17
**experts** 186:12
**explain** 31:7
100:23 184:20
197:10
**explained** 97:10

161:12 187:19
**exploration** 21:9
**expressed**
105:11 154:23
**extent** 13:9
60:19 125:6
144:3 158:9
164:10 182:23
188:16
**extremely** 36:8

**F**

**face** 177:20
178:14
**facetious** 199:18
**facilitate** 95:16
**fact** 15:17 24:14
24:17 33:12
35:16 53:8
57:25 58:11
81:24 112:2
116:5 128:21
145:16 149:15
157:22 164:4
173:20 176:14
178:12,20
208:14,19
209:15
**facts** 208:9
**failed** 176:17
**fails** 177:3,19
**failure** 181:7
**fair** 11:17,18
13:24 24:3
34:7 41:8,12
46:13,17 68:25
104:7,9 113:3
113:7 181:14
181:14 182:12
182:17 183:23
203:7
**fairly** 94:14
160:3
**fairness** 11:9
**fall** 12:9 61:15

in re: TRANSCARE CORPORATION

Page 219

| | | | | |
|---|---|---|---|---|
| **falls** 59:17 62:2 140:5 | 150:14 160:4 170:5,10 | **Fiorello** 150:10 **Fiorillo** 172:24 | 158:10 171:23 173:6 | 159:22,24 181:23 |
| **familiar** 55:16 59:2 87:11 187:4 | 173:18 176:19 181:24 209:23 **fell** 25:14 62:6 68:15 | **firm** 28:24,25 35:12 121:13 148:15 149:22 149:24 187:3 | **follow** 10:19 108:7 182:12 **follow-up** 121:25 132:16 | **foreclosured** 142:23 **forever** 188:13 **forgot** 2:19 32:13 132:23 |
| **far** 102:17 129:7 139:22 140:4 142:13 186:20 | **fiduciary** 184:2 **figure** 73:23 115:10 198:3 | **first** 1:7 2:4 17:22 18:15 22:7 27:18 | 133:5 **following** 35:17 95:7 96:25 173:16 | 135:5 **form** 50:19 85:2 85:4 101:24 106:19 |
| **Fargo** 31:11 37:11 38:2,3 38:13,16 39:9 55:10,11 61:23 108:18 116:2,7 117:2,6,10 118:12,21,24 119:5 120:7,9 149:16,21 150:21 170:2 170:13 171:5 171:23 | **file** 12:20,22,25 29:25 30:6 36:9 110:18 **filed** 30:9 50:13 50:16 53:13 96:24 97:2 105:3 152:17 **filing** 30:5 37:15 41:9 42:17 70:7 71:5 72:16 76:16 95:7 96:23,25 108:13,13,25 | 28:20 29:2,22 40:14 46:15,17 47:14 49:16,23 50:4 53:5 60:3 67:2,3 91:18 93:12 96:2,9,9 96:11 106:7 107:22 108:5 109:17,18 114:18 119:6 119:19 120:10 126:6 128:5 132:21 140:14 | **follows** 1:10 92:14 94:5 132:4 **force** 86:12 **forclose** 67:14 **foreclose** 30:25 66:22 67:5,6 67:10,16,19,21 69:2 97:20 98:9,12 141:5 **foreclosed** 45:23 55:6 60:18 67:14,24 71:17 | **formerly** 143:10 **formula** 194:12 194:13,16 **forth** 68:11 **forward** 104:5 113:22 114:16 **forwarded** 29:14 29:16 **forwards** 135:4 **found** 186:17 **four** 31:17 71:12 193:5 |
| **Fargo's** 37:4 120:16 | 209:16 **fill** 83:5 84:14 | 141:19,21 142:18 144:24 | 72:11 87:15 97:12,13 100:8 | **fourth** 84:3 **frame** 9:18 |
| **February** 6:5 9:17 18:15,18 19:12 22:3,10 26:20 28:10,10 29:9,18 35:25 39:15 40:2,23 43:14 45:8,15 46:4,14,22 63:8,14,15 65:2 70:2 72:6 75:9 76:3,3,5 76:10 77:25 83:22 85:10 86:24 91:19 92:8 95:8 96:13,20 105:23,24 109:19 110:9 112:4 113:5 115:3,24 123:18 126:7 129:19 131:15 140:2 149:15 | **filled** 82:10 83:8 **final** 111:8 141:24 **finance** 26:14 148:19 **financed** 88:3 **financial** 17:2 21:10 51:3 52:5 151:16 **financials** 83:20 **financing** 21:6 88:20 **find** 12:15 54:9 60:25 108:23 167:17 204:15 **fine** 6:10 23:17 137:8 193:7 203:16 **finish** 10:5 192:12 207:22 **finished** 137:8 | 157:4,7 159:13 163:12,12,13 163:14 165:22 165:24 176:11 176:15 178:18 189:17 200:11 **fit** 176:12,15 186:17 **fits** 179:21 **five** 71:12 **fix** 201:4 204:9 **flow** 37:19 38:19 183:8 **fly** 205:21 **focus** 69:18 162:12 **focused** 7:4 64:14 101:6 **focuses** 181:22 **folks** 38:15 62:23 126:19 | 114:23 120:17 124:12,13 140:21 143:12 145:22 **foreclosing** 61:17,21,24 209:2 **foreclosure** 41:10,20 42:16 44:10 75:14 77:5,17 79:14 81:2 100:24,24 102:8 105:5,10 105:12 107:11 133:19 140:24 142:22 143:5 143:20,24 144:6,25 149:11 151:20 158:12 159:9 | 13:10 70:6 148:18 **frankly** 140:6 **fraudulent** 144:13,17,19 **frequently** 160:2 160:3 **Friday** 105:24 106:11 112:17 113:5 115:24 122:21 124:22 129:5 173:18 **front** 37:7 71:21 111:5 **Fuchs** 80:10,14 83:2 96:2 126:17,22 **full** 16:12,14 86:10,12 89:10 150:2 |

in re: TRANSCARE CORPORATION

Page 220

| | | | | |
|---|---|---|---|---|
| **fund** 135:22 | 197:19 | 61:25 87:8 | 125:23 132:24 | 83:12,14 84:11 |
| 136:8,18 | **giving** 34:22 | 93:13 129:7 | 133:7 157:13 | **happen** 163:2,3 |
| 165:15 | 123:23 | 146:7 183:3,12 | 157:23 174:8 | **happened** 29:4 |
| **funded** 209:2 | **Glen** 22:11 | 188:2 190:13 | 202:17 | 36:20 42:17 |
| **funding** 18:24 | 23:11 80:11 | 192:13,16 | **gotten** 35:8 | 77:20 115:17 |
| 19:2 108:19 | 81:9 106:3,4,6 | **going** 5:20 9:12 | 114:24 190:20 | 145:19 |
| 170:13 171:2,5 | 106:9 107:15 | 9:15,21 10:18 | **governed** 89:16 | **happening** |
| **funds** 31:15 32:2 | 107:19,22 | 23:18 28:11 | 90:5 | 100:4 103:16 |
| 168:11 183:6 | 108:4 131:18 | 35:23 36:5 | **Grant** 1:8 | 123:3 125:20 |
| **further** 147:3 | 131:22,22 | 39:21 42:10,13 | **granted** 176:5 | **happens** 195:13 |
| 169:20 191:12 | 133:10 159:19 | 44:9 47:23 | **graphically** | **happy** 10:8 |
| **future** 160:13 | 160:4,9,11 | 60:17 66:2,22 | 187:20 | 175:14 |
| | 167:5 | 67:5,8,25 68:5 | **Great** 162:10 | **harkening** |
| ——————— | **Glenn** 19:14 | 68:11,13,15,20 | **Greenberg** | 139:20 |
| G | 20:2,6,16 | 69:2,9,14 | 82:25 83:2 | **Harrison** 29:11 |
| **gap** 204:24 | 64:21 105:17 | 72:23 73:13,17 | 91:20 167:5,11 | 29:15,18 31:8 |
| **Gary** 108:2,3 | **global** 26:25 | 73:22,24 74:8 | 172:23 186:11 | 33:23,23 34:15 |
| 154:21,23 | **go** 11:19 12:14 | 74:13 80:25 | **ground** 36:11 | 109:20 150:25 |
| **general** 98:7 | 14:25 16:5 | 88:19,25 89:2 | **groundwork** | 151:8 169:25 |
| 100:2 176:24 | 19:4 20:12 | 89:3,11,16 | 9:19 | 172:18 204:2 |
| **gentleman** 9:16 | 22:24 25:4,24 | 90:12 94:16 | **group** 8:23 | 204:13 |
| **gentlemen** | 26:10 28:11 | 104:5 106:21 | 93:14,15 | **he'll** 192:4 |
| 159:23 160:15 | 34:17 39:13,21 | 110:18 112:22 | 130:23 191:10 | 199:23 200:23 |
| **getting** 25:23 | 42:19 44:9 | 117:11 120:21 | **guarantee** 86:10 | 200:24 204:25 |
| 34:21,22 141:8 | 49:19 50:24 | 121:4,13 | **guess** 39:15 | 208:12 |
| 142:13,25 | 52:16 54:12 | 124:20 127:11 | 60:21 75:6 | **head** 105:19 |
| 181:18 | 68:11 69:20 | 127:19 129:5 | 111:9 120:12 | **heading** 173:16 |
| **Giglio** 33:25 | 71:9 78:2 | 129:23 131:5 | 133:25 141:18 | **health** 102:9 |
| 34:2,3,16 | 81:24 96:10,19 | 133:18 134:17 | 155:18 199:13 | 103:10,11,14 |
| 35:24,25 36:5 | 101:16,18 | 136:20 139:13 | 205:4 | **healthcare** |
| 69:24 204:3 | 105:7 106:12 | 141:2 145:14 | **guidance** 175:9 | 191:10 |
| **Gilio** 63:15 | 109:16,17 | 146:16 148:3 | **guy** 80:15 | **hear** 140:21 |
| 69:25 70:13 | 110:7 111:3,15 | 154:8 158:20 | 126:22 136:16 | 157:13,23 |
| 107:22 172:17 | 113:2,11 | 165:16 167:12 | | 183:14 189:23 |
| **give** 21:12 25:19 | 119:19 121:17 | 170:17 174:17 | ——————— | 198:18 |
| 88:25 116:20 | 123:13 125:23 | 180:18 181:16 | H | **heard** 108:9 |
| 148:3,10 | 133:11 142:24 | 182:21 183:6 | **H** 1:6 | 123:10 145:12 |
| 152:13 178:22 | 148:11 156:14 | 185:5 189:13 | **hac** 175:12 | 154:24 157:14 |
| 179:4,12 | 157:6,6,13 | 189:16 191:16 | **half** 142:4 | 180:3 199:22 |
| 186:22 198:14 | 159:2 162:6,8 | 195:3,4 197:25 | 145:16 146:16 | **hearing** 99:23 |
| 200:23,24 | 165:2 167:15 | 198:4 201:18 | **halfway** 44:24 | 198:20 |
| 206:22,23 | 176:3 187:4 | 201:19 202:10 | **Hamilton** | **hearsay** 43:4,8 |
| **given** 88:11,16 | 190:23 195:20 | 202:18 204:20 | 156:21,23 | **held** 151:3 |
| 92:13 142:18 | 195:23 199:4 | 206:19 209:11 | **hand** 9:2 11:3 | **Helfap** 150:9,23 |
| 157:17 160:9 | **goes** 21:21 53:24 | **good** 1:15,16 | 197:3 | **Helfat** 170:3 |
| 181:10 190:11 | | | **handwriting** | |

in re: TRANSCARE CORPORATION

172:5
**help** 64:12 65:25
    161:17 173:18
    178:11
**helped** 64:8
**helpful** 36:8
    176:13 177:7
    179:23
**helping** 160:5
**hereof** 90:7
**hereon** 88:8
**hide** 160:13
**hiding** 45:16
**hire** 28:13
**hired** 17:25
    29:21 33:12,13
**hiring** 27:13
    34:14
**history** 157:17
**hit** 133:3
**hold** 75:22
**honest** 9:6 123:3
**Honor** 5:15 10:9
    11:8 15:7,14
    17:21 21:16
    32:24 42:23
    53:17 54:7
    56:12 57:5,24
    60:6 85:14,19
    87:7 101:17
    106:18,21
    107:13 108:22
    109:14 110:25
    114:11 116:17
    117:7 120:25
    121:22 122:15
    123:15 131:9
    133:15 135:17
    136:24 137:19
    138:9,18,23
    140:16 141:10
    141:23 142:18
    143:21 144:4
    144:23 145:9
    147:24 148:2

152:14 160:18
    163:8 164:14
    164:23 166:13
    166:17 167:21
    168:18 169:20
    169:23 171:9
    171:18 174:4,5
    174:22 175:11
    175:17 176:7
    176:10,16
    179:20 180:2
    183:18 184:4,6
    184:19 185:2
    185:20 186:22
    187:3,19
    188:17 189:5
    189:11 193:19
    196:7 197:23
    198:10 199:10
    199:21 200:5
    201:13 203:17
    205:17,19
    206:17 209:13
**Honor's** 171:10
    191:17
**hope** 202:12
**hoped** 163:2
**hoping** 206:16
**Hour** 186:6
**hours** 106:11
    129:11 137:2
**housed** 101:7
**HR** 166:11,12
**Hudson** 30:12
    126:12 128:13
    128:17 130:25
    136:12,19
**Hurst** 108:3
    154:21
**Husson** 172:8
    173:2

─────── I ───────
**idea** 30:6 66:21
    69:8 74:16,22

85:12 123:5
    187:9,10 188:3
    188:5 202:18
**identified**
    116:18 201:16
**identify** 15:16
    65:25
**ignoring** 62:5
**II** 22:13 23:20
    25:5,11 26:24
    27:8 31:21,25
    32:18 40:5
    49:9 93:6 94:5
    101:13 102:7,9
    103:24 139:2,8
    145:23 146:24
**III** 88:3,20,23
**Illinois** 197:15
    197:16
**imagine** 201:17
**immediately**
    100:22,23
**impact** 111:21
    126:12 129:24
**implicitly** 180:7
**implied** 62:4
**impression**
    191:17
**in-depth** 36:9
**inaccurate**
    92:10
**incidentally**
    152:16 153:16
    155:12
**include** 3:9 33:7
    41:4,4 102:23
    132:16 135:6
**included** 18:20
    19:8 26:24
    30:15 40:23,24
    40:25 57:25
    85:8,9 97:25
    102:21 151:12
    206:5
**including** 6:15

104:3
**inclusion** 56:8
**incorporate**
    22:25 23:3
**incorporating**
    26:23
**incorporation**
    26:11
**incorporator**
    23:11
**incorrect** 92:5,7
**incorrectly**
    190:18
**independently**
    191:7
**indicate** 70:15
    94:12
**indicated** 4:19
    147:5 195:22
**indicates** 187:14
**indicative** 146:3
**information**
    16:25 17:3
    40:24 92:5,9
    98:14 100:12
    108:6 131:18
    131:24 160:7
    160:13 185:25
    188:20 192:15
    192:17
**informed** 165:15
**instance** 8:12
    169:13
**instructed** 15:23
    95:15 107:23
    109:21
**instructions**
    25:19,23
**instrumental**
    34:21
**insufficient**
    188:20
**insurance** 91:15
    93:2 103:15
    135:21 136:8

136:17 165:15
**insurer** 26:24
    91:24
**intangible** 60:15
    98:7 100:2
**intended** 80:13
**intends** 177:9
**intent** 61:25
    146:3,8
**intention** 89:5
**intentional**
    144:19
**inter-creditor**
    62:9
**interact** 95:10
    159:23
**interaction** 95:6
**intercreditor**
    55:17 56:14
    57:9,15,18
    58:22 59:7,10
    60:13 61:6,10
    119:13,16,22
    119:24
**interest** 119:4,8
    119:20,21
    120:2 169:14
    169:16 208:15
**interested** 101:6
    142:8 206:17
**interests** 93:25
**introducing**
    97:4,5
**Investment**
    31:17,24 51:4
    52:5
**Investments**
    49:9 93:6
**involved** 75:22
    75:24 76:22,25
    77:24 79:21
    103:25 104:6
    115:13 152:18
**involvement**
    103:9,18

in re: TRANSCARE CORPORATION

| | | | | |
|---|---|---|---|---|
| **involves** 91:15 | 44:19 | 104:1 105:1 | 194:1 195:1 | 34:25 36:13,17 |
| **irrelevant** 145:15 | **Jonathan** 150:9 150:23 172:5 | 106:1 107:1 108:1 109:1 | 196:1 197:1 198:1 199:1 | 37:2 38:3,13 38:23 39:7 |
| **irrevocably** 117:4,24 | 172:19 | 110:1 111:1 112:1 113:1 | 200:1 201:1 202:1 203:1 | 40:13,16 41:3 42:19 43:7 |
| **issue** 8:19 9:25 24:8 89:2 | **Jones** 172:22 **Judge** 9:24 | 114:1 115:1 116:1 117:1 | 204:1 205:1 206:1 207:1 | 45:18 46:23 48:9,13 49:18 |
| 108:17 123:9 134:19 175:5 | 139:14 168:20 184:12 195:8 | 118:1 119:1 120:1 121:1 | 208:1 209:1 210:1 | 49:25 50:6,7 50:10,11,15,15 |
| 176:15,25 178:3 184:7 | 202:21 **Juge** 202:12 | 122:1 123:1 124:1 125:1 | **June** 116:17,24 **JX** 18:10 26:10 | 50:16,21 52:23 53:2,4,5,6 54:3 |
| 192:10 | **July** 1:1 2:1 3:1 | 126:1 127:1 | 28:11 34:17 | 54:6 55:18 |
| **issued** 24:12,23 | 4:1 5:1 6:1 7:1 | 128:1 129:1 | 35:21 39:13,17 | 56:7 59:15,23 |
| **issues** 10:6 92:19 | 8:1 9:1 10:1 | 130:1 131:1 | 39:18 44:24 | 60:5 63:9,10 |
| 134:21 174:23 | 11:1 12:1 13:1 | 132:1 133:1 | 46:3 53:17 | 63:10,18 65:4 |
| 174:24 175:2 | 14:1 15:1 16:1 | 134:1 135:1 | 56:13 57:21,23 | 65:12,25 68:23 |
| 200:6,20 | 17:1 18:1 19:1 | 136:1 137:1 | 58:4 69:20 | 70:14 74:5 |
| **issuing** 17:12,14 | 20:1 21:1 22:1 | 138:1 139:1 | 77:5 81:24 | 80:20 81:5 |
| 25:13,15 | 23:1 24:1 25:1 | 140:1 141:1 | 84:5 87:8,9 | 84:25 85:3 |
| **italicize** 105:4 | 26:1 27:1 28:1 | 142:1 143:1 | 109:9,10 | 86:24 87:3,13 |
| **Item** 17:14 | 29:1 30:1 31:1 | 144:1 145:1 | 125:23 126:2 | 90:20,23 94:13 |
| **items** 16:2,7 | 32:1 33:1 34:1 | 146:1 147:1 | 152:25 158:5 | 95:2 99:10 |
| 45:23 56:8 | 35:1 36:1 37:1 | 148:1 149:1 | 163:8 | 102:22 104:13 |
| 59:14 61:10 | 38:1 39:1 40:1 | 150:1 151:1 | | 120:12 123:2,5 |
| 67:4 69:19 | 41:1 42:1 43:1 | 152:1 153:1 | **K** | 123:7 125:15 |
| 155:24,25 | 44:1 45:1 46:1 | 154:1 155:1 | **keep** 3:21 19:16 | 125:18,20 |
| 159:4,8 160:9 | 47:1 48:1 49:1 | 156:1 157:1 | 77:21 | 129:6,9 130:9 |
| **iterations** 94:23 | 50:1 51:1 52:1 | 158:1 159:1 | **kept** 12:24,25 | 130:24 131:7 |
| | 53:1 54:1 55:1 | 160:1 161:1 | 117:10 | 131:13 134:21 |
| **J** | 56:1 57:1 58:1 | 162:1 163:1 | **Kevin** 65:9,12 | 136:18 139:9 |
| **January** 32:19 | 59:1 60:1 61:1 | 164:1 165:1 | 66:4,12 | 139:24 143:17 |
| 32:20 139:6 | 62:1 63:1 64:1 | 166:1 167:1 | **Killion** 172:19 | 145:18 146:12 |
| 176:18 | 65:1 66:1 67:1 | 168:1 169:1 | **kind** 12:25 | 153:13,20,21 |
| **Jean** 123:20 | 68:1 69:1 70:1 | 170:1 171:1 | 90:13 202:9 | 156:2 157:18 |
| 150:25 151:8 | 71:1 72:1 73:1 | 172:1 173:1 | **knew** 104:8 | 158:17,21 |
| 172:22 | 74:1 75:1 76:1 | 174:1 175:1 | 125:12,14,18 | 166:4,8,15 |
| **Jeff** 165:24 | 77:1 78:1 79:1 | 176:1 177:1 | 127:14,19 | 168:19 170:7 |
| 166:4,10,11 | 80:1 81:1 82:1 | 178:1 179:1 | 195:5 | 170:16,20,23 |
| **Jeffrey** 166:7 | 83:1 84:1 85:1 | 180:1 181:1 | **know** 5:17 8:4 | 171:6 173:12 |
| **job** 3:5 8:9 | 86:1 87:1 88:1 | 182:1 183:1 | 9:10 13:15 | 179:4 183:7 |
| 176:6 | 89:1 90:1 91:1 | 184:1 185:1 | 18:6 21:9 | 184:9 187:12 |
| **John** 172:8 | 92:1 93:1 94:1 | 186:1 187:1 | 23:15 24:18 | 188:13,21 |
| 173:2 | 95:1 96:1 97:1 | 188:1 189:1 | 27:3 28:3,21 | 189:19 199:21 |
| **join** 2:8 | 98:1 99:1 | 190:1 191:1 | 29:15 33:6,9 | 200:14 202:9 |
| **joint** 28:11 | 100:1 101:1 102:1 103:1 | 192:1 193:1 | 33:19 34:7,8 | 203:17,22,25 |

in re: TRANSCARE CORPORATION

204:8 208:13
209:20
**knowledge** 14:3
17:7 24:12,15
24:25 25:6
33:15 46:15,18
46:20,25 47:6
47:11 48:7,24
51:11 52:9,15
59:16 78:25
91:3,5,7
101:19 105:13
110:12,14
125:7 138:16
149:20 161:22
208:21 209:16
209:20,25
**known** 25:12
**knows** 50:22
59:21,22
**Kossuth** 124:18
126:18 127:4

---

**L**

**L.P** 31:25
**lack** 114:14
**lacks** 43:4
133:14
**Lamark** 207:18
**Landeck** 172:19
172:20
**language** 168:2
**large** 56:15
155:18 160:19
162:2 182:23
**largest** 92:23
**late** 105:23
127:14 188:8
207:2
**latest** 65:3
**law** 2:23 24:22
28:24,25 51:4
52:5 61:14
144:2 148:11
148:12,14,15

148:20 149:21
181:13 182:11
**laws** 23:3
**lawyer** 7:6 14:7
14:10 65:13
69:10 85:23
149:4
**lawyers** 40:18
51:5 150:6
**lawyers'** 204:8
**lay** 9:19 114:13
**Layana** 74:4
**lays** 16:4
**lead** 31:2
**leading** 71:10
**lean** 55:11
**learn** 107:8
**lease** 68:5,21
69:9,14
**leasing** 73:16
**leave** 33:7
**left** 22:23 32:9
32:21 80:19,22
154:22,25
157:15 178:7
**legal** 1:23 17:8
65:16 134:2,9
144:10 152:18
165:25 167:7
**Legally** 161:6
**Leland** 17:22
18:16,22 20:6
64:22 105:17
165:3,23
166:20
**Len** 158:23
**lender** 31:12
**lender's** 59:12
**lenders** 4:16
30:24,25 31:15
42:2 55:9
66:21 67:5,15
67:24 72:11
88:12 97:13,13
97:23 98:9

99:17 100:7
119:17 120:6,7
120:10 142:15
143:13 168:17
169:17
**lenders'** 7:19
47:25 68:16
**lending** 31:10
40:18 51:6
148:19
**length** 158:20
**let's** 10:5,6 12:9
14:25 29:23
35:18 41:19
49:19 54:23
72:14 75:20
77:4 85:17
95:5 104:24
106:6 110:7
113:2 123:18
126:5 135:12
141:13 148:8
157:6,6 163:14
173:15 195:9
198:3 203:8
**letter** 34:18
47:22 108:17
109:5,22 110:8
110:16 111:17
136:22
**levels** 180:5
**liability** 132:11
163:20
**licensed** 2:22,25
**lien** 60:3,9 61:18
61:22 139:3
**liens** 120:8
**lies** 181:4
**light** 97:7
**likes** 67:4
**limine** 174:20
**limitations**
113:18
**line** 10:14 131:8
161:5,16 179:2

**Lines** 10:16
**list** 30:8,12
31:16 32:10,21
33:7 45:22
59:11,13 72:22
92:23 120:11
186:23
**listed** 16:3 61:11
77:12
**literature** 206:2
**little** 26:10 39:19
92:17 165:8
199:18 205:13
**lives** 197:16
**LLC** 1:18 3:10
3:14,18 49:7
51:5 65:15
**LLC's** 27:5
**loan** 4:16 7:19
31:15 32:18
40:5,23 42:2
47:25 55:7,9
55:15 59:12
61:12 66:21
67:5,24 68:16
72:10 88:12
89:2,2,11,15
120:10 142:10
169:10 209:9
**loans** 3:20,24
4:2,17,18 31:9
32:20 50:5
88:7 89:8
139:7 146:9
169:17,18
208:23
**locations** 156:25
**log** 42:22 45:16
**lone** 55:15
**long** 20:13,14
46:3 107:5
174:6 185:16
188:15 194:12
200:12 201:24
207:24

**longer** 4:22,22
102:11
**look** 15:4,25
16:6 33:21
39:4 52:21
54:23 58:7
60:15 63:11
64:16 71:15
84:2 126:10
128:9 137:21
143:23 153:8
156:10 160:17
163:14 165:6
165:21 179:8
182:21 184:18
186:23 187:22
187:25 190:25
195:7,13
201:18
**looked** 28:12
44:15 68:18
69:3,15,19
156:15 158:16
158:19 182:3
191:8 200:17
**looking** 16:21
36:6 45:13,14
56:2,3 58:4
65:11 66:7
76:9 78:13
83:4 91:18,25
96:18 111:16
129:20 145:10
162:18
**looks** 64:23 66:4
66:11 73:12
82:7 133:22
135:3 145:6
192:10
**loop** 205:18
**looseleaf** 1:20
**lot** 9:7 39:20
168:2 196:25
202:22
**Luc** 123:20

in re: TRANSCARE CORPORATION

150:25 151:8
172:22
**lunch** 207:18,19
207:25
**Lynn** 2:17 3:5
4:25 7:7,8,20
8:14 21:5,8
26:5 27:22
29:10,14 33:15
33:23 34:15,25
35:2 38:15
51:24 52:6
70:18 93:7
95:12 98:21,23
98:24 99:2,20
99:22 102:22
108:18 109:20
150:24 151:8
169:25 172:18
172:21 195:11

——————————
**M**
**maiden** 152:21
**main** 123:9
**maintain** 12:15
13:18,20,21
**maintained**
12:11 93:22
**maintaining**
12:9 14:2
**making** 74:18
160:12 210:3
**Mallet** 29:11
33:12 35:12
36:19,23 37:2
37:4 51:20,21
62:22 108:16
110:17 111:10
150:13,20
152:10 170:9
173:6 204:5,7
**man's** 146:11
**managed** 31:16
32:6
**management**

8:22 15:22
35:13,18
188:11
**manager** 3:10
3:13 4:10,11
4:15,23,25 5:8
6:3,6 7:14
168:6,10,12,23
169:7
**managers** 4:16
**March** 5:4 6:3,8
7:14
**Margaret**
112:18
**Mark** 172:20
**marked** 66:13
**market** 177:13
**marketing** 182:6
**Marks** 150:24
151:13
**Marshack** 138:5
**material** 112:23
195:4
**materials** 197:20
**math** 178:8
180:11,24
**matrix** 15:3,17
17:24 19:4
20:3,7 22:17
22:19 52:17,21
**Matt** 123:19
126:11 129:25
131:14
**matter** 23:16
61:14 87:25
91:15 144:2,11
150:7 176:24
188:18
**matters** 7:24
144:3
**Maverick** 187:6
**Max** 110:8
111:6
**mean** 28:4 59:24
65:13 85:17

99:10 115:11
124:9 162:22
179:16 180:14
197:10 208:24
209:22
**means** 39:7
111:11 180:7
**meant** 124:8
**measures** 124:20
**medical** 130:13
155:5
**medication/eq...**
157:19
**meeting** 14:15
14:17 150:20
151:3,19 152:4
152:10 169:25
170:12,17,19
170:21,24
171:23 172:17
173:4,19
**meetings** 14:22
**member** 6:19
7:9,10 14:8
175:18,22
**members** 55:7
124:21
**mention** 167:12
**mentioned**
55:22 134:20
171:21 173:3
**Mercado's**
26:13
**Mervis** 9:23
10:13 11:8,12
15:8 32:23
33:3 44:19
50:18 57:16,22
59:21 60:14
63:18,21 79:8
79:15,24 85:14
106:18 107:3
114:11 117:7
122:14 133:17
133:25 134:6

136:24 137:6
137:12 138:9
138:18 139:12
139:16 141:9
141:17,22
143:21 144:16
144:21 145:8
147:15,17,19
147:24 148:7
152:13 154:5
154:10 156:13
157:9 158:3,14
159:11 160:18
162:3 163:6
164:14,22,25
166:17,24
167:21 168:18
168:25 169:19
173:24 174:5
175:25 176:6
179:3 183:17
184:3,11,18,24
185:4 189:5,9
190:2 191:3
196:6,14 197:9
197:23 198:7
198:18 199:9
199:20 200:5
200:19 201:8
201:12 202:12
202:20,24
203:4,16,25
204:6,12,18
205:12,16
206:4,12,14,16
207:3 208:2,11
208:17 209:18
209:23
**message** 131:19
**messenger** 28:2
28:5
**met** 109:25
150:9
**Michael** 172:23
**microphone**

1:12 2:14
**middle** 66:7,12
90:2 134:15
**Milea** 123:19
126:17,24
127:2 156:17
156:18
**million** 47:25
50:2 88:2,11
88:15,16 89:3
89:10 90:24
208:21,25
209:6,9,10,17
**mind** 10:23 15:4
19:16
**mine** 21:13,21
83:16 207:20
**minor** 146:3
**minority** 19:17
**minute** 42:9
148:9,10
**minutes** 97:11
132:18 133:6
208:5
**misgivings**
105:11 107:10
**mispronounce**
35:23
**mispronounced**
98:20
**missed** 41:5
**missing** 57:3
**misspoke** 88:14
**misstatement**
181:9
**mistake** 32:12
32:16
**mistaken** 26:15
95:20
**mixed** 131:13
**modified** 164:3
**moment** 14:13
21:13 42:20
75:21 86:23
108:23 117:15

in re: TRANSCARE CORPORATION

152:13 164:15
165:6 200:22
**Monday** 37:16
**monetize** 176:18
181:7
**money** 141:2
142:20 143:15
143:18 145:19
145:22
**monitored** 101:8
**month** 69:16
72:23 74:9,25
**monthly** 73:3,21
75:17 161:17
**months** 185:13
185:14
**Morganroth**
95:20,21 113:5
113:8 121:5,25
123:8
**morning** 47:15
77:25 106:11
112:15,17
129:11 175:6
200:10,11,25
203:9
**motion** 174:20
175:4,10 176:3
176:4 182:22
**motions** 202:16
**move** 10:6,12
17:20 21:11,12
27:12 29:23
56:16 61:7
75:20 85:17
87:4 91:13
104:24 114:15
131:11 135:12
138:10 155:19
166:25 173:23
**moved** 75:15
77:7 130:8
147:8 176:10
193:5
**movement**

130:13,15
**moving** 15:10
94:21 113:22
124:5,9 130:19
157:12
**MTA** 59:16
60:10,23 61:14
75:21,24 76:6
76:9,13,15
77:8,11 82:4
82:11,20,21
85:4 95:6,6,17
95:23 98:4
100:8 101:5
114:19 115:6
115:10,15,15
115:19 118:15
119:4,20 121:9
121:14 122:12
123:10 125:11
125:21 126:22
153:4,14,22,24
156:25 162:24
163:5
**MTA's** 100:15
113:24
**much-needed**
97:7
**multiple** 9:17
180:5 187:25

## N

**N** 1:6,6
**name** 43:2 44:14
149:6 150:2,5
150:11
**named** 113:8
**names** 33:22
104:4
**naming** 23:11
**narcotics** 155:8
**nature** 185:9,10
**necessarily** 8:15
8:20,24 39:10
40:17 67:12

160:10
**necessary** 102:4
107:21 128:10
**need** 20:8,11
52:16,18 55:23
57:16 59:6
60:15 114:15
120:24 130:8
167:25 174:12
174:14 185:21
189:17,18,18
193:8 198:11
206:6
**needed** 115:6
124:11 155:20
177:22
**needs** 8:10,14
**negotiate** 16:17
**negotiations**
149:17
**never** 133:22
**new** 1:9 2:23
42:14 66:3
82:20 86:11
102:12 108:16
131:19,24
135:21 136:7
160:14 161:6,8
165:14 175:7
175:20 204:25
205:20
**next-to-the-last**
111:19
**NICS** 191:10
**night** 122:22
125:4 134:15
175:13 185:12
**nine** 58:8
**Nobles** 206:25
**Nolan** 123:19
126:11 128:12
128:13 129:14
129:16,17
130:22 131:14
**normal** 157:4

**normally** 196:3
199:2
**Notary** 1:8
**notations** 42:25
**note** 166:14
**notes** 186:19
**notice** 17:12,14
41:21,24 44:8
44:12 45:3
46:12 47:16
49:3,20 52:10
53:18 56:2
57:4 97:17
114:19 116:14
116:23 133:11
134:24 192:8
209:6,7
**noticed** 165:17
**number** 3:5 7:21
10:14 19:17
69:2,17,18
71:10 88:18
100:13 104:3
127:10 158:5,8
159:4
**numbers** 72:2
93:5 94:14,18
94:21 178:17
184:23
**NYSIF** 135:21
136:16

## O

**O'Brien** 135:20
135:24
**o'clock** 123:11
127:15 137:11
185:12
**object** 32:24
63:22 106:19
122:14 138:22
141:23 142:3
**objected** 141:10
**objection** 15:7
21:15,17 32:23

33:2 43:4
50:18 56:18
57:13,14,22
58:20 64:19
80:2 114:10
116:16 117:8
121:21 133:14
134:13,18
135:17 141:15
147:13,19,23
164:18,21
166:14 173:24
**obligating** 85:25
**obligation** 47:18
52:11 53:20
90:4 91:9,11
182:11,14,16
**obligations**
86:11
**obtain** 177:22
177:23
**obtained** 111:11
111:12
**obviously** 163:3
**occur** 80:13
**occurred** 139:23
142:22 173:5,5
**occurrence**
47:21
**occurs** 134:16
**October** 2:9,10
3:2
**offer** 164:22
175:3
**offered** 81:14
**offering** 15:12
63:19 114:7
163:22
**offers** 21:5
**office** 52:6 93:25
**officers** 27:2
**offices** 93:22
106:13 160:5
**Oh** 4:7 96:16
130:4 152:16

in re: TRANSCARE CORPORATION

163:7
**okay** 1:11 5:15
5:25 56:7 64:6
91:6,6 118:10
120:22,25
125:22 131:2
133:6 135:12
136:2,11
139:12,15
143:14 150:12
154:7 156:5
157:6 158:14
165:21 172:7
175:24 185:3
190:7 200:23
202:23 203:3
**Old** 127:16
152:8 161:18
161:20,23
**once** 17:24
42:16 67:23
69:8
**one-page** 22:21
**ones** 32:4 136:18
186:10
**open** 177:13
207:2
**operate** 31:6
124:14 128:10
155:20 165:20
**operated** 134:4
**operating** 16:10
117:21 133:23
145:7 174:17
**operation**
133:21
**operations**
100:9,15
136:19
**opine** 179:21
**opinion** 180:4
192:14,21,24
193:4 196:23
**opinions** 176:12
**opportunity**

159:23 190:14
**opposed** 20:10
**order** 21:13
52:17 69:6
114:15 138:19
180:8 181:22
188:11 191:17
202:8
**organization**
23:11
**original** 164:7
189:4 192:11
192:21,24
193:4,6 206:5
**originally**
150:13
**ostensibly** 55:5
**Otterbourg** 37:9
38:12 149:25
150:4,23
**outside** 37:25
50:14 51:15
85:23 149:4,21
169:18
**outstanding**
88:7 89:7
**overall** 195:21
**overrule** 134:18
182:21
**Overruled**
166:23
**owed** 129:3
**owing** 90:5
**owned** 25:11
67:24 143:10
**ownership** 91:25
92:9,13,19
134:25
**owns** 24:18,22

_____
**P**
**P** 1:6
**p.m** 29:10 39:16
70:8 83:23
85:10 96:13

109:20 110:6
113:4 115:3,24
121:8,18 122:2
124:3 126:7
128:22 131:15
137:13,14
138:14
**package** 83:25
**page** 10:14,15
22:24 23:10
53:21 71:10
86:8 89:24
96:19 101:25
104:25 109:16
109:17,18,19
110:8,8 111:4
111:7,8,19
123:21 130:3
140:15 141:19
141:21 156:14
157:7 159:13
162:7,9 163:12
163:14 165:22
167:2,16
205:24 206:10
206:14
**pages** 71:13 84:3
**paid** 88:20 89:11
90:3,24 91:4
129:5 132:13
169:14
**pan** 164:11
**paper** 145:2
186:12
**paperclips** 128:9
**papers** 82:4,9,23
189:18
**para** 122:22
**paragraph** 21:2
29:25 36:7
66:7,13 78:13
97:7 101:5,25
102:2 104:11
104:14,25
110:22 111:19

140:19 142:9
143:7 157:4
161:15 162:11
163:17
**paragraphs**
163:12
**paralegal** 51:13
**paratransit**
97:25 100:15
112:19 114:20
115:7 122:20
**paratransit's**
100:9
**Pardon** 137:6
207:9
**parent** 25:18
**parsing** 88:10
**part** 20:14 26:22
71:15 80:11
84:14 132:14
160:14 180:15
**partial** 47:17
49:21 52:11
53:19
**participating**
172:15
**particular** 33:8
44:5 101:6
129:2
**particularly** 8:8
**parties** 120:2
137:15
**partly** 101:11
**Partners** 1:18
2:5 3:7,10,14
3:17,18 8:18
8:21,22 27:4
31:16,25 49:7
51:5 65:14,15
75:11 149:13
160:5 169:15
**party** 10:2 17:4
119:23,25
**pass** 183:18,19
**Patriarch** 1:18

2:5 3:6,10,13
3:17,17 4:21
4:24 8:18,21
8:22 12:25
25:2,3 26:15
27:4 31:16
43:22 49:7
51:5 65:13,15
74:6 75:10
126:19 149:12
160:4 169:14
192:16
**Patriarch's**
26:24,25 93:22
**paused** 39:12
**pay** 74:12,13,16
74:18,24 75:16
86:10 89:3
129:6 132:9,11
164:10 169:13
175:15 209:2
**paying** 18:18
**payment** 116:14
116:24
**payments** 101:9
**payroll** 18:18
74:8 108:19
126:12 128:17
128:20,22
129:2,4 130:25
131:18,25
132:9 160:8
163:18,21
**Pelissier** 15:2
18:16,25 80:14
81:25 82:3,22
82:23 130:18
151:2 158:19
165:4,23 167:4
**pending** 44:2
175:23
**Pennsylvania**
30:12 91:22
148:12
**people** 32:10

in re: TRANSCARE CORPORATION

36:11 64:8,20
64:21 75:8,8
92:23 97:21
104:4,4 122:23
126:18 129:18
146:5 151:13
154:15 155:14
159:14 160:10
172:4,14
181:16 196:16
**people's** 191:5
**percent** 19:18
93:9,17 94:8,9
104:15,18,21
166:9
**perform** 4:21
**performance**
86:10
**performed**
112:4,5
**performing**
75:17
**period** 14:14
16:15 64:4
75:25 76:2,5
127:12
**periods** 129:7
**Perkin's** 98:17
**Perkins** 113:6
**permit** 10:9
**person** 27:19
33:23 81:7
93:3 95:10,22
96:3,8 113:15
203:21
**person's** 149:6
**personal** 7:24
46:18 48:23
**Peter** 34:3 35:4
39:14 40:2
45:10 46:14,24
51:8 52:17
64:22 80:10
81:4,13,13
109:22,25

159:19
**Pfefferle** 172:20
**ph** 74:4 124:18
131:20 138:6
138:13 187:6
**phone** 150:23
172:4,9,11
204:17
**physical** 59:19
130:15 155:25
207:11
**pick** 132:10
163:19,23
187:3
**picked** 187:11
**picket** 198:23
**piece** 26:10
106:9 186:11
**pieces** 203:5
**Pittsburgh**
125:2,15 127:5
**place** 155:21,23
194:21
**places** 157:15
**Plaintiff** 1:4
**Plaintiff's**
134:23
**plan** 16:10 20:15
20:18,22 30:23
38:16 69:13
80:11 128:25
156:8 158:24
158:25 160:14
161:23 162:2
164:4,7,10
**planned** 151:19
159:8
**planning** 174:7
**plans** 156:5
160:13
**plasma** 155:7
**please** 1:3,11
36:13 131:19
135:19 156:14
160:22 162:5,7

162:9 163:7
164:17 167:16
197:5
**plug** 187:24
**point** 4:5,6,10
4:13 7:3 9:16
35:11,14 36:18
37:3,11 40:8
41:7 42:5
51:16 54:13
72:5 73:7
80:16 81:10,25
82:3 90:14
92:17 93:18
95:9,13,24
103:12 104:8
105:2 112:12
115:8 122:12
122:18 139:19
146:10 153:2
160:4 173:9
178:9 179:6
181:10,20
182:3 186:6
193:18 202:11
205:5
**pointed** 140:16
**policies** 27:6
**policy** 27:2,5,5,6
27:9,9 91:21
136:7,11,19
165:16,18,19
**portfolio** 6:11,13
**portion** 68:5
88:6 89:7
99:25 105:8
163:24 208:22
**portions** 83:9
**position** 5:4,6
61:13 81:14
**possession**
124:16
**possible** 28:13
102:11 127:23
140:7 155:11

**Possibly** 10:22
**potential** 140:3
161:17
**power** 105:9
**PPAS** 32:7
47:23 87:16
90:8,13,25
99:8,14 142:15
146:18 149:4
**PPAS'** 44:8
**PPAS's** 169:8
**PPS** 145:17,21
**PPSA** 91:4
**practice** 2:22
204:13
**predicated**
144:14
**prefatory** 9:15
**prepare** 36:5
54:24 89:13
188:24
**prepared** 40:19
62:11
**preparing** 11:23
68:17 159:21
**present** 137:16
**preserve** 139:3
**president** 22:12
81:5,11
**pretrial** 181:21
**pretty** 8:13
100:4 158:17
184:12 202:17
**previewed** 175:5
**previously** 22:18
108:25
**price** 181:14
182:17 183:23
**principal** 9:24
14:6,10 113:12
122:5
**principally**
33:24 64:21
**prior** 46:4,22
129:8

**priority** 55:12
61:12 67:10,13
120:11
**privilege** 42:22
45:16
**pro** 175:12
208:22
**probably** 5:22
9:9 35:10
41:12,18 46:17
52:20 67:21
71:20 74:18
78:4,24 83:6
99:4,7 102:21
131:12 174:8
186:21 195:6
195:10 202:2
**probe** 21:4
**problem** 18:17
117:17 121:14
165:11 176:19
177:2 187:8
203:19 206:24
**Proceed** 15:15
**proceeds** 117:23
117:25 118:3,5
143:8
**process** 26:22
37:12 113:24
181:14 182:6
182:13
**produced** 13:11
131:10
**product** 187:9
189:17 197:4,7
199:16
**profess** 61:13
**profiles** 187:12
**progress** 210:4
**prohibited**
61:24
**project** 178:2
**proof** 145:21
**proofs** 143:18
**properly** 120:4

in re: TRANSCARE CORPORATION

Page 228

| | | | | |
|---|---|---|---|---|
| property 143:9 | purpose 53:3 | 71:24 75:7 | 36:14 108:19 | 14:18,19 18:2 |
| proportion | 100:17 101:13 | 79:16,18,19 | 130:7 | 18:3,5,8,20 |
| 169:17 | 140:7 147:5 | 85:6 98:11 | reached 18:16 | 19:9 20:19 |
| proposal 198:13 | 152:4 177:11 | 106:19 107:4,7 | 20:16 35:3,7 | 27:9,11 28:18 |
| propose 201:21 | purposes 12:14 | 107:13 119:3,9 | 35:16 95:19 | 36:18 37:5 |
| proposed 38:16 | 14:7 42:23 | 119:13 125:9 | 96:2,8 | 38:7,10 39:8 |
| Proskauer 176:8 | 97:20 | 125:13 134:2 | reaching 18:23 | 42:12 48:10 |
| prospective | put 26:25 31:14 | 134:10,12 | read 10:10 11:9 | 51:24,25 56:10 |
| 177:2,5 | 37:7 57:6 69:8 | 138:19,20 | 17:19 59:5 | 63:2,8 70:9,16 |
| protect 100:8,15 | 70:6 86:19 | 141:9 146:11 | 102:2 111:2 | 80:22 82:2,2,6 |
| provide 5:16,21 | 96:3 109:15 | 154:6 169:4 | 120:14 181:21 | 84:24 94:18 |
| 73:13,18 92:6 | 111:6 135:18 | 170:16,23 | 208:10 | 130:11,16 |
| 100:10 102:5 | 138:20 155:22 | 171:10 196:11 | reading 20:6 | 133:20 149:17 |
| 111:22 122:9 | 155:23 171:16 | questioned | 38:4 45:15 | 150:5 151:6,21 |
| 179:22 | 175:8,12 185:6 | 194:8 | 87:23 88:21 | 151:22,23,25 |
| provided 7:20 | 186:11 191:19 | questioning | 119:10 138:11 | 152:12 153:5 |
| 28:23 32:14 | 192:2 194:11 | 179:2 | ready 176:3 | 158:12 162:20 |
| 37:18 92:7 | PX 15:4,16 | questionnaire | realize 135:13 | 165:10,12 |
| 157:2 178:16 | 21:12,13,22 | 82:14 83:15 | 202:7 | 168:7 172:15 |
| 188:19 | 39:18 42:20 | questions 10:10 | realized 117:16 | 173:11 |
| provides 20:9 | 58:17 64:16 | 11:6 134:9 | really 14:23 | recalled 14:21 |
| 85:5 | 66:14 78:2 | 147:3 152:7 | 37:24 43:18 | receipt 141:15 |
| providing 13:15 | 87:4 91:13,14 | 153:17 154:13 | 47:9 115:16 | receivable 66:25 |
| 113:23 | 96:11 111:16 | 158:9 177:16 | 181:8 183:2,12 | 67:2 116:2,8 |
| provision 20:7 | 113:2 116:13 | 191:13 194:25 | 186:5 | 117:5 116:6,11 |
| 60:7 62:6 | 116:25 118:9 | quick 63:11 | realtime 162:18 | 118:17 119:6 |
| 188:10 | 121:3,4,17,22 | 123:23 156:20 | reason 13:13 | receivables |
| proximate | 133:12,15 | quickly 100:4 | 32:9,11,17,20 | 116:11 117:11 |
| 209:24 | 135:12,13,20 | 127:23 136:16 | 33:8 49:15,22 | receive 120:22 |
| Public 1:8 | 137:21,23,24 | quote 187:23 | 101:11 | 142:16 147:4 |
| publicly-traded | 154:11 158:3 | quotes 135:2 | reasonable | 180:8 |
| 191:9 | 160:22 162:5 | | 143:16 | received 21:18 |
| published | 163:7 171:17 | **R** | reasons 12:13 | 37:8 63:9,10 |
| 207:13 | | R 1:6 | 142:2 176:11 | 64:2 65:4 82:3 |
| pull 2:14 148:5 | **Q** | raise 175:3 | 179:19 189:15 | 82:10 114:12 |
| 152:25 154:11 | quarreling | raised 15:6 | rebut 205:11 | 121:23 135:9 |
| 156:11 158:3,6 | 199:10 | random 157:15 | rebuttal 180:21 | 138:13 142:11 |
| 158:15 160:22 | question 10:18 | Randy 98:15 | 185:10,15 | 143:8 147:16 |
| 162:4,5 163:6 | 10:24 11:10,12 | 99:10 108:10 | 188:9,10 190:9 | 147:25 154:20 |
| 164:17 191:25 | 11:20 12:17 | 149:8 154:21 | 190:10 196:3 | 164:24 174:2 |
| pulled 160:6 | 17:17 18:8 | 154:24 172:22 | 196:16 198:16 | 187:13 |
| purchase 88:4 | 32:24 33:5 | range 188:2,5 | 199:8 205:3,10 | receiving 46:16 |
| purchaser 88:2 | 41:16,17 43:19 | ranges 188:6 | rebutting | recess 137:13 |
| 88:5 89:17 | 44:2 45:12 | rata 208:22 | 166:18 | recharacteriza... |
| 90:9 | 57:7,13 66:10 | reach 27:19 | recall 6:9 11:5 | 139:5,18 |

in re: TRANSCARE CORPORATION

recipient 118:25
recitals 87:24
recollection
    10:25 13:9
    23:24 30:19
    41:13 150:16
    152:9 172:9
    173:19
record 63:23
    116:19 120:20
    126:4 147:9
    197:13 200:4
    208:10
records 25:2
    50:11,17 76:15
    93:10,21,23,24
    94:11,12
recover 139:11
redid 194:15
redirect 171:19
    191:23 192:3
    196:25
reducing 42:2
Reeseman 111:9
refer 50:17
    55:20 159:8
reference 37:8
    37:10 110:22
    152:5 153:2
    161:4,9 168:5
    205:25 206:11
references 20:11
referrals 28:23
referred 22:16
referring 19:7
    27:6 66:12
    97:17 106:17
    163:22 166:5
    209:14
refers 91:20
    136:2,6 173:15
refresh 173:19
refused 167:6,16
refuses 146:22
regarding 167:7

192:14 196:2
register 24:15
related 10:2
    12:20 13:2,10
    41:9
relates 31:9
relating 16:18
relationship
    36:11 51:7
    61:5
relative 171:10
released 86:9
relevance 10:4
    15:7 43:5,7
    117:8,9,14
    133:14,17
    138:23 140:4
    140:17 166:15
    166:16,18,21
    179:16
relevancy
    116:16 198:21
relevant 15:9,18
    15:19 134:12
    134:19,20
    138:24 142:21
    143:2 144:7,9
reliable 179:17
    183:10
relief 115:2
    157:25 158:2
relying 191:4
remain 86:12
remainder 31:4
remaining
    124:22
remember 6:7
    28:15,24 29:3
    36:20,21,25
    39:5 43:18
    47:5,9 66:24
    85:7 96:4,9
    100:5,6 102:24
    103:4 105:16
    115:12,16

129:8 132:25
reminded 133:4
reminds 147:7
remove 106:13
    106:15 200:2
removed 139:22
renders 192:13
repaid 209:11
repeatedly
    167:17
reply 138:17
    141:11
report 2:16 38:6
    38:8 157:3
    175:7 180:9
    183:19 185:13
    188:9,11,13
    189:4 190:17
    192:12,19
    193:2,6,7
    194:5,8,11
    196:3,11
    198:15 199:8
    199:25,25
    201:2 205:10
    206:6
reporting
    113:21 156:20
reports 157:14
    194:20 196:17
    199:2
repository 13:6
representatives
    150:20 153:10
represented
    85:20 149:21
    187:21
request 38:18
    82:5 115:23
    121:8 136:25
    205:23
requested 48:12
    102:23
requests 136:6
require 16:21

17:4,9,13 19:3
    20:13
required 17:15
    77:10 124:13
requirements
    60:23
requires 8:9
research 93:19
    93:21 188:24
resigned 5:3 6:6
resolution 12:19
    22:11,16 23:15
    52:8 78:3,5
    121:14
resolutions
    11:24 12:7,10
    12:11,13,15,16
    13:2 22:7,7
respect 4:2 7:12
    16:2 22:8,18
    22:19 41:11
    47:11 75:7
    88:7 89:8
    105:2 140:10
    169:9 174:15
    175:10 176:21
respond 124:2
    146:11 191:19
    193:14 202:21
responded 18:25
    19:11
responding
    41:17 186:3,4
responds 128:12
    128:16 196:24
response 19:13
    20:21 104:23
    120:13 126:11
    146:2 189:3
responses 121:7
responsibilities
    13:18
responsibility
    11:23 12:6
    13:25,25 78:3

82:13 83:14
    103:8
responsible
    13:14 22:2,25
    27:13,16,23,25
    28:4 51:6
rest 23:13 75:7
    83:17 126:18
    141:21
restate 17:16
restructuring
    38:17 80:12
    100:18 128:25
    158:25
result 23:7 77:16
    127:10,10,22
    190:21 191:2
    193:13,17
resumed 137:15
retained 150:13
retrieve 124:22
return 41:25
    48:4 110:2
review 44:8 99:8
reviewed 34:24
    70:18 98:25
    99:2
reviewing 11:24
    34:22
right 2:6 4:22
    5:3 6:24 7:8
    16:7 21:22
    22:13 26:15
    28:13 30:5
    31:22 32:8,18
    33:4 36:7 37:9
    48:21 51:2
    53:17 55:13
    60:20 62:14
    63:7 65:19
    66:6,8,17 67:9
    67:18,21 68:22
    69:4 70:11
    71:15,22 73:2
    73:15 75:20

| | | | | |
|---|---|---|---|---|
| 78:7,9 80:24 | room 151:4 | 84:19 103:4 | 162:10 165:2,7 | 109:8,18,24 |
| 82:14 84:17 | 172:18 197:21 | 104:14,17 | seating 151:6 | 110:3,4,9,11 |
| 85:8 87:19 | Rose 176:8 | 124:19 134:7 | second 22:23 | 110:21 111:22 |
| 88:21 89:6,25 | Roth 112:18 | 135:5 136:16 | 36:7 61:18,22 | 111:24 112:6 |
| 92:22 93:5,20 | row 186:24 | 142:23 144:5 | 86:8 96:19 | 113:13,14,25 |
| 93:24 94:16 | rows 187:5 | 144:10 162:20 | 97:7 109:5,16 | 114:16,17,22 |
| 95:5,22 96:10 | Roy 154:10 | 180:6 199:13 | 110:22 123:21 | 123:22 124:25 |
| 96:17 97:4,20 | 156:13 157:9 | 199:15 | 140:18 142:8 | 126:13 127:12 |
| 98:6 99:15 | 158:3,14 | says 16:5 24:6 | 143:7 145:3 | 127:13,25 |
| 100:22 101:2 | 159:11 162:3,6 | 29:13,15,24 | 156:14 161:5 | 128:6,18,19 |
| 104:12,24 | 163:6 164:18 | 30:18 36:5 | 161:16 162:7 | 130:4 131:3 |
| 106:6 107:3,6 | 164:25 165:7 | 37:14 48:3 | 163:16 175:5 | 133:16 135:23 |
| 110:7 113:11 | 166:25 | 59:8 60:2,2 | 176:13 178:9 | 136:4,8,13,14 |
| 115:21 121:9 | rude 140:9 | 78:11 87:21,24 | 178:21 | 136:16 138:3 |
| 121:11 122:4 | Ruffini 51:8 | 89:6,15 90:2 | Second-line 30:4 | 141:3 156:21 |
| 122:11,25 | run 154:16 | 122:17,17 | Secondly 188:16 | 157:7,20 159:4 |
| 126:19,22 | 200:15 | 126:11 132:8 | secret 174:18 | 159:14 161:4 |
| 129:16 130:6 | running 69:7 | 143:7,14 | section 89:25,25 | 165:5,25 167:3 |
| 130:22 134:6 | 80:16 126:22 | 156:20 161:5 | secure 127:22 | 167:8,10,13 |
| 145:9,21 148:8 | 126:25 127:5 | 161:16 162:12 | 154:15 155:10 | 172:12 186:25 |
| 159:5 166:22 | 130:12 | 163:16,17 | 155:15 | 187:5 |
| 166:24 167:15 | | 165:24 167:5 | secured 30:24 | seeing 112:10 |
| 167:24 171:7 | **S** | 167:12 186:5 | 97:12 120:4 | seek 18:24 |
| 172:3 173:10 | S 1:6 | 187:21 193:6 | 139:2 | seen 5:12,20 |
| 176:4 177:17 | sake 15:10 | 193:11 194:13 | security 119:3,7 | 40:17,20 54:8 |
| 181:25 182:20 | salaries 75:17 | schedule 16:6 | 119:11,19,21 | 56:19 59:2 |
| 184:4 188:2 | salary 74:11,14 | 45:19 46:10 | 120:2 | 76:14 90:17 |
| 193:21 196:9 | sale 16:19 87:14 | 48:19 54:24 | see 18:23 19:14 | 166:19 183:16 |
| 196:20 199:4 | 87:16 143:9 | 62:11,18 77:8 | 19:21 20:3,4 | 202:22 203:2,4 |
| 201:17 206:20 | 209:12 | 196:17 198:2 | 20:20 21:25 | 203:6 205:14 |
| right-hand | Sam 54:9 | 201:5 203:18 | 24:9,10 31:19 | Segal 93:2 |
| 184:25 | Samet 109:9 | Scheduled 45:22 | 35:5,6 37:18 | segue 125:23 |
| rights 115:20,25 | 147:7 164:20 | schedules 204:8 | 37:20 38:18,20 | segues 180:15 |
| risk 177:24,25 | sample 62:23 | scheduling | 38:24 39:22 | selected 56:8 |
| road 154:22 | 63:15 | 203:23 | 40:8,9,11 45:3 | 186:10 187:15 |
| 155:2 | sat 151:7,9 | Schneider 19:5 | 54:4 56:25 | 187:15 188:22 |
| Robber 93:2 | satisfaction | school 148:11,13 | 57:16 63:17 | sell 67:25 182:10 |
| Robert 172:8,25 | 47:17,24 49:22 | 148:14 | 66:16 69:21 | send 35:8 51:21 |
| role 4:14,21 6:18 | 52:11 53:20 | score 113:3 | 70:19 71:10 | 51:23,25 52:3 |
| 6:22,23 8:17 | satisfies 210:2 | screen 57:6 | 73:10 83:9 | 53:6 62:23 |
| 12:8 14:8 | saw 22:17 40:22 | 109:15 135:19 | 86:7,14 87:10 | 99:6 109:22 |
| 169:8 | 58:9 100:25 | 135:22 148:6 | 88:8,9 89:17 | 132:6 133:3 |
| roles 8:2,6,16 | 108:24 127:5 | 156:11 158:6 | 89:19 95:15 | 206:8 |
| 9:17 157:19 | 150:12 | 171:16 | 96:14,16,16 | sending 46:21 |
| rolled 182:25 | saying 29:20 | scroll 159:3,12 | 105:5,6 109:8 | 48:11 70:12,21 |

in re: TRANSCARE CORPORATION

71:4,6 92:24
126:14,16
136:21
**sends** 134:23
**senior** 1:22 81:7
143:13
**sense** 128:4
182:22 196:25
**sent** 19:9 20:5
29:10 39:9,14
39:25 45:5,6
46:24 47:8,14
47:15 48:14,17
48:18 49:2
50:24 51:3
52:4,24 54:15
54:21 56:21
57:2 63:4,7,15
64:24 69:24
70:12 82:23
83:17 99:3,9
102:22 105:22
110:6 111:18
112:23 121:6
121:24,25
133:10 134:24
135:6 138:7
154:18 155:12
163:15 164:5,6
164:8 195:3
**sentence** 107:10
165:24
**separate** 5:11
131:12
**separately**
134:11
**Serbineko** 74:4
**series** 82:4
114:13 116:25
**seriously** 157:18
**serve** 150:14
**server** 128:9
130:20 155:18
**service** 62:19
98:2 100:11

102:6 111:22
**services** 3:14,18
8:22 42:11,16
43:22 49:7
62:16,24 64:9
64:13,15 65:7
65:20 66:18
68:7,10,19
69:23 73:12,18
73:25 74:25
75:17 98:16
112:3 113:23
122:9 127:3
157:2 158:11
160:7 169:15
191:10
**set** 5:18 103:15
121:13 181:15
191:15
**setting** 103:19
103:23
**settlement** 62:18
**seven** 61:9 71:12
**share** 24:15 46:6
46:12 50:5
64:6,11 130:12
187:16
**shared** 46:10
64:9 161:23
**shareholder**
17:3
**shareholders**
19:17
**shares** 24:8,14
24:18,23 25:4
25:14,15,19,23
26:3,5,7
**shed** 97:7
**short** 60:22
201:19,23
**short-term**
122:9
**show** 44:21
50:12 56:13
57:10 60:17

120:24 136:3
154:8 162:24
177:11 183:5
183:23,24
**showed** 93:25
154:7
**shown** 160:23
185:8
**shutting** 127:16
**side** 151:9,10
**sided** 184:15
**Siegel** 26:12,14
**sign** 35:8 48:4,8
52:17 110:2
153:25
**signature** 40:9
40:10,11 53:22
54:2,2 56:17
58:18 86:18
111:12
**signatures** 58:5
58:8 84:12
114:24
**signed** 34:22
35:4 40:7,14
40:17,20 49:6
49:8,10,11,12
53:9,12,18
56:23 108:16
111:10 117:2
153:9
**significant** 190:4
**signing** 58:13
**signs** 72:9
**Silage** 176:8
**Silagi** 175:11,16
175:20,23
176:7 178:24
179:4,15
**similar** 146:23
149:13 188:4
**simple** 146:13
**simply** 63:13
139:19 141:10
178:2,7

**single** 14:15
101:7 184:14
**sir** 189:22
198:17
**sit** 24:17 38:11
94:17 174:7
193:20
**site** 206:2,4
**sitting** 195:2
**six** 71:12 97:11
**skills** 8:10
**skip** 39:12,18,19
**skipped** 87:6
**slide** 184:20
187:19,21
205:24
**slides** 180:17,20
180:21 183:15
185:8 190:10
190:12 191:25
193:22,24
200:3,16,16,18
205:7,14
**slip** 204:20
**smaller** 187:23
200:21
**software** 130:11
**sold** 72:14,15
100:24 177:12
**sole** 6:18 11:23
12:5 14:8 78:6
**solve** 117:17
**somebody** 50:16
54:18 83:19
95:15 103:2
111:9 119:18
194:18
**someplace** 12:21
84:22
**soon** 133:3,3
**sorry** 1:21 4:8
12:2 17:16
44:3 50:23
53:16 54:17
57:5 66:9

85:19 87:7
88:14 96:15,16
121:20 126:3
135:5 144:16
158:5 162:8
163:7 174:25
179:15
**sort** 6:23 153:9
187:7
**sought** 92:18
**sources** 21:7,10
**Southern** 175:25
**speak** 1:12 2:13
28:16,16 52:6
76:6 112:18
152:22 185:5
**speaking** 76:13
98:15
**speaks** 187:7
**specific** 94:15
117:6 134:13
**specifically** 14:4
19:3,7 29:5
52:21 56:10
102:23 103:13
105:19 151:22
152:12
**specifics** 171:6
**speculate** 50:21
**speculation** 75:4
**spent** 45:18
**spoke** 108:2
113:7,12 122:5
170:23
**spoken** 47:7
133:2
**spots** 125:17
**staff** 124:20
**stamp** 40:9 73:9
**stamped** 84:5
**stand** 96:17
161:20 193:20
**standing** 132:24
133:7
**start** 31:2 41:8

in re: TRANSCARE CORPORATION

42:10 123:18
126:5 141:13
158:7 184:6,8
185:11 196:4
**started** 54:3
76:15 123:11
**starting** 18:13
31:11 184:19
**starts** 66:14 73:9
167:11
**state** 1:9 2:23
23:3 41:8
46:13 113:7
122:4 135:21
136:8 165:15
**stated** 111:20
142:2
**statement**
102:16,20,25
105:12 132:4,5
140:19
**statements**
190:15
**stating** 109:21
**status** 158:24
**stay** 106:17
**step** 171:8
174:21 193:24
**Stephen** 1:5,15
1:17 7:3 39:19
44:2 47:3 57:2
129:18 137:20
138:5 140:9,20
143:4 148:8
159:15 162:12
165:4 171:22
**Stephen's**
142:19
**steps** 22:3 23:2,7
99:24
**stipulate** 145:20
**stipulated** 198:9
198:11 208:18
**stipulation**
208:3

**stock** 24:9,11
67:19
**stockholders**
92:22
**stop** 179:2 190:2
**store** 155:24
**story** 202:25
**Strack** 172:8,25
**strategy** 108:12
**streets** 157:16
**string** 18:19
21:3
**strings** 131:12
**structure** 31:8
**stuff** 191:5
**subchapter**
206:18
**subfolders** 13:5
**subject** 47:16,24
48:19,24 49:21
52:10 53:19
54:24 55:25
56:9 79:13
87:22,25
106:25 165:12
192:18
**subpoena**
203:21 204:10
208:3
**subsequent**
34:12 105:16
**subsequently**
191:8 192:16
**subset** 187:23
**subsidiaries**
67:15 143:11
**substance** 56:3
**substantial** 69:2
**successful**
155:16
**suddenly** 114:25
**suggests** 134:3
**suing** 181:6,12
**Suisse** 32:10
41:5 49:16,23

50:4 93:13,15
140:25 141:7
142:14 145:17
146:18,21
198:9,12 208:6
208:14,20
209:15
**suitors** 17:2
**summarize** 35:2
**Sunday** 185:12
**supplementati...**
192:11 193:2
194:4
**support** 3:5 6:10
6:17 7:5 8:14
9:7 10:20
**supported** 4:14
7:8,13,18,23
**supporting** 7:7
11:2
**suppose** 196:10
**supposed** 60:5
104:5 124:12
186:25 208:25
**supposedly**
196:24
**sure** 11:11 18:7
21:3 23:9,12
23:25 24:21
30:14,17 33:8
41:16 43:6
44:16 46:9
51:13 54:6,13
57:17 63:22
67:3 68:17
71:18 76:7
86:5 95:25
96:8 99:13
108:9 128:3
150:2,10
151:24 155:7
155:10 158:17
160:20 166:8,9
168:4 174:6
192:4 193:22

195:9
**surprise** 191:12
**suspect** 165:24
**Sustained** 85:16
122:16
**switched** 108:21
**sworn** 1:7
**syringes** 155:6,6
**system** 130:11
132:13

**T**

**T** 1:6
**TA** 66:6
**table** 151:9,11
**tag** 101:24
**take** 20:9 54:23
63:11 64:16
68:14,15 77:7
118:22 125:22
132:12 137:2,9
137:10,20
156:6,10
157:18 160:17
162:4 165:5
173:16 178:14
187:22 189:2,7
189:20 190:5
194:21 196:2
197:3,12
198:24 199:3,5
199:7,11 203:8
203:9,11
204:23
**taken** 112:14
124:19 137:14
144:9
**takes** 177:20
**talk** 41:19 62:15
95:5 148:9
**talked** 28:14
80:15 103:22
139:24 170:21
174:10 208:10
**talking** 7:2 16:7

16:15 18:22
19:2 32:5
76:15 79:8
92:12 98:3
113:16 134:14
149:17 179:14
**tapped** 49:4
**target** 128:4
**task** 8:23 9:2
11:3
**tasks** 11:14
**TC** 30:16 112:18
**team** 65:12
83:18 84:18
95:9 160:10
**technically** 90:2
**telephone**
171:24 172:2
**tell** 25:3 54:10
59:7 60:16
62:2,7 107:16
115:18 117:12
117:13 125:3
127:9 131:9,17
141:6 160:21
180:13 181:2
185:18 186:20
192:9 193:23
**telling** 104:10,13
106:10 111:25
136:11 180:25
**tells** 119:14
**tender** 185:15
**tenuous** 10:4
**term** 4:16 7:18
31:15 42:2
47:25 50:5
55:7,9 59:12
61:11 66:21
67:4,24 68:16
72:10 88:5,12
97:13,23 99:17
119:17 120:6,7
120:10 142:10
168:17 169:10

in re: TRANSCARE CORPORATION

Page 233

209:9
**terminate**
115:16
**terminated**
115:15
**terminating**
114:20
**termination**
118:15
**terms** 16:18
34:25 35:2
47:22 88:4
101:9,18
130:24 146:4
151:7 168:3
169:8
**test** 177:3,19
180:6
**tested** 180:9,14
**testified** 1:10
**testifies** 189:8
199:12 204:21
205:2
**testify** 61:7
180:18 181:17
191:16 196:13
199:6,23 200:8
201:3
**testimony** 15:2
127:5 152:24
153:3 154:14
166:19 169:3,5
173:4 174:11
174:12,14
178:10 181:19
185:10 189:12
190:16 198:12
198:14 200:25
201:18
**testing** 178:3
180:24
**text** 195:22
**thank** 2:15
63:24 107:13
125:3 137:12

137:18 147:2
157:9,10
169:19 171:8
174:3,21
179:23,25
184:16
**thanking** 124:3
124:3
**theirs** 191:7
**thing** 9:21 25:13
48:13 49:20
59:4 73:8
103:22 155:19
203:6
**things** 15:10
16:5 20:13,16
36:4 41:5 86:2
100:3 114:15
162:25 167:25
178:4 182:14
183:11 190:3
191:20 205:20
**think** 4:19 7:3
8:9 10:3 12:12
14:16,20 24:20
29:11,19 30:6
30:16 35:20
39:2 40:10,12
41:12 43:20,23
54:22 59:13,24
60:16 64:14
69:11,11,12
71:7,11 74:10
74:15,22 85:5
86:15 89:22
91:14 95:25
96:6,12 98:17
101:21 103:13
104:9 107:14
112:13 115:8
115:14 116:16
117:3,11 127:4
130:20 134:7,8
138:21 139:16
139:18,24

140:5 142:12
145:8,15
146:12 148:4
148:25 150:3,8
150:9,12 152:6
153:18 154:13
154:23 155:17
156:24 162:16
163:8 165:14
166:6,12
167:23 168:19
169:2 170:22
172:7,10
173:14 174:6
177:7,8,14
179:18 181:7,8
184:3,5,11
185:6,19,22
187:20 189:14
190:5 195:14
195:15,16,17
196:7,8,19,19
196:21 201:20
205:19 208:7
209:13,18,21
**thinking** 73:24
178:5 195:5
201:25 209:5
**thinks** 187:16
**third** 17:4 21:2
29:24 78:13
84:3 104:25
147:20 162:8
186:24
**Thomas** 96:6,7
**Thompson**
113:6
**thought** 14:23
38:5 98:11
109:6 155:19
171:25 173:5
174:13
**thoughts** 155:13
**three** 28:18
30:19 31:17

71:12 195:12
201:16,20
**tick** 59:3
**Tilton** 2:17 3:5
5:2 7:7,9 11:24
14:7 16:11,15
16:21 23:18
28:7 33:16
38:9 49:12
71:2 78:6,18
79:2,20 99:22
108:18 113:16
114:6 121:12
122:6 131:25
132:5 149:16
168:6 172:21
176:17 181:11
191:5 195:11
201:9,22 202:6
202:10 203:15
205:2
**Tilton's** 17:4,9
17:15 31:25
58:5 93:7 94:6
**time** 2:5 9:18
10:17 13:10
14:13 15:18,19
16:14 17:17
18:15,25 19:23
20:18 23:23
25:8 30:7,23
32:18 37:23
40:14,21 41:7
42:5 45:19
46:15,18 51:14
53:3 62:17
64:4 65:6 70:6
72:5 73:24
74:19 76:8
81:25 82:3
86:5,23 92:17
98:6 99:21
100:20 102:7
105:14,15,20
108:11 115:2

122:18 126:7
130:25 135:10
140:2 148:18
151:16 164:5,6
164:8 173:6
174:8 185:16
185:16,21
188:15,24
190:6 195:13
205:15
**timeline** 42:24
43:11
**times** 8:3,11
94:24
**timing** 188:19
194:3
**title** 1:22,25 81:6
**today** 15:2,19
24:18 94:17
109:7 121:8
173:17 191:16
206:8 209:20
**told** 19:16 47:2,3
97:19 101:23
102:19 103:3
106:3,14
107:18 108:3
108:10 116:6
123:8 125:19
127:21 154:21
190:22 193:15
**Tom** 80:10,14
83:2 96:2
111:18 125:18
125:19,19
157:10
**tomorrow** 124:6
124:9 131:2
157:12 197:24
199:6,19,24
200:7 203:13
203:19 204:17
207:17 208:4
**ton** 92:22

in re: TRANSCARE CORPORATION

**tonight** 36:14
   174:7 206:24
**top** 19:14 101:25
   141:25 159:12
   164:3 167:15
**topic** 21:12
   27:13
**total** 73:2,4
**touch** 96:3
   112:24
**Trancendence**
   81:11
**tranche** 142:10
   142:24 143:15
**trans** 9:24 65:13
**transaction** 9:25
   10:3 140:3
   146:22,24
   149:3
**transactions**
   149:11,13
**TransCare** 4:3
   4:17 5:9 6:15
   6:19 7:2,4,6,7
   7:10,12,17
   8:19 11:22
   12:20,22 13:2
   14:9 15:18,23
   16:13 22:18
   27:14 30:2,25
   31:4 33:13,19
   35:13,15 41:11
   42:14 46:7
   51:18 52:12
   65:24 66:23
   68:6,20 69:7
   69:23 72:4,6
   72:23 73:14
   74:9,10,16,24
   75:3,9,12,16
   75:18 76:23
   78:18 80:16
   81:21 85:21
   86:25 88:17
   90:25 92:13,21

93:10,18 96:23
   100:10 102:4
   102:12 103:21
   112:2 114:19
   116:10 117:4
   117:20,23
   120:5 127:16
   132:9 143:10
   150:25 153:10
   156:25 158:10
   159:18 160:11
   161:21 163:17
   163:24,25
   168:13,16
   169:10,13
   170:13 176:18
   176:20 177:12
   186:19 187:17
**TransCare's** 7:6
   97:14 106:13
   111:20 124:15
   151:15
**Transcendence**
   22:4,13,20
   23:19,20 25:4
   25:5,11,12,16
   26:23,23 27:7
   27:8 31:3
   42:15 68:2,4
   69:24 72:17
   73:13 74:17,21
   74:25 75:16
   76:24 77:18
   78:15,20 80:25
   81:14 87:18
   90:9,14,25
   91:4,16,25
   92:13 94:5
   100:25 101:13
   102:5,7,9
   103:24,24
   107:21 112:5
   112:11 123:6
   124:11,14
   132:10 133:23

134:11 136:17
   145:7 153:11
   153:21 155:20
   161:10 163:19
   163:22 208:16
**Transcendence'**
   111:21
**Transcendenc...**
   72:19 128:10
**Transendence**
   154:2
**transfer** 66:2
   68:7 77:2,4,11
   77:22,25 78:8
   78:14,19,19,20
   79:6 80:4,6
   82:5 87:22,25
   95:11,16
   115:13 142:16
   144:14,17,19
**transferred**
   77:17 102:6
   145:5 161:6
**transferring**
   76:23
**transit** 27:7,8
   31:3 68:19
   86:12,20 87:18
   100:25 102:5,9
   103:24 112:3
   122:23 124:11
   124:14 132:10
   160:7 161:10
   163:19 166:12
**transition** 42:9
   42:11 62:16,19
   62:24 65:7,20
   66:18 69:22
   86:20 158:11
**Transportation**
   98:2
**trial** 191:15
   201:6
**trials** 202:13
**tried** 106:10,12

**trier** 176:14
   178:12,20
**true** 9:4 19:23
   19:24 41:18
   45:21 67:12,13
   75:5 90:11
   102:13,14,18
   104:12 105:12
   105:20,21
   144:13 163:4
   167:19 208:17
**trustee** 105:9
   107:9,25 108:2
   115:9,12,19
   139:10 177:9
   183:24 197:18
   198:5 200:8
   201:2 203:9
**trustee's** 174:11
   174:12,14
   176:16 178:15
   179:20 206:7
**trustees** 177:9
**trustees'** 105:18
   106:14 107:24
   138:25
**truth** 104:8
**try** 100:8,14
   103:15 124:5
   127:22 155:9
   155:10 160:21
   163:5 185:15
   204:18
**trying** 79:16
   89:9 154:14,18
   162:24 167:5
   207:4
**TS** 136:12
**TSA** 66:15,17
**turn** 35:18
**two** 10:10 30:19
   45:14 47:12,13
   51:10 68:11
   71:12 86:20
   97:5 99:24

109:3 129:4
   131:12 132:18
   133:6,18,24
   134:8,15 137:4
   137:7 140:13
   141:18,20
   163:12,13
   174:23,23
   175:2 176:11
   179:16,19
   195:12 200:6
   202:16 208:9
**two-and-a-half**
   137:2
**two-level** 144:22
**two-line** 159:15
**twofold** 188:8
**tying** 106:25
**typically** 11:16
   39:3

---

**U**

**UCC** 148:23
**Uh** 88:13
**ultimate** 13:25
**ultimately** 12:8
   18:19 20:2
   29:14 33:11
   53:9 60:20,21
   91:24 96:5
   121:16 134:8
   156:3 164:9
**Um-hmm**
   152:15 206:3
**unaware** 18:3
**underlie** 177:4
**underlying**
   179:9
**underneath** 94:4
**underscore**
   105:8
**understand** 3:4
   6:21 7:24 8:4
   14:14 37:22
   38:14 44:14

in re: TRANSCARE CORPORATION

59:9 66:20
89:9 117:9
119:5 133:9
145:10 146:25
171:4 172:13
181:20 182:7
184:21 192:22
205:17
**understanding**
12:23 14:5
23:18 26:2,4
36:10 38:12
78:17 89:10,13
89:20 92:2
105:13 115:5
122:19 149:9
161:11 168:9
196:22
**understood** 7:5
18:8 23:23
24:4,5 37:10
37:25 48:13
52:22 58:13
66:17 67:9,23
85:24 96:22
100:19 101:20
115:18 147:6
199:20 201:14
**undertaking**
23:2
**uninterrupted**
111:22
**universe** 195:21
**University**
148:12
**unorthodox**
36:9
**unsecure** 107:20
**untrue** 102:15
106:2 162:16
**unwind** 105:10
**update** 123:23
156:20 158:23
**upfront** 146:4,6
**upside** 184:10

**use** 42:25 43:9
72:24 74:17
177:10
**uses** 176:25
**Usually** 194:19

**V**

**Valley** 30:13
126:12 128:13
128:17 130:25
136:12,19
**valuable** 128:3
**valuation** 183:2
186:12
**value** 177:20
178:15 192:14
**valued** 183:2
**values** 176:20
**various** 7:24 8:5
41:9 169:16
**vehicles** 71:14
71:16 88:24
161:16 177:24
**verify** 99:25
**version** 65:4
90:18 154:9
**vet** 191:7
**vice** 81:5 175:12
**view** 144:23
**VIN** 71:25
**violation** 106:16
**visit** 69:7
**voice** 3:22
**volition** 103:2
**Volume** 206:21
**voyage** 152:21
**VP** 166:12

**W**

**wages** 102:11
**Wait** 208:7
**waiting** 106:22
110:24
**walk** 180:19
**want** 7:25 9:18

16:24 21:9,11
27:12 40:9
41:16 42:23
43:9,10,12
44:16 54:13
58:22,24 61:7
62:15 73:7
85:18 87:4
97:6 101:16
102:2 108:23
111:6,15
116:18 128:8
148:6 155:9
162:11 168:3
175:2,3,7,8
185:23 189:6,8
189:23 193:13
195:25 197:11
197:24 204:13
**wanted** 10:10
16:17 18:7
30:9 38:2,3,25
47:20 63:22
127:22 132:17
133:10 149:2
156:16 185:14
188:14
**WARN** 17:12,14
**wasn't** 13:14,17
40:24 56:21
60:21 76:7,12
127:19 140:22
164:7
**watching** 147:8
**way** 47:14 70:15
72:15 86:19
101:12 104:16
107:4 115:13
130:7 131:8,10
145:3 177:7
181:2,6 185:6
188:8 190:20
190:24 191:14
193:12,15,15
193:18 194:16

195:16,18
**ways** 185:23
**we'll** 5:16 39:19
42:9 56:15
77:21 106:7
115:10 148:5
164:22 198:10
200:2,10 201:4
204:9 207:24
**we're** 3:16 7:2
9:15 16:7,15
28:11 36:5
39:20 46:3
66:7 98:3
129:11 133:17
134:13 136:20
143:22 146:16
168:4 181:6,12
181:18 182:19
197:18,25
210:3
**we've** 19:5 39:20
126:21 127:4
184:11 188:12
191:14 208:4
**wee** 129:11
**week** 123:3
129:8 132:12
163:19 195:7
201:16
**week's** 132:9
**weeks** 45:14
129:4 195:12
**weight** 179:11
179:13 183:3
183:12
**Wells** 31:11 37:4
37:11 38:2,3
38:12,15 39:9
55:10,11 61:23
66:25 67:3,11
108:18 116:2,7
117:2,6,10,17
117:18 118:11
118:21,24

119:5 120:7,9
120:16 149:16
149:21 150:21
170:2,13 171:5
171:23 172:8
**went** 25:24
28:12 29:14
75:14 77:6
120:16 130:18
152:19
**weren't** 13:14
27:25 52:5
56:2 71:13
76:10 108:18
**whatsoever**
173:25
**Whichever** 27:6
**Whilely** 207:13
**William** 135:20
**wind** 127:11,19
152:7
**wise** 18:15 179:3
**withdraw** 15:9
33:3
**Witkis** 138:13
138:17 142:6
143:14
**Witkis'** 142:8
**witness** 1:3,6
12:4 44:3
54:17 58:12
62:12 107:14
107:18 154:3
165:8 170:4,7
170:15,20
171:3 174:22
180:23 182:19
198:4 201:25
202:5 203:12
203:20
**witnesses** 201:7
201:22
**woefully** 188:20
**Wolf** 35:4,8 40:7
45:10 46:14

in re: TRANSCARE CORPORATION

47:3,7,10
50:25 52:17,24
53:9 54:15,21
56:16,21 57:2
58:13 64:22
65:24 72:9
80:10 81:7,13
81:13 159:19
160:25 161:12
161:23
**Wolf's** 109:23
110:2 111:11
111:12
**word** 105:4
114:14 154:20
199:22
**words** 54:19
139:23 141:24
153:18 198:25
**work** 46:8,11
55:18 113:23
115:14 129:4
130:24 132:12
159:17 162:25
187:9 189:17
189:18 194:23
197:4,7 199:14
199:16
**worked** 33:24
34:9,13 43:20
44:6 45:20,25
46:2,6 48:21
50:9 54:25
55:25 64:3,20
129:7 148:15
149:12 150:6
158:10 172:19
**workers** 103:11
**workers'** 91:21
165:19
**working** 36:12
37:17 41:8
42:6,10 43:13
62:17,19 65:7
65:20 99:20

112:16 160:11
**worried** 155:9
**wouldn't** 15:3
39:10 56:20
165:19 168:22
194:17
**wound** 31:5
156:3
**wrap** 26:9
**write** 83:21
92:21 97:9
122:10 131:14
132:15 136:20
167:16
**writes** 124:19
**writing** 91:10
136:10 156:19
**written** 78:8
104:16
**wrong** 41:17
88:15 139:17
139:19 158:5,7
194:14 195:15
208:12
**wrongly** 195:18
**wrote** 21:8 29:18
92:8 101:21
103:6 109:20
121:10 126:10
132:22,23
162:25

**X**

**X** 8:13

**Y**

**Y** 8:13
**yeah** 4:7 32:14
35:20 40:12
41:15,18 52:20
68:23 70:10
78:24 95:12
112:8 113:20
117:3 131:7
141:17,25

158:23 175:20
184:24 197:9
201:12,12
202:15
**year** 2:8 145:15
146:15
**yesterday**
139:21,25
146:20 175:6
201:15
**York** 1:9 2:23
86:11 102:12
135:21 136:7
165:14 175:20
204:25
**young** 178:25
**Youngblood**
22:12 23:12
65:24 80:11
81:4,9 86:21
106:3,4,7,9
107:15 108:5
126:17,21
131:22 133:10
134:23 159:20
160:24 161:13
161:24

**Z**

**Zach** 113:8
**Zohar** 4:2,18
32:4 49:8,8,8
94:8 168:11
**Zohars** 31:18

**0**

**002** 116:25
118:9 121:3
**04:14:35** 129:19

**1**

**1** 208:14
**1,000** 24:8
**1:46** 124:19
**1:53** 70:2
**1:55** 110:6

**10** 10:16 26:20
47:24 50:2
88:2,11,15,16
89:3,10 90:24
170:10 208:21
208:24 209:6,9
209:10,16
**10-expert** 202:5
**10-minute** 202:2
203:11,20
**10:00** 207:17
**10:06** 29:9
**10:43** 92:9
**10:53** 126:7
**10:59** 128:21
**100** 81:24 84:5
87:9 104:15,18
104:21 152:25
166:9
**102** 87:8
**103** 125:23
126:3 129:21
129:22 163:8
**10th** 22:10 43:14
150:17,19
173:12,12,14
**11** 18:11 30:7,9
35:25 36:6
37:15,18 38:13
39:15 40:2
69:11 108:13
109:2 127:15
150:14 170:14
**11:25** 130:23
**11:30** 207:23
**11:34** 112:17
**11:37** 131:15
163:15
**11th** 43:14 45:15
**12** 59:14 63:8,14
63:16 76:3,5
76:10
**12:01** 97:11
**12:07** 45:6 46:5
46:14,22 47:15

97:16
**12:10** 109:19
**12:46** 123:19,20
**12:59** 124:3
**12th** 173:18
**13** 203:13
**13-week** 37:19
38:19
**133** 22:24 23:7
**137** 63:12
**138** 63:12
**13th** 201:11
**140** 171:15
**146** 21:21 44:25
**14th** 201:11
203:13
**15** 32:19 208:4
**15th** 19:12
**16** 205:24
**168** 84:4
**17** 10:16 65:2
**173** 56:23
**174** 56:15 57:6
57:21 58:17,18
**176** 123:13
156:11
**178** 42:20
**18** 110:9
**186** 164:18,24
**19** 10:15
**195,446** 73:5
**197** 39:18
**1st** 138:7,14

**2**

**2** 16:22 116:13
135:13 208:19
**2:00** 115:24
**2:09** 113:4 115:3
121:6
**2:19** 135:6
**2:36** 135:5
**20** 208:4
**200** 21:13,20
175:15

in re: TRANSCARE CORPORATION

| | | | | |
|---|---|---|---|---|
| **200,000** 69:16 | 77:1 78:1 79:1 | 174:1 175:1 | 62:1 63:1 64:1 | 164:1 165:1 |
| **2009** 2:5 | 80:1 81:1 82:1 | 176:1 177:1 | 65:1 66:1 67:1 | 166:1 167:1 |
| **2010** 2:9,10,11 | 83:1 84:1 85:1 | 178:1 179:1 | 68:1 69:1 70:1 | 168:1 169:1 |
| 3:2 | 86:1 87:1 88:1 | 180:1 181:1 | 71:1 72:1 73:1 | 170:1 171:1 |
| **2012** 116:17,25 | 89:1 90:1 91:1 | 182:1 183:1 | 74:1 75:1 76:1 | 172:1 173:1 |
| 118:10 | 92:1 93:1 94:1 | 184:1 185:1 | 77:1 78:1 79:1 | 174:1 175:1 |
| **2015** 2:2 13:11 | 95:1 96:1 97:1 | 186:1 187:1 | 80:1 81:1 82:1 | 176:1 177:1 |
| 14:6 15:19 | 98:1 99:1 | 188:1 189:1 | 83:1 84:1 85:1 | 178:1 179:1 |
| 18:15,18 19:12 | 100:1 101:1 | 190:1 191:1 | 86:1 87:1 88:1 | 180:1 181:1 |
| 148:17 182:4 | 102:1 103:1 | 192:1 193:1 | 89:1 90:1 91:1 | 182:1 183:1 |
| **2016** 5:4 6:3,5 | 104:1 105:1 | 194:1 195:1 | 92:1 93:1 94:1 | 184:1 185:1 |
| 7:14 13:11 | 106:1 107:1 | 196:1 197:1 | 95:1 96:1 97:1 | 186:1 187:1 |
| 14:6 15:19 | 108:1 109:1 | 198:1 199:1 | 98:1 99:1 | 188:1 189:1 |
| 22:3 29:9,18 | 110:1 111:1 | 200:1 201:1 | 100:1 101:1 | 190:1 191:1 |
| 46:4 91:20 | 112:1 113:1 | 202:1 203:1 | 102:1 103:1 | 192:1 193:1 |
| 92:9 95:8 | 114:1 115:1 | 204:1 205:1 | 104:1 105:1 | 194:1 195:1 |
| 96:13 115:24 | 116:1 117:1 | 206:1 207:1 | 106:1 107:1 | 196:1 197:1 |
| 148:18 149:16 | 118:1 119:1 | 208:1 209:1 | 108:1 109:1 | 198:1 199:1 |
| 176:19 | 120:1 121:1 | 210:1 | 110:1 111:1 | 200:1 201:1 |
| **2017** 138:7,14 | 122:1 123:1 | **206** 158:4,15 | 112:1 113:1 | 202:1 203:1 |
| **2019** 1:1 2:1 3:1 | 124:1 125:1 | **21** 17:9 | 114:1 115:1 | 204:1 205:1 |
| 4:1 5:1 6:1 7:1 | 126:1 127:1 | **213** 64:17 66:14 | 116:1 117:1 | 206:1 207:1 |
| 8:1 9:1 10:1 | 128:1 129:1 | 160:22 163:7 | 118:1 119:1 | 208:1 209:1 |
| 11:1 12:1 13:1 | 130:1 131:1 | **221** 21:21 45:2 | 120:1 121:1 | 210:1 |
| 14:1 15:1 16:1 | 132:1 133:1 | **229** 147:9,12,18 | 122:1 123:1 | **234** 162:5 |
| 17:1 18:1 19:1 | 134:1 135:1 | **23** 1:1 2:1 3:1 | 124:1 125:1 | **235** 87:4 91:13 |
| 20:1 21:1 22:1 | 136:1 137:1 | 4:1 5:1 6:1 7:1 | 126:1 127:1 | 91:14 147:9,12 |
| 23:1 24:1 25:1 | 138:1 139:1 | 8:1 9:1 10:1 | 128:1 129:1 | 147:22 |
| 26:1 27:1 28:1 | 140:1 141:1 | 11:1 12:1 13:1 | 130:1 131:1 | **236** 113:2 121:4 |
| 29:1 30:1 31:1 | 142:1 143:1 | 14:1 15:1 16:1 | 132:1 133:1 | **238** 154:11 |
| 32:1 33:1 34:1 | 144:1 145:1 | 17:1 18:1 19:1 | 134:1 135:1 | **239** 147:17 |
| 35:1 36:1 37:1 | 146:1 147:1 | 20:1 21:1 22:1 | 136:1 137:1 | **23rd** 70:2 72:7 |
| 38:1 39:1 40:1 | 148:1 149:1 | 23:1 24:1 25:1 | 138:1 139:1 | 75:9 |
| 41:1 42:1 43:1 | 150:1 151:1 | 26:1 27:1 28:1 | 140:1 141:1 | **24** 46:4 83:23 |
| 44:1 45:1 46:1 | 152:1 153:1 | 29:1 30:1 31:1 | 142:1 143:1 | 85:10 95:8 |
| 47:1 48:1 49:1 | 154:1 155:1 | 32:1 33:1 34:1 | 144:1 145:1 | **240** 133:12,15 |
| 50:1 51:1 52:1 | 156:1 157:1 | 35:1 36:1 37:1 | 146:1 147:1 | 134:22,23 |
| 53:1 54:1 55:1 | 158:1 159:1 | 38:1 39:1 40:1 | 148:1 149:1 | **244** 96:11 |
| 56:1 57:1 58:1 | 160:1 161:1 | 41:1 42:1 43:1 | 150:1 151:1 | 111:17 147:9 |
| 59:1 60:1 61:1 | 162:1 163:1 | 44:1 45:1 46:1 | 152:1 153:1 | 147:12,14,15 |
| 62:1 63:1 64:1 | 164:1 165:1 | 47:1 48:1 49:1 | 154:1 155:1 | **245** 121:17,20 |
| 65:1 66:1 67:1 | 166:1 167:1 | 50:1 51:1 52:1 | 156:1 157:1 | 121:22 |
| 68:1 69:1 70:1 | 168:1 169:1 | 53:1 54:1 55:1 | 158:1 159:1 | **24th** 45:8 46:15 |
| 71:1 72:1 73:1 | 170:1 171:1 | 56:1 57:1 58:1 | 160:1 161:1 | 46:22 72:16 |
| 74:1 75:1 76:1 | 172:1 173:1 | 59:1 60:1 61:1 | 162:1 163:1 | 76:6 78:2 |

in re: TRANSCARE CORPORATION

86:24 97:2
108:15 109:19
110:13 140:2
150:19 181:24
209:24
**25** 126:7 131:15
200:16
**253** 135:12,14
135:16,20
**25th** 76:7 91:19
92:8 96:13,20
105:23 112:4
127:15 174:16
**26** 76:3 93:17
113:5 115:3,24
123:18
**26th** 105:24
106:12 121:6
124:22 128:23
129:12,19
174:16
**28** 200:15
**281** 137:21
**29** 78:2 184:20
185:8 205:7
**29th** 32:20

─────────
**3**
─────────
**3** 15:4,16 21:23
56:13 57:23
89:25,25 94:8
111:19
**3:47** 137:13
**30** 186:24
**300** 133:11
**31** 187:20
**32** 187:21
**33** 17:14
**33.4** 94:9
**335** 206:14
**341s** 200:9
**35** 185:9
**36** 205:8
**390** 100:9 102:3
103:20 162:13

─────────
**4**
─────────
**4** 116:17,24
**4:00** 70:8 137:11
**4:11** 137:14
**400** 106:16
130:20 155:18
**43** 187:5
**43308** 58:7
**43310** 55:2
**4336** 53:24
**43501** 130:2
**44009** 73:9
**48** 19:18
**49032** 40:8,9

─────────
**5**
─────────
**5** 121:8 123:10
124:21,21
**51** 94:8
**5th** 18:15 19:12

─────────
**6**
─────────
**6** 16:24
**6,000** 74:9,25
**6:54** 138:14
**61** 93:9
**69** 186:17
187:23

─────────
**7**
─────────
**7** 69:8 96:24
105:3 108:14
110:19,21
117:21 152:17
**7:01** 121:18
122:2
**70** 39:18
**72** 28:11,12
**73** 26:10
**77** 34:18
**77168** 84:6
**77169** 84:8
**78** 35:20,21
**79** 39:13,17

─────────
**8**
─────────

**8** 59:13 185:11
**8:01** 39:16
**8:27** 85:10
**8:49** 96:14,15,20
105:22
**800** 143:8
**800,000** 139:11
140:17

─────────
**9**
─────────
**9** 29:9,18 40:23
119:10 144:2
148:23 149:3
149:11 151:20
159:22
**9:07** 19:13
**9:08** 19:13
**9:11** 138:7
**9:27** 83:23
**9:56** 96:13
**911** 69:7
**95** 45:2 69:20
**96** 44:24 45:2
46:3 53:17
58:4 77:6
158:5
**98** 109:9,10
**9th** 150:14,17,18
173:11,13

1

```
 1                    UNITED STATES BANKRUPTCY COURT
 2                    SOUTHERN DISTRICT OF NEW YORK
 3   IN RE:                      .    Chapter 7
                                 .
 4   TRANSCARE CORPORATION,      .    Case No. 16-10407-smb
                                 .
 5                               .
                                 .
 6           Debtor.            .    New York, New York
     . . . . . . . . . . . . . . . .  Wednesday, July 24, 2019
 7   LAMONICA                    .    10:03 a.m.
                                 .
 8        v.                     .    Adv. Proc. 18-01021-smb
                                 .
 9   TILTON, et. al              .
     . . . . . . . . . . . . . . . .
10
11           TRANSCRIPT OF TRIAL - A.M./P.M. SESSIONS
12       BEFORE THE HONORABLE STUART M. BERNSTEIN
                UNITED STATES BANKRUPTCY JUDGE
13
14   APPEARANCES:
15   For the Chapter 7 Trustee:   Salvatore LaMonica, Esquire
                                  LAMONICA, HERBST & MANISCALCO, LLP
16                                3305 Jerusalem Avenue
                                  Wantagh, New York 11793
17
     For Salvatore Leggett:       Bijan Amini, Esquire
18                                Avery Samet, Esq.
                                  STORCH AMINI, PC
19                                Two Grand Central Tower
                                  140 East 45th Street, 25th Floor
20                                New York, New York 1001
21   Audio Operator:              Electronically Recorded
                                  by K. Su
22
     Transcription Company:       Reliable
23                                1007 N. Orange Street
                                  Wilmington, Delaware 19801
24                                (302)654-8080
                                  Email:  gmatthews@reliable-co.com
25
```

```
 1   Proceedings recorded by electronic sound recording, transcript
     produced by transcription service.
 2

 3

 4   APPEARANCES (Cont'd):

 5   For The Non-Debtor          Marissa Tillem, Esquire
     Defendants:                 Michael Mervis, Esquire
 6                               PROSKAUER ROSE
                                 Eleven Times Square
 7                               New York, New York 10036

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

1                              INDEX

2
    TRIAL
3
    PLAINTIFF'S WITNESS(S):
4
        A.M. SESSION
5
        JONATHAN ARNOLD
6
        Direct Examination by Mr. Amini              4
7
        Cross-Examination by Mr. Mervis             29
8

9       P.M. SESSION
10
        Continued Cross-Examination by Mr. Mervis   90
11
        Redirect Examination by Mr. Amini          124
12
        Recross-Examination by Mr. Mervis          126
13

14      SALVATORE LAMONICA
15
        Direct Examination by Mr. Amini            128
16
        Cross-Examination by Mr. Mervis            126
17

18
    EXHIBITS(s)                        I.D.    REC'D
19
    PX282    Dr. Arnold's Report                 34
20

21

22

23

24

25

                            A1747

```
 1          (Proceedings commence at 10:03 a.m.)
 2               THE CLERK:  All rise.
 3               Please be seated.
 4               MR. AMINI:  Good morning, Your Honor.
 5               THE COURT:  Good morning.
 6               Call your next witness, please.
 7               MR. AMINI:  The plaintiff calls Dr. Jonathan
 8   Arnold.
 9                    JONATHAN ARNOLD, WITNESS, SWORN
10               THE COURT:  Please take a seat.
11                         DIRECT EXAMINATION
12   BY MR. AMINI:
13   Q     Good morning, Dr. Arnold.
14   A     Good morning, sir.
15   Q     Describe for us your -- let's start with your
16   education; your educational background?
17   A     Well, I have -- I attended the University of Chicago
18   where I ultimately obtained my PhD in business economics; my
19   specialty is in finance and accounting.  Prior to that, I
20   obtained my MBA, also from the University of Chicago and my
21   bachelor's degree is in economics from the University of
22   Chicago.
23   Q     Your bachelor's degree is in what?
24   A     Economics.
25   Q     And --
```

1          THE COURT:  Excuse me; don't talk on the phone

2  please.  Who are you?

3          UNIDENTIFIED SPEAKER:  I'm sorry?

4          THE COURT:  Who are you?

5          UNIDENTIFIED SPEAKER:  I'm a (indiscernible)

6          THE COURT:  You're not supposed to have a phone in

7  here.

8          UNIDENTIFIED SPEAKER:  Huh?

9          THE COURT:  You're not supposed to have a phone in

10  here.

11          UNIDENTIFIED SPEAKER:  Sorry.  (indiscernible).

12          THE COURT:  You're not supposed to have a phone in

13  here.

14          UNIDENTIFIED SPEAKER:  Okay. (indiscernible).

15          THE COURT:  All right.  Let's continue.

16  BY MR. AMINI:

17  Q     Dr. Arnold, all right, so when did you obtain the PhD

18  at the University of Chicago?

19  A     In 2006.

20  Q     And the Master's?

21  A     I got my Master's and Bachelor's in the 1980's.

22  Q     And describe for the court, if you would, your

23  professional experience following your PhD?

24  A     Well I've served as a professional economist for

25  twenty-five --

 1          THE COURT:  Let me just interrupt you.  Is there

 2  an objection to his qualifications as an expert?  I didn't

 3  mean to cut you off, but --

 4          MR. AMINI:  Maybe we can save some time on this

 5  issue.

 6          MR. MERVIS:  So, Your Honor, I certainly don't

 7  have an objection that he's a qualified economist, so if

 8  that's what he's being tendered.

 9          THE COURT:  Well, he's going to testify, we're

10  going to get computation of damages based upon what's set

11  forth in his report.  And I know you have questions about his

12  methodology and things like that, but.

13          MR. MERVIS:  Well, I actually have questions about

14  his qualifications to appraise the value of a business;

15  however, I'm not going to do a voir dire, so I -- I just need

16  to hear what he's being tendered for, that's all.

17          THE COURT:  All right, perfect.

18          MR. MERVIS:  In other words, Your Honor, he

19  doesn't need to do the exam.  I don't know what expertise

20  he's being proffered for.

21          THE COURT:  Well are you contesting his

22  qualifications to give whatever expert testimony and stuff

23  that's in his report?

24          MR. MERVIS:  No, Your Honor.  We'll deal with that

25  on cross.

1         THE COURT:  All right.  He's qualified.  Why don't

2    you start the examination?

3         MR. AMINI:  Thank you, Your Honor.

4    BY MR. AMINI:

5    Q    Dr. Arnold, you were engaged by the plaintiff in this,

6    Mr. LaMonica, correct?

7    A    Correct.

8    Q    And what was your assignment?

9    A    My assignment was to -- I determined the range of

10   values that TransCare could reasonably expect to obtain in an

11   open market transaction based on the analyses that were done

12   at various points in time in January and February 2016.

13   Q    And how many points in time, if you recall?

14   A    Four.

15   Q    All right and if we could, if you look at the first

16   line under assignment.  Are those the four dates -- I don't

17   know but do we have -- are those the four dates we're talking

18   about?

19   A    Yes, January 7th, January 27th, January 28th and

20   February 24th.

21   Q    And let's go through them briefly.  How do you recall

22   the selection?

23   A    They were originally identified by you and your

24   colleagues at Stoch Amini.  And I examined them myself but

25   the qualities that they possessed is that they appear to be

1   the end points of various analytical processes that occurred

2   within Patriarch.  And they also, in most cases, were

3   distributed outside the organization to Wells Fargo or Carl

4   Marks, et cetera.  Or in the one case, it was prepared by

5   Carl Marks who was retained at the instigation of Wells

6   Fargo.

7   Q    Let's go through them.  The January 7th date, the first

8   one on there.  What do you recall about that particular point

9   in time?

10  A    Well the model that emerged on January 7th was the

11  culmination of a process that occurred over several weeks or

12  even a couple of months that originated within TransCare.

13  Ultimately, got transferred to Mr. Pelissier and Mr.

14  Greenberg who worked all through the night.  There was an

15  email to that effect earlier in the week to come up with this

16  analysis that was then shared with Carl Marks.  And appears

17  to be one of the -- appear to be end point of that analytical

18  process.

19  Q    And what did you understand, from the testimony, in

20  this case did you have an understanding of what the

21  analytical process was -- what the objective of it was at

22  that time?

23  A    Sure.  It was motivated by the fact that Wells Fargo

24  was intended -- stated its intention to not renew the credit

25  facility.  And there was then thought within the Patriarch

1  family of companies about restructuring and improving the

2  TransCare situation in order to lead to a sale.

3  Q    And what do you recall of about -- well, in general,

4  what do you recall about that plan, that January 7th plan?

5  A    Well, the January plan contemplated the acquisition of

6  forty new vehicles, twenty new 911 vehicles and twenty new

7  paratransit or vans.  And so, there was some refreshing of

8  the capital stock.

9      There was also some adjustments to how they were going

10 to do their business and relocate some facilities that would

11 improve operations and operational efficiency.  And it

12 generated about -- anticipated about $7 million dollars of

13 EBITDA for 2016.

14 Q    And you had mentioned earlier that some of these plans

15 had been shared.  Do you recall the January 7th plan, who it

16 was shared with?

17 A    Yes.  The January 7th plan was definitely shared with

18 Carl Marks.

19         MR. MERVIS:  Your Honor, this --

20         THE COURT:  All right.  He's reading emails.

21         MR. AMINI:  He's reading his -- he's moved onto a

22 page --

23         MR. MERVIS:  These are all in evidence.  I mean if

24 he wants to --

25         THE WITNESS:  Yeah, I have an exhibit in my report

```
 1  --
 2             THE COURT:  There's no question.
 3  BY MR. AMINI:
 4  Q     Let's go back to the exhibit that we were looking at.
 5  Go back to the last assignment page, if you would.
 6  A     Yes.
 7  Q     In your book and let's stick with that for a second.
 8  Let's move to the next one, the January 27th plan.  What do
 9  you recall about the 27th?
10  A     The January 27th plan is a plan that was circulated by
11  Carl Marks going into the two-day Patriarch meeting.
12  Q     And whom do you recall that meeting was with?
13  A     There was testimony over the last couple of days.  Lynn
14  Tilton was at the meeting; Mr. Greenberg was at the meeting.
15  I believe Mr. Pelissier was at the meeting and others as
16  well.
17  Q     And what did you understood Carl Marks to have done in
18  that interim between January 7th and January 27th?
19  A     Well Carl Marks was officially hired shortly after the
20  January 7th model was prepared.  And in the interim period,
21  they did their own dive into TransCare and made their own --
22  their assessment of what a restructured company would look
23  like going forward.
24  Q     And what about the January 28th model, what do you
25  recall about that?
```

1  A      I recall that during that two-day meeting, Mr.

2  Greenberg reviewed the Carl Marks' model from January 27th,

3  made certain adjustments to it.  He believed that the revenue

4  should be slightly higher and also that the EBITDA for the

5  rest of 2016 should be somewhat higher as well.

6  Q      And subsequent to January 28th, did you see any other -

7  - did you review any other plans for the company as a whole,

8  that you recall?

9  A      No, there were no more holdco company plans that I saw.

10  Q      And then, finally, the February 24th plan, what do you

11  recall about that?

12  A      The February 24th plan is a newco.  Essentially the

13  Transcendent Transit plan, if you would, the anticipation of

14  what assets and EBITDA would emerge from the assets that were

15  proposed to be transferred to Transcendent.

16  Q      And based on your review of these plans, what did you

17  do with them?

18  A      Well, I read them to understand them first.  And then,

19  secondly, the ultimate information that I extracted was the

20  anticipated EBITDA for the rest of 2016 which was an input

21  into my subsequent analysis.

22  Q      And why was the EBITDA the ultimate EBITDA reports?

23  A      Well for all the reasons we've heard over the last two

24  days, the valuation of companies in this industry are

25  typically thought of as multiples of EBITDA.

1  Q    And based on these plans, did you come to an opinion

2  about the value of this company on those particular dates?

3  A    Yes, I did.

4  Q    And if you would turn to summary of opinions, the next

5  document, does that document accurately reflect your

6  conclusions?

7  A    Yes.

8  Q    And if you would, why don't you just go through and

9  explain what we're looking at on this page?

10 A    Sure. So, on this page, I have categories for each of

11 the four plans.  The first three, January 7th, January 27th

12 and January 28th relate to holdco.  And I undertook my or I

13 applied valuation multiples to the forecast EBITDA emerging

14 from each of those three models to identify a range of values

15 that I think could reasonably be expected to emerge from a

16 sale and marketing of TransCare.

17     So, on January 7th, that model produces an EBITDA of

18 about $7 million dollars. And the result of that is that it

19 likely, I think, or could reasonably be expected to have

20 produced a sales price of $50.1 million up to $86.5 million.

21         And the January 27th model, Carl Marks' model, was

22 less optimistic. And based on that forecast EBITDA, the

23 enterprise value for TransCare would, I believe, fall between

24 $35.3 and $60.6 million dollars.  And the model the next day

25 which was the one that Mr. Greenberg revised up slight from

1  January 27th produces slightly higher values of $36.2 to

2  $62.6 million dollars.

3       The last category is newco.  The newco model on

4  February 24th, 2016 which is just a subset of TransCare as a

5  whole and the EBITDA that's reported in that model implies a

6  value of between $22.7 and $39.1 million for TransCare's

7  enterprise value.

8  Q     And underneath the enterprise value, I see a line item

9  for liquidation value.  What did you understand that to be?

10 A     Well, the liquidation value of $19.2 million is, in

11 fact, what the Trustee has obtained by liquidating TransCare.

12 And the $5.7 million that's attributed to the last model,

13 newco, is the portion of the liquidation value that is

14 associated with the proposed newco assets.

15 Q     You touched on this briefly in your prior -- in one of

16 your prior answers; how did you choose what method to go

17 about using the value this company?

18 A     Well, I surveyed the record and identified four

19 different approaches that were evident in the testimony and

20 in the ordinary course of Patriarch's work in managing and

21 supervising TransCare.

22      One of those is a comparable company analysis.  The

23 second is called a precedent transaction or called a merger

24 and acquisition of companies in the space.  A third is the

25 EBITDA multiple range to which Ms. Tilton testified in her

14

1    deposition.  And a fourth is -- and also Mr. Greenberg

2    testified to EBITDA multiple also this week.  And then the

3    fourth is the multiple that was contained in various

4    expressions of interest that TransCare received in 2015.

5    Q     Did you give any consideration to using any other

6    method of valuation before we go through these?

7    A     I thought about applying a DCF method, yes.

8    Q     The DCF method is what?

9    A     Discounted cash flow.

10   Q     And why -- did you use that method?

11   A     I did not.

12   Q     Why not?

13   A     Several reasons.  One is that, that is not a method

14   that anybody within TransCare and Patriarch was using to

15   evaluate the value of TransCare during this relevant period

16   that I have seen in the record.

17          MR. MERVIS:  Your Honor, some of this I'll deal

18   with on cross, but the witness, you know, obviously

19   explaining the facts that he relied upon.  They're not -- I

20   mean he's not testifying as percipient witness.

21          THE COURT:  Well he can testify what he relied on.

22   He can rely on --

23          MR. MERVIS:  Yeah, I understand that, but I think

24   -- well, I'll hold my fire for now.

25          THE COURT:  Okay.  I take that as a withdrawal of

**A1758**

1  any objection you might have just made without prejudice.

2         MR. MERVIS:  Without prejudice.

3         THE COURT:  Okay.  Let's go.

4  BY MR. AMINI:

5  Q     We were talking about the discounted cash flow method.

6  A     Yes.

7  Q     Again, why --

8  A     I'm sorry.  I missed the answer on that.

9  Q     Oh, it's fine.  I still have the train of thought in my

10 head.  The models here and also in the intermediate models

11 that I've seen in the record do not have cash flow forecast

12 going out into the future.  Ordinarily, one would want to see

13 at least five years, maybe more, preferably more.  And that's

14 not any calculation that is contained in what Mr. Greenberg

15 or others or Carl Marks or others did within TransCare and

16 Patriarch.

17        And, in addition, the ingredients or the ability to

18 create one from granular pieces of information is also not

19 available in the record.  So, there are many reasons why DCF

20 could not be implemented here and, therefore, I did not.

21 Q     Now, let's go through the methods that you did employ.

22 If I could, let's start with the comparable company method.

23 There's a slide, I think, if you go a couple --

24        THE COURT:  Which number is the slide?

25        MR. AMINI:  It's slide -- starting with slide 12,

1  actually, we go to slide 13, I believe.

2  BY MR. AMINI:

3  Q     All of the steps you undertook to evaluate this company

4  using the comparable company.

5  A     Well the comparable company method, number one, is to

6  decide which companies are, in fact, comparable that one is

7  going to use.

8        The second step is to think about what is the valuation

9  method or multiple that one is going to use here.  I'm using

10 enterprise value to EBITDA.  There are others that can be

11 used.

12       For example, Mr. Greenberg also reports enterprise

13 value to revenue as a multiple.  But in my approach, I'm

14 using the EBITA multiple.

15       Third is to apply the valuation multiples that one

16 extracts from step one for the comparables and then to apply

17 it to TransCare EBITDA numbers.

18 Q     And let's talk about the selection of the comparable

19 companies.  We have a slide on it, the next slide shows it,

20 but discuss generally with me what you did to select

21 comparable companies?

22 A     Well, ultimately, what I did is I used the two publicly

23 traded comparables that Mr. Greenberg used.  I would just

24 note that there aren't perfect peers.  There never are

25 perfect peers.  So, the usual approach that people use and

1   the one that we heard Mr. Greenberg describe is to identify a

2   set of publicly traded companies that are most similar to

3   TransCare.

4        He identified two.  I looked at them in the databases

5   that I have, confirmed that they are, in fact, in the same

6   space as TransCare.  And I used the two that he employed.

7   Q    And how you go about selecting the valuation multiple?

8   What went into that?  It's the next line.

9   A    Sure.  Well that is informed by the fact that the

10  enterprise value to EBITDA multiple is to me, quite clearly,

11  the relevant multiple in this industry.  The record is

12  replete from Mr. Leland, Mr. Pelissier, Mr. Greenberg, offers

13  from third-parties. So, it is -- what one sees is offers that

14  are expressed in terms of an EBITDA multiple.

15  Q    In your experience, is that all is the case?

16  A    No, not at all.  For example, in the internet world,

17  sometimes people will sell companies based on the number of

18  eyeballs or the number of subscribers; even if there's little

19  or no revenue.  So different industries have different

20  industry standards that are used.

21  Q    And then as I understand it, you used the forward

22  EBITDA, is that correct?

23  A    I did.

24  Q    And that's our next slide.  And why did you do that?

25  A    Well I'm using the -- I'm using TransCare's forward

1   EBITDA because it's historical EBITDA.  The last twelve-month

2   EBITDA for TransCare was obviously not acceptable and was not

3   going to work.  And Patriarch was in the process of

4   restructuring or modeling what a lease structured TransCare

5   would like with a different management and a different

6   process going forward.

7           And anyone buying the company would be buying the

8   future, not the past.  So, for that reason, forward EBITDA is

9   a very common concept.  You can S&P databases report it.

10  Bloomberg's databases report it.  And it is a standard way of

11  thinking about EBITDA in this context.

12  Q    And based on your work, what forwarding -- I'm sorry.

13  What multiples did you -- well, let's look at the next slide,

14  the application of evaluation?

15       What are we looking at on slide 17?

16  A    Here, we're looking at the three holdco plans from

17  January 7th, 27, and 28. I also have on the first line, mid-

18  November Wells Fargo update, just for a point of reference

19  and comparison. But the preliminary plan from January 7th is

20  modeling $6.9 million dollars of EBITDA for 2016.  The

21  January 27th Carl Marks turnaround plan is anticipating $5

22  million dollars of EBITDA.  And the modified version by Mr.

23  Greenberg the next day models and anticipates $5.2 million

24  dollars of EBITDA for 2016.

25  Q    And with respect to the last model which is on the next

1   page?

2   A     The last model, the February 24th model is the newco

3   model and you can see it represents about 35 or 40 percent in

4   terms of revenue of holdco or, excuse me; yeah of holdco and

5   about $3.2 million dollars of EBITDA for 2016.

6   Q     And based on those numbers, what valuation did you come

7   up with and you can look at slide 4 if you want and the

8   actual numbers are there?

9   A     Sure.  Actually, the next slide shows it in a graphical

10  fashion. And what one can see is that for the January 7th

11  model, which is the very top bar, the implied value for

12  TransCare based on the two comparables that were identified

13  and used by Mr. Greenberg, the value of TransCare would fall

14  from $51.1 million up to $86.5 million.

15        Later in the month, under the Carl Marks' plan, it had

16  the lower forecast EBITDA, implied valuation range is $35.3

17  to $60.6. And then that increases a little bit based on Mr.

18  Greenberg's modification to $36.2 million to $62.6 million.

19            And then at the very bottom, the newco model,

20  which of course, is just a fracture of the entire enterprise

21  implies a value of just the newco assets of between $22.7 and

22  $39.1 million dollars.

23  Q     And let's go back for a second because I may have

24  skipped over this.  In this chart that we're looking at you

25  have these multiples and then within the parenthesis, you

1   have two numbers.  Explain how those work in this chart, if
2   you would?
3   A    Yes, so the multiples for the very first January 7th
4   model is $7.2 to $12.5 so that is the enterprise value to
5   afford EBITDA multiple for the two comparables identified by
6   Mr. Greenberg.  One of this was Air Holdings and the other
7   one was Envision.
8   Q    And I noticed they vary in each one of timeframes --
9   A    Yeah, so --
10  Q    Can you please explain how that works and how you
11  arrived at them?
12  A    Yes.  So, the enterprise value to four EBITDA multiple
13  is computed by taking the enterprise value as of each of
14  these dates.  So, for the first one, let's be tangible here.
15       For January 7th, 2016, $7.2 is the multiple for the Air
16  Holdings Company based on the value of its common stock on
17  that date, plus its debt minus cash, and the $12.5 is that
18  ratio based off of Envision.
19       When we then move forward to January 27th, the next
20  row, the multiples are $7.1 to $12.2.  Why did they go down?
21  They went down because the stock market valuation of their
22  shares changed a little bit.  In this case, it went down a
23  bit.
24       And then on January 28th, it went down a little bit
25  further.  So, the ratios do fluctuate a little bit based on

18-01021-smb   Doc 122-1   Filed 07/31/19   Entered 07/31/19 19:39:55   Main Document
Case 1:20-cv-06223-LAK   Document 11-10   Filed 09/30/20   Page 6 of 208
Pg 21 of 173

21

1  stock market performance.

2  Q      And also on February 24th, it also moved, did it not?

3  A      On February 24th, looks like it bounced back up to the

4  level of January 27th, so it's $7.1 to $12.2.

5  Q      And then as I understood your testimony you used a

6  precedent transaction analysis as well?

7  A      Yes.

8  Q      All right and if you go with me two slides up, I think

9  there's a description there of what you did, but explain what

10 you did to that?

11 A      Sure. With respect to the precedent transactions, Mr.

12 Greenberg identified two recent transactions in this space,

13 which I agree with, and he looked at what the enterprise

14 value to EBITDA was for those two transactions.  And as did

15 I.  And I computed the enterprise value to EBITDA multiples

16 based on Envision's acquisition of Rural/Metro and also KKR's

17 acquisition of Air Medical Group.

18 Q      And what did you conclude?

19 A      I have a I think it's summarized in the slide a little

20 bit further, but essentially, I obtained valuation multiples

21 that were similar to what one gets using the comparable

22 company method.

23 Q      Yes.  If we go to slide -- well, why don't we do that

24 in a moment.  You did two other things as I understood it.

25 A      I did.

1   Q      You took two other steps with respect to looking at
2   this valuation.  What were they?
3   A      One was Patriarch's executives is estimates of what the
4   enterprise to EBITDA ratio would be.  And the other one was
5   looking at expressions of interest from third parties.
6   Q      And based on the Patriarch interest, what did you
7   conclude?
8   A      I conclude that it's roughly in the same range.  Ms.
9   Tilton said that she thought a seven to eight EBITDA multiple
10  would be appropriate for TransCare.  And I believe Mr.
11  Greenberg said eight to nine.
12  Q      And do you recall that Mr. Leland had some testimony?
13  A      Mr. Leland also had a number in that range as well.
14  Q      And in terms of the indication of the expressions of
15  interest?
16  A      The expressions of interest when quantified as a
17  multiple of EBITDA were, I believe, eight.
18  Q      And if you go to slide 23, is that what you're
19  referring to when you say expressions of interest?
20  A      Yes.
21  Q      And these were selected from what?
22  A      This was extracted from the various trial exhibits that
23  are listed in the right-hand columns, so they came from
24  multiple sources.  Not all of these expressions of interest
25  were expressed in the form of an EBITDA multiple, but one can

1   see that on May 7th -- I'm sorry; March 7th, 2015 it was

2   expressed as an 8x multiple and then on July 8th from AMR and

3   RCA also expressed as an 8x multiple of EBITDA.

4   Q    And based on these four methods, if you go with me to

5   slide -- it doesn't have a number, but it nears the end --

6   27.  Does this accurately reflect the conclusions as to what

7   multiple was appropriate?

8   A    Yes.

9   Q    And why don't you explain this chart, if you would?

10  A    Sure.  This chart summarizes the range of multiples as

11  a function of what approach or data source I'm using.  So, at

12  the very first row shows a range of 7.02 to 12.5 times EBITDA

13  as an appropriate valuation range when using a comparable

14  company enterprise value to forward EBITDA approach.  The two

15  precedent transactions imply an enterprise value to EBITDA

16  multiple of 10.0 to 10.7.  The expressions of interest that I

17  identified just a moment ago are 8.0 times EBITDA.

18      Ms. Tilton testified I think seven to eight in her

19  deposition.  I believe she said eight to nine at the outside

20  or nine at the outside, in substance that's what I recall her

21  saying.  And then Mr. Leland and Mr. Greenberg -- well Mr.

22  Greenberg testified here and Mr. Leland in his deposition

23  that eight to ten is an appropriate multiple of EBITDA when

24  estimating the value of a company in this industry.

25      So, you can see that overall, all of these approaches

1   encompass a range of 7 to 12.5 and I made my computations

2   based on that.

3   Q     And if you go to the next line, slide 28 --

4           MR. MERVIS:  Your Honor, I actually have an

5   objection to this one slide.  These excerpts of testimony

6   were neither in the expert's report nor were they even cited

7   in the report.

8           There was one citation to Ms. Tilton's testimony

9   about, I think you got it about right, a seven to eight

10  multiple, but this is different in kind and substance.

11          THE COURT:  Are you talking the Leland transcript

12  that's in here?

13          MR. MERVIS:  No, Your Honor, I'm looking at slide

14  28 that Mr. Amini has just put up on the screen.

15          MR. AMINI:  This is the slide that has the

16  quotations from Ms. Tilton.  That's to her belief that the

17  company's valuation was --

18          THE COURT:  That's what he's relied on.

19          MR. MERVIS:  But here's the thing, Your Honor.  He

20  wasn't relying on it on his report.  He said nothing about

21  this in his report.  And what he's basically doing here is --

22  well that's my first objection.

23          The second objection is what he's basically doing

24  here is, you know, interpreting Ms. Tilton's testimony.

25  She's going to be here.  Mr. Amini can ask her what all this

1  means.  But this was not part of his report and the court

2  shouldn't hear it.

3              THE COURT:  I thought that the court needed a

4  reliance on what Ms. Tilton valued her company.

5              MR. AMINI:  On page 30.

6              MR. MERVIS:  That's not correct, Your Honor.

7  Well, let me be precise.  It's a much more narrow --

8              MR. AMINI:  It's paragraph 71, Your Honor.

9              THE COURT:  Seventy-one.

10             MR. AMINI:  One to 41.

11             MR. MERVIS:  Oh, you know what, Your Honor, well I

12  withdraw the objection.  I actually -- I had forgotten this.

13  Okay.  Thank you.

14  BY MR. AMINI:

15  Q     So how did Ms. Tilton's valuation influence your

16  opinion, if at all?

17  A     Well, I wouldn't say it so much influenced it, but

18  rather that it's my overall approach is consistent with Ms.

19  Tilton's method of valuing newco.  And I see this for a

20  variety of reasons.

21       One is that Ms. Tilton valued newco at about $22

22  million dollars.  And then I list the basis for that from her

23  deposition. She said that Transcendence was $22 million and

24  change.  She said that $22 million was the value of the

25  assets transferred from TransCare to newco plus $10 million

1   dollars in new money.

2        I think the way to read that is $22 million includes

3   the $10 million in new money.  She noted that she did a check

4   on her EBITDA multiple and that credit bid plus the new money

5   was a high multiple of cash which is overall if you look at

6   the actual ratios pretty consistent with what I did.

7        And then, ultimately, she said that a back check or

8   another check was at the $22 million and change against the

9   $2.5 million EBITDA was somewhere between eight and nine

10  times a multiple of eight and nine.

11       So that all is very consistent, in my opinion, with the

12  results that I get from the four approaches that I summarized

13  a moment ago.

14  Q    And she's referring to her February 24th plan, is your

15  understanding, correct?

16  A    Yes, she is.

17  Q    And what do you recall the EBITDA -- you mentioned that

18  she said against the $2.5 million dollar EBITDA.  But what do

19  you recall the EBITDA number to be on that January 24th plan,

20  if you remember?

21  A    I believe it was $3.4 million.

22  Q    And did you agree with her that it was a high multiple

23  which is her opinion?

24  A    I do not agree with her that it is a high multiple.

25  Q    And why don't you agree with her that it's a high

1    multiple?  And if you want, you can look at the -- well why

2    don't you?

3    A      The aggregation and combination of all four approaches

4    I described produces a range of seven to about 12.5.  So,

5    eight to nine is not at the high end.  It's more or less in

6    the middle or lower middle part of that range.

7    Q      And finally if you would go to the summary of your

8    opinions on the next two slides, looking at the next to the

9    last slide, does that -- and we looked at it at the beginning

10   too, but it's a different graphic of your opinions, correct?

11   A      Yeah, so this is a bar chart that depicts the ranges of

12   the operating values that are implied by the analysis that I

13   just described.  Holdco on January 7th between $50.1 million

14   and $86.5 million is a reasonable range based on the comps

15   and precedent transactions and the like.

16        Fast forward to January 27th, a reasonable range would

17   be $35.3 to $60.6 million.  As of the next date, based on the

18   update from Mr. Greenberg, $36.2 million to $62.6 million.

19   And then newco alone, without regard to the assets that were

20   going to be left behind, I think would be likely to get an

21   offer in the $22.7 to $39.1 range, one million dollar range

22   based on the modeling of newco.

23        Holdco generated $19.2 million dollars in liquidation

24   proceeds and newco produced, of that, the newco part

25   generated $5.7 million dollars' worth.

1   Q      And I understand your final chart you're just

2   subtracting the holdco and newco liquidation values from the

3   valuations that you've determined for those four dates?

4   A      Right.  So, the bar charts on this last slide shows the

5   difference or the excess of value of the operations over the

6   liquidation value that was actually realized.

7              MR. AMINI:  I have nothing further, Your Honor.

8              THE COURT:  Do you want your court reporter to set

9   up now?

10             MR. AMINI:  We were sharing one to have real

11  times.  So if --

12             THE COURT:  Do you want to take five minutes to

13  have the court report set up?

14             MR. MERVIS:  No, I'm ready to go.

15             THE COURT:  Okay.

16             MR. MERVIS:  Your Honor, we have a binder.  And

17  just to set expectations, I know that Mr. Amini's examination

18  was pretty short.  I actually have a lot of ground to cover.

19  Didn't want to give a false impression.

20                        CROSS EXAMINATION

21  BY MR. MERVIS:

22  Q      Okay. Dr. Arnold, let's just level set for a minute.

23  Actually, let me first get to the objection that I fired up

24  and then withdrew.

25        All the testimony that you gave in her direct about the

1   facts and circumstances around these four plans that was all

2   based on what you read in the discovery materials that Storch

3   Amini provided to you?

4   A    Not all.  It was updated and confirmed by testimony

5   that I've heard over the last couple of days.

6   Q    Right.  The things you heard in this court.

7   A    Yes.

8   Q    And by the way, I didn't notice you were.  Did you miss

9   any of the testimony in this case so far?

10  A    I excused myself to the men's room on a few occasions

11  while there was testimony, but I would say I missed an

12  insubstantial portion.

13  Q    Right.  Okay.

14  A    At least, I hope.

15  Q    We will not fault you for that.  Let's level set.

16       The valuations that you gave are what you say the

17  company would have sold in an open market transaction on each

18  of the four dates of the plans you rely on, is that right?

19  A    I think that's a little too rigid.  What I would say is

20  that the valuation ranges that I report are implied by the

21  contemporaneous market values of comparables and precedent

22  transactions combined with the forecast that EBITDA that are

23  embedded in those four models.

24  Q    Fair enough.  Let me take it --

25  A    Whether it would actually be on that day, we all know

**A1773**

1   it takes some time to market and sell companies, et cetera.

2   Q     Let me be clear. What you're saying is that the values

3   that you came up with, right, are on the, as of the date, of

4   each one of those four plans, right?

5   A     Yes, it's based on the values that exist on those

6   particular days.

7   Q     And let's put aside multiples for a moment.  What your

8   valuation on each of those four dates, one of the inputs is

9   the projected EBITDA going forward in each of those four

10  plans, right?

11  A     Yes.

12  Q     Now let's talk for a moment about the open market

13  process. So, you're talking about third-party buyers, that's

14  the assumption that there are third-party buyers out there

15  who will be looking at this company?

16  A     Yes.

17  Q     And a potential buyer for TransCare in January of 2016

18  and February of 2016, they would, at least, consider,

19  wouldn't they, the company's most recent EBITDA performance?

20  A     I would think a buyer would want to know the past, as

21  well as the anticipation for the future, yes.

22  Q     Okay.  And they'd also think about how likely it would

23  be that if they bought the company, they could increase

24  EBITDA going forward, right?

25  A     Yes.

```
 1  Q     Okay.  And if a potential buyer were looking at the
 2  same plans that you looked at, they would see that each of
 3  them call for some capital needs, right?
 4  A     They do require cash needs. They do have cash needs.
 5  The issue of capital needs, I think, is a somewhat different
 6  question.
 7  Q     I'll accept your words cash needs.
 8  A     Yes.
 9  Q     Okay. And they would, at least, think about whether,
10  first of all, where that cash could come from, right?
11  A     Yes.
12  Q     And whether it would be worth spending, right?
13  A     Yes.
14  Q     Okay.  Now let's get right into the plans.  The January
15  7th plan, you have our binder?
16  A     Yes, I do.
17  Q     Okay.  So, it is PX158, so why don't you turn to that?
18  And, Roy, if you can bring that up on the screen.
19        I'd like to direct your attention, Dr. Arnold, to the
20  first --
21  A     Just one moment.  They're not in numerical order.
22  Q     No, they're not.
23  A     I just need to find it.
24  Q     They're separated by the prefix, so they are in
25  numerical order once you get to the PX. Got it?
```

1   A     Okay. Yes, I do. I have it.

2   Q     Okay.  Now, first off, if you look at the -- this is an

3   email, right, from Mr. Greenberg?

4   A     Yes.

5   Q     Okay.  And if you look at the, just the way it was

6   formatted; at the very top of the page, there's a subject

7   line, right? TransCare updates.

8   A     Yes.

9   Q     Okay.  TransCare updates to preliminary plan based on

10   yesterday's discussion; see that?

11   A     Yes.

12   Q     And you noticed that before you signed your expert

13   report in this case or no?

14   A     Yes, I think there was a -- I think there was another

15   email that was -- this one is one that was forwarded along

16   but there's the one that starts with Jean-Luc and I that I

17   think has that in the subject as well.

18   Q     Right.  But you noticed that it said preliminary up

19   there, right?

20   A     Yes.

21   Q     Okay.  And then if you go down roughly a quarter down

22   the page, there's sort of this initial note to Carl and

23   Jonathan and then it says Michael. And then there's a

24   sentence, "Jean-Luc and I worked all night to arrive at a

25   scenario to address the parameters that we discussed

1  yesterday that support a sale process," (indiscernible); do

2  you see that?

3  A    Yes.

4  Q    And before you signed your expert report in this case,

5  you noticed the reference didn't either to Mr. Greenberg and

6  Mr. Pelissier working all night to create this document?

7  A    I did.

8  Q    Now you viewed this particular plan, the one we'll call

9  the January 7th plan; you viewed this, and more specifically,

10 the projection, the EBITDA projection that was derived from

11 it as the most appropriate of the four different plans you

12 looked at, isn't that right?

13 A    I'm not sure that I assessed which ones were more

14 appropriate than others.  But this was the earliest one when

15 there wasn't, of the four that I looked at.

16 Q    All right, well let me see if I can help. Can you go

17 please to your report which in our binder is PX282.  If you

18 pull that up, Roy, and go to paragraph 73.

19        MR. AMINI:  Your Honor, may I just -- it's not an

20 objection.  I realize that he raised it, but I meant to move

21 the report in.  I don't know Your Honor's procedure.

22        THE COURT:  Is there an objection?

23        MR. MERVIS:  No, Your Honor, I think it's -- well,

24 I think it's admitted for limited purpose which is to explain

25 what the witness did and what his opinion is on.

```
 1              THE COURT:  Normally expert reports are hearsay.

 2              MR. MERVIS:  They are hearsay.  Look, I want to

 3   question him on it so I'm not particularly -- it doesn't

 4   really matter to me whether it's in evidence or not.

 5              THE COURT:  All right, then I'll receive it.

 6         (Exhibit PX282 received into evidence)

 7              MR. MERVIS:  Yeah, my only point is it comes in,

 8   you know, not -- there's a bunch of factual recitations here

 9   that obviously --

10              THE COURT:  Well, I understand the limitations on

11   expert reports.

12              MR. MERVIS:  Thank you, Your Honor.

13   BY MR. MERVIS:

14   Q    Okay.  So, Dr. Arnold, you have paragraph 73, it's on

15   page 32?

16   A    I do.

17   Q    Okay. That paragraph -- well, why don't you just read

18   aloud, if you would, the very last sentence in that

19   paragraph?

20   A    "I, therefore, view the range of operating values

21   derived from January 7th, 2016 preliminary plan as the most

22   appropriate range of implied operating values."

23   Q    And that's what you believed at the time that you wrote

24   the report?

25   A    It is, but you recall you questioned me on it at my
```

1  deposition and I modified my view.

2  Q    Well we'll get to that later.  That's what you wrote.

3       So, let me -- well, let's see if we can agree on this,

4  that the January 7th plan involves changes to the TransCare

5  business, right?

6  A    There are changes, yes.

7  Q    Okay. And they're more than just marginal adjustments,

8  aren't they, in that plan?

9  A    Refreshing the capital stock and getting new vehicles

10 is part of it.

11 Q    Right. And that's more than just a marginal change in

12 the plan?

13 A    I would call that more than a marginal change.  It's

14 more than just getting one or two vehicles.

15 Q    And you believe -- and I think you already testified --

16 you think the projections that came out of that plan are

17 reasonable?

18 A    Well, I think it gives the best insight as of that date

19 as to what Patriarch's view of the future performance of

20 TransCare could be.  And that's the basis on which I did my

21 analysis.

22 Q    You say Patriarch, Ms. Tilton isn't copied on the

23 January 7.

24 A    No.

25 Q    You can take a look if you want.

1  A      No, she is not on that email.

2  Q      And there's nobody from Wells Fargo copied on that

3  email, right?

4  A      No, there isn't.

5  Q      Okay.  And, in fact, at the time that you signed this

6  report, you didn't know whether Ms. Tilton had approved this

7  plan, did you?

8  A      I did not know that she had approved the plan or

9  whether she had approved the plan.

10 Q      But you heard Mr. Greenberg say that in plan that she

11 didn't approve it?

12 A      That she -- you're making it sound as though she

13 rejected it.  I didn't hear that testimony.  What I heard him

14 say is that there was not an issuance of an approval.  Yes;

15 so, yes.  I just want to make sure the implication is clear.

16 Q      Okay.  I think it is.

17 A      Yeah.

18 Q      She didn't approve it. I'll move on.

19        And you don't know whether anybody with authority at

20 Wells Fargo formed any view about the reasonableness of the

21 projection that comes out of this January 7th plan, do you?

22 A      I don't.

23 Q      In fact, you don't even know if anybody from Wells

24 Fargo asked for the projection or even asked for this plan to

25 be created, right?

1   A    I think that's fair. Wells Fargo asked for Carl Marks

2   to be appointed and Carl Marks got a copy. I think that was

3   for the purpose of visibility into TransCare, but I can't

4   point you to a document or have a direct basis to say that

5   somebody at Wells Fargo in authority reviewed and accepted

6   the projections.

7   Q    Or even asked that they be done, right? You didn't see

8   any evidence that anybody from Wells Fargo said, please do

9   this?

10  A    That's true.

11  Q    Now, I want to take a look at some of the assumptions

12  that are baked into this plan. So, if you could -- we'll go

13  back to PX158. And, Roy, if you could pull up there's an

14  Excel that ends in bates 3376 and if you could click on the

15  major assumptions tab.

16          MR. MERVIS:  And, Your Honor, for those of us who

17  -- for me anyway -- for those of us who are looking at paper,

18  Your Honor, what I'm asking the witness to look at is --

19          THE COURT:  I have it.

20          MR. MERVIS:  You you have it, okay.

21  BY MR. MERVIS:

22  Q    And do you have it in front of you, Dr. Arnold?

23          THE COURT:  Wait, I don't have that.

24  BY MR. MEVIS:

25  A    I have it on the screen, yes.

**A1781**

```
1           MR. MERVIS:  Your Honor, it's -- there's some
2   attachments, but there is a -- it's slide four in the lower
3   right-hand corner.  I can show it through the slide.
4        (Participants conferring)
5   BY MR. MERVIS:
6   Q    You would agree, wouldn't you, Dr. Arnold, that the
7   revenue projections that come out of this January 7th plan
8   are based on these assumptions, right?
9   A    No.
10  Q    What did I get wrong?
11  A    You are getting wrong that the third bullet, new leases
12  for a total of 118 vehicles are planned and the sub-bullets
13  following that.
14       The way I read the document is that that is -- this is
15  a legacy tab from earlier versions of or earlier iterations
16  of the model from either November or December 2015.  Because
17  this model does not anticipate new leases for 118 vehicles.
18  This model anticipates 40 new vehicles, 20 of which are 911
19  and ambulances and 20 of which are the vans, I believe Type
20  II.
21  Q    And what you just told me is something you figured out
22  after I took your deposition, right?
23  A    Yes.
24  Q    Because we had some colloquy about the different
25  numbers?
```

1   A     We did discuss this at my deposition; that's correct.

2   Q     Okay.  Well, regardless of the number, you understand,

3   though, that being able to procure those vehicles was an

4   input into the revenue model, right?

5   A     Yes, I believe their review was that some new

6   ambulances out there on the road would be a revenue enhancer.

7   Q     Right. Because you have new ambulances that could make

8   more trips and increase revenue, right?

9   A     Correct.

10  Q     Okay.  Now, at the time you signed your report, you did

11  not know and did not investigate what efforts were taken to

12  obtain any of those vehicles, right?

13  A     Of the 40 vehicles specified in the January 7th plan --

14  Q     At the time you signed your report.

15  A     Yes, that's fair.

16  Q     And same thing, for the 40 vehicles at the time that

17  you signed your report you hadn't investigated the

18  availability on the market of the types of vehicles that

19  would be indicated in this January 7th plan, correct?

20  A     I had not done so; that's true.

21  Q     All right.  And you understood that, at this point,

22  TransCare was having some credit problems, right?

23  A     Yes.

24  Q     And you didn't investigate in connection with the

25  January 7th plan, you didn't investigate how likely it would

1  be that TransCare would be able to restore its credit, right?

2  A    I did not investigate that.

3  Q    And you understood that the ability to lease or acquire

4  these vehicles on reasonable terms could have depended, in

5  part, on TransCare's credit, correct?

6  A    Well if you're thinking about TransCare implementing

7  the plan itself then, yes, that's true.  No, but if I own a -

8  - I don't want to say I own a silver mine but I don't have

9  enough money to buy a shovel, the silver mine is still worth

10 money.  Someone can come along and start shoveling it.

11        So, the question here is that I was thinking of it was

12 not so much what it would take for TransCare to do it, but

13 whether it would have value more generally.

14 Q    Right.  And you're ahead of me.  I'm about to get

15 there.

16 A    Okay.

17 Q    You didn't investigate before you signed the expert

18 report if the types of vehicles that were called for in this

19 forty that you say were even available in the timeframe that

20 the plan calls for, so they could be deployed in a timely

21 fashion?  That's not something you investigated before you

22 signed your report?

23 A    That is not something that I investigated.  It's also

24 not something that's flagged as a concern by the authors of

25 the reports -- of the forecast.

41

1 Q    Yeah, but let's now talk about what you indicated in

2 the report; what would be of concern to a third-party buyer.

3      If a third-party buyer were to examine the January 7th

4 plan, they would read what you read, right, and they would

5 see that there was a need for these 40 vehicles, right?

6 A    Yes.

7 Q    And because what you're talking about here, Dr. Arnold,

8 is a third-party buyer who according to you is going to plunk

9 down eight figures to buy this company, right?

10 A    Yes.

11 Q    They're going to do some diligence, at least, right?

12 A    I would think so.

13 Q    And they would want -- well, wouldn't agree with me

14 that it would be of interest to them whether this plan to

15 acquire these 40 vehicles was feasible?

16 A    Yes.

17 Q    They want to know how much it would cost, right?

18 A    Are you thinking the buyer would just be some random

19 person or that the most likely buyer would be someone who's

20 in the business but just in a different area.  They might

21 already know all that stuff.  They might not have to

22 investigate it because they're already knowledgeable about

23 the industry.  That's common.

24 Q    In your experience, though, Dr. Arnold, when you're

25 talking about a company that's trading at eight figures,

```
 1   there's sort of two types of buyers, right? Strategic and a
 2   financial.  You're aware of that, aren't you?
 3   A     Yes.
 4   Q     Okay.  So strategists might have some of that
 5   information.
 6   A     Right.
 7   Q     Maybe not a financial, though, right?
 8   A     Right a financial buyer may not have that information.
 9   Q     Right.  And even a strategic would look at the types of
10   vehicles that are called for under this plan. And if they
11   didn't know it off the top of their head how easy it was to
12   acquire, they would investigate that, would they not?
13   A     I would expect them to do so, yes.
14   Q     You did not investigate any of that, did you?
15   A     I did not.
16   Q     Let's go back to the email itself; in other words,
17   before the attachments.
18              MR. MERVIS:  Just one second, Your Honor.  I lost
19   my place.
20   BY MR. MERVIS:
21   Q     Okay.  And if we could go to the third page of the
22   email.  By the way, before I get there, I had asked you a
23   question about credit worthiness.  And -- let me ask you a
24   question.
25              If a potential buyer concluded that it would be
```

1  difficult to restore TransCare's credit worthiness in the

2  timeframe necessary to acquire all these vehicles, they had

3  the option of potentially guaranteeing their own money,

4  right?  Putting up the guarantee.

5  A      Yes.

6  Q      And that's something that that they would have to think

7  about whether it was worth putting up their own money to make

8  this investment, right?

9  A      If they followed that path, yes.

10  Q      But that's not something you investigated?

11  A      I did not.

12  Q      Because it depends on the third-party buyer's

13  assumptions about return on investment, right, whether it's

14  worth providing a guarantee?

15  A      I would imagine that would be a consideration, yes.

16  Q      Okay.  All right, let's go to the third page of the

17  email and, Roy, if you could go up to the top, please and

18  highlight the second line.  It says, other AP payments

19  necessary to open back up parts and maintain existing

20  vehicles, do you see that, Dr. Arnold?

21  A      Yes.

22  Q      Okay.

23          MR. MERVIS:  Judge, you there?

24          THE COURT:  Yes.

25  BY MR. MERVIS:

44

```
 1  Q     There was a problem at TransCare because some suppliers
 2  refused to continue supplying, right?
 3  A     Yes.
 4  Q     And you didn't investigate or you didn't make any
 5  investigation into how likely it would be for TransCare,
 6  whether under new ownership or old ownership, to be able to
 7  persuade those vendors to open the supply lines back up,
 8  right?
 9  A     I did not.
10  Q     But if a third-party buyer, someone who's thinking
11  about this in eight-figure sum were thinking about buying
12  TransCare, they'd at least consider whether they could get
13  supplies, right?
14  A     Yes.  Look, there's a market for automobile supplies so
15  it doesn't necessarily have to be with the same suppliers,
16  but I would imagine that it would -- it's certainly plausible
17  that a potential buyer would call up the vendors and say, hey
18  if I'm thinking about buying this company.  If I bring you
19  current, are we good.
20  Q     Yes.
21  A     That would be a natural conversation that wouldn't
22  surprise me at all.
23  Q     And you didn't investigate that issue, right?
24  A     I didn't.  There's really no way to after the fact,
25  but, in any event, I did not.
```

1    Q    And you don't know whether the people who drew up this

2    -- you don't know for a fact that people who drew up this

3    plan had investigated the issue?  How likely it would be to

4    open up a supply line?

5    A    I do not know one way or the other.

6    Q    I'm sorry?

7    A    I don't know.

8    Q    And if -- the January 7th plan -- let me see if you

9    agree with this, like all plans, had some execution risks,

10   right?

11   A    Sure, all plans have execution risks.

12   Q    You did nothing to investigate the execution risks of

13   this January 7th plan, did you?

14   A    I don't think I did in the way that your questions

15   suggest it.  I'm sorry.  I didn't go through piece by piece

16   and say what's the probability of step one being successful

17   or not successful.  I did not engage in that activity.

18        But what I do see is, say Ms. Tilton thought that, said

19   that seven to eight would be reasonable for this company.

20   And that sort of -- that multiple embodies many different

21   features, one of which is the risk or uncertainty of the

22   projection being obtained.

23        So, I think it's embedded in the multiplier, but I did

24   not go through a formal analysis of step by step.

25   Q    Well, let's just figure I understand what you're

1  saying.  You remember Ms. Tilton said something about well

2  seven to eight is a good multiple in this business, right?

3  A     Yes.

4  Q     All right and we'll ask her whether she thought that

5  was the appropriate multiple for a distressed company like

6  TransCare, but let me put my question -- let me change the

7  question, right.

8       Look at the second page of the email.  And, roughly, in

9  the middle of the page there's, right below this bolded

10 heading latest preliminary budget, do you see that?

11 A     Yes.

12 Q     Okay.  And three lines down it says, key assumptions to

13 the latest preliminary budget, do you see that?

14 A     Yes.

15 Q     And there's a whole raft of bullet points below that,

16 right?

17 A     Yes.

18 Q     And in order to achieve the $6.9 million dollars that

19 you used for your evaluation, Dr. Arnold, at least, on

20 average all of those things would have to happen, right?

21 A     Yes.

22 Q     And you -- and you would expect a potential buyer who

23 is looking at this plan to wonder whether all of those things

24 would go right and investigate it, wouldn't you?

25 A     Yes.

1  Q     You did not, other than what you said about the
2  multiple that Ms. Tilton talked about?
3  A     Well, I think that there is conservatism -- well, I
4  shouldn't say conservatism.  I think that those concerns are
5  built into this projection because, for example, this model
6  has $100 million dollars of revenue, give or take, and is
7  anticipating EBITDA of about $8 million, so about eight cents
8  on the dollar.
9        But when you look at the comps, the EBITDA margins are
10 substantially higher. And also, the December iteration of
11 this, I think, had $10 million or $11 million dollars of
12 EBITDA. So, the EBITDA per dollar of revenue is lower than
13 other firms in the industry and lower than the interim
14 version that existed several weeks earlier. So, these are not
15 numbers that are similar to fully functioning successful
16 companies in equilibrium.  These projections are lower than
17 that.
18 Q     Right.  This is a company that in January was in great
19 distress.
20 A     It was in distress, yes.
21 Q     You agree, don't you, that a prudent prospective buyer
22 in looking at those key assumptions would consider the
23 likelihood of whether they would go ripe before plunking down
24 the eight figures that you're talking about here, right?
25 A     Yes.  I would think so.

1  Q    Go back, if you would, to the major assumptions page,

2  the one that's in the Excel spreadsheet.

3      The first bullet point -- one second, Your Honor.  I

4  apologize.

5      The first bullet point under major assumptions says

6  credit agreement must be renewed with Wells Fargo beyond 1/31

7  expiration date.  Do you see that?

8  A    Yes.

9  Q    And it says provided ownership puts in new funding by

10 end of calendar year 2015?

11 A    I see that.

12 Q    And you understood that at this point in time Wells

13 Fargo had sent a no list saying they would not renew the BBL

14 line, right?

15 A    Yes.  They sent that, I believe, in October.  But,

16 again, this is a reference to new funding by the end of 2015

17 which, I think, we all know did not occur by the end of 2015.

18 So, I think this is another example of why these major

19 assumptions 2016 tab in the Excel spreadsheet is a legacy

20 item that is probably not part of because it doesn't sync up

21 to the actual calculations.

22 Q    Dr. Arnold, don't all four of the plans that you looked

23 at require new money funding for Ms. Tilton?

24 A    They require -- they do require cash and, you know,

25 there is discussions about a new asset-based lending

1  agreement and discussions of other ways to obtain it other

2  than cash from Ms. Tilton.  So, the answer is yes, there is

3  cash that is anticipated in these plans.

4  Q    In order for any of these things to work, right?

5  A    Yes.  And any buyer would have to put some amount of

6  cash in or obtain some amount of funds whether it would be

7  cash that they put in themselves or whether they obtained it

8  from bank financing.

9  Q    And at the time you signed your expert report you did

10 not have information about the likelihood that Wells Fargo

11 and Ms. Tilton would repair their relationship, right?

12 A    Can you repeat the question?

13      MR. AMINI:  I didn't hear the last part of the

14 question.

15 BY MR. MERVIS:

16 Q    At the time that you signed your expert report you did

17 not have a -- well, let me rephrase it.  You did not have an

18 understanding as to how likely it was that Ms. Tilton and

19 Wells Fargo would repair their relationship, correct?

20 A    No.  I knew that they didn't.  I signed this report in

21 2018.

22 Q    I'm talking about as of January 7th.

23 A    I did not have a view as to what the likelihood was as

24 of January 7th for such a repair.  That is correct.

25 Q    Thank you.

1      And the peek working capital that -- withdrawn.

2      Let me just note, the peek working capital, at least in

3  the second bullet point of this major assumptions, is 7.8

4  million.

5  A    That's what this bullet says, yes.

6  Q    Okay.  And I think we've seen another number, a lower

7  number, that's elsewhere in this model?

8  A    I believe there's a $4.5 million dollar number floating

9  around that's in here as well.

10  Q    Yes.  And at the time of your deposition, at least, you

11  couldn't tell or explain the difference between those two

12  numbers?

13  A    Yes.  I believe that's right.

14  Q    And without -- regardless of what the source is of the

15  funds this plan doesn't yield $6.9 million dollars of EBITDA

16  for 2016 without that money, right?

17  A    Putting aside the question of whether the correct

18  amount is 7.8 or 4.5 there is some amount of cash that this

19  model requires in order to obtain the EBITDA projection, yes.

20  Q    Now, if you could go a little bit back toward the

21  email.

22      Roy, if you could put up, it's called summary, scenario

23  and comparison.  It's a tab, actually.

24      So, Dr. Arnold, this came to the summary, scenario and

25  comparison.  This was provided to you as part of the

1  materials that accompanied the January 7th plan, wasn't it?

2  A    Yes, it was.

3  Q    And you don't or you didn't, at least, at the time that

4  you signed your report, you didn't have an understanding as

5  to why these other scenarios were run, right?

6  A    Well --

7            MR. MERVIS:  Your Honor, do you not have them?

8            THE COURT:  I probably do, but I --

9            MR. MERVIS:  Is it up on the screen, Judge.  Is it

10 up on the screen?

11           MR. MERVIS:  Your Honor, its Slide 1 of the

12 attachment.  It's right after the email.

13 BY MR. MERVIS:

14 Q    Okay.  So, you saw these scenarios, right, before you

15 signed your expert report?

16 A    Yes, I did.

17 Q    And apart from Scenarios 1A and 1B all the other

18 scenarios, of which there are four, result in negative go

19 forward EBITDA, right, Dr. Arnold?

20 A    Negative EBITDA for 2016, yes.

21 Q    Right.  And you picked the scenario that had the

22 positive EBITDA, right?

23 A    Well, I think it's fair to say that Mr. Greenberg and

24 Mr. Pelissier focused on Scenario 1A, which is the one that I

25 used.  I also think it's perfectly logical to do so because

1  if one model is out four, five, ten, however many different

2  scenarios one thinks of, the idea is to identify the scenario

3  that is superior and then follow that one.  So, of course, if

4  you're maximizing profit you will choose the scenario that

5  gives you the highest profit.

6  Q    Right.  But you didn't make an inquiry to find out why

7  the author of this page ran those other scenarios, right?  At

8  least not before you signed your expert report.

9  A    I did not pick up the phone and try to call Mr.

10  Pelissier, that is true.

11  Q    I'm not asking you whether you called Mr. Pelissier.  I

12  understand.  You didn't even ask the lawyers at the start,

13  how come there are all these different scenarios?

14  A    I didn't.  It's very natural and standard to see this

15  in terms of modeling.  And what I was focused on is the

16  projection that was actually used on which Mr. Greenberg and

17  Mr. Pelissier focused and that was 1A.

18  Q    Right.  When you say actually used that was a scenario

19  that happened to be in this one email, the preliminary plan

20  on January 7th, right?  You saw that?

21  A    Yes, but it wouldn't be commercially logical for them

22  to focus on any of the others.  So, it just seemed pretty

23  natural that that would be the one to focus on and use.

24  Q    So, Dr. Arnold, if a prospective buyer doing diligence

25  on this company and contemplating making an eight-figure

1 purchase price or to stumble upon this model and saw all

2 those other scenarios, they would want to know why they were

3 run, right?

4 A    I don't think so.  I think someone who looked at these

5 scenarios would say, well, the no new vehicle scenario number

6 two is not one that Mr.'s Pelissier and Greenberg would be

7 profitable.  The same thing with going with the bare minimum

8 of just a few 911 ambulances.  And, obviously, the path that

9 leads to superior profits is Scenario 1A because that gives

10 you the highest EBITDA with the smallest amount of initial

11 cash.  Now, they might want to think about whether there is

12 some other scenario that's superior to 1A, but they would see

13 1A as the one to devote their attention to, I would think.

14 Q    So, it's your testimony that it's unlikely that a

15 third-party buyer seeing the other scenarios wouldn't make

16 any inquiry to why they were modeled by the people who did

17 this model?  That's your testimony?

18 A    I don't know what another person would ask or if you

19 had ten people, ten different potential buyers could ask ten

20 different sets of questions.  But if you have a pharma

21 company that's spending a billion dollars a year on R&D would

22 it be logical for them to ask, well, what would we get if we

23 cover a budget to 500 million.  What would we get if we

24 doubled our budget to two billion, and run your scenarios and

25 then make a managerial judgement about which of those paths

18-01... Case... 20-cv-06122-LAK... Filed 07/31/19 Entered 07/31/19 09:39:55 Page 671 of 1218 Main Document
Pg 54 of 173

54

1    is profit maximizing?

2    Q    Let's go to that January 27th plan which is DX-175.

3    Just take a moment, Dr. Arnold, and just confirm for me that

4    this is, in fact, what I just said, what you call the January

5    27th plan.

6    A    Yes.

7    Q    There is a couple emails at the first and second page

8    before the attachment.  You don't see anybody from Wells

9    Fargo copied there, do you?

10   A    I do not.

11   Q    And you don't see Ms. Tilton copied there, do you?

12   A    I do not.

13   Q    Let's just take a look, there's an email -- sorry.  On

14   the second page of the exhibit there is an email from Mr.

15   Kilian [phonetic] at 12:44 p.m., do you see that?

16   A    Yes.

17   Q    And he writes,

18        "Michael, Jean-Luc and Randy."

19        You know who those people are, right?

20   A    I know who Mr. Greenberg and Mr. Pelissier is.  I can't

21   remember who Mr. Jones is as I sit here.

22   Q    Okay.  That's fine.  But in any event, you know, he's a

23   Patriarch person?

24   A    Yes.

25   Q    Okay.  He writes,

```
 1          "Attached is a draft of a presentation."
 2          Do you see that?
 3     A    Yes.
 4     Q    And you saw that before you signed your expert report,
 5     didn't you?
 6     A    Yes.
 7     Q    Go to the first page.  There is another email from Mr.
 8     Kilian and this one is at 12:03 a.m., so it looks like he was
 9     up late too.  And he addresses this to a number of people,
10     right, and he says,
11              "All, attached is a draft of the executive
12     summary."
13          Do you see that?
14     A    I do.
15     Q    And you saw that before you signed your expert report
16     in this case, right?
17     A    Yes.
18     Q    Now, at the time that you submitted your expert report
19     you did not know whether -- let me back up.  The EBITDA
20     projection here is around five million?
21     A    It's about five.
22     Q    For 2016?
23     A    Yes.
24     Q    Okay.  So, 1.7 lower than the plan we just looked at
25     approximately?
```

56

1    A    Something like that, yeah.

2    Q    Or maybe it's 1.9.

3    A    I think 1.9 million lower.

4    Q    In any event, at the time you submitted your report you

5    didn't know whether Ms. Tilton had formed a view as to the

6    reasonableness of the $5 million dollar projection, right?

7    A    True.

8    Q    And you heard Mr. Greenberg testify in this courtroom

9    that Ms. Tilton did not approve this plan, right?

10   A    Yes.

11   Q    And you also -- you don't know what Wells Fargo thought

12   of this Carl Marks plan, right?

13   A    True.

14   Q    In fact, you don't even know if they received it,

15   right?

16   A    I don't know that they received it.  That's true too.

17   Q    If you could go to the -- let's go to the attachment

18   and if you could go to the second page of the deck, it's a

19   slide that's entitled situation analysis.  At the very top of

20   the page -- by the way, you read this whole deck before you

21   opined that the $5 million dollar projection was reasonable?

22   A    I'm not sure its right to say that I formed that

23   judgment, but it reflects the best information from Carl

24   Marks as of this date.  Could they have made a mistake in

25   here, sure.  I didn't do that auditing.  I'm not saying that

1   there is -- I didn't identify anything that was unreasonable

2   and I did use their number for the purpose of making my

3   valuations.

4   Q     Let me make sure I understand what you just said.  Are

5   you saying -- do you have an opinion, one way or the other,

6   as to whether the $5 million dollar projected EBITDA for 2016

7   that's generated or that's reported in this deck is

8   reasonable?  You haven't reviewed it one way or the other?

9   A     I don't know whether it is a reasonable estimate.  I

10  didn't undertake that analysis.  What I am evaluating is what

11  Carl Marks and the Patriarch people believed the EBITDA for

12  2016 would be and what the value for TransCare is that's

13  implied by those beliefs.

14  Q     Okay.  You explained that on your direct.  The step

15  that you didn't take, and I'm not -- I just want a fact.  The

16  step you didn't take was say, you know what, I agree with

17  them.  This makes sense.

18  A     What I would say is that the overall approach that

19  they're taking makes sense.  The modeling that they're doing

20  is consistent with professional standards that I have seen in

21  dozens of other matters that have these types of decks and

22  analysis to them.  The projected EBITDA is hardly greedy in

23  comparison to other firms that are -- there are competitors

24  out there in the marketplace because other firms are

25  producing EBITDA as a percentage of revenue that's far

1  higher.  So, there is nothing here that feels like it's a

2  stretch to me, but I didn't make my own determination that it

3  was reasonable.

4  Q    And in your career, Dr. Arnold, you've looked at

5  hundreds of models and decks that have accompanied models,

6  right?

7  A    I have.

8  Q    It's one of the biggest things that you do

9  professionally, right?

10  A    It's one of the big things that I do.

11  Q    There are times when you actually study the model, and

12  look at the projections, and opine that it's not a reasonable

13  projection, right?  You've done that in your career, haven't

14  you?

15  A    I have and it depends on the facts and circumstances of

16  the case.  That was -- the facts and circumstances of this

17  case and the task I was asked to perform did not require

18  that.

19  Q    Because it wasn't within the scope of your assignment,

20  correct?

21  A    It was not within the scope of my assignment and also,

22  I think -- and my assignment was motivated by the legal

23  posture of the two parties and what counsel for the trustee

24  felt that it was his burden.

25  Q    Okay.  Let me go back to my original question.  Did you

```
 1  actually read this deck before you signed your expert report?
 2  A    Yes.
 3  Q    Okay.  At the top of the page that I directed to you,
 4  which is the second page of the deck, Carl Marks writes,
 5       "TransCare is now operating at an absolute breaking
 6  point."
 7       Do you see that?
 8  A    I remember the language, but could you direct me.
 9  Q    Right at the top, right under situation analysis.
10  Right at the top of the page.  It should be on your screen if
11  you can't find it.
12  A    Oh, yes.  I see that.
13  Q    Okay.  And you saw that when you were doing your
14  analysis, right?
15  A    I did.
16  Q    And if a third-party buyer looking at this company,
17  being asked to plunk down eight figures or to come across
18  this deck in diligence, reasonable to assume they might want
19  to know what that means, right?
20  A    Yes.
21  Q    Okay.  And then right below that there's this, sort of,
22  a chevron.  It says strained and broken customer
23  relationships.  Do you see that?
24  A    Yes.
25  Q    It says current, void and senior management leadership
```

  1  including an open CEO position.  Do you see that?

  2  A     Yes.

  3  Q     Lack of credibility.  The perception is lots of

  4  promises and talk, no action.  Do you see that?

  5  A     Yes.

  6  Q     And examining this deck -- well, let me put it a

  7  different way.  At the time that you signed your expert

  8  report you didn't know what Carl Marks had in mind to try to

  9  fix those problems, right?

 10  A     That's true.  I did not know -- I did not see a

 11  specific list or didn't know what specific lists they had in

 12  mind.

 13  Q     Let me actually just step back to what we've been

 14  calling the January 7th plan.  That's the one that produced

 15  high sixes for projected EBITDA for 2016?

 16  A     Yes.

 17  Q     Are you offering an opinion as to whether that

 18  projection is reasonable?

 19  A     As I said, I didn't undertake that analysis or reach a

 20  conclusion with respect to any of the plans with respect to

 21  that issue.

 22  Q     Okay.  So, let me hit it real quick then.  The same

 23  would be true for the last plan in January, Mr. Greenberg's

 24  email to himself.  You didn't opine on the reasonableness of

 25  EBITDA.  You're not opining on the reasonableness of the

1  EBITDA projection?

2  A    Yes.

3  Q    And the same thing for what we've been calling the

4  Newco plan, the February 24th plan?

5  A    Yes.

6  Q    Let me just ask the question for the record.  You are

7  not opining on the reasonableness of that 2016 EBTIDA

8  projection?

9  A    I'm sorry, you drifted off at the end.  Could you

10  repeat the question, please?

11  Q    You are not opining on the reasonableness of the 2016

12  EBITDA projection for the February 24th Newco plan?

13  A    Yes, I am not.

14  Q    Thank you.

15       All right.  So, go, if you would, to the third page of

16  the Carl Marks deck.  And I want you to take a look at the

17  fourth chevron.  It says, "Developed cyclical plan for

18  upgrading and replacing vehicles."  Do you see that?

19  A    Yes.

20  Q    At the time that you signed your expert report you

21  didn't know what that plan, right?

22  A    I don't take the -- the question does not comport with

23  the chevron because --

24  Q    Tell me why?

25  A    Well, the question suggests that such a plan existed at

1 the time, but this chevron is saying that one should be

2 developed.

3 Q    Okay.  I'll accept that.  So, the third-party buyer

4 came in and found this deck, and is doing diligence, they

5 would inquire about what the plan was, right, or whether it

6 can be developed.  Wouldn't you agree with that?

7 A    No.  I think you're -- the question suggests that this

8 is a very complicated issue.  The issue is you have the

9 ambulances.  There's testimony that they have about a five-

10 year life, four and a half or five-year life, and this is

11 just saying develop a plan to rotate used ones out and

12 replace new ones as I read it.

13 Q    Right, but wouldn't the buyer want to know how many?

14 A    Sure, but that information is in the plan.  You can see

15 how many ambulances there are by type.

16 Q    Wouldn't they want to know how much it would cost?

17 A    I don't know that they would look to TransCare or

18 Patriarch for that information. I think that the price of an

19 ambulance is not that hard to figure out.  I think that they

20 would just do it much like, you know, buying other assets for

21 a company.  If you're a trucking company and you need to buy

22 trucks or semis you buy semis.

23 Q    You think it's not that hard to figure out?  Did you

24 try before you signed your expert report?

25 A    I did not, but it was pretty -- it seemed like a pretty

1  casual conversation that when Ms. Tilton bought two

2  ambulances at the end of January that they would cost about

3  $100,000 dollars.  They did cost about $100,000 dollars.

4  They acquired them pretty quickly.  So, I think this idea

5  that it's some sort of a mystery is not well taken.

6  Q     Dr. Arnold, I want to be clear, I wasn't suggesting it

7  was a mystery. I'm asking a very simple question.  Do you

8  think a buyer doing diligence would want to have an

9  understanding about what Carl Marks is thinking in terms of

10 the potential plan for upgrading and replacing vehicles?

11 A     Maybe, maybe not.  If it was a strategic buyer who

12 already ran a bunch of ambulances they might just look --

13 they might just want to look at the top line revenue, get

14 some information about where they're operating and make their

15 own judgment about how many ambulances they would inject.

16 It's pretty easy to figure out how much revenue you get per

17 ambulance, how much revenue you get for a paratransit

18 vehicle.  They may have their own thought that they can make

19 twelve cents of EBITDA on the dollar and who cares what the

20 people at Patriarch and TransCare are doing because they're

21 going to do it their way.  That's pretty common in M&A

22 transactions that the buyer imposes their model on the

23 acquirer.  That is common.

24 Q     Did you see any -- yes, I appreciate what you just

25 said.  You're -- you accepted or you used, as an input, the

```
 1   EBITDA projection from this model, right?  Not from what some
 2   buyer -- not from a buyer model, right?
 3   A     True.
 4   Q     Now, if you could go, please, to -- actually, it's the
 5   next page.  Let me ask you first -- well, actually, let me
 6   ask you to look at, there's a chevron, this is sort of the
 7   last chevron on the page, it says,
 8         "Plan execution risk is high and, therefore, ultimate
 9   payback on the incremental investment is uncertain."
10         Do you see that?
11   A     Yes.
12   Q     And you read that before you signed your expert report,
13   right?
14   A     I did.
15   Q     And you did not do anything to investigate the
16   execution risk of this plan, right?
17   A     I did not.
18   Q     Okay.  You're an economist, right?
19   A     I am.
20   Q     And you have -- well, maybe you haven't, but have you
21   in your career, when you're looking at financial models,
22   considered whether there's a tolerable or intolerable level
23   of execution risk?  Let me put it differently, how likely it
24   is, how practical it is?
25   A     Those issues come up, yes.
```

1  Q     But you didn't do that here?

2  A     I did not do it here.  Carl Marks is, obviously, aware

3  of the challenges and employee problems with employees, and

4  customers, et cetera, and then produced their model and

5  projections. So, I think the modeling and projections were

6  based in view of and, you know, awareness of the concerns

7  that we're listing here.  It's not as though they produced

8  them without knowing about these challenges.

9  Q     Sure.  But it's true, isn't it, that if the execution

10 failed the EBITDA projection wouldn't be realized, right?

11 A     That is true.  And if you look at the S&P 500 as a

12 whole, enterprise value, the EBITDA is about twelve or

13 thirteen market-wide.  Here we're talking about EBITDA of

14 eight.  So, there are discounts built into the multipliers

15 that reflect all manner of considerations specific to

16 TransCare.

17 Q     Right, but -- withdrawn.

18       Go to Bates -- well, actually staying on this page, I'm

19 sorry.  Go to the second Chevron.

20 A     Yes.

21 Q     It says,

22       "To have a chance at a turnaround TransCare needs an

23 immediate incremental pledge of support from Patriarch

24 totaling 75 million plus, excluding term interest."

25       Then there is a parenthetical, do you see that?

**A1809**

1       Then it says,

2       "At least half over the next several weeks."

3       See that?

4    A    I do.

5    Q    And you saw that when you signed this report?

6    A    I did.

7    Q    Before you signed the report?

8    A    Yes.

9    Q    Let's go to the January 28th plan which is PX-179.  I

10   just have a few questions.

11       The January 28th plan -- are you there, Your Honor?

12   Its --

13           THE COURT:  179?

14           MR. MERVIS:  PX-179.

15   BY MR. MERVIS:

16   Q    The January 28th plan, this is this attachment to an

17   email that Michael Greenberg sent to himself?

18   A    Yes, that's right.

19   Q    Okay.  And your understanding is this is based off of

20   the January 27th Carl Marks plan that we just looked at,

21   right?

22   A    Yes.

23   Q    With a few adjustments?

24   A    Correct.

25   Q    There's nothing on the face of the document to indicate

**A1810**

1   that it was sent to Ms. Tilton, right?

2   A    No.

3   Q    Or to Wells Fargo?

4   A    I agree with that.

5   Q    And you don't know whether Ms. Tilton approved this

6   plan, do you?

7   A    I do not.

8   Q    And you don't know whether Wells Fargo approved this

9   plan?

10  A    I do not.

11  Q    In the discovery materials that you reviewed, Dr.

12  Arnold, you noticed, didn't you, that TransCare had had a

13  couple of turnaround plans in the not so distance past, the

14  beginning of January 2016?

15  A    You mean January 2015?

16  Q    Yeah.  What I'm saying is --

17       THE COURT:  You said 2016.

18       MR. MERVIS:  Yeah.  That was a poorly phrased

19  question.  Let me ask another question.

20  BY MR. MERVIS:

21  Q    You understood that prior to January 2016 TransCare had

22  had a couple of attempts at turnaround plans, right?

23  A    I know that there was a turnaround plan in 2015.  There

24  may have been two.  So, I don't want to get into an argument

25  about the count, but there was definitely a turnaround, at

1  least one turnaround plan in 2015 that I'm aware of.

2  Q    Okay.  And to your knowledge, whether it was one, two

3  or three they all failed, right, ultimately?

4  A    I agree they did ultimately fail.  One can see that

5  EBITDA went positive and was growing nicely in the middle of

6  2015.  Then it did reverse again.

7  Q    After July it plummeted, right?

8  A    After July it plummeted, yes.

9  Q    And a buyer coming into look at this company and do

10 diligence they would see that the company had tried a

11 turnaround plan, at least one, if not more, and failed,

12 right?

13 A    Yes.

14 Q    And that is something that, at least, some buyers

15 thinking about putting down eight figures would take into

16 consideration in terms of whether or not to pay the kind of

17 prices that you're report opines on?

18 A    I would certainly expect them to use it as a point of

19 negotiation and leverage or, at least, to attempt to.  Sure.

20 Q    To drive the price down or try to?

21 A    Yeah.  It would not be to pay more.  I agree.

22 Q    Fair enough.  We are in agreement.

23      If you could look at the February 24th plan which PX-

24 228.  Let's just confirm that this is, in fact, the February

25 24th plan that you roll-up the EBITDA forecast from which you

1  rely on in your calculation?

2  A     Yes.  This is the fourth plan.

3  Q     Okay.  And what this is comprised of is an email that

4  was sent to an insurance broker, right?

5  A     Yes.  I believe this email was directed to Lockton

6  Insurance Brokers.

7  Q     Okay.  And there is some projections attached and that

8  is where you got the numbers from, right?

9  A     Yes.

10  Q     Okay.

11  A     I would just say that what was attached to Lockton was

12  an abbreviated version.  I think there are other versions of

13  this February 24th plan that are in the record, but this is

14  what was sent to Lockton.

15  Q     Okay.  Well, the record is what it is.  But in any

16  event, you did not make an effort, did you, to understand why

17  this February 24th plan was developed in the first place,

18  right?

19  A     No.  I have an understanding, but I didn't do my own

20  investigation.  That's true.

21  Q     You did not investigate why the plan was developed,

22  correct?

23  A     Yes, that is true.

24  Q     And you didn't ask to see all the correspondence that

25  led up to this February 24th plan, did you?

1    A      I don't remember whether I asked for it or not.

2    Q      You don't remember one way or the other?

3    A      No.  I have certainly seen a lot of the exhibits and

4    correspondence over the last couple of days, but I don't

5    remember, as I sit here, whether that was part of what I

6    looked at eight months ago.

7    Q      Let's go back to your report which is PX-282 and I'd

8    like to go back to Paragraph 73.

9    A      Yes.

10            MR. MERVIS:  You there, Your Honor?

11            THE COURT:  Yes.

12   BY MR. MERVIS:

13   Q      We looked at the last sentence.  I'd like you to take a

14   moment and just read the sentences before that to yourself

15   and let me know when you're done.

16   A      Yes, I'm finished.

17   Q      Okay.  The first sentence there is Footnote 2.  You see

18   that?

19   A      Yes.

20   Q      That's an email from a Mr. Benalla to a Mr. Leland and

21   to Mr. Wolf.  Do you see that?

22   A      Yes.

23   Q      The sentences that follow there is no footnote there,

24   is there?

25   A      There are not.

1   Q    And the third sentence in particular, the one that

2 says,

3       "This reduced outlook reflects delays in the board's

4 actions concerning TransCare's urgent and overdue financial

5 obligations and capital requirements to survive as a going

6 concern."

7       Do you see that?

8   A    Yes.

9   Q    And the reduced outlook you're talking about is you're

10 saying, well, what I notice is the EBITDA keeps falling all

11 the time in these different plans, right?

12   A    The subsequent all three plans all have lower revenue

13 and lower EBITDA then the January 7th plan, yes.

14   Q    And you attribute that reduction to inaction on the

15 part of Ms. Tilton, right, in that sentence?

16   A    I do in this sentence, subject to Q&A that we had our

17 deposition.

18   Q    I'm right with you.  And, in fact, that sentence is too

19 strong, isn't it?

20   A    That sentence is too strong for me to say, yes.

21   Q    And one of the reasons for that is that you actually

22 can't say whether the difference in the numbers between the

23 January 7th plan, January 27th plan, January 28th plan, you

24 can't say whether that is simply attributable to a refinement

25 in numbers, right?

**A1815**

1  A     It could be a refinement in the numbers.  So, there's

2  more than one possible explanation.  Yes.

3  Q     More than one possible explanation other than the one

4  that you gave in your report blaming Ms. Tilton, right?

5  A     Yes.

6  Q     Care to retract that accusation?

7  A     I believe I already did.

8  Q     Not here.

9  A     Okay.  True.  I am retracting that sentence.

10 Q     Okay.  Thank you.

11       Now, when you were working on you report you saw a

12 reference in, at least, one of the materials to some issues

13 with the accuracy of TransCare's financial information.

14 Isn't that right?

15 A     Can you refresh my memory?  I'm not sure what you're

16 referring to.

17 Q     Sure.  Go to PX-175 which is, I believe, the Carl Marks

18 deck which you refer to as the January 27th plan.  And go to

19 the page that has Bates Number 2114.  Let me know when you're

20 there.

21 A     Yes, I'm there.

22 Q     Okay.  Very first chevron says, CMA.  That's Carl

23 Marks, yes?

24 A     Carl Marks Advisors, yes.

25 Q     "Carl Marks has worked diligently to develop the most

1    accurate financial picture of the company possible given the

2    limitations of the company's accounting systems and financial

3    reporting."

4         Do you see that?

5    A    Yes.

6    Q    And you saw that as you were preparing your report,

7    right?

8    A    Yes, I did.

9    Q    And you did not do anything to investigate the nature

10   of those limitations, right?

11   A    Well, I've seen testimony to -- at the time I was aware

12   -- I believe I knew at the time that testimony to the effect

13   that financials, audited financials were not current and

14   things like that.

15   Q    Let me ask the question more precisely.  You did not do

16   anything to investigate the statement that I just read to

17   you, the Carl Marks deck?

18   A    That is true, yes.

19   Q    And if a potential buyer had gotten a hold of this deck

20   during the diligence process and read that Chevron you would

21   expect that they would ask about what these limitations are,

22   right?

23   A    Yes.  I would expect that someone would want to know

24   that.

25   Q    Because if you're a buyer, and you're doing diligence,

1   and you're trying to figure out whether the investment is

2   worth it you need to know that you have reliable numbers,

3   right?

4   A     You certainly want reliable numbers.  I totally agree.

5   Q     As far as this company as of January and February 2016

6   did not have audited financial statements beyond 2014, right?

7   A     Yes.

8   Q     Okay.  Let me ask a little bit about -- I want to go

9   back to this concept of the open market.  When you think

10  about an eight-figure transaction -- and you certainly have

11  studied, or touched or been involved in the market, the

12  process for marketing a business for sale.  That's part of

13  your experience, right?

14  A     Yes.

15  Q     Okay.  And when you think about a company that is being

16  marketed for an eight-figure price do sellers sometimes

17  retain investment bankers to help them sell the company?

18  A     Yes.

19  Q     And do those investment bankers sometimes create CIMS

20  or confidential information memoranda that go out to the

21  target audience of buyers?

22  A     Yes.

23  Q     It's fairly typical, right?

24  A     I've seen many of them, yes.

25  Q     Okay.  And do the selling companies typically set up a

1   data room for prospective buyers after they sign a non-

2   disclosure agreement to do diligence?

3   A      That does happen as well, yes.

4   Q      That costs money, right?

5   A      It would -- the investment bankers typically don't cost

6   money up front, but there are expenses that are incurred such

7   as gathering the data and creating a data room.

8   Q      Right.  And let's focus on -- oh, just in your

9   experience, generally speaking, this kind of marketing

10  process we talked about what is the range, in your

11  experience, it could take in terms of months?

12  A      Sometimes it's a long process, but, of course, there

13  are other examples where you call up Goldman or one of the

14  big banks and they can move it fast.  So, I don't know what

15  the number of weeks or months would be in this context.

16  Q      Well, let's see if we can agree on another thing.  Not

17  very likely that Goldman would be involved in trying to

18  market TransCare, right?

19  A      I'm just using that as an example of an investment

20  bank.

21  Q      I'm not -- this is not a Goldman type deal, right?

22  A      You know, if you give them a big enough percentage at

23  the backend you can get them interested in just about

24  anything, but, look, they do billion dollar deals.  I'm sure

25  they do some mid-market and middle-market ones also.  That is

**A1819**

1  not the point.  The point is that, yes, you retain an

2  investment banker and they would assemble the information.

3  That is a way to do it.

4      Another way to do it is to answer calls of people who

5  are making offers or expressing interest over the telephone,

6  or getting back to them.  They are doing, what we call, a

7  telephone market which is just a CEO calling up and asking

8  around for interest from competitors.  So, there are multiple

9  ways of doing it.

10 Q    Right.  But even the telephone call method there's

11 still going to be a diligence period, right?

12 A    I would think so, yes.

13 Q    Now in order for a company to be sold through that

14 process as a going concern they have to keep operating as a

15 going concern until the sale closes, right?

16 A    Yes.

17 Q    Okay.  Now, let's think about where things were in

18 January and February for valuation for TransCare.  As of

19 January 31st, you understood that the Wells Fargo ABL had

20 expired, right?

21 A    Yes.

22 Q    And, in fact, not only would it expire, but the company

23 would be required to repay the outstanding balance of the

24 loan, right?

25 A    I'm not familiar with that level of detail. I am not

1  aware that that's true.

2  Q     Fair enough.

3       And if Wells Fargo, after January 31st, suddenly

4  stopped funding this company based on what you have seen in

5  terms of its financial information in or around this time the

6  company could not continue to operate as a going concern,

7  could it?

8  A     It would have to modify its method of doing business in

9  order to continue as a going concern.

10 Q     Right.  But if it stayed as it was without a

11 restructuring or a reorganization it would have to stop

12 operating, right?

13 A     Or going to the next bank down the street.  There are

14 possibilities.  I don't know what would have happened or

15 could have happened, but that's the job that managers have

16 which is to adjust as situations change.

17 Q     And you think the next bank -- how likely is it that

18 you think the next bank down the street would extend maybe a

19 line of credit to a company that didn't have audited

20 financial statements since 2014?

21 A     I don't know.  There are lots of companies that don't

22 have audited financial statements that have banking

23 relationships.  But I didn't do that analysis.  I don't know.

24 What I am estimating is what is the value implied by these

25 forecasts as of those four dates.  I'm not saying that

1  TransCare could wake up on January 7th at eight a.m. and say

2  let's sell it today and get that amount of money.

3      If they had started this process in December of

4  November and they were then six or eight weeks into in

5  January these are the numbers as of January in terms of

6  forecast EBITDA and that is a number. And what I'm producing

7  is a range of numbers that I think are reasonable for

8  TransCare to possibly have obtained if the transaction went

9  off on that day. It doesn't mean that they started the

10 process on that day. I'm saying that if they ended the

11 process on that day that would be a reasonable range of

12 values.

13 Q    Let's just see if we can agree on one thing. If the

14 company has no money, they can't complete the sale process as

15 a going concern, right?

16 A    Yes, pretty much agree.

17 Q    Okay. Let's change subjects.

18      MR. MERVIS: Your Honor, I don't know if you want

19 to take a mid-morning break or not. I can keep going.

20      THE COURT: How much longer do you have on your

21 cross?

22      MR. MERVIS: I got a bit. I'm a bad estimator,

23 but I would say about an hour.

24      THE COURT: Well, everybody can go another half an

25 hour then we'll just take a break.

```
 1              MR. MERVIS:  Okay.  That's fine.

 2   BY MR. MERVIS:

 3   Q    All right.  Let's go back to your expert report which

 4   is PX-282 in the binder.  I'd like you to turn to Paragraph

 5   63 which is on Page 27.

 6              MR. MERVIS:  Your Honor, you there?

 7              THE COURT:  Yes.

 8   BY MR. MERVIS:

 9   Q    Dr. Arnold, I'd like you to -- it's a long paragraph.

10   Why don't you read it to yourself and then I'll have a couple

11   questions when you're done.

12   A    Yes.

13   Q    All set?  Okay.  So, in this paragraph, at the

14   beginning, you're talking about reasons to look at forward

15   looking projections, right?

16   A    Yes.

17   Q    Then you say,

18        "This is especially true in the case of TransCare

19   because of its volatile recent historical performance,

20   insufficient capital and certain adverse events."

21        Do you see that?

22   A    Yes, that's right.

23   Q    And, again, a prospective buyer doing diligence would

24   have discovered all of those things, right?

25   A    Yes.  I would imagine they would have.
```

1   Q     And you chose not to use any of the actual historical

2   performance information in your work in this case, right?

3   A     Yes, that's right.

4   Q     You only relied on these forward projections?

5   A     Correct.

6   Q     Go to Exhibit 6 of your expert report.  We're on the

7   report, let's just go to Exhibit 6. We'll just wait for His

8   Honor.

9              THE COURT:  Exhibit 6?

10             MR. MERVIS:  Yes.  Exhibit 6 to the report.

11             THE COURT:  I have it.

12  BY MR. MERVIS:

13  Q     Well, let me ask you what these bars are showing, Dr.

14  Arnold, is historical EBITDA for TransCare?

15  A     Yes, that's right.  Exhibit 6, yes.

16  Q     Yes.  And for 2014 -- is this last twelve months

17  EBITDA?

18  A     Well, for -- it depends which bar you're looking at.

19  Q     I'm asking 2014.

20  A     The 2014 bar is for 2014.  The next bar is the last

21  twelve months as of October 2014.  So, it includes a little

22  bit of the prior years, 2014.

23  Q     So, in any event, 2014 is a half a million positive

24  EBITDA?

25  A     Yes.

1  Q      And as you noted, that got a little better, at least,

2  for the first ten months of 2015, right?  It got up to 1.4?

3  A      Yes, that's right.

4  Q      Then what happened?

5  A      Well, you can see on the next exhibit, Exhibit 7, that

6  -- wait, I'm sorry, Exhibit 7 is showing --

7  Q      Let me see if I can help you.  Why don't you go back to

8  the January 7th plan which is PX-158?

9  A      Yes.

10 Q      Just give me a second to catch-up.  If you could --

11 again, Your Honor, we need to -- this is one of these needed

12 files.  If we could pull-up in the Excel, what's called,

13 summary table.  And, Your Honor, this is five pages from the

14 end of the exhibit.

15         THE COURT:  Five pages from what?

16         MR. MERVIS:  From the end of the exhibit. Its

17 entitled summary table at the top.

18         THE COURT:  Is it after the income statements or

19 before?

20         MR. MERVIS:  Its -- I think it's right before.

21 But, in any event, it is on Your Honor's screen.

22         THE COURT:  That assumes I can see it.

23         MR. MERVIS:  It does assume you can see it, but I

24 see you're getting some appropriate assistance.

25         THE COURT:  I don't know if it's helping.

1    BY MR. MERVIS:

2    Q    In any event, Dr. Arnold, you know what this table is,

3    right?

4    A    Yes, I do.

5    Q    And if you look at the left-hand column it says

6    expressed in thousands when you go -- you see there's, sort

7    of, a break in it where it EBITDA margin?

8    A    Yes.

9    Q    Right above that is EBITDA after management fees?

10    A    Yes.

11    Q    So, October of 2016 negative 247, right?

12    A    Yes.

13    Q    November negative 472?

14    A    Yes.

15    Q    December negative 552?

16    A    Yes.

17    Q    Was there a reason why you -- just going back to your

18    Exhibit 6 to your report, was there a reason why only include

19    the first ten months and not the final quarter?

20    A    I'm sorry, Exhibit 6?

21    Q    Yeah.  Exhibit 6 to your report.  That bar graph where

22    you show the positive EBITDA.  Was there a reason why you

23    didn't include the last quarter?

24    A    Yeah.  The point of Exhibit 6 is to show the capacity

25    to produce EBITDA.  We all recognize -- I freely admit,

1   acknowledge, agree that TransCare was experiencing

2   significant financial problems.  You get to the last quarter

3   of 2015 financial performance is poor, very poor, but

4   historically you can see that in many years they have been

5   able to produce EBITDA in the $7 to $9 million dollar range,

6   which as a percent of revenue which you can, sort of, do in

7   one's head by comparing it to the numbers on Exhibit 5.

8        We're talking about EBITDA margins of five or six

9   percent as a percentage of revenue which is, sort of, you

10  know, what historically they have been able to perform when

11  they were running well. It turns out that is a lot less good

12  then competitors who are doing EBITDA margins as roughly

13  twice as much.  This is to give context to the EBITDA

14  generating capability of TransCare.

15  Q    Okay.  Let me ask a more specific question.  The bar

16  graph that you have on this Exhibit 6, you know this was

17  going to be shown to the Judge, right?

18  A    Its --

19  Q    Assuming the case didn't settle?

20  A    Well, as has been noted it's rare for my report to get

21  that far.  It was really a disclosure to you, but happy to

22  have the court look at it.

23  Q    Okay.  But in any event, you have this bar graph that

24  shows $1.4 million dollars in positive EBITDA, but it's LTM

25  October 2015, right?

1    A       Right.

2    Q       But you had it in the very plan that you say -- the

3    very first plan that you looked at, the January 7th plan you

4    had the last quarter results in there.  They were all

5    negative and trending more negative each month, right?

6    A     I think they were trending more negative each month,

7    yes.

8    Q       You had that information?

9    A       I did.

10   Q       You chose not to put it in the bar?

11   A       That is true.

12   Q       Okay.  By the way, do you know the EBITDA results or

13   the EBITDA that's reported in your Exhibit 6 that goes back

14   to 2009, do you know whether that's adjusted or un-adjusted

15   EBITDA?

16           THE COURT:  What do you mean by that?

17           MR. MERVIS:  Well, I will have to ask him if he

18   knows, but I can tell Your Honor, but I think it would

19   probably be better --

20           THE COURT:  Why don't you ask what that means?

21           MR. MERVIS:  All right.

22   BY MR. MERVIS:

23   Q       Dr. Arnold, do you know what the difference is between

24   adjusted and un-adjusted EBITDA?

25   A       I don't know what you're referring to unless you're

1   thinking about management fees.

2   Q    I'm not thinking about management fees.

3        THE COURT:  See, no one knows.

4        MR. MERVIS:  I know someone who knows.

5   BY MR. MERVIS:

6   Q    You're a CPA, right?

7   A    I am.

8   Q    Just to be clear, the four particular dates that you

9   analyzed, your four evaluation dates, those were selected for

10  you by counsel, right?

11  A    Counsel did identify them to me, yes.  I also evaluated

12  what else was available in the record, but I performed my

13  analysis on those four dates that were indicated to me by

14  counsel.

15  Q    Let's talk about DCF for a moment, discounted cash-

16  flow.  So that is a method that you didn't use here, correct?

17  A    Right.

18  Q    And you -- the reason you didn't do that is because

19  there was holes in the financial information that you were

20  provided that made it either difficult or impossible to do

21  that kind of analysis, right?

22  A    That's right.

23  Q    Okay.  And you didn't attempt to fill those holes

24  yourself, right?  You didn't attempt to generate a model to

25  do DCF?

1  A     That's right.  I did not create a DCF model.

2  Q     And one of the reasons for that, one of the reasons

3  that you didn't try is because in all four of the plans that

4  you used to extract forward looking EBITDA what was being

5  modeled was a decidedly different company from what TransCare

6  had been, right?

7  A     Well, it wasn't -- TransCare going forward, as

8  anticipated, was a decidedly different company. It had new

9  ambulances; many different things were being adjusted.  That

10 by itself doesn't prevent one from using and implementing a

11 DCF in the abstract. It just prevents it from being done in

12 this case because nobody was modeling the cash-flows for this

13 newly anticipated envisioned version of TransCare.

14 Q     Right. I think we're on the same page, but let me just

15 close the loop. You didn't try to fill-in the blanks and do a

16 DCF model.  One of the reasons why you didn't -- I'm not

17 being critical. I'm just asking you a fact.  One of the

18 reasons why you didn't do it is because the models you were

19 looking at were all for a decidedly different TransCare from

20 what it had been.

21        THE COURT:  What information was missing that

22 prevented you from doing a DCF?

23        THE WITNESS:  Yeah.  I mean many pieces of

24 information.  It's not as though there were a few blanks that

25 needed to get filled in, which is why I was struggling a

1    little bit with the questioning.  There were not multi-year

2    revenue forecasts.  There was only a revenue forecast going

3    out one year.  There were not capital expenditure budgets

4    going out five plus years into the future.  There were no

5    values or contemplation of what the net operating loss carry-

6    forwards would be worth in terms of tax shields.  So, there

7    many different components that one would want to put into a

8    DCF calculation if one were to implement one.

9           THE COURT:  Thank you.

10   BY MR. MERVIS:

11   Q    I'll just get back to the question I asked.  You didn't

12   consider trying to, whether they were big holes or small

13   holes, you didn't consider trying to fill them yourself,

14   right?

15   A    I evaluated whether it was a feasible thing to do in

16   this situation and concluded that it was not.

17   Q    And one of the reasons that you termed it was not

18   feasible is because the models you were looking at, those

19   four plans, were modeling a decidedly different company then

20   what TransCare had been, correct?

21   A    That was a factor because it meant that one could not

22   take historical data and then use some sort of reasonable

23   extrapolation methods to estimate what various components of

24   cash-flow were into the future because it was going to be a

25   restructured enterprise going forward.  That meant that all

1  sorts of new information was going to have to be modeled out

2  and there was no ability to do that here.

3  Q    All right.  And, in fact, the plans, the four plans

4  assumed that there would be significant changes in the

5  TransCare business, right?

6  A    Yes.  Look, that was always going to be the case if

7  TransCare was going to survive because it was losing money

8  and the company can't lose money forever and survive.  It was

9  generating $100 million plus per year in revenue.  That is

10  potentially attractive to somebody who can restructure and

11  turn it into an engine that produces profits in accordance

12  with other companies of that size in the industry.

13  Q    Dr. Arnold, are you opining that the only way that

14  TransCare could have survived is through purchasing dozens or

15  hundreds of new ambulances and the other things that are set-

16  out in this plan?  Are you offering that opinion in support?

17  A    No.  First of all, I'm not saying hundreds.  The model

18  is for forty, not all of which are ambulances.  Are there

19  other paths that could have been followed, in theory, sure,

20  but these are the four models that capture what Patriarch was

21  envisioning on those particular dates or Carl Marks.

22  Q    Were you here when Mr. Pelissier testified?

23  A    Yes.

24  Q    Did you hear him talk about how, from his standpoint,

25  the biggest problems were where the garage was located and

1    the fact there was not a preventive maintenance program?

2    A    I don't know that he said that was the biggest problem,

3    but I heard him identify those as things that could be

4    sources of improvement.

5    Q    And you're not here to say that if TransCare had made

6    those changes it couldn't have survived, right?  You're not

7    here giving that opinion as an expert, are you?

8    A    I am not.

9    Q    Now, let's talk about multiples unless Your Honor wants

10   to --

11              THE COURT:  You want to take a break now and we'll

12   just reconvene?

13              MR. MERVIS:  I think it makes sense.

14              THE COURT:  All right.  Quarter to two.

15              MR. MERVIS:  Oh, Your Honor, I guess, just the

16   same admonition about witness on cross.

17              THE COURT:  Yeah.  Don't discuss your testimony

18   with anyone during the lunchbreak.

19              MR. MERVIS:  Thank you.

20        (Recess taken at 12:16 p.m.)

21

22

23

24

25

**A1833**

```
 1                         Afternoon Session
 2          (Proceedings resume at 1:47 p.m.)
 3                THE CLERK:  All rise.  Please be seated.
 4                THE COURT:  Continue, Mr. Mervis.
 5                MR. MERVIS:  Thank you, Your Honor.
 6                    CONTINUED CROSS-EXAMINATION
 7   BY MR. MERVIS:
 8   Q     Dr. Arnold, let's spend a few minutes talking about
 9   EBIDTA multiples.  Can you go to JX-55 which is in the
10   binder.  And just so we can orient ourselves, Dr. Arnold, I
11   think it's like the second tab.
12   A     Yes, I have that.
13   Q     Okay.  Just confirm for me that this is the document
14   from Mr. Greenberg from which you derived comparable
15   companies and comparable transactions that you used to pick
16   your multiples.
17   A     Yes.
18   Q     Okay.  Let's go to the very last page of the exhibit.
19   So the two companies that you picked are toward the far right
20   of this chart.  Is that right?  Envision and Air Methods?
21   A     For the market comps, yes, Envision and Air Methods.
22   Q     Okay.  And there was -- well, among the data that's
23   shown in this chart from Mr. Greenberg is last twelve months
24   revenue for certain of these companies.  Right?
25   A     Yes.
```

1    Q    And if you look at Envision, you'll see I guess the

2    second or third piece of information, it says December 15.

3    Do you see that, as you go down that column?

4    A    Yes.

5    Q    What is the significance of that date?

6    A    I believe that means he's measuring the market value as

7    of -- well, I don't know.

8    Q    Okay. Well, let me see if you can answer this question

9    then. A couple, let's see, 1, 2, 3 lines down you'll see

10    that there's a, you'll see there's a revenue number.

11    A    Yes.

12    Q    Right. And that's 5.12 billion.

13    A    Yes.

14        THE COURT: Billion?

15        MR. MERVIS: Billion.

16    BY MR. MERVIS:

17    Q    And that's an LTM number. Is that right?

18    A    Yes.

19    Q    And LTM means revenue that has occurred over the past

20    12 months?

21    A    Yes.

22    Q    And do you know which 12 months comprises that 5.1

23    billion and change number?

24    A    I don't recall checking it. It would frequently be the

25    last four reported quarters. People call it LTM but it may

1  not literally be LTM.  But if there's monthly data it could

2  actually be the last 12 months of data.

3  Q     Okay.  But in any event, you can't tell me in terms of

4  a calendar which 12 months those are.

5  A     No, not as a I sit here.

6  Q     Okay.  If I could look at your expert -- and just keep

7  your finger there so to speak because we're going to move

8  back to it.  But if you can look at your expert report real

9  quick which is toward the back of the binder PX-282.  And I'd

10 like you to turn to Exhibit 5 to your expert report.  And

11 what you show there, Dr. Arnold, are annual revenue figures

12 for TransCare at various time periods.  Is that right?

13 A     Yes.

14 Q     And for October it's just the first three quarters --

15 no, three quarters and a month.  Is that right?  Through

16 October.

17 A     The $118.9 million number?

18 Q     Yes, sir.

19 A     That's the last 12 months through October 2015.

20 Q     Ah.  Okay.  All right.  So, in any event, you have at

21 the, if you look at that 2015 column, right above there you

22 see it says average 136, sorry, 135.6 million?

23 A     Yes.

24 Q     And that -- so why don't you tell the Court what that

25 is an average of.

1  A    That's the average of the bars that are shown in that

2  chart.

3  Q    Of the what?

4  A    Of the bars from 2009 through the last 12 months of

5  2015.

6  Q    So it's the average annual revenue, right, over that

7  time period excepting 2015 where you just have ten months.

8  A    It is the last 12 months, so it has a little bit of

9  2014 in it and mostly 2015.  But yes, it's the average of

10  those numbers.

11  Q    Okay.  So if we were to, if we take the Envision

12  Healthcare number, we don't know what time period it covers,

13  but in any event, that was a $5.1 billion revenue company,

14  and TransCare on average during the time period on Exhibit 5

15  is a $135 million revenue company.  Is that fair?

16  A    Yes.

17  Q    Okay.  And if you go back to, go back to JX-55 and back

18  to that last page again, in looking at the, looking at the

19  revenue number for Air Methods, do you see that, it's a

20  little over a billion?

21  A    Yes.

22  Q    And again, you can't tell me what 12 months that

23  revenue was earned then?

24  A    No, not as I sit here.  It says last 12 months which

25  would mean the 12 months probably through November since it's

1   a December pull on the data and December isn't yet over.  But

2   it could be the last reported quarters.

3   Q    Well, let me make sure I understand.  Again, looking up

4   the column, there's that December/15 entry.  D o you see that?

5   A    Yes.

6   Q    Do you know -- but you didn't know what that

7   represented for Envision.  Do you know what it represents for

8   Air Methods?

9   A    No, but I know the date of the, I know the date of the

10  email which is December 18th, so the last 12 months can't

11  possibly include December of 2015 because December of 2015

12  hasn't yet been completed.

13  Q    Okay.  I agree with you, that makes a lot of sense.   A

14  little while ago we were looking at the Carl Marks plan, the

15  January 27th plan.  And actually, why don't we just flip

16  through it?  I think it's PX-175.  And let's go to the, back

17  to the dec and if you could go to the, again to the 2nd page

18  of the dec, the Bates number is 2111.  And, again, at the top

19  you see that there's this statement by Carl Marx TransCare is

20  now operating at an absolute breaking point.  Based on your

21  working on this case, Dr. Arnold, when the transaction that

22  Mr. Greenberg reported or the, the measurement that -- let me

23  ask differently.  In 2015, was Envision operating at the

24  breaking point or at the absolute breaking point?

25  A    I have no reason to believe that it was.

```
 1   Q      Stable company, right?

 2   A      Certainly compared to TransCare, yes.

 3   Q      Generated billions of dollars in revenue.  Right?

 4   A      Yes.

 5   Q      Same question for Air Method.  Is that a highly

 6   distressed company?

 7   A      It was not.

 8   Q      And in your work in this case did you see any

 9   indication that during the timeframe that Mr. Greenberg was

10   reporting on in his email that Envision was about to launch

11   in a significant change in the structure of its business?

12   A      No.

13   Q      Wasn't, you're not aware of any plan, for example, to

14   make significant changes or transform the [indiscernible]

15   business.

16   A      No, I'm not.

17   Q      I have the same question for Air Methods.  During that

18   same period, do you know of anything to indicate that Air

19   Methods was involved in or about to embark on a substantial

20   transformation the way it did business?

21   A      No.

22   Q      In during your work in this case, did you make any

23   evaluation of the relative risk profiles of TransCare on the

24   one hand and Air Methods and Environ on the other hand?

25   A      You mean calculating a beta or something like that?  I
```

1    did not do something along those lines in this case.  No.

2    Q     Okay.  And actually if you could turn to -- do you have

3    Mr. Amini's binder?  He has your, he has your slides.

4    A     Yes, I do.

5    Q     Okay.  If you could go to page 16 or slide 16.  Let me

6    know when you're there.

7    A     I'm there.

8    Q     Okay.  There is a, there is a literature reference at

9    the bottom of the slide.  Do you see that?

10   A     Yes, I do.

11   Q     That reference wasn't in your original expert report,

12   was it?

13   A     It was not.

14   Q     Why didn't you include that reference in your slides?

15   A     I think the question has come up as to whether

16   backwards looking EBIDTA or forward looking EBIDTA or which

17   of those is appropriate or whether forward EBITDA is

18   appropriate and this is a one quote.  There are many text

19   books that address this issue, that explains the economic

20   logic behind using forward looking multiples.

21   Q     The publication that you reference, was that

22   publication familiar to you between the -- well, you're

23   familiar with it?

24   A     Yeah, it's been one of the most, it's one of the most

25   popular textbooks and has been for over ten years in this

1   area.

2   Q    Okay.  Well, Mr. Samet was good enough to actually send

3   over the books.

4          MR. MERVIS:  So, if I may approach, Your Honor.

5          THE COURT:  I hope you read it last night.

6          MR. MERVIS:  I can't say that I read every word.

7   But there are people in the room who may have.

8          THE COURT:  Okay.  Sounds like a great evening.

9          MR. MERVIS:  It was a pretty good time at 11 Times

10  Square last night, Your Honor.

11  BY MR. MERVIS:

12  Q    All right.  So could you turn, Dr. Arnold, to --

13          MR. MERVIS:  Oh, Your Honor, just for you, we've

14  only marked this for identification, but it's DX-190 in the

15  binder.

16  BY MR. MERVIS:

17  Q    Could you turn to page 331?

18  A    Yes.

19  Q    Okay.  And this, actually this is the beginning of the

20  chapter.  Why don't I ask you to turn to 334, actually?

21  A    Okay.

22  Q    And if you look at the bottom of the page, it says "use

23  forward looking earnings estimates."  Is that title there?

24  A    Yes.

25  Q    And this is, this is where you got that language that

1 appears on slide 16 of your slides.

2 A    Yes.

3 Q    Okay.  So I want to look at some other passages in this

4 same chapter.  If you could go to the first page which is

5 331.

6 A    Yes.

7 Q    So at the very top, the first paragraph it begins,

8 "while discounted cash flow, DCF is the most accurate and

9 flexible method for valuing companies, using a relative

10 valuation approach such as juxtaposing earnings, multiples,

11 of comparative companies can provide insights and help you

12 summarize and test evaluation."  Do you see that?

13 A    I do.

14 Q    And as a general matter, do you agree with what this

15 treatise says that I just read to you?

16 A    Conditionally.  I agree with that proposition assuming

17 that the inputs into the DCF are accurate.  And if they're

18 not, then it's just sort of numbers in numbers out exercise.

19 But the, but I agree with the sentiment that this is the most

20 accurate and flexible method for valuing any given company

21 because the cash flows that one is putting into the model are

22 specific for that company and it's not being analogized to

23 some other or some other set of companies.

24 Q    And sometimes the appraiser just doesn't have the

25 information to run a DCF, right?  It just doesn't exist.

1    A     Correct.

2    Q     Okay.  And in such a case, you would agree that if done

3    properly, using a comparable company or comparable

4    transaction method may get you some good valuation

5    information.  Right?

6    A     Yes.

7    Q     Okay.  If you could go please to page 345.  And, Dr.

8    Arnold, I would like to draw your attention to sort of the

9    bolded heading towards the bottom of the page, use the right

10   peer group.  Do you see that?

11   A     Yes.

12   Q     Can you read to yourself the first two sentences of

13   that paragraph?

14   A     Yes, I have done so.

15   Q     And so what the treatise is saying here is it's saying

16   -- well, first of all, what is a peer group?  Let's just make

17   sure we're using the same terminology.

18   A     A peer group means a, in this context, means a group of

19   companies that has a one or more common, one or more common

20   with the company that one is seeking to value.

21   Q     Okay.  So for example, if you're doing a comparable

22   company transaction, your peer group if you've selected it

23   properly, the idea is I can extrapolate EBIDTA multiple from

24   that group, and if it's done right, apply that multiple to

25   the subject?

1    A     Yes, that's correct.

2    Q     Okay.  You'll see in the next sentence, the treatise

3    says common practice is to select a group of 8 to 15 peers

4    and take the average of the multiple peers.  Do you see that?

5    A     I do.

6    Q     Okay.  Now, putting aside whether you agree that it's a

7    common practice or not, that is a practice that some

8    appraisers engage in.  Right?

9    A     Assuming it's possible to get that many, but yes sure.

10   Q     And if it's, and all things being equal, 8 to 15 is a

11   pretty good number, right?  In other words, in terms of

12   methodological sound, is if you can get a group rate for 15,

13   that's a good set, right?

14   A     In general I would agree with that.  There is almost

15   always a tradeoff between how close a proposed member of the

16   peer group is to the company that one is valuing and the

17   number of companies that one can put into the peer group.  So

18   the wider one casts the net, the more peers one can get, but

19   then marginal companies are farther away from the company

20   that you care about.  So that's one of the judgments that

21   occurs in this process.

22   Q     Okay.  Now in your work in this case, at the time that

23   you signed your report, your peer group was two, right?

24   A     I was using Mr. Greenberg's peer group.

25   Q     Right.

1    A    Which was two.

2    Q    Which was two.  And you didn't, for example, undertake

3    your own independent research before you signed the report to

4    determine whether there were other peers that might be

5    appropriate to put in the group.

6    A    That is true; I did not.

7    Q    Now, if you could go to the next page which is -- oh

8    sorry, page 346, please.

9    A    Okay.

10   Q    And sort of going halfway down the page, there's some

11   calculations that I'm absolutely not going to ask you about.

12   And then right below that, the first full paragraph says a

13   "common flaw".  Do you see that?

14   A    I do.

15   Q    And it says, "a common flaw is to prepare a particular

16   company's multiple with an average multiple of other

17   companies in the same industry regardless of differences in

18   their performance."  Do you see that?

19   A    I do.

20   Q    And that, in your experience, in fact is a common flaw.

21   Isn't it, Dr. Arnold?

22   A    It depends on the facts and circumstances, but it can

23   be, yes.

24   Q    Okay.  Go to the next page, page 347.

25   A    And I would just note that the next sentence refers to

```
 1   the point I was making earlier which is it's better to use a
 2   smaller sub-sample with peers with similar performance.  So
 3   that's one of the balancing elements of such a process.
 4   Q    No, I understand that.  But you're not disputing the,
 5   that what I just read to you is in fact the common flaw.
 6   A    It can be.  It's not a flaw in some circumstances, but
 7   it can be a flaw, yes.
 8   Q    Okay.  Now, go to page 347, please.
 9   A    Yes.
10   Q    So right below the chart there's a paragraph that
11   begins, "once you have collected a list of peers and measured
12   their multiples properly, the digging begins."  Do you see
13   that?
14   A    Yes.
15   Q    And then it says, "this treatise that you cited says
16   you must answer a series of questions."  Right?  Is that what
17   it says?
18   A    Yes.
19   Q    It says, "why are the multiples different across the
20   peer group?"  That's one of the questions.  Do certain
21   companies in the group have superior products that are
22   accessed to customers, recurring revenues or economies of
23   scale.  That's another question.  Right?
24   A    Yes.
25   Q    And then it, and again at the time that you signed your
```

1 report.  You did nothing to investigate either of those

2 questions, did you?

3 A     I did not.

4 Q     And then the final sentence says, "if these strategic

5 advantages translate to superior ROIC and growth rates,

6 better positioned companies should trade at higher

7 multiples."  Do you see that?

8 A     Yes.

9 Q     What is an ROIC growth rate, please?

10 A     He doesn't say ROIC growth rate, he says ROIC --

11 Q     I'm sorry, ROIC.  You're 100 percent right.

12 A     Return on invested capital.

13 Q     And generally speaking, do you agree with that

14 sentence? In other words, better positioned companies should

15 as a general matter traded higher, at higher multiples?

16 A     That is sometimes true, but it's not a universal fact,

17 so I wouldn't characterize it in the very general overarching

18 unqualified sense in this sentence.

19 Q     And the concept that you cited this treatise for, that

20 forward looking projections are good, right, and arguably

21 better than backward looking projections, that's not always

22 true either, is it?  I'm sorry, backward, sorry, the point

23 that you make on your slide 16 that you cite this treatise

24 for, right, that forward looking projections are better

25 indicators for a value than historical performance.  That's

1    not always true.  Right?

2    A    Well, in this, in financing the valuation business,

3    there are very few things almost nothing that is "always

4    true."  But I would say that the, if you have a forward

5    looking projection, if historically you made $80 a year and

6    you have a forward projection of 100, it could be that you're

7    wrong and you end up being at 80, in which case the history

8    actually matches up.  But it's not matching up because the

9    history was 80, it's matching up presumably because something

10   happened during the course of the following year.  But on

11   average overall one would prefer to know, or have an estimate

12   of what was going to happen in the future and make an

13   investment based on that expectation rather than history,

14   especially if there are going to be major changes in the way

15   a company is operated.

16   Q    And that's assuming that the projections were built in

17   a reliable manner.

18   A    Right.  Of course.  Of course.

19   Q    Turn to page 351, please.  I want to draw your

20   attention to the summary of this chapter that you cited.

21   First sentence says, "of the available valuation tools,

22   discounted cash flow continues to deliver the best results."

23   Do you see that?

24   A    I do.

25   Q    And you would agree with that as a general matter.

1  Right?

2  A    Well, it's subject to the caveat that I gave earlier

3  which is DCFs are the most precise and targeted methods of

4  valuation conditional on the inputs being accurate because as

5  soon as people are massaging the cash flow projections and

6  the like, it's possible to get very incorrect results.  Even

7  though you may have a high degree of confidence in them, you

8  could be very wrong, and I've seen that happen.  I've seen

9  litigations over that.  So done right, I would say DCF is the

10 best method because it's targeted to the company that one is

11 remaining.

12 Q    Right.  And going down the paragraph, second to the

13 last sentence says, just be sure -- well, actually let me,

14 let me ask you just to read, actually let me ask you to read

15 the rest of the paragraph to yourself and I'll have a couple

16 of questions.  So starting with "however" down to the bottom

17 of the page.

18 A    I've read it.

19 Q    Okay.  In the second to last sentence, it says, "just

20 be sure that you are analyzing, sorry, that you analyzed the

21 underlying reasons that multiples differ from company to

22 company and never view multiples as a shortcut to valuation."

23 Do you see that?

24 A    Yes.

25 Q    And then, and then the final sentence says, "instead,

1  approach your multiples analysis with as much care as you

2  bring to your DCF analysis."  Do you see that?

3  A      I do.

4  Q      And that's sound practice, isn't it, in your

5  profession?

6  A      I would, I would say it depends on the facts and

7  circumstances of the particular project that one is involved

8  in.  But it's always good to use care.  I'm not going to

9  dispute that.

10 Q      I'm sorry.  Are you saying that there's some fact and

11 circumstances where you would approach a comparable company

12 analysis with less care than you approach a discounted

13 cashflow analysis?

14 A      Well, it depends on the question that I'm being asked

15 to address.  For example, in this matter I was asked to

16 address what is a reasonable range for value of TransCare

17 given what the people within Patriarch were doing in January

18 and February.  That does not require me to do a deep dive

19 into the comparables or the precedent transactions because

20 I'm not giving, I'm not putting my own value on TransCare.  I

21 instead am trying to get insight into the, to answer the

22 question of what is reasonable for TransCare and Patriarch to

23 expect to get in a range based on their analyses both of

24 TransCare itself on a going forward basis and the companies

25 that they believe were comparable or represented precedent

1    transactions.

2    Q     The work that you did in this case was bounded by the

3    assignment you were given.  Right?

4    A     Yes.

5    Q     Now, if you could turn to slide 10 of the

6    demonstratives.  Just let me know when you're there.

7    Q     Okay.  This is another piece of literature that was not

8    cited in your expert report.  Right?

9    A     Yes, I believe that's correct.

10   Q     Okay.  And are you actually familiar with this

11   publication?

12   A     Yes.  Shannon Pratt's books are pretty common in my

13   industry and I have copies in the office.

14   Q     Okay.  Take a look if you would at TX-189 in your

15   binder.

16          MR. MERVIS:  And again, Your Honor, we've only

17   marked this for identification.

18   BY MR. MERVIS:

19   Q     Dr. Arnold, just take a moment and I'll represent to

20   you that we actually had, Mr. Samet didn't have to give it to

21   us, we had this one, and we made a copy of a portion of it.

22   But just based -- are you able to tell if this is the same

23   publication?

24   A     If you're telling me it's the 2005 version, the same

25   edition, that's fine.  I can't quite verify that with the

1   information in front of me.

2   Q    All right.  But in any event, you recognize it as an

3   edition of the same publication.

4   A    Yes.

5   Q    All right.  I want to ask you a few questions about

6   this one, too.  This is -- well actually if you could turn to

7   page 140.

8   A    Yes, I have that in front of me.

9   Q    The title here is, adjusting from reserve market value

10  multiples.  Do you see that?

11  A    Yes.

12  Q    And take a moment, because I know I'm just showing this

13  to you out of the blue, but if you could read, let's see,

14  starting the third paragraph down says, however.  If you

15  could read to yourself from there down to the end of the last

16  full paragraph on this page.

17  A    Yes, I've read that.

18  Q    Okay.  And generally, this is talking about what we've

19  been talking about, in other words EBIDTA multiples and

20  comparable companies.

21  A    Well, not really.  Here he is looking at market value

22  of invested capital and he's, the things that he's capturing

23  here in the second full paragraph have more to do with the

24  capital efficiency of companies so you want to make

25  adjustments to capital efficiency if you're looking, if

1   you're using a market value to sale like a revenue multiple.

2   You know, in the case of Mr. Greenberg's comps, he reports

3   revenue multiples.  They were one times revenue to, you know,

4   1.6 or 1.8.  If you apply that to $100 million in revenue

5   you're going to get implied values of 100 to 180 million.

6   Why are we not getting that here?  We are not getting that

7   here because he is using EBIDTA which is a measure of cash

8   flow, and TransCare is producing much less cash flow per

9   dollar of revenue than other companies.  And he's measuring

10  the value based on the output of the company, the cashflow is

11  not the input which is the total sales.  So this is looking

12  at a slightly different issue.

13  Q     Right.  Fair enough.  So let me, and maybe this is off

14  point, but just the last paragraph, the last full paragraph

15  on that page.  It says, "one must keep in mind that the two

16  factors that influence the selection of multiples of

17  operating variables," do you see that?

18  A     Yes.

19  Q     And what is, what are operating variables?

20  A     I would say operational statistics would be revenue

21  earnings, cashflow, EBIDTA.  Those are examples of operating

22  variables.

23  Q     Okay.  So that sentence goes on and it says -- so, let

24  me go back to it.  It says, "one must keep in mind that the

25  two factors that influence the selection of multiples of

**A1853**

1  operating variables the most are the growth prospects of the

2  subject company relative to the guideline companies and the

3  risks of the subject company relative to the guideline

4  companies." Do you see that?

5  A    Yes.

6  Q    And then it says, "the analysts should review the

7  comparative financial analyses to try to assess these

8  relationships."  Do you see that?

9  A    Yes.

10 Q    And, well, let me leave it at that.  When it comes to

11 the, when it come to your comparison -- I'm sorry.  When it

12 comes to the two comparable companies that you selected and

13 TransCare, you did not prior to signing your report assess

14 the relative risk of those businesses.  Correct?

15 A    You're characterizing them as my comps, so they are the

16 two companies that I use for my comparative analysis, but

17 they do come from Mr. Greenberg's analysis, so I'm, I confirm

18 that they are were in the same industry, that they were

19 similar in their business area to TransCare.  But they came

20 from Mr. Greenberg and it was the view of the Patriarch

21 family.  But putting that qualification to the side, I did

22 not evaluate the riskiness of the company.  I think

23 ordinarily what this sort of thing is addressing is say a

24 debt to equity ratio, how much financial gearing is on a

25 company, if you're trying to value the equity in a company.

1    That is not the exercise that's being done in the January

2    7th, 27th, 28th transactions or the February 24th

3    transaction.  Those are looking at the operating entity

4    exclusively without regard to the debt and equity structure.

5    And the question is what is, what's the, the value of the

6    operating assets.  And no one, the deposition that I saw said

7    that somehow TransCare should be downgraded because of some

8    issue related to this.  So I did not, I did not take any

9    additional step in that regard.

10   A    Okay.  Let me, there's something you said, I just want

11   to follow up on.  You said you took, I don't want to say

12   strong exception, but you did, you quibbled with me I guess

13   about my use of my word, I said your comps, and you said well

14   they weren't my comps, right, they're Mr. Greenberg's.  Is

15   that right?

16   A    Yeah.  I feel bad if you think I'm quibbling.  I'm

17   just, really --

18   Q    No, no.

19   A    -- I'm trying to be clear.

20   Q    I'm sorry, I didn't -- it wasn't meant pejoratively.

21   In any event, you were making a distinction between your

22   comps and Mr. Greenberg's comps.

23   A    Yes.

24   Q    All right.  And now I know you've done some work since

25   the time that you signed your report, signed your report.  So

```
 1  it may not be possible for you to put that out of your head.
 2  But let me see if you can answer this.  Do you know whether
 3  if you had gone, based on what you knew at the time you
 4  signed the report, do you know whether if you had done your
 5  own independent investigation you would have landed on the
 6  same two companies and only those two companies?
 7  A     The answer is yes and no.
 8  Q     Okay.
 9  A     The answer is yes in the sense that if you asked me to
10  find the two closest companies, those are the two that I
11  would choose for you.
12  Q     Yes.  Is that based on what you knew then or what you
13  know now?
14  A     It was something that I looked at after having signed
15  the report.
16  Q     Let me ask you another case you were involved in.  Do
17  you remember a case in the Northern District of California
18  called Fellow [indiscernible]?
19  A     Yes.
20  Q     Okay.  And that was a consumer class action.  Is that
21  right?
22  A     Yes.
23  Q     And you were an expert for the plaintiff, the putative
24  class.  Is that right?
25  A     Yes.
```

**A1856**

```
 1  Q     And you, in connection with a class certification

 2  motion, you offered an opinion.  Right?

 3  A     Yes.

 4  Q     And the Court in that case issued an opinion that among

 5  other things excluded your opinion under Daubert.  Do you

 6  recall that?

 7  A     It excluded my opinion.  I don't remember whether it

 8  was pursuant to Daubert.  My opinion was excluded.

 9  Q     Fair enough.

10  A     Because I do remember a footnote acknowledging that I

11  was an expert and saying no one had challenged that, etc., so

12  I don't think it was a Daubert, but --

13  Q     All right.  Well, the opinion says what it says.

14  A     Yes.

15  Q     In any event, in particular, your opinion involved a

16  damages model that you were testifying about.  Right?

17  A     Yes.

18  Q     And this case had to do with like a defective steering

19  system in Ford automobiles?

20  A     Yes.

21  Q     And the model that you -- do you recall the name that

22  was given to the model that you -- is it a particular model?

23  A     If it had a name, I don't remember what it was.

24  Q     Okay.  There's a written, oh, there's a written opinion

25  that sets out the Judge's reasoning.  Right?
```

```
 1   A      Yes.

 2   Q      And one of the aspects of your testimony was about the

 3   value of the steering system to consumers.  Right?

 4   A      Yes.

 5   Q      And you opined that the value was zero.  Right?

 6   A      I opined that the value was zero, assuming that certain

 7   other fact testimony would be adduced at the hearing.

 8   Q      And what the Judge found was that although you

 9   described what the appropriate model would be, there was

10   nothing to support your assumption of zero value.  Right?

11   A      That's roughly right.  Yes.

12   Q      You, prior to my asking you about your deposition, you

13   had never heard of something called statements on standards

14   for valuation services, is that right?

15   A      Yes, that's right.

16   Q      And, again prior to my asking you about it at the

17   deposition, you did not know what the phrase "applicable

18   standard of value" within that statement on standards meant?

19   A      Yes.  Correct.

20   Q      And there is an organization called the American

21   Institute of Certified Public Accountants. Is there not?

22   A      There is.

23   Q      You're familiar, you've heard of it.  Right?

24   A      Yes.

25   Q      Okay.  You're not a member?
```

```
 1   A      I am not.

 2   Q      And prior to the deposition, prior to the deposition

 3   that we had together, you were not familiar with something

 4   called the Uniform Standards of Professional Appraisal

 5   Practice, or USPAP, correct?

 6   A      True.  Yes.

 7   Q      All right.  And during the entirety of your career, you

 8   have not been familiar with the USPAP standards.  Right?

 9   A      I think I've heard references to them from time to

10   time.  Maybe other experts in the cases were addressing USPAP

11   issues, so I've heard the acronym, but that's as much as I

12   know about it.

13   Q      Just I think one last thing.  I just want to make sure

14   I under -- actually two last things.  Let me ask you to turn

15   -- there is a slide in this presentation or in your

16   demonstrative that summarizes what you describe as

17   expressions of interest.  Remember that slide?

18   A      Yes, I do.

19   Q      Let me just see.  And if you could turn, yes, slide 23.

20   So there's a reference at the far right side of the, the far

21   right column, trial exhibit, do you see that?

22   A      Yes.

23   Q      And some of these, some of the referenced exhibits were

24   in your original expert report and some were not.  Is that

25   fair?
```

1   A       I haven't done the mapping.  I'm not sure.

2   Q       Okay.  Well, did you prepare this slide or was that

3   done by somebody else?

4   A       The slide was done in cooperation with Ms. Van Allen

5   and two other people assisting me on this matter.  The

6   original version of this had the deposition exhibits, or

7   discovery exhibits or Bates numbers on them.  And then the

8   day or two leading up to the production to you, this column

9   was changed to trial exhibit and I was not involved in that

10  process.

11  Q       Okay.  Do you know who was?

12  A       Counsel was, and Ms. Van Allen was.

13  Q       Regardless of the exhibit numbers, did you actually

14  review all of the documents that are cited on, in that column

15  to ensure that they were suitable?

16  A       I did not do so after the trial exhibit codes were put

17  on here, but my belief is that I have, I looked at every

18  document prior to that occurring.

19  Q       Now, I understand that at least one of the things that

20  you believe is informed by the, what you describe as

21  expressions of interest, has to do with EBITDA multiples.  Is

22  that right?

23  A       Yes.

24  Q       Are you, are you saying that any of these expressions

25  of interest inform the fair market value of TransCare on the

1    three, on the January 7th or January 27th or January 28th?

2    A     No.  The 8 point, the 8 ex EBIDTA multiples that are

3    referenced in these expression of interest date back to early

4    to mid-2015 so they are not tethered to January 7th, 2016 or

5    January 27th, 28th and February 24th of that year, but rather

6    they go to the general view, general point that during this

7    period of time, this is how third parties in the industry

8    were thinking about the value of each dollar of EBITDA.

9    Q     Meaning the multiple.

10   A     The multiple.  Yes.

11   Q     You're not saying that the fact that people, whatever

12   thee documents say, you're not opining that the fact that

13   there were people contacting the company means that the

14   company was somehow valuable, are you?

15   A     No.  This is a statement about what market participants

16   view as a reasonable EBIDTA multiple.

17   Q     Okay.  Nothing --

18   A     That's as far as this point goes.

19   Q     Yes.  When you say this point, this slide.

20   A     Yes.

21   Q     Slide 23.

22   A     Well, I guess there are, it stands for another point

23   also unrelated to EBIDTA multiples which is that there were a

24   series of unsolicited contacts expressing an interest in

25   TransCare.

1    Q     And what's the significance of that?

2    A     Well, I assembled the fact of that in this table, and

3    counsel may use that as a piece, as an element of future

4    discussion.

5    Q     That may be, but I'm asking you about your expert

6    opinion.  Are you testifying the fact that these expressions,

7    that there's some significance to the fact that people

8    reached out to TransCare and made inquiries?

9    A     Well, it's inconsistent with any suggestion should it

10   be made that no one would have been interested in TransCare.

11   Q     Okay.  Well let's take a look at at least one of these.

12   So if you could turn to JX-29 in the binder.  So JX-29

13   corresponds to a line on this chart in your demonstratives

14   that says 60 million to 80 million.  Do you see that?

15   A     Yes.

16   Q     And did you see those figures before, before these

17   slides were finalized, that 60 million to 80 million?

18               THE COURT:  What page is that one?

19               MR. MERVIS:  Your Honor, that's page 23 of the

20   slides.

21               THE COURT:  No, that I saw.  But are you referring

22   to something in the --

23               MR. MERVIS:  I am, Your Honor, I'm referring to

24   PX-29, but I'm not there yet.

25               THE COURT:  Okay.

```
 1              MR. MERVIS:  So what I'm asking Dr. Arnold is

 2   you've got this slide here with a line item that cites to JX-

 3   29 and under valuation range you say 60 million to 80

 4   million.  Do you see that?

 5              THE WITNESS:  Yes, I do.

 6   BY MR. MERVIS:

 7   Q     And you reviewed that before this slide was given to

 8   the Court?

 9   A     Yes, I believe so.

10   Q     All right.  Do you have JX-29 open, Dr. Arnold?

11   A     Yes, I do.

12   Q     Now the, on the potential acquirer line for JX-29, you

13   see it says RCA?  I'm talking about the slide 23.

14   A     Yes.

15   Q     Okay.  Do you know what RCA is an acronym for?

16   A     Richmond County Ambulance.

17   Q     Right.  Did you read Exhibit 29 before you permitted

18   this slide to be presented to the Court?

19   A     Yes.

20   Q     Go with me please to page 5 of Exhibit JX-29.

21   A     Right.

22   Q     Please read to yourself what follows the heading

23   Richmond County Ambulance Service.

24   A     Yes, I've read that.

25   Q     Mr. Leland wrote this email.  Right?
```

1  A      He did.

2  Q      And you understand what he's saying here, don't you,

3  about Richmond's supposed $60 to $80 million offer?

4  A      Yes.

5  Q      He's saying that Richmond thought that TransCare's

6  EBIDTA was in the range of $10 million, so if you apply an

7  EBIDTA range of, EBIDTA multiple range of 6 to 8, that gets

8  you to 60 to 80.  Right?

9  A      I don't think he's saying EBIDTA 6 to 8, isn't he

10  saying an EBIDTA, they're using an 8X EBITDA which I guess

11  could mean that the, that they're imagining that EBIDTA could

12  be as low as 7 1/2, 7 1/2 times 8 is 60.

13  Q      But what he is also pointing out is that RCA was wrong

14  about what TransCare's EBIDTA was at the time.  Right?

15  A      He is, yes.

16  Q      Wrong by almost a factor of 10.  Correct?

17  A      Let me, just give me a moment to check.  Certainly by a

18  factor.  I'm not sure it's 10, but it's, they're not making

19  that kind of money at that time.

20  Q      Well, the chart you just looked at, what does it say?

21  $1.4 million EBIDTA for, through October?

22  A      Well, I'm looking at the Exhibit 7 and it's showing the

23  last 12 months and you can see the, as of July 2015, the last

24  12 months was between half a million and a million, but it

25  was rising quickly.  And I seem to recall that there was

1  another chart somewhere that during this period of the year

2  they actually had have a decent recovery.  So I would need to

3  look and see what the monthly run rate is.

4  Q     Yeah, but just to be clear, Dr. Arnold, Mr. Leland's

5  email is dated March 7, 2015.  Right?

6  A     Oh, I'm sorry, this is the March, the March date.  Yes.

7  As of March they certainly were not making that kind of

8  EBIDTA.

9  Q     So I might have actually been conservative when I said

10 a factor of 10.

11 A     You might have been, yes.

12 Q     Okay.  Dr. Arnold, how, not including the three days

13 that you spent in Court and whatever you may have done last

14 week to prepare -- well, let me withdraw that.  You've

15 rendered bills to the trustee.

16 A     Yes.

17 Q     And so far, am I right, that you've rendered bills

18 north of $460,000?

19 A     I don't know the number, but if, there have only been

20 two submissions so those two would capture it.

21 Q     Well, are you aware that a fee application was filed on

22 behalf of yourself and Chicago Economics in this case last

23 week?

24 A     I'm referring to fee applications.  There's more than

25 two statements that were rendered, but two fee applications

1   have been submitted.

2   Q    But the total between those fee applications is just

3   north of 460,000.  Right?

4   A    I don't know, but I'll take your word for it.

5   Q    Well, let me -- did you review the fee application

6   before it was filed?

7   A    No.  I sent the, I sent the statement in --

8   Q    Well, let me show it to you quickly to see if it jogs

9   your memory.

10          MR. MERVIS:  Your Honor, this is, this is, I

11  didn't mark this but this is docket 114-1 which Dr. Arnold is

12  the second to last tab in the binder.

13  BY MR. MERVIS:

14  Q    And if you go to the third -- I'll jut take you through

15  a couple of figures, Dr. Arnold.  The third page -- are you

16  there?

17  A    Yes.

18  Q    In paragraph 9 toward the middle, it references a

19  $25,000 retainer.  Do you see that?

20  A    Yes.

21  Q    Have you applied that retainer?

22  A    Yes.

23  Q    Okay.  So that's been paid.

24  A    Yes.

25  Q    And then if you go to paragraph 11, just take a quick

1　look at the, at what's written there.

2　A　　Yes.

3　Q　　And it makes reference to an application that was made

4　by the trustee for Chicago Economics.  That's your company,

5　right?

6　A　　Yes.

7　Q　　Yeah, for $317,695.74?

8　A　　Yes.

9　Q　　And then -- oh, let me stop.  How much of that has been

10　paid?

11　A　　Most of it.

12　Q　　It has.

13　A　　I think all but $22,000 or so.

14　Q　　And then if you go to paragraph 14, you'll see that,

15　you'll see that Chicago Economics is seeking payment, it's a

16　typo, but of, in the amount of $125,000 and change.  Do you

17　see that?

18　A　　Yes.

19　Q　　Those figures roughly line up with what you understand

20　about what you've billed in this case.

21　A　　I believe they exactly line up.

22　Q　　Do you know how much money is in the estate right now?

23　A　　I do not.

24　Q　　You have not asked that question of anyone?

25　A　　No.

1  Q      Okay.

2              MR. MERVIS:  I have nothing further, Your Honor.

3              THE COURT:  Redirect?

4              MR. AMINI:  Very short.

5              THE COURT:  Go ahead.  Is the trustee here to

6  testify?

7              MR. AMINI:  He was in 341 exams --

8              THE COURT:  In the building, right?

9              MR. AMINI:  Yeah, he hadn't moved when we came, he

10 didn't take lunch.  He thought he was going to be done, Your

11 Honor, today at 1:00.

12             THE COURT:  Well, it's almost 3:00.

13             MR. AMINI:  And it's now -- he had a long group.

14             THE COURT:  Maybe if you can look for him.

15             MR. AMINI:  PX-175.

16                    REDIRECT EXAMINATION

17 BY MR. AMINI:

18 Q     Dr. Arnold, Mr. Mervis showed you I believe it was the

19 January 27th presentation of Carl Marks.  Do you recall that?

20 A     Yes, I do.

21 Q     And he, he focused at one point on that, I don't know

22 the name of this thing, the first paragraph, CMA has worked

23 diligently to develop the most accurate financial possible

24 give the limitation of the company's accounting systems and

25 financial reporting.

1  A     Yes.

2  Q     During the course of your work in this case, you had an

3  opportunity to look over more than just those four plans, did

4  you not?

5  A     Yes, I did.

6  Q     You looked at a lot of the material that the company

7  was working with in that period of time, the financial

8  material.

9  A     Yes, prior to that period of time.

10 Q     Was there any indication at any time that you were

11 working on that, that there are any financial misstatements

12 in the company's books and records?

13 A     I didn't see any, nor did I see any annotations to

14 suggest that there were particular line items that were, you

15 know, to be determined or had to be fixed or anything along

16 those lines.

17 Q     And also to the extent you were asked a lot of

18 questions about what potential buyers like to think, to the

19 extent the buyers were to come and look at this company, do

20 you have any view as to whether this company had sufficient

21 financial information on which a buyer could have made

22 evaluations?

23 A     Yes.  People make offers on imperfect information all

24 the time.  In fact, information is never going to be perfect.

25 But this company had more imperfections than others to be

1   sure.  But a potential buyer would know the revenues and

2   would know that the customers in many cases are governments

3   and that says a lot about the base revenue that one could

4   work off of in order to create profitability.

5            MR. AMINI:  That's all I have, Your Honor.

6            MR. MERVIS:  Your Honor, may I?

7            THE COURT:  Just related to the redirect.

8            MR. MERVIS:  Yes.  Oh, yes.

9                    RECROSS EXAMINATION

10  BY MR. MERVIS:

11       Q    You didn't see anything that, you didn't see

12  anything in the financial information that made you think

13  there were mistakes.  Is that what you're saying?  You looked

14  at -- is that what you're saying?

15  A    I'm saying there weren't errors in the sense that there

16  are missing, in an income statement a missing line for SG&A

17  expenses, or other elements that would make it, you know,

18  incomplete on its face, nor were there annotations that there

19  were numbers in the various monthly and quarterly forecasts

20  that were incomplete or needed further revision or

21  investigation.

22  Q    Did you have access to the general ledger?

23  A    I did not.

24  Q    Did you ask for it?

25  A    No, I did not.

1  Q     Don't people, don't accountants sometimes if they have

2  access to a company's general ledger, don't they sometimes

3  try to take their time between what's stated in the ledger

4  and what's stated in sub accounts to see if it makes sense,

5  to see if it passes the red face test?

6  A     That would be an audit step, yes.

7  Q     You didn't do anything like that, correct?

8  A     I did not do any audit-like activities.

9         MR. MERVIS:  Nothing further, Your Honor.

10        THE COURT:  Okay.  Thank you.  You can step down.

11        THE WITNESS:  Thank you, Your Honor.

12        THE COURT:  Do we have the trustee?

13        MR. AMINI:  The trustee is on his last 341.  He

14  requested [indiscernible].

15        THE COURT:  All right.  We'll take a 15-minute

16  recess.

17     (Recess taken at 2:49 p.m.)

18     (Proceedings resume at 3:16 p.m.)

19        THE CLERK:  All rise.

20        THE COURT:  You may be seated.

21        Mr. Amini?

22        MR. AMINI:  We call the trustee, Salvatore

23  LaMonica.

24         SALVATORE LAMONICA, WITNESS, SWORN)

25        MR. AMINI:  Your Honor, I will preface this by

1  ordinarily in a customary case I would spend at least a few

2  minutes with the witness talking about his history.  As both

3  for decades long working for trustees and being a trustee, it

4  is my understanding that there's probably no need for that

5  with respect to this particular witness.

6          THE COURT:  Your witness.

7          MR. AMINI:  Okay.

8                    DIRECT EXAMINATION

9  BY MR. AMINI:

10  Q    Mr. LaMonica, tell me where do you work.

11  A    I'm a partner at the firm of LaMonica Herbst &

12  Maniscalco, LLP.

13  Q    Will you keep your voice up and speak into the

14  microphone, please?

15          THE WITNESS:  Your Honor, I apologize.  I

16  conducted 41 341 meetings and I'm kind of hoarse, but I'll

17  try my best.

18  BY MR. AMINI:

19  Q    And how long have you been a lawyer, Mr. LaMonica?

20  A    Since 1988.

21  Q    And how long have you been working in the area of

22  bankruptcy?

23  A    Since March of 1989.

24  Q    And just briefly describe your experience as a

25  bankruptcy lawyer.

```
 1   A      March of 1989, I became a law clerk to Judge Dorothy

 2   Eisenberg of the Eastern District of New York.  I stayed with

 3   her until August of 1991 when I joined a firm in Garden City,

 4   Jaspan Schlesinger Silverman and Hoffman.  And I stayed

 5   there, I became a partner there in 1996.  I started, I left

 6   and started my own firm in 1998.

 7   Q      And for how long have you been working, let's start

 8   with for trustees, have you worked for trustees in the past?

 9   A      That's correct.  When I joined the Jaspan firm, one of

10   the partners there, a gentleman named Ken Silverman was a

11   panel trustee in three districts.

12   Q      And how long did you work with Mr. Silverman?

13   A      Until I left the firm in 1998.

14   Q      And you yourself are a trustee, are you not?

15   A      That's correct.

16   Q      And how long have you been a trustee?

17   A      Since March of 2009.

18   Q      And as a trustee, have you come to handle corporate

19   matters?

20   A      Absolutely.

21   Q      And roughly how many since that period of time?

22   A      A dozen.  No, I shouldn't say that -- a dozen a year.

23   Q      A dozen a year.

24   A      Yes.  So probably 100, 120.

25   Q      Did there come a time when you became familiar with
```

1   TransCare at the ambulance company?

2   A    Yes.

3   Q    And when was that if you recall?

4   A    On the afternoon of February 24th, the day the case was

5   filed, I received a phone call from the U.S. Trustee's Office

6   indicating that they were considering me as a trustee and

7   that I should do a conflicts check and get back to them.

8   Q    And that was February 24th, 2016.  Correct?

9   A    That's correct.

10  Q    And what do you recall happening next?

11  A    Ms. Rifkin emailed me the creditor matrix and the list

12  of creditors.  My partners and I went through it and we did a

13  conflicts check, and about two hours later I responded to her

14  that we had no conflicts.

15  Q    Had you ever had any experience with TransCare prior to

16  that?

17  A    No, not at all.

18  Q    Had you ever worked for an ambulance, you know, done

19  any work for an ambulance company prior to that?

20  A    Prior to that, no, I did not.

21  Q    And were you ultimately selected as a trustee in this

22  case?

23  A    That's correct, I was.

24  Q    And do you recall what that happened?  The morning of

25  the 25th or something earlier?  If you recall.

1  A    It was either, I think I got a call later that night

2  from Ms. Rifkin telling me I was appointed and that my

3  appointment would be filed on the docket the next day.

4  Q    And were you told much of anything else at that point?

5  A    I was told that there was an emergency situation

6  because there were ambulances on the road and I needed to

7  jump on top or that.

8  Q    You were told just by Ms. Rifkin or her office.  Is

9  that right?

10 A    I think it was Ms. Rifkin.

11 Q    Okay.  And then what happened that you recall next?

12 A    The next morning when I woke up, I checked the docket

13 to make sure my appointment had been docketed and then I

14 spoke to Mr. Harrison, the attorney for the debtor.

15 Q    Attorney for the debtor.

16 A    That's correct.

17 Q    Lynn Harrison.

18 A    That's correct.

19 Q    And what do you recall about that conversation?

20 A    We talked about the case, we talked about the fact that

21 there were ambulances on the road that he thought it might be

22 worthwhile to consider operating the business so as to

23 realize going concern value.  And we talked about having a

24 meeting with the debtor representatives and bank's counsel

25 and etc., etc., and we agreed that we would meet that

1    afternoon which I think was Thursday the 25th.

2    Q      And the conversation, just so I'm clear, that you were

3    having with Mr. Harrison, you believe was the morning of the

4    25th, that Thursday.

5    A      That's my recollection, yeah.

6    Q      And at that point, what did you know about the business

7    other than it was an ambulance company?

8    A      I guess I went online and did some research on what I

9    could find out online.  I read the filings and not much other

10   than that.

11   Q      And was the next event that occurred in that connection

12   the meeting at Mr. Harrison's office?

13   A      That's correct.

14   Q      And that meeting you indicated I think started some

15   time after lunch on the 25th.

16   A      It was about 1:00.

17   Q      And how long would that meeting go?

18   A      It went into the evening until about 10:30/11:00 at

19   night.

20   Q      And briefly describe, let's start with who was there.

21   Who attended the meeting if you recall.

22   A      I was there.  My partner, Gary Herbst was there; my

23   associate who is now a partner was there, Jacqulyn Loftin;

24   Lynn Harrison was there; his associate, Ms. Giglio; attorney

25   from Otterburg; John Helfat representing Wells Fargo was

1  there; there was a Wells Fargo representative, I don't

2  remember his name but I know there was a representative from

3  Wells Fargo there; Randy Creswell, attorney for the

4  Patriarch; and Carl Landeck from Carl Marks.

5  Q    And describe for the Court, if you would, what happened

6  at that meeting, best you recall.

7  A    I learned a lot about what constituted the business

8  operations of the debtor.  I learned a lot about the current

9  situation in terms that there were 48 ambulances on the road.

10 We talked about unpaid payroll.  We talked about what a

11 budget would look like if I could be convinced to continue to

12 operate the 911 business that was currently operating.  We

13 talked about who, whether I can get commitments from the

14 secured creditors to fund the payroll because I was insisting

15 that I would not operate without commitments to fund the

16 employees.  We talked about all that.  We also talked about

17 wind down expenses because there were five locations, I mean,

18 there were three locations that I needed to secure and I

19 didn't have any money.  And we talked about how that was

20 going to go.  We talked about a lot of different things like

21 relative to that.

22 Q    At that point in time, what did you understand the

23 business was that you were responsible for, if you know?  If

24 you recall.

25 A    That's when I first learned from Mr. Creswell that some

1   of the assets had been already foreclosed prior to my

2   appointment.  And so the only remaining assets for me to deal

3   with were the ambulances at Hamilton Street which is their

4   location in Brooklyn, the assets up in Mount Vernon, the

5   ambulance in Mount Vernon and the 48 ambulances at that time

6   that were still on the road.

7   Q    So you had 48 ambulances on the road, and then whatever

8   it was that were at the Mount Vernon and Hamilton Street

9   locations.

10  A    It's Hamilton Avenue, but it doesn't matter.

11  Q    All right.  Were you aware of the fact that just prior

12  to filing, there had been other, or did they make you aware

13  of the fact that just prior to the filing they had foreclosed

14  on certain other parts of the business?

15  A    Mr. Creswell told me that there was a foreclosure, a

16  strict foreclosure that had occurred the day before my

17  appointment.  He told me that they were asserting that all

18  the ambulances were theirs as a result of that strict

19  foreclosure.  But if I operated, there would have to be an

20  agreement with the secured creditor concerning the use of

21  those ambulances.

22          THE COURT:  Mr. LaMonica, I know your voice is

23  strained, but it's very hard to hear.  Can you pull the

24  microphone closer?

25          THE WITNESS:  I'm sorry.

**A1878**

```
 1              THE COURT:  Okay.
 2   BY MR. AMINI:
 3   Q     So is it fair to state that Mr. Creswell told you that
 4   all the ambulances as far as he understood had been
 5   foreclosed upon?
 6   A     That's what he had said, yes.
 7   Q     And so you, is it fair to state that you were facing a
 8   situation where you actually didn't have any equipment, that
 9   you understood that you had no, that you understood that the
10   equipment that you would need to run the building, the
11   business was now in the possession or at least in the
12   ownership of the term loan lenders, or the secured creditors?
13   A     That's --
14              MR. MERVIS:  Your Honor, there's a lot of leading.
15              THE COURT:  I'll sustain the objection to the form
16   of the question.  He's your witness, you can ask him what
17   assets he had to run the business.
18              MR. AMINI:  All right.
19   BY MR. AMINI:
20   Q     What assets did you have to run the business?
21   A     I had the licenses that I, that I was told at that time
22   were not foreclosed on except for one, one was foreclosed on.
23              THE COURT:  Certificates of need?
24              THE WITNESS:  That's correct.  Those are the
25   license to operate the ambulances.  I had all the physical
```

136

1  plant and Mr. Creswell was telling me that I would have to

2  make a deal with his client over the 48 ambulances if I

3  wanted to use them.

4  BY MR. AMINI:

5  Q    And let's just clear up the physical assets.  The

6  locations, what locations?  You said you had three locations

7  as I recall.

8  A    There was the garage/storage facility and mechanics

9  shop up in Mount Vernon; there was the Hamilton Avenue

10 location which was very large, it was both a mechanic shop

11 and a storage, indoor storage for the vehicles; and there was

12 some corporate offices there; the computer was stored there;

13 there was an enormous generator there; and then we had the

14 corporate headquarters at Metro Tech.

15 Q    And to your understanding, on that day, those were the

16 only three locations that you were responsible for.  Is that

17 right?

18 A    Well, those were the ones that had not been foreclosed

19 upon.

20 Q    Were you aware of the other operations that had been

21 foreclosed on?  Did they discuss what they were with you?

22 A    They told me what they were, yeah.

23 Q    And what do you recall them telling you?

24 A    They told me there was a paratransit business located

25 on Forest Avenue in Brooklyn.  I think the number was 160

1  accessorized buses being used out of there.  They told me

2  there was a location in Maryland, there was a location in

3  Pittsburgh and there was another location in Poughkeepsie.

4  Q    And what did they tell you about those locations in

5  terms of your responsibilities versus what they had been

6  foreclosed on?

7  A    Well, they told me that they had foreclosed on those

8  assets and they were being operated by whoever foreclosed on

9  them.

10 Q    From that point forward, did you seek to exercise any

11 kind of control over those other operations, Maryland,

12 Pittsburgh, paratransit, I think you said Poughkeepsie.

13 A    On that day?  No.

14 Q    On that day or in the next say two or three days.

15 A    No.

16 Q    There came a time, did there not, let's just get this

17 out of the way, there came a time when at least the entities

18 that they foreclosed upon filed.  Is that right?

19 A    That's correct.

20 Q    And that was how much longer if you recall?

21 A    I don't recall exactly.  I know it was a few weeks.

22 Maybe three or four weeks.

23 Q    So describe if you would your efforts to run the

24 business on that day, February 25th and your efforts to fund

25 the running of the business that you thought you had

1  responsibility for?

2  A    Wells Fargo was willing to fund some of the payroll, I

3  think they were willing to come up with another $800,000.

4  Mr. Creswell's client was wiling to come up with, my

5  recollection is, and the numbers are not to the penny, but I

6  think Mr. Creswell was saying that we needed, he was willing

7  to put $200,000 for payroll and Mr. Landau was telling me

8  that wasn't enough, I needed another $200,000 to meet the

9  payroll obligations.  Remember, that next day was a payroll

10  day, that Friday employees were going to be standing there

11  waiting for their check.

12  Q    I was going to ask you about that, when was the next

13  payroll, but you answered it.  And you understood that that

14  payroll was for what, that Friday payroll was to cover what?

15  A    Two weeks.  The prior week and the week that we were

16  in.

17        MR. MERVIS:  I'm sorry, Your Honor, I didn't hear

18  the end of that answer.

19        THE WITNESS:  It would have covered, the payroll

20  that was going to be handed out that Friday would have

21  covered the prior week and the week that we were currently

22  in.

23        MR. MERVIS:  Gotcha.  Thank you.

24  BY MR. AMINI:

25  Q    And were you successful in coming to some kind of

1  resolution to keep the businesses running?

2  A      No.

3  Q      What happened?

4  A      The bank was, the bank and Mr. Creswell's client were

5  taking hard line approaches.  The bank wasn't budging to come

6  up with more.  Patriarch wasn't willing to come up with more.

7  I was insisting that I'm not going to run a company and not

8  pay the employees, so for me that was an easy decision.  And

9  I said if you guys want to realize the value of a going

10 concern, somebody is going to have to pay for it.  And at the

11 end of the day after going back and forth for hours and

12 hours, at the end of the day, sometime about 6:30/7:00, it

13 was decided, no, it's not happening.

14 Q      Let me ask you to take a look if you would at, in that

15 book, there's a book in front of you, at Exhibit JX-104.

16         MR. AMINI:  And there's no objection to this, Your

17 Honor.  It's a joint exhibit.

18 BY MR. AMINI:

19 Q      And in particular, I would like you to look at the

20 email at the bottom of that page.  It's an email from you it

21 looks like at 9:03 p.m. on February 25th, 2016 to Linda

22 Rifkin, USTP.  Is that an email that you sent to Ms. Rifkin

23 on that time on that day?

24 A      Yes.

25 Q      And who is Ms. Rifkin?

1  A      She's the, I guess her title is Assistant United States

2  Trustee for the Southern District.

3  Q      And you write, "believe it or not, negotiations to fund

4  the payroll have started up again."  What were you, what were

5  you indicating to her at that point?

6  A      Well, they had, it was kind of like roller coaster,

7  stopped and started again, stopped.  So I think I had

8  reported to her on a phone call before my email that they

9  had, the negotiations had stopped and that they were not

10 going forward.

11 Q      There's another email at 9:30 what you say is not

12 really going well.  Are you still, to the best of your

13 recollection, where were you when you sent that email?

14 A      I was at Curtis Mallet, at the offices of Curtis

15 Mallet.

16 Q      This is that same meeting that started at like a little

17 after lunch that day?

18 A      That's correct.

19 Q      Okay.  It looks like it's going down.  And then you say

20 we are notifying FDNY.  What does that indicate?

21 A      Well, one of the UST's concern was the fact that there

22 was a 911 aspect of this and they were worried about public

23 safety.  And I was also concerned about that, so I did not

24 want to just call in ambulances to their respective locations

25 without notifying the FDNY that they needed to cover the

1   areas.  So we were arranging to get on the phone with the

2   Commissioner of the fire department to let him know what was

3   about to happen.

4   Q    All right.  And then the next email on this chain is

5   the next morning at 10:36.  Do you see that?

6   A    That's correct.

7   Q    And you state in there, "despite some last-minute

8   negotiations, we were unable to get commitments for funding

9   payroll."

10  A    That's correct.

11  Q    That happened sometime after 9:30 the night before.

12  Correct?

13  A    That's correct.

14  Q    Okay.  And what did you do after that happened that

15  night?  What steps did you take before you sent the email in

16  the morning, that Thursday night?  What, if any, steps did

17  you take down to shut down the 911 operation?

18  A    I spoke to the Commissioner of the fire department.  I

19  told them what was going on and we were going to give the

20  word that the TransCare ambulances should come back to the

21  base.  And I asked him if it would be possible to tell the

22  drivers that if they were not willing to bring the ambulances

23  back to the base, that they could deliver them to the nearest

24  fire department because we were concerned that if they were

25  not getting paid that the drivers would just abandon the

```
 1  ambulances and there were narcotics on them, there was
 2  equipment on them, we didn't think that would be a good for
 3  public safety.  So the thought was to have them delivered to
 4  the nearest firehouse and have the fire department secure it
 5  until we were able to go and get a truck and have a tow truck
 6  and tow them all in, etc., etc.
 7  Q    I understood from your earlier testimony that you had
 8  been told by Mr. Creswell that you didn't own the ambulances
 9  any longer, that they were under the ownership of the secured
10  creditors.
11  A    That's what he told me, yes.
12  Q    And did they, did you have any discussions with who was
13  going to shut down the, and where the ambulances were going
14  to go?
15  A    In terms of where they were going to go --
16  Q    That night, given that they were claiming they were
17  their ambulances, were there any discussions over Mr.
18  Creswell's client taking these ambulances and getting them
19  off the street?
20  A    No.  There was no discussion with him about that.  My
21  primary concern was to get the ambulances off the street
22  because they're registered to TransCare, they're insured by
23  TransCare.  My estate should have no liability and I did not
24  want to have them running calls and exposing my estate to
25  liability.  So the easiest thing is just bring them in and
```

1  nobody was willing to fund the payroll so I didn't want

2  drivers driving out there not getting paid.  So it was easy.

3  That was a no brainer getting them into a secured location.

4  Q     You made, there was an earlier comment that you made

5  about a discussion with Mr. Creswell in which his client was

6  going to make some kind of agreement to allow you to continue

7  operating those ambulances.  Do you recall that?

8  A     That's correct.

9  Q     What do you remember about that conversation?

10 A     We never got into the details about it.  It was just

11 that his client would be willing to let the estate use those

12 ambulances if, we would have to agree to some terms.  We

13 never got into specifics about it.

14 Q     That's what I was going to ask you.  Were any specific

15 terms suggested to you at that time?

16 A     Not that I can recall, no.

17 Q     What happened the next day, the 26th, that Friday if

18 you recall?  What did you do next?

19 A     That morning early in the morning, my partner Jacqulyn

20 Loftin went to the Hamilton Avenue location, tried to get the

21 ambulances parked inside, and they were coming back and we

22 didn't want them on the street so we tried to maneuver them

23 in there.  My partner, and I had met her at Hamilton Avenue,

24 I was there with her at Hamilton Avenue.  Mr. Herbst went up

25 to Mount Vernon and did the same thing there, making sure the

```
1    ambulances were locked, secured, put in as many as could fit
2    inside, we put inside.  I think that afternoon I may have
3    hired a security guard to sit there and watch them because
4    not all of them fit inside.  See, these ambulances never
5    actually went back to the base.  The drivers would meet on a
6    location, and they never even turned them off, they just kept
7    running.
8    Q    In the ordinary course before the --
9    A    Right.  So they really didn't have room for all these
10   ambulances to come back to one location.  We did a pretty
11   good job of securing as many as we could.
12   Q    I want to ask you that.  How many, roughly how many of
13   the ambulances did you get back in the location?
14   A    We fit 110 ambulances in Hamilton Avenue and I think we
15   fit all but 25 ambulances in the Mount Vernon location.
16   Q    Earlier we had discussed the other operations in
17   Pittsburgh.  Did you do anything with respect to the
18   ambulances in the Pittsburgh operation?
19   A    Not right away, no.
20   Q    When you say not right away, did there come a time when
21   you, you addressed anything concerning those ambulances?
22   A    Ultimately those entities filed chapters, chapters 7.
23   Pittsburgh --
24   Q    Several weeks later.
25   A    Yeah, several weeks later.  And then we took steps to
```

**A1888**

```
1   secure those vehicles.  Ultimately, we had an auction there.
2   We had auctions in Maryland and we had an auction in
3   Pittsburgh as well and Poughkeepsie.
4   Q    And that was after they filed.
5   A    That's correct.
6   Q    On the 25th and 26th, did you do anything to shut down,
7   for example, the Hudson Valley operation, the Poughkeepsie
8   one?
9   A    No, I did not.
10  Q    On the 25th, on the 26th, that Friday after going to
11  Hamilton Avenue, where did you go?
12  A    I went to Metro Tech at the debtor's corporate offices.
13  Q    And who did you observe there at Metro Tech?  Who was
14  there?
15  A    My partner, Herbst, met me there after Mount Vernon.
16  We met with Carl Landeck was there; his colleague, John
17  Killion was there; there were some employees of the debtor
18  still there.
19  Q    Mr. Youngblood, was he there?
20  A    Yes, he was.
21  Q    Anybody else that you actually can recall by name?
22  A    Tom Malaya (phonetic); he was the IT person at the
23  debtor, the debtor's former IT person.
24  Q    And from your observation, what were they doing?
25  A    Mr. Youngblood I think was working for the entity.  I
```

1  wasn't sure which entity at the time, but he was working for

2  the entity that had foreclosed on the assets.

3  Q    And when you said working for the entity, did you have

4  any opportunity to observe what he was actually doing for

5  that entity?

6  A    I did not, no.

7  Q    Did he talk to you?  Did you talk to him?

8  A    Sure.

9  Q    And what did he tell you?

10 A    He told me he was starting to work for the new entity.

11 Q    Did you subsequently have further conversations with

12 Mr. Creswell?

13 A    After when?

14 Q    After that Thursday meeting that you were in with him

15 all day.  On Friday, did you have a back and forth with Mr.

16 Creswell?

17 A    Yes.

18 Q    Okay.  Let me ask you to take a look at JX-105.  Did

19 you receive on that Friday, February 26th 2016, did you

20 receive the email at the bottom of that chain at 2:00 p.m.

21 from Randy Creswell?

22 A    That's my recollection, yes.

23 Q    And the Gary in that email, your understanding is it's

24 Gary Herbst, your partner.  Correct?

25 A    That's correct.

1  Q    And he says, "Gary, further to our conversation just

2  now as we discussed, Trans Transit 2 (phonetic) has been

3  providing services under the MPA contract above since the

4  filing date."  See that?

5  A    That's correct.

6  Q    Was that your understanding at the time?

7  A    That's correct.

8  Q    And then he says we have asked whether the trustee will

9  consent to the termination of the existing agreement as part

10 of the wind down process to clear the way for the MTA to

11 enter into a new agreement with [indiscernible].  Do you see

12 that?

13 A    Yes.

14 Q    Was that, did he ask you -- before this email had he

15 asked that of you?  If you recall.

16 A    I don't recall.

17 Q    Okay.  And he sends you a couple of other emails at

18 3:15, an hour and 15 minutes later and again at 4:24, 2

19 hours, roughly 2 and 1/2 hours later.  Again on that topic of

20 asking you, did he not, of whether you would agree to

21 terminate the contract.

22 A    That's correct.

23 Q    All right.  And what did you, what did you ultimately

24 decide?

25 A    What did I ultimately decide?

1  Q     Yes.

2  A     I decided that I would not stand in the way of the

3  termination of the contract.  I spoke to the MTA's lawyer as

4  well and I just wanted to preserve the rights of the estate

5  to collect whatever had been due as of the filing date.

6  Q     And in your last email on this chain, yours to him at

7  5:07, you say "I tried calling you several times."  Is that

8  true?

9  A     Absolutely.

10  Q     Were you able to get ahold of him?

11  A     No.

12  Q     Okay.  And did you subsequently hear from Mr. Creswell?

13  Actually, why don't you just turn to JX-106?  And I'm only

14  interested really in the last email in that chain which is

15  actually the first email on the page.  Did you receive that

16  email from Mr. Creswell on or about February 26th at 5:45

17  p.m.

18  A     Yes.

19  Q     I wanted you to understand and, unfortunately, it does

20  not appear that it will continue, that it will come together.

21  What did you understand him to be telling you?

22  A     That they were -- there was an issue regarding payroll

23  that may not appear in this chain.  So, he had asked if I

24  would be willing, previous, to run payroll through the

25  debtor's system.  And I told him no.

Q     Why?

A     Well, there's a lot of reasons why I wouldn't want the
debtor's books, checks to be issued from the debtor.  There's
Worker's Comp implications, there's tax liabilities.  There's
all kinds of implications for the estate to operate and issue
paychecks.  So, I wasn't willing to do that.

      There was another issue at the debtor that they were
using -- the person who was signing the checks was no longer
employed at the debtor, had not been employed at the debtor
for months and months.  And they were using a stamp that I
would never do as a trustee.  I would never do that.  So,
there were a lot of --

            THE COURT:  You contemplated that the debtor would
issue the checks or that the new entity, Transcendence, would
issue the checks using the debtor's computers?

            THE WITNESS:  The way I understood the request was
they were going to wire the money into the debtors --

            THE COURT:  So, they wanted the debtor to pay for
it?

            THE WITNESS:  And the debtor was going to issue
the check to the employees with a check on the debtor's name
because the debtor had the systems already in place.  I
learned that the checks had already been delivered to the
various locations by ADP.  So, they just had to be handed
out.  The question is whether there was any money in the bank

1   to cover them.

2   BY MR. AMINI:

3   Q    I want to separate a couple things, unless I'm

4   mistaken, but the checks that you say are already issued,

5   which are issued for all the employees of the debtor prior to

6   February 24th is what you understood or not?

7   A    No, that's not what I said.

8   Q    Okay.

9   A    What happened was in ADP, their payroll service, in

10   anticipation of the managers handing out checks on Friday to

11   all the employees, had delivered a box of the checks the day

12   before? And everyone was expecting that on Friday they would

13   get a paycheck. They were waiting for approval to hand them

14   out. Wells Fargo had frozen the bank accounts and swept all

15   the accounts on the filing date. So, those paychecks that

16   had been delivered there were not to be handed out.

17          THE COURT: Were they unsigned?

18          THE WITNESS: No, they were stamped. And that was

19   one of the problems we dealt with in the morning was that one

20   of the managers said, I don't care, I'm handing the checks

21   out anyway. And one of the managers handed checks out to the

22   employees who ran around the corner to the cash checking

23   place and cashed them anyway.

24   BY MR. AMINI:

25   Q    I want you to just look at one more thing, JX-101 --

1   no, JX-100.  I'm sorry.  And in particular I'd like you to go

2   to the third page of that exhibit.  There's an agreement of

3   assignment related to the MTA contract on that page.  Do you

4   see that?  The signer's name TransCare New York, signee name

5   Transcendence Transit II, Inc.

6   A     I see that.

7   Q     Prior to this case -- withdrawn.

8         On that day, the 24th or the 25th -- on any of those

9   days, the day of the 24th, the day of the 25th, the day of

10  the 26th did anybody tell you that this agreement of

11  assignment had been executed?

12  A     No.

13        MR. AMINI:  I don't have anything further, Your

14  Honor.

15        MR. MERVIS:  I'm sorry.  The last language was --

16  the last question was had or hadn't?

17        MR. AMINI:  Hadn't.  Had anybody told --

18        MR. MERVIS:  Had not.  Okay.

19        THE COURT:  Where were the debtor's computers

20  housed, the ones that were needed to issue the payroll?

21        THE WITNESS:  The AS-400 was at Hamilton Avenue in

22  Brooklyn.  There was a link so the computer service at Metro

23  Tech would store data in Hamilton Avenue.

24        THE COURT:  Which entity owned the computers?

25        THE WITNESS:  TransCare.

**A1895**

```
 1              THE COURT:  Well, there are a lot of TransCare
 2    companies.  Was it one of the entities that bought them?
 3              THE WITNESS:  Yes.  Well, I should say, Judge,
 4    that's what I was told.
 5                      CROSS EXAMINATION
 6    BY MR. MERVIS:
 7    Q    Mr. LaMonica, Linda Rifkin, when she called you on the
 8    evening of the 24th of February do you recall her discussing
 9    with you a meeting that she had prior to the filing with
10    lawyers from Curtis Mallet, Otterbourg and Mr. Creswell?
11    A    Do I recall her telling me about it?
12    Q    Yes, sir.
13    A    No. She never told me about it.
14    Q    And the meeting that I just described during the 25th
15    of February when you were all over at Curtis Mallet's office
16    do you remember anybody discussing a meeting that had
17    occurred prior to the filing with Ms. Rifkin?
18    A    No, I don't recall then.  No.
19    Q    All right.  During the course of the meeting at Curtis
20    Mallet on the 25th I think you said there were
21    representatives of Wells Fargo there?
22    A    That's correct.
23    Q    Okay.  And you don't recall any of those
24    representatives during the course of that meeting registering
25    any complaint or objection about the foreclosure that you
```

1  learned about from Mr. Creswell?

2  A    I don't know what you mean by registering a complaint.

3  Q    All right.  I will try it again.

4  A    There were a lot of wise comments or snide snippy

5  comments about it.  There was a lot of back and forth about

6  it.

7  Q    Right.

8  A    But I don't know what you would consider registering a

9  complaint.

10 Q    All right. I will try it again.  Let me just pick-up on

11 what you said.  You were watching the folks on the, we'll use

12 shorthand, Patriarch side of the table interacting with the

13 folks on the Wells Fargo side during the course of that

14 meeting?

15 A    There was only one person for Patriarch.  So, yes.

16 Q    That was Mr. Creswell?

17 A    That's right.

18 Q    But he -- Mr. Harrison and Ms. Giglio did they

19 sometimes caucus with Mr. Creswell during the course of that

20 meeting?

21 A    I think so.  Yes, I would say they did.

22 Q    And from what you observed and what you heard were you

23 able -- did you form an impression that there was some

24 animosity between the Patriarch side and the Wells Fargo side

25 at that point in time?

1   A       Well, yes.  I would say its animosity, yes.

2   Q       Now, let me get back to the question that I asked you.

3   I will try to put it more succinctly.  Did anybody from Wells

4   Fargo during the course of that meeting say, in words of

5   substance, we object to this foreclosure, it didn't happen?

6   A       No.

7   Q       And, in fact, during the course of that meeting --

8   well, am I right that up until today no one from Wells Fargo

9   has ever said to you I objected to that foreclosure, it was

10  wrong?

11  A       I have never spoken to anyone from Wells Fargo.

12  Q       Since that day?

13  A       Yeah.

14  Q       Okay.  And during the course of that meeting on the

15  22nd the Wells Fargo representatives were taking the position

16  that the foreclosure had happened?

17          THE COURT:  On the 22nd?

18          MR. MERVIS:  Sorry.  The 25th, Your Honor.

19          THE WITNESS:  Say that again.

20  BY MR. MERVIS:

21  Q       Let me try it a different way.  During the meeting on

22  the 25th Mr. Harrison took the position that there had been a

23  foreclosure, right?

24  A       Yes.

25  Q       And Mr. Creswell too?

1  A    Yes.

2  Q    And the Otterbourg lawyer for Wells Fargo as well,

3  right?

4         MR. AMINI:  Objection, Your Honor.

5         THE COURT:  What's the objection?

6         MR. AMINI:  I don't know what the Otterbourg

7  person -- where is the foundation for the person taking the

8  position that the foreclosure happened.  There is no evidence

9  in this case that they're involved in it whatsoever.  They

10 come to a meeting after the fact.

11        THE COURT:  Was there any discussion regarding the

12 foreclosure at the meeting?

13        THE WITNESS:  Oh, absolutely.

14        THE COURT:  What, if anything, did the Wells Fargo

15 representative from Otterbourg -- was it Mr. Helfat?

16        THE WITNESS:  Yes.

17        THE COURT:  What, if anything, did he say about

18 the foreclosure?

19        THE WITNESS:  He certainly had questions about its

20 validity and was suggesting that, ultimately, it could be

21 avoided, but he said that's your problem, Sal.  That's the

22 sum and substance of what he said.

23        THE COURT:  Did he say anything like they

24 foreclosed on my collateral or Wells Fargo's collateral?

25        THE WITNESS:  He did not say that, not that I

1  recall.

2  BY MR. MERVIS:

3  Q     And during the course of this meeting on the 25th,

4  whether it was Mr. Helfat or whoever else might have been

5  there from Wells Fargo, their representative of Wells Fargo

6  expressed interest in continuing to operate the paratransit

7  business, right?  They didn't say that to you?

8  A     No.  It was not discussed.

9  Q     And, in fact, at least as of the 25th of February your

10  understanding is that TransCare, as it states, didn't have

11  sufficient funding to continue operating the paratransit

12  business, right?

13  A     We didn't have funding to operate any business without

14  the consent of the secured creditor.

15  Q     When you say the consent of the secured creditor who

16  are you referring to?

17  A     Wells and Patriarch.

18  Q     Okay.  And Wells had swept the account, so there was

19  nothing left.  Right?

20  A     That's correct.

21  Q     So, absent a voluntary infusion of capital from Wells

22  or from the Patriarch side there was nothing left to operate

23  any business, right?

24  A     That's correct.

25  Q     On the 25th?

1  A      In fact, I had to make an emergency motion to borrow

2  $50,000 dollars so I could pay the guards and per diem

3  employees that I had because there was absolutely no money

4  available at all.

5  Q      And the same was true on the 26th, right?  No ability

6  to operate any business as a going concern on that date

7  because there was no money?

8  A      That's right.

9  Q      There were -- I think you said there were three other

10 locations that had ambulances that originally you weren't

11 involved in securing them; Hudson Valley, Pittsburg and

12 Maryland, is that right?

13 A      That's correct.  Not in those first days, no.

14 Q      And there was a time, I think, when some folks at

15 Hudson Valley were questioning whether you were entitled to

16 take control of any of the ambulances up there?

17 A      That's correct.

18 Q      But after the Hudson Valley operation filed that worked

19 itself out?

20 A      That's correct.

21 Q      And as far as you know those ambulances were ultimately

22 secured and safe and sound?

23 A      One or two of them were vandalized, but for the most

24 part they were safe and sound.

25 Q      And the vandalization that's because up at the Hudson

1  Valley facility somebody had cut a hole in the fence and

2  gotten in?

3  A    I'm not sure if it was a hole or somebody just didn't

4  lock the gate.  I don't remember.

5  Q    You're not saying that anybody affiliated with

6  Transcendence did the vandalization?

7  A    No, no, not at all.

8  Q    And as far as you know the ambulances in Pittsburg and

9  Maryland nothing -- they weren't damaged as far as you know

10  during the time period before you took possession of them?

11  A    As far as I know, yes.

12  Q    And as far as you know nothing was stolen from any of

13  the vehicles from Hudson Valley, Maryland or Pittsburg?

14  A    Not that I'm aware of, no.

15  Q    Following the bankruptcy there came a time when you

16  stared to work receivables to get them paid, is that fair?

17  A    That's not accurate, no.

18  Q    All right. So, tell me how it happened.  Receivables

19  were collected on behalf of TransCare's estates, right?

20  A    That's correct.

21  Q    Okay.  So, tell me how that happened?

22  A    What happened was Wells Fargo wanted to hire Carl Marks

23  -- actually, it started out that they wanted me to hire some

24  former employees to collect the receivables and I told them

25  that I was not interested in doing that because I didn't want

1　to have employees' payroll, Worker's Comp and all that.  So,

2　they changed is so that they were hiring Carl Marks who was

3　going to hire some former employees and they were going to

4　rent the debtor's facilities from me as trustee of TransCare

5　and pay the estate some money.  I think ultimately, they paid

6　me $800,000 dollars for that.  That was approved by the

7　Judge.

8　Q　I wasn't suggesting --

9　A　And a stipulation was approved and an order was

10　entered.

11　Q　Okay.  So, what happened post-petition was Wells Fargo

12　hired Carl Marks and the two of them worked the receivables

13　however they were?

14　A　That's correct.  There were a couple of receivables

15　that my firm was involved in.

16　Q　All right.  And Wells Fargo, to your knowledge, was

17　paid in full?

18　A　Yes.

19　　　　THE COURT:  How much was owed to Wells Fargo at

20　the beginning of the case?

21　　　　THE WITNESS:  I believe approximately $13 million

22　dollars, but I don't think they were paid from accounts

23　receivable.  They were paid from the sale of the licenses

24　primarily.

25　BY MR. MERVIS:

1   Q      I want to ask you, Mr. LaMonica, just to take a look in

2   our binder.  If you could take a look there's a first tab

3   that's -- thank you.  First tab -- yeah, there is a tab for a

4   Docket Entry 407.  Do you see that?

5            THE COURT:  It's the second tab in my book.

6            MR. MERVIS:  Yeah; yeah, second tab. That's right.

7   BY MR. MERVIS:

8   Q      And just take a moment for that.  My question is do you

9   recognize this as one of the stipulations that you work firm

10  entered into in this case?

11  A      You want me to read the whole thing?

12  Q      Read as much as you need to, to tell me if this is one

13  of the stipulations that your firm entered into in this case.

14  After your long day, I don't --

15            THE COURT:  Docket 407 is a notice of hearing and

16  an application.

17            MR. MERVIS:  You're right, Your Honor.  What I'm -

18  -

19            THE COURT:  Yeah, 258 looks like --

20            MR. MERVIS:  Yeah, yeah.  No, what I'm -- yes,

21  you're right.  What I'm looking for -- that's a hundred

22  percent right.

23  BY MR. MERVIS:

24  Q      Let me try to shortcut it.  Can you turn to page 9?

25           And if you look at paragraph 32, can you just read

1  paragraph 32 to yourself including the two bullets?  Let me

2  know when you're done.

3  A      Okay.

4  Q     the information that's recounted in that paragraph, as

5  far as you know, that's accurate in terms of what money has

6  been distributed to whom?

7  A      Of course, yes.

8  Q      Yes.  Okay.  And then the other tab in your binder

9  which is PX258.

10           MR. MERVIS:  And for the moment, Your Honor, I'm

11  just marking it for identification, because it is a docket

12  entry.

13  BY MR. MERVIS:

14  Q     And, Mr. LaMonica, I'd like you to turn to the Exhibit

15  A to the order which is page -- well, it's, I guess, the

16  eighth page of the exhibit, see that?

17  A      I'm sorry.  Where are you?

18  Q      Yeah, we're looking at PX258.

19  A      Right.

20  Q      Which is the binder in front of you.  You see there's

21  an order on top, right?

22  A      Uh-hmm.

23  Q      And if you go eight pages in there's a beginning of a

24  stipulation.

25  A      Page 1 of 21 it says?

1  Q      That's exactly right.  And now I'll ask my question

2  which is, again, take a minute if you need it.  But is this

3  one of the stipulations that your firm entered into in this

4  case?

5  A      Yes, it is.

6  Q      Okay.  Do you recall did you have any personal

7  involvement in the negotiation of the stipulation?

8  A      Yeah, I have personal involvement in negotiation of

9  every stipulation.  I'm their client.

10 Q      Would include this one, right?

11 A      Yeah, absolutely.

12 Q      Okay.  So take a look at paragraph five, please.

13 A      That doesn't mean I remember every negotiation, but I

14 certainly have --

15 Q      I heard the very, very large number of cases that you

16 gave on direct testimony, so I believe you.

17        But if you could, but, again, paragraph five, can you

18 just take a look --

19 A      Paragraph five or page 5?

20 Q      Paragraph five on page 6.

21 A      Okay.

22 Q      If you could -- well, let me read it to you.

23        It says, "At PPAS and the lender's consent and request,

24 the trustee has agreed to seek court approval for authority

25 to segregate 10 percent of the creditor carve-out solely for

1  the payment of prepetition Bankruptcy Code Section 507(a)(4)

2  claims.  Do you see that?

3  A     Yes, sir.

4  Q     Do you recall discussions around that carve-out?

5  A     Yes.

6  Q     And do you recall that that was something that PPAS or

7  Ms. Tilton wanted as it says in the stipulation?

8  A     That's correct.

9  Q     Okay.  Let's turn to the binder that Mr. Amini gave to

10 you and I want to ask you to turn to JX105.  This is this

11 email chain with Mr. Creswell?

12 A     That's correct.

13 Q     And you'll see that in the email chain several times he

14 asks you and Mr. Herbst forward respond to his request about

15 the termination of the MTA contract by 5:00 p.m. that day?

16 A     That's correct.

17 Q     And you don't know why -- you don't have an

18 understanding, at least, in talking to Mr. Creswell about why

19 that 5:00 p.m. deadline existed?

20 A     I don't know what you're asking me.  Could you say that

21 again?

22 Q     Yeah, do you know why he was demanding -- not

23 demanding.  But you know he was saying he needed to hear from

24 you by five o'clock.

25 A     I did not know at the time, no.

1    Q     Okay.  And, in fact, you did respond to him an email at

2    5:07, right?

3    A     That's correct.

4    Q     Okay.  And you say you tried to call him.  You

5    understood he was in the airport?

6    A     I found that out later.

7    Q     Okay.  And so, for whatever reason, you didn't connect

8    by phone?

9    A     That's right.

10   Q     But in any event, the first writing that you sent,

11   assenting to his request with the conditions that you put on

12   it was at 5:07?

13   A     That's correct.

14   Q     Now, there was a server, I think it's called the AS400

15   that was in one of the TransCare facilities, is that right?

16   A     That's correct.

17   Q     And --

18   A     Was at Hamilton Avenue.

19   Q     Hamilton Avenue.  Okay.

20         And that server one of the functions of the server was

21   that it needed to operate certain of the foreclosed upon

22   businesses, is that right?

23   A     I have no idea.

24   Q     You didn't know that at the time?

25   A     No.

1   Q     Are you aware that your partner, Mr. Herbst, received a

2   communication from Mr. Youngblood on the evening of the 25th

3   about that server?

4   A     That's correct.

5   Q     And are you aware that Mr. Herbst advised that that

6   server not be moved from the location?

7   A     That's correct.

8         MR. MERVIS:  Your Honor, can I just confer with my

9   colleagues for a moment?

10        (Participants conferring)

11  BY MR. MERVIS:

12  Q     I think you said earlier that the AS400 was something

13  that was owned by TransCare.  Have you come to learn that

14  actually it was owned by the MTA?

15  A     No, that's not correct.

16  Q     That's not, right.

17  A     I think you have the servers mixed up.

18  Q     I'm sorry?

19  A     I think you have the servers mixed up.

20  Q     It is possible.  Which is the server that's owned by

21  the --

22  A     That was the server that was in Foster Avenue.

23        The server that was located on Hamilton Avenue housed

24  all of the debtors' books and records.  And there was no way

25  I was going to let that walk out on the second day of the

```
 1   case.  So, all of the debtors' books and records were on that

 2   location.

 3   Q     You say that's the AS400 server?

 4   A     That's correct.

 5   Q     Okay.

 6           MR. MERVIS:  One second, Your Honor.

 7       (Participants conferring)

 8           MR. MERVIS:  I have nothing further.

 9           THE COURT:  All right, any redirect?

10           MR. AMINI:  No redirect, Your Honor.

11           THE COURT:  Thank you.  You can step down.

12       (Witness excused)

13           MR. LAMONICA:  Thank you, Your Honor.

14           THE COURT:  All right.  We spoke about some

15   scheduling items yesterday.  Have you spoken to the Curtis

16   Mallet folks to figure out when they're available?

17           MR. MERVIS:  So, I had spoken to one of them, Your

18   Honor, and actually she's no longer Curtis Mallet.  She's

19   (indiscernible) which is Ms. Giglio, so she's got a two-week

20   old at home.  So, we did not get far enough into that

21   conversation to see if, you know, she could drag herself away

22   from the two-week old.

23           I have a call into Mr. Harrison.

24           THE COURT:  Okay.

25           MR. MERVIS:  I haven't checked but as soon as I
```

 1   talk to him, I will know whether he's available.

 2              Our expert is available on the 8th which I think

 3   is a date that we talked about yesterday but I can't recall

 4   now.

 5              THE COURT:  Do you think that your expert will

 6   take more than half of the day?

 7              MR. MERVIS:  No.

 8              THE COURT:  Well, it's kind of a dual question.

 9              MR. AMINI:  I don't believe that I have -- I don't

10   think -- I don't believe -- well, I don't know how long he'll

11   take, but I don't think we'll take more than a couple hours

12   at most.  And even that, I think might be --

13              THE COURT:  Why don't we schedule -- it's Dr.

14   Dunn, Mr. Dunn?

15              MR. MERVIS:  Mr. Dunn for August 8th at two

16   o'clock.  And I should say, Your Honor --

17              THE COURT:  Are you free now?

18              MR. AMINI:  Just one moment, Your Honor.  I'm

19   sorry.  Just let me look at my August 8th, Thursday.  No, I'm

20   fine on that date.

21              THE COURT:  Okay.  So, Mr. Dunn, August 8th at

22   2:00 p.m.

23              MR. MERVIS:  And, Your Honor, and just if I have

24   to sort of read the transcript from today to absorb, but if

25   we determine that we're not going to call Mr. Dunn, we'll,

1  obviously, give the court prompt notice.  I mean that is my

2  intention right now, but I, you know, I've been standing here

3  all day.

4          THE COURT:  And you'll check with Mr. Harrison?

5          MR. MERVIS:  Yes, sir.

6          THE COURT:  Now are you going to take Dr. Arnold's

7  deposition?

8          MR. MERVIS:  I have the same answer to that.

9          THE COURT:  Okay.

10          MR. MERVIS:  Yeah, I'm not sure, but I'll make

11  that determination in a day or two.

12          THE COURT:  Well, let's just say if you're going

13  to do it that's subject to his schedule and Mr. Amini's

14  schedule, do it by the 8th.

15          MR. MERVIS:  Oh sure; absolutely.

16          THE COURT:  And that just leaves Ms. Tilton and

17  then any redirect case that you have which we can schedule

18  that through Ms. Tilton.  Okay.

19          MR. MERVIS:  It works.

20          THE COURT:  All right.

21          MR. AMINI:  I think the only issue I have did you

22  want -- and this is for your preference.  If Mr. Dunn

23  testifies on the 8th and we want to put Dr. Arnold on after,

24  did you want him here?  I didn't ask him when he's available.

25  He's left for the day.  Did you want him here on that day or

1   can he come when Ms. Tilton comes?

2           THE COURT:  Why don't we save your rebuttal case

3   for rebuttal.  Let's do Mr. Dunn, if he's going to testify,

4   Harrison, if he's going to testify, and Ms. Tilton.  May you

5   can put on your rebuttal case or rest.  Then I'll let you

6   both.

7           MR. AMINI:  The only request I had and I spoke

8   with Mr. Mervis earlier today was a proffer of some sort so

9   that we know this ten minutes of Mr. Harrison's coming for,

10  what he's coming for.  He was not on their --

11          MR. MERVIS:  I'm happy to give a proffer.  The

12  principle or purpose of the testimony is to talk about I

13  alluded to or asked Mr. LaMonica about it a meeting that

14  occurred with Mr. Creswell and Mr. Harrison an

15  (indiscernible) with the United States Trustee's office prior

16  to the filing of the Chapter 7 petition.

17          Another petition time --

18          THE COURT:  Which is prior to the foreclosure

19  also.

20          MR. MERVIS:  I believe it was, Your Honor, yeah.

21  I can't represent that with certainty, but I believe it was.

22          And there may also be some testimony, I think Your

23  Honor will recall there was Mr. Stephen testified about an

24  all-hands meeting that occurred, I think, around the 12th of

25  February.  So, Mr. Harrison or Ms. Giglio may have some

**A1913**

1  testimony about that.  I don't anticipate it being very long

2  --

3          THE COURT:  Well what (indiscernible) say I think

4  is what Mr. Amini is asking.

5          MR. MERVIS:  All about the meeting I don't know

6  that. I can tell you if you like to know what -- so, this is

7  what they're going to say -- this is what Ms. Giglio would

8  say if she can pull herself way from her newborn would say

9  about the meeting with Ms. Rifkin which is that the parties

10 at the time were anticipating an operating seven, subject to

11 the wounds or the judgment of the trustee. And that they were

12 explaining -- in the meeting, they explained to Ms. Rifkin

13 the interplay between the operating seven or the filed

14 entities and Transcendence and the transition services

15 agreement between the two which you heard testimony from Mr.

16 Stephens about.

17          And, ultimately, the request that was made of Ms.

18 Rifkin was that if possible, she appoint a trustee with

19 experience. And I'm not questioning Mr. LaMonica's

20 experience, who would be able to deal with, you know,

21 somewhat of an unusual circumstance like that.  So that's the

22 proffer on that meeting.

23          THE COURT:  You want to hear him testify?

24          MR. AMINI:  Do I want to hear him testify?  I

25 don't know.

```
1              THE COURT:  Or accept the proffer.

2              MR. AMINI:  Can we discuss it and let him know.

3              THE COURT:  But that only relates to the -- what

4   about the February 12th meeting?

5              MR. MERVIS:  I don't have enough information

6   because I was only able to speak with Ms. Giglio for about

7   ten minutes this morning, so I don't know the answer to that.

8              THE COURT:  Does it make sense for you to send a

9   written proffer.  It can be in a letter form, but it doesn't

10  sound like it's going to be a lot to Mr. Amini.  I'm not

11  going to ask you to ask Mr. Harrison or Ms. Giglio with a

12  two-week old prepare a declaration with their direct

13  testimony and see if you can agree; otherwise, just call him.

14             MR. MERVIS:  I'd be happy to --

15             THE COURT:  I just don't want to have to call busy

16  lawyers in to testify for ten minutes.

17             MR. MERVIS:  And we don't either.  I've been

18  reluctant to do it, but I think it fills out a picture that

19  you will hear from Ms. Tilton.

20             THE COURT:  All right, so when you make your --

21  send a proffer to Mr. Amini and when you make your decision

22  about Mr. Dunn, let everybody know.

23             MR. MERVIS:  Yes, Your Honor. Should I do that by

24  letter to the court, copied to?

25
```

1          THE COURT:  I mean you can tell me that yeah.  You

2   can us that you don't intend to call him.

3          MR. MERVIS:  Okay.

4          THE COURT:  And it doesn't sound like you to have

5   to take Dr. Arnold's deposition for his rebuttal report

6   because there really is no rebuttal.

7          MR. MERVIS:  That's correct, Your Honor.  If we

8   don't call Mr. Dunn, I'm not going to take his deposition.

9          THE COURT:  Why don't you just let us know in a

10  letter beforehand.

11         MR. MERVIS:  Absolutely.

12         THE COURT:  All right, anything else?

13         MR. MERVIS:  Nothing from us.  I don't think so.

14         THE COURT:  Okay.  Thank you very much.

15         MR. MERVIS:  Thank you, Judge.

16         MR. AMINI:  Thank you, Your Honor.

17     (Proceedings conclude at 4:18 p.m.)

18

19

20

21

22

23

24

25

1                             <u>CERTIFICATE</u>

2

3        We, MARY ZAJACZKOWSKI and THERESA PULLAN, certify that

4 the foregoing is a correct transcript from the electronic

5 sound recording of the proceedings in the above-entitled

6 matter.

7

  <u>/s/Mary Zajaczkowski</u>         July 27, 2019
8 Mary Zajaczkowski, CET**D-531

9

  <u>s/ Theresa Pullan</u>           July 27, 2019
10 Theresa Pullan, CET**00650

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**A1917**

1

```
 1                    UNITED STATES BANKRUPTCY COURT
                      SOUTHERN DISTRICT OF NEW YORK
 2
     IN RE:                        .    Chapter 7
 3                                 .
     TRANSCARE CORPORATION,        .    Case No. 16-10407-smb
 4                                 .
                                   .
 5              Debtor.            .    New York, New York
 6   . . . . . . . . . . . . . .   .    Thursday, August 8, 2019
     LAMONICA                      .    2:10 p.m.
 7                                 .
             v.                    .    Adv. Proc. 18-01021-smb
 8                                 .
     TILTON, et. al                .
 9   . . . . . . . . . . . . . .

10

11                     TRANSCRIPT OF TRIAL (Continued)
               BEFORE THE HONORABLE STUART M. BERNSTEIN
12                  UNITED STATES BANKRUPTCY JUDGE

13
     APPEARANCES:
14
     For the Chapter 7 Trustee:   Salvatore LaMonica, Esquire
15                                LAMONICA, HERBST & MANISCALCO, LLP
                                  3305 Jerusalem Avenue
16                                Wantagh, New York 11793

17   For Salvatore Leggett:       Bijan Amini, Esquire
                                  Avery Samet, Esq.
18                                STORCH AMINI, PC
                                  Two Grand Central Tower
19                                140 East 45th Street, 25th Floor
                                  New York, New York 1001
20
     Audio Operator:              Electronically Recorded
21                                by K. Harris

22   Transcription Company:       Reliable
                                  1007 N. Orange Street
23                                Wilmington, Delaware 19801
                                  (302)654-8080
24                                Email:  gmatthews@reliable-co.com

25
     Proceedings recorded by electronic sound recording, transcript
     produced by transcription service.
```

```
 1   APPEARANCES (Cont'd):

 2   For The Non-Debtor          Michael Mervis, Esquire
     Defendants:                 PROSKAUER ROSE
 3                               Eleven Times Square
                                 New York, New York 10036
 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                               INDEX

2

3    TRIAL

PLAINTIFF'S WITNESS(S):

4

5        JEFFREY DUNN

6        Direct Examination by Mr. Mervis                    4

7        Cross-Examination by Mr. Amini                     40

8        Redirect Examination by Mr. Mervis                 78

9

10   EXHIBITS(s)                              I.D.    REC'D

11   PX-283    Rebuttal Report by Mr. Dunn                   9

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              (Proceedings commence at 2:10 p.m.)

 2              THE COURT:  All rise.

 3              Please be seated.

 4              Let's continue.

 5              MR. MERVIS:  Good afternoon, Your Honor.  We're

 6    starting out of order, but I'll call -- well call Jeffrey

 7    Dunn to the stand.

 8              THE COURT:  Okay.

 9              MR. MERVIS:  And we have the binder as well.

10              THE COURT:  Okay.

11                    JEFFREY DUNN, WITNESS, SWORN

12              THE COURT:  Okay, please speak into the

13    microphone.

14              THE WITNESS:  Yes, sir.

15              THE COURT:  Thank you.

16              MR. MERVIS:  All set?

17              THE COURT:  Go ahead.

18                        DIRECT EXAMINATION

19    BY MR. MERVIS:

20    Q    So, Mr. Dunn, good afternoon.  Where do you work?

21    A    Berkeley Research Group.

22    Q    And are you in a particular practice at BRG?

23    A    Yeah, I sit in the corporate finance practice.

24              THE COURT:  Mr. Dunn, would you pull the

25    microphone closer and speak into the microphone; otherwise,
```

5

```
 1  we're not going to pick you up.
 2            THE WITNESS:  Yes, sir.  Is that better?
 3            THE COURT:  Yes.  Thank you.
 4            THE WITNESS:  Thank you.
 5  BY MR. MERVIS:
 6  Q     Sorry.  Could you repeat your --
 7  A     Yeah, I work at Berkeley Research Group in their
 8  corporate finance practice.
 9  Q     All right.  And within that practice, do you have any
10  particular area of concentration?
11  A     Yeah, our corporate finance practice has several
12  different business lines.  In sit in the valuation practice.
13  Q     Prior to joining BRG -- and how long have you been at
14  BRG?
15  A     Three years, I believe, or maybe four -- June 2015, I
16  believe.
17  Q     Prior to that, where did you work?
18  A     I worked at a firm called Capstone Advisory Group.
19  Q     And what did you do at Capstone?
20  A     Capstone was substantially similar to the work I did at
21  BRG and, in fact, it is the genesis of my part of the
22  corporate finance practice at BRG.
23  Q     Okay.  And by substantially similar, the concentration
24  valuation group?
25  A     Yes, sir.
```

6

1    Q      And before Capstone?  This is the last one.

2    A      I worked at Trentwood Valuation. Trentwood was the

3    valuation consulting practice of BDO Seidman.

4    Q      All right.  Do you hold any professional designations?

5    A      I hold the right to use the CFA designation.  I am also

6    a CIRA, certified insolvency and restructuring advisor.

7    Q      Let me focus on the CFA designation.  What does that

8    acronym stand for?

9    A      The CFA stands for chartered financial analyst.

10   Q      And how does one get to become a CFA?

11   A      The CFA program is a very intensive program focused on

12   all aspects of corporate finance, economics, ethics,

13   valuation.  And there's a series of three tests that you pass

14   and work experience to get that designation.

15   Q      And the tests, do they touch on valuation?

16   A      Everything in that -- it's a financial market focused

17   accreditation so everything has a built-up component to

18   valuation.

19   Q      And are you a member of any professional organization?

20   A      As a result of my CFA, I am a member of the CFA

21   Institute. That's the governing body for the CFA designation.

22   And I'm also a member of the AIRA.

23   Q      What is AI --

24   A      Association of insolvency and restructuring advisors.

25   Q      the CFA Institute, does that organization deal with

 1  valuation issues?

 2  A    The CFA Institute is, you know, it holds -- it issues

 3  the CFA accreditation which is, again, a valuation intensive

 4  accreditation so, yes.

 5  Q    What educational degrees do you hold?

 6  A    I first got a bachelor's degree in accounting and

 7  followed that up with a master's degree in finance.

 8  Q    And about how many valuation engagements have you been

 9  involved in?

10  A    Hard to estimate.  It would be in the hundreds over my

11  last thirteen years of practicing specifically valuation and

12  valuation-related engagements.

13  Q    And what types of enterprises have you been involved in

14  valuing?

15  A    We have valued all types of businesses in all

16  industries.  I've worked on cases where we've been valuing

17  businesses, intangible assets, security interests in

18  businesses, loans and equities in businesses. So, it's the

19  full gamut of business valuation and appraisal.

20        MR. MERVIS:  Your Honor, at this point, I'd like

21  to tender Mr. Dunn as an expert on business valuation.

22        THE COURT:  Any objection?

23        MR. AMINI:  No objection.

24        THE COURT:  He is so qualified.

25        MR. MERVIS:  Thank you, Your Honor.

```
 1  BY MR. MERVIS:

 2  Q    Generally, Mr. Dunn, what was your assignment in this

 3  case?

 4  A    I was asked to review the expert report of Dr. Arnold

 5  and prepare a rebuttal report.

 6  Q    And did you do that?

 7  A    Yes.

 8  Q    All right.  If you could take a look in the binder at

 9  PX-283 which is, I think, the second to last tab.  And take a

10  moment, if you need it, but my question is do you know what

11  PX-283 is?

12  A    Yes.  PX-283 appears to be my executed rebuttal report.

13            MR. MERVIS:  Your Honor, I'd like to offer this in

14  evidence.  Obviously, it will be subject to the same

15  limitations that the Arnold was received.

16            THE COURT:  What were those limitations?

17            MR. MERVIS:  Basically, that it's just being used

18  to assist with his testimony for (indiscernible) purposes.

19  It's not actual testimony or for evidence.

20            MR. AMINI:  Subject to those same limitations, we

21  have --

22            THE COURT:  Subject to those limitations.

23        (Exhibit PX-283 received into evidence)

24            MR. MERVIS:  Thank you.

25  BY MR. MERVIS:
```

1    Q    All right.  And high level, Mr. Dunn, what do business

2    valuation professionals do?

3    A    Business valuation professionals offer opinions of

4    value. Those values could be, as we talked about earlier, for

5    full businesses, securities in businesses.  You know that is

6    the work that we do.  We do it for a variety of different

7    reasons, but it all comes down to when there's no an

8    observable market-price for something and you need an opinion

9    as to what the value would be.  That's our work.

10   Q    And what does that mean observable market price?

11   A    You know when there's two arm's length parties that are

12   transacting, you know, you have an observable sale price.

13   It's an observable value that an asset was transferred at.

14   And so, you know, if that value ends up being not affected by

15   other considerations and it's a true arm's length price, then

16   you have an observable value.

17   Q    All right.  And the work that you're doing fair to say

18   that you're valuing businesses for which there was not an

19   observable price?

20   A    Yes.

21   Q    Okay.  Now, again, at a high level are there particular

22   valuation methods that business valuation professionals

23   commonly use?

24   A    Yes.

25   Q    And, at a high level, what are they?

1   A       There's three main approaches to value: the market

2   approach, the income approach and the asset approach.

3   Q       All right.  Let's for a minute just talk about the

4   market approach.  What is the market approach?  And, again,

5   at a high level.

6   A       Yeah, the market approach is where you're using

7   observable transaction prices in other similar assets to use

8   as a reference to estimate the value of an asset that you

9   don't have observable prices for.  So, it's really a -- you

10  know, if you think about it in context of buying a house,

11  it's using other home transactions that are similar to the

12  one you're buying to estimate a value of the house.

13  Q       And are you familiar with the term guideline company?

14  A       Yeah.

15  Q       Is that part of this market approach?

16  A       Yes, the guideline public company method falls under

17  the market approach.

18  Q       All right, well we'll come back to a little more

19  specifics on that later.

20          And then just very briefly, at a high level, what is

21  the income approach?

22  A       The income approach values a business a little

23  differently.  What it looks for is what are the benefits of

24  ownership of, you know, of an asset.  So, for example, if you

25  have -- if you own a business and it's going to generate a

1  certain amount of profit every year, you can estimate its

2  value by estimating the current risk adjusted value of those

3  future profits.

4  Q     Which of the approaches that we've been talking that

5  Dr. Arnold used in this matter?

6  A     Dr. Arnold relied upon the market approach.

7  Q     And only the market approach?

8  A     Only the market approach.

9  Q     All right.  Now are you familiar with the term standard

10 of value?

11 A     Yes.

12 Q     What's your understanding of that term?

13 A     A standard of value is the definition of value that

14 your conclusion is going to conform to.

15 Q     If you could turn to Defendant's Exhibit 193 in the

16 binder and if we could just pull up the first page.  Take as

17 much time as you need, Mr. Dunn, but my first question, do

18 you know what DX-193 is?

19 A     I recognize this.

20 Q     What is it?

21 A     This is the ASA Business Valuation Standards.

22 Q     And what is the ASA?

23 A     The American Society of Appraisers.  It's one of the

24 various accreditation bodies that caters to the business

25 appraisal; or, more broadly, the appraisal industry.

```
 1  Q     And this document, these standards, in your experience,

 2  are these standards that are followed by business valuation

 3  professionals, such as yourself?

 4  A     Yes, clearly by ASA those accredited by the American

 5  Society of Appraisals.  But, you know, there's a core

 6  standard that is consistent among various standards that have

 7  been promulgated and those are followed by appraisers more

 8  generally.

 9          MR. MERVIS:  Your Honor, I'm going to read from --

10  well I'm going to read from particular portions of this under

11  Federal Rule of Evidence 80318, so I'm not going to offer it,

12  but I'm going to ask the witness to take a look at certain

13  sections.

14  BY MR. MERVIS:

15  Q     So, Mr. Dunn, if you could turn please to page 31 of

16  this -- it's a PDF document, so it will have little page 31

17  at the bottom.

18          MR. MERVIS:  And if, Tom, if you could bring up

19  the very last definition.  Thank you.

20  BY MR. MERVIS:

21  Q     So, Mr. Dunn, there's a term, it says Standard of

22  Value.  And it reads, "The identification of a type of value

23  being used in a specific engagement, e.g., fair market value,

24  fair value, investment value," do you see that?

25  A     I see that.
```

18-01... lesm... 20-c... D06... 25-L... Filed 06/14/19... Entered 09/03/19/10... Page 80... of 10... Main Document
Pg 13 of 86

13

1    Q    Are you familiar with that definition?

2    A    Yeah this is what I was speaking to.

3    Q    And, to your understanding, what is meant by when it

4    says the identification?

5    A    This is a standard of value is stated in a valuation

6    report. Because it is -- it's answering a question.  You need

7    to define what that question is.  And the standard of value

8    defines the question of what the opinion is supposed to be

9    concluding on.

10   Q    And within the definition that I read to you, there's

11   also a reference.  It says, "In a specific engagement."  What

12   does that mean?

13   A    Yeah, this just means, for the purposes of each

14   individual engagement, you will have a standard of value.

15   Those can change depending on the circumstances of the

16   engagement.

17   Q    So the standard of value is specific to particular

18   engagement?

19   A    Well, you can see here, they also identify fair market

20   value typically used in tax appraisals.  Fair value typically

21   used in accounting appraisal.  They're all very common, but

22   they are each an individual standard of value.

23   Q    All right.  Why don't we go to defendant's Exhibit 191?

24        MR. MERVIS:    And, again, Your Honor, I'll lay a

25   foundation with this an 80318 document.

 1   BY MR. MERVIS:

 2   Q     So this is toward the beginning of your -- actually,

 3   it's the first tab in your binder.

 4   A     I'm there.

 5   Q     Great.  So, Mr. Dunn, again, take a moment, if you need

 6   it, but my first question is do you know what DX-191 is?

 7   A     Yes.

 8   Q     And what is it?

 9   A     This is the 2018/2019 version of the Uniform Standards

10   of Professional Appraisal Practice, commonly referred to as

11   USPAP.

12   Q     And what organization promulgates this USPAP?

13   A     You'll see here the appraisal foundation has a board

14   that puts out -- that establishes a board that puts out USPAP

15   every two years.

16   Q     And what is the appraisal foundation?

17   A     The appraisal foundation is -- it's a congressionally

18   authorized government financed entity that is supposed to

19   establish appraisal standards.

20   Q     Now are you aware of circumstances where a business

21   valuation expert in valuing the business is required to

22   comply with USPAP standards?

23   A     Yes.

24   Q     And can you share with the court some examples?

25   A     Yes.  Loans are government backed.  In order to

1  qualify for those types of programs or under the law

2  regarding those programs, you have to issue appraisals in

3  conformity with USPAP.  So, there's various legal reasons you

4  would have to conform with USPAP.  Also, if you agree to as

5  part of your engagement with your client.

6  Q    Is there a specific USPAP standard that applies to the

7  valuation of businesses?

8  A    I think there's one that applies to the process of

9  valuing businesses, yes.

10 Q    Why don't we turn now to page 55 of DX-191.  Let me

11 know when you're there.

12 A    I'm there.

13 Q    So the heading on this page is Standard 9 Business

14 Appraisal Development.  Do you know what the standard is?

15 Are you familiar with it?

16 A    Yes.

17 Q    And what is the standard?  Just generally speaking,

18 what is the standard?

19 A    You know, it's really designed towards what process you

20 follow to develop a credible appraisal.

21 Q    Okay.  And if you look after the first paragraph on

22 this page, there's a comment that reads, "Standard 9 is

23 directed toward the substantive aspects of developing a

24 credible appraisal of an interest in a business enterprise or

25 intangible asset," do you see that?

1   A      I see that.

2   Q      Are you familiar with that commentary?

3   A      Yeah, I mean that's my understanding of Standard 9.

4   Q      Let's go down to page, it says Standard Rule 9.2, about

5   halfway down the page.  And that standard begins, it says,

6   "In developing an appraisal of an interest in a business

7   enterprise or intangible asset, an appraiser must," do you

8   see that?

9   A      Yes.

10  Q      And then there's a series of letters, (C) says,

11  "Identify the standard (type) and definition of value and the

12  premise of value," do you see that?

13  A      Yes.

14  Q      And what's your understanding of that subpart of this

15  Rule 9.2?

16  A      It's pointing out the obvious fact that as an appraiser

17  when you offer an opinion of value, it means to be defined.

18  And so, they're saying, you need to identify the definition

19  of value.  The valuation is the standard of value that you're

20  going to use in the engagement.

21  Q      In your experience, this Standard 9.2 is this something

22  that is generally accepted among professional business

23  valuation appraisers like yourself?

24  A      When you have a -- yes.  When you have a new

25  engagement, the first series of correspondence is regarding

1    what is the standard of value that the engagement is relying

2    on.

3    Q    If we could go to PX-282 in the binder.

4            MR. MERVIS:  And, Your Honor, this is actually

5    already in evidence. This is subject to the limitations that

6    we just discussed.

7    BY MR. MERVIS:

8    Q    So, Mr. Dunn, you recognize PX-282?

9    A    Dr. Arnold's report.

10   Q    And you read this?

11   A    Yes.

12   Q    And have you reviewed the transcripts of Dr. Arnold's

13   testimony in this case?

14   A    I have.

15   Q    Both the deposition and trial testimony?

16   A    Yes, sir?

17   Q    If you go to page 2 of the report in paragraph four on

18   the third line of that paragraph, he talks about, it says,

19   "Performed an analysis of the implied valuations of TransCare

20   Corporation," do you see that?

21   A    I see that.

22   Q    In your experience, is implied value a standard of

23   value that's recognized by business valuation professionals?

24   A    It is not.

25   Q    If you could turn to page 4 of the report, please.  At

1   the very top of the page, there's a series of bullet points

2   and the first bullet point starts with the words the

3   operating values, do you see that?

4   A     I see that.

5   Q     In your experience, Mr. Dunn, is operating value a

6   standard of value that's recognized by business valuation

7   professionals?

8   A     Operating value is not a standard of value.

9   Q     Having reviewed Dr. Arnold's report and his various

10  testimony, have you formed an opinion as to whether Dr.

11  Arnold, at least in his report, identified any standard of

12  value -- actually withdraw it.  Let me state the question a

13  little bit differently.

14       In your opinion in his work in his report, did Dr.

15  Arnold identify any standard of value that is generally

16  recognized by business valuation professionals?

17  A     I'm not aware that he has.

18  Q     In your opinion did Dr. Arnold comply with Standard 9.2

19  of USPAP?

20  A     Standard 9.2 requires the statement of a standard of

21  value and that I don't see a statement of standard of value.

22  Q     So no?

23  A     So, no.

24  Q     All right, let's change gears a little bit. Are you

25  familiar with the term hypothetical condition?

```
 1   A     Yes.

 2   Q     And are you familiar with the term extraordinary

 3   assumption?

 4   A     Yes.

 5   Q     All right.  I'd like to take a look at another exhibit.

 6   If you could turn to page -- I'm sorry; Exhibit PX-192.

 7         MR. MERVIS:  And, again, Your Honor, this is an

 8   80318 document.

 9   BY MR. MERVIS:

10   Q     Let me know when you're there.

11   A     Can you see that again?

12   Q     I'm sorry.  DX.  I said PX. DX.

13   A     Thank you.

14   Q     I apologize.  Thank you.

15         All right. So, again, Mr. Dunn, take as much time as

16   you need, but do you recognize what DX-192 is?

17   A     Yes.

18   Q     What is it?

19   A     It's the statements on standards for valuation

20   services.

21   Q     And is this publication promulgated by a particular

22   organization?

23   A     Yes, it's issued by the American Institute of Certified

24   Public Accountants.

25   Q     And what is that organization?
```

1    A     Commonly referred to as the AICPA.  It's the largest

2    membership organization of CPA's.

3    Q     I'd like you to go to Appendix III of Exhibit DX-192

4    which is, I think, on the 39th page, so it will say 39 of 59.

5    A     I'm there.

6          MR. MERVIS:  And, Tom, if we could bring up the

7    definition of hypothetical condition.

8    BY MR. MERVIS:

9    Q     So, it states, "Hypothetical condition that which is or

10   maybe contrary to what exists, but is supposed for the

11   purpose of analysis," do you see that?

12   A     I see that.

13   Q     And are you familiar with that definition?

14   A     That's consistent with my understanding of the meaning

15   of hypothetical condition.

16   Q     In your experience is that definition of hypothetical

17   condition one that is generally known to business valuation

18   professionals?

19   A     It is.

20   Q     If we could go back to the USPAP for a minute, so

21   that's DX-191, the first document in the binder. And if you

22   could turn please to page number 4 of the USPAP.

23   A     I'm there.

24         MR. MERVIS:  And, Tom, if we could pull up the

25   definition of extraordinary assumption.

1   BY MR. MERVIS:

2   Q      So, on this page of the USPAP extraordinary assumption

3   is defined as follows.  "An assignment specific assumption as

4   of the effective date regarding uncertain information, use in

5   an analysis, which if found to be false could alter the

6   appraiser's opinions or conditions, "do you see that?

7   A      I see that.

8   Q      And are you familiar with that definition?

9   A      Yes.

10  Q      And in your experience, is that a definition that is

11  recognized by business valuation professionals?

12  A      Yes.

13  Q      I want to ask you a question about some of the language

14  here.  First of all, do you have an understanding of what's

15  meant by assignment specific assumption?

16  A      Yeah, I think it's referring to a single engagement or

17  a single valuation opinion.

18  Q      All right.  And there's also this term uncertain

19  information, do you see that?

20  A      Yes.

21  Q      What's your understanding of what that means?

22  A      It means things that you don't know that are factually

23  true.

24  Q      So they might be or might not be?

25  A      It's uncertain.

1    Q    Okay.  In reviewing Dr. Arnold's report, did you

2    identify any extraordinary assumptions or hypothetical

3    conditions that he used in his work?

4    A    Yes.

5    Q    And did you summarize those anywhere in your report?

6    A    Yes.

7    Q    All right, why don't we go to your report which is PX-

8    283 toward the back of the binder.  And if you could go to

9    page 4.  And, Mr. Dunn, you'll see on page 4, there's a

10   paragraph (b) and then there's a little one, two, and three.

11   A    Yes.

12   Q    What are you summarizing across those three romanettes?

13   A    The first romanette is stating my opinion that

14   TransCare -- that the hypothetical or extraordinary

15   assumption incorporated in Dr. Arnold's report is that

16   TransCare had all of the assets it needed to continue

17   operating as a going concern.

18   Q    All right, let me stop you there.  And we'll take them

19   one by one.

20   A    Yeah.

21   Q    Explain for the court, what do you mean by that?

22   A    So TransCare and the facts of the case, as I understand

23   it, TransCare did not have a normalized working capital

24   position.  It also had other assets such as its rolling

25   stock, it's ambulances that were deficient and really unable

1   to support the company's continued operation as a going
2   concern.
3   Q     And in terms of Dr. Arnold's analysis, why does this
4   matter?
5   A     Dr. Arnold assumed -- his calculations calculate the
6   value of TransCare if it was an operating business; however,
7   nowhere in those calculations does it account for the
8   additional money or assets that would be needed in order to
9   maintain the company as a going concern.
10  Q     Why does that matter?
11  A     Because any market participant looking to acquire
12  TransCare what TransCare had needs to account for what else
13  they would need to contribute to TransCare in order to reach
14  a total value of the company.
15        Stated alternatively, if you know the total value of
16  the company when it's operating, you would then deduct what
17  else, you know, you deduct what you need to contribute in
18  order to maintain that as an operating business before
19  figuring out what you're willing to pay for the uncapitalized
20  business.
21  Q     In your opinion, would a market participant or could a
22  market participant make an assessment of whether its
23  advisable to invest whatever working capital is needed?
24  A     Well, yes, I mean they -- can you repeat the question?
25  Q     Sure.  Let me withdraw it.

1    In your opinion what, if anything, did Dr. Arnold do to

2    account for this issue?

3    A    Nothing.  He relied on projections that all showed the

4    company needing large infusions of additional capital and

5    that is not accounted for anywhere in his calculations.

6    Q    Let's go back to page 4 of your report and look at

7    romanette two.  What are you summarizing here?

8    A    I'm summarizing that Dr. Arnold assumes that the

9    turnaround plan -- assumes that a market participant, you

10   know, a potential investor in TransCare, would assume that

11   the turnaround plan was achieved without considering the risk

12   to that actually occurring.

13   Q    And when you say the turnaround plan or plans, what are

14   you talking about?

15   A    Dr. Arnold relies on several turnaround plans that show

16   a dramatic and rapid operational and financial turnaround in

17   the company. Those are determinative of his concluded values.

18   And so, what I'm point out is that there's on analytical

19   basis that I see presented in his work that shows why a

20   market participant would conclude that these turnaround plans

21   could be achieved.

22   Q    The turnaround plans had projections in them?

23   A    That's my understanding.

24   Q    Did Dr. Arnold make use of those projections?

25   A    Yes, he did use the projections.

1  Q     In your opinion, should a business valuation

2  professional, in looking at a set of projections, try to

3  asses the reasonableness of the projections?

4  A     Yes.

5  Q     Similar question.  In your opinion, when a business

6  valuation expert or professional is presented with

7  projections, should they make any assessment of the risks

8  that those projections will not be achieved?

9  A     Yes.

10 Q     And why is that?

11 A     Because that is the fundamental effort to work that

12 needs to be done in order to reach an opinion of value.

13 Because basically an evaluation is an assessment of risk and

14 that is what an appraisal opinion embodies is that combined

15 analysis.

16 Q     And what, if anything, did Dr. Arnold do to assess the

17 risk that the projections he relied on might not happen?

18 A     I don't see in his report an analytical basis for

19 concluding that a market participant would conclude that

20 these turnaround plans were achievable.  But it is included

21 mechanically in his, you know, his approach to valuing the

22 company.

23 Q     Right.  But did you see any evidence that he took into

24 account the risks that the projections wouldn't come true?

25 A     No.

1  Q     If you could go to another document which is DX-194.

2  Take a moment, if you need it.  But my first question, Mr.

3  Dunn, is do you know what DX-194 is?

4  A     Yes, any business appraiser would.

5  Q     And what is it?

6  A     This is Revenue Ruling 5960.

7  Q     And generally speaking, what is the subject of this

8  Revenue Ruling 5960?

9  A     Revenue Ruling 5960 was where the Treasury, I believe

10 the Treasury Department laid out the basis for the fair

11 market value standard of value.

12 Q     If you could go to the --

13      MR. MERVIS:  And, Your Honor, again, this is an

14 80318 document.

15 BY MR. MERVIS:

16 Q     If you could to the second page please.  There's a

17 Section 3 that talks about approach to valuation, do you see

18 that?

19 A     I see Section 3.

20 Q     I'm going to read from that, the paragraph .02 toward

21 the bottom of the paragraph where it says, "The value of

22 shares of stock of a company with very uncertain future

23 prospects is highly speculative.  The business appraiser must

24 exercise his judgment as to the degree of risk attaching to

25 the business of the corporation was issued the stock, but

```
 1  that judgment must be related to all of the other factors
 2  effecting value," do you see that?
 3  A    I see that.
 4  Q    In your experience is the guidance that I just read to
 5  you something that is generally known to business valuation
 6  professionals?
 7  A    Yes.
 8  Q    In your opinion, did Dr. Arnold follow that guidance?
 9  A    No.
10  Q    Why not?  Why is that your opinion?
11  A    It gets back to my previous statement which is an
12  evaluation opinion is an assessment of risk because
13  investors, market participants require higher rates of return
14  for assets that have higher risk.
15       So, two companies that generate the same future
16  expected cash flows would not have the same value if they
17  have different commensurate levels of risk in achieving those
18  projections.  So, there is no such thing as a valuation
19  opinion that a credible reliable one that absolves itself of
20  assessing the risk.
21  Q    In considering the issue of risk, do business valuation
22  professionals sometimes look at the historical performance of
23  the company that they're trying to value?
24  A    Yes.
25  Q    Did Dr. Arnold's analysis rely on TransCare's
```

1  historical performance?

2  A    His quantitative approach did not incorporate the

3  historic performance of TransCare.

4  Q    And in your experience, is it appropriate for a

5  business valuation professional to disregard a company's

6  historical financial performance when making an assessment of

7  the value of the company?

8  A    No.

9  Q    Why not?

10  A    Again, there's no way to assess the risk of achieving a

11  set of projections without understanding those projections in

12  the context of the company's historic operational and

13  financial performance.

14  Q    We're still on page 2 of the Revenue Ruling 5960 which

15  is DX-194.  I'd like to direct your attention to Section 4

16  and, in particular, beginning at paragraph .01.

17       It says, "It is advisable to emphasize that in an

18  evaluation of the stock of closely held corporations or the

19  stock corporations where market quotations are rather lacking

20  or too scarce to be recognized, all of available financial

21  data, as well as all relevant factors affecting the fair

22  market use should be considered.  The following factors,

23  although not all inclusive, are fundamental and require

24  careful analysis in each case."

25       And then (a) says, the nature of the business and the

```
 1  history of the enterprise from its inception.  Do you see
 2  that?
 3  A     I see that.
 4  Q     And you're familiar with that guidance?
 5  A     Very much so.
 6  Q     In your experience, is that guidance something that is
 7  generally known to business valuation professionals?
 8  A     In every valuation engagement.
 9  Q     Go down to paragraph .02 and then there's a little (a).
10  So point out to you, it says, "The following is a brief
11  discussion of each of the foregoing factors."  And then it
12  says (a), "The history of a corporate enterprise will show
13  it's past stability or instability, its growth or lack of
14  growth, the diversity or lack of diversity of its operations,
15  and other facts needed to form an opinion of the degree of
16  risk involved in the business."
17        And then I'm going to skip one sentence.  Then it
18  continues, "The detail to be considered should increase with
19  approach to the required date of appraisal since recent
20  events are of greatest help in predicting the future," do you
21  see that?
22  A     Yes.
23  Q     First of all, do you have an understanding of what's
24  meant by should increase with approach to the required date
25  of appraisal.  What is the required date of appraisal?
```

```
 1  A       I think they're talking about the specific date that
 2  the appraisal opinion is going to be as of.
 3  Q       And in this case, what did you understand Dr. Arnold's
 4  appraisal dates to be?
 5  A       Well they're set forth in his report, but they're early
 6  in January 2016, I believe.
 7  Q       All right.  And you're familiar with the guidance that
 8  I just read to you?
 9  A       Yes, very much so.
10  Q       In your experience, is that guidance something that's
11  generally known by business valuation professionals?
12  A       And effectuated by them in an appraisal, yes.
13  Q       Did Dr. Arnold, in your opinion, follow that guidance?
14  A       It's not clear -- his report I don't see that occurring
15  in his report.
16  Q       All right, let's go back, for a minute, to your report,
17  back to page 4, so that's PX-283.  And let's go to the third
18  romanette in your summary of extraordinary assumptions and
19  hypothetical conditions.
20          What are you summarizing in the third romanette?
21  A       Dr. Arnold doesn't account for differences in risk
22  between his selected guideline companies and TransCare when
23  he performs his calculations.
24  Q       Just to set this up.  At a very high level, what are
25  the steps, the essential steps in a market approach
```

1  valuation?

2  A    As we discussed, the market approach requires the

3  identification of relevant and comparable market data.  That,

4  you know, that process requires a search for, a screening

5  for, in this case, publicly traded companies that have the

6  most similar characteristics to the company being valued.

7  And so that's what you do is you start by, you know, figuring

8  out what is the most relevant data that's closest and most

9  instructive as to value of the asset you're trying to value.

10 Q    Now, I asked you this before, but is this term

11 guideline company that comes into play with the market

12 approach?

13 A    Yeah, there's two elements to the market -- there's two

14 different ways you can effectuate a market approach.  They're

15 both based on observable transactions; however, publicly

16 traded companies have observable transactions in their

17 publicly traded shares.  That way you can determine what the

18 value of the company is based on the transaction and those

19 shares.

20      The guidance transaction approach is when you are

21 transacting and controlling interest in companies of the

22 whole company.  So that's the difference here.

23 Q    Now when a business valuation professional is

24 researching guideline companies does it sometimes happen that

25 companies that might appear comparable have various

1  differences in terms of financial metrics with the company

2  you're trying to value?

3  A     Yeah, there's various levels of comparability, whether

4  that be, you know, exposure to comparable industry or

5  comparable business operations. There's also comparable

6  financial performance or financial metrics.

7  Q     And faced with that situation, what is a business

8  valuation professional supposed to do?

9  A     As we talked about earlier, a valuation is an

10 assessment of risk. And so, what you need to do is find the

11 most comparable data and then have an informed judgment as to

12 bridge from that data to what would be -- what a market

13 participant would apply to the particular asset that you're

14 valuing.

15 Q     Now what companies did Dr. Arnold use as guideline of

16 public companies in his work?

17 A     My understanding is Dr. Arnold relied upon an email by

18 Mr. Greenberg which contained two guideline companies so Dr.

19 Arnold intended to rely on those.  Those were Envision and --

20 the name is Air Methods Corp.

21 Q     Okay.  And, in your opinion, did Dr. Arnold perform any

22 assessment of the comparability of those guideline companies

23 to TransCare?

24 A     No, his report is glaringly absent a comparison of his

25 selected guideline companies and TransCare.

1    Q     Did you have an opportunity to make such compare?

2    A     I did for, you know, for presentation purposes, yes.

3    Q     So staying in your report, if you could go to Exhibit

4    2, which I think is the 34th page but it's toward --

5              MR. MERVIS:  Your Honor, it's toward the back.

6    It's like the --

7    BY MR. MERVIS:

8    A     It's the second to last page.

9    Q     And, Mr. Dunn, at a high level, what are you showing on

10   the first page of Exhibit 2?

11   A     I'm not sure.  It's kind of blurry.  I'm just checking.

12   Q     Well, that's why I --

13   A     I should have made it bigger.

14         What I've done here is I've provided some business

15   descriptions of the guideline companies that were originally

16   identified by Mr. Greenberg.  It includes a business

17   description and a breakdown of their different segments which

18   is the different business operations that they have.

19   Q     So let me pick up on the segment piece of that.  For

20   Envision Healthcare, there appears to be two segments, is

21   that right?

22   A     Yes.  As of the valuation date, Envision Healthcare

23   Holding -- as of the valuation dates, Envision Healthcare

24   Holdings, Inc. operated in two different business segments or

25   basically two different industries.

1   Q    And what were they?

2   A    About two thirds of Envision's business or, you know,

3  the majority, two thirds was in staffing acute care centers,

4  surgical centers, and other, you know, healthcare practices.

5   Q    And to your understanding, did TransCare have any

6  business in staffing acute care centers?

7   A    No, it did not.

8   Q    And you said two thirds; two thirds of what?

9   A    Of its total revenue and also as you see here, as

10  presented in Exhibit 2, it's operating in, it's

11  profitability.  The other third of it is revenue and

12  profitability was derived from healthcare transportation

13  services.

14   Q    And then looking at the next company, Air Methods, what

15  at the time of the data that Dr. Arnold used, what was Air

16  Methods principle business?

17   A    Air Methods is principally an operator of helicopter

18  transportation services.  And what you'll see here is just a

19  general breakdown of the different types of end uses of those

20  transportation services, all involving helicopters.

21   Q    And to your understanding, did TransCare have any

22  helicopter-based services?

23   A    I haven't seen any evidence that TransCare operated

24  helicopters.

25   Q    And based on, at least on the research that you did, as

1  summarized in Exhibit 2 to your report, did Air Methods

2  generate any revenue from the operation of we'll call them

3  ambulances with four wheels?

4  A     Ground based ambulances with that clarification, I

5  don't believe Air Methods operated any ground-based

6  ambulances.

7  Q     Let's go to Exhibit 1 in your report which is a little

8  easier to read.

9            MR. MERVIS:  Your Honor, it's just the page

10  before.

11  BY MR. MERVIS:

12  Q     Mr. Dunn, what are you showing, generally speaking;

13  what are you showing on Exhibit 1?

14  A     So, I'm sorry, this was Exhibit 1, right.  Exhibit 1

15  sets forth the comparative financial measures of TransCare as

16  compared to the three guideline companies identified by Mr.

17  Greenberg.

18  Q     Okay.  And where does this data come from?

19  A     This data is sourced from Standard & Poor's Capital IQ.

20  It's a, let's call it a research service that compiles

21  publicly available information and allows you to access in a

22  more centralized location.

23  Q     Did Dr. Arnold in his work also take data from Capital

24  IQ?

25  A     I believe he did, yes.

1   Q     All right, let's just take a look at a few of the line

2   items. So, LTM Revenue at the top, what does that refer to?

3   A     LTM is the last twelve months.  So when you're looking

4   at a revenue measure, it's over a period of time, this is

5   designating that as of the date this analysis is being

6   performed, the last twelve months revenue for TransCare was

7   about $114 million dollars.  And that compares to -- and I've

8   compared it here to the guideline companies which Envision

9   generated over $5 billion dollars' worth of revenue and Air

10  Methods also over $1 billion dollars of revenue.

11  Q     And then if you switch -- go down to the EBITDA column.

12  LTM EBITDA what does that line item refer to?

13  A     Again as a financial measure of profitability over

14  time, this is designating that these are measures over the

15  last twelve months as the date this analysis is being

16  performed.  And you can see here, I'm comparing TransCare

17  Corporation's $1.4 million dollars of LTM EBITDA to the $582

18  million dollars of EBITDA generated by Envision. And the $284

19  million dollars of EBITDA generated by Air Methods

20  Corporation.

21  Q     The next line item LTM EBITDA March, and what is that?

22  A     That is the ratio of LTM EBITDA to LTM revenue.

23  Q     And you've got a comparison here too?

24  A     Embedded in this chart is a comparison of TransCare's

25  1.2 percent EBITDA margin as compared to the guideline

1 companies that were substantially more profitable.

2 Q   And then the last thing I want to touch on this case is

3 EBITA gross.  So, you have two-line items below that, three

4 years, five years.  Just if you could explain for the court

5 what you're doing?

6 A   Yeah, so one of the things I wanted to compare was the

7 historic -- not only the last twelve months of performance of

8 the company versus the guideline companies, but also what

9 were the established trends of the guideline companies as

10 compared to TransCare.

11       And what you'll see here with TransCare borne out

12 by TransCare's financial data is that the company had

13 declining revenues and declining profitability over a long,

14 you know, three and five year periods in advance of the date

15 this analysis.  That similar historic financial and

16 operational performances is inconsistent with that of

17 Envision Healthcare and Air Methods Corp who had demonstrated

18 a history of growing revenue and growing profitability.

19 Q   What significance, if any, did that comparison have?

20 A   Well, it helps you understand what the company's

21 circumstances are, the reality and the differences between

22 TransCare and Envision.  And basically, is a way of assessing

23 the risk of, you know, any forward expectations for the

24 companies.

25 Q   Now these differences that we've been looking at over

1   the last few minutes, do they necessarily mean that Envision

2   and Air Methods are not appropriate guideline companies for

3   TransCare?

4   A    Guideline companies, there's no two perfectly

5   comparable companies, so this analysis doesn't mean that, you

6   know, Envision Healthcare Holdings or Air Methods Corp aren't

7   the most relevant available market data that would be used by

8   a business appraiser.

9   Q    In your judgment and experience, is there anything that

10  a business valuation professional should do to account for

11  the types of differences, both in financial metrics and in

12  the types of business operations that these guideline

13  companies have?

14  A    Yes.  A business appraiser would need to take these

15  differences into account simply, you know, blinding oneself

16  to the differences between the guideline companies and the

17  subject company is not what a business appraiser does. They

18  take responsibility for bridging that difference.  And

19  there's various ways they would account for that because a

20  market participant wouldn't account for that and they might

21  do that by lowering the applied multiple or the observed

22  multiple for the better situated guideline companies.

23  Q    Can you just explain that a little more specifically?

24  A    Yeah.  So, this may be the most comparable market data.

25  It still may be of companies that are much better positioned

18-01...Case:am...Doc...225-L...Filed...Doc...11/19...1...Entered...09/03/19/24...Page...8...Main...Document
Pg 39 of 86

39

1  financially and operationally.  And, therefore, even though

2  you would use this to assess a market participant's basis of

3  appraisal of comparable companies, you would need to take

4  into account the more risk or the higher level of risk that a

5  market participant would ascribe to the subject company.

6  And, therefore, that would mean that the subject company may

7  command a market multiple less than that observed for the

8  guideline companies.

9  Q    And if one were to do that almost lower the multiple,

10 what would the impact be on overall conclude value?

11 A    Right, the multiple lowering lowers concluded value.

12          MR. MERVIS:  Your Honor, if could just have a

13 moment to confer with my colleagues?

14          THE COURT:  Yes.

15          MR. MERVIS:  Just one moment, Your Honor.

16      (Pause)

17          MR. MERVIS:  I'm advised by Mr. Silagi that I

18 misread one of the standards, so I'll just -- for

19 correctness, this is in DX-191 on page 4, the definition of

20 extraordinary assumption.

21          I had said, and I'm taking it from the last clause

22 of the definition, could alter the appraiser's opinions or

23 condition.  I should have said could alter the appraiser's

24 opinions or conclusions.

25          And with that, Your Honor, I have no further

1  questions.

2                        CROSS-EXAMINATION

3  BY MR. AMINI:

4  Q     Good afternoon, Mr. Dunn.

5  A     Good afternoon.

6  Q     Now, let me ask you about these standards for a moment

7  or let's just do them by number; DX-191, do you know that

8  one?

9  A     Yes, sir.

10 Q     That one, remind me, again, that one applies to whom?

11 A     USPAP is issued by the Appraisal Foundation.  The

12 Appraisal Foundation is a government funded organization who

13 was specifically designed to issue appraisal standards for

14 where the government requires the adoption of these standards

15 for certain purposes.

16 Q     Are you holding yourself out as an expert on these

17 standards?

18 A     These standards are commonly understood in the

19 valuation appraisal practice.  I don't know what an expert on

20 these standards entails.

21 Q     Is there a -- on the USPAP is there a group that are

22 members of some organization that apply these standards?

23 A     As I said, these standards are required by law for

24 certain purposes, so I don't know that there are specific --

25 those are the circumstances where it's required to comply

1   with USPAP.

2   Q    Well what circumstances are they required by law for?

3   A    As we discussed earlier, there are certain federally

4   guaranteed loan programs where collateral valuations are

5   necessarily to be -- my understanding is that they are

6   necessarily to be prepared in conformity with USPAP.

7   Q    And where do you get that understanding from?

8   A    That's my understanding of USPAP.

9   Q    What's the source of USPAP of what you just said?  Are

10  you reading a document or from some other place?

11  A    I don't know whether there's specifically addressed in

12  this.  I'm looking at the forward which talks about the

13  history of USPAP.  These standards are widely accepted and

14  recognized by all the business valuation appraisers, so I

15  struggle to answer your question.

16  Q    You're not subject to these standards, are you?

17  A    When I issue a valuation report unless I am going to

18  issue a valuation report that's used for one of the places

19  where it's legally required or I agree that a USPAP compliant

20  report is the deliverable that I've agreed to provide my

21  client, I'm not bound to provide a valuation that complies

22  with these, although depending on what you're talking about,

23  I'm confident it applies or it conforms with the thrust of

24  these standards.

25  Q    Let me take you to DX-192, the next document, if you

1   would.

2   A      Yes, sir.

3   Q      Remind me, again, who these standards apply to, if you

4   know?

5   A      My understanding is these standards apply to CPA's who

6   are members of the American Institute of Certified Public

7   Accountants.

8   Q      Are you holding yourself as an expert with respect to

9   these standards?

10  A      I'm not a CPA.

11  Q      So you're not a member of the Association --

12  A      I'm not a member --

13  Q      -- that develop these standards, are you?

14  A      I am not a member of the AICPA which is a CPA

15  organization.

16  Q      And then the third standard, the American Society of

17  Appraisers, ASA business valuation standards; who do those

18  apply to?

19  A      The American Society of Appraisers is one of the

20  various accreditation agencies for business and other asset

21  appraisers.  And they issue these standards and their members

22  are required to issue their reports in compliance with these

23  standards.

24  Q      Are you holding yourself out as an expert on these

25  standards?

1  A    I struggle to answer what an expert in these standards

2  is.  I've set myself as an expert in business appraisal.  And

3  there's a broad overlap of the core thrust of these standards

4  amongst all three of these documents that I -- yes, I am an

5  expert in applying those appraisal practices.

6  Q    You're not a member of the American Society of

7  Appraisers?

8  A    I am not.

9  Q    These standards don't apply to you?

10 A    I'm not obligated to comply with these standards.

11 Q    And then go with me you've cited DX-194 Treasury

12 Ruling.

13 A    Revenue Ruling 5960.

14 Q    5960.  Are you holding yourself out to be an expert on

15 that?

16 A    It's a document issued by the U.S. Treasury.

17 Q    You made a comment that I missed it, something about

18 this is the U.S. Treasury's -- how did you describe this

19 document?

20 A    This is an IRS Revenue Ruling which set forth basically

21 the, at the time, the definition of fair market value.  It's

22 probably the first document that a business appraiser reads

23 when they get their first job in business appraisal.

24 Q    And what does it apply to, do you know?

25 A    You know, the fair market value standard which is used

1   for a variety of purposes.  One of those purposes is tax

2   issues.

3   Q     Well, my real question was what does this Revenue

4   Ruling apply to, if you know?

5   A     Tax appraisals that are performed in support of

6   people's -- a company's taxes and issue to the federal

7   government.

8   Q     It's for estate tax and gift for tax purposes isn't it

9   specific to those, is it not? Are you aware of that or not?

10  A     Maybe this document is in that context.  Fair market

11  value standard is used widely for a variety of purposes.

12  Q     It says here in Section 3.03 of the document on the

13  second page --

14  A     Yes, sir.

15  Q     -- that in many instances the next best measure -- I'm

16  reading the last sentence -- may be found in the prices of

17  which stocks companies engage in the same are similar lines

18  of business are selling in a free and open market.  Do you

19  see that?

20  A     I see that.

21  Q     All right and were you aware of that?

22  A     Most definitely.

23  Q     Let me -- well let me get one other thing out of the

24  way.  You have no opinion in this case on what standard of

25  value should be applied to TransCare in January and February

1   of 2016, correct?

2   A    I don't have a -- it seems to me to be a legal issue

3   what standard of value the court thinks this measurement

4   should be performed on.

5   Q    Right.  But you have no opinion --

6          THE COURT:  Did you reach an opinion regarding the

7   value of TransCare say on February 24th, 2016?

8          THE WITNESS:  I did not independently do that,

9   Your Honor.

10  BY MR. AMINI:

11  Q    Did you reach any opinion on what TransCare's value was

12  at any time in January or February of 2016?

13  A    I have not specifically quantified a value for

14  TransCare on any specific date, any of the four dates that

15  Dr. Arnold used.

16  Q    That actually leads me to another question which is in

17  this case, give me one moment.  I'm sorry.  In this case, it

18  wasn't part of your assignment to as, I think you stated at

19  your deposition, evaluate the actions that led to the factual

20  record in this matter, is that right?

21  A    In the context that I was being asked questions about

22  people's actions that led to the facts that were being

23  incorporated into the valuation, I wasn't engaged -- it

24  wasn't within the scope of my work.

25  Q    So, for example, you have no opinion on Michael

1  Greenberg's efforts with respect to the TransCare Company in
2  January and February of 2016?
3  A    No.  No, I don't.
4  Q    So, you have no opinion, of any sort, about the work
5  that he did in connection with these plans that he was
6  working on in January and February 2016?
7  A    I struggle to answer that question because, I mean, my
8  report clearly talks about the plans and the achievability of
9  those plans, but if you're specifically speaking to the
10  effort that Mr. Greenberg put into developing those plans
11  that wasn't part -- I took the plans at face value and
12  analyzed them rather than the process that led to them.
13  Q    Do you have any opinion about Michael Greenberg's
14  competency?
15  A    I'm not here to offer any opinions on his competency.
16  Q    You referenced the email, the December 18th email, of
17  Mr. Greenberg's in your direct testimony if I'm not mistaken.
18  I don't know if it's in your book or not.  It's JX-55.
19       Do you have any opinion on the work that Mr. Greenberg
20  did with respect to -- that's reflected in this particular
21  email to his boss, Lynn Tilton?
22  A    Are we speaking specifically about the guideline
23  companies that he identifies?
24  Q    Anything that he did with respect to what -- let me ask
25  you this.  Let me back up for a second.  Do you have an

```
 1   understanding of what the purpose of this email was?

 2   A    Other than is explicitly written in this email?

 3   A    Yes.

 4   Q    You didn't read his testimony in this case?  Did you

 5   read his testimony in this case, that's the proper question?

 6   A    At trial?

 7   Q    Yes.

 8   A    I have not read the trial transcript.

 9   Q    Well, did you have an understanding that the purpose of

10   this particular email was to get an idea of the potential

11   comparable transactions, the comparable public companies that

12   existed within the same or ancillary industries to TransCare?

13   A    I think that's clear from the email.

14   Q    All right.  Do you think that Mr. Greenberg made some

15   kind of mistake in connection with that undertaking?

16   A    That's not my testimony, no.

17   Q    No, I'm just asking.  Do you think he made a mistake?

18   A    What you just read to me is my understanding of what

19   led to this email.

20   Q    Do you have an opinion on whether Mr. Greenberg

21   properly identified relevant comparable transactions?

22   A    Can you repeat the question?  I'm sorry.

23   Q    Do you have an opinion on whether Mr. Greenberg

24   properly identified relevant comparable transactions?

25   A    Well, I mean, the transactions specifically I haven't
```

1  concluded that there is more comparable transactions that

2  should have been identified.  My testimony isn't that these

3  aren't the best market data that could be identified.  My

4  opinion is that it's still not comparable to TransCare.

5  Q    I thought I heard you just say you did not

6  independently identify any comparable company group, did you?

7  A    I haven't run an independent process to identify market

8  data, no.

9  Q    So, I can take it from that last answer that -- well,

10 let me ask my question again.  You did not independently

11 identify a comparable company group to TransCare, did you?

12 A    I didn't independently run a screen to find other

13 potential guideline companies.  My understanding is that

14 these two companies are the most comparable.  If we're

15 talking about the public companies that they are the most

16 comparable.  The question is whether -- how closely

17 comparable are they.

18 Q    All right.  So, you agree that they are the most

19 comparable?

20 A    I haven't found anything to dispute that.

21 Q    Did you find anything else that should have been

22 included -- that you believe should have been included in

23 that group?

24 A    I haven't identified any other companies that are more

25 comparable or equally as comparable as those.

```
 1   Q    How about the relevant comparable transactions; do you
 2   have any opinion on whether Mr. Greenberg properly identified
 3   the relevant comparable transactions that he references?
 4   A    I haven't done the work to confirm that.
 5   Q    You didn't independently identify any other comparable
 6   transactions, did you?
 7   A    It wasn't within the scope of my engagement.
 8   Q    And on that same score do you have any understanding of
 9   whether there are any relevant comparable transactions that
10   you believe Mr. Greenberg missed?
11   A    I haven't done the work that would need to conclude on
12   that.
13   Q    As I understand it you did ask your staff to gather
14   industry reports that existed for the ambulance industry and
15   for the air ambulance industry, did you not?
16   A    That is true.
17        (Participants confer)
18   BY MR. AMINI:
19   Q    And if you would go with me, in the book that I just
20   gave you, to PX-287.  That was one of the two reports that I
21   believe your staff found for you when you asked them to
22   gather industry reports that existed for the ambulance and/or
23   air ambulances.
24   A    That is correct.
25   Q    Then PX-288 is the other report that your staff found
```

1  for you.  That one refers to the air ambulance serves in the

2  United States.

3  A     Yes.

4  Q     That one includes that company you were referring to,

5  which one was it that flies helicopters?

6  A     I think its Air Methods.

7  Q     Air Methods, yes.  And they were included also in the

8  ambulance service report as a market participant as well, are

9  they not?  Do you recall that?

10  A    I'm not sure I recall that at this time.  If you want

11  to direct me to where that's true.

12  Q     That's okay.  And just so we're clear, those are the

13  only reports.  Based on your memory, those are the only

14  industry reports that your staff were able to find for you,

15  correct?

16  A    The only reports I -- I asked for -- well, I mean, my

17  question to my staff is there separate industry reports for

18  ambulances versus air ambulances.  Are they designated as

19  separate industries and the answer was is they came back with

20  these two reports which differentiated between operators of

21  air ambulances and ambulances.

22  Q     So, you were looking for these reports so that you

23  could see if there is a differentiation by people who follow

24  these industries between air ambulance services and ambulance

25  services?

1    A      Yes, sir.

2    Q      And you were not able to find any other reports or your

3    staff didn't present you with any others?

4    A      My request wasn't met with any other information.

5    Q      And with respect to 287, the ambulance services in the

6    U.S., this was the only report that your staff found for you?

7    A      I'm sorry, is that -- I don't understand.

8    Q      With respect to just the ambulance.  Forget the air

9    ambulance for a minute.  In the ambulance services in the

10   U.S., this is the only report that your staff was able to

11   find in response to your request?

12   A      Yes.  They went to -- again, I asked them to go to a

13   specific source, IBISWorld, and provide those.  So, this was

14   -- I don't think IBISWorld is going to have two ambulance

15   reports.  That is the only clarification I'm trying to make

16   there.

17   Q      Let me turn now to your report for a moment.  I put it

18   in this notebook as well.  It's PX-283.

19          If I'm understanding your report correctly you take

20   issue with Dr. Arnold based on what you believe are the

21   different characteristics of the comparable companies?

22   A      I point out that what Dr. Arnold didn't do was an

23   evaluation of the comparability of TransCare to the guideline

24   companies.  My understanding is he solely relied on the email

25   of Mr. Greenberg.

1  Q      And if you go with me, I guess, to, your pages, 22, Mr.

2  Mervis took you through your Exhibit 1 and 2 -- I'm sorry,

3  Exhibit 2 and 3.

4  A      I think you were correct. I think it was Exhibit 1.

5  Q      And 2. Page 22 is the actual part of your report that

6  addresses some of those differences that you think exist that

7  needed to be accounted for. Am I right about that?

8  A      22 is a listing of the differences in the financial

9  metrics that were presented in my Exhibit 1, yes.

10 Q      And if I understand correctly, going to the second

11 bullet point, your first bullet point is that the air

12 ambulance -- I think you already pointed this out that you

13 don't believe that the helicopter ambulance service is in the

14 same category as ground transportation ambulance services for

15 these purposes?

16 A      Depending on what you mean by category. I mean we can

17 all recognize that operating helicopters is different. You

18 know, a nationwide fleet of helicopters that are doing life

19 flights between hospitals and from accidents is different

20 from a company operating ground-based ambulances at local

21 hospitals and for local transportation is. They're different

22 companies.

23 Q      Other than the fact that one flies and one goes along

24 the road, what are those differences?

25 A      I mean, one is the operation of aviation which is, you

1  know, multi-million dollar aircraft.  Commensurately, my

2  understanding is that the reimbursement, you know, revenues

3  that they generate substantially higher for their services.

4  There is all sorts of differences between that business and

5  in-ground based ambulances.

6  Q     What I heard in your answer, and correct me if I'm

7  wrong, is they charge more to helicopter from point A to

8  point B then it would to drive you there in an ambulance?

9  A     It's a completely different service.

10 Q     And, two, the air ambulance company has much greater

11 capital needs?

12 A     I don't know if that's what I said. I did say that

13 helicopters are different from ambulances.  Yes, they are

14 more expensive, that's for sure.

15 Q     Okay.  For our benefit are you -- do you know of any

16 other differences?

17 A     I mean they operate in -- are you talking about between

18 the guideline companies and TransCare?

19 Q     I'm talking between helicopter ambulance companies and

20 ground transportation ambulance companies.

21 A     I haven't prepared a list of those things.

22 Q     Fair enough.  Let's go to IM-2 on Page 22.

23 A     Yeah.

24 Q     Now this one, as I understand it, the point you're

25 trying to make there is because these are larger companies,

1   they're more attractive, they're more valuable.

2   A    I would characterize it as larger companies are often

3   associated with lower risk.

4   Q    Is that true in any industry.

5          THE COURT:  Let him finish the answer.

6          THE WITNESS:  Lower risk businesses are not

7   ascribed the same required rates of return and commensurately

8   market multiples as higher risk smaller businesses.

9   BY MR. AMINI:

10  Q    So, going back to the first part of that answer larger

11  companies are less risky?

12  A    Accounting for differences.  I mean size is a measure

13  of risk.

14  Q    Are larger companies less risky in the ambulance

15  industry or not?

16  A    Holding all things constant a larger company is viewed

17  by market participants as less risky than the smaller one.

18  Q    And do you have any data, are you presenting any data

19  to support that opposition in this case?

20  A    That's why we recognize size as a measure of risk.

21  Q    Let me go to the third bullet point in your report.

22  This one says that -- well, I'm not sure what it is.  That

23  they had substantial higher profitability.  Your equating

24  profitability with the last twelve months EBITDA margins that

25  are larger, is that right?

```
 1   A     I'm pointing out an analysis of the profitability of
 2   TransCare versus the guideline companies that Dr. Arnold did
 3   not include in his report.
 4   Q     That wasn't my question.  I'm sorry.  Maybe I asked it
 5   wrong.  I'm trying to understand in this particular -- you're
 6   equating higher profitability with EBITDA margins?
 7   A     EBITDA margins are a measure of relative profitability,
 8   yes.
 9   Q     That was all I was asking.
10   A     Understood.
11   Q     All right.  So, you're saying in this one that if you
12   have a higher EBITDA margin, you're more valuable?
13   A     I don't see where it says that on this page.
14   Q     Why do the EBITDA margins matter?
15   A     Well, I think it matters very much because what you see
16   here is TransCare's last twelve months EBITDA is such a low
17   percentage of their revenues that they're barely profitable
18   and that tells you a lot about whether this has everything to
19   do with the state of TransCare on the day of the valuation.
20   Q     I had thought that what the point was that a comparable
21   company, if it has a higher EBITDA margin, you need to make
22   an adjustment in valuation?
23   A     I think that's an overly simplistic way of looking of
24   the fact that TransCare was barely profitable as of the
25   valuation date on trailing basis and that that should be
```

1  considered when you're comparing it to companies that have

2  shown the ability to be substantially profitable.

3  Q    Well, is there data that you're presenting in this

4  industry or any industry in which demonstrates that EBITDA

5  margins impact valuation?

6  A    Other than recognizing that EBITDA margins are -- no,

7  they're not.  We don't have that here.

8  Q    As I understand it --

9  A    But that's not consistent with what I understand my

10 report to try to be saying here.

11 Q    As I understand your points, though, you're saying that

12 the multiple that Dr. Arnold gives needed to have a downward

13 adjustment because of these factors.

14 A    That's not what my report specifically says.  Some of

15 those that is true.  This number -- if you read the

16 introduction to this section it says an analysis of the

17 comparability of these companies would have identified the

18 following.

19 Q    So, you're not saying that.  There doesn't need to be a

20 downward adjustment because of these?

21 A    We're talking about number three specifically?

22 Q    Yeah.

23 A    Okay.  Number three, I think there is a downward

24 adjustment.  It's not simply because TransCare has lower LTM

25 profitability, but what that measure actually reflects, which

57

1  is TransCare is barely profitable at the time this valuation

2  is being performed.  It's probably not even generating enough

3  profitability to cover the necessary investments to continue

4  operating.  That is of critical importance in determining

5  whether it's comparable to Envision and would command the

6  same market multiple.

7  Q    Do you have an opinion on whether the lower EBITDA

8  margin would alter a lower multiple?

9  A    It's not strictly a function of the EBITDA margin.

10 Q    And --

11 A    It's what it represents.

12 Q    -- are you familiar with marketplace data that would

13 address that issue?

14 A    Again, I'm not setting forth that EBITDA margin in and

15 of itself is supposed to somehow be directly related to a

16 decline in multiple.  What I'm saying is TransCare is barely

17 profitable at the date this valuation is being performed and

18 that is of critical importance to a valuation that relies on

19 market data for companies that aren't in that circumstance.

20 Q    Let's go to the fourth one, Envision and Air Methods.

21 They had a history of increasing revenues and EBITDA over a

22 three-year period whereas TransCare's EBITDA declined by an

23 annualized rate negative 46.4 percent in that same period.

24 A    Agreed.

25 Q    What is the -- now, are you saying here that the growth

1  rates of the comparable companies have to be taken into

2  consideration when establishing that multiple?

3  A    What I'm saying is that when applying the multiple of

4  guideline companies that have an established history of

5  growth in both size and profitability and you're comparing

6  that to applying that to measures of a company that has an

7  established history over a long term of deteriorating

8  operational and financial performance that that would

9  definitively be a consideration of a business appraiser in

10  determining what multiple to apply.

11  Q    That would require the multiple to go down in this

12  case.  I think your report says dramatically.

13  A    Yeah.  The risk is substantially higher.

14  Q    How much higher?

15  A    You're asking me to parse the part of business

16  appraisal.  Its part art, part science.

17  Q    Well, did you make any effort to quantify that in this

18  case?

19  A    My analysis was not within the scope of my report to

20  specifically quantity the value.

21  Q    Are you presenting -- do you have any data to support -

22  - I think what you just said is if you take both growth rates

23  -- if you take all three growth rate, size and profitability

24  comparables within the same industry the ones that have all

25  three of those that are greater than everyone else will have

1  larger values.  Larger multiples, I'm sorry.  Am I correct?

2  A      I apologize, one more time.

3  Q      That's fair enough.  If I understand correctly, you're

4  now saying that the combination of growth rates, size of a

5  company and profitability is measured by margins, the EBITDA

6  margins is determinative of the size of the multiple that

7  should be applied to a particular competent industry.

8  A      What I'm saying is that when you consider these

9  comparisons between TransCare and the guideline companies a

10 business appraiser would first evaluate these issues and then

11 take them into account, and recognize that each one of these,

12 in its own way, is a measure that there's additional risk to

13 an investment in TransCare as compared to an investment in

14 Envision.  And because they have assessed this as a riskier

15 investment, they have higher required rates of return and

16 higher rates of return are, basically, the equivalent of

17 applying a lower multiple.  So, Envision multiples assume a

18 certain rate of return and then there's a higher rate of

19 return for TransCare then a lower multiple would be applied

20 to TransCare.

21 Q      For that business appraiser to do what you just said

22 you're assuming that those factors will, in fact, across the

23 board within an industry impact the multiple that should be

24 used, correct?

25 A      It's in the assessment of risk, yes.

1  Q      And do you have any data to support such a hypothesis?

2  Are you presenting any in this case?

3  A      We've gone through various of these bullets on Page 22.

4  Do I have specific data here today to try to quantitatively

5  impact each one of these into a reduction in multiple; no, I

6  don't.

7  Q      I'm asking actually a different thing.  I know you

8  don't have any data to quantify it with respect to TransCare.

9  I'm asking do you have any data, industry data, to quantify

10  it generally within an industry, particularly the ambulance

11  industry, but let's say any industry.

12  A      This is part of what it means to be a business

13  appraiser and have an opinion of value.  You suggest that

14  there is no informed judgement that goes into assessing a

15  risk between these observable companies, guideline companies

16  and the subject company.  And I reject that bullet.

17          THE COURT:  Let me ask a question.  Having done

18  the analysis of the comparables and knowing what you know

19  about TransCare do you have an opinion about how much we

20  would lower the multiples of the comparables to compare them

21  to TransCare?

22          THE WITNESS:  Your Honor, I'm not even a hundred

23  percent sure that a market participate would apply a multiple

24  to TransCare because the question becomes what are you

25  applying that multiple to.  If it's a turnaround plan that

1  has, you know, a lot of elements of risk they may not

2  conclude that those are the appropriate projections.

3       The company, on the day of these valuations,

4  doesn't have the assets necessary to continue operating as a

5  going concern.  A market participant might buy this company

6  expecting to liquidate it in a couple weeks.  So, the

7  question of, you know, how to determine what multiple to

8  apply it kind of factors away some of the most important

9  considerations of like what is the company that's actually

10  being valued here.

11       THE COURT:  I thought, though, that some of the

12  analysis assumed a certain level of financing which a buyer

13  might have to do, right?

14       THE WITNESS:  Yeah.

15       THE COURT:  And it assumed, for instance, the cost

16  of forty new ambulances or whatever.

17       THE WITNESS:  Yeah.

18       THE COURT:  And weren't those baked into the

19  projections that Mr. Greenberg did and, I think, Carl Marks?

20       THE WITNESS:  Right.  They were embedded as cash

21  requirements to stabilize the company.

22       THE COURT:  Because earlier I thought you said

23  there was no information regarding how much capital you would

24  have to expend in order to achieve the results that they were

25  talking about?

1          THE WITNESS:  Well, I think there's two things.

2     My point is Dr. Arnold, in his calculations, doesn't account

3     for the fact that the projections say that you need

4     additional capital.

5          THE COURT:  Right.

6          THE WITNESS:  Nowhere quantitatively.  The second

7     is just the additional capital doesn't necessarily mean you

8     effectuate this turnaround.  I mean, I think, when you go

9     through the documents surrounding these plans, you'll

10    appreciate that a lot of things need to happen other than

11    just money showing for this company.

12         THE COURT:  That's true in every forward-looking

13    valuation.

14         THE WITNESS:  And in this case I suggest that

15    there's a lot, a very large list of things that need to

16    occur.  So, my point is that I'm looking at TransCare on the

17    valuation date and there's fundamental questions about what a

18    market participant would see as valuable of TransCare.  So,

19    making a specific adjustment to a multiple and applying it to

20    a turnaround plan that shows it achieving all these things I

21    can't quite -- I haven't come to a specific determination of

22    what number that might be to what projection.

23    BY MR. AMINI:

24    Q    I heard you actually say that you haven't even come to

25    a conclusion that a market participant would apply a multiple

1  in that circumstance, correct?

2  A    That's true.

3  Q    All right.  And would you -- is Ms. Tilton included in

4  your market participants?

5  A    I'm talking about to the turnaround plans.

6  Q    No.  I'm asking you when you use the word market

7  participant would you include Ms. Tilton in that.

8  A    If the market participant was valuing the company,

9  assuming it would continue as a going concern, applying a

10  market multiple would be the way that they'd go about doing

11  that.  My point was there may be a market participant who

12  does not assume that happens and that could be a valuing

13  liquidation.

14  Q    Did you know whether Ms. Tilton, as a market

15  participant, did that in this case?

16  A    With respect to which company?

17  Q    TransCare.

18  A    Itself, I haven't seen a valuation performed by Ms.

19  Tilton of TransCare especially one that uses the turnaround

20  plan.

21  Q    I missed the last part, I'm sorry.

22  A    I haven't seen a valuation performed by Ms. Tilton.

23  Q    You said something about the turnaround plan.

24  A    I was just saying I haven't seen a valuation performed

25  by Ms. Tilton here.

1   Q      Have you heard of one referred to by Ms. Tilton?

2   A      I mean, I assume you're eluding to the Newco.

3   Q      Whatever you know.  I shouldn't assume anything.

4   A      I'm just trying to make sense of your question.

5   Q      Let's talk about the plans because you earlier --

6          THE COURT:  Well, I think his question was were

7   you aware that Ms. Tilton had proposed a multiple for Newco?

8          THE WITNESS:  If that's the question then I

9   understand that.  That is my understanding.  That is of a

10  company that is capitalized.  That is a different company.

11  BY MR. AMINI:

12  Q      What were the capital requirements of Newco?

13  A      My understanding is that there was contemplated

14  transaction to create Newco that didn't happen. That there

15  was a contemplation of an additional, I think, $10 million

16  dollars of equity capital that was needed to capitalize that

17  -- that was contemplated to capitalize that company.

18  Q      What is the $10 million dollars of equity capital that

19  you were referring to?

20  A      That's just my recollection.

21  Q      What do you understand the $10 million dollars of

22  equity capital to have been?

23  A      The capital needed to get the assets necessary to

24  continue operating Newco.

25  Q      What assets did Newco not have if you know?

```
 1   A     If you -- I'm not sure.  I don't recall.

 2   Q     Did you know at some point what assets Newco didn't

 3   have?

 4   A     I don't know how to answer your question.

 5   Q     I want to go back to the plan.  You understand the

 6   plans we're talking about here, the January 7th plan?

 7   A     Okay.

 8   Q     You've seen that?

 9   A     Yes.

10   Q     You've reviewed it?

11   A     Yes.

12   Q     Do you have an opinion on it?

13   A     I haven't offered an independent opinion on it.

14   Q     The January 27th plan, you've seen that one?

15   A     I believe so.

16   Q     Do you know who prepared that one?

17   A     As we sit here right now it's not off the top of my

18   head.

19   Q     Did you review it?

20   A     I've reviewed all the plans that Dr. Arnold included in

21   his report.

22   Q     Do you have an opinion on the January 27th plan?

23   A     My opinion is that the risk inherent in those plans,

24   not of the construction of the plans themselves.

25   Q     I missed that, I'm sorry.  Your voice dropped.
```

```
 1  A     My opinions in this case are regarding -- well, the
 2  analysis set forth in my report evaluates the historic
 3  performance of the company as compared to these turnaround
 4  plans.  My engagement didn't require an independent diligence
 5  of those plans.
 6  Q     Are you -- did you -- just to -- I want to make the
 7  record clear, I'm going to ask the other two just to be sure.
 8  You have no opinion on the January 28th plan either, correct?
 9  A     No.
10  Q     And no opinion on the February 24th plan?
11  A     You say no opinion, but I don't understand what you
12  mean by an opinion.
13  Q     Well, do you have any opinion about whether they were
14  reliable plans?
15             THE COURT:  You mean the projections or the
16  ability to accomplish the plan?
17  BY MR. AMINI:
18  Q     Let's start with the projections?
19  A     I think my report focuses on if you accept those as
20  into a valuation analysis you need to account for the high
21  levels of risk of achieving them.
22  Q     Because Dr. Arnold didn't account for, among other
23  things, the historical performance of this company?
24  A     Yes, sir.
25  Q     Let me ask you a question, do you think Michael
```

1  Greenberg was familiar with the historical performance of the
2  company?
3  A     I assume he was well aware of the company's operation
4  and financial distress.
5  Q     When you say you assume it, were you not aware of the
6  fact that he had worked specifically on this company.  If it
7  will show it, it will show it, but maybe three of its last
8  five years?
9  A     That's my understanding.
10 Q     So, you would agree with me that he was well staked in
11 the historical performance of this company?
12 A     Yes.
13 Q     Are you assuming he didn't consider that in the plans
14 that he was preparing?
15 A     I'm not saying that he didn't consider the financial
16 performance of the company when he prepared the turnaround
17 plans, no.
18 Q     What about Carl Marks?  Do you think Carl Marks took
19 the historical performance of the company in consideration
20 when preparing its, what I think we refer to as, the January
21 27th plan?
22 A     I clearly do because they talk about all of the things
23 that would need to happen and all of the risk to achieving
24 the bridge between the company's historic performance as of
25 the valuation date was negligible profitability and a very

1  profitable company that has effectuated an operational

2  financial turnaround.  So, yes, they do consider that.

3  Q    It's true, isn't it, you have no reason to believe that

4  the people who were preparing these plans thought that they

5  were accurate reflections of what could be achieved?

6  A    One more time, I'm sorry.

7  Q    You have no reason to believe that the people who were

8  preparing these plans thought they were anything other than

9  accurate projections of what they could achieve?

10 A    I struggle to -- a projection -- a company has various

11 different things that could happen to it in the future.  This

12 is one potential future performance for the company.

13 Q    You think an outside business appraiser would be better

14 equipped at predicting the future of TransCare then Michael

15 Greenberg, Ms. Tilton and the ten or so people she testified

16 to worked on these plans around the clock for a period of

17 time?

18 A    Preparing a projection and having an opinion of value

19 are two separate things.  So, I don't understand how you

20 bridge those.

21 Q    Okay.  Let's look at that for a second.  A potential

22 buyer of this company, you don't believe the potential buyer

23 of this company would sit down look at every single contract

24 in the company, look at every division separately and set

25 forth a plan as to what they could achieve going forward with

1 those before determining how much they'd be willing to pay

2 for it?

3 A    I think that's fair.

4 Q    That's what they would do.

5 A    That's the standard.

6 Q    And do you think that's not what these people were

7 doing?  And when I say the people, I mean Ms. Tilton, Mr.

8 Greenberg and the ten or so people that working with them.

9 A    Again, when someone went through that process and then

10 listed out all of the things that were risks to being able to

11 achieve that specific outcome that is what I am assessing,

12 the risk.  The fact that the company could possibly achieve

13 those projections they could possibly, maybe, if all of those

14 things that people were considering as risks to achieving

15 them was dealt with.  That is the difference between a

16 projection and a valuation.

17 Q    I had understood you to have no opinion on whether a

18 hypothetical buyer would consider these plans to be

19 reasonable or not.

20 A    These particular plans?

21 Q    Yes.

22 A    No.  I don't offer any opinion on that.

23 Q    I want to go back to you about the capital for a

24 minute.  Do you know how much capital was being required with

25 each of these plans?

1    A      The plans identify a certain amount of capital.  I

2    can't go offhand right now what that number was.

3    Q      Do you know what assets TransCare was lacking in the

4    January 7th plan?

5    A      I mean are you talking about in the plan or actually as

6    of the January 7th valuation date?

7    Q      What assets were identified as lacking in the plan?

8    A      I believe that all the plans called for some infusion

9    of cash to normalize working capital.  I believe that the

10   plans also included capital expenditures to replace the

11   company's assets that were, you know, unable to support its

12   continued operations.

13   Q      Let's look at the February 24th plan.  How much of that

14   was to, what you call, normalize working capital versus

15   acquire assets?

16   A      I don't know that.

17   Q      And when you say normalize working capital what is it

18   that you are referring to?

19   A      I think we're talking about the company had outstanding

20   bills that were due, that it had not been paid on time.

21   Q      Those aren't assets, right?

22   A      Those are liabilities.  You need to create an asset to

23   cover that liability.

24   Q      You had no opinion -- let me ask you this, you didn't

25   do any investigation into what actions the defendants

1  themselves, and when I say defendants Ms. Tilton and her

2  staff, took in reliance on these plans if any, do you?

3  A      No.

4  Q    I want to ask you a couple more questions about the

5  February 24th plan.  My understanding is you don't even know

6  which assets were foreclosed in connection with that plan, is

7  that right?

8  A      I don't know if assets were foreclosed.

9  Q      Are you aware of the fact that Ms. Tilton through, a

10  company called, Transcendence purchased those assets?

11  A      I don't know whether that's true or not.

12  Q      Are you aware of the price paid for those assets?

13  A      My recollection was that there was some sort of credit

14  to be given for creditors of the assets that were being

15  contributed as well as some additional infusion of money.

16  That is my best understanding.

17  Q    Do you have any opinion about the price she paid for

18  those assets?

19  A      Presuming she paid -- again, I don't know that that

20  transaction ever occurred, but I don't have an opinion one

21  way or another.

22  Q    Do you have any opinion about how that price was

23  calculated?

24  A      An opinion.  I could have knowledge about how it would

25  -- I don't have the knowledge, so I wouldn't have an opinion

1  either.

2  Q     Fair enough.  Do you have any opinion about Ms.

3  Tilton's statement that in the ambulance industry companies

4  turn at seven to eight times their projected EBITDA?

5        MR. MERVIS:  Objection, Your Honor, I don't think

6  that that's actually a fact that's in evidence at this point

7  in time.

8        MR. AMINI:  That may be, but we're going out of,

9  Your Honor, and Ms. Tilton will be here next week.

10       MR. MERVIS:  I think if he rephrases it, it will

11  be okay.

12       THE COURT:  My recollection was that that did come

13  out before that she had -- and by the way, the question has

14  already been asked about her prediction statement regarding

15  multiples because I asked him that question.

16       MR. MERVIS:  No.  I understand that Judge.  It may

17  be slightly different, but I just objected to the way the

18  question was phrased.

19       THE COURT:  Well, you can ask him the question do

20  you have an opinion whether a multiple of seven to eight in

21  the ambulance industry is reasonable, Mr. Amini.  You don't

22  have to talk to Ms. Tilton at this point.  You can just ask

23  whether a multiple of seven to eight in the ambulance

24  industry is reasonable.

25  BY MR. AMINI:

1 Q    Do you have an opinion about whether a multiple of

2 seven to eight in the ambulance industry is reasonable?

3 A    For healthy publicly traded companies I think that that

4 may be even -- there is nothing to say that that's not true.

5 There is market evidence that supports that for healthy

6 public companies.

7 Q    So, you have such an opinion or you don't?

8 A    I'm not here to offer an opinion on what multiple -- I

9 was engaged to rebut Dr. Arnold's report.  He's valuing

10 TransCare and I'm commenting on that valuation, not some

11 other company valuation.

12 Q    I want to talk to you about a couple of other things.

13 You are familiar, are you not, with the fact that there were

14 a number of people out there who expressed, at least, an

15 interest in investigating the type of potential purchases of

16 either all of TransCare or part of its assets?

17 A    Yes.  I understand that there was people who approached

18 the company with that type of message.

19 Q    Just by way of shorthand, we had put in your book Mr.

20 Arnold's demonstratives.  And if you go to Page 23 of those

21 we have -- I mean I could call out each one of these

22 exhibits, but I'm trying to short circuit this.  If you go to

23 Page 23 of his slides --

24 A    I don't have -- oh, there we go.

25 Q    And that page actually has a number at the bottom.

1  A      That's fine.

2  Q      It's the one that starts expressions of interest.

3  A      Yes, sir.

4  Q      Are you familiar -- these are a series of exhibits

5  related to inquiries of these five potential acquirers.  Are

6  you familiar with that?

7           MR. MERVIS:  Your Honor, I object to this line

8  without the actual exhibits.  I know that that may be

9  burdensome, but I can tell you that there is incorrect

10 information in this slide.

11           THE COURT:  The question is, is he aware that, at

12 least, the record contains expressions of possible interest.

13           MR. MERVIS:  I think that question was already

14 asked.  I don't object to that question. I object to the use

15 of this page.

16           MR. AMINI:  I was just trying to see if he was

17 aware that all of these people at one point or another

18 contacted someone at TransCare about some kind of

19 transaction.

20           THE COURT:  You can ask that question.  He asked

21 him the question do you know who contacted him.  When he

22 doesn't remember show him a piece of paper to refresh his

23 recollection.

24           MR. MERVIS:  Not that piece of paper, but --

25           THE COURT:  He can show him anything to refresh

 1  his recollection.

 2            MR. MERVIS:  Your Honor, okay, I suppose that's

 3  right.

 4  BY MR. AMINI:

 5  Q    Are you aware of these entities, you know, making

 6  contact with, at least, someone at TransCare about a

 7  potential acquisition?

 8  A    Sending them a message expressing in that message that

 9  they communicating the message that they wanted to

10  potentially acquire certain assets of TransCare.  Yeah, I

11  think that's clear from various emails I had.

12  Q    Do you know who National Express is?

13  A    Specifically not right now.

14  Q    And do you know what their assets consist of?

15  A    I mean I would have to assume.  I don't know.

16  Q    Do you know what they were interested in at TransCare?

17  A    If you want to show me a document, we can go through

18  that.

19  Q    No, it's a question.

20  A    If you're asking me if I recall right now at this time,

21  I don't recall exactly what assets each one of these emails

22  purported to be interested in, in asking for information for

23  the company.

24  Q    Do you have any understanding of why they never got

25  such a --

76

1          THE COURT:  You know, I think we're going far

2    beyond what this witness testified about.

3          MR. AMINI:  Your Honor, if you would allow me one

4    second.  In terms of testimony is the report then -- is

5    anything in his report with respect to expressions of

6    interest -- if he didn't testify to it is not part of the

7    case?  I'm just trying to --

8          THE COURT:  Well, you're asking the factual

9    question does he know whether TransCare responded to the

10   expressions of interest.  I don't know how he would know

11   that.

12         MR. AMINI:  Well, I understand the witness to --

13         THE COURT:  I don't what it would have to do with

14   valuation, but --

15         MR. AMINI:  We have in Dr. Dunn's report as one of

16   the factors in considering valuation, the four items that he

17   goes down and one of them is related to the expressions of

18   interest.

19   BY MR. AMINI:

20   Q    Mr. Dunn, so I can clear this up for myself as well,

21   you actually, in your report, take issue with the phrase

22   expressions of interest?

23   A     Yeah.

24   Q     You don't believe these to be expressions of interest?

25   A     I'd like to look at my report.

**A1993**

1  Q    Sure, go ahead. It's the last page of your report.  I

2  think it's the last page, Page 23 if I'm remembering

3  correctly.

4  A    Thank you.  One second.

5  Q    Not quite the last, next to the last page.  My

6  apologies, 23 and 24.

7  A    Okay.

8  Q    Do you take issue with these being expressions of

9  interest?  That's why --

10        THE COURT:  That's not what this says.

11 BY MR. AMINI:

12 Q    Well, you don't think they're good indications of the

13 valuation because, among other things, these people did not

14 have access to the financial performance of the company.

15 A    My comments in Section 9 of my report take issue with

16 Dr. Arnold presenting these expressions of interest in a

17 numerical way where he applies those multiples to a business

18 plan that the people who sent an email had never seen.  So,

19 he's presuming that someone was inferring a value for this

20 company that it's not true.  There was an email that

21 contained a multiple without them having any information.

22 So, that's the point as to why I haven't found a reliable

23 indication or haven't treated it the same way Dr. Arnold has.

24        MR. AMINI:  One moment, Your Honor.  We have

25 nothing further, Your Honor.

```
 1              THE COURT:  Okay.  Redirect?
 2              MR. MERVIS:  Yes, sir.  Not very much.
 3                   REDIRECT EXAMINATION
 4  BY MR. MERVIS:
 5  Q    So, Mr. Amini asked you about the three sets of
 6  standards that we looked at earlier.  I asked you various
 7  questions about whether you, personally, were subject to it.
 8  Do you recall that?
 9  A    Yes, I recall.
10  Q    At least with respect to the standards that you and I
11  talked about during your direct examination do you follow
12  them?
13  A    Yes.
14  Q    Do others in your profession follow them?
15  A    These are basic fundamental building blocks of every
16  appraisal exercised.  So, yes, independent of what document
17  and who's bound by that exact document.  These are necessary
18  components of a valuation opinion.
19  Q    Please look at DX-191 which is in the binder that I
20  gave you.
21  A    I'm there.
22  Q    Go to Page Number 1.
23  A    Yes.
24  Q    There's a heading a third of the way down the page
25  history of use.  Do you see that?
```

```
 1   A      Yes.

 2   Q      The very last sentence of that sentence says,

 3          "USPAP represents the generally accepted and recognized

 4   standards of appraisal practice in the United States."

 5          Do you see that?

 6   A      Yes, that's my understanding.

 7   Q      Is that consistent with your understanding of how USPAP

 8   is used in your industry?

 9   A      That is true.

10   Q      Now we also looked at revenue ruling, do you recall

11   that?

12   A      Revenue Ruling 5960.

13   Q      Yes.  And Mr. Amini was asking you what sort of types

14   of transactions it applied to.  How is it that you're so

15   familiar with this revenue?

16   A      Because it is a recognized source for understanding the

17   standard of value.  The hypothetical question that's being

18   asked, what is the -- I mean it's the definition of the

19   valuation profession, right.  An arm's length transaction

20   between a buyer and a seller equally informed under no

21   compulsion to buy.  That is the definition and how you

22   approach to define the question and how you approach it is

23   the appraisal industry.  So, Revenue Ruling 5960 is broadly

24   applicable to all valuation engagements.

25   Q      At least with respect to the guidance portions of the
```

1   Revenue Ruling 5960 that I showed you on your direct

2   examination did you follow that guidance in your practice?

3   A      If I recall correctly, we talked about relying,

4   understanding the historic information of a company,

5   assessing what its actual performance and actual reality is

6   as of the valuation date, and how that impacts a valuation.

7   Also, about how risk is the primary assessment that is being

8   made and is what determines a market value?  Those are the

9   fundamental concepts of every appraisal action.  And that is

10  definitively what I have to do when I perform my work.

11  Q      Now, Mr. Amini asked you some questions about whether

12  you had data to support certain propositions.  So, let me

13  just take an example.  I think you testified that as a

14  general matter larger companies are viewed as less risky than

15  smaller companies.  Is that fair?

16  A      That is true.

17  Q      How do you know that?

18  A      Well, you know that in several ways.  One of them is

19  when you're dealing with privately held -- I mean, there are

20  no small public companies.  I mean the smallest public

21  companies have hundreds of millions of dollars worth of

22  equity value, but when they're not distressed.  In order to

23  be a public company, you need to be much larger.

24         So, when you look at actual transactions in small

25  privately held companies they don't have the same depth as

1   management, they don't have the same access to capital,

2   whether that be financing or equity.  They are riskier

3   businesses as a whole.  That is reflected in market data for

4   small privately held company transactions.

5   Q    I think you -- let me try to understand, but I think

6   you said that a mark-up participant looking at TransCare as

7   compared to Air Methods and Envision would demand a higher

8   rate of return due to risk?

9   A    Yes, that is true.

10  Q    Can you explain what that means?  Specifically, what do

11  you mean by rate of return and how does that relate to risk?

12  A    Okay.  So, taking a step back when you're investing in

13  a risky asset the value you ascribe to it is commensurate

14  with your evaluation of its risk.  For example, the least

15  risky loan investment that you can invest in is issued by the

16  United States Government, right.  You have the full faith and

17  pledge of the United States Government to pay you back.

18  That's called the risk-free rate.

19        So, every other risky asset is some measure of risk

20  above that. If you go to double BA Moody's investment grade

21  loans they require an incremental spread.  Why, because the

22  Federal Government is less risky to loan money to then even a

23  very good company with a good credit rating.  As you move

24  into equity you're not investing in debt anymore.  You have

25  equity.  So, its additional risk to get to equity.  Then when

1   you're in equity there's different risk between investing in

2   a publicly traded company versus, you know, what's called

3   like a venture capital start-up where rates of return can be

4   twenty, thirty, forty percent.

5       So, where you stand on this relative measure of risk of

6   the investment is fundamental to the question of what someone

7   would actually pay for this asset.

8   Q   So, let me ask the question.  I think you just answered

9   it, but what's that go to do with valuing a company?

10  A   So, the risk you attach to the -- you're using

11  projections. If there's a lot of risk to achieving those

12  projections you would have a very high discount rate. The

13  high discount rate is the equivalent of a low multiple.  A

14  multiple reflects a required rate of return and if your rate

15  of return increases then your multiple has to decrease.

16  Q   Based on your analysis or the comparisons that you did

17  between TransCare on the one hand and Envision and their

18  methods on the other hand do you have any doubt in your mind

19  that market participants would view TransCare as a riskier

20  investment?

21  A   Yean.  There is no doubt in my mind that someone who is

22  given the option of investing in Envision, let's assume it's

23  at an eight times multiple, or investing in TransCare at an

24  eight times multiple on a similarly expectation of the future

25  that they found reasonable would choose TransCare.  They

1    would have a higher rate of return.  They would be better off

2    making the same investment at a lower risk.

3    Q     One last subject.  Mr. Amini asked you about Newco and

4    specifically the February 24th Newco plan.  Do you recall

5    that?

6    A     I recall those questions.

7    Q     And he asked what assets did Newco lack under that

8    plan.  Do you recall that?

9    A     I recall the question.

10   Q     Okay.  Do you have an understanding under that plan as

11   to whether any new money financing is required?

12   A     As I tried to explain, my recollection is that there

13   was $10 million dollars of new capital being contributed

14   contemplated to be contributed into that.

15   Q     Under that plan, as you understand it, was new money

16   financing an asset that Newco needed to obtain?

17   A     Yes.

18              MR. MERVIS:  Just one second, Judge.

19   BY MR. MERVIS:

20   Q     Just to clarify one thing, in terms of a market

21   participant assessing risk do you have any doubt that market

22   participants would view Envision as a less risky investment

23   then TransCare?

24   A     No.

25              MR. MERVIS:  Nothing further, Judge.

```
 1              THE COURT:  Thank you.  You can step down.
 2              THE WITNESS:  Thank you, Your Honor.
 3         (Witness excused)
 4              THE COURT:  All right.  Have you taken Dr.
 5    Arnold's deposition?
 6              MR. MERVIS:  Yes, sir.
 7              THE COURT:  Okay.  When is Ms. Tilton scheduled to
 8    come here?
 9              MR. MERVIS:  I believe Tuesday, Your Honor.
10              THE COURT:  So, we need a date for Dr. Arnold?
11              MR. MERVIS:  Yeah.  So, I'm sort of predicting
12    here, but Mr. Amini has the two-hour limitation with Ms.
13    Tilton.  I don't know how long I have; although, I suspect it
14    will be more than two hours, probably along the lines of
15    four'ish, something like that, maybe a little more.  I think
16    we will be able to conclude her testimony before the end of
17    Wednesday.  And so, I think we could have Dr. Arnold either
18    that afternoon or the following morning or afternoon.
19              THE COURT:  Let me just see something.  I think I
20    have a conference call on one of those days.  I have a
21    conference call Thursday.  Is Dr. Arnold available on that
22    Thursday?
23              MR. AMINI:  He is, Your Honor.
24              THE COURT:  All right.  So, why don't we do it
25    that way.  His testimony didn't take very long the last time.
```

**A2001**

85

1          MR. AMINI:  And my expectation is he will be here

2  Wednesday in any event.  So, if we finish Ms. Tilton early,

3  we can put him on if it works for Your Honor and if not we'll

4  bring him back on Thursday.

5          MR. MERVIS:  It appears to be pretty short.

6          THE COURT:  All right.  So, we will continue then

7  on Tuesday and hopefully wrap up on Thursday.

8          MR. AMINI:  Can we start at ten on Tuesday.  I

9  know you have calendars on Tuesday.

10         THE COURT:  Well, yeah, I will do my calendars.

11         MR. MERVIS:  Your Honor, just one housekeeping

12  question.  I know we didn't need them today.  In order to

13  request breakout rooms for next week should we submit a

14  letter?  Would that be the prudent thing to do?

15         THE COURT:  I think you have the same rooms as

16  last time.

17         MR. MERVIS:  Okay.

18         THE COURT:  You should because I don't know what

19  else is going on in the courthouse.

20         MR. MERVIS:  We will do that.  Thank you, Judge.

21         MR. AMINI:  And, Your Honor, as long as we're on

22  housekeeping matters with Your Honor's permission on Tuesday

23  can we have a real time court reporter?  We will make sure to

24  try to have less of the --

25         THE COURT:  I don't have a problem with a real

**A2002**

1   time court reporter, it's when she walked in, in the middle

2   of the examination and wanted to talk to me.

3           MR. AMINI:  The day before --

4           THE COURT:  And had her phone.

5           MR. AMINI:  We had the same problem the day before

6   when the court reporter didn't come on time.

7           THE COURT:  Why don't you tell them it starts at

8   9:30?

9           MR. AMINI:  Thank you, Your Honor.

10          MR. MERVIS:  Thank you Judge.

11      (Proceedings concluded at 4:10 p.m.)

12

13

14

15                        CERTIFICATE

16

17  I certify that the foregoing is a correct transcript from the

18  electronic sound recording of the proceedings in the above-

19  entitled matter.

20
    /s/Mary Zajaczkowski_____          August 9, 2019
21  Mary Zajaczkowski, CET**D-531

22

23

24

25

1

```
 1                  UNITED STATES BANKRUPTCY COURT
                    SOUTHERN DISTRICT OF NEW YORK
 2
     IN RE:                         .    Chapter 7
 3                                  .
     TRANSCARE CORPORATION,         .    Case No. 16-10407-smb
 4                                  .
                                    .
 5            Debtor.               .    New York, New York
     . . . . . . . . . . . . . .    .    Tuesday, August 13, 2019
 6   LAMONICA                       .    10:19 a.m.
 7                                  .
              v.                    .    Adv. Proc. 18-01021-smb
 8                                  .
     TILTON, et. al                 .
 9   . . . . . . . . . . . . . .

10

11                TRANSCRIPT OF TRIAL – A.M. SESSION
             BEFORE THE HONORABLE STUART M. BERNSTEIN
12                UNITED STATES BANKRUPTCY JUDGE

13
     APPEARANCES:
14
     For the Chapter 7 Trustee:   Salvatore LaMonica, Esquire
15                                LAMONICA, HERBST & MANISCALCO, LLP
                                  3305 Jerusalem Avenue
16                                Wantagh, New York 11793

17   For Salvatore Leggett:       Bijan Amini, Esquire
                                  Avery Samet, Esq.
18                                STORCH AMINI, PC
                                  Two Grand Central Tower
19                                140 East 45th Street, 25th Floor
                                  New York, New York 1001
20
     Audio Operator:              Electronically Recorded
21                                by K. Harris

22   Transcription Company:       Reliable
                                  1007 N. Orange Street
23                                Wilmington, Delaware 19801
                                  (302)654-8080
24                                Email: gmatthews@reliable-co.com

25
     Proceedings recorded by electronic sound recording, transcript
     produced by transcription service.
```

```
1    APPEARANCES (Cont'd):

2    For The Non-Debtor          Michael Mervis, Esquire
     Defendants:                 PROSKAUER ROSE
3                                Eleven Times Square
                                 New York, New York 10036
4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                                INDEX

2
   TRIAL
3
   PLAINTIFF'S WITNESS(S):
4
       LYNN TILTON
5
       Direct Examination by Mr. Amini                        4
6
       Cross-Examination by Mr. Mervis
7

8
   EXHIBITS(s)                              I.D.    REC'D
9
   PX-44    Email Dated 3/3/15                        45
10
   PX-73    Email Dated 7/8/15                        45
11
   DX-68    Email Dated 8/4/15                        47
12
   PX-128   Email Dated 12/16/15                      51
13
   DX-108   Emails Between Lynn Tilton & Randy Jones  54
14
   DX-112   Lists of Payments and Amounts to Various
15           Insurance Companies                      58
16
   DX-121   Email Dated 1/29                          60
17
   DX-123   Email Dated 2/4/16                        63
18
   DX-195   Email Dated 2/15                          67
19
   DX-170   Emails                                    75
20
   DX-171   Emails                                    75
21
   PX-219   Term Sheet From Wells Fargo               76
22
   PX-226   Email Dated 2/24                          84
23

24

25

1           (Proceedings commence at 10:20 a.m.)

2                THE COURT:  Mr. Amini.

3                MR. AMINI:  Good morning, Your Honor.

4                THE COURT:  Good morning.

5                MR. AMINI:  We're ready.  The plaintiff would call

6   Lynn Tilton.

7                THE COURT:  All right.  Ms. Tilton.  I'm timing

8   you, Mr. Amini.

9                MR. AMINI:  I know you are.

10               THE COURT:  Raise your right hand, please.

11  LYNN TILTON, WITNESS FOR THE PLAINTIFF, SWORN

12               THE COURT:  Okay.  Please take a seat and speak

13  into the microphone.  You can pull it closer to you.

14               THE WITNESS:  Okay.

15                          DIRECT EXAMINATION

16  BY MR. AMINI:

17  Q    Good morning, Ms. Tilton.

18  A    Good morning.

19  Q    Let me start with the foreclosure.  Is it a fact that,

20  on February 24th, you directed that a foreclosure take place

21  with respect to certain of TransCare's assets?

22  A    Yes.

23  Q    Okay.  And you based -- and that -- and you made a

24  credit bid in that foreclosure based on about 10 million --

25  based on $10 million of the term lender's credits.  Is that

1   correct?

2   A    We credit bid $10 million of the term loans against the

3   assets of the three divisions upon which we foreclosed.

4   Q    You valued -- you looked at the individual assets in the

5   three divisions, and you valued them, and you came up with

6   $10 million based on the book values at that time.

7   A    The December '15 balance -- the December 2015 closing

8   balance sheet for those three divisions, yes.

9   Q    And that would have been Hud -- the three divisions

10  we're talking about are Hudson Valley, Pennsylvania -- which

11  is effectively a Pittsburgh operation, if I'm not mistaken --

12  and the MTA contract.

13  A    That is correct.

14  Q    Okay.  And you only -- as I understand it -- and you

15  told me it was based on the December 31st closing --

16  A    The December 31st, 2015 closing balance sheet for those

17  three divisions -- well, actually, as I went back to review,

18  it was based on the five divisions, and I never changed that

19  credit bid because we lost those two last divisions days

20  before the foreclosure by the loss of those contracts, so --

21           THE COURT:  What two divisions?

22           THE WITNESS:  The other two divisions were Bronx

23  Lebanon and Montefiore Hospital, which were part of the New

24  York, and then it was Westchester -- no, Maryland, Maryland.

25  So it was MTA, Hudson County, Pittsburgh.  And then it was

1  Bronx Lebanon and Montefiore, which were two contracts

2  together in the Bronx.  And then it had been Maryland.  And

3  days before, based on rumors in the market, we lost the

4  Maryland contract and the Bronx Lebanon and Montefiore

5  contract.  So, at the last second, those divisions -- two

6  divisions were not taken.  But I never went back and changed

7  the credit bid to a lower number based on a new opening

8  balance sheet for the three divisions.

9           MR. AMINI:  Your Honor, if I may?

10          THE COURT:  Uh-huh.

11          MR. AMINI:  Witness examination books.

12      (Participants confer)

13          THE WITNESS:  Thank you.

14          THE COURT:  Okay.

15  BY MR. AMINI:

16  Q    Ms. Tilton, you took that action at 12:07 a.m. on the

17  24th of February because you had just gotten the insurance

18  you were waiting for, for Transcendence.

19  A    That is correct.

20  Q    All right.  You placed that insurance through London, if

21  I'm not mistaken.

22  A    I used Willis out of Chicago.  Some of it was NYSIF for

23  workmen compensation.  And the automotive -- automotive

24  insurance, I am not sure where Willis out of Chicago placed

25  it.

```
 1   Q    And if you would look with me to the first -- the first

 2   two tabs are transcripts of testimony.  But if you go to the

 3   third tab -- oh, no, I'm sorry.  We reorganized these a

 4   different way.  We organized these notebooks by DX, JX, and

 5   then PX.  So the first set of documents will be DX documents

 6   we're using, and the second set will be JX documents we're

 7   using, and the third set will be PX documents.

 8        And if you would go and find JX-96, which is in the JX

 9   group of documents, probably towards the middle of your

10   notebook, if you could find that.

11   A    (Witness reviews exhibits)

12   Q    Were you able to find that?

13   A    Yes.

14   Q    All right.  These are the notices that you signed and

15   set out on the early morning -- in the early morning of

16   February 21st, correct?

17   A    I'm going to look at them and then --

18   Q    Sure.

19   A    -- I will answer your question.

20        MR. AMINI:  This document, I believe, was a JX,

21   Your Honor, so there's no -- there's no objection.

22      (Witness reviews exhibit)

23        THE WITNESS:  Yes.

24   BY MR. AMINI:

25   Q    And you were still, at that point, the collateral
```

1  manager for the three Zohar funds that were in the group of

2  term lenders.  Is that correct?

3  A    I had already resigned, but the transition had not taken

4  place.

5  Q    That's right.  You resigned on February 3rd, but

6  effective March 3rd, if I'm not mistaken.

7  A    Or they made it effective March 3rd.  I needed to wait

8  for them to get a new collateral manager.

9  Q    And they put, I believe, Alvarez & Marsal in as the

10  collateral manager?

11  A    It was called AMZM; it was a division of Alvarez &

12  Marsal.

13  Q    All right.  And in connection with this act -- the

14  action that you took that morning, you didn't have Credit

15  Suisse's consent or agreement.  Is that correct?

16  A    I didn't need their consent or agreement, but I did give

17  them upside.  So all the Zohar funds got equity in the NewCo,

18  as well as Credit Suisse, as it was the only action that

19  could possibly give people recoveries.  So I separated the

20  equity amongst the 10 million of credit bid, so that

21  everybody had a chance at recovering from that credit bid.

22  Q    So that, if I understand that correct, you took the 10

23  million and, in proportion to what that was in the term

24  lenders' loans, you gave them an equal amount of equity in

25  the new company Transcendence.

1  A    Gave them 49 -- equivalent, pro rata amounts of 49

2  percent; 51 percent went to the $10 million of new money, 49

3  percent was allocated among the existing creditors on a pro

4  rata basis for their 10 million, so that, if this company

5  worked out, they would have a chance at recovery that would

6  otherwise have been lost in a free-fall liquidation, as we

7  witnessed.

8  Q    But back to my original question.  I know you gave them

9  that.  You didn't actually obtain any consent or agreement

10 from Credit Suisse in this connection.

11 A    And nor did I need it, as the agent for the lenders.

12 Q    And Michael Greenberg handled all those communications,

13 as I recall, between -- for you with Credit Suisse, if you --

14 but that's in accordance with your recollection.

15          MR. MERVIS:  Objection, Your Honor.

16          THE COURT:  Yeah, I'll sustain the objection to

17 conform.  You said all the communications.

18          MR. MERVIS:  Yeah, right.

19          THE COURT:  I don't know that --

20 BY MR. AMINI:

21 Q    The communications with respect to this action, with

22 respect to this particular action that you took, those were

23 handled by Mr. Greenberg, were they not?  With Credit Suisse.

24 A    I'm not aware of Mr. Greenberg talking to them about the

25 foreclosure sale.

1  Q    Okay.  Did you speak to them about the foreclosure?

2  A    I did not.

3  Q    Okay.  Go with me, if you would, to the subject

4  collateral, which is attached to the notice of acceptance.

5  It's Schedule A, it's on Page 5.

6  A    (Witness reviews exhibit)

7  Q    Have you had a chance to look at it?

8  A    Excuse me?

9  Q    Have you had a chance to look at it?

10  A    Yes.

11  Q    All right.  You'll notice it was to all the TransCare

12  entities, you didn't exclude any of them, correct?

13  A    No.

14  Q    Okay.

15  A    It wasn't for --

16  Q    Now --

17  A    -- all the TransCare entities.  It was for TransCare

18  Pennsylvania, TC Hudson, and TC Ambulance Corp, which holds

19  the MTA contract.  It was only for three entities.

20  Q    That -- you're looking at Paragraph 3, correct?  And

21  where it starts, "All shares of capital stock listed in Table

22  A"?

23  A    This was only for the three entities.

24  Q    Okay.  Ms. Tilton, if you would go back with me for one

25  moment to the cover page.  This notice is to every -- all the

1   TransCare entities, is it not?

2   A    It is a notice to all the entities, but we didn't take

3   the collateral of all the entities, we could not have.  We

4   left -- we left 911 and Corp behind in the OldCo unwind

5   model.  And we only took these three entities, that's all it

6   is.  It's all debtors having to do with these three entities

7   only.

8   Q    If you look at Paragraph 1 -- do you see Paragraph 1 of

9   the subject collateral?

10  A    Yes.

11  Q    It's addressed to all of debtors' personal property.  Do

12  you see that?

13  A    In these three entities below.  That's --

14  Q    Where is -- where is that?  Where are you reading that

15  limitation, if you are?

16  A    Because we're talking about these three debtors.

17  Q    I'm only asking where in this document are you reading

18  the limitation that you were taking in Paragraph 1, that you

19  were --

20  A    This --

21  Q    -- only taking -- wait, and if you'd let it finish, and

22  then you can answer -- you were taking only the assets of

23  those three entities.  Where is that limitation in that

24  Paragraph 1, if you know?

25  A    It's -- it is -- it --

1          (Witness reviews exhibit)

2     A     I didn't write the legal document.  That's all we were

3     taking.  We didn't have any -- you know, we didn't have

4     access to the others, nor did we take them or begin to take

5     those assets.  We had an OldCo model, which left behind

6     everything else for Wells to do an orderly wind down over 90

7     days.  And we were taking these three entities.  And it was

8     very clear to everybody involved that it was only these three

9     entities.

10    Q     So is it fair to state that you've never made a claim to

11    TransCare's -- outside of TransCare itself, you've never made

12    a claim to TransCare's vehicles that were being used in the

13    911 activities in New York, in New York City?

14              MR. MERVIS:  Objection to the word "claim," Your

15    Honor.  I don't know -- I'm not sure what that means.

16              THE COURT:  Overruled.

17              THE WITNESS:  The vehicles were held by the term

18    lenders.  They were going to be used in the wind down of the

19    911 and Core business, and any other entity that was

20    remaining after contract losses.  After the time that it was

21    used, they -- proceeds from that would have gone to the term

22    lenders.  But it was not part of this foreclosure.  It would

23    -- so, of course, the term lenders had a security interest in

24    the vehicles.  And any vehicles that were not being picked up

25    by this entity to be used for these only three divisions

```
 1   would have been sold to repay the term lenders.
 2   BY MR. AMINI:
 3   Q    Let me go to the purchase price.  Ultimately, you sold -
 4   - after foreclosing that morning, you sold what had been
 5   foreclosed upon to Transcendence, correct?
 6   A    The assets were sold to Transcendence for 10 million of
 7   new money -- 12 million of new money and 10 million of a
 8   credit bid of the term lenders.
 9   Q    The purchase price was 22 million, roughly, correct?
10   A    That is correct.
11   Q    Actually $22,058,901.77.  I have the advantage of
12   looking at it on ...
13   A    I will take your word for it.
14   Q    All right.  And that consisted of $10 million to credit
15   bid.  Yes?
16   A    Yes.
17   Q    Ten million dollars of new money.
18   A    Fresh cash, yes.
19   Q    And $2,058,901.77 that you had previously lent to
20   TransCare.
21   A    That I was rolling over, yes, that was lent between
22   January 15th and January 29th of 2016, and rolling up into
23   the new money.
24   Q    And you believed --
25               THE COURT:  How much -- what was that?  What was
```

1    that roll-up amount?

2            MR. AMINI:  Twenty-two -- $2,058,901.77.

3            THE COURT:  Okay.

4    BY MR. AMINI:

5    Q    And you believed that the 22 million was an equitable

6    purchase price.

7    A    I thought it was an excessive purchase price, but it was

8    -- it needed 10 million of new money, and I wanted to have 49

9    percent of the equity go to the old lenders, so it turned out

10   to be an equitable purchase price for the future for the old

11   lenders and new lenders.  And it certainly 2.2 -- well, it

12   ended up being three times book value for the three entities

13   and almost ten times the combined EBITDA of the three

14   entities.

15   Q    When you say "almost ten times the combined EBITDA of

16   the three entities," what number are you using for the

17   EBITDA?

18   A    Well, somewhere between two and a half and 3 million

19   before any overhead, CEO, CFO, HR.  So we have different

20   models.  Some, you know, came out at two and a half.  And

21   then, with projections to -- and assumptions to reduce

22   expenses, we got to 3 million, but that didn't include any

23   corporate overhead; that was just the three divisions, no

24   CEO, no CFO, no head of HR.  So you've got to look at

25   $750,000 of additional expenses.

1    Q    And as I understood it, you believed that you had a deal
2    with Wells Fargo to do that foreclosure.
3    A    I had been working with them nonstop for over a week,
4    sending them models back and forth, meeting in my offices,
5    talking to Kurt Marsden, one of the senior-most people at
6    Wells.  And yes, the only thing we didn't have an agreement
7    on was the price that I was willing to pay for their
8    receivables, which they wanted me to pay for private pay that
9    was uncollectible.  So I ultimately went forward with no
10   receivables, which significantly -- significantly reduced the
11   book value, which I never adjusted down, but ended up being
12   willing to go forward without the receivables.  But yes, we
13   had a deal.  And yes, I confirmed with my lawyers on the
14   24th, that they were aware and okay with the foreclosure.
15   Q    And when you say "confirmed," you're talking about
16   Curtis Mallet.
17   A    That is right.  Cindy Giglio.
18   Q    Did you have any conversations directly with Wells
19   confirming that?
20   A    Well, I certainly did the day before.  I -- you know, no
21   the -- they were aware that it was going to happen as soon as
22   we got the insurance.  They even checked in with me on where
23   we were with the insurance.  And ultimately, we were
24   negotiating the price for the receivables up until the last
25   second.  And when we couldn't agree on the price, I allowed

1 them to keep the receivables and was going to deal with the

2 ninety-day issue of having no revenues coming in.

3 Q    And in addition to what you've just told me, you also

4 did a check on what you were bidding for this as a multiple

5 of EBITDA.  You basically told me that already.  But you

6 applied a multiple times EBITDA to check the price, to assure

7 yourself that it was a fair multiple.

8 A    It was a check.  I did it -- you know, I credit bid on

9 the book value, and then I did a check on the credit bid plus

10 the new check that was needed, since there were no

11 receivables, over EBITDA, and realized that it was a multiple

12 far greater than market multiples for healthy companies.

13 Q    I -- my understanding was that you thought the check was

14 somewhere around eight time EBITDA.

15 A    Well, it was 22 million, and we're talking about two and

16 a half to 3 million max before overhead.  So, if you take it

17 down to the two to two and a half, then it's 9 to 11 times.

18 Q    Now --

19 A    I've, since my deposition, been able to look at all the

20 models.

21 Q    Since your deposition, you've been able to do what?

22 A    Review the models, so I --

23 Q    Oh, I see.

24 A    I have a -- I have a better view of what the EBITDA was,

25 and we know what the purchase price wise.

18-01021-smb   Doc 226-1   Filed 06/14/19   Entered 09/03/19 14:43:32   Main Document
Case 1:20-cv-06225-LAK   Document 11   Filed 09/03/20   Page 893 of 1218
Pg 17 of 88

17

1  Q    So when you -- when, at your deposition, you said it was

2  about eight times, you're correcting that now; it was more.

3  A    Yes, because the EBITDA number did not include overhead,

4  which would have to reduce it.

5  Q    And at that time, you believed that seven to eight was a

6  normal multiple, that that was what the industry traded at.

7  A    For a healthy company, not a company that was in free

8  fall, losing contracts every day.

9  Q    So anything above eight, eight to nine, you believed was

10 generous.

11 A    I think anything about four to five, in this distressed,

12 free fall situation, would have been generous.

13 Q    And expressing value that way, as a multiple, that's

14 normally how you express it.

15 A    That's how you express it in a healthy situation, where

16 people are buying cash flow.  So that was a check.  But what

17 we did buy were the assets, and we paid -- what it turned out

18 to be was far more than book value because we lost two

19 divisions and we didn't take the receivables.  So we also

20 ended up probably paying four times book value in the end.

21 Q    Let me talk to you a little bit about the ten-million-

22 dollar credit bid.  Take a look, if you would, at the --

23 well, no, let me step back.

24     Take a look at the bill of sale to Transcendence for a

25 moment, if you would.  That's JX-102.  It should be in the

1   next -- either the next document or two documents further on

2   from where we were.

3   A    (Witness reviews exhibits)

4   Q    That's the document pursuant to which the assets were

5   sold to Transcendence, correct?

6   A    I'm going to read it.  I mean, I'm happy to answer any

7   questions.

8        (Witness reviews exhibit)

9        Okay.

10  Q    It says there that the consideration -- in Paragraph

11  (e), under the recitals --

12  A    Yep.

13  Q    -- for the transfer of the collateral shall be $10

14  million.

15  Q    Do you see that?

16  A    I do.

17  Q    Is that correct?

18  A    Well, I mean, I'm actually reading this and the document

19  sort of -- I think this was when we were buying -- I don't --

20  it wasn't 10 million in cash, it was 10 million of a credit

21  bid, so I don't -- I think the document is written confusing

22  because the new cash was 10 million, which would have paid

23  for the receivables, had that happened in the end.  But the

24  credit bid under the condition of the purchase, you know, the

25  agreement to pay certain outstanding indebtedness, was the 10

1   million credit bid.  So the document is confusing.

2   Q    Well, here it says, "10 million, such allowed to be

3   financed by Archangels III."  Do you see that?

4   A    I understand, but that was --

5   Q    So --

6   A    That was for the purchase of the receivables.  In the

7   end, the 10 million over here:

8          "The purchaser hereby agrees to pay 10 million

9   constituting a portion of the principal amount outstanding

10   under the TransCare credit agreement, as of the date hereof."

11    So this was a credit bid of the 10 million, and then

12   the 10 million was for the receivables that didn't come in

13   the end and just went into new money.  So this must have been

14   prepared and not adjusted when we first -- you know, at the

15   last second, were not able to buy the receivables.

16   Q    But this was the document that you sent out on February

17   24th, to Transcendence, did you not?  And had Mr. Youngblood

18   sign.

19   A    This was a document prepared by the lawyers in the

20   middle of the night.  And yes, it -- it originally accounted

21   for the purchase of the receivables that didn't happen and

22   the credit bid.  Instead, the 10 million was put up to

23   finance the company without receivables.

24   Q    So this Section 3, as far as I'm understanding your

25   testimony, is not correct.

```
 1   A      Section 3?

 2   Q      Yes, where --

 3   A      Or Section (e).

 4   Q      No.  Going to Section 3.  If you look at Section 3, it

 5   says:

 6               "The purchaser hereby agrees to pay $10 million,

 7   constituting" --

 8   A               "-- constituting a portion of the principal amount

 9   outstanding under the TransCare credit agreement."

10        That is the -- that part is correct.  That 10 million

11   was the credit bid against the agreement that provided 49

12   percent of the equity to the old lenders.  This 10 million in

13   Section (e) is incorrect.  It was part of the new company,

14   but the 10 million was supposed to go to buy receivables and

15   provide new money.  And instead, it just was new money going

16   into the company.  There was never a cash amount being paid

17   for the three OldCo book assets.  It was $10 million for the

18   assets, 10 million -- or up to 10 million for receivables

19   from Wells Fargo.  And at the last second, they decided not

20   to sell them.  And I know that there are emails that show

21   that I'm willing to go along without the sale of the

22   receivables to just put up new money.

23   Q    So when it says the purchaser agrees to pay $10 million

24   to the term lender -- credit -- term lenders in Section 3,

25   that's pursuant to a purchase credit agreement that it
```

1    references in there, that's a mistake.

2    A    No, that's correct.

3              THE COURT:  Can I --

4    A    You're --

5              THE COURT:  Can I ask you a question?

6              THE WITNESS:  Sure.

7              THE COURT:  If you look at the last page on

8    Exhibit A, it says that exclude -- at the bottom:

9              "Excluded from the purchase are accounts as such

10   term is defined in the security agreement."

11             Does that refer to accounts receivables?

12             THE WITNESS:  Yes, it does.  And --

13             THE COURT:  So the accounts receivable were

14   expressly excluded under the bill of sale.

15             THE WITNESS:  At the last second.  And obviously,

16   the lawyers did not make the change here because the 10

17   million was new money, but it was the credit bid -- it was

18   always going to be a credit bid for the three divisions.  And

19   the 10 million was to go to the receivables.  But when the

20   receivables couldn't be purchased at the last second -- and I

21   know there's a lot of email traffic to that -- I ended up

22   just putting up the 10 million.

23             And this was done at 12:01 in the morning.  This

24   was -- there were a lot of people working around the clock to

25   try to keep this transaction whole, while leases and

1  everything were -- and contracts were being lost.  And

2  obviously, it is a legal mistake that has was not corrected,

3  and this is the first time I'm seeing that.

4  BY MR. AMINI:

5  Q   So, if I'm understanding correctly, you were going to --

6  in addition to the ten-million-dollar credit bid, you were

7  going to give Transcendence a loan through one of your

8  Archangels III, I believe -- and I'll show it to you in a

9  minute -- but Archangels III, for $10 million.

10 A   I was going to buy the receivables from Wells, who had a

11 first lien on the receivables, for the amount that was

12 accurate at that time of collectible receivables, and then

13 give them a new cash loan for the remaining amount.

14 Q   If I -- if I can just correct -- if I can see if I

15 understand.  You were going to -- Transcendence was going to

16 buy those receivables with the proceeds of a ten-million-

17 dollar revolving loan that you were going to provide them

18 through Archangels III, right?

19 A   That is correct.

20 Q   And you were -- as of February 24th, you were prepared

21 to enter into that credit agreement, correct?

22 A   That is correct.

23 Q   And you -- the $10 million of new money, you said was

24 going to go in on day one.

25 A   It was going to go in on or about day one.  I mean, we

1    were --

2    Q    Okay.

3    A    Yeah, this was around the clock, waiting for insurance,

4    trying to get a deal done with Wells.  The company was in a

5    free fall with an ABL lender who was refusing to fund on a

6    day-to-day basis.  So as soon as -- either it was going to

7    get purchased, go in and purchase Wells on day one, or go in

8    on or about day one, as soon as cash was needed.

9    Q    All right.  And did -- if you go with me to JX-101.

10   A    (Witness reviews exhibits)

11   Q    There's an email from Mr. Greenberg to Mr. Youngblood,

12   but attached to it is a credit agreement.  And this is -- and

13   if you look at the last page of that, it sets forth that

14   Archangels III is the lender, and the commitment to

15   Transcendence is $10 million.

16   A    That is correct.

17   Q    And that was the plan, to have Transcendence enter into

18   such a credit agreement.

19   A    That is correct.

20   Q    And we don't have a signed copy of this, do we?

21   A    I -- I did not do the discovery, so I do not know if you

22   have a signed copy or not.

23   Q    Well, do you have any recollection of ever signing it?

24   A    Things are usually sent for me to affix my signature.  I

25   don't recall whether or not I signed it or not.  But it was

1   going to be signed, and it was a commitment that I had made

2   and made to Wells, as well as Carl Marks, and it was being

3   drafted as quickly as possible.

4   Q    And if you go with me to the -- now to the email and the

5   cover page, you'll see that this is Wednesday, February 24th,

6   at 4 in the afternoon, from the email?

7   A    I see that.

8   Q    And this is after the foreclosure because we established

9   that the foreclosure was at 12:07 a.m., correct?

10  A    That is correct.

11  Q    And Michael Greenberg is asking Glen Youngblood to send

12  back a signed borrowing certificate, which is effectively, as

13  I understand it, a request for funds, correct?

14  A    That is correct.

15  Q    And it should show the five ninety-three outstanding,

16  and that's what you paid to the New York State Insurance

17  Fund, I believe, the day before.  I have a document I can

18  show you, we can probably come back to it.  But you paid that

19  the day before because you needed workmen's comp to get

20  Transcendence up and running.

21  A    That is correct, so I made that payment.

22  Q    And then there was another $65,000 that day.  I think

23  we've established it was for the Foster Avenue rent.

24  A    I don't recall whether I funded that or not.  I --

25  Q    Okay.  And this was intended -- this -- these funds were

1  intended to be borrowed by Transcendence under that credit

2  agreement.

3  A    That is correct.

4  Q    Let me just briefly touch back on that 2 million that

5  was also going to be part of the sale.  What -- you were

6  including two pieces in that, as I understood it.  One was

7  $195,000 that you purchased -- you used to purchase two

8  ambulances on January 29th, and the other was -- let me see

9  if I can -- if I have this note.  The other was the number --

10 was 1,800,000 and change that, when added to the one ninety-

11 five, gets us to the 2,058,901.77 that you had lent to

12 TransCare through Ark II, on January 15th and January 29th.

13 A    To pay for insurance because, if not, the company would

14 have gone out of business the next day.  So, yes, I made

15 those emergency fundings because nobody else was willing to

16 lend cash, and I didn't have the ability to live to the next

17 day unless I funded that insurance, to try to find a

18 solution.

19 Q    So, as a result of this transaction, was TransCare

20 relieved of its obligations to you under that $2 million,

21 having rolled it over to Transcendence?

22 A    Had this transaction been effectuated, yes.  It would

23 have given TransCare $2 million less debt.  And it was first-

24 out money, so it actually was a very good thing for

25 TransCare, if this Transcendence would have gotten up and

1   running.  It also would have taken 700 employees and their

2   payroll.

3   Q    So, from that answer, I take it that no action was ever

4   take back -- taken to actually roll over that 2 million into

5   Transcendence.

6   A    This deal never got effectuated because the trustee, the

7   next day, would not let the server with the ERP system be

8   removed, so that we could run the company and follow up with

9   the transition services agreement for OldCo, and because the

10  trustee did not agree to the MTA contract being transferred.

11  So it never got effectuated, which is why it never got rolled

12  over.

13  Q    Let me ask you about what you just said.  You're now

14  referring to negotiations that took place on the 25th, the

15  day after the filing, correct?  In your last answer.  The

16  trustee wasn't letting --

17  A    When we went to pick up the ERP system, Glen Youngblood

18  was told that he would have personal liability --

19  Q    Okay.

20  A    -- if he took it, and subsequently resigned because he

21  was frightened by Sal LaMonica's lawyer.  And the MTA, which

22  we had negotiated a new contract for NewCo, wanted Sal

23  LaMonica to approve it, and did not do that.  And so we were

24  never able to transfer the assets to effectuate the strict

25  foreclosure sale.

```
 1   Q    Now I think you've told me that you apportioned this 10
 2   million amongst the term loan lenders, and pro rata in
 3   accordance with how much they had lent to TransCare, the
 4   credit bid.
 5   A    That's correct.
 6   Q    And so that would have been the three Zohar funds, one
 7   or two of your Ark funds, and then the group that consisted
 8   of Credit Suisse and First Dominion.
 9   A    That is correct.
10   Q    Okay.  Other than the foreclosure notice and the
11   acceptance, are you aware of anywhere where that transaction
12   was recorded?
13   A    Yes.
14   Q    Where?
15   A    I have a spreadsheet that allocates out how we were
16   going to move forward, and that was going to ultimately --
17   when the LLC agreements got written -- be effectuated.  But I
18   gave direction and we have spreadsheets that document that.
19   Q    All right.  So you did a spreadsheet that documents
20   who's going to get what.
21   A    And sent it to the lawyers.
22   Q    I mean, and you did that before the foreclosure, after
23   the foreclosure, or what?
24   A    Before the foreclosure.
25   Q    Okay.  Now --
```

```
 1  A     I think it was around February 16th.
 2  Q     All right.  Did you -- did anybody ever tell U.S. Bank,
 3  the trustee for the term lenders, that this transaction had
 4  occurred, to your knowledge?
 5  A     The trustee for the Zohar funds?
 6  Q     Yes.
 7  A     No, because it had not yet been effectuated.
 8  Q     And they were never told because it wasn't effectuated,
 9  is what you're saying.
10  A     Well, I mean, the strict foreclosure, the documents were
11  effectuated, but the transfer, nor the agreements were never
12  fully documented because everything fell apart the next day.
13  Q     If you go with me to JX-110, that might be the next --
14  well, I think it's two documents on.
15  A     (Witness reviews exhibits)
16  Q     That's the proof of claim, I believe -- if you're
17  looking at it -- that was filed in this case on behalf of the
18  term lenders, by Patriarch Partners Agency Services, correct?
19  A     Yes.
20  Q     And if you go to the Schedule 1, it lays out the
21  calculation of the claim, which is, I think, the last page.
22  A     I see that.
23  Q     All right.  And you'll see it -- they -- a ten-million-
24  dollar credit is given for the acceptance of the collateral
25  on February 24th, 2016, correct?
```

1    A    I see that.

2    Q    And as I understand your position in this case -- if I

3    can call it that -- that isn't -- that 43 million outstanding

4    principal should remain to this day, that's 43 million, there

5    should be no 10 million because that transaction was never

6    effectuated.

7    A    I am not the lawyer here.  I do not believe that the

8    collateral ever transferred to effectuate a true foreclosure

9    in NewCo.  Whether or not the documents themselves, on the

10   strict foreclosure, credit bid that, and therefore, that

11   claim is no longer TransCare's, is not for me to decide.

12   Q    Now if you will go with me to PX-235 for a minute.  That

13   --

14   A    (Witness reviews exhibits)

15            MR. AMINI:  Which is in evidence, Your Honor.

16            THE COURT:  All right.  Thank you.

17   BY MR. AMINI:

18   Q    I can go to your deposition.  At your deposition, you

19   originally told me that Ark II was going to get 55 percent of

20   -- well, let me ask the question.

21       Was Ark II going to receive 55 percent of

22   Transcendence, the shares?

23   A    I don't remember.  I think it was 54 percent.  It was

24   based on Ark II's positions in OldCo, in the -- in the

25   TransCare entity.  The new money was getting 51 and the old

1   money was getting divided pro rata.

2   Q    All right.  So the 50 -- you're right, 54.7 is the

3   number I had.

4   A    Okay.

5   Q    I had rounded it, I'm sorry.

6        All right.  Now, if we look at PX-235, this is Brian

7   Stephen responding to questions about ownership.  Do you see

8   that, in the last email up there, which is actually the first

9   email in the document?

10  A    Okay.  I'm --

11  Q    All right.  And you understand Robert Siegel is an

12  insurance guy.

13  A    Yes.

14  Q    He was asking --

15  A    Well, he's -- he works for Willis.

16  Q    And he needs the information to bind the insurance.

17  A    I've never seen this document, so, if you'd like me to

18  read through it, if you're --

19  Q    I --

20  A    -- going to ask me questions on it, I would like to --

21  Q    So --

22  A    -- look at it.

23  Q    I'm only interested in that first email.  In that first

24  email, he sets forth the ownership of TransCare -- let's see

25  if we can get that out of the way -- as being 61 percent your

```
 1  entities, 26 percent First Dominion and Credit Suisse's
 2  entities, and then it says it has a ton of other
 3  stockholders, those are just the largest.  Do you agree with
 4  that statement?
 5  A    I --
 6  Q    Is that consistent with your recollection of who owned
 7  TransCare?
 8  A    I -- well, that's only 87 percent.  I do not -- I mean,
 9  I -- sitting here right now, I don't have the LLC agreement
10  and I don't know how much was owned by each entity.
11  Q    You have a share register at your office that shows how
12  much owned -- of each entity owns TransCare, correct?
13  A    Yes.
14  Q    There is no share register for Transcendence, however,
15  is there?
16  A    It was not yet put together.
17  Q    Okay.  And no shares were ever issued in Transcendence,
18  correct?
19  A    The documentation to back up the foreclosure was never
20  completed.  People were working 24/7 for a week.  I had 35
21  people in the office.  Everyone was scrambling day to day to
22  keep TransCare alive and try to get to a new restructuring.
23  The paperwork needed to follow.
24  Q    Well, let me ask you this.  As we sit here today, did
25  any of those entities, those term lenders, ever receive any
```

18-01021-smb   Doc 6226-1   Filed 08/14/19   Entered 09/03/19 14:45:32   Main Document
Case 1:20-cv-06215-LAK   Document 1   Filed 09/03/19   Page 9 of 268
Pg 32 of 88

32

1   portion of Transcendence?

2   A     Transcendence never had any value because the assets

3   never transferred.

4   Q     That wasn't my question.

5         Did any of those term lenders ever receive their

6   interest in Transcendence, whatever that was?  Shares,

7   however you want to caption it.

8   A     I don't believe the documentation for the LLC agreements

9   were ever completed since the foreclosure was never

10  physically effectuated.

11  Q     As of today, is it fair to state that you were the only

12  person who owns a portion of Transcendence?

13  A     I don't think I own Transcendence, either.  I don't

14  think anything was ever effectuated in a share agreement.  I

15  don't believe anyone has any interest in Transcendence.

16             THE COURT:  I have a question.  Was the bill of

17  sale delivered, to your knowledge, to Transcendence?

18             THE WITNESS:  The -- the lawyers did the paperwork

19  in the middle of the night.  And I'm not -- you know, if it

20  got signed, then it was delivered to -- I can go back and

21  take a look.

22             THE COURT:  So --

23             MR. AMINI:  Glen Youngblood --

24             THE COURT:  So what more is required under state

25  law to effectuate a transfer of personal property than to

1   deliver a bill of sale?  I'm asking you.

2          MR. MERVIS:  Oh, I don't think there is anything.

3   But again, I think -- well, I think she's being clear.  We're

4   not -- no one is saying that, on paper, the transaction --

5          THE COURT:  But I'm saying, isn't that the

6   transfer.

7          MR. MERVIS:  Yeah.

8          THE COURT:  All right.  So the transaction --

9          MR. MERVIS:  Of the asset, sure, sure.

10          THE COURT:  Okay.  Go ahead.

11  BY MR. AMINI:

12  Q    Who has the interest in Transcendence, post January of

13  2016; who had the interest in Transcendence?

14  A    It would have been divided between -- had the documents

15  been executed, and if it needs to be separated, it's

16  separated as per the spreadsheet, 54 percent -- 54.7 percent

17  to my entities and the remaining 46.3 percent among the other

18  term lenders.

19  Q    Are Gibson Dunn your lawyers?

20  A    In -- they -- they represent me in certain instances.

21  Q    All right.  And do you know Mark Kirsch at Gibson Dunn?

22  A    Yes.

23  Q    Okay.  Go with me, if you would, to PX-285.

24          MR. AMINI:  There's an objection to this document,

25  Your Honor.  The objection, I believe, is the last -- on

 1  authentication, I will answer if I sent -- we filed --

 2              THE COURT:  Which document?

 3              MR. AMINI:  PX-285.  And so you have to get to the

 4  PX's in the back and then --

 5              THE COURT:  Got it.

 6              MR. AMINI:  -- following, roll to the end, the

 7  very end.

 8              THE COURT:  And there's -- you're offering it and

 9  there's no objection.

10              MR. MERVIS:  No, there is --

11              MR. AMINI:  No, there is an objection, Your Honor.

12              MR. MERVIS:  There is an objection.

13              THE COURT:  Oh.

14              MR. AMINI:  Let me ask -- if I may, let me ask a

15  couple of prefatory questions, if I could.  I just wanted to

16  alert the Court that there's a -- that ...

17  BY MR. AMINI:

18  Q    So Mr. Kirsch is your attorney, correct?  For certain

19  circumstances, certain instances.

20  A    Mister -- Gibson Dunn represents me in certain mattes,

21  yes.

22  Q    Okay.  And looking at PX-285, does it refresh your

23  recollection that you asked Gibson Dunn to represent you, at

24  least in some limited extent, in this matter, TransCare?

25  A    No, it just not.

```
 1              THE COURT:  Okay.  Can I just take a minute to
 2   read this?
 3           (Pause in proceedings)
 4              THE COURT:  Okay.  Go ahead.
 5   BY MR. AMINI:
 6   Q    Alvarez -- you had mentioned earlier that it was an
 7   entity of Alvarez & Marsal that took over the Zohar
 8   management, correct?  Alvarez -- and is it -- and does this
 9   refresh your recollection that that entity was Alvarez &
10   Marsal Zohar Management, LLC?
11   A    For that time period, yes.
12   Q    Okay.
13   A    They are no longer.
14   Q    And Gibson Dunn was -- is your counsel with respect to
15   disputes between you, to the extent there are any, and
16   Alvarez -- at that time, Alvarez & Marsal, concerning Zohar,
17   the Zohar funds, correct?
18   A    Yes.
19              MR. AMINI:  Okay.  Your Honor, I offer it.  I --
20   it's her agent.
21              MR. MERVIS:  Objection, Your Honor.  There's no
22   authenticity.  He hasn't established that this witness has
23   ever seen this letter before.  Mr. Kirsch hasn't come into
24   court.
25              THE COURT:  How have you authenticated it?
```

```
 1              MR. AMINI:  It's -- it was -- it's taken from the
 2  Court's docket, that's how I authenticated it.  We didn't
 3  bother --
 4              THE COURT:  Which --
 5              MR. AMINI:  -- to call Mr. Kirsch here.  It's a
 6  statement to an identified party on behalf of Transcendence.
 7              THE COURT:  Who filed the document?
 8        (Participants confer)
 9              MR. AMINI:  Zohar funds.  The Zohar funds filed
10  the document in this --
11              THE COURT:  That's not -- she's not the collateral
12  manager of the Zohar funds anymore.
13        (Participants confer)
14              MR. AMINI:  (indiscernible) filed the document --
15  filed this document with the Court.
16              THE COURT:  Look, I'm going to sustain the
17  objection.  It hasn't been properly authenticated.
18  BY MR. AMINI:
19  Q    When you got the -- you got $800,000 from the trustee in
20  this case for the sale of ambulances.
21  A    PPAS received 800,000.
22  Q    And that $800,000 was paid to Ark II.
23  A    Which was first in line under the agreements, based on
24  the new money that was put in.
25  Q    And in the process of that sale, you -- on behalf of
```

```
 1   PPAS, papers were filed that claimed that Transcendence was
 2   the owner of those ambulances.
 3   A    Because it had trans -- those ambulances had transferred
 4   as part of the sale of the strict foreclosure.
 5   Q    And you understood, at that time, did you not, that
 6   those were all of TransCare's ambulances?
 7   A    Yes.
 8   Q    Now just for identification -- oh, no, it's a JX.
 9            MR. AMINI:  Never mind, Your Honor.
10   Q    Let me ask you -- let's talk about how the NewCo plan
11   came about briefly.  All right?
12        Take a look with me, if you would, at JX-80.
13   A    (Witness reviews exhibits)
14   Q    And in particular, I'm interested in the first email in
15   the chain, which is the last email on this document, on the
16   back page.
17   A    Okay.  You're going to have to let me get to things and
18   look at them.
19            MR. MERVIS:  Sorry, Counsel.  Eight zero?
20            MR. AMINI:  Eight zero, JX-80.
21            MR. MERVIS:  Okay.  Thank you.
22            THE WITNESS:  I'm going to read through this.
23        (Witness reviews exhibit)
24            THE WITNESS:  Okay.
25   BY MR. AMINI:
```

1  Q    All right.  This is February 11th, a couple of weeks

2  before the foreclosure and the bankruptcy, correct?

3  A    Some of the emails were February 11th, the last one was

4  February 12th, yes.

5  Q    Okay.  And I'm only interested in the last one.  And

6  Bobby is the -- one of your insurance brokers, if I'm not

7  mistaken.

8  A    Bobby Willis.

9  Q    Okay.

10  A    I mean Bobby Siegel from Willis.

11  Q    Okay.

12  A    Sorry.

13  Q    Okay.  I'm going to ask you -- the agency.  All right.

14  A    We call him Bobby Willis.

15  Q    All right.

16  A    That's why I slipped.

17  Q    And the new transit company that you're referring to in

18  the first paragraph is what eventually became Transcendence,

19  correct?

20  A    That is correct.

21  Q    And the -- in the second paragraph, where you say that

22  we're going to have a smaller, less risky transit business

23  that would include New York Transit -- that's the MTA --

24  Hudson Valley, Pittsburgh, and Maryland, which you've already

25  told the Court, subsequently, that contract got canceled.  So

1  it ultimately became just MTA, Hudson Valley, and Pittsburgh.

2  A    Also, it was to include the Bronx contracts under the

3  New York Transit business, and those also were no longer

4  taken.

5  Q    And again, you were sending this info to him because he

6  -- as you understood it, he needed that information to bond

7  insurance.

8  A    That is correct.

9  Q    All right.  And the info in this document -- when I call

10  it the "information," I'm looking specifically at the third

11  full paragraph -- that information would have been derived

12  from the model that you were working on at that time.

13  A    That is correct.

14  Q    In fact, you had a number of people working on different

15  models during that period of time.

16  A    That is correct.

17  Q    My recollection is you said, at one point, you had ten

18  people making three different NewCo models.

19  Q    That is correct.

20  Q    All right.  They were led by three different teams,

21  correct?  Michael Greenberg, Scott Whalen, and Jodie Frazier

22  are the names I have.

23  A    That is correct.

24  Q    All right.  You wanted to make sure you had accurate

25  numbers with no modeling mistakes.

1   A     That was my hope, yes.

2   Q     And you were going to pick -- you know, once you had all

3   your modeling done, you were only going to proceed with the

4   model that you were comfortable with.

5   A     I was hoping they would all check each other, but

6   eventually use one model to move forward and make your

7   decisions and your projections.

8   Q     Okay.  So I think you answered my question, which is:

9   At the end of the day, you selected what you felt was the

10  best model on which to move forward.

11  A     We were -- they were -- it was a dynamic model, and

12  everything was changing by the minute.  So, ultimately, to

13  get the foreclosure done, I had to make decisions in the

14  minute, and certainly things were not settled because

15  contracts were being lost and people were being lost every

16  minute.  But I got as comfortable as I could to make a

17  decision that would try to save as much of this company and

18  as many jobs as I could.

19  Q     The foreclosure and the sale to Transcendence, that was

20  based -- those transactions were based on a financial model

21  that you were -- you had selected to follow, correct?

22  A     It was based on a dynamic financial model that was

23  moving every people with the loss of people and contracts.

24  But yes, I made the best decision I could in the moment at

25  the last moment that we could possibly get this OldCo/NewCo

1  restructure done.

2  Q    And you developed that model rather intensively -- or

3  intensely perhaps.  It was based on -- let me just read for

4  you.  It was based on a deep analysis of each separate unit

5  and division of TransCare, on a quantitative -- on a

6  quantitative and qualitative basis, to determine whether each

7  of their contracts was profitable, and how to go forward.

8  A    We took it down to its basic variables that had not been

9  done by the company or by Carl Marks, to understand each

10 contract down to what it takes, labor and ambulances and

11 contractual commitments, in the mathematical model of how

12 many ambulances you'd need under that contract to see if each

13 contract was profitable, and then tried to build up from the

14 profitable contracts, to save as much of the company as was

15 possible, as we were losing contracts on a daily basis.

16 Q    And is it fair to say that you were fairly well versed

17 at that point in the market for ambulance companies?

18 A    No.

19 Q    Why not?

20 A    I mean, I -- I had one ambulance company that I was

21 working on, but I didn't spend a whole lot of time in the

22 market.  I looked at investment banking multiples, but I was

23 not well versed in ambulance companies.  I didn't run the

24 company, I didn't make day-to-day decisions, and I didn't

25 have any other ambulance company in the portfolio, other than

```
1    TransCare.  But I was trying to understanding that company
2    down to its basic variables, so it could be torn apart and
3    rebuilt.
4    Q    Okay.  But you had mentioned in your last answer, I
5    think, that you were looking at investment bank multiples or
6    investment bankers' multiples, correct?
7    A    Because, at one point, I wanted to figure out how to
8    sell the company before Wells pulled the plug, and so I
9    wanted to understand who were the bankers that had worked on
10   other transactions.  But those transactions were not
11   comparable to this free fall transaction where the company
12   had basically, you know, gone through 9.3 million of cash
13   flow in the last year, and was in need of another 8 million.
14   So it was trying to figure out if we could get valid
15   financials, if we could get enough time and enough
16   information to bring anyone in to look at the company.
17   Q    That 8 million was going to be part of that credit
18   agreement, correct?  For Transcendence.
19   A    I never -- no.
20   Q    Well, you just --
21   A    What --
22   Q    -- referred to a need of 8 million, and I'm wondering
23   whether that company was going to get the 8 million from
24   Transcendence -- from Archangels III --
25   A    I --
```

```
1    Q    -- or Transcendence.

2    A    I was talking about TransCare.

3    Q    Okay.

4    A    I was talking about TransCare and what caused me to move

5    to this transaction, which was Wells brought Carl Marks in

6    because they wanted out of the credit.  And the plan that

7    they showed me in early February showed a need for an

8    additional eight and a half million dollars with no true

9    analysis or no path forward to create a profitable company.

10   That is when I brought my own people in to work directly from

11   the Enterprise software system, to try to rebuild this.  The

12   -- that Transcare was never getting that eight and a half

13   million because I was not willing to put eight and a half

14   million dollars behind Wells in a black hole of losses with

15   no true analysis on how to restructuring the company.

16   Q    The Transcendence transaction was allowing you to put

17   Wells behind.

18   A    No.

19   Q    Okay.

20   A    It was allowing me to create separate entities where

21   Wells was not involved.  Wells was going to wind down OldCo,

22   and I provided them the models to show them that they would

23   be repaid in full in the wind down, while giving 90 days

24   notice to customers and employees.  We had two models going

25   for Wells.  One was the OldCo model that showed them they
```

1  could get out whole in a ninety-day orderly wind down, and

2  the NewCo models, which were to basically try to save as many

3  divisions as could be saved, and take as many employees with

4  us.

5  Q    How much money did you estimate Transcendence was going

6  to need, new money?

7  A    Ten million dollars of fresh cash.

8  Q    And that was the money that was going to come through

9  the Archangels III loan.

10  A    That is correct.

11  Q    And that loan was also going to provide you with a 51 --

12  was it a 52 percent interest in Transcendence?

13  A    That is correct.

14  Q    So you were going to get 51 percent for the loan and the

15  remaining 49 percent was going to go to the term loan lenders

16  for their credit bid.

17  A    I think I've said that a number of times, yes.

18  Q    When were you going to get to the 2 million --

19  A    It was -- it was part of the old term lenders that were

20  getting the -- it was part of that 45 million, divided pro

21  rata over 10 million.

22  Q    All right.  Let me go back.  Again, you were also

23  familiar, were you not, with at least some attempts by other

24  parties to create some interest in perhaps purchasing all or

25  part of TransCare?

 1  A    They were indications of interest that never really

 2  followed through when requested documentation.

 3  Q    All right.  Well go and look at --

 4  A    But yes.

 5  Q    -- PX-44, if you would.

 6  A    (Witness reviews exhibits)

 7  Q    And I had one question:  Is that an email that you

 8  received on or about March 3rd, 2015, from Mike Weinberger

 9  (phonetic) at R -- Richmond County Ambulance?

10  A    Yes.

11         MR. AMINI:  All right.  I just want to move it in,

12  Your Honor.  There is no objection to it.

13         MR. MERVIS:  No objection.

14         THE COURT:  It's received.

15      (PX-44 received in evidence)

16  BY MR. AMINI:

17  Q    And let me ask -- let me ask you, while we're there, to

18  look at PX-73, as well.

19  A    (Witness reviews exhibits)

20  Q    Is that a follow-up that you got from Mark Weinberger on

21  or about July 8th, 2015?

22  A    Yes.

23         MR. AMINI:  Okay.  We will move that one in, too,

24  Your Honor.

25         THE COURT:  Any objection?

```
 1            MR. MERVIS:  No, Your Honor.

 2            THE COURT:  It's received.

 3       (PX-73 received in evidence)

 4  BY MR. AMINI:

 5  Q    And then go with me now, let's move to the DX's for a

 6  minute, so that you got to go back to the beginning of this

 7  notebook.  I'm sorry.

 8  A    It's okay.

 9  Q    The first two are just transcripts, so you don't need

10  the first two now.

11  A    Okay.

12  Q    Go with me now, I'd like to move to the DX's for a

13  minute.  So, you have to go back to the beginning.  I'm

14  sorry.

15  A    Its okay.

16  Q    The first two are just transcripts.  So, you don't need

17  the first three.

18  A    Okay.  What DX are you on?

19  Q    DX-68.

20  A    Okay.

21  Q    Do you have that?

22  A    Yes, I do.

23  Q    Kurt Marsden is a senior --

24  A    Executive.

25  Q    -- executive at Wells Fargo, correct?
```

1   A    That is correct.

2   Q    A person you've dealt with, with some regularity on the

3   TransCare credit?

4   A    He was my contact on multiple credits.  Most of my

5   business was built on taking Wells Fargo and their

6   predecessors out of bad loans.  And they were the only ABL

7   lenders that we ever used up until this TransCare incident.

8   Q    And this is an email -- the top email is an email that

9   you sent to him on or about August 4th, 2015, correct?

10  A    That is correct.

11          MR. AMINI:  All right.  Let me move this in, Your

12  Honor.

13          MR. MERVIS:  There's no objection.

14          THE COURT:  It's received.

15      (DX-68, admitted into evidence)

16  BY MR. AMINI:

17  Q    All right.  And you were forwarding Michael Greenberg's

18  email to you about a recent transaction in that space?

19  A    That is correct.

20  Q    What do you mean by normalized EBITDA that you're

21  referring to in your email to Kurt?

22  A    I was talking about stabilizing the company.  For almost

23  twelve years we had restructured this company from when it

24  was going to be liquidated by the lenders and doing $12 to

25  $14 million dollars of EBITDA a year.  My attempts were to

1  try to get the company back to those levels so that we could

2  sell at a price that would have covered both Wells and the

3  term loan lenders.

4  Q    And in addition to RCA there were others suitors that

5  you're aware of too?  I'm not disagreeing with your

6  characterization of them, as you gave with RCA, I'm just

7  saying others approached the company to your knowledge?

8  A    The only thing I ever saw was National Express which

9  Glenn Leland had said we were willing to pay $16 and $18

10  million dollars for a contract that if it was lost would have

11  put the company into liquidation.  And when I forced a true

12  letter of intent it was closer to $6 million dollars less any

13  new cash that had to be put in, but those are the only two

14  indications of interest that I had seen.  And, frankly, you

15  know, the company had no valid financial statements.  So, it

16  was really hard to try to go through a sale process.

17  Q    I just want to unwind two of those things.  The offer

18  that you ultimately got is a letter offer, I think it said

19  six to eight million, but you understood that to be, in this

20  industry, that trades at seven to eight times, on a seven to

21  eight multiple.  You understand that that was a very low

22  offer?

23  A    Well, it was one contract, but it was a very low offer.

24  It was also three and a half million of maybe five or six

25  EBITDA that the company was doing, which wasn't sufficient

 1  cash-flow to pay the business bills as it was.  So, that sale

 2  would have gone to pay back the lenders first and would have,

 3  ultimately, put TransCare into liquidation at that point.

 4      So, the sale of that, even at $17 or $18 million

 5  dollars, would have been good for lenders, but would have

 6  been terrible for TransCare because it would then no longer

 7  have been able to be in business.  Mr. Leland didn't

 8  understand his credit agreements and that any asset sale

 9  would have gone to pay the lenders would not have been used

10  by the company to fund its losses.

11  Q    And you had to remind Mr. Leland repeatedly that any

12  sale of the MDA contract would have resulted in the immediate

13  liquidation of TransCare?

14  A    Well, it would have gone to pay the lenders and, yes, it

15  would not have had the cash-flow to run the business or

16  rebuild the business which is what I was so desperately

17  trying to accomplish.

18  Q    And so let me ask you this; notwithstanding your email,

19  DX-68 to Kurt Marsden on August 4th, do you recall that about

20  mid-October, I think it was October 14th, Wells Fargo gave

21  you notice that they were no longer interested in staying in

22  this credit?  They wanted out of their ABL?

23  A    That is correct.  They signed a non-renewal notice, I

24  believe it was October 14th.

25  Q    And is it fair to say, from your recollection, that

1   subsequent to receiving that notice on October 14th you

2   worked diligently with Michael Greenberg and Jean-Luc

3   Pelissier, principally, to try to convince them otherwise?

4   A    Yes, I did.

5   Q    All right.  Ultimately, you came to the conclusion

6   sometime in mid-December that you weren't going to convince

7   him of it and you advised them that you were going to

8   undertake a sale or some kind of restructure of TransCare?

9   A    I think that's correct.  They were not going to stay in

10  past January 31st unless it was part of a sale process.  So,

11  that was my best chance of effectuating a transaction that

12  would be good for the constituents.

13  Q    If you will go with me, please, to PX-128.  Is that an -

14  - I'm not interested in the top part that says redacted, but

15  in the email from Kurt Marsden to Lynn Tilton is that an

16  email that you received from Mr. Marsden on or about December

17  16th, 2015?

18  A    Yes.

19          MR. AMINI:  All right.  We move -- there is no

20  objection, I understand, Your Honor, but we move this into

21  evidence.

22          MR. MERVIS:  No objection.

23          THE COURT:  It's received.

24      (PX-128, admitted into evidence)

25  BY MR. AMINI:

```
 1   Q    Are there statements that -- do you dispute any of the
 2   statements that Mr. Marsden is making to you?
 3   A    I have to read it and then I will answer your question.
 4   Q    I understand that.
 5   A    I don't dispute other then I'm not sure of whether the
 6   1.2 versus the 400 was actually correct, but it certainly
 7   concerned me that the management team was not being honest
 8   with --
 9   Q    I interrupted you, I'm sorry.
10   A    -- their banker because I had warned them time and time
11   again that they needed valid numbers, and to be truthful and
12   accurate with Wells Fargo.
13   Q    And that brings me to my next question which is you
14   fired Mr. Leland shortly after, the first week of January, as
15   the CEO?
16   A    I'm not sure whether he was terminated or he left on his
17   own, but I certainly wanted a new CEO far before that date.
18   Q    Fair enough.  And Mr. Bania [phonetic], who was teh
19   acting CFO at that point, he left on that same date as Mr.
20   Leland?
21   A    Most of that was because Carl Marks got brought in and
22   they left when Carl Marks came in to take control over the
23   company.
24   Q    All right. But as of the beginning of January you had no
25   CEO and you had no inside CFO?
```

1  A    That is correct.  We had Carl Marks working as a chief

2  restructuring officer and CFO.

3  Q    And my understanding is you had no audited financials

4  for 2014 at that point?

5  A    I don't think there was 2014 or 2015 which is what made

6  a sale process nearly impossible.

7  Q    Well, you wouldn't have done the financials in 2015 till

8  the spring of 2016, correct?

9  A    That is true.

10 Q    So, the only one that was late at that point was 2014?

11 A    But it was very late.

12 Q    And what steps, if any, did the board take to rectify

13 that; the board of TransCare?

14 A    We asked them to issue their financial statements and to

15 issue their monthly financial statements on time.  And,

16 frankly, I brought an outside CFO in from one of our other

17 portfolio companies to get the 2013 financial statements

18 issued because the company was not capable of issuing their

19 financial statements on time.

20 Q    So, you brought in an outside -- one of your other

21 company's CFO's in 2013 to get those done, correct?

22 A    We did.

23 Q    You didn't do that in 2014?

24 A    Towards -- we were scrambling daily to try to keep the

25 company alive, but I did have a lot of people working on this

1  credit to support the management team.

2  Q    And now after having -- well, having made the

3  determination to sell or restructure you began working more

4  intensely, I take it, with both Mr. Greenberg and Mr.

5  Pelissier to model what kind of an outcome you could hope

6  for?

7  A    Are you asking me personally?

8  Q    Yes.

9  A    Yes.  I got very involved by mid-January and stayed in

10  New York for three straight weeks while not being at the

11  company, the four companies, where I'm the CEO, but worked

12  around the clock to see if this company could be saved in

13  some form.

14  Q    I'd also like you to take a look now at DX-108?

15  A    PX-108?

16  Q    D like David.  Sorry.

17      This concerns the -- the part I'm interested in is this

18  concerns Rob Stuck and Tom Fuchs.  Rob Stuck at that point

19  was --

20  A    I haven't even found the document yet.  So, if you could

21  give me a second I'd really appreciate it.

22  Q    Sure.  DX-108 is a, and I'm only interested, really, in

23  the first and, basically, the top of the second page, back

24  and forth emails between yourself and Randy Jones who was

25  your, I believe, head of talent acquisition, correct?

```
 1    A     Yes.

 2           MR. AMINI:  All right.  We move 108, Your Honor.

 3    It's a defendant's exhibit.

 4           THE COURT:  Any objection?

 5           MR. MERVIS:  No objection.

 6           THE COURT:  It's received.

 7       (DX-108, admitted into evidence)

 8    BY MR. AMINI:

 9    Q     Rob Stuck was your Hudson Valley manager of the Hudson

10    Valley operations, correct?

11    A     Can I please read this email so I can refresh --

12           THE COURT:  Which email are you referring to?

13           MR. AMINI:  At the bottom Randy Jones to Lynn

14    Tilton, Rob Stuck HP Hudson Valley.

15           THE COURT:  The ten a.m. email?

16           MR. AMINI:  Yes.  Sorry.

17           THE WITNESS:  Okay.

18    BY MR. AMINI:

19    Q     Rob Stuck was the Hudson Valley manager at that point,

20    correct?

21    A     He was the VP of Hudson Valley, correct.

22    Q     And Tom Fuchs was the MTA manager?

23    A     He was the VP in charge of MTA.

24    Q     And do you -- were you suggesting -- you suggested to

25    Mr. Jones that you'll offer both of them a $200,000 dollar
```

1    change of control bonus and a $20,000 dollar boost in their

2    salary to keep them at that point?

3    A    That is correct.

4    Q    Ultimately, Mr. Stuck left for a competitor and Matt

5    Nolan took over for him.  Do you recall that?

6    A    No.  Rob Stuck was there, my understanding, until the

7    very end.

8    Q    And Tom Fuchs was too, correct?

9    A    Yes.  They both decided to stay and were very excited

10   about Transcendence and NewCo.

11   Q    So, at the beginning of January of 2016 is it fair to

12   state that you're working with Mr. Greenberg and Mr.

13   Pelissier to model out a potential transaction for TransCare?

14   A    For TransCare?

15   Q    Yes, for TransCare at the beginning of January.

16   A    The beginning of January we were trying to understand

17   TransCare to understand whether we could restructure it and

18   work with the company as a whole and put some new capital in

19   to have a new entity -- not a new entity, the same entity

20   restructured or whether we could get enough information

21   together to try to pull off a sale of the company.

22   Q    And at this point in time -- you know, you mentioned

23   earlier -- let me go back to this, you mentioned 9.3 million

24   that had gone into TransCare over the prior year.  Do you

25   recall that?

1  A     I believe it was from February 2015 through the end of
2  January 2016.  There was approximately $9.3 million of new
3  money.
4  Q     And those were funds that had been leant to TransCare
5  from the various Zohar funds?
6  A     And from Ark II.
7  Q     At this point, in January, is it fair to state that you
8  no longer had available to you Zohar funds with which to fund
9  Transcare?
10 A     That is correct.
11 Q     All right.  So, you were going to have to look somewhere
12 else?
13 A     There was nowhere else to look but my own personal
14 funds.  No one was going to lend in to something without
15 financial statements behind Wells Fargo who had a first lien
16 on all of the quality assets.
17 Q     So, based on that you didn't look for any other funding.
18 You relied on your own?
19 A     I know that there would be no other.  I actually went
20 back to Credit Suisse to ask them to be part of a new credit
21 facility or, at least, Michael Greenberg did based on my
22 direction.  They would not put up any new money.  So, there
23 was no new money to be had in this situation.
24 Q     And even in December you had gone, if I can refresh your
25 recollection, to -- you had sent your staff to Wells or you

1   had gone to Wells and suggested that you would put more --

2   you would be more willing to put more money in if you could

3   do it through their facility?

4   A    That is correct.  I have history with them where I have

5   had the same collateral, but I have seen second in the

6   waterfall.  And given that the company was at risk of Wells

7   pulling their ABL facility and going into liquidation I felt

8   more comfortable putting my money in secured by their

9   collateral, which I felt they were over-collateralized

10  because they were reducing and reducing through reserves

11  their loan and I felt there as excess collateral there.  I

12  was more willing to put in more money if I could do it under

13  that facility.

14  Q    I mean it's fair to state from this point forward if you

15  were going to put more money in you wanted some amount of

16  priority over the other lenders.

17  A    That is correct.

18  Q    Okay.  And so on January 15th, you recall, you put in

19  $1,172,757.73 so as to pay several of TransCare's delinquent

20  insurance bills?

21  A    I don't have the number exactly in front of me, but,

22  yes, I put in over a million dollars to pay insurance that

23  would have put them out of business the next day had it not

24  been paid.

25  Q    Actually, why don't you just take a look at DX-112?

1   Let's take a quick look at DX-112.  I believe it lists that

2   payment on the last page, if you can find it, and the amounts

3   that were going to the various insurance companies.

4   A    That is correct.

5           MR. AMINI:  We move DX-112, Your Honor.

6           MR. MERVIS:  There's no objection.

7           THE COURT:  It's received.

8       (DX-112, admitted into evidence)

9   BY MR. AMINI:

10  Q    At that point you didn't have an agreement for this

11  money, a written agreement, did you?

12  A    I certainly asked them to put a new credit facility

13  together for this agreement.  I don't think I had signed it

14  yet.  It was an emergency payment overnight, you know, where

15  basically I was told if I didn't pay the insurance they were

16  going to liquidate the company.

17  Q    Were you putting this money in as a result of a model

18  you were looking at or something else?

19  A    No.  I think I've stated clearly it was put in to live

20  another day to try to figure out a solution for TransCare.

21  Q    All right.  At the end of the month you also put in

22  another 690,000, again, for insurance payments, if I recall

23  the New York State Insurance Fund.

24  A    It was --

25  Q    Do you recall that?

1    A    Yes, because Wells would not fund it and I got a call at

2    the last second that if we didn't pay it again we would not

3    live another day.

4    Q    And that was on January 29th.  If you look at DX-121, at

5    the bottom of the second page the January 29th, 2:33 p.m.

6    email lists approval a request to approve to release

7    690,168.24.  Does that refresh your recollection?

8    A    Yes.

9    Q    You said you wanted documents to protect you first,

10   correct?

11   A    Yes.

12   Q    And you didn't have those?

13   A    I was out of the office and I was waiting for everyone

14   to put things together.  I don't know if they were pulled

15   together prior to this.

16   Q    All right.  As long as we're here if you look at the

17   next page, the 7:55 p.m. email between yourself and Carlos

18   (indiscernible 11:38:40) between Pages 2 and 3 on this,

19   that's the $195,000 dollars that was going to go to the

20   vehicles, the two vehicles you were purchasing?

21   A    Yes.  That was to try to save the Bronx-Lebanon

22   contract.

23   Q    And you were directing that those be purchased and owned

24   by Ark II and leased to TransCare?

25   A    That is correct.

```
 1              MR. AMINI:  Oh, I'm sorry.  I didn't ask to move
 2  DX-121 in.
 3              MR. MERVIS:  No objection.
 4              THE COURT:  It's received.
 5        (DX-121, admitted into evidence)
 6  BY MR. AMINI:
 7  Q    Take a look with me at PX-197.
 8              MR. AMINI:  This document has already been
 9  admitted, Your Honor.
10              THE COURT:  Thank you.
11  BY MR. AMINI:
12  Q    I'm interested in one item in this document, Ms. Tilton,
13  and that is under the credit agreement, which is not the
14  first document, I think it's the third document.
15              THE COURT:  What's the Bates number on it?
16              MR. AMINI:  I'm looking, Your Honor.  Give me one
17  moment.  It's Bates Number 47333.
18              THE COURT:  Triple three?
19              MR. AMINI:  Yes.
20  BY MR. AMINI:
21  Q    The commitment amount under this credit agreement was
22  six and a half million.  Do you see that?
23  A    Yes.
24  Q    How did you come up with that number?
25  A    I don't recall, but it was to give Wells comfort that
```

1  under certain circumstances each funding needed board

2  approval, but that it was to give Wells comfort that under

3  specific circumstances I would fund.

4  Q    Actually, each funding needed more than board approval,

5  didn't it?

6        (No verbal response)

7  Q    Go with me, if you would, to 2.5 which is PP -- its

8  47343.  There's a section called borrowing mechanics there, I

9  believe 2.5.

10            THE COURT:  Which page is that?

11            MR. AMINI:  It's on Page 11 of what we were

12  looking at, but its 47343 is the Bates Number.

13  BY MR. AMINI:

14  Q    It needed more than board approval.  It needed the

15  lender's approval which is Ark II's approval, correct?

16  A    That is correct.

17  Q    And that was so that if the company fell into somebody

18  else's hands or went into bankruptcy they couldn't borrow

19  under this?

20  A    That was because I was only going to borrow on a need by

21  need basis if I thought the company was going to use that

22  money to work into the future.

23  Q    So, let's talk about how you ended up with the NewCo

24  plan for a minute.  Carl Marks came on board early January,

25  do you recall that?

1  A     Yes.

2  Q     And you sent them or Mr. Greenberg sent them whatever

3  model you were working on at the time with him for TransCare

4  to work on. You were looking to Carl Marks, were you not, to

5  refine that and to make suggestions to you as to how to make

6  this company a success?

7  A     I'm not aware of that.  If you want refresh my

8  recollection.  I was hoping they would build their own models

9  from scratch the way we ultimately did to understand the

10  company down to its basic variables and its business to

11  rebuild it, and to find solutions and cuts so that the

12  company could have a future.

13  Q     They worked on a model and presented you some kind of

14  proposal early on, did they not?

15  A     Yeah, but it wasn't a bottom-up model, it didn't have

16  any kind of specifics by contract and it asked me for eight

17  and a half million dollars of new money to achieve five

18  million of EBITDA.  That doesn't cover the cash-flow, a fixed

19  cost of the business.

20  Q     And that was presented to you on the meeting that you

21  had, a two day meeting, I think you had with them and Michael

22  Greenberg, perhaps others, on January 27th and 28th, 2016.

23  Do you recall that?

24  A     No.  It was presented to me on February 5th.  I believe

25  January 29th I met with them, but on different issues

1  including consultants from Norwell they wanted us to hire.

2  Q    All right.  So, you don't have a recollection of having

3  a meeting with them and a proposal to you for the company's

4  going forward in late January, is that right?

5  A    No.  I had that meeting on February 5th.

6  Q    Well, then, let's go, actually, to DX-123.  Is DX-123

7  emails that you were on, on February 4th, 2016?

8  A    Yes.

9              MR. AMINI:  I move this document, Your Honor.

10             THE COURT:  Any objection?

11             MR. MERVIS:  No, Your Honor.

12             THE COURT:  It's received.

13        (DX-123, admitted into evidence)

14  BY MR. AMINI:

15  Q    And this is the day before the meeting you're saying you

16  had with them on February 5th, correct?

17  A    I believe so.

18  Q    And so what is it that you want them to do on February

19  5th?

20  A    To build a bottom up contract by contract, division by

21  division plan taking out the losing contracts and building

22  around the core business that would be able to pay its bills

23  in the future.  I wasn't against funding some minimum amount

24  to get that there, but I needed to see something that made

25  sense and gave the company a successful chance for a future.

1  Q    From your testimony, and I understand, that you were not

2  satisfied with the results of the February 5th meeting?

3  A    I did not believe that they did what I asked them to and

4  all they did was present me a thirteen week cash-flow

5  statement asking for eight and a half million dollars with no

6  restructuring, or cutting of expenses or look to the details

7  of a business on how to rebuild it.

8  Q    All right.  And so between February 5th and the next

9  week or so you worked with your own staff and came up with

10 what was the beginnings of the NewCo plan?

11 A    I worked with my own staff and people from the TransCare

12 divisional chiefs to try to understand each division down to

13 each contract, to each body, to each hour of labor, to each

14 ambulance needed and the mathematics of moving those people,

15 and ambulances and medical staff around so that we could

16 figure out if there was something to be saved here.

17 Q    And when you say work with your staff, and you mentioned

18 all those divisional chiefs, your staff was working with them

19 to get the data that you felt you needed to do it?

20 A    We wanted the information directly from the enterprise

21 software system and Glenn Youngblood as well as --

22 Q    All right.  Who -- I'm sorry, I interrupted you.

23 A    Its okay.

24 Q    Go with me to DX -- at the same time was Carl Marks

25 working on an OldCo where you going to take part of the

1  company and put it into NewCo and put the OldCo part into

2  Chapter 11?  Was that the plan?

3  A    No.  We were working all the models.  Carl Marks was

4  only reviewing the work that we were doing since they were

5  not able to do the type of work that needed to be done.  So,

6  we had an OldCo plan that actually was an orderly wind-down

7  outside of Chapter 11 and then after sixty to ninety days

8  would have been put into a Chapter 7 and the NewCo which was

9  the product of an Article 9 straight foreclosure sale.

10      There were different types of plans for OldCo because

11  Wells had to approve that, but our models were for a sixty to

12  ninety day orderly wind-down so that receivables could be

13  collected, employees could be given proper notice, customers

14  could be given proper notice and could have others pick-up

15  the routes and, hopefully, buy the ambulances and employ the

16  people.

17  Q    So, go with me, if you would then, to DX-195.  If you

18  look at the last page of that email that's an email from Carl

19  Landeck at Carl Marks at 12:25 p.m. on February 15th to you,

20  correct?

21  A    Did you say JX-195?

22  Q    No, I'm sorry, I said DX.

23  A    Okay.  My fault.  I had the wrong email.  Give me one

24  second.  Okay.

25  Q    These are a series of emails between yourself and the

```
 1  people who were working on TransCare at the time, correct?
 2  A    Well, there a lot of different people.  Most of -- there
 3  were some people from Carl Marks and then there's my lawyers,
 4  the TransCare lawyers, the bankruptcy lawyers, Lynn Harrison
 5  and Cindi Giglio.  So, this were some of the people who were
 6  working on TransCare and Transcendence at the time.
 7            MR. AMINI:  We move this document.  It's a
 8  defendant's exhibit, Your Honor.
 9            THE COURT:  Any objection?
10            MR. MERVIS:  No, Your Honor.
11            THE COURT:  It's received.
12       (DX-195, admitted into evidence)
13  BY MR. AMINI:
14  Q    And Mr. Landeck was attaching his version of the
15  proposed DIP budget, correct, in the first email which is at
16  12:25 p.m.?
17  A    I'm not sure this was his DIP budget or our DIP budget
18  that he had reviewed.
19  Q    But the DIP budget that you're talking about, if you go
20  to the last email in the chain at 12:39 p.m., you will refer
21  that new money must come from a DIP lender.  Do you see that?
22            MR. MERVIS:  Sorry, counsel, where are you?
23            MR. AMINI:  On the very first email of the
24  document, but the last email in the chain.  So, top of the
25  first page.
```

```
 1              MR. MERVIS:  First page.  Thank you.
 2   BY MR. AMINI:
 3   Q    That's from you to Cindi, but with a cc to a number of
 4   people?
 5   A    That is correct.  At this point in time Wells had a
 6   preference to an orderly wind-down in a Chapter 11 at which
 7   point in time I was willing to put up the DIP, but not
 8   subordinated or they needed to put up the DIP and they
 9   refused both options.
10   Q    Go with me now -- but at this point in time you were
11   negotiating with Wells for the combination NewCo and putting
12   the OldCo into the Chapter 11?
13   A    I first talked to Wells about that on February 9th in a
14   conversation with Kurt Marsden and then continued to discuss
15   that with them and share models on a daily basis through
16   February 23rd or 24th.
17   Q    Go with me, if you would, to JX-87, Daniel Fiorillo, who
18   is on the second page of that email -- it's an email that you
19   ultimately respond to.  Daniel Fiorillo, as you understand
20   it, he's at Otterbourg, was representing Wells Fargo, is that
21   right?
22   A    He was at Otterbourg which was Wells attorney.
23   Q    And he was asking you on that day a series of questions.
24   We can see here --
25   A    That wasn't to me.  That was to my two lawyers, Cindi
```

1   Giglio and Lynn Harrison, not Lynn Tilton.

2   Q    I stand corrected.  He asked your lawyers these

3   questions.  They forwarded it to you, correct?

4   A    Yes.

5   Q    And you sent them a response?

6   A    I sent my lawyers a response, yes.

7   Q    The first sentence is notice cannot be given prior to

8   foreclosure on NewCo or there will be no NewCo, correct?

9   A    This was on WARN notices.

10  Q    That's where I was going.

11  A    Okay.  So, this was I didn't want to tell the employees

12  prior to the foreclosure because we didn't want to mass

13  exodus.

14  Q    And then you say they owe me a plan under which they are

15  willing to over-advance.  Do you see that?

16  A    Yes.

17  Q    And what are you referring to there?

18  A    Wells owed me a plan under which they would be willing

19  to over-advance during the wind-down.

20  Q    And did they send you such a proposal?

21  A    I don't think they ultimately were willing to over-

22  advance during this period.

23  Q    When did they send you such a proposal, to your

24  recollection?

25  A    I don't recall.

1   Q   Go with me, if you would, to PX-219?  Going back to, I'm

2   sorry, JX-87 that was February 19th at 10:53 a.m.  I am now

3   interested in PX-219 and specifically the last email on the

4   document which is Friday February 19th at 4:23 p.m. from

5   Jonathan Helfat to your lawyers, more than your lawyers, but

6   specifically to Cindi Giglio and Lynn Harrison with copies to

7   people indicated.  Do you see that?

8   A   Yes.

9   Q   All right.  It says,

10       "As requested, we enclose our client's draft term sheet

11   for your review and comment."

12       Do you see that?

13   A   Yes.

14   Q   And ultimately that's what they sent you that afternoon

15   on the 19th?

16   A   No, that not what they sent me.  They sent me the

17   willingness to continue to fund et al based on certain

18   conditions.  It wasn't about --

19   Q   Well --

20   A   No.  You asked me did they send me anything on their

21   willingness to over-advance.  That's not what this was.  This

22   was a willingness to advance.  February 18th they shut down

23   the company and was not willing to advance at all.  On

24   February 18th Kurt Marsden called me and said they had

25   changed their mind and wanted to work towards a more elegant

1  wind-down.  On February 19th it was an amendment on what

2  conditions they would advance to the company et al and allow

3  it to alive another day.

4  Q   Go with me to the last -- to the proposal that's

5  attached.  We blew it up so it would be legible.  If you go

6  to the next one behind it.  No, right what you were doing.

7  Go to the one you opened right behind you.

8  A   Okay.  Please just tell me.

9  Q   Keep turning.

10          THE COURT:  Mr. Amini, why don't you just open it

11  for her.

12          MR. AMINI:  I'm sorry.

13  BY MR. AMINI:

14  Q   That was, in fact, Wells's proposal as of February 19th,

15  was it not?

16  A   If it's attached then it is.

17  Q   Okay.  And it says right here over-advance.  If you look

18  in the very top existing structure versus proposed structure,

19  one, two, three, fourth line down at least Wells believed it

20  was giving you an over-advance line, correct?

21  A   It was based on their -- they were down to high reserves

22  at that point.  I guess they considered it an over-advance.

23  We did not.

24  Q   Then they had a number of conditions with this proposal,

25  did they not?

1   A    Yes, they did.

2   Q    Can you look at the bottom, a couple of the conditions

3   were that they wanted the consent of the term loan lenders,

4   correct?  Did you understand that at the time?

5   A    No.

6   Q    And they wanted the transition services agreement

7   amongst NewCo and the borrower.

8   A    Can you just --

9          THE COURT:  Where are you looking?

10         MR. AMINI:  I'm looking at the very bottom of that

11  page, the last box that's in all white.  It's not highlighted

12  in yellow.  And it says it's got four specific items that it

13  lists there.  The third one is consent of term loan lenders

14  and four is transition services agreement among NewCo and the

15  borrowers as well as documents in agreement related to the

16  formation of NewCo.

17         THE WITNESS:  Okay.

18  BY MR. AMINI:

19  Q    Did you understand those were their conditions at the

20  time?

21  A    Yeah, but I had the right to consent for the term loan

22  lenders.  So, it was not an issue.

23  Q    And what about the transition services agreement they

24  wanted?

25  A    Well, we were putting together that transition services

1 agreement as you have seen in the documents here.

2 Q    And you understood that that was a condition of their,

3 at least, proposed over-advance?

4 A    Well, we needed a transition services agreement because

5 we were going to be sharing the same ERP system during the

6 wind-down and the same ambulances during the wind-down, we

7 needed that as well.  So, that was not an issue.  It was

8 being placed together?

9         THE COURT:  I'm sorry.  I'm not seeing what you're

10 reading.

11         MR. AMINI:  Your Honor --

12         THE COURT:  Where is the reference to transition

13 services?

14         MR. AMINI:  It's at the very bottom of the -- I

15 can show it to Your Honor.  At the very, very bottom of the

16 document there's a box, a highlighted box that's --

17         THE COURT:  Oh, I see.

18 BY MR. AMINI:

19 Q    In fact, in the earlier email, JX-87, if you go back to

20 that with me for a moment, do you have that?

21 A    Yes, I do.

22 Q    Mr. Fiorillo had also referred, in Paragraph 4, to a

23 transition services agreement in his email to Cindi and Lynn

24 in which he said we will need to see a draft and that that

25 transition services agreement will be at no cost to

1  TransCare.  That was one of the conditions, was it not?

2  A    Yes.

3  Q    Okay.  Go with me -- and then somehow between that

4  Friday the 19th of February and the following week you

5  entered into negotiations with them over what you referred to

6  as purchasing their receivables?

7  A    That is correct.

8  Q    You wanted to purchase the receivables of the three

9  entities you were taking; Pittsburg, Hudson Valley and the

10  MTA?

11  A    Well, I thought that was better for TransCare if it paid

12  down Wells on those receivables rather than having them

13  collect it in a wind-down.  So, it wasn't my desire, but it

14  was more that it would be best for both entities if they sold

15  the receivables.

16  Q    And you refer to some correspondence that you have seen

17  recently between yourself and the Wells people concerning

18  those receivables?

19  A    That is correct.

20  Q    I just want to quickly flip through them.  Well,

21  actually, I'm now seeing that they're JX's.  Well, let's do

22  it quickly; JX-93, that was one of the emails you were

23  referring to, correct, a series of emails?

24  A    That is correct.

25  Q    And then JX-94, if you will look at that one.  This one

```
 1   is, in fact, with your lawyers also at that point, Curtis

 2   Mallet, involved?

 3   A    I'm negotiating through my lawyers at this point, not

 4   with Wells.

 5   Q    And you were still waiting for auto insurance so that

 6   you could do the foreclosure at that point?

 7   A    That is correct.

 8   Q    So, if we go to -- go with me, if you would, to DX-170?

 9         MR. AMINI:  I just want to move the document in,

10   Your Honor.

11         THE COURT:  DX-170?

12         MR. AMINI:  170, yes.

13         THE COURT:  Is there any objection?

14         MR. MERVIS:  No.

15         MR. AMINI:  Well, I don't really have any

16   questions as long as it's in.  I know there's DX-171 as well.

17   That returns to the issue of purchasing the receivables.

18         MR. MERVIS:  No objection.

19         THE COURT:  DX-171 is also received.

20      (DX-170, admitted into evidence)

21      (DX-171, admitted into evidence)

22         MR. AMINI:  Oh, I'm sorry, Your Honor, my

23   colleague reminds me that I didn't move in PX-219.  That was

24   the one with the term sheet from Wells Fargo.

25         THE COURT:  Any objection?
```

```
1            MR. MERVIS:  No.

2            THE COURT:  Received.

3        (PX-219, admitted into evidence)

4            MR. AMINI:  Thank you.

5   BY MR. AMINI:

6   Q    So, at this point you don't have a deal.  Its 4:44 p.m.

7   on February 23rd.  And you don't make a deal for those

8   receivables, correct?

9   A    At this point I have not yet made a deal that we have

10  agreed on for the purchase of receivables.

11  Q    All right.  And if you go with me to -- go quickly with

12  me, if you would, PX-226.  This was to -- we talked about

13  this earlier, but this was the 593 you were paying NYSIF so

14  that you could be up and running the next day?

15  A    That is correct.

16  Q    All right.  Then we know on February 24th at 12:07 a.m.

17  you order the foreclosure.  And if you would now go with me

18  to PX-234.

19  A    I certainly directed and signed the documents for the

20  foreclosure.

21           MR. AMINI:  I'm being reminded that I forgot to

22  move in the PX-226, Your Honor.

23           THE COURT:  Any objection?

24           MR. MERVIS:  We have no objection.

25           THE COURT:  It's received.
```

1          (PX-226, admitted into evidence)

2               MR. AMINI:  PX-234 is admitted, Your Honor.

3    BY MR. AMINI:

4    Q    This is an email that just shows you don't have a deal

5    at this point after the foreclosure?

6               THE COURT:  What are you --

7               MR. AMINI:  Sorry, I'm looking at PX-234.  Its

8    1:29 p.m. on the 24th.

9               THE WITNESS:  This is apropos of something

10   completely different.

11   BY MR. AMINI:

12   Q    Okay.

13   A    This is about payroll for OldCo versus NewCo.

14   Q    But you ask -- if you go back to the second page you're

15   asking Ms. Giglio if Wells knows about the foreclosure,

16   correct?  That's the top of Page 2.

17   A    That is correct.

18   Q    And she tells you yes?

19   A    Yes.

20   Q    All right.

21   A    It was not done in the dark of night.  It was done in

22   the light of day with multiple participants.

23   Q    You had done the foreclosure.  At that point you had

24   also transferred the assets, presumably, by early afternoon

25   to Transcendence?

1  A    On paper, yes.

2  Q    And if you go wiht me to PX-229.

3          MR. AMINI:  It's also in evidence, Your Honor.

4          MR. MERVIS:  Sorry, counsel.  Did you mean to move

5  PX-234?

6          MR. AMINI:  Yes.  I'm sorry.  Oh, no, it's in.

7          MR. MERVIS:  It's already in?

8          MR. AMINI:  It's already in.

9          THE WITNESS:  Okay.  So, now what are you asking

10  me?

11  BY MR. AMINI:

12  Q    PX-229, which is already in evidence.  You not only move

13  the assets over, but you signed a consent as the board to

14  have the MTA contract transferred or assigned from TransCare

15  to Transcendence?

16  A    Subject to the agreement of MTA.

17  Q    Actually, it says where's the MTA as hereto provided the

18  company with its consent to the assignment, if I'm reading

19  the third whereas correctly.

20  A    It does say that.

21  Q    And then you filed bankruptcy.  It was that evening,

22  February 24th, after all these documents had been signed that

23  you directed Curtis Mallet to put the remainder of TransCare

24  into Chapter 7?

25  A    Because I got a call from Curtis Mallet saying that

```
 1  Wells would only fund the wind-down through a Chapter 7.  And
 2  on that basis I directed the other entities to go into
 3  bankruptcy so they could be wound-down on an orderly basis
 4  based on Wells's commitment to do so.
 5  Q    And at that point the next thing that happens is you
 6  file the bankruptcy and Mr. LaMonica was appointed as the
 7  trustee.  You're aware of that, correct?
 8  A    I don't know if that was the exact next thing that
 9  happened, but he was appointed the trustee.
10  Q    And you sent the -- well, your counsel, Randy Creswell,
11  do I have his name right?
12  A    He went to a meeting.
13  Q    Yes.  You sent him to a meeting on the 25th with Mr.
14  LaMonica?
15  A    I don't recall whether I sent him or my lawyers asked
16  him to attend, but he was at a meeting with Sal LaMonica.
17  Q    And from that point Mr. Creswell handled the
18  negotiations for you with Mr. LaMonica?
19  A    On what?
20  Q    On any matter that came up with you and Mr. LaMonica
21  from that point forward.  And he was handling those
22  negotiations.
23  A    On that day?
24  Q    Yes.
25  A    On that day, yes.
```

```
 1   Q    And you're communications as to what was going on were

 2   through Mr. Creswell?

 3   A    Or Mr. Creswell for Brian Stephen to me, not necessarily

 4   me speaking directly to Randy Creswell.

 5   Q    All right.  You weren't having any communication with

 6   Mr. LaMonica or any of his people, correct?

 7   A    I was not at that meeting.  I was out of town by that

 8   point.

 9   Q    As I understand it you're representatives were Mr.

10   Creswell and, I guess, Mr. Stephen as well, correct?

11   A    Well, and Cindi Giglio and Lynn Harrison for the

12   company.  So, when you talk about me I don't know what

13   entities you're talking about.

14   Q    I'm sorry.

15   A    Well, when you say for me what are you talking about?

16   What entities?

17   Q    Well, the information you were getting about what's

18   going on in that meeting is through Mr. Creswell and Mr.

19   Stephen.

20   A    Not only them.  It was also through Cindi Giglio and

21   Lynn Harrison.

22   Q    And then as a consequence of that -- hold on. Oh, let me

23   take you to JX-95 for one moment.  This is an email from Mr.

24   Stephen to Ms. Harrison and Ms. Giglio, but do you recognize

25   this as the transition services agreement we have been
```

1  talking about?

2  A    It is addressed transition services agreement.

3  Q    Right.  Did you have any subsequent draft -- are you

4  aware of any subsequent draft or agreement other than this

5  one?

6  A    I'm not even aware of this one.  I have not reviewed

7  this.

8  Q    Were you aware of the fact that this one has attached to

9  it, has items that were then in the position of

10  Transcendence all of TransCare's New York 911 ambulances?

11             THE COURT:  Which document?

12             MR. AMINI:  JX-95.  They're attached, Your Honor,

13  starting at the end Exhibit C.

14             THE COURT:  Oh, I see.

15  BY MR. AMINI:

16  Q    They list division New York Core is New York 911 or New

17  York EMS.

18  A    Yes.  The term lenders had the security interest in the

19  ambulances and they transferred to Transcendence, but to be

20  used by TransCare for no cost during the wind-down of the 911

21  and Core business.

22  Q    Well, if you look at this document, at the very end, it

23  says that you're going to charge TransCare $195,446 dollars a

24  month for the use of these ambulances, doesn't it?

25  A    Well, let me take a look.  What page are you --

1  Q    The very last page.

2  A    You are correct.  It does say that.

3  Q    And you so you are aware of the fact that you -- you

4  became aware of the fact at some point that following that

5  meeting on the 25th the trustee ordered the shut-down of

6  TransCare's 911 business?

7  A    Well, he ordered the shut-down of all the businesses.

8  Q    I'm sorry, Ms. Tilton.  What personal knowledge do you

9  have that the trustee had any communication with anybody at

10 the Pittsburg business that you had foreclosed on earlier

11 that morning?

12 A    Well, he did have people pick-up the MTA transit

13 vehicles that was part of my --

14 Q    That wasn't my question.  I'm sorry.  I'm interrupting

15 you because I'm out of time and I just need an answer to

16 about five, six more questions.

17      What personal knowledge do you have, if any, of any

18 attempt by Mr. LaMonica to interfere with any of the

19 operations in Pittsburg?

20 A    In Pittsburg I am not aware.

21 Q    Hudson Valley?

22 A    Well, I shouldn't say that.  I have no personal because

23 I didn't speak to him, but I was told by my lawyers --

24 Q    Well --

25           THE COURT:  Let her finish the answer, please.

1  Then you can seek to strike the answer.

2          THE WITNESS:  I was told by my lawyers that he

3  asked for all the ambulances for all the entities to be

4  gathered.  And we worked to do that not just in 911 and Core,

5  but we were asked to help secure all the ambulances in all

6  the entities.  And I know that it was also MTA to gather all

7  their vehicles and we were helpful in doing all those

8  actions. So, it came from the trustee through my attorneys.

9          MR. AMINI:  And I move to strike, Your Honor.

10          THE COURT:  Sustained.  Its lack of personal

11  knowledge and its hearsay.

12          MR. AMINI:  And I would add, Your Honor, that I

13  have four pages of privileged communications between her and

14  Mr. Creswell on the privilege log on the 25th, 26th and the

15  27th.  Mr. Creswell and Mr. Stephen, all of the

16  communications with one exception.

17          THE COURT:  You know, I don't know what to do with

18  that.

19          MR. AMINI:  Well, I think it's unfair to claim a

20  privilege for the written communication and then come here

21  and say but they told me.

22          THE COURT:  She just testified to what her lawyers

23  told her.

24          MR. AMINI:  I understand.

25          THE COURT:  I didn't sustain the objection based

1  on privilege.  I struck the answer simply because it was

2  hearsay.  She had no personal knowledge of what you were

3  seeking to learn.

4  BY MR. AMINI:

5  Q    All right.  Go with me, if you would, to DX-178.

6  A    PX?

7  Q    DX.  Just so I'm clear you understood that on Friday,

8  February 26th the paratransit operations had continued.  That

9  the employees were still out there driving the MTA's buses

10 that day.

11 A    Yes and we were still trying to negotiate the transfer

12 of the contract because the MTA after the filing of the

13 bankruptcy, even though they had agreed to transfer it, then

14 wanted to Sal LaMonica's approval.  So, until we had his

15 approval the contract was held up.

16         MR. AMINI:  All right.  I move to strike the

17 portion that the MTA wanted it.  I mean, again, it would be

18 hearsay.

19         THE COURT:  It's sustained.

20 BY MR. AMINI:

21 Q    Did -- and in this email you say, on February 26th, to

22 Randy Jones at 2:27 p.m.,

23     "I will make a decision at five p.m."

24     Do you see that?

25 A    That is correct.

```
 1   Q    What decision were you going to make at five p.m.?

 2   A    Whether to carry forward with Transcendence.

 3   Q    And then go with me, if you would -- we move DX-178,

 4   Your Honor.

 5             THE COURT:  Any objection?

 6             MR. MERVIS:  No.

 7             THE COURT:  It's received.

 8        (DX-178, admitted into evidence)

 9   BY MR. AMINI:

10   Q    PX-245, I'm going to ask you to go to the last document

11   PX-245.  It should be the last document or it may not be the

12   last.

13             THE COURT:  240?

14             MR. AMINI:  245.  This one has been admitted, Your

15   Honor.

16             THE COURT:  I have it.

17   BY MR. AMINI:

18   Q    This is an email from Mr. Stephen to Diane Morgenroth.

19   You understood that she was at the MTA, correct?

20   A    I don't know whether she was at the MTA or a lawyer for

21   the MTA.

22   Q    Fair enough.  And if you go he references and

23   announcement that was made earlier in his email.  And if you

24   go to the next page he attaches what he claims was an

25   announcement, a message for NewCo employees only.  Do you see
```

85

1   that?

2   A    Yes.  It wasn't a claim.  It was actually an

3   announcement that was sent out prior to this email.

4   Q    And that was sent out at your direction, correct?

5   A    That is correct.  I gave a five o'clock deadline to have

6   the MTA contract transfer that everyone knew, both the MTA as

7   well as the trustee, and I know that personally.  It was if

8   they didn't make that agreement to transfer, since the heart

9   of this deal was the MTA contract, that we would not

10  move forward with Transcendence.

11  Q    You were -- at that point you hadn't sent out a WARN

12  notice, had you?

13  A    No, because these employees were coming with us in

14  Transcendence and the WARN notice was going to go out with

15  the ninety day wind-down that Wells was supposed to agree to.

16  Q    Just to clean-up a couple of things, between December of

17  2016 and the filing, you were the sole board member of

18  TransCare?

19  A    Yes.

20          MR. MERVIS:  I think he meant to say 2015.

21          MR. AMINI:  December 2015.  Yes, I'm sorry.  Thank

22  you.

23  BY MR. AMINI:

24  Q    December 2015 you were the sole board member of

25  TransCare?

1  A    Yes.

2  Q    You didn't consult with anybody else in connection --

3  any other person who had any -- withdrawn.

4      In that period of time you didn't seek out any other

5  potential bidders for the company, correct?

6  A    We couldn't even get financial statements together, no.

7  Q    And you didn't hire any investment bankers?

8  A    I'm in the process of selling eight companies right now.

9  You actually need to have information to put in front of

10  people.  As you know, we were scrambling to get accurate

11  information as late in the day as the 23rd.  We were not in a

12  position to sell this company without valid financial

13  statements or information that could be given to a buyer.

14  Q    Just to finish up, you resigned as a board member of

15  TransCare June 2016.  Is that not correct?

16  A    If you can show me the resignation.

17  Q    There was -- it was subsequent to the filing, the

18  bankruptcy filing?

19  A    Yes, because I authorized the bankruptcy filing.

20  Q    And you authorized -- you also were the person who

21  authorized the bankruptcy filings of Hudson Valley,

22  Pittsburg, Pennsylvania, and the last entity was --

23          THE COURT:  TC Ambulance.

24          MR. AMINI:  TC Ambulance.  Thank you, Your Honor.

25          THE WITNESS:  That is correct.

| | |
|---|---|
| 1 | MR. AMINI: I think the court record will show |
| 2 | when that was, Your Honor. I don't have it. I think my time |
| 3 | is up. Thank you. |
| 4 | THE COURT: Very good. You had two minutes left. |
| 5 | Why don't we take a lunch break and we can -- |
| 6 | MR. MERVIS: Your Honor, can I just ask a couple |
| 7 | questions before that just to clear up one thing that -- |
| 8 | THE COURT: Sure. |
| 9 | CROSS EXAMINATION |
| 10 | BY MR. MERVIS: |
| 11 | Q   Can you pull-up PX-175, which I am pretty sure is |
| 12 | already in evidence. Earlier Mr. Amini was asking you -- |
| 13 | THE COURT: Is there a reason why we're doing this |
| 14 | now? |
| 15 | MR. MERVIS: Well, because, Your Honor, I didn't |
| 16 | like the taste of all these privileged documents that are |
| 17 | being withheld. |
| 18 | THE COURT: Well, it hasn't really been raised |
| 19 | before me. |
| 20 | MR. MERVIS: That's fine. |
| 21 | THE COURT: There is no motion to compel the |
| 22 | production of the documents. |
| 23 | THE COURT: Your Honor, I'm happy to do it later. |
| 24 | It bothered me personally, but I'm happy to do it later. |
| 25 | THE COURT: I hope it won't affect your lunch. |

1      (Laughter)

2         THE COURT:  All right.  Let's reconvene at quarter

3  to two.  Thank you.

4         MR. AMINI:  Your Honor, is the witness --

5         THE COURT:  Don't discuss your testimony with

6  anyone at lunch.

7         THE WITNESS:  I will not.

8         MR. MERVIS:  Oh, Your Honor, when are we resuming?

9         THE COURT:  1:45.

10        MR. MERVIS:  Thank you.

11     (Proceedings concluded at 12:20 p.m.)

12

13

14

15                      CERTIFICATE

16

17  I certify that the foregoing is a correct transcript from the

18  electronic sound recording of the proceedings in the above-

19  entitled matter.

20

  /s/Mary Zajaczkowski_____      August 14, 2019

21  Mary Zajaczkowski, CET**D-531

22

23

24

25

**A2091**

```
 1                    UNITED STATES BANKRUPTCY COURT
                      SOUTHERN DISTRICT OF NEW YORK
 2
   IN RE:                        .    Chapter 7
 3                               .
   TRANSCARE CORPORATION,        .    Case No. 16-10407-smb
 4                               .
                                 .
 5           Debtor.             .    New York, New York
   . . . . . . . . . . . . . . . .    Tuesday, August 13, 2019
 6 LAMONICA                      .    1:47 p.m.
                                 .    P.M. Session
 7         v.                    .
                                 .
 8                               .    Adv. Proc. 18-01021-smb
   TILTON, et. al                .
 9 . . . . . . . . . . . . . . . .
10
11                  TRANSCRIPT OF TRIAL (Continued)
               BEFORE THE HONORABLE STUART M. BERNSTEIN
12                 UNITED STATES BANKRUPTCY JUDGE
13
   APPEARANCES:
14
   For the Chapter 7 Trustee:    Salvatore LaMonica, Esquire
15                               LAMONICA, HERBST & MANISCALCO, LLP
                                 3305 Jerusalem Avenue
16                               Wantagh, New York 11793
17 For Salvatore Leggett:        Bijan Amini, Esquire
                                 Avery Samet, Esq.
18                               STORCH AMINI, PC
                                 Two Grand Central Tower
19                               140 East 45th Street, 25th Floor
                                 New York, New York 1001
20
   Audio Operator:               Electronically Recorded
21                               by K. Harris
22 Transcription Company:        Reliable
                                 1007 N. Orange Street
23                               Wilmington, Delaware 19801
                                 (302)654-8080
24                               Email: gmatthews@reliable-co.com
25
   Proceedings recorded by electronic sound recording, transcript
   produced by transcription service.
```

```
 1   APPEARANCES (Cont'd):

 2   For The Non-Debtor          Michael Mervis, Esquire
     Defendants:                 PROSKAUER ROSE
 3                               Eleven Times Square
                                 New York, New York 10036
 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                                    INDEX

2

3    TRIAL

     PLAINTIFF'S WITNESS(S):

4

5        LYNN TILTON

6        Cross-Examination by Mr. Mervis                        5

7

     EXHIBITS(s)                                    I.D.    REC'D

8

9    DX-175    Email from Mr. Stephen to Ms. Tilton           8

     DX-13     Email from Glenn Leland                       25

10

11   DX-19     Email Chain                                   29

12   DX-64     Email Melissa Probos                          43

13   DX-88     Email Chain                                   44

14   DX-92     Email (12/16)                                 50

15   DX-96     Email from Lynn Tilton to Michael Greenberg   53

16   DX-98     Email (12/21)                                 53

17   DX-99     Email (12/23/15)                              55

18   DX-227    Email from Lynn Tilton to Cindi Giglio and    63
               Lynn Harrison
19

20   DX-130    Email Chain                                   73

21   DX-131    Email Chain                                   79

22   DX-147    Email exchange                                88

23   DX-150    Email                                         94

24   DX-151    Email chain                                   96

25   DX-157    Email chain                                   97

A2094

4

| EXHIBITS(s) | I.D. | REC'D |
|---|---|---|
| PX-209   Email, dated 2/16 | | 116 |
| DX-166   Email, dated 2/22/16 | | 121 |
| PX-191   Financial package for October | | 129 |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

18-01...est...20-c...06-2...27-L...Filed...08/20/19...1...Entered...09/03/19/26...07...ge...969...of...1218...Main Document
Pg 5 of 130

5

```
 1              (Proceedings resume at 1:47 p.m.)
 2                   MR. MERVIS:  Good afternoon, Your Honor.
 3                   Oh, we have a binder to hand out.
 4                        CROSS-EXAMINATION
 5  BY MR. MERVIS:
 6  Q    Before you get there, Ms. Tilton, I want to ask you to
 7  take a look at a few of the documents that we looked at with
 8  Mr. Amini this morning.  So, if you could go into your binder
 9  and pull up or pull out DX-121.
10  A    Yes.
11                   MR. MERVIS:  Your Honor, you got that?
12                   THE COURT:  I got it.
13                   MR. MERVIS:  Great.
14  BY MR. MERVIS:
15  Q    So, Mr. Amini showed this to you briefly.  I want to
16  focus on the same or one of the same emails that he did.  So,
17  this email chain is about some funding, yes?
18  A    Yes.
19  Q    And this is Ark II, is the funder?
20  A    On some of this email Ark II is the funder, and then
21  there's other cash that's being released from PPAS that PPAS
22  that I believe, ultimately, was backed up by Ark II.
23  Q    Right.  So, I want to look at your email on the second
24  page of the document, page 2, at the top at 2:34 p.m. you say
25  in response to a question from Renee Dudley, "Yes, but I need
```

6

1   documents first here to protect me."  Do you see that?

2   A     Yes.

3   Q     What did you mean by that?

4   A     I mean that for Ark II to reimburse PPAS and to make

5   that loan, I needed to have credit agreements under which it

6   would have a first priority lien and be documented properly.

7   Q     And why it important to you for that to happen?

8   A     Because it was on the only basis that I was willing to

9   put in new money in a company that could end up in

10  liquidation days later.

11  Q     And was it your -- when you wrote that email, was it

12  your hope that the document would be created as soon as

13  possible?

14  A     Of course, yes.

15  Q     All right, let's go to DX-175, please.

16         MR. MERVIS:  And, Your Honor -- well let me ask

17  the initial question.

18  BY MR. MERVIS:

19  Q     Ms. Tilton, do you recognize DX-175?

20         THE COURT:  (indiscernible) your book there?

21         MR. MERVIS:  Oh, I'm sorry.  This is on the screen

22  only.  I apologize.

23  BY MR. MERVIS:

24  Q     So my question is do you recognize DX-175 as an email

25  from Mr. Stephen to you?

1    A    Yes.

2    Q    And do you see where it says urgent on the subject?

3    A    Yes.

4    Q    Now, earlier -- oh, let me offer it into evidence if

5    there's no objection.

6            MR. AMINI:  Well, I have an objection, Your Honor;

7    only to the extent that it's being relied on for statements

8    it would be hearsay.  I'm not objecting to the document going

9    in, but I am objecting to the -- there are reports of not

10   nature.  And to the extent for the truth of anything of that

11   nature.

12           MR. MERVIS:  Well, I don't know, Your Honor.  I'm

13   looking at the exhibit list and there's no objection.

14           THE COURT:  (indiscernible) the exhibit list.  Did

15   you object to it early to trial?

16           MR. AMINI:  Prior trial?  No, but based on the

17   testimony that she has -- Brian Stephen testified that he

18   didn't have personal knowledge of those vehicles based on his

19   --

20           THE COURT:  The point of the list and the

21   stipulations is to avoid this.

22           MR. AMINI:  I understand that, but Mr. Stephen's

23   testimony, Your Honor, subsequently was he himself said that

24   the reports of employees needing vehicles was hearsay back

25   when he gave that testimony.

1          THE COURT:  Well, I'll -- there's no objection to

2     the exhibit or there was no and I'll receive it.  And then

3     you can explain that he backed off of the statement.  Goes to

4     the weight, not to the admissibility.

5          (Exhibit DX-175 received into evidence)

6          MR. MERVIS:  I don't think there's going to be

7     controversy on this.

8          THE COURT:  Sounds like it is.

9          MR. MERVIS:  Yeah but he says doesn't quite know.

10    BY MR. MERVIS:

11    Q     So, Ms. Tilton, earlier before we broke from lunch, you

12    were asked some questions about how you knew that the or why

13    you believed the trustee had ordered ambulances off the

14    (indiscernible).  You said well I heard that from lawyer.

15         Looking at DX-175 does this refresh your recollection

16    of where you got that information from?

17    A     That was one of the places and then we also discussed

18    it because we were working with the company to make sure that

19    those ambulances were secured.  So, there were lots of

20    conversations and lots of actions taken to bring those

21    ambulances to safety back to their parking spots.

22    Q     And as far as you know were those actions successful?

23    A     Yes, they were.

24    Q     Now if you could go to -- actually before we get there,

25    let me ask you a few questions about the receivables. We had

1  some testimony earlier about a negotiation that you had with

2  Wells Fargo about receivables.  You were negotiating with

3  Wells Fargo to do what with respect to receivables?  Let me

4  ask that first question.

5  A     I was negotiating for the purchase of the receivables

6  of the three divisions that we were foreclosing upon and

7  taking the equity in.  So, Hudson County, TCA and Pittsburgh,

8  they had a first lien on those receivables.  And I was

9  looking to purchase the receivables for those three entities;

10 one to reduce their ABL by that amount which would have

11 allowed for more collections for the term lenders, and the

12 other so that there was cash coming in, rather than the delay

13 of cash that would happen until we started collecting NewCo's

14 receivables.

15 Q    Now, at the time -- just so we're clear, at the time

16 that you were having this negotiation, these were OldCo

17 receivables, right?  They were TransCare's?

18 A     Absolutely.  Those were OldCo receivables under the

19 lien of the ABL lender.

20 Q     And if you had purchased them or if Wells -- you had

21 struck a deal with Wells to purchase them, what entity would

22 they have gone to?

23 A     They would have been part of Transcendence.

24 Q     NewCo?

25 A     NewCo.

1    Q      Now, I think you alluded to this, but did you see a
2    benefit to NewCo in purchasing these receivables?
3    A      The only benefit was that rather than drawing down on
4    the revolver, there would be cash that came in, in a timely
5    fashion; otherwise, there was just a lag on time until you
6    would use the cash of the $10 million dollar revolver versus
7    collecting receivables.  So, it was perhaps a little bit
8    better, but only at the right price.
9    Q      And the revolver that you just mentioned that's the,
10   we'll call it, the Archangels III facility?
11   A      That is correct.
12   Q      All right.  Now if you had struck a deal with Wells
13   Faro, where was the money going to come from?
14   A      Same Archangels revolver, just rather than being drawn
15   down to pay day-to-day expenses, hopefully, less of that
16   would have had to be drawn because there would have been cash
17   being collected from the receivables that were coming down.
18   Q      And if you couldn't reach a deal, what would that
19   revolver be used for?
20   A      To fund the expenses of the three divisions including
21   payroll and ambulance medical services.  It was basically
22   without revenues.  It would have been drawn down to pay
23   expenses until revenues could be collected.
24   Q      All right, just so to put a fine point on it.  If you
25   didn't reach a deal, you eventually didn't, that full $10

 1  million would have been available as working capital for

 2  NewCo?

 3  A    Yes and it would have been needed to fund the expenses

 4  of NewCo.

 5  Q    Now, I'd like you to take a look at JX-102.

 6  A    In your book or in --

 7  Q    No, in the same -- sorry; Mr. Amini's book.  You there?

 8  A    Yes.

 9  Q    Okay.  So, earlier Mr. Amini asked you a bunch of

10  questions about one of the recitals which is letter (e), do

11  you recall that?

12  A    Yes.

13  Q    I want to direct your attention to actually one of the

14  provisions of the agreement.  If you can turn to the second

15  page of Exhibit 102 and just take a look at the beginning --

16  well just take a look at Section 3.

17  A    Okay.

18  Q    In a nutshell, the $10 million dollars, that's referred

19  to at the very beginning of that section, do you have an

20  understanding of which $10 million dollars this is referring

21  to?

22  A    That's the $10 million dollars of term loan obligations

23  that was credit bid for the assets of those three divisions.

24  Q    Now, I think earlier you had said that you suspected

25  that recital (e) was a mistake.

```
 1  A     Well. . .I mean it was part of the NewCo, but it was
 2  not part of the credit bid for those assets.
 3  Q     And then if you look at, just real quickly; look at the
 4  next signature pages of the document.  Is TransCare a party
 5  to this contract?
 6  A     No.
 7  Q     All right, you can put that one to the side.
 8            THE COURT:  Can I ask a question about this
 9  because I was reading it during the lunch break. There was
10  some testimony that $2s million dollars or something like
11  that was paid for the collateral. Do you recall that
12  testimony?
13            THE WITNESS:  Twenty-two --
14            THE COURT:  There's a $10 million dollar credit
15  bid, and then there's $10 million dollars referred to in the
16  bill of sale and then there was a rollover of some
17  obligation.
18            THE WITNESS:  Right.  But that wasn't what was
19  paid for the collateral.  That would have been the value of
20  NewCo.  I mean without a revolver, there was no value to
21  NewCo because it had no ability to pay its bills.
22            So when I looked at sort of a check on the value
23  of the company, it needed the new money because there were no
24  receivables, plus the collateral to create any kind of
25  business.
```

1        THE COURT:  So does that mean that the debtors got

2   a $10 million dollar credit for a business that was

3   ultimately worth $22 million dollars?

4        THE WITNESS:  Well, it was only worth $22 million

5   dollars if you had $10 million; otherwise, it was worth zero

6   because it had no cash coming in.

7        THE COURT:  So if somebody was willing to put in

8   $10 million dollars, they'd have a $22 million dollar

9   company, right?

10       THE WITNESS:  Well, only if it's worth that.  It

11  only had $2 million of EBITDA.  The hope was that someday

12  with time, it could be, but it wasn't worth $22 million on

13  day one.  It was the price that was paid for it.  But there

14  was only about $2.5 million of EBITDA if every contract was

15  kept and we were losing contracts by the day.

16       So, you know, a value of a company is what you

17  could sell it to someone else for at that day.  But what it

18  took was that new money and those ambulances to be able to

19  even begin to run it because it had no revenues because it

20  had no receivables.  So, it could not have gotten started on

21  day one without fresh cash to pay its expenses; otherwise, it

22  was just liquidating assets.

23       THE COURT:  The other question I had about the

24  bill of sales.  I thought you said that you only bought the

25  assets of the three companies.

```
 1              THE WITNESS:  We only bought --
 2              THE COURT:  Well, let's start with the full budget
 3    because it's the same assets.
 4              THE WITNESS:  Except for the ambulances which
 5    belonged to the term lenders, all the ambulances were taken
 6    as part of that and then --
 7              THE COURT:  The term lenders just had a security
 8    interest.  Who owned the ambulances?
 9              THE WITNESS:  Well TransCare, some of them were
10    leases, some of them -- most of them were on lease. So, some
11    of them were leases, some of them were, you know, depreciated
12    assets where the leases had been paid off.
13              But the term lenders had a security interest in
14    those.  And because many of them were worn down, they were
15    going to be used to wind-down TransCare, the OldCo, and then
16    those ambulances that were left and were capable of going
17    forward would have been used to run Transcendence.
18              THE COURT:  Which entity owned the AS400 computer
19    which has been the subject of testimony?
20              THE WITNESS:  Well, I mean it was owned by
21    TransCare, but it was foreclosed upon as part of the assets
22    that belonged to the term lenders because you couldn't run
23    those three entities without that computer.  But it was what
24    Transcendence was foreclosing upon to be able to have a
25    chance at a new business.
```

```
 1            THE COURT:  Thank you.
 2   BY MR. MERVIS:
 3   Q     Just picking up on that line of questioning, so, Ms.
 4   Tilton, if an entity had all of the assets of what became
 5   NewCo but had no money to run it, is that worth $22 million
 6   dollars?
 7   A     It would have been worth probably what they recovered
 8   which was $800,000 dollars.
 9   Q     And at the time of the foreclosure sale about how much
10   cash was on the balance sheet of TransCare?
11   A     I mean it may have had $50,000 dollars, but it was
12   negative in the hole and it was coming from me.  I mean
13   TransCare was not paying its bills.  It was very deep in the
14   hole and I was doing everything I could to give it any chance
15   at life going forward.
16   Q     With respect to the ambulances that were owned by the
17   other divisions, right, in other words, non-NewCo divisions,
18   did the company have documents that showed the book value of
19   those ambulances in addition to the ones you foreclosed upon?
20   A     Yes.
21   Q     Let me now go to --
22            THE COURT:  Before we leave this.  Did the
23   foreclosure include the certificates of need that TransCare
24   owned or had the right to use?
25            THE WITNESS:  Only for those three divisions that
```

 1   were needed to run those three divisions.

 2           MR. MERVIS:  Actually, Your Honor, I think I can

 3   clear that up.

 4           THE COURT:  Go ahead.

 5   BY MR. MERVIS:

 6   Q    Yeah, JX-96 --

 7           THE COURT:  Is this in your book?

 8           MR. MERVIS:  No, this is -- it may be in Mr.

 9   Amini's book --

10           THE COURT:  JX-96?

11           MR. MERVIS:  Yes.

12   BY MR. MERVIS:

13   Q    So, let me know where you're there --

14   A    I'm there.

15   Q    If you go to page 5 of the --

16           THE COURT:  What's the last three digits?

17           MR. MERVIS:  Sorry.  Page number is 3310.  So,

18   it's Schedule A.  It says the subject collateral.

19   BY MR. MERVIS:

20   Q    So, Ms. Tilton, if you look down at the bottom of the

21   page, right, there's a big capital letter, it's provided,

22   however, that the subject letter collateral expressly it says

23   not include the following; see that?

24   A    Yes.

25   Q    And then it says, accounts as such term as defined in

```
 1   the security agreement.  And then it says (b) any leasehold
 2   or other contract interest except as identified in paragraph
 3   two of the schedule; do you see that?
 4   A     Yes.
 5   Q     Now just take a moment to read paragraph two to
 6   yourself.  Tell me when you're done?
 7   A     I am done.
 8   Q     Based on what you're reading there, do you believe that
 9   any of these a, b, or c is a con?
10   A     Of those two, no.  None of those are cons.
11            THE COURT:  Isn't that a legal question, to
12   interpret the document?
13            MR. MERVIS:  Sure.  But I can show --
14            THE COURT:  Well is a con a contract interest in
15   the meaning of the document?
16            MR. MERVIS:  Well, that's fair, Your Honor.  I
17   mean -- you're right.  It's probably better argued by the
18   lawyers.
19   BY MR. MERVIS:
20   Q     All right, but in any event that seems to be the
21   operative language.
22   A     You know, I think the cons had to be --
23            THE COURT:  There's no question.
24            THE WITNESS:  Okay.
25   BY MR. MERVIS:
```

1  Q     Ms. Tilton, you haven't been here, but your name has

2  come up in this courtroom a lot.  I'd like to spend some time

3  going through your background so we know how we came to this

4  place.

5        First, can you describe for the court what your

6  educational background is?

7  A     I went to Yale undergraduate, graduated in 1981 with an

8  American Studies degree, English major, history minor.  And

9  then I have an MBA in finance from Columbia University.

10 Q     Where did you work after you graduated from Yale?

11 A     I went to Morgan Stanley as an M&A analyst.

12 Q     And from there, you went to business school?

13 A     I went to business school and then worked at Goldman

14 Sachs, Merrill Lynch, Kidder Peabody as an investment banker

15 in corporate finance, worked in banking.  And then distressed

16 research and trading.

17 Q     And after that?

18 A     I worked at a private firm called Amrock Investments.

19 We were the first real buyers and sellers of distressed bank

20 loans and trade claims and then, ultimately, started my own

21 business.

22 Q     Okay.  And what's that business known as today?

23 A     Well, it started -- first, I had a broker dealer called

24 Papillion Partners where I did research for banks and traded

25 bank loans, distressed bank loan paper.  And then,

1  ultimately, that led to me creating Patriarch Partners which

2  was me providing solutions for banks that had large

3  distressed portfolios.  I created a financial model that's

4  patented that allowed them to remove large portfolios of

5  distressed loans from their balance sheet.

6  Q    Okay.  How did you come to obtain your interest in

7  TransCare?

8  A    Actually, TransCare was part of a portfolio that I

9  purchased from Canadian Imperial Bank in 2001.  They were

10  distressed loans that we acquired. And the bank lending group

11  at the time wanted to liquidate the company and I stepped in

12  to use outside money, as well as the loans that we had to buy

13  a majority interest and take TransCare through a bankruptcy.

14  And then worked to restructure it over many years.

15  Q    During the course of the life of the company have you

16  ever taken dividend?

17  A    No.

18  Q    I want to ask about a few of your entities because they

19  come at different times in this case.  Patriarch Partners

20  Management Group, what is that company?

21  A    Patriarch Partners Management Group is a group of

22  operational leaders that we use to sort of replace what

23  others would use consultants for our own people that can go

24  into the operating companies and help them with operational

25  as well as financial restructures.

**A2110**

1   Q    And let me actually pause there for second.  Talks

2   about the operating companies, do you sometimes refer to

3   those as portfolio companies?

4   A    Yes.

5   Q    Back in 2015, approximately how many portfolio

6   companies did you have a majority or sole equity interest in?

7   A    Over seventy.

8   Q    And how many of those were you CEO of?

9   A    I'm a CEO of four companies.

10  Q    Getting to PPMG about how many employees in 2015?

11  A    Probably around twelve. We're up to forty to fifty at

12  one point in time but we were slimming down at that point

13  because we were no longer going to be the collateral manager

14  of the funds.

15  Q    Okay.  Let's talk just for a moment about Patriarch

16  Partners Agency Services.  Actually, let me back up. What's

17  your relationship to PPMG, if any?

18  A    I'm the manager of PPMG.

19  Q    And let's talk about Patriarch Partners Agency Services

20  or PPAS, what's the business of that?

21  A    It provides agency services to the loans that were made

22  from the funds that I own or my personal money.  All these

23  things were set up because the operating companies are in

24  distress and you don't want to pay out big fees.  So, we were

25  able to do the services at much lower rates and then often

1  the companies never paid us.  I think we have a $60 million

2  dollar receivable to PPMG, Patriarch and Patriarch Partners

3  Agency Services from the company.  So, these entities were

4  set out to have lower costs and put lower pressure on the

5  portfolio companies as they were going through

6  restructurings.

7  Q    And when you say companies that didn't pay PPAS, are

8  you referring to the agency fees?

9  A    I'm talking about agency fees; I'm talking about

10 management fees.

11 Q    You're not talking about loans?

12 A    No, not loans.  I'm talking about just money owned to

13 Patriarch entities.  These were entities were set up so that

14 we didn't put pressure on companies to put money out rather

15 than to use them to restructure and ongoing operations.

16 Q    I want to ask you briefly about some of the other

17 companies that we've heard about in the case -- Ark II CLO

18 2001 Limited, called it Ark II, what is that company?

19 A    Ark II used to be an investment fund that paid off all

20 its other lenders and then became my personal investment fund

21 that's all my cash that I invest in, side by side, in the

22 portfolio companies.

23 Q    Right. So, the money in there is all yours?

24 A    It's all mine.

25 Q    All right.  Another company we've heard about Ark

1   Investment Partners or AIP, what is that company?

2   A    Again, it's my personal money.  One started out as a

3   private equity fund with another LP but they were paid in

4   full and got their money back. And then I used this as a

5   personal investment vehicle to invest side by side in the

6   portfolio companies.

7   Q    And what about Archangels?

8   A    Again, another personal fund entity.

9   Q    Let's talk for a minute about the Zohar funds.  It may

10  not be so easy to explain.  What are the Zohar funds?

11  A    They are funds that were started to invest in deeply

12  distressed companies by providing loans to and getting equity

13  upside in those companies.  Basically, the only thing that

14  had in common is we brought companies that were left for dead

15  and provided that capital to try to restructure those

16  companies over long periods of time.

17       And very hard to get lending for companies that are

18  deeply distressed so this allowed us to use these funds to

19  provide that lending.  And then the support of Patriarch and

20  its affiliates to restructure and to take those companies

21  into the future.

22       And the equity upside, the equity liability was borne

23  by me, but the equity upside went to the same fund holders so

24  that the homeruns outweighed the risk of some of this deeply

25  distressed investments.

1    Q      I think we already touched on this.  Patriarch Partners

2    had been the collateral manager for the Zohar funds, at least

3    until sometime in 2016?

4    A      Some of Patriarch's affiliates.  There were a number of

5    different Patriarch's for each fund, but they were the

6    collateral manager through, I think, March 3rd, 2016.

7    Q      Let me let's go to November 2014.

8            MR. MERVIS:  And, Your Honor, this is very

9    briefly, historical points.

10   BY MR. MERVIS:

11   Q      November 2014, did you come to learn or around that

12   time about TransCare's financial condition?

13   A      Well, I came to learn that it was different than I had

14   thought.  I mean I came to learn that they were in -- had not

15   been paying their bills, that the financial information I had

16   been provided wasn't accurate, and that they had not been

17   filing their financial statements for a number of months.

18   And that the bank was very -- Wells Fargo was very concerned.

19   Q      Okay. And how did you learn that?

20   A      Through a meeting that I had with the management team,

21   as well as through people in my office.

22   Q      And what, if anything, did you ask folks to do to try

23   to fix that situation?

24   A      Well, I asked the people who worked for me to get much

25   more deeply involved and I brought in a CFO from one of our

```
 1   other portfolio companies to support the team to get their
 2   financial statements provided. And I asked them to please
 3   work with the bank and get them the financial statements, be
 4   honest.  And I also helped them with my people put together a
 5   budget and a plan for the future that would cut expenses and
 6   take away some contracts and hopefully revive the company.
 7   Q     And when you say your people who are you referring to
 8   Patriarch people?
 9   A     I'm referring to the people who work for me supporting
10   me in my role as director and owner of these companies.
11   Q     And to your knowledge, did they work with the
12   management team to try to figure out this plan that you asked
13   for?
14   A     Absolutely.
15   Q     Now turn to DX-13 in our book.
16         MR. MERVIS:  I think we're running only in our
17   book, Your Honor.
18   BY MR. MERVIS:
19   A     Okay.  I got to switch books.
20   Q     So this is organized JX, DX, PX.
21         THE COURT:  Thirteen, did you say?
22         MR. MERVIS:  That is what I said, DX-13, yeah.
23   BY MR. MERVIS:
24   Q     All right, so, Ms. Tilton, do you recognize DX-13 as an
25   email that you received from a person named Glenn Leland?
```

1   A      Yes.

2          MR. MERVIS:  Your Honor, I'll move this. Again,

3   there's no stated objection.

4          MR. AMINI:  No objection.

5          THE COURT:  It's received.

6      (Exhibit DX-13 received into evidence)

7   BY MR. MERVIS:

8   Q      And you'll see in the first sentence of the email, Mr.

9   Leland writes, "Thank you again for your time today and for

10  hosting me to this TransCare and Patriarch Partners."

11         Why did you have Mr. Leland in?

12  A      Because I was looking for a new CEO based on the things

13  that I had discovered in November and felt that they were in

14  need of new leadership.

15  Q      The second sentence says, "Also, thank you for the

16  photo for my celebrity photo collection."  At the risk of

17  embarrassing you slightly, what is that about?

18  A      He asked me for an autographed picture and I signed it

19  for him.

20  Q      And during the course of your meeting with Mr. Leland,

21  did you form an impression as to whether he had done some

22  research on you and your business model?

23  A      I knew he had because we talked about that and how much

24  he wanted to be part of the Patriarch world and what we do,

25  and he was excited about the prospect.

1   Q    And during those discussions, did you talk about your

2   business model with respect to deeply distressed companies?

3   A    Yeah, I mean as you can -- his second line where he

4   talks about good people plan, I always, when I interview

5   people give them my theory that our job is to create

6   propensity or growth.  And that that's people -- having the

7   right people in the right places, having a plan, a vision for

8   the future, not just numbers but who are our customers, what,

9   you know, who are our vendors, what is our geographic

10   distribution, what are we trying to accomplish. And that

11   process is the invisible web of energy that makes people know

12   how to achieve that plan on a daily basis.  And that pace is

13   the fourth part which is if we don't work around the clock

14   with a sense of urgency, we will not make it there.  And I

15   think he's repeating that right here and that is how you take

16   a company from the depths of loss and darkness to prosperity

17   and light.

18   Q    Going back to the plan that you had asked the then

19   TransCare management team and your Patriarch folks to put

20   together in November of 2014, during the course of your

21   interview with Mr. Leland did you ever tell him that that

22   plan had been successful and completed?

23   A    Well we were only about a week later, so no.  All I had

24   said was that we had worked to put together a plan and that

25   it was going to take a lot of work and that the company was

1  facing significant challenges, but I thought that we had, you

2  know, good customers, good people. And that together, if we

3  could really drive the future that the company could be very

4  successful again.  We had many years where the company

5  actually did not borrow; paid its bills and serves its

6  customers very well.

7  Q    What did you tell him about the company's financial

8  condition?

9  A    That it was significantly distressed, that they hadn't

10 put their financial statements together, that we had an issue

11 with Wells Fargo and we needed to keep them in the company

12 because, otherwise, we wouldn't have the liquidity or the

13 time. And that we really needed to focus in on not only the

14 profitable businesses, but really going for more mass transit

15 business.

16      That we had the experience in New York and that we

17 could go throughout the United States with that model.  I

18 also told him we owned Snelling and Intrepid Home Healthcare

19 and staffing that we could provide around the country, the

20 drivers, as well as the staffing that we would need and that

21 was a much lower fix cost business which is why we should be

22 focused more on mass transit than ambulance which is just

23 such high fix costs.

24 Q    Now if you could now in the same binder to Joint

25 Exhibit JX-8.

```
 1   A      Sorry; can you say that again?

 2   Q      Yes.  JX-8.  It's actually the first document in the

 3   book.

 4   A      Oh, okay.

 5          MR. MERVIS:  And, Your Honor, this is joint

 6   exhibit obviously.

 7   BY MR. MERVIS:

 8   Q      What I'd like to have you focus on for the moment, Ms.

 9   Tilton, is Mr. Leland's email that starts about a third of

10   the way down on page 1, 2:05 p.m.  Just take a moment to

11   review the first two paragraphs.  The paragraph I want to

12   focus you on is the one that says one, recovery plan not

13   viable.

14          Just let me know when you've had a chance to catch up.

15   A      Okay.

16   Q      Okay.  In that paragraph number one, at the very

17   beginning, he writes, "Management team does not support the

18   recovery plan previously submitted," do you see that?

19   A      Yes.

20   Q      Do you know what recovery plan he's referring to?

21   A      The one that was put together in November/December time

22   period.

23   Q      The one after you had that bad meeting and asked people

24   to put it together?

25   A      That's correct.
```

1  Q     Okay.  I take it this wasn't particularly good news?

2  A     No, it was not.

3  Q     All right if you could turn to now the DX-19.  Here we

4  go.  All right, Ms. Leland [sic] take a moment just to peruse

5  this, but my initial question is, is this an email chain that

6  you participated in, in or around February 19, 2005?

7  A     Yes, I, Lynn Tilton, did.

8  Q     Okay.

9        MR. MERVIS:  And, Your Honor, I'll offer this.

10  There's no stated objection.

11        THE COURT:  All right, it's received.

12     (Exhibit DX-19 received into evidence)

13        MR. MERVIS:  Thank you.

14  BY MR. MERVIS:

15  Q     So I want to focus your attention on the email from Mr.

16  Marsden to you that's on the first page, February 19th at

17  10:36.  Now, you mentioned it earlier, but just so we have

18  it, who is Mr. Marsden to you, at this point in time?

19  A     He is the senior most credit person over all the credit

20  lending and worked out of the LA office, but he was my

21  relationship at Wells.

22  Q     Right the person that you, I guess, closest to your

23  point of contact.

24  A     He would be my point of contact, yes.

25  Q     All right, so in the beginning of the email, he writes

1   starting in the second sentence.  Ms. Tilton -- Ms. Tillem

2   told me I called you Mr. Leland, so I apologize.

3   A    That's fine.

4   Q    That was rather inadvertent.  Get that out of the way.

5        In any event, so he says, "I was in the portfolio

6   meeting earlier today and we had a length discussion about

7   TransCare.  From our perspective, the liquidity is extremely

8   tight and it appears likely that the company could run out of

9   liquidity in the next couple of weeks."

10       This is February 19th.  Was this observation from Mr.

11  Marsden of concern to you?

12  A    High concern, yes.

13  Q    Why?

14  A    Because, you know, the company ran out of money.  It

15  was going to need lending but it also meant that I wasn't

16  getting clear financial information from the company because

17  I was not seeing this liquidity crisis, but I certainly was

18  digging in.

19  Q    So, let me make sure I understand.  He was telling you

20  about a liquidity crisis but in the financials that you were

21  reviewing that wasn't apparent to you?  Actually withdrawn.

22  That's a bad question.

23       Let me ask a new question.

24       A few lines down there's a sentence that starts with

25  also.  It says, "Also while management is working diligently

1  to develop a plan, we believe that they would benefit from

2  the expertise and added support that a turnaround consultant

3  could provide," do you see that?

4  A    Yes.

5  Q    And what was your reaction to that suggestion?

6  A    It was to use my own people rather than a turnaround

7  consultant because what that means to Wells is bringing

8  someone in to prepare to protect their loan and liquidate

9  their loan.  It's always the kiss of death, does not give the

10  company a chance to recover, in my vast experience with Wells

11  Fargo.

12  Q    And in addition to yourself, did you believe that you

13  had personnel who fit the bill of restructuring expert?

14  A    We did.

15  Q    All right if we could go to JX-15, please.  Now, Ms.

16  Tilton, this is kind of a long email.  You'll see toward the

17  back it starts with some communications from something called

18  RCA.  I'm not going to bother with that.  But if we could

19  skip ahead to pages 2 and 3 of the email.

20       There's an email from you at the bottom of page 2 sent

21  at 4:24 on February 10th.  You see that?  Goes over to the

22  next page.

23            MR. MERVIS:  Your Honor, could I approach just to

24  make sure?

25            THE COURT:  Yes.

```
 1  BY MR. MERVIS:

 2  A      Okay.  I've done it.

 3  Q      So you write in that email again, you tell Mr. Leland

 4  to hang in there, right?

 5  A      That is correct.

 6  Q      All right.  Mr. Leland responds to you and this is now

 7  on the second page at 10:48 p.m.  And first he says in the

 8  third paragraph he says, "Thanks for all of Jean-Luc, Brad,

 9  and Steve Berlin's (phonetic) help especially in the last

10  eighty hours."

11         Now, we know who Jean-Luc is because he's been here,

12  but could you tell us who Brad was?

13  A      He was a credit officer who was over this credit at the

14  time that was supporting Jean-Luc.

15  Q      So he had the position that Michael Greenberg went

16  into?

17  A      Michael Greenberg had it before and then took it back,

18  yes.

19  Q      And who is this fellow Steve Berlin?

20  A      Steve Berlin had been a CFO of one of our other

21  portfolio companies and felt like he was an expert CFO and

22  could come in and try to get the financial statements issued

23  so that we could actually really understand what the balance

24  sheet looked like and what, where we were because I needed to

25  understand the truth of where the company was to have any
```

18-01021-smb   Doc 2127-1   Filed 08/30/19   Entered 09/03/19 16:07:50   Main Document
Case 1:20-cv-06274-LAK   Document 19-1   Filed 09/30/20   Page 997 of 1218
Pg 33 of 130

33

1   chance at taking it into the future.  And since the company

2   was not issuing them themselves, I brought someone in to try

3   to help get those financial statements issued quickly.

4   Q    Okay.  He then says, "I agree," he, Mr. Leland says, "I

5   agree we will fix this and I will make good on the promises I

6   made in my interview," do you see that?

7   A    Yes.

8   Q    Do you recall what promises he's referring to?

9   A    He felt that he --

10  Q    No, I should say do you know what promises.

11  A    Yeah, I mean, well I mean he knew the situation and

12  felt that he was the guy to help take the company to this

13  moment into the future and to make it a very successful

14  portfolio company for us.

15  Q    Now if you go up to the next email, it's your response.

16  This is sent at 10:51 on February 10th.  And I want to focus

17  on the second and third sentences.  You write, "We must keep

18  the bank at bay."  Who's the bank you're referring to there?

19  A    Wells Fargo.  They had the keys to the kingdom.  They

20  controlled the cash.  They had all the liquidity and we

21  needed to make certain that they would support the company

22  going forward into the future to have any chance of survival.

23  Q    And then you say financial statements must be on time

24  and we need to have a plan for them.  Do you see that?

25  A    Yes.

1    Q      Why were you telling him that?

2    A      Because I've worked with Wells for the last twenty

3    years.  I know that the most important thing for them is to

4    trust management, have valid numbers and to have a plan that

5    they can buy into and support.  And I was very concerned

6    after receiving, you know, emails that the company was losing

7    their support. And once that happens, as it did, it becomes

8    an almost impossible gap to close.

9    Q      Now when you're a director of the portfolio companies

10   for which you're not also an officer, do you get typically

11   get down into the weeds of the production of financial

12   statements?

13   A      No.

14   Q      Who do you rely on?

15   A      I rely on the management teams, the CFO's and their

16   controllers.  The companies produce their own financial

17   statements.  Even where I'm the CEO I don't produce the

18   financial statements, but I analyze them.

19   Q      All right now sticking with the same email, a couple

20   lines down you say, "We will fix.  We may need to get smaller

21   before we grow," do you see that?

22   A      Yes.

23   Q      What were you referring to there?

24   A      There were a lot of contracts that I believe we're

25   losing money.  And so, I really believed to have a chance to

```
 1  restructure this and make it profitable and be able to live
 2  off its cash flow that we needed to give up some of the high-
 3  profile contracts that were losing money.  And so, the way I
 4  restructure a company is I look at every contract to make
 5  certain that it's profitable and exit certain businesses or
 6  contracts that are losing money to have a solid basis for the
 7  future.  Based on certain analyses that were done back in
 8  November, I really believed that we needed to exit certain
 9  businesses and certain contracts.
10  Q    I want to go over to the first page of JX-15.  I'm
11  going to skip Mr. Leland's email at the bottom of page and go
12  to yours to him at 11:01 at night.
13       And you write to him, "Just make sure you have valid
14  numbers."  See that?
15  A    Yes.
16  Q    What are you referring to there?
17  A    The numbers needed to be real numbers and they needed
18  to be accurate.  They couldn't be sort of estimated.  They
19  needed to get their financial statements done and everything
20  needed to be accurate and valid because that's a starting
21  point.  The minute they're not, you lose the confidence of
22  the people around you and a lot of the stuff that I was
23  getting was not based on closed books and accurate financial
24  statements.
25  Q    You go on and you say, "We cannot lose Wells or we will
```

     1   not have the time and cash we need," do you see that?

     2   A     Yes.

     3   Q     What did you mean by have the time and cash we need?

     4   A     It was going to take time to restructure this company.

     5   It had made mistake and was in a liquidity crisis and we were

     6   going to need the time to analyze the company, exist

     7   businesses, restructure and move into the future and you can

     8   only rebuild a company with time and liquidity.  And Wells

     9   was in charge of both.  And I needed to get them comfortable

    10   that they could trust the company and trust the management

    11   team to work into the future while keeping their loan there.

    12   Q     Thank you.

    13         By the way, while we're on the subject of Mr. Leland,

    14   did you ever have a meeting with him at your office where you

    15   cursed at him?

    16   A     No.

    17   Q     Did you ever have a meeting with him in your office

    18   where you threw him out of your office?

    19   A     No.

    20   Q     All right, let's go to DX-68, please.  And I'm going to

    21   get this right this time, Ms. Tilton, this is an email

    22   exchange that you were involved in?  DX-68.

    23   A     Yes between Kurt Marsden and myself.

    24              MR. MERVIS:  Your Honor, I'll move this.  There's

    25   no objection stated.

```
 1              THE COURT:  DX-68?

 2              MR. MERVIS:  Oh, apparently, this is in evidence.

 3   Thank you.  I appreciate that.  I should have noted it.

 4   BY MR. MERVIS:

 5   Q    DX-68.  It's already in evidence.

 6        All right, so yeah, so my question is at this

 7   particular point in time, why did you share Mr. Greenberg's

 8   email with Mr. Marsden, your contact at Wells Fargo?

 9   A    Because I was encouraging him and Wells Fargo to give

10   us the time to rebuild TransCare so that we could sell it

11   with stabilized EBITDA and liquidity and provide the type of

12   return that would have paid back Wells, as well as the term

13   lenders. And I felt that with time, we could get back to a

14   stabilized EBITDA of $10 to $12 million which is what it had

15   been for years.

16   Q    Now during the course of 2015, were you inalterably

17   opposed to selling TransCare?

18   A    No, not if I could get it stable and have financial

19   statements and a management team that could go through a

20   process, of course not.

21   Q    Now you mentioned the process.  Let's just pause for a

22   minute there.  In your career, have you been involved in the

23   buying and selling of companies?

24   A    Yes.

25   Q    Rough number, how many?
```

1  A     Well, I acquired 243 just in my time at Patriarch and

2  was an M&A investment banker for many years, so probably

3  bought and sold more than 300 companies.

4  Q     In your experience in order to run a value maximizing

5  sale process for a company like TransCare, what would have to

6  happen?

7  A     Well, there are two types of sale processes that I've

8  been involved in.  There's when you sell a company through an

9  equity process and that's hiring an investment banker,

10 putting together a book, having, you know, a five-year plan,

11 audited financial statements; sometimes even a quality of

12 earnings report and going through a process that will take

13 anywhere from nine to fifteen months.  I'm doing eight of

14 those this year.  So, I'm quite involved in that right now.

15       And then there are also even processes in 363 sales

16 where you still have to have the information pulled together

17 for any buyer to analyze.  You have to hire an investment

18 banker and have some form of book and financial statements to

19 go out to people and even that would, you know, take 90 to

20 150 days, but you still need to have a company that is stable

21 enough with liquidity and accurate numbers to get through

22 that.

23 Q     Now you mention book a couple of times.  What do you

24 mean by book?  You have to have a book.

25 A     Like a confidential information memo.  Someone who is

1   going to look to buy a company will first start with looking

2   at an information memorandum on the company, it's business

3   lines, as well as its financials by business.  No one is

4   going to buy anything unless they can analyze it.

5   Q      Is that sometimes referred to as a CIM?

6   A      Yeah Confidential information memorandum, also known as

7   a CIM.

8   Q      Generally speaking, are CIM's easy to put together?

9   A      No, I mean the ones that I put together this year took

10  me three to four months with the companies and the bankers.

11  Certainly, something slimmed down could be done quicker than

12  that, but you still need to have people who can work on the

13  information and put a book together. And you still need valid

14  numbers and you need the liquidity to get through a process.

15  Q      Now you mention a bankruptcy 363 sale and I'm going to,

16  if you like I'm going to tell the Judge things, the Judge

17  knows well better than me, but let me ask the question.

18         In your -- you've been involved in 363 sales?

19  A      Yes.

20  Q      In your experience in order for those to be successful,

21  does it have to get financing to operate the company prior to

22  the sale?

23  A      Yes, you need to normally have a debtor-in-possession

24  loan and the most successful ones going in with a stalking

25  horse bid so that everybody knows that it will come out the

1   other end; otherwise, often the vendors and customers will

2   leave because they don't know if they'll be a viable company

3   afterwards.

4   Q    In the, I think you described it as the equity sale

5   process, the one in your experience takes longer; in your

6   experience, does the company have to continue as a going

7   concern or to get to the end of the process?

8   A    Absolutely, yes.

9   Q    And funding is required for this?

10  A    Funding is required and in bankruptcy, you really need

11  to have the funding to a plan for it to even be approved.

12  Forgive me for telling you what you know.

13          THE COURT:  It's your testimony.

14          MR. MERVIS:  I'm sorry.  I didn't hear Your Honor.

15          THE COURT:  You can read back the record.

16          No, you didn't.

17  BY MR. MERVIS:

18  Q    Throughout 2015 and 2016, did you feel that TransCare

19  was in any position to go through a sale process?

20  A    I mean up until the feeling in 2016?

21  Q    Yes.

22  A    No.  I couldn't get it sufficiently stable or permanent

23  funding or financial statements or have a team that could put

24  together a process and help people through due diligence.  It

25  was day-to-day crisis and chaos and trying to figure out if

1  we could live another day.

2  Q     Speaking of crisis, let's focus on July of 2015.

3        Did you in early of July come to learn that TransCare

4  had missed payroll?

5  A     Yes.

6  Q     How did you learn it?

7  A     When I landed from a flight back from Europe, I hadn't

8  had email and I landed only to find out that Wells had

9  refused to fund that payroll on July 3rd and that they had

10 missed that payroll, that they had taken a million and a half

11 reserve on that day, last minute, and refused to fund the

12 payroll.

13 Q     I was going to ask you on the same page.  To your

14 knowledge, the company have any advance notice that Wells

15 Fargo was going to take that reserve?

16 A     To my knowledge, not until that day, no.

17 Q     After the payroll was missed, did you take any steps to

18 try to get things back to normal to the extent that they

19 could?

20 A     I certainly provided the cash to make the payroll and

21 from the investment funds.  And I did try to work with Wells

22 to get to an amendment and to a position where we wouldn't

23 have any of these last-minute reserves taking us by surprise

24 so the company could not plan properly on the payments that

25 were due.

1    Q      And about how late was the payroll?

2    A      I think the -- well I think it was a Friday and it was

3    paid on a Monday.  It was the next day that I could fund.

4    Q      To your understanding was the payroll miss something

5    that got some attention within the industry?

6    A      Yeah, we never really recovered from that.

7    Q      Why is that?

8    A      Because the rumors, the employees all, you know, work

9    at the hospitals and work with the customers and it became

10   very public and that was when the true concerns through the

11   industry started.  Up until then, it was more between, you

12   know, certain vendors like the insurance companies and Wells

13   and myself.  But that was when the rumor (indiscernible)

14   TransCare's ability to go as a going concern began to rise.

15   Q      I think a few minutes ago you said that the funds

16   provided payments to unblock that $1.5 million dollar

17   reserve.  Which funds are you referring to?

18   A      Well, they didn't unblock the reserve.  They lent money

19   so that payroll could be made.

20   Q      Right.  And --

21   A      The Zohar funds.

22   Q      Okay.  Thank you.  Yeah, I got to have (indiscernible).

23          So, let's get to where I want to go which is DX-64,

24   please.  And, Ms. Tilton, do you recognize DX-64 as an email

25   exchange that you joined towards the -- that you joined in

1    midstream?  You're a participant?

2    A    Yes, I am.

3         MR. MERVIS:  Your Honor, I'd like ot move DX-64.

4    There's no objection noted on the list.

5         THE COURT:  Any objection?  DX-64 is received.

6         (Exhibit DX-64 received into evidence)

7    BY MR. MERVIS:

8    Q    I'd like you, Ms. Tilton, to turn to the second page of

9    DX-64.  There's an email at the bottom of the page some

10   person named Melissa Probos (phonetic).  Do you see that?

11   A    Yes.

12   Q    She's a Wells person?

13   A    Yes.

14   Q    Please read on that paragraph to yourself and let me

15   know when you're finished.  Does what Ms. Probos, is what she

16   wrote here is that consistent with your understanding with

17   the agreement that you had reached with Wells Fargo with

18   regard to this payroll issue?

19   A    Well this was in regards to the reserve that she --

20   Q    The reserve issue, right?

21   A    Yes.

22   Q    And what did you do to get it resolved?

23   A    I spent time on the phone with Kurt Marsden and worked

24   with him on an agreement.  They were very concerned about the

25   sort of unbilled transports.  And they wanted us to put in

1 this new EPCR system on the unbilled payables because that

2 was their major concern.  And so, worked that this would be

3 released if we put in this new system and paid for this new

4 system within ninety-days; otherwise, they would begin to

5 implement the reserve again.

6 Q    If you could turn, please, to DX-88.  And just take a

7 moment, Ms. Tilton, to review this email.  This is another

8 email chain in which you're a participant, yes.

9 A    I read it.

10         MR. MERVIS:  And, Your Honor, I'd like to move DX-

11 88.  There's no objection noted.

12         THE COURT:  It's received.

13     (DX-88 received into evidence)

14 BY MR. MERVIS:

15 Q    Now, let's just sort of backup and set the table to

16 talk about this exhibit. So July, there was a missed payroll.

17 And I think with Mr. Amini we established that in October

18 Wells Fargo told you they weren't going to renew, so their

19 ABL was going to go away at the end of January, the very next

20 year, right?

21 A    If I could not get them to extend, yes.

22 Q    All right.  So, here we are in December, December 11th

23 and there's an email on the second page from Mr. Husson

24 (phonetic) to Mr. Pelissier and Mr. Greenberg.  Could you

25 please take a moment to read that email to yourself and let

```
 1   me know when you've finished?
 2   A     I've read it.
 3   Q     You've read it already.  All right.
 4         Do you understand the issue -- well first of all, Mr.
 5   Husson was a Wells Fargo person?
 6   A     Yes, he was.
 7   Q     And do you understand the issue that Mr. Husson lagged
 8   here, in particular this issue about their examiner
 9   discovering issues with a calculation?
10   A     Yes.
11   Q     And, at least, according to this report, what had Wells
12   Fargo found?
13   A     That from June to December there had been twenty-seven
14   unbilled overstatements.  So, these are when you have not yet
15   -- you run the ambulance route, but you have not yet billed
16   for it.  So, there's a suspension that the company was
17   allowed under the credit agreement to put into its
18   receivables.  They had found on those unbilled that it had
19   been overstated twenty-seven times.
20   Q     And what was your reaction, at least, to yourself, when
21   you read that?
22   A     Just, you know, for me was aghast.  And I know that
23   the consequences of losing confidence in management or the
24   borrowing base or the accuracy of numbers would accelerate,
25   you know, Wells' desire to exit and I was highly concerned
```

1  and hoped there was a better explanation for it.

2  Q    If you go to the first page of the exhibit, there's an

3  email from you to Mr. Greenberg, copied to Mr. Pelissier, and

4  Mr. Stephen.  You write, "As you know if they lose faith in

5  the honesty of the management and the company, they will not

6  continue."  Who is the they that you're referring to?

7  A    Wells Fargo.

8  Q    And then if you go to the very top email from you,

9  again to the same people, the one at 12:51 p.m.  You say, "I

10 mean that with all seriousness, otherwise it is game over."

11 What did you mean by game over?

12 A    If Wells decided not to continue, there was no way for

13 the company to continue.  They held the keys to the kingdom.

14 They managed the cash.  The minute they shut off funding, the

15 company would be out of business.

16 Q    If you could turn now to, in the same binder, to JX-53.

17      So, Ms. Tilton, this is two days later, December 13th.

18 Take a moment.  I want to kind of walk this -- I want to walk

19 from the back of this chain to the front.  So, if you go to

20 page number 3, you'll see a third of the way down the page,

21 there's an email from Mr. Greenberg to you.  See that

22 heading?

23 A    Yes.

24 Q    Okay.  He's -- the subject line says yesterday's call

25 at Wells Fargo, do you see that?

1   A      Yes.

2   Q      Go to the next page, please, page 4.  I'd like you to

3   take a look at the heading 2016 Model or Projections.  If you

4   go down to the fourth bullet point, just read that to

5   yourself, please, and let me know when you're done.

6   A      Okay.

7   Q      So, Mr. Greenberg writes, starting on the first line

8   going to the second, "We were surprised to find out that

9   Wells Fargo appeared to be aware of the plan reflecting a

10  $6.5 million dollar request," do you know what that refers

11  to?

12  A      Yes.

13  Q      What?

14  A      The company had presented me a plan with a request for

15  cash but no restructuring initiatives, just me funding the

16  losses and the cash flow gap and it wasn't something that I

17  was willing to accept.  And I sent them back to actually do

18  work on making cuts and restructuring the company.

19  Q      Let's turn to the third page.  Let's take a look at --

20  well actually starts on the bottom of the second page. It's

21  your email of 12:17 p.m.  It goes over to the third page to

22  Mr. Pelissier and a number of other people.

23         And, actually Randy Jones is on there.  We've heard his

24  name a few times, but if you could just remind us what his

25  position was, what's his job?

1 A  He had Talent acquisition, which means he's responsible

2 for hiring all the executives at the portfolio companies.

3 Q  So you write at the very top, "I want to know

4 immediately how Wells Fargo saw Glenn's request for $6.5

5 million," do you see that?

6 A  Yes.

7 Q  And then you say this is an -- in the second line, you

8 say, "This is an act of disloyalty and Glenn does not seem to

9 understand that this is not helpful to him or the company's

10 future," you see that?

11 A  Yes.

12 Q  Why did you believe that what had apparently happened

13 here, the disclosure of the management request to you for

14 $6.5 million dollars, why did you think that that was not

15 helpful to the company's future?

16 A  Because they were showing a plan to Wells that was not

17 approved by the board, which capital I was not willing to put

18 up and, therefore, presenting a plan with that gap need and

19 nobody willing to do that would have led very quickly to

20 Wells no longer being involved in the credit.  So putting

21 together a plan that had a cash need that no one was willing

22 to put up was an issue.

23 Q  If you can go to the second -- oh, sorry before we get

24 there.  A couple lines down in your email on page 3.  You

25 say, "Randy," that's Randy Jones?

```
 1  A      Yes.

 2  Q      "You need to begin a search for a new CEO."

 3  A      That is correct.

 4  Q      Did you mean that?

 5  A      I absolutely meant that.

 6  Q      At this point, you had lost faith in Mr. Leland?

 7  A      I had begun to lose faith long before this, but this

 8  was the last straw for me.

 9  Q      Go to page 2, there's an email from you, again about a

10  third of the way down the page, December 13th at 4:20 p.m.

11  And this is a continuation of the discussion of this issue of

12  the disclosure.

13         And you say in the second line, "I am thinking

14  seriously of just putting the company up for sale.  We will

15  not get a good price by.  I have no confidence this is being

16  turned or handled."  Do you see that?

17  A      Yes.

18  Q      What did you mean we will not get a good price?

19  A      Well, I mean the company was in a cash hole, needed

20  liquidity, and, frankly, was not taking the steps to

21  restructure itself and it was going to have to be a fire sale

22  with Wells only being in the loan until January 31st.

23  Q      As of December 13th of 2015, did the company -- was the

24  company's audit financial statements timely?

25  A      No.
```

1 Q    How about the audit -- well, at this point in time,

2 December 2015, what was the last year for which the company

3 had audits, if you know?

4 A    I believe it was 2013.

5        MR. MERVIS:  One moment, Your Honor.

6 BY MR. MERVIS:

7 Q    Okay.  If you could turn now to DX-92.  Now we're a few

8 days later, December 16th.  And I will ask you initially, Ms.

9 Tilton, is this an email chain that you were a participant

10 in?

11 A    Yes.

12        MR. MERVIS:  Your Honor, I'd like to move DX-92 to

13 which there was no stated objection.

14        THE COURT:  It's received.

15      (DX-92, admitted into evidence)

16 BY MR. MERVIS:

17 Q    I'd like you to go to the second page.  There's an

18 email from Mr. Marsden to you.  Just take a moment -- well, I

19 don't want you to read the whole thing, but you will see that

20 in the second sentence of that email he says,

21      "Additionally, I learned that the Patriarch team is

22 working to determine how much money the company needs in

23 order to reach the completion of the sale process, and

24 consider injecting some capital."

25        Do you see that?

```
 1  A     Yes.

 2  Q     So, at this point in time were you, in fact, still

 3  considering that idea of selling the company?

 4  A     If I could do it through a bankruptcy and put up a DIP

 5  that would actually be a priming DIP well, yes.

 6  Q     And he goes onto say,

 7        "Unfortunately, we discovered, today, that the company

 8  is significantly behind on payroll taxes to the tune of 1.2

 9  million, not the 400,000 that the CFO represented to my team

10  earlier today."

11        Do you see that?

12  A     Yes.

13  Q     Who was the CFO?

14  A     Mark Bonneau.

15  Q     Of the company's management?

16  A     Yes.

17  Q     About -- well, there is some redacted material and,

18  sort of, a long line that says non-responsive in the middle.

19  Do you see that?

20  A     Yes.

21  Q     Then it goes,

22        "We are highly concerned about the company's ability to

23  survive until a sale is completed."

24        Do you see that?

25  A     Yes.
```

1    Q     At this point in time did you share that consent?

2    A     Yes.

3    Q     Why?

4    A     Because Wells was tightening their loan, the company

5    was going further into a liquidity hole, Wells wanted out and

6    I needed time to be able to get any sale process done.

7    Q     If you go down a little bit further, say, one, two,

8    three, four, five lines from the bottom Mr. Marsden writes,

9         "To be clear, our desire is to exit this credit

10   facility and our appetite to support the business outside a

11   process that leads to an exit is extremely limited."

12        Do you see that?

13   A     Yes.

14   Q     Was that a concerning statement to you?

15   A     Yes.  I had been spending many months trying to get

16   them to give us the time to restructure.

17   Q     I'd like you now to turn to DX-96.  So, again, just to

18   set the table we had seen, a few days before this, the issues

19   that Wells Fargo was pointing out and then you write to Mr.

20   Greenberg this email.  First of all, do you remember this

21   email?

22   A     Yes.

23        MR. MERVIS:  Your Honor, I will offer DX-96.

24   There is no objection.

25        THE COURT:  Received.

```
 1              (DX-96, admitted into evidence)
 2    BY MR. MERVIS:
 3    Q      Why did you send Mr. Greenberg DX-96?
 4    A      Because I wanted to see who were the investment bankers
 5    working in this industry, to see if there would be some way
 6    to piece together a sale process and who I should go to if we
 7    were able to do that.
 8    Q      If you could go to DX-98, please.  Take a moment -- I
 9    guess my first question is, is this an email exchange you had
10    with Mr. Marsden on December 21st?
11    A      Yes.
12              MR. MERVIS:  I'll offer it into evidence, Your
13    Honor.  There's no stated objection.
14              THE COURT:  It's received.
15          (DX-98, admitted into evidence)
16    BY MR. MERVIS:
17    Q      Turning to your email, which, technically, starts at
18    the bottom of the first page, but then moves over to the next
19    page, you write,
20          "I have lost a lot of sleep over TransCare over the
21    last few nights."
22          Do you see that?
23    A      Yes.
24    Q      And had you?
25    A      Yes.
```

54

```
 1   Q      You then say -- well, why don't you read the next two
 2   sentences to yourself?
 3   A      (Witness reads to herself)
 4   Q      So, you were talking here about a two-week forbearance.
 5   What was going on?
 6   A      I was -- they wanted out.  So, even though they were
 7   not going past January 2016 we were, sort of, on day to day
 8   funding at this point and I was trying to buy some time to
 9   see if we could figure out a bankruptcy sale process.  We had
10   discussed a two-week forbearance to give me the time to do
11   that.  Each day they would just decide they wouldn't fund
12   payroll or they would just stop funding and, you know, it was
13   a minute to minute.  I had to put money in just to survive
14   the next day.
15          So, we had negotiated, I thought, a two-week
16   forbearance that would just give us the time and they would
17   continue to fund without taking additional reserves.  Then
18   when I had reached -- I had been provided the actual
19   forbearance it was not what we had discussed.
20   Q      When you say not what we discussed less favorable to
21   you?
22   A      Yeah.  They were still going to take reserves, but just
23   give me a call before they did it.  So, it really didn't help
24   me plan because I didn't know whether the company would have
25   funding the next day.
```

1   Q     A couple lines down you write,

2       "I funded in good faith and then received an agreement

3   that in no way reflected what you and I spoke to."

4       Do you see that?

5   A     Yeah, because I agreed to fund a certain amount to

6   receive that forbearance.  I made that funding and then the

7   agreement did not jive with what we had discussed the terms

8   to be.

9   Q     You didn't get your money back, right?

10   A     I did not.

11   Q     All right.  Now, if you could go to DX-99.

12         THE COURT:  Which exhibit, Mr. Mervis?

13         MR. MERVIS:  DX, Your Honor.

14         THE COURT:  DX what?

15         MR. MERVIS:  99.

16  BY MR. MERVIS:

17   Q     Ms. Tilton, this is an email from Mr. Greenberg to you,

18   copied to some others, on December 23rd, 2015.  Do you recall

19   this email?

20   A     Yes.

21         MR. MERVIS:  Your Honor, I will offer it.  There's

22   no stated objection.

23         MR. AMINI:  No objection.

24         THE COURT:  It's received.

25      (DX-99, admitted into evidence)

1    BY MR. MERVIS:

2    Q     Have you had a chance to run your eyes over it?

3    A     Yes.

4    Q     What's going on here?

5    A     Wells has finally insisted on having a third-party

6    consultant at the company level to continue any funding going

7    forward.

8    Q     And you will see there's a list of suggestions that

9    come from Mr. Husson of Wells Fargo.  Was one of these firms

10   hired?

11   A     Ultimately, yes.

12   Q     Which one?

13   A     Carl Marks.

14   Q     Okay.  If we could now go to JX-67.

15         MR. MERVIS:  Your Honor, this is already in

16   evidence.

17   BY MR. MERVIS:

18   Q     Ms. Tilton, why don't you just take a moment to flip

19   through this so you can familiarize yourself with it.  Let me

20   know when you've had a chance to do that.

21   A     Okay.

22   Q     You've seen this before?

23   A     Yes.

24   Q     This -- well, taking a look at the first paragraph this

25   is from Mr. Greenberg copying some others and he writes,

**A2147**

1       "Lynn, Jean-Luc and I worked all night to arrive at a

2   scenario to address the parameters that we discussed

3   yesterday to support a sale process and minimum capital

4   needed.  This report differs from prior reporting, as we

5   discussed yesterday.  It is more operationally driven."

6       Putting aside whether you liked it or not, was this

7   something that you asked these folks to do?

8   A    Yes.  I wanted to look at how to minimize the cash

9   needed to get to a sale process by making some operational

10  changes that I had been asking management to make all year,

11  which expenses they were not cutting which is why the cash-

12  flow was diminishing.

13  Q    If you go to -- well, if you go to the third page of

14  the exhibit, and I think you can see it, toward the bottom of

15  the page, what level of funding was required under this

16  document?

17  A    I think he said it would need four and a half million

18  dollars.

19  Q    Having reviewed this do you consider this to be an

20  operational restructuring plan?

21  A    This was just to get through a sale process.  This was

22  to support a sale process and minimize the need.  There were

23  some operational changes to conserve cash, but for the most

24  part this was just a plan to get through a sales process and

25

1   what would be the minimum amount of cash needed to get

2   through that time period.

3   Q      And did you find the document to be sufficiently

4   reliable to justify an investment of $4.5 million dollars?

5   A      There was more work that needed to be done, but I

6   wanted that four and a half million dollars to go in as a

7   debtor-in-possession loan so that it would come back out. It

8   certainly wasn't reliable to put in subordinated money beyond

9   Wells knowing that the purchase price would not bring any

10  recovery to that money.

11  Q      Did you approve this document?

12  A      I did offer to put up a DIP to get through a sales

13  process, but Wells would not allow me to prime their liens,

14  nor were they willing to put up a DIP to get through a sale

15  process.

16  Q      Just focusing on this document, in particular, did you

17  agree to fund based on this particular document?

18  A      No.

19  Q      All right.  If we could go to PX-165.

20  A      I'm sorry.  Did you say PX-165?

21  Q      Yeah.  I did say that.

22  A      Okay.  Got it.

23  Q      All right.  Ms. Tilton, do you recognize this as an

24  email exchange between you and folks at Carl Marks among

25  other people?

1  A      Yes.

2            MR. MERVIS:  Your Honor, I will offer PX-165.

3  There is no stated objection.

4            MR. AMINI:  No objection.

5            THE COURT:  I'm looking for it.

6            MR. MERVIS:  Yeah.  It's a little hard to find.

7            THE COURT:  That's why I'm looking for it.  I

8  don't see it.

9            MR. MERVIS:  It is right after the DX's end.

10           THE COURT:  I have 157, DX-157 and then its --

11           THE WITNESS:  PX.  P as in Paul.

12           THE COURT:  I got it.

13           MR. MERVIS:  Yeah, it's P.

14  BY MR. MERVIS:

15  Q      If you could turn to the second page of this exhibit,

16  and I want to focus on Mr. Fefferly's [phonetic] email to you

17  on January 14th at 12:59 a.m.  You will see in the second

18  paragraph, right at the beginning he's requesting time for a

19  meeting with you.  Do you see that?

20  A      Yes.

21  Q      And he says, in that same paragraph,

22        "We have been working on, as well as, providing you

23  with our initial analysis of your request this evening for

24  the cost of the BR filing versus the cost of bridging to a

25  sale."

Case 1:18-cv-06270-LAK Document 127 Filed 08/20/19 Entered 09/03/19 15:07:50 Main Document
Pg 60 of 130
18-00328-smb Doc 127-7 Filed 08/20/19 Entered 09/03/19 15:07:50 Page 104 of 1218

60

```
 1          Do you see that?
 2   A      What paragraph are you in?
 3   Q      I'm on the second paragraph.
 4   A      Okay.  Sorry.  Yes.
 5   Q      Was that work that you had asked them to undertake?
 6   A      At that time, yes, as well as my team.
 7   Q      Why?
 8   A      Because, as I said, Wells was only willing to stay in
 9   the credit to bridge to some sort of sale process.  And I had
10   a gun to my head.  I had to figure out if that was possible.
11   Q      It goes down to the next, I guess, two paragraphs.
12   It's a sentence that starts,
13          "Carl Landeck has been functioning as the CFO of
14   TransCare."
15          Then it says,
16          "His focus has been on."
17          Then in the second bullet point he writes,
18          "Understanding the true cash position, vendor situation
19   and what the immediate next several months cash requirements
20   of the company are."
21          Do you see that?
22   A      Yes.
23   Q      At this point in time did you feel like you had a sense
24   of what the company's true cash position was?
25   A      Well it was zero, but what their cash needs were going
```

1   to be, no.

2   Q    And if you go over to the next page, its Bates Number

3   ending 0927, in the middle of the page there's a relatively

4   short paragraph where Mr. Fefferly says,

5        "After three days of work we have reached some

6   preliminary conclusions which, unfortunately, require a

7   substantial amount of funding if the business is going to

8   survive."

9        Do you see that?

10  A    Yes.

11  Q    Was that news that you wanted to hear?

12  A    Not especially, no.  I mean, I also wanted to hear how

13  to restructure it.  I mean when you fund, you're usually

14  expect that money to come back and bridge to something.  And

15  what I was struggling with getting with anyone was why was

16  the cash going in and what was going to be done to make that

17  cash come back and have a company that would survive this

18  period.  That was not the work that was getting done.  I was

19  just being asked for cash.  As Wells loan came down, they

20  were asking me to continue to lend with no visibility into

21  what was going to happen in the future to get that cash back.

22  Q    Now, if you go down a little bit further on that page

23  you will see there's a series of bullet points.  It starts

24  with,

25       "However, we did want to point out the time urgency

```
 1   this week for several of these items."
 2         The first bullet point, do you know what that's about?
 3   A     It's insurance that was going to be cancelled.  I think
 4   that was the -- I think it's NYSIF, not NYSIT.
 5   Q     Yeah.
 6   A     It's the Workman's Comp insurance.
 7   Q     Okay.  What was your understanding of what the
 8   situation was at this point in time with NYSIF?
 9   A     That they were about to cancel the insurance because
10   the company was not caught up on its payment plan.
11   Q     And what would have happened to the company if that
12   policy had been canceled?
13   A     It would have had to shut down the next day.  You
14   couldn't have employees working without Workman's Comp
15   insurance.
16   Q     Now, did you make any efforts to resolve that
17   situation?
18   A     I put in investment funds, personal investment funds.
19   I loaned that money to pay the insurance bills.
20   Q     Let's take a look, if we could, at PX-227.  Ms. Tilton,
21   do you recognize what PX-227 is?
22   A     Yes.
23         MR. MERVIS:  Your Honor, I will move PX-227.
24   There is no objection as it's a plaintiff's exhibit.
25         MR. AMINI:  No objection.
```

```
 1              THE COURT:  It's received.
 2          (PX-227, admitted into evidence)
 3   BY MR. MERVIS:
 4   Q     Okay.  There's a chart -- this is an email from you to
 5   Ms. Giglio and Ms. Harrison.  And there's a chart at the
 6   bottom of the first page that goes over to the second page.
 7   What does that chart show?
 8   A     It showed the funding's from the Zohar funds, which I
 9   own, and my personal investment funds over the course of
10   February 26th through January 29th.  The total funding that
11   was provided to the company to keep it alive during that
12   year.
13   Q     And where -- the numbers that are in this chart where
14   were they pulled from?
15   A     They were pulled from the Patriarch Partners Agency
16   Services loan system which is called "Mamma."
17   Q     And if you look at the chart on the second page there
18   is an entry for January 15th.  Do you see that?
19   A     Yes.
20   Q     It has a $1.17 million dollar funding?
21   A     Yes.
22   Q     Does that relate to the Workman's Compensation
23   insurance that we issued that we just talked about?
24   A     My recollection is I paid four separate insurance bills
25   by direction letter to keep the company from being shut down
```

1    the next day.

2    Q     Now here, I guess, for the first time in the chart the

3    lender is Ark II as opposed to the Zohar funds.  Do you see

4    that?

5    A     Yes.

6    Q     Do you know why, at this point, this money was coming

7    out of your personal funding rather than the fund that you

8    own, the Zohar funds?

9    A     There was no availability left in the Zohar funds for

10   TransCare.  So, the only place that money could come from

11   would be my personal funds.

12   Q     Going back to the -- well, looking up the chart on the

13   second page and going back to the chart on the first page,

14   speaking, generally, what were these funding's for?  What

15   were they used for?  Let me put it this way, what were they

16   intended for?

17   A     Well, primarily, they were last minute funding's when

18   Wells would say they weren't going to fund payroll.  So, most

19   of these were either payroll or insurance payments that Wells

20   would just decide that they would not fund at the last

21   minute.

22   Q     Would you describe them as emergency funding?

23   A     I mean it was emergency payroll.  Payroll taxes are

24   insurance.  And it was always a surprise and an emergency

25   because the company would have gone out of business the next

1    day.

2    Q    We saw earlier today that when you got to the

3    OldCo/NewCo separation plan that part of that plan was to

4    roll-over a little more than $2 million dollars of funding

5    that had been funded by Ark II to TransCare.  Do you recall

6    that?

7    A    Transcendence.

8    Q    Yes.

9    A    It was going to roll it over to Transcendence including

10   the two ambulances that had been purchased with some of that

11   money.

12   Q    At the time that you extended the funding from your

13   personal funds the -- and I'm really referring now to the

14   funding on the 15th, and the 28th and the 29th of January.

15   Did you have a plan at that time to roll over those funds

16   into NewCo?

17   A    No.  I didn't even come up with the idea for the

18   OldCo/NewCo structure until somewhere around February 7th or

19   9th.  It was after the February 5th meeting where I had no

20   confidence in the Carl Marks plan.

21   Q    All right.  Let's go back to PX-165.  So, back to this

22   email exchange between you and Mr. Fefferly.

23   A    One second.

24              MR. MERVIS:  One minute, Your Honor.

25              THE WITNESS:  Did you say PX-165?

1    MR. MERVIS:  Yes.

2    THE WITNESS:  Okay.  Sorry.

3    BY MR. MERVIS:

4    Q    So, if you could go -- wait, I'm sorry.  I think I'm in

5    the wrong place.

6    So, if we go to the first page of Exhibit 165 there's

7    an email from you to Mr. Fefferly and there's a bunch of

8    people copied, sent on January 14th at 2:33 a.m.  In the

9    beginning of that email, the second sentence, you say,

10   "I am being asked to provide money and make decisions

11   on the future of the company.  I must have clarity, and with

12   immediacy, on what is the situation."

13   Do you see that?

14   A    Yes.

15   Q    What did you mean by that?

16   A    They have not been sending me anything directly.  They

17   were supposedly talking to people who worked for me, but I

18   needed them to communicate quickly with me and also with

19   valid numbers and accuracy so that I could make accurate

20   decisions on what to do with the company and also whether to

21   provide financing for the company.

22   Q    Just take a moment.  The next three paragraphs of this

23   email I'd like you to read them to yourself, please, and let

24   me know when you're finished.

25   A    (Witness reads silently)

1       Okay.

2  Q     What I asked you to read there, that you wrote on

3  January 14th, did that accurately summarize your views of the

4  state of play of TransCare at the time?

5  A     Yes.

6  Q     Now, I want to take a look at Mr. Fefferly's response

7  which is at the top of the page; first page of PX-165.  He

8  writes,

9       "Lynn, thank you for your quick response.  This is what

10  we have been concerned about since we got here, funding into

11  a black hole.  So, our focus has been on the size of the hole

12  and, once filled, what the business can generate.  It seems

13  like there is a reason for the company to exist, but the

14  EBITDA numbers we were originally given are significantly

15  over-stated."

16       Do you recall that portion of his email?

17  A     Yes.

18  Q     Did what I read to you at this point, roughly, align

19  with your concern?

20  A     Well, my concern was they were showing me numbers that

21  could never make payroll.  So, that's why -- I mean, I was

22  not seeing any real build-up of numbers with a full cash-flow

23  statement.  They were, basically, showing me that payroll

24  couldn't be made.  That was hard for me to understand since

25  payroll is usually the first thing that gets paid.  So, one

1  of the things I said is I need to see that the company has

2  revenues greater than its payroll.  You know, I was concerned

3  that nobody was providing me a reason to fund for a future

4  company.  That is what I needed to see.

5  Q      This phrase that both you and Mr. Fefferly use, this

6  phrase "black hole", what does that mean?

7  A      Black hole means your funding into darkness without

8  visibility into whether that funding will have a purpose for

9  the future, right.  Now, they just kept asking me for

10 emergency payments without any plan to show that that funding

11 would have a purpose to provide the company or a portion of

12 the company and the people with a future.

13 Q      Go to PX-175, please.

14         MR. MERVIS:  This is in evidence, Your Honor.

15 BY MR. MERVIS:

16 Q      Ms. Tilton, you're not on this email chain.  Have you

17 had a chance before to review the attachment, this deck from

18 Carl Marks?

19 A      Yes.

20 Q      The deck, do you consider this to be a plan of some

21 sort?

22 A      No.  I mean it was a summary of actions that would be

23 able to be taken, but there was no real income statement,

24 balance sheet, cash flow statement, bottom up build plan.  I

25 mean all it was, was a cash-flow statement which actually is

1  supposed to come from an income statement and a balance sheet
2  to create it asking for seven and a half million dollars over
3  the next thirteen weeks, but not plan for the future of the
4  company, no projections, no purpose for the seven and a half
5  million to provide a new future for a restructured company.
6  Q    So, here we are now on January 27th, 2016.  If you
7  could turn to -- in the deck there's a Bates page that ends
8  in 2114.  Let me know when you're there.
9  A    Yes.
10 Q    There's a chevron at the top of the page, and second
11 chevron under the actions that says,
12     "To have a chance of a turnaround TransCare needs an
13 immediate incremental pledge of support from Patriarch
14 totaling $7.5 million excluding 2016 term interest."
15     A couple of questions.  I see the reference to
16 Patriarch.  What was your understanding of who Carl Marks was
17 making this ask of?
18 A    Well, it was of me personally.  Patriarch is not a
19 lender or a fund.  It's a manager and now a family office.
20 So, it was for me personally.
21 Q    Do you have an understanding of why they were coming to
22 you for this funding?
23 A    Because there was no place else to get any money.
24 Nobody was going to lend into this without any visibility to
25 a future, any projections or any plan.  There was only one

1  place that money could possibly come from and that would have
2  been me.
3  Q    This statement excluding 2016 term interest, do you
4  understand what that's about?
5  A    That would have assumed that no interest was paid to
6  the term lenders which was not something that would have been
7  possible without calling default because I was no longer
8  going to be responsible for the term lenders.
9  Q    So, the term lenders -- I think we know what we're
10 talking about, but that's the term loan that had been
11 Zohar's, then Credit Suisse and some others?
12 A    Well, Zohar funds I would no longer be managing and
13 they would have more than fifty-one percent of this.  So,
14 they could easily call a default under the new collateral
15 manager.
16 Q    So, if a company were under this proposal, if the
17 company were required to pay interest on the term loan, about
18 how much was that?
19 A    Well, it would have been approximately another $3
20 million dollars.
21 Q    And this plan assumes that that money doesn't get paid?
22 A    Well, that would have not been a possibility without
23 potentially the term lenders calling a default.
24 Q    If you could go -- well, did you approve this funding
25 request?

1    A      No, because it had no plan for the future.  It was more

2    black hole funding. It was seven and a half million dollars

3    just to survive to try to get a plan together.  As I said, I

4    didn't want to fund into a black hole.  All they were

5    providing me was a plan for a black hole.

6    Q      Actually, in this deck, if you go to the second to the

7    last page it ends in the Bates Number 2123.  There is a --

8    you will see that there is a -- well, I guess it bears the

9    moniker FY 2016 financial projections.  You see that there's

10   a line item for capital contribution?

11   A      Yeah.  It has eight and a half million dollars of

12   capital contribution.

13   Q      And, again, what was your understanding of who Carl

14   Marks thought would be the source of that money?

15   A      It would have come from my personal funds.

16   Q      All right.  Let's go, if we could, to PX-179.

17          MR. MERVIS:  This is already in evidence, Your

18   Honor.

19   BY MR. MERVIS:

20   Q      Ms. Tilton, this is an email from Mr. Greenberg and

21   there's an attachment to it.  Have you had a chance to look

22   at this document before today?

23   A      Yes.

24   Q      Do you consider PX-179 to be a turnaround plan?

25   A      Not in the way I look at a turnaround plan.  I think

```
 1  this was Michael Greenberg's best efforts to see if he could
 2  make some changes to reduce the cash need.
 3  Q    And speaking of that, if you look at Page Number 6,
 4  literally Page Number 6 on the lower right-hand corner, if
 5  you look at the second underlined sentence under assumptions,
 6  does that tell you how much funding was being sought in this
 7  analysis?
 8  A    He felt he could lower the cash need from seven and a
 9  half without interest to 6.35 million without interest.
10  Q    And did you agree to fund pursuant to this document?
11  A    No, because, again, it still wasn't a plan to provide
12  the company with a future.  It was just a stop-gap to get
13  through a period of time.
14             MR. MERVIS:  Just one moment, Your Honor.
15             THE COURT:  Okay.
16             MR. MERVIS:  Your Honor, I'm a little hot.  We've
17  been going for about two hours.  Is it possible to take a
18  ten-minute break?
19             THE COURT:  We can take a ten-minute break.
20             MR. MERVIS:  Thank you.
21        (Recess taken at 3:39 p.m.)
22        (Proceedings resumed at 3:54 p.m.)
23             THE COURT:  Go ahead.
24             MR. MERVIS:  Thank you, Your Honor.
25  BY MR. MERVIS:
```

1   Q      All right.  Ms. Tilton, why don't we take a look at DX-

2   130?  So, Ms. Tilton, do you recognize DX-130 as an email

3   chain that you're a participant in?

4   A      Yes.

5          MR. MERVIS:  Okay.  Your Honor, I move DX-130.

6   There is no objection, at least none that I know of.

7          MR. AMINI:  No objection.

8          THE COURT:  It's received.

9       (DX-130, admitted into evidence)

10         MR. MERVIS:  Thank you.

11  BY MR. MERVIS:

12  Q      So, I want to go to the fourth page of the exhibit.

13  This is an email from you to Mr. Marsden.  And just to, sort

14  of, orient ourselves we have seen correspondence in December

15  where there was discussion of a sale process possibly through

16  bankruptcy.  Do you recall that?

17  A      Yes.

18  Q      All right.  Let me walk you through this email.  You

19  say,

20         "Dear, Kurt.  I think it makes sense for you and I too

21  have a quick and preliminary call on TransCare.  This has

22  unraveled and I am ten million, new money, in the hole."

23         Do you see that?

24  A      Yes.

25  Q      And what did you mean by this had unraveled or has

1  unraveled?

2  A     Just that we were not getting to a place where we were

3  funding into a new plan; that it just kept deteriorating by

4  the day.  The revolver kept going down and I, on behalf of

5  the funds, kept putting new money in.  And we weren't moving

6  anything into the future.  There was no plan to put funding

7  into the company to create a future for that company.

8  Q     And then you say,

9       "Since payroll was blocked in July it has been a

10  constant deterioration of customers, vendors and loss of

11  employees."

12       Do you see that?

13  A     Yes.

14  Q     And is that what had, in fact, happened?

15  A     It was what was continuing to happen.

16  Q     And do you draw a connection between the two?

17  A     Yes.  It was when TransCare's risk of going into

18  liquidation and not being a continuing operation became

19  public to the industry and to customers.  Until that time it

20  was not -- TransCare's financial issues were not public.

21  Q     Now, at this point in time, on November 9th, did you

22  believe that a sale process was still a viable option?

23  A     On February 9th?

24  Q     Yeah, February 9th.

25  A     I did not think it was an option, no.

1   Q      Let me ask you to turn to find out why that is.  Turn

2   to the third page first.  Actually -- sorry.  Yeah, third

3   page first.  If you could go to your email which starts at

4   the bottom of Page 2 and goes onto Page 3.  It's an email

5   from you to Mr. Marsden.  At the second sentence you say,

6         "John's stance" -- who is John?

7   A      John Husson from Wells Fargo.

8   Q      It says,

9         "John's stance is that you want to stay within your

10  formula or you will take the keys.  Under those terms I don't

11  really have an option but to hand you the keys."

12         What did you mean by that, "hand you the keys."

13  A      Well, handing the keys means you basically give them

14  control over the company and the liquidation.

15  Q      And is that something that Wells ever -- did they ever

16  agree to take the keys?

17  A      No.  In the end they didn't want to take the keys.

18  Q      If you go to the first page of Exhibit 130, Page 1,

19  there's an email from Mr. Marsden to you at the very bottom

20  and then it goes over to Page 2.  If you could just read to

21  yourself that email up through the one, two, three, that's

22  there.

23  A      (Witness reads silently).  Okay.

24  Q      So, he's telling you about three potential options from

25  his perspective, right?

1 A      From a call that we have had, yes.

2 Q      Right.  Go to the first page, please.

3 A      Yes.

4 Q      Your responsive email is on February 9th at 8:56 and

5 it says,

6        "Kurt, I think we should have a conversation.  I had

7 two guys from Carl Marks sitting in a conference room with my

8 team trying to find a way to survive the week."

9        And then two sentences in it says,

10        "We had a plan they presented to me on Friday that I

11 have asked them to send to John.  That is the plan that

12 convinced me I could not move forward in this manner."

13        Let me ask you a few questions about that.  First of

14 all, who is the "they" in that sentence?

15 A      They is Carl Marks.

16 Q      Okay.  And you saw you asked them to send to John, I

17 assume that's John Husson?

18 A      That is correct.

19 Q      Do you recall the plan?

20 A      That was the eight and a half million dollar funding

21 plan; you know, the seven and a half million of immediate

22 needs.  That was presented to me on February 5th.

23 Q      Okay.

24 A      That was when we first went through that plan together.

25 I know there was a different date.  And that was the plan

1   that I knew I could not fund because there was no real

2   restructuring plan.  That is when I decided that a third

3   alternative would be the OldCo/NewCo which is the number

4   three that he's talking about in this email when he said the

5   bankruptcy scenario discussed on our earlier call.  That was

6   the OldCo/NewCo restructuring.

7   Q    Okay.  So, you're referring -- if you turn to the

8   second page of the exhibit --

9   A    Yes.

10  Q    -- and you look back at Kurt's email in his one, two,

11  three; three is the bankruptcy scenario discussed on our

12  earlier call.

13  A    That would have been the NewCo, the OldCo wind-down.

14  And at first, we were talking about winding it down in a

15  Chapter 11.

16  Q    Your email on the first page continues,

17       "We are sitting here trying to figure out the plan that

18  I spoke to you of earlier."

19       What plan are you referring to?

20  A    That was the OldCo/NewCo restructuring, the orderly

21  wind-down of OldCo over ninety days and the strict

22  foreclosure to create NewCo.

23  Q    Okay.  Well, why don't we pause here for a minute and

24  maybe you can explain for the court why did you develop this

25  plan?  What was behind it?

1   A     I had not seen a plan that created a future for the

2   company.  And I was trying to figure out, one, how to get

3   Wells out at par in the time period that they wanted, which

4   was quickly, and I wanted to figure out what part of the

5   company could be profitable and saved, and the number of

6   employees that we could possibly keep employed for the

7   future.  So, to me it was the most elegant solution given the

8   timeframe and the only scenario under which I was willing to

9   put in new money because it would have been money going into

10  a company with a future.

11        So, for me ninety days giving WARN notice to the

12  employees, giving customer notices and allowing Wells to

13  collect their receivables in the ordinary course, then having

14  NewCo.  At that point in time it was five entities and much

15  larger before we lost the contracts.  Giving those entities a

16  chance at a new beginning.

17  Q     And did you consider whether the structure of the plan

18  was or was not likely to maximize value in the OldCo

19  businesses as they wound down?

20  A     Well, I wanted it too that's why we were hiring our own

21  CRO because we wanted it to not be just for Wells' benefit

22  because they would take the low hanging fruit.  So, we were

23  hiring our own CRO to wind-down and run that company during

24  the wind-down to make sure that we could maximize all the

25  value from OldCo beyond just want Wells would collect.

1   Q      At this point, on February 9th, after you had seen this

2   plan on February 5th what, in your mind, was the alternative

3   to the NewCo/OldCo plan that you had come up with?

4   A      I think the only alternative was the liquidation of the

5   company.  The question was, was it an orderly liquidation or

6   would Wells insist on a free-fall liquidation.

7   Q      And why did you think that was the only alternative at

8   this point in time?

9   A      Because there was no capital to go into the company and

10  Wells was not willing to fund into the future.

11  Q      If you could turn to PX-131 please.  So, Ms. Tilton,

12  this appears to be a continuation of the chain that we were

13  looking at, but you see at the top here you have another

14  couple email exchanges on the first page with Mr. Marsden?

15  A      I'm sorry, the question.

16  Q      I'll ask another question.  Is Exhibit DX-131 an email

17  exchange in which you were a participant?

18  A      Yes.

19          MR. MERVIS:  Your Honor, I will offer DX-131.  I

20  don't think there's a stated objection.

21          THE COURT:  It's received.

22       (DX-131, admitted into evidence)

23          MR. MERVIS:  Thank you.

24  BY MR. MERVIS:

25  Q      I want to focus on your email on the first page of the

1  exhibit to Mr. Marsden.  You -- in the middle of that email

2  you say,

3          "We will be continuing our work tomorrow."

4          Do you see that?

5  A     Yes.

6  Q     What work were you and -- well, what work was being

7  done?

8  A     We were trying to build bottom-up models, two models;

9  one for OldCo, which was the orderly wind-down of 911 and

10 Core business, and a NewCo model.  We were building them up

11 from the details of each contract, the need for bodies,

12 labor, ambulances, you know, the hours that needed to be

13 worked, where the ambulances needed to be.  On the NewCo side

14 just to try to understand whether the business could be

15 profitable and how much money it would need.  At the same

16 time, we were building for Wells Fargo an OldCo wind-down

17 model to show them that they would fully recover their money.

18 Q     This is the bottom-up exercise that you had earlier

19 talked about?  You had wanted that to be done before that?

20 A     Yes.  We were finally doing it ourselves with the help

21 of certain managers from TransCare giving us the information

22 direct from the enterprise system, not numbers put together

23 by anyone else.

24 Q     Okay.  Just so I'm clear, the TransCare personnel were

25 involved in this model?

1   A      Absolutely.  We needed them.  They were the most

2   knowledgeable about their businesses.  We were working

3   directly with Glenn Youngblood from TransCare and each of the

4   division heads.

5   Q      And in your -- going back to your email to Mr. Marsden

6   at 7:41 p.m. you continue to say,

7          "You are welcome to send someone from your team to join

8   in the process."

9          Did you mean that invitation?

10  A      Absolutely.  I mean, look, we were working together on

11  this project to try to figure out the most elegant solution

12  for a company in crisis.  They were asking for information

13  and if they wanted to have their modelers there at the same

14  time with us, and the company and Carl Marks I welcomed them

15  to be there and help.

16  Q      Did they take you up on the offer?

17  A      Not to help with the modeling. I mean, eventually, we

18  did have meetings together, but they did not come to sit

19  through the modeling exercises.

20  Q      If you could go to JX-84, please.

21              THE COURT:  What number?

22              MR. MERVIS:  84.

23  BY MR. MERVIS:

24  Q      So, Ms. Tilton, this is a pretty long chain.  Actually,

25  we're going to look at it two separate times this afternoon.

1    I'd like you to go to the very end of the -- toward the end

2    of the chain to the page that had Bates Number 0052 at the

3    bottom.

4    A    Okay.

5    Q    And at the bottom of the page there's an email from Mr.

6    Stuck to you and others that goes over to the next two pages.

7    Are you familiar with -- do you recall this?

8    A    Yes.

9    Q    Okay.  Just at a general level, what is Mr. Stuck

10   sending you?

11   A    He's sending a request for models and scenarios.  I

12   mean, they were anxious to move forward.  They didn't want to

13   be in the credit anymore.  They were asking me for a lot of

14   information that we were not yet prepared to send because we

15   wanted something that was well-formulated and accurate.

16   Q    And if you go up to your email on the top of the page

17   that ends in Bates Number 0052 and you say,

18        "Bob, I'm happy to speak to you again today, but as I

19   said to you earlier, we are scrambling here, Patriarch, Carl

20   Marks and the company, to try to figure out a way forward."

21        What work was being done at this point in time?

22   A    We were just modeling.  I mean we were trying to get

23   accurate, detailed basic variable information to build the

24   company by division, by contract back up and then also trying

25   to put together an OldCo model which would run the company

1  for ninety days in an orderly way and wind it down.  So, we

2  were working multiple models and multiple scenarios, but I

3  had only started a couple of days before.  It was a

4  tremendous amount of work and effort on a lot of people's

5  parts.

6  Q     Still trying to build up this OldCo/NewCo plan.

7  A     We were starting from scratch.  We were starting from

8  the basics by contract, by ambulance, by person, by medical

9  person.  We wanted to understand that there was a future for

10 companies and build around those profitable divisions and

11 contracts.  We weren't taking any other information other

12 than the bottom-up build of actual contracts and how they

13 work.

14 Q     One sentence later you write,

15       "If you would like to send any of your Wells people or

16 your own financial advisors to work with us, we would welcome

17 them here."

18       The same question, was that -- you meant that, right?

19 A     Yeah.  I mean we were scrambling and working, and they

20 just kept requesting things.  I thought it would be better if

21 they came down and watched the action and contributed rather

22 than just asking for things because I didn't think they

23 understood what was really going on, on the ground.

24 Q     Was there anything about what you, and the GMAC folks

25 and the TransCare folks were doing that you wanted to shield

84

1   from view from Wells Fargo?

2   A     Absolutely not.  I mean we were all looking at the

3   exact same information to try to make the best decisions.  We

4   just wanted it to be valid and accurate which is not the

5   information that had been coming out of the company or Carl

6   Marks up until that point.

7   Q     I want to leave this document for a little bit, Ms.

8   Tilton, and come back to it.

9         Let's turn now to DX-195.  So, Mr. Amini, I think,

10  showed you this document earlier.  Let me ask you a question;

11  you -- what you were proposing, would you characterize that

12  as an equity DIP?

13  A     No.

14  Q     So, how would you characterize it?

15  A     I was willing to put up a DIP if it was a first lien

16  DIP, but I was not willing to put up subordinated money to

17  act as a DIP.  So, it either needed to come from me and Wells

18  needed to allow me to prime their lien so it was paid first

19  or Wells needed to over-advance that DIP money and get paid

20  back first.

21  Q     And throughout these negotiations did Wells ever

22  indicate a willingness to fund a DIP itself?

23  A     At different points they were willing to over-advance,

24  but they kept changing their mind.

25  Q     If you go to the second page of the exhibit there's an

```
 1  email from you to Mr. Landeck.  And I think we looked at --
 2  there's a paragraph halfway down that says I've made it
 3  clear, right, and this is, again, talking about the DIP liens
 4  needing to be rolled up.  Then you say,
 5       "I suggest that you provide information that is
 6  accurate."
 7       Now you're talking to Carl Marks?
 8  A    Yes.  Carl Marks was not, in my opinion, working in the
 9  interest of the company, but rather for Wells and were making
10  statements and making requests that were not in line with
11  what I was willing to do.
12  Q    And then you write,
13       "As you said very publicly Thursday night."
14       And the "you" here is Mr. Landeck.
15  A    Mr. Landeck, himself, in front of my people and some of
16  the company management.
17  Q    Right. It says,
18       "As you said very publicly Thursday night, I would not
19  put one penny of my personal money into this company.  This
20  is a black hole."
21  A    That is correct.
22  Q    And that was said in public?
23  A    That was said in front of many, many people.
24  Q    Go to JX-82.  If you go to the third page of this
25  exhibit, Ms. Tilton, there's an email from a Mr. Helfat to
```

1   others.  Just read it to yourself and what he said.

2   A      (Witness reads silently).

3   Q      Do you recall after receiving this or after learning of

4   this email where Wells made clear their position about the

5   DIP.  Do you recall any further serious negotiations about

6   DIP financing or Chapter 11?

7   A      No.  We were going into, after that, the OldCo/NewCo

8   structure and the orderly wind-down.

9   Q      Can you go back to JX-84?  I'd like to move forward in

10  this document, also move forward in the calendar that has a

11  Bates Number ending in 0048.

12          THE COURT:  Which exhibit are we on?

13          MR. MERVIS:  We're going back now, Your Honor, to

14  JX-84.

15          THE COURT:  Okay.

16  BY MR. MERVIS:

17  Q      We're going to the page where it has Bates Number

18  ending in 0048.  Are you there, Ms. Tilton?

19  A      (No verbal response)

20  Q      There's an email at the bottom of that page from you to

21  Mr. Stuck.  Do you see that?

22  A      Yes.

23  Q      I want to just focus on a couple of things that you say

24  there.  In the second paragraph you say,

25          "I will try to have something to you in the morning

1  separating NewCo, we are still waiting to make this happen,

2  and the wind-down of OldCo (Core, 911)."

3       At this point, February 16th, were you still in regular

4  communication with Wells Fargo about the OldCo/NewCo plan?

5  A    Absolutely, daily.  We were just trying to wind-down

6  outside of a Chapter 11 at this point and avoid those

7  expenses and the need for the DIP, but we talked to them

8  every day.

9  Q    And the next paragraph says:

10      "I also have an interview with a CRO tomorrow who comes

11 highly recommended from an old friend."

12      Who was the CRO supposed to be for?

13 A    For OldCo.  For -- we were hiring the CRO for OldCo to

14 handle the wind-down in the most efficient way to collect as

15 much as possible not only for Wells, but also for the

16 remaining term lenders.

17 Q    And do you remember the name of this candidate?

18 A    I believe her name is Cindy Romano (ph), and she'd come

19 to me through Steven Gray (ph), who was an old friend of mine

20 from the bankruptcy world.

21 Q    If you go over to the prior page, which ends in --

22 there's a Bates Number ending 0057, there's an email from

23 Mr. Strack and he ends it by saying, "Any update on getting

24 us the mop?"

25      Do you see that?

```
 1   A    Yes.

 2   Q    And then you respond to him and you tell him you had the

 3   entire office working on it; do you see that?

 4   A    Yes.

 5   Q    And then if you go to the next page, the first page, so

 6   this is February 17th, 2:13 -- this email at 2:13, and

 7   Mr. Strack says in the second sentence of this email:

 8        "Without our receiving a viable plan, we are not

 9   approved to further extend the financing, which expired

10   yesterday."

11        Do you see that?

12   A    Yes.

13   Q    Was that a concerning statement to you?

14   A    Yes.  Without financing, the company would have gone

15   into immediate liquidation.

16   Q    Let me ask you to turn to DX-147.

17        And, Ms. Milton, is this an email exchange that you were

18   a participant in?

19   A    Yes.

20           MR. MERVIS:  Your Honor, I'd like to move DX-147.

21   I don't believe there's any standard objection.

22           THE COURT:  Any objection?

23           MR. AMINI:  No, Your Honor.

24           THE COURT:  It's received.

25        (Exhibit DX-147 received in evidence)
```

```
 1  BY MR. MERVIS:
 2  Q    Going to the second page, there's an email from you
 3  about halfway down the page at 3:31 p.m. to Mr. Strack.
 4       Do you see that?
 5  A    Yes.
 6  Q    And you write, "This is the wind-down plan on Corp and
 7  911."
 8       Was that the model that you had been telling
 9  Mr. Strack -- one of the models that you told Mr. Strack that
10  you had been working on?
11  A    Yes, that was the model on their wind-down plan.  I
12  mean, they were receiving both models, but this was the one
13  that looked at their recoveries and I got that out as quickly
14  as possible.
15  Q    You then write, "It assumes that there is a foreclosure
16  sale on the other entities."
17       What did you mean by "foreclosure sale" there?
18  A    The -- that there would be an Article IX foreclosure
19  sale on the other entities and then those would be acquired
20  by Transcendence so that the NewCo, those five entities at
21  the time, would go forward as a new operating company in
22  ongoing business.
23  Q    So, again, at this point in time, they were at
24  February 17th.
25       And prior, the OldCo was the Corp and the 911?
```

```
 1  A     That is correct; that was the wind-down of those two
 2  large businesses.
 3  Q    Okay.  Because, then, if you go up the page, Page 2 --
 4           MR. MERVIS:  Your Honor, I don't want to interrupt
 5  the spill, but --
 6           THE COURT:  It's okay.  I'm following it.
 7           MR. MERVIS:  I just wanted to make sure.
 8           THE COURT:  I've been following it for the last
 9  two hours.
10  BY MR. MERVIS:
11  Q    If you look at that email at the top of the page from
12  Mr. Strack to you, about two-thirds of the way down, he
13  writes:
14       "We are having Otterbourg continue their dialogue with
15  Curtis regarding the legal process structure of carving out
16  the proposed NewCo entities."
17       Do you see that?
18  A    Yes.
19  Q    Was it -- now, Otterbourg was Wells' counsel?
20  A    Yes.
21  Q    Okay.  And I think we've established Curtis is -- Curtis
22  was the company.
23  A    That is correct.
24  Q    To your knowledge, were those conversations ongoing?
25  A    Yes.  I mean everything was done between all the parties
```

 1  and everybody was aware of exactly what was going to happen.

 2  Q    And then he writes, "Is there any update on procuring

 3  insurance for the NewCo."

 4       Do you know what that refers to?

 5  A    Yes.  He knew we couldn't execute on that NewCo entity

 6  or the strict foreclosure sale until we had insurance for

 7  that new entity to run that business.

 8  Q    At the top of his email there's a couple of sentences

 9  where he effectively asks if it's okay if Wells shares your

10  wind-down plan with Carl Marks; is that right?

11  A    Yes, he wanted to know if he could share the Patriarch

12  models with Carl Marks.

13  Q    At this point in time, was it your sense that Wells was

14  looking to Carl Marks for guidance on this issue?

15  A    It was my sense that Carl Marks was there to support

16  Wells in recovering their loan.

17  Q    If you could go over to the first page, there's an email

18  from you -- and this s again, Exhibit 147 -- it's an email

19  from you back to Mr. Strack, and in the, about two-thirds of

20  the way down in the first paragraph, there's a sentence that

21  says, "We're running out different scenarios on the rundown

22  of revenue as we do give 90 days' notice."

23       Do you see that?

24  A    Yes.

25  Q    What's the reference -- what's the meaning of the

1 reference to the 90 days' notice?

2 A    We were -- the wind-down plan assumed 90 days' notice to

3 the customers, as well as to the employees, but we knew that

4 some of the contracts might leave earlier once we noticed

5 them, so we were looking at different scenarios where certain

6 contracts might leave earlier.

7 Q    Okay.  And did the 90 days have anything to do with any

8 legal notice requirements at this point?

9 A    Well, we certainly wanted to give the WARN Act notice to

10 the employees, but we also wanted to give the customers

11 sufficient notice to move their contracts so that nobody was

12 left hanging and we felt that 90 days would accomplish both,

13 knowing that Wells really wanted to be out of the credit

14 quickly.

15 Q    Can you turn to Joint Exhibit 86, please.

16      Ms. Tillem focused you on the first page of this

17 exhibit, which is an email from you to Mr. Strack and

18 you're -- here, you're attaching what you describe as a

19 "bottom-up model."

20 A    That is correct.

21 Q    If you go down to the third paragraph of this email,

22 about halfway down, you write:

23      "The separation of the NewCo assets is achieved such

24 that the 7.5 billion in receivables taken in that separation

25 flows directly, without any additional costs associated to

1    the future business."

2        What is that?

3    A    Well, in this model, we didn't purchase the receivables,

4    but even though we were running the business, all the

5    collections would go to Wells.  And we didn't feel that

6    there'd be any costs to those collections because we were

7    running an ongoing business.

8        Often, when you stop running a business, people don't

9    pay their receivables, they put damages against it.  So, this

10   would have no cost to the collection of those receivables

11   because we were still running the ongoing business.

12   Q    And then in the next sentence, you say a CRO actually

13   runs the business through the wind-down.

14       Was that the thought of having a CRO that was still in

15   play?

16   A    That is correct.  We felt that would -- having someone

17   running the business, communicating with everyone, and making

18   sure certain things were collected would be the best option

19   for fullest recoveries for everybody.

20   Q    I'd like you now, please, to go to DX-150.

21       And I'm focused, in particular, Ms. Milton, on the email

22   that you sent on February 18th at 11:03 at night.  Do you

23   remember this email?

24   A    Yes.

25           MR. MERVIS:  Your Honor, I'd like to move DX-150

 1  in.  There's no stated objection.

 2           MR. AMINI:  No objection.

 3           THE COURT:  It's received.

 4      (Exhibit DX-150 received in evidence)

 5  BY MR. MERVIS:

 6  Q    The email that you sent, you said, "Dear Patriarch

 7  family ..."

 8      Now, I can't, because of the way it's formatted, I can't

 9  say exactly who the recipients were.  But do you have a

10  memory of who the likely candidates were?

11  A    I sent it to the entire New York office because

12  everybody had been working for weeks now just on trying to

13  save this company.  So, I had left the office and I sent it

14  back to the entire team in New York.

15  Q    And about how many people was that team?

16  A    About 35 to 40 people, all of whom were working to save

17  this company.

18  Q    And you talk about a call you received from Kurt Marsden

19  about Wells want to go find a solution, a joint solution to

20  unwind more gracefully.

21      Had something happened earlier in the day that preceded

22  this communication from Mr. Marsden?

23  A    Earlier that evening, we had been told that Wells was no

24  longer going to fund.  And I had told everyone in the office

25  that I wasn't sure that we would have operations the next

 1   day.  That included TransCare leaders who were in the office,

 2   and that we might need to send people home in the morning.

 3        So, it was a very somber evening.  People had been

 4   working around the clock for weeks, I mean, leaving at 2:00

 5   in the morning and getting back at 7:00 in the morning.  And

 6   so, I had sent everybody home earlier, and then, after being

 7   told they would no longer fund, they received a call from

 8   Kurt Marsden in the car on the way home and they told me that

 9   they were changing their mind and wanted to work together to

10   try to do a more graceful wind-down, as we had been

11   previously discussing.

12   Q    And if you recall, was there any discussion about what

13   the structure of that wind-down might look like?

14   A    I mean, we were going back to that 90-day orderly wind-

15   down for OldCo and the foreclosure of the OldCo-NewCo

16   structure that we had been discussing over the last 10 days.

17   Q    So, for a moment, structure of the company looked left

18   for dead and then it got a lifeline?

19   A    Well, we just needed to make sure that every day funding

20   was not stopped.  We needed a few more days to get to a place

21   and we needed the stopping of funding every day to cease so

22   we could get there.

23   Q    If you could go now, please, to DX-151.

24        And first, I'd like to ask you if you recognize this

25   email chain in which you are a participant.  Just take a

1   moment to look at it.

2   A    I recognize the email.

3   Q    And is this something -- this is an email chain that you

4   were a part of?

5   A    Yes, I was.

6           MR. MERVIS:  Your Honor, I'd like to offer DX-151.

7           THE COURT:  Any objection?

8           MR. AMINI:  No objection.

9           THE COURT:  It's received.

10      (Exhibit DX-151 received in evidence)

11  BY MR. MERVIS:

12  Q    So, now, if you look at the second page, Ms. Milton, you

13  have a short email to, I believe it was to Ms. Giglio, "Have

14  you heard from anyone this morning?"

15      Do you see that?

16  A    Yes.

17  Q    And why were you asking the company's lawyer that?

18  A    Because *apropos* of my conversation with Kurt Marsden

19  from Wells the night before, I was wondering if we had a

20  proposal on funding through the transaction.

21  Q    And if you go to the first page of the exhibit, there's

22  a response from Ms. Giglio and she writes:

23      "Just Otterbourg.  Said Wells is very interested in the

24  NewCo plan, so anything you can send in terms of models,

25  timing, et cetera, would be helpful.  I told Wells, if they

```
 1   really want to make NewCo work, they should over-advance
 2   today, so we have enough liquidity to properly make it
 3   through the weekend."
 4        Do you see that?
 5   A    Yes.
 6   Q    Now, at this point -- now we're on February 19th --
 7   what -- was Wells -- did Wells have any commitment beyond the
 8   day-to-day commitment to fund?
 9   A    No, they had no commitment even day-to-day.  We were
10   just living day-to-day.
11   Q    If you could go now to DX-157.  And, Ms. Milton, again,
12   take a moment.
13        My initial question is whether this is an email chain in
14   which you were a participant?
15   A    Yes.
16             MR. MERVIS:  Your Honor, I'll offer DX-157.
17   There's been no objection registered.
18             THE COURT:  Any objection?
19             MR. AMINI:  No objection.
20             THE COURT:  It's received.
21        (Exhibit DX-157 received in evidence)
22             MR. MERVIS:  Thank you.
23   BY MR. MERVIS:
24   Q    I want to start on the second page of the exhibit, the
25   one that at the bottom has a Bates number ending in 5292.
```

**A2188**

1   There's an email from Mr. Strack and this is fairly early in

2   the morning on the 19th.  He says:

3      "Lynn, please send us over whatever information you can

4   provide on your CRO candidate."

5      Do you see that?

6   A    Yes.

7   Q    And your response, you say in the email at 8:36 p.m.,

8   you say:

9      "Bob, I will send her paper when I get to the office.

10   She's very smart and capable, and well-trained by Steven

11   Gray, with whom I have worked and respected deeply."

12      Two lines down, then, you say:

13      "Last night we told her there would be no engagement and

14   we will now need to see if she is still available."

15      Do you see that?

16   A    Yes.

17   Q    Why was she told that there would be no engagement two

18   nights earlier?

19   A    Because that was the night that we were told that Wells

20   would no longer fund and we were signing an engagement letter

21   with her, so we made it clear to her that it was -- that we

22   were not going to be able to move forward at that point.

23   Q    And subsequent to this email, did you go back to the

24   candidate and see if she could do it?

25   A    Yes.

1    Q    Okay.  So, if you look at the email just above the one

2    we went through, which is from Mr. Strack at 3:12 p.m., he

3    says, "We're working on getting a termsheet to you for

4    discussion."

5         What was he talking about?

6    A    A    termsheet on the terms under which they would

7    continue to fund.

8    Q    If you go to the first page of the exhibit, and this is

9    February 19th in the afternoon, your email to Mr. Strack, you

10   say:

11        "Bob, again, the company has just received a 90-day

12   notice from Bronx Lebanon, a contract that we were taking

13   with NewCo."

14        Earlier, I think there had been some discussion about

15   that NewCo was going to essentially everything, but Corp and

16   911.  With this contract being cancelled, what was the impact

17   on that plan?

18   A    It was about two and a half million dollars of EBITDA.

19   I mean, it -- this and Montefiore Hospital were about two and

20   a half million dollars of EBITDA; it was a big hit.

21   Q    Okay.

22   A    This was very important.  It was the reason that I had

23   lent them the money to buy the new ambulances --

24   Q    Okay.

25   A    -- because that was a requirement of the contract that

1  we were trying desperately to keep.

2  Q    And if you go, Ms. Milton, up to the top of the page,

3  there's an email from you to Mr. Strack and others at 3:59.

4       And right toward the end of the email you say:

5       "The Company is unravelling by the minute.  I don't

6  think it's a coincidence that we received two unexpected

7  cancellations today."

8       Let me break those apart.  We'll start with the

9  cancellations.  So, we -- I think we saw already the

10  cancellation at Bronx Lebanon.

11      Do you recall the second contract that was cancelled?

12  A    I'm not sure whether this was Montefiore or Maryland.  I

13  know that both of them came, I just don't remember which one

14  it was right here.

15  Q    And did either of those revisions make it into the final

16  NewCo?

17  A    No, they did not.

18  Q    When you -- you say the company is unravelling by the

19  minute, were you being hyperbolic?

20  A    I really don't think so.

21  Q    Okay.

22  A    I mean, we were losing people, as well -- leadership --

23  as well as contracts on a minute-by-minute basis.  I couldn't

24  keep the model for NewCo together because it kept moving with

25  the loss of contracts.  So, I think that, you know,

1  announcing to certain leadership that we didn't think the

2  company would be there on the morning of the 19th caused

3  these contracts to be cancelled.

4  Q    And I guess connected to that, you write at the end,

5  "This is a rumor mill."

6       What did you mean by that?

7  A    Just that everybody was talking throughout the industry,

8  through all the hospitals, through all the contracts.  And we

9  also lost the head of EMS who was in charge of Bronx Lebanon

10 and Montefiore at the same time.  So, I think the

11 announcement on the night of the 18th was probably the last

12 nail in the coffin.

13 Q    If you could go to JX-90, please.  Just let me know when

14 you're there, Ms. Milton.

15 A    I'm there.

16 Q    So, this is an email that you wrote to three of your

17 lawyers or three of the lawyers.  And in the middle of the

18 email you say, "Our plan is to have Cindy Romano arrive on

19 Tuesday at the company to reduce any execution risk," and

20 then it goes on.

21      Cindy Romano is who, again?

22 A    She was the CRO that we had engaged to wind-down OldCo.

23 Q    And this is -- so, this is three days before the

24 Article IX and the bankruptcy filing?

25 A    That is correct.

1  Q    And you're saying the plan is to have her arrive on

2  Tuesday, the 23rd?

3  A    That is correct.

4  Q    If you could go, please, to JX-93, and if you could turn

5  to the second and third page of the exhibit.  So, now we're

6  into Tuesday the 23rd.  And you'll see on the third page

7  there's an email from Mr. Helfat that encloses -- it says it

8  encloses -- an analysis.

9       Did you know what that, just generally speaking, what

10  that analysis was supposed to be about?

11  A    It was on the receivables.

12  Q    Okay.  And if you'd go into the second page of the

13  exhibit, there's an email from you back to Mr. Helfat, and

14  I'd like you to look at the second-to-last paragraph, the one

15  that says, "We are trying to save 700 jobs."

16      Just read that to yourself, please.

17  A    Okay.

18  Q    What was going on here?

19  A    They were trying to force me to pay more than the amount

20  of the collectible receivables I was taking and acting like

21  they wouldn't let the foreclosure go forward unless I paid

22  them their price.  And I found that disheartening, since we

23  were trying to save a lot of the company and a lot of the

24  people's jobs.

25  Q    You're telling him that he has a choice, right, keeping

1   the receivables or selling them to you, right?

2   A    That is correct.

3   Q    And, ultimately, which choice did Wells take?

4   A    To keep the receivables.

5   Q    In the modeling and financial work that you had done

6   prior to the 23rd, what assumption, if any, had you made

7   about whether you would be able -- you would buy the

8   receivables or not?

9   A    I think we had different models on different occasions.

10  Q    All right.  Fair enough.  I'll show you where.

11  A    Yeah, so ...

12  Q    Okay.  Actually, why don't I do that?  If you could turn

13  to PX-286, please.

14          MR. MERVIS:  And, Your Honor, this is already in

15  evidence.

16  BY MR. MERVIS:

17  Q    It's the very last exhibit.

18  A    Okay.

19  Q    Take a moment just to familiarize yourself with this,

20  but my question, initial question is:  Do you remember this

21  correspondence that was attaching something?

22  A    Yeah, this was one of the initial analyses that were

23  done.

24  Q    Okay.  And this was the -- this is on the 13th?

25  A    Right.

1  Q    Okay.  If you look at the second page, there's a section

2  that says, "Outcome of model is as follows," and then there's

3  a bunch of different bullet points.  Just take a moment to

4  review those bullet points.

5       My question is:  Based on what's written there, did it

6  provide an indication of the approximate amount of working

7  capital that would be needed to operate NewCo and it was then

8  constituened [sic]?

9  A    Yeah, based on this, it was about a little over ten and

10  a half million dollars.

11  Q    Okay.  Now, there's an attachment -- if you go back to

12  the first page, there's an attachment that says,

13  "Transcendence" in the file name.

14            MR. MERVIS:  But (indiscernible) can you pull up

15  the -- I guess this is a spreadsheet.

16            And, Your Honor, this is not in the book because

17  it's just too big.  We couldn't print it, Your Honor.

18            And, (indiscernible), if you could click on the BS

19  tab, or have you already done that?

20            UNIDENTIFIED:  Yeah, we did that.

21            MR. MERVIS:  Okay.  Great.

22  BY MR. MERVIS:

23  Q    Ms. Milton, at a very high level, what are we looking at

24  here?

25  A    You're looking at the combined balance sheet for the

```
 1  five divisions that we were initially looking at taking in
 2  the foreclosure to create NewCo, and this would be the
 3  December 15th closing balance sheet and then a projection
 4  going forward of the balance sheet based on an initial
 5  analysis of those five entities.
 6  Q    Okay.  And the Column B, the December 15 closing balance
 7  sheet, the -- now, the figures for the assets that are listed
 8  there, where were those pulled from?
 9  A    They were pulled from the balance sheets of each
10  individual entity and combined.
11  Q    From the company?
12  A    From the company's balance sheets, yes.
13  Q    Okay.  Now, I want to focus on rows -- and I see why
14  it's helpfully highlighted at Rows 7 through 24 but let me
15  stop.
16       Earlier -- and we've had some -- a lot of conversation
17  about this today -- you talked about how you valued the
18  assets of NewCo using book value; do you recall that?
19  A    Yes.
20  Q    Did you use the data in the cell that's been highlighted
21  here, this Row B, December 15, as part of that calculation?
22  A    I used some of the data in there, yes, to come up with
23  that calculation.
24  Q    Okay.  Let's go through what you used and didn't use.
25  So, what's the first thing that you used?
```

```
 1   A    I used the cash, the receivables, and the inventory, and
 2   then I added to that, the net property, plant, and equipment.
 3   Q    All right.  Now, before we -- well, actually, let's see.
 4   Were -- are you able, through the magic of Excel, to sum
 5   those up.
 6   A    Yeah, it's right at the bottom there, the nine million
 7   nine ninety-six point six.
 8   Q    Okay.  So, the sum of the different asset values that
 9   you used, gets you just under 10 million?
10   A    That's correct.
11   Q    Okay.  Now --
12            THE COURT:  I see a total of 6,855,000.
13            THE WITNESS:  But I didn't take the negative
14   goodwill and I didn't take the pre-paids or the other assets
15   because I had no way of knowing what those assets were.
16   I took the receivables, the cash, the inventory, and the net
17   PP&E and that came to 9,000,966.  You know, I thought like
18   negative goodwill was not something to take the benefit
19   thereof.  I took the real assets.
20            UNIDENTIFIED:  I saw this chart in another
21   exhibit.
22            MR. MERVIS:  It's possible.
23            UNIDENTIFIED:  I've seen it before.
24            UNIDENTIFIED:  We showed it to Michael Greenberg.
25   BY MR. MERVIS:
```

1  Q    All right.  So, Ms. Milton, just to pick up on the

2  judge's question -- now, you already answered it, I just want

3  to understand why.

4       So, you didn't use the goodwill number, which was a

5  negative number -- a pretty big number -- over $5 million.

6       And why didn't you use that?

7  A    Because that was not an asset that was worth anything of

8  what we were taking.  We were just taking the book value of

9  the assets that made sense for the future business in the

10 fresh-start accounting of the new business, and that would

11 have been the receivables, the cash, the inventory, and the

12 net PP&E and that would have been the opening balance sheet

13 for the new business, had we taken these five entities.

14 Q    And the other assets, although it's a fairly small

15 number, what was the reason you didn't apply those?

16 A    Just didn't even know what they were.  So, I mean, I --

17 it wasn't something that I was going to take or give value

18 to.

19 Q    Now, let's look at the receivables for a minute.  So,

20 there are two lines.  I think it's Rows 8 and 9 that indicate

21 receivables.  One says, "OldCo" and one says, "NewCo."  And

22 the NewCo is empty and the OldCo is at 8.165.5.

23      At this point in time, what assumption did you make

24 about whether you would be purchasing the receivables of

25 OldCo and bringing them over to NewCo?

1  A    At that point in time, I thought I'd be buying the

2  receivables and that's why I put that into that original

3  asset value that we credit bid on.

4  Q    But, as it turns out, at the end of the day, you didn't

5  buy those receivables.

6  A    No, but you saw it was at the last second that we didn't

7  come to an agreement.  I had thought all along it would be

8  much better for Wells and they would allow us to purchase

9  those.

10 Q    And we're going to come to sort of why, but I just want

11 to ask the question of impact first.  If you had reversed the

12 assumption and assumed that the receivables would stay with

13 OldCo and not go into NewCo, what effect would that have had

14 on the book value of what you were buying?

15 A    It would have taken the book value down to about, you

16 know, 1.7 million.

17 Q    And that's, in fact, what wound up happening, correct?

18 A    In terms of the book value, yes, that was taken.

19 Q    Now, I just want to ask another couple of questions

20 about this.  If you go to Row D, so this is February 2016.

21      Ms. Milton, does Row D contain actual numbers?

22 A    No, that's a projection of, you know, *pro forma* for what

23 would have happened in February.  I mean, this was earlier in

24 the month where we thought we'd get it done earlier and it

25 just shows the NewCo collecting receivables and new cash

1  going into the company.

2  Q    Okay.  So, just to plan a couple of things, if you look

3  at Line 7 of Row D, you'll see before, there was very little

4  cash.  In December there was very little cash and now you've

5  got close to 3.8 million.

6       But that cash actually wasn't on the balance sheet?

7  A    No.

8       Do you see the incremental funding below?

9  Q    Yeah.

10 A    So, you're getting increment -- you're collecting some,

11 but you're also getting incremental funding.  And as you can

12 see down below, most of that additional cash is coming from

13 almost, you know, $8 million of incremental funding.

14 Q    And you use the December 15 closing -- well, let me ask

15 it a different way.

16      Why did you use the December 15 closing balance as the

17 basis for their book value?

18 A    That was the last time they had closed the books.

19 Q    "They" being?

20 A    TransCare.  So, I felt that that was the best basis upon

21 which to look at the asset value and the opening balance

22 sheet.

23 Q    And I think we've already established the assets that

24 are shown in the December 15 column are not just the assets

25 of the three companies that wound up being in NewCo, right?

1    A    No.  It's five entities and the ambulances.

2              MR. MERVIS:  And, actually, (indiscernible), if

3    you could go to the P&L tab here and bear one second.

4         (Pause)

5              MR. MERVIS:  If you could go to Column O, Row 47,

6    please.

7    BY MR. MERVIS:

8    Q    Okay.  Do you see that, Ms. Milton, that EBITDA number?

9    A    Yeah.  That's based -- that number, I see it, but it's

10   based on projections.

11   Q    Right, based on projections.

12        But what companies or divisions --

13   A    No divisions --

14   Q    -- compromise that?

15   A    Those are the five entities, but it also assumes growing

16   the trends at business.  As you see, the revenues go from 3.6

17   million in February to 5.8 million.  A lot of that is the

18   renegotiation of the transit business, but that's based on

19   five entities' transit:  Bronx Lebanon, Montefiore,

20   Westchester, Pittsburgh, and Maryland.

21   Q    And -- right.  So, it's across the five entities.

22        And did the -- that EBITDA number, that "five point oh

23   nine six" number, did that -- did the model include overhead

24   and SG&A?

25   A    Not yet, no.  This was just based on the five divisions

1  and certain assumptions about growth that we could make to

2  the transit business.

3  Q     And do you have a rough estimate, again, across the five

4  businesses?

5  A     Well, probably it had to be at least a million dollars

6  just because there was no management team, other than

7  divisional heads in here.

8  Q     So, if you assume a million dollars, that would bring

9  the combined projected EBITDA for all five down to a little

10  over 4 million?

11  A     And it was also based on growth that wasn't there yet --

12  Q     Right.

13  A     -- that had to come.  As you can see, in January, the

14  revenues were 2 million; at February, 3 million; and by

15  March, we were looking to grow to 5.8 million.  So, that was

16  all based on what we hoped we could negotiate with MTA to

17  increase the revenue.  So, that was not the current EBITDA.

18       As you can see, it was the five entities were still

19  losing money.  They needed to be restructured and new

20  business needed to be wanting to make this company work.  But

21  this was a look at what we thought might be able to be

22  accomplished with operational changes and new contracts from

23  the MTA.

24            MR. MERVIS:  (Indiscernible), if you could go to

25  Column C, Row 47.

```
 1  BY MR. MERVIS:
 2  Q    Ms. Milton, that negative EBITDA number for January 16,
 3  that's the projection, as well?
 4  A    No.  That was actually what was -- I mean, the financial
 5  statements weren't done, but that's what we were seeing
 6  happened in that month.
 7  Q    Okay.  Across -- again, across these five entities that
 8  were generating --
 9  A    Across the five entities, together, yes.
10  Q    -- generating negative EBITDA?
11  A    They were still because the expenses and changes had not
12  been done yet.
13  Q    Okay.
14        MR. MERVIS:  (Indiscernible), if you could go
15  to -- just one second, Your Honor.
16        THE COURT:  Uh-huh.
17     (Pause)
18        MR. MERVIS:  If you could go to Tab TS, please,
19  and if you could go to Column O, Row 4 -- I'm sorry --
20  Row 47, sorry.
21  BY MR. MERVIS:
22  Q    And you'll see -- again, recognizing this is projected
23  EBITDA -- what is this one-point-two-million-dollar number?
24  A    That's for the transit business.
25  Q    That's for the transit business.  That's one of the
```

1  businesses that would have carried over?

2  A    That is correct.

3  Q    Okay.  And, again, this is before the deduction of

4  overhead and SG&A?

5  A    Well, SG&A.  It would be corporate overhead.  Not

6  overhead -- the company's overhead was in there, but

7  corporate overhead.

8  Q    Gotcha.

9          MR. MERVIS:  (Indiscernible), if you could go to

10 the tab -- that Tab PA, and, again, if you go to Column O,

11 Row 47.

12 BY MR. MERVIS:

13 Q    So, there, we see -- is that a two-hundred-thousand-

14 dollar projected EBITDA?

15 A    That is correct.

16 Q    And for what division is that?

17 A    That is for Pittsburgh --

18 Q    Okay.

19 A    -- the Pennsylvania Division.

20 Q    Okay.  And, again, that's exclusive of the SG&A

21 costs?

22 A    The corporate overhead, yes.

23 Q    Corporate overhead, thank you.

24          MR. MERVIS:  And, (indiscernible), if you could do

25 one more, if you could go to Tab HD, and, again, Column O,

1  Row 47.

2  BY MR. MERVIS:

3  Q    And you will see, Ms. Milton, that there's about a 1.173

4  projected EBITDA.

5  A    That is adequate protection for the year, provided we

6  could make the operational changes and go from actuals of

7  about 50,000 up to 1.173 or almost 125,500 a month.

8  Q    And, again, this is -- and this is for Hudson Valley?

9  A    This is a projection for Hudson Valley once we were able

10 to make the operational changes that we were saying we could

11 make.

12 Q    And, again, this is without deducting expense that was

13 left out of this?

14 A    The corporate overhead to run a full company and a CEO,

15 CFO, HR, among other things.

16 Q    So, if we total up -- I think we've seen about 1.2 for

17 transit -- 1.2 million EBITDA for transit; 200,000 for

18 Pennsylvania; and about 1.173 for Hudson Valley -- what's

19 the -- roughly, what's the combined EBITDA?

20 A    One point four and 2.6 --

21 Q    Okay.

22 A    -- that would have been our projection for the first

23 year, provided that we made operational changes.

24       It wasn't the performance of the entities at the moment.

25 It was based on improvements.

1  Q    Okay.  And, again -- and I know I keep making this

2  point -- but that's all before you deduct overhead costs?

3  A    That is correct.

4  Q    All right.

5          MR. MERVIS:  Your Honor, just one second.

6      (Pause)

7  BY MR. MERVIS:

8  Q    Okay.  Let's move to a new exhibit, which is PX-209.

9      You know, (indiscernible) email, the one about getting

10 hit by lightening --

11 A    But if you knew who it was coming from, you'd laugh very

12 hard because he's not a funny guy.

13 Q    All right.

14 A    He's an accountant.

15 Q    All right.  But, in any event, just take a moment to

16 look at the attachments and let me know if you recognize

17 them.

18 A    My God, could you make it any smaller?

19 Q    I think we can pull them up --

20 A    I do recognize it.

21 Q    Okay.  You recognize this?

22 A    Yes.

23 Q    Is this work that you asked to be done?

24 A    Yes.

25 Q    All right.  Now, the email is dated the 16th of

```
 1   February, so it's a few days after Mr. Pelissier -- about
 2   after Mr. Pelissier's spreadsheet that we just looked at.
 3   Actually, let me ask you first -- well, actually, let me move
 4   the document first.
 5           MR. MERVIS:  I'd move PX-209, Your Honor.  There's
 6   no stated objection.
 7           THE COURT:  Any objection?
 8           MR. AMINI:  No objection.
 9           THE COURT:  It's received.
10       (Exhibit PX-209 received in evidence)
11   BY MR. MERVIS:
12   Q    So, let me ask you first, who is Mr. Mercado?
13   A    He is our senior controller at Patriarch Partners.
14   Q    Okay.  And do you understand this is work he did?
15   A    Yes.
16   Q    Okay.  Is he good at his job?
17   A    He's very good at his job.
18   Q    All right.  Let's take a look at --
19   A    Not so funny, though.
20   Q    Right.  Until this email.
21   A    That's right.
22   Q    Page 3 -- I'd like you to focus your attention on
23   Page 3.  So, if we look at -- well, let me ask a general
24   question, which is:  Generally speaking, what is this page
25   (indiscernible)?
```

1    A    This was how to allocate the equity in Transcend -- it

2    was an analysis done to figure out how to allocate the equity

3    in Transcendence to the old term lenders based upon the ten-

4    million-dollar credit bid.

5    Q    All right.  Now, let's take a look at the box that's

6    labeled "Transcendence" and you'll see -- let's just kind of

7    go row by row on this.  So, in the A    row, there's a 2.05-

8    and-change-million-dollar figure under Ark II.

9         Do you see that?

10   A    Yes.

11   Q    And do you know what that represents?

12   A    That was the $2 million that had been lent to TransCare

13   that would be rolled into the Transcendence revolver.

14   Q    Okay.  Or that you were planning on?

15   A    That I was planning on rolling into the Transcendence

16   revolver.

17   Q    And then the B column -- again, under Transcendence --

18   also under Ark II, there's a ten-million-dollar figure.

19        Do you see that?

20   A    Yes.

21   Q    And what is that?

22   A    That was the revolver loan that, I guess, ultimately, my

23   team decided to do it from Archangels III, maybe just because

24   there because there was cash there, but it was under Ark II

25   as the revolver.

1  Q    So, if you were correcting this, you might change it to

2  say Archangels III?

3  A    That would be correct.

4  Q    All the money comes from --

5  A    It's separate; Lynn Tilton personal funds.

6  Q    All right.  Row C, what is shown in Row C across the

7  columns?

8  A    That is the *pro rata* share of $10 million -- you know,

9  it's 10 million over the 45 times the amount for each lender.

10 So, taking the percentage of 45 million times 10 million to

11 allocate and the percentage to allocate to the equity of the

12 old term lenders.

13 Q    Okay.  So, let me see if I can get this right.  Before

14 you apply the rolled-over amount, the two and change that's

15 in Column A, what is the breakdown, percentage-wise, between

16 we'll call it the "new money" and the "old money"?

17 A    So, this was based on 10 million if it was not diluted

18 by the new revolver.  So, this is just the percentage that

19 the old term lenders would get prior to the new money coming

20 in.

21      And then the next line that says, "Total" is the

22 dilution, based on the new money getting 51 percent.

23 Q    Now, why didn't you allocate equity to the Zohars and

24 Credit Suisse and First Dominion and AIP?

25 A    That was their share of the credit bid for the 10

1  million for the credit bid for the assets of the three

2  divisions, and it was their chance at recovery based on the

3  success of NewCo and the ability to monetize and equitize for

4  the term lenders.  It was our best hope at collecting for the

5  loans that had been made.

6  Q    And, specifically, the term loans?

7  A    The term loans, yeah.  I mean, Wells had the wind-down

8  plan on their assets and hopefully anything above what they

9  would receive on their security interests would go to the

10  term loan lenders, but I felt this was the best opportunity

11  for the term loan lenders to have some recovery based on,

12  hopefully, the ultimate success of NewCo over time.

13  Q    Okay.  And the 50 -- I think you already said this, but

14  just to be clear -- the 54 percent is higher than the 51

15  because why?

16  A    The two million was allocated into the old term loans.

17  The two million to Ark II -- so, the 51 percent went to the

18  new 10 million and the two million got part of the 49

19  percent.

20  Q    Do you know whether any effort was made by folks who

21  worked for you to try to get Credit Suisse to contribute new

22  money?

23  A    Not on this transaction, but when I was putting new

24  money into the old transaction or we did -- and maybe for

25  here today -- I'm not aware -- but when we were trying to put

 1   up new money to execute on plans, we did go to Credit Suisse

 2   and ask them if they wanted to participate in the priming

 3   loan.

 4   Q    And if they had put up that money, what -- depending on

 5   the amount -- I'm not going to ask you for a percentage --

 6   but what would the effect, you know, in terms of their equity

 7   (indiscernible)?

 8   A    They would have gotten a *pro rata* share of the 51

 9   percent of the new money based on the amount of the new money

10   that they put up.

11   Q    Okay.  Why don't we go to DX-166.

12        And Ms. Milton, this is -- well, let me first just

13   confirm that this is an email that you received from a Vikram

14   Agrawal on February 22 of 2016.

15   A    It is.

16   Q    And --

17             MR. MERVIS:  Well, Your Honor, let me offer it,

18   DX-166.  There's no stated objection.

19             THE COURT:  Any objection?

20             MR. AMINI:  One moment, Your Honor.

21        (Pause)

22             MR. AMINI:  This is what document, I'm sorry?

23             MR. MERVIS:  DX-166.

24             MR. AMINI:  Oh, 166.  There's no objection.  No

25   objection, Your Honor.

```
 1              THE COURT:  It's received, but the (indiscernible)
 2  numbers are really hard to read.
 3        (Exhibit DX-166 received in evidence)
 4              MR. MERVIS:  Yeah, it's not the best, but you're
 5  right.  That's why we're going to put it up on Excel or we're
 6  going to try anyway.
 7  BY MR. MERVIS:
 8  Q    But the -- I want to focus on the text for a minute.
 9        Well, first of all, who is Mr. Agrawal?
10  A    He was a credit officer at Patriarch.
11  Q    Okay.  And he -- he says he's attaching something here.
12  Well, you know, we'll get to that in a second.
13        Let me ask you a different question.  Just take a look
14  at the second paragraph of his email.  Just read that to
15  yourself.
16  A    Okay.
17  Q    And what do you understand him to be saying in that
18  portion of his email?
19  A    At this point in time, we were just trying to look at
20  the entities and it didn't include that corporate overhead
21  that we were speaking to earlier or any costs of the
22  transaction or any cash that would be needed immediately for
23  insurance.  So, it was just looking at the entities, no
24  corporate overhead transactions costs or any insurance
25  payments that would need to be made up front.
```

1  Q   And the model, is it correct that the model that he's

2  attaching does not include those expenses?

3  A   That is correct.

4  Q   Okay.

5         MR. MERVIS:  (Indiscernible), can we pull up the

6  spreadsheet, and if you could click on the --  you're already

7  there -- on the NewCo financial model.  If you could go,

8  (indiscernible), for Column K, Rows 59 through 60.

9  BY MR. MERVIS:

10 Q   Ms. Milton --

11        THE COURT:  Is this part of this exhibit?

12        MR. MERVIS:  Yes, it is.

13        THE COURT:  I don't have it in the book.

14        MR. MERVIS:  I know.  It's too hard to -- it

15 doesn't print well, but it's in the discs that we provided to

16 the Court, Your Honor.

17 BY MR. MERVIS:

18 Q   So, what are we looking at here in this row?

19 A   This is what would have been the opening balance sheet

20 for the three divisions that were ultimately being modeled at

21 this point in time, given the loss of contracts.

22 Q   So, now, we're just looking at Hudson Valley,

23 Pittsburgh --

24 A   Transit.

25 Q   -- and transit.

1   A     Yes.

2   Q     And if you look at Rows, I guess it's 62 down to the

3   bottom where it says, "total assets," we looked at a

4   similar -- well, really the same row, remember, for the

5   December closing -- the December closing in the

6   (indiscernible) that we looked at earlier.

7   A     Yes.

8   Q     Okay.  And you noted that when you did your book value

9   calculation for NewCo, as it was constituted at that time,

10  you used certain of the asset inputs and didn't use, for

11  example, negative goodwill.

12         Would you use the same inputs to do the book value based

13  on this model at this point in time?

14  A     I would use the same inputs, which would be receivables,

15  inventory, cash, and PP&E.

16  Q     And what about allowance for bad debt?

17  A     I would not.

18  Q     You would not use it?

19  A     I mean, you know, I guess if they thought that was

20  really bad debt and not a receivable number, but I'm not

21  sure, so I probably would have just taken the receivables.

22  Q     Okay.

23         MR. MERVIS:  So, again, (indiscernible), if we can

24  do the magic of the calculation, or maybe it's already done.

25  Can you load it up, (indiscernible)?

```
 1  BY MR. MERVIS:

 2  Q    So, this sums out to 6.244 million.

 3  A    That's approximately correct, yes.

 4  Q    Okay.

 5  A    About 5.9 and another three fifty-six or so.

 6  Q    And, again, with respect to the receivables, the 5.2 and

 7  change, what does this model assume as to what whether you're

 8  buying the receivables or whether Wells keeps the

 9  receivables?

10  A    In this model, I'm still buying the receivables.

11  Q    And if you -- as it turned out, you didn't buy the

12  receivables.  So, if you were to run the calculation without

13  the receivables, what would the effect be on the calculation?

14  A    The book value of the company would have been minimal, I

15  mean, less than a million dollars.

16  Q    You -- did you update your book valuation of the assets,

17  the one that was based on the February 13th model?

18  A    I did not change my credit bid on it, based on the

19  changes of the balance sheet and the assets that we were

20  taking in the end, no.

21  Q    And why not?

22  A    It was moving very quickly, and I liked the 10 million

23  against the 10 million of new money and I thought that was an

24  equitable way to move forward with the old term lenders.

25  Q    And why do you -- I mean, let me just make sure I
```

1  understand what you say, "An equitable way to move forward
2  with the old term lenders," what did you mean?
3  A    I was giving 49 percent of the equity to the old term.
4  It worked out.  I mean, this was the best chance at recovery
5  and, frankly, there was a lot of debt that was never going to
6  get repaid.  So, to make it a smaller amount made no sense to
7  me.
8  Q    If you had reduced your credit bid down to, you know,
9  6.6 million, what effect would that have had on the split in
10  equity between old equity and new equity?
11  A    It would have given, you know, if you did it on, you
12  know, an equitable basis on dollars, it would have given more
13  money to -- more percentage of the equity to the new money.
14  Q    And that's not something you wanted to see happen?
15  A    It didn't make any sense to me.
16         MR. MERVIS:  (Indiscernible), if you could go to
17  Column DD, Row 44.
18  BY MR. MERVIS:
19  Q    Okay.  And, Ms. Milton, the highlighted, the number
20  3.204, what is that?
21  A    That was our projection of what those three entities
22  could possibly do for the full year of 2016 based on changes
23  that would be made to the company.  But this was our
24  projection of what we could achieve before corporate
25  overhead.

1  Q    And if corporate overhead had been included in this

2  model, approximately how much of that projection would have

3  been reduced?

4  A    Anywhere.  I mean, for the three entities, anywhere from

5  six to $750,000.  I mean, you need a CEO and a CFO whether I

6  have three entities or five entities, so, unfortunately, the

7  overhead is not much different.

8         MR. MERVIS:  One second, Your Honor?

9     (Pause)

10 BY MR. MERVIS:

11 Q    The foreclosure transaction that you went ahead with,

12 did you view that as a riskless transaction?

13 A    Absolutely not.

14         MR. AMINI:  As a what transaction?

15         MR. MERVIS:  Riskless.

16         THE WITNESS:  No.  I mean, I -- there was a lot of

17 assumptions being made to be able to even get to a couple of

18 million of EBITDA.  First of all, I had to lose more

19 contracts going into the foreclosure, as well as, after the

20 foreclosure, and it was happening by the day, and I needed to

21 be able to secure more paratransit business to be able to

22 accomplish it.

23         It was -- given the condition the company was in

24 and the continued loss of people and contracts, it was a very

25 high-risk transaction.

BY MR. MERVIS:

Q    Now, putting aside what ultimately happened at the end
of the day with that transaction, the plan that you
developed, is that something that you take pride in?

A    I think it was an enormous accomplishment with a team of
people in a very short period of time.  We had months where
we were waiting for things from everybody else.  I thought it
was an elegant solution to a very ugly and distressed
situation that would have gotten Wells out at 100 cents on
the dollar; would have been given three divisions life; 700
employees, new employment; and gave people a chance for
recovery for the future.  But it was done, literally, around
the clock, almost 24 hours a day for two weeks and everyone
dropped everything that they were working on to work around
the clock to try to build the models and get everybody
onboard.

     So, I think it was the only potential, decent ending to
a very difficult situation, and I was proud of my team for
all of their efforts.

Q    Has Patriarch Partners been around more two decades?

A    I started in April of 2000 and closed my first large
transaction in December of 2000.

Q    Can you think of a single other portfolio company that
received as much attention from as many people within the --
within your organization over the course of a four-week

```
 1  period of time --

 2  A    We have never --

 3  Q    -- than -- let me finish my question -- than transit?

 4  A    We have never dropped everything to work on one

 5  transaction with over 70 portfolio companies, but we had a

 6  gun to our head and Wells was funding day-to-day and

 7  everybody threw in everything they had in terms of their

 8  focused energy and their heart, to try to make this

 9  transaction a success.  It was the only elegant solution, and

10  we see what happened without this elegant solution.  It was

11  very painful for everybody involved.

12            MR. MERVIS:  May I have just a second?

13            THE COURT:  Yes.

14       (Pause)

15            MR. MERVIS:  One housekeeping matter, Your Honor.

16            (Indiscernible), if you could pull up -- this is

17  not in the binders -- if you could pull up PX-191.  And

18  because I don't have it in hard copy, I'll just ask you,

19  (indiscernible), if you could scroll slowly through the

20  document so Ms. Milton can get a chance to see what it is --

21  not that slowly.

22       (Pause)

23            MR. MERVIS:  Okay.  (Indiscernible), can you go

24  back to the first page.

25  BY MR. MERVIS:
```

```
 1   Q    Ms. Milton, do you know what PX-191?

 2   A    It's a financial package from TransCare for October

 3   financials that were issued on February 5th.

 4   Q    And this is for the whole company?

 5   A    Yes.

 6   Q    Okay.

 7         MR. MERVIS:  Your Honor, I'd move PX-191; it's a

 8   plaintiff's exhibit, so ...

 9         THE COURT:  Any objection?

10         MR. AMINI:  No objection.

11         THE COURT:  Okay.  It's received.

12      (Exhibit PX-191 received in evidence)

13         MR. MERVIS:  Just one second, Your Honor?

14      (Pause)

15         MR. MERVIS:  Okay.  Thank you, Judge.  I don't

16   have any further questions.

17         THE COURT:  All right.  We'll pick up tomorrow

18   morning at 10:30.

19         MR. MERVIS:  10:30?

20         THE COURT:  Yeah.

21         MR. MERVIS:  Thank you, Your Honor.

22      (Proceedings concluded at 5:28 p.m.)

23

24

25
```

```
 1                            CERTIFICATE

 2

 3   I certify that the foregoing is a correct transcript from the

 4   electronic sound recording of the proceedings in the above-

 5   entitled matter.

 6

 7   /s/Mary Zajaczkowski              August 14, 2019
     Mary Zajaczkowski, CET**D-531
 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    UNITED STATES BANKRUPTCY COURT
                     SOUTHERN DISTRICT OF NEW YORK
 2
   IN RE:                        .    Chapter 7
 3                               .
   TRANSCARE CORPORATION,        .    Case No. 16-10407-smb
 4                               .
                                 .
 5            Debtor.            .    New York, New York
   . . . . . . . . . . . . . .   .    Wednesday, August 14, 2019
 6 LAMONICA                      .    10:33 a.m.
                                 .    A.M. Session
 7         v.                    .
                                 .
 8 TILTON, et. al               .    Adv. Proc. 18-01021-smb
                                 .
 9 . . . . . . . . . . . . . .
10
11                 TRANSCRIPT OF TRIAL (Continued)
             BEFORE THE HONORABLE STUART M. BERNSTEIN
12              UNITED STATES BANKRUPTCY JUDGE
13
   APPEARANCES:
14
   For the Chapter 7 Trustee:   Salvatore LaMonica, Esquire
15                              LAMONICA, HERBST & MANISCALCO, LLP
                                3305 Jerusalem Avenue
16                              Wantagh, New York 11793
17 For Salvatore Leggett:       Bijan Amini, Esquire
                                Avery Samet, Esq.
18                              STORCH AMINI, PC
                                Two Grand Central Tower
19                              140 East 45th Street, 25th Floor
                                New York, New York 1001
20
   Audio Operator:              Electronically Recorded
21                              by K. Harris
22 Transcription Company:       Reliable
                                1007 N. Orange Street
23                              Wilmington, Delaware 19801
                                (302)654-8080
24                              Email:  gmatthews@reliable-co.com
25
   Proceedings recorded by electronic sound recording, transcript
   produced by transcription service.
```

```
 1  APPEARANCES (Cont'd):

 2  For The Non-Debtor          Michael Mervis, Esquire
    Defendants:                 PROSKAUER ROSE
 3                              Eleven Times Square
                                New York, New York 10036
 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                                    INDEX

2
3    TRIAL

     PLAINTIFF'S WITNESS(S):
4
5        LYNN TILTON

6        Redirect Examination by Mr. Amini              4

7        Recross Examination by Mr. Mervis              39

8
         Dr. JONATHAN ARNOLD
9
         Direct Examination by Mr. Amini               46
10
         Cross-Examination by Mr. Mervis               58
11
         Redirect Examination by Mr. Amini             76
12
13

14

15

16

17

18

19

20

21

22

23

24

25

4

```
 1        (Proceedings commence at 10:33 a.m.)
 2             THE COURT:  All rise.
 3             Please be seated.
 4             MR. AMINI:  Good morning, Your Honor.
 5             THE COURT:  Good morning.  Let's continue.
 6             Ms. Tilton, you're still under oath.  You
 7   understand that?
 8             THE WITNESS:  Yes, I do.
 9             THE COURT:  Okay.
10          LYNN TILTON, PREVIOUSLY SWORN, RESUMES STAND
11                  REDIRECT EXAMINATION
12   BY MR. AMINI:
13   Q    Good morning, Ms. Tilton.
14   A    Good morning.
15   Q    I'd like you to -- we're going to probably flip back
16   and forth, I apologize, between those two books in front of
17   you today.  But where I'd like to start, if we would, with
18   the Proskauer one that's in front of you.
19        If you wouldn't mind going with me to PX-209, which is
20   near the end.  It's like -- the PX I think ought to be
21   ending.
22        Do you have that in front of you?
23   A    Yes, I do.
24   Q    This was an internal worksheet, correct?
25   A    Yes.
```

1   Q     Besides this copy, do you have any subsequent copies?

2   A     I didn't prepare the discovery, so I don't know if

3   there were, but these were the numbers that were going to be

4   used in there, so I don't know if they were subsequent copies

5   done.

6   Q     And when you say these were the numbers that were going

7   to be used, can you point out which, on which of these

8   worksheets were the numbers that were going to be used?  Do

9   you know which one?

10  A     The 54.7, so I'm on page 3 where it says total, under

11  Transcendence.

12  Q     Yes.

13  A     So 54.7 percent to Ark II, 3 percent to AIP, and then

14  those numbers thereafter were the equity numbers to be used

15  for Transcendence.

16  Q     So Zohar III, for example, was going to get 25.6

17  percent?

18  A     That is correct.

19  Q     All right.  Besides the two people who are on this, do

20  you know if this was ever circulated to anybody else?

21  A     Without sitting here without anything else here, but it

22  was going to go to the lawyers to be put into the LLC

23  agreement.  Whether or not it was circulated, I believe it

24  was, but I would have to have all of the discovery here to be

25  able to see it.  It might have been privileged since it was

1  going to the lawyers.

2  Q    And so, and you said it was going to go the -- which

3  lawyers?

4  A    My internal lawyers who were putting together the

5  limited liability agreement that would have been between

6  Brian Stephen, Adam Katz, and Peter Ruffini would have been

7  the three internal lawyers working on the documents for this

8  transaction.

9  Q    So you would have expected that they would have had --

10 they would have seen it?

11 A    That is correct.

12 Q    Okay.  And was it -- as of this date, was it final?

13 From your testimony, it appears that as of February 16th,

14 these were the final numbers?

15 A    These were the numbers. We never went back to change

16 the credit bid, as I explained yesterday, of $10 million,

17 even after the two other operations fell out of NewCo.  These

18 were the numbers we were using.

19 Q    And other than this document, are you aware of any

20 other record of these percentage -- any percentage interest

21 in this LLC being given to the lenders?

22 A    To the lenders?

23 Q    Wasn't this a calculation, among other things, of what

24 the percentage interest of the term lenders would be in the

25 new LLC that you were working?

1 A    So, you're talking about did we give -- is there any

2 other document that edifies or demonstrates these numbers?

3 I'm not understanding your question.

4 Q    The latter, what you said.

5 A    I believe there were a number of spreadsheets and

6 distribution among Patriarch people and lawyers.  Without

7 sitting here, I can't attest to it, but this was not the only

8 I had seen these numbers being passed along across Patriarch.

9 Q    Do you recall at your deposition, you were served with

10 a notice in which you were designated the 30(b)(6) witness, I

11 believe, do you recall that?

12 A    I don't, sitting here, but I'll take your word on it.

13 Q    My recollection you knew what a 30(b)(6) witness was

14 which was surprising to me.

15 A    Well, I've been a 30(b)(6) witness more than once, so

16 yes, I do understand.

17 Q    And I can pull them up, but one of the -- I guess we

18 can try to find them on the computer.  But one of the items

19 was the collection of documents in this case.  You were the

20 person designated to testify on the collection of documents

21 in this case.

22 A    How it was done not doing it myself, I do not collect

23 the documents.

24        THE COURT:  What's the question?

25        MR. AMINI:  Your Honor, the question is all I have

8

1   is February 16th, so I'm pressing this witness and her

2   testimony is that besides this document as she sits here

3   today, she doesn't know -- she believes there are other

4   documents which we haven't seen. That's where I was going.

5   I'll move on.

6            THE COURT: All right.

7            MR. AMINI: I'll move on.

8   BY MR. AMINI:

9   Q   So, let me go back to the book value with you for a

10   minute, the $10 million dollars that you referenced.

11       That $10 million dollars, and I'm still confused about

12   this. That $10 million dollars was the credit bid part.

13           THE COURT: Wait. There's two $10 million dollar

14   figures. There's the credit bid and then there's the, what

15   looks like, well a loan. It looks like an equity infusion at

16   this point, it's an allocating equity base on it.

17           THE WITNESS: No, it was a new loan. It was a

18   revolving credit facility.

19           THE COURT: There's no question pending.

20           MR. AMINI: But I was going to ask --

21           THE COURT: There's two $10 million dollar figures

22   floating around in the two transactions.

23           MR. AMINI: That's what I understood. Let's start

24   with the first one, the book value one.

25   BY MR. AMINI:

```
 1  Q    It's the one that was associated with the book value.
 2  That was the credit bid the $10 million dollar credit bid.
 3  That was the term loan lender's money.
 4  A    It was a credit bid of the term lender's loan against
 5  the foreclosure sale on assets to which the term lenders had
 6  a lien on those assets.
 7  Q    And the $10 million dollars was going to be -- the term
 8  lenders were going to be compensated for that credit that
 9  they were giving up against TransCare with interest,
10  membership interest or corporate interest in your new
11  Transcendence entity, is that right?
12  A    It would have been membership interest in an LLC, yes.
13  Q    Were they going to be paid back as though it were a
14  loan to or they were just going to get membership interest?
15  A    No, they were getting membership interest in the new
16  entity.  The loan was a $10 million dollar revolving loan
17  from Archangels; that was a revolving credit facility to
18  either purchase the receivables and be secured by them or to
19  provide cash for expenses to later be secured by the
20  receivables and the assets of the company.
21          THE COURT:  Can I ask you a question, though.
22  Under the bill of sale which is Exhibit 102, and I'm having
23  trouble figuring this out.
24          THE WITNESS:  I got to find it.
25          THE COURT:  Let me just ask it.  Section 3 seems
```

1  to say that the purchaser is going to pay $10 million

2  dollars.  That's the purchaser, I guess, Transcendence of the

3  assets.

4          THE WITNESS:  I don't have the bill of sale in

5  front of me.

6          THE COURT:  It's Exhibit 102 in the --

7          THE WITNESS:  Okay.

8          MR. AMINI:  JX --

9          THE WITNESS:  If you can give it to me so that --

10          THE COURT:  JX what?

11          MR. AMINI:  102.

12          THE COURT:  I'm trying to understand this

13  transaction or the two transactions.

14          THE WITNESS:  And I will happily explain it to

15  you.  So if you look at the bill of sale and you look at

16  Section 3, agreement to pay certain outstanding indebtedness

17  under the credit agreement, that's where it says,

18      "The purchaser hereby agrees to pay $10 million dollars

19  constituting a portion of the principle amount outstanding of

20  under the TransCare credit agreement as of the date hereof."

21          So, this was the $10 million dollar credit bid

22  that reduced the term loan lenders from $45 million or $43,

23  if you take the two million out to $33 million.

24          THE COURT:  The trouble I'm having is this is the

25  second transaction.  Through the credit bid, the lenders

1   acquire the collateral.  The second transaction is the

2   collateral is sold to Transcendence.

3           THE WITNESS:  Right.

4           THE COURT:  So who is the $10 million dollars

5   being paid to under the bill of sale?

6           THE WITNESS:  PPAS is the agent for the lenders

7   foreclosed on the assets.

8           THE COURT:  Right.

9           THE WITNESS:  For a $10 million dollar credit bid.

10   PPAS then sold the assets to Transcendence for the equity in

11   Transcendence.  To make that company work, though, there

12   needed to be a revolving loan credit because it had no

13   receivables and no cash to pay its bills.

14           THE COURT:  But recital (e) seems to say that

15   Transcendence, the purchaser, is going to pay $10 million

16   dollars against the term loan.  That's what I'm having

17   trouble with.

18           THE WITNESS:  I believe that this is a recital and

19   it is not actually correct.  What it is saying that, you

20   know, Archangels will finance ten million, but the actual

21   credit bid, I mean what the recital meant to say is in

22   addition to the credit bid to make this company an operating

23   company because otherwise it could not have been, Archangels

24   will provide $10 million dollars revolver so that the company

25   can actually be a continuing operation.

```
 1              THE COURT:  That's not what this says.  In Section
 2   3 which is part of the agreement, not the recital, seems to
 3   also say that -- it says, the purchaser agrees to pay $10
 4   million dollars constituting a portion of the principal
 5   amount, et cetera, et cetera.
 6              THE WITNESS:  Right, but that's where it's a
 7   credit bid.  This is correct.  Section 3 is it's paying $10
 8   million dollars which is a portion of the principal amount
 9   under the TransCare.  It's paying $10 million dollars credit
10   bid.  It's giving $10 million dollars against the credit
11   agreement.  That's why when you see the proof of claim it's
12   $33 million and not $43 million.
13              THE COURT:  I know what the proof of claim says
14   and I know what the theory is, but it doesn't seem to be what
15   the document says.  Maybe it will become clear.
16   BY MR. AMINI:
17   Q    I was just going to use it, I have the same question
18   which is are they getting equity or are they getting their
19   loan paid or are they getting both?
20   A    They were getting equity in exchange for the loan and I
21   was putting up $10 million dollars for there to be a
22   continuing operation for there to be a chance at recovery.  I
23   mean it was a -- it says right here it's a credit bid.
24              THE COURT:  Where does it say credit bid in
25   Section 3?
```

1    THE WITNESS:  Well, it says $10 million dollars

2 constituting a portion of the principal amount outstanding

3 under TransCare credit agreement.  This is TransCare.

4 They're paying with $10 million dollars out of TransCare.

5    THE COURT:  This is Transcendence paying.

6    THE WITNESS:  Except it's being paid through the

7 TransCare credit agreement.  It is the -- this is the

8 agreement to transfer, so PPAS foreclosed on the loan.  And

9 then in exchange for $10 million dollars of forgiveness,

10 TransCare bought the assets.

11    THE COURT:  TransCare didn't buy the assets.

12    THE WITNESS:  I mean Transcendence bought the

13 assets.

14    THE COURT:  But Transcendence wasn't liable on the

15 loan.

16    THE WITNESS:  Transcendence then turned it into

17 equity.

18    THE COURT:  I understand that.

19    THE WITNESS:  Okay.  And TransCare got $10 million

20 forgiven.

21    THE COURT:  I would understand Transcendence

22 turning or -- TransCare or PPAS turning it into equity if,

23 notwithstanding the $10 million dollar forgiveness, the

24 lenders didn't get, basically didn't get the cash.  So,

25 they're getting equity in the new entity as opposed to cash.

1    But this document, and as I said, let's not get

2    bogged down with this any further, seems to say to me that

3    whatever else happened with the strict foreclosure, the next

4    transaction, the purchase and sale, Transcendence was

5    supposed to pay $10 million dollars to the term lenders or to

6    the (indiscernible).

7    THE WITNESS:  I mean that was not the transaction.

8    I designed the transaction, you know if the legal documents

9    don't explain it as clearly, they were getting equity in

10   exchange for the ten million and I was personally putting up

11   anther ten million to try to help them get some recovery

12   because in a forced liquidation, as we've seen, there was no

13   recovery.

14   And so, this was, me putting up new money so that

15   the term lenders could actually recover by ultimately selling

16   the assets of NewCo or the company of NewCo once it was given

17   the time to restructure and go forward.  It was the best

18   option when you had an ABL lender ready to stop funding on a

19   day-to-day basis.

20   THE COURT:  We're going beyond what I asked.  Go

21   ahead.

22   BY MR. AMINI:

23   Q    All right just to be -- well, I think we've done this

24   already.

25   So, the term lenders were getting $10 million dollars

1    of equity.  You were lending $10 million dollars through

2    Archangels III under what you've described to the new entity

3    Transcendence?

4    A    That is correct.

5    Q    And for that you were going to get the status of --

6    that was going to be a revolving loan, correct?

7    A    That is correct.

8    Q    And for that revolving loan, you were going to get your

9    loan paid back under the loan agreement that we saw?

10   A    If the company was able to pay it back in the end.

11   Q    And you were going to get 54.7 percent of the new

12   company for that loan?

13   A    No for that loan, I was getting 51 percent of the new

14   equity.

15   Q    That's right.  I forgot.  The remaining 3.7 percent you

16   were getting for the Ark II loan?

17   A    That is correct.

18   Q    And so, the Ark II loan when you say it was being

19   rolled over, I mean we have no documents about the Ark II

20   loan.  You will agree with me about that, correct?

21   A    I don't -- I can't agree with you because I'm not --

22            THE COURT:  Why don't you just ask the question

23   without the comment.

24   BY MR. AMINI:

25   Q    Do you have any documents that actually embodies the

16

1  rollover of the Ark II loans to Transcendence?

2  A    I believe there are drafts of the credit agreement that

3  does show that.  And then, of course, this document which

4  shows what was going to go on.

5  Q    And these were prepared by the same internal legal

6  staff that you're talking about: Brian Stephen and I forgot

7  the other two names.

8  A    Along with Randy Creswell, I believe, at the time and.

9  Q    And so, the Ark II loan was then going to also be a

10 loan -- Transcendence was going to assume that as a loan,

11 correct?

12 A    That is correct.

13 Q    Under the same terms as TransCare had or something

14 different?

15 A    It would probably have been at the same terms as this.

16 I don't have it in front of me.  I don't remember exactly

17 what the terms are.

18 Q    All right, you might remember it was part -- that was

19 that agreement that got signed on February 10th that was for

20 six and a half million?  I mean I can pull it up but I'm

21 trying to --

22 A    I'm talking about I don't have the Transcendence

23 agreement, the draft of the Transcendence agreement so I

24 don't know what the terms were.

25 Q    When you say the draft of the Transcendence agreement,

1  you talking about which agreement now?

2  A    I believe there was a draft of a Transcendence loan

3  document pulled together that never got executed.

4         THE COURT:  I think there are $10 million dollar

5  loan documents.

6         MR. AMINI:  There is, but I thought we were

7  talking about -- is that one the same one that applies to the

8  two million?  Is there one or are there two because now I'm

9  confused.  I'm sorry.

10        THE COURT:  Is there a separate document by which

11 or agreement by which Transcendence essentially assumes

12 TransCare's obligation for that $2 million dollars, is what

13 he's saying?

14        THE WITNESS:  Sitting here, I --

15        THE COURT:  Okay.  Let's move --

16        MR. AMINI:  All right.

17 BY MR. AMINI:

18 Q    And Ark II was also going to get its loan repaid and

19 equity in the new company?

20 A     If it got -- if the company got up and running, it

21 could have been just that nobody got repaid because this

22 NewCo never was successful.  But in the best of

23 circumstances, if this new money was able to create a highly

24 successful operating company, Ark II would have gotten its

25 money paid back and equity and so would have Archangels.

**A2238**

1    That was the price for the risk that was being taken to

2  build a NewCo and a successful company that could pay it

3  back.  There was also a big risk that I would lose all $12

4  million dollars.

5  Q    You didn't negotiate those terms with any of the

6  lenders?  These are the terms that you came up with on your

7  own, correct?

8  A    Which lenders?

9  Q    Any lenders.

10 A    I was responsible for the -- all the lenders as the

11 agent, and I came up with the terms.

12 Q    That would include Credit Suisse and First Dominion?

13 A    Yes.  I was entitled under the agency agreement to

14 operate for 51 percent of the lenders and with those

15 decisions and I did because I believe it was in the best

16 interest of all the lenders who would otherwise get zero.

17 Q    And, by the way, you were only going to be that agent

18 until March 3rd?

19 A    No, that's not true.

20      THE COURT:  It's the collateral agent, Zohar.

21      THE WITNESS:  I was PPAS remained the agent for

22 years.

23 BY MR. AMINI:

24 Q    But you were acting on the collateral, weren't you?

25 A    No, I was acting on the agency role as PPAS as the

1    agent for the lenders.

2    Q    Right.  I'll move on.

3              THE COURT:  This $10 million dollars that Ark III

4    was going to put in, that was a loan to Transcendence?

5              THE WITNESS:  That is correct.

6              THE COURT:  And Ark III was, it was

7    (indiscernible) would be paid back on that loan?

8              THE WITNESS:  I hoped that it would be paid back

9    overtime when we built a new company that could ultimately be

10   sold.

11             THE COURT:  And for the same loan that 51 percent

12   of Transcendence?

13             THE WITNESS:  That is correct.

14             THE COURT:  Okay.

15             THE WITNESS:  It was a high-risk loan.

16   BY MR. AMINI:

17   Q    I want to go over to the $10 million dollars for a

18   moment, the book value that we were talking about yesterday.

19   And, I guess, the PX-286 --

20             THE COURT:  Which book is that in?

21             MR. AMINI:  Good question.  It's in Proskauer's

22   binder, Your Honor.  I think we're going to have to put it up

23   on the screen because I believe, if I'm not mistaken, it was

24   a spreadsheet that was not -- let me move on.

25             Your Honor, it's here.  I thought we would need it

1  on the screen, but go to PX-286, one, two, three, the fourth

2  page in.

3          THE COURT:  What's the bates number at the bottom,

4  those three digits?

5          MR. AMINI:  519, Your Honor.

6          THE COURT:  Okay.

7  BY MR. AMINI:

8  Q    I believe this is the document that you told us the $10

9  million dollars originated from.

10  A     This was the original, the balance sheet, yes.

11  Q    Would you -- once again, the $10 million dollars was a

12  combination of what?

13  A     At the time, it was the receivables because I thought

14  we were going to buy them; the inventory, and the property,

15  plant and equipment. So, it was 8.165, 623, and the one

16  million one fifty-one.

17  Q    And other than this document, PX-286, is that recorded

18  anywhere else, your calculation of that ten million?

19  A     As I said, I'm not sitting here in front of every

20  document.  I can't tell you.  I've only looked at the

21  documents that have been put in front of me.  This was four

22  years ago.  And I don't remember every document that passed

23  and has been part of discovery here.

24  Q    Well, among other things, I was wondering whether you

25  took any steps to record these calculations and preserve them

1    somewhere?

2    A    In terms of a credit bid, I did.

3    Q    Okay.  Other than making the credit bid.  I mean like a

4    file that would say here's how we calculated.

5    A    The entire asset value of the company, other than the

6    receivables, was about $11 million dollars. This company was

7    not an asset rich company which is why it was so important to

8    try to have a continuing operation to be able to pay back the

9    term lenders.

10       This is not an asset rich company, other than the

11   receivables which were the security interest of Wells.  So,

12   if you even go to your October financial statements, you will

13   see that there's only $5 million dollars of current assets

14   other than receivables -- well, $5 million of assets

15   including PP&E in the -- for the entire company.

16       So, you have, other than receivables and other assets,

17   you have under $5 million dollars of assets for this company.

18   So, and as we've learned on a liquidation basis, there was

19   very little recovery for this company which is why I was

20   willing to put up high risk $10 million dollar money to try

21   to keep it a continuing operation in some form so that there

22   would be recovery for the term lenders.

23   Q    The assets that you just referred to, you're referring

24   to the assets that we see on the balance sheet of the

25   company, correct?

```
 1  A     Well that is how one normally has the assets of a
 2  company is through its balance sheet.
 3  Q     You do that through, I think the terminology is the
 4  lower of costs or market, something like that, correct?
 5  A     I'm not certain --
 6              THE COURT:  This is book value.
 7              THE WITNESS:  This is book value.
 8  BY MR. AMINI:
 9  Q     Oh yes, you do the book value when you're looking at
10  the assets and the balance sheet that's lower.  It's either
11  cost -- it's either mark to market or it's cost, something of
12  that nature, correct?
13  A     I don't -- you know without looking at their financial
14  statements, usually it's book value.  That's why you see all
15  this depreciation.
16  Q     I was going to ask -- your understanding is, is this is
17  the book value what we're looking at?
18  A     That is correct.
19  Q     So, let me because I want to go back to something that
20  now I'm also confused about.  You foreclosed on the stock of
21  two companies, TC Ambulance --
22              THE COURT:  Three companies: Pittsburgh, Hudson
23  Valley, and TC Ambulance, right?
24              MR. AMINI:  That's right.  I apologize.
25  BY MR. AMINI:
```

1  Q      Pittsburgh, Hudson Valley and TC Ambulance, that's

2  right.  Two of those companies had certificate of needs.

3  They operated in New York and they needed certificates of

4  need.  Do you recall that?

5  A     TCA did not need a certificate of need.  You needed --

6  Pittsburgh had a certificate of need that you needed to

7  operate and Hudson Valley had a certificate of need.

8  Q     I won't dispute with you based on this.  There's

9  recordation of the sales of these things in this case which

10 are in the record.  But let's just stick with there were two

11 cons in there.

12       You took the stock because you needed those

13 certificates of need, didn't you to operate?

14 A     Yes, we needed those, but for Pittsburgh the MTA owned

15 the con for transit.  We were just a service provider for

16 TCA, so that was not owned by the company.

17 Q     I wasn't suggesting that the MTA contract had a --

18 associated with it, that was owned by the company.  I was

19 thinking about Hudson Valley actually and the certificates

20 you needed, but I don't really want to debate how many.

21       My question really for you is what steps did you take -

22 - that wasn't on the balance sheet, right?  The certificate

23 of need is nowhere on the balance sheet.

24 A     Unless it's in other assets, I don't, you know, I don't

25 know how the company accounted for their certificates of

1   need.

2   Q     But you understood that they were of some value?

3   A     If they -- at the time, really, not the type of value.

4   You needed them to operate the business and Wells was well

5   aware we needed to take those cons to run the business and

6   they were okay with that transfer.

7   Q     What steps, if any, did you take to value those assets,

8   the certificate of needs?

9   A     We didn't take any steps to value those assets.

10  Q     Did you make any attempt to value any intangibles that

11  you were taking?

12  A     I didn't --

13          MR. MERVIS:  I just object to the form, Your

14  Honor.  Intangibles is such a --

15          THE COURT:  Well, I'll overrule the objection.  I

16  mean the question initially focused on the certificate of

17  need which, I guess, are a type of intangible asset which

18  gets in the --

19          MR. MERVIS:  Well, you're right, Your Honor.  I

20  guess --

21          THE COURT:  A license.

22          MR. MERVIS:  I guess what I'm -- yesterday, Your

23  Honor made the observation that, you know, what was

24  foreclosed upon is a legal question.

25          THE COURT:  You told me the certificate of need

1    were foreclosed on.

2              MR. MERVIS:  Were not, yes.  And that's what I'm -

3    -

4              THE COURT:  So how can they operate without

5    certificate of need?

6              MR. MERVIS:  Do you want me to do that and I'll --

7              THE COURT:  No, because the foreclosure on the

8    stock doesn't give you the assets in the equity.

9              MR. MERVIS:  Your Honor, the -- so the question

10   from the court --

11             THE COURT:  I'm not asking a question.  It's just

12   --

13             MR. MERVIS:  Yes, so --

14             THE COURT:  The witness has testified that the

15   certificate of need were foreclosed on.  Well, they were used

16   by to operate.

17             MR. MERVIS:  Used to operate is not the same thing

18   as foreclosed.

19             THE WITNESS:  They were transferred --

20             THE COURT:  But you told me yesterday that they

21   were not part of the bill of sale.

22             MR. MERVIS:  That's correct, Your Honor.

23             THE WITNESS:  They weren't.

24             MR. MERVIS:  And, look, well I'll do this in our

25   briefing but I'm telling you that and I have a reason to tell

1   you that.

2              THE COURT:  All right.  The objection is

3   overruled.  Go ahead.

4   BY MR. AMINI:

5   Q     So did you make any attempt to locate, ascertain any of

6   the intangibles and value?

7   A     No, I used the balance sheet to value.

8   Q     The MTA contract wasn't on the balance sheet, correct?

9   A     The MTA contract was not on the balance sheet but the

10  revenues and the income were in the income statement which

11  was also used to value.  It was a check and balance.

12  Q     When you say your income statement was used to value,

13  what are referring to now?

14  A     I'm referring to the fact that we also put three

15  divisions together into a NewCo and to look at the EBITDA of

16  that NewCo that included the Transit contract and then use

17  that EBITDA, based on the value of NewCo to do a check to

18  make sure that the price was fair.

19  Q     You were familiar with the fact -- I think we've

20  established this already, and just to be sure -- that at

21  least one suiter out there, National Express, had repeatedly

22  expressed interest in purchasing the MTA contract on a

23  standalone basis.

24  A     For six to seven million dollars, yes.  And I also

25  explained that had I allowed them; the rest of the company

1   would have gone into liquidation.

2   Q    And so, even with that knowledge, did you -- with that

3   knowledge, did you think that maybe steps should be taken to

4   try to ascertain the value of the MTA contract in the

5   foreclosure that you were undertaking?

6   A    The value of the contract was valued in the value of

7   NewCo which was ten million, plus another twelve million

8   which was $22 million dollars of capital being put up to buy

9   a little over of two million of EBITDA.  The credit bid was

10  valued on the balance sheet.  NewCo was valued based on the

11  credit bid and the new cash going into the company.

12  Q    All right, let me go back to where we were looking at

13  the summary balance sheet which is part of PX-286 and you've

14  explained to me how you come up with your $10 million dollars

15  and I assume you came up with that, at least, on or about

16  February 13th because that's the date of PX-286, is that --

17  am I correct about that?

18  A    I believe it was between the 13th and the 16th which

19  was the date on that email with the calculation.

20  Q    And did you -- were you the one who would determine

21  that you would take the value for the credit bid that you

22  would establish the value of the credit bid based on this

23  method that you've described of adding up these items on the

24  balance sheet?

25  A    On the credit bid, yes, that was me.

```
 1   Q    And so, all right, well -- and when did you recall that
 2   you did it this way?  Did you know this all along or for
 3   preparing for trial, did you go ahead and --
 4              THE COURT:  I don't understand that question.
 5              MR. MERVIS:  Yes. You beat me to it.
 6              MR. AMINI:  Well, all right.
 7              THE COURT:  I'll also sustain my objection.
 8              MR. MERVIS:  Thank you, Judge.
 9   BY MR. AMINI:
10   Q    Let me take you, in this case, I deposed you on I don't
11   know, October 29th, 2018.  And I want to take you to your
12   deposition.  Principally, it's in the first --
13              THE COURT:  Just ask her a question.
14              MR. MERVIS:  Your Honor, there's no question.
15              THE COURT:  Just ask her a question.  If she gives
16   a different answer, say were you asked this question, did you
17   give this answer.
18              MR. AMINI:  I just need to find it, Your Honor.
19   It's very long, Your Honor.
20              THE COURT:  Why don't you ask her a question
21   first.  Maybe she'll give you the same answer.
22   BY MR. AMINI:
23   Q    Well wasn't the $10 million dollars the amalgamation of
24   the assets of the MTA, the assets of Hudson County, the
25   assets of Pennsylvania together less than those receivables
```

1  because that belonged to Wells?

2  A    Yes.

3  Q    And the book value you were using at that time was of

4  the ambulances of Hudson County and Pennsylvania because

5  those were the only ambulances you were taking?

6  A    We took all the ambulances that belonged to the term

7  lenders because most of them were not in any kind of shape

8  for the future.  They were going to be used to wind-down

9  OldCo and then the ambulances that were still in good order

10 would have been used to run NewCo.

11 Q    I want to go back to the prior answer. So, now, as I

12 understand it, you agree that the $10 million dollars was

13 simply the assets less the receivables.  That how you came to

14 it?  I mean just -- well, I just need to establish that and

15 I'm done.

16 A    No because the receivables were put into this one when

17 I first did the calculation.  If I did not, it would have

18 been only a few million dollars.  Because as I said to you,

19 the PP&E for the entire company was $3 million dollars and

20 the inventory for the entire company was only $2 million

21 dollars.  So, the entire company only had $5 million dollars

22 of asset value.

23      When I first did this, I did count the receivables,

24 otherwise the number would have only been a couple of million

25 dollars.

1    Q     And what you've just testified to, you've known since

2    you were -- because you were the one who designed this method

3    to value these assets, correct?

4    A     I have credit bid numerous times in the past and we

5    always credit bid based on the book value of the assets at

6    the time.  And that is the methodology. When I went back to

7    see this, I actually credit bid including the receivables

8    even though they did not belong to us.

9              THE COURT:  So, the $10 million dollars included

10   the receivables.  That's what you said.

11             MR. AMINI:  Yes.

12   BY MR. AMINI:

13   Q     And I want to take you to page 127 of your deposition

14   which you can look at.  It's in the first volume of our book

15   and it's the first item.

16        And if you go -- we went back and forth between 122 and

17   127, so there's a -- but I'm principally interested in my

18   question at the top of 127, once you get there.

19        And the question I had at that time is starting at line

20   3 is,

21        "What I'm looking for is, did someone in your

22   reorganization add up these assets and say hey, it comes to

23   just about $10 million dollars."

24             THE COURT:  Wait a minute, there was an objection.

25             MR. AMINI:  Yes, there is.

1          THE COURT:  What's the objection to

2    (indiscernible)?

3          MR. MERVIS:  Your Honor, I didn't (indiscernible).

4          THE COURT:  So on page 127, the question starts on

5    line 3, ends on line 6 and then object to the form of the

6    question.

7          MR. MERVIS:  I think my objection, I can't

8    remember now.  I think it was to the phrase -- well, it has

9    been a while, Judge, right.  I think I was objecting to the

10   words these assets because I'm not sure that he had laid a

11   sufficient predicate, but I can't do any better than that now

12   because --

13         THE COURT:  I'll overrule the objection.  I'll

14   take it for what it's worth.  The reference to assets is a

15   little ambiguous because I don't know what assets you're

16   talking about.

17         MR. AMINI:  The witness will tell me

18   BY MR. AMINI:

19   Q    And the answer, your answer starting at line 9 is:

20        "I've already answered you.  We took assets from MTA,

21   from Hudson County, and from Pennsylvania.  We wanted an open

22   balance sheet, fresh start accounting.  Those assets added up

23   to approximately $10 million and that is in the opening

24   balance sheet.  It is the amalgamation of the assets of MTA,

25   the assets of Hudson County, the asset of Pennsylvania

1  together, less receivables, because that belonged to Wells."

2      Did I ask you that?  And I can read the rest of it too.

3  I'm not meaning to keep it up for any, in fairness purpose.

4  If counsel wants, we'll read it through.

5          MR. MERVIS:  Actually, yes.  What I'd like you to

6  --

7          THE COURT:  What else do you want him to read?

8          MR. MERVIS:  Yes.  In fairness, Your Honor, I'd

9  like him to read the question and answer on page 129 starting

10 at line 11 and going to line 18.

11         THE COURT:  Okay.

12         MR. AMINI:  "And is there a worksheet within your,

13 have you seen a worksheet within your organization that added

14 those all up to come up with the ten million?"

15         And the answer:

16         "The work was done at that time.  It was put into

17 an opening balance sheet.  I have not recently seen the

18 worksheet, but the work was done."

19 BY MR. AMINI:

20 Q    Were you asked those questions?  Did you give those

21 answers?

22 A    I did.

23 Q    That's the only question.  Thank you.

24 A    And, obviously, I made a mistake because I overpaid for

25 the assets because I included the receivables.  Had I taken

1  out the receivables, the opening balance sheet would have

2  only been a couple of million dollars.

3      Because this was not an asset rich company, its future

4  value was based only on an ongoing continuing business which

5  is what I tried to create.

6  Q    I want to go to, I think, just a couple more documents.

7      I want to go back to DX-166 which if I'm not mistaken

8  is in the Proskauer binder, am I right.  And we're going to

9  have to put this one up on the screen because it's produced

10 natively and it's impossible to read.

11          MR. MERVIS:  I'm sorry, counsel.  What exhibit

12 number?

13          MR. AMINI:  DX-166.

14          MR. MERVIS:  PX?

15          MR. AMINI:  No, D.  D like David.

16          Your Honor, again, this is one that unfortunately

17 the book is not going to help us because it just simply does

18 not have the capacity to hold the information that I'm

19 interested in looking at.

20 BY MR. AMINI:

21 Q    This way -- by the way, you can look in the book at the

22 hard copy before I go to the Excel spreadsheet.

23 A    I'd like to do that too following you here.

24 Q    It's just to refresh your recollection as to what it

25 was.  It was Monday, February 26th -- 22nd, I'm sorry.  Mr.

```
 1  Agarwal (phonetic) was sending you this and this was the
 2  updated version of the TransCare model.
 3  A     The TransCare NewCo model, but let me just read so that
 4  I have the context of the assumptions.
 5  Q     And I'm interested, I will just tell you, that and
 6  actually Mr. Agarwal's statement that this model does not
 7  include any expenses, charges related to corporate overhead
 8  at the NewCo level which you testified to yesterday.
 9         So when you're ready, Ms. Tilton, I'll proceed.
10  A     Okay.
11  Q     Now as I understood it your testimony, thus far, is
12  this EBITDA number that is on this.  I remember this 3.2 for
13  some reason for the -- the total one.
14  A     Yeah, I think you have to go further to the right.
15  Q     Right.  And I can only control that.  But the 3.2
16  EBITDA you testified yesterday there were a couple of
17  different spots in response to one of my questions, you said
18  you needed to reduce that by $750,000 dollars to account for
19  corporate overhead.
20  A     And that is just a projection.  Okay.  That wasn't the
21  actual.  You know, the actuals for the entire company were
22  2015 were about two million of EBITDA.  Okay.  So, this was a
23  projection based on what I believe that we could do with the
24  NewCo and then that projection needed to be reduced by about
25  $500- to $750,000 dollars, depending on how much work and
```

1  overhead.  My guess it's closer to 750.

2      But I do need you to understand that this was a

3  projection for 2016 based on actions that would be taken,

4  because as you see your revenues are growing and your

5  expenses are being cut.  That was not the actual performance

6  of those entities at the time.

7          THE COURT:  Now, Ms. Tilton, if you confine

8  yourself to answering the question.

9          THE WITNESS:  Okay.

10          THE COURT:  We'll get out of here a lot faster.

11          THE WITNESS:  Okay.

12  BY MR. AMINI:

13  Q    So and more or less in there embedded with my second

14  question is you told Mr. Mervis at some point because I had

15  the benefit of a transcript last night that it was $6 to $750

16  that you would take out of it.  And, right now, you said $5

17  to $750 so I understand.

18      The corporate overhead was an estimate of sum --

19          THE COURT:  What's the question?

20  BY MR. AMINI:

21  Q    So the question -- there were three entities you

22  taking, Hudson Valley, Pennsylvania and MT, correct?

23  A    TCA, yes.

24  Q    All three had the administrative personnel for the

25  specific division and when you're talking corporate overhead,

1  you're talking a CEO and a CFO above all?

2  A    And a headquarters and a head of HR, anything that's

3  needed to actually run an entire company.

4  Q    And just out of curiosity, is Glenn Youngblood, do you

5  know, because he was your new president and you already

6  anointed him the president, and he was in there running

7  things.  So, was he in these numbers or was he excluded at

8  this point?

9  A    He was excluded from those numbers.

10  Q    All right, so he's -- and so, I guess, what I want to

11  know is you needed an overhead and you needed an office, but

12  these potential purchasers that were out there that you knew

13  about, RCA, for example, Mr. Weinberger introduced himself to

14  you as the CEO of RCA.  He wouldn't have needed a corporate

15  headquarters, would he?

16          THE COURT:  In other words, the question is a

17  potential strategic purchaser wouldn't incur these overhead,

18  additional overhead expenses because they already had a

19  corporate overhead?

20          THE WITNESS:  That is true.  They would have been

21  able to combine this without a corporate overhead.

22  BY MR. AMINI:

23  Q    All right.  And then the only other thing I have for

24  you is and I noticed this later, if you look at this, this

25  3.2 is for ten and a half months.

1   A      You have to roll back.

2   Q      Roll it back.  Max, if you can roll it back.

3          And I can take you to footnotes because I had to read

4   them last night.  But you're starting with nine days in

5   February of 2016 and you're going because the assumptions,

6   which I can find in the brief somewhere, and you're going to

7   December 31st of 2016.  And just as a prefatory you

8   understand that these multiples that we've been talking about

9   that your multiple times EBITDA, you multiply it to a four-

10  year EBITDA.

11  A      Can you please roll down so that I can actually see the

12  performance?

13  Q      Perhaps, scroll -- do what Ms. Tilton asked.

14  A      So this would have been for ten months plus nine days.

15  That is correct.

16  Q      All right, so if you -- and I was looking at your

17  EBITDA and your, you know, your revenue as you like to say

18  and I was noticing that it's a progression that gets larger

19  as the months go on so that you started at a negative, I

20  think, in the first month, and by the time you're in December

21  it's close to $500,000 dollars.

22  A      Because that is what our projection was that we thought

23  if we could increase the transit revenues which we were

24  discussing with the MTA people to get additional, but that

25  was not the performance of those three divisions at that

```
 1  time.  That was my projection of what we might be able to do

 2  that would allow me to be willing to put up $10 million

 3  dollars of fresh capital to try to save NewCo.

 4  Q    But based on this model that your people or you created

 5  if you add those a month and a half your EBITDA is four

 6  million, perhaps even more.

 7  A    No, because it actually lost money in the first two

 8  months.

 9  Q    I'm sorry.

10            THE COURT:  He's saying if you annualized it.

11            THE WITNESS:  Yeah, but it's just a projection.

12            THE COURT:  We understand that.

13            THE WITNESS:  If I -- I mean if I annualized the

14  numbers --

15  BY MR. AMINI:

16  Q    You would add January and February 2017.

17  A    But, again, it was a projection based on based on

18  improvements in the company and improvements in revenues.

19  You don't sell a company on projections.  You sell a company

20  on its actuals and its actuals were negative.

21      (Participants conferring)

22            MR. AMINI:  I have nothing further.

23            MR. MERVIS:  Can I just ask that the spreadsheet

24  be kept on the screen?  Thank you.

25            THE COURT:  Go ahead.
```

```
 1              MR. MERVIS:  Thank you.

 2              THE COURT:  Limit it to his redirect.

 3                      RECROSS-EXAMINATION

 4   BY MR. MERVIS:

 5   Q    So, Ms. Tilton, if you look at the EBITDA numbers that

 6   Mr. Amini was just taking you through and he noted that

 7   wasn't a full year.  Now, we don't have the January number

 8   here -- sorry.  The January '16 number here.  But based on

 9   your understanding of what the company was doing and based on

10   the number that you see for February of '16 is there any

11   chance in the world that the January number was a positive --

12   the January '16 number was a positive number?

13   A    The January --

14              THE COURT:  January '16 or January '17.  The

15   company didn't exist then.

16              THE WITNESS:  The three entities did.

17              MR. MERVIS:  The three entities did not.

18   BY MR. MERVIS:

19   A    So the three entities lost money in January. As you can

20   see even in March, we only think we're going to do 126,000

21   dollars.  If you annualize the $126,000 dollars, you'd be

22   closer to $1.5 million.  The growth was based on projections

23   of what we felt we could do to reduce the cost of doing

24   business and grow the Transit business.

25         This was purely for my purposes to see if I was willing
```

40

```
 1  to put up $10 million dollars of new money and if I had a
 2  chance of getting that money back.  No one would have
 3  purchased the company based on this because it's a hockey
 4  stick projection.
 5       When you sell a company, you sell on actuals and you
 6  sell on, you know, some sort of projection that people can
 7  believe in based on business.  This was done for me so that I
 8  would be willing to put in ten million of new money.  The
 9  company was losing money.  The entire company only did about
10  $2 million dollars of EBITDA, the entire of 2015.  And had $7
11  million dollars of negative cash flow.
12  Q    So if you were to take the three entities, right, and
13  include January in the model here, what effect would that
14  have had on the total EBITDA?
15  A    For the projection?
16  Q    Yeah.
17  A    If you took actual January and February, you would have
18  been down another $4- or $500,000 dollars.
19            THE COURT:  But Mr. Amini's point is the company
20  in January 2017 is a stabilized company --
21            MR. MERVIS:  I understand his point, Your Honor.
22            THE COURT:  So that if you projected out to a full
23  year, the projected EBITDA or revenue for January 2017 would
24  be higher than the revenue or lack of revenue for January
25  2016.
```

41

```
 1              MR. MERVIS:  I understand the point.  There's just
 2  two pieces to this.
 3              Just a few more, Your Honor.
 4  BY MR. MERVIS:
 5  Q     In TransCare, the equity ownership -- the piece that
 6  you had, you held it through one of your investment vehicles?
 7  A     From Ark II.
 8  Q     Okay.  Or AIP?
 9  A     Both.
10  Q     Yeah.  And what was the -- what was your total
11  percentage in TransCare roughly?
12  A     About 65 percent.
13  Q     So you'd be going to the (indiscernible) you'd be going
14  from that percentage to around 54?
15  A     I would have had a lesser percentage in Transcendence
16  that I had in TransCare itself.
17  Q     Mr. Amini -- and actually if you could open your, the
18  deposition transcript for a minute to page 129.  Mr. Amini
19  read to you the question and answer at lines 11 through 18
20  and you made reference to -- he made reference to a worksheet
21  and you answered it.  Do you remember if he showed you that
22  worksheet at any point during the deposition?
23  A     He did not.
24              MR. MERVIS:  Can I just have a moment to confer,
25  Your Honor?
```

```
 1        (Participants conferring)
 2   BY MR. MERVIS:
 3   Q     One final question.
 4        In order to achieve the projections in your NewCo model
 5   approximately how much new money had you forecasted that you
 6   required?
 7             MR. AMINI:  Are we not outside the balance of
 8   direct?
 9             THE COURT:  No, we were talking about the $10
10   million dollars.
11             MR. AMINI:  Is this something beyond the $10
12   million dollars?
13             MR. MERVIS:  No.  No, it's not the other ten --
14             MR. AMINI:  My objection is I'm not sure what it
15   had to do with my examination.
16             THE COURT:  Well, we asked a lot of questions
17   about the funding of the entity and I thought that's what the
18   $10 million dollar three loan was supposed to be.
19   BY MR. MERVIS:
20   A     The company was going to start with no receivables.  It
21   had no ability to pay any expenses on day one without $10
22   million dollars of fresh money.  And then again that money
23   needed to fund a company which had to show improvements of
24   significance, both in terms of revenue increases, as well as
25   in expense reductions based on a more efficient running of
```

1  the business.

2      And so, it was a projection.  But the company could not

3  have started out without any new cash.  It needed, at least,

4  ten million to replace the receivables.

5  Q    So if no money was available what would have happened

6  to these three division?

7  A    They would have been part of the liquidation and we've

8  seen what happened with the value of the assets in these

9  three divisions.

10         MR. MERVIS:  Your Honor. Sorry.  Can you

11  (indiscernible) one more time.

12       (Participants Conferring)

13         MR. MERVIS:  Nothing further, Your Honor.

14         THE COURT:  I have just one question.  The $10

15  million dollars that Ark III is going to loan, is that going

16  to be secured by Transcendence assets?

17         THE WITNESS:  Yes.

18         THE COURT:  Well the term lenders already have a

19  $35 million dollar lien on those assets, doesn't it?

20         THE WITNESS:  Let me correct.  Well, first of all,

21  it was going to be by the inventory receivables, it was an

22  ABL revolving credit facility, so which is primarily

23  receivables.

24         THE COURT:  Okay.  But --

25         THE WITNESS:  So, it's taking Wells' place in the

1  receivables.

2          THE COURT:  All right.  And the term lenders

3  certainly didn't have a lien on Transcendence receivables?

4          THE WITNESS:  No, they did not.

5          THE COURT:  But what about the equipment?

6          THE WITNESS:  No, it was just a revolving credit

7  facility, an ABL facility.

8          THE COURT:  And it wasn't secured by the or wasn't

9  contemplated to be secured by the equipment?

10          THE WITNESS:  No.

11          THE COURT:  Okay.  Thank you.  You can step down.

12          THE WITNESS:  Thank you.

13      (Witness excused.

14          THE COURT:  I guess we're still in your defense.

15  Do you have any more witnesses?

16          MR. MERVIS:  No, Your Honor.

17          MR. AMINI:  We were going to bring back to Dr.

18  Arnold --

19          THE COURT:  Why don't we take a ten-minute break

20  and then you can bring back Dr. Arnold.

21          MR. AMINI:  He's here.

22          THE COURT:  Okay.

23      (Recess at 11:27 a.m.)

24      (Proceedings resume at 11:41 a.m.)

25          MR. AMINI:  Your Honor, we call Jonathan Arnold

1   back to the stand.

2          THE COURT:  Okay.

3          MR. MERVIS:  Your Honor, before we do that, I have

4   an application.  As you know, I took Dr. Arnold's deposition

5   and based on that and based on the addendum to his report

6   that we received I think I know what the testimony is going

7   to be.

8          And my objection -- and I will explain very

9   briefly what my objection is.  This isn't rebuttal testimony.

10  Let me explain why.  The exercise that Dr. Arnold engaged in,

11  and its actually in the slides themselves, is he's responding

12  to what he says were criticisms that Mr. Dunn made of his

13  approach to the comparable company analysis in his report and

14  in his deposition.

15         We've now had Mr. Dunn's testimony in this

16  courtroom.  All of the criticisms that Dr. Arnold perceived

17  none of them were testified to by Mr. Dunn.  So, we can

18  start, but my concern here is I'm going to be jumping up a

19  lot because none of this is actual rebuttal.

20         THE COURT:  Why don't we do this, since I don't

21  know what he's going to say, unlike you --

22         MR. MERVIS:  Right.

23         THE COURT:  -- I can't make that judgment.  Why

24  don't you just have a standing objection and let's hear what

25  he has to say.  And you can always argue that --

```
 1              MR. MERVIS:  I'll argue.

 2              THE COURT:  -- all of it, or most of it, or this

 3    part of it was not rebuttal; it was just a new report,

 4    basically, that he decided to do because of shortcomings

 5    perceived in his original report.

 6              MR. MERVIS:  That's fine, Your Honor.  Again, I

 7    just wanted to raise the issue.

 8              THE COURT:  All right.  That objection will be

 9    preserved.  Go ahead.

10              Dr. Arnold, you're still under oath, do you

11    understand that?

12              THE WITNESS:  I do.

13              THE COURT:  Okay.  Do we need his old binder or do

14    you have something new?

15              MR. AMINI:  No.  I just have three specific items.

16    You marked them, actually.  I don't know if I'll use all of

17    them.

18                         DIRECT EXAMINATION

19    BY MR. AMINI:

20    Q    Dr. Arnold, you sat through most of the trial, correct?

21    A    Yes, I have.

22    Q    You were not here for Mr. Dunn's testimony, were you?

23    A    I was not here that day, yes.

24    Q    You, of course, read his report?

25    A    I have.
```

```
 1  Q     And you've read the transcript of his testimony?

 2  A     Yes, I have.

 3  Q     Okay.  And you're aware of his criticisms of your

 4  comparable company method, are you not?

 5         MR. MERVIS:  Objection, Your Honor.  Where?  At

 6  trial or some other time?

 7         THE COURT:  Why don't we just say are you aware of

 8  his trial testimony.

 9         THE WITNESS:  Yes.  I am aware of his trial

10  testimony.

11         THE COURT:  Ask him another question.

12  BY MR. AMINI:

13  Q     So, at the trial -- did you see at the trial that he

14  criticized your comparable company method?

15  A     Yes, I did.

16  Q     And what did you understand the extent of his

17  criticisms to be?

18  A     I understood his criticisms to be that the enterprise

19  value to four EBITDA multiple that I estimated should be

20  adjusted down for various factors that were attributes that

21  TransCare possesses in contrast to the characteristics of the

22  comparable company sample.

23  Q     And what characteristics did you understand him to

24  focus on?

25  A     He talked about small companies going for a lower
```

1  multiplier. I think he also mentioned that firms under

2  various forms of distress would also trade for lower

3  multiples.

4  Q    And have you taken any steps, all right, to investigate

5  his criticisms?

6  A    Yes.

7  Q    All right. And what, specifically, did you undertake

8  to do?

9  A    I have it laid out in a little more detail in one of my

10  slides, but just briefly, as an overview, I went to the

11  capital IQ data set that the people have referred to,

12  including me, over the course of the trial. And I selected

13  companies that had the same coding or description of their

14  industry type and SIC code that TransCare has. I pulled all

15  those companies out. I then culled the data set -- that was

16  about 177 companies.

17       I then culled that data sets down to those that had

18  complete statistics. Some of them didn't file financial

19  statements and things like that or didn't have complete

20  information. And some of them did not have analyst coverage,

21  so those were excluded. So, the remaining ones had analyst

22  coverage that had estimates of next twelve months EBITDA and

23  other statistics that were used in my analysis. That reduced

24  the set to sixty-nine companies.

25       Then I looked at those sixty-nine companies and

1   identified the group that was the smallest twenty-five

2   percent and did an analysis of the EBITDA multiples on those.

3   I also looked at the companies that were in most distress or

4   had the lowest operating performance, other characteristics

5   that Mr. Dunn testified to.  They were, at least, mentioned

6   in his report.

7        He identified four. I don't remember whether he

8   specifically identified each of those four in his testimony,

9   but I created four sub-categories matching the description

10  and criticism that Mr. Dunn has made previously.  Then, based

11  on those results I computed the range of enterprise value to

12  forward EBITDA multiples for each of those four categories

13  and reached a conclusion.

14  Q    Okay.  And why did you estimate the range of those?

15  A    Well, I took Mr. Dunn's theorizing seriously.  He has a

16  hypothesis that companies need for categories traded for

17  lower multiples then the ones that emerged from Mr.

18  Greenberg's two comparables.  I then -- the nice thing about

19  it is that is subject to an empirical test or empirical

20  analysis.  So, I went and looked at the publicly traded

21  companies in each of these four categories to see whether, in

22  fact, it is empirically true that in this industry at this

23  time companies that are small, or in distress or have low

24  operating performance, in fact, trade at lower multiples.

25  Q    What you did is described, is it not, in Slides 29

1  through 35 which is marked as DX-196?

2  A    Yes.

3  Q    Okay.  Just so we're -- you've already described what

4  you did on Page 29.  This where you selected the -- you came

5  up with 170 some companies and sixty-nine had data.

6  A    Yes, that's right.

7  Q    All right.  And then these are the actual sixty-nine

8  companies listed on Page 30?

9  A    Correct.

10  Q    Then on Page 31 -- well, explain what Page 31is?

11  A    Page 31 describes, in a little more detail, how I

12  identified companies that were at the small end and companies

13  that had low operating performance, how I looked at companies

14  that were in distress and how I identified companies that

15  were under-capitalized.  Those are the four subcategories of

16  overall low performing or small companies.  That was the four

17  sets that I then filtered down to.  I took these sixty-nine

18  and filtered down into these four sub-categories.

19  Q    So, if you go to Page 32 what does that represent?

20  A    Slide 32 is a graphic depiction of the range of

21  enterprise value to forward EBITDA multiples for these four

22  categories show in blue, and then at the very bottom I show

23  the range of 7.0 to 12.5 which is what I had in my original

24  report and testimony.

25  Q    Can you explain to me and to the court, of course, that

1   -- let's just start with the smaller companies.  What does

2   that bar actually represent?

3   A     That bar represents the range of enterprise to four

4   EBITDA multiples for the middle fifty percent of the

5   distribution.  So, I have a lot of companies.  I looked over

6   at it over four different dates; the early January date, the

7   two dates later in January as well as February 24th.  That

8   gets you a range.  And recognizing that some companies can be

9   outliers and have specific unique characteristics that are

10  driving a number either very low or very high I take the

11  middle fifty percent of the distribution and depict it here

12  in this bar.

13       So, the 6.1 X multiple at the low end for smaller

14  companies represents the multiple for a company in the

15  twenty-fifth percentile of the distribution and the 17.0

16  shows the enterprise value to forty, but a multiple for a

17  company that is at the seventy-fifth percentile of the

18  distribution.

19       I have all the other details in my worksheets if anyone

20  wants to look at it and I'm happy to explain it, but that is

21  what I did for smaller companies.

22  Q     And the worksheets are the two items that are in front

23  of you as DX-197 and 198?

24  A     Correct.

25  Q     Roughly, how many companies -- of the sixty-nine, these

1  are -- when you say smaller companies these are the -- they

2  all told, the group that you looked at that you put in the

3  category of smaller companies are they the bottom twenty-five

4  percent or something else?

5  A    No, it's a little different. I think here we should go

6  to the DX-197 which shows the detailed constituents of how I

7  built up to these numbers.  I would invite you to look at

8  Page 6.

9  Q    And what does that Page 6 -- what does Page 6 of PX-197

10 --

11          THE COURT:  Do you have 197?

12          MR. AMINI:  I thought I -- I'm sorry, Your Honor.

13 This is 198.

14          THE COURT:  Oh, I see.  I'm sorry.

15          THE WITNESS:  Yeah.  So, out of this set of sixty-

16 nine companies --

17 BY MR. AMINI:

18 Q    Let's go back to Page 6.

19 A    I'm sorry.  I'm on Page 6 of Exhibit DX-197.  The rule

20 for identifying the smaller companies is firms that are in

21 the lowest cortile of revenue and also the lowest cortile of

22 EBITDA out of the entire sample of sixty-nine.  So, when I

23 look at that I get the companies that are on this list

24 starting with Press Ganey Holdings down to StarTech.  And if

25 we highlight the box on the lower left where it says summary

1  statistics, there we go, that shows the detail of the

2  minimum, maximum enterprise value to four EBITDA multiples,

3  for the entire data set; that's the first column.

4      If we just look at the companies that are "small", the

5  ones that are listed here, we get the range of 4.6 up to

6  22.2.  That is across all the dates.  If someone is

7  interested in looking at the ranges for any particular date

8  we could do that.  If we look at the very last column,

9  February 24th, 2016 you will see that the full range goes

10 from 4.6 up to 19.4, but the middle fifty percent goes from

11 the 25th percentile of 5.1 up to the seventy-fifth percentile

12 of 15.7.

13     So, all the detail is contained in these back-up

14 materials.

15 Q    Are we on sixty-nine or are we on the thirty-four?

16 A    This is the sixty-nine.  So, this is me screening based

17 on the way Capital IQ identifies TransCare.  TransCare is in

18 their data set and it codes them as being part of an SIC

19 code.  It also attaches two industry groups to TransCare.

20 So, I'm using that as my screening mechanism.

21 Q    So, if I took you through each of these categories,

22 companies with low operating performance, distressed

23 companies, under capitalized companies, is it the same

24 analysis?

25 A    Yes, it is.

1   Q    Can you explain it again, Dr. Arnold?

2   A    Sure.  So, I take the sixty-nine companies.  And to

3   identify the small companies, let's just highlight with the

4   blue box in the lower right.  I apply the rule to identify

5   small companies based on whether they're in the lowest

6   twenty-fifth percent of revenue and EBITDA.  If we go to the

7   next page that would be looking at companies with low

8   operating performance.  The page, in that same blue box,

9   describes the rule.  If it's in the lowest twenty-five

10   percent of EBITDA margin that's how I identify companies with

11   low operating performance.  That is their profit as a

12   percentage of revenue is in the worst quarter of all the

13   companies.

14       Then I have other rules to identify distressed

15   companies and under-capitalized companies.  Once I identify

16   the subset of the sixty-nine, I then go through the process

17   of computing the enterprise value to four EBITDA multiplier

18   for each date for the companies in that subset.

19   Q    What conclusion did you come to that's reflected on 32,

20   Slide 32?

21   A    Yes.  I think the overall take-away from Slide 32 is

22   that while hypothetically possible Mr. Dunn's criticisms do

23   not pan out in fact when it comes to this industry at this

24   time. The range of multipliers emerging from Mr. Greenberg's

25   analysis is, you know, confirmed by looking at all of these

1  particular subsets of the group.

2  Q    I noticed that on the upper level or in each one of

3  these is actually higher than your twelve and a half, is that

4  correct?

5  A    Yes.  It is, in fact, higher.  Remember, that is just

6  the seventy-fifth percentile. It actually goes higher still

7  if you look at the complete distribution which I think tells

8  us that it's possible that if one were to actually test the

9  market one would get a possibly unusually high multiple.  We

10  don't know that for a fact, but the data are consistent with

11  that hypothesis.

12  Q    And the same thing on the low side.  Other the then the

13  smaller companies they're all higher than the amount that

14  Michael Greenberg's analysis had?

15  A    Yes.  That is true.  Limiting ourselves to the middle

16  fifty percent to the distribution.  There are certainly

17  particular cases on particular dates that one could find that

18  have a lower enterprise value to EBITDA multiple.  So, I

19  can't rule it out, but the data certainly support the

20  proposition that there is a wide range of multiples, many of

21  which are above the range that I testified to in my initial

22  testimony.

23  Q    Other than the sixty-nine did you take any steps to

24  further refine your search?

25  A    Yes.

1   Q      What did you do?

2   A      I looked at the sixty-nine companies and note that many

3   of them, while in the same overall classification as

4   TransCare -- if you just look at the management discussion

5   and analysis in the 10-K or look to see what their lines of

6   business are at that time, first quarter of 2016, that many

7   of them are -- some of them are farther away from TransCare

8   in terms of their business space than others.

9          In particular, if we take a look at Slide 33, I can

10  explain to you how I further reduce the sample.  I started

11  with the sixty-nine companies that I just described as shown

12  in the second high-level bullet.  Then I excluded a portion

13  of those companies that's listed in the next to last bullet.

14  In particular they're companies who drive the revenues

15  substantially in diagnostics, pharmaceuticals, waste

16  management, animal health, consulting services,

17  administrative services, industrials, information technology

18  and consumer staples.  That, for one reason or another, got

19  classified by Capital IQ in this are because I think they

20  were in the healthcare space to some degree.

21         So, I eliminated those.  There were also, I think, two

22  companies, maybe three, that appeared not to be associated

23  with the healthcare space at all at this time.  So, one thing

24  to note is that the way Capital IQ does its classifications

25  we're looking at the classifications as of, basically, today

1  when we run the data pool.  So, companies that merge or

2  divest themselves in lines of businesses could actually be in

3  a different line of business back in 2015 or, I guess, put

4  differently they might have acquired healthcare business

5  post-2015 -- excuse me, post-2016 which means that they

6  weren't comparable at the time.

7        So, I eliminate those companies and what I'm left with

8  are thirty-four companies that meet all of the search

9  criteria and which somehow or another touch a person.

10 They're either handling a patient or they're managing

11 physicians or nurses who handle patients.  So, that is

12 roughly, at a general level, what the remaining thirty-four

13 companies have in common.

14 Q    Did you run the same analysis that you had run on the

15 sixty-nine companies?

16 A    Yes, I did.

17 Q    And is the result as depicted on Slide 35?

18 A    Yes.

19 Q    And what was your conclusion based on those results?

20 A    The overall conclusion is that the range of enterprise

21 value to four EBITDA multiples are actually somewhat stronger

22 than they were for the larger sample of sixty-nine, but in

23 all events it does not contradict or undermine my original

24 testimony as to what the range, the proper range of multiples

25 should be based on Mr. Greenberg's two comparables that he

1  identified.

2          MR. AMINI:  I have nothing further.

3                      CROSS EXAMINATION

4  BY MR. MERVIS:

5  Q     Dr. Arnold -

6          THE COURT:  Can I ask you why you're contending

7  this isn't a rebuttal report?

8          MR. MERVIS:  Because the only thing that Mr. Dunn

9  said during -- he didn't say go out and try to find other

10 companies that have these characteristics.  He said the

11 criticism of this witness's, and I can hand Your Honor the

12 transcript, opinion with regard to comperables is; (A) he

13 accepted blindly the comperables that came from Mr.

14 Greenberg's email without doing any testing to see if they

15 were, in fact, comparable; (B) that there were material

16 differences between those two companies and TransCare; and

17 (C) a valuation professional should use his or her

18 professional judgment.

19         He didn't say --

20         THE COURT:  I thought he also opined, though, that

21 the multiples should be lower for a company.

22         MR. MERVIS:  He did.

23         THE COURT:  And now Dr. Arnold is going out to

24 more comparable companies and the multiples are actually

25 higher.

| 1 | MR. MERVIS: Let me do the cross, Judge. |

1         MR. MERVIS:  Let me do the cross, Judge.

2         THE COURT:  Okay.  Well, but --

3         MR. MERVIS:  I think it will become clear.

4         THE COURT:  -- I think you're selecting out from

5  his testimony certain things, but he is rebutting some of the

6  things that he said.

7         MR. MERVIS:  Your Honor, as you said, I have a

8  standing objection.

9         THE COURT:  Okay.  Well, you're standing.  So, go

10  ahead.

11         MR. MERVIS:  Thank you.

12  BY MR. MERVIS:

13  Q    Dr. Arnold, if you could go to DX, I guess you're on

14  it, 196 and if you could go to Page 32.  I just want to make

15  sure I heard you correctly.  So, I think what I just heard

16  you say is that what you're showing on this page is that the

17  multiples that are shown are not materially different, in

18  some cases greater, then -- sorry, the multiples for

19  companies in TransCare's industry are, you know, comparable

20  to what you selected, the air methods, right?

21  A    Yes.  Not always higher.  There are some that are

22  lower, but I agree with that, yes.

23  Q    Okay.  So, if you could now go to DX-198.  And if you

24  go -- why don't you go to the tenth page and let's just show

25  the Judge what we're doing here starting at the tenth page.

1   So, starting at the tenth page, Dr. Arnold, what are you

2   reporting?  It goes on for a number of pages.

3   A     Yes.  This is a rather lengthy attachment that contains

4   the business description for each of the sixty-nine companies

5   that I described earlier.  Then also it flags whether I

6   include them in the smaller set of thirty-four companies or

7   if I don't.

8   Q     Right.

9   A     And if I exclude them I have a little note as to why.

10  Q     But to be clear you argued Page 32, the one that we've

11  just talked about, the one where you talked about TransCare's

12  industry, that's all sixty-nine, right; Page 32 of Exhibit

13  196, that's all sixty-nine companies?

14  A     Let me just make sure.  Yes, that is all sixty-nine

15  companies.

16            MR. MERVIS:  Rory, could you move to -- actually,

17  on this same page, if you could blow-up the description for

18  the third company down, the one that starts with A.  I can

19  barely read it, that's why I want to blow it up.  Okay.  Can

20  you make that larger, please?

21  BY MR. MERVIS:

22  Q     Dr. Arnold take a moment, but I am not sure I'm

23  pronouncing this right, but ACCIONA S.A. [phonetic] is one of

24  those sixty-nine, right?

25  A     It is.

```
 1  Q     Take a minute to read the description to yourself,
 2  please.
 3  A     (Witness reads silently).  Yes, I have done so.
 4  Q     It's a wind farm company, isn't it?
 5  A     That is one of its lines of business as of FY 2015,
 6  yes.
 7  Q     It doesn't run ambulances, does it?
 8  A     It didn't as of fiscal year 2015, no.
 9  Q     Right.  And that's the year for which you told the data
10  for these multiples that you used on Page 32, right, of
11  Exhibit 196?
12  A     Yes.
13              MR. MERVIS:  Your Honor, I'm not going to go
14  through every one of these because it's in evidence, but let
15  me move on.
16              THE COURT:  Did you do a similar analysis for the
17  thirty-four that you culled down?
18              THE WITNESS:  This is one of the sixty-nine.  And
19  when I culled down to thirty-four this is one of the
20  companies that was excluded.
21              THE COURT:  But then did you do the same analysis
22  for the thirty-four that you did for the sixty-nine?
23              THE WITNESS:  The thirty-four is a subset of the
24  sixty-nine.
25              THE COURT:  I understand.  His point is that on
```

62

1    Page 32 of DX-196, that's a bar graph --

2              THE WITNESS:  Yes.

3              THE COURT:  -- of the sixty-nine, the middle fifty

4    percentile with the sixty-nine.

5              THE WITNESS:  Yes.

6              THE COURT:  My question is did you also do a

7    similar analysis when you culled it down to thirty-four just

8    using the thirty-four?

9              THE WITNESS:  Yes, I did.  That is on Slide 35.

10   So, Slide 35 has the range of multiples if one limits oneself

11   to the thirty-four that are the more appropriate comparables

12   in my opinion.

13             THE COURT:  35 in which exhibit?

14             THE WITNESS:  196.

15             THE COURT:  Okay.  Go ahead.

16             MR. MERVIS:  Thank you.

17   BY MR. MERVIS:

18   Q    So, while we're on Slide 35, Dr. Arnold, of the thirty-

19   four companies -- and just to be clear the exhibit we just

20   looked at, Exhibit 198, that also has the descriptions for

21   the thirty-four companies, right?

22   A    It does, yeah.

23   Q    Because they're part of the sixty-nine?

24   A    Correct.

25   Q    Okay.  The data that's in the bar graph on Page 35 of

```
 1  Exhibit 196 there's a grand total of one ambulance company of
 2  the thirty-four, right?
 3  A    That's right.  There is one ambulance company.
 4  Q    Now, I just want to be clear because I thought I heard
 5  you say at the beginning of your testimony that the work that
 6  we've been looking at was done during the course of the
 7  trial.  You didn't mean to say that, did you?
 8  A    I don't believe I said that.  I think you misunderstood
 9  what I said.
10  Q    I may have.  This work was done way back in February,
11  right, or even earlier?
12  A    Some of the work was done in February and then it was
13  further refined in July.
14  Q    Okay.  So, now I want to talk about these various
15  criteria that you used to screen the companies and decide
16  which companies go on these bar graphs because I heard you
17  use the word rule a few times, that you used a rule to do the
18  screening.
19  A    Yes.
20  Q    Okay.  All the criteria, those were developed by you
21  and your team, right?
22  A    You're referring to the filtering rule that I used to
23  calculate the four subsets?
24  Q    Yes.
25  A    Yes.
```

1    Q    You didn't go to some professional set of rules and

2    apply those, right?

3    A    I used my professional judgment to implement it in a

4    way that I thought was most reasonable.  It was mine.  It was

5    not some textbook or third-party source.

6    Q    So, for example, one of the filtering methods, and let

7    me make sure I have this right, one of the filtering methods

8    that you used to get to sixty-nine is you filtered out

9    companies that had an enterprise value larger than $5 billion

10    dollars?

11    A    Yes.

12    Q    You could have filtered out at two billion, right?

13    A    I could have.

14    Q    You could have filtered at one billion, right?

15    A    I could have.  It would reduce the size, but I could

16    have.

17    Q    Okay.  In fact, you really could have picked any number

18    that you felt was reasonable, right, as a filter?

19    A    I could have picked another number if I felt it was

20    reasonable, yes.

21    Q    Now, let's go back to Slide 32 for a minute.  Actually,

22    you know what, let's go to 34 which is your -- yeah, 34.  The

23    title at the top of this slide says, the list of thirty-four

24    -- oh, sorry. Yes, let me go to 32, not 34.  32, again, is

25    derived from the group of sixty-nine?

1    A      Yes.

2    Q      And it says,

3           "The inter-cortile ranges of multiples for the broader

4    set of comparable guideline companies do not change my

5    conclusions."

6           Do you see that?

7    A      Yes.

8    Q      You're not opining, are you, that any of the sixty-nine

9    companies that you found are actually appropriate guideline

10   companies with which to value TransCare one way or the other,

11   right?

12   A      I'm not saying they are.  I'm not saying they're not.

13   I'm simply saying that if one were to choose a set using the

14   rules that I described earlier one would get this set of

15   sixty-nine.

16   Q      Right, but you have no opinion, one way or the other,

17   as to whether any of these sixty-nine actually are comparable

18   guideline companies for TransCare?

19   A      That's fair, yes.

20   Q      And the same thing is true -- well, inherently, the

21   same thing is true for the thirty-four, right?

22   A      Yes, that is correct.

23   Q      Let's go, if we could, to DX-197.

24          MR. MERVIS:  That should be, Your Honor, one of

25   the documents that's attached.

```
 1              THE COURT:  I have it.

 2              THE WITNESS:  I have that.

 3   BY MR. MERVIS:

 4   Q    You may have told Mr. Amini, but just generally

 5   speaking what is this worksheet?

 6   A    It is a print-out of an Excel spreadsheet that contains

 7   the raw data and analysis that I used to prepare the data on

 8   the first page of DX-197.

 9              MR. MERVIS:  Just one second, Your Honor.

10              THE COURT:  I didn't count the companies, but is

11   this the sixty-nine or the thirty-four?

12              THE WITNESS:  This is the sixty-nine, Your Honor.

13              THE COURT:  Okay.

14   BY MR. MERVIS:

15   Q    Right, which, again, includes the thirty-four?

16   A    Yes.

17   Q    Okay.  So, I'd like you to turn to Page 10, please.

18              MR. MERVIS:  Rory, could you bring that up on the

19   screen?  Could you try to make it bigger?  Okay.

20   BY MR. MERVIS:

21   Q    Let me make sure we understand what we're looking at

22   here.  At the top of this page you have the company name on

23   the left, right?

24   A    Yes.

25   Q    And then you have forward EBITDA multiples.  Then what
```

1    are the next four columns?

2    A     The next four columns relate to the four sub-categories

3    that I testified to earlier; namely companies that are either

4    small, or have low operating performance, or are distressed

5    or under-capitalized.  I indicate with an X for each company

6    which of these four categories it ends up falling into.

7    Q     Right.

8    A     Sometimes they fall into one, sometimes they fall into

9    all four or somewhere in between.

10   Q     Sometimes they fall into zero, right?

11   A     Well, not on this chart.  This chart just shows the

12   companies that fall into, at least, one of the four

13   subcategories.

14   Q     Okay.  So, let's go back to your original testimony.

15   The two companies that you used, that you gave your opinions

16   the first time in this case, were Envision Healthcare and

17   something called Air Methods, right?

18   A     Yes.

19   Q     And neither are on this chart, are they?

20   A     They are not.

21   Q     And that's because Envision overlaps with exactly none

22   of your four categories, right?

23   A     Right.

24   Q     And Air Methods overlaps with zero of your four

25   categories?

1   A      Right, exactly.  I think that's very much the point.

2   Q      Well, Mr. Amini will talk to you about the point, but

3   that's a fact, right?

4   A      That is a fact.

5   Q      All right.  Now, I want to get into some of the

6   specific sub-categories that you did.  If you go to DX-198,

7   please.  This is your worksheet for the thirty-four, is that

8   right?

9   A      Yes.

10         MR. MERVIS:  Rory, could you go to Page 5, please.

11  And can you blow-up the first chart there?

12  BY MR. MERVIS:

13  Q      Okay.  So, it's a little hard to read, but we have the

14  hard copy.  Refresh us, in order to -- so, this is the small

15  company's data set?

16  A      This is the small company's data set, yes.

17  Q      Right.  So, if you go to the bar graph on the first

18  page of Exhibit 198 and you look at smaller companies, and

19  you see this multiple range of 17.4 what's listed on Page 5

20  of the exhibit are the companies that are in that bar, right?

21  A      Yes.

22  Q      Okay.  And in order to make the cut, right, you used a

23  couple of cut-off criteria, right?

24  A      Correct.

25  Q      So, for example, the companies on this page are ones

1  that in your entire sample size of thirty-four were in the

2  bottom, let me make sure I get this right, bottom cortile in

3  terms of EBITDA?

4  A    Yes.

5  Q    Okay.  And you also have TransCare's numbers on here at

6  the top, right?

7  A    Yes.

8  Q    And isn't it correct, Mr. Arnold -- sorry.  It also has

9  revenue, right?  In other words, to be on this page you have

10 to be in the lowest cortile in terms of annual revenue?

11 A    Yes.

12 Q    Okay.  And isn't it correct, Dr. Arnold, that

13 TransCare's revenue is the lowest of all the ones in the

14 group?

15 A    Yes.

16 Q    Same thing for EBITDA, right?

17 A    Not as projected EBITDA, but for its 2015 EBITDA, yes.

18 Q    Now let's go to Page 6 of the same exhibit.  So, again,

19 there's a cutoff criteria you're using here, right, to get to

20 these companies?

21 A    Yes.

22 Q    And these are the so called low-operating performance

23 companies?

24 A    Yes.

25 Q    And, again, if you look at the bar on the first page of

1  the exhibit these are the companies that fall -- that you get

2  the data from that make up that bar, right?

3  A     The bar from 9.0 to 14.6, yes.

4  Q     Okay.  And what's the criteria -- what's the cut-off

5  criteria you use to include these companies?

6  A     EBITDA margin under seven percent rounding.

7  Q     And if you look at the EBITDA margins, the actuals,

8  TransCare is tied for the lowest, right, with a few others?

9  A     This is reported rounding to the nearest percentage

10  point.  I actually looked at this, this morning and TransCare

11  is not the lowest.  It shows one percent for EBITDA margin.

12  Its actually 1.2 and I believe that NxStage Medical is 0.8

13  percent.  It's close to being at the bottom-end of the range.

14  I'd agree with that.

15  Q     But there are some others that are real close, that's

16  right?

17  A     Yes.

18  Q     Okay.  So, let's take a look at those companies, shall

19  well.

20          MR. MERVIS:  Rory, if you could go to Page 22.

21  BY MR. MERVIS:

22  Q     Just so we have it, Dr. Arnold, what are the names of

23  the other companies that are, essentially, tied to TransCare?

24  A     NxStage Medical, Invacare and BioScrip.

25          MR. MERVIS:  Rory, if you could go to Page 22 of

1  this exhibit.  If you could blow-up the bottom for BioScrip.

2  BY MR. MERVIS:

3  Q     Dr. Arnold, if you could take a minute just to read the

4  description for BioScrip.

5  A     (Witness reads silently).  Yes, I see that.

6  Q     Among other things they provide -- they don't run

7  ambulances, right?

8  A     They don't run ambulances.

9  Q     And, among other things, they provide in-home

10 healthcare infusion therapy?

11 A     Yes.

12 Q     TransCare didn't do that, did it?

13 A     No.

14 Q     Okay.

15        MR. MERVIS:  Let's go to Page 19, Rory.  If you

16 could blow-up Invacare.

17 BY MR. MERVIS:

18 Q     Take moment, Dr. Arnold, to read the description for

19 Invacare.

20 A     (Witness reads silently).  Yes, I read it.

21 Q     They're a manufacturer of medical equipment?

22 A     Among other things, yes.

23 Q     TransCare didn't make medical equipment, did it?

24 A     It did not.

25 Q     Okay.  Let's look at the last one, NxStage.

```
 1              THE COURT:  What page?

 2              MR. MERVIS:  Your Honor, that's at Page 15 on the

 3  same exhibit.

 4  BY MR. MERVIS:

 5  Q    Dr. Arnold, take a moment to review that description to

 6  yourself.

 7  A    (Witness reads silently).  I have reviewed it.

 8  Q    Okay.  It's a company that deals with kidney failure

 9  therapy?

10  A    Yes.

11  Q    Not TransCare's business, right?

12  A    That is not TransCare's, I agree.

13  Q    Let's go to the next category of your company.  So,

14  let's go to Page 7, please -- oh, I'm sorry, the same

15  exhibit, Exhibit 198.  So, these are the stressed companies,

16  right?

17  A    Yes.

18  Q    And you used a bunch of screening criteria here, right?

19  A    Yes.

20  Q    In order to make the cut did they have to hit all or

21  only one or something else?

22  A    I believe they had to ship all of them, but I'd have to

23  go back and check.

24  Q    All right.  So, one of the ratios, if I'm understanding

25  this correctly, is something called current ratio, is that
```

1  right, in terms of a cut-off criteria?

2  A     Let me correct my answer.  You just need to hit one of

3  them.

4  Q     Okay.  So, one of the ratios that you used, one of them

5  is something called current ratio, is that right?

6  A     Yes.

7  Q     And am I correct that TransCare's current ratio is

8  lower than any other company in the set?

9  A     Yes.

10 Q     And another of the criteria is something called

11 operating cash-flow ratio, right?

12 A     Yes.

13 Q     And here TransCare is lower than every company except

14 for BioScrip?

15 A     Yes.

16 Q     And that's one of the companies we looked at just a few

17 minutes ago?

18 A     Yes.

19 Q     Okay.  And then the next criteria is debt to capital

20 and liability asset ratio -- sorry, debt to capital ratio.

21 A     Yes.

22 Q     And in order to -- so here it's a little bit different.

23 The higher the ratio the worse the company, right?

24 A     The more levered it is, yes.

25 Q     Right.  And, again, for both the debt to capital ratio

1  and for the liabilities to assets ratio TransCare's was the

2  highest ratio of the whole group, right?

3  A     Yes.

4  Q     By the way, I noticed that one of the -- well, let's

5  take a look.  If you look at the coverage ratio for TransCare

6  it says NM.  What does that mean?

7  A     Not meaningful.

8  Q     What does that mean, not meaningful?

9  A     It means that it was -- I believe it means negative.

10 So, I'm not sure what the degree of negative was, but there

11 were a number of companies that had covered ratios with that

12 classification.

13 Q     Right, including Invacare.

14        THE COURT:  What is coverage ratio?

15        THE WITNESS:  A coverage ratio is a measure of, an

16 adjusted measure of earnings divided by interest expense.

17 So, how many multiples of one's interest expense every year

18 is a company generating.

19 BY MR. MERVIS:

20 Q     And there's a couple others that have NM coverage ratio

21 and that's Invacare and BioScrip; again, two of the companies

22 that we looked at before, right?

23 A     Yes.

24 Q     Okay.  Let's go to Page 8.  So, on Page 8 this is your

25 set of under-capitalized companies?

1    A      Yes.

2    Q      And, again, there are two cut-off criteria for

3    inclusion?

4    A      Yes.

5    Q      And is it the case that for a company to qualify it

6    just needed to hit on one, not both?

7    A      Yes.

8    Q      Okay.  With respect to working capital to revenue

9    TransCare's is the lowest except for a company called Triple-

10   S Management, is that right?

11   A      Yes.  That is right.

12   Q      And also to be on this page the companies had to, and

13   this is, again, one these things where being higher is being

14   worse.  So, you had to be in the top cortile for accounts

15   payable to revenue?

16   A      Yes, that's correct.

17   Q      And, again, TransCare is the second highest, the only

18   other companies Triple-S management, right?

19   A      Yes, that's right?

20          MR. MERVIS:  And, Rory, if you could go to Page 19

21   of the same exhibit.  And pull-up the description for Triple-

22   S.

23   BY MR. MERVIS:

24   Q      Dr. Arnold, could you take a moment to read that to

25   yourself?

```
 1   A      (Witness reads silently).  I have done so.

 2   Q      Triple-S is some company that operates in Puerto Rico?

 3   A      Yes.

 4   Q      And it's got something to do with insurance?

 5   A      Insurance and managed care, yes.

 6          MR. MERVIS:  Can I have just one moment, Your

 7   Honor.  Nothing further, Your Honor.

 8          THE COURT:  Any redirect?

 9          MR. AMINI:  Very short, Your Honor.

10                      REDIRECT EXAMINATION

11   BY MR. AMINI:

12   Q    Mr. Mervis was asking you on Page 10 of Exhibit 197

13   about the lack of Envision and Air Methods in that group.  Do

14   you recall that?

15   A      Yes.

16   Q    And your response was, I think that's very much the

17   point.  Do you recall that?

18   A      Yes, I do.

19   Q    What were you -- what did you mean by that?

20   A      What I meant by that is that the criticism by Mr. Dunn

21   and to a certain degree Ms. Tilton is that the two

22   comparables identified by Mr. Greenberg are so different from

23   TransCare that it's not appropriate to use the EBITDA

24   multiples that emerge from analyzing them and that one should

25   consider being small, being under-capitalized, et cetera
```

1  because that would, presumably, adjust the numbers down to a

2  lower multiple which is a perfectly reasonable hypothesis

3  which I then tested.  I identified a set of companies that

4  were not those two firms.

5        Instead, I'm identifying companies that are smaller

6  than the two Greenberg comps, that have lower operating

7  performance, that are far less capitalized and under various

8  types of distress and when one does that one gets,

9  substantially, the same answer.  So, I think the point is

10 that we have multiple roads leading to Rome, as it were, and

11 that the criticisms, while plausible in the abstract, just

12 don't pan out in this particular case when one looks at the

13 empirical data.

14 Q    Then the other question I had for you is Mr. Mervis, at

15 the end of his examination, asked you a number of questions

16 and then pointed to the differences between the companies and

17 TransCare.  The last one, as I recall, being a company in

18 Puerto Rico.

19 A    Yes.

20 Q    When you went about selecting this set that ended up

21 being sixty-nine how do you justify selecting such a set and

22 using it for this analysis?

23 A     Several ways.  One is that I'm using the industry

24 classifications that Capital IQ, itself, assigned to

25 TransCare.  So, this is the most comparable set of companies

1  within the Capital IQ database using an objective set of

2  classifications and rules.  I didn't do it personally, S&P

3  did.  I guess the one thing I did in addition to using the

4  three classifications that Cap IQ assigned to TransCare is I

5  also limited it to companies that had business operations in

6  the US.  Puerto Rico is in the US.  So, it fell into the

7  category.

8          MR. AMINI:  Thank you.

9          THE COURT:  I have a question.  One of the

10 purposes of this exercise is to come-up with a market value

11 for TransCare, a NewCo on or about February 24th when

12 TransCare was basically paid $10 million dollars for these

13 assets that were foreclosed on.  The testimony in the case is

14 that in order to get up to these projections of EBITDA the

15 company needed an investment of some range that started at

16 four and half million.  The last I heard it was over $10

17 million dollars.  It's not really an EBITDA question, but

18 what effect would that have on the market value of the

19 company?

20          I assume someone who bought this company would

21 have to invest that money.

22          THE WITNESS:  I think the answer is,

23 unfortunately, not a decisive answer.  I think that the worst

24 case scenario is that if the company -- suppose the company

25 needed $8 million dollars to buy ambulances and refresh its

1 rolling stock, et cetera, one could say, well, figure out the

2 value based on these projected EBITDA numbers and then

3 subtract off at $8 million dollars. I think that's the worst

4 case.

5          What that approach is failing to consider is that

6 all companies, in order to survive, have some sort of capital

7 expenditure that they're making on a recurrent basis to

8 refresh and expand their capital base. So, I think its over-

9 stating it to subtract off the initial investment dollar for

10 dollar. I think it's going to be some fraction of it. And

11 one other thing to notice is in the various rejections in

12 January that we saw as well as Ms. Tilton's own testimony the

13 capital was in the form -- the proposed capital is in the

14 form of a loan. So, it's not permanent capital.

15          If it goes in as permanent capital then I would be

16 much more open to just subtracting it off dollar for dollar.

17 But if the idea that we're going to put it in, but in ten

18 months the company is going to be generating four or five

19 hundred thousand of EBITDA a month, in eleven months and that

20 money can be returned its more in the form of a short to

21 medium term loan which costs the shareholders some amount of

22 money, but it's not a dollar for dollar dilution.

23          THE COURT: Okay. Thank you. You can step down.

24     (Witness excused)

25          THE COURT: Do you have any further witnesses?

```
 1              MR. AMINI:  No, Your Honor.

 2              THE COURT:  Plaintiff rests?

 3              MR. AMINI:  We rest.

 4              THE COURT:  Defendants rest, Mr. Mervis?

 5              MR. MERVIS:  Pardon, Your Honor?

 6              THE COURT:  Defendants rest?

 7              MR. MERVIS:  Yeah, I think we already did, Judge,

 8  unless I want to do sur-rebuttal.

 9              THE COURT:  I'm going to ask for proposed findings

10  and conclusions, but there are some issues that I have or

11  come to the forefront which I think there's some claims that

12  can just be dismissed out of hand.

13              MR. MERVIS:  I don't disagree.

14              THE COURT:  You want to break for lunch?

15              MR. MERVIS:  Sure. I mean we can do a 52(a)

16  motion.

17              THE COURT:  I'll do it after lunch.

18              MR. MERVIS:  That's fine.  Yeah.  That's fine,

19  Your Honor.

20              THE COURT:  I want to tell you what's bothering me

21  about the case.

22              MR. MERVIS:  That actually would be helpful.

23              THE COURT:  All right.  Why don't we break for

24  lunch and come back at two o'clock.

25              MR. MERVIS:  And, Your Honor, I think there's also
```

1  some housekeeping issues with exhibits that we could deal

2  with after lunch as well.  The parties, I think, are agreeing

3  on things, which is generally good.

4          THE COURT:  All right.  Okay.  Thanks.

5       (Recess taken at 12:36 p.m.)

6

7

8                    CERTIFICATE

9

10      I, MARY ZAJACZKOWSKI, certify that the foregoing is a

11  correct transcript from the electronic sound recording of the

12  proceedings in the above-entitled matter.

13
    /s/Mary Zajaczkowski              August 14, 2019
14  Mary Zajaczkowski, CET**D-531

15

16

17

18

19

20

21

22

23

24

25

1

```
1                    UNITED STATES BANKRUPTCY COURT
                     SOUTHERN DISTRICT OF NEW YORK
2
   IN RE:                        .    Chapter 7
3                                .
   TRANSCARE CORPORATION,        .    Case No. 16-10407-smb
4                                .
                                 .
5           Debtor.             .     New York, New York
   . . . . . . . . . . . . . .    .    Wednesday, August 14, 2019
6  LAMONICA                      .    2:01 p.m.
7                                .    P.M. Session
            v.                   .
8                                .    Adv. Proc. 18-01021-smb
   TILTON, et. al                .
9  . . . . . . . . . . . . . .
```

10

```
11              TRANSCRIPT OF TRIAL (Continued)
          BEFORE THE HONORABLE STUART M. BERNSTEIN
12             UNITED STATES BANKRUPTCY JUDGE
```

13

APPEARANCES:

14

```
For the Chapter 7 Trustee:   Salvatore LaMonica, Esquire
15                           LAMONICA, HERBST & MANISCALCO, LLP
                             3305 Jerusalem Avenue
16                           Wantagh, New York 11793

17 For Salvatore Leggett:      Bijan Amini, Esquire
                             Avery Samet, Esq.
18                           STORCH AMINI, PC
                             Two Grand Central Tower
19                           140 East 45th Street, 25th Floor
                             New York, New York 1001
20
   Audio Operator:           Electronically Recorded
21                           by K. Harris

22 Transcription Company:      Reliable
                             1007 N. Orange Street
23                           Wilmington, Delaware 19801
                             (302)654-8080
24                           Email:  gmatthews@reliable-co.com
25
```

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

```
 1  APPEARANCES (Cont'd):

 2  For The Non-Debtor        Michael Mervis, Esquire
    Defendants:               PROSKAUER ROSE
 3                            Eleven Times Square
                              New York, New York 10036
 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                              INDEX

2

3    ARGUMENT:   Avery Samet
                 Bijan Amini
4                Michael Mervis

5                                                  Ruling

6
     Claims based on Violations of the Automatic Stay      4
7
     Equitable Subordination against PPMG/Patriarch Partners  6
8
     Intentional Fraudulent Transfer Claim
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        (Proceedings resume at 2:01 p.m.)

2               THE CLERK:  Please be seated.

3               THE COURT:  I wanted you to come back to hear some

4    closing argument, but I also wanted to mention the concerns,

5    the tentative findings making the case, subject to seeing

6    something different.  And also, I think some claims can

7    simply be dismissed out of the case.

8               So, let me start with you, Mr. Amini.  What

9    evidence is there of claims arising from post-petition

10   conduct committed by anybody?  Your violation of the

11   automatic stay claims.

12              And let's put aside the sale and the $800,000

13   dollars because I think that raise a separate issue.

14              The only evidence that I see in the record is that

15   somebody went to the headquarters after the petition was

16   filed and wanted to get the computer.  The trustee turned

17   them away and that was pretty much the end of it.  Anything

18   else?

19              MR. AMINI:  No, I think we discussed amongst

20   ourselves too, Your Honor.  We would probably be having a

21   very difficult time proving any damages at this point.

22              THE COURT:  I will dismiss the claims based on

23   violations of the automatic stay.  As I said, I'm putting

24   aside the issue of the $800,000 dollars.

25              You also have claims in the nature of equitable

1  subordination, et cetera, against PPMG and Patriarch

2  Partners.  What evidence is there that they did anything,

3  much less anything wrong?

4            MR. AMINI:  Well, I mean, Ms. Tilton acted through

5  her entities, so PPMG --

6            THE COURT:  But what did they do wrong?  PPAS

7  foreclosed.

8            MR. AMINI:  PPAS foreclosed.

9            THE COURT:  That's a separate issue.  What PPMG do

10  and was it Patriarch Partners?

11            MR. AMINI:  Well, why don't you address it.  Go

12  ahead.

13            MR. SAMET:  Well, what I was also going to say,

14  they're only unsecured claims, Your Honor, and so I don't

15  know that it's even worth having this debate to subordination

16  of unsecured claims.

17            THE COURT:  Well, I think you've objected to the

18  claims.

19            MR. SAMET:  We did.  We did.

20            THE COURT:  Seeking to equitably subordinated, so

21  what's the evidence they did some inequitable?

22            MR. SAMET:  What we would argue is that to the

23  extent that the employees of PPMG and Patriarch Partners, and

24  that's -- and Mr. Pelissier and Mr. Greenberg and Mr.

25  Stephen, to the extent that so those entities participated in

1  the acts that we say were otherwise wrong, the argument is

2  that their claim should be subordinated.

3          THE COURT:  That sounds like you're making a claim

4  that they aided and abetted Ms. Tilton's wrongdoing.

5          MR. SAMET:  I understand --

6          THE COURT:  And I don't think it's a claim -- I

7  don't think that's a claim you can assert under the Wagner

8  Doctrine.

9          MR. SAMET:  Okay.

10          THE COURT:  I'm going to dismiss any claims

11  against PPMG and Patriarch Partners.

12          Now, you also have an intentional fraudulent

13  transfer claim arising from the book ledger.  And, by the

14  way, I consider the foreclosure and sale to Transcendence as

15  an integrated transaction.  One would not have occurred

16  without the other.

17          And the only reason that's significant is for the

18  purposes of discussing fraudulent transfers maybe

19  Transcendence is an initial transfer rather than subsequent

20  transfer.  But, having said that, my impression from the

21  evidence is that Ms. Tilton may have had blinders on and that

22  would go to the inherent fairness issue.  But what's the

23  evidence that she wasn't acting with an honest intention to

24  reorganize or save the company?

25          MR. AMINI:  I don't know that we would say that

7

1  she wasn't acting with an honest intention to reorganize or

2  save the company.

3        THE COURT:  So what's the intentional fraudulent

4  transfer of the foreclosure?

5        MR. AMINI:  But I think she's intentionally

6  violating a number of different agreements and her

7  obligations under those agreements.

8        THE COURT:  But what?

9        MR. AMINI:  Like the intercreditor agreement

10  between Wells Fargo and the term loan lenders.

11        THE COURT:  What did she violate?  What she do?

12        MR. AMINI:  Well, for example, the Ark II loan is

13  clearly --

14        THE COURT:  Ark II --

15        MR. AMINI:  -- an attempt to get around that.

16        THE COURT:  Ark II I have a problem with the Ark

17  II security interest, whether or not it actually advanced the

18  funds and has an unsecured claim.  And it may be that you can

19  avoid that security interest and preserve that lien for the

20  estate and get that $800,000 dollars back.

21        But what she do -- I mean what did she violate?

22        MR. AMINI:  The foreclosure was to get rid of

23  Wells. And she went about doing it in a manner that violated

24  Wells' rights.

25        THE COURT:  No, no, no.  I thought that Wells kept

**A2309**

1   the accounts receivable and was eventually paid off in the

2   case.

3           MR. AMINI:  We would show you under the agreements

4   that the intangibles belonged to Wells too.  She had no right

5   to take the cons.  She had no right to take the MTA

6   agreement. She had no right to transfer the MTA to --

7           THE COURT:  Mr. Mervis is going to tell me that

8   they didn't take the cons.  Of course, then I'm going to ask

9   him how they intend to operate the ambulances, but that's a

10   different issue.

11           MR. AMINI:  But even the assignment.  You might

12   recall she signed a directors -- on the 24th, she signed a

13   resolution as the director to the (indiscernible) resolution

14   that said the MPA has agreed to this.  And I'm assigning it -

15   - she directed Youngblood & Wolf to sign an actual assignment

16   that we put in front of you.  Now that assignment, all right,

17   violated Wells Fargo's rights.

18           THE COURT:  But how is that a --

19           MR. AMINI:  It goes to her intent.  Rather than

20   negotiate and work within the confines of the agreements with

21   which she has faced and that she has an obligation to operate

22   under, she's simply going outside of those bounds to

23   accomplish what she wants.

24           THE COURT:  All right, I'm not going to dismiss it

25   today, but you're going to be hard-pressed to convince that

1  there's an intentional fraudulent transfer claim arising from

2  the evidence of the trial.

3         Now what I think the trial did show is there are

4  two transactions that are groups of transactions that are at

5  issue.  The first is this Ark II loan.  There is evidence

6  that Ark II actually advanced the money, by the way.

7         MR. AMINI:  Yes.

8         THE COURT:  Look at the January 15th -- at least,

9  the January 15th advance and one in part of the July 29th

10  advance.  It just struck me that those advances had nothing

11  to do with the Ark II agreement that granted the lien.

12         They're still negotiating, trying to get Credit

13  Suisse to agree.  I think they're still trying to get Wells

14  Fargo to agree to fund at that point.  These were just

15  emergency infusions of cash primarily to pay insurance.

16  There was a settlement involved.

17         I don't know if the trustee has sought to recover

18  that settlement as a preference, but putting that aside.

19         MR. MERVIS:  Do you want me to address that now,

20  Your Honor.  I mean or are we just listing things --

21         THE COURT:  I'm not going to decide this day, but

22  this is the problem I have with that transaction that even if

23  it was a, you know, a loan it was -- the perfection didn't

24  actually occur until up to a month after the loan was made.

25         MR. MERVIS:  Actually, Your Honor, the evidence is

1    to the contrary.  The perfection was on January 29th.

2            THE COURT:  But that's just a UCC.  The security

3    agreement wasn't executed until February 10th or February

4    15th.  I forget what the date is.  And the UCC is meaningless

5    without the security agreement.

6            It just strikes me that, at best, that's an

7    unsecured loan that -- I guess it's a $1.8 million dollar

8    claim, putting aside the $800,000 dollars; should be

9    recharacterized not necessarily as equity but as an unsecured

10   loan under 502 -- 506(d), I think.  And the secured loan

11   should be disallowed and the lien should be preserved for the

12   estate, and the $800,000 dollars should be returned to the

13   estate.

14           MR. MERVIS:  Can I just --

15           THE COURT:  I'll hear from you in a minute, while

16   all this stuff is fresh in my mind.

17           MR. MERVIS:  I apologize.

18           THE COURT:  With respect to the February 4th

19   transaction or transactions, first of all, it strikes me as

20   the foreclosure was a valid foreclosure.  Nobody has argued

21   that it wasn't proper under Article 9.  For example, nobody

22   has shown me that there was a defect in the default notices

23   or the procedure or anything like that.  And it wasn't a

24   strict foreclosure.

25           And, I guess, I mean the issue relating to that

1  transaction really comes down to whether the assets were more

2  than the $10 million dollars of credit that the debtor got.

3  In terms of the breach of fiduciary duty claim, just seems to

4  me that the whole process was unfair where you failed to

5  demonstrate that the process was unfair.

6          You know, as I said before, I think Ms. Tilton

7  entered this with blinders.  She was trying to save the

8  company just looking to what Wells Fargo might do and what

9  she might be able to do or might be willing to do to fund the

10  company going forward.

11          But in December, she had made a decision that the

12  company was going to be sold.  She didn't contact anyone

13  else.  You know, there's evidence that other parties had

14  interest.  I realize there weren't offers, but you pick up

15  the phone and call you them up.

16          So, I don't think that you have demonstrate that

17  the process was fair.  That said, I'm not sure what the

18  damages were.  And that's really the principal issue with

19  respect to that transaction.

20          And then assuming you can prove damages, the

21  question is the appropriate remedy.  You have a lot of

22  cumulative remedies in the case.

23          For example, let's say that the evidence was that

24  -- and just pick a number.  The assets were really worth $25

25  million dollars.  You would argue, I assume, that you're

1  entitled to recover $15 million dollars from Tilton, a breach

2  of a fiduciary duty.

3          MR. MERVIS:  More actually.

4          THE COURT:  Well, let's just keep it simple.

5  Would you also be entitled to the remedy, let's say, of

6  equity subordination against PPAS?  And if so, for how much?

7  Because equitable subordination is just remedial.  It's not

8  penal or anything like that.

9          And once you recover the $15 million dollars,

10 assume you recover it, you've been made whole.  You know,

11 another thing is you seem to be asking for subordination, for

12 example, of the entire PPAS claim.

13         MR. MERVIS:  Yes.

14         THE COURT:  And I don't see, as a matter of law,

15 how you're entitled to that.  At most, you would be entitled

16 to subordinate that portion of the claim that corresponds to

17 any damages you suffered.  I am interested in the kind of the

18 relationship between the failure to prove failed price on

19 their part.

20         And, by the way, I don't think book value is a

21 measure of value.  And I know there's case law to that effect

22 -- a measure of market value.  I think a lot of people have

23 done that.

24         But I'm curious that if they haven't proved that

25 and what you have to do to prove damages, because I know that

1  there's a strain of law that if you're injured, you know,

2  there's a level of proof that's required to show your actual

3  damages which may not be absolute certainty.

4       That's more of a legal issue, though, once you get

5  to the factual issue. Now having said that, I'm happy to

6  hear from the parties.

7       MR. MERVIS: Well, Your Honor, I'll just make a

8  few quick comments. I understand the court is going to take

9  --

10       THE COURT: These are my concerns that --

11       MR. MERVIS: Yeah, no and obviously we appreciate

12  it because we'll focus our submissions on these concerns.

13       On the -- actually, let me just go to one thing

14  that you didn't mention. The breach of fiduciary duty claim

15  is addressed, at least, in the pleading to three things.

16       THE COURT: Yeah, wait, wait, wait. There's one

17  other thing.

18       Ark II is somehow swept up I think in the breach

19  of fiduciary duty claims or the fraudulent transfer claims,

20  whatever, and I just didn't see what role they had.

21       Ark II had an entirely separate issue alone. And

22  the security agreement and all that other stuff that was

23  documented around February 15th, but it wasn't involved in

24  the strict foreclosure, was it?

25       MR. AMINI: If I might -- I think putting the

1    evidence together and discuss this through.  If you look at

2    the timeline --

3             THE COURT:  Right.

4             MR. AMINI:  -- the money goes to the 15th and the

5    29th.  Okay.  She determines that she's going to do the

6    foreclosure by the 9th.  That was her testimony.  Maybe even

7    the 7th of February.  The Ark II loan documents are now

8    entered into on the 10th, after she's made that

9    determination.

10            And I was waiting for today, I mean it finally

11   came out today.  And she was planning to use that to be first

12   in line in Transcendence over the assets that will be in --

13            THE COURT:  Could she do that under the PPAS loan

14   agreement, though?

15            MR. AMINI:  She did the foreclosure under the PPAS

16   loan agreement.  She did the sale of PPAS to Transcendence

17   but somehow Ark II rolled over and, you know.

18            THE COURT:  Well, but so what?

19            MR. AMINI:  Well that shows, to us, that the Ark

20   II entity was part of the -- when all the dust settles, I

21   will own this company.  I mean, we think outright, but okay.

22   I'm 54.7 percent of this company, free and clear of all of

23   the other creditors.  And I will own this part of the

24   business free and clear.  So, it really is tied up in that

25   whole breach of fiduciary duty fraudulent transfer.

```
 1            THE COURT:  But isn't that really a claim that

 2    belongs to the term lenders?  In other words, if she breached

 3    the 2003 agreement or through the Ark II security and credit

 4    agreement she primed them, and we're really talking about her

 5    personal bank account, at this point.  How is the debtor

 6    injured by that?

 7            You may have the right to avoid that claim, for

 8    the reasons I mentioned, but how is the debtor injured by

 9    that?  Isn't that really the fight between the term loan

10    lenders and Ark II?

11            MR. AMINI:  I want to think about it, Your Honor,

12    but instinctively I think the debtor is harmed by it.  I

13    think the whole putting that in place -- see, among other

14    things, the Ark II loan actually acts, if you think about it,

15    as a stop-gap for allowing anybody else to come in.

16    Remember, the Ark II loan is not for two million.  It's for

17    six and a half million and it now occupies a level of -- see,

18    if I were to come in and get a DIP I got to get past the Ark

19    II loan as well at this point.

20            THE COURT:  Well --

21            MR. AMINI:  It's a blocking position.  By putting

22    in six and a half you're really putting in a blocking

23    position.  It's not that you haven't --

24            THE COURT:  Well, how is it different? First of

25    all, she loaned six and a half.  It was up to six and a half,
```

1    as I recall.  She claims she loaned 1.8 and that's what the

2    lien is.  It's like a line of credit.

3              MR. AMINI:  That's true.

4              THE COURT:  You don't get a lien for the whole

5    thing; you know, a lien for the amount of the debt.

6              MR. AMINI:  That's true, but if you're coming in

7    and saying as a potential DIP lender in a Chapter 11 you're

8    going to say I need to be ahead of this.

9              THE COURT:  But how is that a breach of fiduciary

10   -- how does that harm the debtor if she loans money to the

11   debtor?  She may harm the term lenders, but how does that

12   harm the debtor?

13             MR. AMINI:  Well, you know, remember, her

14   testimony was at some point there are only four and a half

15   million dollars left to get to an end game of selling the

16   assets.  That six and a half at that point, that four and a

17   half did it, but it wasn't being given to anybody, it was at

18   her discretion.

19             THE COURT:  It just doesn't strike me that other

20   than the PPAS and Tilton was any claims arising -- maybe

21   Transcendence, any claims arising from that strict

22   foreclosure and subsequent sale.

23             MR. AMINI:  We certainly --

24             THE COURT:  And it looks like the sale is valid

25   also.  I had asked you the question, Mr. Mervis, under New

1    York Law what does it take, you know, to effectuate the

2    transfer of the personal property and I asked maybe

3    rhetorically whether it was simply the delivery of the bill

4    of sale.

5              MR. MERVIS:  As a matter of title I think that's

6    right.

7              THE COURT:  So, the sale was valid.  What happened

8    was it couldn't, I guess, operate the company because the

9    trustee wouldn't let them use the computers and that's the

10   thing that really --

11             MR. MERVIS:  Yeah, Your Honor.  I mean, look, I --

12             THE COURT:  So, the transactions look like they're

13   valid transactions.

14             MR. MERVIS:  The transactions -- we --

15             THE COURT:  In other words the strict foreclosure

16   and the sale to Transcendence.

17             MR. MERVIS:  Well, I'm actually not sure the sale

18   to Transcendence occurred, but I also don't think it matters

19   for purposes of this lawsuit.

20             THE COURT:  Well, it may not.

21             MR. MERVIS:  Right.

22             THE COURT:  Well, maybe transferee of the

23   property.

24             MR. MERVIS:  A transferee of what?

25             THE COURT:  A transferee of the debtor's

1    collateral.

2              MR. MERVIS:  Yeah.  Well, again, on paper.  Well,

3    no.  Look, Your Honor, I do think there's a level of

4    practicality here, right.  I mean the asset -- for what its

5    worth, and it may not be worth anything, it may be

6    irrelevant, the assets never were physically taken by

7    Transcendence they were auctioned off by the trustee.

8              So, again, I don't know that it's necessarily

9    relevant, but I think that's what the record shows.

10             THE COURT:  They were auctioned under a

11   reservation of rights, I assume.

12             MR. MERVIS:  Well, I actually think that that

13   stipulation will be important for some of what Your Honor is

14   thinking about, but, yes, there was a reservation of rights.

15             THE COURT:  Is Transcendence asserting any claims

16   with respect to the proceeds of the trustee sales?

17             MR. MERVIS:  I don't think so, Your Honor.

18             THE COURT:  In fairness, you don't represent

19   Transcendence, though, do you?

20             MR. MERVIS:  Well, they're not a defendant.

21             THE COURT:  But, you know, my --

22             MR. MERVIS:  I do represent Transcendence.  No, I

23   don't think so.

24             THE COURT:  So, there's no transaction.

25             MR. MERVIS:  There is no claim from Transcendence.

1          THE COURT:  All right.

2          MR. MERVIS:  So, Your Honor, let me start with a

3  few of the other claims that you didn't talk about because I

4  think there are a few more that are subject too --

5          THE COURT:  I was looking at the rather lengthy

6  trial order in Chambers.

7          MR. MERVIS:  Well, Your Honor, I don't want to

8  comment on who is responsible for the bulk of that length,

9  but in any event in the first claim or the first cause of

10 action for breach of fiduciary duty as late as we read it

11 there are three, sort of, sub-claims.  One is for the claim

12 that you have already identified with regard to the

13 foreclosure, but there is also the claim, which I believe

14 they have abandoned, but I just want to make sure it's clear

15 that there was somehow a breach of loyalty by not

16 entertaining these entreaties from people like RCA and

17 National Express.  Now, I recall being told that that was

18 abandoned, but I want to make sure, for purposes of the

19 briefing, that that's right.

20          MR. SAMET:  Which paragraph?

21          THE COURT:  Middle of 2015 expressions of interest

22 by RCA.

23          MR. MERVIS:  It's in your --

24          THE COURT:  It's played a big role in your

25 complaint.

1          MR. MERVIS:  And there's lots of talk.  Again, I'm

2     just --

3          THE COURT:  As I read their breach of fiduciary

4     duty claims in the pre-trial order one seems to be based on

5     the foreclosure.

6          MR. MERVIS:  Yes.

7          THE COURT:  The other seems to be related to the

8     WARN Act liability and payroll taxes.

9          MR. MERVIS:  Yeah.  I'm going to get to that in a

10    second.

11         THE COURT:  Well, there was also a claim, by the

12    way, that PPAS had breached some duty by collecting interest

13    or something like that.

14         MR. MERVIS:  In the complaint, but we didn't hear

15    the evidence of that.

16         THE COURT:  Is the plaintiff arguing that there

17    was a separate breach of fiduciary duty by failing to

18    entertain or follow-up in 2015 these expressions of interests

19    which were received by RCA and, I think, National Express or

20    whatever the name is.

21         MR. AMINI:  No.  Obviously, when we drafted the

22    complaint we didn't have any --

23         THE COURT:  Right.

24         MR. MERVIS:  So, I want to get to the WARN piece,

25    Your Honor, because the WARN piece is a claim for breach of a

1   duty of good faith.  Delaware Law under <u>Walt Disney</u> says that

2   you, basically, have to have an I don't care about the

3   consequences attitude.  And what we heard at this trial was

4   that every iteration of this plan had WARN liability in mind.

5   Now, it didn't come to pass, but I don't think that there's

6   any evidence to support the notion that Ms. Tilton had an I

7   don't care about the risks attitude when it came to WARN's.

8           THE COURT:  Yeah, I have to admit, that was my

9   general impression.  It's not enough to say that the estate

10  incurred WARN Act liability.  You have to show that she did

11  something wrong.  I'm not going to rule on that today, but it

12  just struck me that, you know, she had it in mind.  It was

13  her hope that the company would continue for ninety days and

14  eventually the bottom just fell at. That may result in WARN

15  Act liability, I don't know, that's a different case, but it

16  just doesn't strike me that she did anything wrong in respect

17  to that.

18          I will let you present the facts and brief that

19  point.

20          MR. MERVIS:  There are a couple other claims

21  towards the end, Your Honor.  There's a claim that's styled

22  limitation on liens which I think is a Section 552 claim.

23          THE COURT:  Oh, yeah, yeah, I didn't understand

24  that one because there was no post-petition property created.

25  In other words, all of the proceeds of the sales are from

1   property that existed on the petition date.  That's not a

2   proceeds issue.

3               MR. SAMET:  Is this on --

4               THE COURT:  It's your Claim Number 13.

5               MR. SAMET:  I think that's right, Your Honor. I do

6   want to note, though, that to the extent that they would

7   claim some interest in the proceeds of this lawsuit, to the

8   extent there were any --

9               THE COURT:  In this lawsuit?

10              MR. SAMET:  That's right.  To the extent that they

11  would claim a security interest if we were to get a judgment

12  in that event.

13              THE COURT:  Breach of their fiduciary duty?

14              MR. SAMET:  That's right.  We would say limitation

15  --

16              THE COURT:  I'd say that's a tough argument.

17              MR. SAMET:  That's what we think.  Thank you.

18              MR. MERVIS:  I don't think that's what's being

19  argued in the pretrial order.  So, I do think that claim

20  should be dismissed, Your Honor.  I'd hate to have to spill

21  ink over that.

22              THE COURT:  I don't know.  It just doesn't sound

23  like there's any -- are you claiming a security interest in

24  any post-petition proceeds that you might have to pay as

25  damages?

```
 1                MR. MERVIS:  Well --

 2                THE COURT:  I guess if you're saying yes then --

 3                MR. MERVIS:  -- I'm not saying no, but let me --

 4    so, I guess the point is --

 5                THE COURT:  Why don't you think about this?

 6                MR. MERVIS:  All right.  Your Honor, I will think

 7    about it.

 8                THE COURT:  If it turns out --

 9                MR. MERVIS:  I mean, this all seems very

10    hypothetical.

11                THE COURT:  Well, unless you have to spill ink on

12    it.  Unless you're going to assert, one of the entities is

13    going to assert a security interest in the proceeds of this

14    litigation, which, arguably, still may be a prepetition

15    asset, then, you know, you can both make whatever arguments

16    you want to make, but if you're not then just write them

17    because at the end of this I'm going to ask you to each write

18    letters just confirming what's been dismissed so we don't

19    have to deal with that, there's no dispute.

20                MR. MERVIS:  The transcript will, hopefully, help

21    with that, Your Honor.

22                One other claim which is Claim 12.  This is a -- I

23    always found this to be a bit of a curious claim, but the

24    gist of it, as I understand it, is the trustee --

25                THE COURT:  Oh, no.
```

```
 1              MR. MERVIS:  Can I stop talking?

 2              THE COURT:  Yeah.  If Ark II -- this is Claim

 3   Number 12 which claims, I guess, on behalf of PPAS that you

 4   shouldn't have paid Ark II; although, it was PPAS that paid

 5   Ark II, but putting that aside.  If you avoid that lien under

 6   any theory, the Ark II lien, either because it's just not a

 7   secured claim or its re-characterized, it was always just an

 8   unsecured claim, at the end of the day you get that lien

 9   preserve for the estate then the only issue is whether you

10   are entitled to recover the $800,000 dollars that was paid

11   which apparently was paid to PPAS's agent under that Ark II

12   credit agreement for Ark II.

13              If you don't avoid the lien and there's an

14   argument that's between PPAS or the term lenders and Ark II

15   who was entitled to that first $800,000 dollars.  I don't

16   think that's the estate's argument.

17              MR. SAMET:  I think we agree with that, Your

18   Honor.  I would just point out that PPAS is not Ark II's

19   agent.

20              THE COURT:  I thought it was under that Ark II

21   credit agreement.

22              MR. SAMET:  No.

23              THE COURT:  I don't see how it makes a difference.

24              MR. SAMET:  It may not.

25              MR. MERVIS:  I don't think it does.
```

**A2326**

```
1              THE COURT:  Why don't you discuss that and see if
2    you really have to brief that particular issue.
3              MR. MERVIS:  So, let me turn to --
4              THE COURT:  This doesn't sound like it's a
5    separate claim.  If you avoid the lien on some theory you're
6    probably entitled to get the $800,000 dollars back.  If you
7    don't it's a dispute between Ark II, PPAS and the term
8    lenders.
9              MR. MERVIS:  So, Your Honor, let me start right
10   there.
11             THE COURT:  You do it well.
12             MR. MERVIS:  Thank you, Your Honor, I've tried.
13   So, I disagree with Your Honor on one point.
14             THE COURT:  Only one?
15             MR. MERVIS:  Well, I disagree with -- I actually
16   think this is --
17             THE COURT:  Because I made a lot of points, you
18   know.
19             MR. MERVIS:  Well --
20             THE COURT:  Why don't you tell me what you
21   disagree with and then you can tell me what you agree with.
22             MR. MERVIS:  -- Your Honor, I've agreed with,
23   essentially, everything you said about dismissing claims.
24        (Laughter)
25             MR. MERVIS:  I phrased that wrong. I think the
```

 1  $800,000 dollar issue is actually a non-issue and let me

 2  explain why.  We will brief this, but here the so called

 3  personal property stipulation, which was executed way back in

 4  March of 2016, which, you know, we will put in front of you,

 5  it's in the court docket, I think, answers this question.

 6  That $800,000 dollars was paid to PPAs, not to Ark II

 7          THE COURT:  So, Ark II this is proof of claim by

 8  $800,000 dollars.

 9          MR. MERVIS:  That I need to talk with Mr. Parcher

10  about.  I don't know the answer to that.

11          THE COURT:  I can only decide it on the record.

12          MR. MERVIS:  No, no, but, Your Honor, I actually

13  would submit to you that that doesn't matter.  Here is what I

14  disagree with.  You say that that 800,000 should come back

15  into the estate.

16          THE COURT:  There's several steps before that.

17          MR. MERVIS:  That's right.

18          THE COURT:  Let's assume Ark II is not secured,

19  it's just a general unsecured creditor.

20          MR. MERVIS:  Yes.

21          THE COURT:  Isn't that the payment of a

22  prepetition claim post-petition?

23          MR. MERVIS:  It is a payment that was, again,

24  subject to other rulings that may have occurred in this case

25  it was a payment to PPAS, which PPAS unquestionably was

1   entitled to, again, subject to --

2          THE COURT:  Not if Ark II has the first lien.  In

3   other words, when I read all these things together it sounds

4   to me like PPAS was agreeing on behalf of the lenders that

5   Ark II had the first lien.

6          MR. MERVIS:  Yes, Your Honor.  Here is where I

7   think we're disconnecting; it's not an issue for the estate.

8   It may be an issue between Ark II and PPAS, it may be an

9   issue between PPAS and other parties, but no matter what

10  unless the court says I'm subordinating --

11         THE COURT:  No, I don't have to do that.  It

12  preserved the lien for the estate and then the money should

13  have been paid to the estate which has the first lien under

14  Section 552.

15         MR. MERVIS:  Well, Your Honor -- all right.  We

16  will brief it for Your Honor, but I think --

17         THE COURT:  This is pretty clear cut.

18         MR. MERVIS:  I think it's actually clear cut the

19  other way, but we will put it in writing for you.

20         All right.  So, let me get to the issue of --

21  well, actually, let me touch on Ark II for a moment. I hear

22  what you're saying. I still think that these are governed by

23  the Alistair factors.  There was some evidence --

24         THE COURT:  That's for re-characterization.  I

25  don't even have to get to that.  I said, initially, it just

1  looks to me like it was an unsecured infusion of cash at the

2  time it was made having nothing to do with the agreement that

3  was subsequently entered into up to a month later.

4          MR. MERVIS:  Okay.  So, Your Honor --

5          THE COURT:  It was just decided to roll that in

6  because at the time that while this was going on, I guess,

7  TransCare was still trying to get an agreement or maybe

8  Tilton was still trying to get an agreement with Credit

9  Suisse and, I think, Wells Fargo to try to lien on a priming

10 basis.  So, it couldn't have been the loan that was entered

11 into because that loan could have been entered into at any

12 time.

13         MR. MERVIS:  Your Honor, I think that -- again,

14 we'll lay it out for you in the post-trial findings and

15 conclusions, but I think that what the evidence will show --

16 and there's no dispute that the documentation was, you know,

17 somewhere between twenty-five days because then it's a

18 question of a mixed question of fact and law.

19         THE COURT:  It can also be a preference for that

20 reason.

21         MR. MERVIS:  Well, I would actually say, Your

22 Honor, that the evidence really would not allow for a

23 preference because I think regardless of the documentation I

24 don't think there's any question that -- I don't think

25 there's any question that there was an intended

**A2330**

1  contemporaneous exchange of value.

2           THE COURT:  I have a real question about that one.

3           MR. MERVIS:  Well, Your Honor, you are the Judge

4  so it's our job to --

5           THE COURT:  I mean I heard Ms. Tilton's testimony,

6  but there is no evidence that at the time the money was

7  advanced it was meant to be anything more than a band aid at

8  that point to stop the bleeding.  There is no insurance.

9           MR. MERVIS:  I think, Your Honor, that -- I guess

10 what I would say is that is not inconsistent.  I don't

11 disagree that it was an emergency funding.  I don't think

12 that's necessarily inconsistent with a secured loan, but as I

13 said we will deal with it in our briefing.

14          THE COURT:  Okay.

15          MR. MERVIS:  With respect to the foreclosure I

16 guess two points. One, with regard to fair process I

17 understand what Your Honor is saying.  Right, in other words,

18 you raised the, sort of, rhetorical question why didn't you

19 pick-up the phone.  What I will say to you is this; I think

20 that when we lay out this story, and I'm not suggesting Your

21 Honor, you know, wasn't taking it in --

22          THE COURT:  I heard it.

23          MR. MERVIS:  No, no, I understand that.  There is

24 a difference --

25          THE COURT:  I knew what she was going to say. I

1    heard it over the last two days.  I just don't understand why

2    she didn't pick-up the phone.  I mean if somebody is willing

3    to pay $6 to $7 million dollars for the MTA business or maybe

4    the rest of the business was worth more than $3 million

5    dollars.  She was talking about here model.  Other entities

6    may have had different models that would have allowed them to

7    run the business with less money.  I don't know.

8             MR. MERVIS:  So, I think --

9             THE COURT:  But the debtor never had that

10   opportunity.  That's the problem I have.

11            MR. MERVIS:  I understand what you're saying.  I

12   think that -- again, we will address this, but I think that

13   the record will show that given the state of this company as

14   it deteriorated over time that picking up the phone would

15   have been a fool's errand.

16            THE COURT:  I knew you were going to say that.  I

17   don't think I can find that it was futile without any

18   evidence that it was futile other than Ms. Tilton's testimony

19   that nobody is going to buy the company without audited

20   financials.

21            MR. MERVIS:  I'm not sure that I agree with Your

22   Honor that there's no evidence, but, again, understanding

23   that Your Honor is not ruling today that's for us to

24   demonstrate to you.

25            With respect to fair price I don't know, Your

1   Honor, that -- I mean, I heard what you said about book

2   value.  To me this is a mixed question of law and fact

3   because it assumes that for a company, and I do believe we

4   established this that a company at the time had no going

5   concern value because it had no source of working capital,

6   that book value is necessarily an inappropriate measure of

7   value.

8           THE COURT:  Well, see, I'm not sure that it had no

9   going concern value or if somebody would invest money, at

10  least it might have some going concern value or what that

11  going concern value would be is an issue of dispute which

12  maybe goes to damages.

13          MR. MERVIS:  Right.  Well, that's a whole separate

14  issue.

15          THE COURT:  You know, in using Dr. Arnold's

16  analogy or metaphor from the first day, the debtor may not

17  have had the shovel, but somebody else may have had the

18  shovel or a different kind of shovel to mine the silver min.

19          MR. MERVIS:  I think, Your Honor, that to

20  conclude, and, again, I know you're not concluding anything

21  today, but I think that to conclude that because it's a big

22  world and someone might have come along with money

23  necessarily makes it inappropriate to value those assets on a

24  book value basis.  I don't think that's right.  Now, again,

25  we will address it in our briefs, but I don't think that's

1  right.

2          If you think about what these businesses were,

3  right, if there's no money they can't run, there are a bunch

4  of ambulances.  I think what we showed you is that the real

5  book value is like a couple million bucks, right, but I

6  understand what the court's concern is.  So, we will work to

7  address it.

8          THE COURT:  You know, another thing about book

9  value it's got a lot of depreciation in there that reduces

10 the value of the equipment.  Book value is just a --

11 depreciation is just an accounting concept.  I don't know

12 what the ambulances are worth.  I see that the debtor was

13 going to have to pay $195,000 dollars for the month during

14 the transition period to use them.  So, they must have been

15 worth something if they could generate that kind of income.

16         MR. MERVIS:  I'll push back on that briefly.  That

17 was a draft.  The drafter had hoped that that would happen,

18 but it never came to pass.

19         THE COURT:  No, but that's what they were valued

20 at.

21         MR. MERVIS:  I don't think that's right, Your

22 Honor.  I don't think you could take a look at a draft and

23 say, okay, that's the number.  It's a draft.  There's no

24 evidence it was ever negotiated.  For all we know, Wells

25 Fargo would have said, no, I'm paying zero.

```
 1                THE COURT:  Who drafted it?

 2                MR. MERVIS:  Those numbers were -- well, there's

 3   no evidence in the record so I'm not sure I should say, but

 4   those numbers, I think, were filled in by Mr. Stephen.  He's

 5   a lawyer.

 6                THE COURT:  He's counsel of --

 7                MR. MERVIS:  He's not general counsel.  In any

 8   event --

 9                UNIDENTIFIED SPEAKER:  I think Mr. Greenberg did

10   it.

11                THE COURT:  Well, somebody did it.

12                MR. MERVIS:  Yes, Your Honor.  I understand.

13                Again, I think the -- my only point is I think

14   that the -- I don't think its necessarily correct -- in other

15   words, it's one thing to say oh, that book value is wrong, it

16   should have been -- you know, you let out such an such,

17   right.  That is different from saying, no, a foreclosure --

18   and Article 9 -- again, we're going to have to get into some

19   Article 9 here, but I'm not sure that it's right to say that

20   an Article 9 foreclosure is, per say, unfair because the

21   credit bid was based on book value.

22                THE COURT:  I'm saying something else.  The

23   problem I'm having is that Ms. Tilton is on both sides of the

24   transaction.

25                MR. MERVIS:  Sure.
```

1      THE COURT:  And she kicks the book value or she

2  fixed the $10 million dollar value and it just strikes me

3  that, you know, that doesn't necessarily prove anything.

4      MR. MERVIS:  Well, Your Honor, I'm not sure I

5  agree because, again, she didn't pick the number out of a

6  hat.  She went to the company's books and records and pulled

7  the value.  So, if I could just finish I think what you -- I

8  think there may be a conflation between saying, well, someone

9  is on both sides of the transaction.  It could never be that

10  they can come up with a fair price.

11      THE COURT:  No.  You could have -- for example, I

12  was surprised that your damages expert didn't testify as to

13  what you're saying right now or that there was some method of

14  valuing the company, you know, that fixed that $10 million

15  dollar as a fair number.  All we really have is Ms. Tilton's

16  testimony that that was the number.

17      MR. MERVIS:  I differ in one respect.  She's

18  certainly the person who did it, but she showed you how she

19  did it.  She didn't pick the numbers out of the air.  There

20  was method to it.  So, I think the question is -- again, the

21  question is, is -- there's two possibilities; book value is

22  wrong, right, can't do that, that's inherently unfair, I

23  don't think that that's the law.  The second way to look at

24  it is, yes, she used book value, but it was too low.  I don't

25  think there was any evidence to support that.

1          THE COURT:  Well, that's Dr. Arnold's evidence.

2     It's really –

3          MR. MERVIS:  No.

4          THE COURT:  That is what I'm having trouble with,

5     the notion that you failed to prove a fair price and what the

6     damages are because they seem to be the same issues.  And you

7     have the burden on one and they have the burden on the other.

8          MR. MERVIS:  You said that at the very outset of

9     the trial and I said I agree with you.  I said, you know, the

10    issues are close, but there is, sort of, a twostep process.

11    I'm not going to talk about damages because we'll deal with

12    that in the paper.

13         THE COURT:  Right.

14         MR. MERVIS:  Can I just have one second, Your

15    Honor.  Okay.  That's it, Your Honor.

16         MR. AMINI:  Just very briefly.  I don't propose to

17    take-up a lot of time, but I want to pick-up on the latter

18    conversation.  We were surprised, very surprised by no fair

19    price analysis.  We came in with ours and we were sitting and

20    waiting to find out what the fair price was so that we could

21    respond to it and put in our own value.  Then it didn't come.

22    So, now I don't get a rebuttal on that.  She had the burden

23    on fair price and so we thought, okay, we will take her data

24    because we don't have any other data given the way there was

25    no accounting.  As she testified she didn't have a CFO, she

1    didn't have the data, so we used the best data available, we

2    talked to the experts and they said the best data would be

3    their own data.

4         THE COURT:  Can I ask you why Dr. Arnold's first

5    report and second report weren't one report?

6         MR. AMINI:  Weren't one report?

7         THE COURT:  In which he said, look, I can't do the

8    discounted cash-flow analysis, I don't have the information;

9    although, maybe he could have gone back and reconstructed it,

10   I don't know.  It had all these comperables and they'll argue

11   they're not comparable, but he had all these comperables and

12   you could have presented the evidence at that point about an

13   independent comparable company analysis which I assume you

14   would have testified is the most appropriate or only

15   appropriate way to value this company under the circumstances

16   and this is what the value is.

17        MR. AMINI:  Your Honor, believe that he actually

18   did all those things except give you an independent value

19   independent of what they, themselves, were valuing

20        THE COURT:  I guess I don't understand why just

21   didn't do another report, but it may not matter.

22        MR. AMINI:  I do think that this is not a unique

23   circumstance and that we will be able to cite you to a number

24   of Delaware decisions that have faced these circumstances.

25   And, ultimately, in the most extreme, I'm not suggesting Your

1  Honor is going to accept the most extreme, have said, you

2  know, since you had the obligation, if you come in and tell

3  me that this was the value I get to take the range based on

4  that value and --

5          THE COURT:  That was the issue I was getting to.

6          MR. AMINI:  -- I will stick the highest range to

7  you and that's what we gave you, we gave you the range.

8          THE COURT:  Yeah, that's the issue I was getting

9  to.

10         MR. MERVIS:  Well, Your Honor, I guess the only

11  thing I'd say about that is there has -- the person who's --

12  you have to find that that range is reliable.  I mean,

13  obviously, we will address that.

14         THE COURT:  All right.  With respect to the post-

15  trial submissions I want proposed findings of fact and

16  proposed conclusions of law.  They should be submitted in a

17  Word format.  Each proposed finding should be, essentially, a

18  simple declarative sentence; not a long paragraph, a lot of

19  findings.  Each find should be supported with a reference to

20  the record to the evidence.  If you're referring to the trial

21  transcript it should be to the page and the line range.

22         With respect to exhibits -- and we'll talk about

23  the order and submission in a minute, but with respect to

24  exhibits I'd like them in a PDF, not a disc.  I don't need

25  every exhibit you marked.  A lot of exhibits were never used

 1   and never came in.  So, I don't need those.  And when you do

 2   that don't give me one document of 1,000 pages of all the

 3   exhibits.  Each exhibit should be separated by number,

 4   certainly, and if you could put in a brief description.  So,

 5   you know, if it fits in -- so, sometimes when I'm looking for

 6   this --

 7              MR. MERVIS:  Sorry, Your Honor.  Meaning in a --

 8              THE COURT:  So --

 9              MR. MERVIS:  -- index or something like that.

10              THE COURT:  No.  It can be just Exhibits 1 through

11   100.

12              MR. MERVIS:  Oh, on the disc.

13              THE COURT:  But next to Exhibit 1, you know,

14   complaint or something like that just so it's easier to pick

15   out.

16              MR. AMINI:  You had mentioned PDF. Some of the

17   exhibits will come in, as we saw, Excel's.

18              THE COURT:  That's okay.  That's fine.  How long

19   will it take the plaintiffs to submit the proposed findings

20   and conclusions?

21              MR. AMINI:  Three weeks.

22              THE COURT:  Well, Labor Day is coming up.

23              MR. AMINI:  Four weeks.

24              MR. MERVIS:  Your Honor, could I make a

25   suggestion?

39

```
 1              THE COURT:  Sure.

 2              MR. MERVIS:  Thank you.

 3              THE COURT:  You want simultaneous submissions?

 4              MR. MERVIS:  Yeah.  What I would like, Your Honor,

 5  because we have the burden of demonstrating fairness, and I

 6  don't see the point of chopping the claims up, what I would

 7  suggest is that we have simultaneous submissions. I'm going

 8  to suggest three weeks from now, but --

 9              THE COURT:  You have Labor Day in there.  Its two

10  weeks from this weekend.

11              MR. MERVIS:  People work on holidays.

12              THE COURT:  I don't want to ruin anybody's

13  vacation.

14              MR. MERVIS:  No, I don't either, Your Honor.  We

15  will take as much time as we can get.

16              THE COURT:  Why don't we do four weeks?

17              MR. MERVIS:  All right.  Then, I think it would be

18  helpful, Your Honor, to have relatively brief responses to

19  one another.

20              THE COURT:  Well --

21              MR. MERVIS:  It's a pretty big record.

22              THE COURT:  -- it is a big record.  Sometimes when

23  I get those responses they're just -- they become

24  argumentative.  They're, basically, the same brief.

25              MR. MERVIS:  I promise you that we won't.
```

```
 1          THE COURT:  Why don't we limit responses to twenty
 2   pages due two weeks?
 3          MR. AMINI:  I would just suggest that Your Honor
 4   let us know if you want responses.
 5          THE COURT:  What I would like you to do, though,
 6   before all this is write a letter to me as to your
 7   understanding of what claims were dismissed.  So, there is no
 8   issue, since there's simultaneous submissions, that you
 9   thought a claim was dismissed and he thought it wasn't.
10          MR. MERVIS:  Yeah.  I was going to say perish the
11   thought that we might not be hearing the same thing, Your
12   Honor.  So, if we're not able to agree I will so indicate in
13   the letter.
14          THE COURT:  All right.  You can send a joint
15   letter for that.
16          MR. MERVIS:  I think that makes sense.
17          MR. AMINI:  As long as we get that to you.
18          THE COURT:  I'm not concerned for me.  As I said,
19   what I don't want is a situation where you, as the plaintiff,
20   think a claim is still in the case and he thinks the claim
21   wasn't in the case and doesn't deal with it at all.  I just
22   want to make sure we're dealing with the same universe of
23   claims.
24          MR. AMINI:  Proposed findings of fact, proposed
25   conclusions of law and then briefs?
```

```
 1              THE COURT:  No.  The proposed conclusions of law
 2   are, essentially, the brief.  Okay.
 3              Anything else?
 4              MR. AMINI:  We have a couple of housekeeping
 5   matters.  We understand Your Honor to have admitted all the
 6   JX whether we put them in front of a witness or not.
 7              THE COURT:  I mean, yeah.  Is there any dispute as
 8   to that?
 9              MR. MERVIS:  No, Your Honor.
10              THE COURT:  Otherwise, plaintiff's exhibits and
11   defendants exhibits were received or not received.  In terms
12   of getting me the exhibits, unless you're going to cite to
13   the exhibit I'm not going to look at it, probably, even if
14   it's a joint exhibit.
15              MR. MERVIS:  I could be wrong --
16              MR. AMINI:  We have a number of exhibits that they
17   have asked that were PX's or DX's that we didn't put in.
18   They all have to do with agreements related to the lending
19   agreements.  We will agree with them that all those
20   agreements are --
21              THE COURT:  If you can stipulate that exhibits are
22   coming in that's fine.
23              MR. MERVIS:  We will put that in the joint letter
24   if that makes sense.
25              THE COURT:  That's fine.
```

1          MR. MERVIS:  Okay.

2          THE COURT:  As long as there's a record of it so

3    there's no confusion.

4          MR. AMINI:  There was only one more housekeeping

5    matter, Your Honor, and that had to do with a particular

6    day's transcript.  I am going to sit down on this.

7          THE COURT:  A particular day's transcript?

8          MR. SAMET:  The second day of the trial in the

9    afternoon it's my understanding that the official court audio

10   failed.

11         THE COURT:  But I think they were going to back it

12   up?

13         MR. SAMET:  We were able to back it up through the

14   court reporter sitting here.  So, the parties -- she had her

15   own audio and the parties have received a transcript from

16   that.

17         THE COURT:  Okay.  So, have you agreed that that

18   is a transcript -- agreed on the content?

19         MR. MERVIS:  Your Honor, I think so. I'd like to

20   just take a quick look at it.

21         THE COURT:  If not tell me what the disagreement

22   is and my notes, my recollection, and I don't know if we have

23   a disc.  It's been recorded in our files, probably not.

24         MR. MERVIS:  I think that was the problem, Judge.

25   I don't anticipate, you know, other than a missed

1  transcription or something, I don't think there's going to be

2  --

3           THE COURT:  I have a lot of notes.

4           MR. MERVIS:  I saw.

5           THE COURT:  Okay.

6           MR. MERVIS:  All right.  Thank you, Judge.

7           THE COURT:  Thank you.  Thank you very much.  It's

8  a well-tried case.

9       (Proceedings concluded at 2:50 p.m.)

10

11                         CERTIFICATE

12

13  I certify that the foregoing is a correct transcript from the

14  electronic sound recording of the proceedings in the above-

15  entitled matter.

16  /s/Mary Zajaczkowski_____          August 20, 2019

17  Mary Zajaczkowski, CET**D-531

18

19

20

21

22

23

24

25