# 20 Civ. 06274 (LAK)

**United States District Court**

*for the*

**Southern District of New York**

_____

IN RE TRANSCARE CORPORATION, ET AL.

DEBTORS,

_____

PATRIARCH PARTNERS AGENCY SERVICES, LLC, ET AL.

DEFENDANTS-APPELLANTS,

—against—

SALVATORE LAMONICA, AS CHAPTER 7 TRUSTEE OF THE JOINTLY-ADMINISTERED ESTATES OF TRANSCARE CORPORATION, ET AL.,

PLAINTIFF-APPELLEE.

_____

ON APPEAL FROM THE UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK (BERNSTEIN, J.)

IN RE: TRANSCARE CORPORATION, ET AL., CASE NO. 16-10407 (SMB)

LAMONICA V. TILTON, ET AL., ADV. PROC. NO. 18-1021 (SMB)

## APPENDIX TO BRIEF FOR THE APPELLANTS

# Volume XI- A2346-A2913

September 6, 2019

**VIA ECF and EMAIL**

The Honorable Stuart M. Bernstein
United States Bankruptcy Court for the Southern District of New York
One Bowling Green, Courtroom 723
New York, New York 10004
Bernstein.chambers@nysb.uscourts.gov

     **Re:**    **Joint Letter Regarding Bench Rulings and Related Matters in _LaMonica v. Tilton, et al._, Adv. Pro. No. 18-1021**

Dear Judge Bernstein:

As directed by the Court during the August 14, 2019 afternoon trial session in the above-captioned adversary proceeding, the parties respectfully submit this joint letter regarding the Court's August 14, 2019 bench rulings (the "Bench Rulings") and certain other related matters.

Pursuant to the Bench Rulings, the following claims in the Joint Pre-Trial Order [Docket No. 85] have been dismissed:

-    Count III, equitable subordination as against Patriarch Partners, LLC and Patriarch Partners Management Group, LLC;

-    Count VII, actual fraudulent transfer as against Ark II;

-    Count IX, violation of the automatic stay against all Defendants.

The following claims are pending:

-    Count I, breach of fiduciary duty against Tilton;
-    Count III, equitable subordination against PPAS and Ark II;[1]
-    Count IV, recharacterization against Ark II;
-    Count VII, actual fraudulent transfer against PPAS, Ark II, Transcendence Transit, Inc. and Transcendence Transit II, Inc.;
-    Count X, preference against Ark II;
-    Count XI, constructive fraudulent transfer against Ark II;
-    Count XII, payment subordination against PPAS;

---

[1] Patriarch Partners Agency Services, LLC ("PPAS") and Ark II CLO 2001-1, Limited ("Ark II");

Hon. Stuart M. Bernstein
September 6, 2019
Page 2 of 2

- Count XIII, limitations on liens against Ark II and PPAS; and
- Count XIV, turnover and avoidance of $800,000 against PPAS and Ark II.

The parties have agreed to adjust the deadlines for post-trial submissions as follows, subject to the Court's approval: the parties will file (a) Proposed Findings of Fact and Conclusions of Law by September 16, 2019 (from September 11) and (b) responses to one another's Proposed Findings of Fact and Conclusions of Law by October 7, 2019 (from September 25). The responses shall not exceed twenty (20) pages.

The parties have stipulated to the admission into evidence of the following additional exhibits: DX 3, DX 26, DX 30, DX 33, DX 106, DX 133, and PX 1.

The parties have agreed to use the transcript prepared by A&A Court Reporting of the afternoon trial session held on July 23, 2019 as the official transcript of that trial session. The parties will provide the Court with two copies of the entire trial transcript both in hard copy and in electronic format.

The parties respectfully request that the Court approve the above-requested change to the submission dates for post-trial filings and endorse the other matters set forth herein. The parties will make themselves available if and as requested by the Court to address any of the matters set forth herein.

Respectfully submitted,

*s/ Michael T. Mervis*
Michael T. Mervis
PROSKAUER ROSE LLP
Eleven Times Square
New York, NY 10036
Main Line: (212) 969-3000
*Counsel for Defendants*

*s/ Avery Samet*
Avery Samet
STORCH AMINI PC
2 Grand Central Tower
140 East 45th Street, 25th Floor
New York, NY 10018
Main Line: (212) 490-410
*Counsel for Plaintiff*

So ordered: 9/9/19

SMB
WABJ

**A2347**

Case 1:20-cv-06374-AK   Document 11-11   Filed 09/30/20   Page 4 of 569

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------x

In re:                                                    :
                                                          :
                                                          :
        TRANSCARE CORPORATION, et al.,        :          Chapter 7
                                                          :          Case No. 16-10407 (SMB)
                                                          :          (Jointly Administered)
                              Debtors.              :
-------------------------------------------------------------x

SALVATORE LAMONICA, as Chapter 7        :
Trustee for the Estates of TransCare          :
Corporation, et al.,                                  :
                                                          :
                              Plaintiff,             :
                                                          :          Adv. Proc. No. 18-1021 (SMB)
        - against -                                    :
                                                          :
LYNN TILTON, PATRIARCH PARTNERS      :
AGENCY SERVICES, LLC, PATRIARCH          :
PARTNERS, LLC, PATRIARCH                      :
PARTNERS MANAGEMENT GROUP, LLC, ARK II CLO :
2001-1 LIMITED, TRANSCENDENCE            :
TRANSIT, INC., and TRANSCENDENCE         :
TRANSIT II, INC.,                                    :
                                                          :
                              Defendants.          :
                                                          :
-------------------------------------------------------------x

**DEFENDANTS' POST-TRIAL PROPOSED FINDINGS OF FACT**
**AND CONCLUSIONS OF LAW**

# TABLE OF CONTENTS

**Page**

BASIS FOR JURISDICTION ............................................................... 1

FINDINGS OF FACT ......................................................................... 2

I.    TRANSCARE, PATRIARCH PARTNERS AND PPMG ...................... 2

II.   TRANSCARE'S DEBT STRUCTURE .......................................... 4

III.  TRANSCARE'S LIQUIDITY AND FINANCIAL REPORTING CHALLENGES ........... 6

IV.  TRANSCARE RECEIVES UNSOLICITED INQUIRIES ................... 7

V.   TRANSCARE MISSES PAYROLL IN JULY 2015 ...................... 9

VI.  WELLS FARGO DECIDES NOT TO RENEW THE WELLS FARGO ABL AGREEMENT ......... 9

VII. ZOHAR FUNDS PROVIDE FUNDING TO ADDRESS TRANSCARE'S LIQUIDITY SHORTFALLS ......... 10

VIII. TILTON EXPLORES A POTENTIAL SALE OF TRANSCARE .................. 10

IX.  THE ARK II FACILITY ................................................... 20

X.   OLDCO/NEWCO RESTRUCTURING .................................... 22

XI.  THE ARTICLE 9 FORECLOSURE ...................................... 30

XII. VALUING THE SUBJECT COLLATERAL ............................. 31

XIII. BANKRUPTCY FILING AND POST-PETITION EVENTS ............. 37

XIV. VALUING TRANSCARE ................................................. 39

CONCLUSIONS OF LAW ................................................................. 49

XV. THE TRUSTEE'S BREACH OF FIDUCIARY DUTY CLAIM .......... 49

XVI. THE TRUSTEE FAILED TO PROVE DAMAGES FOR THE FIDUCIARY DUTY CLAIM ......... 70

XVII. EQUITABLE SUBORDINATION OF THE CLAIMS OF PPAS AND ARK II IS NOT APPROPRIATE ......... 81

i

XVIII. THE TRUSTEE FAILED TO ESTABLISH THAT AN ACTUAL FRAUDULENT TRANSFER OCCURRED ................................................................................................ 84

XIX. THE SECURITY INTEREST GRANTED TO ARK II IS VALID .................................... 85

XX.  THE TRUSTEE LACKS STANDING TO ASSERT HIS CLAIM FOR "PAYMENT SUBORDINATION" ......................................................................................................... 94

XXI. THE TRANSFER OF THE AUCTION SALE PROCEEDS TO PPAS IS NOT AVOIDABLE UNDER SECTION 549 OF THE BANKRUPTCY CODE ....................... 95

XXII. PPAS'S LIENS ON TRANSCARE'S ASSETS ARE NOT BARRED BY  SECTION 552 OF THE BANKRUPTCY CODE .............................................................................. 97

CONCLUSION ............................................................................................................................... 98

ii

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*ACP Master, Ltd. v. Sprint Corp.*,
2017 WL 3421142 (Del. Ch. July 21, 2017),
*aff'd*, 184 A.3d 1291 (Del 2018)..................................................................61

*Agranoff v. Miller*,
791 A.2d 880 (Del. Ch. 2001)......................................................................78

*Allen v. Wright*,
468 U.S. 737 (1984)....................................................................................83

*Allied Chem. & Dye Corp. v. Steel & Tube Co. of Am.*,
120 A. 486 (Del. Ch. 1923)..........................................................................67

*Arnot v. Endresen (In re Endresen)*,
548 B.R. 258 (B.A.P. 9th Cir. 2016)............................................................98

*Bank of Commc'ns v. Ocean Dev. Am., Inc.*,
904 F. Supp. 2d 356 (S.D.N.Y. 2012)................................................92, 93, 94

*Basho Techs. Holdco B, LLC v. Georgetown Basho Inv'rs, LLC*,
2018 WL 3326693 (Del. Ch. July 6, 2018).....................................................70

*Bayer Corp. v. MascoTech, Inc. (In re AutoStyle Plastics, Inc.)*,
269 F.3d 726 (6th Cir. 2001) .......................................................................86

*Benjamin v. Diamond (In re Mobile Steel Co.)*,
563 F.2d 692 (5th Cir. 1977) .......................................................................82

*Bird v. SKR Credit, Ltd. (In re DigitalBridge Holdings, Inc.)*,
2015 WL 5766761 (Bankr. D. Utah Sept. 30, 2015)...............................83, 84

*Blackmore Partners, L.P. v. Link Energy LLC*,
864 A.2d 80 (Del. Ch. 2004).........................................................................59

*Brehm v. Eisner (In re Walt Disney Co. Deriv. Litig.)*,
906 A.2d 27 (Del. 2006) ..............................................................................69

*Burtch v. Opus, LLC (In re Opus East, LLC)*,
528 B.R. 30 (Bankr. D. Del. 2015),
*aff'd*, 698 F. App'x 711 (3d Cir. 2017) ..................................................66-67

iii

*Cage v. Wyo–Ben, Inc. (In re Ramba Inc.)*,
  437 F.3d 457 (5th Cir. 2006) ...................................................................................96

*Cavalier Oil Corp. v. Harnett*,
  1988 WL 15816 (Del. Ch. Feb. 22, 1988),
  *aff'd*, 564 A.2d 1137 (Del. 1989)............................................................................78

*Cede & Co. v. Technicolor, Inc.*,
  634 A.2d 345 (Del. 1993),
  *decision modified on reargument*, 636 A.2d 956 (Del. 1994) ................................51

*Cinerama, Inc. v. Technicolor, Inc.*,
  663 A.2d 1156 (Del. 1995) ................................................................51, 53, 54, 60, 62

*Cline v. Grelock*,
  2010 WL 761142 (Del. Ch. Mar. 2, 2010)...............................................................70

*Continuing Creditors' Comm. of Star Telecommunications, Inc. v. Edgecomb*,
  385 F. Supp. 2d 449 (D. Del. 2004).........................................................................71

*Cooper v. Pabst Brewing Co.*,
  1993 WL 208763 (Del. Ch. June 8, 1993)...............................................................71

*Crowley v. Chait*,
  322 F. Supp. 2d 530 (D.N.J. 2004) ..........................................................................74

*Doft & Co. v. Travelocity.com Inc.*,
  2004 WL 1152338 (Del. Ch. May 20, 2004)......................................................76, 79

*Edgar v. MITE Corp.*,
  457 U.S. 624 (1982)..................................................................................................49

*Emerald Partners v. Berlin*,
  2003 WL 21003437 (Del. Ch. Apr. 28, 2003),
  *aff'd*, 2003 WL 23019210 (Del. Dec. 23, 2003) ....................................................54

*Finkelstein v. Liberty Digital, Inc.*,
  2005 WL 1074364 (Del. Ch. Apr. 25, 2005) ...........................................................78

*Gelfman v. Weeden Inv'rs, L.P.*,
  859 A.2d 89 (Del. Ch. 2004)....................................................................................54

*Geltzer v. Bloom (In re M. Silverman Laces, Inc.)*,
  404 B.R. 345 (Bankr. S.D.N.Y. 2009) .....................................................................68

*Gen. Motors Corp. v. New Castle Cty.*,
  2000 WL 33113802 (Del. Sup. Ct. Dec. 16, 2000) .................................................73

iv

*Greene v. N.Y. Mercantile Exch., Inc. (In re NYMEX S'holder Litig.)*,
    2009 WL 3206051 (Del. Ch. Sept. 30, 2009) ........................................................61

*Havee v. Belk*,
    589 F. Supp. 600 (W.D.N.C. 1984),
    *aff'd*, 775 F.2d 1209 (4th Cir. 1985) ...............................................................67

*HBE Leasing Corp. v. Frank*,
    48 F.3d 623 (2d Cir. 1995) .............................................................................93

*Huff Fund Inv. P'ship v. CKx, Inc.*,
    2013 WL 5878807 (Del. Ch. Nov. 1, 2013),
    *aff'd*, 2015 WL 631586 (Del. Feb. 12, 2015) ...........................................77, 78

*In re 610 W. 142 Owners Corp.*,
    219 B.R. 363 (Bankr. S.D.N.Y. 1998)..............................................................2

*In re Aéropostale, Inc.*,
    555 B.R. 369 (Bankr. S.D.N.Y. 2016)................................................86, 87, 88

*In re Breitburn Energy Partners LP*,
    582 B.R. 321 (Bankr. S.D.N.Y. 2018)............................................................66

*In re Cold Harbor Assocs., L.P.*,
    204 B.R. 904 (Bankr. E.D. Va. 1997) .............................................................88

*In re Hanover Direct, Inc. S'holders Litig.*,
    2010 WL 3959399 (Del. Ch. Sept. 24, 2010) .................................................65

*In re HH Liquidation, LLC*,
    590 B.R. 211 (Bankr. D. Del. 2018) ...............................................................70

*In re LNR Prop. Corp. S'holders Litig.*,
    896 A.2d 169 (Del. Ch. 2005).........................................................................64

*In re Micro–Precision Techs., Inc.*,
    303 B.R. 238 (Bankr. D.N.H. 2003) ...............................................................88

*In re Nine Sys. Corp. S'holders Litig.*,
    2014 WL 4383127 (Del. Ch. Sept. 4, 2014),
    *aff'd sub nom. Fuchs v. Wren Holdings, LLC*, 129 A.3d 882 (Del. 2015) ......58, 72

*In re Old Carco LLC*,
    500 B.R. 683 (Bankr. S.D.N.Y. 2013) ........................................................83, 95

v

*In re Orchard Enters., Inc.*,
  2012 WL 2923305 (Del. Ch. July 18, 2012),
  *aff'd sub nom. Orchard Enters., Inc. v. Merlin Partners LP*,
  2013 WL 1282001 (Del. Mar. 28, 2013) ........................................................76, 78

*In re Petsmart, Inc.*,
  2017 WL 2303599 (Del. Ch. May 26, 2017) ...................................................75

*In re Quigley Co.*,
  391 B.R. 695 (Bankr. S.D.N.Y. 2008) ..............................................................83

*In re SubMicron Sys. Corp.*,
  432 F.3d 448 (3d Cir. 2006) ..............................................................................87

*In re Trados Inc. S'holder Litig.*,
  73 A.3d 17 (Del. Ch. 2013) ...............................................50, 51, 53, 54, 59

*In re Vision Hardware Grp., Inc.*,
  669 A2d 671 (Del. Ch. 1995),
  *aff'd*, 676 A.2d 909 (Del. 1996) ......................................................................65

*In re Walt Disney Co. Deriv. Litig.*,
  907 A.2d 693 (Del. Ch. 2005),
  *aff'd*, 906 A.2d 27 (Del. 2006) ........................................................................68

*In re Walt Disney Co. Deriv. Litig.*,
  825 A.2d 275 (Del. Ch. 2003) ...........................................................................69

*Jacobs v. D'Alessandro (In re Dewey & LeBoeuf LLP)*,
  2014 WL 4746209 (Bankr. S.D.N.Y. Sept. 23, 2014) .....................................94

*Johnson v. First Nat'l Bank*,
  81 B.R. 87 (Bankr. N.D. Fla. 1987) ..................................................................92

*Kahn v. Tremont Corp.*,
  694 A.2d 422 (Del. 1997) ..................................................................................64

*Kalisch v. Maple Trade Fin. Corp. (In re Kalisch)*,
  413 B.R. 115 (Bankr. S.D.N.Y. 2008),
  *aff'd*, 2009 WL 2900247 (S.D.N.Y. Sept. 9, 2009) .........................................81

*Kohler Co. v. United States*,
  387 F. Supp. 2d 921 (E.D. Wis. 2005),
  *aff'd*, 468 F.3d 1032 (7th Cir. 2006) ...............................................................74

*Kronenberg v. Katz*,
  872 A.2d 568 (Del. Ch. 2004) ...........................................................................75

A2354

*Lake Treasure Holdings, Ltd. v. Foundry Hill GP LLC*,
    2014 WL 5192179 (Del. Ch. Oct. 10, 2014) ....................................................71, 81

*McCord v. Agard (In re Bean)*,
    252 F.3d 113 (2d Cir. 2001)...................................................................................96

*MDG Int'l, Inc. v. Australian Gold, Inc.*,
    2009 WL 1916728 (S.D. Ind. June 29, 2009) .......................................................74

*Midlantic Nat'l Bank N., N.A. v. Borg–Warner Acceptance Corp. (In re Mayo)*,
    112 B.R. 607 (Bankr. D. Vt. 1990).......................................................................81

*Musso v. Brooklyn Navy Yard Dev. Corp. (In re Westchester Tank Fabricators,
    Ltd.)*,
    207 B.R. 391 (Bankr. E.D.N.Y. 1997)...................................................................96

*Neal v. Alabama By–Prods. Corp.*,
    1990 WL 109243 (Del. Ch. Aug. 1, 1990),
    *aff'd*, 588 A.2d 255 (Del. 1991)...........................................................................75

*Obuchowski v. Poulin Grain, Inc. (In re Stevens)*,
    2000 WL 35723732 (Bankr. D. Vt. Oct. 24, 2000) ..............................................82

*Official Comm. on Unsecured Creditors of Adoni Grp., Inc. v. Capital Bus.
    Credit, LLC (In re Adoni Grp.)*,
    530 B.R. 592 (Bankr. S.D.N.Y. 2015)...................................................................90

*Official Comm. of Unsecured Creditors v. Bay Harbour Master Ltd.
    (In re BH S&B Holdings LLC)*, 420 B.R. 112 (Bankr. S.D.N.Y. 2009),
    *aff'd*, 807 F. Supp. 2d 199 (S.D.N.Y. 2011)...................................................86, 87

*Official Comm. of Unsecured Creditors of Fedders N. Am., Inc. v. Goldman Sachs
    Credit Partners L.P. (In re Fedders N. Am., Inc.)*,
    405 B.R. 527 (Bankr. D. Del. 2009) .....................................................................49

*Official Comm. of Unsecured Creditors of Katy Indus., Inc. v. Victory Capital
    Advisors, LLC (In re Katy Indus., Inc.)*,
    590 B.R. 628 (Bankr. D. Del. 2018) .....................................................................71

*OptimisCorp v. Waite*,
    2015 WL 5147038 (Del. Ch. Aug. 26, 2015),
    *aff'd*, 137 A.3d 970 (Del. 2016)......................................................................70, 77

*Pereira v. Hope (In re 550 Les Mouches Fashions, Ltd.)*,
    24 B.R. 509 (Bankr. S.D.N.Y. 1982) ....................................................................93

A2355

*Pfeifer v. Hudson Valley Bank, N.A. (In re Pfeifer),*
2013 WL 3828509 (Bankr. S.D.N.Y. July 23, 2013) ...........................................92

*Premium Mortg. Corp. v. Equifax, Inc.,*
583 F.3d 103 (2d Cir. 2009)...........................................................................95

*Ravenswood Inv. Co., L.P. v. Estate of Winmill,*
2018 WL 1410860 (Del. Ch. Mar. 21, 2018).......................................................71

*Reis v. Hazelett Strip–Casting Corp.,*
28 A.3d 442 (Del. Ch. 2011).............................................................50, 65, 71, 79

*Rivera v. Mendez & Compania,*
988 F. Supp. 2d 174 (D.P.R. 2013)..................................................................74

*Roost v. Toyota Motor Credit Corp. (In re Moon),*
262 B.R. 97 (Bankr. D. Or. 2001).....................................................................90

*Roselink Inv'rs, LLC v. Shenkman,*
386 F. Supp. 2d 209 (S.D.N.Y. 2004)............................................................51, 52

*Rubin v. Manufacturers Hanover Tr. Co.,*
661 F.2d 979 (2d Cir. 1981).............................................................................66

*S. Muoio & Co. LLC v. Hallmark Entm't Invs. Co.,*
2011 WL 863007 (Del. Ch. Mar. 9),
*aff'd,* 35 A.3d 419 (Del. 2011)..................................................................58, 64, 65

*Saavedra v. Eli Lilly & Co.,*
2014 WL 7338930 (C.D. Cal. Dec. 18, 2014) .....................................................74

*Sharp Int'l Corp. v. State St. Bank & Trust Co. (In re Sharp Int'l Corp.),*
403 F.3d 43 (2d Cir. 2005)...............................................................84, 85, 91, 93

*Silverman v. Actrade Capital, Inc. (In re Actrade Fin. Techs., Ltd.),*
337 B.R. 791 (Bankr. S.D.N.Y. 2005).................................................................85

*Silverman Consulting, Inc. v. Canfor Wood Prods. Mktg. (In re Payless
Cashways, Inc.),* 306 B.R. 243 (B.A.P. 8th Cir. 2004),
*aff'd,* 394 F.3d 1082 (8th Cir. 2005)..................................................................89

*Stone v. Ritter,*
911 A.2d 362 (Del. 2006) ................................................................................68

*Telecash Indus., Inc. v. Universal Assets (In re Telecash Indus., Inc.),*
104 B.R. 401 (Bankr. D. Utah 1989) ..............................................................90, 91

A2356

*Thorpe v. CERBCO, Inc.*,
676 A.2d 436 (Del. 1996) .......................................................................70

*Thorpe v. CERBCO, Inc.*,
1993 WL 443406 (Del. Ch. Oct. 29, 1993) ...........................................56

*Tronox Inc. v. Anadarko Petroleum Corp. (In re Tronox Inc.)*,
549 B.R. 21 (S.D.N.Y. 2016)............................................................. 83-84

*United States v. McCombs*,
30 F.3d 310 (2d Cir. 1994)......................................................................91

*Warth v. Seldin*,
422 U.S. 490 (1975)..................................................................................83

*Weinberger v. UOP, Inc.*,
457 A.2d 701 (Del. 1983)..................................................................54, 55

*Weisfelner v. Blavatnik (In re Lyondell Chem. Co.)*,
567 B.R. 55 (Bankr. S.D.N.Y. 2017),
*aff'd*, 585 B.R. 41 (S.D.N.Y. 2018) ................................................. 89-90

*Weisfelner v. Blavatnik (In re Lyondell Chem. Co.)*,
544 B.R. 75 (Bankr. S.D.N.Y. 2016) ......................................86, 87, 88

*William Penn P'ship v. Saliba*,
13 A.3d 749 (Del. 2011) ..........................................................................73

## STATUTES

11 U.S.C. § 541(a)(1)...............................................................................96

11 U.S.C. § 541(d) ....................................................................................96

11 U.S.C. § 547(b) .............................................................................89, 90

11 U.S.C. § 547(e)(2)(A)....................................................................90, 91

11 U.S.C. § 548(a)(1)(A) ..........................................................................84

11 U.S.C. § 549(a) ....................................................................................95

11 U.S.C. § 552(b)(1)................................................................................97

28 U.S.C. § 157(b)(2) ..................................................................................2

28 U.S.C. § 157(c) ................................................................2, 49, 82, 98

ix

28 U.S.C. § 1331 ...........................................................................................................2

28 U.S.C. § 1334 ...........................................................................................................1

N.Y. Debt. & Cred. Law § 272 ..............................................................................91, 93

N.Y. Debt. & Cred. Law § 273 ...................................................................................91

N.Y. Debt. & Cred. Law § 274 ...................................................................................91

N.Y. Debt. & Cred. Law § 275 ...................................................................................91

N.Y. Debt. & Cred. Law § 276 ...................................................................................84

x

Defendants[1] respectfully submit the following post-trial proposed findings of fact and conclusions of law.

1.    Plaintiff Salvatore LaMonica, the chapter 7 trustee in the above-captioned cases ("LaMonica" or the "Trustee"), brought this adversary proceeding alleging that Defendant Lynn Tilton breached her fiduciary duty of loyalty and good faith to TransCare.  The Trustee brought additional claims and claim objections against entities owned or controlled by Tilton (collectively, the "Entity Defendants"), premised on allegations that the Entity Defendants acted inequitably toward TransCare, violated the automatic stay, or otherwise engaged in conduct warranting avoidance, recharacterization, or disallowance of the Entity Defendants' claims.

2.    This Court conducted a trial on these claims on July 22–24, 2019, August 8, 2019 and August 13–14, 2019.

3.    At the conclusion of the trial, the Court dismissed the Trustee's claims for violation of the automatic stay, equitable subordination as to PPMG and Patriarch Partners and actual fraudulent transfer as to Ark II.  (Dkt. No. 131.)

4.    Having considered the evidence adduced during the trial and the arguments of the parties made during the trial, the Court makes the following findings of fact and conclusions of law.[2]

## BASIS FOR JURISDICTION

5.    This Court has jurisdiction over this proceeding pursuant to 28 U.S.C. § 1334 because this action arises in or relates to a case under title 11 of the United States Code (the

---

[1] The Defendants in this adversary proceeding are:  Lynn Tilton, Patriarch Partners Agency Services, LLC ("PPAS"), Patriarch Partners, LLC ("Patriarch Partners"), Patriarch Partners Management Group, LLC ("PPMG"), Ark II CLO 2001–1, Limited ("Ark II"), Transcendence Transit, Inc. ("Transcendence Transit"), and Transcendence Transit II, Inc. ("Transcendence Transit II" and, together with Transcendence Transit, "Transcendence").

[2] To the extent that any finding of fact reflects a legal conclusion, it shall to that extent be deemed a conclusion of law, and vice versa.

1

"Bankruptcy Code") and pursuant to 28 U.S.C. § 1331 as it arises in part under the laws of the United States.

6.      The parties agree that Counts III, IV, VII, X, XI, XII, and XIV of the Amended Complaint (Dkt. No. 53) are statutorily "core" claims within the meaning of 28 U.S.C. § 157(b)(2). However, they dispute whether Count I—a state law claim for breach of fiduciary duty based on pre-petition conduct—is a core claim. Defendants contend that the Trustee's claim for breach of fiduciary duty is non-core. This Court agrees with Defendants. *See In re 610 W. 142 Owners Corp.*, 219 B.R. 363, 370 (Bankr. S.D.N.Y. 1998) ("Here, these state law causes of action for breach of fiduciary duty and negligence arose prepetition. They do not involve the application of bankruptcy law and are therefore non-core.").

7.      Accordingly, on the claim for breach of fiduciary duty, the Court's findings of fact and conclusions of law will constitute proposed findings of fact and conclusions of law to be submitted to the District Court for its consideration pursuant to 28 U.S.C. § 157(c)(1).

## FINDINGS OF FACT

### I.      TransCare, Patriarch Partners and PPMG

8.      TransCare Corporation is a Delaware corporation. (Stipulation No.[3] 1.)

9.      TransCare Corporation, by and through its subsidiaries[4], provided ambulance and paratransit transportation services in New York, Pennsylvania and Maryland. (*Id.*)

10.     Tilton, through funds she owned and managed, purchased TransCare out of bankruptcy in 2003. (Aug. 13 PM Tr. 19:8–13.)

---

[3] As used herein, "Stipulation No." means the undisputed facts to which the Trustee and Defendants stipulated in the Final Pre-Trial Order. (Dkt. No. 85.)

[4] TransCare Corporation's subsidiaries were Delaware corporations. (Stipulation No. 1.) One of the subsidiaries was TransCare New York, Inc. ("TransCare New York") (together with TransCare Corporation and the other subsidiaries, "TransCare" or the "Company"). (*Id.*)

2

11.     Between November 2014 and February 26, 2016 (the "Relevant Time Period"),
Tilton served as the sole board member of TransCare.  (Stipulation No. 2.)

12.     Patriarch Partners is a family office that supports Tilton in her ownership and her
role as manager and director of a number of different companies ("portfolio companies"), of which
TransCare was one.  (*See, e.g.*, July 22 AM Tr. 15:4–10; July 23 PM Tr. 3:4–12.)

13.     During the Relevant Time Period, affiliates of Patriarch Partners also served as the
collateral manager for Zohar CDO 2003–1, Ltd., Zohar II 2005–1, Ltd., and Zohar III, Ltd.
(collectively, the "Zohar Funds").[5]  (Aug. 13 PM Tr. 23:1–6.)

14.     As of 2015, through affiliated entities, Tilton held a majority or sole equity interest
in over seventy portfolio companies and served as CEO of four of them.  (*Id.* at 20:5–9.)

15.     The portfolio companies were, at the time they were acquired, deeply distressed.
(*Id.* at 18:22–19:5.)

16.     Funding was provided to the portfolio companies, in part, by the Zohar Funds,
which "invest[ed] in deeply distressed companies" and provided the necessary capital to
"restructure those companies over long periods of time."  (*Id.* at 22:9–23:6.)

17.     Funding was also provided by certain of Tilton's personal investment funds.
(JX_1.)[6]

18.     PPMG "is a group of operational leaders" that serve as consultants to the portfolio
companies.  (Aug. 13 PM Tr. 19:21–25.)

---

[5] Tilton owned the Zohar Funds during the Relevant Time Period.  (Aug. 13 PM Tr. 63:4–12.)

[6] References to (i) "DX_" are to the Defendants' exhibits that were admitted into evidence at the trial or by stipulation
(Dkt. No. 131); (ii) "PX__" are to the Trustee's exhibits that were admitted into evidence at the trial or by stipulation
(*id.*); and (iii) "JX__" are to the joint exhibits that were admitted into evidence at the trial.

3

## II.   TransCare's Debt Structure

19.     Throughout the Relevant Time Period, TransCare relied on funding provided through a term loan agreement and a separate working capital facility with Wells Fargo.  (JX_1; JX_2.)

### The TLA

20.     TransCare Corporation, as borrower, the Term Loan Lenders (as defined below), as lenders, and PPAS, as administrative agent, are parties to a term loan credit agreement, dated as of August 4, 2003, as amended (the "TLA").  (JX_1.)

21.     The lenders under the TLA were: (i) Ark Investment Partners II, L.P. ("AIP"), (ii) the Zohar Funds; (iii) Credit Suisse Alternative Capital, Inc. ("Credit Suisse"); and (iv) First Dominion Funding I (together with AIP, the Zohar Funds, and Credit Suisse, the "Term Loan Lenders").  (Stipulation No. 10.)

22.     PPAS, as administrative agent, held a senior secured lien on all of TransCare's assets, pursuant to a security agreement, dated as of August 4, 2003 (the "PPAS Security Agreement").  (JX_1, at PP–TRBK0000069, § 6.16.)

23.     The TLA and PPAS Security Agreement gave the Required Lenders (*i.e.*, those Lenders with credit exposure in the aggregate of more than 50%) discretion to instruct PPAS (as agent) to take certain actions on behalf of all Term Loan Lenders.  (*Id.* at PP–TRBK0000049; *id.* at PP–TRBK0000096; DX_3, at TRANSCARE00230136.)

24.     For example, under Section 12.1 of the TLA, the Required Lenders were permitted to enter into any written amendments, supplements, or modifications to the TLA or other loan documents, including the PPAS Security Agreement, subject to certain narrow exceptions.  (JX_1, at PP–TRBK0000096, § 12.1.)

4

25.    One of those exceptions was that the Required Lenders were prohibited from taking actions that "release[d] all or substantially all of the Collateral" (as defined in the PPAS Security Agreement) without the consent of each of the Term Loan Lenders.  (*Id.*)

26.    Thus, in order for TransCare's assets to be sold free and clear, all of the Term Loan Lenders needed to consent.  (*Id.*)

27.    Upon an Event of Default, Section 8 of the PPAS Security Agreement permitted PPAS to, among other things, foreclose on the Collateral on behalf of the Term Loan Lenders. (DX_3, at TRANSCARE00230136, § 8.)

28.    An Event of Default could be called by PPAS with the consent of the Required Lenders or upon their request.  (JX_1, at PP–TRBK0000090–91.)

29.    Under the terms of the TLA, TransCare's failure to make timely interest payments constituted an Event of Default.  (*Id.* at PP–TRBK0000088, § 10(a).)

*The Wells Fargo ABL*

30.    TransCare was also party to a syndicated, asset-backed revolving credit agreement with Wells Fargo N.A. ("Wells Fargo"), dated as of October 13, 2006 (as amended, the "Wells Fargo ABL Agreement").  (JX_2.)

31.    Under Section 5.1 of the Wells Fargo ABL Agreement, Wells Fargo held a security interest in all of TransCare's assets.  (*Id.* at CURTIS_000785, § 5.1.)

32.    TransCare was prohibited from "sell[ing], issu[ing], assign[ing], leas[ing], transfer[ring], abandon[ing] or otherwise dispos[ing] of . . . any of its assets to any other Person[]" without Wells Fargo's consent.  (*Id.* at CURTIS_000818, § 9.7(b), (d).)

5

33.    In connection with the Wells Fargo ABL Agreement, Wells Fargo and PPAS, on behalf of the Term Loan Lenders, entered into an Intercreditor Agreement, dated October 13, 2006 (the "Wells Fargo/PPAS Intercreditor Agreement). (JX_3.)

34.    The Wells Fargo/PPAS Intercreditor Agreement provided for the retention by the Term Loan Lenders of first priority liens on certain property, including equipment, inventory, and vehicles. (*Id.* at CURTIS_000029.)

35.    Wells Fargo had a first-priority position in all of TransCare's other assets, including accounts receivable. (*Id.* at CURTIS_000006, § 1.26.)

### III.    **TransCare's Liquidity and Financial Reporting Challenges**

36.    In November 2014, Tilton learned that the Company was experiencing financial difficulties. (Aug. 13 PM Tr. 23:13–21.)

37.    In response, Tilton, among other things, asked Jean-Luc Pelissier, a platform leader at PPMG, to provide operational assistance to TransCare. (July 23 AM Tr. 8:15–9:4, 55:21–23.)

38.    Thereafter, TransCare developed a turnaround plan. (*Id.* at 57:1–9.)

39.    In or around November 2014, Tilton also determined to make a leadership change at TransCare. (Aug. 13 PM Tr. 25:11–14.)

40.    Glenn Leland was subsequently hired as CEO. (July 23 AM Tr. 57:17–19.)

41.    Shortly after arriving at TransCare, Leland reported to Tilton that the turnaround plan developed in November 2014 was not viable. (JX_8; Aug. 13 PM Tr. 28:16–25; July 23 AM Tr. 59:16–23; JX_10.)

42.    TransCare also struggled to produce timely financial statements. (Aug. 13 AM Tr. 52:3–6.)

A2364

43.     TransCare's liquidity and financial reporting challenges were of concern to Wells Fargo and strained TransCare's relationship with the bank.  (JX_15; DX_19.)

44.     Tilton emphasized to Leland the importance of providing financial statements to Wells Fargo that were "on time" and "valid" and cautioned that "[w]e cannot lose Wells or we will not have the time and cash we need."  (JX_15, at PP–TRBK0028514–15.)

### IV.     TransCare Receives Unsolicited Inquiries

45.     At various times during 2015, Leland and Tilton received inquiries from transportation companies about potentially purchasing some or all of TransCare's assets.  (*See, e.g.*, JX_12; JX_29; JX_40.)

46.     One company, National Express, expressed interest in TransCare's paratransit business, which provided services to the New York City Transit Authority (the "MTA") (*see, e.g.*, JX_12; JX_40) pursuant to a contract between the MTA and TransCare New York (the "MTA Contract").  (Stipulation No. 29.)

47.     At the time, Leland estimated that the MTA Contract produced approximately $3.5 to $4 million of annual EBITDA.   (JX_12, at TRANSCARE00004260; JX_29, at PP–TRBK0071449.)

48.     On July 10, 2015, National Express sent TransCare New York a non-binding Letter of Intent ("LOI") for the paratransit business (JX_40, at PP–TRBK0030759), in which it proposed a purchase price in the range of $6 to $7 million, "less an amount [National Express] determine[d] [wa]s required to operate the acquired business for 60 days."  (*Id.* at PP–TRBK0030760.)

49.     Notably, although the LOI provided that an unspecified portion of the purchase price would be "payable on closing of the transaction," the balance would be "held in retention (the 'Retention Amount')."  (*Id.*)

7

50.     The LOI stated that "the Buyer w[ould] release payments of the Retention Amount in five equal annual installments."  (*Id.*; *see also* July 22 PM Tr. 85:20–86:6 ("A portion is payable as initial consideration, and then the balance is retained but . . . National Express doesn't specify what the initial consideration is versus the retention amount . . . [a]nd it says an agreed-upon portion of the consideration shall be allocated to a five-year non-compete covenant.").)

51.     Thus, the true value of the offer was less than $6–$7 million and likely considerably less when taking into account the time value of money.

52.     Richmond County Ambulance ("RCA") also reached out to both Leland and Tilton. (*See, e.g.*, JX_29, at PP–TRBK0071450.)

53.     In a March 7, 2015 weekly update email from Leland to Tilton, Leland included a summary of one of RCA's email inquiries "proposing $60 to $80MM as valuation" for TransCare. (*Id.*)

54.     Leland did not think the inquiry was worth pursuing: "My thought on this particular opportunity is that RCA must assume TransCare has EBITDA in the $10MM range.  They mentioned on the phone they are using an 8X multiple for valuations (which is high for the industry, but not outside reality).  So, I think this opportunity is not likely to succeed[.]"  (*Id.*)

55.     RCA's inquiry was evidently premised on a significant misimpression of TransCare's current EBITDA which, on an LTM (Last Twelve Months)-basis in March of 2015, was "zero" to "maybe slightly positive."  (*See* July 22 PM Tr. 84:5–13.)

56.     Leland's belief that RCA's proposed price was based on its (albeit mistaken) impression of TransCare's *current* earnings is consistent with Tilton's testimony that prospective buyers look to actual earnings, not projections, when valuing a potential acquisition.  (Aug. 14 AM Tr. 38:17–20.)

8

## V.   TransCare Misses Payroll in July 2015

57.   Throughout 2015, TransCare drew on the Wells Fargo asset based facility to fund the Company's payroll obligations.  (Aug. 13 PM Tr. 41:2–12, 46:8–15.)

58.   On or about July 2, 2015, Wells Fargo determined it was in an over-advanced position and implemented a $1.5 million reserve, resulting in TransCare not being able to make payroll the next day.  (JX_33; July 22 PM Tr. 86:21–87:5; Aug. 13 PM Tr. 41:3–16; DX_64.)

59.   Following the missed payroll, Tilton negotiated a resolution with Wells Fargo to unblock the reserve (Aug. 13 PM Tr. 43:20–44:5; DX_64) which involved, among other things, the Zohar Funds advancing an additional $2 million to TransCare.  (DX_64; PX_227, at PP–TRBK0047615.)

## VI.   Wells Fargo Decides Not To Renew the Wells Fargo ABL Agreement

60.   On October 14, 2015, Wells Fargo issued a Notice of Non-Renewal to TransCare (the "Non-Renewal Notice").  (DX_76.)

61.   The Non-Renewal Notice stated that the Wells Fargo ABL Agreement would expire on January 31, 2016, and that Wells Fargo "presently ha[d] no intention to extend or modify the term of such financing arrangements."  (*Id.* at TRANSCARE00006336.)

62.   The Non-Renewal Notice also stated that the outstanding balance had to be paid in full by TransCare by January 31, 2016 (*see id.*), something which TransCare was in no position to do.  (July 22 PM Tr. 93:6–11.)[7]

63.   In the weeks that followed, TransCare management, with the assistance of Pelissier and Michael Greenberg, the Patriarch Partners credit officer assigned to TransCare (July 22 AM

---

[7] The outstanding balance as of the Initial Petition Date (as defined below) totaled approximately $13 million.  (July 24 Tr. 159:19–22.)

9

Tr. 14:10–13), tried to convince Wells Fargo to renew the Wells Fargo ABL Agreement. (DX_78, at PP–TRBK0107560; July 22 AM Tr. 30:24–31:20.)

64.     During this same time period, Wells Fargo lost confidence in TransCare's management team. (*See, e.g.*, DX_88; DX_89.)

65.     Throughout December 2015, Wells Fargo expressed concerns that TransCare management was not honestly calculating the borrowing base. (*See* DX_88.)

66.     Wells Fargo was also troubled by TransCare management's apparent lack of candor regarding bill payment, including the payment of payroll taxes. (DX_92, at PP–TRBK0075263.)

67.     Moreover, as of December 17, 2015, TransCare had failed to deliver to Wells Fargo (i) monthly unaudited financial statements for October 2015; (ii) quarterly financial statements for the first three quarters of 2015; or (iii) audited consolidated financial statements for 2014. (PX_132, at PP–TRBK0046849–50.)

**VII.   Zohar Funds Provide Funding to Address TransCare's Liquidity Shortfalls**

68.     Between February 2015 and January 2016, the Zohar Funds advanced over $7.2 million to TransCare. (PX_227, at PP–TRBK0047615–16.)

69.     Tilton authorized this funding in her role as manager of the collateral managers of the Zohar Funds. (*See, e.g.*, DX_26, at PP–TRBK0099596.)

70.     The funding was to provide emergency liquidity so that TransCare could continue to operate. (Aug. 13 PM Tr. 63:4–12.)

**VIII.  Tilton Explores a Potential Sale of TransCare**

*Tilton Loses Confidence in TransCare Management*

71.     Efforts to persuade Wells Fargo to reverse course on the renewal of the Wells Fargo ABL Agreement continued in December 2015. (JX_53.)

10

72.    As part of that effort, TransCare management had put together a model for TransCare (the "December Plan") that included a request that Tilton authorize or provide $6.5 million in new funding to TransCare.  (*Id.*)

73.    On December 12, 2015, Tilton learned that TransCare management had made Wells Fargo aware of the $6.5 million funding request in the December Plan (*id*. at PP–TRBK0084009), even though she had not approved the December Plan.  (Aug. 13 PM Tr. 47:14–18.)

74.    Although Tilton had been losing confidence in TransCare's management for some time (*id.* at 49:6–8), this was the "last straw" for her.  (*Id.* at 49:2–8.)

75.    Tilton determined to explore a potential sale of TransCare.  (JX_53, at PP–TRBK0084007–08.)

76.    Wells Fargo supported Tilton's decision to explore a sale (DX_92, at PP–TRBK0075263), but was disinclined to provide long-term funding to TransCare.  (*Id.* ("To be clear, our desire is to exit this credit facility and our appetite to support the business outside a process that leads to an exit is extremely limited.").)

### *Tilton Begins to Plan for a Potential Sale Process*

77.    Tilton has a depth of experience in buying and selling companies.  (Aug. 13 PM Tr. 37:21–41:1.)

78.    She has purchased and sold more than 300 companies, including sales under Section 363 of the Bankruptcy Code.  (*Id.* at 38:1–3.)

79.    In the weeks that followed her decision to support a sale, Tilton took steps to review and analyze the Company to determine whether it was saleable.  (*Id.* at 53:3–7; July 22 AM Tr. 52:23–53:3.)

11

80. Part of that process involved assessing the accuracy of TransCare's financials (Aug. 13 AM Tr. 42:4–16, 86:7–13), since any value-maximizing sale process would require valid financial information. (Aug. 13 PM Tr. 38:20–22, 39:13–14.)

81. Tilton also did background work so that TransCare would be in a position to hire an investment banker if it made sense to sell the Company. (*Id.* at 53:4–7.)

82. To that end she asked Greenberg to get her information about ambulance-company "transactions and [which investment banks] did them." (DX_96, at PP–TRBK0001414.)

83. Four hours later, Greenberg emailed Tilton a list of transactions for ambulance and air medical companies. (JX_55, at PP–TRBK0041410.)

*Negotiations with Wells Fargo about Funding to Bridge through a Sale*

84. Both Tilton and Wells Fargo understood that to engage in a sale process, TransCare would need sufficient liquidity to survive through a sale (Aug. 13 PM Tr. 38:20–21, 39:14, 39:20–24, 40:4–11; DX_98, at PP–TRBK0018258), and both were concerned about TransCare's ability to continue operating for that long. (DX_92, at PP–TRBK0075263 ("we are highly concerned about the company's ability to survive until a sale is completed"); Aug. 13 PM Tr. 51:22–52:6 ("Wells [Fargo] was tightening their loan, the company was going further into a liquidity hole, Wells wanted out and I needed time to be able to get any sale process done.").)

85. Wells Fargo's expectation was that Tilton, through one of her investment vehicles, would provide TransCare with the funding necessary to keep it afloat through the completion of a sale. (DX_92, at PP–TRBK0075263 ("It would be very helpful if we could get clarity on how much financial support Patriarch is considering providing, and how soon the company could have access to that money since the company appears to have immediate liquidity challenges.").)

86.     Tilton likewise knew that TransCare would need continued working capital funding from Wells Fargo.  (Aug. 13 PM Tr. 54:8–9, 54:14–17.)

87.     On December 23, Wells Fargo transmitted to Pelissier and Greenberg a summary of proposed terms for a longer-term forbearance of Wells Fargo's rights in order to bridge to a sale.  (JX_59.)

88.     The Wells Fargo term sheet called for a sale process under which letters of interest would be received by April 1, 2016.  (*Id.* at PP–TRBK0075499.)

89.     In Greenberg's counterproposal, the proposed deadline for receipt of letters of interest was May 31, 2016.  (DX_100, at PP–TRBK0106767.)

90.     By email on December 31, 2015, Wells Fargo's John Husson told Greenberg that Wells Fargo was comfortable with the dates Greenberg had proposed so long as the sale closed by August 15, 2016.  (JX_65, at WF_TC_00000215.)

### *TransCare Hires Carl Marks*

91.     In early January 2016, Tilton retained Carl Marks Advisory Group LLC ("CMAG"), a consulting firm that specializes in corporate restructuring, as a financial advisor to assist TransCare in its restructuring efforts.  (DX_106; July 22 AM Tr. 57:14–16; Aug. 13 AM Tr. 51:22–23 ("[CMAG] came in to take control over the company").)

92.     The scope of CMAG's assignment was set forth in a consulting agreement between TransCare and CMAG (the "CMAG Consulting Agreement").  (DX_106.)

93.     The CMAG Consulting Agreement provided that "CMAG w[ould] report directly to TransCare's Board of Directors [Tilton]" and "assist TransCare by providing and overseeing the implementation process of recommendations intended to manage, secure [and] improve [TransCare's] financial performance and liquidity."  (*Id.* at PP–TRBK0043438.)

13

94.    The CMAG Consulting Agreement further provided that CMAG's services were to include without limitation: (i) "[p]erform[ing] normal duties of the position of TransCare CFO"; (ii) "[a]nalyz[ing] the Company's financial and capital needs in detail"; (iii) "review[ing] and updat[ing] as necessary existing financial projections and internal budget"; (iv) "assist[ing] with further identification of actionable opportunities to improve profitability . . . intended to improve the Company's performance"; and (v) "[p]erform[ing] other tasks and duties related to th[e] engagement as are reasonably directed by the Board . . . and acceptable to CMAG." (*Id.* at PP–TRBK0043439.)

95.    Tilton had hoped that CMAG "would build their own models from scratch . . . to find solutions . . . so that the [C]ompany could have a future." (Aug. 13 AM Tr. 62:8–12.)

96.    The CMAG employees who participated in the engagement included Marc Pfefferle, Carl Landeck, and Jonathan Killion. (DX_106, at PP–TRBK0043438–39.)

97.    One CMAG professional served as the Company's Chief Restructuring Officer and another served as the Company's Chief Financial Officer. (July 22 AM Tr. 75:2–6; *id.* at 55:1–11 ("Q: Wells Fargo wanted an outside chief restructuring officer, did they not? A: Yes. Q: Somebody who would report to not only Ms. Tilton, but to them. A: Yes. Q: And that's ultimately what Carl Marks' role became. A: Yes it is. Q And in addition to appointing at least one of their people as the outside CFO, correct? A: Yes."); *see also* PX_165, at CM_TC2018_0000927 (describing CMAG's provision to TransCare of "restructuring guidance").)

*The January 2016 Plans*

98.    Throughout January 2016, Tilton's team at Patriarch Partners and PPMG, CMAG and TransCare management worked to develop a budget to be reviewed and approved by Wells Fargo—*i.e.*, step one of the sale process negotiations with the bank. (*See, e.g.*, JX_67; PX_165.)

14

### *The 2016 Preliminary Plan*

99.     On January 4, 2016, Tilton asked Greenberg and Pelissier to develop a scenario for TransCare to "support a sale process and minimize capital needed."   (JX_67, at PP–TRBK0106572; July 22 AM Tr. 64:7–22.)

100.     To meet this request, Greenberg and Pelissier put together a revised 2016 preliminary plan (the "2016 Preliminary Plan") (JX_67, at PP–TRBK0106572) in one day.  (*Id.*; July 22 AM Tr. 64:7–11; July 22 PM Tr. 105:11–17.)

101.     The 2016 Preliminary Plan described certain challenges the paratransit division was experiencing since the MTA Contract was renewed in July, including that the MTA had: (i) moved away from a commercial contract to a municipal contract, which limited profitability; (ii) imposed a rebate of $225k/month; (iii) and reduced the division's routes in the second half of 2015.  (JX_67, at PP–TRBK0106572; *see also* July 22 PM Tr. 105:9–107:19.)

102.     The 2016 Preliminary Plan assumed a new money funding need of $4.5 million. (JX_67, at PP–TRBK0106574.)

103.     Tilton testified that the 2016 Preliminary Plan was essentially "just a plan to get through a sale process and what would be the minimum amount of cash needed to get through that time period."  (Aug. 13 PM Tr. 57:24–58:2.)

104.     Neither Tilton nor Wells Fargo approved the 2016 Preliminary Plan.  (July 22 PM Tr. 108:1–4.)

105.     On January 7, 2016, Greenberg shared the 2016 Preliminary Plan with CMAG. (PX_158.)

106.     Tilton and her team expected CMAG to review the plan and "assist[ ] in the project to stabilize the [C]ompany and prepare it for a sale."  (July 22 AM Tr. 77:15–19.)

15

### *The CMAG Executive Summary*

107.     On January 13, 2016, Tilton asked CMAG to provide her with their initial analysis

for the cost of a bankruptcy filing versus the cost of bridging to a sale outside of bankruptcy.

(PX_165, at CM_TC2018_0000925–26; Aug. 13 PM Tr. 59:22–60:6.)

108.     Tilton asked CMAG to perform this analysis "because . . . Wells [Fargo] was only

willing to stay in the credit to bridge to some sort of sale process."  (Aug. 13 PM Tr. 60:8–10.)

109.     By January 14, CMAG began analyzing Tilton's request.  (PX_165.)

110.     That same day, CMAG provided Tilton with a status update (*see id.*) in which

CMAG's Pfefferle explained that TransCare "require[d] a substantial amount of [new money]

funding *if the business [was] going to survive.*"  (*Id.* at CM_TC2018_0000927 (emphasis added).)

111.     He added, "[t]hese are not wish list amounts that might have been asked of you in

the past, *but absolutely necessary in order to keep the business as an ongoing enterprise.*"  (*Id.*

(emphasis added).)

112.     The CMAG team had also determined that "the EBITDA numbers [they] were

originally given [were] significantly overstated."  (*Id.* at CM_TC2018_0000925.)

113.     Tilton expressed concern to CMAG about providing funding without having a plan

to restructure TransCare (*id.* at CM_TC2018_0000925–26 ("I do not want to keep funding into a

black hole that cannot be filled"); Aug. 13 PM Tr. 61:12–21), which concern was shared by

Pfefferle.  (PX_165, at CM_TC2018_0000925.)

114.     The work CMAG performed over the next several weeks further revealed that

TransCare's liquidity situation was indeed dire, and there was an imminent risk that TransCare

could not continue to operate.  (PX_175.)

16

115. On January 27, 2016, CMAG shared with Greenberg, Pelissier, and Patriarch Partners' Randy Jones a presentation CMAG had prepared (the "CMAG Executive Summary"). (*Id.*)

116. The CMAG Executive Summary stated that "TransCare is now operating at an absolute breaking point." (*Id.* at CM_TC2018_0002111.)

117. It described "strained and broken customer relationships" at TransCare, including a "[c]urrent void in Senior Management leadership" and that "*[v]irtually all key customers [were] pursuing or considering replacement options.*" (*Id.* (emphasis added).)

118. CMAG also described the (i) "strained and broken ambulance fleet"; (ii) "strained and broken vendor relationships"; and (iii) "strained and broken landlord relationships." (*Id.* at CM_TC2018_0002111–12.)

119. CMAG reported that it had been "fighting daily fires and *working to hold the business and organization together*." (*Id.* at CM_TC2018_002118 (emphasis added).)

120. The CMAG Executive Summary cautioned that CMAG had "worked diligently to develop the most accurate financial picture of the Company *possible given the limitations of the Company's accounting systems and financial reporting*." (*Id.* (emphasis added).)

121. The CMAG Executive Summary included a series of action items CMAG thought TransCare could take to attempt to effect a turnaround. (*Id.* at CM_TC2018_0002114.)

122. If the action items were successfully implemented, the CMAG Executive Summary projected 2016 EBITDA of $4.97 million. (*Id.* at CM_TC2018_0002123.)

123. However, the FY 16 projections also assumed TransCare would be able to obtain at least $8.5 million of new money funding (*id.*), not including funding needed to make interest payments to the Term Loan Lenders. (*Id.* at CM_TC2018_0002114.)

17

124.   Interest payments owed under the TLA would increase the funding need by approximately $3 million more (or in excess of $10.5 million).  (Aug. 13 PM Tr. 70:16–20.)

125.   Tilton understood that CMAG was making the funding request of her personally because there was no place else to get the money.  (*Id.* at 69:21–23; *see id.* at 69:24–70:2 ("Nobody was going to lend into this without any visibility to a future, any projections or any plan.  There was only one place that money could possibly come from and that would have been me.").)

126.   CMAG also emphasized the riskiness of any additional investment in TransCare: "[T]ime has run out and the decision [for Tilton] to risk significant capital must be made before a turnaround can show meaningful positive results."  (PX_175, at CM_TC2018_0002114.)

127.   CMAG specifically cautioned that "[p]lan execution risk is high and therefore ultimate payback on the incremental investment [of not less than $8.5 million] is uncertain."  (*Id.*)

128.   CMAG did not recommend in its Executive Summary that TransCare engage in a sale process either in the short term or the medium term.  (*Id.* at CM_TC2018_0002122.)

129.   Nor did CMAG recommend seeking new money funding from a third-party or that CMAG should contact any third parties itself.

130.   CMAG instead focused on stabilizing TransCare, assuming necessary funding would be approved or provided by Tilton.  (*Id.* at CM_TC2018_0002121–22.)

131.   Tilton did not approve the funding requested in the CMAG Executive Summary (Aug. 13 PM Tr. 70:24–71:3), which would have been provided by Tilton's personal investment funds because there was no availability under the Zohar Funds' loan tranches.  (*Id*. at 64:6–11.)

### *The Greenberg January 28 Email*

132.   The next day, Greenberg emailed himself a 2016 budget (the "Greenberg January 28 Email").  (PX_179.)

18

133.    The budget required incremental funding of $6.35 million, excluding interest due under the Term Loan.  (*Id.* at PP–TRBK0013265.)

134.    There is no evidence that Tilton received the Greenberg January 28 Email.

135.    Tilton did not approve the funding required in the Greenberg January 28 Email. (Aug. 13 PM Tr. 72:10–13.)

### *Based on CMAG's Work, Tilton Determines That a Sale Process Would not be Viable*

136.    TransCare's cash situation continued to deteriorate in February 2016.  (PX_185.)

137.    On February 2, Landeck shared his concerns about TransCare's liquidity with Greenberg. (*Id.* at CM_TC2018_0002546 ("cash situation is dire and not improving").)

138.    Landeck reiterated the need for a substantial cash infusion in order for TransCare to continue to operate.  (*Id.* at CM_TC2018_0002544 ("We have been telling this group for some time . . . that TC could not continue operations without a significant infusion of cash").)

139.    Landeck also expressed his concerns about the vacuum of senior leadership at TransCare given that TransCare was operating without a CEO.  (*Id.* ("difficult to see how plan can be successfully implemented without the type of leader that can drive necessary changes and can restore customer confidence.").)

140.    Landeck continued: "As far as the return [on investment], you MUST look at it as what is the return on the new money as the old money is essentially only worth what a liquidation (closure or liquidation sale) would yield after [W]ells [Fargo] takes the AR, which practically speaking is not much as it will be net of expenses."  (*Id.* at CM_TC2018_0002543.)

141.    In response, Greenberg observed that the projected EBITDA "forecast is low which will be an issue for all constituents . . . as valuation at end of year would not be that compelling." (*Id.* at CM_TC2018_0002544.)

19

142.     After reviewing the CMAG Executive Summary and meeting with the CMAG team on February 5, 2016, Tilton determined that a sale process would not be viable and should no longer be pursued.  (DX_130, at PP–TRBK0028275 ("We have the plan [CMAG] presented to me on Friday [, February 5, 2016] . . . [t]hat is the plan that convinced me I could not move forward" with a sale process); Aug. 13 PM Tr. 76:10–77:2; *id.* at 40:18–24.)

IX.     **The Ark II Facility**

143.     By mid-January 2016, TransCare needed to make payments on certain critical obligations, including payments to the New York State Insurance Fund ("NYSIF"), TransCare's workman's compensation insurance provider.  (PX_165, at CM_TC2018_0000927.)

144.     Without workman's compensation insurance, TransCare would be forced to shut down immediately.  (Aug. 13 PM Tr. 61:22–62:15.)

145.     On January 15, 2016, Tilton approved a loan from Ark II to TransCare in the amount of approximately $1.2 million to cover the insurance payments (PX_168; DX_112) and prevent the Company from going out of business.  (Aug. 13 AM Tr. 57:18–24.)

146.     At the time, Tilton asked her team to "put a new credit facility together" for the Ark II funding.  (*Id.* at 58:10–20.)

147.     Also on January 15, Greenberg emailed Wells Fargo personnel, stating that the funds for insurance payments were being advanced pursuant to a "new facility" of up to $6.5 million.  (PX_170, at PP–TRBK0014549–50; *see also* July 22 AM Tr. 84:14–18.)

148.     On January 27, Greenberg emailed CMAG a PowerPoint slide updating his discussions with Wells Fargo about the new facility, which was to be inserted in a presentation to Tilton.  (PX_177.)

20

149.    The first bullet point on the slide stated:  "A note for the new facility along with supporting documents has been drafted and presented for your [Tilton's] review."  (*Id.* at CM_TC2018_0006180; July 22 AM Tr. 96:12–25.)

150.    Greenberg testified that the reference to the "facility" in the bullet point was the new Ark II facility for up to $6.5 million, including "*money that had already been given out*" to TransCare.  (July 22 AM Tr. 97:8–98:1 (emphasis added).)

151.    As of January 27, payments were still owed by TransCare to NYSIF.  (PX_175, at CM_TC2018_0002116.)

152.    To avoid a shutdown, on January 29, Tilton authorized PPAS to release $690,168.24 to TransCare which was used, in part, to pay NYSIF.  (Aug. 13 AM Tr. 58:21–59:8.)

153.    Tilton intended for Ark II to reimburse PPAS for the advance.  (Aug. 13 PM Tr. 6:3–6.)

154.    When authorizing the necessary funding, Tilton emphasized that she "*need[ed] the documents first here to protect [her]*."  (DX_121, at PP–TRBK0099193 (emphasis added).)

155.    Tilton testified that the reference to needing "protection" meant that she needed to have properly documented credit agreements in place that gave Ark II a first priority lien.  (Aug. 13 PM Tr. 5:23–6:6.)

156.    Tilton explained that this documentation was important to her "[b]ecause it was . . . the only basis that [she] was willing to put in new money in a company that could end up in liquidation days later."  (*Id.* at 6:7–10.)

157.    On January 29, Ark II filed UCC-1 financing statements with the Delaware Department of State for TransCare, each of which provided that Ark II held a security interest in "[a]ll assets of the debtor . . . ."  (JX_79, at PP–TRBK0049034–46.)

21

158.    On February 10, Greenberg emailed Peter Wolf (of TransCare) a copy of: (i) a Credit Agreement between TransCare and Ark II (the "Ark II Credit Agreement"); (ii) a Security Agreement in favor of Ark II (the "Ark II Security Agreement"); and (iii) an Intercreditor Agreement between Ark II and PPAS, on behalf of the Term Loan Lenders (the "Ark II Intercreditor Agreement"), all of which were dated as of January 15, 2016.  (PX_197.)

159.    TransCare Corporation signed an acknowledgement to the Ark II Intercreditor Agreement expressly acknowledging that it was not a party to or beneficiary of the agreement. (JX_79, at PP–TRBK00490016.)

160.    On or about February 10–11, 2016, Wolf executed the Ark II Credit Agreement, the Ark II Security Agreement, and the Ark II Intercreditor Agreement on behalf of TransCare. (July 22 PM Tr. 21:20–22:3; *see also* JX_79.)

## X.    OldCo/NewCo Restructuring

### *Tilton and Her Team Develop OldCo/NewCo Restructuring Plan*

161.    By February 2016, TransCare's ability to continue operating was wholly dependent on Wells Fargo's willingness to continue funding from day to day.  (PX_185; DX_76.)

162.    Tilton worked with her team (comprised of Patriarch Partners and PPMG personnel) to develop a thorough understanding of each TransCare division so that they "could figure out if there was something to be saved."  (Aug. 13 AM Tr. 64:8–23; *see also* Aug. 13 PM Tr. 76:10–77:6; DX_123, at PP–TRBK0107343–44 ("I really need a plan on Friday on a way to move forward or a shut down plan on Trans[C]are.").)

163.    TransCare management and Landeck and Killion of CMAG worked with Tilton and her team.  (*See, e.g.*, DX_127, at PP–TRBK0046297; July 23 AM Tr. 72:19–73:3.)

22

164.    Although this work continued for several days (DX_127; July 23 AM Tr. 73:16–24; July 22 PM Tr. 39:9–15), as of February 7 Tilton had not yet approved a restructuring plan. (DX_127, at PP–TRBK0046297; July 23 AM Tr. 73:16–24.)

165.    On February 9, 2016, Tilton reached out to Kurt Marsden (her main contact at Wells Fargo) (Aug. 13 PM Tr. 29:15–24) to discuss and determine if there was a path forward for the Company.  (DX_130, at PP–TRBK0028278.)

166.    Marsden asked that CMAG create a budget for three potential scenarios for TransCare: "(1) a forced wind down; (2) an orderly wind down; and (3) the bankruptcy scenario discussed on our earlier call."  (Id. at PP–TRBK0028276; Aug. 13 PM Tr. 75:18–76:1.)

167.    The bankruptcy scenario to which Marsden referred was an OldCo/NewCo Restructuring plan (the "OldCo/NewCo Restructuring"), the details of which are discussed below, which Tilton and Marsden had first discussed that day.  (Aug. 13 PM Tr. 77:10–13.)

168.    None of the three scenarios contemplated a marketed sale process of TransCare. (DX_130, at PP–TRBK0028276.)

169.    None of the three scenarios contemplated that all of TransCare continue to operate as a going concern.  (Id.; see also JX_84, at WF_TC_0000053 (transmitting the terms under which "Wells Fargo would consider financing TransCare on an orderly wind down basis").)

170.    As of February 9, Tilton believed the only alternative to the OldCo/NewCo Restructuring was the liquidation of TransCare.  (Aug. 13 PM Tr. 79:1–10.)

171.    There is no evidence that CMAG, which was then acting as TransCare's CRO, recommended a sale process after February 9, that it recommended Tilton attempt to seek third-party financing for TransCare or that it sought such financing on TransCare's behalf.

23

*Tilton Moves Forward with OldCo/NewCo Restructuring Plan*

172.    Under the OldCo/NewCo Restructuring, TransCare would be divided in two: (i) a new corporate entity would be formed, and would take over operations of certain TransCare business lines (*i.e.*, "NewCo") through an Article 9 foreclosure sale, and (ii) the remaining business lines (*i.e.*, "OldCo") would be wound down in an orderly manner.  (Aug. 13 AM Tr. 65:6–16; Aug. 13 PM Tr. 76:24–77:6; *id.* at 79:1–6.)

173.    The "NewCo" would do business as "Transcendence."  (Aug. 13 PM Tr. 9:20–25.)

174.    OldCo would continue to operate for 90 days.  (*Id.* at 92:2–3.)

175.    The 90-day wind-down period would give OldCo employees 90-day notice under the Worker Adjustment and Retraining Notification Act of 1988 and NY WARN Act (collectively, the "WARN Acts").  (*Id.* at 92:7–14; PX_206, at PP–TRBK0091293; July 23 AM Tr. 19:16–19.)

176.    The wind-down period would also enable TransCare's accounts receivable to be collected while the Company was operating, which Tilton believed would maximize value.  (Aug. 13 AM Tr. 65:6–16; *id.* at 43:20–44:4; Aug. 13 PM Tr. 78:1–10; *id.* at 78:17–25.)

177.    To that end, Tilton intended to hire a CRO for OldCo.  (Aug. 13 PM Tr. 78:22–25 ("[W]e were hiring our own CRO to . . . run th[e] company during the wind-down to make sure that we could maximize all the value from OldCo beyond just w[hat] Wells would collect."); JX_84, at WF_TC_0000048; DX_147, at PP–TRBK0091631.)

178.    The OldCo business lines would also have access during the wind-down period to certain services, equipment and other supplies through a transition services agreement (the "TSA").  (*See, e.g.*, DX_132, at PP–TRBK0002317; DX_138; JX_95.)

179.    There is no evidence that Tilton contemplated an Article 9 foreclosure prior to February 9, 2016.

24

*Transparency of Process*

180.    Although the Trustee alleges that the OldCo/NewCo Restructuring was a secret plan (*see* Am. Compl. ¶ 89), the overwhelming evidence presented at trial showed that it was developed in plain sight of and with the active participation of multiple stakeholders.  (*See, e.g.*, PX_206; PX_234; DX_137; DX_163.)

181.    After first discussing the OldCo/NewCo Restructuring with Marsden on February 9, Tilton continued to engage in daily communication with Wells Fargo personnel about it.  (Aug. 13 AM Tr. 67:10–16; Aug. 13 PM Tr. 87:7–8.)

182.    Those communications concerned, among other things, the preparation and exchange of financial models, the mechanics of the planned Article 9 foreclosure, the potential purchase by Tilton of accounts receivable, issuance of WARN notices and the need for NewCo to bind insurance.  (*See, e.g.*, DX_147; JX_84; JX_86; JX_93; PX_219; Aug. 13 PM Tr. 81:7–15 ("[W]e were working together on this project to try to figure out the most elegant solution for a company in crisis."); *id.* at 83:14–84:4 ("[W]e were all looking at the exact same information to try to make the best decisions."); *id.* at 91:2–7.)

183.    TransCare and Wells Fargo were represented by separate counsel and communicated with each other throughout the two-week period preceding the Article 9 foreclosure.  (JX_77; JX_84, at WF_TC_0000051; July 23 PM Tr. 99:8–16, 149:20–150:11.)

184.    The CMAG team assisted with the analysis of the Article 9 foreclosure (DX_132, at PP–TRBK0002317 (emailing Greenberg "the current draft of the entities contemplated to be in the Article 9 transaction"); July 22 PM Tr. 114:14–115:7) and prepared financial models in connection with the OldCo/NewCo Restructuring.  (PX_206, at PP–TRBK0091292; July 23 AM Tr. 75:13–21.)

25

185. CMAG and Wells Fargo personnel also interacted directly about the OldCo/NewCo Restructuring. (July 22 PM Tr. 116:5–8.)

186. TransCare management also participated in the OldCo/NewCo Restructuring. (*See, e.g.*, PX_206; July 23 AM Tr. 23:14–23, July 23 PM Tr. 159:14–160:16.)

*Funding Needs*

187. The success of the OldCo/NewCo Restructuring depended on TransCare's receipt of short-term and longer-term new money funding. (Aug. 13 PM Tr. 95:20–22; DX_157, at WF TC_00005292 ("Transcare cannot continue to operate on a daily, discretionary basis where no one knows if the company will be evicted, operate without insurance or payroll will not be made.").)

188. Tilton, Wells Fargo, and their respective advisors, engaged in discussions about funding for OldCo through a wind-down and from where and with what priority such funding might be provided, including possible debtor-in-possession ("DIP") financing. (DX_195; JX_82.)

189. On February 15, Landeck emailed Tilton a draft DIP budget which contemplated funding from one of Tilton's personal investment vehicles. (DX_195, at PP–TRBK0078648.)

190. Tilton responded that none of her investment vehicles would provide funding going into a bankruptcy unless it was rolled up into a first-out DIP loan. (*Id.* at PP–TRBK0078647.)

191. Tilton also reminded Landeck that, several days earlier, he had publicly stated that he "WOULD NOT PUT ONE PENNY OF [HIS] PERSONAL MONEY INTO THIS COMPANY. THIS IS A BLACK HOLE." (*Id.* (emphasis in original); Aug. 13 PM Tr. 85:17–23.)

192. Wells Fargo would not agree to subordinate its liens and indebtedness to a DIP loan. (JX_82, at PP–TRBK0048227.)

193. TransCare also needed sufficient liquidity to keep the lights on as the OldCo/NewCo Restructuring was refined. (Aug. 13 PM Tr. 95:20–22; *id.* at 98:19–22; DX_157.)

26

194.    As discussed, by February 9, TransCare was operating at the daily discretion of Wells Fargo. (Aug. 13 AM Tr. 23:4–6 ("The company was in a free fall with an ABL lender who was refusing to fund on a day-to-day basis."); DX_151 ("I told [W]ells . . . they should over advance today, so we have enough liquidity to properly make it to the weekend.").)

195.    During the evening on February 18, Wells Fargo told Tilton that the bank had decided to cease further funding. (Aug. 13 PM Tr. 94:23–24.)

196.    Later that evening, Marsden informed Tilton that Wells Fargo was "changing [its] mind and wanted to work together to try to do a more graceful wind-down, as we had been previously discussing." (*Id.* at 95:3–11; *see also* DX_150.)

### *Loss of Customer Contracts*

197.    During this same time period (*i.e.*, after February 9, 2016), TransCare also struggled to maintain its already unstable customer base. (July 22 PM Tr. 119:23–120:4.)

198.    On February 19, TransCare lost its contracts with Bronx Lebanon, Montefiore hospital and the University of Maryland. (DX_157, at WF_TC_00005291 ("[T]he company just received a 90 day notice from Bronx Lebanon, a contract that we were taking with Newco. This was an important and valuable contract to the new entity."); Aug. 13 PM Tr. 100:8–14.)

199.    Tilton explained that the loss of the Bronx Lebanon and Montefiore contracts were "a big hit" to the OldCo/NewCo Restructuring, as those two contracts generated about $2.5 million of EBITDA. (Aug. 13 PM Tr. 99:18–20.)

200.    Tilton feared that TransCare might continue to lose contracts, given the "rumor mill" that had started throughout the industry and various hospitals. (*Id.* at 101:4–12; *id.* at 100:18–100:23 (describing the loss of contracts "on a minute-by-minute basis").)

27

*Modeling Work*

201.    Tilton, together with substantially all of Patriarch Partners' and PPMG personnel, also worked on developing go-forward models for NewCo.  (*Id*. at 80:6–17; *id.* at 94:15–17.)

202.    The purpose was to determine the amount of new money funding that would be required for Transcendence to operate—not to determine what Transcendence might be worth to a third-party buyer.  (Aug. 14 AM Tr. 39:25–40:9.)

203.    As Tilton testified:

> This was purely for my purposes to see if I was willing to put up $10 million dollars of new money and if I had a chance of getting that money back.  No one would have purchased the company based on this because it's a hockey stick projection. When you sell a company, you sell on actuals and you sell on . . .  some sort of projection that people can believe in based on business.  This [the modeling work] was done for me so that I would be willing to put in ten million of new money.

(*Id.*)

204.    The modeling projected that Transcendence would require approximately $10 million in new money funding.  (PX_286; Aug. 13 PM Tr. 104:1–10.)

*The OldCo Receivables*

205.    In modeling different NewCo scenarios, Tilton assumed that she would purchase TransCare's accounts receivable from Wells Fargo, after which they would be transferred to Transcendence so that cash was immediately coming into Transcendence as the receivables were paid.  (PX_286; DX_166; Aug. 13 PM Tr. 9:15–25.)

206.    Tilton and TransCare's bankruptcy counsel at Curtis Mallet engaged in discussions with Wells Fargo and its counsel regarding Tilton's potential purchase of the receivables.  (*See, e.g.*, JX_93; JX_94; DX_171; Aug. 13 PM Tr. 102:4–103:4; *id.* at 8:24–9:25.)

28

207.    These negotiations continued up until "the last second" on February 23, but ultimately the receivables remained with OldCo.  (Aug. 13 PM Tr. 108:4–9; JX_94.)

*Allocation of Equity in Transcendence*

208.    Tilton and her team also performed an analysis to determine how to allocate the equity in Transcendence among the Term Loan Lenders, on the one hand, and Ark II and another of Tilton's investment vehicles, Ark Angels (which was going to provide a $10 million facility to Transcendence), on the other hand.  (PX_209; Aug. 13 PM Tr. 115:8–117:4.)

209.    On February 16, 2016, Carlos Mercado, senior controller at Patriarch Partners, prepared a spreadsheet for Tilton showing the analysis (PX_209), set forth in the below table:

**TRANSCARE**

| Priority | Debt | Ark II | AIP | Zohar I | Zohar II | Zohar III | Credit Suisse | First Dom | Total |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Term Loan - Ark II+Vehicles | 2,058,900.77 | - | - | - | - | - | - | 2,058,900.77 |
| 2 | All Other Loans | - | 2,905,731.99 | 3,500,000.00 | 4,967,123.26 | 24,545,142.39 | 3,537,243.56 | 4,043,858.69 | 43,499,099.89 |
| 3 | Sub Def Interest | 11,494.54 | | 5,405.40 | 13,942.90 | 79,400.35 | | | 110,243.19 |
| | **Total** | **2,070,395.31** | **2,905,731.99** | **3,505,405.40** | **4,981,066.16** | **24,624,542.74** | **3,537,243.56** | **4,043,858.69** | **45,668,243.85** |

**TRANSCENDENCE**

| | | Ark II | AIP | Zohar I | Zohar II | Zohar III | Credit Suisse | First Dom | Total |
|---|---|---|---|---|---|---|---|---|---|
| | A | 2,058,900.77 | | | | | | | 2,058,900.77 |
| | B | 10,000,000.00 | | | | | | | 10,000,000.00 |
| | C | - | 667,998.19 | 804,614.35 | 1,141,891.04 | 5,642,678.23 | 813,176.27 | 929,641.92 | 10,000,000.00 |
| | | | 6.7% | 8.0% | 11.4% | 56.4% | 8.1% | 9.3% | |
| | **Total** | **12,058,900.77** | **667,998.25** | **804,614.43** | **1,141,891.16** | **5,642,678.79** | **813,176.35** | **929,642.02** | **22,058,901.77** |
| | | 54.7% | 3.0% | 3.6% | 5.2% | 25.6% | 3.7% | 4.2% | |

(PX_209, at PP–TRBK0019089 ("Sheet2" Tab); Aug. 13 PM Tr. 117:1–4.)

210.    Row "A" shows the approximately $1.8 million of funds that had been previously lent to TransCare by Ark II (*see* ¶¶ 145, 152, *supra*), along with approximately $195,000 Tilton expended through another of her investment vehicles to purchase two ambulances for TransCare.  (PX_209; Aug. 13 PM Tr. 117:5–16; Aug. 13 AM Tr. 25:4–25.)

211.    Tilton intended that this approximately $2 million would be rolled over to Transcendence as part of the OldCo/NewCo Restructuring.  (Aug. 13 AM Tr. 13:19–23.)

212.    Row "B" shows the $10 million in new funding that was to be committed to NewCo through the contemplated new Ark Angels facility.  (Aug. 13 PM Tr. 117:17–118:5.)

29

A2387

213.    Row "C" represents the amount of the contemplated credit bid for the TransCare assets that PPAS, as agent, intended to foreclose upon.  (*Id.* at 118:6–12.)

214.    When allocated across the lender group, the analysis showed that Ark II and Ark Angels would hold a 54.7% equity interest in Transcendence, and that the Term Loan Lenders would hold a 45.3% equity interest in Transcendence.  (PX_209.)

215.    Tilton wanted to provide this potential equity upside to the Term Loan Lenders as a possible source of future recovery on the balance of their secured loan to TransCare.  (Aug. 13 PM Tr. 118:23–119:5.)

**XI.    The Article 9 Foreclosure**

216.    Early on February 24, 2016, PPAS (as administrative agent) and TransCare executed the documents for the planned Article 9 foreclosure.  (JX_96.)

217.    PPAS, as administrative agent, the Zohar Funds and AIP issued a Notice of Default and Acceleration, dated February 24, 2016, to TransCare (the "Notice of Default").  (*Id.*)

218.    PPAS, as administrative agent, the Zohar Funds and AIP also issued a Notice of Acceptance of Subject Collateral in Partial Satisfaction of Obligation, dated February 24, 2016, to TransCare (the "Notice of Acceptance").  (*Id.* at PP–TRBK0043306.)

219.    TransCare signed the Notice of Acceptance that same day.  (DX_174.)

220.    The Notice of Acceptance covered certain personal property (defined as the "Subject Collateral") in which the Term Loan Lenders held a security interest.  (*Id.* at PP–TRBK0091201.)

221.    The Notice of Acceptance provided that PPAS, as administrative agent, accepted the Subject Collateral in satisfaction of $10 million of the outstanding TLA balance.  (*Id.* at PP–TRBK0091198.)

30

222.    PPAS did not foreclose on TransCare's accounts receivable.   (*Id.* at PP–TRBK0091201.)

223.    PPAS also did not foreclose on TransCare's Certificates of Need ("CONs").   (*Id.*; *see also* ¶ 274, *infra* (discussing treatment of the CONs in the Personal Property Stipulation).)

224.    The Subject Collateral did include the stock of the entities that operated the Pennsylvania and Hudson Valley divisions (which were to continue operating in Transcendence). (*Id.*; Aug. 14 AM Tr. 22:19–14.)

225.    Tilton understood that, by foreclosing on the stock of these corporations, Transcendence would be able to use their CONs even though title to the CONs would not pass to Transcendence.  (Aug. 14 AM Tr. 23:12–15.)

226.    PPAS, as administrative agent, and Transcendence also entered into a Bill of Sale, Agreement to Pay and Transfer Statement, dated February 24, 2016 (the "Bill of Sale").  (JX_102.)

227.    Wells Fargo was aware of and did not dispute the Article 9 foreclosure.  (PX_234; Aug. 13 AM Tr. 15:13–23, 76:7–21; July 24 Tr. 154:3–6.)

## XII.   Valuing the Subject Collateral

228.    Tilton valued the Subject Collateral by: (i) calculating its book value and (ii) examining the total $22 million "acquisition price" (*i.e.*, the $10 million credit bid plus $12 million in new funding), as a multiple of projected EBITDA.  (Aug. 13 AM Tr. 16:3–17; PX_286; DX_166.)

### A.    Step 1: Book Value Calculation

*February 13, 2016 Model*

229.    On February 13, 2016, Pelissier emailed Tilton a Transcendence Go Forward Model (the "February 13 NewCo Model").  (PX_286, at PP–TRBK0105524 ("BS" Tab).)

31

**A2389**

230. The February 13 NewCo Model contained a combined balance sheet for Transcendence. (*Id.*)

231. Because it was then contemplated that NewCo would operate TransCare's Hudson Valley, Paratransit, Pennsylvania, Maryland, and Bronx 911/Montefiore 911 divisions (*id.* at PP–TRBK0105516), the combined balance sheet consisted of a December 2015 closing balance sheet and going-forward projections for these five divisions. (*Id.* at PP–TRBK0105524; Aug. 13 PM Tr. 104:23–105:5.)

232. Tilton calculated the value of the Subject Collateral based on the book value of the assets of these five divisions as of December 2015, including the accounts receivable (which, at the time, she assumed she would purchase from Wells Fargo and contribute to Transcendence). (PX_286, at PP–TRBK0105524 ("BS" Tab; Col. B, Rows 6–24); Aug. 13 PM Tr. 107:19–108:3.)

233. Tilton believed that using the December 2015 closing balance sheet as the basis for the book value calculation was appropriate because TransCare had not closed its books after December 31, 2015. (Aug. 13 PM Tr. 109:16–22.)

234. The assets identified on the opening balance sheet included: (i) cash and cash equivalents; (ii) accounts receivable; (iii) inventory; (iv) prepaid and other current assets; (v) net property, plant and equipment ("PP&E"); (vi) goodwill; and (vii) "other assets". (PX_286, at PP–TRBK0105524 ("BS" Tab; Col. B, Rows 6–24).)

235. In calculating the value of the Subject Collateral, Tilton used only what she believed were the "real assets"—*i.e.*, cash and cash equivalents, receivables, inventory, and net PP&E—which "would have been the opening balance sheet for the new business, had [NewCo] taken these five entities." (Aug. 13 PM Tr. 106:1–2, 106:19, 107:12–13.)

32

A2390

236.    As set forth in the below table, the sum of these asset values totaled $9,996,000.60, which Tilton rounded up to $10 million:

| CURRENT ASSETS | Dec-15 (millions) |
|---|---|
| Cash and cash equivalents | 56.7 |
| Patient Account Receivables (OldCo) | 8,165.5 |
| Patient Account Receivables (NewCo) | – |
| Inventory | 623.1 |
| PP&E (net) | 1,151.3 |
| **TOTAL** | **9,996.6** |

(PX_286, at PP–TRBK0105524 ("BS" Tab; Col. B, Rows 7–11, 17); Aug. 13 PM Tr. 106:3–7.)

237.    As noted, Tilton did not ultimately purchase the receivables from Wells Fargo. (Aug. 13 PM Tr. 108:4–9; *see* ¶¶ 205–207, *supra.*)

238.    Tilton did not update the book value calculation to reflect that the receivables did not transfer to NewCo but, had she done so, the value of the Subject Collateral would have been reduced from $10 million to approximately $1.7 million.  (Aug. 13 PM Tr. 108:11–16.)

239.    Tilton did not include the prepaid and other current assets, negative goodwill or "other assets" in the book value calculation of the Subject Collateral.  (*Id.* at 106:13–15.)

240.    She excluded them because (i) she did not know what they were; (ii) they were not needed for the NewCo business; or (iii) she did not think it appropriate for the Term Loan Lenders and Transcendence to receive the benefit of including their value in the calculation (*i.e.*, including negative goodwill would have significantly depressed the amount of the credit bid).  (*Id.* at 106:13–19, 107:4–18.)

241.    The book value of all assets (*i.e.,* the assets of the five divisions, including good will and "other assets") as of December 2015 totaled approximately $6.855 million, more than $3 million less than the $10 million credit bid amount.  (PX_286, at PP–TRBK0105524 ("BS" Tab; Col. B, Rows 6–24); Aug. 13 PM Tr. 106:3–7.)

33

*February 22, 2016 Model*

242.    On February 22, 2016, Vikram Agrawal, a credit officer with Patriarch Partners (Aug. 13 PM Tr. 121:8–10), emailed to Tilton an updated version of the NewCo model (the "February 22 NewCo Model").  (DX_166.)

243.    The February 22 NewCo Model consisted of the three divisions that were being modeled for NewCo as of that date (*i.e.*, Hudson Valley, Paratransit and Pennsylvania) given the loss of contracts in the other divisions between February 13 and February 22.  (Aug. 13 PM Tr. 122:19–21; *see* ¶¶ 197–200, *supra*.)

244.    The February 22 NewCo Model contained a combined opening balance sheet for these three divisions.  (DX_166, at PP–TRBK0110489 ("NewCo Financial Model" Tab; Col. K, Rows 59–80).)

245.    Had Tilton used the opening balance sheet in the February 22 NewCo Model to calculate the value for the Subject Collateral, she would have included in the calculation the same "real assets"—*i.e.*, cash and cash equivalents, receivables, inventory, and net PP&E—that she used for the February 13 NewCo Model.  (Aug. 13 PM Tr. 123:12–15.)

246.    As set forth in the table below, the sum of these inputs totals $6.244 million (more than $3.5 million less than the $10 million credit bid):

| CURRENT ASSETS | Opening (as of 2/21) (millions) |
| --- | --- |
| Cash and cash equivalents | – |
| Patient Account Receivables (OldCo) | – |
| Patient Account Receivables (NewCo) | 5,209.6 |
| Inventory | 677.9 |
| PP&E (net) | 356.9 |
| **TOTAL** | **6,244.4** |

(DX_166, at PP–TRBK0110489 ("NewCo Financial Model" Tab; Col. K, Rows 61–80).)

34

247.    The February 22 NewCo Model also assumed that Tilton would purchase the receivables from Wells Fargo. (*Id.* at PP–TRBK0110489; Aug. 13 PM Tr. 124:6–10.)

248.    The effect of excluding the receivables from the book value calculation would reduce the value of the Subject Collateral from approximately $6.25 million to just over $1 million. (Aug. 13 PM Tr. 124:12–15.)

249.    Thus, the $10 million credit bid was "far more than book value because [TransCare] lost two divisions and [Transcendence] didn't take the receivables." (Aug. 13 AM Tr. 17:17–19.)

250.    Tilton did not reduce the $10 million credit bid to $6.25 million (to reflect changes on the NewCo balance sheet from February 13 to February 22). (Aug. 13 PM Tr. 124:16–20.)

251.    Because the equity in Transcendence was allocated based, in part, on the Term Loan Lenders' *pro rata* share of the credit bid (*see* ¶¶ 213–215, *supra*) reducing the amount of the credit bid would have given Ark II (*i.e.*, the new money) a greater percentage of equity in Transcendence relative to the Term Loan Lenders. (Aug. 13 PM Tr. 125:8–13.)

252.    Tilton thought sticking with a credit bid that gave the Term Loan Lenders a larger equity stake in Transcendence was fairer to the Term Loan Lenders. (*Id.* at 124:23–125:15.)

**B.      Step 2: Check Based on Cash Flow**

253.    As a check on the book value calculation, Tilton also compared the total "acquisition price" of approximately $22 million (*i.e.*, the $10 million credit bid and the $12 million in debt funding) against the EBITDA that Tilton and her team projected could be generated by NewCo during the balance of 2016. (Aug. 13 AM Tr. 16:3–17; Aug. 14 AM Tr. 26:16–18 ("[we] use[d] that EBITDA . . . to do a check to make sure that the price was fair").)

254.    As Tilton explained, expressing value as a multiple is appropriate in a "healthy situation, where people are buying cash flow." (Aug. 13 AM Tr. 17:13–16.)

35

255.    The February 13 NewCo Model showed combined projected EBITDA for the Paratransit, Pennsylvania and Hudson Valley divisions of approximately $2.57 million. (PX_286.)[8]

256.    The projected EBITDA on the February 13 NewCo Model profit and loss statement did not include the cost of corporate overhead.  (Aug. 13 PM Tr. 113:3–7, 113:20–22, 114:12–15.)

257.    Tilton expected the cost of corporate overhead to range from about $500,000 to $750,000.  (Aug. 13 AM Tr. 14:24–25; Aug. 14 AM Tr. 34:24–35:1.)

258.    The effect of including the expenses associated with corporate overhead on the February 13 NewCo Model profit and loss statement would be to reduce the projected EBITDA from $2.57 million to approximately $1.8–$2.1 million.

259.    The February 22 NewCo Model showed combined projected EBITDA for the Paratransit, Pennsylvania and Hudson Valley divisions of approximately $3.2 million.  (DX_166, at PP–TRBK0110489 ("NewCo Financial Model" Tab at Col. DD, Row 44).)

260.    The February 22 NewCo Model did not include "any expenses/charges related to corporate overhead at the NewCo level, any one time transaction costs, or any pre-payment/down payment for insurance."  (*Id.*; *see also* Aug. 13 PM Tr. 121:23–122:3 (the model had "no corporate overhead[,] transaction costs or any insurance payments that would need to be made up front.").)

261.    The effect of including those expenses on the February 22 NewCo Model profit and loss statement would be to reduce the projected EBITDA from $3.2 million to approximately $2.5–$2.75 million.  (Aug. 13 AM Tr. 14:24–25; Aug. 14 AM Tr. 34:24–35:1.)[9]

---

[8] The February 13 NewCo Model showed projected EBITDA for the (i) Paratransit division of $1.2 million (PX_286, at PP–TRBK0105524 ("TS–P&L" Tab, Col. O, Row 47)); (ii) Pennsylvania division of $200,000 (*Id.* ("PA–P&L" Tab, Col. O, Row 47)); and (iii) Hudson Valley division of $1.173 million.  (*Id.* ("HV–P&L" Tab, Col. O, Row 47).)

[9] This reduction in projected EBITDA does not include transaction costs or the costs of upfront insurance payments, both of which were excluded from the February 22 NewCo Model.  (DX_166, at PP–TRBK0110489.)

36

262.    Without accounting for the costs of corporate overhead and other operating expenses, the transaction implied a multiple of approximately 7–8.5x based on a $22 million "purchase price" and EBITDA of $2.57–$3.2 million.  (PX_286; DX_166.)

263.    Taking into account the cost of corporate overhead and other operating expenses, the transaction implied a multiple of roughly 8–12x based on a $22 million "purchase price" and EBITDA of $1.8–$2.75 million.  (Aug. 13 AM Tr. 14:11–14 (explaining that the purchase price ended up being "almost ten times the combined EBITDA of the three entities"); *see id.* at 16:15–17 ("So, if you take [the EBITDA] down to the two to two and a half, then it's 9 to 11 times").)

264.    Tilton testified that applying a 7–8x multiple to cash flow could be appropriate in the case of a healthy company—"not a company that was in free fall, losing contracts every day." (Aug. 13 AM Tr. 17:5–16.)

265.    Thus, this check on her book value calculation confirmed to Tilton that the price she calculated was fair.  (*Id.* at 16:3–12.)

### XIII.    **Bankruptcy Filing and Post-Petition Events**

266.    TransCare Corporation and certain of its subsidiaries filed voluntary chapter 7 petitions in this Court on February 24, 2016 (the "Initial Petition Date").  (Stipulation No. 44.)

267.    On February 25, 2016, LaMonica was appointed as the interim Chapter 7 Trustee. (Stipulation No. 45.)

268.    That same day, LaMonica and several of his colleagues met with counsel for TransCare (Curtis Mallet), counsel for PPAS (Randy Creswell), Wells Fargo and its counsel, and a CMAG representative at the offices of Curtis Mallet.  (July 24 Tr. 132:11–133:4.)

269.    At no point during the meeting did Wells Fargo dispute the Article 9 foreclosure or transfer of the Subject Collateral to Transcendence.  (*Id.* at 154:2–6.)

37

270.    At no point during the meeting did Wells Fargo propose to LaMonica that the paratransit business continue to operate as a going concern.  (*Id.* at 156:3–8.)

271.    LaMonica testified that as of February 25–26, 2016, the TransCare estates lacked sufficient funding to operate as a going concern absent a voluntary cash infusion from Wells Fargo or one of Tilton's investment vehicles.  (*Id.* at 156:9–157:8.)

272.    Ultimately, Transcendence was unable to operate, including because the Trustee would not consent to the use of a computer server that was necessary to operate at least one of the divisions.  (Aug. 13 AM Tr. 26:3–12.)

273.    On March 10, 2016, the Trustee, PPAS and Transcendence Transit entered into a stipulation (the "Personal Property Stipulation") concerning the sale of certain property at auction, including the property PPAS foreclosed upon on behalf of the Term Loan Lenders (the "Foreclosed Personal Property Assets").  (*In re TransCare Corporation*, 16–10407–smb, Dkt. No. 52.)

274.    Consistent with the fact that PPAS did not foreclose on the CONs, the Personal Property Stipulation provided that the Foreclosed Personal Property Assets did not include any of the CONs.  (*Id.*, Personal Property Stipulation at 3.)

275.    PPAS and Transcendence consented to the Trustee's sale of the Foreclosed Personal Property Assets.  (*Id.*, Personal Property Stipulation ¶ 1.)

276.    On March 25, 2016, the Bankruptcy Court entered an order approving the Personal Property Stipulation (the "March 25 Order").  (*Id.*)

277.    The March 25 Order authorized the Trustee to employ an auctioneer to conduct auction sales of the Tangible Personal Property Assets (as defined in the March 25 Order) (*see id.* ¶ 6), including the Foreclosed Personal Property Assets.  (*Id.* ¶ 3.)

38

278.     Auction sales were thereafter conducted.  (*In re TransCare Corporation*, 16–10407–smb, Dkt. Nos. 257, 258.)

279.     On or about July 14, 2016, the Trustee distributed $600,000.01 from the auction proceeds to PPAS.  (*In re TransCare Corporation*, 16–10407–smb, Dkt. No. 407–1.)

280.     On or about September 13, 2016, the Trustee distributed an additional $200,000.00 from the auction proceeds to PPAS.  (*Id.*)

281.     None of the proceeds from the sale of the CONs was paid to PPAS.  (*In re TransCare Corporation*, 16–10407–smb, Dkt. No. 379.)

### XIV.  <u>Valuing TransCare</u>

282.     In an effort to prove damages, the Trustee presented an expert witness, Dr. Jonathan I. Arnold, to opine on a reasonable range of value of TransCare as of four days in January and February 2016: January 7, January 27, January 28, and February 24 (the "<u>Valuation Dates</u>") (July 24 Tr. 7:5–20) that had been identified for Arnold by the Trustee's counsel.  (*Id.* at 7:19–24.)

283.     As of each of the Valuation Dates, Arnold calculated a range of alleged values for TransCare as a whole (or "<u>WholeCo</u>") and/or NewCo relative to their respective liquidation values. (*Id.* at 12:4–13:14.)[10]

284.     Arnold applied a "market approach," using what are known as the comparable company and precedent transaction valuation methods.  (*Id.* at 13:18–14:4.)

285.     To calculate the ranges, Arnold relied on financial projections from four documents: (1) a version of the 2016 Preliminary Plan that Greenberg emailed to CMAG on January 7, 2016 (the "<u>January 7 Preliminary Plan</u>"); (2) the CMAG Executive Summary; (3) the

---

[10] Arnold opined that the liquidation value was $19.2 million for WholeCo and $5.7 million for NewCo.  (July 24 Tr. 13:8–14.)

Greenberg January 28 Email; and (4) an email from Greenberg to Todd Trent of Lockton on February 24, 2016, containing metrics for NewCo (the "February 24 Plan" and together with the three other documents, the "Plans"). (*Id.* at 12:4–13:7.)

286.  Defendants offered expert testimony from Jeffrey Dunn to rebut Arnold's testimony. (Aug. 8 Tr. 8:2–7.)

### A.  Arnold Did Not Provide His Own Value Opinion of TransCare

287.  At trial, Arnold first claimed that he was retained to "determine[ ] the range of values that TransCare could reasonably expect to obtain in an open market transaction based on the analyses that were done at various points in time in January and February 2016." (July 24 Tr. 7:9–12.)

288.  On cross-examination, however, he clarified that he was *not* actually engaged to give *his own opinion of* value, but rather only to calculate "value" based on work that was done by "the people within Patriarch" in January and February 2016. (*Id.* at 106:15–107:1.)

289.  Arnold testified:

[I]n this matter I was asked to address what is a reasonable range for value of TransCare **given what the people within Patriarch were doing in January and February. That does not require me to do a deep dive into the comparables or the precedent transactions because I'm not giving, I'm not putting my own value on TransCare**. I instead am trying to get insight into the, to answer the question of what is reasonable for TransCare and Patriarch to expect to get in a range based on **their** analyses both of TransCare itself on a going forward basis and the companies that **they believe** were comparable or represented precedent transactions.

(*Id.* (emphasis added); *see also id.* at 29:19–23 ("[T]he valuation ranges that I report are implied by the contemporaneous market values of comparables and precedent transactions combined with the forecast[ed] EBITDA that are embedded in" the Patriarch Partners and CMAG Plans).)

40

290.   In other words, Arnold's calculations were based solely on what "*Carl Marks and the Patriarch people believed* the EBITDA for 2016 would be and what the value for TransCare is that [was] implied by those beliefs."  (*Id.* at 57:10–13 (emphasis added); *see id.* at 35:18–21 (the projections "give[ ] the best insights as of that date as to what Patriarch's view of [what] the future performance of TransCare could be.  And that's the basis on which [he] did [his] analysis.").)

291.   Although Arnold's calculations rely entirely on projections of future EBITDA performance in the Plans developed by Patriarch Partners and CMAG, he did not independently assess the Plans (July 24 Tr. 39:10–49:24) or even form a view on the reasonableness of the projected EBITDA in the Plans.  (*Id.* at 60:13–61:13; *see id.* at 57:9–10 ("I don't know whether it is a reasonable estimate.  I didn't undertake that analysis.")

292.   Arnold similarly did not find his own comparable companies or transactions; rather, he relied on two companies—Envision and Air Methods—identified by Greenberg in a December 18, 2015 email to Tilton (*see* ¶ 83, *supra*).  (July 24 Tr. 16:18–17:6, 90:8–17.)[11]

293.   The evidence adduced at trial did not support Arnold's uncritical reliance on the work that was done by "the people within Patriarch."

294.   *First*, although Arnold testified that the Plans "appear to be end points of various analytical processes that occurred within Patriarch" (July 24 Tr. 7:25–8:2), the evidence shows the opposite.

295.   For example, the January 7 Preliminary Plan was, as its name would suggest, *preliminary*.

---

[11] Because Arnold did not think it necessary to do a "deep dive," he also did not consider whether TransCare's financial condition was stable enough to even survive a sale process, a concern of both Tilton and Wells Fargo at or around the Valuation Dates (*see* ¶ 84, *supra*).  (July 24 Tr. 74:8–78:16.)  Notably, Arnold admitted that any sale would not happen overnight; at a minimum, "there's still going to be a diligence period."  (*Id.* at 75:8–76:12.)

41

296.    To that point, Greenberg and Pelissier developed the plan after working on it for
only one day.  (PX_158, at CM_TC2018_0003369 ("updates to 2016 preliminary plan based on
yesterday's discussion"); *see id.* ("Jean Luc and I worked all night to arrive at a scenario to address
the parameters we discussed yesterday"); *see* ¶¶ 99–100, *supra*).)

297.    The evidence also shows that the CMAG Executive Summary and Greenberg
January 28 Email were draft documents that Tilton did not believe were true restructuring plans
and did not approve.  (*See* ¶¶ 131, 134–135, *supra*.)

298.    The February 24 Plan was also not an "end point."  (Aug. 13 AM Tr. 40:11–18.)

299.    Tilton testified:

It was a dynamic model, and everything was changing by the minute.  So,
ultimately, to get the foreclosure done, I had to make decisions in the minute, and
*certainly things were not settled because contracts were being lost and people were
being lost every minute.*  But I got as comfortable *as I could* to make a decision that
would try to save as much of this company and as many jobs as I could.

(*Id.* (emphasis added).)

300.    *Second*, each of the Plans depended on the realization of a series of assumptions
and action items.  (PX_158, at CM_TC2018_0003370; PX_175, at CM_TC2018_0002114;
PX_179, at PP–TRBK0013260; DX_166, at PP–TRBK0110489; July 24 Tr. 46:8–21.)

301.    Although Arnold acknowledged that the Plans called for TransCare to make
changes so "significant" that it would result in "a decidedly different company" (July 24 Tr. 35:2–
14, 86:2–8, 88:3–6), he did not investigate the feasibility of the assumptions and action items in
the Plans.  (*Id.* at 39:10–49:24, 59:3–60:12, 64:15–17, 72:17–73:24.)

302.    The authors of the Plans, however, understood the high risk that those assumptions
or action items would not be achieved.  (*See, e.g.*, PX_175, at CM_TC2018_0002114 ("[p]lan
execution risk is high and therefore ultimate payback on the incremental investment is uncertain.");

42

Aug. 13 PM Tr. 126:23–25 ("[G]iven the condition the [C]ompany was in and the continued loss

of people and contracts, it was a very high-risk transaction.").)

### B.  The Analysis Arnold Performed is Inconsistent with that of a Valuation Professional

303.    Dunn offered three primary critiques of Arnold's analysis, all of which centered on

the appropriate methodology a valuation professional must employ when performing a valuation.

(Aug. 8 Tr. 11:15–25:25, 26:1–30:15.)

304.    *First*, Dunn explained that, unlike Arnold, valuation professionals must offer their

own opinion of value by assessing the risk that projections will not be realized; that is, whether the

projections are reasonable.  (*Id*. at 25:5–15.)

305.    As explained by IRS Revenue Ruling 59–60, a generally accepted source among

valuation professionals, "The value of shares of stock of a company with very uncertain future

prospects is highly speculative.  The business appraiser ***must exercise his judgment as to the

degree of risk attaching to the business*** of the corporation [that] issued the stock, but that

judgment must be related to all of the other factors effecting value."  (*Id.* at 26:21–27:2 (emphasis

added).)

306.    Dunn further explained that an independent assessment of risk is critical because

projections are necessarily *not* valuations.  (*Id.* at 69:9–16.)

307.    A plan contains projections, the realization of which assume certain risks are

overcome.  (*Id.* at 68:13–69:16.)

308.    A valuation, on the other hand, "*assess[es] the risk*"—*i.e.*, how possible is it that

the company will overcome those risks.  (*Id.* at 69:9–16 (emphasis added).)

43

309.    The range of what is possible (and the value of that range) is what distinguishes a valuation from a projection.  (*Id.*)

310.    Arnold acknowledged that he did not perform a risk assessment of the Plans.  (*See, e.g.*, July 24 Tr. 64:4–17.)

311.    Moreover, in performing a risk assessment, a valuation professional must take into account the historical performance of the business that is being valued.  (Aug. 8 Tr. 28:14–29:8.)

312.    Dunn discussed IRS Revenue Ruling 59–60, which "require[s]" valuation experts to focus on historical context: "[t]he history of a corporate enterprise will show it's [sic] past stability or instability, its growth or lack of growth, the diversity or lack of diversity of its operations, and other facts needed to form an opinion of the degree of risk involved in the business . . . The detail to be considered should increase with approach to the required date of appraisal since recent events are of greatest help in predicting the future."  (*Id.* at 29:9–20.)

313.    Arnold, however, ignored TransCare's recent historic performance—including at least two years of downward trending revenue (from $131 million in 2014 to $8 million in December 2015) and EBITDA (from $488,000 in 2014 to -$552,000 in December 2015)—while uncritically accepting that the Company would achieve EBITDA of $6.9 million by the end of 2016.  (July 24 Tr. 80:1–84:11; PX_158, at CM_TC_2018_0003376 ("Summary Table" Tab).)

314.    Arnold also ignored TransCare's unsuccessful attempts to implement at least one turnaround plan.  (July 24 Tr. 67:21–68:6.)

315.    Not only did Arnold assume the projections in the Plans would be realized without performing a risk assessment, his opinions of value assume that a buyer would similarly accept the projections in the Plans without performing its own independent analysis or testing the assumptions on which the success of the Plans relied.  (Aug. 8 Tr. 24:8–12 ("Arnold assumes that

44

. . . a potential investor in TransCare, would assume that the turnaround plan [and the projections in the plan] w[ere] achieved without considering the risk to that actually occurring.").)[12]

316.    *Second*, when utilizing the comparable companies method, as Arnold did here, a valuation professional must test the differences between purported comparables and the company being valued and, if warranted, adjust the multiples from the comparables accordingly.  (July 24 Tr. 102:10–24 (referencing *Valuation: Measuring and Managing the Value of Companies*).)

317.    Arnold, however, did not analyze the comparability of the guideline companies he used to TransCare.  (*Id.* at 102:8–103:3; Aug. 8 Tr. 32:15–25.)

318.    He thus committed what a valuation treatise Arnold himself cited identifies as a "common flaw": comparing a subject company to comparison companies without accounting for "difference in their performance."  (July 24 Tr. 101:10–23 (quoting from *Valuation: Measuring and Managing the Value of Companies*).)

319.    As Dunn explained, such differences in performance manifest when comparing the companies' respective operations and financial performance and metrics.  (Aug. 8 Tr. 31:23–32:6.)

320.    Because Arnold committed the "common flaw," however, he did not assess the following differences between TransCare and the comparison companies:

321.    Unlike TransCare, which engaged only in ground transportation, Envision operated two business segments, one of which involved staffing of acute care and surgical centers and which accounted for 66% of Envision's total revenue.  (*Id.* at 33:19–34:13.)

---

[12] Notably, Arnold acknowledged the likelihood that a buyer would ignore the Patriarch Partners models altogether. (July 24 Tr. 63:18–23 ("They [a prospective buyer] may have their own thought that they can make twelve cents of EBITDA on the dollar and **who cares what the people at Patriarch and TransCare are doing because they're going to do it their way.  That's pretty common in M&A transactions that the buyer imposes their model on the acquirer. That is common.**") (emphasis added).)  Moreover, although Arnold did not account for TransCare's recent historic struggles, he expected that a third-party buyer would "use it as a point of negotiation and leverage [it]" to drive the price down.  (*Id.* at 68:18–21.)

45

322.    Similarly, Air Methods principally operated helicopter transportation services and had no ground-based transportation services.  (*Id.* at 34:14–35:6.)

323.    Arnold also failed to account for the following sizable differences in financial metrics between TransCare and those companies:

- In the last twelve months prior to the valuation dates ("LTM"), TransCare generated revenue of $114 million compared to Envision's $5 billion and Air Method's $1 billion of revenue (*id.* at 36:1–10);

- TransCare's LTM EBITDA was $1.4 million compared to Envision's $582 million and Air Method's $284 million (*id.* at 36:11–20);

- TransCare's LTM EBITDA margin (that is, the ratio of EBITDA to revenue that indicates profitability) was 1.2% compared to Envision's 11.4% and Air Method's 26.8% (*id.* at 36:21–37:1; PX_283 at Ex. 1); and

- TransCare's EBITDA growth (*i.e.*, a calculation of established, historic trends in improving or declining profitability and thus relative riskiness) from 2012 to 2015 was -46.4% compared to Envision's +13.8% and Air Method's +3.4%. (Aug. 8 Tr. 37:2–37:18; PX_283, at Ex. 1.)

324.    Moreover, while TransCare was operating "at the absolute breaking point," Arnold admitted that Envision and Air Methods were healthy, stable companies with no sign of distress. (July 24 Tr. 94:13–95:7.)

325.    As Dunn explained, any market participant interested in purchasing TransCare "would need to take these differences into account" by "lowering the applied multiple or the observed multiple" of Envision and Air Methods.  (Aug. 8 Tr. 38:9–22.)

326.    Simply put, the greater the risk in an investment, the lower a potential buyer will pay for the investment.  (*Id.* at 82:5–15.)

327.    As applied here, an investment in TransCare was indisputably riskier than one in Envision and Air Methods, so a potential third-party buyer would lower the multiple it applied to the projected EBITDA and, by extension, the price it would reasonably pay.  (*Id.* at 38:24–39:11.)

46

328.     Dunn further explained that a market participant might even decide not to apply *any* EBITDA multiple to TransCare if the buyer concluded it was unlikely that the Company could continue as a going concern.  (*Id.* at 60:17–61:10.)[13]

329.     *Third*, Dunn testified that a valuation professional must take into account the capital needs of the business it is valuing because, as a general matter, any third-party buyer looking to purchase a company would factor into the sale price the cash the buyer would need to contribute to keep the company operating.  (*Id.* at 22:12–23:14.)

330.     In this case, if a valuation professional were to determine TransCare's going-concern value (if any) in January or February 2016, he would be required to deduct any capital needed to maintain TransCare as a going concern on the Valuation Dates.  (*Id.* at 23:15–20.)

331.     Arnold did not do so.  (*Id.* at 23:5–24:5.)

C.     **Arnold's Rebuttal Testimony**

332.     The Trustee recalled Arnold to offer rebuttal testimony in which he claimed to have investigated certain of Dunn's critiques involving his use of Envision and Air Methods as comparable companies.

333.     Specifically, Arnold looked for new guideline companies and compared their multiples to Envision and Air Methods.  (Aug. 14 AM Tr. 48:4–49:24.)

334.     Arnold explained that this consisted of selecting from a database companies that he claimed were in "TransCare's industry," filtering those companies down to a group of 69 based on

---

[13] Arnold's reliance on the multiples implied by certain purported indications of interest in TransCare in 2015 was similarly inappropriate.  Arnold acknowledged that the so-called expressions of interest in TransCare from 2015 did not actually inform his views. (July 24 Tr. 116:24–117:8.)  Even if they did, National Express's LOI for the paratransit business indicated a purchase price of, at most, $6 to $7 million for a business that was producing $3.5 to $4 million of EBITDA (*see* ¶¶ 47–48, *supra*), thus implying a multiple of only 1.7x to 1.75x.

47

certain filtering "rules," and then further filtering the companies to a group of 34.  (*Id.* at 48:4–24, 60:9–15, 64:21–65:1.)

335.    With the group of 69 and smaller set of 34 companies, Arnold set further filtering "rules" to find subsets of those companies that met Arnold's definition of being either smaller, distressed, low operating, or undercapitalized.  (*Id.* at 52:19–53:25.)

336.    Arnold concluded that "the range of multipliers emerging from Mr. Greenberg's analysis is . . . confirmed by looking at the" multiples of companies in the various subsets.  (*Id.* at 54:19–55:1.)

337.    There are several serious flaws with Arnold's rebuttal work:

338.    *First*, although Arnold claimed the 69 companies are a "broader set of comparable guideline companies," he later admitted that, in fact, he has "no opinion, one way or the other, as to whether *any* of these 69 [companies, including any of his subset of 34] *actually are* comparable guideline companies for TransCare."  (*Id.* at 64:21–65:22 (emphasis added).)

339.    Indeed, only *one* of the 69 was an ambulance company.  (*Id.* at 62:18–63:3.)

340.    Simply put, an expert cannot give an opinion based on supposed comparable company metrics when he has no opinion about whether those companies *actually are* comparable to the one being valued.

341.    *Second*, Arnold claimed to select the filters and subsets based on some "rule," but he admitted on cross examination that he created the "rule" himself and that the rule was really any criteria that he "felt" was reasonable.  (*Id.* at 63:14–64:20.)

342.    *Third*, TransCare's financial condition was often far worse than all (or nearly all) of the companies in a given subset.  (*Id.* at 68:5–76:5.)

48

## CONCLUSIONS OF LAW

### XV.    The Trustee's Breach of Fiduciary Duty Claim[14]

343.    Directors of a Delaware corporation owe a "triad" of duties.  *Official Comm. of Unsecured Creditors of Fedders N. Am., Inc. v. Goldman Sachs Credit Partners L.P. (In re Fedders N. Am., Inc.)*, 405 B.R. 527, 539 (Bankr. D. Del. 2009) (internal citation omitted).[15] "This triad is composed of the duty of care, the duty of loyalty, and the duty to act in good faith."  *Id.*

344.    The Trustee does not assert that Tilton breached her duty of care (nor could he).  As detailed below, Tilton exercised great care in evaluating a potential third-party sale of TransCare, including by retaining CMAG, negotiating with Wells Fargo and ultimately concluding—based in large part on CMAG's analysis—that TransCare could not survive a sale process.

345.    The Trustee instead asserts a claim for breach of the duties of loyalty and good faith based on: (i) Tilton's alleged conduct in pursuing the OldCo/NewCo Restructuring and (b) Tilton's alleged failure to take steps to ensure TransCare complied with its obligations under the WARN Acts and federal/state payroll tax laws.[16]  (Final Pre-Trial Order ("FPTO") ¶ 184.)  As set forth below, this Court finds that Tilton did not breach either duty.

### A.    Tilton's Actions Prior to February 9, 2016 Were a Proper Exercise of Her Fiduciary Duties

346.    As a threshold matter, the Trustee contends that the "entire fairness" standard applies to Tilton's actions from the moment she determined to explore a sale or restructuring of

---

[14] Because the Trustee's breach of fiduciary duty claim is non-core, the conclusions of law stated herein are proposed conclusions.  28 U.S.C. § 157(c).

[15] The Trustee's breach of fiduciary duty claim arises under Delaware law because TransCare is a Delaware corporation.  *See Edgar v. MITE Corp.*, 457 U.S. 624, 645 (1982).

[16] In the Amended Complaint, the Trustee's breach of fiduciary duty claim was also focused on certain third-party inquiries about TransCare's assets in 2015 that Tilton chose not to pursue.  (Am. Compl. ¶¶ 3–4, 40–47, 52–59.)  The Trustee has since abandoned this theory of liability, and so the Court will not address it.  (Aug. 14 PM Tr. 20:16–21.)

49

TransCare in mid-December 2015 through February 24, 2016, the date on which the Article 9 foreclosure documents were executed. (FPTO ¶ 181.) The Trustee, however, misstates the law in this regard. A review of Delaware fiduciary duty jurisprudence, and the testimony and documents presented at trial, demonstrate that the entire fairness standard only applies to Tilton's conduct on and after February 9. That is because, as discussed below, before February 9, Tilton took steps to put the Company in a position to be sold to a *third party*, including retaining an outside restructuring firm to help guide TransCare through the process, engaging in a continuing dialogue with Wells Fargo about the bank providing the financing TransCare needed to continue operating as a going concern through a sale process and reviewing stabilization plans and budgets prepared by CMAG and others, with the assistance of TransCare management. Those actions simply cannot be viewed as self-interested, a pre-requisite condition to the application of entire fairness review.

### i. *Standard of Review*

347.    Breach of fiduciary duty claims are evaluated under standards of review and conduct. *In re Trados Inc. S'holder Litig.*, 73 A.3d 17, 35 (Del. Ch. 2013). "The standard of conduct describes what directors are expected to do and is defined by the content of the duties of loyalty and care. The standard of review is the test that a court applies when evaluating whether directors have met the standard of conduct. It describes what a plaintiff must first plead and later prove to prevail." *Id.* at 35–36.

348.    There are three levels of review when evaluating corporate fiduciary decision-making: the business judgment rule, enhanced scrutiny, and entire fairness.[17]   *Reis v. Hazelett Strip–Casting Corp.,* 28 A.3d 442, 457 (Del. Ch. 2011).

---

[17] Neither side contends that the Court should apply enhanced scrutiny review here.

50

349.     Inherent in the business judgment rule is the presumption that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in honest belief that the action taken was in the best interests of the company." *Roselink Inv'rs, LLC v. Shenkman*, 386 F. Supp. 2d 209, 216 (S.D.N.Y. 2004) (citation omitted) (applying Delaware law).

350.     "[T]he business judgment presumption is a *rule of evidence* that places the initial burden of proof on the plaintiff." *Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1156, 1162 (Del. 1995).  To rebut the business judgment rule, the plaintiff must introduce evidence showing a director confronted actual conflicts of interest in making the challenged decision or otherwise acted in her own self-interest. *Trados,* 73 A.3d at 36; *Roselink*, 386 F. Supp. 2d at 217.  If the plaintiff fails to meet this burden, the business judgment rule will attach to protect the director's decision, unless that decision "cannot be 'attributed to any rational business purpose.'" *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993) (citation omitted), *decision modified on reargument*, 636 A.2d 956 (Del. 1994).  Only if the business judgment rule has been rebutted can a court examine a director's decision under the "entire fairness" standard.

### ii. *Tilton's Actions Prior to February 9 Are Subject to and Protected by the Business Judgment Rule*

351.     The Trustee has not carried his burden of proving that, before February 9, Tilton was on both sides of a transaction at issue in his fiduciary duty claim or otherwise acted in her self-interest at the expense of TransCare. *Trados,* 73 A.3d at 36; *Roselink*, 386 F. Supp. 2d at 217.

352.     Instead, the evidence shows that Tilton engaged in two distinct decision-making processes during this time period.  First, from mid-December 2015 through February 5, 2016, Tilton explored engaging in a marketed sale process to a third-party buyer.  (Proposed Findings of Fact ("PFOF") ¶¶ 71–142.)  To that end, she retained CMAG as TransCare's financial advisor

51

(reporting directly to her as TransCare's director) and was informed by CMAG's conclusions and recommendations. (PFOF ¶¶ 91–97, 107–31, 136–42.) That work, and other work performed by Patriarch Partners and PPMG personnel, revealed the magnitude of TransCare's financial and operational crisis and that it could not continue operating without an immediate and substantial new cash infusion. (PFOF ¶¶ 99–142.) By February 5, after having explored and evaluated a potential sale process, Tilton determined based on CMAG's work that a sale of TransCare was not feasible, due in large part to the rapidly deteriorating condition of the Company—it simply could not survive until a sale. (PFOF ¶¶ 136–42.)

353.    It was only *after* Tilton made this decision that she and her team, along with CMAG and TransCare senior executives, began working on a "bottom up" plan that took out the "losing contracts" and was built around TransCare's profitable business divisions—*i.e.*, the beginning of the process through which the OldCo/NewCo Restructuring was developed. (PFOF ¶¶ 162–63.) Tilton had not approved of any restructuring plan for TransCare as of February 7. (PFOF ¶ 164.) The earliest evidence of Tilton approving of, or sharing the OldCo/NewCo Restructuring with a third party, is her communications with Wells Fargo on February 9. (PFOF ¶¶ 165–67.)

354.    Tilton could not have been acting in her own self-interest or standing on all sides of the OldCo/NewCo Restructuring before February 9 because, prior to that date, the transaction had not yet been developed (much less pursued). It follows then that the business judgment rule applies to Tilton's actions before that date. *Roselink*, 386 F. Supp. 2d at 216–17.

355.    Tilton's decision to explore, but ultimately not move forward with, a sale process prior to February 9 was a reasonable exercise of her business judgment. The evidence supports Tilton's conclusion (on February 5) that TransCare could not survive a sale process. For example, by January 14, CMAG (the acting CRO and restructuring experts) concluded that TransCare

"require[d] a substantial amount of [new money] funding *if the business [was] going to survive*," and that such funding was "absolutely necessary in order to keep the business as an ongoing enterprise." (PFOF ¶¶ 110–11 (emphasis added).)

356.    Likewise, in its January 27 Executive Summary, CMAG cautioned that the plan it was then recommending, in addition to requiring millions in new cash from Tilton, had a high "execution risk" and that "ultimate payback on the incremental investment [was] uncertain." (PFOF ¶¶ 123–27.) Wells Fargo was also skeptical of the Company's ability to survive through a sale process and shared in Tilton's ultimate conclusion that a sale was not viable. (PFOF ¶¶ 84, 165–69.)

357.    In sum, Tilton, working with CMAG and others, appropriately pursued a potential sale of TransCare until it became apparent – based largely on CMAG's work—that the Company would not be able to continue as a going concern for long enough to sell it for value. It was only *then* (starting on February 9) that she determined—again working with CMAG, Wells Fargo and others—to pursue the idea of the OldCo/NewCo Restructuring.

**B.     Tilton's Dealings in Respect of the OldCo/NewCo Restructuring Satisfy the "Entire Fairness" Standard**

358.    The parties do not dispute that the OldCo/NewCo Restructuring is subject to review under the entire fairness standard and that Tilton had the burden of demonstrating entire fairness. The evidence presented by Tilton was sufficient to satisfy that burden.

359.    Under the entire fairness standard, the court reviews a director's decision to ensure it is entirely fair to the corporation's stakeholders. *See Cinerama, Inc.*, 663 A.2d at 1163. "A determination that a transaction must be subjected to an entire fairness analysis is not an implication of liability." *Trados*, 73 A.3d at 55 (internal quotation and citation omitted).

53

360.     In examining entire fairness, courts look at two component pieces: procedural fairness (fair dealing or process) and substantive fairness (fair price). *See Weinberger v. UOP, Inc.*, 457 A.2d 701, 711 (Del. 1983). Whether a transaction is entirely fair depends heavily on the facts of a particular case. *Cinerama, Inc.,* 663 A.2d at 1140. The Court is ultimately called upon to make a unitary fairness conclusion based upon the totality of the circumstances. *Emerald Partners v. Berlin*, 2003 WL 21003437, at *22 (Del. Ch. Apr. 28, 2003), *aff'd*, 2003 WL 23019210 (Del. Dec. 23, 2003). Indeed, entire fairness can be found notwithstanding a court's conclusion that a director did not follow a fair process. *Trados*, 73 A.3d at 76–78 (transaction entirely fair, notwithstanding that directors did not follow a fair process, where evidence showed that deeply distressed company could not have obtained better result for stakeholders).

361.     Here, the set of circumstances in which the Court must evaluate the fairness of the OldCo/NewCo Restructuring is atypical. That is because much of the Delaware fiduciary duty jurisprudence involves an assessment of the entire fairness of a transaction involving relatively healthy companies. *See, e.g.*, *Weinberger*, 457 A.2d at 704–08 (involving the merger of two publicly traded companies and a transaction of millions of shares at $21 per share); *Gelfman v. Weeden Inv'rs, L.P.*, 859 A.2d 89, 94 (Del. Ch. 2004) (assessing fairness of transaction made by directors "at a time when [the Company] was thriving" and "when no exigency required" it).

362.     But that was simply not TransCare's reality in February 2016. TransCare was in substantial distress. Indeed, by January, CMAG described its work for TransCare as "fighting daily fires and working to hold the business and organization together." (PFOF ¶ 119.) When viewed, as the Court must, against this backdrop of a rapidly failing company, the evidence shows that Tilton's actions in forming Transcendence and foreclosing on the Subject Collateral were entirely fair.

54

**The OldCo/NewCo Restructuring Was the Product of Fair Dealing**

363.    A fair process "embraces questions of when the transaction was timed, how it was initiated, structured, [and] negotiated."  *Weinberger*, 457 A.2d at 711.  The cornerstone of the Trustee's claim is that Tilton "deprived TransCare of the ability to monetize TransCare's assets as a going concern" when she "execut[ed] the Transcendence transaction" in February 2016.  (FPTO ¶ 182.)  This contention assumes that TransCare could in fact continue to operate as a going concern at the time of the transaction absent new money funding that Tilton was not required to personally provide and absent continued funding that, despite Tilton's efforts, Wells Fargo was unwilling to provide.

364.    The weight of the evidence presented at trial supports the opposite finding.  At the time of the transaction, TransCare had lost its ABL lender, was in default under its loan agreements, was about a million dollars behind on payroll taxes and had no cash available to independently make payroll.  (PFOF ¶¶ 60–61, 66, 161, 187, 193–94.)

*Timing of the Transaction*

365.    By late 2015 and into 2016, TransCare lacked sufficient capital to continue operations absent new working capital financing.  (PFOF ¶¶ 60–61, 72, 110–11, 114–16, 136–38.)  The evidence shows that such financing was not available for at least three reasons.  *First*, TransCare could no longer rely on Wells Fargo.  By October 2015, Wells Fargo had issued the Non-Renewal Notice to TransCare, the Wells Fargo ABL Agreement was set to expire on January 31, 2016 (on which date *the entire outstanding balance of approximately $13 million would be due and owing*), and Wells Fargo had no intention of continuing to fund TransCare as a going-concern.  (PFOF ¶¶ 60–62, 76, 169.)

55

366.    *Second*, the only new money financing CMAG (TransCare's acting CRO) or Wells Fargo proposed was from *Tilton herself*.  (PFOF ¶¶ 85, 123–25 (PX_175, at CM_TC2018_0002114 ("To have a chance of a turnaround, TransCare needs an immediate incremental pledge of support *from Patriarch* totaling $7.5M+ excluding 2016 term [loan] interest" (emphasis added)).); *see also* JX_82, at PP–TRBK0048227 (indicating that Wells Fargo "expect[ed] that any past due payroll and payroll taxes w[ould] be funded *by Patriarch*") (emphasis added.)  But Delaware law is clear that Tilton had no fiduciary obligation to provide any money to TransCare, let alone the many millions of dollars necessary for it to continue operations.  *See Thorpe v. CERBCO, Inc.*, 1993 WL 443406, at *7 (Del. Ch. Oct. 29, 1993) ("[C]ontrolling shareholders, while not allowed to use their control over corporate property or processes to exploit the minority, are not required to act altruistically towards them.").

367.    Moreover, implicit in the CMAG plan requiring new money financing from Tilton and *only* Tilton was that firm's understanding that third-party financing was not a viable option, particularly as Tilton, her team at Patriarch Partners and PPMG, TransCare management and CMAG were engaged only in preliminary discussions about whether and how TransCare could effect a turnaround.  (PFOF ¶ 125 ("Nobody was going to lend into this without any visibility to a future, any projections or any plan.  There was only one place that money could possibly come from and that would have been me.").)  Notably, there is no evidence that CMAG recommended to Tilton that TransCare should seek financing from a third party or that CMAG ever sought to do so on TransCare's behalf.  This is not surprising given that, in mid-February 2016, CMAG's Landeck told Tilton and others that he "WOULD NOT PUT ONE PENNY OF [HIS] PERSONAL MONEY INTO THIS COMPANY.  THIS IS A BLACK HOLE."  (PFOF ¶ 191 (DX_195, at PP–TRBK0078647 (emphasis in original)); *see also* Aug. 13 PM Tr. 85:17–23.)  Again, the fact that

56

CMAG was retained by Tilton for its restructuring expertise and acted as TransCare's CRO cannot be overstated. Its views and recommendations, and what it did *not* recommend or do itself, are a critical part of the circumstances in which entire fairness must be judged.

368. *Third*, no evidence was presented to indicate that TransCare could have attracted third-party financing during the two weeks Tilton was pursuing the OldCo/NewCo Restructuring (*i.e.*, the period during which the entire fairness standard applies). TransCare's assets were already pledged in full to multiple secured lenders. (PFOF ¶¶ 22, 31, 158.) Thus, there was nothing to offer a new lender as collateral. TransCare was also in default of the Wells Fargo ABL Agreement and the TLA. (PFOF ¶¶ 67, 217.) Moreover, a prospective new lender would also discover that TransCare did not have timely or accurate financial statements and had no audited financial statements for 2014 or 2015. (PFOF ¶¶ 42, 67.) Indeed, TransCare's failure to maintain accurate and timely financials contributed heavily to the deterioration of the relationship with Wells Fargo. (PFOF ¶¶ 42–44, 67.) CMAG also understood the limits of TransCare's financial reporting systems, cautioning that it had "worked diligently to develop the most accurate financial picture of the Company *possible given the limitations of the Company's accounting systems and financial reporting*." (PFOF ¶ 120 (emphasis added).) It requires an impossible stretch of imagination to believe that a new lender would be willing to lend in a subordinated position on an emergency basis based on dated and unreliable financials.

369. Additionally, by February 9, TransCare's business was in dire straits, as CMAG repeatedly noted. (PFOF ¶¶ 110–30, 136–141 (PX_185, at CM_TC2018_0002546 ("cash situation is dire and not improving"); *see id.* at CM_TC2018_0002544 ("We [at CMAG] have been telling this group for some time . . . that TC could not continue operations without a significant infusion of cash").) The CMAG Executive Summary also described the "[c]urrent void in Senior

57

Management leadership" and that "[v]irtually all key customers [were] pursuing or considering replacement options." (PFOF ¶ 117.)

370. Moreover, *the entire outstanding loan balance* on the Wells Fargo ABL Agreement could be called on a moment's notice. (PFOF ¶ 62.) Thus, a new lender would have had to *both* refinance the Wells Fargo ABL Agreement *and* extend millions of dollars in immediately available funds just to keep TransCare alive. (PFOF ¶¶ 62, 110–11, 136–38.) All of this would have been clear to a prospective third-party financing source from even minimal diligence. Under these circumstances, the notion that a 'White Knight' lender might "risk significant capital . . . before a turnaround c[ould] show meaningful positive results" has no evidentiary support. (PFOF ¶ 126.)

371. At bottom, fairness must be measured in context. *See, e.g.*, *S. Muoio & Co. LLC v. Hallmark Entm't Invs. Co.*, 2011 WL 863007, at *11 (Del. Ch. Mar. 9), *aff'd*, 35 A.3d 419 (Del. 2011); *In re Nine Sys. Corp. S'holders Litig.*, 2014 WL 4383127, at *1 (Del. Ch. Sept. 4, 2014) ("[E]ntire fairness standard of review is principally *contextual.* That is, there is no bright-line rule on what is entirely fair") (emphasis in original), *aff'd sub nom. Fuchs v. Wren Holdings, LLC*, 129 A.3d 882 (Del. 2015). Here, that requires that the Court take into account the economic realities facing TransCare at the time of the OldCo/NewCo Restructuring; that is, a company in deep distress, operating at the daily discretion of its ABL lender, and losing key customers on a nearly daily basis. (PFOF ¶¶ 187–200.) In this context, Tilton developed a fair plan to salvage as much of TransCare as possible and maximize value for stakeholders. *See S. Muoio & Co.*, 2011 WL 863007, at *11 (finding fair process because "there was no tangible way that Crown would be able to meet its debt obligations when they were due, and that Crown had no real options other than a recapitalization or bankruptcy. Given the fact that Crown's debt crisis had developed over the

58

years with unprofitable and not-promising operations, it is evident that Crown did not have a

solution that would provide a better opportunity for future value than a recapitalization.").

372.    Indeed, the evidence shows that, by February 9, *liquidation was the Company's*

*only available option*.  (PFOF ¶¶ 140 (PX_185, at CM_TC2018_0002543 ("the old money is

essentially only worth what a liquidation (closure or liquidation sale) would yield")), 170.)  *See*

*Trados*, 73 A.3d at 77 (finding fair process where company "did not have a realistic chance of

generating sufficient return to escape the gravitational pull of the large liquidation preference and

cumulative dividend," "face[d] risks," and "external threats were becoming more serious");

*Blackmore Partners, L.P. v. Link Energy LLC,* 864 A.2d 80, 85–86 (Del. Ch. 2004) (recognizing

that entire fairness standard could be met if defendants could prove that "there was no future for

the business and no better alternative for the unit holders").

### *OldCo/NewCo Restructuring Negotiations*

373.    Moreover, the manner in which the OldCo/NewCo Restructuring was developed

was fair.  The evidence shows that Tilton and her team engaged in an open, coordinated, and arms-

length process involving Wells Fargo and its counsel, TransCare's restructuring counsel,

TransCare management, and CMAG, to create a viable restructuring plan for TransCare.  (*See,*

*e.g.*, PFOF ¶¶ 180–86; JX_84, at WF TC_00000052 ("If you would like to send any of your Wells

people or your own financial advisors to work with us, we would welcome them here.").)  From

February 9 through February 24, Tilton engaged in almost daily discussions with Wells Fargo and

shared with Wells Fargo wind-down models and budgets prepared by her team, with the input of

CMAG and TransCare management.  (PFOF ¶¶ 181–82, 184–86, 205–07.)  TransCare's counsel

was also engaged in continued dialogue with Wells Fargo's counsel.  (PFOF ¶¶ 183, 206; DX_147,

at PP–TRBK0091632 ("We also are having Otterbourg continue their dialogue with Curtis

59

regarding the legal process/structure of carving out the proposed Newco entities.").)  The evidence

shows that the negotiations were intense and adversarial, with Wells Fargo holding and exercising

considerable bargaining power.  (PFOF ¶¶ 181–83, 188, 192, 195–96, 205–07.)

### Structure of the Transaction

374.    The OldCo/NewCo Restructuring was also structured fairly.  As step one, PPAS

(as administrative agent) would foreclose on and recover the Subject Collateral, as it had a right to

do under the operative loan agreements because TransCare was in default, and then transfer those

assets to Transcendence.  (PFOF ¶ 172.)  Thereafter, Tilton would, through her own voluntary

personal financing, save jobs by operating certain business lines with the Subject Collateral.

(PFOF ¶¶ 172, 202–04; JX_93 ("We are trying to save 700 jobs").)  The Term Loan Lenders would

also receive a *pro rata* equity stake in Transcendence, which would provide them a potential upside

to stem the losses on their loan to TransCare.  (PFOF ¶¶ 208–15.)  At the same time, TransCare's

obligations to Wells Fargo would be satisfied through its continued collection of accounts

receivable and the value of OldCo assets would be maximized through an orderly wind-down to

be run by a chief restructuring officer.  (PFOF ¶¶ 176–78; *id.* ¶ 177 ("[W]e were hiring our own

CRO to . . . run th[e] company during the wind-down to make sure that we could maximize all the

value from OldCo beyond just w[hat] Wells would collect.").)

### Tilton's Decision Not to Cold Call Potential Third-Party Buyers
### Did not render the Process Unfair

375.    At trial, the Trustee argued that the process was unfair because Tilton did not make

phone calls to see if any third party was interested in buying TransCare.  In so arguing, the Trustee

ignores that a process need not be perfect in order to be fair.  *See Cinerama*, 663 A.2d at 1179

(citation omitted) ("'Perfection is not possible, or expected' as a condition precedent to a judicial

determination of entire fairness."); *ACP Master, Ltd. v. Sprint Corp.*, 2017 WL 3421142, *29 (Del. Ch. July 21, 2017) ("The outcome had blemishes, even flaws, but it was entirely fair."), *aff'd*, 184 A.3d 1291 (Del. 2018). "In any event, claims of flawed process are properly brought as duty of care, not loyalty, claims," *Greene v. N.Y. Mercantile Exch., Inc. (In re NYMEX S'holder Litig.)*, 2009 WL 3206051, at *7 (Del. Ch. Sept. 30, 2009), and here the Trustee did not sue Tilton for breaching her duty of care.

376.     Moreover, implicit in the Trustee's argument on this point is the assumption that a traditional sale process was unnecessary because TransCare could have been sold as a going concern for reasonable value on an expedited basis, without any marketing of the Company or allowing time for buyer diligence. *But there is no record evidence whatsoever to support that assumption*.

377.     To begin with, any sale process required the support of TransCare's secured lenders because TransCare's assets could not be sold free and clear without their consent. (PFOF ¶¶ 24–25, 32.)  Notably, however, by February 9, none of the scenarios under which Wells Fargo was contemplating providing continued financing to TransCare included a marketed sale process or, for that matter, TransCare continuing to operate as a going concern. (PFOF ¶¶ 165–69; JX_84, at WF_TC_0000053 (transmitting the terms under which "Wells Fargo would consider financing TransCare on an orderly wind down basis").)

378.     Moreover, for the same reasons why it was unreasonable to believe a third-party lender would have provided funding to the Company at this time (as just discussed), it was also unrealistic to think a 'White Knight' would buy TransCare in the near term, particularly "*given the limitations of the Company's accounting systems and financial reporting*." (PFOF ¶ 120 (emphasis added).)  As the Trustee's expert, Arnold, admitted, buyers need valid numbers. (July

61

24 Tr. 73:25–74:4 ("Q: Because if you're a buyer, and you're doing diligence, and you're trying

to figure out whether the investment is worth it you need to know that you have reliable numbers,

right?  A:  You certainly want reliable numbers.  I totally agree.").)  *See Cinerama*, 663 A.2d at

1140–41 (finding process entirely fair because, "while the company was not shopped[,] there is no

indication in the record that more money was possible from [a controlling stockholder] or likely

from anyone else").

379.    To be sure, TransCare received certain expressions of interest in some or all of

TransCare throughout 2015.  However, the notion that any of these companies would have been

ready and willing to immediately purchase TransCare (without due diligence) for an amount

materially greater than liquidation value is simply not plausible.  *First*, the 2015 inquiries were

"blind"; they were made by parties that had not performed any due diligence on TransCare.  (PFOF

¶¶ 54–55; JX_40, at PP–TRBK0030761 (contemplating the "[c]ompletion of customary due

diligence").)  Any due diligence process would have taken weeks, if not months, and would have

revealed that, even with a substantial cash infusion, the projected EBITDA "forecast [was] low"

and "valuation at end of year would not be that compelling."  (PFOF ¶ 141.)  On that point, the

Trustee's expert, Dr. Arnold, admitted that any sale would not happen overnight; at a minimum

"there's still going to be a diligence period."  (PFOF ¶ 292.)

380.    *Second*, there is no evidence CMAG recommended to Tilton that she divert

resources to looking for prospective third-party purchasers, including those who had previously

made inquiries of TransCare, for what would have amounted to an emergency sale.  There is

similarly no evidence that CMAG itself was making such inquiries during this two-week period.

Indeed, CMAG did not recommend in its Executive Summary that TransCare engage in a sale

process either in the short term or the medium term.  (PFOF ¶ 128.)

62

381.    There is also no evidence that, by not 'picking up the phone,' Tilton was trying to benefit herself or putting her own interests before those of other stakeholders.  On the contrary, the evidence shows that the actions taken by Tilton were believed to be in the best interests of all stakeholders.  (PFOF ¶¶ 176–77 (Aug. 13 PM Tr. 78:22–25 (CRO would "run th[e] company during the wind-down to make sure that we could maximize all the value from OldCo beyond just w[hat] Wells would collect.")), 182, 215; *see also* JX_93, at PP-TRBK0051380 ("We are trying to save 700 jobs and pay [Wells Fargo] cash").)  Moreover, in order for the three divisions that were to continue as NewCo to operate, the divisions would require the support of its vendors and thus would need to pay them any amounts then due and owing.

382.    The Trustee asks the Court to assess the fairness of Tilton's decision not to divert critical resources to cold calling potential buyers in a vacuum.  The Court, however, cannot ignore that the Company was essentially in a death spiral during the two-week period at issue.  (PFOF ¶¶ 187–200.)  Tilton provided convincing testimony that simply keeping TransCare together was a daily challenge that even with the required devotion of extensive resources by her and her team continued to freefall.  (Aug. 13 AM Tr. 23:4–6 ("The company was in a free fall with an ABL lender who was refusing to fund on a day-to-day basis."); Aug. 13 PM Tr. 94:11–17 (describing the "35 to 40 people" who "had been working for weeks" trying to save TransCare); *id.* at 99:18–20 (describing the loss of two contracts during the two-week period as a "big hit" because they generated about $2.5 million of EBITDA).)  CMAG's reports even prior to February 9 also reflected severely distressed conditions.  (*See, e.g.*, PFOF ¶ 119 (CMAG was "fighting daily fires and working to hold the business and organization together"); *see also* July 22 AM Tr. 119:23–120:4.)  In the context of what was actually happening at TransCare during the relevant two-week period in February, the evidence compels the conclusion that Tilton's decision was entirely fair.

63

\* \* \* \* \*

383.    In sum, whether or not a process was fair is dictated by the specific facts and context of each case.  This case does not present a situation where insiders made millions by engineering a self-dealing transaction through false or misleading pretenses or cooked books.  Tilton, in fact, *lost* millions and there is simply no evidence that she favored her own interests over those of other stakeholders.  On the contrary, the evidence is uniform that she undertook the OldCo/NewCo Restructuring in an effort to save jobs and otherwise maximize value for TransCare's creditors.  Most importantly, the evidence demonstrates beyond doubt that the only other option she had was to liquidate the Company.  In this regard, the fact that the outside restructuring professionals who acted as TransCare's CRO—CMAG—did not recommend any other course of action that did not involve Tilton funding millions of her own money into what CMAG repeatedly acknowledged was a 'black hole' compels the conclusion that Tilton acted fairly here.

**The Price Paid for the Subject Collateral Was Fair**

384.    TransCare also received a "fair price" for the Subject Collateral.  Fair price "relates to the economic and financial considerations relied on when valuing the purchase price" of the assets.  *In re LNR Prop. Corp. S'holders Litig.*, 896 A.2d 169, 178 n.52 (Del. Ch. 2005).  A fair price is one that falls within the range of reasonable values, even "at the lowest level in a broad range of fairness."  *Kahn v. Tremont Corp.*, 694 A.2d 422, 432 (Del. 1997).

385.    Elements that affect fair price include the financial condition of the company whose assets are being valued.  *S. Muoio & Co*, 2011 WL 863007, at *16.  Put otherwise, an assessment of fair price must take into consideration "the economic reality" which TransCare faced—*i.e.*, a business on the brink of liquidation.  *Id.* at *17 ("[T]reating Crown as if it had no liquidity crisis would require me to ignore the credible evidence adduced at trial.  This I cannot do.").

64

386.    This concept is well-understood under Delaware law.  *See, e.g.*, *In re Vision Hardware Grp., Inc.*, 669 A.2d 671, 677 (Del. Ch. 1995) ("[T]he evidence shows conclusively that but for the TCW proposal and its effectuation, Better Vision was a going concern heading immediately into bankruptcy and, unless new credit was made available, liquidation.  This fact has very basic importance in determining the fair value of Better Vision stock."); *In re Hanover Direct, Inc. S'holders Litig.*, 2010 WL 3959399, at \*3 (Del. Ch. Sept. 24, 2010) ("[T]he company was in fact 'under water' at the time of the merger.  Accordingly, a merger price above $0.00 (in this case, $0.25 per share) was entirely fair.")[18]; *S. Muoio & Co.*, 2011 WL 863007, at \*16 ("[A]bsent the Recapitalization [the challenged transaction], Crown would not have survived long enough to realize any future value, much less value above the level of Hallmark's debt.  Thus, without a recapitalization, Crown was facing insolvency and its equity was worthless.").

387.    As discussed, on February 24, 2016, TransCare could not continue operating as a going concern absent a substantial voluntary cash infusion.  (*See, e.g.*, PFOF ¶¶ 110–11, 136–38, 187–94.)  As such, the Subject Collateral necessarily could not have been worth more than liquidation value.  *See S. Muoio & Co.*, 2011 WL 863007, at \*16–17 (explaining that, because company "was on the brink of bankruptcy and had no ability to refinance its debt," the "corporation's long-term, 'going concern' value becomes irrelevant and instead its value in bankruptcy becomes the relevant metric for determining fair value").  That being the case, the $2.4 million that the Trustee obtained through liquidating the Subject Collateral reflects a fair price for the assets.  (*See In re TransCare Corporation*, 16–10407–smb, Dkt. Nos. 57, 58; PX_282, at Exhibit 13).  Because Tilton's price ($10 million) was nearly five times that amount, it was fair.

---

[18] Although *Hanover* considered fair value in the context of an appraisal action, "the 'fair price' aspect of the unitary entire fairness standard is widely regarded as requiring a valuation analysis equivalent to the 'fair value' inquiry in an appraisal."  *Reis v. Hazelett Strip–Casting Corp.*, 28 A.3d 442, 461 (Del. Ch. 2011).

65

388.    An assessment of the approach Tilton employed to arrive at the $10 million figure similarly shows it was fair.  (PFOF ¶¶ 228–65.)  Tilton determined what price to pay for the Subject Collateral based on the combined balance sheet for NewCo as of February 13, 2016.  (PFOF ¶¶ 229–36.)  At that time, it was assumed that NewCo would continue operations of five business divisions; thus, the combined balance sheet included all five divisions.  (PFOF ¶¶ 231–32.)  The February 13 NewCo Model showed a balance sheet book value of NewCo assets based on cash and cash equivalents, receivables (which Tilton intended to purchase from Wells Fargo and contribute to NewCo), inventory, and net PP&E of just under $10 million.  (PFOF ¶¶ 232, 236.)

389.    Given the rapidly deteriorating situation on the ground, by February 24 NewCo would operate three divisions—not five—thus reducing the book value of the Subject Collateral, including receivables, to approximately $6.25 million.  (PFOF ¶¶ 243–46.)  Ultimately, however, Tilton and Wells Fargo were unable to reach a deal on the purchase of receivables and those receivables were excluded from the transaction.  (PFOF ¶¶ 205–07, 237.)  This further reduced the book value calculation to just over $1 million.  (PFOF ¶ 248.)  Tilton did not adjust the price to reflect these changed circumstances.  (PFOF ¶¶ 238, 248, 249.)  As a result, $10 million represented an overpayment of the actual book value by a factor of 10.

390.    This Court has previously held that book value may not equate to fair market value.  *In re Breitburn Energy Partners LP*, 582 B.R. 321, 344 (Bankr. S.D.N.Y. 2018) (Bernstein, J.).  However, book value may reflect a fair price depending on the circumstances.  *Rubin v. Manufacturers Hanover Tr. Co.*, 661 F.2d 979, 995 (2d Cir. 1981) (emphasis added) (Although the "market value of particular property may" not match "its book value, and the market value of certain . . . assets may" be "greater *or less* than their book value.")  Indeed, courts have recognized that book value can actually overstate market value or fair value.  *See, e.g.*, *Burtch v. Opus, LLC*

66

*(In re Opus E., LLC)*, 528 B.R. 30, 88 (Bankr. D. Del. 2015) (finding valuation of contracts and physical assets' book value was fair), *aff'd*, 698 F. App'x 711 (3d Cir. 2017).[19] The $10 million purchase price was actually 10x the book value of the Subject Collateral, so any concern that the book value understated market value is misplaced in this instance.[20, 21]

391.    The finding that Tilton's book value calculation was fair is bolstered by the fact that she understood the limits of book value as a measure of fair market value.  Thus, she also used a check based on projected cash flow.  Specifically, Tilton compared the total acquisition price of approximately $22 million against the EBITDA that Tilton and her team projected could be generated by the three NewCo divisions during the balance of 2016.  (PFOF ¶¶ 253–65.)

392.    The EBITDA projections that informed Tilton's check were derived from the February 13 NewCo Model and the February 22 NewCo Model, adjusted to account for operating expenses that had been excluded from the models, resulting in a projected EBITDA range of $1.8–$2.75 million.  (PFOF ¶¶ 255–263.)  When compared against the $22 million "purchase price," the transaction implied a multiple of 8 to 12x.  (PFOF ¶ 263.)  This multiple range exceeds the multiple Tilton thought generally applied to a healthy company in the industry (7–8x) and further validates that $10 million was a fair price where TransCare "was in a free fall, losing contracts every day," and operating "at the absolute breaking point."  (PFOF ¶¶ 116, 194, 264–65.)

---

[19] *See also Allied Chem. & Dye Corp. v. Steel & Tube Co. of Am.*, 120 A. 486, 495 (Del. Ch. 1923) ("book value[] may, however, be in excess of fair market value."); *Havee v. Belk*, 589 F. Supp. 600, 605 (W.D.N.C. 1984) (finding fair price for company lacking liquidity was "about 65% of book value"), *aff'd*, 775 F.2d 1209 (4th Cir. 1985).

[20] To be sure, the book value of the assets included considerable depreciation.  But there is no evidence that those values were understated.  On the contrary, the record is replete with evidence that TransCare's ambulance fleet was old.  (PFOF ¶¶ 118, 99–100 (JX_67, at PP–TRBK0106573).)

[21] A draft of the TSA (JX_95) contained monthly rates that NewCo would charge to OldCo during the wind-down period for the use of certain ambulances, ranging from $525 to $1,700.  (*Id.* at PP–TRBK0044011–18.)  Those charges do not shed light on whether Tilton's book value calculation of the Subject Collateral was too low.  There is no record evidence about the basis for the charges, much less any evidence that Wells Fargo agreed to pay them.  Indeed, Wells Fargo was not willing to make *any* payment to NewCo for the use of NewCo assets during the wind-down period.  (JX_87.)  Thus, it cannot be said that the monthly rates in the draft TSA are probative of the value of the vehicles.

67

393.     The fairness of the $10 million price is also corroborated by other record evidence. In particular, the offer for the paratransit division in the LOI from National Express was $6 to $7 million (only a portion of which was proposed to be paid at closing) for a business that generated roughly $3.5 to $4 million in EBITDA at the time the LOI was received.  (PFOF ¶¶ 47–51.)  That proposal thus implied a multiple of no more than 1.75x (and likely less given the time value of money)—far less than the 8–12x implied by the Article 9 foreclosure.  (PFOF ¶¶ 263, 328.)[22]

### C.     Tilton Acted in Good Faith in Seeking to Have TransCare Issue WARN Notice

394.     Finally, Tilton also acted in good faith in taking steps to comply with TransCare's obligations under the WARN Acts.

395.     As a subsidiary element of the duty of loyalty, a breach of fiduciary duty may be found when the fiduciary has failed to act in good faith.  *Stone v. Ritter*, 911 A.2d 362, 370 (Del. 2006).  To succeed on a claim for the breach of the duty of good faith, a plaintiff must demonstrate that a fiduciary either: (1) "intentionally act[ed] with a purpose other than that of advancing the best interests of the corporation"; (2) "act[ed] with the intent to violate applicable positive law"; or (3) "intentionally fail[ed] to act in the face of a known duty to act, demonstrating a conscious disregard for his duties."  *In re Walt Disney Co. Deriv. Litig.*, 907 A.2d 693, 755 (Del Ch. 2005), *aff'd*, 906 A.2d 27 (Del. 2006).

---

[22] As a general intangible, the MTA Contract was not included in the book value of the three divisions.  (Aug. 14 AM Tr. 26:8–9.)  It was not unfair for Tilton to exclude the value of the MTA Contract from her book-value calculation because it had value only if the Company produced cash flow as a going concern.  *See Geltzer v. Bloom (In re M. Silverman Laces, Inc.)*, 404 B.R. 345, 358 (Bankr. S.D.N.Y. 2009) (rejecting Trustee's theory that intangible asset had value, finding asset's worth "was premised on SL's having a positive going concern value" but it was "clear" that SL "could not have survived as a going concern").  Moreover, the evidence shows that Tilton did value the MTA Contract when cross-checking the book value against the total $22 million "purchase price" (*i.e.*, the $10 million *plus* the $12 million in new working capital to operate Transcendence as a going concern).  (Aug. 14 AM Tr. 26:9–11 ("The MTA contract was not on the balance sheet but the revenues and the income were in the income statement which was also used to value."); *id.* at 27:6–11 ("The value of the [MTA] contract was valued in the value of New Co . . . which was $22 million dollars of capital being put up to buy a little over . . . two million of EBITDA.").)

A2426

396.    Here, the Trustee contends that Tilton "was advised of TransCare's obligations under the WARN Acts . . . and took no steps to comply" with the laws' requirements.  (FPTO ¶ 184(c).)  In other words, that Tilton acted with "conscious disregard for [her] responsibilities[.]" *Brehm v. Eisner (In re Walt Disney Co. Deriv. Litig.)*, 906 A.2d 27, 64 (Del. 2006).

397.    A party that bases a breach of fiduciary duty claim on a fiduciary's conscious disregard of her duties bears a heavy burden of proof; the Trustee had to show that Tilton's conduct was "qualitatively more culpable than gross negligence . . . ."  *Id.* at 66.  Delaware courts describe a conscious disregard of fiduciary duty as equivalent to "adopting a 'we don't care about the risks' attitude."  *In re Walt Disney Co. Derivative Litig.*, 825 A.2d 275, 289 (Del. Ch. 2003).

398.    There was no evidence presented at trial to support a finding that Tilton adopted a "we don't care about the risks attitude."  Instead, the testimony and documents presented show the opposite: Tilton designed and negotiated an orderly wind-down of the OldCo business lines over the course of 90 days in an effort to *ensure* compliance with the WARN Acts.  (PFOF ¶¶ 175, 182.)  The "Progress and Action list" Tilton's team developed provided for the timely issuance of WARN notices to OldCo employees.  (PX_206, at PP–TRBK0091293.)  Tilton also discussed the issue with representatives of Wells Fargo in connection with the parties' negotiations.  (PFOF ¶ 182.)  Although TransCare was ultimately unable to issue WARN notices to all OldCo employees as planned due to the sudden halt in TransCare's operations, Tilton took active steps to *avoid* the risks to TransCare of potential liability under the WARN Acts.  Thus, the Trustee failed to meet his burden that Tilton knowingly failed to take steps to comply with the WARN Acts.[23]

---

[23] The Trustee similarly failed to prove that Tilton was advised of TransCare's obligations under federal/state payroll tax laws and adopted an "I don't care about the risks attitude."

## XVI.    The Trustee Failed to Prove Damages for the Fiduciary Duty Claim[24]

399.    Although Tilton is not liable for breach of fiduciary duty, even if such a breach had been proven the Trustee failed to prove damages.  Courts will not award a "meaningful remedy" unless the plaintiff shows (1) "that a sufficiently convincing causal linkage exists between the breach of duty and the remedy sought," and (2) "harm to the beneficiary[.]"  *Basho Techs. Holdco B, LLC v. Georgetown Basho Inv'rs, LLC*, 2018 WL 3326693, at *24 (Del. Ch. July 6, 2018).

400.    "It is well settled that a plaintiff alleging a breach of fiduciary duty claim must prove its damages by a preponderance of the evidence."  *In re HH Liquidation, LLC*, 590 B.R. 211, 273 (Bankr. D. Del. 2018).  A finding of breach does not guarantee a monetary remedy. *OptimisCorp v. Waite*, 2015 WL 5147038, at *73 (Del. Ch. Aug. 26, 2015) ("Having found that breach [of loyalty], however, I am not convinced that it warrants a monetary or equitable remedy."), *aff'd*, 137 A.3d 970 (Del. 2016); *Cline v. Grelock*, 2010 WL 761142, at *2 n.11 (Del. Ch. Mar. 2, 2010) (stating that one may "expect that a self-interested breach of fiduciary duty . . . should be remedied by damages," but "the Court has not been provided any basis for a rational award of damages.").

401.    Moreover, a Plaintiff is not entitled to damages if he offers only speculative damages calculations.  *OptimisCorp*, 2015 WL 5147038, at *81.  Although Delaware law allows courts to sometimes "loosen normally stringent requirements of causation and damages," *Thorpe v. CERBCO, Inc.*, 676 A.2d 436, 445 (Del. 1996) (citation omitted), the Court "cannot award damages that are based on mere speculation or conjecture . . . ."  *In re HH Liquidation, LLC*, 590 B.R. at 273.  While a damage award does not require "mathematical certainty," the difference

---

[24] For the reasons discussed *infra*, the Court concludes that the Trustee failed to prove his claim for actual fraudulent transfer (Count VII).  (*See* Section XVIII, *infra*.)  Even if the Trustee had established the necessary elements of the claim, he would not be entitled to damages because the conclusions herein apply equally to Count VII.

A2428

between a speculative and a sufficient showing of damage is whether the court "has a basis to make a responsible estimate of damages." *Reis*, 28 A.3d at 466.  *See also Lake Treasure Holdings, Ltd. v. Foundry Hill GP LLC*, 2014 WL 5192179, at *12–13 (Del. Ch. Oct. 10, 2014) (distinguishing reasonable estimate from speculation and awarding only nominal damages).  In the absence of such a basis, an award of damage is, "as a matter of law, improper." *Ravenswood Inv. Co v. Estate of Winmill*, 2018 WL 1410860, at *20 (Del. Ch. Mar. 21, 2018).[25]

### A.      The Trustee Failed to Prove Causation

402.      In order to obtain a monetary remedy against Tilton, the Trustee had to show that Tilton's alleged breach of fiduciary duty actually caused the alleged damage.  *See Continuing Creditors' Comm. of Star Telecommunications, Inc. v. Edgecomb*, 385 F. Supp. 2d 449, 460 n.9 (D. Del. 2004) (citation omitted) (stating director may suffer "monetary damages for any harm he causes"); *Official Comm. of Unsecured Creditors of Katy Indus., Inc. v. Victory Park Cap. Advisors, LLC (In re Katy Indus., Inc.)*, 590 B.R. 628, 639 (Bankr. D. Del. 2018) (dismissing fiduciary duty of loyalty claim for failure to allege causation of harm).

403.      Here, evidence of causation is lacking because although the Trustee seeks "damages equal to the lost going concern value" of TransCare (FPTO ¶ 184(b)(iv), 72 ¶ 1(a)), he failed to prove that TransCare would have had any going-concern value but for the challenged transaction.  As discussed at length *supra*, in January and February 2016 TransCare was "operating

---

[25] Although fiduciary duty and appraisal claims under Delaware law overlap in many ways, a key difference arises for damages calculations.  In an appraisal case, neither party has the burden of proof, so the court may disagree with both parties' valuations and pick an amount as it sees fit.  *Cooper v. Pabst Brewing Co.*, 1993 WL 208763, at *8 (Del. Ch. June 8, 1993) ("When . . . none of the parties establishes a value that is persuasive, the Court must make a determination based upon its own analysis.").  In a fiduciary duty case, however, if the plaintiff fails to meet his burden of proof of damages, the plaintiff is not entitled to compensatory damages.  *Ravenswood Inv. Co.*, 2018 WL 1410860, at *2 (although court had broad discretion to fashion a remedy "it cannot create what does not exist in the evidentiary record, and cannot reach beyond that record when it finds the evidence lacking.").  Here, because, the Trustee failed to prove a reasonable damage award, the Court may not propose its own award.

71

at an absolute breaking point" and could not continue without an immediate new money infusion. (PFOF ¶ 116; *see also id.* ¶¶ 110–38.) Moreover, all of the Plans upon which Arnold's calculations are based, including the February 24 Plan, required a significant infusion of new money. (PFOF ¶¶ 102, 123–24, 133, 202–04.) But neither Tilton nor any other party had an obligation, or had agreed, to provide such a life-saving infusion and there is no evidence there would have been one but for the Article 9 foreclosure. Thus the Trustee failed to prove that any lost going-concern value was caused by the foreclosure. *See In re Nine Sys. Corp. S'holders Litig.*, 2014 WL 4383127, at *51 (finding disloyal conduct caused no harm and refusing to conclude that such conduct, "when the Company's equity was worth nothing[,] should now be remedied by an award of damages in the tens (or hundreds) of millions of dollars"; "In other words, but for the [challenged transaction], there is little evidence to suggest the Company would have been worth any amount approaching what the Plaintiffs seek in damages").

404.    Arnold testified that a hypothetical market participant (*i.e.*, someone with a shovel looking to buy a silver mine) could have reviewed the Plans and found value. (July 24 PM Tr. 40:3–13.) This analogy is misguided. Unlike a silver mine, which has inherent value based on untapped reserves whether it is operating or not, TransCare only had more than liquidation value if it operated. But at the time of the Plans, TransCare was on the brink of being shut. Thus, not only would a market participant have had to purchase TransCare's assets, it would also have had to infuse, on an emergency basis, millions in fresh capital just to have the option of continuing the business as a going concern.[26]

---

[26] TransCare's assets could not be sold free and clear without the agreement of both Wells Fargo and the Term Loan Lenders to release their liens. (PFOF ¶¶ 24–25, 32.) Thus, if the total purchase price was less than the full amount of the secured debt (approximately $58 million), one or more of the Term Loan Lenders could veto the sale. (PFOF ¶¶ 62, 209 (PX_209, at PP–TRBK0019089 ("Sheet 2" Tab, Rows 1–2).) (This is in contrast to the Article 9 foreclosure, which Tilton, by virtue of her then control over the Required Lenders, could effectuate without the consent of all the

405. Moreover, those interested in a silver mine would presumably be able to make an informed decision as to whether it would be prudent to make the capital investment for the necessary "shovel" based on technical reports or other objective assessments of the likely value of the silver reserves and the cost of extracting them. The Plans and their projections were, in contrast, subjective assessments that contained numerous risky assumptions.

## B. Arnold's Calculations are Irrelevant and Unduly Speculative

406. Even if the Trustee had proved causation, Arnold's calculations would not be entitled to any weight, thereby leaving the Trustee without any proof to support a damage award.

### Arnold Failed to Provide a Fair Market Valuation

407. Arnold's "valuations" are not entitled to any weight because they are not *his* (or anyone else's) valuations of TransCare's (or NewCo's) fair market value. During trial, Arnold admitted "***I'm not putting my own value on TransCare***." (PFOF ¶ 289 (July 24 Tr. 106:15–107:1 (emphasis added).) Rather, Arnold provided a "range for value of TransCare *given what the people within Patriarch were doing in January and February*" 2016. (*Id.* (emphasis added).) However, an opinion about what "people within Patriarch" believed TransCare could generate in future EBITDA is not the same thing as what price TransCare would have fetched in the market but for the Article 9 foreclosure. The only relevant question is the latter one, *see William Penn P'ship v. Saliba*, 13 A.3d 749, 758 (Del. 2011) (affirming damages analysis based on "value at which the property would likely have sold as a result of a fair bidding process in the open market"), ***but Arnold explicitly offered no opinion on it***. That renders his calculations legally meaningless. *See Gen. Motors Corp. v. New Castle Cty.*, 2000 WL 33113802, at *6 (Del. Super. Ct. Dec. 16, 2000)

---

Term Loan Lenders.) Although it is possible that Credit Suisse would have consented to release its liens for no consideration, that is hardly a certainty and was not likely to happen overnight (thus requiring someone to make an emergency capital infusion to keep the doors open while Credit Suisse assessed the situation).

73

(finding "[expert] obviously did not consider how the property would have [fared] in an arms-length sale between a willing buyer and willing seller, which is the proper standard for fair market value" and instead considered only GM's "subjective" view of the property).[27]

408.  Perhaps because the "valuations" were not Arnold's own, he testified that he was "not require[d] . . . to do a deep dive" into the inputs that went into any of the projections upon which the values he calculated were based.  (PFOF ¶¶ 288–90.)  As Arnold admitted, counsel for the Trustee provided him with the Plans containing the projections, the Greenberg email containing the market multiples, and the Valuation Dates; and Arnold never assessed, and does not know, whether those inputs were reasonable.  (PFOF ¶¶ 282, 291.)  That falls well below the mark for an expert.  *See MDG Int'l, Inc. v. Australian Gold, Inc.*, 2009 WL 1916728, at *4–5 (S.D. Ind. June 29, 2009) (stating "An expert must independently verify facts given to him, rather than 'accepting [them] at the word of . . . counsel'" in case where expert relied "on assumed 'facts' that he never verified" and "did not independently review any of the key data underlying his valuation"); *Crowley v. Chait*, 322 F. Supp. 2d 530, 546–47 (D.N.J. 2004) (finding expert relied on counsel's "highly filtered version of events").[28]

409.  Nor, as he admitted, did Arnold form an opinion about whether the projections themselves were reasonable.  (PFOF ¶¶ 291, 301.)[29]  It almost goes without saying that "methods

---

[27] *See also Kohler Co. v. United States,* 387 F. Supp. 2d 921, 926 (E.D. Wis. 2005) ("Implicit in 'fair market' value is objectivity, not the subjective value attributed by individual parties."), *aff'd*, 468 F.3d 1032 (7th Cir. 2006); *Saavedra v. Eli Lilly & Co.*, 2014 WL 7338930, at *6 (C.D. Cal. Dec. 18, 2014) (making same point); *Rivera v. Mendez & Compania*, 988 F. Supp. 2d 174, 178 (D.P.R. 2013) (explaining difference between "subjective willingness or valuations of the parties" and "the objective fair market value . . . .")

[28] *MDG* and *Crowley* involve questions of admissibility under *Daubert* instead of weight.  Nonetheless, if expert opinion is so unreliable that it must be excluded, the same testimony would necessarily be granted no weight at trial.

[29] To illustrate how unusual it is for an expert to admit that he did not assess the reasonableness of the data on which he relied, the Court is aware of no written opinion that even discusses such a circumstance let alone explains why expert testimony of that type could be proper.

74

of valuation" are "only as good as the inputs to the model. . . . So the relevant question is . . . how correct was the input or datum that produced the answer." *Neal v. Alabama By–Prods. Corp.*, 1990 WL 109243, at \*9 (Del. Ch. Aug. 1, 1990), *aff'd*, 588 A.2d 255 (Del. 1991). In consequence, the Court cannot rely on Arnold's "value" opinions to award damages with a "reasonable degree of precision." *Kronenberg v. Katz*, 872 A.2d 568, 609 (Del. Ch. 2004).

410.   Arnold responded that he did not have to evaluate the Plans or their projections because the people preparing them must have believed they were accurate and they were closest to the facts. (PFOF ¶ 290.) However, the record shows that neither Tilton nor Wells Fargo ever approved any of the WholeCo Plans. (*See* PFOF ¶¶ 104–05, 131, 134–135.) And Tilton was clear that even the February 24 Plan involved substantial risk. (*See* PFOF ¶¶ 299, 302.)

411.   In this regard, the projections at issue were not—as is often the case in valuation disputes—regular management projections created in the ordinary course of business. On the contrary, all of the projections in the Plans assumed a substantial restructuring of TransCare's business and were not prepared for the purpose of facilitating normal business planning. (PFOF ¶¶ 103, 121, 130, 132, 201–03.) Delaware courts have repeatedly rejected expert testimony based on management projections where, as here, they were prepared outside the ordinary course of business. *In re PetSmart, Inc.*, 2017 WL 2303599, at \*33-34 (Del. Ch. May 26, 2017) (rejecting management projections as unreliable because they were "not created in the ordinary course of business" but rather "specifically to aid PetSmart in its pursuit of strategic alternatives"). Moreover, although TransCare management was involved, the projections Arnold relied on were not actually prepared by management; rather, the Plans and the projections in them were prepared by Patriarch Partners and PPMG personnel or CMAG. (PFOF ¶¶ 100, 115, 132, 201.)

75

412.     Moreover, as Dunn persuasively explained, projections are not valuations.  (*See*
PFOF ¶¶ 306–09.)  Projections propose what a company could achieve if certain assumptions are
realized.  (PFOF ¶ 307.)  A valuation, on the other hand, assesses the risk that the assumptions will
occur (*e.g.*, is it impossible, conceivable, reasonable, likely?) and places a dollar value on that risk.
(PFOF ¶¶ 308–09.)  Such an assessment is where the specialized judgment of a skilled valuation
professional comes in.  To perform the assessment correctly, the expert must get his or her "hands
deep in the dough of the projections used in the . . . valuation report."  *In re Orchard Enters., Inc.*,
2012 WL 2923305, at *20 (Del. Ch. July 18, 2012) (crediting opinion of expert who "had his hands
deep in the dough of the projections used in the fairness opinion and then in his valuation report").
Arnold, however, got his hands nowhere near the dough; he did no risk assessment whatsoever.
(*See* PFOF ¶¶ 291, 301.)

**In Any Case, Arnold's Calculations Are Unduly Speculative**

413.     For related reasons, even if Arnold's calculations could be viewed as actual
valuations of TransCare (or NewCo) and he had opined on the reasonableness of the projections
on which the calculations were based (as just explained, he did not), his opinions are still unduly
speculative and should be given no weight for that reason.  *See Doft & Co. v. Travelocity.com Inc.*,
2004 WL 1152338, at *7 (Del. Ch. May 20, 2004)  (granting expert's valuation no weight because
"the record clearly shows that, in the absence of reasonably reliable contemporaneous projections,
the degree of speculation and uncertainty characterizing the future prospects" of the subject
company give the analysis "marginal utility").

*Projected EBITDA*

414.     In each of the Plans, the projected EBITDA for 2016 was, as Tilton described the
projections in the February 24 Plan, a "hockey stick projection" (PFOF ¶ 203; *see also* PX_283,

76

at 8 (containing chart of projections)), meaning that, graphically, the sudden and dramatic uptick in profits resembled the shape of a hockey stick blade.  The Trustee presented no evidence that the projected near-term explosions of profit depicted in the Plans were likely to occur, particularly when viewed against TransCare's dismal performance over the immediately preceding years.  *See OptimisCorp*, 2015 WL 5147038, at *81 (finding projections speculative because prior projections were not "remotely in the ballpark" and "egregiously overstated future performance"); *Huff Fund Inv. P'ship v. CKx, Inc.*, 2013 WL 5878807, at *10 (Del. Ch. Nov. 1, 2013) (finding expert's use of "projections based on a $20 million increase in [television show's] revenue leads to a speculative DCF valuation" where projected increase depended on outcome of future negotiation).

415.    The January 7 Preliminary Plan, for example, projected compound annual revenue growth of 14.3% despite declining revenue over the prior two years.  (PX_158, at CM_TC2018_0003370.)  Notably, CMAG determined that the January 7 Preliminary Plan's EBITDA numbers were "significantly overstated[.]"  (PFOF ¶ 112.)  Similarly, the CMAG Executive Summary predicted an EBITDA increase to $5 million in one year (a 257% increase in 2016 over the actual $1.4 million EBITDA in 2015), the Greenberg January 28 Email predicted a single-year EBITDA increase to $5.2 million (a 271% increase), and the February 24 Plan projected EBITDA of $3.2 million for NewCo alone (a 128% increase over actual 2015 WholeCo EBITDA).[30]  These dramatic near-term spikes in profitability also ignored TransCare's failure to achieve its prior turnaround plans.  (PFOF ¶ 41.)

416.    The authors of the Plans were appropriately cautious about them.  (*See, e.g.*, PFOF ¶¶ 300, 302.)  As noted, CMAG rejected the EBITDA projection in the January 7 Preliminary Plan

---

[30] (*See* PX_158, at CM_TC2018_0003370 (showing EBITDA for 2015); PX_175, at CM_TC2018_0002123; PX_179, at PP–TRBK0013260; DX_166, at PP–TRBK0110489.)

77

as artificially high and warned Tilton that the projection in the CMAG Executive Summary had a high level of execution risk that made return on investment uncertain. (PFOF ¶¶ 112, 126–27.) Greenberg also expressed concerns with the CMAG Executive Summary. (PFOF ¶ 141.) And, as discussed, Tilton similarly considered the February 24 Plan's projections "hockey stick projections" that had considerable risk. (PFOF ¶¶ 203, 299, 302.)

417.    Arnold's value opinions thus improperly ignored the many issues that cast doubt on TransCare or NewCo's ability to achieve the projections in the Plans. *See Finkelstein v. Liberty Digital, Inc.*, 2005 WL 1074364, at *14 (Del. Ch. Apr. 25, 2005) (calling a valuation analysis a "Fantasy Island approach" because it failed "to consider the actual circumstances facing [the subject company] as of the merger date"); *Huff Fund*, 2013 WL 5878807, at *10 ("Simply ignoring . . . fundamental uncertainty does not make it disappear.").

### *EBITDA Multiples*

418.    Even if the Trustee had proven that Arnold's reliance on the projections in the Plans was not unduly speculative, his calculations would still be too speculative because of the EBITDA multiples he used. That is because Arnold took multiples derived from guideline companies and precedent transactions identified by Greenberg in a single email without "adjusting [them] to account for the differences from the company being valued and the comparables . . . ." *Agranoff v. Miller,* 791 A.2d 880, 892 (Del. Ch. 2001). A credible analysis must evaluate the comparable risk and reflect it in a multiple that "would be accepted by a disinterested mind." *Orchard Enters.*, 2012 WL 2923305, at *10; *Cavalier Oil Corp. v. Harnett*, 1988 WL 15816, at *31 (Del. Ch. Feb. 22, 1988) (finding "sufficient uncertainty" in comparable company approach because the guideline company's "business risks and earnings results . . . were unrelated to the risks of the [subject company]"), *aff'd*, 564 A.2d 1137 (Del. 1989).

78

419.    Arnold applied market multiples for Envision and Air Methods, two thriving, multi-billion dollar companies that engaged in ground-based medical transportation only partially or not at all, to TransCare, a ground-based ambulance company that was in deep financial distress. (PFOF ¶¶ 321–24.)  Arnold's failure to consider the differences in actual circumstances and business segments renders the multiples from his comparable companies and precedent transactions unreliable as applied to TransCare.[31]  Indeed, courts have given no weight to expert valuations that failed to account for such differences.  *See Doft & Co.*, 2004 WL 1152338, at *9 (rejecting comparable company analysis as "unduly optimistic" because the expert's analysis "is too speculative when compared to the clear evidence in the record that [the subject company] still faced significant challenges" compared to its comparator company); *Reis*, 28 A.3d at 477 (rejecting expert's comparable companies analysis because "[t]he selected companies have stable earnings and have achieved consistent growth over the past five years.  During the same period, [the subject company's] earnings have been erratic, and the company has suffered losses.  I lack sufficient confidence in the comparability of the selected companies to use the comparable company method, even with adjustments to reflect their differences from [the subject company].").

420.    Arnold testified that other record evidence verified his use of the multiples of *healthy* companies.  The Court disagrees.  He relied, for example, on the testimony of Tilton and Greenberg concerning industry multiples; however, they merely testified to multiples that *could* apply to TransCare *if it were a healthy company*, not to TransCare as it stood in January and February 2016.  (PFOF ¶¶ 254, 264; *see also* July 22 AM Tr. 52:2–11 (noting the EBITDA averages of certain *healthy* companies).)

---

[31] This was not cured by his rebuttal testimony because, as Arnold admitted, he was not opining that *any* of the additional companies he looked at were actually appropriate comparables for TransCare.  (PFOF ¶¶ 338–40.)

79

421.     Nor do the so-called indications of interest in 2015 support Arnold's EBITDA multiples.  First, with the exception of the National Express LOI, these inquiries were at best informal and, in the case of RCA, based on a serious misimpression of TransCare's earnings. (PFOF ¶¶ 53–55.)  What's more, although Leland noted that RCA was purportedly using an 8x multiple for valuations, he also reported that this multiple was "high for the industry."  (PFOF ¶ 54.)  *A company on the brink of liquidation was not likely to command a multiple TransCare's CEO already acknowledged was high*.

422.     Second, as previously discussed, the National Express LOI offered $6 to $7 million (to be paid out over time) for the paratransit division, which produced $3.5 to $4 million EBITDA at the time—in other words, the LOI implied a multiple of 1.7x to 1.75x (at most), several factors lower than the multiples Arnold used in his calculations.  Indeed, the multiple implied by the LOI is arguably the most probative evidence of the appropriate EBITDA multiple to apply to TransCare (or at least NewCo) since it reflected actual market evidence for TransCare itself.

423.     Finally, the Trustee failed to demonstrate why it would be proper to rely on the use of a multiple at all.  As Dunn explained, because the market multiple's purpose is to value years-ahead cash flow, it applies only if the business being valued will continue to generate cash flow. (PFOF ¶ 328.)  Conversely, it is inappropriate to apply any multiple to a business that, like TransCare, was at serious risk of not continuing as a going concern on the valuation date and could not do so absent a substantial infusion of new cash that no one was obligated to provide.

### Arnold's Wildly Overbroad Ranges

424.     Further illustrating the speculative nature of Arnold's calculations is the breadth of the value ranges he offered.

80

425.    In particular, Arnold calculated the supposed difference between his WholeCo "operating value" and WholeCo's liquidation value at $16.1 million at the low end and $67.3 million at the high end.  (PX_282, at Exhibit 14.)  Thus, his high end calculation is ***more than four times that*** of his low end calculation.

426.    Likewise, Arnold calculated the supposed difference between his NewCo "operating value" and NewCo's liquidation value at $17.0 million at the low end and $33.4 million at the high end (nearly twice the amount of his low end number).  (*Id.*)

427.    Arnold offered no opinion as to what point in these broad ranges was the most reliable or accurate, leaving it to the Court to guess or pick a number at random.

428.    Such calculations are far too speculative to form the basis of a damage award.  *See Lake Treasure*, 2014 WL 5192179, at *12 (finding that "plaintiffs failed to provide a basis for a responsible estimate of damages" where expert's "wide range of potential results provides little guidance, essentially inviting the court to pick a number between $2.3 million and $29 million").

### XVII.  Equitable Subordination of the Claims of PPAS and Ark II Is Not Appropriate

429.    The Trustee also seeks to have the Court reorder the priorities of PPAS and Ark II through equitable subordination.  (FPTO ¶ 186.)  The Trustee failed to prove this claim.

430.    "Equitable subordination is an extraordinary remedy that is to be used sparingly." *Kalisch v. Maple Trade Fin. Corp. (In re Kalisch)*, 413 B.R. 115, 133 (Bankr. S.D.N.Y. 2008), *aff'd*, 2009 WL 2900247 (S.D.N.Y. Sept. 9, 2009).  "The goal of the doctrine is not to punish the offending creditor for the wrongful conduct, but rather, is to offset the harm done to other creditors. The doctrine is remedial and not penal."  *MidAtlantic Nat'l Bank N., N.A. v. Borg–Warner Acceptance Corp. (In re Mayo)*, 112 B.R. 607, 650 (Bankr. D. Vt. 1990).

81

431.    Courts apply the three-pronged test set forth in *Benjamin v. Diamond (In re Mobile Steel Co.)*, 563 F.2d 692 (5th Cir. 1977) to analyze equitable subordination claims: (i) the claimant engaged in some type of inequitable conduct; (ii) the misconduct caused injury to the creditors or conferred an unfair advantage on the claimant; and (iii) equitable subordination of the claim is consistent with bankruptcy law. *Id.* at 700.

432.    Although the Trustee has put forth numerous theories, the only asserted basis remaining for the Court's consideration is that "[t]he Transcendence transaction consummated by PPAS [and] Ark II . . . amounted to inequitable conduct towards TransCare and its creditors." (FPTO ¶ 186(b).)[32]    The Court has already concluded that the OldCo/NewCo Restructuring was the product of fair dealing and was at a fair price—in other words, that the transaction itself was fair. (*See supra* Section XV.B.)  It is axiomatic that the purported conduct of PPAS and Ark II in respect of an equitable transaction cannot support equitable subordination.[33]

433.    The Trustee's claim for equitable subordination also fails for other reasons.  As to PPAS, it is not "inequitable" for a creditor to enforce its contractual rights under loan documents upon an event of default, particularly where the creditor does not take actions beyond the scope of its authority under those documents.  *See, e.g.*, *Obuchowski v. Poulin Grain, Inc. (In re Stevens)*, 2000 WL 35723732, at *11 (Bankr. D. Vt. Oct. 24, 2000).

434.    Here, TransCare was in default on its obligations under the TLA.  (PFOF ¶ 217 (JX_96, at PP–TRBK0043311).)  The TLA expressly authorized PPAS to take action to realize

---

[32] The Trustee also contended that equitable subordination was warranted due to Defendants' "inequitable conduct in attempting to secure TransCare's assets for Transcendence."  (FPTO ¶ 186(f) (seeking equitable subordination for violation of the automatic stay).)  Because the Court has dismissed the Trustee's claim for alleged violation of the automatic stay (Dkt. No. 131), it follows that this alleged conduct cannot support equitable subordination.

[33] Although the Court's conclusion is a proposed one (pursuant to 28 U.S.C. § 157(c)) with respect to the Trustee's fiduciary duty claim, it can support the entry of final judgment with respect to the equitable subordination claim.

82

upon the Subject Collateral upon an Event of Default. (PFOF ¶¶ 27–28.) PPAS, as administrative agent, took the following actions (and *only* the following actions) in connection with the OldCo/NewCo Restructuring: (i) executed and issued the Notice of Default; (ii) executed and issued the Notice of Acceptance to TransCare; and (iii) entered into the Bill of Sale. (PFOF ¶¶ 216–18, 226.) As such, PPAS acted within the scope of its authority.

435.     As to Ark II, the Trustee contends that the Ark II Credit Agreement was "illusory" and executed for the purpose of "ensur[ing] that [Tilton] would own the assets transferred to [Transcendence]." (*See, e.g.*, Am. Compl. ¶¶ 77, 85.) As a threshold matter, the Trustee lacks prudential standing to seek equitable subordination in respect of the Ark II Credit Agreement, including in respect of PPAS's agreement to payment and structural subordination to Ark II. *See, e.g.*, *Bird v. SKR Credit, Ltd. (In re DigitalBridge Holdings, Inc.)*, 2015 WL 5766761, at *16 (Bankr. D. Utah Sept. 30, 2015). Prudential standing is a "threshold determinant[] of the propriety of judicial intervention," *Warth v. Seldin*, 422 U.S. 490, 518 (1975), and places a limit "on the exercise of federal jurisdiction." *Allen v. Wright,* 468 U.S. 737, 751 (1984). The party invoking federal jurisdiction bears the burden of demonstrating prudential standing. *In re Old Carco LLC*, 500 B.R. 683, 690 (Bankr. S.D.N.Y. 2013) (Bernstein, J.). To establish prudential standing, a "plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *In re Quigley Co.*, 391 B.R. 695, 702 (Bankr. S.D.N.Y. 2008) (quoting *Warth*, 422 U.S. at 499).

436.     Courts considering standing in the context of equitable subordination claims have determined that a claim belongs solely to an individual creditor where the harm suffered was "particularized." *Tronox Inc. v. Anadarko Petroleum Corp. (In re Tronox Inc.)*, 549 B.R. 21, 42

83

(S.D.N.Y. 2016) ("[A] claim belongs to individual creditors—and not to a debtor's trustee—when the harm suffered was particularized to those creditors, rather than to all creditors as a whole[.]").

437.    Here, the allegation of inequitable conduct is premised on the contention that the Term Loan Lenders suffered an injury when Ark II primed them.  Because this is a particularized injury (*i.e.*, to, allegedly, the Term Loan Lenders and *only* the Term Loan Lenders), the Trustee lacks standing to assert a claim.  *See, e.g.*, *DigitalBridge*, 2015 WL 5766761, at \*16 (emphasis added) (explaining that while "a trustee [could] bring a general equitable subordination claim on behalf of the estate as a whole, and individual creditors can assert equitable subordination claims if they allege particularized injury, *a trustee cannot assert an equitable subordination claim on behalf of individual creditors*.").

438.    Moreover, even assuming the Trustee had prudential standing, for the reasons discussed *infra* (at Section XIX), the Ark II Credit Agreement was not illusory and was not executed to help Tilton with the OldCo/NewCo Restructuring.

### XVIII. The Trustee Failed to Establish That an Actual Fraudulent Transfer Occurred

439.    The Trustee's actual fraudulent transfer claim is based on the Article 9 foreclosure and the subsequent transfer of the Subject Collateral from PPAS to Transcendence.  (FPTO ¶ 185.) The Trustee has failed to adduce a shred of evidence of actual fraud.

440.    To avoid a transaction under section 276 of New York's Debtor and Creditor Law ("DCL") or Section 548 of the Bankruptcy Code, a plaintiff must show that the challenged transfer was made with actual intent to hinder, delay or defraud creditors.  DCL § 276; 11 U.S.C. § 548(a)(1)(A).  The burden of proving actual intent is on the plaintiff.  *Sharp Int'l Corp. v. State St.*

84

A2442

*Bank & Tr. Co. (In re Sharp Int'l Corp.)*, 403 F.3d 43, 56 (2d Cir. 2005). Courts often rely on circumstantial evidence, or "badges of fraud," to infer the debtor's fraudulent intent. *Id.*[34]

441. The Trustee presented two facts that could rise to a "badge of fraud"—*i.e.*, that the transfer of assets was made to an insider and that TransCare was insolvent at the time of the transfer—which were readily admitted. Notably, the Trustee did not prove that the Article 9 foreclosure was conducted in secrecy. (*See* Section XV.B, *supra*.) The evidence showed the polar opposite: Wells Fargo, CMAG, TransCare, Patriarch Partners and PPMG personnel were aware of and participated in the development of the OldCo/NewCo Restructuring. (*See* PFOF ¶¶ 180–86.)

442. Furthermore, for the reasons discussed above, the Trustee did not prove that TransCare received less than fair value for what it transferred. (*See* Section XV.B, *supra*.)

443. Finally, the overwhelming evidence presented at trial showed that in the weeks leading up to the Article 9 foreclosure, Tilton acted with honest intention in a good faith attempt to save as many TransCare jobs as possible, maximize the value of OldCo's assets and get TransCare's senior lender paid. (PFOF ¶¶ 172–78.)

### XIX. The Security Interest Granted to Ark II is Valid

444. The Trustee "asserts three claims in the alternative seeking to avoid the security interest granted to Ark II by TransCare in connection with the Ark II Credit Agreement." (FPTO ¶ 187(a).) At trial, he did not meet his burden on any of them.

---

[34] The "badges of fraud" include: (1) the lack or inadequacy of consideration; (2) the family, friendship or close associate relationship between the parties; (3) the retention of possession, benefit or use of the property in question; (4) the financial condition of the party sought to be charged both before and after the transaction in question; (5) the existence or cumulative effect of a pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; (6) the general chronology of the event and transactions under inquiry; (7) a questionable transfer not in the usual course of business; and (8) the secrecy, haste, or unusualness of the transaction. *Silverman v. Actrade Capital, Inc. (In re Actrade Fin. Techs., Ltd.)*, 337 B.R. 791, 809 (Bankr. S.D.N.Y. 2005).

A2443

A.    **The Funds Advanced to TransCare Pursuant to the Ark II Credit Agreement Were Not Capital Contributions**

445.    In Count IV of his Amended Complaint, the Trustee seeks to recharacterize as equity the funds lent by Ark II to TransCare. (*Id.* ¶ 187(b).)  "Recharacterization is appropriate where the circumstances show that a debt transaction was actually an equity contribution *ab initio*." *Official Comm. of Unsecured Creditors v. Bay Harbour Master Ltd. (In re BH S&B Holdings LLC)*, 420 B.R. 112, 157 (Bankr. S.D.N.Y. 2009) (citation omitted), *aff'd*, 807 F. Supp. 2d 199 (S.D.N.Y. 2011).  "In contrast to equitable subordination, 'recharacterization claims turn on *whether a debt actually exists*—not on whether the claim should be equitably subordinated or disallowed.'"  *BH S&B Holdings LLC*, 420 B.R. at 157 (emphasis added) (citation omitted).

446.    Courts within this District have adopted the eleven-factor test utilized by the Sixth Circuit in *Bayer Corp. v. MascoTech, Inc. (In re AutoStyle Plastics, Inc.)*, 269 F.3d 726 (6th Cir. 2001) (known as the "*AutoStyle* factors") to analyze recharacterization claims.  *See Weisfelner v. Blavatnik (In re Lyondell Chem. Co.)*, 544 B.R. 75, 93 (Bankr. S.D.N.Y. 2016).[35]  Courts in this District also look to other "indicia of intent" to determine whether recharacterization is warranted, including looking at "what [the parties] do through their actions, and . . . [t]he economic reality of the surrounding circumstances."  *Id.* at 101 (citation omitted).  The Trustee has the burden of demonstrating that recharacterization is appropriate by "establish[ing] the vast majority of the *AutoStyle* factors[.]"  *See In re Aéropostale, Inc.*, 555 B.R. 369, 421 (Bankr. S.D.N.Y. 2016).

---

[35] These factors are (i) the names given to the instruments, if any, evidencing the indebtedness; (ii) the presence or absence of a fixed maturity date and schedule of payments; (iii) the presence or absence of a fixed rate of interest and interest payments; (iv) the source of repayments; (v) the adequacy or inadequacy of capitalization; (vi) the identity of interest between the creditor and the stockholder; (vii) the security, if any, for the advances; (viii) the corporation's ability to obtain financing from outside lending institutions; (ix) the extent to which the advances were subordinated to the claims of outside creditors; (x) the extent to which the advances were used to acquire capital assets; and (xi) the presence or absence of a sinking fund to provide repayments. *Lyondell*, 544 B.R. at 93–94.

86

A2444

Case 1:20-cv-06274-LAK    Document 11-11    Filed 09/30/20    Page 101 of 569

447.    At trial, the Trustee presented evidence sufficient to establish only two of the eleven *AutoStyle* factors: undercapitalization (Factor 5) and the corporation's ability to obtain outside financing (Factor 8).  With respect to the former, courts have cautioned that this factor should be given modest weight because "all companies in bankruptcy are in some sense undercapitalized." *BH S&B Holdings*, 420 B.R. at 159.  The evidence showed that the advances to TransCare were made for critical insurance payments to keep its doors open and, it was hoped, eventually stabilize the Company.  (PFOF ¶¶ 143–45, 147, 151–52.)  On these facts, it is "inappropriate to penalize [Ark II] for lending to a distressed company."  *Aéropostale, Inc.*, 555 B.R. at 422.

448.    As to the latter, the evidence shows that "a reasonable outside creditor would [not] have made a loan to the debtor on similar terms."  *Lyondell*, 544 B.R. at 99 (citation omitted).  However, this factor is entitled to only modest weight because as an investment vehicle of the controlling equity holder in TransCare (*see* Stipulation No. 8), Ark II was, at least in part, "looking to protect" Tilton's investment in the Company.  *Id.* ("[W]hen existing [equity holders] make loans to a distressed company, they are trying to protect their [investment] and traditional factors that lenders consider . . . do not apply as they would when lending to a financially healthy company." (quoting *In re SubMicron Sys. Corp.*, 432 F.3d 448, 457 (3d Cir. 2006)).

449.    By contrast, there was substantial evidence that Ark II intended the advances to be debt.  The funds advanced by Ark II were documented as loans under the Ark II Credit Agreement (Factor 1) (PFOF ¶ 160 (JX_79, at PP–TRBK0048967)), which set the maturity date for repayment (Factor 2) (*id.* at PP–TRBK0048973), and contained provisions regarding the rate of interest, the calculation of interest and a schedule for interest payments (Factor 3) (*id.* at PP–TRBK0048977–78, § 2.4).  Moreover, the Ark II Security Agreement granted Ark II a blanket security interest in TransCare's assets (Factor 7) (*id.* at PP–TRBK0049020–21, §§ 2.1–2.2), which had priority over

87

the interests of the Term Loan Lenders under the Ark II Intercreditor Agreement (Factor 9).  (*Id.* at PP–TRBK0049004–05, § 2.)  The advances were used "to meet the daily operating needs of the corporation"—critical insurance payments to sustain operations—not for the purchase of capital assets (Factor 10).  *Lyondell*, 544 B.R. at 100 (citation omitted); (PFOF ¶¶ 143–45, 151–52).[36]

450.    The delay in executing the Ark II loan documents does not compel a different conclusion.  *In re Micro–Precision Techs., Inc.*, 303 B.R. 238, 247 (Bankr. D.N.H. 2003) (declining to recharacterize loan as equity contribution, although "[t]he principals admitted that . . . when funds were loaned, the loan was not documented" where testimony was consistent that, "from the outset of the transaction," the funds were considered to be a loan).  As detailed in the next paragraph, the evidence shows that Tilton intended the funding to be made on a secured basis pursuant to a binding loan agreement.  (PFOF ¶¶ 145–50, 153–56.)  Moreover, the delay was only a matter of weeks.  (PFOF ¶¶ 145, 152, 157, 160.)  *Compare In re Cold Harbor Assocs., L.P.*, 204 B.R. 904, 916 (Bankr. E.D. Va. 1997) (finding unexplained *seven month* delay in creating and delivering promissory notes "casts doubt upon the actual intent of the parties at the time of the transaction").  Notably, the delay was reflective of the chaotic freefall in which TransCare was operating in January and February 2016.  (PFOF ¶¶ 110–20, 125–130, 136–39.)  Indeed, the Ark II loan documents were not the only ones TransCare was delayed in executing: as of February 12, 2016, direction letters documenting the December 8, January 5, and January 7 advances from the Zohar Funds to TransCare also had not been executed.  (*See* PX_203, at PP–TRBK0092128.)

---

[36] Factor 11 (the presence or absence of a sinking fund to provide repayments) is "irrelevant" to the recharacterization analysis where, as here, the advances were "secured by liens over substantially all of the Debtors' assets." *Aéropostale, Inc.*, 555 B.R. at 422–23; (PFOF ¶ 160 (JX_79, at PP–TRBK0049020–21, §§ 2.1–2.2).).  Factor 6 (identity of interest between the creditor and stockholder) is also largely inapplicable because the advances in question were made by a single lender, as opposed to a situation "when several stockholders extend the funds, and one can measure the proportion of the contribution of each against the stock ownership of each." *Lyondell*, 544 B.R. at 98.

451.     Beyond the Trustee's failure to establish a majority of the *AutoStyle* factors, an examination of other "indicia of intent" confirms that Ark II and TransCare intended for the advances to be made pursuant to a new credit facility between Ark II and TransCare, including without limitation: (i) Tilton's testimony that on January 15, the same day the initial advance was made, she had asked her team to "put a new credit facility together for this agreement"; (ii) on or before January 27, copies of the loan documents for the new facility had been drafted and sent to Tilton; (iii) as of January 29, Tilton continued to emphasize the need to have in place "credit agreements under which [Ark II] would have a first priority lien and be documented properly"; and (iv) on that same day, Ark II filed separate UCC–1 financing statements.  (PFOF ¶¶ 146, 148–50, 152–57.)  At trial, Tilton reinforced that the loan documentation was important to her because it was "the only basis that [she] was willing to put in new money in a company that could end up in liquidation days later."  (PFOF ¶ 156 (Aug. 13 PM Tr. 6:7–10); *see also* July 22 AM Tr. 89:2–7 (confirming that Tilton intended the January 15 funding to "have a certain priority.").)

### B.     The Security Interest Granted to Ark II is Not Avoidable as a Preference

452.     The Trustee also seeks to avoid Ark II's security interest as a preference pursuant to § 547(b) of the Bankruptcy Code (FPTO ¶ 187(d)), which authorizes a trustee:

> to avoid a transfer made to or for the benefit of a creditor for or on account of an antecedent debt if the transfer occurred within 90 days of the date of the bankruptcy filing, on the date of the transfer the debtor was insolvent or became insolvent as a result thereof, and the creditor received more on account of such transfer than it would have received in a Chapter 7 liquidation.

*Silverman Consulting, Inc. v. Canfor Wood Prods. Mktg. (In re Payless Cashways, Inc.)*, 306 B.R. 243, 249 (B.A.P. 8th Cir. 2004) (citing 11 U.S.C. § 547(b)).  The Trustee has the burden of proving each element by a preponderance of the evidence.  *Weisfelner v. Blavatnik (In re Lyondell Chem.*

89

*Co.*), 567 B.R. 55, 118 (Bankr. S.D.N.Y. 2017). The Trustee has failed to meet this burden because the security interest TransCare granted to Ark II was not on account of an antecedent debt.

453. Section 547(e) of the Bankruptcy Code defines "when a transfer is made," in part to determine "whether or not [a] transfer was on account of an antecedent debt as required in § 547(b)(2)." *Roost v. Toyota Motor Credit Corp. (In re Moon)*, 262 B.R. 97, 102 (Bankr. D. Or. 2001). Pursuant to § 547(e)(2)(A), a transfer is made: "(A) at the time such transfer takes effect between the transferor and the transferee, if such transfer is perfected at, or within 30 days after, such time . . . ." 11 U.S.C. § 547(e)(2)(A). If perfection occurs within this 30-day window, then the transfer is not "on account of an antecedent debt" for purposes of § 547(b)(2). *See Telecash Indus., Inc. v. Universal Assets (In re Telecash Indus., Inc.)*, 104 B.R. 401, 403 (Bankr. D. Utah 1989). Instead, "if perfection of a security interest occurs within ten days [now 30 days] of the incurrence of indebtedness, perfection relates back to the time of the indebtedness." *Id.*

454. The evidence shows that Ark II perfected its security interest in TransCare's assets within the 30-day safe harbor. The sequencing of events is as follows: on January 15 and January 29, respectively, Ark II advanced funds to TransCare that were intended to be, and were, a part of the Ark II facility of up to $6.5 million. (PFOF ¶¶ 145–50, 152–56.) On January 29, Ark II filed UCC–1 financing statements for TransCare and its subsidiaries. (PFOF ¶ 157.) Then, on February 10–11, the Ark II Credit Agreement and Ark II Security Agreement were executed. (PFOF ¶ 160.)

455. By February 11, Ark II's security interest in TransCare's assets was properly perfected.[37] The lapse in time between the initial advance of funds on January 15 and the execution

---

[37] TransCare's execution of the Ark II Security Agreement authorized and ratified the financing statements filed on January 29, 2016 as a matter of law. *Official Comm. of Unsecured Creditors of Adoni Grp., Inc. v. Capital Bus. Credit LLC (In re Adoni Grp.)*, 530 B.R. 592, 597–601 (Bankr. S.D.N.Y. 2015).

90

A2448

of the loan documents on February 11 totals 26 days and falls within the 30-day safe-harbor period.

*See* 11 U.S.C. § 547(e)(2)(A). Therefore, the transfer "relates back to the time of the indebtedness"—*i.e.*, January 15 and January 29. *Telecash Indus., Inc.*, 104 B.R. at 403.

### C.    The Security Interest Granted to Ark II is Not Avoidable as a Constructive Fraudulent Transfer

456.    The Trustee also seeks to avoid Ark II's security interest as a constructive fraudulent transfer pursuant to §§ 273, 274, and 275 of the DCL. (FPTO ¶ 187(c).) "[A] conveyance by a debtor is deemed constructively fraudulent if it is made without 'fair consideration,'" and if one of the following conditions is met: "(i) the transferor is insolvent or will be rendered insolvent by the transfer in question, DCL § 273; (ii) the transferor is engaged in or is about to engage in a business transaction for which its remaining property constitutes unreasonably small capital, DCL § 274; or (iii) the transferor believes that it will incur debt beyond its ability to pay, DCL § 275." *Sharp*, 403 F.3d at 53.

457.    Because TransCare was insolvent at the time it granted Ark II a security interest, the Trustee's constructive fraudulent transfer claim hinges upon whether the Trustee proved that TransCare did not receive fair consideration for the transfer. Consideration for property is fair if: (1) "in exchange for such property . . . as a fair equivalent therefor, and in good faith, property is conveyed or an antecedent debt is satisfied"; or (2) the property is "received in good faith to secure a present advance or antecedent debt in amount not disproportionately small as compared with the value of the property . . . obtained." DCL § 272. "[W]hat constitutes fair consideration under section 272 must be determined upon the facts and circumstances of each particular case." *United States v. McCombs*, 30 F.3d 310, 326 (2d Cir. 1994) (citation omitted).

91

458.    The evidence shows that Ark II received a security interest in TransCare's assets in good faith to secure a contemporaneous advance of funds to TransCare.  (*See* Section XIX.B, *supra.*)  As already discussed, at the time of the transfer TransCare was delinquent on insurance payments to NYSIF, among other insurers.  Ark II advanced nearly $1.8 million to avoid cancellation of critical insurance policies so that TransCare could continue to operate.  (PFOF ¶¶ 145, 152.)  The loans were also meant to give TransCare breathing room for a potential turnaround.  (PX_185, at CM_TC2018_0002542.)  *Bank of Commc'ns v. Ocean Dev. American, Inc.*, 904 F. Supp. 2d 356, 361–62 (S.D.N.Y. 2012) (transfer that gave debtor "more time to turn around its business" indicative of good faith).

459.    In an attempt to prove that the exchange lacked fair value, the Trustee contends that "Ark II gave nothing to TransCare in exchange for the grant of a security interest under the Ark II Security Agreement" in all of TransCare's assets.  (FPTO ¶¶ 44, 187(c).)  This wholly ignores the $1.8 million in value TransCare received from Ark II.  (*See* Section XIX.B, *supra*; PFOF ¶¶ 145, 152.)  It also fails as a matter of law because the Trustee improperly assumes that the value of the collateral pledged must be proportionate to the amount of the debt secured.  But, "the grant of collateral does not expand the amount of a creditor's debt and only prioritizes the payment of the debt from specific assets."  *Pfeifer v. Hudson Valley Bank, N.A. (In re Pfeifer)*, 2013 WL 3828509, at *4 (Bankr. S.D.N.Y. July 23, 2013).  In other words, "the extent of the interest transferred is only the amount of the loan secured by the [collateral], not the value of the property encumbered."  *Id.* (quoting *Johnson v. First Nat'l Bank*, 81 B.R. 87, 89 (Bankr. N.D. Fla. 1987)).  Therefore, the "extent of the interest transferred" is $1.8 million, *i.e.*, the amount of the loan secured by TransCare's assets, not the value of *all* of TransCare's assets.  By definition, the amount lent to

92

TransCare cannot be "disproportionately small as compared with the value of the" property it pledged to Ark II when those amounts are the same.  DCL § 272.

460.     Even if the Court were to compare the value of all of the collateral to the value of the funds lent to TransCare, the Trustee would still be unable to show that the $1.8 million advances were "disproportionately small."  Ark II had a lien in all of TransCare's assets, but critically, it only had a first priority position in TransCare's personal property.  (JX_79, at PP–TRBK0049004–05, § 2.)  The liquidation value of TransCare's personal property was $2.4 million (PX_282, at Exhibit 13), which constitutes only 25% more than the Ark II debt.  Courts have held that debt is not disproportionately small as compared with the value of collateral where the collateral was worth, for example, between 43–52% more than the debt—far in excess of the 25% difference here.  *See Pereira v. Hope (In re 550 Les Mouches Fashions, Ltd.)*, 24 B.R. 509, 516 (Bankr. S.D.N.Y. 1982) (citing cases).

461.     The Trustee also contends that because Ark II is an "insider," the transfer was in bad faith.  (FPTO ¶ 187(c).)  This fails for two reasons.

462.     *First*, the Trustee's contention assumes that the "insider" exception applies to *any* transaction between an insolvent corporation and a corporate insider, but that is "too broad a reading of the case law."  *Ocean Dev. Am., Inc.*, 904 F. Supp. 2d at 361.  Instead, the "insider" exception only applies when the transfer is on account of an antecedent debt—not to a contemporaneous exchange of value.  *See Sharp*, 403 F.3d at 54 (limiting "insider" exception to transfers made on account of antecedent debt).  That is because "[c]ontemporaneous advance[s] of funds" cannot be found to be fraudulent because "a present advance of commensurate value does not ordinarily prejudice other creditors" and thus does not trigger a presumption of an absence of good faith.  *HBE Leasing Corp. v. Frank*, 48 F.3d 623, 634–35 (2d Cir. 1995).  As discussed above,

93

the exchange here was intended to be contemporaneous and was, in fact, reasonably contemporaneous.  (*See* ¶¶ 450–51, 454, *supra*.)  Moreover, the funds Ark II advanced to TransCare created *new value* for the Company, including by allowing TransCare to avoid the cancellation of insurance policies.  On these facts, the "insider" exception does not apply.

463.    *Second*, even if the "insider" exception applied, it only creates a rebuttable presumption of bad faith.  *See Jacobs v. D'Alessandro (In re Dewey & LeBoeuf LLP)*, 2014 WL 4746209, at *12 (Bankr. S.D.N.Y. Sept. 23, 2014) (questioning the breadth of the presumption that finds transfers to insiders "per se" in bad faith); *Ocean Dev. Am., Inc.*, 904 F. Supp. 2d at 361–62 (holding irrebuttable presumption or "per se" categorization of bad faith was improper as a matter of law where transfer to insider was made in exchange for an asset sale at a fair price).

464.    At trial, Ark II overcame any presumption of bad faith with respect to the grant to Ark II of a security interest in TransCare's assets.  The evidence shows that Ark II advanced the funds for a legitimate purpose; so that TransCare would not immediately shutter and at least have a chance of effecting a turnaround.  (PFOF ¶¶ 143–45, 152.)  Given TransCare's dire condition at the time and the riskiness of the loan, it is hardly surprising (or evidence of bad faith) that Ark II would and did seek a security interest.  There is also no evidence that the loan was made for the purpose of obtaining a security interest.

### XX.    The Trustee Lacks Standing to Assert His Claim for "Payment Subordination"

465.    Relying on Section 2.2 of the Ark II Intercreditor Agreement, which concerns relative priority of liens as between PPAS (as agent for the Term Loan Lenders) and Ark II, the Trustee contends that PPAS may not receive payment unless and until Ark II is paid in full.  (FPTO ¶ 189(a).)  The Trustee lacks standing to assert this claim.

94

466.     As discussed *supra* (at Section XVII), the party invoking federal jurisdiction must
demonstrate prudential standing.  *Old Carco*, 500 B.R. at 690.  In the context of enforcing a
contract, only parties to the contract or third-party beneficiaries have prudential standing to litigate
issues related to it.  *Premium Mortg. Corp. v. Equifax, Inc.,* 583 F.3d 103, 108 (2d Cir. 2009)
(citation omitted) ("A non-party to a contract . . . lacks standing to enforce the agreement in the
absence of terms that 'clearly evidence an intent to permit enforcement by the third party[.]'").

467.     Neither TransCare nor the Trustee is a party to the Ark II Intercreditor Agreement.
Nor do the terms of the Ark II Intercreditor Agreement "clearly evidence an intent to permit
enforcement" by TransCare or the Trustee.  *Premium Mortg. Corp.*, 583 F.3d at 108 (citation
omitted).  On the contrary, the acknowledgement TransCare Corporation executed in connection
with the Ark II Intercreditor Agreement provides, in relevant part, that "[a]lthough it may sign this
Intercreditor Agreement it is not a party hereto and does not and will not receive any right, benefit,
priority or interest under or because of the existence of the foregoing Intercreditor Agreement."
(PFOF ¶ 159 (JX_79, at PP-TRBK000490016).)   This dooms the Trustee's "payment
subordination" claim.

### XXI.     The Transfer of the Auction Sale Proceeds to PPAS Is Not Avoidable Under Section 549 of the Bankruptcy Code

468.     The Trustee seeks to avoid and recover the distribution to PPAS, and from PPAS
to Ark II, of proceeds from the sale of the Foreclosed Personal Property Assets under Section 549
of the Bankruptcy Code (the "Sale Proceeds").  Section 549 provides in relevant part that a trustee
may avoid a transfer of property of the estate that occurs after the petition date that is not authorized
by the Bankruptcy Code or by the court.  11 U.S.C. § 549.  The Trustee failed to prove this claim.

95

A2453

469.    A trustee may avoid only "a transfer of property of the estate." 11 U.S.C. § 549(a).
Property of the estate includes "all legal or equitable interests of the debtor in property as of the
commencement of the case." 11 U.S.C. § 541(a)(1). At trial, it was the Trustee's burden to prove
that TransCare held a property interest in the Sale Proceeds. *Musso v. Brooklyn Navy Yard Dev.
Corp. (In re Westchester Tank Fabricators, Ltd.)*, 207 B.R. 391 (Bankr. E.D.N.Y. 1997). The
Trustee did not carry his burden for at least two reasons.

470.    *First*, as of the commencement of these chapter 7 cases, TransCare held no legal or
equitable title in the Foreclosed Personal Property Assets because, by virtue of the Article 9
foreclosure, the Foreclosed Personal Property Assets belonged to Transcendence—not TransCare.
(PFOF ¶ 226.) The fact that Transcendence ultimately did not use the Foreclosed Personal
Property Assets and instead consented to their sale by the Trustee does not change this fact. (PFOF
¶¶ 272–81.) Because the assets were not property of the estate, neither were the Sale Proceeds.

471.    *Second*, even if the Foreclosed Personal Property Assets had not been transferred
from TransCare prior to the distribution of the Sale Proceeds to PPAS, the Sale Proceeds would
still not constitute property of the estate at the time of the distribution. That is because although
the scope of section 541(a)(1) is broad, property in which the debtor holds only legal title and not
an equitable interest becomes property of the estate "only to the extent of the debtor's legal title to
such property, but not to the extent of any equitable interest in such property that the debtor does
not hold." 11 U.S.C. § 541(d); *see McCord v. Agard (In re Bean)*, 252 F.3d 113, 117 (2d Cir.
2001) ("Any portion of a debtor's property that is unencumbered by mortgage—the equity—is
part of the bankrupt's estate."); *Cage v. Wyo–Ben, Inc. (In re Ramba Inc.)*, 437 F.3d 457, 460–61
(5th Cir. 2006) (rejecting avoidance claim where "Ramba had no interest in the transferred
property other than bare legal title"). As of the Initial Petition Date, all of TransCare's assets,

96

including the Foreclosed Personal Property Assets, were subject to the security interests of Wells Fargo, PPAS, as administrative agent for the Term Loan Lenders, and Ark II. (PFOF ¶¶ 22, 31, 33, 35, 160.) The Foreclosed Personal Property Assets were certainly not worth more than the secured lenders were owed (*i.e.*, approximately $58 million). As such, even assuming the Initial Debtors held legal title to the Foreclosed Personal Property Assets (and any proceeds from the sale thereof), they had no equitable title to the Sale Proceeds because the assets were fully encumbered by the secured lenders' security interests.

### XXII. PPAS's Liens on TransCare's Assets Are Not Barred by Section 552 of the Bankruptcy Code

472.     The Trustee contends that PPAS's liens should not extend to post-petition proceeds of the Collateral (as defined in the PPAS Security Agreement) because PPAS engaged in "inequitable conduct caus[ing] TransCare to liquidate to the detriment of its other creditors." (FPTO ¶ 190.)[38]  On this basis, the Trustee asks this Court to apply the "equities of the case" exception under section 552(b)(1) of the Bankruptcy Code to limit PPAS's liens. That section provides that if a creditor and debtor have a pre-petition security agreement that extends to the proceeds, product, offspring or profits of the underlying collateral, the terms of that agreement will be enforced under applicable non-bankruptcy law, "except to any extent that the court, after notice and a hearing and based on the equities of the case, orders otherwise." *See* 11 U.S.C. § 552(b)(1). The Court has already observed that PPAS's conduct in respect of the Article 9 foreclosure was fair. That conduct, therefore, cannot serve as the basis to limit PPAS's otherwise valid liens.

473.     The Trustee's claim also fails because it misconstrues the narrow contours of the "equities of the case" exception. It is well understood that "the principal purpose of the equities

---

[38] The Trustee does not dispute that PPAS's interest in TransCare's assets extends to proceeds of the underlying collateral. (Am. Compl. ¶¶ 169–70.)

of the case exception is to prevent secured creditors from reaping unjust benefits from an increase

in the value of collateral during a bankruptcy case resulting from the (usually) reorganizing chapter

11 debtor's use of other assets of the estate or from the investment of non-estate assets." *Arnot v.

Endresen (In re Endresen)*, 548 B.R. 258, 274 (B.A.P. 9th Cir. 2016) (collecting cases from the

First, Third, Fourth, and Fifth Circuits).  At trial, the Trustee presented no evidence that the

Collateral increased in value after the Initial Petition Date, a necessary pre-requisite to application

of the equities of the case exception.

## CONCLUSION

474.    For the reasons stated above, the Court finds in favor of Defendants with respect to

all of the Trustee's claims.  For all claims except the claim for breach of fiduciary duty, the Court

will enter judgment in favor of Defendants.

475.    With respect to the fiduciary duty claim, the Court will submit its findings of fact

and conclusions of law to the District Court for its consideration pursuant to 28 U.S.C. § 157(c)(1).


Dated: September 18, 2019                    PROSKAUER ROSE LLP

                                             By: */s/ Michael T. Mervis*
                                             Michael T. Mervis
                                             Timothy Q. Karcher
                                             Marissa Tillem
                                             Eleven Times Square
                                             New York, NY  10036-8299
                                             Tel.: (212) 969-3000
                                             Fax: (212) 969-2900
                                             Email: mmervis@proskauer.com
                                             tkarcher@proskauer.com
                                             mtillem@proskauer.com


                                             *Attorneys for Defendants*

**STORCH AMINI PC**
2 Grand Central Tower
140 East 45th Street, 25th Floor
New York, NY 10017
Telephone: 212.490.4100
bamini@storchamini.com
Bijan Amini, Esq.
Avery Samet, Esq.
Jaime B. Leggett, Esq.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x
In re:                                            :
                                                  :
                                                  :
        TRANSCARE CORPORATION, et al.,            :        Chapter 7
                                                  :        Case No. 16-10407 (SMB)
                                                  :        (Jointly Administered)
                        Debtors.                  :
------------------------------------------------------------x
SALVATORE LAMONICA, as Chapter 7                  :
Trustee for the Estates of TransCare              :
Corporation, et al.,                              :
                                                  :
                        Plaintiff,                :
                                                  :        Adv. Proc. No. 18-1021 (SMB)
        - against -                               :
                                                  :
LYNN TILTON, PATRIARCH PARTNERS                   :
AGENCY SERVICES, LLC, PATRIARCH                   :
PARTNERS, LLC, PATRIARCH PARTNERS                 :
MANAGEMENT GROUP, LLC, ARK II CLO                 :
2001-1 LIMITED, TRANSCENDENCE                     :
TRANSIT, INC., and TRANSCENDENCE                  :
TRANSIT II, INC.,                                 :
                                                  :
                        Defendants.               :
------------------------------------------------------------x

## PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

## <u>TABLE OF CONTENTS</u>

**TABLE OF AUTHORITIES** ........................................................................................ iv

**PROPOSED FINDINGS OF FACT** ............................................................................ 1

    I.  Background ........................................................................................................ 1

        A.  The Debtor ................................................................................................ 1

        B.  TransCare's Debt Structure ...................................................................... 2

        C.  Management of TransCare ........................................................................ 4

        D.  Events Leading up to Tilton's Decision to Sell TransCare ........................ 6

    II.  Events Following Tilton's Decision to Sell TransCare ...................................... 8

        A.  Tilton's Decision to Sell TransCare .......................................................... 8

        B.  Tilton Initially Investigated the Sale of TransCare .................................... 9

        C.  Tilton Negotiates with Wells Fargo to Fund TransCare Towards a Sale ................. 13

        D.  The January 7 Plan ................................................................................... 15

        E.  Tilton Funds the January 7 Plan While Planning Sale ............................... 16

        F.  On February 10, 2016, Tilton Institutes the Transcendence Plan .............. 19

            i.    Tilton Creates Transcendence ....................................................... 19

            ii.   Tilton Engages Bankruptcy Counsel for TransCare ....................... 20

            iii.  The New Ark II Credit Facility ...................................................... 21

            iv.  The Submission of Transcendence Financials to Insurers ............... 23

        G.  Between February 11 and 23, 2016, Tilton Finalizes the Transcendence Plan .......... 24

            i.    Tilton Attempts to Procure Insurance for Transcendence ............... 24

            ii.   Tilton Attempts to Obtain Credit Suisse's Consent to Subordination ........... 25

            iii.  Tilton Refines Business Model ...................................................... 25

            iv.  Tilton's Team Prepares Transition Services Agreement ................. 27

            v.   Tilton Negotiates with Wells Fargo While Preparing to Move Forward With Transcendence ....................................................... 28

        H.  The Foreclosure and Sale ......................................................................... 31

        I.  The February 24 Plan ............................................................................... 34

        J.  Events Subsequent to the Foreclosure and Sale ........................................ 35

            i.    Pittsburgh .................................................................................... 35

            ii.   Hudson Valley .............................................................................. 36

            iii.  Tilton Assigns the MTA Contract to Transcendence and Then Discontinues Service .................................................................... 36

        K.  Until This Trial, Defendants Took the Position That the Foreclosure Had Occurred 39

III. Liquidation of Assets and Claims Against the Estate ...................................................... 41

IV. Facts Relevant to Particular Claims .................................................................................. 43

    A. Tilton Did Not Engage in a Fair Process to Arrive at the Sale Price .......................... 43

    B. Tilton Did Not Pay TransCare a Fair Price for Its Assets ........................................... 45

    C. The Defendants' Expert's Criticisms .......................................................................... 47

    D. Tilton Sold the TransCare Assets to Herself ............................................................. 48

    E. The Foreclosure Plan Was Accompanied by Untruthful Statements .......................... 50

    F. Removing the MTA Contract from TransCare Ensured TransCare's Collapse and Liquidation .................................................................................................................. 50

**CONCLUSIONS OF LAW** ................................................................................................... 51

I. Claim 1: Breach of Fiduciary Duty against Lynn Tilton .................................................. 51

    A. Liability ....................................................................................................................... 51

        i. Fair Dealing ........................................................................................................ 55

        ii. Fair Price ............................................................................................................ 57

    B. Damages ...................................................................................................................... 58

        i. Nature of the Damages ....................................................................................... 58

        ii. Scope of Damages .............................................................................................. 59

            a. Fair Market Value ........................................................................................ 61

            b. WARN Act Liability .................................................................................... 64

        iii. Quantum of Damages: TransCare's Fair Market Value Prior to the Breach of Fiduciary Duty ................................................................................................... 65

            a. EBITDA Projections .................................................................................... 67

            b. EBITDA Multiplier ..................................................................................... 69

II. Claim 7: Fraudulent Transfer Against PPAS and Transcendence ................................... 75

III. Claims 3, 4, 10, 11 and 14: Avoidance and Subordination of Ark II Lien ..................... 85

    A. Preference—Claim 10 ................................................................................................. 85

    B. Constructive Fraud—Claim 11 .................................................................................. 89

    C. Recharacterization—Claim 3 ..................................................................................... 90

    D. Equitable Subordination—Claim 4 ............................................................................ 91

    E. Ark II Should Return the $800,000—Claim 14 .......................................................... 92

IV. Claims 4 and 13: Subordination and Limitation of PPAS Lien ...................................... 93

    A. PPAS' Security Interest Should Not Extend to the Proceeds of This Litigation— Claim 13 ...................................................................................................................... 93

    B. Equitable Subordination of PPAS' Claim—Claim 4 .................................................. 95

V. Conclusion and Remedies ................................................................................................. 98

iii

# TABLE OF AUTHORITIES

**Cases**                                                     **Page(s)**

*ABKCO Music, Inc. v. Harrisongs Music, Ltd.*,
   722 F.2d 988 (2d Cir. 1983) .................................................................... 59

*Arkansas Teacher Ret. Sys. v. Alon USA Energy, Inc.*,
   2019 WL 2714331 (Del. Ch. June 28, 2019) ......................... 53, 54, 55, 56

*Basho Techs. Holdco B, LLC v. Georgetown Basho Investors, LLC*,
   2018 WL 3326693 (Del. Ch. July 6, 2018) .................................... *Passim*

*Bayer Corp. v. MascoTech, Inc. (In re AutoStyle Plastics, Inc.)*,
   269 F.3d 726 (6th Cir. 2001) .................................................................. 90

*Bomarko, Inc. v. Int'l Telecharge, Inc. ("Bomarko I")*,
   794 A.2d 1161 (Del. Ch. 1999) ..................................................... *Passim*

*Boyer v. Wilmington Materials, Inc.*,
   754 A.2d 881 (Del. Ch. 1999) ................................................................ 59

*Carroll v. Tese–Milner (In re Red Dot Scenic, Inc.)*,
   351 F.3d 57 (2d Cir. 2003) ............................................................... 78, 80

*Cede & Co. v. Technicolor, Inc.*,
   634 A.2d 345 (Del. 1993) ........................................................... 52, 57, 62

*Cede & Co. v. Technicolor, Inc.*,
   636 A.2d 956 (Del. 1994) ....................................................................... 52

*Christy v. Alexander & Alexander (In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson, & Casey)*,
   130 F.3d 52 (2d Cir.1997) ...................................................................... 80

*Cinerama, Inc. v. Technicolor, Inc.*,
   663 A.2d 1156 (Del. 1995) ..................................................................... 57

*Citron v. E.I. Du Pont de Nemours & Co.*,
   584 A.2d 490 (Del. Ch. 1990) ................................................................ 55

*Consumer Fin. Prot. Bureau v. NDG Fin. Corp.*,
   2016 WL 7188792 (S.D.N.Y. Dec. 2, 2016) .......................................... 79

*Desimone v. Barrows*,
   924 A.2d 908 (Del. Ch. 2007) ................................................................ 64

*Doft & Co. v. Travelocity.com Inc.*,
   2004 WL 1152338 (Del. Ch. May 20, 2004) ................................................. 67

*Int'l Telecharge Inc. v. Bomarko, Inc.* (*"Bomarko II"*),
   766 A.2d 437 (Del. 2000) ......................................................... 59, 62, 65, 66

*FrontFour Capital Grp. LLC v. Taube*,
   2019 WL 1313408 (Del. Ch. Mar. 11, 2019) ............................................. 53

*Gesoff v. IIC Indus., Inc.*,
   902 A.2d 1130 (Del. Ch. 2006) ................................................................. 54

*Harrah's Tunica Corp. v. Meeks (In re Armstrong)*,
   291 F.3d 517 (8th Cir. 2002) ...................................................................... 87

*Hazout v. Tsang Mun Ting.*,
   134 A.3d 274 (Del. 2016) ........................................................................... 64

*HBE Leasing Corp.v. Frank*,
   48 F.3d 623 (2d Cir. 1995) ......................................................................... 82

*Hexion Specialty Chems., Inc. v. Huntsman Corp.*,
   965 A.2d 715 (Del. Ch. 2008) ................................................................... 66

*HMG/Courtland Props., Inc. v. Gray*,
   749 A.2d 94 (Del. Ch. 1999) ..................................................................... 57

*In re 360networks (USA) Inc.*,
   338 B.R. 194 (Bankr. S.D.N.Y. 2005) ....................................................... 87

*In re Actrade Fin. Techs. Ltd.*,
   337 B.R. 791 (Bankr. S.D.N.Y. 2005) ....................................................... 85

*In re American Cartage, Inc.*,
   656 F.3d 82 (1st Cir. 2011) ................................................................. 94, 95

*In re Bennett Funding Grp., Inc.*,
   220 B.R. 743 (Bankr. N.D.N.Y. 1997) ....................................................... 84

*In re Bernard L. Madoff Inv. Sec., LLC*,
   440 B.R. 243 (Bankr. S.D.N.Y. 2010) ....................................................... 80

*In re Bruno Mach. Corp.*,
   435 B.R. 819 (Bankr. N.D.N.Y. 2010) .................................................. 77, 78

*In re Le Café Crème, Ltd.*,
   244 B.R. 221 (Bankr. S.D.N.Y. 2000) ....................................................... 77

A2461

*In re Cassandra Grp.*,
   338 B.R. 583 (Bankr. S.D.N.Y. 2006) ........................................................... 85

*In re Comprehensive Power*,
   578 B.R. 14 (Bankr. D. Mass. 2017) ............................................................ 91

*In re Condon*,
   198 F. 947 (S.D.N.Y. 1912) ................................................................. 77, 81

*In re Condon*,
   209 F. 800 (2d Cir. 1913) ................................................................... 77, 81

*In re Cornerstone Therapeutics Inc. Stockholder Litig.*,
   115 A.3d 1173 (Del. 2015) ...................................................................... 54

*In re Del Monte Foods Co. Shareholders Litig.*,
   25 A.3d 813 (Del. Ch. 2011) ................................................................... 60

*In re Dreier LLP*,
   452 B.R. 391 (Bankr. S.D.N.Y. 2011) ........................................................... 80

*In re DSI Renal Holdings, LLC*,
   574 B.R. 446 (Bankr. D. Del. 2017) ............................................................ 57

*In re El Paso Corp. Shareholder Litig.*,
   41 A.3d 432 (Del. Ch. 2012) ................................................................... 60

*In re Fan*,
   132 B.R. 430 (Bankr. D. Haw. 1991) ........................................................... 93

*In re Granite Partners, LP*,
   210 B.R. 508 (Bankr. S.D.N.Y. 1997) ...................................................... 91, 92, 96

*In re J.P. Morgan Chase & Co. Shareholder Litig.*,
   906 A.2d 766 (Del. 2006) ...................................................................... 65

*In re Kaiser*,
   722 F.2d 1574 (2d Cir. 1983) .................................................................. 82

*In re Lyondell Chem. Co. ("Lyondell I")*,
   554 B.R. 635 (S.D.N.Y. 2016) ........................................................... 80, 81, 83

*In re Lyondell Chem. Co. ("Lyondell II")*,
   567 B.R. 55 (Bankr. S.D.N.Y. 2017) ......................................................... 77, 79

*In re Lyondell Chem. Co.*,
   585 B.R. 41 (S.D.N.Y. 2018) .................................................................. 77

*In re Manhattan Inv. Fund Ltd.,*
    397 B.R. 1 (S.D.N.Y. 2007) ........................................................................ 80, 81

*In re MAXXAM, Inc.,*
    1997 WL 187317 (Del. Ch. Apr. 4, 1997) ........................................................ 53

*In re Mobile Steel Co.,*
    563 F.2d 692 (5th Cir. 1977) .................................................................... 92, 96

*In re Opus East LLC,*
    528 B.R. 30 (Bankr. D. Del. 2015) ............................................................... 54

*In re Opus East LLC,*
    698 Fed. App'x 711 (3d Cir. 2017) ........................................................... 53, 54

*In re Orchard Enters., Inc. Stockholder Litig.,*
    88 A.3d 1 (Del. Ch. 2014) ....................................................................... 59, 60

*In re Pameco Corp.,*
    356 B.R. 327 (Bankr. S.D.N.Y. 2006) ............................................................ 86

*In re R&W Enters.,*
    181 B.R. 624 (N.D. Fla. 1994) .................................................................... 93

*In re Residential Capital, LLC,*
    497 B.R. 403 (Bankr. S.D.N.Y. 2013) ............................................................ 94

*In re Rural Metro Corp. Stockholders Litig.,*
    88 A.3d 54 (Del. Ch. 2014) ................................................................ 52, 60, 61

*In re Saba Enters., Inc.,*
    421 B.R. 626 (Bankr. S.D.N.Y. 2009) ............................................................ 85

*In re Sharp Int'l Corp.,*
    403 F.3d 43 (2d Cir. 2005) ....................................................................... 82

*In re Singh,*
    434 B.R. 298 (Bankr. E.D.N.Y. 2010) ............................................................ 77

*In re TerreStar Networks, Inc.,*
    457 B.R. 254 (Bankr. S.D.N.Y. 2011) ............................................................ 95

*In re The Brown Schs.,*
    386 B.R. 37 (Bankr. D. Del. 2008) ............................................................... 53

*In re Trados Inc. Shareholder Litig.,*
    73 A.3d 17 (Del. Ch. 2013) ....................................................................... 71

vii

*In re Tribune Co. Fraudulent Conveyance Litig.*,
  2017 WL 82391 (S.D.N.Y. Jan. 6, 2017).................................................................. 81

*In re Walt Disney Co. Derivative Litig.*,
  906 A.2d 27 (Del. 2006)............................................................................................. 64

*In re White Metal Rolling and Stamp Corp.*,
  222 B.R. 417 (Bankr. S.D.N.Y. 1998) ...................................................................... 89

*In re Bayou Grp., LLC*,
  439 B.R. 284 (S.D.N.Y.2010).................................................................................... 80

*Kahn v. Household Acquisition Corp.*,
  591 A.2d 166 (Del. 1991)........................................................................................... 55

*Kahn v. Lynch Commc'ns Sys., Inc.*,
  638 A.2d 1110 (Del. 1994)......................................................................................... 53

*Kahn v. Tremont*,
  694 A.2d 422 (Del. 1977)........................................................................................... 58

*Klein v. Rossi*,
  251 F. Supp. 1 (E.D.N.Y. 1966)................................................................................. 78

*Leser v. U.S. Bank Nat'l Ass'n*,
  2013 WL 3788877 (E.D.N.Y. July 18, 2013) ........................................................... 83

*Lippe v. Bairnco Corp.*,
  249 F. Supp. 2d 357 (S.D.N.Y. 2003)........................................................................ 77

*LNC Invs., Inc. v. First Fidelity Bank, N.A. New Jersey*,
  173 F.3d 454 (2d Cir. 1999)....................................................................................... 60

*Matter of Kelderman*,
  75 B.R. 69 (Bankr. S.D. Iowa 1987) ......................................................................... 93

*Max Sugarman Funeral Home, Inc. v. A.D.B. Investors*,
  926 F.2d 1248 (1st Cir. 1991) .................................................................................... 83

*Milbank, Tweed, Hadley & McCloy v. Boon*,
  13 F.3d 537 (2d Cir. 1994)......................................................................................... 59

*Official Comm. of Unsecured Creditors of Color Tile, Inc. v. Investcorp S.A.*,
  137 F. Supp. 2d 502 (S.D.N.Y. 2001)........................................................................ 53

*Open MRI Radiology Assocs. v. Kessler*,
  898 A.2d 290 (Del. Ch. 2006)......................................................................... 67, 68, 69

viii

*Pereira v. Cogan,*
    52 Fed. App'x 536 (2d Cir. 2002) ................................................................. 53

*Pereira v. Cogan,*
    267 B.R. 500 (S.D.N.Y. 2001) .................................................................... 54

*Poole v. N.V. Deli Maatschappij,*
    243 A.2d 67 (Del. 1968) ........................................................................... 62

*Priestley v. Panmedix Inc.,*
    18 F. Supp. 3d 486 (S.D.N.Y. 2014) ......................................................... 78

*RBC Capital Mkts., LLC v. Jervis,*
    129 A.3d 816 (Del. 2015) .......................................................................... 58

*Red Sail Easter Ltd. Partners v. Radio City Music Hall Prods., Inc.,*
    1992 WL 251380 (Del. Ch. Sept. 29, 1992) .............................................. 65

*Reis v. Hazelett Strip-Casting Corp.,*
    28 A.3d 442 (Del. Ch. 2011) ........................................................... 54, 55, 58

*Related Companies, L.P. v. Ruthling,*
    2018 WL 3315728 (S.D.N.Y. July 5, 2018) .............................................. 55

*Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.,*
    506 A.2d 173 (Del. 1986) .......................................................................... 52

*S.I.P.C. v. Bernard L. Madoff Inv. Sec. LLC,*
    568 B.R. 481 (Bankr. S.D.N.Y. 2017) ...................................................... 76

*Solomon v. Armstrong,*
    747 A.2d 1098 (Del. Ch.1999) .................................................................. 54

*Solomon v. Armstrong,*
    746 A.2d 277 (Del. 2000) .......................................................................... 54

*Staples v. Sisson,*
    274 A.D.2d 779 (3d Dep't 2000) .............................................................. 80

*Strassburger v. Earley,*
    752 A.2d 557 (Del. Ch. 2000) ............................................................ Passim

*Summa Corp. v. Trans World Airlines, Inc.,*
    540 A.2d 403 (Del. 1988) .......................................................................... 57

*Tese–Milner v. Brune (In re Red Dot Scenic, Inc.),*
    293 B.R. 116 (S.D.N.Y. 2003) .................................................................. 80

A2465

*Thorpe v. CERBCO, Inc.*,
676 A.2d 436 (Del. 1996).............................................................................. 59

*Thorpe v. CERBCO, Inc.*,
1993 WL 443406 (Del. Ch. Oct. 29, 1993)................................................... 70

*Universitas Educ., LLC v. Nova Grp., Inc.*,
2014 WL 3883371 (S.D.N.Y. Aug. 7, 2014) ............................................... 83

*Wall St. Assocs. v. Brodsky*,
257 A.D.2d 526 (1st Dep't 1999)................................................................. 82

*Weinberger v. UOP, Inc.*,
457 A.2d 701 (Del. 1983).................................................................... 52, 63

*William Penn P'ship v. Saliba*,
13 A.3d 749 (Del. 2011).............................................................................. 53

## Statutes

11 U.S.C. § 502(d)....................................................................... 77, 92, 98
11 U.S.C. § 502(j)............................................................................. 93, 99
11 U.S.C. § 510(c)............................................................................. 91, 96
11 U.S.C. § 510(c)(2)................................................................................ 98
11 U.S.C. § 544(b)............................................................................. 75, 99
11 U.S.C. § 547......................................................................................... 98
11 U.S.C. § 547(b).................................................................................... 86
11 U.S.C. § 547(c)............................................................................. 86, 87
11 U.S.C. §547(f)...................................................................................... 86
11 U.S.C. § 547(g).................................................................................... 86
11 U.S.C. § 548(a)(1)(A).................................................................... 75, 77
11 U.S.C. § 549......................................................................................... 93
11 U.S.C. § 550(a)............................................................................. 76, 78
11 U.S.C. § 551.................................................................... 85, 94, 98, 99
11 U.S.C. § 552(b)..................................................................................... 99
11 U.S.C. § 552(b)(1)........................................................................ 94, 95
11 U.S.C. § 550(b).................................................................................... 78
11 U.S.C. §§ 541 and 549........................................................................ 85
N.Y. Debtor & Creditor Law § 276 ...................................... 75, 77, 78, 80
N.Y. Uniform Commercial Code § 9-102(13)........................................... 94
N.Y. Uniform Commercial Code § 9-108 .......................................... 94, 95
N.Y. Uniform Commercial Code § 9-204(b)(2)......................................... 95
N.Y. Uniform Commercial Code § 9-619................................................... 95
N.Y. Debtor & Creditor Law § 272(a)....................................................... 89
N.Y. Debtor & Creditor Law § 273..................................................... 89, 99
N.Y. Debtor & Creditor Law § 274..................................................... 89, 99
N.Y. Debtor & Creditor Law § 275..................................................... 89, 99

x

## <u>Other Authorities</u>

Collier on Bankruptcy (L. King 15th ed. rev. 1997) ................................................. 84, 85

Donald J. Wolfe, Jr. & Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery* (2012) ............................................................................ 58

Restatement (Second) of Torts (1963 & 1964) ........................................................... 81

Uniform Fraudulent Transfer Act ............................................................................... 83

xi

Plaintiff Salvatore LaMonica, as Chapter 7 Trustee (the "<u>Trustee</u>") of TransCare Corp. and its debtor-subsidiaries ("<u>TransCare</u>"), submits the following proposed findings of fact and conclusions of law.

These proposed findings and conclusions use the following citation format:

- "DX", "PX" and "JX" refer to the exhibits admitted during the trial.

- "Stipulated Fact" refers to the Stipulated Facts section of the May 14, 2016 Joint Pretrial Order (Dkt. 85) at pages 6-15.

- "Tr. Month/Day" (*e.g.*, "Tr. 7/22") refers to the official transcripts of the trial conducted on July 22, 23, 24, August 8, 13 and 14, 2019.

- "Husson Tr. (*LaMonica*)" and "Husson Tr. (*Ien*)" refer to the designated deposition testimony of John Husson, the Rule 30(b)(6) witness of Wells Fargo, N.A., taken in (i) this action and (ii) *Ien v. TransCare Corp., et al.*, Adv. Proc. No. 16-1033, respectively, and admitted pursuant to the Joint Pretrial Order at Exhibit D.

- "Leland Tr." refers to the designated deposition testimony of Glenn Leland, TransCare's former CEO, admitted pursuant to the Joint Pretrial Order at Exhibit E.

## PROPOSED FINDINGS OF FACT

### I.  <u>Background</u>

#### A.  **The Debtor**

1. TransCare is incorporated under the laws of Delaware and was headquartered in Brooklyn, New York.  (Stipulated Fact 1).

2. TransCare provided ambulance services for both emergency and non-emergency patients to hospitals and municipalities, and paratransit services for individuals with disabilities to the New York Metropolitan Transit Authority (the "<u>MTA</u>").  (Stipulated Fact 1).

1

**A2468**

3.     TransCare's principal business lines were (a) ambulance services in (1) New York City, (2) Westchester, New York, (3) Hudson Valley, headquartered in Poughkeepsie, New York, (4) Pittsburgh, Pennsylvania, and (5) Maryland; and (b) its contract with the MTA to provide paratransit services for people with disabilities throughout the City of New York (the "MTA Contract").  (PX 158).

4.     At all relevant times, Defendant Lynn Tilton was the sole director on TransCare's board of directors.  (Stipulated Fact 2).

5.     Tilton owns and controls 61.3% of TransCare's equity which she holds through two personal investment funds:

     a.   55.7% through Defendant Ark II CLO 2001-1, Ltd ("Ark II"); and

     b.   5.6% through Ark Investment Partners II, L.P. ("Ark Investment").

(Stipulated Facts 6, 8, 9).

6.     Credit Suisse owns outright, or manages, 26% of TransCare's equity on behalf of five separate entities (PX 235 at 98626), and the remaining 12.7% of TransCare is owned by a variety of entities and individuals.  (Dkt. 132).

**B.     TransCare's Debt Structure**

7.     Prior to February 2016, TransCare had two credit facilities: a term loan administered by Defendant Patriarch Partners Administrative Services, LLC ("PPAS") (the "Term Loan") (JX 1) and a revolving asset-backed loan, administered by Wells Fargo, N.A. ("Wells Fargo") (the "ABL").  (JX 2).

8.     PPAS is managed and owned by Tilton.  (Stipulated Fact 3).

9.     Both the Term Loan and the ABL were secured by blanket liens on all of TransCare's assets.  (Stipulated Facts 12, 14; DX 3 at §2; JX 2 at §5.1).

2

**A2469**

10.     Pursuant to an intercreditor agreement between PPAS and Wells Fargo, PPAS had a first priority lien on TransCare's vehicles, certain other physical assets, capital stock, and intellectual property (the "Term Loan Priority Collateral"), and Wells Fargo had a first priority lien on all other assets (consisting primarily of accounts receivable) (the "ABL Priority Collateral").  (JX 3 at §§1.26, 1.35, 2.2).

11.     Pursuant to an irrevocable payment assignment, all of TransCare's receivables were paid to a lockbox controlled by Wells Fargo, including all of the payments received under the MTA Contract.  (PX 2).

12.     As of 12:00 am on February 24, 2016, approximately $13 million was outstanding under the ABL (Tr. 7/24 159:19-24) and $43 million was outstanding under the Term Loan (JX 110).

13.     At all relevant points, there were six lenders under the Term Loan (the "Term Loan Lenders"): Ark Investment; Zohar CDO 2003-1 Ltd., Zohar II 2005-1, Ltd., and Zohar III, Ltd. (collectively, the "Zohar Funds"), Credit Suisse Alternative Capital, Inc., and First Dominion Funding I ("First Dominion").  (Stipulated Fact 10).

14.     Tilton, through various entities, controlled the Zohar Funds as their collateral manager.  She resigned from that position in early February 2016 (effective March 3, 2016).  (Tr. 8/13 A.M. 7:24–8:8).

15.     Credit Suisse controlled First Dominion as its collateral manager.  (JX 1 at 00106; Tr. 7/22 P.M. 30:20-23).

16.     The Zohar Funds owned over 75% of the Term Loan debt.  (PX 209 (native)).

17.     Credit Suisse and First Dominion together owned approximately 18% of the Term Loan debt.  (PX 209 (native)).

18.     Ark Investment owned approximately 7% of the Term Loan debt.  (PX 209 (native)).

### C.     Management of TransCare

19.     Glen Leland served as TransCare's Chief Executive Officer from January 12, 2015 through January 8, 2016.  (Stipulated Fact 24).

20.     Mark Bonilla served as TransCare's Chief Financial Officer from April 2014 through September 29, 2015 and, following his resignation on that date, served as a consultant to TransCare until January 8, 2016.  (Stipulated Fact 25).

21.     Peter Wolf served as TransCare's Chief Operating Officer from November 16, 2014 through February 24, 2016.  (Stipulated Fact 26).

22.     Under an Authority Matrix issued by Tilton as sole director of the Board, the officers of TransCare did not have authority to:  (a) approve an annual operating plan budget or any interim operating plan or budget; (b) negotiate the sale or disposition of any assets; (c) recapitalize or make other change in the capital structure; (d) disclose any financial information to any third-party; (e) enter into any contract or license agreement not contemplated by the approved Annual Plan (of which there was none); (f) enter into any financing or loan agreement;  (g) dispose of any unusable asset or write off any receivable, or make a charitable contribution; (h) change auditors; (i) engage legal counsel; (j) settle or compromise any claim; (k) engage any consultant; or (l) conduct any reduction in force.[1]  (PX 3; Tr. 7/23 P.M. 15:16-17:11).

---

[1] Some of the items are authorized below certain dollar amounts if authorized by a "Designated Executive" or an "Annual Plan" (PX 3); however, during all relevant periods there was no Designated Executive and no Annual Plan.  (Leland Tr. 84:9-16; JX 11 ("the combination of these two factors means that many decisions need to go to the board.")).

4

23.     Even matters that were not specifically prohibited still required Board approval: "for instance, Item 11 prohibits entering into financing transactions, but it does not specifically prohibit laying the groundwork for these types of transactions by making preliminary calls or taking other actions prior to providing financial data, which would be prohibited by Item 6. However, we are absolutely sure that Lynn would want to know and approve the company's exploration of other financing sources." (JX 11 at 87751) (Brian Stephen email).

24.     Tilton managed TransCare through her employees at Patriarch (defined below):

    a.  Michael Greenberg, who oversaw financial matters, payment of vendors and negotiations with Wells Fargo (Tr. 7/22 A.M. 14:10–16:15); (Leland Tr. 59:5–61:14, 144:13–145:17, 245:22–246:24).

    b.  Jean-Luc Pelissier, who oversaw operational matters (Tr. 7/22 A.M. 24:11-19; Tr. 7/23 A.M. 6:7-19; Leland Tr. 46:6-47:12).

    c.  Brian Stephen, an attorney, who oversaw legal matters including the scope of authority granted to the officers under the authority matrix (Tr. 7/23 P.M. 1:22–3:21; Leland Tr. 46:6-51:21); and

    d.  Randy Jones, who oversaw hiring (Tr. 7/22 A.M. 24:22-24; Tr. 8/13 A.M. 53:22–54:1, Tr. 8/13 P.M. 47:23–48:2).

These Patriarch employees reported directly to Tilton, independently of TransCare management, regarding the operations and finances of TransCare. (*E.g.*, Tr. 7/22 A.M. 15:13-18 (Greenberg); Tr. 7/23 A.M. 7:15-17 (Pelissier); 7/23 P.M. 2:16-18 (Stephen); Leland Tr. 82:21–83:25).

25.     Tilton established Defendant Patriarch Partners, LLC ("Patriarch") to provide solutions for banks that had large distressed loan portfolios by creating a financial model that allowed the banks to remove the distressed loans from their balance sheets. (Tr. 8/13 P.M. 18:23–

19:5).  Patriarch, along with a number of other Patriarch entities also owned by Tilton, is

headquartered at 1 Liberty Plaza in downtown Manhattan.  (Stipulated Facts 3, 4, 5).

### D.  Events Leading up to Tilton's Decision to Sell TransCare

26.  In 2001, Tilton purchased the loans extended to TransCare from Canadian Imperial

Bank, a creditor that had otherwise wanted to liquidate TransCare's assets.  (Tr. 8/13 P.M. 19:6-

14).

27.  Tilton used those loans plus outside money to obtain a majority interest in

TransCare and restructured it through a bankruptcy proceeding.  (Tr. 8/13 P.M. 19:10-14).

28.  Tilton testified: "For almost twelve years we had restructured this company from

when it was going to be liquidated by the lenders and doing twelve to $14 million of EBITDA a

year."  (Tr. 8/13 A.M. 47:22-25).

29.  Beginning in 2014 and throughout 2015, TransCare experienced difficulties in

funding employee payroll and paying vendors.  (Stipulated Facts 10, 27).

30.  On July 3, 2015, TransCare missed payroll.  (Stipulated Fact 32).

31.  On July 31, 2015, Greenberg reported to Tilton on Envision Healthcare's purchase

of Rural/Metro Corp., a regional ambulance operator, at a 10x multiple of EBITDA.  (DX 68 at

904469).[2]

32.  On August 4, 2015, Tilton forwarded Greenberg's analysis to Kurt Marsden, her

counterpart at Wells Fargo, and told him "Just to confirm the active M&A market in the ambulance

---

[2] As Greenberg noted in his email (DX 68), Envision Healthcare's medical transportation segment
was named American Medical Response ("AMR").

space.  This is why it makes sense to let TransCare make its way back to normalized EBITDA."
(DX 68 at 90469).

33.     By this statement, Tilton meant that she wanted to get TransCare back to the $12-
14 million of EBITDA that it had historically earned, so she could sell it at a price that could have
covered both the ABL and the Term Loan.  (Tr. 8/13 A.M. 47:22–48:3).

34.     On or about September 30, 2015, Mark Bonilla resigned as CFO of TransCare.
(DX 72 at 42864; Tr. 7/22 A.M. 17:18-24).

35.     Thereafter, Tilton instructed Greenberg to take on responsibility vis-à-vis
TransCare's finances.  (DX 73 at 58180; Tr. 7/22 A.M. 18:19-24).

36.     TransCare had no audited financials for 2014 and had fallen several months behind
in its monthly financial reports.  (Tr. 7/22 P.M. 79:21–80:12).

37.     On October 14, 2015, Wells Fargo notified TransCare and Patriarch that it did not
intend to renew the ABL when it expired on January 31, 2016.  (DX 76 at 06334; Tr. 7/22 A.M.
26:11-21).

38.     Tilton tasked Greenberg to work with management at TransCare to prepare a 2016
budget for TransCare that would be acceptable to Wells Fargo and convince them to extend the
ABL.  (Tr. 7/22 A.M. 28:4-11, 31:14-20).  She also tasked Greenberg with developing the plan
based upon his own assessment of TransCare's business.  (Tr. 7/22 A.M. 33:9-12).

39.     Accordingly, when Greenberg took information from TransCare management, he
confirmed the assessment himself before presenting it to Tilton.  (Tr. 7/22 A.M. 38:11–40:3).

40.     Greenberg worked closely with Pelissier on the development of the plan, and Brian
Stephen was involved as well.  (Tr. 7/22 A.M. 28:12-16).

A2474

41.     On November 14, 2015, Greenberg submitted a presentation for Tilton's review and approval to share with Wells Fargo on November 16, 2015.  (JX 51; Tr. 7/22 A.M. 32:6-25).

42.     The 2016 plan outlined an $8.2 million growth in revenue, resulting in 2016 EBITDA of $11.5 million, a 9% EBITDA margin.  (JX 51; Tr. 7/22 A.M. 32:6-25).

43.     Greenberg testified that the revenue growth in the plan for Wells Fargo was a conservative assumption.  (JX 51; Tr. 7/22 A.M. 34:17-24).  The plan called for 48 new ambulance leases (at $120,000 per vehicle, with a down payment of $30,000).  The plan expressly required $6.4 million in new capital ($2.8 million in lease payments, $2.8 million in new vehicle funding and $0.8 million in A/P reduction).  (JX 51 at 98489, 98535).

44.     Tilton approved the presentation to be shared with Wells Fargo, but Tilton never gave final approval to the plan and did not fund the new ambulances contemplated by the plan. (Tr. 7/22 A.M. 31:21–32:25, 102:6-9; Leland Tr. 547:13–549:9, 583:9–584:25; Tr. 7/22 P.M. 123:13-19).

## II.     Events Following Tilton's Decision to Sell TransCare

### A.     Tilton's Decision to Sell TransCare

45.     In mid-December 2015, Tilton determined to sell TransCare:

    a.  On December 14, 2015, Pelissier informed John Husson of Wells Fargo that Tilton had decided to sell TransCare, that Tilton would provide financing to bridge to a sale, but that Tilton sought to inject that financing through Wells Fargo's ABL loan facility.  (PX 126 at 03375; Husson (*LaMonica*) Tr. 44:25–45:7, 48:11–49:10).

    b.  On December 16, 2016, Kurt Mardsen of Wells Fargo wrote to Tilton: "I understand that your team updated you on this situation over the weekend and

8

**A2475**

you made a determination to sell TransCare." (PX 128 at 06004; Tr. 8/13 A.M. 50:13–51:17 (Tilton agreeing with statement)).

    c.   Tilton on deciding to sell TransCare: "I think that's correct, they [Wells Fargo] were not going to stay in past January 31 unless it was part of a sale process, so that was my best chance of effectuating a transaction that would be good for the constituents." (Tr. 8/13 A.M. 50:9-12).

**B.**    **Tilton Initially Investigated the Sale of TransCare**

46.    In connection with her decision to sell the company:

    a.   Tilton instructed Greenberg to obtain potential comparable transactions and comparable public companies that existed with the same or ancillary industries to TransCare. (Tr. 7/22 A.M. 42:16-23).

    b.   Tilton also instructed Greenberg to find investment bankers to market TransCare. (Tr. 7/22 A.M. 41:6-13, 42:21-23).

47.    Greenberg had experience in private equity investment and portfolio management, comparing companies within a particular set, evaluating capital structure alternatives for companies, and making strategic business assessments for companies. (Tr. 7/22 A.M. 13:17–14:2).

48.    Greenberg also had extensive experience in valuation and modeling. (Tr. 7/22 A.M. 14:7-9).

49.    On December 18, 2015, Greenberg reported his findings to Tilton. (JX 55).

50.    Greenberg located six "transaction comps," meaning comparable transactions that occurred within the same sector as TransCare or related sectors. (JX 55; Tr. 7/22 A.M. 48:2-3).

51.    For each transactions comp, Greenberg listed the date, whether it was completed or announced, and then where available, the purchase price or enterprise value, last twelve month

("LTM") revenue, LTM EBITDA, and the multiple of revenue/EBITDA needed to arrive at the purchase price (calculated by dividing the purchase price/enterprise value by the LTM revenue/EBITDA).  (JX 55; Tr. 7/22 A.M. 48:22–50:13).

52.     Although Greenberg identified six transaction comps, only two of the transaction comps had sufficient public information to calculate EBITDA multiples:

> a.  AMR's (Envision's) purchase of Rural/Metro Corp. at a 10.7x multiple (the same transaction Greenberg had emailed Tilton about in August 2015 (DX 68)); and

> b.  KKR's purchase of Air Medical at a 10.0x multiple.  (JX 55 at 41414 (native)).

53.     Greenberg also identified three "market comps" which "relate to public companies and where they're currently trading in terms of their valuation."  (JX 55; Tr. 7/22 A.M. 48:3-5).

54.     Under "market value" for each market comp, Greenberg listed the market value of the equity of each public company plus the outstanding debt minus the cash on the balance sheet.  (JX 55; Tr. 7/22 A.M. 51:2-7).  The rest of the entries were calculated in the same way as the transaction comps.  (Tr. 7/22 A.M. 51:8-10).

55.  Greenberg identified three market comps:

> a.  Envision, trading at 11.3x multiple;

> b.  Air Methods, trading at an 8.2x multiple; and

> c.  PHI, trading at a 3.5x multiple.

(JX 55 at 41414 (native)).

56.     Greenberg determined that PHI was an outlier, and reported the same to Tilton, because they had other business lines that were only tangentially related to TransCare (62% of PHI's business was oil and gas).  (JX 55 at 41414 (native); Tr. 7/22 A.M. 51:11-22).

57.    In his cover email, reporting on these transaction and market comps, Greenberg reported that the average enterprise value to revenue multiple was 1.8x and the average enterprise value to LTM EBITDA was 10.1x.  (JX 55 at 41410; Tr. 7/22 A.M. 52:2-10).

58.    Greenberg also identified several investment banks which had advised on ambulance transactions and reported the same to Tilton.  (JX 55 at 41410; Tr. 7/22 A.M. 42:24–43:11).

59.    In the same email, Greenberg also reported to Tilton that Leland had received unsolicited calls from (i) the following potential purchasers in the ambulance business: Falck, AMR, Richmond County Ambulance, and Enhanced Equity and also (ii) National Express in the transit business.  (JX 55 at 41410).

60.    In addition to Greenberg's December 18, 2015 report, the record contains the following expressions of interest:

a.    On February 5, 2015, Leland reported that National Express was offering $15-18 million to purchase TransCare's paratransit division.  (JX 12 at 04260; Leland Tr. 85:9–86:14).

b.    On March 3, 2015, Mike Weinberger, the Chief Operating Officer of Richmond County Ambulance Service ("RCA") emailed Tilton seeking to purchase all or part of TransCare.  (PX 44; Tr. 8/13 A.M. 45:7-25).

c.    Weinberger stated that RCA was prepared to offer up to eight times TransCare's EBITDA, and also offered to consider an operational management arrangement.  (PX 44 at 90486; Tr. 8/13 A.M. 45:7-25).

d.    Following the July 3, 2015 missed payroll, Leland started to receive calls and emails from ambulance companies and ambulance company investors

regarding purchasing all or portions of TransCare, including AMR, Falck, and Rural/ Metro Corp.  (Leland Tr. 171:5–172:15; 174:2-175:13).

e.  For example, AMR called Leland seeking to purchase TransCare's Westchester operations.  (Leland Tr. 172:17-24).

f.  On July 8, 2015, Weinberger emailed Tilton again expressing RCA's interest in purchasing or operating TransCare.  (PX 73; Tr. 8/13 A.M. 45:17-24).

g.  On July 10, 2015, National Express emailed Leland a Letter of Intent offering to purchase the MTA Contract for $6 to $7 million and assume up to $2 million in liabilities.  (JX 40).

h.  On July 13, 2015, Greenberg received a message from another Patriarch credit officer that Alluence Capital Advisors representing National Express was interested in purchasing TransCare's paratransit business.  (PX 83; Tr. 7/22 P.M. 74:8-17).

i.  On December 8, 2015, Leland reported to Greenberg and Pelissier that National Express called him that morning about purchasing the paratransit business, and asked whether he was authorized to enter into discussions.  (PX 111; Tr. 8/14 A.M/ 26:19-27:1 (Tilton's knowledge of same)).

j.  On December 16, 2015, Leland reported to Greenberg, Stephen, Pelissier and Bonilla that National Express had called him "a few times" that day to reiterate that their offer to buy TransCare's paratransit contract was "still out there."  (PX 124; Tr. 50:22–51:3).

*See also* Leland Tr. 178:2-180:19 (multiple inquiries by interested parties for TransCare's valuable assets); 176:2-7 (TransCare could be worth as much as $200 million "if we carried out the accelerated business plan.").[3]

61.    According to both Greenberg and Leland, Tilton specifically prohibited Leland from speaking to any of those companies, and even from entering into a non-disclosure agreement with those companies.  (Tr. 7/22 A.M. 46:25–47:19; Leland Tr. 97:11–98:25, 172:25–173:9).

62.    On December 24, 2015, Greenberg updated Tilton with more information concerning investment banks who worked on ambulance transactions, and again sent the same information as he had on December 18, 2015.  (JX 61; Tr. 7/22 A.M. 52:12–53:3).

63.    Greenberg undertook the research in JX 55 and JX 61 for the purpose of negotiating a plan with Wells Fargo to fund TransCare towards a potential sale.  (Tr. 7/22 A.M. 52:23–53:10).

**C.    Tilton Negotiates with Wells Fargo to Fund TransCare Towards a Sale**

64.    Wells Fargo agreed that TransCare needed to be sold and understood that "it was a matter of self preservation" to support TransCare through to a sale.  (Husson (*Ien*) Tr. 35:24–36:20).

65.    On December 21, 2015, Greenberg met with John Husson and Bob Strack of Wells Fargo concerning a deal to extend the ABL so as to facilitate a sale of TransCare.  (DX 97; Tr. 7/22 A.M. 55:17–56:1).

66.    Prior to the meeting, Tilton requested a sixth-month time frame for the sale, or through to May or June 2016.  (Tr. 7/22 A.M. 54:20-22).

---

[3] Pelissier, to whom Leland reported most directly (Leland Tr. 46:7–47:5), agreed with that assessment although he denied that at trial.  (Tr. 7/23 A.M. 46:21–48:8).

67.     Between December 23 and December 31, 2015, Greenberg and Wells Fargo negotiated a deal to extend the ABL subject to a satisfactory budget so as to allow as sale of TransCare.

   a.  Wells Fargo agreed to a timetable for a sale to close by August 15, 2016, including dates for the submission of budgets, hiring of investment bankers, offering memorandums, and purchase documents (JX 65), and also had proposed alternative timetables in the event that the sale needed to be conducted through a section 363 sale (JX 59).[4]

   b.  Wells Fargo agreed to waive the financial covenants in the ABL in favor of TransCare's compliance with the sale budget and timetable.

   c.  Tilton agreed to submit a sale budget for TransCare.

   d.  Tilton agreed to Wells Fargo's request to hire a third-party financial consultant to which Wells Fargo could have access.

(DX 97; Stipulated Fact 35; JX 59; JX 60 at 00146-00147; JX 65 at 215).

68.     Wells Fargo never varied from its position of being willing to fund TransCare through to a sale.  (Husson (*LaMonica*) Tr. 56:14–57:6; Tr. 7/22 A.M. 63:14-20).

69.     Wells Fargo believed that a sale was in its own best interests and those of TransCare as it was a "decent company" with "great employees" and a "wonderful" market share that just needed to address its undercapitalization.  (Husson (*LaMonica*) Tr. 45:8-25).

---

[4] This timetable was longer than Tilton's initial request of six months, but shorter than Tilton's ultimate demand of September 30, 2016.

### D.    The January 7 Plan

70.    On January 4, 2016, Tilton told Greenberg to prepare a budget to support a sale process that would minimize the capital needed to be provided to TransCare.  (JX 67; Tr. 7/22 A.M. 64:12-22).

71.    On January 5, 2016, Greenberg submitted such a budget to Tilton, which Tilton subsequently directed be sent to Carl Marks two days later (the "January 7 Plan").  (JX 67).[5]

72.    Greenberg and Pelissier built the January 7 Plan by working independently from TransCare's management in order to create a scenario more consistent with Tilton's stated parameters from the day before.  (Tr. 7/22 A.M. 69:14–70:5).

73.    The January 7 Plan projected 2016 revenues of $120 million (including $2 million in new services) and EBITDA of $6.9 million.  (JX 67 at 196574).

74.    The January 7 Plan projected a peak need of $4.5 million in new capital consisting of $2.2 million in immediate payment requirements (insurance, payroll, and taxes); $1.3 million in down payments on new vehicles; and $1 million in other past due A/P payments.  (JX 67 at 196575; Tr. 7/22 A.M. 70:22–72:3).[6]

75.    On January 7, 2016, after receiving Tilton's approval, Greenberg shared the January 7 Plan with Carl Marks.  (Tr. 7/22 A.M. 77:4-9).

76.    Tilton never "approved" the January 7 Plan.  (Tr. 7/22 A.M. 80:16-21)

77.    Tilton never "approved" any plan for TransCare between November 14, 2015 and February 24, 2016.  (Tr. 7/22 P.M. 123:13-19).

---

[5] "Carl Marks" refers to the Carl Marks Advisory Group LLC engaged by Tilton for TransCare to satisfy Wells Fargo's request for a third-party financial consultant.  (Tr. 7/22 A.M. 54:23–55:11; *supra* ¶ 67).

[6] "NYSIF" is the New York State Insurance Fund.

### E.   Tilton Funds the January 7 Plan While Planning Sale

78.   Even though Tilton did not "approve" plans, her team still judged the company against those plans.  Each of the elements of an un-approved plan still required Tilton's approval under the authority matrix.  (Tr. 7/22 A.M. 80:6-15).

79.   On January 12, 2016, Tilton directed Randy Jones to offer the vice-presidents in charge of TransCare's paratransit and Hudson Valley divisions (Rob Struck and Tom Fuchs) $200,000 in change of control bonuses on a sale and a $20,000 boost in salary.  (DX 108 at 23057; Tr. 8/13 A.M. 54:19–55:10).

80.   On January 15, 2016, Ark II wired $1,172,757.53 to PPAS for PPAS to make payments on TransCare's behalf as follows:  $221,122.00 to Zurich (auto insurance); $142,993.82 to IPFS (liability insurance); $334,802.76 to Aetna (health insurance); and $473,838.94 to NYSIF (workers' compensation insurance) (collectively, the "January 15 Payments").  (DX 112 (3:58 pm email)).

81.   The January 15 Payments were contemplated by the January 7 Plan and formed a portion of the $4.5 million in new capital contributions (although by this date the $4.5 million had increased to a plan of $6.5 million).  (Tr. 7/22 A.M. 83:7-13; JX 67 at 06575).

82.   That afternoon, Greenberg emailed Wells Fargo asking for their agreement to eight new conditions for the January 15 Payments, which Greenberg characterized as "part of a first funding under a go forward business plan being developed, of up to $6.5MM."  (PX 170, 2:06 pm email).  The conditions included that $6.5 million business plan be supported by a credit facility with a lien junior to Wells Fargo's lien on the collateral for the ABL, but senior to Wells Fargo's lien on the collateral for the Term Loan debt.  (Id.).

83.     Wells Fargo did not agree to terms set forth by Greenberg for the lien priority for the January 15 Payments, but instead was prepared to agree to allow the secured funding to be junior to all liens of Wells Fargo and subject to a new intercreditor agreement.  (PX 170 at 14549).

84.     As of January 26, 2016, Greenberg was still trying to negotiate the security for the January 15 Payments with Wells Fargo.  (PX 174 at 22754, 22753; Tr. 7/22 A.M. 88:1–92:7).

85.     As of that point, there was no agreement with Wells Fargo and no agreement with the Term Loan Lenders concerning the January 15 Payments.  (Tr. 7/22 A.M. 90:9-16).

86.     On January 27 and 28, 2016, Tilton met with Greenberg, Carl Marks and others to review Carl Marks' financial analysis of TransCare.  (Tr. 7/22 A.M. 98:8-12; 7/22 P.M. 4:8-12; PX 175; PX 179).

87.     On January 28, 2016, Tilton approved the purchase of two new ambulances for a total of $195,975, to be owned by Ark II and leased to TransCare.  (DX 120 at 2162; DX 121 at 99194; Tr. 7/22 P.M. 4:9–5:24).

88.     On January 29, 2016, Tilton directed PPAS to advance $690,168.24 on TransCare's behalf to pay NYSIF and certain TransCare creditors (the "January 29 Payments").  (DX 121; Tr. 8/13 A.M. 58:21–59:15).

89.     Tilton claims the January 29 Payments were attributable to Ark II.  (Tr. 8/13 A.M. 25:4-18).

90.     As of February 3, 2016, Tilton still had no agreement with either Wells Fargo or Credit Suisse for a new secured financing facility to TransCare.  (Tr. 7/22 P.M. 8:17-22, 9:20-22).

91.     On February 3, 2016, Greenberg spoke with Alex Witkes, his counterpart at Credit Suisse, to discuss obtaining Credit Suisse's approval to subordinating their security interest to a new lien.  (Tr. 7/22 P.M. 7:20–9:16; PX 189).

92.     Greenberg told Witkes that there was not yet a formal term sheet for the new loan, but that he wanted to send him a Summary of Terms for the new proposed facility.  (PX 189).

93.     The Summary of Terms included a $6.5 million facility which would have a priority junior to Wells but senior to the Term Loan Lenders on the ABL Priority Collateral and would have a priority senior to the Term Loan Lenders on the Term Loan Priority Collateral.   (PX 189; Tr. 7/22 P.M. 11:1-19).  In other words, this would place Credit Suisse and the other Term Loan Lenders in third priority position on the ABL Priority Collateral and in second position on the Term Loan Priority Collateral.  (PX 189).

94.     Greenberg reported that Credit Suisse was open to discussions concerning the new facility and wanted to see a plan showing how they would be better off agreeing to subordinate their position.  (PX 185 at 2543 (7:11 a.m. email)).

95.     Greenberg never sent Credit Suisse such a plan because Tilton never told him to do so.  (Tr. 7/22 P.M. 16:12-25).

96.     As of February 3, 2016, Wells Fargo had also not been provided with a going-forward plan for TransCare.  (Tr. 7/22 P.M. 17:23–18:6).

97.     On or about February 5, 2016, Tilton, dissatisfied with the work of Carl Marks, instructed her own staff and TransCare's divisional chiefs to build a model for a business plan for continuing a version of TransCare under a new company.  (Tr. 8/13 A.M. 64:1-16).

98.     As a result, Tilton began working on two models:  one for a "NewCo" under an Article 9 foreclosure plan and one to wind down the remaining portions of TransCare outside of bankruptcy, and then after 60-90 days putting TransCare into a chapter 7, so that receivables could be collected, employees could be given WARN notices and assets could be wound down in an orderly manner.  (Tr. 8/13 A.M. 65:3-16).  In connection with that,

a. Tilton refused to give WARN notices until she foreclosed on the assets to transfer to NewCo: "notice cannot be given prior to foreclosure on newco or there will be no Newco."  (Tr. 8/13 A.M. 68:7-13; JX 87); and

b. Tilton sought a commitment from Wells Fargo to continue funding TransCare during its wind-down by over-advancing funds through the existing ABL, but (as discussed below) she ultimately rejected Wells Fargo's proposal to over-advance as insufficient.  (Tr. 8/13 A.M. 68:14-19, 70:17-23).

**F.     On February 10, 2016, Tilton Institutes the Transcendence Plan**

99.     As discussed below, on February 10, 2016, Tilton set in motion a plan to sell certain of TransCare's assets to herself and to liquidate the remaining assets in a bankruptcy proceeding: (a) she created two new corporations named Transcendence, (b) she engaged bankruptcy counsel for TransCare, (c) she took a new secured position in TransCare's assets for her personal fund, Ark II, and (d) she submitted financials for the new company to insurance brokers to obtain necessary insurance for Transcendence to operate.

**i.     _Tilton Creates Transcendence_**

100.     On February 10, 2016, Stephen, at Tilton's direction, caused two new corporations to be incorporated under Delaware law:  Transcendence Transit, Inc. and Transcendence Transit II, Inc.  ("Transcendence II," and collectively with Transcendence Transit, Inc., "Transcendence") (DX 133 at 15290, 15294; Tr. 7/23 P.M. 22:2–23:21).

101.     In addition, Stephen set up bank accounts, tax ID numbers, directors, and insurance for both companies.  (Tr. 7/23 P.M. 26:22–28:9, 103:4–104:23).

102.     The same day, Tilton became the sole director of Transcendence, issued a board resolution adopting the authority matrix and appointed Glen Youngblood, a senior vice president at TransCare, as President of Transcendence.  (PX 200; Stipulated Fact 7).

19

**A2486**

103.    Although both certificates of incorporation authorized the boards of Transcendence to issue 1,000 shares of common stock, no shares were ever issued for either Transcendence Transit Inc. or Transcendence II.  (Tr. 7/23 P.M. 24:5-16; DX 133 at 15290, 15294).

104.    Stephen, who was responsible for creating these entities, understood that Transcendence II was to be owned by Transcendence Transit Inc., but did not get around to issuing shares.  (Tr. 7/23 P.M. 25:10-14).

### ii.    *Tilton Engages Bankruptcy Counsel for TransCare*

105.    On the evening of February 9, 2016, Stephen contacted Curtis Mallet to prepare to file a chapter 11 bankruptcy proceeding for certain TransCare entities.  (JX 72, 10:06pm email; Tr. 7/23 P.M. 29:8–30:10).

106.    Stephen excluded two of TransCare's subsidiaries from the list of debtor entities for which Curtis Mallet would file:  TransCare Pennsylvania and TC Hudson Valley.  He did so because, already at that time, Tilton planned that "the secured lenders would foreclose on certain TransCare assets and those assets would lead to start another business, Transcendence Transit business, and the remainder of TransCare would be wound down, but it would still continue to operate."  (Tr. 7/23 P.M. 30:24–31:13).

107.    When describing TransCare's debt structure, Stephen did not identify that there were any loans outstanding from Ark II.  (JX 72 at 51882; Tr. 7/23 P.M. 32:17–33:10).

108.    Stephen described the lenders under the Term Loan as "funds managed by Patriarch Partners" and omitted the existence of Credit Suisse and First Dominion.  (JX 72 at 51882; Tr. 7/23 P.M. 32:9-16).

109.    The February 10, 2016 engagement agreement provided that Curtis Mallet "has been engaged to assist the Company with its out-of-court restructuring matters (including without limitation, in connection with efforts to restructure the Company's overall businesses and a

potential reorganization, recapitalization, refinancing, combination, sale(s) of assets, or any other restructuring), as well as any in-court involuntary or voluntary insolvency proceedings…."  (JX 77 at 51777).

110.    Tilton made the decision to hire Curtis Mallet.  No one else from TransCare was consulted.  (Tr. 7/23 P.M. 33:11-20).

111.    Nevertheless, as discussed below, Curtis Mallet did not advise TransCare with respect to the negotiation of new Ark II Credit Facility and or with respect to the negotiation of the strict foreclosure documents.

### iii.    *The New Ark II Credit Facility*

112.    On February 10, 2016, Peter Ruffini, a lawyer at Patriarch Partners, requested that Greenberg (with a copy to Stephen) have TransCare sign four documents in connection with a new ARK/TransCare facility: (1) a credit agreement between Ark II and TransCare (the "Ark II Credit Agreement"), (2) a security agreement between Ark II and TransCare (the "Ark II Security Agreement"), (3) a guarantee agreement signed by each of TransCare's subsidiaries in favor of Ark II, and (4) an intercreditor agreement between Ark II and PPAS (the "Ark II Intercreditor Agreement") (collectively, the "Ark II Credit Facility").  (PX 197 at 47308, 11:33 a.m. email).[7]

113.    Greenberg then repeatedly followed up with Peter Wolf to have Wolf sign the documents.  (PX 197 at 47307).

114.    Wolf, the Chief Operating Officer, was the most senior of officer at TransCare at this time.  (Tr. 7/22 P.M. 20:15-24).  The next most senior person was Glen Youngblood (Tr. 7/23 P.M. 81:4-12), who at this point was now also the President of Transcendence.

---

[7] There was no administrative agent on the Ark II Credit Facility and PPAS has no connection to the Ark II Credit Facility other than agreeing to the Ark II Intercreditor Agreement.  (JX 197).

115.    Neither Ruffini, Greenberg, nor Stephen copied Curtis Mallet on these emails.  (PX 197).

116.    On February 11, 2016, Stephen emailed a fully executed copy of the Ark II Credit Facility documents (all dated as of January 15, 2016) to Curtis Mallet, stating only "I attach documents with a respect to another term loan for the company."  (JX 79 at 48968).

117.    The Ark II Credit Agreement provided that Ark II would make available a $6.5 million term loan facility to TransCare.  (JX 79 at 48968).  However, Section 2.5(b):

    a.  prohibited TransCare from requesting loans under the Ark II facility unless it first obtained the prior written consent of Ark II; and

    b.  provided that any loan shall "only be made at the sole and absolute discretion of the Lender" and "only be made if it is in accordance with a plan approved by the Lender."

(JX 79 at 48978).

118.    The Ark II Security Agreement granted Ark II a blanket security interest in TransCare's property (JX 79 at 49020) and authorized Ark II to file financing statements in support of the same.  (JX 79 at 49029).[8]

119.    The Ark II Intercreditor Agreement (JX 79 at 49001):

    a.  Granted Ark II both structural and payment priority over the Term Loan Lenders.  (JX 79 at 49004 (§2.2 providing that Ark II's lien would have priority over the Term Loan Lenders' lien), 49005 (§2.3 providing that the proceeds of

---

[8] The Ark II security agreement also provided that it would be subject to the terms of the Ark II intercreditor agreement.  (JX 79 at 49031).

22

**A2489**

any collateral would first be paid to Ark II, and only then to the Term Loan
Lenders));

b.   Provided that "only the party with the senior Lien in the collateral [Ark II] shall
have the right to restrict, permit or approve or disapprove, the sale, transfer or
other disposition" of the TransCare collateral.  (JX 79 at 49007, §2.8(a));

c.   Prohibited PPAS from exercising any of its remedies upon a default (JX 70 at
49008, §2.9(a)); and

d.   Specifically, prohibited PPAS from conducting a strict foreclosure with respect
to its TransCare collateral.  (JX 79 at 49008, §2.9(a)(ii)) ("The party with a
junior Lien on any Collateral… will not… seek to foreclose, enforce or realize
upon (judicially or non-judicially) its junior Lien on such Collateral…").

120.   The Ark II Intercreditor Agreement was signed by Lynn Tilton as manager of Ark
II and by Lynn Tilton as manager of PPAS.  (JX 79 at 49015).

121.   Peter Wolf on behalf of TransCare signed an "acknowledgment" to the Ark II
Intercreditor Agreement, providing that TransCare "acknowledges and agrees to the foregoing
terms and conditions….[and] agrees that it will, together with its successors and assigns be bound
by the provisions hereof."  (JX 79 at 49016).

### iv.   *The Submission of Transcendence Financials to Insurers*

122.   On February 10, 2016, Greenberg emailed several of TransCare's insurance brokers
with a request to bind new insurance policies for Transcendence, and to that end, he provided them
with financial information concerning the new company.  (PX 196; Tr. 7/22 P.M. 43:8–47:22).

123.   As of February 10, 2016, Greenberg told the insurance brokers that Transcendence
would operate five of TransCare's business units: (1) the paratransit division; (2) Pittsburgh; (3)
Hudson Valley; (4) Maryland; and (5) Westchester.  (PX 196; Tr. 7/22 at 43:8–46:19).

23

124.   Greenberg explained that the paratransit division would be operated out of Transcendence II to satisfy the MTA's concerns that their business be run out of a standalone corporate entity.  (Tr. 7/22 P.M. 45:7–46:1).

125.   Greenberg sent the insurance brokers financial statements for the new company which projected that Transcendence would earn $48 million in revenue during calendar year 2016, with EBITDA of $3.76 million.  (PX 196; Tr. 7/22 P.M. 47:9-22).

126.   The procurement of insurance for Transcendence was a necessary item for the foreclosure plan because Transcendence could not operate without first obtaining insurance.  (Tr. 7/22 A.M. 71:8-18; Tr. 7/23 A.M. 20:3-16; Tr. 8/13 A.M. 25:4–26:12).

**G.   Between February 11 and 23, 2016, Tilton Finalizes the Transcendence Plan**

**i.   *Tilton Attempts to Procure Insurance for Transcendence***

127.   On February 11, 2016, Tilton wrote to Bobby Siegel, an insurance broker, for the purpose of procuring insurance for Transcendence and explained that:

> There is a smaller, less risky transit business that we would like to continue in a new company.  This would include our NY Transit business and our suburban ambulance businesses in Hudson Valley, Pittsburgh Pennsylvania and Maryland.  It would allow us to maintain a profitable, lower risk transit company that would still employ over 1000 of our workers.
>
> The models show that this business in 2016 would be approximately $67mm with $4mm of EBITDA and would grow with the additional transit business under the contract to $79mm and $7mm of EBITDA in 2017.  It is because this new business makes sense that I would be providing all the new working capital for this business myself, personally.

(JX 80 at 92228; Tr. 8/13 A.M. 38:5–39:13).

128.   Tilton sent this information because she understood that he needed the information to bind insurance.  (Tr. 8/13 A.M. 39:5-8).

     ii.    **_Tilton Attempts to Obtain Credit Suisse's Consent to Subordination_**

129.    On February 11, 2016, Tilton dictated an email sent by Greenberg to Credit Suisse (Tr. 7/22 P.M. 33:14-17), in which she told Credit Suisse that if they did not agree to subordinate their Term Loan position to a new $6.5 million facility, then TransCare would not be able to borrow the funds and would be forced to file for bankruptcy. (PX 249 at 77102 (Feb. 11, 2016 2:35 p.m. email)).

130.    These statements to Credit Suisse were false because (a) TransCare had already entered into the Ark II Credit Facility, which provided for borrowings up to $6.5 million in Tilton's sole discretion (*supra* ¶¶ 116-117); (b) TransCare had already retained bankruptcy counsel to file an imminent bankruptcy (*supra* ¶¶ 105-109); (c) Tilton had already formed Transcendence and was representing to insurers that Transcendence would carry on five of TransCare's business lines (*supra* ¶¶ 100, 122-125); and (d) Tilton had already executed the Ark II Intercreditor Agreement on behalf of PPAS as agent for the Term Loan Lenders (*supra* ¶¶ 119-120).

131.    Tilton also directed Greenberg to tell Credit Suisse that, as an equity holder, Credit Suisse would be responsible for paying TransCare's unpaid payroll and payroll taxes, and that its share could be between $1 million and $2 million. (PX 249 at 77102; Tr. 7/22 P.M. 32:15–33:17).

132.    Credit Suisse asked for details about the missing payroll and financial problems, to which Greenberg never responded. (Tr. 7/22 P.M. 34:20–35:3).

133.    No one had any contact with Credit Suisse again until Credit Suisse asked for a status update after TransCare's bankruptcy filing. (Tr. 7/22 P.M. 35:10-19).

     iii.    **_Tilton Refines Business Model_**

134.    On February 13, 2016, Pelissier sent Tilton and Stephen the "Transcendence Go Forward Model" that he and Greenberg were preparing. (PX 286). This model constituted the

assets that Tilton would be continuing as a going concern, as of that date.  (Tr. 7/22 P.M. 53:17-23).

135.   The February 13, 2016 model similarly contemplated that Transcendence would operate the following five divisions of TransCare: (1) the MTA Contract, (2) Pittsburgh; (3) Hudson Valley; (4) Maryland and (5) Westchester (including the Bronx).  (PX 286; Tr. 7/22 P.M. 54:8-13).

136.   Under this model, Greenberg (and those he was working with) projected that Transcendence would have consolidated 2016 revenues of $65 million with EBITDA of $5.1 million.  (PX 286 at 105517; Tr. 7/22 P.M. 55:1-7).

137.   Greenberg noted that Transcendence would have an "incremental funding need" of $8 million while the accounts receivable were paid (90 days for the ambulance divisions and 45 days for the paratransit division), "which can be offset if a new ABL line is secured or by cash that builds through the year."  (PX 286 at 105517; Tr. 7/22 P.M. 56:18–57:4).

138.   For this reason, the "incremental funding need" was not listed on the model cash flow statement as a capital expenditure but instead was listed as a financing adjustment.  (PX 286 at 105522; Tr. 7/22 P.M. 56:22–57:2).

139.   The cash flow statement projected virtually no capital expenditures for Transcendence in 2016.  (PX286 at 105522; Tr. 7/22 P.M. 56:13-17).

140.   The plan also assumed a further $2 million would be spent:

    a.   $1.8 million paying certain of TransCare's existing creditors from whom Transcendence would need cooperation (past due employee payroll, facility rents, and amounts owed to vehicle repair suppliers); and

    b.   $237,000 in down payments on eight new vehicles for Transcendence.

(PX 286 at 105517).

141.   At trial, Tilton testified that she derived the $10 million credit given in the February 24, 2016 strict foreclosure from several of the cells included in the February 13, 2016 Excel model. (Tr. 8/13 P.M. 105:16–106:10).   Tilton testified that column B on tab "BS" represented TransCare's "December ['15] closing balance sheet."  (Tr. 8/13 P.M. 104:23–105:12; PX 286 (native)).  She testified that she calculated the $10 million by adding the cells for (1) cash, (2) account receivables, (3) inventory, and the (4) net property, plant and equipment.  (Tr. 8/13 P.M. 105:20–106:10).  She testified that the figures in these cells represented the book value of those specific assets, although she did not know how the book value was calculated.  (Tr. 8/13 P.M. 107:8-13).

142.   During this period, Tilton had ten people making three different models to make sure she ended up with accurate numbers with no mistakes for Transcendence.  She was hoping that the models would check each other, but to eventually select one model to move forward with her decisions and projections. (Tr. 8/13 P.M. 39:17–40:7).

###### iv.   *Tilton's Team Prepares Transition Services Agreement*

143.   Between February 10 and February 24, 2016, Tilton's team internally prepared a draft Transition Services Agreement ("TSA") between TransCare and Transcendence.  (Tr. 7/23 P.M. 68:4-12).

144.   Under the draft TSA (JX 95), TransCare would lease several hundred ambulances back from Transcendence for about $200,000 a month so that it could continue providing its New York ambulance services.  (JX 95 at 44011-44018 (Ex. C); Tr. 7/23 P.M. 68:25–69:13, 71:21–73:6).

145.   Under the draft TSA, TransCare would pay Transcendence for the services of its former employees.  (JX 95 at 44009 (Ex. B); Tr. 7/23 P.M. 74:4–75:19).

146.     There is no indication Tilton ever approved the TSA, and according to Stephen she had not even seen it by February 23, 2016.  (JX 95; Tr. 7/23 P.M. 70:17–71:3).

    **v.**     ***Tilton Negotiates with Wells Fargo While Preparing to Move Forward With Transcendence***

147.     On February 12, 2016, during a phone call with Tilton's representatives and Wells Fargo's lawyers, Tilton's representatives discussed the plan to foreclose on certain assets of TransCare and Wells Fargo's lawyers asked a number questions, including what entities Tilton expected to foreclose upon.  (DX 140; Tr. 7/23 P.M. 169:24–173:21).

148.     On February 14, 2016, Pelissier, at Tilton's direction, circulated the operational plan for Transcendence to Greenberg, Pelissier, Stephen, Wolf, Youngblood, and others.  (PX 206; Tr. 7/23 A.M. 17:7-9).  According to that plan:

    a.   The decision and timing of the foreclosure and bankruptcy filing of TransCare would be determined exclusively by Tilton.  (Tr. 7/23 A.M.17:17-24).

    b.   Curtis Mallet (bankruptcy counsel for TransCare) and Perkins Thomson (bankruptcy counsel for PPAS) had been hired.  (PX 206 at 91292).

    c.   Stephen and another lawyer at Patriarch were tasked with preparing the foreclosure documents by February 11, 2016, and Stephen was to finalize the bankruptcy filing documents by February 14, 2016.  (PX 206 at 91292).

    d.   Stephen would also review which contracts could be assigned to the new company.  (Tr. 7/23 A.M. 25:20–26:8).

    e.   Pelissier and Youngblood, the designated President of Transcendence and the most senior person after Wolf at TransCare, would be in charge of changing remittance forms and payment lock box accounts for Transcendence on day 1. (PX 206 at 91295).

    f.   Pelissier and Youngblood would also be in charge of devising a system for the new company to generate payroll checks. (PX 206 at 91296, 91297; Tr. 7/23 A.M. 24:2–25:1).

    g.   Employees would need to be sent WARN notices and be transferred to Transcendence but no one had yet decided when to do so. (Tr. 7/23 A.M. 19:11-22).

149.    Between February 10 and 17, 2016, Wells Fargo requested a budget to fund the then-proposed bankruptcy. (JX 84 at 53, 51, 49 and 47). "In order for us to seek approval for a DIP Facility, a budget is necessary—even if it is in draft form initially." (JX 84 at 51).

150.    On February 16, 2016, Tilton apologized for not sending any of the models yet and told Wells Fargo that she now believed that it would "be much better for everyone" if TransCare could avoid chapter 11 and its expenses and instead wind down for a 45-60 day period and then file for chapter 7. (JX 84 at 48).

151.    On February 17, 2016, Tilton sent Wells Fargo a wind-down plan for TransCare following a foreclosure sale. (JX 86).

152.    On February 19, 2016, Wells Fargo submitted a written proposal to enter into a new $16.5 million ABL through May 31, 2016, to fund TransCare during a wind-down. (PX 219 at 3192 (native)). The proposal was conditioned on: (1) a release from Patriarch, (2) a budget, (3) consent from the Term Loan lenders, and (4) a "transition services agreement among Newco and [TransCare], as well as documents and agreement related to the formation of Newco, the transfer of assets/liabilities to Newco from certain Borrowers [TransCare]." (PX 219 at 3192 (native, last box on page)).

153.    Tilton did not consider this proposal to be adequate.  (Tr. 8/13 A.M. 79:23–80:7).
Wells Fargo never received a release, a Newco budget, documents relating to the formation of
Newco or a transition services agreement.

154.    At some point after February 19, Tilton entered into negotiations with Wells Fargo
now directed at purchasing TransCare's outstanding receivables for Pittsburgh, Hudson Valley and
the MTA Contract, then being paid to a Wells Fargo lockbox under the ABL.  (Tr. 8/13 A.M. 73:3-
15).

155.    Tilton never reached agreement with Wells Fargo on a purchase price for the
receivables.  (Tr. 8/13 A.M. 15:1-12).

156.    At the same time, Tilton continued waiting for the insurance to be bound for
Transcendence to set the foreclosure in motion.  (Tr. 8/13 A.M. 74:5-7; DX 170, 3:49 P.M. email;
DX 171, 4:44 P.M. email).  Pelissier explained, "if we cannot insure, we cannot operate."  (Tr.
7/23 A.M. 30:8-24).

157.    On February 23, 2016, without an agreement with Wells Fargo, Tilton directed
PPAS to pay $593,000 to NYSIF for Transcendence's workers' compensation insurance.  (PX
226; Tr. 8/13 A.M. 75:6-15).  As discussed below, Tilton applied these funds to a new revolving
loan extended from Ark Angels III (another of her personal investment funds) to Transcendence.
(*Id*.)

158.    Tilton authorized the foreclosure at 12:07 a.m. on February 24, 2016 because she
had received the insurance for Transcendence that she had been waiting for.  (Tr. 8/13 A.M. 6:16-
19).

### H.    The Foreclosure and Sale

159.    At 12:07 a.m. on February 24, 2016, Stephen, at Tilton's direction, provided TransCare with (a) a Notice of Default and Acceleration (JX 96 at 43311) and (b) a Notice of Acceptance of Subject Collateral in Partial Satisfaction of Obligations (JX 96 at 43306).

160.    Stephen did not send the Notice of Default or Notice of Acceptance to Curtis Mallet.  (JX 96; Tr. 7/23 P.M. 50:24-51:21).

161.    Both the Notice of Default and the Notice of Acceptance were signed by Tilton, on behalf of PPAS, the Zohar Funds, and Ark Investment, but not by Credit Suisse or First Dominion. (JX 96 at 43308, 43313).

162.    In the Notice of Default, PPAS declared a default arising from TransCare's failure to pay interest and accelerated all of TransCare's payment obligations under the Term Loan.  (JX 96 at 43311).

163.    By the Notice of Acceptance, PPAS accepted certain of TransCare's collateral in satisfaction of $10 million outstanding under the Term Loan:

> Pursuant to Section 9-620 of the Uniform Commercial Code, notice is hereby given of the Agent's acceptance of the subject collateral identified on Schedule A attached hereto in partial satisfaction of the undersigned entities' Obligations under the Credit Agreement (the "Subject Collateral"). The Subject Collateral is accepted by Agent in satisfaction of $10,000,000 of the Obligations, which represents a partial satisfaction of the Obligations.

(JX 96 at 43307).

164.    According to Schedule A, the Subject Collateral consisted of:

a.    "All of Debtors' personal property of every kind and description…;"

b.    Three contracts, including the MTA Contract; and

   c.  The stock of (i) TransCare Pennsylvania, Inc., (ii) TC Hudson Valley
Ambulance, Inc., and (iii) TC Ambulance Corp.;[9]

   d.  <u>But not</u> any Accounts, as defined in the Security Agreement.

(JX 96 at 43310).

165.    At Tilton's direction, Peter Wolf, the Chief Operating Officer of TransCare,
executed the Notice of Acceptance.  (DX 174; Stipulated Fact 41).

166.    On the morning of February 24, 2016, PPAS, as administrative agent, and
Transcendence, entered into a Bill of Sale, Agreement to Pay and Transfer Statement.  (JX 102;
Stipulated Fact 43).

167.    Tilton made all the decisions for PPAS and the Term Loan Lenders and came up
with terms for the transaction.  (Tr. 8/14 A.M. 18:10-11 ("I was responsible for all the lenders as
the agent and I came up with the terms.")).

168.    The Bill of Sale (JX 102) provided that the Subject Collateral was sold, assigned,
transferred and delivered from PPAS to Transcendence.  (*See* Recital D ("TransCare tendered…
and the Lenders accepted"); Recital F (PPAS "now desires to sell, assign, transfer and deliver the
Subject Collateral, tendered by TransCare pursuant to the Foreclosure Notice (the "<u>Purchased
Assets</u>") to [Transcendence], and [Transcendence] desires to purchase, accept, acquire and take
the Purchased assets."); Section 1 (PPAS "hereby sells, assigns, transfers and delivers to
[Transcendence] all of its and the Lenders' respective rights, title and interest in the Purchased
Assets…"); Section 2 ("[T]he purchased assets are hereby transferred 'as-is, where is' and in its

---

[9] TC Hudson Valley Ambulance, Inc. and TC Ambulance Corp. each held a certificate of need
("<u>CON</u>") issued by the New York Department of Health to operate medical ambulance services in
specified counties.  (Dkt. 201-1 at 1; Dkt. 202-1 at 1).

present condition and state of repair, with all faults, limitations and defects."); and Section 5 ("This

Bill of Sale constitutes a 'transfer statement' for purposes of Section 9-619 of the UCC.")).

169.    As consideration for the Subject Collateral, Transcendence agreed to pay

$10,000,000 to Ark Angels III.  (JX 102 (Bill of Sale)):

> a.  Recital E ("The consideration for the transfer of the Subject Collateral to
> [Transcendence] pursuant to this Bill of Sale shall be $10,000,000 such amount
> to be financed by Ark Angels III, through [Transcendence's] agreement to pay,
> under the terms of the Purchaser Credit Agreement as such term is defined
> below, a portion of the amounts outstanding in respect of the Loans as of the
> date hereof as described below."); and

> b.  Section 3 ("[Transcendence] hereby agrees to pay $10,000,000, constituting a
> portion of the principal amount outstanding of under the TransCare Credit
> Agreement as of the date hereof prior to giving effect to the foreclosure
> described in the Foreclosure Notice… (the "<u>Closing Date Obligations</u>").  Such
> Closing Date Obligations shall be owing by [Transcendence] on and after the
> date hereof and will be governed exclusively by the Credit Agreement, dated as
> of the date hereof, by and between Administrative Agent, the lenders party
> thereto and [Transcendence] (the "<u>Purchaser Credit Agreement</u>")...")

170.    The Purchaser Credit Agreement is structured as a syndicated loan to

Transcendence with PPAS as the administrative agent and Ark Angels III as the sole lender thereto.

(JX 101 at 8674, 8742; Tr. 8/13 A.M. 23:9-16).  Tilton testified that the Ark Angels III loan would

be secured only by Transcendence's receivables.  (Tr. 8/14 A.M. 43:14–44:10).

171.    Tilton testified that the Ark Angels III loan funds would be used to either (a)

purchase TransCare's receivable from Wells Fargo or (b) "go in or about day one as soon as cash

was needed."  (Tr. 8/13 A.M. 22:23–23:8).

172.    Defendants have not produced an executed copy of the Purchaser Credit

Agreement, but (a) Tilton testified that she committed to this loan and (b) Transcendence borrowed

$658,000 under the Purchaser Credit Agreement to pay NYSIF and the lease of the paratransit

facility on Foster Avenue. (JX 101 at 8673; Tr. 7/22 P.M. 59:13–60:10, 8/13 A.M. 24:15-24). These borrowing were charged to the Ark Angels III loan. (Tr. 7/22 P.M. 61:7-8).

173. Greenberg told Todd Trent, an insurance broker at Lockton, that part of the $10 million purchase price for Transcendence would be the unfunded Ark Angels IIII revolving loan. (PX 228, Tr. 7/22 P.M. 63:8-24).

174. Thus, under the written documents constituting the strict foreclosure:

    a. TransCare received a $10 million credit off the Term Loan;

    b. Transcendence received the foreclosed assets;

    c. Transcendence promised to borrow from and repay $10 million to Ark Angels III; and

    d. The Term Lenders received nothing.

**I.**     **The February 24 Plan**

175. On February 24, 2016, Tilton directed Greenberg to send Transcendence's projected 2016 financials to Lockton for the purpose of procuring insurance. (PX 228; Tr. 7/22 P.M. 62:15–63:7).

176. The projected 2016 financials were a 10-month projection, not a full year, because they started on February 21, 2016 and ended on December 31, 2016. (PX 228 at 86223; Tr. 7/22 P.M. 64:7-15; PX 233; Tr. 7/22 P.M. 68:13-18).

177. The 2016 financials showed projected revenues of $37 million and projected EBITDA of $3.2 million ($3,204,500) in that ten-month period. (PX 228 at 86223; Tr. 7/22 P.M. 64:4-18). Tilton admitted that EBITDA would increase to $4 million if annualized over a full twelve months. (Tr. 8/14 A.M. 38:4-12).

178. The difference between the $3.2 million EBITDA shown on the February 24, 2016 financials submitted to Lockton and the $3.7 million EBITDA shown on the earlier forecast (PX

286) resulted from the loss of the Maryland business in the meantime and "possibly also a slight difference in timing in terms of the beginning of the forecast." (Tr. 7/22 P.M.65:4-8).

### J.    Events Subsequent to the Foreclosure and Sale

179.    As discussed below, Transcendence operated the MTA paratransit business, the Pittsburgh business, and the Hudson Valley business on February 24, 25, and 26, 2016. Tilton, not the Trustee, gave the order for these operations to shut down on February 26, 2016.

#### i.    *Pittsburgh*

180.    On the morning of February 24, 2016, Transcendence owned TC Pennsylvania, Inc. as a wholly-owned subsidiary. (Tr. 7/22 P.M. 70:11-14). TC Pennsylvania, Inc. owned the Pittsburgh business assets. (Tr. 7/22 P.M. 46:2-4).

181.    Its manager, Earl Kossuth, reported up through Glen Youngblood (the president of Transcendence) to individuals at Patriarch, including Greenberg and Pelissier. (Tr. 7/22 P.M. 70:15–71:3).

182.    For example, on Friday morning, February 26, 2016, Kossuth reported to Greenberg, Youngblood, Pelissier, Stephen, and Kevin Dell (another lawyer at Patriarch) that he needed to provide a letter describing the ownership of the new company to the Pennsylvania Department of Health or else "we will be forced to stop operating." (PX 243). Greenberg responded that he would get the letter that day. (PX 243; Tr. 7/22 P.M. 71:4-10). The letter was ultimately provided to Kossuth. (Tr. 7/22 P.M. 71:11-12).

183.    TC Pennsylvania, Inc. continued to operate until midnight on February 26, 2016, after which Kossuth reported to Pelissier that the last ambulances returned to base, he notified customers of the shutdown and locked-up all narcotics. (PX 247; Tr. 7/23 A.M. 44:14–45:16).

184.     The Trustee took no action with respect to the assets of the Pittsburgh operation until after TC Pennsylvania, Inc. filed for bankruptcy several weeks later and he conducted an auction in Pittsburgh.  (Tr. 7/24 144:16–145:5).

### ii.     *Hudson Valley*

185.     On the morning of February 24, 2016, Transcendence owned TC Hudson Valley Ambulance, Inc. as a wholly-owned subsidiary.  (Tr. 7/22 P.M. 67:l–68:3).

186.     TC Hudson Valley Ambulance, Inc. owned the CON necessary to operate ambulances in the Hudson Valley.  (Tr. 8/14 A.M. 23:1-7; Dkt. 201-1 at pg. 1 of 8).

187.     Tilton did not put TC Hudson Valley Ambulance Inc. or TC Ambulance Corp. (which held a separate CON for Westchester) into bankruptcy until April 2016.  (Stipulated Facts 50; Dkt. 202-1 at pg. 1 of 8).

188.     TC Hudson Valley Ambulance, Inc. controlled its own intake, computer mapping (CAD) and dispatch systems necessary for the dispatch and tracking of ambulances so it could operate without anything else from TransCare.  (Tr. 7/23 A.M. 20:14–21:11).

189.     The Trustee took no action with respect to the assets of the Hudson Valley operation until that entity filed for bankruptcy several weeks later and he conducted an auction in Poughkeepsie.  (Tr. 7/24 144:16–145:9).

### iii.     *Tilton Assigns the MTA Contract to Transcendence and Then Discontinues Service*

190.     On February 24, 2016, Pelissier forwarded the paperwork necessary to assign the MTA Contract, which he had requested from the MTA, to Stephen, Greenberg, Jones, Wolf and Fuchs.  (JX 100 (1:34 p.m. email)).

191.     Pelissier told them that the MTA "sounded positive and expects the documents back to move forward expeditiously."  (*Id.*)

192.    On February 24, 2016, Tilton signed a written consent as the sole board member of TransCare New York, Inc. directing the Chief Operating Officer of TransCare to assign the MTA Contract to Transcendence II.  (PX 229).

193.    The written consent stated that "the MTA has heretofore provided the Company with its consent to the Assignment."  (PX 229).

194.    At 8:27 p.m. on February 24, 2016, Stephen circulated an executed Agreement of Assignment for the MTA Contract (the "MTA Assignment"), stating that the financial disclosures would need to be completed by someone else.  (JX 100).

195.    The MTA Assignment was executed on behalf of TransCare by Peter Wolf and on behalf of Transcendence II by Glen Youngblood.  (JX 100 at 77168).

196.    The MTA Assignment was also accompanied by a Consent to Assignment, also signed by Wolf and Youngblood.  (JX 100 at 77169).  That Consent provided that TransCare guaranteed the "full performance" of Transcendence II under the MTA Contract.  (JX 100 at 77169 (Term No. 2)).

197.    Counsel for TransCare was not consulted on procuring TransCare's consent to transferring the MTA Contract, nor on executing the MTA Assignment and Consent to Assignment.  (Tr. 7/23 P.M. 81:16-23, 85:20-23).

198.    On February 25, 2016, Stephen confirmed to the MTA that TransCare had transferred everything necessary for servicing the MTA Contract to Transcendence and that nothing prevented Transcendence from servicing the MTA Contract, representing that:

      a.    The secured lenders of TransCare foreclosed on the MTA Contract on February 24, 2016 and immediately thereafter sold the MTA Contract to Transcendence;

    b. They were able to do so because they had a security interest in TransCare's general intangibles and the MTA Contract constituted such an intangible;

    c. "All of the 390 drivers and other TransCare employees necessary for Transcendence Transit II to continue to provide services under the Agreement were transferred to Transcendence Transit II at the time of the foreclosure and are now employees of Transcendence Transit II[;]"

    d. Transcendence had the necessary auto, liability and workers' comp insurance; and

    e. "<u>The bankruptcy of TransCare has no impact on Transcendence Transit II's ability to provide uninterrupted service to the MTA in accordance with the terms of the Agreement</u>." (emphasis in original).

(PX 244 at 43521-22 (8:49 p.m. email)).

199. Tilton approved the above email for Stephen to the MTA. (Tr. 7/23 P.M. 99:2-7).

200. In the same email, Stephen also told the MTA that the Trustee would not impede the transfer of the MTA business to Transcendence ("<u>The bankruptcy trustee does not have the power and authority to unwind the foreclosure—nor has he expressed any misgivings or concerns about the foreclosure.</u>") (PX 244 at 43522 (emphasis in original)).[10]

201. On February 26, 2016, Stephen wrote to the MTA asking them to agree on a "new agreement" with Transcendence II with certain conditions, including that the MTA terminate the MTA Contract with TransCare. (PX 236).

---

[10] In addition, Tilton told the employees of Transcendence that she would pay their wages for their last week of work at TransCare in the event the Trustee did not pay them, a promise she did not keep. (JX 103; Tr. 7/23 P.M. 132:4-17).

202.    Stephen told the MTA that absent agreement to the new terms "we will, unfortunately, be forced to discontinue service at 5:00PM today." (PX 236).

203.    At the same time, Randy Creswell asked the Trustee to consent to termination of the MTA Contract. (JX 105).

204.    The Trustee consented to terminating the MTA Contract as long as it was without prejudice to amounts due to TransCare. (JX 105).

205.    At 7:01 p.m., Stephen told the MTA that, after speaking with Tilton, Transcendence would not be continuing to provide services. (PX 245).

206.    In that same email, Stephen provided the MTA with the termination notice that had been sent to Transcendence's employees that day. (PX 245 at 43517). The notice informed the employees that Transcendence had shut down operations effective "immediately" and instructed them to "secure your vehicles and operations and await further instruction from the court appointed Trustee." (*Id.*).

### K.    Until This Trial, Defendants Took the Position That the Foreclosure Had Occurred

207.    At the initial February 25, 2016 meeting with the Trustee, and other parties in interest, Randy Creswell, the attorney for PPAS, told the Trustee that the strict foreclosure had occurred the day before and that the only remaining business lines for the Trustee to oversee were the New York and Bronx/Westchester ambulance operations, headquartered out of Hamilton Avenue in Brooklyn and Mount Vernon. (Tr. 7/24 133:22–134:22).

208.    Creswell further told the Trustee that PPAS had foreclosed on the paratransit business and the assets located at Maryland, Pittsburgh, and Poughkeepsie and that business lines located at those locations were being operated by a new company. (Tr. 7/24 136:20–137:9).

209.    As a result, the Trustee did not seek to exercise any control over those operations, until much later when they were also filed into bankruptcy.  (Tr. 7/24 137:10-22).

210.    Creswell further told the Trustee that PPAS had foreclosed on all of the ambulances pursuant to the strict foreclosure, but that if the Trustee decided to operate there would have to be an agreement reached with PPAS.  (Tr. 7/24 134:15–135:6).

211.    On February 25, 2016, Brian Stephen told the attorney for the MTA that the foreclosure had occurred, and that Transcendence was operating the paratransit division.  (PX 244 at 43521, 43522).

212.    On February 26, 2016, Creswell again wrote to the Trustee (and his partner) stating that "Transcendence Transit II has been providing services under the MTA Contract above since the filing date."  (JX 105, 2:00 pm email); Tr. 7/24 13:18–14:7).

213.    On February 29, 2016, PPAS filed a response in this Court asserting that PPAS "consummated a strict foreclosure" on "all of Debtors' personal property, vehicles (*i.e.*, ambulances), certain contracts, certain certificates for operation, and the shares of stock in certain non-filing subsidiaries of Transcare Corporation."  (Dkt. 11 at ¶ 6).

214.    On March 23, 2016, PPAS filed a responsive pleading with this Court claiming that the foreclosure had occurred and all legal title and equitable interests in the foreclosed property had transferred to Transcendence.  (Dkt. 49 at ¶¶ 9, 12, 13).

215.    On September 1, 2016, PPAS wrote the Trustee complaining about the administration of the estate and stating that had it known about the Trustee's actions, PPAS "never would have agreed to the sale of its assets by the Trustee.  It would have simply liquidated such assets outside of the bankruptcy process as they never became property of the estate in the first place in light of the prepetition strict foreclosure."  (Dkt. 284-2 at ¶ 4).

216.    Similarly, at trial, Defendants admitted that TransCare's ambulances belonged to PPAS and then to Transcendence following the strict foreclosure:

    a.    Stephen admitted that TransCare's ambulances became Transcendence's ambulances on February 24, 2016 (Tr. 7/23 P.M. 72:9-21);

    b.    Tilton admitted that all of TransCare's ambulances had been transferred to Transcendence as part of the sale of the strict foreclosure.  (Tr. 8/13 A.M. 36:25–37:7).

217.    Finally, in response to the Court's direct inquiry at trial, defense counsel conceded that nothing more was required under state law to effectuate a transfer of personal property than delivering the bill of sale.  (Tr. 8/13 A.M. 32:24–33:9).

## III.    Liquidation of Assets and Claims Against the Estate

218.    At the time of the bankruptcy filing, TransCare owed Wells Fargo approximately $13 million, which was paid in full as a result of the liquidation of assets.  (Tr. 7/24 159:16-24).[11]

219.    The Trustee realized approximately $19.2 million through the liquidation of TransCare's ambulances, equipment, accounts receivable and CONs.  (Tr. 7/24 13:10-14).   The Trustee attributes $5.7 million of those liquidation sales to the foreclosed-upon assets.  (Tr. 7/24 27:23-25).

---

[11] The initial TransCare debtors filed their bankruptcy petitions on February 24, 2016.  (Stipulated Fact 44).  The Trustee was appointed on February 25, 2016.  (Stipulated Fact 45).  The three debtor entities sold to Transcendence filed their bankruptcy petitions on April 25, 2016 and were merged into the estate.  (Stipulated Facts 50-51).

220.    While the Trustee received $3.2 million for the sale of the two CONs which PPAS foreclosed upon,[12] the Trustee was unable to realize a return from the sale of the paratransit division because Tilton had already closed it down on February 26, 2016.

221.    Pursuant to the March 25, 2016 stipulation and order, the Trustee distributed $800,000 to PPAS as agent for the Term Loan Lenders from the proceeds of the auctions. (Stipulated Fact 49; Tr. 8/13 A.M. 36:13-24).

222.    PPAS did not credit the $800,000 it received from the Trustee to the Term Loan. (JX 110 at pg. 9 of 9).

223.    Instead, PPAS turned the $800,000 over to Ark II, and Ark II applied the $800,000 to Ark II's secured claim against the estate.  (Tr. 8/13 A.M. 36:19-24; JX 109 at pg. 5 of 9).

224.    On March 1, 2016, employees of TransCare filed several class action suits against the estate and others seeking unpaid wages for the period February 13 to 24, 2016, as well as amounts due under the federal and state WARN acts, which have been consolidated as *Ien v. TransCare Corp., et al.*, Adv. Proc. No. 16-1033 (collectively, the "WARN Act Liability").

225.    On October 9, 2017, PPAS, as Administrative Agent for the Term Loan Lenders, filed proofs of claim against TransCare seeking $35 million, including $1.5 million in accrued interest, postpetition attorneys' fees and agency fees and also including a $10 million credit for "Acceptance of Collateral."  (Stipulated Fact 54; JX 110 at pg. 9 of 9).

---

[12] As discussed *supra* ¶ 164, PPAS foreclosed on the stock of TC Hudson Valley Ambulance Inc. and TC Ambulance Corp.  By orders dated July 6, 2016, the Trustee sold these CONs issued to these two entities for $1.2 million and $1.9 million, respectively.  (Case No. 16-10407, Dkt. Nos. 201 and 202).

226.    On October 9, 2017, Ark II filed proofs of claim against TransCare's estate seeking $1.1 million, claiming that it had reduced its $1.9 million claim by applying the $800,000 it received from PPAS.  (Stipulated Fact 53; JX 110 at pg. 9 of 9).

## IV.    Facts Relevant to Particular Claims

### A.    Tilton Did Not Engage in a Fair Process to Arrive at the Sale Price

227.    There was never an appraisal of TransCare's assets prior to February 24, 2016.  (Tr. 7/22 P.M. 51:24–52:1).

228.    Greenberg was never tasked with finding a replacement for the ABL.  (Tr. 7/22 P.M. 123:7-12).  Leland was prohibited from seeking any financing.  (Leland Tr. 77:2–78:23, 101:13–101:20).

229.    Tilton never approved a plan for TransCare between November 14, 2015 and February 24, 2016.  (Tr. 7/22 P.M. 123:13-19).[13]

230.    As a result, no plan could be sent to Wells Fargo to satisfy its condition for further financing.  (Tr. 7/22 P.M. 123:20-24).

231.    Greenberg never gave Credit Suisse a plan so that Credit Suisse could consider subordination to a new facility.  (Tr. 7/22 P.M. 16:12-25).

232.    Tilton forbade her team at Patriarch and her executives at TransCare from contacting the parties who had expressed interest in TransCare, as discussed *supra* ¶ 61.  (*See* JX 15 at 28516; Tr. 7/22 A.M. 46:9–47:8).

233.    As a result, Tilton never fully engaged with any potential purchasers.  (Tr. 7/22 P.M. 124:5-9).

─────────────

[13] In fact, despite the necessity for such a plan, Tilton did not approve a plan for TransCare during all of 2015.  (Leland Tr. 80:4-6).

234.    Tilton alone initiated and structured the foreclosure and sale to Transcendence, as discussed *supra* ¶¶ 99, 141, 158.

235.    Tilton did not provide minority shareholders with advance information concerning the foreclosure and sale, and in fact provided some of them with misleading information, as discussed *supra* ¶¶ 129-133.

236.    Tilton offered no contemporaneous document memorializing how she calculated the foreclosure price.  (Tr. 8/14 A.M. 20:17–21:22).

237.    Tilton testified that she used the book value reflected on TransCare's December 2015 balance sheet, as shown in PX 286, to arrive at the $10 million credit bid on the foreclosure.  (Tr. 8/13 P.M. 103:12–106:10).

238.    That book value did not accurately reflect TransCare's assets:

a.    Tilton admitted that the book value did not provide any valuation for TransCare's intangible assets, including the MTA Contract and the two CONs included in the foreclosed assets.  (Tr. 8/14 A.M. 24:7-9 (Tilton did not take any steps to value TransCare's CONs); Tr. 8/14 A.M. 24:10-12, 26:5-7 (Tilton did not take any steps to value the intangibles); Tr. 8/14 A.M. 26:8-11 (balance sheet did not include MTA Contract)).[14]

b.    Tilton claims to have obtained the book value from TransCare's "December ['15] closing balance sheet" (Tr. 8/13 P.M. 104:25–106:10), however, the record indicates the last financial statement prepared for TransCare was October 2015.  (Tr. 8/13 P.M. 129:1-6).

---

[14] As described *supra* ¶ 164, Tilton sought to foreclose upon two CONs and the MTA Contract. In any event, Tilton admitted that she used the book value of assets that did not correspond with the assets she ultimately foreclosed upon.  (Tr. 8/13 P.M. at 107:7–108:9).

239.     Stephen, who sent the default and acceptance notice, could not explain why he sent them at 12:07 a.m. on the morning of February 24, 2016.  (Tr. 7/23 P.M. 52:8–53:7).

### B.     Tilton Did Not Pay TransCare a Fair Price for Its Assets

240.     Tilton gave TransCare a $10 million credit against the now-subordinated Term Loan in exchange for assets which she valued at $22,058,901.77.  (Tr. 8/13 A.M. 13:9–14:14; Tr. 8/13 P.M. 12:8–13:22).[15]

241.     Defendants did not offer any expert valuation of TransCare's assets, or the assets PPAS foreclosed upon and sold to Transcendence.  (Tr. 8/8 45:6-15 (no opinion regarding the value of TransCare at any time in January or February 2016)).

242.     The Trustee's expert, Dr. Jonathan Arnold, used four approaches to value TransCare based upon four business plans prepared by Tilton, or those working for her, between January 5 and February 24, 2016.  Dr. Arnold selected those valuation approaches from what he found "evident in the testimony and in the ordinary course of Patriarch's work in managing and supervising TransCare."  (Tr. 7/24 13:15-21):

    a.  EBITDA multiples of comparable companies;

    b.  EBITDA multiples for precedent transactions analysis;

    c.  EBITDA multiples identified by Tilton and her staff; and

    d.  EBITDA multiples contained in the expressions of interest.

(Tr. 7/24 13:22–14:4).

243.     Using the comparable company analysis, Dr. Arnold used the two companies identified by Greenberg as those most similar to TransCare.  (Tr. 7/24 16:18–17:6).

---

[15] At trial, after stating that the $22 million was generous, Tilton testified it was "an equitable purchase price for future for the old lenders and the new lenders."  (Tr. 8/13 A.M. 14:7-14).

a. First, Dr. Arnold determined that EBITDA multiples were "quite clearly, the relevant multiple in this industry. The record is replete from Mr. Leland, Mr. Pelissier, Mr. Greenberg, and offers from third-parties. So it is—what one sees is offers that are expressed in terms of an EBITDA multiple." (Tr. 7/24 17:7-14).

b. Next, Dr. Arnold calculated the forward EBITDA multiples of the comparable companies on the dates of each of the four business plans. Dr. Arnold used forward EBITDA because "Patriarch was in the process of restructuring or modeling what a [re-]structured TransCare would look like with a different management and a different process going forward. And anyone buying the company would be buying the future, not the past. So, for that reason, forward EBITDA is a very common concept…. And it is a standard way of thinking about EBITDA in this context." (Tr. 7/24 18:3-11).

a. Applying that analysis to the January 7 Plan prepared by Greenberg, Dr. Arnold determined that the value of TransCare would fall between $51.1 and $86.5 million. Applying that analysis to the January 27 and 28 plans, Dr. Arnold determined that the value of TransCare would fall between $35.3 and $62.6 million. And finally, applying that analysis to the Newco model provided by Greenberg to Lockton on February 24, 2016, Dr. Arnold determined that the value of the Newco assets would fall between $22.7 and $39.1 million. (Tr. 7/24 19:6-22).

244. Using the precedent transaction analysis, Dr. Arnold used the two recent precedent transactions identified by Greenberg (Envision's acquisition of Rural/Metro and KKR's

46

**A2513**

acquisition of Air Medical Group) and computed the enterprise value to EBITDA multiples underlying those transactions. (Tr. 7/24 21:11-17). Dr. Arnold obtained valuation multiples in the same range as those obtained using the comparable company method. (Tr. 7/24 21:18-22). Specifically, he obtained valuation multiple ranges of 10.0x to 10.7x. (DX 196 at 27).

245.   Dr. Arnold also noted that the EBITDA multiples contained in the expressions of interest for TransCare's assets also fell within the same range:  8x.  (Tr. 7/24 21:14–22:3 (describing expressions of interest from two potential suitors, AMR and RCA)).

246.   Finally, Dr. Arnold noted that Tilton, Greenberg and Leland each testified that an EBITDA multiple range of 7 to 10 times EBITDA would be appropriate for TransCare. (DX 196 at 26).  (Greenberg at Tr. 7/22 P.M. 77:1-17; Leland at PX 75; Tilton at Tr. 8/13 A.M. 14:5-14, 16:13–17:4).

247.   Based on Tilton's business plans, the Trustee's expert opined that TransCare's value exceeded $10 million under any of Tilton's business plans. (DX 196 at 37).

### C.   The Defendants' Expert's Criticisms

248.   The Defendants' expert, Mr. Jeffrey Dunn, criticized one of these analyses:  the comparable company analysis:

    a.   Mr. Dunn agreed that the two comparable companies used by Dr. Arnold were the most comparable companies to use in analyzing TransCare. (Tr. 8/8 48:9-25).

    b.   However, Mr. Dunn opined that TransCare's size, undercapitalization, distressed history, and low EBITDA margins would result in TransCare fetching lower multiples than those market comparables. (Tr. 8/8 55:20–56:2, 56:22–57:2, 57:25–58:13, 59:3-20).

    c.   Mr. Dunn did not analyze any data to support his hypothesis that TransCare's size, undercapitalization, distressed history, and low EBITDA margins would actually have resulted in a lower multiple using a market company approach. (Tr. 8/8 56:3-7, 58:17-20, 60:1-16, 62:24–63:2).

    d.   In rebuttal, Dr. Arnold performed such an analysis and determined that the market data in TransCare's market showed that size, undercapitalization, distressed history, and low EBITDA margins would not have any observable effect on the EBITDA multiples used to value companies within the health care space. (Tr. 8/14 A.M. 49:15-24; DX 196 at 35). In fact, in each case, Dr. Arnold found that adjusting for these factors would actually lead to higher multiples. (Tr. 8/14 A.M. 54:1-58:1; DX 196 at 35).

249.    Mr. Dunn did not criticize Dr. Arnold's valuation of TransCare using the precedent transaction approach.

250.    Mr. Dunn was unaware of the Transcendence transaction and Tilton's sale, including if any assets were foreclosed upon, if Transcendence purchased assets, what price was paid for the assets, and how the price was calculated. (Tr. 8/8 71:4–72:1).

251.    Mr. Dunn criticized Dr. Arnold's use of the expressions of interest because the parties expressing interest in TransCare were unable to view information about TransCare's financials and business plans. (Tr. 8/8 77:12-23).

252.    Mr. Dunn had no opinion as to whether a hypothetical buyer would consider TransCare's business plans to be reasonable. (Tr. 8/8 69:17-22).

**D.    Tilton Sold the TransCare Assets to Herself**

253.    Tilton sold the assets to Transcendence, which she controlled as the sole board member. (JX 102, Stipulated Fact 7).

48

254.    Tilton, as the sole board member of Transcendence, never issued stock to anyone. (Tr. 7/23 P.M. 23:17–24:16).

255.    Tilton claimed to have intended to negotiate an LLC agreement with the other Term Loan Lenders such that they would become members of a new LLC governing Transcendence. (Tr. 8/14 AM 5:21–6:8, 9:7-12).

256.    Tilton claimed to have intended to distribute some portion of the equity in Transcendence to the Term Loan Lenders.

      a.    Tilton claimed that her intention was reflected on an internal spreadsheet which recited that (a) Ark II would receive 55% of Transcendence and (b) the Term Loan Lenders, 45%. (PX 209; Tr. 8/14 A.M. 4:19-25).

      b.    Tilton also claimed that this internal spreadsheet inaccurately recited her intention:  where it claimed that Ark II would receive 54.7%, actually Tilton intended Ark Angels III to receive 51% and Ark II to receive 3.7%. (Tr. 8/14 A.M. 4:25–15:17).

257.    Stephen, who was responsible for creating Transcendence, was unaware of any records at any Patriarch entity that would indicate to whom the shares of Transcendence were to be issued. (Tr. 7/23 P.M. 24:25–25:6).

258.    Stephen testified that Tilton never instructed him to whom to issue Transcendence shares and never communicated to him who would receive shares in Transcendence. (Tr. 7/23 P.M. 25:18-21, 26:6-8).

259.    As of February 25, 2016, the planned ownership of Transcendence continued to be a moving target that continued to change. (PX 235; Tr. 7/23 P.M. 91:13–94:22).

260.     As discussed above, the formal documentation for the sale did not provide the Term
Loan Lenders with equity in Transcendence.  (JX 102).

### E.     The Foreclosure Plan Was Accompanied by Untruthful Statements

261.     Tilton and those operating at her direction made untruthful statements to a
government agency, the MTA, to effectuate the foreclosure plan.  (*See* PX 244 (Stephen email to
MTA, at Tilton's direction, stating that all Transcendence employees had health benefits and direct
deposit); Tr. 7/23 P.M. 102:3–103:8).

262.     Tilton and those operating at her direction made untruthful statements to Credit
Suisse.  (*See* PX 249 (Greenberg's email to Credit Suisse, dictated by Tilton, stating that TransCare
would have to file bankruptcy because of Credit Suisse's unwillingness to allow a loan that in fact
had already been extended); Tr. 7/22 P.M. 30:15–33:17).

263.     Tilton and those operating at her direction made untruthful statements to the
employees of Transcendence.  (*See* JX 103 (Stephen's email to all Transcendence employees, at
Tilton's direction, promising that Transcendence would pay all Transcendence employees for their
last week of work at TransCare if the estate could not pay them); Tr. 7/23 P.M. 132:4-17).

### F.     Removing the MTA Contract from TransCare Ensured TransCare's Collapse and Liquidation

264.     Tilton recognized that TransCare would immediately fail if severed from the
foreclosed assets, specifically, the MTA Contract.  (Tr. 8/13 A.M. 49:11-17; 8/13 A.M. 48:8-11;
8/14 A.M. 26:19–27:1).

265.     The MTA Contract was a government contract, which paid in full on 45 days (far
faster than the 90 days paid to the ambulance divisions by their customers).  (PX 286 at 105517;
JX 93 at 51381).

266. TransCare had recently renewed the MTA Contract until October 2019. (JX 51 at 98518, Tr. 7/22 A.M. 37:17-20).

267. The MTA Contract was desirable because there was virtually no need for capital investment as the vehicles were provided by the MTA. (Tr. 7/22 A.M. 38:3-10; JX 51 at 98518) ("Since there is almost no capital investment the ROI is highly desirable.").

268. Greenberg reported to Tilton that conservative estimates of revenue indicated that the MTA Contract would generate EBITDA of $1.87 million, $2.73 million, $2.77 million and $2.81 million over the four years, respectively, between November 2015 and October 2019. (JX 51 at 985518; Tr. 7.22 A.M. 38:11–39:14).

269. Numerous suitors were interested in acquiring TransCare's paratransit business and MTA Contract, with National Express reiterating their $8-9 million offer on December 16, 2015. (*Supra* ¶ 60; PX 124).

270. Sometime prior to 7:00 p.m. on February 26, 2019, Tilton made the decision to cease all operations at the paratransit transit division, notified the employees of the same and directed Stephen to notify the MTA. (PX 245).

## CONCLUSIONS OF LAW

I. **Claim 1: Breach of Fiduciary Duty against Lynn Tilton**

A. **Liability**

271. As the sole director of TransCare, a Delaware corporation, Tilton owed fiduciary duties of loyalty and care to the corporation and, by extension, to its shareholders and creditors. *E.g., In re Rural Metro Corp. Stockholders Litig.,* 88 A.3d 54, 80 (Del. Ch. 2014), *decision clarified on denial of reargument sub nom.*, 2014 WL 1094173 (Del. Ch. Mar. 19, 2014).

272. Tilton's fiduciary duties encompassed the duty of loyalty which, *inter alia*, requires that she subordinate her personal interests to those of TransCare. *Cede & Co. v. Technicolor, Inc.,*

51

634 A.2d 345, 361 (Del. 1993) ("[T]he duty of loyalty mandates that the best interest of the corporation and its shareholders takes precedence over any interest possessed by a director, officer or controlling shareholder and not shared by the stockholders generally."), *decision modified on reargument,* 636 A.2d 956 (Del. 1994).

273. Once Tilton determined, no later than December 15, 2015, that TransCare would have to be put up for sale, "[t]he duty of the board had thus changed from the preservation of [the company] as a corporate entity to the maximization of the company's value at a sale for the stockholders' benefit…. The directors' role changed from defenders of the corporate bastion to auctioneers charged with getting the best price for the stockholders at a sale of the company." *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.,* 506 A.2d 173, 182 (Del. 1986).

274. The February 24, 2016, strict foreclosure was a "self-dealing" transaction in that Tilton was on both sides of the transactions by which Transcendence acquired TransCare's valuable assets. *Weinberger v. UOP, Inc.,* 457 A.2d 701, 710 (Del. 1983).[16]

275. Because the February 24 transactions constituted self-dealing, Tilton is liable for breach of the fiduciary duty of loyalty unless she had been able to prove at trial, by a preponderance of evidence, that the transactions were "entirely fair." "It is a well-settled principle of Delaware law that where directors stand on both sides of a transaction, they have 'the burden of establishing its entire fairness, sufficient to pass the test of careful scrutiny by the courts.'" *Weinberger,* 457 at 710 (internal citations omitted). "There is no 'safe harbor' for such divided loyalties in

---

[16] This is true whether the transfer of assets from TransCare to PPAS, and then from PPAS to Transcendence are viewed as separate transactions, or whether they are collapsed, the view the Court indicated that it was inclined to take (Tr. 8/14 P.M. 6:13-20). *See, e.g., Strassburger v. Earley,* 752 A.2d 557, 570-71 (Del. Ch. 2000) (when two transactions were part of a single, unified plan, even the non-self-interested transaction was subject to entire fairness review with the burden of proof resting on defendants).

Delaware."  *Id.*; *In re Opus East LLC*, 698 Fed. App'x 711, 718 (3d Cir. 2017) ("A plaintiff alleging a breach of this duty need only show that the director was on both sides of a challenged transaction… The burden then shifts to the director to 'demonstrat[e] the entire fairness of the transaction.'"), citing *In re The Brown Schs.*, 386 B.R. 37, 47 (Bankr. D. Del. 2008) and quoting *William Penn P'ship v. Saliba*, 13 A.3d 749, 756 (Del. 2011); *Pereira v. Cogan*, 52 Fed. App'x 536, 538 (2d Cir. 2002) ("Under Delaware law, a controlling shareholder 'standing on both sides of a transaction'…'bears the burden of proving its entire fairness."), quoting *Kahn v. Lynch Commc'ns Sys., Inc.*, 638 A.2d 1110, 1115 (Del. 1994); *Official Comm. of Unsecured Creditors of Color Tile, Inc. v. Investcorp S.A.*, 137 F. Supp. 2d 502, 508 (S.D.N.Y. 2001) ("'Where a controlling shareholder stands on both sides of a transaction, the standard ordinarily is that the controlling shareholder (and the directors who are subject to that control) will bear the burden of proving the entire fairness of the transaction.'"), quoting *In re MAXXAM, Inc.*, 1997 WL 187317, at *13 (Del. Ch. Apr. 4, 1997); *FrontFour Capital Grp. LLC v. Taube*, 2019 WL 1313408, at *20 (Del. Ch. Mar. 11, 2019) ("Entire fairness review arises 'when the board labors under actual conflicts of interest,' such as when a controlling stockholder [or other "controller"] stands on both sides of a challenged transaction."  (footnotes omitted)).  *See also* Del. C. § 144 (providing safe harbors when independent parties provide assurances of fairness).

276.    "Entire fairness" is "'Delaware's most onerous standard' of review."  *Arkansas Teacher Ret. Sys. v. Alon USA Energy, Inc.*, 2019 WL 2714331, at *17 (Del. Ch. June 28, 2019) (footnote omitted); *accord In re Opus East LLC*, 528 B.R. 30, 65 (Bankr. D. Del. 2015).  "The burden of proving entire fairness is often a daunting task," involving "a standard so exacting that it ordinarily, but not invariably, results in a finding of liability." *Pereira v. Cogan,* 267 B.R. 500,

508 (S.D.N.Y. 2001), quoting *Solomon v. Armstrong,* 747 A.2d 1098, 1138 n.39 (Del. Ch.1999), *aff'd,* 746 A.2d 277 (Del. 2000).

277.    The Court need not find that Tilton intentionally did anything wrong to find that the transaction was not proven to have been entirely fair; the Court can find that Tilton was sincerely trying to salvage value from TransCare, but in doing so "with blinders" such that she focused solely on how much she personally was willing to contribute to the company, and on what terms, she thereby breached her duty of loyalty.  "Not even an honest belief that the transaction was entirely fair will be sufficient to establish entire fairness.  Rather, the transaction itself must be objectively fair, independent of the board's beliefs." *Reis v. Hazelett Strip-Casting Corp.,* 28 A.3d 442, 459 (Del. Ch. 2011), quoting *Gesoff v. IIC Indus., Inc.,* 902 A.2d 1130, 1145 (Del. Ch. 2006).  "The entire fairness standard is 'exacting,' and requires the director to show that the deal was objectively fair, not just that he believed it to be so."  *See*, *e.g.*, *Opus East*, 698 Fed. App'x at 719.  "Indeed, as to the interested party itself, a finding of unfairness after trial will subject it to liability for breach of the duty of loyalty regardless of its subjective bad faith." *In re Cornerstone Therapeutics Inc. Stockholder Litig.*, 115 A.3d 1173, 1181 (Del. 2015).  A director's sin in breaching the duty of loyalty is not necessarily one of venality, "but, rather, of indifference to their duty to protect the interests of the corporation and its minority shareholders." *Strassburger*, 752 A.2d at 581.

278.    In order to have carried her burden to prove entire fairness, Tilton was required to show both fair dealing *and* fair price.  *Arkansas Teacher Ret. Sys.,* 2019 WL 2714331, at *21 (footnote omitted); *accord*, *Related Companies, L.P. v. Ruthling*, 2018 WL 3315728, at *14 (S.D.N.Y. July 5, 2018).  She proved neither.

### i. *Fair Dealing*

279.    Fair dealing addresses "questions of when the transaction was timed, how it was initiated, structured, negotiated, disclosed to the directors, and how the approvals of the directors and the stockholders were obtained." *Arkansas Teacher Ret. Sys.,* 2019 WL 2714331, at *21. Here, Tilton alone initiated and structured the transactions; there was no negotiation, disclosure or approvals. *See Strassburger*, 752 A.2d at 576-77 ("there was no fair dealing because there was no advocate committed to protect the minority's interests…"). *Cf. Citron v. E.I. Du Pont de Nemours & Co.,* 584 A.2d 490, 504 (Del. Ch. 1990) ("Built into the process by which the merger terms were set were procedural protections that tended to assure a fair result and to approximate what independent parties would have arrived at in an arm's length bargain."). Tilton had no evidence of fair dealing.

280.    The $10 million credit bid (the price TransCare received for its assets transferred to Transcendence) was not a negotiated number and was not set based on third party advice as to value.  There was no contemporaneous documentation detailing how the $10 million was calculated.  Even at trial, the explanation did not quite add up:  Tilton asserted it represented TransCare's "book value" but (a) Tilton presented no evidence that book value was an appropriate measure of value of the assets transferred[17]; and, even if she could and had, (b) the evidence showed that her calculation failed to credit assets of very substantial value, namely the MTA

---

[17] As the Court noted, book value is an accounting construct that, among other things, deducts depreciation and has no necessary connection to market value.  (Tr. 8/14 6:14-16).  Valuation based on book value "arguably" makes sense where, unlike TransCare, "a business…derives significant value from its physical assets," *Reis*, 28 A.3d at 476.  Even then, naked "book value" is rarely, if ever, accepted as a valuation without adjustment, at least an adjustment to the lower of cost or market so that, after deducting associated costs, it produces a liquidation value and, thus, "a floor value of the business." *Id.* at 477.  *See, e.g., Kahn v. Household Acquisition Corp.,* 591 A.2d 166, 173 (Del. 1991).

Contract and the CONs.[18]  (Facts ¶¶ 141, 238).  More importantly, the determination that "book value" is the appropriate amount Tilton should pay is, itself, the antithesis of fair process when it is just decided unilaterally by Tilton's fiat.

281.     Tilton was the sole director and the majority shareholder of TransCare, but she was not the sole shareholder. (Facts ¶¶ 4-6). Rather than obtaining the consent of disinterested shareholders, which would have been consistent with fair process, *e.g.*, *Arkansas Teacher Ret. Sys.*, 2019 WL 2714331, at *21, Tilton concealed this information from the next largest shareholder, Credit Suisse.  (Facts ¶¶ 129-133.)

282.     There was ample evidence of third-party interest in acquiring all or some of TransCare while it was still a going concern, and Tilton had recognized that there was an "active [] market in the ambulance space."  (Facts ¶¶ 32-33, 59-60).   Fair dealing would have involved, as the Court noted (Tr. 8/14 P.M. 29:25–30:7), at least "picking up the phone" to inquire whether third parties were still interested and willing to pay more than "book value."  *See Bomarko, Inc. v. Int'l Telecharge, Inc.*, 794 A.2d 1161, 1181 (Del. Ch. 1999) ("Bomarko I") (holding that director's interference with company's attempts to obtain outside funding constituted unfair dealing) *aff'd*, *Int'l Telecharge Inc. v. Bomarko, Inc.*, 766 A.2d 437 (Del. 2000) ("Bomarko II").

283.     The timing of the strict foreclosure and the failure to give a WARN Act notice was itself driven solely by Tilton's self-dealing because Tilton waited to consummate her strict foreclosure until February 24, until the eve of the company defaulting on its payroll, only because she was waiting for Transcendence's vehicle liability insurance to be bound.  (Facts ¶¶ 156, 158).

---

[18] While Tilton did not investigate the value of the MTA Contract or the CONs (Facts ¶ 238(a)), the evidence showed that (a) there were several unsolicited offers for the MTA Contract, including National Express which offered $15-18 million in February 2015 and $6-8 million in July and December 2015, and (b) the Trustee liquidated the two CONs sold to Transcendence for $3.2 million.  (Facts ¶¶ 60, 220).

Moreover, she knew that she was obligated to give a WARN Act notice and intentionally avoided doing so because she did not want the employees to leave.  (Facts ¶¶ 98(a), 148(g)).

### ii.  *Fair Price*

284.    "[T]he 'fair price' aspect of an entire fairness analysis requires the board of directors to demonstrate 'that the price offered was the highest value reasonably available under the circumstances.'"  *Cinerama, Inc. v. Technicolor, Inc.,* 663 A.2d 1156, 1163 (Del. 1995), quoting *Cede & Co.,* 634 A.2d at 361.  Tilton made no effort to ascertain whether a better price was available from third parties at the time, and made no effort to prove, at trial, that the amount paid by Tilton was reasonable, let alone the highest value that could be realized.  It was and is not Plaintiff's burden to prove that a higher price was available; it was Tilton's burden to prove that one was not.  *E.g., Summa Corp. v. Trans World Airlines, Inc.,* 540 A.2d 403, 408 (Del. 1988).  *Bomarko I*, 794 A.2d at 1161 ("I realize that this involves proving a negative and is a difficult burden for [defendant] to meet.  Yet it is the only fair way to proceed….").

285.    It would not be enough for Tilton to show (not to say that she did) that her $10 million credit bid based on book value was reasonable and within the range of what she would have expected from an arms-length transaction.  *See, e.g., HMG/Courtland Props., Inc. v. Gray,* 749 A.2d 94, 116-17 (Del. Ch. 1999) (finding that although price fell within lower range of fairness, "The defendants have failed to persuade me that HMG would not have gotten a materially higher value for Wallingford and the Grossman's Portfolio….  That is, they have not convinced me that their misconduct did not taint the price to HMG's disadvantage."); *In re DSI Renal Holdings, LLC,* 574 B.R. 446, 472 (Bankr. D. Del. 2017) (defendants' failure to seek the highest value reasonably available for the company during the sales process supported the inferences that the Defendants breached the duty of loyalty by, *inter alia*, engaging in a self-interested decision-making process or by acting with gross negligence.); *Reis,* 28 A.3d at 467 (when the "price is

57

**A2524**

entirely fair, but the process is faulty," plaintiff can be entitled to a "fairer" price). Where as "here, the process is so intertwined with price that under *Weinberger's* unitary standard a finding that the price negotiated by the Special Committee might have been fair does not save the result" under the entire fairness test. *Bomarko I*, 794 A.2d at 1183, quoting *Kahn v. Tremont*, 694 A.2d 422, 432 (Del. 1977).

286.     Tilton failed to carry her burden to prove that the strict foreclosure transactions, by which the Debtor received just a $10 million credit in exchange for its most valuable assets, was entirely fair to the Debtor and, therefore, she is liable for breach of the fiduciary duty of loyalty.

**B.     Damages**

### i.    *Nature of the Damages*

287.     As a general matter, the Trustee is entitled to recover all damages proximately caused by Tilton's culpable conduct, defined under Delaware law as those losses which would not have occurred "but for" the breach of duty "which in natural and continuous sequence, unbroken by any efficient intervening cause, produces the injury and without which the result would not have occurred." *RBC Capital Mkts., LLC v. Jervis*, 129 A.3d 816, 864 (Del. 2015).

288.     However, "the Delaware Supreme Court has suggested on more than one occasion that rescissory damages are the preferred remedial measure where a transaction fails to pass the test of entire fairness…." *Basho Techs. Holdco B, LLC v. Georgetown Basho Investors, LLC*, 2018 WL 3326693, at *49 n.513 (Del. Ch. July 6, 2018), quoting Donald J. Wolfe, Jr. & Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery* § 12.04[b] (2012).  *See also, e.g.*, *Strassburger*, 752 A.2d at 576-77 ("Rescissory damages…may be recovered only for a breach of the duty of loyalty").  "Rescissory damages are 'the monetary equivalent of rescission' and may be awarded when 'the equitable remedy of rescission is impractical.'"  *In re Orchard Enters., Inc. Stockholder Litig.*, 88 A.3d 1, 38 (Del. Ch. 2014)

("The remedy is available for an adjudicated breach of the duty of loyalty, such as cases involving self dealing or where a fiduciary puts personal interests ahead of the interests of its beneficiary."). Thus, TransCare should be restored to the position it was in prior to Tilton's breach of the duty of loyalty and her strict foreclosure transactions, and the $10 million credit bid should be rescinded. *E.g., Bomarko II*, 766 A.2d at 440-41 (affirming Chancellor's conclusion that rescissory damages for breach of loyalty in connection with a corporate merger was "at a minimum, what [plaintiffs'] shares would have been worth at the time of the Merger if [the director] had not breached his fiduciary duties," and noting that the damages remedy has "a different focus" from appraisal which looks to what they were actually worth at the time), quoting *Bomarko I*, 794 A.2d at 1184 (Del. Ch. 1999).

### ii.  *Scope of Damages*

289.    "Delaware law dictates that the scope of recovery for a breach of the duty of loyalty is not to be determined narrowly." *Thorpe v. CERBCO, Inc.*, 676 A.2d 436 (Del. 1996). "[B]reaches of a fiduciary relationship in any context comprise a special breed of cases that often loosen normally stringent requirements of causation and damages." *Milbank, Tweed, Hadley & McCloy v. Boon,* 13 F.3d 537, 543 (2d Cir. 1994). That is so because "the strict imposition of penalties under Delaware law are designed to discourage disloyalty," (*Boyer v. Wilmington Materials, Inc.,* 754 A.2d 881, 906 (Del. Ch. 1999), quoting *Thorpe*, 676 A.2d at 445), and the award of damages is not merely compensatory but "should eliminate the possibility of profit flowing to defendants from the breach of the fiduciary relationship." *Bomarko II*, 766 A.2d at 441. "An action for breach of fiduciary duty is a prophylactic rule intended to remove all incentive to breach—not simply to compensate for damages in the event of a breach." *LNC Invs., Inc. v. First Fidelity Bank, N.A. New Jersey*, 173 F.3d 454, 465 (2d Cir. 1999), quoting *ABKCO Music, Inc. v. Harrisongs Music, Ltd.*, 722 F.2d 988, 955-96 (2d Cir. 1983).

59

290.    This analysis is in contradistinction to the price component of the entire fairness standard which was to be evaluated by reference to "the highest value [otherwise] reasonably available under the circumstances." (*See supra* ¶ 284).   "Under the entire fairness test, the fair price measure would operate as an aspect of the standard of review; it would not inherently require a damages award in that amount."  *Orchard Enters., 88 A.3d at 43.*

291.    Tilton's breach of fiduciary duty caused TransCare's affairs to unfold differently than they otherwise would have, and while no one can say what would have happened, a disinterested board of TransCare had numerous opportunities to achieve a superior result.  As explained in *Rural Metro*:

> RBC's self-interested manipulations caused the Rural process to unfold differently than it otherwise would have. *See [In re Del Monte Foods Co. Shareholders Litig.*, 25 A.3d 813, 833 (Del. Ch. 2011)] ('But for Barclays' manipulations, the Del Monte process would have played out differently'). RBC's actions led to an ill-timed sale of Rural that did not capture value attributable to its acquisition strategy; (ii) a mismanaged sale process that generated only one final bid by a bidder that knew it had the upper hand in bidding and price negotiations; and (iii) uninformed board approval based on manipulated valuation analyses. To be sure, '[n]o one can tell what would have happened had unconflicted parties negotiated the Merger. That is beyond the capacity of humans.' *In re El Paso Corp. Shareholder Litig.*, [41 A.3d 432, 447 (Del. Ch. 2012)]. Nevertheless, but for RBC's actions, a fully-informed Board would have had numerous opportunities to achieve a superior result.

*Rural Metro*, 88 A.3d at 101.  *Bomarko I,* 794 A.2d at 1185 (adopting measure of damages that resolved uncertainties in plaintiff's favor by assuming that the company had been successfully restructured without the breach of loyalty).  A disinterested board would have engaged valuation advisors or potential suitors.  *Cf. Rural Metro*, 88 A.3d at 101 ("a disinterested board…would have received valuation materials periodically throughout the process, rather than getting a valuation deck for the first time after 9:30 p.m…and approving the merger shortly after midnight.").

292.    Because the transactions cannot be unwound to restore TransCare's *status quo ante* as an operating business that could be restructured, and because the assets transferred to Transcendence were subsequently returned to the Estate in a non-operating state and subsequently liquidated, completion of the rescission requires (a) awarding rescissory damages consisting of the difference between the fair market value of the company as a going concern before the breach of fiduciary duty began, and its value today, namely the $19.2 recovered in liquidation of its assets and (b) granting judgment declaring that Tilton must pay any judgment imposed upon TransCare for having failed to pay salaries or ceased operations abruptly in violation of the WARN Act.

a.    Fair Market Value

293.    Where fiduciaries acquire property through self-dealing, and "through a combination of the taking and their subsequent use of the property, destroy[] its value entirely[,]" they are liable for the value the property would have had absent the breach of loyalty, not just its value immediately before the breach:

> Through the Executive Committee, Georgetown froze out the Company's other directors, managed the Company unilaterally and in Georgetown's own interest, and then demanded that the directors periodically ratify everything that had been done. During this period, Georgetown engaged in self-dealing and continued to reject offers of third-party capital so as to maintain its position of control. Given this course of conduct and the ultimate result, the plaintiffs have not sought to tie specific damages amounts to specific decisions. Instead, they have sought what I regard as an apt remedy for the defendants' behavior.
>
> The award differs from the usual concept of rescissory damages. Traditionally in Delaware, rescissory damages could come into play when a defendant fiduciary wrongfully took control of property, and the value of the property went up during the period of the fiduciary's control. In that setting, *the law does not limit the plaintiff beneficiary to the value of the property at the time of the taking, plus an award of interest. The plaintiff beneficiary is entitled to recover the property itself or a measure of its full value. In this case, the plaintiffs have invoked the reciprocal of these principles*. The defendant fiduciaries wrongfully took control of the property and, through a combination of the taking and their subsequent use of the property, destroyed its value entirely. In both settings, the same

61

> overarching principle governs: The disloyal fiduciary who wrongfully takes
> property from the beneficiary is liable for changes in value while the
> wrongfully taken property is under the disloyal fiduciary's control.

*Basho*, 2018 WL 3326693, at *50 (emphasis added).  Defendants are entitled to the value that

TransCare would have had if it had been successfully restructured without a breach of fiduciary

duty.  *See Bomarko II*, 766 A.2d at 440-41.

294.    In this case, the "reciprocal of these principles" highlighted in *Basho*, above,

means that the "full value" recoverable by the Trustee is not merely what a third-party sale would

likely have produced if Tilton sold under desperate circumstances, but its fair market value defined

as the hypothetical "price which would be agreed upon by a willing seller and a willing buyer

under usual and ordinary circumstances, after consideration of all available uses and purposes,

without any compulsion upon the seller to sell or upon the buyer to buy."  *Poole v. N.V. Deli

Maatschappij,* 243 A.2d 67, 70 n.1 (Del. 1968).[19]  *Cf. Cede & Co.,* 634 A.2d at 371 (in a duty of

care claim in connection with a merger, "we emphasize that the measure of any recoverable loss

by Cinerama under an entire fairness standard of review is not necessarily limited to the difference

between the price offered and the 'true' value as determined under appraisal proceedings.

Under *Weinberger,* the Chancellor may 'fashion any form of equitable and monetary relief as may

be appropriate, including rescissory damages.' 457 A.2d at 714. The Chancellor may incorporate

---

[19] In *Poole*, the Delaware Supreme Court held that in calculating damages from a fraudulently
induced sale, the assets should be valued at market value rather than "going concern value"
because market value recognizes that the assets might be put to a "higher and better use" whereas
going concern value required that the assets continue to be valued as deployed in the existing manner.
243 A.2d at 71-72.  To be clear, the Trustee refers herein to valuing TransCare as a going concern
not to limit the valuation of its assets to their then-current use as in *Poole*, but because the market
value of TransCare was higher as an operating business even if the highest and best use of the
assets would ultimately involve the strategic break up of the business.

elements of rescissory damages into his determination of fair price, if he considers such elements: (1) susceptible to proof; and (2) appropriate under the circumstances.  *Id.*").

295.    Here, the damages are recoverable as the natural and foreseeable consequences of Tilton's actions sale of the assets to herself, without a process to ensure that the transactions were were fair and without getting consent from all participants.  To wit:

a.  Over the prior year, TransCare had received over nine unsolicited inquiries from at least six different potential strategic purchasers and Tilton rebuffed them all. (Facts ¶¶ 59-60).

b.  Once Tilton decided to sell, she did not attempt to contact a single person that had expressed an interest in purchasing TransCare (several of them repeatedly) (Facts ¶¶ 232-233), and even though she expressly recognized that there was an active market in the ambulance space (Facts ¶ 32).

c.  Tilton was paying, through a credit bid, just $10 million for the most desirable of TransCare's assets that she, herself, valued at $22 million.  (Facts ¶ 240).

d.  Tilton never sought a replacement for the ABL or any other third-party funding. (Facts ¶ 228), and provided no reason not to expect that "new money" would have been readily available from third-parties on the same terms, if not better, than the terms upon which Tilton was committing to provide Transcendence with $10 million in credit.

e.  Wells Fargo had indicated that it was prepared to continue funding TransCare pending a sale provided that Tilton had presented it with a plan to effectuate the sale in the reasonable future, which Tilton never did (Facts ¶¶ 229-230); there is no evidence suggesting that Wells Fargo had ever been informed of those third party offers, nor any evidence that it (or for that matter a new short-term lender) would not have been willing to continue funding in the face of a serious expression of interest by a strategic purchaser who would be willing to pay fair value for the operating entities.

f.  Despite having been planned for weeks, the self-dealing strict foreclosure was effectuated without the necessary planning (with respect to, for example, the computer systems and the failure to have in place a transition agreement) that would have enabled Transcendence to function supported by TransCare's employees and would have enabled TransCare to wind down in an orderly fashion without, *inter alia*, potential WARN Act Liability.

g.  By her own statements, Tilton understood that removing the paratransit division would cause the remainder of the company to be immediately liquidated.  (Facts

63

**A2530**

¶ 264.) On top of that, she foreclosed on all of TransCare's ambulances the day before payroll was due. (Facts ¶¶ 164, 216.)

296. But for Tilton's refusal to seek third-party funding or an arms-length purchaser while she attempted to acquire TransCare's best assets for herself, it is more likely than not that TransCare would not (a) have been destroyed as an operating entity when her attempted self-dealing fell apart, and (b) now be facing WARN Act Liability by reason of shutting down abruptly when Tilton's strict foreclosure did not work out as planned.

b.   WARN Act Liability

297. Tilton is also responsible for indemnifying the estate for the WARN Act Liability for three independent reasons. First, as an element of rescission, because TransCare had no such liability prior to Tilton's breach of loyalty and Tilton thus must bear that liability in order to put TransCare back to where it was prior to the breach. Second, the WARN Act Liability was also a natural and foreseeable consequence of Tilton's actions (for the same reasons discussed *supra* ¶ 295).

298. Finally, under Delaware law, a corporate officer or director who knowingly causes the corporation to violate the law necessarily fails to act in good faith and thereby breaches her fiduciary duty of loyalty. *Hazout v. Tsang Mun Ting.*, 134 A.3d 274, 283 (Del. 2016), relying on *In re Walt Disney Co. Derivative Litig.*, 906 A.2d 27, 67 (Del. 2006). "In short, by consciously causing the corporation to violate the law, a director would be disloyal to the corporation and could be forced to answer for the harm he has caused." *Desimone v. Barrows*, 924 A.2d 908, 934 (Del. Ch. 2007). Tilton intentionally did not issue a WARN Act notice because she did not want TransCare's employees to be looking for new jobs (one of the purposes of the Act is, of course, to give employees an opportunity to find new jobs). (Facts ¶ 98(a).)

64

299.    The consequential WARN Act Liability TransCare faces has not yet been liquidated in the proceeding where the question is pending.  Accordingly, the appropriate relief with respect to the WARN Act damages is a declaratory judgment directing Tilton to promptly pay any judgment imposed upon TransCare as employer.  *See Strassburger*, 752 A.2d at 582 ("To address these problems, and undo the harm caused…the remedy must therefore include elements that go beyond a rescissory damages award.").

### iii.    *Quantum of Damages: TransCare's Fair Market Value Prior to the Breach of Fiduciary Duty*

300.    The final question is the quantum of damages to award based on the value of TransCare before the breach that resulted in the strict foreclosure transaction.  In that regard, as long as damages are "logically and reasonably related to the harm or injury for which compensation is being awarded," then "[t]he law does not require certainty in the award of damages where a wrong has been proven and injury established.  Responsible estimates that lack m[a]thematical certainty are permissible so long as the court has a basis to make a responsible estimate of damages."  *Basho*, 2018 WL 3326693, at *50 (footnotes omitted citing *In re J.P. Morgan Chase & Co. Shareholder Litig.*, 906 A.2d 766, 773 (Del. 2006) and *Red Sail Easter Ltd. Partners v. Radio City Music Hall Prods., Inc.*, 1992 WL 251380, at *7 (Del. Ch. Sept. 29, 1992)).  A court "has greater discretion when fashioning an award of damages in an action for a breach of the duty  of loyalty than it would when assessing fair value in an appraisal proceeding."  *Bomarko II*, 766 A.2d at 441.

301.    The Trustee's expert, Dr. Arnold, who was qualified without objection (Tr. 7/24 6:1–7:2), utilized standard valuation methodology to calculate a range of reasonable estimates for TransCare's market value, or Enterprise Value ("EV"), in January 2016—after Tilton had determined to sell TransCare, but prior to Tilton's preparations for the sale to Transcendence (*id.*

7:8–11:9).  Dr. Arnold also calculated a range of reasonable estimates for the subset of TransCare's

businesses sold to Transcendence on February 24, 2016.  (*Id*. 11:10-15; *see also id*. 11:16–14:4).

302.    Dr. Arnold calculated a market value, or EV, for TransCare by multiplying an

appropriate EV-to-EBIDTA ratio against TransCare's EBIDTA projected by management as of

the three preparation dates—January 7, 27 and 28, 2016, all dates prior to Tilton's breach of

fiduciary duty (if one adopts the conservative assumption that she did not plan to self-deal through

the strict foreclosure until she actually began to put the plan in motion on February 7, 2016).  (Facts

¶¶ 243(b)-(c)).  In addition, he did the same calculation based on the February 24, 2016, forecast

that Tilton's team put together for the subset of assets that Tilton assembled into Transcendence.

(*Id*.).  This was accepted methodology that Tilton did not impugn and that courts have noted has

the benefit of providing a valuation without the need to adjust for different capital structures

because "EBITDA is independent of capital structure[.]"  *Hexion Specialty Chems., Inc. v.*

*Huntsman Corp*., 965 A.2d 715, 740 (Del. Ch. 2008).

303.    Dr. Arnold explained why he could not use a discounted cash flow approach, an

explanation that was not challenged by Defendants.  The data was simply not there.  (Tr. 7/24

14:5–15:20).  In fact, Tilton testified that as of December 2015, TransCare had no audited

financials for 2014 and was not current in its monthly unaudited financials.  (Tr. 8/13 A.M. 52:3–

53:1).  For example, the October 2015 monthly financials were not circulated until February 2016.

(PX 191 at 4695; Tr. 8/14 A.M. 129:1-6).  *See, e.g., Bomarko I*, 794 A.2d at 1185 (finding the

discounted cash flow methodology "too unreliable" when the expert had to extrapolate from

management's one-year forecast).  Tilton as the sole board member (with the authority matrix)

was responsible for this state of affairs.  Thus, the only reliable data from which to determine the

value of TransCare or its separate business lines were the very models prepared by Tilton's staff

in connection with a plan to stabilize TransCare for a sale. Therefore, Dr. Arnold used the data that Tilton had available to arrive at a reasonable estimate of TransCare's value based on such data. (Tr. 7/24 106:14–107:4). "[I]t is not a sufficient remedy to award plaintiffs their pure out-of-pocket damages, at least as measured … by the fair market value of [the company] at the time of the Merger without giving effect to the debt restructuring." *Bomarko I*, 794 A.2d at 1184.

304.    There are two elements to Dr. Arnold's valuation analysis: EBITDA projections and an appropriate EV-to-EBITA multiplier.

### a.    EBITDA Projections

305.    Management's projections are the preferred projections to use, when available, in valuing a company, and Tilton offered no alternative, let alone one that would arguably be better. *See, e.g.*, *Del. Open MRI Radiology Assocs. v. Kessler*, 898 A.2d 290, 332 n.108 (Del. Ch. 2006) ("Delaware law clearly prefers valuations based on contemporaneously prepared management projections because management ordinarily has the best first-hand knowledge of a company's operations."), quoting *Doft & Co. v. Travelocity.com Inc.*, 2004 WL 1152338, at *5 (Del. Ch. May 20, 2004).

306.    Tilton's team prepared numerous 2016 projections for TransCare after she decided to sell TransCare in December 2015. (Facts ¶¶ 71, 86, 97-98, 125, 127, 134, 175-178). Dr. Arnold examined four projections that were shared with or produced by third-parties. (Facts ¶¶ 71, 86, 175, 242). These projections were the best data available concerning the reasonable earnings of TransCare, and they were only data Tilton had when she advanced money to TransCare during January 2016 (and to Transcendence in February 2016).[20] These projections already accounted for the risk TransCare was facing. (Tr. 7/22 P.M. 122:16–123:2). Finally, Tilton gave the Court

---

[20] For Tilton advancing money, *see* Facts ¶¶ 79, 80, 81, 87, 88, 157, 172; for lack of financials, *see* Facts ¶¶ 36, 78.

no reason to prefer any other projection. (*See* Facts ¶ 254 (Tilton's expert, Dunn, had no opinion as to the reasonableness of the business plans relied upon by Dr. Arnold)).

307.    Delaware law gives great weight to contemporaneous projections sent to third parties, especially when management intends those third-parties to rely on those projections. *Del. Open MRI Radiology Assocs.,* 898 A.2d at 332 ("[t]hat is especially so when management provides estimates to a financing source and is expected by that source (and sometimes by positive law) to provide a reasonable best estimate of future results. Therefore, we have regarded with rightful suspicion attempts by parties who produced such projections to later disclaim their reliability, when that denial serves their litigation objective."). The February 24 Plan was given to Lockton to bind insurance and the January 7 Plan was shared with Carl Marks at Wells Fargo's request for visibility into TransCare. (Facts ¶¶ 175, 67-71).

308.    In fact, the February 24 projections are an extension of the January 7 projections, adjusted for the the loss of the Maryland and Bronx/Westchester businesses in the interim:

  a.   The February 24 forecast projected a $3.2 million EBITDA over only ten months and Tilton acknowledged that the annualized EBITDA would be at least $4 million. (Tr. 8/14 A.M. 38:4-20).

  b.   Greenberg acknowledged that the $3.2 million estimate had been $3.7 million, $500,000 higher, just before the loss of the University of Maryland contract. (Tr. 7/22 P.M. 64:16–65:8).

  c.   Tilton testified that the Bronx/Westchester operations had generated an additional $2.5 million EBIDA per year. (Tr. 8/13 P.M. 99:11-20).

  d.   Tilton testified that the projections omitted necessary salaries totaling between $500,000 to $750,000. (Tr. 8/13 A.M. 14:15-25; 8/14 A.M. 34:15–35:1).

  e.   $4 million + $500,000 + $2.5 million – $500,000 = $ 6.5 million, very close to the $6.9 million EBITDA projected for the company as a whole on January 7. (Facts ¶ 73).

309.    Therefore, the January 7 projections are consistent with the February 24 projections that Tilton was relying on herself, and do not require further adjustments to approximate the value

of the lost Maryland and Bronx/Westchester businesses, so it is reasonable to rely on the January

7 projections for the appropriate EBITDA to value TransCare as a whole, namely $6.9 million.

> b.   <u>EBITDA Multiplier</u>

310.   The appropriate multiplier to use in valuing TransCare based on the January 7,

2016, projections is 12.5x:

> a.   Dr. Arnold analyzed the data available to Tilton to derive a range of appropriate
>
> multipliers based on two recognized methodologies: looking at the market value
>
> of comparable public companies produced a range of approximately 7.0x–12.5x
>
> (Tr. 7/24 23:4–24:2); looking at precedent transactions produced a range at
>
> almost the midpoint of the foregoing, 10.0x–10.7x (*id.*).   Third-party offers to
>
> buy the company (which Tilton ignored) referenced an 8x multiple as an
>
> opening bid.   (*Id.*).   Tilton's expert acknowledged that the number produced by
>
> the precedent transactions involved the most comparable companies (Facts ¶
>
> 248(a)), and Greenberg, Tilton's financial analyst assigned to and very familiar
>
> with this credit, acknowledged that the industry average multiple in fact was
>
> approximately 10.1x (Facts ¶ 57).
>
> b.   Therefore, anything below the mid-point, 10.1x, would be the wrong multiplier
>
> to use.   Whether comparable companies had multiples evenly distributed within
>
> the range of 7.0x–12.5x, or the distribution followed a bell-curve, using the
>
> mid-point would evenly distribute the risk that the valuation, and hence the
>
> damages award, is over- or under- stated.   Stated another way, the likelihood of
>
> the use of 10.1x resulting in too low a damages award is equal to the chances
>
> of it resulting in one that is too high.   That is inconsistent with the principle of
>
> Delaware law that "once a breach of duty is established, uncertainties in

awarding damages are generally resolved against the wrongdoer." *Basho*, 2018
WL 3326693, at *50 (footnote omitted citing *Thorpe v. CERBCO, Inc.*, 1993
WL 443406, at *12 (Del. Ch. Oct. 29, 1993).  The appropriate multiplier should,
accordingly, be *at least* 10.1x in order for the Defendants to bear the majority
of the uncertainty.

c. But in a breach of loyalty context, there is no reason that the wrongdoer should
not bear the entire uncertainty—at any multiple below 12.5x there is a
possibility that Tilton will be paying less than her just and fair share of the
damage that her actions caused.  Tilton and her expert did not objectively
dispute that 12.5x is a reasonable multiplier for TransCare based upon a
comparable company analysis, relying instead on Mr. Dunn's testimony that
Dr. Arnold did not use a "standard of value that's recognized by business
professionals." (Tr. 8/8 18:5-17).  In fact, Defendants and their expert failed to
identify any value for TransCare or even what standard of value applied.  (*Id.*
44:23–45:15). Tilton never identified what she would contend to be a more
appropriate multiplier under the circumstances, and Mr. Dunn's general
criticism that Dr. Arnold's conclusions as to the range of appropriate multiples
was inflated because the companies Tilton originally relied on were not truly
comparable, was debunked when Dr. Arnold subsequently did the analysis that
Mr. Dunn suggested (but did not do himself) which showed that the range of
"more comparable" multipliers thus calculated was ***higher***.  (Facts ¶ 248(b)-
(d)).

311.     Similarly, Mr. Dunn's reasoning—that market multiples should be adjusted downward or upward based upon a subjective analysis of the riskiness of a business plan—actually militates *in favor of* using a higher multiple for the Transcendence assets under the February 24, 2016 projection:

a. The unimpeached (and strengthened through attempted impeachment) testimony is that the range of multipliers for comparable companies is 7.0x to 12.5x, if not higher.[21]   Consistent with Mr. Dunn's argument that the appropriate multiplier is one adjusted for risk (Facts ¶ 248(b)), Transcendence was deserving of a multiplier at the highest end of that range: Transcendence represented Tilton's expert cherry-picking of the safest and most profitable of the assets of TransCare, acquired debt-free but for a promised $10 million short-term line of credit that Tilton intended to extend to Transcendence herself.[22] Indeed, TransCare's most profitable business, the MTA paratransit business, required virtually no capital investment because the City provided the vehicles and the business was guaranteed by contract through October 2019.  (Facts ¶¶ 265-269; Tr. 7/22 A.M. 38:3-10 ("Since there is almost no capital investment the ROI is highly desirable.")).   Even the computer that Tilton mistakenly

---

[21] Dr. Arnold's comparable company analysis is conservative in inherently understating the range of resulting multiples to the extent reliance on stock price builds in a minority discount, whereas the purchaser of the entire company is generally subject to a control premium.  *See, e.g., In re Trados Inc. Shareholder Litig.*, 73 A.3d 17, 70 & n.46 (Del. Ch. 2013).  *See also Bomarko I*, 794 A.2d at 1185-86 (approving addition to value of "a 30% premium to account for the minority discount inherent in comparable companies analysis").

[22] There is no security agreement for the Ark Angels III loan, but Tilton testified that she intended to be secured only by Transcendence's accounts receivable.  (Facts ¶ 170).

71

identified as being at TransCare's offices, was an MTA-owned asset and at the location of the vehicles on Foster Avenue.  (Tr. 7/24 165:12-22).

b.  Tilton testified that she was paying $22 million for the subset of assets incorporated into Transcendence and that her "cross-check" on the reasonableness of the price she contended she was paying was that it translated into a multiple of approximately 10.0x based on the projected EBITDA she assumed to be $2.2 million (Tr. 8/13 A.M. 14:5-14).[23]  Tilton's own "reasonableness check" showed that she was undervaluing Transcendence in settling on a price that reflected a multiple at the very riskiest end of the range for the business she described as "less risky." (JX 80 at 92228).  (*See* Facts ¶ 128; Tr. A.M. 45:8-24; 47:1-20).

c.  The earlier January 7 projection of a $6.9 million EBITDA was based on the same assets as the February 24 projections for Transcendence, *plus* the additional assets that were not incorporated into Transcendence and which were in fact later liquidated for $13.5 million, *plus* the Maryland and Bronx/Westchester businesses that were subsequently lost before Transcendence could assume them in the strict foreclosure.  (*See supra* ¶ 308).  There is no reason—and Tilton certainly has not articulated one—to not attribute to the January 7 TransCare the same risk profile and, hence, same 12.5x multiplier, as to the Transcendence entity alone.

---

[23] Dr. Arnold used Tilton's deposition testimony of an 8.0x multiple of $2.5-2.75 million when conducting his analysis.  (Tr. 7/24 23:18-19).

312.   Thus, resolving doubts against the wrongdoer, *see, e.g.*, *Basho*, 2018 WL 3326693, at *50, pre-breach TransCare was worth 12.5 x $6.9 million,[24] or $86.25 million.  Value of $19.2 million was recovered from the assets in liquidation resulting in rescissory damages of $67.05 million.

313.   In reaching the foregoing conclusion, there is no need to deduct the $10 million in credit that Tilton intended to extend to Transcendence through Ark Angels III.

    a.   As noted above, the projected EBITDA from the February 24 Plan was essentially the same as that produced by the January 7 Plan once adjusted for the Maryland and Bronx/Westchester businesses lost in the interim.  But the two Plans were very different in one important aspect: the January 7 Plan was for the entirety of TransCare, and required an additional $4.5 million, a capital investment of $1.3 million in down payments on new vehicles, and $3.2 million for payment of outstanding debts, whereas the February 24 Plan contemplated wind-down of the less productive businesses, required no payment of TransCare's debt,[25] and required no new capital investment at all.  In short, by restructuring to create Transcendence and thereby shedding assets and debt, the reorganized company would be able to project similar EBITDA without the need for additional capital.

---

[24] Given that all doubts are to be resolved against the wrongdoer, the Trustee does not believe the $4.5 million in new capital that was incorporated into the January 7 Plan should be deducted from the value.  (Tr. 8/14 A.M. 78:9–79:22).  As Dr. Arnold testified the proposed capital was in the form of a loan.  (*Id.* 79:11-14).  That capital need subsequently increased to $6.5 million, and ultimately became the $6.5 million Ark II Credit Facility.  (Facts ¶¶ 81-82, 117).

[25] Tilton inexplicably claims Transcendence assumed responsibility for $2 million that Tilton's Ark II had previously lent to TransCare, a different company entirely.

b. The evidence showed that the $10 million in the February 24 Plan merely served as a short-term replacement for a standard ABL line of credit like that which Wells Fargo had extended to TransCare but had terminated. Tilton's original intent was to use that money to buy back the Wells Fargo debt so as to release the lien on TransCare's (now Transcendence's) accounts receivable to permit Transcendence to use those assets to secure an ABL loan. When that failed, she simply agreed to loan the same money ("up to" $10 million) to Transcendence to tide it over until Wells Fargo had been fully paid from the accounts receivable. (Facts ¶¶ 137-139, 154-155, 171).

c. Tilton did not show that a $10 million ABL loan, or a short-term bridge loan until the ABL was in place, would result in a capital structure that was in any way unusual in the industry. Also, as Dr. Arnold testified in response to a question from the Court, there might be situations where permanent capital has to be injected to "buy ambulances and refresh rolling stock," for example, and therefore justifies the deduction of some portion of that from a valuation, but this is not that case:

> But if the idea that we're going to put it in [the $10 million loan] but in ten months a company is going to be generating four or five hundred thousand of EBITDA a month, in eleven months and that money can be returned, it's more in the form of a short to mid-term loan which costs the shareholders some amount of money, but it's not a dollar for dollar dilution.

(Tr. 8/14 A.M. 79:17-22). Even Tilton's expert did not contend that such deductions were appropriate. In short, the Court was presented no more reason to deduct loans from Transcendence's enterprise value than to deduct the amount of outstanding credit from every company's valuation.

74

**A2541**

314.     However, in the event the Court determines the Trustee is not entitled to a recovery based upon the value of the whole company, but only upon that of the foreclosed assets, the Trustee would still be entitled to no less than $44.3 million under the same principles.  The Trustee arrives at that amount by multiplying the $4 million EBITDA that results from a full year application of the February 24 Plan (Facts ¶ 177) times the upper multiple of 12.5, less the $5.7 million recovered by the Trustee in liquidation sales.  As discussed above, the Court should rescind the $10 million credit bid and not deduct it from the damages.[26]

315.     Nevertheless, measuring the damages solely by the value of the foreclosed assets provides zero value for the remainder of TransCare's assets, despite the evidence showing that there were numerous suitors for those assets.  Damages on the Trustee's first claim, for breach of fiduciary duty, should therefore be awarded against Tilton in the amount of $67.05 million and judgment entered declaring that Tilton is obligated to pay any WARN Act liability imposed upon TransCare.

## II.     Claim 7: Fraudulent Transfer Against PPAS and Transcendence

316.     The Trustee asserts a claim for actual fraudulent transfer against PPAS and Transcendence under 11 U.S.C. §548(a)(1)(A) and N.Y. Debtor & Creditor Law ("NYDCL") sections 276 and 276-a, made applicable by 11 U.S.C. §544(b), to recover the value of the assets TransCare transferred to each of them, respectively, on February 24, 2016, together with attorneys' fees.

317.     Under 11 U.S.C. §550(a), the Trustee may recover for the benefit of the estate the property transferred, or, if the Court so orders, the value of such property.  "The purpose of §

---

[26] Unlike the January 7 Plan, as shown at trial, the February 24 Plan had no provision for additional capital, relying solely on a revolving loan secured by accounts receivable for its additional cash needs.  (Facts ¶¶ 137-138, 170-171).

550(a) is to restore the estate to the condition it would have been in if the transfer had never occurred." *S.I.P.C. v. Bernard L. Madoff Inv. Sec. LLC*, 568 B.R. 481, 486 (Bankr. S.D.N.Y. 2017). By this claim, the Trustee seeks the value of the paratransit, Pittsburgh, and Hudson Valley business lines prior to their transfer to PPAS and then to Transcendence, when they were still operating entities.

318.    Based on Tilton's plan, Dr. Arnold concluded those assets had a fair market value of between $22 and $39 million. For purposes of this claim (which involves different standards), the Court should apply the 10.1 multiple reported by Greenberg as the average of all the EBITDA-multiple data points. The Court should apply this multiple against the $4 million annual EBITDA projection in the February 24 Plan that Tilton directed Greenberg to provide to Lockton.[27] For purposes of this claim, the Court may deduct the value of the $10 million credit provided by PPAS for the assets.

319.    After shutting down those three business lines and terminating the employees, Transcendence returned the hard assets to the estate when it filed the three transferred TransCare entities into bankruptcy on April 25, 2016. (Facts ¶¶ 206, 218, n.9). The Court should therefore subtract the $5.7 million liquidation value of those assets from any award on this claim, for a total of $16.62 million. (Tr. 8/14 A.M. 13:8-14).

320.    In addition, this claim seeks attorneys' fees under NYDCL section 276-a and disallowance of PPAS' claim pursuant to 11 U.S.C. §502(d), until the amount for which PPAS has been found liable is satisfied.

---

[27] The plan itself was only for 10 months and indicated EBITDA of $3.2 million, which Tilton admitted would increase to $4 million if annualized over a full twelve months. (Facts ¶ 177).

321.    To the extent that liability under this claim duplicates liability on the breach of fiduciary claim, the Trustee can have but one recovery.  The breach of fiduciary duty damages subsume the fraudulent transfer damages, while the fraudulent transfer damages are just a subset of the fiduciary duty damages.

322.    Under NYDCL section 276 and under 11 U.S.C. §548(a)(1)(A), a transfer made with actual intent to "hinder, delay, or defraud" creditors is avoidable regardless of insolvency or whether fair consideration was provided.  If a transfer is actually fraudulent under New York law, it will likewise be actually fraudulent under Bankruptcy Code section 548(a)(1)(A).  *In re Singh*, 434 B.R. 298, 298 (Bankr. E.D.N.Y. 2010); *In re Le Café Crème, Ltd.*, 244 B.R. 221 (Bankr. S.D.N.Y. 2000).  A clear and convincing standard of proof has been applied with respect to fraudulent intent under New York State law, but some District Courts within this Circuit have applied a preponderance of the evidence standard to the fraudulent transfer claim under the Bankruptcy Code.  *See, e.g., In re Lyondell Chem. Co.,* 567 B.R. 55, 142 n.38 (Bankr. S.D.N.Y. 2017) ("Lyondell II"), *aff'd,* 585 B.R. 41 (S.D.N.Y. 2018).   The Trustee has satisfied both standards.

323.    To be liable for an actual fraudulent transfer under NYDCL section 276, a transferor need not intend actually to defraud, it is sufficient that the transferor merely intended to hinder or delay creditors.  *E.g., Lippe. v. Bairnco Corp.*, 249 F. Supp. 2d 357 (S.D.N.Y. 2003); *In re Bruno Mach. Corp.*, 435 B.R. 819 (Bankr. N.D.N.Y. 2010).  As Judge Learned Hand explained over a hundred years ago:  "the fraudulent intent which the law requires need not necessarily involve moral obliquity.  The ancient phrase 'to hinder, delay, or defraud,' has always been in the disjunctive, and an intent to hinder or delay is adequate even if it be not an intent to defraud."  *In re Condon*, 198 F. 947, 950 (S.D.N.Y. 1912), *aff'd,* 209 F. 800 (2d Cir. 1913).  "Initial transferees

are strictly liable for recovery of preferentially transferred property. *Carroll v. Tese–Milner (In re Red Dot Scenic, Inc.),* 351 F.3d 57, 58 (2d Cir. 2003) (citing 11 U.S.C. § 550(a)). Immediate or mediate transferees, however, may assert a good faith defense to recovery. *In re Red Dot Scenic,* 351 F.3d at 58 (citing 11 U.S.C. § 550(b)). *In re Bruno Mach. Corp.,* 435 B.R. at 848.

324.    Thus, for example, in *Priestley v. Panmedix Inc.*, 18 F. Supp. 3d 486, 503–04 (S.D.N.Y. 2014), the court held that a transfer was actually fraudulent even though the intent was not to enrich insiders but to save the company:

> In one respect, this is an unusual fraudulent conveyance case.  In the paradigmatic such case, a debtor corporation denudes the company of assets by giving them away to preferred insiders or creditors, frustrating the rightful demands of other creditors.  Here, in contrast, the debtor corporation's intent in displacing the rightful creditor was, apparently, to keep operating, because the creditor's claim was upon the corporation's few remaining productive assets (*e.g.,* its patents).  To do this, the company sought to place the claims of its insider-creditors (its officers and directors, their relatives, and outside counsel) ahead of that creditor, with the aim perhaps of blocking the creditor from taking those assets and thereby fortifying the company, rather than enriching these insider-creditors.  But the law equally forbids such a conveyance as fraudulent.  Petitioner Priestley has provided overwhelming indicia of fraud, and the respondents have failed utterly to demonstrable a bona fide purpose for the Security Agreement, other than to block and hinder Priestley from getting at corporate assets to which she was lawfully entitled.  The Security Agreement is, therefore, a fraudulent conveyance within the meaning of DCL § 276.

325.    In *Klein v. Rossi*, 251 F. Supp. 1, 2–3 (E.D.N.Y. 1966), the court explained why that is so:

> A debtor is not free to transfer selected property for the specific purpose of putting it beyond his creditors' reach, and his retention of enough illiquid assets to pay his debts, but only after delay for liquidation, does not relieve the transfer of its inherently fraudulent nature.  A solvent man may, perhaps deal with his property as he will; it may be that his creditors must take the risks of his impulses of generosity as they have the advantage of his acumen in increasing his means.  They do not take the risk that he will, without receiving executionable assets in exchange, put part of his property where his creditors cannot reach it for the very purpose of defeating their writs of execution against that property and of confining them to extending their

78

> executions on other property if the obtain judgments against him that he does not promptly pay. Such transfers are frauds because, however contingently they may do it, they are by their very nature calculated to hinder, delay and defeat the collection of a known debt; they are characterized as fraudulent by the dominance of the intention to withdraw the particular executionable asset from the reach of process. …The words 'hinder' and 'delay' have separate significance: they embrace, although within the general framework of 'fraudulent' purpose…, the solvent person's deliberate effort to stave off creditors by putting property beyond their reach even when the purpose of that is not to cheat them of ultimate payment but only to wrest from them time to restore the debtor's affairs.

(Citations omitted.)

326. Although the Court indicated at trial that it was inclined to collapse the strict foreclosure transactions such that Transcendence would be viewed as the initial transferee, doing so would obscure the role of PPAS, which effectuated both the initial transfer from TransCare to the Term Lenders, as well as the transfer from the Term Lenders to Transcendence. PPAS would argue that it was acting merely as the agent for the Term Lenders, which is a doubtful proposition given that the Term Lenders such as Credit Suisse were not controlling PPAS and were not even aware of what PPAS had been doing, but that nevertheless would not stop PPAS from being the "initial transferee." "Agency requires that '[t]he alleged agent must have acted (1) for the benefit of, (2) with the knowledge of, (3) with the consent of, and (4) under the control of, the principal.'" *Lyondell II,* 567 B.R. at 147, quoting *Consumer Fin. Prot. Bureau v. NDG Fin. Corp.*, 2016 WL 7188792, at *8 (S.D.N.Y. Dec. 2, 2016). Agent or not, PPAS was no mere conduit, but was the driving force behind the transfers: PPAS, acting through Tilton, determined what assets would be foreclosed upon, how much TransCare would receive, how the assets would nominally pass through the hands of the Term Lenders, that they would ultimately rest with Transcendence, and decided that the Term Lenders were allegedly going to receive membership interests in some limited liability company Tilton intended to create. Under the "mere conduit test" as applied by the Second Circuit, PPAS qualifies as the initial transferee because it exercised dominion over the

transferred assets.  *E.g.*, *In re Manhattan Inv. Fund Ltd.,* 397 B.R. 1, 15 (S.D.N.Y. 2007); *Tese–Milner v. Brune (In re Red Dot Scenic, Inc.),* 293 B.R. 116, 119 (S.D.N.Y. 2003) (citing *Christy v. Alexander & Alexander (In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson, & Casey),* 130 F.3d 52, 57-58 (2d Cir.1997)), *aff'd,* 351 F.3d 57 (2d Cir. 2003).  None of the other Defendants on this claim can succeed on a good faith defense because all acted through Tilton and, therefore, necessarily knew what TransCare knew.[28]

327.    As noted above, the necessary scienter on the part of the transferor, TransCare, need only be to "hinder or delay" creditors, there need not be an intent to commit actual fraud for there to be liability for actual fraudulent conveyance.  (*See supra*, ¶ 322).    "The debtor's actual intent to defraud "need not target any particular entity or individual as long as the intent is generally directed toward present or future creditors of the debtor."  *In re Lyondell Chem. Co.,* 554 B.R. 635, 650 (S.D.N.Y. 2016) ("Lyondell I"), quoting *In re Bayou Grp., LLC,* 439 B.R. 284, 304 (S.D.N.Y.2010).  In *Lyondell*, Judge Cote held that "[a]n actual intent to…hinder or delay may not be presumed" per the tort doctrine that a person intends the natural consequences of her actions.  *Cf. Staples v. Sisson*, 274 A.D.2d 779, 781 (3d Dep't 2000) (upholding jury verdict finding intentional tort because "a jury could infer that defendant intended the natural and probable consequences of [his actions].").  Instead, per *Lyondell I*, there must be proof of an added element, the "mental apprehension of those consequences."    554 B.R. at 650, quoting the Honorable Learned Hand in *In re Condon*, 198 F. at 950.  Stated another way, there must be "proof of a desire

---

[28] Some courts have also required a plaintiff to plead the transferee's fraudulent intent under NYDCL section 276.  *See, e.g., In re Dreier LLP,* 452 B.R. 391, 429-35 (Bankr. S.D.N.Y. 2011); *In re Bernard L. Madoff Inv. Sec., LLC,* 440 B.R. 243, 257 (Bankr. S.D.N.Y. 2010).  Although most courts have determined that there is no obligation to prove the transferee's intent in order to recover under section 276, such intent still must be proven to recover attorneys' fees under section 276-a.  *E.g., Dreier,* 452 B.R. at 435.  Here, no such issue of proof arises because the transferor and transferee necessarily shared the same intent in that they both were being controlled by Tilton.

to cause harm or a belief that such harm is substantially certain to occur." *Lyondell I*, 554 B.R. at

651. "Knowledge to a substantial certainty constitutes intent in the eyes of the law." *In re Tribune*

*Co. Fraudulent Conveyance Litig.*, 2017 WL 82391, at *11 (S.D.N.Y. Jan. 6, 2017), quoting *In*

*re Manhattan Inv. Fund Ltd.*, 397 B.R. 1, 12 n.16 (S.D.N.Y. 2007), citing Restatement (Second)

of Torts § 8A (1963 & 1964). Here, Tilton may not have desired to cause harm, but she certainly

was aware that such harm was substantially certain to occur.

    a. *Lyondell I* recognized that "proof of the natural consequences of one['s] acts
       may serve as circumstantial evidence that one appreciated those consequences."
       554 B.R. at 651 n.17.

    b. Here, the natural consequence of the strict foreclosure was also its express
       purpose: to free TransCare's most valuable assets from the claims of all
       creditors other than Tilton herself. *See In re Condon*, 198 F. at 951 ("Now here
       the respondent intended to hinder and delay his creditors, for that was the very
       purpose of his acts. He thought he had the right to do so, because he thought
       that the whole of the property was exempt. That was a mistake as to the extent
       of his rights, and I suppose it answers the claim that he intended to defraud
       them, for common usage would limit the word 'fraud' to some act which was
       directed to depriving another of what the actor knew to be his rights. However,
       it would be a wholly new rule that a conveyance intended to prevent creditors
       from pursuing their legal remedies was not within the statute, because the debtor
       supposed he could do it.").

    c. Finally, Tilton understood TransCare would likely fail after losing the assets
       she intended to foreclose upon (Facts ¶ 264), especially in February 2016 when

81

**A2548**

TransCare had unpaid payroll and payroll taxes (Facts ¶ 129) and lacked

availability to pay its immediate bills (JX 88).

328.    Additionally, actual intent was independently proven by means of the "badges of

fraud":

> "Due to the difficulty of proving actual intent to hinder, delay, or defraud
> creditors, the pleader is allowed to rely on 'badges of fraud' to support his
> case, i.e., circumstances so commonly associated with fraudulent transfers
> that their presence gives rise to an inference of intent." *Wall St. Assocs. v.
> Brodsky,* 257 A.D.2d 526, 529 [] (1st Dep't 1999) (internal citations and
> quotation marks omitted).   These "badges of fraud" may include (*inter
> alia* ): "a close relationship between the parties to the alleged fraudulent
> transaction; a questionable transfer not in the usual course of business;
> inadequacy of the consideration;…and retention of control of the property
> by the transferor after the conveyance." *Id.; see also HBE Leasing Corp.[v.
> Frank,* 48 F.3d 623, 639 (2d Cir. 1995)] ("Actual fraudulent intent…may
> be inferred from the circumstances surrounding the transaction, including
> the relationship among the parties and the secrecy, haste, or unusualness of
> the transaction."); *In re Kaiser,* 722 F.2d 1574, 1582–83 (2d Cir. 1983).

*In re Sharp Int'l Corp.,* 403 F.3d 43, 56 (2d Cir. 2005).   A more extensive, but still not exhaustive

list of such "badges" was presented in *Lyondell*:

(1) the transfer or obligation was to an insider;

(2) the debtor retained possession or control of the property transferred after
the transfer;

(3) the transfer or obligation was disclosed or concealed;

(4) before the transfer was made or obligation was incurred, the debtor had
been sued or threatened with suit;

(5) the transfer was of substantially all the debtor's assets;

(6) the debtor absconded;

(7) the debtor removed or concealed assets;

(8) the value of the consideration received by the debtor was not reasonably
equivalent to the value of the asset transferred or the amount of the
obligation incurred;

(9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

(10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and

(11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

*Lyondell I,* 554 B.R. at 652-53 (quoting Uniform Fraudulent Transfer Act section 4). "While '[t]he presence of a single badge of fraud may spur mere suspicion, the confluence of several can constitute conclusive evidence of an actual intent to defraud, absent 'significantly clear' evidence of a legitimate supervening purpose.'" *Lyondell I,* 554 B.R. at 653, quoting *Max Sugarman Funeral Home, Inc. v. A.D.B. Investors,* 926 F.2d 1248, 1254-55 (1st Cir. 1991). "Absence of these indicators—'evidence that fair consideration was paid, the parties dealt at arm's-length, the transferor was solvent, the transfer was not questionable or suspicious, the transfer was made openly, or the transferor did not retain control'—suggests that no fraudulent intent was present." *Universitas Educ., LLC v. Nova Grp., Inc.*, 2014 WL 3883371, at *10 (S.D.N.Y. Aug. 7, 2014), quoting *Leser v. U.S. Bank Nat'l Ass'n,* 2013 WL 3788877, at *8 (E.D.N.Y. July 18, 2013).

329. Here, there was no absence of indicators; multiple badges were proven:

a. The transfer was to an insider;

b. Tilton had possession and control of the property in the hands of the Debtor and continued to have possession and control as it was transferred through PPAS and after it came to rest with Transcendence;

c. The strict foreclosure was effectuated in the dead of night (at 12:07am) and, with the exception of Wells Fargo, which did not agree to such foreclosure, there is no evidence that any of TransCare's creditors or stockholders were

aware that it had been planned; the evidence in fact showed that Credit Suisse, which was both a Term Lender and a substantial shareholder, had been kept entirely in the dark.  And the transaction was both hasty and unusual.

d.  TransCare had no counsel negotiating the strict foreclosure, despite the fact that TransCare had engaged Curtis Mallet as restructuring counsel;

e.  As discussed above in connection with fair value, the $10 million credit TransCare received was not even close to the value of the assets transferred;

f.  TransCare was insolvent or at least was rendered insolvent by the transaction; and finally,

g.  The debtor transferred the essential assets of the business to a lienor (the Term Lenders) who transferred the assets to an insider of the debtor (Tilton's company, Transcendence).

A leading treatise identifies other badges that are satisfied here, including "the existence of an unconscionable discrepancy between the value of the property transferred and the consideration received therefor" and "the creation by an oppressed debtor of a closely-held corporation to receive the transferred property."  *In re Bennett Funding Grp., Inc.,* 220 B.R. 743, 755 (Bankr. N.D.N.Y. 1997), quoting 5 Collier on Bankruptcy ¶ 548.04[2][b] at 548–24, 25-26 (L. King 15th ed. rev. 1997)

330.   "A single badge of fraud has been held sufficient to support actual fraudulent intent. *In re Cassandra Grp.,* 338 B.R. 583, 598 (Bankr. S.D.N.Y. 2006) (absence of fair consideration). "In the present case, however, several badges of fraud are present, and the existence of several badges of fraud constitutes 'clear and convincing evidence of actual intent.'" *In re Saba Enters.,*

*Inc.,* 421 B.R. 626, 644 (Bankr. S.D.N.Y. 2009), quoting *In re Actrade Fin. Techs. Ltd.,* 337 B.R.

791, 809 (Bankr. S.D.N.Y. 2005) (citing 4 Collier On Bankruptcy ¶ 548.04[2]).

331.    Accordingly, the Trustee is entitled to judgment against PPAS, Transcendence and

Transcendence II in the amount $16.62 million on the fraudulent transfer claim.

**III.    Claims 3, 4, 10, 11 and 14:  Avoidance and Subordination of Ark II Lien**

332.    TransCare's grant of a security interest to Ark II on February 10, 2016 can be

avoided or subordinated under four alternative theories:

      a.  Preference (to the extent TransCare previously incurred debt to Ark II);

      b.  Constructive Fraud (to the extent TransCare did not incur debt to Ark II);

      c.  Recharacterization as equity (to the extent Tilton intended the transaction as an
         equity investment); and

      d.  Equitable subordination.

333.    To the extent the Ark II lien is avoided or subordinated, the lien should be preserved

for the benefit of the estate pursuant to 11 U.S.C. §551, and the $800,000 received by Ark II on

account of its lien should be returned to the estate pursuant to 11 U.S.C. §§541 and 549.

**A.    Preference—Claim 10**

334.    To the extent Ark II advanced $1.9 million to TransCare in January 2016, with the

understanding that the funds were to be repaid to Ark II, TransCare's February 10, 2016 grant of

a security interest to secure that debt can be avoided as a preference pursuant to 11 U.S.C. §547(b).

335.    Under such circumstances, the February 10, 2016 transfer of a blanket security

interest in TransCare's property satisfies all of the elements of any avoidable transfer under 11

U.S.C. §547(b).  The transfer:

      a.  was made for the benefit of a creditor, Ark II;

    b.   was made on account of an antecedent debt, the Ark II payments on January 15 and 29, 2016;

    c.   was made while TransCare was insolvent, as TransCare is presumed to be pursuant to §547(f) and, in any event, TransCare was not paying its debts in the ordinary course;

    d.   was made within two weeks before the petition date (and to an insider); and

    e.   enabled Ark II to receive more than it would have received if the case were under chapter 7, the transfer had not been made and the creditor received payment as provided by the bankruptcy code.  Had the transfer of the security interest not been granted to Ark II, Ark II would otherwise have been a general unsecured claimant, and such claimants are likely to receive nothing in this case.  Instead, Ark II has already received $800,000, and claims that it is first in line to receive an additional $1.1 million.

336.    Ark II has raised the affirmative defense of contemporaneous new value pursuant to 11 U.S.C. §547(c).  Ark II bears the burden of proving this defense.  *See* 11 U.S.C. §547(g); *In re Pameco Corp.*, 356 B.R. 327, 338 (Bankr. S.D.N.Y. 2006) ("A creditor against whom a preference suit is sought has the burden of proving one of the defenses in §547(c) by a preponderance of the evidence.").

337.    Ark II cannot satisfy its burden because:

    a.   TransCare did not in fact contemporaneously receive anything from Ark II when it granted Ark II a security interest on February 10, 2016—no new funds or other benefits were given to TransCare in exchange for granting the security interest to secure unsecured debts.

    b.  Until February 10, 2016, neither Tilton, nor anyone at TransCare, knew what security agreement or under lending agreement would be entered into, if any, between Ark II and TransCare.

    c.  The exchange was not substantially contemporaneous.

338.  "The critical inquiry in determining whether there has been a contemporaneous exchange for new value is whether the parties intended such an exchange." *In re 360networks (USA) Inc.*, 338 B.R. 194, 208-09 (Bankr. S.D.N.Y. 2005), quoting *Harrah's Tunica Corp. v. Meeks (In re Armstrong),* 291 F.3d 517, 525 (8th Cir. 2002).

339.  Tilton authorized the January 15 and 29, 2016 payments to TransCare's creditors on an emergency basis because TransCare had immediate needs.  After advancing the funds, she later to tried to allocate and structure the funding.  Between January 15 and February 10, 2016, Tilton negotiated with Wells Fargo and Credit Suisse and worked with her own team, and with Carl Marks to devise a go forward strategy for TransCare.  (Facts ¶¶ 80-98).

340.  Not until February 10, 2016 did she determine to characterize the January 15 and 29, 2016 payments as secured lending from Ark II to TransCare under a new credit, security, guarantee and intercreditor agreement.  (Facts ¶ 112).

341.  At multiple points between January 15, 2016 and February 10, 2016, Tilton's people confirmed that there was no agreement on the security interest:

    a.  On January 15, 2016 Greenberg asked Wells Fargo for an agreement on the terms of a potential lending arrangement and provided no less than eight separate terms.  Wells Fargo did not agree.  (Facts ¶¶ 82-83).

b. As of January 26, 2016, Greenberg again confirmed that there was no agreement on the security interest, but told Wells Fargo that they expected to provide a budget shortly. (Facts ¶ 84).

c. As of February 3, 3016, Greenberg confirmed to Credit Suisse that there was not even a term sheet for the proposed lending to TransCare but only a summary of terms, such as the lending entity, the interest rate, the amount of the loan, the fees, as well as the priority of the security for the new loan. (Facts ¶¶ 90-93; *see also* PX 189).

d. As of February 9, 2016, Stephen did not include any Ark II debt in his summary of TransCare's debt structure that he provided to Curtis Mallet. (Facts ¶ 107).

342. The first time an Ark II secured lending facility was provided to TransCare was February 10, 2016, after TransCare had already engaged bankruptcy counsel for an imminent filing. (Facts ¶¶ 99, 105-111). Nevertheless, the Ark II documents were not negotiated through counsel and not even shared with counsel until after they were executed. (Facts ¶ 116; JX 79 ("I attach documents with respect to another term loan for the company.")).

343. TransCare did not sign the Ark II lending facility documents until February 11, 2016.

344. Importantly, Tilton did not give any testimony concerning her intent on January 15, and January 29, 2016 to structure the payments as secured loans to TransCare. Instead, she testified that she paid the funds on an emergency basis because TransCare had immediate needs. (Tr. 8/13 A.M. 25:13-18).

345. Finally, TransCare was contractually prohibited from granting a priority security interest to Ark II under both the ABL and the Term Loan on January 15 and 29, 2016. (*See* JX 2

at §9.8 (ABL covenant of TransCare prohibiting additional grants of security interests in collateral); JX 1 at §9.3 (Term Loan covenant of TransCare prohibiting grant of additional security interests in collateral)).

346.     For all these reasons, Ark II cannot meet its burden to prove that the parties intended the February 10 or 11, 2016 grant of a security interest to Ark II to be contemporaneous exchange for new value.

## B.     Constructive Fraud—Claim 11

347.     The Trustee also seeks to avoid the grant of a security interest to Ark II as a constructive fraudulent transfer under the NYDCL sections 273, 274 and 275.

348.     Under NYDCL section 272(a), consideration provided for a transfer must (a) have a value fairly equivalent to what the debtor gave and (b) be conveyed in good faith.  However, "[a] transfer made by an insolvent debtor to an affiliate or insider in satisfaction of an antecedent debt lacks good faith and is constructively fraudulent."  *In re White Metal Rolling and Stamp Corp.*, 222 B.R. 417, 430 (Bankr. S.D.N.Y. 1998).

349.     Ark II was an insider because it was the majority shareholder of TransCare and Tilton's personal investment account.  (Facts ¶ 5).

350.     Therefore, to the extent TransCare granted the blanket security interest to Ark II on February 11, 2016 in satisfaction of an antecedent debt to Ark II (*i.e.*, some unwritten obligation to repay the January 15 and 29, 2016 fundings to Ark II), such transfer was not made in good faith and is constructively fraudulent.

351.     To the extent TransCare granted the blanket security interest to Ark II on February 11, 2016 not in satisfaction of any antecedent debt, then the transfer was obviously constructively fraudulent because it was made without fairly equivalent value.

89

**A2556**

### C.      Recharacterization—Claim 3

352.    "Recharacterization of a claim from debt to equity is appropriate where the circumstances show that a debt transaction was actually an equity contribution *ab initio*." Memorandum Decision dated April 30, 2019 (Dkt. 78 ("April 30 Order") at 14), quoting *Bayer Corp. v. MascoTech, Inc.* (*In re AutoStyle Plastics, Inc.*), 269 F.3d 726, 747-48 (6th Cir. 2001).

353.    Courts in this circuit have adopted the eleven-factor analysis set forth in *AutoStyle*. *See* April 30 Order at 14-15 (listing factors).  No one factor is controlling.  The ultimate question for the court is whether the parties called an instrument one thing but intended something else.  *Id*. at 15.

354.    In the April 30 Order, the Court recognized that "the recharacterization question is intensely factual" and could not be decided on a motion to dismiss.  (*Id*. at 18.)  In identifying the factual issues, however, the Court noted the numerous *AutoSyle* factors that appeared, based on the pleaded allegations, to weigh in favor of recharacterization of the Ark II loan as equity.  (*Id*. at 16-18.)  The Trustee respectfully submits that the trial has now established as fact what was previously mere allegation and that recharacterization is justified.

355.    In January 2016, Tilton authorized the payments on an emergency basis, without written documentation and without a clear plan as to how the funding would be structured. Between January 15 and February 10, 2016, Tilton attempted to (a) negotiate such a structure with TransCare's other secured lenders and equity holders, Wells Fargo and Credit Suisse and (b) create a go-forward business model for how she would restructure TransCare.  (Facts ¶¶ 80-98; *cf.* April 30 Order at 16-17).

356.    On February 10, 2016, Tilton decided to characterize the January fundings as the first $1.9 million of a $6.5 million senior secured credit facility.  This facility was part and parcel of Tilton's corporate reorganization of TransCare:  the same day Tilton hired bankruptcy counsel

for TransCare, formed Transcendence and told insurers that Transcendence would continue TransCare's business lines. (Facts ¶ 99; *cf.* April 30 Order at 18).).

357.     Tilton did not reasonably expect that TransCare would repay Ark II. Instead, she testified that she intended for Transcendence to assume TransCare's debt to Ark II and testified that in exchange for this assumption she intended to issue either 54.7% or 3.7% of Transcendence's equity to Ark II. *See In re Comprehensive Power*, 578 B.R. 14, 27 (Bankr. D. Mass. 2017) (sustaining recharacterization claim where the claimant "was implementing a unique 'loan-to-own' transaction rather than establishing a true lender-borrower relationship"). Tilton did not provide any documentation or contemporaneous recordings of these intended transactions.

358.     In truth, it is Tilton who is seeking to recharacterize, as a loan, what had previously been by all indications just an emergency cash infusion and, in doing so, attempting to further her own interests over those of the other creditors.

### D.      Equitable Subordination—Claim 4

359.     Under 11 U.S.C. §510(c), the Court may, under principles of equitable subordination, subordinate for purposes of distribution all or part of a claim to all or part of another claim. *In re Granite Partners, LP*, 210 B.R. 508, 513 (Bankr. S.D.N.Y. 1997).

360.     The Trustee is entitled to prevail on equitable subordination if (a) the claimant engaged in some type of inequitable conduct, (b) the misconduct caused injury to creditors or conferred an unfair advantage on the claimant, and (c) equitable subordination is consistent with bankruptcy law. *In re Mobile Steel Co.,* 563 F.2d 692, 700 (5th Cir. 1977).

361.     The level of proof required to prevail is lower for insiders of the debtor. *Granite Partners*, 210 B.R. at 514.

362.    Inequitable conduct has been found in cases involving (a) breaches of fiduciary duty, fraud, or illegality, (b) undercapitalization or (c) control or use of the debtor as an alter ego for the benefit of the claimant.  *Id.*

363.    By obtaining for itself a senior secured position for no value and also doing so as part of the Transcendence scheme, Ark II engaged in inequitable conduct.

364.    Ark II's conduct caused injury to the creditors of TransCare by reducing the amount of unencumbered assets available to them and by preventing TransCare from realizing TransCare's full value.

365.    In particular, Ark II obtained the senior secured position in order to enable Tilton to step ahead of other creditors and position herself as majority owner of Transcendence.

366.    Also, Ark II deceived Credit Suisse by falsely telling them that Credit Suisse needed to consent to Ark II's senior secured position in order to prevent a bankruptcy filing, which was already being planned along with Transcendence.  (Facts ¶¶ 129-130).

### E.    Ark II Should Return the $800,000—Claim 14

367.    Ark II received a distribution of $800,000 from the Trustee's sale of estate assets. (Facts ¶¶ 220-223, 226).

368.    Once the Ark II security interest is avoided or subordinated, Ark II has no entitlement to distribution on its claim and the $800,000 should be returned to the estate.  *See* 11 U.S.C. §502(d) (disallowance of claim until creditor pays the amount for which it is liable); §542(a) (turnover of estate property).

369.    Ordinarily when a creditor has received distributions pursuant to a court order on a claim which is subsequently disallowed, thereby leaving the creditor with excess distributions, the Trustee may employ 11 U.S.C. §502(j) to recover such excess payments from the creditor.  *In re R&W Enters.*, 181 B.R. 624, 648 (N.D. Fla. 1994) (§502(j) "specifically allows the Trustee to

recover from a creditor any excess payment or transfer made to such creditor."); *Matter of Kelderman*, 75 B.R. 69, 70-71 (Bankr. S.D. Iowa 1987) (noting that §502(j) "recogniz[es] the trustee's right to recover any excess payments of dividends" and holding bankruptcy courts have an "ancient and elementary power to reconsider prior orders" that allows reconsideration of distribution orders) (citations and quotation omitted).

370.    Here, Ark II did not receive distributions pursuant to a court order.  Instead, PPAS claimed an entitlement to the $800,000 on the grounds that they either had "first-priority security interests" or alternatively, owned the property outright as a result of the strict foreclosure.  (Dkt. 49 at ¶ 9; Facts ¶¶ 214, 221).  The Trustee stipulated to—and the Court so ordered—the distribution to PPAS from the sale proceeds subject to the Trustee's reservation of rights.  (Facts ¶ 221; Dkt. 52).  Later, and without notice to the Trustee, PPAS paid the funds to Ark II, which applied it to its own claim.  (Facts ¶ 223).  Importantly, PPAS did <u>not</u> apply the $800,000 to PPAS' claim. (Facts ¶ 222; JX 110 at pg. 9 of 9).

371.    Thus, the $800,000 is also avoidable from Ark II pursuant to 11 U.S.C. §549 because it was property transferred (a) after the commencement of the case and (b) not authorized under by the Bankruptcy Code or by the Court.  *See In re Fan*, 132 B.R. 430, 432-33 (Bankr. D. Haw. 1991) (avoiding transfer under §549 as not authorized by court order where debtor made "deceptive" representations to court, including failing to disclose transferee's insider status).

## IV.    Claims 4 and 13: Subordination and Limitation of PPAS Lien

### A.    PPAS' Security Interest Should Not Extend to the Proceeds of This Litigation—Claim 13

372.    At the August 14, 2016 conference, the Court asked Defendants whether they would stipulate that PPAS' lien would not extend to proceeds of this litigation.  They would not do so.

373.    PPAS has not explained how its lien extends to proceeds from the Trustee's breach of fiduciary duty claim.[29]

374.    Under 11 U.S.C. §552(b)(1), pre-petition security interests extend to proceeds acquired post-petition only insofar as applicable under non-bankruptcy law, unless the Court orders otherwise based on the equities of the case.

375.    The breach of fiduciary duty claim is a Commercial Tort Claim under the New York Uniform Commercial Code (the "NY UCC") §9-102(13) (defining a commercial tort claim as a tort claim where the claimant is an organization); *In re American Cartage, Inc.*, 656 F.3d 82, 88 (1st Cir. 2011) (breach of fiduciary claims are commercial tort claims).

376.    Under the NY UCC, security interests only extend to commercial tort claims that are specifically described.  NY UCC §9-108(e)(1) ("A description only by type of collateral defined in this chapter is an insufficient description of … a commercial tort claim."); *id.* at §9-108, Cmt. 5 ("Subsection (e) requires greater specificity of description in order to prevent debtors from inadvertently encumbering certain property.").  The breach of fiduciary claim against Tilton is not described.

377.    Also, the NY UCC provides that security interests do not extend to commercial tort claims that were not in existence at the time of the security agreement.  NY UCC §9-204(b)(2) ("A security interest does not attach under a term constituting an after-acquired property clause to … (2) a commercial tort claim"); *id.* at §9-204, Cmt. 4 ("In order for a security interest in a tort claim to attach, the claim must be in existence when the security agreement is authenticated."); *id.* at §9-108, Cmt. 5 ("Under Section 9-204, an after-acquired collateral clause in a security agreement will

---

[29] PPAS' lien does not extend to proceeds of the fraudulent transfer claim and the avoidance/subordination of the Ark II lien.  *See* 11 U.S.C. §§ 551 and 552(a); *In re Residential Capital, LLC*, 497 B.R. 403, 414-15 (Bankr. S.D.N.Y. 2013).

not reach future commercial tort claims."). The breach of fiduciary claim did not exist when the security agreement for the Term Loan was authenticated in 2003.

378.    Even if the security interest extended to the breach of fiduciary duty claim against Tilton, the equities of this case do not support granting PPAS a lien in the proceeds of that claim. *See* 11 U.S.C. §552(b)(1); *In re TerreStar Networks, Inc.*, 457 B.R. 254, 270 (Bankr. S.D.N.Y. 2011) (explaining that the equities of the case exception is not narrowly applied, although it is generally applied to situations where the secured lender would unjustly benefit from the estate's expense of resources to increase the value of collateral).

379.    In any event, the equities of this case do not support distributing the proceeds of the breach of fiduciary duty claim to PPAS because:

>    a.    PPAS should not benefit from the breach of fiduciary duty committed by its sole owner and manager, Tilton, especially when Tilton employed PPAS to commit her tort; and

>    b.    PPAS should not benefit from the liquidation of the claim which it did not support and indeed opposed when litigating this action.

**B.    Equitable Subordination of PPAS' Claim—Claim 4**

380.    As discussed above, the Court may equitably subordinate claims to all or part of other claims pursuant to 11 U.S.C. §510(c). *See Mobile Steel Co.,* 563 F.2d at 692; *Granite Partners,* 210 B.R. at 514.

381.    By engaging in the strict foreclosure in particular and the Transcendence scheme in general, PPAS committed inequitable conduct.

382.    As discussed throughout, PPAS' conduct sought to confer an unfair advantage on its owner and manager, Tilton.

95

383.    In addition to the damages caused by the fraudulent transfer (*supra* Section II),

PPAS' conduct caused TransCare to immediately cease operations such that employees could not

be paid on the payday scheduled for the day after the strict foreclosure and employees could not

be given WARN notices.

384.    PPAS has filed a proof of claim on behalf of its itself and as administrative agent

for the Term Loan Lenders in the amount of $35,090,492.76.  (Stipulated Fact 54; JX 110).  The

proof of claim recites that this amount includes $568,119.66 incurred directly by PPAS in

"Postpetition Attorneys' Fees" and "Agency Fees."  (JX 110 at pg. 9 of 9).

385.    Even though the Term Loan Lenders include Credit Suisse and First Dominion (two

lenders who did not participate in the strict foreclosure), the PPAS credit agreement gave Tilton

the right to act on their behalf:

> Q:  You didn't negotiate those terms with any of the lenders.  These are the
> terms that you came up with on your own; correct?
> A: Which lenders?
> Q:  Any lenders.
> A:  I was responsible for all the lenders as the agent and I came up with the
> terms.
> Q: That would include Credit Suisse and First Dominion?
> A: Yes, I was entitled under the agency agreement to operate for fifty-one
> percent of the lenders and make those decisions…

(Tr. 8/14 A.M. 18:5-15).

386.    As Defendants have argued, Credit Suisse may or may not have claims against

PPAS for its actions in this case, but that is not the Trustee's concern.

387.    PPAS' claim should be subordinated to the claims of allowed general unsecured

creditors so that PPAS will recover after the priority claims of TransCare's employees.

388.    Subordination is also fair because PPAS voluntarily agreed to lien and payment subordination of its then-$45 million secured claim to Ark II, even after TransCare had engaged bankruptcy counsel and in exchange for no new consideration to TransCare or PPAS.

389.    Finally, subordination is also fair to prevent PPAS from obtaining a lien over the proceeds, if any, of this litigation (*supra* ¶ 379).

A2564

## V.    Conclusion and Remedies

390.    Therefore, the Trustee is entitled to relief as follows:

<u>Claim 1</u>:    Judgment on the breach of fiduciary duty claim against Defendant Tilton (a) for damages no less than $67.05 million and (b) a declaration that Tilton must indemnify the estate for any liability incurred in the *Ien* adversary proceeding, including the attorneys' fees incurred to date in that case, plus pre- and post judgment interest.

<u>Claim 3</u>:    An Order recharacterizing Defendant Ark II's claims against TransCare's estates as equity interests, and preserving Ark II's lien for the benefit of the estate pursuant to 11 U.S.C. §551.

<u>Claim 4</u>:

(1)    An Order subordinating Defendant Ark II's claims against TransCare's estates to the claims of the allowed general unsecured creditors and preserving Ark II's lien for the benefit of the estates pursuant to 11 U.S.C. §510(c)(2).

(2)    An Order subordinating Defendant PPAS' claims against TransCare's estates to the claims of the allowed general unsecured creditors and preserving Ark II's lien for the benefit of the estates pursuant to 11 U.S.C. §510(c)(2).

<u>Claim 7</u>:    Judgment for fraudulent transfer against Defendants PPAS, Transcendence and Transcendence II of no less than $16.62 million, plus (a) the Trustee's reasonable attorneys' fees and expenses; (b) pre- and post-judgment interest; and (c) an Order disallowing PPAS' claims against the estate until Judgment is satisfied, pursuant to 11 U.S.C. §502(d).

<u>Claim 10</u>:    Judgment avoiding TransCare's pre-petition grant of a security interest to Ark II pursuant to 11 U.S.C. §547 and preserving Ark II's lien for the benefit of TransCare's estates pursuant to 11 U.S.C. §551.

**A2565**

Case 1:20-cv-06374-LAK    Document 11-11    Filed 09/30/20    Page 223 of 569

Claim 11:        Judgment avoiding TransCare's pre-petition grant of a security interest to

Ark II as a constructive fraudulent transfer pursuant to NYDCL sections 273, 274 and 275, and 11

U.S.C. §544(b), and preserving Ark II's lien for the benefit of TransCare's estates pursuant to 11

U.S.C. §551.

Claim 13:        An Order directing that the liens asserted by Ark II and PPAS do not extend

to any proceeds of this litigation, pursuant to 11 U.S.C. §552(b).

Claim 14:        Judgment and Order directing Ark II to return the $800,000 it received on

account of its purported claims against TransCare's estates, pursuant to 11 U.S.C. §§502(j), 542,

549 and 550(a), plus pre- and post-judgment interest.

Dated: New York, New York                          Respectfully submitted,
       September 18, 2019

                                           */s/ Bijan Amini*
                                           Bijan Amini
                                           Avery Samet
                                           Jaime B. Leggett
                                         STORCH AMINI PC
                                         2 Grand Central Tower
                                         140 East 45th Street, 25th Floor
                                         New York, New York 10017

                                         Tel: (212) 490-4100
                                         Fax: (212) 490-4208
                                         bamini@storchamini.com
                                         asamet@storchamini.com
                                         jleggett@storchamini.com

                                         *Special Counsel to Plaintiff Salvatore*
                                         *LaMonica, as Chapter 7 Trustee*

**A2566**

**STORCH AMINI PC**
2 Grand Central Tower
140 East 45th Street, 25th Floor
New York, NY 10017
Telephone: 212.490.4100
bamini@storchamini.com
Bijan Amini, Esq.
Avery Samet, Esq.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------x
In re:                                            :
                                                  :
                                                  :
          TRANSCARE CORPORATION, et al.,          :          Chapter 7
                                                  :          Case No. 16-10407 (SMB)
                                                  :          (Jointly Administered)
                              Debtors.            :
------------------------------------------------------------x
SALVATORE LAMONICA, as Chapter 7                  :
Trustee for the Estates of TransCare              :
Corporation, et al.,                              :
                                                  :
                              Plaintiff,          :
                                                  :          Adv. Proc. No. 18-1021 (SMB)
                  - against -                     :
                                                  :
LYNN TILTON, PATRIARCH PARTNERS                   :
AGENCY SERVICES, LLC, PATRIARCH                   :
PARTNERS, LLC, PATRIARCH PARTNERS                 :
MANAGEMENT GROUP, LLC, ARK II CLO                 :
2001-1 LIMITED, TRANSCENDENCE                     :
TRANSIT, INC., and TRANSCENDENCE                  :
TRANSIT II, INC.,                                 :
                                                  :
                              Defendants.         :
------------------------------------------------------------x

**PLAINTIFF'S RESPONSE TO DEFENDANTS' PROPOSED**
**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

## <u>TABLE OF CONTENTS</u>

**TABLE OF AUTHORITIES** ........................................................................... ii

**RESPONSE TO FACTS** ................................................................................ 3

**RESPONSE TO LAW** ................................................................................... 5

**I.   THE COURT SHOULD AWARD DAMAGES AGAINST TILTON FOR BREACHING HER FIDUCIARY DUTY** ........................................................ 5

   A.  Tilton Did Not Engage in a Fair Process for Selling TransCare .................... 5

   B.  Tilton Did Not Pay a Fair Price for TransCare ........................................ 9

   C.  The Court Should Award Reasonable Damages ...................................... 10

      1.  The Projections Were the Most Reliable Data in the Record .............. 12

      2.  The Trustee's Burden Was to Estimate Damages, Not Conduct a Valuation ...... 16

**II.  SELECTED RESPONSE TO REMAINING CLAIMS** ............................. 19

   A.  Actual Fraudulent Transfer:  Badges of Fraud, Not Actual Fraud, Is Required ........ 19

   B.  Preference:  11 U.S.C. §547(e)(2) Does Not Apply .................................. 20

   C.  Recovery of $800,000:  Defendants §549 Argument Makes No Sense ............ 20

**CONCLUSION** ........................................................................................... **20**

i

## <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>                                                                              <u>Page(s)</u>

*ACP Master, Ltd. v. Sprint Corp.*,
   2017 WL 3421142 (Del. Ch. July 21, 2017) ............................................................. 10

*ACP Master, Ltd. v. Sprint Corp.*,
   184 A.3d 1291 (Del. 2018) ..................................................................................... 10

*Basho Tech. Holdco B, LLC v. Georgetown Basho Investors, LLC*,
   2018 WL 3326693 (Del. Ch. July 6, 2018) ............................................................... 8

*Bomarko, Inc. v. Int'l Telecharge, Inc.*,
   794 A.2d 1161 (Del. Ch. 1999) ....................................................... 8, 11, 16, 17

*Cede & Co. v. Technicolor, Inc.*,
   2003 WL 23700218 (Del. Ch. Dec. 31, 2003) ......................................................... 12

*Cede & Co. v. Technicolor, Inc.*,
   884 A.2d 26 (Del. 2005) ......................................................................................... 12

*Doft & Co. v. Travelocity.com Inc.*,
   2004 WL 1152338 (Del. Ch. May 20, 2014) ........................................................... 13

*Duncan v. Theratx*,
   775 A.2d 1019 (Del. 2001) ..................................................................................... 10

*Gentile v. Rossette*,
   2010 WL 2171613 (Del. Ch. May 28, 2010) ........................................................... 16

*Hart v. Rick's Cabaret Int'l, Inc.*,
   60 F. Supp. 3d 447 (S.D.N.Y. 2014) ....................................................................... 12

*In re Appraisal of Dole Food Co., Inc.*,
   114 A.3d 541 (Del. Ch. 2014) ................................................................................. 16

*In re Del Monte Foods Co. S'holders Litig.*,
   25 A.3d 813 (Del. Ch. 2011) ..................................................................................... 8

*In re Loral Space & Comms. Inc.*,
   2008 WL 4293781 (Del. Ch. Sept. 19, 2008) ........................................................... 6

*In re Orchard Enterprises, Inc.*,
   2012 WL 2923305 (Del. Ch. July 18, 2012) ..................................................... 14, 15

*In re PetSmart, Inc.*,
   2017 WL 2303599 (Del. Ch. May 26, 2017) ..................................................... 14, 17

*In re Rural Metro Corp. S'Holders Litig.*,
    88 A.3d 54 (Del. Ch. 2014) ............................................................................ 8, 11

*In re Sentinel M'gmt Grp., Inc.*,
    728 F.3d 660 (7th Cir. 2013) ................................................................................ 20

*In re Vision Hardware Grp., Inc.*,
    669 A.2d 671 (Del. Ch. 1995) ............................................................................ 5, 6

*Kahn v. Tremont Corp.*,
    694 A.2d 422 (Del. 1997) .................................................................................. 9, 10

*Lake Treasure Holdings, Ltd. v. Foundry Hill GP LLC*,
    2014 WL 5192179 (Del. Ch. 2014) ....................................................................... 17

*Paradee v. Paradee*,
    2010 WL 3959604 (Del. Ch. Oct. 5, 2010) ........................................................... 18

*Prescott Group Small Cap, L.P. v. Coleman Co. Inc.*,
    2004 WL 2059515 (Del. Ch. Sept. 8, 2004) ......................................................... 14

*RBC Capital Mkts., LLC v. Jervis*,
    129 A.3d 816 (Del. 2015) ...................................................................................... 9

*Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.*,
    506 A.2d 173 (Del. 1986) ...................................................................................... 9

*S. Muoio & Co. LLC v. Hallmark Entm't Invests. Co.*,
    2011 WL 863007 (Del. Ch. Mar. 9, 2011) .......................................................... 5, 17

*Telecash Indus., Inc.*,
    104 B.R. 401 (Bankr. D. Utah 1989) .................................................................... 20

*Thorpe v. CERBCO Inc.*,
    676 A.2d 436 (Del. 1996) ...................................................................................... 17

*Union Ill. 1995 Inv. Ltd. P'ship v. Union Fin. Grp., Ltd.*,
    847 A.2d 340 (Del. Ch. 2004) ............................................................................... 16

*Wyndham, Inc. v. Wilmington Trust Co.*,
    59 A.2d 456 (1948) ................................................................................................ 10

## Statutes

11 U.S.C. §547(c)(3) ................................................................................................ 20

11 U.S.C. §547(e)(2) ................................................................................................ 20

iii

According to Defendants' proposed findings of fact and conclusions of law (Dkt. 133) ("D-PFC"), Tilton had no choice *but* to sell TransCare to herself in late February 2016.  Tilton argues that TransCare had not taken the steps to prepare itself for a sale:  it had no financials, no consent from the secured creditors (Wells Fargo and Credit Suisse), no appraisals or valuations, and no investment banks ready with marketing materials.  Thus, Tilton argues that TransCare had no alternative but to do what she did and any contrary supposition is "speculative" and "uncertain."

Tilton has it backwards.  *Tilton* failed to prepare TransCare for a sale.  *Tilton* failed to prepare financials.  *Tilton* failed to provide the budgets requested by Wells Fargo and Credit Suisse.  *Tilton* failed to conduct an appraisal.  *Tilton* failed to hire investment banks.  At all points, she looked only to Lynn Tilton to sell or refinance TransCare.  At all points, Tilton negotiated only with herself.  She refrained from taking any steps to sell or restructure TransCare in a disinterested manner, and then she unilaterally picked a number with which to credit bid other people's money.  Therefore, it is *Tilton* who cannot prove whether TransCare could have obtained a fairer price than a $10 million, junior credit-bid.  At trial, she did not even try: she offered no contemporaneous valuation for TransCare and submitted no expert valuation testimony.  Even so, the record is replete with (a) unsolicited suitors, (b) banks willing to fund TransCare through a sale, and (c) Tilton's employees' projections of TransCare's value.

It was Tilton's burden to present a valuation of TransCare to show that she paid a fair price, not the Trustee's.  The Trustee's burden was, instead, to approximate a reasonable estimation of damages *in light of* Tilton's failure to take disinterested steps to maximize TransCare's sale value once she decided to sell it.  Here, Tilton's Delaware cases are instructive: in those cases, the boards had taken numerous objective steps—forming special committees to seek out alternatives and negotiate on behalf of the company, hiring investment banks (and law firms) to fairly value the

1

company's assets, or conducting arms-length negotiations with stakeholders—to demonstrate that they obtained the best possible result for the company. It is the essence of the Trustee's claim that Tilton is liable *because* she did none of those things; their *absence* is not exculpatory for Tilton.

It is impossible to know what a disinterested board, taking objective steps to ascertain and monetize TransCare, could have received for TransCare's assets. Nevertheless, Delaware law provides guidance where, as here, conflicted fiduciaries tilt the playing field to direct the company into a self-dealing transaction.

First, the Court should ascertain a reasonable range of values based upon contemporaneous projections. Here, Tilton, and her employees who were the most knowledgeable about TransCare's financials and operations, who had managed TransCare for years, and who, additionally, worked in Tilton's business which specialized in distressed companies, prepared numerous contemporaneous projections based upon the information available to them, and in close cooperation with TransCare's employees. Significantly, they shared these projections with outside financial institutions to induce those institutions to *rely* on them. Now Tilton claims the projections are worthless, and this Court, contrary to the views of every single contemporaneous participant (including Carl Marks, Wells Fargo, Tilton herself, Greenberg, Pelissier and Leland), should assume that TransCare was worth more dead than alive.

Second, the Court should apply broadly-recognized valuation methodologies to approximate what the company could have received for its assets but for the breach of fiduciary duty, placing all the burden of uncertainty on Tilton. The Trustee's expert, Dr. Arnold, a qualified economist, derived a market EBITDA multiple *based upon the very companies and precedent transactions identified by Greenberg, Tilton's financial analyst assigned to TransCare.* Those EBITDA multiples are consistent with each and every multiple in the record as well as with

Tilton's own testimony of what she claimed she was paying for the assets. Unlike the defendants in the vast majority of the cases she cites, Tilton failed to submit her own expert valuation and so does not even advance a contrary number. Instead, her expert hypothesized that TransCare's attributes might result in a lower multiple. On rebuttal, Dr. Arnold demonstrated that Mr. Dunn's hypothesis was simply not supported by any of the market evidence. By contrast, Mr. Dunn did not attempt to investigate whether his hypothesis was correct. In their 475-paragraph submission, Defendants do not proffer *any* competing calculation of damages.

Due to space constraints, and without intending to waive or abandon any claim, the Trustee will address only certain points advanced by Defendants.

## RESPONSE TO FACTS

1. **PPAS foreclosed on the CONs.** Defendants admit Transcendence acquired the rights to the CONs (D-PFC ¶225), but claim PPAS did not foreclose on them, citing the Personal Property Stipulation as their proof (D-PFC ¶¶223, 274). But the Personal Property Stipulation *expressly* recites that both PPAS and Transcendence claimed that the CONs issued to TC Hudson Valley and TC Ambulance Corp. constituted property of *Transcendence*. (*See* Dkt. 37-1, p.2 (defining these as the "Non-Debtor CONs"); p.3 (asserting "the Non-Debtor CONs were transferred, sold, and/or assigned to Transcendence.")). Defendants took the CONs because they foreclosed upon the stock of the companies to which the CONs were issued.

2. **Tilton never engaged Carl Marks to explore a sale.** The D-PFC makes a novel argument that Tilton hired Carl Marks to explore a third-party sale and that Carl Marks' purported non-recommendation of such a sale is evidence that none was possible. (D-PFC ¶¶171, 352, 380). But no witness, including Tilton, testified that TransCare engaged Carl Marks to explore third-party sale options or third-party financing. Nor did Carl Marks' engagement agreement call for

it.  (DX 106 at §2, *Scope*).  Instead, in Tilton's own words: "You can let Carl Marks know that we never thought we hired them to ask for cash but actually to help rationalize the business, cut expenses and make it work.  Overpaid bill payers."  (DX 123);  "You were hired as the CFO…Act in the role and make decisions on what needs to be paid."  (JX 88) (responding to Carl Landek's query how to prioritize payments).   In fact, when asked whether Carl Marks was even working on the go-forward models, Tilton testified, "No. We were working all the models. Carl Marks was only reviewing the work that we were doing since they were not able to do the type of work that needed to be done."  (Tr. 8/13 A.M. 65:8-11).  (*See also* DX 97 (Greenberg reporting to Tilton that Wells Fargo wanted a consultant "to be interim CFO, and review budget, assist Mark [Bonilla] in managing liquidity, perform a variance analysis of actual v. budget.")).  No one (not Carl Marks, nor any TransCare officer or Patriarch employee) could contact any potential purchaser or lender without Tilton's direction.  (Tr. 7/22 A.M. 46:14-47:19; P-PFC ¶23,[1] including JX 11 at 87751: "We are absolutely sure that Lynn would want to know and approve the company's exploration of other financing sources.").[2]

3.     **Wells Fargo did not prohibit a sale.**  Tilton similarly put on no evidence that Wells Fargo considered Tilton to be the sole source of funding for TransCare.  To argue the contrary, Defendants point to a December 16, 2015 email where Wells Fargo asked for clarity as to how much financing Patriarch would be providing (D-PFC ¶85, citing DX 92).  But this email came two days after Pelissier told Wells Fargo that Tilton intended to inject financing to bridge TransCare to a sale.  (P-PFC ¶45(a)).  Defendants also point to an email sent February 15, 2016

---

[1] "P-PFC" refers to Plaintiff's Proposed Findings of Fact and Conclusions of Law [Dkt. 134].

[2] Defendants failed to call anyone from Carl Marks to testify, but rely on the *absence* of any evidence showing that Carl Marks attempted to either market the company or suggest a course of action beyond Tilton.  (D-PFC ¶¶128-130, 171, 367, 380, 383).  But it was *Tilton* who failed to present evidence that she ever directed Carl Marks to do so.

(D-PFC ¶366, citing JX 82), in which Wells Fargo responded to a subordination proposal from Patriarch stating that they expected Patriarch (and not them) to pay past due payroll.[3]  At all points, Wells Fargo remained willing to provide financial support in the form of continuing the ABL through a sale, subject to the submission of a budget for the sale process, including even a DIP facility.  (*See* P-PFC ¶¶ 64, 67-69, 149).  Indeed, on February 19, 2016, Wells Fargo gave Tilton a written proposal for a new $16.5 million ABL to fund a wind-down, also subject to appropriate releases and consents, and a budget.  (P-PFC ¶152).  Tilton never gave Wells Fargo any of those.[4] (Tr. 7/22 A.M. 58:10-17; Tr. 7/22 P.M. 122:13-24; P-PFC ¶¶149, 152).

## RESPONSE TO LAW

I.   **THE COURT SHOULD AWARD DAMAGES AGAINST TILTON FOR BREACHING HER FIDUCIARY DUTY**

### A.  Tilton Did Not Engage in a Fair Process for Selling TransCare

Defendants rely on several cases, where after trying every disinterested option, directors approved an arms-length recapitalization, leaving nothing for equity.[5]  Those cases in fact demonstrate why Tilton failed to meet her burden to show fair process here.  *See S. Muoio* (where the board (1) formed a special committee of disinterested directors to seek a buyer, (2) retained independent legal and financial advisors to engage in an extensive sales process involving key players in the relevant industry, (3) specifically recruited a new CEO to locate a buyer, plus (4) the controller shareholder directly "engaged in discussions with several potential acquirers or other sources of financing[,]" and when those initiatives failed, (5) the board formed a new special

---

[3] Tilton herself understood that as an equity holder she was responsible for unpaid payroll and payroll taxes and conveyed that to Credit Suisse around the same time.  (P-PFC ¶131).

[4] As Defendants admit, Wells Fargo advised Tilton in October 2015 that the ABL would not renew after January 2016. (D-PFC ¶¶60-61), but supported Tilton's initial plan to sell Transcare (D-PFC ¶¶76, 84).

[5] *See S. Muoio & Co. LLC v. Hallmark Entm't Invests. Co.*, 2011 WL 863007, at *14 (Del. Ch. Mar. 9, 2011), cited by D-PFC ¶¶371, 385, 387; *In re Vision Hardware Grp., Inc.*, 669 A.2d 671 (Del. Ch. 1995), cited by D-PFC at ¶386.

5

independent committee to consider the controlling shareholder's reorganization proposal, which (6) hired independent legal and financial counsel, (7) who engaged extensive due diligence and prepared a valuation of the company, following which (8) the special committee retained a second financial advisor who issued a fairness opinion, and (9) the special committee conducted an arms-length negotiation with the controlling shareholder, during which they improved the terms of the reorganization).  *See also Vision Hardware*, 669 A.2d at 677 (where the company "had exhaustively sought alternative financing but to no avail.")

Tilton undertook *none*—not even a subset—of these acts.  Once she decided to sell TransCare, she apprised herself of the going market multiples and then only considered (a) financing TransCare herself or (b) selling TransCare to herself at a price she selected.  *See In re Loral Space & Comms. Inc.*, 2008 WL 4293781, at *25 (Del. Ch. Sept. 19, 2008) (special committee breached its fiduciary duty by employing "tunnel vision" when negotiating a new round of financing with company's controlling shareholder, not bothering to explore alternative options and not using any leverage to negotiate against the insider).

Defendants argue that Carl Marks convinced Tilton not to sell TransCare in an arms-length process, and that this occurred only on February 5, 2016.  Paragraph 142 purports to cite record evidence supporting that proposition:

> After reviewing the CMAG Executive Summary and meeting with the CMAG team on February 5, 2016, Tilton determined that a sale process would not be viable and should no longer be pursued. (DX_130, at PP–TRBK0028275 ("We have the plan [CMAG] presented to me on Friday [, February 5, 2016] . . . [t]hat is the plan that convinced me I could not move forward" with a sale process); Aug. 13 PM Tr. 76:10–77:2; *id.* at 40:18-24.)

(D-PFC ¶142).  First, none of the citations support this proposition.  (*See* DX 130 ("That is the plan that convinced me I could not move forward *in this manner.*") (emphasis added); Tr. 8/13 P.M. 76:19–77:6) ("And that was the plan *that I knew I could not fund* because there was no real

Case 1:20-cv-06374-LAK   Document 11-11   Filed 09/30/20   Page 233 of 569

restructuring plan.") (emphasis added); 8/13 P.M. 40:18–41:1 (Tilton claiming to *never* have believed that TransCare could be sold)).

Second, Tilton did not rely on Carl Marks to make any decision. Instead, Tilton testified that Carl Marks was so incompetent that she *could not* rely on their work product.[6]  In any event, Carl Marks is not an investment bank, Carl Marks was not engaged to explore a sale or alternative sources of financing. *See supra* pp. 3-4. Tilton disclaims Carl Marks' projections of $5 million in 2016 EBITDA and argues that their January 27 Plan is not reliable. (D-PFC ¶415).[7]

Third, Tilton testified that she rejected the January 27 Plan because she personally did not want to invest $8 million based on the deficiencies she perceived in Carl Marks' analysis, not because Carl Marks convinced her that a third-party sale or restructuring was impossible:

- "Transcare was never getting that eight and a half million because I was not willing to put eight and a half million dollars behind Wells in a black hole of losses with *no true analysis* on how to restructuring [*sic*] the company." (Tr. 8/13 A.M. 43:6-15) (emphasis added);

- "It was seven and a half million dollars just to survive to try to get a plan together. As I said, I didn't want to fund into a black hole." (Tr. 8/13 P.M. 71:1-5);

- "There was no availability left in the Zohar funds for TransCare. So, the only place that money could come from would be my personal funds." (*Id*. 64:6-11);

- "So, to me it [the foreclosure] was the most elegant solution given the timeframe and the only scenario under which I was willing to put in new money because it would have been money going into a company with a future." (*Id*. 78:7-10);

- "Q: And why [was] it important to you for that to happen [Giving Ark II a first lien]? A: Because it was on the only basis that I was willing to put in new money in a company that could end up in liquidation days later." (*Id*. 6:7-10).

---

[6] See *supra* p. 4 ("overpaid bill payers," "not able to do the type of work that needed to be done"); *see also* Tr. 8/13 P.M. 85:8-11 ("not, in my opinion, working in the interest of the company"); 8/13 P.M. 84:3-6 (not getting valid and accurate information from Carl Marks).

[7] Defendants cite 17 times to negative statements in Carl Mark's January 27 Plan, but refuse to credit the plan's outcome. *See also* Greenberg's testimony that all of the plans incorporated the negative headwinds facing TransCare. (Tr. 7/22 P.M. 122:16-24). Defendants offered no specific evidence about "unreliable" financials. (*Cf*. D-PFC ¶368).

The truth is that Tilton never explored any option, whether sale or restructuring, that did not involve her. Throughout 2015, Tilton forbade Leland from exploring any sale of Transcare or any alternative sources of financing.[8]  Nor did she give that authorization to Greenberg, her financial point person for TransCare. (P-PFC ¶¶228, 232).  Nor did she pursue a December 16, 2015 offer.  ("National Express Called a few times yesterday and I just returned their call.  They reiterate that the letter they sent before, offering to buy the TC Paratransit contract, is 'still out there.'") (PX 124; Tr. 7/23 A.M. 50:22–51:3).  From the moment of her decision, Tilton only contemplated funding a sale herself.  (P-PFC ¶45(a), 228, 232).

Under Delaware law, fiduciaries are liable when they tilt the playing field such that the only possible solution is a self-dealing transaction.  *See Basho Tech. Holdco B, LLC v. Georgetown Basho Investors, LLC*, 2018 WL 3326693, at * 29 (Del. Ch. July 6, 2018) (fiduciary maneuvered the company into "the position of being the sole life line of the Company for money" by blocking alternative transactions); *In re Rural Metro Corp. S'Holders Litig.*, 88 A.3d 54, 101 (Del. Ch. 2014) ("RBC's self-interested manipulations caused the [sale] process to unfold differently than it otherwise would have."); *In re Del Monte Foods Co. S'holders Litig.*, 25 A.3d 813, 833 (Del. Ch. 2011) ("But for Barclays' manipulations, the [sale] process would have played out differently."); *Bomarko, Inc. v. Int'l Telecharge, Inc.,* 794 A.2d 1161, 1184-85 (Del. Ch. 1999) ("*Bomarko I*") (director's interference with company's attempts to obtain outside funding was not fair dealing).

Even disinterested directors have a duty to obtain the "best price" for stockholders once they determine to sell or restructure the corporation (or the same becomes inevitable).  *Revlon, Inc.*

---

[8] (Leland Tr. 77:2-78:20 (CEO prohibited from seeking financing alternatives for TransCare); *id*. 97:11-19 (after bringing one expression of interest, Tilton admonished Leland "'Don't ever' – expletive – 'sell one of my companies.'"); *id*. 101:13-20 (Tilton told Leland that finding funding for TransCare was exclusively her responsibility); *id*. 148:24–149:3 (no permission granted to seek alternative sources of financing); *id*. 604:4-15 (Pelissier directed Leland to not explore a replacement lender)).  TransCare could not even sell individual ambulances without Tilton's personal signature.  (*Id*. 81:18–82:5).

*v. MacAndrews & Forbes Holdings, Inc.*, 506 A.2d 173, 182 (Del. 1986).  The Delaware Supreme Court has rejected the argument that such duty does not apply until the Board formally determines to sell.  *RBC Capital Mkts., LLC v. Jervis*, 129 A.3d 816, 853-54 (Del. 2015).  Tilton had an even greater responsibility to act because she was not disinterested.   During the period after she determined to sell, Tilton: (a) controlled PPAS, the Term Loan Lender; (b) sought to inject funds to TransCare through Wells Fargo's facility; (c) made the January 15 and 29, 2016 Payments; (d) purchased two ambulances on January 28, 2016 to *lease* to TransCare; (e) entered into the Ark II Credit Facility on February 10-11, 2016; (f) entered into the strict foreclosure at 12:07 a.m. on February 24, 2016.

Therefore, even if it were true that immediately before the strict foreclosure, TransCare had no other option than to sell to Tilton—something that Tilton has not come close to proving, given that she did not even pick up the phone, and she internally valued the company at $22 million—that is so because Tilton had not undertaken any of the steps necessary for an arms-length sale.  Even then, Tilton did not engage in any arms-length negotiation for TransCare:  she had TransCare execute new security agreements, assignment agreements and the strict foreclosure documents all without the involvement of counsel and all by fiat.

**B.  Tilton Did Not Pay a Fair Price for TransCare**

Contrary to Tilton's assertion, her obligation was not merely to show that the price she paid was "at the lowest level in a broad range of fairness." (D-PFC ¶384, quoting *Kahn v. Tremont Corp.*, 694 A.2d 422, 432 (Del. 1997).)  What the Delaware Supreme Court actually held in *Kahn* was that a price "deemed to be at the lowest level in a broad range of fairness" does "not satisfy the *Weinberger* test."  *Kahn*, 694 A.2d at 432.  If Tilton were right, a fiduciary would always be entitled to acquire her beneficiary's assets at the lowest price she could justify, the precise opposite

of what a fiduciary should do. "[T]he range of fairness is not a safe-harbor that permits controllers to extract barely fair transactions." *ACP Master, Ltd. v. Sprint Corp.,* 2017 WL 3421142, at *19 (Del. Ch. July 21, 2017) *aff'd,* 184 A.3d 1291 (Del. 2018). Where, as here, the price was not arrived at through a fair procedure, the price paid must be at the very top of the fairness range in order pass the entire fairness test. (*See* P-PFC ¶¶284-285).[9]

Tilton presented no valuation of TransCare. She conceded that her purchase price placed (i) zero going concern value on the three business lines of TransCare that she intended to continue; (ii) zero value for the MTA Contract, which had suitors, including one for $7-9 million as of December 16, 2015; and (iii) zero value on the CONs, which the Trustee was able to liquidate (absent any accompanying ambulance services) for $3.2 million. (P-PFC ¶¶161, 220, 238, 269).

Ultimately, the question is what TransCare's assets could have been worth had Tilton conducted a disinterested process, contacted buyers, engaged disinterested professionals, conducted an appraisal or other prepared financial materials to share with potential suitors, and appointed a disinterested special committee to negotiate with her. Tilton put on no evidence of what *that* price would be. Therefore, she did not carry her burden.

## C. The Court Should Award Reasonable Damages

Because Tilton's actions made it impossible to know what TransCare would have sold for in a fair and arms-length process, the Trustee valued TransCare based upon the available information compiled by Tilton's own employees as to their expectations of TransCare's earnings potential. (P-PFC ¶242). *Rural Metro*, 88 A.3d at 101 (It "is beyond the capacity of humans" to

---

[9] This is consistent with other remedies the Delaware Supreme Court has endorsed, for example, the "highest intermediate price" that a stock could have been sold for when a stockholder was prevented from selling, *Duncan v. Theratx*, 775 A.2d 1019, 2012 (Del. 2001), and "the measure of damages for the loss (as capital) of converted shares of stock of fluctuating value" which "is the highest value from the time of conversion up to a reasonable time after the owner acquires knowledge of the conversion," *id.* at 2012 n.10, *quoting Wyndham, Inc. v. Wilmington Trust Co.,* Del. Super., 59 A.2d 456, 459-60 (1948).

prove what would have happened if Tilton had not breached her fiduciary duties and it is sufficient to have established, as the Trustee has, that but for Tilton's actions, TransCare "would have had numerous opportunities to achieve a superior result."); *Bomarko I,* 794 A.2d at 1184-85 (what would have happened absent the breach of fiduciary duty is "inherently unknowable" and, therefore, the court valued the company as though it had been successfully found financing and restructured its debt without a breach of duty).[10]

Defendants criticize the Trustee for relying on that evidence. First, they claim that their own projections are not reliable to approximate the value of TransCare. (D-PFC ¶¶414-417). Next, they claim that the market multiples which Greenberg reported to Tilton, and which Dr. Arnold validated, were only for "healthy" companies. (D-PFC ¶¶418-420). Importantly, Defendants do not offer any competing projections, financial statements or market information which they believe Dr. Arnold *should* have used. They offer no competing approach or methodology to approximate TransCare's value in January and February 2016. This is important because the Trustee is attempting to value what TransCare's assets could have obtained had Tilton acted in a disinterested manner and prepared the very analyses, reports and market tests the lack of which Defendants now claim doom the analysis. The Southern District of New York addressed this tactic in a recent labor case:

> [S]trikingly, defendants, for their part, have not come forward with any alternative method for calculating damages. Defendants' expert, Dr. Paul White, instead devotes his expert report to criticizing Dr. Crawford's methodology and his client's own Clubtrax data. However, he makes no effort to make his own calculation for class-wide damages. The fact that defendants have failed to offer an alternative, let alone a superior, methodology is a relevant consideration under *Mt. Clemens*…. Here, defendants have failed to provide any good reason to discredit Dr. Crawford's estimate of damages as other than "just and reasonable." On the

---

[10] To muddy the waters, Defendants cite a string *appraisal* cases—not damages cases—where both parties have equal burden and the Court is required to, literally, appraise the value of the subject company. *See infra* p. 16.

> contrary, the absence of any alternative methodology is a telling indication
> that defendants, in attacking Dr. Crawford's report, can do no more than
> spot imperfections that would exist in any damages methodology given the
> imperfect Clubtrax data.

*Hart v. Rick's Cabaret Int'l, Inc.*, 60 F. Supp. 3d 447, 467 (S.D.N.Y. 2014) (citation to record omitted). This reasoning is all the more applicable as Defendants' own expert admitted that (a) he had no opinion about the reasonableness of the business plans valued by Dr. Arnold (Tr. 8/8 69:17-22) and (b) the market comparables employed by Dr. Arnold were *the most comparable* public companies to TransCare (*id.* 47:23-49:7) (Dunn did not testify concerning the precedent transactions employed by Dr. Arnold). Defendants provide no other documentation or methodology upon which this Court should assess damages, and all of their criticisms of Dr. Arnold would apply to any valuation of TransCare given Tilton's failure to undertake the steps necessary to sell TransCare in a disinterested manner.

1. The Projections Were the Most Reliable Data in the Record

   a. *Management's Projections Are Preferred*

Management projections are ordinarily the preferred projections to use because they reflect the most knowledgeable assessment of what is expected. *See Cede & Co. v. Technicolor, Inc.,* 2003 WL 23700218, at *3, 7 (Del. Ch. Dec. 31, 2003), *aff'd in relevant part, rev'd in part,* 884 A.2d 26 (Del. 2005). This is particularly true here:

- Regarding the January 7 Plan, Greenberg (i) had been involved in managing Transcare for many years and preparing their financials, (ii) took increased responsibility for TransCare's financial reporting after TransCare's CFO resigned in September 2015 and (iii) worked for Patriarch for many years, assessing and modeling the future financial performance of portfolio companies.[11]

- Regarding the February 24 Plan, Tilton had no less than three separate teams validate the assumptions used for a company that she had controlled for over a decade (Tr. 8/13 A.M. 39:17–40:18). She directed this plan to be sent to insurance

---

[11] (Tr. 7/22 A.M. 13:17–16:12; 33:13-16; Leland Tr. 74:3-18; P-PFC ¶¶34-41).

12

brokers to induce their reliance (P-PFC ¶¶175), and submitted versions of the same plan to other insurers for the same purpose (P-PFC ¶¶122-26, 127-28).

Defendants misread three Delaware appraisal cases for the proposition that Dr. Arnold was required to independently come to a different conclusion than Greenberg and Tilton concerning the reliability of the projections. Among specific errors (below), Defendants conflate the use of projections in a discounted cash flow ("DCF") analysis with their use in a comparable company approach. Dr. Arnold testified that the projections in the record were *not* sufficient to conduct a DCF analysis. ("[T]he ingredients or the ability to create [a sufficient cash flow forecast] from granular pieces of information is also not available in the record. So there are many reasons why DCF could not be implemented here and, therefore, I did not." (Tr. 7/24 A.M. 15:17-20)). Therefore, Dr. Arnold used the comparable company approach.

Contrary to Defendants' citation, that is exactly the process endorsed by *Doft & Co. v. Travelocity.com Inc.*, 2004 WL 1152338, at *7 (Del. Ch. May 20, 2014). Defendants have altered the quote from the case to make it seem as it the Court rejected a comparable company approach based upon the reliability of projections. (D-PFC ¶413). Instead, the Court held—like Dr. Arnold– that the absence of reliable projections "make the DCF analysis of marginal utility as a valuation technique in this case." *Travelocity.com*, 2004 WL 1152338 at *7.[12] Because of that, the Court— like Dr. Arnold—went on to apply a comparable company approach. *Id.*

Similarly, *In re PetSmart, Inc.*, 2017 WL 2303599, at *32-34 (Del. Ch. May 26, 2017) concerned the application of a DCF analysis. The Court discounted five-year cash flow projections for four independent reasons, including that "management engaged in the process of creating the auction-related projections in the midst of intense pressure from the Board to be aggressive, with

---

[12] Defendants removed the phrase "*DCF analysis*" from the quote to make the case seem analogous. As *Travelocity.com* explained, "The goal of the DCF method of valuation is to value future cash flows." *Id.*

the expectation that the projections would be discounted by potential bidders." *Id.* at 33. *Three* witnesses testified that the auction-projections "were designed to be aggressive because the Board [] were convinced that potential bidders would discount whatever projections were put in front of them." *Id.* at 34.[13] No one gave any such testimony here. Instead, Greenberg testified that the projections were based on his honest and best effort to independently project earnings for TransCare and Tilton testified that the projections were validated by three separate teams working in her offices. *Cf. Prescott Group Small Cap, L.P. v. Coleman Co. Inc.*, 2004 WL 2059515, at *22 (Del. Ch. Sept. 8, 2004) (projections delivered to purchaser's bank were "management's honest and best effort, at that time, to predict Coleman's performance for the year 2000").

Finally, Defendants miscite *In re Orchard Enterprises, Inc.* 2012 WL 2923305, at *20 (Del. Ch. July 18, 2012) for the proposition that the Court credited the opinion of an expert who "had his hands deep in the dough of the projections." (D-PFC ¶412). However, the Court *rejected* the opinion of that expert, who, at trial, attempted to discount his own contemporaneous projections by applying a company-specific risk premium "to account for the specific risks facing Orchard[.]" *Orchard Enters.* at 19. The Court used the phrase "deep in the dough" to refer to the fact that Orchard's valuation expert also prepared the projections used in the merger being challenged in the litigation. *Id.* at 20. Rejecting this attempted discount, the Court determined to use the projections the expert had prepared contemporaneously for the defendants. *Id.* Here, too, the Court should adopt the analyses of the individuals who contemporaneously prepared the projections for Tilton's use and benefit.

---

[13] Thus, contrary to Defendants' assertion, the Court did not reject the projections merely because they were designed to "aid in the pursuit of strategic alternatives." (D-PFC ¶411).

### b.  Tilton Relied on the Projections

The plans at issue were not outliers.  The February 24 Plan remained completely consistent with Patriarch's January 7 plan prepared almost two months prior, but for the interim loss of the Maryland and the Bronx/Westchester businesses.  (*See* P-PFC ¶308).  And Tilton may not have "approved" of any plan formally, but that was her practice as the Board of TransCare.  (P-PFC ¶¶ 22, n.1, 44, 75-77, 78-82).  Tilton relied on those plans when she: (i) on January 12, 2016, offered raises and change of control bonuses to TransCare's divisional VPs for paratransit and Hudson Valley (*id*. ¶79); (ii) on January 15 and 29, 2016, funded a portion of the financing called for by the January 7 Plan (and confirmed to Wells Fargo that the funds were part the "go forward business plan being developed") (*id*. ¶81-82); (iii) committed $10 million in financing secured by Transcendence's accounts receivable (*id*. ¶¶169-172), and (iv) and funded $658,000 of that loan towards Transcendence's operations (*id*. ¶172).  It is hard to find more concrete "approval" than Tilton's commitment of these funds.  As Tilton explained in a January 14, 2015, email (PX165 at 00925), she would not have provided additional funding if she did not believe that the plan was viable: "I am being asked to provide money and make decisions on the future of the company…. I do not want to keep funding into a black hole that cannot be filled or a company that cannot generate sufficient cash to cover its expenses.  It makes me sad but it is more important that I understand the reality before I fund more and more cash . . . ."[14]

Tilton's continued investment in TransCare speaks volumes.  *See Gentile v. Rossette,* 2010 WL 2171613, at *10 (Del. Ch. May 28, 2010) (defendant's "persistent willingness—even though admittedly marked at times by grave doubts—to pour his ultimately limited resources into the

---

[14] Tilton relies on the Carl Marks' response to her email at PX 165 in which Marc Pfefferle stated that "the EBITDA numbers we were originally given are significantly overstated."  Not only is that hearsay, but Tilton presented no testimony from Pfefferle as to what EBITDA projections he was referring or how he made that determination.

Company" was the most persuasive evidence of the company's value, notwithstanding his trial testimony that "the Company was worthless and on a path to oblivion."). *See also In re Appraisal of Dole Food Co., Inc.,* 114 A.3d 541, 557-58 (Del. Ch. 2014) ("[S]elf-interest concentrates the mind, and people who must back their beliefs with their purses are more likely to assess the value of the judgment accurately than are people who simply seek to make an argument[.]").

Finally, as far as Dr. Arnold not vetting the plans for reasonableness, Tilton fails to explain why he would be more qualified to do so than she and her Patriarch team. *Cf.*, *Union Ill. 1995 Inv. Ltd. P'ship v. Union Fin. Grp., Ltd.,* 847 A.2d 340, 360 (Del. Ch. 2004) (rejecting expert's decision to reduce management's projected variable costs because management was in the best position to estimate such costs).

### 2.    The Trustee's Burden Was to Estimate Damages, Not Conduct a Valuation

Tilton's criticisms of Dr. Arnold's "valuation" are misplaced because it was Tilton's obligation to show fair value as part of the price element of the entire fairness test, not the Trustee's.  Dr. Arnold was not appraising TransCare, he was opining as to damages, and damages assume the hypothetical situation that Tilton successfully sold or refinanced TransCare without breaching her duty of loyalty. *See, e.g., Bomarko I*, 794 A.2d at 1183, 1184-85 ("what plaintiffs are entitled to receive is, at a minimum, what their shares would have been worth at the time of the Merger if [the controlling shareholder] had not breached his fiduciary duties" and accounting for the effects of the breach of fiduciary duty in considering both entire fairness and damages while noting that "were this an appraisal action, I might reach a different result on this issue.")

Contrary to Defendants' arguments (D-PFC n. 18, 25), appraisals require a higher bar for certainty than damage calculations because both parties have the burden of proof, and because the Court is independently required to appraise the value of the company.  *PetSmart*, 2017 WL

2303599, at *1.  "[U]nlike the more exact process followed in an appraisal action, the law does not require certainty in the award of damages where a wrong has been proven and injury established.  Responsible estimates that lack mathematical certainty are permissible so long as the Court has a basis to make a responsible estimate of damages."  *Bomarko I*, 794 A.2d at 1184 (citations omitted).  Where "issues of loyalty are involved, potentially harsher rules come into play.  'Delaware law dictates that the scope of recovery for a breach of the duty of loyalty is not to be determined narrowly.... The strict imposition of penalties under Delaware law are designed to discourage disloyalty.'"  *Id.*, quoting *Thorpe v. CERBCO Inc.*, 676 A.2d 436, 445 (Del. 1996).

Virtually all of Defendants' cases attacking Dr. Arnold's work were *appraisal* actions. (D-PFC ¶¶413-428).  The one exception is *Lake Treasure Holdings, Ltd. v. Foundry Hill GP LLC*, 2014 WL 5192179 (Del. Ch. 2014), where the Court adopted the Defendants' expert analysis showing that software Defendants had previously thought to be valuable was actually "a simplistic arrangement of public domain components and concepts."  *Id.* at *1.

> [T]heir expert cogently explained how anyone with moderate skill with computers and basic knowledge of trading could reproduce the software using retail programs and sources freely available on the internet. Despite [Defendants'] earlier belief to the contrary, the software did not have any value as intellectual property.

*Id.*  For that primary reason (in addition to many others), the Court granted nominal damages.[15]

Similarly, Tilton asserts that Dr. Arnold relied on "the testimony of Tilton and Greenberg concerning industry multiples; however, they merely testified to multiples that could apply to

---

[15] Defendants wrongly claim the Court rejected the damages analysis because of the range size (not the intrinsic lack of value in the software) (D-PFC ¶428).  Even so, the proposed damages range extended from $2.3 to $29 million, a number more than 12 times as large.  *Id.* at *12.  Valuations are usually expressed in ranges, and Dr. Arnold's were narrower than Tilton states when she characterizes it as ranging from $16.1 to $67.3 million.  (D-PFC ¶425.)  That figure mixes the valuations implicit in the different projections he looked at.  For example, the valuation based upon the February 24 Plan values just three of TransCare's business lines.  Even the WholeCo valuation based upon the January 7 Plan produces a range of just $30.9 to $67.3 million (after deducting the $19.2 million recovered in liquidation).  That range is not unusual.  *See S. Muoio*, 2011 WL 836007, at *5 ($500 million to $1 billion range).

17

Case 1:20-cv-06374-LAK   Document 11-11   Filed 09/30/20   Page 244 of 569

TransCare *if it were a healthy company*, not to TransCare as it stood in January and February 2016." (D-PFC ¶420, emphasis Tilton's.). But Tilton provided no evidence for this hypothesis and Dr. Arnold rebutted this theory when he showed that the 2016 market did not support any reduction in multiples for (a) small, (b) undercapitalized, (c) low-performing or (d) distressed companies. (P-PFC ¶248).

Because Tilton failed to carry her burden to show that it was impossible for the company to be sold to or funded by anyone but herself, the damages analysis must assume that the company would have been successfully sold or funded before it went under. (P-CF ¶¶293-296, 302). *See, e.g., Paradee v. Paradee,* 2010 WL 3959604, at *13 (Del. Ch. Oct. 5, 2010) ("Although it would be improbable (bordering on impossible) for the Trust to have sold precisely at the top of the market, the faithless fiduciary must bear that risk, not the innocent beneficiary."); *see supra* n.9.

Defendants' post-trial submission states that the January and February projections contemplate unrealistically high increases in EBITDA (D-PFC ¶415). But Tilton, who controlled TransCare for over 12 years, testified that Transcare had historical EBITDA of $12-14 million. (P-PFC ¶¶26-29). That's why, as she explained to Wells Fargo, she wanted to return TransCare to its historic profitability before selling it in August 2015. (P-PFC ¶33). The January 7 Plan, containing the highest 2016 projection, contemplated just half of that historic EBITDA. (*See also* Dr. Arnold's similar testimony (Tr. 7/24 A.M. 47:3-17; 65:9-16; 82:24–83:14)).

That TransCare required financing (in some form) to realize its significant earnings potential and consequent value is not in dispute. (Leland Tr. 176:3-7; P-PFC ¶¶38-44 Greenberg); P-PFC ¶69 (Wells Fargo)). The issue here is how to account for that need with respect to the fiduciary duty damages. The Trustee proposes the following resolution: First, the projections prepared by Greenberg (and others working with Tilton) are not only the best available evidence

but reflect the good faith, honest beliefs of the people who prepared them at the time, and who had the competency to do so. Second, the EBITDA multiples identified by Greenberg, and confirmed by Dr. Arnold, represent the best multiples to use; there is no basis in the market data to make an arbitrary, company-specific reduction in the multiple. Using anything less than a 10.5x multiple would improperly grant Tilton the benefit of any uncertainty in TransCare's sale value. Third, the $10 million junior, credit-bid should not be deducted because Delaware law applies a recessionary framework to breach of duty of loyalty claims in the present circumstances. Fourth, the contemplated financings should not be deducted because (under the January 7 and February 24 plans) they were contemplated as secured loans, not capital investments. Fifth, the liquidation amount recovered by the Trustee should be deducted, thus $19.2 million should be deducted from any valuation of TransCare as a whole, $5.7 million of which was attributable to Transcendence. The Trustee therefore seeks $67.05 million using the January 7 Plan (WholeCo plan) (P-PFC ¶312) or at the very least, $44.3 million using the February 24 Plan (NewCo plan) (P-PFC ¶314).

## II.    SELECTED RESPONSE TO REMAINING CLAIMS

### A.  Actual Fraudulent Transfer:  Badges of Fraud, Not Actual Fraud, Is Required

Significantly, Defendants agree that Tilton need not have acted with actual intent to defraud anyone, and that "actual intent to hinder, delay or defraud" requires the Court to examine a number of factors to determine whether Tilton acted with the necessary scienter. (D-PFC ¶440-441 (conceding two badges of fraud); P-PFC ¶¶329-330). However, a desire to stay in business is not inconsistent with actual intent to hinder, delay or defraud. *See In re Sentinel M'gmt Grp., Inc.*, 728 F.3d 660, 667 (7th Cir. 2013) (overturning district court's conclusion that "such motivation was insufficient to constitute actual intent to hinder, delay, defraud Sentinel's FCM clients.").

### B.  Preference:  11 U.S.C. §547(e)(2) Does Not Apply

11 U.S.C. §547(e)(2) defines the date a transfer occurs by reference to when perfection occurs:  here, both parties agree that occurred on February 11, 2016 as the Ark II filing had no legal effect until TransCare executed the grant.  (D-PFC ¶455; P-PFC ¶343).  The transfer date does not alter the fact that TransCare incurred a debt to Ark II (to the extent TransCare ever incurred a debt) on January 15 and 29, 2016.  Defendants' out-of-context quotation from *Telecash Industries, Inc.,* 104 B.R. 401, 403 (Bankr. D. Utah 1989) simply describes how perfection relates back to the transfer of a security interest generally.  None of Defendants' cases hold that an insider has 30 days to secure otherwise unsecured advances.[16]

### C.  Recovery of $800,000:  Defendants §549 Argument Makes No Sense

Defendants argue that $800,000 paid by the Trustee did not represent property of the estate.  (D-PFC ¶¶470-471), but:  (1) the $800,000 came from an estate bank account; (2) the property from which it was derived was estate property after Transcendence returned it (Tr. 7/24 144:16-145:5; 157:9-24) (not to mention that this contradicts Defendants' core assertions that Transcendence *never* acquired the property (PTO pp. 4-5, 57, 60); (3) PPAS gave the funds to Ark II purportedly because they were TransCare proceeds under the Ark II Intercreditor Agreement; and (4) Ark II used the funds to reduce the balance owed to it by TransCare  (P-PFC ¶223).

### <u>CONCLUSION</u>

The Court should rule in accordance with the Trustee's proposed findings and conclusions.

---

[16] Defendants did not raise this contention in the PTO.  (Dkt. 85 at 62, 67).  Nor did they raise the §547(c)(3) defense (lien perfection within 30 days), which provides four separate requirements concerning the documentation of the Ark II Credit Facility which Defendants cannot meet.  11 U.S.C. §547(c)(3)(a).  Further, if TransCare had no antecedent obligation to repay the January 15 and 29 Payments (D-PFC ¶452), then the grant of a security interest was made without consideration and thus constructively fraudulent.

Dated: New York, New York
      October 11, 2019

Respectfully submitted,

*/s/ Bijan Amini*
Bijan Amini
Avery Samet
STORCH AMINI PC
2 Grand Central Tower
140 East 45th Street, 25th Floor
New York, New York 10017

Tel: (212) 490-4100
Fax: (212) 490-4208
bamini@storchamini.com
asamet@storchamini.com

*Special Counsel to Plaintiff Salvatore
LaMonica, as Chapter 7 Trustee*

A2591

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x

In re : 

               :

               :

     TRANSCARE CORPORATION, <u>et al.</u>, :      Chapter 7

               :      Case No. 16-10407 (SMB)

               :      (Jointly Administered)

            Debtors. :

------------------------------------------------------------x

SALVATORE LAMONICA, as Chapter 7 :

Trustee for the Estates of TransCare :

Corporation, <u>et al.</u>, :

               :

           Plaintiff, :

               :      Adv. Proc. No. 18-1021 (SMB)

     - against - :

               :

LYNN TILTON, PATRIARCH PARTNERS :

AGENCY SERVICES, LLC, PATRIARCH :

PARTNERS, LLC, PATRIARCH PARTNERS :

MANAGEMENT GROUP, LLC, ARK II CLO :

2001-1 LIMITED, TRANSCENDENCE :

TRANSIT, INC., and TRANSCENDENCE :

TRANSIT II, INC., :

               :

          Defendants. :

               :

------------------------------------------------------------x

**DEFENDANTS' RESPONSE TO TRUSTEE'S POST-TRIAL**
**PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

## TABLE OF CONTENTS

Page

THE TRUSTEE'S FUNDAMENTAL COUNTERFACTUAL ASSUMPTIONS ...................... 1

THE TRUSTEE'S UNTRUTHFUL, MISLEADING, AND DISTORTED PROPOSED FINDINGS OF "FACT" ................................................................................................ 4

    A.    The Trustee's Misstatements Concerning The OldCo/NewCo Restructuring ............................................................................................. 5

    B.    The Trustee's Misstatements Concerning TransCare's Value ............................ 10

    C.    The Trustee's Misstatements Concerning The Ark II Facility ............................ 13

THE TRUSTEE MISSTATES AND MISAPPLIES THE LAW ................................................. 14

    Count I:  Fair Dealing and Fair Price ..................................................................... 14

    Count I:  Damages ................................................................................................. 17

    Count VII:  Actual Fraudulent Conveyance ........................................................... 19

i

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**CASES**

*Agranoff v. Miller*,
   791 A.2d 880 (Del. Ch. 2001)...................................................................12

*Bomarko, Inc. v. Int'l Telecharge, Inc.*,
   794 A.2d 1161 (Del. Ch. 1999),
   *aff'd*, 766 A.2d 437 (Del. 2000)....................................14, 15, 16, 17, 18

*Cede & Co. v. Technicolor, Inc.*,
   634 A.2d 345 (Del. 1993) ......................................................................17

*Cinerama, Inc. v. Technicolor, Inc.*,
   663 A.2d 1156 (Del. 1995) ....................................................................17

*Gelzer v. Bloom (In re M. Silverman Laces, Inc.)*,
   404 B.R. 345 (Bankr. S.D.N.Y. 2009) .....................................................4

*Guiliano v. Schnabel (In re DSI Renal Holdings, LLC)*,
   574 B.R. 446 (Bankr D. Del. 2017) .......................................................17

*HMG/Courtland Props. Inc. v. Gray*,
   749 A.2d 94 (Del. Ch. 1999)..................................................................17

*In re CheckFreeCorp. S'holders Litig.*,
   2007 WL 3262188 (Del. Ch. Nov. 1, 2007) ...........................................16

*In re Dreier LLP*,
   452 B.R. 391 (Bankr. S.D.N.Y. 2011) ...................................................20

*In re Nine Sys. Corp. S'holders Litig.*,
   2014 WL 4383127 (Del. Ch. Sept. 4, 2014),
   *aff'd sub nom. Fuchs v. Wren Holdings, LLC*, 129 A.3d 882 (2015).......2

*In re Santa Fe Pac. S'holder Litig.*,
   669 A.2d 59 (Del. 1995) ........................................................................17

*Int'l Telecharge Inc. v. Bomarko, Inc.*,
   766 A.2d 437 (Del. 2000) ......................................................................18

*Jackson Nat'l Life Ins. Co. v. Kennedy*,
   741 A.2d 377 (Del. Ch. 1999).................................................................16

ii

*Kahn v. Tremont Corp.*,
   694 A.2d 422 (Del. 1997) ................................................................................16

*Lake Med. Ctr. v. Shalala*,
   89 F. Supp. 2d 83 (D.D.C. 2000),
   *aff'd*, 243 F.3d 568 (D.C. Cir. 2001) ...........................................................3

*LCN Invs., Inc. v. First Fidelity Bank, N.A. N.J.*,
   173 F.3d 454 (2d Cir. 1999).............................................................................19

*Lyondell Chem. Co. v. Ryan*,
   970 A.2d 235 (Del. 2009) ................................................................................17

*Milbank, Tweed, Hadley & McCloy v. Boon*,
   13 F.3d 537 (2d Cir. 1994).............................................................................19

*Mishkin v. Ensminger* (*In re Adler, Coleman Clearing Corp.*),
   247 B.R. 51 (Bankr. S.D.N.Y. 1999) ..........................................................4

*N. Clackamas Community Hosp. v. Harris*,
   664 F.2d 701 (9th Cir.1980) ........................................................................3-4

*Priestly v. Panmedix*,
   18 F. Supp. 3d 486 (S.D.N.Y 2014)..............................................................20

*Solomon v. Pathe Commc'ns Corp.*,
   1995 WL 250374 (Del. Ch. Apr. 21, 1995),
   *aff'd*, 672 A.2d 35 (Del. 1996)......................................................................16

*Summa Corp. v. Trans World Airlines, Inc.*,
   540 A.2d 403 (Del. 1998) ................................................................................17

*United Rentals, Inc. v. Pruett*,
   296 F. Supp. 2d 220 (D. Conn. 2003) ............................................................1

Defendants[1] respectfully submit this Response to the Trustee's Proposed Findings of Fact and Conclusions of Law (the "Submission" or "Sub."). Defendants will first address two fundamental counterfactual assumptions that pervade the Submission and render the Trustee's core arguments meritless. Next, Defendants will address the many factual misstatements and distortions in the Submission. Finally, Defendants will address the Trustee's misstatements and distortions of law.[2]

## THE TRUSTEE'S FUNDAMENTAL COUNTERFACTUAL ASSUMPTIONS[3]

As a threshold matter, the Submission relies heavily on two critical assumptions that are flatly contradicted by the overwhelming evidence adduced at trial.

**First**, the Submission portrays TransCare as if it was a healthy business operating in the ordinary course until Tilton suddenly—and without legitimate justification—"set in motion a plan to sell certain of TransCare's assets to herself." (Sub. ¶ 99.) The evidence presented at trial demonstrates the exact opposite. As discussed in Defendants' PFOF[4], at the time Tilton first conceived the OldCo/NewCo Restructuring, TransCare "was in a free fall" and operating "at the absolute breaking point." (PFOF ¶¶ 116, 194; *id.* ¶¶ 60–62, 76, 110–40, 187–200.)

Moreover, the Trustee's suggestion that Tilton simply woke up on the morning of February 10[5], decided without justification to abandon the sale process she and Wells Fargo had been

---

[1] Capitalized terms not defined herein have the meaning ascribed to them in Defendants' Proposed Post-Trial Findings of Fact and Conclusions of Law. (Dkt. No. 133.)

[2] Due to space limitations, Defendants cannot address every misstatement and unsupported statement in the Trustee's Submission. Defendants focus here mainly on the Trustee's claim for breach of fiduciary duty relating to the Article 9 foreclosure, with brief mention of certain issues relating to Ark II's loan to TransCare and the Trustee's claim for actual fraudulent conveyance.

[3] The Submission relies heavily on the deposition testimony of Glenn Leland, TransCare's former CEO, and John Husson, a representative of Wells Fargo. Contrary to the Trustee's assertion (Sub. at 1), the deposition designations were not "admitted" pursuant to the FPTO. In fact, Defendants objected to significant portions of the designated testimony and made cross-designations. (FPTO, Exs. D–E.) A chart of objections and cross-designations is attached to this Response as **Exhibit A**. Defendants respectfully request that Leland's testimony, especially the cross-designations, be reviewed by videotape. *United Rentals, Inc. v. Pruett*, 296 F. Supp. 2d 220, 229 (D. Conn. 2003).

[4] "PFOF" refers to Defendants' Proposed Post-Trial Findings of Fact. (Dkt. No. 133.)

[5] The Trustee agrees that Tilton first decided to pursue the OldCo/NewCo Restructuring on February 10. (Sub. ¶ 99.)

1

discussing in December 2015 and January 2016 and instead pursue a self-interested path blatantly ignores the trial record. The record demonstrates that after months of deterioration, by early February 2016, Tilton, CMAG and Wells Fargo all understood that TransCare lacked sufficient time and capital to survive a sale process. (PFOF ¶¶ 110–11, 142, 165–68.) In light of TransCare's then-existing reality, the Trustee's focus on Tilton's observation in *August 2015* that "there was an active M&A market in the ambulance space" for *stable* companies (Sub. ¶¶ 32–33)—an observation Tilton made *months before* Wells Fargo informed TransCare that it would not renew the Wells Fargo ABL Agreement (PFOF ¶¶ 60–62)—is particularly misplaced and wholly irrelevant.

The absence in the Submission of any discussion of TransCare's financial and operational crises is a critical flaw because it is in that context—*i.e.*, a business on the brink of liquidation—that Tilton developed and tried to implement the OldCo/NewCo Restructuring. Tilton's decisions must be judged in *that* context because the "entire fairness standard of review is principally *contextual*." (PCOL ¶ 371 (citing *In re Nine Sys. Corp. S'holders Litig.*, 2014 WL 4383127, at *1 (Del. Ch. Sept. 4, 2014) (emphasis in original)); *see id.* ¶¶ 372, 382–83.)

**Second**, the Trustee repeatedly conflates the value of *assets* with the value of a *going concern business*. For example, he intentionally confuses Tilton's calculation of the value of the Subject Collateral (*i.e.*, $10 million) with the potential value of NewCo if it operated as a going concern (*i.e.*, $22 million), which would be possible only with a massive new cash infusion by Tilton. (Sub. ¶ 240.) The trial record is clear: the former was calculated using the book value of the "real assets" to be transferred to NewCo as of February 13, 2016[6]; the latter was the total

---

[6] Tilton calculated the Subject Collateral's value based on the book value, as of December 2015, of the assets of the five divisions she intended for NewCo to operate. (PFOF ¶¶ 231–32.) The Trustee criticizes Tilton's reliance on

2

"acquisition price" of NewCo based on the $10 million credit bid, an additional $10 million of new working capital funding and the rollover of approximately $2 million in debt from OldCo to NewCo.  (PFOF ¶¶ 209–13, 253.)  Remarkably, the very testimony the Trustee cites says *the exact opposite* of what he represents in his Submission:

> THE COURT: There was some testimony that $2[2] million dollars or something like that was paid for the collateral . . .

> MS. TILTON:  But that *wasn't what was paid for the collateral.  That would have been the value of NewCo.*

(Sub. ¶ 240 (citing Aug. 13 PM Tr. 12:9–20) (emphasis added); *see also* Aug. 13 AM Tr. 20:17–18 ("It was $10 million for the assets"); *id.* at 5:4–8; Aug 13 PM Tr. 105:16–106:10.)

The Trustee's arguments that Arnold's calculations bear on fair price (Sub. ¶¶ 242–47) also wrongly conflate the value of assets and the value of a going concern.  Arnold was "asked to address what is a reasonable range of value of *TransCare*" as an *operating* business—*not* the fair market value *of the foreclosed-upon assets*.  (PFOF ¶ 289 (emphasis added).)  Accordingly, even if Arnold had performed an actual valuation of TransCare as a going concern or done so credibly (and he did neither (*see* PCOL ¶¶ 402–28)), his calculations cannot serve as a proxy for the value of the Subject Collateral.  That is particularly so because, as case law make clear, the going concern value of TransCare or NewCo is necessarily greater than the sum of their respective assets.  *See Lake Med. Ctr. v. Shalala*, 89 F. Supp. 2d 83, 90 (D.D.C. 2000).  Put differently, "'[g]oing concern' value refers to a market determination that a business in operation is worth more than the fair market value of its separately sold assets."  *Id.* (quoting *N. Clackamas Community Hosp. v. Harris*,

---

December 2015 financial data because the last unaudited financial statements were for October 2015 (Sub. ¶ 238(b)). However, the February 13 NewCo Model indicates that the December 2015 data was "based on October reported financials."  (*See, e.g.*, PX_286, at PP–TRBK0105524 (MD – BS Tab) Column B, Row 3.)  Thus, the Trustee's criticism is baseless.

3

664 F.2d 701, 705 (9th Cir. 1980) (finding going concern value is "an amount the Provider was willing to pay beyond the fair market value of specific identifiable tangible assets in order to conduct its business" and observing that this was "in accordance with standard accounting practices").

In short, courts recognize there is a difference between valuing the assets of a business and valuing the business as a going concern, particularly when the business is—like TransCare was— in deep financial distress.  *See, e.g.*, *Mishkin v. Ensminger (In re Adler, Coleman Clearing Corp.)*, 247 B.R. 51, 111 (Bankr. S.D.N.Y. 1999) ("[W]here a company is on its 'deathbed', we will value its assets according to what could be obtained at a liquidation sale and not give them a 'going concern value'"); *Gelzer v. Bloom (In re M. Silverman Laces, Inc.)*, 404 B.R. 345, 362–63 (Bankr. S.D.N.Y. 2009) (finding business had no goodwill to transfer when it "was at 'death's door'" and "lacked unencumbered assets to pledge for new credit"); (PCOL ¶¶ 385–87).  Here, PPAS, as agent for the Term Loan Lenders, foreclosed on TransCare's assets when the Company was on the brink of liquidation.  Arnold, however, purported to value TransCare as a going concern based on (speculative) projections of future performance.  For that reason, Arnold's values are irrelevant to the question of fair price.

## THE TRUSTEE'S UNTRUTHFUL, MISLEADING, AND DISTORTED PROPOSED FINDINGS OF "FACT"

As detailed below through a discussion of the more glaring examples,[7] the Submission is filled with other misstatements, omissions, and distortions of the record.

---

[7] Again, space limitations prevent Defendants from addressing all of the dozens (if not hundreds) of such misstatements, omissions and distortions.  By way of example, the Trustee misrepresents Tilton's exploration of a potential sale of TransCare (*compare* PFOF ¶¶ 71–142 *with* Sub. ¶¶ 45–69); the events surrounding the Ark II Facility (*compare* PFOF ¶¶ 143–160 *with* Sub. ¶¶ 112–121); and the Article 9 foreclosure (*compare* PFOF ¶¶ 216–227 *with* Sub. ¶¶ 159–174), to name a few.

4

### A.    The Trustee's Misstatements Concerning The OldCo/NewCo Restructuring

- *The Trustee wrongly asserts TransCare received over nine unsolicited inquiries from at least six "suitors".  (Sub. ¶¶ 59–60, 295(a), 295(b).)*

Although the Trustee implies there were a host of serious potential buyers for the Company, the trial record shows something very different.  Indeed, the only written indication of interest from any "suitor"—the National Express LOI—implied an EBITDA multiple of no more than 1.75x.  (PCOL ¶ 393.)[8]  RCA's "offer" was based on its misimpression of TransCare's *actual* EBITDA as of March 2015, which was essentially zero.  (PFOF ¶¶ 53–55.)  TransCare never received a written indication of interest from AMR, Falck or Rural/Metro and the record is devoid of any written contact from them at all.[9]

The Trustee contends that "[o]nce Tilton decided to sell, she did not attempt to contact a single person that had expressed an interest in purchasing TransCare."  (Sub. ¶ 295(b).)  But in the sale plan Tilton was developing with Wells Fargo in December 2015, outreach to potential third-party buyers *was expressly contemplated* to occur (between March 31 and May 31, 2016), *after* certain milestones were achieved.  (PFOF ¶¶ 87–90.)[10]  The reason there was ultimately no outreach had nothing to do with any disloyalty.  Rather, it was because Tilton and Wells Fargo concluded in early February 2016 that TransCare was not saleable.  (PFOF ¶¶ 142, 165–68.)

---

[8] As of January 2016, the paratransit business was substantially less profitable than it had been in July 2015.  (PFOF ¶ 101.)  Even if National Express would still have been interested in buying the paratransit division in early 2016 (and there is no evidence that it was), its offer would presumably have been reduced.

[9] The Trustee refers to emails from Leland to Patriarch Partners personnel in December 2015 concerning National Express's purported continuing interest in the MTA Contract.  There is no evidence these were shared with Tilton.  (Sub. ¶ 60(i) (citing to Tilton's testimony regarding *general knowledge* of National Express interest as purported evidence of her knowledge of its alleged interest in December 2015); JX_40 (showing LOI expired "within 7 days from the date hereof" (or *July 17, 2015*)).)

[10] *See also* Husson (*Ien*) Tr. 34:23–35:2 ("[W]e needed to determine if there was enough capital in the company to . . . sustain the [sale] process and buy enough time to actually market the company"), *id.* at 35:6–17 ("Q: Was it the case that in that proposed transaction that came from Patriarch there would be needed a runway of six to nine months for a marketing diligence period before the completion of a closing?  A: I mean, there was a significant amount of time that was required . . . It was going to take time.").)

5

- *The Trustee wrongly asserts Tilton prohibited Leland and others from securing alternative financing for TransCare.  (Sub. ¶ 228.)*

Leland did not work at TransCare at the time of the OldCo/NewCo Restructuring, so Tilton could not have "prohibited" him from seeking alternative financing at that time.  (Stipulation No. 24.)  In any event, Leland was never told he could not look for alternative financing.  (July 23 AM Tr. 66:4–6.)[11]  Nor, as the Trustee insinuates (Sub. ¶ 228), would Greenberg have been tasked with finding replacement or alternative lending for TransCare in early 2016.  Instead, as of early 2016, it was CMAG—not Greenberg—that was tasked with "[p]erform[ing] normal duties of the position of TransCare CFO" and acting as TransCare's CRO.  (PFOF ¶ 94.)  There is no evidence CMAG recommended that Tilton seek new or different outside financing for TransCare, that it sought such financing on TransCare's behalf, or that it was "prohibited" from doing so.  (PFOF ¶ 171.)[12]

- *The Trustee wrongly asserts "Wells Fargo never varied from its position of being willing to fund TransCare through to a sale."  (Sub. ¶¶ 68–69.)*

Wells Fargo's willingness to fund TransCare through a sale process was *expressly conditioned* on, *inter alia*, Tilton providing TransCare with a substantial capital infusion to keep it afloat through the completion of a sale (something Tilton was not required to do as a matter of law (*see* PCOL ¶ 366)).  (PFOF ¶¶ 85, 87; Husson (*LaMonica*) Tr. 56:22–57:3 (Wells Fargo was prepared to fund if "there was an acceptable . . . agreement for selling the company."))[13]

---

[11] Any discussions Leland had with Tilton about alternative financing prior to February 2016 are irrelevant to the question of whether the OldCo/NewCo Restructuring was fair.  (PCOL ¶¶ 351–57.)

[12] Although the authority matrix provides that Tilton would have to approve alternative financing, there is no evidence that CMAG (or anybody else) sought her approval and was denied.

[13] Husson acknowledged that TransCare lacked sufficient capital investment and "needed owners that were going to really put *a massive investment* in the company."  (Husson (*LaMonica*) Tr. 45:11–25 (emphasis added).)

6

By February 9, Wells Fargo was no longer supportive of either a sale process or continuing to finance TransCare as a going concern.  (PFOF ¶¶ 165–69.)  On February 18, Wells Fargo told Tilton that the bank had decided to cease funding altogether, only to change its mind to try to do "a more graceful wind-down."  (PFOF ¶¶ 195–96.)  By February 23, Wells Fargo stopped funding altogether, as it had threatened to do just a few days earlier.  (JX_94, at PP–TRBK0096546; *see also* July 22 PM Tr. 118:3–10.)

Critically, if Wells Fargo wanted to compel a sale of TransCare (or believed a sale was likely to generate sufficient proceeds to repay its debt), it had the leverage to do so (*i.e.*, the ability to sweep TransCare's bank accounts and cease funding).  (*See* Aug. 13 PM Tr. 46:12–15.)  There is no evidence that Wells Fargo made such a demand; rather, the only evidence is that by February 2016, it did not want to continue funding TransCare as a going concern.  (PFOF ¶¶ 165–69.)

- *The Trustee misleadingly asserts "Wells Fargo had indicated that it was prepared to continue funding TransCare pending a sale provided that Tilton had presented it with a plan to effectuate the sale in the reasonable future, which Tilton never did."  (Sub. ¶ 295(e).)*

This assertion is misleading because it implies that Tilton did not approve a sale plan for ill-motivated reasons.[14]  On the contrary, the record shows she made a good faith effort to agree with Wells Fargo on a plan.  Wells Fargo first requested a budget on December 23 in connection with discussions about a potential sale of TransCare (PFOF ¶ 87), which budget was to be reviewed by a third-party financial advisor.  (JX_65, at WF_TC_00000216.)  As of January 14, CMAG had been engaged and was still working to "complete[ ] the forecast model with as much accuracy as possible given 4 days on the job fighting fires."  (PX_165, at CM_TC2018_0000925).  On January

---

[14] In any event, whether Tilton approved a "plan" for TransCare prior to February 10 is irrelevant to whether the OldCo/NewCo Restructuring was fair.  (PCOL ¶¶ 351–57.)

27, CMAG transmitted the CMAG Executive Summary to Tilton.  (PFOF ¶¶ 115–31.)  Tilton then

determined, based on CMAG's work, that TransCare was not saleable.  (PFOF ¶ 142.)

More to the point, criticism of Tilton about how she evaluated or prepared for a sale process

is irrelevant; *he did not assert a duty of care claim and there is no evidence that her decisions*

*regarding a potential sale involved self-dealing.*  Although she ultimately declined to contribute

her own capital to a sale process, she had no fiduciary obligation to do so.

- *The Trustee wrongly asserts "Tilton offered no contemporaneous document memorializing*
  *how she calculated the foreclosure price."  (Sub. ¶ 236.)*

The Trustee's only cited support for this assertion actually acknowledges that the price for

the Subject Collateral was derived from *and memorialized in a spreadsheet attached to an email*

*from Pelissier to Tilton and others dated February 13*.  (Sub. ¶ 236 (citing Aug. 14 AM Tr. 20:17–

18 ("Q: *And other than this document, PX-286, is that recorded anywhere else, your calculation of*

*that ten million?"*) (emphasis added)); *see also* PX_286; PFOF ¶¶ 229–41.)

- *The Trustee wrongly asserts that Tilton's book value calculation "failed to credit" the*
  *MTA Contract and the CONs.  (Sub. ¶¶ 238(a), 280(b).)*

PPAS did not foreclose on the CONs.  (PFOF ¶¶ 223, 274.)  Although PPAS foreclosed on

the MTA Contract, it obviously had no value unless the paratransit business could operate.  (PCOL

¶ 393 n.22.)  Moreover, the evidence shows that Tilton *did* value the MTA Contract when cross-

checking the book value against the total $22 million "purchase price"—*i.e.*, the potential value of

the paratransit business as a going concern.  (*Id.*)

- *The Trustee irrelevantly asserts that Credit Suisse was not informed of the Article 9*
  *foreclosure and did not consent it.  (Sub. ¶¶ 231, 235.)*

The TLA authorized PPAS to foreclose on the Subject Collateral and agree to subordinate

the priority position of the Term Loan Lenders without notifying Credit Suisse or otherwise

8

obtaining additional consent beyond that of the Required Lenders (which PPAS had). (PFOF ¶¶ 23–24, 27–28; *see also* Sub. ¶¶ 14, 16.) Thus, the Trustee's reliance on the failure to inform or obtain Credit Suisse's consent to the Article 9 foreclosure is misplaced, as such fact is irrelevant.

- *The Trustee wrongly asserts the Term Loan Lenders received nothing for the Subject Collateral. (Sub. ¶ 174.)*

As the record shows, had the OldCo/NewCo Restructuring been successful, the Term Loan Lenders would have received a 45.3% equity interest in Transcendence. (PFOF ¶¶ 208–15.)[15]

- *The Trustee misleadingly asserts Tilton understood that removing the MTA Contract from TransCare ensured TransCare's immediate liquidation and that Tilton's actions prohibited the Trustee from realizing a return on the sale of the paratransit division. (Sub. ¶¶ 220, 264.)*

The Trustee's inability to "realize a return from the sale of the paratransit division" on or after February 26, 2016 (Sub. ¶ 220) had nothing to do with the foreclosure on the MTA Contract; rather, as the Trustee testified, as of February 25 "there was absolutely no money available at all." (July 24 Tr. 157:1–4.) As the Trustee admitted, absent a voluntary cash infusion, the Company had no funds to make payroll or to operate *any* of the business divisions. (*Id.* at 156:9–24.)

The Trustee also misrepresents Tilton's testimony regarding the effect of the loss of the MTA Contract. This testimony was about Leland's enthusiasm about National Express's purported interest *in February and July 2015.* (*See, e.g.*, Aug. 13 AM Tr. 48:8–11.) In contrast, the OldCo/NewCo Restructuring was designed specifically to *avoid* an immediate liquidation of TransCare through an orderly wind down. (JX_84, at WF_TC_00000052 ("A forced liquidation of this [C]ompany will not serve any party."); PFOF ¶¶ 172–78.)

---

[15] The Submission's focus on the sale of the Subject Collateral from PPAS to Transcendence is also misplaced. (Sub. ¶¶ 168–69.) Any action PPAS took in respect of the Subject Collateral *after it foreclosed upon the assets* had no impact on TransCare's estate and is thus irrelevant.

9

**B.     The Trustee's Misstatements Concerning TransCare's Value**

- *The Trustee wrongly asserts the projections prepared in 2016 for TransCare were "management's projections." (Sub. ¶¶ 24, 305–06.)*

The Submission incorrectly implies that the projections Arnold relied on were "management's projections" because "Tilton managed TransCare through her employees at Patriarch." (Sub. ¶¶ 24, 305–06.)  The record shows that none of Tilton, Patriarch Partners or PPMG personnel managed TransCare. (Aug. 13 AM Tr. 41:20–42:3; July 23 AM Tr. 61:14–18.) Tilton was a director and Patriarch Partners and PPMG personnel served only as advisors to Tilton and the portfolio companies. (PFOF ¶¶ 12, 18; July 23 AM Tr. 41:6–7.)

- *The Trustee wrongly asserts the 2016 Plans "already accounted for the risk TransCare was facing." (Sub. ¶ 306.)*

The Trustee misconstrues Greenberg's testimony to misleadingly imply that the projections in the Plans were already discounted to reflect execution risk. (Sub. ¶ 306 (citing July 22 PM Tr. 122:16–123:2).)  Greenberg only testified that the Plans identified "negative reports about the company"—*not* that the projections in the Plans would otherwise have been higher but for the risk the Plans posed. As discussed in the PFOF, the Plans' authors recognized the significant risk that the action items or assumptions underpinning each Plan would not be achieved. (PFOF ¶ 302; *id.* ¶¶ 199–200; *id.* ¶ 127 ("[p]lan execution risk is high").)  There is no evidence the projections were discounted to account for the acknowledged risk.[16]

- *The Trustee misleadingly asserts EBITDA multiples are "the relevant multiple in this industry." (Sub. ¶ 243(a).)*

---

[16] *See also* Leland Tr. (Jan. 3, 2019) 553:5–554:11 ("Q: Were you saying that the [December] model was overly optimistic because you didn't think that Ms. Tilton would agree to provide $6.4 million in investment? A: No. *We were counting on an investment in the business.*  What was possibly optimistic is we forecast what volume, rate increases, new products, new contracts we didn't currently have, and a lot of optimistic change that we could not know for certain would occur.  So it was an optimistic forecast.  *A lot of things [that] were outside of our control would have to go our way.*") (emphasis added).

10

Multiples can express value for healthy companies (PFOF ¶¶ 254, 264), which TransCare was not. In fact, the application of an EBITDA multiple may not be appropriate if it is unlikely that a company can continue as a going concern. (PFOF ¶ 328.)

- *The Trustee wrongly asserts Greenberg acknowledged that the industry average multiple was 10.1x. (Sub. ¶ 310(a).)*

The Trustee misrepresents the record and Greenberg's testimony. Greenberg emailed Tilton eight "potential comparable transactions and comparable public companies that existed within the same or ancillary industries." (July 22 AM Tr. 42:17–18 (referring to JX_55).) Of the eight, only four had reported financial information. (JX_55.) Although the average EBITDA multiple of those four was 10.1x, that does not reflect an "industry average" and Greenberg did not testify that it did. In fact, Leland, who had "been in the ambulance business . . . [s]ince 1977" (Leland Tr. 10:20–22), told Tilton that an 8x multiple was "high for the industry." (PFOF ¶ 54.)

- *The Trustee wrongly asserts Dunn agreed that Envision and Air Methods were the most comparable companies to use in analyzing TransCare. (Sub. ¶ 248.)*

The Trustee misconstrues Dunn's testimony. Dunn testified that even if Envision and Air Methods were "the most comparable" companies to TransCare, the key question is "*how closely comparable are they*." (Aug. 8 Tr. 48:12–17 (emphasis added).) Because TransCare's financial metrics were far worse than those of Envision and Air Methods, the risk of achieving the projected cash flow "[wa]s substantially higher." (*Id.* at 58:11–13.) As a result, Dunn explained, a market participant would apply a lower (or no) multiple to TransCare than it would to Envision or Air Methods. (*See, e.g.*, PFOF ¶¶ 325, 328.)

- *The Trustee wrongly asserts Dunn did not support his "hypothesis" that TransCare's size, undercapitalization, distressed history, and low EBITDA margins would result in the application of a lower multiple. (Sub. ¶ 248(c).)*

11

Case 1:20-cv-06374-LAK Document 11-11 Filed 09/30/20 Page 263 of 569

Dunn's opinion that a lower multiple should apply to TransCare was not a "hypothesis." IRS Revenue Ruling 59–60 provides that a "business appraiser *must* exercise his judgment as to the degree of risk attaching to the business" and that the "judgment must be related to all of the factors effecting value" (PFOF ¶ 305), including a business's "historical context," "growth or lack of growth," and "past stability or instability." (PFOF ¶ 312.) Moreover, in the case law, multiples are often adjusted to account for differences between comparables and the subject. *See Agranoff v. Miller*, 791 A.2d 880, 892 (Del. Ch. 2001) (explaining valuation expert must "adjust[] [the] multiples to account for the differences from the company being valued and the comparables").

- *The Trustee wrongly asserts Dunn did not criticize Arnold's use of the precedent transaction approach. (Sub. ¶ 249.)*

Dunn's criticisms of Arnold's use of the comparable company method apply equally to Arnold's use of the precedent transaction method, as both require an "assessment of risk" as between TransCare and the same two comparable companies, Envision and Air Methods. (Aug. 8 Tr. 31:2–32:14; *see id.* at 47:23–48:4 ("Q: Do you have an opinion on whether Mr. Greenberg properly identified relevant comparable transactions? A: . . . My testimony isn't that these aren't the best market data that could be identified. My opinion is that it's still not comparable to TransCare.").)

- *The Trustee wrongly asserts "the February 24 projections are an extension of the January 7 projections, adjusted for the loss of the Maryland and Bronx/Westchester businesses in the interim." (Sub. ¶ 308.)*

The record evidence demonstrates that the February 24 Plan was not a refinement of the 2016 Preliminary Plan, but rather a separate and different plan. To take just two examples:

*First*, the differences in the projected EBITDA between the February 24 Plan and the 2016 Preliminary Plan reflect *more than* the loss of the "Maryland and Bronx/Westchester business"—*i.e.*, "an additional $2.5 million EBI[T]DA per year." (Sub. ¶ 308(c).) The

2016 Preliminary Plan contemplated the continued operation of all of TransCare's then-existing business lines, including *all* of its Core and 911 business.  (JX_67, at PP–TRBK0106586 ("Region Rev-EBITDA by Month 2016" Tab (showing projected 2016 EBITDA for NY Core and 911 of *over $9.3 million*)).)

*Second*, the Trustee's contention that the loss of the University of Maryland contract resulted in a decrease in projected 2016 EBITDA of $500,000 is also wrong.  (Sub. ¶ 308(b).)  Instead, as of February 13, several days before the contract was canceled, the internal modeling projected 2016 EBITDA for Maryland of *negative $131,000*.  (February 13 NewCo Model, PX_286, at PP–TRBK0105524 (MD – P&L Tab).)[17]

## C.     The Trustee's Misstatements Concerning The Ark II Facility

- *The Trustee wrongly asserts Tilton did not intend to structure the advances to TransCare in January 2016 as loans until February 10 as "part and parcel of Tilton's corporate reorganization of TransCare."  (See, e.g., Sub. ¶¶ 339–44, 356.)*

The Trustee asserts that (i) the advances made to TransCare in January 2016 were not intended as loans from Ark II to TransCare and (ii) the Ark II Facility was somehow intertwined with the OldCo/NewCo Restructuring.  (*See, e.g.*, Sub. ¶¶ 339–44, 356.)  Both assertions are false. (PFOF ¶¶ 143–60; PCOL at Section XIX.)  For example, the Submission states: "*Importantly*, Tilton did not give *any* testimony concerning her intent on January 15, and January 29, 2016 to structure the payments as secured loans to TransCare."  (Sub. ¶ 344 (emphasis added).)  That is flatly untrue.  The evidence shows that the advances were always intended to be fully-documented loans.  (*See* Aug. 13 AM Tr. 57:18–58:16 (explaining that Tilton had asked her team to "put a new credit facility together" for the January 15 advance); *id.* at 58:21–59:15; Aug. 13 PM Tr. 5:6–6:14 (explaining that Tilton "needed to have credit agreements under which [the loan] would have a first priority lien and be documented properly," because that was "the only basis [Tilton] was

---

[17] The Trustee also mischaracterizes the funding need noted in the 2016 Preliminary Plan, which reflected *the least amount of cash needed* to support a sale process.  (JX_67.)  Similarly, rather than "requir[ing] no new capital investment at all" (Sub. ¶ 313), the NewCo modeling showed a working capital need of $10 million.  (PFOF ¶ 204.)

13

A2608

willing to put in new money in a company that could end up in liquidation days later").)[18]  Tilton also testified that, at the time the advances were made, she had no plan to roll over to NewCo the funds lent from Ark II to TransCare.  (Aug. 13 PM Tr. 65:12–19 ("Q:  At the time that you extended the funding from your personal funds [in January 2016].  Did you have a plan at that time to roll over those funds into NewCo?  A:  No.  I didn't even come up with the idea for the OldCo/NewCo structure until somewhere around February 7th or 9th").)

## THE TRUSTEE MISSTATES AND MISAPPLIES THE LAW

### Count I:  Fair Dealing and Fair Price

Defendants' Proposed Conclusions of Law demonstrate that the OldCo/NewCo Restructuring was the product of fair dealing and at a fair price.  (PCOL ¶¶ 358–393.)  Nothing in the Submission alters that conclusion.

As to fair dealing, the Submission fails to demonstrate that the case law required Tilton to call third parties to see if they were interested in purchasing TransCare (Sub. ¶ 282) during the two-week period at issue.  (PFOF ¶¶ 161–227.)  In the one case on which the Trustee relies for this argument, *Bomarko, Inc. v. Int'l Telecharge, Inc.*, 794 A.2d 1161 (Del. Ch. 1999) ("*Bomarko I*") (*see* Sub. ¶ 282), the court's concerns about fair dealing did not involve a director's alleged failure to engage in outreach; rather, the evidence of unfair dealing was the director's active interference with *then-ongoing discussions* between the company and a potential third-party financing source.  *Id.* at 1178–79.

---

[18] Wells Fargo also understood that, as of December 2015, Tilton would only provide additional funding to TransCare on a protected basis.  (*See* Husson (*LaMonica*) Tr. 49:3–10 ("[Tilton] wanted to put it in as a junior participation in our deal . . . she would've been part of the senior secured facility and all the benefits that went along with being part of the senior secured facility . . . [a]nd that was a safe way for her to put additional capital in the company.").)

14

In *Bomarko I*, International Telecharge, Inc. ("ITI") was nearly-bankrupt and needed a source of financing. ITI's Board established a special committee to search for financing as part of an attempt to restructure. *Id.* at 1178. Defendant Ronald Haan, the Chairman, CEO, and President of ITI, began discussions with Bell Atlantic about potential financing. *Id.* at 1168–69. After a meeting between Bell Atlantic, Haan, and ITI's CFO, Bell Atlantic sent Haan a proposed term sheet. *Id.* at 1169. Instead of sharing the term sheet with the special committee, Haan *hid* it from them and continued secret negotiations with Bell Atlantic in order to advance his own personal interests. *Id.* at 1169, 1178. As a result, the special committee labored under the misimpression that Bell Atlantic was unlikely to provide financing to ITI. *Id.* at 1171. The ITI Board, believing that no other financing was available, thereafter entered into a merger agreement with another company wholly owned by Haan. *Id.* at 1171–72. The court concluded that Haan's "secretive and disruptive contacts with Bell Atlantic" and his "efforts to conceal his Bell Atlantic contacts betray[ed] his guilty knowledge that those contacts had a material impact on ITI's search for financing" and reflected "his disrespect for the norms of fiduciary behavior." *Id.* at 1181.

Tilton's actions in respect of the OldCo/NewCo Restructuring bear no similarity to Haan's actions in *Bomarko I*. Haan's "faithless behavior" in concealing the Bell Atlantic term sheet from the special committee impeded ITI's ability to "work[] out a deal with Bell Atlantic." *Id.* at 1181. In sharp contrast, Tilton did not interfere (and could not have interfered) with any opportunity to sell TransCare in the two-week period in which the OldCo/NewCo Restructuring was pursued because *no active opportunity existed*. Instead, in early February 2016, Tilton, Wells Fargo, and CMAG had decided not to pursue a sale because TransCare was not stable enough to survive a sale process. (PFOF ¶¶ 142, 165–68.) Put simply, Haan's decision to steer a much-needed source of funds away from ITI for his own self-interest at a time when the terms of such financing "were

15

fully negotiable" (*Bomarko I*, 794 A.2d at 1181) is completely distinguishable from Tilton not contacting third parties to see if they were even interested in TransCare as the Company was falling apart.

Nor, as the Trustee argues (Sub. ¶ 281), did fair dealing require Tilton to disclose or discuss the OldCo/NewCo Restructuring with all of TransCare shareholders, including Credit Suisse, before moving forward with the Article 9 foreclosure. That is because Delaware law only requires that directors "disclose all material information in their possession to shareholders when *seeking shareholder approval for some corporate action*." *In re CheckFreeCorp. S'holders Litig.*, 2007 WL 3262188, at *2 (Del. Ch. Nov. 1, 2007) (emphasis added); *see also Jackson Nat'l Life Ins. Co. v. Kennedy*, 741 A.2d 377, 388 (Del. Ch. 1999) (emphasis added) (finding director had no fiduciary obligation to disclose transaction to stockholder because plaintiff stockholder "*did not have the right to participate in any stockholder action surrounding the disputed transaction.*").

Here, Tilton did not seek shareholder approval for the OldCo/NewCo Restructuring *because it was not required.* Instead, under the plain terms of the TLA, the Required Lenders had sole discretion to foreclose on the Collateral upon an Event of Default. (PFOF ¶¶ 27–28.) Stated differently, Credit Suisse had no right or ability to prevent the Article 9 foreclosure, and thus had no right to decide if or how it occurred. *See Solomon v. Pathe Commc'ns Corp.*, 1995 WL 250374, at *6 (Del. Ch. Apr. 21, 1995).[19],[20]

---

[19] In any event, the OldCo/NewCo Restructuring was in part designed to benefit Credit Suisse and the other Term Loan Lenders. (*See* PFOF ¶¶ 208–15.)

[20] The Trustee also contends that the timing of the transaction was unfair because Tilton waited to foreclose until insurance for NewCo was bound. (Sub. ¶ 283.) That is a red herring. *Of course* the timing of the Article 9 foreclosure corresponded to binding insurance for NewCo; NewCo *could not operate* without it. (*See* DX_147 (Strack stating to Tilton, "Is there any update on procuring insurance for Newco?").) However, there is simply no evidence that Tilton *opportunistically* timed when insurance would be bound to advantage herself or, for that matter, had any control over whether and when NewCo would bind insurance at all. *Cf. Kahn v. Tremont Corp.*, 694 A.2d 422, 431 (Del. 1997) (finding timing was fair even though the controlling shareholder "obtained a significant financial advantage in the timing of the purchase" because he "did not do so at the expense of [the controlled company]").

16

The Submission also misconstrues the showing Tilton must make to establish that the price paid for the Subject Collateral was fair; contrary to the Trustee's assertion, entire fairness does not require that Tilton prove the price paid for the Subject Collateral was "the highest value that could be realized." (Sub. ¶ 284.) The duty of directors to maximize sale price applies only in the so-called *Revlon* context, when directors "embark[] on a transaction . . . that will result in a change of control" of the corporation such as a merger or the sale of the corporation for cash. *Lyondell Chem. Co. v. Ryan*, 970 A.2d 235, 242 (Del. 2009); *In re Santa Fe Pac. Corp. S'holder Litig.*, 669 A.2d 59, 71 (Del. 1995).

The Trustee made no argument that *Revlon* enhanced scrutiny applies to this case (FPTO ¶ 184(b)) and it does not. Tilton ultimately decided not to put the Company up for sale because she concluded—in consultation with Wells Fargo and CMAG—that a sale process would not be viable. (PFOF ¶¶ 136–42, 161–68.) Moreover, had the OldCo/NewCo Restructuring succeeded, there would have been no change of control: Tilton, through her investment vehicles, was the majority owner of TransCare and would have been the majority owner of NewCo. (Stipulation Nos. 8–9, PFOF ¶¶ 208–15.)[21]

**Count I: Damages**

Similarly misleading is the Trustee's discussion of the case law on fiduciary duty damages.

---

[21] The Submission relies on several cases considering fair price in the *Revlon* context which, as stated, are inapposite. *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993) (emphasis added) (discussing maximizing price in "transaction *involving a sale of a company*"); *Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1156, 1163 (Del. 1995) (applying *Revlon* standards in entire fairness context "*because the contested action [wa]s the sale of a company*"); *Guiliano v. Schnabel (In re DSI Renal Holdings, LLC)*, 574 B.R. 446, 472 (Bankr. D. Del. 2017) (denying motion to dismiss where defendants failed to seek highest value reasonably available for the company *during sale process*). Moreover, the courts in *Bomarko I*, *HMG/Courtland Props. Inc. v. Gray*, 749 A.2d 94, 116–17 (Del. Ch. 1999) and *Summa Corp. v. Trans World Airlines, Inc.*, 540 A.2d 403, 408 (Del. 1998) (*see* Sub. ¶¶ 284–85), did not even address the question of whether a director must prove the price received was the highest price available, let alone conclude such proof is *required*. On the contrary the *HMG* court acknowledged that "fairness is often a range, rather than a point." *HMG*, 749 A.D. 94 at 117 (citation omitted).

17

For example, the Trustee argues he is "entitled to the value that TransCare would have had if it had been successfully restructured without a breach of fiduciary duty." (Sub. ¶ 293.) He makes this argument in an apparent attempt to bolster Arnold's calculations, all of which assume TransCare would have been successfully restructured. The Trustee cites only one case in support, *Int'l Telecharge Inc. v. Bomarko, Inc.*, 766 A.2d 437 (Del. 2000), but, as discussed above, the trial court's opinion (*Bomarko I*) shows that the case differs factually from this one in crucial respects.

In *Bomarko I*, ITI restructured some of its debt prior to implementing the challenged merger transaction. The defendants argued that, in valuing the company, the court should not include the benefit of the debt restructuring because, without the merger transaction, ITI would not have been able to obtain needed financing and restructure its debt, rendering ITI valueless. In rejecting that contention, the court stressed that Haan had interfered with the specific existing financing opportunity with Bell Atlantic in order "to divert the opportunity to secure financing from Bell Atlantic away from ITI at the moment ITI most needed it." *Bomarko I*, 794 A.2d at 1173. The court further found that Haan "fully understood the impropriety of his conduct and affirmatively tried to conceal it . . . ." *Id.*

Thus, it was precisely "[b]ecause of the nature of the wrongs committed" by Haan that the court rejected defendants' argument that the value of ITI should not include the debt restructuring. *Id.* at 1184. Indeed, the trial court recognized that although this was a "potentially harsh" result, it was nonetheless appropriate "given the nature of Haan's misconduct." *Id.* at 1185.

Here, unlike in *Bomarko I*, there was no specific opportunity to restructure or sell TransCare that Tilton wrongfully interfered with, much less one she sabotaged for her personal benefit or concealed from stakeholders. Thus, there is no basis for the Court to apply the reasoning

18

of *Bomarko I* and assume that TransCare would have somehow been successfully restructured, or sold for tens of millions of dollars (as the Trustee argues), but for the Article 9 foreclosure.[22]

The Trustee also cites several cases applying *New York* law for the proposition that breaches of fiduciary duty "'comprise a special breed of cases that often loosen normally stringent requirements of causation and damages.'"   (Sub. ¶ 289 (quoting *Milbank, Tweed, Hadley & McCloy v. Boon*, 13 F.3d 537, 543 (2d Cir. 1994)).)   However, as one of the very cases the Trustee cites makes clear, whether this loosening of stringent requirements applies depends "on the type of remedy sought."   *LCN Invs., Inc. v. First Fidelity Bank, N.A. NJ*, 173 F.3d 454, 465 (2d Cir. 1999).   Where, as here, the remedy sought is to compensate for a loss, as opposed to preventing the defendant's unjust enrichment, the normal damages-causation rules apply.   *Id.*[23]

## Count VII:  Actual Fraudulent Conveyance

The Trustee's legal arguments in support of his claim for actual fraudulent conveyance are similarly flawed.[24]   For example, after the close of evidence, the Court asked the Trustee's counsel, with regard to the claim for actual fraudulent conveyance, "what's the evidence that [Tilton] wasn't acting with an honest intention to reorganize or save the company?"   (Aug. 14 PM Tr. 6:22–24.)

---

[22] The Trustee similarly argues "that the 'full value' recoverable by the Trustee is not merely what a third-party sale would likely have produced if Tilton sold under desperate circumstances, but its fair market value." (Sub. ¶ 294.) This attempted distinction is meaningless; between February 9 and February 24, TransCare's fair market value inherently reflected the Company's desperate conditions. Arnold's calculations, in contrast, improperly ignored them.
[23] To justify Arnold's decision not to perform a DCF valuation of TransCare, the Trustee contends that a DCF analysis could not be done without audited financials. (Sub. ¶ 303 ("The data was simply not there.").) At the same time, the Trustee's contentions concerning Tilton's purported lack of fair dealing rely on the notion that some hypothetical buyer or new lender would have put tens of millions of dollars at risk notwithstanding the fact that, in the Trustee's own words, "the data was simply not there." (*See, e.g., id.* ¶ 282.) The Trustee cannot have it both ways: the data that was "too unreliable" for Arnold (*id.* ¶ 303) would have been similarly and prohibitively unreliable for a potential third-party buyer or lender assessing whether to invest in TransCare. The Trustee's contention that Tilton was responsible for "this state of affairs" (*see id.*)—*i.e.*, the lack of current audited financials—is also off base because, even if true (which it is not), it is irrelevant to whether Tilton breached her duty *of loyalty*.
[24] Due to space limitations, Defendants respectfully refer to paragraphs 440–443 of their Proposed Post-Trial Conclusions of Law for a correct discussion of the applicable law and analysis of the actual fraudulent conveyance claim.

19

The Trustee's counsel replied: "I don't know that we would say that she wasn't acting with an honest intention to reorganize or save the company." (*Id.* at 6:25–7:2.)

The Trustee now tries to save this claim by citing *Priestly v. Panmedix*, 18 F. Supp. 3d 486 (S.D.N.Y 2014), a case where an actual fraudulent conveyance was found even though the conveyance was intended to save the company. (Sub. ¶ 324.) In *Priestly*, however, the court found the case was "brimming with badges of fraud" and the evidence compellingly supported the conclusion that the challenged conveyance was specifically designed to frustrate a judgment creditor's ongoing effort to enforce her judgment. 18 F. Supp. 3d at 503. Here, in contrast, there are no material badges of fraud whatsoever (PCOL ¶¶ 440–43) and no evidence that the purpose of the Article 9 foreclosure was to frustrate any creditor's ability to collect (much less ongoing efforts to do so). Rather, the credible evidence was that the OldCo/NewCo Restructuring was intended to save jobs, provide a chance for the Term Loan Lenders to recover through an equity upside and otherwise maximize value for Wells Fargo and other creditors through an orderly wind-down of OldCo.[25] (*See* PFOF ¶¶ 174–78, 208–15.)[26], [27]

---

[25] Notably, although the Trustee argues that the "express purpose" of the Article 9 foreclosure was "to free TransCare's most valuable assets from the claims of all creditors other than Tilton herself" (Sub. ¶ 327(b)), he cites to *nothing* (and there *is* nothing) to support that claim.

[26] The Trustee also mistakenly contends that if the transfer of the Subject Collateral from TransCare to PPAS, as administrative agent, is avoided, he may recover between $22 and $39 million (*i.e.*, the amount Arnold concluded the NewCo business lines were worth "when they were still operating entities"). (Sub. ¶¶ 317–18.) As the Submission states, however, "[t]he purpose of § 550(a) is to restore the estate to the condition it would have been in if the transfer had never occurred." *Id.* As of February 24, TransCare was out of money and its business lines necessarily could not have operated without a substantial and voluntary cash infusion. (*See, e.g.*, PFOF ¶¶ 110–11, 136–38, 187–94.) In other words, at the time of the transfer, TransCare was only worth what its assets could garner in a liquidation, not what the NewCo business could be worth as a going concern.

[27] The Trustee is similarly not entitled to an award of attorneys' fees under Section 276-a of the DCL. The Trustee does not dispute that attorneys' fees may only be awarded when a conveyance is found to have been made by the debtor *and* received by the transferee with actual intent. (Sub. ¶ 326 n.28 (citing *In re Dreier LLP*, 452 B.R. 391, 435 (Bankr. S.D.N.Y. 2011)).) As discussed, there is no evidence to support that TransCare transferred the Subject Collateral with any intent to hinder, delay or defraud creditors. (PCOL ¶¶ 440–43.) The record is similarly devoid of evidence showing PPAS received the assets with the requisite intent. Instead, PPAS, as administrative agent, simply exercised the Term Loan Lenders' rights to realize upon the Collateral as set forth in the TLA and PPAS Security Agreement. (*See, e.g.*, PCOL ¶¶ 433–34.)

20

Dated: October 11, 2019

PROSKAUER ROSE LLP

By: */s/ Michael T. Mervis*

Michael T. Mervis
Timothy Q. Karcher
Marissa Tillem
Eleven Times Square
New York, NY  10036-8299
Tel.: (212) 969-3000
Fax: (212) 969-2900
Email: mmervis@proskauer.com
tkarcher@proskauer.com
mtillem@proskauer.com
*Attorneys for Defendants*

21

**A2616**

Case 1:20-cv-06274-LAK Document 11-1 Filed 09/30/20 Page 273 of 569

# EXHIBIT A

Case 1:20-cv-06274-LAK   Document 11-14   Filed 09/30/20   Page 374 of 569

I.      November 27, 2018 Deposition Transcript of Glenn Leland ("Leland I Tr.") and January 3, 2019 Deposition Transcript of
Glenn Leland ("Leland II Tr.")

| | Glenn Leland | | | |
|---|---|---|---|---|
| | **Trustee's Designation(s)** | **Objection(s)** | **Cross-Designation(s); Additional Rebuttal Leland Designations[1]** | **Additional Rebuttal Evidence Adduced At Trial** |
| 1. | Leland I Tr. 46:6–51:21 | 46:19–47:5: Lack of relevance<br>47:9–12: Lack of relevance<br>47:22–48:2: Lack of relevance<br>49:12–15: Lack of relevance<br>50:17–22: Lack of relevance<br>50:25–51:21: Lack of relevance | | July 23 AM Tr. 50:11–14; 54:21–55:2 |
| 2. | Leland I Tr. 59:5–61:14 | 60:17–19: Lack of relevance | Leland II Tr. 377:19–378:14<br>Leland II Tr. 686:20–691:13 | July 22 AM Tr. 60:9–17<br>July 23 AM Tr. 61:14–25<br>Aug. 13 PM Tr. 23:11–18<br>JX_7<br>JX_46, at PP-TRBK0053413 |
| 3. | Leland I Tr. 77:2–78:23 | Lack of relevance | Leland I Tr. 101:22–24 | July 23 AM Tr. 66:4–6<br>July 23 PM Tr. 20:25–21:10<br>JX_11, at PP-TRBK0087751 |
| 4. | Leland I Tr. 80:4–6 | Lack of relevance | Leland II Tr. 411:9–19, 415:10–14, 421:22–17<br>Leland II Tr. 458:12–15, 461:21–462:15 | JX_32, at PP-TRBK0031309 |

---

[1] The testimony designated in this column consists of (i) Defendants' cross-designations to Leland's deposition testimony (FPTO, Ex. E); (ii) testimony Defendants' designated from the January 3, 2019 deposition of Mr. Leland; and (iii) additional deposition testimony of Mr. Leland that the Trustee designated in the FPTO but did not reference in his Submission.

| Glenn Leland | | | |
|---|---|---|---|
| **Trustee's Designation(s)** | **Objection(s)** | **Cross-Designation(s); Additional Rebuttal Leland Designations[1]** | **Additional Rebuttal Evidence Adduced At Trial** |
| 5. | Leland I Tr. 82:21–83:25 | 83:13–25: Lack of relevance | Leland II Tr. 511:3–513:3<br>Leland II Tr. 537:17–539:6 | JX_29<br>JX_32<br>JX_44<br>JX_52 |
| 6. | Leland I Tr. 84:9–16 | Lack of relevance | Leland II Tr. 320:25–321:13<br>Leland II Tr. 326:16–328:3 | JX_32, at PP-TRBK0031309 |
| 7. | Leland I Tr. 85:9–86:14 | | | July 23 AM Tr. 63:2–64:7<br>Aug. 13 AM Tr. 48:8–16 |
| 8. | Leland I Tr. 97:11–98:25 | | | Aug. 13 AM Tr. 48:8–11; 49:1–17<br>Aug. 13 PM Tr. 36:13–19 |
| 9. | Leland I Tr. 101:13–101:20 | | Leland I Tr. 101:22–24 | JX_11, at PP-TRBK0087751 |
| 10. | Leland I 144:13–145:17 | | Leland II Tr. 377:19–378:14<br>Leland II Tr. 686:20–691:13 | July 22 AM Tr. 60:9–17<br>JX_49, at TRANSCARE00006122 |
| 11. | Leland I Tr. 171:5–172:24 | | | July 22 PM Tr. 89:1–25; 90:6–14 |
| 12. | Leland I 172:25–173:9 | | | Aug. 13 PM Tr. 36:13–16; 37:16–20 |
| 13. | Leland I Tr. 174:2–175:13 | | | Aug. 13 PM Tr. 38:4–39:14 |
| 14. | Leland I Tr. 176:2–7 | | | July 23 AM Tr. 53:4–22 |
| 15. | Leland I Tr. 178:2–180:19 | | Leland I Tr. 179:13–180:2 | |
| 16. | Leland I Tr. 245:22–246:24 | | Leland II Tr. 377:19–378:14<br>Leland II Tr. 686:20–691:13 | JX_45, at PP-TRBK0030459<br>JX_51, at PP-TRBK0098489 |
| 17. | Leland II Tr. 547:13–549:9 | | | July 22 PM Tr. 94:14–96:12 |
| 18. | Leland II Tr. 583:9–584:25 | | | July 22 PM Tr. 94:14–96:12 |

2

II.     *LaMonica v. Tilton, et al.*, Adv. Proc. No. 18-1021: November 12, 2018 Deposition of John Husson ("<u>Husson (*LaMonica*) Tr.</u>")

| John Husson | | | |
|---|---|---|---|
| **Trustee's Designation(s)** | **Objection(s)** | **Cross-Designation(s)** | **Additional Rebuttal Evidence Adduced At Trial** |
| 1. Husson (*LaMonica*) Tr. 44:25–45:25 | | | DX_88, at PP-TRBK0109644<br>DX_92, at PP-TRBK0075200 |
| 2. Husson (*LaMonica*) Tr. 48:11–49:10 | Lack of relevance | | |
| 3. Husson (*LaMonica*) Tr. 56:14–57:6 | | | July 22 PM Tr. 118:3–10<br>DX_92, at PP-TRBK0075200<br>DX_130, at PP-TRBK0028276<br>JX_84, at WF_TC_0000053 |

III.     *Ien v. TransCare Corp., et al.*, Adv. Proc. No. 16-1033: November 12, 2018 Deposition Transcript of John Husson ("<u>Husson (*Ien*) Tr.</u>")

| John Husson | | | |
|---|---|---|---|
| **Trustee's Designation(s)** | **Objection(s)** | **Cross-Designation(s)** | **Additional Rebuttal Evidence Adduced At Trial** |
| 1. Husson (*Ien*) Tr. 35:24–36:20 | 36:17–20: Lack of personal knowledge; Improper lay opinion | | DX_92, at PP-TRBK0075200 |

3

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------x

In re:                                          :

                                         :

          TRANSCARE CORPORATION, *et al.*,    :    Chapter 7

                                           :    Case No. 16-10407 (SMB)

                                         :    (Jointly Administered)

                        Debtors.    :

---------------------------------------------------------x

SALVATORE LAMONICA, as Chapter 7         :
Trustee for the Estates of TransCare      :
Corporation, *et al.*,                    :

                                      :

                    Plaintiff,       :

                                         :

          - against -                      :

                                         :    Adv. Proc. No. 18-01021 (SMB)

LYNN TILTON, PATRIARCH PARTNERS         :
AGENCY SERVICES, LLC, PATRIARCH          :
PARTNERS, LLC, PATRIARCH PARTNERS        :
MANAGEMENT GROUP, LLC, ARK II CLO        :
2001-1 LIMITED, TRANSCENDENCE            :
TRANSIT, INC., and TRANSCENDENCE         :
TRANSIT II, INC.,                        :

                                      :

                    Defendants.     :

---------------------------------------------------------x

## POST-TRIAL FINDINGS OF FACT
## AND CONCLUSIONS OF LAW

**A P P E A R A N C E S :**

STORCH AMINI PC
*Attorneys for Plaintiff*
2 Grand Central Tower
140 East 45th Street, 25th Floor
New York, NY 10017

      Bijan Amini, Esq.
      Avery Samet, Esq.
      Jaime B. Leggett, Esq.
          Of Counsel

PROSKAUER ROSE LLP
*Attorneys for Defendants*
Eleven Times Square
New York, NY 10036-8299

> Michael T. Mervis, Esq.
> Timothy Q. Karcher, Esq.
> Marissa Tillem, Esq.
>         Of Counsel

**STUART M. BERNSTEIN**
**United States Bankruptcy Judge:**

## INTRODUCTION

Salvatore LaMonica, Esq. ("Trustee") commenced this adversary proceeding on behalf of the estates (collectively, the "Estate") of the debtor TransCare Corporation and its debtor-affiliates (collectively, "TransCare" or the "Debtors") to recover damages and avoid certain transfers that occurred before or after the filing of the initial petitions in these cases. He also seeks other forms of relief. The Trustee's claims arise, for the most part, from two discrete though related transactions: (1) the strict foreclosure of the Debtors' most valuable assets by an entity controlled by an insider and immediate resale of those assets to another entity controlled by the same insider, and (2) the granting of a lien to yet another entity controlled by the same insider.

The Court conducted a multi-day bench trial and based upon the evidence adduced, respectfully recommends to the District Court that it enter a money judgment against defendant Lynn Tilton in the sum of $41.8 million. The Court finds and concludes that the transfer resulting from the strict foreclosure must be avoided, and the Estate is awarded a judgment in the amount of $39.2 million against PPAS, in addition to the Trustee's reasonable attorneys' fees. Finally, the lien granted to the insider must also be avoided and preserved for the benefit of the Estate.

# FINDINGS OF FACT[1]

## A.    The Parties

The Debtor TransCare Corporation is a Delaware corporation headquartered in Brooklyn, New York.  (Stipulation No. 1.)  TransCare Corporation, by and through its subsidiaries, provided ambulance services to hospitals and municipalities for both emergency and non-emergency patients, and paratransit services to the New York Metropolitan Transit Authority ("MTA") for individuals with disabilities.  (Stipulation No. 1.)  TransCare's principal business lines were (a) ambulance services in (1) New York City, (2) Westchester, New York, (3) Hudson Valley, headquartered in Poughkeepsie, New York, (4) Pittsburgh, Pennsylvania, and (5) Maryland; and (b) its contract with the MTA to provide paratransit services for people with disabilities throughout the City of New York (the "MTA Contract") using vehicles leased from the MTA.  On July 13, 2015,

---

[1]    This decision uses the following conventions:  "DX", "PX" and "JX" refer, respectively, to the Defendants' trial exhibits, the Plaintiff's trial exhibits and the parties' joint trial exhibits.

"Stipulation No." refers to the numbered paragraphs in the Stipulated Facts section of the May 14, 2019 Joint Pretrial Order (ECF Doc. # 85) at pages 6-15.  Unless otherwise indicated, the ECF references are to the electronic docket in this adversary proceeding.

"Tr. Month/Day" (*e.g.*, "Tr. 7/22") refers to the official transcripts of the trial conducted on July 22, 23, 24, August 8, 13 and 14, 2019.  "A.M." and "P.M." refer to the morning and afternoon sessions, respectively.

"Husson Tr. (*LaMonica*)" and "Husson Tr. (*Ien*)" refer to the designated deposition testimony of John Husson, the Rule 30(b)(6) witness of Wells Fargo, N.A., taken in (i) this action and (ii) *Ien v. TransCare Corp., et al.*, Adv. Proc. No. 16-01033 (SMB).

"Leland Tr." refers to the deposition testimony of Glenn Leland, TransCare's former CEO.  The Defendants requested that the Court review the video of Leland's deposition and not just the excerpts from the 731-page transcript, (*Defendants' Response to Trustee's Post-Trial Proposed Findings of Fact and Conclusions of Law* ("*Defendants' Response*"), dated Oct. 11, 2019, at 1 n. 3 (ECF Doc. # 137)), but have not explained why my review of the transcript is insufficient and I decline the Defendants' request.

In addition, the *Defendants' Response* included a chart, attached as Exhibit A that, at least in some cases, provided a basis for an objection to the designated Husson or Leland deposition testimony and/or cross-designated other testimony or evidence.  Where Exhibit A does not indicate a basis for an objection and cross-designates other testimony or evidence relating to the excerpt, I assume that the inclusion of the excerpt on Exhibit A was solely for the purpose of cross-designation and not to object.

TransCare New York, Inc. and the MTA executed a Modification to the MTA Contract which extended the MTA Contract through October 31, 2019. (PX 158; Stipulation Nos. 29-30.)

At all relevant times, the Defendant Lynn Tilton served as the sole director of TransCare. (Stipulation No. 2.) The Defendant Ark II CLO 2001-1, Limited ("Ark II"), a Cayman Islands company, owns a 55.7% direct interest in TransCare, and Tilton owns 99% of Ark II. (Stipulation Nos. 6, 8.) Non-party Ark Investment Partners II, L.P. ("AIP"), a Tilton affiliate, owns 5.6% of TransCare's shares. (Stipulation No. 9.) Credit Suisse Alternative Capital, Inc. ("Credit Suisse") owns outright, or manages, 26% of TransCare's equity on behalf of five separate entities (PX 235 at 98626[2]), and the remaining 12.7% of TransCare is owned by various entities and individuals. (ECF Case No. 16-10407 Doc. #132.)

The Defendants Patriarch Partners Agency Services, LLC ("PPAS"), Patriarch Partners, LLC ("Patriarch Partners") and Patriarch Partners Management Group, LLC ("PPMG") are Delaware limited liability companies, and the Defendants Transcendence Transit, Inc. ("Transcendence Transit") and its direct subsidiary, Transcendence Transit II, Inc. ("Transcendence II" and, together with Transcendence Transit, "Transcendence") are Delaware corporations. (Stipulation Nos. 3-7.) Tilton is the sole manager and ultimate indirect owner of PPAS, Patriarch Partners and PPMG, (Stipulation Nos. 3-5), and the sole director of both Transcendence entities. (Stipulation No. 7.) Lastly, PPAS, Patriarch Partners, PPMG and Ark II maintain their principal

---

[2]     In citing to the Bates-stamped page numbers, the Court will omit the prefix and refer to the last five or six digits of the Bates-stamped page number.

places of business at 1 Liberty Street, 35th Floor, New York, New York, (Stipulation Nos. 3-6), and the Transcendence entities have a mailing address at that location. (Stipulation No. 7.)

## B.    TransCare's Debt Structure

### 1.    Term Loan

TransCare Corporation, as borrower, the Term Loan Lenders (defined below), as lenders, and PPAS, as Administrative Agent, are parties to a Credit Agreement, dated as of August 4, 2003 (as amended, the "Term Loan"). From November 1, 2014 through February 24, 2016 (the "Relevant Period"), the lenders under the Term Loan were: (i) AIP, (ii) Zohar CDO 2003-1, Ltd., Zohar II 2005-1, Ltd., and Zohar III, Ltd. (collectively, the "Zohar Funds"); (iii) Credit Suisse and (iv) First Dominion Funding I ("First Dominion" and, together with AIP, the Zohar Funds, and Credit Suisse, the "Term Loan Lenders").[3] (Stipulation No. 10.) The Zohar Funds owned over 75% of the Term Loan debt. (PX 209.) Credit Suisse acted as collateral manager for First Dominion, (JX 1 at 00106; Tr. 7/22 P.M. 30:20-23), and Credit Suisse and First Dominion together owned approximately 18% of the Term Loan debt. (PX 209.) AIP owned approximately 7% of the Term Loan debt. (PX 209.)

In connection with the Term Loan, TransCare Corporation executed a Security Agreement, dated as of August 4, 2003, and as amended, supplemented or modified, in favor of PPAS, as Administrative Agent for the Term Loan Lenders. (Stipulation No. 12.) In addition to the Security Agreement, the TransCare Corporation's subsidiaries,

---

[3]    The Term Loan is governed by New York law. (Stipulation No. 11.)

5

debtors in these cases, executed a Guarantee, dated as of August 4, 2003, as amended, supplemented or modified, in favor of PPAS, as Administrative Agent for the Term Loan Lenders. (Stipulation No. 13.)

### 2. Wells Fargo Credit Facility

TransCare Corporation, TransCare New York, Inc., TransCare Pennsylvania, Inc., TransCare Maryland, Inc., TransCare ML, Inc., TC Hudson Valley Ambulance Corp., TC Billing and Services Corp., TC Ambulance Corporation, TransCare Management Services, Inc., TCBA Ambulance, Inc., TransCare Westchester, Inc. and TransCare Harford County, Inc., as Borrowers and TC Ambulance Group, Inc. and TC Ambulance North, Inc., as Guarantors, entered into a Loan and Security Agreement with Wells Fargo N.A., as successor-by-merger with Wachovia Bank, N.A. ("Wells Fargo"), dated October 13, 2006 (as amended, the "ABL"). The ABL is a syndicated asset-backed revolving credit facility, (Stipulation No. 14), and is governed by New York law. (Stipulation No. 15.)

Both the Term Loan and the ABL were secured by blanket liens on all of TransCare's assets. (DX 3 at § 2; JX 2 at § 5.1.) Wells Fargo and PPAS, on behalf of the Term Loan Lenders, entered into an Intercreditor Agreement, dated October 13, 2006 (the "2006 Intercreditor Agreement"). (Stipulation No. 16.) Under the 2006 Intercreditor Agreement, PPAS received a first priority lien on TransCare's vehicles, certain other physical assets, capital stock of the subsidiaries, and intellectual property (the "Term Loan Priority Collateral"), and Wells Fargo received a first priority lien on all other assets (the "ABL Priority Collateral"), including the Accounts (including accounts receivable) and general intangibles. (JX 3 at §§ 1.26, 1.35, 2.2.) Pursuant to an

6

**A2626**

irrevocable payment assignment, all of TransCare's receivables were paid to a lockbox controlled by Wells Fargo, including all of the payments received under the MTA Contract.  (PX 2.)

### 3.    Ark II Credit Agreement

TransCare Corporation and Ark II entered into a Credit Agreement, dated as of January 15, 2016 (the "Ark II Credit Agreement").  (Stipulation No. 17.)  The Ark II Credit Agreement is governed by New York law.  (Stipulation No. 18.)  In connection with the Ark II Credit Agreement, TransCare Corporation executed a Security Agreement, dated as of January 15, 2016, in favor of Ark II (the "Ark II Security Agreement"), (Stipulation No. 19), and on January 29, 2016, Ark II filed separate UCC-1 financing statements with the Delaware Department of State for TransCare Corporation and its subsidiaries.  Each UCC-1 financing statement provided that Ark II held a security interest in "All assets of the debtor . . . ."  (Stipulation No. 23.)  In addition to the Ark II Security Agreement, the TransCare Corporation's subsidiaries executed a Guaranty, dated as of January 15, 2016, in favor of Ark II (the "Ark II Guaranty"). (Stipulation No. 20.)  In connection with the Ark II Credit Agreement, Ark II and PPAS entered into an intercreditor agreement, dated as of January 15, 2016 (the "2016 Intercreditor Agreement"), described in greater detail below, for which TransCare executed an acknowledgment.  (Stipulation No. 22.)

Notwithstanding the dates on these documents, the Ark II Credit Agreement, Ark II Security Agreement, Ark II Guaranty and the 2016 Intercreditor Agreement were not executed until on or about February 10 or 11, 2016.  (Stipulation Nos. 21, 22.)

## C.    Management of TransCare

Glenn Leland served as TransCare's Chief Executive Officer ("CEO") from January 12, 2015 through January 8, 2016.  (Stipulation No. 24.)  Mark Bonilla served as TransCare's Chief Financial Officer ("CFO") from April 2014 through September 29, 2015 and, following his resignation on that date, served as a consultant to TransCare until January 8, 2016, (Stipulation No. 25), but per Tilton's instructions, Michael Greenberg, a Patriarch Partners credit officer, took on the responsibility for TransCare's finances.  (DX 73 at 58180; Tr. 7/22 A.M. 18:19-24.)  Peter Wolf served as TransCare's Chief Operating Officer ("COO") from November 16, 2015 through February 24, 2016. (Stipulation No. 26.)

Under an Authority Matrix issued by Tilton as sole director of the Board, the officers of TransCare did not have authority to:  (a) approve an annual operating plan budget or any interim operating plan or budget; (b) negotiate the sale or disposition of any assets; (c) recapitalize or make other change in the capital structure; (d) disclose any financial information to any third-party; (e) enter into any contract or license agreement not contemplated by the approved Annual Plan (of which there was none); (f) enter into any financing or loan agreement;  (g) dispose of any unusable asset or write off any receivable, or make a charitable contribution; (h) change auditors; (i) engage legal counsel; (j) settle or compromise any claim; (k) engage any consultant; or (l) conduct any reduction in force.  (PX 3; Tr. 7/23 P.M. 15:16-17:11.)  Some items below certain dollar amounts could be authorized by a "Designated Executive" or an "Annual

A2628

Plan," (PX 3), but during the Relevant Period there was no Designated Executive and no Annual Plan. (*See* Leland Tr. 84:9-13;[4] JX 11.)

Accordingly, Tilton made all decisions for TransCare and managed TransCare through her employees at the Patriarch entities. Greenberg oversaw financial matters, payment of vendors and negotiations with Wells Fargo. (Tr. 7/22 A.M. 14:10−16:15; Leland Tr. 59:5−60:16, 144:13−145:17, 245:22−246:24.) Jean-Luc Pelissier, a platform leader at PPMG, oversaw operational matters. (Tr. 7/22 A.M. 24:11-19; Tr. 7/23 A.M. 6:7-19; Leland Tr. 46:6-47:12.[5]) Brian Stephen, an attorney and senior director of legal at Patriarch Partners, supported Tilton in legal matters regarding all of the Patriarch entities. (Tr. 7/23 P.M. 1:22−3:21.) Finally, Randy Jones of Patriarch Partners oversaw hiring. (Tr. 7/22 A.M. 24:22-24; Tr. 8/13 A.M. 53:22−54:1; Tr. 8/13 P.M. 47:23−48:2.) These Patriarch employees reported directly to Tilton, independently of TransCare management, regarding the operations and finances of TransCare. (*See* Tr. 7/22 A.M. 15:13-18 (Greenberg); Tr. 7/23 A.M. 7:15-17 (Pelissier); 7/23 P.M. 2:16-18 (Stephen).)

## D. TransCare's Growing Financial Problems

Throughout the Relevant Period, TransCare experienced difficulties in funding employee payroll and paying vendors. (Stipulation No. 27.) TransCare did not have audited financials for 2014, (Tr. 7/22 P.M. 79:21−80:12), and had delayed transmitting

---

[4]    The Defendants objected to this excerpt from the Leland Deposition as irrelevant. (*Defendants' Response*, Ex. A, item I.6.) The testimony supports the finding for which it is cited and the finding is relevant to Tilton's control over TransCare. The objection is overruled.

[5]    The Defendants objected to this excerpt from the Leland Deposition as irrelevant. (*Defendants' Response*, Ex. A, item I.1.) The testimony supports the finding for which it is cited, and the finding is relevant to Tilton's control over TransCare. The objection is overruled.

monthly financial statements to its lenders. (Stipulation No. 28.) On or about July 2, 2015, Wells Fargo informed TransCare that Wells Fargo was in an over-advanced position under the ABL facility and informed TransCare management that it would not fund TransCare's payroll for the week ending July 4, 2015. (Stipulation No. 31.) Consequently, on July 3, 2015, TransCare missed payroll. (Stipulation No. 32.)

In hindsight, the missed payroll marked the beginning of the end for TransCare. Following the missed payroll, Tilton negotiated a resolution with Wells Fargo to unblock the reserve, (Tr. 8/13 P.M. 43:20–44:5; DX 64), which involved, among other things, the Zohar Funds advancing an additional $2 million to TransCare.[6] (DX 64; PX 227 at 47615.) However, on October 14, 2015, Wells Fargo issued a Notice of Non-Renewal to TransCare (the "Non-Renewal Notice"). (DX 76; Stipulation No. 34.) The Non-Renewal Notice stated that the ABL would expire on January 31, 2016, and Wells Fargo "presently ha[d] no intention to extend or modify the term of such financing arrangements." (DX 76 at 06336.) The Non-Renewal Notice also stated that the outstanding balance had to be paid in full by TransCare by January 31, 2016, (*see id.*), something which TransCare was in no position to do. (Tr. 7/22 P.M. 93:6–11.)[7]

Needing Wells Fargo's financial support, Tilton tasked Greenberg to work with management at TransCare to prepare a 2016 budget that would be acceptable to Wells Fargo and convince it to extend the ABL. (Tr. 7/22 A.M. 28:4-11, 31:14-20.) She also

---

[6]     Between February 2015 and January 2016, the Zohar Funds advanced over $7.2 million to TransCare. (PX 227 at 47615–16.)

[7]     The outstanding balance owed to Wells Fargo as of the initial petition date, February 24, 2016, totaled approximately $13 million. (Tr. 7/24 159:19–22.)

directed Greenberg to develop a plan based upon his own assessment of TransCare's business. (Tr. 7/22 A.M. 33:9-12.) Working primarily with Pelissier, Greenberg submitted a presentation for Tilton's review and approval on November 14, 2015 to share with Wells Fargo at a meeting scheduled for two days later. (JX 51; Tr. 7/22 A.M. 32:6-25.) The 2016 plan conservatively estimated an $8.2 million growth in revenue, resulting in 2016 EBITDA of $11.5 million. (JX 51; Tr. 7/22 A.M. 32:6-25.) The plan called for forty-eight new ambulances (at $120,000 per vehicle, with a down payment of $30,000). (JX 51 at 98488-89.) It required $6.4 million in new capital ($2.8 million in lease payments, $2.8 million in new vehicle funding and $0.8 million in accounts payable reduction). (JX 51 at 98489, 98535.) Tilton agreed the plan could be shared with Wells Fargo, but never gave final approval to the plan and did not fund the new ambulances contemplated by the plan. (Tr. 7/22 A.M. 31:21–32:25, 102:6-9; Leland Tr. 547:13–549:9, 583:9–584:25; Tr. 7/22 P.M. 123:13-19.)

Meanwhile, starting in early 2015, TransCare received expressions of interest from other ambulance companies to acquire certain TransCare assets and business lines. On February 5, 2015, Leland reported that National Express was offering $15-18 million to purchase TransCare's paratransit division. (JX 12 at 04260; Leland Tr. 85:9–86:14.) On March 3, 2015, Mike Weinberger, the Chief Operating Officer of Richmond County Ambulance Service ("RCA") emailed Tilton seeking to purchase all or part of TransCare. (PX 44; Tr. 8/13 A.M. 45:7-15.) Weinberger stated that RCA was prepared to offer up to eight times TransCare's EBITDA, and also offered to consider an operational management arrangement. (PX 44 at 90486; Tr. 8/13 A.M. 45:7-15.)

11

A2631

Even after the payroll default, TransCare continued to receive expressions of interest. American Medical Response ("AMR") called Leland seeking to purchase TransCare's Westchester operations. (Leland Tr. 172:17-24.) On July 8, 2015, Weinberger emailed Tilton again expressing RCA's interest in purchasing or operating TransCare. (PX 73; Tr. 8/13 A.M. 45:17-24.) On July 10, 2015, National Express emailed Leland a Letter of Intent offering to purchase the MTA Contract for $6 to $7 million and assume up to $2 million in liabilities. (JX 40.) On July 13, 2015, Greenberg received a message from another Patriarch credit officer that Alliance Capital Advisors representing National Express was interested in purchasing TransCare's paratransit business. (PX 83; Tr. 7/22 P.M. 74:8-17.)

On July 31, 2015, Greenberg reported to Tilton on Envision Healthcare's purchase of Rural/Metro Corp., a regional ambulance operator, at a 10x multiple of EBITDA. (DX 68 at 904469.)[8] A few days later, Tilton forwarded Greenberg's analysis to Kurt Marsden of Wells Fargo and told him "Just to confirm the active M&A market in the ambulance space. This is why it makes sense to let TransCare make its way back to normalized EBITDA." (DX 68 at 90469.) Tilton wanted to get TransCare back to the $12-14 million of EBITDA that it had historically earned, so she could sell it at a price that would cover both the ABL and the Term Loan. (Tr. 8/13 A.M. 47:22–48:3.)

National Express continued to express an interest into December 2015. On December 8, 2015, Leland reported to Greenberg and Pelissier that National Express

---

[8]     Envision Healthcare's medical transportation segment was named American Medical Response. (DX 68.)

called him that morning about purchasing the paratransit business and asked whether he was authorized to enter into discussions. (PX 111; Tr. 8/14 A.M. 26:19-27:1.) On December 16, 2015, Leland reported to Greenberg, Stephen, Pelissier and Bonilla that National Express had called him "a few times" that day to reiterate that its offer to buy TransCare's paratransit contract was "still out there." (PX 124; Tr. 7/23 A.M. 50:22–51:3.)

According to Greenberg, Tilton specifically prohibited Leland, Greenberg, Pelissier or anyone else from speaking to any of these companies. (Tr. 7/22 A.M. 46:21–47:19.)

## E. Events Leading to the Tilton Plan and Bankruptcies

On December 14, 2015, Pelissier informed John Husson of Wells Fargo that Tilton had decided to sell TransCare. Tilton was prepared to provide bridge financing until a sale could be consummated but wanted to inject the financing through Wells Fargo's ABL loan facility. (Husson (*LaMonica*) Tr. 48:11–49:21.)[9] On December 16, 2015, Kurt Mardsen of Wells Fargo wrote to Tilton confirming his understanding that she had determined to sell TransCare and inquired into her view about possibly running the sale through a bankruptcy proceeding. (PX 128.) He wanted to "get clarity on how much financial support Patriarch is considering providing, and how soon the company could have access to that money since the company appears to have immediate liquidity

---

[9]     The Defendants objected to this excerpt from the Husson (*LaMonica*) Deposition as irrelevant. (*Defendants' Response*, Ex. A, item II.1.) The testimony supports the finding for which it is cited, and the finding is relevant to Tilton's reason for entering into the Ark II Security Agreement, described in the succeeding text, pursuant to which Ark II primed the Term Loan Lenders' lien. The objection is overruled.

challenges." (PX 128.)  Tilton understood that Wells Fargo was not going to stay in past

January 31 absent a sale process.  (Tr. 8/13 A.M. 50:9-12.)

On December 21, 2015, Greenberg met with John Husson and Bob Strack of

Wells Fargo concerning a deal to extend the ABL so as to facilitate a sale of TransCare.

(DX 97; Tr. 7/22 A.M. 55:17–56:1.)  Prior to the meeting, Tilton requested a sixth-month

time frame for the sale, or through to May or June 2016.  (Tr. 7/22 A.M. 54:20-22.)  On

December 23, 2015, Wells Fargo transmitted a summary of proposed terms for a longer-

term forbearance of the Wells Fargo ABL facility to Jean-Luc Pelissier and Michael

Greenberg.  (Stipulation No. 35.)  The proposed terms included the engagement by

TransCare of a third-party financial advisor and a budget for TransCare.  In response,

on January 7, 2016, TransCare retained Carl Marks Advisory Group LLC ("Carl Marks")

and entered into a consulting agreement.  (Stipulation No. 36.)

In the meantime, Tilton instructed Greenberg to obtain potential comparable

transactions and comparable public companies that existed within the same or ancillary

industries to TransCare.[10]  (Tr. 7/22 A.M. 42:16-23.)  She also instructed Greenberg to

find investment bankers to market TransCare.  (Tr. 7/22 A.M. 41:6-13, 42:21-23; *see* DX

96.)  On December 18, 2015, Greenberg reported his findings to Tilton.  (JX 55.)  He

identified six comparable transactions that occurred within the same sector as

TransCare or related sectors.  (JX 55; Tr. 7/22 A.M. 48:2-3.)  For each comparable

---

[10]     Greenberg had experience in private equity investment and portfolio management, comparing
companies within a particular set, evaluating capital structure alternatives for companies, and making
strategic business assessments for companies.  (Tr. 7/22 A.M. 13:17–14:2.)  Greenberg also had extensive
experience in valuation and modeling.  (Tr. 7/22 A.M. 14:7-9.)

transaction, Greenberg listed the date, whether it was completed or announced, and where available, the purchase price or enterprise value, last twelve-month ("LTM") revenue, LTM EBITDA, and the multiple of revenue/EBITDA needed to arrive at the purchase price. (JX 55; Tr. 7/22 A.M. 48:22–50:13.)

Only two of the transaction comparables had sufficient public information to calculate EBITDA multiples. AMR (Envision) purchased Rural/Metro Corp. at a 10.7x multiple (*i.e.*, the purchase price was 10.7 times the LTM EBITDA) and KKR purchased Air Medical at a 10.0x multiple. (JX 55.) Greenberg also identified three "market comps" that "relate to public companies and where they're currently trading in terms of their valuation." (JX 55; Tr. 7/22 A.M. 48:3-5.) Under "market value" for each market comp, Greenberg listed the market value of the equity of each public company plus the outstanding debt minus the cash on the balance sheet. (JX 55; Tr. 7/22 A.M. 51:2-7.) The rest of the entries were calculated in the same way as the transaction comps. (Tr. 7/22 A.M. 51:8-10.) Based on Greenberg's analysis, Envision, traded at an 11.3x multiple, Air Methods at an 8.2x multiple and PHI traded at a 3.5x multiple. (JX 55.) However, Greenberg determined that PHI was an outlier, and reported the same to Tilton, because PHI had other business lines that were only tangentially related to TransCare's business. (JX 55 at 41410; Tr. 7/22 A.M. 51:11-22.)

In his cover email to Tilton reporting on these transaction and market comparables, Greenberg stated that the average enterprise value to revenue multiple was 1.8x and the average enterprise value to LTM EBITDA was 10.1x. (JX 55 at 41410; Tr. 7/22 A.M. 52:2-11.) Greenberg also identified several investment banks that had advised on ambulance transactions, including Barclays, Deutsche Bank and Royal Bank

15

**A2635**

of Canada. (JX 55 at 41410; Tr. 7/22 A.M. 42:24–43:11.) Finally, Greenberg informed Tilton that Leland had received unsolicited calls from several potential purchasers in the ambulance business including Falck, AMR, RCA, and Enhanced Equity and also from National Express which was in the transit business. (JX 55 at 41410.)

Greenberg followed up with more information six days later. In a December 24, 2015 email to Tilton, he identified additional potential investment banks that had acted as advisors in smaller transactions, including Avondale Partners, Benchmark International, Provident Healthcare Partners, Genesis Capital and Carter, Morse & Mathias. (JX 61.) He asked Tilton "whether we should begin to reach out to potential investment banks to gather more information." (*Id.*) Greenberg undertook this research for the purpose of negotiating a plan with Wells Fargo to fund TransCare towards a potential sale. (Tr. 7/22 A.M. 52:23–53:10.) Tilton, however, never hired an investment banker to pursue a possible sale.

Wells Fargo agreed that TransCare needed to be sold and understood that "it was a matter of self preservation" to support TransCare through to a sale. (Husson (*Ien*) Tr. 35:24–36:17.) Between December 23 and December 31, 2015, Greenberg and Wells Fargo negotiated a deal to extend the ABL to allow a sale of TransCare. On December 23, 2015, Melissa Provost of Wells Fargo sent an email to Greenberg and Pelissier with a proposed long-term forbearance agreement to fund TransCare through a sale. (JX 59.) The proposal required Patriarch Partners to provide additional funding in an amount to be determined to help finance TransCare's Critical Expenses (*i.e.*, insurance, rent, payroll, payroll tax obligations and other critical operating expenses). (JX 59 at 75498.) On December 31, 2015, Greenberg sent an email to Husson and Provost that included a

proposed timetable that addressed the hiring of an investment banker by February 15, 2016 and a sale closing by September 30, 2016.  (JX 65 at 00216.)  Wells Fargo had proposed the retention of an investment banker by January 31, 2016 and a sale closing by July 31, 2016.  (JX 65 at 00216.)  Husson responded to Greenberg later that same day that the milestones were acceptable except the sale had to close by August 15, 2016.  (JX 65 at 00215.)

### 1.  The January 7 Plan

On January 4, 2016, Tilton told Greenberg to prepare a budget to support a sale process that would minimize the capital TransCare would need.  (JX 67; Tr. 7/22 A.M. 64:12-22.)  Greenberg submitted a budget to Tilton the next day, and Tilton directed that it be sent to Carl Marks two days later (the "January 7 Plan").  (JX 67.)  Greenberg and Pelissier built the January 7 Plan working independently from TransCare's management and created a scenario they thought was more consistent with Tilton's stated parameters.  (Tr. 7/22 A.M. 69:14–70:5.)

The January 7 Plan projected 2016 revenues of $120 million (including $2 million in new services) and EBITDA of $6.9 million.  (JX 67 at 196574.)  The January 7 Plan projected a peak need of $4.5 million in new capital consisting of $2.2 million in immediate payment requirements (insurance, payroll, and taxes); $1.3 million in down payments on new vehicles; and $1 million in other past due accounts payable.  (JX 67 at 196575; Tr. 7/22 A.M. 70:22–72:3.)  After receiving Tilton's approval, Greenberg shared the January 7 Plan with Carl Marks, (Tr. 7/22 A.M. 77:4-9), but she never "approved" the January 7 Plan.  (Tr. 7/22 A.M. 80:16-21.)

Carl Marks provided a preliminary assessment to Tilton on January 14, 2016. Marc Pfefferle of Carl Marks stated that, among other things, TransCare needed a substantial amount of funding to survive, and the weekly cash flow was barely covering the payroll and payroll taxes. (PX 165 at 00927.) He also stated that all of TransCare's insurers had issued cancellation notices and urged immediate payments to numerous insurers. (PX 165 at 00927.) Tilton expressed concern about providing funding with no plan to restructure TransCare, (PX 165 at 00925–26), and warned that she did "not want to keep funding into a black hole that cannot be filled." (PX 165 at 00925.) Pfefferle agreed with the latter concern adding it "[s]eems like there is a reason for the Company to exist, but the EBITDA numbers we were originally given are significantly overstated," and anticipated that a more complete picture would follow. (PX 165 at 00925.)

Despite the absence of an approved plan, Tilton provided emergency funding in January 2016 to keep TransCare operating. On January 15, 2016, Ark II wired $1,172,757.53 to PPAS to allow PPAS to make insurance payments on TransCare's behalf. These included $221,122.00 to Zurich (auto insurance); $142,993.82 to IPFS (liability insurance); $334,802.76 to Aetna (health insurance); and $473,838.94 to the New York State Insurance Fund ("NYSIF") (workers' compensation insurance) (collectively, the "January 15 Payments"). (DX 112 (3:58 pm email).) The January 7 Plan contemplated that these payments formed a portion of the $4.5 million in new capital contributions (although by this date the $4.5 million had increased to a plan of $6.5 million). (Tr. 7/22 A.M. 83:7-13; JX 67 at 06575; *see* PX 170 at 14549–50.)

That afternoon, Greenberg emailed Wells Fargo asking for its agreement to eight new conditions for the January 15 Payments, which Greenberg characterized as "part of a first funding under a go forward business plan being developed, of up to $6.5MM." (PX 170 (2:06 pm email).) The conditions included that the $6.5 million business plan be supported by a credit facility with a lien junior to Wells Fargo's lien on the collateral for the ABL, but senior to Wells Fargo's lien on the collateral for the Term Loan debt. (*Id.*) Wells Fargo did not agree to the proposed lien priority but was prepared to agree to allow the secured funding junior to all liens of Wells Fargo and subject to a new intercreditor agreement. (PX 170 at 14549.) Greenberg continued to negotiate the security for the January 15 Payments with Wells Fargo through the end of January. (PX 174 at 22754, 22753; Tr. 7/22 A.M. 88:1–92:7.)

### 2. The January 27 Executive Summary

Carl Marks produced its 2016 Plan Executive Summary ("Executive Summary") on or about January 27, 2016. (PX 175.) It listed a litany of significant problems with vendors, customers, landlords and equipment, (*see* PX 175 at 002111-12), and projected the need for an immediate pledge of financial support from Patriarch in excess of $7.5 million, (PX 175 at 002114), of which $3.5 million was needed over the next two weeks. (PX 175 at 002114.) The Executive Summary included a series of action items Carl Marks thought TransCare could take to effect a turnaround, (PX 175 at 002114), and recommended against a TransCare bankruptcy predicting that it would provide no immediate financial benefit and jeopardize the customer base. (*See* PX 275 at 002116.) On the other hand, if the action items were successfully implemented, the Executive Summary projected 2016 operating revenue of $100,532,000 and EBITDA of $4.97

19

million or 4.9% of operating revenue.[11]  (PX 175 at 002123.)  Tilton declined to provide the funding required under the Executive Summary, (Tr. 8/13 P.M. 70:24–71:3), although on January 28, 2016, she approved the purchase of two new ambulances (but not the medical equipment) for a total of $195,975 that Ark II would own and lease to TransCare, (DX 120 at 02162; DX 121 at 99194), and the next day, she directed PPAS to advance $690,168.24 on TransCare's behalf to pay the NYSIF and certain TransCare creditors (the "January 29 Payments," and together with the January 15 Payments, the "January Payments").  (Tr. 8/13 A.M. 58:21–59:15; *see* DX 121 at 99192.)  According to Tilton, she intended for Ark II to reimburse PPAS for the advance, (Tr. 8/13 P.M. 6:3–6), but there is no evidence that it ever did.

### 3.  Negotiations with Credit Suisse

As of February 3, 2016, Tilton still had no agreement with either Wells Fargo or Credit Suisse, the non-affiliated Term Loan Lender, for a new secured financing facility to TransCare.  (Tr. 7/22 P.M. 8:17-22, 9:20-22.)  However, Greenberg reported to Pfefferle earlier that day that Credit Suisse, which also represented First Dominion's interest as a Term Loan Lender, wanted to see a plan that showed it was better off agreeing to subordinate its position in favor of the new facility meaning the value had to exceed Wells Fargo's debt plus the new facility.  (PX 185.)  Later that day, Greenberg sent Alex Witkes of Credit Suisse a "Summary of Terms for New Facility."  (PX 189.) The summary included a $6.5 million facility which would be junior in priority to Wells

---

[11]     On January 28, 2016, Greenberg emailed himself another set of projections that were not materially different from the Executive Summary.  He projected 2016 operating revenue in the sum of $102,262,000 and EBITDA of $5,176,000.  (PX 179 at 13262.)  There was no evidence presented at trial that he shared these projections with anyone.

Fargo but senior to the Term Loan Lenders on the ABL Priority Collateral and would have a priority senior to the Term Loan Lenders on the Term Loan Priority Collateral. However, Greenberg never sent Credit Suisse a formal plan because Tilton never told him to do so. (Tr. 7/22 P.M. 16:12-25.) Nor had Wells Fargo been provided with a going-forward plan for TransCare. (Tr. 7/22 P.M. 17:23–18:6.)

### 4. The Tilton Plan

On or about February 5, 2016, Tilton, dissatisfied with the work of Carl Marks, instructed her own staff and TransCare's divisional chiefs to build a model for a business plan designed to continue a version of TransCare under a new company ("Tilton Plan"). (Tr. 8/13 A.M. 64:1-16.) She planned to split TransCare in two. PPAS, acting on behalf of the Term Loan Lenders, would foreclose through U.C.C. Article 9 on their TransCare collateral and transfer the collateral to "NewCo." NewCo, which would become Transcendence, would continue to operate part of TransCare's business and save a substantial number of jobs. The balance of TransCare, "OldCo," would wind down outside of bankruptcy for a period of 60-90 days and then commence a chapter 7 and collect the accounts receivable on which Wells Fargo had the first lien. (Tr. 8/13 A.M. 65:3-16.) Tilton sought a commitment from Wells Fargo to continue funding TransCare during its wind-down by over-advancing funds through the existing ABL, but she ultimately rejected Wells Fargo's proposal to over-advance as insufficient. (Tr. 8/13 A.M. 68:14-22, 70:17-23.)

### a. Creation of Transcendence

Tilton set her plan in motion on February 10, 2016. Per her direction, Stephen caused the two Transcendence entities to be incorporated under Delaware law, (DX 133

at 15290, 15294; Tr. 7/23 P.M. 22:2–23:21; *see* Stipulation No. 37), and set up bank

accounts, tax ID numbers, directors, and insurance for both companies.  (Tr. 7/23 P.M.

26:22–28:9, 103:4–104:23.)  The same day, Tilton became the sole director of

Transcendence, issued a board resolution adopting the authority matrix and appointed

Glen Youngblood, a senior vice president at TransCare, as President of Transcendence.[12]

(PX 200; Stipulation No. 7.)

### b.    Retention of Counsel

On the evening of the previous day, Stephen had contacted the law firm Curtis,

Mallet-Prevost, Colt & Mosle LLP ("Curtis Mallet") to prepare to file a chapter 11

bankruptcy proceeding for certain TransCare entities, (JX 72 (10:06pm email); Tr. 7/23

P.M. 29:8–30:10), and by letter agreement dated February 10, 2016, TransCare engaged

Curtis Mallet to advise on an out-of-court restructuring or in-court proceeding.  (JX 77;

Stipulation No. 38.)   Tilton made the decision to hire Curtis Mallet without consulting

anyone else from TransCare.  (Tr. 7/23 P.M. 33:11-20.)

Stephen excluded two of TransCare's subsidiaries — TransCare Pennsylvania and

TC Hudson Valley — from the list of potential debtors.  By then, Tilton planned that "the

secured lenders would foreclose on certain TransCare assets and those assets would lead

to start another business, Transcendence Transit business, and the remainder of

---

[12]    Both certificates of incorporation authorized the Transcendence boards to issue 1,000 shares of
common stock, but no shares were ever issued for either Transcendence entity.  (Tr. 7/23 P.M. 24:5-16;
DX 133 at 15290, 15294.)

TransCare would be wound down, but it would still continue to operate." (Tr. 7/23 P.M. 30:24–31:13.)

### c. The New Ark II Credit Facility

As noted earlier, Tilton was unwilling to fund any portion of TransCare's wind down Critical Expenses unless she received a security interest in the Term Loan Lenders' collateral that primed the Term Loan Lenders' lien.[13]  Greenberg had previously sought Credit Suisse's consent to what amounted to the subordination of its lien but had not received it.  Tilton decided instead to circumvent the Term Loan Lenders.  In a February 10, 2016 email, Peter Ruffini, a lawyer at Patriarch Partners, asked Greenberg (copying Stephen) to have TransCare sign four documents in connection with a new Ark II/TransCare facility: (1) the Ark II Credit Agreement, (2) the Ark II Security Agreement, (3) the Ark II Guaranty, and (4) the 2016 Intercreditor Agreement (collectively, the "Ark II Facility").  (PX 197 at 47308 (11:33 a.m. email).)[14] On February 11, 2016, Stephen emailed a fully executed copy of the Ark II Facility documents (all dated as of January 15, 2016) to Curtis Mallet, stating only "I attach documents with respect to another term loan for the company."  (JX 79 at 48966.)  No evidence was offered showing that Curtis Mallet had any participation in the negotiation, drafting or execution of these documents by TransCare.

The Ark II Credit Agreement, § 2.1, provided that Ark II would loan up to $6.5 million to TransCare, (JX 79 at 48976-77), but under § 2.5(b), prohibited TransCare

---

[13]     She also wanted the new facility to prime Wells Fargo, but Wells Fargo refused.

[14]     There was no administrative agent on the Ark II Credit Facility and PPAS had no connection to the Ark II Credit Facility other than agreeing to the 2016 Intercreditor Agreement.  (JX 197.)

from requesting loans under the Ark II Facility unless it first obtained the prior written consent of Ark II.  (JX 79 at 48978.)  The Ark II Security Agreement, § 2.2, granted Ark II a blanket security interest in TransCare's property.  (JX 79 at 49020-21.)  The 2016 Intercreditor Agreement (JX 79 at 49001) granted Ark II both structural and payment priority over the Term Loan Lenders.  (*See* JX 79 at 49004, § 2.2 (granting Ark II lien priority over the Term Loan Lenders' lien); JX 79 at 49005, § 2.2(a) (providing that the proceeds of any collateral would first be paid to Ark II); JX 79 at 49007, § 2.8(a) (stating that "only the party with the senior Lien in the collateral [*i.e.*, Ark II] shall have the right to restrict, permit or approve or disapprove, the sale, transfer or other disposition" of the TransCare collateral); JX 79 at 49008, § 2.9(a) (prohibiting PPAS from exercising any of its remedies upon a default); and JX 79 at 49008, § 2.9(a)(ii) (prohibiting PPAS from foreclosing on its TransCare collateral).)  Tilton signed the 2016 Intercreditor Agreement on behalf of PPAS, as agent for the Term Loan Lenders and Ark II, (JX 79 at 49015), and Peter Wolf signed an "acknowledgment" to the 2016 Intercreditor Agreement, providing that TransCare "acknowledges and agrees to the foregoing terms and conditions….[and] agrees that it will, together with its successors and assigns be bound by the provisions hereof."  (JX 79 at 49016.)

One day later, on February 11, 2016, Tilton crafted, (Tr. 7/22 P.M. 33:14-17), an email, (PX 249 at 77102 (Feb. 11, 2016 2:35 p.m. email)), that Greenberg sent to Credit Suisse.  It warned Credit Suisse that because it would not agree to subordinate its Term Loan position to a new $6.5 million loan facility (a feat already accomplished through the 2016 Intercreditor Agreement), TransCare was going to be forced to file for bankruptcy.  (Tr. 7/22 P.M. 31:15-32:2.)  The email also advised Credit Suisse that as an

equity holder it would be responsible for paying TransCare's unpaid payroll and payroll taxes and its share could be between $1 million and $2 million. (PX 249 at 77102 (Feb. 11, 2016 2:35 p.m. email); Tr. 7/22 P.M. 32:15–33:17.) Credit Suisse asked for details about the missing payroll and financial problems, (PX 249 at 77101 (Feb. 12, 2016 4:24 p.m. email)), but Greenberg never responded. (Tr. 7/22 P.M. 34:20–35:3.) No one had any contact with Credit Suisse again until Credit Suisse asked for a status update after TransCare's bankruptcy filing. (Tr. 7/22 P.M. 35:10-19.)

### d. The Acquisition of Insurance

The procurement of insurance for Transcendence was the final missing element to the success of the Tilton Plan; Transcendence could not operate without insurance. (Tr. 7/22 A.M. 71:8-18; Tr. 7/23 A.M. 20:3-16; Tr. 8/13 A.M. 25:4–26:12.) On February 10, 2016, Greenberg emailed several of TransCare's insurance brokers with a request to bind new insurance policies for Transcendence and provided the brokers with financial information about Transcendence. (PX 196; Tr. 7/22 P.M. 43:8–47:22.) He informed the brokers that Transcendence would operate five of TransCare's business units: (1) the paratransit division; (2) Pittsburgh; (3) Hudson Valley; (4) Maryland; and (5) Westchester. (PX 196; Tr. 7/22 P.M. at 43:8–46:19.) The financial information he sent projected $48 million in operating revenue for Transcendence during calendar year 2016 (it was already February) and $3.76 million in EBITDA. (PX 196; Tr. 7/22 P.M. 47:9-22.)

On February 11, 2016, Tilton wrote to Bobby Siegel, an insurance broker, for the purpose of procuring insurance for Transcendence. She explained that:

> [T]here is a smaller, less risky transit business that we would like to continue in a new company. This would include our NY Transit business and our suburban ambulance businesses in Hudson Valley, Pittsburgh Pennsylvania and Maryland. It would allow us to maintain a profitable, lower risk transit company that would still employ over 1000 of our workers.
>
> The models show that this business in 2016 would be approximately $67mm with $4mm of EBITDA and would grow with the additional transit business under the contract to $79mm and $7mm of EBITDA in 2017. It is because this new business makes sense that I would be providing all the new working capital for this business myself, personally.

(JX 80 at 92228; Tr. 8/13 A.M. 38:5−39:13.) She understood that Siegel needed this financial information to bind insurance. (Tr. 8/13 A.M. 39:5-8.)

### e. The Revised Business Model

On February 13, 2016, Pelissier sent Tilton and Stephen the "Transcendence Go Forward Model" that he and Greenberg were preparing. (PX 286.) This model included the assets that would continue to operate as a going concern. (Tr. 7/22 P.M. 53:17-23.) This model contemplated that Transcendence would operate six divisions of TransCare: (1) paratransit, (2) Pittsburgh; (3) Hudson Valley; (4) Maryland, and (5) Westchester and (6) Bronx 911/Montefiore 911. (PX 286; Tr. 7/22 P.M. 54:8-13.) The model projected that Transcendence would achieve consolidated 2016 operating revenues of $65 million and EBITDA of $5.1 million. (PX 286 at 105517; Tr. 7/22 P.M. 55:1-7.)

Transcendence would have an "incremental funding need" of $8 million while accounts receivable were paid down (ninety days for the ambulance divisions and forty-five days for the paratransit division), "which can be offset if a new ABL line is secured or by cash that builds through the year." (PX 286 at 105517; Tr. 7/22 P.M. 56:18−57:4.) For this reason, the "incremental funding need" was not listed on the model cash flow

26

statement as a capital expenditure but instead, was listed as a financing adjustment. (PX 286 at 105522; Tr. 7/22 P.M. 56:22–57:2.)  The cash flow statement projected only $120,000 in capital expenditures for Transcendence in 2016.  (PX 286 at 105522; Tr. 7/22 P.M. 56:13-17.)

After finishing a telephone call with Tilton on February 14, 2016, and with Tilton's authorization, Pelissier circulated the operational plan for Transcendence to Greenberg, Pelissier, Stephen, Wolf, Youngblood, and others.  (PX 206; Tr. 7/23 A.M. 17:7-9.)  Tilton maintained exclusive control over the decision and timing of the foreclosure and bankruptcy filing of TransCare.  (Tr. 7/23 A.M. 17:17-24.)  The operational plan included a detailed list of tasks and the assigned responsibility for those tasks.  Among other things, Stephen and another lawyer at Patriarch were tasked with preparing the foreclosure documents by February 11, 2016, and Stephen was to finalize the bankruptcy filing documents by February 14, 2016.  (PX 206 at 91292.)  Stephen would also review which contracts could be assigned to the new company.  (Tr. 7/23 A.M. 25:20–26:8.)  Pelissier and Youngblood, the designated President of Transcendence and the most senior person after Wolf at TransCare, would be in charge of changing remittance forms and payment lock box accounts for Transcendence on day one.  (PX 206 at 91295.)  Pelissier and Youngblood would also be in charge of devising a system for the new company to generate payroll checks.  (PX 206 at 91296, 91297; Tr. 7/23 A.M. 24:2–25:1.)  Employees would need to receive WARN notices and be transferred to Transcendence, but no one had yet decided when to do this.  (Tr. 7/23 A.M. 19:11-22.)

27

### f. TransCare's Final Days

TransCare continued to deteriorate. On February 19, TransCare lost its contracts with Bronx Lebanon, Montefiore hospital and the University of Maryland. (DX 157 at 05291.) Transcendence was to take over the Bronx Lebanon contract. Tilton testified that the Bronx Lebanon and Montefiore contracts generated about $2.5 million of EBITDA and their loss was "a big hit" to the Tilton Plan. (Tr. 8/13 P.M. 99:18–20.) She feared that TransCare might continue to lose contracts. (Tr. 8/13 P.M. 101:4–12, 100:18–100:23.)

### F. The Foreclosure and Sale

Tilton continued waiting for the insurance for Transcendence to set the foreclosure in motion. (Tr. 8/13 A.M. 74:5-7; DX 170 (3:49 P.M. email); DX 171 (4:44 P.M. email).) Pelissier explained, "if we cannot insure, we cannot operate." (Tr. 7/23 A.M. 30:8-24.) On February 24, 2016, Tilton directed Greenberg to transmit Transcendence's projected 2016 financials to Todd Trent of Lockton, a potential insurer, for the purpose of procuring insurance. (PX 228; Tr. 7/22 P.M. 62:15–63:7.) The email suggests that the financial information was actually provided the previous day. The projections encompassed the last few days of February and the remaining ten months of 2016 rather than a full year. (PX 228 at 86223; Tr. 7/22 P.M. 64:7-15, 68:13-18; PX 233.) The financials projected operating revenues of $36,379,000 and EBITDA of $3,204,500 during this approximate ten-month period. (PX 228 at 86223.) Tilton testified that EBITDA would increase to $4 million if annualized over a full twelve months. (Tr. 8/14 A.M. 38:4-12.) The difference between the $3.2 million EBITDA shown on the February 24, 2016 financials submitted to Lockton and the $3.7 million

28

EBITDA shown on the earlier forecast, (PX 286), resulted from the decision to exclude
the Maryland, Westchester and Bronx 911/Montefiore 911 divisions, (PX 286 at 105516),
and "possibly also a slight difference in timing in terms of the beginning of the forecast."
(Tr. 7/22 P.M. 65:4-8.)

Transcendence apparently received the insurance it needed to operate at some
point on February 23, 2016 because Tilton authorized the foreclosure at 12:07 a.m. on
February 24, 2016. (Tr. 8/13 A.M. 6:16-19.) Stephen immediately provided TransCare
with (a) a Notice of Default and Acceleration (JX 96 at 43311) and (b) a Notice of
Acceptance of Subject Collateral in Partial Satisfaction of Obligations, (JX 96 at 43306;
DX 174), but did not send the Notice of Default or Notice of Acceptance to Curtis Mallet.
(JX 96; Tr. 7/23 P.M. 50:24-51:21.)

Both the Notice of Default and the Notice of Acceptance were signed by Tilton, on
behalf of PPAS, the Zohar Funds, and AIP, but not by Credit Suisse or First Dominion.
(JX 96 at 43308, 43313.) The Notice of Default declared a default arising from
TransCare's failure to pay interest and accelerated all of TransCare's payment
obligations under the Term Loan. (JX 96 at 43311.) By the Notice of Acceptance, PPAS
accepted the collateral (the "Subject Collateral") in satisfaction of $10 million (of
approximately $43 million) outstanding under the Term Loan. (JX 96 at 43307.) The
Subject Collateral included all of TransCare's personal property (including the computer
servers and related data), three specific contracts (MTA Contract, an equipment lease
for ventilators and emsCharts Service Agreement dated Aug. 21, 2015) and the stock of
TransCare Pennsylvania, Inc., TC Hudson Valley Ambulance, Inc. and TC Ambulance
Corp. The Subject Collateral did not include the Accounts, as defined in the security

agreement associated with the Term Loan, or any lease or other contract that was not specifically identified.  (JX 96 at 43310.)  Peter Wolf, the Chief Operating Officer of TransCare, executed the Notice of Acceptance on behalf of TransCare.[15]  (DX 174 at 91200.)

As is evident from the documents, the Tilton Plan was not limited to the foreclosure and sale of NewCo's assets; it included OldCo's property as well.  The Subject Collateral was defined, with certain exceptions, as "[a]ll of the Debtors' personal property of every kind and description," and expressly included the MTA Contract, which was property of OldCo's TransCare New York, Inc., and the shares of capital stock of TransCare Pennsylvania, Inc., TC Hudson Valley Ambulance Corp. and TC Ambulance Corp., which belonged to OldCo's TransCare Corporation.  (DX 174 at 91201.)  The Notice of Acceptance was directed to each of the fourteen Debtors, (DX 174 at 91197), was signed by Wolf on behalf of each of the fourteen Debtors, (DX 174 at

---

[15]     The parties had previously disputed whether the Subject Collateral included TransCare's Certificates of Need ("CONs").  The CONs were issued by the New York State Department of Health and were needed to operate the ambulances.  (Tr. 7/24 135:20-25; PX 255 (*Stipulation Respecting the Sale of Certain Personal Property*, dated Mar. 10, 2016 ("*Personal Property Stipulation*").)  Prior to February 24, 2016, TransCare held seven CONs, five were issued to Initial Debtors and two were issued to Subsequent Debtors.  (*Personal Property Stipulation* at 2.)

PPAS originally took the position that it had foreclosed on the Subsequent Debtors' CONs and transferred them to Transcendence.  (*Id.* at 3.)  However, it now concedes that none of the CONs were included in the Subject Collateral.  (*Defendants' Post-Trial Proposed Findings of Fact and Conclusions of Law*, dated Sept. 18, 2019 ("*DPFC*"), at ¶¶ 223, 274 (ECF Doc. # 133).)  Moreover, the 2006 Intercreditor Agreement contains a schedule of the Term Loan Priority Collateral and the schedule does not include the CONs.  (JX 3, Ex. A at 00029.)  Rather, the CONs were part of the collateral retained as part of the ABL Priority Collateral.  Tilton nevertheless believed that by foreclosing on the stock of the Subsequent Debtors, Transcendence would be able to use their CONs even though title to the CONs would not pass to Transcendence.  (Tr. 8/14 A.M. 23:12–15.)  The Trustee eventually liquidated TransCare's seven CONs for an aggregate gross price of $12,250,000.  (*See* ECF Case No. 16-10407 Doc. ## 199-205.)

A2650

91200), and the Bill of Sale transferred all of these assets to Transcendence. (*Compare* DX 174 at 91201 *with* JX 102 at 91207.)

The foreclosure complete, Tilton immediately moved on to the second stage — transferring the Subject Collateral to Transcendence. On the morning of February 24, 2016, PPAS, as administrative agent, and Transcendence entered into a Bill of Sale, Agreement to Pay and Transfer Statement ("Bill of Sale") (JX 102), pursuant to which PPAS, as agent for the Term Loan Lenders, sold all of the Subject Collateral to Transcendence. (JX 102; Stipulation No. 43.) As consideration for the purchase of the Subject Collateral, Transcendence agreed to pay PPAS $10 million. Ark Angels III, a Tilton affiliate, would finance the purchase under a Purchase Credit Agreement and was deemed to have loaned Transcendence $10 million. (JX 101.) The trial exhibit was unexecuted, but Tilton testified that (a) she was committed to this loan and (b) Transcendence borrowed $658,000 under the Purchaser Credit Agreement to pay NYSIF and the lessor of the paratransit facility on Foster Avenue. (JX 101 at 8673; Tr. 7/22 P.M. 59:13−60:10; Tr. 8/13 A.M. 24:15-24.) It does not appear that any portion of the $10 million purchase price was actually paid to PPAS or the Term Loan Lenders.

## G. The Unraveling of the Tilton Plan

On February 24, 2016, TransCare Corp., TransCare New York, Inc., TransCare ML, Inc., TC Ambulance Group, Inc., TransCare Management Services, Inc., TCBA Ambulance, Inc., TC Billing and Services Corporation, TransCare Westchester, Inc., TransCare Maryland, Inc., TC Ambulance North, Inc. and TransCare Harford County, Inc. (collectively, the "Initial Debtors") filed chapter 7 petitions in this Court. (Stipulation No. 44.) The out-of-court and chapter 11 wind down plans had been

scrapped presumably due to lack of funding. Salvatore LaMonica, Esq. was appointed

as the interim chapter 7 trustee of the Initial Debtors' cases the next day. (Stipulation

No. 45.) With the exception of the Accounts, the CONs and some property carved out of

the Bill of Sale, all of TransCare's personal property was the subject of the foreclosure

and was now owned by Transcendence. The surviving entities, TransCare Pennsylvania,

Inc., TC Hudson Valley Ambulance Corp., and TC Ambulance Corporation, whose

operations were to continue through Transcendence, did not file bankruptcy at that

time.

The filing of the chapter 7 ultimately spelled doom for Transcendence. The most

pressing problem was paying TransCare's drivers. Forty-eight emergency ambulances

that Transcendence now owned were on the road driven by former TransCare

employees who were owed pay for the prior two weeks. The payroll was scheduled to be

disbursed the next day but TransCare was now in chapter 7. PPAS's counsel advised the

Trustee that Transcendence owned all of the ambulances but would be amenable to the

Trustee's use of the ambulances to operate if they could reach an agreement. (Tr. 7/24

134:11-22.) There were three obstacles to this plan. First, the Trustee had no money but

even if he did, he could not pay pre-petition wages without a court order. Second, Wells

Fargo and PPAS were prepared to fund $1 million but the Trustee needed $1.2 million,

(Tr. 7/24 138:2-22), and neither Wells Fargo nor PPAS were willing to come up with

more money. The Trustee refused to run TransCare if the employees were not going to

be paid. (Tr. 7/24 139:4-13.) Third, PPAS needed TransCare's computers to process the

payroll and wanted the Trustee to issue the checks using TransCare's payroll system but

the Trustee refused fearing employer tax and other obligations and potential liabilities.
(Tr. 7/24 142:20-143:3, 148:22-149:22.)

Once the possibility of a funding agreement fell through, the Trustee arranged to shut down TransCare's 911 operations. (JX 104.) His concern was for the public's safety because the ambulances were furnished with narcotics and equipment. He spoke to the New York City Fire Commissioner and arranged for the drivers to return the ambulances to the nearest firehouse if they refused to return them to one of TransCare's garages. (Tr. 7/24 141:14-142:6.) In addition, the Trustee was concerned about the Estate's potential liability because the ambulances were still registered in TransCare's name and insured by TransCare. (Tr. 7/24 142:20-25.)

The Trustee's control of the TransCare computer server also hindered Transcendence's ongoing operations. The Subject Collateral included TransCare's server, (JX 96 at 43310), but the server was housed at the Hamilton Avenue address that was leased by one of the Initial Debtors. Tilton had apparently intended for Transcendence to take possession of the server which it needed to operate and would give access to TransCare under a Transition Services Agreement which was never executed.[16] (Tr. 8/13 A.M. 26:6-9.) However, the server contained TransCare's books and records and the Trustee was not about to surrender it. (Tr. 7/24 165:23-166:4.) According to Tilton, when Glen Youngblood, now President of Transcendence, showed

---

[16]     Greenberg had forwarded a draft Transition Services Agreement to Tilton on February 23, 2016. (JX 95.) Under the proposed agreement, Transcendence would provide TransCare with use of certain equipment including systems and software support. (JX 95 at 44010.)

A2653

up at TransCare's headquarters to seize the server, the Trustee threatened him with personal liability and Youngblood resigned.  (Tr. 8/13 A.M. 26:17-21.)

The MTA Contract was another problem.  Historically, the paratransit business was TransCare's second biggest revenue producer accounting for 26% of TransCare's operating revenue, (JX 67 at 106572), and $4 million of EBITDA.  (JX 12 at 04260.)  As a component of Transcendence, it would be the most valuable division with a projected annual operating revenue of $25 million.  (PX 196 at 27756; PX 286 at 105516.)  Furthermore, unlike the ambulance business, it demanded limited capital because the fleet was leased from the MTA.  (JX 12 at 04260.)  TransCare New York, Inc., destined for chapter 7, was the TransCare entity that was party to the MTA Contract.  (Stipulation No. 29; PX 229.)

On February 24, 2016, and before the filing of the chapter 7 cases, Pelissier forwarded the paperwork necessary to assign the MTA Contract which he had requested from the MTA to Stephen, Greenberg, Jones, Wolf and Thomas Fuchs of TransCare.  (JX 100 (1:34 p.m. email).)  Tilton signed a written consent as the sole board member of TransCare New York, Inc. that same day directing TransCare's COO to assign the MTA Contract to Transcendence II.  (PX 229.)  At 8:27 p.m. on February 24, 2016, fourteen minutes before the filing of TransCare New York's chapter 7 petition, Stephen circulated an executed Agreement of Assignment for the MTA Contract (the "MTA Assignment"), stating that the financial disclosures would need to be completed by someone else.  (JX 100.)  The MTA Assignment (and TransCare New York's consent to the MTA Assignment) was executed on behalf of TransCare by COO Peter Wolf.  (JX 100 at 77168.)  Counsel for TransCare was not consulted.  (Tr. 7/23 P.M. 81:16-23, 85:20-23.)

34

**A2654**

On February 25, 2016, Stephen confirmed to the MTA that TransCare had transferred everything necessary for servicing the MTA Contract to Transcendence and that nothing prevented Transcendence from servicing the MTA Contract. He assured the MTA that the foreclosure had taken place and "[t]he bankruptcy of TransCare has no impact on Transcendence Transit II's ability to provide uninterrupted service to the MTA in accordance with the terms of the Agreement." (PX 244 at 43521-22 (8:49 p.m. email) (underscoring in original).) On February 26, 2016, Stephen wrote to the MTA asking it to agree on a "new agreement" with Transcendence II with certain conditions, including that the MTA terminate the MTA Contract with TransCare New York. (PX 236.) Stephen told the MTA that absent agreement to the new terms "we will, unfortunately, be forced to discontinue service at 5:00PM today." (PX 236.)

At the same time, Randy Creswell (counsel to PPAS) asked the Trustee to consent to termination of the MTA Contract. (JX 105.) At trial, Tilton blamed Transcendence's loss of the MTA Contract on the Trustee's refusal to consent per the MTA's insistence,[17] (see Tr. 8/13 A.M. 26:21-25), but the Trustee was willing to consent to the termination of the MTA Contract as long as it was without prejudice to amounts due to TransCare, (JX 105), and informed the MTA's lawyer of his consent. (Tr. 7/24 148:2-5.)

At 7:01 p.m., Stephen informed the MTA that after speaking with Tilton, Transcendence would not be continuing to provide services. (PX 245.) In that same email, Stephen provided the MTA with the termination notice that had been sent to

---

[17] The MTA's insistence on the Trustee's consent may have been due to the concern that any attempt to terminate the MTA Contract without his consent could violate the automatic stay triggered by TransCare New York's chapter 7 case.

Transcendence's employees that day. (PX 245 at 43517.) The notice informed the employees that Transcendence had shut down operations effective "immediately" and instructed them to "secure your vehicles and operations and await further instruction from the court appointed Trustee." (*Id.*)

Transcendence's predecessors, TransCare Pennsylvania, Inc., TC Hudson Valley Ambulance Corp., and TC Ambulance Corporation (together, the "Subsequent Debtors") filed voluntary chapter 7 bankruptcy petitions in this Court on April 25, 2016. LaMonica serves as Trustee of their estates as well, and the cases of the Initial Debtors and the Subsequent Debtors are being jointly administered. (Stipulation Nos. 50-51.)

## H.    Post-Petition Events

At the time of the bankruptcy filing by the Initial Debtors, TransCare owed Wells Fargo approximately $13 million, which was paid in full through the liquidation of assets. (Tr. 7/24 159:16-24.) With the agreement of PPAS as set forth in the *Personal Property Stipulation*, the Trustee sold all of the property, including the Subject Collateral, and realized approximately $19.2 million through the liquidation of ambulances, equipment, accounts receivable and CONs owned or formerly owned by TransCare. (Tr. 7/24 13:10-14.) The sum of $5.7 million represented the proceeds of the liquidation sales of the Transcendence assets. (Tr. 7/24 27:23-25.) As noted, the Trustee also liquidated the seven CONs for the aggregate sum of $12,250,000 but the CONs were part of the ABL Priority Collateral and were not included in the Subject Collateral.

Pursuant to the *Personal Property Stipulation*, the Trustee distributed $800,000 of the sale proceeds to PPAS as agent for the Term Loan Lenders. (Stipulation No. 49; Tr. 8/13 A.M. 36:13-24.) PPAS did not credit the $800,000 to the Term Loan. (JX 110 at ECF p. 9 of 9.)[18] Instead, PPAS turned the $800,000 over to Ark II, and Ark II applied the $800,000 to its alleged secured claim against the Estate. (Tr. 8/13 A.M. 36:19-24; JX 109 at ECF p. 5 of 9.)

On October 9, 2017, four Patriarch entities filed proofs of claim. PPAS, as Administrative Agent for the Term Loan Lenders, filed proofs of claim in the sum of $35,090,492.76. (Stipulation No. 54.) The claims reflect a $10 million credit for "Acceptance of Collateral." (JX 110 at pg. 9 of 9.) Ark II filed proofs of claim against TransCare asserting a secured claim in the sum of $1,077,966.97 in connection with the Ark II Credit Agreement. (Stipulation No. 53.) The Ark II claims reflect a credit in the sum of $789,457.00 based on the proceeds received from PPAS. (JX 109 at ECF p. 9 of 9.) Patriarch Partners filed a proof of claim asserting an unsecured claim in the sum of $2,587.98 for advanced expenses. (Stipulation No. 55; JX 111.) Finally, PPMG filed proofs of claim against TransCare asserting an unsecured claim in the sum of $2,038,515.87 in management fees. (Stipulation No. 56; JX 112.)

---

[18]     "ECF p. _" refers to the page number imprinted on the top of the page by the Court's electronic filing system.

A2657

# I.    This Adversary Proceeding

The Trustee's many claims have been narrowed during the course of this adversary proceeding.[19]   The parties' Joint Pre-Trial Order, dated May 14, 2019 ("JPTO") (ECF Doc. # 85), superseded the prior pleadings.  (JPTO p. 15 ("The pleadings are deemed amended to embrace the following, and only the following, contentions of the parties").)  The overriding claim involved the damages to the Debtors through the execution of what has been described above as the Tilton Plan.  (JPTO p. 47.)   The JPTO identified the claims that remained from the Amended Complaint:

| Count | JPTO Reference (pp.) | Defendants | Nature of Claim |
|-------|----------------------|------------|-----------------|
| 1 | 48, 65-66 | Tilton | Breach of fiduciary duties of loyalty and good faith under Delaware law by executing the Transcendence transaction (*i.e.,* the Tilton Plan) resulting in the loss of going concern value and the incurrence of WARN Act liability |
| 3 | 50, 66 | PPAS, Ark II, PPMG and Patriarch Partners | Equitable subordination based on participation in the Transcendence transaction and violations of the automatic stay |
| 4 | 51, 66 | Ark II | Recharacterization its claim as equity |
| 7 | 49, 66 | PPAS, Ark II and Transcendence | Actual fraudulent transfer of the Subject Collateral |

---

[19]    *See LaMonica v. Tilton* (*In re TransCare Corp.*), 602 B.R. 234 (Bankr. S.D.N.Y. 2019) (dismissing certain claims asserted in the Amended Complaint); *LaMonica v. Tilton* (*In re TransCare Corp.*), 592 B.R. 272 (Bankr. S.D.N.Y. 2018) (dismissing certain claims in the initial Complaint).

38

A2658

| 9 | 53, 67 | All Defendants | Violation of the automatic stay based on the Defendants' active interference with the Trustee's ability to marshal the estate's assets |
| 10 | 52, 67 | Ark II | Preferential transfer based on the grant of a lien to secure an antecedent debt |
| 11 | 51-52, 67 | Ark II | Constructive fraudulent transfer based on the grant of a lien |
| 12 | 53, 68 | PPAS | Contractual subordination of PPAS's claim under the 2016 Intercreditor Agreement based upon the avoidance of the Ark II lien, its preservation for the estate and Ark II's payment priority |
| 13 | 53-54, 68 | PPAS and Ark II | Limitation on liens under the "equities of the case" exception, 11 U.S.C. 552(b) |
| 14 | 54, 68 | PPAS and Ark II | Avoidance, recovery and turnover of the $800,000 post-petition transfer pursuant to the *Personal Property Stipulation* |

The Court conducted a six-day bench trial between July 22, 2019 and August 14, 2019. At the conclusion of the trial, the Court dismissed the Trustee's claims for violation of the automatic stay (Count 9), equitable subordination against PPMG and Patriarch Partners (Count 3) and the actual fraudulent transfer claim against Ark II (Count 7). (ECF Doc. # 131.)

## DISCUSSION

### A. Jurisdiction

The Court has jurisdiction under 28 U.S.C. §§ 157 and 1334(b) and the *Amended Standing Order of Reference*, No. M 10-468, 12 Misc. 00032 (S.D.N.Y. Jan. 31, 2012).

A2659

Both sides consented to this Court's authority to enter a final judgment on any core claims but the Defendants did not similarly consent with regard to any non-core claims.[20]  (JPTO at pp. 5-6.)

      The breach of fiduciary duty claim is non-core; it is related to the TransCare bankruptcy case but did not arise under the Bankruptcy Code or in this case.  The claim arose immediately prior to the filing of the chapter 7 petitions, is asserted under state law and seeks money damages to augment the Estate.  *See Iannacchino v. Ruzza* (*In re Iannacchino*), 15-cv-09408 (NSR), 2018 WL 1009279, at *3 (S.D.N.Y. Feb. 20, 2018); *Wechsler v. Squadron, Ellenoff, Plesent, & Sheinfeld LLP*, 201 B.R. 635, 639 (S.D.N.Y. 1996); *see Pension Fin. Servs., Inc. v. O'Connell* (*In re Arbco Capital Mgmt.*), 479 B.R. 254, 266 (S.D.N.Y. 2012) (concluding that claims for breach of fiduciary duty and negligence "involve non-core proceedings and are indisputably private rights").  In addition, Tilton did not file a proof of claim.  Accordingly, the Court proposes findings and conclusions and does not make findings and conclusions with respect to the breach of fiduciary duty claim against Tilton.  *See* 28 U.S.C. § 157(c)(1).  The remaining claims are core and the Court makes findings and conclusions with respect to those claims.

---

[20]    The Trustee contended in the JPTO that the Defendants waived any objections to the Court's authority to enter a final order on all claims, based apparently on their failure to comply with Federal Bankruptcy Rule 7012(b)'s requirement to state whether the answering defendant consents to the entry of final orders by the bankruptcy court.  (*See* JPTO at pp. 5-6.)  The Defendants' original answer omitted the required allegation but their Amended Answer (p. 23) stated that "[t]o the extent the Trustee's claims are non-core, Defendants do not consent to the entry of final orders or judgment by the Bankruptcy Court with respect to such non-core claim or claims."  (ECF Doc. # 84.)  The Trustee did not repeat or brief his waiver argument in his post-trial submissions, and I deem it abandoned.  In any case, the Defendants' Amended Answer preserved the Defendants' position.

A2660

B.    **Count 1:  Breach of Fiduciary Duty Against Tilton**

Count 1 alleges that Tilton breached her fiduciary duties of loyalty and good faith (but not her duty of care).  The Trustee's breach of fiduciary duty claim consists of two components:  (1) the failure to maximize the value of TransCare beginning in December 2015 when Tilton decided to sell the company and (2) the formulation and execution of the Tilton Plan that culminated in the strict foreclosure by PPAS on most of TransCare's personal property and the sale of TransCare's more profitable assets and attendant operations to Transcendence.  The Debtors were incorporated under Delaware law and claims for breach of fiduciary duty are governed by Delaware law under the internal affairs doctrine.  *Hausman v. Buckley*, 299 F.2d 696, 703 (2d Cir.), *cert. denied*, 369 U.S. 885 (1962); *Official Comm. of Unsecured Creditors of Hydrogen, L.L.C. v. Blomen* (*In re Hydrogen, L.L.C.*), 431 B.R. 337, 346–47 (Bankr. S.D.N.Y. 2010).

Tilton, as the sole director of TransCare, owed fiduciary duties of loyalty as well as the duty of care to TransCare and its shareholders.  *N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla,* 930 A.2d 92, 99 (Del. 2007); *Guth v. Loft,* 5 A.2d 503, 510 (Del. 1939).  The duty of loyalty is violated where a "fiduciary intentionally acts with a purpose other than that of advancing the best interests of the corporation."  *Brehm v. Eisner* (*In re Walt Disney Co. Derivative Litig.*), 906 A.2d 27, 67 (Del. 2006) ("*Walt Disney II*") (quoting *In re Walt Disney Co. Derivative Litig.*, 907 A.2d 693, 755 (Del. Ch. 2005)); *accord In re Orchard Enters., Inc. Stockholder Litig.*, 88 A.3d 1, 33 (Del. Ch. 2014).  This includes circumstances where there is "a financial or other cognizable fiduciary conflict of interest," or "where the fiduciary fails to act in good faith."  *Stone v. Ritter*, 911 A.2d 362, 370 (Del. 2006).  The requirement to act in good

41

faith is "a subsidiary element, *i.e.*, a condition, of the fundamental duty of loyalty." *In re Orchard Enters.*, 88 A.3d at 32–33 (quoting *Stone v. Ritter*, 911 A.2d at 370). An officer or director "cannot act loyally towards the corporation unless she acts in the good faith belief that her actions are in the corporation's best interest." *Stone v. Ritter*, 911 A.2d at 370 (quoting *Guttman v. Huang*, 823 A.2d 492, 506 n. 34 (Del. Ch. 2003)).

Although the business judgment rule protects directors through the presumption that "the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company," *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984), *overruled in part on other grounds by Brehm v. Eisner*, 746 A.2d 244, 253-54 (Del. 2000), a director who "stands on both sides of a transaction . . . has the burden of establishing its entire fairness, sufficient to pass the test of careful scrutiny by the courts." *Weinberger v. UOP, Inc.*, 457 A.2d 701, 710 (Del. 1983); *accord Pereira v. Cogan*, 267 B.R. 500, 508 (S.D.N.Y. 2001) ("When a controlling shareholder or other insider engages in a self-dealing transaction that is not approved by an independent board (acting in accordance with certain standards), the transaction is unlawful unless the proponent thereof carries his burden of justifying it under the Delaware 'entire fairness' doctrine."); *Kahn v. Lynch Commc'n Sys., Inc.*, 638 A.2d 1110, 1117 (Del. 1994). Here, the parties agree that entire fairness is the proper standard of review for the strict foreclosure and sale transaction (*i.e.*, the execution of the Tilton Plan) on February 24, 2016, and Tilton bears the burden of proving entire fairness. (*Plaintiff's Proposed Findings of Fact and Conclusions of Law*, dated Sept. 18, 2019 ("*PPFC*") at ¶¶ 274-75 (ECF Doc. # 134); *DPFC* at ¶ 358.) They disagree, however, on whether entire fairness standard applies to the claim that Tilton failed to maximize

42

the value of TransCare once she decided to sell the entire company and before she switched to the Tilton Plan.

I conclude that the entire fairness standard does not apply to the period before Tilton pursued the Tilton Plan. As a result, the Trustee failed to overcome the business judgment rule and carry his burden of proving that Tilton failed to maximize the value of the entire TransCare. In mid-December 2015, Tilton determined that TransCare should be sold but also determined that it was not primed for a sale given its financial condition. She retained Carl Marks as TransCare's financial advisor and CFO and considered Carl Marks's conclusions and recommendations. By February 5, after having explored and evaluated a potential sale process, Tilton determined based on Carl Marks's work that a sale of the entire TransCare was not feasible, due in large part to the rapidly deteriorating condition of the company and the need for an immediate infusion of a substantial amount of cash that was not readily available. Although Wells Fargo had indicated a willingness to fund a wind down of the entire company, it conditioned its willingness on Tilton's partial funding on a subordinated basis. She was under no obligation to fund TransCare personally. The Trustee offered no evidence that her decision was tainted by any conflict or self-interest or that her actions or decisions were dictated by the goal to acquire the entire company or any part of it for her own benefit. Rather, she made a good faith determination that the company as a whole was not saleable.

The Trustee argues, quoting *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.*, 506 A.2d 173 (Del. 1986), that once Tilton decided no later than December 15, 2015, that TransCare would have to be put up for sale, "[t]he duty of the board had thus

43

changed from the preservation of [the company] as a corporate entity to the maximization of the company's value at a sale for the stockholders' benefit. . . . The directors' role changed from defenders of the corporate bastion to auctioneers charged with getting the best price for the stockholders at a sale of the company." *Id.* at 182. In *Revlon*, a complex case involving a hostile takeover, the Revlon board had adopted anti-takeover measures that benefitted noteholders at the expense of the company's shareholders. The Delaware Supreme Court noted, at one point in the decision, that the directors had breached their duty of loyalty because the benefit of the anti-takeover measures inured principally to the directors by avoiding their personal liability to a group of noteholders. "[W]hen a board ends an intense bidding contest on an insubstantial basis, and where a significant by-product of that action is to protect the directors against a perceived threat of personal liability for consequences stemming from the adoption of previous defensive measures, the action cannot withstand the enhanced scrutiny which *Unocal* requires of director conduct." *Id.* at 184 (citing *Unocal Corp. v. Mesa Petroleum Co.*, 493 A.2d 946, 954-55 (Del. 1985)). In the end, however, the Supreme Court concluded that the Board's actions violated the duty of *care*:

> [I]n granting an asset option lock-up to Forstmann, we must conclude that under all the circumstances the directors allowed considerations other than the maximization of shareholder profit to affect their judgment, and followed a course that ended the auction for Revlon, absent court intervention, to the ultimate detriment of its shareholders. No such defensive measure can be sustained when it represents a breach of the directors' fundamental duty of care.

*Id.* at 185.

*Revlon* is distinguishable. At most, Tilton arguably mismanaged the initial process of maximizing TransCare's assets by failing to retain a financial advisor in

December and instead, concluding that it was premature to do so or engage in any sale efforts until TransCare was stabilized. But this was, at worst, a violation of her duty of care, a claim that the Trustee has not asserted. As noted, the Trustee offered no proof that her efforts to maximize the value of the entire company were tainted by conflict or self-interest.

Accordingly, I turn to consideration of the Tilton Plan and whether Tilton has demonstrated its entire fairness. The Tilton Plan involved splitting TransCare into OldCo and NewCo. First, OldCo would be wound down in one of two ways: (i) outside of bankruptcy over ninety days followed by chapter 7 or (ii) through a chapter 11. Second, PPAS would foreclose on the Subject Collateral and sell it to NewCo which would continue to operate as a going concern. The foreclosure and sale to NewCo was the problem.

### 1. Entire Fairness Review

"The 'entire fairness' standard is Delaware's most onerous standard and requires that the defendant prove that the transaction was the product of both fair dealing and fair price." *Burtch v. Opus, LLC* (*In re Opus E., LLC*), 528 B.R. 30, 66 (Bankr. D. Del. 2015), *aff'd*, No. 15-346-RGA, 2016 WL 1298965 (D. Del. Mar. 31, 2016), *aff'd*, 698 F. App'x 711 (3d Cir. 2017). "Not even an honest belief that the transaction was entirely fair will be sufficient to establish entire fairness. Rather, the transaction itself must be objectively fair, independent of the board's beliefs." *Reis v. Hazelett Strip-Casting Corp.*, 28 A.3d 442, 459 (Del. Ch. 2011) (quoting *Gesoff v. IIC Indus., Inc.*, 902 A.2d 1130, 1145 (Del. Ch. 2006)). While fair dealing and fair price are both elements of entire fairness, courts look at the entirety of the transaction in determining fairness. *See*

*Weinberger*, 457 A.2d at 711; *William Penn P'ship v. Saliba*, 13 A.3d 749, 757 (Del. 2011)

("While fair dealing and fair price are distinct concepts, the burden to establish them is

not bifurcated. Rather, this Court must evaluate a transaction as a whole to determine if

the interested party has met his burden of establishing entire fairness.").

### a. Fair Dealing

Fair dealing "embraces questions of when the transaction was timed, how it was

initiated, structured, negotiated, disclosed to the directors, and how the approvals of the

directors and the stockholders were obtained." *Weinberger*, 457 A.2d at 711. Courts

routinely analyze the relevant factors enumerated in *Weinberger* in assessing whether a

majority shareholder or other insider met her burden of proving that a transaction was

the product of fair dealing. *See Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1156, 1172-

77 (Del. 1995) (applying the *Weinberger* factors in assessing the fair dealing element of

entire fairness); *Bomarko, Inc. v. Int'l Telecharge, Inc.*, 794 A.2d 1161, 1181 (Del. Ch.

1999), *as revised* (Nov. 16, 1999) ("*Bomarko I*") ("My analysis of the factors articulated

in *Weinberger* also supports a finding of unfair dealing."), *aff'd*, 766 A.2d 437 (Del.

2000).

The cornerstone of fair dealing is a process implemented by the board that

reflects arm's length bargaining and provides protections for the interests of all

shareholders. *See FrontFour Capital Grp. LLC v. Taube*, C.A. No. 2019-0100-KSJM,

2019 WL 1313408, at *26 (Del Ch. Mar. 11, 2019), as revised (Mar. 22, 2019) (holding

that the defendants failed to prove fair dealing where "the timing, structure, initiation,

and negotiation of the Proposed Transactions were conceived for the purpose of—and

did—advance the [defendants'] interest at the expense of Medley Capital's other

46

stockholders."); *Reis v. Hazelett Strip-Casting Corp.*, 28 A.3d at 464 ("There was no dealing in this case that could be called 'fair.' Procedural protections were not implemented, and no one bargained for the minority."); *Strassburger v. Earley*, 752 A.2d 557, 576–77 (Del. Ch. 2000), as revised (Jan. 27, 2000) ("[T]here was no fair dealing, because there was no advocate committed to protect the minority's interests, and because the players were either indifferent, or had objectives adverse, to those interests."). Such procedures generally include an independent special committee formed to assess and negotiate the transaction; however, where there is no independent committee, fairness "'can be equated to conduct by a theoretical, wholly independent, board of directors.'" *Pereira v. Cogan*, 267 B.R. at 509 (*quoting Weinberger*, 457 A.2d at 709-10 n. 7). However, "'such frail support as the defendants' own evaluation of their innocence of wrongdoing and on the fairness of [the transaction]'" is insufficient to prove fair dealing. *Id.* (*quoting Merritt v. Colonial Foods, Inc.*, 505 A.2d 757, 765 (Del. Ch. 1986)).

Admittedly, TransCare was rapidly declining and time was running out. Nevertheless, while the viability of the corporation may properly factor into a board's decision to sell substantially all of a corporation's assets, the directors must still follow a fair process in doing so. *See Pereira v. Cogan*, 267 B.R. at 511 ("Self-dealing transactions are improper regardless of whether or not the corporation is solvent.").[21] Whether a board explored alternatives to the challenged transaction, such as reaching

---

[21] The Defendants rely on *In re Trados Inc. S'holder Litig.*, 73 A.3d 17 (Del. Ch. 2013) for the proposition that the Court should look beyond the procedural deficiencies in the process here because TransCare faced liquidation; however, the court in that case found that the defendants had failed to establish fair dealing where "there was no contemporaneous evidence suggesting that the directors set out to deal with the common stockholders in a procedurally fair manner." *Id.* at 56.

47

out to potential buyers, is relevant evidence of fair dealing. *See Gesoff v. IIC Indus.*, 902 A.2d at 1148–49 (noting the defendants may have been able to prove fair dealing if they had sought "alternative, third-party buyers for the company, for example . . . ."); *In re Cysive, Inc. S'holders Litig.*, 836 A.2d 531, 553 (Del. Ch. 2003) (holding that the defendants met their burden of proving fair dealing where, among other things, "the decision to enter into the Snowbird Agreement was preceded by an active and aggressive search for a third-party buyer."). Fiduciaries are liable when they tilt the playing field such that the only possible solution is a self-dealing transaction. *See Basho Techs. Holdco B, LLC v. Georgetown Basho Inv'rs, LLC*, No. CV 11802-VCL, 2018 WL 3326693, at *29 (Del. Ch. July 6, 2018) (fiduciary maneuvered the company into "the position of being the sole life line of the Company for money" by blocking alternative transactions), *aff'd sub nom.*, *Davenport v. Basho Techs. Holdco B, LLC*, 221 A.3d 100 (Del. 2019); *In re Rural Metro Corp. Stockholders Litig.*, 88 A.3d 54, 101 (Del. Ch.) ("RBC's self-interested manipulations caused the [sale] process to unfold differently than it otherwise would have."), *appeal dismissed*, 105 A.3d 990 (Del. 2014); *In re Del Monte Foods Co. S'holders Litig.*, 25 A.3d 813, 833 (Del. Ch. 2011) ("But for Barclays' manipulations, the [sale] process would have played out differently."); *Bomarko I*, 794 A.2d at 1184-85 (director's interference with company's attempts to obtain outside funding was not fair dealing).

There was nothing fair about the process through which Tilton effectuated the part of the Tilton Plan that involved the strict foreclosure and the sale to Transcendence. Acting through her affiliates, she foreclosed on the Subject Collateral, consented to the strict foreclosure, sold the foreclosed assets to herself and fixed the sale price. Tilton

48

stood on every side of the transaction and controlled every aspect of the transaction with neither negotiation nor oversight nor approval by an unconflicted person. Tilton did not retain a financial advisor to seek out possible third-party interest in purchasing the assets or investing in TransCare. She did not consider the possibility of placing the NewCo predecessor entities into a chapter 11, or negotiating with Wells Fargo for debtor-in-possession financing for the viable NewCo as opposed to the liquidating OldCo, nor did she entertain the thought of selling the NewCo assets to a third party free and clear of liens claims and interests, with or without Wells Fargo's and PPAS's consent, pursuant to Bankruptcy Code § 363, a common practice. Moreover, she did not even pick up the phone and call any of the ambulance or other companies that had been expressing interest in acquiring TransCare since the previous July.

Instead, she made the determination that no one other than herself would lend to NewCo or buy its assets even though she viewed NewCo as such a good business venture that she was willing to loan up to $10 million of her own money. (JX 80 at 92228; Tr. 8/13 A.M. 38:5–39:13, 44:5-10.) Tilton's willingness to acquire the assets and invest $10 million of her own money through Ark Angels III is the best evidence that Transcendence had substantial value. *Gentile v. Rossette,* C.A. No. 20213–VCN, 2010 WL 2171613, at *10 (Del. Ch. May 28, 2010) (defendant's "persistent willingness—even though admittedly marked at times by grave doubts—to pour his ultimately limited resources into the Company" was the most persuasive evidence of the company's value, notwithstanding his trial testimony that "the Company was worthless and on a path to oblivion."); *see also In re Appraisal of Dole Food Co., Inc.,* 114 A.3d 541, 557-58 (Del. Ch. 2014) ("[S]elf-interest concentrates the mind, and people who must back their

49

beliefs with their purses are more likely to assess the value of the judgment accurately than are people who simply seek to make an argument.") (quoting *In re Cent. Ice Cream Co.*, 836 F.2d 1068, 1072 n. 3 (7th Cir. 1987)).  In the end, she owned the same approximate amount of equity in Transcendence that she did in TransCare[22] unencumbered, however, by PPAS's foreclosed lien and TransCare's unsecured debt.[23]

### b.    Fair Price

Fair price "relates to the economic and financial considerations of the proposed merger, including all relevant factors: assets, market value, earnings, future prospects, and any other elements that affect the intrinsic or inherent value of a company's stock." *Weinberger*, 457 A.2d at 711.  The fair price analysis "is not itself a remedial calculation" but a determination of whether the price "fell within a range of fairness." *Reis v. Hazelett Strip-Casting Corp.*, 28 A.3d at 465; *see also Basho*, 2018 WL 3326693 at *36 ("For purposes of determining fairness, as opposed to crafting a remedy, the court's task is not to pick a single number, but to determine whether the transaction price falls within a range of fairness.") (internal citation and quotation marks omitted).  In determining whether a price was fair, courts consider "whether the transaction was one 'that a reasonable seller, under all of the circumstances, would regard as within a range of fair value; one that such a seller could reasonably accept.'" *In re Dole Food Co., Inc. Stockholder Litig.*, No. CV 8703-VCL, 2015 WL 5052214, at *33 (Del. Ch. Aug. 27, 2015)

---

[22]    Ark II was to own 54.7% of Transcendence Transit with the balance of the equity allocated to the Term Loan Lenders.  In fact, no shares were ever issued to anyone.  (Tr. 7/23 P.M. 23:17–24:16.)  Nor is there any evidence that Transcendence paid $10 million for the Subject Collateral or that the supposed proceeds of the sale to Transcendence were distributed to the Term Loan Lenders.

[23]    It is far from clear whether the foreclosure cut off Wells Fargo's subordinate lien in the personalty.  However, Wells Fargo satisfied its claim through a combination of the post-petition collection of the accounts receivable and the proceeds of the sale of the CONs by the Trustee.  (*See* Tr. 7/24 159:11-24.)

50

(*quoting Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1134, 1143 (Del. Ch. 1994), *aff'd*, 663 A.2d 1156 (Del. 1995)).

"Merely showing that the sale price was in the range of fairness, however, does not necessarily satisfy the entire fairness burden when fiduciaries stand on both sides of a transaction and manipulate the sales process." *William Penn*, 13 A.3d at 758 (internal citation omitted). Where the fair dealing element of entire fairness reveals a process infected by the actions of directors, the defendant may be unable to show that any price was entirely fair. *See id.* ("The [defendants'] self interest in the transaction and their domination of the sales process tainted the entire transaction."); *Kahn v. Tremont Corp.*, 694 A.2d 422, 432 (Del. 1997) ("But here, the process is so intertwined with price that under *Weinberger's* unitary standard a finding that the price negotiated by the Special Committee might have been fair does not save the result."); *Reis v. Hazelett Strip-Casting Corp.*, 28 A.3d at 467 ("A strong record of fair dealing can influence the fair price inquiry, reinforcing the unitary nature of the entire fairness test. The converse is equally true: process can infect price."). In such a situation, the defendant fails to meet its burden of proving a price was fair without the need for assessing whether that price fell within a hypothetical range of fairness. *See Gesoff v. IIC Indus.*, 902 A.2d at 1154 (defendants failed to show that the tender offer price of $10.50 per share was fair in light of the dishonest process); *Bomarko I*, 794 A.2d at 1183 (defendants failed to carry their burden of proving $0.30 per share was a fair price where "the unfairness of the process also infects the fairness of the price.").

Given the tainted process and the complete absence of an independent analysis, review or approval, Tilton did not carry her burden of showing that the price was fair.

A2671

In addition, her attempts to justify the $10 million foreclosure credit showed that it was not. At trial, she testified that in deriving the $10 million credit she began with TransCare's "December ['15] closing balance sheet." (Tr. 8/13 P.M. 104:23–105:12; *see* PX 286 at 105523.) She had originally contemplated that NewCo would operate five divisions in addition to the MTA Contract: (Hudson Valley, Westchester, Pennsylvania, Maryland, and Bronx 911/Montefiore 911), and the combined balance sheet consisted of a December 2015 closing balance sheet and going-forward projections for these five divisions. (PX 286 at 105524; Tr. 8/13 P.M. 104:23–105:5.) Tilton's calculation of book value of the assets of these five divisions included the accounts receivable which, at the time, she assumed she would purchase from Wells Fargo and contribute to Transcendence. (PX 286 at 105524; Tr. 8/13 P.M. 107:19–108:3.) The sum of these asset values totaled $9,996,000.60, which Tilton rounded up to $10 million. (PX 286 at 105524; Tr. 8/13 P.M. 106:3–7.) Tilton did not ultimately purchase the receivables from Wells Fargo. (Tr. 8/13 P.M. 108:4–9.) By removing the receivables from the equation, her calculation would have been reduced from $10 million to approximately $1.7 million. (Tr. 8/13 P.M. 108:11–16.)

On February 22, 2016, Vikram Agrawal, a credit officer with Patriarch Partners (Tr. 8/13 P.M. 121:8–10), emailed Tilton an updated version of the NewCo model (the "February 22 NewCo Model"). (DX 166.) The February 22 NewCo Model consisted of the paratransit business and three divisions (Hudson Valley, Paratransit and Pennsylvania) rather than the five in the earlier model. (Tr. 8/13 P.M. 122:19–21.) The combined balance sheet for the three divisions, (DX 166 at 110489), using the same assets as the previous model, totaled $6.244 million and included $5.2 million in

receivables that were never transferred to NewCo.  If the receivables were excluded, the book value of the Subject Collateral, at least according to Tilton, would have been less than $1 million.  (Tr. 8/13 P.M. at 124:12–15.)

There were patent errors in the calculation of the $10 million credit.  First, the Subject Collateral on which PPAS foreclosed and sold to Transcendence was not limited to the three TransCare divisions that Transcendence would operate.  With some exceptions, notably the Accounts and the CONS, the Subject Collateral included all of the personal property owned by all fourteen Debtors.  (*See* JX 96.)  Using the book value for just the three Debtors destined for Transcendence undervalued the Subject Collateral.  The 13-week wind down plan valued OldCo's plant, property and equipment ("PPE") at approximately $3.6 million, and this did not account for the wind down value of the PPE owned by Maryland, Westchester and Bronx 911/Montefiore 911.  At the time of the wind down projections, these operations were slated for assumption by NewCo, not OldCo.  In addition, Tilton did not ascribe any value to the CONs owned by TC Hudson Valley or TC Ambulance Corp.  Although PPAS did not foreclose on the CONs, it foreclosed on the stock of these two entities and transferred the stock to Transcendence.  The CONs they owned allowed them to operate their ambulances and increased the value of their stock.  The Trustee sold the two CONs for the aggregate sum of $3.2 million at a *liquidation* sale after they filed for bankruptcy.  Thus, Tilton's valuation of the Subject Collateral ignored almost $7 million of book value.

Second, the use of book value to value the assets of the three divisions that Transcendence planned to operate undervalued those assets.  "[B]ook values are not ordinarily an accurate reflection of the market value of an asset."  *Lawson v. Ford*

Motor Co. (*In re Roblin Indus., Inc.*), 78 F.3d 30, 36 (2d Cir. 1996); *accord In re Breitburn Energy Partners LP*, 582 B.R. 321, 344 (Bankr. S.D.N.Y. 2018).  "Book value can be an appropriate valuation method for a business that derives significant value from its physical assets," but "tends to undervalue a business as a going concern because it does not fully account for intangible value attributable to the operations."  *Reis v. Hazelett Strip-Casting Corp.*, 28 A.3d at 476.  Book value may have been an appropriate method of valuing the Subject Collateral owned by the Initial Debtors that were liquidating, but the strict foreclosure contemplated the continuation of the three TransCare divisions as a going concern operating through Transcendence.

Third, Tilton did not attribute any value to the MTA Contract, although it was to be the crown jewel of Transcendence.  Greenberg had attributed $25 million in annual revenues to the MTA Contract.  Tilton contends that the $22 million she attributed to the value of Transcendence reflected the value of the MTA Contract, (*DPFC* at ¶ 393 n. 22), but this explanation does not withstand scrutiny.  The $22 million figure was an arbitrary amount based on (1) the $10 million of value attributed to the Subject Collateral, (2) the loan up to $10 million Tilton was willing make through Ark Angels III and (3) the approximate $2 million representing prepaid insurance and the cost of two ambulances funded by PPAS and/or Ark II.  (*DPFC* at ¶¶ 209-12; PX 209.)

Accordingly, the Court finds that Tilton failed to sustain her burden of proving the entire fairness in connection with the formulation and execution of the part of the Tilton Plan involving the strict foreclosure and sale to Transcendence and breached her fiduciary duties of loyalty and good faith owed to TransCare.

A2674

### 2. Damages

"Delaware law dictates that the scope of recovery for a breach of the duty of loyalty is not to be determined narrowly . . . .  The strict imposition of penalties under Delaware law are designed to discourage disloyalty." *Thorpe by Castleman v. CERBCO, Inc.*, 676 A.2d 436, 445 (Del. 1996).  In the appraisal context, the damages remedy would equal the fair value as determined by the Court; however, "[u]nder the entire fairness test, the fair price measure would operate as an aspect of the standard review; it would not inherently require a damages award in that amount." *In re Orchard Enters.*, 88 A.3d at 43; *see Reis v. Hazelett Strip-Casting Corp.*, 28 A.3d at 468 (noting that courts collapse the fair price and damages calculation in the context of an appraisal action but not in an entire fairness review); *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 371 (Del. 1993), as revised (Nov. 1, 1993) ("[W]e emphasize that the measure of any recoverable loss by [the plaintiff] under an entire fairness standard of review is not necessarily limited to the difference between the price offered and the 'true' value as determined under appraisal proceedings."), *modified in part on other grounds*, 636 A.2d 956 (Del. 1994).

Instead, the Court has broad power to fashion "equitable and monetary relief under the entire fairness standard as may be appropriate, including rescissory damages." *Int'l Telecharge, Inc. v. Bomarko, Inc.*, 766 A.2d 437, 440 (Del. 2000) ("*Bomarko II*") (affirming a grant of rescissory damages based on the estimated value of the plaintiffs' shares at the time of the challenged merger if the defendant had not breached his fiduciary duties).  A court "has greater discretion when fashioning an award of damages in an action for a breach of the duty of loyalty than it would when

55

assessing fair value in an appraisal action." *Bomarko II*, 766 A.2d at 441. That is so

because "[t]he strict imposition of penalties under Delaware law are designed to

discourage disloyalty," *Boyer v. Wilmington Materials, Inc.,* 754 A.2d 881, 906 (Del.

Ch. 1999), and the award of damages is not merely compensatory but "should eliminate

the possibility of profit flowing to defendants from the breach of the fiduciary

relationship." *Bomarko II*, 766 A.2d at 441. "An action for breach of fiduciary duty is a

prophylactic rule intended to remove all incentive to breach—not simply to compensate

for damages in the event of a breach." *LNC Invs., Inc. v. First Fid. Bank, N.A. N.J.*, 173

F.3d 454, 465 (2d Cir. 1999) (quoting *ABKCO Music, Inc. v. Harrisongs Music, Ltd.*,

722 F.2d 988, 955-96 (2d Cir. 1983)).

Where fiduciaries acquire property through self-dealing, and "through a

combination of the taking and their subsequent use of the property, destroy[] its value

entirely[,]" they are liable for the value the property would have had absent the breach

of loyalty, not just its value immediately before the breach:

> The award differs from the usual concept of rescissory damages.
> Traditionally in Delaware, rescissory damages could come into play when
> a defendant fiduciary wrongfully took control of property, and the value of
> the property went up during the period of the fiduciary's control. In that
> setting, the law does not limit the plaintiff beneficiary to the value of the
> property at the time of the taking, plus an award of interest. The plaintiff
> beneficiary is entitled to recover the property itself or a measure of its full
> value. In this case, the plaintiffs have invoked the reciprocal of these
> principles. The defendant fiduciaries wrongfully took control of the
> property and, through a combination of the taking and their subsequent
> use of the property, destroyed its value entirely. In both settings, the same
> overarching principle governs: The disloyal fiduciary who wrongfully takes
> property from the beneficiary is liable for changes in value while the
> wrongfully taken property is under the disloyal fiduciary's control.

*Basho*, 2018 WL 3326693, at *50.

The plaintiff alleging a breach of fiduciary duty bears the burden of proving its damages by a preponderance of the evidence. *See Official Comm. of Unsecured Creditors of HH Liquidation, LLC v. Comvest Grp. Holdings, LLC* (*In re HH Liquidation, LLC*), 590 B.R. 211, 273 (Bankr. D. Del. 2018) (citing *Beard Research, Inc. v. Kates*, 8 A.3d 573, 613 (Del. Ch. 2010)). In determining the amount of damages for a breach of fiduciary duty, "responsible estimates that lack mathematical certainty are permissible so long as the court has a basis to make a responsible estimate of damages" and any "uncertainties in awarding damages are generally resolved against the wrongdoer." *Basho*, 2018 WL 3326693, at *50 (internal citation and quotation marks omitted); *Beard Research*, 8 A.3d at 613. However, proof of such damages must be based on more than "mere speculation or conjecture." *In re HH Liquidation, LLC*, 590 B.R. at 273. Within these boundaries, the Court may take "a more liberal approach . . . [that includes] proof of value by any techniques or methods which are generally considered acceptable in the financial community and otherwise admissible in court." *Weinberger*, 457 A.2d at 713. Delaware law affords great weight to contemporaneous management projections in determining value, when available. *See, e.g.*, *Del. Open MRI Radiology Assocs. v. Kessler*, 898 A.2d 290, 332 n. 108 (Del. Ch. 2006) ("Delaware law clearly prefers valuations based on contemporaneously prepared management projections because management ordinarily has the best first-hand knowledge of a company's operations.") (quoting *Doft & Co. v. Travelocity.com Inc.*, No. Civ. A. 19734, 2004 WL 1152338, at *5 (Del. Ch. May 20, 2004)); *Cede & Co. v. JRC Acquisition Corp.*, No. CIV. A. 18648-NC, 2004 WL 286963, at *2 (Del. Ch. Feb. 10, 2004) ("Expert

57

valuations that disregard contemporaneous management projections are sometimes completely discounted.").[24]

### a. NewCo/Transcendence

Greenberg's projections provide the best evidence of the value that TransCare could have realized through an arms-length sale of NewCo. At the time he issued them, he, along with Pelissier, were essentially functioning as TransCare's senior management reporting directly to Tilton. On February 10, 2016, at inception of the Tilton Plan, Greenberg sent the insurance brokers financial information seeking coverage for Transcendence. (PX 196.) At that time, the plan provided for Transcendence to operate five TransCare divisions. Greenberg projected operating revenue in 2016 of $48,404,000 and EBITDA in the amount of $3,761,000. (PX 196 at 27760.) Tilton was

---

[24] The Defendants cited *In re PetSmart, Inc.*, C.A. No. 10782–VCS, 2017 WL 2303599 (Del. Ch. May 26, 2017) for the contrary proposition that the Court should not credit management projections prepared outside of the ordinary course of business. (*DPFC* ¶ 411.) *PetSmart*, an appraisal case, concerned the application of a discounted cash flow analysis. The Court rejected five-year cash flow projections for four independent reasons: "(1) PetSmart management did not have a history of creating and, therefore, had virtually no experience with, long-term projections; (2) even management's short term projections frequently missed the mark; (3) the Management Projections were not created in the ordinary course of business but rather for use in the auction process; and (4) management engaged in the process of creating all of the auction-related projections in the midst of intense pressure from the Board to be aggressive, with the expectation that the projections would be discounted by potential bidders." *Id.* at *33. Three witnesses testified that the auction-projections "were designed to be aggressive because the Board [] [was] convinced that potential bidders would discount whatever projections were put in front of them." *Id.* at *34.

Here, the evidence showed that Greenberg, an experienced financial analyst, prepared numerous projections as did Carl Marks, a financial consulting firm. Moreover, PPAS was involved with TransCare since 2003, and there was no evidence that any prior TransCare projections "frequently missed the mark." Next, the most relevant projections on or about February 24 were sent to an insurance broker to obtain coverage for Transcendence and the procurement of insurance was part of any ambulance company's ordinary course of business. Unlike *PetSmart*, the projections were not part of an auction process; Tilton had foreclosed the possibility of an auction. Finally, this is not an appraisal case; it is a breach of fiduciary duty case and the absence of any "better" financial information is ultimately attributable to Tilton, who exercised absolute control over TransCare.

even more optimistic. Two days later, she wrote to Bobby Siegel, an insurance broker

from whom she was seeking assistance to procure insurance for Transcendence:

> The models show that this business in 2016 would be approximately
> $67mm with $4mm of EBITDA and would grow with the additional transit
> business under the contract to $79mm and $7mm of EBITDA in 2017. It
> is because this new business makes sense that I would be providing all the
> new working capital for this business myself, personally.

(JX 80.)

On February 24, 2016, Greenberg sent another set of financial projections to

Todd Trent, an insurance broker. (PX 228.) By then, Transcendence was down to three

TransCare operating divisions. Greenberg projected operating revenue for

approximately ten months in 2016 (late February-December) in the amount of

$37,188,400 and EBITDA of $3,204,500 but Tilton testified that a full year projection

would result in $4 million of EBITDA.

The Trustee's damages expert, Jonathan Arnold, developed an appropriate

multiple of EBITDA to apply to Transcendence's projections to determine the projected

value of the Transcendence business, and hence, TransCare's damages resulting from

the stripping of that business through an unfair, tainted process. In December, Tilton

had asked Greenberg to identify comparable companies or transactions that could be

used to determine TransCare's sale value. As discussed earlier, he identified six

comparable transactions that occurred within the same sector as TransCare or related

sectors but only two had sufficient public information to calculate EBITDA multiples.

AMR (Envision) purchased Rural/Metro Corp. at a 10.7x multiple and KKR purchased

Air Medical at a 10.0x multiple. (JX 55.)

Greenberg also identified three "market comps" that "relate to public companies and where they're currently trading in terms of their valuation." (JX 55; Tr. 7/22 A.M. 48:3-5.) Based on Greenberg's analysis, Envision, traded at an 11.3x multiple, Air Methods at an 8.2x multiple and PHI at a 3.5x multiple, but Greenberg reported to Tilton that PHI was an outlier because it was engaged in other business lines that were only tangentially related to TransCare's business. (JX 55 at 41414; Tr. 7/22 A.M. 51:11-22.) In his cover email to Tilton, Greenberg stated that the average enterprise value to revenue multiple was 1.8x and the average enterprise value to LTM EBITDA was 10.1x. (JX 55 at 41410; Tr. 7/22 A.M. 52:2-11.)

Armed with Greenberg's analysis, Dr. Arnold utilized the Comparable Company and Precedent Transaction methods, two standard valuation methods, to determine the value of the entire TransCare company ("WholeCo") and NewCo. (PX 282 at ¶ 66.) He did not use a discounted cash flow approach because the data was unavailable. (Tr. 7/24 14:5–15:20.) TransCare had no audited financials for 2014 and was not current in its monthly unaudited financials. (Tr. 8/13 A.M. 52:3–53:1.) Thus, the only reliable data from which to determine the value of TransCare or its separate business lines were the models that Greenberg prepared. (Tr. 7/24 106:14–107:4.) *See, e.g.*, *Bomarko I*, 794 A.2d at 1185 (finding the discounted cash flow methodology "too unreliable" when the expert had to extrapolate from management's one-year forecast).

The Comparable Company method determines the implied value of a company based on the trading prices of similar public companies. (PX 282 at ¶ 67.) Greenberg identified two reliable comparables that traded at multiples of between 8.2x and 11.3x LTM EBITDA. Dr. Arnold recalculated this range at between 7.1x and 12.2x EBITDA

apparently by adding the debt to the value of the common stock and subtracting cash. (Tr. 7/24 20:15-23.)  Applying this range of multiples to NewCo's projected EBITDA of $3.2 million as of February 24, 2016 yielded an implied value of between $22.7 million and $39.1 million for NewCo.  (PX 282 at ¶¶ 7, 80., Ex. 12a.)

The Precedent Transaction method implies a company's value based on the multiples paid in prior transactions.  (PX 282 at ¶ 68.)  Greenberg identified two reliable precedent transactions that sold at multiples of 10.0x and 10.7x EBITDA.  Applying multiples to NewCo's projected EBITDA of $3.2 million as of February 24, 2016 yielded an implied value of between $32.0 million and $34.3 million for NewCo.  (PX 282 at ¶¶ 7, 80, Ex. 12b.)  The combination of these valuation methods yielded an average mean multiple of 10.1x EBITDA and an implied value of $32.3 million for NewCo as of February 24, 2016.[25]

The Defendants criticized Dr. Arnold's approach on several grounds relying on their own expert, Jeffrey Dunn.  According to the Defendants, Dr. Arnold did not do any independent work and instead, relied exclusively on Greenberg's (and Carl Marks's) projections which were not appropriate for use in deciding value, (*DPFC* ¶¶ 287-302), he did not make his own assessment of risk which is required in determining value from projections of future performance or consider TransCare's historically declining performance, (*DPFC* ¶¶ 303-15), his (and Greenberg's) comparables were not

---

[25]     Dr. Arnold also performed a separate analysis based on expressions of interest that TransCare had received from third parties prior to the strict foreclosure.  (*See* PX 282, Ex. 12c.)  As they were too indefinite and never reached the stage of an actual offer (primarily because Tilton never followed them up), I do not credit them.

comparable, (*DPFC* ¶¶ 316-28), and he failed to account for the capital needs of NewCo. (*DPFC* ¶¶ 329-31.)

During rebuttal testimony, Dr. Arnold explained that he had investigated certain of the criticisms involving his use of Envision and Air Methods as comparable companies.  He looked for new guideline companies and created a larger database of a group of sixty-nine companies that he filtered down to a group of thirty-four, (Tr. 8/14 A.M. 48:4–24, 60:9–15, 64:21–65:1), which met his definition of being either smaller, distressed, low operating, or undercapitalized.  (Tr. 8/14 A.M. 52:19–53:25.)  He concluded that they confirmed Greenberg's analysis.  (Tr. 8/14 A.M. 54:19–55:1.)  The Defendants criticized the expanded set of comparables on the bases they were still not comparable and TransCare's financial condition was generally worse that the companies in any given subset.  (*DPFC* ¶¶ 338-42.)

Despite their many criticisms, the Defendants did not offer their own analysis or suggest an alternative damage assessment.  They did not identify companies that were more comparable; their expert did not identify a more appropriate EBITDA multiple; and Mr. Dunn did not make an adjustment based on his own, independent risk assessment.  Indeed, there was little need for any risk adjustment.  In Tilton's own words, she was funding Transcendence personally because it was smaller and less risky with good growth prospects.  (JX 80.)  Furthermore, if better financial information was unavailable, it is only because TransCare did not generate better financial information under Tilton's watch.  Dr. Arnold was making his best estimate of TransCare's damages in light of the best available financial information — financial information that Tilton thought sufficiently credible to send to insurance brokers to procure insurance for

62

Transcendence and commit to invest up to $10 million of her own funds through Ark

Angels III.  Facing similar criticisms of the plaintiff's damage evidence in a case under

the Fair Labor Standards Act, District Judge Engelmayer observed:

> [S]trikingly, defendants, for their part, have not come forward with any
> alternative method for calculating damages.  Defendants' expert, Dr. Paul
> White, instead devotes his expert report to criticizing Dr. Crawford's
> methodology and his client's own Clubtrax data.  However, he
> makes no effort to make his own calculation for class-wide damages.  The
> fact that defendants have failed to offer an alternative, let alone a superior,
> methodology is a relevant consideration under *Mt. Clemens. . . .*  Here,
> defendants have failed to provide any good reason to discredit Dr.
> Crawford's estimate of damages as other than "just and reasonable."  On
> the contrary, the absence of any alternative methodology is a telling
> indication that defendants, in attacking Dr. Crawford's report, can do no
> more than spot imperfections that would exist in any damages
> methodology given the imperfect Clubtrax data.

*Hart v. Rick's Cabaret Int'l, Inc.*, 60 F. Supp. 3d 447, 467 (S.D.N.Y. 2014).

I accept Dr. Arnold's higher intermediate figure of 11x EBITDA in determining an

amount of damages that will compensate the Estate for the lost opportunity caused by

Tilton's breach of fiduciary duty.  The unfair process prevented the possibility of selling

NewCo to a strategic buyer.  A strategic buyer would not incur some of the projected

operating expenses or would incur them in a lower amount and would recalculate its

projected operating expenses and EBITDA accordingly.  *See, e.g.*, *Merrill Lynch Bus.*

*Fin. Servs., Inc. v. Am. Reprographics Co., LLC* (*In re Louis Frey Co., Inc.*), Adv. No.

03–91486 (SMB), 2006 WL 2090083, at *18-19 (Bankr. S.D.N.Y. July 28, 2006)

(backing out expenses that a strategic buyer would not incur when computing what it

would have paid for the debtor's business).  For example, the February 24 financial

information projected management and administrative staffing expenses in the sum of

$3,074,600 and professional fees of $145,000.  (PX 228 at 86223.)  A strategic buyer

A2683

already running an ambulance or similar business with an existing infrastructure would have its own management, administrative and legal staff in place and might not have to pay additional staff inherent in Greenberg's projections. In addition, Greenberg projected facility costs in the sum of $1,352,600, (PX 228 at 86223), but a strategic buyer would already have its own headquarters and garages, and while it might need additional garage space, it might not incur the incremental costs in the sum projected for Transcendence. Finally, Greenberg projected payments to OldCo under the proposed Transition Services Agreement in the approximate sum of $250,000. (PX 228 at 86223.) It is unlikely that a strategic buyer would ever pay OldCo anything. While Tilton would undoubtedly discount these savings as mere speculation, they are speculative only because Tilton never engaged in a fair process that might elicit interest from such buyers, particularly those who had reached out to TransCare during the preceding year. Using the higher multiple (11x EBITDA) for purposes of computing damages captures the lost opportunity that Tilton usurped.

In addition, the use of an EBITDA of $4 million to calculate damages is also supported by the evidence. On February 23 or 24, Greenberg computed a 2016 EBITDA of $3.2 million based on ten months and Tilton testified that it would increase to $4 million on an annualized basis. Moreover, her earlier email to Bobby Siegel, (JX 80), predicted that NewCo, as then conceived, would grow to $7 million the following calendar year. While Tilton contends that TransCare could not have sold the Subject Collateral without the secured parties' consent, at least outside of a bankruptcy sale under Bankruptcy Code § 363(f), she accomplished precisely that result by authorizing PPAS to foreclose and sell the assets to Transcendence without Credit Suisse's, and

apparently Wells Fargo's, consent. Accordingly, the damages that the Debtors suffered Tilton's breach of fiduciary duty totaled $44 million subject to certain adjustments.

The first adjustment relates to the working capital investment that a buyer might have to make in NewCo. The Executive Summary prepared by Carl Marks stated that TransCare needed $7.2 million during the next three months, (PX 175 at 02115 (13 Week Cash Forecast), 02116), and on February 13, 2016, Pelissier predicted that NewCo would need an $8 million initial investment in working capital. (PX 286 at 105517.) At the time, the Tilton Plan called for a Transcendence consisting of six TransCare divisions rather than the three that Transcendence ultimately assumed. A smaller NewCo would presumably need less working capital but neither Greenberg nor Pelissier nor Carl Marks computed that amount.

In addition, much of the funding was needed to pay TransCare's debts which a third-party buyer would not pay. For example, the thirteen-week forecast in the Executive Summary budgeted $700,000 for past due payroll and $1.395 million for past due payroll taxes. (PX 175 at 02115-16.) Carl Marks received a monthly fee of $135,000, (DX 106 at 43440), and the thirteen-week cash flow forecast budgeted $405,000 to pay Carl Marks. Another large portion was attributable either to amounts past due to vendors and landlords or ongoing payments on leases that a third-party buyer might not need.

Finally, Greenberg's projections, (PX 228), showed positive net income without any capital investment. The cover email, (PX 228 at 86219), estimated that an approximate $10 million revolver would ultimately be added to the *pro forma* financial

65

**A2685**

information, but some of it would be an unfunded revolver. In fact, Jonathan Killion of

Carl Marks recalculated the necessary funding on February 10, 2016 at the inception of

the Tilton Plan and estimated that Transcendence would need about $3.2 million in

capital investment at a time when the plan involved five or six TransCare entities. (DX

132.)

At trial, the Court questioned Dr. Arnold as to whether it was appropriate to

deduct required funding from the purchase price a third party would be willing to pay. I

assumed that a third party would have to provide the same funding and would

essentially treat it as part of the purchase price. (Tr. 8/14 A.M. 78:9-21.) Dr. Arnold

responded that the situation posited would be the "worst case" scenario that did not

apply for at least two reasons. First, every company has a recurring program for making

capital expenditures and "I think its overstating it to subtract off the initial investment

dollar for dollar. I think it's going to be some fraction of it." (Tr. 8/14 A.M. 79:5-10.)

Second, Tilton was proposing to provide a revolving line of credit rather than invest

capital. Under the circumstances, only a portion of the proposed revolver should be

deducted from the purchase price:

> THE WITNESS: . . . . If it goes in as permanent capital then I would be
> much more open to just subtracting it off dollar for dollar. But if the idea
> that we're going to put it in, but in ten months the company is going to be
> generating four or five hundred thousand of EBITDA a month, in eleven
> months and that money can be returned its more in the form of a short to
> medium term loan which costs the shareholders some amount of money,
> but it's not a dollar for dollar dilution.

(Tr. 8/14 A.M. 79:15-22.)

Greenberg's February 24 financial *pro forma* projected an average monthly

EBITDA of $400,000 during 2016, sufficient to fund operations and repay any advances

that Tilton might have made. Given Dr. Arnold's unrefuted testimony and the fact that a substantial portion of TransCare's financing needs according to the Executive Summary would be used to pay TransCare debts that a buyer would not pay or would pay in a lesser amount, the Court concludes that it is appropriate to deduct $1 million from the value of the NewCo assets foreclosed upon and sold to Transcendence.

### b.    Post-Petition Liquidation

The next adjustment relates to the Trustee's liquidation of certain assets. The Trustee liquidated all of the assets pursuant to the *Personal Property Stipulation* for $19.2 million net of sale expenses. (PX 282, Ex. 13.) Of the $19.2 million, $11.7 million (net) was attributable to the CONs and another $5.6 million was attributable to the collection of accounts receivable. (PX 282, Ex. 13.) Neither the CONs nor the accounts receivable were included in the Subject Collateral and were not part of the Term Loan Priority Collateral. Only $2 million (net) was attributable to the sale of the physical assets, (*see* PX 282, Ex. 13), and the Trustee paid $800,000 of those proceeds to PPAS.[26] Accordingly, the value of the liquidation of the Subject Collateral to the Estate was only $1.2 million. This sum represents a reduction in the amount of damages that TransCare suffered as a result of the strict foreclosure.[27]

### c.    $10 Million Credit

---

[26]    PPAS transferred the $800,000 to Ark II presumably under the 2016 Intercreditor Agreement and Ark II credited that transfer on its proof of claim. As discussed in the succeeding text, PPAS was not entitled to receive any portion of its claim because its claim is disallowed. However, the Trustee abandoned the separate claim against PPAS to recover the $800,000.

[27]    The Trustee would give Tilton credit for the full $5.7 million in proceeds derived from the liquidation of the NewCo assets. However, the collection of the accounts receivable and the sale of the CONs accounted for $5 million of that sum and the accounts receivable and CONs were not included in the strict foreclosure or sale to Transcendence.

PPAS gave TransCare a $10 million credit against the Term Loan as compensation for the foreclosure and reduced its proof of claim by $10 million. The question is whether the credit should also reduce the damage award against Tilton. I conclude that it should not. Instead, the effect of the Tilton Plan should be reversed and PPAS's claim should be increased by $10 million. The foreclosure and sale should not have unfolded as it did. By reversing the transaction and returning the parties to the *status quo*, the effect of Tilton's breach of fiduciary duty will be undone leaving the Debtors with a damage claim based on their ownership of a substantial asset that could have been sold to a third party. In addition, as discussed below, the PPAS claim will be disallowed and PPAS is not entitled to the $10 million distribution through an offset in connection with its disallowed claim.

### d. WARN Act Liability

The final element of damages claimed by the Trustee relates to the Debtors' potential WARN Act liability for failing to give adequate notice of mass layoffs to TransCare's employees.[28] The Trustee seeks a declaratory judgment that Tilton is responsible for indemnifying the Estate for the WARN Act liability because (i) TransCare had no such liability prior to Tilton's breach of loyalty and she must bear that liability in order to put TransCare back to where it was prior to the breach; (ii) the WARN Act liability was a natural and foreseeable consequence of Tilton's actions; and (iii) under Delaware law, a corporate officer or director who knowingly causes the

---

[28]     The WARN Act claims are proceeding separately as a class action *See Ien v. TransCare Corp.* (*In re TransCare Corp.*), 611 B.R. 160 (Bankr. S.D.N.Y. 2020) ("*Ien I*") and *Ien v. TransCare Corp.* (*In re TransCare Corp.*), 614 B.R. 187 (Bankr. S.D.N.Y. 2020) ("*Ien II*"). Tilton is named as a defendant in that adversary proceeding on state wage law claims but not on the WARN Act claims.

A2688

corporation to violate the law necessarily fails to act in good faith and thereby breaches her fiduciary duty of loyalty. *Hazout v. Tsang Mun Ting*, 134 A.3d 274, 283 n. 20 (Del. 2016); *Desimone v. Barrows*, 924 A.2d 908, 934-35 (Del. Ch. 2007).

The requirements of the federal and New York State WARN Acts are discussed at length in *Ien I*. Basically, and with certain exceptions, an employer must give 60-days advance written notice under the federal WARN Act and 90-days advance written notice under the New York WARN Act prior to effecting a mass layoff. *Ien I*, 611 B.R. at 165-67. The plaintiff in *Ien I* moved for partial summary judgment contending that the WARN Act notices were deficient and, essentially, of no force or effect. The Trustee conceded the point and the Court struck the Trustee's WARN Act defenses that depended on the giving of sufficient notice. *Id.* at 168. The Tilton-affiliates that were defendants on the WARN Act claims contested the plaintiff's claim of insufficiency. The Court concluded as to those defendants that the February 24 Notice was insufficient under the WARN Acts and struck certain defenses. In contrast, the February 26 Notice given to the NewCo employees was sufficient. *Id.* at 168-69.[29]

According to the Trustee, Tilton purposely chose not to issue a WARN Act notice because she did not want TransCare's employees to look for new jobs. The claim is based on an email exchange that occurred on February 19, 2016. (JX 87.) At the time, Wells Fargo and Tilton were still discussing Wells Fargo's possible funding of a 90-day

---

[29]    In *Ien II*, the Court granted partial summary judgment in favor of several Tilton-affiliates on the WARN Act claims, and the only remaining non-Debtor defendant is Patriarch Partners. *See Ien II*, 614 B.R. at 208 (denying partial summary judgment in favor of Patriarch Partners on the "single employer" issue), 211 (denying partial summary judgment in favor of Patriarch Partners on the "unforeseeable business circumstances" defense).

A2689

wind down of OldCo.  Daniel Fiorello, Esq., an attorney representing Wells Fargo, posed several questions to Lynn Harrison, III, Esq. and Cindi Giglio, Esq., the two attorneys with Curtis Mallet acting as TransCare's bankruptcy counsel.  One of the questions Fiorello asked was, "Will the TransCare Warn Act notices go out of [sic] Monday, February 22nd?"  (JX 87 at 47844.)  The email was forwarded to Tilton who responded, "Notice cannot be given prior to a foreclosure on NEWCO or there will be no NEWCO." (JX 87 at 47843.)  At trial, Tilton amplified her response: she "didn't want to tell the employees prior to the foreclosure because we didn't want to mass exodus."  (Tr. 8/13 A.M. 68:7-13.)

Even if Patriarch Partners is liable for violating the WARN Acts, the evidence relied on by the Trustee does not support imposing an obligation on Tilton to indemnify the Estate on the theory that she caused those violations in bad faith.  To establish bad faith, the Trustee had to demonstrate that Tilton's conduct in failing to provide WARN Act notice sooner was "qualitatively more culpable than gross negligence . . . ."  *Walt Disney II*, 906 A.2d at 66; *see also id.* at 63 ("We perceive no substantive difference between the Court of Chancery's 2003 definition of bad faith—a 'conscious[ ] and intentional[ ] disregard[ ][of] responsibilities, adopting a "we don't care about the risks" attitude ...'—and its 2005 post-trial definition—an 'intentional dereliction of duty, a conscious disregard for one's responsibilities.'") (alterations in original).

The Tilton Plan contemplated that the foreclosure of the NewCo assets and the commencement of the wind down of the OldCo assets would occur at the same time. OldCo was to be wound down in chapter 11 over a period of ninety days and Tilton contemplated giving that amount of WARN Act notice to the OldCo employees.  (DX 147

at 91631; Tr. 8/13 P.M. 91:25-92:14.) The proposed timing of the notice would have met the requirements under the WARN Act, and as of February 22, Wells Fargo and Tilton were still trying to set up a meeting to discuss the 13-week wind down. (JX 91 (email string).) At some point, between February 22 and February 24, the plan for an orderly 90-day wind down in chapter 11 broke down and switched to a liquidation in chapter 7 but the 90-day schedule remained in place.

It is true Tilton did not want to give the notice until the foreclosure was completed but she still subjectively believed that TransCare had adequate time to send the WARN Act notices. While Tilton has failed to justify the part of the Tilton Plan that involved the self-dealing transaction with NewCo's assets, the Trustee has failed to show that Tilton deliberately delayed the timing of the WARN Act notices because she did not care about the requirements of the WARN Act or that her actions were the product of calculated wrongdoing or intentional disregard of her responsibilities with TransCare.

To recapitulate, the Subject Collateral was worth $44 million, less the $1 million buyer capital investment, leaving $43 million as TransCare's damages for Tilton's breach of fiduciary duty at the time of the strict foreclosure. The Trustee liquidated the Subject Collateral for a net benefit to the Estate in the sum of $1.2 million, and the Estate's damages should be reduced by that amount. Consequently, Tilton's breach of her fiduciary duties of loyalty and good faith resulted in damages to TransCare in the sum of $41.8 million.

71

## C.    Count 7:  Fraudulent Transfer Against PPAS and Transcendence

### 1.    The Trustee's *Prima Facie* Case

Count 7 seeks to avoid the strict foreclosure as an actual fraudulent transfer under federal and New York state law, the latter made applicable through 11 U.S.C. § 544(b)(1), and recover the value of the transfer from PPAS and Transcendence under 11 U.S.C. § 550(a).  The Trustee also seeks his attorneys' fees pursuant to N.Y. Debtor & Creditor Law ("NYDCL") § 276-a.[30]  A conveyance or transfer is intentionally fraudulent under either NYDCL § 276 or 11 U.S.C. § 548(a)(1)(A) if the debtor made the transfer with the actual intent to hinder, delay or defraud a present or future creditor.[31]  The strict foreclosure effected a transfer of TransCare's property, *see* 11 U.S.C. § 101(54) (defining "transfer"), and the only question is whether the Trustee demonstrated TransCare's *scienter* through the imputation of Tilton's knowledge and intent.[32]

---

[30]    All references to the NYDCL refer to the version of the NYDCL in existence at the time of the transfer.  That version was repealed effective April 4, 2020 and replaced by the Uniform Voidable Transactions Act.  *See* 2019 N.Y. Sess. Laws Ch. 580 (A. 5622) (McKinney).

[31]    NYDCL § 276 provides:

> Every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors.

> Bankruptcy Code § 548(a)(1)(A) states that a trustee may avoid a transfer of an interest of the debtor in property or any obligation made or incurred by the debtor, whether voluntary or involuntary, within two years of the petition date if the debtor

> made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted . . . .

[32]    Tilton effectuated the strict foreclosure on behalf of TransCare and PPAS, both of whom she controlled, and her knowledge and intent are imputed to these corporations.  *Kirschner v. Fitzsimons* (*In re Tribune Co. Fraudulent Conveyance Litig.*), No. 12-cv-2652 (RJS), 2017 WL 82391, at *5 (S.D.N.Y. Jan. 6, 2017) ("Because all corporations must act through agents, *see In re Parmalat Sec. Litig.*, 421 F. Supp. 2d 703, 715 (S.D.N.Y. 2006), courts assessing the intent of a corporation in a fraudulent conveyance claim will look to the intent of the corporate actors who effectuated the transaction on behalf of the corporation.").

The ancient phrase "'to hinder, delay, or defraud,' has always been in the disjunctive, and an intent to hinder or delay is adequate even if it be not an intent to defraud." *In re Condon*, 198 F. 947, 950 (S.D.N.Y. 1912), *aff'd*, 209 F. 800 (2d Cir. 1913). "A deliberate attempt to stave off creditors by putting property in such a form and place that creditors cannot reach it, even when the purpose of that action is not to defraud them of ultimate payment but only to obtain enough time to restore the debtor's affairs, comes within the meaning of 'hinder' and 'delay' as set forth in section 276 of the Debtor and Creditor Law." *Flushing Sav. Bank v. Parr*, 438 N.Y.S.2d 374, 376-77 (N.Y. App. Div.), *appeal dismissed*, 426 N.E.2d 752 (N.Y. 1981). If a transfer is actually fraudulent under New York law, it will likewise be actually fraudulent under Bankruptcy Code section 548(a)(1)(A). *Kramer v. Sooklall* (*In re Singh*), 434 B.R. 298, 311 n. 5 (Bankr. E.D.N.Y. 2010).

Except in Ponzi scheme cases, fraudulent intent is not presumed, *Weisfelner v. Hofmann* (*In re Lyondell Chem. Co.*), 554 B.R. 635, 650 (S.D.N.Y. 2016), and the plaintiff must prove it. A transferor rarely admits her own fraudulent intent. As a result, courts rely on "badges of fraud" to fill the void. *Sharp Int'l Corp. v. State St. Bank & Tr. Co.* (*In re Sharp Int'l Corp.*), 403 F.3d 43, 56 (2d Cir. 2005). These include the following:

(1) the lack or inadequacy of consideration;

(2) the family, friendship or close associate relationship between the parties;

(3) the retention of possession, benefit or use of the property in question;

(4) the financial condition of the party sought to be charged both before and after the transaction in question;

 (5) the existence or cumulative effect of a pattern or series of transactions
or course of conduct after the incurring of debt, onset of financial
difficulties, or pendency or threat of suits by creditors; and

(6) the general chronology of the events and transactions under inquiry.

*Salomon v. Kaiser* (*In re Kaiser*), 722 F.2d 1574, 1582-83 (2d Cir. 1983); *accord Sharp Int'l Corp.,* 403 F.3d at 56; *Tribune Co. Fraudulent Conveyance Litig.*, 2017 WL 82391, at *13. Other indicia of fraud include "shifting of assets by the debtor to a corporation wholly controlled by him," *Kaiser*, 722 F.2d at 1583, and circumstances suggesting secrecy, haste or unusualness of the transaction. *HBE Leasing Corp. v. Frank*, 48 F.3d 623, 639 (2d Cir. 1995).

While the presence or absence of one badge of fraud is not conclusive, the presence of multiple indicia will increase the strength of the inference of fraudulent intent. *Tribune Co. Fraudulent Conveyance Litig.*, 2017 WL 82391, at *13. "In other words, while '[t]he presence of a single badge of fraud may spur mere suspicion, the confluence of several can constitute conclusive evidence of an actual intent to defraud, absent "significantly clear" evidence of a legitimate supervening purpose.'" *Id.* (quoting *Max Sugarman Funeral Home, Inc. v. A.D.B. Inv'rs*, 926 F.2d 1248, 1254–55 (1st Cir. 1991)); *accord Bear Stearns Sec. Corp. v. Gredd* (*In re Manhattan Inv. Fund Ltd.*), 397 B.R. 1, 10 n. 13 (S.D.N.Y. 2007) ("[T]he existence of several badges of fraud can constitute clear and convincing evidence of actual intent.") (quoting *Silverman v. Actrade Capital, Inc.* (*In re Actrade Fin. Techs. Ltd.*), 337 B.R. 791, 809 (Bankr. S.D.N.Y. 2005)).

Virtually all of the badges of fraud identified, *supra*, are present in this case providing strong circumstantial evidence of Tilton's fraudulent intent. Acting through

74

entities she controlled, she sold the Subject Collateral to herself at a price she picked. In addition, the strict foreclosure was outside of TransCare's ordinary course of business, the consideration PPAS credited to the transaction was inadequate for the reasons stated in connection with the breach of fiduciary duty claim and Tilton retained control of the transferred assets through her majority interest in and control of PPAS as the foreclosing party and thereafter through Transcendence as PPAS's buyer. In fact, she purported to own the same interest in Transcendence as in TransCare (no Transcendence stock was ever issued), but her interest in Transcendence was free and clear of the Term Loan Lenders' lien which had been eliminated through the foreclosure and sale and TransCare's unsecured debt.[33]

In addition, the entire transaction was conducted in haste and under a veil of secrecy. The Tilton Plan was conceived and executed in just fourteen days, delayed only by the time it took to procure insurance for Transcendence. Furthermore, the only TransCare personnel who were let in on the Tilton Plan were Glen Youngblood, who was to become president of Transcendence, and Peter Wolf, the TransCare COO who would be called upon to agree on TransCare's behalf to the terms of the strict foreclosure. (DX 174.) Although TransCare's counsel, Curtis Mallet, was retained to oversee OldCo's wind down, Stephen bypassed Curtis Mallet and sent the foreclosure documents, which included OldCo's assets, directly to Wolf, and Tilton did not forewarn Term Loan Lenders and shareholders Credit Suisse and First Dominion.

---

[33] According to the January 7 Plan, TransCare owed approximately $12 million in accounts payable and additional accrued expenses of roughly $1.7 million. (JX67 at 106577.)

Accordingly, the numerous badges of fraud establish Tilton's fraudulent intent to delay and defraud TransCare's creditors and she has not pointed to "significantly clear evidence of a legitimate supervening purpose" to effectuate a transfer of substantially all of TransCare's value for less than a quarter of its worth. The Trustee has sustained his burden of proving that TransCare transferred the Subject Collateral to PPAS[34] with the intent to hinder and delay TransCare's creditors and avoids the strict foreclosure under NYDCL § 276 and 11 U.S.C. § 548(a)(1)(A).[35]

### 2. The Remedy

Bankruptcy Code § 550(a) provides:

Except as otherwise provided in this section, to the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from--

(1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or

(2) any immediate or mediate transferee of such initial transferee.

"The purpose of § 550(a) is to restore the estate to the condition it would have been in if the transfer had never occurred." *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 568 B.R. 481, 486 (Bankr. S.D.N.Y. 2017). Where, as here, TransCare

---

[34] During the trial, the Court had suggested that it might collapse the strict foreclosure and the sale to Transcendence, deem PPAS a mere conduit and treat Transcendence as the initial transferee of the Subject Collateral. PPAS did not assert this argument in opposition to the actual fraudulent transfer claim in the *DPFC* or in its response to the *PPFC* and accordingly, I do not consider it.

[35] A clear and convincing standard of proof has been applied with respect to fraudulent intent under New York State law, but some District Courts within this Circuit have applied a preponderance of the evidence standard to a fraudulent transfer claim under the Bankruptcy Code. *See, e.g., Weisfelner v. Blavatnik* (*In re Lyondell Chem. Co.*)*, 567 B.R. 55, 142 n. 38 (Bankr. S.D.N.Y. 2017)*, *aff'd,* 585 B.R. 41 (S.D.N.Y. 2018). The Trustee has satisfied both standards.

A2696

transferred a going concern and the Trustee subsequently sold the same assets in liquidation sales, the starting point is the value of the Subject Collateral at the time of the strict foreclosure.

Although this claim involves the same transfer as Count 1, the Trustee proposes a different measure of damages. He argues for the use of a 10.1x EBITDA multiplier and the deduction of the $10 million credit and the $5.7 million liquidation proceeds from the award. (*See PPFC* ¶¶ 318-319.) The Court accepts the 10.1x EBITDA multiplier because it reflects the average of Dr. Arnold's four credible "market comps" and does not involve many of the considerations that go into computing damages for breach of fiduciary duty. The Court rejects the deduction of the $5.7 million because, for the reasons already stated, it is not supported by the evidence. Specifically, it includes $5 million of accounts receivable and CONs that were not part of the foreclosure and it excludes the liquidation of the OldCo collateral that was part of the Subject Collateral. Thus, the award should be reduced by $1.2 million, the net proceeds of the Subject Collateral realized through the Trustee's liquidation sales.

Finally, the Court rejects the Trustee's proposal to reduce the award by the $10 million credit because it is based on an incorrect view of the law. A fraudulent transferee has a defense to the extent it received the transfer for value and in good faith, 11 U.S.C. § 548(c), or without knowledge of the fraud, NYDCL § 278(1),[36] *i.e.*, a good

---

[36]     Bankruptcy Code § 548(c) provides:

Except to the extent that a transfer or obligation voidable under this section is voidable under section 544, 545, or 547 of this title, a transferee or obligee of such a transfer or obligation *that takes for value and in good faith* has a lien on or may retain any interest transferred or may enforce any obligation incurred, as the case may be, to the extent that

faith purchaser for value. *Commodity Futures Trading Comm'n v. Walsh*, 618 F.3d 218, 229 (2d Cir. 2010) ("DCL § 278 provides that a creditor whose claim has matured may have a conveyance set aside 'against any person,' other than a good faith purchaser for value, defined as 'a purchaser for fair consideration without knowledge of the fraud.'"), *answering certified question*, 951 N.E.2d 369 (N.Y. 2011). The defendant bears the burden of proving this defense. *Fed. Deposit Ins. Co. v. Malin,* 802 F.2d 12, 18 (2d Cir. 1986) ("Phyllis Malin [transferee] must also satisfy the remaining elements of section 278 to claim its benefits. Specifically, it must be determined whether Phyllis was a 'purchaser for fair consideration without knowledge of the fraud at the time of the purchase.'") (citation omitted).

Even if the $10 million credit constituted value, PPAS failed to prove that it received the Subject Collateral in good faith. To the contrary, the Court has already found that TransCare made the involuntary transfer through the strict foreclosure with the intent to hinder and delay its creditors. Its wrongful intent was imputed from Tilton. Tilton's same wrongful intent is imputed to PPAS which participated with

---

such transferee or obligee gave value to the debtor in exchange for such transfer or obligation.

(Emphasis added.)

NYDCL § 278(1) provides:

Where a conveyance or obligation is fraudulent as to a creditor, such creditor, when his claim has matured, may, as against any person except a purchaser *for fair consideration without knowledge of the fraud at the time of the purchase*, or one who has derived title immediately or mediately from such a purchaser,

    a. Have the conveyance set aside or obligation annulled to the extent necessary to satisfy his claim, or

    b. Disregard the conveyance and attach or levy execution upon the property conveyed.

(Emphasis added.)

TransCare (and Transcendence) in the Tilton Plan and received the Subject Collateral in bad faith and with the knowledge of Tilton's intent to hinder and delay TransCare's creditors.

Accordingly, the Trustee is entitled to recover $39.2 million from PPAS pursuant to 11 U.S.C. § 550(a), and PPAS's claims are disallowed under 11 U.S.C. § 502(d).[37]  The Trustee is also entitled to recover $39.2 million from Transcendence as the immediate transferee of PPAS.  11 U.S.C. § 550(a)(2).  The damages for breach of fiduciary duty and the fraudulent conveyance remedy the same injury and the Trustee is entitled to only a single satisfaction.  (*See PPFC* ¶ 321.)

### 3.    Attorneys' Fees

A plaintiff who successfully avoids an intentional fraudulent conveyance may be entitled to recover his attorneys' fees.  NYDCL § 276-a provides in relevant part:

> In an action ... brought by a creditor [or] trustee in bankruptcy ... to set aside a conveyance by a debtor, where such conveyance is found to have been made by the debtor and received by the transferee with actual intent, as distinguished from intent presumed in law, to hinder, delay or defraud either present or future creditors, in which action ... the creditor [or] trustee in bankruptcy ... shall recover judgment, the justice or surrogate presiding at the trial shall fix the reasonable attorney's fees of the creditor [or] trustee in bankruptcy ... in such action or special proceeding, and the creditor [or] trustee in bankruptcy ... shall have judgment therefor against ... the transferee....

---

[37]    Section 502(d) states in pertinent part:

[T]he court shall disallow any claim of any entity from which property is recoverable under section . . . 550. . . of this title or that is a transferee of a transfer avoidable under section 544 [or] 548 . . . of this title, unless such entity or transferee has paid the amount, or turned over any such property, for which such entity or transferee is liable under section . . . 550 . . . of this title.

A2699

The Court has found that TransCare made and PPAS received the Subject Collateral with actual intent to hinder and delay TransCare's creditors. This finding led to the conclusion that PPAS was not a good faith purchaser for value entitled to a $10 million reduction in the Trustee's award based on the credit it gave TransCare. The same finding entitles the Trustee to an award of reasonable attorneys' fees to be fixed by the Court in subsequent proceedings.

## D.    Counts 4, 10 and 11: Avoidance and Recharacterization of Ark II Lien

The Trustee seeks to avoid or subordinate Ark II's lien, granted on February 11, 2016, when TransCare executed the Ark II Security Agreement in connection with the Ark II Facility. He relies on three theories: (i) preference, (ii) constructive fraudulent transfer and (iii) recharacterization as equity. In addition, Count 3 seeks to equitably subordinate Ark II's and PPAS's liens and/or claims, and the equitable subordination claim is addressed below. To the extent the Ark II lien is avoided, the Trustee seeks to preserve the lien for the benefit of the estate, *see* 11 U.S.C. § 551.[38]

### 1.    Count 10: Preference

Under Bankruptcy Code § 547(b), a trustee may avoid a transfer (1) made to or for the benefit of a creditor, (2) for or on account of an antecedent debt, (3) while the debtor was insolvent, (4) on or within ninety days of the petition date (one year if the transferee was an insider), (5) that enables the creditor to receive more than it would

---

[38]    Bankruptcy Code § 551 provides:

Any transfer avoided under section 522, 544, 545, 547, 548, 549, or 724(a) of this title, or any lien void under section 506(d) of this title, is preserved for the benefit of the estate but only with respect to property of the estate.

A2700

have received in a chapter 7 case if the transfer was never made and the creditor

received payment of the debt in accordance with the Bankruptcy Code.[39]  The Trustee

has the burden of proving each element under section 547(b).  11 U.S.C. § 547(g).

The Trustee contends that the granting of the lien to Ark II pursuant to the Ark II

Security Agreement to secure, *inter alia*, the January Payments in the approximate

aggregate sum of $1.9 million was a preference.[40]  Although the Ark II credit documents

were backdated to January 15, 2016, they were signed by TransCare on February 11,

2016.  TransCare granted and Ark II perfected the lien on that date, and the granting of

---

[39]     Section 547(b) states:

Except as provided in subsections (c) and (i) of this section, the trustee may . . . avoid any transfer of an interest of the debtor in property--

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made--

  (A) on or within 90 days before the date of the filing of the petition; or

  (B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

(5) that enables such creditor to receive more than such creditor would receive if--

  (A) the case were a case under chapter 7 of this title;

  (B) the transfer had not been made; and

  (C) such creditor received payment of such debt to the extent provided by the provisions of this title.

[40]     Ark II never advanced any funds directly to TransCare.  The evidence showed that the January 15 Payment in the sum of $1,172,757.53 was wired by Ark II to PPAS to allow PPAS to make insurance payments on TransCare's behalf.  Treating that advance as a loan to TransCare rather than a loan to PPAS, Ark II became a creditor of TransCare at that point.  On the other hand, the January 29 Payment in the sum of $690,168.24 was paid by PPAS on TransCare's behalf to meet obligations to the NYSIF and certain TransCare creditors.  Although the parties have sometimes lumped the two sets of payments together and treated them as having been made by Ark II, Ark II did not make the January 29 Payment.  Furthermore, while Tilton testified that it was her intention that Ark II would reimburse PPAS once Ark II was granted a lien priority under a future credit agreement, (Tr. 8/13 P.M. 6:3-6; *see* DX 121 at 99194), there was no evidence that the reimbursement occurred.  Accordingly, the only advance Ark II made was in the sum of $1,172,757.53 million in connection with the January 15 Payment and that is the extent of its claim.

81

a lien was a transfer, *see* 11 U.S.C. § 101(54)(A), that occurred within ninety days of the petition date. At the time of the transfer, Ark II was a creditor of TransCare, and TransCare was presumed to be insolvent. 11 U.S.C. § 547(f).

Finally, the lien would allow Ark II to obtain a greater recovery in a hypothetical chapter 7 case than if the transfer had not been made. To satisfy the fifth prong, a trustee must prove that the defendant received a greater amount on its claim than it would receive on the petition date in a hypothetical chapter 7 case. *Sama v. Mullaney* (*In re Wonderwork, Inc.*)*,* 611 B.R. 169, 213-14 (Bankr. S.D.N.Y. 2020); *Savage & Assocs., P.C. v. Mandl* (*In re Teligent, Inc.*), 380 B.R. 324, 339 (Bankr. S.D.N.Y. 2008). As a result of the lien granted on February 11, 2016 and the lien priority it obtained over PPAS's lien by virtue of the 2016 Intercreditor Agreement, Ark II was fully secured by assets worth substantially more than the January 15 Payment and would have received full payment on its claim as of the petition date in a hypothetical chapter 7.

If, instead, Ark II did not receive the lien and its claim was unsecured, it would receive a lower distribution, if any distribution, in a hypothetical chapter 7 case. According to financial information and projections prepared by Greenberg on January 28, 2016, TransCare had approximately $41 million in total assets and $81 million in total liabilities, mostly secured debt. (PX 179 at 13263.) By February 24, most of its valuable assets had been foreclosed upon and transferred to Transcendence but TransCare's liabilities had been reduced by the $10 million credit. The only valuable assets that escaped the foreclosure were the accounts receivable and the CONS. Wells Fargo had a first lien and PPAS had the second lien on those assets under the 2016 Intercreditor Agreement. Following the foreclosure and as of the petition date

TransCare owed Wells Fargo $13 million and still owed PPAS $35 million. The proceeds of the accounts receivable and CONs were substantially less than $48 million leaving unsecured creditors with nothing.

PPAS contends that the Trustee failed to establish that the grant of the lien was on account of an antecedent debt or that it enabled Ark II to recover more than it would recover in a chapter 7 case if it did not receive the transfer and instead, received a distribution on its claim. The latter contention has already been rejected. In addition, PPAS asserted in the JPTO, though not in its post-trial submissions, that the grant of the lien was a contemporaneous exchange for value under 11 U.S.C. § 547(c)(1).

### a.  Antecedent Debt

As noted, Ark II was already a creditor at the time TransCare granted the lien. Despite the obvious gap in time between the January 15 Payment and the February 11 transfer of the lien, PPAS argues that the lien relates back to the January 15 Payment under 11 U.S.C. § 547(e)(2)(A). The latter subsection provides:

> For the purposes of this section, except as provided in paragraph (3) of this subsection, a transfer is made--
>
> (A) at the time such transfer takes effect between the transferor and the transferee, if such transfer is perfected at, or within 30 days after, such time, except as provided in subsection (c)(3)(B). . . .

Section 547(e)(2)(A) is inapplicable. The only transfer *by* TransCare was made on February 11, 2016, and the lien it granted on that date was simultaneously perfected by virtue of the earlier, January 29 filing of the U.C.C. financing statement. The granting of the lien on February 11 to secure the earlier advance was no different analytically than the repayment of the January 15 Payment with cash. Thus, when a debtor grants a lien to secure a pre-existing debt, the transfer is preferential regardless

83

of whether the creditor simultaneously perfects the lien or perfects it more than thirty days later. *Cf. Corn Exch. Nat'l Bank & Tr. Co. v. Klauder*, 318 U.S. 434, 437 (1943) ("By thus postponing the effective time of the transfer, the debt, which is effective when actually made, will be made antecedent to the delayed effective date of the transfer and therefore will be made a preferential transfer in law. . . .") (decided under the 1898 Bankruptcy Act).

PPAS's reliance on *Telecash Indus., Inc. v. Universal Assets* (*In re Telecash Indus., Inc.*), 104 B.R. 401 (Bankr. D. Utah 1989), in support of its relation back argument, is misplaced. There, the creditor made a loan and allegedly received a security interest under the loan documentation but did not perfect the security interest within ten days, the statutory reach back period at the time under 11 U.S.C. § 547(e)(2), since increased to thirty days. *See id.* at 402. The debtor-in-possession brought an adversary proceeding to avoid the lien as a preference and moved for summary judgment. The bankruptcy court agreed that the perfection did not relate back to the granting of the lien, *id.* at 403, but ruled that the failure to perfect the lien within ten days did not foreclose the defendant's affirmative defense that the subsequent perfection constituted a contemporaneous exchange for value for the loan under 11 U.S.C. § 547(c)(1). *Id.* at 404 ("Although perfection of a security interest may not relate back under section 547(e)(2) to the underlying loan transaction, that perfection may still be considered 'substantially contemporaneous' under section 547(c)(1)."). The bankruptcy court concluded that disputed issues of fact concerning the defense prevented the grant of summary judgment. *Id.*

84

Unlike *Telecash*, and notwithstanding the backdating of the Ark II credit documents, TransCare did not purport to grant a security interest to Ark II at the time of the January 15 Payment. There was no documentation evidencing a grant of a security interest at that time and TransCare did not sign the Ark II Security Agreement until February 11, 2016.

### b.  Contemporaneous Exchange for Value

Bankruptcy Code § 547(c)(1) provides a defense to a preference

to the extent that such transfer was--

(A) intended by the debtor and the creditor to or for whose benefit such transfer was made to be a contemporaneous exchange for new value given to the debtor; and

(B) in fact a substantially contemporaneous exchange

11 U.S.C. § 547(c)(1). "The critical inquiry in determining whether there has been a contemporaneous exchange for new value is whether the parties intended such an exchange." *Official Comm. of Unsecured Creditors of 360networks (USA) Inc. v. U.S. Relocation Servs., Inc.* (*In re 360networks (USA) Inc.*), 338 B.R. 194, 208-09 (Bankr. S.D.N.Y. 2005) (quoting *Harrah's Tunica Corp. v. Meeks* (*In re Armstrong*), 291 F.3d 517, 525 (8th Cir. 2002)). PPAS has the burden of proving this affirmative defense. 11 U.S.C. § 547(g).

Tilton testified that she authorized the January 15 Payment (as well as the January 29 Payment) to TransCare's creditors on an emergency basis "because, if not, the company would have gone out of business the next day [and] because nobody else was willing to lend cash." (Tr. 8/13 A.M. 25:13-18.) There was no agreement regarding the nature of the debt or the terms of the loans. On January 28, 2016, Greenberg created financial information and *pro forma* projections for the entire company that did

85

not show any liability to Ark II.  (PX 179 at 13263.)  On February 3, 2016, Greenberg confirmed to Credit Suisse that there was no term sheet for the proposed lending to TransCare but only a summary of terms for a new facility between "a Patriarch Partners, LLC affiliate" and TransCare.  (PX 189.)  It did not mention Ark II or indicate that the January Payments would be part of the new $6.5 million facility.  On February 9, 2016, Stephen provided Curtis Mallet with a summary of TransCare's debt structure, including the Term Loan and the ABL but did not include Ark II.  (*See* JX 72.)  At trial, Stephen could not explain why he omitted the Ark II loan supposedly incorporated into the Ark II Credit Agreement.  (Tr. 7/23 P.M. 31:7-33:10.)

The Ark II Credit Agreement was an afterthought.  It was born from Wells Fargo's reluctance to further fund TransCare or allow a new facility to prime its liens and Tilton's failure to convince Credit Suisse to a subordination of the Term Loan liens in favor of a new facility.  Tilton circumvented these problems on February 10, 2016 by creating the Ark II Facility, rolling the January Payments into the new, secured facility and agreeing on behalf of PPAS to subordinate the Term Loan Lenders' lien to Ark II. Hence, PPAS has failed to prove that the parties (*i.e.*, Tilton) intended for the lien granted to Ark II on February 11, 2016 to be a contemporaneous exchange for the January 15 Payment.

Accordingly, the lien granted to Ark II is avoided as a preference and the lien is preserved for the benefit of the estate. 11 U.S.C. § 551.

### 2.  Count 11:  Constructive Fraudulent Transfer

The grant of a lien to Ark II is also a constructive fraudulent transfer under the

NYDCL.[41]  NYDCL § 273 provides:

> Every conveyance made and every obligation incurred by a person who is
> or will be thereby rendered insolvent is fraudulent as to creditors without
> regard to his actual intent if the conveyance is made or the obligation is
> incurred without a fair consideration.

Under NYDCL § 272, "[f]air consideration is given for property, or obligation ... [w]hen

in exchange for such property, or obligation, as a fair equivalent therefor, and in good

faith, property is conveyed or an antecedent debt is satisfied [or] [w]hen such property,

or obligation is received in good faith to secure a present advance or antecedent debt in

amount not disproportionately small as compared with the value of the property, or the

obligation obtained."  "A transfer made by an insolvent debtor to an affiliate or insider

in satisfaction of an antecedent debt lacks good faith and is constructively fraudulent."

*Nisselson v. Drew Indus., Inc.* (*In re White Metal Rolling & Stamp Corp.*), 222 B.R. 417,

430 (Bankr. S.D.N.Y. 1998); *accord Rubin v. Mfrs. Hanover Tr. Co.,* 661 F.2d 979, 991

(2d Cir. 1981) ("[C]ourts have long recognized that '[t]ransfers made to benefit third

parties are clearly not made for a "fair" consideration,' and, similarly, that 'a conveyance

by a corporation for the benefit of an affiliate (should not) be regarded as given for fair

consideration as to the creditors of the conveying corporations.'") (citation omitted); *see*

*Atlanta Shipping Corp., Inc. v. Chem. Bank*, 818 F.2d 240, 249 (2d Cir. 1987) ("In

general, repayment of an antecedent debt constitutes fair consideration unless the

---

[41]     The Trustee asserts the constructive fraudulent conveyance claims under NYDCL §§ 273, 274 and
275.  In light of the Court's conclusion that the granting of the lien to Ark II was a constructive fraudulent
conveyance under NYDCL § 273, it is unnecessary to consider the other grounds.

transferee is an officer, director, or major shareholder of the transferor.").

At the approximate time that TransCare granted the lien to Ark II to secure the earlier advances, TransCare was woefully insolvent with negative net equity of nearly $40 million. The granting of the lien also lacked good faith, and hence, fair consideration. Ark II and TransCare were affiliates because Tilton directly or indirectly owned the majority of their securities and controlled both entities, *see* 11 U.S.C. § 101(2)(B), and Ark II and Tilton were insiders of TransCare. *See* 11 U.S.C. § 101(31)(B)(iii), (E). Accordingly, the granting of the lien to Ark II under the Ark II Security Agreement is avoided as a constructive fraudulent transfer and the lien is preserved for the benefit of the estate. 11 U.S.C. § 551.

### 3. Count 4: Recharacterization

Count 4 seeks to recharacterize as equity all claims asserted by Ark II based on the January 15 Payment. As courts of equity, bankruptcy courts have the equitable power to recharacterize claims asserted against a debtor so that "substance will not give way to form." *Pepper v. Litton*, 308 U.S. 295, 305 (1939). Recharacterization of a claim from debt to equity "is appropriate where the circumstances show that a debt transaction was actually an equity contribution *ab initio.*" *Bayer Corp. v. MascoTech, Inc.* (*In re AutoStyle Plastics, Inc.*), 269 F.3d 726, 747-48 (6th Cir. 2001) ("*AutoStyle*") (quoting *In re Cold Harbor Assocs., L.P.*, 204 B.R. 904, 915 (Bankr. E.D. Va. 1997)) (internal quotes omitted).

Courts in this District have adopted the eleven-factor analysis set forth in *AutoStyle*. *See, e.g., In re Aéropostale, Inc.*, 555 B.R. 369, 420-21 (Bankr. S.D.N.Y.

88

2016); *In re Sabine Oil & Gas Corp.*, 547 B.R. 503, 566 (Bankr. S.D.N.Y.), *aff'd*, 562 B.R. 211 (S.D.N.Y. 2016), *appeal dismissed*, No. 16-2187 (2d Cir. Nov 22, 2016); *Weisfelner v. Blavatnik* (*In re Lyondell Chem. Co.*), 544 B.R. 75, 93-94 (Bankr. S.D.N.Y. 2016); *Official Comm. of Unsecured Creditors v. Bay Harbour Master Ltd.* (*In re BH S & B Holdings LLC*), 420 B.R. 112, 157-58 (Bankr S.D.N.Y. 2009), *aff'd*, 807 F. Supp. 2d 199 (S.D.N.Y. 2011); *Adelphia Commc'ns Corp. v. Bank of Am., N.A.* (*In re Adelphia Commc'ns Corp.*), 365 B.R. 24, 74 (Bankr. S.D.N.Y. 2007), *aff'd in part*, 390 B.R. 64 (S.D.N.Y. 2008). Under this test, the Court considers: (1) the names given to the instruments, if any, evidencing the indebtedness; (2) the presence or absence of a fixed maturity date and schedule of payments; (3) the presence or absence of a fixed rate of interest and interest payments; (4) the source of repayments; (5) the adequacy or inadequacy of capitalization; (6) the identity of interest between the creditor and the stockholder; (7) the security, if any, for the advances; (8) the corporation's ability to obtain financing from outside lending institutions; (9) the extent to which the advances were subordinated to the claims of outside creditors; (10) the extent to which the advances were used to acquire capital assets; and (11) the presence or absence of a sinking fund to provide repayments. *AutoStyle*, 269 F.3d at 749-50. "No one factor is controlling or decisive [and] [t]he factors must be considered within the particular circumstances of each case." *Id.*; *accord Aéropostale*, 555 B.R. at 423; *BH S & B Holdings*, 420 B.R. at 157. A bankruptcy court can recharacterize a claim as equity even if fewer than all of the factors weigh in favor of recharacterization. *Lyondell*, 544 B.R. at 94. The ultimate question for the court is "whether the parties called an instrument one thing when in fact they intended it as something else.... Answers lie in facts that confer

A2709

context case-by-case." *Cohen v. KB Mezzanine Fund II, LP* (*In re SubMicron Sys. Corp.*), 432 F.3d 448, 456 (3d Cir. 2005).

Here, the evidence points in both directions. The parties attempted to document the January 15 Payment, albeit belatedly, as a secured loan from Ark II to TransCare. The loan was to be repaid by TransCare pursuant to the contemplated strict foreclosure, the sale to Transcendence and the subordination of PPAS's lien in the Subject Collateral. In addition, the January 15 Payment met emergency needs rather than the purchase of capital assets and was not subordinated to the claims of outside creditors. In fact, the 2016 Intercreditor Agreement gave Ark II a priority in payment. On the other hand, TransCare was inadequately capitalized, was unable to borrow money elsewhere, there was no sinking fund to provide repayment (though that was to come through the proceeds of the foreclosure and sale) and Tilton owned Ark II and the majority of TransCare's shares and controlled both. However, bankrupt companies are generally short of cash and the shareholders are often the only source.

I conclude that the Trustee has failed to sustain his burden of proving that the January 15 Payment should be recharacterized as an equity contribution. At the time of the advance, TransCare was out of cash and needed the money to pay for insurance so that TransCare could continue to operate. There was no time to draft a loan agreement even if anyone had thought about it. The advances preceded the Tilton Plan, were not used solely to protect the assets destined for NewCo and the parties could not have intended the January 15 Payment as a contribution to NewCo. There were many problems with the granting of a secured claim to Ark II for the reasons stated above but the January 15 Payment was still a loan.

90

Accordingly, the Count 4 is dismissed.

## E.      Count 14:  Return of the $800,000

After the Trustee was appointed, he and PPAS entered into the *Personal Property Stipulation*, (PX 258), to permit the Trustee to sell the assets under his control, including the Subject Collateral.[42]  The *Personal Property Stipulation*, which was approved by the Court,[43] acknowledged the parties' disputes relating to the ownership of the assets, agreed that the Trustee could sell the assets, and provided a distribution formula; the Trustee would receive 20% of the net proceeds and  PPAS would receive 80%.  (*Personal Property Stipulation* ¶ 3.)  The purpose of the *Personal Property Stipulation* was to facilitate the sale of the disputed assets, not resolve the disputes regarding the validity of the strict foreclosure or the ownership of the Subject Collateral, and each party reserved its respective rights.  As concerned the Trustee:

> Except as specifically set forth in this Stipulation, nothing herein shall be deemed to waive any and all claims, defenses, interests, rights, entitlements, or causes of action of whatever kind, nature, character and description, whether in law or equity, whether in tort, contract or under other applicable law, whether known or unknown, whether liquidated or unliquidated, whether contingent or, fixed, and whether anticipated or

---

[42]      Ark II and PPAS agreed in the 2016 Intercreditor Agreement that

Notwithstanding anything to the contrary contained in any of the Agreements, only the party with the senior Lien [Ark II] in the Collateral shall have the right to restrict or permit, or approve or disapprove, the Sale, transfer or other disposition of such Collateral.

2016 Intercreditor Agreement § 2.8(a).  Ark II was not a party to the *Personal Property Stipulation* and did not expressly consent to the proposed sale.  However, given Tilton's control over Ark II, that consent can be inferred.

[43]      See *Order: (I) Approving the Stipulation Respecting the Sale of Certain Personal Property; (II) Authorizing the Public Auction Sales of Certain Personal Property; (III) Approving the Sale and Notice Terms for the Public Auction Sales of Certain Personal Property; (IV) Approving the Sale of Certain Personal Property, Free and Clear of All Liens, Claims and Encumbrances, Security Interests and Other Interests to the Successful Bidders at the Public Auction Sales; (V) Approving the Employment of Maltz Auctions, Inc. as Auctioneer to Market and Publicly Auction Certain Personal Property; (VI)Authorizing the Trustee to Donate or Otherwise Dispose of Certain De Minimus Personal Property; and (VII) Granting Related Relief*, dated Mar. 25, 2016, at ¶ 2.  (PX 258.)

unanticipated, which the Trustee and the Debtors' estates have, had, may ever have or may ever claim to have against any third parties including, but not limited to, PPAS, Lenders, and Transcendence or any other "person" (within the meaning of Bankruptcy Code§ 101(41)).

(*Personal Property Stipulation* ¶ 6.)  The *Personal Property Stipulation* further provided:

Nothing contained herein is a waiver of any of the Trustee's rights to contest or otherwise object to any other party asserting a claim or interest in the Foreclosed Personal Property Assets and/or the CONs.

(*Personal Property Stipulation* ¶ 10.)

Following the sale, PPAS received $800,000 in accordance with the *Personal Property Stipulation* which it turned over to Ark II pursuant to the 2016 Intercreditor Agreement.  While it is unusual in the Court's experience to turn over disputed sale proceeds rather than escrow the funds until the dispute is resolved, the *Personal Property Stipulation* did not state that the payments were intended to be a final resolution of the parties' dispute regarding the parties' rights to the proceeds of the sale — the reservation of rights indicates that it was not — and neither PPAS nor Ark II argued that it was.  Consequently, the *Personal Property Stipulation* does not bar the recovery of the $800,000.

The Trustee now seeks to recover the $800,000 directly from Ark II on two theories.[44]  First, he argues that he is entitled to reimbursement or disgorgement under

---

[44]    Count 14 also sought to recover the $800,000 from PPAS, but the Trustee did not repeat the request or include proposed findings or conclusions in his *PPFC*.  Accordingly, the claim against PPAS is deemed abandoned.  *Desiderio v. Celebrity Cruise Lines, Inc.*, No. 97 Civ. 5185(AJP), 1999 WL 440775, at *3 (S.D.N.Y. June 28, 1999) (deeming plaintiffs' negligence claims abandoned because their post-trial submissions propose no findings of fact or conclusions of law); *McAllister Bros., Inc. v. Ocean Marine Indem. Co.,* No. 87 Civ. 3840 (LMM), 1992 WL 34152, at *6 (S.D.N.Y. Feb. 18, 1992) (dismissing counterclaim as abandoned where defendants did not refer to it in pre-trial or post-trial briefs);

A2712

11 U.S.C. § 502(j) based upon the overpayment of Ark II's now-avoided secured claim. (*PPFC* ¶¶ 369-70.) Second, he contends that the $800,000 transfer was an unauthorized post-petition transfer that he can avoid and recover from Ark II as either an initial transferee (if PPAS is a conduit) or a subsequent transferee (if PPAS is the initial transferee). (*PPFC* ¶ 371.) Ark II responds that the Trustee cannot recover the $800,000 because he failed to prove that the Estate had a property interest in the Subject Collateral and hence, the sale proceeds, and the Estate lacked any equity in the proceeds because the proceeds secured a debt in the approximate sum of $58 million. (*DPFC* ¶¶ 468-71.)

### 1. Section 502(j)

Bankruptcy Code § 502(j) provides, in pertinent part:

> A claim that has been allowed or disallowed may be reconsidered for cause. A reconsidered claim may be allowed or disallowed according to the equities of the case. . . . *This subsection does not alter or modify the trustee's right to recover from a creditor any excess payment or transfer made to such creditor.*

11 U.S.C § 502(j) (emphasis added). The last sentence appears to be derived from section 57(l) of the 1898 Bankruptcy Act which provided in relevant part that "the trustee may also recover any excess dividend paid to any creditor," *In re Kelderman*, 75 B.R. 69, 70 (Bankr. S.D. Iowa 1987), and has been interpreted to authorize the Trustee to recover an excess payment to a creditor. *E.g.*, *Wells Fargo Bank NA v. Thompson*, 15-CV-941-JPS, 2016 WL 1611472, at *3 (E.D. Wis. Apr. 21, 2016) ("Courts have found support for disgorgement in the trustee's authority to recover overpayments to

---

*Sonnenblick–Goldman Corp. v. Marbella Del Caribe, Inc.*, 412 F. Supp. 439, 445 (S.D.N.Y. 1975) (defendant abandoned counterclaims that were not argued in its post-trial brief).

creditors. . . .  As discussed above, this disgorgement is contemplated by 11 U.S.C. § 502(j).") (citing cases); *United States v. Rhodey* (*In re R&W Enters.*), 181 B.R. 624, 648 (Bankr. N.D. Fla. 2006) (trustee can recover overpayment to IRS because "[s]ection 502(j) of the Bankruptcy Code specifically allows the Trustee 'to recover from a creditor any excess payment or transfer made to such creditor.'"); *Kerney v. Capital One Fin. Corp.* (*In re Sims*), 278 B.R. 457, (Bankr. E.D. Tenn. 2002) ("It is clear from [the last sentence of § 502(j)] that a trustee's authority to recover overpayments from a creditor is implied or contemplated by the Bankruptcy Code notwithstanding the absence of a specific Bankruptcy Code provision expressly granting such authority.").

The problem with the Trustee's argument is that he paid PPAS, not Ark II, and PPAS was not a mere conduit that lacked dominion and control over the proceeds. While the 2016 Intercreditor Agreement gave Ark II a priority over PPAS to the sale proceeds, the Trustee has not pointed to any provision requiring PPAS to turn the proceeds over to Ark II or segregate the proceeds or hold the proceeds in trust for Ark II. Instead, Ark II had a contractual right to the proceeds.  In contrast, under the Ark II Security Agreement executed at the same time, Ark II could require TransCare in the event of a default to "segregate" the proceeds of any accounts receivable or general intangibles and hold them "in trust" for Ark II.  (Ark II Security Agreement § 5.2(a).) The Trustee has not identified a basis under 11 U.S.C. § 502(j) for recovering the excess payment from Ark II, PPAS's transferee.

## 2.  Unauthorized Post-Petition Payment

Bankruptcy Code § 549 states, in pertinent part:

94

(a) Except as provided in subsection (b) or (c) of this section, the trustee may avoid a transfer of property of the estate--

(1) that occurs after the commencement of the case; and

(2). . . .

(B) that is not authorized under this title or by the court.

11 U.S.C. § 549(a). The transfer of $800,000 to PPAS is not avoidable under section 549 because it was expressly authorized by the order approving the *Personal Property Stipulation*. Whether it could be recovered under the *Personal Property Stipulation* is an issue that has not been raised. In any event, the $800,000 is already reflected in the reduced credit granted to PPAS in connection with the recovery awarded to the Estate under 11 U.S.C. § 550(a) as a consequence of the avoidance of the strict foreclosure.

Accordingly, Count 14 is dismissed.

## F.    Count 3:  Equitable Subordination

In Count 3, the Trustee seeks to equitably subordinate the claims of PPAS and Ark II and transfer their liens to the estate. Bankruptcy Code § 510(c) provides:

Notwithstanding subsections (a) and (b) of this section, after notice and a hearing, the court may--

(1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest; or

(2) order that any lien securing such a subordinated claim be transferred to the estate.

11 U.S.C. § 510(c). The proponent of equitable subordination must show that (a) the claimant engaged in some type of inequitable conduct, (b) the misconduct caused injury to creditors or conferred an unfair advantage on the claimant, and (c) equitable subordination is consistent with bankruptcy law. *Benjamin v. Diamond* (*In re Mobile*

95

*Steel Co.)*, 563 F.2d 692, 699-700 (5th Cir. 1977).  If the creditor is an insider of the

debtor, inequitable conduct may include (a) a breach of fiduciary duty, fraud, or

illegality, (b) undercapitalization or (c) control or use of the debtor as an alter ego for

the benefit of the claimant.  *ABF Capital Mgmt. v. Kidder Peabody & Co., Inc.* (*In re*

*Granite Partners, LP*), 210 B.R. 508, 514 (Bankr. S.D.N.Y. 1997).

 Equitable subordination has its limits.  It is remedial, not penal, *80 Nassau*

*Assocs. v. Crossland Fed. Sav. Bank* (*In re 80 Nassau Assocs.*), 169 B.R. 832, 840

(Bankr. S.D.N.Y. 1994), and "should be applied only to the extent necessary to offset

specific harm that creditors have suffered on account of the inequitable conduct."

*Assante v. E. Sav. Bank, FSB* (*In re Assante*), No. 12−CV−5309 (CS), 2013 WL 787968,

at *3 (S.D.N.Y. Mar. 4, 2013) (quoting *Enron Corp. v. Springfield Assocs., LLC* (*In re*

*Enron Corp.*), 379 B.R. 425, 434 (S.D.N.Y. 2007)).  Once the harm has been undone

through another remedy, equitable subordination is not available.  For example,

equitable subordination is an alternative to a monetary recovery for the creditor's

wrongdoing, and the trustee cannot recover damages and equitably subordinate a claim

based on the same wrong.  *Hirsch v. Pa. Textile Corp.* (*In re Centennial Textiles, Inc.*),

227 B.R. 606, 611 (Bankr. S.D.N.Y. 1998); *Granite Partners,* 210 B.R. at 517.

Furthermore, equitable subordination is inferior to disallowance because equitable

subordination merely postpones payment but does not disallow the claim.  *80 Nassau*

*Assocs.*, 169 B.R. at 837.

 Equitable subordination may be preferable remedy for injuries caused by an

insolvent creditor who asserts a substantial, allowed claim.  This, however, is not such a

case.  The PPAS secured claim has been disallowed under Bankruptcy Code § 502(d)

because it is the recipient of a fraudulent conveyance and the Trustee has received a judgment for money damages based on the fraudulent conveyance. If PPAS pays that judgment, the harm will be fully remedied, and section 502(d) will no longer bar the allowance of the claim.

The analysis relating to Ark II is slightly different but yields the same conclusion. The Court has avoided Ark II's security interest because the grant of the security interest was a preference and a fraudulent conveyance. The avoidance of the Ark II lien provides the Estate with a complete remedy from the harm caused by the lien. Ark II did not engage in inequitable conduct in making an emergency loan to TransCare prior to the inception of the Tilton Plan, and there is no reason in equity why it should not have a general unsecured claim for the amount of the January 15 Payment. It is true that PPAS transferred $800,000 from the sale proceeds pursuant to the *Personal Property Stipulation* and Ark II credited that payment against its claim, but the transfer was a matter of contractual agreement between PPAS and Ark II and as just noted, the judgment awarded against PPAS on the fraudulent transfer claim reflects the $800,000. Accordingly, Count 4 is dismissed.[45]

## G.  Count 12:  Contractual Subordination

The Amended Complaint and the JPTO included a claim against PPAS for contractual subordination under the 2016 Intercreditor Agreement based upon the avoidance of the Ark II priority lien and the preservation of the lien for the benefit of the

---

[45]     Ark II argued that the Trustee lacked prudential standing to assert an equitable subordination claim because the only parties injured by the granting of the lien were the Term Loan Lenders. (*DPFC* ¶ 437.)  The avoidance of Ark II's lien and the disposition of the equitable subordination claim make it unnecessary to decide the issue.

Estate.  The Trustee's post-trial proposed findings of fact and conclusions of law did not mention this claim.  For the reasons previously stated, the claim is deemed abandoned.

## H.    Count 13:  Liens on Post-Petition Proceeds

In the JPTO, which superseded the pleadings, the parties disputed whether the "equities of the case exception," described below, precluded the extension of the Ark II and PPAS liens to the post-petition proceeds of the sale of the Subject Collateral.  (JPTO at pp. 53-54, 64.)  The *PPFC* drops Ark II and seeks a completely different conclusion of law:  PPAS's lien does not extend to the proceeds of the breach of fiduciary duty claim under the Uniform Commercial Code and the "equities of the case" exception.  (*PPFC* ¶¶ 372-79.)  This claim was never raised in the pleadings or the JPTO, and I do not consider it.

PPAS contends that the "equities of the case" exception does not apply to the sale proceeds because it is limited to a situation where the secured creditor tries unjustly to reap the benefit of an increase in the value of the collateral, and the Trustee failed to prove an increase in value.  Bankruptcy Code § 552(b)(1), which governs the question provides:

> Except as provided in sections 363, 506(c), 522, 544, 545, 547, and 548 of this title, if the debtor and an entity entered into a security agreement before the commencement of the case and if the security interest created by such security agreement extends to property of the debtor acquired before the commencement of the case and to proceeds, products, offspring, or profits of such property, then such security interest extends to such proceeds, products, offspring, or profits acquired by the estate after the commencement of the case to the extent provided by such security agreement and by applicable nonbankruptcy law, *except to any extent that the court, after notice and a hearing and based on the equities of the case, orders otherwise.*

11 U.S.C. § 552(b)(1) (emphasis added).

The "equities of the case" exception is a means of allocating the value of post-petition collateral proceeds between the secured creditor and the estate:

> The equities of the case doctrine is intended to ensure that secured creditors do not receive a windfall benefit when a trustee uses assets of the estate, for example, to finish uncompleted inventory, and it is also used to adjust recovery by a secured creditor in situations where there is an improvement or decline in the post-petition collateral, especially in situations where the change in value is brought about by a party in the bankruptcy.

*In re Barbara K. Enters.,* No. 08–11474 (MG), 2008 WL 2439649, at \*11 (Bankr. S.D.N.Y. June 16, 2008) (citations omitted); *accord Sprint Nextel Corp. v. U.S. Bank Nat'l Ass'n* (*In re TerreStar Networks, Inc.*) 457 B.R. 254, 271 (Bankr. S.D.N.Y. 2011); *see Nanuet Nat'l Bank v. Photo Promotion Assocs., Inc.* (*In re Photo Promotion Assocs., Inc.*)*,* 61 B.R. 936, 939 (Bankr. S.D.N.Y. 1986) ("The equity exception is meant for the case where the trustee or debtor in possession uses other assets of the bankrupt estate (assets that would otherwise go to the general creditors) to increase the value of the collateral.") (quoting *J. Catton Farms, Inc. v. First Nat'l Bank of Chicago,* 779 F.2d 1242, 1246 (7th Cir. 1985)) (internal quotation marks omitted).

The Trustee admitted in the Amended Complaint that PPAS's lien extended to the proceeds of the collateral he sold. (*See* Amended Complaint ¶¶ 169-72.) His *PPFC* did not submit proposed factual findings or legal conclusions regarding the application of the "equities of the case" exception to the proceeds of the sale of the collateral. Accordingly, and for reasons previously stated, the claim is deemed abandoned and is dismissed.

A2719

## FURTHER CONSIDERATIONS

The disposition of the Trustee's claims requires further consideration regarding how to proceed. The findings and conclusions relating to the breach of fiduciary duty claim are proposed and the parties have the right to seek *de novo* review by the District Court in accordance with Federal Bankruptcy Rule 9033(d). The remaining, core claims, on the other hand, are ready for the entry of judgment subject, however, to the fixing of reasonable attorneys' fees in connection with the intentional fraudulent transfer claim against PPAS. The parties are directed to contact chambers to arrange a conference to discuss the scheduling of the inquest in connection with the award of attorneys' fees, the submission of the report and recommendation to the District Court and the entry of judgment on the core claims.

Dated: New York, New York
      July 6, 2020

                                   /s/ *Stuart M. Bernstein*
                                   STUART M. BERNSTEIN
                     United States Bankruptcy Judge

A2720

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>TRANSCARE CORPORATION, et al.,<br><br>Debtors. | Chapter 7<br><br>Case No. 16-10407-smb |
| SALVATORE LAMONICA, as Chapter 7 Trustee for the Estates of TransCare Corporation, et al.,<br>Plaintiff,<br><br>- against -<br><br>LYNN TILTON, PATRIARCH PARTNERS AGENCY SERVICES, LLC, PATRIARCH PARTNERS, LLC, PATRIARCH PARTNERS MANAGEMENT GROUP, LLC, ARK II CLO 2001-1 LIMITED, TRANSCENDENCE TRANSIT, INC. and TRANSCENDENCE TRANSIT II, INC.,<br>Defendants. | Adv. Proc. No. 18-01021-smb<br><br>**JUDGMENT**<br><br><br>BC 20,0023 |

For the reasons set forth in the Post-Trial Findings of Fact and Conclusions of Law, entered July 6, 2020:

1. Judgment is hereby entered in favor of Plaintiff Salvatore LaMonica against Defendants Patriarch Partners Agency Services, LLC, Transcendence Transit, Inc. and Transcendence Transit II, Inc., jointly and severally, in the amount of $39,200,000.00, plus pre-judgment interest in the amount of $6,025,523.29, calculated for the period February 24, 2016 through July 15, 2020, for a total judgment in the amount of $45,225,523.29, plus post-judgment interest at the rate prescribed by 28 U.S.C. § 1961.

2. The claims of Defendant Patriarch Partners Agency Services, LLC are disallowed pursuant to Bankruptcy Code section 502(d).

3.   The security interests and liens granted to Defendant Ark II CLO 2001-1 Limited under its Security Agreement, dated as of January 15, 2016, with Debtor TransCare Corporation, as Grantor, and Debtors TC Ambulance Corporation, TC Ambulance Group, Inc., TC Ambulance North, Inc., TC Billing and Services Corp., TC Hudson Valley Ambulance Corp., TCBA Ambulance, Inc., TransCare Harford County, Inc., TransCare Management Services, Inc., TransCare Maryland, Inc., TransCare ML, Inc., TransCare New York, Inc., TransCare Pennsylvania, Inc. and TransCare Westchester, Inc., as Additional Grantors, are avoided and preserved for the benefit of said Debtors' respective estates, pursuant to Bankruptcy Code section 551; and Ark II CLO 2001-1 Limited's proofs of claim herein shall accordingly be treated as unsecured.

4.   Plaintiff shall recover nothing from Defendants Patriarch Partners, LLC, Patriarch Partners Management Group, LLC and Ark II CLO 2001-1 Limited. The Court dismissed Plaintiff's claims against Defendants Patriarch Partners, LLC and Patriarch Partners Management Group, LLC, and accordingly, the claims asserted by Defendants Patriarch Partners, LLC and Patriarch Partners Management Group, LLC shall be allowed as unsecured claims.


Pursuant to Rule 7054, Plaintiff's time to apply for reasonable attorney's fees is extended until fourteen (14) days after the Judgment in Paragraph 1, above, has become final and non-appealable.


Dated: New York, New York
       July **15th**, 2020

                                              **/s/ STUART M. BERNSTEIN**
                                              Honorable Stuart M. Bernstein
                                              United States Bankruptcy Judge

**PROSKAUER ROSE LLP**
Michael T. Mervis
Timothy Q. Karcher
Eleven Times Square
New York, NY 10036-8299
Tel.: (212) 969-3000

*Attorneys for Defendants-Appellants*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ------------------------------------------------------------x | |
| In re: : | |
| : | |
| : | |
| TRANSCARE CORPORATION, et al., : | Chapter 7 |
| : | Case No. 16-10407 (SMB) |
| : | (Jointly Administered) |
| Debtors. : | |
| ------------------------------------------------------------x | |
| SALVATORE LAMONICA, as Chapter 7 : | |
| Trustee for the Estates of TransCare : | |
| Corporation, et al., : | |
| : | |
| Plaintiff, : | |
| : | Adv. Proc. No. 18-1021 (SMB) |
| - against - : | |
| : | |
| LYNN TILTON, PATRIARCH PARTNERS : | |
| AGENCY SERVICES, LLC, PATRIARCH : | |
| PARTNERS, LLC, PATRIARCH PARTNERS : | |
| MANAGEMENT GROUP, LLC, ARK II CLO : | |
| 2001-1 LIMITED, TRANSCENDENCE : | |
| TRANSIT, INC., and TRANSCENDENCE : | |
| TRANSIT II, INC., : | |
| : | |
| Defendants. : | |
| : | |
| ------------------------------------------------------------x | |

## <u>NOTICE OF APPEAL</u>

**Part 1: Identify the Appellant(s)**

1.     **Name(s) of appellants:**  Patriarch Partners Agency Services, LLC, Transcendence Transit, Inc., Transcendence Transit II, Inc., and Ark II CLO 2001-1 Limited (collectively, "Defendants-Appellants").

2.     **Position of appellants in the adversary proceeding that is the subject of this appeal:**  Defendants.

**Part 2: Identify the subject of this appeal**

1.     **Describe the judgment, order or decree appealed from:**  Defendants-Appellants, by their undersigned counsel, hereby appeal under 28 U.S.C. § 158(a) and Federal Rules of Bankruptcy Procedure 8002 and 8003, from the judgment entered against Defendants-Appellants by the United States Bankruptcy Court for the Southern District of New York on July 15, 2020 [Dkt. No. 141] (the "Judgment") (annexed hereto as **Exhibit A**), pursuant to the *Post-Trial Findings of Fact and Conclusions of Law* of the United States Bankruptcy Court for the Southern District of New York, dated July 6, 2020 [Dkt. No. 138] (annexed hereto as **Exhibit B**), with respect to Counts 7, 10, and 11 of Plaintiff-Appellee's Amended Complaint.

2.     **State the date on which the judgment, order, or decree was entered:** the Judgment was entered on Wednesday, July 15, 2020.

**Part 3: Identify the other parties to the appeal**

The relevant parties to the judgment, order, or decree appealed from, and the names, addresses, and telephone numbers of their respective attorneys are as follows:

| Parties | Attorneys |
|---|---|
| **Plaintiff-Appellee:**<br>Salvatore LaMonica (Chapter 7 Trustee) | Bijan Amini<br>Avery Samet<br><br>Amini LLC<br>131 West 35th St., 12th Floor<br>New York, NY 10001<br>Tel: (212) 490-4700 |
| **Defendants-Appellants:**<br>Patriarch Partners Agency Services, LLC<br>Transcendence Transit, Inc.<br>Transcendence Transit II, Inc.<br>Ark II CLO 2001-1 Limited | Michael T. Mervis<br>Timothy Q. Karcher<br><br>Proskauer Rose LLP<br>11 Times Square<br>New York, NY 10036<br>Tel: (212) 969-3000 |

**Part 4: Not Applicable (No BAP in this District)**

**Part 5: Signature**

Dated: July 27, 2020
      New York, New York

Respectfully submitted,

PROSKAUER ROSE LLP

By: */s/ Michael T. Mervis*
    Michael T. Mervis
    Timothy Q. Karcher
    Eleven Times Square
    New York, NY 10036-8299
    Tel.: (212) 969-3000
    Fax: (212) 969-2900
    Email: mmervis@proskauer.com
        tkarcher@proskauer.com

    *Attorneys for Defendants-Appellants*

3

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 27th day of July 2020, a true and correct copy of the foregoing was filed with the Clerk of Court using the CM/ECF system, which will send a notice of such filing to the Chapter 7 Trustee's counsel and the interested parties registered to receive ECF notification from the court.

*/s/ Michael T. Mervis*
Michael T. Mervis

# EXHIBIT A

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 7 |
| TRANSCARE CORPORATION, et al., | Case No. 16-10407-smb |
| Debtors. | |
| SALVATORE LAMONICA, as Chapter 7 Trustee for the Estates of TransCare Corporation, et al., | Adv. Proc. No. 18-01021-smb |
| Plaintiff, | **JUDGMENT** |
| - against - | |
| LYNN TILTON, PATRIARCH PARTNERS AGENCY SERVICES, LLC, PATRIARCH PARTNERS, LLC, PATRIARCH PARTNERS MANAGEMENT GROUP, LLC, ARK II CLO 2001-1 LIMITED, TRANSCENDENCE TRANSIT, INC. and TRANSCENDENCE TRANSIT II, INC., | BC 20,0023 |
| Defendants. | |

For the reasons set forth in the Post-Trial Findings of Fact and Conclusions of Law, entered July 6, 2020:

1. Judgment is hereby entered in favor of Plaintiff Salvatore LaMonica against Defendants Patriarch Partners Agency Services, LLC, Transcendence Transit, Inc. and Transcendence Transit II, Inc., jointly and severally, in the amount of $39,200,000.00, plus pre-judgment interest in the amount of $6,025,523.29, calculated for the period February 24, 2016 through July 15, 2020, for a total judgment in the amount of $45,225,523.29, plus post-judgment interest at the rate prescribed by 28 U.S.C. § 1961.

2. The claims of Defendant Patriarch Partners Agency Services, LLC are disallowed pursuant to Bankruptcy Code section 502(d).

3.   The security interests and liens granted to Defendant Ark II CLO 2001-1 Limited under its Security Agreement, dated as of January 15, 2016, with Debtor TransCare Corporation, as Grantor, and Debtors TC Ambulance Corporation, TC Ambulance Group, Inc., TC Ambulance North, Inc., TC Billing and Services Corp., TC Hudson Valley Ambulance Corp., TCBA Ambulance, Inc., TransCare Harford County, Inc., TransCare Management Services, Inc., TransCare Maryland, Inc., TransCare ML, Inc., TransCare New York, Inc., TransCare Pennsylvania, Inc. and TransCare Westchester, Inc., as Additional Grantors, are avoided and preserved for the benefit of said Debtors' respective estates, pursuant to Bankruptcy Code section 551; and Ark II CLO 2001-1 Limited's proofs of claim herein shall accordingly be treated as unsecured.

4.   Plaintiff shall recover nothing from Defendants Patriarch Partners, LLC, Patriarch Partners Management Group, LLC and Ark II CLO 2001-1 Limited. The Court dismissed Plaintiff's claims against Defendants Patriarch Partners, LLC and Patriarch Partners Management Group, LLC, and accordingly, the claims asserted by Defendants Patriarch Partners, LLC and Patriarch Partners Management Group, LLC shall be allowed as unsecured claims.


Pursuant to Rule 7054, Plaintiff's time to apply for reasonable attorney's fees is extended until fourteen (14) days after the Judgment in Paragraph 1, above, has become final and non-appealable.


Dated: New York, New York
       July **15**th, 2020

                                   **/s/ STUART M. BERNSTEIN**
                                   Honorable Stuart M. Bernstein
                                   United States Bankruptcy Judge

# EXHIBIT B

# UNITED STATES BANKRUPTCY COURT
# SOUTHERN DISTRICT OF NEW YORK

```
------------------------------------------------------x
In re:                                      :
                                            :
                                            :
    TRANSCARE CORPORATION, et al.,          :    Chapter 7
                                            :    Case No. 16-10407 (SMB)
                                            :    (Jointly Administered)
                       Debtors.             :
------------------------------------------------------x
SALVATORE LAMONICA, as Chapter 7            :
Trustee for the Estates of TransCare        :
Corporation, et al.,                        :
                                            :
                       Plaintiff,           :
                                            :
        - against -                         :
                                            :    Adv. Proc. No. 18-01021 (SMB)
LYNN TILTON, PATRIARCH PARTNERS             :
AGENCY SERVICES, LLC, PATRIARCH             :
PARTNERS, LLC, PATRIARCH PARTNERS           :
MANAGEMENT GROUP, LLC, ARK II CLO           :
2001-1 LIMITED, TRANSCENDENCE               :
TRANSIT, INC., and TRANSCENDENCE            :
TRANSIT II, INC.,                           :
                                            :
                       Defendants.          :
------------------------------------------------------x
```

## POST-TRIAL FINDINGS OF FACT
## AND CONCLUSIONS OF LAW

**A P P E A R A N C E S :**

STORCH AMINI PC
*Attorneys for Plaintiff*
2 Grand Central Tower
140 East 45th Street, 25th Floor
New York, NY 10017

      Bijan Amini, Esq.
      Avery Samet, Esq.
      Jaime B. Leggett, Esq.
         Of Counsel

PROSKAUER ROSE LLP
*Attorneys for Defendants*
Eleven Times Square
New York, NY 10036-8299

    Michael T. Mervis, Esq.
    Timothy Q. Karcher, Esq.
    Marissa Tillem, Esq.
        Of Counsel

**STUART M. BERNSTEIN**
**United States Bankruptcy Judge:**

## INTRODUCTION

    Salvatore LaMonica, Esq. ("Trustee") commenced this adversary proceeding on behalf of the estates (collectively, the "Estate") of the debtor TransCare Corporation and its debtor-affiliates (collectively, "TransCare" or the "Debtors") to recover damages and avoid certain transfers that occurred before or after the filing of the initial petitions in these cases. He also seeks other forms of relief. The Trustee's claims arise, for the most part, from two discrete though related transactions: (1) the strict foreclosure of the Debtors' most valuable assets by an entity controlled by an insider and immediate resale of those assets to another entity controlled by the same insider, and (2) the granting of a lien to yet another entity controlled by the same insider.

    The Court conducted a multi-day bench trial and based upon the evidence adduced, respectfully recommends to the District Court that it enter a money judgment against defendant Lynn Tilton in the sum of $41.8 million. The Court finds and concludes that the transfer resulting from the strict foreclosure must be avoided, and the Estate is awarded a judgment in the amount of $39.2 million against PPAS, in addition to the Trustee's reasonable attorneys' fees. Finally, the lien granted to the insider must also be avoided and preserved for the benefit of the Estate.

2

# FINDINGS OF FACT[1]

## A.    The Parties

The Debtor TransCare Corporation is a Delaware corporation headquartered in Brooklyn, New York.  (Stipulation No. 1.)  TransCare Corporation, by and through its subsidiaries, provided ambulance services to hospitals and municipalities for both emergency and non-emergency patients, and paratransit services to the New York Metropolitan Transit Authority ("MTA") for individuals with disabilities.  (Stipulation No. 1.)  TransCare's principal business lines were (a) ambulance services in (1) New York City, (2) Westchester, New York, (3) Hudson Valley, headquartered in Poughkeepsie, New York, (4) Pittsburgh, Pennsylvania, and (5) Maryland; and (b) its contract with the MTA to provide paratransit services for people with disabilities throughout the City of New York (the "MTA Contract") using vehicles leased from the MTA.  On July 13, 2015,

---

[1]    This decision uses the following conventions:  "DX", "PX" and "JX" refer, respectively, to the Defendants' trial exhibits, the Plaintiff's trial exhibits and the parties' joint trial exhibits.

"Stipulation No." refers to the numbered paragraphs in the Stipulated Facts section of the May 14, 2019 Joint Pretrial Order (ECF Doc. # 85) at pages 6-15.  Unless otherwise indicated, the ECF references are to the electronic docket in this adversary proceeding.

"Tr. Month/Day" (*e.g.,* "Tr. 7/22") refers to the official transcripts of the trial conducted on July 22, 23, 24, August 8, 13 and 14, 2019.  "A.M." and "P.M." refer to the morning and afternoon sessions, respectively.

"Husson Tr. (*LaMonica*)" and "Husson Tr. (*Ien*)" refer to the designated deposition testimony of John Husson, the Rule 30(b)(6) witness of Wells Fargo, N.A., taken in (i) this action and (ii) *Ien v. TransCare Corp., et al.,* Adv. Proc. No. 16-01033 (SMB).

"Leland Tr." refers to the deposition testimony of Glenn Leland, TransCare's former CEO.  The Defendants requested that the Court review the video of Leland's deposition and not just the excerpts from the 731-page transcript, (*Defendants' Response to Trustee's Post-Trial Proposed Findings of Fact and Conclusions of Law* ("*Defendants' Response*"), dated Oct. 11, 2019, at 1 n. 3 (ECF Doc. # 137)), but have not explained why my review of the transcript is insufficient and I decline the Defendants' request.

In addition, the *Defendants' Response* included a chart, attached as Exhibit A that, at least in some cases, provided a basis for an objection to the designated Husson or Leland deposition testimony and/or cross-designated other testimony or evidence.  Where Exhibit A does not indicate a basis for an objection and cross-designates other testimony or evidence relating to the excerpt, I assume that the inclusion of the excerpt on Exhibit A was solely for the purpose of cross-designation and not to object.

A2733

TransCare New York, Inc. and the MTA executed a Modification to the MTA Contract which extended the MTA Contract through October 31, 2019.  (PX 158; Stipulation Nos. 29-30.)

At all relevant times, the Defendant Lynn Tilton served as the sole director of TransCare.  (Stipulation No. 2.)  The Defendant Ark II CLO 2001-1, Limited ("Ark II"), a Cayman Islands company, owns a 55.7% direct interest in TransCare, and Tilton owns 99% of Ark II.  (Stipulation Nos. 6, 8.)  Non-party Ark Investment Partners II, L.P. ("AIP"), a Tilton affiliate, owns 5.6% of TransCare's shares.  (Stipulation No. 9.)  Credit Suisse Alternative Capital, Inc. ("Credit Suisse") owns outright, or manages, 26% of TransCare's equity on behalf of five separate entities (PX 235 at 98626[2]), and the remaining 12.7% of TransCare is owned by various entities and individuals.  (ECF Case No. 16-10407 Doc. #132.)

The Defendants Patriarch Partners Agency Services, LLC ("PPAS"), Patriarch Partners, LLC ("Patriarch Partners") and Patriarch Partners Management Group, LLC ("PPMG") are Delaware limited liability companies, and the Defendants Transcendence Transit, Inc. ("Transcendence Transit") and its direct subsidiary, Transcendence Transit II, Inc. ("Transcendence II" and, together with Transcendence Transit, "Transcendence") are Delaware corporations.  (Stipulation Nos. 3-7.)  Tilton is the sole manager and ultimate indirect owner of PPAS, Patriarch Partners and PPMG, (Stipulation Nos. 3-5), and the sole director of both Transcendence entities.  (Stipulation No. 7.)  Lastly, PPAS, Patriarch Partners, PPMG and Ark II maintain their principal

---

[2]     In citing to the Bates-stamped page numbers, the Court will omit the prefix and refer to the last five or six digits of the Bates-stamped page number.

A2734

places of business at 1 Liberty Street, 35th Floor, New York, New York, (Stipulation Nos. 3-6), and the Transcendence entities have a mailing address at that location. (Stipulation No. 7.)

## B.    TransCare's Debt Structure

### 1.    Term Loan

TransCare Corporation, as borrower, the Term Loan Lenders (defined below), as lenders, and PPAS, as Administrative Agent, are parties to a Credit Agreement, dated as of August 4, 2003 (as amended, the "Term Loan").  From November 1, 2014 through February 24, 2016 (the "Relevant Period"), the lenders under the Term Loan were: (i) AIP, (ii) Zohar CDO 2003-1, Ltd., Zohar II 2005-1, Ltd., and Zohar III, Ltd. (collectively, the "Zohar Funds"); (iii) Credit Suisse and (iv) First Dominion Funding I ("First Dominion" and, together with AIP, the Zohar Funds, and Credit Suisse, the "Term Loan Lenders").[3]  (Stipulation No. 10.)  The Zohar Funds owned over 75% of the Term Loan debt.  (PX 209.)  Credit Suisse acted as collateral manager for First Dominion, (JX 1 at 00106; Tr. 7/22 P.M. 30:20-23), and Credit Suisse and First Dominion together owned approximately 18% of the Term Loan debt.  (PX 209.)  AIP owned approximately 7% of the Term Loan debt.  (PX 209.)

In connection with the Term Loan, TransCare Corporation executed a Security Agreement, dated as of August 4, 2003, and as amended, supplemented or modified, in favor of PPAS, as Administrative Agent for the Term Loan Lenders.  (Stipulation No. 12.)  In addition to the Security Agreement, the TransCare Corporation's subsidiaries,

---

[3]    The Term Loan is governed by New York law.  (Stipulation No. 11.)

5

debtors in these cases, executed a Guarantee, dated as of August 4, 2003, as amended, supplemented or modified, in favor of PPAS, as Administrative Agent for the Term Loan Lenders. (Stipulation No. 13.)

### 2. Wells Fargo Credit Facility

TransCare Corporation, TransCare New York, Inc., TransCare Pennsylvania, Inc., TransCare Maryland, Inc., TransCare ML, Inc., TC Hudson Valley Ambulance Corp., TC Billing and Services Corp., TC Ambulance Corporation, TransCare Management Services, Inc., TCBA Ambulance, Inc., TransCare Westchester, Inc. and TransCare Harford County, Inc., as Borrowers and TC Ambulance Group, Inc. and TC Ambulance North, Inc., as Guarantors, entered into a Loan and Security Agreement with Wells Fargo N.A., as successor-by-merger with Wachovia Bank, N.A. ("Wells Fargo"), dated October 13, 2006 (as amended, the "ABL"). The ABL is a syndicated asset-backed revolving credit facility, (Stipulation No. 14), and is governed by New York law. (Stipulation No. 15.)

Both the Term Loan and the ABL were secured by blanket liens on all of TransCare's assets. (DX 3 at § 2; JX 2 at § 5.1.) Wells Fargo and PPAS, on behalf of the Term Loan Lenders, entered into an Intercreditor Agreement, dated October 13, 2006 (the "2006 Intercreditor Agreement"). (Stipulation No. 16.) Under the 2006 Intercreditor Agreement, PPAS received a first priority lien on TransCare's vehicles, certain other physical assets, capital stock of the subsidiaries, and intellectual property (the "Term Loan Priority Collateral"), and Wells Fargo received a first priority lien on all other assets (the "ABL Priority Collateral"), including the Accounts (including accounts receivable) and general intangibles. (JX 3 at §§ 1.26, 1.35, 2.2.) Pursuant to an

6

irrevocable payment assignment, all of TransCare's receivables were paid to a lockbox controlled by Wells Fargo, including all of the payments received under the MTA Contract. (PX 2.)

### 3. Ark II Credit Agreement

TransCare Corporation and Ark II entered into a Credit Agreement, dated as of January 15, 2016 (the "Ark II Credit Agreement"). (Stipulation No. 17.) The Ark II Credit Agreement is governed by New York law. (Stipulation No. 18.) In connection with the Ark II Credit Agreement, TransCare Corporation executed a Security Agreement, dated as of January 15, 2016, in favor of Ark II (the "Ark II Security Agreement"), (Stipulation No. 19), and on January 29, 2016, Ark II filed separate UCC-1 financing statements with the Delaware Department of State for TransCare Corporation and its subsidiaries. Each UCC-1 financing statement provided that Ark II held a security interest in "All assets of the debtor . . . ." (Stipulation No. 23.) In addition to the Ark II Security Agreement, the TransCare Corporation's subsidiaries executed a Guaranty, dated as of January 15, 2016, in favor of Ark II (the "Ark II Guaranty"). (Stipulation No. 20.) In connection with the Ark II Credit Agreement, Ark II and PPAS entered into an intercreditor agreement, dated as of January 15, 2016 (the "2016 Intercreditor Agreement"), described in greater detail below, for which TransCare executed an acknowledgment. (Stipulation No. 22.)

Notwithstanding the dates on these documents, the Ark II Credit Agreement, Ark II Security Agreement, Ark II Guaranty and the 2016 Intercreditor Agreement were not executed until on or about February 10 or 11, 2016. (Stipulation Nos. 21, 22.)

## C. Management of TransCare

Glenn Leland served as TransCare's Chief Executive Officer ("CEO") from January 12, 2015 through January 8, 2016. (Stipulation No. 24.) Mark Bonilla served as TransCare's Chief Financial Officer ("CFO") from April 2014 through September 29, 2015 and, following his resignation on that date, served as a consultant to TransCare until January 8, 2016, (Stipulation No. 25), but per Tilton's instructions, Michael Greenberg, a Patriarch Partners credit officer, took on the responsibility for TransCare's finances. (DX 73 at 58180; Tr. 7/22 A.M. 18:19-24.) Peter Wolf served as TransCare's Chief Operating Officer ("COO") from November 16, 2015 through February 24, 2016. (Stipulation No. 26.)

Under an Authority Matrix issued by Tilton as sole director of the Board, the officers of TransCare did not have authority to: (a) approve an annual operating plan budget or any interim operating plan or budget; (b) negotiate the sale or disposition of any assets; (c) recapitalize or make other change in the capital structure; (d) disclose any financial information to any third-party; (e) enter into any contract or license agreement not contemplated by the approved Annual Plan (of which there was none); (f) enter into any financing or loan agreement; (g) dispose of any unusable asset or write off any receivable, or make a charitable contribution; (h) change auditors; (i) engage legal counsel; (j) settle or compromise any claim; (k) engage any consultant; or (l) conduct any reduction in force. (PX 3; Tr. 7/23 P.M. 15:16-17:11.) Some items below certain dollar amounts could be authorized by a "Designated Executive" or an "Annual

8

Plan," (PX 3), but during the Relevant Period there was no Designated Executive and no Annual Plan.  (*See* Leland Tr. 84:9-13;[4] JX 11.)

Accordingly, Tilton made all decisions for TransCare and managed TransCare through her employees at the Patriarch entities.  Greenberg oversaw financial matters, payment of vendors and negotiations with Wells Fargo.  (Tr. 7/22 A.M. 14:10–16:15; Leland Tr. 59:5–60:16, 144:13–145:17, 245:22–246:24.)  Jean-Luc Pelissier, a platform leader at PPMG, oversaw operational matters.  (Tr. 7/22 A.M. 24:11-19; Tr. 7/23 A.M. 6:7-19; Leland Tr. 46:6-47:12.[5])  Brian Stephen, an attorney and senior director of legal at Patriarch Partners, supported Tilton in legal matters regarding all of the Patriarch entities.  (Tr. 7/23 P.M. 1:22–3:21.)  Finally, Randy Jones of Patriarch Partners oversaw hiring.  (Tr. 7/22 A.M. 24:22-24; Tr. 8/13 A.M. 53:22–54:1; Tr. 8/13 P.M. 47:23–48:2.)  These Patriarch employees reported directly to Tilton, independently of TransCare management, regarding the operations and finances of TransCare.  (*See* Tr. 7/22 A.M. 15:13-18 (Greenberg); Tr. 7/23 A.M. 7:15-17 (Pelissier); 7/23 P.M. 2:16-18 (Stephen).)

## D.    **TransCare's Growing Financial Problems**

Throughout the Relevant Period, TransCare experienced difficulties in funding employee payroll and paying vendors.  (Stipulation No. 27.)  TransCare did not have audited financials for 2014, (Tr. 7/22 P.M. 79:21–80:12), and had delayed transmitting

---

[4]     The Defendants objected to this excerpt from the Leland Deposition as irrelevant.  (*Defendants' Response*, Ex. A, item I.6.)  The testimony supports the finding for which it is cited and the finding is relevant to Tilton's control over TransCare.  The objection is overruled.

[5]     The Defendants objected to this excerpt from the Leland Deposition as irrelevant.  (*Defendants' Response*, Ex. A, item I.1.)  The testimony supports the finding for which it is cited, and the finding is relevant to Tilton's control over TransCare.  The objection is overruled.

monthly financial statements to its lenders. (Stipulation No. 28.) On or about July 2, 2015, Wells Fargo informed TransCare that Wells Fargo was in an over-advanced position under the ABL facility and informed TransCare management that it would not fund TransCare's payroll for the week ending July 4, 2015. (Stipulation No. 31.) Consequently, on July 3, 2015, TransCare missed payroll. (Stipulation No. 32.)

In hindsight, the missed payroll marked the beginning of the end for TransCare. Following the missed payroll, Tilton negotiated a resolution with Wells Fargo to unblock the reserve, (Tr. 8/13 P.M. 43:20–44:5; DX 64), which involved, among other things, the Zohar Funds advancing an additional $2 million to TransCare.[6] (DX 64; PX 227 at 47615.) However, on October 14, 2015, Wells Fargo issued a Notice of Non-Renewal to TransCare (the "Non-Renewal Notice"). (DX 76; Stipulation No. 34.) The Non-Renewal Notice stated that the ABL would expire on January 31, 2016, and Wells Fargo "presently ha[d] no intention to extend or modify the term of such financing arrangements." (DX 76 at 06336.) The Non-Renewal Notice also stated that the outstanding balance had to be paid in full by TransCare by January 31, 2016, (*see id.*), something which TransCare was in no position to do. (Tr. 7/22 P.M. 93:6–11.)[7]

Needing Wells Fargo's financial support, Tilton tasked Greenberg to work with management at TransCare to prepare a 2016 budget that would be acceptable to Wells Fargo and convince it to extend the ABL. (Tr. 7/22 A.M. 28:4-11, 31:14-20.) She also

---

[6]    Between February 2015 and January 2016, the Zohar Funds advanced over $7.2 million to TransCare. (PX 227 at 47615–16.)

[7]    The outstanding balance owed to Wells Fargo as of the initial petition date, February 24, 2016, totaled approximately $13 million. (Tr. 7/24 159:19–22.)

10

directed Greenberg to develop a plan based upon his own assessment of TransCare's business. (Tr. 7/22 A.M. 33:9-12.) Working primarily with Pelissier, Greenberg submitted a presentation for Tilton's review and approval on November 14, 2015 to share with Wells Fargo at a meeting scheduled for two days later. (JX 51; Tr. 7/22 A.M. 32:6-25.) The 2016 plan conservatively estimated an $8.2 million growth in revenue, resulting in 2016 EBITDA of $11.5 million. (JX 51; Tr. 7/22 A.M. 32:6-25.) The plan called for forty-eight new ambulances (at $120,000 per vehicle, with a down payment of $30,000). (JX 51 at 98488-89.) It required $6.4 million in new capital ($2.8 million in lease payments, $2.8 million in new vehicle funding and $0.8 million in accounts payable reduction). (JX 51 at 98489, 98535.) Tilton agreed the plan could be shared with Wells Fargo, but never gave final approval to the plan and did not fund the new ambulances contemplated by the plan. (Tr. 7/22 A.M. 31:21–32:25, 102:6-9; Leland Tr. 547:13–549:9, 583:9–584:25; Tr. 7/22 P.M. 123:13-19.)

Meanwhile, starting in early 2015, TransCare received expressions of interest from other ambulance companies to acquire certain TransCare assets and business lines. On February 5, 2015, Leland reported that National Express was offering $15-18 million to purchase TransCare's paratransit division. (JX 12 at 04260; Leland Tr. 85:9–86:14.) On March 3, 2015, Mike Weinberger, the Chief Operating Officer of Richmond County Ambulance Service ("RCA") emailed Tilton seeking to purchase all or part of TransCare. (PX 44; Tr. 8/13 A.M. 45:7-15.) Weinberger stated that RCA was prepared to offer up to eight times TransCare's EBITDA, and also offered to consider an operational management arrangement. (PX 44 at 90486; Tr. 8/13 A.M. 45:7-15.)

11

Even after the payroll default, TransCare continued to receive expressions of interest. American Medical Response ("AMR") called Leland seeking to purchase TransCare's Westchester operations. (Leland Tr. 172:17-24.) On July 8, 2015, Weinberger emailed Tilton again expressing RCA's interest in purchasing or operating TransCare. (PX 73; Tr. 8/13 A.M. 45:17-24.) On July 10, 2015, National Express emailed Leland a Letter of Intent offering to purchase the MTA Contract for $6 to $7 million and assume up to $2 million in liabilities. (JX 40.) On July 13, 2015, Greenberg received a message from another Patriarch credit officer that Alliance Capital Advisors representing National Express was interested in purchasing TransCare's paratransit business. (PX 83; Tr. 7/22 P.M. 74:8-17.)

On July 31, 2015, Greenberg reported to Tilton on Envision Healthcare's purchase of Rural/Metro Corp., a regional ambulance operator, at a 10x multiple of EBITDA. (DX 68 at 904469.)[8] A few days later, Tilton forwarded Greenberg's analysis to Kurt Marsden of Wells Fargo and told him "Just to confirm the active M&A market in the ambulance space. This is why it makes sense to let TransCare make its way back to normalized EBITDA." (DX 68 at 90469.) Tilton wanted to get TransCare back to the $12-14 million of EBITDA that it had historically earned, so she could sell it at a price that would cover both the ABL and the Term Loan. (Tr. 8/13 A.M. 47:22–48:3.)

National Express continued to express an interest into December 2015. On December 8, 2015, Leland reported to Greenberg and Pelissier that National Express

---

[8]     Envision Healthcare's medical transportation segment was named American Medical Response. (DX 68.)

called him that morning about purchasing the paratransit business and asked whether

he was authorized to enter into discussions. (PX 111; Tr. 8/14 A.M. 26:19-27:1.) On

December 16, 2015, Leland reported to Greenberg, Stephen, Pelissier and Bonilla that

National Express had called him "a few times" that day to reiterate that its offer to buy

TransCare's paratransit contract was "still out there." (PX 124; Tr. 7/23 A.M. 50:22–

51:3.)

According to Greenberg, Tilton specifically prohibited Leland, Greenberg, Pelissier

or anyone else from speaking to any of these companies. (Tr. 7/22 A.M. 46:21–47:19.)

## E.   Events Leading to the Tilton Plan and Bankruptcies

On December 14, 2015, Pelissier informed John Husson of Wells Fargo that

Tilton had decided to sell TransCare. Tilton was prepared to provide bridge financing

until a sale could be consummated but wanted to inject the financing through Wells

Fargo's ABL loan facility. (Husson (*LaMonica*) Tr. 48:11–49:21.)[9] On December 16,

2015, Kurt Mardsen of Wells Fargo wrote to Tilton confirming his understanding that

she had determined to sell TransCare and inquired into her view about possibly running

the sale through a bankruptcy proceeding. (PX 128.) He wanted to "get clarity on how

much financial support Patriarch is considering providing, and how soon the company

could have access to that money since the company appears to have immediate liquidity

---

[9]      The Defendants objected to this excerpt from the Husson (*LaMonica*) Deposition as irrelevant. (*Defendants' Response*, Ex. A, item II.1.) The testimony supports the finding for which it is cited, and the finding is relevant to Tilton's reason for entering into the Ark II Security Agreement, described in the succeeding text, pursuant to which Ark II primed the Term Loan Lenders' lien. The objection is overruled.

A2743

challenges." (PX 128.) Tilton understood that Wells Fargo was not going to stay in past January 31 absent a sale process. (Tr. 8/13 A.M. 50:9-12.)

On December 21, 2015, Greenberg met with John Husson and Bob Strack of Wells Fargo concerning a deal to extend the ABL so as to facilitate a sale of TransCare. (DX 97; Tr. 7/22 A.M. 55:17–56:1.) Prior to the meeting, Tilton requested a sixth-month time frame for the sale, or through to May or June 2016. (Tr. 7/22 A.M. 54:20-22.) On December 23, 2015, Wells Fargo transmitted a summary of proposed terms for a longer-term forbearance of the Wells Fargo ABL facility to Jean-Luc Pelissier and Michael Greenberg. (Stipulation No. 35.) The proposed terms included the engagement by TransCare of a third-party financial advisor and a budget for TransCare. In response, on January 7, 2016, TransCare retained Carl Marks Advisory Group LLC ("Carl Marks") and entered into a consulting agreement. (Stipulation No. 36.)

In the meantime, Tilton instructed Greenberg to obtain potential comparable transactions and comparable public companies that existed within the same or ancillary industries to TransCare.[10] (Tr. 7/22 A.M. 42:16-23.) She also instructed Greenberg to find investment bankers to market TransCare. (Tr. 7/22 A.M. 41:6-13, 42:21-23; *see* DX 96.) On December 18, 2015, Greenberg reported his findings to Tilton. (JX 55.) He identified six comparable transactions that occurred within the same sector as TransCare or related sectors. (JX 55; Tr. 7/22 A.M. 48:2-3.) For each comparable

---

[10] Greenberg had experience in private equity investment and portfolio management, comparing companies within a particular set, evaluating capital structure alternatives for companies, and making strategic business assessments for companies. (Tr. 7/22 A.M. 13:17–14:2.) Greenberg also had extensive experience in valuation and modeling. (Tr. 7/22 A.M. 14:7-9.)

transaction, Greenberg listed the date, whether it was completed or announced, and where available, the purchase price or enterprise value, last twelve-month ("LTM") revenue, LTM EBITDA, and the multiple of revenue/EBITDA needed to arrive at the purchase price. (JX 55; Tr. 7/22 A.M. 48:22–50:13.)

Only two of the transaction comparables had sufficient public information to calculate EBITDA multiples. AMR (Envision) purchased Rural/Metro Corp. at a 10.7x multiple (*i.e.*, the purchase price was 10.7 times the LTM EBITDA) and KKR purchased Air Medical at a 10.0x multiple. (JX 55.) Greenberg also identified three "market comps" that "relate to public companies and where they're currently trading in terms of their valuation." (JX 55; Tr. 7/22 A.M. 48:3-5.) Under "market value" for each market comp, Greenberg listed the market value of the equity of each public company plus the outstanding debt minus the cash on the balance sheet. (JX 55; Tr. 7/22 A.M. 51:2-7.) The rest of the entries were calculated in the same way as the transaction comps. (Tr. 7/22 A.M. 51:8-10.) Based on Greenberg's analysis, Envision, traded at an 11.3x multiple, Air Methods at an 8.2x multiple and PHI traded at a 3.5x multiple. (JX 55.) However, Greenberg determined that PHI was an outlier, and reported the same to Tilton, because PHI had other business lines that were only tangentially related to TransCare's business. (JX 55 at 41410; Tr. 7/22 A.M. 51:11-22.)

In his cover email to Tilton reporting on these transaction and market comparables, Greenberg stated that the average enterprise value to revenue multiple was 1.8x and the average enterprise value to LTM EBITDA was 10.1x. (JX 55 at 41410; Tr. 7/22 A.M. 52:2-11.) Greenberg also identified several investment banks that had advised on ambulance transactions, including Barclays, Deutsche Bank and Royal Bank

15

of Canada. (JX 55 at 41410; Tr. 7/22 A.M. 42:24—43:11.) Finally, Greenberg informed Tilton that Leland had received unsolicited calls from several potential purchasers in the ambulance business including Falck, AMR, RCA, and Enhanced Equity and also from National Express which was in the transit business. (JX 55 at 41410.)

Greenberg followed up with more information six days later. In a December 24, 2015 email to Tilton, he identified additional potential investment banks that had acted as advisors in smaller transactions, including Avondale Partners, Benchmark International, Provident Healthcare Partners, Genesis Capital and Carter, Morse & Mathias. (JX 61.) He asked Tilton "whether we should begin to reach out to potential investment banks to gather more information." (*Id.*) Greenberg undertook this research for the purpose of negotiating a plan with Wells Fargo to fund TransCare towards a potential sale. (Tr. 7/22 A.M. 52:23—53:10.) Tilton, however, never hired an investment banker to pursue a possible sale.

Wells Fargo agreed that TransCare needed to be sold and understood that "it was a matter of self preservation" to support TransCare through to a sale. (Husson (*Ien*) Tr. 35:24—36:17.) Between December 23 and December 31, 2015, Greenberg and Wells Fargo negotiated a deal to extend the ABL to allow a sale of TransCare. On December 23, 2015, Melissa Provost of Wells Fargo sent an email to Greenberg and Pelissier with a proposed long-term forbearance agreement to fund TransCare through a sale. (JX 59.) The proposal required Patriarch Partners to provide additional funding in an amount to be determined to help finance TransCare's Critical Expenses (*i.e.*, insurance, rent, payroll, payroll tax obligations and other critical operating expenses). (JX 59 at 75498.) On December 31, 2015, Greenberg sent an email to Husson and Provost that included a

16

proposed timetable that addressed the hiring of an investment banker by February 15, 2016 and a sale closing by September 30, 2016. (JX 65 at 00216.) Wells Fargo had proposed the retention of an investment banker by January 31, 2016 and a sale closing by July 31, 2016. (JX 65 at 00216.) Husson responded to Greenberg later that same day that the milestones were acceptable except the sale had to close by August 15, 2016. (JX 65 at 00215.)

### 1. The January 7 Plan

On January 4, 2016, Tilton told Greenberg to prepare a budget to support a sale process that would minimize the capital TransCare would need. (JX 67; Tr. 7/22 A.M. 64:12-22.) Greenberg submitted a budget to Tilton the next day, and Tilton directed that it be sent to Carl Marks two days later (the "January 7 Plan"). (JX 67.) Greenberg and Pelissier built the January 7 Plan working independently from TransCare's management and created a scenario they thought was more consistent with Tilton's stated parameters. (Tr. 7/22 A.M. 69:14–70:5.)

The January 7 Plan projected 2016 revenues of $120 million (including $2 million in new services) and EBITDA of $6.9 million. (JX 67 at 196574.) The January 7 Plan projected a peak need of $4.5 million in new capital consisting of $2.2 million in immediate payment requirements (insurance, payroll, and taxes); $1.3 million in down payments on new vehicles; and $1 million in other past due accounts payable. (JX 67 at 196575; Tr. 7/22 A.M. 70:22–72:3.) After receiving Tilton's approval, Greenberg shared the January 7 Plan with Carl Marks, (Tr. 7/22 A.M. 77:4-9), but she never "approved" the January 7 Plan. (Tr. 7/22 A.M. 80:16-21.)

Carl Marks provided a preliminary assessment to Tilton on January 14, 2016. Marc Pfefferle of Carl Marks stated that, among other things, TransCare needed a substantial amount of funding to survive, and the weekly cash flow was barely covering the payroll and payroll taxes. (PX 165 at 00927.) He also stated that all of TransCare's insurers had issued cancellation notices and urged immediate payments to numerous insurers. (PX 165 at 00927.) Tilton expressed concern about providing funding with no plan to restructure TransCare, (PX 165 at 00925–26), and warned that she did "not want to keep funding into a black hole that cannot be filled." (PX 165 at 00925.) Pfefferle agreed with the latter concern adding it "[s]eems like there is a reason for the Company to exist, but the EBITDA numbers we were originally given are significantly overstated," and anticipated that a more complete picture would follow. (PX 165 at 00925.)

Despite the absence of an approved plan, Tilton provided emergency funding in January 2016 to keep TransCare operating. On January 15, 2016, Ark II wired $1,172,757.53 to PPAS to allow PPAS to make insurance payments on TransCare's behalf. These included $221,122.00 to Zurich (auto insurance); $142,993.82 to IPFS (liability insurance); $334,802.76 to Aetna (health insurance); and $473,838.94 to the New York State Insurance Fund ("NYSIF") (workers' compensation insurance) (collectively, the "January 15 Payments"). (DX 112 (3:58 pm email).) The January 7 Plan contemplated that these payments formed a portion of the $4.5 million in new capital contributions (although by this date the $4.5 million had increased to a plan of $6.5 million). (Tr. 7/22 A.M. 83:7-13; JX 67 at 06575; *see* PX 170 at 14549–50.)

18

That afternoon, Greenberg emailed Wells Fargo asking for its agreement to eight new conditions for the January 15 Payments, which Greenberg characterized as "part of a first funding under a go forward business plan being developed, of up to $6.5MM." (PX 170 (2:06 pm email).) The conditions included that the $6.5 million business plan be supported by a credit facility with a lien junior to Wells Fargo's lien on the collateral for the ABL, but senior to Wells Fargo's lien on the collateral for the Term Loan debt. (*Id.*) Wells Fargo did not agree to the proposed lien priority but was prepared to agree to allow the secured funding junior to all liens of Wells Fargo and subject to a new intercreditor agreement. (PX 170 at 14549.) Greenberg continued to negotiate the security for the January 15 Payments with Wells Fargo through the end of January. (PX 174 at 22754, 22753; Tr. 7/22 A.M. 88:1–92:7.)

### 2. The January 27 Executive Summary

Carl Marks produced its 2016 Plan Executive Summary ("Executive Summary") on or about January 27, 2016. (PX 175.) It listed a litany of significant problems with vendors, customers, landlords and equipment, (*see* PX 175 at 002111-12), and projected the need for an immediate pledge of financial support from Patriarch in excess of $7.5 million, (PX 175 at 002114), of which $3.5 million was needed over the next two weeks. (PX 175 at 002114.) The Executive Summary included a series of action items Carl Marks thought TransCare could take to effect a turnaround, (PX 175 at 002114), and recommended against a TransCare bankruptcy predicting that it would provide no immediate financial benefit and jeopardize the customer base. (*See* PX 275 at 002116.) On the other hand, if the action items were successfully implemented, the Executive Summary projected 2016 operating revenue of $100,532,000 and EBITDA of $4.97

19

million or 4.9% of operating revenue.[11]  (PX 175 at 002123.)  Tilton declined to provide

the funding required under the Executive Summary, (Tr. 8/13 P.M. 70:24–71:3),

although on January 28, 2016, she approved the purchase of two new ambulances (but

not the medical equipment) for a total of $195,975 that Ark II would own and lease to

TransCare, (DX 120 at 02162; DX 121 at 99194), and the next day, she directed PPAS to

advance $690,168.24 on TransCare's behalf to pay the NYSIF and certain TransCare

creditors (the "January 29 Payments," and together with the January 15 Payments, the

"January Payments").  (Tr. 8/13 A.M. 58:21–59:15; *see* DX 121 at 99192.)  According to

Tilton, she intended for Ark II to reimburse PPAS for the advance, (Tr. 8/13 P.M. 6:3–

6), but there is no evidence that it ever did.

### 3.  Negotiations with Credit Suisse

As of February 3, 2016, Tilton still had no agreement with either Wells Fargo or

Credit Suisse, the non-affiliated Term Loan Lender, for a new secured financing facility

to TransCare.  (Tr. 7/22 P.M. 8:17-22, 9:20-22.)  However, Greenberg reported to

Pfefferle earlier that day that Credit Suisse, which also represented First Dominion's

interest as a Term Loan Lender, wanted to see a plan that showed it was better off

agreeing to subordinate its position in favor of the new facility meaning the value had to

exceed Wells Fargo's debt plus the new facility.  (PX 185.)  Later that day, Greenberg

sent Alex Witkes of Credit Suisse a "Summary of Terms for New Facility."  (PX 189.)

The summary included a $6.5 million facility which would be junior in priority to Wells

---

[11]      On January 28, 2016, Greenberg emailed himself another set of projections that were not
materially different from the Executive Summary.  He projected 2016 operating revenue in the sum of
$102,262,000 and EBITDA of $5,176,000.  (PX 179 at 13262.)  There was no evidence presented at trial
that he shared these projections with anyone.

A2750

Fargo but senior to the Term Loan Lenders on the ABL Priority Collateral and would have a priority senior to the Term Loan Lenders on the Term Loan Priority Collateral. However, Greenberg never sent Credit Suisse a formal plan because Tilton never told him to do so.  (Tr. 7/22 P.M. 16:12-25.)  Nor had Wells Fargo been provided with a going-forward plan for TransCare.  (Tr. 7/22 P.M. 17:23–18:6.)

### 4.  The Tilton Plan

On or about February 5, 2016, Tilton, dissatisfied with the work of Carl Marks, instructed her own staff and TransCare's divisional chiefs to build a model for a business plan designed to continue a version of TransCare under a new company ("Tilton Plan"). (Tr. 8/13 A.M. 64:1-16.)  She planned to split TransCare in two.  PPAS, acting on behalf of the Term Loan Lenders, would foreclose through U.C.C. Article 9 on their TransCare collateral and transfer the collateral to "NewCo."  NewCo, which would become Transcendence, would continue to operate part of TransCare's business and save a substantial number of jobs.  The balance of TransCare, "OldCo," would wind down outside of bankruptcy for a period of 60-90 days and then commence a chapter 7 and collect the accounts receivable on which Wells Fargo had the first lien.  (Tr. 8/13 A.M. 65:3-16.)  Tilton sought a commitment from Wells Fargo to continue funding TransCare during its wind-down by over-advancing funds through the existing ABL, but she ultimately rejected Wells Fargo's proposal to over-advance as insufficient.  (Tr. 8/13 A.M. 68:14-22, 70:17-23.)

### a.    Creation of Transcendence

Tilton set her plan in motion on February 10, 2016.  Per her direction, Stephen caused the two Transcendence entities to be incorporated under Delaware law, (DX 133

A2751

at 15290, 15294; Tr. 7/23 P.M. 22:2–23:21; *see* Stipulation No. 37), and set up bank accounts, tax ID numbers, directors, and insurance for both companies. (Tr. 7/23 P.M. 26:22–28:9, 103:4–104:23.) The same day, Tilton became the sole director of Transcendence, issued a board resolution adopting the authority matrix and appointed Glen Youngblood, a senior vice president at TransCare, as President of Transcendence.[12] (PX 200; Stipulation No. 7.)

### b.    Retention of Counsel

On the evening of the previous day, Stephen had contacted the law firm Curtis, Mallet-Prevost, Colt & Mosle LLP ("Curtis Mallet") to prepare to file a chapter 11 bankruptcy proceeding for certain TransCare entities, (JX 72 (10:06pm email); Tr. 7/23 P.M. 29:8–30:10), and by letter agreement dated February 10, 2016, TransCare engaged Curtis Mallet to advise on an out-of-court restructuring or in-court proceeding. (JX 77; Stipulation No. 38.) Tilton made the decision to hire Curtis Mallet without consulting anyone else from TransCare. (Tr. 7/23 P.M. 33:11-20.)

Stephen excluded two of TransCare's subsidiaries — TransCare Pennsylvania and TC Hudson Valley — from the list of potential debtors. By then, Tilton planned that "the secured lenders would foreclose on certain TransCare assets and those assets would lead to start another business, Transcendence Transit business, and the remainder of

---

[12]    Both certificates of incorporation authorized the Transcendence boards to issue 1,000 shares of common stock, but no shares were ever issued for either Transcendence entity. (Tr. 7/23 P.M. 24:5-16; DX 133 at 15290, 15294.)

A2752

TransCare would be wound down, but it would still continue to operate." (Tr. 7/23 P.M. 30:24–31:13.)

### c. The New Ark II Credit Facility

As noted earlier, Tilton was unwilling to fund any portion of TransCare's wind down Critical Expenses unless she received a security interest in the Term Loan Lenders' collateral that primed the Term Loan Lenders' lien.[13]  Greenberg had previously sought Credit Suisse's consent to what amounted to the subordination of its lien but had not received it.  Tilton decided instead to circumvent the Term Loan Lenders.  In a February 10, 2016 email, Peter Ruffini, a lawyer at Patriarch Partners, asked Greenberg (copying Stephen) to have TransCare sign four documents in connection with a new Ark II/TransCare facility: (1) the Ark II Credit Agreement, (2) the Ark II Security Agreement, (3) the Ark II Guaranty, and (4) the 2016 Intercreditor Agreement (collectively, the "Ark II Facility").  (PX 197 at 47308 (11:33 a.m. email).)[14]  On February 11, 2016, Stephen emailed a fully executed copy of the Ark II Facility documents (all dated as of January 15, 2016) to Curtis Mallet, stating only "I attach documents with respect to another term loan for the company."  (JX 79 at 48966.)  No evidence was offered showing that Curtis Mallet had any participation in the negotiation, drafting or execution of these documents by TransCare.

The Ark II Credit Agreement, § 2.1, provided that Ark II would loan up to $6.5 million to TransCare, (JX 79 at 48976-77), but under § 2.5(b), prohibited TransCare

---

[13]     She also wanted the new facility to prime Wells Fargo, but Wells Fargo refused.

[14]     There was no administrative agent on the Ark II Credit Facility and PPAS had no connection to the Ark II Credit Facility other than agreeing to the 2016 Intercreditor Agreement.  (JX 197.)

23

from requesting loans under the Ark II Facility unless it first obtained the prior written consent of Ark II. (JX 79 at 48978.) The Ark II Security Agreement, § 2.2, granted Ark II a blanket security interest in TransCare's property. (JX 79 at 49020-21.) The 2016 Intercreditor Agreement (JX 79 at 49001) granted Ark II both structural and payment priority over the Term Loan Lenders. (*See* JX 79 at 49004, § 2.2 (granting Ark II lien priority over the Term Loan Lenders' lien); JX 79 at 49005, § 2.2(a) (providing that the proceeds of any collateral would first be paid to Ark II); JX 79 at 49007, § 2.8(a) (stating that "only the party with the senior Lien in the collateral [*i.e.*, Ark II] shall have the right to restrict, permit or approve or disapprove, the sale, transfer or other disposition" of the TransCare collateral); JX 79 at 49008, § 2.9(a) (prohibiting PPAS from exercising any of its remedies upon a default); and JX 79 at 49008, § 2.9(a)(ii) (prohibiting PPAS from foreclosing on its TransCare collateral).) Tilton signed the 2016 Intercreditor Agreement on behalf of PPAS, as agent for the Term Loan Lenders and Ark II, (JX 79 at 49015), and Peter Wolf signed an "acknowledgment" to the 2016 Intercreditor Agreement, providing that TransCare "acknowledges and agrees to the foregoing terms and conditions....[and] agrees that it will, together with its successors and assigns be bound by the provisions hereof." (JX 79 at 49016.)

One day later, on February 11, 2016, Tilton crafted, (Tr. 7/22 P.M. 33:14-17), an email, (PX 249 at 77102 (Feb. 11, 2016 2:35 p.m. email)), that Greenberg sent to Credit Suisse. It warned Credit Suisse that because it would not agree to subordinate its Term Loan position to a new $6.5 million loan facility (a feat already accomplished through the 2016 Intercreditor Agreement), TransCare was going to be forced to file for bankruptcy. (Tr. 7/22 P.M. 31:15-32:2.) The email also advised Credit Suisse that as an

24

equity holder it would be responsible for paying TransCare's unpaid payroll and payroll taxes and its share could be between $1 million and $2 million. (PX 249 at 77102 (Feb. 11, 2016 2:35 p.m. email); Tr. 7/22 P.M. 32:15–33:17.) Credit Suisse asked for details about the missing payroll and financial problems, (PX 249 at 77101 (Feb. 12, 2016 4:24 p.m. email)), but Greenberg never responded. (Tr. 7/22 P.M. 34:20–35:3.) No one had any contact with Credit Suisse again until Credit Suisse asked for a status update after TransCare's bankruptcy filing. (Tr. 7/22 P.M. 35:10-19.)

### d. The Acquisition of Insurance

The procurement of insurance for Transcendence was the final missing element to the success of the Tilton Plan; Transcendence could not operate without insurance. (Tr. 7/22 A.M. 71:8-18; Tr. 7/23 A.M. 20:3-16; Tr. 8/13 A.M. 25:4–26:12.) On February 10, 2016, Greenberg emailed several of TransCare's insurance brokers with a request to bind new insurance policies for Transcendence and provided the brokers with financial information about Transcendence. (PX 196; Tr. 7/22 P.M. 43:8–47:22.) He informed the brokers that Transcendence would operate five of TransCare's business units: (1) the paratransit division; (2) Pittsburgh; (3) Hudson Valley; (4) Maryland; and (5) Westchester. (PX 196; Tr. 7/22 P.M. at 43:8–46:19.) The financial information he sent projected $48 million in operating revenue for Transcendence during calendar year 2016 (it was already February) and $3.76 million in EBITDA. (PX 196; Tr. 7/22 P.M. 47:9-22.)

On February 11, 2016, Tilton wrote to Bobby Siegel, an insurance broker, for the purpose of procuring insurance for Transcendence. She explained that:

25

> [T]here is a smaller, less risky transit business that we would like to continue in a new company.  This would include our NY Transit business and our suburban ambulance businesses in Hudson Valley, Pittsburgh Pennsylvania and Maryland.  It would allow us to maintain a profitable, lower risk transit company that would still employ over 1000 of our workers.
>
> The models show that this business in 2016 would be approximately $67mm with $4mm of EBITDA and would grow with the additional transit business under the contract to $79mm and $7mm of EBITDA in 2017.  It is because this new business makes sense that I would be providing all the new working capital for this business myself, personally.

(JX 80 at 92228; Tr. 8/13 A.M. 38:5−39:13.)  She understood that Siegel needed this financial information to bind insurance.  (Tr. 8/13 A.M. 39:5-8.)

### e.    The Revised Business Model

On February 13, 2016, Pelissier sent Tilton and Stephen the "Transcendence Go Forward Model" that he and Greenberg were preparing.  (PX 286.)  This model included the assets that would continue to operate as a going concern.  (Tr. 7/22 P.M. 53:17-23.)  This model contemplated that Transcendence would operate six divisions of TransCare: (1) paratransit, (2) Pittsburgh; (3) Hudson Valley; (4) Maryland, and (5) Westchester and (6) Bronx 911/Montefiore 911.  (PX 286; Tr. 7/22 P.M. 54:8-13.)  The model projected that Transcendence would achieve consolidated 2016 operating revenues of $65 million and EBITDA of $5.1 million.  (PX 286 at 105517; Tr. 7/22 P.M. 55:1-7.)

Transcendence would have an "incremental funding need" of $8 million while the accounts receivable were paid down (ninety days for the ambulance divisions and forty-five days for the paratransit division), "which can be offset if a new ABL line is secured or by cash that builds through the year."  (PX 286 at 105517; Tr. 7/22 P.M. 56:18−57:4.)  For this reason, the "incremental funding need" was not listed on the model cash flow

26

statement as a capital expenditure but instead, was listed as a financing adjustment. (PX 286 at 105522; Tr. 7/22 P.M. 56:22–57:2.) The cash flow statement projected only $120,000 in capital expenditures for Transcendence in 2016. (PX 286 at 105522; Tr. 7/22 P.M. 56:13-17.)

After finishing a telephone call with Tilton on February 14, 2016, and with Tilton's authorization, Pelissier circulated the operational plan for Transcendence to Greenberg, Pelissier, Stephen, Wolf, Youngblood, and others. (PX 206; Tr. 7/23 A.M. 17:7-9.) Tilton maintained exclusive control over the decision and timing of the foreclosure and bankruptcy filing of TransCare. (Tr. 7/23 A.M. 17:17-24.) The operational plan included a detailed list of tasks and the assigned responsibility for those tasks. Among other things, Stephen and another lawyer at Patriarch were tasked with preparing the foreclosure documents by February 11, 2016, and Stephen was to finalize the bankruptcy filing documents by February 14, 2016. (PX 206 at 91292.) Stephen would also review which contracts could be assigned to the new company. (Tr. 7/23 A.M. 25:20–26:8.) Pelissier and Youngblood, the designated President of Transcendence and the most senior person after Wolf at TransCare, would be in charge of changing remittance forms and payment lock box accounts for Transcendence on day one. (PX 206 at 91295.) Pelissier and Youngblood would also be in charge of devising a system for the new company to generate payroll checks. (PX 206 at 91296, 91297; Tr. 7/23 A.M. 24:2–25:1.) Employees would need to receive WARN notices and be transferred to Transcendence, but no one had yet decided when to do this. (Tr. 7/23 A.M. 19:11-22.)

27

### f.    TransCare's Final Days

TransCare continued to deteriorate.  On February 19, TransCare lost its contracts with Bronx Lebanon, Montefiore hospital and the University of Maryland.  (DX 157 at 05291.)  Transcendence was to take over the Bronx Lebanon contract.  Tilton testified that the Bronx Lebanon and Montefiore contracts generated about $2.5 million of EBITDA and their loss was "a big hit" to the Tilton Plan.  (Tr. 8/13 P.M. 99:18–20.)  She feared that TransCare might continue to lose contracts.  (Tr. 8/13 P.M. 101:4–12, 100:18–100:23.)

## F.    The Foreclosure and Sale

Tilton continued waiting for the insurance for Transcendence to set the foreclosure in motion.  (Tr. 8/13 A.M. 74:5-7; DX 170 (3:49 P.M. email); DX 171 (4:44 P.M. email).)  Pelissier explained, "if we cannot insure, we cannot operate." (Tr. 7/23 A.M. 30:8-24.)  On February 24, 2016, Tilton directed Greenberg to transmit Transcendence's projected 2016 financials to Todd Trent of Lockton, a potential insurer, for the purpose of procuring insurance.  (PX 228; Tr. 7/22 P.M. 62:15–63:7.)  The email suggests that the financial information was actually provided the previous day.  The projections encompassed the last few days of February and the remaining ten months of 2016 rather than a full year.  (PX 228 at 86223; Tr. 7/22 P.M. 64:7-15, 68:13-18; PX 233.)  The financials projected operating revenues of $36,379,000 and EBITDA of $3,204,500 during this approximate ten-month period.  (PX 228 at 86223.)  Tilton testified that EBITDA would increase to $4 million if annualized over a full twelve months.  (Tr. 8/14 A.M. 38:4-12.)  The difference between the $3.2 million EBITDA shown on the February 24, 2016 financials submitted to Lockton and the $3.7 million

28

EBITDA shown on the earlier forecast, (PX 286), resulted from the decision to exclude the Maryland, Westchester and Bronx 911/Montefiore 911 divisions, (PX 286 at 105516), and "possibly also a slight difference in timing in terms of the beginning of the forecast." (Tr. 7/22 P.M. 65:4-8.)

Transcendence apparently received the insurance it needed to operate at some point on February 23, 2016 because Tilton authorized the foreclosure at 12:07 a.m. on February 24, 2016. (Tr. 8/13 A.M. 6:16-19.) Stephen immediately provided TransCare with (a) a Notice of Default and Acceleration (JX 96 at 43311) and (b) a Notice of Acceptance of Subject Collateral in Partial Satisfaction of Obligations, (JX 96 at 43306; DX 174), but did not send the Notice of Default or Notice of Acceptance to Curtis Mallet. (JX 96; Tr. 7/23 P.M. 50:24-51:21.)

Both the Notice of Default and the Notice of Acceptance were signed by Tilton, on behalf of PPAS, the Zohar Funds, and AIP, but not by Credit Suisse or First Dominion. (JX 96 at 43308, 43313.) The Notice of Default declared a default arising from TransCare's failure to pay interest and accelerated all of TransCare's payment obligations under the Term Loan. (JX 96 at 43311.) By the Notice of Acceptance, PPAS accepted the collateral (the "Subject Collateral") in satisfaction of $10 million (of approximately $43 million) outstanding under the Term Loan. (JX 96 at 43307.) The Subject Collateral included all of TransCare's personal property (including the computer servers and related data), three specific contracts (MTA Contract, an equipment lease for ventilators and emsCharts Service Agreement dated Aug. 21, 2015) and the stock of TransCare Pennsylvania, Inc., TC Hudson Valley Ambulance, Inc. and TC Ambulance Corp. The Subject Collateral did not include the Accounts, as defined in the security

29

agreement associated with the Term Loan, or any lease or other contract that was not specifically identified. (JX 96 at 43310.) Peter Wolf, the Chief Operating Officer of TransCare, executed the Notice of Acceptance on behalf of TransCare.[15] (DX 174 at 91200.)

As is evident from the documents, the Tilton Plan was not limited to the foreclosure and sale of NewCo's assets; it included OldCo's property as well. The Subject Collateral was defined, with certain exceptions, as "[a]ll of the Debtors' personal property of every kind and description," and expressly included the MTA Contract, which was property of OldCo's TransCare New York, Inc., and the shares of capital stock of TransCare Pennsylvania, Inc., TC Hudson Valley Ambulance Corp. and TC Ambulance Corp., which belonged to OldCo's TransCare Corporation. (DX 174 at 91201.) The Notice of Acceptance was directed to each of the fourteen Debtors, (DX 174 at 91197), was signed by Wolf on behalf of each of the fourteen Debtors, (DX 174 at

---

[15]    The parties had previously disputed whether the Subject Collateral included TransCare's Certificates of Need ("CONs"). The CONs were issued by the New York State Department of Health and were needed to operate the ambulances. (Tr. 7/24 135:20-25; PX 255 (*Stipulation Respecting the Sale of Certain Personal Property*, dated Mar. 10, 2016 ("*Personal Property Stipulation*").) Prior to February 24, 2016, TransCare held seven CONs, five were issued to Initial Debtors and two were issued to Subsequent Debtors. (*Personal Property Stipulation* at 2.)

    PPAS originally took the position that it had foreclosed on the Subsequent Debtors' CONs and transferred them to Transcendence. (*Id.* at 3.) However, it now concedes that none of the CONs were included in the Subject Collateral. (*Defendants' Post-Trial Proposed Findings of Fact and Conclusions of Law*, dated Sept. 18, 2019 ("*DPFC*"), at ¶¶ 223, 274 (ECF Doc. # 133).) Moreover, the 2006 Intercreditor Agreement contains a schedule of the Term Loan Priority Collateral and the schedule does not include the CONs. (JX 3, Ex. A at 00029.) Rather, the CONs were part of the collateral retained as part of the ABL Priority Collateral. Tilton nevertheless believed that by foreclosing on the stock of the Subsequent Debtors, Transcendence would be able to use their CONs even though title to the CONs would not pass to Transcendence. (Tr. 8/14 A.M. 23:12—15.) The Trustee eventually liquidated TransCare's seven CONs for an aggregate gross price of $12,250,000. (*See* ECF Case No. 16-10407 Doc. ## 199-205.)

A2760

91200), and the Bill of Sale transferred all of these assets to Transcendence.  (*Compare* DX 174 at 91201 *with* JX 102 at 91207.)

The foreclosure complete, Tilton immediately moved on to the second stage — transferring the Subject Collateral to Transcendence.  On the morning of February 24, 2016, PPAS, as administrative agent, and Transcendence entered into a Bill of Sale, Agreement to Pay and Transfer Statement ("Bill of Sale") (JX 102), pursuant to which PPAS, as agent for the Term Loan Lenders, sold all of the Subject Collateral to Transcendence.  (JX 102; Stipulation No. 43.)  As consideration for the purchase of the Subject Collateral, Transcendence agreed to pay PPAS $10 million.  Ark Angels III, a Tilton affiliate, would finance the purchase under a Purchase Credit Agreement and was deemed to have loaned Transcendence $10 million.  (JX 101.)  The trial exhibit was unexecuted, but Tilton testified that (a) she was committed to this loan and (b) Transcendence borrowed $658,000 under the Purchaser Credit Agreement to pay NYSIF and the lessor of the paratransit facility on Foster Avenue.  (JX 101 at 8673; Tr. 7/22 P.M. 59:13–60:10; Tr. 8/13 A.M. 24:15-24.)  It does not appear that any portion of the $10 million purchase price was actually paid to PPAS or the Term Loan Lenders.

## G.  The Unraveling of the Tilton Plan

On February 24, 2016, TransCare Corp., TransCare New York, Inc., TransCare ML, Inc., TC Ambulance Group, Inc., TransCare Management Services, Inc., TCBA Ambulance, Inc., TC Billing and Services Corporation, TransCare Westchester, Inc., TransCare Maryland, Inc., TC Ambulance North, Inc. and TransCare Harford County, Inc. (collectively, the "Initial Debtors") filed chapter 7 petitions in this Court. (Stipulation No. 44.)  The out-of-court and chapter 11 wind down plans had been

scrapped presumably due to lack of funding. Salvatore LaMonica, Esq. was appointed as the interim chapter 7 trustee of the Initial Debtors' cases the next day. (Stipulation No. 45.) With the exception of the Accounts, the CONs and some property carved out of the Bill of Sale, all of TransCare's personal property was the subject of the foreclosure and was now owned by Transcendence. The surviving entities, TransCare Pennsylvania, Inc., TC Hudson Valley Ambulance Corp., and TC Ambulance Corporation, whose operations were to continue through Transcendence, did not file bankruptcy at that time.

The filing of the chapter 7 ultimately spelled doom for Transcendence. The most pressing problem was paying TransCare's drivers. Forty-eight emergency ambulances that Transcendence now owned were on the road driven by former TransCare employees who were owed pay for the prior two weeks. The payroll was scheduled to be disbursed the next day but TransCare was now in chapter 7. PPAS's counsel advised the Trustee that Transcendence owned all of the ambulances but would be amenable to the Trustee's use of the ambulances to operate if they could reach an agreement. (Tr. 7/24 134:11-22.) There were three obstacles to this plan. First, the Trustee had no money but even if he did, he could not pay pre-petition wages without a court order. Second, Wells Fargo and PPAS were prepared to fund $1 million but the Trustee needed $1.2 million, (Tr. 7/24 138:2-22), and neither Wells Fargo nor PPAS were willing to come up with more money. The Trustee refused to run TransCare if the employees were not going to be paid. (Tr. 7/24 139:4-13.) Third, PPAS needed TransCare's computers to process the payroll and wanted the Trustee to issue the checks using TransCare's payroll system but

A2762

the Trustee refused fearing employer tax and other obligations and potential liabilities. (Tr. 7/24 142:20-143:3, 148:22-149:22.)

Once the possibility of a funding agreement fell through, the Trustee arranged to shut down TransCare's 911 operations. (JX 104.) His concern was for the public's safety because the ambulances were furnished with narcotics and equipment. He spoke to the New York City Fire Commissioner and arranged for the drivers to return the ambulances to the nearest firehouse if they refused to return them to one of TransCare's garages. (Tr. 7/24 141:14-142:6.) In addition, the Trustee was concerned about the Estate's potential liability because the ambulances were still registered in TransCare's name and insured by TransCare. (Tr. 7/24 142:20-25.)

The Trustee's control of the TransCare computer server also hindered Transcendence's ongoing operations. The Subject Collateral included TransCare's server, (JX 96 at 43310), but the server was housed at the Hamilton Avenue address that was leased by one of the Initial Debtors. Tilton had apparently intended for Transcendence to take possession of the server which it needed to operate and would give access to TransCare under a Transition Services Agreement which was never executed.[16] (Tr. 8/13 A.M. 26:6-9.) However, the server contained TransCare's books and records and the Trustee was not about to surrender it. (Tr. 7/24 165:23-166:4.) According to Tilton, when Glen Youngblood, now President of Transcendence, showed

---

[16] Greenberg had forwarded a draft Transition Services Agreement to Tilton on February 23, 2016. (JX 95.) Under the proposed agreement, Transcendence would provide TransCare with use of certain equipment including systems and software support. (JX 95 at 44010.)

A2763

up at TransCare's headquarters to seize the server, the Trustee threatened him with personal liability and Youngblood resigned. (Tr. 8/13 A.M. 26:17-21.)

The MTA Contract was another problem. Historically, the paratransit business was TransCare's second biggest revenue producer accounting for 26% of TransCare's operating revenue, (JX 67 at 106572), and $4 million of EBITDA. (JX 12 at 04260.) As a component of Transcendence, it would be the most valuable division with a projected annual operating revenue of $25 million. (PX 196 at 27756; PX 286 at 105516.) Furthermore, unlike the ambulance business, it demanded limited capital because the fleet was leased from the MTA. (JX 12 at 04260.) TransCare New York, Inc., destined for chapter 7, was the TransCare entity that was party to the MTA Contract. (Stipulation No. 29; PX 229.)

On February 24, 2016, and before the filing of the chapter 7 cases, Pelissier forwarded the paperwork necessary to assign the MTA Contract which he had requested from the MTA to Stephen, Greenberg, Jones, Wolf and Thomas Fuchs of TransCare. (JX 100 (1:34 p.m. email).) Tilton signed a written consent as the sole board member of TransCare New York, Inc. that same day directing TransCare's COO to assign the MTA Contract to Transcendence II. (PX 229.) At 8:27 p.m. on February 24, 2016, fourteen minutes before the filing of TransCare New York's chapter 7 petition, Stephen circulated an executed Agreement of Assignment for the MTA Contract (the "MTA Assignment"), stating that the financial disclosures would need to be completed by someone else. (JX 100.) The MTA Assignment (and TransCare New York's consent to the MTA Assignment) was executed on behalf of TransCare by COO Peter Wolf. (JX 100 at 77168.) Counsel for TransCare was not consulted. (Tr. 7/23 P.M. 81:16-23, 85:20-23.)

34

On February 25, 2016, Stephen confirmed to the MTA that TransCare had transferred everything necessary for servicing the MTA Contract to Transcendence and that nothing prevented Transcendence from servicing the MTA Contract. He assured the MTA that the foreclosure had taken place and "[t]he bankruptcy of TransCare has no impact on Transcendence Transit II's ability to provide uninterrupted service to the MTA in accordance with the terms of the Agreement." (PX 244 at 43521-22 (8:49 p.m. email) (underscoring in original).) On February 26, 2016, Stephen wrote to the MTA asking it to agree on a "new agreement" with Transcendence II with certain conditions, including that the MTA terminate the MTA Contract with TransCare New York. (PX 236.) Stephen told the MTA that absent agreement to the new terms "we will, unfortunately, be forced to discontinue service at 5:00PM today." (PX 236.)

At the same time, Randy Creswell (counsel to PPAS) asked the Trustee to consent to termination of the MTA Contract. (JX 105.) At trial, Tilton blamed Transcendence's loss of the MTA Contract on the Trustee's refusal to consent per the MTA's insistence,[17] (*see* Tr. 8/13 A.M. 26:21-25), but the Trustee was willing to consent to the termination of the MTA Contract as long as it was without prejudice to amounts due to TransCare, (JX 105), and informed the MTA's lawyer of his consent. (Tr. 7/24 148:2-5.)

At 7:01 p.m., Stephen informed the MTA that after speaking with Tilton, Transcendence would not be continuing to provide services. (PX 245.) In that same email, Stephen provided the MTA with the termination notice that had been sent to

---

[17]    The MTA's insistence on the Trustee's consent may have been due to the concern that any attempt to terminate the MTA Contract without his consent could violate the automatic stay triggered by TransCare New York's chapter 7 case.

Transcendence's employees that day. (PX 245 at 43517.) The notice informed the employees that Transcendence had shut down operations effective "immediately" and instructed them to "secure your vehicles and operations and await further instruction from the court appointed Trustee." (*Id.*)

Transcendence's predecessors, TransCare Pennsylvania, Inc., TC Hudson Valley Ambulance Corp., and TC Ambulance Corporation (together, the "Subsequent Debtors") filed voluntary chapter 7 bankruptcy petitions in this Court on April 25, 2016. LaMonica serves as Trustee of their estates as well, and the cases of the Initial Debtors and the Subsequent Debtors are being jointly administered. (Stipulation Nos. 50-51.)

## H. Post-Petition Events

At the time of the bankruptcy filing by the Initial Debtors, TransCare owed Wells Fargo approximately $13 million, which was paid in full through the liquidation of assets. (Tr. 7/24 159:16-24.) With the agreement of PPAS as set forth in the *Personal Property Stipulation*, the Trustee sold all of the property, including the Subject Collateral, and realized approximately $19.2 million through the liquidation of ambulances, equipment, accounts receivable and CONs owned or formerly owned by TransCare. (Tr. 7/24 13:10-14.) The sum of $5.7 million represented the proceeds of the liquidation sales of the Transcendence assets. (Tr. 7/24 27:23-25.) As noted, the Trustee also liquidated the seven CONs for the aggregate sum of $12,250,000 but the CONs were part of the ABL Priority Collateral and were not included in the Subject Collateral.

36

A2766

Pursuant to the *Personal Property Stipulation*, the Trustee distributed $800,000 of the sale proceeds to PPAS as agent for the Term Loan Lenders. (Stipulation No. 49; Tr. 8/13 A.M. 36:13-24.) PPAS did not credit the $800,000 to the Term Loan. (JX 110 at ECF p. 9 of 9.)[18] Instead, PPAS turned the $800,000 over to Ark II, and Ark II applied the $800,000 to its alleged secured claim against the Estate. (Tr. 8/13 A.M. 36:19-24; JX 109 at ECF p. 5 of 9.)

On October 9, 2017, four Patriarch entities filed proofs of claim. PPAS, as Administrative Agent for the Term Loan Lenders, filed proofs of claim in the sum of $35,090,492.76. (Stipulation No. 54.) The claims reflect a $10 million credit for "Acceptance of Collateral." (JX 110 at pg. 9 of 9.) Ark II filed proofs of claim against TransCare asserting a secured claim in the sum of $1,077,966.97 in connection with the Ark II Credit Agreement. (Stipulation No. 53.) The Ark II claims reflect a credit in the sum of $789,457.00 based on the proceeds received from PPAS. (JX 109 at ECF p. 9 of 9.) Patriarch Partners filed a proof of claim asserting an unsecured claim in the sum of $2,587.98 for advanced expenses. (Stipulation No. 55; JX 111.) Finally, PPMG filed proofs of claim against TransCare asserting an unsecured claim in the sum of $2,038,515.87 in management fees. (Stipulation No. 56; JX 112.)

---

[18]     "ECF p. _" refers to the page number imprinted on the top of the page by the Court's electronic filing system.

A2767

## I.    This Adversary Proceeding

The Trustee's many claims have been narrowed during the course of this adversary proceeding.[19]   The parties' Joint Pre-Trial Order, dated May 14, 2019 ("JPTO") (ECF Doc. # 85), superseded the prior pleadings.  (JPTO p. 15 ("The pleadings are deemed amended to embrace the following, and only the following, contentions of the parties").)  The overriding claim involved the damages to the Debtors through the execution of what has been described above as the Tilton Plan.  (JPTO p. 47.)   The JPTO identified the claims that remained from the Amended Complaint:

| Count | JPTO Reference (pp.) | Defendants | Nature of Claim |
|---|---|---|---|
| 1 | 48, 65-66 | Tilton | Breach of fiduciary duties of loyalty and good faith under Delaware law by executing the Transcendence transaction (*i.e.,* the Tilton Plan) resulting in the loss of going concern value and the incurrence of WARN Act liability |
| 3 | 50, 66 | PPAS, Ark II, PPMG and Patriarch Partners | Equitable subordination based on participation in the Transcendence transaction and violations of the automatic stay |
| 4 | 51, 66 | Ark II | Recharacterization its claim as equity |
| 7 | 49, 66 | PPAS, Ark II and Transcendence | Actual fraudulent transfer of the Subject Collateral |

---

[19]    *See LaMonica v. Tilton* (*In re TransCare Corp.*), 602 B.R. 234 (Bankr. S.D.N.Y. 2019) (dismissing certain claims asserted in the Amended Complaint); *LaMonica v. Tilton* (*In re TransCare Corp.*), 592 B.R. 272 (Bankr. S.D.N.Y. 2018) (dismissing certain claims in the initial Complaint).

A2768

| 9 | 53, 67 | All Defendants | Violation of the automatic stay based on the Defendants' active interference with the Trustee's ability to marshal the estate's assets |
| 10 | 52, 67 | Ark II | Preferential transfer based on the grant of a lien to secure an antecedent debt |
| 11 | 51-52, 67 | Ark II | Constructive fraudulent transfer based on the grant of a lien |
| 12 | 53, 68 | PPAS | Contractual subordination of PPAS's claim under the 2016 Intercreditor Agreement based upon the avoidance of the Ark II lien, its preservation for the estate and Ark II's payment priority |
| 13 | 53-54, 68 | PPAS and Ark II | Limitation on liens under the "equities of the case" exception, 11 U.S.C. 552(b) |
| 14 | 54, 68 | PPAS and Ark II | Avoidance, recovery and turnover of the $800,000 post-petition transfer pursuant to the *Personal Property Stipulation* |

The Court conducted a six-day bench trial between July 22, 2019 and August 14, 2019. At the conclusion of the trial, the Court dismissed the Trustee's claims for violation of the automatic stay (Count 9), equitable subordination against PPMG and Patriarch Partners (Count 3) and the actual fraudulent transfer claim against Ark II (Count 7). (ECF Doc. # 131.)

## DISCUSSION

### A. Jurisdiction

The Court has jurisdiction under 28 U.S.C. §§ 157 and 1334(b) and the *Amended Standing Order of Reference*, No. M 10-468, 12 Misc. 00032 (S.D.N.Y. Jan. 31, 2012).

A2769

Both sides consented to this Court's authority to enter a final judgment on any core claims but the Defendants did not similarly consent with regard to any non-core claims.[20]  (JPTO at pp. 5-6.)

The breach of fiduciary duty claim is non-core; it is related to the TransCare bankruptcy case but did not arise under the Bankruptcy Code or in this case.  The claim arose immediately prior to the filing of the chapter 7 petitions, is asserted under state law and seeks money damages to augment the Estate.  *See Iannacchino v. Ruzza* (*In re Iannacchino*), 15-cv-09408 (NSR), 2018 WL 1009279, at *3 (S.D.N.Y. Feb. 20, 2018); *Wechsler v. Squadron, Ellenoff, Plesent, & Sheinfeld LLP*, 201 B.R. 635, 639 (S.D.N.Y. 1996); *see Pension Fin. Servs., Inc. v. O'Connell* (*In re Arbco Capital Mgmt.*), 479 B.R. 254, 266 (S.D.N.Y. 2012) (concluding that claims for breach of fiduciary duty and negligence "involve non-core proceedings and are indisputably private rights").  In addition, Tilton did not file a proof of claim.  Accordingly, the Court proposes findings and conclusions and does not make findings and conclusions with respect to the breach of fiduciary duty claim against Tilton.  *See* 28 U.S.C. § 157(c)(1).  The remaining claims are core and the Court makes findings and conclusions with respect to those claims.

---

[20]    The Trustee contended in the JPTO that the Defendants waived any objections to the Court's authority to enter a final order on all claims, based apparently on their failure to comply with Federal Bankruptcy Rule 7012(b)'s requirement to state whether the answering defendant consents to the entry of final orders by the bankruptcy court. (*See* JPTO at pp. 5-6.)  The Defendants' original answer omitted the required allegation but their Amended Answer (p. 23) stated that "[t]o the extent the Trustee's claims are non-core, Defendants do not consent to the entry of final orders or judgment by the Bankruptcy Court with respect to such non-core claim or claims." (ECF Doc. # 84.)  The Trustee did not repeat or brief his waiver argument in his post-trial submissions, and I deem it abandoned.  In any case, the Defendants' Amended Answer preserved the Defendants' position.

A2770

## B.    Count 1:  Breach of Fiduciary Duty Against Tilton

Count 1 alleges that Tilton breached her fiduciary duties of loyalty and good faith (but not her duty of care).  The Trustee's breach of fiduciary duty claim consists of two components:  (1) the failure to maximize the value of TransCare beginning in December 2015 when Tilton decided to sell the company and (2) the formulation and execution of the Tilton Plan that culminated in the strict foreclosure by PPAS on most of TransCare's personal property and the sale of TransCare's more profitable assets and attendant operations to Transcendence.  The Debtors were incorporated under Delaware law and claims for breach of fiduciary duty are governed by Delaware law under the internal affairs doctrine.  *Hausman v. Buckley*, 299 F.2d 696, 703 (2d Cir.), *cert. denied*, 369 U.S. 885 (1962); *Official Comm. of Unsecured Creditors of Hydrogen, L.L.C. v. Blomen* (*In re Hydrogen, L.L.C.*), 431 B.R. 337, 346–47 (Bankr. S.D.N.Y. 2010).

Tilton, as the sole director of TransCare, owed fiduciary duties of loyalty as well as the duty of care to TransCare and its shareholders.  *N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla*, 930 A.2d 92, 99 (Del. 2007); *Guth v. Loft*, 5 A.2d 503, 510 (Del. 1939).  The duty of loyalty is violated where a "fiduciary intentionally acts with a purpose other than that of advancing the best interests of the corporation."  *Brehm v. Eisner* (*In re Walt Disney Co. Derivative Litig.*), 906 A.2d 27, 67 (Del. 2006) ("*Walt Disney II*") (quoting *In re Walt Disney Co. Derivative Litig.*, 907 A.2d 693, 755 (Del. Ch. 2005)); *accord In re Orchard Enters., Inc. Stockholder Litig.*, 88 A.3d 1, 33 (Del. Ch. 2014).  This includes circumstances where there is "a financial or other cognizable fiduciary conflict of interest," or "where the fiduciary fails to act in good faith."  *Stone v. Ritter*, 911 A.2d 362, 370 (Del. 2006).  The requirement to act in good

41

faith is "a subsidiary element, *i.e.*, a condition, of the fundamental duty of loyalty." *In re Orchard Enters.*, 88 A.3d at 32–33 (quoting *Stone v. Ritter*, 911 A.2d at 370). An officer or director "cannot act loyally towards the corporation unless she acts in the good faith belief that her actions are in the corporation's best interest." *Stone v. Ritter*, 911 A.2d at 370 (quoting *Guttman v. Huang*, 823 A.2d 492, 506 n. 34 (Del. Ch. 2003)).

Although the business judgment rule protects directors through the presumption that "the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company," *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984), *overruled in part on other grounds by Brehm v. Eisner*, 746 A.2d 244, 253-54 (Del. 2000), a director who "stands on both sides of a transaction . . . has the burden of establishing its entire fairness, sufficient to pass the test of careful scrutiny by the courts." *Weinberger v. UOP, Inc.*, 457 A.2d 701, 710 (Del. 1983); *accord Pereira v. Cogan*, 267 B.R. 500, 508 (S.D.N.Y. 2001) ("When a controlling shareholder or other insider engages in a self-dealing transaction that is not approved by an independent board (acting in accordance with certain standards), the transaction is unlawful unless the proponent thereof carries his burden of justifying it under the Delaware 'entire fairness' doctrine."); *Kahn v. Lynch Commc'n Sys., Inc.*, 638 A.2d 1110, 1117 (Del. 1994). Here, the parties agree that entire fairness is the proper standard of review for the strict foreclosure and sale transaction (*i.e.*, the execution of the Tilton Plan) on February 24, 2016, and Tilton bears the burden of proving entire fairness. (*Plaintiff's Proposed Findings of Fact and Conclusions of Law*, dated Sept. 18, 2019 ("*PPFC*") at ¶¶ 274-75 (ECF Doc. # 134); *DPFC* at ¶ 358.) They disagree, however, on whether entire fairness standard applies to the claim that Tilton failed to maximize

42

the value of TransCare once she decided to sell the entire company and before she switched to the Tilton Plan.

I conclude that the entire fairness standard does not apply to the period before Tilton pursued the Tilton Plan. As a result, the Trustee failed to overcome the business judgment rule and carry his burden of proving that Tilton failed to maximize the value of the entire TransCare. In mid-December 2015, Tilton determined that TransCare should be sold but also determined that it was not primed for a sale given its financial condition. She retained Carl Marks as TransCare's financial advisor and CFO and considered Carl Marks's conclusions and recommendations. By February 5, after having explored and evaluated a potential sale process, Tilton determined based on Carl Marks's work that a sale of the entire TransCare was not feasible, due in large part to the rapidly deteriorating condition of the company and the need for an immediate infusion of a substantial amount of cash that was not readily available. Although Wells Fargo had indicated a willingness to fund a wind down of the entire company, it conditioned its willingness on Tilton's partial funding on a subordinated basis. She was under no obligation to fund TransCare personally. The Trustee offered no evidence that her decision was tainted by any conflict or self-interest or that her actions or decisions were dictated by the goal to acquire the entire company or any part of it for her own benefit. Rather, she made a good faith determination that the company as a whole was not saleable.

The Trustee argues, quoting *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.*, 506 A.2d 173 (Del. 1986), that once Tilton decided no later than December 15, 2015, that TransCare would have to be put up for sale, "[t]he duty of the board had thus

changed from the preservation of [the company] as a corporate entity to the

maximization of the company's value at a sale for the stockholders' benefit. . . . The

directors' role changed from defenders of the corporate bastion to auctioneers charged

with getting the best price for the stockholders at a sale of the company." *Id.* at 182. In

*Revlon*, a complex case involving a hostile takeover, the Revlon board had adopted anti-

takeover measures that benefitted noteholders at the expense of the company's

shareholders. The Delaware Supreme Court noted, at one point in the decision, that the

directors had breached their duty of loyalty because the benefit of the anti-takeover

measures inured principally to the directors by avoiding their personal liability to a

group of noteholders. "[W]hen a board ends an intense bidding contest on an

insubstantial basis, and where a significant by-product of that action is to protect the

directors against a perceived threat of personal liability for consequences stemming

from the adoption of previous defensive measures, the action cannot withstand the

enhanced scrutiny which *Unocal* requires of director conduct." *Id.* at 184 (citing *Unocal*

*Corp. v. Mesa Petroleum Co.*, 493 A.2d 946, 954-55 (Del. 1985)). In the end, however,

the Supreme Court concluded that the Board's actions violated the duty of *care*:

> [I]n granting an asset option lock-up to Forstmann, we must conclude that
> under all the circumstances the directors allowed considerations other
> than the maximization of shareholder profit to affect their judgment, and
> followed a course that ended the auction for Revlon, absent court
> intervention, to the ultimate detriment of its shareholders. No such
> defensive measure can be sustained when it represents a breach of the
> directors' fundamental duty of care.

*Id.* at 185.

*Revlon* is distinguishable. At most, Tilton arguably mismanaged the initial

process of maximizing TransCare's assets by failing to retain a financial advisor in

A2774

December and instead, concluding that it was premature to do so or engage in any sale efforts until TransCare was stabilized. But this was, at worst, a violation of her duty of care, a claim that the Trustee has not asserted. As noted, the Trustee offered no proof that her efforts to maximize the value of the entire company were tainted by conflict or self-interest.

Accordingly, I turn to consideration of the Tilton Plan and whether Tilton has demonstrated its entire fairness. The Tilton Plan involved splitting TransCare into OldCo and NewCo. First, OldCo would be wound down in one of two ways: (i) outside of bankruptcy over ninety days followed by chapter 7 or (ii) through a chapter 11. Second, PPAS would foreclose on the Subject Collateral and sell it to NewCo which would continue to operate as a going concern. The foreclosure and sale to NewCo was the problem.

### 1. Entire Fairness Review

"The 'entire fairness' standard is Delaware's most onerous standard and requires that the defendant prove that the transaction was the product of both fair dealing and fair price." *Burtch v. Opus, LLC* (*In re Opus E., LLC*), 528 B.R. 30, 66 (Bankr. D. Del. 2015), *aff'd*, No. 15-346-RGA, 2016 WL 1298965 (D. Del. Mar. 31, 2016), *aff'd*, 698 F. App'x 711 (3d Cir. 2017). "Not even an honest belief that the transaction was entirely fair will be sufficient to establish entire fairness. Rather, the transaction itself must be objectively fair, independent of the board's beliefs." *Reis v. Hazelett Strip-Casting Corp.*, 28 A.3d 442, 459 (Del. Ch. 2011) (quoting *Gesoff v. IIC Indus., Inc.*, 902 A.2d 1130, 1145 (Del. Ch. 2006)). While fair dealing and fair price are both elements of entire fairness, courts look at the entirety of the transaction in determining fairness. *See*

45

*Weinberger*, 457 A.2d at 711; *William Penn P'ship v. Saliba*, 13 A.3d 749, 757 (Del. 2011) ("While fair dealing and fair price are distinct concepts, the burden to establish them is not bifurcated. Rather, this Court must evaluate a transaction as a whole to determine if the interested party has met his burden of establishing entire fairness.").

### a. Fair Dealing

Fair dealing "embraces questions of when the transaction was timed, how it was initiated, structured, negotiated, disclosed to the directors, and how the approvals of the directors and the stockholders were obtained." *Weinberger*, 457 A.2d at 711. Courts routinely analyze the relevant factors enumerated in *Weinberger* in assessing whether a majority shareholder or other insider met her burden of proving that a transaction was the product of fair dealing. *See Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1156, 1172-77 (Del. 1995) (applying the *Weinberger* factors in assessing the fair dealing element of entire fairness); *Bomarko, Inc. v. Int'l Telecharge, Inc.*, 794 A.2d 1161, 1181 (Del. Ch. 1999), *as revised* (Nov. 16, 1999) ("*Bomarko I*") ("My analysis of the factors articulated in *Weinberger* also supports a finding of unfair dealing."), *aff'd*, 766 A.2d 437 (Del. 2000).

The cornerstone of fair dealing is a process implemented by the board that reflects arm's length bargaining and provides protections for the interests of all shareholders. *See FrontFour Capital Grp. LLC v. Taube*, C.A. No. 2019-0100-KSJM, 2019 WL 1313408, at *26 (Del Ch. Mar. 11, 2019), as revised (Mar. 22, 2019) (holding that the defendants failed to prove fair dealing where "the timing, structure, initiation, and negotiation of the Proposed Transactions were conceived for the purpose of—and did—advance the [defendants'] interest at the expense of Medley Capital's other

stockholders."); *Reis v. Hazelett Strip-Casting Corp.*, 28 A.3d at 464 ("There was no dealing in this case that could be called 'fair.' Procedural protections were not implemented, and no one bargained for the minority."); *Strassburger v. Earley*, 752 A.2d 557, 576–77 (Del. Ch. 2000), as revised (Jan. 27, 2000) ("[T]here was no fair dealing, because there was no advocate committed to protect the minority's interests, and because the players were either indifferent, or had objectives adverse, to those interests."). Such procedures generally include an independent special committee formed to assess and negotiate the transaction; however, where there is no independent committee, fairness "'can be equated to conduct by a theoretical, wholly independent, board of directors.'" *Pereira v. Cogan*, 267 B.R. at 509 (*quoting Weinberger*, 457 A.2d at 709-10 n. 7). However, "'such frail support as the defendants' own evaluation of their innocence of wrongdoing and on the fairness of [the transaction]'" is insufficient to prove fair dealing. *Id.* (*quoting Merritt v. Colonial Foods, Inc.*, 505 A.2d 757, 765 (Del. Ch. 1986)).

Admittedly, TransCare was rapidly declining and time was running out. Nevertheless, while the viability of the corporation may properly factor into a board's decision to sell substantially all of a corporation's assets, the directors must still follow a fair process in doing so. *See Pereira v. Cogan*, 267 B.R. at 511 ("Self-dealing transactions are improper regardless of whether or not the corporation is solvent.").[21] Whether a board explored alternatives to the challenged transaction, such as reaching

---

[21]     The Defendants rely on *In re Trados Inc. S'holder Litig.*, 73 A.3d 17 (Del. Ch. 2013) for the proposition that the Court should look beyond the procedural deficiencies in the process here because TransCare faced liquidation; however, the court in that case found that the defendants had failed to establish fair dealing where "there was no contemporaneous evidence suggesting that the directors set out to deal with the common stockholders in a procedurally fair manner." *Id.* at 56.

A2777

out to potential buyers, is relevant evidence of fair dealing. *See Gesoff v. IIC Indus.*, 902 A.2d at 1148–49 (noting the defendants may have been able to prove fair dealing if they had sought "alternative, third-party buyers for the company, for example . . . ."); *In re Cysive, Inc. S'holders Litig.*, 836 A.2d 531, 553 (Del. Ch. 2003) (holding that the defendants met their burden of proving fair dealing where, among other things, "the decision to enter into the Snowbird Agreement was preceded by an active and aggressive search for a third-party buyer."). Fiduciaries are liable when they tilt the playing field such that the only possible solution is a self-dealing transaction. *See Basho Techs. Holdco B, LLC v. Georgetown Basho Inv'rs, LLC*, No. CV 11802-VCL, 2018 WL 3326693, at *29 (Del. Ch. July 6, 2018) (fiduciary maneuvered the company into "the position of being the sole life line of the Company for money" by blocking alternative transactions), *aff'd sub nom.*, *Davenport v. Basho Techs. Holdco B, LLC*, 221 A.3d 100 (Del. 2019); *In re Rural Metro Corp. Stockholders Litig.*, 88 A.3d 54, 101 (Del. Ch.) ("RBC's self-interested manipulations caused the [sale] process to unfold differently than it otherwise would have."), *appeal dismissed*, 105 A.3d 990 (Del. 2014); *In re Del Monte Foods Co. S'holders Litig.*, 25 A.3d 813, 833 (Del. Ch. 2011) ("But for Barclays' manipulations, the [sale] process would have played out differently."); *Bomarko I*, 794 A.2d at 1184-85 (director's interference with company's attempts to obtain outside funding was not fair dealing).

There was nothing fair about the process through which Tilton effectuated the part of the Tilton Plan that involved the strict foreclosure and the sale to Transcendence. Acting through her affiliates, she foreclosed on the Subject Collateral, consented to the strict foreclosure, sold the foreclosed assets to herself and fixed the sale price. Tilton

48

stood on every side of the transaction and controlled every aspect of the transaction with neither negotiation nor oversight nor approval by an unconflicted person. Tilton did not retain a financial advisor to seek out possible third-party interest in purchasing the assets or investing in TransCare. She did not consider the possibility of placing the NewCo predecessor entities into a chapter 11, or negotiating with Wells Fargo for debtor-in-possession financing for the viable NewCo as opposed to the liquidating OldCo, nor did she entertain the thought of selling the NewCo assets to a third party free and clear of liens claims and interests, with or without Wells Fargo's and PPAS's consent, pursuant to Bankruptcy Code § 363, a common practice. Moreover, she did not even pick up the phone and call any of the ambulance or other companies that had been expressing interest in acquiring TransCare since the previous July.

Instead, she made the determination that no one other than herself would lend to NewCo or buy its assets even though she viewed NewCo as such a good business venture that she was willing to loan up to $10 million of her own money. (JX 80 at 92228; Tr. 8/13 A.M. 38:5–39:13, 44:5-10.) Tilton's willingness to acquire the assets and invest $10 million of her own money through Ark Angels III is the best evidence that Transcendence had substantial value. *Gentile v. Rossette*, C.A. No. 20213–VCN, 2010 WL 2171613, at *10 (Del. Ch. May 28, 2010) (defendant's "persistent willingness—even though admittedly marked at times by grave doubts—to pour his ultimately limited resources into the Company" was the most persuasive evidence of the company's value, notwithstanding his trial testimony that "the Company was worthless and on a path to oblivion."); *see also In re Appraisal of Dole Food Co., Inc.*, 114 A.3d 541, 557-58 (Del. Ch. 2014) ("[S]elf-interest concentrates the mind, and people who must back their

beliefs with their purses are more likely to assess the value of the judgment accurately than are people who simply seek to make an argument.") (quoting *In re Cent. Ice Cream Co.*, 836 F.2d 1068, 1072 n. 3 (7th Cir. 1987)).  In the end, she owned the same approximate amount of equity in Transcendence that she did in TransCare[22] unencumbered, however, by PPAS's foreclosed lien and TransCare's unsecured debt.[23]

### b.     Fair Price

Fair price "relates to the economic and financial considerations of the proposed merger, including all relevant factors: assets, market value, earnings, future prospects, and any other elements that affect the intrinsic or inherent value of a company's stock." *Weinberger*, 457 A.2d at 711.  The fair price analysis "is not itself a remedial calculation" but a determination of whether the price "fell within a range of fairness." *Reis v. Hazelett Strip-Casting Corp.*, 28 A.3d at 465; *see also Basho*, 2018 WL 3326693 at *36 ("For purposes of determining fairness, as opposed to crafting a remedy, the court's task is not to pick a single number, but to determine whether the transaction price falls within a range of fairness.") (internal citation and quotation marks omitted).  In determining whether a price was fair, courts consider "whether the transaction was one 'that a reasonable seller, under all of the circumstances, would regard as within a range of fair value; one that such a seller could reasonably accept.'" *In re Dole Food Co., Inc. Stockholder Litig.*, No. CV 8703-VCL, 2015 WL 5052214, at *33 (Del. Ch. Aug. 27, 2015)

---

[22]     Ark II was to own 54.7% of Transcendence Transit with the balance of the equity allocated to the Term Loan Lenders.  In fact, no shares were ever issued to anyone. (Tr. 7/23 P.M. 23:17—24:16.)  Nor is there any evidence that Transcendence paid $10 million for the Subject Collateral or that the supposed proceeds of the sale to Transcendence were distributed to the Term Loan Lenders.

[23]     It is far from clear whether the foreclosure cut off Wells Fargo's subordinate lien in the personalty.  However, Wells Fargo satisfied its claim through a combination of the post-petition collection of the accounts receivable and the proceeds of the sale of the CONs by the Trustee.  (*See* Tr. 7/24 159:11-24.)

A2780

(*quoting Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1134, 1143 (Del. Ch. 1994), *aff'd*, 663 A.2d 1156 (Del. 1995)).

"Merely showing that the sale price was in the range of fairness, however, does not necessarily satisfy the entire fairness burden when fiduciaries stand on both sides of a transaction and manipulate the sales process." *William Penn*, 13 A.3d at 758 (internal citation omitted). Where the fair dealing element of entire fairness reveals a process infected by the actions of directors, the defendant may be unable to show that any price was entirely fair. *See id.* ("The [defendants'] self interest in the transaction and their domination of the sales process tainted the entire transaction."); *Kahn v. Tremont Corp.*, 694 A.2d 422, 432 (Del. 1997) ("But here, the process is so intertwined with price that under *Weinberger's* unitary standard a finding that the price negotiated by the Special Committee might have been fair does not save the result."); *Reis v. Hazelett Strip-Casting Corp.*, 28 A.3d at 467 ("A strong record of fair dealing can influence the fair price inquiry, reinforcing the unitary nature of the entire fairness test. The converse is equally true: process can infect price."). In such a situation, the defendant fails to meet its burden of proving a price was fair without the need for assessing whether that price fell within a hypothetical range of fairness. *See Gesoff v. IIC Indus.*, 902 A.2d at 1154 (defendants failed to show that the tender offer price of $10.50 per share was fair in light of the dishonest process); *Bomarko I*, 794 A.2d at 1183 (defendants failed to carry their burden of proving $0.30 per share was a fair price where "the unfairness of the process also infects the fairness of the price.").

Given the tainted process and the complete absence of an independent analysis, review or approval, Tilton did not carry her burden of showing that the price was fair.

In addition, her attempts to justify the $10 million foreclosure credit showed that it was not. At trial, she testified that in deriving the $10 million credit she began with TransCare's "December ['15] closing balance sheet." (Tr. 8/13 P.M. 104:23–105:12; *see* PX 286 at 105523.) She had originally contemplated that NewCo would operate five divisions in addition to the MTA Contract: (Hudson Valley, Westchester, Pennsylvania, Maryland, and Bronx 911/Montefiore 911), and the combined balance sheet consisted of a December 2015 closing balance sheet and going-forward projections for these five divisions. (PX 286 at 105524; Tr. 8/13 P.M. 104:23–105:5.) Tilton's calculation of book value of the assets of these five divisions included the accounts receivable which, at the time, she assumed she would purchase from Wells Fargo and contribute to Transcendence. (PX 286 at 105524; Tr. 8/13 P.M. 107:19–108:3.) The sum of these asset values totaled $9,996,000.60, which Tilton rounded up to $10 million. (PX 286 at 105524; Tr. 8/13 P.M. 106:3–7.) Tilton did not ultimately purchase the receivables from Wells Fargo. (Tr. 8/13 P.M. 108:4–9.) By removing the receivables from the equation, her calculation would have been reduced from $10 million to approximately $1.7 million. (Tr. 8/13 P.M. 108:11–16.)

On February 22, 2016, Vikram Agrawal, a credit officer with Patriarch Partners (Tr. 8/13 P.M. 121:8–10), emailed Tilton an updated version of the NewCo model (the "February 22 NewCo Model"). (DX 166.) The February 22 NewCo Model consisted of the paratransit business and three divisions (Hudson Valley, Paratransit and Pennsylvania) rather than the five in the earlier model. (Tr. 8/13 P.M. 122:19–21.) The combined balance sheet for the three divisions, (DX 166 at 110489), using the same assets as the previous model, totaled $6.244 million and included $5.2 million in

52

receivables that were never transferred to NewCo. If the receivables were excluded, the book value of the Subject Collateral, at least according to Tilton, would have been less than $1 million. (Tr. 8/13 P.M. at 124:12–15.)

There were patent errors in the calculation of the $10 million credit. First, the Subject Collateral on which PPAS foreclosed and sold to Transcendence was not limited to the three TransCare divisions that Transcendence would operate. With some exceptions, notably the Accounts and the CONS, the Subject Collateral included all of the personal property owned by all fourteen Debtors. (*See* JX 96.) Using the book value for just the three Debtors destined for Transcendence undervalued the Subject Collateral. The 13-week wind down plan valued OldCo's plant, property and equipment ("PPE") at approximately $3.6 million, and this did not account for the wind down value of the PPE owned by Maryland, Westchester and Bronx 911/Montefiore 911. At the time of the wind down projections, these operations were slated for assumption by NewCo, not OldCo. In addition, Tilton did not ascribe any value to the CONs owned by TC Hudson Valley or TC Ambulance Corp. Although PPAS did not foreclose on the CONs, it foreclosed on the stock of these two entities and transferred the stock to Transcendence. The CONs they owned allowed them to operate their ambulances and increased the value of their stock. The Trustee sold the two CONs for the aggregate sum of $3.2 million at a *liquidation* sale after they filed for bankruptcy. Thus, Tilton's valuation of the Subject Collateral ignored almost $7 million of book value.

Second, the use of book value to value the assets of the three divisions that Transcendence planned to operate undervalued those assets. "[B]ook values are not ordinarily an accurate reflection of the market value of an asset." *Lawson v. Ford*

A2783

*Motor Co.* (*In re Roblin Indus., Inc.*), 78 F.3d 30, 36 (2d Cir. 1996); *accord In re Breitburn Energy Partners LP*, 582 B.R. 321, 344 (Bankr. S.D.N.Y. 2018). "Book value can be an appropriate valuation method for a business that derives significant value from its physical assets," but "tends to undervalue a business as a going concern because it does not fully account for intangible value attributable to the operations." *Reis v. Hazelett Strip-Casting Corp.*, 28 A.3d at 476. Book value may have been an appropriate method of valuing the Subject Collateral owned by the Initial Debtors that were liquidating, but the strict foreclosure contemplated the continuation of the three TransCare divisions as a going concern operating through Transcendence.

Third, Tilton did not attribute any value to the MTA Contract, although it was to be the crown jewel of Transcendence. Greenberg had attributed $25 million in annual revenues to the MTA Contract. Tilton contends that the $22 million she attributed to the value of Transcendence reflected the value of the MTA Contract, (*DPFC* at ¶ 393 n. 22), but this explanation does not withstand scrutiny. The $22 million figure was an arbitrary amount based on (1) the $10 million of value attributed to the Subject Collateral, (2) the loan up to $10 million Tilton was willing make through Ark Angels III and (3) the approximate $2 million representing prepaid insurance and the cost of two ambulances funded by PPAS and/or Ark II. (*DPFC* at ¶¶ 209-12; PX 209.)

Accordingly, the Court finds that Tilton failed to sustain her burden of proving the entire fairness in connection with the formulation and execution of the part of the Tilton Plan involving the strict foreclosure and sale to Transcendence and breached her fiduciary duties of loyalty and good faith owed to TransCare.

## 2. Damages

"Delaware law dictates that the scope of recovery for a breach of the duty of loyalty is not to be determined narrowly . . . . The strict imposition of penalties under Delaware law are designed to discourage disloyalty." *Thorpe by Castleman v. CERBCO, Inc.*, 676 A.2d 436, 445 (Del. 1996). In the appraisal context, the damages remedy would equal the fair value as determined by the Court; however, "[u]nder the entire fairness test, the fair price measure would operate as an aspect of the standard review; it would not inherently require a damages award in that amount." *In re Orchard Enters.*, 88 A.3d at 43; *see Reis v. Hazelett Strip-Casting Corp.*, 28 A.3d at 468 (noting that courts collapse the fair price and damages calculation in the context of an appraisal action but not in an entire fairness review); *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 371 (Del. 1993), as revised (Nov. 1, 1993) ("[W]e emphasize that the measure of any recoverable loss by [the plaintiff] under an entire fairness standard of review is not necessarily limited to the difference between the price offered and the 'true' value as determined under appraisal proceedings."), *modified in part on other grounds*, 636 A.2d 956 (Del. 1994).

Instead, the Court has broad power to fashion "equitable and monetary relief under the entire fairness standard as may be appropriate, including rescissory damages." *Int'l Telecharge, Inc. v. Bomarko, Inc.*, 766 A.2d 437, 440 (Del. 2000) ("*Bomarko II*") (affirming a grant of rescissory damages based on the estimated value of the plaintiffs' shares at the time of the challenged merger if the defendant had not breached his fiduciary duties). A court "has greater discretion when fashioning an award of damages in an action for a breach of the duty of loyalty than it would when

55

assessing fair value in an appraisal action." *Bomarko II*, 766 A.2d at 441. That is so because "[t]he strict imposition of penalties under Delaware law are designed to discourage disloyalty," *Boyer v. Wilmington Materials, Inc.*, 754 A.2d 881, 906 (Del. Ch. 1999), and the award of damages is not merely compensatory but "should eliminate the possibility of profit flowing to defendants from the breach of the fiduciary relationship." *Bomarko II*, 766 A.2d at 441. "An action for breach of fiduciary duty is a prophylactic rule intended to remove all incentive to breach—not simply to compensate for damages in the event of a breach." *LNC Invs., Inc. v. First Fid. Bank, N.A. N.J.*, 173 F.3d 454, 465 (2d Cir. 1999) (quoting *ABKCO Music, Inc. v. Harrisongs Music, Ltd.*, 722 F.2d 988, 955-96 (2d Cir. 1983)).

Where fiduciaries acquire property through self-dealing, and "through a combination of the taking and their subsequent use of the property, destroy[] its value entirely[,]" they are liable for the value the property would have had absent the breach of loyalty, not just its value immediately before the breach:

> The award differs from the usual concept of rescissory damages. Traditionally in Delaware, rescissory damages could come into play when a defendant fiduciary wrongfully took control of property, and the value of the property went up during the period of the fiduciary's control. In that setting, the law does not limit the plaintiff beneficiary to the value of the property at the time of the taking, plus an award of interest. The plaintiff beneficiary is entitled to recover the property itself or a measure of its full value. In this case, the plaintiffs have invoked the reciprocal of these principles. The defendant fiduciaries wrongfully took control of the property and, through a combination of the taking and their subsequent use of the property, destroyed its value entirely. In both settings, the same overarching principle governs: The disloyal fiduciary who wrongfully takes property from the beneficiary is liable for changes in value while the wrongfully taken property is under the disloyal fiduciary's control.

*Basho*, 2018 WL 3326693, at *50.

56

The plaintiff alleging a breach of fiduciary duty bears the burden of proving its damages by a preponderance of the evidence. *See Official Comm. of Unsecured Creditors of HH Liquidation, LLC v. Comvest Grp. Holdings, LLC* (*In re HH Liquidation, LLC*), 590 B.R. 211, 273 (Bankr. D. Del. 2018) (citing *Beard Research, Inc. v. Kates*, 8 A.3d 573, 613 (Del. Ch. 2010)). In determining the amount of damages for a breach of fiduciary duty, "responsible estimates that lack mathematical certainty are permissible so long as the court has a basis to make a responsible estimate of damages" and any "uncertainties in awarding damages are generally resolved against the wrongdoer." *Basho*, 2018 WL 3326693, at *50 (internal citation and quotation marks omitted); *Beard Research*, 8 A.3d at 613. However, proof of such damages must be based on more than "mere speculation or conjecture." *In re HH Liquidation, LLC*, 590 B.R. at 273. Within these boundaries, the Court may take "a more liberal approach . . . [that includes] proof of value by any techniques or methods which are generally considered acceptable in the financial community and otherwise admissible in court." *Weinberger*, 457 A.2d at 713. Delaware law affords great weight to contemporaneous management projections in determining value, when available. *See, e.g.*, *Del. Open MRI Radiology Assocs. v. Kessler*, 898 A.2d 290, 332 n. 108 (Del. Ch. 2006) ("Delaware law clearly prefers valuations based on contemporaneously prepared management projections because management ordinarily has the best first-hand knowledge of a company's operations.") (quoting *Doft & Co. v. Travelocity.com Inc.*, No. Civ. A. 19734, 2004 WL 1152338, at *5 (Del. Ch. May 20, 2004)); *Cede & Co. v. JRC Acquisition Corp.*, No. CIV. A. 18648-NC, 2004 WL 286963, at *2 (Del. Ch. Feb. 10, 2004) ("Expert

57

**A2787**

valuations that disregard contemporaneous management projections are sometimes completely discounted.").[24]

### a.    NewCo/Transcendence

Greenberg's projections provide the best evidence of the value that TransCare could have realized through an arms-length sale of NewCo. At the time he issued them, he, along with Pelissier, were essentially functioning as TransCare's senior management reporting directly to Tilton. On February 10, 2016, at inception of the Tilton Plan, Greenberg sent the insurance brokers financial information seeking coverage for Transcendence. (PX 196.) At that time, the plan provided for Transcendence to operate five TransCare divisions. Greenberg projected operating revenue in 2016 of $48,404,000 and EBITDA in the amount of $3,761,000. (PX 196 at 27760.) Tilton was

---

[24]    The Defendants cited *In re PetSmart, Inc.*, C.A. No. 10782–VCS, 2017 WL 2303599 (Del. Ch. May 26, 2017) for the contrary proposition that the Court should not credit management projections prepared outside of the ordinary course of business. (*DPFC* ¶ 411.) *PetSmart*, an appraisal case, concerned the application of a discounted cash flow analysis. The Court rejected five-year cash flow projections for four independent reasons: "(1) PetSmart management did not have a history of creating and, therefore, had virtually no experience with, long-term projections; (2) even management's short term projections frequently missed the mark; (3) the Management Projections were not created in the ordinary course of business but rather for use in the auction process; and (4) management engaged in the process of creating all of the auction-related projections in the midst of intense pressure from the Board to be aggressive, with the expectation that the projections would be discounted by potential bidders." *Id.* at *33. Three witnesses testified that the auction-projections "were designed to be aggressive because the Board [] [was] convinced that potential bidders would discount whatever projections were put in front of them." *Id.* at *34.

   Here, the evidence showed that Greenberg, an experienced financial analyst, prepared numerous projections as did Carl Marks, a financial consulting firm. Moreover, PPAS was involved with TransCare since 2003, and there was no evidence that any prior TransCare projections "frequently missed the mark." Next, the most relevant projections on or about February 24 were sent to an insurance broker to obtain coverage for Transcendence and the procurement of insurance was part of any ambulance company's ordinary course of business. Unlike *PetSmart*, the projections were not part of an auction process; Tilton had foreclosed the possibility of an auction. Finally, this is not an appraisal case; it is a breach of fiduciary duty case and the absence of any "better" financial information is ultimately attributable to Tilton, who exercised absolute control over TransCare.

even more optimistic. Two days later, she wrote to Bobby Siegel, an insurance broker

from whom she was seeking assistance to procure insurance for Transcendence:

> The models show that this business in 2016 would be approximately
> $67mm with $4mm of EBITDA and would grow with the additional transit
> business under the contract to $79mm and $7mm of EBITDA in 2017. It
> is because this new business makes sense that I would be providing all the
> new working capital for this business myself, personally.

(JX 80.)

On February 24, 2016, Greenberg sent another set of financial projections to

Todd Trent, an insurance broker. (PX 228.) By then, Transcendence was down to three

TransCare operating divisions. Greenberg projected operating revenue for

approximately ten months in 2016 (late February-December) in the amount of

$37,188,400 and EBITDA of $3,204,500 but Tilton testified that a full year projection

would result in $4 million of EBITDA.

The Trustee's damages expert, Jonathan Arnold, developed an appropriate

multiple of EBITDA to apply to Transcendence's projections to determine the projected

value of the Transcendence business, and hence, TransCare's damages resulting from

the stripping of that business through an unfair, tainted process. In December, Tilton

had asked Greenberg to identify comparable companies or transactions that could be

used to determine TransCare's sale value. As discussed earlier, he identified six

comparable transactions that occurred within the same sector as TransCare or related

sectors but only two had sufficient public information to calculate EBITDA multiples.

AMR (Envision) purchased Rural/Metro Corp. at a 10.7x multiple and KKR purchased

Air Medical at a 10.0x multiple. (JX 55.)

59

Greenberg also identified three "market comps" that "relate to public companies and where they're currently trading in terms of their valuation." (JX 55; Tr. 7/22 A.M. 48:3-5.) Based on Greenberg's analysis, Envision, traded at an 11.3x multiple, Air Methods at an 8.2x multiple and PHI at a 3.5x multiple, but Greenberg reported to Tilton that PHI was an outlier because it was engaged in other business lines that were only tangentially related to TransCare's business. (JX 55 at 41414; Tr. 7/22 A.M. 51:11-22.) In his cover email to Tilton, Greenberg stated that the average enterprise value to revenue multiple was 1.8x and the average enterprise value to LTM EBITDA was 10.1x. (JX 55 at 41410; Tr. 7/22 A.M. 52:2-11.)

Armed with Greenberg's analysis, Dr. Arnold utilized the Comparable Company and Precedent Transaction methods, two standard valuation methods, to determine the value of the entire TransCare company ("WholeCo") and NewCo. (PX 282 at ¶ 66.) He did not use a discounted cash flow approach because the data was unavailable. (Tr. 7/24 14:5–15:20.) TransCare had no audited financials for 2014 and was not current in its monthly unaudited financials. (Tr. 8/13 A.M. 52:3–53:1.) Thus, the only reliable data from which to determine the value of TransCare or its separate business lines were the models that Greenberg prepared. (Tr. 7/24 106:14–107:4.) *See, e.g., Bomarko I*, 794 A.2d at 1185 (finding the discounted cash flow methodology "too unreliable" when the expert had to extrapolate from management's one-year forecast).

The Comparable Company method determines the implied value of a company based on the trading prices of similar public companies. (PX 282 at ¶ 67.) Greenberg identified two reliable comparables that traded at multiples of between 8.2x and 11.3x LTM EBITDA. Dr. Arnold recalculated this range at between 7.1x and 12.2x EBITDA

60

apparently by adding the debt to the value of the common stock and subtracting cash. (Tr. 7/24 20:15-23.) Applying this range of multiples to NewCo's projected EBITDA of $3.2 million as of February 24, 2016 yielded an implied value of between $22.7 million and $39.1 million for NewCo. (PX 282 at ¶¶ 7, 80., Ex. 12a.)

The Precedent Transaction method implies a company's value based on the multiples paid in prior transactions. (PX 282 at ¶ 68.) Greenberg identified two reliable precedent transactions that sold at multiples of 10.0x and 10.7x EBITDA. Applying multiples to NewCo's projected EBITDA of $3.2 million as of February 24, 2016 yielded an implied value of between $32.0 million and $34.3 million for NewCo. (PX 282 at ¶¶ 7, 80, Ex. 12b.) The combination of these valuation methods yielded an average mean multiple of 10.1x EBITDA and an implied value of $32.3 million for NewCo as of February 24, 2016.[25]

The Defendants criticized Dr. Arnold's approach on several grounds relying on their own expert, Jeffrey Dunn. According to the Defendants, Dr. Arnold did not do any independent work and instead, relied exclusively on Greenberg's (and Carl Marks's) projections which were not appropriate for use in deciding value, (*DPFC* ¶¶ 287-302), he did not make his own assessment of risk which is required in determining value from projections of future performance or consider TransCare's historically declining performance, (*DPFC* ¶¶ 303-15), his (and Greenberg's) comparables were not

---

[25] Dr. Arnold also performed a separate analysis based on expressions of interest that TransCare had received from third parties prior to the strict foreclosure. (*See* PX 282, Ex. 12c.) As they were too indefinite and never reached the stage of an actual offer (primarily because Tilton never followed them up), I do not credit them.

comparable, (*DPFC* ¶¶ 316-28), and he failed to account for the capital needs of NewCo. (*DPFC* ¶¶ 329-31.)

During rebuttal testimony, Dr. Arnold explained that he had investigated certain of the criticisms involving his use of Envision and Air Methods as comparable companies. He looked for new guideline companies and created a larger database of a group of sixty-nine companies that he filtered down to a group of thirty-four, (Tr. 8/14 A.M. 48:4–24, 60:9–15, 64:21–65:1), which met his definition of being either smaller, distressed, low operating, or undercapitalized. (Tr. 8/14 A.M. 52:19–53:25.) He concluded that they confirmed Greenberg's analysis. (Tr. 8/14 A.M. 54:19–55:1.) The Defendants criticized the expanded set of comparables on the bases they were still not comparable and TransCare's financial condition was generally worse that the companies in any given subset. (*DPFC* ¶¶ 338-42.)

Despite their many criticisms, the Defendants did not offer their own analysis or suggest an alternative damage assessment. They did not identify companies that were more comparable; their expert did not identify a more appropriate EBITDA multiple; and Mr. Dunn did not make an adjustment based on his own, independent risk assessment. Indeed, there was little need for any risk adjustment. In Tilton's own words, she was funding Transcendence personally because it was smaller and less risky with good growth prospects. (JX 80.) Furthermore, if better financial information was unavailable, it is only because TransCare did not generate better financial information under Tilton's watch. Dr. Arnold was making his best estimate of TransCare's damages in light of the best available financial information — financial information that Tilton thought sufficiently credible to send to insurance brokers to procure insurance for

62

Transcendence and commit to invest up to $10 million of her own funds through Ark

Angels III.  Facing similar criticisms of the plaintiff's damage evidence in a case under

the Fair Labor Standards Act, District Judge Engelmayer observed:

> [S]trikingly, defendants, for their part, have not come forward with any alternative method for calculating damages.  Defendants' expert, Dr. Paul White, instead devotes his expert report to criticizing Dr. Crawford's methodology and his client's own Clubtrax data.  However, he makes no effort to make his own calculation for class-wide damages.  The fact that defendants have failed to offer an alternative, let alone a superior, methodology is a relevant consideration under *Mt. Clemens. . . .*  Here, defendants have failed to provide any good reason to discredit Dr. Crawford's estimate of damages as other than "just and reasonable."  On the contrary, the absence of any alternative methodology is a telling indication that defendants, in attacking Dr. Crawford's report, can do no more than spot imperfections that would exist in any damages methodology given the imperfect Clubtrax data.

*Hart v. Rick's Cabaret Int'l, Inc.*, 60 F. Supp. 3d 447, 467 (S.D.N.Y. 2014).

I accept Dr. Arnold's higher intermediate figure of 11x EBITDA in determining an

amount of damages that will compensate the Estate for the lost opportunity caused by

Tilton's breach of fiduciary duty.  The unfair process prevented the possibility of selling

NewCo to a strategic buyer.  A strategic buyer would not incur some of the projected

operating expenses or would incur them in a lower amount and would recalculate its

projected operating expenses and EBITDA accordingly.  *See, e.g.*, *Merrill Lynch Bus.*

*Fin. Servs., Inc. v. Am. Reprographics Co., LLC* (*In re Louis Frey Co., Inc.*), Adv. No.

03–91486 (SMB), 2006 WL 2090083, at *18-19 (Bankr. S.D.N.Y. July 28, 2006)

(backing out expenses that a strategic buyer would not incur when computing what it

would have paid for the debtor's business).  For example, the February 24 financial

information projected management and administrative staffing expenses in the sum of

$3,074,600 and professional fees of $145,000.  (PX 228 at 86223.)  A strategic buyer

A2793

already running an ambulance or similar business with an existing infrastructure would have its own management, administrative and legal staff in place and might not have to pay additional staff inherent in Greenberg's projections. In addition, Greenberg projected facility costs in the sum of $1,352,600, (PX 228 at 86223), but a strategic buyer would already have its own headquarters and garages, and while it might need additional garage space, it might not incur the incremental costs in the sum projected for Transcendence. Finally, Greenberg projected payments to OldCo under the proposed Transition Services Agreement in the approximate sum of $250,000. (PX 228 at 86223.) It is unlikely that a strategic buyer would ever pay OldCo anything. While Tilton would undoubtedly discount these savings as mere speculation, they are speculative only because Tilton never engaged in a fair process that might elicit interest from such buyers, particularly those who had reached out to TransCare during the preceding year. Using the higher multiple (11x EBITDA) for purposes of computing damages captures the lost opportunity that Tilton usurped.

In addition, the use of an EBITDA of $4 million to calculate damages is also supported by the evidence. On February 23 or 24, Greenberg computed a 2016 EBITDA of $3.2 million based on ten months and Tilton testified that it would increase to $4 million on an annualized basis. Moreover, her earlier email to Bobby Siegel, (JX 80), predicted that NewCo, as then conceived, would grow to $7 million the following calendar year. While Tilton contends that TransCare could not have sold the Subject Collateral without the secured parties' consent, at least outside of a bankruptcy sale under Bankruptcy Code § 363(f), she accomplished precisely that result by authorizing PPAS to foreclose and sell the assets to Transcendence without Credit Suisse's, and

64

apparently Wells Fargo's, consent.  Accordingly, the damages that the Debtors suffered

Tilton's breach of fiduciary duty totaled $44 million subject to certain adjustments.

The first adjustment relates to the working capital investment that a buyer might

have to make in NewCo.  The Executive Summary prepared by Carl Marks stated that

TransCare needed $7.2 million during the next three months, (PX 175 at O2115 (13 Week

Cash Forecast), O2116), and on February 13, 2016, Pelissier predicted that NewCo would

need an $8 million initial investment in working capital.  (PX 286 at 105517.)  At the

time, the Tilton Plan called for a Transcendence consisting of six TransCare divisions

rather than the three that Transcendence ultimately assumed.  A smaller NewCo would

presumably need less working capital but neither Greenberg nor Pelissier nor Carl

Marks computed that amount.

In addition, much of the funding was needed to pay TransCare's debts which a

third-party buyer would not pay.  For example, the thirteen-week forecast in the

Executive Summary budgeted $700,000 for past due payroll and $1.395 million for past

due payroll taxes.  (PX 175 at O2115-16.)  Carl Marks received a monthly fee of $135,000,

(DX 106 at 43440), and the thirteen-week cash flow forecast budgeted $405,000 to pay

Carl Marks.  Another large portion was attributable either to amounts past due to

vendors and landlords or ongoing payments on leases that a third-party buyer might not

need.

Finally, Greenberg's projections, (PX 228), showed positive net income without

any capital investment.  The cover email, (PX 228 at 86219), estimated that an

approximate $10 million revolver would ultimately be added to the *pro forma* financial

information, but some of it would be an unfunded revolver. In fact, Jonathan Killion of Carl Marks recalculated the necessary funding on February 10, 2016 at the inception of the Tilton Plan and estimated that Transcendence would need about $3.2 million in capital investment at a time when the plan involved five or six TransCare entities. (DX 132.)

At trial, the Court questioned Dr. Arnold as to whether it was appropriate to deduct required funding from the purchase price a third party would be willing to pay. I assumed that a third party would have to provide the same funding and would essentially treat it as part of the purchase price. (Tr. 8/14 A.M. 78:9-21.) Dr. Arnold responded that the situation posited would be the "worst case" scenario that did not apply for at least two reasons. First, every company has a recurring program for making capital expenditures and "I think its overstating it to subtract off the initial investment dollar for dollar. I think it's going to be some fraction of it." (Tr. 8/14 A.M. 79:5-10.) Second, Tilton was proposing to provide a revolving line of credit rather than invest capital. Under the circumstances, only a portion of the proposed revolver should be deducted from the purchase price:

> THE WITNESS: . . . . If it goes in as permanent capital then I would be much more open to just subtracting it off dollar for dollar. But if the idea that we're going to put it in, but in ten months the company is going to be generating four or five hundred thousand of EBITDA a month, in eleven months and that money can be returned its more in the form of a short to medium term loan which costs the shareholders some amount of money, but it's not a dollar for dollar dilution.

(Tr. 8/14 A.M. 79:15-22.)

Greenberg's February 24 financial *pro forma* projected an average monthly EBITDA of $400,000 during 2016, sufficient to fund operations and repay any advances

66

that Tilton might have made. Given Dr. Arnold's unrefuted testimony and the fact that a substantial portion of TransCare's financing needs according to the Executive Summary would be used to pay TransCare debts that a buyer would not pay or would pay in a lesser amount, the Court concludes that it is appropriate to deduct $1 million from the value of the NewCo assets foreclosed upon and sold to Transcendence.

### b. Post-Petition Liquidation

The next adjustment relates to the Trustee's liquidation of certain assets. The Trustee liquidated all of the assets pursuant to the *Personal Property Stipulation* for $19.2 million net of sale expenses. (PX 282, Ex. 13.) Of the $19.2 million, $11.7 million (net) was attributable to the CONs and another $5.6 million was attributable to the collection of accounts receivable. (PX 282, Ex. 13.) Neither the CONs nor the accounts receivable were included in the Subject Collateral and were not part of the Term Loan Priority Collateral. Only $2 million (net) was attributable to the sale of the physical assets, (*see* PX 282, Ex. 13), and the Trustee paid $800,000 of those proceeds to PPAS.[26] Accordingly, the value of the liquidation of the Subject Collateral to the Estate was only $1.2 million. This sum represents a reduction in the amount of damages that TransCare suffered as a result of the strict foreclosure.[27]

### c. $10 Million Credit

---

[26] PPAS transferred the $800,000 to Ark II presumably under the 2016 Intercreditor Agreement and Ark II credited that transfer on its proof of claim. As discussed in the succeeding text, PPAS was not entitled to receive any portion of its claim because its claim is disallowed. However, the Trustee abandoned the separate claim against PPAS to recover the $800,000.

[27] The Trustee would give Tilton credit for the full $5.7 million in proceeds derived from the liquidation of the NewCo assets. However, the collection of the accounts receivable and the sale of the CONs accounted for $5 million of that sum and the accounts receivable and CONs were not included in the strict foreclosure or sale to Transcendence.

A2797

PPAS gave TransCare a $10 million credit against the Term Loan as compensation for the foreclosure and reduced its proof of claim by $10 million. The question is whether the credit should also reduce the damage award against Tilton. I conclude that it should not. Instead, the effect of the Tilton Plan should be reversed and PPAS's claim should be increased by $10 million. The foreclosure and sale should not have unfolded as it did. By reversing the transaction and returning the parties to the *status quo*, the effect of Tilton's breach of fiduciary duty will be undone leaving the Debtors with a damage claim based on their ownership of a substantial asset that could have been sold to a third party. In addition, as discussed below, the PPAS claim will be disallowed and PPAS is not entitled to the $10 million distribution through an offset in connection with its disallowed claim.

### d. WARN Act Liability

The final element of damages claimed by the Trustee relates to the Debtors' potential WARN Act liability for failing to give adequate notice of mass layoffs to TransCare's employees.[28] The Trustee seeks a declaratory judgment that Tilton is responsible for indemnifying the Estate for the WARN Act liability because (i) TransCare had no such liability prior to Tilton's breach of loyalty and she must bear that liability in order to put TransCare back to where it was prior to the breach; (ii) the WARN Act liability was a natural and foreseeable consequence of Tilton's actions; and (iii) under Delaware law, a corporate officer or director who knowingly causes the

---

[28] The WARN Act claims are proceeding separately as a class action *See Ien v. TransCare Corp.* (*In re TransCare Corp.*), 611 B.R. 160 (Bankr. S.D.N.Y. 2020) ("*Ien I*") and *Ien v. TransCare Corp.* (*In re TransCare Corp.*), 614 B.R. 187 (Bankr. S.D.N.Y. 2020) ("*Ien II*"). Tilton is named as a defendant in that adversary proceeding on state wage law claims but not on the WARN Act claims.

68

corporation to violate the law necessarily fails to act in good faith and thereby breaches her fiduciary duty of loyalty. *Hazout v. Tsang Mun Ting*, 134 A.3d 274, 283 n. 20 (Del. 2016); *Desimone v. Barrows*, 924 A.2d 908, 934-35 (Del. Ch. 2007).

The requirements of the federal and New York State WARN Acts are discussed at length in *Ien I*. Basically, and with certain exceptions, an employer must give 60-days advance written notice under the federal WARN Act and 90-days advance written notice under the New York WARN Act prior to effecting a mass layoff. *Ien I*, 611 B.R. at 165-67. The plaintiff in *Ien I* moved for partial summary judgment contending that the WARN Act notices were deficient and, essentially, of no force or effect. The Trustee conceded the point and the Court struck the Trustee's WARN Act defenses that depended on the giving of sufficient notice. *Id.* at 168. The Tilton-affiliates that were defendants on the WARN Act claims contested the plaintiff's claim of insufficiency. The Court concluded as to those defendants that the February 24 Notice was insufficient under the WARN Acts and struck certain defenses. In contrast, the February 26 Notice given to the NewCo employees was sufficient. *Id.* at 168-69.[29]

According to the Trustee, Tilton purposely chose not to issue a WARN Act notice because she did not want TransCare's employees to look for new jobs. The claim is based on an email exchange that occurred on February 19, 2016. (JX 87.) At the time, Wells Fargo and Tilton were still discussing Wells Fargo's possible funding of a 90-day

---

[29]    In *Ien II*, the Court granted partial summary judgment in favor of several Tilton-affiliates on the WARN Act claims, and the only remaining non-Debtor defendant is Patriarch Partners. *See Ien II*, 614 B.R. at 208 (denying partial summary judgment in favor of Patriarch Partners on the "single employer" issue), 211 (denying partial summary judgment in favor of Patriarch Partners on the "unforeseeable business circumstances" defense).

A2799

wind down of OldCo. Daniel Fiorello, Esq., an attorney representing Wells Fargo, posed several questions to Lynn Harrison, III, Esq. and Cindi Giglio, Esq., the two attorneys with Curtis Mallet acting as TransCare's bankruptcy counsel. One of the questions Fiorello asked was, "Will the TransCare Warn Act notices go out of [sic] Monday, February 22nd?" (JX 87 at 47844.) The email was forwarded to Tilton who responded, "Notice cannot be given prior to a foreclosure on NEWCO or there will be no NEWCO." (JX 87 at 47843.) At trial, Tilton amplified her response: she "didn't want to tell the employees prior to the foreclosure because we didn't want to mass exodus." (Tr. 8/13 A.M. 68:7-13.)

Even if Patriarch Partners is liable for violating the WARN Acts, the evidence relied on by the Trustee does not support imposing an obligation on Tilton to indemnify the Estate on the theory that she caused those violations in bad faith. To establish bad faith, the Trustee had to demonstrate that Tilton's conduct in failing to provide WARN Act notice sooner was "qualitatively more culpable than gross negligence . . . ." *Walt Disney II*, 906 A.2d at 66; *see also id.* at 63 ("We perceive no substantive difference between the Court of Chancery's 2003 definition of bad faith—a 'conscious[ ] and intentional[ ] disregard[ ][of] responsibilities, adopting a "we don't care about the risks" attitude ...'—and its 2005 post-trial definition—an 'intentional dereliction of duty, a conscious disregard for one's responsibilities.'") (alterations in original).

The Tilton Plan contemplated that the foreclosure of the NewCo assets and the commencement of the wind down of the OldCo assets would occur at the same time. OldCo was to be wound down in chapter 11 over a period of ninety days and Tilton contemplated giving that amount of WARN Act notice to the OldCo employees. (DX 147

70

at 91631; Tr. 8/13 P.M. 91:25-92:14.) The proposed timing of the notice would have met the requirements under the WARN Act, and as of February 22, Wells Fargo and Tilton were still trying to set up a meeting to discuss the 13-week wind down. (JX 91 (email string).) At some point, between February 22 and February 24, the plan for an orderly 90-day wind down in chapter 11 broke down and switched to a liquidation in chapter 7 but the 90-day schedule remained in place.

It is true Tilton did not want to give the notice until the foreclosure was completed but she still subjectively believed that TransCare had adequate time to send the WARN Act notices. While Tilton has failed to justify the part of the Tilton Plan that involved the self-dealing transaction with NewCo's assets, the Trustee has failed to show that Tilton deliberately delayed the timing of the WARN Act notices because she did not care about the requirements of the WARN Act or that her actions were the product of calculated wrongdoing or intentional disregard of her responsibilities with TransCare.

To recapitulate, the Subject Collateral was worth $44 million, less the $1 million buyer capital investment, leaving $43 million as TransCare's damages for Tilton's breach of fiduciary duty at the time of the strict foreclosure. The Trustee liquidated the Subject Collateral for a net benefit to the Estate in the sum of $1.2 million, and the Estate's damages should be reduced by that amount. Consequently, Tilton's breach of her fiduciary duties of loyalty and good faith resulted in damages to TransCare in the sum of $41.8 million.

A2801

## C.     Count 7:  Fraudulent Transfer Against PPAS and Transcendence

### 1.     The Trustee's *Prima Facie* Case

Count 7 seeks to avoid the strict foreclosure as an actual fraudulent transfer under federal and New York state law, the latter made applicable through 11 U.S.C. § 544(b)(1), and recover the value of the transfer from PPAS and Transcendence under 11 U.S.C. § 550(a).  The Trustee also seeks his attorneys' fees pursuant to N.Y. Debtor & Creditor Law ("NYDCL") § 276-a.[30]  A conveyance or transfer is intentionally fraudulent under either NYDCL § 276 or 11 U.S.C. § 548(a)(1)(A) if the debtor made the transfer with the actual intent to hinder, delay or defraud a present or future creditor.[31]  The strict foreclosure effected a transfer of TransCare's property, *see* 11 U.S.C. § 101(54) (defining "transfer"), and the only question is whether the Trustee demonstrated TransCare's *scienter* through the imputation of Tilton's knowledge and intent.[32]

---

[30]     All references to the NYDCL refer to the version of the NYDCL in existence at the time of the transfer.  That version was repealed effective April 4, 2020 and replaced by the Uniform Voidable Transactions Act.  *See* 2019 N.Y. Sess. Laws Ch. 580 (A. 5622) (McKinney).

[31]     NYDCL § 276 provides:

> Every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors.

> Bankruptcy Code § 548(a)(1)(A) states that a trustee may avoid a transfer of an interest of the debtor in property or any obligation made or incurred by the debtor, whether voluntary or involuntary, within two years of the petition date if the debtor

>> made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted . . . .

[32]     Tilton effectuated the strict foreclosure on behalf of TransCare and PPAS, both of whom she controlled, and her knowledge and intent are imputed to these corporations.  *Kirschner v. Fitzsimons* (*In re Tribune Co. Fraudulent Conveyance Litig.*), No. 12-cv-2652 (RJS), 2017 WL 82391, at *5 (S.D.N.Y. Jan. 6, 2017) ("Because all corporations must act through agents, *see In re Parmalat Sec. Litig.*, 421 F. Supp. 2d 703, 715 (S.D.N.Y. 2006), courts assessing the intent of a corporation in a fraudulent conveyance claim will look to the intent of the corporate actors who effectuated the transaction on behalf of the corporation.").

A2802

The ancient phrase "'to hinder, delay, or defraud,' has always been in the disjunctive, and an intent to hinder or delay is adequate even if it be not an intent to defraud." *In re Condon*, 198 F. 947, 950 (S.D.N.Y. 1912), *aff'd*, 209 F. 800 (2d Cir. 1913). "A deliberate attempt to stave off creditors by putting property in such a form and place that creditors cannot reach it, even when the purpose of that action is not to defraud them of ultimate payment but only to obtain enough time to restore the debtor's affairs, comes within the meaning of 'hinder' and 'delay' as set forth in section 276 of the Debtor and Creditor Law." *Flushing Sav. Bank v. Parr*, 438 N.Y.S.2d 374, 376-77 (N.Y. App. Div.), *appeal dismissed*, 426 N.E.2d 752 (N.Y. 1981). If a transfer is actually fraudulent under New York law, it will likewise be actually fraudulent under Bankruptcy Code section 548(a)(1)(A). *Kramer v. Sooklall* (*In re Singh*), 434 B.R. 298, 311 n. 5 (Bankr. E.D.N.Y. 2010).

Except in Ponzi scheme cases, fraudulent intent is not presumed, *Weisfelner v. Hofmann* (*In re Lyondell Chem. Co.*), 554 B.R. 635, 650 (S.D.N.Y. 2016), and the plaintiff must prove it. A transferor rarely admits her own fraudulent intent. As a result, courts rely on "badges of fraud" to fill the void. *Sharp Int'l Corp. v. State St. Bank & Tr. Co.* (*In re Sharp Int'l Corp.*), 403 F.3d 43, 56 (2d Cir. 2005). These include the following:

(1) the lack or inadequacy of consideration;

(2) the family, friendship or close associate relationship between the parties;

(3) the retention of possession, benefit or use of the property in question;

(4) the financial condition of the party sought to be charged both before and after the transaction in question;

A2803

(5) the existence or cumulative effect of a pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; and

(6) the general chronology of the events and transactions under inquiry.

*Salomon v. Kaiser* (*In re Kaiser*), 722 F.2d 1574, 1582-83 (2d Cir. 1983); *accord Sharp Int'l Corp.*, 403 F.3d at 56; *Tribune Co. Fraudulent Conveyance Litig.*, 2017 WL 82391, at *13. Other indicia of fraud include "shifting of assets by the debtor to a corporation wholly controlled by him," *Kaiser*, 722 F.2d at 1583, and circumstances suggesting secrecy, haste or unusualness of the transaction. *HBE Leasing Corp. v. Frank*, 48 F.3d 623, 639 (2d Cir. 1995).

While the presence or absence of one badge of fraud is not conclusive, the presence of multiple indicia will increase the strength of the inference of fraudulent intent. *Tribune Co. Fraudulent Conveyance Litig.*, 2017 WL 82391, at *13. "In other words, while '[t]he presence of a single badge of fraud may spur mere suspicion, the confluence of several can constitute conclusive evidence of an actual intent to defraud, absent "significantly clear" evidence of a legitimate supervening purpose.'" *Id.* (quoting *Max Sugarman Funeral Home, Inc. v. A.D.B. Inv'rs*, 926 F.2d 1248, 1254−55 (1st Cir. 1991)); *accord Bear Stearns Sec. Corp. v. Gredd* (*In re Manhattan Inv. Fund Ltd.*), 397 B.R. 1, 10 n. 13 (S.D.N.Y. 2007) ("[T]he existence of several badges of fraud can constitute clear and convincing evidence of actual intent.") (quoting *Silverman v. Actrade Capital, Inc.* (*In re Actrade Fin. Techs. Ltd.*), 337 B.R. 791, 809 (Bankr. S.D.N.Y. 2005)).

Virtually all of the badges of fraud identified, *supra*, are present in this case providing strong circumstantial evidence of Tilton's fraudulent intent. Acting through

74

**A2804**

entities she controlled, she sold the Subject Collateral to herself at a price she picked. In addition, the strict foreclosure was outside of TransCare's ordinary course of business, the consideration PPAS credited to the transaction was inadequate for the reasons stated in connection with the breach of fiduciary duty claim and Tilton retained control of the transferred assets through her majority interest in and control of PPAS as the foreclosing party and thereafter through Transcendence as PPAS's buyer. In fact, she purported to own the same interest in Transcendence as in TransCare (no Transcendence stock was ever issued), but her interest in Transcendence was free and clear of the Term Loan Lenders' lien which had been eliminated through the foreclosure and sale and TransCare's unsecured debt.[33]

In addition, the entire transaction was conducted in haste and under a veil of secrecy. The Tilton Plan was conceived and executed in just fourteen days, delayed only by the time it took to procure insurance for Transcendence. Furthermore, the only TransCare personnel who were let in on the Tilton Plan were Glen Youngblood, who was to become president of Transcendence, and Peter Wolf, the TransCare COO who would be called upon to agree on TransCare's behalf to the terms of the strict foreclosure. (DX 174.) Although TransCare's counsel, Curtis Mallet, was retained to oversee OldCo's wind down, Stephen bypassed Curtis Mallet and sent the foreclosure documents, which included OldCo's assets, directly to Wolf, and Tilton did not forewarn Term Loan Lenders and shareholders Credit Suisse and First Dominion.

---

[33]    According to the January 7 Plan, TransCare owed approximately $12 million in accounts payable and additional accrued expenses of roughly $1.7 million. (JX67 at 106577.)

Accordingly, the numerous badges of fraud establish Tilton's fraudulent intent to delay and defraud TransCare's creditors and she has not pointed to "significantly clear evidence of a legitimate supervening purpose" to effectuate a transfer of substantially all of TransCare's value for less than a quarter of its worth.  The Trustee has sustained his burden of proving that TransCare transferred the Subject Collateral to PPAS[34] with the intent to hinder and delay TransCare's creditors and avoids the strict foreclosure under NYDCL § 276 and 11 U.S.C. § 548(a)(1)(A).[35]

### 2.    The Remedy

Bankruptcy Code § 550(a) provides:

Except as otherwise provided in this section, to the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from--

(1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or

(2) any immediate or mediate transferee of such initial transferee.

"The purpose of § 550(a) is to restore the estate to the condition it would have been in if the transfer had never occurred."  *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 568 B.R. 481, 486 (Bankr. S.D.N.Y. 2017).   Where, as here, TransCare

---

[34]    During the trial, the Court had suggested that it might collapse the strict foreclosure and the sale to Transcendence, deem PPAS a mere conduit and treat Transcendence as the initial transferee of the Subject Collateral.  PPAS did not assert this argument in opposition to the actual fraudulent transfer claim in the *DPFC* or in its response to the *PPFC* and accordingly, I do not consider it.

[35]    A clear and convincing standard of proof has been applied with respect to fraudulent intent under New York State law, but some District Courts within this Circuit have applied a preponderance of the evidence standard to a fraudulent transfer claim under the Bankruptcy Code.  *See, e.g., Weisfelner v. Blavatnik* (*In re Lyondell Chem. Co.*), 567 B.R. 55, 142 n. 38 (Bankr. S.D.N.Y. 2017), *aff'd*, 585 B.R. 41 (S.D.N.Y. 2018).  The Trustee has satisfied both standards.

A2806

transferred a going concern and the Trustee subsequently sold the same assets in liquidation sales, the starting point is the value of the Subject Collateral at the time of the strict foreclosure.

Although this claim involves the same transfer as Count 1, the Trustee proposes a different measure of damages. He argues for the use of a 10.1x EBITDA multiplier and the deduction of the $10 million credit and the $5.7 million liquidation proceeds from the award. (*See PPFC* ¶¶ 318-319.) The Court accepts the 10.1x EBITDA multiplier because it reflects the average of Dr. Arnold's four credible "market comps" and does not involve many of the considerations that go into computing damages for breach of fiduciary duty. The Court rejects the deduction of the $5.7 million because, for the reasons already stated, it is not supported by the evidence. Specifically, it includes $5 million of accounts receivable and CONs that were not part of the foreclosure and it excludes the liquidation of the OldCo collateral that was part of the Subject Collateral. Thus, the award should be reduced by $1.2 million, the net proceeds of the Subject Collateral realized through the Trustee's liquidation sales.

Finally, the Court rejects the Trustee's proposal to reduce the award by the $10 million credit because it is based on an incorrect view of the law. A fraudulent transferee has a defense to the extent it received the transfer for value and in good faith, 11 U.S.C. § 548(c), or without knowledge of the fraud, NYDCL § 278(1),[36] *i.e.*, a good

---

[36]     Bankruptcy Code § 548(c) provides:

Except to the extent that a transfer or obligation voidable under this section is voidable under section 544, 545, or 547 of this title, a transferee or obligee of such a transfer or obligation *that takes for value and in good faith* has a lien on or may retain any interest transferred or may enforce any obligation incurred, as the case may be, to the extent that

A2807

faith purchaser for value. *Commodity Futures Trading Comm'n v. Walsh*, 618 F.3d 218, 229 (2d Cir. 2010) ("DCL § 278 provides that a creditor whose claim has matured may have a conveyance set aside 'against any person,' other than a good faith purchaser for value, defined as 'a purchaser for fair consideration without knowledge of the fraud.'"), *answering certified question*, 951 N.E.2d 369 (N.Y. 2011). The defendant bears the burden of proving this defense. *Fed. Deposit Ins. Co. v. Malin*, 802 F.2d 12, 18 (2d Cir. 1986) ("Phyllis Malin [transferee] must also satisfy the remaining elements of section 278 to claim its benefits. Specifically, it must be determined whether Phyllis was a 'purchaser for fair consideration without knowledge of the fraud at the time of the purchase.'") (citation omitted).

Even if the $10 million credit constituted value, PPAS failed to prove that it received the Subject Collateral in good faith. To the contrary, the Court has already found that TransCare made the involuntary transfer through the strict foreclosure with the intent to hinder and delay its creditors. Its wrongful intent was imputed from Tilton. Tilton's same wrongful intent is imputed to PPAS which participated with

---

such transferee or obligee gave value to the debtor in exchange for such transfer or obligation.

(Emphasis added.)

NYDCL § 278(1) provides:

Where a conveyance or obligation is fraudulent as to a creditor, such creditor, when his claim has matured, may, as against any person except a purchaser *for fair consideration without knowledge of the fraud at the time of the purchase*, or one who has derived title immediately or mediately from such a purchaser,

   a.  Have the conveyance set aside or obligation annulled to the extent necessary to satisfy his claim, or

   b.  Disregard the conveyance and attach or levy execution upon the property conveyed.

(Emphasis added.)

A2808

TransCare (and Transcendence) in the Tilton Plan and received the Subject Collateral in bad faith and with the knowledge of Tilton's intent to hinder and delay TransCare's creditors.

Accordingly, the Trustee is entitled to recover $39.2 million from PPAS pursuant to 11 U.S.C. § 550(a), and PPAS's claims are disallowed under 11 U.S.C. § 502(d).[37]  The Trustee is also entitled to recover $39.2 million from Transcendence as the immediate transferee of PPAS.  11 U.S.C. § 550(a)(2).  The damages for breach of fiduciary duty and the fraudulent conveyance remedy the same injury and the Trustee is entitled to only a single satisfaction.  (*See PPFC* ¶ 321.)

### 3.    Attorneys' Fees

A plaintiff who successfully avoids an intentional fraudulent conveyance may be entitled to recover his attorneys' fees.  NYDCL § 276-a provides in relevant part:

> In an action ... brought by a creditor [or] trustee in bankruptcy ... to set aside a conveyance by a debtor, where such conveyance is found to have been made by the debtor and received by the transferee with actual intent, as distinguished from intent presumed in law, to hinder, delay or defraud either present or future creditors, in which action ... the creditor [or] trustee in bankruptcy ... shall recover judgment, the justice or surrogate presiding at the trial shall fix the reasonable attorney's fees of the creditor [or] trustee in bankruptcy ... in such action or special proceeding, and the creditor [or] trustee in bankruptcy ... shall have judgment therefor against ... the transferee....

---

[37]     Section 502(d) states in pertinent part:

[T]he court shall disallow any claim of any entity from which property is recoverable under section . . . 550. . . of this title or that is a transferee of a transfer avoidable under section 544 [or] 548 . . . of this title, unless such entity or transferee has paid the amount, or turned over any such property, for which such entity or transferee is liable under section . . . 550 . . . of this title.

A2809

The Court has found that TransCare made and PPAS received the Subject Collateral with actual intent to hinder and delay TransCare's creditors. This finding led to the conclusion that PPAS was not a good faith purchaser for value entitled to a $10 million reduction in the Trustee's award based on the credit it gave TransCare. The same finding entitles the Trustee to an award of reasonable attorneys' fees to be fixed by the Court in subsequent proceedings.

### D.  Counts 4, 10 and 11:  Avoidance and Recharacterization of Ark II Lien

The Trustee seeks to avoid or subordinate Ark II's lien, granted on February 11, 2016, when TransCare executed the Ark II Security Agreement in connection with the Ark II Facility. He relies on three theories: (i) preference, (ii) constructive fraudulent transfer and (iii) recharacterization as equity. In addition, Count 3 seeks to equitably subordinate Ark II's and PPAS's liens and/or claims, and the equitable subordination claim is addressed below. To the extent the Ark II lien is avoided, the Trustee seeks to preserve the lien for the benefit of the estate, *see* 11 U.S.C. § 551.[38]

#### 1.  Count 10: Preference

Under Bankruptcy Code § 547(b), a trustee may avoid a transfer (1) made to or for the benefit of a creditor, (2) for or on account of an antecedent debt, (3) while the debtor was insolvent, (4) on or within ninety days of the petition date (one year if the transferee was an insider), (5) that enables the creditor to receive more than it would

---

[38]     Bankruptcy Code § 551 provides:

Any transfer avoided under section 522, 544, 545, 547, 548, 549, or 724(a) of this title, or any lien void under section 506(d) of this title, is preserved for the benefit of the estate but only with respect to property of the estate.

A2810

have received in a chapter 7 case if the transfer was never made and the creditor

received payment of the debt in accordance with the Bankruptcy Code.[39]  The Trustee

has the burden of proving each element under section 547(b).  11 U.S.C. § 547(g).

The Trustee contends that the granting of the lien to Ark II pursuant to the Ark II

Security Agreement to secure, *inter alia*, the January Payments in the approximate

aggregate sum of $1.9 million was a preference.[40]  Although the Ark II credit documents

were backdated to January 15, 2016, they were signed by TransCare on February 11,

2016.  TransCare granted and Ark II perfected the lien on that date, and the granting of

---

[39]     Section 547(b) states:

Except as provided in subsections (c) and (i) of this section, the trustee may . . . avoid any transfer of an interest of the debtor in property--

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made--

    (A) on or within 90 days before the date of the filing of the petition; or

    (B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

(5) that enables such creditor to receive more than such creditor would receive if--

    (A) the case were a case under chapter 7 of this title;

    (B) the transfer had not been made; and

    (C) such creditor received payment of such debt to the extent provided by the provisions of this title.

[40]     Ark II never advanced any funds directly to TransCare.  The evidence showed that the January 15 Payment in the sum of $1,172,757.53 was wired by Ark II to PPAS to allow PPAS to make insurance payments on TransCare's behalf.  Treating that advance as a loan to TransCare rather than a loan to PPAS, Ark II became a creditor of TransCare at that point.  On the other hand, the January 29 Payment in the sum of $690,168.24 was paid by PPAS on TransCare's behalf to meet obligations to the NYSIF and certain TransCare creditors.  Although the parties have sometimes lumped the two sets of payments together and treated them as having been made by Ark II, Ark II did not make the January 29 Payment.  Furthermore, while Tilton testified that it was her intention that Ark II would reimburse PPAS once Ark II was granted a lien priority under a future credit agreement, (Tr. 8/13 P.M. 6:3-6; *see* DX 121 at 99194), there was no evidence that the reimbursement occurred.  Accordingly, the only advance Ark II made was in the sum of $1,172,757.53 million in connection with the January 15 Payment and that is the extent of its claim.

81

a lien was a transfer, *see* 11 U.S.C. § 101(54)(A), that occurred within ninety days of the petition date.  At the time of the transfer, Ark II was a creditor of TransCare, and TransCare was presumed to be insolvent.  11 U.S.C. § 547(f).

Finally, the lien would allow Ark II to obtain a greater recovery in a hypothetical chapter 7 case than if the transfer had not been made.  To satisfy the fifth prong, a trustee must prove that the defendant received a greater amount on its claim than it would receive on the petition date in a hypothetical chapter 7 case.  *Sama v. Mullaney* (*In re Wonderwork, Inc.*), 611 B.R. 169, 213-14 (Bankr. S.D.N.Y. 2020); *Savage & Assocs., P.C. v. Mandl* (*In re Teligent, Inc.*), 380 B.R. 324, 339 (Bankr. S.D.N.Y. 2008).  As a result of the lien granted on February 11, 2016 and the lien priority it obtained over PPAS's lien by virtue of the 2016 Intercreditor Agreement, Ark II was fully secured by assets worth substantially more than the January 15 Payment and would have received full payment on its claim as of the petition date in a hypothetical chapter 7.

If, instead, Ark II did not receive the lien and its claim was unsecured, it would receive a lower distribution, if any distribution, in a hypothetical chapter 7 case.  According to financial information and projections prepared by Greenberg on January 28, 2016, TransCare had approximately $41 million in total assets and $81 million in total liabilities, mostly secured debt.  (PX 179 at 13263.)  By February 24, most of its valuable assets had been foreclosed upon and transferred to Transcendence but TransCare's liabilities had been reduced by the $10 million credit.  The only valuable assets that escaped the foreclosure were the accounts receivable and the CONS.  Wells Fargo had a first lien and PPAS had the second lien on those assets under the 2016 Intercreditor Agreement.  Following the foreclosure and as of the petition date

TransCare owed Wells Fargo $13 million and still owed PPAS $35 million. The proceeds of the accounts receivable and CONs were substantially less than $48 million leaving unsecured creditors with nothing.

PPAS contends that the Trustee failed to establish that the grant of the lien was on account of an antecedent debt or that it enabled Ark II to recover more than it would recover in a chapter 7 case if it did not receive the transfer and instead, received a distribution on its claim. The latter contention has already been rejected. In addition, PPAS asserted in the JPTO, though not in its post-trial submissions, that the grant of the lien was a contemporaneous exchange for value under 11 U.S.C. § 547(c)(1).

###     a.     Antecedent Debt

As noted, Ark II was already a creditor at the time TransCare granted the lien. Despite the obvious gap in time between the January 15 Payment and the February 11 transfer of the lien, PPAS argues that the lien relates back to the January 15 Payment under 11 U.S.C. § 547(e)(2)(A). The latter subsection provides:

> For the purposes of this section, except as provided in paragraph (3) of this subsection, a transfer is made--
> (A) at the time such transfer takes effect between the transferor and the transferee, if such transfer is perfected at, or within 30 days after, such time, except as provided in subsection (c)(3)(B). . . .

Section 547(e)(2)(A) is inapplicable. The only transfer *by* TransCare was made on February 11, 2016, and the lien it granted on that date was simultaneously perfected by virtue of the earlier, January 29 filing of the U.C.C. financing statement. The granting of the lien on February 11 to secure the earlier advance was no different analytically than the repayment of the January 15 Payment with cash. Thus, when a debtor grants a lien to secure a pre-existing debt, the transfer is preferential regardless

83

of whether the creditor simultaneously perfects the lien or perfects it more than thirty days later. *Cf. Corn Exch. Nat'l Bank & Tr. Co. v. Klauder*, 318 U.S. 434, 437 (1943) ("By thus postponing the effective time of the transfer, the debt, which is effective when actually made, will be made antecedent to the delayed effective date of the transfer and therefore will be made a preferential transfer in law. . . .") (decided under the 1898 Bankruptcy Act).

PPAS's reliance on *Telecash Indus., Inc. v. Universal Assets* (*In re Telecash Indus., Inc.*), 104 B.R. 401 (Bankr. D. Utah 1989), in support of its relation back argument, is misplaced. There, the creditor made a loan and allegedly received a security interest under the loan documentation but did not perfect the security interest within ten days, the statutory reach back period at the time under 11 U.S.C. § 547(e)(2), since increased to thirty days. *See id.* at 402. The debtor-in-possession brought an adversary proceeding to avoid the lien as a preference and moved for summary judgment. The bankruptcy court agreed that the perfection did not relate back to the granting of the lien, *id.* at 403, but ruled that the failure to perfect the lien within ten days did not foreclose the defendant's affirmative defense that the subsequent perfection constituted a contemporaneous exchange for value for the loan under 11 U.S.C. § 547(c)(1). *Id.* at 404 ("Although perfection of a security interest may not relate back under section 547(e)(2) to the underlying loan transaction, that perfection may still be considered 'substantially contemporaneous' under section 547(c)(1)."). The bankruptcy court concluded that disputed issues of fact concerning the defense prevented the grant of summary judgment. *Id.*

Unlike *Telecash*, and notwithstanding the backdating of the Ark II credit documents, TransCare did not purport to grant a security interest to Ark II at the time of the January 15 Payment. There was no documentation evidencing a grant of a security interest at that time and TransCare did not sign the Ark II Security Agreement until February 11, 2016.

### b. Contemporaneous Exchange for Value

Bankruptcy Code § 547(c)(1) provides a defense to a preference

to the extent that such transfer was--

(A) intended by the debtor and the creditor to or for whose benefit such transfer was made to be a contemporaneous exchange for new value given to the debtor; and

(B) in fact a substantially contemporaneous exchange

11 U.S.C. § 547(c)(1). "The critical inquiry in determining whether there has been a contemporaneous exchange for new value is whether the parties intended such an exchange." *Official Comm. of Unsecured Creditors of 360networks (USA) Inc. v. U.S. Relocation Servs., Inc.* (*In re 360networks (USA) Inc.*), 338 B.R. 194, 208-09 (Bankr. S.D.N.Y. 2005) (quoting *Harrah's Tunica Corp. v. Meeks* (*In re Armstrong*), 291 F.3d 517, 525 (8th Cir. 2002)). PPAS has the burden of proving this affirmative defense. 11 U.S.C. § 547(g).

Tilton testified that she authorized the January 15 Payment (as well as the January 29 Payment) to TransCare's creditors on an emergency basis "because, if not, the company would have gone out of business the next day [and] because nobody else was willing to lend cash." (Tr. 8/13 A.M. 25:13-18.) There was no agreement regarding the nature of the debt or the terms of the loans. On January 28, 2016, Greenberg created financial information and *pro forma* projections for the entire company that did

85

not show any liability to Ark II. (PX 179 at 13263.) On February 3, 2016, Greenberg confirmed to Credit Suisse that there was no term sheet for the proposed lending to TransCare but only a summary of terms for a new facility between "a Patriarch Partners, LLC affiliate" and TransCare. (PX 189.) It did not mention Ark II or indicate that the January Payments would be part of the new $6.5 million facility. On February 9, 2016, Stephen provided Curtis Mallet with a summary of TransCare's debt structure, including the Term Loan and the ABL but did not include Ark II. (*See* JX 72.) At trial, Stephen could not explain why he omitted the Ark II loan supposedly incorporated into the Ark II Credit Agreement. (Tr. 7/23 P.M. 31:7-33:10.)

The Ark II Credit Agreement was an afterthought. It was born from Wells Fargo's reluctance to further fund TransCare or allow a new facility to prime its liens and Tilton's failure to convince Credit Suisse to a subordination of the Term Loan liens in favor of a new facility. Tilton circumvented these problems on February 10, 2016 by creating the Ark II Facility, rolling the January Payments into the new, secured facility and agreeing on behalf of PPAS to subordinate the Term Loan Lenders' lien to Ark II. Hence, PPAS has failed to prove that the parties (*i.e.*, Tilton) intended for the lien granted to Ark II on February 11, 2016 to be a contemporaneous exchange for the January 15 Payment.

Accordingly, the lien granted to Ark II is avoided as a preference and the lien is preserved for the benefit of the estate. 11 U.S.C. § 551.

A2816

### 2. Count 11: Constructive Fraudulent Transfer

The grant of a lien to Ark II is also a constructive fraudulent transfer under the

NYDCL.[41]  NYDCL § 273 provides:

> Every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration.

Under NYDCL § 272, "[f]air consideration is given for property, or obligation ... [w]hen in exchange for such property, or obligation, as a fair equivalent therefor, and in good faith, property is conveyed or an antecedent debt is satisfied [or] [w]hen such property, or obligation is received in good faith to secure a present advance or antecedent debt in amount not disproportionately small as compared with the value of the property, or the obligation obtained."  "A transfer made by an insolvent debtor to an affiliate or insider in satisfaction of an antecedent debt lacks good faith and is constructively fraudulent." *Nisselson v. Drew Indus., Inc.* (*In re White Metal Rolling & Stamp Corp.*), 222 B.R. 417, 430 (Bankr. S.D.N.Y. 1998); *accord Rubin v. Mfrs. Hanover Tr. Co.*, 661 F.2d 979, 991 (2d Cir. 1981) ("[C]ourts have long recognized that '[t]ransfers made to benefit third parties are clearly not made for a "fair" consideration,' and, similarly, that 'a conveyance by a corporation for the benefit of an affiliate (should not) be regarded as given for fair consideration as to the creditors of the conveying corporations.'") (citation omitted); *see Atlanta Shipping Corp., Inc. v. Chem. Bank*, 818 F.2d 240, 249 (2d Cir. 1987) ("In general, repayment of an antecedent debt constitutes fair consideration unless the

---

[41]     The Trustee asserts the constructive fraudulent conveyance claims under NYDCL §§ 273, 274 and 275.  In light of the Court's conclusion that the granting of the lien to Ark II was a constructive fraudulent conveyance under NYDCL § 273, it is unnecessary to consider the other grounds.

A2817

transferee is an officer, director, or major shareholder of the transferor.").

At the approximate time that TransCare granted the lien to Ark II to secure the earlier advances, TransCare was woefully insolvent with negative net equity of nearly $40 million. The granting of the lien also lacked good faith, and hence, fair consideration. Ark II and TransCare were affiliates because Tilton directly or indirectly owned the majority of their securities and controlled both entities, *see* 11 U.S.C. § 101(2)(B), and Ark II and Tilton were insiders of TransCare. *See* 11 U.S.C. § 101(31)(B)(iii), (E). Accordingly, the granting of the lien to Ark II under the Ark II Security Agreement is avoided as a constructive fraudulent transfer and the lien is preserved for the benefit of the estate. 11 U.S.C. § 551.

### 3.  Count 4: Recharacterization

Count 4 seeks to recharacterize as equity all claims asserted by Ark II based on the January 15 Payment. As courts of equity, bankruptcy courts have the equitable power to recharacterize claims asserted against a debtor so that "substance will not give way to form." *Pepper v. Litton*, 308 U.S. 295, 305 (1939). Recharacterization of a claim from debt to equity "is appropriate where the circumstances show that a debt transaction was actually an equity contribution *ab initio*." *Bayer Corp. v. MascoTech, Inc.* (*In re AutoStyle Plastics, Inc.*), 269 F.3d 726, 747-48 (6th Cir. 2001) ("*AutoStyle*") (quoting *In re Cold Harbor Assocs., L.P.*, 204 B.R. 904, 915 (Bankr. E.D. Va. 1997)) (internal quotes omitted).

Courts in this District have adopted the eleven-factor analysis set forth in *AutoStyle*. *See, e.g., In re Aéropostale, Inc.*, 555 B.R. 369, 420-21 (Bankr. S.D.N.Y.

2016); *In re Sabine Oil & Gas Corp.*, 547 B.R. 503, 566 (Bankr. S.D.N.Y.), *aff'd*, 562 B.R. 211 (S.D.N.Y. 2016), *appeal dismissed*, No. 16-2187 (2d Cir. Nov 22, 2016); *Weisfelner v. Blavatnik* (*In re Lyondell Chem. Co.*), 544 B.R. 75, 93-94 (Bankr. S.D.N.Y. 2016); *Official Comm. of Unsecured Creditors v. Bay Harbour Master Ltd.* (*In re BH S & B Holdings LLC*), 420 B.R. 112, 157-58 (Bankr S.D.N.Y. 2009), *aff'd*, 807 F. Supp. 2d 199 (S.D.N.Y. 2011); *Adelphia Commc'ns Corp. v. Bank of Am., N.A.* (*In re Adelphia Commc'ns Corp.*), 365 B.R. 24, 74 (Bankr. S.D.N.Y. 2007), *aff'd in part*, 390 B.R. 64 (S.D.N.Y. 2008). Under this test, the Court considers: (1) the names given to the instruments, if any, evidencing the indebtedness; (2) the presence or absence of a fixed maturity date and schedule of payments; (3) the presence or absence of a fixed rate of interest and interest payments; (4) the source of repayments; (5) the adequacy or inadequacy of capitalization; (6) the identity of interest between the creditor and the stockholder; (7) the security, if any, for the advances; (8) the corporation's ability to obtain financing from outside lending institutions; (9) the extent to which the advances were subordinated to the claims of outside creditors; (10) the extent to which the advances were used to acquire capital assets; and (11) the presence or absence of a sinking fund to provide repayments. *AutoStyle*, 269 F.3d at 749-50. "No one factor is controlling or decisive [and] [t]he factors must be considered within the particular circumstances of each case." *Id.*; *accord Aéropostale*, 555 B.R. at 423; *BH S & B Holdings*, 420 B.R. at 157. A bankruptcy court can recharacterize a claim as equity even if fewer than all of the factors weigh in favor of recharacterization. *Lyondell*, 544 B.R. at 94. The ultimate question for the court is "whether the parties called an instrument one thing when in fact they intended it as something else.... Answers lie in facts that confer

89

context case-by-case." *Cohen v. KB Mezzanine Fund II, LP* (*In re SubMicron Sys. Corp.*), 432 F.3d 448, 456 (3d Cir. 2005).

Here, the evidence points in both directions. The parties attempted to document the January 15 Payment, albeit belatedly, as a secured loan from Ark II to TransCare. The loan was to be repaid by TransCare pursuant to the contemplated strict foreclosure, the sale to Transcendence and the subordination of PPAS's lien in the Subject Collateral. In addition, the January 15 Payment met emergency needs rather than the purchase of capital assets and was not subordinated to the claims of outside creditors. In fact, the 2016 Intercreditor Agreement gave Ark II a priority in payment. On the other hand, TransCare was inadequately capitalized, was unable to borrow money elsewhere, there was no sinking fund to provide repayment (though that was to come through the proceeds of the foreclosure and sale) and Tilton owned Ark II and the majority of TransCare's shares and controlled both. However, bankrupt companies are generally short of cash and the shareholders are often the only source.

I conclude that the Trustee has failed to sustain his burden of proving that the January 15 Payment should be recharacterized as an equity contribution. At the time of the advance, TransCare was out of cash and needed the money to pay for insurance so that TransCare could continue to operate. There was no time to draft a loan agreement even if anyone had thought about it. The advances preceded the Tilton Plan, were not used solely to protect the assets destined for NewCo and the parties could not have intended the January 15 Payment as a contribution to NewCo. There were many problems with the granting of a secured claim to Ark II for the reasons stated above but the January 15 Payment was still a loan.

90

Accordingly, the Count 4 is dismissed.

## E.    Count 14:  Return of the $800,000

After the Trustee was appointed, he and PPAS entered into the *Personal Property Stipulation*, (PX 258), to permit the Trustee to sell the assets under his control, including the Subject Collateral.[42]  The *Personal Property Stipulation*, which was approved by the Court,[43] acknowledged the parties' disputes relating to the ownership of the assets, agreed that the Trustee could sell the assets, and provided a distribution formula; the Trustee would receive 20% of the net proceeds and  PPAS would receive 80%.  (*Personal Property Stipulation* ¶ 3.)  The purpose of the *Personal Property Stipulation* was to facilitate the sale of the disputed assets, not resolve the disputes regarding the validity of the strict foreclosure or the ownership of the Subject Collateral, and each party reserved its respective rights.  As concerned the Trustee:

> Except as specifically set forth in this Stipulation, nothing herein shall be deemed to waive any and all claims, defenses, interests, rights, entitlements, or causes of action of whatever kind, nature, character and description, whether in law or equity, whether in tort, contract or under other applicable law, whether known or unknown, whether liquidated or unliquidated, whether contingent or, fixed, and whether anticipated or

---

[42]    Ark II and PPAS agreed in the 2016 Intercreditor Agreement that

Notwithstanding anything to the contrary contained in any of the Agreements, only the party with the senior Lien [Ark II] in the Collateral shall have the right to restrict or permit, or approve or disapprove, the Sale, transfer or other disposition of such Collateral.

2016 Intercreditor Agreement § 2.8(a).  Ark II was not a party to the *Personal Property Stipulation* and did not expressly consent to the proposed sale.  However, given Tilton's control over Ark II, that consent can be inferred.

[43]    See *Order: (I) Approving the Stipulation Respecting the Sale of Certain Personal Property; (II) Authorizing the Public Auction Sales of Certain Personal Property; (III) Approving the Sale and Notice Terms for the Public Auction Sales of Certain Personal Property; (IV) Approving the Sale of Certain Personal Property, Free and Clear of All Liens, Claims and Encumbrances, Security Interests and Other Interests to the Successful Bidders at the Public Auction Sales; (V) Approving the Employment of Maltz Auctions, Inc. as Auctioneer to Market and Publicly Auction Certain Personal Property; (VI)Authorizing the Trustee to Donate or Otherwise Dispose of Certain De Minimus Personal Property; and (VII) Granting Related Relief*, dated Mar. 25, 2016, at ¶ 2.  (PX 258.)

A2821

> unanticipated, which the Trustee and the Debtors' estates have, had, may ever have or may ever claim to have against any third parties including, but not limited to, PPAS, Lenders, and Transcendence or any other "person" (within the meaning of Bankruptcy Code§ 101(41)).

(*Personal Property Stipulation* ¶ 6.) The *Personal Property Stipulation* further provided:

> Nothing contained herein is a waiver of any of the Trustee's rights to contest or otherwise object to any other party asserting a claim or interest in the Foreclosed Personal Property Assets and/or the CONs.

(*Personal Property Stipulation* ¶ 10.)

Following the sale, PPAS received $800,000 in accordance with the *Personal Property Stipulation* which it turned over to Ark II pursuant to the 2016 Intercreditor Agreement. While it is unusual in the Court's experience to turn over disputed sale proceeds rather than escrow the funds until the dispute is resolved, the *Personal Property Stipulation* did not state that the payments were intended to be a final resolution of the parties' dispute regarding the parties' rights to the proceeds of the sale — the reservation of rights indicates that it was not — and neither PPAS nor Ark II argued that it was. Consequently, the *Personal Property Stipulation* does not bar the recovery of the $800,000.

The Trustee now seeks to recover the $800,000 directly from Ark II on two theories.[44] First, he argues that he is entitled to reimbursement or disgorgement under

---

[44]     Count 14 also sought to recover the $800,000 from PPAS, but the Trustee did not repeat the request or include proposed findings or conclusions in his *PPFC*. Accordingly, the claim against PPAS is deemed abandoned. *Desiderio v. Celebrity Cruise Lines, Inc.*, No. 97 Civ. 5185(AJP), 1999 WL 440775, at *3 (S.D.N.Y. June 28, 1999) (deeming plaintiffs' negligence claims abandoned because their post-trial submissions propose no findings of fact or conclusions of law); *McAllister Bros., Inc. v. Ocean Marine Indem. Co.*, No. 87 Civ. 3840 (LMM), 1992 WL 34152, at *6 (S.D.N.Y. Feb. 18, 1992) (dismissing counterclaim as abandoned where defendants did not refer to it in pre-trial or post-trial briefs);

A2822

11 U.S.C. § 502(j) based upon the overpayment of Ark II's now-avoided secured claim. (*PPFC* ¶¶ 369-70.)  Second, he contends that the $800,000 transfer was an unauthorized post-petition transfer that he can avoid and recover from Ark II as either an initial transferee (if PPAS is a conduit) or a subsequent transferee (if PPAS is the initial transferee).  (*PPFC* ¶ 371.)  Ark II responds that the Trustee cannot recover the $800,000 because he failed to prove that the Estate had a property interest in the Subject Collateral and hence, the sale proceeds, and the Estate lacked any equity in the proceeds because the proceeds secured a debt in the approximate sum of $58 million. (*DPFC* ¶¶ 468-71.)

### 1.    Section 502(j)

Bankruptcy Code § 502(j) provides, in pertinent part:

> A claim that has been allowed or disallowed may be reconsidered for cause.  A reconsidered claim may be allowed or disallowed according to the equities of the case. . . .  ***This subsection does not alter or modify the trustee's right to recover from a creditor any excess payment or transfer made to such creditor.***

11 U.S.C § 502(j) (emphasis added).  The last sentence appears to be derived from section 57(l) of the 1898 Bankruptcy Act which provided in relevant part that "the trustee may also recover any excess dividend paid to any creditor," *In re Kelderman*, 75 B.R. 69, 70 (Bankr. S.D. Iowa 1987), and has been interpreted to authorize the Trustee to recover an excess payment to a creditor.  *E.g.*, *Wells Fargo Bank NA v. Thompson*, 15-CV-941-JPS, 2016 WL 1611472, at *3 (E.D. Wis. Apr. 21, 2016) ("Courts have found support for disgorgement in the trustee's authority to recover overpayments to

---

*Sonnenblick–Goldman Corp. v. Marbella Del Caribe, Inc.*, 412 F. Supp. 439, 445 (S.D.N.Y. 1975) (defendant abandoned counterclaims that were not argued in its post-trial brief).

creditors. . . .  As discussed above, this disgorgement is contemplated by 11 U.S.C. §

502(j).") (citing cases); *United States v. Rhodey* (*In re R&W Enters.*), 181 B.R. 624, 648

(Bankr. N.D. Fla. 2006) (trustee can recover overpayment to IRS because "[s]ection

502(j) of the Bankruptcy Code specifically allows the Trustee 'to recover from a creditor

any excess payment or transfer made to such creditor.'"); *Kerney v. Capital One Fin.*

*Corp.* (*In re Sims*), 278 B.R. 457, (Bankr. E.D. Tenn. 2002) ("It is clear from [the last

sentence of § 502(j)] that a trustee's authority to recover overpayments from a creditor

is implied or contemplated by the Bankruptcy Code notwithstanding the absence of a

specific Bankruptcy Code provision expressly granting such authority.").

The problem with the Trustee's argument is that he paid PPAS, not Ark II, and

PPAS was not a mere conduit that lacked dominion and control over the proceeds.

While the 2016 Intercreditor Agreement gave Ark II a priority over PPAS to the sale

proceeds, the Trustee has not pointed to any provision requiring PPAS to turn the

proceeds over to Ark II or segregate the proceeds or hold the proceeds in trust for Ark II.

Instead, Ark II had a contractual right to the proceeds.  In contrast, under the Ark II

Security Agreement executed at the same time, Ark II could require TransCare in the

event of a default to "segregate" the proceeds of any accounts receivable or general

intangibles and hold them "in trust" for Ark II.  (Ark II Security Agreement § 5.2(a).)

The Trustee has not identified a basis under 11 U.S.C. § 502(j) for recovering the excess

payment from Ark II, PPAS's transferee.

## 2. Unauthorized Post-Petition Payment

Bankruptcy Code § 549 states, in pertinent part:

94

(a) Except as provided in subsection (b) or (c) of this section, the trustee may avoid a transfer of property of the estate--

(1) that occurs after the commencement of the case; and

(2). . . .

(B) that is not authorized under this title or by the court.

11 U.S.C. § 549(a). The transfer of $800,000 to PPAS is not avoidable under section 549 because it was expressly authorized by the order approving the *Personal Property Stipulation*. Whether it could be recovered under the *Personal Property Stipulation* is an issue that has not been raised. In any event, the $800,000 is already reflected in the reduced credit granted to PPAS in connection with the recovery awarded to the Estate under 11 U.S.C. § 550(a) as a consequence of the avoidance of the strict foreclosure.

Accordingly, Count 14 is dismissed.

## F. Count 3: Equitable Subordination

In Count 3, the Trustee seeks to equitably subordinate the claims of PPAS and Ark II and transfer their liens to the estate. Bankruptcy Code § 510(c) provides:

Notwithstanding subsections (a) and (b) of this section, after notice and a hearing, the court may--

(1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest; or

(2) order that any lien securing such a subordinated claim be transferred to the estate.

11 U.S.C. § 510(c). The proponent of equitable subordination must show that (a) the claimant engaged in some type of inequitable conduct, (b) the misconduct caused injury to creditors or conferred an unfair advantage on the claimant, and (c) equitable subordination is consistent with bankruptcy law. *Benjamin v. Diamond* (*In re Mobile*

95

*Steel Co.*), 563 F.2d 692, 699-700 (5th Cir. 1977). If the creditor is an insider of the debtor, inequitable conduct may include (a) a breach of fiduciary duty, fraud, or illegality, (b) undercapitalization or (c) control or use of the debtor as an alter ego for the benefit of the claimant. *ABF Capital Mgmt. v. Kidder Peabody & Co., Inc.* (*In re Granite Partners, LP*), 210 B.R. 508, 514 (Bankr. S.D.N.Y. 1997).

Equitable subordination has its limits. It is remedial, not penal, *80 Nassau Assocs. v. Crossland Fed. Sav. Bank* (*In re 80 Nassau Assocs.*), 169 B.R. 832, 840 (Bankr. S.D.N.Y. 1994), and "should be applied only to the extent necessary to offset specific harm that creditors have suffered on account of the inequitable conduct." *Assante v. E. Sav. Bank, FSB* (*In re Assante*), No. 12–CV–5309 (CS), 2013 WL 787968, at *3 (S.D.N.Y. Mar. 4, 2013) (quoting *Enron Corp. v. Springfield Assocs., LLC* (*In re Enron Corp.*), 379 B.R. 425, 434 (S.D.N.Y. 2007)). Once the harm has been undone through another remedy, equitable subordination is not available. For example, equitable subordination is an alternative to a monetary recovery for the creditor's wrongdoing, and the trustee cannot recover damages and equitably subordinate a claim based on the same wrong. *Hirsch v. Pa. Textile Corp.* (*In re Centennial Textiles, Inc.*), 227 B.R. 606, 611 (Bankr. S.D.N.Y. 1998); *Granite Partners*, 210 B.R. at 517. Furthermore, equitable subordination is inferior to disallowance because equitable subordination merely postpones payment but does not disallow the claim. *80 Nassau Assocs.*, 169 B.R. at 837.

Equitable subordination may be preferable remedy for injuries caused by an insolvent creditor who asserts a substantial, allowed claim. This, however, is not such a case. The PPAS secured claim has been disallowed under Bankruptcy Code § 502(d)

96

because it is the recipient of a fraudulent conveyance and the Trustee has received a judgment for money damages based on the fraudulent conveyance. If PPAS pays that judgment, the harm will be fully remedied, and section 502(d) will no longer bar the allowance of the claim.

The analysis relating to Ark II is slightly different but yields the same conclusion. The Court has avoided Ark II's security interest because the grant of the security interest was a preference and a fraudulent conveyance. The avoidance of the Ark II lien provides the Estate with a complete remedy from the harm caused by the lien. Ark II did not engage in inequitable conduct in making an emergency loan to TransCare prior to the inception of the Tilton Plan, and there is no reason in equity why it should not have a general unsecured claim for the amount of the January 15 Payment. It is true that PPAS transferred $800,000 from the sale proceeds pursuant to the *Personal Property Stipulation* and Ark II credited that payment against its claim, but the transfer was a matter of contractual agreement between PPAS and Ark II and as just noted, the judgment awarded against PPAS on the fraudulent transfer claim reflects the $800,000. Accordingly, Count 4 is dismissed.[45]

## G. Count 12: Contractual Subordination

The Amended Complaint and the JPTO included a claim against PPAS for contractual subordination under the 2016 Intercreditor Agreement based upon the avoidance of the Ark II priority lien and the preservation of the lien for the benefit of the

---

[45] Ark II argued that the Trustee lacked prudential standing to assert an equitable subordination claim because the only parties injured by the granting of the lien were the Term Loan Lenders. (*DPFC* ¶ 437.) The avoidance of Ark II's lien and the disposition of the equitable subordination claim make it unnecessary to decide the issue.

A2827

Estate.  The Trustee's post-trial proposed findings of fact and conclusions of law did not mention this claim.  For the reasons previously stated, the claim is deemed abandoned.

## H.    Count 13:  Liens on Post-Petition Proceeds

In the JPTO, which superseded the pleadings, the parties disputed whether the "equities of the case exception," described below, precluded the extension of the Ark II and PPAS liens to the post-petition proceeds of the sale of the Subject Collateral.  (JPTO at pp. 53-54, 64.)  The *PPFC* drops Ark II and seeks a completely different conclusion of law:  PPAS's lien does not extend to the proceeds of the breach of fiduciary duty claim under the Uniform Commercial Code and the "equities of the case" exception.  (*PPFC* ¶¶ 372-79.)  This claim was never raised in the pleadings or the JPTO, and I do not consider it.

PPAS contends that the "equities of the case" exception does not apply to the sale proceeds because it is limited to a situation where the secured creditor tries unjustly to reap the benefit of an increase in the value of the collateral, and the Trustee failed to prove an increase in value.  Bankruptcy Code § 552(b)(1), which governs the question provides:

> Except as provided in sections 363, 506(c), 522, 544, 545, 547, and 548 of this title, if the debtor and an entity entered into a security agreement before the commencement of the case and if the security interest created by such security agreement extends to property of the debtor acquired before the commencement of the case and to proceeds, products, offspring, or profits of such property, then such security interest extends to such proceeds, products, offspring, or profits acquired by the estate after the commencement of the case to the extent provided by such security agreement and by applicable nonbankruptcy law, *except to any extent that the court, after notice and a hearing and based on the equities of the case, orders otherwise.*

11 U.S.C. § 552(b)(1) (emphasis added).

98

**A2828**

The "equities of the case" exception is a means of allocating the value of post-petition collateral proceeds between the secured creditor and the estate:

> The equities of the case doctrine is intended to ensure that secured creditors do not receive a windfall benefit when a trustee uses assets of the estate, for example, to finish uncompleted inventory, and it is also used to adjust recovery by a secured creditor in situations where there is an improvement or decline in the post-petition collateral, especially in situations where the change in value is brought about by a party in the bankruptcy.

*In re Barbara K. Enters.*, No. 08–11474 (MG), 2008 WL 2439649, at *11 (Bankr. S.D.N.Y. June 16, 2008) (citations omitted); *accord Sprint Nextel Corp. v. U.S. Bank Nat'l Ass'n* (*In re TerreStar Networks, Inc.*) 457 B.R. 254, 271 (Bankr. S.D.N.Y. 2011); *see Nanuet Nat'l Bank v. Photo Promotion Assocs., Inc.* (*In re Photo Promotion Assocs., Inc.*), 61 B.R. 936, 939 (Bankr. S.D.N.Y. 1986) ("The equity exception is meant for the case where the trustee or debtor in possession uses other assets of the bankrupt estate (assets that would otherwise go to the general creditors) to increase the value of the collateral.") (quoting *J. Catton Farms, Inc. v. First Nat'l Bank of Chicago*, 779 F.2d 1242, 1246 (7th Cir. 1985)) (internal quotation marks omitted).

The Trustee admitted in the Amended Complaint that PPAS's lien extended to the proceeds of the collateral he sold. (*See* Amended Complaint ¶¶ 169-72.) His *PPFC* did not submit proposed factual findings or legal conclusions regarding the application of the "equities of the case" exception to the proceeds of the sale of the collateral. Accordingly, and for reasons previously stated, the claim is deemed abandoned and is dismissed.

99

## FURTHER CONSIDERATIONS

The disposition of the Trustee's claims requires further consideration regarding how to proceed.  The findings and conclusions relating to the breach of fiduciary duty claim are proposed and the parties have the right to seek *de novo* review by the District Court in accordance with Federal Bankruptcy Rule 9033(d).  The remaining, core claims, on the other hand, are ready for the entry of judgment subject, however, to the fixing of reasonable attorneys' fees in connection with the intentional fraudulent transfer claim against PPAS.  The parties are directed to contact chambers to arrange a conference to discuss the scheduling of the inquest in connection with the award of attorneys' fees, the submission of the report and recommendation to the District Court and the entry of judgment on the core claims.

Dated:  New York, New York
   July 6, 2020

         /s/ *Stuart M. Bernstein*
          STUART M. BERNSTEIN
        United States Bankruptcy Judge

JS 44C/SDNY
REV. 06/01/17

**CIVIL COVER SHEET**

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for use of the Clerk of Court for the purpose of initiating the civil docket sheet.

| PLAINTIFFS | DEFENDANTS |
|---|---|
| Salvatore LaMonica (Chapter 7 Trustee) | Lynn Tilton; Patriarch Partners Agency Services, LLC; Patriarch Partners, LLC; Patriarch Partners Management Group, LLC; Ark II CLO 2001-1 Limited; Transcendence Transit, Inc.; and Transcendence Transit II, Inc. |

| ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER | ATTORNEYS (IF KNOWN) |
|---|---|
| Amini LLC                    Attn: Bijan Amini; Avery Samet | Proskauer Rose LLP          Attn: Michael Mervis; Timothy Karcher |
| 131 West 35th St., 12th Floor | 11 Times Square |
| New York, NY 10001    Tel: (212) 490-4700 | New York, NY 10036    Tel: (212) 969-3000 |

CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE)
(DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY)

28 USC §158 appeal: damages, avoidance of transfers, disallowance of claims- 11 USC §§548(a)(1)(A), 544(b)(1), 547(b), 550, 551, 502(d)

Judge Previously Assigned

Has this action, case, or proceeding, or one essentially the same been previously filed in SDNY at any time? No [x] Yes [ ]

If yes, was this case Vol. [ ] Invol. [ ] Dismissed. No [ ] Yes [ ] If yes, give date _____ & Case No. _____

Is this an international arbitration case?    No [x]    Yes [ ]

*(PLACE AN [x] IN ONE BOX ONLY)*            NATURE OF SUIT

**TORTS**

**ACTIONS UNDER STATUTES**

| CONTRACT | PERSONAL INJURY | PERSONAL INJURY | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| [ ] 110 INSURANCE | [ ] 310 AIRPLANE | [ ] 367 HEALTHCARE/ PHARMACEUTICAL PERSONAL INJURY/PRODUCT LIABILITY | [ ] 625 DRUG RELATED SEIZURE OF PROPERTY 21 USC 881 | [x] 422 APPEAL 28 USC 158 | [ ] 375 FALSE CLAIMS |
| [ ] 120 MARINE | [ ] 315 AIRPLANE PRODUCT LIABILITY | | | [ ] 423 WITHDRAWAL 28 USC 157 | [ ] 376 QUI TAM |
| [ ] 130 MILLER ACT | [ ] 320 ASSAULT, LIBEL & SLANDER | [ ] 365 PERSONAL INJURY PRODUCT LIABILITY | [ ] 690 OTHER | | [ ] 400 STATE REAPPORTIONMENT |
| [ ] 140 NEGOTIABLE INSTRUMENT | [ ] 330 FEDERAL EMPLOYERS' LIABILITY | [ ] 368 ASBESTOS PERSONAL INJURY PRODUCT LIABILITY | | | [ ] 410 ANTITRUST |
| [ ] 150 RECOVERY OF OVERPAYMENT & ENFORCEMENT OF JUDGMENT | [ ] 340 MARINE | | **PROPERTY RIGHTS** | | [ ] 430 BANKS & BANKING |
| | [ ] 345 MARINE PRODUCT LIABILITY | **PERSONAL PROPERTY** | [ ] 820 COPYRIGHTS | | [ ] 450 COMMERCE |
| [ ] 151 MEDICARE ACT | [ ] 350 MOTOR VEHICLE | [ ] 370 OTHER FRAUD | [ ] 830 PATENT | | [ ] 460 DEPORTATION |
| [ ] 152 RECOVERY OF DEFAULTED STUDENT LOANS (EXCL VETERANS) | [ ] 355 MOTOR VEHICLE PRODUCT LIABILITY | [ ] 371 TRUTH IN LENDING | [ ] 835 PATENT-ABBREVIATED NEW DRUG APPLICATION | | [ ] 470 RACKETEER INFLU- ENCED & CORRUPT ORGANIZATION ACT (RICO) |
| [ ] 153 RECOVERY OF OVERPAYMENT OF VETERAN'S BENEFITS | [ ] 360 OTHER PERSONAL INJURY | [ ] 380 OTHER PERSONAL PROPERTY DAMAGE | [ ] 840 TRADEMARK | | [ ] 480 CONSUMER CREDIT |
| | [ ] 362 PERSONAL INJURY - MED MALPRACTICE | [ ] 385 PROPERTY DAMAGE PRODUCT LIABILITY | **SOCIAL SECURITY** | | [ ] 490 CABLE/SATELLITE TV |
| [ ] 160 STOCKHOLDERS SUITS | | | [ ] 861 HIA (1395ff) | | [ ] 850 SECURITIES/ COMMODITIES/ EXCHANGE |
| [ ] 190 OTHER CONTRACT | | **PRISONER PETITIONS** | [ ] 862 BLACK LUNG (923) | | |
| [ ] 195 CONTRACT PRODUCT LIABILITY | | [ ] 463 ALIEN DETAINEE | **LABOR** | | |
| | | [ ] 510 MOTIONS TO VACATE SENTENCE 28 USC 2255 | [ ] 710 FAIR LABOR STANDARDS ACT | | [ ] 863 DIWC/DIWW (405(g)) |
| [ ] 196 FRANCHISE | **ACTIONS UNDER STATUTES** | [ ] 530 HABEAS CORPUS | [ ] 720 LABOR/MGMT RELATIONS | | [ ] 864 SSID TITLE XVI |
| | **CIVIL RIGHTS** | [ ] 535 DEATH PENALTY | [ ] 740 RAILWAY LABOR ACT | | [ ] 865 RSI (405(g)) |
| | [ ] 440 OTHER CIVIL RIGHTS (Non-Prisoner) | [ ] 540 MANDAMUS & OTHER | [ ] 751 FAMILY MEDICAL LEAVE ACT (FMLA) | | [ ] 890 OTHER STATUTORY ACTIONS |
| **REAL PROPERTY** | [ ] 441 VOTING | | [ ] 790 OTHER LABOR LITIGATION | **FEDERAL TAX SUITS** | [ ] 891 AGRICULTURAL ACTS |
| [ ] 210 LAND CONDEMNATION | [ ] 442 EMPLOYMENT | **PRISONER CIVIL RIGHTS** | [ ] 791 EMPL RET INC SECURITY ACT (ERISA) | [ ] 870 TAXES (U.S. Plaintiff or Defendant) | [ ] 893 ENVIRONMENTAL MATTERS |
| [ ] 220 FORECLOSURE | [ ] 443 HOUSING/ ACCOMMODATIONS | [ ] 550 CIVIL RIGHTS | | [ ] 871 IRS-THIRD PARTY 26 USC 7609 | [ ] 895 FREEDOM OF INFORMATION ACT |
| [ ] 230 RENT LEASE & EJECTMENT | [ ] 445 AMERICANS WITH DISABILITIES - EMPLOYMENT | [ ] 555 PRISON CONDITION | **IMMIGRATION** | | [ ] 896 ARBITRATION |
| [ ] 240 TORTS TO LAND | | [ ] 560 CIVIL DETAINEE CONDITIONS OF CONFINEMENT | [ ] 462 NATURALIZATION APPLICATION | | [ ] 899 ADMINISTRATIVE PROCEDURE ACT/REVIEW OR APPEAL OF AGENCY DECISION |
| [ ] 245 TORT PRODUCT LIABILITY | [ ] 446 AMERICANS WITH DISABILITIES -OTHER | | [ ] 465 OTHER IMMIGRATION ACTIONS | | [ ] 950 CONSTITUTIONALITY OF STATE STATUTES |
| [ ] 290 ALL OTHER REAL PROPERTY | [ ] 448 EDUCATION | | | | |

*Check if demanded in complaint:*

[ ] CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $_____ OTHER _____

*Check YES only if demanded in complaint*

JURY DEMAND: [ ] YES [x] NO

DO YOU CLAIM THIS CASE IS RELATED TO A CIVIL CASE NOW PENDING IN S.D.N.Y. AS DEFINED BY LOCAL RULE FOR DIVISION OF BUSINESS 13? IF SO, STATE:

JUDGE _____ DOCKET NUMBER _____

NOTE: You must also submit at the time of filing the Statement of Relatedness form (Form IH-32).

**ORIGIN**

*(PLACE AN x IN ONE BOX ONLY)*

[x] 1 Original Proceeding  [ ] 2 Removed from State Court  [ ] 3 Remanded from Appellate Court  [ ] 4 Reinstated or Reopened  [ ] 5 Transferred from (Specify District)  [ ] 6 Multidistrict Litigation (Transferred)  [ ] 7 Appeal to District Judge from Magistrate Judge

  [ ] a. all parties represented

  [ ] b. At least one party is pro se.

[ ] 8 Multidistrict Litigation (Direct File)

*(PLACE AN x IN ONE BOX ONLY)*  **BASIS OF JURISDICTION**  *IF DIVERSITY, INDICATE CITIZENSHIP BELOW.*

[ ] 1 U.S. PLAINTIFF  [ ] 2 U.S. DEFENDANT  [x] 3 FEDERAL QUESTION (U.S. NOT A PARTY)  [ ] 4 DIVERSITY

**CITIZENSHIP OF PRINCIPAL PARTIES (FOR DIVERSITY CASES ONLY)**

(Place an [X] in one box for Plaintiff and one box for Defendant)

|  | PTF | DEF |  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|---|---|---|
| CITIZEN OF THIS STATE | [ ] 1 | [ ] 1 | CITIZEN OR SUBJECT OF A FOREIGN COUNTRY | [ ] 3 | [ ] 3 | INCORPORATED and PRINCIPAL PLACE OF BUSINESS IN ANOTHER STATE | [ ] 5 | [ ] 5 |
| CITIZEN OF ANOTHER STATE | [ ] 2 | [ ] 2 | INCORPORATED or PRINCIPAL PLACE OF BUSINESS IN THIS STATE | [ ] 4 | [ ] 4 | FOREIGN NATION | [ ] 6 | [ ] 6 |

PLAINTIFF(S) ADDRESS(ES) AND COUNTY(IES)

Plaintiff-Appellee Salvatore LaMonica (Chapter 7 Trustee)
LaMonica Herbst & Maniscalco, LLP
3305 Jerusalem Avenue
Wantagh, New York 11793 (Nassau County)

DEFENDANT(S) ADDRESS(ES) AND COUNTY(IES)

Defendants-Appellants Patriarch Partners Agency Services, LLC; Transcendence Transit, Inc.;
Transcendence Transit II, Inc.; and Ark II CLO 2001-1 Limited:

1 Liberty Street, 35th Floor
New York, NY 10006  (New York County)

DEFENDANT(S) ADDRESS UNKNOWN
REPRESENTATION IS HEREBY MADE THAT, AT THIS TIME, I HAVE BEEN UNABLE, WITH REASONABLE DILIGENCE, TO ASCERTAIN
THE RESIDENCE ADDRESSES OF THE FOLLOWING DEFENDANTS:

**COURTHOUSE ASSIGNMENT**

I hereby certify that this case should be assigned to the courthouse indicated below pursuant to Local Rule for Division of Business 18, 20 or 21.

Check one:  THIS ACTION SHOULD BE ASSIGNED TO:  [ ] WHITE PLAINS  [x] MANHATTAN

*/s/ Michael T. Mervis*

DATE 07/27/2020  SIGNATURE OF ATTORNEY OF RECORD

ADMITTED TO PRACTICE IN THIS DISTRICT
[ ] NO
[x] YES (DATE ADMITTED Mo. 12  Yr. 1991 )
Attorney Bar Code # MM0306

RECEIPT #

Magistrate Judge is to be designated by the Clerk of the Court.

Magistrate Judge _____ is so Designated.

Ruby J. Krajick, Clerk of Court by _____ Deputy Clerk, DATED _____.

UNITED STATES DISTRICT COURT (NEW YORK SOUTHERN)

**A2832**

**EXECUTION COPY**

CREDIT AGREEMENT

among

TRANSCARE CORPORATION,
Borrower,

The Several Lenders
from Time to Time Parties Hereto,

and

PATRIARCH PARTNERS AGENCY SERVICES, LLC,
as Administrative Agent

Dated as of August 4, 2003

\_0

**JX 001**

LaMonica v. Tilton, et al., 18-1021-smb

Confidential

PP-TRBK0000027

# TABLE OF CONTENTS

Page

## SECTION 1. DEFINITIONS

1.1    Defined Terms.................................................................................1
1.2    Other Definitional Provisions................................................20

## SECTION 2. AMOUNT AND TERMS OF TERM LOANS

2.1    Term Loans..................................................................................21
2.2    Procedure for Term Loan Distribution................................21
2.3    Repayment of Term Loans.......................................................21

## SECTION 3. AMOUNT AND TERMS OF REVOLVING CREDIT COMMITMENTS

3.1    Revolving Credit Commitments.............................................22
3.2    Procedure for Revolving Credit Borrowing.......................22
3.3    Commitment Fee, Facility Fee................................................23
3.4    Termination or Reduction of Revolving Credit Commitments..................23

## SECTION 4. [RESERVED]

## SECTION 5. GENERAL PROVISIONS APPLICABLE TO LOANS

5.1    Interest Rates and Payment Dates........................................23
5.2    Conversion and Continuation Options................................24
5.3    Minimum Amounts of Tranches; Maximum Number of Tranches..................25
5.4    Repayment of Loans; Evidence of Debt...............................25
5.5    Optional Prepayments..............................................................25
5.6    Mandatory Prepayments..........................................................26
5.7    Computation of Interest and Fees.........................................27
5.8    Inability to Determine Interest Rate.....................................27
5.9    Pro Rata Treatment and Payments.......................................28
5.10   Illegality......................................................................................29
5.11   Requirements of Law...............................................................29
5.12   Taxes............................................................................................30
5.13   Indemnity....................................................................................32
5.14   Lending Offices; Change of Lending Office........................32
5.15   Substitution of Lender.............................................................32

## SECTION 6. REPRESENTATIONS AND WARRANTIES

6.1    Financial Condition..................................................................33
6.2    No Change...................................................................................34

\_0

-i-

**A2834**

| 6.3 | Existence; Compliance with Law | 34 |
| 6.4 | Power; Authorization; Enforceable Obligations | 35 |
| 6.5 | No Legal Bar | 35 |
| 6.6 | No Material Litigation | 35 |
| 6.7 | No Default | 35 |
| 6.8 | Ownership of Property; Liens | 35 |
| 6.9 | Intellectual Property | 35 |
| 6.10 | No Burdensome Restrictions | 35 |
| 6.11 | Taxes | 35 |
| 6.12 | Federal Regulations | 35 |
| 6.13 | ERISA | 35 |
| 6.14 | Investment Company Act; Other Regulations | 35 |
| 6.15 | Subsidiaries | 36 |
| 6.16 | Security Documents | 36 |
| 6.17 | Accuracy and Completeness of Information | 36 |
| 6.18 | Labor Relations | 37 |
| 6.19 | Insurance | 37 |
| 6.20 | Solvency | 37 |
| 6.21 | Purpose of Loans | 37 |
| 6.22 | Environmental Matters | 38 |
| 6.23 | Regulation H | 39 |
| 6.24 | Key-Person Life Insurance Policies | 39 |
| 6.25 | Existing Indebtedness | 39 |
| 6.26 | Concerning Regulatory Matters | 39 |

## SECTION 7. CONDITIONS PRECEDENT

| 7.1 | Conditions to Initial Loans | 39 |
| 7.2 | Conditions to Each Loan | 42 |

## SECTION 8. AFFIRMATIVE COVENANTS

| 8.1 | Financial Statements | 43 |
| 8.2 | Certificates; Other Information | 44 |
| 8.3 | Payment of Obligations | 45 |
| 8.4 | Conduct of Business and Maintenance of Existence | 45 |
| 8.5 | Maintenance of Property; Insurance | 45 |
| 8.6 | Inspection of Property; Books and Records; Discussions | 46 |
| 8.7 | Notices | 46 |
| 8.8 | Environmental Laws | 47 |
| 8.9 | Periodic Audit of Accounts Receivable | 47 |
| 8.10 | Additional Collateral; Additional Subsidiary Guarantors | 47 |
| 8.11 | Vehicles | 48 |

## SECTION 9. NEGATIVE COVENANTS

| 9.1 | Financial Condition Covenants | 48 |
| 9.2 | Limitation on Indebtedness | 49 |
| 9.3 | Limitation on Liens | 50 |
| 9.4 | Limitation on Guarantee Obligations | 51 |

\_0

-ii-

Confidential

| | | |
|---|---|---|
| 9.5 | Limitation on Fundamental Changes | 51 |
| 9.6 | Limitation on Sale of Assets | 51 |
| 9.7 | Limitation on Dividends and Miscellaneous Payments. | 52 |
| 9.8 | Limitation on Capital Expenditures | 52 |
| 9.9 | Limitation on Investments, Loans and Advances. | 52 |
| 9.10 | Limitation on Optional Payments and Modifications of Agreements | 52 |
| 9.11 | Limitation on Transactions with Affiliates | 53 |
| 9.12 | Limitation on Sales and Leasebacks | 53 |
| 9.13 | Limitation on Changes in Fiscal Year | 53 |
| 9.14 | Limitation on Negative Pledge Clauses | 53 |
| 9.15 | Limitation on Lines of Business | 54 |
| 9.16 | Governing Documents | 54 |
| 9.17 | Limitation on Payroll Accounts | 54 |

## SECTION 10. EVENTS OF DEFAULT

## SECTION 11. THE AGENT

| | | |
|---|---|---|
| 11.1 | Appointment | 57 |
| 11.2 | Delegation of Duties | 57 |
| 11.3 | Exculpatory Provisions | 58 |
| 11.4 | Reliance by Administrative Agent | 59 |
| 11.5 | Notice of Default | 59 |
| 11.6 | Non-Reliance on Administrative Agent and Other Lenders | 60 |
| 11.7 | Indemnification | 60 |
| 11.8 | Administrative Agent in Its Individual Capacity | 61 |
| 11.9 | Successor Administrative Agent | 61 |
| 11.10 | Authorization to Release Liens | 62 |
| 11.11 | The Arranger; the Documentation Agents | 62 |
| 11.12 | The Administrative Agent and the Secured Parties | 62 |

## SECTION 12. MISCELLANEOUS

| | | |
|---|---|---|
| 12.1 | Amendments and Waivers | 62 |
| 12.2 | Notices | 63 |
| 12.3 | No Waiver; Cumulative Remedies | 64 |
| 12.4 | Survival of Representations and Warranties | 64 |
| 12.5 | Payment of Expenses and Taxes | 64 |
| 12.6 | Successors and Assigns; Participations and Assignments | 64 |
| 12.7 | Adjustments; Set-off | 67 |
| 12.8 | Counterparts | 68 |
| 12.9 | Severability | 68 |
| 12.10 | Integration | 68 |
| 12.11 | GOVERNING LAW | 68 |
| 12.12 | Submission To Jurisdiction; Waivers | 68 |
| 12.13 | Acknowledgments | 68 |
| 12.14 | WAIVERS OF JURY TRIAL | 69 |
| 12.15 | Confidentiality | 69 |

\_ 0

**A2836**

Confidential

PP-TRBK0000030

SCHEDULES

Schedule 1.0          Lenders, Commitments, and Applicable Lending Offices

Schedule 1.1(a)       Reorganization Charges; Investigation Expenses

Schedule 1.1(b)       Leased Real Property

Schedule 1.1(c)       Existing Specified Leases

Schedule 5.9(c)       Funding and Payment Office

Schedule 6.1(a)       Exceptions to Financial Statements

Schedule 6.1(c)       Exceptions to Forecast

Schedule 6.3          Existence; Compliance with Law

Schedule 6.4          Consents and Filings

Schedule 6.5          Requirements of Law and Contractual Obligations

Schedule 6.6          Material Litigation

Schedule 6.15         Subsidiaries

Schedule 6.16         Filing Jurisdictions

Schedule 6.17(b)      Projections

Schedule 6.18         Labor Relations

Schedule 6.19         Insurance

Schedule 6.22         Environmental Matters

Schedule 6.26         Investigations

Schedule 9.2          Existing Indebtedness

Schedule 9.3          Existing Liens

Schedule 9.4          Existing Guarantee Obligations

Schedule 9.11         Limitation on Transactions with Affiliates

Schedule 9.17         Payroll Account Amount

\_0

**A2837**

Confidential                                    PP-TRBK0000031

EXHIBITS

| Exhibit A-1 | Form of Term Note |
| Exhibit A-2 | Form of Revolving Credit Note |
| Exhibit B | Form of Pledge Agreement |
| Exhibit C | Form of Security Agreement |
| Exhibit D | Form of Subsidiaries Guarantee |
| Exhibit E | Form of Non Bank Status Certificate |
| Exhibit F | Form of Closing Certificate |
| Exhibit G | Form of Opinion of Counsel to the Loan Parties |
| Exhibit H | Form of Landlord Agreement |
| Exhibit I | Form of Assignment and Acceptance |

ANNEX

| Annex I | Form of Notice of Borrowing |
| Annex II | Form of Continuation/Conversion Notice |

\_0

-2-

**A2838**

Confidential

## CREDIT AGREEMENT

CREDIT AGREEMENT, dated as of August 4, 2003, among TRANSCARE CORPORATION, a Delaware corporation (the "Borrower"), the lenders from time to time parties to this Agreement (the "Lenders"), and PATRIARCH PARTNERS AGENCY SERVICES, LLC ("PPAS"), as administrative agent for the Lenders hereunder.

### RECITALS

WHEREAS, Old TransCare (as hereinafter defined) and certain of its subsidiaries are debtors in the Bankruptcy Cases (as hereinafter defined);

WHEREAS, pursuant to the Plan of Reorganization and Confirmation Order (as hereinafter defined), Old TransCare and its subsidiaries shall be reorganized as provided therein;

WHEREAS, as part of such reorganization, the Borrower has requested that the Lenders make available the credit provided for in this Agreement, and the Lenders are willing to make such credit available only on the terms, and subject to the conditions, set forth in this Agreement and the other Loan Documents (as hereinafter defined).

NOW, THEREFORE, in consideration of the premises and the mutual covenants herein contained, the parties hereto hereby agree as follows:

SECTION 1.   DEFINITIONS

1.1   Defined Terms..  As used in this Agreement, terms defined in the preamble or recitals hereto shall have the meanings set forth therein, and the following terms shall have the following meanings:

"Accounts": all of the Loan Parties' now owned or hereafter acquired or arising accounts as defined in the UCC, including any rights to payment for the sale or lease of goods or rendition of services, whether or not they have been earned by performance, including but not limited to the Loan Parties' Medicare/Medicaid Receivables, Private Pay/Co Pay Receivables, Institutional Receivables, and Third Party Receivables.

"Acquired Person": as to any Person, any other Person (i) at least 80% of the Capital Stock of which is owned by such Person and (ii) which is consolidated with such Person in accordance with GAAP.

"Acquisition": as to any Person, the acquisition by such Person of (a) Capital Stock of any other Person if, after giving effect to the acquisition of such Capital Stock, such other Person would be a Subsidiary, (b) all or substantially all of the assets of any other Person or (c) assets constituting one or more business units of any other Person.

"Adjusted Base Rate": in the case of a Term Loan which is a Base Rate Loan, the greater of (a) the Base Rate plus the Applicable Margin or (b) the Fixed Rate.

\_0

Confidential

"Adjusted Eurodollar Rate": in the case of a Term Loan which is a Eurodollar Loan, the greater of (a) the Eurodollar Rate plus the Applicable Margin or (b) the Fixed Rate.

"Administrative Agent": PPAS, together with any successor Administrative Agent appointed pursuant to Section 11.9.

"Affiliate": as to any Person, any other Person (other than a Subsidiary) which, directly or indirectly, is in control of, is controlled by, or is under common control with, such Person. For purposes of this definition, "control" of a Person (including, with its correlative meanings, "controlled by" and "under common control with") means the power, directly or indirectly, either to (a) vote 10% or more of the securities having ordinary voting power for the election of directors of such Person or (b) direct or cause the direction of the management and policies of such Person, whether by contract or otherwise. Hampshire Persons and the Lenders shall only be deemed Affiliates of the Borrower and any other Loan Party for purposes of Section 9.11.

"Aggregate Outstanding RC Extensions of Credit": at any time, the aggregate of the Revolving Extensions of Credit of all Revolving Credit Lenders outstanding at such time.

"Agreement": this Credit Agreement, as amended, supplemented or otherwise modified from time to time.

"Applicable Lending Office": for each Lender and for each Type of Loan, the lending office of such Lender designated for such Type of Loan on Schedule 1.0 hereto (or any other lending office from time to time notified to the Administrative Agent by such Lender ) as the office at which its Loans of such Type are to be made and maintained.

"Applicable Margin": (a) for any Term Loan of any Type at any time during the periods set forth in the table below, the rate per annum set forth under the relevant column heading opposite the applicable period below:

| Period | Base Rate Loans | Eurodollar Loans |
|---|---|---|
| Closing Date to but excluding the first anniversary of the Closing Date | 3.25% | 4.50% |
| First anniversary of the Closing Date and thereafter | 4.75% | 6.00% |

and

(b)      for any Revolving Credit Loan at any time, 4.50% in the case of Eurodollar Loans and 3.25% in the case of Base Rate Loans.

"Approved Fund": means (a) with respect to any Lender, any Bank CLO of such Lender, and (b) with respect to any Lender that is a fund that invests in commercial loans and similar extensions of credit, any other fund that invests in commercial loans and similar extensions of credit and is managed by the same investment advisor or collateral manager as such Lender or by an Affiliate or Subsidiary of such investment advisor or collateral manager.

L_0

**A2840**

Confidential

PP-TRBK0000034

"<u>Asset Sale</u>":  any sale, lease or other disposition of property or series of related sales, leases or other dispositions of property (excluding any such sale, leases or other disposition permitted by clauses (b), (c), (d), (e) and (f) of Section 9.6) which yields net proceeds in any fiscal year of the Borrower to the Borrower or any of its Subsidiaries (valued at the initial principal amount thereof in the case of non-cash proceeds consisting of notes or other debt securities and valued at fair market value in the case of other non-cash proceeds), together with the net proceeds of all other sales, leases or other dispositions of property during such fiscal year of the Borrower, in excess of an aggregate amount of $250,000 per fiscal year of the Borrower.

"<u>Assignee</u>":  as defined in Section 12.6(c).

"<u>Assignment and Acceptance</u>":  as defined in Section 12.6(c).

"<u>Available RC Commitment</u>":  as to any Lender at any time, an amount equal to the excess, if any, of (a) the amount of such Lender's Revolving Credit Commitment at such time over (b) such Lender's Revolving Extensions of Credit.

"<u>Bank CLO</u>":  as to any Lender, any entity (whether a corporation, partnership, trust or otherwise) that is engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its business and is administered or managed by such Lender or an Affiliate or Subsidiary of such Lender.

"<u>Bankruptcy Cases</u>":  the reorganization proceedings filed by Old TransCare and certain Subsidiaries thereof under chapter 11 of the Bankruptcy Code pursuant to voluntary petitions filed September 9, 2002, case no. 02-14385 (RDD).

"<u>Bankruptcy Code</u>":  Title 11 of the United States Code, as amended (11 U.S.C. § 101 <u>et seq</u>.).

"<u>Bankruptcy Court</u>":  the United States Bankruptcy Court for the Southern District of New York.

"<u>Base Rate</u>":  for any day, the rate per annum equal to the greater of (a) the Prime Rate in effect on such day and (b) the Federal Funds Effective Rate in effect on such day plus ½ of 1%.  For purposes hereof:  "Prime Rate" shall mean the rate of interest publicly announced by Wachovia from time to time as its prime rate (the prime rate not being intended to be the lowest rate of interest charged by Wachovia in connection with extensions of credit to debtors).

"<u>Base Rate Loans</u>":  Loans the rate of interest applicable to which is based upon the Adjusted Base Rate in the case of Term Loans or the Base Rate in the case of Revolving Credit Loans.

"<u>Benefited Lender</u>":  as defined in Section 12.7(a).

"<u>Board</u>":  the Board of Governors of the Federal Reserve System of the United States (or any successor).

"<u>Borrower</u>":  as defined in the heading to this Agreement.

"<u>Borrowing Date</u>":  any Business Day specified in a notice pursuant to Section 2.2 or 3.2 as a date on which the Borrower requests the Lenders to make Loans, hereunder.

\_0

-3-

Confidential                                                     PP-TRBK0000035

"Business":  as defined in Section 6.22.

"Business Day":  (i) for all purposes other than as covered by clause (ii) of this definition, a day other than a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by law to close, and, (ii) with respect to all notices and determinations in connection with, and payments of principal and interest on, Eurodollar Loans, any day which is a Business Day as described in clause (i) of this definition and which is also a day on which dealings in Dollar deposits are carried out in the interbank eurodollar market.

"Capital Stock":  any and all shares, interests, participations or other equivalents (however designated) of capital stock of a corporation, any and all similar ownership interests in a Person (other than a corporation) and any and all warrants, rights or options to purchase any of the foregoing.

"Cash Equivalents":  (a) securities with maturities of 90 days or less from the date of acquisition issued or fully guaranteed or insured by the United States Government or any agency thereof, (b) certificates of deposit and eurodollar time deposits with maturities of 90 days or less from the date of acquisition and overnight bank deposits of any Lender or of any commercial bank having capital and surplus in excess of $500,000,000, (c) repurchase obligations of any Lender or of any commercial bank satisfying the requirements of clause (b) of this definition, having a term of not more than seven days with respect to securities issued or fully guaranteed or insured by the United States Government, (d) commercial paper of a domestic issuer rated at least A-1 or the equivalent thereof by Standard and Poor's Ratings Group ("S&P") or P-1 or the equivalent thereof by Moody's Investors Service, Inc. ("Moody's") and in either case maturing within 90 days after the day of acquisition, (e) securities with maturities of 90 days or less from the date of acquisition issued or fully guaranteed by any state, commonwealth or territory of the United States, by any political subdivision or taxing authority of any such state, commonwealth or territory or by any foreign government, the securities of which state, commonwealth, territory, political subdivision, taxing authority or foreign government (as the case may be) are rated at least A by S&P or A by Moody's, (f) securities with maturities of 90 days or less from the date of acquisition backed by standby letters of credit issued by any Lender or any commercial bank satisfying the requirements of clause (b) of this definition or (g) shares of money market mutual or similar funds which invest exclusively in assets satisfying the requirements of clauses (a) through (f) of this definition.

"Certain Reinvestment Receipts":  as defined in the proviso to the definition of "Reinvestment Notice".

"Class":  as to any Loan, its classification as a Term Loan or Revolving Credit Loan.

"Closing Date":  the date on which the conditions precedent set forth in Section 7.1 are satisfied or waived.

"Code":  the Internal Revenue Code of 1986, as amended from time to time.

"Collateral":  all property and interests in property of the Loan Parties, now owned or hereinafter acquired, upon which a Lien is purported to be created by any Security Document.

"Commitment":  any Term Loan Commitment or Revolving Credit Commitment.

"Common Stock":  the common stock, par value $0.01 per share, of the Borrower.

"Commonly Controlled Entity":  an entity, whether or not incorporated, which is under common control with the Borrower within the meaning of Section 4001 of ERISA or is part of a group

\_0

Confidential

which includes the Borrower and which is treated as a single employer under Section 414(b) or (c) of the Code or, for purposes of the Code, Section 414(m) or (o) of the Code.

"Conduit Lender": any special purpose corporation organized and administered by any Lender for the purpose of making Loans otherwise required to be made by such Lender and designated by such Lender in a written instrument; provided, that the designation by any Lender of a Conduit Lender shall not relieve the designating Lender of any of its obligations to fund a Loan under this Agreement if, for any reason, its Conduit Lender fails to fund any such Loan, and the designating Lender (and not the Conduit Lender) shall have the sole right and responsibility to deliver all consents and waivers required or requested under this Agreement with respect to its Conduit Lender, and provided, further, that no Conduit Lender shall (a) be entitled to receive any greater amount pursuant to Section 5.11, 5.12, 5.13 or 12.5 than the designating Lender would have been entitled to receive in respect of the extensions of credit made by such Conduit Lender or (b) be deemed to have any Commitment.

"Confirmation Order": the final order of the Bankruptcy Court, dated July 15, 2003, confirming the Plan of Reorganization pursuant to Section 1129 of the Bankruptcy Code, a copy of which has been provided to each Lender, and such additional orders relating thereto or in aid of consummation thereof as are reasonably satisfactory to the Administrative Agent and each Lender, in each case as amended, supplemented, waived or otherwise modified in accordance with Section 9.10.

"Consolidated Capital Expenditures": for any period, each expenditure made by or committed to be made by the Borrower or any Subsidiary during such period that, in conformity with GAAP, shall be classified as a capital expenditure, regardless of the source of financing.

"Consolidated Current Assets": at a particular date, all amounts which would, in conformity with GAAP, be included under current assets on a consolidated balance sheet of the Borrower and its Subsidiaries at such date; provided, however, that such amounts shall not include (a) any amounts for any Indebtedness owing by an Affiliate of the Borrower, unless such Indebtedness arose in connection with the sale of goods or other property in the ordinary course of business and would otherwise constitute current assets in conformity with GAAP, (b) any Capital Stock issued by a Subsidiary or Affiliate of the Borrower, or (c) the cash surrender value of any life insurance policy.

"Consolidated Current Liabilities": at a particular date, all amounts which would, in conformity with GAAP, be included under current liabilities on a consolidated balance sheet of the Borrower and its Subsidiaries as at such date.

"Consolidated EBITDA": for any period, the sum for such period, without duplication, of (a) Consolidated Net Income for such period, (b) the sum of provisions for such period for income taxes, interest expense, and depreciation and amortization expense used in determining such Consolidated Net Income, (c) amounts deducted in calculating Consolidated Net Income for such period in respect of non-cash expenses in accordance with GAAP, (d) to the extent deducted in the calculation of such Consolidated Net Income, reorganization charges incurred by the Loan Parties during the fiscal years of the Borrower ended December 31, 2002 and 2003 in connection with the Bankruptcy Cases and the Plan of Reorganization, of the type and in the maximum amounts for the periods set forth on Part A of Schedule 1.1(a), (e) to the extent deducted in the calculation of such Consolidated Net Income, noncash expenses deducted in such period in connection with stock options, the Management Agreement or the Stockholders Agreement, noncash charges in connection with the impairment of certain intangible assets pursuant to the application of Financial Accounting Standards Bulletin ("FASB") Nos. 141 and 142 (Impairment of Goodwill) and FASB Nos. 121 and 144 (Other Impairment of Intangibles), and subsequent revisions to or replacements for such Bulletins, and (f) to the extent deducted in the calculation of such Consolidated Net Income, costs and fees incurred in respect of the investigations

\_0

Confidential

disclosed in Schedule 6.6 in the maximum amounts for the periods set forth on Part B of Schedule 1.1(a) all as determined on a consolidated basis in accordance with GAAP.

"Consolidated Fixed Charges": for any period, the sum of (i) the amounts deducted for the cash portion of Consolidated Interest Expense in determining Consolidated Net Income for such period, and (ii) the amount of scheduled payments of principal of Indebtedness after the Closing Date made by the Borrower and its Subsidiaries during such period (excluding all payments under Financing Leases during such period) as determined on a consolidated basis in accordance with GAAP.

"Consolidated Interest Expense": for any period, the amount which, in conformity with GAAP, would be set forth opposite the caption "interest expense" or any like caption (including without limitation, imputed interest included in payments under Financing Leases) on a consolidated income statement of the Borrower and the Subsidiaries for such period excluding the amortization of any original issue discount; provided that, for the first periods of one, two and three fiscal quarters of the Borrower ended following the Closing Date, Consolidated Interest Expense shall be calculated by multiplying the amount determined pursuant to this definition (excluding this proviso) for such one, two or three fiscal quarter period by a fraction, the numerator of which is four and the denominator is the number of fiscal quarters of the Borrower elapsed since the Closing Date as of the end of such period.

"Consolidated Lease Expense": for any period, the aggregate amount of fixed or contingent rentals payable by the Borrower and its Subsidiaries in respect of Financing Leases, determined on a consolidated basis in accordance with GAAP, for such period with respect to leases of real and personal property.

"Consolidated Net Income": for any period, the consolidated net income (or deficit) of the Borrower and the Subsidiaries for such period (taken as a cumulative whole), determined in accordance with GAAP; provided that there shall be excluded (a) the income (or deficit) of any Person accrued prior to the date it becomes a Subsidiary or is merged into or consolidated with the Borrower or any Subsidiary, (b) the income (or deficit) of any Person (other than a Subsidiary) in which the Borrower or any Subsidiary has an ownership interest, except to the extent that any such income has been actually received by the Borrower or such Subsidiary in the form of dividends or similar distributions, (c) the undistributed earnings of any Subsidiary to the extent that the declaration or payment of dividends or similar distributions by such Subsidiary is not at the time permitted by the terms of any Contractual Obligation or Requirement of Law applicable to such Subsidiary, (d) any restoration to income of any contingency reserve, except to the extent that provision for such reserve was made out of income accrued during such period, (e) any aggregate net gain or net loss during such period arising from the sale, exchange or other disposition of capital assets (such term to include all fixed assets, whether tangible or intangible, all inventory sold in conjunction with the disposition of fixed assets and all securities), (f) any write-up of any asset, (g) any net gain from the collection of the proceeds of life insurance policies, (h) any gain arising from the acquisition of any securities, or the extinguishment, under GAAP, of any Indebtedness, of the Borrower or any Subsidiary, (i) in the case of a successor to the Borrower by consolidation or merger or as a transferee of its assets, any earnings of the successor corporation prior to such consolidation, merger or transfer of assets, and (j) any deferred credit representing the excess of equity in any Subsidiary at the date of acquisition over the cost of the investment in such Subsidiary.

"Consolidated Senior Indebtedness": at any time, Consolidated Total Indebtedness at such time minus the aggregate outstanding principal amount of all Subordinated Indebtedness of the Borrower and its Subsidiaries at such time determined on a consolidated basis in accordance with GAAP.

"Consolidated Total Indebtedness": at any time, the aggregate principal amount (including, with respect to any Indebtedness originally issued at a discount, the accreted portion thereof)

\_ 0

Confidential

of Indebtedness of Borrower and its Subsidiaries at such time, determined on a consolidated basis in accordance with GAAP, but excluding any Indebtedness in respect of issued but undrawn letters of credit.

"Continue", "Continuation" and "Continued" shall refer to the continuation of a Eurodollar Loan from one Interest Period to the next Interest Period.

"Contractual Obligation": as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"Convert", "Conversion" and "Converted" shall refer to a conversion of Base Rate Loans into Eurodollar Loans or of Eurodollar Loans into Base Rate Loans, which may be accompanied by the transfer by a Lender (at its sole discretion) of a Loan from one Applicable Lending Office to another.

"Co-Payment Obligation" with respect to an Account, the obligation of a Person for whom services were rendered to pay a portion of the cost of such services giving rise to such Account, including, without limitation, any amounts for which a Person for whom services were rendered is personally obligated to pay, including deductibles and co-insurance amounts.

"Credit Exposure": as to any Lender at any time, the sum of (a) its Revolving Credit Commitment (or, if the Revolving Credit Commitments shall have expired or been terminated, the aggregate unpaid principal amount of its Revolving Credit Loans) and (b) the unpaid principal amount of its Term Loans.

"Credit Exposure Percentage": as to any Lender at any time, the fraction (expressed as a percentage), the numerator of which is the Credit Exposure of such Lender at such time and the denominator of which is the aggregate Credit Exposures of all of the Lenders at such time.

"Default": any of the events specified in Section 10, whether or not any requirement for the giving of notice, the lapse of time, or both, or any other condition, has been satisfied.

"Deposit Account Control Agreement": as defined in the Security Agreement.

"DIP Credit Agreement": the Debtor in Possession Financing and Security Agreement, dated as of September 11, 2002, among Old TransCare, certain Subsidiaries of Old TransCare, the lenders parties thereto, and State Street Bank and Trust Company, as agent, as amended, supplemented or otherwise modified prior to the date hereof.

"DIP Loan Documents": the "Loan Documents", as defined in the DIP Credit Agreement.

"Disclosure Statement": means the Disclosure Statement that relates to the Plan of Reorganization and has been approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code, as such Disclosure Statement may be amended, modified, or supplemented (and all exhibits and schedules annexed thereto or referred to therein).

"Dollars" and "$": dollars in lawful currency of the United States of America.

"Eligible Assignee": means (a) a Lender or an affiliate of a Lender, (b) a commercial bank organized under the laws of the United States or any state and having total assets in excess of $500,000,000 or an affiliate of any such bank or (c) any other fund or financial institution or affiliate or

\_ 0

-7-

Confidential

Approved Fund thereof that in the ordinary course of business extends credit or invests in extensions of credit of a type similar to the Loans and has total assets of at least $100,000,000.

"Environmental Laws": any and all foreign, Federal, state, local or municipal laws, rules, orders, regulations, statutes, ordinances, codes, decrees, requirements of any Governmental Authority or other Requirements of Law (including common law) regulating, relating to or imposing liability or standards of conduct concerning protection of human health or the environment, as now or may at any time hereafter be in effect.

"Equipment": as defined in the Security Agreement.

"ERISA": the Employee Retirement Income Security Act of 1974, as amended from time to time.

"Eurocurrency Reserve Requirements": for any day as applied to a Eurodollar Loan, the aggregate (without duplication) of the rates (expressed as a decimal fraction) of reserve requirements current on such day (including, without limitation, basic, supplemental, marginal and emergency reserves under any regulations of the Board or other Governmental Authority having jurisdiction with respect thereto), as now and from time to time hereafter in effect, dealing with reserve requirements prescribed for eurocurrency funding (currently referred to as "Eurocurrency Liabilities" in Regulation D of such Board) maintained by a member bank of the Federal Reserve System.

"Eurodollar Base Rate": with respect to each day during each Interest Period pertaining to a Eurodollar Loan, the rate per annum determined on the basis of the rate for deposits in Dollars for a period equal to such Interest Period commencing on the first day of such Interest Period appearing on Page 3750 of the Telerate screen (or any successor page) at approximately 11:00 a.m. (London time) two Business Days prior to the first day of such Interest Period. In the event that such rate does not appear on Page 3750 of the Telerate screen (or otherwise on such screen), the "Eurodollar Base Rate" shall be determined by reference to such other comparable publicly available service for displaying eurodollar rates as may be selected by the Administrative Agent or, in the absence of such availability, by reference to the rate at which the Administrative Agent is offered Dollar deposits at or about 11:00 A.M., New York City time, two Business Days prior to the beginning of such Interest Period in the interbank eurodollar market where its eurodollar and foreign currency and exchange operations are then being conducted for delivery on the first day of such Interest Period for the number of days comprised therein.

"Eurodollar Loans": Loans the rate of interest applicable to which is based upon the Adjusted Eurodollar Rate in the case of Term Loans or the Eurodollar Rate in the case of Revolving Credit Loans.

"Eurodollar Rate": with respect to each day during each Interest Period pertaining to a Eurodollar Loan, a rate per annum determined for such day in accordance with the following formula (rounded upwards to the nearest $1/100^{th}$ of 1%):

$$\frac{\text{Eurodollar Base Rate}}{1.00 - \text{Eurocurrency Reserve Requirements}}$$

"Event of Default": any of the events specified in Section 10; provided that any requirement for the giving of notice, the lapse of time, or both, or any other condition, has been satisfied.

"Excess Cash Flow": for each fiscal year of the Borrower beginning with the fiscal year ending December 31, 2003:

\_0

Confidential

(a) Consolidated EBITDA for such fiscal year;

<u>plus</u> (b) the decrease (if any) in the amount of the excess of Consolidated Current Assets (excluding cash and cash equivalents) over Consolidated Current Liabilities at the end of such fiscal year compared to the amount of the excess of Consolidated Current Assets (excluding cash and cash equivalents) over Consolidated Current Liabilities at the end of the immediately preceding fiscal year of the Borrower;

<u>minus</u> (c) the sum of (i) the amount of all regularly scheduled payments of principal of the Term Loans and other permitted Indebtedness actually made by the Borrower and its Subsidiaries during such fiscal year and the amount of any voluntary prepayment of principal of the Term Loans made during such fiscal year, (ii) the amount of all interest payments actually made in cash during such fiscal year by the Borrower and its consolidated Subsidiaries, (iii) Consolidated Lease Expense for such fiscal year, (iv) the amount of cash capital expenditures actually made by the Borrower and its Subsidiaries during such fiscal year to the extent permitted by Section 9.8, (v) cash income taxes paid by the Borrower and its Subsidiaries during such fiscal year, and (vi) the increase (if any) in the amount of the excess of Consolidated Current Assets (excluding cash and cash equivalents) over Consolidated Current Liabilities at the end of such fiscal year compared to the amount of the excess of Consolidated Current Assets (excluding cash and cash equivalents) over Consolidated Current Liabilities at the end of the immediately preceding fiscal year of the Borrower.

"<u>Existing Specified Leases</u>": collectively, the Financing Leases referred to on Schedule 1.1(c) entered into to finance vehicles and/or equipment listed on Schedule 1.1(c).

"<u>Extraordinary Receipt</u>": any cash received by or paid to or for the account of any Person other than in the ordinary course of business in respect of tax refunds, pension plan reversions, proceeds of insurance (other than proceeds of Recovery Events), indemnity payments, purchase price adjustments received in connection with any purchase agreement (or other similar agreement) and payments in respect of judgments or settlements of claims, litigation or proceedings; <u>provided</u>, that Extraordinary Receipts shall not include cash receipts received from proceeds of indemnity payments or payments in respect of judgments or settlements of claims, litigation or proceedings to the extent that such proceeds, awards or payments are received by any Person in respect of any third party claim against or loss by such Person and promptly applied to pay (or to reimburse such Person for its prior payment of) such claim or loss and the costs and expenses of such Person with respect thereto and that any such third party being so reimbursed shall not be a Loan Party or a Subsidiary or Affiliate of a Loan Party.

"<u>Facility</u>": each of the Term Loan Facility and the Revolving Credit Facility.

"<u>Federal Funds Effective Rate</u>": for any day, the weighted average of the rates on overnight federal funds transactions with members of the Federal Reserve System arranged by federal funds brokers, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day which is a Business Day, the average of the quotations for the day of such transactions received by the Administrative Agent from three federal funds brokers of recognized standing selected by it.

"<u>Financing Lease</u>": any lease of property, real or personal, the obligations of the lessee in respect of which are required in accordance with GAAP to be capitalized on a balance sheet of the lessee.

Confidential

"Fixed Rate": at any time during any period set forth below, the rate per annum set forth opposite such period below:

| Period | Rate |
|---|---|
| Closing Date through but excluding first anniversary of Closing Date | 8% |
| First anniversary of Closing Date to but excluding second anniversary of Closing Date | 10% |
| Second anniversary of Closing Date and thereafter | 12% |

"Fixed Rate Loans": Loans the rate of interest applicable to which is based upon the Fixed Rate.

"Funding and Payment Office": as defined in Section 5.9(c).

"GAAP": generally accepted accounting principles in the United States of America in effect from time to time.

"Governing Documents": as to any Person, its articles or certificate of incorporation and by-laws, its partnership agreement, its certificate of formation and operating agreement, and/or the other organizational or governing documents of such Person.

"Governmental Authority": any nation or government, any state or other political subdivision thereof and any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government.

"Guarantee Obligation": as to any Person (the "guaranteeing person"), any obligation of (a) the guaranteeing person or (b) another Person (including, without limitation, any bank under any letter of credit) to induce the creation of which the guaranteeing person has issued a reimbursement, counterindemnity or similar obligation, in either case guaranteeing or in effect guaranteeing any Indebtedness, leases, dividends or other obligations (the "primary obligations") of any other third Person (the "primary obligor") in any manner, whether directly or indirectly, including, without limitation, any obligation of the guaranteeing person, whether or not contingent, (i) to purchase any such primary obligation or any property constituting direct or indirect security therefor, (ii) to advance or supply funds (1) for the purchase or payment of any such primary obligation or (2) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, (iii) to purchase property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation or (iv) otherwise to assure or hold harmless the owner of any such primary obligation against loss in respect thereof; provided, however, that the term Guarantee Obligation shall not include endorsements of instruments for deposit or collection in the ordinary course of business. The terms "Guarantee" and "Guaranteed" used as a verb shall have a correlative meaning. The amount of any Guarantee Obligation of any guaranteeing person shall be deemed to be the lower of (a) an amount equal to the stated or determinable amount of the primary obligation in respect of which such Guarantee Obligation is made and (b) the maximum amount for which such guaranteeing person may be liable pursuant to the terms of the instrument embodying such Guarantee Obligation, unless such primary obligation and the maximum amount for which such guaranteeing person may be liable are not stated or

\_0

-10-

Confidential

determinable, in which case the amount of such Guarantee Obligation shall be such guaranteeing person's maximum reasonably anticipated liability in respect thereof as determined by the Borrower in good faith.

"Hampshire Management":  Hampshire Management Company LLC.

"Hampshire Persons":  collectively, Hampshire Management, ING Equity, Hampshire Media C Corp. II and Hampshire Media Partners II, L.P.

"Hedge Agreement":  any interest rate or currency swap, cap or collar agreement or similar arrangement or foreign exchange contract entered into by the Borrower or any of its Subsidiaries providing for protection against fluctuations in interest rates or currency exchange rates or the exchange of nominal interest obligations, either generally or under specific contingencies.

"Immaterial Subsidiaries":  Each of the Subsidiaries whose assets are less than $50,000 and whose annual revenues are less than $50,000; but only so long as the aggregate of all assets of all such Subsidiaries is less than $250,000 and the aggregate of all revenues of all such Subsidiaries is less than $250,000.

"Indebtedness":  of any Person at any date, without duplication, (a) all indebtedness of such Person for borrowed money (whether by loan or the issuance and sale of debt securities) or for the deferred purchase price of property or services (other than current trade liabilities incurred in the ordinary course of business and payable in accordance with customary practices), (b) any other indebtedness of such Person which is evidenced by a note, bond, debenture or similar instrument, (c) all obligations of such Person under Financing Leases, (d) all obligations of such Person in respect of letters of credit in excess of any cash collateral securing such letters of credit as permitted under Section 9.2(h), acceptances or similar instruments issued or created for the account of such Person, (e) all Guarantee Obligations of such Person in respect of obligations of the kind referred to in clauses (a) through (d) above, (f) all liabilities secured by (or for which the holder of such obligations has an existing right, contingent or otherwise, to be secured by) any Lien on any property owned by such Person even though such Person has not assumed or otherwise become liable for the payment thereof, (g) for the purposes of Section 10 (f) only, all obligations of such Person in respect of Hedge Agreements, (h) the redemption price for any preferred stock to the extent of any redemption required prior to maturity of the Loans and (i) all obligations of such Person in respect of synthetic-leases, sale-leasebacks and securitization transactions. The amount of any Indebtedness under (x) clause (f) shall be equal to the lesser of (A) the stated amount of the relevant obligations and (B) the fair market value of the property subject to the relevant Lien and (y) clause (g) shall be the net amount, including any net termination payments, required to be paid to a counterparty rather than the notional amount of the applicable Hedge Agreement. "Indebtedness" of any Person shall not include any obligations, including interest or other charges, incurred by such Person to finance insurance premiums in the ordinary course of such Person's business.

"ING Equity":  ING Equity Partners L.P. I.

"Insolvency":  with respect to any Multiemployer Plan, the condition that such Plan is insolvent within the meaning of Section 4245 of ERISA.

"Insolvent":  pertaining to a condition of Insolvency.

"Institutional Receivables":  Accounts arising from the delivery of services by the Borrower or a Subsidiary for which the obligor is a hospital, nursing home or other institution, including without limitation, the Veteran's Hospital, the New York Board of Education, and the Veterans

\_0

-11-

**A2849**

PP-TRBK0000043

Administration, and in any event excluding that portion of an account receivable constituting a Co-Payment Obligation.

"Interest Payment Date": (a) as to any Base Rate Loan or Fixed Rate Loan, the first Business Day of each month, (b) as to any Eurodollar Loan having an Interest Period of one month, the last day of such Interest Period, (c) as to any Eurodollar Loan having an Interest Period longer than one month, (i) each day which is one month, or a whole multiple thereof, after the first day of such Interest Period, and (ii) the last day of such Interest Period and (d) as to any Loan (other than any Revolving Credit Loan that is a Base Rate Loan), the date of any repayment or prepayment made in respect thereof.

"Interest Period": with respect to any Eurodollar Loan:

    (a)    initially, the period commencing on the borrowing or Conversion date, as the case may be, with respect to such Eurodollar Loan and ending one, two, or three months thereafter, as selected by the Borrower in its notice of borrowing or notice of Conversion, as the case may be, given with respect thereto (in the form of Annex I) ; and

    (b)    thereafter, each period commencing on the last day of the next preceding Interest Period applicable to such Eurodollar Loan and ending one, two, or three months thereafter, as selected by the Borrower by irrevocable notice (in the form of Annex I) to the Administrative Agent not less than three Business Days prior to the last day of the then current Interest Period with respect thereto;

provided that, all of the foregoing provisions relating to Interest Periods are subject to the following:

    (1) if any Interest Period would otherwise end on a day that is not a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless the result of such extension would be to carry such Interest Period into another calendar month in which event such Interest Period shall end on the immediately preceding Business Day;

    (2) any Interest Period with respect to any Revolving Credit Loan that would otherwise extend beyond the Revolving Credit Termination Date, shall end on the Revolving Credit Termination Date, and any Interest Period with respect to any Term Loan that would otherwise extend beyond the date final payment is due on the Term Loan shall end on such date of final payment, as the case may be;

    (3) any Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall end on the last Business Day of a calendar month; and

    (4) the Borrower shall select Interest Periods so as not to require a payment or prepayment of any Eurodollar Loan during an Interest Period for such Loan.

"Inventory": as defined in the Security Agreement.

"Lender": as defined in the preface.

"Leverage Ratio": at any time, the ratio of (a) Consolidated Senior Indebtedness as of such time to (b) Consolidated EBITDA for the twelve consecutive months most recently ended at or most recently prior to such time.

Confidential

"Lien": any mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), charge or other security interest or any preference, priority or other security agreement or preferential arrangement of any kind or nature whatsoever (including, without limitation, any conditional sale or other title retention agreement and any Financing Lease having substantially the same economic effect as any of the foregoing), and the filing of any financing statement under the Uniform Commercial Code or comparable law of any jurisdiction in respect of any of the foregoing.

"Loan": any loan made by any Lender pursuant to this Agreement.

"Loan Documents": this Agreement, the Notes, the Applications, the Subsidiaries Guarantee and the Security Documents.

"Loan Parties": the Borrower and any Subsidiary of the Borrower which is or becomes a party to a Loan Document.

"Majority Facility Lenders": with respect to any Facility, the holders of more than 50% of the aggregate unpaid principal amount of the Term Loans or the Aggregate Outstanding RC Extensions of Credit, as the case may be, outstanding under such Facility (or, in the case of the Revolving Credit Facility, prior to any termination of the Revolving Credit Commitments, the holders of more than 50% of the aggregate Revolving Credit Commitments of all Revolving Credit Lenders).

"Management Agreement": the Management Consulting Services Agreement, dated as of August 4, 2003, among the Borrower and Hampshire Management, as amended, supplemented an otherwise modified from time to time as permitted under Section 9.10.

"Management Fees": the periodic fees payable to the Hampshire Persons pursuant to the Management Agreement.

"Material Adverse Effect": a material adverse effect on (a) the business, operations, property, condition (financial or otherwise) or prospects of the Borrower and its Subsidiaries taken as a whole or (b) the validity or enforceability of this Agreement or any of the other Loan Documents or the rights or remedies of the Administrative Agent or the Lenders hereunder or thereunder.

"Material Environmental Amount": as defined in Section 6.22(a).

"Materials of Environmental Concern": any gasoline or petroleum (including crude oil or any fraction thereof) or petroleum products or any hazardous or toxic substances, materials or wastes, defined or regulated as such in, or which form the basis of liability under, or under any Environmental Law, including, without limitation, asbestos, polychlorinated biphenyls and urea-formaldehyde insulation, medical waste, radioactive materials and electromagnetic fields.

"Medicare Controlled Account Agreement": as defined in the Security Agreement.

"Medicare/Medicaid Receivables": Accounts arising from the delivery of services by the Borrower or a Subsidiary of the Borrower that are billed to the Medicare Programs ("Medicare Receivables") or Medicaid Programs ("Medicaid Receivables"), and in any event excluding, at such time as the Borrower is advised that a portion thereof is a Co-Payment Obligation, that portion of an Account constituting a Co-Payment Obligation.

\_0

-13-

Confidential

"Mortgage": each mortgage, if required, to be executed and delivered by the Loan Parties, form approved by the Administrative Agent and the Required Lenders, with respect to the real properties or interests in real property on which any Loan Party is required to grant a Lien and security interest to the Administrative Agent, for the ratable benefit of the Lenders, pursuant to Section 8.10, as the same may be amended, supplemented or otherwise modified from time to time.

"Mortgage Documents": collectively, the Mortgages and any landlord estoppels, landlord waivers, surveys, title insurance policies or other documents or instruments, required to be delivered in connection with a Mortgage.

"Multiemployer Plan": a Plan which is a "multiemployer plan" as defined in Section 4001(a)(3) of ERISA and which is subject to Title IV of ERISA.

"Net Cash Proceeds": with respect to any Asset Sale, Recovery Event or Extraordinary Receipt, as the case may be, the aggregate amount of cash received from time to time (whether as initial consideration or through payment or disposition of deferred consideration) by or on behalf of such Person for its own account in connection with any such transaction, after deducting therefrom only:

(a)     reasonable and customary brokerage commissions, underwriting fees and discounts, legal fees, finder's fees and other similar fees, costs and commissions that, in each case, are actually paid to a Person that is not a Subsidiary or Affiliate of any of the Loan Parties, any Hampshire Person, or any of their respective Subsidiaries or Affiliates;

(b)     the amount of taxes payable in connection with or as a result of such transaction that, in each case, are actually paid at the time of receipt of such cash to the applicable taxation authority or other Governmental Authority or, so long as such Person is not otherwise indemnified therefor, are reserved for in accordance with GAAP, as in effect at the time of receipt of such cash, based upon such Person's reasonable estimate of such taxes, and paid to the applicable taxation authority or other Governmental Authority within 180 days after the date of receipt of such cash or when due;

(c)     in the case of any Asset Sale or Recovery Event, the outstanding principal amount of, the premium or penalty, if any, on, and any accrued and unpaid interest on, any Indebtedness (other than Indebtedness under or in respect of the Loan Documents) that is secured by a Lien on the property and assets subject to such sale, lease, transfer or other disposition and is repaid under the terms of such Indebtedness as a result of such sale, lease, transfer or other disposition, in each case, to the extent that the amounts so deducted are actually paid within 180 days after the time of receipt of such cash to a Person that is not an Affiliate of any of the Loan Parties or any of their Affiliates; and

(d)     in the case of any Asset Sale, any portion of cash proceeds reserved in good faith for post-closing adjustments, indemnities and retained liabilities;

provided, that any and all amounts so deducted by any such Person pursuant to clauses (a) through (d) of this definition shall be properly attributable to such transaction or to the property or asset that is the subject thereof and provided, further, that if, at the time any of the taxes or obligations referred to in clause (b) or (d) are actually paid or otherwise satisfied, the reserve therefor exceeds the amount paid or otherwise satisfied, then the amount of such excess reserve shall constitute "Net Cash Proceeds" on and as of the date of such payment or other satisfaction for all purposes of this Agreement and, to the extent required under Section 5.6, the Borrower shall reduce the Commitments on such date in accordance with the terms of Section 5.6, and shall prepay the Loans outstanding on such date in accordance with the terms of Section 5.6, in an amount equal to the amount of such excess reserve.

\_0

-14-

Confidential                                                                        PP-TRBK0000046

"New Lending Office": as defined in Section 5.12(c)(ii).

"Non-Bank Status Certificate": as defined in Section 5.11(b)(i)(B).

"Non-Excluded Taxes": as defined in Section 5.10.

"Notes": the collective reference to the Revolving Credit Notes and the Term Notes.

"Obligations": the unpaid principal amount of, and interest (including, without limitation, interest accruing after the maturity of the Loans and interest accruing after the filing of any petition in bankruptcy, or the commencement of any insolvency, reorganization or like proceeding, relating to the Borrower, whether or not a claim for post-filing or post-petition interest is allowed in such proceeding) on the Loans, and all other obligations and liabilities of the Loan Parties to the Administrative Agent and the Lenders, whether direct or indirect, absolute or contingent, due or to become due, or now existing or hereafter incurred, which may arise under, or out of or in connection with this Agreement, the Notes, the Subsidiaries Guarantee, the Security Documents, any other Loan Documents, any Hedge Agreement entered into with any Lender or any Affiliate or Subsidiary of any Lender, and any other document made, delivered or given in connection therewith or herewith, whether on account of principal, interest, reimbursement obligations, fees, indemnities, costs, expenses (including, without limitation, all fees and disbursements of counsel to the Administrative Agent or to the Lenders that are required to be paid by a Loan Party pursuant to the terms of the Loan Documents) or otherwise.

"Old TransCare": TransCare Corporation, a Delaware corporation, prior to the consummation of the reorganization contemplated by the Plan of Reorganization and the Confirmation Order.

"Participant": as defined in Section 12.6(b).

"Patriarch": collectively, (a) Patriarch Partners II, LLC, a Delaware limited liability company, as collateral manager for ARK II CLO 2001-1, Limited, and (b) Patriarch Partners III, LLC, a Delaware limited liability company, as investment advisor for ARK Investment Partners II L.P.

"Payroll Accounts": as defined in the Security Agreement.

"PBGC": the Pension Benefit Guaranty Corporation established pursuant to Subtitle A of Title IV of ERISA.

"Person": an individual, partnership, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, Governmental Authority or other entity of whatever nature.

"Plan": at a particular time, any employee benefit plan which is covered by ERISA and in respect of which the Borrower or a Commonly Controlled Entity is (or, if such plan were terminated at such time, would under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA.

"Plan of Reorganization": the Debtors' Third Amended Joint Consolidated Plan of Reorganization, dated June 18, 2003, proposed by Old TransCare and its Subsidiaries debtors in the Bankruptcy Cases in the form attached to the Disclosure Statement, as amended, supplemented or otherwise modified prior to the Closing Date and as thereafter further amended, supplemented or otherwise modified in accordance with Section 9.10.

\_ 0

Confidential

PP-TRBK0000047

"Pledge Agreement": the Pledge Agreement, to be dated as of the date hereof, by the Borrower, TransCare Maryland, Inc. and TransCare New York, Inc., and any other subsidiary required to become parties thereto pursuant to Section 8.10, in favor of the Administrative Agent, substantially in the form of Exhibit B, as the same may be amended, supplemented or otherwise modified from time to time.

"Private Pay/Co-Pay Receivables": Accounts arising from the delivery of services by the Borrower or a Subsidiary of the Borrower (a) to the extent the obligor thereunder is not the United States pursuant to Medicare or Medicaid and (b) which are not Institutional Receivables or Third Party Insurance Receivables; provided that Private Pay/Co-Pay Receivables shall in any event include Co-Payment Obligations.

"Properties": as defined in Section 6.22.

"Qualified Counterparty": with respect to any Specified Hedge Agreement, any counterparty thereto that, at the time such Specified Hedge Agreement was entered into, was a Lender or an Affiliate or Subsidiary of a Lender.

"Recovery Event": any settlement of or payment in respect of any property or casualty insurance claim (including, without limitation, proceeds of business interruption insurance), any settlement of or payment from any fund for Persons affected by disasters or acts of terrorism or other similar events, or any condemnation proceeding relating to any asset of the Borrower or any of its Subsidiaries with a value, together with all other such settlements or payments during any fiscal year, in excess of $250,000 in any fiscal year of the Borrower.

"Register": as defined in Section 12.6(d).

"Regulation U": Regulation U of the Board as in effect from time to time.

"Reinvestment Deferred Amount": with respect to any Reinvestment Event, the aggregate Net Cash Proceeds received by the Borrower or any of its Subsidiaries in connection therewith which are not applied to prepay the Term Loans or reduce the Revolving Credit Commitments pursuant to Section 5.6(c) as a result of the delivery of a Reinvestment Notice.

"Reinvestment Event": any Asset Sale, Recovery Event or receipt of Extraordinary Receipts in respect of which the Borrower has delivered a Reinvestment Notice.

"Reinvestment Notice": a written notice executed by a Responsible Officer and delivered to the Administrative Agent, stating that no Event of Default has occurred and is continuing and that the Borrower (directly or indirectly through a Subsidiary Guarantor) intends and expects to use all or a specified portion of the Net Cash Proceeds of an Asset Sale, Recovery Event or Extraordinary Receipt to acquire assets (directly or through the purchase of the Capital Stock of a Person) pursuant to an acquisition of any assets or property useful in its business, provided, however, in the case of (x) any Recovery Event other than a payment in respect of any casualty loss or condemnation proceeding relating to the loss of a specific asset or (y) in the case of an Extraordinary Receipt (collectively, the proceeds of Recovery Events and Extraordinary Receipts described in clauses (x) and (y) of this proviso are referred to as "Certain Reinvestment Receipts"), the Borrower need only state that such Net Cash Proceeds will be used for working capital purposes or to cover financial losses resulting from the event or to so acquire assets useful in its business.

"Reinvestment Prepayment Amount": with respect to any Reinvestment Event, the Reinvestment Deferred Amount relating thereto less any amount expended prior to the relevant

-16-

**A2854**

PP-TRBK0000048

Reinvestment Prepayment Date to acquire assets (directly or through the purchase of the Capital Stock of a Person pursuant to an acquisition of any assets or property) useful in the Borrower's or any of its Subsidiaries' business.

"Reinvestment Prepayment Date":  with respect to any Reinvestment Event, the earlier of (a) the date occurring six months after such Reinvestment Event (or in the case of any Reinvestment Event arising out of a casualty insurance claim where the Borrower or any of its Subsidiaries is rebuilding, restoring, or replacing the property subject to such casualty, the date occurring twelve months after such Reinvestment Event), (b) the date on which the Borrower shall have determined not to, or shall have otherwise ceased to, acquire assets (directly or through the purchase of the Capital Stock of a Person pursuant to an acquisition of assets or property) useful in the Borrower's or any of its Subsidiaries' business with all or any portion of the relevant Reinvestment Deferred Amount or, in the case of Certain Reinvestment Receipts to use such Net Cash Proceeds for working capital purposes or to cover financial losses resulting from the event, and (c) in the case of Certain Reinvestment Receipts, twelve months.

"Reorganization":  with respect to any Multiemployer Plan, the condition that such plan is in reorganization within the meaning of Section 4241 of ERISA.

"Reportable Event":  any of the events set forth in Section 4043(b) of ERISA, other than those events as to which the thirty day notice period is waived under Sections .21, .22, .23, .26, .27 or .28 of PBGC Reg. § 4043.

"Required Lenders":  at any time, Lenders the Credit Exposure Percentages of which aggregate more than 50%.

"Required Prepayment Lenders":  the Majority Facility Lenders in respect of each Facility.

"Requirement of Law":  as to any Person, the certificate of incorporation and by-laws or other organizational or Governing Documents of such Person, and any law, treaty, rule or regulation or determination of an arbitrator or a court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"Responsible Officer":  the chief executive officer or the president of the Borrower, and, with respect to financial matters, the chief financial officer, president or vice president of the Borrower.

"Revolving Credit Commitment":  as to any Lender, the obligation of such Lender to make Revolving Credit Loans to the Borrower pursuant to Section 3.1 in an aggregate principal and/or face amount at any one time outstanding not to exceed the amount set forth opposite such Lender's name on Schedule 1.0 under the caption "Revolving Credit Commitment" or, as the case may be, in the Assignment and Acceptance pursuant to which such Lender became a party hereto, as such amount may be changed from time to time in accordance with the provisions of this Agreement.  The original aggregate amount of the Revolving Credit Commitment is $5,000,000.

"Revolving Credit Commitment Percentage":  as to any Lender at any time, the percentage which such Lender's Revolving Credit Commitment then constitutes of the aggregate Revolving Credit Commitments (or, at any time after the Revolving Credit Commitments shall have expired or terminated, the percentage which the aggregate principal amount of such Lender's Revolving Credit Loans then outstanding constitutes of the aggregate principal amount of the Revolving Credit Loans then outstanding).

\_0

Confidential

PP-TRBK0000049

"Revolving Credit Commitment Period":  the period from and including the date hereof to but not including the Revolving Credit Termination Date or such earlier date on which the Revolving Credit Commitments shall terminate as provided herein.

"Revolving Credit Facility":  the Revolving Credit Commitments and the extensions of credit made thereunder.

"Revolving Credit Lender":  any Lender who has a Revolving Credit Commitment.

"Revolving Credit Loans":  as defined in Section 3.1.

"Revolving Credit Note":  as defined in Section 5.4(e).

"Revolving Credit Termination Date":  December 31, 2005.

"Revolving Extensions of Credit":  as to any Revolving Credit Lender at any time, an amount equal to the aggregate principal amount of all Revolving Credit Loans made by such Revolving Credit Lender then outstanding.

"Security Agreement":  the Security Agreement, to be dated as of the date hereof, to be executed and delivered by the Borrower and each Subsidiary in favor of the Administrative Agent, substantially in the form of Exhibit C, as the same may be amended, supplemented or otherwise modified from time to time.

"Security Documents":  the collective reference to the Security Agreement, the Pledge Agreement, the Mortgages (if any), and all other security documents hereafter delivered to the Administrative Agent granting a Lien on any asset or assets of any Person to secure any of the Obligations or to secure any guarantee of any such Obligations.

"Single Employer Plan":  any Plan which is covered by Title IV of ERISA, but which is not a Multiemployer Plan.

"Specified Hedge Agreement":  any Hedge Agreement entered into by (a) the Borrower or any of its Subsidiaries and (b) any Person that, at the time such Hedge Agreement is entered into, is a Qualified Counterparty.

"Stock Equivalents":  all securities convertible into or exchangeable for Capital Stock and all warrants, options or other rights to purchase or subscribe for any Capital Stock, whether or not presently convertible, exchangeable or exercisable.

"Stockholders' Agreement":  the Stockholders Agreement, dated as of August 4, 2003, among the Borrower and the stockholders listed on the signature pages thereto, as amended, supplemented or otherwise modified from time to time in accordance with Section 9.10.

"Stock Option Plan":  the Borrower's 2003 Stock Incentive Plan, as amended, supplemented or otherwise modified from time to time in accordance with Section 9.10, and the option or other award agreements issued thereunder.

"Subordinated Indebtedness":  any Indebtedness of the Borrower or any of its Subsidiaries which is by its terms junior in right of payment to any other Indebtedness of the Borrower or any of its Subsidiaries on terms and conditions reasonably acceptable to the Required Lenders.

Confidential

"Subsidiaries Guarantee" or the "Guarantee":  the Guarantee, to be dated as of the date hereof, to be executed and delivered by each Subsidiary in favor of the Administrative Agent, substantially in the form of Exhibit D as the same may be amended, supplemented or otherwise modified from time to time.

"Subsidiary":  as to any Person, a corporation, partnership or other entity of which shares of stock or other ownership interests having ordinary voting power (other than stock or such other ownership interests having such power only by reason of the happening of a contingency) to elect a majority of the board of directors or other managers of such corporation, partnership or other entity are at the time owned, or the management of which is otherwise controlled, directly or indirectly through one or more intermediaries, or both, by such Person.  Unless otherwise qualified, all references to a "Subsidiary" or to "Subsidiaries" in this Agreement shall refer to a Subsidiary or Subsidiaries of the Borrower but shall exclude the Immaterial Subsidiaries.

"Subsidiary Guarantor":  any Subsidiary party to the Subsidiaries Guarantee as a guarantor.

"Supplemental Agent":  as defined in Section 11.2.

"TCNY":  TransCare New York, Inc., a Delaware corporation.

"Term Loan":  as defined in Section 2.1.

"Term Loan Commitment":  as to each Lender, the obligation of such Lender, if any, to accept a Term Loan owing by the Borrower hereunder as part of its distribution under the Plan of Reorganization in connection with the Bankruptcy Cases in a principal amount equal to the amount set forth opposite such Lender's name on Schedule 1.0 under the caption "Term Loan Commitment", or, as the case may be, in the Assignment and Acceptance pursuant to which such Lender became a party hereto, as such amount may be changed from time to time in accordance with the provisions of this Agreement.  The original aggregate amount of the Term Loan Commitments is $30,000,000.

"Term Loan Facility":  the Term Loan Commitments and the Term Loans made thereunder.

"Term Loan Lender":  any Lender who has a Term Loan Commitment.

"Term Loan Percentage":  as to any Lender at any time, the percentage which such Lender's Term Loan Commitment then constitutes of the aggregate Term Loan Commitments (or, at any time after the Closing Date, the percentage which the principal amount of such Lender's Term Loan then outstanding constitutes of the aggregate principal amount of the Term Loans then outstanding); provided, that solely for purposes of calculating the amount of each installment of Term Loans (other than the last installment) payable to a Term Loan Lender pursuant to Section 2.2, such Term Loan Lender's Term Loan Percentage shall be calculated without giving effect to any portion of any prior mandatory or optional prepayment attributable to such Term Loan Lender's Term Loans which shall have been declined by such Term Loan Lender (or, in the case of any Term Loan Lender which shall have acquired its Term Loans by assignment from another Person, by such other Person).

"Term Note":  as defined in Section 5.4(e).

Confidential

"Third Party Insurance Receivables":  accounts receivable arising from the delivery of services by the Borrower or a Subsidiary for which the obligor is a managed care organization, and in any event excluding that portion of an account receivable constituting a Co-Payment Obligation.

"Tranche":  the collective reference to Eurodollar Loans the then current Interest Periods with respect to all of which begin on the same date and end on the same later date (whether or not such Loans shall originally have been made on the same day).

"Transferee":  as defined in Section 12.6(f).

"Type":  as to any Loan, its nature as a Base Rate Loan or a Eurodollar Loan.

"UCC":  the Uniform Commercial Code (or any successor statute), as in effect from time to time, of the State of New York or of any other state the laws of which are required as a result thereof to be applied in connection with the issue of perfection of security interests.

"Uniform Customs":  the Uniform Customs and Practice for Documentary Credits (1993 Revision), International Chamber of Commerce Publication No. 500, as the same may be amended from time to time.

"Vehicle":  as defined in the Security Agreement.

"Vehicle Triggering Event":  as defined in Section 8.11 hereof.

"Wachovia":  as defined in Section 11.2 hereof.

"Warrant Agreement":  the Warrant Agreement to be entered into among the Borrower and the Persons parties thereto as holders pursuant to the Plan of Reorganization, as the same may be amended, supplemented or otherwise modified from time to time.

"Warrant Documents":  collectively, the Warrant Agreement and the Warrants.

"Warrants":  the Tranche A Warrants and Tranche B Warrants to purchase common stock of the Borrower issued pursuant to the Warrant Agreement.

1.2    Other Definitional Provisions.  (a)  Unless otherwise specified therein, all terms defined in this Agreement shall have the defined meanings when used in any Notes or any other Loan Documents or any certificate or other document made or delivered pursuant hereto.

(b)    As used herein and in any Notes, any other Loan Document and any certificate or other document made or delivered pursuant hereto, accounting terms relating to the Borrower and its Subsidiaries not defined in Section 1.1 and accounting terms partly defined in Section 1.1, to the extent not defined, shall have the respective meanings given to them under GAAP.

(c)    The words "hereof", "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and Section, Schedule and Exhibit references are to this Agreement unless otherwise specified.

(d)    The meanings given to terms defined herein shall be equally applicable to both the singular and plural forms of such terms.

-20-

**A2858**

PP-TRBK0000052

SECTION 2.   AMOUNT AND TERMS OF TERM LOANS

2.1   <u>Term Loans</u>.  Subject to the terms and conditions hereof, on the Closing Date and pursuant to the Plan of Reorganization and the Confirmation Order and as a portion of its distribution under the Plan of Reorganization, each Term Loan Lender shall receive ownership of a term loan (a "<u>Term Loan</u>") owing by the Borrower in an amount equal to the Term Loan Commitment of such Term Loan Lender then in effect. The Term Loans distributed on the Closing Date shall constitute the "New Notes" referred to in the Plan of Reorganization.  The Term Loans may from time to time be (a) Eurodollar Loans, (b) Base Rate Loans or (c) a combination thereof, as determined by the Borrower and notified to the Administrative Agent in accordance with Section 5.2.

2.2   <u>Procedure for Term Loan Distribution</u>.   The Borrower shall give the Administrative Agent irrevocable notice (in the form of Annex I) (which notice must be received by the Administrative Agent prior to 10:00 a.m., New York City time, three Business Days prior to the Closing Date (and the Administrative Agent shall provide each Term Loan Lender with such notice prior to 3:00 p.m., New York City time, on such date), requesting that the Term Loan Lenders accept distribution of the Term Loans on the Closing Date pursuant to the Plan of Reorganization and specifying (i) the Closing Date, (ii) the aggregate principal amount of Term Loans, which shall not be less than the amount specified on Schedule 1.0, (iii) whether the Term Loans are to be initially Eurodollar Loans, Base Rate Loans or a combination thereof, and (iv) if the Term Loans are to be entirely or partly Eurodollar Loans, the amounts of such Type of Loan and the lengths of the initial Interest Periods therefor.  Upon receipt of such notice the Administrative Agent shall promptly notify each Term Loan Lender thereof.  Upon the satisfaction of the conditions precedent set forth in Sections 7.1 and 7.2 on the Closing Date, the Term Loans shall be deemed to have been distributed to the Term Loan Lenders in satisfaction of and in the principal amount of the Term Loan Lenders' respective Term Loan Commitments, and Administrative Agent shall record in the Register the name and address of each such Term Loan Lender and the principal amount of such Term Loan Lender's Term Loan, whereupon the Term Loans shall be obligations owing by the Borrower in accordance with the terms of, and shall be entitled to the benefits of, this Agreement and the other Loan Documents.

2.3   <u>Repayment of Term Loans</u>.  The Borrower shall pay to the Administrative Agent, for the account of the Term Loan Lenders, the principal amount of the Term Loans in nine consecutive quarterly installments payable on the last day of March, June, September and December of each year, commencing on December 31, 2003, each of which shall be in an amount equal to the amount set forth below opposite such installment (and, upon receipt thereof, the Administrative Agent will distribute to each Term Loan Lender its Term Loan Percentage of each such payment):

| Installment | Principal Amount |
| --- | --- |
| December 31, 2003 | $125,000 |
| March 31, 2004 | $125,000 |
| June 30, 2004 | $125,000 |
| September 30, 2004 | $125,000 |
| December 31, 2004 | $250,000 |
| March 31, 2005 | $250,000 |
| June 30, 2005 | $250,000 |
| September 30, 2005 | $250,000 |

-21-

**A2859**

PP-TRBK0000053

December 31, 2005          $28,875,000 or the unpaid
balance

SECTION 3.    AMOUNT AND TERMS OF REVOLVING CREDIT
COMMITMENTS

    3.1    Revolving Credit Commitments. (a)  Subject to the terms and conditions hereof, each Revolving Credit Lender severally agrees to make revolving credit loans ("Revolving Credit Loans") to the Borrower from time to time during the Revolving Credit Commitment Period in an aggregate principal amount at any one time outstanding which does not exceed the amount of such Revolving Credit Lender's Revolving Credit Commitment then in effect, provided that, without the prior written consent of the Majority Facility Lenders in respect of the Revolving Credit Facility, no such Revolving Credit Loan shall be made if, after giving effect thereto, the aggregate Available RC Commitments of all the Revolving Credit Lenders would be less than $350,000.  During the Revolving Credit Commitment Period the Borrower may use the Revolving Credit Commitments by borrowing, prepaying the Revolving Credit Loans in whole or in part, and reborrowing, all in accordance with the terms and conditions hereof.

    (b)    The Revolving Credit Loans may from time to time be (i) Eurodollar Loans, (ii) Base Rate Loans or (iii) a combination thereof, as determined by the Borrower and notified to the Administrative Agent in accordance with Sections 2.3 and 5.2; provided, that no Revolving Credit Loan shall be made as a Eurodollar Loan after the day that is one month prior to the Revolving Credit Termination Date.

    3.2    Procedure for Revolving Credit Borrowing.  The Borrower may borrow under the Revolving Credit Commitments during the Revolving Credit Commitment Period on any Business Day in an aggregate principal amount not exceeding the aggregate Available RC Commitments, provided that the Borrower shall give the Administrative Agent irrevocable notice (in the form of Annex I) which notice must be received by the Administrative Agent prior to 10:00 a.m., New York City time, two Business Days prior to the requested Borrowing Date (and the Administrative Agent shall provide each Revolving Credit Lender with such notice prior to 3:00 p.m., New York City time, on such date), specifying (i) the amount to be borrowed, (ii) the requested Borrowing Date, (iii) whether the borrowing is to be of Eurodollar Loans, Base Rate Loans or a combination thereof and (iv) if the borrowing is to be entirely or partly of Eurodollar Loans, the amounts of such Type of Loan and the respective lengths of the initial Interest Periods therefor.  Each borrowing under the Revolving Credit Commitments shall be in an amount equal to (x) in the case of Base Rate Loans, $100,000 or a whole multiple of $100,000 in excess thereof (or, if the then Available RC Commitments are less than $100,000 such lesser amount) and (y) in the case of Eurodollar Loans, $1,000,000 or a whole multiple of $100,000 in excess thereof, provided that the initial Revolving Credit Loans to be made on the Closing Date may be Base Rate Loans equal to the amount owing under the DIP Loan Documents, notwithstanding that such amount is different from the amount provided in clause (x) of this sentence.  Upon receipt of any such notice from the Borrower, the Administrative Agent shall promptly notify each Revolving Credit Lender thereof.  Each Revolving Credit Lender will make the amount of its pro rata share of each borrowing available to the Administrative Agent for the account of the Borrower at the office of the Administrative Agent specified in Section 12.2 prior to 11:00 a.m., New York City time, on the Borrowing Date requested by the Borrower in funds immediately available to the Administrative Agent.  Such borrowing will then be made available to the Borrower by the Administrative Agent crediting the account of the Borrower on the books of such office with the aggregate of the amounts made available to the Administrative Agent by the Revolving Credit Lenders and in like funds as received by the Administrative Agent.

\_ 0

-22-

**A2860**

3.3     Commitment Fee, Facility Fee.     (a)   The Borrower agrees to pay to the Administrative Agent for the account of each Revolving Credit Lender a commitment fee for the period from and including the first day of the Revolving Credit Commitment Period to but not including the Revolving Credit Termination Date, computed at the rate of 0.625% per annum on the average daily amount of the Available RC Commitment of such Revolving Credit Lender during the period for which payment is made, payable quarterly in arrears on the first Business Day of each January, April, July and October and on the Revolving Credit Termination Date or such earlier date as the Revolving Credit Commitments shall terminate as provided herein, commencing on the first of such dates to occur after the date hereof.

(b)     The Borrower agrees to pay to the Administrative Agent for the account of each Revolving Credit Lender a facility fee for the period from and including the first day of the Revolving Credit Commitment Period to but not including the Revolving Credit Termination Date, computed at the rate of 2% per annum on the average daily amount of the Revolving Credit Commitment of such Revolving Credit Lender during the period for which payment is made, payable (i) for the first year following the Closing Date, in advance on the Closing Date, and (ii) thereafter, annually in advance on each anniversary of the Closing Date and on the Revolving Credit Termination Date or such earlier date as the Revolving Credit Commitments shall terminate as provided herein, commencing on the first of such dates to occur after first anniversary of the Closing Date.

3.4     Termination or Reduction of Revolving Credit Commitments.   The Borrower shall have the right, upon not less than three Business Days' notice to the Administrative Agent, to terminate the Revolving Credit Commitments or, from time to time, to reduce the amount of the Revolving Credit Commitments, provided that no such termination or reduction shall be permitted if, after giving effect thereto and to any prepayments of the Revolving Credit Loans made on the effective date thereof, the aggregate principal amount of the Revolving Credit Loans then outstanding would exceed the Revolving Credit Commitments then in effect.  Any such reduction shall be in an amount equal to $1,000,000 or a whole multiple thereof and shall reduce permanently the Revolving Credit Commitments then in effect.

SECTION 4.     [RESERVED]

SECTION 5.     GENERAL PROVISIONS APPLICABLE TO LOANS

5.1     Interest Rates and Payment Dates.   (a)   Each Term Loan which is a Eurodollar Loan shall bear interest for each day during each Interest Period with respect thereto at a rate per annum equal to the Adjusted Eurodollar Rate determined for such Interest Period.

(b)     Each Term Loan which is a Base Rate Loan shall bear interest at a rate per annum equal to the Adjusted Base Rate.

(c)     Each Revolving Credit Loan (i) which is a Eurodollar Loan shall bear interest for each day during each Interest Period with respect thereto at a rate per annum equal to the Eurodollar Rate as determined for such Interest Period plus the Applicable Margin and (ii) which is a Base Rate Loan shall bear interest at a rate per annum equal to the Base Rate plus the Applicable Margin.

(d)     At and time that any Event of Default has occurred and is continuing, the principal of the Loans and any interest, facility fee, commitment fee or other amount shall bear interest

Confidential

at a rate per annum which is (x) in the case of principal, the rate that would otherwise be applicable thereto pursuant to the foregoing provisions of this Section plus 2% or (y) in the case of any such interest, facility fee, commitment fee or other amount, the rate described in paragraph (b) of this Section plus 2%, in each case from the date of such non-payment until such overdue principal, interest, commitment fee or other amount is paid in full (as well after as before judgment).

(e)     Interest shall be payable in arrears on each Interest Payment Date, <u>provided</u> that interest accruing pursuant to paragraph (d) of this Section shall be payable from time to time on demand.

5.2     <u>Conversion and Continuation Options</u>.  (a)  The Borrower may elect from time to time to Convert Eurodollar Loans to Base Rate Loans by giving the Administrative Agent at least two Business Days' prior irrevocable notice of such election (in the form of Annex II) (such notice specifying the amount and the date such Conversion is to be made), <u>provided</u> that any such Conversion of Eurodollar Loans may only be made on the last day of an Interest Period with respect thereto.  The Borrower may elect from time to time to Convert Base Rate Loans to Eurodollar Loans by giving the Administrative Agent at least three Business Days' prior irrevocable notice of such election.  Any such notice of Conversion to Eurodollar Loans shall specify the amount to be Converted, the date of such Conversion and the length of the initial Interest Period or Interest Periods therefor if a Base Rate Loan is to be converted to a Eurodollar Loan.  Upon receipt of any such notice the Administrative Agent shall promptly notify each Lender thereof.  All or any part of outstanding Eurodollar Loans and Base Rate Loans may be Converted as provided herein, <u>provided</u> that (i) no Loan may be Converted into a Eurodollar Loan when any Event of Default has occurred and is continuing, (ii) any such Conversion may only be made if, after giving effect thereto, Section 5.3 shall not have been contravened, and (iii) no Loan may be converted into a Eurodollar Loan after the date that is one month prior to the Revolving Credit Termination Date (in the case of Conversions of Revolving Credit Loans) or the date of the final installment of principal (in the case of Conversions of Term Loans).

(b)     Any Eurodollar Loans may be Continued as such upon the expiration of the then current Interest Period with respect thereto by the Borrower giving irrevocable notice to the Administrative Agent, in accordance with the applicable provisions of the term "<u>Interest Period</u>" set forth in Section 1.1, of the length of the next Interest Period to be applicable to such Loans, <u>provided</u> that no Eurodollar Loan may be Continued as such (i) when any Event of Default has occurred and is continuing, (ii) if, after giving effect thereto, Section 5.3 would be contravened or (iii) after the date that is one month prior to the Revolving Credit Termination Date (in the case of Continuations of Revolving Credit Loans) or the date of the final installment of principal (in the case of Continuations of Term Loans) and <u>provided, further</u>, that if the Borrower shall fail to give such notice or if such Continuation is not permitted such Loans shall be automatically converted to Base Rate Loans on the last day of such then expiring Interest Period.

5.3     <u>Minimum Amounts of Tranches; Maximum Number of Tranches</u>.  (a)  All borrowings, conversions and continuations of Loans hereunder and all selections of Interest Periods hereunder shall be in such amounts and be made pursuant to such elections so that, after giving effect thereto, the aggregate principal amount of the Loans comprising each Tranche shall be equal to $1,000,000 or a whole multiple of $100,000 in excess thereof.

(b)     No more than three (3) Tranches of Eurodollar Loans shall be outstanding at any one time.

-24-

**A2862**

Confidential

5.4     Repayment of Loans; Evidence of Debt.

(a)     The Borrower hereby unconditionally promises to pay to the Administrative Agent for the account of the appropriate Revolving Credit Lender or Term Loan Lender, as the case may be, (i) the then unpaid principal amount of each Revolving Credit Loan of such Revolving Credit Lender on the Revolving Credit Termination Date (or such earlier date on which the Loans become due and payable pursuant to Section 10), and (ii) the principal amount of the Term Loan of such Term Loan Lender in installments according to the amortization schedule set forth in Section 2.3 (or on such earlier date on which the Loans become due and payable pursuant to Section 10). The Borrower hereby further agrees to pay interest on the unpaid principal amount of the Loans from time to time outstanding from the date hereof until payment in full thereof at the rates per annum, and on the dates, set forth in Section 5.1.

(b)     Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing indebtedness of the Borrower to such Lender resulting from each Loan of such Lender from time to time, including the amounts of principal and interest payable and paid to such Lender from time to time under this Agreement.

(c)     The Administrative Agent, on behalf of the Borrower, shall maintain the Register pursuant to Section 12.6(c), and a subaccount therein for each Lender, in which shall be recorded (i) the amount of each Loan made hereunder and any Note evidencing such Loan, the Type thereof and each Interest Period applicable thereto, (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrower to each Lender hereunder and (iii) both the amount of any sum received by the Administrative Agent hereunder from the Borrower and each Lender's share thereof.

(d)     The entries made in the Register and the accounts of each Lender maintained pursuant to Section 5.4(b) shall, to the extent permitted by applicable law, be prima facie evidence of the existence and amounts of the obligations of the Borrower therein recorded (absent manifest error); provided, however, that the failure of any Lender or the Administrative Agent to maintain the Register or any such account, or any error therein, shall not in any manner affect the obligation of the Borrower to repay (with applicable interest) the Loans made to such Borrower by such Lender and other Obligations owing to such Lender in accordance with the terms of this Agreement.

(e)     The Borrower agrees that, upon the request to the Administrative Agent by any Lender, the Borrower will execute and deliver to such Lender a promissory note of the Borrower evidencing the Term Loan or Revolving Credit Loans, as the case may be, of such Lender, substantially in the forms of Exhibit A-1 or A-2, respectively, with appropriate insertions as to date and principal amount (a "Term Note" or "Revolving Credit Note", respectively).

5.5     Optional Prepayments. The Borrower may on the last day of any Interest Period with respect thereto, in the case of Eurodollar Loans, or at any time and from time to time, in the case of Base Rate Loans, prepay the Loans, in whole or in part, without premium or penalty, upon irrevocable notice delivered to the Administrative Agent prior to 12:00 noon, New York City time, at least three Business Days prior thereto, in the case of Eurodollar Loans, or upon irrevocable notice delivered to the Administrative Agent, prior to 12:00 noon, New York City time, on the Business Day thereof, in the case of Base Rate Loans, specifying the date and amount of prepayment and whether the prepayment is of Eurodollar Loans, Base Rate Loans or a combination thereof, and, if of a combination thereof, the amount allocable to each. Upon receipt of any such notice the Administrative Agent shall promptly notify each Lender thereof. If any such notice is given, the amount specified in such notice shall be due and payable on the date specified therein, together with any amounts payable pursuant to Section 5.13 and, in the case

\_0

-25-

**A2863**

Confidential

of prepayments of the Term Loans only, accrued interest to such date on the amount prepaid.  Partial prepayments of the Term Loans pursuant to this Section shall be applied to the installments of principal thereof in the inverse order of their scheduled maturities.  Amounts prepaid on account of the Term Loans may not be reborrowed.  Partial prepayments pursuant to this Section shall be in an aggregate principal amount of $100,000 or a whole multiple thereof.

        5.6   <u>Mandatory Prepayments</u>.  (a)   Subject to Section 5.13, if on any date the Aggregate Outstanding RC Extensions of Credit exceeds the aggregate Revolving Credit Commitments, the Borrower shall immediately prepay the Revolving Credit Loans in an amount equal to the amount of such excess.

        (b)     Unless the Required Prepayment Lenders shall otherwise agree, if on any date the Borrower or any of its Subsidiaries shall receive Net Cash Proceeds from any Asset Sale, Recovery Event or Extraordinary Receipts then, unless a Reinvestment Notice shall be delivered in respect thereof within thirty days thereafter, 100% of such Net Cash Proceeds shall be applied on such thirtieth day after receipt toward the prepayment of the Term Loans and the reduction of the Revolving Credit Commitments as set forth in Section 5.6(d); <u>provided</u>, that, notwithstanding the foregoing, (i) the aggregate Net Cash Proceeds of all Asset Sales that may be excluded from the foregoing requirement pursuant to one or more Reinvestment Notices shall not exceed $500,000 in any fiscal year of the Borrower, (ii) the aggregate Net Cash Proceeds of all Recovery Events consisting of proceeds of property or casualty insurance claims or condemnation proceedings that may be excluded from the foregoing requirement pursuant to one or more Reinvestment Notices shall not exceed $2,000,000 in any fiscal year of the Borrower, (iii) the aggregate Net Cash Proceeds of all Recovery Events consisting of proceeds of business interruption insurance claims that may be excluded from the foregoing requirement pursuant to one or more Reinvestment Notices shall not exceed $1,000,000 in any fiscal year of the Borrower, (iv) the aggregate Net Cash Proceeds of all Extraordinary Receipts that may be excluded from the foregoing requirement pursuant to one or more Reinvestment Notices shall not exceed $750,000 in any fiscal year of the Borrower, and (v) on each Reinvestment Prepayment Date, an amount equal to the Reinvestment Prepayment Amount with respect to the relevant Reinvestment Event shall be applied toward the prepayment of the Term Loans and the reduction of the Revolving Credit Commitments as set forth in Section 5.6(d).

        (c)     On or before the earlier of the date on which the financial statements referred to in Section 8.1(a) are required to be delivered in respect of a fiscal year of the Borrower, beginning with the fiscal year ending December 31, 2003, and the date on which such financial statements are actually delivered, the Borrower shall prepay the Term Loans in the amount of 60% of Excess Cash Flow for the fiscal year covered by such financial statements, together with accrued interest to such date on the amount prepaid.

        (d)     Amounts prepaid pursuant to this Section 5.6 (other than Section 5.6(a)) shall be applied <u>first</u>, to the installments of principal of the Term Loans until paid in full, and <u>second</u>, to the reduction of the Revolving Credit Commitments and the prepayment of the Revolving Credit Loans.  Prepayments of installments of Term Loans shall be applied in the inverse order of maturity and such amounts so prepaid may not be reborrowed.

        (e)     Any prepayment of Loans and/or reduction of Commitments pursuant to this Section, and the rights of the Lenders in respect thereof, are subject to the provisions of Section 5.9.

\_0

Confidential

5.7   <u>Computation of Interest and Fees</u>.  (a)  All commitment fees, facility fees and interest shall be calculated on the basis of a 360-day year for the actual days elapsed.  The Administrative Agent shall as soon as practicable notify the Borrower and the Lenders of each determination of a Eurodollar Rate.  Any change in the interest rate on a Loan resulting from a change in the Base Rate or the Eurocurrency Reserve Requirements shall become effective as of the opening of business on the day on which such change becomes effective.  The Administrative Agent shall as soon as practicable notify the Borrower and the Lenders of the effective date and the amount of each such change in interest rate.

(b)   Each determination of an interest rate by the Administrative Agent pursuant to any provision of this Agreement shall be conclusive and binding on the Borrower and the Lenders in the absence of manifest error.  The Administrative Agent shall, at the request of the Borrower, deliver to the Borrower a statement showing the quotations used by the Administrative Agent in determining any interest rate pursuant to Section 5.1(a) or (c).

5.8   <u>Inability to Determine Interest Rate</u>.  If prior to the first day of any Interest Period:

(a)   the Administrative Agent shall have determined (which determination shall be conclusive and binding upon the Borrower) that, by reason of circumstances affecting the relevant market, adequate and reasonable means do not exist for ascertaining the Eurodollar Rate for such Interest Period, or

(b)   the Administrative Agent shall have received notice from the Majority Facility Lenders in respect of the relevant Facility that the Eurodollar Rate determined or to be determined for such Interest Period will not adequately and fairly reflect the cost to such Lenders (as conclusively certified by such Majority Facility Lenders) of making or maintaining their affected Loans during such Interest Period, the Administrative Agent shall give telecopy or telephonic notice thereof to the Borrower and the relevant Lenders as soon as practicable thereafter.  If such notice is given (x) any Eurodollar Loans under the relevant Facility requested to be made on the first day of such Interest Period shall be made as Base Rate Loans, (y) any Base Rate Loans under the relevant Facility that were to have been Converted on the first day of such Interest Period to Eurodollar Loans shall be Continued as Base Rate Loans and (z) any outstanding Eurodollar Loans shall be Converted, on the first day of such Interest Period, to Base Rate Loans.  Until such notice has been withdrawn by the Administrative Agent, no further Eurodollar Loans under the relevant Facility shall be made or Continued as such, nor shall the Borrower have the right to Convert Loans to Eurodollar Loans.  The Administrative Agent shall withdraw (i) any such notice pursuant to clause (a) above if the Administrative Agent determines that the relevant circumstances have ceased to exist and (ii) any such notice pursuant to clause (b) above upon receipt of notice from the Majority Facility Lenders in respect of the relevant Facility that the relevant circumstances described in such clause (b) have ceased to exist.

5.9   <u>Pro Rata Treatment and Payments</u>.  (a)  Each borrowing by the Borrower from the Lenders hereunder, each payment by the Borrower on account of any commitment fee hereunder and any reduction of the Revolving Credit Commitments of the Lenders shall be made pro rata according to the respective Term Loan Percentages or Revolving Credit Commitment Percentages, as applicable, of the Lenders.  Each payment (including each prepayment) by the Borrower on account of principal of and interest on the Term Loans or the Revolving Credit Loans shall be made pro rata according to the respective outstanding principal amounts of the Term Loans or the Revolving Credit Loans, as applicable, then held by the Lenders.

\_0

Confidential

A2865

PP-TRBK0000059

(b)      Notwithstanding anything to the contrary in Section 5.6 or this Section, each Term Loan Lender may, at its option, decline all or any portion of any mandatory prepayment applicable to the Term Loans of such Lender; accordingly, with respect to the amount of any mandatory prepayment described in Section 5.6 that is allocated to the Term Loans (such amounts, the "Prepayment Amount") the Borrower will, in lieu of applying such amount to the prepayment of Term Loans as provided in Section 5.6(d), on the date specified in Section 5.6 for such prepayment, give the Administrative Agent telephonic notice (promptly confirmed in writing) of the aggregate amount required to be applied to prepay Term Loans and requesting that the Administrative Agent prepare and provide to each Term Loan Lender a notice (each, a "Prepayment Option Notice") as described below. As promptly as practicable after receiving such notice from the Borrower, the Administrative Agent will send to each Term Loan Lender a Prepayment Option Notice which shall include an offer by the Borrower to prepay on the date (each a "Prepayment Date") that is 10 Business Days after the date of the Prepayment Option Notice, the Term Loan of such Term Loan Lender by an amount equal to the portion of the Prepayment Amount indicated in such Lender's Prepayment Option Notice as being applicable to such Lender's Term Loans.  On the Prepayment Date, (i) the Borrower shall pay to the Administrative Agent the aggregate amount necessary to prepay that portion of the outstanding relevant Term Loans in respect of which Lenders have accepted full or partial prepayment as described above (such Lenders, the "Accepting Lenders") as notified by the Administrative Agent to the Borrower, and such amount shall be applied to reduce the Prepayment Amounts, as applicable, with respect to each Accepting Lender, and (ii) the Borrower shall be entitled to retain 100% of the portion of the Prepayment Amount not accepted by the Lenders.

(c)      All payments (including prepayments) to be made by the Borrower hereunder, whether on account of principal, interest, fees or otherwise, shall be made without set-off or counterclaim and shall be made prior to 12:00 noon, New York City time, on the due date thereof to the Administrative Agent, for the account of the Lenders, at the "Funding and Payment Office" specified in Schedule 5.9(c), in Dollars and in immediately available funds.  The Administrative Agent shall distribute such payments to the Lenders promptly upon receipt in like funds as received.  If any payment hereunder (other than payments on Eurodollar Loans) becomes due and payable on a day other than a Business Day, such payment shall be extended to the next succeeding Business Day.  If any payment on a Eurodollar Loan becomes due and payable on a day other than a Business Day, the maturity thereof shall be extended to the next succeeding Business Day unless the result of such extension would be to extend such payment into another calendar month in which event such payment shall be made on the immediately preceding Business Day.  In the case of any extension of any payment of principal pursuant to the preceding two sentences, interest thereon shall be payable at the then applicable rate during such extension.

(d)      Unless the Administrative Agent shall have been notified in writing by any Lender prior to a borrowing that such Lender will not make the amount that would constitute its share of such borrowing available to the Administrative Agent, the Administrative Agent may assume that such Lender is making such amount available to the Administrative Agent, and the Administrative Agent may, in reliance upon such assumption, make available to the Borrower a corresponding amount.  If such amount is not made available to the Administrative Agent by the required time on the Borrowing Date therefor, such Lender shall pay to the Administrative Agent, on demand, such amount with interest thereon at a rate equal to the daily average Federal Funds Effective Rate for the period until such Lender makes such amount immediately available to the Administrative Agent.  A certificate of the Administrative Agent submitted to any Lender with respect to any amounts owing under this Section shall be conclusive in the absence of manifest error.  If such Lender's share of such borrowing is not made available to the Administrative Agent by such Lender within three Business Days of such Borrowing Date, the Administrative Agent shall also be entitled to recover such amount with interest thereon at the rate per annum applicable to Base Rate Loans hereunder, on demand, from the Borrower.

\_0

-28-

5.10    _Illegality_.  Notwithstanding any other provision herein, if the adoption of or any change in any Requirement of Law or in the interpretation or application thereof shall make it unlawful for any Lender to make or maintain Eurodollar Loans as contemplated by this Agreement, (a) the commitment of such Lender hereunder to make Eurodollar Loans, Continue Eurodollar Loans as such and Convert Base Rate Loans to Eurodollar Loans shall forthwith be canceled and (b) such Lender's Loans then outstanding as Eurodollar Loans, if any, shall be Converted automatically to Base Rate Loans on the respective last days of the then current Interest Periods with respect to such Loans or within such earlier period as required by law.  If any such Conversion of a Eurodollar Loan occurs on a day which is not the last day of the then current Interest Period with respect thereto, the Borrower shall pay to such Lender such amounts, if any, as may be required pursuant to Section 5.13.

5.11    _Requirements of Law_.  (a)  If the adoption of or any change in any Requirement of Law or in the interpretation or application thereof or compliance by any Lender with any request or directive (whether or not having the force of law) from any central bank or other Governmental Authority made subsequent to the date hereof:

(i)    does or shall subject any Lender to any tax of any kind whatsoever with respect to this Agreement, any Note or any Eurodollar Loan made by it, or change the basis of taxation of payments to such Lender in respect thereof (except for Non-Excluded Taxes covered by Section 5.12 and changes in the rate of tax on the overall net income of such Lender);

(ii)    does or shall impose, modify or hold applicable any reserve, special deposit, compulsory loan or similar requirement against assets held by, deposits or other liabilities in or for the account of, advances, loans or other extensions of credit by, or any other acquisition of funds by, any office of such Lender which is not otherwise included in the determination of the Eurodollar Rate hereunder; or

(iii)    does shall impose on such Lender any other condition;

and the result of any of the foregoing is to increase the cost to such Lender, by an amount which such Lender deems to be material, of making, Converting into, Continuing or maintaining Eurodollar Loans or to reduce any amount receivable hereunder in respect thereof, then, in any such case, the Borrower shall promptly, after receiving notice as specified in subsection (c), pay such Lender such additional amount or amounts as will compensate such Lender for such increased cost or reduced amount receivable.  The Borrower shall not be required to pay any additional amounts to any Lender pursuant to this subsection (a) to the extent that the obligation to pay such additional amounts would not have arisen but for a failure by such Lender to comply with the provisions of Section 5.12(b) of this Agreement.

(b)    Any Lender claiming any additional amounts payable pursuant to this Section 5.11 or Section 5.12 shall use reasonable efforts (consistent with its internal policy and legal and regulatory restrictions and so long as, in its sole determination, such efforts would not be disadvantageous to it) to file any certificate or document reasonably requested in writing by the Borrower if the making of such a filing would avoid the need for or reduce the amount of any such additional amounts.

(c)    If a Lender or the Administrative Agent shall become aware that it is entitled to receive a refund in respect of taxes as to which it has been indemnified by the Borrower pursuant to Section 5.12 or this Section 5.11, it shall promptly notify the Borrower of the availability of such refund and shall, within thirty (30) days after receipt of a request by the Borrower apply for such refund.  If any

\_ 0

-29-

**A2867**

Lender or the Administrative Agent, as applicable, receives a refund in respect of any taxes to which it has been indemnified by the Borrower pursuant to Section 5.12 or this Section 5.11, it shall promptly pay such refund to the Borrower (to the extent of amounts that have been paid by the Borrower under Section 5.12 or this Section 5.11 with respect to such refund), provided that the Borrower, upon the request of such Lender or the Administrative Agent, as applicable, agrees to return such refund to such Lender or the Administrative Agent in the event such Lender or the Administrative Agent is required to repay such refund. The Borrower shall be responsible for any costs incurred by such Lender or the Administrative Agent in applying for any such refund and promptly reimburse such Lender or the Administrative Agent therefor on demand.

(d)     If any Lender shall have determined that the adoption of or any change in any Requirement of Law regarding capital adequacy or in the interpretation or application thereof or compliance by such Lender or any corporation controlling such Lender with any request or directive regarding capital adequacy (whether or not having the force of law) from any Governmental Authority made subsequent to the date hereof shall have the effect of reducing the rate of return on such Lender's or such corporation's capital as a consequence of its obligations hereunder to a level below that which such Lender or such corporation could have achieved but for such adoption, change or compliance (taking into consideration such Lender's or such corporation's policies with respect to capital adequacy) by an amount deemed by such Lender to be material, then from time to time, the Borrower shall promptly pay to such Lender such additional amount or amounts as will compensate such Lender for such reduction.

(e)     If any Lender becomes entitled to claim any additional amounts pursuant to this Section, it shall promptly notify the Borrower (with a copy to the Administrative Agent) of the event by reason of which it has become so entitled. A certificate as to any additional amounts payable pursuant to this Section submitted by such Lender to the Borrower (with a copy to the Administrative Agent) shall be conclusive in the absence of manifest error. The agreements in this Section shall survive the termination of this Agreement and the payment of the Loans and all other amounts payable hereunder.

5.12     Taxes. (a) All payments made by the Borrower under this Agreement and any Notes shall be made free and clear of, and without deduction for or on account of, any present or future income, stamp or other taxes, levies, imposts, duties, charges, fees, deductions or withholdings, now or hereafter imposed, levied, collected, withheld or assessed by any Governmental Authority, excluding net income taxes and franchise taxes imposed in lieu of net income taxes imposed on the Administrative Agent or any Lender as a result of a present or former connection between the Administrative Agent or such Lender and the jurisdiction of the Governmental Authority imposing such tax or any political subdivision or taxing authority thereof or therein (other than any such connection arising solely from the Administrative Agent or such Lender having executed, delivered or performed its obligations or received a payment under, or enforced, this Agreement or any other Loan Documents). If any such non-excluded taxes, levies, imposts, duties, charges, fees deductions or withholdings ("Non-Excluded Taxes") are required to be withheld from any amounts payable to the Administrative Agent or any Lender hereunder or under any Note, the amounts so payable to the Administrative Agent or such Lender shall be increased to the extent necessary to yield to the Administrative Agent or such Lender (after payment of all Non-Excluded Taxes) interest or any such other amounts payable hereunder at the rates or in the amounts specified in this Agreement, provided, however, that the Borrower shall not be required to increase any such amounts payable to any Lender that is not organized under the laws of the United States of America or a state thereof if such Lender fails to comply with the requirements of clause (c) of this Section. Whenever any Non-Excluded Taxes are payable by the Borrower, as promptly as possible thereafter the Borrower shall send to the Administrative Agent for its own account or for the account of such Lender, as the case may be, a certified copy of an original official receipt received by the Borrower showing payment thereof. If the Borrower fails to pay any Non-Excluded Taxes when due to

\_0

-30-

Confidential

the appropriate taxing authority or fails to remit to the Administrative Agent the required receipts or other required documentary evidence, the Borrower shall indemnify the Administrative Agent and the Lenders for any incremental taxes, interest or penalties that may become payable by the Administrative Agent or any Lender as a result of any such failure.  The agreements in this Section shall survive the termination of this Agreement and the payment of the Loans and all other amounts payable hereunder.

(b)    In addition, the Borrower agrees to pay to the relevant Governmental Authority in accordance with applicable law any current or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies (including, without limitation, mortgage recording taxes and similar fees) imposed by any Governmental Authority that arise from any payment made hereunder or under any Note, or from the execution, delivery or registration of, or otherwise with respect to, this Agreement or any Note or any other Loan Document ("Other Taxes").

(c)    Each Lender (or Transferee) that is not a United States Person (as such term is defined in Section 7701(a)(30) of the Code (a "US Person")) for United States federal income tax purposes (a "Non-US Lender") shall deliver or caused to be delivered to the Borrower and the Administrative Agent the following properly completed and duly executed documents:

(i) two complete and executed (x) U.S. Internal Revenue Forms W-8BEN (or any successor form thereto) with respect to an income tax treaty providing for a zero rate of withholding tax on interest, or (y) U.S. Internal Revenue Service Forms W-8ECI (or any successor form thereto); or

(ii) two complete and executed U.S. Internal Revenue Service Forms W-8BEN (or any successor form thereto), including all appropriate attachments, documenting the status of the Lender (or Transferee) as a Non-U.S. Lender and (y) a certificate substantially in the form of Exhibit E (a "Non-Bank Status Certificate"); or

(iii) two complete and executed U.S. Internal Revenue Service Forms W-8IMY (or any successor form thereto) including all appropriate attachments, documenting the status of the Lender (or Transferee) as a Non-U.S. Lender; or

(iv) comparable statements in accordance with applicable U.S. law and regulations and amendments thereto which indicate that such Lender is not subject to withholding requirements.

Such documents shall be delivered by each Lender (or Transferee) on or before the date it becomes a party to this Agreement (or, in the case of a Transferee that is a participation holder, on or before the date such participation holder becomes a Transferee hereunder) and on or before the date, if any, such Lender (or Transferee) changes its applicable lending office by designating a different lending office (a "New Lending Office").  In addition, each Lender (or Transferee) shall deliver or cause to be delivered such Forms and/or Certificates promptly upon or before the expiration, obsolescence or invalidity of any document previously delivered by such Lender (or Transferee).  Notwithstanding any other provision of this Section 5.12(c), a Lender (or Transferee) shall not be required to deliver any document pursuant to this Section 5.12(c) that such Lender (or Transferee) is not legally able to deliver.

(d)    The Borrower shall not be required to indemnify any Lender (or Transferee) or to pay any additional amounts to any Lender (or Transferee) in respect of any U.S. federal income or withholding tax pursuant to paragraph (a) or (c) above to the extent that

\_0

-31-

**A2869**

Confidential

(i)     the obligation to withhold any amounts with respect to U.S. federal income tax existed on the date such Lender became a party to this Agreement (or, in the case of a Transferee that is a participation holder, on the date such participation holder became a Transferee hereunder) or, with respect to payments to a New Lending Office, the date such Lender (or Transferee) designated such New Lending Office, provided, however, that this clause (i) of this paragraph (d) shall not apply (x) to any Transferee or New Lending Office that becomes a Transferee or New Lending Office as a result of an assignment, participation, transfer or designation made at the request of the Borrower or (y) to the extent the indemnity payment or additional amounts any Lender (or Transferee), acting through a Lending Office, would be entitled to receive (without regard to this paragraph (d)) do not exceed the indemnity payment or additional amounts that the person making the assignment, participation or transfer to such Lender (or Transferee) or making the designation of such New Lending Office, would have been entitled to receive in the absence of such assignment, participation, transfer or designation, or

(ii)     the obligation to pay such indemnity payment or additional amounts would not have arisen but for a failure by such Lender (or Transferee) to comply with the provisions of paragraph (c) above.

(e)     Nothing contained in this Section 5.12 shall require any Lender (or any Transferee) or the Administrative Agent to make available any of its tax returns or any other information that it deems to be confidential or proprietary.

5.13     Indemnity.  The Borrower agrees to indemnify each Lender and to hold each Lender harmless from any actual loss or expense which such Lender may sustain or incur as a consequence of (a) default by the Borrower in making a borrowing of, Conversion into or Continuation of Eurodollar Loans after the Borrower has given a notice requesting the same in accordance with the provisions of this Agreement, (b) default by the Borrower in making any prepayment after the Borrower has given a notice thereof in accordance with the provisions of this Agreement or (c) the making of a prepayment of Eurodollar Loans on a day which is not the last day of an Interest Period with respect thereto.  This covenant shall survive the termination of this Agreement and the payment of Loans and all other amounts payable hereunder.

5.14     Lending Offices; Change of Lending Office.  (a)  Loans of each Type made by any Lender shall be made and maintained at such Lender's Applicable Lending Office for Loans of such Type.

(b)     Each Lender agrees that if it makes any demand for payment under Section 5.11 or 5.12(a), or if any adoption or change of the type described in Section 5.10 shall occur with respect to it, it will use reasonable efforts (consistent with its internal policy and legal and regulatory restrictions and so long as such efforts would not be disadvantageous to it, as determined in its sole discretion) to designate a different lending office if the making of such a designation would reduce or obviate the need for the Borrower to make payments under Section 5.11 or 5.12(a), or would eliminate or reduce the effect of any adoption or change described in Section 5.10.

5.15     Substitution of Lender.  In the event the Borrower is, or would be, required to pay any additional amounts pursuant to subsections 5.11 or 5.12(a), the Borrower may, so long as no Event of Default has occurred and is continuing, require any Lender claiming such additional amounts, upon five Business Days' prior written notice from the Borrower to such Lender, to assign the entire Revolving Credit Commitment and Loans of such Lender to another bank or financial institution selected by the Borrower and, if such bank or financial institution is not then a Lender, reasonably satisfactory to

Confidential

PP-TRBK0000064

the Administrative Agent. Any such assignment shall be effected in accordance with subsection 12.6 and, as a condition to such assignment, the Borrower shall pay all amounts due to the assigning Lender hereunder on the effective date of such assignment.

SECTION 6.  REPRESENTATIONS AND WARRANTIES

To induce the Administrative Agent and the Lenders to enter into this Agreement and to make the Loans, the Borrower hereby represents and warrants to the Administrative Agent and each Lender that:

6.1  Financial Condition. (a) The consolidated balance sheet of Old TransCare and its consolidated Subsidiaries as at December 31, 2000 and the related consolidated statements of income, retained earnings, cash flows and changes in stockholders' equity for the fiscal year ended on such date, reported on by Arthur Andersen L.L.P., copies of which have heretofore been furnished to each Lender, are complete and correct and present fairly in all material respects the consolidated financial condition of Old TransCare and its consolidated Subsidiaries as at such date, and the consolidated results of their operations and their consolidated cash flows for the fiscal year then ended. The unaudited consolidated balance sheet of Old TransCare and its consolidated Subsidiaries as at December 31, 2001 and as at December 31, 2002 and the related unaudited consolidated statements of income, retained earnings, cash flow and changes in stockholders' equity for the fiscal year ended on such date, certified by a Responsible Officer, copies of which have heretofore been furnished to each Lender, are complete and correct and present fairly in all material respects the consolidated financial condition of Old TransCare and its consolidated Subsidiaries as at such date, and the consolidated results of their operations and their consolidated cash flows for the fiscal year then ended (subject to normal year-end audit adjustments). The interim unaudited consolidated balance sheet of Old TransCare and its consolidated Subsidiaries as at May 31, 2003 and the related unaudited consolidated statements of income, retained earnings, cash flow and changes in stockholders' equity for the period from January 1, 2003 through May 31, 2003, certified by a Responsible Officer, copies of which have heretofore been furnished to each Lender, are complete and correct and present fairly in all material respects the consolidated financial condition of Old TransCare and its consolidated Subsidiaries as at such date, and the consolidated results of their operations and their consolidated cash flows for such period. All such financial statements, including the related schedules and notes thereto, have been prepared in accordance with GAAP applied consistently throughout the periods involved (except as approved by such accountants or Responsible Officer, as the case may be, and as disclosed therein) or on Schedule 6.1(a) attached hereto.

(b)  The pro forma consolidated balance sheet of the Borrower and its consolidated Subsidiaries as at May 31, 2003, and the pro forma statements of income, retained earnings, cash flow and changes in stockholders' equity for the five-month period then ended (the "Pro Forma Financial Statements"), copies of which has heretofore been furnished to the Administrative Agent and each Lender, and the unaudited consolidated balance sheet and statements of income, retained earnings, cash flow and changes in stockholders' equity of the Borrower and its consolidated Subsidiaries as of such date and period, adjusted to give effect (as if such events had occurred on the first day of such period) to (i) the confirmation of the Plan of Reorganization and the consummation of the transactions contemplated by the Plan of Reorganization, (ii) the making of the Term Loans hereunder, (iii) the making of Revolving Credit Loans hereunder in an amount equal to the outstanding amounts owing under the DIP Loan Documents, and the application of the proceeds thereof to the repayment of all amounts owing under the DIP Loan Documents, (iv) all other transactions to be consummated on the Closing Date, and (v) the payment of all fees and expenses related to the foregoing transactions, as estimated in good faith as of the date of the balance sheet included in the Pro Forma Financial

\_0

-33-

**A2871**

Statements. The Pro Forma Financial Statements present fairly in all material respects, on a pro forma basis, the consolidated financial condition of the Borrower and its consolidated Subsidiaries as at such date, and the consolidated results of their operations and their consolidated cash flows for the five-month period then ended, assuming the events described in the immediately preceding sentence had occurred on the first day of such period.

(c)     The operating forecast and cash flow projections of the Borrower, dated as of July 3, 2003, a copy of which have been furnished to the Lenders, have been prepared in good faith under the direction of a Responsible Officer of the Borrower, and in accordance with GAAP except that such forecast and projections do not include footnotes and other disclosures which may be required pursuant to GAAP, and except as set forth on Schedule 6.1(c), the operating forecast and cash flow projections were or are based on good faith estimates and assumptions believed to be reasonable at the time made, it being recognized by the Lenders that such projections as to future events are not to be viewed as facts and that actual results during the period or periods covered by any such projections may differ significantly from the projected results.

6.2     No Change.  (i) There has been no development or event which has had or would have a Material Adverse Effect (x) if and to the extent the representation in this clause (i) is made or deemed made on or prior to the Closing Date, since May 31, 2003, except the commencement of the Bankruptcy Cases and the consummation of the transactions contemplated by the Plan of Reorganization or as disclosed in the Disclosure Statement or in the projections delivered to the Administrative Agent pursuant to Section 6.1(c), and (y) to the extent that the representation in this clause (i) is made or deemed made after the Closing Date, since the Closing Date (subject to any waiver or amendment pursuant to Section 12.1); and (ii) during the period from June 1, 2003 to the Closing Date, except as contemplated by the Plan of Reorganization or permitted by Section 9.7(a) hereof, no dividends or other distributions have been declared, paid or made upon the Capital Stock of the Borrower nor has any of the Capital Stock of the Borrower been redeemed, retired, purchased or otherwise acquired for value by the Borrower or any of its Subsidiaries.

6.3     Existence; Compliance with Law.  Each of the Borrower and its Subsidiaries (a) is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization, (b) has the corporate power and authority, and the legal right, to own and operate its property, to lease the property it operates as lessee and to conduct the business in which it is currently engaged, (c) except as set forth on Schedule 6.3, is duly qualified as a foreign corporation and in good standing under the laws of each jurisdiction where its ownership, lease or operation of property or the conduct of its business requires such qualification and (d) except as set forth on Schedule 6.3, is in compliance with all Requirements of Law, except, in the case of the foregoing clauses (c) and (d), and to the extend not disclosed on Schedule 6.3, to the extent that the failure to comply therewith would not, in the aggregate, reasonably be expected to have a Material Adverse Effect.

6.4     Power; Authorization; Enforceable Obligations.  Each of the Loan Parties has the corporate power and authority, and the legal right, to make, deliver and perform the Loan Documents to which it is a party and, in the case of the Borrower, to borrow hereunder and has taken all necessary corporate action to authorize, in the case of the Borrower, the borrowings on the terms and conditions of this Agreement and any Notes, and, in the case of all Loan Parties, to authorize the execution, delivery (other than by the Lenders with respect to themselves) and performance of the Loan Documents to which it is a party.  Except as set forth on Schedule 6.4, no consent or authorization of, filing with, notice to or other act by or in respect of, any Governmental Authority or any other Person is required in connection with the borrowings hereunder or with the execution, delivery, performance, validity or enforceability of

\_0

-34-

**A2872**

Confidential

PP-TRBK0000066

the Loan Documents to which the Borrower or any other Loan Party is a party. This Agreement has been, and each other Loan Document to which it is a party will be, duly executed and delivered on behalf of each Loan Party. This Agreement constitutes, and each other Loan Document to which it is a party when executed and delivered will constitute, a legal, valid and binding obligation of each Loan Party enforceable against such Loan Party in accordance with its terms, subject to the effects of bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and other similar laws relating to or affecting creditors' rights generally, general equitable principles (whether considered in a proceeding in equity or at law) and an implied covenant of good faith and fair dealing.

6.5    No Legal Bar.  Except as disclosed on Schedule 6.5, the execution, delivery and performance of the Loan Documents to which the Borrower or any other Loan Party is a party, the borrowings hereunder and the use of the proceeds thereof will not violate any Requirement of Law or Contractual Obligation of any Loan Party and will not result in, or require, the creation or imposition of any Lien on any of their respective properties or revenues pursuant to any such Requirement of Law or Contractual Obligation (other than Liens created by the Security Documents in favor of the Administrative Agent).

6.6    No Material Litigation.  Except as disclosed on Schedule 6.6, no litigation, investigation or proceeding of or before any arbitrator or Governmental Authority is pending or, to the knowledge of the Borrower, threatened by or against the Borrower or any Loan Party or against any of its or their respective properties or revenues (i) with respect to any of the Loan Documents or any of the transactions contemplated hereby or thereby, or (ii) which would have a Material Adverse Effect.

6.7    No Default.  After giving effect to the transactions contemplated by this Agreement, the Plan of Reorganization and the Confirmation Order to occur on the Closing Date, neither the Borrower nor any Loan Party is in default under or with respect to any of its Contractual Obligations in any respect which could have a Material Adverse Effect.  After giving effect to the transactions contemplated by this Agreement, the Plan of Reorganization and the Confirmation Order, on the Closing Date, no Default or Event of Default has occurred and is continuing.

6.8    Ownership of Property; Liens.  Each of the Loan Parties has good and marketable title in fee simple to, or a valid leasehold interest in, all its real property, and good title to, or a valid leasehold interest in, all its other material property, and none of such property is subject to any Lien except as permitted by Section 9.3. The Loan Parties do not own any real property in fee simple as of this Closing Date.  The properties listed on Schedule 1.1(b) constitute all the real property leased by any Loan Party as of the Closing Date.

6.9    Intellectual Property.  Each of the Loan Parties owns, or is licensed to use, all trademarks, tradenames, copyrights, technology, know-how and processes necessary for the conduct of its business as currently conducted except for those the failure to own or license which could not have a Material Adverse Effect (the "Intellectual Property").  No claim has been asserted and is pending by any Person challenging or questioning the use by the Loan Parties of any such Intellectual Property or the validity or effectiveness of any such Intellectual Property, nor does the Borrower know of any valid basis for any such claim, except for such claims and infringements that, in the aggregate, would not reasonably be expected to have a Material Adverse Effect.  The use by the Loan Parties of any material Intellectual

\_0

Confidential                                                                                 PP-TRBK0000067

Property of the Loan Parties does not infringe on the rights of any Person, except for such claims and infringements that, in the aggregate, would not reasonably be expected to have a Material Adverse Effect.

6.10   <u>No Burdensome Restrictions</u>.  No Requirement of Law or Contractual Obligation of the Borrower or any of the other Loan Parties has a Material Adverse Effect.

6.11   <u>Taxes</u>.  Except as otherwise contemplated by the Plan of Reorganization and the Confirmation Order, each of the Loan Parties has filed or caused to be filed all tax returns which, to the knowledge of the Borrower, are required to be filed and has paid all taxes shown to be due and payable on said returns or on any assessments made against it or any of its property and all other taxes, fees or other charges imposed on it or any of its property by any Governmental Authority (other than any the amount or validity of which are currently being contested in good faith by appropriate proceedings and with respect to which reserves in conformity with GAAP have been provided on the books of the relevant Loan Party); no tax Lien has been filed, and, to the knowledge of the Borrower, no claims are being asserted, with respect to any such tax, fee or other charge which, if adversely determined, would reasonably be expected to result in the repayment of $500,000 or more in the aggregate.

6.12   <u>Federal Regulations</u>.  No part of the proceeds of any Loans will be used for "purchasing" or "carrying" any "margin stock" within the respective meanings of each of the quoted terms under Regulation U of the Board as now and from time to time hereafter in effect, or for any purpose which violates, or which would be inconsistent with, the provisions of the regulations of such Board.  If requested by any Lender or the Administrative Agent, the Borrower will furnish to the Administrative Agent and each Lender a statement to the foregoing effect in conformity with the requirements of FR Form G-3 or U-1 referred to in Regulation U, as the case may be.

6.13   <u>ERISA</u>.  Neither a Reportable Event nor an "accumulated funding deficiency" (within the meaning of Section 412 of the Code or Section 302 of ERISA) has occurred during the five-year period prior to the date on which this representation is made or deemed made with respect to any Single Employer Plan, and each Plan (other than a Multiemployer Plan or a multiemployer welfare plan maintained pursuant to a collective bargaining agreement) has complied in all material respects with the applicable provisions of ERISA and the Code.  No termination of a Single Employer Plan has occurred (other than a termination described in Section 4041(b) of ERISA with respect to which the Borrower has incurred no liability (i) to the PBGC or (ii) in excess of $1,000,000), and no Lien in favor of the PBGC or a Plan has arisen, during such five-year period.  Except to the extent that any such excess could not have a Material Adverse Effect, the present value of all accrued benefits under each Single Employer Plan (based on those assumptions used to fund such Plans) did not, as of the last annual valuation date prior to the date on which this representation is made or deemed made, exceed the value of the assets of such Plan allocable to such accrued benefits by more than $1,000,000.  Neither the Borrower nor any Commonly Controlled Entity has had a complete or partial withdrawal from any Multiemployer Plan, and, to the knowledge of the Borrower, the Borrower would not become subject to any material liability under ERISA if the Borrower or any Commonly Controlled Entity were to withdraw completely from all Multiemployer Plans as of the valuation date most closely preceding the date on which this representation is made or deemed made.  To the knowledge of the Borrower, no such Multiemployer Plan is in Reorganization or Insolvent.  Except to the extent that any such excess could not have a Material Adverse Effect, the present value (determined using actuarial and other assumptions which are reasonable in respect of the benefits provided and the employees participating) of the liability of the Borrower and each Commonly Controlled Entity for post retirement benefits to be provided to their current and former

\_0

-36-

**A2874**

employees under Plans which are welfare benefit plans (as defined in Section 3(1) of ERISA) other than such liability disclosed in the financial statements of the Borrower does not, in the aggregate, exceed the assets under all such Plans allocable to such benefits by an annual amount in excess of $1,000,000.

6.14   <u>Investment Company Act; Other Regulations.</u>   The Borrower is not an "investment company", within the meaning of the Investment Company Act of 1940, as amended (the "<u>Investment Company Act</u>"), and the execution, delivery and performance of the Loan Documents by the Borrower and the other Loan Parties will not violate the Investment Company Act.  The Borrower is not subject to regulation under any Federal or State statute or regulation (other than Regulation X of the Board) which limits its ability to incur Indebtedness.

6.15   <u>Subsidiaries.</u>   Schedule 6.15 sets forth the name of each direct or indirect Subsidiary of the Borrower, its form of organization, its jurisdiction of organization, the total number of issued and outstanding shares or other interests of Capital Stock thereof, the classes and number of issued and outstanding shares or other interests of Capital Stock of each such class, the name of each holder of Capital Stock thereof and the number of shares or other interests of such Capital Stock held by each such holder and the percentage of all outstanding shares or other interests of such class of Capital Stock held by such holders and Schedule 6.15 identifies all Immaterial Subsidiaries.

6.16   <u>Security Documents.</u>   (a)   The provisions of each Security Document are effective to create in favor of the Administrative Agent, for the ratable benefit of the Lenders, a legal, valid and enforceable security interest in all right, title and interest of the Loan Party which is party thereto in the "<u>Collateral</u>" described therein.

(b)   (i)   When proper financing statements have been filed in the offices in the jurisdictions listed in Schedule 6.16, the Security Agreement shall constitute a fully perfected first Lien on, and security interest in, all right, title and interest of the Loan Parties in the "<u>Collateral</u>" described therein, which can be perfected by such filing (subject as to priority only to the Liens permitted by Section 9.3 and subject to Section 6.16(c)).

(ii)   When certificates representing the Pledged Stock (as defined in the Pledge Agreement) are delivered to the Administrative Agent, together with stock powers endorsed in blank by a duly authorized officer of the pledgors thereof, and assuming continued possession by the Administrative Agent of the Pledged Stock, the Pledge Agreement shall constitute a fully perfected first Lien on, and security interest in, all right, title and interest of the pledgors parties thereto in the Pledged Stock.

(c)   Neither the Borrower nor any other Loan Party owns any property, or has any interest in any property, that is not subject to a fully perfected first priority Lien (subject as to priority only to Liens permitted by Section 9.3) on, or security interest in, such property in favor of the Administrative Agent, other than (i) any such property having an aggregate fair market value at any one time not exceeding $500,000 and (ii) other property which is the subject of Liens permitted by Section 9.3 securing Indebtedness permitted under Sections 9.2(c) or 9.2(d) which prohibits the granting of any other Lien on such property.

6.17   <u>Accuracy and Completeness of Information.</u> (a)  All factual information, reports and other papers and data with respect to the Loan Parties (other than projections) furnished, and all factual statements and representations made in writing, to the Lenders by a Loan Party, or on behalf of a

\_0

**A2875**

Confidential

Loan Party, are, when taken together with all such other written factual information, reports and other papers and data previously so furnished and all such other written factual statements and representations previously so made (and, in any case excluding such information, reports, papers, factual statements and representations which have been superseded or replaced by subsequent such items), complete and correct in all material respects, to the extent necessary to give the Lenders true and accurate knowledge of the subject matter thereof in all material respects, and do not contain any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements contained therein not misleading in light of the circumstances in which the same were made.

(b)     The projections attached hereto as Schedule 6.17(b) are based on good faith estimates and assumptions believed to be reasonable at the time made, it being recognized by the Lenders that such projections as to future events are not to be viewed as facts and that actual results during the period or periods covered by any such projections may differ significantly from the projected results. All projections with respect to the Loan Parties which are furnished by or on behalf of a Loan Party to the Lenders after the Closing Date will be based on good faith estimates and assumptions believed to be reasonable at the time made, it being recognized by the Lenders that such projections as to future events are not to be viewed as facts and that actual results during the period or periods covered by any such projections may differ significantly from the projected results.

6.18    Labor Relations.  No Loan Party is engaged in any unfair labor practice which would reasonably be expected to have a Material Adverse Effect.  Except as disclosed on Schedule 6.18, there is, other than would not reasonably be expected to have a Material Adverse Effect, (a) no unfair labor practice complaint pending or, to the knowledge of each Loan Party, threatened against a Loan Party before the National Labor Relations Board and no grievance or arbitration proceeding arising out of or under any collective bargaining agreement is so pending or threatened; (b) no strike, labor dispute, slowdown or stoppage pending or, to the best knowledge of each Loan Party, threatened against a Loan Party; and (c) no union representation question existing with respect to the employees of a Loan Party and no union organizing activities are taking place with respect to any thereof.

6.19    Insurance.  Each Loan Party has, with respect to its properties and business, insurance covering the risks, in the amounts, with the deductible or other retention amounts, and with the carriers, listed on Schedule 6.19, which insurance meets the requirements of Section 8.5 hereof.

6.20    Solvency.  On the Closing Date, after giving effect to the confirmation of the Plan of Reorganization by the Confirmation Order and the consummation of the transactions contemplated by the Plan of Reorganization and Confirmation Order and to the incurrence of all indebtedness and obligations being incurred on or prior to the Closing Date in connection herewith and therewith, (i) the amount of the "present fair saleable value" of the assets of the Borrower and its Subsidiaries taken as a whole will, as of such date, exceed the amount of all "liabilities of the Borrower and its Subsidiaries taken as a whole, contingent or otherwise", as of such date, as such quoted terms are determined in accordance with applicable federal and state laws governing determinations of the insolvency of debtors, (ii) the present fair saleable value of the assets of the Borrower and its Subsidiaries taken as a whole will, as of such date, be greater than the amount that will be required to pay the liabilities of the Borrower and its Subsidiaries taken as a whole on their debts as such debts become absolute and mature, (iii) the Borrower and its Subsidiaries taken as a whole will not have, as of such date, an unreasonably small amount of capital with which to conduct their businesses, and (iv) the Borrower and its Subsidiaries taken as a whole will be able to pay their debts as they mature.  For purposes of this Section 6.20, "debt" means "liability on a claim", "claim" means any (x) right to payment, whether or not

\_0

-38-

Confidential

such a right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured, and (y) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured or unmatured, disputed, undisputed, secured or unsecured.

6.21 <u>Purpose of Loans</u>. Term Loans were distributed to the initial Term Loan Lenders hereunder on the Closing Date as part of the reorganization of the Borrower contemplated by the Plan of Reorganization and Confirmation Order. The proceeds of the Revolving Credit Loans shall be used on the Closing Date to repay all amounts owing under the DIP Loan Documents, and thereafter, for the working capital requirements from time to time of the Borrower in the ordinary course of business (including, without limitation, for cash collateral in connection with the issuances of letters of credit as permitted under Section 9.2(h)) and to pay fees and expenses incurred in connection herewith and in connection with the concurrent transactions referred to in Section 7.1 which are to be consummated on the Closing Date.

6.22 <u>Environmental Matters</u>. Except as set forth on Schedule 6.22:

(a) The facilities and properties that are owned, leased or operated by the Borrower or any Subsidiary (the "<u>Properties</u>") do not contain any Materials of Environmental Concern in amounts or concentrations which (i) constitute or constituted a violation of, or (ii) could give rise to liability under, any Environmental Law which could reasonably be expected to result in the payment of an amount payable by the Loan Parties in excess of $250,000 for remedial costs, compliance costs, compensatory damages, punitive damages, fines, penalties or any combination thereof (a "<u>Material Environmental Amount</u>").

(b) To the knowledge of the Loan Parties, the Properties and all operations of the Loan Parties at the Properties are in material compliance with all applicable Environmental Laws, and there is no contamination at, under or about the Properties or violation of any Environmental Law with respect to the Properties resulting from any activities on the part of any Loan Party or the business operated by the Borrower and its Subsidiaries (the "<u>Business</u>") which could reasonably be expected to result in the payment of a Material Environmental Amount.

(c) No Loan Party has not received any notice of violation, alleged violation, non-compliance, liability or potential liability regarding environmental matters or compliance with Environmental Laws with regard to any of the Properties or the Business other than would reasonably be expected not to have a Material Adverse Effect, nor does any Loan Party have knowledge that any such notice will be received or is being threatened.

(d) Materials of Environmental Concern have not been transported or disposed of from the Properties in violation of, or in a manner or to a location which could give rise to liability under, any Environmental Law, nor have any Materials of Environmental Concern been generated, treated, stored or disposed of at, on or under any of the Properties in violation of, or in a manner that could give rise to liability under, any applicable Environmental Law, other than, in each case, would reasonably be expected not to result in the payment of a Material Environmental Amount.

(e) No judicial proceeding or governmental or administrative action is pending or, to the knowledge of the Loan Parties, threatened, under any Environmental Law to which the Borrower

\_0

-39-

Confidential                                                                                           PP-TRBK0000071

or any Subsidiary is or will be named as a party with respect to the Properties or the Business, nor are there any consent decrees or other decrees, consent orders, administrative orders or other orders, binding upon the Loan Parties, outstanding under any Environmental Law with respect to the Properties or the Business, if the same require the payment of a Material Environmental Amount or if the failure to comply therewith could reasonably be expected to result in a payment of a Material Environmental Amount.

(f)     There has been no release or threat of release of Materials of Environmental Concern at or from the Properties, or arising from or related to the operations of the Borrower or any Subsidiary in connection with the Properties or otherwise in connection with the Business, in violation of or in amounts or in a manner that would give rise to the incurrence of a Material Environmental Amount under Environmental Laws.

6.23    Regulation H.  No Mortgage encumbers improved real property owned by a Loan Party which is located in an area that has been identified by the Secretary of Housing and Urban Development as an area having special flood hazards and in which flood insurance has been made available under the National Flood Insurance Act of 1968.

6.24    Key-Person Life Insurance Policies.   As of the Closing Date, neither the Borrower nor any Subsidiary has obtained any policy of "key-person" life insurance on any officer or director of the Borrower or any Subsidiary.

6.25    Existing Indebtedness.   Immediately after giving effect to the Confirmation Order and the consummation of the Plan of Reorganization, the only Indebtedness of the Borrower and its Subsidiaries, other than the Loans, will be that listed on Schedule 9.2.

6.26    Concerning Regulatory Matters.  (a)  Each of the Borrower and each Subsidiary is, and for the last three years has been, in material compliance with all applicable federal and state laws, regulations, rules, and guidelines applicable to providers of medical transportation services, including, but not limited to, federal and state fraud and abuse laws, anti-kickback laws, self-referral laws, and/or laws, rules, regulations and guidelines relating to the filing of false claims or statements or unacceptable practices.

(b)     Each of the Borrower and each Subsidiary has all licenses and/or certifications that it needs to conduct its business in its present form if the failure to have such licenses and certificates could have a Material Adverse Effect, such licenses and/or certifications have not been terminated, suspended or revoked, and there are presently no termination, suspension or revocation proceedings, actual, pending, or threatened, in respect thereof.

(c)     Except as set forth on Schedule 6.26, neither the Borrower nor any Subsidiary is, and for the last three years has not been, the subject of any current, pending or, to its knowledge, threatened investigations, audits, consent decrees, settlements, or other extraordinary examinations or reviews by any federal or state agency or other government or administrative office, including, but not limited to, the Center for Medicare and Medicaid Services, the Office of the Inspector General, the Federal Bureau of Investigation, fiscal intermediaries, and state departments of health, social services, transportation, insurance, or any other state agency involved in the regulation of medical transportation

Confidential

services or in the regulation of reimbursement received by companies providing medical transportation services through the Medicare and Medicaid programs.

SECTION 7.    CONDITIONS PRECEDENT

7.1    <u>Conditions to Initial Loans</u>.  The agreement of each Lender to make its initial Loans is subject to the satisfaction, immediately prior to or concurrently with the making of such Loans on the Closing Date, of the following conditions precedent:

(a)    <u>Loan Documents</u>.  The Administrative Agent shall have received:

(i)    this Agreement, executed and delivered by a duly authorized officer of the Borrower and the Lenders, with a counterpart for each Lender;

(ii)    for the account of each Lender having a Term Loan Commitment which requests the same, a Term Loan Note of the Borrower conforming to the requirements hereof and executed by a duly authorized officer of the Borrower;

(iii)    for the account of each Lender having a Revolving Credit Commitment which requests the same, a Revolving Credit Note of the Borrower conforming to the requirements hereof and executed by a duly authorized officer of the Borrower;

(iv)    the Subsidiaries Guarantee, executed and delivered by a duly authorized officer of each of the parties thereto, with a counterpart or conformed copy for each Lender;

(v)    the Security Agreement, executed and delivered by a duly authorized officer of the parties thereto, with a counterpart or a conformed copy for each Lender;

(vi)    the Pledge Agreement, executed and delivered by a duly authorized officer of the Borrower, TransCare New York, Inc. and TransCare Maryland, Inc., with a counterpart or a conformed copy for each Lender;

(vii)    to the extent required by the Security Agreement, a Medicare Controlled Account Agreement with respect to deposit accounts of the Loan Parties into which Medicare/Medicaid Receivables are deposited directly by such payors or by deposit of checks from such payors, executed and delivered by duly authorized officers of the parties thereto, with a counterpart or conformed copy for each Lender, on terms acceptable to the Borrower and Lenders; and

(viii)    to the extent required by the Security Agreement, a Deposit Account Control Agreement, with respect to certain deposit accounts of the Loan Parties, executed and delivered by duly authorized officers of the parties thereto, with a counterpart or conformed copy for each Lender, on terms acceptable to the Borrower and Lenders.

(b)    <u>Related Agreements</u>.  The Administrative Agent and each Lender shall have received true and correct copies of each of the Disclosure Statement, the Plan of Reorganization, the Confirmation Order, the Management Agreement, the Stockholders' Agreement, the Stock Option Plan, the Warrant Documents, and such other documents or instruments as may be reasonably requested by the Administrative Agent, each duly executed and delivered by the respective parties thereto.

-41-

**A2879**

Confidential

PP-TRBK0000073

(c)     <u>Plan of Reorganization; Concurrent Transactions</u>.

(i)     The Plan of Reorganization shall have been confirmed by the entry of the Confirmation Order by the Bankruptcy Court;

(ii)     All of the conditions to the confirmation of the Plan of Reorganization and conditions to the effectiveness of confirmation of the Plan of Reorganization shall have been satisfied or waived;

(iii)     All amounts owing under the DIP Loan Documents shall have been, or shall be concurrently with the Closing Date, paid in full;

(iv)     The Common Stock shall have been issued and distributed as provided in the Plan of Reorganization. All Capital Stock and Stock Equivalents of Old TransCare shall no longer be outstanding as a result of the Plan of Reorganization and Confirmation Order.

(v)     All fees and expenses of the Lenders, the DIP Lenders and the Term Loan Lenders required to be paid by the Borrower, Old TransCare or any of their Subsidiaries in connection with the Bankruptcy Cases, the DIP Loan Documents, this Agreement or the transactions contemplated by the Plan of Reorganization, including without limitation, all professional fees and expenses of advisors to the Lenders, the DIP Lenders and the Term Loan Lenders, shall have been paid in full.

(vi)     The terms and conditions, and all documentation, of any Indebtedness and all equity securities of the Borrower or any of its Subsidiaries to be outstanding at or after the Closing Date, the certificate of incorporation and by-laws or other Governing Documents of all Loan Parties, the Management Agreement, the Stockholders' Agreement, the Stock Option Plan and the Warrant Documents, in each case after giving effect to the confirmation of the Plan of Reorganization pursuant to the Confirmation Order, shall be in form and substance consistent with the Plan of Reorganization and the Confirmation Order and otherwise satisfactory in form and substance to the Administrative Agent and the Lenders.

(d)     <u>Governing Documents</u>.  The Administrative Agent shall have received, with a counterpart for each Lender, true and complete copies of the Governing Documents of each Loan Party, certified as of the Closing Date as complete and correct copies thereof by the Secretary or an Assistant Secretary of such Loan Party.

(e)     <u>Corporate Proceedings of the Borrower</u>.  The Administrative Agent shall have received, with a counterpart for each Lender, a copy of the resolutions, in form and substance reasonably satisfactory to the Administrative Agent, of the Board of Directors of the Borrower authorizing (i) the execution, delivery and performance of this Agreement and the other Loan Documents to which it is a party, (ii) the borrowings contemplated hereunder and (iii) the granting by it of the Liens created pursuant to the Security Documents, certified by the Secretary or an Assistant Secretary of the Borrower as of the Closing Date, which certificate shall be in form and substance reasonably satisfactory to the Administrative Agent and shall state that the resolutions thereby certified have not been amended, modified, revoked or rescinded.

(f)     <u>Borrower Incumbency Certificate</u>.  The Administrative Agent shall have received, with a counterpart for each Lender, a certificate of the Borrower, dated the Closing Date, as to the incumbency and signature of the officers of the Borrower executing any Loan Document reasonably satisfactory in form and substance to the Administrative Agent, executed by the Chairman, Chief

\_0

-42-

**A2880**

Executive Officer, President or any Vice President and the Secretary or any Assistant Secretary of the Borrower.

(g)     <u>Corporate Proceedings of each Subsidiary Guarantor</u>.  The Administrative Agent shall have received, with a counterpart for each Lender, a copy of the resolutions, in form and substance reasonably satisfactory to the Administrative Agent, of the Board of Directors of each Subsidiary Guarantor, authorizing the execution, delivery and performance of the Loan Documents to which such Subsidiary Guarantor is a party, certified by the Secretary or an Assistant Secretary of such Subsidiary Guarantor as of the Closing Date, which certificate shall be in form and substance reasonably satisfactory to the Administrative Agent and shall state that the resolutions thereby certified have not been amended, modified, revoked or rescinded.

(h)     <u>Subsidiary Guarantor Incumbency Certificate</u>.  The Administrative Agent shall have received, with a counterpart for each Lender, a certificate of each Subsidiary Guarantor, dated the Closing Date, as to the incumbency and signature of the officers of such Subsidiary Guarantor executing any Loan Document reasonably satisfactory in form and substance to the Administrative Agent, executed by the Chairman, Chief Executive Officer, President or any Vice President and the Secretary or any Assistant Secretary of such Subsidiary Guarantor.

(i)     <u>Good Standing Certificates</u>.  The Administrative Agent shall have received, with a copy for each Lender, certificates dated as of a recent date from the Secretary of State or other appropriate authority, evidencing the good standing of the Borrower and each other Loan Party (i) in the jurisdiction of its organization and (ii) in each other jurisdiction where its ownership, lease or operation of property or the conduct of its business requires it to qualify as a foreign Person except, as to this subclause (ii), where the failure to so qualify could not have a Material Adverse Effect.

(j)     <u>Consents, Licenses and Approvals</u>.  The Administrative Agent shall have received, with a counterpart for each Lender, a certificate of a Responsible Officer of the Borrower stating that, assuming that the Lenders have made all required filings and received all required consents with respect to the ownership of Capital Stock of the Borrower, all consents, authorizations, licenses and filings referred to in Section 6.4 (except as otherwise indicated on Schedule 6.4) are in full force and effect, and each such consent, authorization and filing shall be in form and substance satisfactory to the Administrative Agent.

(k)     <u>Fees and Interest</u>.  The Administrative Agent shall have received (i) for the account of Patriarch, a structuring fee in an amount equal to $250,000, and (ii) for the account of each Lender, the facility fee for the first year following the Closing Date pursuant to Section 3.3(b)(i).

(l)     <u>Legal Opinions</u>.  The Administrative Agent shall have received, with a counterpart for each Lender, the executed legal opinion of Nixon Peabody, LLP, counsel to the Borrower and the other Loan Parties, substantially in the form of Exhibit G.

(m)     <u>Pledged Stock; Stock Powers; Pledged Interests</u>.  The Administrative Agent shall have received the certificates representing the shares of each Subsidiary of the Borrower pledged pursuant to the Pledge Agreement, together with an undated stock power for each such certificate executed in blank by a duly authorized officer of the pledgor thereof.  Each such Subsidiary shall have delivered an acknowledgment of and consent to such Pledge Agreement, executed by a duly authorized officer of such Subsidiary, in substantially the form appended to such Pledge Agreement.

\_0

-43-

Confidential

(n) <u>Actions to Perfect Liens</u>. The Administrative Agent shall have received all financing statements on form UCC-1, necessary or, in the opinion of the Administrative Agent, desirable to perfect the Liens created by the Security Documents.

(o) <u>Landlord Agreements</u>. The Administrative Agent shall have received, with respect to each parcel of real property leased by any Loan Party at which the books and records of billed accounts receivable are located, a landlord estoppel and collateral access agreement substantially in the form of Exhibit H or such other form as may be approved by the Administrative Agent (a "<u>Landlord Agreement</u>"), duly executed and delivered by the lessor of such parcel of real property.

(p) <u>Insurance</u>. The Administrative Agent shall have received evidence in form and substance satisfactory to it that all of the requirements of Section 8.5 hereof shall have been satisfied.

7.2 <u>Conditions to Each Loan</u>. The agreement of each Lender to make any extension of credit requested to be made by it on any date after the Closing Date is subject to the satisfaction of the following conditions precedent:

(a) <u>Representations and Warranties</u>. Each of the representations and warranties made by the Borrower and the other Loan Parties in or pursuant to the Loan Documents shall be true and correct in all material respects on and as of such date as if made on and as of such date (or, if any such representation or warranty is expressly stated to have been made as of a specific date, as of such specific date).

(b) <u>No Default</u>. No Default or Event of Default shall have occurred and be continuing on such date (after giving effect to the transactions contemplated by this Agreement to occur on the Closing Date and to the consummation of the transactions contemplated by the Plan of Reorganization and Confirmation Order) or after giving effect to the Loans requested to be made on such date.

(c) <u>No Bankruptcy</u>. There shall not have been commenced against the Borrower or any Subsidiary an involuntary case under the Bankruptcy Code or any other law referred to in Section 10(g)(i), or any case, proceeding or other action for the appointment of a receiver, liquidator, assignee, custodian, trustee, sequestrator (or similar official) of such Person or for any substantial part of its Property or for the winding up or liquidation of its affairs, and which involuntary case or other case, proceeding or other action shall not have been dismissed.

Each borrowing by the Borrower hereunder shall constitute a representation and warranty by the Borrower as of the date thereof that the conditions contained in this Section 7.2 have been satisfied or waived in accordance with Section 12.1 hereof.

SECTION 8.    AFFIRMATIVE COVENANTS

The Borrower hereby agrees that, so long as any of the Commitments remain in effect or any amount is owing to any Lender or the Administrative Agent hereunder or under any other Loan Document, the Borrower shall and (except in the case of delivery of financial information, reports and notices) shall cause each of its Subsidiaries to:

8.1 <u>Financial Statements</u>.    Furnish to the Administrative Agent, and the Administrative Agent will provide a copy to each Lender:

A2882

Confidential

(a)      (i) as soon as available, but in any event within 120 days after the end of the 2003 fiscal year of the Borrower ending December 31, 2003, a copy of the consolidated balance sheet of the Borrower and its consolidated Subsidiaries as at the end of such year and the related consolidated statements of income, retained earnings, cash flow and changes in stockholders' equity for the period from August 4, 2003 to December 31, 2003, reported on without a "going concern" or like qualification or exception, or qualification arising out of the scope of the audit, by J.H. Cohn or other independent certified public accountants of nationally recognized standing reasonably acceptable to the Required Lenders, and an unaudited consolidated operating summary by business segment for such period; and

(ii) as soon as available, but in any event within 120 days after the end of each fiscal year of the Borrower, commencing with the fiscal year ending December 31, 2004, a copy of the consolidated balance sheet of the Borrower and its consolidated Subsidiaries as at the end of such year and the related consolidated statements of income, retained earnings, cash flow and changes in stockholders' equity for such year, setting forth in each case in comparative form the figures for the previous year, reported on without a "going concern" or like qualification or exception, or qualification arising out of the scope of the audit, by J.H. Cohn or other independent certified public accountants of nationally recognized standing reasonably acceptable to the Required Lenders, and an unaudited consolidated operating summary by business segment for such fiscal year; and

(b)      as soon as available, but in any event not later than 45 days after the end of each of the first three quarterly periods of each fiscal year of the Borrower commencing with the quarterly period ending September 30, 2003, the unaudited consolidated balance sheet of the Borrower and its consolidated Subsidiaries as at the end of such quarter and the related unaudited consolidated statements of income, retained earnings, cash flow and changes in stockholders' equity of the Borrower and its consolidated Subsidiaries for such quarter and the portion of the fiscal year through the end of such quarter, setting forth in each case in comparative form the figures for the previous year, and consolidated operating summary by business segments for such quarter, certified by a Responsible Officer as being fairly stated in all material respects (subject to normal year-end audit adjustments); and

(c)      as soon as available, but in any event not later than 30 days after the end of each calendar month commencing with the month ending July 31, 2003, the unaudited consolidated balance sheet of the Borrower and its consolidated Subsidiaries as at the end of such month and the related unaudited consolidated statements of income, retained earnings, cash flow and changes in stockholders' equity of the Borrower and its consolidated Subsidiaries for such month and the portion of the fiscal year through the end of such month, setting forth in each case in comparative form the figures for (i) the previous year and (ii) the projected and operating cash flow budgets for the current fiscal year, and consolidated operating summary by business segments for such month, certified by a Responsible Officer as being fairly stated in all material respects (subject to normal year-end audit adjustments);

all such financial statements shall be complete and correct in all material respects and shall be prepared in reasonable detail and in accordance with GAAP applied consistently throughout the periods reflected therein and with prior periods (except as approved by such accountants or officer, as the case may be, and disclosed therein).

8.2      <u>Certificates; Other Information</u>.  Furnish to each Lender:

(a)      concurrently with the delivery of the financial statements referred to in Section 8.1(a), a certificate of the independent certified public accountants reporting on such financial statements stating that in making the examination necessary therefor no knowledge was obtained of any

Confidential

Default or Event of Default not waived pursuant hereto, except as specified in such certificate, and a copy of any management letter prepared for the Borrower;

(b)     concurrently with the delivery of the financial statements referred to in Sections 8.1(a) and (b), a certificate of a Responsible Officer (i) stating that, to the best of such Officer's knowledge, the Borrower during such period has observed or performed all of its covenants and other agreements, and satisfied every condition, contained in this Agreement and the other Loan Documents to be observed, performed or satisfied by it, and that such Officer has obtained no knowledge of any existing Default or Event of Default not waived pursuant hereto except as specified in such certificate and (ii) showing in detail the calculations supporting such Officer's certification of the Borrower's compliance with the requirements of Section 9.1(a) through 9.1(e) for the applicable fiscal quarter;

(c)     not later than the last day of each fiscal year of the Borrower, a copy of the projections by the Borrower of the operating budget and cash flow budget of the Borrower and its Subsidiaries for the succeeding fiscal year, such projections to be accompanied by a certificate of a Responsible Officer to the effect that such projections have been prepared in good faith based upon reasonable assumptions;

(d)     within five days after the same are sent, copies of all financial statements and reports related in part or in whole to the financial performance of the Borrower which the Borrower sends to its stockholders, and within five days after the same are filed, copies of all financial statements and reports which the Borrower may make to, or file with, the Securities and Exchange Commission or any successor or analogous Governmental Authority;

(e)     during the month of January in each calendar year, valid certificates of insurance with respect to the insurance maintained by the Borrower and its Subsidiaries in accordance with Section 8.5 of this Agreement and such supplemental reports as the Administrative Agent may from time to time reasonably request; and

(f)     promptly, such additional financial and other information as any Lender may from time to time reasonably request.

8.3     Payment of Obligations.  Pay, discharge or otherwise satisfy at or before maturity or before they become delinquent consistent with past practices, as the case may be, all its material obligations of whatever nature arising after the Closing Date, except where the amount or validity thereof is currently being contested in good faith by appropriate proceedings and reserves in conformity with GAAP with respect thereto have been provided on the books of the Borrower or its Subsidiaries, as the case may be.

8.4     Conduct of Business and Maintenance of Existence.  Continue to engage in business relating to a line of business substantially similar to the line of business now conducted by it and preserve, renew and keep in full force and effect its corporate existence and take all reasonable action to maintain all rights, privileges and franchises necessary or desirable in the normal conduct of its business except as otherwise permitted pursuant to Section 9.5; comply with all Contractual Obligations and Requirements of Law except to the extent that failure to comply therewith could not, in the aggregate, have a Material Adverse Effect.

8.5     Maintenance of Property; Insurance.  (a)  Keep all property useful and necessary in its business in good working order and condition.

-46-

Confidential

(b)      Maintain with financially sound and reputable insurance companies insurance on all its property in at least such amounts and against at least such risks (but including in any event public liability, product liability and business interruption) as are usually insured against in the same general area by companies engaged in the same or a similar business, which insurance shall name the Administrative Agent as lender loss payee (other than worker's compensation, public utility liability, employee benefits and welfare insurance) in the case of property or casualty insurance, and as an additional insured, in the case of liability insurance; and furnish to the Administrative Agent, upon written request, full information as to the insurance carried.

(c)      Maintain, with financially sound and reputable companies, insurance policies (i) insuring the Inventory, Equipment and Vehicles against loss by fire, explosion, theft and such other casualties as may be reasonably satisfactory to the Administrative Agent in amounts comparable to amounts of insurance coverage obtained by similar businesses of similar size acting prudently and (ii) insuring each Loan Party, the Administrative Agent and the Lenders against liability for personal injury and property damage relating to such Inventory, Equipment and Vehicles, such policies to be in such form and amounts and having such coverage as shall be comparable to forms, amounts and coverage, respectively, obtained by similar businesses of similar size acting prudently, with losses payable to any Loan Party, the Administrative Agent and the Lenders as their respective interests may appear or, in the case of liability insurance, showing the Administrative Agent and the Lenders as additional insured parties.  All such insurance shall (i) provide that no cancellation, material reduction in amount or material change in coverage thereof shall be effective until at least 30 days after receipt by the Administrative Agent of written notice thereof, (ii) name the Administrative Agent and the Lenders as insured parties and loss payees, (iii) include a breach of warranty clause and (iv) be reasonably satisfactory in all other respects to the Administrative Agent.

8.6      <u>Inspection of Property; Books and Records; Discussions</u>. (a)  Keep proper books of records and account in which full, true and correct entries in conformity with GAAP and all Requirements of Law shall be made of all dealings and transactions in relation to its business and activities; and permit representatives of any Lender to visit and inspect any of its properties and examine and (b) make abstracts from any of its books and records at any reasonable time and as often as may reasonably be desired and to discuss the business, operations, properties and financial and other condition of the Borrower and its Subsidiaries with officers and management employees of the Borrower and its Subsidiaries and with its independent certified public accountants.

8.7      <u>Notices</u>.  In the case of an event described in subparagraph (a)(i), no later than five (5) Business Days following the date on which a Responsible Officer of a Loan Party has knowledge thereof, in the case of an event described in subparagraph (a)(ii), no later than two (2) Business Days following the date on which a Responsible Officer of a Loan Party has knowledge thereof, and in each other case, promptly and, in any event, within five days following the actual knowledge of a Responsible Officer of the Borrower of the occurrence thereof, give notice to the Administrative Agent and each Lender of:

(a)      the occurrence of any (i) Default or (ii) Event of Default;

(b)      any (i) default or event of default by Borrower or any Subsidiary under any Contractual Obligation of the Borrower or any of its Subsidiaries or (ii) litigation, investigation or proceeding which may exist at any time between the Borrower or any of its Subsidiaries and any Governmental Authority, which in either case, if not cured or if adversely determined, as the case may be, would reasonably be expected to have a Material Adverse Effect;

-47-

Confidential

(c)    any litigation or proceeding affecting the Borrower or any of its Subsidiaries in which the amount involved is $1,000,000 or more and not covered by insurance or in which injunctive or similar relief is sought;

(d)    the acquisition by any Loan Party of any property or interest in property (including, without limitation, real property) the purchase price of which exceeds $500,000, that is not subject to a perfected Lien in favor of the Administrative Agent pursuant to the Security Documents (except to the extent such property is subject to a Lien permitted by Section 9.3);

(e)    the occurrence of any transaction or occurrence referred to in Section 5.6(b), and the receipt of any Net Cash Proceeds which are then required to be applied to the repayment of Loans and reduction of Revolving Credit Commitments as specified in Section 5.6(b)) because no Reinvestment Notice has been or will be delivered;

(f)    the following events, as soon as possible and in any event within 30 days after the Borrower knows or has reason to know thereof: (i) the occurrence or expected occurrence of any Reportable Event with respect to any Single Employer Plan, a failure to make any required contribution or contributions to a Plan which individually exceeds $250,000 or in the aggregate exceed $1,000,000, the creation of any Lien in favor of the PBGC or a Plan or any withdrawal from, or the termination, Reorganization or Insolvency of, any Multiemployer Plan or (ii) the institution of proceedings or the taking of any other action by the PBGC or the Borrower or any Commonly Controlled Entity or any Multiemployer Plan with respect to the withdrawal from, or the termination, Reorganization or Insolvency of, any Multiemployer Plan; and

(g)    any development or event which could reasonably be expected to have a Material Adverse Effect, other than changes of law or other regulatory events affecting the healthcare services industry or medical transportation industry generally.

Each notice pursuant to this Section shall be accompanied by a statement of a Responsible Officer setting forth details of the occurrence referred to therein and stating what action the Borrower proposes to take with respect thereto.

8.8    <u>Environmental Laws</u>.  (a)  Comply with and use commercially reasonable efforts to ensure compliance by all tenants and subtenants, if any, with all applicable Environmental Laws and obtain and comply with and maintain, and use commercially reasonable efforts to ensure that all tenants and subtenants obtain and comply with and maintain, any and all material licenses, approvals, notifications, registrations or permits required by applicable Environmental Laws, except to the extent that the failure to so comply would not reasonably be expected to have a Material Adverse Effect or result in a liability of the Loan Parties in a Material Environmental Amount.

(b)    Conduct and complete all investigations, studies, sampling and testing, and all remedial, removal and other actions required under Environmental Laws and promptly comply with all lawful orders and directives of all Governmental Authorities regarding Environmental Laws, except to the extent that the failure to so comply would not reasonably be expected to have a Material Adverse Effect or result in a liability of the Loan Parties in a Material Environmental Amount.

8.9    <u>Periodic Audit of Accounts Receivable</u>.    The Administrative Agent shall be entitled to perform a periodic due diligence inspection, test and review of the accounts receivable of the Borrower and its Subsidiaries on a mutually convenient Business Day twice during each calendar year at the expense of the Borrower and shall in each case be satisfied in all material respects with the results

\_0

Confidential

thereof; provided, however, that upon the occurrence and during the continuation of an Event of Default, the Administrative Agent shall be entitled to perform such additional due diligence inspections, tests and review of such accounts receivable as any Lender shall deem necessary or advisable at the expense of the Borrower.

8.10    Additional Collateral; Additional Subsidiary Guarantors. (a) In the event that the Borrower or any Subsidiary acquires any property or interest in property (including, without limitation, real property) other than property made subject to a Lien permitted under Section 9.3(g), that is not subject to a perfected Lien in favor of the Administrative Agent pursuant to the Security Documents, the Borrower shall, and shall cause the Subsidiary to, take such action (including, without limitation, the preparation and filing of mortgages or deeds of trust in form and substance satisfactory to the Administrative Agent) as the Administrative Agent shall request in order to create and/or perfect a Lien in favor of the Administrative Agent on such property.

(b)    In the event that the Borrower has any Subsidiary (other than an Immaterial Subsidiary that is not a Subsidiary Guarantor), the Borrower shall give prior notice to the Administrative Agent thereof and execute a supplement to the Pledge Agreement (if applicable) and such Subsidiary shall execute a supplement to the Subsidiaries Guarantee, a supplement to the Security Agreement, in form and substance satisfactory to the Administrative Agent, pursuant to which such Subsidiary becomes a party thereto, and the Borrower and/or any Subsidiary which is a holder of any Capital Stock of such Subsidiary shall execute such pledge agreements, each in form and substance satisfactory to the Administrative Agent, and shall take such other action as shall be necessary or advisable (including, without limitation, the execution, delivery and recording of mortgages) in order to perfect the Liens granted by such Subsidiary in favor of the Administrative Agent for the benefit of the Lenders and to effect and perfect the pledge of all of the Capital Stock of such Subsidiary in favor of the Administrative Agent for the benefit of the Lenders. Such Subsidiary shall thereupon become a Subsidiary Guarantor for all purposes under the Loan Documents, including, without limitation, Section 8.10(a) of this Agreement, and such additional security agreements, security guarantees and/or pledge agreements shall become "Security Documents" hereunder. The Administrative Agent shall be entitled to receive legal opinions of one or more counsel to the Borrower and such Subsidiary addressing such of the following matters as the Administrative Agent or its counsel may reasonably request, including the enforceability of the Subsidiary Guaranty and the Security Agreement and any pledge agreements and mortgages to which such Subsidiary becomes a party and the pledge of the Capital Stock of such Subsidiary, and the creation, validity and perfection of the Liens so granted by such Subsidiary and the Borrower and/or other Subsidiaries to the Administrative Agent for the benefit of the Lenders.

8.11    Vehicles. In the event that, at any time following the Closing Date, the aggregate value of Vehicles owned by the Borrower and its Subsidiaries which are not subject to lease or other third-party financing or Lien permitted hereunder is at least $500,000 (the "Vehicle Triggering Event"), the Borrower shall and cause each such Subsidiary to furnish to the Administrative Agent, no later than ninety (90) days following such Vehicle Triggering Event, certificates of title for each such Vehicle owned by the Borrower or any Subsidiary that is not subject to lease or other third-party financing or existing Lien permitted hereunder, together with fully-completed forms acceptable for presentation to the applicable state motor vehicle bureau or department, noting the lien of the Administrative Agent on each such certificate of title or otherwise perfecting the lien of the Administrative Agent on such Vehicle.

\_0

-49-

Confidential                                                                 PP-TRBK0000081

## SECTION 9.   NEGATIVE COVENANTS

The Borrower hereby agrees that, so long as any of the Revolving Credit Commitments remain in effect or any amount is owing to any Lender or the Administrative Agent hereunder or under any other Loan Document, the Borrower shall not, and (except with respect to Section 9.1) shall not permit any of its Subsidiaries to, directly or indirectly:

9.1     Financial Condition Covenants.

(a)     Leverage Ratio.  Permit the Leverage Ratio at any time during any period set forth in the table below to be greater than the ratio set forth opposite such period below:

| Period | Ratio |
| --- | --- |
| Closing Date - 12/31/03 | 5.75 to 1.00 |
| 1/1/04 - 6/30/04 | 5.50 to 1.00 |
| 7/1/04 - 12/31/04 | 5.25 to 1.00 |
| 1/1/05 - 6/30/05 | 4.75 to 1.00 |
| 7/1/05 and thereafter | 4.50 to 1.00 |

(b)     Interest Coverage.  Permit the ratio at the end of any fiscal quarter of the Borrower, commencing with the fiscal quarter ended March 31, 2003, of (i) Consolidated EBITDA for any period of twelve consecutive months ending on the last day of such fiscal quarter to (ii) the cash portion of Consolidated Interest Expense for such twelve-month period (calculated as provided in the definition of "Consolidated Interest Expense" in the case of the first three fiscal quarters ended after the Closing Date) to be less than the ratio set forth opposite such period in the table below:

| Period | Ratio |
| --- | --- |
| Closing Date - 06/30/04 | 1.75 to 1.00 |
| 7/1/04 - 12/31/04 | 2.00 to 1.00 |
| 1/1/05 and thereafter | 2.15 to 1.00 |

(c)     Fixed Charge Coverage.  Permit the ratio at the end of any fiscal quarter of the Borrower ended during any period set forth in the table below of (i) Consolidated EBITDA for the twelve-month period ending on the last day of such fiscal quarter minus Consolidated Capital Expenditures during such twelve-month period to (ii) Consolidated Fixed Charges for such twelve-month period (calculated in the case of Consolidated Interest Expense as set forth in the definition of "Consolidated Interest Expense" with respect to the first three fiscal quarters following the Closing Date) to be less than the ratio set forth opposite such period in the table below:

| Period | Ratio |
| --- | --- |
| Closing Date - 12/31/03 | 0.85 to 1.00 |
| 1/1/04 - 6/30/04 | 0.90 to 1.00 |
| 7/1/04 - 12/31/04 | 0.95 to 1.00 |
| 1/1/05 and thereafter | 1.05 to 1.00 |

9.2     Limitation on Indebtedness.   Create, incur, assume or suffer to exist any Indebtedness, except:

(a)      Indebtedness of the Borrower under this Agreement;

\_0

-50-

Confidential                                                          PP-TRBK0000082

(b)    Indebtedness of the Borrower to any Subsidiary Guarantor and of any Subsidiary Guarantor to the Borrower or any other Subsidiary Guarantor;

(c)    Indebtedness of the Borrower and any of its Subsidiaries incurred to finance the acquisition of fixed or capital assets in an aggregate principal amount not exceeding as to the Borrower and its Subsidiaries $7,500,000 at any time outstanding;

(d)    Indebtedness outstanding on the date hereof and listed on Schedule 9.2;

(e)    Indebtedness of the Borrower or any Subsidiary relating to performance, surety, statutory, appeal or other like bonds obtained in the ordinary course of business;

(f)    Guarantee Obligations permitted under Section 9.4;

(g)    additional unsecured Indebtedness of the Borrower in an aggregate principal amount not exceeding $500,000 at any one time outstanding; and

(h)    letters of credit issued at the request of the Borrower or any Subsidiary Guarantor in a face amount not to exceed $500,000 in the aggregate at any one time.

9.3    <u>Limitation on Liens</u>.  Create, incur, assume or suffer to exist any Lien upon any of its property, assets or revenues, whether now owned or hereafter acquired, except for:

(a)    Liens for taxes not yet due or which are being contested in good faith by appropriate proceedings, <u>provided</u> that adequate reserves with respect thereto are maintained on the books of the Borrower or its Subsidiaries, as the case may be, in conformity with GAAP;

(b)    carriers', warehousemen's, mechanics', materialmen's, repairmen's or other like Liens arising in the ordinary course of business which are not overdue for a period of more than 60 days or which are being contested in good faith by appropriate proceedings;

(c)    pledges or deposits in connection with workers' compensation, unemployment insurance and other social security legislation and deposits securing liability to insurance carriers under insurance or self-insurance arrangements and Liens on insurance policies and proceeds thereof securing obligations for the payment of insurance premiums under insurance premium financing arrangements, <u>provided</u> that such Liens do not exceed $10,000,000 in the aggregate at any one time;

(d)    deposits to secure the performance of bids, trade contracts (other than for borrowed money), leases, statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature incurred in the ordinary course of business;

(e)    easements, rights-of-way, restrictions and other similar encumbrances incurred in the ordinary course of business which, in the aggregate, are not substantial in amount and which do not in any case materially detract from the value of any Loan Party's interest in the property subject thereto or materially interfere with the ordinary conduct of the business of the Borrower or such Subsidiary;

(f)    Liens in existence on the date hereof listed on Schedule 9.3, securing Indebtedness permitted by Section 9.2(d), <u>provided</u> that no such Lien is spread to cover any additional property after the Closing Date and that the amount of Indebtedness secured thereby is not increased

-51-

Confidential

except that, notwithstanding the foregoing, Liens in respect of the financing of Vehicles or equipment (and proceeds thereof) may secure other Indebtedness of the same Person (or its Affiliates) permitted by Section 9.2(c), which is incurred from time to time in connection with the financing of Vehicles or equipment (and proceeds thereof);

(g)        Liens securing Indebtedness of the Borrower and its Subsidiaries permitted by Section 9.2(c) incurred to finance the acquisition of fixed or capital assets, provided that (i) such Liens shall be created substantially simultaneously with the acquisition of such fixed or capital assets, (ii) such Liens do not at any time encumber any property other than the property financed by such Indebtedness and proceeds thereof, and (iii) the principal amount of Indebtedness secured by any such Lien shall at no time exceed 100% of the original purchase price of such property at the time it was acquired except that, notwithstanding the foregoing clauses (i), (ii) and (iii), Liens in respect of the financing of Vehicles or equipment may encumber any or all Vehicles or equipment financed by a particular Person from time to time (and its Affiliates) and proceeds thereof;

(h)        Liens (not otherwise permitted hereunder) which secure obligations not exceeding (as to the Borrower and all Subsidiaries) $500,000 in aggregate amount at any time outstanding;

(i)        Liens created pursuant to the Security Documents; and

(j)        Liens consisting of cash collateral obligations securing the issuance of letters of credit permitted under Section 9.2(h).

9.4        <u>Limitation on Guarantee Obligations</u>.  Create, incur, assume or suffer to exist any Guarantee Obligation except (other than for Immaterial Subsidiaries):

(a)        Guarantee Obligations in existence on the date hereof and listed on Schedule 9.4;

(b)        Guarantee Obligations incurred after the date hereof in an aggregate amount not to exceed $500,000 at any one time outstanding;

(c)        guarantees made by the Borrower of obligations of any of its Subsidiaries, and guarantees made by any Subsidiary of obligations of the Borrower or another Subsidiary, which obligations in each case are otherwise permitted or not prohibited under this Agreement; and

(d)        the Subsidiaries Guarantee.

9.5        <u>Limitation on Fundamental Changes</u>.  Enter into any merger, consolidation or amalgamation, or liquidate, wind up or dissolve itself (or suffer any liquidation or dissolution), or convey, sell, lease, assign, transfer or otherwise dispose of, all or substantially all of its property, business or assets, or make any material change in its present method of conducting business, except:

(a)        any Subsidiary of the Borrower may be merged or consolidated with or into the Borrower (provided that the Borrower shall be the continuing or surviving corporation) or with or into any one or more wholly owned Subsidiaries of the Borrower (other than Immaterial Subsidiaries) (provided that the wholly owned Subsidiary or Subsidiaries shall be the continuing or surviving

\_0

Confidential

corporation and if such Subsidiary is not a Subsidiary Guarantor, it shall become a Subsidiary Guarantor prior to or simultaneously with consummation of such transaction); and

(b)      any wholly owned Subsidiary may sell, lease, transfer or otherwise dispose of any or all of its assets (upon voluntary liquidation or otherwise) to the Borrower or any other wholly owned Subsidiary (other than Immaterial Subsidiaries) of the Borrower.

9.6      <u>Limitation on Sale of Assets</u>.  Convey, sell, lease, assign, transfer or otherwise dispose of any of its property, business or assets (including, without limitation, receivables and leasehold interests), whether now owned or hereafter acquired, or, in the case of any Subsidiary, issue or sell any shares of such Subsidiary's Capital Stock to any Person other than the Borrower or any wholly owned Subsidiary, except (other than for Immaterial Subsidiaries):

(a)      the sale or other disposition in the ordinary course of business of obsolete or worn out property or any asset or property no longer used or useful in the business of the Borrower or any Subsidiary; <u>provided</u> that the Net Cash Proceeds of each such transaction are applied to the prepayment of the Loans to the extent required by Section 5.6(b);

(b)      the sale of inventory in the ordinary course of business;

(c)      the sale or discount without recourse of accounts receivable arising in the ordinary course of business in connection with the compromise or collection thereof;

(d)      as permitted by Section 9.5(a) or (b);

(e)      the sale of assets pursuant to sale-leaseback transactions permitted by Section 9.12;

(f)      the sale of assets by a Subsidiary Guarantor to a Subsidiary Guarantor; and

(g)      as required by the Plan of Reorganization and the Confirmation Order.

9.7      <u>Limitation on Dividends and Miscellaneous Payments</u>.

(a)      Declare or pay any dividend (other than dividends payable solely in common stock of the Borrower) on, or make any payment on account of, or set apart assets for a sinking or other analogous fund for, the purchase, redemption, defeasance, retirement or other acquisition of, any shares of any class of Capital Stock of the Borrower or any warrants or options to purchase any such Capital Stock, whether now or hereafter outstanding, or make any other distribution in respect thereof, either directly or indirectly, whether in cash or property or in obligations of the Borrower or any Subsidiary (any of the foregoing, a "<u>Restricted Payment</u>"), except for (i) Restricted Payments made solely in Stock Equivalents and (ii) so long as no Event of Default has occurred and is continuing, Restricted Payments required as provided in the Warrant Documents, (iii) except to the extent, if any, restricted pursuant to the terms of the Management Agreement during the continuance of an Event of Default, the issuance and exercise of options pursuant to the Management Agreement, and (iv) so long as no Default or Event of Default shall have occurred and be continuing or would result therefrom, the repurchase of Capital Stock by the Borrower as permitted by the Stock Option Plan or any option or award issued pursuant thereto or the exercise of any right of first refusal pursuant to the Stockholders Agreement.

\_0

**A2891**

Confidential

(b)     Make any payments (i) with respect to the Management Fee except in accordance with the terms of the Management Agreement, and (ii) with respect to any management fee or deferred investment banking fee other than the Management Fee without the prior written consent of the Administrative Agent and the Required Lenders.

9.8     <u>Limitation on Capital Expenditures</u>.  Make or commit to make (by way of the acquisition of securities of a Person or otherwise) any expenditure in respect of the purchase or other acquisition of fixed or capital assets (excluding any such asset acquired in connection with normal replacement and maintenance programs properly charged to current operations) not exceeding, in the aggregate for the Borrower and its Subsidiaries during any fiscal year of the Borrower, $4,850,000; provided that any portion thereof not expended in such fiscal year may be carried over for expenditure in the next following fiscal year.

9.9     <u>Limitation on Investments, Loans and Advances</u>.  Make any advance, loan, extension of credit or capital contribution to, or purchase any stock, bonds, notes, debentures or other securities of or any assets constituting a business unit of, or make any other investment in, any Person, except:

(a)     extensions of trade credit in the ordinary course of business;

(b)     investments in Cash Equivalents;

(c)     loans and advances to employees of the Borrower or its Subsidiaries for travel, entertainment and relocation expenses in the ordinary course of business in an aggregate amount for the Borrower and its Subsidiaries not to exceed $150,000 at any one time outstanding, which loans and advances may not be forgiven; and

(d)     additional investments, loans and advances in an aggregate principal amount not exceeding $750,000 at any one time outstanding.

9.10     <u>Limitation on Optional Payments and Modifications of Agreements</u>.  (a)  Except as contemplated by the Plan of Reorganization and Confirmation Order, make any optional payment or prepayment on or redemption or purchase of any Indebtedness (other than (i) the Loans and (ii) Indebtedness incurred to finance the acquisition of Vehicles or equipment to the extent such Indebtedness is so prepaid, redeemed or repurchased (A) from the proceeds of new Indebtedness permitted hereunder incurred to refinance the same, (B) from payments of casualty or property insurance, or (C) from other cash available to the Borrower in an aggregate amount not to exceed $500,000 per year), (b) amend, modify, waive or change, or consent or agree to or accept the benefit of any amendment, modification, waiver or change to any of the terms of any such Indebtedness (other than financings of Vehicles and equipment), the Stockholder's Agreement, the Management Agreement or any Warrant Documents (other than any such amendment, modification, waiver or change which (i) would not materially and adversely affect the Lenders or the Lenders' rights under the Loan Documents, (ii) would extend the maturity or reduce the amount of any payment of principal of any such Indebtedness, (iii) would reduce the rate or extend the date for payment of interest on any such Indebtedness, or (iv) would not make any of the affirmative or negative covenants or default provisions contained therein more restrictive to the Loan Parties than those contained therein on the Closing Date) or (c) amend, waive, supplement or otherwise modify, or agree to any amendment, waiver, supplement other modification to, the Plan of Reorganization or the Confirmation Order except as required by applicable law.

\_0

**A2892**

Confidential                                                                                    PP-TRBK0000086

9.11    <u>Limitation on Transactions with Affiliates</u>.  Except as set forth on Schedule 9.11 (but subject to Section 9.7(a)) and except for payments of the Management Fee permitted pursuant to Section 9.7(b) and except for the Management Agreement and the transactions contemplated by the Plan of Reorganization and Confirmation Order, including the issuance of options under the Stock Option Plan, the Warrant Documents, the Stockholders Agreement and Management Agreement, enter into any transaction, including, without limitation, any purchase, sale, lease or exchange of property or the rendering of any service, with any Affiliate unless such transaction is (a) otherwise permitted under this Agreement, (b) in the ordinary course of the Borrower's or such Subsidiary's business and (c) upon fair and reasonable terms no less favorable to the Borrower or such Subsidiary, as the case may be, than it would obtain in a comparable arm's length transaction with a Person which is not an Affiliate.

9.12    <u>Limitation on Sales and Leasebacks</u>.  Enter into any arrangement with any Person providing for the leasing by the Borrower or any Subsidiary of real or personal property which has been or is to be sold or transferred by the Borrower or such Subsidiary to such Person or to any other Person to whom funds have been or are to be advanced by such Person on the security of such property or rental obligations of the Borrower or such Subsidiary, which arrangements exceed $250,000 in the aggregate.

9.13    <u>Limitation on Changes in Fiscal Year</u>.  Permit the fiscal year of the Borrower to end on a day other than December 31.

9.14    <u>Limitation on Negative Pledge Clauses</u>.  Enter into with any Person any agreement, other than (a) this Agreement, and (b) any industrial revenue bonds, purchase money mortgages, Financing Leases or other Indebtedness permitted by Section 9.2(c) or (d) of this Agreement (in which cases, any prohibition or limitation shall only be effective against the assets financed thereby except as otherwise permitted pursuant to Sections 9.3(f) and 9.3(g) hereof), which prohibits or limits the ability of the Borrower or any of its Subsidiaries to create, incur, assume or suffer to exist any Lien upon any of its property, assets or revenues, whether now owned or hereafter acquired other than agreements with Persons prohibiting any such lien or assets in which such Person has a prior security interest which is permitted by Section 9.3, <u>provided</u> that, except for restrictions limited to assets financed under the related agreement or as permitted by Section 9.3(c) or (d) hereof, such agreements do not prohibit or limit the ability of the Borrower or any of its Subsidiaries to incur the Liens created pursuant to the Security Documents.

9.15    <u>Limitation on Lines of Business</u>.  Enter into any business, either directly or through any Subsidiary, except for those businesses in which the Borrower and its Subsidiaries are engaged in or which relate to a line of business substantially similar to the line of business engaged in by the Borrower or the Subsidiaries on the date of this Agreement.

9.16    <u>Governing Documents</u>.  Amend its certificate of incorporation (except to increase the number of authorized shares of common stock), or other Governing Documents in a manner that would have a material adverse effect on the Lenders' rights under the Loan Documents or any Loan Party's ability to fulfill its obligations thereunder, without the prior written consent of the Required Lenders, which shall not be unreasonably withheld or delayed.

\_0

Confidential                                                                                   PP-TRBK0000087

9.17    Limitation on Payroll Accounts.  (a) Permit the aggregate amount held in the Payroll Accounts at any time to exceed the amount set forth on Schedule 9.17; or (b) convert any deposit account into which Payroll Accounts are deposited maintained by any Loan Party into a Payroll Account, or permit the creation or substitution of any Payroll Account, or otherwise maintain any Payroll Accounts, other than those Payroll Accounts listed on Schedule VIII to the Security Agreement, unless the Borrower shall have given the Administrative Agent at least ten Business Days prior notice thereof; or (c) permit any Payroll Account to be used for any purpose other than those described in the definition of "Payroll Accounts" in the Security Agreement.

## SECTION 10.   EVENTS OF DEFAULT

If any of the following events shall occur and be continuing:

(a)    The Borrower shall fail to pay any principal of any Loan when due in accordance with the terms thereof or hereof; or the Borrower shall fail to pay any interest on any Loan within five Business Days after becoming due hereunder; or the Borrower shall fail to pay any other amount payable hereunder or under the other Loan Documents or the Fee Letter within five days after notice that any such interest or other amount is due in accordance with the terms thereof or hereof (an invoice for any such amount due to be deemed notice thereof for purposes of this provision); or

(b)    Any representation or warranty made or deemed made by the Borrower or any other Loan Party herein or in any other Loan Document or which is contained in any certificate, document or financial or other statement furnished by it at any time on or after the Closing Date under or in connection with this Agreement or any such other Loan Document shall prove to have been incorrect in any material respect on or as of the date made or deemed made; or

(c)    (i) The Borrower or any other Loan Party shall default in the observance or performance of any agreement contained in Section 8.7(a), Section 8.11 or Section 9 of this Agreement, Section 5 of the Security Agreement, or Section 5 of the Pledge Agreement, or (ii) the Borrower or any other Loan Party shall default in the observance or performance of Section 8.6(b), 8.9, or 8.10 of this Agreement, and such default shall continue unremedied for a period of two (2) Business Days after the receipt of notice from the Administrative Agent; or

(d)    The Borrower shall be in default with respect to Section 16, or Article III of the Borrower's Amended and Restated By-laws, Section 5(a) of the Management Agreement, or Section 8.1 of the Stockholders' Agreement; or

(e)    The Borrower or any other Loan Party shall default in the observance or performance of any other agreement contained in this Agreement or any other Loan Document (other than as provided in paragraphs (a) through (c) of this Section), and such default shall continue unremedied for a period of 30 days from the date that a Responsible Officer of the Borrower or such Loan Party has knowledge of such default; or

(f)    The Borrower or any of its Subsidiaries shall:

(i) default in any payment of principal of or interest on any Indebtedness (other than the Loans, Indebtedness under the Existing Specified Leases and Indebtedness under Financing Leases entered into to finance Vehicles or Equipment) or in the payment of any Guarantee Obligation with respect to such Indebtedness, beyond the period of grace, if any, provided in the instrument or agreement under which such Indebtedness or Guarantee Obligation

\_0

-56-

**A2894**

was created, if the aggregate amount of the Indebtedness and/or Guarantee Obligations in respect of which such default or defaults shall have occurred is at least $250,000; default in the observance or performance of any other agreement or condition relating to any such Indebtedness or Guarantee Obligation or contained in any instrument or agreement evidencing, securing or relating thereto beyond the period of grace, or any other event shall occur or condition exist, the effect of which default or other event or condition is to cause, or to permit the holder or holders of such Indebtedness or beneficiary or beneficiaries of such Guarantee Obligation (or a trustee or agent on behalf of such holder or holders or beneficiary or beneficiaries) to cause, with the giving of notice if required, such Indebtedness to become due prior to its stated maturity or such Guarantee Obligation to become payable, if the aggregate amount of the Indebtedness and/or Guarantee Obligations in respect of which such default or defaults or such other events referred to above in this clause (i) shall have occurred is at least $250,000; or

(ii) default in any payment of principal or interest on Indebtedness under any Financing Leases entered into finance Vehicles or Equipment (other than the Existing Specified Leases) or in the payment of any Guarantee Obligation with respect to such Indebtedness, beyond the period of grace, if any, provided in such Financing Lease or the instrument pursuant to which such Guarantee Obligation was created, if the aggregate amount of such Indebtedness and/or Guarantee Obligations in respect of which such default or defaults shall have occurred is at least $500,000; or default in the observance or performance of any other agreement or condition relating to any such Financing Lease or Guarantee Obligation or contained in any instrument or agreement evidencing, securing or relating thereto beyond the period of grace, if any, provided in such Financing Lease or instrument or agreement, or any other event shall occur or condition exist with respect to any such Financing Lease or Guarantee Obligation, and as a result of which, after the giving of any notice by the holder or holders of such Financing Lease or beneficiary or beneficiaries of such Guarantee Obligation (or a trustee or agent on behalf of such holder or holders or beneficiary or beneficiaries), such Financing Lease becomes or shall have become due prior to its stated maturity or such Guarantee Obligation to become payable, if the aggregate amount of the Indebtedness in respect of which such default or defaults or such other events referred to above in this clause (ii) shall have occurred is at least $500,000; or

(iii) default in any payment of principal or interest on Indebtedness under any Existing Specified Lease or in the payment of any Guarantee Obligation with respect to such Indebtedness, beyond the period of grace, if any, provided in such Existing Specified Lease or the instrument pursuant to which such Guarantee Obligation was created; or default in the observance or performance of any other agreement or condition relating to any such Existing Specified Lease or Guarantee Obligation or contained in any instrument or agreement evidencing, securing or relating thereto beyond the period of grace, if any, provided in such Existing Specified Lease or instrument or agreement, or any other event shall occur or condition exist with respect to any such Indebtedness or Guarantee Obligation, and as a result of which, after the giving of any notice by the holder or holders of such Indebtedness or beneficiary or beneficiaries of such Guarantee Obligation (or a trustee or agent on behalf of such holder or holders or beneficiary or beneficiaries), such Indebtedness becomes or shall have become due prior to its stated maturity or such Guarantee Obligation becomes payable prior to its stated maturity; provided that no Default Event of Default shall exist or shall be deemed to have existed under this clause (iii) with respect to any Existing Specified Lease if subsequent to any such default all such Indebtedness with respect to such Existing Specified Lease shall have been repaid in full; or

(g)    (i) The Borrower or any of its Subsidiaries shall commence any case, proceeding or other action (A) under any existing or future law of any jurisdiction, domestic or foreign, relating to bankruptcy, insolvency, reorganization or relief of debtors, seeking to have an order for relief

Confidential

entered with respect to it, or seeking to adjudicate it a bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, winding-up, liquidation, dissolution, composition or other relief with respect to it or its debts, or (B) seeking appointment of a receiver, trustee, custodian, conservator or other similar official for it or for all or any substantial part of its assets, or the Borrower or any of its Subsidiaries shall make a general assignment for the benefit of its creditors; or (ii) there shall be commenced against the Borrower or any of its Subsidiaries any case, proceeding or other action of a nature referred to in clause (i) above which (A) results in the entry of an order for relief or any such adjudication or appointment or (B) remains undismissed, undischarged or unbonded for a period of 60 days; or (iii) there shall be commenced against the Borrower or any of its Subsidiaries any case, proceeding or other action seeking issuance of a warrant of attachment, execution, distraint or similar process against all or any substantial part of its assets which results in the entry of an order for any such relief which shall not have been vacated, discharged, or stayed or bonded pending appeal within 60 days from the entry thereof; or (iv) the Borrower or any of its Subsidiaries shall take any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the acts set forth in clause (i), (ii), or (iii) above; or (v) the Borrower or any of its Subsidiaries shall generally not, or shall be unable to, or shall admit in writing its inability to, pay its debts as they become due; or

(h)      (i) Any Person shall engage in any "prohibited transaction" (as defined in Section 406 of ERISA or Section 4975 of the Code) involving any Plan, (ii) any "accumulated funding deficiency" (as defined in Section 302 of ERISA), whether or not waived, shall exist with respect to any Single Employer Plan or any Lien in favor of the PBGC or a Plan shall arise on the assets of the Borrower or any Commonly Controlled Entity, (iii) a Reportable Event shall occur with respect to, or proceedings shall commence to have a trustee appointed, or a trustee shall be appointed, to administer or to terminate, any Single Employer Plan, which Reportable Event or commencement of proceedings or appointment of a trustee is, in the reasonable opinion of the Required Lenders, likely to result in the termination of such Plan for purposes of Title IV of ERISA, (iv) any Single Employer Plan shall terminate for purposes of Title IV of ERISA, (v) the Borrower or any Commonly Controlled Entity shall, or in the reasonable opinion of the Required Lenders is likely to, incur any liability in connection with a withdrawal from, or the Insolvency or Reorganization of, a Multiemployer Plan or (vi) any other event or condition shall occur or exist with respect to a Plan; and in each case in clauses (i) through (vi) above, such event or condition, together with all other such events or conditions, if any, could have a Material Adverse Effect; or

(i)      One or more judgments or decrees shall be entered against the Borrower or any of its Subsidiaries involving in the aggregate a liability (not paid or fully covered by insurance) of $1,000,000 or more, and all such judgments or decrees shall not have been vacated, discharged, stayed or bonded pending appeal within 60 days from the entry thereof; or

(j)      (i) Any of the Security Documents shall cease, for any reason, to be in full force and effect, or the Borrower or any other Loan Party which is a party to any of the Security Documents shall so assert, or (ii) the Lien created by any of the Security Documents shall cease to be enforceable and of the same effect and priority purported to be created thereby; or

(k)      The Subsidiaries Guarantee shall cease, for any reason, to be in full force and effect or any Subsidiary Guarantor shall so assert;

then, and in any such event, (A) if such event is an Event of Default specified in clause (i) or (ii) of paragraph (g) of this Section with respect to the Borrower, automatically the Revolving Credit Commitments shall immediately terminate and the Loans hereunder (with accrued interest thereon) and all other amounts owing under this Agreement shall immediately become due and payable, and (B) if such event is any other Event of Default, either or both of the following actions may be taken: (i) with the

\_ 0

-58-

Confidential

consent of the Required Lenders, the Administrative Agent may, or upon the request of the Required Lenders, the Administrative Agent shall, by notice to the Borrower declare the Commitments to be terminated forthwith, whereupon the Commitments shall immediately terminate; and (ii) with the consent of the Required Lenders, the Administrative Agent may, or upon the request of the Required Lenders, the Administrative Agent shall, by notice to the Borrower, declare the Loans hereunder (with accrued interest thereon) and all other amounts owing under this Agreement to be due and payable forthwith, whereupon the same shall immediately become due and payable. Except as expressly provided above in this Section, presentment, demand, protest and all other notices of any kind are hereby expressly waived.

SECTION 11.  THE AGENT

11.1  <u>Appointment</u>.  Each Lender hereby irrevocably designates and appoints the Administrative Agent as the agent of such Lender under this Agreement and the other Loan Documents, and each such Lender irrevocably authorizes the Administrative Agent, in such capacity, to take such action on its behalf under the provisions of this Agreement and the other Loan Documents and to exercise such powers and perform such duties as are expressly delegated to the Administrative Agent by the terms of this Agreement and the other Loan Documents, together with such other powers as are reasonably incidental thereto.  Notwithstanding any provision to the contrary elsewhere in this Agreement, the Administrative Agent shall not have any duties or responsibilities, except those expressly set forth herein, or any fiduciary relationship with any Lender, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or any other Loan Document or otherwise exist against the Administrative Agent.

11.2  <u>Delegation of Duties</u>.  The Administrative Agent may execute any of its duties under this Agreement and the other Loan Documents by or through agents or attorneys-in-fact, or may assign such duties to its wholly owned nominee without the consent of the Lenders, and shall be entitled to advice of counsel concerning all matters pertaining to such duties.  The Administrative Agent shall not be responsible for the negligence or misconduct of any agents or attorneys-in-fact selected by it with reasonable care.  It is recognized that it may be necessary or desirable that the Administrative Agent appoint an additional individual or institution as a separate subagent, trustee, co-trustee, collateral agent or collateral co-agent (any such additional individual or institution being referred to herein individually as a "Supplemental Agent" and collectively as "<u>Supplemental Agents</u>").  The Administrative Agent hereby appoints Wachovia Bank, National Association ("<u>Wachovia</u>") as a Supplemental Agent hereunder.  The Borrower, each Subsidiary Guarantor and each Lender agree to and acknowledge (i) the appointment of Wachovia as Supplemental Agent herein, (ii) that the Supplemental Agent shall be entitled to the benefit of the provisions of Section 12.5 of the Credit Agreement and this Section 11,  including without limitation the indemnification provisions of Section 11.7; <u>provided</u>, <u>however</u>, that a Supplemental Agent shall only be entitled to payment of any allocated reasonable fees and expenses of in-house counsel pursuant to Section 12.5, if such fees and expenses are authorized and approved by the Required Lenders in writing, and (iii) all references to the Administrative Agent in this Agreement shall also be deemed references to Supplemental Agent, as the context may require. In the event that the Administrative Agent appoints a Supplemental Agent, (i) each and every right, power, privilege or duty expressed or intended by this Agreement or any of the other Loan Documents to be exercised by or vested in or conveyed to the Administrative Agent shall be exercisable by and vest in such Supplemental Agent to the extent, necessary to enable such Supplemental Agent to exercise such rights, powers and privileges with respect to its role as the Administrative Agent hereunder and to perform such duties with respect to its role as the Administrative Agent hereunder and every covenant and obligation contained in the Loan Documents and necessary to the exercise or performance thereof by such Supplemental Agent shall run to and be enforceable by either the Administrative Agent or such Supplemental Agent; <u>provided</u>, <u>however</u>, that each Supplemental Agent shall in no event be entitled to consent to any amendments or modifications or

\_0

-59-

**A2897**

waive any terms hereunder other than amendments, modifications or waivers concerning this entire Section 11, Section 12.1 or Section 12.5, and (ii) the provisions of this Section 11 that refer to the Administrative Agent shall inure to the benefit of such Supplemental Agent and all references therein to the Administrative Agent shall be deemed to be references to the Administrative Agent and/or such Supplemental Agent, as the context may require. Should any instrument in writing from Borrower or any other Loan Party be required by any Supplemental Agent so appointed by the Administrative Agent for more fully and certainly vesting in and confirming to him or it such rights, powers, privileges and duties, Borrower shall, or shall cause such Loan Party to, execute, acknowledge and deliver any and all such instruments promptly upon request by the Administrative Agent. In case any Supplemental Agent, or a successor thereto, shall die, become incapable of acting, resign or be removed, all the rights, powers, privileges and duties of such Supplemental Agent, to the extent permitted by law, shall vest in and be exercised by the Administrative Agent until the appointment of a new Supplemental Agent.

11.3    Exculpatory Provisions. Neither the Administrative Agent nor any of its officers, directors, employees, agents, attorneys-in-fact or affiliates shall be (i) liable for any action lawfully taken or omitted to be taken by it or such Person under or in connection with this Agreement or any other Loan Document (except to the extent that any of the foregoing are found by a final and nonappealable decision of a court of competent jurisdiction to have resulted from its or such Person's own gross negligence or willful misconduct) or (ii) responsible in any manner to any of the Lenders for any recitals, statements, representations or warranties made by the Borrower or any officer thereof contained in this Agreement or any other Loan Document or in any certificate, report, statement or other document referred to or provided for in, or received by the Administrative Agent under or in connection with, this Agreement or any other Loan Document or for the value, validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement or any other Loan Document or for any failure of the Borrower to perform its obligations hereunder or thereunder. The Administrative Agent shall not be under any obligation to any Lender to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Agreement or any other Loan Document, or to inspect the properties, books or records of any Loan Party. The Administrative Agent shall not be responsible for delays or failures in performance resulting from acts beyond its reasonable control. Such acts shall include but not be limited to acts of God, strikes, lockouts, riots, acts of war or terrorism, epidemics, nationalization, expropriation, currency restrictions, governmental regulations superimposed after the fact, fire, communications line failures, computer viruses, power failures, earthquakes or other disasters, but shall in no event include the financial condition or financial inability of the Administrative Agent.

11.4    Reliance by Administrative Agent. The Administrative Agent shall be entitled to rely, and shall be fully protected in relying, upon any note, writing, resolution, notice, consent, certificate, affidavit, letter, cablegram, telegram, or telecopy message, statement, order or other document or conversation believed by it to be genuine and correct and to have been signed, sent or made by the proper Person or Persons and upon advice and statements of legal counsel (including, without limitation, counsel to the Borrower or any other Loan Party), independent accountants and other experts selected by the Administrative Agent. The Administrative Agent may deem and treat the payee of any Note as the owner thereof for all purposes unless a written notice of assignment, negotiation or transfer thereof shall have been filed with the Administrative Agent. The Administrative Agent shall be fully justified in failing or refusing to take any action under this Agreement or any other Loan Document which involve discretionary decision making, including without limitation those actions contemplated by Section 5.8(b) of this Agreement, unless it shall first receive such advice or concurrence of the Required Lenders as it deems appropriate or it shall first be indemnified to its satisfaction by the Lenders against any and all liability and expense which may be incurred by it by reason of taking or continuing to take any such action. The Administrative Agent shall in all cases be fully protected in acting, or in refraining from

\_0

-60-

Confidential

acting, under this Agreement and the other Loan Documents in accordance with a request of the Required Lenders, and such request and any action taken or failure to act pursuant thereto shall be binding upon all the Lenders and all future holders of the Loans.

11.5    Notice of Default.   The Administrative Agent shall not be deemed to have knowledge or notice of the occurrence of any Default or Event of Default hereunder except for defaults in the payment of principal, interest and fees required to be made to the Administrative Agent for the account of the Lenders, unless the Administrative Agent has received notice from a Lender or the Borrower referring to this Agreement, describing such Default or Event of Default and stating that such notice is a "notice of default". In the event that the Administrative Agent receives such a notice, the Administrative Agent shall give notice thereof to the Lenders. The Administrative Agent shall take such action with respect to such Default or Event of Default as shall be reasonably directed by the Required Lenders; provided that unless and until the Administrative Agent shall have received such directions, the Administrative Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default or Event of Default as it shall deem advisable in the best interests of the Lenders.

11.6    Non-Reliance on Administrative Agent and Other Lenders.   Each Lender expressly acknowledges that neither the Administrative Agent nor any of its officers, directors, employees, agents, attorneys-in-fact or Affiliates has made any representations or warranties to it and that no act by the Administrative Agent hereinafter taken, including any review of the affairs of the Borrower or any other Loan Party, shall be deemed to constitute any representation or warranty by the Administrative Agent to any Lender. Each Lender represents to the Administrative Agent that it has, independently and without reliance upon the Administrative Agent or any other Lender, and based on such documents and information as it has deemed appropriate, made its own appraisal of and investigation into the business, operations, property, financial and other condition and creditworthiness of the Borrower and the other Loan Parties and made its own decision to make its Loans hereunder and enter into this Agreement. Each Lender also represents that it will, independently and without reliance upon the Administrative Agent or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit analysis, appraisals and decisions in taking or not taking action under this Agreement and the other Loan Documents, and to make such investigation as it deems necessary to inform itself as to the business, operations, property, financial and other condition and creditworthiness of the Borrower. Except for notices, reports and other documents expressly required to be furnished to the Lenders by the Administrative Agent hereunder or under the other Loan Documents, the Administrative Agent shall not have any duty or responsibility to provide any Lender with any credit or other information concerning the business, operations, property, condition (financial or otherwise), prospects or creditworthiness of the Borrower or any other Loan Party which may come into the possession of the Administrative Agent or any of its officers, directors, employees, agents, attorneys-in-fact or Affiliates.

11.7    Indemnification.   The Lenders agree to indemnify the Administrative Agent in its capacity as such (to the extent not reimbursed by the Borrower and without limiting the obligation of the Borrower to do so), ratably according to their respective Credit Exposure Percentages in effect on the date on which indemnification is sought (or, if indemnification is sought after the date upon which the Commitments shall have terminated and the Loans shall have been paid in full, ratably in accordance with such Credit Exposure Percentages immediately prior to such date), from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses, or the reasonable and documented fees and disbursements of counsel (including the allocated fees and expenses of in-house

\_0

**A2899**

counsel) or disbursements of any kind whatsoever which may at any time (including, without limitation, at any time following the payment of the Loans) be imposed on, incurred by or asserted against the Administrative Agent in any way relating to or arising out of, the Revolving Credit Commitments, this Agreement, any of the other Loan Documents or any documents contemplated by or referred to herein or therein or the transactions contemplated hereby or thereby or any action taken or omitted by the Administrative Agent under or in connection with any of the foregoing; <u>provided</u> that no Lender shall be liable for the payment of any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements which are found by a final and nonappealable decision of a court of competent jurisdiction to have resulted solely from the Administrative Agent's gross negligence or willful misconduct.  The agreements in this Section shall survive the payment of the Loans and all other amounts payable hereunder.  If any indemnity furnished to the Administrative Agent for any purpose shall, in the opinion of the Administrative Agent, be insufficient or become impaired, the Administrative Agent may request additional indemnity and cease, or not commence, to do the acts indemnified against until such additional indemnity is furnished.

11.8    Administrative Agent in Its Individual Capacity.  The Administrative Agent and its Affiliates may make loans to, accept deposits from and generally engage in any kind of business with the Borrower and the other Loan Parties as though the Administrative Agent were not the Administrative Agent hereunder and under the other Loan Documents.  With respect to the Loans made by it, the Administrative Agent shall have the same rights and powers under this Agreement and the other Loan Documents as any Lender and may exercise the same as though it were not the Administrative Agent, and the terms "Lender" and "Lenders" shall include the Administrative Agent in its individual capacity.

11.9    Successor Administrative Agent.  (a)  The Administrative Agent may resign at any time by giving not less than ten days prior written notice thereof to the Lenders and the Borrower. Upon any such resignation, the Required Lenders shall have the right to appoint a successor Administrative Agent; provided that, so long as no Default or Event of Default has occurred and is continuing, the Borrower shall have the right to consent to any such successor Administrative Agent, such consent not to be unreasonably withheld.

(b)    If no successor Administrative Agent shall have been so appointed by the Required Lenders within thirty days after the resigning Administrative Agent's giving of notice of resignation, then the resigning Administrative Agent may appoint, on behalf of the Borrower and the Lenders, a successor Administrative Agent, which is acceptable to the Required Lenders.  In the event that the Administrative Agent is unable to appoint a replacement successor within such thirty day period after using reasonable efforts, the Administrative Agent may nonetheless resign by delivering a written resignation to the Lenders and the Borrower; provided that in such circumstances, and unless and until a successor Administrative Agent is appointed, the Administrative Agent shall remain Administrative Agent solely for the purpose of serving as secured party of record with respect to the Collateral, its sole duty in that capacity shall be to take such ministerial actions as it shall be directed to take by the Required Lenders (including, without limitation, the execution and delivery of documents or instruments relating to the Collateral), and the Administrative Agent shall be entitled to reimbursement from the Borrower for its out-of-pocket costs and expenses and reasonable compensation from the Borrower for its services.  If the Administrative Agent has resigned and no successor Administrative Agent has been appointed, subject to the preceding sentence, the Lenders shall perform the duties of the Administrative Agent hereunder, and the Borrower shall make all payments in respect of the Obligations to the applicable Lender and shall deal directly with the Lenders and the Lenders shall be entitled to exercise all the rights provided to Administrative Agent hereunder and all Lenders shall have

-62-

the rights, benefits, indemnities and exculpations and other limitations of liability to which Administrative Agent is entitled under Section 11 of this Agreement.

(c)     No successor Administrative Agent shall be deemed to be appointed hereunder until such successor Administrative Agent has accepted the appointment in writing.  Upon the acceptance of any appointment as Administrative Agent hereunder by a successor Administrative Agent and upon the execution and filing of such financing statements, or amendments thereto, and such other instruments and notices, as may be necessary or desirable or as the Required Lenders may request, in order to continue the perfection of the Liens granted or purported to be granted under the Security Documents, such successor Administrative Agent shall succeed to and become vested with all the rights, powers, discretion, privileges and duties of the resigning Administrative Agent, and the resignation of the Administrative Agent shall then be effective for all purposes.  Upon the effectiveness of the resignation of the Administrative Agent, the resigning Administrative Agent shall be discharged from its duties and obligations under the Loan Documents.  After the effectiveness of the resignation of an Administrative Agent, the provisions of this Section 11 shall inure to its benefit as to any actions taken or omitted to be taken by it while it was acting as the Administrative Agent under this Agreement."

(d)     The Required Lenders may replace the Administrative Agent with a successor Administrative Agent, with or without cause, at any time by giving not less than 30 days prior written notice thereof to the Administrative Agent and the Borrower.

11.10   Authorization to Release Liens.  The Administrative Agent is hereby irrevocably authorized by each of the Lenders to release any Lien covering any property of the Borrower or any of its Subsidiaries or any Loan Party that is the subject of a sale, lease, assignment or other disposition which is permitted by this Agreement or any other Loan Document or which has been consented to in accordance with Section 12.1.

11.11   The Arranger; the Documentation Agents.   Neither the Arranger nor the Documentation Agents, in their respective capacities as such, shall have any duties or responsibilities, and shall incur no liability, under this Agreement and the other Loan Documents.

11.12   The Administrative Agent and the Secured Parties.  Notwithstanding that the Administrative Agent is named in one or more of the Security Documents as agent for Qualified Counterparties as well as for the Lenders, each Lender agrees, on behalf of itself and any affiliate thereof that may at any time be a Qualified Counterparty under any Specified Hedge Agreement, that the Administrative Agent (i) shall have no duty or obligation whatsoever to any Qualified Counterparty under any Specified Hedge Agreement, and (ii) shall have no duty or obligation to any Qualified Counterparty under any Security Documents other than the obligation to deliver to such Qualified Counterparty its ratable share (as determined by the Administrative Agent) of any proceeds received by the Administrative Agent under the Security Documents upon the exercise by the Administrative Agent of its remedies thereunder.  Without limiting the generality of the foregoing, each Lender agrees, on behalf of itself and any affiliate thereof that may at any time be a Qualified Counterparty under any Specified Hedge Agreement, that (i) the Administrative Agent shall incur no liability to any Qualified Counterparty as a result of any release by the Administrative Agent of any Collateral or Subsidiary Guarantors under any Security Document or any other action or inaction by the Administrative Agent under any Security Document and (ii) the Administrative Agent shall be entitled to the same exculpations and protections, in respect of the Qualified Counterparties, as it is entitled to with respect to the Lenders pursuant to the other provisions of this Section 11 (other than Section 11.7), mutatis mutandis.

\_0

-63-

**A2901**

PP-TRBK0000095

## SECTION 12.  MISCELLANEOUS

12.1   <u>Amendments and Waivers</u>.   Neither this Agreement nor any other Loan Document, nor any terms hereof or thereof may be amended, supplemented or modified except in accordance with the provisions of this Section 12.1.  The Required Lenders may, or, with the written consent of the Required Lenders (except with respect to modifications to the Guarantee and the Security Documents contemplated under Section 8.10), the Administrative Agent may, from time to time, (a) enter into with the Borrower written amendments, supplements or modifications hereto and to the other Loan Documents for the purpose of adding any provisions to this Agreement or the other Loan Documents or changing in any manner the rights of the Lenders or of the Borrower hereunder or thereunder or (b) waive, on such terms and conditions as the Required Lenders or the Administrative Agent, as the case may be, may specify in such instrument, any of the requirements of this Agreement or the other Loan Documents or any Default or Event of Default and its consequences; provided, however, that a Supplemental Agent's consent shall in no way be necessary for an amendment, modification or waiver to be declared effective and valid other than for amendments, modifications or waivers concerning Section 11, this Section 12.1 and Section 12.5; and provided, further, that no such waiver and no such amendment, supplement or modification shall (i) reduce the amount or extend the scheduled date of maturity of any Loan or of any installment thereof, or reduce the stated rate of any interest or fee payable hereunder or extend the scheduled date of any payment thereof, or increase the amount or extend the expiration date of any Lender's Revolving Credit Commitment, in each case without the consent of each Lender affected thereby, or (ii) amend, modify or waive any provision of this Section 12.1 or reduce the percentage specified in the definition of Required Lenders or Required Prepayment Lenders, or consent to the assignment or transfer by the Borrower of any of its rights and obligations under this Agreement and the other Loan Documents or release all or substantially all of the Collateral or release all or substantially all of the Subsidiary Guarantors from their obligations under the Guarantee, in each case without the written consent of each of the Lenders directly affected thereby, or (iii) amend, modify or waive any condition precedent to any extension of credit under the Revolving Credit Facility set forth in Section 7.2 (including, without limitation, in connection with any waiver of an existing Default or Event of Default) without the consent of the Majority Facility Lenders with respect to the Revolving Credit Facility, or (iv) reduce the percentage specified in the definition of Majority Facility Lenders with respect to any Facility without the written consent of all Lenders under such Facility, or (v) amend, modify or waive any provision of Section 5.9(b) without the consent of the Majority Facility Lenders of the Term Loan Facility and each Lender directly affected thereby, or amend, modify or waive any provision of Section 5.6(b), (c) or (d) without the consent of the Required Prepayment Lenders, or (vi) amend, modify or waive any provision of Section 11 without the written consent of the then Administrative Agent.  Any such waiver and any such amendment, supplement or modification shall apply equally to each of the Lenders and shall be binding upon the Borrower, the Lenders, the Administrative Agent and all future holders of the Loans. In the case of any waiver, the Borrower, the Lenders and the Administrative Agent shall be restored to their former positions and rights hereunder and under the other Loan Documents, and any Default or Event of Default waived shall be deemed to be cured and not continuing; but no such waiver shall extend to any subsequent or other Default or Event of Default or impair any right consequent thereon.

12.2   <u>Notices</u>.   All notices, requests and demands to or upon the respective parties hereto to be effective shall be in writing (including by facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made (a) in the case of delivery by hand, when delivered, (b) in the case of delivery by mail, five (5) days after being sent by certified or registered mail, return receipt requested, postage prepaid, or (c) in the case of delivery by facsimile transmission, when sent and receipt has been electronically confirmed, addressed as follows in the case of the Borrower and the Administrative Agent, and as set forth in Schedule 1.0 in the case of the other parties hereto, or to such other address as may be hereafter notified by the respective parties hereto:

\_0

-64-

**A2902**

The Borrower:                TransCare Corporation
5811 Foster Avenue
Brooklyn, New York  11234
Attention:  Chief Financial Officer
Fax:  (718) 968-0756
Phone:  (718) 763-8888, Ext. 353

The Administrative Agent:      Patriarch Partners Agency Services, LLC
c/o Patriarch Partners, LLC
112 South Tryon Street, Suite 700
Charlotte, North Carolina 28284
Attention: Lon Brown
Fax: (704) 375-0358
Phone: (704) 227-1205

and to:

Patriarch Partners Agency Services, LLC
c/o Patriarch Partners, LLC
40 Wall Street, 25th floor
New York, New York 10005
Attention: Lynn Tilton
Fax: (212) 825-2038
Phone: (212) 825-0550

The Supplemental Agent:      Wachovia Bank, National Association
401 South Tryon Street
12th floor, NC-1179
Charlotte, North Carolina 28288
Attention: Kevin Stephens
Fax: (704) 715-~~3329~~3321

provided that any notice, request or demand to or upon the Administrative Agent or the Lenders pursuant to Section 2.2, 3.2, 3.4, 5.2 or 5.8(b) shall not be effective until received.

12.3     No Waiver; Cumulative Remedies.   No failure to exercise and no delay in exercising, on the part of the Administrative Agent or any Lender, any right, remedy, power or privilege hereunder or under the other Loan Documents shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.  The rights, remedies, powers and privileges herein provided are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law.

12.4     Survival of Representations and Warranties.  All representations and warranties made hereunder, in the other Loan Documents and in any document, certificate or statement delivered

\_0

Confidential

pursuant hereto or in connection herewith shall survive the execution and delivery of this Agreement and the making of the Loans hereunder.

12.5    Payment of Expenses and Taxes.  The Borrower agrees (a) to pay or reimburse the Administrative Agent for all its reasonable out-of-pocket costs and expenses incurred in connection with the development, preparation and execution of, and any amendment, supplement or modification to, this Agreement and the other Loan Documents and any other documents prepared in connection herewith or therewith, and the consummation and administration of the transactions contemplated hereby and thereby, including, without limitation, the reasonable and documented fees and disbursements of counsel to the Administrative Agent, (b) to pay or reimburse each Lender and the Administrative Agent for all its costs and expenses incurred in connection with the enforcement or preservation of any rights under this Agreement, the other Loan Documents and any such other documents entered into in connection with the Credit Agreement, including, without limitation, the reasonable and documented fees and disbursements of counsel (including the allocated reasonable fees and expenses of in-house counsel and reasonable travel expenses incurred by the Administrative Agent or the Lenders in preserving rights under this Agreement) to each Lender and of counsel to the Administrative Agent, (c) to pay, indemnify, and hold each Lender and the Administrative Agent harmless from, any and all recording and filing fees and any and all liabilities with respect to, or resulting from any delay on the part of the Borrower or any Subsidiary in paying, stamp, excise and other taxes, if any, which may be payable or determined to be payable in connection with the execution and delivery of, or consummation or administration of any of the transactions contemplated by, or any amendment, supplement or modification of, or any waiver or consent under or in respect of, this Agreement, the other Loan Documents and any such other documents, and (d) to pay, indemnify, and hold each Lender and the Administrative Agent and their respective officers, directors, employees, affiliates, agents and controlling persons (each, an "Indemnitee") harmless from and against any and all other liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever with respect to the execution, delivery, enforcement, performance and administration of this Agreement, the other Loan Documents, the confirmation of the Plan of Reorganization and the transactions contemplated thereby and by the Confirmation Order, or the use of the proceeds of the Loans in connection with the confirmation of the Plan of Reorganization and the transactions contemplated thereby and by the Confirmation Order, and any such other documents, including, without limitation, any of the foregoing relating to the violation of, noncompliance with or liability under, any Environmental Law applicable to the operations of the Borrower, any of its Subsidiaries or any of the Properties (all the foregoing in this clause (d), collectively, the "indemnified liabilities"), provided, that the Borrower shall have no obligation hereunder to any Indemnitee with respect to indemnified liabilities to the extent such indemnified liabilities (i) resulted from the gross negligence or willful misconduct of such Indemnitee, or (ii) arise from legal proceedings commenced against the Administrative Agent or any such Lender by any security holder or creditor thereof arising out of and based upon rights afforded any such security holder or creditor solely in its capacity as such.  The agreements in this Section shall survive repayment of the Loans and all other amounts payable hereunder.

12.6    Successors and Assigns; Participations and Assignments.  (a)  This Agreement shall be binding upon and inure to the benefit of the Borrower, the Lenders, the Administrative Agent and their respective successors and assigns, except that the Borrower may not assign or transfer any of its rights or obligations under this Agreement without the prior written consent of each Lender.

(b)    Any Lender may, in accordance with applicable law, at any time sell to one or more banks, financial institutions or other entities ("Participants") participating interests in any Loan

\_ 0

-66-

Confidential

**A2904**

PP-TRBK0000098

owing to such Lender, any Revolving Credit Commitment of such Lender or any other interest of such Lender hereunder and under the other Loan Documents.  In the event of any such sale by a Lender of a participating interest to a Participant, such Lender's obligations under this Agreement to the other parties to this Agreement shall remain unchanged, such Lender shall remain solely responsible for the performance thereof, such Lender shall remain the holder of any such Loan for all purposes under this Agreement and the other Loan Documents, and the Borrower and the Administrative Agent shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement and the other Loan Documents.  In no event shall any Participant under any such participation have any right to approve any amendment or waiver of any provision of any Loan Document, or any consent to any departure by any Loan Party therefrom, except to the extent that such amendment, waiver or consent would reduce the principal of, or the stated rate of interest on, the Loans or any fees payable hereunder or the extend the schedules date of payment thereof, or postpone the date of the final maturity of the Loans or release all or substantially all of the Collateral, in each case to the extent subject to such participation.  The Borrower agrees that if amounts outstanding under this Agreement are due or unpaid, or shall have been declared or shall have become due and payable upon the occurrence of an Event of Default, each Participant shall, to the maximum extent permitted by applicable law, be deemed to have the right of setoff in respect of its participating interest in amounts owing under this Agreement to the same extent as if the amount of its participating interest were owing directly to it as a Lender under this Agreement, provided that, in purchasing such participating interest, such Participant shall be deemed to have agreed to share with the Lenders the proceeds thereof as provided in Section 12.7(a) as fully as if it were a Lender hereunder.  The Borrower also agrees that each Participant shall be entitled to the benefits of, and bound by the obligations imposed on the Lender in, Sections 5.11, 5.12 and 5.13 with respect to its participation in the Revolving Credit Commitments and the Loans outstanding from time to time as if it was a Lender; provided that, in the case of Section 5.12, such Participant shall have complied with the requirements of said Section and provided, further, that no Participant shall be entitled to receive any greater amount pursuant to any such Section than the transferor Lender would have been entitled to receive in respect of the amount of the participation transferred by such transferor Lender to such Participant had no such transfer occurred.

        (c)      Any Lender may, in accordance with applicable law, at any time and from time to time assign to any Lender or any affiliate or Approved Fund thereof or, with the consent of the Administrative Agent and, so long as no Default or Event of Default has occurred and is continuing, the Borrower (which in each case shall not be unreasonably withheld (reasonable grounds for withholding consent to include an assignee who would subject the Borrower to the payment of greater costs described in Sections 5.11, 5.12 and 5.13 than the Borrower is otherwise subject to paying)), to an additional bank, financial institution or other entity (other than the Borrower or any of its Affiliates) (an "Assignee") all or any part of its rights and obligations under this Agreement and the other Loan Documents pursuant to an Assignment and Acceptance, substantially in the form of Exhibit I, with appropriate completions and attaching the Assignee's relevant tax forms, administrative details and wiring instructions (an "Assignment and Acceptance"), executed by such Assignee, such assigning Lender (and, in the case of an Assignee that is not then a Lender or Approved Fund or an affiliate thereof, by the Administrative Agent and the Borrower so long as no Event of Default has occurred and is continuing) and delivered to the Administrative Agent for its acceptance and recording in the Register, provided that (i) no such assignment to an Assignee (other than any Lender or any affiliate or Approved Fund thereof) shall be in an aggregate principal amount of less than $1,000,000 (other than in the case of (a) an assignment of all of a Lender's interests under this Agreement or (b) an assignment to another Lender or an Affiliate of such Assignor), unless otherwise agreed by the Borrower and the Administrative Agent (such amount to be aggregated in respect of assignments by or to any Lender and the affiliates or Approved Funds thereof), (ii) if the Assignor is a Revolving Credit Lender, such assignor's rights and obligations with respect to its Revolving Credit Commitment or any part thereof shall be assigned to an Eligible Assignee, (iii) in the case of an assignment by a Lender to a Bank CLO

\_0

-67-

Confidential

managed by such Lender or an affiliate of such Lender, unless such assignment to such Bank CLO has been consented to by the Borrower (such consent not to be unreasonably withheld or delayed), the assigning Lender shall retain the sole right to approve any amendment, waiver or other modification of this Agreement or any other Loan Document, provided that the Assignment and Acceptance between such Lender and such Bank CLO may provide that such Lender will not, without the consent of such Bank CLO, agree to any amendment, modification or waiver that requires the consent of each Lender directly affected thereby pursuant to Section 12.1, and (iv) each Assignee which is not a US Person shall comply with the provisions of Section 5.12(c) (and such Assignee shall not be entitled to the benefits of Section 5.12 unless such Assignee complies with such Section 5.12(c))). Upon such execution, delivery, acceptance and recording, from and after the effective date determined pursuant to such Assignment and Acceptance, (x) the Assignee thereunder shall be a party hereto and, to the extent provided in such Assignment and Acceptance, have the rights and obligations of a Lender hereunder with Commitments as set forth therein, and (y) the assigning Lender thereunder shall, to the extent provided in such Assignment and Acceptance, be released from its obligations under this Agreement (and, in the case of an Assignment and Acceptance covering all or the remaining portion of an assigning Lender's rights and obligations under this Agreement, such assigning Lender shall cease to be a party hereto). Unless requested by the Assignee and/or the assigning Lender, new Notes shall not be required to be executed and delivered by the Borrower, for any assignment which occurs at any time when any of the events described in Section 10(g) shall have occurred and be continuing. Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this Section 12.6 shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with clause (b) of this Section 12.6.

(d)     The Administrative Agent, on behalf of the Borrower, shall maintain at the address of the Administrative Agent referred to in Section 12.2 a copy of each Assignment and Acceptance delivered to it and a register (the "Register") for the recordation of the names and addresses of the Lenders and the Revolving Credit Commitments of, and principal amounts of the Loans owing to, each Lender from time to time. The entries in the Register shall be conclusive, in the absence of manifest error, and the Borrower, the Administrative Agent and the Lenders may (and, in the case of any Loan or other obligation hereunder not evidenced by a Note, shall) treat each Person whose name is recorded in the Register as the owner of a Loan or other obligation hereunder as the owner thereof for all purposes of this Agreement and the other Loan Documents, notwithstanding any notice to the contrary. Any assignment of any Loan or other obligation hereunder, whether or not evidenced by a Note, shall be effective only upon appropriate entries with respect thereto being made in the Register. The Register shall be available for inspection by the Borrower or any Lender at any reasonable time and from time to time upon reasonable prior notice.

(e)     Upon its receipt of an Assignment and Acceptance executed by an assigning Lender and an Assignee (and, in the case of an Assignee that is not then a Lender or an affiliate or Approved Fund thereof, by the Administrative Agent) together with payment to the Administrative Agent of a registration and processing fee of $3,500, the Administrative Agent shall (i) promptly accept such Assignment and Acceptance and (ii) on the effective date determined pursuant thereto record the information contained therein in the Register and give notice of such acceptance and recordation to the Lenders and the Borrower.

(f)     The Borrower authorizes each Lender to disclose to any potential Participant or Assignee (each, a "Transferee") and any prospective Transferee any and all financial information in such Lender's possession concerning the Borrower and its Affiliates which has been delivered to such Lender by or on behalf of the Borrower pursuant to this Agreement or which has been delivered to such Lender by or on behalf of the Borrower in connection with such Lender's credit evaluation of the

\_0

-68-

**A2906**

Borrower and its Affiliates prior to becoming a party to this Agreement; provided that such Transferee agrees in advance to be bound by the provisions of Section 12.15 hereof.

(g)     For avoidance of doubt, the parties to this Agreement acknowledge that the provisions of this Section concerning assignments of Loans and Notes relate only to absolute assignments and that such provisions do not prohibit assignments creating security interests, including, without limitation, any pledge or assignment by a Lender of any Loan or Note to any Federal Reserve Bank in accordance with applicable law.

(h)     Notwithstanding the foregoing, any Conduit Lender may assign any or all of the Loans it may have funded hereunder to its designating Lender without the consent of the Borrower or the Administrative Agent and without regard to the limitations set forth in Section 12.6(c). Each of the Borrower, each Lender and the Administrative Agent hereby confirms that it will not institute against a Conduit Lender or join any other Person in instituting against a Conduit Lender any bankruptcy, reorganization, arrangement, insolvency or liquidation proceeding under any state bankruptcy or similar law, for one year and one day after the payment in full of the latest maturing commercial paper note issued by such Conduit Lender; provided, however, that each Lender designating any Conduit Lender hereby agrees to indemnify, save and hold harmless each other party hereto for any loss, cost, damage or expense arising out of its inability to institute such a proceeding against such Conduit Lender during such period of forbearance. In addition, notwithstanding the foregoing, any Conduit Lender may (i) with notice to, but without the prior written consent of, the Borrower and the Administrative Agent and without paying any processing fee therefor, assign all or a portion of its interests in any Loans to any financial institutions (consented to by the Borrower and Administrative Agent) providing liquidity and/or credit support to or for the account of such Conduit Lender to support the funding or maintenance of Loans by such Conduit Lender and (ii) disclose on a confidential basis any non-public information relating to its Loans to any rating agency, commercial paper dealer or provider of any surety, guarantee or credit or liquidity enhancement to such Conduit Lender. This clause (h) may not be amended without the written consent of any Conduit Lender directly affected thereby.

12.7     Adjustments; Set-off.

(a)     If any Lender (a "Benefited Lender") shall at any time receive any payment of all or part of its Loans, or interest thereon, or other obligations owing under the Loan Documents or receive any collateral in respect thereof (whether voluntarily or involuntarily, by set-off, pursuant to events or proceedings of the nature referred to in Section 10(g), or otherwise), in a greater proportion than any such payment to or collateral received by any other Lender, if any, in respect of such other Lender's Loans, or interest thereon or other obligations owing under the Loan Documents, such Benefited Lender shall purchase for cash from the other Lenders a participating interest in such portion of each such other Lender's Loan or other obligations owing under the Loan Documents, or shall provide such other Lenders with the benefits of any such collateral, or the proceeds thereof, as shall be necessary to cause such Benefited Lender to share the excess payment or benefits of such collateral or proceeds ratably with each of the Lenders; provided, however, that if all or any portion of such excess payment or benefits is thereafter recovered from such Benefited Lender, such purchase shall be rescinded, and the purchase price and benefits returned, to the extent of such recovery, but without interest. The Borrower agrees that each Lender so purchasing a portion of another Lender's Loan or other obligations owing under the Loan Documents may exercise all rights of payment (including, without limitation, but subject to the provisions of clause (b) of this Section 12.7, rights of set-off) with respect to such portion as fully as if such Lender were the direct holder of such portion.

\_0

-69-

**A2907**

PP-TRBK0000101

(b)　Upon the occurrence and during the continuance of an Event of Default, in addition to any rights and remedies of the Lenders provided by law, each Lender shall have the right, without prior notice to the Borrower, any such notice being expressly waived by the Borrower to the extent permitted by applicable law, upon any amount becoming due and payable by the Borrower hereunder (whether at the stated maturity, by acceleration or otherwise) to set-off and appropriate and apply against such amount any and all deposits (general or special, time or demand, provisional or final), in any currency, and any other credits, indebtedness or claims, in any currency, in each case whether direct or indirect, absolute or contingent, matured or unmatured, at any time held or owing by such Lender or any branch or agency thereof to or for the credit or the account of the Borrower; provided that none of the Lenders shall have any such right of set off, appropriation and application against any Payroll Accounts. Each Lender agrees promptly to notify the Borrower and the Administrative Agent after any such set-off and application made by such Lender, provided that the failure to give such notice shall not affect the validity of such set-off and application.

12.8    Counterparts.  This Agreement may be executed by one or more of the parties to this Agreement on any number of separate counterparts (including by facsimile transmission of signature pages hereto), and all of said counterparts taken together shall be deemed to constitute one and the same instrument.  A set of the copies of this Agreement signed by all the parties shall be lodged with the Borrower and the Administrative Agent.

12.9    Severability.  Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

12.10    Integration.  This Agreement and the other Loan Documents represent the agreement of the Borrower, the Administrative Agent and the Lenders with respect to the subject matter hereof, and there are no promises, undertakings, representations or warranties by the Administrative Agent or any Lender relative to subject matter hereof not expressly set forth or referred to herein or in the other Loan Documents.

12.11    GOVERNING LAW.    THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.

12.12    Submission To Jurisdiction; Waivers.  The Borrower hereby irrevocably and unconditionally:

(a)    submits for itself and its property in any legal action or proceeding relating to this Agreement and the other Loan Documents to which it is a party, or for recognition and enforcement of any judgment in respect thereof, to the non-exclusive general jurisdiction of the courts of the State of New York, the courts of the United States of America for the Southern District of New York, and appellate courts from any thereof;

\_0

**A2908**

Confidential
PP-TRBK0000102

(b)      consents that any such action or proceeding may be brought in such courts and waives any objection that it may now or hereafter have to the venue of any such action or proceeding in any such court or that such action or proceeding was brought in an inconvenient court and agrees not to plead or claim the same;

(c)      agrees that service of process in any such action or proceeding may be effected by mailing a copy thereof by registered or certified mail (or any substantially similar form of mail), postage prepaid, to the Borrower at its address set forth in Section 12.2 or at such other address of which the Administrative Agent shall have been notified pursuant thereto;

(d)      agrees that nothing herein shall affect the right to effect service of process in any other manner permitted by law or shall limit the right to sue in any other jurisdiction; and

(e)      waives, to the maximum extent not prohibited by law, any right it may have to claim or recover in any legal action or proceeding referred to in this Section any special, exemplary, punitive or consequential damages.

12.13   <u>Acknowledgments</u>.  The Borrower hereby acknowledges that:

(a)      it has been advised by counsel in the negotiation, execution and delivery of this Agreement and the other Loan Documents;

(b)      neither the Administrative Agent nor any Lender has any fiduciary relationship with or duty to the Borrower arising out of or in connection with this Agreement or any of the other Loan Documents, and the relationship between the Borrower and the other Loan Parties, on one hand, and Administrative Agent and Lenders, on the other hand, in connection herewith or therewith is solely that of debtor and creditor; and

(c)      no joint venture is created hereby or by the other Loan Documents or otherwise exists by virtue of the transactions contemplated hereby among the Lenders or among the Borrower and the Lenders.

12.14   <u>WAIVERS OF JURY TRIAL</u>.  THE BORROWER, THE AGENT AND THE LENDERS HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT AND FOR ANY COUNTERCLAIM THEREIN.

12.15   <u>Confidentiality</u>.   Each Lender agrees to keep confidential all non-public information provided to it by the Borrower pursuant to this Agreement that is designated by the Borrower in writing as confidential; <u>provided</u>, that nothing herein shall prevent any Lender from disclosing any such information (i) to the Administrative Agent or any other Lender, (ii) to any proposed Transferee which agrees to comply with the provisions of this Section 12.15, (iii) to its employees, directors, agents, attorneys, accountants and other professional advisors, (iv) upon the request or demand of any examiner or other Governmental Authority having jurisdiction over such Lender, (v) in response to any order of any court or other Governmental Authority or as may otherwise be required pursuant to any Requirement of Law, (vi) which has been publicly disclosed other than in breach of this Agreement, or (vii) in connection with the exercise of any remedy hereunder.  Notwithstanding anything herein to the contrary, information subject to this Section 12.15 shall not include, and the Administrative Agent and each Lender may disclose without limitation of any kind, any information with respect to the "tax treatment" and "tax

Confidential

structure" (in each case, within the meaning of Treasury Regulation Section 1.6011-4) of the transactions contemplated hereby and all materials of any kind (including opinions or other tax analyses) that are provided to the Administrative Agent or such Lender relating to such tax treatment and tax structure; provided that with respect to any document or similar item that in either case contains information concerning the tax treatment or tax structure of the transaction as well as other information, this sentence shall only apply to such portions of the document or similar item that relate to the tax treatment or tax structure of the Loans and transactions contemplated hereby.

[Signature Pages Follow]

\_ 0

**A2910**

Confidential                                                                PP-TRBK0000104

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their proper and duly authorized officers as of the day and year first above written.

TRANSCARE CORPORATION

By: _____
    Name:
    Title:

PATRIARCH PARTNERS AGENCY SERVICES, LLC
    as Administrative Agent

By: _____
    Name:
    Title:

ARK II CLO 2001-1, LIMITED, as Lender

By:   PATRIARCH PARTNERS II, LLC, its
      Collateral Manager

By: _____
    Name:
    Title: Manager

ARK INVESTMENT PARTNERS II L.P., as Lender

By:   PATRIARCH PARTNERS III, LLC, its
      Investment ~~Advisor~~Adviser

By: _____
    Name:
    Title: Manager

\_0

**A2911**

Confidential

FIRST DOMINION FUNDING I, as
    a Lender

By:    Credit- Suisse Asset Management, LLC, its
    Collateral Manager

By:    _____
    Name:
    Title:


FIRST DOMINION FUNDING II, as
    a Lender

By:    Credit- Suisse Asset Management, LLC, its
    Collateral Manager

By:    _____
    Name:
    Title:

\_ 0

**A2912**

Confidential

Document comparison done by DeltaView on Sunday, August 03, 2003 18:15:46

| Input | |
|---|---|
| Document 1 | pcdocs://nycdoc_1/183322/5 |
| Document 2 | pcdocs://nycdoc_1/183322/6 |
| Rendering set | Standard |

| Legend | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics | Count |
|---|---|
| Insertions | 13 |
| Deletions | 11 |
| Moved from | 0 |
| Moved to | 0 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 24 |

\_0

**A2913**

Confidential