# 20 Civ. 06274 (LAK)

**United States District Court**

*for the*

**Southern District of New York**

_____

IN RE TRANSCARE CORPORATION, ET AL.

DEBTORS,

_____

PATRIARCH PARTNERS AGENCY SERVICES, LLC, ET AL.,

DEFENDANTS-APPELLANTS,

—against—

SALVATORE LAMONICA, AS CHAPTER 7 TRUSTEE OF THE JOINTLY-
ADMINISTERED ESTATES OF TRANSCARE CORPORATION, ET AL.,

PLAINTIFF-APPELLEE.

_____

ON APPEAL FROM THE UNITED STATES BANKRUPTCY COURT FOR
THE SOUTHERN DISTRICT OF NEW YORK (BERNSTEIN, J.)

IN RE: TRANSCARE CORPORATION, ET AL., CASE NO. 16-10407 (SMB)

LAMONICA V. TILTON, ET AL., ADV. PROC. NO. 18-1021 (SMB)

## APPENDIX TO BRIEF FOR THE APPELLANTS

# Volume XII- A2914-A3112

[Execution Version]

LOAN AND SECURITY AGREEMENT

by and among

TransCare Corporation
TransCare New York, Inc.
TransCare Pennsylvania, Inc.
TransCare Maryland, Inc.
TransCare ML, Inc.
TC Hudson Valley Ambulance Corp.
TC Billing and Services Corp.
TC Ambulance Corporation
TransCare Management Services, Inc.
TCBA Ambulance, Inc.
TransCare Westchester,  Inc. and
TransCare Harford County, Inc.

as Borrowers

and

TC Ambulance Group, Inc. and
TC Ambulance North, Inc.

as Guarantors

and

WACHOVIA BANK, NATIONAL ASSOCIATION,
as Lender

Dated:  October __, 2006

707761.15

JX 002

LaMonica v. Tilton, et al., 18-1021-smb

CONFIDENTIAL

CURTIS_000736

# TABLE OF CONTENTS

Page

SECTION 1. DEFINITIONS .............................................................................................. 7

SECTION 2. CREDIT FACILITIES ................................................................................. 38
    2.1    Loans. .................................................................................................... 38
    2.2    Letters of Credit. ................................................................................... 38
    2.3    Increase in Maximum Credit. ............................................................... 41
    2.4    Eligibility of Transportation/Management Service Accounts ............... 41
    2.5    Joint and Several Liability. ................................................................... 42

SECTION 3. INTEREST AND FEES ............................................................................... 43
    3.1    Interest. ................................................................................................. 43
    3.2    Unused Line Fee. .................................................................................. 44
    3.3    Letter of Credit Fees ............................................................................. 45
    3.4    Changes in Laws and Increased Costs of Loans................................... 45

SECTION 4. CONDITIONS PRECEDENT ...................................................................... 47
    4.1    Conditions Precedent to Initial Loans and Letters of Credit. ............... 47
    4.2    Conditions Precedent to All Loans and Letters of Credit..................... 50

SECTION 5. GRANT AND PERFECTION OF SECURITY INTEREST ......................... 50
    5.1    Grant of Security Interest. ..................................................................... 50
    5.2    Perfection of Security Interests............................................................. 52

SECTION 6. COLLECTION AND ADMINISTRATION ................................................. 56
    6.1    Borrowers' Loan Accounts.................................................................... 56
    6.2    Statements............................................................................................. 56
    6.3    Collection of Accounts. ........................................................................ 56
    6.4    Payments............................................................................................... 58
    6.5    Authorization to Make Loans. ............................................................... 59
    6.6    Use of Proceeds. ................................................................................... 59

707761.15

**A2915**

6.7     Appointment of Administrative Borrower as Agent for Requesting Loans and Receipts of Loans and Statements. ........................................................60

SECTION 7. COLLATERAL REPORTING AND COVENANTS ............................................60
7.1     Collateral Reporting. ........................................................60
7.2     Accounts Covenants. ........................................................62
7.3     Inventory Covenants. ........................................................64
7.4     Equipment and Real Property Covenants. ........................................................64
7.5     Power of Attorney. ........................................................65
7.6     Right to Cure. ........................................................66
7.7     Access to Premises. ........................................................66

SECTION 8. REPRESENTATIONS AND WARRANTIES ............................................67
8.1     Corporate Existence, Power and Authority. ........................................................67
8.2     Name; State of Organization; Chief Executive Office; Collateral Locations. ........................................................67
8.3     Financial Statements; No Material Adverse Change. ........................................................68
8.4     Priority of Liens; Title to Properties. ........................................................68
8.5     Tax Returns. ........................................................68
8.6     Litigation. ........................................................69
8.7     Compliance with Other Agreements and Applicable Laws. ........................................................69
8.8     Environmental Compliance. ........................................................69
8.9     Employee Benefits. ........................................................70
8.10    Bank Accounts. ........................................................71
8.11    Intellectual Property. ........................................................71
8.12    Subsidiaries; Affiliates; Capitalization; Solvency. ........................................................71
8.13    Labor Disputes. ........................................................72
8.14    Restrictions on Subsidiaries. ........................................................73
8.15    Material Contracts. ........................................................73
8.16    Payable Practices. ........................................................73
8.17    Credit Card Agreements. ........................................................73
8.18    Interrelated Businesses. ........................................................74
8.19    HIPAA Compliance. ........................................................74
8.20    Compliance with Health Care Laws. ........................................................74

707761.15

**A2916**

| 8.21 | License of Ambulances. | 76 |
| 8.22 | Accuracy and Completeness of Information. | 77 |
| 8.23 | Survival of Warranties; Cumulative. | 77 |

SECTION 9. AFFIRMATIVE AND NEGATIVE COVENANTS ............................................... 77

| 9.1 | Maintenance of Existence. | 77 |
| 9.2 | New Collateral Locations. | 78 |
| 9.3 | Compliance with Laws, Regulations, Etc. | 78 |
| 9.4 | Payment of Taxes and Claims. | 79 |
| 9.5 | Insurance. | 79 |
| 9.6 | Financial Statements and Other Information. | 80 |
| 9.7 | Sale of Assets, Consolidation, Merger, Dissolution, Etc. | 82 |
| 9.8 | Encumbrances. | 85 |
| 9.9 | Indebtedness. | 87 |
| 9.10 | Loans, Investments, Etc. | 91 |
| 9.11 | Dividends and Redemptions. | 93 |
| 9.12 | Transactions with Affiliates. | 94 |
| 9.13 | Compliance with ERISA. | 95 |
| 9.14 | End of Fiscal Years; Fiscal Quarters. | 95 |
| 9.15 | Credit Card Agreements. | 95 |
| 9.16 | Change in Business. | 96 |
| 9.17 | Limitation of Restrictions Affecting Subsidiaries. | 96 |
| 9.18 | Fixed Charge Coverage Ratio. | 96 |
| 9.19 | License Agreements. | 96 |
| 9.20 | Inactive Subsidiaries. | 97 |
| 9.21 | Foreign Assets Control Regulations, Etc. | 97 |
| 9.22 | Costs and Expenses. | 98 |
| 9.23 | Further Assurances. | 98 |

SECTION 10. EVENTS OF DEFAULT AND REMEDIES ............................................... 99

| 10.1 | Events of Default. | 99 |
| 10.2 | Remedies. | 101 |

707761.15

**A2917**

SECTION 11. JURY TRIAL WAIVER; OTHER WAIVERS AND CONSENTS; GOVERNING LAW ....................................................................................104

11.1    Governing Law; Choice of Forum; Service of Process; Jury Trial Waiver. ......................................................................................104

11.2    Waiver of Notices. ...............................................................................105

11.3    Amendments and Waivers. ..................................................................105

11.4    Waiver of Counterclaims. ....................................................................106

11.5    Indemnification. ..................................................................................106


SECTION 12. TERM OF AGREEMENT; MISCELLANEOUS ..............................106

12.1    Term. ...................................................................................................106

12.2    Interpretative Provisions. ....................................................................108

12.3    Notices. ...............................................................................................110

12.4    Partial Invalidity. ................................................................................111

12.5    Successors. ..........................................................................................111

12.6    Entire Agreement. ...............................................................................112

12.7    USA Patriot Act. .................................................................................112

12.8    Confidentiality. ...................................................................................112

12.9    Counterparts, Etc. ...............................................................................113

707761.15

**A2918**

CONFIDENTIAL

CURTIS_000740

INDEX TO
EXHIBITS AND SCHEDULES

| | |
|---|---|
| Exhibit A | Information Certificate |
| Exhibit B | Form of Borrowing Base Certificate |
| Exhibit C | Form of Compliance Certificate |
| Schedule 1.134 | List of Second Lien Documents |
| Schedule 8.17 | Credit Card Agreements |
| Schedule 8.19 | Business Associate Agreements |
| Schedule 8.20(a) | Medicare/Medicaid Provider Agreements |
| Schedule 8.20(e) | Pending Investigations |
| Schedule 8.20(f) | Participation Agreements |
| Schedule 8.20(g) | Agreements with Facilities |
| Schedule 9.18 | Fixed Charge Coverage Ratio |

707761.15

**A2919**

CURTIS_000741

# LOAN AND SECURITY AGREEMENT

This Loan and Security Agreement, dated October __, 2006, is entered into by and among Wachovia Bank, National Association, a national banking association ("Lender" as hereinafter further defined), and TransCare Corporation, a Delaware corporation ("TransCare"), TransCare New York, Inc., a Delaware corporation ("TransCare NY"), TransCare Pennsylvania, Inc., a Delaware corporation ("TransCare PA"), TransCare Maryland, Inc., a Delaware corporation ("TransCare MD"), TransCare ML, Inc., a Delaware corporation ("TCML"), TC Hudson Valley Ambulance Corp., a Delaware corporation ("TC Hudson Valley"), TC Billing and Services Corp., a Delaware corporation ("TC Billing"), TC Ambulance Corporation, a Delaware corporation ("TC Corp"), TransCare Management Services, Inc., a Delaware corporation ("TC Management"), TCBA Ambulance, Inc., a Delaware corporation ("TCBA"), TransCare Westchester, Inc., a Delaware corporation ("TransCare Westchester"), TransCare Harford County, Inc., a Delaware corporation and ("TransCare Harford", and together with TransCare, TransCare NY, TransCare PA, TransCare MD, TCML, TC Hudson Valley, TC Billing, TC Corp,  TC Management, TCBA, and TransCare Westchester, each individually a "Borrower" and collectively, "Borrowers" as hereinafter further defined), TC Ambulance Group, Inc., a Delaware corporation ("TC Group"), and TC Ambulance North, Inc., a Delaware corporation ("TC North" and together with TC North, each individually a "Guarantor" and collectively, "Guarantors" as hereinafter further defined).

## W I T N E S S E T H:

WHEREAS, Borrowers and Guarantors have requested that Lender enter into financing arrangements with Borrowers pursuant to which Lender may make loans and provide other financial accommodations to Borrowers; and

WHEREAS, Lender is willing to agree to make such loans and provide such financial accommodations on the terms and conditions set forth herein;

NOW, THEREFORE, in consideration of the mutual conditions and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

## SECTION 1. DEFINITIONS

For purposes of this Agreement, the following terms shall have the respective meanings given to them below:

1.1   "Account Debtor" shall mean a person obligated on an Account, including, without limitation, an "account debtor" as such term is defined in the UCC, a Credit Card Issuer, a Credit Card Processor, a Facility, a Fiscal Intermediary, or other Third Party Payor.

1.2   "Accounts" shall mean, as to each Borrower and Guarantor, all present and future rights of such Borrower and Guarantor to payment of a monetary obligation, whether or not earned by performance, which is not evidenced by chattel paper or an instrument, (a) for property that has been or is to be sold, leased, licensed, assigned, or otherwise disposed of, (b) for services rendered or to be rendered, (c) for a secondary obligation incurred or to be incurred,

707761.15

**A2920**

CONFIDENTIAL

CURTIS_000742

or (d) arising out of the use of a credit or charge card or information contained on or for use with the card.  The term "Accounts" as used herein shall include, without limitation, all Medicare Accounts, Medicaid Accounts, CHAMPUS/CHAMPVA Accounts, Insurance Accounts, Facility Contract Accounts, Unbilled Accounts, Private Pay Accounts, Health Care Receivables, Credit Card Receivables, Paratransit Accounts, Pending Medicaid Accounts and Transportation/Management Service Accounts.

      1.3    "Adjusted Eurodollar Rate" shall mean, with respect to each Interest Period for any Eurodollar Rate Loan comprising part of the same borrowing (including conversions, extensions and renewals), the rate per annum determined by dividing (a) the London Interbank Offered Rate for such Interest Period by (b) a percentage equal to: (i) one (1) minus (ii) the Reserve Percentage.  For purposes hereof, "Reserve Percentage" shall mean for any day, that percentage (expressed as a decimal) which is in effect from time to time under Regulation D of the Board of Governors of the Federal Reserve System (or any successor), as such regulation may be amended from time to time or any successor regulation, as the maximum reserve requirement (including, without limitation, any basic, supplemental, emergency, special, or marginal reserves) applicable with respect to Eurocurrency liabilities as that term is defined in Regulation D (or against any other category of liabilities that includes deposits by reference to which the interest rate of Eurodollar Loans is determined), whether or not Lender has any Eurocurrency liabilities subject to such reserve requirement at that time.  Eurodollar Loans shall be deemed to constitute Eurocurrency liabilities and as such shall be deemed subject to reserve requirements without benefits of credits for proration, exceptions or offsets that may be available from time to time to Lender.  The Adjusted Eurodollar Rate shall be adjusted automatically on and as of the effective date of any change in the Reserve Percentage.

      1.4    "Administrative Borrower" shall mean TransCare Corporation, a Delaware corporation, in its capacity as Administrative Borrower on behalf of itself and the other Borrowers pursuant to Section 6.7 hereof and it successors and assigns in such capacity.

      1.5    "Affiliate" shall mean, with respect to a specified Person, any other Person which directly or indirectly, through one or more intermediaries, controls or is controlled by or is under common control with such Person, and without limiting the generality of the foregoing, includes (a) any Person which beneficially owns or holds ten (10%) percent or more of any class of Voting Stock of such Person or other equity interests in such Person, (b) any Person of which such Person beneficially owns or holds ten (10%) percent or more of any class of Voting Stock or in which such Person beneficially owns or holds ten (10%) percent or more of the equity interests and (c) any director or executive officer of such Person.  For the purposes of this definition, the term "control" (including with correlative meanings, the terms "controlled by" and "under common control with"), as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of Voting Stock, by agreement or otherwise.

      1.6    "Ambulance" shall mean a ground vehicle owned, leased or operated by a Borrower or Guarantor that transports persons from one destination to another in medical emergency and non-emergency situations, including, any ambulance, ambulette and wheelchair van.

707761.15

**A2921**

CONFIDENTIAL

1.7    "Ambulance Equipment and Supplies" shall mean, as to each Borrower and Guarantor, all emergency and non-emergency medical and paramedical equipment attached to or located in an Ambulance, including, without limitation, stretchers, linens, emergency medical supplies, oxygen equipment and other lifesaving emergency medical equipment, that may be used in connection with Ambulance Services.

1.8    "Ambulance Services" shall mean any ground Ambulance transports provided by a Borrower or Guarantor on behalf of person in medical emergency and non-emergency situations in an Ambulance, any standby ambulance services or employee shuttle services.

1.9    "Ambulance Transportation Services Agreement" shall mean, (a) an Ambulance Transportation Services Agreement entered into between a Borrower and a Facility, as the same may be amended, modified, supplemented, extended, renewed, restated or replaced or (b) an oral or written agreement between a Borrower and a Facility to provide Ambulance Services for or on behalf of such Facility.

1.10    "Approved Medicare Ambulance Provider" shall mean a provider or supplier of services certified to provide ambulance services to Medicare beneficiaries and to be paid therefor pursuant to Medicare Regulations.

1.11    "Approved Medicaid Ambulance Provider" shall mean a provider or supplier of services certified to provide ambulance services to Medicaid beneficiaries and to be paid therefor pursuant to Medicaid Regulations.

1.12    "Assignment of Claims Act" shall mean, collectively, the Federal Assignment of Claims Act of 1940, as amended, and any equivalent statute enacted by any State or other Governmental Authority, as the same now exists or may from time to time hereafter exist and be amended, modified, recodified or supplemented, together with all rules, regulations and interpretations thereunder or related thereto.

1.13    "Bank Products" shall mean any one or more of the following types or services or facilities provided to a Borrower by Wachovia or any Affiliate of Wachovia: (a) credit cards or stored value cards or (b) cash management or related services, including (i) the automated clearinghouse transfer of funds for the account of a Borrower pursuant to agreement or overdraft for any accounts of Borrowers maintained at Wachovia or any Affiliate of Wachovia that are subject to the control of Lender pursuant to any Deposit Account Control Agreement or otherwise, and (ii) controlled disbursement services and (c) hedge agreements between a Borrower or a Guarantor and Wachovia or any Affiliate of Wachovia if and to the extent permitted hereunder.

1.14    "Bankruptcy Code" shall mean the United States Bankruptcy Code, being Title 11 of the United States Code as enacted in 1978, as the same has heretofore been or may hereafter be amended, recodified, modified or supplemented, together with all rules, regulations and interpretations thereunder or related thereto.

1.15    "Blocked Accounts" shall have the meaning set forth in Section 6.3 hereof.

1.16    "Borrowers" shall mean, collectively, the following (together with their respective

707761.15

**A2922**

CONFIDENTIAL                                                                  CURTIS_000744

successors and assigns): (a) TransCare New York, Inc., a Delaware corporation, (b) TransCare Pennsylvania, Inc., a Delaware corporation, (c) TransCare Maryland, Inc., a Delaware corporation, (d) TransCare ML, Inc., a Delaware corporation, (e) TC Hudson Valley Ambulance Corp., a Delaware corporation (f) TC Billing and Services Corp., a Delaware corporation, (g) TransCare Corporation, a Delaware corporation, (h) TC Ambulance Corporation, a Delaware corporation, (i) TransCare Management Services, Inc. (j) TCBA Ambulance, Inc., a Delaware corporation, (k) TransCare Westchester, Inc., a Delaware corporation, (l) TransCare Harford County, Inc., a Delaware corporation, and (m) any other Person that at any time after the date hereof becomes a Borrower; each sometimes being referred to herein individually as a "Borrower".

1.17    "Borrowing Base" shall mean, at any time, the amount equal to:

(a)    the lesser of:

(i)    the sum of: (A) eighty-five (85%) percent of the Reimbursable Amount of Eligible Accounts of Borrowers, plus, (B) the lesser of (1) eighty-five (85%) percent of the Reimbursable Amount of Eligible Unbilled Accounts of Borrowers and (2) $5,000,000, plus (C) the lesser of (1) eighty-five (85%) percent of the Reimbursable Amount of Eligible Pending Medicaid Accounts and (2) $300,000, and

(ii)    the aggregate amount of the actual cash collections of Borrowers from payments on Medicare Accounts, Medicaid Accounts, CHAMPUS/CHAMPVA Accounts, Insurance Accounts, Facility Contract Accounts, Pending Medicaid Accounts, Paratransit Accounts, Private Pay Accounts and Transportation/Management Service Accounts during the immediately preceding sixty (60) days, minus

(b)    Reserves.

1.18    "Borrowing Base Certificate" shall mean a certificate substantially in the form of Exhibit B hereto, as such form may from time to time be modified by Lender, which is duly completed (including all schedules thereto) and executed by a Designated Officer on behalf of Administrative Borrower and delivered to Lender.

1.19    "Business Day" shall mean any day other than a Saturday, Sunday, or other day on which commercial banks are authorized or required to close under the laws of the State of New York or the State of North Carolina, and a day on which Lender is open for the transaction of business, except that if a determination of a Business Day shall relate to any Eurodollar Rate Loans, the term Business Day shall also exclude any day on which banks are closed for dealings in dollar deposits in the London interbank market or other applicable Eurodollar Rate market.

1.20    "Capital Leases" shall mean, as applied to any Person, any lease of (or any agreement conveying the right to use) any property (whether real, personal or mixed) by such Person as lessee which in accordance with GAAP, is required to be reflected as a liability on the balance sheet of such Person.

1.21    "Capital Stock" shall mean, with respect to any Person, any and all shares, interests, participations or other equivalents (however designated) of such Person's capital stock

707761.15

CONFIDENTIAL    CURTIS_000745

or partnership, limited liability company or other equity interests at any time outstanding, and any and all rights, warrants or options exchangeable for or convertible into such capital stock or other interests (but excluding any debt security that is exchangeable for or convertible into such capital stock).

1.22   "Cash Equivalents" shall mean, at any time, (a) any evidence of Indebtedness with a maturity date of ninety (90) days or less issued or directly and fully guaranteed or insured by the United States of America or any agency or instrumentality thereof; provided, that, the full faith and credit of the United States of America is pledged in support thereof; (b) certificates of deposit or bankers' acceptances with a maturity of ninety (90) days or less of any financial institution that is a member of the Federal Reserve System having combined capital and surplus and undivided profits of not less than $500,000,000; (c) commercial paper (including variable rate demand notes) with a maturity of ninety (90) days or less issued by a corporation (except an Affiliate of any Borrower or Guarantor) organized under the laws of any State of the United States of America or the District of Columbia and rated at least A-1 by Standard & Poor's Ratings Service, a division of The McGraw-Hill Companies, Inc. or at least P-1 by Moody's Investors Service, Inc.; (d) repurchase obligations with a term of not more than thirty (30) days for underlying securities of the types described in clause (a) above entered into with any financial institution having combined capital and surplus and undivided profits of not less than $500,000,000; (e) repurchase agreements and reverse repurchase agreements relating to marketable direct obligations issued or unconditionally guaranteed by the United States of America or issued by any governmental agency thereof and backed by the full faith and credit of the United States of America, in each case maturing within ninety (90) days or less from the date of acquisition; provided, that, the terms of such agreements comply with the guidelines set forth in the Federal Financial Agreements of Depository Institutions with Securities Dealers and Others, as adopted by the Comptroller of the Currency on October 31, 1985; and (f) investments in money market funds and mutual funds which invest substantially all of their assets in securities of the types described in clauses (a) through (e) above.

1.23   "C.F.R." shall mean the Code of Federal Regulations, as the same now exists or may from time to time hereafter be amended, modified, recodified or supplemented. All references to any section or part of the "C.F.R." contained herein shall mean such section or part and any successor or replacement section or part.

1.24   "CHAMPUS" shall mean the Civilian Health and Medical Program of the Uniformed Services under 10 U.S.C. §§ 1071 et seq., as the same now exists or may from time to time hereafter be amended, modified, recodified or supplemented.

1.25   "CHAMPVA" shall mean the Civilian Health and Medical Program of Veterans Affairs under 38 U.S.C. § 1713, as the same now exists or may from time to time hereafter be amended, modified, recodified or supplemented.

1.26   "CHAMPUS/CHAMPVA Account" shall mean, as to each Borrower and Guarantor, all Accounts of such Borrower or Guarantor arising pursuant to services rendered by such Borrower or Guarantor to eligible CHAMPUS or CHAMPVA beneficiaries to be paid by a Fiscal Intermediary, the United States Department of Veterans Affairs, the Department of Defense or the United States of America acting under the CHAMPUS program, the CHAMPVA

707761.15

CONFIDENTIAL

CURTIS_000746

program or any other Governmental Authority.

1.27    "CHAMPUS/CHAMPVA Regulations" means, collectively, all Federal statutes related to the health insurance program under CHAMPUS (including the TRICARE program of the Department of Defense) or CHAMPVA, as the same now exist or may from time to time hereafter be amended, modified, recodified or supplemented, together with all applicable provisions of all Federal rules, regulations, manuals and orders of all Governmental Authorities promulgated pursuant to or in connection with CHAMPUS or CHAMPVA, including, without limitation, all Federal administrative, reimbursement and other guidelines of all Governmental Authorities related to CHAMPUS or CHAMPVA, in each case as may be amended, modified, recodified or supplemented.

1.28    "Change of Control" shall mean (a) the transfer (in one transaction or a series of transactions) of all or substantially all of the assets of any Borrower or Guarantor to any Person or group (as such term is used in Section 13(d)(3) of the Exchange Act), other than as permitted in Section 9.7 hereof; (b) the liquidation or dissolution of any Borrower or Guarantor or the adoption of a plan by the stockholders of any Borrower or Guarantor relating to the dissolution or liquidation of such Borrower or Guarantor, other than as permitted in Section 9.7 hereof; (c) the acquisition by any Person or group (as such term is used in Section 13(d)(3) of the Exchange Act), except for a Permitted Holder, of beneficial ownership, directly or indirectly, of a majority of the voting power of the total outstanding Voting Stock of any Borrower or Guarantor or the Board of Directors of any Borrower or Guarantor; (d) during any period of two (2) consecutive years, individuals who at the beginning of such period constituted the Board of Directors of any Borrower or Guarantor (together with any new directors who have been appointed by a Permitted Holder, or whose nomination for election by the stockholders of such Borrower or Guarantor, as the case may be, was approved by a vote of at least a majority of the directors then still in office who were either directors at the beginning of such period or whose election or nomination for election was previously so approved) cease for any reason to constitute a majority of the Board of Directors of any Borrower or Guarantor then still in office; (e) the failure of a Permitted Holder to own directly or indirectly thirty (30%) percent of the voting power of the total issued and outstanding Voting Stock of Parent; or (f) the failure of Parent to own directly or indirectly one hundred (100%) percent of the voting power of the total outstanding Voting Stock of any other Borrower or Guarantor.

1.29    "CMS" shall mean the Centers for Medicare and Medicaid Services of the United States Department of Health and Human Services, formerly know as the Health Care Financing Administration, or any successor or replacement Governmental Authority with the same or similar powers and responsibilities.

1.30    "Code" shall mean the Internal Revenue Code of 1986, as the same now exists or may from time to time hereafter be amended, modified, recodified or supplemented, together with all rules, regulations and interpretations thereunder or related thereto.

1.31    "Collateral" shall have the meaning set forth in Section 5 hereof.

1.32    "Collateral Access Agreement" shall mean an agreement in writing, in form and substance satisfactory to Lender, from any lessor of premises to any Borrower or Guarantor, or any other person to whom any Collateral is consigned or who has custody, control or possession

707761.15

**A2925**

CONFIDENTIAL

CURTIS_000747

of any such Collateral or is otherwise the owner or operator of any premises on which any of such Collateral is located, in favor of Lender with respect to the Collateral at such premises or otherwise in the custody, control or possession of such lessor, consignee or other person.

     1.33   "Consolidated Net Income" shall mean, with respect to any Person for any period, the aggregate of the net income (loss) of such Person and its Subsidiaries, on a consolidated basis, for such period (and as to Borrowers and Guarantors, excluding to the extent included therein (i) any extraordinary, one-time or non-recurring gains, (ii) extraordinary, one-time or non-recurring non-cash losses or charges, and (iii) operations that have been discontinued on or before the date hereof) after deducting all charges which should be deducted before arriving at the net income (loss) for such period (but without regard to operations that have been discontinued on or before the date hereof) and after deducting the Provision for Taxes for such period, all as determined in accordance with GAAP; provided, that,

     (a) the net income of any Person that is accounted for by the equity method of accounting shall be included only to the extent of the amount of dividends or distributions paid or payable to such Person or a Subsidiary of such Person;

     (b) except to the extent included pursuant to the foregoing clause, the net income of any Person accrued prior to the date it becomes a Subsidiary of such Person or is merged into or consolidated with such Person or any of its Subsidiaries or that Person's assets are acquired by such Person or by any of its Subsidiaries shall be excluded;

     (c) the net income (if positive) of any wholly-owned Subsidiary to the extent that the declaration or payment of dividends or similar distributions by such wholly-owned Subsidiary to such Person or to any other wholly-owned Subsidiary of such Person is not at the time permitted by operation of the terms of its charter or any agreement, instrument, judgment, decree, order, statute, rule or governmental regulation applicable to such wholly-owned Subsidiary shall be excluded.

For the purposes of this definition, net income excludes any gain and non-cash loss together with any related Provision for Taxes for such gain and non-cash loss realized upon the sale or other disposition of any assets that are not sold in the ordinary course of business or of any Capital Stock of such Person or a Subsidiary of such Person and any net income or non-cash loss realized as a result of changes in accounting principles or the application thereof to such Person and any net income realized as the result of the extinguishment of debt.

     1.34   "Credit Card Acknowledgments" shall mean, collectively, the agreements by Credit Card Issuers or Credit Card Processors who are parties to Credit Card Agreements in favor of Lender acknowledging Lender's first priority security interest in the monies due and to become due to a Borrower (including, without limitation, credits and reserves) under the Credit Card Agreements, and agreeing to transfer all such amounts to the Blocked Accounts, as the same now exist or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced, sometimes being referred to herein individually as a "Credit Card Acknowledgment".

     1.35   "Credit Card Agreements" shall mean all agreements now or hereafter entered into by any Borrower or for the benefit of any Borrower, in each case with any Credit Card Issuer or

707761.15

CONFIDENTIAL

any Credit Card Processor, as the same now exist or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced, including, but not limited to, the agreements set forth on Schedule 8.17 hereto.

1.36   "Credit Card Issuer" shall mean any person (other than a Borrower) who issues or whose members issue credit cards, including, without limitation, MasterCard or VISA bank credit or debit cards or other bank credit or debit cards issued through MasterCard International, Inc., Visa, U.S.A., Inc. or Visa International and American Express, Discover, Diners Club, Carte Blanche and other non-bank credit or debit cards, including, without limitation, credit or debit cards issued by or through American Express Travel Related Services Company, Inc. and Novus Services, Inc..

1.37   "Credit Card Processor" shall mean any servicing or processing agent or any factor or financial intermediary who facilitates, services, processes or manages the credit authorization, billing transfer or payment procedures with respect to any Borrower's transactions involving credit card or debit card purchases of services by customers using credit cards or debit cards issued by any Credit Card Issuer.

1.38   "Credit Card Receivables" shall mean, collectively, (a) all present and future rights of any Borrower or Guarantor to payment from any Credit Card Issuer, Credit Card Processor or other third party arising from sales of goods or rendition of services to customers who have purchased such goods or services using a credit card or debit card and (b) all present and future rights of any Borrower or Guarantor to payment from any Credit Card Issuer, Credit Card Processor or other third party in connection with the sale or transfer of Accounts arising pursuant to the sale of goods or rendition of services to customers who have purchased such goods or services using a credit card or a debit card, including, but not limited to, all amounts at any time due or to become due from any Credit Card Issuer or Credit Card Processor under the Credit Card Agreements or otherwise.

1.39   "Credit Facility" shall mean the Loans and Letters of Credit provided to or for the benefit of any Borrower pursuant to Sections 2.1 and 2.2 hereof.

1.40   "Default" shall mean an act, condition or event which with notice or passage of time or both would constitute an Event of Default.

1.41   "Deposit Account Control Agreement" shall mean an agreement in writing, in form and substance satisfactory to Lender in good faith, by and among Lender, the Second Lien Agent, the Borrower or Guarantor with a deposit account, other than an Excluded Deposit Account, at any bank and the bank at which such deposit account is at any time maintained which provides that such bank will comply with instructions originated by Lender directing disposition of the funds in the deposit account without further consent by such Borrower or Guarantor and has such other terms and conditions as Lender may require.

1.42   "Designated Officer" shall mean the Chairman, President, Chief Executive Officer, Chief Financial Officer or Chief Operating Officer or Vice President of a Borrower or such other officer, agent or representative of a Borrower that Lender may agree to from time to time in writing, at the request of such Borrower.

707761.15

**A2927**

CONFIDENTIAL                                                                                                 CURTIS_000749

1.43   "EBITDA" shall mean, as to any Person, with respect to any period, an amount equal to: (a) the Consolidated Net Income of such Person and its Subsidiaries for such period, plus (b) depreciation and amortization and other non-cash charges including imputed interest, deferred compensation and in the case of Borrowers and Guarantors or other Subsidiary of Parent (to the extent deducted in the computation of Consolidated Net Income of such Person), all in accordance with GAAP, plus (c) Interest Expense for such period (to the extent deducted in the computation of Consolidated Net Income of such Person), plus (d) the Provision for Taxes for such period (to the extent deducted in the computation of Consolidated Net Income of such Person).

1.44   "Eligible Accounts" shall mean Medicaid Accounts, Medicare Accounts, Facility Contract Accounts, Insurance Accounts, Paratransit Accounts, Pending Medicaid  and CHAMPUS/CHAMPVA Accounts of Borrowers arising in the ordinary course of the respective businesses of Borrowers which are and at all times continue to be acceptable to Lender in its good faith based on the criteria contained herein. In general, except in Lender's discretion, Facility Contract Accounts, Insurance Accounts, Medicaid Accounts, Medicare Accounts, Paratransit Accounts and CHAMPUS/CHAMPVA Accounts and shall be an Eligible Account if:

(a)   such Accounts arise from the actual and bona fide delivery of Ambulance Services or Paratransit Accounts, as the case may be, by such Borrower in the ordinary course of its business (other than such Accounts described in paragraph (ee) of this definition of Eligible Accounts);

(b)   as to Medicare Accounts, such Accounts are not unpaid more than one hundred twenty (120) days after the date submitted for reimbursement or payment;

(c)   as to Paratransit Accounts, such Accounts are not unpaid more than one hundred twenty (120) days after the date submitted for reimbursement or payment;

(d)   as to Medicaid Accounts, CHAMPUS/CHAMPVA Accounts, Facility Contract Accounts, Insurance Accounts, such Accounts are not unpaid more than one hundred eighty (180) days after the date submitted for reimbursement or payment;

(e)   such Accounts comply in all respects with the representations and warranties contained in Section 7.2(b) hereof;

(f)   such Accounts arise from Ambulance Services or Paratransit Services, as the case may be (other than such Accounts described in paragraph (ee) of this definition of Eligible Accounts), provided by such Borrower within the United States of America;

(g)   such Accounts do not arise from sales on consignment, guaranteed sale, sale and return, sale on approval, or other terms under which payment by the Account Debtor may be conditional or contingent;

(h)   such Accounts do not consist of progress billings (such that the obligation of the Account Debtors with respect to such Accounts is conditioned upon such Borrower's satisfactory completion of any further performance under the agreement giving rise thereto), bill and hold invoices, retainage invoices or Unbilled Accounts;

707761.15

**A2928**

CONFIDENTIAL

CURTIS_000750

     (i)     as to Facility Contract Accounts, Insurance Accounts and Paratransit Accounts, the Account Debtor with respect to such Accounts has not asserted a counterclaim, defense or dispute and is not owed or does not claim to be owed any amounts that may give rise to any right of setoff or recoupment against such Accounts (but the portion of the Accounts of such Account Debtor in excess of the amount at any time and from time to time owed by such Borrower to such Account Debtor or claimed owed by such Account Debtor may be deemed Eligible Accounts);

     (j)     as to Medicare Accounts, Medicaid Accounts and CHAMPUS/CHAMPVA Accounts, (i) such Account is not owed to a Borrower that is under any investigation (other than the periodic audits or reviews conducted by a Fiscal Intermediary or Program Integrity Contractor in the ordinary course of business); (ii) such Account is not subject to any action or proceeding concerning the status of such Borrower as an Approved Medicaid Ambulance Provider, Approved Medicare Ambulance Provider or, if applicable, an approved provider of Ambulance Services under CHAMPUS or CHAMPVA; (iii) the payments to such Borrower under Medicare, Medicaid, CHAMPUS or CHAMPVA have not been suspended, delayed, deferred, postponed, recouped or offset by a Fiscal Intermediary, Program Integrity Contractor, CMS or other Person that has the right to so suspend, delay, defer, postpone, recoup or offset; and (iv) the payments to such Borrower under Medicare, Medicaid, CHAMPUS or CHAMPVA have not been contested, disputed or challenged due to any investigation, action or proceeding by a Fiscal Intermediary, Program Integrity Contractor, CMS or other Person that has the right to contest, dispute or challenge such payments; provided, that, if such payments have been so contested, disputed or challenged, such Account will nevertheless continue to be deemed an Eligible Account so long as (A) Lender has received notice from such Borrower of the amount and nature of the payment being contested, disputed or challenged, together with any notices or other documents received by such Borrower from the Fiscal Intermediary, Program Integrity Contractor, CMS or such other Person that has initiated such investigation, action or proceeding, (B) such Borrower is diligently pursuing all of its rights and remedies to contest any right to suspend, delay, defer, postpone, recoup or offset the full amount of such payment, and (C) the right of such Fiscal Intermediary, Program Integrity Contractor, CMS or other Person to suspend, delay, defer, postpone, recoup or offset any such payments may not under the Medicare Regulations, Medicaid Regulations or other applicable law be exercised such that payments to such Borrower may in fact be suspended, delayed, deferred, postponed, recouped or offset (but the portion of the Accounts of such Account Debtor in excess of the amount at any time so suspended, delayed, deferred, postponed, recouped or offset by such Account Debtor may be deemed Eligible Accounts);

     (k)     there are no facts, events or occurrences which would (i) impair the validity, enforceability or collectability of such Accounts or (ii) reduce the amount payable or delay payment under such Accounts, other than the facts, events or circumstances specifically contemplated by, and to the extent provided in, paragraphs (i) and (j) of this definition of Eligible Accounts;

     (l)     such Accounts are subject to the first priority, valid and perfected security interest of Lender and were not, subject to any liens except those permitted by this Agreement that are subject to the Second Lien Intercreditor Agreement or other intercreditor agreement in

707761.15

**A2929**

form and substance satisfactory to Lender in its good faith judgment between the holder of such security interest or lien and Lender;

(m)    neither the Account Debtor nor any officer or employee of the Account Debtor with respect to such Accounts is an officer, director, employee, agent, or other Affiliate of any Borrower or Guarantor (other than (i) employees of an Affiliate of any Borrower or Guarantor in the ordinary course of business or (ii) an Account Debtor that is an Affiliate of, and controlled by, Patriarch Partners Agency Services, LLC acceptable to Lender so long as the Ambulance Services or Paratransit Services provided to such Account Debtor are on fair and reasonable terms no less favorable to such Borrower that such Borrower would obtain in a comparable arms' length transaction with an unaffiliated person as determined by Lender in good faith);

(n)    there are no proceedings or actions which are threatened or pending against the Account Debtors with respect to such Accounts which might reasonably be expected to result in any material adverse change in any such Account Debtor's financial condition (including, without limitation, any bankruptcy, dissolution, liquidation, reorganization or similar proceeding);

(o)    as to Medicare Accounts, such Accounts are not due from a Third Party Payor who is obligated to reimburse Borrowers for  Accounts that have been unpaid more than one hundred twenty (120) days after the date such Accounts are submitted for reimbursement which constitute more than fifty (50%) percent of the total Accounts due from such Third Party Payor;

(p)    as to CHAMPUS/CHAMPVA Accounts, such Accounts are not due from a Third Party Payor who is obligated to reimburse Borrowers for  Accounts that have been unpaid more than one hundred twenty (120) days after the date such Accounts are submitted for reimbursement which constitute more than fifty (50%) percent of the total Accounts due from such Third Party Payor;

(q)    as to Medicaid Accounts, such Accounts are not due from a Third Party Payor who is obligated to reimburse Borrowers for  Accounts that have been unpaid more than one hundred eighty (180) days after the date such Accounts are submitted for reimbursement which constitute more than fifty (50%) percent of the total Accounts due from such Third Party Payor;

(r)    as to Facility Contract Accounts and Insurance Accounts, such Accounts are not owed by an Account Debtor who has Accounts unpaid more than one hundred eighty (180) days after the date such Accounts are submitted for reimbursement which constitute more than fifty (50%) percent of the total Accounts of such Account Debtor;

(s)    the Account Debtor is not located in a state requiring the filing of a Notice of Business Activities Report or similar report in order to permit such Borrower to seek judicial enforcement in such State of payment of such Account, unless such Borrower has qualified to do business in such state or has filed a Notice of Business Activities Report or equivalent report for the then current year or such failure to file and inability to seek judicial enforcement is capable of being remedied without any material delay or material cost;

707761.15

CONFIDENTIAL

CURTIS_000752

(t)     such Accounts are owed by Account Debtors whose total indebtedness to such Borrower does not exceed the credit limit (if any) with respect to such Account Debtors as determined by such Borrower from time to time, to the extent such credit limit as to any Account Debtor is established consistent with the current practices of such Borrower as of the date hereof and such credit limit is acceptable to Lender (but the portion of the Accounts not in excess of such credit limit shall be deemed Eligible Accounts to the extent such Account otherwise satisfies the eligibility criteria hereunder); and

(u)     such Accounts are owed by Account Debtors deemed creditworthy at all times by Lender in good faith;

(v)     as to Accounts arising from Ambulance Services, the Ambulance Service rendered giving rise to such Account has been posted to the computer billing system maintained by such Borrower in a manner and within the time period consistent with the practices of such Borrower as of the date hereof previously disclosed to Lender in writing;

(w)     such Accounts do not constitute Private Pay Accounts, Unbilled Accounts or Pending Medicaid Accounts;

(x) if such Account was originally an Eligible Unbilled Account, such Account is no longer an Eligible Unbilled Account;

(y) as to Medicaid Accounts, (i)  the Ambulance Service giving rise to such Medicaid Account has been billed or submitted within the time period required by the ambulance claims processing rules under the Medicaid Regulations and within the time period consistent with such Borrower's claims processing practices as of the date hereof; (ii) the person to whom the Ambulance Services are rendered giving rise to such Account is an eligible Medicaid beneficiary at the time the Ambulance Services are rendered; (iii) such Borrower shall have agreed to accept an assignment of such beneficiary's right to payment under Medicaid in accordance with the applicable Medicaid Regulations; (iv) such Accounts comply with the representations and warranties contained in Section 7.2(e) hereof; and (v) the amount of such Account does not exceed the amounts to which the Borrower providing such Ambulance Service is entitled to reimbursement for such eligible Medicaid beneficiary under applicable Medicaid Regulations;

(z) as to Medicare Accounts, (i) the Ambulance Service giving rise to such Medicare Account has been billed or submitted within the time period required by the ambulance claims processing rules under the Medicare Regulations and within the time period consistent with such Borrower's claims processing practices as of the date hereof previously disclosed to Lender in writing; (ii) the person to whom the Ambulance Services are rendered giving rise to such Account is an eligible Medicare beneficiary at the time the Ambulance Services are rendered; (iii) such Borrower shall have agreed to accept an assignment of such beneficiary's right to payment under Medicare in accordance with the applicable Medicare Regulations; (iv) such Account complies with the representations and warranties contained in Section 7.2(d) hereof; and (v) the amount of such Account does not exceed the amounts to which the Borrower providing such Ambulance Service is entitled to reimbursement for such eligible Medicare beneficiary under applicable Medicare Regulations;

CONFIDENTIAL

(aa)    as to CHAMPUS/CHAMPVA Accounts, (i) the Ambulance Service giving rise to such CHAMPUS/CHAMPVA Account has been billed or submitted within the time period required by the ambulance claims processing rules under the CHAMPUS/CHAMPVA Regulations and within the time period consistent with such Borrower's claims processing practices as of the date hereof previously disclosed to Lender in writing; (ii) the person to whom the Ambulance Services are rendered giving rise to such Account is an eligible CHAMPUS or CHAMPVA beneficiary at the time the Ambulance Services are rendered; (iii) such Borrower shall have agreed to accept an assignment of such beneficiary's right to payment under CHAMPUS or CHAMPVA in accordance with the applicable CHAMPUS/CHAMPVA Regulations; (iv) such Account complies with the representations and warranties contained in Section 7.2(h) hereof; and (v) the amount of such Account does not exceed the amounts to which the Borrower providing such Ambulance Service is entitled to reimbursement for such eligible CHAMPUS or CHAMPVA beneficiary under applicable CHAMPUS/CHAMPVA Regulations;

(bb)    as to Facility Contract Accounts, (i) the Borrower providing such Ambulance Service has a valid and enforceable Ambulance Transportation Services Agreement with the Account Debtor with respect thereto providing for payment to such Borrower, or, if no Ambulance Transportation Services Agreement exists, such other arrangements acceptable to Lender with the Facility that is the Account Debtor with respect thereto providing for payment to such Borrower; (ii) the claim giving rise to such Account shall have been submitted to the Facility who is the Account Debtor for payment within the time period required under the Ambulance Transportation Services Agreement (or if no Ambulance Transportation Services Agreement, such other arrangement with the Facility previously disclosed to Lender); (iii) such Accounts comply with the representations and warranties contained in Section 7.2(f) hereof; (iv) the Account Debtor with respect to such Facility Contract Accounts is not a Governmental Authority unless, at the request of Lender, such Borrower shall comply in all respects with the applicable Assignment of Claims Act with respect to such Accounts in a manner satisfactory to Lender; (v) the Ambulance Services giving rise to such Account are of the type that are covered under the Ambulance Transportation Services Agreement (or if no Ambulance Transportation Services Agreement, such other arrangement with the Facility previously disclosed to Lender) and the party receiving such Ambulance Services is entitled to coverage under such agreement (or such other arrangements); and (vi) the amount of such Account does not exceed the amounts to which the Borrower providing such Ambulance Service is entitled to reimbursement for the Ambulance Services provided under the terms of the Ambulance Transportation Services Agreement (or if no Ambulance Transportation Services Agreement, such other arrangement with the Facility previously disclosed to Lender);

(cc)    as to Insurance Accounts, (i) the Borrower providing the Ambulance Services giving rise to such Account has either a valid agreement valid and enforceable agreement with the insurance company that is the Third Party Payor or a valid assignment of insurance providing for payment to such Borrower or such Borrower is otherwise entitled to payment from such Third Party Payor; (ii) the Ambulance Services provided by such Borrower giving rise to such Account are of the type that are covered under the agreement or assignment or other entitlement to payment with such Third Party Payor and the person receiving such Ambulance Services is entitled to coverage under such agreement or assignment; (iii) such Accounts comply with the representations and warranties contained in Section 7.2(g) hereof; (iv) the Borrower providing such Ambulance Services is entitled to reimbursement for such

707761.15

**A2932**

CURTIS_000754

Account from such Third Party Payor; (v) the amount of such Account does not exceed the amounts to which the Borrower rendering such service is entitled to reimbursement or payment from such Third Party Payor for Ambulance Services under the terms of such agreements or arrangements or entitlement to payment; and (vi) there are no contractual or statutory limitations or restrictions on the rights of the Borrower providing such Ambulance Services to assign its rights to payment arising as a result thereof or to grant any security interest therein;

(dd)    as to Paratransit Accounts, upon the request of Lender, (i)  such Borrower shall comply in all respects with the applicable Assignment of Claims Act with respect to such Accounts in a manner satisfactory to Lender and (ii) if such Account Debtor is a Governmental Authority organized under the laws of the State of New York, such Borrower shall, to the extent applicable, comply in all respects with the New York State Finance Law Section 138 New York and General Municipal Law Section 109 with respect to such Accounts in a manner satisfactory to Lender;

(ee)    as to Facility Accounts arising from such Borrower's standby services under its agreements or arrangements with a Facility, such Borrower is actually entitled to bill such Facility that is the Account Debtor and is entitled at such time to receive payment in accordance with such agreements or arrangements previously disclosed to Lender in writing; and

(ff)    if all or a portion of such Account is a Credit Card Receivable, such Account complies with the representations and warranties in Section 8.17 hereof and covenants in  Section 9.15 hereof.

The criteria for Eligible Accounts set forth above may only be changed and any new criteria for Eligible Accounts may only be established by Lender in good faith based on either: (i) an event, condition or other circumstance arising after the date hereof, or (ii) an event, condition or other circumstance existing on the date hereof to the extent Lender has no written notice thereof from a Borrower prior to the date hereof, in either case under clause (i) or (ii) which adversely affects or could reasonably be expected to adversely affect the Accounts in the good faith determination of Lender.  Any Medicare Accounts, Medicaid Accounts, CHAMPUS /CHAMPVA Accounts, Facility Contract Accounts, Insurance Accounts or Paratransit Accounts that are not Eligible Accounts shall nevertheless be part of the Collateral.

1.45    "Eligible Pending Medicaid Accounts" shall mean Pending Medicaid Accounts of Borrowers arising in the ordinary course of the respective businesses of Borrowers which are and at all times continue to be acceptable to Lender in good faith based on the criteria contained herein. In general, except in Lender's discretion, a Pending Medicaid Account shall be a Eligible Pending Medicaid Account if:

(a)    such Accounts arise from the actual and bona fide delivery of Ambulance Services by such Borrower in the ordinary course of its business;

(b)    the Ambulance Services with respect to such Account has been completed by such Borrower;

(c)    such Accounts are not Private Pay Accounts or Unbilled Accounts;

707761.15

**A2933**

   (d) such Accounts constitute valid, enforceable rights to receive payment from an Account Debtor;

   (e) such Accounts are not unpaid more than one hundred eighty (180) days after the date submitted for reimbursement or payment;

   (f) such Accounts are subject to the first priority, valid and perfected security interest of Lender and were not, subject to any liens except those permitted by this Agreement that are subject to the Second Lien Intercreditor Agreement or other intercreditor agreement in form and substance satisfactory to Lender in its good faith judgment between the holder of such security interest or lien and Lender; and

   (g) all documents and records with respect to such Account are properly maintained in accordance with the practices of such Borrower as of the date hereof previously disclosed to Lender.

The criteria for Eligible Pending Medicaid Accounts set forth above may only be changed and any new criteria for Eligible Pending Medicaid Accounts may only be established by Lender in good faith based on either:  (i) an event, condition or other circumstance arising after the date hereof, or (ii) an event, condition or other circumstance existing on the date hereof to the extent Lender has no written notice thereof from a Borrower prior to the date hereof, in either case under clause (i) or (ii) which adversely affects or could reasonably be expected to adversely affect the Accounts in the good faith determination of Lender.  Any Pending Medicaid Accounts that are not Eligible Pending Medicaid Accounts shall nevertheless be part of the Collateral.

  1.46 "Eligible Unbilled Accounts" shall mean Unbilled Accounts of Borrowers arising in the ordinary course of the respective businesses of Borrowers which are and at all times continue to be acceptable to Lender in good faith based on the criteria contained herein. In general, except in Lender's discretion, an Unbilled Account shall be an Eligible Unbilled Account if:

   (a) such Accounts arise from the actual and bona fide delivery of Ambulance Services or Paratransit Services by such Borrower in the ordinary course of its business;

   (b) the Ambulance Services or Paratransit Services with respect to such Account has been completed by such Borrower or Borrower;

   (c) such Accounts are not Private Pay Accounts or Pending Medicaid Accounts;

   (d) such Accounts constitute valid, enforceable rights to receive payment from an Account Debtor;

   (e) such Accounts are subject to the first priority, valid and perfected security interest of Lender and were not, subject to any liens except those permitted by this Agreement that are subject to the Second Lien Intercreditor Agreement or other intercreditor agreement in form and substance satisfactory to Lender in its good faith judgment between the holder of such security interest or lien and Lender;

707761.15

CONFIDENTIAL

(f)     such Account shall not remain unbilled for more than sixty (60) days after the date that the Ambulance Services were provided by such Borrower; and

(g)     all documents and records with respect to such Account are properly maintained in accordance with the practices of such Borrower as of the date hereof previously disclosed to Lender.

The criteria for Eligible Unbilled Accounts set forth above may only be changed and any new criteria for Eligible Unbilled Accounts may only be established by Lender in good faith based on either: (i) an event, condition or other circumstance arising after the date hereof, or (ii) an event, condition or other circumstance existing on the date hereof to the extent Lender has no written notice thereof from a Borrower prior to the date hereof, in either case under clause (i) or (ii) which adversely affects or could reasonably be expected to adversely affect the Accounts in the good faith determination of Lender.  Any Unbilled Accounts that are not Eligible Unbilled Accounts shall nevertheless be part of the Collateral.

1.47     "Environmental Laws" shall mean all foreign, Federal, State and local laws (including common law), legislation, rules, codes, licenses, permits (including any conditions imposed therein), authorizations, judicial or administrative decisions, injunctions or agreements between any Borrower or Guarantor and any Governmental Authority, (a) relating to pollution and the protection, preservation or restoration of the environment (including air, water vapor, surface water, ground water, drinking water, drinking water supply, surface land, subsurface land, plant and animal life or any other natural resource), or to human health or safety, (b) relating to the exposure to, or the use, storage, recycling, treatment, generation, manufacture, processing, distribution, transportation, handling, labeling, production, release or disposal, or threatened release, of Hazardous Materials, or (c) relating to all laws with regard to recordkeeping, notification, disclosure and reporting requirements respecting Hazardous Materials.  The term "Environmental Laws" includes (i) the Federal Comprehensive Environmental Response, Compensation and Liability Act of 1980, the Federal Superfund Amendments and Reauthorization Act, the Federal Water Pollution Control Act of 1972, the Federal Clean Water Act, the Federal Clean Air Act, the Federal Resource Conservation and Recovery Act of 1976 (including the Hazardous and Solid Waste Amendments thereto), the Federal Solid Waste Disposal and the Federal Toxic Substances Control Act, the Federal Insecticide, Fungicide and Rodenticide Act, and the Federal Safe Drinking Water Act of 1974, (ii) applicable state counterparts to such laws and (iii) any common law or equitable doctrine that may impose liability or obligations for injuries or damages due to, or threatened as a result of, the presence of or exposure to any Hazardous Materials.

1.48     "Equipment" shall mean, as to each Borrower and Guarantor, all of such Borrower's and Guarantor's now owned and hereafter acquired equipment, wherever located, including machinery, data processing and computer equipment (whether owned or licensed and including embedded software), vehicles, tools, furniture, fixtures, all attachments, accessions and property now or hereafter affixed thereto or used in connection therewith, and substitutions and replacements thereof, wherever located, including, without limitation, all Ambulances.

1.49     "ERISA" shall mean the Employee Retirement Income Security Act of 1974, together with all rules, regulations and interpretations thereunder or related thereto.

707761.15

CONFIDENTIAL                                                        CURTIS_000757

1.50    "ERISA Affiliate" shall mean any person required to be aggregated with any Borrower, any Guarantor or any of its or their respective Subsidiaries under Sections 414(b), 414(c), 414(m) or 414(o) of the Code.

1.51    "ERISA Event" shall mean (a) any "reportable event", as defined in Section 4043(c) of ERISA or the regulations issued thereunder, with respect to a Pension Plan, other than events as to which the requirement of notice has been waived in regulations by the Pension Benefit Guaranty Corporation; (b) the adoption of any amendment to a Pension Plan that would require the provision of security pursuant to Section 401(a)(29) of the Code or Section 307 of ERISA; (c) a complete or partial withdrawal by any Borrower, Guarantor or any ERISA Affiliate from a Multiemployer Plan or a cessation of operations which is treated as such a withdrawal or notification that a Multiemployer Plan is in reorganization; (d) the filing of a notice of intent to terminate, the treatment of a Pension Plan amendment as a termination under Section 4041 or 4041A of ERISA, or the commencement of proceedings by the Pension Benefit Guaranty Corporation to terminate a Pension Plan; (e) an event or condition which might reasonably be expected to constitute grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Plan; (f) the imposition of any liability under Title IV of ERISA, other than the Pension Benefit Guaranty Corporation premiums due but not delinquent under Section 4007 of ERISA, upon any Borrower, Guarantor or any ERISA Affiliate in excess of $500,000 and (g) any other event or condition with respect to a Plan including any Pension Plan subject to Title IV of ERISA maintained, or contributed to, by any ERISA Affiliate that could reasonably be expected to result in liability of any Borrower in excess of $500,000.

1.52    "Eurodollar Rate Loans" shall mean any Loans or portion thereof on which interest is payable based on the Adjusted Eurodollar Rate in accordance with the terms hereof.

1.53    "Event of Default" shall mean the occurrence or existence of any event or condition described in Section 10.1 hereof.

1.54    "Excess Availability" shall mean the amount, as determined by Lender, calculated at any date, equal to:

(a) the Borrowing Base after giving effect to any Reserves other than any Reserves in respect of Letter of Credit Obligations, minus

(b) the sum of:

(i) the amount of all then outstanding and unpaid Obligations (but not including for this purpose Obligations of a Borrower arising pursuant to any guarantees in favor of Lender of the Obligations of the other Borrowers or any outstanding Letter of Credit Obligations), plus

(ii) the amount of all Reserves then established in respect of Letter of Credit Obligations, plus

(iii) the aggregate amount of all then outstanding and unpaid trade payables owed to suppliers which are outstanding more than sixty (60) days past due as of the end of the immediately preceding month or at Lender's option, as of a more recent date based on

707761.15

CONFIDENTIAL                                                                                                    CURTIS_000758

such reports as Lender may from time to time specify (other than trade payables or other obligations being contested or disputed by Borrowers in good faith), <u>plus</u>

(iv) without duplication, the amount of checks issued by Borrowers to pay trade payables owed to suppliers (including, without limitations held checks) as of the end of the immediately preceding month or at Lender's option, as of a more recent date based on such reports as Lender may from time to time specify (other than trade payables being contested or disputed by Borrowers in good faith), but not yet sent.

1.55    "Exchange Act" shall mean the Securities Exchange Act of 1934, together with all rules, regulations and interpretations thereunder or related thereto.

1.56    "Excluded Collateral" shall have the meaning set forth in Section 5.1 hereof.

1.57    "Excluded Deposit Accounts" shall mean (a) any  Medicare/Medicaid Payment Account, (b) any deposit account specifically and exclusively used for payroll, payroll taxes and other employee wage and benefit payments and (c) a deposit account of Borrowers and Guarantors that is an operating account maintained at a bank to be used for petty cash so long as the amounts in such deposit account do not exceed $25,000 at any one time.

1.58    "Facility" shall mean a hospital, nursing care facility or other public or private, profit or non-profit agency, organization, corporation, partnership or other entity to which a Borrower or Guarantor furnishes Ambulances Services or provides employee shuttle services for such entity from one location to another location.

1.59    "Facility Contract Accounts" shall mean, as to each Borrower and Guarantor, all Accounts of such Borrower or Guarantor arising pursuant to Ambulance Services or employee shuttle services rendered by such Borrower or Guarantor to a Facility pursuant to the applicable Ambulance Transportation Services Agreement with such Facility.

1.60    "Financing Agreements" shall mean, collectively, this Agreement and all notes, guarantees, security agreements, deposit account control agreements, investment property control agreements, intercreditor agreements and all other agreements, documents and instruments now or at any time hereafter executed or delivered by any Borrower or Guarantor in connection with this Agreement.

1.61    "Fiscal Intermediary" shall mean any "carrier" or other qualified insurance company or financial institution that has entered into an ongoing relationship with any Governmental Authority to make payments to payees under Medicare, Medicaid or any other Federal, State or local public health care or medical assistance program pursuant to any of the Health Care Laws.

1.62    "Fixed Charge Coverage Ratio" shall mean, with respect to any date of determination, the ratio of (a) the amount equal to EBITDA of any Person and its Subsidiaries, on a consolidated basis, as of the end of a fiscal period (or in the case of Section 9.18 hereof, such other period as may be provided for therein) to (b) Fixed Charges of such Person and its Subsidiaries, on a consolidated basis, for such period.

707761.15

**A2937**

CONFIDENTIAL

1.63   "Fixed Charges" shall mean, as to any Person and its Subsidiaries, on a consolidated basis, with respect to any period, the sum of, without duplication, (a) all cash Interest Expense, plus (b) all regularly scheduled (as determined at the beginning of the respective period) principal payments of Indebtedness for borrowed money, Indebtedness for the deferred purchase price of any property or services (other than an account payable to a trade creditor (whether or not an Affiliate) incurred in the ordinary course of business of such Person and payable in accordance with customary trade practices, and Indebtedness with respect to Capital Leases (and without duplicating in items (a) and (b) of this definition, the interest component with respect to Indebtedness under Capital Leases), plus (c)  Provision for Taxes to the extent actually paid in cash during such period, plus (d)  dividends and other distributions in respect of Capital Stock paid during such period plus (e)  all prepayments of principal of the Second Lien Debt to the extent permitted under and in accordance with Section 9.9(g) hereof.

1.64   "Funding Bank" shall have the meaning given to such term in Section 3.7 hereof.

1.65   "GAAP" shall mean generally accepted accounting principles in the United States of America as in effect from time to time as set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and the statements and pronouncements of the Financial Accounting Standards Board which are applicable to the circumstances as of the date of determination consistently applied, except that, for purposes of Section 9.18 hereof, GAAP shall be determined on the basis of such principles in effect on the date hereof and consistent with those used in the preparation of the most recent audited financial statements delivered to Lender prior to the date hereof.

1.66   "Governmental Authority" shall mean any nation or government, any state, province, or other political subdivision thereof, any central bank (or similar monetary or regulatory authority) thereof, and any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government, including, without limitation, the Department of Health and Humans Services, its Office of the Inspector General, the Centers for Medicare and Medicaid Services, CMS or any successor or replacement authority or entity succeeding to the functions of any of the foregoing.

1.67   "Guarantors" shall mean, collectively, the following (together with their respective successors and assigns): (a) TC Ambulance Group, Inc., a Delaware corporation, and (b) TC Ambulance North, Inc., a Delaware corporation, and (c) any other Person that at any time after the date hereof becomes party to a guarantee in favor of Lender or otherwise liable on or with respect to the Obligations or who is the owner of any property which is security for the Obligations (other than Borrowers), each sometimes being referred to herein individually as a "Guarantor".

1.68   "Hazardous Materials" shall mean any hazardous, toxic or dangerous substances, materials and wastes, including hydrocarbons (including naturally occurring or man-made petroleum and hydrocarbons), flammable explosives, asbestos, urea formaldehyde insulation, radioactive materials, biological substances, polychlorinated biphenyls, pesticides, herbicides and any other kind and/or type of pollutants or contaminants (including materials which include hazardous constituents), sewage, sludge, industrial slag, solvents and/or any other similar substances, materials, or wastes and including any other substances, materials or wastes that are

707761.15

CONFIDENTIAL

CURTIS_000760

or become regulated under any Environmental Law (including any that are or become classified as hazardous or toxic under any Environmental Law).

1.69    "Health Care Laws" shall mean all Federal, State and local laws, rules, regulations, interpretations, guidelines, ordinances and decrees relating to any health care provider, medical assistance and cost reimbursement program, as now or at any time hereafter in effect, applicable to the Ambulances Services, Ambulances or any other part of the businesses and facilities of Borrowers and Guarantors, including, without limitation, the Social Security Act, the Social Security Amendments of 1972, the Medicare-Medicaid Anti-Fraud and Abuse Amendments of 1977, the Medicare and Medicaid Patient and Program Protection Act of 1987, the Balanced Medicare Prescription Drug, Improvement and Modernization Act of 2003, the Deficit Reduction Act of 2005, HIPAA, CHAMPUS and CHAMPVA.

1.70    "Health Care Receivables" shall mean, as to each Borrower and Guarantor, any interest or claim under a policy of insurance which is a right to payment of a monetary obligations for health care goods or services provided by such Borrower or Guarantor.

1.71    "HIPAA" shall mean the Health Insurance Portability and Accountability Act of 1996, 42. U.S.C. § § 1171, et seq., as the same now exists or may from time to time hereafter be amended, modified, recodified or supplemented, together with all rules, regulations and interpretations thereunder or related thereto.

1.72    "Inactive Subsidiary" shall mean, collectively, (a) Montgomery County Ambulance, Inc., a Delaware corporation, TransCare West Virginia, Inc., Nassau Ambulance - Ambulette, Inc., Nationwide Nassau Ambulance, Inc. and Allstate Ambulance & Medical Services, Inc. and (b) a Subsidiary of Parent designated in writing by Administrative Borrower to Lender after the date hereof as an Inactive Subsidiary and agreed to by Lender; provided, that, such Subsidiary so designated after the date hereof shall only be considered an Inactive Subsidiary to the extent that the representations with respect thereto set forth in Section 8.12(f) hereof are true and correct with respect to such Subsidiary and Lender shall have received such evidence thereof as it may require.

1.73    "Indebtedness" shall mean, with respect to any Person, any liability, whether or not contingent, (a) in respect of borrowed money (whether or not the recourse of the lender is to the whole of the assets of such Person or only to a portion thereof) or evidenced by bonds, notes, debentures or similar instruments; (b) representing the balance deferred and unpaid of the purchase price of any property or services (other than an account payable to a trade creditor (whether or not an Affiliate) incurred in the ordinary course of business of such Person and payable in accordance with customary trade practices); (c) all obligations as lessee under leases which have been, or should be, in accordance with GAAP recorded as Capital Leases; (d) any contractual obligation, contingent or otherwise, of such Person to pay or be liable for the payment of any indebtedness described in this definition of another Person, including, without limitation, any such indebtedness, directly or indirectly guaranteed, or any agreement to purchase, repurchase, or otherwise acquire such indebtedness, obligation or liability or any security therefor, or to provide funds for the payment or discharge thereof, or to maintain solvency, assets, level of income, or other financial condition; (e) all obligations with respect to redeemable stock and redemption or repurchase obligations under any Capital Stock or other

707761.15

CONFIDENTIAL

CURTIS_000761

equity securities issued by such Person; (f) all reimbursement obligations and other liabilities of such Person with respect to surety bonds (whether bid, performance or otherwise), letters of credit, banker's acceptances, drafts or similar documents or instruments issued for such Person's account; (g) all indebtedness of such Person in respect of indebtedness of another Person for borrowed money or indebtedness of another Person otherwise described in this definition which is secured by any consensual lien, security interest, collateral assignment, conditional sale, mortgage, deed of trust, or other encumbrance on any asset of such Person, whether or not such obligations, liabilities or indebtedness are assumed by or are a personal liability of such Person, all as of such time; (h) all obligations, liabilities and indebtedness of such Person (marked to market) arising under swap agreements, cap agreements and collar agreements and other agreements or arrangements designed to protect such person against fluctuations in interest rates or currency or commodity values; (i) all obligations owed by such Person under License Agreements with respect to non-refundable, advance or minimum guarantee royalty payments; (j) indebtedness of any partnership or joint venture in which such Person is a general partner or joint venturer to the extent such Person is liable therefor as a result of such Person's ownership interest in such entity, except to the extent that the terms of such indebtedness expressly provide that such Person is not liable therefor or such Person has no liability therefor as a matter of law and (k) the principal and interest portions of all rental obligations of such Person under any synthetic lease or similar off-balance sheet financing where such transaction is considered to be borrowed money for tax purposes but is classified as an operating lease in accordance with GAAP.

1.74    "Information Certificate" shall mean the Information Certificate of Parent attached hereto as Exhibit A containing material or other information with respect to Borrowers and Guarantors, their respective businesses and assets provided by or on behalf of Borrowers and Guarantors to Lender.

1.75    "Insurance Account" shall mean, as to each Borrower and Guarantor, all Accounts of such Borrower or Guarantor arising pursuant to services rendered by such Borrower or Guarantor to a person eligible for reimbursement for such services under an insurance policy or other agreement with an insurance company.

1.76    "Insurance Premium Finance Agreements" shall mean, collectively, all agreements, documents and instruments executed or delivered by Borrowers and Guarantor in favor of Insurance Premium Finance Party in connection with or related to the insurance premium finance as the same now exist or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced.

1.77    "Insurance Premium Collateral" shall mean (a) the right or claim of the Insurance Premium Finance Party to receive and be paid any and all unearned premiums financed by the Insurance Premium Finance Party that are paid by or on behalf of the insurance company issuing the policy described in the insurance premium finance agreements between the Insurance Premium Finance Party and Parent and (b) the right of the Insurance Premium Finance Party to receive the proceeds of insurance if an event of default exists or has occurred and is continuing under the Insurance Premium Finance Agreements; provided, that, the right or claim of the Insurance Premium Finance Party shall not apply to any of the other Collateral.

707761.15

**A2940**

1.78   "Insurance Premium Finance Party" shall mean an insurance company or a third party that enters into arrangements to allow any Borrower or Guarantor to pay all or a portion of the applicable insurance premiums on such insurance policies in installments, and its successors and assigns.

1.79   "Intellectual Property" shall mean, as to each Borrower and Guarantor, such Borrower's and Guarantor's now owned and hereafter arising or acquired:  patents, patent rights, patent applications, copyrights, works which are the subject matter of copyrights, copyright applications, copyright registrations, trademarks, servicemarks, trade names, trade styles, trademark and service mark applications, and licenses and rights to use any of the foregoing and all applications, registrations and recordings relating to any of the foregoing as may be filed in the United States Copyright Office, the United States Patent and Trademark Office or in any similar office or agency of the United States, any State thereof, any political subdivision thereof or in any other country or jurisdiction, together with all rights and privileges arising under applicable law with respect to any Borrower's or Guarantor's use of any of the foregoing; all extensions, renewals, reissues, divisions, continuations, and continuations-in-part of any of the foregoing; all rights to sue for past, present and future infringement of any of the foregoing; inventions, trade secrets, formulae, processes, compounds, drawings, designs, blueprints, surveys, reports, manuals, and operating standards; goodwill (including any goodwill associated with any trademark or servicemark, or the license of any trademark or servicemark); customer and other lists in whatever form maintained; trade secret rights, copyright rights, rights in works of authorship, domain names and domain name registration; software and contract rights relating to computer software programs, in whatever form created or maintained.

1.80   "Interest Expense" shall mean, for any period, as to any Person and its Subsidiaries, all of the following as determined in accordance with GAAP: (a)  total interest expense, whether paid or accrued (including the interest component of Capitalized Lease obligations for such period), including, without limitation, all bank fees, commissions, discounts and other fees and charges owed with respect to letters of credit, banker's acceptances or similar instruments, but excluding (i) amortization of discount and amortization of deferred financing fees and closing costs, (ii)  interest paid in property other than cash and (iii) any other interest expense not payable in cash, minus (b)  any net payments received during such period as interest income received in respect of its investments in cash and cash equivalents.

1.81   "Interest Period" shall mean for any Eurodollar Rate Loan, a period of approximately one (1), two (2), or three (3) months duration as any Borrower (or Administrative Borrower on behalf of such Borrower) may elect, the exact duration to be determined in accordance with the customary practice in the applicable Eurodollar Rate market; provided, that, such Borrower (or Administrative Borrower on behalf of such Borrower) may not elect an Interest Period which will end after the last day of the then-current term of this Agreement.

1.82   "Interest Rate" shall mean,

(a)     Subject to clause (b) of this definition below:

(i)    as to Prime Rate Loans, a rate equal to the Prime Rate,

707761.15

CONFIDENTIAL

CURTIS_000763

(ii) as to Eurodollar Rate Loans, a rate equal to two (2%) percent per annum in excess of the Adjusted Eurodollar Rate (in each case, based on the London Interbank Offered Rate applicable for the Interest Period selected by a Borrower, or by Administrative Borrower on behalf of such Borrower, as in effect two (2) Business Days prior to the commencement of the Interest Period, whether such rate is higher or lower than any rate previously quoted to any Borrower or Guarantor).

(b)     Notwithstanding anything to the contrary contained in clause (a) of this definition, the Interest Rate shall mean the rate of two (2%) percent per annum in excess of the Prime Rate as to Prime Rate Loans and the rate of four (4%) percent per annum in excess of the Adjusted Eurodollar Rate as to Eurodollar Rate Loans, at Lender's option, without notice, (i) either (A) for the period on and after the date of termination or non-renewal hereof until such time as all Obligations are indefeasibly paid and satisfied in full in immediately available funds, or (B) for the period from and after the date of the occurrence of any Event of Default, and for so long as such Event of Default is continuing as determined by Lender and (ii) on the Revolving Loans to any Borrower at any time outstanding in excess of the Borrowing Base (whether or not such excess(es) arise or are made with or without Lender's knowledge or consent and whether made before or after an Event of Default).

1.83    "Inventory" shall mean, as to each Borrower and Guarantor, all of such Borrower's and Guarantor's now owned and hereafter existing or acquired goods, wherever located, which (a) are leased by such Borrower or Guarantor as lessor; (b) are held by such Borrower for sale or lease or to be furnished under a contract of service; (c) are furnished by such Borrower or Guarantor under a contract of service; or (d) consist of raw materials, work in process, finished goods or materials used or consumed in its business.

1.84    "Investment Property Control Agreement" shall mean an agreement in writing, in form and substance satisfactory to Lender, by and among Lender, any Borrower or Guarantor (as the case may be) and any securities intermediary, commodity intermediary or other person who has custody, control or possession of any investment property of such Borrower or Guarantor acknowledging that such securities intermediary, commodity intermediary or other person has custody, control or possession of such investment property on behalf of Lender, that it will comply with entitlement orders originated by Lender with respect to such investment property, or other instructions of Lender, and has such other terms and conditions as Lender may require.

1.85    "Lender" shall mean Wachovia Bank, National Association, a national banking association, and its successors and assigns.

1.86    "Lender Payment Account" shall mean account no. 5000000030279 of Lender at Wachovia Bank, National Association or such other account of Lender as Lender may from time to time designate to Administrative Borrower as the Lender Payment Account for purposes of this Agreement and the other Financing Agreements.

1.87    "Letter of Credit Documents" shall mean, with respect to any Letter of Credit, such Letter of Credit, any amendments thereto, any documents delivered in connection therewith, any application therefor, and any agreements, instruments, guarantees or other documents (whether general in application or applicable only to such Letter of Credit) governing or providing for (a) the rights and obligations of the parties concerned or at risk or (b) any

707761.15

CONFIDENTIAL

CURTIS_000764

collateral security for such obligations.

1.88   "Letter of Credit Limit" shall mean $5,000,000.

1.89   "Letter of Credit Obligations" shall mean, at any time, the sum of (a) the aggregate undrawn amount of all Letters of Credit outstanding at such time, plus (b) the aggregate amount of all drawings under Letters of Credit for which Lender has not at such time been reimbursed.

1.90   "Letters of Credit" shall mean all letters of credit (whether documentary or stand-by and whether for the purchase of inventory, equipment or otherwise) issued by Lender for the account of any Borrower pursuant to this Agreement, and all amendments, renewals, extensions or replacements thereof and including, but not limited to, the Existing Letters of Credit.

1.91   "License Agreements" shall have the meaning set forth in Section 8.11 hereof.

1.92   "Loans" shall mean the Revolving Loans.

1.93   "London Interbank Offered Rate" shall mean, with respect to any Eurodollar Loan for the Interest Period applicable thereto, the rate of interest per annum (rounded upwards, if necessary, to the nearest 1/100 of 1%) appearing on Telerate Page 3750 (or any successor page) as the London interbank offered rate for deposits in U.S. Dollars at approximately 11:00 A.M. (London time) two (2) Business Days prior to the first day of such Interest Period for a term comparable to such Interest Period; provided, that, if more than one rate is specified on Telerate Page 3750, the applicable rate shall be the arithmetic mean of all such rates.  If, for any reason, such rate is not available, the term "London Interbank Offered Rate" shall mean, with respect to any Eurodollar Loan for the Interest Period applicable thereto, the rate of interest per annum (rounded upwards, if necessary, to the nearest 1/100 of 1%) appearing on Reuters Screen LIBO Page as the London interbank offered rate for deposits in Dollars at approximately 11:00 A.M. (London time) two (2)  Business Days prior to the first day of such Interest Period for a term comparable to such Interest Period; provided, however, if more than one rate is specified on Reuters Screen LIBO Page, the applicable rate shall be the arithmetic mean of all such rates.

1.94   "Management Agreement" shall mean the consulting agreement dated March 14, 2006, among Patriarch Partners Management Group, LLC and Parent, as the same now exists or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced.

1.95   "Material Adverse Effect" shall mean a material adverse effect on (a) the financial condition, business, performance or operations of the Borrowers and the Guarantors taken as a whole; (b) the legality, validity or enforceability of a material provision of this Agreement or any of the other Financing Agreements; (c) the legality, validity, enforceability, perfection or priority of the security interests and liens of Lender upon Collateral (d) any Collateral having a value in excess of $500,000; (e) the ability of the Borrowers and the Guarantors taken as a whole, to repay the Obligations or of the Borrowers and the Guarantors, taken as whole, to perform their obligations under this Agreement or any of the other Financing Agreements as and when to be performed; or (f) the ability of Lender to enforce the Obligations or realize upon the Collateral or to exercise the rights and remedies under this Agreement or any of the other Financing Agreements.

707761.15

**A2943**

CURTIS_000765

1.96    "Material Contract" shall mean (a)  any contract or other agreement, or series of contracts or agreements (other than the Financing Agreements or the agreements in respect of Indebtedness permitted by Section 9.9 of this Agreement), written or oral, of any Borrower or Guarantor involving monetary liability of or to any Person (or Affiliates of such Person) in an amount in excess of $6,000,000 in any fiscal year and (b) any other contract or other agreement (other than the Financing Agreements or the agreements in respect of Indebtedness permitted by Section 9.9 of this Agreement), whether written or oral, to which any Borrower or Guarantor is a party as to which the breach, nonperformance, cancellation or failure to renew by any party thereto would have a Material Adverse Effect.

1.97    "Maximum Credit" shall mean the amount of $20,000,000, or such greater amount to the extent increased in accordance with the terms and conditions of Section 2.3 hereof.

1.98    "Medicaid" shall mean the medical financial assistance program jointly financed and administered by the Federal and state governments under Title XIX of the Social Security Act (42 U.S.C. §§ 1396 et seq .), as the same now exists or may from time to time hereafter be amended, modified, recodified or supplemented.

1.99    "Medicaid Account" shall mean, as to each Borrower and Guarantor, all Accounts of such Borrower or Guarantor arising pursuant to services rendered by such Borrower or Guarantor to eligible Medicaid beneficiaries to be paid by a Fiscal Intermediary or by the United States of America acting under the Medicaid program, any State or the District of Columbia acting pursuant to a health plan adopted pursuant to Title XIX of the Social Security Act or any other Governmental Authority under Medicaid; provided, that, a Medicaid Account shall not include a Pending Medicaid Account.

1.100    "Medicaid Regulations" shall mean, collectively, (a) all Federal statutes related to the medical assistance program established by Title XIX of the Social Security Act (42 U.S.C. §§ 1396 et seq.), as the same now exist or may from time to time hereafter be amended, modified, recodified or supplemented, together with all applicable provisions of all Federal rules, regulations, manuals and orders of all Governmental Authorities promulgated pursuant to or in connection with Medicaid, including, without limitation, all Federal administrative, reimbursement and other guidelines of all Governmental Authorities related to Medicaid and (b) all State and local statutes and plans for medical assistance enacted in connection with Medicaid, together with all applicable provisions of all rules, regulations, manuals and orders of all Governmental Authorities promulgated pursuant to or in connection with such State statutes and plans, including, without limitation, all State administrative, reimbursement and other guidelines of all Governmental Authorities related to Medicaid, in each case as may be amended, modified, recodified or supplemented.

1.101    "Medicare" shall mean the medical financial assistance program under Title XVIII of the Social Security Act (42 U.S.C. §§ 1395 et seq .), as the same now exists or may from time to time hereafter be amended, modified, recodified or supplemented.

1.102    "Medicare Account" shall mean, as to each Borrower and Guarantor, all Accounts of such Borrower or Guarantor arising pursuant to services rendered by such Borrower or Guarantor to eligible Medicare beneficiaries to be paid by a Fiscal Intermediary or by the United States of America acting under the Medicare program or any other Governmental Authority

707761.15

**A2944**

CURTIS_000766

under Medicare.

1.103  "Medicare/Medicaid Payment Accounts" shall have the meaning set forth in Section 6.3 hereof.

1.104  "Medicare/Medicaid Payment Direction Letters" shall mean a payment direction letter in writing, in form and substance satisfactory to Lender, by and among Lender, the Second Lien Agent, the Borrower or Guarantor with a Medicare/Medicaid Payment Account at any bank and the bank at which such Medicare/Medicaid Payment Account is at any time maintained with respect to which Borrower instructs such Bank to remit all funds in the Medicare/Medicaid Payment Account to the Lender Payment Account and has such other terms and conditions as Lender may require.

1.105  "Medicare Regulations" means, collectively, all Federal statutes related to the health insurance program for the aged and disabled established by Title XVIII of the Social Security Act (42 U.S.C. §§ 1395 et seq .), as the same now exist or may from time to time hereafter be amended, modified, recodified or supplemented, together with all applicable provisions of all Federal rules, regulations, manuals and orders of all Governmental Authorities promulgated pursuant to or in connection with Medicare, including, without limitation, all Federal administrative, reimbursement and other guidelines of all Governmental Authorities related to Medicare, in each case as may be amended, modified, recodified or supplemented.

1.106  "Multiemployer Plan" shall mean a "multi-employer plan" as defined in Section 4001(a)(3) of ERISA which is or was at any time during the current year or the immediately preceding six (6) years contributed to by any Borrower, Guarantor or any ERISA Affiliate or with respect to which any Borrower, Guarantor or any ERISA Affiliate may incur any liability.

1.107  "Obligations" shall mean any and all Loans, Letter of Credit Obligations, Bank Products and all other obligations, liabilities and indebtedness of every kind, nature and description owing by any or all of Borrowers to Lender or any of its Affiliates, including principal, interest, charges, fees, costs and expenses, however evidenced, whether as principal, surety, endorser, guarantor or otherwise, arising under this Agreement or any of the other Financing Agreements or on account of any Letter of Credit and all other Letter of Credit Obligations, whether now existing or hereafter arising, whether arising before, during or after the initial or any renewal term of this Agreement or after the commencement of any case with respect to such Borrower under the United States Bankruptcy Code or any similar statute (including the payment of interest and other amounts which would accrue and become due but for the commencement of such case, whether or not such amounts are allowed or allowable in whole or in part in such case), whether direct or indirect, absolute or contingent, joint or several, due or not due, primary or secondary, liquidated or unliquidated, or secured or unsecured.

1.108  "Paratransit Accounts" shall mean, as to each Borrower and Guarantor, all Accounts of such Borrower or Guarantor arising pursuant to the rendition of Paratransit Services (but not Ambulance Services) pursuant to a Paratransit Services Agreement.

1.109  "Paratransit Services" shall mean shall mean any ground transports provided by a Borrower or Guarantor on behalf of disabled, handicapped or other persons in paratransit buses and other vehicles pursuant to a Paratransit Services Agreement.

707761.15

CONFIDENTIAL                                                                      CURTIS_000767

1.110   "Paratransit Services Agreement" shall mean an agreement entered into between a Borrower and a Governmental Authority or other Account Debtor to pursuant to which such Borrower provides transports of disabled, handicapped or other persons in paratransit buses and other vehicles pursuant to a fee schedule, as the same may be amended, modified, supplemented, extended, renewed, restated or replaced.

1.111   "Parent" shall mean TransCare Corporation, a Delaware corporation, and its successors and assigns.

1.112   "Participant" shall mean any financial institution that acquires and holds a participation in the interest of Lender in any of the Loans and Letters of Credit in conformity with the provisions of Section 12.5 of this Agreement governing participations..

1.113   "Pending Medicaid Account" shall mean, as to each Borrower and Guarantor, all Accounts of such Borrower or Guarantor arising pursuant to Ambulances Services rendered by such Borrower or Guarantor to a person who the Borrower or Guarantor has been advised by such person and the applicable Facility that such person has duly filed an application to become an eligible Medicaid beneficiary under the Medicaid program.

1.114   "Pension Plan" shall mean a pension plan (as defined in Section 3(2) of ERISA) subject to Title IV of ERISA which any Borrower or Guarantor sponsors, maintains, or to which any Borrower, Guarantor or ERISA Affiliate makes, is making, or is obligated to make contributions, other than a Multiemployer Plan.

1.115   "Permitted Holder" shall mean each of (a) Patriarch Partners Agency Services, LLC, a Delaware limited liability company, (b) ARK Investment Partners II, L.P., (c) ARK II CLO 2001-1, Limited, (d) any Affiliates of the foregoing controlled by Patriarch Partners LLC or Patriarch Partners Agency Services, LLC,  and (e) any other Affiliate controlled by Patriarch Partners LLC.

1.116   "Person" or "person" shall mean any individual, sole proprietorship, partnership, corporation (including any corporation which elects subchapter S status under the Code), limited liability company, limited liability partnership, business trust, unincorporated association, joint stock corporation, trust, joint venture or other entity or any government or any agency or instrumentality or political subdivision thereof.

1.117   "Plan" shall mean an employee benefit plan (as defined in Section 3(3) of ERISA) which any Borrower or Guarantor sponsors, maintains, or to which it makes, is making, or is obligated to make contributions, or in the case of a Multiemployer Plan has made contributions at any time during the immediately preceding six (6) plan years or with respect to which any Borrower or Guarantor may incur liability.

1.118   "Prime Rate" shall mean the rate from time to time publicly announced by Lender, or its successors, as its prime rate, whether or not such announced rate is the best rate available at such bank.

1.119   "Prime Rate Loans" shall mean any Loans or portion thereof on which interest is payable based on the Prime Rate in accordance with the terms thereof.

707761.15

**A2946**

CONFIDENTIAL                                                                  CURTIS_000768

1.120  "Private Pay Accounts" shall mean, as to each Borrower and Guarantor, all Accounts of such Borrower or Guarantor arising pursuant to services rendered by such Borrower or Guarantor to any person who will pay such Account directly to such Borrower or Guarantor providing such services and not through any Third Party Payor.

1.121  "Program Integrity Contractors" shall mean "program safeguard contractors" or such other Persons authorized under the applicable Medicare Regulations, Medicaid Regulations or CHAMPUS/CHAMPVA Regulations to conduct investigations to identify overpayments, abuse or fraud under Medicare, Medicaid or CHAMPUS/CHAMPVA.

1.122  "Provision for Taxes" shall mean an amount equal to all taxes imposed on or measured by net income, whether Federal, State, county or local, and whether foreign or domestic, that are paid or payable by any Person in respect of any period in accordance with GAAP.

1.123  "Real Property" shall mean all now owned and hereafter acquired real property of each Borrower and Guarantor, including leasehold interests, together with all buildings, structures, and other improvements located thereon and all licenses, easements and appurtenances relating thereto, wherever located.

1.124  "Receivables" shall mean all of the following now owned or hereafter arising or acquired property of each Borrower and Guarantor: (a) all Accounts; (b) all interest, fees, late charges, penalties, collection fees and other amounts due or to become due or otherwise payable in connection with any Account; (c) all payment intangibles of such Borrower or Guarantor; (d) letters of credit, indemnities, guarantees, security or other deposits and proceeds thereof issued payable to any Borrower or Guarantor or otherwise in favor of or delivered to any Borrower or Guarantor in connection with any Account; or (e) all other accounts, contract rights, chattel paper, instruments, notes, general intangibles, revenue and other forms of obligations owing to any Borrower or Guarantor, whether from the rendition of Ambulance Services or other services, the operation of Equipment, the sale and lease of goods or other property, licensing of any property (including Intellectual Property or other general intangibles) or from loans or advances by any Borrower or Guarantor or to or for the benefit of any third person (including loans or advances to any Affiliates or Subsidiaries of any Borrower or Guarantor) or otherwise associated with any Accounts, Inventory, Equipment or general intangibles of any Borrower or Guarantor (including, without limitation, choses in action, causes of action, tax refunds, tax refund claims, any funds which may become payable to any Borrower or Guarantor in connection with the termination of any Plan or other employee benefit plan and any other amounts payable to any Borrower or Guarantor from any Plan or other employee benefit plan, rights and claims against carriers and shippers, rights to indemnification, business interruption insurance and proceeds thereof, casualty or any similar types of insurance and any proceeds thereof and proceeds of insurance covering the lives of employees on which any Borrower or Guarantor is a beneficiary).

1.125  "Records" shall mean, as to each Borrower and Guarantor, all of such Borrower's and Guarantor's present and future books of account of every kind or nature, purchase and sale agreements, invoices, ledger cards, bills of lading and other shipping evidence, statements, correspondence, memoranda, credit files and other data relating to the Collateral or any Account Debtor, together with the tapes, disks, diskettes and other data and software storage media and

707761.15

**A2947**

CURTIS_000769

devices, file cabinets or containers in or on which the foregoing are stored (including any rights of any Borrower or Guarantor with respect to the foregoing maintained with or by any other person).

1.126  "Reimbursable Amount" shall mean the net amount of Eligible Medicaid Accounts, Eligible Medicare Accounts, Eligible CHAMPUS/CHAMPVA Accounts, Eligible Insurance Accounts, Eligible Facility Contract Accounts, Eligible Paratransit Accounts, Eligible Unbilled Accounts and Eligible Pending Medicaid Accounts, which amount shall be net of any deductible or co-payment by any person for whom such Ambulance Services are provided by a Borrower, which amounts are within the usual and customary fee schedules for the types of Ambulance Services rendered by Borrowers giving rise to such Accounts established from time to time by the appropriate Governmental Authority or other Third Party Payor who is the Account Debtor with respect thereto and determined by such Governmental Authority or other Third Party Payor to be reimbursable or payable under Medicare, Medicaid, CHAMPUS/CHAMPVA, Ambulance Transportation Services Agreements or insurance policies and contracts or otherwise if no Ambulance Transportation Services Agreement, insurance policy or contract exists.

1.127  "Renewal Date" shall have the meaning set forth in Section 12.1 hereof.

1.128  "Reserves" shall mean as of any date of determination, such amounts as Lender may from time to time establish and revise in good faith reducing the amount of Revolving Loans and Letters of Credit which would otherwise be available to any Borrower under the lending formula(s) provided for herein:  (a) to reflect events, conditions, contingencies or risks which, as determined by Lender in good faith, adversely affect, or would have a reasonable likelihood of adversely affecting, either (i) the Collateral or any other property which is security for the Obligations, its value or the amount that might be received by Lender from the sale or other disposition or realization upon such Collateral, or (ii) the assets, business or prospects of any Borrower or Guarantor or (iii) the security interests and other rights of Lender in the Collateral (including the enforceability, perfection and priority thereof) or (b) to reflect Lender's good faith belief that any collateral report or financial information furnished by or on behalf of any Borrower or Guarantor to Lender is or may have been incomplete, inaccurate or misleading in any material respect or (c) to reflect outstanding Letters of Credit as provided in Section 2.2 hereof or (d) in respect of any state of facts which Lender determines in good faith constitutes a Default or an Event of Default.  Without limiting the generality of the foregoing, Reserves may, at Lender's option, be established to reflect: dilution with respect to the Accounts as calculated by Lender for any period is or is reasonably anticipated to be greater than five (5%) percent; discounts, claims, credits and allowances of any nature that are not paid pursuant to the reduction of Accounts; sales, excise or similar taxes included in the amount of any Accounts reported to Lender; amounts due or to become due to owners and lessors of premises any Collateral is located, other than for those locations where Lender has received a Collateral Access Agreement that Lender has accepted in writing.  The amount of any Reserve established by Lender shall have a reasonable relationship to the event, condition or other matter which is the basis for such reserve as determined by Lender in good faith and to the extent that such Reserve is in respect of amounts that may be payable to third parties Lender may, at its option, deduct such Reserve from the Maximum Credit, at any time that such limit is less than the amount of the Borrowing Base.

707761.15

**A2948**

CONFIDENTIAL

CURTIS_000770

1.129   "Restricted Subsidiary" shall mean each direct or indirect Subsidiary of Parent, other than the Unrestricted Subsidiaries.

1.130   "Revolving Loans" shall mean the loans now or hereafter made by or on behalf of Lender for the account of any Borrower on a revolving basis (involving advances, repayments and readvances) as set forth in Section 2.1 hereof.

1.131   "Second Lien Agent" shall mean Patriarch Partners Agency Services, LLC, a Delaware limited liability company, in its capacity as agent for Second Lien Lenders under the Second Lien Agreement, and its successors and assigns, and any successor or replacement agent appointed pursuant to the terms and conditions of the Second Lien Agreement.

1.132   "Second Lien Debt" shall mean all obligations, liabilities and indebtedness of every kind, nature and description owing by Borrowers and Guarantors to Second Lien Agent and Second Lien Lenders, including principal, interest, charges, fees, premiums, indemnities, costs and expenses, however evidenced, whether as principal, surety, endorser, guarantor or otherwise, arising under or in connection with the Second Lien Loan Documents.

1.133   "Second Lien Agreement" shall mean the Credit Agreement, dated as of August 4, 2003, by and among TransCare, Second Lien Agent and Second Lien Lenders, as amended by First Amendment to Credit Agreement, dated as of March 8, 2004, the letter agreement, dated December 7, 2004, the letter agreement, dated April 7, 2005, the letter agreement, dated August 1, 2005, Second Amendment to Credit Agreement, dated as of October 27, 2005, Waiver and Third Amendment to Credit Agreement, dated as of March 14, 2006, Fourth Amendment to Credit Agreement dated as of May 8, 2006, Fifth Amendment to Credit Agreement, dated as of July 31, 2006, and Sixth Amendment to Credit Agreement, dated as of September 22, 2006, and the Seventh Amendment to Credit Agreement, dated as of the date hereof, as the same now exists or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced.

1.134   "Second Lien Documents" shall mean, collectively, the following (as the same now exist or may hereafter exist upon the execution and delivery thereof and may hereafter or thereafter, as the case may be, be amended, modified, supplemented, extended, renewed, restated or replaced): (i) the Second Lien Agreement, (ii) each of the documents listed on the Schedule 1.134 hereto, and (iii) all agreements, documents, and instruments executed or delivered in connection with any of the foregoing.

1.135   "Second Lien Intercreditor Agreement" shall mean the Intercreditor Agreement, dated as of the date hereof, by and between Lender and Second Lien Agent, as acknowledged and agreed to by Borrowers and Guarantors, as the same now exists or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced.

1.136   "Second Lien Lenders" shall mean, collectively, the lenders from time to time party to the Second Lien Loan Agreement as lenders, and their respective successors and assigns.

1.137   "Solvent" shall mean, at any time with respect to any Person, that at such time such Person (a) is able to pay its debts as they mature and has (and has a reasonable basis to believe it will continue to have) sufficient capital (and not unreasonably small capital) to carry on its business consistent with its practices as of the date hereof, and (b) the assets and properties

707761.15

**A2949**

CURTIS_000771

of such Person at a fair valuation (and including as assets for this purpose at a fair valuation all rights of subrogation, contribution or indemnification arising pursuant to any guarantees given by such Person) are greater than the Indebtedness of such Person, and including subordinated and contingent liabilities (without duplication) computed at the amount which, such person has a reasonable basis to believe, represents an amount which can reasonably be expected to become an actual or matured liability (and including as to contingent liabilities, without duplication, arising pursuant to any guarantee the face amount of such liability as reduced to reflect the probability of it becoming a matured liability).

1.138  "Subsidiary" or "subsidiary" shall mean, with respect to any Person, any corporation, limited liability company, limited liability partnership or other limited or general partnership, trust, association or other business entity of which an aggregate of at least a majority of the outstanding Capital Stock or other interests entitled to vote in the election of the board of directors of such corporation (irrespective of whether, at the time, Capital Stock of any other class or classes of such corporation shall have or might have voting power by reason of the happening of any contingency), managers, trustees or other controlling persons, or an equivalent controlling interest therein, of such Person is, at the time, directly or indirectly, owned by such Person and/or one or more subsidiaries of such Person.

1.139  "Third Party Payor" shall mean any Person, including, without limitation, a Fiscal Intermediary, health insurance provider or private health insurance company, which is obligated to reimburse or otherwise make payments to Persons providing Ambulance Services, Paratransit Services, health care services, medical care or medical assistance for eligible patients under Medicare, Medicaid, CHAMPUS/CHAMPVA or any private insurance contract or to make payments that are Transportation/Management Service Accounts.

1.140  "Transportation/Management Service Accounts" shall mean, collectively, as to any Borrower or Guarantor, (a) all Accounts of such Borrower or Guarantor arising pursuant to transportation management or consulting services, operation or management of call centers for third parties for the use of employees and transportation and medical billing services and (b) all Accounts of such Borrower or Guarantor arising pursuant to any other Ambulance Services provided by such Borrower or Guarantor, other than Medicare Accounts, Medicaid Accounts, CHAMPUS/CHAMPVA Accounts, Insurance Accounts, Facility Contract Accounts, Unbilled Accounts, Private Pay Accounts and Paratransit Accounts.

1.141  "UCC" shall mean the Uniform Commercial Code as in effect in the State of New York , and any successor statute, as in effect from time to time (except that terms used herein which are defined in the Uniform Commercial Code as in effect in the State of New York on the date hereof shall continue to have the same meaning notwithstanding any replacement or amendment of such statute except as Lender may otherwise determine).

1.142  "Unbilled Accounts" shall mean Medicare Accounts, Medicaid Accounts, Insurance Accounts, Facility Contract Accounts, CHAMPUS/CHAMPVA Accounts, Paratransit Accounts and Pending Medicaid Accounts of Borrowers with respect to which the Ambulance Services have been completed and such Borrower has otherwise fully and completely performed its obligations to the Account Debtor sufficient to entitle it to payment and to create a valid and legally enforceable indebtedness, but for which an invoice or other billing document or

707761.15

**A2950**

CURTIS_000772

instrument evidencing such Account has not been generated and rendered to the Account Debtor.

1.143   "Unrestricted Subsidiary" shall mean any direct or indirect Subsidiary of Parent, any Borrower or any Guarantor designated as such by Administrative Borrower; provided, that, (i) in no event shall any Unrestricted Subsidiary include any Subsidiary of Parent that is a Borrower or Guarantor on the date hereof, (ii) an Inactive Subsidiary may become an Unrestricted Subsidiary if the terms and conditions hereunder are satisfied for being designated an Unrestricted Subsidiary, (ii) the representations and warranties with respect to any such Unrestricted Subsidiary set forth in Section 8.12(e) hereof are true and correct with respect to such Unrestricted Subsidiary.

1.144   "Voting Stock" shall mean with respect to any Person, (a) one (1) or more classes of Capital Stock of such Person having general voting powers to elect at least a majority of the board of directors, managers or trustees of such Person, irrespective of whether at the time Capital Stock of any other class or classes have or might have voting power by reason of the happening of any contingency, and (b) any Capital Stock of such Person convertible or exchangeable without restriction at the option of the holder thereof into Capital Stock of such Person described in clause (a) of this definition.

1.145   "Wachovia" shall mean Wachovia Bank, National Association,  a national banking association, in its individual capacity, and its successors and assigns.

## SECTION 2.  <u>CREDIT FACILITIES</u>

2.1   <u>Loans</u>.

(a)   Subject to and upon the terms and conditions contained herein, Lender agrees to make Revolving Loans to Borrowers from time to time in amounts requested by a Borrower (or Administrative Borrower on behalf of such Borrower) up to the amount outstanding at any time equal to the lesser of: (i) the Borrowing Base or (ii) the Maximum Credit.

(b)   Except in Lender's discretion or as otherwise provided herein, (i) the aggregate amount of the Loans and the Letter of Credit Obligations outstanding at any time shall not exceed the Maximum Credit, and (ii) the aggregate principal amount of the Revolving Loans and Letter of Credit Obligations outstanding at any time to a Borrower shall not exceed the Borrowing Base.

(c)   In the event that (i) the aggregate amount of the Loans and the Letter of Credit Obligations outstanding at any time exceed the Maximum Credit, or (ii) except as otherwise provided herein, the aggregate principal amount of the Revolving Loans and Letter of Credit Obligations outstanding to a Borrower exceed the Borrowing Base, such event shall not limit, waive or otherwise affect any rights of Lender in such circumstances or on any future occasions and Borrowers shall, upon demand by Lender, which may be made at any time or from time to time, immediately repay to Lender the entire amount of any such excess(es) for which payment is demanded.

2.2   <u>Letters of Credit</u>.

707761.15

CONFIDENTIAL                                                                                     CURTIS_000773

(a)     Subject to and upon the terms and conditions contained herein and in the Letter of Credit Documents, at the request of a Borrower (or Administrative Borrower on behalf of such Borrower), Lender agrees to issue for the account of such Borrower one or more Letters of Credit, containing terms and conditions acceptable to Lender in good faith.

(b)     The Borrower requesting such Letter of Credit (or Administrative Borrower on behalf of such Borrower) shall give Lender three (3) Business Days' prior written notice of such Borrower's request for the issuance of a Letter of Credit.  Such notice shall be irrevocable and shall specify the original face amount of the Letter of Credit requested, the effective date (which date shall be a Business Day and in no event shall be a date less than ten (10) days prior to the end of the then current term of this Agreement) of issuance of such requested Letter of Credit, whether such Letter of Credit may be drawn in a single or in partial draws, the date on which such requested Letter of Credit is to expire (which date shall be a Business Day and shall not be more than one year from the date of issuance), the purpose for which such Letter of Credit is to be issued, and the beneficiary of the requested Letter of Credit. The Borrower requesting the Letter of Credit (or Administrative Borrower on behalf of such Borrower) shall attach to such notice the proposed terms of the Letter of Credit.  The renewal or extension of any Letter of Credit shall, for purposes hereof, be treated in all respects the same as the issuance of a new Letter of Credit hereunder.

(c)     In addition to being subject to the satisfaction of the applicable conditions precedent contained in Section 4 hereof and the other terms and conditions contained herein, no Letter of Credit shall be available unless each of the following conditions precedent have been satisfied in a manner satisfactory to Lender:  (i) the Borrower requesting such Letter of Credit (or Administrative Borrower on behalf of such Borrower) shall have delivered to the Lender at such times and in such manner Lender may require, an application, in form and substance satisfactory to Lender, for the issuance of the Letter of Credit and such other Letter of Credit Documents as may be required pursuant to the terms thereof, and the form and terms of the proposed Letter of Credit shall be satisfactory to Lender, (ii) as of the date of issuance, no order of any court, arbitrator or other Governmental Authority shall purport by its terms to enjoin or restrain money center banks generally from issuing letters of credit of the type and in the amount of the proposed Letter of Credit, and no law, rule or regulation applicable to money center banks generally and no request or directive (whether or not having the force of law) from any Governmental Authority with jurisdiction over money center banks generally shall prohibit, or request that Lender refrain from, the issuance of letters of credit generally or the issuance of such Letter of Credit, (iii) after giving effect to the issuance of such Letter of Credit, the Letter of Credit Obligations shall not exceed the Letter of Credit Limit, and (iv) the Excess Availability prior to giving effect to any Reserves with respect to such Letter of Credit, on the date of the proposed issuance of any Letter of Credit shall be in an amount equal to one hundred (100%) percent of the Letter of Credit Obligations with respect thereto. Effective on the issuance of each Letter of Credit, a Reserve shall be established in the amount set forth in Section 2.2(c)(iv).

(d)     Except in Lender's discretion,  the amount of all outstanding Letter of Credit Obligations shall not at any time exceed the Letter of Credit Limit.

(e)     Each Borrower shall reimburse immediately Lender for any draw under any Letter of Credit issued for the account of such Borrower and pay Lender the amount of all

707761.15

CONFIDENTIAL                                                                        CURTIS_000774

other charges and fees payable to Lender in connection with any Letter of Credit issued for the account of such Borrower immediately when due, irrespective of any claim, setoff, defense or other right which such Borrower may have at any time against Lender or any other Person. Each drawing under any Letter of Credit or other amount payable in connection therewith when due shall constitute a request by the Borrower for whose account such Letter of Credit was issued to Lender for a Prime Rate Loan in the amount of such drawing or other amount then due. The date of such Loan shall be the date of the drawing or as to other amounts, the due date therefor. Any payments made to reimburse Lender in connection with any Letter of Credit shall constitute additional Revolving Loans to such Borrower pursuant to this Section 2.

(f)     Borrowers and Guarantors shall indemnify and hold Lender harmless from and against any and all losses, claims, damages, liabilities, costs and expenses which Lender may suffer or incur in connection with any Letter of Credit and any documents, drafts or acceptances relating thereto, including any losses, claims, damages, liabilities, costs and expenses due to any action taken by Lender or correspondent with respect to any Letter of Credit, except for such losses, claims, damages, liabilities, costs or expenses that are a direct result of the gross negligence or willful misconduct of Lender as determined pursuant to a final non-appealable order of a court of competent jurisdiction. Each Borrower and Guarantor assumes all risks with respect to the acts or omissions of the drawer under or beneficiary of any Letter of Credit and for such purposes the drawer or beneficiary shall be deemed such Borrower's agent. Each Borrower and Guarantor assumes all risks for, and agrees to pay, all foreign, Federal, State and local taxes, duties and levies relating to any goods subject to any Letter of Credit or any documents, drafts or acceptances thereunder. Each Borrower and Guarantor hereby releases and holds Lender harmless from and against any acts, waivers, errors, delays or omissions, with respect to or relating to any Letter of Credit, except for the gross negligence or willful misconduct of Lender as determined pursuant to a final, non-appealable order of a court of competent jurisdiction. The provisions of this Section 2.2(f) shall survive the payment of Obligations and the termination of this Agreement.

(g)     In connection with Inventory purchased pursuant to any Letter of Credit, Borrowers and Guarantors shall, at Lender's request, instruct all suppliers, carriers, forwarders, customs brokers, warehouses or others receiving or holding cash, checks, Inventory, documents or instruments in which Lender holds a security interest that upon Lender's request, such items are to be delivered to Lender and/or subject to Lender's order, and if they shall come into such Borrower's or Guarantor's possession, to deliver them, upon Lender's request, to Lender in their original form. Except as otherwise provided herein, Lender shall not exercise such right to request such items so long as no Default or Event of Default shall exist or have occurred and be continuing. Except as Lender may otherwise specify, Borrowers and Guarantors shall designate Lender as the consignee on all bills of lading and other negotiable and non-negotiable documents.

(h)     Each Borrower and Guarantor hereby irrevocably authorizes and directs Lender to name such Borrower or Guarantor as the account party therein and to deliver to Lender all instruments, documents and other writings and property received by issuer pursuant to the Letter of Credit and to accept and rely upon Lender's instructions and agreements with respect to all matters arising in connection with the Letter of Credit or the Letter of Credit Documents with respect thereto. Nothing contained herein shall be deemed or construed to grant any Borrower or

707761.15

**A2953**

CONFIDENTIAL                                                                 CURTIS_000775

Guarantor any right or authority to pledge the credit of Lender in any manner.  Borrowers and Guarantors shall be bound by any reasonable interpretation made in good faith by Lender under or in connection with any Letter of Credit or any documents, drafts or acceptances thereunder, notwithstanding that such interpretation may be inconsistent with any instructions of any Borrower or Guarantor.

(i)     The obligations of Borrowers to pay each Letter of Credit Obligations shall be absolute, unconditional and irrevocable and shall be performed strictly in accordance with the terms of this Agreement under any and all circumstances, whatsoever.

2.3     Increase in Maximum Credit.

(a)     Administrative Borrower may, time from time to time, deliver a written request to Lender to increase the Maximum Credit.  Any such written request shall specify the amount of the increase in the Maximum Credit that Borrowers are requesting; provided, that, (i) the aggregate amount of any such increase in the Maximum Credit shall not cause the Maximum Credit to exceed $25,000,000, (ii) such request shall be for an increase of not less than $1,000,000 or any integral multiple of $500,000 in excess thereof, (iii) such request shall be irrevocable, (iv) Lender shall have received such written request at least five (5) Business Days before the effective date of the requested increase and (iv) Lender shall receive no more than one such request each month.

(b)     The Maximum Credit may be increased by Lender by the amount requested upon satisfaction of each of the following conditions as determined by Lender in good faith:

(i)     the conditions precedent to the making of Loans set forth in Section 4.2 hereof shall be satisfied as of the date of the increase in the Maximum Credit, both before and after giving effect to such increase;

(ii)     Borrowers shall have paid to Lender a line increase fee in the amount equal to three-quarters of one (3/4%) percent of the principal amount of such increase, which fee shall be fully earned and payable as of the effective date of such increase;

(iii)     such increase shall have been approved internally by Lender; and

(iv)     no Default or Event of Default shall exist or have occurred and be continuing at the time of and after giving effect to such increase.

(c)     As of the effective date of any such increase in the Maximum Credit, each reference to the term Maximum Credit herein and in any of the other Financing Agreements shall be deemed amended to mean the amount of the Maximum Credit specified in the most recent written notice from Borrower to Administrative Borrower requesting an increase in the Maximum Credit and approved by Lender.

2.4     Eligibility of Transportation/Management Service Accounts.  Borrowers may request and Lender may in its discretion, agree to include Transportation/Management Service

707761.15

CONFIDENTIAL

CURTIS_000776

Accounts as Eligible Accounts so long as each of the following shall be fully satisfied, as determined by:

(a)     Lender shall have received not less than thirty (30) days prior written notice from Borrowers and Guarantors requesting that Lender include Transportation/Management Service Accounts as Eligible Accounts;

(b)     Borrower shall have Transportation/Management Service Accounts outstanding of not less than $50,000;

(c)     Lender shall have completed any due diligence covering such Accounts including, but not limited to, a field examination, site visits and review of books and records in respect thereof and obtained the internal approval of Lender;

(d)     Lender shall have received the original of all Financing Agreements that Lender determines in its good faith judgment are necessary to realize on and collect any such Transportation/Management Service Accounts, in form and substance satisfactory to Lender in good faith, duly executed and delivered by Borrower;

(e)     Lender shall have a valid perfected and first priority security interests in and liens upon any such Transportation/Management Service Accounts, subject only to the security interests and liens (if any) permitted herein;

(f)     at Lender's request, Borrower shall deliver to Lender  in form and substance satisfactory to Lender, such agreements, documents or instruments as evidence of the subsistence of corporate authorizing resolutions and an opinion of counsel to Borrower with respect to the Financing Agreements and the transactions contemplated thereby, and such other matters as Lender shall reasonably require, in form and substance and satisfactory to Lender; and

(g)     all of the conditions precedent set forth in Section 4.2 hereof shall have been satisfied.

    2.5     Joint and Several Liability.

(a)     Each Borrower shall be jointly and severally liable for all amounts due to Lender under this Agreement and the other Financing Agreements, regardless of which Borrower actually receives the Loans or Letter of Credit Accommodations hereunder or the amount of such Loans received or the manner in which Lender accounts for such Loans, Letter of Credit Accommodations or other extensions of credit on its books and records.  All references herein or in any of the other Financing Agreements to any of the obligation of Borrowers to make any payment hereunder or thereunder shall constitute joint and several obligations of Borrowers. The Obligations with respect to Loans made to a Borrower, and the Obligations arising as a result of the joint and several liability of a Borrower hereunder, with respect to Loans made to the other Borrowers, shall be separate and distinct obligations, but all such other Obligations shall be primary obligations of all Borrowers.

(b)     The Obligations arising as a result of the joint and several liability of a Borrower hereunder with respect to Loans, Letter of Credit Accommodations or other extensions

707761.15

**A2955**

CONFIDENTIAL                                                                              CURTIS_000777

of credit made to the other Borrowers shall, to the fullest extent permitted by law, be unconditional irrespective of (i) the validity or enforceability, avoidance or subordination of the Obligations of the other Borrowers or of any promissory note or other document evidencing all or any part of the Obligations of the other Borrowers, (ii) the absence of any attempt to collect the Obligations from the other Borrowers, any Guarantor or any other security therefor, or the absence of any other action to enforce the same, (iii) the waiver, consent, extension, forbearance or granting of any indulgence by Lender with respect to any provisions of any instrument evidencing the Obligations of the other Borrowers, or any part thereof, or any other agreement now or hereafter executed by the other Borrowers and delivered to Lender, (iv) the failure by Lender to take any steps to perfect and maintain its security interest in, or to preserve its rights and maintain its security or collateral for the Obligations of the other Borrowers, (v) the election of Lender in any proceeding instituted under the Bankruptcy Code, of the application of Section 1111(b)(2) of the Bankruptcy Code, (vi) the disallowance of all or any portion of the claim(s) of Lender for the repayment of the Obligations of the other Borrowers under Section 502 of the Bankruptcy Code, or (vii) any other circumstances which might constitute a legal or equitable discharge or defense of a Guarantor or of the other Borrowers. With respect to the Obligations arising as a result of the joint and several liability of a Borrower hereunder with respect to Loans, Letter of Credit Accommodations or other extensions of credit made to the other Borrowers hereunder, each Borrower waives, until the Obligations shall have been paid in full and this Agreement shall have been terminated, any right to enforce any right of subrogation or any remedy which Lender now has or may hereafter have against any Borrower or Obligor and any benefit of, and any right to participate in, any security or collateral given to Lender. If an Event of Default exists or has occurred and is continuing, Lender may proceed directly and at once, without notice, against any Borrower to collect and recover the full amount, or any portion of the Obligations, without first proceeding against the other Borrowers or any other Person, or against any security or collateral for the Obligations. Each Borrower consents and agrees that Lender shall be under no obligation to marshall any assets in favor of Borrower(s) or against or in payment of any or all of the Obligations.

## SECTION 3.  INTEREST AND FEES

3.1    Interest.

(a)    Borrowers shall pay to Lender interest on the outstanding principal amount of the Loans at the Interest Rate. All interest accruing hereunder on and after of an Event of Default has occurred and for so long as it is continuing or on and after the date of termination of this Agreement shall be payable on demand.

(b)    Each Borrower (or Administrative Borrower on behalf of such Borrower) may from time to time request Eurodollar Rate Loans or may request that Prime Rate Loans be converted to Eurodollar Rate Loans or that any existing Eurodollar Rate Loans continue for an additional Interest Period. Such request from a Borrower (or Administrative Borrower on behalf of such Borrower) shall specify the amount of the Eurodollar Rate Loans or the amount of the Prime Rate Loans to be converted to Eurodollar Rate Loans or the amount of the Eurodollar Rate Loans to be continued (subject to the limits set forth below) and the Interest Period to be applicable to such Eurodollar Rate Loans. Subject to the terms and conditions contained herein, three (3) Business Days after receipt by Lender of such a request from a Borrower (or

707761.15

CONFIDENTIAL                                                                                      CURTIS_000778

Administrative Borrower on behalf of such Borrower), such Eurodollar Rate Loans shall be made or Prime Rate Loans shall be converted to Eurodollar Rate Loans or such Eurodollar Rate Loans shall continue, as the case may be, provided, that, (i) no Default or Event of Default shall exist or have occurred and be continuing, (ii) no party hereto shall have sent any notice of termination of this Agreement, (iii) such Borrower (or Administrative Borrower on behalf of such Borrower) shall have complied with such customary procedures as are established by Lender and specified by Lender to Administrative Borrower from time to time for requests by Borrowers for Eurodollar Rate Loans, (iv) no more than four (4) Interest Periods may be in effect at any one time, (v) the aggregate amount of the Eurodollar Rate Loans must be in an amount not less than $1,000,000 or an integral multiple of $1,000,000 in excess thereof, (vi) the maximum amount of the Eurodollar Rate Loans in the aggregate at any time requested by Borrowers shall not exceed the amount equal to  eighty (80%) percent of the lowest principal amount of the Revolving Loans which it is anticipated will be outstanding during the applicable Interest Period, in each case as determined by Lender in good faith (but with no obligation of Lender to make such Loans), and (vii) Lender shall have determined that the Interest Period or Adjusted Eurodollar Rate is available to Lender and can be readily determined as of the date of the request for such Eurodollar Rate Loan by Borrower.  Any request by or on behalf of a Borrower for Eurodollar Rate Loans or to convert Prime Rate Loans to Eurodollar Rate Loans or to continue any existing Eurodollar Rate Loans shall be irrevocable.  Notwithstanding anything to the contrary contained herein, Lender shall not be required to purchase United States Dollar deposits in the London interbank market or other applicable Eurodollar Rate market to fund any Eurodollar Rate Loans, but the provisions hereof shall be deemed to apply as if Lender had purchased such deposits to fund the Eurodollar Rate Loans.

(c)     Any Eurodollar Rate Loans shall automatically convert to Prime Rate Loans upon the last day of the applicable Interest Period, unless Lender has received and approved a request to continue such Eurodollar Rate Loan at least three (3) Business Days prior to such last day in accordance with the terms hereof.  Any Eurodollar Rate Loans shall, at Lender's option, upon notice by Lender to Parent, be subsequently converted to Prime Rate Loans in the event that this Agreement shall terminate or not be renewed.  Borrowers shall pay to Lender, upon demand by Lender (or Lender may, at its option, charge any loan account of any Borrower) any amounts required to compensate Lender or Participant for any loss (including loss of anticipated profits), cost or expense incurred by such person, as a result of the conversion of Eurodollar Rate Loans to Prime Rate Loans pursuant to any of the foregoing.

(d)     Interest shall be payable by Borrowers to Lender monthly in arrears not later than the first day of each calendar month and shall be calculated on the basis of a three hundred sixty (360) day year and actual days elapsed.  The interest rate on non-contingent Obligations (other than Eurodollar Rate Loans) shall increase or decrease by an amount equal to each increase or decrease in the Prime Rate effective on the day of any change in such Prime Rate.  In no event shall charges constituting interest payable by Borrowers to Lender exceed the maximum amount or the rate permitted under any applicable law or regulation, and if any such part or provision of this Agreement is in contravention of any such law or regulation, such part or provision shall be deemed amended to conform thereto.

3.2     Unused Line Fee.  Borrowers shall pay to Lender monthly an unused line fee at a rate equal to one quarter of one (1/4%) percent per annum calculated upon the amount by which

707761.15

CONFIDENTIAL                                                                                     CURTIS_000779

the Maximum Credit exceeds the average daily principal balance of the outstanding Revolving Loans and Letters of Credit during the immediately preceding month (or part thereof) while this Agreement is in effect and for so long thereafter as any of the Obligations are outstanding, which fee shall be payable on the first day of each month in arrears.

3.3    <u>Letter of Credit Fees</u>.

(a)    Borrowers shall pay to Lender a fee at a rate equal to two (2%) percent per annum on the average daily maximum amount available to be drawn under all of such Letters of Credit for the immediately preceding month (or part thereof), payable in arrears as of the first day of each succeeding month, computed for each day from the date of issuance to the date of expiration; except that Borrowers shall pay, at Lender's option, without notice, such fee at a rate two (2%) percent greater than the otherwise applicable rate on such average daily maximum amount for:  (a) the period from and after the date of termination or non-renewal hereof until Lender has received full and final payment of all Obligations (notwithstanding entry of a judgment against Borrowers) and (b) the period from and after the date of the occurrence of an Event of Default for so long as such Event of Default is continuing as determined by Lender. Such letter of credit fees shall be calculated on the basis of a three hundred sixty (360) day year and actual days elapsed and the obligation of Borrowers to pay such fee shall survive the termination or non-renewal of this Agreement.

(b)    In addition to the letter of credit fees provided above, Borrowers shall pay to Lender the letter of credit fronting and negotiation fees agreed to by Borrowers and Lender from time to time and the customary charges from time to time of Lender with respect to the issuance, amendment, transfer, administration, cancellation and conversion of, and drawings under, such Letters of Credit.

3.4    <u>Changes in Laws and Increased Costs of Loans</u>.

(a)    If after the date hereof, either (i) any change in, or in the interpretation of, any law or regulation is introduced, including, without limitation, with respect to reserve requirements, applicable to Lender or any banking or financial institution from whom Lender borrows funds or obtains credit (a "Funding Bank"), or (ii) a Funding Bank or Lender complies with any future guideline or request from any central bank or other Governmental Authority or (iii) a Funding Bank or Lender determines that the adoption of any applicable law, rule or regulation regarding capital adequacy, or any change therein, or any change in the interpretation or administration thereof by any Governmental Authority, central bank or comparable agency charged with the interpretation or administration thereof has or would have the effect described below, or a Funding Bank or Lender complies with any request or directive regarding capital adequacy (whether or not having the force of law) of any such authority, central bank or comparable agency, and in the case of any event set forth in this clause (iii), such adoption, change or compliance has or would have the direct or indirect effect of reducing the rate of return on Lender's capital as a consequence of its obligations hereunder to a level below that which Lender could have achieved but for such adoption, change or compliance (taking into consideration the Funding Bank's or Lender's policies with respect to capital adequacy) by an amount deemed by Lender to be material, and the result of any of the foregoing events described in clauses (i), (ii) or (iii) is or results in an increase in the cost to Lender of funding or

707761.15

CONFIDENTIAL                                                                      CURTIS_000780

maintaining the Loans or the Letters of Credit, then Borrowers and Guarantors shall from time to time upon demand by Lender pay to Lender additional amounts sufficient to indemnify Lender against such increased cost on an after-tax basis (after taking into account applicable deductions and credits in respect of the amount indemnified). A certificate as to the amount of such increased cost shall be submitted to Administrative Borrower by Lender and shall be conclusive, absent manifest error.

(b) If prior to the first day of any Interest Period, (i) Lender shall have determined in good faith (which determination shall be conclusive and binding upon Borrowers and Guarantors) that, by reason of circumstances affecting the relevant market, adequate and reasonable means do not exist for ascertaining the Adjusted Eurodollar Rate for such Interest Period, (ii) Lender determines that the Adjusted Eurodollar Rate determined or to be determined for such Interest Period will not adequately and fairly reflect the cost to Lender of making or maintaining Eurodollar Rate Loans during such Interest Period, or (iii) Dollar deposits in the principal amounts of the Eurodollar Rate Loans to which such Interest Period is to be applicable are not generally available in the London interbank market, Lender shall give telecopy or telephonic notice thereof to Administrative Borrower as soon as practicable thereafter, and will also give prompt written notice to Administrative Borrower when such conditions no longer exist. If such notice is given (A) any Eurodollar Rate Loans requested to be made on the first day of such Interest Period shall be made as Prime Rate Loans, (B) any Loans that were to have been converted on the first day of such Interest Period to or continued as Eurodollar Rate Loans shall be converted to or continued as Prime Rate Loans and (C) each outstanding Eurodollar Rate Loan shall be converted, on the last day of the then-current Interest Period thereof, to Prime Rate Loans. Until such notice has been withdrawn by Lender, no further Eurodollar Rate Loans shall be made or continued as such, nor shall any Borrower (or Administrative Borrower on behalf of any Borrower) have the right to convert Prime Rate Loans to Eurodollar Rate Loans.

(c) Notwithstanding any other provision herein, if the adoption of or any change in any law, treaty, rule or regulation or final, non-appealable determination of an arbitrator or a court or other Governmental Authority or in the interpretation or application thereof occurring after the date hereof shall make it unlawful for Lender to make or maintain Eurodollar Rate Loans as contemplated by this Agreement, (i) Lender shall promptly give written notice of such circumstances to Administrative Borrower (which notice shall be withdrawn whenever such circumstances no longer exist), (ii) the commitment of Lender hereunder to make Eurodollar Rate Loans, continue Eurodollar Rate Loans as such and convert Prime Rate Loans to Eurodollar Rate Loans shall forthwith be canceled and, until such time as it shall no longer be unlawful for Lender to make or maintain Eurodollar Rate Loans, Lender shall then have a commitment only to make a Prime Rate Loan when a Eurodollar Rate Loan is requested and (iii) Loans then outstanding as Eurodollar Rate Loans, if any, shall be converted automatically to Prime Rate Loans on the respective last days of the then current Interest Periods with respect to such Loans or within such earlier period as required by law. If any such conversion of a Eurodollar Rate Loan occurs on a day which is not the last day of the then current Interest Period with respect thereto, Borrowers and Guarantors shall pay to such Lender such amounts, if any, as may be required pursuant to Section 3.3(d) hereof.

(d) Borrowers and Guarantors shall indemnify Lender and to hold Lender harmless from any loss or expense which Lender may sustain or incur as a consequence of (i) default by

707761.15

CONFIDENTIAL

any Borrower in making a borrowing of, conversion into or extension of Eurodollar Rate Loans after such Borrower has given a notice requesting the same in accordance with the provisions of this Agreement, (ii) default by any Borrower in making any prepayment of a Eurodollar Rate Loan after such Borrower (or Administrative Borrower on behalf of such Borrower) has given a notice thereof in accordance with the provisions of this Agreement, and (iii) the making of a prepayment of Eurodollar Rate Loans on a day which is not the last day of an Interest Period with respect thereto. With respect to Eurodollar Rate Loans, such indemnification may include an amount equal to the excess, if any, of (A) the amount of interest which would have accrued on the amount so prepaid, or not so borrowed, converted or extended, for the period from the date of such prepayment or of such failure to borrow, convert or extend to the last day of the applicable Interest Period (or, in the case of a failure to borrow, convert or extend, the Interest Period that would have commenced on the date of such failure) in each case at the applicable rate of interest for such Eurodollar Rate Loans provided for herein over (B) the amount of interest (as determined by such Lender) which would have accrued to Lender on such amount by placing such amount on deposit for a comparable period with leading banks in the interbank Eurodollar market. This covenant shall survive the termination or non-renewal of this Agreement and the payment of the Obligations.

## SECTION 4. <u>CONDITIONS PRECEDENT</u>

4.1    <u>Conditions Precedent to Initial Loans and Letters of Credit</u>. The obligation of Lender to make the initial Loans or to issue the initial Letters of Credit hereunder is subject to the satisfaction of, or waiver of, immediately prior to or concurrently with the making of such Loan or the issuance of such Letter of Credit of each of the following conditions precedent:

(a) all requisite corporate action and proceedings in connection with this Agreement and the other Financing Agreements shall be satisfactory in form and substance to Lender in good faith, and Lender shall have received all information and copies of all documents, including records of requisite corporate action and proceedings which Lender may have requested in connection therewith, such documents where requested by Lender or its counsel to be certified by appropriate corporate officers or Governmental Authority, which shall set forth the same complete corporate name of such Borrower or Guarantor as is set forth herein and such document as shall set forth the organizational identification number of each Borrower or Guarantor that is not a Delaware corporation, if one is issued in its jurisdiction of incorporation);

(b) no material adverse change shall have occurred in the assets, business or prospects of Borrowers since the date of Lender's latest field examination (not including for this purpose the field review referred to in clause (d) below) and no change or event shall have occurred which would impair the ability of any Borrower or Guarantor to perform its obligations hereunder or under any of the other Financing Agreements to which it is a party or of Lender to enforce the Obligations or realize upon the Collateral;

(c) Lender shall have completed a field review of the Records and such other information with respect to the Collateral as Lender may require to determine the amount of Loans available to Borrowers (including, without limitation, current perpetual inventory records and/or roll-forwards of Accounts and Inventory through the date of closing and test counts of the

707761.15

CONFIDENTIAL                                                                    CURTIS_000782

Inventory in a manner satisfactory to Lender, together with such supporting documentation as may be necessary or appropriate, and other documents and information that will enable Lender to accurately identify and verify the Collateral), the results of which each case shall be satisfactory to Lender, not more than three (3) Business Days prior to the date hereof or such earlier date as Lender may agree;

(d) Lender shall have received, in form and substance satisfactory to Lender, all consents, waivers, acknowledgments and other agreements from third persons which Lender may deem necessary or desirable in order to permit, protect and perfect its security interests in and liens upon the Collateral or to effectuate the provisions or purposes of this Agreement and the other Financing Agreements, other than Collateral Access Agreements with respect to leased locations of Borrowers or Guarantors;

(e) the Excess Availability as determined by Lender, as of the date hereof, shall be not less than $2,000,000 after giving effect to the initial Loans made or to be made and Letters of Credit issued or to be issued in connection with the initial transactions hereunder;

(f) Lender shall have received evidence, in form and substance satisfactory to Lender, that Lender has a valid perfected first priority security interest in all of the Collateral (other than the Collateral in which the Second Lien Agent has a first priority security interest in accordance with the Second Lien Intercreditor Agreement);

(g) Lender shall have received and reviewed lien and judgment search results for the jurisdiction of organization of each Borrower and Guarantor, the jurisdiction of the chief executive office of each Borrower and Guarantor and all jurisdictions in which assets of Borrowers and Guarantors are located, which search results shall be in form and substance satisfactory to Lender;

(h) Lender shall have received copies of the shares of the stock certificates representing all of the issued and outstanding shares of the Capital Stock of each Borrower and Guarantor (other than Parent) and owned by any Borrower or Guarantor, in each case together with copies of stock powers duly executed in blank with respect thereto;

(i) Lender shall have received a Borrowing Base Certificate setting forth the Loans available to Borrowers as of the date hereof as completed in a manner satisfactory to Lender and duly authorized, executed and delivered on behalf of Administrative Borrower;

(j) Lender shall have received evidence of insurance and loss payee endorsements required hereunder and under the other Financing Agreements, in form and substance satisfactory to Lender, and certificates of insurance policies and endorsements naming Lender as loss payee;

(k) Lender shall have received true, correct and complete copies of each of the Second Lien Loan Documents set forth on Schedule 1.134, as duly authorized, executed and delivered by each of the parties thereto, which shall be on terms and conditions reasonably acceptable to Lender;

707761.15

**A2961**

CURTIS_000783

(l)  Lender shall have received, in form and substance acceptable to Lender, the Second Lien Intercreditor Agreement, duly authorized executed and delivered by Second Lien Agent and Second Lien Lenders, as the case may be;

(m)  Lender shall have received, in form and substance acceptable to Lender, evidence of the requisite approval by the stockholders of Parent of the financing contemplated by this Agreement as required by the terms and conditions of (i) the Amended and Restated By-Laws of Parent and (ii) Section 8.1 of the Stockholders Agreement, dated as of August 4, 2003, Parent and the Persons party thereto as stockholders;

(n)  Lender shall have received, in form and substance acceptable to Lender, evidence that any existing Medicare or Medicaid deposit accounts maintained by Borrowers or Guarantors with Lender shall have been closed;

(o)  Lender shall have received, in form and substance satisfactory to Lender, all releases, terminations and such other documents as Lender may request to evidence and effectuate the termination of any interest in and to any assets and properties of each Borrower and Guarantor, except for the interests expressly permitted hereunder, duly authorized, executed and delivered by the holder of such interest, including, but not limited to, UCC termination statements for UCC financing statements previously filed by a holder of such interest, or its predecessor, as secured party and any Borrower or Guarantor, as debtor;

(p)  Lender shall have received, in form and substance acceptable to Lender, audited consolidated financial statements and unaudited consolidating financial statements of Parent and its Restricted Subsidiaries (including in each case balance sheets, statements of income and loss, statements of cash flow, and statements of shareholders' equity), and the accompanying notes thereto, all in reasonable detail, fairly presenting in all material respects the financial position and the results of the operations of Parent and its Restricted Subsidiaries as of the end of and for each of the fiscal years ended December 31, 2004 and December 31, 2005, together with the unqualified opinion of independent certified public accountants with respect to such audited consolidated financial statements, which accountants shall be an independent accounting firm selected by Administrative Borrower and acceptable to Lender, that such audited consolidated financial statements have been prepared in accordance with GAAP and present fairly in all material respects the results of operations and financial condition of Parent and its Restricted Subsidiaries as of the end of and for the fiscal years ended December 31, 2004 and December 31, 2005;

(q)  Lender shall have received, in form and substance satisfactory to Lender, (i) an opinion letters of counsel to Borrowers and Guarantors with respect to the Financing Agreements and such other matters as Lender or its counsel may request and (ii) an opinion letter of counsel to Borrowers and Guarantors with respect to the certain Health Care Laws and such other matters as Lender or its counsel may request; and

(r)  the other Financing Agreements and all instruments and documents hereunder and thereunder shall have been duly executed and delivered to Lender, in form and substance satisfactory to Lender.

707761.15

CONFIDENTIAL

CURTIS_000784

4.2    Conditions Precedent to All Loans and Letters of Credit. The obligation of Lender to make the Loans, including the initial Loans, or to issue any Letter of Credit, including the initial Letters of Credit, is subject to the further satisfaction of, or waiver of, immediately prior to or concurrently with the making of each such Loan or the issuance of such Letter of Credit of each of the following conditions precedent:

(a)    all representations and warranties contained herein and in the other Financing Agreements shall be true and correct in all material respects with the same effect as though such representations and warranties had been made on and as of the date of the making of each such Loan or providing each such Letter of Credit and after giving effect thereto, except to the extent that such representations and warranties expressly relate solely to an earlier date (in which case such representations and warranties shall have been true and accurate on and as of such earlier date);

(b)    no law, regulation, order, judgment or decree of any Governmental Authority shall exist, and no action, suit, investigation, litigation or proceeding shall be pending or threatened in any court or before any arbitrator or Governmental Authority, which (i) purports to enjoin, prohibit, restrain or otherwise affect (A) the making of the Loans or providing the Letter of Credit, or (B) the consummation of the transactions contemplated pursuant to the terms hereof or the other Financing Agreements or (ii) had or has a reasonable likelihood of having a Material Adverse Effect; and

(c)    no Default or Event of Default shall exist or have occurred and be continuing on and as of the date of the making of such Loan or providing each such Letter of Credit and after giving effect thereto.

## SECTION 5. GRANT AND PERFECTION OF SECURITY INTEREST

5.1    Grant of Security Interest. To secure payment and performance of all Obligations, each Borrower and Guarantor hereby grants to Lender, a continuing security interest in, a lien upon, and a right of set off against, and hereby assigns to Lender, as security, all personal and real property and fixtures, and interests in property and fixtures, of each Borrower and Guarantor, whether now owned or hereafter acquired or existing, and wherever located (together with all other collateral security for the Obligations at any time granted to or held or acquired by Lender, collectively, the "Collateral"), including:

(i)    all Accounts;

(ii)    all general intangibles, including, without limitation, all Intellectual Property;

(iii) all goods, including, without limitation, Inventory and Equipment;

(iv) all Real Property and fixtures;

(v)    all chattel paper, including, without limitation, all tangible and electronic chattel paper;

707761.15

**A2963**

CONFIDENTIAL                                    CURTIS_000785

(vi) all instruments, including, without limitation, all promissory notes;

(vii) all documents;

(viii)   all deposit accounts;

(ix) all letters of credit, banker's acceptances and similar instruments and including all letter-of-credit rights;

(x)   all supporting obligations and all present and future liens, security interests, rights, remedies, title and interest in, to and in respect of Receivables and other Collateral, including (A) rights and remedies under or relating to guaranties, contracts of suretyship, letters of credit and credit and other insurance related to the Collateral, (B) rights of stoppage in transit, replevin, repossession, reclamation and other rights and remedies of an unpaid vendor, lienor or secured party, (C) goods described in invoices, documents, contracts or instruments with respect to, or otherwise representing or evidencing, Receivables or other Collateral, including returned, repossessed and reclaimed goods, and (D) deposits by and property of Account Debtors or other persons securing the obligations of Account Debtors;

(xi) all (A)  investment property (including securities, whether certificated or uncertificated, securities accounts, security entitlements, commodity contracts or commodity accounts) and (B) monies, credit balances, deposits and other property of any Borrower or Guarantor now or hereafter held or received by or in transit to Lender or its Affiliates or at any other depository or other institution from or for the account of any Borrower or Guarantor, whether for safekeeping, pledge, custody, transmission, collection or otherwise;

(xii) all commercial tort claims, including, without limitation, those identified in the Information Certificate;

(xiii)   to the extent not otherwise described above, all Receivables;

(xiv)   all Records; and

(xv) all products and proceeds of the foregoing, in any form, including insurance proceeds and all claims against third parties for loss or damage to or destruction of or other involuntary conversion of any kind or nature of any or all of the other Collateral.

(b) Notwithstanding anything to the contrary set forth in Section 5.1(a) hereof, the types or items of Collateral shall not include any rights or interests in any contract or lease (including Capital Leases) covering any Equipment (including, without limitation, Ambulances or other vehicles) if under the terms of such contract, financing arrangement or lease (including Capital Leases), or applicable law with respect thereto, the valid grant of a security interest or lien therein or in any Equipment financed thereunder (and the proceeds arising from the sale of such Equipment or proceeds of casualty insurance) to Lender is prohibited and such prohibition has not been or is not waived or the consent of the other party to such contract or lease (including Capital Leases) has not been or is not otherwise obtained or under applicable law such prohibition cannot be waived; provided, that, the foregoing exclusion shall in no way be construed (i)  to apply if any such prohibition is unenforceable under Sections 9-406, 9-407 or 9-

707761.15

CONFIDENTIAL

CURTIS_000786

408 of the UCC or other applicable law or (ii) so as to limit, impair or otherwise affect Lender's unconditional continuing security interests in and liens upon any rights or interests of a Borrower or Guarantor in or to monies due or to become due under any such contract, lease, permit, license, charter or license agreement (including, without limitation, any Accounts or Receivables arising from the use or operation of any such Equipment that may be subject to such contract, lease, permit, license, charter or license agreement).

(c) Nothing contained herein shall be deemed to be (i) an assignment or grant of a power of attorney as to Medicare Accounts in violation of the Social Security Act Amendments of 1972, as amended, 42 U.S.C. S 1395g, or any similar state statute applicable to Borrowers or Guarantors, as amended, and the rules and regulations promulgated thereunder, (ii) an assignment or grant of a power of attorney as to Medicaid Accounts in violation of the Social Security Act Amendments of 1972, 42 U.S.C. S 1396(a)(32), or any similar state statute applicable to Borrowers or Guarantors, as amended, and the rules and regulations promulgated thereunder, (iii) an assignment or grant of a power of attorney as to CHAMPUS/CHAMPVA Accounts in violation of the Civilian Health and Medical Program of the Uniformed Services under 10 U.S.C. §§ 1071 et seq. or the Civilian Health and Medical Program of Veterans Affairs under 38 U.S.C. § 1713, as the case may be, or any similar state statute applicable to Borrowers or Guarantors, as amended, and the rules and regulations promulgated thereunder or (iv) an assignment, control or grant of a power of attorney as to a Medicare/Medicaid Payment Account in violation of the Social Security Act Amendments of 1972, as amended, 42 U.S.C. S 1395g, Civilian Health and Medical Program of the Uniformed Services under 10 U.S.C. §§ 1071 et seq. or the Civilian Health and Medical Program of Veterans Affairs under 38 U.S.C. § 1713, or any similar state or local statute, rule or regulation applicable to Borrowers or Guarantors, as amended, and the rules and regulations promulgated thereunder.

5.2     <u>Perfection of Security Interests.</u>

(a) Each Borrower and Guarantor irrevocably and unconditionally authorizes Lender (or its agent) to file at any time and from time to time such financing statements with respect to the Collateral naming Lender or its designee as the secured party and such Borrower or Guarantor as debtor, as Lender may require, and including any other information with respect to such Borrower or Guarantor or otherwise required by part 5 of Article 9 of the Uniform Commercial Code of such jurisdiction as Lender may determine, together with any amendment and continuations with respect thereto, which authorization shall apply to all financing statements so filed on, prior to or after the date hereof. Each Borrower and Guarantor hereby ratifies and approves all financing statements naming Lender or its designee as secured party and such Borrower or Guarantor, as the case may be, as debtor with respect to the Collateral (and any amendments with respect to such financing statements) filed by or on behalf of Lender prior to the date hereof and ratifies and confirms the authorization of Lender to file such financing statements (and amendments, if any), copies of which shall be provided to Administrative Borrower. Each Borrower and Guarantor hereby authorizes Lender to adopt on behalf of such Borrower and Guarantor any symbol required for authenticating any electronic filing. In the event that the description of the collateral in any financing statement naming Lender or its designee as the secured party and any Borrower or Guarantor as debtor includes assets and properties of such Borrower or Guarantor that do not at any time constitute Collateral, whether hereunder, under any of the other Financing Agreements or otherwise, the filing of such

707761.15

CONFIDENTIAL                                                                                                      CURTIS_000787

financing statement shall nonetheless be deemed authorized by such Borrower or Guarantor to the extent of the Collateral included in such description and it shall not render the financing statement ineffective as to any of the Collateral or otherwise affect the financing statement as it applies to any of the Collateral.  In no event shall any Borrower or Guarantor at any time file, or permit or cause to be filed,  any correction statement or termination statement with respect to any financing statement (or amendment or continuation with respect thereto) naming Lender or its designee as secured party and such Borrower or Guarantor as debtor.

(b) Each Borrower and Guarantor does not have any chattel paper (whether tangible or electronic) or instruments as of the date hereof, except as set forth in the Information Certificate.  In the event that any Borrower or Guarantor shall be entitled to or shall receive any chattel paper or instrument after the date hereof, Borrowers and Guarantors shall promptly notify Lender thereof in writing.  Promptly upon the receipt thereof by or on behalf of any Borrower or Guarantor (including by any agent or representative), such Borrower or Guarantor shall deliver, or cause to be delivered to Lender, all tangible chattel paper and instruments that such Borrower or Guarantor has or may at any time acquire, accompanied by such instruments of transfer or assignment duly executed in blank as Lender may from time to time specify, in each case except as Lender may otherwise agree.  At Lender's option, each Borrower and Guarantor shall, or Lender may at any time on behalf of any Borrower or Guarantor, cause the original of any such instrument or chattel paper to be conspicuously marked in a form and manner acceptable to Lender with the following legend referring to chattel paper or instruments as applicable: "This [chattel paper][instrument] is subject to the security interest of Wachovia Bank, National Association and any sale, transfer, assignment or encumbrance of this [chattel paper][instrument] violates the rights of such secured party."

(c) In the event that any Borrower or Guarantor shall at any time hold or acquire an interest in any electronic chattel paper or any "transferable record" (as such term is defined in Section 201 of the Federal Electronic Signatures in Global and National Commerce Act or in Section 16 of the Uniform Electronic Transactions Act as in effect in any relevant jurisdiction), such Borrower or Guarantor shall promptly notify Lender thereof in writing.  Promptly upon Lender's request, such Borrower or Guarantor shall take, or cause to be taken, such actions as Lender may request in good faith to give Lender control of such electronic chattel paper under Section 9-105 of the UCC and control of such transferable record under Section 201 of the Federal Electronic Signatures in Global and National Commerce Act or, as the case may be, Section 16 of the Uniform Electronic Transactions Act, as in effect in such jurisdiction.

(d) Each Borrower and Guarantor does not have any deposit accounts as of the date hereof, except as set forth in the Information Certificate.  Borrowers and Guarantors shall not, directly or indirectly, after the date hereof open, establish or maintain any deposit account unless each of the following conditions is satisfied: (i) Lender shall have received not less than five (5) Business Days prior written notice of the intention of any Borrower or Guarantor to open or establish such account which notice shall specify in reasonable detail and specificity acceptable to Lender the name of the account, the owner of the account, the name and address of the bank at which such account is to be opened or established, the individual at such bank with whom such Borrower or Guarantor is dealing and the purpose of the account, (ii)  the bank where such account is opened or maintained shall be acceptable to Lender in good faith, and (iii) on or before the opening of such deposit account, such Borrower or Guarantor shall as Lender may

707761.15

**A2966**

CONFIDENTIAL

CURTIS_000788

specify either (A) deliver to Lender a Deposit Account Control Agreement with respect to such deposit account duly authorized, executed and delivered by such Borrower or Guarantor and the bank at which such deposit account is opened and maintained or (B) arrange for Lender to become the customer of the bank with respect to the deposit account on terms and conditions acceptable to Lender. The terms of this subsection (d) shall not apply to any Excluded Deposit Accounts..

(e) No Borrower or Guarantor owns or holds, directly or indirectly, beneficially or as record owner or both, any investment property, as of the date hereof, or have any investment account, securities account, commodity account or other similar account with any bank or other financial institution or other securities intermediary or commodity intermediary as of the date hereof, in each case except as set forth in the Information Certificate.

(i)    In the event that any Borrower or Guarantor shall be entitled to or shall at any time after the date hereof hold or acquire any certificated securities, such Borrower or Guarantor shall promptly endorse, assign and deliver the same to Lender, accompanied by such instruments of transfer or assignment duly executed in blank as Lender may from time to time specify. If any securities, now or hereafter acquired by any Borrower or Guarantor are uncertificated and are issued to such Borrower or Guarantor or its nominee directly by the issuer thereof, such Borrower or Guarantor shall immediately notify Lender thereof and shall as Lender may specify, either (A) cause the issuer to agree to comply with instructions from Lender as to such securities, without further consent of any Borrower or Guarantor or such nominee, or (B) arrange for Lender to become the registered owner of the securities.

(ii)    Borrowers and Guarantors shall not, directly or indirectly, after the date hereof open, establish or maintain any investment account, securities account, commodity account or any other similar account (other than a deposit account) with any securities intermediary or commodity intermediary at which accounts such Borrower or Guarantor maintains individually or in the aggregate more than $50,000, unless each of the following conditions is satisfied: (A)  Lender shall have received not less than five (5) Business Days prior written notice of the intention of Borrower or Guarantor to open or establish such account which notice shall specify in reasonable detail and specificity acceptable to Lender the name of the account, the owner of the account, the name and address of the securities intermediary or commodity intermediary at which such account is to be opened or established, the individual at such intermediary with whom such Borrower or Guarantor is dealing and the purpose of the account, (B) the securities intermediary or commodity intermediary (as the case may be) where such account is opened or maintained shall be acceptable to Lender, and (C) on or before the opening of such investment account, securities account or other similar account with a securities intermediary or commodity intermediary, such Borrower or Guarantor shall as Lender may specify either (1) execute and deliver, and cause to be executed and delivered to Lender, an Investment Property Control Agreement with respect thereto duly authorized, executed and delivered by such Borrower or Guarantor and such securities intermediary or commodity intermediary or (2) arrange for Lender to become the entitlement holder with respect to such investment property on terms and conditions acceptable to Lender.

(f) Borrowers and Guarantors are not the beneficiary or otherwise entitled to any right to payment under any letter of credit, banker's acceptance or similar instrument as of the

707761.15

**A2967**

CURTIS_000789

date hereof, except as set forth in the Information Certificate.  In the event that any Borrower or Guarantor shall be entitled to or shall receive any right to payment under any letter of credit, banker's acceptance or any similar instrument, whether as beneficiary thereof or otherwise after the date hereof, such Borrower or Guarantor shall promptly notify Lender thereof in writing. Such Borrower or Guarantor shall promptly, as Lender may specify, either (i) deliver, or cause to be delivered to Lender, with respect to any such letter of credit, banker's acceptance or similar instrument, the written agreement of the issuer and any other nominated person obligated to make any payment in respect thereof (including any confirming or negotiating bank), in form and substance satisfactory to Lender, consenting to the assignment of the proceeds of the letter of credit to Lender by such Borrower or Guarantor and agreeing to make all payments thereon directly to Lender or as Lender may otherwise direct or (ii) cause Lender to become, at Borrowers' expense, the transferee beneficiary of the letter of credit, banker's acceptance or similar instrument (as the case may be).

(g)Borrowers and Guarantors do not have any commercial tort claims as of the date hereof, except as set forth in the Information Certificate.  In the event that any Borrower or Guarantor shall at any time after the date hereof have any commercial tort claims, such Borrower or Guarantor shall promptly notify Lender thereof in writing, which notice shall (i) set forth in reasonable detail the basis for and nature of such commercial tort claim and (ii) include the express grant by such Borrower or Guarantor to Lender of a security interest in such commercial tort claim (and the proceeds thereof).  In the event that such notice does not include such grant of a security interest, the sending thereof by such Borrower or Guarantor to Lender shall be deemed to constitute such grant to Lender. Upon the sending of such notice, any commercial tort claim described therein shall constitute part of the Collateral and shall be deemed included therein. Without limiting the authorization of Lender provided in Section 5.2(a) hereof or otherwise arising by the execution by such Borrower or Guarantor of this Agreement or any of the other Financing Agreements, Lender is hereby irrevocably authorized from time to time and at any time to file such financing statements naming Lender or its designee as secured party and such Borrower or Guarantor as debtor, or any amendments to any financing statements, covering any such commercial tort claim as Collateral. In addition, each Borrower and Guarantor shall promptly upon Lender's request, execute and deliver, or cause to be executed and delivered, to Lender such other agreements, documents and instruments as Lender may require in connection with such commercial tort claim.

(h)Borrowers and Guarantors do not have any goods, documents of title or other Collateral in the custody, control or possession of a third party as of the date hereof, except as set forth in the Information Certificate and except for goods located in the United States in transit to a location of a Borrower or Guarantor permitted herein in the ordinary course of business of such Borrower or Guarantor in the possession of the carrier transporting such goods.  In the event that any goods, documents of title or other Collateral are at any time after the date hereof in the custody, control or possession of any other person not referred to in the Information Certificate or such carriers, Borrowers and Guarantors shall promptly notify Lender thereof in writing. Promptly upon Lender's request, Borrowers and Guarantors shall deliver to Lender a Collateral Access Agreement duly authorized, executed and delivered by such person and the Borrower or Guarantor that is the owner of such Collateral.

707761.15

**A2968**

 CURTIS_000790

(i) Borrowers and Guarantors shall take any other actions reasonably requested by Lender from time to time to cause the attachment, perfection and first priority (subject to the terms of the Second Lien Intercreditor Agreement) of, and the ability of Lender to enforce, the security interest of Lender in any and all of the Collateral, including, without limitation, (i) executing, delivering and, where appropriate, filing financing statements and amendments relating thereto under the UCC or other applicable law, to the extent, if any, that any Borrower's or Guarantor's signature thereon is required therefor, (ii) except to the extent prohibited by the terms of the and conditions of the financing of Ambulances permitted by and in accordance with Section 9.9(b) hereof and consistent with the terms of Section 5.1 hereof) causing Lender's name to be noted as secured party on any certificate of title for a titled good if such notation is a condition to attachment, perfection or priority of, or ability of Lender to enforce, the security interest of Lender in such Collateral, (iii) complying with any provision of any statute, regulation or treaty of the United States as to any Collateral if compliance with such provision is a condition to attachment, perfection or priority of, or ability of Lender to enforce, the security interest of Lender in such Collateral, and (iv) obtaining the consents and approvals of any Governmental Authority or third party, including, without limitation, any consent of any licensor, lessor (other than the leased premises of Borrowers and Guarantors on the date hereof located in Brooklyn, New York and Mount Vernon New York to the extent that the landlord under the lease refuses to execute and deliver a Collateral Access Agreement acceptable to Lender) or other person obligated on Collateral, and taking all actions required by any earlier versions of the UCC or by other law, as applicable in any relevant jurisdiction.

## SECTION 6.  <u>COLLECTION AND ADMINISTRATION</u>

6.1    <u>Borrowers' Loan Accounts</u>.  Lender shall maintain one or more loan account(s) on its books in which shall be recorded (a) all Loans, Letters of Credit and other Obligations and the Collateral, (b) all payments made by or on behalf of any Borrower or Guarantor and (c) all other appropriate debits and credits as provided in this Agreement, including fees, charges, costs, expenses and interest.  All entries in the loan account(s) shall be made in accordance with Lender's customary practices as in effect from time to time.

6.2    <u>Statements</u>.  Lender shall render to Administrative Borrower each month a statement setting forth the balance in the Borrowers' loan account(s) maintained by Lender for Borrowers pursuant to the provisions of this Agreement, including principal, interest, fees, costs and expenses.  Each such statement shall be subject to subsequent adjustment by Lender but shall, absent manifest errors or omissions, be considered correct and deemed accepted by Borrowers and Guarantors and conclusively binding upon Borrowers and Guarantors as an account stated except to the extent that Lender receives a written notice from Administrative Borrower of any specific exceptions of Administrative Borrower thereto within thirty (30) days after the date such statement has been received by Parent.  Until such time as Lender shall have rendered to Administrative Borrower a written statement as provided above, the balance in any Borrower's loan account(s) shall be presumptive evidence of the amounts due and owing to Lender by Borrowers and Guarantors.

6.3    <u>Collection of Accounts</u>.

707761.15

**A2969**

CURTIS_000791

(a) Borrowers shall establish and maintain, at their expense, blocked accounts or lockboxes and related blocked accounts (in either case, "Blocked Accounts"), as Lender may specify, with such banks as are acceptable to Lender in good faith into which Borrowers shall promptly deposit and direct their respective Account Debtors to directly remit all payments on Receivables and all payments constituting proceeds of other Collateral, other than Medicare Accounts, Medicaid Accounts or CHAMPUS/CHAMPVA Accounts, in the identical form in which such payments are made, whether by cash, check or other manner. Within ninety (90) days after the date hereof, as to any deposit account and other bank accounts maintained by any Borrower or Guarantor, other than Excluded Deposit Accounts, Borrowers and Guarantors shall close all such existing deposit and other bank accounts maintained at a bank, other than Lender and open new deposit accounts with Lender. At the request of Lender, Borrowers and Guarantors shall deliver to Lender a Deposit Account Control Agreement, duly authorized, executed and delivered, by such Borrowers and Guarantors, as the case may be, with respect to such Blocked Accounts with Lender.  If Lender determines at any time after such ninety (90) day period that a Borrower or Guarantor may maintain a Blocked Account at a bank other than Lender that is acceptable to Lender, then such Borrower or Guarantor shall deliver, or cause to be delivered to Lender a Deposit Account Control Agreement, duly authorized, executed and delivered by each bank where a Blocked Account is maintained as provided in Section 5.2 hereof or at any time and from time to time Lender may become the bank's customer with respect to any of the Blocked Accounts and promptly upon Lender's request, Borrowers shall execute and deliver such agreements and documents as Lender may require in connection therewith. Each Borrower and Guarantor agrees that all payments made to such Blocked Accounts or other funds received and collected by Lender, whether in respect of the Receivables, as proceeds of Collateral or otherwise shall be treated as payments to Lender in respect of the Obligations and therefore shall constitute the property of Lender to the extent of the then outstanding Obligations.

(b) Borrowers shall establish and maintain, at their expense, a separate lockbox and related deposit account into which such Borrower shall promptly deposit, and shall direct each Fiscal Intermediary or other Third Party Payor in accordance with the applicable Medicare Regulations, Medicaid Regulations and CHAMPUS/CHAMPVA Regulations to directly remit, all payments in respect of any Medicare Accounts, Medicaid Accounts or CHAMPUS/CHAMPVA Accounts (collectively, the "Medicare/Medicaid Payment Accounts"). Such separate deposit accounts and lockboxes shall only be used for purposes of receiving payments in respect of Medicare Accounts, Medicaid Accounts and CHAMPUS/CHAMPVA Accounts and shall be under the sole control and dominion of the applicable Borrower. Borrowers agree to instruct the depository banks at which the Medicare/Medicaid Payment Accounts are maintained to remit by federal funds wire transfer all funds received or deposited into such Medicare/Medicaid Payment Accounts amounts on deposit in such accounts on a daily basis to the Lender Payment Account or such bank account Lender as Lender may from time to time designate for such purpose pursuant to a Medicare/Medicaid Payment Direction Letter. Each Borrower agrees to provide Lender at least three (3) Business Days' prior written notice of the intention of such Borrower to change such payment instructions.  Any change in such instructions without the prior written consent of Lender or the failure by Borrowers to cause such payments to be remitted to the Medicare/Medicaid Payment Accounts shall constitute an Event of Default.

707761.15

**A2970**

CURTIS_000792

(c) For purposes of calculating the amount of the Loans available to Borrowers, such payments will be applied (conditional upon final collection) to the Obligations on the Business Day of receipt by Lender of immediately available funds in the Lender Payment Account provided such payments and notice thereof are received in accordance with Lender's usual and customary practices as in effect from time to time and within sufficient time to credit such Borrower's loan account on such day, and if not, then on the next Business Day.  For the purposes of calculating interest on the Obligations, such payments or other funds received will be applied (conditional upon final collection) to the Obligations on the same Business Day of receipt of immediately available funds by Lender in the Lender Payment Account provided such payments or other funds and notice thereof are received in accordance with Lender's usual and customary practices as in effect from time to time and within sufficient time to credit such Borrower's loan account on such day, and if not, then on the next Business Day.  In the event that at any time or from time to time there are no Revolving Loans outstanding, Lender shall be entitled to an administrative fee in an amount calculated based on the Interest Rate for Prime Rate Loans (on a per annum basis) multiplied by the amount of the funds received in the Blocked Accounts and Medicare/Medicaid Payment Accounts for such day as calculated by Lender in accordance with its customary practice.

(d) Each Borrower and Guarantor and their respective employees, agents and Subsidiaries shall, acting as trustee for Lender, receive, as the property of Lender, any monies, checks, notes, drafts or any other payment relating to proceeds of Accounts or other Collateral which come into their possession or under their control and immediately upon receipt thereof, shall deposit or cause the same to be deposited in the Blocked Accounts, or remit the same or cause the same to be remitted, in kind, to Lender.  In no event shall the same be commingled with any Borrower's or Guarantor's own funds.  Borrowers agree to reimburse Lender on demand for any amounts owed or paid to any bank or other financial institution at which a Blocked Account or any other deposit account or investment account is established or any other bank, financial institution or other person involved in the transfer of funds to or from the Blocked Accounts arising out of Lender's payments to or indemnification of such bank, financial institution or other person.  The obligations of Borrowers to reimburse Lender for such amounts pursuant to this Section 6.3 shall survive the termination of this Agreement.

6.4     Payments.

(a) All Obligations shall be payable to the Lender Payment Account as provided in Section 6.3 hereof or such other place as Lender may designate from time to time.  Subject to the other terms and conditions contained herein, including, without limitation, Sections 9.5 and 9.7 hereof and in the Second Lien Intercreditor Agreement, Lender shall apply payments received or collected from any Borrower or Guarantor or for the account of any Borrower or Guarantor (including the monetary proceeds of collections or of realization upon any Collateral) as follows: first, to pay any fees, indemnities or expense reimbursements then due to Lender from any Borrower or Guarantor; second, to pay interest due in respect of any Loans or Letter of Credit Obligations; third, to pay or prepay principal in respect of the Loans; fourth, to pay or prepay any other Obligations whether or not then due, in such order and manner as Lender determines and at any time an Event of Default exists or has occurred and is continuing, to provide cash collateral for any Letter of Credit Obligations.  Notwithstanding anything to the contrary contained in this Agreement, (i) unless so directed by Administrative Borrower, or unless a Default or an Event of

Default shall exist or have occurred and be continuing, Lender shall not apply any payments which it receives to any Eurodollar Rate Loans, except (A) on the expiration date of the Interest Period applicable to any such Eurodollar Rate Loans or (B) in the event that there are no outstanding Prime Rate Loans and (ii) to the extent any Borrower uses any proceeds of the Loans or Letters of Credit to acquire rights in or the use of any Collateral or to repay any Indebtedness used to acquire rights in or the use of any Collateral, payments in respect of the Obligations shall be deemed applied first to the Obligations arising from Loans and Letters of Credit that were not used for such purposes and second to the Obligations arising from Loans and Letters of Credit the proceeds of which were used to acquire rights in or the use of any Collateral in the chronological order in which such Borrower acquired such rights in or the use of such Collateral.

(b) At Lender's option, all principal, interest, fees, costs, expenses and other charges provided for in this Agreement or the other Financing Agreements may be charged directly to the loan account(s) of any Borrower maintained by Lender. If after receipt of any payment of, or proceeds of Collateral applied to the payment of, any of the Obligations, Lender is required to surrender or return such payment or proceeds to any Person for any reason, then the Obligations intended to be satisfied by such payment or proceeds shall be reinstated and continue and this Agreement shall continue in full force and effect as if such payment or proceeds had not been received by Lender. Borrowers and Guarantors shall be liable to pay to Lender, and do hereby indemnify and hold Lender harmless for the amount of any payments or proceeds surrendered or returned. This Section 6.4(b) shall remain effective notwithstanding any contrary action which may be taken by Lender in reliance upon such payment or proceeds. This Section 6.4 shall survive the payment of the Obligations and the termination of this Agreement.

6.5     Authorization to Make Loans. Lender is authorized to make the Loans based upon telephonic or other instructions received from anyone purporting to be an officer of Administrative Borrower or any Borrower or other authorized person or, at the discretion of Lender, if such Loans are necessary to satisfy any Obligations. All requests for Loans or Letters of Credit hereunder shall specify the date on which the requested advance is to be made (which day shall be a Business Day) and the amount of the requested Loan. Requests received after 11:00 a.m. New York City time on any day shall be deemed to have been made as of the opening of business on the immediately following Business Day. All Loans and Letters of Credit under this Agreement shall be conclusively presumed to have been made to, and at the request of and for the benefit of, any Borrower or Guarantor when deposited to the credit of any Borrower or Guarantor or otherwise disbursed or established in accordance with the instructions of any Borrower or Guarantor or in accordance with the terms and conditions of this Agreement.

6.6     Use of Proceeds. Borrowers shall use the initial proceeds of the Loans and Letters of Credit hereunder only for: (a) payments to Second Lien Agent on behalf of Second Lien Lenders in respect of the Second Lien Debt and to each of the other persons listed in and in the amounts set forth on the disbursement direction letter furnished by Borrowers to Lender on or about the date hereof and (b) costs, expenses and fees in connection with the preparation, negotiation, execution and delivery of this Agreement and the other Financing Agreements. All other Loans made or Letters of Credit provided to or for the benefit of any Borrower pursuant to the provisions hereof shall be used by such Borrower only for general operating, working capital and other proper corporate purposes of such Borrower not otherwise prohibited by the terms hereof. None of the proceeds will be used, directly or indirectly, for the purpose of purchasing or

707761.15

**A2972**

CURTIS_000794

carrying any margin security or for the purposes of reducing or retiring any indebtedness which was originally incurred to purchase or carry any margin security or for any other purpose which might cause any of the Loans to be considered a "purpose credit" within the meaning of Regulation U of the Board of Governors of the Federal Reserve System, as amended.

6.7    Appointment of Administrative Borrower as Agent for Requesting Loans and Receipts of Loans and Statements.

(a) Each Borrower hereby irrevocably appoints and constitutes Administrative Borrower as its agent and attorney-in-fact to request and receive Loans and Letters of Credit pursuant to this Agreement and the other Financing Agreements from Lender in the name or on behalf of such Borrower.  Lender may disburse the Loans to such bank account of Administrative Borrower or a Borrower or otherwise make such Loans to a Borrower and provide such Letters of Credit to a Borrower as Administrative Borrower may designate or direct, without notice to any other Borrower or Guarantor.  Notwithstanding anything to the contrary contained herein, Lender may at any time and from time to time require that Loans to or for the account of any Borrower be disbursed directly to an operating account of such Borrower.

(b) Administrative Borrower hereby accepts the appointment by Borrowers to act as the agent and attorney-in-fact of Borrowers pursuant to this Section 6.7. Administrative Borrower shall ensure that the disbursement of any Loans to each Borrower requested by or paid to or for the account of  Parent, or the issuance of any Letter of Credit for a Borrower hereunder, shall be paid to or for the account of such Borrower.

(c) Each Borrower and other Guarantor hereby irrevocably appoints and constitutes Administrative Borrower as its agent to receive statements on account and all other notices from Lender with respect to the Obligations or otherwise under or in connection with this Agreement and the other Financing Agreements.

(d)  Any notice, election, representation, warranty, agreement or undertaking by or on behalf of any other Borrower or any Guarantor by Administrative Borrower shall be deemed for all purposes to have been made by such Borrower or Guarantor, as the case may be, and shall be binding upon and enforceable against such Borrower or Guarantor to the same extent as if made directly by such Borrower or Guarantor.

(e) No purported termination of the appointment of Administrative Borrower as agent as aforesaid shall be effective, except after ten (10) days' prior written notice to Lender.

## SECTION 7.  **COLLATERAL REPORTING AND COVENANTS**

7.1    Collateral Reporting.

(a) Borrowers shall provide Lender with the following documents in a form satisfactory to Lender:

(i) on a weekly basis (but in any event by the third (3rd) Business Day after the end of each week) or more frequently at Borrower's option or as Lender may request, a Borrowing Base Certificate setting forth Borrower's calculation of the Revolving Loans and

707761.15

CONFIDENTIAL                                                                                                          CURTIS_000795

Letter of Credit Accommodations available to Borrower pursuant to the terms and conditions contained herein as of the last business day of the immediately preceding period as to the Accounts, duly completed and executed on behalf of Administrative Borrower by a Designated Officer, together with all schedules required pursuant to the terms of the Borrowing Base Certificate duly completed; provided, that, without limiting any other rights of Lender, upon Lender's request, Borrowers shall provide Lender on a daily basis with a schedule of Accounts, collections received and credits issued;

(ii) as soon as possible after the end of each month (but in any event within ten (10) Business Days after the end of the month), on a monthly basis or more frequently as Lender may request, (A) agings of accounts receivable, (B) agings of accounts payable (and including information indicating the amounts owing to lessors of any Ambulances that leased by any Borrower or Guarantors, owners and lessors of the leased premises, warehouses, processors and other third parties from time to time in possession of any Collateral), and (C) the amount of checks held by Borrowers and Guarantors;

(iii) as soon as possible after the end of each month (but in any event within thirty (30) days after the end of the month), on a monthly basis or more frequently as Lender may request, (A) a reconciliation of the then current months' aging of accounts receivable to the general ledger and (B) the amount of all accrual accounts of Borrowers and Guarantors that represent liabilities and non-cash-based assets;

(iv) upon Lender's good faith request, copies in electronic form, if that is the only medium in which Borrowers and Guarantors store any of the following, otherwise copies in electronic form or photocopies as so requested by Lender, of the following (A) any Medicare or Medicaid submissions for payment or claims for reimbursement in respect of Medicare Accounts and Medicaid Accounts, all invoices issued under Ambulance Transportation Services Contracts and to insurance companies in respect of Insurance Contracts, , and (B) any Ambulance Transportation Services Agreements, provider agreements, leases for Ambulances, purchase orders or invoices for Inventory and Equipment acquired by any Borrower or Guarantor; and

(v) such other reports and information as to the Collateral as Lender shall request in good faith from time to time.

(b) Nothing contained in any Borrowing Base Certificate shall be deemed to limit, impair or otherwise affect the rights of Lender contained herein and in the event of any conflict or inconsistency between the calculation of the Revolving Loans and Letter of Credit Obligations available to Borrowers as set forth in any Borrowing Base Certificate and as determined by Lender in accordance with the terms and conditions of this Agreement, the determination of Lender shall govern and be conclusive and binding upon Borrowers. Without limiting the foregoing, Borrowers shall furnish to Lender any information which Lender may reasonably request regarding the determination and calculation of any of the amounts set forth in the Borrowing Base Certificate. If any records or reports of Borrowers of the Collateral are prepared or maintained by an accounting service, contractor, shipper or other agent, Borrowers hereby irrevocably authorize such service, contractor, shipper or agent to deliver such records, reports

707761.15

**A2974**

CONFIDENTIAL

CURTIS_000796

and related documents to Lender and to follow Lender's instructions with respect to further services at any time that an Event of Default exists or has occurred and is continuing.

    7.2   <u>Accounts Covenants</u>.

    (a) Borrowers shall notify Lender promptly of: (i) any material delay in any Borrower's performance of any of its material obligations to any Account Debtor or the assertion of any material claims, offsets, defenses or counterclaims by any Account Debtor, or any material disputes with Account Debtors, or any settlement, adjustment or compromise thereof involving amounts in excess of $250,000 individually or in the aggregate for all Accounts, other than Private Pay Accounts, (ii) all material adverse information known to any Borrower or Guarantor relating to the financial condition of any Account Debtor whose accounts exceed $100,000, (iii) any event or circumstance which, to the best of any Borrower's or Guarantor's knowledge, would cause Lender to consider any then existing Accounts in excess of $100,000 as no longer constituting Eligible Accounts, (iv) any notice of determination from a Third Party Payor or a Program Integrity Contractor that a Borrower or Guarantor has received any overpayments under Medicare, Medicaid, CHAMPUS/CHAMPVA in excess of $250,000 individually or in the aggregate, (v) any  right that may be exercised to recoup or offset any payments due to any Borrower under the Medicare Regulations, Medicaid Regulations, or the CHAMPUS/CHAMPVA Regulations in excess of $100,000, individually or in the aggregate, (vi) any right that may be exercised to suspend, delay, defer or postpone any payments due to any Borrower under the Medicare Regulations, Medicaid Regulations, or the CHAMPUS/CHAMPVA Regulations and (vii) any notice from any Credit Card Issuer or Credit Card Processor that such person is ceasing or suspending, or will cease or suspend, any present or future payments due or to become due to any Borrower from such person, or that such person is terminating or will terminate any of the Credit Card Agreements.  Except to the extent permitted by this Section 7.2(a), no credit, discount, allowance or extension or agreement for any of the foregoing in excess of $250,000 individually or in the aggregate shall be granted to any Account Debtor without Lender's consent, except (i) in the ordinary course of a Borrower's or Guarantor's business in accordance with practices and policies previously disclosed in writing to Lender, and (ii) as set forth in the schedules delivered to Lender pursuant to Section 7.1(a) hereof.  So long as no Event of Default exists or has occurred and is continuing, Borrowers and Guarantors may settle, adjust or compromise any claim, offset, counterclaim or dispute with any Account Debtor, including, without limitation, any Account Debtor obligated on any Private Pay Account.  At any time that an Event of Default exists or has occurred and is continuing, Lender shall, at its option, have the exclusive right to settle, adjust or compromise any claim, offset, counterclaim or dispute with Account Debtors or grant any credits, discounts or allowances with respect to Accounts, other than Medicare Accounts, Medicaid Accounts and CHAMPUS/CHAMPVA Accounts unless Lender shall have taken such action as may be required under the applicable Medicare Regulations, Medicaid Regulations or CHAMPUS/CHAMPVA Regulations in order to exercise its rights of enforcement with respect to such Medicare Accounts, Medicaid Accounts or CHAMPUS/CHAMPVA Accounts, as the case may be.

    (b) With respect to each Account: (i) the amounts shown on any submission for payment or reimbursement or any invoice delivered to Lender or schedule thereof delivered to Lender shall be true and complete, (ii) no payments shall be made thereon except payments

707761.15

CONFIDENTIAL

immediately delivered to Lender pursuant to the terms of this Agreement, (iii) no credit, discount, allowance or extension or agreement for any of the foregoing shall be granted to any Account Debtor except in accordance with this Agreement and except for credits, discounts, allowances or extensions made or given in the ordinary course of each Borrower's business in accordance with practices and policies previously disclosed to Lender, (iv) there shall be no setoffs, deductions, contras, defenses, counterclaims or disputes existing or asserted with respect thereto in excess of $100,000, except as reported to Lender in accordance with the terms of this Agreement , and (v) none of the services provided or transactions giving rise thereto will violate any applicable foreign, Federal, State or local laws or regulations, all documentation relating thereto will be legally sufficient under such laws and regulations and all such documentation will be legally enforceable in accordance with its terms.

(c)  Lender shall have the right at any time or times, in Lender's name or in the name of a nominee of Lender, to verify the validity, amount or any other matter relating to any Receivables or other Collateral, by mail, telephone, facsimile transmission or otherwise.

(d)  For each Medicare Account included as an Eligible Account in the most recent Borrowing Base Certificate delivered to Lender, all required authorizations and submissions have been made in accordance with applicable Medicare Regulations in order for the Borrower providing such Ambulance Service to be reimbursed and paid for such Account.

(e)  For each Medicaid Account included as an Eligible Account in the most recent Borrowing Base Certificate delivered to Lender, all required authorizations and submissions have been made in accordance with applicable Medicaid Regulations in order for the Borrower providing such Ambulance Service to be reimbursed and paid for such Account.

(f)  For each Facility Contract Account included as an Eligible Account in the most recent Borrowing Base Certificate delivered to Lender, all applicable procedures have been completed and documentation obtained and submitted that are required in order for the Borrower providing such ambulance or other service to be reimbursed and paid for such Account.

(g)  For each Insurance Account included as an Eligible Account in the most recent Borrowing Base Certificate delivered to Lender, the patient to whom the Borrower has provided Ambulance Services is entitled to coverage by the applicable insurance company and such Borrower has complied in all material respects with the applicable authorizations, procedures and documentation that are required in order for such Borrower such Ambulance Service to be reimbursed and paid for such Account.

(h)  For each CHAMPUS/CHAMPVA Account included as an Eligible Account in the most recent  Borrowing Base Certificate delivered to Lender, all required authorizations and submissions have been made in accordance with applicable CHAMPUS/CHAMPVA Regulations in order for the Borrower providing such Ambulance Service to be reimbursed and paid for such Account.

(i)  For each Paratransit Contract Account included as an Eligible Account in the most recent Borrowing Base Certificate delivered to Lender, all applicable procedures have been completed and documentation obtained and submitted that are required in order for the Borrower providing such Paratransit Service or to be reimbursed and paid for such Account.

707761.15

**A2976**

CONFIDENTIAL

CURTIS_000798

(j)  Borrowers and Guarantors have established and will maintain a compliance program to ensure that the practices and policies of Borrowers and Guarantors with respect to the businesses of Borrowers and Guarantors adhere to and comply with the Medicare Regulations, Medicaid Regulations, CHAMPUS/CHAMPVA Regulations and all other applicable Health Care Laws and applicable insurance law in order to ensure that Borrowers and Guarantors will be reimbursed and paid for claims submitted to the applicable Third Party Payor.  Notwithstanding the foregoing provisions of Sections 7.2(b) through (h), Borrowers shall not be deemed be in breach of any representation or warranty set forth in such Sections to the extent that a breach thereof arises from (i) a subsequent change in the Third Party Payor with respect to any Accounts (including any resulting change in the classification of such Accounts) included in a Borrowing Base Certificate previously delivered to Lender and (ii) any adjustments resulting from billing and documentation errors and corrections in the ordinary course of such Borrower's or Guarantor's business, provided, that, as to either of the foregoing clause (i) or (ii), (A) such change or adjustments do not affect an aggregate of more than $250,000 of Accounts included in any single Borrowing Base Certificate delivered to Lender and (B) any such change or adjustments are reflected or disclosed in the first Borrowing Base Certificate delivered to Lender after Borrower has notice of, is advised of, or has actual knowledge of the need to make such change or adjustment.   Nothing contained in this Section 7.2(j) shall limit any of the rights of Lender with respect to any Revolving Loans in excess of the Borrowing Base as a result of such changes or adjustments to the Borrowing Base.

7.3    Inventory Covenants.  With respect to the Inventory: (a) each Borrower and Guarantor shall at all times maintain inventory records reasonably satisfactory to Lender; (b) each Borrower and Guarantor shall maintain Inventory at the locations set forth herein, except for (i) Inventory in Ambulances that used or consumed in Ambulance Services in the ordinary course of its business, (ii) Inventory moved from one location permitted herein to another such location and (iii) Inventory in transit to the locations set forth or permitted herein; (c) Borrowers and Guarantors shall use, store and maintain the Inventory with all reasonable care and caution and in accordance with applicable standards of any insurance and in conformity with applicable laws; (d) none of the Inventory or other Collateral constitutes farm products or the proceeds thereof; (e) each Borrower and Guarantor shall be responsible for any liability arising from or relating to the use, sale or other disposition of the Inventory; (f) Borrowers and Guarantors shall not sell Inventory to any customer on approval, or any other basis which entitles the customer to return or may obligate any Borrower or Guarantor to repurchase such Inventory; (g) Borrowers and Guarantors shall keep the Inventory in good condition; and (h) Borrowers and Guarantors shall not, without prior written notice to Lender or the specific identification of such Inventory in a report with respect thereto provided by Administrative Borrower to Lender pursuant to Section 7.1(a) hereof, acquire or accept any Inventory on consignment or approval.

7.4    Equipment and Real Property Covenants. With respect to the Equipment and Real Property:  (a) Borrowers and Guarantors shall keep the Equipment, including, without limitation, all Ambulances and Ambulance related Equipment in good order, repair, running and marketable condition (ordinary wear and tear excepted), except for Ambulances and service vehicles that a Borrower or Guarantor determines in good faith are no longer necessary to use in order to conduct its business; (b) Borrowers and Guarantors shall use the Equipment and Real Property with all reasonable care and caution and in accordance with applicable standards of any insurance and in conformity in all material respects with all applicable laws; (c) the Equipment is

707761.15

CONFIDENTIAL                                                                                                      CURTIS_000799

and shall be used in the business of Borrowers and Guarantors and not for personal, family, household or farming use; (d) Borrowers and Guarantors shall not remove any Equipment from the locations set forth or permitted herein, except to the extent necessary to have any Equipment repaired or maintained in the ordinary course of its business or to move Equipment directly from one location set forth or permitted herein to another such location and except for the movement of Ambulances and other motor vehicles, including Inventory and Equipment located therein, used by or for the benefit of such Borrower or Guarantor in the ordinary course of business; (e) the Equipment is now and shall remain personal property and Borrowers and Guarantors shall not permit any of the Equipment to be or become a part of or affixed to real property; and (f) each Borrower and Guarantor shall be responsible for any liability arising from its use of the Equipment and Real Property.

7.5    <u>Power of Attorney</u>. Except with respect to Medicare Accounts, Medicaid Accounts and CHAMPUS/CHAMPVA Accounts or any other Account where the Account Debtor is a Governmental Authority and such designation or appointment is prohibited by applicable law (<u>provided, that</u>, the foregoing exception shall be deemed to limit Lender's rights or remedies to the extent that Lender has complied with the applicable Medicare Regulations, Medicaid Regulations or CHAMPUS/CHAMPVA Regulations, as the case may be, in order to exercise its rights and remedies under applicable law), each Borrower and Guarantor hereby irrevocably designates and appoints Lender (and all persons designated by Lender) as such Borrower's and Guarantor's true and lawful attorney-in-fact, and authorizes Lender, in such Borrower's, Guarantor's or Lender's name, to: (a) at any time an Event of Default exists or has occurred and is continuing (i) demand payment on Receivables or other Collateral, (ii) enforce payment of Receivables by legal proceedings or otherwise, (iii) exercise all of such Borrower's or Guarantor's rights and remedies to collect any Receivable or other Collateral, (iv) sell or assign any Receivable upon such terms, for such amount and at such time or times as the Lender deems advisable, (v) settle, adjust, compromise, extend or renew an Account, (vi) discharge and release any Receivable, (vii) prepare, file and sign such Borrower's or Guarantor's name on any proof of claim in bankruptcy or other similar document against an Account Debtor or other obligor in respect of any Receivables or other Collateral, (viii) notify the post office authorities to change the address for delivery of remittances from Account Debtors or other obligors in respect of Receivables or other proceeds of Collateral to an address designated by Lender, and open and dispose of all mail addressed to such Borrower or Guarantor and handle and store all mail relating to the Collateral; and (ix) do all acts and things which are necessary, in Lender's good faith determination, to fulfill such Borrower's or Guarantor's obligations under this Agreement and the other Financing Agreements and (b) at any time to (i) take control in any manner of any item of payment in respect of Receivables or constituting Collateral or otherwise received in or for deposit in the Blocked Accounts or otherwise received by Lender, (ii) have access to any lockbox or postal box into which remittances from Account Debtors or other obligors in respect of Receivables or other proceeds of Collateral are sent or received, (iii) endorse such Borrower's or Guarantor's name upon any items of payment in respect of Receivables or constituting Collateral or otherwise received by Lender and deposit the same in Lender's account for application to the Obligations, (iv) endorse such Borrower's or Guarantor's name upon any chattel paper, document, instrument, invoice, or similar document or agreement relating to any Receivable or any goods pertaining thereto or any other Collateral, including any warehouse or other receipts, or bills of lading and other negotiable or non-negotiable documents, (v) clear Inventory the purchase of which was financed with a Letter of Credit through U.S.

707761.15

**A2978**

CURTIS_000800

Customs or foreign export control authorities in such Borrower's or Guarantor's name, Lender's name or the name of Lender's designee, and to sign and deliver to customs officials powers of attorney in such Borrower's or Guarantor's name for such purpose, and to complete in such Borrower's or Guarantor's or Lender's name, any order, sale or transaction, obtain the necessary documents in connection therewith and collect the proceeds thereof, and (vi) sign such Borrower's or Guarantor's name on any verification of Receivables and notices thereof to Account Debtors or any secondary obligors or other obligors in respect thereof. Each Borrower and Guarantor hereby releases Lender and its officers, employees and designees from any liabilities arising from any act or acts under this power of attorney and in furtherance thereof, whether of omission or commission, except as a result of Lender's own gross negligence or willful misconduct as determined pursuant to a final non-appealable order of a court of competent jurisdiction.

7.6     Right to Cure. Lender may, at its option, upon notice to Administrative Borrower, (a) cure any default by any Borrower or Guarantor under any material agreement with a third party that affects the Collateral, its value or the ability of Lender to collect, sell or otherwise dispose of the Collateral or the rights and remedies of Lender therein or the ability of any Borrower or Guarantor to perform its obligations hereunder or under any of the other Financing Agreements, (b) pay or bond on appeal any judgment entered against any Borrower or Guarantor, (c) discharge taxes, liens, security interests or other encumbrances at any time levied on or existing with respect to the Collateral and (d) pay any amount, incur any expense or perform any act which, in Lender's judgment, is necessary or appropriate to preserve, protect, insure or maintain the Collateral and the rights of Lender with respect thereto; provided, that so long as no Default or Event of Default exists or has occurred and is continuing, Lender agrees to first request that Borrowers or Guarantors take the action referred to in the immediately preceding clauses (a) through (c), and Borrowers and Guarantors shall have failed to take such action within ten (10) Business Days. Lender may add any amounts so expended to the Obligations and charge any Borrower's account therefor, such amounts to be repayable by Borrowers on demand. Lender shall be under no obligation to effect such cure, payment or bonding and shall not, by doing so, be deemed to have assumed any obligation or liability of any Borrower or Guarantor. Any payment made or other action taken by Lender under this Section shall be without prejudice to any right to assert an Event of Default hereunder and to proceed accordingly.

7.7     Access to Premises. From time to time as requested by Lender, at the cost and expense of Borrowers, (a) Lender or its designee shall have complete access to all of each Borrower's and Guarantor's premises during normal business hours and after notice to Parent, or at any time and without notice to Administrative Borrower if an Event of Default exists or has occurred and is continuing, for the purposes of inspecting, verifying and auditing the Collateral and all of each Borrower's and Guarantor's books and records, including the Records, and (b) each Borrower and Guarantor shall promptly furnish to Lender such copies of such books and records or extracts therefrom as Lender may request in good faith, and (c) Lender or Lender's designee may use during normal business hours such of any Borrower's and Guarantor's personnel, equipment, supplies and premises as may be reasonably necessary for the foregoing and if an Event of Default exists or has occurred and is continuing for the collection of Receivables and realization of other Collateral.

707761.15

CONFIDENTIAL                                                                                          CURTIS_000801

## SECTION 8.  REPRESENTATIONS AND WARRANTIES

Each Borrower and Guarantor hereby represents and warrants to Lender the following (which shall survive the execution and delivery of this Agreement):

8.1     Corporate Existence, Power and Authority.  Each Borrower and Guarantor is a corporation duly organized and in good standing under the laws of its jurisdiction of organization and is duly qualified as a foreign corporation and in good standing in all states or other jurisdictions where the nature and extent of the business transacted by it or the ownership of assets makes such qualification necessary, except for those jurisdictions in which the failure to so qualify would not have a material adverse effect on such Borrower's or Guarantor's financial condition, results of operation or business or the rights of Lender in or to any of the Collateral. The execution, delivery and performance of this Agreement, the other Financing Agreements and the transactions contemplated hereunder and thereunder (a) are all within each Borrower's and Guarantor's corporate powers, (b)  have been duly authorized, (c) are not in contravention of any law or the terms of any Borrower's or Guarantor's certificate of incorporation, by-laws, or other organizational documentation, or any material indenture, agreement or undertaking to which any Borrower or Guarantor is a party or by which any Borrower or Guarantor or its property are bound and (d) will not result in the creation or imposition of, or require or give rise to any obligation to grant, any lien, security interest, charge or other encumbrance upon any property of any Borrower or Guarantor.  This Agreement and the other Financing Agreements to which any Borrower or Guarantor is a party constitute legal, valid and binding obligations of such Borrower and Guarantor enforceable in accordance with their respective terms.

8.2     Name; State of Organization; Chief Executive Office; Collateral Locations.

(a) The exact legal name of each Borrower and Guarantor is as set forth on the signature page of this Agreement and in the Information Certificate.  No Borrower or Guarantor has, during the five years prior to the date of this Agreement, been known by or used any other corporate or fictitious name or been a party to any merger or consolidation, or acquired all or substantially all of the assets of any Person, or acquired any of its property or assets out of the ordinary course of business, except as set forth in the Information Certificate.

(b) Each Borrower and Guarantor is an organization of the type and organized in the jurisdiction set forth in the Information Certificate.  The Information Certificate accurately sets forth the organizational identification number of each Borrower and Guarantor that is not a Delaware corporation or accurately states that such Borrower or Guarantor has none and accurately sets forth the federal employer identification number of each Borrower and Guarantor.

(c) The chief executive office and mailing address of each Borrower and Guarantor and each Borrower's and Guarantor's Records concerning Accounts are located only at the address identified as such in Schedule 8.2 to the Information Certificate and, as of the date hereof, its only other places of business and the only other locations of Collateral, if any, are the addresses set forth in Schedule 8.2 to the Information Certificate, except for (i) any call centers from time to time located at any Facility and (ii) the movement of Ambulances and other vehicles, and any Inventory and Equipment located therein, in the ordinary course of business, and subject to the rights of any Borrower or Guarantor to establish new locations in accordance

707761.15

CONFIDENTIAL

CURTIS_000802

with Section 9.2 hereof.  The Information Certificate correctly identifies any of such locations which are not owned by a Borrower or Guarantor and sets forth the owners or operators thereof.

     8.3    <u>Financial Statements; No Material Adverse Change</u>.

     (a) The audited consolidated financial statements of Parent and its Subsidiaries for the fiscal years ending December 31, 2004 and December 31, 2005, including the consolidated balance sheets, statements of income, operating summary by business segment, cash flows and changes in stockholders' equity for the fiscal years ended on such dates used to prepare such audited financial statements, and the unaudited consolidated financial statements of Parent and its Subsidiaries for the six-month period ended June 30, 2006, including the unaudited consolidated balance sheets, statements of income, operating summary by business segment, cash flows and changes in stockholder's equity for the six-month period ended on such date (the "Interim Financial Statements"), copies of which have been delivered to Lender, have been prepared in accordance with GAAP, consistently applied (except as to the Interim Financial Statements, to the extent such statements are subject to normal year-end adjustments and do not include any notes) and fairly present in all material respects the financial position of the Parent and its Subsidiaries on a consolidated basis at such dates and the results of their operations for such periods.  Since the December 31, 2005, there has been no Material Adverse Change in the financial condition of Borrowers and Guarantors from that shown in the December 31, 2005 financial statements delivered to Lender, except as disclosed in the Interim Financial Statements.

     (b) The projections dated June 1, 2006 of the Parent and its Subsidiaries on a consolidated basis for the fiscal years ending December 31, 2006 and December 31, 2007 that have been furnished to Lender on or prior to the date hereof, have been prepared in good faith, based on estimates and assumptions believed by Borrowers to be reasonable at the time being made (it being understood that actual results may differ from those set forth in such projected financial statements but the fact that such difference may result will not entitle Borrowers and Guarantor to a defense against any right or remedy that Lender may have if such projections were not prepared in accordance with this Section 8.3(b)).

     8.4    <u>Priority of Liens; Title to Properties</u>.  The security interests and liens granted to Lender under this Agreement and the other Financing Agreements constitute valid and perfected first priority liens and security interests in and upon the Collateral subject only to the liens indicated on Schedule 8.4 to the Information Certificate and the other liens permitted under Section 9.8 hereof.  Each Borrower and Guarantor has (a) good and marketable fee simple title to or a valid leasehold interest in all of its Real Property that is necessary for the conduct of the business and operations of such Borrower and Guarantor and (a) good, valid and merchantable title to or a valid leasehold interest in or a license to all of its other properties and assets, in each case, subject to no liens, mortgages, pledges, security interests, encumbrances or charges of any kind, except those granted to Lender and such others as are specifically listed on Schedule 8.4 to the Information Certificate or permitted by Section 9.8 hereof.

     8.5    <u>Tax Returns</u>.  Each Borrower and Guarantor has filed, or caused to be filed, in a timely manner all tax returns, reports and declarations which are required to be filed by it.  All information in such tax returns, reports and declarations is complete and accurate in all material respects.  Each Borrower and Guarantor has paid or caused to be paid all taxes due and payable

707761.15

CONFIDENTIAL

or claimed due and payable in any assessment received by it, except taxes the validity of which are being contested in good faith by appropriate proceedings diligently pursued and available to such Borrower or Guarantor and with respect to which adequate reserves have been set aside on its books.  Adequate provision has been made for the payment of all accrued and unpaid Federal, State, county, local, foreign and other taxes whether or not yet due and payable and whether or not disputed.

8.6    Litigation.  Except as set forth on Schedule 8.6 to the Information Certificate, (a) there is no investigation by any Governmental Authority pending, or to the best of any Borrower's or Guarantor's knowledge threatened, against or affecting any Borrower or Guarantor, its or their assets or business and (b) there is no action, suit, proceeding or claim by any Person pending, or to the best of any Borrower's or Guarantor's knowledge threatened, against any Borrower or Guarantor or its or their assets or goodwill, or against or affecting any transactions contemplated by this Agreement, in each case, which if adversely determined against such Borrower or Guarantor has or could reasonably be expected to have a Material Adverse Effect.

8.7    Compliance with Other Agreements and Applicable Laws.

(a) Borrowers and Guarantors are not in default in any respect under, or in violation in any respect of the terms of, any material agreement, contract, instrument, lease or other commitment to which it is a party or by which it or any of its assets are bound where such default or violation has or could reasonably be expected to have a Material Adverse Effect.  Borrowers and Guarantors are in compliance with the requirements of all applicable laws, rules, regulations and orders of any Governmental Authority relating to their respective businesses, including, without limitation, those set forth in or promulgated pursuant to the Occupational Safety and Health Act of 1970, as amended, the Fair Labor Standards Act of 1938, as amended, ERISA, the Code, as amended, and the rules and regulations thereunder, and all Environmental Laws, except where the failure to so comply does not or could not reasonably be expected to have a Material Adverse Effect.

(b) Borrowers and Guarantors have obtained all material permits, licenses, approvals, consents, certificates, orders or authorizations of any Governmental Authority required for the lawful conduct of its business (the "Permits").  All of the Permits are valid and subsisting and in full force and effect.  There are no actions, claims or proceedings pending or to the best of any Borrower's or Guarantor's knowledge, threatened that seek the revocation, cancellation, suspension or modification of any of the Permits where the revocation, cancellation, suspension or modification of any of the Permits has or could reasonably be expected to have a Material Adverse Effect.

8.8 Environmental Compliance.

(a) Except as set forth on Schedule 8.8 to the Information Certificate, Borrowers, Guarantors and any Subsidiary of any Borrower or Guarantor have not generated, used, stored, treated, transported, manufactured, handled, produced or disposed of any Hazardous Materials, on or off its premises (whether or not owned by it) in any manner which at any time violates in any material respect any applicable Environmental Law or Permit, and the operations of Borrowers, Guarantors and any Subsidiary of any Borrower or Guarantor complies in all material

707761.15

CONFIDENTIAL

CURTIS_000804

respects with all Environmental Laws and all Permits, except where the failure to so comply does not or could not reasonably be expected to have a Material Adverse Effect.

(b) Except as set forth on Schedule 8.8 to the Information Certificate, (i) there has been no investigation by any Governmental Authority or any proceeding, complaint, order, directive, claim, citation or notice by any Governmental Authority or any other person nor is any pending or to the best of any Borrower's or Guarantor's knowledge threatened, with respect to any non-compliance with or violation of the requirements of any Environmental Law by any Borrower or Guarantor and any Restricted Subsidiary of any Borrower or Guarantor that has or could reasonably be expected to have a Material Adverse Effect, or (ii) there has been no release, spill or discharge, threatened or actual, of any Hazardous Material or the generation, use, storage, treatment, transportation, manufacture, handling, production or disposal of any Hazardous Materials or any other environmental, health or safety matter in violation of any applicable Environmental Law that has or could reasonably be expected to have a Material Adverse Effect.

(c) Except as set forth on Schedule 8.8 to the Information Certificate, to the best of their knowledge, Borrowers, Guarantors and their Restricted Subsidiaries have no material liability (contingent or otherwise) in connection with a release, spill or discharge, threatened or actual, of any Hazardous Materials or the generation, use, storage, treatment, transportation, manufacture, handling, production or disposal of any Hazardous Materials in violation of any Environmental Law.

(d) Borrowers, Guarantors and their Restricted Subsidiaries have all Permits required to be obtained or filed in connection with the operations of Borrowers and Guarantors under any Environmental Law are valid and in full force and effect, except where the failure to obtain or maintain all such Permits does not or could not reasonably be expected to have a Material Adverse Effect.

8.9     Employee Benefits.

(a) Each Plan is in compliance in all material respects with the applicable provisions of ERISA, the Code and other Federal or State law.  Each Plan which is intended to qualify under Section 401(a) of the Code has received a favorable determination letter from the Internal Revenue Service and to the best of any Borrower's or Guarantor's knowledge, nothing has occurred which would cause the loss of such qualification.  Each Borrower and its ERISA Affiliates have made all required contributions to any Plan subject to Section 412 of the Code, and no application for a funding waiver or an extension of any amortization period pursuant to Section 412 of the Code has been made with respect to any Plan.

(b) There are no pending, or to the best of any Borrower's or Guarantor's knowledge, threatened claims, actions or lawsuits, or action by any Governmental Authority, with respect to any Plan.  There has been no prohibited transaction or violation of the fiduciary responsibility rules with respect to any Plan.

(c) (i)  No ERISA Event has occurred or is reasonably expected to occur; (ii) based on the latest valuation of each Pension Plan and on the actuarial methods and assumptions employed for such valuation (determined in accordance with the assumptions used for funding such Pension Plan pursuant to Section 412 of the Code), the aggregate current value of

707761.15

**A2983**

CURTIS_000805

accumulated benefit liabilities of such Pension Plan under Section 4001(a)(16) of ERISA does not exceed the aggregate current value of the assets of such Pension Plan; (iii) each Borrower and Guarantor, and their ERISA Affiliates, have not incurred and do not reasonably expect to incur, any liability under Title IV of ERISA with respect to any Plan (other than premiums due and not delinquent under Section 4007 of ERISA); (iv) each Borrower and Guarantor, and their ERISA Affiliates, have not incurred and do not reasonably expect to incur, any liability (and no event has occurred which, with the giving of notice under Section 4219 of ERISA, would result in such liability) under Section 4201 or 4243 of ERISA with respect to a Multiemployer Plan; and (v) each Borrower and Guarantor, and their ERISA Affiliates, have not engaged in a transaction that would be subject to Section 4069 or 4212(c) of ERISA.

      8.10   Bank Accounts. All of the deposit accounts, investment accounts or other accounts in the name of or used by any Borrower or Guarantor maintained at any bank or other financial institution are set forth on Schedule 8.10 to the Information Certificate, subject to the right of each Borrower and Guarantor to establish new accounts in accordance with Section 5.2 hereof.

      8.11   Intellectual Property. Each Borrower and Guarantor owns or licenses or otherwise has the right to use all Intellectual Property necessary for the operation of its business as presently conducted or proposed to be conducted. As of the date hereof, Borrowers and Guarantors do not have any material Intellectual Property necessary to conduct their business registered, or subject to pending applications, in the United States Patent and Trademark Office or any similar office or agency in the United States, any State thereof, any political subdivision thereof or in any other country, other than those described in Schedule 8.11 to the Information Certificate and has not granted any licenses with respect thereto other than as set forth in Schedule 8.11 to the Information Certificate. No event has occurred which permits or would permit after notice or passage of time or both, the revocation, suspension or termination of such rights that are material to the conduct of the business of Borrowers and Guarantors. To the best of any Borrower's and Guarantor's knowledge, no slogan or other advertising device, product, process, method, substance or other Intellectual Property or goods bearing or using any such material Intellectual Property presently contemplated to be used by any Borrower or Guarantor infringes any patent, trademark, servicemark, tradename, copyright, license or other Intellectual Property owned by any other Person presently and no claim or litigation is pending or, to the best of each Borrower's and Guarantor's knowledge, threatened against or affecting any Borrower or Guarantor contesting its right to sell or use any such material Intellectual Property. Schedule 8.11 to the Information Certificate sets forth all of the agreements or other arrangements of each Borrower and Guarantor pursuant to which such Borrower or Guarantor has a license or other right to use any trademarks, logos, designs, representations or other Intellectual Property that are material to the operation of the business of each Borrower and Guarantor that are owned by another person as in effect on the date hereof and the dates of the expiration of such agreements or other arrangements of such Borrower or Guarantor as in effect on the date hereof (collectively, together with such agreements or other arrangements as may be entered into by any Borrower or Guarantor after the date hereof, collectively, the "License Agreements" and individually, a "License Agreement"), except for such licensed software that is generally commercially available for a fee.

      8.12   Subsidiaries; Affiliates; Capitalization; Solvency.

707761.15

CONFIDENTIAL

CURTIS_000806

(a) As of the date hereof, no Borrower or Guarantor (i) has any direct or indirect Subsidiaries or Affiliates that are stockholders of Parent (except in the case of Parent, Affiliates not known by Parent to be an Affiliate of a stockholder) or (ii) is engaged in any joint venture or partnership, except, in each case as set forth in Schedule 8.12 to the Information Certificate.

(b) Each Borrower and Guarantor is the record and beneficial owner of all of the issued and outstanding shares of Capital Stock of each of the Subsidiaries listed on Schedule 8.12 to the Information Certificate as being owned as of the date hereof by such Borrower or Guarantor and there are no proxies, irrevocable or otherwise, with respect to such shares and no equity securities of any of the Subsidiaries are or may become required to be issued by reason of any options, warrants, rights to subscribe to, calls or commitments of any kind or nature and there are no contracts, commitments, understandings or arrangements by which any Subsidiary is or may become bound to issue additional shares of it Capital Stock or securities convertible into or exchangeable for such shares.

(c) The issued and outstanding shares of Capital Stock of each Borrower (other than Parent) and Guarantor are directly and beneficially owned and held by the persons indicated in the Information Certificate. The record owners of the issued and outstanding shares of Capital Stock of Parent are indicated in the Information Certificate.  The issued and outstanding shares of Capital Stock as of the date hereof of each Borrower and Guarantor have been duly authorized and are fully paid and non-assessable, free and clear of all claims, liens, pledges and encumbrances of any kind, except as disclosed in the Information Certificate or as permitted by Section 9.8 hereof.

(d) Borrowers and Guarantors taken as a whole are Solvent and will continue to be Solvent after the creation of the Obligations, the security interests of Lender and the other transaction contemplated hereunder.

(e) The Unrestricted Subsidiaries do not own any assets or have any liabilities and are not engaged in any business or commercial activities, except for any Unrestricted Subsidiary so designated after the date hereof and agreed to by Lender after the date hereof, that (i) does not own any assets with a book value greater than $50,000, (ii) is not liable for any obligations, liabilities or indebtedness except as Lender and Administrative Borrower may agree to in writing, and (iii) is only engaged in business or commercial activities as Lender and Administrative Borrower may agree in writing.  No Borrower, Guarantor or Restricted Subsidiary has any obligation or liability (contingent or otherwise) with respect to any Unrestricted Subsidiary.

(f) The Inactive Subsidiaries (i) are not engaged in any business or commercial activities, (ii) do not own any assets with a book value greater than $50,000 individually or $100,000 in the aggregate and (iii) are not obligated or liable, directly or indirectly, contingently or otherwise, in respect of any Indebtedness or other obligations other than taxes and other obligations to maintain their existence in excess of $5,000.

8.13    Labor Disputes.

(a) Set forth on Schedule 8.13 to the Information Certificate is a list (including dates of termination) of all collective bargaining or similar labor agreements between or

707761.15

CONFIDENTIAL

CURTIS_000807

applicable to any Borrower or Guarantor and any union, labor organization or other bargaining agent in respect of the employees of any Borrower or Guarantor on the date hereof.

(b) There is (i) no significant unfair labor practice complaint pending against any Borrower or Guarantor or, to the best of any Borrower's or Guarantor's knowledge, threatened against it, before the National Labor Relations Board, and no significant grievance or significant arbitration proceeding arising out of or under any collective bargaining agreement is pending on the date hereof against any Borrower or Guarantor or, to best of any Borrower's or Guarantor's knowledge, threatened against it, and (ii) no significant strike, labor dispute, slowdown or stoppage is pending against any Borrower or Guarantor or, to the best of any Borrower's or Guarantor's knowledge, threatened against any Borrower or Guarantor.

8.14    Restrictions on Subsidiaries.   Except for restrictions contained in this Agreement or any other agreement with respect to Indebtedness of any Borrower or Guarantor permitted hereunder, there are no contractual or consensual restrictions on any Borrower or Guarantor or any of its Subsidiaries which prohibit or otherwise restrict (a) the transfer of cash or other assets (i) between any Borrower or Guarantor and any of its or their Subsidiaries or (ii) between any Subsidiaries of any Borrower or Guarantor or (b) the ability of any Borrower or Guarantor or any of its or their Subsidiaries to incur Indebtedness or grant security interests to Lender in the Collateral.

8.15    Material Contracts.   Schedule 8.15 to the Information Certificate sets forth all Material Contracts to which any Borrower or Guarantor is a party or is bound as of the date hereof. Borrowers and Guarantors have delivered true, correct and complete copies of such Material Contracts to Lender on or before the date hereof.  Borrowers and Guarantors are not in breach or in default in any material respect of or under any Material Contract and have not received any notice of the intention of any other party thereto to terminate any Material Contract.

8.16    Payable Practices.   Each Borrower and Guarantor has not made any material change in the historical accounts payable practices from those in effect immediately prior to the date hereof.

8.17    Credit Card Agreements.   Set forth in Schedule 8.17 hereto is a correct and complete list of all of the Credit Card Agreements existing as of the date hereof between or among any Borrower or any Guarantor, the Credit Card Issuers and the Credit Card Processors. The Credit Card Agreements constitute all of such agreements necessary for each Borrower to operate its business as presently conducted with respect to credit cards and debit cards and no Receivables of any Borrower arise from purchases by customers of Inventory with credit cards or debit cards, other than those which are issued by Credit Card Issuers with whom such Borrower has entered into one of the Credit Card Agreements set forth on Schedule 8.17 hereto or with whom Borrower has entered into a Credit Card Agreement in accordance with Section 9.15 hereof.  Each of the Credit Card Agreements constitutes the legal, valid and binding obligations of the Borrower that is party thereto and to the best of each Borrower's and Guarantor's knowledge, the other parties thereto, enforceable in accordance with their respective terms and is in full force and effect. Each Borrower and Guarantor has complied in all material respects with all of the terms and conditions of the Credit Card Agreements to the extent necessary for such Borrower to be entitled to receive all payments thereunder.  Borrowers have delivered, or caused

707761.15

**A2986**

CURTIS_000808

to be delivered to Lender, true, correct and complete copies of all of the Credit Card Agreements in effect as of the date hereof.

8.18    Interrelated Businesses. Borrowers and Guarantors make up a related organization of various entities constituting a single economic and business enterprise so that Borrowers and Guarantors share an identity of interests such that any benefit received by any one of them benefits the others. Borrowers and Guarantors render services to or for the benefit of the other Borrowers or Guarantors, as the case may be, purchase or sell and supply goods to or from or for the benefit of the others, make loans, advances and provide other financial accommodations to or for the benefit of the other Borrowers and Guarantors and provide administrative, marketing, payroll and management services to or for the benefit of the other Borrowers and Guarantors. Borrowers and Guarantors have the same chief executive office, certain centralized billing, accounting and legal services, certain common officers and directors and generally do not provide consolidating financial statements to creditors.

8.19    HIPAA Compliance.

(a) To the extent that and for so long as any Borrower or Guarantor is a "covered entity" within the meaning of HIPAA, such Borrower or Guarantor (i) has undertaken or will undertake all surveys, audits, inventories, reviews, analyses and/or assessments (including any necessary risk assessments) of its business and operations as and to the extent required by HIPAA; (ii) has developed or will promptly develop an appropriate plan and time line for becoming HIPAA Compliant (a "HIPAA Compliance Plan"); and (iii) has implemented or will implement those provisions of such HIPAA Compliance Plan, to the extent not HIPAA Compliant in all material respects necessary to ensure that such Borrower or Guarantor is or becomes HIPAA Compliant.

(b) For purposes hereof, "HIPAA Compliant' shall mean that a Borrower or Guarantor (i) is or will be in compliance in all material respects with each of the applicable requirements of the so-called "Administrative Simplification" provisions of HIPAA on and as of each date that any part thereof, or any final rule or regulation thereunder, becomes effective in accordance with its or their terms, as the case may be (each such date, a "HIPAA Compliance Date") and (ii) is not and could not reasonably be expected to become, as of any date following any such HIPAA Compliance Date, the subject of any civil or criminal penalty, process, claim, action or proceeding, or any administrative or other regulatory review, survey, process or proceeding (other than routine surveys or reviews conducted by any government health plan or other accreditation entity) that has or could reasonably be expected to have a Material Adverse Effect.

(c) Schedule 8.19 hereto sets forth substantially all the "business associate agreements" (as such term is defined in HIPAA) that any Borrower or Guarantor has entered into with any Facility.

8.20    Compliance with Health Care Laws. Without limiting the generality of Sections 8.1, 8.7, 8.18 or 8.19, or any other representation or warranty made herein or in any of the other Financing Agreements:

707761.15

**A2987**

(a)  Schedule 8.20(a) hereto sets forth each Borrower and Guarantor that is an Approved Medicare Ambulance Provider and Approved Medicaid Ambulance Provider and which is designated as eligible to receive reimbursement or payment for ambulance services under the Medicare Regulations and Medicaid Regulations and, if applicable, under the existing provider or other agreements with the Medicare and Medicaid programs through the applicable Fiscal Intermediary or other Third Party Payor for the states or regions indicated in Schedule 8.20(a) hereto.

(b) Each Borrower and Guarantor who is an Approved Medicare Ambulance Provider and Approved Medicaid Ambulance Provider is in compliance with all Health Care Laws, including, without limitation, all Medicare Regulations, Medicaid Regulations and CHAMPUS/CHAMPVA Regulations applicable to them, in each case where the failure to so comply has or could reasonably be expected to have a Material Adverse Effect.. No Borrower or Guarantor has received notice by a Governmental Authority of any violation of any provisions of the Medicare and Medicaid Anti-Fraud and Abuse or Anti-Kickback Amendments of the Social Security Act, as amended,  or the Medicare and Medicaid Patient and Program Protection Act of 1987 that has not been resolved, except as set forth on the Information Certificate.

(c)  Each Borrower and Guarantor provides Ambulance Services to persons in accordance with the Medicare, Medicaid, CHAMPUS and CHAMPVA program rules to ensure that such Borrower or Guarantor will obtain reimbursement for providing such ambulance transport and services covered by Medicare, Medicaid, CHAMPUS or CHAMPVA programs to persons. Each Borrower and Guarantor has maintained in all material respects all documents, reports and records required to be maintained by the Federal and State Medicare and Medicaid programs as required by the Health Care Laws necessary to provide ambulance services and necessary to be reimbursed or paid for providing Ambulance Services, including, without limitation, the national fee schedule for ambulance services furnished as a benefit under Medicare Part B under Section 1834(1) of the Social Security Act, as added by Section 4531 of the Balanced Budget Act of  1997, and the Medicaid Regulations thereunder.

(d) Each Borrower and Guarantor has all necessary permits, licenses, franchises, certificates and other approvals or authorizations of Governmental Authority as are required under applicable Medicare Regulations, Medicaid Regulations and other Health Care Laws to provide ambulance services in each state and other jurisdictions in which each Borrower or Guarantor provides such services that are necessary to conduct its business as presently conducted or proposed to be conducted.

(e)  Each Borrower and Guarantor has in a timely manner filed all reports, claims and other reports required to be filed in connection with all Medicare, Medicaid and CHAMPUS/CHAMPVA programs due on or before the date hereof that are required for such Borrower or Guarantor to be entitled to be reimbursed or paid the amount requested to be paid for any Medicare Accounts, Medicaid Accounts or CHAMPUS/CHAMPVA Accounts all of which are complete and correct in all material respects.  Except as set forth on Schedule 8.20(e) hereto, there are no investigations, claims, actions or appeals pending before any Fiscal Intermediary, the Provider Reimbursement Review Board, the Administrator of CMS, the Department of Defense or the United States Department of Veterans Affairs or other Governmental Authority with respect to any Medicare, Medicaid, CHAMPUS or CHAMPVA payments, ambulance fee

707761.15

CONFIDENTIAL

CURTIS_000810

schedule, cost reports or claims filed by any Borrower or Guarantor, other than routine investigations or claims in the ordinary course of business involving amounts of less than $250,000 individually or in the aggregate. There currently exist no restrictions, deficiencies, required plans of correction actions or other such remedial measures with respect to Federal and State Medicare and Medicaid certifications or licensure with respect to the Ambulance Services of any Borrower or Guarantor.

(f)    Schedule 8.20(f) hereto sets forth as of the date hereof a current list of substantially all participation agreements of any Borrower or Guarantor with health maintenance organizations, insurance programs, preferred provider organizations and other Third Party Payors and all such agreements are in full force and effect and no material default exists thereunder.

(g)    Schedule 8.20(g) hereto sets forth as of the date hereof an accurate, complete and current list of substantially all Facilities with whom Borrowers and Guarantors have agreements to provide Ambulance Services or Paratransit Services where the payment will exceed $250,000 in any calendar year.

(h)    Each of Borrowers and Guarantors who is a an Approved Medicare Ambulance Provider and Approved Medicaid Ambulance Provider has in a timely manner filed all requisite reports, claims and other documents required to be filed to remain an Approved Medicare Ambulance Provider and an Approved Medicaid Provider in connection with all Medicare and Medicaid programs due on or before the date hereof, all of which are complete and correct in all material respects. No validation review or program or corporate integrity review or program related to Borrowers or Guarantors that may adversely affect the providing of Ambulances Services or any of the assets or business of Borrowers or Guarantors has been conducted by any Third Party Payor or Governmental Authority in connection with Medicare, Medicare, CHAMPUS or CHAMPVA programs, other than the Corporate Integrity Agreement, dated May 8, 2003, between TransCare NY and the Office of the Inspector General of the Department of Health and Human Services, and to the best of Borrowers' and Guarantors' knowledge no such reviews are scheduled, pending or threatened against or affecting Borrowers or Guarantors, or any of their assets, or the consummation of the transactions contemplated hereby.

(i)    Except a set forth in the Information Certificate as of the date hereof, there are no pending or, to the best of Borrowers' and Guarantors' knowledge, threatened investigations, actions or proceedings (other than routine audits or reviews) as result of the Ambulance Services or other health care activities, programs and practices of Borrowers or Guarantors for any violations of or failure to comply with any Health Care Laws, including, without limitation, any Medicare Regulations or Medicaid Regulations.

8.21    License of Ambulances.  All Ambulances that are used by Borrowers or Guarantors in their business have all necessary licenses and certifications to provide Ambulance Services in those States and local jurisdictions in which such Borrower or Guarantor provides Ambulance Services, except where the failure to have such licenses and certifications would not affect more than five (5%) percent of the Ambulances operated by such Borrower or Guarantor. All Ambulances satisfy all applicable vehicle requirements, other than those licenses, certifications and requirements for which a Borrower or Guarantor has obtained a valid waiver from the applicable Governmental Authority, to provide Ambulance Services in accordance with

707761.15

**A2989**

CONFIDENTIAL

CURTIS_000811

all applicable Federal, State and local emergency and non-emergencies ambulance transportation service Health Care Laws, except where the failure to comply with such requirements would not affect more than five (5%) percent of the Ambulances operated by such Borrower or Guarantor. All Ambulances of Borrowers and Guarantors are operated by personnel who are duly licensed and certified, or otherwise permitted, to provide ambulance services in the State and local jurisdictions in which such Borrowers and Guarantors provide Ambulance Services.

8.22    Accuracy and Completeness of Information.  All information furnished by or on behalf of any Borrower or Guarantor in writing to Lender in connection with this Agreement or any of the other Financing Agreements or any transaction contemplated hereby or thereby, including all information on the Information Certificate is true and correct in all material respects on the date as of which such information is dated or certified and does not omit any material fact necessary in order to make such information not misleading as of the date of which such information is dated or certified, other than in the case of projections to the extent set forth in Section 8.3(b) hereof.  No event or circumstance has occurred since December 31, 2005 which has had or could reasonably be expected to have a Material Adverse Affect, which has not been fully and accurately disclosed to Lender in writing prior to the date hereof.

8.23    Survival of Warranties; Cumulative.  All representations and warranties contained in this Agreement or any of the other Financing Agreements shall survive the execution and delivery of this Agreement and shall be deemed to have been made again to Lender on the date of each additional borrowing or other credit accommodation hereunder and shall be conclusively presumed to have been relied on by Lender regardless of any investigation made or information possessed by Lender (except to the extent any such representation or warranty was expressly made as of a specified date including the date hereof, in which case it shall only be deemed made as of such date). The representations and warranties set forth herein shall be cumulative and in addition to any other representations or warranties which any Borrower or Guarantor shall now or hereafter give, or cause to be given, to Lender.

## SECTION 9.  AFFIRMATIVE AND NEGATIVE COVENANTS

9.1    Maintenance of Existence.

(a) Each Borrower and Guarantor shall at all times preserve, renew and keep in full force and effect its corporate existence and rights and franchises with respect thereto and maintain in full force and effect all licenses, trademarks, tradenames, approvals, authorizations, leases, contracts and Permits necessary to carry on the business as presently or proposed to be conducted, except as and to the extent permitted in accordance with the terms and conditions of Section 9.7 hereof.

(b) No Borrower or Guarantor shall change its name unless each of the following conditions is satisfied: (i) Lender shall have received not less than thirty (30) days prior written notice from Administrative Borrower of such proposed change in its corporate name, which notice shall accurately set forth the new name; and (ii) Lender shall have received a copy of the amendment to the Certificate of Incorporation of such Borrower or Guarantor providing for the name change certified by the Secretary of State of the jurisdiction of incorporation or organization of such Borrower or Guarantor promptly after it is available.

707761.15

CONFIDENTIAL                                                                 CURTIS_000812

(c) No Borrower or Guarantor shall change its chief executive office or the mailing address thereof or organizational identification number (or if it does not have one, shall not acquire one) unless Lender shall have received not less than ten (10) days' prior written notice from Administrative Borrower of such proposed change, which notice shall set forth such information with respect thereto as Lender may require and Lender shall have received such agreements as Lender may reasonably require in connection therewith. No Borrower or Guarantor shall change its type of organization, jurisdiction of organization or other legal structure, except as and to the extent permitted in accordance with the terms and conditions of Section 9.7 hereof.

9.2     New Collateral Locations. Each Borrower and Guarantor may only open any new location within the continental United States provided such Borrower or Guarantor (a) gives Lender ten (10) days prior written notice of the intended opening of any such new location and (b) executes and delivers, or causes to be executed and delivered, to Lender such agreements, documents, and instruments as Lender may deem reasonably necessary or desirable to protect its interests in the Collateral at such location; provided, that, Borrowers and Guarantors shall not be required to give notice of the location of a call center at a Facility, unless Lender requests such information and notice at any time a Default or Event of Default exists or has occurred and is continuing.

9.3     Compliance with Laws, Regulations, Etc.

(a)     Each Borrower and Guarantor shall, and shall cause any Restricted Subsidiary to, at all times, comply in all material respects with all laws, rules, regulations, licenses, approvals, orders and other Permits applicable to it and duly observe all requirements of any foreign, Federal, State or local Governmental Authority, except where the failure to so comply or observe does not or could not reasonably expected to have a Material Adverse Effect.

(b)     Borrowers and Guarantors shall give written notice to Lender promptly upon any Borrower's or Guarantor's receipt of any notice of, or any Borrower's or Guarantor's otherwise obtaining knowledge of, (i) the occurrence of any event involving the release, spill or discharge, threatened or actual, of any Hazardous Material in violation of any Environmental Law or (ii) any investigation, proceeding, complaint, order, directive, claims, citation or notice with respect to: (A) any non-compliance with or violation of any Environmental Law by any Borrower or Guarantor or (B) the release, spill or discharge, threatened or actual, of any Hazardous Material other than in the ordinary course of business and other than as permitted under any applicable Environmental Law. Copies of all environmental surveys, audits, assessments, feasibility studies and results of remedial investigations shall be promptly furnished, or caused to be furnished, by such Borrower or Guarantor to Lender. Each Borrower and Guarantor shall take prompt action to respond to any material non-compliance with any of the Environmental Laws and, upon request, shall report to Lender on such response.

(c)     Without limiting the generality of the foregoing, whenever Lender reasonably determines that there is non-compliance, or any condition which requires any action by or on behalf of any Borrower or Guarantor in order to avoid any non-compliance, with any Environmental Law, Borrowers shall, at Lender's request and Borrowers' expense: (i) cause an independent environmental engineer reasonably acceptable to Lender to conduct such tests of

707761.15

CONFIDENTIAL                                                                 CURTIS_000813

the site where non-compliance or alleged non-compliance with such Environmental Laws has occurred as to such non-compliance and prepare and deliver to Lender a report as to such non-compliance setting forth the results of such tests, a proposed plan for responding to any environmental problems described therein, and an estimate of the costs thereof and (ii) provide to Lender a supplemental report of such engineer whenever the scope of such non-compliance, or such Borrower's or Guarantor's response thereto or the estimated costs thereof, shall change in any material respect.

(d)     Each Borrower and Guarantor shall indemnify and hold harmless Lender and its directors, officers, employees, agents, invitees, representatives, successors and assigns, from and against any and all losses, claims, damages, liabilities, costs, and expenses (including reasonable attorneys' fees and expenses) directly or indirectly arising out of or attributable to the use, generation, manufacture, reproduction, storage, release, threatened release, spill, discharge, disposal or presence of a Hazardous Material, including the costs of any required or necessary repair, cleanup or other remedial work with respect to any property of any Borrower or Guarantor and the preparation and implementation of any closure, remedial or other required plans. All representations, warranties, covenants and indemnifications in this Section 9.3 shall survive the payment of the Obligations and the termination  of this Agreement.

9.4     Payment of Taxes and Claims.  Each Borrower and Guarantor shall, and shall cause any Restricted Subsidiary to, duly pay and discharge all taxes, assessments, contributions and governmental charges upon or against it or its properties or assets, except for taxes the validity of which are being contested in good faith by appropriate proceedings diligently pursued and available to such Borrower, Guarantor or Restricted Subsidiary, as the case may be, and with respect to which adequate reserves have been set aside on its books. Each Borrower and Guarantor shall be liable for any tax or penalties imposed on Lender as a result of the financing arrangements provided for herein and each Borrower and Guarantor agrees to indemnify and hold Lender harmless with respect to the foregoing, and to repay to Lender on demand the amount thereof, and until paid by such Borrower or Guarantor such amount shall be added and deemed part of the Loans, provided, that, nothing contained herein shall be construed to require any Borrower or Guarantor to pay any income or franchise taxes attributable to the income of Lender from any amounts charged or paid hereunder to Lender. The foregoing indemnity shall survive the payment of the Obligations and the termination of this Agreement.

9.5     Insurance.

(a) Each Borrower and Guarantor shall, and shall cause any Restricted Subsidiary to, at all times, maintain with financially sound and reputable insurers insurance with respect to the Collateral against loss or damage and all other insurance of the kinds and in the amounts customarily insured against or carried by corporations of established reputation engaged in the same or similar businesses and similarly situated.  Said policies of insurance shall be reasonably satisfactory to Lender as to form, amount and insurer.  Borrowers and Guarantors shall furnish certificates, policies or endorsements to Lender as Lender shall reasonably require as proof of such insurance, and, if any Borrower or Guarantor fails to do so within five (5) days after written request by Lender, Lender is authorized, but not required, to obtain such insurance at the expense of Borrowers.  All policies shall provide for at least thirty (30) days prior written notice to Lender of any cancellation or reduction of coverage and that Lender may act as attorney for

707761.15

**A2992**

CONFIDENTIAL

CURTIS_000814

each Borrower and Guarantor in obtaining, and at any time an Event of Default exists or has occurred and is continuing, adjusting, settling, amending and canceling such insurance. Borrowers and Guarantors shall cause Lender to be named as a loss payee and an additional insured (but without any liability for any premiums) under such insurance policies and Borrowers and Guarantors shall obtain non-contributory lender's loss payable endorsements to all insurance policies in form and substance satisfactory to Lender. Such lender's loss payable endorsements shall specify that the proceeds of such insurance shall be payable to Lender as its interests may appear and further specify that Lender shall be paid regardless of any act or omission by any Borrower, Guarantor or any of its or their Affiliates. Subject to the terms of Section 9.5(b) hereof, any insurance proceeds received by Lender at any time may be applied to payment of the Obligations, whether or not then due, in any order and in such manner as Lender may determine; provided, that, to the extent that Second Lien Creditor has a security interest or lien senior to the security interest or lien of Lender in such Collateral, such proceeds shall be applied in accordance with the terms of the Second Lien Intercreditor Agreement. If such proceeds are applied to the Revolving Loans, Revolving Loans shall be made available subject and pursuant to the terms of this Section 9.5(a) to be used for the costs of repair or replacement of the Collateral lost or damages resulting in the payment of such insurance proceeds.

(b) If any of the Equipment or Inventory is lost, physically damaged or destroyed, Borrowers and Guarantors shall be entitled to receive the cash proceeds in respect of any property or casualty insurance claim(s) to replace or repair the equipment or inventory so lost, damaged or destroyed so long as the following conditions are satisfied: (i) the net insurance proceeds with respect to such insurance claim(s) is $2,000,000 or less in any twelve (12) month period; (ii) Borrowers and Guarantors use such insurance proceeds to repair, refurbish or replace the Equipment or Inventory so lost, damaged or destroyed; and (iii) no Default or Event of Default exists or has occurred and is continuing unless Second Lien Creditor has otherwise agreed to permit Borrowers and Guarantors to use such net cash proceeds to so replace such Equipment or Inventory as provided by and in accordance with the terms and conditions of the Second Lien Intercreditor Agreement.

9.6    Financial Statements and Other Information.

(a) Each Borrower and Guarantor shall, and shall cause any Restricted Subsidiary to, keep proper books and records in which true and complete entries shall be made of all dealings or transactions of or in relation to the Collateral and the business of such Borrower, Guarantor and its Subsidiaries in accordance with GAAP. Borrowers and Guarantors shall promptly furnish to Lender all such financial and other information as Lender shall reasonably request relating to the Collateral and the assets, business and operations of Borrowers and Guarantors, and to notify the auditors and accountants of Borrowers and Guarantors that Lender is authorized to obtain such information directly from them. Without limiting the foregoing, Administrative Borrower shall furnish or cause to be furnished to Lender, the following:

(i) within thirty (30) days after the end of each fiscal month, monthly unaudited consolidated financial statements (including balance sheets, statements of income and loss, operating summary by business segment, statements of cash flow, and statements of shareholders' equity), all in reasonable detail, fairly presenting in all material respects the financial position and the results of the operations of Parent and its Subsidiaries as of the end of

707761.15

**A2993**

CURTIS_000815

and through such fiscal month, certified to be correct by the Designated Officer on behalf of Parent, subject to normal year-end adjustments and accompanied by a compliance certificate substantially in the form of Exhibit B hereto, along with a schedule in form reasonably satisfactory to Lender of the calculations used in determining, as of the end of such month, whether Borrowers and Guarantors were in compliance with the covenant set forth in Section 9.18 of this Agreement for such month; and

(ii)  within one hundred twenty (120) days after the end of each fiscal year, audited consolidated financial statements of Parent and its Subsidiaries (including in each case balance sheets, statements of income and loss, operating summary by business segment, statements of cash flow, and statements of shareholders' equity), and the accompanying notes thereto, all in reasonable detail, fairly presenting in all material respects the financial position and the results of the operations of Parent and its Subsidiaries as of the end of and for such fiscal year, together with the unqualified opinion of independent certified public accountants with respect to the audited consolidated financial statements, which accountants shall be an independent accounting firm selected by Administrative Borrower and acceptable to Lender (Lender acknowledges that for the present, J.H. Cohn is an accounting firm acceptable to Lender, but Lender reserves the right to suggest or require such other accountants as Lender may determine in good faith), that such audited consolidated financial statements have been prepared in accordance with GAAP, and present fairly in all material respects the results of operations and financial condition of Parent and its Subsidiaries on a consolidated basis as of the end of and for the fiscal year then ended; and

(iii) at such time as available, but in no event later than the last day of each fiscal year (commencing with the fiscal year of Borrowers ending December 31, 2006), projected consolidated financial statements (including in each case, forecasted balance sheets and statements of income and loss, statements of cash flow, and statements of shareholders' equity) of Parent and its Subsidiaries for the next fiscal year, all in reasonable detail, and in a format consistent with the projections delivered by Borrowers to Lender prior to the date hereof, together with such supporting information as Lender may reasonably request.  Such projected financial statements shall be prepared on a monthly basis for the next succeeding year. Such projections shall represent the reasonable best estimate made at the time by Borrowers and Guarantors of the future financial performance of Parent and its Subsidiaries for the periods set forth therein and shall have been prepared on the basis of the estimates and assumptions set forth therein which Borrowers and Guarantors believe are fair and reasonable as of the date of preparation in light of current and reasonably foreseeable business conditions (it being understood that actual results may differ from those set forth in such projected financial statements but the fact that such difference may result will not entitle Borrowers and Guarantor to a defense against any right or remedy that Lender may have if such projections were not prepared in accordance with this Section 9.6(a)(iii)).  Borrowers shall provide to Lender an update with respect to such projections promptly whenever Borrowers update such projections from time to time or at any time a Default or Event of Default exists or has occurred and is continuing, upon the request of Lender as Lender may require in good faith.

(b) Borrowers and Guarantors shall promptly notify Lender in writing of the details of (i) any loss, damage, investigation, action, suit, proceeding or claim relating to Collateral having a value of more than $250,000 (other than personal injury actions against Borrowers  and

707761.15

**A2994**

CURTIS_000816

Guarantors covered by insurance) or which if adversely determined would result in any material adverse change in the business, properties, assets, goodwill or condition, financial or otherwise of Borrowers and Guarantors taken as a whole, (ii) any Material Contract being terminated, (iii) any order, judgment or decree in excess of $250,000 shall have been entered against any Borrower or Guarantor any of its or their properties or assets, (iv) any notification of a material violation of laws or regulations received by any Borrower or Guarantor, (v) any ERISA Event, and (vi) the occurrence of any Default or Event of Default.  Borrowers and Guarantors shall notify Lender in writing within thirty (30) days after such Borrower or Guarantor enters into any new Material Contract (in which event Borrowers and Guarantors shall provide Lender with a copy of such Material Contract).

(c) Promptly after the sending or filing thereof, Borrowers shall send to Lender copies of (i) all reports which Parent or any of its Subsidiaries sends to its security holders generally (ii) all reports and registration statements which Parent or any of its Subsidiaries files with the Securities Exchange Commission, any national or foreign securities exchange or the National Association of Securities Dealers, Inc., and such other reports as Lender may hereafter specifically identify to Administrative Borrower that Lender will require be provided to Lender, (iii) all press releases and (iv) all other statements concerning material changes or developments in the business of a Borrower or Guarantor made available by any Borrower or Guarantor to the public.

(d) Borrowers and Guarantors shall furnish or cause to be furnished to Lender such budgets, forecasts, projections and other information respecting the Collateral and the business of Borrowers and Guarantors, as Lender may, from time to time, reasonably request.  Lender is hereby authorized to deliver a copy of any financial statement or any other information relating to the business of Borrowers and Guarantors to any court or other Governmental Authority or to any Lender or Participant or prospective Lender or Participant or any Affiliate of any Lender or Participant, subject to the provisions set forth in Section 12.9 hereof and in compliance with any "business associate agreement" (as defined in HIPAA) entered into among Borrowers and Guarantors and Lender.  Each Borrower and Guarantor hereby irrevocably authorizes and directs all accountants or auditors to deliver to Lender, at Borrowers' expense, copies of the financial statements of any Borrower and Guarantor and any reports or management letters prepared by such accountants or auditors on behalf of any Borrower or Guarantor and to disclose to Lender such information as they may have regarding the business of any Borrower and Guarantor.  Any documents, schedules, invoices or other papers delivered to Lender may be destroyed or otherwise disposed of by Lender one (1) year after the same are delivered to Lender, except as otherwise designated by Administrative Borrower to Lender in writing.

9.7     <u>Sale of Assets, Consolidation, Merger, Dissolution, Etc.</u>  Each Borrower and Guarantor shall not, and shall not permit any Restricted Subsidiary to, directly or indirectly,

(a)     merge into or with or consolidate with any other Person or permit any other Person to merge into or with or consolidate with it <u>except that</u>

(i)     a wholly-owned Subsidiary of Parent (other than a Borrower)  may merge with and into or consolidate with any other wholly-owned Subsidiary of Parent (other than a Borrower); <u>provided, that,</u> each of the following conditions is satisfied as determined by

707761.15

CONFIDENTIAL

CURTIS_000817

Lender in good faith: (A) Lender shall have received not less than ten (10) Business Days' prior written notice of the intention of such Subsidiaries to so merge or consolidate, which notice shall set forth in reasonable detail satisfactory to Lender, the persons that are merging or consolidating, which person will be the surviving entity, the locations of the assets of the persons that are merging or consolidating, and the material agreements and documents relating to such merger or consolidation, (B) Lender shall have received such other information with respect to such merger or consolidation as Lender may reasonably request, (C) as of the effective date of the merger or consolidation and after giving effect thereto, no Default or Event of Default shall exist or have occurred and be continuing, (D) Lender shall have received, true, correct and complete copies of all agreements, documents and instruments relating to such merger or consolidation, including, but not limited to, the certificate or certificates of merger to be filed with each appropriate Secretary of State (with a copy as filed promptly after such filing), and (E) the surviving corporation shall expressly confirm, ratify and assume the Obligations and the Financing Agreements to which it is a party in writing, in form and substance satisfactory to Lender, and Borrowers and Guarantors shall execute and deliver such other agreements, documents and instruments as Lender may request in connection therewith; and

(ii) any Guarantor may merge with and into or consolidate with any Borrower or another Guarantor and any Borrower may merge with and into or consolidate with any Borrower; provided, that, each of the following conditions is satisfied as determined by Lender in good faith: (A) Lender shall have received not less than ten (10) Business Days' prior written notice of the intention of such Borrower or Guarantor to so merge or consolidate, which notice shall set forth in reasonable detail satisfactory to Lender, the persons that are merging or consolidating, which person will be the surviving entity, the locations of the assets of the persons that are merging or consolidating, and the material agreements and documents relating to such merger or consolidation, (B) Lender shall have received such other information with respect to such merger or consolidation as Lender may reasonably request, (C) as of the effective date of the merger or consolidation and after giving effect thereto, no Default or Event of Default shall exist or have occurred and be continuing, (D) Lender shall have received, true, correct and complete copies of all agreements, documents and instruments relating to such merger or consolidation, including, but not limited to, the certificate or certificates of merger to be filed with each appropriate Secretary of State (with a copy as filed promptly after such filing), and (E) the surviving corporation shall expressly confirm, ratify and assume the Obligations and the Financing Agreements to which it is a party in writing, in form and substance satisfactory to Lender, and Borrowers and Guarantors shall execute and deliver such other agreements, documents and instruments as Lender may request in connection therewith; and

(b) sell, issue, assign, lease, license, transfer, abandon or otherwise dispose of, as the case may be, any Capital Stock or Indebtedness to any other Person or any of its assets to any other Person, except for

(i) sales, transfers or other dispositions of assets other than Accounts or Receivables by a Borrower or a Guarantor to another Borrower or Guarantor;

(ii) sales of Inventory in the ordinary course of business,

707761.15

**A2996**

CONFIDENTIAL

CURTIS_000818

(iii) the sale or other disposition of Equipment, including, without limitation Ambulances (including worn-out or obsolete Equipment or Equipment no longer used or useful in the business of any Borrower or Guarantor) so long as (A) with respect to any Equipment other than Ambulances, the aggregate fair market value of such Equipment does not exceed $200,000 for all such Equipment disposed of in any fiscal year of Borrowers or as Lender may otherwise agree or (B) with respect to any Equipment consisting of Ambulances, (1) the net cash proceeds with respect to such sale or disposition does not exceed $500,000, (2) Borrowers and Guarantors apply the net sale proceeds to replace the Ambulance so sold or disposed of; and (3) no Default or Event of Default exists or has occurred and is continuing unless Second Lien Creditor has otherwise agreed to permit Borrowers and Guarantors to use such net cash proceeds to so replace such ambulance as provided by and in accordance with the terms and conditions of the Second Lien Intercreditor Agreement; and

(iv) the issuance and sale by any Borrower or Guarantor of Capital Stock of such Borrower or Guarantor after the date hereof; provided, that, (A) Lender shall have received not less than ten (10) Business Days' prior written notice of such issuance and sale by such Borrower or Guarantor, which notice shall specify the parties to whom such shares are to be sold, the terms of such sale, the total amount which it is anticipated will be realized from the issuance and sale of such stock and the net cash proceeds which it is anticipated will be received by such Borrower or Guarantor from such sale, (B) such Borrower or Guarantor shall not be required to pay any cash dividends or repurchase or redeem such Capital Stock or make any other payments in respect thereof, except as otherwise permitted in Section 9.11 hereof, (C) the terms of such Capital Stock, and the terms and conditions of the purchase and sale thereof, shall not include any terms that include any limitation on the right of any Borrower to request or receive Loans or Letters of Credit or the right of any Borrower and Guarantor to amend or modify any of the terms and conditions of this Agreement or any of the other Financing Agreements or otherwise in any way relate to or affect the arrangements of Borrowers and Guarantors with Lender or are more restrictive or burdensome to any Borrower or Guarantor than the terms of any Capital Stock in effect on the date hereof, (D) except as Lender may otherwise agree in writing, all of the proceeds of the sale and issuance of such Capital Stock shall be paid to Lender for application to the Obligations in such order and manner as Lender may determine or at Lender's option, to be held as cash collateral for the Obligations if any contingent Obligations owed to Lender are then outstanding, and (E) as of the date of such issuance and sale and after giving effect thereto, no Default or Event of Default shall exist or have occurred and be continuing;

(v) the issuance of Capital Stock of any Borrower or Guarantor consisting of common stock pursuant to an employee stock option or grant or similar equity plan or 401(k) plans of such Borrower or Guarantor for the benefit of its employees, directors and consultants, provided, that, in no event shall such Borrower or Guarantor be required to issue, or shall such Borrower or Guarantor issue, Capital Stock pursuant to such stock plans or 401(k) plans which would result in a Change of Control or other Event of Default;

(vi) the sale or lease by one Borrower to another Borrower or the grant by one Borrower to another Borrower of the use of Equipment or Inventory in the ordinary course of business of Borrowers and Guarantors;

707761.15

**A2997**

CONFIDENTIAL

(vii) the sale of Capital Stock to the extent permitted by and in accordance with the terms and conditions of Section 9.7 hereof and intercompany loans and dividends permitted by Section 9.11 hereof; and

(viii)   the discount of Accounts by Borrowers or Guarantors in the ordinary course of business to the extent permitted by and in accordance with the terms and conditions of Sections 7.2(a) and (b) hereof;

(c)  wind up, liquidate or dissolve except that any Guarantor (other than Parent) may wind up, liquidate and dissolve, provided, that, each of the following conditions is satisfied, (i) the winding up, liquidation and dissolution of such Guarantor shall not violate any law or any order or decree of any court or other Governmental Authority in any material respect and shall not conflict with or result in the breach of, or constitute a default under, any indenture, mortgage, deed of trust, or any other agreement or instrument to which any Borrower or Guarantor is a party or may be bound, (ii) such winding up, liquidation or dissolution shall be done in accordance with the requirements of all applicable laws and regulations, (iii) effective upon such winding up, liquidation or dissolution, all of the assets and properties of such Guarantor shall be duly and validly transferred and assigned to a Borrower, free and clear of any liens, restrictions or encumbrances other than the security interest and liens of Lender (and Lender shall have received such evidence thereof as Lender may require) and Lender shall have received such deeds, assignments or other agreements as Lender may request to evidence and confirm the transfer of such assets of such Guarantor to a Borrower, (iv) Lender shall have received all material documents and agreements that any Borrower or Guarantor has filed with any Governmental Authority or as are otherwise required to effectuate such winding up, liquidation or dissolution, (v) no Borrower or Guarantor shall assume any Indebtedness, obligations or liabilities as a result of such winding up, liquidation or dissolution, or otherwise become liable in respect of any obligations or liabilities of the entity that is winding up, liquidating or dissolving, unless such Indebtedness is otherwise expressly permitted hereunder, (vi) Lender shall have received not less than ten (10) Business Days' prior written notice of the intention of such Guarantor to wind up, liquidate or dissolve, and (vii) as of the date of such winding up, liquidation or dissolution and after giving effect thereto, no Default or Event of Default shall exist or have occurred; or

(d)  agree to do any of the foregoing (unless conditioned upon Lender's consent).

9.8     Encumbrances.  Each Borrower and Guarantor shall not, and shall not permit any Restricted Subsidiary to, create, incur, assume or suffer to exist any security interest, mortgage, pledge, lien, charge or other encumbrance of any nature whatsoever on any of its assets or properties, including the Collateral, or file or permit the filing of, or permit to remain in effect, any financing statement or other similar notice of any security interest or lien with respect to any such assets or properties, except:

(a)  the security interests and liens of Lender;

(b)  liens securing the payment of taxes, assessments or other governmental charges or levies either not yet overdue or the validity of which are being contested in good faith by appropriate proceedings diligently pursued and available to such Borrower, or Guarantor or

707761.15

**A2998**

CONFIDENTIAL

Subsidiary, as the case may be and with respect to which adequate reserves have been set aside on its books;

(c) non-consensual statutory liens (other than liens securing the payment of taxes) arising in the ordinary course of such Borrower's, Guarantor's or Subsidiary's business to the extent: (i) such liens secure Indebtedness which is not overdue or (ii) such liens secure Indebtedness relating to claims or liabilities which are fully insured and being defended at the sole cost and expense and at the sole risk of the insurer or being contested in good faith by appropriate proceedings diligently pursued and available to such Borrower, Guarantor or such Subsidiary, in each case prior to the commencement of foreclosure or other similar proceedings and with respect to which adequate reserves have been set aside on its books;

(d) zoning restrictions, easements, licenses, covenants and other restrictions affecting the use of Real Property which do not interfere in any material respect with the use of such Real Property or ordinary conduct of the business of such Borrower, Guarantor or such Subsidiary as presently conducted thereon or materially impair the value of the Real Property (or in the case of any leasehold interest, the value of such Borrower's or Guarantor's interest in the Real Property) that is subject thereto;

(e) purchase money security interests and liens in Equipment (including Capital Leases) and the proceeds thereof and purchase money mortgages on Real Property and the proceeds thereof to secure Indebtedness permitted by and in accordance with the terms of Section 9.9(b) hereof; provided, that; (i) such security interests, liens and mortgages do not apply to any property of such Borrower, Guarantor or Subsidiary other than the Equipment or Real Property so acquired, (ii) to the extent that such security interests, liens and mortgages may extend to proceeds, such security interest, lien or mortgage does not apply to any Accounts or other Receivables of such Borrower, Guarantor or Subsidiary, and (iii) the Indebtedness secured thereby does not exceed the cost of the Equipment or Real Property so acquired, as the case may be, except that, the security interests and liens in respect of any one or more Ambulances or other vehicles and the proceeds thereof (but not proceeds consisting of any Accounts or other Receivables of such Borrower, Guarantor or Subsidiary) may secure Indebtedness of any one or more Borrowers or Guarantors that is permitted by Section 9.9(b) or Section 9.9(h) hereof and is owed to the same Person in connection with the financing (including Capital Leases) of Ambulances or other vehicles;

(f) pledges and deposits of cash by any Borrower or Guarantor after the date hereof in the ordinary course of business in connection with workers' compensation, unemployment insurance and other types of social security benefits consistent with the current practices of such Borrower or Guarantor as of the date hereof;

(g) pledges and deposits of cash by any Borrower or Guarantor after the date hereof to secure the performance of tenders, bids, leases, trade contracts (other than for the repayment of Indebtedness), statutory obligations and other similar obligations in each case in the ordinary course of business consistent with the current practices of such Borrower or Guarantor as of the date hereof; provided, that, in connection with any performance bonds issued by a surety or other person, the issuer of such bond shall have waived in writing any rights in or

707761.15

CONFIDENTIAL

CURTIS_000821

to, or other interest in, any of the Collateral in an agreement, in form and substance satisfactory to Lender;

(h)  liens arising from (i) operating leases and the precautionary UCC financing statement filings in respect thereof (including operating leases for Ambulances) and (ii) equipment or other materials which are not owned by any Borrower or Guarantor located on the premises of such Borrower or Guarantor (but not in connection with, or as part of, the financing thereof) from time to time in the ordinary course of business and consistent with current practices of such Borrower or Guarantor and the precautionary UCC financing statement filings in respect thereof; provided, that; (A) such liens do not apply to any property of such Borrower, Guarantor or Subsidiary, including, without limitation, any Accounts or other Receivables of such Borrower, Guarantor or Subsidiary and (B) such liens arising from operating leases for Ambulances secure or relate to indebtedness to the extent permitted by and in accordance with the terms of Section 9.9(b) hereof;

(i)  judgments and other similar liens arising in connection with court proceedings that do not constitute an Event of Default; provided, that, (i) such liens are being contested in good faith and by appropriate proceedings diligently pursued, (ii) adequate reserves or other appropriate provision, if any, as are required by GAAP have been made therefor, (iii) a stay of enforcement of any such liens is in effect and (iv) Lender may establish a Reserve with respect thereto;

(j)  liens, encumbrances or rights in favor of Insurance Premium Finance Party securing the Indebtedness to the extent permitted by Section 9.9(j) hereof; provided, that, such encumbrances or rights shall extend only to the Insurance Premium Collateral;

(k)  the liens and security interests granted to Second Lien Agent and Second Lien Lenders as set forth in the Second Lien Documents to secure the indebtedness arising under the Second Lien Documents to the extent permitted by Section 9.9(g) hereof and subject to the Second Lien Intercreditor Agreement; and

(l)  pledges by Borrowers to insurance companies of cash collateral to secure the contingent obligations of Borrowers to pay deductibles under insurance policies in the ordinary course of business not to exceed $500,000 in the aggregate to the extent permitted by Section 9.9(k) hereof; provided, that, if Borrowers arrange for the issuance of a Letter of Credit hereunder to replace such cash collateral, Borrowers will direct such insurance companies to remit the amount of such cash collateral so pledged to the Lender Payment Account.

9.9    Indebtedness.  Each Borrower and Guarantor shall not, and shall not permit any Restricted Subsidiary to, incur, create, assume, become or be liable in any manner with respect to, or permit to exist, any Indebtedness, or guarantee, assume, endorse, or otherwise become responsible for (directly or indirectly), the Indebtedness, performance, obligations or dividends of any other Person, except:

(a)  the Obligations;

(b)  purchase money or other Indebtedness (including Capital Leases and operating leases that constitute Indebtedness, if any) arising after the date hereof to the extent secured by

707761.15

**A3000**

CURTIS_000822

purchase money security interests in Equipment, including, without limitation Ambulances (including Capital Leases and operating leases that constitute Indebtedness, if any) and purchase money mortgages on Real Property not to exceed $7,500,000 in the aggregate at any time outstanding to the extent provided in Section 9.8(e) hereof;

(c) guarantees by any Borrower or Guarantor of the Obligations of the other Borrowers or Guarantors in favor of Lender;

(d) the Indebtedness of any Borrower or Guarantor to any other Borrower or Guarantor pursuant to loans or advances by any Borrower or Guarantor permitted under Section 9.10(g) hereof;

(e) unsecured Indebtedness of any Borrower or Guarantor arising after the date hereof to any third person (but not to any other Borrower or Guarantor);  provided, that, each of the following conditions is satisfied as determined by Lender: (i) such Indebtedness shall be on terms and conditions acceptable to Lender and shall be subject and subordinate in right of payment to the right of Lender to receive the prior indefeasible payment and satisfaction in full payment of all of the Obligations pursuant to the terms of an intercreditor agreement between Lender and such third party, in form and substance satisfactory to Lender, (ii) Lender shall have received not less than ten (10) days prior written notice of the intention of such Borrower or Guarantor to incur such Indebtedness, which notice shall set forth in reasonable detail satisfactory to Lender the amount of such Indebtedness, the person or persons to whom such Indebtedness will be owed, the interest rate, the schedule of repayments and maturity date with respect thereto and such other information as Lender may request with respect thereto, (iii) Lender shall have received true, correct and complete copies of all material agreements, documents and instruments evidencing or otherwise related to such Indebtedness, (iv) except as Lender may otherwise agree in writing, all of the proceeds of the loans or other accommodations giving rise to such Indebtedness shall be paid to Lender for application to the Obligations in such order and manner as Lender may determine or at Lender's option, to be held as cash collateral for the Obligations, (v) in no event shall the aggregate principal amount of such Indebtedness incurred during the term of this Agreement exceed $5,000,000, (vi) as of the date of incurring such Indebtedness and after giving effect thereto, no Default or Event of Default shall exist or have occurred and be continuing, (vii) such Borrower and Guarantor shall not, directly or indirectly, (A) amend, modify, alter or change the terms of such Indebtedness or any agreement, document or instrument related thereto, except, that, such Borrower or Guarantor may, after prior written notice to Lender, amend, modify, alter or change the terms thereof so as to extend the maturity thereof, or defer the timing of any payments in respect thereof, or to forgive or cancel any portion of such Indebtedness (other than pursuant to payments thereof), or to reduce the interest rate or any fees in connection therewith, or (B) redeem, retire, defease, purchase or otherwise acquire such Indebtedness (except pursuant to regularly scheduled payments permitted herein), or set aside or otherwise deposit or invest any sums for such purpose, and (viii) Borrowers and Guarantors shall furnish to Lender all material notices or demands in connection with such Indebtedness either received by any Borrower or Guarantor or on its behalf promptly after the receipt thereof, or any material notices or demands sent by any Borrower or Guarantor or on its behalf concurrently with the sending thereof, as the case may be;

707761.15

CONFIDENTIAL

CURTIS_000823

(f) Indebtedness of Borrowers and Guarantors to any Insurance Premium Finance Party with respect to loans or other financial accommodations provided by Insurance Premium Finance Party to Borrowers and Guarantors to finance the insurance premiums of Borrowers and Guarantors payable on certain insurance policies maintained by Borrowers and Guarantors as set forth in the Insurance Premium Finance Agreements; provided, that, (i) the outstanding principal amount of such Indebtedness shall not exceed $14,000,000 in the aggregate (after deducting the amount of all premiums paid by Borrowers and Guarantors), (ii) such Indebtedness shall be secured only by the Insurance Premium Collateral, (iii) Borrowers and Guarantors may only make the regularly scheduled monthly payments in accordance with the payment schedule set forth in the Insurance Premium Finance Agreements with respect to such Indebtedness, (iv) upon the request of Lender, Borrowers shall deliver to Lender an agreement, in form and substance satisfactory to Lender, providing that, among other things, Insurance Premium Finance Party shall provide Lender with not less than thirty (30) days' prior written notice of a default under the Insurance Premium Finance Agreements and the intent of Insurance Premium Finance Party to cancel the policies, (v) upon the request of Lender, Borrower shall deliver to Lender, true, correct and complete copies of all the Insurance Premium Finance Agreements, as duly authorized, executed and delivered by the parties thereto, and (vi) Borrowers and Guarantors shall not, directly or indirectly, (A) amend, modify, alter or change the material terms of the Insurance Premium Finance Agreements, except, that, such Borrower or Guarantor may amend, modify, alter or change the terms thereof so as to extend the maturity thereof, or defer the timing of any payments in respect thereof, or to forgive or cancel any portion of such Indebtedness (other than pursuant to payments thereof), or to reduce the interest rate or any fees in connection therewith, or (B) redeem, retire, defease, purchase or otherwise acquire such Indebtedness (except pursuant to regularly scheduled payments permitted herein), or set aside or otherwise deposit or invest any sums for such purpose;

(g) the Indebtedness of Borrowers and Guarantors owed to Second Lien Agent and Second Lien Lenders in respect of the Second Lien Debt evidenced by and as set forth in the Second Lien Documents as in effect on the date hereof; provided, that,

(i) Borrowers and Guarantors may enter into amendments to the Second Lien Documents with Second Lien Agent and Second Lien Lenders to make available such additional loans and advances as Second Lien Agent, Second Lien Loan Lenders, Borrowers and Guarantors may agree so long as the following conditions shall have been satisfied as determined by Lender in good faith:

(A) the proposed amendments to the Second Lien Documents do not result in terms that are more burdensome or restrictive than the terms of the Second Lien Debt as in effect as of the date hereof; and

(B) Lender shall have received copies of the executed amendments to the Second Lien Documents and all other documents or agreements executed or delivered in connection with such additional Second Lien Debt;

(ii) Borrowers and Guarantors shall not, directly or indirectly, make any payments in respect of such indebtedness, including, but not limited to, any prepayments or other non-mandatory payments, except that,

707761.15

CONFIDENTIAL

CURTIS_000824

(A)      Borrowers may make regularly scheduled payments of interest and fees in respect of the Second Lien Debt so long as of the date of any such payment and after giving effect thereto, no Default or Event of Default exists or has occurred and is continuing; provided, that, if a Default or an Event of Default exists or has occurred and is continuing, Borrowers may nevertheless make payments of interest in cash using sources of funds other than the proceeds of Revolving Loans in accordance with the Second Lien Intercreditor Agreement so long as Lender has not accelerated the Obligations; and

(B)      Borrowers may make payments or prepayments of principal in respect of the Second Lien Debt so long as of the date of any such payment and after giving effect thereto, (1) the aggregate amount of the Excess Availability of Borrowers on such date and the immediately preceding thirty (30) consecutive days before such payment shall be not less than $2,000,000 and (2) no Default or Event of Default exists or has occurred and is continuing; provided, that, (I) in connection with any mandatory prepayment of Second Lien Debt from sales or dispositions of, or any loss or damage to, any "Term Loan Priority Collateral" (as defined in the Second Lien Intercreditor Agreement), Second Lien Agent and Second Lien Lenders may apply proceeds of such sales or other dispositions or proceeds of insurance paid in respect of such loss or damage to the outstanding amount of Second Lien Debt in accordance with the terms and conditions of the Second Lien Intercreditor Agreement and (II) if a Default or Event of Default exists or has occurred and is continuing, Borrowers may nevertheless make payments of principal in cash using sources of funds other than the proceeds of Revolving Loans in accordance with the Second Lien Intercreditor Agreement so long as Lender has not accelerated the Obligations;

(iii) Borrowers and Guarantors shall not, directly or indirectly, (A) amend, modify, alter or change any material terms of such indebtedness, except, that, Borrowers and Guarantors may amend, modify, alter or change the terms thereof so as to extend the maturity thereof or defer the timing of any payments in respect thereof, or to forgive or cancel any portion of such indebtedness (other than pursuant to payments thereof), or to reduce the interest rate or any fees in connection therewith, or to release any liens or security interests in any assets and properties of Borrowers and Guarantors, or to make available additional advances or loans available to Borrowers or to make any covenants contained therein less restrictive or burdensome as to Borrowers and Guarantors or otherwise more favorable to Borrowers and Guarantors so long as Lender shall have received notification of such amendment, modification, alteration or change not later than two (2) Business Days thereafter, together with the agreement, documents and instruments executed or delivered in connection therewith, or (B) except as provided in clause (ii) of this Section 9.9(g), redeem, retire, defease, purchase or otherwise acquire such indebtedness, or set aside or otherwise deposit or invest any sums for such purpose; and

(iv) Borrowers and Guarantors shall furnish to Lender all material notices, demands or other materials received after the date hereof concerning such indebtedness either received by any of Borrowers or Guarantors or on its or their behalf, promptly after receipt thereof, or sent by any of Borrowers or Guarantors or on its or their behalf, concurrently with the sending thereof, as the case may be;

707761.15

CONFIDENTIAL

(h) the outstanding Indebtedness set forth on Schedule 9.9 to the Information Certificate permitted by Section 9.9(b), (f), (g), (j) or (k) hereof;

(i)  unsecured Indebtedness of any Borrower or Guarantor not otherwise permitted under this Agreement arising after the date hereof to any third person (but not to any other Borrower or Guarantor); provided, that, each of the following conditions is satisfied as determined by Lender: (i) such Indebtedness does not exceed $250,000 in the aggregate, (ii) Lender shall have received not less than ten (10) days prior written notice of the intention of such Borrower or Guarantor to incur such Indebtedness, which notice shall set forth in reasonable detail satisfactory to Lender the amount of such Indebtedness, the person or persons to whom such Indebtedness will be owed, the interest rate, the schedule of repayments and maturity date with respect thereto and such other information as Lender may request with respect thereto, (iii) Borrowers and Guarantors may only make regularly scheduled payments of principal and interest in respect of such Indebtedness in accordance with the terms of the agreement or instrument evidencing or giving rise to such Indebtedness as in effect on the date hereof, (iv) Borrowers and Guarantors shall not, directly or indirectly, (A) amend, modify, alter or change the terms of such Indebtedness or any agreement, document or instrument related thereto as in effect on the date hereof except, that, Borrowers and Guarantors may, after prior written notice to Lender, amend, modify, alter or change the terms thereof so as to extend the maturity thereof, or defer the timing of any payments in respect thereof, or to forgive or cancel any portion of such Indebtedness (other than pursuant to payments thereof), or to reduce the interest rate or any fees in connection therewith, or (B) redeem, retire, defease, purchase or otherwise acquire such Indebtedness, or set aside or otherwise deposit or invest any sums for such purpose, and (v) Borrowers and Guarantors shall furnish to Lender all material notices or demands in connection with such Indebtedness either received by any Borrower or Guarantor or on its behalf, promptly after the receipt thereof, or sent by any Borrower or Guarantor or on its behalf, concurrently with the sending thereof, as the case may be;

(j)  guarantees by any Borrower or Guarantor of the Indebtedness arising in connection with the Second Lien Debt in favor of Second Lien Agent and Second Lien Lenders to the extent permitted by Section 9.9(g) hereof; and

(k) contingent obligations of Borrowers and Guarantors owed to insurance companies in respect of deductibles payable by Borrowers under insurance policies in the ordinary course of business of Borrowers and Guarantors.

9.10   Loans, Investments, Etc.  Each Borrower and Guarantor shall not, and shall not permit any Restricted Subsidiary to, directly or indirectly, make any loans or advance money or property to any person, or invest in (by capital contribution, dividend or otherwise) or purchase or repurchase the Capital Stock or Indebtedness or all or a substantial part of the assets or property of any person, or form or acquire any Subsidiary, or agree to do any of the foregoing (unless conditioned upon Lender's consent), except:

(a) the endorsement of instruments for collection or deposit in the ordinary course of business;

(b) investments in cash or Cash Equivalents of less than $10,000 in the aggregate or investments held in deposit accounts described in clauses (b) and (c) of the definition of

707761.15

**A3004**

CURTIS_000826

Excluded Deposit Accounts, and conditions and investments in cash or Cash Equivalents in excess of $10,000; provided, that (i) no Loans are outstanding at such time and (ii) the terms and conditions of Section 5.2 hereof shall have been satisfied with respect to the deposit account, investment account or other account in which such cash or Cash Equivalents;

       (c)  the existing equity investments of each Borrower and Guarantor on and after the date hereof in its Subsidiaries, provided, that, (i) to the extent that such investment gives rise to any Indebtedness, such Indebtedness is permitted hereunder, (ii) to the extent that such investment gives rise to the issuance of any shares of Capital Stock, such issuance is permitted hereunder and (iii) to the extent of any investments by a Borrower or Guarantor in a Subsidiary of Parent that is not a Borrower or Guarantor, the aggregate amount of such Investments shall not exceed $10,000 at any time outstanding and as of the date of any such Investment and after giving effect thereto, no Default or Event of Default shall exist or have occurred and be continuing;

       (d)  loans and advances by any Borrower or Guarantor to employees of such Borrower or Guarantor in accordance with applicable law not to exceed the principal amount of $200,000 in the aggregate at any time outstanding for: (i) reasonably and necessary work-related travel or other ordinary business expenses to be incurred by such employee in connection with their work for such Borrower or Guarantor and (ii) reasonable and necessary relocation expenses of such employees (including home mortgage financing for relocated employees);

       (e)  stock or obligations issued to any Borrower or Guarantor by any Person (or the representative of such Person) in respect of Indebtedness of such Person owing to such Borrower or Guarantor in connection with the insolvency, bankruptcy, receivership or reorganization of such Person or a composition or readjustment of the debts of such Person; provided, that, the original of any such stock or instrument evidencing such obligations shall be promptly delivered to Lender, upon Lender's request, together with such stock power, assignment or endorsement by such Borrower or Guarantor as Lender may request;

       (f)  obligations of Account Debtors to any Borrower or Guarantor arising from Accounts which are past due evidenced by a promissory note made by such Account Debtor payable to such Borrower or Guarantor; provided, that, promptly upon the receipt of the original of any such promissory note by such Borrower or Guarantor, such promissory note shall be endorsed to the order of Lender by such Borrower or Guarantor and promptly delivered to Lender as so endorsed;

       (g)  loans and advances by a Borrower to a Guarantor or loans or advances by a Guarantor to a Borrower or another Guarantor after the date hereof; provided, that, as to all of such loans and advances (i) upon the request of Lender, Borrowers shall provide to Lender a report in form and substance satisfactory to Lender of the outstanding amount of such loans or advances as of the last day of the immediately preceding month and indicating any loans or advances made and payments received during the period requested, (ii) the Indebtedness arising pursuant to any such loan or advance shall not be evidenced by a promissory note or other instrument, unless the single original of such note or other instrument is promptly delivered to Lender upon its request to hold as part of the Collateral, with such endorsement and or assignment by the payee of such note or other instrument as Lender may require, and (iii) as of

707761.15

CONFIDENTIAL

CURTIS_000827

the date of any such loan or advance and after giving effect thereto, no Default or Event of Default shall exist or have occurred and be continuing; provided, further, that, as to loans by a Guarantor to a Borrower, (A) the Indebtedness arising pursuant to such loan shall be subject to, and subordinate in right of payment to, the right of Lender to receive the prior final payment and satisfaction in full of all of the Obligations, except for payments permitted by clause (C) below, on terms and conditions acceptable to Lender, (B) promptly upon Lender's request, Lender shall have received a subordination agreement, in form and substance satisfactory to Lender, providing for the terms of the subordination in right of payment of such Indebtedness of such Borrower to the prior final payment and satisfaction in full of all of the Obligations, duly authorized, executed and delivered by such Guarantor and such Borrower, and (C) such Borrower shall not, directly or indirectly make, or be required to make, any payments in respect of such Indebtedness at any time that a Default or Event of Default shall exist or have occurred and be continuing;

(h) the loans and advances set forth on Schedule 9.10 to the Information Certificate; provided, that, as to such loans and advances, (i) Borrowers and Guarantors shall not, directly or indirectly, amend, modify, alter or change the terms of such loans and advances or any agreement, document or instrument related thereto and (ii) Borrowers and Guarantors shall furnish to Lender all material notices or demands in connection with such loans and advances either received by any Borrower or Guarantor or on its behalf, promptly after the receipt thereof, or sent by any Borrower or Guarantor or on its behalf, concurrently with the sending thereof, as the case may be;

(i) investments after the date hereof by a Borrower or Guarantor to any Person, other than an Affiliate of any Borrower or Guarantor that is not a Borrower or Guarantor; provided, that, each of the following conditions shall be satisfied:

(i) Lender shall have received (A) not less than ten (10) Business Days' prior written notice thereof setting forth in reasonable detail the nature and terms thereof, (B) true, correct and complete copies of all agreements, documents and instruments relating thereto and (C) such other information with respect thereto as Lender may request in good faith;

(ii) the aggregate amount of all such investments shall not exceed $750,000 in the aggregate, and the terms and conditions of such investment shall be acceptable to Lender in its good faith judgment;

(iii) as of the date of any such investment, and after giving effect thereto, the aggregate amount of Excess Availability shall have been not less than $2,000,000 for each of the immediately preceding thirty (30) consecutive days and as of the date of any such investment and after giving effect thereto, the aggregate amount of the Excess Availability shall be not less than $2,000,000; and

(iv) as of the date of any such investment, and after giving effect thereto, no Default or Event of Default shall exist or have occurred and be continuing.

9.11    Dividends and Redemptions. Each Borrower and Guarantor shall not, directly or indirectly, declare or pay any dividends on account of any shares of class of any Capital Stock of such Borrower or Guarantor now or hereafter outstanding, or set aside or otherwise deposit or

707761.15

**A3006**

CONFIDENTIAL

invest any sums for such purpose, or redeem, retire, defease, purchase or otherwise acquire any shares of any class of Capital Stock (or set aside or otherwise deposit or invest any sums for such purpose) for any consideration or apply or set apart any sum, or make any other distribution (by reduction of capital or otherwise) in respect of any such shares or agree to do any of the foregoing, <u>except</u> that:

(a)  any Borrower or Guarantor may declare and pay such dividends or redeem, retire, defease, purchase or otherwise acquire any shares of any class of Capital Stock for consideration in the form of shares of common stock (so long as after giving effect thereto no Change of Control or other Default or Event of Default shall exist or have occurred and be continuing);

(b)  Borrowers and Guarantors may pay dividends to the extent permitted in Section 9.12 hereof;

(c)  any Borrower, any Guarantor or any Subsidiary of a Borrower or Guarantor may pay dividends to any Borrower;

(d)  Borrowers and Guarantors may repurchase Capital Stock consisting of common stock held by employees pursuant to any employee stock ownership plan thereof upon the termination, retirement or death of any such employee in accordance with the provisions of such plan, <u>provided</u>, <u>that</u>, as to any such repurchase, each of the following conditions is satisfied: (i) as of the date of the payment for such repurchase and after giving effect thereto, no Default or Event of Default shall exist or have occurred and be continuing, (ii) such repurchase shall be paid with funds legally available therefor, (iii) such repurchase shall not violate any law or regulation or the terms of any indenture, agreement or undertaking to which such Borrower or Guarantor is a party or by which such Borrower or Guarantor or its or their property are bound, and (iv) the aggregate amount of all payments for such repurchases in any calendar year shall not exceed $250,000.

9.12   <u>Transactions with Affiliates</u>.  Each Borrower and Guarantor shall not, directly or indirectly:

(a)  purchase, acquire or lease any property from, or sell, transfer or lease any property to, any officer, director or other Affiliate of such Borrower or Guarantor (other than a Borrower or Guarantor but only to the extent any such transaction is otherwise expressly permitted by the terms and conditions of Section 9.7, 9.9 or 9.10 hereof and in accordance with applicable law), except in the ordinary course of and pursuant to the reasonable requirements of such Borrower's or Guarantor's business (as the case may be) and upon fair and reasonable terms no less favorable to such Borrower or Guarantor than such Borrower or Guarantor would obtain in a comparable arm's length transaction with an unaffiliated person; or

(b)  make any payments (whether by dividend, loan or otherwise) of management, consulting or other fees for management or similar services, or of any Indebtedness owing to any officer, employee, shareholder, director or any other Affiliate of such Borrower or Guarantor, <u>except</u> (i) reasonable compensation to officers, employees and directors for services rendered to such Borrower or Guarantor in the ordinary course of business in accordance with applicable law, (ii) payments by a Borrower or Guarantor to another Borrower or Guarantor for actual and

707761.15

CONFIDENTIAL

CURTIS_000829

necessary reasonable out-of-pocket legal and accounting, insurance, marketing, payroll and similar types of services paid for by Parent on behalf of such Borrower or Guarantor, in the ordinary course of their respective businesses or as the same may be directly attributable to such Borrower or Guarantor to the extent not covered by the Management Agreement and consistent with the terms and conditions of this Agreement to the extent applicable to such payment and in accordance with applicable law, (iii) payments by any such Borrower or Guarantor to Patriarch Partners Management Group LLC in respect amounts due under the Management Agreement in the ordinary course of business when due in accordance with the terms and conditions of the Management Agreement; provided, that, (A) the aggregate amount of all such payments in any calendar year shall not exceed $500,000 and (B) as of the date of any such payment and after giving effect thereto, no Default or Event of Default shall exist or have occurred and be continuing and (iv) payments to Second Lien Agent and Second Lien Lenders to the extent permitted by and in accordance with the terms and conditions of Section 9.9(g) hereof.

9.13   Compliance with ERISA.  Each Borrower and Guarantor shall, and shall cause each of its ERISA Affiliates to:  (a) maintain each Plan in compliance in all material respects with the applicable provisions of ERISA, the Code and other Federal and State law; (b) cause each Plan which is qualified under Section 401(a) of the Code to maintain such qualification; (c) not terminate any Pension Plan so as to incur any material liability to the Pension Benefit Guaranty Corporation;  (d) not allow or suffer to exist any prohibited transaction involving any Plan or any trust created thereunder which would subject such Borrower, Guarantor or such ERISA Affiliate to a material tax or other material liability on prohibited transactions imposed under Section 4975 of the Code or ERISA; (e) make all required contributions to any Plan which it is obligated to pay under Section 302 of ERISA, Section 412 of the Code or the terms of such Plan; (f) not allow or suffer to exist any accumulated funding deficiency, whether or not waived, with respect to any such Pension Plan; (g)  not engage in a transaction that could be subject to Section 4069 or 4212(c) of ERISA; or (h) not allow or suffer to exist any occurrence of a reportable event or any other event or condition which presents a material risk of termination by the Pension Benefit Guaranty Corporation of any Plan that is a single employer plan, which termination could result in any material liability to the Pension Benefit Guaranty Corporation.

9.14   End of Fiscal Years; Fiscal Quarters.  Each Borrower and Guarantor shall, for financial reporting purposes, cause its, and each of its Subsidiaries' (a) fiscal years to end on December 31 of each year and (b) fiscal quarters to end on March 31, June 30, September 30 and December 31of each year.

9.15 Credit Card Agreements.  Each Borrower shall (a) observe and perform all material terms, covenants, conditions and provisions of the Credit Card Agreements to be observed and performed by it at the times set forth therein; (b) at all times maintain in full force and effect the Credit Card Agreements and not terminate any of the Credit Card Agreements, except, that, any Borrower may terminate or cancel any of the Credit Card Agreements in the ordinary course of the business of such Borrower; (c) not enter into any new Credit Card Agreements with any new Credit Card Issuer unless (i) Lender shall have received not less than thirty (30) days prior written notice of the intention of such Borrower to enter into such agreement and (ii) such Borrower delivers, or causes to be delivered to Lender, a Credit Card Acknowledgment in favor of Lender; and (d)  furnish to Lender, promptly upon the request of Lender, such information and evidence as Lender may require in good faith from time to time concerning the observance,

707761.15

**A3008**

CONFIDENTIAL

performance and compliance by such Borrower or the other party or parties thereto with the terms, covenants or provisions of the Credit Card Agreements.

9.16   Change in Business.  No Borrower or Guarantor shall engage in any business other than the business of any Borrower or Guarantor on the date hereof, including any Ambulance Services and services giving rise to Paratransit Accounts and Transportation/Management Service Accounts and any business reasonably related, ancillary or complimentary to such business or substantially similar to a line of business, that any Guarantor or Borrower is engaged on the date hereof.

9.17   Limitation of Restrictions Affecting Subsidiaries.  Each Borrower and Guarantor shall not, directly, or indirectly, create or otherwise cause or suffer to exist any encumbrance or restriction which prohibits or limits the ability of any Subsidiary of such Borrower or Guarantor, to (a) pay dividends or make other distributions or pay any Indebtedness owed to such Borrower or Guarantor or any Subsidiary of such Borrower or Guarantor; (b) make loans or advances to such Borrower or Guarantor or any Subsidiary of such Borrower or Guarantor, (c) transfer any of its properties or assets to such Borrower or Guarantor or any Subsidiary of such Borrower or Guarantor; or (d) create, incur, assume or suffer to exist any lien upon any of its property, assets or revenues, whether now owned or hereafter acquired, other than encumbrances and restrictions arising under (i) applicable law, (ii) this Agreement, the Second Lien Documents or Indebtedness to the extent permitted by Sections 9.8 and Section 9.9 hereof, (iii) customary provisions restricting subletting or assignment of any lease governing a leasehold interest of such Borrower or Guarantor or any Subsidiary of such Borrower or Guarantor, (iv) customary restrictions on dispositions of real property interests found in reciprocal easement agreements of such Borrower or Guarantor or any Subsidiary of such Borrower or Guarantor, (v) any agreement relating to permitted Indebtedness incurred by a Subsidiary of such Borrower or Guarantor prior to the date on which such Subsidiary was acquired by such Borrower or such Guarantor  and outstanding on such acquisition date, and (vi) the extension or continuation of contractual obligations in existence on the date hereof; provided, that, any such encumbrances or restrictions contained in such extension or continuation are no less favorable to Lender than those encumbrances and restrictions under or pursuant to the contractual obligations so extended or continued.

9.18   Fixed Charge Coverage Ratio.  Parent and its Subsidiaries shall not permit the Fixed Charge Coverage Ratio of Parent and its Subsidiaries to be less than the ratio set forth on Schedule 9.18 hereto the next to the end of such measurement period set forth on Schedule 9.18 hereto.

9.19   License Agreements.

(a) Each Borrower and Guarantor shall (i) promptly observe and perform all of the material terms, covenants, conditions and provisions of the material License Agreements to which it is a party to be observed and performed by it, at the times set forth therein, if any, (ii) not do, permit, suffer or refrain from doing anything that could reasonably be expected to result in a default under or breach of any of the terms of any material License Agreement that has or could reasonably be expected to have a Material Adverse Effect, (iii) not cancel, surrender, modify, amend, waive or release any material License Agreement in any material respect or any term, provision or right of the licensee thereunder in any material respect, or consent to or permit

707761.15

**A3009**

CONFIDENTIAL
CURTIS_000831

to occur any of the foregoing; except, that, subject to Section 9.19(b) hereof, such Borrower or Guarantor may cancel, surrender or release any material License Agreement (A) in the ordinary course of the business of such Borrower or Guarantor or (B) if such License Agreement is no longer used or necessary in the business of such Borrower or Guarantor; provided, that, such Borrower or Guarantor (as the case may be) shall give Lender not less than thirty (30) days prior written notice of its intention to so cancel, surrender and release any such material License Agreement, (iv) give Lender prompt written notice of any material License Agreement entered into by such Borrower or Guarantor after the date hereof, together with a true, correct and complete copy thereof and such other information with respect thereto as Lender may request in good faith, (v) give Lender prompt written notice of any material breach or any material default, by any party under any material License Agreement, and deliver to Lender a copy of such notice received or delivered by such Borrower or Guarantor in connection with any material License Agreement which relates to the right of such Borrower or Guarantor to continue to use the property subject to such License Agreement which has or could reasonably be expected to have a Material Adverse Effect, and (vi) furnish to Lender, promptly upon the request of Lender, such information and evidence as Lender may reasonably require from time to time concerning the observance, performance and compliance by such Borrower or Guarantor or the other party or parties thereto with the material terms, covenants or provisions of any material License Agreement.

(b) Each Borrower and Guarantor will either exercise any option to renew or extend the term of each License Agreement to which it is a party that is material to its business at the time of renewal or extensions in such manner as will cause the term of such material License Agreement to be effectively renewed or extended for the period provided by such option and give prompt written notice thereof to Lender or give Lender prior written notice that such Borrower or Guarantor does not intend to renew or extend the term of any such material License Agreement or that the term thereof shall otherwise be expiring, not less than thirty (30) days prior to the date of any such non-renewal or expiration. In the event of the failure of such Borrower or Guarantor to extend or renew any material License Agreement to which it is a party, Lender shall have, and is hereby granted, the irrevocable right and authority, at its option, to renew or extend the term of such material License Agreement, whether in its own name and behalf, or in the name and behalf of a designee or nominee of Lender or in the name and behalf of such Borrower or Guarantor, as Lender shall determine at any time that an Event of Default shall exist or have occurred and be continuing. Lender may, but shall not be required to, perform any or all of such obligations of such Borrower or Guarantor under any of the License Agreements, including, but not limited to, the payment of any or all sums due from such Borrower or Guarantor thereunder. Any sums so paid by Lender shall constitute part of the Obligations.

9.20    Inactive Subsidiaries. Borrowers and Guarantors will not permit any Inactive Subsidiary to (i) engage in any business or conduct any operations, (ii) own assets with a book value of more than $10,000 in the aggregate or (iii) incur any obligations or liabilities in respect of any Indebtedness.

9.21    Foreign Assets Control Regulations, Etc. No request for borrowing or the borrowing of the Loans or the request for issuance, extension or renewal of any Letter of Credit or the use of the proceeds of any thereof will violate the Trading With the Enemy Act (50 U.S.C.

707761.15

CONFIDENTIAL

CURTIS_000832

§1 et seq., as amended) (the "Trading With the Enemy Act") or any of the foreign assets control regulations of the United States Treasury Department (31 C.F.R., Subtitle B, Chapter V, as amended) (the "Foreign Assets Control Regulations") or any enabling legislation or executive order relating thereto (including, but not limited to (a) Executive order 13224 of September 21, 2001 Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism (66 Fed. Reg. 49079 (2001)) (the "Executive Order") and (b) the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Public Law 107-56). None of Borrowers or any of their Subsidiaries or other Affiliates is or will become a "blocked person" as described in the Executive Order, the Trading with the Enemy Act or the Foreign Assets Control Regulations or engages or will engage in any dealings or transactions, or be otherwise associated, with any such "blocked person".

9.22    Costs and Expenses. Borrowers and Guarantors shall pay to Lender on demand all costs, expenses, filing fees and taxes paid or payable in connection with the preparation, negotiation, execution, delivery, recording, syndication, administration, collection, liquidation, enforcement and defense of the Obligations, Lender's rights in the Collateral, this Agreement, the other Financing Agreements and all other documents related hereto or thereto, including any amendments, supplements or consents which may hereafter be contemplated (whether or not executed) or entered into in respect hereof and thereof, including:  (a) all costs and expenses of filing or recording (including Uniform Commercial Code financing statement filing taxes and fees, documentary taxes, intangibles taxes and mortgage recording taxes and fees, if applicable); (b) costs and expenses and fees for insurance premiums, environmental audits, title insurance premiums, surveys, assessments, engineering reports and inspections, appraisal fees and search fees, background checks, costs and expenses of remitting loan proceeds, collecting checks and other items of payment, and establishing and maintaining the Blocked Accounts, together with Lender's customary charges and fees with respect thereto; (c) charges, fees or expenses charged by any bank or issuer in connection with any Letter of Credit; (d) costs and expenses of preserving and protecting the Collateral; (e) costs and expenses paid or incurred in connection with obtaining payment of the Obligations, enforcing the security interests and liens of Lender, selling or otherwise realizing upon the Collateral, and otherwise enforcing the provisions of this Agreement and the other Financing Agreements or defending any claims made or threatened against Lender arising out of the transactions contemplated hereby and thereby (including preparations for and consultations concerning any such matters); (f) all out-of-pocket expenses and costs heretofore and from time to time hereafter incurred by Lender during the course of periodic field examinations of the Collateral and such Borrower's or Guarantor's operations, plus a per diem charge at Lender's then standard rate for Lender's examiners in the field and office (which rate as of the date hereof is $850 per person per day); and (g) the reasonable fees and disbursements of counsel (including legal assistants) to Lender in connection with any of the foregoing.

9.23    Further Assurances. At the request of Lender at any time and from time to time, Borrowers and Guarantors shall, at their expense, duly execute and deliver, or cause to be duly executed and delivered, such further agreements, documents and instruments, and do or cause to be done such further acts as may be necessary or proper to evidence, perfect, maintain and enforce the security interests and the priority thereof in the Collateral and to otherwise effectuate the provisions or purposes of this Agreement or any of the other Financing Agreements. Lender

707761.15

CONFIDENTIAL

CURTIS_000833

may at any time and from time to time request a certificate from an officer of any Borrower or Guarantor representing that all conditions precedent to the making of Loans and providing Letters of Credit contained herein are satisfied. In the event of such request by Lender, Lender may, at Lender's option, cease to make any further Loans or provide any further Letters of Credit until Lender has received such certificate and, in addition, Lender has determined that such conditions are satisfied.

## SECTION 10. **EVENTS OF DEFAULT AND REMEDIES**

10.1   Events of Default. The occurrence or existence of any one or more of the following events are referred to herein individually as an "Event of Default", and collectively as "Events of Default":

(a) (i) any Borrower fails to pay any of the Obligations when due or (ii) any Borrower or Guarantor fails to perform any of the covenants contained in Sections 9.3, 9.4, 9.13, 9.14, 9.15, 9.16 and 9.19 of this Agreement and such failure shall continue for ten (10) days; provided, that, such ten (10) day period shall not apply in the case of: (A) any failure to observe any such covenant which is not capable of being cured at all or within such ten (10) day period or which has been the subject of a prior failure within a six (6) month period or (B) an intentional breach by any Borrower or Guarantor of any such covenant or (iii) any Borrower or Guarantor fails to perform any of the terms, covenants, conditions or provisions contained in this Agreement or any of the other Financing Agreements other than those described in Sections 10.1(a)(i) and 10.1(a)(ii) above;

(b) any representation, warranty or statement of fact made by any Borrower or Guarantor in this Agreement, the other Financing Agreements or any other written agreement, schedule, confirmatory assignment or otherwise shall when made or deemed made be false or misleading in any material respect;

(c) any Guarantor revokes or terminates or purports to revoke or terminate, or fails to perform any of the terms, covenants, conditions or provisions of any guarantee, endorsement or other agreement of such party in favor of Lender;

(d) any judgment for the payment of money is rendered against any Borrower or Guarantor in excess of $500,000 in any one case or in excess of $1,000,000 in the aggregate (to the extent not covered by insurance where the insurer has assumed responsibility in writing for such judgment) and shall remain undischarged or unvacated for a period in excess of thirty (30) days or execution shall at any time not be effectively stayed, or any judgment other than for the payment of money, or injunction, attachment, garnishment or execution is rendered against any Borrower or Guarantor or any of the Collateral having a value in excess of $500,000;

(e) any Guarantor dissolves or suspends or discontinues doing business except to the extent permitted by and in accordance with the terms and conditions of Section 9.7 hereof;

(f) any Borrower or Guarantor makes an assignment for the benefit of creditors, makes or sends notice of a bulk transfer or calls a meeting of its creditors or principal creditors in connection with a moratorium or adjustment of the Indebtedness due to them;

707761.15

CONFIDENTIAL

CURTIS_000834

(g)  a case or proceeding under the bankruptcy laws of the United States of America now or hereafter in effect or under any insolvency, reorganization, receivership, readjustment of debt, dissolution or liquidation law or statute of any jurisdiction now or hereafter in effect (whether at law or in equity) is filed against any Borrower or Guarantor or all or any part of its properties and such petition or application is not dismissed within forty-five (45) days after the date of its filing or any Borrower or Guarantor shall file any answer admitting or not contesting such petition or application or indicates its consent to, acquiescence in or approval of, any such action or proceeding or the relief requested is granted sooner;

(h)  a case or proceeding under the bankruptcy laws of the United States of America now or hereafter in effect or under any insolvency, reorganization, receivership, readjustment of debt, dissolution or liquidation law or statute of any jurisdiction now or hereafter in effect (whether at a law or equity) is filed by any Borrower or Guarantor or for all or any part of its property;

(i)  any default in respect of the Second Lien Documents or any other Indebtedness of any Borrower or Guarantor (other than Indebtedness owing to Lender hereunder), in any case in an amount in excess of $250,000, which default continues for more than the applicable cure period, if any, with respect thereto or is not waived in writing by the other parties thereto;

(j)  any material provision hereof or of any of the other Financing Agreements shall for any reason cease to be valid, binding and enforceable with respect to any party hereto or thereto (other than Lender) in accordance with its terms, or any such party shall challenge the enforceability hereof or thereof, or shall assert in writing, or take any action or fail to take any action based on the assertion that any provision hereof or of any of the other Financing Agreements has ceased to be or is otherwise not valid, binding or enforceable in accordance with its terms, or any security interest provided for herein or in any of the other Financing Agreements shall cease to be a valid and perfected first priority security interest in any of the Collateral purported to be subject thereto (except as otherwise permitted herein or therein);

(k)  an ERISA Event shall occur which results in or could reasonably be expected to result in liability of any Borrower in an aggregate amount in excess of $250,000;

(l)  any Change of Control;

(m)  the indictment by any Governmental Authority, or as Lender may reasonably and in good faith determine, the threatened indictment by any Governmental Authority of any Borrower or Guarantor of which any Borrower, Guarantor or Lender receives notice, in either case, as to which there is a reasonable possibility of an adverse determination, in the good faith determination of Lender, under any criminal statute, or commencement or threatened commencement of criminal or civil proceedings against such Borrower or Guarantor, pursuant to which statute or proceedings the penalties or remedies sought or available include forfeiture of any Collateral or any property of any Borrower or Guarantor which is necessary or material to the conduct of its business having a value individually or in the aggregate in excess of $250,000;

(n)  there shall be a material adverse change in the business, assets or prospects of Borrowers or Guarantors taken as a whole after the date hereof; or

707761.15

**A3013**

CONFIDENTIAL

CURTIS_000835

(o) an event of default shall exist or have occurred and be continuing under any of the other Financing Agreements.

10.2    Remedies.

(a)   At any time an Event of Default exists or has occurred and is continuing, Lender shall have all rights and remedies provided in this Agreement, the other Financing Agreements, the UCC and other applicable law, all of which rights and remedies may be exercised without notice to or consent by any Borrower or Guarantor, except as such notice or consent is expressly provided for hereunder or required by applicable law.  All rights, remedies and powers granted to Lender hereunder, under any of the other Financing Agreements, the UCC or other applicable law, are cumulative, not exclusive and enforceable, in Lender's discretion, alternatively, successively, or concurrently on any one or more occasions, and shall include, without limitation, the right to apply to a court of equity for an injunction to restrain a breach or threatened breach by any Borrower or Guarantor of this Agreement or any of the other Financing Agreements.  Lender may, at any time or times, proceed directly against any Borrower or Guarantor to collect the Obligations without prior recourse to the Collateral.

(b)   Without limiting the foregoing, at any time an Event of Default exists or has occurred and is continuing, Lender may, in its discretion, (i) accelerate the payment of all Obligations and demand immediate payment thereof to Lender, (provided, that, upon the occurrence of any Event of Default described in Sections 10.1(g) and 10.1(h), all Obligations shall automatically become immediately due and payable), (ii) with or without judicial process or the aid or assistance of others, enter upon any premises on or in which any of the Collateral may be located and take possession of the Collateral or complete all or any portion of the Collateral, (iii) require any Borrower or Guarantor, at Borrowers' expense, (A) to assemble and make available to Lender any part or all of the Collateral at any place and time designated by Lender, or (B) to complete the Ambulance Services to the extent not prohibited by applicable law (unless a  waiver of any such prohibition is obtained or granted) or to collect the Accounts from all Account Debtors; (iv) collect, foreclose, receive, appropriate, setoff and realize upon any and all Collateral, (v) remove any or all of the Collateral from any premises on or in which the same may be located for the purpose of effecting the sale, foreclosure or other disposition thereof or for any other purpose, (vi) sell, lease, transfer, assign, deliver or otherwise dispose of any and all Collateral (including entering into contracts with respect thereto, public or private sales at any exchange, broker's board, at any office of Lender or elsewhere) at such prices or terms as Lender may deem reasonable, for cash, upon credit or for future delivery, with the Lender having the right to purchase the whole or any part of the Collateral at any such public sale, all of the foregoing being free from any right or equity of redemption of any Borrower or Guarantor, which right or equity of redemption is hereby expressly waived and released by Borrowers and Guarantors or (vii) terminate this Agreement.  If any of the Collateral is sold or leased by Lender upon credit terms or for future delivery, the Obligations shall not be reduced as a result thereof until payment therefor is finally collected by Lender.  If notice of disposition of Collateral is required by law, ten (10) days prior notice by Lender to Administrative Borrower designating the time and place of any public sale or the time after which any private sale or other intended disposition of Collateral is to be made, shall be deemed to be reasonable notice thereof and Borrowers and Guarantors waive any other notice.  In the event Lender institutes an action to recover any Collateral or seeks recovery of any Collateral by way of prejudgment remedy, each

707761.15

**A3014**

CONFIDENTIAL                                                     CURTIS_000836

Borrower and Guarantor waives the posting of any bond which might otherwise be required. At any time an Event of Default exists or has occurred and is continuing, upon Lender's request, Borrowers will either, as Lender shall specify, furnish cash collateral to the issuer to be used to secure and fund Lender's reimbursement obligations to the issuer in connection with any Letter of Credit Obligations or furnish cash collateral to Lender for the Letter of Credit Obligations. Such cash collateral shall be in the amount equal to one hundred five (105%) percent of the amount of the Letter of Credit Obligations plus the amount of any fees and expenses payable in connection therewith through the end of the latest expiration date of the Letters of Credit giving rise to such Letter of Credit Obligations.

(c)   At any time or times that an Event of Default exists or has occurred and is continuing, Lender may, in its discretion, enforce the rights of any Borrower or Guarantor against any Account Debtor, secondary obligor or other obligor in respect of any of the Accounts or other Receivables.  Without limiting the generality of the foregoing, Lender may, in its discretion, at such time or times (i) notify any or all Account Debtors, secondary obligors or other obligors in respect thereof that the Receivables have been assigned to Lender and that Lender has a security interest therein and Lender may direct any or all Account Debtors, secondary obligors and other obligors to make payment of Receivables directly to Lender, except with respect to Medicare Accounts, Medicaid Accounts or CHAMPUS/CHAMPVA Accounts, unless Lender has complied with the applicable Medicare Regulations, Medicaid Regulations or CHAMPUS/CHAMPVA Regulations, as the case may be, to exercise its rights and remedies to so notify the applicable Account Debtor, (ii) extend the time of payment of, compromise, settle or adjust for cash, credit, return of merchandise or otherwise, and upon any terms or conditions, any and all Receivables or other obligations included in the Collateral and thereby discharge or release the Account Debtor or any secondary obligors or other obligors in respect thereof without affecting any of the Obligations, (iii) demand, collect or enforce payment of any Receivables or such other obligations, but without any duty to do so, and Lender shall not be liable for any failure to collect or enforce the payment thereof nor for the negligence of its agents or attorneys with respect thereto and (iv) take whatever other action Lender may deem necessary or desirable for the protection of its interests.  At any time that an Event of Default exists or has occurred and is continuing, at Lender's request, all invoices and statements sent to any Account Debtor shall state that the Accounts (other than Medicaid Accounts, Medicare Accounts and CHAMPUS Accounts, unless Lender has complied with the applicable Medicare Regulations, Medicaid Regulations or CHAMPUS/CHAMPVA Regulations, as the case may be, to so notify the applicable Account Debtor, and such other obligations have been assigned to Lender and are payable directly and only to Lender and Borrowers and Guarantors shall deliver to Lender such originals of documents evidencing the sale and delivery of goods or the performance of services giving rise to any Accounts as Lender may require.  In the event any Account Debtor returns Inventory when an Event of Default exists or has occurred and is continuing, Borrowers shall, upon Lender's request, hold the returned Inventory in trust for Lender,  segregate all returned Inventory from all of its other property, dispose of the returned Inventory solely according to Lender's instructions, and not issue any credits, discounts or allowances with respect thereto without Lender's prior written consent.

(d)   To the extent that applicable law imposes duties on Lender to exercise remedies in a commercially reasonable manner (which duties cannot be waived under such law), each Borrower and Guarantor acknowledges and agrees that it is not commercially unreasonable

707761.15

CONFIDENTIAL

CURTIS_000837

for Lender (i) to fail to incur expenses reasonably deemed significant by Lender to prepare Collateral for disposition or otherwise to complete raw material or work in process into finished goods or other finished products for disposition, (ii) to fail to obtain third party consents for access to Collateral to be disposed of, or to obtain or, if not required by other law, to fail to obtain consents of any Governmental Authority or other third party for the collection or disposition of Collateral to be collected or disposed of, (iii) to fail to exercise collection remedies against Account Debtors, secondary obligors or other persons obligated on Collateral or to remove liens or encumbrances on or any adverse claims against Collateral, (iv) to exercise collection remedies against Account Debtors and other persons obligated on Collateral directly or through the use of collection agencies and other collection specialists, (v) to advertise dispositions of Collateral through publications or media of general circulation, whether or not the Collateral is of a specialized nature, (vi) to contact other persons, whether or not in the same business as any Borrower or Guarantor, for expressions of interest in acquiring all or any portion of the Collateral, (vii) to hire one or more professional auctioneers to assist in the disposition of Collateral, whether or not the collateral is of a specialized nature, (viii) to dispose of Collateral by utilizing Internet sites that provide for the auction of assets of the types included in the Collateral or that have the reasonable capability of doing so, or that match buyers and sellers of assets, (ix) to dispose of assets in wholesale rather than retail markets, (x) to disclaim disposition warranties, (xi) to purchase insurance or credit enhancements to insure Lenders against risks of loss, collection or disposition of Collateral or to provide to Lender a guaranteed return from the collection or disposition of Collateral, or (xii) to the extent deemed appropriate by Lender, to obtain the services of other brokers, investment bankers, consultants and other professionals to assist Lender in the collection or disposition of any of the Collateral. Each Borrower and Guarantor acknowledges that the purpose of this Section is to provide non-exhaustive indications of what actions or omissions by Lender would not be commercially unreasonable in the exercise by any Lender of remedies against the Collateral and that other actions or omissions by Lender shall not be deemed commercially unreasonable solely on account of not being indicated in this Section. Without limitation of the foregoing, nothing contained in this Section shall be construed to grant any rights to any Borrower or Guarantor or to impose any duties on Lender that would not have been granted or imposed by this Agreement or by applicable law in the absence of this Section.

(e)  For the purpose of enabling Lender to exercise the rights and remedies hereunder, each Borrower and Guarantor hereby grants to Lender, to the extent assignable, an irrevocable, non-exclusive license (exercisable at any time an Event of Default shall exist or have occurred and for so long as the same is continuing) without payment of royalty or other compensation to any Borrower or Guarantor, to use, assign, license or sublicense any of the trademarks, service-marks, trade names, business names, trade styles, designs, logos and other source of business identifiers and other Intellectual Property and general intangibles now owned or hereafter acquired by any Borrower or Guarantor, wherever the same maybe located, including in such license reasonable access to all media in which any of the licensed items may be recorded or stored and to all computer programs used for the compilation or printout thereof.

(f)  At any time an Event of Default exists or has occurred and is continuing, Lender may apply the cash proceeds of Collateral actually received by Lender from any sale, lease, foreclosure or other disposition of the Collateral to payment of the Obligations, in whole or in part and in accordance with the terms hereof, whether or not then due or may hold such

707761.15

**A3016**

CONFIDENTIAL

CURTIS_000838

proceeds as cash collateral for the Obligations.  Borrowers and Guarantors shall remain liable to Lender for the payment of any deficiency with interest at the highest rate provided for herein and all costs and expenses of collection or enforcement, including attorneys' fees and expenses.

(g)  Without limiting the foregoing, upon the occurrence of a Default or an Event of Default, Lender may, at Lender's option, without notice, (i) cease making Loans or arranging for Letters of Credit or reduce the lending formulas or amounts of Loans and Letters of Credit available to Borrowers or (ii) terminate any provision of this Agreement providing for any future Loans or Letters of Credit to be made by Lender to Borrowers or (iii) establish such Reserves as Lender determines, without limitation or restriction, notwithstanding anything to the contrary contained herein.

## SECTION 11.  JURY TRIAL WAIVER; OTHER WAIVERS AND CONSENTS; GOVERNING LAW

11.1    Governing Law; Choice of Forum; Service of Process; Jury Trial Waiver.

(a)    The validity, interpretation and enforcement of this Agreement and the other Financing Agreements (except as otherwise provided therein) and any dispute arising out of the relationship between the parties hereto, whether in contract, tort, equity or otherwise, shall be governed by the internal laws of the State of New York but excluding any principles of conflict of laws or other rule of law that would cause the application of the law of any jurisdiction other than the laws of the State of New York.

(b)    Borrowers, Guarantors and Lender irrevocably consent and submit to the non-exclusive jurisdiction of the Supreme Court of the State of New York for New York County and the United States District Court for the Southern District of New York, whichever Lender may elect, and waive any objection based on venue or forum non conveniens with respect to any action instituted therein arising under this Agreement or any of the other Financing Agreements or in any way connected with or related or incidental to the dealings of the parties hereto in respect of this Agreement or any of the other Financing Agreements or the transactions related hereto or thereto, in each case whether now existing or hereafter arising, and whether in contract, tort, equity or otherwise, and agree that any dispute with respect to any such matters shall be heard only in the courts described above (except that Lender shall have the right to bring any action or proceeding against any Borrower or Guarantor or its or their property in the courts of any other jurisdiction which Lender deems necessary or appropriate in order to realize on the Collateral or to otherwise enforce its rights against any Borrower or Guarantor or its or their property).

(c)    Each Borrower and Guarantor hereby waives personal service of any and all process upon it and consents that all such service of process may be made by certified mail (return receipt requested) directed to its address set forth herein and service so made shall be deemed to be completed five (5) days after the same shall have been so deposited in the U.S. mails, or, at Lender's option, by service upon any Borrower or Guarantor (or Administrative Borrower on behalf of such Borrower or Guarantor) in any other manner provided under the rules of any such courts.  Within thirty (30) days after such service, such Borrower or Guarantor shall appear in answer to such process, failing which such Borrower or Guarantor shall be

707761.15

**A3017**

CONFIDENTIAL

CURTIS_000839

deemed in default and judgment may be entered by Lender against such Borrower or Guarantor for the amount of the claim and other relief requested.

(d)   BORROWERS, GUARANTORS AND LENDER EACH HEREBY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION (i) ARISING UNDER THIS AGREEMENT OR ANY OF THE OTHER FINANCING AGREEMENTS OR (ii) IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO IN RESPECT OF THIS AGREEMENT OR ANY OF THE OTHER FINANCING AGREEMENTS OR THE TRANSACTIONS RELATED HERETO OR THERETO IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER IN CONTRACT, TORT, EQUITY OR OTHERWISE.  BORROWERS, GUARANTORS AND LENDER HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY AND THAT ANY BORROWER, ANY GUARANTOR OR LENDER MAY FILE AN ORIGINAL COUNTERPART OF A COPY OF THIS AGREEMENT WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES HERETO TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.

(e)   Lender shall not have any liability to any Borrower or Guarantor (whether in tort, contract, equity or otherwise) for losses suffered by such Borrower or Guarantor in connection with, arising out of, or in any way related to the transactions or relationships contemplated by this Agreement, or any act, omission or event occurring in connection herewith, unless it is determined by a final and non-appealable judgment or court order binding on Lender , that the losses were the result of acts or omissions constituting gross negligence or willful misconduct.  In any such litigation, Lender shall be entitled to the benefit of the rebuttable presumption that it acted in good faith and with the exercise of ordinary care in the performance by it of the terms of this Agreement.  Each Borrower and Guarantor:  (i) certifies that neither Lender nor any representative, agent or attorney acting for or on behalf of Lender has represented, expressly or otherwise, that Lender would not, in the event of litigation, seek to enforce any of the waivers provided for in this Agreement or any of the other Financing Agreements and (ii) acknowledges that in entering into this Agreement and the other Financing Agreements, Lender is relying upon, among other things, the waivers and certifications set forth in this Section 11.1 and elsewhere herein and therein.

11.2   Waiver of Notices.  Each Borrower and Guarantor hereby expressly waives demand, presentment, protest and notice of protest and notice of dishonor with respect to any and all instruments and chattel paper, included in or evidencing any of the Obligations or the Collateral, and any and all other demands and notices of any kind or nature whatsoever with respect to the Obligations, the Collateral and this Agreement, except such as are expressly provided for herein.  No notice to or demand on any Borrower or Guarantor which Lender may elect to give shall entitle such Borrower or Guarantor to any other or further notice or demand in the same, similar or other circumstances.

11.3   Amendments and Waivers.  Neither this Agreement nor any provision hereof shall be amended, modified, waived or discharged orally or by course of conduct, but only by a written agreement signed by an authorized officer of Lender, and as to amendments, as also

707761.15

**A3018**

CONFIDENTIAL

CURTIS_000840

signed by an authorized officer of Borrowers. Lender shall not, by any act, delay, omission or otherwise be deemed to have expressly or impliedly waived any of its rights, powers and/or remedies unless such waiver shall be in writing and signed by an authorized officer of Lender. Any such waiver shall be enforceable only to the extent specifically set forth therein. A waiver by Lender of any right, power and/or remedy on any one occasion shall not be construed as a bar to or waiver of any such right, power and/or remedy which Lender would otherwise have on any future occasion, whether similar in kind or otherwise.

      11.4   <u>Waiver of Counterclaims</u>. Each Borrower and Guarantor waives all rights to interpose any claims, deductions, setoffs or counterclaims of any nature (other than compulsory counterclaims) in any action or proceeding with respect to this Agreement, the Obligations, the Collateral or any matter arising therefrom or relating hereto or thereto.

      11.5   <u>Indemnification</u>. Each Borrower and Guarantor shall, jointly and severally, indemnify and hold Lender, and its officers, directors, agents, employees, advisors and counsel and their respective Affiliates (each such person being an "Indemnitee"), harmless from and against any and all losses, claims, damages, liabilities, costs or expenses (including attorneys' fees and expenses) imposed on, incurred by or asserted against any of them in connection with any litigation, investigation, claim or proceeding commenced or threatened related to the negotiation, preparation, execution, delivery, enforcement, performance or administration of this Agreement, any other Financing Agreements, or any undertaking or proceeding related to any of the transactions contemplated hereby or any act, omission, event or transaction related or attendant thereto, including amounts paid in settlement, court costs, and the fees and expenses of counsel except that Borrowers and Guarantors shall not have any obligation under this Section 11.5 to indemnify an Indemnitee with respect to a matter covered hereby resulting from the gross negligence or willful misconduct of such Indemnitee as determined pursuant to a final, non-appealable order of a court of competent jurisdiction (but without limiting the obligations of Borrowers or Guarantors as to any other Indemnitee). To the extent that the undertaking to indemnify, pay and hold harmless set forth in this Section may be unenforceable because it violates any law or public policy, Borrowers and Guarantors shall pay the maximum portion which it is permitted to pay under applicable law to Lender in satisfaction of indemnified matters under this Section. To the extent permitted by applicable law, no Borrower or Guarantor shall assert, and each Borrower and Guarantor hereby waives, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any of the other Financing Agreements or any undertaking or transaction contemplated hereby. Subject to Section 12.8 hereof, no Indemnitee referred to above shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed by it through telecommunications, electronic or other information transmission systems in connection with this Agreement or any of the other Financing Agreements or the transaction contemplated hereby or thereby. All amounts due under this Section shall be payable upon demand. The foregoing indemnity shall survive the payment of the Obligations and the termination or non-renewal of this Agreement.

## SECTION 12.  <u>TERM OF AGREEMENT; MISCELLANEOUS</u>

      12.1   <u>Term</u>.

707761.15

CONFIDENTIAL

CURTIS_000841

(a) This Agreement and the other Financing Agreements shall become effective as of the date set forth on the first page hereof and shall continue in full force and effect for a term ending on the date five (5) years from the date hereof (the "Renewal Date"), and from year to year thereafter, unless sooner terminated pursuant to the terms hereof.  Lender may, at its option, terminate this Agreement and the other Financing Agreements, or Administrative Borrower or any Borrower may terminate this Agreement and the other Financing Agreements, each case, effective on the Renewal Date or on the anniversary of the Renewal Date in any year by giving to the other party at least sixty (60) days prior written notice; provided, that, this Agreement and all other Financing Agreements must be terminated simultaneously.  In addition, Borrowers may terminate this Agreement at any time upon ten (10) days' prior written notice to Lender (which notice shall be irrevocable) and Lender may, at its option, terminate this Agreement at any time an Event of Default exists or has occurred and is continuing.  Upon the Renewal Date or any other effective date of termination of the Financing Agreements, Borrowers shall pay to Lender all outstanding and unpaid Obligations and shall furnish cash collateral to Lender (or at Lender's option, a letter of credit issued for the account of Borrowers and at Borrowers' expense, in form and substance satisfactory to Lender, by an issuer acceptable to Lender and payable to Lender as beneficiary) in such amounts as Lender determines are reasonably necessary to secure Lender and Lenders from loss, cost, damage or expense, including reasonable attorneys' fees and expenses, in connection with any contingent Obligations, including issued and outstanding Letters of Credit Obligations and checks or other payments provisionally credited to the Obligations or as to which Lender has not yet received final and indefeasible payment and any continuing obligations of Lender pursuant to any Deposit Account Control Agreement.  The amount of such cash collateral (or letter of credit, as Lender may determine) as to any Letter of Credit Obligations shall be in the amount equal to one hundred five (105%) percent of the amount of the Letter of Credit Obligations plus the amount of any fees and expenses payable in connection therewith through the end of the latest expiration date of the Letters of Credit giving rise to such Letter of Credit Obligations.  Such payments in respect of the Obligations and cash collateral shall be remitted by wire transfer in Federal funds to the Lender Payment Account or such other bank account of Lender, as Lender may, in its discretion, designate in writing to Administrative Borrower for such purpose.  Interest shall be due until and including the next Business Day, if the amounts so paid by Borrowers to the Lender Payment Account or other bank account designated by Lender are received in such bank account later than 12:00 noon, New York City time.

(b) No termination of this Agreement or any of the other Financing Agreements shall relieve or discharge any Borrower or Guarantor of its respective duties, obligations and covenants under this Agreement or any of the other Financing Agreements until all Obligations have been fully and finally discharged and paid, and Lender's continuing security interest in the Collateral and the rights and remedies of Lender hereunder, under the other Financing Agreements and applicable law, shall remain in effect until all such Obligations have been fully and finally discharged and paid.  Accordingly, each Borrower and Guarantor waives any rights it may have under the UCC to demand the filing of termination statements with respect to the Collateral and Lender shall not be required to send such termination statements to Borrowers or Guarantors, or to file them with any filing office, unless and until this Agreement shall have been terminated in accordance with its terms and all Obligations paid and satisfied in full in immediately available funds.

707761.15

CONFIDENTIAL

CURTIS_000842

(c) If for any reason this Agreement is terminated prior to the second anniversary of the date of this Agreement, in view of the impracticality and extreme difficulty of ascertaining actual damages and by mutual agreement of the parties as to a reasonable calculation of Lender's lost profits as a result thereof, Borrowers agree to pay to Lender, upon the effective date of such termination, an early termination fee in the amount equal to one half of one (1/2%) percent of the Maximum Credit. Such early termination fee shall be presumed to be the amount of damages sustained by Lender as a result of such early termination and Borrowers and Guarantors agree that it is reasonable under the circumstances currently existing (including, but not limited to, the borrowings that are reasonably expected by Borrowers hereunder and the interest, fees and other charges that are reasonably expected to be received by Lender). In addition, Lender shall be entitled to such early termination fee upon the occurrence of any Event of Default described in Sections 10.1(g) and 10.1(h) hereof that occurs before the second anniversary of the date of this Agreement, even if Lender does not exercise the right to terminate this Agreement, but elects, at its option, to provide financing to any Borrower or permit the use of cash collateral under the United States Bankruptcy Code. The early termination fee provided for in this Section 12.1 shall be deemed included in the Obligations.

(d) Notwithstanding anything to the contrary contained in Section 12.1(c) hereof, in the event of the termination of the financing arrangements provided for herein, Borrowers and Guarantors shall not be required to pay the early termination fee provided for in Section 12.1(c) hereof if all the Obligations have been fully and finally repaid in accordance with the terms and conditions of this Agreement to the extent that such Obligations have been so repaid from (i) proceeds of advances provided by Patriarch Partners, LLC to purchase the Obligations in accordance with the terms and conditions of the Second Lien Intercreditor Agreement or (ii) proceeds of initial loans and advances from a credit facility provided or underwritten by Wachovia Bank, National Association or its Affiliates (or for which Wachovia Bank, National Association or any of its Affiliates, including, without limitation, Wachovia Bank, National Association, is acting as agent) to Borrowers and Guarantors in connection with thee replacement of the financing arrangements provided for herein.

12.2    Interpretative Provisions.

(a)    All terms used herein which are defined in Article 1, Article 8 or Article 9 of the UCC shall have the meanings given therein unless otherwise defined in this Agreement.

(b)    All references to the plural herein shall also mean the singular and to the singular shall also mean the plural unless the context otherwise requires.

(c)    All references to any Borrower, Guarantor and Lender pursuant to the definitions set forth in the recitals hereto, or to any other person herein, shall include their respective successors and assigns.

(d)    The words "hereof", "herein", "hereunder", "this Agreement" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not any particular provision of this Agreement and as this Agreement now exists or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced.

707761.15

**A3021**

CONFIDENTIAL

CURTIS_000843

(e)     The word "including" when used in this Agreement shall mean "including, without limitation" and the word "will" when used in this Agreement shall be construed to have the same meaning and effect as the word "shall".

(f)     An Event of Default shall exist or continue or be continuing until such Event of Default is waived in accordance with Section 11.3 or is cured in a manner satisfactory to Lender, if such Event of Default is capable of being cured as determined by Lender. Any reference herein to a Default or Event of Default that "exists" shall only include a Default or Event of Default, as the case may be, that has not been cured or waived in accordance with the terms hereof, so that such Default or Event of Default, as the case may be, shall cease to exist and shall not be deemed to be continuing if it has been so cured or waived.

(g)     All references to the term "good faith" used herein when applicable to Lender shall mean, notwithstanding anything to the contrary contained herein or in the UCC, honesty in fact in the conduct or transaction concerned notwithstanding anything to the contrary contained herein or in the UCC, honesty-in-fact in the conduct or transaction concerned and observance of reasonable commercial standards of fair dealing based on how an asset-based lender with similar rights providing a credit facility of the type set forth herein would act in similar circumstances at the time with the information then available to it.  All references to the term "reasonably" as applied to any conduct or determination by Lender  shall be based on how an asset-based lender with similar rights providing a credit facility of the type set forth herein would act in similar circumstances..  Borrowers and Guarantors shall have the burden of proving any lack of good faith on the part of Lender or failure to act reasonably alleged by any Borrower or Guarantor at any time.

(h)     Any accounting term used in this Agreement shall have, unless otherwise specifically provided herein, the meaning customarily given in accordance with GAAP, and all financial computations hereunder shall be computed unless otherwise specifically provided herein, in accordance with GAAP as consistently applied and using the same method for inventory valuation as used in the preparation of the financial statements of Parent most recently received by Lender prior to the date hereof. Notwithstanding anything to the contrary contained in GAAP or any interpretations or other pronouncements by the Financial Accounting Standards Board or otherwise, the term "unqualified opinion" as used herein to refer to opinions or reports provided by accountants shall mean an opinion or report that is unqualified and also does not include any explanation, supplemental comment or other comment concerning the ability of the applicable person to continue as a going concern or the scope of the audit.

(i)     In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including", the words "to" and "until" each mean "to but excluding" and the word "through" means "to and including".

(j)     Unless otherwise expressly provided herein, (i) references herein to any agreement, document or instrument shall be deemed to include all subsequent amendments, modifications, supplements, extensions, renewals, restatements or replacements with respect thereto, but only to the extent the same are not prohibited by the terms hereof or of any other Financing Agreement, and (ii) references to any statute or regulation are to be construed as

707761.15

**A3022**

CONFIDENTIAL

CURTIS_000844

including all statutory and regulatory provisions consolidating, amending, replacing, recodifying, supplementing or interpreting the statute or regulation.

(k)     The captions and headings of this Agreement are for convenience of reference only and shall not affect the interpretation of this Agreement.

(l)     This Agreement and other Financing Agreements may use several different limitations, tests or measurements to regulate the same or similar matters. All such limitations, tests and measurements are cumulative and shall each be performed in accordance with their terms.

(m)     This Agreement and the other Financing Agreements are the result of negotiations among and have been reviewed by counsel to Lender and the other parties, and are the products of all parties. Accordingly, this Agreement and the other Financing Agreements shall not be construed against Lender merely because of Lender's involvement in their preparation.

12.3  <u>Notices</u>.

(a)     All notices, requests and demands hereunder shall be in writing and deemed to have been given or made: if delivered in person, immediately upon delivery; if by facsimile transmission, immediately upon sending and upon confirmation of receipt; if by nationally recognized overnight courier service with instructions to deliver the next Business Day, one (1) Business Day after sending; and if by certified mail, return receipt requested, five (5) days after mailing. Notices delivered through electronic communications shall be effective to the extent set forth in Section 12.3(b) hereof. All notices, requests and demands upon the parties are to be given to the following addresses (or to such other address as any party may designate by notice in accordance with this Section):

| | |
|---|---|
| If to any Borrower or Guarantor to Administrative Borrower: | TransCare Corporation<br>5811 Foster Avenue<br>New York, New York 11234<br>Attention:. President<br>Telephone No.: (718) 251-2900<br>Facsimile No.: (718) 209-1381 |
| with a copy to: | Nixon Peabody LLP<br>437 Madison Avenue<br>New York, New York 10022<br>Attention: Lauren Wiesenberg, Esq.<br>Telephone No.: (212) 940-3000<br>Facsimile No.: (212) 940-3111 |
| If to Lender: | Wachovia Bank, National Association<br>1133 Avenue of the Americas<br>New York, New York 10036 |

707761.15

**A3023**

CONFIDENTIAL

CURTIS_000845

Attention: Portfolio Manager
Telephone No.: 212-845-2000
Facsimile No.: 212-545-4283

(b)   Notices and other communications to Lenders hereunder may be delivered or furnished by electronic communication (including e-mail and Internet or intranet websites) pursuant to procedures approved by Lender or as otherwise determined by Lender.  Lender or any Borrower or Guarantor may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it, provided, that, approval of such procedures may be limited to particular notices or communications. Unless Lender otherwise requires, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement), provided, that, if such notice or other communication is not given during the normal business hours of the recipient, such notice shall be deemed to have been sent at the opening of business on the next Business Day for the recipient, and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (i) of notification that such notice or communications is available and identifying the website address therefor.

12.4  Partial Invalidity.  If any provision of this Agreement is held to be invalid or unenforceable, such invalidity or unenforceability shall not invalidate this Agreement as a whole, but this Agreement shall be construed as though it did not contain the particular provision held to be invalid or unenforceable and the rights and obligations of the parties shall be construed and enforced only to such extent as shall be permitted by applicable law.

12.5  Successors.  This Agreement, the other Financing Agreements and any other document referred to herein or therein shall be binding upon and inure to the benefit of and be enforceable by Lender and Borrowers and their respective successors and assigns, except that Borrowers may not assign their rights under this Agreement, the other Financing Agreements and any other document referred to herein or therein without the prior written consent of Lender. Any such purported assignment without such express prior written consent shall be void. Lender may, after notice to Administrative Borrower, assign its rights and delegate its obligations under this Agreement and the other Financing Agreements and further may assign, or sell participations in, all or any part of the Loans, the Letters of Credit or any other interest herein to another financial institution or other person on terms and conditions acceptable to Lender; provided, that, with respect to the sale by Lender of any such participation: (a) Lender's obligations under this Agreement and the other Financing Agreements shall remain unchanged, (b) Lender shall remain responsible to the performance of such obligations, and Borrowers and Guarantors shall continue to deal solely and directly with Lender in connection with Lender's rights and obligations under this Agreement and the other Financing Agreements, and (c) the participant shall not have any rights under this Agreement or any of the other Financing Agreements (the Participant's rights against Lender in respect of such participation to be those set forth in the agreement executed by

707761.15

**A3024**

CONFIDENTIAL

CURTIS_000846

such Lender in favor of the Participant relating thereto) and all amounts payable by Borrower or any Obligor hereunder shall be determined as if Lender had not sold such participation.

12.6   <u>Entire Agreement</u>.  This Agreement, the other Financing Agreements, any supplements hereto or thereto, and any instruments or documents delivered or to be delivered in connection herewith or therewith represents the entire agreement and understanding concerning the subject matter hereof and thereof between the parties hereto, and supersede all other prior agreements, understandings, negotiations and discussions, representations, warranties, commitments, proposals, offers and contracts concerning the subject matter hereof, whether oral or written.  In the event of any inconsistency between the terms of this Agreement and any schedule or exhibit hereto, the terms of this Agreement shall govern.

12.7   <u>USA Patriot Act</u>.  Lender hereby notifies Borrowers and Guarantors that pursuant to the requirements of the USA PATRIOT Act (Title III of Pub.L. 107-56 (signed into law October 26, 2001) (the "Act"), it is required to obtain, verify and record information that identifies each person or corporation who opens an account and/or enters into a business relationship with it, which information includes the name and address of Borrowers and Guarantors and other information that will allow such Lender to identify such person in accordance with the Act and any other applicable law.  Borrowers and Guarantors are hereby advised that any Loans or Letters of Credit hereunder are subject to satisfactory results of such verification.

12.8   <u>Confidentiality</u>.

(a) Lender shall use all reasonable efforts to keep confidential, in accordance with its customary procedures for handling confidential information and safe and sound lending practices, any non-public information supplied to it by or on behalf of Borrower or any Guarantor pursuant to this Agreement; <u>provided</u>, <u>that</u>, nothing contained herein shall limit the disclosure of any such information: (i) to the extent required by statute, rule, regulation, subpoena or court order, (ii) to bank examiners and other regulators, auditors or accountants,  in connection with any litigation to which Lender is a party, (iii) to any assignee or participant (or prospective assignee or participant) or to any Affiliate of Lender so long as such assignee or participant (or prospective assignee or participant) or Affiliate shall have been instructed to treat such information as confidential in accordance with this Section 12.8 and any "business associate agreement" as defined in HIPAA that Lender and Borrowers and Guarantors may enter into), or (iv) to counsel for Lender or any participant or assignee (or prospective participant or assignee).

(b) In the event that Lender receives a request or demand to disclose any confidential information pursuant to any subpoena or court order, Lender agrees (i) to the extent permitted by applicable law or if permitted by applicable law, to the extent Lender determines in good faith that it will not create any risk of liability to such Lender, then Lender will promptly notify Administrative Borrower of such request so that Administrative Borrower may seek a protective order or other appropriate relief or remedy and (ii) if disclosure of such information is required, disclose such information and, subject to reimbursement by Borrowers of Lender's expenses, cooperate with Borrowers in reasonable efforts to obtain an order or other reliable assurance that confidential treatment will be accorded to such portion of the disclosed information which any Borrower so designates, to the extent permitted by applicable law or if

707761.15

**A3025**

CONFIDENTIAL

CURTIS_000847

permitted by applicable law, to the extent Lender determines in good faith that it will not create any risk of liability to Lender.

(c)   In no event shall this Section 12.8 or any other provision of this Agreement or applicable law be deemed: (i) to apply to or restrict disclosure of information that has been or is made public by any Borrower, any Obligor or any third party or otherwise becomes generally available to the public other than as a result of a disclosure in violation hereof, (ii) to apply to or restrict disclosure of information that was or becomes available to Lender on a non-confidential basis from a person other than a Borrower or Guarantor, or (iii) to require Lender to return any materials furnished by a Borrower or Guarantor to Lender or  prevent Lender from responding to routine informational requests in accordance with the Code of Ethics for the Exchange of Credit Information promulgated by The Robert Morris Associates or other applicable industry standards relating to the exchange of credit information.  The obligations of Lender under this Section 12.8 shall supersede and replace the obligations of Lender under any confidentiality letter signed prior to the date hereof.

12.9  Counterparts, Etc.  This Agreement or any of the other Financing Agreements may be executed in any number of counterparts, each of which shall be an original, but all of which taken together shall constitute one and the same agreement. Delivery of an executed counterpart of this Agreement or any of the other Financing Agreements by telefacsimile or other electronic method of transmission shall have the same force and effect as the delivery of an original executed counterpart of this Agreement or any of such other Financing Agreements.  Any party delivering an executed counterpart of any such agreement by telefacsimile or other electronic method of transmission shall also deliver an original executed counterpart, but the failure to do so shall not affect the validity, enforceability or binding effect of such agreement.

[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]

707761.15

**A3026**

CONFIDENTIAL    CURTIS_000848

IN WITNESS WHEREOF, Lender, Borrowers and Guarantors have caused these presents to be duly executed as of the day and year first above written.

LENDER                                      BORROWERS

WACHOVIA BANK, NATIONAL                      TRANSCARE CORPORATION
ASSOCIATION

By: _____             By: _____
Name.  Richard Schultz                       Name: Patrick Seiler
Title:   Director                            Title: Vice President

                                            TRANSCARE NEW YORK, INC.

                                            By: _____
                                            Name: Patrick Seiler
                                            Title: Vice President

                                            TRANSCARE PENNSYLVANIA, INC.

                                            By: _____
                                            Name: Patrick Seiler
                                            Title: Vice President

                                            TRANSCARE MARYLAND, INC.

                                            By: _____
                                            Name: Patrick Seiler
                                            Title: Vice President

                                            TRANSCARE ML, INC.

                                            By: _____
                                            Name: Patrick Seiler
                                            Title: Vice President

                                            TC HUDSON VALLEY AMBULANCE
                                            CORP.

                                            By: _____
                                            Name: Patrick Seiler
                                            Title: Vice President

[SIGNATURES CONTINUE ON FOLLOWING PAGE]

A3027

CONFIDENTIAL                                       CURTIS_000849

[SIGNATURES CONTINUED FROM PREVIOUS PAGE]

TC BILLING AND SERVICES CORP.

By: _____
Name: Patrick Seiler
Title: Vice President

TC AMBULANCE CORPORATION

By: _____
Name: Patrick Seiler
Title: Vice President

TRANSCARE MANAGEMENT
SERVICES, INC.

By: _____
Name: Patrick Seiler
Title: Vice President

TCBA AMBULANCE, INC.

By: _____
Name: Patrick Seiler
Title: Vice President

TRANSCARE HARFORD COUNTY, INC.

By: _____
Name: Patrick Seiler
Title: Vice President

TRANSCARE WESTCHESTER, INC.

By: _____
Name: Patrick Seiler
Title: Vice President

[SIGNATURES CONTINUE ON FOLLOWING PAGE]

**A3028**

CONFIDENTIAL

[SIGNATURES CONTINUED FROM PREVIOUS PAGE]

GUARANTORS

TC AMBULANCE GROUP, INC.

By: _____
Name: Patrick Seiler
Title: Vice President

TC AMBULANCE NORTH, INC.

By: _____
Name: Patrick Seiler
Title: Vice President

**A3029**

CONFIDENTIAL

CONFIDENTIAL

CURTIS_000852

EXHIBIT A
TO
LOAN AND SECURITY AGREEMENT

Information Certificate

(See Attached)

A-1

**A3031**

CONFIDENTIAL

CURTIS_000853

INFORMATION CERTIFICATE

OF

TRANSCARE CORPORATION
AND ITS SUBSIDIARIES

October ___, 2006

Wachovia Bank, National Association
1133 Avenue of the Americas
New York, New York 10036

In connection with certain financing provided or to be provided by Wachovia Bank, National Association ("Lender"), pursuant to a Loan and Security Agreement among each of the undersigned (individually, a "Company" and, collectively, the "Companies") and Lender, each of the undersigned jointly and severally represents and warrants to Lender as follows:

1. The full and exact name of each Company as set forth in its certificate of incorporation (or its certificate of formation or other organizational document filed with the applicable state governmental authority, as the case may be) is as follows: **See Schedule 1**

2. Each Company uses and owns the following trade name(s) in the operation of its business (e.g. billing, advertising, etc.; note: do not include names which are product names only):

   **See Schedule 2**

3. Each Company is a registered organization of the following type (for example, corporation, limited partnership, limited liability company, etc.): **See Schedule 1**

4. The organizational identification number of each Company issued by its jurisdiction of organization if the jurisdiction of organization is not Delaware is as set forth below (or if none is issued by the jurisdiction of organization indicate "none"). Each Company is organized under Delaware law.

5. The Federal Employer Identification Number of each Company is as follows:

   **See Schedule 1**

6. Each Company is duly qualified and authorized to transact business as a foreign organization in the following states and is in good standing in such states:

10126957.5

**A3032**

CONFIDENTIAL

CURTIS_000854

### See Schedule 1

7.   Since the date of its organization, the name of each Company as set forth in its organizational documentation as filed of record with the applicable state authority has been changed as follows:

| Company | Date of Change | Prior Name |
|---|---|---|
| TransCare New York, Inc. | 11/17/94 | Trans Care New York, Inc. |
| TransCare Corporation | 7/15/94 | Trans Care Corporation |

8.   Since the date of five (5) years prior to the date hereof, each Company has made or entered into the following mergers or acquisitions:

| Company | Merger/Acquisition | Date |
|---|---|---|
| TransCare ML, Inc. | Acquisition of assets from Great Valley Health and Main Line Health, Inc. | 4/1/04 |
| TC Hudson Valley Ambulance Corp. | Purchased a NYS ambulance license from FINOVA Capital Corporation and Century Ambulance and Ambulette, Inc. | 7/17/02 |

9.   The chief executive office and mailing address of each Company is located at the address indicated for such Company on **Schedule 8.2** hereto.

10.   The books and records of each Company pertaining to accounts, contract rights, inventory, and other assets are located at the addresses indicated for such Company on **Schedule 8.2** hereto.

11.   Each Company has other places of business and/or maintains inventory or other assets only at the addresses (indicate whether locations are owned, leased or operated by third parties and if leased or operated by third parties, their name and address) indicated for such Company on **Schedule 8.2** hereto.

12.   The places of business or other locations of any assets used by each Company during the last four (4) months other than those listed above are as indicated for such Company on **Schedule 8.2** hereto.

**A3033**

CONFIDENTIAL

CURTIS_000855

13. Each Company's assets are owned and held free and clear of liens, mortgages, pledges, security interests, encumbrances or charges except as set forth on **Schedule 8.4** hereto.

14. There are no judgments or litigation pending by or against any Company, its subsidiaries and/or affiliates or any of its officers/principals, except as set forth on **Schedule 8.6** hereto.

15. Each Company is in compliance with all environmental laws applicable to its business or operations except as set forth on **Schedule 8.8** hereto and except where the failure to so comply is not reasonably expected to have a Material Adverse Effect.

16. No Company has any deposit accounts, investment accounts, securities account or similar accounts with any bank, savings and loan or other financial institution, except as set forth on **Schedule 8.10** hereto for the purposes and of the types indicated therein.

17. No Company owns or licenses any trademarks, patents, or copyrights, except as set forth on **Schedule 8.11** hereto and except for those that are not material to its business (indicate type of intellectual property and whether owned or licensed, registration number, date of registration, and, if licensed, the name and address of the licensor). [Schedule may include items that are not material.]

18. Each Company is affiliated with, or has ownership in, the corporations (including subsidiaries) and other organizations set forth on **Schedule 8.12** hereto.

19. The names of the stockholders (or members or partners, including general partners and limited partners) of each Company and their holdings are as set forth on **Schedule 8.12** hereto (if stock or other interests are widely held indicate only holders owning 10% or more of the voting stock or other interests).

20. No Company is a party to or bound by an collective bargaining or similar agreement with any union, labor organization or other bargaining agent except as set forth on **Schedule 8.13** hereto (indicate date of agreement, parties to agreement, description of employees covered, and date of termination).

21. Attached as **Schedule 8.15** hereto is a list of contracts and agreements, or series of contracts or agreements (other than the Financing Agreements and indebtedness listed on Schedule 9.9) of the Borrowers and Guarantors as of the date hereof involving monetary liability of or to any Person (or Affiliates of such Person) in an amount in excess of $6,000,000 in a fiscal year.

22. No Company has any "indebtedness" except as set forth on **Schedule 9.9** hereto. For this purpose, the term "indebtedness" means any liability, whether or not contingent, (a) in respect of borrowed money (whether or not the recourse of the lender is to the whole of the assets of such Company or only to a portion thereof) or evidenced by bonds, notes, debentures or similar instruments; (b) representing

CONFIDENTIAL

CURTIS_000856

the balance deferred and unpaid of the purchase price of any property or services (other than an account payable to trade creditor (whether or not an affiliate) incurred in the ordinary course of business of such Company; (c) all obligations as lessee under leases which have been, or should be, in accordance with generally accepted accounting principles recorded as capital leases; (d) any contractual obligation, contingent or otherwise, of such Company to pay or be liable for the payment of any indebtedness described in this definition of another person or entity, including, without limitation, any such indebtedness, directly or indirectly guaranteed, or any agreement to purchase, repurchase, or otherwise acquire such indebtedness, obligation or liability or any security therefor, or to provide funds for the payment or discharge thereof, or to maintain solvency, assets, level of income, or other financial condition; (e) all obligations with respect to redeemable stock and redemption or repurchase obligations under any capital stock or other equity securities issued by such Company; (f) all reimbursement obligations and other liabilities of such Company with respect to surety bonds (whether bid, performance or otherwise), letters of credit, banker's acceptances, drafts or similar documents or instruments issued for such Company's account; (g) all indebtedness of such Company in respect of indebtedness of another person or entity for borrowed money or indebtedness of another person or entity otherwise described in this definition which is secured by any consensual lien, security interest, collateral assignment, conditional sale, mortgage, deed of trust, or other encumbrance on any asset of such Company, whether or not such obligations, liabilities or indebtedness are assumed by or are a personal liability of such Company, all as of such time; (h) all obligations, liabilities and indebtedness of such Company (marked to market) arising under swap agreements, cap agreements and collar agreements and other agreements or arrangements designed to protect such person against fluctuations in interest rates or currency or commodity values; (i) all obligations owed by such Company under license agreements with respect to non-refundable, advance or minimum guarantee royalty payments; and (j) the principal and interest portions of all rental obligations of such Company under any synthetic lease or similar off-balance sheet financing where such transaction is considered to be borrowed money for tax purposes but is classified as an operating lease in accordance with generally accepted accounting principles.

23.    No Company has made any loans or advances or guaranteed or otherwise become liable for the obligations of any others, except as set forth on **Schedule 9.10** hereto.

24.    No Company has any chattel paper (whether tangible or electronic) or instruments as of the date hereof, except as follows:  None

25.    No Company has any commercial tort claims, except as follows: None

26.    Except as set forth on **Schedule A**, there is no provision in the certificate of incorporation, certificate of formation,  articles of organization, by-laws or operating agreement of any Company (as applicable) or the other organizational

CONFIDENTIAL

documents of such Company, or in the laws of the State of its organization, requiring any vote or consent of it shareholders, members or other holders of the equity interests therein to borrow or to authorize the mortgage or pledge of or creation of a security interest in any assets of such Company or any subsidiary. Except as set forth on **Schedule A**, such power is vested exclusively in its Board of Directors (or in the case of a limited partnership, the general partner that is the signatory hereto, or in the case of a limited liability company, the manager that is the signatory hereto).

27.     The officers of each Company and their respective titles are as follows: Todd L. Miller, President, Chief Operating Officer and Secretary and Patrick Seiler, Vice President, Finance, Controller and Assistant Secretary

The following will have signatory powers as to all transactions of each Company with Lender: Todd L. Miller, President, Chief Operating Officer and Secretary; Patrick Seiler, Vice President, Finance, Controller and Assistant Secretary

28.     The members of the Board of Directors of each Company  are: The directors of each Company are Lynn Tilton and Peter Harris.

29.     At the present time, there are no delinquent taxes due (including, but not limited to, all payroll taxes, personal property taxes, real estate taxes or income taxes) except as follows:

| Company | Payee | Tax | Amount Due* |
|---|---|---|---|
| TC Ambulance Group, Inc. | NYC Dept of Finance NY City Tax Warrant 2/24/03  8654391 Kings County, NY | 2002 NYC Corporate Tax | $437.16 |
| TC Ambulance North, Inc. | NYC Dept of Finance NY City Tax Warrant 2/24/03  8654356 Kings County, NY | 2002 NYC Corporate Tax | $437.16 |
| TransCare Management Services, Inc. | NYC Dept of Finance NY City Tax Warrant 2/24/03 Kings County, NY | 2002 NYC Corporate Tax | $437.16 |
| TransCare Westchester, Inc. | NYC Dept of Finance NY City Tax Warrant 2/24/03  8653622 Kings County, NY | 2002 NYC Corporate Tax | $437.16 |

* The amount s set forth above were included as part of the Companies' resolution of bankruptcy claims.  The Company is working with the New York City Department of Finance to resolve the matter.

CONFIDENTIAL                                                          CURTIS_000858

30.   Certified Public Accountants for each Company is the firm of:

Name:  J.H. Cohn LLP
Address: 4 Becker Farm Road, Roseland, NJ 07068
Partner Handling Relationship: John Alfonso

Were statements uncertified for any fiscal year, commencing with the 2003 fiscal
year?  No, financial statements have been audited and reported on by the
Companies' independent  public accountants for the period from August 1, 2003
through December 31, 2003 and for fiscals years  2004 and 2005.

**A3037**

CONFIDENTIAL                                                                    CURTIS_000859

Lender shall be entitled to rely upon the foregoing in all respects and each Company certifies that the officer signing this Information Certificate is duly authorized to execute and deliver this Information Certificate on behalf of the Company for which he or she is signing.

Very truly yours,

TRANSCARE CORPORATION

By: _____

Title: _Vice President_____


TransCare New York, Inc.
TransCare Pennsylvania, Inc.
TransCare Maryland, Inc.
TransCare Harford County, Inc.
TransCare Westchester, Inc.
TC Ambulance Corporation
TC Ambulance North, Inc.
TC Ambulance Group, Inc.
TransCare Management Services, Inc.
TCBA Ambulance, Inc.
TC Hudson Valley Ambulance Corp.
TC Billing and Services Corp.
TransCare ML, Inc.

By: _____

Title: _Vice President_____

A3038

CONFIDENTIAL                                                                 CURTIS_000860

**SCHEDULE 1**
**to**
**INFORMATION CERTIFICATE**

**Corporate Names,; Date and Jurisdiction of Organization and Foreign Qualifications**

| Name of Corporation | Jurisdiction and Date of Organization | Federal Identification Number | Foreign Qualifications |
|---|---|---|---|
| 1. TransCare Corporation | Delaware 12/1/93 | 75-2528381 | New York |
| 2. TransCare New York, Inc. | Delaware 4/29/94 | 51-0355671 | New York |
| 3. TransCare Pennsylvania, Inc. | Delaware 4/20/95 | 75-2598438 | Pennsylvania |
| 4. TransCare Maryland, Inc. | Delaware 4/29/97 | 11-3374923 | Maryland; District of Columbia |
| 5. TransCare Harford County, Inc. | Delaware 1/5/98 | 52-2072846 | Maryland |
| 6. TransCare Westchester, Inc. | Delaware 4/7/98 | 11-3428782 | New York |
| 7. TC Ambulance Corporation | Delaware 10/21/98 | 11-3461540 | New York |
| 8. TC Ambulance North, Inc. | Delaware 1/6/99 | 11-3538754 | New York |
| 9. TC Ambulance Group, Inc. | Delaware 1/6/99 | 11-3538755 | New York |
| 10. TransCare Management Services, Inc. | Delaware 8/5/99 | 25-1848213 | New York, Pennsylvania |
| 11. TCBA Ambulance, Inc. | Delaware 12/9/99 | 11-3558429 | New York |
| 12. TC Billing and Services Corp. | Delaware 12/5/01 | 01-0718002 | New York |
| 13. TC Hudson Valley Ambulance Corp. | Delaware 6/22/01 | 11-3619234 | New York |
| 14. TransCare ML, Inc. | Delaware 3/2/04 | 20-0806409 | Pennsylvania |

**A3039**

CONFIDENTIAL                                                                                     CURTIS_000861

| | **Date Filed** |
|---|---|
| **TransCare New York, Inc.**　　　**51-0355671** | |
| • Parkway Hospital Emergency Ambulance Service** | 09/12/00 |
| • Peninsula Hospital Center, Affiliate of North Shore – Long Island Jewish Health System Ambulance Service | 05/06/04 |
| • Physicians' Ambulance Service** | 11/24/99 |
| • St. Barnabas Hospital | 01/26/00 |
| • St. Vincent Catholic Medical Centers Comprehensive Cardiovascular Center Ambulance Service | 05/06/04 |
| • TC Paratransit | 07/25/06 |
| • The Brooklyn Hospital Center Caledonian Campus Ambulance Service** | 07/03/01 |
| • TMS Services** | 05/02/01 |
| • TransCare | 05/26/04 |
| • Unimet Ambulance** | 11/24/99 |
| • Unimet Ambulette | 09/12/00 |
| • United Ambulance** | 03/24/00 |
| **TCBA Ambulance, Inc.**　　　**11-3558429** | |
| **License #0574** | |
| • Big Apple Ambulance Service88 | 01/18/00 |
| • St. Barnabas Hospital Emergency Service | 12/12/01 |
| • TransCare | 05/26/04 |
| **TC Ambulance Group, Inc.**　　　**11-3538755** | |
| **License # 0508** | |
| • Albert Einstein College of Medicine (a division of Montefiore Medical Center) Ambulance Service | 06/29/01 |
| • Beth Israel Medical Center Ambulance Service | 11/23/99 |
| • METROCARE88 | 11/23/99 |
| • Metropolitan Ambulance and First Aid88 | 02/05/99 |
| • Montefiore Medical Center Ambulance Service | 06/29/01 |
| • New York Westchester Square Medical Center Ambulance Service88 | 06/29/01 |
| • TransCare | 05/26/04 |
| • The Brooklyn Hospital Center Caledonian Campus Ambulance | 06/29/01 |

A3040

CONFIDENTIAL

CURTIS_000862

| | **Date Filed** |
|---|---|
| **TransCare New York, Inc.**          **51-0355671** | |
| Service** | |
| **TC Ambulance North, Inc.**          **11-3538754** | |
| **License # 0509** | |
| • METROCARE** | 11/23/99 |
| • Physicians' Ambulance Service** | 02/04/99 |
| • TransCare | 05/26/04 |
| • St. Barnabas Hospital | 01/26/00 |
| **TransCare Westchester, Inc.**          **11-3428782** | |
| **License # 0470** | |
| • Abbey Richmond Ambulance Service** | 06/04/98 |
| • METROCARE** | 03/13/01 |
| • TransCare | 05/26/04 |
| **TC Ambulance Corporation**          **11-3461540** | |
| **License # 0510** | |
| • Albert Einstein College of Medicine (a division of Montefiore Medical Center) Ambulance Service | 07/15/02 |
| • Beth Israel Medical Center Ambulance Service | 06/29/00 |
| • Bronx Lebanon Hospital Center Emergency Ambulance Service | 06/12/02 |
| • Brookdale University Hospital and Medical Center** | 12/17/99 |
| • Kingsbrook Jewish Medical Center Emergency Ambulance Service** | 09/08/00 |
| • Metro EMS | 12/12/01 |
| • Metro North Ambulance** | 02/04/99 |
| • METROCARE** | 11/23/99 |
| • Mount Sinai Medical Center | 06/12/02 |
| • Mount Sinai NYU Health** | 06/12/02 |
| • Mountefiore Medical Center Ambulance Service | 06/29/01 |
| • New York Community Hospital Emergency Ambulance Service** | 09/08/00 |
| • New York Westchester Square Medical Center Ambulance Service** | 06/29/01 |

A3041

CONFIDENTIAL

CURTIS_000863

| | Date Filed |
|---|---|
| **TransCare New York, Inc.**       **51-0355671** | |
| • North General Hospital Emergency Ambulance Service | 06/12/02 |
| • Parkway Hospital Emergency Ambulance Service** | 09/07/00 |
| • St. Barnabas Hospital Emergency Ambulance Service | 08/02/00 |
| • TransCare | TransCare |
| • The Brooklyn Hospital Center Caledonian Campus Ambulance Service** | 06/29/01 |
| **TC Hudson Valley Ambulance Corp.**       **11-3619234** | |
| **License # 0667** | |
| • MetroCare** | 07/24/02 |
| • Mid-Hudson Valley Ambulance Service** | 07/05/01 |
| • TransCare | 05/26/04 |
| **TC Billing and Services Corp.**       **01-0718002** | |
| **License # N/A** | |
| • Billing Associates | 03/15/02 |

\*\* means assumed name certificate filed but entity is not currently using such assumed name

The trade name filings listed below.

| Company | Tradename | Filing Office |
|---|---|---|
| TransCare ML, Inc. | TRANSCARE | New Castle County, DE trade name registration |
| TransCare ML, Inc. | TRANSCARE | Kent County, DE trade name registration |
| TransCare ML, Inc. | TRANSCARE | Sussex County, DE trade name registration |
| TransCare ML, Inc. | TRANSCARE | MD Dept of Assessments and Taxation trade name registration |
| | | |

CONFIDENTIAL

CURTIS_000864

**SCHEDULE 8.2**
**To**
**INFORMATION CERTIFICATE**

**Chief Executive Office; Locations**

1.  Chief Executive Office(s)

| Company | Chief Executive Office(s) |
|---|---|
| TransCare Corporation | 5811 Foster Avenue, Brooklyn, NY 11234 |
| TransCare New York, Inc. | 5811 Foster Avenue, Brooklyn, NY 11234 |
| TransCare Westchester, Inc. | 5811 Foster Avenue, Brooklyn, NY 11234<br>20 Ferris Avenue, White Plains, NY 10601 |
| TransCare Maryland, Inc. | 5811 Foster Avenue, Brooklyn, NY 11234<br>1500 Caton Center Drive, Baltimore, MD 21047 |
| TransCare Harford County, Inc. | 5811 Foster Avenue, Brooklyn, NY 11234<br>1500 Caton Center Drive, Baltimore, MD 21047 |
| TransCare Pennsylvania, Inc. | 5811 Foster Avenue, Brooklyn, NY 11234<br>400 Seco Road, Monroeville, PA 15164 |
| TC Ambulance Corporation | 5811 Foster Avenue, Brooklyn, NY 11234 |
| TC Ambulance North, Inc. | 5811 Foster Avenue, Brooklyn, NY 11234<br>154 East 3rd Street, Mt. Vernon, NY 10550 |
| TC Ambulance Group, Inc. | 5811 Foster Avenue, Brooklyn, NY 11234 |
| TransCare Management Services, Inc. | 5811 Foster Avenue, Brooklyn, NY 11234<br>400 Seco Road, Monroeville, PA 15164 |
| TCBA Ambulance, Inc. | 5811 Foster Avenue, Brooklyn, NY 11234 |
| TC Hudson Valley Ambulance Corp. | 5811 Foster Avenue, Brooklyn, NY 11234<br>80 Airport Drive, Bay #5 and #6, Wappinger Falls, NY 12590 |
| TC Billing and Services Corp. | 5811 Foster Avenue, Brooklyn, NY 11234 |
| TransCare ML, Inc. | 5811 Foster Avenue, Brooklyn, NY 11234<br>306 West Central Avenue, Paoli, PA 19301 |

**A3043**

CONFIDENTIAL                                                                    CURTIS_000865

2.    Location of Books and Records

| COMPANY | DESCRIPTION OF BOOKS AND RECORDS | ADDRESS |
|---|---|---|
| TRANSCARE CORPORATION | CORPORATE OFFICE WHERE ACCOUNTING AND BILLING RECORDS ARE LOCATED; PRIMARY DATA CENTER THAT PROVIDES BILLING FOR SUBSIDIARIES | 5811 FOSTER AVENUE BROOKLYN, NY 11234 |
| TRANSCARE PENNSYLVANIA, INC. | THIS LOCATION INCLUDES THIS COMPANY'S SECONDARY DATA CENTER THAT PROVIDES  SUPPORT FOR TRANSCARE MARYLAND, INC., TRANSCARE ML, INC. AND TRANSCARE PENNSYLVANIA, INC. AND SUPPORTS THE CRYSTAL REPORT SERVER | 400 SECO ROAD, MONROEVILLE, PA 15164 |
| ALL OTHER SUBSIDIARIES LISTED ABOVE UNDER ITEM 1. | OTHER LOCATIONS MAY HAVE BILLING RECORDS THAT ARE IN PROCESS AND ARE TO BE SENT TO TRANSCARE CORPORATION AT 5811 FOSTER AVENUE, BROOKLYN, NY; ALSO MAY HAVE OTHER RECORDS, INCLUDING HUMAN RESOURCE AND OTHER EMPLOYEE FILES | |

A3044

CONFIDENTIAL

CURTIS_000866

3.   <u>Locations of Inventory, Equipment and Other Assets</u>

A.     Leased Locations or arrangement to use space

| ADDRESS | NAME/ADDRESS OF LESSOR OR THIRD PARTY, AS APPLICABLE |
|---|---|
| 5811 FOSTER AVENUE, BROOKLYN, NEW YORK  11234 OFFICE & FLEET MAINTENANCE FACILITY | STEVE ZAKHEIM 5350 KINGS HIGHWAY BROOKLYN, NY 11203 |
| 1212 FIFTH AVENUE, NEW YORK, NY 10029 [TRANSPORTATION OFFICE MT. SINAI] OFFICE | MT. SINAI REAL ESTATE DIVISION 50 EAST 98TH STREET NEW YORK, NY 10029 |
| 400 SECO ROAD, MONROEVILLE, PA  15164 OFFICE & FLEET MAINTENANCE FACILITY | F&T PROPERTIES, LLP C/O DOLLAR BANK 2700 LIBERTY AVENUE PITTSBURGH, PA 15222 |
| 1500 CATON CENTER DRIVE, BALTIMORE, MD  21047 OFFICE & FLEET MAINTENANCE FACILITY | ST. JOHN PROPERTIES 2560 LORD BALTIMORE DR BALTIMORE, MD 21244 |
| 5801 FOSTER AVENUE, BROOKLYN, NEW YORK  11234 OFFICE | 5809 FOSTER PARTNERS 5350 KINGS HIGHWAY BROOKLYN, NY 11203 |
| 5809 FOSTER AVENUE, BROOKLYN, NEW YORK  11234 OFFICE | 5809 FOSTER CORP. 5350 KINGS HIGHWAY BROOKLYN, NY 11203 |
| 106-15 FOSTER AVENUE, BROOKLYN, NEW YORK 11236 OFFICE & OPERATIONS CENTER | SEZ FOSTER LLC 5350 KINGS HIGHWAY BROOKLYN, NY 11203 |
| 154 EAST 3RD STREET, MT. VERNON, NEW YORK  10550. OFFICE & FLEET MAINTENANCE FACILITY | 33 BERTEL, LLC 5350 KINGS HIGHWAY BROOKLYN, NY 11203 |
| 1650 GRAND CONCOURSE, BRONX, NY 10457. OFFICE | BRONX LEBANON HOSPITAL MR. STEVE ANDERMSN 1650 GRAND CONCOURSE BRONX, NY 10457 |

**A3045**

CONFIDENTIAL                                                            CURTIS_000867

| | |
|---|---|
| 20 FERRIS AVENUE, WHITE PLAINS, NY 10603. OFFICE & GARAGE | CITY OF WHITE PLAINS 255 MAIN ST. WHITE PLAINS, NY 10601 |
| 80 AIRPORT DRIVE, BAY #5 AND #6, WAPPINGER FALLS, NY 12590. OFFICE & GARAGE SPACE | LOCUST TREE RESIDENTIAL PROPERTIES, LLC 80 AIRPORT RD WAPPINGERS FALL, NY 12590 |
| 32 RANICK DRIVE W., AMITYVILLE, NY 11701. OFFICE & FLEET MAINTENANCE FACILITY | LUCY RACANELLI – GARANTOR TRUST C/O LOUIS D. COLLETTI 3505 VETERANS MEMORIAL HIGHWAY, SUITE A RONKONKOMA, NY 11779 |
| 306 WEST CENTRAL AVENUE, PAOLI, PA 19301 OFFICE | KOCHER BROTHER LIMITIED PARTNERSHIP 228 NORTH PHOENIXVILLE PIKE MALVERN, PA 19355 |
| 380 NORTH OXFORD VALLEY ROAD, LANGHORNE, PA 19047. OFFICE | FRANKFORD BUCKS HOSPITAL 380 NORTH OXFORD VALLEY ROAD, LANGHORNE, PA 19047 |
| 6 BELLECOR DRIVE, SUITE 101, NEW CASTLE, DE 19720. | REYBOLD VENTURE GROUP 116 EAST SCOTLAND DR BEAR, DE 19701 |
| 1560-68 MADISON AVE NEW YORK NY 10029 OFFICE & PARKING | TERENCE CARDINAL COOKE HEALTH CARE CENTER C/O ROBIN QUARLES 1249 5TH AVE NEW YORK, NY 10029 |
| 10101 FOSTER AVE BROOKLYN NY 11236 [PARKING LOT] | PROMPT REALTY LLC 10101 FOSTER AVE BROOKLYN NY 11236 |

CONFIDENTIAL

CURTIS_000868

B.  The following is a list of client or customer hospitals or facilities which are not facilities owned or leased by one or more of the Companies or any of its subsidiaries, where certain inventory or equipment may be located from time to time. These locations are subject to change in connection with the termination of services agreements or as such time as new service agreements are entered into:

1.  Madison Square Garden
    8 Penn Plaza
    New York, New York  10001

2.  Yankee Stadium
    1 Ruppert Place
    Bronx, New York  10451

3.  Roseland Ballroom
    239 West 52nd Street
    New York, New York  10019

4.  Nassau Coliseum
    1255 Hempstead Turnpike
    Uniondale, New York  11553

5.  Staten Island Yankees
    75 Richmond Terrace
    Staten Island, New York 10301

6.  Brooklyn Hospital
    121 DeKalb Avenue
    Brooklyn, New York  11201

7.  Montefiore Hospital
    111 East 210th Street
    Bronx, New York  10467

8.  St. Vincent Hospital
    153 West 11th Street
    NR 7th Avenue
    New York, New York  10011

9.  Mt. Sinai Hospital
    1190 5th Avenue
    New York, New York  10029

A3047

CONFIDENTIAL

CURTIS_000869

10.   Mary Immaculate Hospital
15211 89th Avenue
Jamaica, New York 11432

11.   Mt. Sinai of Queens
2510 30th Avenue
Astoria, NY 11102

12.   St. Johns Hospital
9002 Queens Boulevard
Flushing, New York 11373

13.   Bronx Lebanon Hospital Concourse Division
1650 Grand Concourse
Bronx, NY 10457

14.   Frankford Hospital
4900 Frankford Avenue
Philadelphia, PA  19124

15.   Frankford Bucks Hospital
380 North Oxford Valley Road
Langhorne, PA 19047

16.   Christiana Hospital
4755 Ogletown – Station Road
Newark, DE  19713

17.   Paoli Hospital
255 Lancaster Avenue
Paoli, PA  19301

18.   Frankford Torresdale Hospital
Knights & Red Lion Road
Philadelphia, PA  19114


4.   Employees:  Certain employees have personal computers, pagers and cell phones
provided by the Companies that are located at their residences.

5.   Hospital Locations: The following is a list of hospital locations at which Inventory and/or
Equipment of the Companies may be located from time to time (911 Hospitals). These
locations are subject to change in connection with the termination of services agreements
or as such time as new service agreements are entered into.

**A3048**

CONFIDENTIAL                                                    CURTIS_000870

A.    Albert Einstein College of Medicine (Montefiore Medical Center)
      1825 Eastchester Avenue
      Bronx, NY 10463

B.    Beth Israel Medical Center Petrie Division
      16th Street and 1st Avenue
      New York, New York  10003

C.    Montefiore Medical Center
      111 East 210th Street
      Bronx, New York 10701

D.    Mt. Sinai Hospital
      1212 Fifth Avenue
      New York, New York 10029

E.    North General Hospital
      1879 Madison Avenue
      New York, New York 10035

F.    St. Barnabas Hospital
      Third Avenue and 183rd Street
      Bronx, New York 10457

G.    NYU Medical Center
      550 1st Avenue
      New York, New York  10016

H.    Bronx Lebanon Hospital
      Concourse Division
      1650 Grand Concourse
      Bronx, New York 10457

I.    Brooklyn Hospital
      121 DeKalb Avenue
      Brooklyn, New York 11201

6.    <u>Locations of Assets in Prior 4 Months not Listed Above</u>

      100 Lancaster Avenue
      Wynnewood PA 19096

      4900 Frankford Avenue
      Philadelphia, PA 19124

      6400 Georgia Avenue NW
      Washington DC 20012

**A3049**

CONFIDENTIAL

CURTIS_000871

**SCHEDULE 8.4**
**to**
**INFORMATION CERTIFICATE**

**Existing Liens**

| Name of Company | Name of Secured Party | Description of Collateral | File No. of Financing Statement/Jurisdiction (Optional) |
|---|---|---|---|
| 1. All Companies | Patriarch Partners Agency Services, LLC, as Agent for the lenders parties thereto | All assets | |
| 2. See attached list | See attached list | Vehicles – ambulances and ambulettes | |
| 3. See attached list | equipment lessors | specified equipment and proceeds thereof | |
| 4. Companies | Arch Insurance | Cash collateral in the amount of $500,000 held as security for potential deductible obligations of the Companies | |

**A3050**

CONFIDENTIAL

CURTIS_000872

CONFIDENTIAL

## TRANSCARE CORP

### SCHEDULE OF LEASES AS OF AUGUST 2006

| Co. | Type / Description | Lease # | VIN # | Leasing Co. | Lien Holder / Finance Co. | # of Payments Made | Period | 1st Payment | Last Payment | Monthly Payment | Principal Bal. Aug. 2006 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | **Capital Leases** | | | | | | |
| TCMD | 2002 Ford E 456 SD | FP9672 | 1FDXE45FX2HA54314 | Forman Price | Forman Price | 42 | 48 | Jan-03 | Dec-06 | $ 2,662.00 | $ 7,810.01 |
| TCMD | 2003 Ford E-350 Type II | 426662 | 1FDSS34F03HB01057 | Kin Leasing | Sovereign Bank | 36 | 48 | Jul-03 | Jun-07 | 951.00 | 9,051.44 |
| TCMD | 2003 Ford E-350 Type II | 426668 | 1FDSS34F63HB01063 | Kin Leasing | Sovereign Bank | 36 | 48 | Jul-03 | Jun-07 | 951.00 | 9,051.44 |
| TCMD | 2003 Ford E-350 Type II | 426728 | 1FDSS34F93HB10484 | Kin Leasing | Sovereign Bank | 35 | 48 | Aug-03 | Jul-07 | 945.00 | 9,848.13 |
| TCMD | 2003 Ford E-350 Type II | 426674 | 1FDSS34F23HB10486 | Kin Leasing | Sovereign Bank | 35 | 48 | Aug-03 | Jul-07 | 951.00 | 9,912.36 |
| TCMD | 2003 Ford E-350 SR 84 Type III | 426740 | 1FDSE35F33HB05397 | Kin Leasing | Sovereign Bank | 35 | 48 | Aug-03 | Jul-07 | 1,174.00 | 12,288.15 |
| TCMD | 2003 Ford E-350 SR 84 Type III | 426758 | 1FDSE35F53HB05398 | Kin Leasing | Sovereign Bank | 35 | 48 | Aug-03 | Jul-07 | 1,174.00 | 12,288.15 |
| TCMD | 2003 Ford E-350 SR 84 Type III | 426764 | 1FDSE35F13HB05396 | Kin Leasing | Sovereign Bank | 35 | 48 | Aug-03 | Jul-07 | 1,174.00 | 12,288.15 |
| TCMD | 2003 Ford E-350 | 426752 | 1FDXE45F13HA90264 | Kin Leasing | Sovereign Bank | 35 | 48 | Aug-03 | Jul-07 | 1,550.00 | 16,223.36 |
| TCMD | 2003 Ford E-350 Type II | 426800 | 1FDSS34F23HB23058 | Kin Leasing | All Points Capital Corp. | 34 | 48 | Sep-03 | Aug-07 | 945.00 | 10,695.62 |
| TCMD | 2003 Ford E-350 | 426524 | 1FDSS34F63HB58038 | Kin Leasing | Sovereign Bank | 27 | 36 | Apr-04 | Mar-07 | 1,212.00 | 8,187.96 |
| TCMD | 2004 Ford E-350 Diesel | 024165 | 1FTSS34P84HB10488 | Kin Leasing | Sovereign Bank | 25 | 36 | Jun-04 | May-07 | 1,039.00 | 8,925.54 |
| TCMD | 2004 Ford E-350 Diesel | 024164 | 1FTSS34PX4HB10489 | Kin Leasing | Sovereign Bank | 25 | 36 | Jun-04 | May-07 | 1,039.00 | 8,925.54 |
| TCMD | 2003 Ford E-350 | FP9815 | 1FDSS34FX3HB58043 | Forman Price | Forman Price | 25 | 36 | Jun-04 | May-07 | 1,212.00 | 10,435.00 |
| TCMD | 2004 Ford E-350 Type II Ambulance | FP9828 | 1FDSS34F43HB65067 | Forman Price | Forman Price | 23 | 36 | Aug-04 | Jul-07 | 1,222.00 | 10,495.27 |
| TCMD | 2004 Ford E-350 Type II Ambulance | 024151 | 1FDSS34P34HB04254 | Kin Leasing | Sovereign Bank | 23 | 36 | Aug-04 | Jul-07 | 1,222.00 | 12,709.21 |
| TCMD | 2004 Ford E-350 Type II Ambulance | 024185 | 1FDSS34P94HB09488 | Kin Leasing | Sovereign Bank | 23 | 36 | Aug-04 | Jul-07 | 1,222.00 | 12,709.21 |
| TCMD | 2005 Ford E-350  Type II | 025556 | 1FDSS34P05HA59769 | Kin Leasing | New World LF LLC | 15 | 48 | Apr-05 | Mar-09 | 874.00 | 23,344.73 |
| TCMD | 2005 Ford E-350  Type II | 025553 | 1FDSS34P75HA59790 | Kin Leasing | New World LF LLC | 15 | 48 | Apr-05 | Mar-09 | 874.00 | 23,344.73 |
| TCMD | 2006 Ford E-350  Type III | 025590 | 1FDWE35P66HA24506 | Kin Leasing | Sovereign Bank | 6 | 48 | Jan-06 | Dec-09 | 1,098.00 | 46,136.26 |
| TCMD | 2006 Ford E-450 Type III Horton   M53 | 025590 | 1FDXE45PO6HA53509 | Kin Leasing | Sovereign Bank | 1 | 60 | Jun-06 | May-11 | 2,468.00 | 112,707.16 |
| TCML | 2004 Ford E-350 | 024156 | 1FDSS34P84HA54371 | Kin Leasing | Sovereign Bank | 25 | 36 | Jun-04 | May-07 | 1,238.08 | 10,875.19 |
| TCML | 2004 Ford E-350 | 024157 | 1FDSS34P44HA23912 | Kin Leasing | Sovereign Bank | 25 | 36 | Jun-04 | May-07 | 1,238.08 | 10,875.19 |
| TCML | 2004 Ford E-350 WCV | 024177 | 1FTSS34P04HB24921 | Kin Leasing | Sovereign Bank | 23 | 36 | Aug-04 | Jul-07 | 1,101.34 | 11,484.70 |
| TCML | 2004 Ford E-350 II | FP8009 | 1FDSS34P54HB04255 | Forman Price | Forman Price | 23 | 36 | Aug-04 | Jul-07 | 1,238.08 | 12,937.31 |
| TCML | 2004 Ford E-350 II | FP8010 | 1FDSS34P74HB04256 | Forman Price | Forman Price | 23 | 36 | Aug-04 | Jul-07 | 1,238.08 | 12,937.31 |
| TCML | 2004 Ford E-350 Type II | 024188 | 1FDSS34P74HB09487 | Kin Leasing | Sovereign Bank | 23 | 36 | Aug-04 | Jul-07 | 1,238.08 | 12,937.31 |
| TCML | 2005 Ford E350       VAN | FP8016 | 1FTSS34P85HA64758 | Kin Leasing | Forman Price | 17 | 36 | Feb-05 | Jan-08 | 1,047.28 | 15,614.69 |
| TCML | 2005 Ford E350 II | 024497 | 1FTSS34P05HA91551 | Kin Leasing | New World LF LLC | 14 | 48 | May-05 | Apr-09 | 842.70 | 23,796.01 |
| TCML | 2005 Ford E350 II | 025565 | 1FDSS34PX5HB39360 | Kin Leasing | New World LF LLC | 14 | 48 | May-05 | Apr-09 | 1,001.70 | 28,324.81 |
| TCML | 2005 Ford E350 WCM Mobility | 025508 | 1FTSS34PX5HA52112 | Kin Leasing | New World LF LLC | 12 | 48 | Jul-05 | Jun-09 | 792.88 | 23,217.63 |
| TCML | 2005 Ford E350 WCM Mobility | 025509 | 1FTSS34P85HB01341 | Kin Leasing | New World LF LLC | 12 | 48 | Jul-05 | Jun-09 | 792.88 | 23,217.63 |
| TCML | 2005 Ford E350 | 025507 | 1FTSS34P85HA91555 | Kin Leasing | New World LF LLC | 12 | 48 | Jul-05 | Jun-09 | 853.30 | 25,037.19 |
| TCML | 2005 Ford E350 | 025516 | 1FDSS34P26HA53123 | Kin Leasing | All Points Capital | 11 | 48 | Aug-05 | Jul-09 | 999.58 | 30,331.64 |
| TCML | 2005 Ford E350 | 025517 | 1FDSS34P96HA24489 | Kin Leasing | All Points Capital | 11 | 48 | Aug-05 | Jul-09 | 999.58 | 30,331.64 |
| TCML | 2006 Ford E350 Type II | 025522 | 1FDSS34P16HA62153 | Kin Leasing | Sovereign Bank | 10 | 48 | Sep-05 | Aug-09 | 999.58 | 31,076.75 |
| TCML | 2006 Ford E450 Type III | 025530 | 1FDXE45P56HA83220 | Kin Leasing | Sovereign Bank | 9 | 48 | Oct-05 | Sep-09 | 1,809.42 | 57,499.64 |
| TCML | 2006 Ford E350 Type II | 025532 | 1FDSS34P56HA62155 | Kin Leasing | Sovereign Bank | 8 | 48 | Nov-05 | Oct-09 | 1,001.70 | 29,051.17 |
| TCML | 2006 Ford E250       VAN | 025545 | 1FTNS24W78HA52634 | Kin Leasing | Sovereign Bank | 5 | 36 | Feb-06 | Jan-09 | 836.34 | 21,119.35 |
| TCML | 2006 Ford E250       VAN | 025544 | 1FTNS24W78HA52617 | Kin Leasing | Sovereign Bank | 5 | 36 | Feb-06 | Jan-09 | 836.34 | 21,119.35 |
| TCML | 2006 Ford E250       VAN | 025543 | 1FTNS24W78HA52617 | Kin Leasing | Sovereign Bank | 5 | 36 | Feb-06 | Jan-09 | 836.34 | 21,119.35 |
| TCML | 2006 Ford E250       WCV | 025587 | 1FTNS24W05HB02516 | Kin Leasing | All Points Capital | 2 | 36 | May-06 | Apr-09 | 963.54 | 25,089.39 |
| TCML | 2006 Ford E250       WCV | 025588 | 1FTNS24W98HA85540 | Kin Leasing | Sovereign Bank | 1 | 36 | Jun-06 | May-09 | 878.74 | 23,405.89 |
| TCML | 2006 Ford E250       WCV | 025589 | 1FTNS24W08HA95538 | Kin Leasing | Sovereign Bank | 1 | 36 | Jun-06 | May-09 | 878.74 | 23,405.89 |

CURTIS_000873

**A3051**

CONFIDENTIAL

**TRANSCARE CORP**

**SCHEDULE OF LEASES AS OF AUGUST 2006**

| Co. | Type / Description | Lease # | VIN # | Leasing Co. | Lien Holder / Finance Co. | # of Payments Made | Period | 1st Payment | Last Payment | Monthly Payment | Principal Bal. Aug. 2006 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| TCNY | 2002 Ford E 351 | FP9650 | 1FDSE35F42HA44785 | Forman Price | Forman-Price | 43 | 48 | Dec-02 | Nov-06 | 1,279.00 | 3,753.30 |
| TCNY | 2002 Ford E 456 SD | FP9676 | 1FDXE45F82HB59076 | Forman Price | Forman-Price | 43 | 48 | Dec-02 | Nov-06 | 1,662.00 | 4,876.30 |
| TCNY | 2003 Ford E-350 Type II | 426410 | 1FDSS34F53HA62112 | Kin Leasing | All Points Capital | 41 | 48 | Feb-03 | Jan-07 | 976.00 | 4,736.24 |
| TCNY | 2003 Ford E-350 | 426440 | 1FDSS34FX3HA67578 | Kin Leasing | Sovereign Bank | 40 | 48 | Mar-03 | Feb-07 | 984.00 | 5,702.38 |
| TCNY | 2003 Ford E-350 | 426446 | 1FDSS34F63HA74298 | Kin Leasing | Sovereign Bank | 40 | 48 | Mar-03 | Feb-07 | 984.00 | 5,702.38 |
| TCNY | 2003 Ford E-350 | 426464 | 1FDSS34F43HA90239 | Kin Leasing | Sovereign Bank | 38 | 48 | May-03 | Apr-07 | 984.00 | 7,528.63 |
| TCNY | 2003 Ford E-350 | 426458 | 1FDSS34F03HA85894 | Kin Leasing | Sovereign Bank | 38 | 48 | May-03 | Apr-07 | 984.00 | 7,528.63 |
| TCNY | 2003 Ford E-350 | 426470 | 1FDSS34F13HA97231 | Kin Leasing | Sovereign Bank | 38 | 48 | May-03 | Apr-07 | 984.00 | 7,528.63 |
| TCNY | 2003 Ford E-350 | 426476 | 1FDSS34F63HA97242 | Kin Leasing | Sovereign Bank | 38 | 48 | May-03 | Apr-07 | 984.00 | 7,528.63 |
| TCNY | 2003 Ford E-350 | 426512 | 1FDSS34F83HA87580 | Kin Leasing | Sovereign Bank | 38 | 48 | May-03 | Apr-07 | 984.00 | 7,528.63 |
| TCNY | 2003 Ford E-350 | 426518 | 1FDSS34F03HA74295 | Kin Leasing | Sovereign Bank | 38 | 48 | May-03 | Apr-07 | 984.00 | 7,528.63 |
| TCNY | 2003 Ford E-350 | 426530 | 1FDSS34F23HA90238 | Kin Leasing | Sovereign Bank | 38 | 48 | May-03 | Apr-07 | 984.00 | 7,528.63 |
| TCNY | 2003 Ford E-350 Mini Mod Type III | 426488 | 1FDSE35F93HA93823 | Kin Leasing | Sovereign Bank | 38 | 48 | May-03 | Apr-07 | 1,239.00 | 9,533.89 |
| TCNY | 2003 Ford E-350 Mini Mod Type III | 426500 | 1FDSE35FX3HB05395 | Kin Leasing | Sovereign Bank | 38 | 48 | May-03 | Apr-07 | 1,239.00 | 9,533.89 |
| TCNY | 2003 Ford E-350 Mini Mod Type III | 426506 | 1FDBE35F03HA93824 | Kin Leasing | Sovereign Bank | 38 | 48 | May-03 | Apr-07 | 1,239.00 | 9,533.89 |
| TCNY | 2003 Ford E-350 Type II XL | 426560 | 1FDSS34F83HB01047 | Kin Leasing | Sovereign Bank | 37 | 48 | Jun-03 | May-07 | 951.00 | 8,182.70 |
| TCNY | 2003 Ford E-350 Type II XL | 426566 | 1FDSS34F53HB05394 | Kin Leasing | Sovereign Bank | 37 | 48 | Jun-03 | May-07 | 951.00 | 8,182.70 |
| TCNY | 2003 Ford E-350 Type II XL | 426572 | 1FDSS34F43HB01059 | Kin Leasing | Sovereign Bank | 37 | 48 | Jun-03 | May-07 | 951.00 | 8,182.70 |
| TCNY | 2003 Ford E-350 Medix | 426620 | 1FDSS34F13HA60955 | Kin Leasing | Sovereign Bank | 36 | 48 | Jul-03 | Jun-07 | 941.00 | 8,952.94 |
| TCNY | 2003 Ford E-350 Medix | 426626 | 1FDSS34F33HA60956 | Kin Leasing | Sovereign Bank | 36 | 48 | Jul-03 | Jun-07 | 941.00 | 8,952.94 |
| TCNY | 2003 Ford E-350 Medix | 426638 | 1FDSS34F73HA60958 | Kin Leasing | Sovereign Bank | 36 | 48 | Jul-03 | Jun-07 | 941.00 | 8,952.94 |
| TCNY | 2003 Ford E-350 Medix | 426644 | 1FDSS34F33HA60957 | Kin Leasing | Sovereign Bank | 36 | 48 | Jul-03 | Jun-07 | 941.00 | 8,952.94 |
| TCNY | 2003 Ford E-350 Type II XL | 426608 | 1FDSS34F33HB01053 | Kin Leasing | Sovereign Bank | 36 | 48 | Jul-03 | Jun-07 | 951.00 | 9,051.44 |
| TCNY | 2003 Ford E-350 Type II XL | 426614 | 1FDSS34F93HB01056 | Kin Leasing | Sovereign Bank | 36 | 48 | Jul-03 | Jun-07 | 951.00 | 9,051.44 |
| TCNY | 2003 Ford E-350 Type II | 426680 | 1FDSS34F13HB01066 | Kin Leasing | Sovereign Bank | 35 | 48 | Aug-03 | Jul-07 | 945.00 | 9,848.13 |
| TCNY | 2003 Ford E-350 Type II | 426686 | 1FDSS34F73HB01069 | Kin Leasing | Sovereign Bank | 35 | 48 | Aug-03 | Jul-07 | 945.00 | 9,848.13 |
| TCNY | 2003 Ford E-350 Type II | 426692 | 1FDSS34F93HB01073 | Kin Leasing | Sovereign Bank | 35 | 48 | Aug-03 | Jul-07 | 945.00 | 9,848.13 |
| TCNY | 2003 Ford E-350 Type II | 426698 | 1FDSS34F13HB10477 | Kin Leasing | Sovereign Bank | 35 | 48 | Aug-03 | Jul-07 | 945.00 | 9,848.13 |
| TCNY | 2003 Ford E-350 Type II | 426704 | 1FDSS34F33HB10478 | Kin Leasing | Sovereign Bank | 35 | 48 | Aug-03 | Jul-07 | 945.00 | 9,848.13 |
| TCNY | 2003 Ford E-350 Type II | 426710 | 1FDSS34F53HB10479 | Kin Leasing | Sovereign Bank | 35 | 48 | Aug-03 | Jul-07 | 945.00 | 9,848.13 |
| TCNY | 2003 Ford E-350 Type II | 426716 | 1FDSS34F83HB10485 | Kin Leasing | Sovereign Bank | 35 | 48 | Aug-03 | Jul-07 | 945.00 | 9,848.13 |
| TCNY | 2003 Ford E-350 Type II | 426722 | 1FDSS34F73HB10483 | Kin Leasing | Sovereign Bank | 35 | 48 | Aug-03 | Jul-07 | 945.00 | 9,848.13 |
| TCNY | 2003 Ford E-350 Type II | 426734 | 1FDSS34F13HB14531 | Kin Leasing | Sovereign Bank | 35 | 48 | Aug-03 | Jul-07 | 945.00 | 9,848.13 |
| TCNY | 2003 Ford E-350 Type II | 426770 | 1FDSS34F43HB23062 | Kin Leasing | Sovereign Bank | 35 | 48 | Aug-03 | Jul-07 | 945.00 | 9,848.13 |
| TCNY | 2003 Ford E-350 Type II | 426764 | 1FDSS34F03HB23057 | Kin Leasing | All Points Capital | 34 | 48 | Sep-03 | Aug-07 | 945.00 | 10,695.62 |
| TCNY | 2003 Ford E-350 Type II | 024101 | 1FDSS34F83HB23064 | Kin Leasing | Sovereign Bank | 34 | 48 | Sep-03 | Aug-07 | 945.00 | 10,695.62 |
| TCNY | 2003 Ford E-350 Type II | 024102 | 1FDSS34F73HB18017 | Kin Leasing | Sovereign Bank | 34 | 48 | Sep-03 | Aug-07 | 945.00 | 10,695.62 |
| TCNY | 2003 Ford E-350 Type II | 024108 | 1FDSS34F83HB18012 | Kin Leasing | Sovereign Bank | 34 | 48 | Sep-03 | Aug-07 | 945.00 | 10,695.62 |
| TCNY | 2003 Ford E-350 Type II | 024103 | 1FDSS34F13HB14500 | Kin Leasing | Sovereign Bank | 34 | 48 | Sep-03 | Aug-07 | 945.00 | 10,695.62 |
| TCNY | 2003 Ford E-350 Type II | 024104 | 1FDSS34F33HB14501 | Kin Leasing | Sovereign Bank | 34 | 48 | Sep-03 | Aug-07 | 945.00 | 10,695.62 |
| TCNY | 2003 Ford E-350 Type II | 024110 | 1FDSS34F93HB14999 | Kin Leasing | Sovereign Bank | 34 | 48 | Sep-03 | Aug-07 | 945.00 | 10,695.62 |
| TCNY | 2003 Ford E-350 Type II | 024105 | 1FDSS34F53HB14502 | Kin Leasing | Sovereign Bank | 34 | 48 | Sep-03 | Aug-07 | 945.00 | 10,695.62 |
| TCNY | 2004 Ford Escape XLS 4WD | 024107 | 1FMYU92104KA81243 | Kin Leasing | All Points Capital | 33 | 48 | Oct-03 | Sep-07 | 405.00 | 5,298.81 |
| TCNY | 2003 Ford E-350 | 024114 | 1FDSS35F53HB05403 | Kin Leasing | Sovereign Bank | 33 | 48 | Oct-03 | Sep-07 | 1,434.00 | 2,826.90 |
| TCNY | 2004 Ford Escape XLS | 024115 | 1FMYU92174DA24064 | Kin Leasing | All Points Capital | 30 | 36 | Jan-04 | Dec-06 | 515.00 | 2,477.85 |
| TCNY | 2004 Ford Escape XLS 4WD | 024125 | 1FMYU92174DA10388 | Kin Leasing | All Point Capital | 30 | 36 | Jan-04 | Dec-06 | 530.00 | 2,557.22 |
| TCNY | 2003 Ford E-350 Type II | 024126 | 1FDSS34F43HB53808 | Kin Leasing | Sovereign Bank | 29 | 36 | Feb-04 | Jan-07 | 1,212.00 | 7,049.31 |

CURTIS_00087

**A3052**

CONFIDENTIAL

## TRANSCARE CORP

### SCHEDULE OF LEASES AS OF AUGUST 2006

| Co. | Type / Description | Lease # | VIN # | Leasing Co. | Lien Holder / Finance Co. | # of Payments Made | Period | 1st Payment | Last Payment | Monthly Payment | Principal Bal. Aug. 2006 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| TCNY | 2003 Ford E-350 Type II | 024127 | 1FDSS34F23HB53807 | Kin Leasing | Sovereign Bank | 29 | 36 | Feb-04 | Jan-07 | 1,212.00 | 7,049.31 |
| TCNY | 2003 Ford E-350 XL Type III | 024124 | 1FDWE35F53HB83309 | Kin Leasing | Sovereign Bank | 29 | 36 | Feb-04 | Jan-07 | 1,321.00 | 20,445.63 |
| TCNY | 2003 Ford E351 | FP9787 | 1FDSS34F73HB53816 | Forman Price | Forman Price | 29 | 36 | Feb-04 | Jan-07 | 1,245.00 | 8,356.67 |
| TCNY | 2003 Ford E351 | FP9788 | 1FDSS34F43HB53811 | Forman Price | Forman Price | 29 | 36 | Feb-04 | Jan-07 | 1,245.00 | 8,356.67 |
| TCNY | 2003 Ford E351 | FP9789 | 1FDSS34F83HB53809 | Forman Price | Forman Price | 29 | 36 | Feb-04 | Jan-07 | 1,245.00 | 8,356.67 |
| TCNY | 2003 Ford E-350 XL Type III | 024128 | 1FDWE35F03HB42859 | Kin Leasing | Sovereign Bank | 29 | 48 | Feb-04 | Jan-08 | 1,293.00 | 21,654.08 |
| TCNY | 2003 Ford E-350 XL Type III | 024129 | 1FDWE35F93HB42858 | Kin Leasing | Sovereign Bank | 29 | 48 | Feb-04 | Jan-08 | 1,293.00 | 21,654.08 |
| TCNY | 2005 Ford Escape XLT | 024143 | 1FMYU93105KA45396 | Kin Leasing | All Points Capital | 27 | 36 | Mar-04 | Mar-07 | 590.00 | 3,962.99 |
| TCNY | 2004 Ford E-350 15 Passenger Van | 024132 | 1BSS31L44HA1028 | Kin Leasing | All Points Capital | 27 | 36 | Apr-04 | Mar-07 | 757.00 | 5,088.04 |
| TCNY | 2004 Ford E-350 Diesel | 024137 | 1FTSS34P54HA88515 | Kin Leasing | Sovereign Bank | 27 | 36 | Apr-04 | Mar-07 | 977.00 | 6,596.45 |
| TCNY | 2004 Ford E-350 Diesel | 024138 | 1FTSS34P34HA88514 | Kin Leasing | Sovereign Bank | 27 | 36 | Apr-04 | Mar-07 | 977.00 | 6,596.45 |
| TCNY | 2003 Ford E-350 Type II | 024141 | 1FDSS34F43HB58037 | Kin Leasing | Sovereign Bank | 27 | 36 | Apr-04 | Mar-07 | 1,212.00 | 8,187.96 |
| TCNY | 2003 Ford E-350 Type II | 024140 | 1FDSS34F23HB58036 | Kin Leasing | Sovereign Bank | 27 | 36 | Apr-04 | Mar-07 | 1,212.00 | 8,187.96 |
| TCNY | 2004 Ford E-350 Diesel | 024136 | 1FTSS34PX4HB05289 | Kin Leasing | Sovereign Bank | 26 | 36 | May-04 | Apr-07 | 1,051.00 | 8,071.58 |
| TCNY | 2004 Ford E-350 Diesel | 024139 | 1FTSS34P44HB10486 | Kin Leasing | Sovereign Bank | 26 | 36 | May-04 | Apr-07 | 1,051.00 | 8,071.58 |
| TCNY | 2004 Ford E-350 Diesel | 024135 | 1FTSS34PX4HB10492 | Kin Leasing | Sovereign Bank | 26 | 36 | May-04 | Apr-07 | 1,051.00 | 8,071.58 |
| TCNY | 2004 Ford E-350 National Starquest | 024167 | 1FDWE35P74HA98065 | Kin Leasing | All Points Capital | 25 | 36 | Jun-04 | May-07 | 998.00 | 19,946.03 |
| TCNY | 2003 Ford E-351 Ambulance | FP9813 | 1FDSS34F83HB58041 | Forman-Price | Forman-Price | 25 | 36 | Jun-04 | May-07 | 1,212.00 | 11,543.58 |
| TCNY | 2003 Ford E-351 Ambulance | FP9814 | 1FDSS34F83HB58042 | Forman-Price | Forman-Price | 25 | 36 | Jun-04 | May-07 | 1,212.00 | 11,543.58 |
| TCNY | 2004 Ford E-350 Type II Ambulance | 024158 | 1FDSS34P14HA69410 | Kin Leasing | All Points Capital | 25 | 36 | Jun-04 | May-07 | 1,222.00 | 11,607.45 |
| TCNY | 2004 Ford E-350 Type II Ambulance | 024159 | 1FDSS34PX4HA69423 | Kin Leasing | All Points Capital | 25 | 36 | Jun-04 | May-07 | 1,222.00 | 11,607.45 |
| TCNY | 2004 Ford E-350 Type II Ambulance | 024160 | 1FDSS34P64HA69449 | Kin Leasing | All Points Capital | 25 | 36 | Jun-04 | May-07 | 1,222.00 | 11,607.45 |
| TCNY | Ford Escape XLT | 024180 | 1FMYU93125DA19984 | Kin Leasing | Sovereign Bank | 24 | 36 | Jul-04 | Jun-07 | 590.00 | 5,590.53 |
| TCNY | Ford Escape XLT | 024179 | 1FMYU93105DA19983 | Kin Leasing | Sovereign Bank | 24 | 36 | Jul-04 | Jun-07 | 590.00 | 5,590.53 |
| TCNY | Ford Escape XLT | 024179 | 1FMYU931X5DA14175 | Kin Leasing | Sovereign Bank | 24 | 36 | Jul-04 | Jun-07 | 590.00 | 5,590.53 |
| TCNY | Ford E-350 Type III | 024171 | 1FDWE35F54HB03114 | Kin Leasing | Sovereign Bank | 24 | 36 | Jul-04 | Jul-07 | 1,221.00 | 24,819.53 |
| TCNY | Ford E-350 Type III | 024172 | 1FDWE35P44HA68128 | Kin Leasing | Sovereign Bank | 24 | 36 | Jul-04 | Jul-07 | 1,221.00 | 24,819.53 |
| TCNY | 2004 Ford E-350 Type II | FP8001 | 1FDSS34P34HA54374 | Forman Price | Forman Price | 23 | 36 | Aug-04 | Jul-07 | 1,212.00 | 12,642.32 |
| TCNY | 2004 Ford E-350 Type II | FP8007 | 1FDSS34P54HA69443 | Forman Price | Forman Price | 23 | 36 | Aug-04 | Jul-07 | 1,212.00 | 12,642.32 |
| TCNY | 2004 Ford E-350 Type II Ambulance | 024161 | 1FDSS34P14HA48797 | Kin Leasing | All Points Capital | 23 | 36 | Aug-04 | Jul-07 | 1,222.00 | 11,607.45 |
| TCNY | 2004 Ford E-350 Type II Ambulance | 024162 | 1FDSS34P54HA48799 | Kin Leasing | All Points Capital | 23 | 36 | Aug-04 | Jul-07 | 1,222.00 | 11,607.45 |
| TCNY | 2004 Ford E-350 Type II Ambulance | 024163 | 1FDSS34P64HA48794 | Kin Leasing | All Points Capital | 23 | 36 | Aug-04 | Jul-07 | 1,222.00 | 11,607.45 |
| TCNY | 2004 Ford E-350 Type II Ambulance | FP9823 | 1FDSS34P84HA74085 | Forman Price | Forman Price | 23 | 36 | Aug-04 | Jul-07 | 1,222.00 | 11,607.45 |
| TCNY | 2004 Ford E-350 Type II Ambulance | FP9824 | 1FDSS34F33HB58045 | Forman Price | Forman Price | 23 | 36 | Aug-04 | Jul-07 | 1,222.00 | 11,607.45 |
| TCNY | 2004 Ford E-350 Type II Ambulance | FP9825 | 1FDSS34P44HA69448 | Forman Price | Forman Price | 23 | 36 | Aug-04 | Jul-07 | 1,222.00 | 11,607.45 |
| TCNY | 2004 Ford E-350 Type II Ambulance | FP9826 | 1FDSS34P03HB65065 | Forman Price | Forman Price | 23 | 36 | Aug-04 | Jul-07 | 1,222.00 | 11,607.45 |
| TCNY | 2004 Ford E-350 Type II Ambulance | FP9827 | 1FDSS34P34HA89442 | Forman Price | Forman Price | 23 | 36 | Aug-04 | Jul-07 | 1,222.00 | 11,607.45 |
| TCNY | 2004 Ford E-350 Amb | FP8002 | 1FDSS34P04HA98316 | Forman Price | Forman Price | 23 | 36 | Aug-04 | Jul-07 | 1,222.00 | 11,607.45 |
| TCNY | 2004 Ford E-350 Amb | FP8003 | 1FDSS34P24HA98317 | Forman Price | Forman Price | 23 | 36 | Aug-04 | Jul-07 | 1,222.00 | 11,607.45 |
| TCNY | 2004 Ford E-350 Amb | FP8004 | 1FDSS34P44HA98318 | Forman Price | Forman Price | 23 | 36 | Aug-04 | Jul-07 | 1,222.00 | 11,607.45 |
| TCNY | 2004 Ford E-350 Amb | FP8005 | 1FDSS34P64HA98319 | Forman Price | Forman Price | 23 | 36 | Aug-04 | Jul-07 | 1,222.00 | 11,607.45 |
| TCNY | 2004 Ford E-350 Amb | FP8006 | 1FDSS34P14HA54373 | Forman Price | Forman Price | 23 | 36 | Aug-04 | Jul-07 | 1,222.00 | 11,607.45 |
| TCNY | 2004 Ford Freestar (Pass. Van) | 024180 | 2FMZAS2234BA67322 | Kin Leasing Corp | Sovereign Bank | 22 | 36 | Sep-04 | Aug-07 | 739.00 | 8,364.93 |
| TCNY | 2004 Ford E-350 Type II | FP8013 | 1FDSS34P24HA98320 | Forman Price | Forman Price | 22 | 36 | Sep-04 | Aug-07 | 1,212.00 | 12,642.32 |
| TCNY | 2004 Ford E-350 Type II | FP8015 | 1FDSS34P44HA98321 | Forman Price | Forman Price | 22 | 36 | Sep-04 | Aug-07 | 1,212.00 | 12,642.32 |
| TCNY | 2004 Ford E-350 Type II | FP8014 | 1FDSS34P04HA98865 | Forman Price | Forman Price | 22 | 36 | Sep-04 | Aug-07 | 1,212.00 | 12,642.32 |
| TCNY | 2004 Ford E-350 Type II | FP8012 | 1FDSS34P74HA69444 | Forman Price | Forman Price | 22 | 36 | Sep-04 | Aug-07 | 1,212.00 | 12,642.32 |

CURTIS_ 000875

A3053

CONFIDENTIAL

CURTIS_000870

## TRANSCARE CORP

### SCHEDULE OF LEASES AS OF AUGUST 2006

| Co. | Type / Description | Lease # | VIN # | Leasing Co. | Lien Holder / Finance Co. | # of Payments Made | Period | 1st Payment | Last Payment | Monthly Payment | Principal Bal. Aug, 2006 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| TCNY | 2004 Ford E-350 Type II | FP8011 | 1FDSS34P24HA98866 | Forman Price | Forman Price | 22 | 36 | Sep-04 | Aug-07 | 1,212.00 | 12,642.32 |
| TCNY | 2004 Ford E-350 Type III | 024191 | 1FDWE35P54HB12217 | Kin Leasing Corp | Sovereign Bank | 22 | 36 | Sep-04 | Aug-07 | 1,221.00 | 26,893.02 |
| TCNY | 2004 Ford E-350 Type III | 024192 | 1FDWE35P44HB12211 | Kin Leasing Corp | Sovereign Bank | 22 | 36 | Sep-04 | Aug-07 | 1,221.00 | 26,893.02 |
| TCNY | 2005 Ford E-350 Van Con Ambulette | 024197 | 1FTSS34P15HA22707 | Kin Leasing Corp | Sovereign Bank | 20 | 36 | Nov-04 | Oct-07 | 934.00 | 12,124.49 |
| TCNY | 2005 Ford E351 WCV | 024453 | 1FTSS34P45HA02828 | Kin Leasing Corp | Sovereign Bank | 20 | 36 | Nov-04 | Oct-07 | 980.00 | 12,809.14 |
| TCNY | 2005 Ford E351 WCV | 024454 | 1FTSS34P65HA02829 | Kin Leasing Corp | Sovereign Bank | 20 | 36 | Nov-04 | Oct-07 | 980.00 | 12,809.14 |
| TCNY | 2005 Ford E351 WCV | 024455 | 1FTSS34P25HA02830 | Kin Leasing Corp | Sovereign Bank | 20 | 36 | Nov-04 | Oct-07 | 980.00 | 12,809.14 |
| TCNY | 2005 Ford E-350 Van Con Ambulette | 024198 | 1FTSS34P65HA31399 | Kin Leasing Corp | Sovereign Bank | 20 | 36 | Nov-04 | Oct-07 | 999.00 | 13,015.27 |
| TCNY | 2005 Ford Free Star | 024465 | 2FMDA52235BA41220 | Kin Leasing Corp | All Points Capital | 19 | 36 | Dec-04 | Nov-07 | 825.00 | 11,336.19 |
| TCNY | 2005 Ford E-350 Diesel | 024460 | 1FTSS34P45HA57791 | Kin Leasing Corp | All Points Capital | 19 | 36 | Dec-04 | Nov-07 | 942.00 | 13,034.18 |
| TCNY | 2005 Ford E-350 Diesel | 024461 | 1FTSS34P85HA57793 | Kin Leasing Corp | All Points Capital | 19 | 36 | Dec-04 | Nov-07 | 942.00 | 13,034.18 |
| TCNY | 2005 Ford E-350 Diesel | 024462 | 1FTSS34P25HA57787 | Kin Leasing Corp | All Points Capital | 19 | 36 | Dec-04 | Nov-07 | 942.00 | 13,034.18 |
| TCNY | 2005 Ford E-350 Diesel | 024463 | 1FTSS34P95HA57785 | Kin Leasing Corp | All Points Capital | 19 | 36 | Dec-04 | Nov-07 | 942.00 | 13,034.18 |
| TCNY | 2005 Ford E-350 Diesel | 024458 | 1FTSS34PX5HA52109 | Kin Leasing Corp | All Points Capital | 19 | 36 | Dec-04 | Nov-07 | 975.00 | 13,490.54 |
| TCNY | 2005 Ford E-350 Diesel | 024459 | 1FTSS34P65HA52110 | Kin Leasing Corp | All Points Capital | 19 | 36 | Dec-04 | Nov-07 | 975.00 | 13,490.54 |
| TCNY | 2005 Ford E351    VAN | FP8017 | 1FTSS34P45HA91553 | Kin Leasing | Forman Price | 17 | 36 | Feb-05 | Jan-08 | 900.00 | 14,005.83 |
| TCNY | 2005 Ford E351    VAN | FP8018 | 1FTSS34P25HA91549 | Kin Leasing | Forman Price | 17 | 36 | Feb-05 | Jan-08 | 900.00 | 14,005.83 |
| TCNY | 2005 Ford E351    VAN | FP8019 | 1FTSS34PX5HA54759 | Kin Leasing | Forman Price | 17 | 36 | Feb-05 | Jan-08 | 900.00 | 14,005.83 |
| TCNY | 2005 Ford E350 | 024476 | 1FTSS34P85HB01340 | Kin Leasing | All Points Capital | 16 | 36 | Mar-05 | Feb-08 | 916.00 | 14,968.50 |
| TCNY | 2005 Ford E350 | 024478 | 1FTSS34PX5HB01339 | Kin Leasing | All Points Capital | 16 | 36 | Mar-05 | Feb-08 | 916.00 | 14,968.50 |
| TCNY | 2005 Ford E350 | 024479 | 1FTSS34P95HB01338 | Kin Leasing | All Points Capital | 16 | 36 | Mar-05 | Feb-08 | 916.00 | 14,968.50 |
| TCNY | 2005 Ford E350 | 024474 | 1FTSS34P65HB24701 | Kin Leasing | All Points Capital | 16 | 36 | Mar-05 | Feb-08 | 916.00 | 14,968.50 |
| TCNY | 2005 Ford E350 | 024475 | 1FTSS34P45HB24700 | Kin Leasing | All Points Capital | 16 | 36 | Mar-05 | Feb-08 | 916.00 | 14,968.50 |
| TCNY | 2005 Ford E350 | 024477 | 1FTSS34P15HB24699 | Kin Leasing | All Points Capital | 16 | 36 | Mar-05 | Feb-08 | 916.00 | 14,968.50 |
| TCNY | 2005 Ford E-350 Type III | 024491 | 1FDSS34P35HA58698 | Kin Leasing | Sovereign Bank | 16 | 48 | Mar-05 | Feb-09 | 854.00 | 22,462.05 |
| TCNY | 2005 Ford E-350 Type III | 024490 | 1FDSS34P15HA58697 | Kin Leasing | Sovereign Bank | 16 | 48 | Mar-05 | Feb-09 | 854.00 | 22,462.05 |
| TCNY | 2005 Ford E-350 Type III | 024488 | 1FDWE35P55HA85081 | Kin Leasing | Sovereign Bank | 16 | 48 | Mar-05 | Feb-09 | 1,186.00 | 31,232.06 |
| TCNY | 2005 Ford E-350 Type III | 024489 | 1FDWE35P05HA85079 | Kin Leasing | Sovereign Bank | 16 | 48 | Mar-05 | Feb-09 | 1,186.00 | 31,232.06 |
| TCNY | Ford Escape XLT | 025552 | 1FMYU83145KE22019 | Kin Leasing | All Points Capital | 15 | 36 | Apr-05 | Mar-08 | 585.00 | 9,938.04 |
| TCNY | Ford Escape XLT | 024499 | 1FMYU93135KD98182 | Kin Leasing | Sovereign Bank | 15 | 36 | Apr-05 | Mar-08 | 585.00 | 9,938.04 |
| TCNY | Ford E-350 | 025557 | 1FTSS34PHA91546 | Kin Leasing | New World LF LLC | 15 | 48 | Apr-05 | Mar-09 | 702.00 | 18,902.16 |
| TCNY | 2005 Ford Explorer XLT 4WD | 024492 | 1FMZU73T3E15UB41232 | Kin Leasing | A8 Points Capital | 15 | 48 | Apr-05 | Mar-08 | 789.00 | 13,279.49 |
| TCNY | 2005 Ford E-350 Type II | 024485 | 1FDSS34P45HA85840 | Kin Leasing | All Points Capital | 15 | 48 | Apr-05 | Mar-09 | 839.00 | 22,677.85 |
| TCNY | 2005 Ford E-350 Type II | 024486 | 1FDSS34P65HA65838 | Kin Leasing | All Points Capital | 15 | 48 | Apr-05 | Mar-09 | 839.00 | 22,677.85 |
| TCNY | Ford E-350 Type III | 025551 | 1FDWE35P05HA85082 | Kin Leasing | New World LF LLC | 15 | 48 | Apr-05 | Mar-09 | 1,186.00 | 32,140.88 |
| TCNY | Ford E-350 Type III | 024500 | 1FDWE35P75HA85080 | Kin Leasing | New World LF LLC | 15 | 48 | Apr-05 | Mar-09 | 1,186.00 | 32,140.88 |
| TCNY | 2005 Ford E350 II | 025564 | 1FDSS34P15HB39361 | Kin Leasing | New World LF LLC | 14 | 48 | May-05 | Apr-09 | 945.00 | 26,208.01 |
| TCNY | Ford E-350 Starcraft | 025566 | 1FDNE35P25H01399 | Kin Leasing | New World LF LLC | 14 | 48 | May-05 | Apr-09 | 950.00 | 26,269.94 |
| TCNY | Ford E-350 Type II | 025554 | 1FDSS34P35HA76683 | Kin Leasing | New World LF LLC | 13 | 48 | Jun-05 | May-09 | 854.00 | 21,537.71 |
| TCNY | Ford E-350 Type II | 025511 | 1FDSS34P45HA85837 | Kin Leasing | Sovereign Bank | 12 | 48 | Jul-05 | Jun-09 | 854.00 | 24,666.02 |
| TCNY | Ford E-350 Type II | 025512 | 1FDSS34P15HB31406 | Kin Leasing | Sovereign Bank | 12 | 48 | Jul-05 | Jun-09 | 854.00 | 24,666.02 |
| TCNY | Ford E-350 Type II | 025510 | 1FDSS34P35HB31407 | Kin Leasing | Sovereign Bank | 12 | 48 | Jul-05 | Jun-09 | 857.00 | 25,142.09 |
| TCNY | Ford E-350 Type III | 025505 | 1FDWE35P85HA17023 | Kin Leasing | Sovereign Bank | 12 | 48 | Jul-05 | Jun-09 | 1,199.00 | 34,910.87 |
| TCNY | Ford E-350 Type II | 025518 | 1FDSS34P85HA85839 | Kin Leasing | New World LF LLC | 11 | 48 | Aug-05 | Jul-09 | 854.00 | 25,276.89 |
| TCNY | Ford E-350 Type III | 025506 | 1FDWE35P55HA20641 | Kin Leasing | Sovereign Bank | 11 | 48 | Aug-05 | Jul-09 | 1,199.00 | 35,783.23 |
| TCNY | 2006 Ford Medix E-350 Type II | 025525 | 1FDSS34P26HA82182 | Kin Leasing | Sovereign Bank | 10 | 48 | Sep-05 | Aug-09 | 854.00 | 25,881.95 |
| TCNY | 2005 Ford E-350 WCV Mobility | 024465 | 1FTSS34P85HA52111 | Kin Leasing | Sovereign Bank | 9 | 48 | Oct-05 | Sep-09 | 711.00 | 22,171.93 |

A3054

CONFIDENTIAL

## TRANSCARE CORP

### SCHEDULE OF LEASES AS OF AUGUST 2006

| Co. | Type / Description | Lease # | VIN # | Leasing Co. | Lien Holder / Finance Co. | # of Payments Made | Period | 1st Payment | Last Payment | Monthly Payment | Principal Bal. Aug. 2006 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| TCNY | 2006 Ford E-350  Type III | 025581 | 1FDWE35P36DA19464 | Kin Leasing | Sovereign Bank | 4 | 60 | Mar-06 | Feb-11 | 1,044.00 | 45,019.86 |
| TCNY | 2006 Ford E-350  Type III | 025580 | 1FDWE35P76DA19435 | Kin Leasing | Sovereign Bank | 4 | 60 | Mar-06 | Feb-11 | 1,044.00 | 45,019.86 |
| TCNY | 2006 Ford E350      TYPE III | 011101 | 1FDWE35P66DA91873 | Kin Leasing | Sovereign Bank | 0 | 48 | Aug-06 | Jul-10 | 1,262.00 | 47,713.00 |
| TCNY | 2006 Ford E350      TYPE III | 011102 | 1FDWE35P35DA91877 | Kin Leasing | Sovereign Bank | 0 | 48 | Aug-06 | Jul-10 | 1,262.00 | 47,713.00 |
| TCPA | 2003 Ford E-350 Medix Con | 426632 | 1FDSS34FX3HA60954 | Kin Leasing | Sovereign Bank | 37 | 48 | Jun-03 | May-07 | 922.34 | 8,791.61 |
| TCPA | 2003 Ford E-350 Type II | 426650 | 1FDSS34F23HB01061 | Kin Leasing | Sovereign Bank | 37 | 48 | Jun-03 | May-07 | 928.76 | 8,853.62 |
| TCPA | 2003 Ford E-350 Type II | 426656 | 1FDSS34F13HB10480 | Kin Leasing | Sovereign Bank | 36 | 48 | Jul-03 | Jun-07 | 928.76 | 9,697.18 |
| TCPA | 2003 Ford E-250 | 024112 | 1FTNS24L63HB23744 | Kin Leasing | Sovereign Bank | 34 | 48 | Sep-03 | Aug-07 | 705.14 | 9,931.32 |
| TCPA | 2003 Ford E-250 | 024113 | 1FTNS24L83HB23745 | Kin Leasing | Sovereign Bank | 34 | 48 | Sep-03 | Aug-07 | 705.14 | 9,931.32 |
| TCPA | 2003 Ford E250 Ambulette | 024116 | 1FTNS24L73HC05966 | Kin Leasing | All Points Capital | 32 | 36 | Nov-03 | Oct-06 | 918.06 | 3,587.83 |
| TCPA | 2003 Ford E-350 | 024144 | 1FDSS34F43HB58040 | Kin Leasing | Sovereign Bank | 28 | 36 | Mar-04 | Feb-07 | 1,249.76 | 8,297.83 |
| TCPA | 2004 Ford E-350 Van | 024150 | 1FTSS34P64HB10487 | Kin Leasing | Sovereign Bank | 26 | 36 | May-04 | Apr-07 | 1,150.25 | 9,923.34 |
| TCPA | 2004 E -350 Type WCV | 024174 | 1FTSS34P74HB24916 | Kin Leasing | Sovereign Bank | 24 | 36 | Jul-04 | Jun-07 | 1,106.38 | 11,820.36 |
| TCPA | 2004 Ford E-350 Type WCV | 024175 | 1FTSS34PX4HB20455 | Kin Leasing | Sovereign Bank | 24 | 36 | Jul-04 | Jun-07 | 1,106.38 | 11,820.36 |
| TCPA | 2004 Ford E-350 Type WCV | 024173 | 1FTSS34P34HB42135 | Kin Leasing | Sovereign Bank | 24 | 36 | Jul-04 | Jun-07 | 1,166.30 | 12,335.89 |
| TCPA | 2003 Ford E-350 | FP9819 | 1FDSS34F13HB58044 | Forman-Price | Forman Price | 24 | 36 | Jul-04 | Jun-07 | 1,249.76 | 11,928.03 |
| TCPA | 2004 Ford E-350 Type II | FP8008 | 1FDSS34P74HB00322 | Forman-Price | Forman Price | 24 | 36 | Jul-04 | Jun-07 | 1,249.76 | 13,065.92 |
| TCPA | 2004 Ford E-350 Type II | 024187 | 1FDSS34P04HB04258 | Kin Leasing | Sovereign Bank | 24 | 36 | Jul-04 | Jun-07 | 1,249.76 | 13,065.92 |
| TCPA | 2004 Ford E-350 Type II | 024189 | 1FDSS34P04HB09489 | Kin Leasing | Sovereign Bank | 23 | 36 | Aug-04 | Jul-07 | 1,249.76 | 14,194.19 |
| TCPA | 2005 Ford E-350 | 025559 | 1FTSS34P65HA91547 | Kin Leasing | New World LF LLC | 15 | 48 | Apr-05 | Mar-09 | 829.25 | 22,467.67 |
| TCPA | 2005 Ford E-350 | 025558 | 1FTSS34P05HA91548 | Kin Leasing | New World LF LLC | 14 | 48 | May-05 | Apr-09 | 829.25 | 23,098.07 |
| TCPA | 2005 Ford E-350 WCW VAN CONVERS | 025519 | 1FTSS34P35HA98221 | Kin Leasing | Sovereign Bank | 11 | 48 | Aug-05 | Jul-09 | 891.31 | 26,872.14 |
| TCPA | 2005 Ford E-350 Type II | 025526 | 1FDSS34P25HA93586 | Kin Leasing | Sovereign Bank | 11 | 48 | Aug-05 | Jul-09 | 951.23 | 29,611.57 |
| TCPA | 2005 Ford E-350 Type II | 025515 | 1FDSS34P05HA93585 | Kin Leasing | All Points Capital | 11 | 48 | Aug-05 | Jul-09 | 957.65 | 29,250.99 |
| TCPA | 2005 E-250 Ambulette  Van | 025537 | 1FTNS24L95HA98177 | Kin Leasing | Sovereign Bank | 7 | 48 | Dec-05 | Nov-09 | 1,002.59 | 23,457.79 |
| TCPA | 2006 Ford E-350 Type III | 025595 | 1FDSS34P86DA47057 | Kin Leasing | Sovereign Bank | 1 | 48 | Jun-06 | May-10 | 1,074.28 | 39,776.71 |

### Operating Leases

| Co. | Type / Description | Lease # | VIN # | Leasing Co. | Lien Holder / Finance Co. | # of Payments Made | Period | 1st Payment | Last Payment | Monthly Payment | Principal Bal. Aug. 2006 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| TCMD | Nortel BCM 200 | 101-51955 | 101-51955 | NEC Financial | NEC Financial | | 24 | Aug-06 | Jul-08 | $ 642.25 | $ 7,707.00 |
| TCMD | Savin 4045SP | MM2432M | J5936600451L | Advance Bus Sys | Advance Bus Sya | | 60 | Nov. 03 | Dec. 08 | 189.89 | 5,506.81 |
| TCML | Option 11 Phone System | 1500950-001 | 1500950-001 | Verizon Credit | Verizon Credit | | 60 | Oct. 04 | Nov. 09 | 759.12 | 12,364.00 |
| TCNY | Voice Phone Recorder - Comlog NP 72 | 024493 | 05-C05-001 | Kin Leasing | All Points Capital | 15 | 36 | Apr-05 | Mar-08 | 757.55 | 12,355.83 |
| TCNY | 2004 SAVIN 2525  (COPIER) | 024194 | J534070C535 | Kin Leasing Corp | Sovereign Bank | 22 | 36 | Sep-04 | Aug-07 | 399.00 | 4,464.14 |
| TCNY | 2055 DP Savin Copier | 147167 | H4724900497 | De Lage | De Lange Landen Fin. | | Mth to Mth | | | 471.39 | 4,000.00 |
| TCNY | 5627 Digital Copier | 008-2119456 | 11001453 | Lanier | Lanier | | 60 | Jan. 02 | Jan. 07 | 331.72 | 1,990.32 |
| TCNY | LD245SP Digital Copier | 001-2065073 | 64902293 | Lanier | Lanier | | 48 | Mar. 06 | Apr. 10 | 432.92 | 19,481.40 |
| TCNY | LD245SP Digital Copier | 001-0033943 | 64902310 | Lanier | Lanier | | 48 | Apr. 06 | May 10 | 433.92 | 19,960.32 |
| TCPA | Canon IR50201I | 001-0298263 | JCM11423 | Canon | Canon | | 48 | Feb. 06 | Mar. 10 | 393.77 | 17,325.88 |
| TCPA | Transmission Flush machine | 003-0358732 | | Great Amer. Leasing | Great Amer. Leasing | | 60 | Jun. 06 | Jul. 11 | 99.73 | 5,784.34 |

CURTIS_00087

A3055

**SCHEDULE 8.6**
**to**
**INFORMATION CERTIFICATE**

**Pending Material Litigation**

The following is a list of actions, suits, proceedings and investigations pending or threatened against the Companies. The Companies are unable to express an opinion as to the materiality of any matters listed under item I below. References to "TransCare" below are to TransCare Corporation and/or a Subsidiary thereof.

I.    Personal Injury Litigation.

One or more of the Companies and/or persons or entities which the Companies indemnify, are defendants in various lawsuits alleging personal injury, wrongful death, medical malpractice and similar allegations, and/or potential lawsuits where a statutory notice of intent to sue was timely served. These lawsuits allege a variety of personal injury allegations arising from patient care, employment-related claims, automobile accidents and other personal injury incidents. The lawsuits are pending in various state courts in New York , Pennsylvania and Maryland all of which are covered by insurance, subject to deductible amounts up to $10,000 per occurrence, except that under TransCare New York, Inc.'s general liability and professional liability policy with Arch Insurance the deductible is $250,000 per occurrence for the indemnity portion, not expenses. Below is a list of the open claims and amount the insurer has established as an indemnity reserve as of August 15, 2006, such reserves are subject to change in the discretion of the insurer at any time.

| CLAIMANT | DATE OF LOSS | COMPANY | STATE | INDEMNITY RESERVE |
|---|---|---|---|---|
| ROSARIO, ROSA AND RAFAEL | 7/23/2003 | TRANSCARE NEW YORK, INC. | NEW YORK | $100,000 |
| BASTIEN, MATTHEW | 9/8/2004 | TRANSCARE NEW YORK, INC. | NEW YORK | $50,000 |
| BROOKS, LORRAINE | 5/29/2004 | TRANSCARE NEW YORK, INC. | NEW YORK | $75,000 |
| EDWARDS III, DEREK A. | 9/19/2004 | TRANSCARE NEW YORK, INC. | NEW YORK | $50,000 |
| ESTRADA, WINSTON | 11/12/2003 | TRANSCARE NEW YORK, INC. | NEW YORK | $75,000 |
| FLORES, MARIA | 5/22/2004 | TRANSCARE NEW YORK, INC. | NEW YORK | $75,000 |

10126957.5

-21-

**A3056**

CONFIDENTIAL

CURTIS_000878

| CLAIMANT | DATE OF LOSS | COMPANY | STATE | INDEMNITY RESERVE |
|---|---|---|---|---|
| FIGUEROA, ROSAMARIA, ESTATE OF | 11/7/2004 | TRANSCARE NEW YORK, INC. | NEW YORK | $75,000 |

As security for potential deductible obligations of the Companies, Arch Insurance has $500,000 in cash from the Companies on deposit.


## II. Other Matters

The following matters are disclosed for informational purposes only.

1. Ovidio Atiles v. TransCare New York, Inc. dba Metrocare and Donald M. Cardone, Index No. 967/06

   In 2006, Mr. Atiles filed an action in Supreme Court for the State of New York, Kings County, seeking redress for termination due to discrimination and invoking the Whistleblower Laws.  Mr. Atiles was terminated for falsifying official documents. The suit is in the early stages of discovery. The Company has investigated this matter and does not believe that the claims have merit an d it intends to prosecute , if necessary, this action vigorously.

2. Gina Nespolini v. TransCare New York, Inc., EEOC Charge No. 160-2004-0070

   Ms. Nespolini was terminated in September 2003. She thereafter filed a charge with the Equal Employment Opportunity Commission alleging that she was discriminated against on the basis of gender. The matter is presently being investigated by the Commission, but the Company does not believe Ms. Nespolini's claims have merit and it intends to prosecute the defense of this action vigorously.

10126957.5

-22-

**A3057**

CONFIDENTIAL

CURTIS_000879

**SCHEDULE 8.8**
**to**
**INFORMATION CERTIFICATE**

**Environmental Compliance**

**None**

**A3058**

CONFIDENTIAL                                                                    CURTIS_000880

**SCHEDULE 8.10**
**to**
**INFORMATION CERTIFICATE**

A.    **DEPOSIT ACCOUNTS**

**Medicare/Medicaid Payment Accounts**

| ACCOUNT HOLDER/COMPANY | FINANCIAL INSTITUTION and ADDRESS; ACCOUNT NUMBER | PURPOSE |
|---|---|---|
| | | |
| TransCare New York, Inc. | HSBC - 678-716935 | |
| TransCare Maryland, Inc. – Medicare/Medicaid Payment Account | Bank of America - 003929290095 | |
| TransCare Pennsylvania, Inc. – Medicare/Medicaid Payment Account | National City Bank - 967171213 | |

**Deposit and Petty Cash Accounts**

| ACCOUNT HOLDER/COMPANY | FINANCIAL INSTITUTION AND ADDRESS; ACCOUNT NUMBER | PURPOSE |
|---|---|---|
| | | |
| TransCare Corporation – Disbursement Account* | Bank of America – 003916398858 | Collection disbursement |
| TransCare New York, Inc. – Petty Cash Account | HSBC – 678-702497 | Petty cash |
| TransCare Maryland, Inc.– Operating Account* | Bank of America – 003934263460 | Collection , Lockbox & Funds Transfer to TransCare Corporation Account |
| TransCare Pennsylvania, Inc.– Operating Account* | National City Bank – 41018922 | Collection , Lockbox & Funds Transfer to TransCare Corporation Account |
| TransCare ML, Inc.- Operating Account* | Wachovia Bank, N.A.- 2000020259813 | Collection , Lockbox & Funds Transfer to TransCare Corporation Account |
| TC Billing and Services Corp. – Operating Account* | HSBC-678723567 | Collection & Funds Transfer to TransCare Corporation Account |

* These accounts will be closed after the Closing

**A3059**

CONFIDENTIAL

CURTIS_000881

B.    **PAYROLL ACCOUNTS**

| ACCOUNT HOLDER/COMPANY | FINANCIAL INSTITUTION/ ACCOUNT NUMBER |
|---|---|
| TransCare Corporation | Wachovia Bank, B. A. 200030130948 |
| TransCare New York, Inc. – Payroll Account** | HSBC - 678702489 |
| TransCare Maryland, Inc.** | Bank of America - 003934263473 |
| TransCare Pennsylvania, Inc.** | National City Bank - 41018913 |
| TransCare ML, Inc.** | Wachovia Bank, N.A. 2000020259826 |
| TC Billing and Services Corp.** | HSBC - 678723559 |

\*\* These accounts will be closed after Closing and a single payroll account will remain

C.    **RECEIVABLES AND CONTROLLED DISBURSEMENT ACCOUNTS**

| ACCOUNT HOLDER/COMPANY | FINANCIAL INSTITUTION/ ACCOUNT NUMBER |
|---|---|
| TransCare Corporation – Receivables Account | Wachovia Bank, N.A. 2000030130935 |
| TransCare Corporation – Disbursement Account | Wachovia Bank, N.A. 2079951066782 |

**A3060**

CONFIDENTIAL                                                        CURTIS_000882

**SCHEDULE 8.11**
**to**
**INFORMATION CERTIFICATE**

**Intellectual Property**

Listed below are the trademarks for which a registration has been filed.  However, the trademarks listed below may not be in active use and are not being actively maintained as valid trademarks. The trademarks listed below are not considered material Intellectual Property necessary to the conduct of business by the Companies. The inclusion of trademarks on this Schedule shall not be deemed to imply that such trademarks are material and such information is being provided for informational purposes.

1.(a)(i) Owned Trademarks

**TransCare Pennsylvania. Inc.**

| Trademark | Registration Number | Registration Date | Expiration Date |
|---|---|---|---|
| CARE COACH | 1,816,176 | 01/11/1994 | 01/11/2014 |

| Trademark Application | Application/Serial Number | Application Date |
|---|---|---|
| | 74/380338 | 04/19/1993 |

**TransCare New York, Inc.**

| Trademark | Registration Number | Registration Date | Expiration Date |
|---|---|---|---|
| METROLANCE | 2,238,101 | 04/13/1999 | 04/13/2009 |

| Trademark Application | Application/Serial Number | Application Date |
|---|---|---|
| | 75/279207 | 04/22/1997 |

**A3061**

CONFIDENTIAL
CURTIS_000883

**TransCare Corporation**

| Trademark | Registration Number | Registration Date | Expiration Date |
|---|---|---|---|
| TRANSCARE | 2,143,825 | 03/17/1998 | 03/17/2008 |

| Trademark Application | Application/Serial Number | Application Date |
|---|---|---|
|  | 74/664406 | 04/21/1995 |

(a)(ii)  Licensed – None except for certain informal rights to use a third party's trademark or name on ambulances servicing such third party

(b)      **Patents**:  NONE

(c)      **Copyrights**:  NONE

**A3062**

CONFIDENTIAL                                                                                    CURTIS_000884

**SCHEDULE 8.12**
**to**
**INFORMATION CERTIFICATE**

**Subsidiaries; Affiliates; Investments**

**I.**     **Subsidiaries (More than 50% owned by Company indicated)**

| Name of Subsidiary | Jurisdiction and Date of Organization | Authorized and Outstanding Stock and Record Owner |
|---|---|---|
| 1.  TransCare New York, Inc. | Delaware 4/29/94 | 1,000 shares, par value $.01 |
| | | Record Owner: TransCare Corporation; 1,000 shares; 100% of issued and outstanding stock |
| 2.  TransCare Pennsylvania, Inc. | Delaware 4/20/95 | 1,000 shares of Common Stock, par value $.01 |
| | | Record Owner: TransCare Corporation; 1,000 shares; 100% of issued and outstanding stock |
| 3.  TransCare Maryland, Inc. | Delaware 4/29/97 | 1,000, par value $.01 |
| | | Record Owner: TransCare Corporation; 100 shares; 100% of issued and outstanding stock |
| 4.  TransCare Harford County, Inc. | Delaware | 1,000, par value $.01 |
| | | Record Owner: TransCare Maryland, Inc., 100 shares; 100% of issued and outstanding stock |

**A3063**

CONFIDENTIAL                                                                    CURTIS_000885

| Name of Subsidiary | Jurisdiction and Date of Organization | Authorized and Outstanding Stock and Record Owner |
|---|---|---|
| 5.  TransCare Westchester, Inc. | Delaware 4/7/98 | 1,000 par value $.01 |
| | | Record Owner: TransCare New York, Inc., 100 shares; 100% of issued and outstanding stock |
| 6.  TC Ambulance Corporation | Delaware | 1,000 par value $.01 |
| | | Record Owner: TransCare Corporation, 100 shares; 100% of issued and outstanding stock |
| 7. TC Ambulance North, Inc. | Delaware | 1,000 par value $.01 |
| | | Record Owner: TransCare Corporation, 100 shares; 100% of issued and outstanding stock |
| 8.  TC Ambulance Group, Inc. | Delaware | 1,000 par value $.01 |
| | | Record Owner: TransCare Corporation, 100 shares; 100% of issued and outstanding stock |
| 9.  TransCare Management Services, Inc. | Delaware | 1,000 par value $.01 Record Owner: TransCare Corporation, 100 shares; 100% of issued and outstanding stock |
| 10. TCBA Ambulance, Inc. | Delaware | 1,000 par value $.01 Record Owner: TransCare Corporation, 100 shares; 100% of issued and outstanding stock |

CONFIDENTIAL

CURTIS_000886

| Name of Subsidiary | Jurisdiction and Date of Organization | Authorized and Outstanding Stock and Record Owner |
|---|---|---|
| 11. TC Billing and Services Corp. | Delaware | 1,000 par value $.01 Record Owner: TransCare Corporation, 100 shares; 100% of issued and outstanding stock |
| 12. TC Hudson Valley Ambulance Corp. | Delaware | 1,000 par value $.01 Record Owner: TransCare Corporation, 100 shares; 100% of issued and outstanding stock |
| 13. TransCare ML, Inc. | Delaware | 1,000 par value $.01 Record Owner: TransCare Corporation, 100 shares; 100% of issued and outstanding stock |

(I)      **Inactive Subsidiaries**

The following entities were acquired by the TransCare Corporation and certain of its Subsidiaries as part of transactions consummated over 9 years ago and such entities are not involved in the operation of TransCare Corporation's or any of its Subsidiaries' business. Such entities are in the process of being dissolved or may be dissolved.

1.      TransCare West Virginia, Inc.
2.      Nassau Ambulance - Ambulette, Inc.
3.      Nationwide Nassau Ambulance, Inc.
4.      Allstate Ambulance & Medical Services, Inc.

Montgomery County Ambulance, Inc., a Delaware corporation, was formed for a transaction that was not consummated, does not conduct business or own assets and may be dissolved.

**II.**      **Stockholders of TransCare Corporation** (If widely held, only holders with more than 10%)

        **See attached Schedule 8.12(b)**

CONFIDENTIAL

CURTIS_000887

**SCHEDULE 8.12(b)**
**to**
**INFORMATION CERTIFICATE**

**<u>Stockholder List Attached</u>**

-31-

A3066

CONFIDENTIAL
CURTIS_000888

Attachment 3

TransCare Corporation
Shareholder Listing
As of 9/15/06

| Name and Address of Holder | Certificate Number and Date | Number of Shares | % Ownership | Options[1] | Warrants - Tranche A [2] | Warrants - Tranche B [3] | Total |
|---|---|---|---|---|---|---|---|
| ARK II CLO 2001-1, Limited c/o Patriarch Partners III, LLC 112 South Tryon Street, Suite 700 Charlotte, NC 28284 | 1 8/4/2003 | 177,303 | 25.04% | | | | 177,303 |
| ARK II CLO 2001-1, Limited c/o Patriarch Partners III, LLC 112 South Tryon Street, Suite 700 Charlotte, NC 28284 | 3 8/4/2003 | 209,215 | 29.55% | | | | 209,215 |
| ARK Investment Partners II, L.P. c/o Patriarch Partners III, LLC 112 South Tryon Street, Suite 700 Charlotte, NC 28284 | 4 8/4/2003 | 39,009 | 5.51% | | | | 39,009 |
| Sigler & Company c/o First Dominion Funding I c/o Credit Suisse Asset Management 466 Lexington Avenue, 14th Floor New York, NY 10017 | 24 5/6/2004 | 54,289 | 7.67% | | | | 54,289 |
| Sigler & Co. c/o First Dominion Funding II c/o Credit Suisse Asset Management 466 Lexington Avenue, 14th Floor New York, NY 10017 | 25 5/6/2004 | 47,487 | 6.71% | | | | 47,487 |
| Hampshire TC Holdings LLC c/o Hampshire Equity Partners 520 Madison Avenue New York, NY 10022 | 7 8/4/2003 | 60,000 | 8.47% | 140,000 [1a] | | | 200,000 |
| John Hancock Life Insurance Company Investment Law Division T-30 200 Clarendon Street Boston, MA 02117 | 8 8/4/2003 | 7,337 | 1.04% | 1,467 | 7,723 | 8,129 | 24,656 |
| Hancock Mezzanine Partners, L.P. c/o John Hancock Life Insurance Company Investment Law Division T-30 200 Clarendon Street Boston, MA 02117 | 9 8/4/2003 | 12,228 | 1.73% | 2,446 | 12,871 | 13,549 | 41,094 |
| Sigler & Company as nominee for First Dominion Funding I c/o Credit Suisse Asset Management 466 Lexington Avenue, 14th Floor New York, New York 10017 | 10 8/4/2003 | 3,268 | 0.46% | 654 | 3,440 | 3,621 | 10,983 |
| Hare & Co. as nominee for Signature 3 Limited c/o John Hancock Life Insurance Company Investment Law Division T-30 200 Clarendon Street Boston, MA 02117 | 11 8/4/2003 | 4,891 | 0.69% | 976 | 5,149 | 5,420 | 16,438 |
| Radd Leeds 90 Birch Street East Hills, NY 11576 | 12 8/4/2003 | 286 | 0.04% | 57 | 301 | 317 | 961 |
| Al Liguori 200 Blackheath Road Lido Beach, NY 11561 | 13 8/4/2003 | 286 | 0.04% | 57 | 301 | 317 | 961 |
| G. Jayne Bargman 1315 Oakview Avenue White Oak, PA 15131 | 14 8/4/2003 | 706 | 0.10% | 141 | 743 | 782 | 2,372 |
| William Bleil P.O. Box 392 Erie, PA 16512 | 15 8/4/2003 | 370 | 0.05% | 74 | 389 | 410 | 1,243 |
| Anthony Brown P.O. Box 10025 Baldwin, MD 21013 | 16 8/4/2003 | 968 | 0.14% | 194 | 1,019 | 1,073 | 3,254 |
| Gerald Schultz 812 Peters Road Kingsville, MD 21087 | 17 8/4/2003 | 968 | 0.14% | 194 | 1,019 | 1,073 | 3,254 |
| Orlando Orsine, Jr. c/o Best American Ambulance 1735 East Joppa Road Baltimore, MD 21234 | 18 8/4/2003 | 748 | 0.11% | 150 | 788 | 829 | 2,515 |
| Albert J. Zawicki 14 Perine Court Baltimore, MD 21234 | 19 8/4/2003 | 499 | 0.07% | 100 | 525 | 553 | 1,677 |
| Albion Alliance Mezzanine Fund, L.P. 1345 Avenue of the Americas New York, New York 10105 | 20 8/4/2003 | 10,412 | 1.47% | 2,082 | 10,960 | 11,537 | 34,991 |

**A3067**

CONFIDENTIAL

CURTIS_000889

Attachment 3

TransCare Corporation
Shareholder Listing
As of 9/15/06

| Name and Address of Holder | Certificate Number and Date | Number of Shares | % Ownership | Options[1] | Warrants - Tranche A [2] | Warrants - Tranche B [3] | Total |
|---|---|---|---|---|---|---|---|
| Inletside & Co. as nominee for Alliance Investment Opportunities Fund L.L.C. 1345 Avenue of the Americas New York, New York 10105 | 21 8/4/2003 | 3,471 | 0.49% | 694 | 3,853 | 3,846 | 11,664 |
| Paul Martha 5008 Starfish Way San Diego, CA 92154 | 22 8/4/2003 | 370 | 0.05% | 74 | 389 | 410 | 1,243 |
| Susan Witty 2906 Country Lane Ellicott, MD 21043 | 23 8/4/2003 | 398 | 0.06% | 80 | 419 | 441 | 1,338 |
| Sigler & Co. c/o CSAM Funding II c/o Credit Suisse Asset Management 466 Lexington Avenue, 14th Floor New York, NY 10017 | 26 5/6/2004 | 24,232 | 3.42% | | | | 24,232 |
| Sigler & Co. c/o CSAM Funding III c/o Credit Suisse Asset Management 466 Lexington Avenue, 14th Floor New York, NY 10017 | 27 5/6/2004 | 24,232 | 3.42% | | | | 24,232 |
| Sigler & Co. c/o Atrium CDO c/o Credit Suisse Asset Management 466 Lexington Avenue, 14th Floor New York, NY 10017 | 28 5/6/2004 | 24,232 | 3.42% | | | | 24,232 |
| Abbey Richmond Ambulance Service, Inc. c/o Ellen Dawson 59 Mayfair Drive White Plains, NY 10603 | 29 | 245 | 0.03% | 49 | 258 | 271 | 823 |
| Peconic Ambulance Service, Inc. c/o Sean McCabe P.O. Box 623 Jamesport, NY 11947 | 30 | 543 | 0.08% | 109 | 572 | 602 | 1,826 |
| Totals | | 707,993 | 100.00% | 149,600 | 50,519 | 53,180 | 961,292 |

[1] Options, excluding those issued to Hampshire TC Holdings LLC expire 8/4/13, price $.01
[1a] Options Issued to Hampshire TC Holdings LLC
    *50,000 issued 8/4/03, expires 8/4/13, price $.01
    *40,000 issued 8/4/04, expires 8/4/13, price $.01
    *50,000 issued 8/4/05, expires 8/4/13, price $.01
[2] Warrant, price $40, expires 8/4/08
[3] Warrant, price $45, expires 8/4/10

A3068

CONFIDENTIAL

CURTIS_000890

**SCHEDULE 8.13
to
INFORMATION CERTIFICATE**

**Labor Matters**

None

-32-

**A3069**

CONFIDENTIAL

CURTIS_000891

**SCHEDULE 8.15**
**to**
**INFORMATION CERTIFICATE**

**Material Contracts**

Contracts with the following entities:

1. Montefiore  Medical Center/ Albert Einstein college of Medicine

2. Mount Sinai Medical Center/Mount Sinai Hospital

3. Continuum Health Care and certain of its affiliated entities (Beth Israel Medical Center, Long Island College, St. Luke's/Roosevelt Hospital, New York Eye and Ear Infirmary)

4. The New York City Transit Authority Contract No. 06D9374D

5. University of Maryland Medical System

6. Highmark Blue Cross Blue Shield/Keystone Healthplan West

**A3070**

CONFIDENTIAL

CURTIS_000892

## Schedule 8.20  (Section 8.20(g) Agreements with Facilities

**TransCare Corporation**
List of Facilities

 **Facility Name**
 A HOLLY PATTERSON GERIATRIC CT
 ADVANCED AIR AMBULANCE
 AGRESSIVE SKATERS ASSOCIATION
 AIR AMBULANCE AMERICA
 AIR AMBULANCE SERVICE
 AIR AMBULANCE SPECIALIST
 AIR RESPONSE
 AIRSTAT
 ALBERT EINSTEIN HOSP/CATH LAB
 ALBERT EINSTEIN INSTITUTE
 ALICE MANOR NURSING HOME
 ALLEGHENY VALLEY HOSP
 ANDRUS ON HUDSON
 ANNAPOLIS NURSING & REHAB
 ANNE ARUNDEL MEDICAL CENTER
 AVALON GARDENS NURSING HOME
 BALDOCK NURSING HOME
 BALTIMORE WASH MED CTR 2 MILES
 BALTIMORE WASH MED CTR 3 MILES
 BALTIMORE WASHINGTON MED CTR
 BAYVIEW MEDICAL CENTER
 BELLEVUE HOSPITAL
 BEST AMERICAN
 BETH ABRAHAM HOME HOSPITAL
 BETH ISRAEL HOSPITAL
 BETH ISRAEL MED CTR/KINGS HWY
 BEVERLY HEALTHCARE PHOENIXVILL
 BISHOP HEN HUCLES NURSING HOME
 BLUE POINT NURSING & REHAB
 BON SECOUR HOSPITAL
 BON SECOURS HOSPITAL
 BOOTH MEMORIAL HOSPITAL
 BOXING EVENT
 BRANDYWINE HALL
 BRANDYWINE HOSPITAL
 BRIGHTEN AT BROOMALL
 BRIGHTEN AT BRYN MAWR
 BROADMEAD NURSING CENTER
 BRONX LEBANON HOSP/CONCOURSE
 BRONX VA SPINAL CORD CLINIC
 BRONX VETERANS HOSPITAL
 BROOKDALE HOSPITAL

CONFIDENTIAL
CURTIS_000893

BRUNSWICK HOSPITAL
BRUNSWICK HOSPITAL/MRI
BRYN MAWR HOSPITAL
BRYN MAWR REHAB HOSP
BRYN MAWR TERRACE
CABRINI HOSPICE
CABRINI MEDICAL CENTER
CALVARY HOSPITAL
CALVERY HOSPITAL @ LUTHERAN
CARROL TRANSIT MEDICAID
CARROLL COUNTY HOSPITAL
CASTLE POINT VET ADMIN HOSP
CASTLE POINT VET HOSP
CATSKILL REGIONAL MED CENTER
CENTRAL ISLAND NURSING HOME
CENTRAL MONTGOMERY MED CNTR
CHAPEL HILL CONVALESCENT HOME
CHARLES MORRIS CENTER
CHESTER COUNTY HOSPITAL
CHRISTIANA HOSPITAL
CNR PROSPECT HOSPICE
COL SPECIAL P. FUND CHILD HOSP
COLER MEMORIAL HOSP NH
COLUMBIA PRESBYTERIAN HOSPITAL
COMMUNITY HOSPITAL
COMPASSION CARE HOSPICE
COMPASSIONATE CARE HOSPICE
CONTINUUM HOSPICE
CREST HALL NURSING HOME
DELAWARE COUNTY MEMORIAL HOSP
DELAWARE PSYCHIATRIC CENTER
DEVEREUX MAPLETON CENTER
DOWNSTATE MEDICAL CENTER
DOYLESTOWN HOSPITAL
DUMONT MASONIC HOME
DUNWOODY NURSING HOME
EAST COAST AMBULANCE
ELLENVILLE VOLUNTEER AMB CORP
ELMHURST HOSPITAL CENTER
EYE YORK EYE & EAR HOSPITAL
FAMILY HOSPICE & PALLIATIVE CR
FLUSHING HOSPITAL
FORBES REGIONAL
FRANKFORD BUCKS
FRANKFORD FRANKFORD
FRANKFORD HOSPITAL BUCKS
FRANKFORD HOSPITAL MRI
FRANKFORD TORESDALE HOSP
FRANKLIN GENERAL HOSPITAL
FRANKLIN HOSP ADULT DAY CARE

**A3072**

CONFIDENTIAL

CURTIS_000894

FRANKLIN SQUARE HOSPITAL
FREDERICK VILLA NURSING HOME
FUTURE CARE LOCHEARN
FUTURECARE
FUTURECARE IRVINGTON
GARDEN CARE CENTER
GATEWAY HEALTH HOSPICE
GBMC HOSPITAL
GENESIS
GENESIS MULTI MEDICAL
GIRARD MEDICAL CENTER
GLENN ISLAND CARE CENTER
GOLDWATER HOSPITAL
GOOD SAMARITAN HOSPITAL
GRACIE SQUARE HOSPITAL
GRADUATE HOSPITAL
GREATER S.E. COMMUNITY HOSP
GREENARY HEALTH CENTER
HADLEY MEMORIAL HOSP
HARBOR HOSPITAL CENTER
HARRISON HOUSE OF CHRISTIANA
HARTLAND HOSPICE STOCKTON BLDG
HAVERFORD ESTATES
HEALTH PARTNERS OF NEW YORK
HEALTHSOUTH HARMARVILLE REHAB
HEARTLAND HOSPICE
HEBREW HOSPITAL HOME OF WESTCH
HEMPSTEAD PARK NURSING HOME
HERITAGE HARBOR NURSING HOME
HERITAGE SHADYSIDE
HICKORY HOUSE NURSING HOME
HOCKESSIN HILLS
HOLLISWOOD HOSPITAL
HOME CARE HOSPICE
HOSPICE CARE OF LONG ISLAND
HOSPICE INN
HOSPICE OF BALTIMORE
HOSPICE OF DUTCHESS COUNTY
HOSPICE OF NEW YORK
HOSPICE OF THE CHESAPEAKE
HOSPICE OF WESTCHESTER
HOSPITAL FOR JOINT DISEASES
HOSPITAL FOR SICK CHILDREN
HOSPITAL FOR SPECIAL SURGERY
HOSPS OF ORANGE & SULLIVAN CTY
HOWARD COUNTY GENERAL HOSPITAL
HUNTINGTON HOSPITAL
HURLEYVILLE EMERG.RELIEF SQUAD
INTENSIVE AIR AMBULANCE
JACOBI HOSPITAL BX MUNICIPAL

**A3073**

CONFIDENTIAL

CURTIS_000895

JAMAICA HOSPITAL
JENNERSVILLE REGIONAL HOSP
JEWISH CONVALESCENT CENTER
JEWISH HOME AND HOSPITAL
JOHN HOPKINS HOSPITAL
KAHUNAVILLE  ATT: SUSIE CASEY
KENNEDY MEDICAL JFK AIRPORT
KERNAN HOSPITAL
KINGS COUNTY G BUILDING
KINGSBROOK JEWISH LAB SERVICE
KINGSBROOK JEWISH MEDICAL CTR
LANKENAU HOSP ER
LANKENAU HOSPITAL
LAUREL REGIONAL HOSPITAL
LEVINDALE HEBREW HOSPITAL
LEVINDALE NURSING CENTER
LIBERTY NURSING AND REHAB
LIBERTY VOLUNTEER AMBULANCE CO
LIC/PHU SHUTTLE
LIFE CARE OF PITTSBURGH
LIFE LINE AIR AMBULANCE
LIFELINE AIR AMBULANCE
LIFENET
LINCOLN HOSPITAL CENTER
LOGISTICARE
LONG BEACH MEDICAL CENTER
LONG ISLAND CARE CENTER
LONG ISLAND COLLEGE HOSP/PSYC
LONG ISLAND COLLEGE HOSPITAL
LONG ISLAND COLLEGE/SOCIAL WRK
LONG ISLAND JEWISH HOSPITAL
LORIEN FRANKFORD NURSING HOME
LUTHERAN AUGUSTANA CENTER
LUTHERAN MEDICAL CENTER
MADISON SQUARE GARDEN
MAGEE WOMENS HOSPITAL
MAIMONIDES MEDICAL CENTER
MAINLINE NURSING & REHAB
MAMAKATING FIRST AID SQUAD
MANOR CARE AT PIKE CREEK
MANOR CARE KING OF PRUSSIA
MANOR CARE LANSDALE
MANOR CARE OF DEVON
MANOR CARE POTTSTOWN
MANOR CARE ROLAND PARK
MANOR CARE RUXTON
MANOR CARE YARDLEY
MANOR CARE YARDLEY
MARINER CATONSVILLE
MARINER NORTH ARUNDEL

**A3074**

CONFIDENTIAL

CURTIS_000896

MARY IMMACULATE HOSPITAL
MARYLAND BAPTIST AGED NH
MARYLAND EXPRESSCARE
MARYLAND GENERAL HOSPITAL
MCKEESPORT GERI PROGRAM
MCKEESPORT HOSPITAL
MCMURRAY HILLS MANOR
MEADOWS AT SHANNONDELL
MED LINK HOSP
MEMORIAL SLOAN KETTERING
MERCY HOSPITAL
MERCY HOSPITAL CENTER
MERCY SUBURBAN HOSPITAL
METRO HOSPICE @ GREATER NY
MICHAELS EIGHTH AVENUE
MID ATLANTIC HOSPICE
MILLENNIUM CNTR AT MARLEY NECK
MONSIGNOR FITZPATRICK NH
MONTEFIORE HOSPITAL
MONTEFIORE HOSPITAL
MONTGOMERY HOSPITAL
MOUNT SINAI HOSPITAL
MOUNT SINAI HOSPITAL QUEENS
MT SINAI HOSPITAL
MT VERNON HOSPITAL
MT WASHINGTON PEDIATRIC HOSP
N.Y. UNIVERSITY HOSP
NATIONAL HEALTH INSTITUTE
NEW ISLAND HOSPITAL
NEW YORK CENTER FOR REHAB
NEW YORK DOWNTOWN HOSPITAL
NEW YORK HOSPITAL
NEW YORK PRESBYTERIAN WESTCHST
NEW YORK STATE VETERANS HOME
NEW YORK UNIVERSITY HOSP
NEW YORK UNIVERSITY HOSPITAL
NORTH ARUNDEL
NORTH CENTRAL BRONX HOSPITAL
NORTH GENERAL HOSPITAL
NORTHSHORE UNIVERSITY HOSPITAL
NORTHWEST HEALTH REHAB CENTER
NORTHWEST HOSPITAL CENTER
NORTHWEST HOSPITAL TRUST
NY HYPERBARIC & WOUND CARE
NYS VETS HOME AT MONTROSE
OAK HOLLOW NURSING HOME BLDG 2
OUR LADY OF MERCY HOSPITAL
PAOLI ER DEPT
PAOLI MEMORIAL HOSPITAL
PARK AVENUE EXTENDED CENTER

**A3075**

CONFIDENTIAL

CURTIS_000897

PARK AVENUE EXTENDED DAY CARE
PARKLANE AT BELLINGHAM
PARKWAY HOSPITAL
PENINSULA HOSPITAL CENTER
PENN HOME CARE HOSPICE
PHELPS MEMORIAL HOSPITAL
PHOENIXVILLE HOSPITAL
PORT JEFFERSON HEALTH CARE
PORT JERVIS VOLUNTEER AMB CORP
POTTSTOWN MEM MED CTR
PRESBYTERIAN HOSPITAL
PROVIDENCE HOSPITAL
QUEENS HOSPITAL CENTER
RAVENWOOD NURSING HOME
REGINA NURSING HOME
RESORT BEACH NURSING
RIVERSIDE NURSING CENTER
ROCK GLEN NURSING HOME
ROCKFORD CENTER
ROOSEVELT HOSPITAL
ROSCOE &ROCKLAND VOLUNTEER AMB
ROSEMONT MANOR
RUTH TAYLOR CARE CENTER
SAN SIMEON BY THE SOUND NH
SARAH R NEWMAN NURSING HOME
SAUNDERS HOUSE
SHADYSIDE HOSPITAL
SHADYSIDE NURSING AND REHAB
SILVERLAKE CENTER PA
SINAI HOSPITAL
SKYVUE TERRACE
SMITHTOWN CTR FOR REHAB & NH
SOMMERTON CENTER
SOUTH HAMPTON HOSPITAL
SOUTH OAKS HOSPITAL
SOUTHRIVER HEALTH REHAB CENTER
SOUTHSIDE HOSPITAL
SPILT ROCK NURSING HOME
SPORTS AND ENTERTAINMENT
SPRAIN BROOK MANOR NURSING HOM
ST AGNES NURSING
ST ALBANS VETERAN HOSPITAL
ST BARNABAS HOSPITAL
ST CLARE'S HOSPITAL
ST FRANCIS HOSPITAL
ST JOHNS FAMILY CLINIC
ST JOHNS HOSPITAL
ST LUKES HOSPITAL
ST MARGARETS HOSPITAL
ST MARTHA'S MANOR

**A3076**

CONFIDENTIAL

CURTIS_000898

ST MARYS CHILDREN HOSPITAL
ST PATRICKS NURSING HOME
ST THOMAS MONESTARY
ST VINCENT/WESTCHESTER
ST VINCENTS CANCER CENTER
ST VINCENTS HOSP/INPATIENT
ST VINCENTS HOSP/SOCIAL WORK
ST VINCENTS HOSPITAL
ST VINCENTS HOSPITAL (ER)
ST VINCENTS HOSPITAL/CATH LAB
STANDBY
STAT AIR AMBULANCE WCMC
STELLA MARIS FACILITIES
STONEY LODGE HOSPITAL
SYOSSET COMM HOSP  NSU
TERENCE CARDINAL COOKE NURSING
THI FRANKLIN SQUARE AND REHAB
THOMAS JEFFERSON UNIV HOSP
THROGGS NECK EXTENDED CARE CTR
TOWSON UNIVERSITY
TRANSPLANT RESOURCE CTR OF MD
UNITED HEBREW NURSING HOME
UNIVERSITY BEHAVIORAL ASSOC
UNIVERSITY HOSP OF PA
UNIVERSITY HOSPICE
UNIVERSITY SPECIALTY HOSPITAL
URSULINE SENIOR SERVICES
VALLEY FORGE MIDDLE SCHOOL
VANDERBILT UNIVERSITY HOSP
VETERANS HOSPITAL
VICTORY HOSPITAL
VILLAGE NURSING HOME
VISITING NURSE SERVICE
VITAS HOSPICE
WASHINGTON ADVENTIST HOSP
WAYNE NURSING & REHAB CENTER
WESLEY HOME INC
WEST CHESTER REHAB HOSPITAL
WEST PENN HOSPITAL
WESTCHESTER MEDICAL CENTER
WESTCHESTER SQUARE MEDICAL CTR
WESTFALL VAC
WESTMINSTER NURSING HOME
WHITEPLAINS HOSPITAL
WOODBOURNE VAC
WOODHULL HOSPITAL
WYKOFF HEIGHTS HOSPITAL
YELLOW TRANSPORTATION

**A3077**

CONFIDENTIAL

CURTIS_000899

**SCHEDULE 9.9**
**to**
**INFORMATION CERTIFICATE**

**Existing Indebtedness**

**I.     Direct Debt**

(a)     Indebtedness under and in connection with the Credit Agreement dated as of August 4, 2003, among TrasnCare Corporation, as Borrower, the lenders a party thereto and Patriarch Partners Agency Services, LLC, as Agent for such lenders, as amended, the outstanding principal amount of which is $40,775,868 as of September 30, 2006.

(b)     The leases and equipment financings listed in the attachments to Schedule 8.4.

**II.     Guarantees**

(a)     Each of the Companies has guaranteed all obligations in connection with the Credit Agreement dated as of August 4, 2003, among TransCare Corporation, as Borrower, the lenders a party thereto and Patriarch Partners Agency Services, LLC, as Agent for such lenders, as amended.

(b)     Guaranties by each of the Subsidiaries of TransCare Corporation of Indebtedness of TransCare Corporation and Subsidiaries of TransCare Corporation in respect of the financing of vehicles and equipment listed on this Schedule 9.9.

**III.**     Insurance premium financing arrangements, the outstanding amount of which was $5,708,262.35 as of October 5, 2006.

**A3078**

CONFIDENTIAL

CURTIS_000900

**SCHEDULE 9.10**
**to**
**INFORMATION CERTIFICATE**

**Loans and Advances**

The guaranties referred to on Schedule 9.9 permitted as of the date hereof as provided in Section 9.9 of the Loan and Security Agreement  and any intercompany obligations to the extent permitted as provided in Section 9.10 of the Loan and Security Agreement/.

**A3079**

CONFIDENTIAL                                                              CURTIS_000901

## SCHEDULE A
## to
## INFORMATION CERTIFICATE

### **Required Consents**

2.      Stockholders Agreement dated as of August 4, 2003, among TransCare Corporation and certain stockholders of TransCare Corporation, as amended and supplemented, requires that a refinancing of the TransCare's indebtedness pursuant to the Second Lien Agreement be approved by affirmative consent of certain stockholders of TransCare Corporation.

3.      Article III, Section 16 of the Amended and Restated Bylaws of Certificate of Incorporation of TransCare Corporation requires that a refinancing of the TransCare's indebtedness pursuant to the Second Lien Agreement be approved by the affirmative consent of certain stockholders of TransCare Corporation.

**A3080**

CONFIDENTIAL                                              CURTIS_000902

**A3081**

CONFIDENTIAL
CURTIS_000903

EXHIBIT B
TO
LOAN AND SECURITY AGREEMENT

<u>BORROWING BASE CERTIFICATE</u>

(See Attached)

737372.1

**A3082**

Date: _____
Number: _____

## BORROWING BASE CERTIFICATE

      Pursuant to the Loan and Security Agreement among Wachovia Bank, National Association ("Lender") and TransCare Corporation on behalf itself and certain of its Subsidiaries as borrowers ("Administrative Borrower"), and certain of its Subsidiaries (as amended, the "Loan Agreement), Administrative Borrower hereby certifies on behalf of itself and the other Borrowers, to Lender, as of the above date, as follows:

### A. LOAN AVAILABILITY

   1. **Medicare Accounts**

| | |
|---|---|
| Gross Amount of Medicare Accounts | $_____ |
| Less Ineligible Medicare Accounts | $_____ |
| Reimbursable Amount of Eligible Accounts consisting of Medicare Accounts | $_____ |
| Advance Rate | 85% |
| Net Medicare Account Loan Availability | $_____ |

   2. **Medicaid Accounts**

| | |
|---|---|
| Gross Amount of Medicaid Accounts | $_____ |
| Less Ineligible Medicaid Accounts | $_____ |
| Reimbursable Amount of Eligible Accounts consisting of Medicaid Accounts | $_____ |
| Advance Rate | 85% |
| Net Medicaid Account Loan Availability | $_____ |

   3. **Insurance Accounts**

| | |
|---|---|
| Gross Amount of Insurance Accounts | $_____ |
| Less Ineligible Insurance Accounts | $_____ |
| Reimbursable Amount of Eligible Accounts consisting of Insurance Accounts | $_____ |
| Advance Rate | 85% |
| Net Insurance Account Loan Availability | $_____ |

737372.1

**A3083**

CONFIDENTIAL

CURTIS_000905

4. **Facility Contract Accounts**

| | |
|---|---|
| Gross Amount of Facility Contract Accounts | $_____ |
| Less Ineligible Facility Contract Accounts | $_____ |
| Reimbursable Amount of Eligible Accounts consisting of Facility Contract Accounts | $_____ |
| Advance Rate | 85% |
| Net Facility Contract Account Loan Availability | $_____ |

5. **Paratransit Accounts**

| | |
|---|---|
| Gross Amount of Paratransit Accounts | $_____ |
| Less Ineligible Paratransit Accounts | $_____ |
| Reimbursable Amount of Eligible Accounts consisting of Paratransit Accounts | $_____ |
| Advance Rate | 85% |
| Net Paratransit Account Loan Availability | $_____ |

6. **CHAMPUS/CHAMPVA Accounts**

| | |
|---|---|
| Gross Amount of CHAMPUS/CHAMPVA Accounts | $_____ |
| Less Ineligible CHAMPUS/CHAMPVA Accounts | $_____ |
| Reimbursable Amount of Eligible Accounts consisting of CHAMPUS/CHAMPVA Accounts | $_____ |
| Advance Rate | 85% |
| Net CHAMPUS/CHAMPVA Account Loan Availability | $_____ |

7. **Unbilled Accounts**

| | |
|---|---|
| Gross Amount of Unbilled Accounts | $_____ |
| Less Ineligible Unbilled Accounts | $_____ |
| Reimbursable Amount of Eligible Accounts consisting of Unbilled Accounts | $_____ |
| Advance Rate | 85% |

737372.1

2

**A3084**

CONFIDENTIAL

CURTIS_000906

Net Unbilled Accounts (A)      $_____

Unbilled Accounts Loan Limit (B)      $5,000,000

Net Unbilled Account Loan Availability (the lesser of item 7(A) or item 7(B))      $_____

8. **Pending Medicaid Accounts**

Gross Amount of Pending Medicaid Accounts      $_____

Less Ineligible Pending Medicaid Accounts      $_____

Reimbursable Amount of Eligible Accounts consisting of Pending Medicaid Accounts      $_____

Advance Rate      85%

Net Pending Medicaid Account (A)      $_____

Pending Medicaid Accounts Loan Limit (B)      $300,000

Net Pending Medicaid Account Loan Availability (the lesser of item 8(A) or item 8(B))      $_____

9. Total Eligible Accounts, Eligible Unbilled Accounts and Eligible Pending Medicaid Accounts. (the sum of items 1 through 8)      $_____

10. The amount of sixty (60) days cash receipts      $_____

11. Amount of Eligible Accounts (the lesser of item 9 or item 10)      $_____

12. Less Reserves      $_____

13. Net Amount of Availability      $_____

14. Maximum Credit      $_____

15. Total Availability (the lesser of item 13 or item 14)      $_____

**B. RECONCILIATION OF LOAN BALANCE**

16. Current Principal Amount of outstanding Loan balance as of the date hereof      $_____

17. Current Undrawn Amount of Outstanding Letters of Credit (Reserved for in Item 12)      $_____

18. Total Loan Balance and Letters of Credit (item 16      $_____

**A3085**

CONFIDENTIAL

CURTIS_000907

plus item 17)

19. Unused Availability (Item 15 less Item 16)                    $_____

20. Amount of Loan requested                                      $_____


As of the date of this Certificate, no Event of Default exists or has occurred and is continuing. Administrative Borrower acknowledge that the Loans and Letter of Credit Accommodations by Lender to Borrowers are based upon Lender's reliance on the information contained herein and all representations and warranties with respect to Accounts in the Loan Agreement are applicable to the Accounts included in this Certificate.  The reliance by Lender on this Certificate should not be deemed to limit the right of Lender to establish or revise criteria of eligibility or Reserves or otherwise limit, impair, or affect in any manner the rights of Lender under the Loan Agreement.  In the event of any conflict between the determination of Lender of the amount of the Loans and Letter of Credit Accommodations available to Borrowers in accordance with the terms of the Loan Agreement and the determination by Borrowers of such amounts, the determination of Lender shall govern.  All capitalized terms used in this Certificate shall have the meaning assigned to them in the Loan Agreement.

<div style="margin-left:40%">

TRANSCARE CORPORATION, as
Administrative Borrower


By:_____

Title:_____

</div>

737372.1                                            4

**A3086**

CONFIDENTIAL                                             CURTIS_000908



**A3087**

CONFIDENTIAL

CURTIS_000909

EXHIBIT C
TO
LOAN AND SECURITY AGREEMENT

Compliance Certificate

To:    Wachovia Bank, National Association
1133 Avenue of the Americas
New York, New York 10036
Attention: Portfolio Manager

Ladies and Gentlemen:

Pursuant to Section 9.6 of the Loan Agreement (as defined below) TransCare Corporation, as Administrative Borrower ("Administrative Borrower") hereby certifies to you as set forth below.

Capitalized terms used herein without definition shall have the meanings given to such terms in the Loan and Security Agreement, dated October __, 2006, by and among Wachovia Bank, National Association ("Lender"), Administrative Borrower and certain subsidiaries of Administrative Borrower (as such Loan and Security Agreement is amended, modified or supplemented, from time to time, the "Loan Agreement").

1.    Borrowers and Guarantors have reviewed the terms of the Loan Agreement, and have made, or have caused to be made under the supervision of a Designated Officer, a review in reasonable detail of the transactions and the financial condition of Borrowers and Guarantors, during the immediately preceding fiscal month.

2.    The review described in Section 1 above did not disclose the existence during or at the end of such fiscal month, and the undersigned has no knowledge of the existence and continuance on the date hereof, of any condition or event which constitutes a Default or an Event of Default, except as set forth on Schedule I attached hereto.  Schedule I attached hereto sets forth the exceptions, if any, to this Section 2 listing, in detail, the nature of the condition or event, the period during which it has existed and the action which any Borrower or Guarantor has taken, is taking, or proposes to take with respect to such Default or Event of Default.

3.    Borrowers and Guarantors hereby certify that, based on the review described in Section 1 above, no Borrower or Guarantor has at any time during or at the end of such fiscal month, except as specifically described on Schedule II attached hereto or as permitted by the Loan Agreement, done any of the following:

        (a)    Changed its respective corporate name, or transacted business under any trade name, style, or fictitious name, other than those previously described to you and set forth in the Financing Agreements or listed on Schedule I hereto.

707761.15

C-1

**A3088**

CONFIDENTIAL

CURTIS_000910

(b)    Changed the location of its chief executive office, changed its jurisdiction of incorporation, changed its type of organization or changed the location of or disposed of any of its properties or assets (other than pursuant to the sale of Inventory in the ordinary course of its business or as otherwise permitted by Section 9.7 of the Loan Agreement), or established any new asset locations except in accordance with or as permitted by the Loan Agreement.

(c)    Materially changed the terms upon which it provides Ambulances Services, Paratransit Services or other services that may give rise to an Account.

(d)    Permitted or suffered to exist any security interest in or liens on any of its properties, whether real or personal, other than as specifically permitted in the Financing Agreements.

(e)    Received any notice of, or obtained knowledge of any of the following not previously disclosed to Lender:

(i) any notice or notices of determination from a Third Party Payor or a Program Integrity Contractor that a Borrower or Guarantor has received any overpayments or is not entitled to retain prior payments under Medicare, Medicaid or CHAMPUS/CHAMPVA in excess of $250,000, individually or in the aggregate,

(ii) any right that has been exercised or that is then exercisable to recoup or offset any payments due to any Borrower under the Medicare Regulations, Medicaid Regulations, or the CHAMPUS/CHAMPVA Regulations in excess of $100,000, individually or in the aggregate,

(iii) any right that has been exercised or that is then exercisable to suspend, delay, defer or postpone any payments due to any Borrower under the Medicare Regulations, Medicaid Regulations, or the CHAMPUS/CHAMPVA Regulations,

(iv) the occurrence of any event involving the release, spill or discharge of any Hazardous Material in violation of applicable Environmental Law in a material respect; or

(v) any investigation, proceeding, complaint, order, directive, claims, citation or notice with respect to: (A) any non-compliance with or violation of any applicable Environmental Law by any Borrower or Guarantor in any material respect or (B) the release, spill or discharge of any Hazardous Material in violation of applicable Environmental Law in a material respect or (C) the generation, use, storage, treatment, transportation, manufacture, handling, production or disposal of any Hazardous Materials in violation of applicable Environmental Laws in a

707761.15

C-2

**A3089**

CURTIS_000911

material respect or (D) any other environmental, health or safety matter, which has a material adverse effect on any Borrower or Guarantor or its business, operations or assets or any properties at which such Borrower or Guarantor transported, stored or disposed of any Hazardous Materials.

(f)    Become aware of, obtained knowledge of, or received notification of, any breach or violation of any material covenant contained in any instrument or agreement in respect of Indebtedness for money borrowed in excess of $250,000 by any Borrower or Guarantor that extends beyond the applicable cure period and is not waived.

(g)    Become aware of, obtained knowledge of, or received notification that any Person not already the record holder of ten (10%) percent or more of the issued and outstanding shares of Capital Stock of Parent, has become such a ten (10%) percent holder.

4.    Attached hereto as Schedule III are the calculations used in determining, as of the end of such fiscal month whether Borrowers and Guarantors are in compliance with the covenants set forth in Section 9.18 of the Loan Agreement.

The foregoing certifications are made and delivered by the undersigned, being a Designated Officer of Administrative Borrower, this ____ day of _____ 20__.

Very truly yours,

TRANSCARE CORPORATION

By:_____

Title:_____

**A3090**

CONFIDENTIAL                                                                                   CURTIS_000912

**A3091**

CONFIDENTIAL

CURTIS_000913

**SCHEDULE 1.134**
**TO**
**LOAN AND SECURITY AGREEMENT**

**SECOND LIEN DOCUMENTS**

1.  Security Agreement, dated as of August 4, 2003, by TransCare Corporation and certain of its subsidiaries in favor of the Second Lien Agent, and the Addendum to Security Agreement dated as of April 1, 2004 by TransCare ML, Inc., as amended and supplemented.

2.  Pledge Agreement, dated as of August 4, 2003, by TransCare Corporation, TransCare Maryland, Inc. and TransCare New York, Inc., with acknowledgement by the subsidiaries, in favor of the Second Lien Agent, and the Pledge Agreement Supplement dated as of April 1, 2004, as amended and supplemented.

3.  UCC financing statements in favor of the Second Lien Agent, as secured party, filed with the Delaware Secretary of State respect to the security interests in favor of the Second Lien Agent pursuant to the Second Lien Documents.

10147103.1

CONFIDENTIAL

CURTIS_000914

**SCHEDULE 8.17**
**TO**
**LOAN AND SECURITY AGREEMENT**

**CREDIT CARD AGREEMENTS**

1.  Agreement between American Express and TransCare New York, Inc.

2.  Merchant Services Agreement between Discover Financial Services, Inc 9Discover Network) and TransCare Corporation

3.  Agreement between BA Merchant Services and TransCare Pennsylvania, Inc.

4.  VISA/Mastercard agreement between Chase Merchant Services LLC and TransCare Corporation, as amended

**A3093**

CONFIDENTIAL

CURTIS_000915

**SCHEDULE 8.19**
**TO**
**LOAN AND SECURITY AGREEMENT**

**BUSINESS ASSOCIATE AGREEMENTS**

See attached list

**A3094**

CONFIDENTIAL

CURTIS_000916

**TransCare New York, Inc. Business Associates Agreements**

Accurint
AIM COMPUTER ASSOCIATES, INC.
AMAC
B & B Imaging
Bronx Lebanon Hospital Center
BRONX VETERANS HOSPITAL
BRONX VETERANS HOSPITAL
BRONX VETERANS HOSPITAL
BRONX VETERANS HOSPITAL
BROOKLYN HOSPITAL
Brooklyn Hospital Center Home Health Services
Catskill Regional Medical Center
Chapin Home for the Aging
City of White Plains
Collection Bureau Hudson Valley Inc.
Communication Consulting Services, Inc.
Concourse Nursing Home
CROSS & GUARD, INC.
Daleview Care Center
East Rockaway Progressive Care Facility
Eastchester Rehabilitation
Elmhurst Care Center
Envoy/Expressbill , Inc.
First to Care Home Care
Four Seasons Nursing and Rehabilitation Center
Franklin Center for Rehabilitation & Nursing
Geln Island Care Center
Gouverneur Hospital
Gouverneur Nursing Home
Grace Plaza of Great Neck
Grandell Rehabilitation and Nursing Center
HEALTH AND HOSPITAL CORP.
Healthcare Financial Services
Holliswood Hospital
HOSPICE OF NEW YORK
HOSPICE OF WESTCHESTER
Hudson Valley Hospital Center
Insurance Marketing Agencies, Inc.
JH Cohn, LLP
Lawrence Hospital Center
LUTHERAN MEDICAL CENTER
Marcus Garvey Nursing Home
MEADOWBROOK NURSING REHAB
Medi Corp
Medical Services of America
Metro Jewish Geriatric Center
Midway Nursing Home

**A3095**

CURTIS_000917

Mount Sinai Hospital
New Rochelle and Radiology
New San Souci Nursing Home
New York Eye and Ear Hospital
New York University Hospital
North General Hospital
Oxford Management Services
PAUL MICHAELS ASSOCIATES
Peninsula Hospital
Professional Recovery Associates, Inc.
Promenade Rehabilitation and Health Care Center
Prospect Park Care Center
Regal Heights Rehabilitation
Roosevelt Hospital
Saint Patrick Home for the Ages
Shalom Nursing Home
Sprain Brook Manor
ST VINCENTS HOSPITAL
St. Francis Hospital
Tecnova India Pvt. Ltd
The Brooklyn Hospital Center
Treetops Rehab & Care Center
Union Plaza Care Center
United Ambulette, Inc.
United Hebrew Geriatric Center
Wayne Center for Nursing and Rehab
WESTCHESTER MEDICAL CENTER
Willoughby Rehabilitation and Health Care Center
Winthrop University Hospital

## TransCare Pennsylvania, Inc. Business Associates Agreements
University of Pittsburgh Medical Center
- Montefiore Hospital
- Presbyterian University Hospital
- Shadyside Hospital
- McKeesport Hospital
Healthsouth Harmarville Rehabilitation Hospital
Highmark Blue Cross Blue Shield

## TransCare ML, Inc. Business Associates Agreements
Beverly Phoenixville
Coatesville VA
AseraCare Hospice
Bryn Mawr Terrace

**A3096**

CURTIS_000918

## TransCare Maryland, Inc. Business Associates Agreements

Baltimore City Corrections Ctr
Baltimore City Detention Ctr
Baltimore County Jail for Men
Baltimore Pre Release Unit
Brockbridge Correctional Institution
Central Booking Intake Facility
Herman Toulson Boot Camp
Home Detention Unit
Jessup Pre-Relase Unit
MD Correctional Adjustment Ctr
MD Correctional Inst. - Women
MD Correctional Institute - Jessup
MD House of Corrections
Metropolitan Transition Center
MRDCC
Patuxent Institution

Anne Arundel Medical Center
Baltimore VA Hospital
Baltimore Washington Medical Center
Bon Secour Hospital
Howard County Hospital
Kernan Hospital
Levindale Hospital
Maryland General Hospital
Mercy Hospital – Transitional Unit
Mercy Medical Center
Northwest Hospital
Perry Point VA Hospital
Sinai Hospital
Spring Grove State Hospital
University of Maryland Medical Center
University Specialty Hospital
VA Hospital –
Womens Jail Detention Center

**A3097**

CONFIDENTIAL

CURTIS_000919

Alice Manor Nursing Home
Augsburg Lutheran
Catonsville Mairner Home
Chapel Hill Convalescent Home
Fairfield Nursing Home
Frederick Villa Nursing home
Future Care Irvington
Future care lochearn
Genesis Brightwood
Genesis Catonsville Commons
Genesis Franklin Woods
Genesis Hammond Lane
Genesis Knollwood
Genesis Randallstown
Genesis Severna Park
Haven Nursing Home
Heartland Hospice
Heritage Harbor Nursing Home
Hospice Facilities of Baltimore
Gilcrest
Glen Burnie Health and Rehab
Hospice of Baltimore
Inns of Blue Point
Blue Point Nursing & Rehab
Kenesaw Nursing Home
Keswick Nursing
Levindale Nursing Center
Liberty Nursing and Rehab
Lorien Columbia
Lorien Frankford
Millennium Marley Neck
Mt. Washington Pediatrics
North Arundel Health and Rehab
Northwest Health and Rehab
Ravenwood Nursing Home
Ridgeway Manor

**Billing Associates Business Associates Agreements**
East Midwood Volunteer Ambulance
Lutheran Medical Center
Visnova Solutions Pvt. Ltd.
Wantagh-Levittown Volunteer Ambulance
Whiteford Volunteer Ambulance

**A3098**

CONFIDENTIAL

CURTIS_000920

CONFIDENTIAL

# SCHEDULE 8.20(a)
## TO
## LOAN AND SECURITY AGREEMENT

## MEDICARE/MEDICAID PROVIDER AGREEMENT

| Name of Covered Entity | Tax Identification Number | License Number (Agency Code) | License Valid From | License Expiration | Issuing Agency | NPI [1] (National Provider Identification) | Medicaid Identification [2] Number(s) | Medicaid Effective Date | Medicare Identification [3] Number(s) | Medicare Effective Date | Railroad [3] Medicare Number | Section 1011 [4] P/N | Areas Covered |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| TransCare New York, Inc. | 51-0355671 | 0184 | 1/27/2006 | 2/28/2008 | NYS DOH | 1215930193 | 01518996 01519222 | 11/19/1994 | A09832 A09831 A09833 | 11/19/1994 11/19/1994 11/19/1994 | 590009035 | NY0000D100091 | Kings, Queens New York, Bronx Suffolk, Nassau & Westchester |
| TC Ambulance Corp. dba MetroEMS | 11-3461540 | 0510 | 1/27/2006 | 2/28/2008 | NYS DOH | 1477550348 | 02301095 | 6/18/2002 | A41822 | 3/3/2000 | P00018365 | NY0000D100133 | Westchester, Richmond New York, Bronx, Richmond |
| TC Ambulance North, Inc. | 11-3536754 | 0509 | 1/27/2006 | 2/28/2008 | NYS DOH | 1569475398 | | | A46511 | 3/3/2000 | | NY0000D100152 | Kings, Queens, Westchester New York, Bronx, Richmond |
| TransCare Westchester, Inc. | 11-3428782 | 0470 | 1/27/2006 | 2/28/2008 | NYS DOH | 1568442806 | | | A46501 | 9/6/2000 | | NY0000D100153 | Kings, Queens Westchester |
| TC Ambulance Group, Inc. dba Beth Israel | 11-3536755 | 0508 | 1/27/2006 | 2/28/2008 | NYS DOH | 1386947014 | | | A46421 | 3/29/2000 | | NY0000D100082 | Kings, Queens, Richmond Bronx, New York |
| TCBA Ambulance, Inc. dba St. Barnabas | 11-3558429 | 0574 | 2/10/2006 | 2/28/2008 | NYS DOH | | | | | | | | New York |
| TC Hudson Valley Ambulance Corp. | 11-3619234 | 0667 | 6/8/2006 | 6/30/2008 | NYS DOH | 1689677551 | 02320654 | 9/1/2002 | A53181 | | | P00019259 | NY0000D100151 | Sullivan, Delaware, Putnam Rockland, Orange, Ulster |
| TMS Services, Inc. | 25-1848213 | | | | | | | | | | | | Pennsylvania |
| TC Billing and Services Corp. | 01-0718002 | | | | | | 992159100 (Florida) | 11/11/2004 | | | | | |
| TransCare Corp. | 75-2528381 | | | | | | | | | | | | |
| TransCare Harford County, Inc. | 52-2072846 | | | | | | 264500400 | 7/1/1999 | 663Q | 1/7/1998 | | | Maryland |
| TransCare Maryland, Inc. | 11-3374923 | 586916 586917 586918 | 7/1/2006 7/1/2006 7/1/2006 | 6/30/2007 6/30/2007 6/30/2007 | MD EMS | 1164426922 | 407462900 | 5/1/2005 | MD497Q | 10/1/1995 | 590012909 | MD0000D100078 | Maryland |
| TransCare Maryland, Inc. (DC) | 11-3374923 | | | | DC DOH | | 036959900 | | | | | | Washington D.C. |
| TransCare Maryland, Inc. (VA) | 11-3374923 | A-208 A-212 | 10/26/2004 10/26/2004 | 10/29/2006 10/29/2006 | VA DOH | | | | | | | | Virginia |
| TransCare Pennsylvania, Inc | 75-2598438 | 03531 | 11/24/2003 | 4/1/2007 | PA DOH | 1497758254 | 01545318 | 10/1/1995 | 236704 058758 (inactive 4/2005) | 9/14/1995 12/1/1996 | 590009506 | PA0000D100150 | Pennsylvania |
| TransCare ML, Inc. (PA) | 20-0806409 | 04028 | 3/22/2004 | 4/1/2007 | PA DOH | 1053314807 | 1008969700001 | 4/1/2004 | 077293 | 4/1/2004 | P00128706 | PA0000D100119 | Chester, Bucks, Philly |
| TransCare ML, Inc. (DE) | 20-0806409 | 3494 3495 3496 3497 | 1/1/2006 1/1/2006 1/1/2006 1/1/2006 | 12/31/2006 12/31/2006 12/31/2006 12/31/2006 | DE State Fire Prevention Commission | 1679576417 | 1000027198 | 4/1/2004 | 491722 | 4/1/2004 | P00100260 | NY0000D100003 | Montgomery, Delaware New Castle, Kent Sussex |
| TransCare ML, Inc. (MD) | 20-0806409 | 606001 606002 606190 606278 | 7/1/2006 7/1/2006 7/1/2006 7/1/2006 | 6/30/2007 6/30/2007 6/30/2007 6/30/2007 | MD EMS MD EMS MD EMS MD EMS | 1222301958 | 408245100 | 10/15/2004 | | | | NY0000D100003 | |
| TransCare ML, Inc. (NJ) | | | | | | | | | | | | | |

(1) NPI numbers will replace Medicare & Medicaid numbers slowly starting May 27, 2007.
(2) Due to mergers, the company inherited and has decided to keep active multiple ID numbers.
(3) A separate ID is required to bill for Railroad Medicare.
(4) Section 1011 allows the company to bill Medicare for Illegal Aliens.

CURTIS_000921

**SCHEDULE 8.20(e)**
**TO**
**LOAN AND SECURITY AGREEMENT**

NONE

CONFIDENTIAL

CURTIS_000922

## SCHEDULE 8.20(f)
## TO
## LOAN AND SECURITY AGREEMENT

## PARTICIPATION AGREEMENTS

| Insurance Name                Prov ID/Ins Code | State(s) Plans Operate In |
|---|---|
| 1199 | New York |
| Vytra   (VYT) | New York |
| Aetna/UsHealthcare (USH) | New York |
| Anthem Health (ANT, HZN) | New York |
| Chubb 510355671 (CHB) | New York |
| Cigna 510355671 (CIG) | New York |
| CMO | New York |
| Elder Plan (EPI) | New York |
| Empire Blue Cross/Blue Shield A0983 (BCB, BSP, BLC) | New York |
| Empire Blue Cross/Blue Shield A4180 (BCB, BSP, BLC) | New York |
| EverCare (EVE) | New York |
| Health First - Medicare + 113461540 (HFS) | New York |
| Health First - Medicare + 510355671 (HFS) | New York |
| Heritage of NY 113461540 (CHR) | New York |
| Heritage of NY 510355671 (CHR) | New York |
| HIP 113461540 (HIP) | New York |
| HIP 510355671 (HIP) | New York |
| Magnacare 510355671 | New York |
| Magnacare 113461540 | New York |
| Medichoice 510355671 | New York |
| Multiplan 113461540 | New York |
| Multiplan 510355671 | New York |
| Neighborhood Health Poviders (NHP, NPS) | New York |
| NY Hotel Trade Council (HOT, HMN) | New York |
| Nylcare 38504 (NYL, NYN) | New York |
| Oxford   (OXF) | New York |
| Oxford ANC1506 (oxx, oxf) | New York |
| PHS (PHS) | New York |
| PHS 2C7608 (PHS) | New York |
| Prudential 510355671 (PDD) | New York |
| United Healthcare - UAG Non Empire 113461540 | New York |
| United Healthcare - UNH, UAG Non Empire 510355671 | New York |
| United Healthcare - UNT Empire Plan 113461540 | New York |
| United Healthcare - UNT Empire Plan 510355671 | New York |
| Wellcare - Healthy Choice/Family Health Plus      (WAC,WC,W8,C8) | New York |
| Wellcare - Senior Plan/Child Health Plus              (WEL,WLC) | New York |
| Aetna/US Healthcare (AET03/USH01) Prov #2050438 | Pennsylvania |
| Medi-Home Hospice (TMS08) | Pennsylvania |

9/26/2006

**A3101**

CONFIDENTIAL

CURTIS_000923

List of Insurance Contracts

| Insurance Name              Prov ID/Ins Code | State(s) Plans Operate In |
|---|---|
| Coventry Senior Life Management (TMS03) | Pennsylvania |
| Cigna Healthcare for Seniors (TMS01) | Pennsylvania |
| Cigna Mid Atlantic Hlthcare(HMO/PPO) (TMS02) | Pennsylvania |
| Advantra (TMS09) | Pennsylvania |
| Health America / Health Assurance (TMS10) | Pennsylvania |
| Keystone Health Plan Security Blue (TMS07) | Pennsylvania |
| Keystone Health Plan West, Select Blue POS (TMS06), Community Blue (TMS04)and Prefferred Blue PPO (TMS26) | Pennsylvania |
| Heath System Alliance | Pennsylvania |
| Unicare | Pennsylvania |
| National Capital PPO | Pennsylvania |
| Cigna Healthcare - Western PA | Pennsylvania |
| Devon Healthcare Services / Ullicare | Pennsylvania |
| Cigna Healthcare -     West Va / SE Ohio | Pennsylvania |
| Flora - ACS - PA | Pennsylvania |
| Flora - ACS - WV | Pennsylvania |
| Flora - ACS - Ohio | Pennsylvania |
| Medicaid (MED03) | Pennsylvania |
| Qualcare, Inc - HMO (TMS18) | Pennsylvania |
| Qualcare, Inc - PPO (TMS19) | Pennsylvania |
| Intergroup Services | Pennsylvania |
| HealthGuard (TMS24) | Pennsylvania |
| Gateway (GAT03) | Pennsylvania |
| Gateway Medicare (GAT05) | Pennsylvania |
| Value Options (VAL06) | Pennsylvania |
| UPMC Health Plans CAID (BES12) | Pennsylvania |
| UPMC Health Plans (UPM12,13) | Pennsylvania |
| Aetna/US Healthcare of West Virginia (TMS25) | Pennsylvania |
| Aetna US Healthcare (AET12) Effect | Maryland |
| Alliance PPO  (AAA21, AAA22, AAA24,AAA25)             EFF 05/01/06 | Maryland |
| CareFirst (CAF02, CAF03,CAF09,CA | Maryland |
| Correctional Medical Svcs | Maryland |
| Coventry Healthcare (CVE01, CHC02-04)             Effective 11/01/05 | Maryland |
| Elder Health  (ELD01) New Rate effective 8/9/04 | Maryland |
| Evercare  (EVV01, EVV02) | Maryland |
| Helix Family Choice (HLX01) | Maryland |
| JAI Medical Systems (JAI01) | Maryland |
| Kaiser Permanente - EMI (KAI05) | Maryland |
| Kaiser Permanente - Senior Advantag | Maryland |
| MD Physician Care (MMM21) - Non | Maryland |
| MidAtlantic Medical Services | Maryland |
| MidAtlantic Psychiatric Services | Maryland |
| MDIPA Primary Physician EFF 05/01/06 | Maryland |
| MultiPlan Ins (AAA39,FFF03,04&05, JHP01, PPP28, EEE10, UUU95, MEB01, MHL02, MMM16, NNN01) Effective 01/01/06 | Maryland |
| Optimum Choice (OOO05) EFF 05/01/06 | Maryland |
| The Perferred Health Network | Maryland |
| Prison Health Services - Univ of Mary | Maryland |

9/26/2006

A3102

CONFIDENTIAL                CURTIS_000924

**List of Insurance Contracts**

| Insurance Name                Prov ID/Ins Code | State(s) Plans Operate In |
|---|---|
| Prison Health Services - NOT Univ of | Maryland |
| UBH MidAtlantic | Maryland |
| UHC Medicare Railroad (UUU20) | Maryland |
| United Healthcare MidAtlantic/MAMSI (UUU23, MMM06, MMM07) EFF 05/01/06 | Maryland |
| Wexford Health Sources (WEF01) | Maryland |
| ABH | PA/DE and NJ |
| Aetna - DE | PA/DE and NJ |
| Aetna - NJ | PA/DE and NJ |
| Aetna - PA (hmo/ppo) | PA/DE and NJ |
| Americhoice MCD | PA/DE and NJ |
| Americhoice MCR | PA/DE and NJ |
| Blue Cross Blue Shield Delaware | PA/DE and NJ |
| CCN Managed Care (Non-Par) | PA/DE and NJ |
| Choice Care Network | PA/DE and NJ |
| Cigna | PA/DE and NJ |
| Clear Care Corp. (ppo) | PA/DE and NJ |
| Community Care | PA/DE and NJ |
| Coventry Health Plan | PA/DE and NJ |
| Delaware Care | PA/DE and NJ |
| Devon Health Services (ppo) (65%) | PA/DE and NJ |
| DMAP - Diamond State Partners | PA/DE and NJ |
| Elderheath | PA/DE and NJ |
| ███████████████████ | PA/DE and NJ |
| Evolutions Healthcare (64% of Base) | PA/DE and NJ |
| Fidelity Insurance | PA/DE and NJ |
| First Health Network (Non-Par) | PA/DE and NJ |
| First State Health Plan (Non-Par) | PA/DE and NJ |
| ForMost Inc./BCE Emergis (now Mu | PA/DE and NJ |
| Galaxy Health Network (70%) | PA/DE and NJ |
| Great West Health Plan (78%) | PA/DE and NJ |
| Health Care Payors Coalition of NJ | PA/DE and NJ |
| Health Net (Non-par) | PA/DE and NJ |
| Health Partners | PA/DE and NJ |
| Health Payors Organization (80%) (Midwest Medical Preferred Providers) | PA/DE and NJ |
| Horizon (BC/BS) of NJ | PA/DE and NJ |
| Humana (ppo) | PA/DE and NJ |
| IBC (ppo) | PA/DE and NJ |
| InterGroup Services Corp. (60%) | PA/DE and NJ |
| Jefferson Behavioral Health | PA/DE and NJ |
| Keystone Health Plan East/Amerihea | PA/DE and NJ |
| Keystone Mercy | PA/DE and NJ |
| MAMSI | PA/DE and NJ |
| MasterCare Companies, Inc. | PA/DE and NJ |
| Mid-Atlantic Health Plan/Christiana Care Health Plan Non-Emergency (Bill Standard Rate) Emergency (Pending Agreement) | PA/DE and NJ |
| MultiPlan, Inc. | PA/DE and NJ |
| National Provider Network (80%) | PA/DE and NJ |
| Oxford | PA/DE and NJ |
| ppo Next (60%) | PA/DE and NJ |
| Preferred Care (Non-Par) | PA/DE and NJ |
| Senior Partners | PA/DE and NJ |
| Student Insurance | PA/DE and NJ |
| United | PA/DE and NJ |

9/26/2006

**A3103**

CONFIDENTIAL

CURTIS_000925

## SCHEDULE 8.20(g)
## TO
## LOAN AND SECURITY AGREEMENT

### AGREEMENTS WITH FACILITIES

**TransCare Corporation**
List of Facilities

**Facility Name**
A HOLLY PATTERSON GERIATRIC CT
ADVANCED AIR AMBULANCE
AGRESSIVE SKATERS ASSOCIATION
AIR AMBULANCE AMERICA
AIR AMBULANCE SERVICE
AIR AMBULANCE SPECIALIST
AIR RESPONSE
AIRSTAT
ALBERT EINSTEIN HOSP/CATH LAB
ALBERT EINSTEIN INSTITUTE
ALICE MANOR NURSING HOME
ALLEGHENY VALLEY HOSP
ANDRUS ON HUDSON
ANNAPOLIS NURSING & REHAB
ANNE ARUNDEL MEDICAL CENTER
AVALON GARDENS NURSING HOME
BALDOCK NURSING HOME
BALTIMORE WASH MED CTR 2 MILES
BALTIMORE WASH MED CTR 3 MILES
BALTIMORE WASHINGTON MED CTR
BAYVIEW MEDICAL CENTER
BELLEVUE HOSPITAL
BEST AMERICAN
BETH ABRAHAM HOME HOSPITAL
BETH ISRAEL HOSPITAL
BETH ISRAEL MED CTR/KINGS HWY
BEVERLY HEALTHCARE PHOENIXVILL
BISHOP HEN HUCLES NURSING HOME
BLUE POINT NURSING & REHAB
BON SECOUR HOSPITAL
BON SECOURS HOSPITAL
BOOTH MEMORIAL HOSPITAL
BOXING EVENT
BRANDYWINE HALL
BRANDYWINE HOSPITAL
BRIGHTEN AT BROOMALL
BRIGHTEN AT BRYN MAWR
BROADMEAD NURSING CENTER
BRONX LEBANON HOSP/CONCOURSE
BRONX VA SPINAL CORD CLINIC
BRONX VETERANS HOSPITAL
BROOKDALE HOSPITAL

**A3104**

CONFIDENTIAL

CURTIS_000926

BRUNSWICK HOSPITAL
BRUNSWICK HOSPITAL/MRI
BRYN MAWR HOSPITAL
BRYN MAWR REHAB HOSP
BRYN MAWR TERRACE
CABRINI HOSPICE
CABRINI MEDICAL CENTER
CALVARY HOSPITAL
CALVERY HOSPITAL @ LUTHERAN
CARROL TRANSIT MEDICAID
CARROLL COUNTY HOSPITAL
CASTLE POINT VET ADMIN HOSP
CASTLE POINT VET HOSP
CATSKILL REGIONAL MED CENTER
CENTRAL ISLAND NURSING HOME
CENTRAL MONTGOMERY MED CNTR
CHAPEL HILL CONVALESCENT HOME
CHARLES MORRIS CENTER
CHESTER COUNTY HOSPITAL
CHRISTIANA HOSPITAL
CNR PROSPECT HOSPICE
COL SPECIAL P. FUND CHILD HOSP
COLER MEMORIAL HOSP NH
COLUMBIA PRESBYTERIAN HOSPITAL
COMMUNITY HOSPITAL
COMPASSION CARE HOSPICE
COMPASSIONATE CARE HOSPICE
CONTINUUM HOSPICE
CREST HALL NURSING HOME
DELAWARE COUNTY MEMORIAL HOSP
DELAWARE PSYCHIATRIC CENTER
DEVEREUX MAPLETON CENTER
DOWNSTATE MEDICAL CENTER
DOYLESTOWN HOSPITAL
DUMONT MASONIC HOME
DUNWOODY NURSING HOME
EAST COAST AMBULANCE
ELLENVILLE VOLUNTEER AMB CORP
ELMHURST HOSPITAL CENTER
EYE YORK EYE & EAR HOSPITAL
FAMILY HOSPICE & PALLIATIVE CR
FLUSHING HOSPITAL
FORBES REGIONAL
FRANKFORD BUCKS
FRANKFORD FRANKFORD
FRANKFORD HOSPITAL BUCKS
FRANKFORD HOSPITAL MRI
FRANKFORD TORESDALE HOSP
FRANKLIN GENERAL HOSPITAL
FRANKLIN HOSP ADULT DAY CARE

**A3105**

CONFIDENTIAL  CURTIS_000927

FRANKLIN SQUARE HOSPITAL
FREDERICK VILLA NURSING HOME
FUTURE CARE LOCHEARN
FUTURECARE
FUTURECARE IRVINGTON
GARDEN CARE CENTER
GATEWAY HEALTH HOSPICE
GBMC HOSPITAL
GENESIS
GENESIS MULTI MEDICAL
GIRARD MEDICAL CENTER
GLENN ISLAND CARE CENTER
GOLDWATER HOSPITAL
GOOD SAMARITAN HOSPITAL
GRACIE SQUARE HOSPITAL
GRADUATE HOSPITAL
GREATER S.E. COMMUNITY HOSP
GREENARY HEALTH CENTER
HADLEY MEMORIAL HOSP
HARBOR HOSPITAL CENTER
HARRISON HOUSE OF CHRISTIANA
HARTLAND HOSPICE STOCKTON BLDG
HAVERFORD ESTATES
HEALTH PARTNERS OF NEW YORK
HEALTHSOUTH HARMARVILLE REHAB
HEARTLAND HOSPICE
HEBREW HOSPITAL HOME OF WESTCH
HEMPSTEAD PARK NURSING HOME
HERITAGE HARBOR NURSING HOME
HERITAGE SHADYSIDE
HICKORY HOUSE NURSING HOME
HOCKESSIN HILLS
HOLLISWOOD HOSPITAL
HOME CARE HOSPICE
HOSPICE CARE OF LONG ISLAND
HOSPICE INN
HOSPICE OF BALTIMORE
HOSPICE OF DUTCHESS COUNTY
HOSPICE OF NEW YORK
HOSPICE OF THE CHESAPEAKE
HOSPICE OF WESTCHESTER
HOSPITAL FOR JOINT DISEASES
HOSPITAL FOR SICK CHILDREN
HOSPITAL FOR SPECIAL SURGERY
HOSPS OF ORANGE & SULLIVAN CTY
HOWARD COUNTY GENERAL HOSPITAL
HUNTINGTON HOSPITAL
HURLEYVILLE EMERG.RELIEF SQUAD
INTENSIVE AIR AMBULANCE
JACOBI HOSPITAL BX MUNICIPAL

**A3106**

CONFIDENTIAL

CURTIS_000928

JAMAICA HOSPITAL
JENNERSVILLE REGIONAL HOSP
JEWISH CONVALESCENT CENTER
JEWISH HOME AND HOSPITAL
JOHN HOPKINS HOSPITAL
KAHUNAVILLE  ATT: SUSIE CASEY
KENNEDY MEDICAL JFK AIRPORT
KERNAN HOSPITAL
KINGS COUNTY G BUILDING
KINGSBROOK JEWISH LAB SERVICE
KINGSBROOK JEWISH MEDICAL CTR
LANKENAU HOSP ER
LANKENAU HOSPITAL
LAUREL REGIONAL HOSPITAL
LEVINDALE HEBREW HOSPITAL
LEVINDALE NURSING CENTER
LIBERTY NURSING AND REHAB
LIBERTY VOLUNTEER AMBULANCE CO
LIC/PHU SHUTTLE
LIFE CARE OF PITTSBURGH
LIFE LINE AIR AMBULANCE
LIFELINE AIR AMBULANCE
LIFENET
LINCOLN HOSPITAL CENTER
LOGISTICARE
LONG BEACH MEDICAL CENTER
LONG ISLAND CARE CENTER
LONG ISLAND COLLEGE HOSP/PSYC
LONG ISLAND COLLEGE HOSPITAL
LONG ISLAND COLLEGE/SOCIAL WRK
LONG ISLAND JEWISH HOSPITAL
LORIEN FRANKFORD NURSING HOME
LUTHERAN AUGUSTANA CENTER
LUTHERAN MEDICAL CENTER
MADISON SQUARE GARDEN
MAGEE WOMENS HOSPITAL
MAIMONIDES MEDICAL CENTER
MAINLINE NURSING & REHAB
MAMAKATING FIRST AID SQUAD
MANOR CARE AT PIKE CREEK
MANOR CARE KING OF PRUSSIA
MANOR CARE LANSDALE
MANOR CARE OF DEVON
MANOR CARE POTTSTOWN
MANOR CARE ROLAND PARK
MANOR CARE RUXTON
MANOR CARE YARDLEY
MANOR CARE YARDLEY
MARINER CATONSVILLE
MARINER NORTH ARUNDEL

**A3107**

CONFIDENTIAL

CURTIS_000929

MARY IMMACULATE HOSPITAL
MARYLAND BAPTIST AGED NH
MARYLAND EXPRESSCARE
MARYLAND GENERAL HOSPITAL
MCKEESPORT GERI PROGRAM
MCKEESPORT HOSPITAL
MCMURRAY HILLS MANOR
MEADOWS AT SHANNONDELL
MED LINK HOSP
MEMORIAL SLOAN KETTERING
MERCY HOSPITAL
MERCY HOSPITAL CENTER
MERCY SUBURBAN HOSPITAL
METRO HOSPICE @ GREATER NY
MICHAELS EIGHTH AVENUE
MID ATLANTIC HOSPICE
MILLENNIUM CNTR AT MARLEY NECK
MONSIGNOR FITZPATRICK NH
MONTEFIORE HOSPITAL
MONTEFIORE HOSPITAL
MONTGOMERY HOSPITAL
MOUNT SINAI HOSPITAL
MOUNT SINAI HOSPITAL QUEENS
MT SINAI HOSPITAL
MT VERNON HOSPITAL
MT WASHINGTON PEDIATRIC HOSP
N.Y. UNIVERSITY HOSP
NATIONAL HEALTH INSTITUTE
NEW ISLAND HOSPITAL
NEW YORK CENTER FOR REHAB
NEW YORK DOWNTOWN HOSPITAL
NEW YORK HOSPITAL
NEW YORK PRESBYTERIAN WESTCHST
NEW YORK STATE VETERANS HOME
NEW YORK UNIVERSITY HOSP
NEW YORK UNIVERSITY HOSPITAL
NORTH ARUNDEL
NORTH CENTRAL BRONX HOSPITAL
NORTH GENERAL HOSPITAL
NORTHSHORE UNIVERSITY HOSPITAL
NORTHWEST HEALTH REHAB CENTER
NORTHWEST HOSPITAL CENTER
NORTHWEST HOSPITAL TRUST
NY HYPERBARIC & WOUND CARE
NYS VETS HOME AT MONTROSE
OAK HOLLOW NURSING HOME BLDG 2
OUR LADY OF MERCY HOSPITAL
PAOLI ER DEPT
PAOLI MEMORIAL HOSPITAL
PARK AVENUE EXTENDED CENTER

**A3108**

CONFIDENTIAL

CURTIS_000930

PARK AVENUE EXTENDED DAY CARE
PARKLANE AT BELLINGHAM
PARKWAY HOSPITAL
PENINSULA HOSPITAL CENTER
PENN HOME CARE HOSPICE
PHELPS MEMORIAL HOSPITAL
PHOENIXVILLE HOSPITAL
PORT JEFFERSON HEALTH CARE
PORT JERVIS VOLUNTEER AMB CORP
POTTSTOWN MEM MED CTR
PRESBYTERIAN HOSPITAL
PROVIDENCE HOSPITAL
QUEENS HOSPITAL CENTER
RAVENWOOD NURSING HOME
REGINA NURSING HOME
RESORT BEACH NURSING
RIVERSIDE NURSING CENTER
ROCK GLEN NURSING HOME
ROCKFORD CENTER
ROOSEVELT HOSPITAL
ROSCOE &ROCKLAND VOLUNTEER AMB
ROSEMONT MANOR
RUTH TAYLOR CARE CENTER
SAN SIMEON BY THE SOUND NH
SARAH R NEWMAN NURSING HOME
SAUNDERS HOUSE
SHADYSIDE HOSPITAL
SHADYSIDE NURSING AND REHAB
SILVERLAKE CENTER PA
SINAI HOSPITAL
SKYVUE TERRACE
SMITHTOWN CTR FOR REHAB & NH
SOMMERTON CENTER
SOUTH HAMPTON HOSPITAL
SOUTH OAKS HOSPITAL
SOUTHRIVER HEALTH REHAB CENTER
SOUTHSIDE HOSPITAL
SPILT ROCK NURSING HOME
SPORTS AND ENTERTAINMENT
SPRAIN BROOK MANOR NURSING HOM
ST AGNES NURSING
ST ALBANS VETERAN HOSPITAL
ST BARNABAS HOSPITAL
ST CLARE'S HOSPITAL
ST FRANCIS HOSPITAL
ST JOHNS FAMILY CLINIC
ST JOHNS HOSPITAL
ST LUKES HOSPITAL
ST MARGARETS HOSPITAL
ST MARTHA'S MANOR

**A3109**

CONFIDENTIAL

CURTIS_000931

ST MARYS CHILDREN HOSPITAL
ST PATRICKS NURSING HOME
ST THOMAS MONESTARY
ST VINCENT/WESTCHESTER
ST VINCENTS CANCER CENTER
ST VINCENTS HOSP/INPATIENT
ST VINCENTS HOSP/SOCIAL WORK
ST VINCENTS HOSPITAL
ST VINCENTS HOSPITAL (ER)
ST VINCENTS HOSPITAL/CATH LAB
STANDBY
STAT AIR AMBULANCE WCMC
STELLA MARIS FACILITIES
STONEY LODGE HOSPITAL
SYOSSET COMM HOSP  NSU
TERENCE CARDINAL COOKE NURSING
THI FRANKLIN SQUARE AND REHAB
THOMAS JEFFERSON UNIV HOSP
THROGGS NECK EXTENDED CARE CTR
TOWSON UNIVERSITY
TRANSPLANT RESOURCE CTR OF MD
UNITED HEBREW NURSING HOME
UNIVERSITY BEHAVIORAL ASSOC
UNIVERSITY HOSP OF PA
UNIVERSITY HOSPICE
UNIVERSITY SPECIALTY HOSPITAL
URSULINE SENIOR SERVICES
VALLEY FORGE MIDDLE SCHOOL
VANDERBILT UNIVERSITY HOSP
VETERANS HOSPITAL
VICTORY HOSPITAL
VILLAGE NURSING HOME
VISITING NURSE SERVICE
VITAS HOSPICE
WASHINGTON ADVENTIST HOSP
WAYNE NURSING & REHAB CENTER
WESLEY HOME INC
WEST CHESTER REHAB HOSPITAL
WEST PENN HOSPITAL
WESTCHESTER MEDICAL CENTER
WESTCHESTER SQUARE MEDICAL CTR
WESTFALL VAC
WESTMINSTER NURSING HOME
WHITEPLAINS HOSPITAL
WOODBOURNE VAC
WOODHULL HOSPITAL
WYKOFF HEIGHTS HOSPITAL
YELLOW TRANSPORTATION

**A3110**

CONFIDENTIAL

CURTIS_000932

SCHEDULE 9.18
TO
<u>LOAN AND SECURITY AGREEMENT</u>

<u>Fixed Charge Coverage Ratio</u>

(a) Parent and its Subsidiaries shall not, as to any fiscal month commencing October 1, 2006, permit the Fixed Charge Coverage Ratio of Parent and its Subsidiaries commencing October 1, 2006 and ending on the last day of the applicable fiscal month end of the measurement period set forth below, to be less than the ratio set forth below next to the end of such measurement period:

| Measurement Period | Fixed Charge Coverage Ratio |
|---|---|
| October 1, 2006 through October 31, 2006 | .60:1.0 |
| October 1, 2006 through November 30, 2006 | .7:1.0 |
| October 1, 2006 through December 31, 2006 | .75:1.0 |
| October 1, 2006 through January 31, 2007 | .80:1.0 |
| October 1, 2006 through February 28, 2007 | .80:1.0 |
| October 1, 2006 through March 31, 2007 | .85:1.0 |
| October 1, 2006 through April 30, 2007 | 1.0:1.0 |
| October 1, 2006 through May 31, 2007 | 1.0:1.0 |
| October 1, 2006 through June 30, 2007 | 1.0:1.0 |
| October 1, 2006 through July, 31, 2007 | 1.0:1.0 |
| October 1, 2006 through August 31, 2007 | 1.0:1.0 |
| October 1, 2006 through September 30, 2007 | 1.0:1.0 |

(b) Parent and its Subsidiaries shall not, as to any fiscal month commencing on October 1, 2007 and at all times thereafter calculated as of the end of each fiscal month on a cumulative twelve (12) month basis commencing on October 1, 2007 and for each month thereafter calculated based on the immediately preceding twelve (12) months, permit the Fixed Charge Coverage Ratio of Parent and its Subsidiaries to be less than 1.0:1.0.

707761.15

i

**A3111**

CONFIDENTIAL

CURTIS_000933

(c)  Administrative Borrower shall deliver to Lender each month as set forth in the compliance certificate for such period in accordance with Section 9.6(a) of the Loan Agreement. If any of the financial or other information used to calculate the Fixed Charge Coverage Ratio for any applicable measurement period is or may be incorrect such that the amount of the Fixed Charge Coverage Ratio calculated at any prior measurement period in clauses (a) or (b) of this Schedule 9.18 shall have been incorrect, Borrowers and Guarantors shall promptly inform Lender of such event.  If the corrected information would result in a Fixed Charge Coverage Ratio that breaches the minimum amounts required to be maintained for any such applicable measurement periods, such breach shall, at Lender's option, constitute an Event of Default. Lender specifically reserves all of its rights and remedies under this Agreement and the other Financing Agreements with respect to the delivery by Borrowers and Guarantors of such incorrect information and the calculation of the Fixed Charge Coverage Ratio for any such applicable measurement period.

707761.15

ii

CONFIDENTIAL

CURTIS_000934