# 20 Civ. 06274 (LAK)

## United States District Court

### *for the*

### Southern District of New York

_____

*IN RE TRANSCARE CORPORATION*, ET AL.

DEBTORS,

_____

PATRIARCH PARTNERS AGENCY SERVICES, LLC, ET AL.

DEFENDANTS-APPELLANTS,

—against—

SALVATORE LAMONICA, AS CHAPTER 7 TRUSTEE OF THE JOINTLY-ADMINISTERED ESTATES OF TRANSCARE CORPORATION, ET AL.,

PLAINTIFF-APPELLEE.

_____

ON APPEAL FROM THE UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK (BERNSTEIN, J.)

IN RE: TRANSCARE CORPORATION, ET AL., CASE NO. 16-10407 (SMB)

LAMONICA V. TILTON, ET AL., ADV. PROC. NO. 18-1021 (SMB)

## APPENDIX TO BRIEF FOR THE APPELLANTS

# Volume XIII- A3113-A3150

[Execution Version]

## INTERCREDITOR AGREEMENT

THIS INTERCREDITOR AGREEMENT ("Intercreditor Agreement"), dated as of October 13, 2006, is by and among Wachovia Bank, National Association ("Revolving Loan Lender" as hereinafter further defined) pursuant to the Revolving Loan Agreement (as hereinafter defined) and Patriarch Partners Agency Services, LLC, serving in its capacity as agent pursuant to the Term Loan Agreement (as hereinafter defined) acting for and on behalf of the financial institutions which are parties thereto as lenders (in such capacity, "Term Loan Agent" as hereinafter further defined) and the financial institutions which are parties to the Term Loan Agreement as lenders ("Term Loan Lenders" as hereinafter further defined).

## W I T N E S S E T H:

WHEREAS, Term Loan Agent and the Term Loan Lenders have made certain term loans, revolving loans and other advances and financial accommodations to TransCare Corporation, a Delaware corporation ("TransCare") secured by certain assets and properties of TransCare;

WHEREAS, the obligations of TransCare to Term Loan Agent and Term Loan Lenders are guaranteed by TransCare New York, Inc., a Delaware corporation ("TransCare NY"), TransCare Pennsylvania, Inc., a Delaware corporation ("TransCare PA"), TransCare Maryland, Inc., a Delaware corporation ("TransCare MD"), TransCare ML, Inc., a Delaware corporation ("TCML"), TC Hudson Valley Ambulance Corp., a Delaware corporation ("TC Hudson Valley"), TC Billing and Services Corp., a Delaware corporation ("TC Billing"), TC Ambulance Corporation, a Delaware corporation ("TC Corp"), TransCare Management Services, Inc., a Delaware corporation ("TC Management"), TCBA Ambulance, Inc., a Delaware corporation ("TCBA"), TransCare Westchester, Inc., a Delaware corporation ("TransCare Westchester"), TransCare Harford County, Inc., a Delaware corporation ("TransCare Harford"), TC Ambulance Group, Inc., a Delaware corporation ("TC Group"), and TC Ambulance North, Inc., a Delaware corporation ("TC North") and secured by certain of their assets and properties;

WHEREAS, Revolving Loan Lender has made or is about to make loans and advances and to provide other financial accommodations to TransCare, TransCare NY, TransCare PA, TransCare MD, TCML, TC Hudson Valley, TC Billing, TC Corp, TC Management, TCBA, TransCare Westchester and TransCare Harford secured by certain of their assets and properties;

WHEREAS, the obligations of TransCare, TransCare NY, TransCare PA, TransCare MD, TCML, TC Hudson Valley, TC Billing, TC Corp, TC Management, TCBA, TransCare Westchester and TransCare Harford to Revolving Loan Lender are or are about to be guaranteed by TC Group and TC North and secured by certain of their assets and properties;

WHEREAS, Revolving Loan Lender, Term Loan Agent and Term Loan Lenders desire to enter into this Intercreditor Agreement to confirm the relative priority of the security interests of Revolving Loan Lender and the Term Loan Agent in the assets and properties of TransCare,

724750.8

JX 003

LaMonica v. Tilton, et al., 18-1021-smb

CONFIDENTIAL

CURTIS_000001

TransCare NY, TransCare PA, TransCare MD, TCML, TC Hudson Valley, TC Billing, TC Corp, TC Management, TCBA, TransCare Westchester, TransCare Harford, TC Group and TC North (each individually, a "Debtor" and collectively, "Debtors" as hereinafter further defined), and (ii) provide for the orderly sharing among them, in accordance with such priorities, of proceeds of such assets and properties upon any foreclosure thereon or other disposition thereof;

NOW THEREFORE, in consideration of the mutual benefits accruing to Revolving Loan Lender, Term Loan Agent and Term Loan Lenders hereunder and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto do hereby agree as follows:

1.   DEFINITIONS

As used above and in this Intercreditor Agreement, the following terms shall have the meanings ascribed to them below:

1.1     "Agreements" shall mean, collectively, the Revolving Loan Agreements and the Term Loan Agreements.

1.2     "Business Day " shall have the meaning given in the Revolving Loan Agreement.

1.3     "Collateral" shall mean, collectively, the Revolving Loan Priority Collateral and the Term Loan Priority Collateral.

1.4     "Computer Equipment" shall mean, as to each Debtor, all of such Debtor's now owned and hereafter acquired computer and related equipment, wherever located (whether owned or licensed and including embedded software) related to the billing and collection of Receivables of any Debtor or the processing of any claims related to any Receivables of any Debtor, together with all attachments, accessions and property now or hereafter affixed thereto or used in connection therewith, and substitutions and replacements thereof.

1.5     "Creditors" shall mean, collectively, Revolving Loan Lender and Term Loan Creditors and their respective successors and assigns; each sometimes being referred to herein individually as a "Creditor".

1.6     "Debtors" shall mean, collectively, TransCare Corporation, a Delaware corporation, TransCare New York, Inc., a Delaware corporation, TransCare Pennsylvania, Inc., a Delaware corporation, TransCare Maryland, Inc., a Delaware corporation, TransCare ML, Inc., a Delaware corporation, TC Hudson Valley Ambulance Corp., a Delaware corporation, TC Billing and Services Corp., a Delaware corporation, TC Ambulance Corporation, a Delaware corporation, TransCare Management Services, Inc., a Delaware corporation, TCBA Ambulance, Inc., a Delaware corporation, TransCare Westchester, Inc., a Delaware corporation, TransCare Harford County, Inc., a Delaware corporation, TC Ambulance Group, Inc., a Delaware corporation, and TC Ambulance North, Inc., a Delaware corporation, together with their successors and assigns and including, without limitation, a receiver, trustee or debtor-in-possession on behalf of such person or on behalf of any such successor or assign; each sometimes being referred to herein individually as a "Debtor".

CONFIDENTIAL                                                                    CURTIS_000002

1.7    "Default" shall have the meaning given in the Revolving Loan Agreement.

1.8    "Event of Default" shall have the meaning given in the Revolving Loan Agreement.

1.9    "Insolvency Proceeding" shall mean, as to any Debtor, any of the following, occurring after the date hereof: (a) any case or proceeding with respect to such Debtor under the United States Bankruptcy Code, any other Federal, State or provincial bankruptcy, insolvency, reorganization or other law affecting creditors' rights generally or any other or similar proceedings of any other jurisdiction or otherwise seeking any stay, reorganization, arrangement, liquidation, dissolution, composition or readjustment of the obligations and indebtedness of such Debtor or (b) any proceeding seeking the appointment of any receiver, administrative receiver, receiver and manager, examiner, judicial custodian, trustee, liquidator, official manager, administrator or similar official for any Debtor or any material part of its properties or (c) any proceedings for liquidation, dissolution or other winding up of the business of such Debtor or (d) sale of all or substantially all of the assets or capital stock of such Debtor or (e) any assignment for the benefit of creditors or any marshaling of assets of such Debtor.

1.10   "Intellectual Property" shall mean, as to each Debtor, such Debtor's now owned and hereafter arising or acquired: patents, patent rights, patent applications, copyrights, works which are the subject matter of copyrights, copyright applications, copyright registrations, trademarks, servicemarks, trade names, trade styles, trademark and service mark applications, and licenses and rights to use any of the foregoing and all applications, registrations and recordings relating to any of the foregoing as may be filed in the United States Copyright Office, the United States Patent and Trademark Office or in any similar office or agency of the United States, any State thereof, any political subdivision thereof or in any other country or jurisdiction, together with all rights and privileges arising under applicable law with respect to any Debtor's use of any of the foregoing; all extensions, renewals, reissues, divisions, continuations, and continuations-in-part of any of the foregoing; all rights to sue for past, present and future infringement of any of the foregoing; inventions, trade secrets, formulae, processes, compounds, drawings, designs, blueprints, surveys, reports, manuals, and operating standards; goodwill (including any goodwill associated with any trademark or servicemark, or the license of any trademark or servicemark); customer and other lists in whatever form maintained; trade secret rights, copyright rights, rights in works of authorship, domain names and domain name registration; software and contract rights relating to computer software programs, in whatever form created or maintained.

1.11   "Lenders" shall mean, collectively, Revolving Loan Lender and Term Loan Lenders and their respective successors and assigns; sometimes being referred to herein individually as a "Lender".

1.12   "Lien" shall mean any mortgage, deed of trust, pledge, hypothecation, assignment, deposit arrangement, security interest, encumbrance (including, but not limited to, easements, rights of way and the like), lien (statutory or other), security agreement or transfer intended as security, including, without limitation, any conditional sale or other title retention agreement, the interest of a lessor under a capital lease or any financing lease having substantially the same economic effect as any of the foregoing.

724750.8

- 3 -

**A3115**

CONFIDENTIAL

CURTIS_000003

1.13    "Lien Enforcement Action" shall mean (a) any action by any Creditor to foreclose on the Lien of such Person in all or a material portion of the Collateral, (b) any action by any Creditor to take possession of, sell or otherwise realize (judicially or non judicially) upon all or any material portion of the Collateral (including, without limitation, by setoff or notification of account debtors), or (c) the commencement by any Lender of any legal proceedings against or with respect to all or any material portion of the Collateral to facilitate the actions described in (a) and (b) above.

1.14    "Person" or "person" shall mean any individual, sole proprietorship, partnership, corporation (including, without imitation, any corporation which elects subchapter S status under the Internal Revenue Code of 1986, as amended), limited liability company, limited liability partnership, business trust, unincorporated association, joint stock company, trust, joint venture, or other entity or any government or any agency or instrumentality or political subdivision thereof.

1.15    "Payment in Full" or "payment in full" shall mean (a) as applied to the Revolving Loan Debt, that (i) Revolving Loan Lender has received payment and satisfaction in full of all of the Revolving Loan Debt in cash or other immediately available funds and (ii) the Revolving Loan Agreements have been terminated or are otherwise not in effect; provided, that, if after receipt of any payment of, or proceeds of collateral applied to the payment of, any of the Revolving Loan Debt, Revolving Loan Lender is required to surrender or return such payment or proceeds to any Person for any reason, then the Revolving Loan Debt intended to be satisfied by such payment or proceeds shall be reinstated and continue as if such payment or proceeds had not been received by Revolving Loan Lender and Revolving Loan Lender shall not be deemed to have received "payment in full" of the Revolving Loan Debt and (b) as applied to the Term Loan Debt, that (i) Term Loan Agent and Term Loan Lenders have received payment and satisfaction in full of all of the Term Loan Debt in cash or other immediately available funds and (ii) the Term Loan Agreements have been terminated or are otherwise not in effect; provided, that, if after receipt of any payment of, or proceeds of collateral applied to the payment of, any of the Term Loan Debt, any Term Loan Creditor is required to surrender or return such payment or proceeds to any Person for any reason, then the Term Loan Debt intended to be satisfied by such payment or proceeds shall be reinstated and continue as if such payment or proceeds had not been received by such Term Loan Creditor and such Term Loan Creditor shall not be deemed to have received "payment in full" of the Term Loan Debt.

1.16    "Purchase Date" shall have the meaning given in Section 3.2 hereof.

1.17    "Purchase Notice" shall have the meaning given in Section 3.1 hereof.

1.18    "Purchase Option" shall have the meaning given in Section 3.1 hereof.

1.19    "Purchasers" shall mean those Persons identified by Term Loan Agent to be the purchasers of the Revolving Loan Debt upon the exercise by Term Loan Agent of the Purchase Option, which may include any Term Loan Lender that, in its sole discretion, consents to so purchase the Revolving Loan Debt as provided by the terms and conditions of this Agreement.

724750.8

-4-

**A3116**

CONFIDENTIAL                                                    CURTIS_000004

1.20    "Purchase Price" shall mean the payment in full of all Revolving Loan Debt outstanding on the Purchase Date, including, without limitation, all principal, interest, fees and expenses (including reasonable attorneys' fees and legal expenses); provided, that,

(a)    the Purchase Price shall exclude the amount of the early termination fee payable pursuant to Section 12.1(c) of the Revolving Loan Agreement if (and only if):

(i)    within twenty (20) days prior to the receipt by Revolving Loan Lender of the Purchase Notice, Revolving Loan Lender shall have terminated the commitment to make Revolving Loans pursuant to the Revolving Loan Agreements and such termination shall not have been rescinded by Revolving Loan Lender on or before the Purchase Date; or

(ii)    Revolving Loan Lender shall have commenced any Lien Enforcement Action which has not been rescinded or revoked on or before the Purchase Date; and

(b)    the Purchase Price shall exclude the amount equal to fifty (50%) of the early termination fee payable pursuant to Section 12.1(c) of the Revolving Loan Agreement if (and only if):

(i)    within twenty (20) days prior to the receipt by Revolving Loan Lender of the Purchase Notice, Revolving Loan Lender shall have implemented additional Reserves such that as a result of such additional Reserves, the aggregate amount of Excess Availability shall have fallen below the lesser of (A) five (5.0%) percent of the aggregate amount of the Borrowing Base, determined as of the date of such additional Reserve, or (B) $250,000, but only so long as such additional Reserves shall not have been eliminated by Revolving Loan Lender on or before the Purchase Date;

(ii)    within twenty (20) days prior to the receipt by Revolving Loan Lender of the Purchase Notice, Revolving Loan Lender shall have decreased the advance rates set forth in the Section 2.1 of the Revolving Loan Agreement such that as a result of such decrease, the aggregate amount of Excess Availability shall have fallen below the lesser of (A) five (5%) percent of the aggregate amount of the Borrowing Base, determined as of the date of such decrease, or (B) $250,000, but only so long as such decrease shall not have been rescinded or revoked by Revolving Loan Lender on or before the Purchase Date; provided, that, any changes by Revolving Loan Lender to the advance rates with respect to the amount of eligible accounts to reflect a proportional increase in the amount of dilution of accounts shall not constitute a decrease in the advance rates for purposes of this clause (ii);

(iii)    within twenty (20) days prior to the receipt by Revolving Loan Lender of the Purchase Notice, Revolving Loan Lender shall have changed or established new criteria for eligible accounts such that as a result of such change or establishment, the aggregate amount of Excess Availability shall have fallen below the lesser of (A) five (5%) percent of the aggregate amount of the Borrowing Base, determined as of the date of such change or establishment, or (B) $250,000, but only so long as such change or establishment shall not have been rescinded or revoked by Revolving Loan Lender on or before the Purchase Date; or

CONFIDENTIAL                                    CURTIS_000005

(iv)     Wachovia Bank, National Association or one of its subsidiaries shall no longer be a Revolving Loan Lender.

1.21     "Purchased Obligations" shall have the meaning given in Section 3.1 hereof.

1.22     "Receivable" shall have the meaning given in the Revolving Loan Agreement.

1.23     "Reserves" shall have the meaning given to such term in the Revolving Loan Agreement.

1.24     "Revolving Loan Agreement" shall mean the Loan and Security Agreement, dated as of the date hereof, among Revolving Loan Lender and Debtors, as the same now exists or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced.

1.25     "Revolving Loan Agreements" shall mean, collectively, the Revolving Loan Agreement and all agreements, documents and instruments at any time executed or delivered by any Debtor or any other person with, to or in favor of Revolving Loan Lender in connection therewith or related thereto, as all of the foregoing now exist or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced.

1.26     "Revolving Loan Priority Collateral" shall mean all assets and properties of any Debtor, other than the Term Loan Priority Collateral.

1.27     "Revolving Loan Debt" shall mean any and all obligations, liabilities and indebtedness of every kind, nature and description owing by any Debtor to Revolving Loan Lender, including principal, interest, charges, fees, premiums, indemnities and expenses, however evidenced, whether as principal, surety, endorser, guarantor or otherwise, arising under the Revolving Loan Agreements, whether now existing or hereafter arising, whether arising before, during or after the initial or any renewal term of the Revolving Loan Agreements or after the commencement of any Insolvency Proceeding (and including, without limitation, any principal, interest, fees, costs, expenses and other amounts, which would accrue and become due but for the commencement of such Insolvency Proceeding, whether or not such amounts are allowable in whole or in part in any such case or proceeding), whether direct or indirect, absolute or contingent, joint or several, due or not due, primary or secondary, liquidated or unliquidated, secured or unsecured, and whether arising directly or howsoever acquired by Revolving Loan Lender.

1.28     "Revolving Loan Lender" shall mean Wachovia Bank, National Association, a national banking association, and its successors and assigns (including any other lender or group of lenders that at any time succeeds to or refinances, replaces or substitutes for all or any portion of the Revolving Loan Debt at any time and from time to time).

1.29     "Term Loan Agent" shall mean Patriarch Partners Agency Services, LLC, a Delaware limited liability company, in its capacity as agent pursuant to the Term Loan Agreement acting for the benefit and on behalf of Term Loan Lenders, and its successors and assigns (and including, without limitation, any successor, assignee or additional person at any time acting as agent for the benefit of or on behalf of it or Term Loan Lenders).

724750.8

- 6 -

**A3118**

CONFIDENTIAL

CURTIS_000006

1.30   "Term Loan Agreement" shall mean the Credit Agreement, dated as of August 4, 2003, by and among TransCare, Term Loan Agent and the Term Loan Lenders, as amended by First Amendment to Credit Agreement, dated as of March 8, 2004, the letter agreement, dated December 7, 2004, the letter agreement, dated April 7, 2005, the letter agreement, dated August 1, 2005, Second Amendment to Credit Agreement, dated as of October 27, 2005, Waiver and Third Amendment to Credit Agreement, dated as of March 14, 2006, Fourth Amendment to Credit Agreement dated as of May 8, 2006, Fifth Amendment to Credit Agreement, dated as of July 31, 2006, Sixth Amendment to Credit Agreement, dated as of September 22, 2006, and Seventh Amendment to Credit Agreement dated as of the date hereof, as the same now exists or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced.

1.31   "Term Loan Agreements" shall mean, collectively, the Term Loan Agreement and all agreements, documents and instruments at any time executed or delivered by any Debtor or any other person with, to or in favor of Term Loan Agent or any Term Loan Lender in connection therewith or related thereto, as all of the foregoing now exist or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced.

1.32   "Term Loan Creditors" shall mean, collectively, Term Loan Agent and Term Loan Lenders and their respective successors and assigns (and including any other lender or group of lenders that at any time (a) refinances or succeeds to all or any portion of the Term Loan Debt or (b) is otherwise party to the Term Loan Documents); each sometimes being referred to herein individually as "Term Loan Creditor".

1.33   "Term Loan Debt" shall mean all obligations, liabilities and indebtedness of every kind, nature and description owing by any Debtor to Term Loan Agent or any of the Term Loan Lenders, including principal, interest, charges, fees, premiums, indemnities and expenses, however evidenced, whether as principal, surety, endorser, guarantor or otherwise, arising under the Term Loan Agreements, whether now existing or hereafter arising, whether arising before, during or after the initial or any renewal term of the Term Loan Agreements or after any Insolvency Proceeding (and including, without limitation, any principal, interest, fees, costs, expenses and other amounts, which would accrue and become due but for the commencement of such Insolvency Proceeding, whether or not such amounts are allowable in whole or in part, in any such case or proceeding), whether direct or indirect, absolute or contingent, joint or several, due or not due, primary or secondary, liquidated or unliquidated, secured or unsecured, and whether arising directly or howsoever acquired by Term Loan Agent or any Term Loan Lender.

1.34   "Term Loan Lenders" shall mean, collectively, the lenders that may become parties to the Term Loan Agreement and their respective successors and assigns (including any other lender or group of lenders that at any time succeeds to or refinances, replaces or substitutes for all or any portion of the Term Loan Debt at any time and from time to time); sometimes being referred to herein individually as a "Term Loan Lender".

1.35   "Term Loan Priority Collateral" shall mean the assets and properties of any Debtor set forth on Exhibit A hereto.

1.36   "Triggering Condition" shall have the meaning given in Section 3.1 hereof.

724750.8

- 7 -

**A3119**

CONFIDENTIAL

CURTIS_000007

1.37    All terms defined in the Uniform Commercial Code as in effect in the State of New York, unless otherwise defined herein shall have the meanings set forth therein.  All references to any term in the plural shall include the singular and all references to any term in the singular shall include the plural. All references to the term "including" shall be deemed to mean "including, without limitation".

2.    SECURITY INTERESTS; PRIORITIES; REMEDIES

2.1    Acknowledgment of Liens. Revolving Loan Lender hereby acknowledges that Term Loan Agent acting for and on behalf of itself and Term Loan Lenders has been granted Liens upon all of the Collateral pursuant to the Term Loan Agreements to secure the Term Loan Debt. Term Loan Agent, on behalf of itself and each Term Loan Lender, hereby acknowledges that Revolving Loan Lender has been granted Liens upon all of the Collateral pursuant to the Revolving Loan Agreements to secure the Revolving Loan Debt.

2.2    Priority of Liens. Notwithstanding the order or time of attachment, or the order, time or manner of perfection, or the order or time of filing or recordation of any document or instrument, or other method of perfecting a security interest in favor of each Creditor in any Collateral, and notwithstanding any conflicting terms or conditions which may be contained in any of the Agreements, (a) the Liens upon the Revolving Loan Priority Collateral of Revolving Loan Lender have and shall have priority over the Liens upon the Revolving Loan Priority Collateral of Term Loan Agent and Term Loan Lenders and such Liens of Term Loan Agent and Term Loan Lenders in the Revolving Loan Priority Collateral are and shall be, in all respects, subject and subordinate to the Liens of Revolving Loan Lender in the Revolving Loan Priority Collateral, and (b) the Liens upon the Term Loan Priority Collateral of Term Loan Agent have and shall have priority over the Liens upon the Term Loan Priority Collateral of Revolving Loan Lender and such Liens of Revolving Loan Lender in the Term Loan Priority Collateral are and shall be, in all respects, subject and subordinate to the Liens of Term Loan Agent in the Term Loan Priority Collateral.

2.3    Payments. Except for the payments in accordance with the terms and conditions of Section 2.4 hereof, the proceeds of any Collateral shall be applied immediately after the calculation thereof as follows:

(a)    The proceeds of any sale, disposition or other realization upon all or any part of the Revolving Loan Collateral shall be applied immediately after the calculation thereof in the following order of priorities:

(i)    first, to the payment in full in immediately available funds of the expenses of the collection and enforcement of the Revolving Loan Debt and such sale, disposition or other realization, including all expenses, liabilities and advances incurred or made by Revolving Loan Lender, or any amounts paid to or on behalf of Revolving Loan Lender in connection therewith;

(ii)    second, to the payment in full in immediately available funds of all of the Revolving Loan Debt to the extent of the Revolving Loan Debt in whatever manner and order Revolving Loan Lender chooses in accordance with the provisions of the Revolving Loan

724750.8

- 8 -

**A3120**

CONFIDENTIAL

CURTIS_000008

Agreements and applicable law (and including to hold as cash collateral for any Revolving Loan Debt which is contingent to the extent provided in and pursuant to the terms and conditions of the Revolving Loan Agreements); and

(iii)    third, to the payment in full in immediately available funds of all of the Term Loan Debt in whatever manner and order Term Loan Agent chooses in accordance with the provisions of the Term Loan Agreements and applicable law.

(b)    The proceeds of any sale, disposition or other realization upon all or any part of the Term Loan Priority Collateral (other than a sale or disposition of equipment consisting of ambulances or ambulettes to the extent provided in Section 2.3(c) hereof or proceeds of insurance for any loss to any equipment or inventory to the extent provided in Section 2.3(d) hereof) shall be applied immediately after the calculation thereof in the following order of priorities:

(i)    first, to the payment in full in immediately available funds of the expenses of the collection and enforcement of the Term Loan Debt and such sale, disposition or other realization, including all expenses, liabilities and advances incurred or made by Term Loan Agent or any Term Loan Creditor, or any amounts paid to or on behalf of Term Loan Agent by any Term Loan Creditor in connection therewith;

(ii)    second, to the payment in full in immediately available funds of all of the Term Loan Debt to the extent of the Term Loan Debt in whatever manner and order Term Loan Agent chooses in accordance with the provisions of the Term Loan Agreements and applicable law (and including to hold as cash collateral for any Term Loan Debt which is contingent to the extent provided in and pursuant to the terms and conditions of the Term Loan Agreements);  and

(iii)    third, to the payment in full in immediately available funds of all of the Revolving Loan Debt in whatever manner and order Revolving Loan Lender chooses in accordance with the provisions of the Revolving Loan Agreements and applicable law.

(c)    With respect to any sale or disposition of equipment consisting of ambulances or ambulettes in the ordinary course of business of Debtors, Debtors may apply the net cash proceeds to replace the ambulance or ambulette so sold or disposed so long as (i) the net cash proceeds with respect to such sale or disposition do not exceed $500,000 in any twelve (12) month period, and (ii) no default or event of default exists or has occurred and is continuing under any of the Agreements unless Term Loan Agent has otherwise agreed to permit Debtors to use such net cash proceeds to so replace such ambulance or ambulette.  Any net cash proceeds in excess of $500,000 or if a default or event of default exists or has occurred and is continuing under any of the Agreements or if Debtors elect not to replace such ambulance or ambulette, then, in any such case, such proceeds shall be applied in accordance with the lien priorities in Section 2.3(b) hereof.

(d)    If any of the equipment or inventory of any Debtor is lost, physically damaged or destroyed, Debtors may receive the net cash proceeds in respect of any property or casualty insurance claim(s) to replace or repair the equipment or inventory so lost, damaged or

724750.8

- 9 -

**A3121**

CONFIDENTIAL

destroyed so long as the following conditions are satisfied: (i) the net insurance proceeds with respect to such insurance claim(s) do not exceed $2,000,000 in any twelve (12) month period; (ii)  Debtors use such insurance proceeds to repair, refurbish or replace the equipment or inventory so lost, damaged or destroyed; and (iii) no default or event of default exists or has occurred and is continuing under any of the Agreements unless Term Loan Agent has otherwise agreed to permit Debtors to use such net insurance proceeds.  Any such insurance proceeds in excess of  $2,000,000 in any twelve (12) month period or if a default or event of default exists or has occurred and is continuing under any of the Agreements or if Debtors elect not to replace such equipment or inventory, then, in either case, such proceeds shall be applied in accordance with the lien priorities in Section 2.3(b) hereof.

(e)     With respect to any proceeds of business interruption insurance, (i) if Revolving Loan Lender has not terminated the commitment to lend pursuant to the Revolving Loan Agreement, such proceeds shall be applied in accordance with the lien priorities in Section 2.3(a) hereof and such proceeds shall be applied to the extent possible as determined by Revolving Lender under the terms of the Revolving Loan Agreement in order to create loan availability for Debtors, and (ii) if Revolving Loan Lender has terminated the commitment to lend pursuant to the Revolving Loan Agreement, such proceeds shall be applied in accordance with the lien priorities in Section 2.3(b) hereof.

2.4     Permitted Payments.   Debtors shall not pay and Term Loan Agent and Term Loan Lenders shall not receive, directly or indirectly, any payments in respect of such Term Loan Debt, including, but not limited to, any prepayments or other non-mandatory payments; provided, that:

(a)     Debtors may make, and Term Loan Agent and Term Loan Lenders may receive and keep, regularly scheduled payments of interest, fees and costs in respect of the Term Loan Debt from time to time in accordance with the terms of the Term Loan Agreements as in effect on the date hereof, so long as on the date of any such payment and after giving effect thereto, no Default or Event of Default exists or has occurred and is continuing; provided, that, if a Default or Event of Default exists or has occurred and is continuing, Debtors may nevertheless make payments of interest in cash using sources of funds other than the proceeds of loans made pursuant to the Revolving Loan Agreement so long as Revolving Loan Lender has not accelerated the Revolving Loan Debt;

(b)     Debtors may make, and Term Loan Agent and Term Loan Lenders may receive and keep, any voluntary or mandatory payments or prepayments of principal in respect of the Term Loan Debt so long as (i) on the date of any such payment and after giving effect thereto, no Default or Event of Default exists or has occurred and is continuing and (ii) the aggregate amount of the Excess Availability (as defined in the Revolving Loan Agreement) of Borrowers on such date and the immediately preceding thirty (30) consecutive days before such payment shall be not less than $2,000,000; provided, that, (A) in connection with any mandatory prepayment of Term Loan Debt from sales or dispositions of, or any loss or damage to, any Term Loan Priority Collateral, Term Loan Agent and Term Loan Lenders may apply proceeds of such sales or other dispositions or proceeds of insurance paid in respect of such loss or damage to the outstanding amount of Term Loan Debt in accordance with the terms hereof and (B) if a Default or Event of Default exists or has occurred and is continuing, Debtors may nevertheless make

724750.8                                    - 10 -

CONFIDENTIAL                                                                                                                CURTIS_000010

payments of interest in cash using sources of funds other than the proceeds of loans made pursuant to the Revolving Loans Agreement so long as Revolving Loan Lender has not accelerated the Revolving Loan Debt.

2.5     Priorities Unaffected by Action or Inaction. The lien priorities provided in Section 2.2 shall not be altered or otherwise affected by any amendment, modification, supplement, extension, renewal, restatement, replacement or refinancing of either the Revolving Loan Debt or the Term Loan Debt, nor by any action or inaction which any Agent or Lender may take or fail to take in respect of the Collateral.

2.6     Rights of Third Parties; No Contest of Lien. Each Creditor shall be solely responsible for perfecting and maintaining the perfection of its Lien in and to each item constituting the Collateral in which such Agent has been granted a Lien.  The foregoing provisions of this Intercreditor Agreement are intended solely to govern the respective lien priorities as between Creditors and shall not impose on any Creditor any obligations in respect of the disposition of proceeds of foreclosure on any Collateral which would conflict with prior perfected claims therein in favor of any other person or any order or decree of any court or other governmental authority or any applicable law. Each Creditor agrees that it will not contest the validity, perfection, priority or enforceability of the Liens upon the Collateral of Revolving Loan Lender or Term Loan Agent, as the case may be, and that as between Revolving Loan Lender, on the one hand, and the Term Loan Agent and Term Loan Lenders, on the other, the terms of this Intercreditor Agreement shall govern even if part or all of the Revolving Loan Debt or the Term Loan Debt or the Liens securing payment and performance thereof are avoided, disallowed, set aside or otherwise invalidated in any judicial proceeding or otherwise.

2.7     Access to Books and Records. In the event that any Creditor shall, in the exercise of its respective enforcement rights under its Agreements, receive possession or control of any books and records of any Debtor which contain information identifying or pertaining to any of the property of any Debtor in which the other party has been granted a Lien, it shall notify Term Loan Agent and Revolving Loan Lender that it has received such books and records and shall, as promptly as practicable thereafter, make available to Term Loan Agent or Revolving Loan Lender, as the case may be, such books and records for inspection and duplication.

2.8     Right to Enforce Agreements. Subject to the terms and conditions set forth in this Intercreditor Agreement, (a) Revolving Loan Lender shall have the exclusive right to manage, perform and enforce the terms of the Revolving Loan Agreements with respect to the Revolving Loan Priority Collateral, to exercise and enforce all privileges and rights thereunder according to their discretion and the exercise of their business judgment, including, without limitation, the exclusive right to take or retake control or possession of such Collateral and to hold, prepare for sale, process, sell, lease, dispose of, or liquidate such Collateral and (b) Term Loan Agent and Term Loan Lenders shall have the exclusive right to manage, perform and enforce the terms of the Term Loan Agreements with respect to the Term Loan Priority Collateral, to exercise and enforce all privileges and rights thereunder according to their discretion and the exercise of their business judgment, including, without limitation, the exclusive right to take or retake control or possession of such Collateral and to hold, prepare for sale, process, sell, lease, dispose of, or liquidate such Collateral.

724750.8

A3123

CONFIDENTIAL

CURTIS_000011

2.9   <u>Sale and Release of Collateral</u>.  Notwithstanding anything to the contrary contained in any of the Agreements, only the Creditor with the senior Lien in the Collateral shall have the right to restrict or permit, or approve or disapprove, the sale, transfer or other disposition of such Collateral.  The Creditor with the junior Lien on any Collateral shall:  (a) be deemed to have automatically and without further action released and terminated any Liens it may have on such Collateral to the extent such Collateral is sold or otherwise disposed of either by the Creditor with the senior Lien on such Collateral, any agent of such Creditor, or any Debtor with the consent of such Creditor, (b) be deemed to have authorized the Creditor with the senior Lien on such Collateral to file UCC amendments and terminations covering the Collateral so sold or otherwise disposed of as to UCC financing statements between any Debtor and the Creditor with the junior Lien thereon to evidence such release and termination, (c) promptly upon the request of the Creditor with the senior Lien thereon execute and deliver such other release documents and confirmations of the authorization to file UCC amendments and terminations provided for herein, in each case as the Creditor with the senior Lien thereon may require in connection with such sale or other disposition by such Creditor, such Creditor's agents or any Debtor with the consent of such Creditor to evidence and effectuate such termination and release; <u>provided</u>, <u>that</u>, any such release or UCC amendment or termination by or on behalf of the Creditor with the junior Lien thereon shall not extend to or otherwise affect any of the rights, if any, of such Creditor with the junior Lien to the proceeds from any such sale or other disposition of Collateral upon the payment and satisfaction in full of the Revolving Loan Debt or the Term Loan Debt, as the case may be, whichever is secured by the senior Lien on such Collateral and (d)  be deemed to have consented under the Agreements of the Creditor with the junior Lien thereon and the Lenders for whom such Creditor is acting to such sale or other disposition.

2.10   <u>Limitation on Remedies</u>.   The Creditor with a junior Lien on any Collateral and the Lenders for whom such Creditor is acting will not, directly or indirectly, (a) exercise any of its or their rights or remedies upon a default or event of default by any Debtor under its Agreements against such Collateral, or (b) seek to foreclose or realize upon (judicially or non-judicially) its junior Lien on such Collateral or assert any claims or interest therein (including, without limitation, by setoff or notification of account debtors), or (c) subject to the terms and conditions contained herein, take any other action that would interfere in any material respect with the rights of the Creditor with the senior Lien in such Collateral.

2.11   <u>Rights of Access and Use</u>.

(a)   In connection with any Lien Enforcement Action taken by Revolving Loan Lender, Revolving Loan Lender and its agents shall have the irrevocable right, at its option, to use for a period of up to one hundred twenty (120) days commencing on the date that Revolving Loan Lender notifies Term Loan Agent that Revolving Loan Lender is commencing a Lien Enforcement Action (the "Access Period"), any of the Term Loan Priority Collateral consisting of the real property, the Intellectual Property and equipment consisting of Computer Equipment related to the storage or processing of records, documents or files pertaining to the Revolving Loan Priority Collateral to handle, deal with or dispose of any Revolving Loan Priority Collateral pursuant to the rights of Revolving Loan Lender as set forth in the Revolving Loan Agreements, the Uniform Commercial Code of any applicable jurisdiction and other applicable law, such right to include, without limitation, the right to bill, process and collect all

724750.8

- 12 -

CONFIDENTIAL                                                                                     CURTIS_000012

receivables or conduct one or more public or private sales or auctions of the Revolving Loan Priority Collateral.

(b)      Without limiting Revolving Loan Lender's rights set forth in Section 2.1(a) hereof, Revolving Loan Lender and its agents shall have the irrevocable right, at its option, to use for a period of up to forty-five (45) days during the Access Period, any of the Term Loan Priority Collateral, other than the real property, Intellectual Property and equipment consisting of Computer Equipment, to handle, deal with or dispose of any Revolving Loan Priority Collateral pursuant to the rights of Revolving Loan Lender as set forth in the Revolving Loan Agreements, the Uniform Commercial Code of any applicable jurisdiction and other applicable law, such right to include, without limitation, the right to conduct one or more public or private sales or auctions of the Revolving Loan Priority Collateral.

(c)      In consideration of the right of Revolving Loan Lender to have access to and to use the Term Loan Collateral in connection with the sale or other disposition of the Revolving Loan Priority Collateral, Revolving Loan Lender agrees that commencing on the date that Revolving Loan Lender exercises its rights to use the Term Loan Priority Collateral, if a third party lessor or owner of any of the Term Loan Priority Collateral requires payment for access to the Term Loan Priority Collateral utilized by Revolving Loan Lender in the exercise by Revolving Loan Lender of its access rights under Section 2.11(a) or (b) hereof, then Revolving Loan Lender agrees that Revolving Loan Lender, and not Term Loan Agent or Term Loan Lenders, shall pay such amounts to such third party lessor or owner (other than a lessor or owner that is an affiliate of Term Loan Agent or Term Loan Lenders) in order to use such Term Loan Priority Collateral. Revolving Loan Lender and its agents shall not, and shall not be deemed to, assume any such leases or other agreements or incur any other obligations of any of the Debtors in connection with the exercise of Revolving Loan Lender's access and use rights hereunder. Revolving Loan Lender shall have the right to access and use any of the Term Loan Priority Collateral at any time during normal business hours without the payment of any amount in the absence of any Lien Enforcement Action by Revolving Loan Lender in order to review and exam the Revolving Loan Priority Collateral in accordance with the terms and conditions of the Revolving Loan Agreements.

(d)      If Term Loan Agent and Term Loan Lenders shall sell or otherwise dispose of Term Loan Collateral during the Access Period, Term Loan Agent shall cause the buyer thereof to permit Revolving Loan Lender to have access to such Term Loan Collateral on the same terms and conditions set forth this Section 2.11.

(e)      Term Loan Agent and Term Loan Lenders shall not have any responsibility or liability for the acts or omissions of Revolving Loan Lender and Revolving Loan Lender shall not have any responsibility or liability for the acts or omissions of Term Loan Agent or any Term Loan Lender, in each case arising in connection with such other Creditor's use of any of the Term Loan Priority Collateral or the Revolving Loan Priority Collateral, as the case may be.

2.12    <u>Right to Cure.</u>

724750.8

- 13 -

**A3125**

CONFIDENTIAL

CURTIS_000013

(a)      Revolving Loan Lender shall have the right, but not any obligation, to cure any event of default, or act, condition or event which with notice or passage of time or both would constitute an event of default, under the Term Loan Agreements for the account of Debtors.  In no event shall Revolving Loan Lender, by virtue of the payment of amounts or performance of any obligation required to be paid or performed by any Debtor be deemed to have assumed any obligation of any Debtor to Term Loan Agent, Term Loan Lenders or any other person.

(b)      Term Loan Agent and Term Loan Lenders shall have the right, but not any obligation, to cure any event of default, or act, condition or event which with notice or passage of time or both would constitute an event of default, under the Revolving Loan Agreements for the account of Debtors.  In no event shall Term Loan Agent or any Term Loan Lender, by virtue of the payment of amounts or performance of any obligation required to be paid or performed by any Debtor be deemed to have assumed any obligation of any Debtor to Revolving Loan Lender or any other person.

2.13    Certain Revolving Loans.  If Revolving Loan Lender should honor a request by any Debtor for a loan, advance or other financial accommodation under the Revolving Loan Agreements, whether or not Revolving Loan Lender has knowledge that the honoring of such request would result in an event of default, or act, condition or event which with notice or passage of time or both would constitute an event of default, under the Term Loan Agreements, in no event shall Revolving Loan Lender have any liability whatsoever to Term Loan Agent or any Term Loan Lender as a result of such breach, and without limiting the generality of the foregoing, Term Loan Agent and Term Loan Lenders agree that Revolving Loan Lender shall not have any liability for tortious interference with contractual relations or for inducement by Revolving Loan Lender of any Debtor to breach of contract or otherwise.  Nothing contained in this Section 2.13 shall limit or waive any right that Term Loan Agent has to enforce any of the provisions of the Term Loan Agreements against any Debtor, subject to such limitations, waivers or restrictions that are otherwise imposed on the Term Loan Agent or Term Loan Lenders as provided for herein.

3.    TERM LOAN AGENT'S PURCHASE OPTION

3.1    Notwithstanding anything to the contrary herein, at any time and from time to time, Term Loan Agent shall have the option on behalf of itself and the Purchasers (the "Purchase Option"), upon two (2) Business Days' prior written notice to Revolving Loan Lender (the "Purchase Notice"), to purchase from Revolving Loan Lender all of Revolving Loan Lender's right, title and interest in, to and under the Revolving Loan Debt owing to Revolving Loan Lender on the Purchase Date (collectively, the "Purchased Obligations") in accordance with the terms and conditions hereof.  Except as expressly provided in the last sentence of this Section 3.1, the Purchase Notice shall be irrevocable, unless otherwise agreed to in writing by Revolving Loan Lender.  If Term Loan Agent believes that any of the conditions listed in clauses (a) or (b) of the definition of Purchase Price each a "Triggering Condition" and collectively, the "Triggering Conditions") have been satisfied such that the Purchase Option Purchase Price (as hereinafter defined) should not include one hundred (100%) percent of the early termination fee payable pursuant to Section 12.1(c) of the Revolving Loan Agreement, then the Purchase Notice shall state that a Triggering Condition exists and shall describe such Triggering Condition in

724750.8                                                    - 14 -

CONFIDENTIAL                                                                                                                          CURTIS_000014

reasonable detail. If a Triggering Condition exists, Revolving Loan Lender shall have the right, at any time on or before the Purchase Date, to cure, rescind or revoke the actions or events giving rise to such Triggering Condition or otherwise cause such Triggering Condition to cease to exist; provided, that, if Revolving Loan Lender shall have cured, rescinded or revoked the actions giving rise to such Triggering Condition or otherwise shall have caused such Triggering Condition to cease to exist between date of the receipt by Revolving Loan Lender of the Purchase Notice and the Purchase Date, then Term Loan Agent may revoke the Purchase Option by delivering a written notice of revocation to Revolving Loan Lender on or before the Purchase Date.

3.2    On the date specified by Term Loan Agent (the "Purchase Date") in the Purchase Notice (which shall not be less than five (5) Business Days, nor more than twenty (20) Business Days, after the receipt by Revolving Loan Lender of the Purchase Notice), Revolving Loan Lender shall, subject to any required approval of any court or other governmental authority, if any, sell to Term Loan Agent or Purchasers, and Term Loan Agent or Purchasers shall purchase from Revolving Loan Lender all of the Purchased Obligations; provided, that, Revolving Loan Lender shall retain all rights to be indemnified or held harmless by Debtors and Obligors in accordance with the terms of the Revolving Loan Agreements but shall not retain any rights to the security therefor, other than with respect to any Letter of Credit Accommodations (as defined in the Revolving Loan Agreement) outstanding on the Purchase Date that have not been replaced in accordance with the terms and conditions of the Revolving Loan Agreements.

3.3    On the Purchase Date, Revolving Loan Lender shall sell and assign to Term Loan Agent or Purchasers, and Term Loan Agent or Purchasers shall purchase from Revolving Loan Lender, all of Revolving Loan Lender's right, title and interest in, to and under the Purchased Obligations and the Collateral therefor in exchange for the payment of the Purchase Price by Term Loan Agent or Purchasers to Revolving Loan Lender; provided, that, on the Purchase Date, Term Loan Agent and Purchasers shall also

(a)    furnish cash collateral to Revolving Loan Lender in a manner and in such amounts as Revolving Loan Lender determines is reasonably necessary to secure Revolving Loan Lender in connection with any issued and outstanding letters of credit provided by Revolving Loan Lender (or letters of credit that Revolving Loan Lender has arranged to be provided by third parties pursuant to the financing arrangements of Revolving Loan Lender with Debtors) to Debtors or any Obligor (but not in any event in an amount greater than one hundred five (105%) percent of the aggregate undrawn face amount of such letters of credit),

(b)    agree to reimburse Revolving Loan Lender for any loss, cost, damage or expense (including reasonable attorneys' fees and legal expenses) in connection with any commissions, fees, costs or expenses related to any issued and outstanding letters of credit as described above and any checks or other payments provisionally credited to the Revolving Loan Debt, or as to which Revolving Loan Lender has not yet received final payment,

(c)    agree to reimburse Revolving Loan Lender in respect of indemnification obligations of Debtors under this Agreement as to matters or circumstances known to Revolving Loan Lender at the time of the purchase and sale which would reasonably be expected to result in any loss, cost, damage or expense (including reasonable attorneys' fees and legal expenses) to

CONFIDENTIAL                                                                      CURTIS_000015

Revolving Loan Lender; provided, that, in no event shall Term Loan Agent or Purchasers have any liability for such amounts under this clause (c) in excess of the lesser of (i) the outstanding principal amount of the Term Loans as of the Purchase Date or (ii) the aggregate value of the Collateral as reflected in the most recent reports and appraisals received by Revolving Loan Lender prior to the Purchase Date pursuant to this Agreement, and

(d)     agree to indemnify and hold harmless Revolving Loan Lender from and against any loss, liability, claim, damage or expense (including reasonable fees and expenses of legal counsel) arising out of any claim asserted by a third party in respect of the Purchased Obligations or Collateral as a direct result of any acts by Term Loan Agent or any Purchaser occurring after the date of such purchase.

3.4     The Purchase Price and such cash collateral shall be remitted by wire transfer of federal funds to such bank account of Revolving Loan Lender, as Revolving Loan Lender may designate in writing to Term Loan Agent for such purpose.  Interest shall be calculated to but excluding the Business Day on which such purchase and sale shall occur if the amounts so paid by Term Loan Agent or Purchasers to the bank account designated by Revolving Loan Lender are received in such bank account prior to 12:00 noon, New York City time on such Business Day and interest shall be calculated to and including such Business Day if the amounts so paid by Term Loan Agent or Purchasers to the bank account designated by Revolving Loan Lender are received in such bank account later than 12:00 noon, California time on such Business Day.

3.5     Any purchase pursuant to the Purchase Option shall be expressly made without representation or warranty of any kind by Revolving Loan Lender, as to the Obligations, the Collateral or otherwise and without recourse to Revolving Loan Lender, except that Revolving Loan Lender shall represent and warrant: (a) the amount of the Purchased Obligations as reflected in the books and records of Revolving Loan Lender (but without representation or warranty as to the collectability, validity or enforceability thereof), (b) that Revolving Loan Lender owns the Purchased Obligations free and clear of any liens or encumbrances created by or through it and (c) Revolving Loan Lender has the right to assign all of its right, title and interest in and to the Purchased Obligations and the assignment is duly authorized.

3.6     Revolving Loan Lender shall provide Term Loan Agent with five (5) Business Days' prior written notice of the intention of Revolving Loan Lender to accelerate the Obligations or to commence any Lien Enforcement Action against the Revolving Loan Priority Collateral.  In the event that during such five (5) Business Day period, Term Loan Agent shall send to Revolving Loan Lender the irrevocable Purchase Notice, Revolving Loan Lender shall not commence any Lien Enforcement Action (other than continuing to collect Receivables and other actions permitted under the Revolving Loan Agreements shall not be prohibited hereunder); provided, that, Revolving Loan Lender's agreement to forbear pursuant to this Section 3.6 shall terminate if the purchase and sale with respect to the Purchased Obligations provided for in this Section 3 shall not have closed within five (5) Business Days of the receipt by Revolving Loan Lender of the irrevocable Purchase Notice from Term Loan Agent or Revolving Loan Lender shall not have received payment in full in respect of the Purchased Obligations as provided for herein within such five (5) Business Day period.

724750.8

- 16 -

CONFIDENTIAL                                                                                                    CURTIS_000016

3.7    In connection with the calculation of the Purchase Price by Term Loan Agent, upon the request of Term Loan Agent, Revolving Loan Lender agrees to furnish to Term Loan Agent within three (3) Business Days, a statement setting forth the amount of any increase by Revolving Loan Lender of reserves against the amount of loans available under the Revolving Loan Agreements or the decrease by Revolving Loan Lender in advance rates with respect to the lending formulas under the Revolving Loan Agreements.

4.    <u>MISCELLANEOUS</u>

4.1    <u>Additional Representations</u>.

(a)    Term Loan Agent and each Term Loan Lender represents and warrants severally for itself and not jointly to Revolving Loan Lender that:

(i)    the execution, delivery and performance of this Intercreditor Agreement by Term Loan Agent is within its powers in its capacity as agent for the Term Loan Lenders, has been duly authorized by the Term Loan Lenders, and does not contravene any law, any provision of any of the Term Loan Agreements or any agreement to which Term Loan Agent or any Term Loan Lender is a party or by which it is bound;

(ii)    the Term Loan Agent and the Term Loan Lenders have not been granted and do not have any Liens upon the assets and properties of any Debtor pursuant to the Term Loan Agreements, <u>except</u> to the extent of the Liens granted by such Debtor to Term Loan Agent in its capacity as agent acting for and on behalf of the Term Loan Lenders;

(iii)    this Intercreditor Agreement constitutes the legal, valid and binding obligations of Term Loan Agent and such Term Loan Lender, enforceable in accordance with its terms and shall be binding on it.

(b)    Revolving Loan Lender  hereby represents and warrants to Term Loan Agent and the Term Loan Lenders that:

(i)    the execution, delivery and performance of this Intercreditor Agreement by Revolving Loan Lender is within its powers and does not contravene any law, any provision of any of the Revolving Loan Agreements or any agreement to which Revolving Loan Lender or any Revolving Loan Lender is a party or by which it is bound;

(ii)    the Revolving Loan Lender has not been granted and do not have any Liens upon the assets and properties of any Debtor pursuant to the Revolving Loan Agreements;

(iii)    this Intercreditor Agreement constitutes the legal, valid and binding obligations of Revolving Loan Lender and such Revolving Loan Lender, enforceable in accordance with its terms and shall be binding on it.

4.2    <u>Amendments</u>.  Any waiver, permit, consent or approval by any Lender of or under any provision, condition or covenant to this Intercreditor Agreement must be in writing and shall be effective only to the extent it is set forth in writing and as to the specific facts or

CONFIDENTIAL                                                                        CURTIS_000017

circumstances covered thereby. Any amendment of this Intercreditor Agreement must be in writing and signed by Revolving Loan Lender and Term Loan Agent. Any waiver, permit, consent or approval of or under any provision of this Intercreditor Agreement, or any amendment hereto, in writing and signed only by Term Loan Agent shall constitute the valid and binding agreement upon all of the Term Loan Lenders, and Revolving Loan Lender shall be entitled to rely thereon without any inquiry or diligence. Any waiver, permit, consent or approval of or under any provision of this Intercreditor Agreement, or any amendment hereto, in writing and signed only by Revolving Loan Lender shall constitute the valid and binding agreement upon Revolving Loan Lender, and Term Loan Agent and Term Loan Lenders shall be entitled to rely thereon without any inquiry or diligence.

4.3    Successors and Assigns.

(a)    This Intercreditor Agreement shall be binding upon each Creditor and its successors and assigns and shall inure to the benefit of each Creditor and its successors, participants and assigns.

(b)    To the extent provided in their respective Agreements, each Creditor reserves the right to grant participations in, or otherwise sell, assign, transfer or negotiate all or any part of, or any interest in, the Revolving Loan Debt or Term Loan Debt, as the case may be, and the Collateral securing same; provided, that, no Creditor shall be obligated to give any notices to or otherwise in any manner deal directly with any participant in the Revolving Loan Debt or Term Loan Debt, as the case may be, and no participant shall be entitled to any rights or benefits under this Intercreditor Agreement except through the Lender with which it is a participant. In connection with any participation or other transfer or assignment, a Lender (i) may, subject to its Agreements, disclose to such assignee, participant or other transferee or assignee all documents and information which such Lender now or hereafter may have relating to Debtors, any of Obligors or the Collateral and (ii) shall disclose to such participant or other transferee or assignee the existence and terms and conditions of this Intercreditor Agreement. In the case of an assignment or transfer, the assignee or transferee acquiring any interest in the Term Loan Debt or the Revolving Loan Debt, as the case may be, shall execute and deliver to each Creditor a written acknowledgement of receipt of a copy of this Intercreditor Agreement and the written agreement by such person to be bound by the terms of this Intercreditor Agreement.

(c).    In connection with any successor financing or replacement of the existing credit facility provided by Revolving Loan Lender to Debtors, Term Loan Agent and Term Loan Lenders agree to execute and deliver an agreement containing terms substantially identical to those contained herein in favor of any such successor or replacement lenders and in connection with any successor financing or replacement of the existing credit facility provided by Term Loan Lenders to Debtors, Revolving Loan Lender agrees to execute and deliver an agreement containing terms substantially identical to those contained herein in favor of any such successor or replacement lenders.

4.4    Insolvency. This Intercreditor Agreement shall be applicable both before and after any Insolvency Proceeding by or against any Debtor and all converted or succeeding cases in respect thereof, and all references herein to any Debtor shall be deemed to apply to a trustee

CONFIDENTIAL CURTIS_000018

for such Debtor or any Debtor as debtor-in-possession. The relative rights of Revolving Loan Lender, on the one hand, and Term Loan Agent and Term Loan Lenders, on the other, to repayment of the Revolving Loan Debt and the Term Loan Debt, respectively, and in or to any distributions from or in respect of any Debtor or any Collateral or proceeds of Collateral, shall continue after the filing thereof on the same basis as prior to the date of the petition, subject to any court order approving the financing of, or use of cash collateral by, any Debtor as debtor-in-possession.

4.5    Bankruptcy Financing. If any Debtor shall become subject to an Insolvency Proceeding and if Revolving Loan Lender desires to permit the use of cash collateral or to provide financing to such Debtor under either Section 363 or Section 364 of the U.S. Bankruptcy Code or other applicable statute, Term Loan Agent and Term Loan Lenders agree as follows: (a) adequate notice to Term Loan Agent and Term Loan Lenders shall have been provided for such financing or use of cash collateral if Term Loan Agent receives notice two (2) Business Days' prior to the entry of the order approving such financing or use of cash collateral and (b) no objection will be raised by Term Loan Agent or any Term Loan Lender to any such financing or use of cash collateral on the ground of a failure to provide "adequate protection" for the Liens of Term Loan Agent or any other grounds, provided Term Loan Agent retains a Lien on the post-petition Collateral with the same priority as existed prior to the commencement of such case or proceeding. For purposes of this Section 4.5, notice of a proposed financing or use of cash collateral shall be deemed given when given, in the manner prescribed by Section 4.8 hereof, to Term Loan Agent or its counsel.

4.6    Bailee for Perfection. Each Creditor hereby appoints the others as agent for the purposes of perfecting their respective Liens in and on any of the Collateral; provided, that, no Creditor shall have any duty or liability to protect or preserve any rights pertaining to any of the Collateral and, except for gross negligence or wilful misconduct as determined pursuant to a final non-appealable order of a court of competent jurisdiction, each Creditor hereby waives, and releases the other Lenders from, all claims and liabilities arising pursuant to the other's role as bailee with respect to the Collateral.

4.7    Notices of Default, Acceleration and Enforcement. Each Creditor shall give the other written notice of: (a) sending any written notice to a Debtor of an event of default under its Agreements which has not been waived or cured; (b) any demand of payment of any of the Term Loan Debt or the Revolving Loan Debt, as the case may be, and (c) any commencement of a foreclosure or other lien enforcement proceeding by such Creditor against any Debtor or any of the Collateral, in each case concurrently with the sending of such notice to any Debtor; provided, that, the failure of any Creditor to do so shall not create a cause of action against such Creditor or create any claim against it or effect the relative rights, duties or priorities established by this Intercreditor Agreement. The failure by any Creditor to send a copy of any such notice to the other shall not affect the validity of such notice as against any Debtor. Each Debtor hereby authorizes and consents to each Agent sending to the other such notices or any other information with respect thereto.

4.8    Notices. All notices, requests and demands to or upon the respective parties hereto shall be in writing and shall be deemed duly given, made or received: if delivered in person, immediately upon delivery; if by facsimile transmission, immediately upon sending and

724750.8                                        - 19 -

CONFIDENTIAL                                        CURTIS_000019

upon confirmation of receipt; if by nationally recognized overnight courier service with instructions to deliver the next Business Day, one (1) Business Day after sending; and if mailed by certified mail, return receipt requested, five (5) days after mailing to the parties at their addresses set forth below (or to such other addresses as the parties may designate in accordance with the provisions of this Section 4.8):

> To Revolving Loan Lender:
>
> Wachovia Bank, National Association
> 1133 Avenue of the Americas
> New York, New York 10036
> Attention: Portfolio Manager
> Telephone No.: 212-840-2000
> Facsimile No.: 212-545-4283
>
> To Term Loan Agent
> and Term Loan Lenders:
>
> Patriarch Partners Agency Services, LLC
> 227 West Trade Street
> Suite 1400
> Charlotte, North Carolina 28202
> Attention:  Loan Administration/TransCare
> Telephone No:  (704) 227-1200
> Facsimile No:  (704) 375-0358

Either party may change the address(es) to which all notices, requests and other communications are to be sent by giving written notice of such address change to the other party in conformity with this Section 4.8, but such change shall not be effective until notice of such change has been received by the other party.

4.9     Counterparts.  This Intercreditor Agreement may be executed in any number of counterparts, each of which shall be an original, but all of which taken together shall constitute one and the same agreement. In making proof of this Intercreditor Agreement it shall not be necessary to produce or account for more than one counterpart thereof signed by each of the parties hereto.  Delivery of an executed counterpart of this Intercreditor Agreement by telefacsimile or other electronic method of transmission shall have the same force and effect as the delivery of an original executed counterpart of this Intercreditor Agreement.  Any party delivering an executed counterpart of this Agreement by telefacsimile or other electronic method of transmission shall also deliver an original executed counterpart, but the failure to do so shall not affect the validity, enforceability or binding effect of this Agreement.

4.10     Governing Law.  The validity, interpretation and enforcement of this Agreement shall be governed by the internal laws of the State of New York but excluding any principles of conflict of laws or other rule of law that would cause the application of the law of any jurisdiction other than the laws of the State of New York.  Without in any limiting way the foregoing, the parties elect to be governed by New York law in accordance with, and relying on (at least in part), Sections 5-1401 and 5-1402 of the General Obligations Law of the State of New York.

724750.8

- 20 -

CONFIDENTIAL

CURTIS_000020

4.11   <u>Consent to Jurisdiction; Waiver of Jury Trial</u>. EACH PARTY HERETO HEREBY SUBMITS TO THE NON EXCLUSIVE JURISDICTION OF THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK AND OF THE SUPREME COURT OF THE STATE OF NEW YORK SITTING IN NEW YORK COUNTY (INCLUDING ITS APPELLATE DIVISION), AND OF ANY OTHER APPELLATE COURT IN THE STATE OF NEW YORK, FOR THE PURPOSES OF ALL LEGAL PROCEEDINGS ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY. EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF THE VENUE OF ANY SUCH PROCEEDING BROUGHT IN SUCH A COURT AND ANY CLAIM THAT ANY SUCH PROCEEDING BROUGHT IN SUCH A COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM. EACH PARTY HERETO HEREBY WANES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION ARISING UNDER THIS AGREEMENT OR IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO IN RESPECT OF THIS AGREEMENT, WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER IN CONTRACT, TORT, EQUITY OR OTHERWISE.

4.12   <u>Complete Agreement</u>. This written Intercreditor Agreement is intended by the parties as a final expression of their agreement and is intended as a complete statement of the terms and conditions of their agreement.

4.13   <u>No Third Parties Benefitted</u>. Except as expressly provided in Section 4.3 and consents which are deemed to have been given under Section 2.9 hereof, this Intercreditor Agreement is solely for the benefit of Creditors and their respective successors, participants and assigns, and no other person shall have any right, benefit, priority or interest under, or because of the existence of, this Intercreditor Agreement.

4.14   <u>Disclosures; Non-Reliance</u>. Each Creditor has the means to, and shall in the future remain, fully informed as to the financial condition and other affairs of Debtors and no Lender shall have any obligation or duty to disclose any such information to any other Lender. Except as expressly set forth in this Intercreditor Agreement, the parties hereto have not otherwise made to each other nor do they hereby make to each other any warranties, express or implied, nor do they assume any liability to each other with respect to: (a) the enforceability, validity, value or collectability of any of the Term Loan Debt or Revolving Loan Debt or any guarantee or security which may have been granted to any of them in connection therewith, (b) the title of any Debtor to or the right of any Debtor to transfer any of the Collateral, or (c) any other matter except as expressly set forth in this Intercreditor Agreement.

4.15   <u>Term</u>. This Intercreditor Agreement is a continuing agreement and shall remain in full force and effect until the earlier of (a) indefeasible payment and satisfaction in full of all Revolving Loan Debt and the termination of the financing arrangements between Revolving Loan Lender and Debtors or (b) indefeasible payment and satisfaction in full of all Term Loan Debt and the termination of the financing arrangements between Term Loan Agent and Term Loan Lenders and Debtors.

724750.8

CONFIDENTIAL                                                                 CURTIS_000021

4.16   <u>Inconsistency</u>.  As between Revolving Loan Lender and Term Loan Agent and Term Loan Lenders, to the extent any term or provision of this Intercreditor Agreement is inconsistent with any terms or provisions of any of the Agreements, such term or provisions of this Intercreditor Agreement shall control to the extent necessary to give full effect to such term or provision contained in this Intercreditor Agreement.

[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]

724750.8

CONFIDENTIAL                                                                                                      CURTIS_000022

IN WITNESS WHEREOF, the parties have caused this Intercreditor Agreement to be duly executed as of the day and year first above written.

WACHOVIA BANK, NATIONAL
ASSOCIATION, as Revolving Loan Lender

By: _____

Name: _____

Title: _____


PATRIARCH PARTNERS AGENCY SERVICES,
LLC, as Term Loan Agent

By: _____

Name:   Lynn Tilton

Title:   Manager


**[SIGNATURES CONTINUE ON FOLLOWING PAGE]**

**A3135**

CONFIDENTIAL

IN WITNESS WHEREOF, the parties have caused this Intercreditor Agreement to be duly executed as of the day and year first above written.

WACHOVIA BANK, NATIONAL
ASSOCIATION, as Revolving Loan Lender

By: _____

Name: _____

Title: _____


PATRIARCH PARTNERS AGENCY SERVICES,
LLC, as Term Loan Agent

By: _____

Name:   Lynn Tilton

Title:   Manager


[SIGNATURES CONTINUE ON FOLLOWING PAGE]

**A3136**

CONFIDENTIAL

CURTIS_000024

[SIGNATURES CONTINUED FROM PREVIOUS PAGE]

ARK INVESTMENT PARTNERS II, L.P. as a
Term Loan Lender

By:     Patriarch Partners III, LLC,
        its Investment Adviser

By:
        Name: Lynn Tilton
        Title:   Manager

ARK II CLO 2001-1, LIMITED, as a Term Loan
Lender

By:
        Name: Lynn Tilton
        Title:   Director

ZOHAR CDO 2003-1, LIMITED as a Term Loan
Lender

By: Patriarch Partners VIII, LLC,
    its Collateral Manager

By:
        Name: Lynn Tilton
        Title:   Manager

[SIGNATURES CONTINUE ON FOLLOWING PAGE]

A3137

CURTIS_000025

[SIGNATURES CONTINUED FROM PREVIOUS PAGE]

ZOHAR III, LIMITED, as a Term Loan Lender

By: Patriarch Partners XIV, LLC,
     its Interim Collateral Manager

By:    _____
       Name:  Lynn Tilton
       Title:   Manager


FIRST DOMINION FUNDING I, as a Term Loan
Lender

By:    Credit-Suisse Alternative Capital, Inc.,
       its Collateral Manager


By:    _____
       Name:  David Lerner
       Title:   Authorized Signatory


FIRST DOMINION FUNDING II, as a Term Loan
Lender

By:    Credit-Suisse Alternative Capital, Inc.,
       its Collateral Manager


By:    _____
       Name:  David Lerner
       Title:   Authorized Signatory


[SIGNATURES CONTINUE ON FOLLOWING PAGE]

A3138

CURTIS_000026

[SIGNATURES CONTINUED FROM PREVIOUS PAGE]

ZOHAR III, LIMITED, as a Term Loan Lender

By: Patriarch Partners XIV, LLC,
    its Interim Collateral Manager

By: _____
       Name:  Lynn Tilton
       Title:   Manager

FIRST DOMINION FUNDING I, as a Term Loan
Lender

By:    Credit-Suisse Alternative Capital, Inc.,
       its Collateral Manager

By:    _____
       Name:  Thomas Flannery
       Title:   Authorized Signatory

FIRST DOMINION FUNDING II, as a Term Loan
Lender

By:    Credit-Suisse Alternative Capital, Inc.,
       its Collateral Manager

By:    _____
       Name:  Thomas Flannery
       Title:   Authorized Signatory

[SIGNATURES CONTINUE ON FOLLOWING PAGE]

CONFIDENTIAL

CURTIS_000027

[SIGNATURES CONTINUED FROM PREVIOUS PAGE]

CSAM FUNDING II, as a Term Loan Lender

By:    Credit-Suisse Alternative Capital, Inc.,
       its Collateral Manager

By:    _____
       Name:  Thomas Flannery
       Title:   Authorized Signatory


CSAM FUNDING III, as a Term Loan Lender

By:    Credit-Suisse Alternative Capital, Inc.,
       its Collateral Manager

By:    _____
       Name:  Thomas Flannery
       Title:   Authorized Signatory


ATRIUM CDO, as a Term Loan Lender

By:    Credit-Suisse Alternative Capital, Inc.,
       its Collateral Manager

By:    _____
       Name:  Thomas Flannery
       Title:   Authorized Signatory


**A3140**

EXHIBIT A
TO
INTERCREDITOR AGREEMENT

Term Loan Priority Collateral

The term "Term Loan Priority Collateral" shall mean and include the following items or types of assets or property of any Debtor:

(a)     all of each Debtor's now owned and hereafter acquired machinery and equipment, including, without limitation, the Computer Equipment, wherever located;

(b)     all of each Debtor's now owned and hereafter acquired inventory, wherever located;

(c)     all of each Debtor's cars, trucks, trailers, construction and earth moving equipment and other vehicles covered by a certificate of title law of any state and, in any event, including, without limitation, the vehicles listed on Schedule IV to the Security Agreement, dated as of August 4, 2003, by Debtors in favor of Term Loan Agent (as such Schedule IV may be updated, amended, restated or replaced from time to time), and all tires and other appurtenances to any of the foregoing;

(d)     all of the shares of capital stock of each direct or indirect subsidiary of TransCare;

(e)     all of the Intellectual Property;

(f)     books and records related to any of the foregoing; and

(g)     all products and proceeds of the foregoing, in any form, including insurance proceeds and all claims against third parties for loss or damage to or destruction of or other involuntary conversion of any kind or nature of any or all of the other Term Loan Priority Collateral (including proceeds of business interruption insurance to the extent Term Loan Creditors are entitled to such proceeds as set forth in Section 2.3(e) hereof).

**A3141**

CONFIDENTIAL

CURTIS_000029

## ACKNOWLEDGMENT

Each of the undersigned hereby acknowledges and agrees to the foregoing terms and provisions. By its signature below, the undersigned agrees that it will, together with its successors and assigns, be bound by the provisions hereof.

Each of the undersigned agrees that any Creditor holding Collateral does so as bailee (under the UCC) for each other Creditor which has a Lien on such Collateral and is hereby authorized to and may turn over to the other Creditor upon request therefor any such Collateral, after all obligations and indebtedness of each of the undersigned to the bailee Creditors have been fully paid and performed.

Each of the undersigned acknowledges and agrees that: (i) although it may sign this Intercreditor Agreement it is not a party hereto and does not and will not receive any right, benefit, priority or interest under or because of the existence of the foregoing Intercreditor Agreement (except for a consent which is deemed to have been given by any of Creditors under Section 2.9), and (ii) it will execute and deliver such additional documents and take such additional action as may be necessary or desirable in the opinion of either of Term Loan Agent or Revolving Loan Lender to effectuate the provisions and purposes of the foregoing Intercreditor Agreement.

TRANSCARE CORPORATION

By: _____
Name: Patrick Seiler
Title:  Vice President

TRANSCARE NEW YORK, INC.

By: _____
Name: Patrick Seiler
Title:  Vice President

TRANSCARE PENNSYLVANIA, INC.

By: _____
Name: Patrick Seiler
Title:  Vice President

## [SIGNATURES CONTINUE ON FOLLOWING PAGE]

**A3142**

[SIGNATURES CONTINUED FROM PREVIOUS PAGE]

TRANSCARE MARYLAND, INC.

By: _____
    Name:  Patrick Seiler
    Title:  Vice President


TRANSCARE ML, INC.

By: _____
    Name:  Patrick Seiler
    Title:  Vice President


TC HUDSON VALLEY AMBULANCE CORP.

By: _____
    Name:  Patrick Seiler
    Title:  Vice President


TC BILLING AND SERVICES CORP.

By: _____
    Name:  Patrick Seiler
    Title:  Vice President


TC AMBULANCE CORPORATION

By: _____
    Name:  Patrick Seiler
    Title:  Vice President


TRANSCARE MANAGEMENT SERVICES, INC.

By: _____
    Name:  Patrick Seiler
    Title:  Vice President


[SIGNATURES CONTINUE ON FOLLOWING PAGE]

A3143

CONFIDENTIAL
CURTIS_000031

[SIGNATURES CONTINUED FROM PREVIOUS PAGE]

TCBA AMBULANCE, INC.

By: _____
Name: Patrick Seiler
Title:   Vice President

TRANSCARE WESTCHESTER, INC.

By: _____
Name: Patrick Seiler
Title:   Vice President

TRANSCARE HARFORD COUNTY, INC.

By: _____
Name: Patrick Seiler
Title:   Vice President

TC AMBULANCE GROUP, INC.

By: _____
Name: Patrick Seiler
Title:   Vice President

TC AMBULANCE NORTH, INC.

By: _____
Name: Patrick Seiler
Title:   Vice President

**A3144**

CONFIDENTIAL

CURTIS_000032

| From: | Lynn Tilton <Lynn.Tilton@PatriarchPartners.Com> |
|---|---|
| To: | Glenn Leland |
| CC: | Jean Luc Pelissier; Randy Jones; Jim O'Connor; Mark Bonilla; Jeff Ellis |
| Sent: | 1/26/2015 12:52:22 PM |
| Subject: | RE: TransCare Weekly Report - Supplemental |

Glenn,
Welcome to our world. That said, this report is very disappointing and makes me question how management can be so far off again.
I believe in the phoenix and have compared myself to this mythical being more than once.
But one cannot rebuild until the issues are understood down to the basic variables. It starts with truth and understanding.
I fear that I the data I have received all year has been faulty and I need to understand why.

I was not involved in the last recovery plan—much time was spent with Jean Luc and the team.
I would like to understand how the June plan was so far off the November plan and now this again, does not work.
Is it a lack of understanding?

We will await your recovery plan.
Lynn

From: Glenn Leland [mailto:glennl@transcare.com]
Sent: Sunday, January 25, 2015 2:05 PM
To: Lynn Tilton
Cc: Jean Luc Pelissier; Randy Jones; Jim O'Connor; Mark Bonilla; Jeff Ellis
Subject: TransCare Weekly Report - Supplemental

I am excited to be onboard this week, and to submit this first email update.  First subway ride alone this afternoon, so I'm continuing my New Yorker training.

Jim O'Connor will also submit a weekly report in the more traditional format, and there will only be one from us starting next week. Future weekly reports will be more succinct and focus on measures and progress.

Sorry that this is not a report of good news and smooth sailing, but instead conveys surprising and disturbing news. Probably not the first new CEO that has had to do this, but a wise person once told me, "bad news does not improve with age". I assure you I am taking leadership of the company and developing a revised recovery plan. TransCare can overcome these challenges, and like the mythical Phoenix emerge from the fire stronger. My vision of the company's future is bright and that it will become a valuable asset in the portfolio. After first week meetings the team conveyed to me excitement and optimism about our long-range prospects. But, the recovery will not be as fast or easy as previously communicated. The executive team and I remain convinced there is enough goodwill for the brand in its core customers that renovation and recovery and subsequent growth are possible.

Jean Luc will get some time on your calendar in about two week's time. By then I will have looked under most of the stones to find what is different from what was expected, and will present the revised plan. (Spoiler alert, the plan will include a request for investment). We will not simply cut our way to Phoenix, but will efficiently and effectively transform to positive equity. Here are some highlights of surprises from my first few days:

1.   **Recovery plan not viable.**  The management team does not support the recovery plan previously presented, as it failed to anticipate some conditions now evident.  For example, some of the costs thought to be G&A, and earmarked for cuts in late 2014, are actually contractually required direct operating expenses. With revenue declines there has not been a matching reduction in operating costs (some but not matching), so TransCare is not profitable and cash flow is negative. Inventories, reserves and credit have been depleted.   We will have a new and viable plan in two weeks.

2.   **Customers not as happy as communicated.**  Ambulance customers in large part earn customer loyalty thru timeliness, with ambulance and crewmember aesthetics as a secondary evaluation criterion. TransCare is late as much as 50% of the time, despite in some cases having contractual obligations for 90% on-time reliability.  That sets up the next three topics:

EXHIBIT
10.8
10-29-18

TRANSCARE00067400

JX 008

LaMonica v. Tilton, et al., 18-1021-smb

a.   **Leakage.** There is widespread leakage of call volume to competitors and a decline in share of requirement (AKA client marketshare). There is a week-over-week decline in transport volume and revenue for at least the past 20-consecutive weeks. This is a direct effect of poor on-time performance and secondary quality indicators eroding customer loyalty.

b.   **Client terminations.** Two clients left altogether in the past six months, and another (Main Line Hospital System in Pennsylvania) contacted me this week to inform us they would be issuing an RFP to replace TransCare. Timeliness, vehicle aesthetics and reliability were the primary reasons cited. (Jim and I will meet with this client Thursday in an attempt to salvage the $4M revenue business). However, the fact that customers have remained as loyal as they have despite service quality is a testament to the brand and the relationship key clients have with Jim O'Connor's and others. That key strength is the foundation upon which we will base our Phoenix plan.

c.   **Ambulance fleet unreliable.** Of the 400+ ambulances scheduled daily, only 250 were operable one day this week (close to 40% inoperable as compared to an industry norm of 15% including scheduled preventative maintenance). 76% were inoperable at Main Line one day last week. Management reorganization of the fleet management process in October is helping and there is improvement, but not enough. For the Phoenix plan we are analyzing options that mix acceleration of vehicle replacement to termination of certain profitable, but inefficient clients to allocate scarce vehicles to the best clients.

3.   **Cash and credit are strained.** To conserve scarce cash and credit, TransCare has depleted inventories, delayed maintenance, let service levels deteriorate and only paid vendors when supply lines are critical. The ABL with Wells Fargo has breached loan covenants and the bank has asked me to meet with them as soon as practical. Accounts payables balance has increased $3.6 million since last year at this time (and was not current then). Non-payment of vendors (to conserve cash) means many vendors have suspended services. Several landlords are threatening eviction for non-payment of rent. An example of the suboptimal decision resulting from the cash starved situation, is ambulances needing bodywork and paint in Pittsburgh are brought to New York, where services are performed at a premium cost, because no Pittsburgh body and paint shops are willing to extend credit. Obviously this not only wastes resources with an inefficient supply chain, and creates risk, but also leads to lack of ability to obtain supplies / services at favorable pricing. It also consumes an inordinate amount of management time with daily cash juggling – which I think has greatly contributed to some of the misses in the original recovery plan.

Once again, I am sorry to submit such a distressing and surprising report as my first weekly update. We are changing our action plans to fit the reality of the situation and viable options. From the ashes, the Phoenix will rise.

Thanks,

**Glenn Leland, MBA**
Chief Executive Officer
TransCare Corporation

GlennL@TransCare.com

1 Metrotech Center, 20th Floor
Brooklyn, NY 11201

Mobile (917) 635-2900
Office (718) 510-9181

*Safe | Team-based | Attentive | Respectful | Customer accountable | Appropriate | Reasonable | Ethical--*

**TransCare Corporation Confidentiality Note** This E-mail message is intended to be received by persons entitled to receive the confidential information it may contain. Please do not Read, Copy, Forward or Save this message unless you are the intended recipient. If you have received this message in error, Please Forward it back to the Sender and Delete it completely from your computer system.

TRANSCARE00067401

Checked: By Barracuda Spam and Virus Firewall

TRANSCARE00067402

**From:**       Microsoft Outlook on behalf of Jean Luc Pelissier (CBA)
**Sent:**       Wednesday, February 4, 2015 9:29 PM
**To:**         Lynn Tilton
**Cc:**         Brad Schneider; Glenn.Farris@uic.com
**Subject:**    Transcare :: Escalated situation & corrective proposal
**Attachments:** Transcare :: Escalated situation & corrective proposal

Sender: pelissier@cbagroupllc.com
Subject: Transcare :: Escalated situation & corrective proposal
Message-Id: <01e401d040eb$6fbd6600$4f383200$@cbagroupllc.com>
Recipient: Lynn.Tilton@patriarchpartners.com



JX 010

LaMonica v. Tilton, et al., 18-1021-smb

EXHIBIT
85
10/24/8

1

PP-TRBK0028597

| From: | Jean Luc Pelissier (CBA) |
|---|---|
| Sent: | Wednesday, February 4, 2015 9:29 PM |
| To: | Lynn Tilton |
| Cc: | Brad Schneider; Glenn.Farris@uic.com |
| Subject: | Transcare :: Escalated situation & corrective proposal |
| Attachments: | Transcare Corrective Plans.pptx |

Lynn,

I would rather not have to write this email, unfortunately, as reported in his last two weekly updates, Glenn Leland has uncovered a significantly more distressed and deteriorating situation at Transcare than previously understood. The situation faced by the company requires immediate attention and liquidity to remedy.

While Transcare has not executed correctly and timely its recovery plan defined in December, several further discoveries have been made including worsening client satisfaction, significantly reduced fleet reliability and poor business process and data collection systems than reported during the planning process.

As a result there has been a significant deterioration in the financial condition of the company, since the middle of last year. The company has exhausted all internal liquidity sources and will require an emergency funding tomorrow of $1.9M to meet their Friday payroll.

Glenn and the team , helped by Brad has been formulating corrective actions which I had the opportunity to review with the team today. Below is an executive summary and enclosed is a slide deck with the proposed scenarios.

## Two paths to profitability are proposed hereafter:

Fast Path to profit

Cut to the core most profitable customers from $130M revenue down to $83M generating 12% EBITDA margin . 60% reduction in workforce, eliminating 1,460 jobs. The scenario requires $1.9 million for payroll immediately and as much as $6.7 million thru early April. It will take as much as 90 days to execute because of the WARN act and contract termination constraints.

Glenn also proposes a slower path to greater profit.

This scenario requires $6.7 million between now and April in emergency cash, but also an estimated $8 million in infrastructure investment by July to rejuvenate the fleet and add technology tools to manage the operations efficiently . The improved infrastructure will improve efficiency of operation which is the root cause of the current problems . But, most importantly, resets the service reputation of the company and sets up a platform for growth.

Glenn and the team are available for an immediate meeting at any time.

1

Best regards; Jean-Luc

2

PP-TRBK0028599