# 20 Civ. 06274 (LAK)

**United States District Court**

*for the*

**Southern District of New York**

_____

IN RE TRANSCARE CORPORATION, ET AL.

DEBTORS,

_____

PATRIARCH PARTNERS AGENCY SERVICES, LLC, ET AL.

DEFENDANTS-APPELLANTS,

—against—

SALVATORE LAMONICA, AS CHAPTER 7 TRUSTEE OF THE JOINTLY-
ADMINISTERED ESTATES OF TRANSCARE CORPORATION, ET AL.,

PLAINTIFF-APPELLEE.

_____

ON APPEAL FROM THE UNITED STATES BANKRUPTCY COURT FOR
THE SOUTHERN DISTRICT OF NEW YORK (BERNSTEIN, J.)

IN RE: TRANSCARE CORPORATION, ET AL., CASE NO. 16-10407 (SMB)

LAMONICA V. TILTON, ET AL., ADV. PROC. NO. 18-1021 (SMB)

---

## APPENDIX TO BRIEF FOR THE APPELLANTS

---

# Volume XV- A3167-A3207

| | |
|---|---|
| **From:** | Glenn Leland </O=TRANSCARE/OU=FIRST ADMINISTRATIVE GROUP/CN=RECIPIENTS /CN=GLENNL> |
| **To:** | Jean Luc Pelissier; Brad Schneider; Mark Bonilla; Steve Berlin; Brian Stephen |
| **Sent:** | 2/6/2015 2:50:33 PM |
| **Subject:** | Re: New alternative to consider |
| **Importance:** | High |

Brad, here is a resend of this email since it was not clear if you at Patriarch received the original. I added Brian and Steve so we are all working from the same information.

Next, as a point of research we reviewed the MTA contract, and here is the clause about transfer of the contract:

# ARTICLE 204     CONSENT OF AUTHORITY SUBLETTING OR ASSIGNMEN

## The Contractor shall not subcontract, assign, transfer, Contract or its right, title or interest in or to the same consent of the Authority. A violation of this provision s Contract.

This clause establishes that assignment is possible. The entire contract is too large to email (17mg) but we can provide by FTP or USB if you want the entire contract.

National Express has followed up to reiterate their interest in the transaction described below.

There is urgency to determine if this is a viable approach, because we are increasingly concerned about the MTA as a stable customer (due to concerns about our financial stability which will be exacerbated).

I am requesting authorization to do the following steps:

1. **Ask National Express to draft a Letter of Intent for our review.** That Letter Of Intent (LOI) would describe the offer of a non-refundable deposit which would be used as a down payment on the transfer of a renewed contract. The LOI would also establish the cash offer in the event the contract is renewed and is transferred to National Express.
2. **Meet with leadership of the MTA** to introduce the idea and determine if they would agree to renew the contract and subsequently allow us to assign the contract. I have a meeting with MTA leadership next week, and hope to use that occasion to introduce this proposal. I would like to include National Express executives in that meeting.

If authorized to take these actions, I will report back with the findings from the meeting with the MTA, and subsequent actions.

Last, if we sell this business to generate cash, we are proposing to use the proceeds for some of the short term

**JX 012**

LaMonica v. Tilton, et al., 18-1021-smb

TRANSCARE00004259



EXHIBIT
54
10-17-18

cash we need between April 10 - April 30 to duck the majority of the predicted deconstruction charges of $4.2 ~~Cash we need ... April 6 to April 6 ... majority of the predicted deconstruction charges~~ and critical unpaid supply chain partners, so we can execute a modified recovery plan. Obviously that will require a detailed business plan and approval. But, we have limited planning resources here at TransCare and would like to know if there is conceptual support for this use of the proceeds, before we focus much of our scarce talent fleshing out a detail plan (in the next week).

Ready to discuss as needed, at your earliest convenience.

Glenn

On 2/5/15, 11:48 AM, "Glenn Leland" <glennl@transcare.com> wrote:

*The sharks are circling. Every threat can however be an opportunity if we adjust our paradigm.*

There is a new alternative to the emergency cash request and accelerated recovery plans we put forward to you and the Board yesterday. (Early payment by the MTA may solve our problem this week, but as we discussed yesterday the cash deficit returns and escalates to a peak of $6.7 in early April).

Under this alternative we would sell our most valuable asset for an estimate $15 to 18 million, and use that cash (as opposed to new investment by Patriarch Partners) to fund a modified version of the Slow Path to Profit and Growth model I've been conceiving and introducing over the past two weeks.

Furthermore, we can possibly get some of that cash (which is an alternative to the cash request thru April we requested over the past two weeks) as early as Monday February 9th.

I will develop an analysis of this alternative to the same initial detail as the two paths presented yesterday, for discussion today. That will come to you in the form of an amended and updated email and PowerPoint like sent last night, but with the new alternative and revised numbers. I agree we need more detailed plans, but I will get at least that level of a sketch of the plan in a few hours.

Background:

TransCare enjoys a contract with the Metropolitan Transit Authority for paratransit services. It is one of our most profitable businesses and is include in both our Fast and Slow Path plans. The contract produces $4 million of EBITDA and has very little capital demand (fleet provided by MTA). We reduced our EBITDA plan to $3.7 to factor likely concessions to renew the contract.

Our contract however is nearing expiration and we are working with the MTA on a five year extension. Our service levels have been very good (unlike our ambulance business) and the customer is reasonably satisfied. The only concern we have heard from the customer is our financial stability. We believe that is why the contract renewal is delayed.

Today I was approached by executives of National Express, an international transit services leader (see stats below).

| National Express | (Billions) | |
|---|---|---|
| LON:NEX | £ | $ |
| Revenues | 1.90 | 2.91 |
| Operating Income | 0.19 | 0.29 |
| Market Cap | 1.36 | 2.08 |

National Express is familiar with our contract and wants to break into these services with the New York Transit Authority. They have been researching our situation and believe that the hold up on our contract

TRANSCARE00004260

renewal is our unstable financial condition, they are key. Further, absent that approach, the likely action of the MTA would be to distribute our business to other small vendors, which eliminates their opportunity.

So, they proposed to me the following steps:

1.  **Partner on the contract renewal.** National Express would provide the stable financial condition and platform the MTA prefers.

2.  **Meet with MTA.** The next step would be to introduce this alliance to the MTA and demonstrate the new stability and strength. (This will be important to do in the next two business days before our exectution of the recovery plan and lay off increase customer concern).

**3.  Execute the renewed contract.**

4.  **Transfer ownership to National Express.** We would create a call option or other transaction model that provides them to the right to buy the company at a pre determined price.

They described their valuation process and schema. It is a 85 to 90% of contract life value model. So in this case that would likley mean the following values:

| Potential valuation | (000's) |
|---|---|
| EBITDA | $4,000 |
| Term | 5 years |
| Value | $20,000 |
| Discount 10% | $18,000 |
| Discount 15% | $17,000 |

Because of our immediate cash emergency, I told them that if I take this to our Board for consideration, it would be very helpful to make a non-refundable deposit on the option. I requested $6.7 million, with $1.7 as soon as today (assuming the Board is interested in this approach). These funds would be credit toward the final transaction, but if the transaction did not occur for some reason, would not be refunded.

National Express COO just visited my office to tell me that they are confident they could provide a $1.7 million deposit on Monday, if we elect to move forward. With the early payment by MTA, we don't need the cash today but we do still need emergency relief ahead – so this deposit on the option could be not only the fund to reinvest in infrastructure, but also the emergency cash source.

Thanks,

**Glenn Leland, MBA**
Chief Executive Officer
**TransCare** Corporation

GlennL@TransCare.com

1 Metrotech Center, 20th Floor
Brooklyn, NY  11201

Mobile (917) 635-2900

TRANSCARE00004261

*Safe | Team-based | Attentive | Respectful | Customer accountable | Appropriate | Reasonable | Ethical--*

TRANSCARE00004262

**A3170**

**From:**               Glenn Leland <GlennL@transcare.com>
**Sent:**               Tuesday, February 10, 2015 11:13 PM
**To:**                Lynn Tilton
**Cc:**                Brad Schneider; Jean Luc Pelissier
**Subject:**         Re: RCA Ambulance Service NYC

Understood.

They want to meet with me and I have postponed until I have a clear perspective. I think we are getting to the point I need to engage them to preserve time.   There is only so much honeymoon afforded a new CEO and the expiration date with the bank in near.

By the way I share your concern about the bank

Sent from my iPhone

On Feb 10, 2015, at 11:01 PM, Lynn Tilton <Lynn.Tilton@PatriarchPartners.Com> wrote:

> Just make sure you have valid numbers.  We cannot lose Wells or we will not have the
> time and cash we need.
> Transparency and trust will be essential.
>
> <image001.jpg>
> Lynn Tilton
> Chief Executive Officer
> Patriarch Partners, LLC
> One Broadway, 5th Floor
> New York, NY 10004
> 212-825-6772
> 212-825-2038 – FAX
> Lynn.Tilton@PatriarchPartners.com
> Web: www.patriarchpartners.com
>
> **From:** Glenn Leland [mailto:GlennL@transcare.com]
> **Sent:** Tuesday, February 10, 2015 11:00 PM
> **To:** Lynn Tilton
> **Cc:** Brad Schneider; Jean Luc Pelissier
> **Subject:** Re: RCA Ambulance Service NYC
>
> We are in the foxhole and appreciate your leadership and company. No one knew it was this bad. But, we will be the Phoenix and are building a plan. Ugly and crude at first but we do not give up in EMS.
>
> I have half a dozen plans and are narrowing down to the best.
>
> If you ask the team here, they would tell you they are more energized than ever. We know what it takes. Just have to distill it into something we can support with more than gut. A few days and we will be ready

1



**EXHIBIT**
**IK3**
**10-29-18**

**JX 015**

LaMonica v. Tilton, et al., 18-1021-smb

PP-TRBK0028514

Some of the ideas are crazy. But normal thinking is what got us in this mess. A little crazy just might be the right prescription..

Thanks again for you patience and support.

Sent from my iPhone

On Feb 10, 2015, at 10:51 PM, Lynn Tilton <Lynn.Tilton@PatriarchPartners.Com> wrote:

> And know that I will climb into the fox hole and help you get there.
> We must keep the bank at bay. Financial statements must be on time and we need to have a plan for them.
> I am very sad that this company was mismanaged and that truth was not reported.
> We will fix. We may need to get smaller before we grow but we will find our way into the light.
>
> <image001.jpg>
> Lynn Tilton
> Chief Executive Officer
> Patriarch Partners, LLC
> One Broadway, 5th Floor
> New York, NY 10004
> 212-825-6772
> 212-825-2038 – FAX
> Lynn.Tilton@PatriarchPartners.com
> Web: www.patriarchpartners.com
>
> **From:** Glenn Leland [mailto:GlennL@transcare.com]
> **Sent:** Tuesday, February 10, 2015 10:48 PM
> **To:** Lynn Tilton
> **Cc:** Brad Schneider; Jean Luc Pelissier
> **Subject:** Re: RCA Ambulance Service NYC
>
> Appreciate that vote of confidence! That means so much to us right now.
>
> Have some interesting ideas for when we meet next week. Not as well analyzed and packaged as we all prefer, but it's a very dynamic situation over here.
>
> Thanks for all of Jean Luc, Brad and Steve Berlin's help - especially in the last 80 hours. I agree - we will fix this and I will make good on the promises I made in my interview. (Despite a worse situation any of us imagined.)
>
> I took a picture of a plaque in your lobby and show Otto my team everyday. We did not dream this. It is not our reality. Our reality is different and we will get there.
>
> Sent from my iPhone
>
> On Feb 10, 2015, at 4:24 PM, Lynn Tilton <Lynn.Tilton@PatriarchPartners.Com> wrote:
>
>> I am not interested in changing management. I just wanted to know who they are and what might have brought them to me.

2

PP-TRBK0028515

A3172

Hang in there.  We will fix this.

<image001.jpg>
Lynn Tilton
Chief Executive Officer
Patriarch Partners, LLC
One Broadway, 5th Floor
New York, NY 10004
212-825-6772
212-825-2038 – FAX
Lynn.Tilton@PatriarchPartners.com
Web: www.patriarchpartners.com

**From:** Glenn Leland [mailto:GlennL@transcare.com]
**Sent:** Tuesday, February 10, 2015 4:18 PM
**To:** Lynn Tilton
**Cc:** Brad Schneider; Jean Luc Pelissier
**Subject:** Re: RCA Ambulance Service NYC

Understood

We will write a short note about what we know of this company.

Sent from my iPhone

On Feb 10, 2015, at 4:06 PM, Lynn Tilton
<Lynn.Tilton@PatriarchPartners.Com> wrote:

No.

<image001.jpg>
Lynn Tilton
Chief Executive Officer
Patriarch Partners, LLC
One Broadway, 5th Floor
New York, NY 10004
212-825-6772
212-825-2038 – FAX
Lynn.Tilton@PatriarchPartners.com
Web: www.patriarchpartners.com

**From:** Glenn Leland [mailto:GlennL@transcare.com]
**Sent:** Tuesday, February 10, 2015 4:06 PM
**To:** Lynn Tilton
**Cc:** Brad Schneider; Jean Luc Pelissier
**Subject:** Re: RCA Ambulance Service NYC

Want me to contact them and research?

Sent from my iPhone

On Feb 10, 2015, at 4:03 PM, Lynn Tilton
<Lynn.Tilton@PatriarchPartners.Com> wrote:

3

PP-TRBK0028516

They don't want to buy. I think they
want to come in and run Transcare.

<image001.jpg>
Lynn Tilton
Chief Executive Officer
Patriarch Partners, LLC
One Broadway, 5th Floor
New York, NY 10004
212-825-6772
212-825-2038 – FAX
Lynn.Tilton@PatriarchPartners.com
Web: www.patriarchpartners.com

**From:** Glenn Leland
[mailto:GlennL@transcare.com]
**Sent:** Tuesday, February 10, 2015 3:23
PM
**To:** Lynn Tilton
**Cc:** Brad Schneider; Jean Luc Pelissier
**Subject:** Re: RCA Ambulance Service
NYC

As suspected, our team does know this
company. It is the group replacing us in
the highly unprofitable board of
education contract at the end of this
month. They are focused on deeply
discounted nursing home business.

It was uncertain from the note if they
want to buy or sell (although I presume
buy). If it's ok with you I can follow up
with them to see what they are
contemplating and include that in an
upcoming report, or plan.

Glenn

Sent from my iPhone

On Feb 10, 2015, at 2:56 PM, Lynn
Tilton
<Lynn.Tilton@PatriarchPartners.Com>
wrote:

> I just received this. I
> do not know who
> these people are. Do
> you?
>
> <image002.jpg>
> Lynn Tilton
> Chief Executive
> Officer

4

PP-TRBK0028517

**A3174**

Patriarch Partners, LLC
One Broadway, 5th
Floor
New York, NY 10004
212-825-6772
212-825-2038 – FAX
Lynn.Tilton@PatriarchP
artners.com
Web:
www.patriarchpartner
s.com

**From:** Mike Weinberger
[mailto:mweinberger@r
cambulance.co]
**Sent:** Tuesday,
February 10, 2015 2:54
PM
**To:** Lynn Tilton
**Subject:** RCA
Ambulance Service NYC

Good afternoon,

First let me introduce
myself, my name is
Mike Weinberger COO
of RCA Ambulance
Service in the NYC five
boroughs. RCA has
been in business since
1966 and new
ownership took over
appx three years ago.
Since then we have
been able to grow the
company successfully
and continue to do so.
Reason for this email is
to inquire if you and the
Transcare team had any
interest in either a sale
or management
takeover to operate the
company in NYC as well
as outside of the NYC
territory. The RCA
management team
comes with many years
of ambulance service
experience in
Operations, Billing,
Human Resources, and
Fleet Maintenance. I

5

PP-TRBK0028518

A3175

look forward to hearing
back from you at your
earliest convenience.

Sincerely

**Mike Weinberger**
**Chief Operating**
**Officer**
**RCA Ambulance**
**Service**
**1355 Castleton Ave**
**Staten Island, NY**
**10310**
**Office: 718-273-7703**
**Ext: 240**
**Fax: 718-273-3898**
**Cell: 516-434-0606**
<image001.jpg>

TransCare Corporation
Confidentiality Note
This E-mail message is
intended to be received
by persons entitled to
receive the confidential
information it may
contain.  Please do not
Read, Copy, Forward or
Save this message unless
you are the intended
recipient.  If you have
received this message in
error, Please Forward it
back to the Sender and
Delete it completely
from your computer
system.


Checked: By Barracuda
Spam and Virus Firewall

6

PP-TRBK0028519

**A3176**

**TransCare Corporation Confidentiality Note** This E-mail message is intended to be received by persons entitled to receive the confidential information it may contain. Please do not Read, Copy, Forward or Save this message unless you are the intended recipient. If you have received this message in error, Please Forward it back to the Sender and Delete it completely from your computer system.

Checked: By Barracuda Spam and Virus Firewall

**TransCare Corporation Confidentiality Note** This E-mail message is intended to be received by persons entitled to receive the confidential information it may contain. Please do not Read, Copy, Forward or Save this message unless you are the intended recipient. If you have received this message in error, Please Forward it back to the Sender and Delete it completely from your computer system.

Checked: By Barracuda Spam and Virus Firewall

**TransCare Corporation Confidentiality Note** This E-mail message is intended to be received by persons entitled to receive the confidential information it may contain. Please do not Read, Copy, Forward or Save this message unless you are the intended recipient. If you have received this message in

7

PP-TRBK0028520

A3177

error, Please Forward it back to the Sender and Delete
it completely from your computer system.

Checked: By Barracuda Spam and Virus Firewall

**TransCare Corporation Confidentiality Note** This E-mail message
is intended to be received by persons entitled to receive the
confidential information it may contain.  Please do not Read,
Copy, Forward or Save this message unless you are the intended
recipient.  If you have received this message in error, Please
Forward it back to the Sender and Delete it completely from your
computer system.

Checked: By Barracuda Spam and Virus Firewall

**TransCare Corporation Confidentiality Note** This E-mail message is intended
to be received by persons entitled to receive the confidential information
it may contain.  Please do not Read, Copy, Forward or Save this message
unless you are the intended recipient.  If you have received this message
in error, Please Forward it back to the Sender and Delete it completely
from your computer system.

Checked: By Barracuda Spam and Virus Firewall

8

PP-TRBK0028521

**A3178**

| | |
|---|---|
| **From:** | Glenn Leland <glennl@transcare.com> |
| **Sent:** | Saturday, March 7, 2015 2:05 PM |
| **To:** | Lynn Tilton |
| **Cc:** | Jean Luc Pelissier; Michael Greenberg; Randy Jones; John Pothin; Brian Stephen; Mark Bonilla |
| **Subject:** | TransCare highlights March 1 to 7, 2015 |

Focus this week (and next several) is on execution of the stabilization plan and financing activities related to Wells Fargo, liquidity and on-going operations.

## Financing activities:

Emergency cash provided by Patriarch Partners (thank you!).

Unfortunately it was not received in time to fund payroll. ADP selected the TC ParaTransit payroll to hold for insufficient funds, despite our request to fund it first (all other payroll funded internally). We issued a statement to impacted employees. Depending on their bank, some employees received direct deposits on Saturday, but there are many who will not receive direct deposit until Monday. We have invited impacted employees to file an incident report if there are consequences of the delayed payroll, so we can assess the scale of impact and determine if any actions are viable.

Mark Bonilla and Michael Greenberg collaborated on cash flow analysis as well as information for Wells Fargo intended to result in a forbearance agreement this week. Expect a specific update Monday evening or Tuesday morning as we see what deposits are received in the first few days of the week.

There are several essential suppliers communicating escalation of supply chain or service interruption or eviction due to non-payment. Once again, expect an update to the cash flow for this upcoming week. The immediate threats this week in addition to our challenge with payroll until the stabilization plan effected are realized, are insurance and worker compensation. These coverages must be funded on 3/13 or TransCare faces irrevocable termination of coverage 3/15, and would cease to operate (auto insurance and workers compensation are required).

## Stabilization plan rollout:

We are making significant progress on execution of the stabilization plan. Highlights follow:

**Board of Education.** As planned the Board of Education contract ceased on March 1st and its operational assets were redeployed. This will have a significant impact on profitability.

The contract required 100% on time performance and represents about 60 transports per school day. So, we expected a decline in transport volume and deterioration in on time performance statistics this first week. In actuality, we experienced higher volume on other more profitable clients and essentially the same on time performance; which means our performance improved better than planned. We will begin to see these

1



EXHIBIT
226 Leland

**JX 029**

LaMonica v. Tilton, et al., 18-1021-smb

**A317**

improvements in our operational dashboard next week (they are one week in arrears) and in the March financial reports.

**Reduction in Force.**  Highlights of immediate actions executed this week:

*Corporate*

➢   VP Human Resources (Jeff Ellis) – off payroll effective 3/6 and to remain unfilled until stabilization is working

➢   VP Business Development – (Jim O'Connor replacement) –off payroll effective 2/20 and this will remain unfilled until stabilization plan is working

➢   Director Clinical Operations – budgeted position will not be filled

➢   2 Billing positions – 1 eliminated as of 3/3; the other in approximately 2 weeks after transition of MD/ML billing to Corporate

➢   1 financial analyst – budgeted position will not be filled

➢   1 operations analyst – budgeted position will not be filled


*New York Operations*

➢   VP NYC Operations - budgeted position will not be filled

➢   Dispatch Manager – position eliminated and employee laid off effective 2/27

➢   ECC communications rep – position eliminated and employee laid off effective 3/2

➢   NYC 911 Logistics Runner - position eliminated and employee laid off effective 3/2

➢   NYC 911 Vehicle Mover - position eliminated and employee laid off effective 3/2

➢   ACR Scanner – position eliminated and employee laid off effective 3/3

➢   Unit hours eliminated as per plan.  (This will phase in over next several weeks as we stabilize other changes, to preserve OTP to remaining customers)


*Main Line Operation*

➢   Regional Director Business Development – employee given 60 day WARN notice 3/2

➢   Director Operations - employee given 60 day WARN notice 3/2

➢   Base Manager - employee given 60 day WARN notice 3/2

➢   All employees given WARN notice 3/2

➢   90-day contract termination issued to Main Line Health Systems.  Working on accelerated transition.

A3180

PP-TRBK0071447

> Unit hours eliminated as per plan.  (This will phase in over next 60 to 90 days due to contract exit obligations)

*Maryland Operations*

> Billing Manager – position eliminated – notice given 3/2 – retaining employee 2 weeks for transition of operations to NY Billing

> Billers (7 positions) – all eliminated - notice given 3/2 – retaining employee 2 weeks for transition of operations to NY Billing

**Rollout communications.**  The management talking points (included in last week's report) were conveyed in person to management in Baltimore, Philadelphia and NYC Core, NYC EMS, TC ParaTransit and HQ.  Management and supervisors then orally communicating stabilization plan to all employees.  Message was well received and virtually all leaders commented that they are "on the bus".

Communications rollout (combined with client meetings) continues this upcoming week in the less impacted business units in Hudson Valley and Pittsburgh.

**Fleet reductions.**  Tom Fuchs has developed a fleet retirement and salvage plan.  31 vehicles were retired this week in NYC.  22 were retired in Maryland, Delaware and Pennsylvania. More will be retired this week.

Discussions are underway with several potential buyers of retired ambulances (minimal salvage value, but also looking for an efficient auto parts harvest process).  Arlene Menachem (KIN leasing) is considering accepting some vehicles as partial payment of overdue leases.

## Customer relations:

We continue to meet with customers to convey the stabilization plan impacts.  We have experienced an increase is transport volume during the first few days of the new plan, despite elimination of the large and unprofitable Board of Education contract.  Following are notable customer discussions:

**Metropolitan Transit Authority (MTA).**  The MTA has sent several follow up emails regarding the third party audit of FY2013.  We are awaiting the Wells Fargo forbearance agreement, and then a "comfort letter" to the auditor BDO.  Once that is completed, we will ask for approval of the Audit report, so we can get it to the MTA as soon as possible.

Inside sources at the MTA tell us that concerns of TransCare's financial stability are increasing within the MTA and the probability of contract renewal is declining.  Delays in the audit are the primary issue, but we also know that delayed payroll to our TC ParaTransit employees has been noted, and that several vendors and our landlord have complained directly to the MTA.  The situation is precarious.

MTA at the same time added several additional "vehicle service hours" to our service, which increase our February revenues about $200k over expectations.  However, we will not receive this payment until April, and observed an increase in labor cost to add the additional work.  This increases EBITDA, but of course has an adverse short-term working capital impact.

3

PP-TRBK0071448

**Mount Sinai.** Meeting with President and COO David Reich and several key staff members to discuss and resolve on time performance challenges. We conveyed our expectation of improved service thru the stabilization plan. Now will have bi-weekly performance progress updates. In the same Meeting Dr. Reich described the strategic focus of Mount Sinai as it adjusts to a new order following merger with two other major health systems. Hospital throughput and patient flow are top executive priorities (which make transportation reliability paramount). We also discussed several process flow innovations I introduced in Northern California, and there was great interest in further system redesign discussions. We agreed that the existing contract needs to change to reflect a new design and a new economic reality, and these design / contract revision discussions will begin in the next several weeks.

VP of ED and EMS, Dr. Carl Ramsay has asked for a meeting this upcoming Friday to review current NYC EMS operations. We anticipate criticism of scaled back quality improvement processes included in the November RIF. Insiders at Mount Sinai tell us that Dr. Ramsay is trying to gain support for taking over the EMS operation in-house, and this meeting will be an important relationship development discussion. I anticipate a set of QI commitments will come from the meeting.

**Main Line Health Systems.** Earl Kossuth and I met with our client and issued the 90-day contract termination notice. We discussed a more rapid exit strategy, which will require continued dialog.

**Manor Care SNF.** Earl Kossuth and I will meet with our Pittsburgh client to renegotiate service mix as well as rates.

## Key Performance Indicators (KPI):

Since KPI are a week in arrears, the changes in the stabilization plan are not yet reflected. So, to conserve time, I will not include the KPI this week, but instead will focus next week on the KPI and the impacts we are seeing from the stabilization plan, as well as the actions taken prior to the new stabilization plan.

## Other topics:

Two organizations continue to contact me to pursue acquisition of TransCare or its assets. I include this in this report because it is outside my authority to autonomously respond to these inquiries. I thought it best to convey these on-going options for your judgment:

**National Express.** You may recall this is a multi-national transit operation with market cap >$2B. They are interested in the MTA contract. They believe that concerns about TransCare's financial stability will result in non-renewal, and that eliminates any opportunity for them to enter the market. So, they are interested in buying our MTA business and have suggested an immediate purchase of $14 to 18MM (the contract has a viable assignment clause). National Express is prepared to make an immediate down payment this week (which could be used for both emergency cash needs and to accelerate the stabilization plan), if you so desire. National Express is also willing to buy all the assets of TransCare.

Obviously a loss of the MTA contract and its $3.5MM EBITDA would be a significant impact to on-going ambulance operations. But as you noted in a recent meeting, we are fighting for the life of our company and we might be more viable harvesting the value given the precarious nature of the contract renewal. My recommendation would be to wait until we see how the MTA responds to the BDO Audit, and what cash

4

PP-TRBK0071449

demands are realized mid-week.  I recommend we remain prepared to capitalize on this opportunity as it may become our last and best alternative.

**Richmond County Ambulance (RCA).**  This group emailed you directly several weeks ago, and then started communicating with me when they received no reply.  They are interested to buy TransCare and have sent an email proposing $60 to $80MM as valuation.

My thought on this particular opportunity is that RCA must assume TransCare has EBITDA in the $10MM range.  They mentioned on the phone they are using an 8X multiple for valuations (which is high for the industry, but not outside reality).  So, I think this opportunity is not likely to succeed and recommend we either reject any further inquiry or ask them to make a formal "as is" offer for a stipulated amount which exceeds negative equity. Let me know how you would like me to respond to their inquiries.


Thanks,

Glenn Leland, MBA
Chief Executive Officer



One Metrotech Center, 20th Floor, Brooklyn, NY 11201
M: 917-635-2900
O: 718-510-9181
F: 347-689-7326

**S**afety | **T**eam-based | **A**ttentive | **R**espectful | **C**ustomer accountable | **A**ppropriate | **R**easonable | **E**thical

please consider the environment before printing this email

************************************Confidentiality Note************************************
This E-Mail message is intended to be received by persons entitled to receive the confidential information it may contain.  Please do not Read, Copy, Forward or Save this message unless you are the intended recipient.  If you have received this message in error, please Forward it back to the Sender and Delete it completely from your computer system.
*****

**TransCare Corporation Confidentiality Note** This E-mail message is intended to be received by persons entitled to receive the confidential information it may contain.  Please do not Read, Copy, Forward or Save this message unless you are the intended recipient.  If you have received this message in error, Please Forward it back to the Sender and Delete it completely from your computer system.

Checked: By Barracuda Spam and Virus Firewall

A3183

PP-TRBK0071450

| | |
|---|---|
| **From:** | Michael Greenberg <Michael.Greenberg@PatriarchPartners.com> |
| **To:** | Lynn Tilton |
| **CC:** | Jean Luc Pelissier; Brian Stephen; Financial and Investment Law |
| **Sent:** | 7/3/2015 9:30:57 AM |
| **Subject:** | TransCare - update (privileged and confidential) |

Privileged and Confidential

Lynn,

I would like to apologize for having to raise this situation over this weekend but, unfortunately, this has come to us by surprise. Late yesterday, we were made aware of an issue in TransCare's ABL calculation.

Tuesday evening, a Wells Fargo audit of their ABL facility indicated a timing issue as it relates to the posting of receipts against A/R.

Wells Fargo had historically missed this timing issue and did not realize they were in an over advance position.

The 3-week break down and failure of the OCR and scanning technology in April exacerbated those delays and the scanning issue was fixed in early May.
The Wells Fargo auditor informed the bank yesterday that there was a delay in posting reductions to ARs at the end of April.  Wells Fargo audits the borrowing base at the end of each month.

Yesterday, as a result of this issue, we were notified in the afternoon that Wells Fargo refused to provide funding under the ABL as they view themselves to be in an over-advance position until the company catches up on its application of receipts against their A/R balance (expected to be completed over the next week – posting expected to be completed by next Wednesday).

As a result of Wells Fargo's unwillingness to fund against the ABL yesterday, Transcare was not able to fund payroll yesterday of $950k but had to delay payroll until Monday (ADP is closed today).

We attempted to address the issue with Wells Fargo but Wells Fargo's higher level people were not in the office today.  We took the following steps:
- We escalated the issue with John Husson who was unable or unwilling to provide any relief but who did reach out to Kurt Marsden.  Overall, Wells Fargo is concerned about the liquidity of the company.  They are encouraged by the progress being made in terms of profitability but are concerned about the upcoming insurance obligations in addition to the other issues previously raised (replacement of vehicles, investment in IT infrastructure).

- We held a number of calls with Wells Fargo yesterday but were unable to get them to assist.  They are unwilling to provide funding under the ABL until the company catches up on all of its A/R posting and they can assess whether there is availability afterward.

Below are the facts to date.
- Due to Wells Fargo's unwillingness to fund the company yesterday until they are comfortable that the A/R posting has caught up, payroll of $950k had to be delayed until Monday.  Payroll taxes from this past week of $500k will still be outstanding.  Interest is also due of $324k (CS is a lender as well).  Wells Fargo has been saying that interest should not be paid until payroll taxes are current (otherwise, threatening an additional $500k reserve).  Payroll is paid weekly so there will be upcoming payroll at the end of next week of a similar amount.

- Below are the timing differences due to this issue from prior months and the current estimate.  The CFO Mark Bonilla believes that the shortfall is closer to $1.9MM as of the end of May and $1.5MM - $1.7MM by the end of June (still being reconciled).  This is against current outstanding under the ABL of $18.5MM (gross A/R at the end of May of $35.2MM (net A/R of $20.2MM)).  Collections are typically $300k - $350k

**JX 033**

LaMonica v. Tilton, et al., 18-1021-smb

TRANSCARE00007937

per day.  Mark said that the issue was cited in prior audit work papers by other auditors but not raised as an issue in borrowing.  Wells Fargo has said that historically dating back a year, the timing issue was closer to $100k.

|  | Timing Difference |  |
|---|---|---|
| November 2014 | $1.8MM | |
| January 2015 | $1.1MM | |
| February 2015 | $1.8MM | |
| March 2015 | $2.1MM | |
| April 2015 | $2.6MM | |
| May 2015 | $1.9MM | |
| June 2015 (estimate) | $1.5MM - $1.7MM | 1 week collections |

· As a reminder, Wells Fargo currently has a $1.5MM reserve in place to cover accrued payroll since the time of the waiver in Q1.

· As mentioned above, Wells Fargo is also concerned about upcoming insurance payments which we were working on remedies to address.  The insurance payments total approximately $1.6MM and include the following: $877k for May and June workers compensation insurance (company has been provided until July 15th as an accommodation) (includes $320k in assessments from last year) and auto insurance renewal down payment of $800k (2.5 month deposit) also moved from June 30th to July 15th.  We are seeing if Lockton can assist further in delaying these or possibly financing them.

· Wells Fargo also mentioned concern about fleet replacement as well.

<u>Plan to address the A/R posting issue</u>
· As June remains open, the company can rectify by ensuring all A/R gets posted for receipts received through the end of the month.
· The CFO's estimate is that the delta is anywhere from $1.5MM - $1.7MM which will be rectified through catching up on posting or collecting A/R.  Mark expects the closing of June and the catch up on posting of A/R to be completed by Wednesday so that the amount of shortfall can be better assessed.
· The estimated time frame for them to rectify the issue is 3 to 5 days and ensure the proper controls are in place (creation of an unapplied cash report on a daily basis to put into the ineligibles and someone is responsible is running the posting on a nightly basis).

<u>Financial Performance – P&L</u>
· The financial performance has improved on an accrual basis but was still slightly below plan through May.  The chart below shows the YTD May financial performance.
  o May performance shows that, while revenue is above plan by 2%, gross margin has been $675k or 4% below plan (primarily due to higher than plan labor) and EBITDA is $(168)k below plan at $1.0MM.
  o Through 3 weeks, June revenue is ahead of plan by $650k at $7.9MM and EBITDA is ahead of the $1.1MM plan by $146k.
    § Labor is c. $500k or 13% higher than Plan as there is still better fleet efficiencies that can be realized.  One area of particular focus is potential exiting Main Line or Maryland markets (analysis is ongoing).
    § Overall labor / revenue of ambulance is at 44.6% vs. 41.6% in the Plan.  This can be improved upon with increased efficiencies from new parking spaces in Manhattan, securing leases for the addition of new vehicles, a potential ePCR (per transaction) new service and potentially exiting Main Line and/or Maryland.
  o The liquidity analysis below will show the reasons for the shortfall in availability relative to forecast (even before yesterday's events) despite performance which is close to plan on an EBITDA basis.

**A3185**

TRANSCARE00007938

| REVENUES BY REGION (amounts in thousands) | Actual May-15 | Plan May-15 | $ Variance May-15 | % Variance May-15 |
|---|---|---|---|---|
| New York Revenues Core | $8,428 | $6,782 | 1,646 | 24% |
| NY Subsidy Core | $565 | $500 | 65 | 13% |
| Transit Revenues | $13,496 | $12,217 | 1,279 | 10% |
| Maryland Revenues | $3,181 | $2,506 | 675 | 27% |
| Main Line Revenues | $1,976 | $2,344 | (368) | -16% |
| Main Line Subsidy | $242 | $145 | 97 | 67% |
| Pittsburgh Revenues | $2,762 | $2,147 | 615 | 29% |
| Pittsburgh Subsidy | $263 | $255 | 8 | 3% |
| NY 911 Revenues | $10,504 | $13,771 | (3,267) | -24% |
| NY 911 Subsidy | $3,485 | $3,569 | (84) | -2% |
| Hudson Valley Revenues | $3,983 | $3,585 | 398 | 11% |
| Hudson Valley Subsidy | $1,135 | $1,125 | 10 | 1% |
| Billing Associates | $194 | $174 | 20 | 12% |
| All Revenues | 50,215 | 49,120 | 1,094 | 2% |
| | | | | |
| New York Gross Margin Core | 2,128 | $3,231 | (1,103) | -34% |
| Transit Gross Margin | 3,665 | $3,354 | 311 | 9% |
| Maryland Gross Margin | 475 | $915 | (440) | -48% |
| Main Line Gross Margin | (35) | $748 | (783) | -105% |
| Pittsburgh Gross Margin | 1,118 | $1,167 | (49) | -4% |
| NY 911 Gross Margin | 5,024 | $4,167 | 857 | 21% |
| Hudson Valley Gross Margin | 2,040 | $1,522 | 518 | 34% |
| Billing Associates | 194 | $179 | 15 | 9% |
| Gross Margins | 14,609 | $15,284 | (675) | -4% |
| Gross Margin % | 29.1% | 31.1% | -2.0% | |
| | | | | |
| New York EBITDA Core | (692) | $354 | (1,046) | -120% |
| Transit EBITDA | 1,712 | $1,653 | 59 | -13% |
| Maryland EBITDA | (117) | $101 | (218) | -156% |
| Main Line EBITDA | (936) | ($264) | (672) | -660% |
| Pittsburgh EBITDA | 227 | $245 | (18) | -36% |
| NY 911 EBITDA | 2,404 | $1,427 | 978 | 124% |
| Hudson Valley EBITDA | 950 | $348 | 602 | 102% |
| Corp OH | (2,330) | ($2,465) | 135 | -9% |
| Billing Associates | (198) | ($211) | 13 | -71% |
| EBITDA | 1,020 | $1,189 | (168) | -31% |
| EBITDA margin % | 2.03% | 2.42% | -0.39% | |

Liquidity – explanation of liquidity challenges from March through May (last funding at the end of February) and the latest 13-week cash forecast

Cash plan variance analysis (March – May)
Below is the cash plan variance analysis.

TRANSCARE00007939

**TransCare Corporation**
**13 Week Cash Plan**
(000's Omitted)

| | Actual March | PLAN March | March Difference | Actual APRIL | PLAN APRIL | APRIL Difference | Actu MA |
|---|---|---|---|---|---|---|---|
| **RECEIPTS** | | | | | | | |
| Ambulance Receipts | $ 6,844 | $ 6,900 | $ (56) | $ 7,580 | $ 8,600 | $ (1,020) | $ |
| Paratransit Receipts | $ 2,283 | $ 2,300 | $ (17) | $ 2,317 | $ 2,300 | $ 17 | $ |
| **TOTAL RECEIPTS** | $ 9,127 | $ 9,200 | $ (73) | $ 9,896 | $ 10,900 | $ (1,004) | $ |
| **DISBURSEMENTS** | | | | | | | |
| *Payroll* | | | | | | | |
| Wages and employer taxes | $ 6,823 | $ 6,976 | $ (153) | $ 7,278 | $ 6,450 | $ 828 | $ |
| H.S.A. funding | $ - | $ 75 | $ (75) | $ 55 | $ 60 | $ (5) | $ |
| UHC - Employee Medical | $ 390 | $ 390 | $ - | $ - | $ 390 | $ (390) | $ |
| Total Benefits | $ 55 | $ 465 | $ (410) | $ 55 | $ 450 | $ (395) | $ |
| Total payroll & benefits | $ 7,213 | $ 7,441 | $ (228) | $ 7,333 | $ 6,900 | $ 433 | $ |
| *Insurance* | $ 1,480 | $ 1,878 | $ (399) | $ 708 | $ 1,193 | $ (485) | $ |
| *Debt interest* | $ 411 | $ 432 | $ (21) | $ 462 | $ 432 | $ 30 | $ |
| *Other disbursements* | | | | | | | |
| Rent | $ 412 | $ 55 | $ 357 | $ 533 | $ 381 | $ 152 | $ |
| ACH Debits | $ 359 | $ 530 | $ (171) | $ 296 | $ 538 | $ (242) | $ |
| Vehicle lease payments | $ 60 | $ 84 | $ (24) | $ 64 | $ 106 | $ (42) | $ |
| Vehicle purchase down payments | $ 60 | $ - | $ 60 | $ 64 | $ - | $ 64 | $ |
| Accounts payable | $ 1,209 | $ 327 | $ 882 | $ 1,182 | $ 717 | $ 465 | $ |
| Total other disbursements | $ 2,100 | $ 996 | $ 1,104 | $ 2,138 | $ 1,742 | $ 397 | $ |
| **TOTAL DISBURSEMENTS** | $ 11,203 | $ 10,747 | $ 456 | $ 10,641 | $ 10,266 | $ 374 | $ 1 |
| **CHANGE IN CASH** | $ (2,076) | $ (1,547) | $ (529) | $ (744) | $ 634 | $ (1,378) | $ (1 |
| **AVAILABLITY CASH** | $ 293 | $ 981 | $ (688) | $ 293 | $ 1,829 | $ (1,536) | $ |
| Wachovia ABL balance | $ 20,353 | $ 17,381 | $ 2,972 | $ 20,353 | $ 16,997 | $ 3,355 | $ 2 |
| Patriarch term loan | 24,801 | 24,801 | $ - | 24,801 | 24,801 | $ - | 2 |
| Credit Suisse term loan | 7,583 | 7,583 | $ - | 7,583 | 7,583 | $ - | |
| Total of term loans | $ 32,384 | $ 32,384 | $ - | $ 32,384 | $ 32,384 | $ - | $ 3 |
| Total Debt | $ 52,737 | $ 49,765 | $ 2,972 | $ 52,737 | $ 49,381 | $ 3,355 | $ 5 |
| Trailing 60-day cash | $ 22,341 | $ 23,658 | $ (1,317) | $ 22,341 | $ 23,480 | $ (1,139) | $ 2 |
| Eligible AR | $ 20,646 | $ 18,362 | $ 2,284 | $ 20,646 | $ 18,826 | $ 1,820 | $ 1 |

Key variances to the late February cash plan (March – May) are (June has not been estimated yet but is expected to show the same trend):

- Receipts which are $849k below plan at $28.4MM.
  - Key reasons for the shortfall in receipts are the April issues in scanning and billing, which resulted in delayed receipts which are expected to be collected and a 28-day hold on Medicare/Medicaid A/R.
- The Wells Fargo ABL balance is $4.0MM above plan due to higher borrowing levels as eligible A/R exceeded plan by $1.7MM, on average, over the period, the lower than plan receipts ($0.85MM), higher than plan labor ($1.6MM).
- Total disbursements, other than labor, were $0.8MM below plan as certain unexpected payments had to be made to maintain operations ($2.8MM primarily to repay landlords to avoid eviction and other uncooperative vendors required to maintain operations) offset by $1MM in below plan insurance payments.

Latest 13-week cash forecast

- In order to provide additional perspective, the latest 13-week cash forecast as of 06/30/15 (prior to yesterday's events) showed a $1.4MM deficit but it does not include a potential insurance rebate of $500k and any potential catch up on collections (at least $200k in availability to gain).

**A3187**

§  The peak shortfall is $1.4MM but shows improvement over the 13 weeks down to net availability shortfall of $375k as the company moves past some of the short-term cash constraints including the $877k in May and June workers compensation payments (including audit assessment from last year of $340k) and an $800k auto insurance down payment due July 15th.  The latest cash forecast assumed the May workers compensation payment was part of outstanding checks and that the June payment would be paid this week.

Glenn is in CA moving his family but available to fly back in as needed.  Mark Bonilla will be in the office next week.  Please let us know if you have any questions or would like to discuss.

Thank you,
Michael
Michael S. Greenberg, CFA
Patriarch Partners
One Broadway, 5th Floor
New York, NY 10004
Direct: 646-723-7657
Fax:  212-825-2038
Email: michael.greenberg@patriarchpartners.com
www.patriarchpartners.com
**Exhibit I** – Latest 13-week cash forecast

TRANSCARE00007941

**TransCare Corporation**
**13 Week Cash Plan**
(000's Omitted)

| | Actual 6/5/15 | Actual 6/12/15 | Actual 6/19/15 | Actual 6/26/15 | Plan Week 1 7/3/15 | Plan Week 2 7/10/15 | Plan Week 3 7/17/15 | Plan Week 4 7/24/15 |
|---|---|---|---|---|---|---|---|---|
| **RECEIPTS** | | | | | | | | |
| Ambulance Receipts | $ 2,222 | $ 1,538 | $ 1,340 | $ 1,441 | $ 1,600 | $ 1,750 | $ 1,750 | $ 1,750 |
| Paratransit Receipts | $ - | $ - | $ 2,531 | $ - | $ - | $ 2,400 | $ - | $ - |
| **TOTAL RECEIPTS** | $ 2,222 | $ 1,538 | $ 3,870 | $ 1,441 | $ 1,600 | $ 4,150 | $ 1,750 | $ 1,750 |
| | | | | | | | | |
| **DISBURSEMENTS** | | | | | | | | |
| *Payroll* | | | | | | | | |
| Wages and employer taxes | $ 1,994 | $ 950 | $ 1,941 | $ 1,453 | $ 994 | $ 1,760 | $ 1,140 | $ 1,950 |
| Montefiore | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| HIP & Voluntary Benefits | $ - | $ - | $ - | $ - | $ - | $ 15 | $ 15 | $ 15 |
| H.S.A. funding | $ 11 | $ 11 | $ 11 | $ 11 | $ 15 | $ 15 | $ 15 | $ 15 |
| UHC - Employee Medical | $ - | $ - | $ - | $ - | $ - | $ - | $ 400 | $ - |
| Total Benefits | $ 11 | $ 11 | $ 11 | $ 11 | $ 15 | $ 30 | $ 430 | $ 30 |
| Total payroll & benefits | $ 2,005 | $ 961 | $ 1,951 | $ 1,464 | $ 1,009 | $ 1,790 | $ 1,570 | $ 1,980 |
| *Insurance* | $ 13 | $ - | $ - | $ - | $ 435 | $ 40 | $ 855 | $ 33 |
| *Debt interest* | $ - | $ 366 | $ - | $ - | $ 85 | $ 354 | $ - | $ - |
| *Other disbursements* | | | | | | | | |
| Rent | $ - | $ - | $ - | $ - | $ - | $ 339 | $ - | $ - |
| ACH Debits | $ 51 | $ 49 | $ 83 | $ 65 | $ 95 | $ 110 | $ 110 | $ 110 |
| Vehicle lease payments | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 93 |
| Vehicle purchase down payments | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Accounts payable | $ 369 | $ 197 | $ 727 | $ 485 | $ 280 | $ 217 | $ 127 | $ 72 |
| Total other disbursements | $ 420 | $ 246 | $ 810 | $ 551 | $ 375 | $ 666 | $ 237 | $ 274 |
| **TOTAL DISBURSEMENTS** | $ 2,438 | $ 1,573 | $ 2,761 | $ 2,014 | $ 1,904 | $ 2,850 | $ 2,662 | $ 2,287 |
| **CHANGE IN CASH** | $ (216) | $ (35) | $ 1,109 | $ (574) | $ (304) | $ 1,300 | $ (912) | $ (537) |
| **NET AVAILABLE CASH** | $ 441 | $ 665 | $ 215 | $ (0) | $ (561) | $ (851) | $ (1,403) | $ (1,380) |
| | | | | | | | | |
| Wachovia ABL balance | $ 19,494 | $ 19,529 | $ 18,419 | $ 18,993 | $ 19,643 | $ 18,344 | $ 19,255 | $ 19,792 |
| Patriarch term loan | 24,801 | 24,801 | 24,801 | 24,801 | 24,801 | 24,801 | 24,801 | 24,801 |
| Credit Suisse term loan | 7,583 | 7,583 | 7,583 | 7,583 | 7,583 | 7,583 | 7,583 | 7,583 |
| Total of term loans | $ 32,384 | $ 32,384 | $ 32,384 | $ 32,384 | $ 32,384 | $ 32,384 | $ 32,384 | $ 32,384 |
| **Total Debt** | $ 51,878 | $ 51,913 | $ 50,803 | $ 51,377 | $ 52,027 | $ 50,728 | $ 51,639 | $ 52,176 |
| | | | | | | | | |
| Trailing 60-day cash | $ 21,573 | $ 21,511 | $ 20,824 | $ 20,876 | $ 20,318 | $ 22,676 | $ 20,224 | 19,990 |
| Eligible AR | $ 19,935 | $ 20,194 | $ 18,634 | $ 18,993 | $ 19,083 | $ 17,493 | $ 17,853 | $ 18,413 |
| Availability impacted by trailing 60-day | | | | $ - | $ - | $ - | $ - | $ - |
| Availability impacted by loan balance limit | | | | $ - | $ - | $ - | $ - | $ - |

| ACCOUNTS PAYABLE AGING | 06/05/15 | 06/12/15 | 06/19/15 | 06/26/15 | | | | |
|---|---|---|---|---|---|---|---|---|
| 0-30 Days | $ 1,315 | $ 1,135 | $ 1,302 | $ 1,409 | | | negative | negative |
| 31-60 Days | $ 1,886 | $ 1,642 | $ 1,600 | $ 1,291 | | | | |
| 61-90 Days | $ 974 | $ 951 | $ 838 | $ 649 | | | | |
| 90+ Days | $ 5,572 | $ 5,607 | $ 5,516 | $ 5,654 | | | | |
| Total | $ 9,747 | $ 9,335 | $ 9,256 | $ 9,003 | | | | |
| Change from Prior Week | $ 1,414 | $ (412) | $ (79) | $ (253) | | | | |

**A3189**

TRANSCARE00007942

| | |
|---|---|
| **From:** | Microsoft Outlook on behalf of Glenn Leland |
| **Sent:** | Friday, July 10, 2015 7:36 PM |
| **To:** | Jean Luc Pelissier; Michael Greenberg; Scott Whalen |
| **Cc:** | Mark Bonilla |
| **Subject:** | Fwd: LOI for Transcare Transit |
| **Attachments:** | Fwd: LOI for Transcare Transit |

Sender: GlennL@transcare.com
Subject: Fwd: LOI for Transcare Transit
Message-Id: <F13B53D7-27CF-4440-9F72-613AFF3CB234@transcare.com>
Recipient: Scott.Whalen@PatriarchPartners.com



**JX 040**

LaMonica v. Tilton, et al., 18-1021-smb

EXHIBIT

6

9/27/18

PP-TRBK0030755

1

| | |
|---|---|
| **From:** | Glenn Leland |
| **Sent:** | Friday, July 10, 2015 7:35 PM |
| **To:** | Jean Luc Pelissier; Michael Greenberg; Scott Whalen |
| **Cc:** | Mark Bonilla |
| **Subject:** | Fwd: LOI for Transcare Transit |
| **Attachments:** | ATT00001.htm; NEC-Project Granite Offer (july10.550).cleancopywithdadsignature.docx; ATT00002.htm |

Here is an email I just received from National Express to acquire TransCare's MTA para transit company. I have not yet reviewed the document so offer no specific comment or analysis. That wil follow.

Sent from my iPhone

Begin forwarded message:

> **From:** "Rushin, Mike R." <Mike.Rushin@nationalexpresstransit.com>
> **To:** "GlennL@transcare.com" <GlennL@transcare.com>
> **Cc:** "Waits, Gary" <Gary.Waits@nationalexpresstransit.com>, "LaBelle, Mike" <Michael.LaBelle@nellc.com>
> **Subject: LOI for Transcare Transit**
>
>
> Glenn,
>
> Attached is a Letter of intent offer from National Express signed by our CEO David Duke. We look forward to hearing back from you in the very near future.
>
> Regards,
> Mike Rushin
> *Chief Operating Officer*

**TransCare Corporation Confidentiality Note** This E-mail message is intended to be received by persons entitled to receive the confidential information it may contain. Please do not Read, Copy, Forward or Save this message unless you are the intended recipient. If you have received this message in error, Please Forward it back to the Sender and Delete it completely from your computer system.

Checked: By Barracuda Spam and Virus Firewall

1

4300 Weaver Blvd

Warrenville, 1L
Cell: [ PII ]

Fax: 877-786-2603

National Express Transit, *providing the safest, highest quality transportation services for our customers and the communities we serve - on time, every time.*

**Visit us:**

nationalexpresstransit.com

nationalexpresscorp.com

**Follow us:**

National Express Transit on Facebook

National Express Transit on Twitter (@NatExTrans)

National Express Transit on LinkedIn

The information contained in or attached to this e-mail is intended only for the use of the addressee. If you are not the intended recipient of this e-mail, or a person responsible for delivering it to the intended recipient, you are strictly prohibited from disclosing, copying, distributing, or retaining this e-mail or any part of it. It may contain information which is confidential and/or covered by legal, professional or other privilege under applicable law. If you have received this e-mail in error, please notify the author by replying to this e-mail immediately and delete this e-mail from your system. The views expressed in this email may not necessary be the views held by the organization. E-mail transmission cannot be guaranteed to be secure or error-free as information could be intercepted, corrupted, lost, destroyed, arrive late or incomplete, or contain viruses. The sender therefore does not accept liability for any errors or omissions in the contents of this message, which arise as a result of e-mail transmission.

**TransCare Corporation Confidentiality Note** This E-mail message is intended to be received by persons entitled to receive the confidential information it may contain. Please do not Read, Copy, Forward or Save this message unless you are the intended recipient. If you have received this message

PP-TRBK0030757

in error, Please Forward it back to the Sender and Delete it completely from your computer system.

Checked: By Barracuda Spam and Virus Firewall

PP-TRBK0030758

**A3193**

# national express

**NATIONAL EXPRESS LLC**
4300 Weaver Parkway
Warrenville Illinois 60555

July 10, 2015

TransCare New York, Inc.
One Metrotech, 20th Floor
Brooklyn, NY 11201

Dear Sirs/Madams:

National Express LLC, a Delaware limited liability company ("*NELLC*"), is interested in the acquisition (the proposed "*Acquisition*") of the transit business of TransCare New York, Inc. (the "*Company*") including its adult care shuttle business, by assignment of the Company's operating and transportation contracts and acquisition of certain of the operating and related assets of the Company (the "*Assets*"), as generally described in Paragraphs 1 and 2 of Section I below. This letter, when executed by the Company and the shareholder of the Company as identified on the signature page of this letter (the "*Shareholder*"), will evidence (1) our non-binding mutual intent, as set forth in Section I of this letter, with respect to the proposed Acquisition by NELLC or one of its affiliates (the "*Buyer*") of the Assets and (2) certain binding agreements, as set forth in Section II of this letter, relating to the proposed Acquisition.

The matters set forth in Section I of this letter constitute an expression of our mutual intent only and are contingent upon the following: (1) the negotiation, execution and delivery of a definitive agreement among the Buyer, the Company and the Shareholder setting forth in detail the terms, provisions and conditions of the proposed Acquisition, and (2) NELLC's satisfaction of its due diligence investigation of the Company and the Assets. As indicated above and in Paragraph 5 of Section II hereof, this letter does not create any binding obligation of NELLC, the Company or the Shareholder with respect to such matters. The matters set forth in Section II of this letter, however, constitute binding agreements among NELLC, the Company and the Shareholder.



**National Express LLC**
4300 Weaver Parkway
Warrenville, IL 60555
Voice: 800.950.0485

PP-TRBK0030759

## <u>NON-BINDING AGREEMENT</u>

1.   **Overview**

    A.    The Buyer is offering to acquire the assets, free and clear of all liens, claims and encumbrances, for the following consideration:

        (1)    A consideration (final price to be negotiated) in a range of $6,000,000 to $7,000,000 (and less an amount the Buyer determines is required to operate the acquired business for 60 days) (the *"Consideration"*), a portion of which will be payable on closing of the transaction (the *"Initial Consideration"*), with the balance held in retention (the *"Retention Amount"*) and paid to the Company in accordance with terms to be negotiated; and

        (2)    Assumption by Buyer of the Company's overpayment obligation to MBTA up to an amount not to exceed $2,000,000 (*"Assumed MBTA Obligation"*); and

        (3)    An agreed portion of the Consideration shall be allocated to a 5 year non-compete covenant.

    B.    On or before the closing of the Acquisition, (i) all indebtedness related to the Assets would be discharged by the Company such that the Assets are transferred to the Buyer free and clear of all liens, claims, security interests or other encumbrances and (ii) all overpayment amounts owed to the MBTA in excess of the Assumed MBTA Obligation and all other amounts owed to creditors to the Company would be discharged, including any amounts owed to taxing authorities, vendors and employees.

2.   **The Initial Consideration and the Retention Amount**

The Consideration will be split between the Initial Consideration and the Retention Amount. The Retention Amount is to secure the proposed post-closing obligations of the Company and the Shareholder which include:

    A.    Indemnification for Retained Obligations (as hereinafter defined) and for breaches of representations, warranties or covenants;

    B.    A non-competition obligation on the part of the Company and the Shareholder for a term of five years from the closing of the Acquisition, in consideration for which the Buyer will release payments of the Retention Amount in five equal annual installments.

 

National Express LLC
4300 Weaver Parkway
Warrenville, IL 60555
Voice: 800.950.0485

PP-TRBK0030760

3.   **Conditions**

Based solely upon the preliminary information that the consummation of the Acquisition and the final determination of the purchase price would be contingent upon, among other items, the following:

- Completion of customary due diligence satisfactory to NELLC in its discretion;

- Negotiation, execution and delivery of a definitive Asset Purchase Agreement (the "Agreement");

- Approval by the National Express Group PLC Board of Directors;

- Approval from the applicable customers of the assignment of the operating and transportation contracts (including for the MBTA) and receipt of any other required governmental or other third party approvals, including any required landlord approvals;

- Allocation of the purchase price among the Assets and the non-compete covenant in a manner agreed to by the parties in the Agreement;

- That the Buyer will not assume any liabilities or obligations of the Company other than the Assumed MBTA Obligations and obligations arising from and after the closing of the Acquisition under the operating and transportation contracts assigned to the Buyer pursuant to the Acquisition (obligations retained by the Company being defined as the "*Retained Obligations*");

- That the Assets will include, without limitation, the rolling stock inventory of the Company;

- That the Assets shall not include the accounts receivable, cash or cash equivalents of the Company;

- That the Buyer shall have entered into employment arrangements with such employees of the Company, and on such terms, as it shall determine in its discretion; and

- That the Buyer shall have received such indemnity and other liability protection and assurances as it may require connection with the ongoing lawsuit of the Company relating to the adult care shuttle business.



National Express LLC
4300 Weaver Parkway
Warrenville, IL 60555
Voice: 800.950.0485

PP-TRBK0030761

## BINDING AGREEMENT

1.    (a)    NELLC shall have, on reasonable prior notice to the Company, and at such time as the Company and NELLC shall reasonably mutually agree, such access to the books the records of the Company and other information pertaining to the business or the assets of the Company as it deems necessary in connection with the proposed Acquisition, including, without limitation, access to any real property owned or used by the Company; provided, however, that NELLC shall not unreasonably interfere with the carrying on of business by the Company.

(b)    NELLC agrees that the terms of the Confidential Nondisclosure Agreement effective July 10, 2015 and attached to the Letter of Intent as Exhibit A (the "*Confidentiality Agreement*") shall remain in full force and effect in accordance with its terms.

2.    NELLC shall pay its own costs and expenses incurred in connection with the proposed Acquisition.   The Shareholder or the Company shall pay all costs and expenses incurred by any of them in connection with the Acquisition.

3.    The parties agree that neither they nor any of their respective officers, directors, employees or agents and, in the case of NELLC and National Express Group PLC, their respective officers, directors, employees or agents, shall disclose to any third party or publicly announce the proposed Acquisition until such time as the parties mutually agree to make such disclosure or announcement or unless otherwise required by law, regulation or rules of the appropriate exchanges, in which case the party under the obligation to disclose shall prior to making such disclosure use its reasonable best efforts to consult with the other parties hereto in order to ensure that such disclosure is satisfactory to them.   The content and timing of any disclosure or public announcement concerning the proposed Acquisition shall be approved in advance by appropriate officers of the Company and NELLC who shall cooperate in good faith.

4.    To encourage NELLC to proceed immediately with its due diligence activity relating to the proposed Acquisition, and in consideration of NELLC's instruction to its counsel to go forward with the preparation of the Agreement, from the date hereof through August 31, 2015 the Company and the Shareholder agree that they will not, directly or indirectly, solicit, entertain or encourage inquiries or proposals or enter into an agreement or negotiate with any other party, to sell or enter into any merger or consolidation with respect to, all or substantially all of the business or assets of the Company, or with respect to any transfer of the shares of the Company.

5.    It is understood by the parties hereto that Section 1 of this letter merely constitutes a statement of the mutual intentions of the parties with respect to the proposed Acquisition outlined herein and does not contain all matters upon which



National Express LLC
4300 Weaver Parkway
Warrenville, IL 60555
Voice: 800.950.0485

PP-TRBK0030762

agreement must be reached in order for the proposed Acquisition to be consummated. A binding commitment with respect to the proposed Acquisition will result only from execution and delivery of the Agreement. The provisions of Section II of this letter, however, are agreed to be fully binding on the parties hereto upon the execution of this letter, unless and until such provisions are superseded by the Agreement.

6. Without prejudice to the non-binding nature of Section I hereof, this letter may be terminated:

   (a) at any time, by mutual consent of the parties hereto; or

   (b) by any party hereto at any time after July 17, 2015 if the Agreement has not been executed and delivered by the parties thereto by such date.

   If this letter is terminated in accordance with the foregoing provisions of this Paragraph 6, it shall become void and of no further force and effect, except for the provisions of Paragraphs 1(b), 2, 3, 4, 5, 6, 7, and 8 of Section II, which shall survive such termination, provided that the foregoing shall not relieve any party from liability for damages actually incurred as a result of any breach of Section II of this letter.

7. The Shareholder and the Company each represent to NELLC that, there is no known impediment prohibiting any of them from executing this letter or the Agreement or the parties from consummating the Acquisition or limiting the ability of any of them to fulfill their respective responsibilities under this letter or the Agreement or in connection with the consummation of the Acquisition.

8. This letter will be governed by and construed in accordance with the laws of Illinois, without regard to the conflict of law and principals thereof.



National Express LLC
4300 Weaver Parkway
Warrenville, IL 60555
Voice: 800.950.0485

PP-TRBK0030763

9.  If the foregoing correctly sets forth the understanding between us with respect to the proposed Acquisition outlined herein, please sign and return to the undersigned the enclosed copy of this letter within 7 days from the date hereof, after which the offer set forth herein shall cease to be valid.

Very truly yours,

**NATIONAL EXPRESS LLC**

By: _____
Name: _____David A Duke_____
Title: _Chief Executive Officer_____

ACCEPTED AND AGREED TO:

**TRANSCARE NEW YORK, INC.**

By: _____
Name: _____
Title: _____

    **COMPANY**

**PATRIARCH CAPITAL**

By: _____
Name: _____
Title: _____

    **SHAREHOLDER**

Gardere01 - 6874312v.2



National Express LLC
4300 Weaver Parkway
Warrenville, IL 60555
Voice: 800.950.0485

PP-TRBK0030764



National Express LLC
4300 Weaver Parkway
Warrenville, IL 60555
Voice: 800.950.0485

PP-TRBK0030765

**EXHIBIT A**

**CONFIDENTIAL NONDISCLOSURE AGREEMENT**

This Confidential Nondisclosure Agreement (this "Agreement") is made to be effective July 10, 2015 between NATIONAL EXPRESS LLC (hereinafter "COMPANY") and TRANSCARE NEW YORK, INC. (hereinafter "SELLER").

1.   Purpose.  COMPANY or one or more of its affiliates and SELLER wish to consider and explore the potential acquisition by COMPANY or one of its affiliates of SELLER'S including the transit and adult care shuttle business ("Potential Transaction").  In connection with the Potential Transaction, business or other relationship, certain confidential information, including trade secrets and proprietary information of SELLER and its affiliates, may be provided to COMPANY.  SELLER and its affiliates are willing to disclose such information only if COMPANY agrees to maintain the confidentiality of such information in accordance with the following terms and conditions.

2.   Definition.  "Confidential Information" means any information, data or know-how, that is not generally known and that SELLER treats as confidential and does not generally make available publicly, including, but not limited to, SELLER's and its affiliates' services; agreements; routes; service schedules; products; ideas; processes; designs; equipment; software, firmware or hardware; customer, client or supplier lists; fee schedules or price lists; business relationships; inventions; drawings; marketing or financial plans; trade secrets; trademarks; service marks; or any other tangible or intangible property, which is disclosed to COMPANY by SELLER or any of its affiliates or any of their respective officers, directors, or shareholders, either directly or indirectly in writing, orally or by physical inspection.  Confidential Information does not include information that (i) is or becomes publicly known other than as a result of any action or inaction of COMPANY; (ii) is approved for release by written authorization of SELLER or any of its affiliates; or (iii) was or becomes available to COMPANY on a non-confidential basis from a source other than SELLER or any of its affiliates or their respective advisors.

3.   Nondisclosure of Confidential Information.  COMPANY agrees not to use or disclose the Confidential Information for its own use or for the use of any other party or for any purpose except to (i) evaluate the Potential Transaction (ii) disclose to COMPANY, COMPANY's affiliates or any of their respective directors, officers, employees, representatives and agents ("Advisors") who need to know such information for the purpose of evaluating whether COMPANY desires to enter into the Potential Transaction with SELLER or any of its affiliates.  COMPANY shall advise all of its Advisors to whom the Confidential Information is disclosed of its obligations under this Agreement and shall inform such persons or entities to whom disclosure is made of the confidentiality thereof and shall direct them to treat such information confidentially. COMPANY agrees that it shall protect the confidentiality

PP-TRBK0030766

of and avoid disclosure or use of the Confidential Information except as permitted hereunder or in writing by SELLER or any of its affiliates or except as required by deposition, interrogatories, requests for information or documents in legal proceedings, subpoena, civil investigative demand or any other similar process or any judicial or other governmental order. In complying with its obligations herein, COMPANY shall exercise at least the same degree of care to safeguard the Confidential Information as if the Confidential Information were its own.

4.   <u>Termination of Negotiations</u>.   Nothing in this Agreement requires COMPANY to enter into any business relationship or to negotiate any such relationship for any specified period of time. COMPANY and its affiliates reserve the right, in their sole and absolute discretion, to reject any and all proposals and to terminate discussions and negotiations with, or directly or indirectly involving, SELLER at any time.

5.   <u>Return of Materials</u>.   Any materials, documents, books, records or other written or recorded materials of SELLER or any of its affiliates that are furnished to COMPANY will be promptly returned by COMPANY to SELLER or its affiliates, accompanied by all copies of such items made by COMPANY, in the event COMPANY and SELLER or any of its affiliates decide not to enter into the Potential Transaction, business or in the event the Potential Transaction is terminated, or at any time if so requested by SELLER or any of its affiliates. Alternatively, COMPANY may elect to destroy all aforementioned materials, documents, books, records, or other written or recorded materials of SELLER or its affiliates, including any or all copies, reproductions and translations thereof; except however that COMPANY shall (i) be permitted to retain one (1) copy of the SELLER's Confidential Information for archival purposes (notwithstanding anything herein to the contrary, the restriction on the use of the retained copy of the Confidential Information for archival purposes only shall survive this Agreement without any limitation), (ii) only be required to use reasonable efforts to destroy Confidential Information stored electronically due to the retentive nature of electronic storage systems; provided, however, that this obligation will not otherwise require the COMPANY to modify it electronic documents retention policy (notwithstanding anything herein to the contrary, the restriction on the use of Confidential Information otherwise retained in an electronic system shall survive this Agreement without any limitation), and (iii) not be required to expunge any minutes of its Board of Directors or of the Board of Directors of any of its Affiliates to the officers or employees of which the COMPANY is entitled to disclose information pursuant to this Agreement

6.   <u>Miscellaneous</u>.   This Agreement is binding upon and shall inure to the benefit of the parties, their successors and assigns. This Agreement shall expire on the earlier of (a) the execution of a definitive agreement between the parties or (b) one (1) year from the date hereof.

7.   <u>Applicable Law</u>.   This Agreement shall be governed by the laws of the State of Illinois.

PP-TRBK0030767

8.    <u>No Disclosure of Negotiations</u>.  Without the prior written consent of the other party, neither the Company nor the Seller will disclose to any person (other than (x) by Seller to its advisors who need to know such information, are advised of the confidentiality obligation of this Section 8, and for whom Seller shall be responsible for causing compliance with the terms of this Section 8, and (y) by the Company to persons to whom disclosure of Confidential Information may be made in accordance with Section 3 hereof) either the fact that discussions or negotiations are taking place concerning a possible transaction, business or other relationship, or any of the terms, conditions or other facts with respect to any such possible transaction, business or other relationship, including the status thereof.

9.    <u>No Restriction on COMPANY Activities</u>.    SELLER acknowledges that the COMPANY (i) has existing school bus and transit and para-transit transportation operations, (ii) is actively pursuing other acquisition opportunities, and (iii) has developed (and continues to develop) its own confidential and proprietary information regarding the school bus transportation, transit and para-transit industries ("COMPANY Information").  Nothing in this Agreement shall be deemed to limit or otherwise restrict the ability of the COMPANY to pursue such operations and activities or to utilize the COMPANY Information in any manner as it shall determine in its sole discretion.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first written above.

NATIONAL EXPRESS LLC

By:_____
Name: <u>David A. Duke</u>
Title: <u>Chief Executive Officer</u>

TRANSCARE NEW YORK, INC.

By:_____
Name:_____
Title:_____

PP-TRBK0030768



PP-TRBK0030769

**A3204**

PP-TRBK0030770



A3205



PP-TRBK0030771

**A3206**

**TransCare Corporation Confidentiality Note** This E-mail message is intended to be received by persons entitled to receive the confidential information it may contain.  Please do not Read, Copy, Forward or Save this message unless you are the intended recipient.  If you have received this message in error, Please Forward it back to the Sender and Delete it completely from your computer system.

Checked: By Barracuda Spam and Virus Firewall