# 20 Civ. 06274 (LAK)

**United States District Court**

*for the*

**Southern District of New York**

_____

IN RE TRANSCARE CORPORATION, ET AL.

DEBTORS,

_____

PATRIARCH PARTNERS AGENCY SERVICES, LLC, ET AL.

DEFENDANTS-APPELLANTS,

—against—

SALVATORE LAMONICA, AS CHAPTER 7 TRUSTEE OF THE JOINTLY-
ADMINISTERED ESTATES OF TRANSCARE CORPORATION, ET AL.,

PLAINTIFF-APPELLEE.

_____

ON APPEAL FROM THE UNITED STATES BANKRUPTCY COURT FOR
THE SOUTHERN DISTRICT OF NEW YORK (BERNSTEIN, J.)

IN RE: TRANSCARE CORPORATION, ET AL., CASE NO. 16-10407 (SMB)

LAMONICA V. TILTON, ET AL., ADV. PROC. NO. 18-1021 (SMB)

## APPENDIX TO BRIEF FOR THE APPELLANTS

# Volume XX- A3461-A3493

| | |
|---|---|
| **From:** | Michael Greenberg |
| **Sent:** | Wednesday, February 24, 2016 4:09 PM |
| **To:** | Glen Youngblood |
| **Subject:** | FW: TT Borroweing Certificate and Credit Agreement |
| **Attachments:** | Transcendence Transit Credit Agreement (PPAS) 02.doc; Borrowing Certificate (TT) (Revolver).doc |

Glen,

Can you please send back a signed borrowing certificate.  It should show $593,000 outstanding and a borrowing today of $65,000.  This is for today's Sez Foster payment.

Thank you,
Michael

Michael S. Greenberg
Patriarch Partners
One Broadway, 5th Floor
New York, NY 10004
Direct: 646-723-7657
Fax:  212-825-2038
Email: michael.greenberg@patriarchpartners.com
www.patriarchpartners.com

**From:** Peter Ruffini
**Sent:** Wednesday, February 24, 2016 3:51 PM
**To:** Arriann Mathurin; Michael Greenberg
**Subject:** TT Borroweing Certificate and Credit Agreement

See attached.

**PATRIARCH PARTNERS, LLC**

**Peter J. Ruffini**
Compliance Officer & Counsel
1 Broadway, 5th Floor
New York, NY 10004
T: 646.723.7642
C: 516.455.5098

www.patriarchpartners.com

JX 101

LaMonica v. Tilton, et al., 18-1021-smb

Confidential

PP-TRBK0008673

**CREDIT AGREEMENT**

**among**

**TRANSCENDENCE TRANSIT, INC.,**

**as Borrower,**

**THE DOMESTIC SUBSIDIARIES OF THE BORROWER
FROM TIME TO TIME GUARANTORS HEREUNDER,**

**as Guarantors,**

**THE LENDERS PARTY HERETO,**

**and**

**PATRIARCH PARTNERS AGENCY SERVICES, LLC,**

**as Administrative Agent**

**Dated as of February 24, 2016**

**A3462**

Confidential

# TABLE OF CONTENTS

**Page**

ARTICLE I          Defined Terms ............................................................................. 1

    Section 1.1          Definitions ......................................................................... 1

ARTICLE II         Loans ........................................................................................ 18

    Section 2.1          Loans ................................................................................. 18
    Section 2.2          Borrowing Mechanics ...................................................... 19
    Section 2.3          Use of Proceeds ................................................................ 20
    Section 2.4          Evidence of Debt; Register; Notes .................................... 20
    Section 2.5          Interest on Loans ............................................................... 21
    Section 2.6          Changed Circumstances .................................................... 22
    Section 2.7          Fees .................................................................................... 22
    Section 2.8          Repayment ......................................................................... 23
    Section 2.9          Optional Prepayments ....................................................... 23
    Section 2.10         Mandatory Prepayments; Mandatory Commitment Reductions ........................ 23
    Section 2.11         Application of Prepayments ............................................... 25
    Section 2.12         General Provisions Regarding Payments ............................ 25
    Section 2.13         Ratable Sharing .................................................................. 26
    Section 2.14         Termination or Reduction of Commitments ...................... 26

ARTICLE III        Conditions Precedent; Conditions Subsequent ........................ 26

    Section 3.1          Conditions Precedent; Closing Date .................................. 26
    Section 3.2          Conditions to Each Borrowing ........................................... 28

ARTICLE IV         Representations and Warranties ................................................ 29
    Section 4.1          Representations and Warranties ......................................... 29

ARTICLE V          Affirmative Covenants ............................................................. 37

    Section 5.1          Affirmative Covenants ....................................................... 37

ARTICLE VI         Negative Covenants/Financial Covenants ............................... 44

    Section 6.1          Negative Covenants ........................................................... 44
    Section 6.2          Financial Covenants .......................................................... 50

ARTICLE VII        Increased Costs; Taxes; Indemnifications, Set Off; Etc .......... 51

    Section 7.1          Increased Costs; Capital Adequacy .................................... 51
    Section 7.2          Taxes; Withholding, Etc. .................................................... 51
    Section 7.3          Indemnification .................................................................. 52
    Section 7.4          Right of Set Off .................................................................. 53
    Section 7.5          Funding Breakage ............................................................... 54

ARTICLE VIII       Events of Default ...................................................................... 54

    Section 8.1          Events of Default ................................................................ 54
    Section 8.2          Remedies ............................................................................ 57

ARTICLE IX         The Administrative Agent ......................................................... 58

    Section 9.1          Appointment of Administrative Agent ................................ 58
    Section 9.2          Powers and Duties .............................................................. 59
    Section 9.3          Delegation of Duties .......................................................... 59
    Section 9.4          General Immunity ............................................................... 59
    Section 9.5          Administrative Agent Entitled to Act with the Borrower .... 60

i

**A3463**

PP-TRBK0008675

# TABLE OF CONTENTS
## (Continued)

Page

Section 9.6      Lenders' Representations, Warranties and Acknowledgment ............................ 60
Section 9.7      Right to Indemnity ...................................................................... 61
Section 9.8      Successor Administrative Agent .......................................................... 61
Section 9.9      Collateral Documents .................................................................... 62
Section 9.10     Proof of Claims ......................................................................... 63
Section 9.11     Notice of Default ....................................................................... 63

ARTICLE X        Miscellaneous ........................................................................... 63

Section 10.1     Amendments and Waivers; Release of Collateral ........................................... 63
Section 10.2     Notices ................................................................................. 64
Section 10.3     Expenses ................................................................................ 65
Section 10.4     Enforceability; Successors and Assigns .................................................. 66
Section 10.5     Lenders' Obligations Several ............................................................ 67
Section 10.6     Integration ............................................................................. 67
Section 10.7     No Waiver; Remedies ..................................................................... 67
Section 10.8     Submission to Jurisdiction .............................................................. 67
Section 10.9     Execution in Counterparts ............................................................... 68
Section 10.10    Governing Law ........................................................................... 68
Section 10.11    Waiver of Jury .......................................................................... 68
Section 10.12    Severability ............................................................................ 68
Section 10.13    Survival ................................................................................ 68
Section 10.14    Maximum Lawful Interest ................................................................. 69
Section 10.15    Marshaling .............................................................................. 69
Section 10.16    Lender-Creditor Relationship ............................................................ 69
Section 10.17    No Press Releases; Confidentiality ...................................................... 69
Section 10.18    Interpretation .......................................................................... 69

ii

Confidential                                                                    PP-TRBK0008676

Exhibit A              Form of Borrowing Certificate
Exhibit B              Form of Corporate Authority Certificate
Exhibit C              Form of Closing Date Certificate
Exhibit D              Form of Joinder
Exhibit E              Form of Assignment Agreement
Schedule 2.1           Commitments

**A3465**

Confidential                                                                PP-TRBK0008677

CREDIT AGREEMENT, dated as of February 24, 2016, among TRANSCENDENCE TRANSIT, INC., a Delaware corporation (the "Borrower"), its Domestic Subsidiaries that from time to time become guarantors hereunder and under any Guaranty (collectively, the "Guarantors"), the financial institutions and other investors from time to time lenders hereunder (collectively, the "Lenders"), and PATRIARCH PARTNERS AGENCY SERVICES, LLC, a Delaware limited liability company ("PPAS"), as agent for the Lenders (in such capacity, the "Administrative Agent").

RECITALS

WHEREAS, the Borrower has entered into the Bill of Sale, pursuant to which, among other things, the Borrower has agreed to pay to Lenders pursuant to, and under the terms of, this Agreement the Closing Date Obligations, which aggregate amount is equal to the Closing Date Amounts set forth on Schedule 2.1 which represents a portion of the principal amount of the loans outstanding under the TransCare Credit Agreement as of the Closing Date; and

WHEREAS, in connection therewith, the Borrower has requested and the Lenders are willing to enter into this Agreement to (i) evidence their agreement with respect to, among other things, payment of the Closing Date Obligations and certain ongoing financial obligations to be provided by the Lenders to the Borrower and (ii) provide a credit facility for working capital and general corporate purposes of the Borrower and to pay the purchase price, costs and expenses related to the Acquisition upon the terms and conditions set forth in this Agreement.

NOW THEREFORE, the parties hereto agree as follows:

ARTICLE I
Defined Terms

Section 1.1    Definitions.  As used in this Agreement, including the preamble, recitals, exhibits and schedules hereto, the following terms have the meanings stated:

"Account" has the meaning assigned to such term in the UCC as adopted and in effect in the State of New York.

"Account Control Agreement" has the meaning stated in Section 5.1(g).

"Acquisition" means the acquisition contemplated by the Bill of Sale, and any other bill of sale, assignment and other instrument of conveyance executed by the TransCare Agent or any TransCare Lender and the Borrower to assign to the Borrower any assets obtained from TransCare.

"Action" against a Person means an action, suit, litigation, arbitration, investigation, complaint, dispute, contest, hearing, inquiry, inquest, audit, examination or other proceeding threatened or pending against, affecting or purporting to affect such Person or its property, whether civil, criminal, administrative, investigative or appellate, in law or equity before any arbitrator or Governmental Body.

"Administrative Agent" means initially PPAS and thereafter any successor agent appointed pursuant to Section 9.8.

"Administrative Agent Account" has the meaning stated in Section 5.1(g).

Confidential

"<u>Affiliate</u>" means, with respect to a specified Person, any other Person, directly or indirectly, through one or more intermediaries, controlling or being controlled by or under common control with such Person.  For the purposes of this definition, the term "<u>control</u>" (including with correlative meanings, the terms "<u>controlled by</u>" and "<u>under common control with</u>"), as used with respect to any Person, means being a director, manager, general partner or executive officer of such Person or possessing, directly or indirectly, through the ownership of Voting Stock, through a Contractual Obligation or otherwise, (i) if such Person is a Joint Venture, any interest of 5% or more in such Person or (ii) in any case, (A) the power to direct or cause the direction of the management and policies of such Person, or (B) the power to vote, or beneficial ownership of, 5% or more of any class of the Voting Stock of such Person or of any other equity interests in such Person.  Notwithstanding the foregoing, none of the Administrative Agent, any Lender or any Affiliate of the Administrative Agent or any Lender (other than the Credit Parties and their Subsidiaries), on the one hand, and the Credit Parties and their Subsidiaries, on the other hand, shall be "Affiliates" of each other.

"<u>Agreement</u>" means this Agreement, as it may be amended, restated, supplemented or otherwise modified from time to time.

"<u>Applicable Margin</u>" means, with respect to any Loan, the percentage set forth on <u>Schedule 2.1</u> for such Loan.

"<u>Approved Fund</u>" means, with respect to any Lender or prospective Lender, any Person (other than a natural Person) that (a) is or will be engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its business and (b) is administered, advised or managed by (i) such Lender or prospective Lender, (ii) an Affiliate of such Lender or prospective Lender or (iii) any entity or any Affiliate of any entity that administers, advises or manages such Lender or prospective Lender.

"<u>Asset Sale</u>" means a sale, lease or sublease (as lessor or sublessor), sale and leaseback, conveyance, transfer, assignment or other disposition to, or any exchange of property (other than cash) with, any Person of, or any other transaction permitting any Person to acquire, in one transaction or a series of transactions, any interest in, all or any part of a business or any property of any kind (other than cash) including a sale, factoring at maturity, collection of or other disposal, with or without recourse, of any notes or accounts receivable.

"<u>Assignee</u>" has the meaning stated in Section 10.4(b).

"<u>Assignment</u>" has the meaning stated in Section 10.4(b).

"<u>Assignment Agreement</u>" has the meaning stated in Section 10.4(b).

"<u>Assignment Fee</u>" has the meaning stated in Section 10.4(b).

"<u>Authorized Officer</u>" means, as applied to any Person, any individual holding the position of chairman of the board, manager, chief executive officer, president or one of its vice presidents (or, in each case, the equivalent thereof), and such Person's chief financial officer or treasurer.

"<u>Bankruptcy Code</u>" means Title 11 of the United States Code entitled "Bankruptcy", as now and hereafter in effect, or any successor statute.

**A3467**

Confidential

PP-TRBK0008679

"<u>Base Rate</u>" means, for any day, a fluctuating rate per annum equal to the "prime rate" of interest in effect for such day as published in the Wall Street Journal, such rate to be adjusted by the Administrative Agent on the effective date of any change thereafter.

"<u>Bill of Sale</u>" means the Bill of Sale, Agreement to Pay and Transfer Statement, dated as of the date hereof, by and among the TranCare Lenders, the TransCare Agent and the Borrower.

"<u>Borrower</u>" has the meaning stated in the Preamble of this Agreement.

"<u>Borrowing</u>" means the making of any Loan.

"<u>Borrowing Certificate</u>" means a Borrowing Certificate substantially in the form of <u>Exhibit A</u>.

"<u>Borrowing Date</u>" means the date of a Borrowing.

"<u>Budget</u>" has the meaning stated in Section 5.1(a)(vi).

"<u>Business Day</u>" means a day other than Saturday or Sunday or other day on which commercial banks in New York City, New York are authorized or required by Regulation or other governmental action to close and, with respect to any Borrowings, disbursements and payments in respect of any calculations, interest rates and interest periods pertaining to LIBOR, such day is also a day on which dealings are carried on for deposits in Dollars by and among banks in the London interbank market.

"<u>Capital Lease</u>" means, as applied to any Person, any lease of, or other arrangement conveying the right to use, any property (whether real, personal or mixed) by that Person as lessee that, in conformity with GAAP, is or should be accounted for as a capital lease on the balance sheet of that Person.

"<u>Capital Stock</u>" means any share, participation or other equivalent (however designated) of the capital stock of a corporation, any equivalent ownership interest in any other Person, including partnership interests and membership interests, and any warrant, right or option to purchase or other arrangement (including through a conversion or exchange of any other property) to acquire or subscribe for any item otherwise satisfying the definition of "Capital Stock", whether or not presently convertible, exchangeable or exercisable.

"<u>Cash</u>" means a credit balance in any Deposit Account, money or currency.

"<u>Change of Control</u>" means any of the following events:

     (i)    the acquisition by any Person or group (as such term is used in Section 13(d)(3) of the Securities Exchange Act of 1934), except for one or more Permitted Holders, of beneficial ownership, directly or indirectly, of a majority of the voting power of the total outstanding Voting Stock of the Borrower without the Administrative Agent's prior written consent;

     (ii)    the failure of the Permitted Holders to own directly or indirectly fifty-one (51%) percent of the voting power of the total outstanding Voting Stock of the Borrower without the Administrative Agent's prior written consent; or

     (iii)    the failure of the Borrower to own directly or indirectly one hundred (100%) percent of the voting power of the total outstanding Voting Stock of any Guarantor.

- 3 -

**A3468**

PP-TRBK0008680

"Closing Date" means the first date on which any Loan is made.

"Closing Date Certificate" has the meaning stated in Section 3.1.

"Closing Date Obligations" means the "Closing Date Obligations" under and as defined in the Bill of Sale and as further set forth on Schedule 2.1.

"Collateral" means any and all "Collateral" as defined in the Security Agreement or any other Collateral Document, as applicable, together with all property and interests in property and proceeds thereof now owned or hereafter acquired by any Credit Party in or upon which a Lien is granted or purported to be granted pursuant to any Collateral Document.

"Collateral Documents" means the Security Agreement, the Mortgages, and all other documents delivered pursuant to this Agreement or any other Credit Document (including all UCC financing statements, intellectual property security agreements and account control agreements) and granting or purporting to grant to any Secured Party a Lien as security for any Obligation.

"Collateral Update Certificate" means a certificate in form satisfactory to the Administrative Agent and the Lenders informing the Administrative Agent on any changes in the Collateral since the date hereof.

"Collection Account" has the meaning stated in Section 5.1(g).

"Commitments" means, collectively, the Revolving Credit Commitments and the Term Loan Commitments.

"Consents" means any approval, consent, authorization, notice to, or any other action by, any Person other than any Governmental Body.

"Contractual Obligation" means, with respect to any Person, any provision of any Security issued by such Person or of any agreement, undertaking, contract, lease, indenture, mortgage, deed of trust or other instrument (other than a Credit Document) to which such Person is a party or by which it or any of its property is bound or to which any of its property is subject.

"Credit Document" means any of this Agreement, the Notes (if any), the Collateral Documents, the Guaranties, and all other documents executed and delivered by any Credit Party to, or for the benefit of, any Secured Party in connection herewith.  For the avoidance of doubt, "Credit Document" shall not include the TransCare Credit Agreement or any "Loan Document" (as defined under the TransCare Credit Agreement) executed prior to the date hereof.

"Credit Party" means each Borrower, Guarantor and each other Person granting or purporting to grant a Lien pursuant to any Credit Document for the benefit of any Secured Party as security for any Obligation.

"Currency Agreement" means any foreign exchange contract, currency swap agreement, futures contract, option contract, synthetic cap or other similar agreement or arrangement.

"Default" means a condition or event that, after notice or lapse of time or both, would constitute an Event of Default.

- 4 -

**A3469**

"<u>Deposit Account</u>" means any deposit account (as such term is defined in the UCC as adopted and in effect in the State of New York), including a demand, time, savings, passbook or like account with a bank, savings and loan association, credit union or like organization, other than an account evidenced by a negotiable certificate of deposit.

"<u>Derivative</u>" means any Interest Rate Agreement, Currency Agreement, futures or forward contract, spot transaction, commodity swap, purchase or option agreement, other commodity price hedging arrangement, cap, floor or collar transaction, any credit default or total return swap, any other derivative instrument, any other similar speculative transaction and any other similar agreement or arrangement designed to alter the risks of any Person arising from fluctuations in any underlying variable, including interest rates, currency values, insurance, catastrophic losses, climatic or geological conditions or the price or value of any other derivative instrument.  For the purposes of this definition, "derivative instrument" means "any derivative instrument" as defined in Statement of Financial Accounting Standards No. 133 (Accounting for Derivative Instruments and Hedging Activities) of the United States Financial Accounting Standards Board, and any defined with a term similar effect in any successor statement or any supplement to, or replacement of, any such statement.

"<u>Dollars</u>" and the sign "<u>$</u>" mean the lawful money of the United States of America.

"<u>Domestic Credit Party</u>" means any Credit Party organized under the laws of the United States of America or any State thereof.

"<u>Domestic Subsidiary</u>" means any Subsidiary of any Credit Party organized under the laws of the United States of America or any State thereof.

"<u>Eligible Assignee</u>" means (i) any Lender or any Affiliate of any Lender, (ii) any commercial bank, insurance company, investment or mutual fund or other entity that is an "accredited investor" (as defined in Regulation D under the Securities Act) and that extends credit or buys loans as one of its businesses, (iii) any Approved Fund of any Lender and (iv) any other Person approved by the Administrative Agent.

"<u>Employee Benefit Plan</u>" means any "employee benefit plan" as defined in Section 3(3) of ERISA that is or, within the six years preceding the date of this Agreement, was sponsored, maintained or contributed to by, or required to be contributed to by, any Credit Party or any Subsidiary of any Credit Party or any of their respective ERISA Affiliates.

"<u>Environmental Laws</u>" means all Regulations and Permits whether now or hereinafter in effect and as amended or supplemented from time to time relating in any way to pollution, the environment or natural resources, Hazardous Materials, animal or human health and safety matters, including the Resource Conservation and Recovery Act, the Comprehensive Environmental Response Compensation and Liability Act of 1980, the Hazardous Material Transportation Act, the Superfund Amendments and Reauthorization Act of 1986, the Federal Clean Water Act, the Federal Clean Air Act, the Federal Water Pollution Control Act, the Federal Insecticide, Fungicide, and Rodenticide Act, the Occupational Safety and Health Act, the Safe Drinking Water Act, the Resource Conservation and Recovery Act, the Toxic Substances Control Act, and each of their state and local counterparts and equivalents and any transfer of ownership notification or approval statute (including New Jersey's Industrial Site Recovery Act), and all Regulations and Permits arising under or related thereto.

Confidential

"Environmental Liability" means any actual, alleged or contingent Losses (including any action to study, prevent, clean up, monitor or otherwise address any of the following) of any Credit Party or any Subsidiary of any Credit Party directly or indirectly resulting from or based on (i) violations or alleged violations of any Environmental Law, (ii) the generation, use, handling, transportation, management, storage, treatment or disposal of any Hazardous Material, (iii) exposure to any Hazardous Material, (iv) the release or threatened release of any Hazardous Material into the environment or (v) any Contractual Obligation, Permit or other arrangement pursuant to which Losses are assumed or imposed with respect to any of the foregoing.

"Environmental Permits" means all Permits required by any applicable Environmental Laws for the use, storage, treatment, transportation, release, emission and disposal of raw materials, by-products, wastes and other substances used or produced by or otherwise relating to the operations of any Credit Party or any Subsidiary of any Credit Party.

"Equipment" means, as to each Credit Party, all of such Credit Party's now owned and hereafter acquired equipment, wherever located, including machinery, data processing and computer equipment (whether owned or licensed and including embedded software), vehicles, tools, furniture, fixtures, all attachments, accessions and property now or hereafter affixed thereto or used in connection therewith, and substitutions and replacements thereof, wherever located.

"ERISA" means the Employee Retirement Income Security Act of 1974.

"ERISA Affiliate" means, as applied to any Person, (i) any corporation that is a member of a controlled group of corporations within the meaning of Section 414(b) of the Internal Revenue Code of which that Person is a member, (ii) any trade or business (whether or not incorporated) that is a member of a group of trades or businesses under common control within the meaning of Section 414(c) of the Internal Revenue Code of which that Person is a member, and (iii) any member of an affiliated service group within the meaning of Section 414(m) or (o) of the Internal Revenue Code of which that Person, any corporation described in clause (i) above or any trade or business described in clause (ii) above is a member. Any former ERISA Affiliate of any Credit Party or any Subsidiary of any Credit Party shall continue to be considered an ERISA Affiliate of such Credit Party or such Subsidiary within the meaning of this definition with respect to the period such entity was an ERISA Affiliate of such Credit Party or such Subsidiary and with respect to liabilities arising after such period for which such Credit Party or such Subsidiary could be liable under the Internal Revenue Code or ERISA.

"ERISA Event" means (i) a "reportable event" within the meaning of Section 4043 of ERISA and the Regulations issued thereunder with respect to any Pension Plan (excluding those for which the provision for 30-day notice to the PBGC has been waived by Regulation), (ii) the failure to meet the minimum funding standard of Section 412 of the Internal Revenue Code with respect to any Pension Plan (whether or not waived in accordance with Section 412(d) of the Internal Revenue Code) or the failure to make by its due date a required installment under Section 412(m) of the Internal Revenue Code with respect to any Pension Plan or the failure to make any required contribution to a Multiemployer Plan, (iii) the provision by the administrator of any Pension Plan pursuant to Section 4041(a)(2) of ERISA of a notice of intent to terminate such plan in a distress termination described in Section 4041(c) of ERISA, (iv) the withdrawal by any Credit Party, any Subsidiary of any Credit Party or any of their respective ERISA Affiliates from any Pension Plan with two or more contributing sponsors or the termination of any such Pension Plan resulting in liability pursuant to Section 4063 or 4064 of ERISA, (v) the institution by the PBGC of proceedings to terminate any Pension Plan, or the occurrence of any event or condition which might constitute grounds under ERISA for the termination of, or the appointment of a trustee to

- 6 -

Confidential

PP-TRBK0008683

administer, any Pension Plan, (vi) the imposition of liability on any Credit Party or any Subsidiary of any Credit Party or any of their respective ERISA Affiliates pursuant to Section 4062(e) or 4069 of ERISA or by reason of the application of Section 4212(c) of ERISA, (vii) the withdrawal of any Credit Party or any Subsidiary of any Credit Party or any of their respective ERISA Affiliates in a complete or partial withdrawal (within the meaning of Sections 4203 and 4205 of ERISA) from any Multiemployer Plan if there is any potential liability therefor, or the receipt by any Credit Party or any Subsidiary of any Credit Party or any of their respective ERISA Affiliates of notice from any Multiemployer Plan that it is in reorganization or insolvency pursuant to Section 4241 or 4245 of ERISA, or that it intends to terminate or has terminated under Section 4041A or 4042 of ERISA, (viii) the occurrence of an act or omission that could give rise to the imposition on any Credit Party or any Subsidiary of any Credit Party or any of their respective ERISA Affiliates of fines, penalties, taxes or related charges under Chapter 43 of the Internal Revenue Code or under Section 409, Section 502(c), (i) or (1), or Section 4071 of ERISA in respect of any Employee Benefit Plan, (ix) the assertion of a material claim (other than routine claims for benefits) against any Employee Benefit Plan other than a Multiemployer Plan or the assets thereof, or against any Credit Party or any Subsidiary of any Credit Party or any of their respective ERISA Affiliates in connection with any Employee Benefit Plan, (x) receipt from the Internal Revenue Service of notice of the failure of any Pension Plan (or any other Employee Benefit Plan intended to be qualified under Section 401(a) of the Internal Revenue Code) to qualify under Section 401(a) of the Internal Revenue Code, or the failure of any trust forming part of any Pension Plan to qualify for exemption from taxation under Section 501(a) of the Internal Revenue Code, or (xi) the imposition of a Lien pursuant to Section 401(a)(29) or 412(n) of the Internal Revenue Code or pursuant to ERISA with respect to any Pension Plan.

"Event of Default" has the meaning stated in Section 8.1.

"Financial Officer Certification" means, with respect to the financial statements for which such certification is required, the certification of the chief financial officer of the Borrower (or any other officer of the Borrower acceptable to the Administrative Agent in its sole discretion) that such financial statements fairly present, in all material respects, the financial condition of the Borrower and its Subsidiaries on a consolidated basis as at the dates indicated and the results of their operations and their cash flows for the periods indicated, subject to the absence of footnotes and changes resulting from audit and normal year-end adjustments.

"Financials" means, with respect to any Person for any period, the balance sheet of such Person as at the end of such period, and the related statement of income and expense and statement of cash flow of such Person for such period, each setting forth in comparative form the figures for the previous comparable fiscal period, all in reasonable detail and prepared in accordance with GAAP.

"Fiscal Quarter" means a fiscal quarter of any Fiscal Year.

"Fiscal Year" means the fiscal year of the Borrower and its Subsidiaries ending on December 31 of each calendar year.

"Foreign Lender" has the meaning stated in Section 7.2(a).

"Foreign Subsidiary" means any Subsidiary of the Borrower that is not a Domestic Subsidiary.

"GAAP" means generally accepted accounting principles in the United States as in effect from time to time, consistently applied throughout the periods to which reference is made.

- 7 -

**A3472**

PP-TRBK0008684

"Governmental Body" means the government of the United States or of any state thereof or any other nation or any political subdivision thereof, whether state, regional, provincial or local, and any agency, authority, instrumentality, regulatory body, court (or arbitrator or similar Person), central bank, self-regulatory authority, stock exchange or other entity exercising executive, legislative, judicial, taxing, police, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank) and any Person owned or controlled, through stock or capital ownership or otherwise, by any of the foregoing.

"Guarantors" has the meaning stated in the Preamble to this Agreement.

"Guaranty" has the meaning stated in Section 5.1(n).

"Hazardous Materials" means any hazardous or toxic substance, waste, contaminant, pollutant, gas or material, including radioactive materials, oil, petroleum and petroleum products and constituents thereof, in case regulated under any Environmental Law, including any substance, waste or material that is (i) designated a "pollutant", "hazardous substance", "extremely hazardous substance" or "toxic chemical" under any Environmental Law or (ii) regulated in any way under the Regulations of any state where any Credit Party or any Subsidiary of any Credit Party conducts its business or owns any real property or has any leasehold or in which any Relevant Property is located.

"Indebtedness" means, with respect to any Person, without duplication, the following:  (i) all indebtedness of such Person for borrowed money, (ii) all obligations of such Person for the deferred purchase price of property or services other than accounts payable and accrued liabilities incurred in respect of property or services purchased in the ordinary course of business, but including any Overdue Trade Payable that the Administrative Agent has designated in a notice to the Borrower as constituting "Indebtedness" hereunder, (iii) all obligations of such Person evidenced by notes, bonds, debentures or similar borrowing or securities instruments, (iv) all obligations of such Person created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person, (v) all obligations of such Person as lessee under Capital Leases, (vi) all reimbursements and all other obligations of such Person with respect to (A) letters of credit, bank guarantees or bankers' acceptances or (B) surety, customs, reclamation, performance or other similar bonds, (vii) all obligations of such Person secured by Liens on the assets of such Person, (viii) all obligations of such Person to purchase, redeem, retire, defease or otherwise make any payment in respect of any Capital Stock or other ownership or profit interest in such Person or any other Person or any warrants, rights or options to acquire such Capital Stock, (ix) all obligations of such Person in respect of any guaranty by such Person of any obligation of another Person of the type described in clauses (i) through (viii) of this definition, (x) all obligations of another Person of the type described in clauses (i) through (ix) secured by a Lien on the property assets of such Person (whether or not such Person is otherwise liable for such obligations of such other Person) and (xi) after taking into account the effect of any legally-enforceable netting Contractual Obligation of such Person, all payments that would be required to be made in respect of any Derivative in the event of a termination (including an early termination) on the date of determination.

"Intellectual Property" means, collectively, all copyrights, all patents and all trademarks, together with:  (i) all inventions, processes, production methods, proprietary information, know-how and trade secrets; (ii) all licenses or user or other agreements granted to any Credit Party or any Subsidiary of any Credit Party with respect to any of the foregoing, in each case whether now or hereafter owned or used including the licenses or other agreements with respect to any Collateral;

- 8 -

Confidential

(iii) all customer lists, identification of suppliers, data, plans, blueprints, specifications, designs, drawings, recorded knowledge, surveys, engineering reports, test reports, manuals, materials standards, processing standards, performance standards, catalogs, computer and automatic machinery software and programs; (iv) all field repair data, sales data and other information relating to sales or service of products now or hereafter manufactured; (v) all accounting information and all media in which or on which any information or knowledge or data or records may be recorded or stored and all computer programs used for the compilation or printout of such information, knowledge, records or data; and (vi) all causes of action, claims and warranties, in each case, now or hereafter owned or acquired by any Credit Party or any Subsidiary of any Credit Party in respect of any item listed above.

"Interest Payment Date" means, for any Loan, the date set forth as such on Schedule 2.1 for such Loan.

"Interest Period" means (a) in the case of the first Interest Payment Date after the Closing Date, the period beginning on the Closing Date and ending on the calendar month last ending prior to such Interest Payment Date, (b) in the case of each other Interest Payment Date, the calendar month last ending prior to such Interest Payment Date and (c) in the case of the Maturity Date, the period starting on the day following the last day of the preceding Interest Period and ending on the Maturity Date.

"Interest Rate Agreement" means any interest rate swap agreement, interest rate cap agreement, interest rate collar agreement, interest rate hedging agreement or other similar agreement or arrangement.

"Internal Revenue Code" means the Internal Revenue Code of 1986.

"Investment" means, with respect to any Person, (i) any direct or indirect purchase or other acquisition by such Person of, or of a beneficial interest in, any Security (including any Capital Stock but excluding the Obligations) of any other Person, (ii) any direct or indirect redemption, retirement, purchase or other acquisition for value, by such Person of any Capital Stock of any other Person and (iii) any direct or indirect loan, or capital contribution by such Person to any other Person, including (x) any Overdue Trade Receivable that the Administrative Agent has designated in a notice to the Borrower as being an "Investment" hereunder, (y) any indebtedness owing by, or accounts receivable from, any other Person that did not arise from sales or do not constitute ordinary trade credit extended in the ordinary course of business and (z) any guaranty or assumption by such Person of any loan or advance to any other Person.  The amount of any Investment shall be the original cost of such Investment plus the cost of all additions thereto, without any adjustments for increases or decreases in value, or write-ups, write-downs or write-offs with respect to such Investment.

"Joint Venture" means a joint venture, partnership or other similar Contractual Obligation or arrangement, whether in corporate, partnership or other legal form; provided, in no event shall any Subsidiary of any Person be considered to be a Joint Venture of such Person.

"Leasehold Property" means any leasehold interest of any Credit Party as lessee under any lease of real property, other than any such leasehold interest designated from time to time by the Administrative Agent in its sole discretion as not being required to be included in the Collateral.

"Lenders" has the meaning stated in the Preamble to this Agreement.

- 9 -

Confidential                                                                                                                    PP-TRBK0008686

"LIBOR" means, as to any Loan for any Interest Period, the rate quoted by Bloomberg Information Service (or by any successor or substitute for such Service providing rate quotations comparable to those currently provided by such service, as determined by the Administrative Agent from time to time for purposes of providing quotations of interest rates applicable to Dollar deposits in the London interbank market) at approximately 11:00 a.m., London time, two Business Days before the beginning of such Interest Period, as the rate for Dollar deposits with a maturity comparable to such Interest Period.  If such rate is not available at such time for any reason, LIBOR for any Interest Period shall be the arithmetic mean (rounded upward, if necessary, to the next 1/16 of 1%) of the offered quotations of at least two Reference Banks to the prime banks in the London interbank market for dollar deposits with a maturity comparable to such Interest Period at approximately 11:00 a.m., London time, two Business Days before the beginning of such Interest Period.  For purposes of this definition, "Reference Banks" shall mean major banks in the London interbank market selected by the Administrative Agent.  For all purposes hereunder, LIBOR with respect to any Loan having a LIBOR Floor shall never be below such LIBOR Floor when calculated with respect to such Loan.

"LIBOR Floor" means, for any Loan, the percentage set forth as such on Schedule 2.1 for such Loan, if any.

"License Agreement" has the meaning stated in Section 4.1(t).

"Lien" means (a) any mortgage, deed of trust, pledge, hypothecation, assignment, charge, deposit arrangement, encumbrance, easement, lien (statutory or other), security interest or other security arrangement, (b) any preference, priority or preferential arrangement of any kind or nature whatsoever, including any conditional sale contract or other title retention agreement, the interest of a lessor under a Capital Lease and any other financing lease having substantially the same economic effect as any of the foregoing and (c) any filing of any financing statement under the UCC, any hypothecations, chattel mortgages, real estate mortgages filings and any similar filing before any Government Body governing preference or priority among creditors.

"Loans" means, collectively, the Revolving Credit Loans and the Term Loans.

"Losses" means all liabilities, rights, demands, covenants, duties, obligations (including, without limitation, indebtedness, receivables and other contractual obligations), claims, Actions and causes of actions, settlements, judgments, damages, losses, debts, responsibilities, fines, penalties, sanctions, commissions and interest, disbursements, taxes, interest, charges, costs, fees and expenses (including, without limitation, fees, charges, and disbursements of financial, legal and other advisors, consultants and professionals and, if applicable, any value-added and other taxes and charges thereon), in each case of any kind or nature, whether joint or several, whether now existing or hereafter arising and however acquired and whether or not known, asserted, direct, contingent, liquidated, due, consequential, actual, punitive or treble.

"Material Adverse Effect" means any material adverse effect on or change in (i) the business, operations, assets or condition (financial or otherwise) of the Credit Parties and their Subsidiaries taken as a whole, (ii) the ability of any Credit Party to perform its obligations hereunder or under of any other Credit Document, (iii) the legality, validity or enforceability of any Credit Document or (iv) the Collateral or the perfection or priority of any Liens granted to any Secured Party under any Collateral Document.

"Maturity Date" means, for any Loan or Commitment, the earlier of (i) the date set forth as such on Schedule 2.1 for such Loan or Commitment; provided, when the defined term "Maturity Date"

Confidential

shall not be used with respect to particular Loans or Commitments, then the date used for purposes of this clause (i) shall be the latest date listed on such Schedule 2.1 and (ii) the date that all Loans shall become due and payable in full hereunder, whether by acceleration or otherwise.

"Mortgages" means, collectively, each mortgage, deed of trust, or deed to secure debt pursuant to which any Credit Party grants to the Administrative Agent (for itself and the Lenders) Liens upon the real property owned by such Credit Party as security for the Obligations.

"Multiemployer Plan" means any Employee Benefit Plan that is a "multi-employer plan" as defined in Section 3(37) of ERISA.

"Net Asset Sale Proceeds" means, with respect to any Asset Sale of property of any Credit Party or any Subsidiary of any Credit Party, an amount equal to: (i) Cash payments (including any Cash received by way of deferred payment pursuant to, or by monetization of, a note receivable or otherwise, but only as and when so received) received by any Credit Party or any Subsidiary of any Credit Party from such Asset Sale, minus (ii) any bona fide direct costs incurred in connection with such Asset Sale, including (A) income or gains taxes actually payable by the seller as a result of any gain recognized in connection with such Asset Sale, (B) payment of the outstanding principal amount of and premium or penalty, if any, and interest on any Indebtedness (other than the Loans) that is secured by a Lien on the property in question and that is required to be repaid under the terms thereof as a result of such Asset Sale and (C) a reasonable reserve for any indemnification payments (fixed or contingent) attributable to seller's indemnities and representations and warranties to purchaser in respect of such Asset Sale undertaken by any Credit Party or any Subsidiary of any Credit Party in connection with such Asset Sale.

"Net Insurance/Condemnation Proceeds" means an amount equal to: (i) any Cash payments or proceeds received by any Credit Party or any Subsidiary of any Credit Party (A) under any casualty insurance policy in respect of a covered loss thereunder or (B) as a result of the taking of any assets of any Credit Party or any Subsidiary of any Credit Party by any Person pursuant to the power of eminent domain, condemnation or otherwise, or pursuant to a sale of any such assets to a purchaser with such power under threat of such a taking minus (ii) (A) any actual and reasonable documented costs incurred by any Credit Party or any Subsidiary of any Credit Party in connection with the adjustment or settlement of any of their claims in respect of such assets, and (B) any bona fide direct costs incurred in connection with any sale of such assets as referred to in clause (i)(B) of this definition, including income taxes actually payable as a result of any gain recognized in connection therewith.

"Notes" has the meaning stated in Section 2.4(c).

"Notices" has the meaning stated in Section 10.2.

"Obligations" means, with respect to any Credit Party, all amounts, indebtedness, obligations, liabilities, covenants and duties of every type and description owing by such Credit Party from time to time to any Secured Party or any Affiliate of any Secured Party, whether direct or indirect, joint or several, absolute or contingent, due or to become due, liquidated or unliquidated, secured or unsecured, now existing or hereafter arising and however acquired (regardless of whether acquired by assignment), whether or not evidenced by any note or other instrument or for the payment of money and whether arising under Contractual Obligations, Regulations or otherwise, including, without duplication, (i) all amounts, fees, interest, commissions, charges, costs, expenses, attorneys' fees and disbursements, indemnities, reimbursement of amounts paid and other sums chargeable to such Credit Party under any Credit Document or otherwise arising under

- 11 -

Confidential

any Credit Document, (ii) the Loans owing by such Credit Party, whether directly or through the Guaranty, and (iii) all interest on any item otherwise qualifying as "Obligation" hereunder, whether or not accruing after the filing of any petition in bankruptcy, or the commencement of any insolvency, reorganization or similar proceeding, whether or not a claim for post-filing or post-petition interest is allowed in such proceeding.  When used without reference to any Credit Party, "Obligations" shall include all Obligations of each Credit Party.

"OFAC" means the Office of Foreign Assets Control of the U.S. Department of the Treasury.

"OID Number" means, with respect to any Tranche, the number set forth as such on Schedule 2.1 for such Tranche.

"Overdue Trade Payable" means, any account payable or other accrued liability owing by any Credit Party or any Subsidiary of any Credit Party to any other Person to the extent (a) such account payable or other accrued liability is overdue by more than 120 days according to the Contractual Obligation between such Credit Party or such Subsidiary and such other Person and (b) the aggregate principal amount (including any late fees and other fees and charges) of all of the accounts payable and accrued liabilities owing to such other Person or its Affiliates by any Credit Party or any Subsidiary of any Credit Party and satisfying clause (a) above exceeds $250,000.

"Overdue Trade Receivable" means, any account receivable or other indebtedness owing to any Credit Party or any Subsidiary of any Credit Party by any other Person, in each case to the extent (a) such account receivable or other indebtedness is overdue by more than 120 days according to the Contractual Obligation between such Credit Party or such Subsidiary and such other Person and (b) the aggregate principal amount (including any late fees and other fees and charges) of all of the accounts receivable and other indebtedness owing by such other Person or its Affiliates to any Credit Party or any Subsidiary of any Credit Party and satisfying clause (a) above exceeds $250,000.

"Participant" has the meaning stated in Section 10.4(c).

"Participation" has the meaning stated in Section 10.4(c)

"PBGC" means the Pension Benefit Guaranty Corporation or any successor thereto.

"Pension Plan" means any Employee Benefit Plan, other than a Multiemployer Plan, that is subject to Section 412 of the Internal Revenue Code or Section 302 of ERISA.

"Permit" means, with respect to any Person, any permit, filing, notice, license, approval, variance, exception, permission, concession, grant, franchise, confirmation, endorsement, waiver, certification, registration, qualification, clearance or other Contractual Obligation or arrangement with, or authorization by, to or under the authority of, any Governmental Body or pursuant to any federal, state, local or foreign Regulation, or any other action by any Governmental Body in each case whether or not having the force of law and affecting or applicable to or binding upon such Person, its Contractual Obligations or arrangements or other liabilities or any of its property or to which such Person, its Contractual Obligations or any of its property is or is purported to be subject.

"Permitted Holders" means each of (i) Patriarch Partners Agency Services, LLC, a Delaware limited liability company, (ii) ARK INVESTMENT PARTNERS II, L.P. (iii) ZOHAR III,

- 12 -

**A3477**

Confidential                                                                    PP-TRBK0008689

LIMITED, (iv) ZOHAR II 2005-1, LIMITED, (v) ZOHAR CDO 2003-1, LIMITED, (vi) any Approved Funds of the foregoing and (vii) any Affiliates of any Person otherwise qualifying as a "Permitted Holder".

"Permitted Liens" has the meaning stated in Section 6.1(b).

"Person" means and includes natural persons, corporations, limited partnerships, general partnerships, limited liability companies, limited liability partnerships, joint stock companies, estate, associations, companies, firms, enterprises, unincorporated associations, trusts, banks, trust companies, land trusts, business trusts, public benefit corporations, or other organizations, whether or not legal entities, other legal entities, Governmental Bodies and joint ventures, partnerships or other similar Contractual Obligations or arrangements, whether in corporate, partnership or other legal form.

"PPAS" has the meaning stated in the Preamble to this Agreement.

"Prepayment Preference" means, for any Loan, the number therefor set forth as such on Schedule 2.1.

"Principal Office" means, for the Administrative Agent, its office located at One Broadway, 5th Floor, New York, New York 10004, Attention: Loan Administration/ Transcendence Transit, Inc., or such other office as the Administrative Agent may from time to time designate in writing to the Borrower and each Lender.

"Pro Rata Share" means, with respect to any Lender, (i) with respect to all payments, computations and other matters relating to any Tranches, the percentage obtained by dividing (x) the sum of the aggregate principal amount of the Loans of such Lender of such Tranches and any outstanding undrawn Commitment of such Lender in such Tranches by (y) the sum of the aggregate principal amount of all Loans of such Tranches and the outstanding undrawn Commitments of all Lenders in such Tranches and (ii) otherwise, the percentage set forth in clause (i) above calculated with respect to all Tranches.

"Real Property" of any Person means, collectively, all real property of such Person, together with the right, title and interest of such Person, if any, in and to the streets, any real property lying in the bed of any streets, roads or avenues, opened or proposed, in front of, the air space and development rights pertaining to such real property and the right to use such air space and development rights, all rights of way, privileges, liberties, tenements, hereditaments and appurtenances belonging or in any way appertaining thereto, all fixtures, all easements now or hereafter benefiting any real property and all royalties and rights appertaining to the use and enjoyment of any real property, including all alley, vault, drainage, mineral, water, oil and gas rights, together with all of the buildings and other improvements now or hereafter erected on any real property and any fixtures appurtenant thereto.

"Real Property Documents" means, with respect to any real property subject to a Mortgage, the following, to the extent requested by the Administrative Agent and in form and substance satisfactory to the Administrative Agent: (i) a mortgagee title policy (or binder therefor) covering the Administrative Agent's interest under such Mortgage, in a form and amount and by an insurer acceptable to the Administrative Agent, the premium and other costs of issuance of which must be fully paid by the Credit Parties on such effective date, (ii) such assignments of leases, estoppel letters, attornment agreements, consents, waivers, and releases as the Administrative Agent may require with respect to other Persons having an interest in such real property, (iii) a current, as-

- 13 -

Confidential

built survey of such real property, containing a metes-and-bounds property description and flood plain certification, certified by a licensed surveyor acceptable to the Administrative Agent, (iv) flood insurance in an amount, with endorsements and by an insurer acceptable to the Administrative Agent, if such real property is within a flood plain, (v) a current qualified appraisal of such real property, (vi) an environmental assessment regarding such real property, prepared by environmental engineers acceptable to the Administrative Agent, and accompanied by such reports, certificates, studies, or data as the Administrative Agent may reasonably require, or, if permitted by the Administrative Agent, environmental insurance pursuant to a policy, and issued by an underwriter, acceptable to the Administrative Agent, (vii) if applicable, a UCC-1 fixture financing statement, (viii) an opinion from counsel licensed to practice in the jurisdiction in which such real property is located, addressing, among other things, the enforceability of such Mortgage and the attachment and perfection of the Administrative Agent's Lien in and to such real property and (ix) and such other documents, instruments, or agreements as the Administrative Agent may reasonably require with respect to such real property or Mortgage.

"Register" has the meaning stated in Section 2.4(b).

"Regulation" means, all international, federal, state and local laws (whether civil or common law or rule of equity and whether U.S. or foreign), treaties, constitutions, statutes, codes, tariffs, rules, guidelines, regulations, writs, injunctions, orders, judgments, decrees, ordinances and administrative or judicial precedents or authorities, including, in each case whether or not having the force of law, the interpretation or administration thereof by any Governmental Body, all policies, recommendations or guidance of any Governmental Body and all administrative orders, directed duties, directives, requirements, requests.

"Related Parties" means, with respect to any Person, such Person's Affiliates and the shareholders, partners, members, managers, directors, officers, employees, agents, contractors, trustees, representatives and advisors of such Person or of such Person's Affiliates. Notwithstanding the foregoing, none of the Administrative Agent, any Lender or any Related Party of the Administrative Agent or any Lender (other than the Credit Parties and their Subsidiaries), on the one hand, and the Credit Parties and their Subsidiaries, on the other hand, shall be "Related Parties" of each other.

"Relevant Property" means all sites, facilities, locations, Real Property and leaseholds (i) presently or formerly owned, leased, used or operated by any Credit Party (whether or not such properties are currently owned, leased, used or operated by any Credit Party), (ii) at which any Hazardous Material has been transported, disposed, treated, stored or released by any Credit Party or (iii) that are directly adjacent to any sites, facilities, locations, real property or leaseholds presently or formerly owned, leased, used or operated by any Credit Party.

"Required Lenders" means, at any time, one or more of the Lenders having Pro Rata Shares representing more than 50%.

"Restricted Junior Payment" means, for any Person, (i) any dividend or other distribution, direct or indirect, on account of any shares of any class of Capital Stock of such Person now or hereafter outstanding, except a dividend payable solely in shares of that class of Capital Stock to the holders of that class, (ii) any redemption, retirement, sinking fund or similar payment, purchase or other acquisition for value, direct or indirect, of any shares of any class of Capital Stock of such Person now or hereafter outstanding, and (iii) any payment made to retire, or to obtain the surrender of, any outstanding warrants, options or other rights to acquire shares of any class of Capital Stock of such Person now or hereafter outstanding.

- 14 -

**A3479**

PP-TRBK0008691

"Revolving Credit Commitment" means, with respect to each Lender and each Tranche of Revolving Credit Loans, the amount, if any, set forth as such opposite such Lender's name on Schedule 2.1 for Revolving Credit Loans of such Tranche, as modified to reflect assignments thereof set forth in Assignment Agreements and reductions otherwise provided for in this Agreement.

"Revolving Credit Commitment Period" means, with respect to Revolving Credit Commitments in any Tranche, the period set forth as such on Schedule 2.1 for such Tranche.

"Revolving Credit Loan" means a Loan made by a Revolving Lender to the Borrower pursuant to Section 2.1(b).

"Revolving Lender" means a Lender that has a Revolving Credit Commitment.

"Sanctioned Entity" means (a) any country or Governmental Body, (b) any organization directly or indirectly controlled by any country or Governmental Body, (c) any Person or individual resident or determined to be resident in a country, in each case that is subject or purported to be subject to a country sanctions program administered or enforced by OFAC and (d) any Person or individual that commits, threatens or conspires to commit or supports "terrorism", as defined in applicable United States Regulations.

"Sanctioned Person" means a person named on the list of "specially designated nationals" maintained by OFAC.

"Secured Party" means each of the Administrative Agent, the Lenders and their Related Parties.

"Securities" means any Capital Stock, voting trust certificates, certificates of interest or participation in any profit-sharing Contractual Obligation or arrangement, loans, bonds, debentures, notes, or other evidences of indebtedness, secured or unsecured, convertible, subordinated or otherwise, any other item commonly known as "security", any other item treated as "security" under the Securities Act, the Investment Advisers Act of 1940 or any other Regulation of the United States, any State or any political subdivision of either of them and any certificate of interest, share or participation in temporary or interim certificates for the purchase or acquisition of, or any option, warrant, right to subscribe to, purchase or acquire, or any Derivative valued by reference to, any item otherwise qualifying as Security hereunder.

"Securities Act" means the Securities Act of 1933.

"Security Agreement" means the Security Agreement, dated as of the date hereof, among the Borrower and the Administrative Agent (for itself and as the Administrative Agent for the Lenders).

"Solvent" means, with respect to any Person, that, as of the date of determination, both (i) the capital of such Person is not unreasonably small in relation to its business or any transaction contemplated or undertaken by such Person, and (ii) such Person neither intends to incur, nor believes (nor should it reasonably believe) that it will incur, debts beyond its ability to pay such debts as they become due.

"Sub-Agent" has the meaning stated in Section 9.3.

- 15 -

**A3480**

"<u>Subsidiary</u>" means, with respect to any Person, any Person (other than natural persons) the management of which is, directly or indirectly, controlled by, or of which an aggregate of 50% or more of the outstanding Voting Stock is, at the time, owned or controlled, directly or indirectly, by such Person or one or more Subsidiaries of such Person.

"<u>Tax</u>" means any present or future tax, levy, impost, duty, assessment, charge, fee, deduction or withholding of any nature and whatever called, by whomsoever, on whomsoever and wherever imposed, levied, collected, withheld or assessed, <u>provided</u>, that "Tax on the overall net income" of a Person shall be construed as a reference to a tax imposed by the jurisdiction in which that Person is organized or in which that Person's applicable principal office (and/or, in the case of a Lender, its lending office) is located or in which that Person (and/or, in the case of a Lender, its lending, office) is deemed to be doing business on all or part of the net income, profits or gains (whether worldwide, or only insofar as such income, profits or gains are considered to arise in or to relate to a particular jurisdiction, or otherwise) of that Person (and/or, in the case of a Lender, its applicable lending office).

"<u>Term Loan</u>" means a Loan made by a Term Loan Lender to the Borrower pursuant to Section 2.1(a).

"<u>Term Loan Commitment</u>" means, with respect to each Lender and each Tranche of Term Loans, the amount, if any, set forth as such opposite such Lender's name on <u>Schedule 2.1</u> for Term Loans of such Tranche, as modified to reflect assignments thereof set forth in Assignment Agreements and reductions otherwise required by this Agreement.

"<u>Term Loan Commitment Period</u>" means, with respect to Term Loan Commitments in any Tranche, the period set forth as such on <u>Schedule 2.1</u> for such Tranche.

"<u>Term Loan Lender</u>" means a Lender that has a Term Loan Commitment.

"<u>Tranche</u>" means, for any Loan, the identifier therefor set forth on <u>Schedule 2.1</u>.

"<u>TransCare</u>" means TransCare Corporation, a Delaware corporation.

"<u>TransCare Agent</u>" means PPAS in its capacity as administrative agent for the TransCare Lenders under the TransCare Credit Agreement.

"<u>TransCare Credit Agreement</u>" means the Credit Agreement, dated as of August 4, 2003, among TransCare, as borrower, the lenders and other financial institutions from time to time party thereto as lenders, PPAS, as administrative agent for the lenders, in effect on the date hereof.

"<u>TransCare Lenders</u>" means the financial institutions and other Persons party on the date hereof to the TransCare Credit Agreement as "Lenders" under and as defined in the TransCare Credit Agreement.

"<u>UCC</u>" means the Uniform Commercial Code (or any similar or equivalent legislation) as in effect in any applicable jurisdiction.

"<u>Voting Stock</u>" means Capital Stock of any Person (i) having ordinary power to vote in the election of any member of the board of directors or any manager, trustee or other controlling persons of such Person (irrespective of whether, at the time, Capital Stock of any other class or classes of such entity shall have or might have voting power by reason of the happening of any

- 16 -

**A3481**

contingency) and (ii) any Capital Stock of such Person convertible or exchangeable without restriction at the option of the holder thereof into Capital Stock of such Person described in clause (i) of this definition.

ARTICLE II
Loans

Section 2.1       Loans.

(a)       Term Loans.  (i) On the Closing Date, subject to the terms and conditions hereof and relying on the representations and warranties set forth herein, each Term Loan Lender shall be deemed to have made, severally and not jointly and severally, a Term Loan to the Borrower of a Tranche and for an amount set forth as such opposite such Lender's name on Schedule 2.1 for Term Loans of such Tranche and by virtue of the agreement to pay the Closing Date Obligations as set forth in clause (e) below, and (ii) during the Term Loan Commitment Period for any Tranche, subject to the terms and conditions hereof and relying on the representations and warranties set forth herein, each Term Loan Lender having a Term Loan Commitment in such Tranche agrees, severally and not jointly and severally, to make a Term Loan of such Tranche to the Borrower in an aggregate amount up to but not exceeding such Commitment; provided that the proceeds actually disbursed to the Borrower shall not exceed such Commitment multiplied by the OID Number for such Tranche, as set forth in clause (d) below.  Any amount borrowed under this Section 2.1(a) and subsequently repaid or prepaid may not be reborrowed.

(b)       Revolving Credit Loans.  (i) On the Closing Date, subject to the terms and conditions hereof and relying on the representations and warranties set forth herein, each Revolving Lender shall be deemed to have made, severally and not jointly and severally, a Revolving Credit Loan to the Borrower of a Tranche and for an amount set forth as such opposite such Lender's name on Schedule 2.1 for Revolving Credit Loans of such Tranche and by virtue of the agreement of the Borrower to pay the Closing Date Obligations as set forth in clause (e) below, and (ii) during the Revolving Credit Commitment Period for any Tranche, subject to and upon the terms and conditions hereof, each Revolving Lender having a Revolving Credit Commitment in such Tranche agrees, severally and not jointly and severally, to make Revolving Credit Loans of such Tranche to the Borrower in the aggregate amount up to but not exceeding such Revolving Credit Commitment.  Amounts borrowed pursuant to this Section 2.1(b) may be repaid and reborrowed during the Revolving Credit Commitment Period.

(c)       General.  Subject to Sections 2.9 and 2.10, all amounts owed under this Section 2.1 shall be paid in full no later than the Maturity Date.  Any amount borrowed under this Section 2.1 shall (i) bear interest as provided in Section 2.5(a) hereof and (ii) be entitled to the security interests, collateral and other rights and benefits provided pursuant to this Agreement and the other Credit Documents.

(d)       OID.

(i)       Term Loans.  The aggregate principal amount of the Term Loans of any Tranche deemed outstanding hereunder shall equal the aggregate principal amount of the proceeds of such Term Loans of such Tranche advanced to the Borrower hereunder divided by the OID Number for such Tranche.  Such principal amount deemed outstanding hereunder shall be owed by the Borrower hereunder from the date such proceeds are advanced hereunder and shall be deemed to be the principal amount of the Loan of such Tranche outstanding hereunder for all purposes under the Credit

- 17 -

**A3482**

Documents, including for purposes of calculating proceeds to be disbursed and undrawn Commitments remaining pursuant to clause (a) above.

(ii) <u>Revolving Credit Loans</u>. Instead of the procedure set forth above for Term Loans, in the case of Revolving Credit Loans of any Tranche, the Borrower shall make a one-time payment to each Lender having a Commitment in such Tranche at the time such Commitment shall first become effective in an amount equal to the difference between (x) such Commitment and (y) the product of such Commitment and the OID Number for such Tranche.

(e) <u>Closing Date Obligations</u>.

(i) As set forth in the Bill of Sale, on the date hereof, the Borrower has agreed to pay the Closing Date Obligations, which consist of a portion of the principal amount outstanding under the TransCare Credit Agreement as of the date of the Bill of Sale, excluding TransCare's liabilities and obligations to pay any accrued and unpaid interest on such principal amount or costs and expenses in connection with such principal amount or commitments under the TransCare Credit Agreement, by agreeing to pay such aggregate amount and the Tranches thereof as set forth in <u>Schedule 2.1</u>.

(ii) All of the Closing Date Obligations shall hereafter be deemed outstanding and governed by the terms of this Agreement, with the aggregate amount of the Closing Date Obligations constituting the principal amount of the Loans under this Agreement outstanding on the date hereof, allocated between Revolving Loans and Term Loans and among Tranches of Loans as set forth on <u>Schedule 2.1</u>.

Section 2.2   <u>Borrowing Mechanics</u>.

(a) Loans of any Tranche shall be made in an aggregate minimum amount of $25,000 and integral multiples of $10,000 in excess of that amount (or such lesser amount as shall constitute the entire applicable Commitment then available in such Tranche). No Lender shall be responsible for any default by any other Lender in such other Lender's obligation to make the Loans hereunder.

(b) Whenever the Borrower desires that the Lenders make a Loan, the Borrower shall deliver to the Administrative Agent a fully executed Borrowing Certificate no later than 10:00 a.m. (New York City time) at least one Business Day in advance of the proposed Borrowing Date, which Borrowing Date shall be a Business Day.

(c) Notice of receipt of each Borrowing Certificate in respect of the applicable Loans, together with the amount of each Lender's Pro Rata Share thereof, together with the applicable interest rate, shall be provided by the Administrative Agent to each applicable Lender by facsimile with reasonable promptness, but (<u>provided,</u> the Administrative Agent shall have received such notice by 10:00 a.m. (New York City time)) not later than 4:00 p.m. (New York City time) on the same day as the Administrative Agent's receipt of such Borrowing Certificate from the Borrower.

(d) Each Lender shall make the amount of its Loans available to the Administrative Agent no later than 2:00 p.m. (New York City time) on the applicable Borrowing Date by wire transfer of same day funds in Dollars, at the Administrative Agent's Principal Office. Except as provided herein, upon satisfaction or waiver of the conditions precedent specified herein, the

- 18 -

**A3483**

PP-TRBK0008695

Administrative Agent shall make the proceeds of such Loans available to the Borrower on the applicable Borrowing Date by causing an amount of same day funds in Dollars equal to the proceeds of all such Loans received by the Administrative Agent from the Lenders to be deposited by wire transfer to the account of the Borrower designated in writing to the Administrative Agent by the Borrower.

Section 2.3     <u>Use of Proceeds</u>.  The Loans shall be used by the Borrower solely (a) for working capital and general corporate purposes of the Borrower and its Subsidiaries, (b) to pay the purchase price, costs and expenses related to the Acquisition, and (c) to pay the costs and expenses related to the transactions contemplated by this Agreement.

Section 2.4     <u>Evidence of Debt; Register; Notes</u>.

(a)     <u>Lenders' Evidence of Debt</u>.  Each Lender shall maintain on its internal records an account or accounts evidencing the Indebtedness of the Borrower to such Lender, including the amounts of the Loans owed to it and each repayment and prepayment in respect thereof.  Any such record shall be conclusive and binding on the Credit Parties, absent manifest error; <u>provided</u>, failure to make any such record, or any error in such record, shall not affect any Lender's Commitments, Loans or any Obligation; and <u>provided</u>, <u>further</u>, in the event of any inconsistency between the Register and any Lender's records, the entries in the Register shall govern.

(b)     <u>Register</u>.  The Administrative Agent shall maintain, as the Borrower's agent, at the Administrative Agent's Principal Office a register for the recordation of the names and addresses of each Lender and such Lender's Commitments and the fees, interest and principal amount of Loans owed to each Lender (the "<u>Register</u>").  The Register shall be available for inspection by the Borrower or any Lender at any reasonable time and from time to time upon reasonable prior notice.  The Administrative Agent shall record in the Register the Commitments, and the fees, interest and the outstanding balance of the Loans, and each repayment or prepayment in respect of the principal amount of and interest, fees and other amounts with respect to the Loans, and any such recordation shall be conclusive and binding on the Borrower and each Lender, absent manifest error; <u>provided</u>, failure to make any such recordation, or any error in such recordation, shall not affect any Lender's Commitments or the Borrower's Obligations in respect of any Loan.  No transfer of the Commitments, the Loans and/or any interests therein shall be effective until such transfer is recorded in the Register.

(c)     <u>Notes</u>.  At any time, the Borrower shall (if requested by the Administrative Agent) execute and deliver to each Lender in any Tranche a promissory note in a form acceptable to the Administrative Agent to evidence the Loans of such Lender in such Tranche (each a "<u>Note</u>").

Section 2.5     <u>Interest on Loans</u>.

(a)     <u>Applicable Rates</u>.  Except as otherwise set forth in any Credit Document, each Loan and other outstanding overdue Obligations shall bear interest on the unpaid principal amount thereof from the date made through repayment (whether by acceleration or otherwise) on the unpaid principal amount thereof at a rate per annum equal to LIBOR plus the Applicable Margin; <u>provided</u>, unless otherwise expressly provided in any Credit Document, the principal amount of all outstanding overdue Obligations (other than Loans) shall bear interest at the highest interest rate applicable to any Loan pursuant to this clause (a).

- 19 -

**A3484**

(b)      _Calculation of Interest Rates_.  Interest payable pursuant to this Section 2.5 shall be computed on the basis of a 360-day year for the actual number of days elapsed in the period during which it accrues.  In computing interest on any Loan, the date of the making of such Loan or the first day of an interest period applicable to such Loan shall be included, and the date of payment of such Loan or the expiration date of an interest period applicable to such Loan shall be excluded; _provided_, if such Loan is repaid on the same day on which it is made, one day's interest shall be paid on such Loan.

(c)      _Payment of Interest_.  Interest on each Loan shall be payable in arrears on (i) each Interest Payment Date, (ii) except as otherwise agreed by the Administrative Agent in its sole discretion, the date of any prepayment of such Loan, whether voluntary or mandatory, to the extent accrued on the amount being prepaid and (iii) the Maturity Date of such Loan, including final maturity.

(d)      _Default Interest_.  Except as otherwise expressly provided in any Credit Document, upon the occurrence and during the continuance of an Event of Default described in Section 8.1, the principal amount of all Loans and, to the extent permitted by applicable Regulations, any interest payments on the Loans or any fees or other Obligations not paid when due, in each case whether at stated maturity, by notice of prepayment, by acceleration or otherwise, may, upon notice to the Borrower sent by and at the sole discretion of the Administrative Agent, thereafter bear interest (including interest, as provided in this Agreement, accruing after the filing of any petition in bankruptcy or the commencement of any insolvency, reorganization or similar proceeding, whether or not a claim for post-filing or post-petition interest is allowed in such proceeding) payable on demand at a rate that is 2.0% per annum in excess of the interest rate otherwise payable hereunder with respect to such Loans, interest payments, fees or other Obligations.  Payment or acceptance of the increased rates of interest provided for in this Section 2.5 is not a permitted alternative to timely payment and shall not constitute a waiver of any Event of Default or otherwise prejudice or limit any rights or remedies of the Administrative Agent or any Lender.

Section 2.6      _Changed Circumstances_.  If the introduction of or any change in or in the interpretation of (in each case, after the date hereof) any Regulation or Permit applicable to any Lender makes it unlawful, or any Governmental Body asserts, after the date hereof, that it is unlawful, for any Lender to perform its obligations hereunder to maintain the Loans at LIBOR, such Lender shall notify the Administrative Agent of such event and the Administrative Agent shall notify the Borrower of such event, and the right of the Borrower to apply LIBOR to any subsequent Interest Period shall be suspended until the Administrative Agent shall notify the Borrower that the circumstances causing such suspension no longer exist, and the Borrower shall forthwith prepay in full the Loans then outstanding, and shall pay all interest accrued thereon through the date of such prepayment, unless the Borrower, within three Business Days after such notice from the Administrative Agent, requests that the interest rate applicable to the Loans be converted from LIBOR plus the Applicable Margin to the Base Rate as in effect from time to time _plus_ 4.5%; _provided_, that if the date of such repayment or proposed conversion is not the last day of an Interest Period applicable to the Loans, the Borrower shall also pay any amount due pursuant to Section 7.5.

Section 2.7      _Fees_.

(a)      _Commitment Fee_.  The Borrower agrees to pay to the Administrative Agent, for the ratable benefit of the Revolving Lenders in any Tranche, commitment fees on the actual daily amount by which the Revolving Credit Commitments in such Tranche exceed the aggregate outstanding principal amount of Revolving Credit Loans of such Tranche, at a rate equal to

Confidential

1.50% per annum of such amount.   Such commitment fees shall accrue daily during the Revolving Credit Commitment Period for such Tranche and be payable in arrears on each Interest Payment Date for the Revolving Credit Loans of such Tranche and on the last day of the Revolving Credit Commitment Period for such Tranche.

(b)   Agency Fee.   The Borrower agrees to pay to the Administrative Agent, for its own account, an agency fee in an amount equal to $75,000 fully earned and due on the Closing Date and on each anniversary thereof on terms and conditions separately agreed upon by the Administrative Agent and the Borrower.   On the Maturity Date or any time when all Loans shall be repaid in full, the Borrower shall pay to the Administrative Agent the agency fee otherwise next scheduled to be payable, with the amount thereof prorated for actual days elapsed since the due date for last such agency fee.

(c)   Calculations; Distributions.   All fees referred to in this Section 2.7 shall be calculated on the basis of a 360-day year and the actual number of days elapsed.   Upon receipt of the fees referred to in Section 2.7 (a) above, the Administrative Agent shall promptly distribute to each Lender in the applicable Tranche its Pro Rata Share thereof.

Section 2.8   Repayment.   Subject to Sections 2.9 and 2.10, the Loans shall be due and payable, and the Borrower shall be required to repay all of the Obligations (including all accrued and unpaid principal and interest on the principal amounts of the Loans) on the Maturity Date.

Section 2.9   Optional Prepayments.

(a)   Optional Prepayments.   At any time and from time to time the Borrower may (i) prepay, without premium or penalty, Loans of any Tranche on any Business Day in whole or in part in an aggregate minimum amount of $250,000 and integral multiples of $50,000 in excess of that amount (or such lesser amount that shall constitute the entire amount of the Loans then outstanding for such Tranche) or (ii) reduce any Commitments, without premium or penalty (provided that the Revolving Credit Commitment in any Tranche may not be reduced below the outstanding Revolving Credit Loans of such Tranche), on any Business Day in whole or in part in an aggregate minimum amount of $500,000 and integral multiples of $100,000 in excess of that amount, and such Commitments shall be permanently reduced by such amount.   Loans of, and Commitments in, any Tranche shall be prepaid or reduced according to each respective Lender's Pro Rata Share thereof.   Prior to the maturity of all Loans (whether by acceleration or otherwise), any optional prepayment of the Loans shall be applied to prepay the outstanding principal amount of the Loans in order of their Prepayment Preferences, with Loans of Tranches having the same Prepayment Preference being prepaid ratably in accordance with the Pro Rata Share of each Lender in such Tranches (and, if applicable, reduce any drawn outstanding Commitments of the Lenders in such Tranches in the amount of such prepayment so applied), with Loans of Tranches having the same Prepayment Preference being prepaid ratably in accordance with the Pro Rata Share of each Lender in such Tranches.

(b)   Notice of Optional Prepayment.   All such prepayments and/or commitment reductions shall be made on a Business Day and, unless otherwise agreed by the Administrative Agent, upon not less than one Business Day's prior written or telephonic notice from the Borrower, in each case given to the Administrative Agent by 12:00 p.m. (New York City time) on the date required and, if given by telephone, promptly confirmed in writing to the Administrative Agent (and the Administrative Agent will promptly transmit such telephonic or original notice for the applicable Loans by facsimile or telephone to each Lender).   Upon the giving of any such notice, the principal amount of the Loans specified in such notice shall become due and payable

- 21 -

Confidential                                                                                                         PP-TRBK0008698

and/or the Commitment specified in such notice shall be permanently reduced on the date specified therein.  In the case of an optional prepayment of Revolving Credit Loans, the Borrower shall specify in such notice whether such prepayment shall be applied to permanently reduce the Revolving Credit Commitment or to reduce the outstanding amount of Revolving Credit Loans without reducing the amount of the Revolving Credit Commitment; provided in the event the Borrower fails to specify how the prepayment of Revolving Credit Loans shall be applied, such prepayment shall be applied to reduce the outstanding amount of Revolving Credit Loans without reducing the amount of the Revolving Credit Commitment.

(c)     Cash Sweep.  The Administrative Agent may apply to the payment of the Obligations all payments received pursuant to the automatic sweep of Collection Accounts required under Section 5.1(g) hereunder without regard to the minimum repayment amounts, priorities and notice requirements set forth in this Section 2.9.  Each such payment shall be treated as an optional prepayment under this Agreement in the absence of, at the time such payment is made, any requirement to repay the Obligations besides those set forth in Section 5.1(g), and each such payment treated as an optional prepayment shall not operate to reduce the Commitments.

Section 2.10     Mandatory Prepayments; Mandatory Commitment Reductions.

(a)     Excess Over Commitment.  If at any time the outstanding principal amount of the Revolving Credit Loans of any Tranche exceeds the Revolving Credit Commitment in such Tranche, the Borrower shall immediately pay the amount of such excess to the Administrative Agent for application to Revolving Credit Loans of such Tranche.  Failure to pay such amount shall be an immediate Event of Default under this Agreement.

(b)     Asset Sales.  No later than the first Business Day following the date of receipt by the Borrower or any of its Subsidiaries of any Net Asset Sale Proceeds, the Borrower shall prepay the Loans and/or the Commitments shall be permanently reduced as set forth in Section 2.11 in an aggregate amount equal to such Net Asset Sale Proceeds; provided (i) so long as no Default or Event of Default shall have occurred and be continuing and (ii) to the extent that aggregate Net Asset Sale Proceeds from the Closing Date through the applicable date of determination do not exceed $100,000, the Borrower shall have the option, directly or through one or more of its wholly-owned Subsidiaries, to invest Net Asset Sale Proceeds within one hundred and eighty (180) days of receipt thereof in long term productive assets of the general type used in the business of the Borrower and its Subsidiaries; provided, further, pending any such investment all such Net Asset Sale Proceeds shall be applied to prepay outstanding Revolving Credit Loans (without a reduction in Revolving Credit Commitments).

(c)     Insurance/Condemnation Proceeds.  No later than the first Business Day following the date of receipt by the Borrower or any of its Subsidiaries, or the Administrative Agent as loss payee, of any Net Insurance/Condemnation Proceeds, the Borrower shall prepay the Loans and/or the Commitments shall be permanently reduced as set forth in Section 2.11 in an aggregate amount equal to such Net Insurance/Condemnation Proceeds; provided (i) so long as no Default or Event of Default shall have occurred and be continuing and (ii) to the extent that aggregate Net Insurance/Condemnation Proceeds from the Closing Date through the applicable date of determination do not exceed $100,000, the Borrower shall have the option, directly or through one or more of its wholly-owned Subsidiaries to invest such Net Insurance/Condemnation Proceeds within one hundred and eighty (180) days of receipt thereof in long term productive assets of the general type used in the business of the Borrower and its Subsidiaries, which investment may include the repair, restoration or replacement of the

- 22 -

Confidential                                                                                    PP-TRBK0008699

applicable assets thereof; provided, further, pending any such investment all such Net Insurance/Condemnation Proceeds, as the case may be, shall be applied to prepay outstanding Revolving Credit Loans (without a reduction in Revolving Credit Commitments).

(d)     Letters of Credit.  The Borrower shall from time to time immediately prepay the Revolving Credit Loans to the extent that any letters of credit permitted to be incurred pursuant to Section 6.1(a)(v) expire or terminate and the cash supporting such letter of credit is returned to the Borrower or any Guarantor.

Section 2.11     Application of Prepayments.  Prior to the maturity of all Loans (whether by acceleration or otherwise), any mandatory prepayment of the Loans pursuant to Sections 2.10(b), (c) or (e) shall be applied first to prepay the outstanding principal amount of the Loans in order of their Prepayment Preferences, with Loans of Tranches having the same Prepayment Preference being prepaid ratably in accordance with the Pro Rata Share of each Lender in such Tranches (and, if applicable, reduce any drawn outstanding Commitments of the Lenders in such Tranches in the amount of such prepayment so applied) and then to permanently reduce any outstanding undrawn Commitments of the Lenders ratably in order of the Prepayment Preferences of such Tranches.  Concurrently with any prepayment of the Loans and with any reduction of the Commitments pursuant to this Section 2.11, the Borrower shall deliver to the Administrative Agent a certificate of an Authorized Officer demonstrating the calculation of the amount required to be prepaid.

Section 2.12     General Provisions Regarding Payments.

(a)     Payments.  All payments by the Borrower of principal, interest, fees and other Obligations shall be made to the Administrative Agent for the benefit of the Lenders in Dollars in same-day funds, without defense, setoff or counterclaim, free of any restriction or condition, and delivered to the Administrative Agent not later than 2:00 p.m. (New York City time) on the date due at the Administrative Agent's Principal Office without presentment, demand, protest or notice or any kind, all of which are expressly waived by the Borrower.

(b)     Non-Conforming Payments.  The Administrative Agent shall deem any payment by or on behalf of the Borrower that is not made to the Administrative Agent in same day funds prior to 2:00 p.m. (New York City time) to be a non-conforming payment.  Any such payment shall not be deemed to have been received by the Administrative Agent until the later of (i) the time such funds become available funds and (ii) the applicable next Business Day.  The Administrative Agent shall give prompt telephonic notice to the Borrower and each applicable Lender (confirmed in writing) if any payment is non-conforming.  To the extent any non-conforming payment may be deemed to have been received on a date after the date such payment was due hereunder pursuant to the provisions of this Section 2.12(b), such failure of such payment to have been made when due will constitute or become a Default or Event of Default to the extent so provided under the terms of Section 8.1.  Interest shall continue to accrue on any principal as to which a non-conforming payment is made until such funds become available funds (but in no event less than the period from the date of such payment to the next succeeding applicable Business Day) at the rate determined pursuant to Section 2.5 from the date such amount was due and payable until the date such funds become available funds (but in no event less than the period from the date of such payment to the next succeeding applicable Business Day).

(c)     Payments to Include Accrued Interest.  Except as otherwise agreed by the Administrative Agent in its sole discretion and for payments allocated by the Administrative Agent pursuant to Section 5.1(g), all payments in respect of the principal amount of any Loan

- 23 -

**A3488**

(whether mandatory or optional) shall include payment of accrued interest on the principal amount being, repaid or prepaid, and all such payments (and, in any event, any payments in respect of any Loan on a date when interest is due and payable with respect to such Loan) shall be applied to the payment of interest before application to principal.

(d)     Distributions by the Administrative Agent.  The Administrative Agent shall promptly distribute to each Lender such Lender's applicable Pro Rata Share of all payments and prepayments of principal and interest due hereunder, together with all other amounts due thereto, including all fees payable with respect thereto, to the extent received by the Administrative Agent.

(e)     Business Days.  Whenever any payment to be made hereunder shall be stated to be due on a day that is not a Business Day, such payment shall be made on the next succeeding Business Day (subject to the definition of Interest Period) and such extension of time shall be included in the computation of the payment of interest hereunder.

Section 2.13     Ratable Sharing.  At the maturity of all Loans (whether by acceleration or otherwise), any repayment of the Loans shall be applied to prepay the outstanding principal amount of the Loans in order of their Prepayment Preferences, with Loans of Tranches having the same Prepayment Preference being prepaid ratably in accordance with the Pro Rata Share of each Lender in such Tranches. If any Secured Party (other than the Administrative Agent) shall, except as otherwise provided in the Collateral Documents with respect to amounts realized from the exercise of rights with respect to Liens on the Collateral, whether by voluntary payment (other than a voluntary prepayment of Loans made and applied in accordance with the terms hereof), through the exercise of any right of set-off or banker's lien, by counterclaim or cross action or by the enforcement of any right under the Credit Documents or otherwise, or as adequate protection of a deposit treated as cash collateral under the Bankruptcy Code, receive payments of the Obligations that exceed the amount such Lender would have been entitled to receive if all payments had gone to, and been distributed by, the Administrative Agent in accordance with this Agreement, then such Secured Party shall purchase for immediately available cash from all other Secured Parties participations in the outstanding Obligations of such Secured Parties as necessary to ensure that the benefit of such excess payments is received by the Secured Parties that would have received such excess payments if such payments had gone to, and been distributed by, the Administrative Agent and shall notify the Administrative Agent of such purchase; provided, if all or part of such excess payments are thereafter recovered from such Lender upon the bankruptcy or reorganization of any Credit Party or otherwise, those purchases shall be rescinded and the purchase prices paid for such participations shall be returned to such purchasing Lender ratably to the extent of such recovery, but without interest. The Credit Parties expressly consent to the foregoing arrangement and agrees that any holder of a participation so purchased may exercise any and all rights of banker's lien, set-off or counterclaim with respect to any and all monies owing by the Credit Parties to that holder with respect thereto as fully as if that holder were owed the amount of the participation held by that holder.

Section 2.14     Termination or Reduction of Commitments.  Unless previously terminated, each of the Commitments automatically shall terminate on the Maturity Date. The Commitments shall be permanently reduced in accordance with Sections 2.9, 2.10 and 2.11.

ARTICLE III
Conditions Precedent

Section 3.1     Conditions Precedent; Closing Date.  The obligation of any Lender to make any Loan and the other financial accommodations described herein on the Closing Date is subject to the

- 24 -

**A3489**

satisfaction, or waiver in accordance with Section 10.1, of the following conditions on or before the Closing Date:

      (a)    <u>Documents</u>.  The Administrative Agent shall have received each of the following:

      (i)    <u>Credit Documents</u>. (A) Duly executed originals of Guaranties duly executed by each Guarantor party to this Agreement, (B) duly executed originals of the Security Agreement, (C) duly executed Account Control Agreements with respect to each Deposit Account of any Credit Party, (D) duly authorized UCC financing statements from all Credit Parties in all jurisdictions requested by the Administrative Agent or any Lender and (E) all original promissory notes, stock certificates, instruments and other documents (accompanied by instruments of transfer or assignment duly endorsed in blank and otherwise in form and substance satisfactory to the Administrative Agent) representing or evidencing all negotiable documents, instruments, tangible chattel paper, certificated securities and certificates of title (each as defined in the UCC) included in the Collateral.

      (ii)    <u>Corporate Certificate</u>. A certificate of the secretary or assistant secretary, the chief executive officer, the authorized signatory, the manager or the general partner, as the case may be, of each Credit Party, each substantially in the form of <u>Exhibit B</u>, with respect to (i) the articles of incorporation, certificate of formation or similar organizational document filed with any Governmental Body of such Credit Party, (ii) any other organizational document of such Credit Party, including any bylaws, operating agreement or limited partnership agreement, (iii) the resolutions of the board of directors, managers or general partners or similar controlling person of such Credit Party approving each Credit Document to which such Credit Party is a party and the other documents to be delivered by such Credit Party under the Credit Documents and the performance of the obligations of such Credit Party thereunder and (iv) the names and true signatures of the officers of such Credit Party or such other persons authorized to sign each Credit Document to which such Credit Party is a party and the other documents to be delivered by it under the Credit Documents.

      (iii)    <u>Reserved</u>.

      (iv)    <u>Closing Date Certificate</u>.  An originally executed Closing Date Certificate, in the form of <u>Exhibit C</u> (the "<u>Closing Date Certificate</u>"), from the Borrower, together with any attachments thereto.

      (v)    <u>Evidence of Insurance</u>. The Administrative Agent shall have received a certificate from the Borrower's insurance broker or other evidence satisfactory to it that all insurance required to be maintained pursuant to Section 5.1(c) is in full force and effect and that Administrative Agent, for the benefit of the Lenders and the Administrative Agent, has been named as additional insured and loss payee thereunder.

      (vi)    <u>Reserved</u>.

      (vii)    <u>Other Information</u>. The Administrative Agent shall have received any other financial or non-financial information regarding any Credit Party or any Subsidiary of any Credit Party as it may reasonably request.

Confidential

(b)     Proceedings.   All proceedings taken or to be taken in connection with the transactions contemplated by this Agreement shall be satisfactory to the Administrative Agent and the Lenders and their counsel.

(c)     Fees and Costs.   The Borrower shall have paid all fees and expenses (including attorneys' fees) and out of pocket expenses of the Lenders and the Administrative Agent incurred in connection with this Agreement and the other Credit Documents.

Section 3.2     Conditions to Each Borrowing.   The obligation of each Lender to make any Loan on any Borrowing Date, including the Closing Date, is subject to the satisfaction, or waiver in accordance with Section 10.1, of the following conditions precedent:

(a)     Borrowing Certificate.   The Administrative Agent and the Lenders shall have received a fully executed and delivered Borrowing Certificate, in accordance with Section 2.2. Each Borrowing Certificate shall be executed by an Authorized Officer of the Borrower in a writing delivered to the Administrative Agent and the Lenders on a Business Day.

(b)     Representations, Warranties and Covenants.   As of such Borrowing Date, the representations, warranties and covenants of the Credit Parties contained in the Credit Documents shall be true, correct and complied with on and as of that Borrowing Date, as if made on and as of that Borrowing Date.

(c)     No Default or Event of Default.   As of such Borrowing Date, no event shall have occurred and be continuing or would result from the consummation of the applicable Borrowing that would constitute an Event of Default or a Default.

(d)     Consents.   The Lenders shall have received such Permits, Consents and other information, opinions or documents reasonably requested by the Administrative Agent or the Lenders in connection with such Borrowing.

(e)     Available Commitment.   After making all Loans requested on such Borrowing Date, (i) the aggregate outstanding principal amount of all Revolving Credit Loans of any Tranche shall not exceed the aggregate outstanding Commitments in such Tranche and (ii) the aggregate outstanding principal amount of Term Loans in any Tranche requested on such Borrowing Date shall not exceed the aggregate outstanding Commitments in such Tranche.

(f)     No Material Adverse Effect.   No Material Adverse Effect shall have occurred after giving effect to the making of the Loans.

ARTICLE IV
Representations and Warranties

Section 4.1     Representations and Warranties.   In order to induce the Administrative Agent and the Lenders to enter into this Agreement and to make each Borrowing to be made thereby, each Credit Party hereby represents and warrants to the Secured Parties, on the Closing Date and on each Borrowing Date as follows:

(a)     Status; Authorization.   Each Credit Party and each Subsidiary of each Credit Party is duly organized, validly existing, and in good standing under the Regulations of its jurisdiction of organization and is duly qualified and in good standing in every other jurisdiction where it is doing business except where the failure to so qualify could not reasonably be expected

- 26 -

Confidential

to have a Material Adverse Effect, and the execution, delivery and performance by each Credit Party of each Credit Document (i) are within the authority of such Credit Party, (ii) have been duly authorized by such Credit Party and (iii) do not conflict with or contravene the constitutive documents of such Credit Party.  The execution, delivery, performance by each Credit Party of its obligations, and exercise of its rights under the Credit Documents, including the making of the Loans under this Agreement, (y) do not require any Consents or Permits that have not been obtained and (z) are not and will not be in conflict with or prohibited or prevented by (A) any Regulation or Permit, (B) any corporate governance document, corporate minute or resolution or (C) any Contractual Obligation or provision thereof binding on any Credit Party or any Subsidiary of any Credit Party or affecting any property of any Credit Party or any of their Subsidiaries.

(b)       <u>Execution and Binding Effect</u>.   Upon execution and delivery thereof, each Credit Document shall constitute the legal, valid and binding obligation of each Credit Party listed on the signature pages as a party thereto, enforceable against such Credit Party in accordance with its terms.

(c)       <u>Properties</u>.

(i)       Each Credit Party and each Domestic Subsidiary of any Credit Party has good and marketable title to, or valid leasehold interests in, all Real Property and good title to all personal property owned or purported to be owned by it, in each case free of all Liens other than the Permitted Liens.  No Real Property currently owned by any Credit Party or any Domestic Subsidiary of any Credit Party except with respect to Real Property listed on any Collateral Update Certificate after the date hereof.

(ii)       Each Credit Party and each Domestic Subsidiary of any Credit Party is, or when leases creating Leasehold Properties are executed will be, lawfully possessed of a valid and subsisting leasehold estate in and to all of its Leasehold Properties that it purports to lease, free and clear of all Liens other than the Permitted Liens.

(iii)       Each Credit Party and each Domestic Subsidiary of any Credit Party enjoys, and will enjoy, peaceful and undisturbed possession of, or a lease or license to use, all property (subject only to the Permitted Liens) that are necessary for their respective businesses.

(iv)       As of the date hereof, no real property is held by any Credit Party or any Domestic Subsidiary of any Credit Party.

(d)       <u>Financials; Budget</u>.   The Borrower has provided to the Administrative Agent and the Lenders (i) its unaudited management-prepared pro-forma Financials dated as of the Closing Date, after giving effect to the Acquisition and the other transactions contemplated by this Agreement, and such Financials are complete and correct and fairly present in all material respects the position of the Credit Parties and their Subsidiaries as at such dates and for such periods in accordance with GAAP consistently applied, except for the absence of footnotes and year-end audit adjustments, and (ii) a Budget for the period starting as of the Closing Date.

(e)       <u>Litigation</u>.   There are no Actions pending or threatened against any Credit Party or any Subsidiary of any Credit Party that could, if adversely determined, alone or together, reasonably be expected to have a Material Adverse Effect.

- 27 -

**A3492**

(f)     Governmental Approvals and Filings.   No Permit is or will be necessary in connection with the execution and delivery of this Agreement or any other Credit Document, consummation by the Credit Parties of the transactions herein or therein contemplated, or performance of or compliance with the terms and conditions hereof or thereof, other than the filings and recordations contemplated by the Collateral Documents.   No Credit Party and no Subsidiary of any Credit Party is subject to regulation under the Public Utility Holding Company Act of 2005, the Federal Power Act, the Interstate Commerce Act or the Investment Company Act of 1940 or to any Regulation or Permit limiting any Credit Party's ability to incur Indebtedness for money borrowed.   No Credit Party and no Subsidiary of any Credit Party is an "investment company" or a company "controlled" by an "investment company", with the meaning of the Investment Company Act of 1940.

(g)     Absence of Conflicts.   The execution and delivery by each Credit Party of this Agreement and each other Credit Document to which it is a party and performance by it hereunder and thereunder will not violate any Regulation (including Regulations T, U and X of the Federal Reserve Board) and will not conflict with or result in a breach of any order, writ, injunction, resolution, decree or other similar document of any court or Governmental Body or its certificate of incorporation or by-laws or similar constituent documents or create (with or without the giving of notice or lapse of time, or both) a default under or breach of any material Contractual Obligation, in each case to which it is a party (by successor in interest or otherwise), or by which it is bound or any material portion of its property is affected, or, except under the Collateral Documents, result in the imposition of any Lien (other than Permitted Liens) of any nature whatsoever upon any asset owned by or used in connection with the business of the Credit Parties and their Subsidiaries.

(h)     Collateral.   From and after the execution and delivery of the Collateral Documents and the filing of the documents thereby required, the Administrative Agent, on behalf of the Lenders, shall have a first-priority perfected security interest in and to all of the Collateral, free and clear of any Liens other than the Permitted Liens, and entitled to priority under applicable Regulations, with no financing statements, hypothecations, chattel mortgages, real estate mortgages or similar filings on record anywhere other than such filings in connection with this Agreement, the Collateral Documents or the Permitted Liens.   Each of the representations and warranties made by each Credit Party in each Collateral Document to which it is a party is true and correct in all material respects as of each date made or deemed made.

(i)     Partnerships, Etc.   No Credit Party and no Subsidiary of any Credit Party is a partner (general or limited) of any partnership, is a party to any Joint Venture or owns (beneficially or of record) any equity or similar interest in any similar Person (including any interest pursuant to which any Credit Party or any Subsidiary of any Credit Party has or may in any circumstance have an obligation to make capital contributions to, or be generally liable for or on account of the liabilities, acts or omissions of such other Person) other than, in each case, such arrangement solely among the Credit Parties and their Subsidiaries.

(j)     Fiscal Year.   Each fiscal year of each Credit Party and each Subsidiary of any Credit Party begins on January 1 of each calendar year and ends on December 31 of each calendar year.

(k)     Subsidiaries.   The Borrower is organized under the law of the State of Delaware, has no Subsidiaries on the date hereof and its Capital Stock is not covered by any outstanding options, warrants, rights of conversion or purchase or similar rights.

- 28 -

**A3493**

PP-TRBK0008705