# 20 Civ. 06274 (LAK)

**United States District Court**

*for the*

**Southern District of New York**

———————————————

*IN RE TRANSCARE CORPORATION*, ET AL.

DEBTORS,

———————————————

PATRIARCH PARTNERS AGENCY SERVICES, LLC, ET AL.

DEFENDANTS-APPELLANTS,

—against—

SALVATORE LAMONICA, AS CHAPTER 7 TRUSTEE OF THE JOINTLY-ADMINISTERED ESTATES OF TRANSCARE CORPORATION, ET AL.,

PLAINTIFF-APPELLEE.

———————————————

ON APPEAL FROM THE UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK (BERNSTEIN, J.)

IN RE: TRANSCARE CORPORATION, ET AL., CASE NO. 16-10407 (SMB)

LAMONICA V. TILTON, ET AL., ADV. PROC. NO. 18-1021 (SMB)

**APPENDIX TO BRIEF FOR THE APPELLANTS**

# Volume XXIII- A3546-A3554

Execution Copy

## SECURITY AGREEMENT

SECURITY AGREEMENT, dated as of August 4, 2003, made by TRANSCARE CORPORATION, a Delaware corporation (the "Borrower") and EACH OF THE UNDERSIGNED SUBSIDIARIES OF THE BORROWER (together with the Borrower, each a "Grantor", collectively, the "Grantors"), in favor of PATRIARCH PARTNERS AGENCY SERVICES, LLC, as administrative agent (in such capacity, the "Administrative Agent") for the Lenders (the "Lenders") parties to the Credit Agreement referred to below.

### RECITALS

Pursuant to the Credit Agreement, dated as of August 4, 2003 (as amended, supplemented or otherwise modified from time to time, the "Credit Agreement"), among the Borrower, the Lenders and the Administrative Agent, the Lenders have severally agreed to make loans to the Borrower upon the terms and subject to the conditions set forth therein, such loans to be evidenced by the Notes issued by the Borrower thereunder. It is a condition precedent to the obligation of the Lenders to make their respective loans to the Borrower under the Credit Agreement that each Grantor shall have executed and delivered this Security Agreement to the Administrative Agent for the ratable benefit of the Lenders.

NOW, THEREFORE, in consideration of the premises and to induce the Lenders and the Administrative Agent to enter into the Credit Agreement and to induce the Lenders to make their respective loans to the Borrower under the Credit Agreement, each Grantor hereby agrees with the Administrative Agent, for the ratable benefit of the Lenders, as follows:

Section 1.   Defined Terms.  (a) Unless otherwise defined herein, capitalized terms which are defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement; the following terms which are defined in the Uniform Commercial Code in effect in the State of New York on the date hereof are used herein as so defined: Accounts, Chattel Paper, Commercial Tort Claims, Documents, Equipment, Farm Products, General Intangibles, Instruments, Inventory, Investment Property, Letter of Credit Rights and Proceeds; and the following terms shall have the following meanings:

"Bank Account": (i) any of (A) a deposit, custody or other account (whether, in any case, time or demand or interest or non-interest bearing) either maintained by any Grantor with the Administrative Agent, any Lender, or with respect to which a Deposit Account Control Agreement has been entered into for the benefit of the Administrative Agent, or (B) a Medicare Controlled Account, (ii) all cash and Investment Property from time to time standing to the credit of such account, and (iii) all interest, principal and other distributions payable on or with respect to, such account or such cash or securities; provided that no Payroll Account shall constitute a "Bank Account".

"Code": the Uniform Commercial Code as from time to time in effect in the State of New York.

"Collateral": as defined in Section 2 of this Security Agreement.

"Copyright": (a) any copyright in any original work of authorship fixed in any tangible medium of expression (including, without limitation, any thereof referred to on Schedule I hereto), including, without limitation, all databases, source codes, object codes and manuals, whether published or

N187178.1

DX 3
LaMonica v. Tilton, et al.
18-01021-smb

unpublished, whether now or hereafter existing, and whether in the United States or any other country, and all applications, registrations, renewals, extensions and recordings relating thereto filed in the United States Copyright Office or in any other governmental office or agency in the United States or any other country or political subdivision thereof, in each case in which any Grantor has any right, title or interest, whether as author, assignee, transferee or otherwise, and all other rights which any Grantor presently has or hereafter acquires pursuant to any Copyright License relating to any such copyright, including, without limitation, copyright assignments, and exclusive and nonexclusive licenses, and (b) all right, title and interest of any Grantor in all physical materials embodying any work with respect to which any Grantor owns or holds rights in any Copyright or Copyright License.

"Copyright License": (a) any agreement, written or oral, naming any Grantor as licensor or licensee, granting any right in or to any Copyright or copyright registration in the United States or any foreign country (including, without limitation, any thereof referred to on Schedule I hereto) or (b) any and all present and future agreements, including, without limitation, assignments and consents, as any such agreements may from time to time be amended or supplemented, pursuant to which any Grantor now has or hereafter acquires any direct or beneficial interest in any Copyright, or is a grantor of rights to any third party with respect to any copyright, whether as a party to any such agreement or as an assignee of any rights under any such agreement (including, without limitation, any thereof referred to on Schedule I hereto) excluding, however, non-exclusive computer software licenses.

"Deposit Account Control Agreement": with respect to any deposit account other than any Medicare Controlled Account or any Payroll Account, a control agreement substantially in the form of Annex D-1 or such other form approved by the Administrative Agent, as amended, supplemented or otherwise modified from time to time.

"Excluded Property": as defined in Section 2.

"Hedge Agreement": as to any Person, any swap, cap, collar or similar arrangement entered into by such Person providing for protection against fluctuations in interest rates or currency exchange rates or the exchange of nominal interest obligations, either generally or under specific contingencies.

"Material": with respect to any Copyright, Copyright License, Patent, Patent License, Trademark or Trademark License, any of the same as to which the Grantors reasonably deems to be material to the operation of any Grantor's business or to have material economic value.

"Medicare Account": any Account payable by the Centers for Medicare and Medicaid Services or other federal or state Governmental Authority ("Governmental Medical Payors") under the Medicare or Medicaid programs established or authorized pursuant to the Social Security Act (42 U.S.C. §§ 1395 and 1396 et seq), as amended, any similar or implementing state statutes and the rules and regulations promulgated pursuant to any thereof ("Medicare/Medicaid Programs").

"Medicare Controlled Account": as defined in Section 3(d)(i)(A).

"Medicare Controlled Account Agreement": as defined in Section 3(d)(i)(A).

"Medicare Controlled Account Bank": as defined in Section 3(d)(i)(A).

"Medicare Controlled Account Bank Office": as defined in Section 3(d)(i)(A).

"Non-Medicare Account": any Account other than a Medicare Account.

"Non-Medicare Controlled Account": any Bank Account (other than a Medicare Account) with respect to which a Deposit Account Control Agreement has been entered into among the applicable Grantor, the depository financial institution of such Bank Account and the Administrative Agent.

"Patent License": any agreement, whether written or oral, providing for the grant by or to any Grantor of any right to manufacture, use or sell any invention covered by a Patent, and all rights of any Grantor under such agreement; including, without limitation, any thereof referred to in Schedule II hereto.

"Patents": (a) all letters patent of the United States or any other country, including patents, design patents and utility models, and all registrations and recordings thereof, including, without limitation, any thereof referred to in Schedule II hereto, (b) all applications for letters patent of the United States or any other country and (c) all reissues, extensions, divisions, continuations and continuations-in-part thereof, and the inventions disclosed or claimed therein, including the right to make, sell and/or use the inventions disclosed or claimed therein; including, without limitation, any thereof referred to in Schedule II hereto.

"Payroll Accounts": any one or more deposit, custody or other accounts maintained by any Grantor with a bank or other institution if such account is used solely to deposit funds (i) which are to be applied to the payment of wages and other compensation payable to employees of any Grantor and any withholding, social security, payroll, unemployment or other taxes relating thereto, imposed by any federal, state, county or local government or a subdivision or agency thereof, including any charges, fees, assessments, interest, penalties or additions payable in connection with any of the foregoing or which are to be applied, to the extent of amounts withheld or deducted from compensation payable to any employee of any Grantor, to the payment of health insurance or other benefits generally provided to employees of any Grantor, or (ii) which are transferred to a Bank Account because they are not required to make a payment contemplated by the foregoing clause (i).

"Secured Obligations": the collective reference to (a) the Obligations, and (b) all obligations and liabilities of each Grantor to the Administrative Agent and the Lenders, whether direct or indirect, absolute or contingent, due or to become due, or now existing or hereafter incurred, which may arise under, out of or in connection with any Hedge Agreement entered into by any Grantor with any Lender and any other document made, delivered or given in connection therewith, whether on account of principal, interest, reimbursement obligations, fees, indemnities, costs, expenses (including, without limitation, all fees and disbursements of counsel to the Administrative Agent or to the Lenders that are required to be paid by any Grantor pursuant to the terms of such Hedge Agreement or other documents) or otherwise.

"Security Agreement": this Security Agreement, as amended, supplemented or otherwise modified from time to time.

"Trademark License": any agreement, written or oral, providing for the grant by or to any Grantor of any right to use any Trademark, including, without limitation, any thereof referred to in Schedule III hereto.

"Trademarks": (a) all trademarks, trade names, corporate names, company names, business names, fictitious business names, trade styles, service marks, logos and other source or business identifiers, all prints or labels on which any of the foregoing appear, and all designs and general intangibles of a like nature, and the goodwill associated therewith or symbolized thereby, and all other assets, rights and interests that uniquely embody such goodwill, now existing or hereafter adopted or

TRANSCARE00230122

acquired, all registrations and recordings thereof, and all applications in connection therewith, whether in the United States Patent and Trademark Office or in any similar office or agency of the United States, any state thereof or any other country or any political subdivision thereof, or otherwise, including, without limitation, any thereof referred to in Schedule III hereto, and (b) all extensions or renewals thereof.

"Transcare New York": TransCare New York, Inc., a Delaware corporation.

"Vehicles": all cars, trucks, trailers, construction and earth moving equipment and other vehicles covered by a certificate of title law of any State and, in any event, including, without limitation, the vehicles listed on Schedule IV hereto and all tires and other appurtenances to any of the foregoing.

(b)  The words "hereof", "herein" and "hereunder" and words of similar import when used in this Security Agreement shall refer to this Security Agreement as a whole and not to any particular provision of this Security Agreement, and Section, Schedule. Annex, and Exhibit references are to this Security Agreement unless otherwise specified. The meanings given to terms defined herein shall be equally applicable to both the singular and plural forms of such terms.

Section 2.  <u>Grant of Security Interest</u>.  As collateral security for the prompt and complete payment and performance when due (whether at the stated maturity, by acceleration or otherwise) of the Secured Obligations, each Grantor hereby grants to the Administrative Agent for the ratable benefit of the Lenders a security interest in all of the following property now owned or at any time hereafter acquired by such Grantor or in which such Grantor now has or at any time in the future may acquire any right, title or interest (collectively, the "Collateral"):

(i)     all Accounts;
(ii)    all Bank Accounts;
(iii)   all Chattel Paper;
(iv)    all Commercial Tort Claims;
(v)     all Contracts;
(vi)    all Copyrights;
(vii)   all Copyright Licenses;
(viii)  all Documents;
(ix)    all Equipment;
(x)     all General Intangibles;
(xi)    all Instruments;
(xii)   all Inventory;
(xiii)  all Investment Property;
(xiv)   all Letter of Credit Rights;
(xv)    all Patents;
(xvi)   all Patent Licenses;
(xvii)  all Trademarks;
(xviii) all Trademark Licenses;
(xix)   all Vehicles;
(xx)    all books and records pertaining to the Collateral; and
(xxi)   to the extent not otherwise included, all Proceeds and products of any and all of the foregoing.

Notwithstanding the foregoing, the Collateral shall not include any Equipment or Vehicles and proceeds thereof which are the subject of any Financing Lease or Lien permitted by Section 9.3(f) or (g) of the Credit Agreement or any right of any Grantor under any such Financing Lease, in any

NJ87178.1

4

**A3549**

TRANSCARE00230123

such case in which the Financing Lease or agreement creating or governing such Lien expressly prohibits the granting of a security interest in or other Lien on the Grantor's rights under such Financing Lease or on such Equipment or Vehicles financed thereunder and the proceeds thereof, to the extent such prohibition is enforceable under applicable law (any such property or interests in property excluded from the security interest granted hereunder pursuant to this sentence, the "Excluded Property").

Section 3.   Rights of Agent and Lenders; Limitations on Agent's and Lenders' Obligations.

(a)   Borrower Remains Liable under Accounts.  Anything herein to the contrary notwithstanding, each Grantor shall remain liable under each of the Accounts to observe and perform all the conditions and obligations to be observed and performed by it thereunder, all in accordance with the terms of any agreement giving rise to each such Account. None of the Administrative Agent nor any Lender shall have any obligation or liability under any Account (or any agreement giving rise thereto) by reason of or arising out of this Security Agreement or the receipt by the Administrative Agent or any such Lender of any payment relating to such Account pursuant hereto, nor shall the Administrative Agent or any Lender be obligated in any manner to perform any of the obligations of any Grantor under or pursuant to any Account (or any agreement giving rise thereto), to make any payment, to make any inquiry as to the nature or the sufficiency of any payment received by it or as to the sufficiency of any performance by any party under any Account (or any agreement giving rise thereto), to present or file any claim, to take any action to enforce any performance or to collect the payment of any amounts which may have been assigned to it or to which it may be entitled at any time or times.

(b)   Notice to Account Debtors and Contracting Parties.  Upon the request of the Administrative Agent at any time after the occurrence and during the continuance of an Event of Default, (i) each Grantor shall notify account debtors on the Non-Medicare Accounts that the Non-Medicare Accounts have been assigned to the Administrative Agent for the ratable benefit of the Lenders and that payments in respect thereof shall be made directly to the Administrative Agent, and (ii) the Borrower shall use its best efforts to obtain, and shall assist and cooperate with the Administrative Agent in obtaining, an appropriate order of a Governmental Authority of competent jurisdiction providing for the payment of all Medicare Accounts directly to the Administrative Agent.

(c)   Analysis of Accounts.  The Administrative Agent shall have the right to make test verifications of the Accounts in any manner and through any medium that it reasonably considers advisable, on a mutually convenient Business Day twice during each calendar year and shall in each case be satisfied in all material respects with the results thereof, and each Grantor shall furnish all such assistance and information as the Administrative Agent may require in connection therewith; provided, however, that upon the occurrence and during the continuation of an Event of Default, the Administrative Agent shall be entitled to perform such additional due diligence inspections, tests and review of such Accounts as any Lender shall deem necessary or advisable. Upon the Administrative Agent's request and at the expense of the Grantors, each Grantor shall cause independent public accountants or others satisfactory to the Administrative Agent to furnish to the Administrative Agent reports showing reconciliations, aging and test verifications of, and trial balances for, the Accounts. The Administrative Agent may, upon prior notice to the Grantor if no Event of Default has occurred and is continuing, in its own name or in the name of others communicate with account debtors on the Accounts to verify with them to its satisfaction the existence, amount and terms of any Accounts.

(d) Collections on Accounts; Account Control System.

(i) <u>Transcare New York</u>. (A). <u>Medicare Accounts</u>. All Medicare Accounts with respect to all services performed by Transcare New York are billed by and are payable to Transcare New York. Transcare New York hereby agrees that (x) within 20 days after the date hereof, it shall establish one or more deposit accounts in its name and under its control, for the purpose of receiving payments in respect of all Medicare Accounts (each, a "<u>Medicare Controlled Account</u>") and it shall deliver to the Administrative Agent a supplemental Schedule V, Part A, setting forth each financial institution at which a Medicare Controlled Account has been established (a "<u>Medicare Controlled Account Bank</u>"), the office of such Medicare Controlled Account Bank (the "<u>Medicare Controlled Account Bank Office</u>") and account number therefor, (y) within 30 days after the date hereof, it shall enter into with respect to each Medicare Controlled Account, a deposit account instruction agreement substantially in the form of Annex D-2 to this Security Agreement or such other agreement acceptable to the Administrative Agent (as amended, supplemented or otherwise modified from time to time, a "<u>Medicare Controlled Account Agreement</u>"), and (z) within 40 days after the date hereof, it shall instruct each Governmental Medical Payor (as defined in the definition of "Medicare Account") with respect to any Medicare Accounts that makes payment to Transcare New York by wire transfer to make all payments with respect thereto via wire transfer directly to a Medicare Controlled Account. So long as this Security Agreement is in effect, Transcare New York warrants that it shall continue to direct all Governmental Medical Payors in respect of its Medicare Accounts that make payment to Transcare New York by wire transfer to make all payments of Medicare Accounts by wire transfer directly to a Medicare Controlled Account. After such time as a Medicare Controlled Account has been established, any funds or other proceeds that Transcare New York collects or receives on account of any of its Medicare Accounts, whether consisting of cash, checks or other items, shall be deposited in a Medicare Controlled Account within two (2) Business Days of receipt thereof. Nothing in this Security Agreement or any Medicare Controlled Account Agreement shall be deemed to limit the sole dominion and control of Transcare New York over any Medicare Controlled Account. Transcare New York and each of the other Grantors agrees that any change, amendment, modification or rescission of (x) the instruction set forth in any Medicare Controlled Account Agreement to the applicable Medicare Controlled Account Bank to transfer funds from such Medicare Controlled Account to a Non-Medicare Controlled Account (other than to transfer funds to another Non-Medicare Controlled Account), or (y) the instructions to any Governmental Medical Payor regarding the Medicare Controlled Account(s) to which payments under any Medicare/Medicaid Programs are transferred by wire transfer of funds (other than to make payment to another Medicare Controlled Account), or (z) the giving of any notice to the Administrative Agent or any Lender of any such prohibited modification or rescission, shall each constitute an Event of Default.

(B) <u>Non-Medicare Accounts</u>. Transcare New York and/or TransCare Corporation has established the deposit accounts described on Part B of Schedule V (the "Existing Bank Accounts"), with the financial institutions and at the offices set forth on such Part B of Schedule V. Certain obligors with respect to the Medicare Accounts currently make payments into the existing Bank Accounts. TransCare New York agrees that it or TransCare Corporation, as applicable, will enter into a Deposit Account Control Agreement with the financial institution with respect to each Existing Bank Account and the Administrative Agent which shall be effective on the date which is 60 days after the date hereof (the "<u>Non-Medicare Account Effective Date</u>"), whereupon each such Existing Bank Account shall be deemed a Non-Medicare Controlled Account. Transcare New York has instructed, and shall continue to instruct, each obligor that makes payment to Transcare New York by wire transfer with respect to any Non-Medicare Accounts to make all payments with respect thereto via wire transfer directly to the Existing Bank Accounts or a Non-Medicare Controlled Account hereinafter established. In the event that Transcare New York collects or receives any funds or other proceeds on account of any of its Non-Medicare Accounts, whether consisting of cash, checks or other items, then Transcare New York shall deposit such funds or proceeds in the Existing Bank Accounts or a Non-Medicare Controlled Account within two (2) Business Day of receipt thereof (duly endorsed by Transcare New York to the Administrative Agent, if required), and pending such deposit all such funds or proceeds shall be held by

N187178.1

6

A3551

TRANSCARE00230125

Transcare New York in trust for the Administrative Agent and the Lenders and shall continue to be held as collateral security for the Secured Obligations.

(ii) Other Grantors. (A) Medicare Accounts. Each Grantor (other than Transcare New York) represents that all Medicare Accounts with respect to all services performed by such Grantor are billed by and are payable to such Grantor. Each Grantor (other than Transcare New York) hereby agrees that, promptly upon the request of the Administrative Agent at any time after any Event of Default has occurred and is continuing, such Grantor (x) shall establish segregated deposit accounts at financial institutions reasonably satisfactory to the Administrative Agent, in such Grantor's name and under its control, for the purpose of receiving payments in respect of Medicare Accounts, (y) shall cause a Medicare Controlled Account Agreement to be entered into among such Grantor, the Administrative Agent and such financial institution at which such deposit account is established, and (z) shall instruct each Governmental Medical Payor with respect to any Medicare Accounts that makes payment to such Grantor by wire transfer to make all payments with respect thereto via wire transfer directly to such deposit account. Each such deposit account shall thereupon be deemed a Medicare Controlled Account and such depositary financial institution shall be deemed a Medicare Controlled Account Bank for purposes of this Security Agreement. Each such Grantor warrants that, from and after such request by the Administrative Agent, it shall continue to direct all Governmental Medical Payors in respect of its Medicare Accounts that make payment to such Grantor by wire transfer to make all payments of Medicare Accounts by wire transfer directly to a Medicare Controlled Account. Any funds or proceeds collected or received by any such Grantor, at any time after receiving such instruction from the Administrative Agent, on account of any of its Medicare Accounts, whether consisting of cash, checks or other items, shall be deposited in a Medicare Controlled Account within two (2) Business Days of receipt thereof. Nothing in this Security Agreement or any Medicare Controlled Account Agreement shall be deemed to limit the sole dominion and control of any such Grantor over any Medicare Controlled Account. Each Grantor agrees that any change, amendment, modification or rescission of (x) the instruction set forth in any Medicare Controlled Account Agreement to the applicable Medicare Controlled Account Bank to transfer funds from such Medicare Controlled Account to a Non-Medicare Controlled Account (other than to transfer funds to another Non-Medicare Controlled Account), or (y) the instructions to any Governmental Medical Payor regarding the Medicare Controlled Account(s) to which payments under any Medicare/Medicaid Programs are transferred by wire transfer of funds (other than to make payment to another Medicare Controlled Account), or (z) the giving of any notice to the Administrative Agent or any Lender of any such prohibited modification or rescission, shall each constitute an Event of Default. Prior to the time of entering into Medicare Controlled Account Agreements pursuant to this paragraph, no Grantor shall enter into any account control agreement or similar agreement with respect to any such deposit account in favor of any Person other than the Administrative Agent.

(B) Non-Medicare Accounts. Promptly upon the request of the Administrative Agent after the occurrence and during the continuance of any Event of Default, each Grantor (other than Transcare New York) shall enter into a Deposit Account Control Agreement among such Grantor, the Administrative Agent, and the depositary financial institution with respect to each deposit account into which only proceeds of any Non-Medicare Accounts are deposited (including any such deposit accounts listed on Part C of Schedule V), and such deposit account shall thereupon be deemed Non-Medicare Controlled Accounts for purposes of this Security Agreement. Prior to the time of entering into Deposit Account Control Agreements pursuant to this paragraph, no Grantor shall enter into any account control agreement or similar agreement with respect to any such deposit account in favor of any Person other than the Administrative Agent. At any time after such request from the Administrative Agent, such Grantor shall and shall continue to instruct each obligor that makes payment to such Grantor by wire transfer with respect to any Non-Medicare Accounts to make all payments with respect thereto via wire transfer directly to a Non-Medicare Controlled Account. In the event that at any time after such request from the

Administrative Agent such Grantor collects or receives any funds or other proceeds on account of any of its Non-Medicare Accounts, whether consisting of cash, checks or other items, then such Grantor shall deposit such funds or proceeds in a Non-Medicare Controlled Account within two (2) Business Days of receipt thereof (duly endorsed by such Grantor to the Administrative Agent, if required), and pending such deposit all such funds or proceeds shall be held by such Grantor in trust for the Administrative Agent and the Lenders and shall continue to be held as collateral security for the Secured Obligations.

(iii)   Information as to Accounts. Each Grantor will provide the Administrative Agent, upon request of the Administrative Agent, copies of all periodic reports, lists and/or bank statements, in each case prepared or received in the ordinary course of business, which identify deposits into each Medicare Controlled Account or Non-Medicare Controlled Account or Existing Bank Account, promptly upon request by the Administrative Agent. At the Administrative Agent's request, the relevant Grantor shall deliver to the Administrative Agent copies of all documents evidencing, and relating to, the agreements and transactions which gave rise to the Accounts, including, without limitation, all orders and invoices.

(iv)   Proceeds Not Directly Deposited.  All Proceeds of Medicare Accounts of Transcare New York received more than 60 days after the date hereof (or, after the establishment of Medicare Controlled Account with respect to any other Grantor, of such Grantor) which are not deposited directly into a Medicare Controlled Account by an obligor, when collected by the relevant Grantor, whether consisting of checks, notes, drafts, bills of exchange, money orders, commercial paper of any kind whatsoever, or other documents or otherwise, received in payment of any Medicare Account of such Grantor shall be promptly deposited by such Grantor in the exact form received, except for any endorsement by such Grantor to the Administrative Agent if required, in a Medicare Controlled Account, and until so deposited, shall be deemed to be held in trust by such Grantor for the Administrative Agent and shall not be commingled with such Grantor's other funds. All Proceeds of Non-Medicare Accounts of Transcare New York received after the Non-Medicare Account Effective Date (or, after the establishment of Non-Medicare Controlled Accounts with respect to any other Grantor, of such Grantor) which are not deposited directly into a Non-Medicare Controlled Account by an obligor, when collected by the relevant Grantor, whether consisting of checks, notes, drafts, bills of exchange, money orders, commercial paper of any kind whatsoever, or other documents or otherwise, received in payment of any Non-Medicare Account of such Grantor shall be promptly deposited by such Grantor in the exact form received, except for any endorsement by such Grantor to the Administrative Agent if required, in a Non-Medicare Controlled Account, and until so deposited, shall be deemed to be held in trust by such Grantor for the Administrative Agent and shall not be commingled with such Grantor's other funds.

(vi)   Distributions of Collections.  (A)  All Proceeds constituting collections of Accounts or Contracts while held by the Administrative Agent (or by any Grantor in trust for the Administrative Agent) shall continue to be collateral security for all of the Secured Obligations and shall not constitute payment thereof until applied as hereinafter provided.

(B)   Upon the occurrence and during the continuance of an Event of Default, the Administrative Agent may notify the Grantors in writing (by hand delivery or facsimile transmission) that such Event of Default has occurred and is continuing, and that the Borrower's ability to withdraw, transfer or otherwise access funds from the Non-Medicare Controlled Accounts is being curtailed contemporaneously with such notice; provided, that no such notice need be given by the Administrative Agent to the Grantors if such Event of Default is an Event of Default specified in either Section 10(g)(i) or (ii) of the Credit Agreement. Any such notice to the Grantors shall be deemed to be notice to all Loan Parties. Upon the giving of such notice, or upon the occurrence of an Event of Default specified in either Section 10(g)(i) or (ii) of the Credit Agreement, the Administrative Agent shall be entitled, at the Administrative Agent's sole discretion, to withdraw all or any portion of funds deposited in any Non-

NJ87178.1

8

Medicare Controlled Account and apply such funds to the payment of the Secured Obligations in such order as the Administrative Agent may elect.

Section 4. Representations and Warranties. Each Grantor hereby represents and warrants (subject to notices and supplements with respect to the matters set forth in this Section 4 provided pursuant to Section 5) that:

(a) Title; No Other Liens. Except for the Liens granted to the Administrative Agent for the ratable benefit of the Lenders pursuant to this Security Agreement, and the other Liens permitted to exist on the Collateral pursuant to the Credit Agreement, each Grantor's right, title and interest in each item of the Collateral is free and clear of any and all Liens or claims of others. No effective security agreement, financing statement or other public notice with respect to all or any part of the Collateral is on file or of record in any public office, except such as may have been filed in favor of the Administrative Agent, for the ratable benefit of the Lenders, pursuant to this Security Agreement or as may be permitted pursuant to the Credit Agreement.

(b) Perfected First Priority Liens. (i) When financing statements have been filed in the offices in the jurisdictions listed in Schedule 6.16 to the Credit Agreement, to the extent that perfection may be made by filing financing statements, the Liens granted pursuant to this Security Agreement will constitute fully perfected Liens in favor of the Administrative Agent, for the ratable benefit of the Lenders, in the Collateral as collateral security for the Secured Obligations, which Liens are prior to all other Liens on the Collateral created by the Grantors and in existence on the date hereof and which are enforceable as such against all creditors of and purchasers from any Grantor, subject as to priority to the Liens permitted by the Credit Agreement and as otherwise permitted by Section 6.16(c) of the Credit Agreement. (ii) When control agreements have been entered into, registration applications filed with respect to intellectual property, vehicle titles filed with the applicable department of motor vehicles, showing the Administrative Agent as lienholder, and any mortgages recorded, to the extent that perfection is made other than by filing financing statements, the Liens granted pursuant to this Security Agreement will constitute fully perfected Liens in favor of the Administrative Agent, for the ratable benefit of the Lenders, in the Collateral as collateral security for the Secured Obligations, which Liens are prior to all other Liens on the Collateral created by the Grantors and in existence on the date hereof and which are enforceable as such against all creditors of and purchasers from any Grantor, subject as to priority to the Liens permitted by the Credit Agreement and as otherwise permitted by Section 6.16(c) of the Credit Agreement.

(c) Accounts. The amount represented by each Grantor to the Administrative Agent from time to time as owing by all account debtors in respect of the Accounts will at such time be the correct amount actually owing by such account debtor or debtors thereunder, except to the extent of adjustments in respect of co-payments, deductibles and rebilling to other account debtors. No amount payable to any Grantor under or in connection with any Account is evidenced by any Instrument or Chattel Paper which has not been delivered or which is not promptly delivered to the Administrative Agent. The place where each Grantor keeps its billing records concerning the Accounts is specified on Schedule VII.

(d) Inventory and Equipment. The Inventory and the Equipment are kept at the locations listed on Schedule VI hereto, except, in the case of Vehicles, when such Vehicles (and any Equipment therein) are being used in the ordinary course of the respective Grantor's business.