# 20 Civ. 06274 (LAK)

## United States District Court

### *for the*

### Southern District of New York

————————————————

*IN RE TRANSCARE CORPORATION*, ET AL.

DEBTORS,

————————————————

PATRIARCH PARTNERS AGENCY SERVICES, LLC, ET AL.,

DEFENDANTS-APPELLANTS,

—against—

SALVATORE LAMONICA, AS CHAPTER 7 TRUSTEE OF THE JOINTLY-
ADMINISTERED ESTATES OF TRANSCARE CORPORATION, ET AL.,

PLAINTIFF-APPELLEE.

————————————————

ON APPEAL FROM THE UNITED STATES BANKRUPTCY COURT FOR
THE SOUTHERN DISTRICT OF NEW YORK (BERNSTEIN, J.)

IN RE: TRANSCARE CORPORATION, ET AL., CASE NO. 16-10407 (SMB)

LAMONICA V. TILTON, ET AL., ADV. PROC. NO. 18-1021 (SMB)

## APPENDIX TO BRIEF FOR THE APPELLANTS

# Volume XXVIII- A3606-A3649

<u>**ANNEX E**</u>

ADDENDUM TO SECURITY AGREEMENT

Each of the undersigned, [NAME OF NEW SUBSIDIARY] (each a "<u>New Grantor</u>", together the "<u>New Grantors</u>"):

(i)      agrees to all of the provisions of the Security Agreement, dated as of _____ ___, 2003 (as amended, supplemented or otherwise modified prior to the date hereof, the "<u>Security Agreement</u>"), made by TRANSCARE CORPORATION, a Delaware corporation (together with its successors and assigns, the "<u>Borrower</u>") and each subsidiary of the Borrower (together with the Borrower, each a "<u>Grantor</u>" collectively the "<u>Grantors</u>") in favor of PATRIARCH PARTNERS AGENCY SERVICES, LLC, as administrative agent (in such capacity, the "<u>Administrative Agent</u>") for the Lenders, made pursuant to the Credit Agreement, dated as of _____ ___, 2003, among the Borrower, the Lenders, and the Administrative Agent;

(ii)      effective on the date hereof, becomes a party to the Security Agreement, as a Grantor, with the same effect as if the undersigned were an original signatory to the Security Agreement and with the representations and warranties contained therein being deemed to be made by it on and as of the date hereof;

(iii)     as additional collateral security for the prompt and complete payment when due (whether at stated maturity, by acceleration or otherwise) of the Secured Obligations and in order to induce the Lenders to make and maintain outstanding their Loans under the Credit Agreement and the other Loan Documents, hereby grants to the Administrative Agent, for the benefit of the Lenders, a security interest in all of the property listed in Section 2 of the Security Agreement now owned or at any time hereafter acquired by such New Grantor or in which such New Grantor now has or at any time in the future may acquire any right, title or interest (collectively, the "<u>New Grantor Collateral</u>");

(iv)     represents and warrants that the information provided on the attached schedules disclose, with respect to it, all information that is required under the Security Agreement to be disclosed by a Grantor; and

(v)      the Schedules to the Security Agreement are hereby supplemented by (a) if a supplement to any such Schedule is attached to this Supplement, by including the items listed on such supplement to such Schedule in such Schedule, and (b) if any such Schedule refers to the Collateral Certificate delivered by the Grantors on the Closing Date, by deeming incorporated in such Collateral Certificate the Supplement to Collateral Certificate delivered by the New Grantor to the Administrative Agent on the date of this Supplement.

Terms defined in the Security Agreement and the Credit Agreement shall have such defined meanings when used herein.

N187178.1

Annex E-1

TRANSCARE00230180

By its acceptance hereof, the undersigned New Grantor hereby ratifies and confirms its respective obligations under the Security Agreement, as supplemented hereby.

[NAME OF NEW GRANTOR]


By   _____
      Name:
      Title:


Date: _____ __, 2003


ACCEPTED AND AGREED:


PATRIARCH PARTNERS AGENCY
SERVICES, LLC, as Administrative Agent


By:   _____
    Name:
    Title:


N187178.1

Annex E-2

**A3607**

TRANSCARE00230181

**Schedule I**

## COPYRIGHTS

| Registration No. | Country | Issue or File Date | Title of Work |
|---|---|---|---|

## COPYRIGHT LICENSES

| Registration No. | Owner | Issue or File Date | Title of Work |
|---|---|---|---|

## COPYRIGHT APPLICATIONS

| Title of Work | File Date |
|---|---|

N187178.1

I-1

**A3608**

TRANSCARE00230182

Schedule II

## PATENTS

| Serial No. or Patent No. | Inventor | Country | Issue or File Date | Title |
|---|---|---|---|---|
| | | | | |

## PATENT LICENSES

| Serial No. or Patent No. | Owner | Issue or File Date |
|---|---|---|
| | | |

## PATENT APPLICATIONS

| Serial No. | Owner | Nature Of Interest | Filing Date |
|---|---|---|---|
| | | | |

N187178.1

II-1

**A3609**

TRANSCARE00230183

Schedule III

## TRADEMARKS

| Serial No. or Registration No. | County | Issue or File Date | Mark |
|---|---|---|---|

## TRADEMARK LICENSES

| Serial No. or Registration No. | Owner | County | Issue or File Date | Mark |
|---|---|---|---|---|

## TRADEMARK APPLICATIONS

| Serial Number | Filing Date | Mark |
|---|---|---|

N187178.1

III-1

**Schedule IV**

# **VEHICLES**

N187178.1

A3611

TRANSCARE00230185

Schedule V

## MEDICARE CONTROLLED ACCOUNTS

N187178.1

TRANSCARE00230186

**Schedule VI**

## INVENTORY AND EQUIPMENT

N187178.1

A3613

TRANSCARE00230187

<u>**Schedule VII**</u>

<u>**NAME, CHIEF EXECUTIVE OFFICE, AND**</u>
<u>**JURISDICTION OF ORGANIZATION OF GRANTORS**</u>

N187178.1

VII-1

**A3614**

TRANSCARE00230188

<u>**Schedule VIII**</u>

## <u>PAYROLL ACCOUNTS</u>

A3615

TRANSCARE00230189

4

TRANSCARE00230190

| | |
|---|---|
| **From:** | Lynn Tilton |
| **Sent:** | Thursday, February 19, 2015 11:26 PM |
| **To:** | 'kurt.marsden@wellsfargo.com' |
| **Subject:** | Re: Transcare |

Kurt,
I will call you tomorrow. I threw a full team at the company last week when I became aware of how deep was the issue. Let's discuss tomorrow. I am tied up until later in the afternoon but will call you then.
Respectfully,
Lynn
Lynn Tilton
Chief Executive Officer
Patriarch Partners, LLC
One Broadway, 5th Floor
New York, NY 10004
212-825-6772
212-825-2038 – FAX
Lynn.Tilton@PatriarchPartners.com
Web: www.patriarchpartners.com

**From**: Kurt.Marsden@wellsfargo.com [mailto:Kurt.Marsden@wellsfargo.com]
**Sent**: Thursday, February 19, 2015 10:36 PM
**To**: Lynn Tilton
**Subject**: Transcare

Lynn,

I hope this email finds you well and I apologize for reaching out to you so soon on the heels of our ⸢Non-Responsive⸣ conversations.  I was in a portfolio meeting earlier today, and we had a lengthy discussion about Transcare.  From our perspective, liquidity is extremely tight and it appears likely that the company could run out of liquidity in the next couple of weeks.  I understand that your team has guided management to focus on reducing expenses and that a capital infusion from Patriarch is unlikely, which is understandable given the challenges in the business.   Resultantly, we are concerned that a liquidity event could occur that backs us into an over formula situation, which is a situation that we would like to avoid.  Also, while management is working diligently to develop a plan, we believe that they would benefit from the expertise and added support that a turnaround consultant could provide.  I'm certain that you have given thought to this matter and I would greatly appreciate any insight that you are willing to provide.  I recognize that you are extremely busy, and this is a matter that can certainly wait a few days.  Please let me know when would be a convenient time to speak.

Best Regards,

Kurt R. Marsden

**Executive Vice President**

Wells Fargo Capital Finance | 2450 Colorado Avenue, Suite 3000 West | Santa Monica, CA 90404
Tel 310-453-7345 | Cell 818-404-2581 | Fax 866-358-0779

1

| DX | 19 |
|---|---|

LaMonica v. Tilton, et al.
18-01021-smb

**A3617**

PP-TRBK0042690

kurt.marsden@wellsfargo.com

This message may contain confidential and/or priviledged information.  If you are not the addressee or authorized to receive this for the addressee, you must not use, copy, disclose, or take any action based on this message or any information herein.  If you have received this message in error, please advise the sender immediately by reply e-mail and delete this message.  Thank you for your cooperation.

2

**A3618**

Confidential

**AMENDMENT 24**
**TO CREDIT AGREEMENT OF**
**TRANSCARE CORPORATION**

Amendment 24 (this "Amendment"), dated as of February 26, 2015, to the Credit Agreement, dated as of August 4, 2003 (as modified to the date hereof, the "Credit Agreement"), among TRANSCARE CORPORATION, a Delaware corporation (the "Borrower"), the financial institutions and other investors from time to time party thereto as Lenders and PATRIARCH PARTNERS AGENCY SERVICES, LLC, a Delaware limited liability company, as administrative agent for such Lenders (in such capacity, the "Administrative Agent"). Capitalized terms used herein but not defined herein are used as defined in the Credit Agreement.

W I T N E S S E T H:

WHEREAS, the Borrower, the Guarantors, the Lenders and the Administrative Agent are party to the Credit Agreement;

WHEREAS, the Lenders party to this Amendment, the Borrower and the Administrative Agent have agreed, subject to certain limitations and conditions set forth below, to make certain amendments to the Credit Agreement, as more specifically set forth below;

NOW, THEREFORE, the parties hereto agree as follows:

Section 1.      Amendments to the Credit Agreement.   The Credit Agreement is, effective as of the date first written above and subject to the satisfaction (or due waiver) of the conditions set forth in Section 2 (Conditions Precedent to the Effectiveness of this Amendment) hereof, hereby amended as follows (with boldface, underlining, highlighting, indenting and other formatting modified to conform to the formatting of the Credit Agreement):

(a)      Amendments to Section 1 (Definitions).

(i)      The following definitions are hereby inserted in Section 1.1 (Defined Terms) of the Credit Agreement in the appropriate place to preserve the alphabetical order of the definitions in such section (and, if applicable, the following definitions shall replace in their entirety existing definitions for the corresponding terms in such section):

"Domestic Credit Party" means any Loan Party organized under the laws of the United States of America or any State thereof.

"LIBOR" means, as to any Loan for any day of any calendar month, the rate quoted by Bloomberg Information Service (or by any successor or substitute for such service providing rate quotations comparable to those currently provided by such service, as determined by the Administrative Agent from time to time for purposes of providing quotations of interest rates applicable to Dollar deposits in the London interbank market) at approximately 11:00 a.m., London time, two Business Days before the beginning of such calendar month, as the rate for Dollar deposits with a maturity comparable to one month.  If such rate is not available at such time for any reason, LIBOR for any calendar month shall be the arithmetic mean (rounded upward, if necessary, to the next 1/16 of

DX   26

LaMonica v. Tilton, et al.
18-01021-smb

Confidential

PP-TRBK0099588

1%) of the offered quotations of at least two Reference Banks to the prime banks in the London interbank market for dollar deposits with a maturity comparable to one month at approximately 11:00 a.m., London time, two Business Days before the beginning of such calendar month.  For purposes of this definition, "Reference Banks" shall mean major banks in the London interbank market selected by the Administrative Agent.

"Revolving Credit Commitment" means, with respect to each Revolving Credit Lender and each Revolving Credit Loans, the amount, if any, set forth as such opposite such Revolving Credit Lender's name on <u>Schedule 1.0</u> for Revolving Credit Loans of, as modified from time to time.

"Revolving Credit Commitment Period" means, with respect to Revolving Credit Commitments, the period set forth as such on <u>Schedule 1.0</u> for such Revolving Credit Loans.

"Revolving Credit Loan" means a Revolving Credit Loan made by a Revolving Lender to the Borrower pursuant to Section 3.1.

"Revolving Credit Termination Date" means April 15, 2019.

(ii)     The definitions of the following terms are hereby deleted in their entirety from Section 1.1 (Defined Terms) of the Credit Agreement:

"Revolving Credit Commitment Percentage"

(b)     Amendments to Section 3 (Amount and Terms of Revolving Credit Commitments

(i)     Section 3.1 is hereby amended and restated in its entirety to read as follows:

3.1     <u>Revolving Credit Loans.</u>

(a)     During the Revolving Credit Commitment Period for any Revolving Credit Loan, subject to and upon the terms and conditions hereof, each Lender having a Revolving Credit Commitment in such Revolving Credit Loan agrees, severally and not jointly and severally, to make Revolving Credit Loans to the Borrower in the aggregate amount up to but not exceeding such Revolving Credit Commitment.

(b)     Amounts borrowed pursuant to this Section 3.1may be repaid and reborrowed during the Revolving Credit Commitment Period.  Subject to Sections 5.5 and 5.6, all amounts owed under this Section 2.1 shall be paid in full no later than the Revolving Credit Termination Date.

(c)     Any amount borrowed under this Section 3.1 shall (i) bear interest as set forth as such on <u>Schedule 1.0</u> and (ii) be entitled to the security

- 2 -

**A3620**

interests, collateral and other rights and benefits provided pursuant to this Agreement and the other Loan Documents.

(ii)     Section 3.2 is hereby amended and restated in its entirety to read as follows:

3.2     <u>Revolving Credit Loan Borrowing Mechanics</u>.

(a)     Revolving Credit Loans shall be made in an aggregate minimum amount of $25,000 and integral multiples of $10,000 in excess of that amount.  No Lender shall be responsible for any default by any other Lender in such other Lender's obligation to make the Revolving Credit Loans hereunder.

(b)     Whenever the Borrower desires that the Lenders make a Revolving Credit Loan, the Borrower shall deliver to the Administrative Agent a fully executed borrowing certificate no later than 10:00 a.m. (New York City time) at least one Business Day in advance of the proposed Borrowing Date, which Borrowing Date shall be a Business Day.

(iii)     Section 3.3 is hereby amended and restated in its entirety to read as follows:

3.2     <u>Commitment Fee</u>.  The Borrower agrees to pay to the Administrative Agent, for the ratable benefit of the Lender in any Revolving Credit Loan, commitment fees on the actual daily amount by which the Revolving Credit Commitments in such Revolving Credit Loan exceed the aggregate outstanding principal amount of Revolving Credit Loan, at a rate equal to 0.625% per annum of such amount.  Such commitment fees shall accrue daily during the Revolving Credit Commitment Period for such Revolving Credit Loan and be payable in arrears on each Interest Payment Date for the Revolving Credit Loans and on the last day of the Revolving Credit Commitment Period for such Revolving Credit Loan.

(c)     <u>Amendments to Section 5 (General Provisions Applicable to Loans</u>

(i)     Clause (h) Section 5.1 (Interest Rates and Payment Dates) is hereby amended and restated in its entirety to read as follows:

(h) Each Revolving Credit Loan shall bear interest at a rate per annum equal to LIBOR + 4%.

(b)     <u>Amendment to Schedules to the Credit Agreement</u>.  The contents of Schedule 1.0 to the Credit Agreement are hereby replaced in their entirety with the contents of <u>Schedule A</u> hereto.

- 3 -

**A3621**

PP-TRBK0099590

Section 2.        Conditions Precedent to the Effectiveness of this Amendment.  This Amendment shall become effective as of the date first written above (the "Amendment Effective Date") when, and only when, each of the following conditions precedent shall have been satisfied or duly waived by the Administrative Agent (the date each such conditions precedent is satisfied or duly waived, the "Conditions Precedent Date"):

(a)        Certain Documents.  The Administrative Agent shall have received this Amendment, duly executed by the Borrower, each other Loan Party and the Lenders party hereto, constituting the Required Lenders, together with such additional documentation as the Administrative Agent may reasonably require, dated the Amendment Effective Date (unless otherwise agreed by the Administrative Agent) and in form and substance satisfactory to it;

(b)        Representations and Warranties.  Each of the representations and warranties contained in this Amendment were true when made;

(c)        No Default or Event of Default.  After giving effect to this Amendment, no Default or Event of Default shall have occurred and be continuing, either on the date hereof or on the Conditions Precedent Date;

(d)        Corporate and Other Proceedings.  All corporate and other proceedings, and all documents, instruments, consents and other legal matters ancillary to the transactions contemplated by this Amendment shall be completed in a form and manner satisfactory in all respects to the Administrative Agent; and

(e)        Fees and Expenses Paid.  The Borrower shall have paid all Obligations due, after giving effect to this Amendment, on or before the later of the date hereof and the Conditions Precedent Date, including, without limitation, all fees set forth in Section 4 (Fees and Expenses) hereof and all other costs, expenses and fees due under any Loan Document and invoiced prior to the Conditions Precedent Date.

Section 3.        Representations and Warranties.  On and as of the date hereof and as of the Conditions Precedent Date, after giving effect to this Amendment, each Loan Party hereby represents and warrants to the Administrative Agent and each Lender as follows:

(a)        Binding Obligation.  This Amendment has been duly authorized, executed and delivered by such Loan Party and constitutes a legal, valid and binding obligation of such Loan Party, enforceable against such Loan Party in accordance with its terms and the Credit Agreement as modified by this Amendment;

(b)        Subsidiaries.  (i) If such Loan Party is the Borrower, the representations and warranties set forth in Section 6.15 (Subsidiaries) of the Credit Agreement are true as of the date hereof (replacing "Closing Date" therein with the date of this Amendment and taking into account any updated information delivered by the Borrower to the Administrative Agent on or prior to the date hereof) and all new Loan Documents required to be executed and delivered by or with respect to Subsidiaries of the Borrower existing on the Conditions Precedent Date by the existing Loan Documents, including, without limitation, Section 8.10 (Additional Collateral; Additional Subsidiary Guarantors) thereof, have been executed and delivered and (ii) in any case, all certificates, statements, updated schedules, collateral and other updates and other documents required to be delivered by such Loan Party to the Administrative Agent or any Lender pursuant to any Loan Document as modified hereby have been delivered thereunder and all filings required to

- 4 -

**A3622**

be made by or on behalf of such Loan Party pursuant to any such Loan Document have been made;

(c)      Representations and Warranties in Loan Documents.  Each of the other representations and warranties of such Loan Party contained any Loan Document (as modified hereby) or in any certificate, document or financial or other statement furnished at any time under or in connection therewith is true in all material respects on and as of the date hereof and the Conditions Precedent Date, in each case as if made on and as of such date and except to the extent that such representations and warranties expressly relate to a specific date, in which case such representations and warranties shall be true in all material respects as of such specific date; provided, that, as used therein, (i) "Credit Agreement" shall refer to the Credit Agreement and after giving effect to this Amendment and (ii) "Loan Documents" shall include this Amendment;

(d)      No Litigation or Defense.  No litigation has been commenced or threatened against such Loan Party or any of its Subsidiaries seeking to restrain or enjoin (whether temporarily, preliminarily or permanently) the performance of any action by any Loan Party or any Subsidiary of any Loan Party required or contemplated by the terms of this Amendment or any other Loan Document as modified hereby, and there exists no cause of action, offset, claim, counterclaim or defense, whether or not asserted, against the Administrative Agent or any Lender or any of their Related Parties (as defined below) with respect to the Obligations under any Loan Document;

(e)      No Default or Event of Default.  No Default or Event of Default is continuing; and

Section 4.      Fees and Expenses.

(a)      As consideration for the execution of this Amendment, the Loan Parties jointly and severally agree to pay to the Administrative Agent for this Amendment by 5 p.m. (New York Time) on the date of this Amendment (or such later date or time as the Administrative Agent and the Borrower may agree), an amendment fee equal to $3,000.  The Administrative Agent may (but shall not be obligated to), as payment thereof, deduct such fee from the proceeds of any Loan to be funded to the Borrower on or after the date hereof.

(b)      Each Loan Party agrees to pay on demand in accordance with the terms of Section 12.5 (Payment of Expenses and Taxes) of the Credit Agreement all costs and expenses of the Administrative Agent in connection with the preparation, reproduction, execution, delivery and enforcement of this Amendment and all other Loan Documents entered into in connection herewith (including, without limitation, the fees and expenses of attorneys, advisors and other professionals hired by the Administrative Agent with respect to the Loan Parties or the Loan Documents).

Section 5.      Release.

(a)      In further consideration for the execution by the Administrative Agent and the Lenders party hereto of this Amendment and without limiting any rights or remedies the Administrative Agent or any Lender may have, each Loan Party hereby releases each of the Administrative Agent, each Lender and each of their Related Parties (each a "Releasee" and, collectively, the "Releasees") from any and all Claims that any Loan Party has or may have

- 5 -

**A3623**

against any Releasee, whether or not relating to any Loan Document, Obligation, Collateral, or legal relationship that exists or may exist between any Releasee and any Loan Party.

(b)        As used in this Section 5, (i) "Claims" means all liabilities, rights, demands, covenants, duties, obligations (including, without limitation, indebtedness, receivables and other contractual obligations), claims, actions and causes of actions, suits, disputes, judgments, damages, losses, debts, responsibilities, fines, penalties, sanctions, commissions and interest, disbursements, taxes, charges, costs, fees and expenses (including, without limitation, fees, charges and disbursements of financial, legal and other advisors, consultants and professionals and, if applicable, any value-added and other taxes and charges thereon), in each case of any kind or nature, whether joint or several, whether now existing or hereafter arising and however acquired and whether or not known, asserted, direct, contingent, liquidated, due, consequential, actual, punitive or treble, (ii) "Related Party" means, with respect to any Person, any Affiliate of such Person or of another Related Party of such Person (excluding, in each case, (A) the Loan Parties and their Controlled Affiliates and (B) any other Portfolio Company) and such Person's and such Affiliate's predecessors, successors, assigns, managers, members, partners, directors, officers, employees (regardless of whether seconded to a third party and including, without limitation, individuals with independent contractor or similar status), individual stockholders, agents, attorneys-in-fact, trustees, fiduciaries, representatives and advisors, (iii) "Portfolio Company" means any Person and its Controlled Affiliates in which any Lender or any other Affiliated Investor has made any investment, whether through the purchase of debt or equity securities, loans or otherwise, (iv) "Affiliated Investor" means any Person that is a collateralized debt obligation, collateralized loan obligation or any other investment pooling vehicle or other entity that (A) is created primarily to invest in equity or debt securities, loans and other investments, (B) does not operate any trade or business and (C) is administered, advised or managed by, or directly or indirectly under common administration, advice or management with, the Administrative Agent or any Lender or any Affiliate of any Lender or the Administrative Agent and (v) "Controlled Affiliate" means, with respect to any entity, any Person directly or indirectly "controlled" (as defined in the definition of "Affiliate" set forth in the Credit Agreement on the date hereof) by one or more of such entity and its other Controlled Affiliates.

Section 6.        Consent of Subsidiary Guarantors and Reaffirmation of Obligations. Each Subsidiary Guarantor hereby consents to this Amendment and agrees that it continues to guaranty, pursuant to the Loan Documents, jointly and severally, unconditionally and irrevocably, as primary obligor and not as surety, the prompt and complete payment and performance when due of the Obligations as modified hereby and that the terms hereof shall not affect in any way its obligations and liabilities, as expressly modified hereby, under the Loan Documents.  Each Loan Party hereby reaffirms (a) all such obligations and liabilities, and agrees that such obligations and liabilities shall remain in full force and effect, (b) the Liens granted under the Loan Documents, and agrees that such Liens shall continue to secure the Obligations as expressly modified hereby, and (c) the validity and enforceability of the Loan Documents.

Section 7.        Effect on the Loan Documents.  This Amendment is a Loan Document and is limited as written.  As of the date each modification set forth herein shall become effective, each reference in the Credit Agreement to "this Agreement," "hereunder," "hereof," "herein," or words of like import, and each reference in the other Loan Documents to the Credit Agreement (including, without limitation, by means of words like "thereunder," "thereof" and words of like import), shall refer to the Credit Agreement as modified thereby, and this Amendment and the Credit Agreement shall be read together and construed as a single agreement.  The execution,

- 6 -

**A3624**

Confidential

delivery and effectiveness of this Amendment shall not, except as expressly provided herein, (a) waive or modify any right, power or remedy under, or any other provision of, any Loan Document or (b) commit or otherwise obligate the Administrative Agent or any Lender to enter into or consider entering into any other waiver or modification of any Loan Document.

    Section 8.  <u>Waiver of Jury Trial; Miscellaneous</u>.  Headings are for convenience only and do not form part of this Amendment, except when used to reference an article or section, in which case such title reference shall govern absent manifest error in case of conflict.  All communications and notices hereunder shall be given as provided in the Loan Documents.  This Amendment (a) shall be governed by and construed in accordance with the law of the State of New York, (b) is for the exclusive benefit of the parties hereto and, together with the other Loan Documents, constitutes the entire agreement of such parties, superseding all prior agreements among them, with respect to the subject matter hereof, (c) may be modified, waived or assigned only in writing and only to the extent such modification, waiver or assignment would be permitted under the Loan Documents (and any attempt to assign this Amendment without such writing shall be null and void), (d) may be executed in counterparts, which may be effectively transmitted by fax or e-mail (in each case return receipt requested and obtained) and which, together, shall constitute one and the same instrument, (e) is a negotiated document, entered into freely among the parties upon advice of their own counsel, and it should not be construed against any of its drafters and (f) shall survive the satisfaction or discharge of the Obligations.  The fact that any term or provision of this Amendment is held invalid, illegal or unenforceable as to any person in any situation in any jurisdiction shall not affect the validity, enforceability or legality of the remaining terms or provisions hereof or the validity, enforceability or legality of such offending term or provision in any other situation or jurisdiction or as applied to any person.  **Each party hereto hereby irrevocably and unconditionally waives any right to trial by jury with respect to this Amendment.**

[SIGNATURE PAGES FOLLOW]

- 7 -

**A3625**

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be executed by their respective officers and general partners thereunto duly authorized, as of the date first written above.

TRANSCARE CORPORATION,
as Borrower

By: _____
Name: Michael Greenberg
Title:

TC AMBULANCE CORPORATION
TC AMBULANCE GROUP, INC.
TC AMBULANCE NORTH, INC.
TC BILLING AND SERVICES CORP.
TC HUDSON VALLEY AMBULANCE CORP.
TCBA AMBULANCE, INC.
TRANSCARE HARFORD COUNTY, INC.
TRANSCARE MANAGEMENT SERVICES, INC.
TRANSCARE MARYLAND, INC.
TRANSCARE ML, INC.
TRANSCARE NEW YORK, INC.
TRANSCARE PENNSYLVANIA, INC.
TRANSCARE WESTCHESTER, INC.,
as Subsidiary Guarantor

By: _____
Name: Michael Greenberg
Title:

Confidential

PATRIARCH PARTNERS AGENCY SERVICES, LLC,
    as Administrative Agent

By: _____
    Name:  Lynn Tilton
    Title:  Manager


ZOHAR CDO 2003-1, LIMITED,
    as Lender
By: Patriarch Partners VIII, LLC,
    its Collateral Manager

By: _____
    Name:  Lynn Tilton
    Title:  Manager


ZOHAR II 2005-1, LIMITED,
    as Lender
By: Patriarch Partners XIV, LLC,
    its Collateral Manager

By: _____
    Name:  Lynn Tilton
    Title:  Manager


ZOHAR III, LIMITED,
    as Lender
By: Patriarch Partners XV, LLC,
    its Collateral Manager

By: _____
    Name:  Lynn Tilton
    Title:  Manager

Confidential                                                    PP-TRBK0099596

ARK INVESTMENT PARTNERS II, L.P.,
    as Lender
By: Ark Investment GP II, LLC,
    its General Partner

By: _____
    Name:   Lynn Tilton
    Title:   Manager

Confidential                                        PP-TRBK0099597

FIRST DOMINION FUNDING I,
    as Lender
By: Credit- Suisse Asset Management, LLC,
    its Collateral Manager

By: _____
    Name:
    Title:

CREDIT SUISSE ALTERNATIVE CAPITAL, INC.,
    as Lender

By: _____
    Name:
    Title:

SIGNATURE PAGE TO AMENDMENT 24
TO THE CREDIT AGREEMENT OF TRANSCARE CORPORATION

**A3629**

SCHEDULE A TO
AMENDMENT 24
TO THE CREDIT AGREEMENT OF TRANSCARE CORPORATION

(As of February 26, 2015)

Revolving Credit Loans

| Revolving Credit Lender | Revolving Credit Loan Commitment | Revolving Credit Loan Commitment Period |
|---|---|---|
| Zohar III, Limited | $1,100,000 | N/A |

Tranche A Term Loans

| Tranche A Term Loan Lender | Tranche A Term Loans Outstanding |
|---|---|
| Ark Investment Partners II, L.P. | $2,905,731.99 |
| Zohar III, Limited | $15,584,129.76 |
| First Dominion Funding I | $4,043,858.69 |
| Credit Suisse Alternative Capital, Inc. | $3,537,243.56 |

Tranche B Term Loans

| Tranche B Term Loan Lender | Tranche B Term Loans Outstanding |
|---|---|
| Zohar CDO 2003-1, Limited | $3,500,000.00 |

Tranche C Term Loans

| Tranche C Term Loan Lender | Tranche C Term Loans Outstanding |
|---|---|
| Zohar II 2005-1, Limited | $0 |

Tranche D Term Loans

| Tranche D Term Loan Lender | Tranche D Term Loans Outstanding |
|---|---|
| Zohar III, Limited | $2,961,052.63 |

Tranche E Term Loans

| Tranche E Term Loan Lender | Tranche E Term Loans Outstanding |
|---|---|
| Zohar II 2005-1, Limited | $850,000.00 |

Tranche F Term Loans

| Tranche F Term Loan Lender | Tranche F Term Loans Outstanding | Tranche F Term Loan Commitment |
|---|---|---|
| Zohar III, Limited | $3,983,560.00 | $4,900,000.00 |

**A3630**

PP-TRBK0099599

| | |
|---|---|
| **From:** | Lynn Tilton |
| **Sent:** | Thursday, July 16, 2015 2:54 PM |
| **To:** | Scott Whalen; Michael Greenberg |
| **Cc:** | Jean Luc Pelissier; Brian Stephen |
| **Subject:** | RE: TransCare - Availability Block (good news) |

Agreed.



Lynn Tilton
Chief Executive Officer
Patriarch Partners, LLC
One Broadway, 5th Floor
New York, NY 10004
212-825-6772
212-825-2038 – FAX
Lynn.Tilton@PatriarchPartners.com
Web: www.patriarchpartners.com

**From:** Scott Whalen
**Sent:** Thursday, July 16, 2015 2:53 PM
**To:** Michael Greenberg; Lynn Tilton
**Cc:** Jean Luc Pelissier; Brian Stephen
**Subject:** RE: TransCare - Availability Block (good news)

We will also need to put together a restructuring announcement to allay fears.

**From:** Michael Greenberg
**Sent:** Thursday, July 16, 2015 2:51 PM
**To:** Lynn Tilton
**Cc:** Jean Luc Pelissier; Scott Whalen; Brian Stephen
**Subject:** FW: TransCare - Availability Block (good news)

Lynn,

We continue to work on the information for planning purposes.  The most difficult part, which is the cash flow forecast through year end, is almost complete.

However, below is an e-mail from Wells Fargo announcing a removal of the $1.5MM block effective today.

Thank you,
Michael

1

**DX   64**

LaMonica v. Tilton, et al.
18-01021-smb

**A3631**

Michael S. Greenberg, CFA
Patriarch Partners
One Broadway, 5th Floor
New York, NY 10004
Direct: 646-723-7657
Fax:  212-825-2038
Email:  michael.greenberg@patriarchpartners.com
www.patriarchpartners.com

---

**From:** Mark Bonilla [mailto:markb@transcare.com]
**Sent:** Thursday, July 16, 2015 2:43 PM
**To:** Michael Greenberg; Jean Luc Pelissier
**Cc:** Glenn Leland
**Subject:** FW: Availability Block

---

**M a r k   B o n i l l a   C F O**
**TransCare Corporation**
**1 Metrotech Center, 20th Floor | Brooklyn, NY 11201 |**
**☎: (718) 510-9094 | 📠: (917) 991-0348 |**
**✉: Markb@transcare.com or Bonillamark@aol.com |**

---

**From:** melissa.provost@wellsfargo.com [mailto:melissa.provost@wellsfargo.com]
**Sent:** Thursday, July 16, 2015 2:42 PM
**To:** Mark Bonilla
**Subject:** Availability Block

Based on the recent verbal agreement between Lynn Tilton and Kurt Marsden, WFCF will be eliminating the $1.5 million
availability reserve today and Patriarch will fund $2.0 million to the company of which just under $1.5 million was wired
to TransCare today.  In addition, Lynn agreed that a new billing system, EPCR, which will be implemented at TransCare
within in the next 90 days.  If this has not been implemented, then WFCF will reinstate the $1.5 million availability
reserve at a rate of $100 thousand a week.  These terms will be formally documented in an amendment to the Loan and
Security Agreement and am following up with our counsel to begin documentation.

Regards,

Melissa Provost

Vice President/Senior Relationship Manager
Wells Fargo Capital Finance

Business Finance | One Boston Place, 18th Floor | Boston, MA  02108-4407
MAC J9214-180
Tel (617) 854-4336 | Mobile (518) 578-8604 | eFax (855) 477-5033

melissa.provost@wellsfargo.com

This message (including any attachments) contains confidential information intended for a
specific individual and purpose, and is protected by law. If you are not the intended
recipient, you should delete this message and are hereby notified that any disclosure,
copying, or distribution of this message, or the taking of any action based on it, is
strictly prohibited.

**A3632**

Confidential                                                                                                    PP-TRBK0063507

3

**A3633**

Confidential

PP-TRBK0063508

| | |
|---|---|
| **From:** | Lynn Tilton |
| **Sent:** | Thursday, October 1, 2015 7:02 PM |
| **To:** | Randy Jones |
| **Subject:** | RE: TransCare CFO |
| **Attachments:** | image001.jpg |

Then we will need an interim solution. We can not end up without a CFO here given the relationship with Wells.

Lynn Tilton
Chief Executive Officer
Patriarch Partners, LLC
212-825-6772
212-825-2038 -FAX
Lynn.Tilton@PatriarchPartners.com
www.patriarchpartners.com

-------- Original message --------
From: Randy Jones <Randy.Jones@PatriarchPartners.com>
Date: 10/01/2015 3:50 PM (GMT-08:00)
To: Lynn Tilton <Lynn.Tilton@PatriarchPartners.Com>
Subject: RE: TransCare CFO

Jean Luc is seeing our top candidate, Peter Wolf in the morning.  The issue is he feels he must give 4 weeks notice.

**W. Randall Jones**

**Managing Director**

**Patriarch Partners, LLC**

**One Broadway**

**5th Floor**

**New York, NY 10004**

**212-825-2034 (O)**

1

DX    72

LaMonica v. Tilton, et al.
18-01021-smb

**A3634**

Confidential

PP-TRBK0042862



**From:** Lynn Tilton
**Sent:** Thursday, October 01, 2015 6:44 PM
**To:** Michael Greenberg
**Cc:** Jean Luc Pelissier; Randy Jones
**Subject:** RE: TransCare CFO

You need to get someone in place immediately.  We cannot afford to have balls dropped with Wells Fargo on this credit.  They will look for a reason.  We must try to have someone there immediately.



Lynn Tilton

Chief Executive Officer

Patriarch Partners, LLC

One Broadway, 5th Floor

New York, NY 10004

212-825-6772

212-825-2038 – FAX

Lynn.Tilton@PatriarchPartners.com

Web: www.patriarchpartners.com

**From:** Michael Greenberg
**Sent:** Thursday, October 01, 2015 9:24 AM
**To:** Lynn Tilton
**Cc:** Jean Luc Pelissier; Randy Jones
**Subject:** TransCare CFO

2

**A3635**

Confidential                                                                 PP-TRBK0042863

Lynn,

As Jean Luc mentioned earlier, Mark Bonilla resigned yesterday but agreed to continue to work full time for at least 2 weeks (through October 15th at a minimum) and possibly further to assist in the transition.

Mark said that he wants to continue to help the company and will be always available, as needed.

We had an extensive meeting covering the overall business and will follow with a comprehensive update.

There are 2 candidates in the pipeline that Jean Luc, Randy and Glenn will be meeting with later this week and next.

Hopefully, we will have candidates to present to you shortly.

We will keep you informed.

Thank you,

Michael

Michael S. Greenberg, CFA
Patriarch Partners
One Broadway, 5th Floor
New York, NY 10004
Direct: 646-723-7657
Fax:  212-825-2038
Email: michael.greenberg@patriarchpartners.com
www.patriarchpartners.com

**A3636**

Confidential                                                                     PP-TRBK0042864

| | |
|---|---|
| **From:** | melissa.provost@wellsfargo.com |
| **To:** | Glenn Leland |
| **CC:** | Mark Bonilla; Michael Greenberg |
| **Sent:** | 10/14/2015 12:30:13 PM |
| **Subject:** | RE: Notice of Non-Renewal |
| **Attachments:** | TransCare Notice of Non-Renewal 10.14.15.pdf |

Melissa Provost

Vice President/Senior Relationship Manager
Wells Fargo Capital Finance

Business Finance | One Boston Place, 18th Floor | Boston, MA  02108-4407
MAC J9214-180
Tel (617) 854-4336 | Mobile (518) 578-8604 | eFax (855) 477-5033

melissa.provost@wellsfargo.com

This message (including any attachments) contains confidential information intended for a
specific individual and purpose, and is protected by law. If you are not the intended
recipient, you should delete this message and are hereby notified that any disclosure,
copying, or distribution of this message, or the taking of any action based on it, is
strictly prohibited.

---

**From:** Provost, Melissa A.
**Sent:** Wednesday, October 14, 2015 12:30 PM
**To:** Glenn Leland (GlennL@transcare.com)
**Cc:** Mark Bonilla (markb@transcare.com); 'Michael Greenberg'
**Subject:** Notice of Non-Renewal

As we discussed last week, attached please find our Notice of Non-Renewal under TransCare's Loan Agreement
with Wells Fargo Bank.  An original will follow via Federal Express to yourself and Peter Ruffini at Patriarch as
required.

Melissa Provost

Vice President/Senior Relationship Manager
Wells Fargo Capital Finance

Business Finance | One Boston Place, 18th Floor | Boston, MA  02108-4407
MAC J9214-180
Tel (617) 854-4336 | Mobile (518) 578-8604 | eFax (855) 477-5033

melissa.provost@wellsfargo.com

This message (including any attachments) contains confidential information intended for a
specific individual and purpose, and is protected by law. If you are not the intended
recipient, you should delete this message and are hereby notified that any disclosure,
copying, or distribution of this message, or the taking of any action based on it, is
strictly prohibited.

**DX    76**

LaMonica v. Tilton, et al.
18-01021-smb

TRANSCARE00006334

**WELLS FARGO BANK, NATIONAL ASSOCIATION**
One Boston Place, 18th Floor
Boston, Massachusetts 02108

October 14, 2015

**VIA FEDERAL EXPRESS AND CERTIFIED**
**MAIL, RETURN RECEIPT REQUESTED**
TransCare Corporation
One Metrotech Center
Brooklyn, New York 11201
Attention: Mr. Glenn Leland

### Re: **Notice of Non-Renewal**

Ladies and Gentlemen:

  Wells Fargo Bank, National Association, successor by merger to Wachovia Bank, National Association ("Lender"), has made and may make loans and advances and provide other financial accommodations to TransCare Corporation, a Delaware corporation ("Parent" or "Administrative Borrower"), TransCare New York, Inc., a Delaware corporation ("TransCare NY"), TransCare Pennsylvania, Inc., a Delaware corporation ("TransCare PA"), TransCare Maryland, Inc., a Delaware corporation ("TransCare MD"), TransCare ML, Inc., a Delaware corporation ("TCML"), TC Hudson Valley Ambulance Corp., a Delaware corporation ("TC Hudson Valley"), TC Billing and Services Corp., a Delaware corporation ("TC Billing"), TC Ambulance Corporation, a Delaware corporation ("TC Corp"), TransCare Management Services, Inc., a Delaware corporation ("TC Management"), TCBA Ambulance, Inc., a Delaware corporation ("TCBA"), TransCare Westchester, Inc., a Delaware corporation ("TransCare Westchester"), TransCare Harford County, Inc., a Delaware corporation and ("TransCare Harford", and together with Parent, TransCare NY, TransCare PA, TransCare MD, TCML, TC Hudson Valley, TC Billing, TC Corp, TC Management, TCBA, and TransCare Westchester, each individually a "Borrower" and collectively, "Borrowers"), TC Ambulance Group, Inc., a Delaware corporation ("TC Group"), and TC Ambulance North, Inc., a Delaware corporation ("TC North" and together with TC Group, each individually a "Guarantor" and collectively, "Guarantors") pursuant to the Loan Agreement (as hereinafter defined), by and among Borrowers, Guarantors and Lender, as amended by Amendment No. 1 to Loan and Security Agreement, dated June 28, 2007, Amendment No. 2 to Loan and Security Agreement, dated October 24, 2007, Amendment No. 3 to Loan and Security Agreement, dated January 31, 2008, Amendment No. 4 to Loan and Security Agreement, dated August 13, 2008, Amendment No. 5 to Loan and Security Agreement, dated December 22, 2008, Amendment No. 6 to Loan and Security Agreement, dated September 18, 2009, Amendment No. 7 to Loan and Security Agreement, dated February 12, 2010, Amendment No. 8 to Loan and Security Agreement and Waiver, dated as of January 31, 2013, Amendment No. 9 to Loan and Security Agreement and Waiver, dated as of May 31, 2013; Amendment No. 10 to Loan and Security Agreement and Waiver, dated as of August 14, 2013; and Amendment No. 11 to Loan and Security Agreement and Waiver, dated as of April 23, 2015 (as the same now exists or may hereafter be further

3805096.3

**A3638**

amended, modified, supplemented, extended, renewed, restated or replaced, the "Loan Agreement"), and the other agreements, documents and instruments referred to therein or at any time executed and/or delivered in connection therewith or related thereto (all of the foregoing, together with the Loan Agreement, as the same now exist or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced, being collectively referred to herein as the "Financing Agreements"). All capitalized terms used herein shall have the meaning assigned thereto in the Loan Agreement, unless otherwise defined herein.

Lender hereby formally notifies Borrowers and Guarantors that, in accordance with the terms of Section 12.1(a) of the Loan Agreement, the term of the Loan Agreement and the other Financing Agreements shall expire on January 31, 2016 and Lender presently has no intention to extend or modify the term of such financing arrangements. Accordingly, Borrowers and Guarantors (as applicable) are required to repay to Lender, for itself and the benefit of Lenders, in full, all outstanding and unpaid Obligations and provide for the payment of contingent Obligations, all in accordance with the terms of Section 12.1(a) of the Loan Agreement, and shall arrange to execute and deliver such documentation as Lender deems necessary or appropriate in connection therewith.

Please be advised that nothing in this Notice amends, waives, or modifies the terms of the Financing Agreements. Lender expressly reserves the right to exercise any or all of its rights and remedies under the Financing Agreements or otherwise, and nothing in this Notice or any delay on Lender's part in exercising any such rights or remedies, should be construed as a waiver of any such rights or remedies.

Very truly yours,

WELLS FARGO BANK, NATIONAL ASSOCIATION, successor by merger to Wachovia Bank, National Association

By: _____

Name: _MELISSA PROVOST_____

Title: _Vice President_____

cc: Mr. Peter J. Ruffini
   Patriarch Partners, LLC
   One Broadway, 5th Floor
   New York, NY 10004
   (Via Federal Express Overnight Delivery)

3805096.3

**A3639**

TRANSCARE00006336

| | |
|---|---|
| **From:** | Michael Greenberg |
| **Sent:** | Thursday, October 29, 2015 12:17 PM |
| **To:** | Jean Luc Pelissier (CBA); Jean Luc Pelissier; Brian Stephen |
| **Subject:** | RE: Draft: TransCare - Meeting Follow up |

I'll ask Mark when he will be ready when I speak with him (probably speak this afternoon – likely focused on BBC and payroll funding today – very comfortable about having no issues for today as of yesterday).

**From:** Jean Luc Pelissier [mailto:pelissier@cbagroupllc.com]
**Sent:** Thursday, October 29, 2015 12:07 PM
**To:** Michael Greenberg; Jean Luc Pelissier; Brian Stephen
**Subject:** RE: Draft: TransCare - Meeting Follow up

This is why the holistic view is critically important and urgent, in absence of it he will continue to strike payment plans deals that he cannot deliver
If you want to have him come here tomorrow to review the whole AP table we can,

**From:** Michael Greenberg [mailto:Michael.Greenberg@PatriarchPartners.com]
**Sent:** Thursday, October 29, 2015 11:56 AM
**To:** Jean Luc Pelissier (CBA); Jean Luc Pelissier; Brian Stephen
**Subject:** RE: Draft: TransCare - Meeting Follow up

Ok.  That works.  I will send along to Glenn, Glenn and Mark.

The biggest items right now are upcoming interest payment next week, NYSIF, auto, liability insurance, rent, audit payments ($100k), medical supplies.

We can plan to meet with them early next week to discuss.

**From:** Jean Luc Pelissier [mailto:pelissier@cbagroupllc.com]
**Sent:** Thursday, October 29, 2015 11:46 AM
**To:** Michael Greenberg; Jean Luc Pelissier; Brian Stephen
**Subject:** RE: Draft: TransCare - Meeting Follow up

The holistic payment plan is a must and must be reviewed in a formal meeting by all of us. This has to be done quickly, then the cash forecast can be made. Not the other way around ? What do you think
The big nuts in the in the AP table have to be discussed, it is critical that we design a payment plan that CAN WORK and that we will then be tasked to NEGOTIATE. The payment plan need to extend until the end of 2016
We need to stop the ad hoc erratic payments
We need to put target date in place to get plan for a plan and then completion of objectives and we need to have a review system to meet and review each plan.
We also need to design a weekly flash reporting system that give us visibility in the progress of the company toward those objectives.

DX   78

LaMonica v. Tilton, et al.
18-01021-smb

1

**A3640**

Confidential

PP-TRBK0107559

I think you captured it all.
Best regards; Jean-Luc

---

**From:** Michael Greenberg [mailto:Michael.Greenberg@PatriarchPartners.com]
**Sent:** Thursday, October 29, 2015 11:07 AM
**To:** Jean Luc Pelissier; Brian Stephen
**Subject:** Draft: TransCare - Meeting Follow up

Jean Luc/Brian –

draft to send to management team (likely to Glenn, Glenn and Mark – my thought is that they can distribute from their as needed).

Michael

_____
_____
_____

As a follow up to the meeting, below are some key action items discussed (of course, open to any comments/additions):

- Follow up on workers compensation to develop revised payment plan within the internally generated cash through year-end
  - Would recommend payment tomorrow and Monday of some portion of $750k and request for NYSIF not to send a letter out on Monday.
  - I just heard today that, for this particular fund, interest will need to be paid by Wednesday (11/4) next week.

- Other payment plans
  - Set up critical payments through year-end (insurance, rent, parts, auditor in order to get 2014 audit scheduled)
  - Decide on approach to other vendors (in terms of priority)

- Wells Fargo
  - Request 2 weeks as we work to finalize 2016 plan including new lines of business being developed
  - COO Peter Wolf, an addition to management team with healthcare industry experience, joining team

- Remco follow up
  - I reached out to Ken Martin (CEO).  New facility will have space for at least 5 ambulances (possibly more) in LIC.
  - Maintenance
    - 61 vehicles
    - Mileage is much less significant (only 5,000 miles driven per year)
    - 50% date back to 2000 – 2003
    - Balance of the fleet purchased in 2008 (7 years old) and Ford vans purchased in 2012.
    - Inspected weekly as part of safety program.
    - Minor repairs are handled by warehouse team.  Oil changes, brakes, tires, etc. are outsourced to a local garage as needed.

- Fleet Maintenance

2

**A3641**

- o  Set up a streamlined garage, Snap-on tools
- o  Improve diagnostics
- o  Consistent maintenance program
- o  Set up more of an assembly line
- o  Research utilization of garages for repairs to alleviate issue regarding parts holds
- o  Utilize small windows of time in order to fix vehicles

- New Lines of Business
  - o  Mobile Units
    - Home units (Home Health Care) – could work with [Non-Responsive] (discuss with Wes Perry) (Mobile Integrated Home Unit)
      - o  Research requirements, services to provide, licensing
      - o  **Non-Responsive**
      - o  Financial model
    - Mobile Units in hospital parking lot
      - o  Discuss with Mount Sinai
      - o  Services to provide
      - o  Solve hospital problems (improve care)
      - o  Interns – clinical time
      - o  Licensing
      - o  Financial model
    - Mobile Urgent Care
    - Medical staffing **Non-Responsive**

Thank you,
Michael

Michael S. Greenberg, CFA
Patriarch Partners
One Broadway, 5th Floor
New York, NY 10004
Direct: 646-723-7657
Fax:  212-825-2038
Email: michael.greenberg@patriarchpartners.com
www.patriarchpartners.com

**A3642**

Confidential

PP-TRBK0107561

| | |
|---|---|
| **From:** | Lynn Tilton <Lynn.Tilton@PatriarchPartners.Com> |
| **Sent:** | Friday, December 11, 2015 12:51 PM |
| **To:** | Michael Greenberg |
| **Cc:** | Jean Luc Pelissier; Brian Stephen |
| **Subject:** | RE: TransCare - Analysis of BBC Reporting of Unbilled Subsidy Revenue Amounts (privileged and confidential) |

I mean that with all seriousness.  Otherwise it is game over.

I

**From:** Michael Greenberg
**Sent:** Friday, December 11, 2015 12:49 PM
**To:** Lynn Tilton
**Cc:** Jean Luc Pelissier; Brian Stephen
**Subject:** RE: TransCare - Analysis of BBC Reporting of Unbilled Subsidy Revenue Amounts (privileged and confidential)

Agreed and understood.

Michael S. Greenberg
Patriarch Partners
One Broadway, 5th Floor
New York, NY 10004
Direct: 646-723-7657
Fax:  212-825-2038
Email: michael.greenberg@patriarchpartners.com
www.patriarchpartners.com

**From:** Lynn Tilton
**Sent:** Friday, December 11, 2015 12:47 PM
**To:** Michael Greenberg
**Cc:** Jean Luc Pelissier; Brian Stephen
**Subject:** RE: TransCare - Analysis of BBC Reporting of Unbilled Subsidy Revenue Amounts (privileged and confidential)

As you know if they lose faith in the honesty of the management and the company, they will not continue.
There better be a reverse argument other than dishonesty.

**From:** Michael Greenberg
**Sent:** Friday, December 11, 2015 12:33 PM
**To:** Lynn Tilton
**Cc:** Jean Luc Pelissier; Brian Stephen
**Subject:** TransCare - Analysis of BBC Reporting of Unbilled Subsidy Revenue Amounts (privileged and confidential)

Privileged and confidential

Lynn,

DX   88

LaMonica v. Tilton, et al.
18-01021-smb

1

**A3643**

PP-TRBK0109643

We were just made aware of this issue.  It will be discussed on the call.  We will provide you with an update as part of the overall call update.

Michael

Michael S. Greenberg
Patriarch Partners
One Broadway, 5th Floor
New York, NY 10004
Direct: 646-723-7657
Fax:  212-825-2038
Email: michael.greenberg@patriarchpartners.com
www.patriarchpartners.com

---

**From:** john.husson@wellsfargo.com [mailto:john.husson@wellsfargo.com]
**Sent:** Friday, December 11, 2015 12:00 PM
**To:** Jean Luc Pelissier; Michael Greenberg
**Cc:** robert.strack@wellsfargo.com; melissa.provost@wellsfargo.com
**Subject:** FW: Analysis of BBC Reporting of Unbilled Subsidy Revenue Amounts

Gentlemen

We have an issue we need to discuss today on the call.  Our examiner discovered that the calculation related to reporting of unbilled subsidy revenue had been overstated from 6/1 to 12/10 approximately 27 times.  In each instance the miscalculations resulted in availability being overstated (never understated).  These discrepancies ranged from $20M to $350M.  The integrity of the borrowing base is paramount to us and frankly any Asset Based lender.  I asked Mark for an explanation and he stated it was training, or system  issues or careless mistakes.  I find  this explanation most troubling and asked him for a more formal explanation and we will be discussing this issue today.  I just wanted to inform you of this development.

---

**From:** Provost, Melissa A.
**Sent:** Thursday, December 10, 2015 3:59 PM
**To:** Husson, John E.
**Subject:** FW: Analysis of BBC Reporting of Unbilled Subsidy Revenue Amounts

-----Original Message-----
**From:** Chiang, Chuck
**Sent:** Thursday, December 10, 2015 02:48 PM Central Standard Time
**To:** Provost, Melissa A.
**Cc:** Muller, Michael
**Subject:** Analysis of BBC Reporting of Unbilled Subsidy Revenue Amounts

**A3644**

Confidential

| From: | Michael Greenberg |
|---|---|
| Sent: | Friday, December 11, 2015 8:14 PM |
| To: | Jean Luc Pelissier (CBA) |
| Cc: | Jean Luc Pelissier; Brian Stephen |
| Subject: | Re: Draft:  TransCare - Today's call with Wells Fargo |

Makes sense thanks

Sent from my iPhone

On Dec 11, 2015, at 8:08 PM, Jean Luc Pelissier <pelissier@cbagroupllc.com> wrote:

> I would not call what they showed us a 2016  plan, a model at best and/or proposed financials.
> There was no operational considerations, there were no AP analysis and they were no margin and pricing justification on the new business.
> The billing backlog was not addressed, no AP strategy was presented neither while the total AP was taken down 5M$ for the year while requesting 6.4M$ of funding.
>
> Otherwise ok to me.
>
> **From:** Michael Greenberg [mailto:Michael.Greenberg@PatriarchPartners.com]
> **Sent:** Friday, December 11, 2015 4:33 PM
> **To:** Jean Luc Pelissier; Brian Stephen
> **Subject:** Draft: TransCare - Today's call with Wells Fargo
>
> Please let me know if you have any comments on the below.  Thanks, Michael
> _____
> _____
>
> Lynn,
>
> The focus of the call was liquidity, the 2016 plan and Wells Fargo also discussed the issue with the borrowing base calculation.
>
> **Liquidity**
> Wells Fargo outlined the following concerns:
> - By the end of the year, there are a number of critical payments:

| Date | Vendor | Payment | Risk |
|---|---|---|---|
| Tuesday, December 15th & Thursday, December 31st | Milea/Hamilton judgment | 2 $444k payments ($888k) | Eviction, account attachment |
| Through year-end | NYSIF (payment plan) | $1MM | Loss of NY workers comp., required for renewal |

1

**A3645**

DX   89

LaMonica v. Tilton, et al.
18-01021-smb

| Total | | $1.89MM (approx. $2MM) | |
|---|---|---|---|

- At this point, Wells Fargo is not aware that 2 payroll tax payments need to be caught up on ($900k).  1 payroll tax is expected to be paid on Monday.
- Based on this, Wells Fargo mentioned a short term need of $2MM.  When asking the management team, we were surprised that Glenn corroborated the amount.
- As an appendix below, I have provided the latest weekly cash forecast from the company including certain risk points and background.  Of course, they will try to manage as best as they can but it will require a day-to-day assessment of where they are at.
- This does not include any benefit from reducing pre-billing ($1.5MM benefit).  This was originally to occur in November and December but now has been pushed into Q1.
- We have requested a plan but have not received one regarding how they will reduce pre-bill amounts.  They have begun to make some progress over the past week (but it is just back to where it was before ePCR).

**2016 Plan**
- Jean Luc and I first saw the revised 2016 plan this past Monday.  We will work to write something up on it as management believes that this plan is one that they can manage.
- We have asked for a number of items to assess the plan and present the plan.
- Though we de-briefed with Mark (were unable to reach Glenn), we were surprised to find out that Wells Fargo was aware of the plan reflecting a $6.5MM request (includes the $3.0MM in the cash flow forecast through year-end plus $1MM for non-emergency vehicle deposits) in the company's plan.  We asked Glenn and Mark and they said they were not sure how Wells Fargo would have heard or seen that number.
- John said that he wanted to know Patriarch's position on supporting the plan.
- We advised that the plan has not presented or discussed with the Board at this point.
- In the discussion, John mentioned that there are defaults but Wells Fargo continues to lend on a discretionary basis.

**Borrowing base**
- Wells Fargo cited timing and mistakes surrounding the borrowing base.
- They did not accuse of any wrongdoing but cited that the subsidy calculation is simple at ($ amount / 30) * # of days elapsed.
- John said that it has been consistently overstated around payroll days (dating back to June) and also mentioned the unapplied cash issue back in July.
- Mark mentioned that it has been understated as well (at times) and that he would have a response which would address their concern but that it was due to a breakdown in their process.

**Requests by Wells Fargo**
- Bob Streck said that they would touch base this upcoming Monday, given the immediate liquidity concerns, to see if PPAS was prepared to lend the company an additional $2MM to the company in the near term.
- Explanation of the historical borrowing base discrepancies from Mark.  Mark has sent us a draft of his response.
- Longer term, they want to understand if PPAS is willing to support the company's 2016 plan.  We told them that we are preparing the plan for a meeting with the Board to discuss the revisions that have been made to the plan since mid-November.

**A3646**

Confidential                                                                                    PP-TRBK0107076

Both Jean Luc and I will be working this weekend to gather as much information as we can to provide additional details surrounding the short-term cash challenges and the 2016 plan.

We just asked the management team for some of the follow up information we have wanted.  They are working to provide what is needed.

Please let us know if you would like to discuss (at your convenience).

Thank you,
Michael

Michael S. Greenberg
Patriarch Partners
One Broadway, 5th Floor
New York, NY 10004
Direct: 646-723-7657
Fax:  212-825-2038
Email: michael.greenberg@patriarchpartners.com
www.patriarchpartners.com

**Exhibit I — Weekly cash forecast**

- Below is the company's short-term cash forecast.  I will ask if they can extend this out but this is what I have receive thus far.
- This has changed meaningfully since just mid-t0-late November.
- The most meaningful is the rent figures which includes the Milea/Hamilton payments ($888k) and the recent $157k to Sez Foster.
- Additionally, the company has made the following changes versus the November 15th forecast.

\<image006.png\>

**\<image008.png\>**

3

**A3647**

Confidential

$ in thousands

**Recent Events reflected in latest cash flow forecast (12-07-15)**

| Cash plan as of 11-16-15 | Amount | Comments |
|---|---|---|
| Ending net availability | 31 | |
| | | |
| **Key changes to forecast:** | | |
| November billing (delay in ePCR pick up) | (700) | - Challenges with integration of ePCR into billing resulted in delays. |
| December billing (delay in ePCR pick up) | (700) | - No longer assumes pick up in billing until Q1 2016 and April. |
| Lower than expected Nov. collections | (300) | - ePCR implementation delayed collections ($2.0 * 15% = $300k) |
| Milea / Hamiton 11-23-15 court order | (888) | - $444k due Dec. 15th and $444k due Dec. 31st.  Must be paid or double the judgment is due. |
| Sez Foster payment (12-08-15) | (157) | - Had to be paid yesterday to avoid eviction.  Balance to be paid over 2016. |
| Insurance deductible payment | (164) | - Case settled.  Must pay deductible.  Timing dictated by insurance company. |
| Other court mandated payments | (50) | - Salisbury payment of $50k not included in previous forecast. |
| Miscellaneous | (195) | |
| | | |
| **Cash plan as of 12-08-15** | | |
| Ending net availability | (3,123) | |

**A3648**

Confidential

PP-TRBK0107078

| TransCare Corporation Short-term Cash Plan (000's Omitted) | Plan Week 1 12/4/15 | Plan Week 2 12/11/15 | Plan Week 3 12/18/15 | Plan Week 4 12/25/15 | Plan Week 5 1/1/16 | Plan Week 6 1/8/16 | Total Week 1 - 6 |
|---|---|---|---|---|---|---|---|
| RECEIPTS | | | | | | | |
| Ambulance Receipts | $ 1,396 | $ 1,690 | $ 1,750 | $ 1,750 | $ 1,602 | $ 1,602 | $ 9,790 |
| Paratransit Receipts and/or New Funding | $ - | $ - | $ 2,000 | $ - | $ - | $ - | $ - |
| TOTAL RECEIPTS | $ 1,396 | $ 1,690 | $ 3,750 | $ 1,750 | $ 1,602 | $ 1,602 | $ 9,790 |
| DISBURSEMENTS | | | | | | | |
| *Payroll* | | | | | | | |
| Wages and employer taxes | $ 1,362 | $ 1,276 | $ 1,750 | $ 1,285 | $ 1,700 | $ 1,285 | $ 8,658 |
| HIP & Voluntary Benefits | $ 15 | $ 15 | $ 15 | $ 15 | $ 15 | $ 15 | $ 90 |
| H.S.A. funding | $ 15 | $ 15 | $ 15 | $ 15 | $ 15 | $ 15 | $ 90 |
| UHC - Employee Medical | | $ - | $ 370 | $ - | $ - | $ - | |
| Total Benefits | $ 30 | $ 30 | $ 430 | $ 30 | $ 30 | $ 30 | $ 8,838 |
| **Total payroll & benefits** | $ 1,392 | $ 1,306 | $ 2,150 | $ 1,315 | $ 1,730 | $ 1,315 | $ 8,838 |
| | | | | | | | |
| *Insurance* | $ - | $ - | $ 151 | $ 1,153 | $ - | $ 160 | $ 1,464 |
| *Debt interest* | $ 85 | $ - | $ 293 | $ - | $ 85 | $ - | $ 463 |
| *Other disbursements* | | | | | | $ - | |
| Rent | $ - | $ 150 | $ 519 | $ 220 | $ 444 | $ 216 | $ 1,549 |
| ACH Debits | $ 126 | $ 129 | $ 110 | $ 110 | $ 110 | $ 110 | $ 692 |
| Vehicle lease payments | $ 66 | $ - | $ - | $ - | $ - | $ - | $ 66 |
| Vehicle purchase down payments 20% | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Accounts payable | $ 92 | $ 52 | $ 125 | $ 272 | $ 102 | $ 50 | $ 693 |
| Total other disbursements | $ 284 | $ 331 | $ 754 | $ 602 | $ 656 | $ 376 | $ 3,000 |
| TOTAL DISBURSEMENTS | $ 1,761 | $ 1,637 | $ 3,348 | $ 3,070 | $ 2,471 | $ 1,851 | $ 13,765 |
| | | | | | | | |
| CHANGE IN CASH | $ (365) | $ 54 | $ 403 | $ (1,320) | $ (869) | $ (249) | $ (3,975) |
| | | | | | | | |
| NET AVAILABLE CASH | $ 26 | $ (0) | $ (686) | $ (2,474) | $ (3,039) | $ (3,123) | $ (3,123) |
| Wachovia ABL balance | $ 16,353 | $ 16,307 | $ 15,717 | $ 17,389 | $ 16,545 | $ 16,266 | |
| Trailing 60-day cash | $ 19,500 | $ 18,775 | $ 21,281 | $ 18,593 | $ 18,624 | $ 18,511 | |
| Eligible AR | $ 16,515 | $ 16,480 | $ 15,040 | $ 14,923 | $ 15,227 | $ 15,391 | |

**A3649**

PP-TRBK0107079