# 20 Civ. 06274 (LAK)

**United States District Court**

*for the*

**Southern District of New York**

_____

IN RE TRANSCARE CORPORATION, ET AL.

DEBTORS,

_____

PATRIARCH PARTNERS AGENCY SERVICES, LLC, ET AL.,

DEFENDANTS-APPELLANTS,

—against—

SALVATORE LAMONICA, AS CHAPTER 7 TRUSTEE OF THE JOINTLY-
ADMINISTERED ESTATES OF TRANSCARE CORPORATION, ET AL.,

PLAINTIFF-APPELLEE.

_____

ON APPEAL FROM THE UNITED STATES BANKRUPTCY COURT FOR
THE SOUTHERN DISTRICT OF NEW YORK (BERNSTEIN, J.)

IN RE: TRANSCARE CORPORATION, ET AL., CASE NO. 16-10407 (SMB)

LAMONICA V. TILTON, ET AL., ADV. PROC. NO. 18-1021 (SMB)

**APPENDIX TO BRIEF FOR THE APPELLANTS**

# Volume XXXVI - A3967-A4107

| | |
|---|---|
| **From:** | Michael Greenberg |
| **Sent:** | Wednesday, February 10, 2016 1:54 PM |
| **To:** | Peter Wolf |
| **Cc:** | Brian Stephen; Peter Ruffini |
| **Subject:** | FW: Ark/Transcare Docs |
| **Attachments:** | Security Agt  (Transcare_Ark) 02.doc; Guaranty (Transcare_ARK) 01.doc; Credit Agreement(Transcare_Ark) 03.doc; Intercreditor Agreement (Transcare_Ark) 01.doc |

Pete,

You never did get to execute these documents.

Thank you,
Michael

Michael S. Greenberg
Patriarch Partners
One Broadway, 5th Floor
New York, NY 10004
Direct: 646-723-7657
Fax:  212-825-2038
Email: michael.greenberg@patriarchpartners.com
www.patriarchpartners.com

**From:** Michael Greenberg
**Sent:** Wednesday, February 10, 2016 12:03 PM
**To:** Peter Wolf
**Cc:** Brian Stephen; Peter Ruffini
**Subject:** FW: Ark/Transcare Docs

The documents I had mentioned for you to sign.  I will print them out.  Thanks.

Michael S. Greenberg
Patriarch Partners
One Broadway, 5th Floor
New York, NY 10004
Direct: 646-723-7657
Fax:  212-825-2038
Email: michael.greenberg@patriarchpartners.com
www.patriarchpartners.com

**From:** Peter Ruffini
**Sent:** Wednesday, February 10, 2016 11:33 AM
**To:** Michael Greenberg
**Cc:** Financial and Investment Law; Brian Stephen
**Subject:** Ark/Transcare Docs

1

PX 197

LaMonica v. Tilton, et al., 18-1021-smb

Confidential

PP-TRBK0047307

EXHIBIT
_6 5_
Blumberg No. 5118
10-17-18

Michael,

Please have the company sign the following documents in connection with the new ARK/Transcare facility:

1. **Credit Agreement (Transcare/Ark II)**
2. **Security Agreement in favor of Ark II**
3. **Guaranty in favor of Ark II**
4. **Inter-Creditor Agreement**

Thanks,
Peter

PATRIARCH PARTNERS, LLC

Peter J. Ruffini
Compliance Officer & Counsel
1 Broadway, 5th Floor
New York, NY 10004
T: 646.723.7642
C: 516.455.5098

www.patriarchpartners.com

2

Confidential

PP-TRBK0047308

**A3968**

**SECURITY AGREEMENT**

**Dated as of January 15, 2016**

among

**TRANSCARE CORPORATION**

and

**Each Grantor**
**From Time to Time Party Hereto**

and

**ARK II CLO 2001-1, LTD.,**
as Lender

Confidential

SECURITY AGREEMENT, dated as of January 15, 2016, by TRANSCARE CORPORATION (the "Borrower") and each of the other entities listed on the signature pages hereof or that becomes a party hereto pursuant to Section 7.5 (together with the Borrower, the "Grantors"), in favor of ARK II CLO 2001-1, LTD., as Lender (in such capacity, together with its successors and permitted assigns, the "Lender") under the Credit Agreement referred to below.

## W I T N E S S E T H:

WHEREAS, pursuant to the Credit Agreement dated as of January 15, 2016 (as the same may be modified from time to time, the "Credit Agreement") between the Borrower and the Lender, the Lender has agreed to make extensions of credit to the Borrower upon the terms and subject to the conditions set forth therein;

WHEREAS, each Grantor will derive substantial direct and indirect benefits from the making of the extensions of credit under the Credit Agreement; and

WHEREAS, it is a condition precedent to the obligation of the Lender to make its extensions of credit to the Borrower under the Credit Agreement that the Grantors shall have executed and delivered this Agreement to the Lender;

NOW, THEREFORE, in consideration of the premises and to induce the Lender to enter into the Credit Agreement and to induce the Lender to make its extensions of credit to the Borrower thereunder, each Grantor hereby agrees with the Lender as follows:

## ARTICLE I

## DEFINED TERMS

Section 1.1    Definitions.  (a) Capital terms used herein without definition are used as defined in the Credit Agreement.

(b)    Unless otherwise defined herein, capitalized terms which are defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement; the following terms which are defined in the UCC in effect in the State of New York on the date hereof are used herein as so defined: Accounts, Chattel Paper, Commercial Tort Claims, Documents, Equipment, Farm Products, General Intangibles, Instruments, Inventory, Investment Property, Letter of Credit Rights and Proceeds.

(c)    The following terms shall have the following meanings:

"Agreement" means this Security Agreement.

"Collateral" has the meaning specified in Section 2.1.

"UCC" means the Uniform Commercial Code as from time to time in effect in the State of New York; provided, that, in the event that, by reason of mandatory provisions of any applicable law, any of the attachment, perfection or priority of the Lender's security interest in any Collateral is governed by the Uniform Commercial Code of a jurisdiction other than the State of New York, "UCC" shall mean the Uniform Commercial Code as in effect in such other

Confidential

jurisdiction for purposes of the provisions hereof relating to such attachment, perfection or priority and for purposes of the definitions related to or used in such provisions.

"Vehicles" means all cars, trucks, trailers, construction and earth moving equipment and other vehicles covered by a certificate of title law of any State and, in any event, including, without limitation, all tires and other appurtenances to any of the foregoing.

Section 1.2    Certain Other Terms.    (a) The meanings given to terms defined herein shall be equally applicable to both the singular and plural forms of such terms.  The terms "herein", "hereof" and similar terms refer to this Agreement as a whole and not to any particular Article, Section or clause in this Agreement.  References herein to a Schedule, Article, Section or clause refer to the appropriate Schedule to, or Article, Section or clause in this Agreement. Where the context requires, provisions relating to any Collateral when used in relation to a Grantor shall refer to such Grantor's Collateral or any relevant part thereof.

(b)    Except for the terms set forth in clause (a) above, Sections 1.2 (Certain Terms), 1.3 (Certain References) and 1.4 (Interpretation) of the Credit Agreement is applicable to this Agreement as and to the extent set forth therein.

## ARTICLE II

### GRANT OF SECURITY INTEREST

Section 2.1    Collateral.    For the purposes of this Agreement, all of the following property now owned or at any time hereafter acquired by a Grantor or in which a Grantor now has or at any time in the future may acquire any right, title or interests is collectively referred to as the "Collateral":

(a)    all Accounts;

(b)    all Chattel Paper;

(c)    all Commercial Tort Claims;

(d)    all Contracts;

(e)    all Copyrights

(f)    all Copyright Licenses

(g)    all Documents;

(h)    all Equipment;

(i)    all General Intangibles;

(j)    all Instruments;

(k)    all Inventory;

2

Confidential

      (l)      all Investment Property;

      (m)     all Letter of Credit Rights;

      (n)     all Patents;

      (o)     all Patent Licenses;

      (p)     all Trademarks;

      (q)     all Trademark Licenses;

      (r)     all Vehicles;

      (s)     all books and records pertaining to the Collateral; and

      (t)     to the extent not otherwise included, all Proceeds and products of any of the foregoing.

      Section 2.2    Grant of Security Interest in Collateral.  Each Grantor, as collateral security for the prompt and complete payment and performance when due (whether at stated maturity, by acceleration or otherwise) of the Obligations of such Grantor (the "Secured Obligations"), hereby mortgages, pledges and hypothecates to the Lender, and grants to the Lender a Lien on and security interest in, all of its right, title and interest in, to and under the Collateral of such Grantor.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES

      To induce the Lender to enter into the Credit Documents, each Grantor hereby represents and warrants each of the following to the Lender:

      Section 3.1    Title; No Other Liens.  Except for the Lien granted to the Lender pursuant to this Agreement and other Liens permitted under the Credit Agreement (unless such Liens are not permitted to exist on any Collateral) under any Credit Document (including Section 3.2), such Grantor owns each item of the Collateral free and clear of any and all Liens or claims of others. Such Grantor has rights in or the power to transfer each other item of Collateral in which a Lien is granted by it hereunder, free and clear of any other Lien.

      Section 3.2    Perfection and Priority.  The security interest granted pursuant to this Agreement constitutes a valid and continuing perfected security interest in favor of the Lender in all Collateral subject, for the following Collateral, to the occurrence of the following:  in the case of all Collateral in which a security interest may be perfected by filing a financing statement under the UCC, the completion of the filings and other actions required by Lender(which, in the case of all filings and other documents, have been delivered to the Lender in completed and duly authorized form).  [Except as otherwise set forth in the "Amended and Restated Intercreditor Agreement, dated as of ____, among ____, ] such security interest shall be prior to all other Liens on the Collateral except for Customary Permitted Liens having priority over the Lender's Lien by operation of law or unless otherwise expressly permitted by any Credit Document upon the

3

delivery thereof to the Lender of such instruments and tangible chattel paper. Except as set forth in this <u>Section 3.2</u>, all actions by each Grantor necessary or desirable to protect and perfect the Lien granted hereunder on the Collateral have been duly taken.

Section 3.3    <u>Jurisdiction of Organization; Chief Executive Office</u>. Such Grantor's jurisdiction of organization, legal name and organizational identification number, if any, and the location of such Grantor's chief executive office or sole place of business, in each case as of the date hereof, has been disclosed to the Lender.

Section 3.4    <u>Locations of Inventory</u>. On the date hereof, such Grantor's inventory (other than inventory in transit) and books and records concerning the Collateral are kept at the Borrower's notice address set forth in the Credit Agreement.

Section 3.5    <u>Accounts Evidenced by Instruments or Tangible Chattel Paper</u>. No amount payable to such Grantor under or in connection with any account is evidenced by any instrument or tangible chattel paper or otherwise constitutes chattel paper.

Section 3.6    <u>Enforcement</u>. No authorization, license, consent, permit, notice to or filing with any governmental authority or any other Person or any consent from any Person is required for the exercise by the Lender of its rights (including voting rights) provided for in this Agreement or the enforcement of remedies in respect of the Collateral pursuant to this Agreement, including the transfer of any Collateral, except for any approvals that may be required to be obtained from any bailees or landlords to collect the Collateral.

Section 3.7    <u>Representations and Warranties of the Credit Agreement</u>.    The representations and warranties as to such Grantor and its Subsidiaries made by the Borrower in <u>Article 4 (Representations and Warranties)</u> of the Credit Agreement are true and correct on each date as required by <u>Article 3 (Conditions Precedent)</u> of the Credit Agreement or any other Credit Document.

ARTICLE IV

COVENANTS

Each Grantor agrees with the Lender to the following, as long as any Obligation remains outstanding and, in each case, unless the Lender otherwise consent in writing:

Section 4.1    <u>Maintenance of Perfected Security Interest; Further Documentation and Consents</u>. (a) <u>Generally</u>. Such Grantor shall (i) not use or permit any Collateral to be used unlawfully or in violation of any provision of any Credit Document, any legal requirement or any policy of insurance covering the Collateral and (ii) not enter into any Contractual Obligation or undertaking restricting the right or ability of such Grantor or the Lender to Sell any Collateral except as may be agreed by the Lender.

(b)    Such Grantor shall maintain the security interest created by this Agreement as a perfected security interest having at least the priority described in <u>Section 3.2</u> and shall defend such security interest and such priority against the claims and demands of all Persons.

4

Confidential

TRANSCARE CORPORATION

(c)     Such Grantor shall furnish to the Lender from time to time statements and schedules further identifying and describing the Collateral and such other documents in connection with the Collateral as the Lender may reasonably request, all in reasonable detail and in form and substance satisfactory to the Lender.

(d)     At any time and from time to time, upon the written request of the Lender, such Grantor shall, for the purpose of obtaining or preserving the full benefits of this Agreement and of the rights and powers herein granted, (i) promptly and duly execute and deliver, and have recorded, such further documents, including an authorization to file (or, as applicable, the filing) of any financing statement or amendment under the UCC (or other filings under similar applicable law) in effect in any jurisdiction with respect to the security interest created hereby and (ii) take such further action as the Lender may reasonably request.

Section 4.2     Changes in Locations, Name, Etc.  Except upon 30 days' prior written notice to the Lender and delivery to the Lender of (a) all documents reasonably requested by the Lender to maintain the validity, perfection and priority of the security interests provided for herein and (b) if applicable, a written supplement showing any additional locations at which inventory or equipment shall be kept, such Grantor shall not do any of the following:

(i)     permit any inventory to be kept at a location other than those described in Section 3.4, except for inventory in transit;

(ii)     change its jurisdiction of organization or its location, in each case from that referred to in Section 3.3; or

(iii)     change its legal name or organizational identification number, if any, or corporation, limited liability company, partnership or other organizational structure to such an extent that any financing statement filed in connection with this Agreement would become misleading.

Section 4.3     Accounts.  (a) Such Grantor shall not, other than in the ordinary course of business, (i) grant any extension of the time of payment of any account that is part of the Collateral, (ii) compromise or settle any such account for less than the full amount thereof, (iii) release, wholly or partially, any Person liable for the payment of any such account, (iv) allow any credit or discount on any such account or (v) amend, supplement or modify any such account in any manner that could adversely affect the value thereof.

(b)     The Lender shall have the right to make test verifications of the accounts that are part of the Collateral in any manner and through any medium that it reasonably considers advisable, and such Grantor shall furnish all such assistance and information as the Lender may reasonably require in connection therewith.  At any time and from time to time, upon the Lender's request, such Grantor shall cause independent public accountants or others satisfactory to the Lender to furnish to the Lender reports showing reconciliations, aging and test verifications of, and trial balances for, the accounts that are part of the Collateral.

Section 4.4     Delivery of Instruments and Tangible Chattel Paper and Control of Electronic Chattel Paper.  (a) If any amount payable under or in connection with any Collateral owned by such Grantor shall be or become evidenced by an instrument or tangible chattel paper, such Grantor shall enter into an amendment hereto with the Lender satisfactory to the Lender in its sole discretion to pledge such instrument or chattel paper to the Lender.

5

Confidential

(b)      If any amount payable under or in connection with any Collateral owned by such Grantor shall be or become evidenced by electronic chattel paper, such Grantor shall take all steps necessary to grant the Lender control of all such electronic chattel paper for the purposes of Section 9-105 of the UCC (or any similar section under any equivalent UCC) and all "transferable records" as defined in each of the Uniform Electronic Transactions Act and the Electronic Signatures in Global and National Commerce Act.

Section 4.5      Notices.  Such Grantor shall promptly notify the Lender in writing of its acquisition of any interest hereafter in property that is of a type where a security interest or lien must be or may be registered, recorded or filed under, or notice thereof given under, any federal statute or regulation.

Section 4.6      Compliance with Credit Agreement.  Such Grantor agrees to comply with all covenants and other provisions applicable to it under the Credit Agreement, and agrees, as its separate obligation, to comply with the provisions of Sections 2.10 (Taxes), 7.5 (Costs, Expenses and Taxes) and 7.11 (Indemnification) of the Credit Agreement mutatis mutandis as if it were the Borrower, and agrees to the same submission to jurisdiction as that agreed to by the Borrower in the Credit Agreement.

## ARTICLE V

## REMEDIAL PROVISIONS

Section 5.1      Code and Other Remedies.  (a) UCC Remedies.  During the continuance of an Event of Default, the Lender may exercise, in addition to all other rights and remedies granted to it in this Agreement and in any other instrument or agreement securing, evidencing or relating to any Secured Obligation, all rights and remedies of a secured party under the UCC or any other applicable law.

(b)      Disposition of Collateral.   Without limiting the generality of the foregoing, the Lender may, without demand of performance or other demand, presentment, protest, advertisement or notice of any kind (except any notice required by law referred to below) to or upon any Grantor or any other Person (all and each of which demands, defenses, advertisements and notices are hereby waived), during the continuance of any Event of Default (personally or through its agents or attorneys), (i) enter upon the premises where any Collateral is located, without any obligation to pay rent, through self-help, without judicial process, without first obtaining a final judgment or giving any Grantor or any other Person notice or opportunity for a hearing on the Lender's claim or action, (ii) collect, receive, appropriate and realize upon any Collateral and (iii) Sell, grant option or options to purchase and deliver any Collateral (enter into Contractual Obligations to do any of the foregoing), in one or more parcels at public or private sale or sales, at any exchange, broker's board or office of the Lender or elsewhere upon such terms and conditions as it may deem advisable and at such prices as it may deem best, for cash or on credit or for future delivery without assumption of any credit risk.  The Lender shall have the right, upon any such public sale or sales and, to the extent permitted by the UCC and other applicable law, upon any such private sale, to purchase the whole or any part of the Collateral so sold, free of any right or equity of redemption of any Grantor, which right or equity is hereby waived and released.

(c)      Management of the Collateral.  Each Grantor further agrees, that, during the continuance of any Event of Default, (i) at the Lender's request, it shall assemble the

6

PP-TRBK0047315

**A3975**

Collateral and make it available to the Lender at places that the Lender shall reasonably select, whether at such Grantor's premises or elsewhere, (ii) without limiting the foregoing, the Lender also has the right to require that each Grantor store and keep any Collateral pending further action by the Lender and, while any such Collateral is so stored or kept, provide such guards and maintenance services as shall be necessary to protect the same and to preserve and maintain such Collateral in good condition, (iii) until the Lender is able to Sell any Collateral, the Lender shall have the right to hold or use such Collateral to the extent that it deems appropriate for the purpose of preserving the Collateral or its value or for any other purpose deemed appropriate by the Lender and (iv) the Lender may, if it so elects, seek the appointment of a receiver or keeper to take possession of any Collateral and to enforce any of the Lender's remedies, with respect to such appointment without prior notice or hearing as to such appointment.  The Lender shall not have any obligation to any Grantor to maintain or preserve the rights of any Grantor as against third parties with respect to any Collateral while such Collateral is in the possession of the Lender.

(d)     Application of Proceeds.  The Lender shall apply the cash proceeds of any action taken by it pursuant to this Section 5.1, after deducting all reasonable costs and expenses of every kind incurred in connection therewith or incidental to the care or safekeeping of any Collateral or in any way relating to the Collateral or the rights of the Lender hereunder, including reasonable attorneys' fees and disbursements, to the payment in whole or in part of the Secured Obligations, as set forth in the Credit Agreement, and only after such application and after the payment by the Lender of any other amount required by law, need the Lender account for the surplus, if any, to any Grantor.

(e)     Direct Obligation.  The Lender shall not be required to make any demand upon, or pursue or exhaust any right or remedy against, any Grantor, any other Credit Party or any other Person with respect to the payment of the Obligations or to pursue or exhaust any right or remedy with respect to any Collateral therefor or any direct or indirect guaranty thereof.  All of the rights and remedies of the Lender under any Credit Document shall be cumulative, may be exercised individually or concurrently and not exclusive of any other rights or remedies provided by any applicable law.  To the extent it may lawfully do so, each Grantor absolutely and irrevocably waives and relinquishes the benefit and advantage of, and covenants not to assert against the Lender, any valuation, stay, appraisement, extension, redemption or similar laws and any and all rights or defenses it may have as a surety, now or hereafter existing, arising out of the exercise by them of any rights hereunder.  If any notice of a proposed sale or other disposition of any Collateral shall be required by law, such notice shall be deemed reasonable and proper if given at least 10 days before such sale or other disposition.

(f)     Commercially Reasonable.  To the extent that applicable law impose duties on the Lender to exercise remedies in a commercially reasonable manner, each Grantor acknowledges and agrees that it is not commercially unreasonable for the Lender to do any of the following:

(i)     fail to incur significant costs, expenses or other Liabilities reasonably deemed as such by the Lender to prepare any Collateral for disposition or otherwise to complete raw material or work in process into finished goods or other finished products for disposition;

(ii)     fail to obtain permits, or other consents, for access to any Collateral to Sell or for the collection or Sale of any Collateral, or, if not required by other applicable

7

law, fail to obtain Permits or other consents for the collection or disposition of any Collateral;

(iii)     fail to exercise remedies against account debtors or other Persons obligated on any Collateral or to remove Liens on any Collateral or to remove any adverse claims against any Collateral;

(iv)     advertise dispositions of any Collateral through publications or media of general circulation, whether or not such Collateral is of a specialized nature or to contact other Persons, whether or not in the same business as any Grantor, for expressions of interest in acquiring any such Collateral;

(v)     exercise collection remedies against account debtors and other Persons obligated on any Collateral, directly or through the use of collection agencies or other collection specialists, hire one or more professional auctioneers to assist in the disposition of any Collateral, whether or not such Collateral is of a specialized nature or, to the extent deemed appropriate by the Lender, obtain the services of other brokers, investment bankers, consultants and other professionals to assist the Lender in the collection or disposition of any Collateral, or utilize Internet sites that provide for the auction of assets of the types included in the Collateral or that have the reasonable capacity of doing so, or that match buyers and sellers of assets to dispose of any Collateral;

(vi)     dispose of assets in wholesale rather than retail markets;

(vii)     disclaim disposition warranties, such as title, possession or quiet enjoyment; or

(viii)     purchase insurance or credit enhancements to insure the Lender against risks of loss, collection or disposition of any Collateral or to provide to the Lender a guaranteed return from the collection or disposition of any Collateral.

Each Grantor acknowledges that the purpose of this Section 5.1 is to provide a non-exhaustive list of actions or omissions that are commercially reasonable when exercising remedies against any Collateral and that other actions or omissions by the Lender shall not be deemed commercially unreasonable solely on account of not being indicated in this Section 5.1. Without limitation upon the foregoing, nothing contained in this Section 5.1 shall be construed to grant any rights to any Grantor or to impose any duties on the Lender that would not have been granted or imposed by this Agreement or by applicable law in the absence of this Section 5.1.

(g)     IP Licenses. For the purpose of enabling the Lender to exercise rights and remedies under this Section 5.1 (including in order to take possession of, collect, receive, assemble, process, appropriate, remove, realize upon, Sell or grant options to purchase any Collateral) at such time as the Lender shall be lawfully entitled to exercise such rights and remedies, each Grantor hereby grants to the Lender (i) an irrevocable, nonexclusive, worldwide license (exercisable without payment of royalty or other compensation to such Grantor), including in such license the right to sublicense, use and practice any Intellectual Property now owned or hereafter acquired by such Grantor and access to all media in which any of the licensed items may be recorded or stored and to all Software and programs used for the compilation or printout thereof and (ii) an irrevocable license (without payment of rent or other compensation to

8

PP-TRBK0047317

such Grantor) to use, operate and occupy all real property owned, operated, leased, subleased or otherwise occupied by such Grantor.

Section 5.2    Accounts and Payments in Respect of General Intangibles.    (a) In addition to, and not in substitution for, any similar requirement in the Credit Agreement, if required by the Lender at any time during the continuance of an Event of Default, any payment of accounts or payment in respect of general intangibles that form part of the Collateral, when collected by any Grantor, shall be promptly (and, in any event, within 2 Business Days) deposited by such Grantor in the exact form received, duly indorsed by such Grantor to the Lender, in an account designated by the Lender. Until so turned over, such payment shall be held by such Grantor in trust for the Lender, segregated from other funds of such Grantor. Each such deposit of proceeds of accounts and payments in respect of general intangibles shall be accompanied by a report identifying in reasonable detail the nature and source of the payments included in the deposit.

(b)    At any time during the continuance of an Event of Default:

(i)    each Grantor shall, upon the Lender's request, deliver to the Lender all original and other documents evidencing, and relating to, the Contractual Obligations and transactions that gave rise to any account or any payment in respect of general intangibles, including all original orders, invoices and shipping receipts and notify account debtors that the accounts or general intangibles have been collaterally assigned to the Lender and that payments in respect thereof shall be made directly to the Lender; and

(ii)    the Lender may, without notice, at any time during the continuance of an Event of Default, limit or terminate the authority of a Grantor to collect its accounts or amounts due under general intangibles or any thereof and, in its own name or in the name of others, communicate with account debtors to verify with them to the Lender's satisfaction the existence, amount and terms of any account or amounts due under any general intangible. In addition, the Lender may at any time enforce such Grantor's rights against such account debtors and obligors of general intangibles;

(c)    Anything herein to the contrary notwithstanding, each Grantor shall remain liable under each account and each payment in respect of general intangibles to observe and perform all the conditions and obligations to be observed and performed by it thereunder, all in accordance with the terms of any agreement giving rise thereto. The Lender shall not have any obligation or liability under any agreement giving rise to an account or a payment in respect of a general intangible by reason of or arising out of any Credit Document or the receipt by the Lender of any payment relating thereto, nor shall the Lender be obligated in any manner to perform any obligation of any Grantor under or pursuant to any agreement giving rise to an account or a payment in respect of a general intangible, to make any payment, to make any inquiry as to the nature or the sufficiency of any payment received by it or as to the sufficiency of any performance by any party thereunder, to present or file any claim, to take any action to enforce any performance or to collect the payment of any amounts that may have been assigned to it or to which it may be entitled at any time or times.

Section 5.3    Deficiency.    Each Grantor shall remain liable for any deficiency if the proceeds of any sale or other disposition of any Collateral are insufficient to pay the Secured Obligations and the fees and disbursements of any attorney employed by the Lender to collect such deficiency.

9

PP-TRBK0047318

## ARTICLE VI

## THE LENDER

Section 6.1    Lender's Appointment as Attorney-in-Fact.    (a) Each Grantor hereby irrevocably constitutes and appoints the Lender, with full power of substitution, as its true and lawful attorney-in-fact with full irrevocable power and authority in the place and stead of such Grantor and in the name of such Grantor or in its own name, for the purpose of carrying out the terms of the Credit Documents, to take any appropriate action and to execute any document or instrument that may be necessary or desirable to accomplish the purposes of the Credit Documents, and, without limiting the generality of the foregoing, each Grantor hereby gives the Lender the power and right, on behalf of such Grantor, without notice to or assent by such Grantor, to do any of the following when an Event of Default shall be continuing:

(i)    in the name of such Grantor, in its own name or otherwise, take possession of and indorse and collect any check, draft, note, acceptance or other instrument for the payment of moneys due under any account or general intangible that forms part of the Collateral or with respect to any other Collateral and file any claim or take any other action or proceeding in any court of law or equity or otherwise deemed appropriate by the Lender for the purpose of collecting any such moneys due under any account or general intangible or with respect to any other Collateral whenever payable;

(ii)    pay or discharge taxes and Liens levied or placed on or threatened against any Collateral, effect any repair or pay any insurance called for by the terms of the Credit Agreement (including all or any part of the premiums therefor and the costs thereof);

(iii)    execute, in connection with any sale provided for in Section 5.1, any document to effect or otherwise necessary or appropriate in relation to evidence the Sale of any Collateral; or

(iv)    (A) direct any party liable for any payment under any Collateral to make payment of any moneys due or to become due thereunder directly to the Lender or as the Lender shall direct, (B) ask or demand for, and collect and receive payment of and receipt for, any moneys, claims and other amounts due or to become due at any time in respect of or arising out of any Collateral, (C) sign and indorse any invoice, freight or express bill, bill of lading, storage or warehouse receipt, draft against debtors, assignment, verification, notice and other document in connection with any Collateral, (D) commence and prosecute any suit, action or proceeding at law or in equity in any court of competent jurisdiction to collect any Collateral and to enforce any other right in respect of any Collateral, (E) defend any actions, suits, proceedings, audits, claims, demands, orders or disputes brought against such Grantor with respect to any Collateral, (F) settle, compromise or adjust any such actions, suits, proceedings, audits, claims, demands, orders or disputes and, in connection therewith, give such discharges or releases as the Lender may deem appropriate and (G) generally, Sell, grant a Lien on, make any Contractual Obligation with respect to and otherwise deal with, any Collateral as fully and completely as though the Lender were the absolute owner thereof for all purposes and do, at the Lender's option, at any time or from time to time, all acts and things that the Lender deems necessary to protect, preserve or realize upon any Collateral and the

10

Confidential

**A3979**

Lender's security interests therein and to effect the intent of the Credit Documents, all as fully and effectively as such Grantor might do.

(b)     If any Grantor fails to perform or comply with any Contractual Obligation contained herein, the Lender, at its option, but without any obligation so to do, may perform or comply, or otherwise cause performance or compliance, with such Contractual Obligation.

(c)     The expenses of the Lender incurred in connection with actions undertaken as provided in this Section 6.1, together with interest thereon at the rate set forth in the Credit Agreement with respect to the Loans, from the date of payment by the Lender to the date reimbursed by the relevant Grantor, shall be payable by such Grantor to the Lender on demand.

(d)     Each Grantor hereby ratifies all that said attorneys shall lawfully do or cause to be done by virtue of this Section 6.1. All powers, authorizations and agencies contained in this Agreement are coupled with an interest and are irrevocable until this Agreement is terminated and the security interests created hereby are released.

Section 6.2     Authorization to File Financing Statements. Each Grantor authorizes the Lender and its Affiliates and it and its Affiliates' counsel and other representatives, at any time and from time to time, to file or record financing statements, amendments thereto, and other filing or recording documents or instruments with respect to any Collateral in such form and in such offices as the Lender reasonably determines appropriate to perfect the security interests of the Lender under this Agreement, and such financing statements and amendments may described the Collateral covered thereby as "all assets of the debtor". A photographic or other reproduction of this Agreement shall be sufficient as a financing statement or other filing or recording document or instrument for filing or recording in any jurisdiction. Such Grantor also hereby ratifies its authorization for the Lender to have filed any initial financing statement or amendment thereto under the UCC (or other similar laws) in effect in any jurisdiction if filed prior to the date hereof.

Section 6.3     Duty; Obligations and Liabilities. (a) Duty of Lender. The Lender's sole duty with respect to the custody, safekeeping and physical preservation of the Collateral in its possession shall be to deal with it in the same manner as the Lender deals with similar property for its own account. The powers conferred on the Lender hereunder are solely to protect the Lender's interest in the Collateral and shall not impose any duty upon the Lender to exercise any such powers. The Lender shall be accountable only for amounts that it receives as a result of the exercise of such powers, and neither it nor any of its Affiliates or any of its or its Affiliates' counsel or representatives shall be responsible to any Grantor for any act or failure to act hereunder, except for their own gross negligence or willful misconduct as finally determined by a court of competent jurisdiction. In addition, the Lender shall not be liable or responsible for any loss or damage to any Collateral, or for any diminution in the value thereof, by reason of the act or omission of any warehousemen, carrier, forwarding agency, consignee or other bailee if such Person has been selected by the Lender in good faith.

(b)     Obligations and Liabilities with respect to Collateral. Neither the Lender nor any of its Affiliates, or its or its Affiliates' counsel or representatives shall be liable for failure to demand, collect or realize upon any Collateral or for any delay in doing so or shall be under any obligation to sell or otherwise dispose of any Collateral upon the request of any Grantor or any other Person or to take any other action whatsoever with regard to any Collateral. The

11

PP-TRBK0047320

powers conferred on the Lender hereunder shall not impose any duty upon the Lender to exercise any such powers. The Lender shall be accountable only for amounts actually received as a result of the exercise of such powers, and neither the Lender nor any of its respective officers, directors, employees or agents shall be responsible to any Grantor for any act or failure to act hereunder, except for their own gross negligence or willful misconduct as finally determined by a court of competent jurisdiction.

## ARTICLE VII

## MISCELLANEOUS

Section 7.1    Reinstatement.  Each Grantor agrees that, if any payment made by any Credit Party or other Person and applied to the Secured Obligations is at any time annulled, avoided, set aside, rescinded, invalidated, declared to be fraudulent or preferential or otherwise required to be refunded or repaid, or the proceeds of any Collateral are required to be returned by the Lender to such Credit Party, its estate, trustee, receiver or any other party, including any Grantor, under any bankruptcy law, state or federal law, common law or equitable cause, then, to the extent of such payment or repayment, any Lien or other Collateral securing such liability shall be and remain in full force and effect, as fully as if such payment had never been made. If, prior to any of the foregoing, any Lien or other Collateral securing such Grantor's liability hereunder shall have been released or terminated by virtue of the foregoing, such Lien or other Collateral or provision shall be reinstated in full force and effect.

Section 7.2    Independent Obligations.  The obligations of each Grantor hereunder are independent of and separate from the Secured Obligations. If any Secured Obligation is not paid when due, or upon any Event of Default, the Lender may, at its sole election, proceed directly and at once, without notice, against any Grantor and any Collateral to collect and recover the full amount of any Secured Obligation then due, without first proceeding against any other Grantor, any other Credit Party or any other Collateral and without first joining any other Grantor or any other Credit Party in any proceeding.

Section 7.3    No Waiver by Course of Conduct.  The Lender shall not by any act (except by a written instrument pursuant to Section 7.4), delay, indulgence, omission or otherwise be deemed to have waived any right or remedy hereunder or to have acquiesced in any Default or Event of Default.  No failure to exercise, nor any delay in exercising, on the part of the Lender, any right, power or privilege hereunder shall operate as a waiver thereof.  No single or partial exercise of any right, power or privilege hereunder shall preclude any other or further exercise thereof or the exercise of any other right, power or privilege.  A waiver by the Lender of any right or remedy hereunder on any one occasion shall not be construed as a bar to any right or remedy that the Lender would otherwise have on any future occasion.

Section 7.4    Amendments in Writing.  None of the terms or provisions of this Agreement may be waived, amended, supplemented or otherwise modified except in accordance with Section 7.1 (Amendments, Etc.) of the Credit Agreement.

Section 7.5    Additional Grantors.  If, at the option of the Borrower or as required pursuant to the Credit Agreement, the Borrower shall cause any Subsidiary that is not a Grantor to become a Grantor hereunder, such Subsidiary shall execute and deliver to the Lender a Joinder Agreement in a form acceptable to the Lender in its sole discretion and shall thereafter for all

12

Confidential

purposes be a party hereto and have the same rights, benefits and obligations as a Grantor party hereto on the Closing Date.

Section 7.6    Notices.  All notices, requests and demands to or upon the Lender or any Grantor hereunder shall be effected in the manner provided for in Section 7.3 of the Credit Agreement; provided, that any such notice, request or demand to or upon any Grantor shall be addressed to the Borrower's notice address set forth in such Section 7.3.

Section 7.7    Successors and Assigns.  This Agreement shall be binding upon the successors and assigns of each Grantor and shall inure to the benefit of the Lender and its successors and assigns; provided, that no Grantor may assign, transfer or delegate any of its rights or obligations under this Agreement without the prior written consent of the Lender.

Section 7.8    Counterparts.  This Agreement may be executed in any number of counterparts and by different parties in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.  Signature pages may be detached from multiple separate counterparts and attached to a single counterpart.  Delivery of an executed signature page of this Agreement by facsimile transmission or by e-mail shall be as effective as delivery of a manually executed counterpart hereof.

Section 7.9    Severability.  Any provision of this Agreement being held illegal, invalid or unenforceable in any jurisdiction shall not affect any part of such provision not held illegal, invalid or unenforceable, any other provision of this Agreement or any part of such provision in any other jurisdiction.

Section 7.10    Governing Law.  This Agreement and the rights and obligations of the parties hereto shall be governed by, and construed and interpreted in accordance with, the law of the State of New York.

Section 7.11    WAIVER OF JURY TRIAL.  EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES TRIAL BY JURY IN ANY SUIT, ACTION OR PROCEEDING WITH RESPECT TO, OR DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH, ANY CREDIT DOCUMENT OR THE TRANSACTIONS CONTEMPLATED THEREIN OR RELATED THERETO (WHETHER FOUNDED IN CONTRACT, TORT OR ANY OTHER THEORY).  EACH PARTY HERETO (A) CERTIFIES THAT NO OTHER PARTY AND NO REPRESENTATIVE OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 7.11.

Section 7.12    Intercreditor Agreement.  All provisions of this Agreement and any other Credit Documents are subject to the Intercreditor Agreement and, in case of direct conflict with such provisions, the provisions of the Intercreditor Agreement shall govern, anything else in this Agreement or any other Credit Document to the contrary notwithstanding.

[SIGNATURE PAGES FOLLOW]

13

PP-TRBK0047322

IN WITNESS WHEREOF, each of the undersigned has caused this Security Agreement to be duly executed and delivered as of the date first above written.

TRANSCARE CORPORATION,
as Grantor

By: _____
    Name:
    Title:


TC AMBULANCE CORPORATION
TC AMBULANCE GROUP, INC.
TC AMBULANCE NORTH, INC.
TC BILLING AND SERVICES CORP.
TC HUDSON VALLEY AMBULANCE CORP.
TCBA AMBULANCE, INC.
TRANSCARE HARFORD COUNTY, INC.
TRANSCARE MANAGEMENT SERVICES, INC.
TRANSCARE MARYLAND, INC.
TRANSCARE ML, INC.
TRANSCARE NEW YORK, INC.
TRANSCARE PENNSYLVANIA, INC.
TRANSCARE WESTCHESTER, INC.,
    as Additional Grantors

By: _____
    Name:
    Title:


ACCEPTED AND AGREED
as of the date first above written:

ARK II CLO 2001-1, LTD.,
    as Lender

By: _____
    Name:
    Title:


SIGNATURE PAGE TO SECURITY AGREEMENT FOR TRANSCARE CORPORATION

Confidential

GUARANTY (this "Agreement"), dated as of January 15, 2016, by TRANSCARE ML, INC.], and each of the other entities listed on the signature pages hereof or that becomes a party hereto pursuant to **Error! Reference source not found.** (together with the Borrower, the "Guarantors"), in favor of ARK II CLO 2001-1, LTD. ("ARK"), Lender (as defined in the Credit Agreement referred to below).

## WITNESSETH:

WHEREAS, pursuant to the Credit Agreement dated as of January 15, 2016 (as the same may be modified from time to time, the "Credit Agreement"; capitalized terms used herein without definition are used as defined in the Credit Agreement) among Transcare Corporation (the "Borrower"), as Borrower, and ARK, as Lender, ARK agreed to make extensions of credit to the Borrower upon the terms and subject to the conditions set forth therein;

WHEREAS, each Guarantor has agreed to guaranty the Obligations (as defined in the Credit Agreement) of the Borrower;

WHEREAS, each Guarantor will derive substantial direct and indirect benefits from the making of the extensions of credit under the Credit Agreement; and

WHEREAS, it is a condition precedent to the obligation of the Lenders to make their respective extensions of credit to the Borrower under the Credit Agreement that the Guarantors shall have executed and delivered this Agreement to ARK;

NOW, THEREFORE, in consideration of the premises and to induce the Lender to enter into the Credit Agreement and to induce Lender to make their respective extensions of credit to the Borrower thereunder, each Guarantor hereby agrees as follows:[1]

## ARTICLE I

## GUARANTY

Section 1.1     Guaranty.  To induce the Lenders to make the Loans, each Guarantor hereby, jointly and severally, absolutely, unconditionally and irrevocably guarantees, as primary obligor and not merely as surety, the full and punctual payment when due, whether at stated maturity or earlier, by reason of acceleration, mandatory prepayment or otherwise in accordance with any Credit Document, of all the Obligations of the other Credit Parties whether existing on the date hereof or hereinafter incurred or created (the "Guaranteed Obligations"). This guaranty by each Guarantor hereunder constitutes a guaranty of payment and not of collection.

Section 1.2     Limitation of Guaranty.  Any term or provision of this Agreement or any other Credit Document to the contrary notwithstanding, the maximum aggregate amount for which any Guarantor that is not a direct or indirect owner of stock in the Borrower (any "Subsidiary Guarantor") shall be liable hereunder shall not exceed the maximum amount for which such Subsidiary Guarantor can be liable without rendering this Agreement or any other Credit Document, as it relates to such Subsidiary Guarantor, subject to avoidance under applicable Requirements of Law relating to fraudulent conveyance or fraudulent transfer (including the Uniform Fraudulent Conveyance Act, the Uniform Fraudulent Transfer Act and

PP-TRBK0047324

Section 548 of title 11 of the United States Code or any applicable provisions of comparable Requirements of Law) (collectively, "Fraudulent Transfer Laws"). Any analysis of the provisions of this Agreement for purposes of Fraudulent Transfer Laws shall take into account the right of contribution established in Section 1.3 and, for purposes of such analysis, give effect to any discharge of intercompany debt as a result of any payment made under this Agreement.

Section 1.3    Contribution.  To the extent that any Subsidiary Guarantor shall be required hereunder to pay any portion of any Guaranteed Obligation exceeding the greater of (a) the amount of the economic benefit actually received by such Subsidiary Guarantor from the Loans and other Obligations and (b) the amount such Subsidiary Guarantor would otherwise have paid if such Subsidiary Guarantor had paid the aggregate amount of the Guaranteed Obligations (excluding the amount thereof repaid by the Borrower and any Guarantor that is not a Subsidiary Guarantor) in the same proportion as such Subsidiary Guarantor's net worth on the date enforcement is sought hereunder bears to the aggregate net worth of all the Subsidiary Guarantors on such date, then such Subsidiary Guarantor shall be reimbursed by such other Subsidiary Guarantors for the amount of such excess, pro rata, based on the respective net worth of such other Subsidiary Guarantors on such date.

Section 1.4    Authorization; Other Agreements.  The Lender and each other holder of an Obligation (collectively, and together with their successors and permitted assigns, the "Beneficiaries") are hereby authorized, without notice to or demand upon any Guarantor and without discharging or otherwise affecting the obligations of any Guarantor hereunder and without incurring any liability hereunder, from time to time, to do each of the following:

(a)    (i) modify, amend, supplement or otherwise change, (ii) accelerate or otherwise change the time of payment or (iii) waive or otherwise consent to noncompliance with, any Guaranteed Obligation or any Credit Document;

(b)    apply any sums by whomever paid or however realized to any Guaranteed Obligation in such order as provided in the Credit Documents;

(c)    refund at any time any payment received by any Beneficiary in respect of any Guaranteed Obligation;

(d)    (i) enter into asset sale with respect to, or exchange, enforce, waive, substitute, liquidate, terminate, release, abandon, fail to perfect, subordinate, accept, substitute, surrender, exchange, affect, impair or otherwise alter or release, any Collateral for any Guaranteed Obligation or any other guaranty therefor in any manner, (ii) receive, take and hold additional Collateral to secure any Guaranteed Obligation, (iii) add, release or substitute any one or more other Guarantors, makers or endorsers of any Guaranteed Obligation or any part thereof and (iv) otherwise deal in any manner with the Borrower and any other Guarantor, maker or endorser of any Guaranteed Obligation or any part thereof; and

(e)    settle, release, compromise, collect or otherwise liquidate the Guaranteed Obligations.

Section 1.5    Guaranty Absolute and Unconditional.  Each Guarantor hereby waives and agrees not to assert any defense, whether arising in connection with or in respect of any of the following or otherwise, and hereby agrees that its obligations under this Agreement are irrevocable, absolute and unconditional and shall not be discharged as a result of or otherwise

GUARANTY FOR CREDIT AGREEMENT OF TRANSCARE ML, INC.]                                    2

Confidential

affected by any of the following (which may not be pleaded and evidence of which may not be introduced in any proceeding with respect to this Agreement, in each case except as otherwise agreed in writing by the Lender):

(a)     the invalidity or unenforceability of any obligation of the Borrower or any other Guarantor under any Credit Document or any other agreement or instrument relating thereto (including any amendment, consent or waiver thereto), or any security for, or other guaranty of, any Guaranteed Obligation or any part thereof, or the lack of perfection or continuing perfection or failure of priority of any security for the Guaranteed Obligations or any part thereof;

(b)     the absence of (i) any attempt to collect any Guaranteed Obligation or any part thereof or from the Borrower or any other Guarantor or other action to enforce any of the same or (ii) any action to enforce any Credit Document or any Lien thereunder;

(c)     the failure by any Person to take any steps to perfect and maintain any Lien on, or to preserve any rights with respect to, any Collateral;

(d)     any workout, insolvency, bankruptcy proceeding, reorganization, arrangement, liquidation or dissolution by or against the Borrower, any other Guarantor or any of the Borrower's other Subsidiaries or any procedure, agreement, order, stipulation, election, action or omission thereunder, including any discharge or disallowance of, or bar or stay against collecting, any Guaranteed Obligation (or any interest thereon) in or as a result of any such proceeding;

(e)     any foreclosure, whether or not through judicial sale, and any other asset sale involving Collateral or any election following the occurrence of an Event of Default by any Beneficiary to proceed separately against any Collateral in accordance with such Beneficiary's rights under any applicable law (including any applicable Regulation or Consent of any Governmental Authority); or

(f)     any other defense, setoff, counterclaim or any other circumstance that might otherwise constitute a legal or equitable discharge of the Borrower, any other Guarantor or any of the Borrower's other Subsidiaries, in each case other than the payment in full of the Guaranteed Obligations.

Section 1.6     Waivers.  Each Guarantor hereby unconditionally and irrevocably waives and agrees not to assert any claim, defense, setoff or counterclaim based on diligence, promptness, presentment, requirements for any demand or notice hereunder including any of the following: (a) any demand for payment or performance and protest and notice of protest, (b) any notice of acceptance, (c) any presentment, demand, protest or further notice or other requirements of any kind with respect to any Guaranteed Obligation (including any accrued but unpaid interest thereon) becoming immediately due and payable and (d) any other notice in respect of any Guaranteed Obligation or any part thereof, and any defense arising by reason of any disability or other defense of the Borrower or any other Guarantor.  Each Guarantor further unconditionally and irrevocably agrees not to (x) enforce or otherwise exercise any right of subrogation or any right of reimbursement or contribution or similar right against the Borrower or any other Guarantor by reason of any Credit Document or any payment made thereunder or (y) assert any claim, defense, setoff or counterclaim it may have against any other Credit Party or set off any of its obligations to such other Credit Party against obligations of such Credit Party to such

Confidential

Guarantor. No obligation of any Guarantor hereunder shall be discharged other than by complete performance.

Section 1.7    Reliance.   Each Guarantor hereby assumes responsibility for keeping itself informed of the financial condition of the Borrower, each other Guarantor and any other guarantor, maker or endorser of any Guaranteed Obligation or any part thereof, and of all other circumstances bearing upon the risk of nonpayment of any Guaranteed Obligation or any part thereof, that diligent inquiry would reveal, and each Guarantor hereby agrees that no Beneficiary shall have any duty to advise any Guarantor of information known to it regarding such condition or any such circumstances. In the event any Beneficiary, in its sole discretion, undertakes at any time or from time to time to provide any such information to any Guarantor, such Beneficiary shall be under no obligation to (a) undertake any investigation not a part of its regular business routine, (b) disclose any information that such Beneficiary, pursuant to accepted or reasonable commercial finance or banking practices, wishes to maintain confidential or (c) make any future disclosures of such information or any other information to any Guarantor.

## ARTICLE II

## MISCELLANEOUS

Section 2.1    Representations and Warranties; Covenants.   To induce the Lender and to enter into the Credit Documents, each Guarantor hereby agrees to each of the following with the Lendes and the other Beneficiaries, as long as any Obligation or Commitment remains outstanding and, in each case, unless the Lender otherwise consents in writing:

(a)    the representations and warranties as to such Guarantor and its Subsidiaries made by the Borrower in Article IV (Representations and Warranties) of the Credit Agreement are true and correct on each date; and

Section 2.2    Reinstatement.   Each Guarantor agrees that, if any payment made by any Credit Party or other Person and applied to the Guaranteed Obligations is at any time annulled, avoided, set aside, rescinded, invalidated, declared or sought to be declared to be fraudulent or preferential or otherwise required to be refunded or repaid, then, if, prior to any of the foregoing, any provision of this Agreement (including the guaranty of such Guarantor hereunder) shall have been terminated, cancelled or surrendered, such provision shall be reinstated in full force and effect and such prior termination, cancellation or surrender shall not diminish, release, discharge, impair or otherwise affect the obligations of any such Guarantor in respect of the amount of such payment.

Section 2.3    Independent Obligations.   The obligations of each Guarantor hereunder are independent of and separate from the Guaranteed Obligations. If any Guaranteed Obligation is not paid when due, or upon any Event of Default, the Lender may, at its sole election, proceed directly and at once, without notice, against any Guarantor to collect and recover the full amount or any portion of any Guaranteed Obligation then due, without first proceeding against any other Guarantor or any other Credit Party and without first joining any other Guarantor or any other Credit Party in any proceeding.

Section 2.4    No Waiver by Course of Conduct.   No Beneficiary shall by any act (except by a written instrument pursuant to Section 2.5), delay, indulgence, omission or otherwise be deemed to have waived any right or remedy hereunder or to have acquiesced in any Default or

GUARANTY FOR CREDIT AGREEMENT OF TRANSCARE ML, INC.]                                      4

Confidential                                                        PP-TRBK0047327

Event of Default. No failure to exercise, nor any delay in exercising, on the part of any Beneficiary, any right, power or privilege hereunder shall operate as a waiver thereof. No single or partial exercise of any right, power or privilege hereunder shall preclude any other or further exercise thereof or the exercise of any other right, power or privilege. A waiver by any Beneficiary of any right or remedy hereunder on any one occasion shall not be construed as a bar to any right or remedy that such Beneficiary would otherwise have on any future occasion.

Section 2.5    Amendments in Writing. None of the terms or provisions of this Agreement may be waived, amended, supplemented or otherwise modified except in accordance with Section 7.1 (Amendment, Etc.) of the Credit Agreement.

Section 2.6    Reserved.

Section 2.7    Notices. All notices, requests and demands to or upon the Lender or any Guarantor hereunder shall be effected in the manner provided for in Section 7.3 (Notices) of the Credit Agreement; provided, however, that any such notice, request or demand to or upon any Guarantor shall be addressed to the Borrower's notice address set forth in such Section 7.3.

Section 2.8    Successors and Assigns. This Agreement shall be binding upon the successors and assigns of each Guarantor and shall inure to the benefit of each Beneficiary and their successors and assigns; provided, however, that no Guarantor may assign, transfer or delegate any of its rights or obligations under this Agreement without the prior written consent of the Lender.

Section 2.9    Counterparts. This Agreement may be executed in any number of counterparts and by different parties in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement. Signature pages may be detached from multiple separate counterparts and attached to a single counterpart. Delivery of an executed signature page of this Agreement by facsimile transmission or by e-mail shall be as effective as delivery of a manually executed counterpart hereof.

Section 2.10    Interpretation. Section 10.18 (Interpretation) of the Credit Agreement is applicable to this Agreement as and to the extent set forth therein. The meanings given to terms defined herein shall be equally applicable to both the singular and plural forms of such terms. The terms "herein," "hereof" and similar terms refer to this Agreement as a whole and not to any particular Article, Section or clause in this Agreement. References herein to an Annex, Article, Section or clause refer to the appropriate Annex to, or Article, Section or clause of this Agreement.

Section 2.11    Severability. Any provision of this Agreement being held illegal, invalid or unenforceable in any jurisdiction shall not affect any part of such provision not held illegal, invalid or unenforceable, any other provision of this Agreement or any part of such provision in any other jurisdiction.

Section 2.12    Governing Law. This Agreement and the rights and obligations of the parties hereto shall be governed by, and construed and interpreted in accordance with, the law of the State of New York.

Confidential                                                                PP-TRBK0047328

**A3988**

Section 2.13    WAIVER OF JURY TRIAL. EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES TRIAL BY JURY IN ANY SUIT, ACTION OR PROCEEDING WITH RESPECT TO, OR DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH, ANY LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED THEREIN OR RELATED THERETO (WHETHER FOUNDED IN CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO OTHER PARTY, NO BENEFICIARY AND NO AFFILIATE OR REPRESENTATIVE OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 2.13.

[SIGNATURE PAGES FOLLOW]

GUARANTY FOR CREDIT AGREEMENT OF TRANSCARE ML, INC.]                                              6

Confidential

IN WITNESS WHEREOF, each of the undersigned has caused this Agreement to be duly executed and delivered as of the date first above written.

TRANSCARE ML, INC.]
as Guarantor

By: _____

    Name:
    Title:

TC AMBULANCE CORPORATION
TC AMBULANCE GROUP, INC.
TC AMBULANCE NORTH, INC.
TC BILLING AND SERVICES CORP.
TC HUDSON VALLEY AMBULANCE
    CORP.
TCBA AMBULANCE, INC.
TRANSCARE HARFORD COUNTY, INC.
TRANSCARE MANAGEMENT SERVICES,
    INC.
TRANSCARE MARYLAND, INC.
TRANSCARE ML, INC.
TRANSCARE NEW YORK, INC.
TRANSCARE PENNSYLVANIA, INC.
TRANSCARE WESTCHESTER, INC.,
    as Guarantor

By: _____

    Name:
    Title:

[SIGNATURE PAGE TO GUARANTY FOR  [NAME OF BORROWER]'S CREDIT AGREEMENT]

Confidential

ANNEX I
TO
GUARANTY

## FORM OF JOINDER AGREEMENT

This JOINDER AGREEMENT, dated as of _____ __, 20__, is delivered pursuant to **Error! Reference source not found.** of the Guaranty, dated as of January 15, 2016, by TRANSCARE ML, INC.] and its Affiliates from time to time party thereto as Guarantors in favor of ARK II CLO 2001-1, LTD. (the "Guaranty"). Capitalized terms used herein without definition are used as defined in the Guaranty.

By executing and delivering this Joinder Agreement, the undersigned, as provided in **Error! Reference source not found.** of the Guaranty, hereby becomes a party to the Guaranty as a Guarantor thereunder with the same force and effect as if originally named as a Guarantor therein and, without limiting the generality of the foregoing, expressly assumes all obligations and liabilities of a Guarantor thereunder and hereby agrees to be bound as a Guarantor for purposes thereof.

The undersigned hereby represents and warrants that each of the representations and warranties contained in Article II of the Guaranty applicable to it is true and correct on and as the date hereof as if made on and as of such date.

IN WITNESS WHEREOF, the undersigned has caused this Joinder Agreement to be duly executed and delivered as of the date first above written.

[ADDITIONAL GUARANTOR]

By: _____
    Name:
    Title:

A1-1

PP-TRBK0047331

A3991

CREDIT AGREEMENT

among

TRANSCARE CORPORATION,

as Borrower,

THE DOMESTIC SUBSIDIARIES OF THE BORROWER
FROM TIME TO TIME GUARANTORS HEREUNDER,

as Guarantors,
and

ARK II CLO 2001-1, LTD.,

as Lender

Dated as of January 15, 2016

Confidential

PP-TRBK0047332

CREDIT AGREEMENT (this "Agreement"), dated as of January 15, 2016 by and between **TRANSCARE CORPORATION** (together with its successors and permitted assigns, the "Borrower"), its Domestic Subsidiaries that from time to time become guarantors hereunder and under any Guaranty (collectively, the "Guarantors"),  and **ARK II CLO 2001-1, LTD.** (together with its successors and permitted assigns, the "Lender").

WITNESSETH:

WHEREAS, the Borrower has requested that the Lender make available, and the Lender has agreed to make available, a term loan facility under which the Lender makes term loans to the Borrower of up to $6,500,000.00 (the "Commitment") in aggregate principal amount outstanding upon the terms and subject to the conditions set forth herein;

NOW, THEREFORE, in consideration of the premises and the covenants contained herein, the parties hereto hereby agree as follows:

1.   DEFINITIONS

1.1    Definitions.  As used in this Agreement, the following terms have the following meanings (such meanings to be equally applicable to both the singular and plural forms and, unless the context otherwise requires, to all genders and all other grammatical forms of the terms defined):

"Affiliate" means, with respect to any Person, each officer, director, general partner or joint-venturer of such Person and any other Person that directly or indirectly controls, is controlled by, or is under common control with, such Person; provided, that none of the Lender and its other Affiliates shall be an Affiliate of the Borrower and its Subsidiaries.  For purpose of this definition, "control" means the possession of either (a) the power to vote, or the beneficial ownership of, 5% or more of the Voting Stock of such Person or (b) the power to direct or cause the direction of the management and policies of such Person, whether by contract or otherwise.

"Applicable Margin" means 2%.

"Base Rate" means, for any day, a fluctuating rate per annum equal to the "prime rate" of interest in effect for such day as published in the Wall Street Journal, such rate to be adjusted on the effective date of any change thereafter.

"Borrower" has the meaning set forth in the preamble.

"Borrowing" means the making of any Loan.

"Borrowing Certificate" means a Borrowing Certificate substantially in the form of Exhibit A.

"Borrowing Date" means the date of a Borrowing.

Confidential

CREDIT AGREEMENT
TRANSCARE CORPORATION

"Borrower's Account" all of the Borrower's now owned or hereafter acquired or arising accounts as defined in the UCC, including any rights to payment for the sale or lease of goods or rendition of services, whether or not they have been earned by performance

"Business Day" means a day of the year other than Saturday, Sunday and other than any day on which banks are required or authorized to close in New York City and, with respect to notices, determinations, fundings and payments in connection with LIBOR or any LIBOR Loans, a day on which dealings in Dollar deposits are also carried on in the London interbank market.

"Change of Control" means any of the following events:

(i)     the acquisition by any Person or group (as such term is used in Section 13(d)(3) of the Securities Exchange Act of 1934), except for one or more Permitted Holders, of beneficial ownership, directly or indirectly, of a majority of the voting power of the total outstanding Voting Stock of the Borrower without the Lender's prior written consent;

(ii)     the failure of the Permitted Holders to own directly or indirectly fifty-one (51%) percent of the voting power of the total outstanding Voting Stock of the Borrower without the Lender's prior written consent; or

(iii)     the failure of the Borrower to own directly or indirectly one hundred (100%) percent of the voting power of the total outstanding Voting Stock of any Guarantor.

"Closing Date" means the date in which the Loan is advanced hereunder.

"Collateral" means all property and interests in property and proceeds thereof now owned or hereafter acquired by any Loan Party in or upon which a Lien is granted or purported to be granted pursuant to any Loan Document.

"Credit Document" mean this Agreement, the Guaranty and any other document executed and delivered by the Borrower or any Guarantor to the Lender in connection with this Agreement.

"Credit Party" means the Borrower and each Guarantor.

"Customary Permitted Liens" means, with respect to any Person, any of the following Liens:

(a)     Liens with respect to the payment of taxes, assessments or other governmental charges in each case that are not yet due or that are being contested in good faith by appropriate proceedings diligently conducted and with respect to which adequate reserves or other appropriate provisions are being maintained to the extent required by GAAP;

(b)     Liens of suppliers, carriers, materialmen, warehousemen, workmen or mechanics and other similar Liens, in each case (i) imposed by law or arising in the ordinary course of business, (ii) prior to the commencement of any foreclosure or similar proceedings, (iii) for amounts not yet due or relating to claims and liabilities that are fully

- 2 -

Confidential

PP-TRBK0047334

A3994

insured and being defended at the sole cost and expense and at the sole risk of the insurer or that are being contested in good faith by appropriate proceedings diligently pursued and (iv) with respect to which adequate reserves or other appropriate provisions are being maintained to the extent required by GAAP;

(c)     judgment liens (other than for the payment of taxes, assessments or other governmental charges) securing judgments and other proceedings not constituting an Event of Default; provided, that, (i) such Liens are being contested in good faith and by appropriate proceedings diligently pursued and available to the Borrower or such Subsidiary, as the case may be, (ii) adequate reserves or other appropriate provision, if any, as are required by GAAP have been made therefor, and (iii) a stay of enforcement of any such Liens is in effect;

(d)     Liens arising by reason of zoning restrictions, easements, licenses, reservations, covenants, rights-of-way, utility easements, building restrictions, encroachments, minor defects or irregularities in title (including leasehold title) and other similar encumbrances on the use of real property that (i) do not materially impair the value or marketability of such real property and (ii) do not materially interfere with the ordinary conduct of the business conducted and proposed to be conducted at such real property;

(e)     Liens of landlords and mortgagees of landlords (i) arising by statute or under customary contracts entered into in the ordinary course of business, (ii) on fixtures and movable tangible property located on real property leased, (iii) for amounts not yet due and payable and (iv) with respect to which adequate reserves or other appropriate provisions are being maintained to the extent required by GAAP;

(f)     Liens on the real property of a lessor or sublessor consisting of leases or subleases (in each case other than capital leases) otherwise permitted hereunder that, in the aggregate (i) do not materially impair the value or marketability of such real property and (ii) do not materially interfere with the ordinary conduct of the business conducted and proposed to be conducted at such real property; and

(g)     Liens of (i) Wells Fargo Bank, National Association ("Wells Fargo") in connection with the Loan and Security Agreement, dated as of October 13, 2006, by and among Borrower, TransCare New York, Inc., TransCare Pennsylvania, Inc., TransCare Maryland, Inc., TransCare ML, Inc., TC Hudson Valley Ambulance Corp., TC Billing and Services Corp., TC Ambulance Corporation, TransCare Management Services, Inc., TCBA Ambulance, Inc., TransCare Westchester, Inc., TransCare Harford County, Inc., as borrowers, and Wells Fargo, as lender, (as may be amended or otherwise modified from time to time, the "Wells Fargo Credit Facility") and (ii) Patriarch Partners Agency Services, LLC ("PPAS")and the lenders party to the Credit Agreement, dated as of August 4, 2003, by and between Borrower, PPAS and the lenders party thereto (as may be amended or otherwise modified from time to time, the "PPAS Credit Facility").

(g)     the title and interest of, and precautionary financing statements with respect to the rights of, a lessor or sublessor in and to personal property leased or subleased (other than through a capital lease), in each case extending only to such personal property.

- 3 -

"Default" means an event which, with the giving of notice or lapse of time, or both, would constitute an Event of Default.

"Dollars" and "$" mean the lawful currency of the United States of America.

"Domestic Subsidiary" means any Subsidiary of the Borrower organized under the laws of the United States of America or any State thereof.

"ERISA" means the United States Employee Retirement Income Security Act of 1974.

"Event of Default" means any of the occurrences set forth in Section 6.1 after the expiration of any applicable grace period and the giving of any applicable notice, in each case as expressly provided in Section 6.1.

"Existing Credit Facilities" means the Wells Fargo Credit Facility and the PPAS Credit Facility.

"Financials" means, with respect to any Person for any period, the balance sheet of such Person as at the end of such period, and the related statement of income and expense and statement of cash flow of such Person for such period, each setting forth in comparative form the figures for the previous comparable fiscal period, all in reasonable detail and prepared in accordance with GAAP.

"GAAP" means generally accepted accounting principles in the United States of America, as in effect from time to time, set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants, in the statements and pronouncements of the Financial Accounting Standards Board and in such other statements by such other entity as may be in general use by significant segments of the accounting profession that are applicable to the circumstances as of the date of determination. Except as otherwise provided herein, all references to "GAAP" shall be to GAAP applied consistently with the principles used in the preparation of the financial statements delivered to the Lender prior to the Closing Date.

"Guarantor" has the meaning stated in the Preamble to this Agreement.

"Hedging Agreement" means any interest rate swap agreement and interest rate insurance, foreign exchange, swap, option or forward contract, spot, cap, floor or collar transaction, any other derivative instrument and any other similar speculative transaction and any other similar agreement or arrangement designed to alter the risks of any Person arising from fluctuations in any underlying variable.

"Indebtedness" means, with respect to any Person, without duplication, the following: (i) all indebtedness of such Person for borrowed money, (ii) all obligations of such Person for the deferred purchase price of property or services other than accounts payable and accrued liabilities classified as current under GAAP and incurred in the ordinary course of business, (iii) all obligations of such Person evidenced by notes, bonds, debentures or similar borrowing or securities instruments, (iv) all obligations of such Person created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person, (v) all

- 4 -

Confidential

obligations of such Person as lessee under any lease of any property (whether real, personal or mixed) by that Person as lessee that, in conformity with GAAP, is or should be accounted for as a capital lease on the balance sheet of that Person, (vi) all obligations of such Person in respect of banker's acceptances, letters of credit, surety, customs, reclamation or performance bonds, (vii) all obligations of such Person secured by Liens on the assets and property of such Person, (viii) all obligations of such Person to purchase, redeem, retire, defease or otherwise make any payment in respect of any Stock or Stock Equivalents of such Person or a direct or indirect parent entity thereof, (ix) all payments that would be required to be made under a Hedging Agreement in the event of a termination on the date of determination, (ix) all obligations of such Person in respect of any guaranty by such Person of any obligation of another Person of the type described in clauses (i) through (viii) of this definition and (x) all obligations of another Person of the type described in clauses (i) through (ix) secured by a Lien on the property or assets of such Person (whether or not such Person is otherwise liable for such obligations of such other Person).

"Indemnitees" has the meaning ascribed to such term in Section 7.11.

"Intellectual Property" means all rights, title and interests in or relating to intellectual property and industrial property arising under any law and all IP Ancillary Rights relating thereto, including all Copyrights, Patents, Trademarks, Internet Domain Names, Trade Secrets and IP Licenses (each as defined in the Security Agreement).

"Investment" means, with respect to any Person, to do any of the following: (a) to own, whether beneficially or otherwise, to purchase or otherwise acquire, any investment, including any interest in (i) any Security, or beneficial interest in any Security, issued by any other Person (other than any evidence of any Obligation) or (ii) any other equity interest, ownership interest or any partnership, joint venture or other profit interest in, any other Person; (b) to purchase or otherwise acquire, whether in one transaction or in a series of transactions, all or a significant part of the assets of any other Person or a business conducted by any other Person, or all or substantially all of the assets constituting the business of a division, branch, brand or other unit operation of any other Person; and (c) o enter into, or to remain liable under, any guaranty or similar obligation or other obligation to make, hold, purchase or otherwise acquire, in each case directly or indirectly, any deposit, loan, advance, commitment to lend or advance, or other extension of credit, excluding demand deposits with financial institutions, prepaid expenses, accounts receivable and similar items made or incurred in the ordinary course of business as presently conducted; or (d) to make any contribution to the capital of any other Person.

"LIBOR" means, with respect to any Loan for any calendar month, the rate quoted by Bloomberg Information Service (or by any successor or substitute for such service, providing rate quotations comparable to those currently provided by such service, as determined by the Lender from time to time for purposes of providing quotations of interest rates applicable to Dollar deposits in the London interbank market) at approximately 11:00 a.m., London time, two Business Days before the beginning of such calendar month, as the rate for Dollar deposits with a one-month maturity. If such rate is not available at such time for any reason, LIBOR shall be the arithmetic mean (rounded upward, if necessary, to the next 1/16 of 1%) of the offered quotations of at least two Reference Banks to the prime banks in the London interbank market for dollar deposits with a one-month maturity at approximately 11:00 a.m., London time, two Business Days before the beginning of such calendar month. For purposes of this definition, "Reference

- 5 -

Confidential

Banks" shall mean major banks in the London interbank market selected by the LIBOR.  For all purposes hereunder, LIBOR shall never below 0% per annum.

"LIBOR Loan" means the Term Loan when it bears interest at a rate determined by reference to LIBOR and the LIBOR Margin as provided in <u>Section 2.4</u>.

"Lien" means any mortgage, deed of trust, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), security interest or preference, priority or other security agreement or preferential arrangement of any kind or nature whatsoever intended to assure payment of any Indebtedness or other obligation, including, without limitation, any conditional sale or other title retention agreement, the interest of a lessor under leases which shall have been or should be, in accordance with GAAP, recorded as capital leases, any financing lease having substantially the same economic effect as any of the foregoing and the filing of any financing statement or similar notice (other than a financing statement filed by a "true" lessor or consignor pursuant to Section 9-408 of the Uniform Commercial Code in any State of the United States) naming the owner of the asset to which such Lien relates as debtor.

"Lender" has the meaning set forth in the preamble.

"Loan" has the meaning ascribed to such term in <u>Section 2.1</u>.

"Maturity Date" means April 15, 2019.

"Net Disposition Proceeds" means, with respect to any Sale (other than to a Credit Party), any covered loss under any casualty insurance policy or the taking of any property of the Credit Parties and their Subsidiaries pursuant to the power of eminent domain, condemnation or otherwise, an amount equal to: (i) cash payments (including any cash received by way of deferred payment pursuant to, or by monetization of, a note receivable or otherwise, but then only as and when so received) received by any Credit Party or any Subsidiary of any Credit Party from such Sale, taking or insurance policy, <u>minus</u> (ii) any reasonable, documented and out-of-pocket direct costs incurred in connection with such Sale, taking or the adjustment or settlement of any claims for such insurance policy, including (A) income or gains taxes actually paid or reasonably estimated to be payable by the seller directly as a result of any gain recognized in connection therewith, (B) subject to any applicable intercreditor agreement, any cash payment of any Indebtedness (other than the Loans and any Indebtedness owing to any Credit Party or any Subsidiary of any Credit Party) that is permitted hereunder, secured by a Lien on the property that is subject to such Sale, taking or covered loss and required by its terms to be repaid as a result of such Sale, taking or receipt of insurance proceeds for such covered loss and (C) in the case of an Sale, a reasonable reserve for any indemnification payments (fixed or contingent) in an amount acceptable to the Lender attributable to seller's indemnities and representations and warranties to purchaser in respect of such Sale undertaken by the Credit Parties and their Subsidiaries in connection with such Sale.

"Note" has the meaning ascribed to such term in <u>Section 2.3(b)</u>.

"Obligations" means, with respect to any Credit Party, all amounts, obligations, liabilities, covenants and duties of every type and description owing by any Credit Party to the Lender or its Affiliates arising out of, under, or in connection with, any Credit Document, whether direct or indirect (regardless of whether acquired by assignment), absolute or contingent,

Confidential                                                   PP-TRBK0047338

due or to become due, whether liquidated or not, now existing or hereafter arising and however acquired, and whether or not evidenced by any instrument or for the payment of money, including, without duplication, (a) if such Credit Party is the Borrower, the Loan, (b) all interest, whether or not accruing after the filing of any petition in bankruptcy or after the commencement of any insolvency, reorganization or similar proceeding, and whether or not a claim for post-filing or post-petition interest is allowed in any such proceeding, and (c) all other fees, expenses (including fees, charges and disbursement of counsel), interest, commissions, charges, costs, disbursements, indemnities and reimbursement of amounts paid and other sums chargeable to such Credit Party under any Credit Document.

"Permitted Holders" means each of (i) Patriarch Partners Agency Services, LLC, a Delaware limited liability company, (ii) Zohar CDO 2003-1, Limited, (iii) Zohar II 2005-1, Limited, (iv) Zohar III, Limited, (v) ARK II CLO 2001-1, LTD., (vi) ARK INVESTMENT PARTNERS II, L.P., (vii) any Approved Funds of the foregoing and (viii) any Affiliates of any Person otherwise qualifying as a "Permitted Holder".

"Person" means an individual, partnership, corporation (including any not-for-profit corporation), limited liability company, joint stock company, trust, unincorporated association, joint venture, estate, labor union, governmental authority or other entity of whatever nature.

"Related Person" means, with respect to any individual, (a) each other member of such individual's Family, (b) any Person that is directly or indirectly controlled (as defined herein in the definition of "Affiliate") by such individual or one or more members of such individual's Family, (c) any Person in which such individual or members of such individual's Family hold, individually or in the aggregate, a Material Interest and (d) any Person with respect to which such individual or one or more members of such individual's Family serves as director, officer, partner, executor, trustee, or in a similar capacity. For purposes of this definition, (i) the "Family" of an individual includes, without limitation, (x) the individual, (y) the individual's spouse, and the individual or the individual spouse's children (whether or not by adoption), parents, grandparents, other direct ascendants, direct descendants and first or second degree cousins, and (z) any other natural person who resides with such individual, and (b) "Material Interest" means direct or indirect beneficial ownership (as defined in Rule 13d-3 under the Securities Exchange Act) of voting securities or other voting interest representing at least five percent (5%) of the outstanding voting power of a Person or equity securities or other equity interests representing at least five percent (5%) of the outstanding equity securities or equity interests in a Person.

"Restricted Payment" means (a) any dividend, return of capital, distribution or any other payment, whether direct or indirect (including through the use of Hedging Agreements and similar contractual obligations) and whether in cash, securities or other property, on account of any Stock or Stock Equivalent of any Credit Party now or hereafter outstanding, including with respect to a claim for rescission of a Sale thereof, and (b) any redemption, retirement, termination, defeasance, cancellation, purchase or other acquisition for value, whether direct or indirect (including through the use of Hedging Agreements, and similar contractual obligations), of any Stock or Stock Equivalent of any Credit Party or any direct or indirect parent company or shareholder (other than the Lender) of any Credit Party now or hereafter outstanding and any payment or other transfer setting aside funds for any such redemption, retirement, termination,

- 7 -

cancellation, purchase or other acquisition, whether directly or indirectly and whether to a sinking fund, a similar fund or otherwise.

"Security" means any Stock, Stock Equivalent, voting trust certificate, bond, debenture, note or other evidence of Indebtedness, whether or not secured, convertible or subordinated, or any certificate of interest, share or participation in, any temporary or interim certificate for the purchase or acquisition of, or any warrant, option or other right to subscribe to, purchase or acquire, any of the foregoing.

"Security Agreement" means the Security Agreement dated as of the date hereof pursuant to which the Borrower grants to the Lender a Lien on substantially all of its assets.

"Sell" means, with respect to any asset, to sell, convey, transfer, assign, lease or otherwise dispose of, such asset or any interest therein, or to permit any Person to acquire such asset or any interest therein, including, in each case, through a sale and leaseback transaction or through a sale, factoring at maturity, collection of or other disposal, with or without recourse, of any notes or accounts receivable. "Sale" and "Purchase" have correlative meanings.

"Stock" means all shares of capital stock (whether denominated as common stock or preferred stock), equity interests, beneficial, partnership or membership interests, joint venture interests, participations or other ownership or profit interests in or equivalents (regardless of how designated) of or in a Person (other than an individual), whether voting or non-voting.

"Stock Equivalents" means all securities convertible into or exchangeable for Stock or any other Stock Equivalent and all warrants, options or other rights to purchase, subscribe for or otherwise acquire any Stock or any other Stock Equivalent, whether or not presently convertible, exchangeable or exercisable.

"Solvent" means, with respect to any Person, that the value of the assets of such Person (both at fair value and present fair saleable value) is, on the date of determination, greater than the total amount of liabilities (including, without limitation, contingent and unliquidated liabilities) of such Person as of such date and that, as of such date, such Person is able to pay all liabilities of such Person as such liabilities mature and does not have unreasonably small capital. In computing the amount of contingent or unliquidated liabilities at any time, such liabilities will be computed at the amount which, in light of all the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability.

"Subsidiary" means, with respect to any Person, any corporation, partnership, limited liability company or other business entity of which an aggregate of fifty percent (50%) or more of the issued and outstanding capital stock having ordinary voting power to elect a majority of the board of directors, managers, trustees or other controlling persons, is, at the time, directly or indirectly, owned or controlled by such Person and/or one or more Subsidiaries of such Person (irrespective of whether, at the time, capital stock of any other class or classes of such entity shall have or might have voting power by reason of the happening of any contingency).

"Taxes" has the meaning ascribed to such term in Section 2.10.

- 8 -

Confidential

PP-TRBK0047340

"UCC" means the Uniform Commercial Code (or any successor statute), as in effect from time to time, of the State of New York or of any other state the laws of which are required as a result thereof to be applied in connection with the issue of perfection of security interests.

"Wholly-Owned Subsidiary" of any Person means any Subsidiary of such Person, all of the Stock of which (other than nominal holdings and director's qualifying shares) is owned by such Person, either directly or through one or more Wholly-Owned Subsidiaries of such Person.

1.2     Certain Terms. Except as set forth in any Credit Document, all accounting terms not specifically defined herein shall be construed in accordance with GAAP (except for the term "property", which shall be interpreted as broadly as possible, including, in any case, cash, Securities, other assets, rights under contractual obligations, permits and licenses and any right or interest in any property). The terms "herein", "hereof" and similar terms refer to this Agreement as a whole. In the computation of periods of time from a specified date to a later specified date in any Credit Document, the terms "from" means "from and including" and the words "to" and "until" each mean "to but excluding" and the word "through" means "to and including." In any other case, the term "including" when used in any Credit Document means "including without limitation." The term "documents" means all writings, however evidenced and whether in physical or electronic form, including all documents, instruments, agreements, notices, demands, certificates, forms, financial statements, opinions and reports. The term "incur" means incur, create, make, issue, assume or otherwise become directly or indirectly liable in respect of or responsible for, in each case whether directly or indirectly, and the terms "incurrence" and "incurred" and similar derivatives shall have correlative meanings.

1.3     Certain References. Unless otherwise expressly indicated, references (i) in this Agreement to an Exhibit, Schedule, Article, Section or clause refer to the appropriate Exhibit or Schedule to, or Article, Section or clause in, this Agreement and (ii) in any Credit Document, to (A) any agreement shall include, without limitation, all exhibits, schedules, appendixes and annexes to such agreement and, unless the prior consent of any Secured Party required therefor is not obtained, any modification to any term of such agreement and (B) any statute shall be to such statute as modified from time to time and to any successor legislation thereto, in each case as in effect at the time any such reference is operative. Titles of articles, sections, clauses, exhibits, schedules and annexes contained in any Credit Document are without substantive meaning or content of any kind whatsoever and are not a part of the agreement between the parties hereto. Unless otherwise expressly indicated, the meaning of any term defined (including by reference) in any Credit Document shall be equally applicable to both the singular and plural forms of such term.

1.4     Construction. The parties acknowledge and agree that they have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement.

2.     AMOUNT AND TERM OF THE LOAN

2.1     The Loan. The Lender agrees, on the terms and subject to the conditions hereinafter set forth, to make a term loan to the Borrower in the aggregate principal amount of up

- 9 -

Confidential

to $6,500,000.00 (the "Loan") in same day Dollars made available to the Borrower's Account. Any part of the Loan, when repaid or prepaid, may not be reborrowed.

2.2     Use of Proceeds. The proceeds of the Loan shall be used by the Borrower solely for working capital and general corporate purposes and to pay the cost and expenses related to this Agreement.

2.3     Evidence of Indebtedness; Notes. (a) The Lender shall maintain on its internal records an account evidencing all Indebtedness of the Borrower to the Lender resulting from the Loan, including, the amounts of principal and interest of the Loan owed to it and amounts repaid or prepaid from time to time under this Agreement. The entries made in such account shall, to the extent permitted by applicable law, be prima facie evidence of the existence and amounts of the obligations recorded therein; provided, that the failure of the Lender to maintain such an account or any error therein shall not in any manner affect the obligation of the Borrower to repay the Loan in accordance with its terms.

(b)     Upon request by the Lender at any time on or after the Closing Date, the Loan shall be evidenced by a promissory note of the Borrower to the Lender in a form acceptable to the Lender (the "Note").

2.4     Interest on the Loans. (a) Rate of Interest. Except as otherwise set forth herein, the drawn amount of the Loan shall bear interest on the unpaid principal amount thereof from the date made until paid in full at a rate per annum equal to LIBOR plus the Applicable Margin; provided, that such rate shall not exceed the maximum rate permitted by applicable law.

(b)     Calculation of Interest Rates. Interest shall be computed on the basis of a 360-day year for the actual number of days elapsed in the period during which it accrues. In computing interest on the Loan, the date of the making of such Loan or the first day of an interest period applicable to such Loan shall be included, and the date of payment of such Loan or the expiration date of an interest period applicable to such Loan shall be excluded; provided, if such Loan is repaid on the same day on which it is made, one day's interest shall be paid on such Loan. Each determination by the Lender of an interest rate hereunder shall be conclusive and binding for all purposes, absent manifest error.`



(d)     Default Interest. Notwithstanding the rates of interest specified in Section 2.4 (Rate of Interest) or elsewhere in this Agreement, effective immediately upon (i) the occurrence of an Event of Default described in Section 6.1(a) or (b) or (ii) the occurrence of any other Event of Default and notice from the Lender of the effectiveness of this Section 2.4(d), and for as long thereafter as such Event of Default shall be continuing, the principal balance of any Loan and any other Obligation then owing shall bear interest at a rate which is two percent (2%) per annum in excess of the rate otherwise applicable to the Loans hereunder.

(e)     Interest Rate Unascertainable, Inadequate or Unfair. In the event that at least one (1) Business Day before the LIBOR Interest Rate Determination Date, the Lender determines that adequate and fair means do not exist for ascertaining the applicable interest rates

- 10 -

by reference to which LIBOR then being determined is to be fixed, then the Lender shall forthwith give notice thereof to the Borrower, whereupon (until the Lender notifies the Borrower that the circumstances giving rise to such suspension no longer exist) the Loan shall bear interest at a rate equal to the Base Rate plus the Applicable Margin starting on the first day of the next calendar month.

(f)     Illegality.  (i)  If at any time the Lender determines (which determination shall, absent manifest error, be final and conclusive and binding upon all parties) that the making or continuation of any LIBOR Loan has become unlawful or impermissible by compliance by the Lender with any law, governmental rule, regulation or order of any governmental authority (whether or not having the force of law and whether or not failure to comply therewith would be unlawful or would result in costs or penalties), then, and in any such event, the Lender may give notice of that determination, in writing, to the Borrower.  When notice is given by the Lender under Section 2.4(f)(i) (Illegality), the Loan shall immediately bear interest at a rate per annum equal to the Base Rate plus the Applicable Margin until the Lender determines that it may lawfully make a LIBOR Loan and gives notice of that determination, in writing, to the Borrower, at which point the Loans shall bear interest as otherwise provided herein.

2.5     Borrowing Mechanics.

(a)  Loans shall be made in an aggregate minimum amount of $25,000 and integral multiples of $1,000 in excess of that amount (or such lesser amount as shall constitute the entire applicable Commitment then available).

(b)  The Borrower shall obtain the written consent of the Lender prior to requesting any Loan.  Upon such written consent of the Lender, the Borrower shall deliver to the Lender a fully executed Borrowing Certificate no later than 10:00 a.m. (New York City time) at least one Business Day in advance of the proposed Borrowing Date, which Borrowing Date shall be a Business Day, unless otherwise permitted by the Lender.  Notwithstanding anything herein to the contrary, any Loan made by the Lender hereunder shall (x) only be made at the sole and absolute discretion of the Lender and (y) only be made if it is in accordance with a plan approved by the Lender.

2.6     Repayment.  Subject to Sections 2.7 and 2.8, the Borrower shall repay the entire unpaid principal amount of the Loan, all unpaid interest accrued thereon and all other Obligations then accrued on the Maturity Date, in accordance with the terms of this Agreement.

2.7     Optional Prepayments.  The Borrower may on any Business Day prepay the outstanding principal amount of the Loan in whole or in part, together with accrued interest to the date of such prepayment on the principal amount prepaid, in an aggregate minimum principal amount not less than $500,000 and integral multiples of $100,000 in excess of that amount.

- 11 -

2.8     Mandatory Prepayments.  No later than the first Business Day following the date of receipt by any Credit Party or any Subsidiary of any Credit Party of any Net Disposition Proceeds, the Borrower shall prepay the Loans in an aggregate amount equal to such Net Disposition Proceeds; provided, that (i) so long as no Default shall be continuing, and (ii) to the extent that aggregate net asset sale proceeds from the Closing Date through the applicable date of determination do not exceed $100,000, the Borrower shall have the option, directly or through one or more of its Wholly-Owned Subsidiaries, to invest such Net Disposition Proceeds within one hundred eighty (180) days of receipt thereof in long term productive assets of the general type used in the business of the Credit Parties and their Subsidiaries.

2.9     General Provisions Regarding Payments.  (a)  The Borrower shall make each payment hereunder of principal of and interest on the Loan and other Obligations for the benefit of the Lender in Dollar in same day funds, without defense, set off, counterclaim, free of any restriction or condition, and delivered to the Lender not later than 2:00 P.M. (New York City time) on the day when due in Dollars at its address referred to in Section 7.3 (Notices, Etc.) without presentment, demand, protest or notice of any kind, all of which are expressly waived by the Borrower.

(b)  Non-Conforming Payments.  The Lender shall deem any payment by or on behalf of the Borrower that is not made in same day funds prior to 2:00 p.m. (New York City time) to be a non-conforming payment.  Any such payment shall not be deemed to have been received by the Lender, including for purposes of calculation of interest and determination of Events of Default until the later of (i) the time such funds become available funds and (ii) the applicable next Business Day.

(c)  Payments to Include Accrued Interest.  All payments in respect of the principal amount of the Loan (whether mandatory or optional) shall include payment of accrued interest on the principal amount being, repaid or prepaid, and all such payments (and, in any event, any payments in respect of the Loan on a date when interest is due and payable with respect to such Loan) shall be applied to the payment of interest before application to principal.

(d)  Business Days.  Whenever any payment to be made hereunder shall be stated to be due on a day that is not a Business Day, such payment shall be made on the next succeeding Business Day and such extension of time shall be included in the computation of the payment of interest hereunder.

2.10    Taxes.  Any and all payments by the Borrower hereunder or other document evidencing any Obligations shall be made free and clear of and without reduction for any and all present or future taxes, levies, imposts, deductions, charges, withholdings, and all stamp or documentary taxes, excise taxes, ad valorem taxes and other taxes imposed on the value of the property, charges or levies which arise from the execution, delivery or registration, or from payment or performance under, any of the Credit Documents and all other liabilities with respect thereto excluding, taxes imposed on or measured by net income or overall gross receipts and capital and franchise taxes that now or hereafter may be imposed on the Lender by (i) the United States, (ii) the governmental authority of the jurisdiction in which the Lender's LIBOR Lending Office or other applicable domestic lending office is located or any political subdivision thereof or (iii) the governmental authority in which the Lender is organized, managed and controlled or any political subdivision thereof (all such non-excluded taxes, levies, imposts, deductions, charges and withholdings being hereinafter referred to as "Taxes").  If the Borrower shall be

- 12 -

required by law to withhold or deduct any Taxes from or in respect of any sum payable hereunder or such document to the Lender, (A) the sum payable to the Lender shall be increased as may be necessary so that after making all required withholding or deductions (including withholding or deductions applicable to additional sums payable under this Section 2.10) the Lender receives an amount equal to the sum it would have received had no such withholding or deductions been made, (B) the Borrower shall make such withholding or deductions and (C) the Borrower shall pay the full amount withheld or deducted to the relevant taxation authority or other authority in accordance with applicable law.  The Borrower will indemnify the Lender against, and reimburse the Lender on demand for, the full amount of all Taxes (including any Taxes imposed by any governmental authority on amounts payable under this Section 2.10 and any additional income or franchise taxes resulting therefrom) incurred or paid by the Lender or any bank holding company parent of the Lender and any liability (including penalties, interest, and out-of-pocket expenses paid to third parties) arising therefrom or with respect thereto, whether or not such Taxes were lawfully payable.  Within thirty (30) days after the date of any payment of Taxes by the Borrower, it will furnish to the Lender, at its address referred to in Section 7.3 (Notices, Etc.), the original or a certified copy of a receipt or other documentation reasonably satisfactory to the Lender, evidencing payment thereof.

3.    CONDITIONS PRECEDENT

The obligation of the Lender to make the Loan hereunder is subject to fulfillment (or waiver in writing by the Lender) of all of the following conditions precedent:

        (a)    The representations and warranties made in Article 4 (Representations and Warranties) shall be true and correct on and as of the date of the Loan, before and after giving effect to the Loan and to the application of the proceeds therefrom, as though made on and as of such date.

        (b)    No event shall have occurred and be continuing, or would result from the Loan, or from the application of the proceeds therefrom, which would constitute a Default or an Event of Default in effect on, and as of the date of, the Loan.

        (c)    The Borrower shall have paid all fees and expenses (including attorneys' fees and out of pocket expenses) of the Lender incurred in connection with the Credit Documents prior to the Closing Date.

        (d)    There shall have been delivered to the Lender on or before the Closing Date all of the following, each in form and substance satisfactory to the Lender:

            (i)    The Security Agreement and each other relevant Credit Document signed by the Borrower and, if applicable, each other Credit Party, including all documents necessary to perfect the security interest of the Lender in the Collateral;

            (ii)    True and complete copies of the certificate of incorporation and bylaws of the Borrower, certified copies of the resolutions of the board of directors of the Borrower approving this Agreement, the Security Agreement and all other Credit Documents delivered on the Closing Date and certified copies of all documents evidencing other necessary corporate action and governmental approvals, if any, with respect to this Agreement, the Security Agreement and such other Credit Documents;

- 13 -

Confidential

CREDIT AGREEMENT
TRANSCARE CORPORATION

(iii)    Full and complete UCC, fixture filing and tax lien searches with respect to the Borrower; and

(iv)    Such other certificates, documents, agreements, instruments and information as the Lender may, in its sole discretion, request.

4.    REPRESENTATIONS AND WARRANTIES

4.1    Representations and Warranties of the Borrower. The Borrower represents and warrants on and as of the date hereof and on the Closing Date as follows:

(a)    The Borrower is duly incorporated, validly existing and in good standing under the laws of the State of Delaware has the corporate power and authority to own its assets and to transact the business in which it is now engaged or proposed to be engaged.

(b)    The execution, delivery and performance by the Borrower of the Credit Documents to which it is a party have been duly authorized by all necessary corporate actions and do not and will not (i) contravene its certificate of incorporation or bylaws, (ii) violate any provision of, or require any filing, registration, consent or approval under, any law, rule, regulation, order, writ, judgment, injunction, decree, determination or award applicable to the Borrower, (iii) result in a breach of or constitute a default or require any consent under any agreement, lease or instrument to which the Borrower is a party or by which the Borrower or its properties may be bound or (iv) cause a default (with or without notice or lapse of time or both) under any such law, rule, regulation, order, writ, judgment, injunction, decree, determination or award or any such agreement, lease or instrument that is applicable to the Borrower.

(c)    Each of the Credit Documents to which the Borrower is a party has been duly executed and delivered and constitutes its legal, valid and binding obligation enforceable against it in accordance with its terms, except as such enforcement may be limited by applicable bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally and general principles of equity (regardless of whether such enforceability is considered in a proceeding at law or in equity).

(d)    No authorization or approval or other action by, and no notice to or filing with, any governmental authority or regulatory body is required for the due execution, delivery and performance by the Borrower of any Credit Document to which it is a party.

(e)    The Borrower is not engaged in the business of extending credit for the purpose of purchasing or carrying margin stock (within the meaning of Regulation U issued by the Board of Governors of the Federal Reserve System), and no proceeds of the Loan will be used to purchase or carry any margin stock or to extend credit to others for the purpose of purchasing or carrying any margin stock. The Borrower is not (a) an "investment company" or an "affiliated person" of, or "promoter" or "principal underwriter" for, an "investment company", as such terms are defined in the Investment Company Act of 1940 or (b) a "holding company" or an "affiliate" of a "holding company" or a "subsidiary company" of a "holding company", as each such term is defined and used in the Public Utility Holding Company Act of 1935.

(f)    The Borrower owns or licenses all Intellectual Property that is necessary for the operations of its businesses. To the knowledge of the Borrower, (a) the conduct and

- 14 -

Confidential                                                        PP-TRBK0047346

**A4006**

operations of the businesses of the Borrower does not infringe, misappropriate, dilute, violate or otherwise impair any Intellectual Property owned by any other Person and (b) no other Person has contested any right, title or interest of the Borrower in, or relating to, any Intellectual Property, other than, in each case, as cannot reasonably be expected to affect the Loan Documents and the transactions contemplated therein and would not, in the aggregate, have a Material Adverse Effect.  In addition, (x) there are no pending (or, to the knowledge of the Borrower, threatened) actions, investigations, suits, proceedings, audits, claims, demands, orders or disputes affecting the Borrower with respect to, (y) no judgment or order regarding any such claim has been rendered by any competent governmental authority, no settlement agreement or similar contractual obligation has been entered into by the Borrower, with respect to and (z) the Borrower does not know and has no reason to know of any valid basis for any claim based on, any such infringement, misappropriation, dilution, violation or impairment or contest.

(g)       The policies, binders or self-insurance programs for fire, liability, product liability, workmen's compensation, vehicular and other insurance currently held by or on behalf of the Borrower insure its material properties and business activities against such losses and risks as are adequate to protect its properties in accordance with customary industry practice when entered into or renewed.  As of the date hereof, all such policies, binders and self-insurance programs are in full force and effect.  As of the date hereof, the Borrower has not received notice from any insurer or agent of such insurer that substantial capital improvements or other expenditures are required.  As of the date hereof, the Borrower has not received notice of cancellation of any material insurance policy or binder.

(h)   The Borrower has and is in compliance in all material respects with all laws.

(i)       The representations and warranties of the Borrower contained in this Agreement and the other Credit Documents and all certificates, documents and other information including, without limitation, financial information delivered by the Borrower to the Lender in connection therewith do not contain any untrue statement of material fact or omit to state a material fact necessary in order to make the statements contained therein not misleading.

5.       COVENANTS

5.1      Affirmative Covenants.  As long as any Obligation remains outstanding, the Borrower shall do, and shall ensure that each Credit Party does, each of the following:

(a)       Maintenance of Corporate Existence.  At all times maintain its corporate existence and preserve and keep in full force and effect its rights, privileges and franchises necessary or desirable to its business.

(b)       Compliance with Laws, Etc.   Comply in all respects with (i) all applicable laws, rules, regulations and orders and (ii) all indentures, or loan or credit agreements or any other agreement, lease or instrument to which it is a party or by which it or its properties may be bound or affected.

(c)       Taxes.  Duly file all tax returns required to be file with respect to it and its property which are required to be filed, and duly pay all claims, taxes assessments, charges and levies shown thereon to be due and payable by it, including all quarterly tax assessments.

- 15 -

(d)     Insurance.  Maintain at all times insurance, in such amounts and against such risks as is common industry practice and in any event reasonably acceptable to the Lender, with the Lender named as sole loss payee with respect to all such policies.

(e)     Books and Records.  Keep proper books of record and account in which entries in conformity with GAAP shall be made of all dealings and transactions in relation to their businesses and activities.

(f)     Inspection.  Permit the Lender and its representatives during business hours and with prior notice to inspect the facilities, the location and condition of the Collateral and its books and records, to make copies and extracts therefrom and to discuss its affairs, finances and accounts with its officers, employees and accountants (and by this provision authorizes such accountants to discuss with the Lender and its representatives such affairs, finances and accounts at any reasonable time).

(g)     Reporting Requirements.  Furnish to the Lender all of the following, together with certifications in form and substance satisfactory to the Lender:

(i)     as soon as available but in any event within one hundred eighty (180) days after the close of each fiscal year, the audited consolidated financial statements of the Borrower and its Subsidiaries for such fiscal year, certified by the Borrower's accountants;

(ii)     as soon as available but in any event within ninety (90) days after the end of each fiscal year, the unaudited consolidated Financials of the Borrower and its Subsidiaries for such quarter, certified by its chief financial officer;

(iii)     as soon as available but in any event within thirty (30) Business Days after the end of each fiscal month, the unaudited consolidated Financials of the Borrower and its Subsidiaries for such month, certified by its chief financial officer;

(h)     Further Assurances.  Execute and deliver from time to time to the Lender all such further documents and do all such other acts and things as may be reasonably required by the Lender to enable the Lender to exercise and enforce its rights hereunder and under the other documents referred to herein and to perfect, continue the perfection of, preserve and protect its lien on the Collateral, including providing appraisals of the Collateral, landlord's consents, mortgages, deposit account control agreements for all new deposit accounts, notices with respect to new Collateral and guaranties from each new Wholly-Owned Subsidiary of any Credit Party incorporated in the United States and ensuring that substantially all assets of such Subsidiary become part of the Collateral.

5.2     Negative Covenants.  As long as any Obligation remains outstanding, the Borrower agrees that it shall not do, and it shall ensure that no Credit Party does, any of the following:

(a)     Incur any Indebtedness other than (i) the Obligations, (ii) the Wells Fargo Credit Facility, (iii) the PPAS Credit Facility, (iv) purchase money Indebtedness, Indebtedness arising under any performance or surety bond or other unsecured Indebtedness (and guaranties thereof), in each case arising after the date hereof and acceptable to the Lender in its sole discretion;

- 16 -

Confidential                                                    PP-TRBK0047348

(b)     create or suffer to exist, any Lien upon or with respect to any of its properties, whether now owned or hereafter acquired, or assign any right to receive income, in each case to secure or provide for the payment of any Indebtedness of any person or entity, other than (i) purchase money Liens upon or in any personal property acquired or held by any Credit Party in the ordinary course of business to secure the purchase price of such personal property or to secure Indebtedness incurred solely for the purpose of financing the acquisition of such personal property or (ii) Liens existing on such personal property at the time of its acquisition (other than any such Lien created in contemplation of such acquisition) and acceptable to the Lender in its sole discretion and (iii) Customary Permitted Liens;

(c)     make any Investments other than in (i) cash, marketable obligation of the United States maturing within at most one (1) year, certificates of deposit, bankers' acceptances and time and demand deposits of United States' banks having total assets in excess of $1,000,000,000 or other similar cash equivalents, (ii) the Stock or Stock Equivalents of any Subsidiary of the Borrower that is a Credit Party and (iii) Indebtedness owing to any Credit Party;

(d)     Sell any property (including Securities, whether or not their own) or any interest therein other than (i) cash equivalents described in Section 5.2(c)(i) above, (ii) inventory, (iii) equipment that is obsolete or no longer useful, (iv) a true lease or sublease or real property not constituting Indebtedness and not as part of a sale and leaseback transaction, (iv) intellectual property in the ordinary course of business, (v) to any Credit Party, (vi) to the Lender;

(e)     issue any Security or directly or indirectly, declare, order, pay, make or set apart any sum for any Restricted Payment (other than to any Credit Party);

(f)     merge or consolidate with or into, or convey, transfer, lease or otherwise dispose of (whether in one transaction or in a series of transactions) all or substantially all of its assets (whether now owned or hereafter acquired) to, acquire all or substantially all of the assets of, any Person or division of any Person or materially change the nature or conduct of its business as conducted on the date hereof;

(g)     Default in the performance of any material obligation; and

(h)     Amend, modify or otherwise change any of the terms or provisions in its certificate of incorporation, its bylaws, any document setting forth the designation, amount, relative rights, limitations and preferences of any class or series of Stock or Stock Equivalents of the Borrower and, in each case, any equivalent documents as in effect on the Closing Date.

6.     EVENTS OF DEFAULT

6.1     Events of Default.  If any of the following shall occur and be continuing (each an "Event of Default"):

(a)     The Borrower shall fail to pay any principal of the Loan when the same becomes due and payable; or

(b)     The Borrower shall fail to pay any interest on the Loan or any other Obligation when the same becomes due and payable and such non-payment continues for a period of more than five (5) days; or

- 17 -

PP-TRBK0047349

(c)      Any representation or warranty made by the Borrower herein or in the other Credit Documents to which it is a party, by the Guarantor in the Guaranty or in the other Credit Documents to which it is a party by either of the Borrower or the Guarantor in any certificate agreement or statement contemplated by or made and delivered to the Lender in connection with this Agreement shall prove to have been incorrect in any material respect when made; or

(d)      The Borrower or the Guarantor shall (i) fail to perform or observe any term, covenant or agreement binding on such Person under Sections 5.1(a) (Maintenance of Corporate Structure), 5.1(f) (Inspection) or Section 5.2 (Negative Covenants) or (ii) default in the performance or compliance with any term contained in this Agreement (other than as covered by Sections 6.1(a), 6.1(b) or 6.1(c), or clause (i) of this Section 6.1(d)) or any default or event of default shall occur under any of the other Credit Documents and such default or event of default continues for a period of more than thirty (30) days after the occurrence thereof; or

(e)      Any Credit Party shall fail to pay any principal of or premium or interest on any of its Indebtedness (other than the Obligations) in connection with the Wells Fargo Credit Facility or the PPAS Credit Facility when the same becomes due and payable (whether by scheduled maturity, required prepayment, acceleration, demand or otherwise), or any other event shall occur or condition shall exist under any agreement or instrument relating to any such Indebtedness, if the effect of such event or condition is to accelerate, or to permit the acceleration of, such Indebtedness; or any such Indebtedness shall become or be declared to be due and payable, or required to be prepaid (other than by a regularly scheduled required repayment), redeemed, purchased or defeased or an offer to prepay, redeem, purchase or defease such Indebtedness shall be required to be made, in each case prior to the stated maturity thereof; or

(f)      (i) Any Credit Party shall generally not pay its debts as such debts become due, or shall admit in writing their inability to pay its debts generally, or shall make a general assignment for the benefit of creditors or (ii) any proceeding shall be instituted by or against any Credit Party seeking to adjudicate it a bankrupt or insolvent, or seeking liquidation, winding up, reorganization, arrangement, adjustment, protection, relief, or composition of either of them or their debts under any law relating to bankruptcy, insolvency or reorganization or relief of debtors, or seeking the entry of an order for relief or the appointment of a receiver, trustee, custodian or other similar official for any Credit Party or for any substantial part of any property of any Credit Party and, in the case of any such proceeding instituted against a Credit Party or its property, either such proceeding shall remain undismissed or unstayed for a period of 30 days, or any of the actions sought in such proceeding (including, without limitation, the entry of an order for relief against, or the appointment of a receiver, trustee, custodian or other similar official for, either of them or for any substantial part of their property) shall occur; or (iii) any Credit Party shall take any corporate action to authorize any of the foregoing; or

(g)      Any judgment or order for the payment of money in excess of fifty thousand Dollars ($50,000) shall be rendered against the Borrower or the Guarantor and either (i) enforcement proceedings shall have been commenced by any creditor upon such judgment or order or (ii) there shall be any period of ten (10) consecutive days during which a stay of enforcement of such judgment or order, by reason of a pending appeal or otherwise, shall not be in effect; or

- 18 -

Confidential

PP-TRBK0047350

(h)     Any Credit Document shall, at any time after their respective execution and delivery and for any reason, cease to be in full force and effect or shall be declared null and void and not replaced by substantially similar instruments in form and substance reasonably satisfactory to the Lender, or the validity or enforceability thereof or the security interests granted thereunder shall be contested by Borrower or the Guarantor, or Borrower or the Guarantor shall deny that such person has any further liability or obligation under any Credit Document; or

(i)     There shall occur a Change of Control;

then, and in any such event, the Lender may, by notice to the Borrower declare the Loan, all Obligations to be forthwith due and payable, whereupon all Obligations shall become due and payable, (or in the case of clause (f)(ii) above, all Obligations shall, automatically and without notice of any kind) become due and payable) without presentment, demand, protest, or further notice of any kind, all of which are hereby expressly waived by the Borrower.  Notwithstanding any other rights the Lender may have under applicable law and hereunder, the Credit Parties agree that upon the occurrence and during the continuance of an Event of Default, the Lender shall have the right to apply (including by way of set-off) any property of any Credit Party held by the Lender or thereafter coming into the Lender's possession to reduce the Obligations.

## 7.     MISCELLANEOUS

7.1     <u>Amendments, Etc</u>.  No amendment or waiver of any provision of any Credit Document, nor consent to any departure by the Borrower therefrom, shall in any event be effective unless the same shall be in writing and signed by the Lender, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

7.2     <u>Headings</u>.  The headings and table of content are included in this Agreement for convenience only and shall not in any way affect the meaning of or interpretation of this Agreement; <u>provided</u>, that any reference herein to an Exhibit, Schedule, Article, Section, subsection or clause that is immediately followed by a heading written out in parenthesis shall be a reference to the Exhibit, Schedule, Article or Section having such heading or to a subsection or clause of an Article or Section having such heading, regardless of the number used to reference such Exhibit, Schedule, Article, Section, subsection or clause.

7.3 <u>Notices, Etc</u>.  All notices and other communications provided for hereunder shall be in writing (including telecopier, telegraphic, telex or cable communication) and mailed, telecopied, telegraphed, telexed, cabled or delivered, if to the Borrower, at its address at One Metrotech Center, Brooklyn, New York 11201, Attention:  Chief Financial Officer, and, if to the Lender, at its address at: One Broadway, 5th Floor, New York, NY 10004, Telephone: (212) 825-0550, Facsimile: (212) 825-2038, Attention: Loan Administration/Transcare, or, as to each party, at such other address as shall be designated by such party in a written notice to the other party.  All such notices and communications shall, when mailed, telecopied, telegraphed, telexed or cabled, be effective when deposited in the mails, telecopied, delivered to the telegraph company, confirmed by telex answerback or redelivered to the cable company, respectively, except

- 19 -

Confidential

PP-TRBK0047351

that notices to the Lender pursuant to the provisions of Article 2 (Amount and Term of the Loan) shall not be effective until received by the Lender.

7.4     No Waiver; Remedies.  No failure on the part of the Lender to exercise, and no delay in exercising, any right hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any such right preclude any other or further exercise thereof or the exercise of any other right.  The remedies herein provided are cumulative and not exclusive of any remedies provided by law.

7.5     Costs, Expenses and Taxes.  The Borrower agrees to pay on demand all reasonable costs and expenses in connection with the preparation, execution, delivery, administration, modification and amendment of any Credit Document, including, without limitation, the reasonable fees and out-of-pocket expenses of counsel for the Lender with respect thereto and with respect to advising the Lender as to its rights and responsibilities under this Agreement.  The Borrower further agrees to pay after an Event of Default on demand all costs and expenses, if any (including fees and expenses of counsel), (i) in connection with the enforcement (whether through negotiations, legal proceedings or otherwise) of any Credit Document, including reasonable counsel fees and expenses in connection with the enforcement of rights under this Section 7.5, (ii) in connection with any refinancing or restructuring of the credit arrangements provided under this Agreement in the nature of a "work out" or in any insolvency or bankruptcy proceeding and (iii) in commencing, defending or intervening in any litigation or in filing a petition, complaint, motion or other pleadings in any legal proceeding relating to the Obligations, the Collateral, the Borrower and related to or arising out of the transactions contemplated hereby or by any of the other Credit Documents.  In addition, the Borrower shall pay any and all stamp and other taxes (other than those taxes excluded pursuant to Section 2.10 (Taxes)) payable or determined to be payable in connection with the execution and delivery of any Credit Document to be delivered hereunder and agrees to save the Lender harmless from and against any and all liabilities with respect to or resulting from any delay in paying or omission to pay such taxes.

7.6     Right of Set-off.  Upon the occurrence and during the continuance of an Event of Default, the Lender is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other indebtedness at any time owing by the Lender to or for the credit or the account of the Borrower or the Guarantor against any and all of the Obligations of the Borrower or the Guarantor now or hereafter existing, whether or not the Lender shall have made any demand under any Credit Document and although such Obligations may be unmatured.  The Lender agrees promptly to notify the Borrower and the Guarantor after any such set-off and application, provided that the failure to give such notice shall not affect the validity of such set-off and application.  The rights of the Lender under this Section 7.6 are in addition to other rights and remedies (including other rights of set-off) which the Lender may have.

7.7     Binding Effect; Assignment.  This Agreement shall be binding upon and inure to the benefit of the Borrower and the Lender and their respective successors and assigns, except that the Borrower shall not have the right to assign its rights hereunder or any interest herein without the prior written consent of the Lender.  The Lender may assign all or a portion of its rights and obligations under this Agreement upon notice to the Borrower and the Lender may at

- 20 -

Confidential

any time create a security interest in all or any portion of its rights under this Agreement (including, without limitation, Obligations owing to it) in favor of any bank member of the Federal Reserve Board of the United States of America in accordance with Regulation A thereof.

7.8     Execution in Counterparts. This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement. One or more counterparts of this Agreement (or portions hereof) may be delivered via telecopier, with the intention that they shall have the same effect as an original counterpart hereof (or such portions hereof). All signature pages need not be on the same counterpart.

7.9     Entire Agreement; Severability of Provisions. The Credit Documents contain the entire agreement of the parties hereto and supersede all prior agreements and understandings, oral and otherwise, among the parties hereto with respect to the matters contained in the Credit Documents. If any provision of this Agreement, or the application thereof to any Person or circumstance, is invalid or unenforceable or contravenes any law, regulation or document applicable to such Person, such provision or application shall be deemed ineffective ab initio, but the remainder of this Agreement and the application of such provision to other Persons or circumstances shall not be affected thereby, and the provisions of this Agreement shall be severable in any such instances.

7.10     Independence of Representations and Warranties. The parties hereby agree that each representation, warranty and covenant contained herein shall have independent significance. If any party hereto has breached any representation, warranty or covenant contained herein, the fact that there exists another representation, warranty or covenant relating to a similar subject matter (regardless of the level of specificity) that such party has not breached shall not detract from or mitigate the fact that such party is in breach of the first representation, warranty or covenant.

7.11     Indemnification. The Borrower agrees to indemnify the Lender and its Affiliates and each of their respective stockholders, directors, officers, agents, attorneys and employees, and the successors and assigns of the foregoing (collectively, "Indemnitees"), from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses, disbursements of any kind or nature whatsoever which may be imposed on, incurred by or asserted against any Indemnitee in any way relating to or arising out of the Credit Documents, any related transactions (whether actual or proposed) or any action taken or omitted by the Lender under the Credit Documents, including any claim, suit, action or cause of action now or hereafter asserted by any broker or any Person acting in a similar capacity; provided that the Borrower shall not be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from the gross negligence or willful misconduct of such Indemnitee as finally determined by a court of competent jurisdiction. The foregoing agreements shall survive the making and repayment of the Loan.

7.12     Governing Law. This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York.

- 21 -

PP-TRBK0047353

     7.13   <u>Consent to Jurisdiction</u>. The Borrower represents that it has no immunity with respect to any action or proceeding brought in connection with this Agreement or the other Credit Documents and agrees that any legal or equitable action or proceeding arising out of, in connection with, or related to any Credit Document to which it is a party or the enforcement thereof may be brought in any Federal or State court of competent jurisdiction sitting in the City of New York, Borough of Manhattan and, by execution and delivery of this Agreement, it accepts for itself and its property, generally and unconditionally, the exclusive jurisdiction of the aforesaid courts and any related appellate court, irrevocably agrees to be bound by any judgment rendered thereby in any legal or equitable action or proceeding arising out of, in connection with, or related to any Credit Document to which it is a party or the enforcement thereof. The Borrower hereby irrevocably waives any objection it may now or hereafter have as to the venue of any such action or proceeding brought in such a court or that such court is an inconvenient forum. The Borrower consents to the service of process out of any of the aforementioned courts in any such action or proceeding by mailing of copies thereof by registered mail, postage prepaid, such service to become effective three (3) Business Days after such mailing. Nothing herein shall affect the Lender's right to serve process in any other manner prescribed by law or the right to bring legal or equitable actions or proceedings in other competent jurisdictions. Any judicial proceeding by the Borrower against the Lender involving, directly or indirectly, any matter in any way arising out of, related to or connected with any Credit Document shall be brought only in a court sitting in the City of New York, Borough of Manhattan. EACH OF BORROWER AND THE LENDER HEREBY WAIVES TRIAL BY JURY IN ANY JUDICIAL PROCEEDING BROUGHT BY THE BORROWER OR THE LENDER INVOLVING, DIRECTLY OR INDIRECTLY, ANY MATTER IN ANY WAY ARISING OUT OF, RELATED TO OR CONNECTED WITH ANY CREDIT DOCUMENT OR THE TRANSACTIONS CONTEMPLATED THEREBY.

[Signature page to follow]

- 22 -

Confidential

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first above written.

TRANSCARE CORPORATION,
as Borrower

By:_____
    Name:
    Title:

ARK II CLO 2001-1, LTD.,
as Lender

By:_____
    Name:
    Title:

TC AMBULANCE CORPORATION
TC AMBULANCE GROUP, INC.
TC AMBULANCE NORTH, INC.
TC BILLING AND SERVICES CORP.
TC HUDSON VALLEY AMBULANCE CORP.
TCBA AMBULANCE, INC.
TRANSCARE HARFORD COUNTY, INC.
TRANSCARE MANAGEMENT SERVICES, INC.
TRANSCARE MARYLAND, INC.
TRANSCARE ML, INC.
TRANSCARE NEW YORK, INC.
TRANSCARE PENNSYLVANIA, INC.
TRANSCARE WESTCHESTER, INC.,
as Guarantors

By: _____
Name:
Title:

- 23 -

Confidential

CREDIT AGREEMENT
TRANSCARE CORPORATION

EXHIBIT A

FORM OF BORROWING CERTIFICATE

ARK II CLO 2001-1, LTD.,
as Lender
One Broadway, 5th Floor
New York, NY 10004
Attn: Loan Administration/Transcare

_____ __, 2016

Ladies and Gentlemen:

Reference is made to the Credit Agreement, dated as of January 15, 2016(as modified to the date hereof, the "Credit Agreement"), among the undersigned, as Borrower, the affiliates thereof from time to time party thereto as Guarantors, and ARK II CLO 2001-1, LTD., as Lender. Capitalized terms used herein but not defined herein are used as defined in the Credit Agreement.

Pursuant to Sections 2.5(b) of the Credit Agreement, the undersigned hereby requests that a Loan in the principal amount of $_____] be made on        , 20    (the "Borrowing Date"). The undersigned understands that this request is irrevocable and binding on us and obligates the Borrower to accept the requested Loan on such Borrowing Date.

The undersigned hereby certifies as follows: (a) prior to giving effect to the Loans requested hereby, the aggregate outstanding principal amount of the Loans on and as of the Borrowing Date is        ; (b) the undersigned shall use the proceeds of the Loans requested hereby strictly in accordance with each of the terms and conditions of the Credit Agreement (including, without limitation, Section 2.2 of the Credit Agreement); (c) each of the representations, warranties and covenants contained in the Credit Agreement and/or in any other Credit Document (i) are true, correct and complied with on and as of the date of this borrowing request and (ii) shall be true, correct and complied with on and as of the Borrowing Date; (d) all conditions precedent under the Credit Agreement for a Borrowing have been satisfied in full; (e) as of the date of this borrowing request, no event has occurred or is continuing or would result from the consummation of the applicable Borrowing that would constitute a Default or Event of Default; and (f) as of the Borrowing Date, no event shall have occurred and be continuing or would result from the consummation of the applicable Borrowing that would constitute a Default or Event of Default.

Very truly yours,

TRANSCARE CORPORATION

By:   _____
Name:

- 24 -

Confidential

PP-TRBK0047356

A4016

## INTERCREDITOR AGREEMENT

**THIS INTERCREDITOR AGREEMENT** (**"Intercreditor Agreement"**), dated as of January 15, 2016  is by and among ARK II CLO 2001-1, LTD., serving in its capacity as lender pursuant to the Ark Facility Agreement (as hereinafter defined) (**"Ark Facility Lender"** as hereinafter further defined) and **PATRIARCH PARTNERS AGENCY SERVICES, LLC**, in its capacity as agent (in such capacity, **"Working Capital Agent"** as hereinafter further defined) pursuant to the Working Capital Agreement (as hereinafter defined) acting for and on behalf of the Working Capital Creditors (as hereinafter defined).

## W I T N E S S E T H:

WHEREAS, Working Capital Agent and the Working Capital Lenders have made certain advances to Transcare Corporation (the **"Borrower"**) under the Working Capital Agreement, secured by certain assets and properties of Borrower, guaranteed by various guarantors (the **"Working Capital Guarantors"**) and secured by certain of the assets and properties of Working Capital Guarantors;

WHEREAS, Ark Facility Lender has made and may hereafter make Ark Facility Loans to the Borrower secured by certain of the assets and properties of Ark Facility Borrowers guaranteed by various guarantors (the "**Ark Facility Guarantors**" together with the Borrower and the Working Capital Guarantors, the **"Debtors"**);

WHEREAS, Ark Facility Lender and Working Capital Agent desire to enter into this Intercreditor Agreement to (i) confirm the relative priority of the security interests of Ark Facility Lender and the Working Capital Agent in the assets and properties of Debtors, and (ii) provide for the orderly sharing among them, in accordance with such priorities, of the proceeds of such assets and properties upon any foreclosure or enforcement thereon, or other disposition thereof;

NOW THEREFORE, in consideration of the mutual benefits accruing to Ark Facility Lender, Working Capital Agent and Working Capital Creditors hereunder and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto do hereby agree as follows:

1.    DEFINITIONS

As used above and in this Intercreditor Agreement, the following terms shall have the meanings ascribed to them below:

**"Account Debtor"** shall mean any Person who is obligated on an Account, chattel paper or a general intangible.

**"Affiliates"** or **"affiliate"** shall have the meaning given in the Working Capital Facility Agreement (as in effect on the date hereof or as the same may be modified with the consent of Ark Facility Lender).

**"Agreements"** shall mean, collectively, the Ark Facility Documents and the Working Capital Documents.

Confidential

PP-TRBK0047357

"**Ark Facility Agreement**" shall mean the Credit Agreement, dated of even date herewith, by and between Ark Facility Lender and Borrower, as the same now exists or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced.

"**Ark Facility Documents**" shall mean the "Credit Documents" under and as defined under the Ark Facility Agreement on the date hereof, as the same may be modified from time to time.

"**Ark Facility Lenders**" shall mean any "Lender" under and as defined under the Ark Facility Agreement on the date hereof, as the same may be modified from time to time.

"**Ark Facility Obligations**" shall mean any and all "Obligations" under and as defined under the Ark Facility Agreement on the date hereof, as the same may be modified from time to time.

"**Ark Facility Priority Collateral**" shall mean, in each case whether now owned or hereafter acquired all "Collateral" under and as defined under the "Security Agreement" (as defined in Ark Facility Agreement on the date hereof) on the date hereof, as the same may be modified from time to time.

"**Business Day**" shall have the meaning given in the Ark Facility Agreement (as in effect on the date hereof or as the same may be modified with the consent of Ark Facility Lender and Working Capital Agent).

"**Capital Stock**" shall mean, with respect to any Person, any and all shares, interests, participations or other equivalents (however designated) of such Person's capital stock or partnership, limited liability company or other equity interests at any time outstanding, and any and all rights, warrants or options exchangeable for or convertible into such capital stock or other interests (but excluding any debt security that is exchangeable for or convertible into such capital stock).

"**Collateral**" shall mean, collectively, the Ark Facility Priority Collateral and the Working Capital Priority Collateral.

"**Creditors**" shall mean, collectively, Ark Facility Creditors and Working Capital Creditors; each sometimes being referred to herein individually as a "**Creditor**".

"**Default**" shall mean any "Default" under and as defined under either the Ark Facility Agreement or the Working Capital Agreement, each as defined on the date hereof with such changes acceptable to both the Working Capital Agent and the Ark Facility Lender.

"**Event of Default**" shall mean any "Event of Default" under and as defined under either the Ark Facility Agreement or the Working Capital Agreement, each as defined on the date hereof with such changes acceptable to both the Working Capital Agent and the Ark Facility Lender.

"**Insolvency Proceeding**" shall mean, as to any Debtor, any of the following, occurring after the date hereof: (a) any case or proceeding with respect to such Debtor under the United States Bankruptcy Code, or any other Federal, State or local bankruptcy, insolvency, reorganization or other law affecting creditors' rights generally or any other or similar

2

PP-TRBK0047358

proceedings of any other jurisdiction or otherwise seeking any stay, reorganization, arrangement, liquidation, dissolution, composition or readjustment of the obligations and indebtedness of such Debtor or (b) any proceeding seeking the appointment of any receiver, interim receiver, administrative receiver, receiver and manager, examiner, judicial custodian, trustee, liquidator, official manager, administrator or similar official for any Debtor or any material part of its properties or (c) any proceedings for liquidation, dissolution or other winding up of the business of such Debtor or (d) sale of all or substantially all of the assets or Capital Stock of such Debtor or (e) any assignment for the benefit of creditors or any marshaling of assets of such Debtor.

"**Lien**" shall mean any mortgage, deed of trust, pledge, hypothecation, assignment, deposit arrangement, security interest, encumbrance (including, but not limited to, easements, rights of way and the like), lien (statutory or other), security agreement or transfer intended as security, including, without limitation, any conditional sale or other title retention agreement, the interest of a lessor under a capital lease or any financing lease having substantially the same economic effect as any of the foregoing.

"**Lien Enforcement Action**" shall mean (a) any action by any Creditor to foreclose on or enforce the Lien of such Person in all or a material portion of the Collateral, (b) any action or application by any Creditor to take possession of, sell or otherwise realize (judicially or non-judicially) upon all or any material portion of the Collateral (including, without limitation, by setoff or notification of Account Debtors), or (c) the commencement by any Creditor of any legal proceedings against or with respect to all or any material portion of the Collateral to facilitate the actions described in **(a) and (b)** above.

"**Payment in Full**" or "**payment in full**" shall mean payment in full, including all interest accrued or accruing (or which would, absent the commencement of an Insolvency Proceeding, accrue) after the commencement of an Insolvency Proceeding in accordance with and at the rate specified in the applicable agreement whether or not the claim for such interest is allowed as a claim in such Insolvency Proceeding.  To the extent any payment is declared to be fraudulent or preferential in any respect, set aside or required to be paid to a debtor in possession, trustee, receiver or similar Person, then the obligation or part thereof originally intended to be satisfied shall be deemed to be reinstated and outstanding as if such payment had not occurred.

"**Person**" or "**person**" shall mean any individual, sole proprietorship, partnership, corporation (including, without limitation, any corporation which elects subchapter S status under the Internal Revenue Code of 1986, as amended), limited liability company, limited liability partnership, business trust, unincorporated association, joint stock company, trust, joint venture, or other entity or any government or any agency or instrumentality or political subdivision thereof.

"**Subsidiary**" shall have the meaning given in the Ark Facility Agreement (as in effect on the date hereof or as the same may be modified with the consent of Ark Facility Lender and Working Capital Agent).

"**Working Capital Agent**" shall mean Patriarch Partners Agency Services, LLC, a Delaware limited liability company, in its capacity as agent pursuant to the Working Capital Agreement acting for the benefit and on behalf of Working Capital Lenders, and its successors and

3

PP-TRBK0047359

assigns (and including, without limitation, any successor, assignee or additional person at any time acting as agent for the benefit of or on behalf of it or Working Capital Lenders).

"**Working Capital Agreement**" shall mean the Credit Agreement dated as of August 4, 2003, by and among the Borrower, Working Capital Guarantors, Working Capital Agent and Working Capital Lenders, as the same may be amended, modified, supplemented, extended, renewed, restated or replaced.

"**Working Capital Documents**" shall mean the "Loan Documents" under and as defined under the Working Capital Agreement on the date hereof, as the same may be modified with the consent of the Working Capital Agent.

"**Working Capital Lenders**" shall mean, collectively, the "Lenders" under and as defined under the Working Capital Agreement on the date hereof, as the same may be modified with the consent of the Working Capital Agent.

"**Working Capital Obligations**" shall mean any and all obligations under the Working Capital Agreement on the date hereof, as the same may be modified with the consent of the Working Capital Agent.

"**Working Capital Priority Collateral**" shall mean all assets and properties of Debtors other than the Ark Facility Priority Collateral.

1.1     All terms defined in the Uniform Commercial Code as in effect in the State of New York, unless otherwise defined herein shall have the meanings set forth therein. All references to any term in the plural shall include the singular and all references to any term in the singular shall include the plural. All references to the term "including" shall be deemed to mean "including, without limitation".

2.     SECURITY INTERESTS; PRIORITIES; REMEDIES

2.1     Acknowledgment of Liens.

(a)     Ark Facility Lender hereby acknowledges that Working Capital Agent, acting for and on behalf of itself and Working Capital Creditors, has been granted Liens upon all of the Collateral pursuant to the Working Capital Documents to secure the Working Capital Obligations.

(b)     Working Capital Agent, on behalf of itself and each Working Capital Creditor, hereby acknowledges that Ark Facility Lender has been granted Liens upon all of the Collateral pursuant to the Ark Facility Documents to secure the Ark Facility Obligations.

2.2     Priority of Liens. Notwithstanding the order or time of attachment, or the order, time or manner of perfection, or the order or time of filing or recordation of any document or instrument, or other method of perfecting a security interest in favor of Ark Facility Lender and Working Capital Agent in any Collateral, and notwithstanding any conflicting terms or conditions which may be contained in any of the Agreements, the Liens upon the Ark Facility Priority Collateral of the Ark Facility Lender have and shall have priority over the Liens upon the Ark Facility Priority Collateral of Working Capital Agent and Working Capital Creditors and such Liens of Working Capital Agent

4

and Working Capital Creditors in the Ark Facility Priority Collateral are and shall be, in all respects, subject and subordinate to the Liens of Ark Facility Lender in the Ark Facility Priority Collateral.

        (a)    <u>Payments</u>. The proceeds of any Collateral shall be in the following order of priorities:

        (i)    <u>first</u>, to the payment in full in immediately available funds of the expenses of the collection and enforcement of the Ark Facility Obligations and such sale, disposition or other realization, including all expenses, liabilities and advances incurred or made by Ark Facility Lender, or any amounts paid by or on behalf of Ark Facility Lender, in connection therewith;

        (ii)    <u>second</u>, to the payment in full in immediately available funds of the expenses of the collection and enforcement of the Working Capital Obligations and such sale, disposition or other realization, including all expenses, liabilities and advances incurred or made by Working Capital Agent, or any amounts paid by or on behalf of Working Capital Agent, in connection therewith;

        (iii)    <u>third</u>, to the payment in full in immediately available funds of all of the Ark Facility Obligations in whatever manner and order Ark Facility Lender chooses in accordance with the provisions of the Ark Facility Documents and applicable law; and

        (iv)    <u>fourth</u>, to the payment in full in immediately available funds of all of the Working Capital Obligations in whatever manner and order Working Capital Agent chooses in accordance with the provisions of the Working Capital Documents and applicable law.

    2.3    Proceeds of business interruption insurance shall be applied in accordance with the lien priorities in **Section 2.3(a)** hereof.

    2.4    <u>Priorities Unaffected by Action or Inaction</u>. The Lien priorities provided in **Section 2.2** hereof shall not be altered or otherwise affected by any amendment, modification, supplement, extension, renewal, restatement, replacement or refinancing of either the Ark Facility Obligations or the Working Capital Obligations, nor by any action or inaction which any Creditor may take or fail to take in respect of the Collateral.

    2.5    <u>Rights of Third Parties; No Contest of Lien</u>. Each of Ark Facility Lender and Working Capital Agent shall be solely responsible for perfecting and maintaining the perfection of its Lien in and to each item constituting the Collateral in which Ark Facility Lender and Working Capital Agent, as the case may be, has been granted a Lien. The foregoing provisions of this Intercreditor Agreement are intended solely to govern the respective Lien priorities as between Ark Facility Lender, on the one hand, and Working Capital Agent and Working Capital Lenders, on the other, and shall not impose on any Creditor any obligations in respect of the disposition of proceeds of foreclosure or enforcement on any Collateral which would conflict with prior perfected claims therein in favor of any other person or any order or decree of any court or other governmental authority or any applicable law. Ark Facility Lender agrees that it will not contest the validity, perfection, priority or enforceability of the Liens upon the Collateral of Working Capital Agent, and Working Capital Agent agrees that it and Working Capital Creditors will not contest the validity, perfection, priority or enforceability of the Liens upon the Collateral of Ark Facility Lender and that, as between Ark Facility Lender, on the one hand, and the Working Capital Agent and Working Capital Lenders, on the other, the terms of this Intercreditor Agreement shall govern even if part or

5

PP-TRBK0047361

all of the Ark Facility Obligations or the Working Capital Obligations or the Liens securing payment and performance thereof are avoided, disallowed, set aside or otherwise invalidated in any judicial proceeding or otherwise, except that (a) if the lack of, or delay in, perfection, or the invalidity of, any Lien (or purported Lien) of the Ark Facility Lender or Working Capital Agent (as the case may be) having, by the terms hereof other than this **clause (a)**, the senior Lien (or purported Lien) upon any item of Collateral, because of the priorities established by **Section 2.2**, entitle any other person (including a trustee in bankruptcy or other insolvency official) to priority over the Liens of the other party on such item of Collateral, or a right to payment from the proceeds of such item of Collateral, prior to the rights of the Ark Facility Lender or Working Capital Agent (as the case may be) with the junior Lien on such Collateral to payment from such proceeds, then the priorities with respect to such item of Collateral set forth in **Sections 2.2, 2.3 and 2.4** as to the party with the junior Lien shall not be deemed to apply to such item and (b) to the extent that the lack of, or delay in, perfection, or the invalidity of, any Lien (or purported Lien) of the party having, by the terms hereof other than this **clause (b)**, the senior Lien (or purported Lien) upon any item of Collateral would, because of the priorities established by **Section 2.2**, and the terms of **Sections 2.2 and 2.3**, result in the party with the junior Lien on such item of Collateral under the terms hereof being required (but for this **clause (b)**) to pay over to the party having the senior Lien (or purported Lien) proceeds of such item received or to be received by such party with the junior Lien, and the debt owing to the party with the junior Lien being deemed to have been repaid with such proceeds so that the party with the junior Lien on such item of Collateral would not receive the payment from the proceeds of the Collateral subject to its senior Lien that it would otherwise be entitled to, the priorities as to the Collateral set forth in **Section 2.2** as to the party with the junior Lien therein (and the terms of **Sections 2.3 and 2.4**), shall not be deemed to apply to such item.

2.6   Access to Books and Records.

(a)    In the event that Ark Facility Lender shall, in the exercise of its enforcement rights under the Ark Facility Documents, receive possession or control of any books and records of any Debtor which contain information identifying or pertaining to any of the property of any Debtor in which the Working Capital Agent has been granted a Lien, it shall notify Working Capital Agent that it has received such books and records and shall, as promptly as practicable thereafter, make available to Working Capital Agent such books and records for inspection and duplication.

(b)    In the event that Working Capital Agent shall, in the exercise of its enforcement rights under the Working Capital Documents, receive possession or control of any books and records of any Debtor which contain information identifying or pertaining to any of the property of any Debtor in which the Ark Facility Lender has been granted a Lien, it shall notify Ark Facility Lender that it has received such books and records and shall, as promptly as practicable thereafter, make available to Ark Facility Lender such books and records for inspection and duplication.

2.7   Right to Enforce Agreements.  Subject to the terms and conditions set forth in this Intercreditor Agreement, (a) Ark Facility Lender shall have the exclusive right to manage, perform and enforce the terms of the Ark Facility Documents with respect to the Ark Facility Priority Collateral, to exercise and enforce all privileges and rights thereunder with respect to the Ark Facility Priority Collateral according to its discretion and the exercise of its business judgment, including, without limitation, the exclusive right to take or retake control or possession of such Collateral and to hold, prepare for sale, process, sell, lease, dispose of, or liquidate such Collateral or consent to the sale, transfer or other disposition thereof by the Debtors in accordance with **Section 2.8** hereof, and

6

(b) Working Capital Agent and Working Capital Lenders shall have the exclusive right to manage, perform and enforce the terms of the Working Capital Documents with respect to the Working Capital Priority Collateral, to exercise and enforce all privileges and rights thereunder with respect to the Working Capital Priority Collateral according to their discretion and the exercise of their business judgment, including, without limitation, the exclusive right to take or retake control or possession of such Collateral and to hold, prepare for sale, process, sell, lease, dispose of, or liquidate such Collateral or consent to the sale, transfer or other disposition thereof by the Debtors in accordance with **Section 2.8** hereof. Nothing contained in **Section 2.4** hereof shall restrict the rights of any Creditor under this **Section 2.7**.

2.8    Sale and Release of Collateral.

(a)    Notwithstanding anything to the contrary contained in any of the Agreements, only the party with the senior Lien in the Collateral shall have the right to restrict or permit, or approve or disapprove, the sale, transfer or other disposition of such Collateral. The party with the junior Lien on any Collateral shall: (i) be deemed to have automatically and without further action released and terminated any Liens it may have on such Collateral to the extent such Collateral is sold or otherwise disposed of either by the party with the senior Lien on such Collateral, any agent of such party, or any Debtor with the consent of such party; provided, that, the Liens of the party with such senior Lien on the Collateral so sold or disposed of are released at the same time, (ii) be deemed to have authorized the party with the senior Lien on such Collateral to file UCC amendments and terminations covering the Collateral so sold or otherwise disposed of with respect to the UCC financing statements between any Debtor and the party with the junior Lien thereon to evidence such release and termination, (iii) promptly upon the request of the party with the senior Lien thereon, execute and deliver such other release documents and confirmations of the authorization to file UCC amendments and terminations provided for herein, in each case as the party with the senior Lien thereon may require in connection with such sale or other disposition by such party, such party's agents or any Debtor with the consent of such party to evidence and effectuate such termination and release; provided, that, any such release or UCC amendment or termination by or on behalf of the party with the junior Lien thereon shall not extend to or otherwise affect any of the rights, if any, of such party with the junior Lien to the proceeds from any such sale or other disposition of Collateral upon the payment and satisfaction in full of the Ark Facility Obligations or the Working Capital Obligations, as the case may be, whichever is secured by the senior Lien on such Collateral and (iv) be deemed to have consented under the Agreements of the party with the junior Lien thereon and the Creditors for whom such party is acting to such sale or other disposition. Nothing contained in **Section 2.4** hereof shall restrict the rights of any Creditor under this **Section 2.8**.

(b)    Until the Payment in Full of the Ark Facility Obligations or the Working Capital Obligations, as applicable, owing to the party with the senior Lien in the Collateral, the party with the junior Lien in the Collateral agrees that, in the event of any Insolvency Proceeding, the party with the junior Lien in the Collateral will not contest, object or oppose (or support any Person in objecting or opposing) a motion or application for any sale, lease, license, exchange, transfer or other disposition of any Collateral free and clear of the Liens of or for the benefit of party with the junior Lien in the Collateral or other claims under Section 363, 365 or 1129 of the United States Bankruptcy Code, or other substantially similar legislation or court order, (and shall not object to any bid procedures or related motions with respect thereto approved by the party with the senior Lien on the Collateral), and shall be deemed to have consented to any such any sale, lease, license, exchange, transfer or other disposition of any Collateral under Section 363(f) of the United States Bankruptcy Code, or other substantially similar legislation or court order, in each case that has been consented to

7

by the party with the senior Lien on the Collateral; provided, that, the proceeds of such sale, transfer or other disposition of any Collateral to be applied to the Ark Facility Obligations or the Working Capital Obligations in accordance with **Section 2.3**.

(c)     In the event that proceeds of Collateral are received in connection with a the sale, transfer or other disposition of Collateral that directly or indirectly involves both of some or all of the Ark Facility Priority Collateral and some or all of the Working Capital Priority Collateral, the Ark Facility Lender and the Working Capital Agent shall use commercially reasonable efforts in good faith to allocate the proceeds received in connection with such sale, transfer or other disposition of such Collateral to the Ark Facility Priority Collateral and the Working Capital Priority Collateral. If the Ark Facility Lender and Working Capital Agent are unable to agree on such allocation within ten (10) Business Days (or such other period of time as Ark Facility Lender and Working Capital Agent agree) of the consummation of such sale, transfer or other disposition, the portion of such proceeds that shall be allocated as proceeds of Ark Facility Priority Collateral for purposes of this Intercreditor Agreement shall be an amount equal to the sum of the book value of the Accounts and Ark included in the Collateral subject to such sale, transfer or other disposition (determined at the time of such sale, transfer or other disposition) with the balance of the proceeds to be allocated to the Working Capital Priority Collateral.

2.9     Limitation on Remedies.

(a)     The party with a junior Lien on any Collateral and the Creditors for whom such party is acting will not, directly or indirectly, (i) exercise any of its or their rights or remedies upon a default or event of default by any Debtor under its Agreements against such Collateral, (ii) seek to foreclose, enforce or realize upon (judicially or non-judicially) its junior Lien on such Collateral or assert any claims or interest therein (including, without limitation, by setoff or notification of Account Debtors), or (iii) subject to the terms and conditions contained herein, take any other action that would interfere in any material respect with the rights of the party with the senior Lien in such Collateral.

(b)     Nothing contained in **Section 2.9(a)** shall be construed to in any way limit or impair the right of the party with the junior Lien on any Collateral or any Creditor for whom such party is acting to: (i) bid for and purchase any of such Collateral at any private or judicial foreclosure or enforcement upon such Collateral initiated by the party with the senior Lien on such Collateral, or (ii) send such notices of the existence of, or any evidence or confirmation of, the obligations owing to such party or Creditor or the Liens of such party in the Collateral to any court or governmental agency, or file or record any such notice or evidence, in each case to the extent necessary to create, prove, perfect or preserve the Liens of such party in the Collateral subject to its junior Lien or the obligations owing to it or such Creditors, or (iii) join (but not control) any foreclosure or other Lien Enforcement Action with respect to the Collateral subject to the junior Lien of such party initiated by the party with the senior Lien on such Collateral, so long it does not delay or interfere with the exercise by the party with the senior Lien on such Collateral of its rights with respect to such Collateral. Nothing contained in **Section 2.9(a)** shall be construed to in any way limit or impair the right of the party with the senior Lien on Collateral to take any action against, or with respect to, any of the Collateral subject to such senior Lien, including, but not limited to, seeking relief from any stay of proceedings, including the automatic stay under the United States Bankruptcy Code, or requesting adequate protection under the United States Bankruptcy Code (or any court-ordered Lien or interest of similar nature to adequate protection under the Bankruptcy Code), in each case, as to the Collateral subject to the senior Lien of such party.

8

2.10    Right to Cure.

(a)    Ark Facility Lender shall have the right, but not any obligation, to cure any event of default, or act, condition or event which with notice or passage of time, or both, would constitute an event of default, under the Working Capital Documents for the account of Debtors. In no event shall Ark Facility Lender, by virtue of the payment of amounts or performance of any obligation required to be paid or performed by any Debtor be deemed to have assumed any obligation of any Debtor to Working Capital Agent, Working Capital Lenders or any other person.

(b)    Working Capital Agent and Working Capital Lenders shall have the right, but not any obligation, to cure any event of default, or act, condition or event which with notice or passage of time, or both, would constitute an event of default, under the Ark Facility Documents for the account of Debtors. In no event shall Working Capital Agent or any Working Capital Lender, by virtue of the payment of amounts or performance of any obligation required to be paid or performed by any Debtor be deemed to have assumed any obligation of any Debtor to Ark Facility Lender or any other person.

2.11    Certain Loans.  If any Creditor should honor a request by any Debtor for a loan, advance or other financial accommodation, whether or not such Creditor, has knowledge that the honoring of such request would result in an event of default, or act, condition or event which with notice or passage of time or both would constitute an event of default, under the Working Capital Documents, in no event shall such Creditor have any liability whatsoever to any other Creditor as a result of such breach, and without limiting the generality of the foregoing, no Creditor shall have any liability for tortious interference with contractual relations or for inducement by Creditor of any Debtor to breach of contract or otherwise.  Nothing contained in this **Section 2.11** (or **Section 3.11**, in relation to this **Section 2.11**) shall limit or waive any right that any Creditor has to enforce any of the provisions of the Working Capital Documents against any Debtor, subject to such limitations, waivers or restrictions that are otherwise imposed on such Creditor as provided for herein.

2.12    Physical Possession of Certain Collateral.  If (a) the Ark Facility Documents require that a certain type or item of Collateral be delivered to and/or held by the Ark Facility Lender and (b) the Working Capital Documents require that the same type or item of Collateral be delivered to and/or held by the Working Capital Agent or the Working Capital Lenders, then in such event such type or item of Collateral be delivered (i) to the Ark Facility Lender, if such type or item of Collateral is Ark Facility Priority Collateral, and (ii) to the Working Capital Agent, if such type or item of Collateral is Working Capital Priority Collateral.

3.    MISCELLANEOUS

3.1    Additional Representations.

(a)    Working Capital Agent, on behalf of itself and each Working Capital Creditor, severally, represents and warrants, to Ark Facility Lender that:

(i)    the execution, delivery and performance of this Intercreditor Agreement by Working Capital Agent is within its powers in its capacity as agent for Working Capital Creditors, has been duly authorized by Working Capital Creditors, and does not contravene any law, any provision of any of the Working Capital Documents or any agreement to which Working Capital Agent or any Working Capital Creditor is a party or by which it is bound;

9

Confidential

    (ii) Working Capital Agent and Working Capital Creditors have not been granted and do not have any Liens upon the assets and properties of any Debtor pursuant to the Working Capital Documents, <u>except</u> to the extent of the Liens granted by such Debtor to Working Capital Agent in its capacity as agent acting for and on behalf of Working Capital Creditors; and

    (iii) this Intercreditor Agreement constitutes the legal, valid and binding obligations of Working Capital Agent and Working Capital Creditors, enforceable in accordance with its terms and shall be binding on each of them.

   (b) Ark Facility Lender represents and warrants to Working Capital Agent and Working Capital Creditors that:

    (i) the execution, delivery and performance of this Intercreditor Agreement by Ark Facility Lender is within its powers in its capacity, has been duly authorized by all corporate action and does not contravene any law, any provision of any of the Ark Facility Documents or any agreement to which Ark Facility Lender is a party or by which it is bound;

    (ii) Ark Facility Lender has not been granted and do not have any Liens upon the assets and properties of any Debtor pursuant to the Ark Facility Documents, <u>except</u> to the extent of the Liens granted by such Debtor to Ark Facility Lender;

    (iii) this Intercreditor Agreement constitutes the legal, valid and binding obligations of Ark Facility Lender, enforceable in accordance with its terms and shall be binding on them.

  3.2 <u>Amendments</u>.  Any waiver, permit, consent or approval by any Creditor of or under any provision, condition or covenant to this Intercreditor Agreement must be in writing and shall be effective only to the extent it is set forth in writing and as to the specific facts or circumstances covered thereby.  Any amendment of this Intercreditor Agreement must be in writing and signed by Ark Facility Lender and Working Capital Agent.  Any waiver, permit, consent or approval of or under any provision of this Intercreditor Agreement, or any amendment hereto, in writing and signed only by Working Capital Agent shall constitute the valid and binding agreement upon all of the Working Capital Creditors, and Ark Facility Lender shall be entitled to rely thereon without any inquiry or diligence.

  3.3 <u>Successors and Assigns</u>.

   (a) This Intercreditor Agreement shall be binding upon each Creditor and its successors and assigns and shall inure to the benefit of each Creditor and its successors, participants and assigns.

   (b) To the extent provided in their respective Agreements, each Creditor reserves the right to grant participations in, or otherwise sell, assign, transfer or negotiate all or any part of, or any interest in, the Ark Facility Obligations or Working Capital Obligations, as the case may be, and the Collateral securing same.

   (c) In connection with any participation or other transfer or assignment, a Creditor (i) may, subject to its Agreements, disclose to such assignee, participant or other transferee or assignee all documents and information which such Creditor now or hereafter may have relating to

10

Debtors or the Collateral and (ii) shall disclose to such participant or other transferee or assignee the existence and terms and conditions of this Intercreditor Agreement. In the case of an assignment or transfer, the assignee or transferee acquiring any interest in the Working Capital Obligations or the Ark Facility Obligations, as the case may be, shall execute and deliver to each of Ark Facility Lender and Working Capital Agent a written acknowledgement of receipt of a copy of this Intercreditor Agreement and the written agreement by such person to be bound by the terms of this Intercreditor Agreement.

(d) In connection with any successor financing or replacement of the existing credit facility provided by Ark Facility Lender to Debtors, Working Capital Agent agrees to execute and deliver an agreement containing terms substantially identical to those contained herein in favor of any such successor or replacement lenders, and in connection with any successor financing or replacement of the existing credit facility provided by Working Capital Agent and Working Capital Lenders to Debtors, Ark Facility Lender agrees to execute and deliver an agreement containing terms substantially identical to those contained herein in favor of any such successor or replacement lenders.

3.4     Insolvency. This Intercreditor Agreement shall be applicable both before and after any Insolvency Proceeding by or against any Debtor and all converted or succeeding cases or proceedings in respect thereof, and all references herein to any Debtor shall be deemed to apply to a trustee, receiver or interim receiver for such Debtor or any Debtor as debtor-in-possession. The relative rights of Ark Facility Lender, on the one hand, and Working Capital Agent and Working Capital Creditors, on the other hand, to repayment of the Ark Facility Obligations and the Working Capital Obligations, respectively, and in or to any distributions from or in respect of any Debtor or any Collateral or proceeds of Collateral, shall continue after the filing of an Insolvency Proceeding on the same basis as prior to the date of the commencement of such Insolvency Proceeding, subject to any court order approving the financing of, or use of cash collateral by, any Debtor as debtor-in-possession.

3.5     Bankruptcy Financing. If any Debtor shall become subject to an Insolvency Proceeding and if Working Capital Agent or any Working Capital Lender agrees to permit the use of cash collateral or to provide debtor-in-possession financing to such Debtor under either Section 363 or Section 364 of the United States Bankruptcy Code or other applicable statute or court order, the Ark Facility Lender agrees as follows: (a) adequate notice to the Ark Facility Lender shall have been provided for such financing or use of cash collateral if the Ark Facility Lender receives notice two (2) Business Days' prior to the entry of the order approving such financing or use of cash collateral, and (b) no objection will be raised by the Ark Facility Lender to any such financing or use of cash collateral on the ground of a failure to provide "adequate protection" (or any court-ordered Lien or interest of a similar nature to "adequate protection") for the Liens of Ark Facility Lender.

3.6     Bailee for Perfection. Each of Ark Facility Lender and Working Capital Agent (and the Creditors for whom each thereof is acting) hereby appoints the other as bailee or as agent, as the case may be, for the purposes of perfecting its Liens in and on any of the Collateral (including, without limitation, any deposit account, investment account, securities account or similar account included in the Collateral that is subject to the "control" (as defined in the UCC) of such other party, such bailment and agency being intended, among other things, to satisfy the requirements of Sections 8-301(a)(2) and 9-313(c) of the UCC), and each of Ark Facility Lender and Working Capital Agent hereby accepts and acknowledges such appointment; provided, that, (a) no Creditor shall have any duty or liability to protect or preserve any rights pertaining to any of the Collateral and, except for

11

PP-TRBK0047367

gross negligence or willful misconduct as determined pursuant to a final non-appealable order of a court of competent jurisdiction, each Creditor hereby waives, and releases the other Creditors from, all claims and liabilities arising pursuant to the other's role as bailee with respect to the Collateral and (b) after the payment in full of the Ark Facility Obligations, promptly upon the request of Working Capital Agent, at the expense of Debtors (if reasonable and documented), Ark Facility Lender shall deliver any Collateral then in its possession, or take all reasonable actions to turn over control as to any Collateral for which it has control, as the case may be, to Working Capital Agent, except to the extent that either (i) Ark Facility Lender has retained or otherwise acquired such Collateral in satisfaction of all or any part of the Ark Facility Obligations, (ii) such Collateral has been sold or otherwise disposed of by Ark Facility Lender or any Debtor as provided herein or (iii) it may otherwise be required by applicable law or any order of any court or other governmental or regulatory authority. Each Debtor acknowledges and agrees to the delivery or transfer of control by Ark Facility Lender to Working Capital Agent of any such Collateral and waives and releases Ark Facility Lender from any liability as a result of such action.

3.7     Notices of Default, Acceleration and Enforcement.  Each of Ark Facility Lender and Working Capital Agent shall give the other written notice of: (a) sending any written notice to a Debtor of an event of default under its Agreements which has not been waived or cured; (b) any demand of payment of any of the Working Capital Obligations or the Ark Facility Obligations, as the case may be, and (c) any commencement of a foreclosure or other Lien Enforcement Action by Ark Facility Lender or Working Capital Agent, as the case may be, such Creditor or the Creditors for whom such party is acting against any Debtor or any of the Collateral, in each case concurrently with the sending of such notice to any Debtor; provided, that, except as expressly provided for herein, the failure of Ark Facility Lender or Working Capital Agent, as the case may be, to do so shall not create a cause of action against such Creditor or create any claim against it or effect the relative rights, duties or priorities established by this Intercreditor Agreement.  The failure by Ark Facility Lender or Working Capital Agent to send a copy of any such notice to the other shall not affect the validity of such notice as against any Debtor.  Each Debtor hereby authorizes and consents to each of Ark Facility Lender and Working Capital Agent sending to the other such notices or any other information with respect thereto.

3.8     Notices.  All notices, requests and demands to or upon the respective parties hereto shall be in writing and shall be deemed duly given, made or received: if delivered as set forth in the Working Capital Agreement or the Ark Facility Agreement on the date hereof. Either of Ark Facility Lender or Working Capital Agent may change the address(es) to which all notices, requests and other communications are to be sent by giving written notice of such address change to the other in conformity with this **Section 3.8**, but such change shall not be effective until notice of such change has been received by the other Creditor.

3.9     Counterparts.  This Intercreditor Agreement may be executed in any number of counterparts, each of which shall be an original, but all of which taken together shall constitute one and the same agreement.  In making proof of this Intercreditor Agreement it shall not be necessary to produce or account for more than one counterpart thereof signed by each of the parties hereto. Delivery of an executed counterpart of this Intercreditor Agreement by telefacsimile or other electronic method of transmission shall have the same force and effect as the delivery of an original executed counterpart of this Intercreditor Agreement.  Ark Facility Lender or Working Capital Agent, as the case may be, delivering an executed counterpart of this Intercreditor Agreement by telefacsimile or other electronic method of transmission shall also deliver an original executed

12

                                                          PP-TRBK0047368

**A4028**

counterpart, but the failure to do so shall not affect the validity, enforceability or binding effect of this Intercreditor Agreement.

3.10    Governing Law. The validity, interpretation and enforcement of this Intercreditor Agreement shall be governed by the internal laws of the State of New York but excluding any principles of conflict of laws or other rule of law that would cause the application of the law of any jurisdiction other than the laws of the State of New York.

3.11    Consent to Jurisdiction; Waiver of Jury Trial. EACH PARTY HERETO HEREBY SUBMITS TO THE NON EXCLUSIVE JURISDICTION OF THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK AND OF THE SUPREME COURT OF THE STATE OF NEW YORK (INCLUDING ITS APPELLATE DIVISION) FOR THE PURPOSES OF ALL LEGAL PROCEEDINGS ARISING OUT OF OR RELATING TO THIS INTERCREDITOR AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY. EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF THE VENUE OF ANY SUCH PROCEEDING BROUGHT IN SUCH A COURT AND ANY CLAIM THAT ANY SUCH PROCEEDING BROUGHT IN SUCH A COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM. EACH PARTY HERETO HEREBY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION ARISING UNDER THIS INTERCREDITOR AGREEMENT OR IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO IN RESPECT OF THIS INTERCREDITOR AGREEMENT, WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER IN CONTRACT, TORT, EQUITY OR OTHERWISE.

3.12    Complete Agreement. This written Intercreditor Agreement is intended by the parties as a final expression of their agreement and is intended as a complete statement of the terms and conditions of their agreement.

3.13    No Third Parties Benefitted. Except as expressly provided in **Section 3.3** hereof and consents which are deemed to have been given under **Section 2.9** hereof, this Intercreditor Agreement is solely for the benefit of Creditors and their respective successors, participants and assigns, and no other person shall have any right, benefit, priority or interest under, or because of the existence of, this Intercreditor Agreement.

3.14    Disclosures; Non-Reliance. Each Creditor has the means to, and shall in the future remain, fully informed as to the financial condition and other affairs of Debtors and no Creditor shall have any obligation or duty to disclose any such information to any other Creditor. Except as expressly set forth in this Intercreditor Agreement, the parties hereto have not otherwise made to each other nor do they hereby make to each other any warranties, express or implied, nor do they assume any liability to each other with respect to: (a) the enforceability, validity, value or collectability of any of the Working Capital Obligations or Ark Facility Obligations or any guarantee or security which may have been granted to any of them in connection therewith, (b) the title of any Debtor to or the right of any Debtor to transfer any of the Collateral, or (c) any other matter except as expressly set forth in this Intercreditor Agreement.

13

Confidential

3.15     Term. This Intercreditor Agreement is a continuing agreement and shall remain in full force and effect until the earlier of (a) the payment in full of all Ark Facility Obligations, or (b) the payment in full of all Working Capital Obligations.

3.16     Inconsistency. As between Ark Facility Lender and Working Capital Agent, to the extent any term or provision of this Intercreditor Agreement is inconsistent with any terms or provisions of any of the Agreements, such term or provision of this Intercreditor Agreement shall control to the extent necessary to give full effect to such term or provision contained in this Intercreditor Agreement.

3.17     Agent Fees and Expenses. Ark Facility Lender hereby agrees that fees and expenses for Ark Facility Lender's services shall be billed to the applicable Person in a manner consistent with the usual and customary historical practices between Ark Facility Lender and Working Capital Agent.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

14

Confidential

IN WITNESS WHEREOF, the parties have caused this Intercreditor Agreement to be duly executed as of the day and year first above written.

**ARK II CLO 2001-1, LTD.**, as Ark Facility Lender

By: _____

Name: _____

Title: _____

**PATRIARCH PARTNERS AGENCY SERVICES, LLC**, as Working Capital Agent

By: _____

Name: _____

Title: _____

Confidential

PP-TRBK0047371

A4031

## ACKNOWLEDGMENT

Each of the undersigned hereby acknowledges and agrees to the foregoing terms and provisions. By its signature below, each of the undersigned agrees that it will, together with its successors and assigns, be bound by the provisions hereof.

Each of the undersigned agrees that any Creditor holding Collateral does so as bailee (under the UCC) for each other Creditor which has a Lien on such Collateral and is hereby authorized to and may turn over to the other Creditor upon request therefor any such Collateral, after all obligations and indebtedness of each of the undersigned to the bailee Creditors have been fully paid and performed.

Each of the undersigned acknowledges and agrees that: (i) although it may sign this Intercreditor Agreement it is not a party hereto and does not and will not receive any right, benefit, priority or interest under or because of the existence of the foregoing Intercreditor Agreement (except for a consent which is deemed to have been given by any of Creditors under **Section 2.9**), and (ii) it will execute and deliver such additional documents and take such additional action as may be necessary or desirable in the opinion of either of Working Capital Agent or Ark Facility Lender to effectuate the provisions and purposes of the foregoing Intercreditor Agreement.

### TRANSCARE CORPORATION

By: _____
Name: _____
Title: _____

Confidential

Confidential

| | |
|---|---|
| **From:** | Peter Wolf |
| **Sent:** | Friday, February 12, 2016 12:52 PM |
| **To:** | Michael Greenberg |
| **Cc:** | Adam Katz |
| **Subject:** | RE: Transcare Direction Letters |
| **Attachments:** | Direction Letter-January 15-2016.pdf; Direction Letter-January 29-2016.pdf |

Gentlemen:
I can comfortably sign the direction letters for January 15th and January 29th (had to make a handwritten change on the one for the 29th after discussion with Michael). They are attached. I am in no way comfortable signing direction letters for December 8th, January 5th and January 7th. On those dates I had no authority to do so and there was a CEO here. I would ask that you guys please sort this out.
Thanks,
Pete

**From:** Michael Greenberg [mailto:Michael.Greenberg@PatriarchPartners.com]
**Sent:** Thursday, February 11, 2016 8:15 PM
**To:** Peter Wolf
**Cc:** Adam Katz
**Subject:** FW: Transcare Direction Letters

Peter,

Attached are the documents I mentioned.

Thank you,
Michael

Michael S. Greenberg
Patriarch Partners
One Broadway, 5th Floor
New York, NY 10004
Direct: 646-723-7657
Fax:  212-825-2038
Email: michael.greenberg@patriarchpartners.com
www.patriarchpartners.com

**From:** Arriann Mathurin
**Sent:** Thursday, February 11, 2016 7:13 PM
**To:** Michael Greenberg
**Cc:** Financial and Investment Law
**Subject:** FW: Transcare Direction Letters

Hey Michael,

Just following up on the attached direction letters.

1

**PX 203**

LaMonica v. Tilton, et al., 18-1021-smb

**A4034**

PP-TRBK0092127

Kind regards,

Arriann Z. Mathurin
Patriarch Partners, LLC
646-723-7653

---

**From:** Arriann Mathurin
**Sent:** Tuesday, February 02, 2016 5:37 PM
**To:** Michael Greenberg
**Cc:** Financial and Investment Law
**Subject:** Transcare Direction Letters

Hey Michael,

Attached, please find the Transcare direction letters that are pending execution by Transcare, thanks!

Kind regards,

Arriann Z. Mathurin
Legal Analyst
Patriarch Partners, LLC
One Broadway, 5th Fl.
New York, NY 10004

---

**TransCare Corporation Confidentiality Note** This E-mail message is intended to be received by persons entitled to receive the confidential information it may contain.  Please do not Read, Copy, Forward or Save this message unless you are the intended recipient.  If you have received this message in error, Please Forward it back to the Sender and Delete it completely from your computer system.

---

Checked: By Barracuda Spam and Virus Firewall

**A4035**

Confidential

# TRANSCARE CORPORATION

January 15, 2016

ARK II CLO 2001-1, LTD
1 Broadway, 5th Floor
New York, NY 10004
Attention: Loan Administration/ Transcare Corporation

      Re:      <u>Direction Letter for Payment of Certain Loan Proceeds</u>

Dear Sir or Madam:

      Reference is made to the Credit Agreement, dated as of January 15, 2016 (as modified to the date hereof, the "<u>Credit Agreement</u>"), among TRANSCARE CORPORATION, a Delaware corporation (the "<u>Borrower</u>" or "<u>you</u>"), the affiliates thereof from time to time party thereto as Guarantors, and Ark II CLO 2001-1, LTD (the "<u>Lender</u>"). Capitalized terms used herein but not defined herein are used as defined in the Credit Agreement.

      Anything else in the Credit Agreement to the contrary notwithstanding, the Borrower hereby directs the Secured Parties to disburse proceeds to the applicable accounts set forth on <u>Exhibit A</u> attached hereto.

      In further consideration for the execution of this letter by the Secured Parties party hereto and without limiting any rights or remedies any Secured Party may have, the Borrower hereby releases each Secured Party and each of their Related Parties (each a "<u>Releasee</u>" and, collectively, the "<u>Releasees</u>") from any and all Claims that the Borrower has or may have against any Releasee, whether or not relating to the Credit Agreement or any other legal relationship that exists or may exist between any Releasee and the Borrower. As used in this paragraph, (i) "<u>Claims</u>" means all liabilities, rights, demands, covenants, duties, obligations (including, without limitation, indebtedness, receivables and other contractual obligations), claims, actions and causes of actions, suits, disputes, judgments, damages, settlements, losses, debts, responsibilities, fines, penalties, sanctions, commissions and interest, disbursements, taxes, charges, interest, costs, fees, and expenses (including, without limitation, fees, charges and disbursements of financial, legal and other advisors, consultants and professionals and, if applicable, any value-added and other taxes and charges thereon), in each case of any kind or nature, whether joint or several, whether now existing or hereafter arising and however acquired and whether or not known, asserted, direct, contingent, liquidated, due, consequential, actual, punitive or treble, (ii) "<u>Related Party</u>" means, with respect to any person, any Affiliate of such person or of another Related Party of such person (excluding, in each case, (A) the Secured Parties and their Controlled Affiliates and (B) any other Portfolio Company) and such person's and such Affiliate's predecessors, successors, assigns, managers, members, partners, directors, officers, employees (regardless of whether seconded to a third party and including, without limitation, individuals with independent contractor or similar status), individual stockholders, agents, attorneys-in-fact, trustees, fiduciaries, representatives and advisors, (iii) "<u>Portfolio Company</u>" means any person and its Controlled Affiliates in which any Lender or any other Affiliated Investor has made any investment, whether through the purchase of debt or equity

**A4036**

Confidential

securities, loans or otherwise, (iv) "<u>Affiliated Investor</u>" means any person that is a collateralized debt obligation, collateralized loan obligation or any other investment pooling vehicle or other entity that (A) is created primarily to invest in equity or debt securities, loans and other investments, (B) does not operate any trade or business and (C) is administered, advised or managed by, or directly or indirectly under common administration, advice or management with, the Lender or any Affiliate of the Lender, (v) "<u>Controlled Affiliate</u>" means, with respect to any entity, any person directly or indirectly "controlled" (as defined below) by one or more of such entity and its other Controlled Affiliates, (vi) "<u>Affiliate</u>" means, with respect to a specified person, any other person, directly or indirectly, through one or more intermediaries, controlling or being controlled by or under common control with such person and (vii) "<u>control</u>" (including with correlative meanings, the terms "<u>controlled by</u>" and "<u>under common control with</u>"), as used with respect to any person, means being a director, manager, general partner or executive officer of such person or possessing, directly or indirectly, through the ownership of voting securities or other equity interests, through an agreement or otherwise, (A) the power to direct or cause the direction of the management and policies of such person, or (B) the power to vote, or beneficial ownership of, 5% or more of any class of voting securities of such person or of any other equity interests in such person.

This letter (a) shall be governed by and construed in accordance with the law of the State of New York, (b) is for the exclusive benefit of the parties hereto and, together with the Credit Agreement constitutes the entire agreement of such parties, superseding all prior agreements among them, with respect to the subject matter hereof and (c) may be modified, waived or assigned only in writing and only to the extent such modification, waiver or assignment would be permitted under the Credit Agreement (and any attempt to assign this letter without such writing shall be null and void).

[SIGNATURE PAGES TO FOLLOW]

2

Confidential

PP-TRBK0092130

This letter may be executed in counterparts, which may be effectively transmitted by fax or e-mail (in each case return receipt requested and obtained) and which, together, shall constitute one and the same instrument.

Very truly yours,

TRANSCARE CORPORATION,
as Borrower

By: _____
Name: Peter N. Wolf
Title: CEO

TC AMBULANCE CORPORATION
TC AMBULANCE GROUP, INC.
TC AMBULANCE NORTH, INC.
TC BILLING AND SERVICES CORP.
TC HUDSON VALLEY AMBULANCE CORP.
TCBA AMBULANCE, INC.
TRANSCARE HARFORD COUNTY, INC.
TRANSCARE MANAGEMENT SERVICES, INC.
TRANSCARE MARYLAND, INC.
TRANSCARE ML, INC.
TRANSCARE NEW YORK, INC.
TRANSCARE PENNSYLVANIA, INC.
TRANSCARE WESTCHESTER, INC.,
as Subsidiary Guarantor

By: _____
Name: Peter N. Wolf
Title: CEO

Confidential

Accepted and Agreed
As of the Date First Written Above:

ARK II CLO 2001-1, LTD.,
as Lender


By: _____
Name:  Lynn Tilton
Title:  Director

Confidential                                                        PP-TRBK0092132

EXHIBIT A

| Payee | Amount | Purpose | Payment Instructions |
|---|---|---|---|
| IPFS Corporation | $142,993.83 | G/L & P/L Insurance | Bank: Commerce Bank<br>Account Name: IPFS Corporation<br>Account Number: 19597<br>Routing Number: 101000019<br>Reference: IMPERIAL PFS ACCT # ILC-91463<br>          Installment # 6 |
| New York (NYSIF) | $473,838.94 | Worker's Compensation Insurance | Bank: Bank of America<br>Account Name: Worker's Compensation Fund<br>Account Number: 483043565543<br>Routing Number: 026009593<br>Institution: New York State Insurance Fund |
| Zurich American Insurance Company | $221,122.00 | Auto Insurance | Bank: Bank of America<br>Account Name: Zurich American Insurance Company<br>Account Number: 5801003152<br>Routing Number: 026009593<br>Reference: Policy Number – BAP 0944137-01 |
| Aetna | $334,802.76 | Health Care Insurance December 2015 Premium | CHECK |

**A4040**

Confidential

# TRANSCARE CORPORATION

January 29, 2016

ARK II CLO 2001-1, LTD
1 Broadway, 5th Floor
New York, NY 10004
Attention:  Loan Administration/ Transcare Corporation

      Re:     Direction Letter for Payment of Certain Loan Proceeds

Dear Sir or Madam:

      Reference is made to the Credit Agreement, dated as of January 15, 2016 (as modified to the date hereof, the "Credit Agreement"), among TRANSCARE CORPORATION, a Delaware corporation (the "Borrower" or "you"), the affiliates thereof from time to time party thereto as Guarantors, and Ark II CLO 2001-1, LTD (the "Lender"). Capitalized terms used herein but not defined herein are used as defined in the Credit Agreement.

      Anything else in the Credit Agreement to the contrary notwithstanding, the Borrower hereby directs the Secured Parties to disburse proceeds to the applicable accounts set forth on Exhibit A attached hereto.

      In further consideration for the execution of this letter by the Secured Parties party hereto and without limiting any rights or remedies any Secured Party may have, the Borrower hereby releases each Secured Party and each of their Related Parties (each a "Releasee" and, collectively, the "Releasees") from any and all Claims that the Borrower has or may have against any Releasee, whether or not relating to the Credit Agreement or any other legal relationship that exists or may exist between any Releasee and the Borrower. As used in this paragraph, (i) "Claims" means all liabilities, rights, demands, covenants, duties, obligations (including, without limitation, indebtedness, receivables and other contractual obligations), claims, actions and causes of actions, suits, disputes, judgments, damages, settlements, losses, debts, responsibilities, fines, penalties, sanctions, commissions and interest, disbursements, taxes, charges, interest, costs, fees, and expenses (including, without limitation, fees, charges and disbursements of financial, legal and other advisors, consultants and professionals and, if applicable, any value-added and other taxes and charges thereon), in each case of any kind or nature, whether joint or several, whether now existing or hereafter arising and however acquired and whether or not known, asserted, direct, contingent, liquidated, due, consequential, actual, punitive or treble, (ii) "Related Party" means, with respect to any person, any Affiliate of such person or of another Related Party of such person (excluding, in each case, (A) the Secured Parties and their Controlled Affiliates and (B) any other Portfolio Company) and such person's and such Affiliate's predecessors, successors, assigns, managers, members, partners, directors, officers, employees (regardless of whether seconded to a third party and including, without limitation, individuals with independent contractor or similar status), individual stockholders, agents, attorneys-in-fact, trustees, fiduciaries, representatives and advisors, (iii) "Portfolio Company" means any person and its Controlled Affiliates in which any Lender or any other Affiliated Investor has made any investment, whether through the purchase of debt or equity

**A4041**

Confidential

securities, loans or otherwise, (iv) "<u>Affiliated Investor</u>" means any person that is a collateralized debt obligation, collateralized loan obligation or any other investment pooling vehicle or other entity that (A) is created primarily to invest in equity or debt securities, loans and other investments, (B) does not operate any trade or business and (C) is administered, advised or managed by, or directly or indirectly under common administration, advice or management with, the Lender or any Affiliate of the Lender, (v) "<u>Controlled Affiliate</u>" means, with respect to any entity, any person directly or indirectly "controlled" (as defined below) by one or more of such entity and its other Controlled Affiliates, (vi) "<u>Affiliate</u>" means, with respect to a specified person, any other person, directly or indirectly, through one or more intermediaries, controlling or being controlled by or under common control with such person and (vii) "<u>control</u>" (including with correlative meanings, the terms "<u>controlled by</u>" and "<u>under common control with</u>"), as used with respect to any person, means being a director, manager, general partner or executive officer of such person or possessing, directly or indirectly, through the ownership of voting securities or other equity interests, through an agreement or otherwise, (A) the power to direct or cause the direction of the management and policies of such person, or (B) the power to vote, or beneficial ownership of, 5% or more of any class of voting securities of such person or of any other equity interests in such person.

This letter (a) shall be governed by and construed in accordance with the law of the State of New York, (b) is for the exclusive benefit of the parties hereto and, together with the Credit Agreement constitutes the entire agreement of such parties, superseding all prior agreements among them, with respect to the subject matter hereof and (c) may be modified, waived or assigned only in writing and only to the extent such modification, waiver or assignment would be permitted under the Credit Agreement (and any attempt to assign this letter without such writing shall be null and void).

[SIGNATURE PAGES TO FOLLOW]

2

**A4042**

Confidential

This letter may be executed in counterparts, which may be effectively transmitted by fax or e-mail (in each case return receipt requested and obtained) and which, together, shall constitute one and the same instrument.

Very truly yours,

TRANSCARE CORPORATION,
   as Borrower

By: _____
   Name: Peter N. Wolf
   Title: COO

TC AMBULANCE CORPORATION
TC AMBULANCE GROUP, INC.
TC AMBULANCE NORTH, INC.
TC BILLING AND SERVICES CORP.
TC HUDSON VALLEY AMBULANCE CORP.
TCBA AMBULANCE, INC.
TRANSCARE HARFORD COUNTY, INC.
TRANSCARE MANAGEMENT SERVICES, INC.
TRANSCARE MARYLAND, INC.
TRANSCARE ML, INC.
TRANSCARE NEW YORK, INC.
TRANSCARE PENNSYLVANIA, INC.
TRANSCARE WESTCHESTER, INC.,
   as Subsidiary Guarantor

By: _____
   Name: Peter N. Wolf
   Title: COO

SIGNATURE PAGE TO DIRECTION LETTER (January 29, 2016)

**A4043**

Confidential

Accepted and Agreed
As of the Date First Written Above:

ARK II CLO 2001-1, LTD.,
as Lender


By: _____ ____
Name:  Lynn Tilton
Title:   Director

Confidential

EXHIBIT A

| Payee | Amount | Purpose | Payment Instructions |
|-------|--------|---------|---------------------|
| Transcare | $77,087.24 | Salisbury Settlement | Bank: Wells Fargo NA<br>Account Name: Transcare Corporation<br>Account Number: 2000030130935<br>Routing Number: 121000248<br>Reference: Salisbury Settlement |
| New York (NYSIF) | $613,081.00 | NYSIF Worker's Compensation Insurance | Electronic Check- Bill #: 50594388<br>*wire transfer on 2/1/16* |

**A4045**

Confidential

PP-TRBK0092138

| | |
|---|---|
| **From:** | Jean Luc Pelissier (CBA) |
| **Sent:** | Sunday, February 14, 2016 5:18 PM |
| **To:** | Randy Jones; John Pothin; Michael Greenberg; Peter Wolf; Glen Youngblood; Brian Stephen; Kevin Dell |
| **Cc:** | Lynn Tilton |
| **Subject:** | Privileged and Confidential :: Transcare / Progress and action list / review tomorrow Monday. |

## **Privileged and Confidential**

Team,


I was on the phone with Lynn until a few minutes ago.

Lynn will be in the office by 9:30am tomorrow morning and would like us to be ready there with all the information needed to review with her in a final form as much as possible. I will be there around 8:00am.

- Go forward financial plan ready for review.
- Exact status of the insurance, with focus on workman compensation and automobile.
- People division between companies, leased and owned ambulance division between the companies.
- Master service agreements between the companies and day one actions.
- Wind down model fully ready for review on OldCo.


Please see hereafter the running list of deliverables  that we put together last week for your reference.

## **Can you please review and let me know if anything is missing or add to the list .**

### **Key milestones**

- **Timing of Filing of Article 9 foreclosure**                                **Lynn , TBD**
- **Timing of Old Co. Bankruptcy filing**                                          **Lynn, TBD**

### **Project Plan**

- **Legal**

---

**PX 206**

LaMonica v. Tilton, et al., 18-1021-smb



1

- o Hired bankruptcy counsels : Curtis Mallet-Prevost, Colt and Mosley LLP; Perkins Thomson.            Done
- o Created legal entities (Transcendence Transit Inc. ; Transcendence Transit II Inc. (MTA)).            Done
- o Get the lawyers started , call Peter                                                                                          Done
- o List of all contracts by entity and review                                                                     Done, Brian
- o List of all assets by entity and review                                                                                Done, all
- o List of all people by entity and review                                                                                Done, all
- o Where are located all the vehicles
- o Legal entities to file, legal entities to foreclose on                                                        Done
- o Article 9 foreclosure documents
  Brian/Peter   2/11 evening
- o Bankruptcy filing documents
       Brian          2/14

- **Banking & finance**
  - o Bank accounts established for the two entities.                                                          Done
  - o Operating and payroll for each @ BB&T.                                                                       Done
  - o Talk to credit Suisse
           Done
  - o Wells to visit and review proposed path and intent, support                                     Done
  - o Need to open a lockbox account in each entities                                                   Carlos 2/12
  - o Financial model & cash requirements                                                                                          C
    arl Marcs 2/11 evening
  - o Budget for bankruptcy, DIP facility requirements                                          Carl Marcs 2/11
  - o Establish liquidity facility for New Co

- **Employee transfers & benefits, unions.**

2

- Establish new ADP accounts , one for each new entities
  Carlos/John  2/12
- Finalize a list of employees to transfer and keep in new entities and wind down.  Jean-Luc 2/12 morning
- Secure employee insurances, medical, dental , LTD , STD, benefits  – New Medical cards.  John 2/11
- Prepare the letter form for employees transfer from MTA and from 911 Bronx operations  John/Kevin  Done
- Determine how employees will be notified by email or by letter.  John, 2/12
- Print employees transfer letters  TBD
- Advise the MTA unions and obtain support prior to employees transfers.  TBD
- Distribute employees transfer letters  TBD
- Employee communication meeting in New Co.  TBD
- Employee communication meeting in Old Co.  TBD
- Issue WARN notice to all Old Co employees  TBD

- **Company insurance (Auto, Workers comp and GLDNO, Umbrella)**
  - Secure workers comp insurance for New Co. for Monday 2/15.  Michael 2/12
  - Secure Vehicle insurance for New Co. for Monday 2/15.  Michael 2/12
  - Secure General Liability and DNO insurance for New Co. for Monday 2/15.  Michael 2/12
  - Secure Umbrella Policy for New Co. for Monday 2/15.  Michael 2/12

- **Information technology & communication**

  - **Call intake, CAD & Dispatch**
    - Bronx 911
      JLP/GY 2/12
      - Dispatched by FDNY, no changes expected and no need on day 1.

3

- Westchester
  911
  - JLP/GY 2/12
    - Dispatched by White Plain police or FD, This will not change, no need on day 1.
- Hudson
  Valley
  - JLP/GY 2/12
    - Independent already using rescue net, no need of any sort on day 1
- MTA
  - JLP/GY 2/12
    - MTA proprietary solution, in place today no other need on day 1
- Pittsburgh
  - JLP/GY 2/12
    - Uses AS400 based at OldCo Hamilton base, call and dispatchers in Pittsburgh.
    - On Day 1 , will need to continue to have access to AS400 through service agreement.
    - Migrate to rescue net within 90 days, need to explore cost and options.
- Maryland
  - JLP/GY 2/12
    - Uses AS400 based at OldCo Hamilton Base, call and dispatchers in Maryland
    - On Day 1 , will need to continue to have access to AS400 through service agreement
    - Migrate to rescue net within 90 days, need to explore cost and options

- **Billing**
  - Bronx
    911
    - JLP/GY 2/12
      - Currently in Headquarter OldCo billing, ePCR report triggers bill, biller process the claim
      - Continue through a billing service agreement with OldCo until transition to NewCo RescuNet
      - Transfer billing to RescuNet system in Hudson Valley
      - Recruit up to 5 billers in Hudson Valley, develop API between EMS chart and RescuNet
      - Day 1 , transfer Mt Sanai associated vehicles to Transcare NY INC for billing purposes
      - On day 1 : Change remittance forms / lock box, company address.

4

- Westchester
  911
  - JLP/GY 2/12
    - Reassign vehicles associated with town of MT pleasant to NY Inc.
    - Westchester is already billing out of Hudson Valley on RescuNet, so no changes
    - On day 1 : Change remittance forms / lock box, company address.
- Hudson
  Valley
  - JLP/GY 2/12
    - Currently on RescuNet , no changes
    - On day 1 : Change remittance forms / payment lock box account, company address.
- MTA
  - JLP/GY 2/12
    - Billing is performed by MTA
    - On day 1 : Change remittance forms / payment lock box accounts, company address.
- Pittsburgh
  - JLP/GY 2/12
    - Process their own billing which uses the AS400 and ePCR
    - On day 1 : Change remittance forms / lock box, company address.

- Maryland.
  - Pre billing is done locally, and billing is done at the headquarter          JLP/GY 2/12
  - Continue through a billing service agreement with OldCo until transition to NewCo RescuNet
  - Transfer billing to RescuNet system in Pittsburgh
  - Recruit up to 2 billers in Pittsburgh, install an API between EMS chart and RescuNet
  - On day 1 : Change remittance forms / lock box, company address.

o ePCR contract, ePCR data and hardware

New agreement with emsCharts for NewCo

Adjust ePCR metadata to link correct Agency / Unit / etc. to legal entity

Until then, MSA with OldCo for PCR and supporting documents storage and management

5

Ability to transfer managed documents to NewCo on closure of OldCo operations –

destruction of records in OldCo account that were managed for NewCo

iPads: included in mobile telecoms agreement. Eventually, NewCo has own devices.

- Bronx
  911

  JLP/GY 2/12

- Westchester
  911

  JLP/GY 2/12

- Hudson
  Valley

  JLP/GY 2/12

- MTA

  JLP/GY 2/12

- Pittsburgh

  JLP/GY 2/12

- Maryland

  JLP/GY 2/12

- ○ MSA for AS 400 & other IT
  services                                                                                      GY & Ricky
- ○ Finance system ,
  MRP
  GY & Ricky
      Need new, until then, MSA

- ○ Human resources system and payroll software

  All require either new contract with ADP or MSA while we are transitioning to new
  services

  - Bronx
    911

    JLP/GY 2/12

  - Westchester
    911

    JLP/GY 2/12

  - Hudson
    Valley

    JLP/GY 2/12

6

- MTA
  - JLP/GY 2/12
- Pittsburgh
  - JLP/GY 2/12
- Maryland
  - JLP/GY 2/12
- Headquarter
  - JLP/GY 2/12

- Cell phones & communication
  - Bronx
    911
    - JLP/GY 2/12
  - Westchester
    911
    - JLP/GY 2/12
  - Hudson
    Valley
    - JLP/GY 2/12
  - MTA
    - JLP/GY 2/12
  - Pittsburgh
    - JLP/GY 2/12
  - Maryland
    - JLP/GY 2/12
  - Headquarter
    - JLP/GY 2/12

- Customer service & post sale call taking
  - Bronx
    911
    - JLP/GY 2/12
  - Westchester
    911
    - JLP/GY 2/12
  - Hudson
    Valley
    - JLP/GY 2/12
  - MTA
    - JLP/GY 2/12

7

- Pittsburgh

  JLP/GY 2/12

- Maryland

  JLP/GY 2/12

- **Operations questions and other actions**
  - Where do we locate the new entity headquarter : Poughkeepsie, Pittsburgh or Canarsie.(Mt Vernon or MTA building ?)
  - How do we make payroll, what is the process and who is consolidating ? Do we need a service agreement ?
  - Can we established immediate billing for NewCo, do we need a service agreement with OldCo ?
  - We have to separate customer service between NewCo and OldCo, New hot line , phone numbers, communication
  - We need a compliance service agreement or move the compliance person from OldCo to NewCo
  - We need business associate agreement ?
  - Who stays to manage old co during the chapter 11 process ? (Barbara ad Carl Marks).
  - Peter would go to New Co to manage the MTA contract & oversee all operations.
  - Glen Youngblood would become operation officer
  - The other New York transit contracts are in OldCo, the resources are in Transcare NY Inc.
  - Brian Looked at all contracts in NY Transcare Inc.
    - Bronx Lebanon 911 service : Terminate on bankruptcy, consent required for assignment.
    - Montefiore 911 Service : Terminate on bankruptcy, consent required for assignment.
    - Montefiore Core : Silent on Bankruptcy, consent required for assignment
    - Mont Pleasant Transcare Corp : Silent on bankruptcy, consent required for assignment
    - Mont Pleasant Transcare NY : Silent on bankruptcy, consent required for assignment
    - MTA
  - MTA , petty cash account needed
    ?

  - Where are the ambulances ?

- **Employee Communication**
  - Brunswick , want to know the legal strategy, what we were thinking
  - Messaging for new employees in New Co & Old Co

8

**A4053**

- **Press, customer and regulator communication**
  - o Need to be proactive with the reporters
  - o Overall plan to be defined
  - o Customer communication plan

=== END ===

9

 PP-TRBK0091299

| | |
|---|---|
| **From:** | Carlos Mercado |
| **Sent:** | Tuesday, February 16, 2016 1:31 PM |
| **To:** | Guillaume Fillebeen |
| **Subject:** | Loan Daily Extract-Transcare.xls |
| **Attachments:** | Loan Daily Extract-Transcare.xls |

This is the file I've been working with in case I get hit by lightning.

CM

PX 209

LaMonica v. Tilton, et al., 18-1021-smb

1

**A4055**

**Document Produced Natively**

Confidential

# RE: TransCare term sheet

From:

robert.strack@wellsfargo.com

To:

clandeck@carlmarks.com, mclaster@carlmarks.com, mpfefferle@carlmarks.com, jkillion@carlmarks.com

Cc:

john.husson@wellsfargo.com, melissa.provost@wellsfargo.com

Date:

Fri, 19 Feb 2016 17:19:57 -0500

Attachments:

4258422_2 (2).xlsx (572.28 kB)

Term sheet attached.

**From:** Strack, Robert P.
**Sent:** Friday, February 19, 2016 4:43 PM
**To:** 'Carl Landeck'; 'Mark Claster'; 'Marc Pfefferle'; Jonathan Killion (jkillion@carlmarks.com)
**Cc:** Husson, John E.; Provost, Melissa A. (melissa.provost@wellsfargo.com)
**Subject:** FW: TransCare

Sorry guys, should have copied you originally on the below.

***Robert P. Strack***
Senior VP / Regional Portfolio Manager
**Wells Fargo Capital Finance**
**Tel: 212-545-4230**

*robert.strack@wellsfargo.com*

**From:** Strack, Robert P.
**Sent:** Friday, February 19, 2016 4:41 PM
**To:** 'Lynn Tilton'; 'jhelfat@otterbourg.com'; 'cgiglio@curtis.com'; 'lharrison@curtis.com'; 'Jean Luc Pelissier'; 'Randy Jones'; 'Michael Greenberg'; Marsden, Kurt; Forte, Laurence S.; Husson, John E.; Provost, Melissa A.; Brighton, Joel T; 'Brian Stephen'
**Cc:** 'dfiorillo@otterbourg.com'
**Subject:** RE: TransCare

Given the time crunch we are all operating under, we can process a wire to cover the $102,000 of critical needs and $450,000 payroll funding request.  Procedurally, the request needs to be submitted via the CEO application that your team is familiar with.

*Bob*

**From:** Lynn Tilton [mailto:Lynn.Tilton@PatriarchPartners.Com]
**Sent:** Friday, February 19, 2016 4:34 PM
**To:** Strack, Robert P.; jhelfat@otterbourg.com; cgiglio@curtis.com; lharrison@curtis.com; Jean Luc Pelissier; Randy Jones; Michael Greenberg; Marsden, Kurt; Forte, Laurence S.; Husson, John E.; Provost, Melissa A.; Brighton, Joel T; Brian Stephen

CONFIDENTIAL

PX 219

LaMonica v. Tilton, et al., 18-1021-smb

CM_TC2018_0003189

**Cc:** dfiorillo@otterbourg.com
**Subject:** RE: TransCare

Bob,
We will review.  However, I do not see how we will be able to respond with the immediacy of funding deadlines.
There is work that needs to be done here and conversations that must be had.
The loss of two major contracts today, both of which were destined to be part of NEWCO makes me highly concerned for the future.
There are 2,500 workers and this tenuous situation is not a secret to them.  Further, the relationship between leaders on the ground and Carl Marks is deeply strained.
I do not know who is working against the future here but it is our reality.
It saddens me deeply that so many people will be hurt in this unnecessary constituency conflict.
Lynn



*Lynn Tilton*
Chief Executive Officer
Patriarch Partners, LLC
One Broadway, 5th Floor
New York, NY 10004
212-825-6772
212-825-2038 – FAX
Lynn.Tilton@PatriarchPartners.com
Web: www.patriarchpartners.com

---

**From:** robert.strack@wellsfargo.com [mailto:robert.strack@wellsfargo.com]
**Sent:** Friday, February 19, 2016 4:25 PM
**To:** jhelfat@otterbourg.com; cgiglio@curtis.com; lharrison@curtis.com; Lynn Tilton; brian.stephens@patriarchpartners.com; Jean Luc Pelissier; Randy Jones; Michael Greenberg; Kurt.Marsden@wellsfargo.com; laurence.forte@wellsfargo.com; john.husson@wellsfargo.com; melissa.provost@wellsfargo.com; joel.brighton@wellsfargo.com
**Cc:** dfiorillo@otterbourg.com
**Subject:** RE: TransCare

When opening the term sheet, you may need to click on the "Transaction Grid" tab to view.

*Robert P. Strack*
Senior VP / Regional Portfolio Manager
**Wells Fargo Capital Finance**
**Tel: 212-545-4230**

*robert.strack@wellsfargo.com*

---

**From:** Jonathan N. Helfat [mailto:jhelfat@otterbourg.com]
**Sent:** Friday, February 19, 2016 4:23 PM
**To:** 'Giglio, Cindi'; Harrison III, Lynn P. (lharrison@curtis.com); lynn.tilton@patriarchpartners.com; 'brian.stephens@patriarchpartners.com'; jeanluc.pelissier@patriarchpartners.com;

randy.jones@patriarchpartners.com; michael.greenberg@patriarchpartners.com; Marsden, Kurt; Forte, Laurence S.; Strack, Robert P.; Husson, John E.; Provost, Melissa A.; Brighton, Joel T
**Cc:** Daniel F. Fiorillo
**Subject:** FW: TransCare

As requested we enclose our client's draft term sheet for your review and comment.



_____
**Jonathan N. Helfat** • Otterbourg P.C. • 230 Park Avenue • New York, NY 10169 • Direct: (212) 905-3626 • Fax: (212) 682-6104 • jhelfat@otterbourg.com • otterbourg.com
_____
The information contained in this communication may be privileged and/or confidential and is intended only for the individual to whom it is addressed or agent responsible to deliver it to the intended recipient. If you have received this communication in error, please immediately notify us by telephone.

This document has not been tiffed because it either (a) is being produced natively or (b) is a file type that cannot be tiffed

CONFIDENTIAL

CM_TC2018_0003192

**From:**                    Lynn Tilton
**Sent:**                    Wednesday, February 24, 2016 2:06 PM
**To:**                       'Giglio, Cindi'; Harrison III, Lynn P.
**Cc:**                       Brian Stephen
**Subject:**                FW: Transcare borrowings - Privileged and Confidential

**Importance:**         High

I have funded payroll all year.
Wells has taken my money and then not made payroll.



*Lynn Tilton*
Chief Executive Officer
Patriarch Partners, LLC
One Broadway, 5th Floor
New York, NY 10004
212-825-6772
212-825-2038 – FAX
Lynn.Tilton@PatriarchPartners.com
Web: www.patriarchpartners.com

## Transcare Corporation

| Effective Date | Principal Balance | Funds Came From |
|---|---|---|
| 02/26/2015 | $ 1,100,000.00 | Zohar Funds |
| 03/05/2015 | $ 250,000.00 | Zohar Funds |
| 04/09/2015 | $ 300,000.00 | Zohar Funds |
| 04/10/2015 | $ 300,000.00 | Zohar Funds |
| 04/23/2015 | $ 550,000.00 | Zohar Funds |
| 07/07/2015 | $ 150,115.00 | Zohar Funds |
| 07/08/2015 | $ 650,000.00 | Zohar Funds |
| 07/16/2015 | $ 1,479,906.42 | Zohar Funds |
| 10/08/2015 | $ 250,000.00 | Zohar Funds |
| 10/16/2015 | $ 500,000.00 | Zohar Funds |
| 12/08/2015 | $ 100,000.00 | Zohar Funds |
| 12/11/2015 | $ 110,000.00 | Zohar Funds |

1

Confidential

**PX 227**

LaMonica v. Tilton, et al., 18-1021-smb

PP-TRBK0047615

| 12/17/2015 | $ | 1,278,501.84 | Zohar Funds |
|---|---|---|---|
| 01/05/2016 | $ | 115,000.00 | Zohar Funds |
| 01/07/2016 | $ | 100,000.00 | Zohar Funds |
| 1/15/2016 | $ | 1,172,757.53 | Ark II - CLO 2001-1 |
| 1/28/2016 | $ | 195,975.00 | Ark Angels II |
| 1/29/2015 | $ | 690,168.24 | Ark II - CLO 2001-1 |

Totals:

| Zohar Funds: | $ | 7,233,523.26 |
|---|---|---|
| Ark II - CLO 2001-1 | $ | 1,862,925.77 |
| Ark Angels II | $ | 195,975.00 |
| Grand Total : | $ | 9,292,424.03 |

2

**A4062**

Confidential

PP-TRBK0047616

| | |
|---|---|
| **From:** | Lynn Tilton |
| **Sent:** | Wednesday, February 24, 2016 1:29 PM |
| **To:** | 'Giglio, Cindi' |
| **Cc:** | Harrison III, Lynn P.; Brian Stephen; Buenger, Peter J.; 'rcreswell@perkinsthompson.com' |
| **Subject:** | RE: Board Meeting |

Wells cannot collect the cash going to the company and then pay down their loan at the expense of payrolls and then pin it on me.
They have collected more than sufficient cash over the weeks to make payroll and they have not.
I am not being backed into this corner.
And I cannot believe lawyers sit back quiet while the company is told by Landeck that whether people are paid on Friday depends on me.
Really???



*Lynn Tilton*
Chief Executive Officer
Patriarch Partners, LLC
One Broadway, 5th Floor
New York, NY 10004
212-825-6772
212-825-2038 – FAX
Lynn.Tilton@PatriarchPartners.com
Web: www.patriarchpartners.com

---

**From:** Giglio, Cindi [mailto:cgiglio@curtis.com]
**Sent:** Wednesday, February 24, 2016 12:57 PM
**To:** Lynn Tilton
**Cc:** Harrison III, Lynn P.; Brian Stephen; Buenger, Peter J.
**Subject:** Re: Board Meeting

Yes

Cindi Giglio
Curtis, Mallet-Prevost, Colt & Mosle LLP
101 Park Avenue
New York, NY 10178
(212) 696-6936

1

Confidential

PX 234

LaMonica v. Tilton, et al., 18-1021-smb

PP-TRBK0047662

On Feb 24, 2016, at 12:54 PM, Lynn Tilton
<Lynn.Tilton@PatriarchPartners.Com<mailto:Lynn.Tilton@patriarchpartners.com>> wrote:

Is Wells aware of the foreclosure?

<image001.jpg>
Lynn Tilton
Chief Executive Officer
Patriarch Partners, LLC
One Broadway, 5th Floor
New York, NY 10004
212-825-6772
212-825-2038 – FAX
Lynn.Tilton@PatriarchPartners.com<mailto:Lynn.Tilton@PatriarchPartners.com>
Web: www.patriarchpartners.com<http://www.patriarchpartners.com/>

From: Giglio, Cindi [mailto:cgiglio@curtis.com]
Sent: Wednesday, February 24, 2016 10:59 AM
To: Lynn Tilton
Cc: Harrison III, Lynn P.; Brian Stephen; Buenger, Peter J.
Subject: Board Meeting

Lynn,

Can we plan to do the telephonic board meeting at 5PM? If that works, we will circulate a dial in.

Thanks,
Cindi

Cindi Giglio
Counsel


Curtis, Mallet-Prevost, Colt & Mosle LLP

101 Park Avenue
New York, New York 10178-0061


Direct Dial: +1 212 696 6936
Fax: +1 917 368 8863
cgiglio@curtis.com<mailto:cgiglio@curtis.com>


[http://www.curtis.com/pix/announcements/curtis_esignature.jpg]<http://www.curtis.com/>
www.curtis.com<http://www.curtis.com/>


[http://www.curtis.com/pix/announcements/curtis_environment.jpg]

2

**A4064**

Confidential

Please consider the
environment before
printing this email.

---

This e-mail, including any attachments, may contain information that is protected by law as privileged and confidential, and is transmitted for the sole use of the intended recipient. If you are not the intended recipient, you are hereby notified that any use, dissemination, copying or retention of this e-mail or the information contained herein is strictly prohibited. If you have received this e-mail in error, please immediately notify the sender by telephone or reply e-mail, and permanently delete this e-mail from your computer system. Your privacy is very important to our firm. Therefore, if this message contains unsolicited commercial content, you may forward this e-mail to unsubscribe@curtis.com<mailto:unsubscribe@curtis.com> or click here (www.curtis.com/unsubscribe.htm<http://www.curtis.com/unsubscribe.htm>) if you do not want to receive further messages of this nature. Thank you.

Curtis, Mallet-Prevost, Colt & Mosle LLP (101 Park Avenue, New York, NY 10178)

---

**A4065**

Confidential                                                                    PP-TRBK0047664

| **From:** | Brian Stephen |
| **Sent:** | Thursday, February 25, 2016 10:48 AM |
| **To:** | Siegel, Robert; Michael Greenberg |
| **Cc:** | Scott Whalen; Vila, Mark |
| **Subject:** | RE: Insurance |

TransCare Corporation has a ton of stockholders and the largest are (these are aggregate ownership percentages):

| **ARK II CLO 2001-1, Limited** **ARK Investment Partners II, L.P.** c/o Patriarch Partners III, LLC 32 Avenue of the Americas, 17th Fl New York, NY 10013 | 61% |
|---|---|
| **First Dominion Funding I** **First Dominion Funding II** **CSAM Funding II** **CSAM Funding III** **Atrium CDO** | 26% |

Transcendence is as follows:

Ark II (see above for name) – 51%
Zohar III 33.4%

At no point has Patriarch Partners, LLC owned any of the companies.

---

**From:** Brian Stephen
**Sent:** Thursday, February 25, 2016 10:43 AM
**To:** 'Siegel, Robert'; Michael Greenberg
**Cc:** Scott Whalen; Vila, Mark
**Subject:** RE: Insurance

The ownership information isn't accurate. I can't fix it at this moment – is there anyone else here that can look at this?

---

**From:** Siegel, Robert [mailto:Robert.Siegel@WillisTowersWatson.com]
**Sent:** Thursday, February 25, 2016 10:39 AM
**To:** Michael Greenberg
**Cc:** Scott Whalen; Brian Stephen; Vila, Mark
**Subject:** FW: Insurance

This is what is needed to bind

**Robert Siegel**
**Executive Vice President**

1

**PX 235**

LaMonica v. Tilton, et al., 18-1021-smb

Confidential                                                                                                              PP-TRBK0098626

**Global Client Advocate**
**Willis Towers Watson**
**51 Lime Street**
**London EC3M 7DQ**
**United Kingdom**

UK:    +44 (0) 7879 602176
USA:    +1   312 420-9493
robert.siegel@willistowerswatson.com,
www.willistowerswatson.com

**Follow us on social media** -- and the **WillisWire** blog

---

**From:** Friemann, Scott
**Sent:** Thursday, February 25, 2016 3:38 PM
**To:** Siegel, Robert; Nazar, Tom; Holt, Zeynep
**Cc:** Vila, Mark
**Subject:** RE: Insurance

Bob,

Here's the update on the PA coverage. UPMC still doesn't know how the state will treat their mod until they file the ERM 14. Here's what we need on the ERM 14 to be complete:

1) The date the new entity will take on the payroll. UPMC has indicated they can turn this around in a day, so we need to have the date Transcendence wants to flip the switch
2) The FEIN of Transcendence. Without the FEIN, the ERM 14 will be deemed incomplete and the state won't move forward with it
3) The signature of an officer. I'm not sure who qualifies as an officer of Transcendence at this time, but we will need that person to sign the form

As for the program costs there are still some parts up in the air. Once the ERM 14 gets processed, UPMC will find out what mod the state will let them apply to Transcendence. If they keep the TransCare 2015 mod, they are at a 1.03. If they use TransCare's 2016 mod, they are at 1.01. If we get a unity mod, we are at 1. The state will also have to decide whether they will allow the safety credit that TransCare earned to apply to Transcendence. If the credit doesn't apply, I am pushing UPMC to adjust their debit to get the credit back, since we will have the same safety protocols in place. We will also look to have a short term policy for Transcendence to get us to 4/1/2016. UPMC rates will be decreasing in April, so we want to take advantage of the lower rates as soon as possible.

As for the TransCare policy, the UPMC policy is on a monthly reporting basis. We don't technically have to cancel the TransCare policy. We could report $0 payroll if all TransCare exposure ceases after the move to Transcendence. But if there is still some TransCare payroll in Pennsylvania after the transition to Transcendence, we would still have the backstop of coverage.

Let me know if this helps.

I have attached the ERM 14 in its current state for your files.

Regards,
Scott

**Scott Friemann, ARM, ARe**
Senior Broker, Casualty – Midwest Region

**Willis Towers Watson**
Willis of Illinois, Inc. | 233 S. Wacker Dr. Suite 2000 | Chicago IL 60606

Direct: +1 312 288 7803, Mobile: +1 917 558 0846,
scott.friemann@willistowerswatson.com
willistowerswatson.com

Follow Willis Towers Watson on social media

---

**From:** Siegel, Robert
**Sent:** Thursday, February 25, 2016 9:23 AM
**To:** Nazar, Tom; Friemann, Scott; Holt, Zeynep
**Cc:** Vila, Mark
**Subject:** FW: Insurance

2

**A4067**

PP-TRBK0098627

**Robert Siegel**
**Executive Vice President**
**Global Client Advocate**
**Willis Towers Watson**
**51 Lime Street**
**London EC3M 7DQ**
**United Kingdom**

UK:   +44 (0) 7879 602176
USA:   +1   312 420-9493
robert.siegel@willistowerswatson.com,
www.willistowerswatson.com

Follow us on social media -- and the WillisWire blog

---

**From:** Michael Greenberg [mailto:Michael.Greenberg@PatriarchPartners.com]
**Sent:** Thursday, February 25, 2016 3:20 PM
**To:** Siegel, Robert
**Cc:** John Foerst; John Pothin
**Subject:** Insurance

Bob,

Have you handled the workers compensation policy in PA?  Please see below notes.  Willis is the BOR on this policy so want to make sure this is covered.

| | | | | | |
|---|---|---|---|---|---|
| Work Comp (PA) | WC100-0006100-20154 | UPMC Health Benefits, Inc. | List Transcendence entities as additional insured, in place on a standalone basis until 4/1/16. | 1-800-633-1197 | WC: Statutory Limits Employers Liability: $1,000,000 Bodily Injury b Accident $1,000,000 Bodily Injury b Disease Policy Limit $1,000,000 Bodily Injury b Disease Each Employee |

Thank you,
Michael

Michael S. Greenberg
Patriarch Partners
One Broadway, 5th Floor
New York, NY 10004
Direct: 646-723-7657
Fax:  212-825-2038
Email: michael.greenberg@patriarchpartners.com
www.patriarchpartners.com

---

For information pertaining to Willis' email confidentiality and monitoring policy, usage restrictions, or specific company registration and regulatory status information, please visit

3

**A4068**

PP-TRBK0098628

http://www.willis.com/email_trailer.aspx

We are now able to offer our clients an encrypted email capability for secure communication purposes. If you wish to take advantage of this service or learn more about it, please let me know or contact your Client Advocate for full details. ~W67897

---

4

**A4069**

Confidential

PP-TRBK0098629

| Work Comp (PA) | WC160-0001760-20154 | UBMC Health Benefits, Inc. | ...names UBMC as additional insured, in place on a standalone basis until 4/1/18. | 1-800-633-1197 | WC: Statutory Limits $1,000,000 Bodily Injury by Accident $1,000,000 Bodily Injury by Disease Policy Limit $1,000,000 Bodily Injury by Disease Each Employee | ** Policy covers personnel located in the state of Pennsylvania | 4/1/2015-4/1/2016 | $ 173,199 | This has been BOR'd to WBS, as of 2/22/18. Please let us know if you would like us to rescind this BOR. If so, we will need to proceed with getting the name changed on the policy to any extent. Triumvara Pennsylvania, Inc. |

Confidential

# UNITED STATES BANKRUPTCY COURT
# SOUTHERN DISTRICT OF NEW YORK

In re: )
TRANSCARE CORPORATION, et al. )
                    Debtors, )
  )
  )
SALVATORE LAMONICA, as Chapter 7 )
Trustee for the Estates of TransCare )
Corporation, et al. )
  )
  )
                    Plaintiff, )
  )
    v. )
  )
  ) Chapter 7
  ) Case No.: 16-10407 (SMB)
LYNN TILTON, ) (Jointly Administered)
PATRIARCH PARTNERS AGENCY )
SERVICES, LLC, )
PATRIARCH PARTNERS, LLC, )
PATRIARCH PARTNERS )
MANAGEMENT GROUP, LLC, )
ARKII CLO 2001-1, LIMITED )
TRANSCENDENCE TRANSIT, INC. and )
TRANSCENDENCE TRANSIT II, INC. )
  )

## EXPERT REPORT OF JONATHAN I. ARNOLD, Ph.D.

November 30, 2018



**PX 282**

LaMonica v. Tilton, et al., 18-1021-smb

**EXHIBIT**

tabbies®

Arnold-A

2-11-19

EXPERT REPORT OF
JONATHAN I. ARNOLD, PH.D.
*IN RE: TRANSCARE CORPORATION, ET AL.*

CONFIDENTIAL

# CONTENTS

I.    INTRODUCTION ........................................................................................................ 1

   A.    Qualifications .................................................................................................. 1

   B.    Assignment ..................................................................................................... 2

   C.    Summary of Opinions ..................................................................................... 3

II.    BACKGROUND ........................................................................................................ 5

   A.    TransCare Corporation ................................................................................... 5

   B.    Other Relevant Parties ................................................................................... 7

     1.    Defendants .............................................................................................. 7

     a)    Lynn Tilton ............................................................................................. 7

     b)    Patriarch Defendant Entities .................................................................. 8

   C.    Events Prior to Liquidation Filing Date ...................................................... 10

III.    TRANSCARE'S HISTORICAL AND PROJECTED FINANCIAL
       PERFORMANCE ...................................................................................................... 17

   A.    Historical Financial Performance ................................................................. 17

   B.    Projected Financial Performance .................................................................. 19

     1.    January 7, 2016 Preliminary Plan ........................................................ 20

     2.    January 27, 2016 Carl Marks Turnaround Plan .................................. 24

     3.    January 28, 2016 Executive Summary Updates by Mr. Greenberg to Carl Marks
         Turnaround Plan ................................................................................... 25

     4.    February 24, 2016 NewCo Model ....................................................... 25

   C.    Capital Needs ................................................................................................ 26

IV.    OPERATING VALUES ........................................................................................... 27

   A.    Introduction .................................................................................................. 27

   B.    Valuations Based on Industry Multiples Identified by Ms. Tilton .............. 30

   C.    Valuations Based on Potential Offers for Assets .......................................... 30

   D.    Ms. Tilton's Foreclosure and Buy-Out Transaction .................................... 31

   E.    Summary ....................................................................................................... 31

V.    LIQUIDATION VALUE AFTER FEBRUARY 24, 2016 ...................................... 32

VI.    DIFFERENCE BETWEEN OPERATING VALUES AND LIQUIDATION
       VALUE ...................................................................................................................... 33

   A.    Measuring the Difference ............................................................................. 33

VII.    CONCLUSION ......................................................................................................... 34

ii

EXPERT REPORT OF
JONATHAN I. ARNOLD, PH.D.
IN RE: TRANSCARE CORPORATION, ET AL.

CONFIDENTIAL

# I.   INTRODUCTION

## A.   QUALIFICATIONS

1.      My name is Jonathan Arnold.  I am an employee of Chicago Economics Corp. and specialize in the application of economics to legal and regulatory disputes. Prior to my current position, I served as Chief Economist at the New York State Office of the Attorney General (the "OAG").  In this role, I served as senior policymaker on economics questions for the Attorney General -- covering Economic Justice, Criminal Justice, and Social Justice -- as well as (i) overseeing economic analyses of key matters, (ii) retaining and supervising outside expert witnesses, and (iii) integrating economic analysis with legal analysis at the OAG. I have also taught economics at a number of schools, including The University of Chicago (in both the Booth School of Business and the Department of Economics).

2.      I earned a Ph.D. in Economics and M.B.A. from the University of Chicago's Booth School of Business and a B.A. from the University of Chicago.  In addition, I am a Certified Public Accountant, registered in Illinois.

3.      During my professional career, I have conducted economic analyses on a variety of valuation, economics, and accounting topics and offered expert testimony in the form of live testimony in numerous court and arbitration proceedings, depositions, expert reports, and affidavits.  In my work, I regularly analyze questions relating to

1

EXPERT REPORT OF
JONATHAN I. ARNOLD, PH.D.
IN RE: TRANSCARE CORPORATION, ET AL.

CONFIDENTIAL

A4073

valuation, and the calculation of damages. My *curriculum vitae*, attached as Appendix A, summarizes my qualifications and contains information relating to my previous employment, affiliations, testimony, and publications.[1]

**B.    ASSIGNMENT**

4.     I have been asked by counsel for Salvatore LaMonica, acting in his capacity as Chapter 7 Trustee for the Estates of TransCare Corporation, et al. ("Plaintiff") to examine economic evidence and perform an analysis of the implied valuations of TransCare Corporation ("TransCare" or "Company") at four points during January and February 2016.[2] The valuations rely on models and projections prepared by TransCare, employees of Patriarch Partners, LLC or affiliated companies ("Patriarch"), and TransCare advisor Carl Marks & Co. Inc. ("Carl Marks"). These dates are: (i) January 7, 2016; (ii) January 27, 2016; (iii) January 28, 2016; and (iv) February 24, 2016. January 7, 2016 is the day that Patriarch Director Michael Greenberg ("Mr. Greenberg") sent TransCare advisor Carl Marks his updates to the TransCare 2016 preliminary plan. January 27, 2016 is the day Carl Marks issued its "Turnaround Plan" for TransCare).

---

[1]    Chicago Economics Corp. is compensated for my time spent on this matter at a rate of $950 per hour. I was assisted by Coherent Economics, LLC, which is compensated for time spent by its staff members working under my direction on this matter. Compensation is not contingent on the outcome of this proceeding.

[2]    I understand that Mr. LaMonica, acting in his capacity as Chapter 7 Trustee for the Estates of TransCare Corporation, et al. ("Plaintiff") is claiming damages suffered by TransCare Corporation, et al. ("Debtors") as a result of, among other acts detailed in the amended complaint, Lynn Tilton's alleged breach of the duty of loyalty while acting as the sole member of TransCare's Board of Directors. See Amended complaint, *In re TransCare Corporation, et. al* (Case No. 16-10407) on November 28, 2018 ("Complaint").

2

January 28, 2016 reflects the day of Mr. Greenberg's updates to the Turnaround Plan and his "Executive Summary" to be shared with Lynn Tilton ("Ms. Tilton"). February 24, 2016 the latest date for which I have seen documents updating Patriarch's model.[3]

5.      I understand that, subsequent to February 24, 2016 (the "Liquidation Filing Date"), the assets of TransCare were in fact liquidated, through the bankruptcy liquidation process, for a total consideration of approximately $19.2 million (the "Liquidation Value").

6.      My analysis included a review and analysis of certain documents, produced in the course of this dispute, that provide insight into the historical performance and forecasted outlook for TransCare.[4]  To estimate the value of TransCare, I use TransCare's financial forecasts as prepared during January 2016 and February 2016.  I then use the TransCare, Patriarch, and Carl Marks models, which I discuss in detail below, to assess the implied valuation of TransCare if it had pursued an orderly asset sale or continued operations as a going concern instead of entering into the forced Liquidation.  See Section V for further discussion.

C.      SUMMARY OF OPINIONS

7.      As a result of my analyses, I have reached the following opinions, which I

---

[3]  This is the last update to Patriarch's model as shared with insurance broker Lockton Companies ("Lockton"). It assumes that the Paratransit, Hudson Valley, and Pittsburgh business segments – termed "NewCo" – would transfer to the newly incorporated Transcendence Transit, Inc. and that the remaining assets -- "OldCo" – would be liquidated in a wind down.

[4]  I understand discovery in this case is ongoing and I may supplement this report to reflect material new information that I become aware of.

EXPERT REPORT OF
JONATHAN I. ARNOLD, PH.D.
IN RE: TRANSCARE CORPORATION, ET AL.

CONFIDENTIAL

hold to a reasonable degree of certainty:

- The Operating Values (as defined below at paragraph 10) based on January 2016 projections for TransCare in its entirety ("WholeCo") range from $35.3 million to $86.5 million;

- The Operating Value based on February 2016 projections for selected assets ("NewCo") ranges from $22.7 million to $39.1 million;

- The difference between TransCare's Operating Values based on January 2016 projections for WholeCo and the Liquidation Value is between $16.1 million and $67.3 million; and

- The difference between TransCare's Operating Value based on February 2016 projections for NewCo and the Liquidation Value is between $17.0 million and $33.4 million.

8.      In forming my opinions, I reviewed and considered the materials produced in this litigation as well as publicly available information.  The materials I relied upon in forming my opinions are listed in Appendix B.

9.      I analyzed historical and projected financial models, results, business plans, presentations and updates to TransCare's Board concerning TransCare that were created by TransCare, Carl Marks, and Patriarch employees.  These materials have helped me to understand contemporaneous beliefs of the financial outlook of TransCare and its capital needs to continue as a going concern.  Finally, I have performed valuations of TransCare as a going concern up to the Liquidation Filing Date ("Operating Values").  I compute the differences between each of TransCare's valuation as of the pre-Liquidation dates listed

4

EXPERT REPORT OF
JONATHAN I. ARNOLD, PH.D.
IN RE: TRANSCARE CORPORATION, ET AL.

CONFIDENTIAL

A4076

above and the Liquidation Value.[5]

10.     The balance of this report is organized as follows:  In Section II, I review the documentary record showing TransCare's history, business model and organization, the relevant parties in this matter, and the events leading up to TransCare's Chapter 7 liquidation.    Section III contains TransCare's historical and projected financial performance at various points leading up to the Liquidation Filing Date.  In Section IV I describe the methodologies and inputs for my analyses of the Operating Values of TransCare.   In Section V, I describe the Liquidation Value of TransCare.   Section VI discusses the difference between the Operating Values and the Liquidation Value. Section VII contains a brief statement of my conclusions.

## II.     BACKGROUND

11.     In this section, I provide background information relevant to my economic analysis of the Operating Value of TransCare and summarize the different parties in this matter.

### A.     TransCare Corporation

12.     TransCare was founded in 1993 to create a business of providing paratransit services for both emergency and non-emergency patients and individuals with

---

[5]   For Patriarch's February 24, 2016 "NewCo" model, which includes selected TransCare assets and is defined in detail below, I compute the difference between the implied valuation of NewCo and the Liquidation Value attributable to only those assets contemplated by Ms. Tilton and Patriarch to be part of NewCo.

5

EXPERT REPORT OF
JONATHAN I. ARNOLD, PH.D.
IN RE: TRANSCARE CORPORATION, ET AL.

CONFIDENTIAL

A4077

disabilities.[6] TransCare provided these services to both (i) healthcare facilities and (ii) municipalities.[7]

13.     In September 2002, TransCare filed for Chapter 11 bankruptcy protection with a pre-planned reorganization plan.  At that time, Ark II CLO 2001-1, Limited, which I discuss below, was its lead lender through approximately $34.0 million in one secured claim with interest.[8] TransCare emerged from Chapter 11 bankruptcy in July 2003.[9]

14.     As of 2015, TransCare held itself out as a large healthcare transportation service.[10] By mid-2015, TransCare owned a fleet of over 600 ambulances, buses, vans and

---

[6]   TransCare (July 20, 2015). TransCare Announces Two Significant Milestones. $130 Million Contract Renewal with the New York City Transit Authority. New Amendment to its Lender Agreement. *BusinessWire*.

[7]   Specifically, "to acute care hospitals, skilled nursing or sub-acute care facilities, outpatient centers, clinics, medical specialty service facilities, long-term care facilities and transit authorities throughout the mid-Atlantic region." TransCare Corporation and Subsidiaries Consolidated Financial Statements Year Ended December 31, 2013 ("2013 Audited Financial Statements") (TRANSCARE00062782 – 801) at 9.  I understand these to be the last audited financial statements for TransCare.

[8]   Schedules of Assets and Liabilities entered on September 20, 2002 before the U.S. Bankruptcy Court of the Southern District of New York (Chapter 11 Case No. 02-14385 (RDD)).

[9]   Glover, L. (July 7, 2003). TransCare set to emerge from Ch. 11. *Pittsburgh Business Times*.

[10]  Specifically, "one of the largest privately-held providers of healthcare transportation services in the United States with operations in New York (including New York City, Long Island and Hudson Valley), Delaware Valley (including Philadelphia and Delaware), Baltimore and Pittsburgh." See, TransCare Announces Two Significant Milestones. $130 Million Contract Renewal with the New York City Transit Authority. New Amendment to its Lender Agreement. *BusinessWire* (July 20, 2015).  The article further notes that TransCare provides "a full range of medical services including: emergency ambulance services (911) in New York City and Hudson Valley, non-emergency and critical care ambulance services in all its markets, paratransit services in New York City (Access-A-Ride program), shuttle services for hospitals, nursing homes, adult day care and other health care facilities in all its markets, call center services for hospitals and clinics in all its markets."

6

paratransit vehicles and employed 1,900 full and part-time employees.[11]

15.     During January and February 2016, TransCare, along with Patriarch and advisor Carl Marks, identified investment and internal organization needs with an emphasis on improving the size and quality of its fleet through vehicle purchases or leases in order to continue to operate as a going concern.[12] Notwithstanding these efforts, TransCare filed for Chapter 7 bankruptcy liquidation on February 24, 2016.[13]

**B.     OTHER RELEVANT PARTIES**

**1.     Defendants**

**a)     Lynn Tilton**

16.     At all times relevant to my analysis, Defendant Ms. Tilton was the sole member of the Board of Directors of TransCare.  A broad set of TransCare's executive decisions required Ms. Tilton's direct approval, including: (1) approving annual or interim operating plans and capital budgets; (2) forming joint ventures; (3) negotiating or

---

[11]   "TransCare Announces Two Significant Milestones. $130 Million Contract Renewal with the New York City Transit Authority. New Amendment to its Lender Agreement." *BusinessWire* (July 20, 2015)

[12]   E-mail from Mr. Greenberg to Carl Landeck and Jonathan Killion, dated January 7, 2016 (CM_TC2018_0003369 at CM_TC2018_0003369) and CM_TC2018_0003376 (collectively, "January 7, 2016 Preliminary Plan"); E-mail from Marc Pfefferle to Mr. Greenberg et al., dated January 27, 2016 and attached Carl Marks 2016 Plan Executive Summary dated January 27, 2016 (CM_TC2018_0002108–24) ("January 27, 2016 Carl Marks Turnaround Plan"); E-mail from Mr. Greenberg to himself dated January 28, 2016 (PP-TRBK0013259-74) and PP-TRBK0013273 (collectively, "January 28, 2016 Update to Carl Marks Turnaround Plan"); E-mail from Mr. Greenberg to Todd Trent, dated February 24, 2016 (PP-TRBK0086219 at PP-TRBK0086219), PP-TRBK0004527 and PP-TRBK0019229 (collectively "February 24, 2016 NewCo Model").

[13]   Complaint at para. 103; Noto, A. (February 25, 2016).  Private ambulance service backed by "Wonder Woman of Wall Street" files bankruptcy. *New York Business Journal Online.*

7

committing to terms relating to the acquisition, disposition or sale of the entire company or any of its assets; (4) entering into contracts (including financing or loan contracts); (5) committing to any capital expenditure not contemplated in the approved annual plan; (6) writing off or disposing of inventory; (7) agreeing to make charitable contributions; (8) entering into related party transactions; (9) replacing auditors or tax preparers; (10) engaging counsel; (11) settling claims; (12) engaging consultants; (13) initiating, terminating, or changing employment contracts of the CEO and direct reports;  (14) modifying sales incentives; (15) issuing or granting equity; (16) granting a lien or encumbering any company asset; (17) adding or removing Board members; (18) appointing directors or officers; and (19) disclosing financials or shareholder information of TransCare to any third parties.[14]

### b) Patriarch Defendant Entities

17.    Defendant Patriarch Partners Agency Services, LLC ("PPAS") was owned and managed by Ms. Tilton. PPAS keeps custodial relationships with and serves as the agent for the lender groups to the Patriarch portfolio companies.[15]

18.    Defendant Patriarch Partners Management Group, LLC was owned and managed by Ms. Tilton. It employed Patriarch employees who focused on managing and

---

[14]    Complaint at para. 9; TransCare Corporation Written Consent of the Sole Director ("TransCare Authority Matrix") dated July 10, 2012; E-mail from Mr. Stephen to Mr. Leland et al. dated February 5, 2015 (PP-TRBK0087751).

[15]    Deposition of Ms. Tilton dated October 29, 2018 ("Tilton Deposition") at p. 19.

8

EXPERT REPORT OF
JONATHAN I. ARNOLD, PH.D.
IN RE: TRANSCARE CORPORATION, ET AL.

CONFIDENTIAL

A4080

restructuring Patriarch's portfolio companies.[16]

19.    Defendant Patriarch Partners, LLC was founded by Ms. Tilton. Ms. Tilton is the company's Chief Executive Officer ("CEO").[17]

20.    Defendant Ark II CLO 2001-1, Ltd. ("Ark II") is solely owned by Ms. Tilton and functions both as an equity owner and lender to the Patriarch portfolio companies. Ms. Tilton describes Ark II, a lender to TransCare, as her personal investment account.[18]

21.    Defendants Transcendence Transit, Inc. and Transcendence Transit II, Inc. (collectively, "Transcendence" or "NewCo") were incorporated in the state of Delaware on February 10, 2016.[19] On February 24, 2016, Ms. Tilton, acting in her capacity as the sole Director of TransCare, signed a written consent to transfer and assign TransCare's Access-A-Ride transportation agreement with the New York City Transit Authority ("MTA Contract") to Transcendence Transit II, Inc.[20] Transcendence Transit Inc. was the holding company of Transcendence Transit II, Inc. and other selected operating subsidiaries.[21]

22.    Exhibit 1 illustrates the flow of management fees, interest payments, and

---

[16]    Tilton Deposition at pp. 16-17.

[17]    Tilton Deposition at p. 11.

[18]    Tilton Deposition at p. 19-20.

[19]    Certificate of Incorporation for Transcendence Transit, Inc., dated February 10, 2016 (PP-TRBK0015293); Certificate of Incorporation for Transcendence Transit II, Inc., dated February 10, 2016 (PP-TRBK0015289).

[20]    TransCare New York Inc., Written Consent of the Sole Director dated February 24, 2016 (TRANSCARE00231115-116).

[21]    E-mail from Mr. Greenberg to Don Arrowood et al. dated February 10, 2016 at 1 (PP-TRBK0027756 – PP-TRBK0027758).

9

EXPERT REPORT OF
JONATHAN I. ARNOLD, PH.D.
CONFIDENTIAL                                    IN RE: TRANSCARE CORPORATION, ET AL.

A4081

equity and loan funds between TransCare, Tilton-controlled Patriarch entities and investment funds, and outside equity and loan investors at all relevant times to my analysis.

23.   Exhibit 2 illustrates Ms. Tilton's various roles within the Patriarch business structure in the period relevant to my analysis, as identified in her deposition testimony.

### C.   EVENTS PRIOR TO LIQUIDATION FILING DATE

24.   On January 19, 2015, Glenn Leland ("Mr. Leland") was appointed as TransCare's CEO.[22]   Shortly after assuming this position, he was provided with TransCare's Authority Matrix, which stated that TransCare's Board (i.e., Ms. Tilton) authorized the CEO to:

> approve, adopt, authorize, agree or enter into contracts, commitments, agreements and undertakings... on behalf of the Corporation, subject, however to obtaining approval and authorization... by the Designated Executive or the full Board...[23]

25.   Patriarch's Senior Director (Legal) Brian Stephen ("Mr. Stephen") informed Mr. Leland that there was no Designated Executive.[24]   Instead, Mr. Stephen instructed Mr. Leland that:

> [t]here is room to operate but it would probably be easier to discuss plans [with Ms. Tilton] as they arise since it is difficult to understand how [the Authority Matrix] works tougher [sic] in a vacuum.[25]

---

[22]   Mr. Leland Offer Letter (TRANSCARE00074331).

[23]   TransCare Authority Matrix at 1.

[24]   E-mail from Mr. Stephen to Mr. Leland et al. dated February 5, 2015 (PP-TRBK0087751) stating "[t]he company does not have a Designated Executive as this time."

[25]   E-mail from Mr. Stephen to Mr. Leland et al. dated February 5, 2015 (PP-TRBK0087751).   In citing an example of the type of executive decision that would require Ms. Tilton's approval,

EXPERT REPORT OF
JONATHAN I. ARNOLD, PH.D.
IN RE: TRANSCARE CORPORATION, ET AL.

CONFIDENTIAL

26.     Among other things, Mr. Leland was tasked with assessing TransCare's challenges and overseeing improvements to its operations.[26] From January 19, 2015 until his departure on or around January 7, 2016, Mr. Leland periodically provided operational information and forecasts to representatives at Patriarch, typically in the form of "plans" or "updates." These plans, which are described further below, identify the challenges facing TransCare, as well as management's view of (frequently urgent) capital needs required to maintain and improve its operations. They also contain forecasts concerning relevant operating metrics for TransCare.

27.     During this period, Ms. Tilton or her representatives at Patriarch were provided with updates on TransCare's performance and its central obstacles to improved performance. For example, on February 19, 2015, Mr. Greenberg shared an executive update with Ms. Tilton describing that "[the] business ha[d] deteriorated over the past 7 months of 2014 from average monthly revenue and EBITDA for 1st 5 months of $11.0MM and $450k, respectively."[27] He further explained that:

> [T]he primary difference [with 2013] is an increase in fleet compensation costs from 47% of revenue to 51% of revenue due primarily to challenges with the age of the fleet resulting in more time on task which increases the compensation to revenue ratio. The Transit business is intact and performed consistently in 2014 vs. 2013 but there is concern about the upcoming renewal due to the company's financial position and a lack of support from the procurement group. We want to

---

Mr. Stephen stated that: "[w]e are absolutely sure that Lynn would want to know and approve the company's exploration of other financing sources…."

[26]   Mr. Leland Offer Letter (TRANSCARE00074331).

[27]   E-mail from Mr. Greenberg to Ms. Tilton dated February 19, 2015 (PP-TRBK0042324 – 25).

11

make you aware of the liquidity challenges but have told the management team that we cannot meet until the plan is completed.[28]

28.   On January 25, 2015, Mr. Leland shared an update with Ms. Tilton identifying the following challenges to TransCare's performance: (a) "strained" cash flows, (b) depleted credit capacity on a revolving credit facility provided by Wells Fargo (the "Wells Fargo ABL Facility"), which had been in breach of its covenants for a year, (c) an unreliable fleet with only 60 percent of ambulances operable, leading to poor on-time performance, (d) lost clients and reduced market share, (e) delayed vendor payments, and (f) a "non-viable" recovery plan in place.[29]

29.   Throughout 2015, TransCare received several inquiries regarding a possible sale of itself or some of its key assets.  Exhibit 3 summarizes the indications of interest received by TransCare between February and December 2015.  For example, between February and July 2015, RCA Emergency Medical Services' ("RCA") Chief Operating Officer ("COO") Mike Weinberger ("Mr. Weinberger") separately contacted TransCare Chief Financial Officer ("CFO") Mark Bonilla ("Mr. Bonilla"), Mr. Leland and Ms. Tilton to inquire about purchasing either TransCare as a whole or specific assets, or entering into an operational management agreement.  RCA consistently expressed that, subject to due diligence, "RCA is prepared to offer up to eight times the EBITDA."[30]  Also, in

---

[28]   E-mail from Mr. Greenberg to Ms. Tilton dated February 19, 2015 (PP-TRBK0042324 – 25).

[29]   Plaintiff's Exhibit 84.

[30]   E-mail from Mr. Weinberger to Ms. Tilton dated February 10, 2015 (PP–TRBK0033683); E-mail from Mr. Weinberger to Mr. Leland dated February 20, 2015 (TRANSCARE00195974); E-mail from Mr. Weinberger to Mr. Bonilla and Mr. Leland dated February 18, 2015

12

February, July and December 2015, National Express, LLC indicated an interest in purchasing TransCare's MTA Contract. See Exhibit 3.

30.   On September 29, 2015, Mr. Bonilla resigned as CFO from TransCare.[31]

31.   On January 7, 2016, Mr. Leland departed as CEO from TransCare.[32]

32.   After Mr. Leland's departure, TransCare had neither a designated CEO nor CFO on its executive management team.

33.   As of January 15, 2016, Ms. Tilton committed a $6.5 million loan to TransCare via her Ark II personal investment vehicle ("Ark II Agreement").[33] Carl Marks prepared a TransCare turnaround plan on January 27, 2016, saying "[t]he message is a difficult one, but I believe accurate."[34] This plan was prepared for and shared with Ms. Tilton.[35] The 2015 income statement from this plan indicates that TransCare generated

---

(TRANSCARE00004048 - 49); E-mail from Mr. Weinberger to Ms. Tilton dated March 3, 2015 (PP-TRBK0090486 – 87); E-mail from Mr. Leland to Ms. Tilton dated March 7, 2015 (PP-TRBK0071446 – 50); E-mail exchange between Mr. Greenberg, Mr. Pelissier, Mr. Whalen, and Mr. Leland dated July 9, 2015 (PP-TRBK0033600 – 02).

[31]   Mr. Bonilla's Out of Office AutoReply stating: "Please be aware that my consulting agreement ended with the company as of 2016, and that I have elected not to return to employment in my former role as CFO, which was terminated on 9/29/2015." (TRANSCARE00043758-9).

[32]   E-mail from Mr. Leland to Randy Jones dated January 8, 2016 (PP-TRBK0019062-63).

[33]   Credit Agreement of TransCare Corporation dated January 15, 2016 among TransCare Corporation and Ark II CLO 2001-1, Limited (CURTIS_000521 – 46).

[34]   E-mail from Mr. Greenberg to Marc Pfefferle dated January 27, 2016 (PP-TRBK0024842-43).

[35]   The e-mail from Melissa Provost to Mr. Greenberg dated January 28, 2016 (WF_TC_00003874) references a prior day's budget meeting with Ms. Tilton. Additionally, the e-mail from Mr. Greenberg to Marc Pfefferle dated January 27, 2016 (PP-TRBK0024842) indicates that the Carl Marks plan was intended for Ms. Tilton.

13

EXPERT REPORT OF
JONATHAN I. ARNOLD, PH.D.
IN RE: TRANSCARE CORPORATION, ET AL.

CONFIDENTIAL

A4085

negative EBITDA for the months of October through December of 2015, a reversal of the strong gains (reflected by positive EBITDA) made in April through June of 2015.

34.    On February 7, 2016, Carl Marks Managing Director Carl Landeck ("Mr. Landeck") sent an e-mail to Ms. Tilton directly explaining the need for additional funding in the week to come.[36]  Mr. Stephen reached out to Curtis, Mallet-Prevost, Colt & Mosle LLP ("Curtis Mallet") on February 9, 2016 for assistance in filing Chapter 11 bankruptcy on behalf of TransCare.[37]  On February 15, 2016, in response to a proposed Debtor-In-Possession ("DIP") budget from Carl Marks, Ms. Tilton wrote that, "not I nor the Zohar funds will be providing any additional cash going into the bankruptcy unless it is rolled into the DIP as first cash out."[38]  A spreadsheet dated February 16, 2016 by Patriarch's Controller, Carlos Mercado, indicated that only approximately $1.9 million had been transferred to TransCare under the Ark II Agreement as of that date.[39]

35.    On February 10, 2016, Transcendence Transit, Inc. and Transcendence Transit II, Inc. were incorporated in Delaware.[40]  TransCare's Glen Youngblood ("Mr.

---

[36]   E-mail from Mr. Landeck to Ms. Tilton dated February 7, 2016 (PP-TRBK0022363-65).

[37]   E-mail from Lynn P. Harrison III to Mr. Stephen dated February 9, 2016 (PP-TRBK0051881-83).

[38]   E-mail from Ms. Tilton to Mr. Landeck dated February 15, 2016 (CM_TC2018_0008781-2).

[39]   Tilton Deposition Exhibit 106; PP-TRBK0019089.

[40]   Certificate of Incorporation for Transcendence Transit, Inc., dated February 10, 2016 (PP-TRBK0015293); Certificate of Incorporation for Transcendence Transit II, Inc., dated February 10, 2016 (PP-TRBK0015289).

14

EXPERT REPORT OF
JONATHAN I. ARNOLD, PH.D.
IN RE: TRANSCARE CORPORATION, ET AL.

CONFIDENTIAL

A4086

Youngblood") was named "director" of both corporations the same day.[41]   Messrs.

Youngblood and Greenberg discussed in emails that day that Transcendence Transit II,

Inc. would operate the Paratransit business segment and that Transcendence Transit, Inc.

would be comprised of Transcendence Transit II, Inc. and the Hudson Valley, Pittsburgh,

Maryland, and Westchester business segments.[42]   Also on February 10, 2016, Patriarch

employees: (a) reached out to insurance broker Willis Towers Watson ("Willis") to add

the two new entities to Patriarch's global Directors and Officers ("D&O") liability

insurance policy; (b) applied for and obtained an Employer Identification Number from

the Internal Revenue Service for each entity; and (c) provided both Willis and Lockton

with "insurance information requested."[43]   On February 14, 2016, Patriarch's Platform

Leader Jean Luc Pelissier ("Mr. Pelissier") sent a "[p]rogress and action list" to Patriarch

and TransCare officials, including Ms. Tilton, detailing what needed to be done in

connection with the bankruptcy and transition to the Transcendence entities, as well as

who needed to do it, and by what date it should be done. [44]   The list had several items

---

[41]   Organization Action in Writing of Incorporator for Transcendence Transit, Inc., dated February 10, 2016 (PP-TRBK0015295); Organization Action in Writing of Incorporator for Transcendence Transit II, Inc., dated February 10, 2016 (PP-TRBK0015291).

[42]   E-mails between Mr. Youngblood and Mr. Greenberg, dated February 10, 2016 (PP-TRBK0006471).

[43]   Email from Carlos Mercado to Willis (PP-TRBK0015312); Internal Revenue Service Notice addressed to Transcendence Transit, Inc., dated February 10, 2016 (PP-TRBK0015306); Internal Revenue Service Notice addressed to Transcendence Transit II, Inc., dated February 10, 2016 (PP-TRBK0015309); E-mail from Mr. Greenberg to Don Arrowood et al. dated February 10, 2016 at 1 (PP-TRBK0027756 – PP–TRBK0027758); E-mail from Mr. Greenberg to Robert Siegel et al. dated February 10, 2016 at 1 (PP-TRBK0027792 – PP–TRBK0027794).

[44]   E-mail from Mr. Pelissier to Ms. Tilton al., dated February 14, 2016 (PP-TRBK0091282).

15

CONFIDENTIAL

A4087

that were marked "TBD" with regards to ownership and completion date, including printing and distributing employee transfer letters, "[a]dvis[ing] the MTA unions and obtain[ing] support prior to employees [sic] transfers," holding employee communication meetings in OldCo and NewCo, and "[i]ssu[ing] Worker Adjustment and Training Notification ("WARN") notice to all Old Co employees."[45]

36.    If Ms. Tilton's efforts to transfer NewCo assets to Transcendence had proceeded as planned, NewCo assets would have been operated within Transcendence as a going concern (the "Foreclosure and Buy-Out Transaction").[46] Exhibit 4 shows that the transaction contemplated: (i) rolling over $2.1 million in funding from Ark II from TransCare to Transcendence (including approximately $0.2 million in vehicle purchases to be owned by Ark II); (ii) infusing $10.0 million in new working capital from Ark II; (iii) a $10 million credit bid converting existing lenders' outstanding $43.6 million debt in TransCare into $10.0 million in Transcendence equity, implying consideration to existing lenders of approximately 23 cents on the dollar (that is, $10.0 million divided by $43.6 million).[47] This contemplated transaction assumed a NewCo value of $22.1 million. See Exhibit 4.

37.    On February 24, 2016, Patriarch employees corresponded under the

---

[45]    E-mail between Mr. Pelissier et al., dated February 14, 2016 (PP-TRBK0091282).

[46]    Tilton Deposition at p. 79-81. Ms. Tilton stated that "That was the deal; $12 million of new money and $10 million of credit bid, the MTA contract, assets, Pennsylvania, and Hudson County [sic]."

[47]    Tilton Deposition at pp. 97-143 and Exhibit 106; PP-TRBK0019089.

16

apparent assumption that the NewCo TransCare assets would be successfully transferred to the Transcendence entities, and Ms. Tilton approved of the assignment agreement transferring the MTA Service Agreement to Transcendence Transit II, Inc. on that day.[48] Nonetheless, on February 26, 2016, Carlos Mercado wrote to Chris Hill, Senior Vice President of Corporate Banking at BB&T, that Patriarch was "unsuccessful in the [their] efforts to establish a foundation for restructuring of the company as Transcendence Transit" and that "all work on [BB&T's] end with respect to the establishment of bank accounts...should cease immediately."[49]

## III.   TRANSCARE'S HISTORICAL AND PROJECTED FINANCIAL PERFORMANCE

### A.   HISTORICAL FINANCIAL PERFORMANCE

38.     TransCare generated annual net service revenue of between $118.9 million and $152.1 million from 2009 through the last twelve months ending October 2015.[50] See Exhibit 5.  Average annual net service revenue was $135.6 million during this period. Net service revenue peaked at $152.1 million in 2010, and declined in the following years.  As Exhibit 5 shows, by October 2015 (the last available date for which TransCare provided consolidated financial statements), the net service revenue for the last twelve months was $118.9 million.

---

[48]   TransCare New York, Inc. Written Consent of the Sole Director, dated February 24, 2016.

[49]   E-mail between Carlos Mercado and Chris Hill, dated February 26, 2016 (PP-TRBK0089542).

[50]   I understand that TransCare did not obtain audited financial statements for fiscal years 2014 and thereafter.

EXPERT REPORT OF
JONATHAN I. ARNOLD, PH.D.
IN RE: TRANSCARE CORPORATION, ET AL.

CONFIDENTIAL

39.    TransCare also reported and analyzed financial performance by region: New York Core, Transit, Maryland, Main Line, Pittsburgh, New York 911, and Hudson Valley. For the five months ending May 2015, TransCare's New York 911 segment reported $14.0 million (or 27.9 percent of total revenues), followed by Transit reporting $13.5 million in revenues (representing 27.0 percent of total revenues), and then by New York Core reporting $9.0 million (or 17.9 percent of total revenues).[51]

40.    TransCare reported historical average annual EBITDA of $5.1 million for the period 2009 to the last twelve months ending October 2015, with considerable year-to-year variability.  See Exhibit 6.  As the exhibit shows, TransCare's annual EBTIDA exceeded $7.0 million in the years 2009 (EBITDA of $9.1 million), 2010 (EBITDA of $7.7 million), 2012 (EBITDA of $8.9 million), and 2013 (EBITDA of $7.2 million).   Yet TransCare generated EBITDA of only $0.9 million in 2011, $0.5 million in 2014, and $1.4 million for the last twelve months ending October 2015.  See Exhibit 6.

41.    Exhibit 7 shows EBITDA over the last twelve months for each of the months from November 2014 through October 2015.  As the exhibit shows, TransCare's financial performance improved during the second half of 2015 through October 2015.  See Exhibit 7.

42.    At the region level for the five months ending May 2015, four segments were profitable: New York 911 (achieving $2.4 million EBITDA), Transit (achieving $1.7 million EBITDA), Hudson Valley ($0.9 million EBITDA), and Pittsburgh (achieving $0.2

---

[51]    E-mail from Mr. Greenberg to Ms. Tilton dated July 3, 2015 (TRANSCARE00007937).

18

EXPERT REPORT OF
JONATHAN I. ARNOLD, PH.D.
CONFIDENTIAL                                         IN RE: TRANSCARE CORPORATION, ET AL.

A4090

million EBITDA).   Corporate overhead reduced EBITDA by $2.3 million, resulting in overall EBITDA of $1.0 for this five-month period.[52]

### B.   PROJECTED FINANCIAL PERFORMANCE

43.     The Preliminary Plan Mr. Greenberg shared with TransCare's financial advisor, Carl Marks, incorporated long-term annual projections of revenue and EBITDA. See Exhibits 8 and 9.  Patriarch representatives and Carl Marks also forecasted financial models in January and February 2016 for the full year 2016.  Patriarch additionally created models in February 2016 – the so-called "NewCo" models -- that contemplate performance projections for only certain assets.  I have not seen documents in the production indicating that TransCare continued to make its own forecasts from early 2016 through the Liquidation Filing Date.  After January 7, 2016, TransCare had neither a CEO nor CFO.

44.     Because each of these parties – TransCare, Patriarch, and Carl Marks -- were the most informed entities with respect to TransCare's performance and its outlook assuming that it was provided with sufficient capital to operate as a going concern, I treat their projections as the best available contemporaneous information concerning the TransCare's prospects in the two months prior to the Chapter 7 filing. See Exhibits 8 and 9.

45.     Exhibit 8 reports the projected annual EBITDA for the years 2016 through 2020 as presented in the January 7, 2016 Preliminary Plan and forecasts for full year 2016

---

[52]   E-mail from Mr. Greenberg to Ms. Tilton dated July 3, 2015 (TRANSCARE00007937).

EXPERT REPORT OF
JONATHAN I. ARNOLD, PH.D.
IN RE: TRANSCARE CORPORATION, ET AL.

CONFIDENTIAL

as presented in each of the plans or models prepared between January and February 2016 that I was able to identify in the production materials. Exhibit 9 summarizes the plans' projected annual revenues. Exhibits 8 and 9 only report the results of models or plans that were contemporaneously shared with third parties. Exhibit 10 indicates the entities that received the plans or models developed between January and February 2016 that I consider in my valuation.

46.    While each plan or model varies in its underlying assumptions, the near-uniform expectations that TransCare could improve its annual EBITDA by 2016 suggests that there was a consensus (at least until February 2016) that TransCare had potential value as a going concern.[53] I describe below the underlying assumptions and key projected metrics provided in each plan/model. I then apply these relevant projections in Section IV when determining the implied value of TransCare under each plan/model in the January 2016 to February 2016 period.

### 1.    January 7, 2016 Preliminary Plan

47.    On December 21, 2015, Messrs. Greenberg and Pelissier met with Wells

---

[53]    Wells Fargo representatives also stated their belief that TransCare was a viable company:

> [b]ecause the company was faltering, and it didn't have the capital investment it needed today to sustain itself. And from my perspective, the company was actually a descent [sic] company, had great employees, it had a wonderful, you know, market share, had a lot of routes, you know, routes that were – that could've been probably serving the biggest Metropolitan area in the United States. And, but the company just was undercapitalized. It needed new cars, ambulances, vehicles systems, [short-term] cash, and it needed owners that were going to really put a massive investment in the company.

Deposition of Mr. Husson dated November 12, 2018 ("Husson Deposition") at p. 45.

I also understand that Mr. Leland testified during his November 27, 2018 deposition (which has not yet completed as of the date of this expert report) that if TransCare had been sufficiently capitalized, it could have achieved value as a going concern.

20

Fargo's Loan Portfolio Manager John Husson ("Mr. Husson") and Senior VP/Regional Portfolio Manager Robert Strack ("Mr. Strack") to discuss a long-term agreement to extend the Wells Fargo ABL Facility.  One of the components to reaching an agreement was a mutually acceptable budget. Mr. Greenberg reported to Ms. Tilton that "Wells Fargo would like to receive a budget [that] shows TransCare paying all expenses on a current basis" and that "Wells Fargo would want a third-party consultant" who "would report to the Board but Wells Fargo would have access to."[54]  Subsequently, Wells Fargo's Vice President/Senior Relationship Manager Melissa Provost ("Ms. Provost") requested in an e-mail to Messrs. Greenberg and Pelissier "for the 'Budget' to be provided by December 30, 2015 and subsequently reviewed by the Financial Advisor."[55]

48.     Carl Marks Advisors was hired as a third-party consultant to TransCare Corporation on January 11, 2016.[56] On January 7, 2016, Mr. Greenberg sent Carl Marks an e-mail and attached model described as "updates to 2016 preliminary plan based on yesterday's discussion."[57]  This is the earliest date in the document production I have reviewed that shows collaboration between Patriarch and Carl Marks to develop a TransCare budget to present to Wells Fargo.

---

[54]   E-mail from Mr. Greenberg to Mr. Pelissier dated December 21, 2015 (PP-TRBK0046839 at PP-TRBK0046839).

[55]   E-mail from Ms. Provost to Mr. Greenberg and Mr. Pelissier, dated December 23, 2015 (PP-TRBK0004093 at PP-TRBK0004093); Summary of Proposed Terms (PP-TRBK0004095 at PP-TRBK0004095).

[56]   Consulting Agreement (PP-TRBK0052000 at PP-TRBK0052001).

[57]   January 7, 2016 Preliminary Plan.

21

EXPERT REPORT OF
JONATHAN I. ARNOLD, PH.D.
CONFIDENTIAL                                                    IN RE: TRANSCARE CORPORATION, ET AL.

A4093

49.     The January 7, 2016 Preliminary Plan projected EBITDA for the fiscal year 2016 of $6.9 million. The Plan outlined a "peak need of close to $4.5MM" in funding driven by: (i) $2.2 million in immediate requirements (including a $1 million New York State Insurance Fund ("NYSIF") payment and other obligations including payroll and payroll taxes); (ii) $1.3 million for a 25 percent down payment on 40 vehicles; (iii) $1.0 million in other accounts payables necessary to open back up parts supplies and maintain existing vehicles.[58]

50.     Further, the Plan provided key operating assumptions, in addition to those mentioned above, which included: (i) maintenance and payments of parts vendors in the first quarter; (ii) a facility move to South Bronx to improve efficiency and volume (by up to 30 percent); and (iii) additional MTA routes.[59]  The Plan assumed that the successful implementation of these initiatives would result in TransCare's gross margin percentage improving from 28.6 percent to 32.1 percent.[60]

51.     The January 7, 2016 plan is an iteration of the preliminary plan presented to Wells Fargo in November 2015 and further developed by TransCare management throughout December 2015.   These models, which were prepared by TransCare management working with Messrs. Greenberg and Pelissier, followed the same

---

[58]    January 7, 2016 Preliminary Plan.

[59]    January 7, 2016 Preliminary Plan.

[60]    January 7, 2016 Preliminary Plan.

22

framework and format as the January 7, 2016 Preliminary Plan.[61]

52.    I note that the early December 2015 iterations that I have reviewed forecasted a significantly higher 2016 EBITDA of between $10.5 million and $11.5 million than the 2016 annual EBITDA forecasts found in any of the subsequent models that I consider in my valuation of TransCare.  See Exhibit 8.

53.    TransCare management attributed such differences in projected profitability between early December 2015 and early January 2016 to the "inaction by the Board," whose sole director remained Ms. Tilton.[62]  On January 3, 2016, Mr. Bonilla expressed:

> For 6 weeks [Messrs. Greenberg and Pelissier] have delayed, asked for more data, and finally so much time elapsed we had to refresh all the numbers and company has almost shut down due to cash shortfall of $4mm by 12/31. We handled all inquiries, but they always came back looking for different result [sic]. Now we have less than 24 hours at this juncture to get critical funds requested 45 days ago and what has happened beyond that is we lost more than $4mm in potential EBITDA in 2016.

---

[61]  For example, Mr. Bonilla circulated internal TransCare financial models on December 1, 2015 (TRANSCARE00107866-68) ("TransCare Business Model 2015 and 2016"), and December 3, 2015 (TRANSCARE00107987-989) ("Final Revised 2016 Budget"). Mr. Bonilla later included Messrs. Greenberg and Pelissier as recipients of these models. Mr. Bonilla also sent a model version on December 17, 2015 (TRANSCARE00005770-771) ("TransCare Business Model 2015 and 2016"). E-mail from Mr. Bonilla to Messrs. Leland, Wolf, and Greenberg dated December 13, 2015 and attached model (PP-TRBK0012469-70); Plaintiff's Exhibit 115 (Email from Mr. Bonilla to Mr. Leland dated December 14, 2015 with an attached presentation "TransCare Wells Fargo Nov 16.pptx").

[62]  E-mail from Mr. Bonilla to Messrs. Leland and Wolf dated January 3, 2016 (TRANSCARE00005261 - 262).

EXPERT REPORT OF
JONATHAN I. ARNOLD, PH.D.
IN RE: TRANSCARE CORPORATION, ET AL.

CONFIDENTIAL

**2.       January 27, 2016 Carl Marks Turnaround Plan**

54.      On January 27, 2016, Carl Marks' Partner Marc Pfefferle ("Mr. Pfefferle") circulated a preliminary executive summary that highlighted TransCare being at "breaking point" and explained that Carl Marks had worked to "develop the most accurate financial picture of TransCare possible given the limitations of TransCare's accounting systems and financial reporting."[63]

55.      Mr. Pfefferle explained that "[t]o have a chance of a turnaround, TransCare needs an immediate incremental pledge of support from Patriarch totaling $7.5M+ excluding 2016 term interest" of which "$3.5M… is required over the next two weeks including $1M this week to cover critical or unavoidable obligations to keep the business running."[64]  This capital infusion would allow for TransCare to achieve "a Q4 EBITDA run rate of $2M+, which could support operations, capital lease payments and interest obligations on a go-forward basis" and 2016 EBITDA of $5.0 million.[65]

56.      While the presentation cautioned that "execution risk is high and therefore ultimate payback on the incremental investment is uncertain," it also highlighted that TransCare had "several key attributes that provide the opportunity for a successful turnaround" such as "…dedicated employees…, long standing customer relationships and historical reputation for service…, and [achievable] operational fixes and

---

[63]    January 27, 2016 Carl Marks Turnaround Plan at pp. 2 and 5.

[64]    January 27, 2016 Carl Marks Turnaround Plan at 5.

[65]    January 27, 2016 Carl Marks Turnaround Plan at 5 and 14.

24

CONFIDENTIAL

EXPERT REPORT OF
JONATHAN I. ARNOLD, PH.D.
IN RE: TRANSCARE CORPORATION, ET AL.

A4096

infrastructure improvement over time with the right leadership and commitment to invest in the business."[66]

### 3. January 28, 2016 Executive Summary Updates by Mr. Greenberg to Carl Marks Turnaround Plan

57.     On January 28, 2016, Mr. Greenberg sent an updated version of the January 27, 2016 budget and accompanying executive summary that was intended to be shared with Ms. Tilton at a meeting that day.[67]

58.     The January 28, 2016 Executive Summary projects EBITDA for the fiscal year 2016 of $5.2 million (an improvement of $0.2 million over the January 27, 2016 Carl Marks plan due to slightly higher forecasted Transit revenue) assuming that TransCare would: (i) lease or acquire twenty Type II (non-emergency) vehicles; (ii) lease or acquire at least twenty-three Type III (911) vehicles (eleven or more for New York, eight for St. Barnabas, one for each of the other main accounts (Bronx-Lebanon, Montefiore, Mt Sinai), and one for the University of Maryland); and (iii) move its NY Core facility out of Hamilton by June 30, 2016.[68]

### 4. February 24, 2016 NewCo Model

59.     On February 24, 2016, Mr. Greenberg, sent a "TransCare NewCo Model" to

---

[66]   January 27, 2016 Carl Marks Turnaround Plan at 5 and 8.

[67]   E-mails between Messrs. Grenberg, Pfefferle, Killion, Pelissier and others dated January 27,2016 (PP-TRBK0024842); E-mails between Mr. Greenberg, Ms. Provost, Mr. Husson, Mr. Landeck, and Mr. Pelissier, dated January 28, 2016 (WF_TC_00003874).

[68]   January 28, 2016 Update to Carl Marks Turnaround Plan at 1.

CONFIDENTIAL

EXPERT REPORT OF
JONATHAN I. ARNOLD, PH.D.
*IN RE: TRANSCARE CORPORATION, ET AL.*

Todd Trent ("Mr. Trent") of Lockton Companies, TransCare's insurance broker. Mr. Greenberg informed Mr. Trent that NewCo was Transcendence Transit, Inc.[69]

60.     The TransCare NewCo Model projects EBITDA for fiscal year 2016 of $3.2 million for only the Paratransit, Pennsylvania, and Hudson Valley divisions, excluding corporate overhead.[70]  The model also "includes purchase of 5 ambulances ($300k) in February" for the Pennsylvania division.[71]

### C.     CAPITAL NEEDS

61.     Exhibit 11 identifies TransCare's stated capital needs that, if fulfilled, would have supported the projected financial performance as identified in the business plans in January and February 2016. The exhibit illustrates that the requested capital was intended to be used in order of priority: first, for either covering immediate accounts payable obligations (including payroll, payroll taxes, insurance, and rent), and second to purchase or lease new vehicles to enable the growth that would achieve each plan's projected EBITDA.

---

[69]   E-mail from Mr. Greenberg to Mr. Trent, dated February 24, 2016 (PP-TRBK0086219 at PP-TRBK0086219).

[70]   February 24, 2016 NewCo Model. The model, which includes a "toggle" field to add or remove divisions from NewCo, shows that fiscal year 2016 EBITDA totals $5.2 million. This reflects the performance of the default NewCo entities along with the Maryland, White Plains/Westchester, and Montefiore/Bronx Lebanon (TC Ambulance Corporation) divisions.

[71]   February 24, 2016 NewCo Model.

EXPERT REPORT OF
JONATHAN I. ARNOLD, PH.D.
*IN RE: TRANSCARE CORPORATION, ET AL.*

CONFIDENTIAL

## IV.   OPERATING VALUES

### A.   INTRODUCTION

62.   To determine the Operating Value of TransCare as of various dates between January and February 2016, I consider three widely used valuation methodologies: the discounted cash flow ("DCF") approach, the "Comparable Company", and the "Precedent Transaction" methods.[72]

63.   The value of a company is based upon the cash flows it is expected to generate in the future, along with the riskiness of realizing the expected cash flows. Forecasts of a firm's future cash flows reflect beliefs about the most current indicators of the firm's prospects.  Because the future is uncertain – and that uncertainty increases the further one projects into the future – projections of an entity's nearest future performance are often easier to forecast.  This is especially true in the case of TransCare because of its volatile recent historical performance, insufficient capital and certain adverse events (such as loss of contracts, payroll issues, and vehicle breakdowns) that affected its operations but which were expected to be addressed in the future.  In each of the valuation methodologies that I consider, therefore, I emphasize forward-looking forecasts in assessing TransCare's Operating Value.

64.   The DCF method consists of valuing a firm by adding the present value of

---

[72]   I have implemented all of these models in the past, and all can be appropriate means of estimating valuations. Many academic and professional texts describe these models, including Rosenbaum, Joshua & Joshua Pearl, 2013, Investment Banking: Valuation, Leveraged Buyouts, and Mergers & Acquisitions (Wiley, Second Edition) ("Rosenbaum & Pearl 2013") at pp. 13, 83, and 125.

27

EXPERT REPORT OF
JONATHAN I. ARNOLD, PH.D.
IN RE: TRANSCARE CORPORATION, ET AL.

CONFIDENTIAL

A4099

its projected free cash flows into perpetuity, discounted at a rate that reflects the riskiness of those cash flows.  The inputs necessary to derive projected free cash flows include projections of expected financial performance (e.g., revenue growth rates, profit margins), expected investment and capital requirements (e.g., capital expenditures, net working capital, and associated depreciation and amortization), expected tax rates, and expected riskiness of the cash flows (e.g., discount rate or weighted average cost of capital).[73] None of these are present in the January 7, 2016 Preliminary Plan.

65.     The January 7, 2016 Preliminary Plan forecasts annual revenue and EBITDA for the years 2016 through 2020.  See Exhibits 8 and 9.  As Exhibits 8 and 9 show, it is the only financial model prepared in January and February 2016 that provides long-term annual revenue and EBITDA projections for years beyond 2016 that I consider in my valuation.  While annual revenue and EBITDA forecasts are almost always a necessary component to perform an accurate DCF analysis, these inputs are not sufficient for me to apply the DCF method, which also requires forecasts of TransCare's annual expected free cash flows.  In this case, TransCare's management and the creators of the January 7, 2016 Preliminary Plan did not prepare long-term projections or assumptions on capital expenditures, net working capital or associated depreciation and amortization.[74]  In the absence of these forecasts, I do not have sufficient information to infer operating cash flow forecasts.  Additionally, TransCare's recent state of financial distress, the historical

---

[73]     Rosenbaum & Pearl 2013 at p. 125.

[74]     January 7, 2016 Preliminary Plan.

CONFIDENTIAL

variability in its performance (as summarized in Exhibits 5 and 6), and its lack of recent audited financial statements prevent me from reliably estimating those inputs myself. For these reasons, I do not further develop the DCF method in my assessment of TransCare's Operating Value.

66.    I next turn to the Comparable Company and Precedent Transaction methods of estimating the value of TransCare. In both cases, I use forward-looking valuation metrics to estimate TransCare's Operating Value.

67.    In the Comparable Company methodology, the implied value of a firm is determined based on the trading prices of public companies that are similar to the subject firm. The industry in which TransCare operates has two publicly traded peers during the relevant period:  Envision Healthcare Corporation and Air Methods Corporation. I note that these firms were identified by Mr. Greenberg in his market comparable companies analysis, which he shared with Ms. Tilton, on December 18, 2015.[75]  In summarizing his analysis, Mr. Greenberg concluded that "EV to revenue multiple averages 1.8x and EV to LTM EBITDA averages 10.1x."[76]  The value of TransCare is determined by applying the comparable companies' Enterprise Value – to – Projected Earnings Before Interest, Taxes, Depreciation, and Amortization multiple ("EV /

---

[75]    E-mail from Mr. Greenberg to Ms. Tilton dated December 18, 2015 (PP-TRBK0041410) and attachment (PP-TRBK0041414). Mr. Greenberg also identified PHI, Inc. as a potential comparable but excluded it from his analysis since it "appears to be an outlier."  I further note that S&P Capital IQ does not report Forward EV/EBITDA multiples for PHI, Inc.

[76]    E-mail from Mr. Greenberg to Ms. Tilton dated December 18, 2015 (PP-TRBK0041410)

EXPERT REPORT OF
JONATHAN I. ARNOLD, PH.D.
IN RE: TRANSCARE CORPORATION, ET AL.

CONFIDENTIAL

Forward EBITDA Multiple") to TransCare's projected EBITDA.[77]

68.     When implementing the Precedent Transaction method, the implied value
of a firm is determined based on the multiples paid for comparable companies in prior
M&A transactions.[78]  I rely on the two transaction comparables and the EV / EBITDA
multiples identified by Mr. Greenberg and shared with Ms. Tilton on December 18, 2015:
(i) Envision Healthcare Corporation's acquisition of Rural/Metro Corporation, and (ii)
KKR & Co., Inc.'s acquisition of Air Medical Group Holdings.[79]

### B.     VALUATIONS BASED ON INDUSTRY MULTIPLES IDENTIFIED BY MS. TILTON

69.     In addition, I perform a valuation of TransCare relying on the 7.0x – 8.0x
EV / EBITDA industry multiples range identified by Ms. Tilton during her deposition.[80]
I note that Ms. Tilton's assumed multiples range is generally consistent with the multiples
range derived from the Comparable Company method, which provides support to my
conclusions on TransCare's Operating Value using that method.  See Exhibit 12.

### C.     VALUATIONS BASED ON POTENTIAL OFFERS FOR ASSETS

70.     I estimate a total enterprise value of TransCare relying on the 8.0x

---

[77]   Rosenbaum & Pearl 2013 at p. 13.

[78]   Rosenbaum & Pearl 2013 at p. 83.

[79]   E-mail from Mr. Greenberg to Ms. Tilton dated December 18, 2015 (PP-TRBK0041410) and
attachment (PP-TRBK0041414). Mr. Greenberg also identified the following transactions as
comparable but didn't report EV/EBITDA multiples for them: (i) Falck USA Holdings, Inc.'s
acquisition of Verihealth Inc.; (ii) Air Methods Corp.' acquisition of Tri-State CareFlight, LLC;
(iii) ProTransport-1, LLC's acquisition of Century Ambulance Service, Inc.; and (iv)
ProTransport-1, LLC's acquisition of PRN Ambulance, Inc. I further note that S&P Capital
IQ does not report EV/EBITDA multiples for the transaction comparables identified by Mr.
Greenberg.

[80]   Tilton Deposition at p. 119.

30

EV/EBITDA offered by RCA for all or part of TransCare's assets on at least three dates in the course of 2015. I note that this multiple falls within the multiple ranges derived from the Comparable Company Approach and provides support to my conclusions on Operating Value. See Exhibit 12. I also note, however, that these preliminary offers were made without the benefit of due diligence.

**D. MS. TILTON'S FORECLOSURE AND BUY-OUT TRANSACTION**

71. In the attempted Foreclosure and Buy-Out transaction, Ms. Tilton represented the interests of the acquirer, the target, and the majority of the lenders. I note that her valuation of NewCo at $22.1 million is just below the low range of the Operating Value of NewCo that I estimate in this report.

**E. SUMMARY**

72. Exhibit 12e provides a summary of the implied Operating Values that I derive using the methods described above and as reflected in Exhibits 12a through 12d. The exhibits show an implied Operating Value of between $22.7 million and $86.5 million using the Comparable Company and Precedent Transaction methods. As the exhibit shows, the implied Operating Values for WholeCo range from $35.3 million to $86.5 million and the implied Operating Values for NewCo range from $22.7 million to $39.1 million. The exhibit also shows a range of implied Operating Values of $39.7 million to $55.5 million for WholeCo and $25.6 million for NewCo based upon the expressions of interest. Exhibit 12e also shows a range of implied Operating Values based upon Ms. Tilton's industry multiples of $34.8 million to $55.5 million for WholeCo and $22.4 million

31

to $25.6 million for NewCo.

73.    As described above, TransCare's management had apparently concluded by January 3, 2016 that TransCare's reduced earnings outlook was due to "inaction" by the Board (that is, Ms. Tilton).[81]  With time, that outlook only worsened: throughout January 2016, each subsequent set of projections forecasts lower 2016 EBITDA.  This reduced outlook reflects delays in the Board's actions concerning TransCare's urgent (and overdue) financial obligations and capital requirements to survive as a going concern.  I therefore view the range of Operating Values derived from January 7, 2016 Preliminary Plan as the most appropriate range of implied Operating Values.

## V.    LIQUIDATION VALUE AFTER FEBRUARY 24, 2016

74.    On February 24, 2016, TransCare entered Chapter 7 liquidation and TransCare's assets were to be sold off collectively or individually in a forced manner, as opposed to an orderly manner, and in a shorter time frame than would normally be needed to achieve the Operating Value.

75.    I was instructed to estimate the Liquidation Values based on documents provided to me by counsel from the Chapter 7 bankruptcy proceedings case docket.

76.    I understand that the Liquidation Value of TransCare as a whole is $19.2 million ("WholeCo Liquidation Value") and results from the sum of the sale value (net of sale and collection costs) of TransCare's assets: (i) $11.7 million from the sale of

---

[81]  E-mail from Mr. Bonilla to Messrs. Leland and Wolf dated January 3, 2016 (TRANSCARE00005261 - 262).

EXPERT REPORT OF
JONATHAN I. ARNOLD, PH.D.
*IN RE: TRANSCARE CORPORATION, ET AL.*

CONFIDENTIAL

Certificates of Need ("CONs"), (ii) $2.0 from the sale of equipment and physical assets sold, and (iii) $5.6 million from TransCare's accounts receivable collected. See Exhibit 13.

77.   I understand that the Liquidation Value of the assets included in NewCo is $5.7 million ("NewCo Liquidation Value") and results from the sum of the sale value (net of allocable sale and collection costs) of TransCare's assets as planned to be distributed to NewCo: (i) $1.9 million from the sale of the Certificate of Need no. 0667, (ii) $0.8 million equipment and physical assets, and (iii) $3.1 million from TransCare's accounts receivable collected. See Exhibit 13.

## VI.   DIFFERENCE BETWEEN OPERATING VALUES AND LIQUIDATION VALUE

### A.   MEASURING THE DIFFERENCE

78.   Counsel for the Plaintiff has asked me to calculate the difference between TransCare's Operating Values and Liquidation Value based on plans and models developed by TransCare, Patriarch, and Carl Marks at different points in time between January and February 2016. Exhibit 14 shows that the difference between Operating Values and Liquidation Value across assets to be operated or sold and across dates ranges from $16.1 million and $67.3 million. When using the implied Operating Values based upon January 2016 projections for WholeCo, Exhibit 14 shows that the difference ranges from $16.1 million to $67.3 million. When using the implied Operating Value based on February 2016 projections for NewCo, the Difference ranges from $17.0 million to $33.4 million.

33

EXPERT REPORT OF
JONATHAN I. ARNOLD, PH.D.
IN RE: TRANSCARE CORPORATION, ET AL.

CONFIDENTIAL

A4105

## VII.  CONCLUSION

79.   Based on the foregoing, it is my opinion that TransCare's Operating Values between January and February 2016 was between $22.7 million and $86.5 million prior to the Liquidation Filing Date.   The difference between the Operating Values and Liquidation Value of TransCare ranges from $16.1 million to $67.3 million.

80.   Further, when I break down the analysis for WholeCo and NewCo, I conclude that:

- The Operating Values based on January 2016 projections for the TransCare in its entire ("WholeCo") range from $35.3 million to $86.5 million;

- The Operating Value based on February 2016 projections for selected assets ("NewCo") ranges from $22.7 million to $39.1 million;

- The difference between TransCare's Operating Values based on January 2016 projections for WholeCo and the Liquidation Value is between $16.1 million and $67.3 million; and

- The difference between TransCare's Operating Value based on February 2016 projections for NewCo and the Liquidation Value is between $17.0 million and $33.4 million.

34

CONFIDENTIAL

EXPERT REPORT OF
JONATHAN I. ARNOLD, PH.D.
IN RE: TRANSCARE CORPORATION, ET AL.

November 30, 2018

Jonathan I. Arnold, Ph.D.

35

CONFIDENTIAL

EXPERT REPORT OF
JONATHAN I. ARNOLD, PH.D.
IN RE: TRANSCARE CORPORATION, ET AL.

A4107