# 20 Civ. 06274 (LAK)

**United States District Court**

*for the*

**Southern District of New York**

---

*IN RE TRANSCARE CORPORATION*, ET AL.

DEBTORS,

---

PATRIARCH PARTNERS AGENCY SERVICES, LLC, ET AL.

DEFENDANTS-APPELLANTS,

—against—

SALVATORE LAMONICA, AS CHAPTER 7 TRUSTEE OF THE JOINTLY-ADMINISTERED ESTATES OF TRANSCARE CORPORATION, ET AL.,

PLAINTIFF-APPELLEE.

---

ON APPEAL FROM THE UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK (BERNSTEIN, J.)

IN RE: TRANSCARE CORPORATION, ET AL., CASE NO. 16-10407 (SMB)

LAMONICA V. TILTON, ET AL., ADV. PROC. NO. 18-1021 (SMB)

---

## APPENDIX TO BRIEF FOR THE APPELLANTS

---

# Volume XXXVII - A4108-A4184

NOVEMBER 2018

CURRICULUM VITAE

# Jonathan I. Arnold, Ph.D.

jonathan.arnold@chicagoecon.com

## EDUCATION:

Ph.D.    Business Economics, Graduate School of Business, The University of Chicago

M.B.A.   Finance and Accounting, The University of Chicago Graduate School of Business

B.A.     Economics, The University of Chicago

## PROFESSIONAL EXPERIENCE SINCE 1995:

2013 –        *Testifying Expert Economist*, Chicago Economics Corp.

2015 –        *Senior Consultant*, Coherent Economics

2013 -        *Senior Consultant*, Compass Lexecon.

2012 – 2013   *Chief Economist*, Office of the Attorney General, New York State

2006 – 2012   *Managing Principal*, Analysis Group, Inc.

1995 – 2006   *Principal*, Chicago Partners

## TESTIMONY – SINCE 2014:

- Rebuttal Expert Report in *Jo Ann Howard and Associates v. J. Douglas Cassity*, U.S. District Court Eastern District of Missouri, Case No. 09-CV-1252-ERW. (November 2018)
- Expert Report in *U.S.A. v. Matthew Connolly and Gavin Black*, U.S. District Court, Southern District of New York, Case No. 01:16-CR-00370 (CM). (September 2018)
- Deposition in *Jo Ann Howard and Associates v. J. Douglas Cassity*, U.S. District Court Eastern District of Missouri, Case No. 09-CV-1252-ERW. (August 2018)
- Expert Report in *Jo Ann Howard and Associates v. J. Douglas Cassity*, U.S. District Court Eastern District of Missouri, Case No. 09-CV-1252-ERW. (July 2018)

CONFIDENTIAL

- Deposition in *Eagle View Technologies v. Xactware Solutions*, U.S. District Court for the District of New Jersey, Civil Action No. 15-cv-07025. (May 2018)

- Expert Report in *State of Washington v. LG Electronics*, Superior Court of King County, Washington, Case No. 12-2-15842-8. (May 2018)

- Rebuttal Expert Report in *Eagle View Technologies v. Xactware Solutions*, U.S. District Court for the District of New Jersey, Civil Action No. 15-cv-07025. (May 2018)

- Expert Report in *Eagle View Technologies v. Xactware Solutions*, U.S. District Court for the District of New Jersey, Civil Action No. 15-cv-07025. (May 2018)

- Expert Report in *Eagle View Technologies v. Xactware Solutions*, U.S. District Court for the District of New Jersey, Civil Action No. 15-cv-07025. (April 2018)

- Testimony *In the Matter of Certain Two-Way Radio Equipment and Systems, Related Software and Components Thereof*, United States International Trade Commission, Washington, D.C., Investigation No. 337-TA-1053. (January 2018)

- Deposition *In the Matter of Certain Two-Way Radio Equipment and Systems, Related Software and Components Thereof*, United States International Trade Commission, Washington, D.C., Investigation No. 337-TA-1053. (November 2017)

- Expert Report *In the Matter of Certain Two-Way Radio Equipment and Systems, Related Software and Components Thereof*, United States International Trade Commission, Washington, D.C., Investigation No. 337-TA-1053. (October 2017)

- Deposition *In re Avaya*, U.S. Bankruptcy Court of the Southern District of New York, Ch. 11, Case No. 17-10089. (October 2017)

- Expert Report *In re Avaya*, U.S. Bankruptcy Court of the Southern District of New York, Ch. 11, Case No. 17-10089. (October 2017)

- Deposition in *Stark Master Fund Ltd. and Stark Global Opportunities Master Fund Ltd. v. Credit Suisse Securities*, U.S. District Court for the Eastern District of Wisconsin, No. 14-cv-689. (August 2017)

- Testimony in *The Financial Oversight and Management Board for Puerto Rico, as representative of The Commonwealth of Puerto Rico* (PROMESA Title III No. 17 BK 3283-LTS); in re: The Financial Oversight and Management Board for Puerto Rico, as representative of Puerto Rico Highways & Transportation Authority (PROMESA Title III, No. 17 BK 3567-LTS); Peaje Investments v. Puerto Rico Highways & Transportation Authority (Adv. Proc. No. 17-151-LTS in 17 BK 3567-LTS and Adv. Proc. No. 17-152-LTS in 17 BK 3283-LTS) (August 2017)

- Rebuttal Expert Report in *Stark Master Fund Ltd. and Stark Global Opportunities Master Fund Ltd. V. Credit Suisse Securities*, U.S. District Court of the Eastern District of Wisconsin, No. 14-cv-689. (August 2017)

- Deposition in *The United States of America, ex rel., John H. Oberg v. Pennsylvania Higher Education Assistance Agency,* U.S. District court of the Easter District of Virginia, No. 1:07-cv-00960-CMH-JFA. (August 2017)

- Deposition in *The Financial Oversight and Management Board for Puerto Rico, as representative of The Commonwealth of Puerto Rico* (PROMESA Title III No. 17 BK 3283-LTS); in re: The

Financial Oversight and Management Board for Puerto Rico, as representative of Puerto Rico Highways & Transportation Authority (PROMESA Title III, No. 17 BK 3567-LTS); Peaje Investments v. Puerto Rico Highways & Transportation Authority (Adv. Proc. No. 17-151-LTS in 17 BK 3567-LTS and Adv. Proc. No. 17-152-LTS in 17 BK 3283-LTS) (July 2017)

- Declaration in *The Financial Oversight and Management Board for Puerto Rico, as representative of The Commonwealth of Puerto Rico* (PROMESA Title III No. 17 BK 3283-LTS); in re: The Financial Oversight and Management Board for Puerto Rico, as representative of Puerto Rico Highways & Transportation Authority (PROMESA Title III, No. 17 BK 3567-LTS); Peaje Investments v. Puerto Rico Highways & Transportation Authority (Adv. Proc. No. 17-151-LTS in 17 BK 3567-LTS and Adv. Proc. No. 17-152-LTS in 17 BK 3283-LTS) (July 2017)

- Expert Report in *Stark Master Fund Ltd. and Stark Global Opportunities Master Fund Ltd. V. Credit Suisse Securities,* U.S. District Court of the Eastern District of Wisconsin, No. 14-cv-689. (July 2017)

- Expert Report in *The United States of America, ex rel., John H. Oberg v. Pennsylvania Higher Education Assistance Agency,* U.S. District court of the Easter District of Virginia, No. 1:07-cv-00960-CMH-JFA. (June 2017)

- Deposition in *The State of Illinois v. Hitachi,* Circuit Court of Cook County, Illinois, County Department, Chancery Division, Case No. 2012-CH-35266. (April 2017)

- Hearing Testimony in *Arista Networks, Inc. v. Cisco Systems, Inc.,* International Trade Commission Washington, D.C., Investigation No. 337-TA-977. (April 2017)

- Deposition in *Arista Networks, Inc. v. Cisco Systems, Inc.,* International Trade Commission Washington, D.C., Investigation No. 337-TA-977. (February 2017)

- Second Supplemental Expert Report in *Arista Networks v. Cisco Systems,* International Trade Commission Washington, D.C., Investigation No. 337-TA-977. (February 2017)

- Supplemental Expert Report in *Arista Networks v. Cisco Systems,* International Trade Commission Washington, D.C., Investigation No. 337-TA-977. (February 2017)

- Expert Report in *Arista Networks v. Cisco Systems,* International Trade Commission Washington, D.C., Investigation No. 337-TA-977. (January 2017)

- Rebuttal Expert Report in *The State of Illinois v. Hitachi,* Circuit Court of Cook County, Illinois, County Department, Chancery Division, Case No. 2012-CH-35266. (January 2017)

- Court Testimony in a consolidated proceeding comprising *Brigade Leveraged Capital Structures Fund v. Alejandro Garcia-Padilla* (16-1610), *National Public Finance Guarantee v. Alejandro Garcia-Padilla* (16-2101), *Dionisio Trigo-Gonzalez v. Alejandro Garcia-Padilla* (16-2257), and *U.S. Bank Trust National Association v. The Commonwealth of Puerto Rico* (16-2510), U.S. District Court, District of Puerto Rico. (September 2016)

- Deposition in *MyFord Touch Consumer Litigation,* U.S. District Court, Northern District of California, San Francisco Division, Case No. 13-cv-3072-EMC. (September 2016)

- Responsive Damages Expert Report in *MyFord Touch Consumer Litigation,* U.S. District Court, Northern District of California, San Francisco Division, Case No. 13-cv-3072-EMC. (September 2016)

CONFIDENTIAL

- Expert Report in *The State of Illinois v. Hitachi*, Circuit Court of Cook County, Illinois, County Department, Chancery Division, Case No. 2012-CH-35266. (August 2016)

- Deposition in *Philips v. Ford*, U.S. District Court, Northern District of California, San Jose Division, Case No. 5:14-cv-02989-LHK. (August 2016)

- Trial Testimony in *Nortek Air Solutions v. Energy Labs*, U.S. District Court, Northern District of California, San Jose Division, Case No. 5:14-cv-02919-BLF. (August 2016)

- Damages Expert Report in *MyFord Touch Consumer Litigation*, U.S. District Court, Northern District of California, San Francisco Division, Case No. 13-cv-3072-EMC. (August 2016)

- Expert Report in *Philips v. Ford*, U.S. District Court, Northern District of California, San Jose Division, Case No. 5:14-cv-02989-LHK. (July 2016)

- Responsive Expert Report in *MyFord Touch Consumer Litigation*, U.S. District Court, Northern District of California, San Francisco Division, Case No. 13-cv-3072-EMC. (May 2016)

- Supplemental Declaration *Lena K. Thodos and David Miller v. Nicor*, Circuit Court of Cook County, Illinois County Department, Chancery Division, Case No. 11CH06556. (April 2016)

- Deposition in *Nortek Air Solutions v. Energy Labs*, U.S. District Court, Northern District of California, San Jose Division, Case No. 5:14-cv-02919-BLF (March 2016)

- Expert Report in *Nortek Air Solutions v. Energy Labs*, U.S. District Court, Northern District of California, San Jose Division, Case No. 5:14-cv-02919-BLF (February 2016)

- Deposition in *MyFord Touch Consumer Litigation*, U.S. District Court, Northern District of California, San Francisco Division, Case No. 13-cv-3072-EMC. (February 2016)

- Deposition in *Richard S. Stack, M.D. v. Abbott Laboratories*, U.S. District Court, Middle District of North Carolina, Case No. 1:12-CV-148. (January 2016)

- Expert Report in *MyFord Touch Consumer Litigation*, U.S. District Court, Northern District of California, San Francisco Division, Case No. 13-cv-3072-EMC. (January 2016)

- Deposition in *Lena K. Thodos and David Miller v. Nicor*, Circuit Court of Cook County, Illinois County Department, Chancery Division, Case No. 11CH06556. (December 2015)

- Expert Report in *Richard S. Stack, M.D. v. Abbott Laboratories*, U.S. District Court, Middle District of North Carolina, Case No. 1:12-CV-148. (December 2015)

- Declaration in *Russell Dover v. British Airways*, U.S. District Court, Eastern District of New York, Case No. 1:12-CV-05567. (November 2015)

- Declaration in *Lena K. Thodos and David Miller v. Nicor*, Circuit Court of Cook County, Illinois County Department, Chancery Division, Case No. 11CH06556. (October 2015)

- Deposition in *Jo Ann Howard and Associates v. J. Douglas Cassity*, U.S. District Court Eastern District of Missouri, Case No. 09-CV-1252-ERW. (October 2015)

- Supplemental Expert Report in *Russell Dover v. British Airways*, U.S. District Court, Eastern District of New York, Case No. 1:12-cv-05567. (September 2015)

CONFIDENTIAL

- Deposition in *Russell Dover v. British Airways*, U.S. District Court, Eastern District of New York, Case No. 1:12-cv-05567. (August 2015)

- Rebuttal Expert Report in *Russell Dover v. British Airways*, U.S. District Court, Eastern District of New York, Case No. 1:12-cv-05567. (June 2015)

- Expert Report in *Russell Dover v. British Airways*, U.S. District Court, Eastern District of New York, Case No. 1:12-cv-05567. (May 2015)

- Expert Report in *Thomas & Betts International v. Burny*, U.S. District Court, Western District of Tennessee, Case No. 2:14-cv-2296-JPM-tmp. (April 2015)

- Testimony in *Jo Ann Howard and Associates v. J. Douglas Cassity*, U.S. District Court Eastern District of Missouri, Case No. 09-CV-1252-ERW. (March 2015)

- Deposition in *Jo Ann Howard and Associates v. J. Douglas Cassity*, U.S. District Court Eastern District of Missouri, Case No. 09-CV-1252-ERW. (February 2015)

- Deposition in *Jo Ann Howard and Associates v. J. Douglas Cassity*, U.S. District Court Eastern District of Missouri, Case No. 09-CV-1252-ERW. (January 2015)

- Expert Report in *Jo Ann Howard and Associates v. J. Douglas Cassity*, U.S. District Court Eastern District of Missouri, Case No. 09-CV-1252-ERW. (January 2015)

- Reply Declaration in *Cryolife, Inc. v. C.R. Bard*, U. S. District Court of the District of Delaware, Case No. CV-14-00559-SLR. (January 2015)

- Declaration in *Cryolife, Inc. v. C.R. Bard*, U. S. District Court of the District of Delaware, Case No. CV-14-00559-SLR. (September 2014)

- Expert Report in *Illinois Pension Litigation*, Circuit Court for the Seventh Judicial Circuit, Sangamon County Illinois, Case No. 2014-MR1. (August 2014)

- Deposition in *Jo Ann Howard and Associates v. J. Douglas Cassity*, U.S. District Court Eastern District of Missouri, Case No. 09-CV-1252-ERW. (August 2014)

- Expert Report in *Jo Ann Howard and Associates v. J. Douglas Cassity*, et al., U.S. District Court Eastern District of Missouri, Case No. 09-CV-1252-ERW. (July 2014)

- Testimony in *SolidFX v. Jeppesen Sanderson*, U.S. District Court, District of Colorado, Case No. 11-CV-1468. (April 2014)

## TEACHING EXPERIENCE:

- **Columbia University and Duke University**
  *Guest Lecturer (2002 – 2004)*

- **The University of Chicago, Department of Economics and Graduate School of Business**
  *Lecturer (1998 – 1999)*

  Taught microeconomics (topics included price theory, industrial organization, capital theory, principles of labor economics, and durable goods economics)

- **Loyola University Chicago School of Law**

CONFIDENTIAL

*Lecturer of Law (1997 – 1998)*

Taught antitrust economics

## PROFESSIONAL AFFILIATIONS:

American Economics Association

## OTHER:

Certified Public Accountant

CONFIDENTIAL

# MATERIALS RELIED UPON

**Legal Filings**

Schedules of Assets and Liabilities, In the United States Bankruptcy Court of the Southern District of New York, Case No 02-14385, September 20, 2002.

Amended Complaint In re TransCare Corporation, et al, In the United States Bankruptcy Court of the Southern District of New York, Case No 16-10407, November 28 2018.

Debtor TransCare Corporation's Amended List of Equity Security Holders and Statement of Corporate Ownership, In the United States Bankruptcy Court of the Southern District of New York, Case No 16-10407, May 9, 2016.

Defendants FSAR Holdings, Inc. Post-Trial Brief, In the Court of Chancery of the State of Delaware, public version filed July 3, 2017.

Defendants FSAR Holdings, Inc. Post-Trial Brief, In the Court of Chancery of the State of Delaware, C.A. No. 12946-VCS, public version filed July 3, 2017.

Defendants Lynn Tilton's Corrected Post-Trial Brief, In the Court of Chancery of the State of Delaware, C.A. No. 12946-VCS, public version filed July 5, 2017.

Memorandum Opinion re Zohar II 2005-1, Limited and Zohar III, Limited v. FSAR Holdings, Inc. et al., In the Court of Chancery of the State of Delaware, C.A. No. 12946-VCS, November 30, 2017.

Order, Pursuant to 11 U.S.C. §§ 105(a) and 721, Authorizing the Chapter 7 Trustee to Operate the Debtors' Business and Pay Certain Operating Expenses of These Estates, In the United States Bankruptcy Court of the Southern District of New York, Case No 16-10407, March 24, 2016.

Auctioneer's Report of Commission and Expenses for the Auction Sale of the Assets Conducted on June 21, 2016, In the United States Bankruptcy Court of the Southern District of New York, Case No 16-10407, August 23, 2016.

Auctioneer's Report of Commission and Expenses for the Auction Sale of the Assets Conducted on April 20th, May 4th, May 6th, May 11th, & May 12th, 2016, In the United States Bankruptcy Court of the Southern District of New York, Case No 16-10407, August 23, 2016.

Debtors TransCare Corporation, et al., Monthly Operating Statement for the Period Ended September 30, 2016, In the United States Bankruptcy Court of the Southern District of New York, Case No 16-10407, October 17, 2016.

Order Authorizing and Approving the Sale of Ambulance Service Certificate No. 0667 to Maler Group LLC, In the United States Bankruptcy Court of the Southern District of New York, Case No 16-10407, July 6, 2016.

Affirmation to Confirm the Results of the Sale of the Debtors' Ambulance Service Certificates Issued by the New York State Department of Health, In the United States

1

CONFIDENTIAL

Bankruptcy Court of the Southern District of New York, Case No 16-10407, July 1, 2016.

Summary Sheet for First Interim Application of LaMonica Herbst & Maniscalco, LLP, Counsel to Salvatore LaMonica, as Chapter 7 Trustee, for Allowance of Interim Compensation and Reimbursement of Expenses, In the United States Bankruptcy Court of the Southern District of New York, Case No 16-10407, January 17, 2017.

Order Authorizing the Chapter 7 Trustee to Allocate the Expenses of the Public Auctions Between the Debtors' Estates and Reimburse the TransCare Corporation Estate for the Related Relief, In the United States Bankruptcy Court of the Southern District of New York, Case No 16-10407, April 4, 2017.

First Interim Fee Application of Lucy L. Thomson For Allowance of Compensation for Service Rendered as Patient Care Ombudsman, In the United States Bankruptcy Court of the Southern District of New York, Case No 16-10407, January 18, 2017.

Notice of Hearing on the Motion of Chapter 7 Trustee Seeking Entry of an Order Pursuant to the Federal Rule of Bankruptcy Procedure 9019(a), Approving the Mutual Release and Settlement Agreement By and Between the Chapter 7 Trustee, On Behalf of the Debtors' Estates, Wells Fargo Bank, N.A., and Montefiore Medical Center, Montefiore Mount Vernon Hospital and Montefiore New Rochelle Hospital, In the United States Bankruptcy Court of the Southern District of New York, Case No 16-10407, December 6, 2016.

Monthly Operating Statement for the Period Ended September 30, 2016, In the United States Bankruptcy Court of the Southern District of New York, Case No 16-10407, October 18, 2016

Monthly Operating Statement for the Period Ended November 30, 2016, In the United States Bankruptcy Court of the Southern District of New York, Case No 16-10407, January 18, 2017.

Monthly Operating Statement for the Period Ended December 31, 2016, In the United States Bankruptcy Court of the Southern District of New York, Case No 16-10407, January 17, 2017.

Monthly Operating Statement for the Period Ended March 31, 2017, In the United States Bankruptcy Court of the Southern District of New York, Case No 16-10407, May 16, 2017.

Monthly Operating Statement for the Period Ended February 29, 2016, In the United States Bankruptcy Court of the Southern District of New York, Case No 16-10407, April 26, 2016.

Monthly Operating Statement for the Period Ended March 31, 2016, In the United States Bankruptcy Court of the Southern District of New York, Case No 16-10407, April 26, 2016.

Monthly Operating Statement for the Period Ended April 30, 2016, In the United States Bankruptcy Court of the Southern District of New York, Case No 16-10407, June 1, 2016.

Monthly Operating Statement for the Period Ended May 31, 2016, In the United

CONFIDENTIAL

States Bankruptcy Court of the Southern District of New York, Case No 16-10407, July 7, 2016.

Monthly Operating Statement for the Period Ended June 30, 2016, In the United States Bankruptcy Court of the Southern District of New York, Case No 16-10407, August 19, 2016.

Monthly Operating Statement for the Period Ended July 31, 2016, In the United States Bankruptcy Court of the Southern District of New York, Case No 16-10407, August 19, 2016.

Monthly Operating Statement for the Period Ended August 31, 2016, In the United States Bankruptcy Court of the Southern District of New York, Case No 16-10407, September 20, 2016.

Monthly Operating Statement for the Period Ended October 31, 2016, In the United States Bankruptcy Court of the Southern District of New York, Case No 16-10407, November 15, 2016.

Monthly Operating Statement for the Period Ended January 31, 2017, In the United States Bankruptcy Court of the Southern District of New York, Case No 16-10407, February 23, 2017.

Monthly Operating Statement for the Period Ended February 28, 2017, In the United States Bankruptcy Court of the Southern District of New York, Case No 16-10407, March 16, 2017.

Monthly Operating Statement for the Period Ended April 30, 2017, In the United States Bankruptcy Court of the Southern District of New York, Case No 16-10407, May 16, 2017.

## Depositions

Deposition of Lynn Tilton, October 29, 2018

Deposition of John Husson, November 11, 2018

Deposition of Glenn Leland, November 27, 2018

## Academic Literature/Textbooks

Rosenbaum, Joshua & Joshua Pearl, 2013, Investment Banking: Valuation, Leveraged Buyouts, and Mergers & Acquisitions (Wiley, Second Edition)

## Press Releases/News Articles

"Ambulance Company speeds into Chapter 11." The Westchester County Business Journal, September 3, 2002.

"Private Ambulance Service Backed by 'Wonder Woman of Wall Street' Files Bankruptcy." New York Business Journal Online, February 25, 2016

3

CONFIDENTIAL

"TransCare Announces Two Significant Milestones" BusinessWire, July 20, 2015, available at http://www.businesswire.com/news/home/20150720005828/en/, accessed November 5, 2018.

"TransCare set to emerge from Ch. 11." Pittsburgh Business Times, July 7, 2003, available at https://www.bizjournals.com/pittsburgh/stories/2003/07/07/story6.html?sprint, accessed November 5, 2018.

## Bates Stamped Documents

| | |
|---|---|
| AL-00176 | PP-TRBK0004095 |
| AL-00196 | PP-TRBK0004527 |
| AL-00216 | PP-TRBK0004695 |
| AL-00236 | PP-TRBK0004573 |
| AL-00256 | PP-TRBK0004574 |
| AL-00341 | PP-TRBK0006471 |
| AL-00400 | PP-TRBK0012469 |
| AL-00380 | PP-TRBK0013259 |
| AL-00485 | PP-TRBK0013273 |
| AL-00695 | PP-TRBK0013274 |
| CM_TC2018_0002108 | PP-TRBK0015289 |
| CM_TC2018_0002110 | PP-TRBK0015291 |
| CM_TC2018_0003369 | PP-TRBK0015293 |
| CM_TC2018_0003376 | PP-TRBK0015295 |
| CM_TC2018_0004132 | PP-TRBK0015306 |
| CM_TC2018_0005038 | PP-TRBK0015309 |
| CM_TC2018_0005039 | PP-TRBK0015312 |
| CM_TC2018_0008781 | PP-TRBK0019062 |
| CM_TC2018_0013875 | PP-TRBK0019088 |
| CM_TC2018_0013895 | PP-TRBK0019089 |
| CM_TC2018_0013915 | PP-TRBK0019229 |
| CM_TC2018_0013935 | PP-TRBK0020769 |
| CM_TC2018_0013955 | PP-TRBK0022363 |
| CURTIS_000521 | PP-TRBK0024842 |
| PP-TRBK0004093 | PP-TRBK0027756 |

4

CONFIDENTIAL

| | |
|---|---|
| PP-TRBK0028485 | TRANSCARE00004048 |
| PP-TRBK0033600 | TRANSCARE00004191 |
| PP-TRBK0041410 | TRANSCARE00004259 |
| PP-TRBK0041414 | TRANSCARE00004571 |
| PP-TRBK0042324 | TRANSCARE00004609 |
| PP-TRBK0042693 | TRANSCARE00005261 |
| PP-TRBK0044399 | TRANSCARE00005770 |
| PP-TRBK0046839 | TRANSCARE00007937 |
| PP-TRBK0051881 | TRANSCARE00035020 |
| PP-TRBK0052000 | TRANSCARE00043758 |
| PP-TRBK0053856 | TRANSCARE00062780 |
| PP-TRBK0071446 | TRANSCARE00067400 |
| PP-TRBK0078085 | TRANSCARE00074331 |
| PP-TRBK0086219 | TRANSCARE00107866 |
| PP-TRBK0087751 | TRANSCARE00195974 |
| PP-TRBK0089542 | TRANSCARE00198138 |
| PP-TRBK0090486 | TRANSCARE00231115 |
| PP-TRBK0091282 | WF00001541 |
| TRANSCARE00000395 | WF_TC_00003874 |

All materials cited in this report and exhibits.

5

EXHIBIT 1

# TransCare Corporation

## Funds, Fees, and Interest Payments Flow to and from TransCare Tilton-Controlled Entities and Outside Equity and Debt Holders



CONFIDENTIAL

EXHIBIT 1

**Notes:**

(1) Includes Wells Fargo, NA; Credit Suisse Alternative Capital, Inc.; First Dominion Funding I

(2) Includes Sigler & Company c/o First Dominion Funding I; Sigler & Co. Credit Suisse Alternative Capital; Sigler & Company as nominee for First Dominion Funding I; Sigler & Co. c/o CSAM Funding II; Sigler & Co. c/o CSAM Funding III; Sigler & Co. c/o Atrium CDO

(3) Includes Patriarch Partners Agency Services, LLC; Patriarch Partners II, LLC; Patriarch Partners III, LLC; Patriarch Partners VIII, LLC; Patriarch Partners XIV, LLC; Patriarch Partners XV, LLC; LD Investments, LLC

(4) "Zohar Funds" include Zohar CDO 2003-1, Limited; Zohar II 2005-1, Limited; Zohar III, Limited

(5) Includes Ark II CLO 2001-1, Limited; Ark Investment Partners II, L.P.; Ark Investment GP II, LLC

The Authority Matrix that governs the actions of TransCare's management states, "the Director [Tilton] hereby authorizes the Chief Executive Officer to approve, adopt, authorize, agree, or enter into contracts....on behalf of the Corporation, subject.... to obtaining approval and authorization.... by the Designated Executive or the full Board." According to the Complaint at 10, as of 2015 no Designated Executive had been appointed and the only Board member was Tilton. See Schedule A of TransCare Corporation Written Consent of the Sole Director dated July 10, 2012.

**Sources:**

Complaint at 4-10, 16, 19-21, 32; Exhibit A of Amendment No. 27 to Credit Agreement of TransCare Corporation dated July 7, 2015 among TransCare Corporation and Patriarch Partners Agency Services, LLC (TRANSCARE00000395); Credit Agreement of TransCare Corporation dated January 15, 2016 among TransCare Corporation and Ark II CLO 2001-1, Limited at 1; Memorandum Opinion In Zohar II 2005-1 Ltd., et al. v. FSAR Holdings Inc. et al., Case No. 12946-VCS before the Delaware Court of Chancery Filed on November 30, 2017 at 2-14; Defendant Lynn Tilton's Corrected Post-Trial Brief In Zohar II 2005-1 Ltd., et al. v. FSAR Holdings Inc. et al., Case No. 12946-VCS before the Delaware Court of Chancery Filed on July 5, 2017 at 31-32; Debtor TransCare Corporation's Amended List of Equity Security Holders and Statement of Corporate Ownership In re: TransCare Corporation, et al. Chapter 7 Case No. 16-10407 (SMB) before the United States Bankruptcy Court Southern District of New York Filed on May 9, 2016 at 1-2; Defendants FSAR Holdings, Inc., Glenoit Universal Ltd., and UI Acquisition Holding Co.'s Post-Trial Brief In Zohar II 2005-1 Ltd., et al. v. FSAR Holdings Inc. et al., Case No. 12946-VCS before the Delaware Court of Chancery Filed on July 3, 2017 at 12; Consolidated Financial Statements, TransCare Corporation and Subsidies, Year Ended December 31, 2013 at 15-20 (TRANSCARE00062780 at TRANSCARE00062797-802).

CONFIDENTIAL

EXHIBIT 2

# Ms. Tilton
## Roles within the Patriarch Business Structure



CONFIDENTIAL

A4121

EXHIBIT 2

**Source:** Tilton Deposition at 10-13, 17-26, 52, 61-65, 74.

**Notes:**

(1) Includes Patriarch Partners VIII, LLC; Patriarch Partners XIV, LLC; Patriarch Partners XV, LLC. These entities ceased their roles as collateral managers in March 2016.

(2) Includes Zohar CDO 2003-1, Limited; Zohar II 2005-1, Limited; Zohar III, Limited. Ms. Tilton is a noteholder in all three funds.

(3) Includes Ark II CLO 2001-1, Limited; Ark Investment Partners II, L.P.

(4) Includes MB Helicopters, Inc.; Dura Automotive Systems; Stila Cosmetics; and approximately 57 other companies. Ms. Tilton is a director of each company.

Patriarch Partners Management Group, LLC employees work on the operational side of the Portfolio Companies.

Zohar Holdings, LLC is owned 99% by Ms. Tilton and 1% by a trust for Ms. Tilton's daughter.

Ms. Tilton is the CEO of MB Helicopters, Dura Automotive Systems, Global Automotive Systems, and Stila Cosmetics.

CONFIDENTIAL

EXHIBIT 3

## TransCare Corporation
## Summary of Indications of Interest

| Date | Potential Acquiror | Interest | Valuation Multiple | Valuation Range |
|------|--------------------|----------|--------------------|-----------------|
| 02/05/15 | National Express | MTA Contract | None Specified. Potential offer based on $4MM EBITDA per year 5-year contract, discounted at 10%-15%. | $17.0mm to $18.0mm |
| 02/10/15 | RCA | "Sale or management takeover to operate the company in NYC as well as outside of the NYC territory." | None Specified | None Specified |
| 02/13/15 | RCA | "Sale of Transcare or operating management agreement takeover by RCA... In NYC as well as outside NYC." | None Specified | None Specified |
| 02/20/15 | RCA | "Part or all of Transcare Ambulance... We would also consider an operational management arrangement" | "Before getting into details on financials RCA is prepared to offer up to **eight times the EBITDA**" | None Specified |
| 03/03/15 | RCA | "Part or all of Transcare Ambulance... We would also consider an operational management arrangement" | "Before getting into details on financials RCA is prepared to offer up to **eight times the EBITDA**" | None Specified |
| 04/07/15 | RCA | Any assets | None Specified | None Specified |
| 07/08/15 | RCA | Whole Company | **EBITDA multiple of 8X** | $80mm to $96mm before debt |
| 07/10/15 | National Express | MTA Contract | None Specified | $6.0mm to $7.0mm plus assumption of up to $2.0mm of obligations |
| 10/11/15 | MONOC | "Service lines outside of the State of New York" | None Specified | None Specified |
| 12/16/15 | National Express | MTA Contract | None Specified | $6.0mm to $7.0mm plus assumption of up to $2.0mm of obligations |

**Sources:** E-mail from Mr. Leland to Mr. Pelissier, et al. dated February 6, 2015 (TRANSCARE00004259); LOI for Transcare Transit dated July 10, 2015 (PP-TRBK0012428-37); E-mail from Mr. Weinberger to Mr. Bonilla and Mr. Leland dated April 7, 2015 (TRANSCARE00198138); E-mail from Mr. Weinberger to Mr. Leland dated February 20, 2015 (TRANSCARE00195974); E-mail chain containing an e-mail from Mr. Leland dated July 8, 2015 (PP-TRBK0033600 - 02); E-mail from Mr. Weinberger to Ms. Tilton dated February 10, 2015 (PP-TRBK0033684); E-mail from Mr. Weinberger to Ms. Tilton dated March 3, 2015 (PP-TRBK0090486 - 87); E-mail from Mr. Weinberger to Mr. Bonilla dated February 13, 2015 (TRANSCARE00004191); E-mail from Mr. Hector to Messrs. Leland, Jones, and Greenberg dated October 11, 2015 (PP-TRBK0057441); E-mail from Mr. Leland to Mr. Greenberg dated December 16, 2015 (PP-TRBK0012426).

CONFIDENTIAL

EXHIBIT 4

## TransCare Corporation
## Attempted Foreclosure & Buy-Out Transaction Details
### February 15, 2015
#### In Millions

| ($ in millions) | | TransCare | | Pro Forma Transcendence / NewCo | | |
|---|---|---|---|---|---|---|
| Source of Funded Capital | | $ Amount | Description | $ Amount | % of Total Capital | Description |
| **Payment Priority 1** | | | | | | |
| Ark II (Ms. Tilton's personal investment vehicle) | [A] | $2.1 | Includes $1.9 funded $6.5 Term Loan plus $0.20 in vehicles owned by Ms. Tilton and leased to TransCare | $12.1 | 54.7% | Includes $2.1 rolled over capital from TransCare to NewCo, and $10.0 of new working capital funding |
| **Payment Priority 2** | | | | | | |
| AIP (Ms. Tilton's personal investment vehicle) | [B] | $2.9 | Fully Funded Term Loan | $0.7 | 3.0% | Pro-rata portions of $10.0 credit bid equal to book value of NewCo assets excluding accounts receivable due to Wells Fargo |
| Zohar I | [C] | $3.5 | Fully Funded Term Loan | $0.8 | 3.6% | |
| Zohar II | [D] | $5.0 | Fully Funded Term Loans | $1.1 | 5.2% | |
| Zohar III | [E] | $24.6 | Fully Funded Term Loans | $5.6 | 25.6% | |
| Credit Suisse | [F] | $3.5 | Fully Funded Term Loan | $0.8 | 3.7% | |
| First Dominion | [G] | $4.0 | Fully Funded Term Loan | $0.9 | 4.2% | |
| Subtotal | [H] | $43.6 | | $10.0 | 45.3% | Total credit bid |
| | | | | | | |
| Total | [I] = [A] + [H] | $45.7 | | $22.1 | 100.0% | |

**Notes:**

Displayed figures are rounded to the first decimal place.

[A], [B]: At all times relevant to my analysis, ARK II CLO 2001-1 Limited ("Ark II") and Ark Investment Partners II LLP ("AIP") constituted Ms. Tilton's personal investment vehicles. The Ark II $10.0 million in funding committed to NewCo included the accounts receivable due to Wells Fargo.

[C], [D], [E]: At all times relevant to my analysis, Ms. Tilton was the Zohar funds' sole equity owner and collateral manager.

[F], [G]: Outside lenders that rolled over their facilities in conjunction with TransCare's 2004 Chapter 11 bankruptcy emergence.

[H]: Priority 2 investors were to receive 23 cents on the dollar (equal to $10.0 million divided to $43.6 million) through the credit bid for TransCare loans in the foreclosure.

**Sources:** Tilton Deposition at pp. 19-21, 25-26, 52-54, 61-65, 97-142, Exhibit 106; PP-TRBK0019089 at tabs "Daily Extract" and "Sheet2 (2)".

CONFIDENTIAL

A4124

EXHIBIT 5



## TransCare Corporation
## Historical Revenue
## 2009 - LTM October 2015
### In Millions

Average: $135.6

| 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | LTM October 2015 |
|------|------|------|------|------|------|------------------|
| $138.3 | $152.1 | $143.5 | $137.7 | $127.4 | $131.1 | $118.9 |

Net Service Revenue — — Average Net Service Revenue

**Notes:** Values are presented as stated in the most recent audited financial statement for which a given year's Statement of Operations was provided. 2014 value is unaudited. 2015 value includes the last twelve months ("LTM") ended October 31, 2015 and reflects the last available actual results. Displayed figures are rounded to the first decimal place.

**Sources:** Transcare Corporation and Subsidiaries Consolidated Financial Statements for the Years Ended December 31, 2009-2013 (TRANSCARE00062780-860); TransCare Monthly Financial Memorandum for November 2014 (AL-00400 at AL-00410), TransCare Monthly Financial Memorandum for December 2014 (PP-TRBK0028485 at PP-TRBK0028494), TransCare Monthly Financial Memorandum for October 2015 (PP-TRBK0004695 at PP-TRBK0004704).

CONFIDENTIAL

EXHIBIT 6



# TransCare Corporation
## Historical EBITDA
## 2009 - LTM October 2015
### In Millions

| Year | EBITDA |
|------|--------|
| 2009 | $9.1 |
| 2010 | $7.7 |
| 2011 | $0.9 |
| 2012 | $8.9 |
| 2013 | $7.2 |
| 2014 | $0.5 |
| LTM October 2015 | $1.4 |

Average: $5.1

■ EBITDA   --- Average EBITDA

**Notes:** Values are presented as stated in the most recent audited financial statement for which a given year's Statement of Operations was provided. 2014 value is unaudited. 2015 value includes the last twelve months ("LTM") ended October 31, 2015 and reflects the last available actual results. Displayed figures are rounded to the first decimal place.

**Sources:** Transcare Corporation and Subsidiaries Consolidated Financial Statements for the Years Ended December 31, 2009-2013 (TRANSCARE00062780-860); TransCare Monthly Financial Memorandum for November 2014 (AL-00400 at AL-00410); TransCare Monthly Financial Memorandum for December 2014 (PP-TRBK0028485 at PP-TRBK0028494), TransCare Monthly Financial Memorandum for October 2015 (PP-TRBK0004695 at PP-TRBK0004704).

CONFIDENTIAL



TransCare Corporation
LTM EBITDA
November 2014 - October 2015
In Millions

EXHIBIT 7

CONFIDENTIAL

A4127

EXHIBIT 7

**Sources:** TransCare Monthly Financial Memorandum for December 2013 (CM_TC2018_0004132 at CM_TC2018_0004141), TransCare Monthly Financial Memorandum for January 2014 (TRANSCARE00004571 at TRANSCARE00004580), TransCare Monthly Financial Memorandum for February 2014 (AL-00176 at AL-00186), TransCare Monthly Financial Memorandum for March 2014 (TRANSCARE00004609 at TRANSCARE00004618), TransCare Monthly Financial Memorandum for April 2014 (AL-00196 at AL-00206), TransCare Monthly Financial Memorandum for May 2014 (AL-00216 at AL-00226), TransCare Monthly Financial Memorandum for June 2014 (AL-00236 at AL-00246), TransCare Monthly Financial Memorandum for July 2014 (AL-00256 at AL-00266), TransCare Monthly Financial Memorandum for August 2014 (PP-TRBK0020769 at PP-TRBK0020778), TransCare Monthly Financial Memorandum for September 2014 (AL-00341 at AL-00351), TransCare Monthly Financial Memorandum for October 2014 (PP-TRBK0028798 at PP-TRBK0028807), TransCare Monthly Financial Memorandum for November 2014 (AL-00400 at AL-00410), TransCare Monthly Financial Memorandum for December 2014 (PP-TRBK0028485 at PP-TRBK0028494), TransCare Monthly Financial Memorandum for January 2015 (AL-00380 at AL-00390), TransCare Monthly Financial Memorandum for February 2015 (AL-00485 at AL-00495), TransCare Monthly Financial Memorandum for March 2015 (CM_TC2018_0013895 at CM_TC2018_0013904), TransCare Monthly Financial Memorandum for April 2015 (CM_TC2018_0013875 at CM_TC2018_0013884), TransCare Monthly Financial Memorandum for May 2015 (CM_TC2018_0013955 at CM_TC2018_0013964), TransCare Monthly Financial Memorandum for June 2015 (CM_TC2018_0013935 at CM_TC2018_0013944), TransCare Monthly Financial Memorandum for July 2015 (CM_TC2018_0013915 at CM_TC2018_0013924), TransCare Monthly Financial Memorandum for August 2015 (TRANSCARE00035020 at TRANSCARE00035030), TransCare Monthly Financial Memorandum for September 2015 (AL-00695 at AL-00705), TransCare Monthly Financial Memorandum for October 2015 (PP-TRBK0004695 at PP-TRBK0004704).

CONFIDENTIAL

EXHIBIT 8

# TransCare Corporation
## Annual EBITDA Forecasts
### 2015 - 2020
### In Millions

| As Of Date | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | Source |
|---|---|---|---|---|---|---|---|
| 01/07/16 | $ 1.4 | $ 6.9 | $ 13.3 | $ 17.2 | $ 21.8 | $ 26.1 | January 7, 2016 Preliminary Plan |
| 01/27/16 | | $ 5.0 | | | | | January 27, 2016 Carl Marks Turnaround Plan |
| 01/28/16 | | $ 5.2 | | | | | January 28, 2016 Update to Carl Marks Turnaround Plan |
| 02/24/16 | | $ 3.2 | | | | | February 24, 2016 NewCo Model |

**Notes:** Projections as of 02/24/16 are for the three business lines to be included in NewCo: Pennsylvania, Hudson Valley, and Paratransit.
Displayed figures are rounded to the first decimal place.

CONFIDENTIAL

EXHIBIT 9

# TransCare Corporation
## Annual Revenue Forecasts
### 2015 - 2020
### In Millions

| As Of Date | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | Source |
|---|---|---|---|---|---|---|---|
| 01/07/16 | $115.0 | $117.0 | $140.0 | $169.0 | $207.0 | $223.0 | January 7, 2016 Preliminary Plan |
| 01/27/16 | | $100.5 | | | | | January 27, 2016 Carl Marks Turnaround Plan |
| 01/28/16 | | $102.3 | | | | | January 28, 2016 Update to Carl Marks Turnaround Plan |
| 02/24/16 | | $ 37.2 | | | | | February 24, 2016 NewCo Model |

**Notes:** Projections as of 02/24/16 are for the three business lines to be included in NewCo: Pennsylvania, Hudson Valley, and Paratransit.
Displayed figures are rounded to the first decimal place.

CONFIDENTIAL

EXHIBIT 10

## TransCare Corporation
### Summary of Projections by Viewing Parties

| As Of Date | Patriarch | Carl Marks | Lockton | Source |
|---|---|---|---|---|
| 01/07/16 | YES | YES | | January 7, 2016 Preliminary Plan |
| 01/27/16 | YES | YES | | January 27, 2016 Carl Marks Turnaround Plan |
| 01/28/16 | YES | | | January 28, 2016 Update to Carl Marks Turnaround Plan |
| 02/24/16 | YES | | YES | February 24, 2016 NewCo Model |

CONFIDENTIAL



# TransCare Corporation
## Summary of Capital Requested by Intended Use
### In Millions

EXHIBIT 11

**Notes:** Amounts shown pertain to achieving projected 2016 year-end EBITDA. Intended use categories are shown by most to least critical from bottom to top, based on representations made in the plans and models. Accounts Payable includes payroll, payroll taxes, insurance, rent, and other. These figures do not include interest deferment. The 02/24/16 NewCo Model doesn't identify capital requests associated with achieving projected 2016 year-end EBITDA. Displayed figures are rounded to the first decimal place.

**Sources:** January 7, 2016 Preliminary Plan (CM_TC2018_0003369 at CM_TC2018_0003370-71); January 27, 2016 Carl Marks Turnaround Plan (CM_TC2018_002108 at CM_TC2018_002116); January 28, 2016 Update to Carl Marks Turnaround Plan (PP-TRBK0013274).

CONFIDENTIAL



EXHIBIT 12a

## TransCare Corporation
## Implied Total Enterprise Value
## Comparable Company EV / Forward EBITDA Multiples Method
### In Millions

**Notes:** In an analysis prepared for Ms. Tilton, Mr. Greenberg identified Envision Healthcare Corporation, Air Methods Corp., and PHI, Inc. as market comparables. Mr. Greenberg excluded PHI of the analysis because it "appear[ed] to be an outlier". This analysis is based on TEV/EBITDA multiples for Envision Healthcare Corporation and Air Methods Corporation as of each valuation date.

**Sources:** S&P Capital IQ, January 7, 2016 Preliminary Plan; January 27, 2016 Carl Marks Turnaround; January 28, 2016 Update to Carl Marks Turnaround; February 24, 2016 NewCo Model; PP-TRBK0041414.

CONFIDENTIAL



# TransCare Corporation
## Implied Total Enterprise Value
## Precedent Transaction EV / EBITDA Multiples Method
### In Millions

**Notes:** In an analysis prepared for Ms. Tilton, Mr. Greenberg identified two transaction comparables with available multiples: 1) July 2015 Envision Healthcare Corporation's acquisition of Rural/Metro Corporation, and 2) KKR & Co., Inc.'s acquisition of Air Medical Group Holdings. This analysis is based on TEV / LTM EBITDA multiples for the targets in the two acquisitions as identified by Mr. Greenberg.

**Sources:** January 7, 2016 Preliminary Plan; January 27, 2016 Carl Marks Turnaround Plan; January 28, 2016 Update to Carl Marks Turnaround Plan; February 24, 2016 NewCo Model; PP-TRBK0041414.

CONFIDENTIAL



TransCare Corporation
Implied Total Enterprise Value
EV/EBITDA Multiple from Expressions of Interest
In Millions

**Sources:** Exhibit 3; January 7, 2016 Preliminary Plan; January 27, 2016 Carl Marks Turnaround Plan; January 28, 2016 Update to Carl Marks Turnaround Plan; February 24, 2016 NewCo Model.

CONFIDENTIAL

**A4135**

# TransCare Corporation
## Implied Total Enterprise Value
## EV/EBITDA Industry Multiples Identified by Ms. Tilton
### In Millions



**Sources:** January 7, 2016 Preliminary Plan (CM_TC2018_0003376); January 27, 2016 Carl Marks Turnaround Plan; January 28, 2016 Update to Carl Marks Turnaround Plan; February 24, 2016 NewCo Model; Tilton Deposition at p. 119.

CONFIDENTIAL

**TransCare Corporation**
**Summary of Implied Total Enterprise Value Ranges**
**In Millions**

| EV / EBITDA Multiples Methodology | 01/07/16 | WholeCo 01/27/16 | 01/28/16 | NewCo 02/24/16 |
|---|---|---|---|---|
| Comparable Company Method | $50.1 - $86.5 | $35.3 - $60.6 | $36.2 - $62.6 | $22.7 - $39.1 |
| Precedent Transaction Method | $69.4 - $74.3 | $49.7 - $53.1 | $51.8 - $55.4 | $32 - $34.3 |
| Range Based on Comparable Company and Precedent Transaction Methods | | $35.3 - $86.5 | | $22.7 - $39.1 |
| | | | | |
| Expressions of Interest | $55.5 | $39.7 | $41.4 | $25.6 |
| Industry Multiple Range identified by Ms. Tilton | $48.6 - $55.5 | $34.8 - $39.7 | $36.2 - $41.4 | $22.4 - $25.6 |

**Note:** Displayed figures are rounded to the first decimal place.
**Sources:** Exhibits 12a - 12d.

CONFIDENTIAL

A4137

EXHIBIT 13

## TransCare Corporation
## Summary of Liquidation Value
### In Millions

| | | WholeCo | NewCo |
|---|---|---|---|
| Sale of Certificates of Need | [A.1] | $12.3 | $1.9 |
| Cost of Sale of Certificates of Need | [A.2] | $0.6 | $0.0 |
| **Net Proceeds from Sale of Certificates of Need** | **[A.3] = [A.1] - [A.2]** | **$11.7** | **$1.9** |
| | | | |
| Sale of Equipment and Physical Assets | [B.1] | $2.4 | $0.8 |
| Cost of Sale of Equipment and Physical Assets | [B.2] | $0.4 | $0.0 |
| **Net Proceeds from Sale of Equipment and Physical Assets** | **[B.3] = [B.1] - [B.2]** | **$2.0** | **$0.8** |
| | | | |
| Accounts Receivable Collected Post-Bankruptcy | [C.1] | $5.6 | $3.1 |
| Cost of Accounts Receivable Collection | [C.2] | $0.0 | $0.0 |
| **Net Proceeds from Accounts Receivable Collection** | **[C.3] = [C.1] - [C.2]** | **$5.6** | **$3.1** |
| | | | |
| **Total Liquidation Value** | **[D] = [A.3] + [B.3] + [C.3]** | **$19.2** | **$5.7** |

### Notes:

Displayed figures are rounded to the first decimal place.

[A.1]: For WholeCo, the entire amount received from the sale of the Certificates of Need is included. For NewCo, only the amount received from the sale of Certificate of Need No. 0667 is included.

[A.2]: For WholeCo, I identified the following expenses: A payment of $90 thousand associated with a "Break-Up Fee" to Maier Group, LLC, a payment for Trustee's expenses of $205 thousand, a payment of $259 thousand for reimbursement of expenses associated with the public auctions of the Certificates of Need, and a payment of $29 thousand associated with the expenses of the Patient Care Ombudsman. For NewCo, I identified $2.3 thousand in Trustee's expenses associated with selling Certificate of Need No. 0667, the only one attributable to the NewCo assets.

[B.1]: The NewCo value includes auctions held on May 6, 2016 in Poughkeepsie, NY and May 11, 2016 in Monroeville, PA.

[B.2]: I was not able to identify costs associated with the sale of equipment and physical assets directly attributable to NewCo assets. I have therefore conservatively assigned a value of zero.

[C.1]: I understand Wells Fargo received approximately an additional $2.6 million in accounts receivable collected by parties other than the Estate. Per counsel's instruction, I estimate this additional amount to be equal to the difference of the Wells Fargo loan balance as of February 24, 2016 ($13.4 million) and all of the funds received by Wells Fargo from the Trustee associated with the sale of TransCare's assets ($10.8 million). Therefore, the total amount of accounts receivable attributable to WholeCo consists of the sum of 1) the $2.6 million estimated as explained above, 2) the $2.43 million settlement amount received from the New York City Transit Authority and its affiliate the Metropolitan Transportation Authority, and 3) the $595 thousand settlement with the Bronx-Lebanon Hospital Center and the St. Barnabas Hospital. I assume a 19.8% allocation for the Hudson Valley and Pittsburgh operations of TransCare out of the total amount of accounts receivable (excluding the MTA operations) based on the accounts receivables balances for NewCo and OldCo as of February 23, 2016.

[C.2]: I conservatively do not include any costs associated with collecting the accounts receivable.

CONFIDENTIAL

EXHIBIT 13

**Sources:**

Affirmation to Confirm the Sale of the Debtors' Ambulance Service Certificates Issued by the New York State Department of Health entered on July 1, 2016 before the U.S. Bankruptcy Court of the Southern District of New York (Chapter 7 Case No. 16-10407 (SMB)); Auctioneer's Report of Sale for the Auction Sales Conducted on April 20, May 4, May 6, May 11, and May 12, 2016 entered on August 23, 2016 submitted before the U.S. Bankruptcy Court of the Southern District of New York (Chapter 7 Case No. 16-10407 (SMB)); Auctioneer's Report of Sale for the Auction Sale Conducted on June 21, 2016 entered on August 23, 2016 submitted before the U.S. Bankruptcy Court of the Southern District of New York (Chapter 7 Case No. 16-10407 (SMB)); Monthly Operating Statement for the Period Ended September 30, 2016 entered on October 18, 2016 submitted before the U.S. Bankruptcy Court of the Southern District of New York (Chapter 7 Case No. 16-10407 (SMB)); Monthly Operating Statement for the Period Ended November 30, 2016 entered on January 18, 2017 submitted before the U.S. Bankruptcy Court of the Southern District of New York (Chapter 7 Case No. 16-10407 (SMB)); Monthly Operating Statement for the Period Ended December 31, 2016 entered on January 17, 2017 submitted before the U.S. Bankruptcy Court of the Southern District of New York (Chapter 7 Case No. 16-10407 (SMB)); Monthly Operating Statement for the Period Ended March 31, 2017 entered on May 16, 2017 submitted before the U.S. Bankruptcy Court of the Southern District of New York (Chapter 7 Case No. 16-10407 (SMB)); Monthly Operating Statement for the Period Ended February 29, 2016 entered on April 26, 2016 submitted before the U.S. Bankruptcy Court of the Southern District of New York (Chapter 7 Case No. 16-10407 (SMB)); Monthly Operating Statement for the Period Ended March 31, 2016 entered on April 26, 2016 submitted before the U.S. Bankruptcy Court of the Southern District of New York (Chapter 7 Case No. 16-10407 (SMB)); Monthly Operating Statement for the Period Ended April 30, 2016 entered on June 1, 2016 submitted before the U.S. Bankruptcy Court of the Southern District of New York (Chapter 7 Case No. 16-10407 (SMB)); Monthly Operating Statement for the Period Ended May 31, 2016 entered on July 7, 2016 submitted before the U.S. Bankruptcy Court of the Southern District of New York (Chapter 7 Case No. 16-10407 (SMB)); Monthly Operating Statement for the Period Ended June 30, 2016 entered on August 19, 2016 submitted before the U.S. Bankruptcy Court of the Southern District of New York (Chapter 7 Case No. 16-10407 (SMB)); Monthly Operating Statement for the Period Ended July 31, 2016 entered on August 19, 2016 submitted before the U.S. Bankruptcy Court of the Southern District of New York (Chapter 7 Case No. 16-10407 (SMB)); Monthly Operating Statement for the Period Ended August 31, 2016 entered on September 20, 2016 submitted before the U.S. Bankruptcy Court of the Southern District of New York (Chapter 7 Case No. 16-10407 (SMB)); Monthly Operating Statement for the Period Ended October 31, 2016 entered on November 15, 2016 submitted before the U.S. Bankruptcy Court of the Southern District of New York (Chapter 7 Case No. 16-10407 (SMB)); Monthly Operating Statement for the Period Ended January 31, 2017 entered on February 23, 2017 submitted before the U.S. Bankruptcy Court of the Southern District of New York (Chapter 7 Case No. 16-10407 (SMB)); Monthly Operating Statement for the Period Ended February 28, 2017 entered on March 16, 2017 submitted before the U.S. Bankruptcy Court of the Southern District of New York (Chapter 7 Case No. 16-10407 (SMB)); Monthly Operating Statement for the Period Ended April 30, 2017 entered on May 16, 2017 submitted before the U.S. Bankruptcy Court of the Southern District of New York (Chapter 7 Case No. 16-10407 (SMB)); Schedule 1 of Order Authorizing the Chapter 7 Trustee to Allocate the Expenses of the Public Auctions Between the Debtors' Estates and Reimburse the TransCare Corporation Estate and for Related Relief entered on April 5, 2017 submitted before the U.S. Bankruptcy Court of the Southern District of New York (Chapter 7 Case No. 16-10407 (SMB)); Schedule 2 of Order Authorizing the Chapter 7 Trustee to Allocate the Expenses of the Public Auctions Between the Debtors' Estates and Reimburse the TransCare Corporation Estate and for Related Relief entered on April 5, 2017 submitted before the U.S. Bankruptcy Court of the Southern District of New York (Chapter 7 Case No. 16-10407 (SMB)); Exhibit C of Summary Sheet for First Interim Application of Lamonica Herbst & Maniscalco, LLP, Counsel to Salvatore Lamonica, As Chapter 7 Trustee, for Allowance of Interim Compensation and Reimbursement of Expenses entered on February 7, 2017 submitted before the U.S. Bankruptcy Court of the Southern District of New York (Chapter 7 Case No. 16-10407 (SMB)); Order Authorizing and Approving the Sale of Ambulance Service Certificate No. 0667 to Maler Group LLC entered on July 7, 2016 submitted before the U.S. Bankruptcy Court of the Southern District of New York (Chapter 7 Case No. 16-10407 (SMB)); First Interim Fee Application of Lucy L. Thomson for Allowance of Compensation for Services Rendered as Patient Care Ombudsman entered on February 7, 2017 submitted before the U.S. Bankruptcy Court of the Southern District of New York (Chapter 7 Case No. 16-10407 (SMB)); Notice of Hearing on the Motion of Chapter 7 Trustee Seeking Entry of an Order, Pursuant to Federal Rule of Bankruptcy Procedure 9019(a), Approving the Mutual Release and Settlement Agreement By and Between the Chapter 7 Trustee, On Behalf of the Debtors' Estates, Wells Fargo Bank, N.A., and Montefiore Medical Center, Montefiore Mount Vernon Hospital and Montefiore New Rochelle Hospital entered on December 6, 2016 submitted before the U.S. Bankruptcy Court of the Southern District of New York (Chapter 7 Case No. 16-10407 (SMB)); CM_TC2018_0005038; CM_TC2018_0005039; PP-TRBK0078085; PP-TRBK0044399; PP-TRBK0044573; PP-TRBK0004574; WF00001541.

CONFIDENTIAL

EXHIBIT 14

## TransCare Corporation
### Difference between Operating Value and Liquidation Value
### In Millions

| | | WholeCo | | NewCo | |
|---|---|---|---|---|---|
| | | Min | Max | Min | Max |
| Operating Value | [A] | $35.3 | $86.5 | $22.7 | $39.1 |
| Liquidation Value | [B] | $19.2 | $19.2 | $5.7 | $5.7 |
| Difference | [C] = [A] - [B] | $16.1 | $67.3 | $17.0 | $33.4 |

**Note:** Displayed figures are rounded to the first decimal place.

**Sources:**
[A]: Exhibit 12.
[B]: Exhibit 13.

CONFIDENTIAL

In re:

TRANSCARE CORPORATION, et al.
                                    Debtors,

SALVATORE LAMONICA, as Chapter 7 Trustee
for the Estates of TransCare Corporation, et al.
                                    Plaintiff,
v.

LYNN TILTON,
PATRIARCH PARTNERS AGENCY
SERVICES, LLC,
PATRIARCH PARTNERS, LLC,
PATRIARCH PARTNERS
MANAGEMENT GROUP, LLC,
ARKII CLO 2001-1, LIMITED
TRANSCENDENCE TRANSIT, INC. and
TRANSCENDENCE TRANSIT II, INC.

In the United States Bankruptcy
Court Southern District of New York

Chapter 7

Case No.:16-10407 (SMB)

(Jointly Administered)

Adv. Proc. No. 18-01021

## EXPERT REBUTTAL REPORT OF JEFFREY R. DUNN

### February 11, 2019

CONFIDENTIAL



PX 283

LaMonica v. Tilton, et al., 18-1021-smb

EXHIBIT
arnold-J
3-11-19

| | | |
|---|---|---|
| 1. | Introduction | 1 |
| 2. | Qualifications | 1 |
| 3. | Compensation | 2 |
| 4. | Background and Summary of Opinions and Conclusions | 2 |
| 5. | TransCare | 5 |
| | 5.1. Background and Operations | 5 |
| | 5.2. Historic Financial Performance | 5 |
| | 5.3. Early 2016 Turnaround Plans | 7 |
| 6. | Business Valuation Standards | 12 |
| 7. | The Arnold Report Does Not Invoke a Standard of Value | 13 |
| 8. | The Arnold Report Incorporates Extraordinary Assumptions | 15 |
| | 8.1. The Arnold Report Assumes that TransCare was Adequately Capitalized | 17 |
| | 8.2. The Arnold Report Assumes TransCare Would Effectuate an Operational Turnaround | 19 |
| | 8.3. The Arnold Report Fails to Assess Comparability | 21 |
| 9. | Other Observations on Dr. Arnold's Calculations | 23 |
| | 9.1. Third-Party Expressions of Interest | 23 |
| 10. | Right to Supplement | 24 |

Appendices:

Appendix A – Dunn CV
Appendix B – Documents Relied Upon

Exhibits

1.    **Introduction**

I have been retained by Proskauer Rose LLP ("Counsel"), on behalf of the defendants in the above-captioned proceeding, to review and comment on the November 30, 2018 report submitted in the matter by Jonathan I. Arnold, Ph.D. (the "Arnold Report"). This rebuttal report sets forth my observations regarding the methodology, assumptions, and conclusions reached therein. In evaluating Dr. Arnold's opinions as to the value of TransCare Corporation (the "Company" or "TransCare"), I have used the definition of Fair Market Value as set forth in IRS Revenue Ruling 59-60, as follows:

> The price at which the property would change hands between a willing buyer and a willing seller when the former is not under any compulsion to buy and the latter is not under any compulsion to sell, both parties having reasonable knowledge of relevant facts.[1, 2]

2.    **Qualifications**

I have over 12 years of financial experience as a business appraiser and valuation analyst. I am a Director at Berkeley Research Group, LLC ("BRG") in its corporate finance division and have served in this position since June 2015. The services provided by BRG include business and securities valuation, solvency and fairness opinions, consultation in business turnaround and restructuring situations, bankruptcy matters, turnaround management, crisis management, transaction advisory and due diligence services, forensic accounting, and dispute resolution services. Prior to joining BRG in June 2015, I was a Managing Director at Capstone Advisory Group, LLC ("Capstone"), a financial services consulting firm which provided similar services to those offered by BRG. Prior to joining Capstone, I was a Senior Associate of Trenwith Valuation, LLC, a subsidiary of BDO Seidman LLP focused on providing business valuation consulting services. I have received both a Master's of Science in Finance and Bachelor of Arts in Accounting from

---

[1] Revenue Ruling 59-60, Section 2, paragraph 02.
[2] Court decisions frequently state in addition that the hypothetical buyer and seller are assumed to be able, as well as willing, to trade and to be well informed about the property and concerning the market for such property. Ibid.

Bentley University. I hold the right to use the Chartered Financial Analyst® designation and am a Certified Insolvency and Restructuring Advisor.

I have been involved in hundreds of valuation and valuation-related engagements as a consultant to companies, funds and other equity investors, creditors, and various other parties-in-interest. These engagements have spanned a variety of industries including, but not limited to, financial services, telecommunications, technology, manufacturing, mining and materials, infrastructure and energy, retail and wholesale distribution, real estate, and healthcare and pharmaceuticals. A copy of my curriculum vitae is attached hereto as Appendix A.

## 3. Compensation

BRG is compensated for the time I spent working on this matter at my standard hourly rate of $770. BRG is also compensated for the time of other professionals who worked under my supervision and at my direction in preparing this report at their standard hourly rates. BRG's compensation is unrelated to the outcome of this matter.

## 4. Background and Summary of Opinions and Conclusions

In his report, Dr. Arnold states that he was asked to "examine economic evidence and perform an analysis of the *implied valuations* [emphasis added] of [TransCare] at four points during January and February 2016"[3] to "assess the *implied valuation* of TransCare if it had pursued an orderly asset sale or continued operations as a going concern instead of entering into the forced Liquidation."[4] In addition, Dr. Arnold states that he was "instructed [by plaintiff's counsel] to estimate the Liquidation Values"[5] for the TransCare assets and then "*asked... to* [emphasis added] calculate the difference between TransCare's Operating Values [i.e., his *implied values*] and Liquidation Value."[6] I note that Dr. Arnold's valuation dates are all within less than two months of the filing of TransCare

---

[3] Arnold Report, page 2.
[4] Arnold Report, page 3.
[5] Arnold Report, page 32.
[6] Arnold Report, page 33.

2

for protection under Chapter 7 of the United States Bankruptcy Code on February 24, 2016 (the "TransCare Filing Date").

The Arnold Report sets forth certain analysis and calculations that Dr. Arnold says support his following (summarized) opinions:

- The *implied* "Operating Value"[7] for TransCare was within a range of $35.3 million and $86.5 million in January 2016 and the NewCo[8] assets had an *implied value* of between $22.7 million and $39.1 million on February 24, 2016, two days prior to the TransCare Filing Date.

- Subtracting the realized liquidation proceeds from the sale of TransCare's assets of $19.2 million for the Company as a whole and $5.7 million for only the NewCo assets from his respective *implied values* results in a difference of between $16.1 million and $67.3 million for TransCare and between $17.0 million and $33.4 million for NewCo.

Based on work I have performed, I have reached the following opinions:

1. The conclusions of value reached by Dr. Arnold are not reliable or meaningful measures because his report and analysis do not conform to certain valuation standards and accepted valuation practice. I observe that:

   a. The Arnold Report fails to measure value according to a stated standard of value. Various methodological and analytical errors stem from this critical failure, divorcing Dr. Arnold's concluded "Operating Values" from the amount that could have actually been realized assuming a hypothetical sale of TransCare as of his selected valuation dates (i.e., at a *fair market value*).[9]

---

[7] Dr. Arnold appears to equate "Operating Value" to a valuation of TransCare performed on a premise of value as a going concern subject to certain extraordinary assumptions and hypothetical conditions that are detailed later in this report.

[8] The Arnold Report separately evaluates certain "NewCo" assets, a subset of TransCare's operations.

[9] Although I observe Dr. Arnold has chosen valuation dates that correspond with the transmittal of certain turnaround plans, the Arnold Report does not otherwise specify the importance of these dates, if any, to the claims in this matter.

3

b. The Arnold Report reaches hypothetical and speculative *implied values* for TransCare because Dr. Arnold's analysis is reliant on extraordinary assumptions and/or hypothetical conditions[10] that are inconsistent with the operational reality of TransCare as of his chosen valuation dates, including that:

    i. *TransCare had all of the assets necessary to continue operating as a going concern as of his selected valuation dates.* I have been informed by Counsel that the Company did not have the requisite contractually obligated sources of capital or debt financing as of the valuation dates to effectuate the turnaround plans upon which Dr. Arnold bases his *implied values.* Dr. Arnold's conclusions fail to consider the impact this deficiency would have on the assumption that the Company could continue operating as a going concern as of the valuation dates and how the Company's working capital deficiency would affect the proceeds generated by a sale of the Company's assets.

    ii. *TransCare had already achieved the dramatic operational turnaround reflected in each of the fiscal year 2016 forecasts used by Dr. Arnold to imply value.* The Arnold Report presents no analysis of the reasonableness of the forecasts or the turnaround plans from which the forecasts were derived, nor any assessment of the risks inherent in achieving those forecasts. Accordingly, his analysis ignores facts that would be of critical importance to a potential buyer as of his valuation dates, including the Company's prior inability to achieve its previous turnaround projections.

    iii. *TransCare was an investment of comparable risk to the guideline companies and precedent transactions that Dr. Arnold relies upon for his selected valuation multiples.* I note that the Arnold Report fails to

---

[10] These are specific valuation terms that are defined in the International Glossary of Business Valuation Terms, published by the Appraisal Standards Board of the Appraisal Foundation in the Uniform Standards of Professional Appraisal Practice ("USPAP"), 2018-2019 Edition, and adopted by American Institute of Certified Public Accountants, American Society of Appraisers, National Association of Certified Valuation Analysts, The Canadian Institute of Chartered Business Valuators and The Institute of Business Appraisers.

independently assess any market data for comparability, instead relying on third party emails and generalized statements as the analytical underpinnings of his purported valuation.

2. Accordingly, Dr. Arnold's *implied values* are dramatically higher than the amount that would have been received in an arms-length transaction for the Company as of his selected valuation dates. This is because each extraordinary assumption and/or hypothetical condition, if corrected for, would dramatically reduce his *implied values* for TransCare.[11]

In forming my opinions on this matter, I have considered documents and information provided to me by Counsel at my request, as well as financial and market information from sources such as S&P CapitalIQ, IBISWorld, and publicly available data. A listing of the documents that I have considered in forming the opinions detailed in this report is attached hereto as Appendix B.

## 5. TransCare

### 5.1. Background and Operations

TransCare was established in 1993 in Brooklyn, New York, eventually operating five divisions including New York, Hudson Valley, Pittsburgh, Baltimore, and Delaware Valley. The Company, and its wholly-owned subsidiaries, provided medical transportation services to patients through its ambulance segment (including both emergency and nonemergency) and to individuals with disabilities through its paratransit segment prior to the TransCare Filing Date.[12]

### 5.2. Historic Financial Performance

As of the valuation dates, TransCare's revenue had been steadily declining since 2010 with an average annual revenue growth rate of negative 2.9%.[13] This declining

---

[11] I note that the Arnold Report relies on the direction of counsel for the assumption that a comparison of his concluded "Operating Values" to the proceeds received from the liquidation of TransCare is meaningful to the claims set forth in the *LaMonica v. Tilton, et al.*, Amended Complaint (the "Amended Complaint").
[12] S&P CapitalIQ business description.
[13] Calculated using 2015 fiscal year revenue of $114.3 million. (CM_TC2018_0003369).

5

performance was in spite of generally improving conditions in the marketplace for ambulance and medical transportation services. According to IBISWorld, an industry research provider, the ambulatory and medical transportation industry achieved an average annual revenue growth rate of positive 1.6% over the same period.[14] The following chart demonstrates the historic revenue achieved by TransCare for the periods in which I have documented financial information.[15,16]



Sources: TRANSCARE00062806, TRANSCARE00062825, TRANSCARE00062845, TRANSCARE00062788, CM_TC2018_0003376, CM_TC2018_0003369

At the same time, TransCare was reporting variable EBITDA results. I note that certain one-time events appear to have contributed to the variance in reported EBITDA over this period of time.[17] The following chart shows unadjusted reported EBITDA performance for 2009 to 2015.

---

[14] IBISWorld Ambulance Services Report, page 34.
[15] I note that TransCare did not receive audit opinions for its annual financial statements after 2013. Audited financial statements were provided for the period from 2009 through 2013. (1146851_2019_01_24_09_00_PM).
[16] My review of the Company's financial memorandums has identified various inconsistencies between reported monthly and annual financial results.
[17] For example, management referenced hurricane Sandy as a one-time boost to 2012 and 2013 EBITDA and noted that it also affected NYC 911 revenues in 2014 and or 2015. I also observe evidence that changes in accounting estimates may have contributed to observed variability in EBITDA. For example, management

CONFIDENTIAL



TransCare Annual EBITDA

Sources: TRANSCARE00062806, TRANSCARE00062825, TRANSCARE00062845, TRANSCARE00062788, CM_TC2018_0003376, CM_TC2018_0003369

The compounded annual EBITDA growth rate achieved by TransCare over this period was -27.1%.

### 5.3. Early 2016 Turnaround Plans

The Arnold Report relies upon forecasted fiscal year 2016 EBITDA sourced from several potential turnaround plans prepared in January and February 2016 to establish the "Operating Value" of TransCare.[18] All of these plans were prepared at a time when the Company was in negotiations with Wells Fargo regarding its existing revolving secured credit facility. I note that Wells Fargo informed TransCare of its decision to cease providing additional funding by no later than February 24, 2016.[19]

---

noted that a noncash bad debt reserve adjustment of $2.441 million was recorded in December 2012. (CM_TC2018_0004132 and CM_TC2018_0003369)

[18] Dr. Arnold also *implies* a value for NewCo.

[19] PP-TRBK0013783.

7

The first plan, dated January 7, 2016, projected compounded annual revenue growth of 14.3%. The following table compares the historic operating revenue performance of TransCare to the January 7, 2016 plan.



**TransCare Annual Revenue**

Sources: TRANSCARE00062806, TRANSCARE00062825, TRANSCARE00062845, TRANSCARE00062788, CM_TC2018_0003376, CM_TC2018_0003369

The January 7, 2016 plan also showed EBITDA growing at a compound annual growth rate of 80.4% from 2015 to 2020 – rising from $1.4 million to $26.1 million.

CONFIDENTIAL



**TransCare Annual EBITDA**

Sources: TRANSCARE00062806, TRANSCARE00062825, TRANSCARE00062845, TRANSCARE00062788, CM_TC2018_0003376, CM_TC2018_0003369, CM_TC2018_0002110, PP-TRBK0013273

In January 2016, Carl Marks Advisory Group, LLC ("CMA"), a restructuring and crisis management advisor, was retained by TransCare at the request of Wells Fargo.[20,21] On January 27, 2016, CMA circulated a draft fiscal year 2016 turnaround plan showing that the Company, following an operational turnaround, would generate EBITDA of $5.0 million for FY 2016.[22] CMA suggested that its forecast of fiscal year 2016 reflected "the most accurate financial picture… possible given the limitations of the Company's accounting system and financial reporting[.]"[23] CMA also stated in a presentation accompanying the transmittal of the CMA plan that the Company had:

---

[20] Although the retention of CMA in early January 2016 is referenced in various documents in this matter, I have assumed the Amended Complaint is correct in its statement that CMA was retained on January 11, 2016.

[21] PP-TRBK0046839 and PP-TRBK0004095.

[22] I note that CMA issued an updated version of these projections on January 28, 2016 showing the Company generating EBITDA of $5.2 million in fiscal year 2016. PP-TRBK0013273.

[23] CM_TC2018_0002110, page 5.

9

- *Strained and broken customer relationships*, noting more specifically: a void in senior management (including an open CEO position); lack of credibility with customers; worry over business viability; and the loss of previously dependable critical employees. CMA concluded by saying "Virtually all key customers are pursuing or considering replacement options" and that the "loss of another key customer will likely create 'domino effect'."[24]

- *Strained and broken employee relationships*, noting more specifically: $2.1 million in past due payroll and payroll taxes; mechanical issues disrupting service; lack of critical supplies and equipment issues; and the absence of a CEO who would be needed to establish credibility, lead the management team, restructure operations and execute change.[25]

- *Strained and broken ambulance fleet*, with approximately 50 of 248 vehicles currently out of service, and the majority of the fleet aged beyond industry standard, which was leading to the inability to service many daily calls.[26]

- *Strained and broken vendor relationships*, with over $5 million in non-payroll, non-landlord, non-insurance payables over 120 days.[27]

- *Strained and broken landlord relationships*, affecting a host of physical locations.[28]

CMA further stated that "to have a chance of turnaround, TransCare needs an immediate incremental pledge of [equity] totaling $7.5+ million," excluding interest due and payable on the Company's $43.6 million of term loan indebtedness, with the "+" accounting for

---

[24] CM_TC2018_0002110, page 2.
[25] Ibid.
[26] CM_TC2018_0002110, page 3.
[27] Ibid.
[28] Ibid.

10

"surprises, shortfalls and contingencies."[29,30,31] CMA further noted that the business continued to deteriorate and that:

- "the decision to risk significant capital must be made;"[32]

- "plan execution risk is high and therefore ultimate payback on the incremental investment is uncertain;"[33]

- "the projections [were] attainable but include[d] a significant amount of operating risk;"[34] and

- Profit improvement was "dependent on not only strong execution, but several non-controllable factors such as weaker than forecast run rate trip volumes" and "avoiding further loss of business," amongst others.[35]

CMA went on to state that the turnaround plan would not pay all past due vendors and that it didn't believe that bankruptcy was a viable strategy for TransCare.[36] The presentation ends with an empty page titled "Status of Wells Fargo Discussions."[37,38]

I note that TransCare and its managers previously had similar turnaround plans that the Company failed to achieve. For example, when Mr. Leland, TransCare's CEO during portions of 2015 and 2016, first joined the Company he expressed that the Company's then existing "recovery plan" was not able to be achieved as "it failed to anticipate some

---

[29] I further note that the $7.5 million of required capital was to cover needs in the 13 weeks following the CMA Plan. Total required capital over 2016, as estimated by CMA, was $8.5 million plus contingencies. (CM_TC2018_0002110, pages 6 and 14).
[30] Loan value as of February 15, 2016. (PP-TRBK0019089).
[31] CM_TC2018_0002110, page 5.
[32] Ibid.
[33] Ibid.
[34] CM_TC2018_0002110, page 14.
[35] CM_TC2018_0002110, page 5.
[36] CM_TC2018_0002110, page 7.
[37] CM_TC2018_0002110, page 15.
[38] On January 27, 2016, Mr. Greenberg attached a completed "Status of Wells Fargo Discussions" page in his email to CMA which discusses a short-term forbearance agreement. (Husson Exhibit 171).

conditions now evident."[39] My understanding is that the "recovery plan" that he was referencing was prepared by predecessor TransCare management.[40]

## 6.  Business Valuation Standards

To guide business appraisers towards best practices as they conduct valuation engagements, there are various professional standards that have been issued by quasi-governmental organizations and professional societies. This section identifies and describes the valuation standards which I found relevant to my review of the Arnold Report:

The Uniform Standards of Professional Appraisal Practice (USPAP) - USPAP is the generally accepted standards for professional appraisal practice in North America. USPAP contains standards for all types of appraisal services.[41] Standards are included for real estate, personal property, business and mass appraisal. The Financial Institutions Reform, Recovery and Enforcement Act of 1989 recognizes USPAP as the generally accepted appraisal standards and requires USPAP compliance for appraisers in federally related transactions. State Appraiser Certification and Licensing Boards; federal, state, and local agencies, appraisal services; and appraisal trade associations also require compliance with USPAP.[42] Most importantly, USPAP Standard 9, entitled Business Appraisal, Development, is the USPAP standard governing the development of a business valuation. This Standard, according to the USPAP authors, "is directed toward the substantive aspects of developing a credible appraisal of an interest in a business enterprise or intangible asset."[43]

Statement on Standards for Valuation Services No. 1 ("SSVS 1") – SSVS 1 was authored by the Consulting Services Executive Committee of the American Institute of Certified Public Accountants (the "AICPA"), a body designated by AICPA Council to promulgate

---

[39] TRANSCARE00067400.

[40] It appears that another recovery plan was prepared as early as June 2015, which was then revised in November 2015, and which Mr. Leland revised again following his January 2015 email. (TRANSCARE00067400).

[41] Appraisal Foundation, *What is USPAP?*

[42] Appraisal Foundation, *The Appraisal Foundation – Maintaining Public Trust in Valuation.*

[43] USPAP 2018-2019 Edition, Standard 9: Business Appraisal, Development, Comment on page 55.

12

professional standards for member CPA's performing business valuations. The Consulting Services Executive Committee of the AICPA, which is the largest membership organization for CPA's, developed the standard to improve the consistency and quality of practice among AICPA members performing business valuations.[44] SSVS 1 provides mandatory guidance to practicing CPA's performing "[v]aluations of businesses, business ownership interests, securities, or intangible assets (hereinafter collectively referred to in this Foreword as business valuations)...for a wide variety of purposes including the following: Litigation (or pending litigation) relating to matters such as... bankruptcy."[45] AICPA members are required to follow SSVS 1 when they "perform engagements to estimate value that culminate in the expression of a conclusion of value or a calculated value."[46]

The remainder of this report will demonstrate how the analysis set forth by Dr. Arnold is not compliant with these business valuation standards and describe why this failure to comply with valuation standards negates the reliability of Dr. Arnold's conclusions in this matter.

7.     **The Arnold Report Does Not Invoke a Standard of Value**

According to the International Glossary of Business Valuation Terms published in ASA Business Valuation Standards (the "International Glossary"), a standard of value is "the identification of the type of value being used in a specific engagement; e.g. fair market value, fair value, investment value."[47] The importance of explicitly adopting a standard of value is referenced in all of the valuation standards that I have considered as summarized below:

- USPAP Standards Rule 9 - 2 states that "[i]n developing an appraisal of an interest in a business enterprise or intangible asset, an appraiser must: ... (c) identify the standard (type) and definition of value and the premise of value;"

---

[44] American Institute of Public Accountants, Inc., *Valuation Services.*
[45] SSVS 1, page 1.
[46] SSVS 1, page 2.
[47] American Society of Appraisers – ASA Business Valuation Standards, page 31.

- SSVS 1 paragraph 25 states that "[t]he analysis of the subject interest will assist the valuation analyst in considering, evaluating, and applying the various valuation approaches and methods to the subject interest. The nature and extent of the information needed to perform the analysis will depend on, *at a minimum* [emphasis added], the following:... [a]pplicable standard of value..."

The Arnold Report does not specify the standard of value under which Dr. Arnold has prepared his analysis and his opinions of value.[48] The failure to define and comply with a standard of value is one of the factors contributing to the unreliability of Dr. Arnold's concluded values. I have reviewed the valuation conclusions contained in the Arnold Report in accordance with the fair market value standard of value. Fair market value (defined earlier in this report) invokes the concept of a hypothetical arms-length transaction as of a specified valuation date and is supposed to consider both:

(i) The actual circumstances of the subject asset as of the valuation date and the expectations for the future that would be considered by a hypothetical willing buyer having reasonable knowledge of relevant facts;[49] and

(ii) The prevailing market conditions for the disposition or sale of the subject property as indicated either by transactions in similar assets (taking into account any adjustments required to account for issues of comparability - i.e., differences in riskiness) or evaluating market required rates of return for similarly risky investments.[50]

By approaching a valuation in compliance with this standard, a valuation opinion is supposed to reflect the amount that could have been realized from a hypothetical sale of the property on the valuation date.

---

[48] I note that Dr. Arnold was instructed by his counsel to "perform an analysis of the *implied valuations* [emphasis added]" of TransCare. The word "implied" seems to suggest that he was not asked to provide an opinion of value subject to a standard of value, but instructed to imply a valuation using simplifying extraordinary assumptions according to his own determination and without applying the typical analytical practices required to reach a reliable opinion of value.
[49] For purposes of this statement, I assume a standard of value of fair market value or fair value; investment value does not measure value assuming a sale to a hypothetical arms-length market participant but, instead, the value of the property to a specific market participant.
[50] Pratt & Niculita 2008, page 202.

14

My understanding is that Dr. Arnold's conclusions reflect a sui generis standard of value that assumes, contrary to evidence as of the valuation date, that the Company would be able to effectuate the turnaround plans upon which his value conclusions are based. This assumption ignores the operative reality for TransCare as of January and February 2016, including that:

(i) The Company had generated negligible EBITDA in the preceding twelve months which was insufficient to meet its ongoing operating and capital investment requirements;

(ii) There was uncertainty regarding the ability of the Company to access financing under the Wells Fargo revolving credit facility;[51]

(iii) The Company had been unable to meet its debts as they were coming due in the normal course of business;[52] and

(iv) By no later than February 24, 2016, the Company had been unable to reach terms acceptable to its revolving credit facility lender to continue receiving advances needed to finance the Company's working capital needs;[53]

The failure of the Arnold Report to incorporate these basic facts into the determination of value creates nothing more than a hypothetical exercise that assumes an alternate reality for TransCare as of the valuation dates. Accordingly, Dr. Arnold's conclusions do not qualify as a standards-based opinion of value, and are fundamentally disconnected from the price that could have been received for TransCare in an arms-length transaction as of his selected valuation dates.

### 8. The Arnold Report Incorporates Extraordinary Assumptions

The Arnold Report incorporates what professional societies and The International Glossary define as extraordinary assumptions and/or hypothetical conditions. USPAP

---

[51] Husson Exhibit 166.
[52] CMA Plan notes that "[the Company] currently ha[s] over $5 million in non payroll, non landlord, non insurance payables over 120 days" (CM_TC2018_0002110, page 3).
[53] PP-TRBK0013783.

CONFIDENTIAL

defines an extraordinary assumption as "an assignment specific assumption as of the [valuation] date regarding uncertain information used in an analysis which, if found to be false, could alter the appraiser's opinions or conclusions."[54] A hypothetical condition is defined in SSVS 1 Appendix 3 as "[t]hat which is or may be contrary to what exists, but is supposed for the purpose of analysis."[55]

There are at least three specific extraordinary assumptions or hypothetical conditions that are embedded in the analysis set forth in the Arnold Report:

(i) As of the valuation dates, TransCare had access to all of the assets necessary to continue operating as a going concern;

(ii) TransCare would achieve the operational turnaround reflected in the various projections of fiscal year 2016 results that Dr. Arnold uses to reach his *implied values;* and

(iii) The guideline public companies and precedent transactions used by Dr. Arnold had risk profiles similar to the risk profile that an investment in TransCare would have had as of the valuation dates (i.e., that TransCare would command the same market multiple in an arms-length transaction as of the valuation dates).

The USPAP Comment to Standards Rule 9-2(f) states "An extraordinary assumption may be used in an assignment only [under the following conditions]:"[56]

---

[54] USPAP 2018-2019 Edition, Definitions, page 4.
[55] SSVS 1 Appendix 3.
[56] USPAP 2018-2019 Edition, Standard 9: Business Appraisal, Development, page 56.

16

| Condition Allowing For The Inclusion of an Extraordinary Assumption | Observation |
|---|---|
| It is required to properly develop credible opinions and conclusions; | The assumptions identified above impair the credibility of the opinion and conclusions of Dr. Arnold |
| The appraiser has a reasonable basis for the extraordinary assumption; | Dr. Arnold presents no independent analysis substantiating that such extraordinary assumptions would similarly be adopted by market participants willing to purchase TransCare as of the valuation dates |
| Use of the extraordinary assumption results in a credible analysis; and | The analysis set forth by Dr. Arnold is not credible because it is designed specifically to avoid answering questions relevant to the reliability of his conclusions |
| The appraiser complies with the disclosure requirements set forth in USPAP for extraordinary assumptions. | The extraordinary assumptions are not explicitly disclosed by Dr. Arnold and could mislead a reader of the Arnold Report |

As observed in the table above, the extraordinary assumptions and hypothetical conditions incorporated into the Arnold Report do not meet the criteria for inclusion in developing an opinion of value pursuant to USPAP. The following subsections analyze Dr. Arnold's reliance on the extraordinary assumptions and/or hypothetical conditions identified above.

## 8.1. The Arnold Report Assumes that TransCare was Adequately Capitalized

The Arnold Report's assumption that TransCare had all of the assets it required to continue operating as a going concern contradicts the projections incorporated into Dr. Arnold's analysis. Each plan he relied upon requires a substantial capital infusion or debt financing. I have been informed by Counsel that the Company did not have the necessary contractually obligated sources of capital or debt financing as of the valuation dates. This extraordinary assumption is not merely a theoretical issue; it affects every *implied value* in the Arnold Report.

17

Dr. Arnold claims that "projections or assumptions on capital expenditures, net working capital or associated depreciation and amortization" are of critical importance to a discounted cash flow ("DCF") analysis. He is correct, in order to properly apply the DCF method (which is a form of valuation known as the "Income Approach"), a business appraiser needs to confirm that the projections accurately reflect the future expected cash flows of the business, including any cash outflows necessary to acquire the assets needed to achieve its future projections. These required investments are typically reflected as cash requirements from expected changes in working capital balances and/or projected capital expenditures.[57] A DCF analysis that fails to incorporate any cash outflows would overvalue the subject company.

Dr. Arnold decided to exclude the Income Approach from consideration as a result of his inability to determine the capital investment requirements of TransCare. However any opinion of value, under *any* approach, needs to specifically account for the capital requirements of the business. This is because an investor, in determining the value of the Company, would evaluate whether there was incremental capital needed to continue operating TransCare on a going concern basis that was not owned by TransCare as of the valuation date (i.e., the date of a hypothetical arms-length purchase). After determining any undercapitalization of the business, an investor would either:

(i) Use projections incorporating these cash outflows to determine the value of the business under the Income Approach to value (i.e., reducing the present value of the expected future profits of the business by the present value of the investment cash outflows); or

(ii) Value the company based on market multiples and then deduct the amount by which the company was undercapitalized, since the guideline companies or transactions were not undercapitalized and therefore the multiples reflected the value of a properly capitalized business.[58]

---

[57] Pratt & Niculita 2008, page 180.
[58] Pratt & Niculita 2008, page 299.

18

Accordingly, no market participant would agree to purchase TransCare without having formed a reasonable degree of certainty regarding the magnitude of the Company's capital needs because it affects the value of the Company to the investor. Amongst other errors contained in his analysis, Dr. Arnold makes no adjustment to his *implied values* for the capital deficiency, causing his conclusions to be fundamentally unsound.

### 8.2. The Arnold Report Assumes TransCare Would Effectuate an Operational Turnaround

The Arnold Report fails to recognize the substantial risk as of the valuation dates that the Company might fail to achieve the projected performance in the plans that are the sole determinant of the *implied values* of TransCare according to Dr. Arnold's calculations. In fact, the Arnold Report fails to present any independent analysis leading to a reasonable basis to conclude that a market participant would assume the realization of such projections for TransCare, all of which represent a marked turnaround of the business - especially knowing that:

(i) CMA recognized, as described above, that the "plan execution risk is high and therefore ultimate payback on the incremental investment is uncertain."[59]

(ii) The plans forecasted a reversal of the Company's historic trends;

(iii) The Company had failed to achieve a series of previous turnaround plans; and

(iv) Turnaround plans, by their very nature, show a company returning to profitability irrespective of the risks of achieving those plans.[60]

In this regard, Dr. Arnold has clearly failed to apply the necessary professional judgment required to assess the reasonableness of the projections, or their embedded risks. These assessments are necessary to reach a conclusion of value because:

---

[59] CM_TC2018_0002110, page 5.
[60] The plans, other than the February 24, 2016 NewCo plan, were prepared by the Company and its advisors in connection with the Company's negotiations with Wells Fargo concerning its revolving credit facility. For example, the CMA plans contemplated the continuation of the Wells Fargo facility and a minimum capital contribution of $7.5 million. In addition, the plans implied that there would need to be a forgiveness of the Company's term loan indebtedness. CM_TC2018_0002110.

*"[u]ncertainty as to the stability or continuity of the future income from a property decreases its value by increasing the risk of loss of earnings and value in the future. The value... of a company with very uncertain future prospects is highly speculative. The appraiser must exercise his judgment as to the degree of risk attaching to the business."*[61]

Furthermore, Dr. Arnold assumes that a market participant would fully ignore the most reliable evidence of TransCare's profitability: its actual historically achieved results. Instead, he assumes that a market participant would rely exclusively on forward measures of profitability.[62] This ignores the reality that actual realized performance would suggest values a mere fraction of Dr. Arnold's conclusions (if not the conclusion that the Company had only liquidation value). I note the following statement from Revenue Ruling 59-60, which specifically addresses the importance of considering actual performance measures:

*"The history of a corporate enterprise will show its past stability or instability, its growth or lack of growth, the diversity or lack of diversity of its operations, and other facts needed to form an opinion of the degree of risk involved in the business... The detail to be considered should increase with approach to the required date of appraisal, since recent events are of greatest help in predicting the future."*[63]

Dr. Arnold ignores the actual historic performance of TransCare in every analysis that is set forth in the Arnold Report including the guideline public company method and the precedent transaction method. In addition to the standard methods under the Market Approach, Dr. Arnold prepares other calculations that reflect his application of multiples to the forecasted performance of TransCare, all suffering from this same reliance on the extraordinary assumption that TransCare would achieve the turnaround plans. One of

---

[61] Revenue Ruling 59-60, Section 3, para. 02.
[62] In addition to simply assuming the turnaround of TransCare, Dr. Arnold also fails to properly apply trailing EBITDA multiples to trailing measures of EBITDA in various calculations set forth in his Market Approach to value. Pratt & Niculita, page 304.
[63] Revenue Ruling 59-60, Section 4, para. 02(a).

these calculations reflects the application of a range of EBITDA multiples from 7.0x to 8.0x which he sources from a statement made by Ms. Tilton at her deposition specifically relating to NewCo. I note that Ms. Tilton qualified her statement by expressing that application of such a multiple was generous for a very distressed company.[64]

## 8.3. The Arnold Report Fails to Assess Comparability

As noted above, the Arnold Report relies solely on the Market Approach to value through his application of the public guideline company and precedent transactions methods. The core premise of the Market Approach is to identify comparable market data in order to use observable transaction prices to estimate the value of a company. The first task in this process is to identify a universe of potentially comparable data and then to determine whether that market data shares sufficiently similar characteristics as the subject asset to provide an applicable indication of prevailing market conditions.[65,66] All valuation opinions require professional judgment to determine whether there should be adjustments to the observed market data to reflect differences between the subject asset and the market transaction assets.[67] Dr. Arnold fails to independently search for relevant market data and similarly provides no assessment of the comparability of the guideline public companies or precedent transactions to TransCare. Instead, he blindly relies upon an email from Mr. Greenberg, an employee of Patriarch Partners, sent to Ms. Tilton, among others.[68]

Dr. Arnold's failure to independently determine what market data was comparable to TransCare results in a glaring error in the Arnold Report. Although labeled "Envision", his guideline public company method does not actually include the Envision Healthcare Holdings, Inc. identified by Mr. Greenberg (i.e., the company that operated Rural/Metro Corp. ambulance operations). Instead, Dr. Arnold mistakenly includes the market

---

[64] Tilton Deposition, pages 119-120.
[65] Pratt & Niculita 2008, pages 266-267.
[66] "The use of professional judgment is an essential component of estimating value." SSVS 1 para. 4.
[67] Pratt & Niculita 2008, page 301.
[68] Mr. Greenberg initially identifies three guideline public companies in the ambulance or air medical transportation industries, including Envision Healthcare Holdings, Inc. ("Envision"), Air Methods Corporation ("Air Methods"), and PHI, Inc. ("PHI"). Mr. Greenberg's cover email states that "PHI... appears to be an outlier." Based solely on this email, and incorporating the error noted in the text following this footnote, Dr. Arnold applies his calculated forward EBITDA multiples for Amsurg and Air Methods as of his selected valuation dates to determine the *implied value* of TransCare. (PP-TRBK0041410), Arnold Report pages 29-30.

multiples for a company named Amsurg that was renamed Envision Healthcare Corporation subsequent to its merger with Envision Healthcare in late 2016, *after* the valuation dates (i.e., prior to Amsurg having any ambulance operations).

Even assuming that Dr. Arnold had actually used the companies Mr. Greenberg identified, an analysis of the comparability of these companies would have identified the following:[69]

> (i) Envision generates approximately two thirds of its revenues and operating profits from outsourced medical services (i.e., healthcare staffing services and related management services) and Air Methods generates 100% of its revenue from medical helicopter transportation operations.

> (ii) Envision and Air Methods were substantially larger companies, generating $5.1 billion and $1.1 billion in LTM revenues, respectively, as compared to TransCare's approximate $114 million. Similarly, Envision and Air Methods generated LTM EBITDA of $583 million and $285 million compared to TransCare's $1.4 million.

> (iii) Envision and Air Methods had substantially higher profitability generating LTM EBITDA margins of 11.4% and 26.8%, respectively, as compared to TransCare's 1.2%.

> (iv) Envision and Air Methods had an established history of increasing revenues and EBITDA over the past three-year period (experiencing annualized growth rates of 13.8% and 3.4%, respectively), whereas TransCare EBITDA declined by an annualized rate of *negative* 46.4% over that same period.

Based on my observation (i) above, there are substantial differences between the public companies identified by Mr. Greenberg (and even that data is limited to only two observations). Even assuming that Envision and Air Methods were sufficiently comparable to warrant their inclusion as guideline public companies, my observations (ii) through (iv) suggest that there would need to be a substantial downward adjustment to

---

[69] See Exhibits 1 to 3 for information I have compiled regarding the companies and transactions identified by Mr. Greenberg.

the applied multiple in order to account for the significantly higher risk of investing in TransCare as compared to the guideline public companies as of the valuation dates. Market participants would recognize much higher risk for investing in TransCare related to its historic operating performance as compared to the guideline companies, TransCare's significantly smaller size, and its substantially lower profitability that are readily observable in the financial comparisons above.[70] This incremental risk is before considering the actual operational distress that TransCare was experiencing as of the valuation dates. Accordingly, a market participant incorporating the financial and operational risks of TransCare as compared to the guideline companies would ascribe value to the company that was far less than the observed market multiples for the identified public companies.[71,72]

## 9.  Other Observations on Dr. Arnold's Calculations

### 9.1.  Third-Party Expressions of Interest

Dr. Arnold also performs a calculation of value based on what he refers to as third-party "expressions of interest." Specifically, Dr. Arnold applies an 8.0x EBITDA multiple, sourced from unsolicited emails from RCA, to forecasted 2016 EBITDA per the plans. I note that these calculations fail to present any view by an informed market participant as to an actual price they were willing to pay for TransCare as a whole as of the valuation dates because:

---

[70] Rosenbaum & Pearl 2013, page 147.

[71] The Arnold Report similarly fails to set forth any analysis regarding the comparability of the precedent transactions contained in the email from Mr. Greenberg which Dr. Arnold uses to imply value in the precedent transaction approach.

[72] Pratt & Niculita 2008, page 305.

(i) RCA did not have access to the financial performance records of the Company and had not performed standard due diligence to assess TransCare; [73]

(ii) The emails do not suggest that RCA was willing to pay 8.0x forecasted 2016 EBITDA assuming a turnaround of TransCare; and

(iii) The "expressions of interest" were not proximate to the valuation dates.

## 10. Right to Supplement

I reserve the right to supplement or amend this report based on any new information that may come to my attention that is relevant to the opinions contained herein.

Respectfully Submitted,

Jeffrey R. Dunn, CFA, CIRA

New York, New York

February 11, 2019

---

[73] Dr. Arnold concedes that RCA "preliminary offers" were made without the benefit of due diligence. Arnold Report, page 31.

**JEFFREY R. DUNN, CFA, CIRA**

Director
Berkeley Research Group, LLC
810 7th Ave, 41st Floor
New York, NY 10019
212-782-1421
jdunn@thinkbrg.com

## SUMMARY

Mr. Dunn is a Director in the valuation practice of Berkeley Research Group ("BRG") specializing in the preparation of expert testimony related to valuation, solvency, and damages. Prior to joining BRG in June 2015, he was a Managing Director of Capstone Advisory Group ("Capstone"). He holds the right to use the Chartered Financial Advisor® designation and is a Certified Insolvency and Restructuring Advisor with over 10 years of financial experience as a business appraiser and valuation analyst.

## PROFESSIONAL EXPERIENCE

**Berkeley Research Group, LLC – June 2015 – Present**
Director

**Capstone Valuation Services, LLC – January 2008 – June 2015**
Managing Director

**Trenwith Valuation, LLC – July 2006 – January 2008**
Senior Associate

At BRG, Capstone, and Trenwith, Mr. Dunn has provided business valuation and related financial advisory services to clients including companies, private investment funds, and parties to bankruptcy and large commercial disputes. His valuations assisted clients in complying with financial and tax reporting requirements including fair value engagements such as purchase price allocations, goodwill impairment tests, and recurring equity, fixed-income, and derivative portfolio valuation services. In addition, he has led numerous fair market value engagements such as 409a enterprise valuations and cancellation of debt income analyses. His clients included some of the largest regulated financial institutions and private investment companies, public and private companies, and bankruptcy

constituents. He has participated in several of the most prominent cases to be tried in federal bankruptcy courts as part of his role as a financial advisor. Sample assignments (Dunn executed expert reports in *bold*) include:

*Confidential (2018) – Preparation of testimony for international nation-state investor arbitration.*

*Windstream Services, LLC (2018) – Preparation of testimony regarding any premium received by participants to an exchange offer*

***CNH Diversified Opportunities Master Account, L.P. et al. v. Cleveland Unlimited, Inc. et al. (2017) – Valuation of telecommunications company and related opinions (Complaint dismissed following the issuance of expert report and delivery of deposition testimony)***

*Confidential (2016) –* Valuation of reinsurance broker

*Confidential (2016) –* Valuation of loan portfolio

*Confidential (2016) –* Valuation of apparel company

*Altegrity (2015-2016) –* Valuation of foreign subsidiaries of a consulting firm

***East Coast Brokers & Packers (2015) – Analysis of solvency for an agricultural business (issued expert report in contemplation of expert testimony – case settled prior to deposition)***

*ISN (2014 – 2016) –* Valuation of a technology company in support of expert testimony in connection with petition for appraisal rights in the Delaware Court of Chancery

*MPM Silicones / Momentive (2014 - 2018) –* Valuation and credit analysis of a materials company in connection with representation of secured lenders

*Confidential (2014) –* Valuation of hotel portfolio

*HSS (2014) –* Equity valuation for a packaging company

*Energy Futures Intermediate Holdings (2013-2015) –* Valuation of Texas energy utility and analysis of reinvestment risk in connection with engagement as financial advisor to ad hoc group of First Lien lenders

*Lukoil / Getty Petroleum Marketing (2013-2015) –* Valuation of gas stations in support of expert testimony

***FIA Leveraged Fund (2012) – Valuation of option to purchase preferred stock and related warrants (Issued report in contemplation of litigation)***

*Biolitec (2011) –* Valuation of biotech company

*Forest Labs (2011) –* Valuation of a pharmaceutical company for financial reporting purposes

*Northrop Grumman (2011)* – Analysis of solvency of an aerospace company

*TBS International (2011)* – Valuation of a homebuilder

*Archstone (2010-2013)* – Valuation for purposes of cancellation of debt income assessment and compliance with fair value requirements under GAAP

*Almatis (2010)* – Valuation in support of expert testimony in connection with the representation of mezzanine lenders

*Barclays Financial Corp (2010)* – Valuation of equity in a credit card business for tax purposes

*Titan Outdoor (2010)* – Valuation of preferred and common equity in advertising company

*CCS Medical (2010)* – Valuation of medical supplies company

*Large Publicly Traded Commercial Bank (2009 - present)* – Valuation of large commercial loan portfolios, individual loan facilities and leases for financial reporting and taxation purposes

*Lyondell (2009-2016)* – Valuation and solvency analysis of a petrochemical and refining company

*Extended Stay Hotels (2009)* – Valuation of portfolio of extended stay hotel properties

*Holman (2009)* – Equity valuation for retail automotive company

*Tropicana (2009)* – Valuation of casino properties

*Technical Graphics (2009)* – Equity valuation of technology company in support of expert testimony in arbitration

*SemGroup (2009)* – Valuation of various oil & gas related business units in connection with the representation of secured lenders

*Xpress (2009)* – Valuation of the assets of a telecommunications company

## **MEMBERSHIPS**

CFA Institute

New York Society of Security Analysts

Association of Insolvency & Restructuring Advisors

## EDUCATION

Bentley University – Elkin B. McCallum Graduate School of Business

Masters in Finance – 2006

Bentley University

Bachelors in Accounting - 2005

## SPEAKING ENGAGEMENTS

2009 - Current Topics in Business Valuations, New York City Chapter of the American Society of Appraisers

Documents Relied Upon

### Depositions

Deposition of Lynn Tilton, October 29, 2018
Deposition of John Husson, November 11, 2018
Deposition of Glenn Leland, November 27, 2018

### Academic Literature/Textbooks

Koller, Tim, et al. *Valuation: Measuring and Managing the Value of Companies*. 6th ed., Wiley, 2015.
Rosenbaum, Joshua, and Joshua Pearl. *Investment Banking: Valuation, Leveraged Buyouts, and Sale Process.* 2nd ed., Pratt, Shannon P., and Alina V. Niculita. *Valuing a Business: the Analysis and Appraisal of Closely Held Companies*. 5th ed., McGraw-Hill Education, 2008.
Duff & Phelps. *Valuation Handbook, U.S. Guide to Cost of Capital,* 2017, John Wiley & Sons.

### Press Releases/New Articles/Websites

"AMR Acquiring Rural/Metro Corporation." EMS1, 30 July 2015, www.ems1.com/american-medical-response/articles/3017676-AMR-acquiring-Rural-Metro-corporation/.
Beckerman, Josh. "Envision Healthcare to Buy Ambulance-Services Provider Rural/Metro." The Wall Street Journal, Dow Jones & Company, 30 July 2015, www.wsj.com/articles/envision-healthcare-to-buy-rural-metro-an-ambulance-services-Cimilluca, Dana, and Dana Mattioli. "Envision Healthcare, AmSurg to Merge." The Wall Street Journal, Dow Jones & Company, 15 June 2016, www.wsj.com/articles/envision-healthcare-amsurg-to-merge-1466022361.
"Envision Healthcare and AMSURG Shareholders Approve Merger." AMSURG, Nashville Geek, 28 Nov. 2016, www.amsurg.com/news/envision-healthcare-and-amsurg-shareholders-approve-merger/.
"ENVISION HEALTHCARE HOLDINGS, INC. (EVHC) IPO." NASDAQ.com, Nasdaq, www.nasdaq.com/markets/ipos/company/envision-healthcare-holdings-inc-908664-72781.
Reuters. "Envision and AmSurg Are Set to Merge." Fortune, Fortune, 16 June 2016, fortune.com/2016/06/16/envision-The Appraisal Foundation. "Home." *Uniform Standards of Professional Appraisal Practice (USPAP)*, The Appraisal Foundation, www.appraisalfoundation.org/.
"TransCare Announces Two Significant Milestones." Business Wire, Business Wire, Inc., 20 July 2015, www.businesswire.com/news/home/20150720005828/en/TransCare-Announces-Significant-Milestones.
Turk, Sarah. "Ambulance Services in the US: IBISWorld Industry Report 62191". IBISWorld. Nov. 2015, https://clients1.ibisworld.com/reports/reportdownload/?rcid=1&rtid=17&mgid=4&eid=1581&fileID=b50564a9-9273-4cdb-b115-44d2e38b2076&chid=101&ft=pdf.
Ulama, Darryle. "Air Ambulance Services in the US: IBISWorld Industry Report OD5969". IBISWorld. Jan. 2015, https://clients1.ibisworld.com/reports/reportdownload/?rcid=1&rtid=17&mgid=4&eid=5969&fileID=2c3d1a4a-a2af-40e8-bfa9-"Voce Capital Sends Letter to Board of Air Methods Corporation." Business Wire, Business Wire, Inc., 16 Sept. 2015, www.businesswire.com/news/home/20150916005862/en/Voce-Capital-Sends-Letter-Board-Air-Methods.
"What Is USPAP?" *Uniform Standards of Professional Appraisal Practice (USPAP)*, The Appraisal Foundation, www.appraisalfoundation.org/imis/TAF/Standards/Appraisal_Standards/Uniform_Standards_of_Professional_Appraisal_Practice/TAF/USPAP.aspx?hkey=a6420a67-dbfa-41b3-9878-fac35923d2af.

### SEC Filings

Envision Healthcare Holdings, Inc. *Form 8-K*, 2015. Web. 5 Feb. 2019.
Envision Healthcare Holdings, Inc. *Form 10-K 2015*, 2016. Web. 5 Feb. 2019.
Envision Healthcare Corporation. *Form 10-K 2016*, 2017. Web. 5 Feb. 2019.
Falck Holding A/S. *2013 Annual Report*, 2014. Web. 5 Feb. 2019.
PHI, Inc. *Form 10-K 2015*, 2016. Web. 5 Feb. 2019.

### S&P Capital IQ Precedent Transaction Tearsheets

AMR Holdco, Inc., Oct. 28, 2015. CIQ Transaction ID: IQTR308111786.
Century Ambulance Service, Inc., Sep. 24, 2015. CIQ Transaction ID: IQTR312153960.
Global Medical Response Inc. CIQ Transaction ID: IQTR288164473.
PRN Ambulance, Inc., Aug. 4, 2015. CIQ Transaction ID: IQTR278154665.
TriState CareFlight, LLC, Jan. 19, 2016. CIQ Transaction ID: IQTR316215675.
Verihealth Inc. CIQ Transaction ID: IQTR240684383.

### Valuation Standards

2018-2019 Uniform Standards of Professional Appraisal Practice (USPAP), Appraisal Standards Board. Jan. 2019.
ASA Business Valuation Standards, American Society of Appraisers. Jul. 2008.
Rev Rul 59-60, Internal Revenue Service. Jan. 1959.
Statements on Standards for Valuation Services, American Institute of Certified Public Accountants. Jun. 2007.

**CONFIDENTIAL**

## Documents Relied Upon

**Bates Stamped Documents**

| | | |
|---|---|---|
| 1146851_2019_01_24_09_00_PM | PP-TRBK0004574 | PP-TRBK0071446 |
| AL-00176 | PP-TRBK0004695 | PP-TRBK0075769 |
| AL-00196 | PP-TRBK0006471 | PP-TRBK0078085 |
| AL-00216 | PP-TRBK0012469 | PP-TRBK0086219 |
| AL-00236 | PP-TRBK0013259 | PP-TRBK0087751 |
| AL-00256 | PP-TRBK0013273 | PP-TRBK0089542 |
| AL-00341 | PP-TRBK0013274 | PP-TRBK0090486 |
| AL-00380 | PP-TRBK0015289 | PP-TRBK0091282 |
| AL-00400 | PP-TRBK0015291 | TRANSCARE00000395 |
| AL-00485 | PP-TRBK0015293 | TRANSCARE00000395 |
| AL-00695 | PP-TRBK0015295 | TRANSCARE00003900 |
| CM_TC2018_0002108 | PP-TRBK0015306 | TRANSCARE00004048 |
| CM_TC2018_0002110 | PP-TRBK0015309 | TRANSCARE00004191 |
| CM_TC2018_0003369 | PP-TRBK0015312 | TRANSCARE00004259 |
| CM_TC2018_0003376 | PP-TRBK0019062 | TRANSCARE00004571 |
| CM_TC2018_0004132 | PP-TRBK0019088 | TRANSCARE00004609 |
| CM_TC2018_0005038 | PP-TRBK0019089 | TRANSCARE00005261 |
| CM_TC2018_0005039 | PP-TRBK0019229 | TRANSCARE00005639 |
| CM_TC2018_0008781 | PP-TRBK0020769 | TRANSCARE00005770 |
| CM_TC2018_0013875 | PP-TRBK0022003 | TRANSCARE00005839 |
| CM_TC2018_0013895 | PP-TRBK0022363 | TRANSCARE00007937 |
| CM_TC2018_0013915 | PP-TRBK0024842 | TRANSCARE00035020 |
| CM_TC2018_0013935 | PP-TRBK0027756 | TRANSCARE00043758 |
| CM_TC2018_0013955 | PP-TRBK0028485 | TRANSCARE00062780 |
| CURTIS_000521 | PP-TRBK0033600 | TRANSCARE00067400 |
| Husson Exhibit 166 | PP-TRBK0033684 | TRANSCARE00074331 |
| Husson Exhibit 171 | PP-TRBK0041410 | TRANSCARE00081368 |
| PP00026768_PP-TRBK010 | PP-TRBK0041414 | TRANSCARE00107866 |
| PP00026769_PP-TRBK010 | PP-TRBK0042324 | TRANSCARE00107987 |
| PP00029624_PP-TRBK010 | PP-TRBK0042693 | TRANSCARE00195974 |
| PP00092349_PP-TRBK013 | PP-TRBK0044399 | TRANSCARE00198138 |
| PP-TRBK0004093 | PP-TRBK0046839 | TRANSCARE00207025 |
| PP-TRBK0004095 | PP-TRBK0051881 | TRANSCARE00231115 |
| PP-TRBK0004527 | PP-TRBK0052000 | WF_TC_00000046 |
| PP-TRBK0004573 | PP-TRBK0053856 | WF_TC_00003874 |

**CONFIDENTIAL**

EXHIBIT 1

**Guideline Companies - Financial Metrics**
Market Data as of January 07, 2016

*All data in USD Millions unless noted otherwise*[*]

| | | TransCare Corporation [1] | Envision Healthcare Holdings, Inc. | Air Methods Corporation | PHI, Inc. |
|---|---|---|---|---|---|
| **Revenue** | | | | | |
| LTM Revenue | [2] | $114.3 | $5,123.9 | $1,062.4 | $828.2 |
| *Revenue Growth* | | | | | |
| 3Yrs (2012-2015) | [3] | -6.0% | 18.2% | 8.3% | 7.5% |
| 5Yrs (2010-2015) | [3] | -5.5% | 13.8% | 14.0% | 9.2% |
| **EBITDA** | | | | | |
| LTM EBITDA | [4] | $1.4 | $582.9 | $284.5 | $166.3 |
| LTM EBITDA Margin | | 1.2% | 11.4% | 26.8% | 20.1% |
| *EBITDA Growth* | | | | | |
| 3Yrs (2012-2015) | [3] | -46.4% | 13.8% | 3.4% | 13.9% |
| 5Yrs (2010-2015) | [3] | -29.4% | 14.1% | 13.9% | 17.0% |

**Notes**
[1] LTM Period as of December 31, 2015 per CM_TC2018_0003369.
[2] Transcare LTM Revenue of $114,342mm per CM_TC2018_0003369.
[3] Compounded annual growth rate.
[4] Transcare LTM EBITDA of $1,365mm per CM_TC2018_0003369.

**Sources**
[1] S&P CapitalIQ
[2] Docs used for calculating compounded growth rates: TRANSCARE00062806, TRANSCARE00062825, TRANSCARE00062845,
TRANSCARE00062788, CM_TC2018_0003376, CM_TC2018_0003369.

CONFIDENTIAL

EXHIBIT 2

## Guideline Companies - Descriptions

### Envision Healthcare Holdings, Inc.

As of December 1, 2016, Envision Healthcare Holdings, Inc. was acquired by AmSurg Corp. Envision Healthcare Holdings, Inc. provides physician-led outsourced medical services to consumers, hospitals, healthcare systems, health plans, and government entities in the United States. It offers a range of hospital-based physician services, including contract management services, including contract management; staffing, recruiting, scheduling, operational improvement assessment, practice support, and practice improvement services for emergency departments, anesthesiology, hospitalist/inpatient care, radiology, tele-radiology, and surgery programs; and physician-led care management solutions to patients outside the hospital. The company also provides community based medical transportation services, such as emergency response services, non-emergency medical transportation services, such as critical care transfers, and wheelchair and other site-facility transport services; and other services comprising managed transportation, dispatch, event medical, paramedic training, fixed-wing air ambulance, and onsite and offsite emergency medical services, and incidents. Its services primarily under the EmCare and AMR brands. The company was formerly known as CDRT Holding Corporation and changed its name to Envision Healthcare Holdings, Inc. in June 2013. Envision Healthcare Holdings, Inc. is headquartered in Greenwood Village, Colorado.

| Segment Name | Segment Description | % of Revenue | % of Operating Income |
|---|---|---|---|
| Facility-Based and Post-Acute Care Physician Services | This segment provides integrated facility based and post acute care physician services to healthcare facilities in the United States. It offers physician staffing and related management services. | 67% | 65% |
| Healthcare Transportation Services | This segment provides emergency 911 healthcare transportation, non emergency transportation, managed transportation, fire protection, fixed wing air ambulance, disaster response, and event medical services. | 33% | 35% |

### Air Methods Corporation

Air Methods Corporation, together with its subsidiaries, provides air medical transportation services in the United States. The company offers emergency air medical transport and treatment services. It also designs and manufactures aeromedical and aerospace technology; and provides helicopter tours and charter flights in the Las Vegas/Grand Canyon region and Hawaii. In addition, the company offers self-reporting tools, including aviation safety action program, accident incident damage malfunction operations reports, maintenance safety action program, and the air methods multi-disciplinary application for pilots, mechanics, and clinicians; operates owned, leased, or maintained civilian fleet of helicopters and fixed wing aircraft, which are equipped with night vision goggles, XM satellite weather and tracking systems, and GPS and helicopter terrain awareness and warning systems; provides communication services, such as fleet tracking, flight coordination, flight following, and logistical support to the air medical services team; and facilitates critical care technology services to cardiac patients requiring transfer to tertiary care facilities. Further, it sells used aircraft. Air Methods Corporation was founded in 1980 and is headquartered in Englewood, Colorado with a network of maintenance centers and base operations in the United States.

| Segment Name | Segment Description | % of Revenue [2] | % of Operating Income |
|---|---|---|---|
| Air Medical Services (AMS) | This segment provides air medical transportation services to the general population as an independent service, as well as to hospitals or other institutions under exclusive operating agreements. Its services include medical care, aircraft operation and maintenance, 24-hour communications and dispatch, and billing and collections. | 86% | n/a |
| Tourism | This segment provides aerial tours and charter flights, primarily focusing on Grand Canyon and Hawaiian Island tours. It markets its tours through Websites, as well as through various channel partners, such as online booking companies, hotels, resorts, and cruise operators. This segment operates helicopters and fixed wing aircraft. | 12% | n/a |
| United Rotorcraft (UR) | This segment designs, manufactures, installs, and certifies modular medical interiors, multi-mission interiors, and other aerospace and medical transport products for domestic and international customers. It also offers quality assurance and certification services. | 4% | n/a |

### PHI, Inc.

PHI, Inc., together with its subsidiaries, provides transportation services to, from, and among offshore facilities for customers in the oil and gas exploration, development, and production industry in the United States and internationally. It operates through three business segments: Oil and Gas, Air Medical, and Technical Services. The Oil and Gas segment provides helicopter services primarily for the integrated and independent oil and gas exploration and production companies, and other offshore oil service companies for routine transportation of personnel and equipment, transportation of personnel and equipment during medical and safety emergencies, and evacuation of personnel during the threat of hurricanes and other adverse weather conditions. The Air Medical segment companies for routine transportation of personnel and equipment, transportation of personnel and equipment, and evacuation of personnel during the threat of hurricanes and other adverse weather conditions. The Air Medical segment provides air medical transportation services for hospitals and emergency service agencies in 18 states. The Technical Services segment provides helicopter repair and overhaul services for flight operations customers, as well as operates aircraft for the National Science Foundation in Antarctica. It also provides software as a service to certain of its oil and gas customers for passenger check-in and compliance verification. As of December 31, 2017, the company owned or operated 245 aircraft, including 133 dedicated to Oil and Gas operations, 106 dedicated to Air Medical operations, and 6 dedicated to Technical Services operations. PHI, Inc. was founded in 1949 and is headquartered in Lafayette, Louisiana.

| Segment Name | Segment Description | % of Revenue | % of Operating Income |
|---|---|---|---|
| Oil and Gas | This segment provides helicopter services primarily for the integrated and independent oil and gas exploration and production companies, and other offshore oil service companies for routine transportation of personnel and equipment, transportation of personnel and equipment during medical and safety emergencies, and evacuation of personnel during the threat of hurricanes and other adverse weather conditions. | 59% | 52% |
| Air Medical | This segment provides air medical transportation services for hospitals and emergency service agencies. | 38% | 44% |
| Technical Services | This segment provides helicopter repair and overhaul services for flight operations customers, as well as operates aircraft for the National Science Foundation in Antarctica. | 4% | 4% |

Notes
[1] LTM Period as of January 07, 2016.
[2] Q3% of Revenue are allocated to Corporate adjustment.

Sources
[1] S&P CapitalIQ

CONFIDENTIAL

EXHIBIT 3

## Precedent Transactions

All data in USD Millions unless noted otherwise*

| Target Name | Close Date | Majority/Minority | Transaction Implied EV | LTM Revenue | LTM EBITDA | EBITDA Margin | EV/Revenue | EV/EBITDA |
|---|---|---|---|---|---|---|---|---|
| RuralMetro Corporation | 10/28/2015 | Majority | 620 | 598 | 58 | 9.7% | 1.0x | 10.7x |
| Verihealth Inc. | | n/a Majority | 81 | | | | n/a | n/a |
| TriState CareFlight, LLC | 1/19/2016 | Majority | 223 | 82 | - | 0.0% | 2.7x | n/a |
| Global Medical Response Inc. | [1] | n/a Majority | 2,000 | 737 | 200 | 27.1% | 2.7x | 10.0x |
| Century Ambulance Service, Inc. | 9/24/2015 | Majority | | | | | n/a | n/a |
| PRN Ambulance, Inc. | 8/4/2015 | Majority | | 49 | - | 0.0% | 0.0x | n/a |
| **Max** | | | | | | | 2.7x | 10.7x |
| **Average** | | | | | | | 1.8x | 10.3x |
| **Min** | | | | | | | 0.0x | 10.0x |

## Target Company Description

**RuralMetro Corporation**

RuralMetro Corporation offers private ambulance and fire protection services. The company provides emergency ambulance and interfacility ambulance services. Additionally, it offers special event ambulance services for state fairs, concerts, block parties, marathons, golf tournaments, and cycling events. The company also provides community fire protection, industrial fire protection, and wildland fire protection services. It serves local governments and hospitals and healthcare systems. RuralMetro Corporation was founded in 1948 and is based in Scottsdale, Arizona. RuralMetro Corporation operates as a subsidiary of AMR Holdco, Inc.

**Verihealth Inc.**

As per the transaction announced on May 3, 2013, Verihealth Inc. operates as a subsidiary of Falck USA Holdings, Inc.

**TriState CareFlight, LLC**

TriState CareFlight, LLC provides critical care air transport services to adult and pediatric patients in Arizona, Colorado, Nevada, and New Mexico. The company specializes in trauma, medical, surgical, and pediatric transports. It transports critically ill and injured patients for healthcare facilities and emergency medical services agencies through its fleet of rotor and fixed wing aircraft. The company was founded in 2002 and is headquartered in Bullhead City, Arizona. As of January 19, 2016, TriState CareFlight, LLC operates as a subsidiary of Air Methods Corp.

**Global Medical Response Inc.**

Global Medical Response Inc., through its subsidiaries, provides emergency air medical services. It offers community-based air ambulance services. Further, the company provides medically-equipped helicopters, fixed wing aircrafts, and ground ambulances. The company was formerly known as Air Medical Group Holdings, Inc. The company was incorporated in 2004 and is headquartered in Lewisville, Texas. Global Medical Response Inc. operates as a subsidiary of Global Medical Response, Inc.

**Century Ambulance Service, Inc.**

Century Ambulance Service, Inc. provides emergency and non-emergency medical transport and healthcare services. The company offers non-medical stretcher and wheelchair transport services from facility to rehab, facility to home, home to facility, home to home, and home to store/restaurant; and basic life support transportation services for dialysis patients, psychiatric center clients, bariatric patients, non-facility transports, and hospital/facility and residential evacuations, as well as transportation from hospital to nursing, rehab, and assisted living facilities. It also provides advanced life support services, including scene to ER transports, 911 assist transports, trauma center transports, burn unit transports, air ambulance and helipad transports, IV therapy and sedation transports, ICU/CCU transfers, STEMI transfers, stroke alerts, ventilator and bi-pap transports, and neonatal and pediatric critical care and standard care transports; and specialty care transport services for patient requiring respiratory, ventilator, bipap, cardiac, multitrauma, multisystem dysfunction/failure, burns, high altitude, balloon pumps, and other critical care needs, and neonatal care services. In addition, the company offers critical care inter-facility transfer services for ventilator/bipap, trauma, burns, MI and SPI MI, strokes, high altitude, balloon pumps, and other critical care needs; and EMS standby services at events, such as high school and professional football games, as well as other organized sports events from marathons and cycling to professional bull riding. It serves patients and healthcare customers in the United States. The company was founded in 1981 and is based in Jacksonville, Florida. As of September 24, 2015, Century Ambulance Service, Inc. operates as a subsidiary of Protransport-1, Llc.

**PRN Ambulance, Inc.**

As of August 4, 2015, PRN Ambulance, Inc. was acquired by Protransport-1, Llc. PRN Ambulance, Inc. provides medical transportation services in the Southern California region, including Los Angeles County, Orange County, Los Angeles, and Long Beach. It offers basic life support, advanced life support, critical care transport, and neonatal transport services. The company was founded in 2000 and is based in North Hills, California.

**Notes**

[1] Global Medical Response Inc. Transaction is estimated to be approximately 9.5x-10.0x EBITDA per Business Wire article.

**Sources**

[1] S&P Capital IQ
[2] PPI-768/4/3/414114.
[3] Envision Healthcare Holdings, Inc. Form 8-K (October 28, 2015).
[4] Falck Annual Report 2013 (pg 72).
[5] "Voca Capital Sends Letter to Board of Air Methods Corporation" (Business Wire, September 16, 2015).

CONFIDENTIAL

| From: | Jean Luc Pelissier (CBA) |
| --- | --- |
| Sent: | Saturday, February 13, 2016 12:04 PM |
| To: | Lynn Tilton |
| Cc: | Michael Greenberg; Brian Stephen |
| Subject: | Privileged & Confidential :: Transcendence Go Forward Model |
| Attachments: | Transcendence 2 10 16 v10.xlsx |

**Privileged & Confidential :: Transcendence Go Forward Model**

Lynn, I am still on the phone with Michael and am sending you the go forward model. We are still working on the wind down. I will drop you an email to talk as soon as I am finished with my call with Michael.
Best regards; Jean-Luc


This model contains the following markets and key assumptions on a go forward basis. I was not able to include the Westchester balance sheet due to limited information.

Transcendence will operate in the following business segments (Total vehicles of approximately 314 including 188 ParaTransit vehicles owned by NYC MTA).

- Transit (Transcendence II, Inc.): Current contract runs through October 2019. TransCare operates the Access-A-Ride paratransit service for the NYC MTA. It is currently running 168 routes but has run routes as high as 228. The contract through October 2019 allows growth up to 300+ routes to be run. The NYC Transit Authority provides the vehicles with insurance but they are fully maintained by Transcendence Transit II.

  o This division is estimated at $25MM run rate today, with 188 vehicles and an headcount of approximately 390 people.

- Hudson Valley: Hudson Valley is a $12MM primarily emergency, 911 (Dutchess and Hudson Valley) and non-emergency transport business which provides service to Putnam County, a number of municipalities in Dutchess County, and certain key customers including HealthQuest and New York Presbyterian. It has 28 vehicles and headcount of approximately 203.

- Pittsburgh: Pittsburgh is a $7MM emergency and non-emergency revenue market including wheelchair van business (no 911 contracts). Key customers include VA Pittsburgh Health System, University of Pittsburgh, ManorCare and Lifecare Hospitals. This market has 34 vehicles and 94 employees.

- Maryland: (no 911 contracts). Maryland is a $7MM revenue market with the primarily customer being University of Maryland and includes a hospital-branded Critical Care Transfer service. The Maryland market has 27 vehicles and 128 people in headcount and also provides wheelchair van services.

- Westchester: Westchester is a $2MM revenue business which has 8 vehicles and 40 people working in this division focused solely on Emergency Medical Services. The primary relationship is with the City of White Plains. They will share the Bronx 911 turnout facility therefore reducing overhead.

- Bronx 911/Montefiore 911: This is a $13MM revenue business with 24 vehicles and 94 in headcount. It is very profitable business to keep if the non-emergency is not included.

1

**PX 286**

LaMonica v. Tilton, et al., 18-1021-smb

Confidential

PP-TRBK0105516

- Key assumptions in the model include:

  - Solid management team at divisional level and key enhancements at the senior level (CEO, CFO, HR).
  - Improvement in volume back to levels since in June 0f 2015.
  - UHU improvement driven by increased efficiencies and focus on opening back up parts vendor relationships (Hudson Valley, Pittsburgh).
  - Increased supervision in Maryland market with addition of new supervisor and plan to increase volume with University of Maryland.
  - Resumption of routes over time with NYC Transit through improved parts supply and separation of financing.

- Outcome of model is as follows (below is a summary consolidated income statement, balance sheet and cash flow statement).

  - Consolidated revenue of $65MM, gross margin of $19.6MM (30%) and EBITDA of $5.1MM (7.9% EBITDA margin).

  - Wells Fargo's $8.2MM in A/R (due to inclusion of Bronx Lebanon and Montefiore an additional $3.5MM in A/R excludes old A/R) is paid down in the 1st half of the year.

  - Company has an incremental funding need of approximately $8MM due to the initial investment in working capital (A/R days in the ambulance segment average 90days while the Transit segment only 45 days) which can be offset if a new ABL line is secured or by cash that builds throughout the year.

  - This assumes that past due payroll and past payroll taxes are accounted for in OldCo for ~$1.2M

  - Approximately $1M of the funding will be required upfront to address NewCo past due facility rents ~212K , unjam the vehicle repair parts availability ~$410k  and down payments for necessary 8 new vehicles ~$237k.

# Summary P&L for 2016

Confidential

| Amounts in 000's | Jan-16 | Feb-16 | Mar-16 | Apr-16 |
|---|---|---|---|---|
| Service Revenue | 2,045.2 | 3,637.5 | 5,824.5 | 5,495 |
| Other Revenues | - | - | - | - |
| **Total Operating Revenue** | 2,045.2 | 3,637.5 | 5,824.5 | 5,495 |
| | | | | |
| Driver Compensation & Related | 885.7 | 1,580.9 | 2,488.3 | 2,236 |
| Benefits | 185.5 | 279.4 | 506.0 | 455 |
| Workers Comp | 78.2 | 183.0 | 268.8 | 268 |
| COPY/DISPATCH'S Compensation | 26.6 | 53.6 | 98.9 | 87 |
| Fleet Maint Compensation | 96.6 | 179.4 | 312.2 | 273 |
| Repairs & Maintenance | 117.6 | 187.5 | 250.9 | 225 |
| Accident Costs | 75.9 | 96.3 | 114.8 | 115 |
| Fuel, Tolls & Parking Costs | 57.2 | 78.3 | 94.0 | 94 |
| Medical Supplies, Rentals & Repairs | 32.0 | 46.8 | 62.1 | 62 |
| Communications | 10.2 | 16.3 | 25.3 | 23 |
| Uniforms | 5.4 | 8.5 | 13.0 | 12 |
| Equipment | 11.1 | 14.2 | 17.5 | 17 |
| Health & Safety | 2.1 | 2.2 | 2.2 | 2 |
| Licenses & Permits | 3.6 | 5.4 | 7.9 | 7 |
| SUB TOTAL - COST OF SERVICE | 1,587.9 | 2,731.7 | 4,262.0 | 3,882 |
| | | | | |
| Gross Profit | 457.3 | 905.8 | 1,562.5 | 1,613 |
| GP % | 22.4% | 24.9% | 26.8% | 29. |
| | | | | |
| Administrative Staffing | 179.1 | 275.4 | 410.3 | 371 |
| Facility Costs | 67.2 | 113.2 | 177.6 | 159 |
| Insurance Auto/Liability | 94.0 | 101.5 | 112.0 | 109 |
| Professional Fees | 5.8 | 8.3 | 11.8 | 10 |
| All Other SG&A | 36.3 | 145.5 | 116.3 | 104 |
| Transition Services | - | 168.0 | 322.0 | 322 |
| Bad Debt | 110.1 | 155.3 | 195.8 | 199 |
| TOTAL OPERATING EXPENSES | 492.5 | 967.2 | 1,345.8 | 1,276 |
| | | | | |
| EBITDA | (35.2) | (61.4) | 216.7 | 336 |
| | -1.7% | -1.7% | 3.7% | 6 |

3

Confidential

# Summary Balance Sheet for 2016

| Amounts in 000's | Dec-15 | Jan-16 | Feb-16 | Mar-16 | Apr- |
|---|---|---|---|---|---|
| **Current Assets** | | | | | |
| Cash and cash equivalents | 56.7 | 1,716.4 | 3,793.4 | 2,564.7 | 2 |
| Patient Account Receivables (OldCo) | 8,165.5 | 6,909.9 | 7,277.3 | 2,531.8 | |
| Patient Account Receivables (NewCo) | - | - | 1,860.6 | 6,758.8 | 9 |
| Inventory | 623.1 | 623.1 | 773.1 | 848.1 | |
| Prepaid and Other Current Assets | 374.1 | 374.1 | 374.1 | 374.1 | |
| Total Current Assets | 9,219.4 | 9,623.5 | 14,078.4 | 13,077.6 | 13 |
| **Property, Plant and Equipment** | | | | | |
| Property, Plant and Equipment | 17,115.0 | 17,115.0 | 17,235.0 | 17,235.0 | 17 |
| Accumulated Depreciation | (15,963.7) | (15,997.7) | (16,031.7) | (16,065.7) | (16 |
| Property and equipment, net | 1,151.3 | 1,117.3 | 1,203.3 | 1,169.3 | 1 |
| **Other Assets** | | | | | |
| Goodwill | (5,368.4) | (5,368.4) | - | - | |
| Other Assets | 70.1 | 1,853.6 | 1,853.6 | 1,853.6 | 1 |
| Total Other Assets | (5,298.3) | (5,298.3) | 70.1 | 70.1 | |
| **Total Assets** | 6,855.9 | 7,225.9 | 17,135.3 | 16,100.5 | 16 |
| | | | | | |
| Current Operating Liabilities | | | | | |
| Accounts payable | 2,263.8 | 2,703.1 | 1,570.0 | 1,483.8 | 1 |
| Accrued Management Fees | - | - | - | - | |
| Accrued expenses | 1,443.3 | 3,051.5 | 3,366.5 | 3,301.5 | 3 |
| InterCompany Balance | (31,915.4) | (31,915.4) | - | - | |
| Payable To Wells | - | - | 7,277.3 | 2,531.8 | |
| Total Current Liabilities | (28,708.3) | (28,769.0) | 7,080.9 | 5,378.0 | 3 |
| | | | | | |
| Other Long Term Liabilities | | | | | |
| Asset Based Loan | - | - | - | - | |
| Incremental Funding | | - | 1,838.4 | 5,521.0 | 7 |
| Capital Lease | 292.7 | 292.7 | 376.7 | 376.7 | |
| Non Current Liabilitites | 292.7 | 292.7 | 2,215.0 | 5,897.7 | 7 |
| Total Liabilities | (26,307.4) | (25,868.1) | 14,428.8 | 13,214.9 | 13 |
| | | | | | |
| Common Equity | 33,163.3 | 33,094.1 | 2,339.0 | 2,518.1 | 2 |
| Total Equity | 4,642.1 | 4,642.1 | 3,619.8 | 3,791.1 | 4 |
| | | | | | |
| Total Liabilities & Net Assets | (0) | (0) | (0) | (0) | |

Confidential

PP-TRBK0105519

# Summary Cash Flow Statement for 2016

| Amounts in 000's | Jan-16 | Feb-16 | Mar-16 | Apr-16 |
|---|---|---|---|---|
| Cash Flow | | | | |
| Net Income | (69.2) | (30,440.1) | 179.1 | 299.3 |
| Total Adjustments | | | | |
| Adjustment to reconcile to net income | | | | |
| Non Cash Article 9 Impact | - | (3,754.6) | - | - |
| Recognition to Wells Fargo Liability | - | 5,663.5 | - | - |
| Depreciation and amortization | 34.0 | 34.0 | 34.0 | 34.0 |
| Total Adjustment to reconcile to net income | (35.2) | (28,497.2) | 213.1 | 333.3 |
| Operating Adjustments | | | | |
| (Increase) Decrease in Assets | | | | |
| Accounts Receivable (OldCo) | 1,255.7 | (367.5) | 4,745.5 | 1,717.0 |
| Accounts Receivable (NewCo) | - | (1,860.6) | (4,898.3) | (2,481.3) |
| Inventory | - | (150.0) | (75.0) | - |
| Prepaid Expenses and Other | - | - | - | - |
| Other Long-Term Assets | - | - | - | - |
| Total (Increase) Decrease in Assets | 1,255.7 | (2,378.0) | (227.8) | (764.4) |
| Increase (Decrease) In Liabilities | | | | |
| A/P and Accrued Expenses | 439.3 | (1,133.1) | (86.1) | 9.2 |
| Capital Lease Obligations | - | 84.0 | - | - |
| InterCompany Payable | - | 31,915.4 | - | - |
| Total Increase (Decrease) In Liabilities | 439.3 | 30,866.3 | (151.1) | (55.8) |
| Total Operating Adjustments | 1,659.7 | (8.9) | (165.8) | (486.9) |
| | | | | |
| Investing Adjustments | | | | |
| Capital Expenditures | - | (120.0) | - | - |
| Total Investing Adjustments | - | (120.0) | - | - |
| | | | | |
| Financing Adjustments | | | | |
| Accrued Interest | - | - | - | - |
| Payable to Wells Fargo of Old AR | - | 367.5 | (4,745.5) | (1,717.0) |
| Term Loan | - | - | - | - |
| Capital Lease | - | - | - | - |
| Incremental Funding | - | 1,838.4 | 3,682.7 | 1,827.8 |
| Asset Based Loan | - | - | - | - |
| Total Financing Adjustments | - | 2,205.8 | (1,062.8) | 110.8 |
| Total Cash Flow | 1,659.7 | 2,076.9 | (1,228.6) | (376.1) |

Confidential

PP-TRBK0105520

| Amounts in 000's | Jan-16 | Feb-16 | Mar-16 | Apr-16 | May-16 | Jun-16 | Jul-16 | Aug-16 | Sep-16 | Oct-16 | Nov-16 | Dec-16 | Fcst 2016 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Service Revenue | 2,045.2 | 3,637.5 | 5,824.5 | 5,495.9 | 5,561.6 | 6,139.4 | 5,826.6 | 5,939.9 | 6,279.5 | 5,939.2 | 5,899.0 | 6,447.9 | 65,036.2 |
| Other Revenues | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Operating Revenue** | 2,045.2 | 3,637.5 | 5,824.5 | 5,495.9 | 5,561.6 | 6,139.4 | 5,826.6 | 5,939.9 | 6,279.5 | 5,939.2 | 5,899.0 | 6,447.9 | 65,036.2 |
| | | | | | | | | | | | | | |
| Driver Compensation & Related | 885.7 | 1,580.9 | 2,488.3 | 2,236.7 | 2,260.6 | 2,479.3 | 2,295.8 | 2,318.1 | 2,452.4 | 2,268.8 | 2,252.2 | 2,478.1 | 25,997 |
| Benefits | 185.5 | 279.4 | 506.0 | 455.4 | 460.2 | 503.7 | 467.1 | 471.6 | 498.6 | 462.0 | 458.7 | 503.9 | 5,252 |
| Workers Comp | 78.2 | 183.0 | 268.8 | 268.8 | 268.8 | 268.8 | 268.8 | 268.8 | 268.8 | 268.8 | 268.8 | 268.8 | 2,949 |
| COPY/DISPATCH'S Compensation | 26.6 | 53.6 | 98.9 | 87.7 | 89.7 | 106.9 | 96.4 | 99.7 | 109.8 | 98.9 | 97.7 | 114.1 | 1,080 |
| Fleet Maint Compensation | 98.6 | 179.4 | 312.2 | 273.5 | 278.8 | 324.9 | 297.5 | 306.3 | 333.3 | 304.7 | 301.5 | 345.4 | 3,354 |
| Repairs & Maintenance | 117.6 | 187.5 | 250.9 | 225.3 | 229.9 | 270.2 | 246.0 | 253.7 | 277.3 | 252.1 | 249.3 | 287.6 | 2,847 |
| Accident Costs | 75.9 | 96.3 | 114.8 | 115.6 | 115.8 | 117.4 | 118.0 | 118.3 | 119.3 | 119.5 | 119.4 | 120.9 | 1,351 |
| Fuel, Tolls & Parking Costs | 57.2 | 78.3 | 94.0 | 94.5 | 94.6 | 96.2 | 96.5 | 96.8 | 97.8 | 97.7 | 97.6 | 99.1 | 1,100 |
| Medical Supplies, Rentals & Repairs | 32.0 | 46.8 | 62.1 | 62.1 | 62.2 | 63.7 | 63.6 | 64.0 | 64.9 | 64.4 | 64.3 | 65.8 | 716 |
| Communications | 10.2 | 16.3 | 25.3 | 23.7 | 24.0 | 26.9 | 25.3 | 25.8 | 27.5 | 25.8 | 25.6 | 28.3 | 285 |
| Uniforms | 5.4 | 8.5 | 13.0 | 12.1 | 12.3 | 13.8 | 13.0 | 13.2 | 14.1 | 13.2 | 13.1 | 14.5 | 146 |
| Equipment | 11.1 | 14.2 | 17.5 | 17.3 | 17.4 | 18.1 | 17.9 | 18.0 | 18.4 | 18.1 | 18.1 | 18.7 | 205 |
| Health & Safety | 2.1 | 2.2 | 2.2 | 2.3 | 2.3 | 2.3 | 2.3 | 2.3 | 2.3 | 2.3 | 2.3 | 2.3 | 27 |
| Licenses & Permits | 3.6 | 5.4 | 7.9 | 7.4 | 7.5 | 8.4 | 7.9 | 8.0 | 8.6 | 8.0 | 8.0 | 8.8 | 90 |
| SUB TOTAL - COST OF SERVICE | 1,587.9 | 2,731.7 | 4,262.0 | 3,882.3 | 3,924.0 | 4,300.4 | 4,016.0 | 4,064.7 | 4,293.1 | 4,004.5 | 3,976.8 | 4,356.3 | 45,400 |
| | | | | | | | | | | | | | |
| Gross Profit | 457.3 | 905.8 | 1,562.5 | 1,613.6 | 1,637.6 | 1,839.0 | 1,810.6 | 1,875.3 | 1,986.4 | 1,934.6 | 1,922.2 | 2,091.6 | 19,637 |
| GP % | 22.4% | 24.9% | 26.8% | 29.4% | 29.4% | 30.0% | 31.1% | 31.6% | 31.6% | 32.6% | 32.6% | 32.4% | 30.2% |
| | | | | | | | | | | | | | |
| Administrative Staffing | 179.1 | 275.4 | 410.3 | 371.8 | 371.8 | 410.3 | 371.8 | 371.8 | 410.3 | 371.8 | 371.8 | 410.3 | 4,327 |
| Facility Costs | 67.2 | 113.2 | 177.6 | 159.2 | 159.2 | 177.6 | 159.2 | 159.2 | 177.6 | 159.2 | 159.2 | 177.6 | 1,846 |
| Insurance Auto/Liability | 94.0 | 101.5 | 112.0 | 109.0 | 109.0 | 112.0 | 109.0 | 109.0 | 112.0 | 109.0 | 109.0 | 112.0 | 1,298 |
| Professional Fees | 5.8 | 8.3 | 11.8 | 10.8 | 10.8 | 11.8 | 10.8 | 10.8 | 11.8 | 10.8 | 10.8 | 11.8 | 126 |
| All Other SG&A | 36.3 | 145.5 | 116.3 | 104.6 | 104.6 | 116.3 | 104.6 | 104.6 | 116.3 | 104.6 | 104.6 | 116.3 | 1,275 |
| Transition Services | - | 168.0 | 322.0 | 322.0 | 322.0 | 322.0 | 322.0 | 322.0 | 322.0 | 322.0 | 322.0 | 322.0 | 3,388 |
| Bad Debt | 110.1 | 155.3 | 195.8 | 199.3 | 199.3 | 199.4 | 202.4 | 202.7 | 202.8 | 204.8 | 204.8 | 205.0 | 2,282 |
| TOTAL OPERATING EXPENSES | 492.5 | 967.2 | 1,345.8 | 1,276.7 | 1,276.7 | 1,349.5 | 1,279.8 | 1,280.1 | 1,352.9 | 1,282.3 | 1,282.3 | 1,355.0 | 14,541 |
| | | | | | | | | | | | | | |
| EBITDA | (35.2) | (61.4) | 216.7 | 336.9 | 360.9 | 489.5 | 530.9 | 595.2 | 633.6 | 652.4 | 639.9 | 736.5 | 5,096 |
| | -1.7% | -1.7% | 3.7% | 6.1% | 6.5% | 8.0% | 9.1% | 10.0% | 10.1% | 11.0% | 10.8% | 11.4% | |
| Article 9 Process (Non Cash) | - | 30,340.8 | - | - | - | - | - | - | - | - | - | - | 30,341 |
| Interest Expense | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Capital Leases | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Depreciation | 34.0 | 34.0 | 34.0 | 34.0 | 34.0 | 34.0 | 34.0 | 34.0 | 34.0 | 34.0 | 34.0 | 34.0 | 408 |
| All Other | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Income Tax | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Subtotal | 34.0 | 30,374.8 | 34.0 | 34.0 | 34.0 | 34.0 | 34.0 | 34.0 | 34.0 | 34.0 | 34.0 | 34.0 | 408 |
| | | | | | | | | | | | | | |
| Net Income | (69.2) | (30,436.2) | 182.7 | 302.9 | 326.9 | 455.5 | 496.9 | 561.2 | 599.6 | 618.4 | 605.9 | 702.5 | (25,653) |

Confidential

**A4181**

PP-TRBK0105521

| Amounts in 000's | Jan-16 | Feb-16 | Mar-16 | Apr-16 | May-16 | Jun-16 | Jul-16 | Aug-16 | Sep-16 | Oct-16 | Nov-16 | Dec-16 | Fcst 2016 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Cash Flow** | | | | | | | | | | | | | |
| Net Income | (69.2) | (30,440.1) | 179.1 | 299.3 | 316.0 | 444.3 | 485.5 | 549.9 | 581.5 | 600.5 | 588.1 | 684.1 | (25,780.8) |
| Total Adjustments | | | | | | | | | | | | | - |
| Adjustment to reconcile to net income | | | | | | | | | | | | | |
| Non Cash Article 9 Impact | - | (3,754.6) | - | - | - | - | - | - | - | - | - | - | (3,754.6) |
| Recognition to Wells Fargo Liability | - | 5,663.5 | - | - | - | - | - | - | - | - | - | - | 5,663.5 |
| Depreciation and amortization | 34.0 | 34.0 | 34.0 | 34.0 | 34.0 | 34.0 | 34.0 | 34.0 | 34.0 | 34.0 | 34.0 | 34.0 | 408.0 |
| Total Adjustment to reconcile to net income | (35.2) | (28,497.2) | 213.1 | 333.3 | 350.0 | 478.3 | 519.5 | 583.9 | 615.5 | 634.5 | 622.1 | 718.1 | (23,463.9) |
| Operating Adjustments | | | | | | | | | | | | | |
| (Increase) Decrease in Assets | | | | | | | | | | | | | |
| Accounts Receivable (OldCo) | 1,255.7 | (367.5) | 4,745.5 | 1,717.0 | 814.9 | - | - | - | - | - | - | - | 8,165.5 |
| Accounts Receivable (NewCo) | - | (1,860.6) | (4,898.3) | (2,481.3) | (1,658.6) | (169.3) | (162.1) | (217.8) | (83.4) | (50.7) | (2.2) | (92.0) | (11,676.4) |
| Inventory | - | (150.0) | (75.0) | - | - | - | - | - | - | - | - | - | (225.0) |
| Prepaid Expenses and Other | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other Long-Term Assets | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Total (Increase) Decrease in Assets | 1,255.7 | (2,378.0) | (227.8) | (764.4) | (843.7) | (169.3) | (162.1) | (217.8) | (83.4) | (50.7) | (2.2) | (92.0) | (3,735.8) |
| Increase (Decrease) in Liabilities | | | | | | | | | | | | | |
| A/P and Accrued Expenses | 439.3 | (1,133.1) | (86.1) | 9.2 | (36.6) | 83.8 | 24.5 | 52.7 | (18.2) | 5.4 | .8 | 6.9 | (651.6) |
| Capital Lease Obligations | - | 84.0 | - | - | - | - | - | - | - | - | - | - | 84.0 |
| InterCompany Payable | - | 31,915.4 | - | - | - | - | - | - | - | - | - | - | 31,915.4 |
| Total Increase (Decrease) in Liabilities | 439.3 | 30,866.3 | (151.1) | (55.8) | (101.6) | 18.8 | 4.5 | 32.7 | (33.2) | 5.4 | .8 | 6.9 | 31,032.8 |
| Total Operating Adjustments | 1,659.7 | (8.9) | (165.8) | (486.9) | (595.3) | 327.8 | 361.7 | 398.9 | 498.8 | 589.2 | 620.7 | 633.1 | 3,833.0 |
| | | | | | | | | | | | | | |
| Investing Adjustments | | | | | | | | | | | | | |
| Capital Expenditures | - | (120.0) | - | - | - | - | - | - | - | - | - | - | (120.0) |
| Total Investing Adjustments | - | (120.0) | - | - | - | - | - | - | - | - | - | - | (120.0) |
| | | | | | | | | | | | | | |
| Financing Adjustments | | | | | | | | | | | | | |
| Accrued Interest | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Payable to Wells Fargo of Old AR | - | 367.5 | (4,745.5) | (1,717.0) | (814.9) | - | - | - | - | - | - | - | (6,909.9) |
| Term Loan | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Capital Lease | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Incremental Funding | - | 1,838.4 | 3,682.7 | 1,827.8 | 568.2 | 30.4 | 28.8 | 5.1 | 10.0 | 3.8 | - | - | 7,995.1 |
| Asset Based Loan | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Total Financing Adjustments | - | 2,205.8 | (1,062.8) | 110.8 | (246.6) | 30.4 | 28.8 | 5.1 | 10.0 | 3.8 | - | - | 1,085.2 |
| Total Cash Flow | 1,659.7 | 2,076.9 | (1,228.6) | (376.1) | (841.9) | 358.2 | 390.5 | 403.9 | 508.8 | 592.9 | 620.7 | 633.1 | 4,798.2 |

**A4182**

Confidential

| Amounts in 000's | Dec-15 | Jan-16 | Feb-16 | Mar-16 | Apr-16 | May-16 | Jun-16 | Jul-16 | Aug-16 | Sep-16 | Oct-16 | Nov-16 | Dec-16 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Current Assets | | | | | | | | | | | | | |
| Cash and cash equivalents | 56.7 | 1,716.4 | 3,733.6 | 2,564.7 | 2,188.7 | 1,346.8 | 1,705.0 | 2,095.5 | 2,499.6 | 3,098.2 | 3,801.4 | 4,221.8 | 4,854.9 |
| Patient Account Receivables (OldCo) | 8,185.8 | 8,909.9 | 7,277.3 | 2,831.8 | 814.9 | - | - | - | - | - | - | - | - |
| Patient Account Receivables (NewCo) | - | - | 1,880.6 | 6,758.8 | 8,740.2 | 10,896.8 | 11,068.1 | 11,290.2 | 11,488.9 | 11,581.4 | 11,342.2 | 11,586.4 | 11,876.8 |
| Inventory | 623.1 | 623.1 | 773.1 | 848.1 | 848.1 | 848.1 | 848.1 | 848.1 | 848.1 | 848.1 | 848.1 | 848.1 | 848.1 |
| Prepaid and Other Current Assets | 374.1 | 374.1 | 374.1 | 374.1 | 374.1 | 374.1 | 374.1 | 374.1 | 374.1 | 374.1 | 374.1 | 374.1 | 374.1 |
| Total Current Assets | 9,223.4 | 8,623.5 | 14,078.4 | 13,377.6 | 13,483.8 | 13,467.7 | 13,995.2 | 14,547.8 | 15,193.6 | 15,761.8 | 16,695.5 | 17,928.4 | 17,753.4 |
| Property, Plant and Equipment | | | | | | | | | | | | | |
| Property, Plant and Equipment | 17,115.0 | 17,115.0 | 17,235.0 | 17,235.0 | 17,235.0 | 17,235.0 | 17,235.0 | 17,235.0 | 17,235.0 | 17,235.0 | 17,235.0 | 17,235.0 | 17,235.0 |
| Accumulated Depreciation | (15,963.7) | (15,997.7) | (16,031.7) | (16,065.7) | (16,099.7) | (16,133.7) | (16,167.7) | (16,201.7) | (16,235.7) | (16,269.7) | (16,303.7) | (16,337.7) | (16,371.7) |
| Property and equipment, net | 1,151.3 | 1,117.3 | 1,203.3 | 1,169.3 | 1,135.3 | 1,101.3 | 1,067.3 | 1,033.3 | 999.3 | 965.3 | 931.3 | 897.3 | 863.3 |
| Other Assets | | | | | | | | | | | | | |
| Goodwill | (5,368.4) | (5,368.4) | - | - | - | - | - | - | - | - | - | - | - |
| Other Assets | 70.1 | 1,853.6 | 1,853.6 | 1,853.6 | 1,853.6 | 1,853.6 | 1,853.6 | 1,853.6 | 1,853.6 | 1,853.9 | 1,853.6 | 1,853.9 | 1,853.6 |
| Total Other Assets | (5,298.3) | (5,298.2) | 70.1 | 70.1 | 70.1 | 70.1 | 70.1 | 70.1 | 70.1 | 70.1 | 70.1 | 70.1 | 70.1 |
| Total Assets | 6,853.8 | 7,225.9 | 17,135.3 | 16,100.5 | 19,464.8 | 16,422.6 | 16,926.2 | 17,434.8 | 18,022.5 | 18,380.7 | 19,590.4 | 19,779.3 | 20,470.4 |
| Current Operating Liabilities | | | | | | | | | | | | | |
| Accounts payable | 2,793.8 | 2,703.1 | 1,579.0 | 1,481.8 | 1,583.0 | 1,496.5 | 1,580.3 | 3,564.6 | 3,617.3 | 3,399.4 | 3,694.5 | 1,805.3 | 1,441.1 |
| Accrued Management Fees | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Accrued expenses | 1,443.3 | 3,051.5 | 3,386.5 | 3,301.5 | 3,236.5 | 3,171.5 | 3,166.5 | 3,686.5 | 3,086.5 | 3,051.5 | 3,051.5 | 3,051.5 | 1,443.3 |
| InterCompany Balance | (31,915.4) | (31,915.4) | - | - | - | - | - | - | - | - | - | - | - |
| Payable To Wells | - | - | 2,227.3 | 2,591.8 | 814.9 | - | - | - | - | - | - | - | - |
| Total Current Liabilities | (28,708.3) | (28,769.6) | 7,080.9 | 5,378.0 | 3,736.2 | 3,852.8 | 2,871.2 | 2,824.7 | 2,906.3 | 2,872.4 | 2,877.0 | 2,877.8 | 2,888.4 |
| Other Long Term Liabilities | | | | | | | | | | | | | |
| Asset Based Loan | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Incremental Funding | - | - | 1,838.6 | 5,525.0 | 7,348.8 | 7,937.1 | 7,947.5 | 7,076.8 | 7,981.6 | 7,994.3 | 7,995.1 | 7,995.1 | 7,995.1 |
| Capital Lease | 292.7 | 292.7 | 378.7 | 376.7 | 376.7 | 376.7 | 376.7 | 378.7 | 378.7 | 378.7 | 378.7 | 376.7 | 376.7 |
| Non Current Liabilities | 292.7 | 292.7 | 2,215.0 | 5,857.7 | 7,725.5 | 8,296.7 | 8,324.1 | 8,352.9 | 8,358.0 | 8,368.0 | 8,371.8 | 8,371.3 | 8,371.8 |
| Total Liabilities | (26,267.4) | (28,898.1) | 14,426.8 | 13,214.9 | 13,269.0 | 13,021.7 | 12,970.0 | 13,064.0 | 13,041.8 | 13,018.9 | 13,027.7 | 13,028.3 | 13,038.4 |
| Common Equity | 33,108.3 | 33,098.1 | 2,839.0 | 2,528.1 | 2,817.4 | 3,335.5 | 3,871.8 | 4,063.3 | 4,613.4 | 5,596.7 | 5,795.2 | 6,583.3 | 7,047.4 |
| Total Equity | 4,842.3 | 4,642.1 | 3,619.8 | 3,791.1 | 4,021.4 | 4,287.9 | 4,613.0 | 4,992.4 | 5,436.1 | 5,804.3 | 6,385.6 | 6,888.1 | 7,388.6 |
| Total Liabilities & Net Assets | (0) | (0) | (0) | (0) | (0) | (0) | (0) | (0) | (0) | (0) | (0) | (0) | (0) |

**A4183**

**Document Produced Natively**

Confidential