# 20 Civ. 06274 (LAK)

## United States District Court

### *for the*

## Southern District of New York

<hr>

I<small>N RE</small> T<small>RANS</small>C<small>ARE</small> C<small>ORPORATION</small>, <small>ET AL.</small>

D<small>EBTORS</small>,

<hr>

P<small>ATRIARCH</small> P<small>ARTNERS</small> A<small>GENCY</small> S<small>ERVICES</small>, LLC, <small>ET AL.</small>,

D<small>EFENDANTS</small>-A<small>PPELLANTS</small>,

—against—

S<small>ALVATORE</small> L<small>A</small>M<small>ONICA</small>, <small>AS</small> C<small>HAPTER</small> 7 T<small>RUSTEE OF THE</small> J<small>OINTLY-</small>
A<small>DMINISTERED</small> E<small>STATES OF</small> T<small>RANS</small>C<small>ARE</small> C<small>ORPORATION</small>, <small>ET AL.</small>,

P<small>LAINTIFF</small>-A<small>PPELLEE</small>.

<hr>

ON APPEAL FROM THE UNITED STATES BANKRUPTCY COURT FOR
THE SOUTHERN DISTRICT OF NEW YORK (BERNSTEIN, J.)

IN RE: TRANSCARE CORPORATION, ET AL., CASE NO. 16-10407 (SMB)

LAMONICA V. TILTON, ET AL., ADV. PROC. NO. 18-1021 (SMB)

## BRIEF FOR THE APPELLEE

Bijan Amini

Avery Samet

AMINI LLC
131 West 35th Street
12th Floor
New York, NY 10001
Tel.: (212) 490-4700
bamini@aminillc.com
asamet@aminillc.com
*Attorneys for Plaintiff-*
*Appellee Salvatore LaMonica, as*
*Chapter 7 Trustee*

## <u>TABLE OF CONTENTS</u>

**TABLE OF AUTHORITIES** ........................................................................................ ii

**STATEMENT OF THE ISSUES AND APPLICABLE STANDARD OF APPELLATE REVIEW** .......................................................................................... 1

**STATEMENT OF THE CASE** ................................................................................... 2

**SUMMARY OF THE ARGUMENT** ........................................................................ 17

**ARGUMENT** ............................................................................................................ 19

I.   STANDARD OF REVIEW FOR CLEAR ERROR ...................................................... 19

II.   THE BANKRUPTCY COURT DID NOT COMMIT CLEAR ERROR IN DETERMINING THAT TRANSCARE ACTED WITH INTENT TO HINDER, DELAY OR DEFRAUD ITS CREDITORS ....... 21

    A.   The Bankruptcy Court Applied the Correct Legal Standard ..................................... 21

    B.   Tilton Did Not Intend to Benefit Creditors ................................................ 23

    C.   The Badges Supported a Finding of Intent to Hinder, Delay or Defraud ................... 26

III.   THE BANKRUPTCY COURT DETERMINED THE CORRECT DAMAGES ................................... 28

    A.   The Bankruptcy Court Did Not Commit Clear Error In Valuing the Subject Collateral As a Going Concern ........................................................ 28

    B.   The Bankruptcy Court Did Not Commit Clear Error in Using the Transcendence Projections to Value the Transcendence Assets ................................. 32

**CONCLUSION** ......................................................................................................... 37

# TABLE OF AUTHORITIES

**Cases**                                                                **Page(s)**

*Anderson v. City of Bessemer City, N.C.*,
  470 U.S. 564, 105 S. Ct. 1504 (1985) ................................................................. 20

*Atlanta Shipping Corp., Inc. v. Chemical Bank*,
  631 F. Supp. 335 (S.D.N.Y. 1986) ...................................................................... 25

*Bear Stearns Sec. Corp. v. Gredd*, (*In re Manhattan Inv. Fund Ltd.*),
  397 B.R. 1 (S.D.N.Y. 2007) ................................................................................ 23

*Bessemer Trust Co., N.A. v. Branin*,
  618 F.3d 76 (2d Cir. 2010) .................................................................................... 2

*Ceraso v. Motiva Enters., LLC*,
  326 F.3d 303 (2d Cir. 2003) ................................................................................ 20

*Chemipal Ltd. v. Slim-Fast Nutritional Foods Int'l, Inc.*,
  350 F. Supp. 2d 582 (D. Del. 2004) ................................................................... 32

*Flushing Sav. Bank v. Parr*,
  438 N.Y.S.2d 374 (2d Dep't 1981) ..................................................................... 22

*Gentile v. Rossette*,
  C.A. No. 20213-VCN, 2010 WL 2171613 (Del. Ch. May 28, 2010) ...................... 19

*Gill v. Maddalena*,
  176 B.R. 551 (Bankr. C.D. Cal. 1995) ........................................................... 28, 29

*Great Atlantic & Pacific Tea Co., Inc. v. 380 Yorktown Food Corp.*,
  No. 16-cv-5250, 2020 WL 4432065 (S.D.N.Y. July 31, 2020) ............................. 25

*H&C Dev. Group, Inc. v. Miner*,
  229 B.R. 561 (B.A.P. 2d Cir. 1999) .................................................................... 20

*Hart v. Rick's Cabaret Int'l, Inc.*,
  60 F. Supp. 3d 447 (S.D.N.Y. 2014) ................................................................... 36

*HBE Leasing Corp. v. Frank*,
  48 F.3d 623 (2d Cir. 1995) .............................................................................. 3, 22

*In Re Andrew Velez Construction, Inc.*,
  373 B.R. 262 (Bankr. S.D.N.Y. Aug. 14, 2007) .................................................. 30

*In re Appraisal of Dole Food Co., Inc.*,
  114 A.3d 541 (Del. Ch. 2014)........................................................................... 19

*In re Atlas Computs., Inc.*,
  No. 07-11665, 2012 WL 3018256 (Bankr. N.D. Okla. July 24, 2012) ..................................... 31

*In re Bonnanzio*,
  91 F.3d 296 (2d Cir.1996)........................................................................... 1

*In re Cent. Ice Cream Co.*,
  836 F.2d 1068 (7th Cir. 1987) ........................................................................... 19

*In re Chalasani*,
  92 F.3d 1300 (2d Cir.1996)........................................................................... 1

*In re Condon*,
  198 F. 947 (S.D.N.Y. 1912)........................................................................... 22

*In re DiFabio*,
  363 B.R. 343 (D. Conn. 2007) ........................................................................... 21

*In re Flagstaff Foodservice Corp.*,
  56 B.R. 899 (Bankr. S.D.N.Y. 1986)........................................................................... 31

*In re M. Silverman Laces, Inc.*,
  404 B.R. 345 (Bankr. S.D.N.Y. 2009) ........................................................................... 31

*In re Miller & Rhoads, Inc.*,
  146 B.R. 950 (Bankr. E.D. Va. 1992)........................................................................... 31

*In re Pisculli*,
  426 B.R. 52 (E.D.N.Y. 2010) ........................................................................... 21

*In re Sharp Int'l Corp.*,
  403 F.3d 43 (2d Cir. 2005) ........................................................................... 3, 22

*Italian Colors Rest. v. Am. Express Travel Related Servs. Co.*,
  554 F.3d 300 (2d Cir. 2009)........................................................................... 20

*Jacked Up, LLC v. Sara Lee Corp.*,
  291 F. Supp. 3d 795 (N.D. Tex. 2018) ........................................................................... 32

*Jimmy Swaggart Ministries v. Hayes*,
  310 F.3d 796 (5th Cir. 2002) ........................................................................... 30

*Kawache v. United States,*
  471 F. App'x 10 (2d Cir. 2012) .............................................................. 32

*Kittay v. Peter D. Leibowits Co.,*
  265 B.R. 524 (Bankr. S.D.N.Y. 2001) .................................................... 29

*Lippe v. Bairnco Corp.,*
  249 F. Supp. 2d 357 (S.D.N.Y. 2003).................................................... 25

*Lucente v. IBM Corp.,*
  310 F.3d 243 (2d Cir. 2002)..................................................................... 2

*Open MRI Radiology Assocs., P.A., v. Kessler,*
  898 A.2d 290 (Del. Ch. 2006)................................................................ 36

*Ortega v. Duncan,*
  333 F.3d 102 (2d Cir. 2003)................................................................... 20

*Priestly v. Panmedix Inc.,*
  18 F. Supp. 3d 486 (S.D.N.Y. 2014)...................................................... 25

*Rosa v. TCC Commc'ns, Inc.,*
  15 CV 1665, 2017 WL 980338 (S.D.N.Y. Mar. 13, 2017)...................... 25

*Salomon v. Kaiser, (In re Kaiser),*
  722 F.2d 1574 (2d Cir. 1983)............................................................. 3, 22

*Schneider v. Barnard,*
  508 B.R. 533 (E.D.N.Y. 2014) .............................................................. 20

*The Cadle Co. v. Smith, (In re Smith),*
  321 F. App'x 32 (2d Cir. 2009) ................................................................ 1

*Tribune Co. Fraudulent Conveyance Litig.,*
  12-cv-2652, 2017 WL 82391 (S.D.N.Y. Jan. 6, 2017)..................... 23, 27

*United States v. Carlin,*
  948 F. Supp. 271 (S.D.N.Y. 1996)........................................................... 5

*White v. White Rose Food,*
  237 F.3d 174 (2d Cir. 2001)..................................................................... 2

## **Statutes**

11 U.S.C.  § 502(d)................................................................................... 5

11 U.S.C. § 548(a) .............................................................................................................. 21

11 U.S.C. § 550(a) ........................................................................................................... 5, 21

11 U.S.C. § 550(a)(2) ........................................................................................................... 5

11 U.S.C § 544(b)(1) ........................................................................................................... 21

NYDCL § 276 .................................................................................................................... 21

NYDCL § 276-a ............................................................................................................... 5, 21

**<u>Rules</u>**

Fed. R. Bankr. Proc. 8013 ...................................................................................................... 1

Fed. R. Bankr. Proc. 9033 ...................................................................................................... 7

Salvatore LaMonica, in his capacity as the Chapter 7 trustee (the "Trustee") of TransCare, Inc. and its subsidiaries ("TransCare") submits this Appellee's Brief pursuant to Bankruptcy Rule 8014(b) in opposition to the brief ("App. Br.") submitted by Appellants Patriarch Partners Administrative Services, LLC ("PPAS"), Transcendence Transit, Inc. and Transcendence Transit II, Inc. (together "Transcendence" and collectively, with PPAS, the "Appellants"), on appeal from the Post-Trial Findings of Fact and Conclusions of Law dated July 6, 2020 (the "PFC") entered by the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").

## STATEMENT OF THE ISSUES AND APPLICABLE STANDARD OF APPELLATE REVIEW

<u>Issue 1</u>:  Did the Bankruptcy Court err in determining that TransCare transferred the Subject Collateral to PPAS and Transcendence with the intent to hinder, delay and defraud TransCare's creditors?

<u>Standard of Review</u>:  Whether a debtor acted with intent to hinder, delay or defraud creditors is a question of fact reviewed on appeal for clear error only.  *See The Cadle Co. v. Smith*, (*In re Smith*), 321 F. App'x 32 (2d Cir. 2009) relying on *In re Bonnanzio*, 91 F.3d 296, 301 (2d Cir.1996) (intent to hinder or defraud creditors is a question of fact), *In re Chalasani,* 92 F.3d 1300, 1306 (2d Cir.1996) (bankruptcy court's findings of fact are reviewed for clear error), and Fed. R. Bankr. Proc. 8013 ("Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses.").

<u>Issue 2</u>:  Did the Bankruptcy Court err in determining the value of the business lines transferred to PPAS and Transcendence?

Standard of Review:  "The question of 'the amount of recoverable damages is a question of fact' … that we review for clear error."  *Bessemer Trust Co., N.A. v. Branin*, 618 F.3d 76, 85 (2d Cir. 2010) (quoting *Lucente v. IBM Corp.*, 310 F.3d 243, 261 (2d Cir. 2002)).  In performing a clear error analysis, "[w]e will not upset a factual finding unless we are left with the definite and firm conviction that a mistake has been committed."  *Id*. quoting *White v. White Rose Food*, 237 F.3d 174, 178 (2d Cir. 2001).

## **STATEMENT OF THE CASE**

This is an appeal from the Bankruptcy Court's determination that TransCare acted with fraudulent intent in transferring three of its most valuable business lines to entities controlled by TransCare's sole director, Lynn Tilton.  Faced with TransCare's financial distress and growing insolvency, Tilton determined to siphon off TransCare's most lucrative business lines and transfer them to a newly-created entity controlled by her, free and clear of TransCare's liens and unsecured claims.  To accomplish this transfer on February 24, 2016, Tilton caused PPAS – another entity wholly-owned and controlled by Tilton – to call a default on the Term Loan that it administered to TransCare and then, immediately, caused TransCare to voluntarily consent to a foreclosure of the assets that Tilton had selected to transfer to her new company, Transcendence (the "Subject Collateral").  Later the same day, Tilton caused PPAS to "sell" all of the Subject Collateral to Transcendence in exchange for a promise by Transcendence to pay down a loan for yet another Tilton entity, Ark Angels III.  Once Transcendence owned TransCare's assets free and clear of liens and unsecured claims, Tilton caused the remaining shell of TransCare to file for Chapter 7 bankruptcy protection.

After a six-day bench trial, the Bankruptcy Court determined that TransCare acted with intent to hinder, delay or defraud its creditors when entering into the transaction described above.

A2692-96 (PFC at 72-76).  First, the Bankruptcy Court determined that the Tilton's intent would be imputed to TransCare because she was TransCare's corporate actor.  A2692 (PFC at 72, n.32). Second, because "[a] transferor rarely admits her own fraudulent intent," the Bankruptcy Court examined the badges of fraud identified by the Second Circuit.  A2693-96 (PFC at 73-76, relying on *Sharp Int'l Corp. v. State St. Bank & Tr. Co.,* (*In re Sharp Int'l Corp.*), 403 F.3d 43, 56 (2d Cir. 2005); *Salomon v. Kaiser (In re Kaiser*), 722 F.2d 1574, 1583 (2d Cir. 1983) and *HBE Leasing Corp. v. Frank*, 48 F.3d 623, 639 (2d Cir. 1995)).

The Bankruptcy Court found that "virtually all of the badges of fraud identified [by the case law] are present in this case."  A2694 (PFC at 74).  Acting through entities she controlled, namely Ark II CLO 2001-1 Ltd. ("Ark II"), PPAS, Transcendence and Transcendence II, Tilton sold the Subject Collateral to herself at a price she picked.  A2695 (PFC at 75).[1]  The consensual foreclosure was outside of TransCare's ordinary course of business.  *Id*.[2]  The consideration credited was inadequate.  *Id*.  Tilton retained control of the transferred assets both at PPAS and then at Transcendence, an entity she formed herself and controlled.  *Id*.[3]  Indeed, even though Tilton never caused Transcendence to issue stock to anyone, she purported to own (through her wholly-owned fund Ark II), the same interest in Transcendence that she owned in TransCare.  *Id*.[4] As result of the strict foreclosure transactions, Tilton's interest in Transcendence was free and clear of TransCare's Term Loan and TransCare's unsecured debt.  *Id*.[5]

In addition, the Bankruptcy Court noted the haste and secrecy surrounding the transaction. A2695 (PFC at 75).  Tilton did not negotiate the strict foreclosure with anyone else from TransCare

---

[1]     Appellants do not challenge this finding.
[2]     Appellants do not challenge this finding.
[3]     Appellants do not challenge this finding.
[4]     Appellants do not challenge this finding.
[5]     Appellants do not challenge this finding.

or even with TransCare's outside attorneys.  *Id*.  She did not negotiate the transaction with any of TransCare's other shareholders and she did not negotiate, or even forewarn, the Term Loan lenders that she did not control.  *Id*.[6]

Instead of challenging the Bankruptcy Court's factual findings, Appellants claim that the Bankruptcy Court ignored the context of Tilton's actions.  For example, Tilton claims that she undertook the strict foreclosure to protect the Term Loan Lenders.  This is hardly accurate:  Tilton immediately caused PPAS to transfer the Subject Collateral *away* from the Term Loan Lenders to Transcendence, an entity she formed herself, free and clear of their liens.  Tilton claims that she had an intention to grant the Term Loan Lenders a *minority* interest in Transcendence (subject to her own, unexplained majority interest) but she never issued them any stock.  In any event, as part of the plan, Tilton subordinated the Term Loan Lenders to Ark II, her own entity, and affirmatively kept the two Term Loan Lenders that she did not control in the dark about her plans and TransCare's finances.

As to the remedy, the Bankruptcy Court found that "[w]here, as here, TransCare transferred a going concern and the Trustee subsequently sold the same assets in liquidation sales, the starting point is the value of the Subject Collateral at the time of the strict foreclosure."  A2696-97 (PFC at 76-77).  Appellants challenge this finding, claiming that the operating business lines transferred by TransCare to Transcendence should have been valued on a liquidation basis.  App. Br. at 34-38.

The Bankruptcy Court calculated the value of the Subject Collateral by applying a 10.1x EBITDA multiplier to the $4 million annualized EBITDA projection that Tilton and her team

---

[6]      Appellants do not challenge these facts, but nevertheless claim that Tilton operated openly. App. Br. at 14.

compiled for Transcendence.  A2697 (PFC at 77); A2678-87 (PFC at 58-67).  The Bankruptcy Court explained that "the 10.1x EBITDA multiplier … reflects the average of [the Trustee's expert's] four credible 'market comps' and does not involve many of the considerations that go into computing damages for breach of fiduciary duty."  A2697 (PFC at 77).  Finally, the Bankruptcy Court reduced the award by $1.2 million, which represented the net proceeds of the Subject Collateral that the Trustee realized through liquidation sales.  *Id.*[7]  As a result, the Bankruptcy Court awarded the Trustee $39.2 million in damages.  A2699 (PFC at 79).  Appellants contend that the Bankruptcy Court wrongly relied on the Trustee's damages expert's calculations, which they contend were "wholly speculative and entitled to no weight."  App. Br. at 39.  Otherwise, Appellants do not challenge the Bankruptcy Court's calculation of damages and determination of the appropriate remedy.  A2697-99 (PFC 77-79).

**Procedural History**

TransCare Corp. and ten of its subsidiaries (the "Initial Debtors") commenced chapter 7 (petitions) bankruptcy proceedings on the evening of February 24, 2016.  A2651 (PFC at 31).  On April 25, 2016, TransCare Pennsylvania, Inc., TC Hudson Valley Ambulance Corp., and TC Ambulance Corp. (the "Subsequent Debtors") filed chapter 7 petitions.  A2656 (PFC at 36).  The Trustee now serves as Trustee of both the Initial and Subsequent Debtors, and their bankruptcy

---

[7]     The Bankruptcy Court made a number of subsidiary rulings concerning the award of damages and other relief, which Appellants do not challenge on this appeal.  For example, the Bankruptcy Court ruled that PPAS was not entitled to a $10 million reduction because it did not take the Subject Collateral in good faith.  A2697-99 (PFC at 77-79).  The Bankruptcy Court ruled that TransCare could recover from PPAS pursuant to 11 U.S.C. § 550(a) and from Transcendence as the immediate transferee of PPAS under 11 U.S.C. § 550(a)(2), but that the Trustee is entitled to only a single satisfaction.  A2699 (PFC at 79).  The Bankruptcy Court ruled that PPAS's claims are disallowed under 11 U.S.C. § 502(d).  *Id.*  Finally, the Bankruptcy Court also awarded the Trustee attorneys' fees pursuant to NYDCL § 276-a.  A2699-00 (PFC at 79-80).  Pursuant to stipulation and order, the parties have deferred the inquest on the Trustee's attorneys' fees.  A2722.

cases have been jointly administered by the Bankruptcy Court. *Id*.

On February 22, 2018, the Trustee commenced this action against the Appellants, Ark II, Tilton and certain other affiliates. Each defendant is controlled by Tilton and each is headquartered at the same office. A2624-25 (PFC at 4-5). Prior to trial, the Bankruptcy Court narrowed the Trustee's claims through decisions pursuant to Rule 12(b)(6). A2658 (PFC at 38).

Over six days in July and August 2019, the Bankruptcy Court heard live testimony from Tilton, Michael Greenberg (the Patriarch credit officer overseeing TransCare), Jean-Luc Pelissier (the Patriarch operations officer overseeing TransCare), Brian Stephen (the Patriarch lawyer who advises Tilton with respect to all of her portfolio companies) and the Trustee. The Bankruptcy Court also heard expert testimony from the Trustee's damages expert, Dr. Jonathan Arnold, and from Appellants' rebuttal expert, Mr. Jeffrey Dunn. The Bankruptcy Court reviewed over 150 exhibits submitted into evidence by the parties, and also considered the deposition testimony of Wells Fargo, N.A. ("Wells Fargo"), TransCare's senior secured lender, and Glenn Leland, TransCare's former CEO. The Bankruptcy Court also considered the parties' pre- and post-trial stipulations. A2623 (PFC at 3, n.1).

As discussed above, the Bankruptcy Court issued the PFC on July 6, 2020. With respect to Tilton, the Bankruptcy Court determined that the PFC constituted a report and recommendation. With respect to all other defendants, the Bankruptcy Court determined that the PFC constituted a final determination. A2660 (PFC at 40). The Bankruptcy Court determined that Tilton had breached her fiduciary duty of loyalty to TransCare and awarded the Trustee $41.8 million in damages. The Bankruptcy Court determined that the lien granted to Ark II as part of Tilton's Transcendence plan would be avoided as constructively fraudulent and preferential. A2700-08 (PFC 80-88). As also discussed above, the Bankruptcy Court determined that TransCare had

committed an actual fraudulent transfer when transferring the Transcendence assets to the Appellants, and ruled that Appellants were liable to the estate in the amount of $39.2 million. A2699 (PFC at 79).  Finally, the Bankruptcy Court dismissed the Trustee's other claims against the defendants.  A2659 (PFC at 39); A2708-19 (PFC at 88-99).

On July 15, 2020, the Bankruptcy Court entered Judgment against all defendants but Tilton. A2721.  Tilton has separately objected to the PFC pursuant to Bankruptcy Rule 9033.  Ark II has dropped its appeal from the Judgment entered against it.  App. Br. at 6.

## Counterstatement of Facts

### 1.  TransCare's Capital and Equity Structure

Lynn Tilton owned approximately 61% of TransCare's equity, which she held through two entities, Ark II and Ark Investment Partners II, L.P. ("AIP").  A2624 (PFC at 4).  Tilton also owned PPAS, which administered a syndicated Term Loan to TransCare.  In addition to her control of PPAS, Tilton also controlled the Term Loan through her control of four out of the six Term Loan lenders: AIP (which she owned) and three Zohar funds (which she controlled as collateral manager) (all six lenders collectively, the "Term Loan Lenders").[8]

By February 2016, TransCare owed approximately $45 million under the Term Loan.  In addition to the Term Loan, TransCare also owed approximately $13 million to Wells Fargo. A2630 (PFC at 10, n.7).  Both PPAS and Wells Fargo had blanket liens on all of TransCare's property.  Pursuant to a 2006 intercreditor agreement between them, PPAS had a first priority lien

---

[8]     The other two lenders were Credit Suisse Alternative Capital, Inc. ("Credit Suisse") and First Dominion Funding I ("First Dominion").  A2625 (PFC at 5).  Credit Suisse controlled its own loan and First Dominion's, and together they held 18% of the Term Loan debt.  *Id*.  In addition, Credit Suisse owned or managed 26% of TransCare's equity on behalf of five separate entities. A2624 (PFC at 4).  The remaining 12.7% of TransCare was owned by various other entities and individuals. *Id.*

on TransCare's vehicles and capital stock of its subsidiaries, while Wells Fargo had a first priority

lien on all other assets, including TransCare's account receivables and general intangibles.  A2626

(PFC at 6).

Tilton changed TransCare's capital structure on February 10 or 11, 2016.  Tilton caused

TransCare to enter into a new $6.5 million senior secured lending facility with Ark II (the entity

through which she owned 55% of TransCare's debt), granting Ark II another blanket lien on its

assets.  In connection with the Ark II credit facility, Tilton, on behalf of both PPAS and Ark II,

signed a new intercreditor agreement pursuant to which PPAS subordinated both its liens and right

to payment from TransCare to Ark II.  A2344 (PFC at 24).  The fraudulent nature of the Ark II

Credit Facility and its instrumentality to Tilton's scheme is discussed below.

Thus, as of February 11, 2016, TransCare's lien priority structure appeared as follows:

- Vehicles and capital stock: (1) Ark II, (2) PPAS, (3) Wells Fargo[9]

- All other assets: (1) Wells Fargo, (2) Ark II, (3) PPAS.

2.  TransCare's Financial Distress

Throughout 2015 and early 2016, TransCare had trouble funding its payroll and paying

vendors.  A2629 (PFC at 9).  At various points in 2015, Tilton caused the Zohar funds to advance

additional funds to TransCare under the Term Loan.  A2630 (PFC at 10).  On October 14, 2016,

Wells Fargo notified TransCare that it did not intend to renew the ABL when it was due to expire

on January 31, 2016.  *Id.*  Initially, Tilton tasked Michael Greenberg, a Patriarch financial analyst

and credit officer, to develop a plan for TransCare based on his own assessment.  A2630-31 (PFC

at 10-11).  Working with others at Patriarch, Greenberg prepared a plan to share with Wells Fargo

---

[9]      Because Wells Fargo never agreed to be subordinated behind Ark II, it is doubtful whether
the Ark II security interest could actually recover ahead of Wells Fargo.

projecting $11.5 million in 2016 EBITDA.  A2631 (PFC at 11).  The plan called for $6.4 million in new capital to purchase 48 new ambulances and a paydown of TransCare's accounts payable. *Id*.  Greenberg, who had experience in the field, and had overseen the TransCare account for Tilton for many years, testified that the plan was achievable and conservative.  *Id*.; A2678 (PFC 58 at n.4); A1215 at 34:15-24 [Greenberg]; A1219 at 38:11-23 [Greenberg].  While Tilton approved the plan to be shared with Wells Fargo, she elected not to fund the plan.  A2631 (PFC at 11).

At the same time, Tilton knew that TransCare was receiving expressions of interest from other companies to acquire TransCare's assets and business lines:  National Express (February, July and December 2015), Richmond County Ambulance (March and July), American Medical Response (July).  A2631-33 (PFC at 11-13).  Tilton was also monitoring the market for ambulance businesses.  In August 2015, she forwarded Greenberg's analysis of Envision Healthcare's acquisition of Rural/Metro Corp. to Wells Fargo, explaining: "Just to confirm the active M&A market in the ambulance space.  This is why it makes sense to let TransCare make its way back to normalized EBTIDA."  A2632 (PFC at 12).  By normalized EBITDA, Tilton testified that she meant the $12-14 million of EBITDA that TransCare had historically earned.  *Id.*  Nevertheless, Tilton specifically prohibited anyone at TransCare or Patriarch from speaking with these suitors. A2633 (PFC at 13).

By December 2016, Tilton had determined to sell TransCare.  A2633 (PFC at 13).  Wells Fargo was supportive of selling TransCare and understood that "it was a matter of self-preservation" to fund TransCare through a sale.  A2636 (PFC at 16).  In fact, after negotiation, Wells Fargo was agreeable to a long-term forbearance agreement to fund TransCare through to a sale and to a timetable for selling TransCare by August 15, 2016.  A2634 (PFC at 14); A2636-37 (PFC at 16-17).  The plan contemplated Patriarch Partners providing additional financing to fund

TransCare's outstanding liabilities, and was also conditioned upon Tilton's submission of a 2016 budget for TransCare and the retention of a third-party financial advisor.  A2634 (PFC at 14).

On January 7, 2016, TransCare engaged Carl Marks Advisory Group LLC ("Carl Marks") to be that financial advisor.  A2634 (PFC at 14).  Contrary to the central role that Carl Marks now plays in Appellants' appeal, Carl Marks' actual role was quite limited, and Tilton disparaged their contribution and even their competence.[10]  Tilton never engaged Carl Marks to value TransCare's assets or to market them, and Carl Marks never provided Tilton with an opinion concerning the marketability of the foreclosed assets, let alone any combination of TransCare's assets.  Tilton specifically disclaimed Carl Marks' ability to undertake the required financial modelling, and when asked about their contribution, testified:  "No. We were working all the models.  Carl Marks was only reviewing the work that we were doing since they were not able to do the type of work that needed to be done." A2068 at 65:3-5 [Tilton].  *See also* A3657 (Consulting Agreement, § 2 (scope of Carl Marks retention)).  Appellants failed to call anyone from Carl Marks to testify at trial.

On February 5, 2016, *because* Tilton was dissatisfied with Carl Marks, she "instructed her own staff and TransCare's divisional chiefs to build a model for a business plan designed to continue a version of TransCare under a new company."  A2641 (PFC at 21); A2067-68 at 64:1-65:16 [Tilton].  At that point, Tilton planned to split TransCare in two, with PPAS foreclosing on the business lines that Tilton wanted to save and transferring them to a NewCo; NewCo would

---

[10]    In Tilton's own words:  "You can let Carl Marks know that we never thought we hired them to ask for cash but actually to help rationalize the business, cut expenses and make it work. Overpaid bill payers." A3672 (DX 123); "You were hired as the CFO...Act in the role and make decisions on what needs to be paid."  A3407 (JX 88) (responding to Carl Marks' query how to prioritize payments).  *See also* A4185 (DX 97) (Greenberg reporting to Tilton that Wells Fargo wanted a consultant "to be interim CFO, and review budget, assist Mark [Bonilla] in managing liquidity, perform a variance analysis of actual v. budget.").

continue TransCare's business and the remainder of TransCare would wind-down for 60-90 days (the "Tilton Plan").  A2641 (PFC at 21).  "Tilton set her plan in motion on February 10, 2016." *Id*.  On that day, Tilton caused Transcendence to be incorporated and became the sole director of Transcendence.  A2642 (PFC at 22).  As sole director, Tilton issued a board resolution adopting the Authority Matrix, which reserved virtually all decisions to herself (*see* A2628-29 (PFC at 8-9)), and appointed Glen Youngblood, then serving as a senior vice-president at TransCare, as President of Transcendence (A2642 (PFC at 22)).[11]

Also on February 10, 2016, Tilton caused TransCare to engage outside counsel to prepare a bankruptcy proceeding for some (but not all) of TransCare's subsidiaries.  A2642 (PFC at 22).  "Stephen excluded two of TransCare's subsidiaries – TransCare Pennsylvania and TC Hudson Valley – from the list of potential debtors.  By then, Tilton planned that 'the secured lenders would foreclose on certain TransCare assets and those assets would lead to start another business, Transcendence Transit business, and the remainder of TransCare would be wound down, but it would still continue to operate.'"  A2642-43 (PFC at 22-23, quoting Stephen's testimony).

Also, on February 10 and 11, 2016, Tilton caused TransCare to enter into the Ark II Credit Facility.  A2643-44 (PFC at 23-24).  As discussed above, by the Ark II Credit Facility, TransCare purported to grant Ark II a senior secured interest in all of its assets.  But Ark II advanced no new funds to TransCare.  Instead, the Ark II facility purported to "secure" previous unsecured advances made to TransCare's creditors by PPAS, which Tilton claimed had originally been funded by Ark II.  A2643 (PFC at 23); A2701-02 (PFC at 81-82).  The Ark II facility actually prohibited TransCare from requesting further funds from Ark II without Tilton's prior written consent.

---

[11]     At trial, Tilton claimed that she intended to grant a minority interest in Transcendence to the Term Loan Lenders.  But Tilton never issued any shares to any Term Loan Lender and did not consult with any of them prior to appointing herself sole director and making these decisions.

A2643-44 (PFC at 23-24, citing A3313 at § 2.5(b)).

As part of the Ark II Credit Facility, Tilton signed an intercreditor agreement (on behalf of both PPAS and Ark II), which TransCare also signed and acknowledged agreeing to be bound (the "2016 Intercreditor Agreement"). A2644 (PFC at 24). Pursuant to this agreement, PPAS granted Ark II both structural and payment priority over the Term Loan Lenders. A2644 (PFC at 24, citing A3339 at §2.2). In addition, the 2016 Intercreditor Agreement prohibited PPAS from exercising any remedies upon a default (A2644 (PFC at 24, citing A3343 at § 2.9(a))) and prohibited PPAS from foreclosing on any of its TransCare collateral. A2644 (PFC at 24, citing A3343 at § 2.9(a)(ii)). The 2016 Intercreditor Agreement also provided that only Ark II "shall have the right to restrict, permit or approve or disapprove, the sale, transfer or other disposition" the TransCare collateral. A2644 (PFC at 24, citing A3342at § 2.8(a)).

The next day, Tilton dictated an email that Greenberg sent to Credit Suisse (which owned or controlled 18% of the Term Loan). A2644 (PFC at 24). As the Bankruptcy Court found, the email "warned Credit Suisse that because it would not agree to subordinate its Term Loan position to a new $6.5 million facility (a feat already accomplished through the 2016 Intercreditor Agreement), TransCare was going to be forced to file for bankruptcy." *Id.* When Credit Suisse responded by asking for financial details, Greenberg never responded. A2645 (PFC at 25). In fact, "no one had any contact with Credit Suisse again until Credit Suisse asked for a status update after TransCare's bankruptcy filing." *Id.*[12]

Before Tilton could implement her plan to split TransCare into two, she needed to procure

---

[12]    Despite the fact that no one told Credit Suisse about the foreclosure, Appellants now suggest there was no "evidence that Credit Suisse or First Dominion ever disputed or objected to the foreclosure." App. Br. at 32. In any event, as the Bankruptcy Court found, Tilton sold the assets to Transcendence without Credit Suisse's consent. A2684-85 (PFC at 64-65).

insurance for the new entity.  As the Bankruptcy Court found, "the procurement of insurance for Transcendence was the final missing element to the success of the Tilton Plan; Transcendence could not operate without insurance."  A2645 (PFC at 25, citing the testimony of Greenberg, Pelissier and Tilton).  Tilton and her team at Patriarch Partners swung into action to procure this missing element.  On February 10, 2016, Greenberg emailed several insurance brokers with a request to bind insurance for Transcendence and provided them with financial information for the business lines that Transcendence would take over from TransCare.  *Id.*  This financial information included projections for the N.Y.C. paratransit division and the Pittsburgh, Hudson Valley, Maryland and Westchester ambulance divisions, and projected $3.76 million in EBITDA for calendar year 2016.  *Id.*  On February 11, 2016, Tilton wrote to another insurance broker,

> [T]here is a smaller, less risky transit business that we would like to continue in a new company. This would include our NY Transit business and our suburban ambulance businesses in Hudson Valley, Pittsburgh Pennsylvania and Maryland. It would allow us to maintain a profitable, lower risk transit company that would still employ over 1000 of our workers.
>
> The models show that this business in 2016 would be approximately $67mm with $4mm of EBITDA and would grow with the additional transit business under the contract to $79mm and $7mm of EBITDA in 2017. It is because this new business makes sense that I would be providing all the new working capital for this business myself, personally.

A2646 (PFC at 26, quoting A3383).  Tilton testified that she understood that the broker needed this financial information in order to bind insurance.  *Id.* (citing Tilton's testimony).

While Tilton was waiting to bind insurance, she had her Patriarch team do a deep and independent dive into validating the assumptions behind the Transcendence financial model. A2646-47 (PFC at 26-27).  Tilton testified that the projections were validated by three separate, experienced teams working with TransCare's management in her offices to assure herself of the

accuracy of the model she was prepared to put $10 million of her own money behind.  A2042-43 at 39:17-40:18 [Tilton].  *See also* A2669 (PFC at 49); A2067 at 64:8-21 [Tilton]; A2065 62:7-12 [Tilton]; A2185 at 94:11-17 [Tilton].  She claimed to have herself worked with the separate teams of analysts from her offices and company management, to develop a model that "took it down to its basic variables that had not been done by the company or Carl Marks, to understand each contract down to what it takes, labor and ambulances and contractual commitments, in the mathematical model of how many ambulances you'd need under that contract to see if each contract was profitable, and then tried to build up from the profitable contracts, to save as much of the company as was possible, as we were losing contracts on a daily basis." A2042-43 at 39:9-40:7 [Tilton]; A2044 at 41:8-15 [Tilton].  *See also* A2171 at 80:6-23 [Tilton] ("We were finally doing it ourselves with the help of certain managers from TransCare..., not numbers put together by anyone else.")

Tilton finally found insurance late in the evening of February 23, 2016.  A2649 (PFC at 29).  At 12:07 a.m. on February 24, 2016, Tilton authorized the foreclosure and had Stephen immediately provide TransCare with a Notice of Default and Acceleration and a Notice of Acceptance of Subject Collateral in Partial Satisfaction of Obligations.  *Id.*  The Notice of Default declared a default under the Term Loan due to TransCare's failure to pay interest.  *Id*.  By the Notice of Acceptance, PPAS accepted the Subject Collateral listed on Exhibit A thereto in satisfaction of $10 million, out of $43 million, outstanding under the Term Loan.  *Id*.  The Notice of Default and Notice of Acceptance were signed by Tilton on behalf of PPAS, the Zohar Funds and AIP (and not signed at all by Credit Suisse or First Dominion) (*id*.), and at Tilton's direction, by Peter Wolf, the Chief Operating Officer of TransCare.  A2650 (PFC at 30).

The Subject Collateral included (a) all of TransCare's personal property, including all of

its ambulances and computers; (b) three specific contracts, including the MTA Contract; and (c) the stock of three subsidiaries:  TransCare Pennsylvania, Inc., TC Hudson Valley Ambulance, Inc. and TC Ambulance Corp.  A2649 (PFC at 29).

On the morning of February 24, 2016, PPAS entered into a Bill of Sale with Transcendence which provided that the Subject Collateral was sold, assigned, transferred and delivered from PPAS to Transcendence.  A2651 (PFC at 31).  At trial, Appellants conceded that the document consummated the sale.  A2035-36 at 32:2-33:2 [Tilton].  Although the trial testimony was far from consistent, on paper Transcendence agreed to pay $10 million to Ark Angels III as consideration for the Subject Collateral.  A3531 (JX 102, Recital E and Section 3).[13]  Ark Angels III committed to loan Transcendence $10 million.  A2651 (PFC at 31).  Although the trial exhibit was unexecuted, Tilton testified that she was committed to the loan, and Transcendence actually borrowed $658,000 under the Ark Angels III loan agreement.  *Id.*  The Ark Angels III facility was a revolving line of credit, backed by Transcendence's accounts receivable, and intended to provide Transcendence with working capital while it got off of the ground.  A2646-47 (PFC at 26-27); A2685-2687 (PFC at 65-67).

Thus, pursuant to the written transaction documents:

    a.   Transcendence received the Subject Collateral

    b.   TransCare received a $10 million credit off the Term Loan

    c.   Transcendence promised to borrow from and repay $10 million to Ark Angels III

    d.   The Term Lenders received nothing.

3.   <u>The Selection of the Price</u>

---

[13]    Under direct questioning from the Bankruptcy Court, Tilton could not explain how the words of the Bill of Sale related to the transaction that she claims to have intended.  A2230-35 at 9:21-14:19 [Tilton].

As discussed above, TransCare voluntarily agreed to transfer the Subject Collateral to PPAS in exchange for a $10 million credit off of PPAS' then junior secured lien.  There was no bid and ask over the price.  Tilton admitted that she selected it herself.  A2672, A2695 (PFC at 52, 75).  While there is no draft notice or draft calculation in the record, Tilton testified at trial that she selected the $10 million figure based on the book value of assets of the five divisions that she had initially planned to take over including their accounts receivable.  A2672 (PFC at 52).  "There were patent errors in the calculation of the $10 million credit."  A2673 (PFC at 53).[14]  Just by way of example only, "Tilton's valuation of the Subject Collateral ignored almost $7 million of book value."  Id.[15]

Further, book value had little relevance to TransCare's assets.  A2674 (PFC at 54).  Again, by way of example, "Tilton did not attribute any value to the MTA Contract, although it was to be the crown jewel of Transcendence [and] Greenberg had attributed $25 million in annual revenues to the MTA Contract."  Id.  Similarly, the Pittsburgh and Hudson Valley divisions were operating entities, and Tilton's Plan contemplated that all three divisions "would be continued as a going concern operating through Transcendence."  Id.

On February 24, 2016, the same day as the strict foreclosure and sale, Tilton directed Greenberg to submit Transcendence's projected 2016 financials to Todd Trent of Lockton so that Lockton could bind insurance for Transcendence.  A2648 (PFC at 28).  These financial projections encompassed just three of TransCare's divisions – Pittsburgh, Hudson Valley and the MTA Contract – and projected operating revenues of $36 million and $3.2 million of EBITDA for calendar year 2016 (which at that point had ten months plus six days left).  A2648-49 (PFC at 28-

---

[14]     Appellants do not contend the Bankruptcy Court committed any error here.
[15]     Appellants do not contend the Bankruptcy Court committed any error here either.

16

29).  Annualized to a full year, the financials projected $4 million in EBITDA.  A2679, A2684
(PFC at 59, 64).

    4.  Post -Transaction Events

Transcendence operated for the next three days under Tilton's control.  A2651-56 (PFC at
31-36); *see*, *e.g.,* A4193-94 (PX 244).  Contrary to the assertions made in Appellants' brief, there
was no evidence concerning paying TransCare's trade creditors. Further Tilton expressly told the
Transcendence employees that she would pay them for their previous work at TransCare, even if
the Trustee did not, but then failed to keep that promise.  A4187 (JX 103); A1638 at 132:4-17
[Stephen].  At 7pm on February 26, 2016, Tilton determined to shut down Transcendence and
terminate the employees "effective immediately."  A2655-56 (PFC at 35-36).  As discussed above,
the three TransCare subsidiaries (although now no longer operating) filed for bankruptcy in April
2016.

The Trustee obtained approximately $19.2 million in liquidation sales of TransCare's
assets, which included $5.7 million in liquidation sales of assets associated with Transcendence.
A2656 (PFC at 36).  However, the Bankruptcy Court subsequently determined that $2 million (net)
was attributable to the sale of physical assets actually foreclosed upon and sold to Transcendence.
A2687 (PFC at 67).

## SUMMARY OF THE ARGUMENT

Appellants raise no issue of law wrongfully decided by the Bankruptcy Court.  Instead,
they challenge the Bankruptcy Court's determination of TransCare's intent when transferring its
profitable and operating business lines to a company controlled by TransCare's sole director.  They
also challenge the Bankruptcy Court's determination of damages.  But here too, Appellants
identify no facts wrongfully decided by the Bankruptcy Court.  Instead, they ask this Court to

weigh the facts differently. But that is the opposite of clear error review, which evaluates only whether the trial court's findings were supported by the evidence. Because Appellants cannot point to any clear error committed by the Bankruptcy Court, this Court should affirm.

Indeed, Appellants' appeal has little to do with the record presented below. Tilton transferred TransCare's assets to a company controlled entirely by herself, stripping them of all liens and claims from other creditors – she did not take any action to *protect* TransCare's creditors. To execute her plan, she subordinated the Term Loan Lenders below the brand new, and fraudulent liens of Ark II, and then immediately caused PPAS to transfer the assets to Transcendence for no clear consideration whatsoever. As a result, on February 24, 2016, Transcendence owned TransCare's profitable Pittsburgh division, profitable Hudson Valley division and profitable MTA paratransit business (in addition to 100% of TransCare's ambulances) free and clear of TransCare's debts. These facts were undisputed at trial and remain so on this appeal.

Instead, Appellants argue that the assets taken by Tilton had little value to TransCare because TransCare as a whole was insolvent. But the evidence at trial indicated that third-parties were repeatedly inquiring about bidding on TransCare's assets, and in particular TransCare's lucrative MTA paratransit business. Tilton assigned her own staff at Patriarch Partners to identify the most profitable lines, and after an intense validation process, unilaterally selected the identified assets to transfer to herself. Tilton then submitted the resulting financial model to multiple third-party insurers to bind insurance for Transcendence. Tilton considered Transcendence such a good bet that she committed to lend Transcendence $10 million in an asset-backed loan. As the Bankruptcy Court found:

> Instead, she made the determination that no one other than herself would lend to NewCo or buy its assets even though she viewed NewCo as such a good business venture that she was willing to loan up to $10 million of her own money. (JX 80 at 92228; Tr. 8/13 A.M.

38:5–39:13, 44:5-10.) Tilton's willingness to acquire the assets and invest $10 million of her own money through Ark Angels III is the best evidence that Transcendence had substantial value. *Gentile v. Rossette,* C.A. No. 20213-VCN, 2010 WL 2171613, at *10 (Del. Ch. May 28, 2010) (defendant's "persistent willingness—even though admittedly marked at times by grave doubts—to pour his ultimately limited resources into the Company" was the most persuasive evidence of the company's value, notwithstanding his trial testimony that "the Company was worthless and on a path to oblivion."); *see also In re Appraisal of Dole Food Co., Inc.,* 114 A.3d 541, 557-58 (Del. Ch. 2014) ("[S]elf-interest concentrates the mind, and people who must back their beliefs with their purses are more likely to assess the value of the judgment accurately than are people who simply seek to make an argument.") (quoting *In re Cent. Ice Cream Co.*, 836 F.2d 1068, 1072 n. 3 (7th Cir. 1987)). In the end, she owned the same approximate amount of equity in Transcendence that she did in TransCare unencumbered, however, by PPAS's foreclosed lien and TransCare's unsecured debt.

A2669-70 (PFC at 49-50). The Bankruptcy Court did not commit clear error by valuing the Transcendence assets the way that Tilton did, as profitable, and continuing, business lines.

The Bankruptcy Court likewise did not commit clear error by crediting Dr. Arnold's damages analysis. Appellants contend that Dr. Arnold, and hence the Bankruptcy Court, should not have relied on the projections prepared and relied upon by Tilton and her team. But the Bankruptcy Court considered and took extensive testimony concerning the preparation, purposes and bases of these projections. A2630-31, A2637-40, A2645-46, A2648-49, A2672-73, A2678-80, A2683-85 (PFC at 10-11, 17-20, 25-26, 28-29, 52-53, 58-60, 63-65). Appellants do not challenge any of those findings on appeal. In any event, it was not clear error for the Bankruptcy Court to rely on projections that were internally validated at Patriarch and communicated to third-parties to obtain their reliance.

## ARGUMENT

## I.  Standard of Review for Clear Error

As discussed above, the Bankruptcy Court's determination of intent and damages are issues

19

of fact that are subject to clear error review on appeal.  Under the clearly erroneous standard, a

"party that seeks to overturn" the bankruptcy court's factual findings "bears a heavy burden."

*H&C Dev. Group, Inc. v. Miner*, 229 B.R. 561, 565 (B.A.P. 2d Cir. 1999).  *See also Branin*, 618

F.3d 76 at 85 ("Under the clearly erroneous standard, there is a strong presumption in favor of a

trial court's findings of fact if supported by substantial evidence.") (quotation and citation

omitted).  The appellate court may only reverse if it is left with a "definite and firm conviction"

that a mistake has been made. *Ortega v. Duncan*, 333 F.3d 102, 107 (2d Cir. 2003).[16]

      If "there are two permissible views of the evidence, the factfinder's choice between them

cannot be clearly erroneous." *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 573-74, 105

S. Ct. 1504, 1511-12 (1985).  "This is so even when the district court's findings do not rest on

credibility determinations, but are based instead on physical or documentary evidence or

inferences from other facts." *Id.*, 470 U.S. at 574, 105 S. Ct. at 1512.  Furthermore, "[t]he weight

of the evidence is not a ground for reversal on appeal, and the fact that there may have been

evidence to support an inference contrary to that drawn by the trial court does not mean that the

findings are clearly erroneous." *Ceraso v. Motiva Enters., LLC*, 326 F.3d 303, 316-17 (2d Cir.

2003) (internal citations omitted).  Thus, an appellant cannot succeed by asking the appellate court

to "weigh[] the facts in the record differently than the Bankruptcy Court did." *Schneider v.

Barnard*, 508 B.R. 533, 544 (E.D.N.Y. 2014).

      On this appeal, Appellants explicitly ask this Court to weigh the facts in the record

---

[16]    Contrary to Appellants' assertion, citing a 2004 district court opinion (App. Br. at 6), mixed questions of law and fact are reviewed "either de novo or under the clearly erroneous standard depending on whether the question is predominantly legal or factual." *Italian Colors Rest. v. Am. Express Travel Related Servs. Co.,* 554 F.3d 300, 316 n. 11 (2d Cir. 2009) (citation omitted).  However, Appellants' Brief does not identify any such "mixed questions" determined by the Bankruptcy Court that they seek appellate review of, under any standard.

differently.  App. Br. at 21-32.  They do not a challenge a specific factual finding made by the Bankruptcy Court.  Instead, they assert that the Court should have weighed other facts (like Tilton's idiosyncratic beliefs).  App. Br. at 21-22.  For this reason alone, their appeal should fail. *See also In re DiFabio*, 363 B.R. 343, 345 (D. Conn. 2007) (applying clear-error review to bankruptcy court's finding regarding whether transfer was made with intent to hinder, delay or defraud creditors); *In re Pisculli*, 426 B.R. 52, 68 (E.D.N.Y. 2010) (affirming because appellate court was "not left with 'the definite and firm conviction' that the bankruptcy court committed any mistake in its determination, upon appropriate consideration of the 'badges of fraud' and appellant's explanations therefor, that appellant possessed the requisite intent to defraud").

## II.     The Bankruptcy Court Did Not Commit Clear Error in Determining That TransCare Acted With Intent to Hinder, Delay or Defraud Its Creditors

### A.   The Bankruptcy Court Applied the Correct Legal Standard

Appellants do not challenge the legal standard applied by the Bankruptcy Court.  Under both 11 U.S.C. § 548(a) and New York Debtor and Creditor Law ("NYDCL") § 276, a transfer is avoidable if the debtor made it with "actual intent to hinder, delay, or defraud a present or future creditor."[17]  As the Bankruptcy Court correctly found, without challenge by Appellants, the phrase "to hinder, delay, or defraud has always been in the disjunctive, and an intent to hinder or delay is adequate even if it be not an intent to defraud."   A2693 (PFC at 73, quoting *In re Condon*, 198 F.

---

[17]     As described by the Bankruptcy Court (A2692 (PFC at 72)), the Trustee challenged the strict foreclosure under both federal and New York state law.  New York state law is made applicable through 11 U.S.C § 544(b)(1).  The Trustee sought to recover the value of the transfer from PPAS and Transcendence under 11 U.S.C. § 550(a), and his attorney's fees pursuant to NYDCL § 276-a.  A transfer fraudulent under New York law is likewise actually fraudulent under federal law.  A2693 (PFC at 73).  Appellants do not challenge these conclusions.

As also described by the Bankruptcy Court, all references to the NYDCL refer to the version in effect at the time of the transfer, which was repealed and replaced effective April 4, 2020.  A2692 (PFC at 72 n. 30).

947, 950 (S.D.N.Y. 1912) (Hand, L.J.), *aff'd*, 209 F. 800 (2d Cir. 1913)).  Similarly, "[a] deliberate attempt to stave off creditors by putting property in such a form and place that creditors cannot reach it, even when the purpose of that action is not to defraud them of ultimate payment but only to obtain enough time to restore the debtor's affairs" constitutes intent to hinder, delay or defraud. A2693 (PFC at 73, quoting *Flushing Sav. Bank v. Parr*, 438 N.Y.S.2d 374, 376-77 (2d Dep't 1981)).[18]

Because transferors rarely admit their own fraudulent intent, courts rely on "badges of fraud" to determine fraudulent intent.  *Sharp Int'l.*, 403 F.3d at 56.  These badges include: "(1) the lack or inadequacy of consideration; (2) the family, friendship or close associate relationship between the parties;  (3) the retention of possession, benefit or use of the property in question; (4) the financial condition of the party sought to be charged both before and after the transaction in question; (5) the existence or cumulative effect of a pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; and (6) the general chronology of the events and transactions under inquiry."  A2693-94 (PFC at 73-74).  As the Bankruptcy Court noted, additional indicia include "shifting of assets by the debtor to a corporation wholly controlled by him."  A2694 (PFC at 74, quoting *Kaiser*, 722 F.2d at 1583).   The Bankruptcy Court also noted that the Second Circuit has ruled that "circumstances suggesting secrecy, haste or unusualness of the transaction" is also considered a badge of fraud.  A2694 (PFC at 74, citing *HBE Leasing Corp. v. Frank*, 48 F.3d 623, 639 (2d Cir. 1995)).

As the Bankruptcy Court found, under the case law, the presence of one badge may be inconclusive, but the presence of multiple badges will increase the inference of fraudulent intent.

---

[18]     Appellants do not challenge this law, or even cite, these cases on appeal.

A2694 (PFC at 74, quoting *Tribune Co. Fraudulent Conveyance Litig.*, 12-cv-2652, 2017 WL 82391, at *13 (S.D.N.Y. Jan. 6, 2017) and *Bear Stearns Sec. Corp. v. Gredd*, (*In re Manhattan Inv. Fund Ltd.*), 397 B.R. 1, 10, n.13 (S.D.N.Y. 2007)).  Here, multiple badges were present.  The transfer was made to an insider; Tilton continued to maintain control of the property, both as it was transferred through PPAS and after it came to rest at Transcendence; the foreclosure was effectuated in the dead of night without negotiation; TransCare had no counsel negotiating the strict foreclosure, despite the fact that TransCare had engaged outside restructuring counsel; the $10 million credit was not even close to the value of the assets transferred and was arbitrarily selected; TransCare was insolvent; and TransCare transferred the essential assets of its business to a lienor who transferred the assets to an insider.  A2668-74; A2694-96 (PFC at 48-54; 74-76).

Other than the value of the assets, Appellants do not contest any of these badges.  Instead, they make two arguments:  first that Tilton's "unrefuted" testimony as to her own intent to protect creditors should trump those badges of fraud, and second that other badges weigh in favor of an inference that Tilton did not intend to hinder, delay or defraud creditors.  Neither argument is accurate and neither constitutes clear error.

### B.  Tilton Did Not Intend to Benefit Creditors

Appellants claim that when transferring its most lucrative assets free and clear of liens and claims to an entity controlled entirely by its sole director, TransCare intended to "benefit" its creditors.  App. Br. at 21-24.  To execute her plan, Tilton subordinated the Term Loan Lenders behind her own fraudulent lien, lied to the only Term Loan Lenders that she did not control, and immediately transferred the assets *away* from PPAS in exchange for essentially no consideration to her own company.

Appellants make much of Tilton's stated, but never executed, intention to give a minority interest in Transcendence to the Term Loan Lenders.  App. Br. at 13, 27, 29-30.  Other than Tilton's

say so, the only contemporaneous evidence of such an intention was an internal spreadsheet emailed between two Patriarch employees. A4055 ("This is the file I've been working with in case I get hit by lightning.").[19]  Brian Stephen, who set up Transcendence and handled corporate governance issues for Tilton (A2629, A2641 (PFC at 9, 21)), testified that Tilton alone would determine who received shares in Transcendence, but that Tilton never communicated to him who would receive the shares and that there were no records at Patriarch showing who would get the shares. A1443-45 at 24:17-26:8.  Thus, Tilton did not "allocate[] equity in Transcendence to each of the Term Loan Lenders." App. Br. at 27.  *See also* A2670 (PFC at 50, n. 22) ("In fact, no shares were ever issued to anyone.  Nor is there any evidence that Transcendence paid $10 million for the Subject Collateral or that the supposed proceeds of the sale to Transcendence were distributed to the Term Loan Lenders.").

Nevertheless, even under the plan she orally described, Tilton proposed to grant 55% of Transcendence's equity to Ark II, the exact same percentage that Ark II held in TransCare, but now unencumbered by TransCare's debt.  A2670 (PFC at 50).  Appellants wrongly suggest that Ark II would have been entitled to this equity for providing loans to Transcendence.  App. Br. at 13, n.7.  First, there was never any plan for *Ark II* to provide any funds to Transcendence.  Second, *Ark Angels III* did not make "a $10 million new money investment."  *Id.*  Rather than an investment, Ark Angels III extended a short-term loan, secured by Transcendence's receivables. A2651 (PFC at 31).  *See also* A2686 (PFC at 66) ("Tilton was proposing to provide a revolving line of credit rather than invest capital.").  Finally, Tilton's proposed equity allocation was based

---

[19]     Greenberg, who as discussed throughout was singularly involved in the Transcendence planning, also could not say who was to own Transcendence.    A1328-29 at 44:21-45:6 [Greenberg]. *See also* A1714 at 208:7-18 (where Appellants stipulated to Credit Suisse having no interest in Transcendence).

upon a separate $22 million valuation of Transcendence, which made little sense and which the Bankruptcy Court rejected as an arbitrary amount that "could not withstand scrutiny."  A2674 (PFC at 54).

In any event, as accurately concluded by the Bankruptcy Court, the standard "hinder, delay or defraud" does not require any exclusively, malicious intent and Tilton's stated desire to continue those portions of TransCare which were most lucrative is not inconsistent with a finding that TransCare also intended to hinder, delay or defraud its creditors.  A2693 (PFC at 73).  *See also Priestly v. Panmedix Inc.*, 18 F. Supp. 3d 486, 503-04 (S.D.N.Y. 2014) (granting summary judgment on actual fraudulent transfer even though the debtor intended to keep the company operating); *Lippe v. Bairnco Corp.*, 249 F. Supp. 2d 357, 374 (S.D.N.Y. 2003) ("only an actual intent to hinder and delay need be established, not an actual intent to defraud.");[20] *Rosa v. TCC Commc'ns, Inc.*, 15 CV 1665, 2017 WL 980338, at *5 (S.D.N.Y. Mar. 13, 2017) (the deliberate attempt to place assets beyond the immediate reach of creditors even when the purpose is not to defraud them is sufficient).

Here, the whole point of the Transcendence plan was to remove the lucrative assets away from TransCare and continue operating them without the other financial liabilities saddling TransCare.  Rather than sell the assets in an arms-length transaction, or place them into bankruptcy to conduct a transparent restructuring process, or even conduct the same plan with independent fiduciaries authorized to negotiate on behalf of TransCare, Tilton unilaterally picked a price and

---

[20]     *Lippe* relied upon *United States v. Carlin*, 948 F. Supp. 271, 277-78 (S.D.N.Y. 1996), which in turn relied upon *Atlanta Shipping Corp., Inc. v. Chemical Bank,* 631 F. Supp. 335, 346-47 (S.D.N.Y. 1986), *aff'd,* 818 F.2d 240 (2d Cir. 1987) and the cases cited therein.  *See also Great Atlantic & Pacific Tea Co., Inc. v. 380 Yorktown Food Corp.*, No. 16-cv-5250, 2020 WL 4432065, at *18 (S.D.N.Y. July 31, 2020).

transferred them free and clear to a company that she controlled.

### C.  The Badges Supported a Finding of Intent to Hinder, Delay or Defraud

The Bankruptcy Court did not commit clear error in weighing the badges of fraud.  As discussed above, the badges weighed in favor of an intent to hinder, delay or defraud creditors. *Supra* at 21-22.  Appellants claim that the Bankruptcy Court should have weighed the evidence differently.   App. Br. at 25-33.[21]   But Appellants' suggested weighing requires a skewed interpretation of the evidence.

The Close Relationship Between TransCare, PPAS and Transcendence: First, as discussed above, at no point were assets transferred to any company not owned by Tilton.  No transaction document called for any funds to be paid to any company not owned by Tilton.  Tilton hid the transaction from the Term Loan Lenders that she did not control.  That Tilton, as sole director of Transcendence, could have, in the future, issued a minority stake in Transcendence to others does not weigh in her favor.

The foreclosure was outside the ordinary course of business:  Second, the voluntary foreclosure was obviously outside of TransCare's ordinary course of business.  Tilton claims that "*any* foreclosure is, by definition outside of the usual course of business." App. Br. at 27 (emphasis in original).  That is misleading.  The fraudulent transfer alleged here is TransCare's voluntary agreement to concede to PPAS's midnight foreclosure demand for specified assets for a \$10

---

[21]     Appellants assert that the Bankruptcy Court did not consider three badges of fraud: TransCare's financial condition, the pattern of transactions and the general chronology.  App. Br. at 25.  But the Bankruptcy Court extensively considered these facts.  A2624-27, A2629-57, A2667-70, A2671-74, A2678-87, A2694-96 (PFC 4-7, 9-37, 47-50, 51-54, 58-67, 74-76).  In any event, "the presence or absence of one badge of fraud is not conclusive," and "the existence of several badges of fraud can constitute clear and convincing evidence of actual intent."  A2694 (PFC at 74, citations omitted).

million credit off of a junior lien.[22]

The consideration for the Subject Collateral was inadequate: Third, the Bankruptcy Court did not "assume[] that the property transferred was a going concern." App. Br. at 28. The Bankruptcy Court found as a matter of fact that the property transferred constituted going concern business lines. A2645-46, A2648-49, A2665, A2674, A2696-97 (PFC at 25-26, 28-29, 45, 54, 76-77). As discussed below, that finding was well supported in the evidence.

Tilton retained control over the Subject Collateral: Fourth, as discussed above, Tilton retained control over the Subject Collateral at all points, and indeed improved her position through the Tilton Plan. Appellants' novel argument that by continuing the Transcendence business lines, some of TransCare's unsecured creditors *could* have done future business with Transcendence is irrelevant. App. Br. at 28-29. In Tilton's own words, the point of the Transcendence transaction was to escape paying TransCare's existing creditors and continue a smaller version of TransCare with less liability.[23]

The Tilton Plan was executed in secrecy and haste: Fifth, Tilton claims that Wells Fargo, Carl Marks and TransCare's executives knew of the strict foreclosure. App. Br. at 30. First, this overstates the facts: Carl Marks and TransCare's executives worked for Tilton (and as discussed above, even these parties were largely excluded from the foreclosure planning) and Wells Fargo, far from "active participation," did not consent to the strict foreclosure. A2684-85 (PFC at 64-

---

[22]     *Cf. Tribune Co. Fraudulent Conveyance Litig.*, 2017 WL 82391, at *15, where "the LBO was the product of months of elaborate negotiations among sophisticated parties and received widespread publicity."

[23]     Appellants cite no evidence for their contention that TransCare's unsecured creditors had no hope of being able to reach the Subject Collateral. App. Br. at 30. They confuse the value of TransCare with the value of the Subject Collateral, which constituted just a subset of TransCare's assets and liabilities. Despite the Tilton Plan, the Trustee was still able to recover over $17 million, on a net basis, for TransCare's assets in *liquidation* sales excluding the Transcendence assets.

65); A4211-12 at 82:3-83:8 [Wells Fargo]).  Second, and more importantly, there is no evidence

that Tilton forewarned any of TransCare's other creditors or stockholders; and in fact the evidence

showed that Credit Suisse had been kept in the dark.  *See supra* at 12; *see also* A2643 (PFC at 23)

("Tilton decided instead to circumvent the Term Loan Lenders.").  Finally, Tilton did not negotiate

the terms of the strict foreclosure – and particularly the $10 million junior credit bid – with anyone.

## III.   The Bankruptcy Court Determined the Correct Damages

### A.   The Bankruptcy Court Did Not Commit Clear Error In Valuing the Subject Collateral As a Going Concern

The Bankruptcy Court did not commit clear error in valuing the operating business lines

that TransCare transferred to Transcendence as going concern entities.  At the time of the transfer,

these were operating businesses, and Tilton valued them as such in selecting them for transfer to

Transcendence.

Moreover, TransCare was not going to sell the business lines to itself.  Tilton herself

recognized "the active market in the ambulance space" and numerous companies expressed their

interest in purchasing TransCare's assets.  Faced with this, Appellants employ a sleight of hand by

claiming that even if the Subject Collateral would have continued to be a going concern under

Transcendence's control, "it would have been worth no more than liquidation value *to TransCare*"

(App. Br. at 34, emphasis added), somehow insinuating that the value of the same assets is different

from different points of view and that the Bankruptcy Court took the wrong point of view.  But

the only case cited for this unfounded proposition is *Gill v. Maddalena*, 176 B.R. 551, 557 (Bankr.

C.D. Cal. 1995).  That case indeed focuses "not on what the transferee gained by the transaction,

but rather on what the bankruptcy estate lost as a result of the transaction," but it provides no

support for the claim that the same assets are worth different amounts depending on whether they

are assumed to be owned by the transferor or the transferee.  Rather, it focuses on an entirely

different issue that supports the Bankruptcy Court's findings here, namely that the same assets can be worth different amounts at different points in time and that "[t]he determination of value must be made as of the date of the transfer." *Id*. at 553.

The asset transferred in *Gill* was an unsecured promissory note in favor of the debtor with a balance as of the time of transfer of approximately $97,000, and the Bankruptcy Court concluded after hearing from multiple expert witnesses that its market value at the time of transfer was $65,000, including an appropriate discount reflecting its illiquidity and the risk of non-payment. While this was more than the $30,000 the debtor's son had paid him for the transfer of the note (making the son liable to the estate for the difference), the court rejected the trustee's claim that since the obligor on the promissory note had eventually paid the full amount due, the trustee was entitled to recoup from the son the full amount he had ultimately realized from the transferred asset. *Id*. at 557.  The court "decline[d] … to fashion an award based upon hindsight," noting that the transferee had assumed the downside risk that the obligor on the note would default as well as the upside possibility of payment in full and indicating that it would have awarded damages based on the same $65,000 valuation even if the downside risk had subsequently come to pass and the transferee had failed to collect on the note.  In other words, "what the bankruptcy estate lost" as a result of the transfer did not involve assessing how much value the asset eventually would have generated had the estate retained it rather than transferring it, but what its fair market value to an arms-length purchaser (with both the upside risk and the downside risk to any potential purchaser factored in) was as of the date of the transfer.  *See also Kittay v. Peter D. Leibowits Co*., 265 B.R. 524, 532 (Bankr. S.D.N.Y. 2001) ("The critical time is when the transfer is 'made.'  Neither subsequent depreciation nor appreciation in the value of the consideration affects the question of whether reasonably equivalent value was given.").

That as a result of both Tilton's refusal to engage with the numerous interested buyers for the assets and her failure to get away with the Transcendence scheme, the assets fraudulently transferred here *subsequently* ended up worth no more than liquidation value is precisely the sort of hindsight argument that the law forbids. *See also In Re Andrew Velez Construction, Inc.*, 373 B.R. 262, 274 (Bankr. S.D.N.Y. Aug. 14, 2007) ("When a debtor cannot be made whole by the return of property lost through an avoidable transfer because of depreciation in value of the property, the court may enter an award of money judgment equal to the property's value as of the date of the petition.") (quotation and citation omitted).

Appellants' argument is also indistinguishable from that rejected by the Fifth Circuit in *Jimmy Swaggart Ministries v. Hayes*, 310 F.3d 796, 801-04 (5th Cir. 2002). After a real estate developer's various business entities went into bankruptcy, the entities' bankruptcy trustee sought to recoup as constructive fraudulent transfers millions of dollars that had been paid for never-exercised purchase options on real estate, claiming that the options received in return for the payments were worthless because the developer would never as a practical matter have had the financial wherewithal to exercise the options and proceed with the development. The Fifth Circuit rejected this argument, noting that option agreements typically have genuine economic value even though many options end up never actually being exercised and that "their values are to be determined at the time of origination" (under the circumstances identical with the time of the allegedly fraudulent transfers). Denying the transferee's § 548(c) defense, it held that "a transferor's practical inability to exercise his option is irrelevant to its valuation." *Id.* at 803. Here, there was not even a practical inability as numerous parties sought to bid on TransCare's assets and Tilton and her team recognized the active market in this space. Instead, Tilton sought to continue the three lucrative business lines herself, which she projected would earn positive

EBITDA even in the first year of business.[24]

Finally, there is no contradiction between TransCare's insolvency, as whole, and the positive value of several of its business segments. That is the Trustee's point – Tilton stripped the best assets from TransCare during its financial crisis and left creditors with the remainder.[25] Appellants' claim (App. Br. at 35) that the Bankruptcy Court "ignored…its own finding that TransCare was woefully insolvent" in valuing the Subject Collateral on a going-concern basis disingenuously mixes apples and oranges, as does their invocation of the Bankruptcy Court's finding that "Tilton determined…that a sale of the *entire* TransCare was not feasible." A2663 (PFC at 43, emphasis added). The whole point of TransCare's Tilton-ordered transfer of the Subject Collateral via the Tilton-controlled PPAS to the Tilton-controlled Transcendence is that it was *not* a transfer of the "entire" distressed TransCare, but only a transfer of the valuable cherry-picked assets and lines of business that Tilton intended for Transcendence to continue to operate post-transfer as a going concern without any interruption in business, free and clear of TransCare's

---

[24]     By contrast, none of the cases cited by Appellants required the Bankruptcy Court to value the Transcendence assets on a liquidating basis, as none of them dealt with the transfer of an operating company projected to earn a profit. App. Br. at 35. *In re Flagstaff Foodservice Corp.*, 56 B.R. 899, 906 (Bankr. S.D.N.Y. 1986) (valuing a reclamation claim where the debtor was already liquidating in a bankruptcy proceeding); *In re M. Silverman Laces, Inc.*, 404 B.R. 345, 362 (Bankr. S.D.N.Y. 2009) (declining to value "goodwill" in the absence of any transfer of property, employees, or proprietary information); *In re Atlas Computs., Inc.*, No. 07-11665, 2012 WL 3018256, at *8 (Bankr. N.D. Okla. July 24, 2012) (overruling objection to settlement where there was "no evidence of a willing buyer," the principal engineer of internet service provider has refused to work further and the debtor's property was transferred to the highest bidder at auction conducted at a sheriff's sale); *In re Miller & Rhoads, Inc.*, 146 B.R. 950, 956 (Bankr. E.D. Va. 1992) (defendant who had relied solely on the debtor's bankruptcy schedules and ignored all contemporaneous evidence, including appraisals, failed to rebut presumption of insolvency).

[25]     Here too Appellants overstate the facts. The Trustee obtained $20 million for TransCare's assets in *liquidation* sales, more than enough to repay Wells Fargo in full. Tilton was so focused on maintaining control of TransCare's assets that she never explored marketing them to a third-party, despite ample interest, or seeking out third-party financing or restructuring them through an open and fair process.

debts and other less viable lines of business. Appellants have presented no arguments as to why the specific assets they received on the explicit assumption that they could and would be operated as a going concern under Transcendence's ownership (A2642-43 (PFC at 22-23)) should not be valued on a going-concern basis, much less that it was clear error for the Bankruptcy Court to have done so.

### B. The Bankruptcy Court Did Not Commit Clear Error in Using the Transcendence Projections to Value the Transcendence Assets

Appellants claim that the Bankruptcy Court committed clear error by relying on Dr. Arnold's damage analysis. App. Br. at 38-39. They claim that Dr. Arnold's analysis, and hence the Bankruptcy Court's, was flawed because it relied upon the Transcendence projections prepared and validated by Tilton and the Appellants. App. Br. at 39.

As an initial matter, Appellants do not claim that the Bankruptcy Court erred by admitting the expert testimony of Dr. Arnold or by qualifying him as an expert. App. Br. at 38-39. Nor could they as they dropped any challenge at trial. A1750-51 at 6:21-7:2.[26] Second, Appellants do not challenge the 10.1 x EBITDA multiple calculated by Dr. Arnold and adopted by the Bankruptcy Court. A2679-84, A2697 (PFC at 59-64, 77). Instead, Appellants challenge the Bankruptcy Court's application of the multiple to the Transcendence projections prepared by Tilton and her Patriarch team. App. Br. at 39. But it was not clear error for the Bankruptcy Court to rely on

---

[26]     Thus, Appellants citations to two in limine decisions are not applicable to this appeal. App. Br. at 39-40.  *Cf. Jacked Up, LLC v. Sara Lee Corp.*, 291 F. Supp. 3d 795, 803-05 (N.D. Tex. 2018) (excluding expert testimony where there was no evidence presented that projections were reliable); *Chemipal Ltd. v. Slim-Fast Nutr. Foods Int'l, Inc.*, 350 F. Supp. 2d 582, 589-91 (D. Del. 2004) (excluding expert testimony where expert relied on third-party, foreign marketing presentation marketing without any understanding of how the presentation was assembled and testifying that "[h]e did not know what he was basing his testimony on."). *See also Kawache v. United States*, 471 F. App'x 10, 13 (2d Cir. 2012) ("appellant does not argue that the defense experts' testimony was inadmissible, but rather challenges the district court's decision to credit that evidence, which, as noted above, is reviewed for clear error.").

Appellants' contemporaneous projections.  The Bankruptcy Court heard direct testimony about the preparation of the projections from the people who prepared them.  The Bankruptcy Court made detailed findings about those projections (A2645, 2648 (PFC at 25, 28)), their preparation (A2645-47 (PFC at 25-27)), their relationship to TransCare's previous projections and business plans (A2630-31, A2637-40, (PFC at 10-11, 17-20)), their intended use (A2645-46 (PFC at 25-26)) and their constituent pieces (A2683-84 (PFC at 63-64)).

The Bankruptcy Court's findings were well supported. No less than ten Patriarch employees, working in three separate teams, validated the assumptions behind the Transcendence projections.  A2042-43 at 39:17–40:18 [Tilton].  They conducted "a deep analysis of each separate unit and division of TransCare, on a quantitative – on a quantitative and qualitative basis, to determine whether each of their contracts was profitable, and how to go forward" taken "down to its basic variables .... to understand each contract down to what it takes, labor and ambulances and contractual commitments, in the mathematical model of how many ambulances you'd need under that contract to see if each contract was profitable, and then tried to build up from the profitable contracts, to save as much of the company as was possible." A2044 at 41:2-15 [Tilton].  The Patriarch staff had access to the TransCare divisional chiefs to assist them in detailing the value of each division down "to each contract, to each body, to each hour of labor, to each ambulance needed and the mathematics of moving those people, and ambulances and medical staff around." A2067 at 64:8-21 [Tilton]; *see also* A2065 at 62:7-12 [Tilton]; A2171-72 at 80:6–81:4 [Tilton]; A2185 at 94:11-17 [Tilton]; A3792 (DX 150) (thanking the "35 to 40 people, all of whom were working to save this company").

Further, Tilton and her Patriarch team repeatedly submitted those projections to third-party insurers for the purpose of procuring those parties' financial reliance.  Tilton herself told the

insurers that the Transcendence plan was "smaller, less risky transit business that we would like to continue in a new company…. It is because this new business makes sense that I would be providing all the new working capital for this business myself, personally."  A2646 (PFC at 26).  Greenberg and Tilton had the requisite experience and training to prepare the projections:  Greenberg had experience in private equity investment and portfolio management, evaluating capital structure alternatives and making strategic business assessments, as well as extensive experience in valuation and modelling.  A1194-95 at 13:17–14:9 [Greenberg].  He had overseen the TransCare account since 2009, with a hiatus in 2013 and 2014.  A1196-97 at 15:16–16:12 [Greenberg].  Tilton had overseen TransCare for over twelve years (A2050-51 at 47:22–48:3 [Tilton]), and so she was well familiar with the earning potential of TransCare's business lines.  *See also* A2678 (PFC at 58, n.24).  Notably, the Transcendence projections were not outliers but were consistent with the other financial information in the record.  A2631, A2637, A2639-40, A2645-47, A2648-49, A2678-79 (PFC at 11, 17, 19-20, 25-27, 28-29, 58-59).

As the Bankruptcy Court carefully described – without challenge from Appellants on this appeal – the Transcendence plan required just a revolving credit line, rather than the investment of new capital.  A2646-47, A2685-87 (PFC at 26-27, 65-67).  Moreover, it required expenditures that a third-party would be unlikely to pay.  A2684 (PFC at 64).  Finally, Tilton "viewed NewCo as such a good business venture that she was willing to loan up to $10 million of her own money.  Tilton's willingness to acquire the assets and invest $10 million of her own money through Ark Angels III is the best evidence that Transcendence had substantial value."  A2669 (PFC at 49, citations to the record and precedent omitted).

Appellants' reliance on their own expert's testimony is misplaced.  App. Br. at 39.  Dunn gave no testimony concerning the projections, prospects or business of Transcendence.  In fact, he

testified that he was unaware of the transaction.  A1988-89 at 71:4–72:1 [Dunn] (no knowledge if any assets were foreclosed, no knowledge whether Transcendence purchased assets, no knowledge of the foreclosure price and no knowledge as to how the price was calculated).  Dunn also admitted conducting no investigation into what actions the Appellants took in reliance on the Transcendence projections.  A1987-88 at 70:24–71:3 [Dunn].  By contrast, Dr. Arnold methodically explained how he arrived at a multiple of forward-looking annual EBITDA using Tilton's own plan as a reasonable estimate of the value of Transcendence at the time of sale.  A1761-63 at 17:21–19:22 [Arnold].

Dr. Arnold also explained how Mr. Dunn's generalized hypotheticals as to "risk" were unsupported in the market data.[27]  On cross-examination, Dr. Arnold explained his understanding of why Tilton's data was reliable, and his understanding that the risks to which Tilton and Dunn referred were embedded in the forecast.  A1808-09 at 64:20–65:16 [Arnold]; *see also* A1801-02 at 57:4–58:3[Arnold].  To address the specific factors Dunn claimed increased the risk and reduced the value, on rebuttal Dr. Arnold undertook a survey of those factors.  To do so, Dr. Arnold employed the same Capital IQ SIC database as Dunn confirmed experts relied upon to locate comparable companies and precedent transactions, albeit using a larger population than simply most comparable.  A2269-70 at 48:7–49:13 [Arnold]; A1952 at 35:12-25 [Dunn]. Dr. Arnold applied transparent, defined criteria to divide the database of participants in TransCare's classification, identifying 69 originally with available data, and subsequently culling that group

---

[27]   Mr. Dunn's criticisms of the appropriate range of multiples to apply to Tilton's EBITDA forecast focused on four risk factors Dunn claimed warranted applying a lower range of multiples: (1) TransCare was small; (2) TransCare was distressed; (3) TransCare had low operating margins; and (4) TransCare was undercapitalized.  A1970 at 53:22–60:6 [Dunn] (discussing A4174 (PX 283 at Ex. 2)).  According to Dunn, application of these factors would result in a reduced range of values from those identified by Dr. Arnold, though Dunn did not testify to any formula or amount associated with such adjustments.  *Id.*

down to a subset of 34 for reasons clearly stated in his report, to observe the EBITDA results for the identified entities in either smaller, distressed, lower operating margin or undercapitalized categories that Dunn claimed should have resulted in lower multiples.  A2269-79 at 48:7–58:1 [Arnold].  Dr. Arnold's verifiable results confirmed Greenberg's initial multiples and did not support Dunn's hypotheses.  A2275-76 at 54:1–55:1 [Arnold].  Appellants offered no rebuttal. A2300-01 at 79:23–80:8.

It was not clear error for the Bankruptcy Court to rely on the Transcendence projections prepared by and relied upon by Tilton and her team at the time they effectuated the strict foreclosure.  Nor was it clear error for the Bankruptcy Court to weigh Dr. Arnold's damages analysis favorably, especially in the absence of any affirmative valuation proffered by the Appellants.  Even now, after a full trial, numerous rounds of briefing and this appeal, Appellants cannot point to any errors in the Transcendence projections or state what the true value of Transcendence should have been.  *See* A2682-83 (PFC at 62-63, citing *Hart v. Rick's Cabaret Int'l, Inc.*, 60 F. Supp. 3d 447, 467 (S.D.N.Y. 2014).

Management projections are the best source of indications of value, and "[t]hat is especially so when management provides estimates to a financing source and is expected by that source (and sometimes by positive law) to provide a reasonable best estimate of future results.  Therefore, we have regarded with rightful suspicion attempts by parties who produced such projections to later disclaim their reliability, when that denial serves their litigation objective."  *Open MRI Radiology Assocs., P.A., v. Kessler*, 898 A.2d 290, 332 (Del. Ch. 2006) (Strine, V.C.).  Here, the Bankruptcy Court determined that the Transcendence projections represented "the best evidence of the value that TransCare could have realized through an arms-length sale of NewCo[,]" and were prepared by Greenberg and Pelissier who, at the time, "were essentially functioning as TransCare's senior

36

management reporting directly to Tilton." A2678 (PFC at 58).  Tilton provided those projections

to third-parties to induce their reliance, and herself relied on them in executing the Tilton Plan and

extending the Ark Angels III facility to Transcendence.  A2645-46, A2669-70, A2679, A2682-83

(PFC at 25-26, 49-50, 59, 62-63).  As such, it was not clear error for the Bankruptcy Court to rely

on those projections in valuing Transcendence.

## CONCLUSION

Because the Bankruptcy Court did not commit clear error in determining TransCare's

intent to hinder, delay or defraud creditors or in determining the value of the Subject Collateral

when transferred to PPAS and Transcendence, the Court should affirm the Bankruptcy Court's

Post-Trial Findings of Fact and Conclusions of Law.

Dated: November 2, 2020
        New York, New York

*/s/  Avery Samet*
            Bijan Amini
            Avery Samet
AMINI LLC
131 West 35th Street, 12th Floor
New York, New York 10001
Tel: (212) 490-4700
Fax: (212) 490-4208
bamini@aminillc.com
asamet@aminillc.com

*Attorneys for Plaintiff-Appellee Salvatore
LaMonica, as Chapter 7 Trustee*