# 20 Civ. 06274 (LAK)

**United States District Court**

*for the*

**Southern District of New York**

————————————————

IN RE TRANSCARE CORPORATION, ET AL.

DEBTORS,

————————————————

PATRIARCH PARTNERS AGENCY SERVICES, LLC, ET AL.

DEFENDANTS-APPELLANTS,

—against—

SALVATORE LAMONICA, AS CHAPTER 7 TRUSTEE OF THE JOINTLY-ADMINISTERED ESTATES OF TRANSCARE CORPORATION, ET AL.,

PLAINTIFF-APPELLEE.

————————————————

ON APPEAL FROM THE UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK (BERNSTEIN, J.)

IN RE: TRANSCARE CORPORATION, ET AL., CASE NO. 16-10407 (SMB)

LAMONICA V. TILTON, ET AL., ADV. PROC. NO. 18-1021 (SMB)

## APPELLANTS' REPLY BRIEF

Michael T. Mervis
Timothy Q. Karcher
Q. Jennifer Yang
**PROSKAUER ROSE LLP**
Eleven Times Square
New York, NY  10036-8299
Tel.: (212) 969-3000
Email: mmervis@proskauer.com
      tkarcher@proskauer.com
      jyang@proskauer.com
*Attorneys for Defendants-Appellants*

## <u>TABLE OF CONTENTS</u>

Page(s)

INTRODUCTION ....................................................................................................................1

ARGUMENT ..........................................................................................................................4

I.     The Bankruptcy Court Erred in Finding TransCare Transferred the Subject
Collateral with Actual Intent to Hinder, Delay, or Defraud Its Creditors..........................4

     A.     The Record as a Whole Shows the Restructuring Plan and Foreclosure
Were Intended to *Benefit* TransCare's Creditors ......................................................4

     B.     When The Record as a Whole is Considered, it is Clear The Badges of
Fraud Do Not Support a Finding of Intent to Hinder, Delay, or Defraud...............8

II.    The Bankruptcy Court Erred in Awarding $39.2 Million in Damages............................13

     A.     TransCare Did Not Transfer a Going Concern ......................................................13

     B.     Dr. Arnold's Calculation of "Value" Deserved No Weight .................................16

CONCLUSION........................................................................................................................17

i

# TABLE OF AUTHORITIES

**Page(s)**

<small>CASES</small>

Babitt v. Vebeliunas (*In re Vebeliunas*),
   332 F.3d 85 (2d Cir. 2003)....................................................................................................9

Combined Res. Interiors, Inc. v. Frankl (In re Frankl),
   2020 WL 4530317 (S.D.N.Y. Aug. 6, 2020)........................................................................9

Doe v. Menefee,
   391 F.3d 147 (2d Cir. 2004)..................................................................................................5

Enter. Prods. Operation L.P. v. Enron Gas Liquids Inc. (In re Enron Corp.),
   306 B.R. 33 (S.D.N.Y. 2004),
   *aff'd sub nom. Enter. Prod. Operating L.P. v. Enron Gas Liquids Inc.*,
   119 F. App'x 344 (2d Cir. 2005) ..........................................................................................9

Gill v. Maddalena (In re Maddalena),
   176 B.R. 551 (Bankr. C.D. Cal. 1995).................................................................................14

Gillman v. Sci. Res. Prods. (In re Mama D'Angelo, Inc.),
   55 F.3d 552 (10th Cir. 1995)...............................................................................................13

GMAM Inv. Funds Tr. I v. Globo Comunicacoes e Participacoes S.A.(In re Globo
   Comunicacoes e Participacoes S.A.),
   317 B.R. 235 (S.D.N.Y. 2004)..............................................................................................9

Gullickson v. Brown (*In re Brown*),
   108 F.3d 1290 (10th Cir. 1997) ............................................................................................9

Heilig-Meyers Co. v. Wachovia Bank, N.A. (In re Heilig-Meyers Co.),
   319 B.R. 447 (Bankr. E.D. Va. 2004),
   *aff'd*, 328 B.R. 471 (E.D. Va. 2005) ..................................................................................14

In re Hygrade Envelope Corp.,
   366 F.2d 584 (2d Cir. 1966)................................................................................................13

Italian Colors Rest. v. Am. Express Travel Related Servs. Co. (In re Am. Express
   Merchants' Litig.),
   554 F.3d 300 (2d Cir. 2009)..................................................................................................9

Jimmy Swaggart Ministries v. Hayes (In re Hannover Corp.),
   310 F.3d 796 (5th Cir. 2002) ..............................................................................................16

*Kumho Tire Co. v. Carmichael*,
    526 U.S. 137 (1999).........................................................................................17

*Lippe v. Bairnco Corp.*,
    249 F. Supp. 2d 357 (S.D.N.Y. 2003),
    *aff'd*, 99 F. App'x 274 (2d Cir. 2004)..................................................................6

*Marine Midland Bank v. Murkoff*,
    120 A.D.2d 122 (2d Dep't 1986) .........................................................................4

*Mazer-Marino v. S.J.P.B., Inc. (In re Thakur)*,
    498 B.R. 410 (S.D.N.Y. 2013)..............................................................................1

*McCord v. Ally Fin., Inc. (In re USA United Fleet, Inc.)*,
    559 B.R. 41 (Bankr. E.D.N.Y. 2016) ...................................................................8

*Oney v. Weinberg (In re Weinberg)*,
    410 B.R. 19 (B.A.P. 9th Cir. 2009),
    *aff'd*, 407 F. App'x 176 (9th Cir. 2010)..............................................................17

*Priestley v. Panmedix Inc.*,
    18 F. Supp. 3d 486 (S.D.N.Y. 2014),
    *aff'd*, 99 F. App'x 274 (2d Cir. 2004)..................................................................6

*United States v. McCombs*,
    30 F.3d 310 (2d Cir. 1994)....................................................................................1

## STATUTES

11 U.S.C. § 502(d) .................................................................................................17

## INTRODUCTION

What is most notable about the Trustee's answering brief ("A. Br.") is what it omits—namely, a discussion of *any direct evidence* that the Restructuring Plan, of which the Article 9 foreclosure was a part, was intended to hinder, delay, or defraud TransCare's creditors.[1]  This omission is consistent with the Trustee's counsel's inability, at the close of the trial, to point to any "evidence that [Tilton] wasn't acting with an honest intention to reorganize or save [TransCare]," and his concession that "I don't know that we would say that she wasn't acting with an honest intention to reorganize or save [TransCare]."  A2308-09 at 6:22-7:2.  It speaks volumes that the Trustee makes no attempt in his brief to address or explain this concession.

Instead, the Trustee asks this Court to (i) ignore (just as the bankruptcy court ignored) the testimonial and documentary evidence demonstrating that the intent of the Restructuring Plan was to provide the greatest recovery possible to TransCare's creditors, at a time when TransCare had no path forward except liquidation, and (ii) find that the Trustee met his burden of proving fraudulent intent based primarily (in fact, almost exclusively) on Tilton's role on both sides of the transaction.  This is wrong for at least two reasons.

First, the bankruptcy court's findings constitute an error of both fact and law precisely because the court failed to assess the record *as a whole* and correctly apply the legal standard to the record.[2]  Appellants do not, as the Trustee argues, ask this Court to weigh the evidence

---

[1] Capitalized terms used but not defined herein have the meaning given to them in the opening brief of PPAS and Transcendence (collectively, "Appellants") [Dkt. No. 11] ("O. Br.").

[2] *See Mazer-Marino v. S.J.P.B., Inc. (In re Thakur)*, 498 B.R. 410, 418–19 (S.D.N.Y. 2013) (emphasis added) (citation omitted) ("A finding of fact is clearly erroneous if, *after reviewing the evidence as a whole*, 'the reviewing court is left with the definite and firm conviction that a mistake has been committed'"); *United States v. McCombs,* 30 F.3d 310, 328 (2d Cir. 1994) ("we will review the district court's ultimate conclusion that the conveyance was fraudulent under section 276 [of the NYDCL] *de novo* as an issue involving the application of law to fact").

differently than the bankruptcy court.  Rather, what Appellants have demonstrated is that, both with respect to direct evidence of Tilton's intent and with the badges of fraud analysis, the bankruptcy court inexplicably ignored the larger record (without explanation) and thus reached a conclusion about intent that was factually and legally erroneous.

Second, as is explained in Appellants' opening brief (at 4, 33), the Trustee's singular focus on Tilton's dual role improperly conflates his actual fraudulent conveyance claim with his separate claim for breach of fiduciary duty, and falls far short of meeting his burden of proving intent to hinder, delay or defraud by clear and convincing evidence (*see* O. Br. at 20).

It bears emphasizing that, at the time of the foreclosure, TransCare was in default under the TLA, and PPAS, as administrative agent for the Term Loan Lenders, had a contractual right to foreclose on the collateral that secured this debt.  Thereafter PPAS, as agent for the Term Loan Lenders, had the contractual right to transfer the collateral to another entity at the direction of the Required Lenders.  The Trustee does not dispute the contractual right of the lenders to take these actions.  Rather, he makes much of the fact that the Subject Collateral was transferred "free and clear of TransCare's liens and unsecured claims."  A. Br. at 2; *see also id.* at 4, 17, 25, 27.  But a foreclosure *always* removes the foreclosed-upon assets from the financial liabilities of the transferor.  The relevant inquiry here is the transferor's intent, not the mechanics of the transfer.

With most foreclosures, there is no concern on the part of the lender as to what happens to the borrower and its remaining creditors after the foreclosure.  Here, in contrast, the unrefuted evidence is that Tilton carefully considered the impact of the Restructuring Plan on TransCare's creditors and sought to provide the greatest recovery possible to each of three creditor groups—(i) a potential equity upside in Transcendence for the Term Loan Lenders, (ii) repayment of Wells Fargo's loan, and (iii) hundreds of jobs saved for TransCare's employees.  This is the opposite of

fraudulent intent.

With regard to damages, the Trustee does not contest that, by the time of the foreclosure, TransCare was beyond death's door.  Nor does he dispute that the foreclosure did not cause or contribute to TransCare's dire financial situation.  Rather, the Trustee attempts to draw a distinction between TransCare's desperate condition and the supposed value of the Subject Collateral had it been sold as a going concern.

In so arguing, the Trustee fails to come to grips with the fact that, at the time of the challenged transfer—which is the point in time at which value is to be measured under § 550 of the Bankruptcy Code—*all* of TransCare's assets, including the Subject Collateral, were encumbered by tens of millions of dollars in already-defaulted secured debt.  At that point, there was no money left to continue operations of the business lines that Tilton hoped could be operated by Transcendence (with an infusion of new money working capital).  With no funds to continue to operate, there was certainly not sufficient cash to engage in and survive a process to sell these business lines as a going concern.  The Trustee argues that Tilton is blameworthy because she should have tried to sell the assets for going concern value (presumably before the Wells Fargo ABL Facility expired in January 2016).  But even if there were anything to the Trustee's aspersions (and there is not), this has nothing to do with the value of the Subject Collateral *at the time of the challenged transfer*.[3]

The Trustee also stresses that the business lines at issue were still operating on February 24.  But that does not mean they were a going concern or could have been sold for going concern value on that date.  The Trustee fails to engage with the case law cited by Appellants which makes

---

[3] What the Trustee is really trying to do is reargue an abandoned claim that Tilton breached her fiduciary duties by not engaging potential buyers prior to 2016.  A2321-22 at 19:2-20:23.

clear the Subject Collateral was no longer a going concern at the time of the foreclosure. Accordingly, the Trustee cannot use fraudulent conveyance law to obtain for the estate a benefit (*i.e.*, going concern value) that it could not have obtained had the transfer not occurred.[4]  Indeed, the $39.2 million damages award is the very definition of a windfall, bearing no relation to the value of the Subject Collateral to TransCare at the time of the transfer.[5]

## ARGUMENT

I.    **The Bankruptcy Court Erred in Finding TransCare Transferred the Subject Collateral with Actual Intent to Hinder, Delay, or Defraud Its Creditors**

A.    **The Record as a Whole Shows the Restructuring Plan and Foreclosure Were Intended to *Benefit* TransCare's Creditors**

The Trustee does not contest that (1) Tilton's testimony, and the supporting contemporaneous documentary evidence, about what the Restructuring Plan was intended to accomplish was unrefuted, and (2) nowhere in its PFC did the bankruptcy court find Tilton's testimony was not credible or the corroborating documentary evidence was not probative of her intent.  The Trustee also does not argue there is any direct evidence the Restructuring Plan was *not* meant to do what Tilton testified it was meant to do—save jobs, pay Wells Fargo's debt, and provide an equity upside to the Term Loan Lenders.  Instead, the Trustee argues (1) the bankruptcy court did not need to consider "Tilton's idiosyncratic beliefs" (A. Br. at 21), and (2) Tilton's intent to give an equity interest in Transcendence to the Term Loan Lenders should be disregarded

---

[4] *See Marine Midland Bank v. Murkoff*, 120 A.D.2d 122, 133 (2d Dep't 1986) ("The creditor's remedy in a fraudulent conveyance action is limited to reaching the property which would have been available to satisfy the judgment had there been no conveyance . . . .").

[5] Even if going concern value were appropriate here, the wildly speculative calculation proffered by the Trustee's expert, Dr. Arnold, should have been given no weight because, among other things, he did nothing to vet the projections upon which his calculation was based.  Contrary to the Trustee's arguments, it was not for the bankruptcy court to do what Arnold failed to do.  His opinions should never have been admitted in the first place.

because the shares were never issued (*id.* at 4, 11 n.11, 23-24).  Both arguments lack merit, and do not begin to explain or support a finding that the Trustee affirmatively met *his* burden of proving an intent to hinder, delay, or defraud creditors by clear and convincing evidence (*see* O. Br. at 20).

First, the Trustee's contention that the bankruptcy court did not need to consider evidence about "Tilton's idiosyncratic beliefs" (A. Br. at 21) is contrary to the law, since an actual fraudulent conveyance claim turns *entirely* on the transferor's intent.  The bankruptcy court's failure to address the only direct record evidence of Tilton's intent in finding that she had a "fraudulent intent to delay and defraud TransCare's creditors and [had] not pointed to 'significantly clear evidence of a legitimate supervening purpose'" (A2802-06 (PFC at 72-76)) was clear error.  *See Doe v. Menefee*, 391 F.3d 147, 164 (2d Cir. 2004) ("We have found a district court's factual findings to be clearly erroneous where the court has failed to synthesize the evidence in a manner that accounts for conflicting evidence . . . .  Thus, we have reversed factual findings . . . where the court failed to weigh all of the relevant evidence before making its factual findings").  The record evidence of Tilton's intent was crystal clear and unrefuted.  *See* O. Br. at 13-14, 21-24.

Second, the Trustee's downplaying of Tilton's documented intent that a 45.3% equity interest in Transcendence would be held by the Term Loan Lenders, based solely on the fact that no Transcendence shares were ultimately issued, misses the point entirely.  It is unsurprising that no shares were issued to *anyone* (including Tilton's investment vehicles) since, due in large part to the Trustee's interference (A2029 at 26:3–12), Transcendence never got off the ground.[6]  The fact that no shares were issued does not undermine the unrefuted evidence of Tilton's intent.[7]

---

[6] Indeed, the NLRB found that Transcendence never operated at all.  *Transcendence Transit II, Inc., et al. and Local 1181–10601, et al.,* Case 29–CA–182049, at 15 (N.L.R.B. 2020) ("Transcendence . . . was in fact not operating at any given time.").

[7] The Trustee largely ignores the contemporaneous detailed calculations for the planned allocation of Transcendence equity to the Term Loan Lenders.  A4055.  Why were these calculations

The Trustee's broad assertion that Tilton "did not take any action to *protect* TransCare's creditors" (A. Br. at 18 (emphasis in original)) is false and contrary to the record evidence. The intended allocation of Transcendence equity to the Term Loan Lenders was based on Tilton's belief, not refuted by any evidence, that doing so gave them the "best hope at collecting for the [term] loans that had been made." A2047 at 44:2-4; A2210 at 119:2–7. Tilton also testified, also without contradiction, that the Restructuring Plan was an attempt to save jobs. O. Br. at 13-14, 22. In fact, belying his sweeping contention that "Tilton did not intend to benefit creditors" (A. Br. at 23), the Trustee cites emails from Tilton to insurance brokers that expressly state the Restructuring Plan would allow Transcendence to "still employ over 1000 of our [TransCare's] workers." *Id.* at 13 (quoting A2646 (PFC at 26, quoting A3383)).[8] Thus, far from being a deliberate attempt to place assets beyond the immediate reach of creditors (A. Br. at 25 (internal citation omitted)), the Restructuring Plan expressly contemplated placing the assets into a business that would be partially owned by the Term Loan Lenders and employ "over 1000" TransCare employees.[9]

_____

prepared if Tilton did not intend to act on them? The Trustee's contention that "Appellants stipulated to Credit Suisse having no interest in Transcendence" (A. Br. at 24 n.19) is highly misleading. The trial transcript merely reflects a stipulation that "Credit Suisse doesn't have an interest in Transcendence" *at the time of trial*. A1714 at 208:7-18. That is irrelevant.

[8] The Trustee cites a February 25 email stating that Transcendence employees in good standing would be paid for their previous work at TransCare and asserts Tilton "failed to keep that promise." A. Br. at 17 (citing A4187). Here too, the Trustee ignores that Transcendence never got off the ground. The email does not refute (and in fact adds to) the evidence that at the time of Article 9 foreclosure, Tilton's *intent* was for these employees to work for Transcendence.

[9] The Trustee cites *Priestley v. Panmedix Inc.*, 18 F. Supp. 3d 486 (S.D.N.Y. 2014), for the proposition that "the standard 'hinder, delay or defraud' does not require an exclusively, [sic] malicious intent." A. Br. at 25. That case is inapposite; the court found the defendant's desire to continue operating its business was for the purpose of "displacing" a specific "rightful creditor," not to give creditors a chance to recover in a circumstance where, as here, they otherwise would not be able to do so. *Priestley*, 18 F. Supp. 3d at 503-504. Moreover, Appellants are not arguing the Trustee was required to prove fraud or malice, so *Lippe v. Bairnco Corp.*, 249 F. Supp. 2d 357 (S.D.N.Y. 2003) (cited at A. Br. at 25), *aff'd*, 99 F. App'x 274 (2d Cir. 2004), is irrelevant.

The Trustee's repeated refrain that the purpose of the Restructuring Plan was to "remove the [Subject Collateral] away from TransCare and continue operating them without the other financial liabilities saddling TransCare" (A. Br. at 25; *see also id.* at 2, 4, 18, 27) is legally meaningless and proves nothing.  If removing assets from a debtor company "without the other financial liabilities saddling" the company amounted to a fraudulent conveyance, then every foreclosure would be presumptively fraudulent.  Indeed, to state the obvious, the mere fact that assets are transferred in a foreclosure does not itself prove the intent of the transfer was to frustrate the ability of other creditors to recover.  Here, the record, as a whole, shows that the point of the Restructuring Plan was to give TransCare's creditors a chance to recover (or remain employed) when the alternative was total liquidation.

The Trustee also makes much of the fact that the Term Loan Lenders' lien on TransCare's assets was subordinated to Ark II, describing this as "instrumental[] to Tilton's scheme."  A. Br. at 8; *see also id.* at 4, 11-12, 18, 24.  But nowhere does the Trustee explain why or how.  The Term Loan Lenders (via PPAS), *not Ark II*, were the ones who foreclosed on the Subject Collateral, and Ark II did not assert priority or otherwise object to the foreclosure.  The Trustee in fact brought a fraudulent conveyance claim against Ark II, which the bankruptcy court *dismissed* at the close of the evidence, describing it as "an entirely separate issue." A2769 (PFC at 39); A2315 at 13:18-21.

Finally, the Trustee suggests that because Tilton did not "sell the assets in an arms-length transaction, or place them into bankruptcy," or conduct the Restructuring Plan "with independent fiduciaries authorized to negotiate on behalf of TransCare," she must have had a fraudulent intent. A. Br. at 25-26.  This is a logical and legal fallacy.  First, there is no evidence these other options were available to TransCare at the time of the foreclosure.  And, in fact, they were not, since TransCare had run out of money by then.  O. Br. at 15-16; A2708 (PFC at 88).  Regardless, even

7

if Tilton could have pursued a different course of action, that would not make the one she did

pursue fraudulent, or evidence an intent to hinder, delay, or defraud creditors.[10]   What the Trustee

is *really* complaining about is that Tilton was on both sides of the transaction.  But, as discussed

in Appellants' opening brief (at 23-24, 33), alleged self-dealing is not itself dispositive evidence

of an intent to hinder, delay, or defraud creditors, and both the Trustee and the bankruptcy court's

nearly exclusive reliance on this single factor conflates the actual fraudulent conveyance claim

with the Trustee's separate and distinct claim for breach of the fiduciary duty of loyalty.  This is

improper because the burdens of proof on the respective claims are reversed.  *Id.*

**B.    When The Record as a Whole is Considered, it is Clear The Badges of Fraud
       Do Not Support a Finding of Intent to Hinder, Delay, or Defraud**

Contrary to the Trustee's assertion, Appellants do not "claim that the Bankruptcy Court

should have weighed the evidence differently."  A. Br. at 26.  Rather, as set forth in Appellants'

opening brief (at 24-33), the bankruptcy court's analysis was flawed in two fundamental ways.

First, the bankruptcy court omitted any discussion of three of the six badges of fraud cited in the

very case law the court relied on, and failed to offer any explanation for this omission.  Second, as

to those badges it did discuss, the court ignored, again without explanation, a wealth of other

evidence—evidence that places into context the narrow selection of evidence the court did discuss.

The bankruptcy court thus failed to correctly apply the legal standard to the facts of this case,

which was an error of both fact and law.  *See McCord v. Ally Fin., Inc. (In re USA United Fleet,*

---

[10] For the same reason, the Trustee's lengthy discussions of Greenberg's November 2015 plan and
Tilton's exploration of a potential sale in December 2015 (A. Br. at 8-10) are irrelevant.  Indeed,
Tilton did not even conceive of the Restructuring Plan until early February 2016 (A2751 (PFC at
21)), and there is no basis to impute a nefarious intent from events that occurred before then.  In
addition, as the Trustee acknowledges (A. Br. at 9-10), both Greenberg's plan and the potential
sale of TransCare contemplated additional funding from Tilton.  As the bankruptcy court
recognized, Tilton "was under no obligation to fund TransCare personally."  A2663 (PFC at 43).

*Inc.)*, 559 B.R. 41, 62 (Bankr. E.D.N.Y. 2016) (citation omitted) (the "badges of fraud should be viewed in the context of all of the facts and circumstances, and 'the existence of a badge of fraud should be considered in the context of the case and any probative evidence of innocent intent'").[11]

In a footnote, the Trustee claims the bankruptcy court "considered" facts related to the three badges of fraud it failed to analyze, citing, indiscriminately, large swaths of the PFC. A. Br. at 26 n.21. But the Trustee does not (and cannot) identify any place where the bankruptcy court specifically *analyzed* these badges, or explained how (if at all) they factored into the court's decision on the Trustee's claim for actual fraudulent conveyance. Instead, the Trustee states "[i]n any event, the presence or absence of one badge of fraud is not conclusive." *Id.* (quotation omitted). But the Trustee does not explain how this excuses the bankruptcy court's wholesale failure to analyze *three of the six* badges identified by the very case law the court cited. *See*, *e.g.*, *Gullickson v. Brown* (*In re Brown)*, 108 F.3d 1290, 1293 (10th Cir. 1997) (holding bankruptcy court clearly erred in finding debtor had intent to hinder, delay, or defraud creditors where it only pointed to two badges of fraud and failed to examine the "circumstances of the transaction"). Tellingly, the Trustee himself offers no discussion of the badges the bankruptcy court failed to consider, effectively conceding that, as set forth in Appellants' opening brief (at 25-26), all three

---

[11] The Trustee cites *Italian Colors Rest. v. Am. Express Travel Related Servs. Co. (In re Am. Express Merchants' Litig.)*, 554 F.3d 300, 316 n.11 (2d Cir. 2009), for the proposition that mixed questions of law and fact are reviewed "either de novo or under the clearly erroneous standard depending on whether the question is predominantly legal or factual." A. Br. at 20 n.16. However, that case was not an appeal from a bankruptcy court. In bankruptcy appeals, courts within this District have repeatedly held that "mixed questions of fact and law are subject to de novo review." *See*, *e.g.*, *GMAM Inv. Funds Tr. I v. Globo Comunicacoes e Participacoes S.A. (In re Globo Comunicacoes e Participacoes S.A.)*, 317 B.R. 235, 245 (S.D.N.Y. 2004); *Enter. Prods. Operation L.P. v. Enron Gas Liquids Inc. (In re Enron Corp.)*, 306 B.R. 33, 37 (S.D.N.Y. 2004), *aff'd sub nom. Enter. Prod. Operating L.P. v. Enron Gas Liquids Inc.*, 119 F. App'x 344 (2d Cir. 2005); *Babitt v. Vebeliunas* (*In re Vebeliunas)*, 332 F.3d 85, 90 (2d Cir. 2003); *Combined Res. Interiors, Inc. v. Frankl (In re Frankl)*, 2020 WL 4530317, at *2 (S.D.N.Y. Aug. 6, 2020).

badges weigh *against* a finding of fraudulent intent.

The Trustee's discussion of the badges of fraud the bankruptcy court did discuss misstates the facts and largely relies on extraneous arguments having nothing to do with each badge.

          1.     *"the family, friendship or close associate relationship between the parties"*

The Trustee's assertion that "at no point were assets transferred to any company not owned by Tilton" (A. Br. at 26) is overly simplistic. The Subject Collateral was transferred from TransCare to PPAS, which acted as administrative agent for *all* the Term Loan Lenders. As discussed, Tilton intended that equity in Transcendence be allocated to each of the Term Loan Lenders—she did not intend that the transfer would be only to her. O. Br. at 13, 27. It was not the case that Tilton simply "could have, in the future, issued a minority stake in Transcendence to others" (A. Br. at 26); it was clearly her intention to do so.[12]

          2.     *"a questionable transfer not in the usual course of business"*

Although the Trustee argues it is "misleading" to say that any foreclosure is, by definition, outside of the usual course of business (A. Br. at 26), what he claims is out of the ordinary about *this* foreclosure is, once again, that Tilton was on both sides of it. Thus, once again, the Trustee improperly conflates his actual fraudulent conveyance claim with his separate claim for breach of fiduciary duty. The Trustee describes the challenged transaction as "TransCare's voluntary agreement to concede to PPAS's midnight foreclosure demand . . . ." A. Br. at 26. But a voluntary (*i.e.*, strict) foreclosure is a recognized option under Article 9 of the UCC, and thus is hardly extraordinary. Similarly, notwithstanding the Trustee's colorful portrayal of a "midnight" scheme,

---

[12] Whether Tilton gave advance notice of the Restructuring Plan to Credit Suisse and First Dominion has nothing to do with this badge and, as discussed below and in Appellants' opening brief, is not indicative of fraudulent intent. *See* O. Br. at 32; *infra* at 13 n.16.

the undisputed evidence shows that the foreclosure had been planned for over two weeks, with people working around the clock, and with the active participation of multiple third parties.  *See* O. Br. at 12-15, 30-31; *see also infra* at 12-13.  Simply put, there was no skullduggery.

3.    "*the lack or inadequacy of consideration*"

As discussed in Appellants' opening brief (at 28, 34-38), the bankruptcy court erred in finding that the property transferred was a going concern.  There is no dispute that the liquidation value of the Subject Collateral was $2 million, considerably less than the $10 million PPAS credited to TransCare as consideration for these assets.  *Id.* at 18, 28.[13]  The Trustee's flawed arguments for going concern value are addressed below (at 13-16).

4.    "*the retention of possession, benefit or use of the property in question*"

The Trustee merely echoes the PFC in arguing that Tilton "retained control over the Subject Collateral" (A. Br. at 27), ignoring Appellants' point that "had the Restructuring Plan worked, the possession, benefit and use of this property would also have been enjoyed by the Term Loan Lenders through their minority stake in the new business."  O. Br. at 28.  Here again, the Trustee makes the argument that "the point of the Transcendence transaction was to escape paying TransCare's existing creditors."  A. Br. at 27.  But this confuses the mechanics of the transaction with its purpose, which was to salvage business lines that otherwise could not be sustained—due

---

[13] The Trustee contends that the price "was arbitrarily selected" (A. Br. at 23) and there is no draft calculation in the record (*id.* at 16).  This is false.  Tilton testified without contradiction as to the in-depth analysis she undertook to calculate the price and there are, in fact, detailed spreadsheets showing how it was calculated.  *See* A4176-84; A3800-32; A3795; A4055; A2190-215 at 99:18-125:15.  That Tilton "selected [the price] herself" (A. Br. at 16) is irrelevant to the fraudulent conveyance claim, given that the price was more than adequate.  *See* O. Br. at 27 n.12.  For the same reason, the Trustee's assertion that there were errors in the calculation of the price (A. Br. at 15-17, 25) is also irrelevant.  In any event, this assertion is also incorrect for the reasons explained in *Defendant Lynn Tilton's Objections to the Bankruptcy Court's Post-Trial Findings of Fact and Conclusions of Law*, Case No. 20-cv-06523-LAK, Dkt. No. 3 ("Tilton Objections"), at 68-76.

to TransCare's crushing debt and lack of working capital—and thereby provide creditors a chance at a recovery and employment they otherwise would not have. *See supra* at 4-7.[14]

     5.     "*the secrecy, haste, or unusualness of the transaction*"

Although the Trustee quibbles over the role of the various parties who were aware of and involved in the planning of the Restructuring Plan and foreclosure and the extent of their involvement (A. Br. at 27-28), he does not and cannot dispute that at least the following knew about Restructuring Plan (including the foreclosure) as it was being developed: (i) Wells Fargo, (ii) Wells Fargo's outside counsel, (iii) CMAG, (iv) several TransCare executives, and (v) TransCare's outside counsel. *See* O. Br. at 14-15, 30-32.[15] And, as the Trustee notes, Tilton and her agents contacted "several insurance brokers" to procure insurance for Transcendence (A. Br. at 13), thereby also announcing the Restructuring Plan to these insurers before the foreclosure happened. This is the opposite of secrecy. That there were some parties Tilton did not "forewarn[]" (A. Br. at 28) does not mean she acted in secrecy, and the Trustee does not identify

---

[14] The Trustee asserts that "Appellants cite no evidence for their contention that TransCare's unsecured creditors had no hope of being able to reach the Subject Collateral." A. Br. at 27 n.23. This is wrong. The unsecured creditors' claims were subordinate to TransCare's outstanding secured debt to the Term Loan Lenders of approximately $45 million, as well as Wells Fargo's secured debt of approximately $14 million. *See* O. Br. at 30. Therefore, the value of the Subject Collateral would not have been enough to clear the secured debt unless it was worth more than $59 million. No one contends it was. The Trustee also points to his supposed recovery of $17 million in liquidation sales of all of TransCare's assets. A. Br. at 27 n.23. This assertion is not supported by any citation to record evidence and, even if it were accurate, $17 million would also not have been enough to clear the secured debt of $59 million.

[15] The Trustee's contention that CMAG and TransCare's executives worked for Tilton (A. Br. at 27) is irrelevant to whether they were involved in planning the transaction and thus whether it was conducted in secrecy. It was not. The contention that Wells Fargo "did not consent to the strict foreclosure" (*id.*) is also misleading. Tilton first discussed the Restructuring Plan with Wells Fargo on February 9, and then continued to engage in daily communications with Wells Fargo personnel about the plan, including the foreclosure. *See* O. Br. at 12-14. TransCare and Wells Fargo's respective counsel also communicated with each other throughout this period. *Id.* At no point did Wells Fargo object to the Restructuring Plan and foreclosure, either before or after it took place. A1898 at 154:2–6; A1899-900 at 155:23–156:1. The Trustee does not really dispute any of this.

*any* party Tilton was required to, but did not, inform of the Restructuring Plan.[16]

## II.     The Bankruptcy Court Erred in Awarding $39.2 Million in Damages

### A.     TransCare Did Not Transfer a Going Concern

In finding that TransCare transferred a going concern worth over $40 million, the bankruptcy court misapplied and ignored undisputed facts about TransCare's deep financial distress, and failed to cite or analyze any case law addressing when a failing business is no longer a going concern. *See* O. Br. at 34-38. The bankruptcy court's damages award was thus the result of both clear factual errors and a failure to correctly apply the facts to the applicable legal standards. *See In re Hygrade Envelope Corp.*, 366 F.2d 584, 588 (2d Cir. 1966) (where "the issue is [a trial judge's] application of a legal standard to [the] facts . . . reversal is not limited to results that are 'clearly erroneous'; it is enough that the appellate court should be convinced, as we are here, that the result does not jibe with the applicable rule of law").

The Trustee argues the bankruptcy court did not err in finding TransCare transferred a going concern because the business lines that owned the assets at issue were "operating" on the day of the transfer. A. Br. at 28. However, courts have routinely held that a company is no longer a going concern when it is under extreme financial distress, even if it has not yet shut its doors. *See*, *e.g.*, *Gillman v. Sci. Res. Prods. (In re Mama D'Angelo, Inc.)*, 55 F.3d 552, 555–56 (10th Cir. 1995) (emphasis added) ("Liquidation value is appropriate 'if at the time in question the business is *so close to shutting its doors* that a going concern standard is unrealistic.'"); *Heilig-Meyers Co.*

---

[16] The Trustee repeatedly argues Tilton did not tell Credit Suisse and First Dominion about the foreclosure ahead of time. *See* A. Br. at 4, 12, 14, 28. But contractually PPAS was not required to do so, and there is no evidence that either party disputed or objected to the foreclosure after it took place. *See* O. Br. at 8, 32. In any event, even if such a post-petition dispute had arisen, the bankruptcy court made clear at trial that it would be beside the point, since it would be a private contractual dispute having nothing to do with the TransCare estate. A1651-52 at 145:24-146:18.

*v. Wachovia Bank, N.A. (In re Heilig-Meyers Co.)*, 319 B.R. 447, 457 (Bankr. E.D. Va. 2004) (emphasis added) (a "deathbed" company is "one where the debtor is 'in a precarious financial condition' so that 'liquidation was imminent when the petition was filed,' and *the debtor 'could continue in business postpetition for only a brief period'"*), *aff'd*, 328 B.R. 471 (E.D. Va. 2005). Every one of TransCare's business lines (including those Transcendence hoped to operate) ceased operations by February 26. A1900-01 at 156:9–157:8. This belies any notion that any of them were a going concern just two days prior. *See also* O. Br. at 34-37.

In fact, as discussed in Appellants' opening brief (at 34-37), at the time of the transfer— which is the relevant point for measuring the value of transferred property for purposes of 11 U.S.C. § 550 (*see* A2806-07 (PFC at 76-77); *Gill v. Maddalena (In re Maddalena)*, 176 B.R. 551, 558 (Bankr. C.D. Cal. 1995))—TransCare met *all* the case law's indicia of no longer being a going concern. The Trustee's attempt to distinguish Appellants' cited cases by arguing that none "dealt with the transfer of an operating company projected to earn a profit" (A. Br. at 31 n.24) misses the mark. There is no evidence that these business lines, *as part of TransCare*, were projected to earn a profit. And the projections for *Transcendence* upon which the Trustee's expert relied required millions in new money working capital and other resources, none of which was available to TransCare by the date of the foreclosure. A2104 at 13:1–22; A2216-17 at 125:23–126:7; O. Br. 12, 15-16. Indeed, the bankruptcy court explicitly found that, by early 2016, TransCare was in no position to borrow money. A2710 (PFC at 90).

The Trustee's discussion of *In re Maddalena* (*see* A. Br. at 28-30) misconstrues that decision and misrepresents the record in this case. The Trustee argues that *Maddalena* supports valuing the Subject Collateral as a going concern based not on "how much value the asset eventually would have generated had the estate retained it," but rather on "its fair market value to

14

an arms-length purchaser." *Id.* at 29.  Thus, according to the Trustee, the Court should assume

that if the transfer had never occurred, TransCare would have sold the Subject Collateral to an

arms-length purchaser, and would have received going concern value from that hypothetical sale.

However, the *Maddalena* court explicitly *rejected* the notion that value for purposes of § 550(a)

can be based on speculation about what the debtor *might* have done with the property in question.

*See* 176 B.R. at 557 ("Plaintiff argues that had the note not been transferred, the trustee in Debtor's

bankruptcy case would have been entitled to collect all payment made by Markulis for the benefit

of the Estate.  That the trustee would have done so, however, is speculation.").

Here, there is also no evidence that, at the time of the transfer, TransCare could have sold

the Subject Collateral as a going concern.  In fact, Dr. Arnold acknowledged any sale would not

happen overnight; at minimum, there would need to be a diligence period.  A1820 at 76:10–12.

No such process had begun either by the time the Restructuring Plan was conceived in early

February 2016, or by the date of the foreclosure on February 24.  And, by the time of the

foreclosure, TransCare did not have the funds to continue operating at all, much less for long

enough to accommodate a sale process.  Thus, the Trustee is simply wrong in arguing there was

no "practical inability" to sell TransCare's assets at the time of the foreclosure (A. Br. at 30).[17]

Importantly, Arnold's damages calculation, which the bankruptcy court adopted, *assumed*

that by the time of the foreclosure, a sale *had already occurred*: "[W]hat I'm producing is a range

of numbers that I think are reasonable for TransCare to possibly have obtained ***if the [sale]***

***transaction went off on that day [the date of the projections].  It doesn't mean that they started***

---

[17] The Trustee's contention that there were expressions of interest to acquire some of TransCare's
assets in 2015 (*see* A. Br. at 9, 18, 28, 30) is irrelevant to whether the Subject Collateral could
have been sold as a going concern *at the time of the foreclosure*.  In any event, these supposed
expressions of interest do not support the bankruptcy court's valuation of the Subject Collateral at
over $40 million, as explained in the Tilton Objections at 97.

*the process on that day.  I'm saying that if they ended the process on that day that would be a reasonable range of values.*"  *See* A1821-22 at 77:24-78:12 (emphases added).   Since this assumption was false as of February 24, Arnold's calculation bore no relationship to the condition TransCare would have been in if the transfer had never occurred.[18]

### B.    Dr. Arnold's Calculation of "Value" Deserved No Weight

As discussed in Appellants' opening brief (at 38-40), as a matter of law an expert cannot rely on projections without independently determining they are valid and reasonable.  *The Trustee cites no case to the contrary*.  Instead, he argues that *the bankruptcy court* (rather than Dr. Arnold himself) made findings regarding the projections Arnold relied on in his calculation of damages. A. Br. at 33.  But this does not change the fact that *Arnold* did not independently assess the reliability of the projections, assess the reasonableness of their underlying assumptions, or make adjustments for the substantial risk that they would not be realized. O. Br. at 39.[19]  This renders his calculations impermissibly speculative and legally meaningless.  *See id.* at 39-40.

The Trustee does not attempt to distinguish Appellants' cases on the facts.  Instead, he asserts—without legal support—that *in limine* decisions are not "applicable to this appeal." A. Br. at 32 n.26.  That is not so: if expert testimony should have been precluded altogether, it cannot be

---

[18] The Trustee's reliance on *Jimmy Swaggart Ministries v. Hayes (In re Hannover Corp.)*, 310 F.3d 796 (5th Cir. 2002) (A. Br. at 30), is misplaced.  *Swaggart* involved a Section 548(c) defense to a fraudulent conveyance claim.  The plaintiff (not the defendant) argued that the consideration given by the transferee (purchase options) for the transferred property (cash paid over time pursuant to an option contract) had no value.  In rejecting that argument, the court found, among other things, that the options had potential value at the time the option contract was made.  310 F.3d at 802.  That has nothing to do with this case, where the issue is what the value of the assets was at the time they were transferred, not whether they ever had any value at all.  Similarly, the assets at issue did not, as the Trustee contends, "*subsequently* end[] up worth no more than liquidation value . . . ." A. Br. at 30 (emphasis in original).  Rather, they had only liquidation value *at the time they were transferred* because there was no money available to operate them.

[19] The Trustee argues the projections Arnold used were "management projections." A. Br. at 36-37.  That is incorrect, for the reasons explained in the Tilton Objection at 88-89.

credited by the finder of fact.  There is nothing unusual about an appellate court reviewing *Daubert*

case law to aid in its analysis of whether a lower court erred in crediting an expert's testimony.

*See*, *e.g.*, *Oney v. Weinberg (In re Weinberg),* 410 B.R. 19, 32 (B.A.P. 9th Cir. 2009) (citing *Kumho*

*Tire Co. v. Carmichael*, 526 U.S. 137 (1999)—a leading *Daubert* decision—to explain "[a] trial

court has very broad discretion whether to discredit [admitted] expert opinion if it is not reliable

or does not aid the fact finder in its task"), *aff'd*, 407 F. App'x 176 (9th Cir. 2010).[20]

## <u>CONCLUSION</u>

For the foregoing reasons and those set forth in Appellants' opening brief, this Court should

reverse the Judgment of liability against Appellants for actual fraudulent transfer.  Alternatively,

if the Court affirms on liability, it should reverse the bankruptcy court's award of damages and its

order that PPAS's claims be disallowed under 11 U.S.C. § 502(d).

Dated: November 16, 2020
   New York, New York

PROSKAUER ROSE LLP

By:  */s/ Michael T. Mervis*
Michael T. Mervis
Timothy Q. Karcher
Q. Jennifer Yang
Eleven Times Square
New York, NY  10036–8299
Tel.: (212) 969–3000
Fax: (212) 969–2900
Email: mmervis@proskauer.com
   tkarcher@proskauer.com
   jyang@proskauer.com

*Attorneys for Appellants*

---

[20] The Trustee also falsely claims that Appellants "dropped any challenge" to Arnold at trial.  A. Br. at 32.  The cited transcript reference (A1750-51 at 6:21-7:2) merely indicates that Appellants opted not to contest Arnold's *qualifications* through voir dire.  This is a far cry from waiving the right to challenge the admissibility or weight of *his testimony about his opinions*, which Appellants in fact moved to exclude (*see*, *e.g.*, A0809-27; A0828- A1159).