UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
In re

TRANSCARE CORPORATION, et al.,

Debtors.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
SALVATORE LAMONICA, as Chapter 7 Trustee of the
Jointly-Administered Estates of TransCare Corporation, et al.,

Plaintiff-Appellee,


-against-                                           20-cv-06274 (LAK)
                                                    20-cv-06523 (LAK)
                                           (Bankr. Case No. 16-10407 (SMB))
                                            (Adv. Proc. No. 18-1021 (SMB))
LYNN TILTON, PATRIARCH PARTNERS AGENCY
SERVICES, LLC, PATRIARCH PARTNERS, LLC,
PATRIARCH PARTNERS MANAGEMENT GROUP, LLC,
ARK II CLO 2001-1 LIMITED, TRANSCENDENCE
TRANSIT, INC., and TRANSCENDENCE TRANSIT II, INC.,

Defendants-Appellants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


## MEMORANDUM OPINION


Appearances:


> Bijan Amini
> Avery Samet
> AMINI LLC
> *Attorneys for Plaintiff-Appellee*


> Michael T. Mervis
> Timothy Q. Karcher
> Q. Jennifer Yang
> PROSKAUER ROSE LLP
> Attorneys for Defendant Lynn Tilton

2

and Defendants-Appellants Patriarch Partners
Agency Services, LLC, Transcendence Transit, Inc.,
and Transcendence Transit II, Inc.

LEWIS A. KAPLAN, *District Judge.*

Before the Court is an adversary proceeding in the bankruptcy of TransCare Corp.

("TransCare"), which resulted in a bench trial on various "core" and "non-core" bankruptcy claims.

At the outset, it is helpful to note that bankruptcy courts generally may hear and finally adjudicate

all "core proceedings" arising under Title 11 of the Bankruptcy Code – such as fraudulent

conveyance claims – subject to appellate review by the district court.[1] If a proceeding is "non-core"

– but is otherwise related to a case under Title 11 – and the parties have not consented to final

adjudication by the bankruptcy court, the bankruptcy court may hear the case but must only "propose

findings of fact and conclusions of law."[2]

Upon objection, a bankruptcy court's proposed findings of fact and conclusions of

law are reviewed by the district court *de novo* before it enters final judgment.[3] A bankruptcy court's

final adjudication of core claims is reviewed under traditional appellate standards: findings of fact

are reviewed for clear error, and conclusions of law are reviewed *de novo.*[4]

In this case, the bankruptcy court issued Post-Trial Findings of Fact and Conclusions

---

[1]      28 U.S.C. § 157; *Exec. Benefits Ins. Agency v. Arkison*, 573 U.S. 25, 33-34 (2014).

[2]      *Exec. Benefits Ins. Agency*, 573 U.S. at 33-34.

[3]      *Id.*; *see also* Bankr. R. 9033.

[4]      *In re Bonnanzio*, 91 F.3d 296, 300 (2d Cir. 1996).

3

of Law (the "PFC")[5] at the culmination of the trial. The PFC adjudicated core claims against

defendants-appellants Patriarch Partners Agency Services, LLC ("PPAS"), Transcendence Transit,

Inc., and Transcendence Transit II, Inc. (together with Transcendence Transit, Inc., "Transcendence")

and proposed findings and conclusions as to a non-core claim against defendant Lynn Tilton. PPAS

and Transcendence appeal the final judgment entered on the core claims. Tilton objects to the

proposed findings and conclusions on the non-core claim.[6]

At issue on both the objection and the appeal is a single transaction executed by

Tilton, the sole director of TransCare, while the company was on the brink of bankruptcy.

Specifically, Tilton caused PPAS (which she controlled) to foreclose on certain of TransCare's assets

related to its most profitable business lines (the "Subject Collateral"). PPAS then sold the Subject

Collateral to Transcendence (which Tilton also controlled) for $10 million. What was left of

TransCare filed for Chapter 7 bankruptcy.

The bankruptcy court concluded that the foreclosure on the Subject Collateral was

an actual fraudulent conveyance and entered judgment for $39.2 million in damages against PPAS

and Transcendence.[7] It further recommended to this Court that Tilton be held liable on the non-core

claim for breach of the fiduciary duties of loyalty and good faith and that $41.8 million in damages

be awarded against her. As the damages for the breach of fiduciary duty and the fraudulent

---

[5]

> No. 20-cv-6523, Dkt. 1 [hereinafter PFC]. Unless otherwise noted, pagination references
> are to ECF-stamped page numbers.

[6]

> Tilton's objection is No. 20-cv-6523 (LAK). PPAS and Transcendence's appeal is No.
> 20-cv-6274 (LAK).

[7]

> The bankruptcy court decided a number of additional core claims from which the parties
> have not appealed.

conveyance remedy the same injury, the bankruptcy court concluded that the trustee is entitled to only a single satisfaction.[8]

For the following reasons, the Court adopts the bankruptcy court's recommendation on liability and modifies the damages award against Tilton to $38.2 million. The Court affirms the bankruptcy court's judgment of $39.2 million against PPAS and Transcendence.

### *Facts*

The bankruptcy court issued a detailed 100-page opinion setting forth the facts established at the bench trial. The Court adopts its findings of facts except to the extent, if any, that they are inconsistent with the summary in this opinion.[9]

### I.    *TransCare's Structure*

TransCare is a Delaware corporation headquartered in Brooklyn, New York. It provided ambulance services to hospitals and municipalities principally in New York, Pennsylvania, and Maryland, as well as paratransit services to the New York Metropolitan Transit Authority ("MTA") for people with disabilities.

Tilton was the sole director of TransCare. She is also the ultimate beneficial owner of around 61 percent of its equity.[10] Credit Suisse Alternative Capital, Inc. ("Credit Suisse") owns

---

[8]      PFC at 79.

[9]      The following factual summary is derived from the PFC and the record on appeal, which was designated as part of the record for Tilton's objection. *See* 20-cv-6523, Dkt. 8.

[10]     Specifically, Ark II CLO 2001-1, Limited ("Ark II") owns 55.7 percent of TransCare's equity. Tilton owns 99 percent of Ark II, which is one of her personal investment vehicles. Tilton Obj. [No. 20-cv-6523, Dkt. 3] at 33. Ark Investment Partners II, L.P. ("AIP") owns

outright, or manages, 26 percent of TransCare's equity. The remaining 12.7 percent of TransCare is owned by various entities and individuals.

Tilton maintained ultimate control over all of TransCare's significant financial and operational decisions. Under an authority matrix that she issued, TransCare's officers were required to secure her approval before engaging in a number of actions, including negotiating the sale or disposition of any assets, finalizing an operating plan or budget, disclosing any financial information to a third party, engaging legal counsel or consultants, and entering into any financing or loan agreement.

TransCare had two lines of credit that are relevant to the Subject Collateral transaction. The first was known as the "Term Loan." It was a secured credit agreement between TransCare and lenders including (i) AIP (a Tilton personal investment vehicle),[11] (ii) Zohar CDO 2003-1, Ltd., Zohar II 2005-1, Ltd., and Zohar III, Ltd. (collectively, the "Zohar Funds"),[12] (iii) Credit Suisse, and (iv) First Dominion Funding I[13] ("First Dominion," and, together with AIP, the Zohar Funds, and Credit Suisse, the "Term Loan Lenders"). PPAS, of which Tilton was sole manager and ultimate indirect owner, acted as administrative agent on behalf of the Term Loan Lenders. Pursuant to a security agreement between it and TransCare, PPAS did not need the consent

---

5.6 percent of TransCare's stock. AIP was another of Tilton's "personal investment vehicle[s]." Appellant Br. [No. 20-cv-6274, Dkt. 11] at 30.

[11]

AIP owned 7 percent of the Term Loan's debt. *Id.* at 14.

[12]

Tilton controlled and was legal owner of the Zohar Funds – which owned over 75 percent of the Term Loan's debt – but they were funded by outside investors. *Id.* at 14-15.

[13]

Credit Suisse acted as collateral manager for First Dominion. Credit Suisse and First Dominion together owned around 18 percent of the Term Loan debt. *Id.* at 15.

of the Term Loan Lenders to foreclose on TransCare's collateral securing the loan in the event of a default.[14]

The second line of credit was known as the Wells Fargo credit facility or the "ABL." It was a syndicated asset-backed revolving credit facility extended by Wells Fargo N.A. ("Wells Fargo") to TransCare and its subsidiaries.[15]

Both the Term Loan and the ABL were secured by blanket liens on TransCare's assets. PPAS, on behalf of the Term Loan Lenders, and Wells Fargo entered into an intercreditor agreement under which PPAS received a first priority lien on TransCare's vehicles, certain other physical assets, capital stock of the subsidiaries, and intellectual property (the "Term Loan Priority Collateral"). In turn, Wells Fargo received a first priority lien on all other assets (the "ABL Priority Collateral"), including the accounts (such as accounts receivable) and general intangibles.

## II.    TransCare's Financial Distress

By the end of 2014, TransCare was experiencing financial issues that increased in severity as time went on. By mid-2015, Wells Fargo was "in an over-advanced position" on the ABL and blocked additional funding, causing TransCare to miss payroll.[16]    Although Wells Fargo ultimately agreed to unblock the ABL's reserve, it issued a notice of non-renewal in October 2015

---

[14]

Tilton Obj. at 22.

[15]

The subsidiaries were TransCare New York, Inc., TransCare Pennsylvania, Inc., TransCare Maryland, Inc., TransCare ML, Inc., TC Hudson Valley Ambulance Corp., TC Billing and Services Corp., TC Ambulance Corporation, TransCare Management Services, Inc., TCBA Ambulance, Inc., TransCare Westchester, Inc. and TransCare Harford County, Inc. Under the ABL, TC Ambulance Group, Inc. and TC Ambulance North, Inc. were guarantors.

[16]

PFC at 10.

stating that the ABL would expire and that its outstanding balance – which TransCare "was in no position to" pay back – would come due on January 31, 2016.[17]

A.    *Tilton Explores a Sale of TransCare*

By mid-December 2015, Tilton understood that Wells Fargo was not going to renew the ABL "absent a sale process."[18] She accordingly decided to sell TransCare. By that point, several ambulance companies had expressed interest in acquiring certain of TransCare's assets and business lines.  For instance, in around February 2015, National Express offered $15 to18 million to buy TransCare's paratransit contract with the MTA.  It reiterated versions of the offer in July 2015 and in December 2015.[19]  In December 2015, Michael Greenberg, a credit officer at Tilton's management company, Patriarch Partners, LLC ("Patriarch Partners"),[20] identified several "potential comparable

---

17

     *Id.*

18

     *Id.* at 14.

19

     In July 2015, National Express offered to buy TransCare's contract with the MTA for $6 to $7 million and assume up to $2 million in liabilities.  In December 2015, National Express reiterated its interest in purchasing the MTA contract and asked whether TransCare's chief executive officer was authorized to enter into discussions.

     TransCare received expressions of interests from a number of other potential buyers.  In March 2015, Richmond County Ambulance Service expressed interest in buying all or part of TransCare at up to eight times TransCare's EBITDA. Richmond County Ambulance ("RCA") reiterated this offer in July 2015, after TransCare missed payroll. In July 2015, American Medical Response expressed interest in buying TransCare's Westchester operations.

     In December 2015, TransCare received "unsolicited calls from several potential purchases in the ambulance business including Falck, AMR, RCA, and Enhanced Equity." *Id.* at 16.

20

     Greenberg worked intimately with TransCare's finances during the relevant period. Patriarch Partners, which Tilton solely managed and owned, "is a family office that

transactions" and "comparable public companies" to TransCare that were valued at approximately eight to 11 times EBITDA.[21] Nevertheless, Tilton prohibited discussions with any company interested in buying all or part of TransCare.

Tilton and Wells Fargo agreed that a sale of TransCare – which was having "immediate liquidity challenges"[22] – would have been dependent on new financing to keep the company afloat until the sale was consummated. Wells Fargo believed "it was a matter of self preservation to support TransCare through to a sale" but was clear that it was not going to provide bridge financing on its own.[23] Instead, in late December 2015, Wells Fargo proposed a long-term forbearance deal that would have extended the ABL but required Patriarch Partners to help finance an undetermined amount of "[c]ritical [e]xpenses" like insurance, rent, and payroll.[24] The proposal envisioned a sale closing by August 2016 at the earliest. In connection with these negotiations, TransCare agreed to retain Carl Marks Advisory Group LLC ("Carl Marks") as its third-party financial advisor and to prepare a budget acceptable to Wells Fargo.

In January 2016, Tilton and her staff worked primarily to (i) determine the minimum amount of capital needed to support TransCare through a sale and (ii) measure the extent of

---

supports Tilton in her ownership of, and her role as manager and director of, a number of different companies" including TransCare. Affiliates of Patriarch Partners served as the collateral manager of the Zohar Funds. Tilton Obj. at 20.

[21]  PFC at 14-15.

[22]  *Id.* at 13-14.

[23]  *Id.* at 16 (quotation marks omitted).

[24]  *Id.*

TransCare's financial distress. To this end, Greenberg created a budget that projected that TransCare would see $120 million in revenue and $6.9 million in EBITDA in 2016. To survive, however, the company would need $6.5 million in new capital, at least $2.2 million of which was needed immediately to cover insurance, payroll, and tax payments. Likewise, Carl Marks provided a "preliminary assessment" that stated that TransCare needed a substantial amount of funding to survive and that weekly cash flow was barely covering payroll.[25] According to Carl Marks, immediate payments to TransCare's insurers – all of which had issued cancellation notices – was vital.

Tilton, who "did not want to keep funding into a black hole that [could not] be filled," was concerned about continuing to finance TransCare without a restructuring plan.[26] Nevertheless, on January 15, 2016, she caused Ark II to wire over $1 million to PPAS to make insurance payments on TransCare's behalf.[27] That afternoon, Greenberg asked Wells Fargo to agree to certain conditions for the January 15 payments, which he "characterized as part of a first funding under a go forward business plan being developed, of up to $6.5MM."[28] Specifically, Greenberg requested that the $6.5 million business plan be supported by a secured credit facility with a lien junior to Wells Fargo's lien on the collateral for the ABL but senior to its lien on the collateral for

---

[25]
    *Id.* at 18.

[26]
    *Id.* (quotation marks omitted).

[27]
    Tilton advanced, via PPAS, additional sums of money to TransCare in January 2016, including for certain insurance and creditor payments.

[28]
    *Id.* at 19 (quotation marks omitted).

the Term Loan. Wells Fargo refused to agree to subordinate its lien. It, however, was prepared to agree to secured funding junior to its liens.

Meanwhile, TransCare's financial condition grew more dire. Carl Marks produced a "2016 Plan Executive Summary" on January 27, 2016, which "listed a litany of significant problems with vendors, customers, landlords, and equipment" – as well as issues with the company's accounting systems and financial reporting – and "projected the need for" Patriarch Partners immediately to "pledge" in excess of $7.5 million to TransCare, $3.5 million of which was needed over the next two weeks.[29] The executive summary included also a series of action items that TransCare could take to effect a turnaround. If the action items were implemented, Carl Marks projected a 2016 operating revenue of over $100 million and EBITDA of $4.97 million.

By February 3, 2016, TransCare still had no agreement with Wells Fargo for a new secured financing facility and was in default on the Term Loan. Credit Suisse, the largest non-affiliated Term Loan Lender, expressed interest in "see[ing] a plan that shows they [would be] better off by agreeing to subordinate their position to [a] new facility."[30] Greenberg accordingly sent Credit Suisse a "[s]ummary of [t]erms" for a $6.5 million facility that would be junior in priority to Wells Fargo but senior to the Term Loan Lenders on both the ABL and Term Loan Priority Collateral.[31]

---

29    *Id.* Carl Marks's executive summary also recommended against bankruptcy, which it believed would "provide no immediate financial benefit and jeopardize the customer base." *Id.*

30    A3904.

31    PFC at 20.

Greenberg never sent Credit Suisse "a formal plan" because Tilton never directed him to do so.[32]

B.     *The OldCo/NewCo Restructuring Plan*

By February 5, 2016, Tilton determined – based on TransCare's "rapidly deteriorating condition" and the unavailability of immediate financing – that a sale of the company *as a whole* was not feasible.[33]  At that point, TransCare "was deep in the red" and dependent on Wells Fargo for day-to-day funding.[34]  The bankruptcy court determined that Tilton's decision not to sell the whole company was made in good faith, as she "was under no obligation to fund TransCare personally."[35]  Neither party challenges this conclusion.

Tilton, "dissatisfied with the work of Carl Marks," subsequently devised a restructuring plan under which a few of TransCare's business lines would continue under a new company.[36]  With the help of her staff and TransCare's divisional chiefs, Tilton prepared to split TransCare into two: "OldCo" and "NewCo." To effect the restructuring, PPAS, acting on behalf of the Term Loan Lenders, would foreclose on most of the Term Loan Priority Collateral and transfer

---

[32]     *Id.*

[33]     *Id.* at 43.

[34]     Tilton Obj. at 34-35.

[35]     PFC at 43.

[36]     *Id.* at 21.

it to NewCo. NewCo, which would become Transcendence,[37] would continue to operate select divisions of TransCare as a going concern, ultimately including its paratransit (including the MTA contract), Pennsylvania, and Hudson Valley divisions.[38] The balance of TransCare ("OldCo") would wind down outside of bankruptcy for a period of 60-90 days, at which point OldCo would file for bankruptcy and collect the accounts receivable on which Wells Fargo had the first lien.[39] On February 9, 2016, Tilton described this plan, which she believed could "create[] a future for the company," to Wells Fargo.[40]

On or about February 10, 2016, Tilton caused Ark II to extend a $6.5 million credit facility – secured by a blanket lien on TransCare's assets – to TransCare. Although Greenberg had not received Credit Suisse's consent to subordinate its lien in connection with the Term Loan, Tilton signed an intercreditor agreement on behalf of PPAS, as agent for the Term Loan Lenders and Ark II, that granted Ark II structural and payment priority over the Term Loan Lenders, including Credit Suisse. Despite that she already had subordinated Credit Suisse's Term Loan position, Tilton "crafted" an email that Greenberg sent to Credit Suisse warning that TransCare was going to be forced to file for bankruptcy because Credit Suisse would not agree to subordinate its Term Loan

---

[37]

As noted, Transcendence was comprised of two corporate entities, Transcendence Transit, Inc. and its direct subsidiary, Transcendence Transit II, Inc. Tilton is the sole director of both Transcendence entities.

[38]

A3800.

[39]

On February 10, 2016, Brian Stephen, senior director of legal at Patriarch Partners, engaged the law firm Curtis, Mallet-Provost, Colt & Mosle LLP ("Curtis Mallet") to advise TransCare on an out-of-court restructuring or in-court bankruptcy proceeding.

[40]

A2169.

position.[41]  Credit Suisse asked for details about TransCare's financial problems, but Greenberg never responded.  Credit Suisse indisputably was not informed about the planned foreclosure on the Subject Collateral.

Before the restructuring plan could be executed, Transcendence needed insurance. Beginning on February 10, 2016, Tilton and her staff provided insurance brokers with financial information about Transcendence for the purpose of binding a new insurance policy.  Greenberg wrote several insurance brokers stating that Transcendence was projected to have $48 million in revenue and $3.76 million in EBITDA during the calendar year 2016.  On February 11, 2016, Tilton wrote to an insurance broker explaining that

> "there is a smaller, less risky transit business that we would like to continue in a new company. This would include our NY Transit business and our suburban ambulance businesses in Hudson Valley, Pittsburgh Pennsylvania and Maryland. It would allow us to maintain a profitable, lower risk transit company that would still employ over 1000 of our workers."

> "The models show that this business in 2016 would be approximately $67mm with $4mm of EBITDA and would grow with the additional transit business under the contract to $79mm and $7mm of EBITDA in 2017. It is because this new business makes sense that I would be providing all the new working capital for this business myself, personally."[42]

On February 13, 2016, Tilton received a "Transcendence Go Forward Model" prepared by Greenberg and others.[43]  It contemplated that Transcendence would operate six divisions of TransCare, including paratransit, Pennsylvania, Hudson Valley, Maryland, Westchester, and

---

[41]
      PFC at 24 (quotation marks omitted).

[42]
      *Id.* at 25-26 (alteration omitted).

[43]
      A4176-77.

Bronx 911/Montefiore 911 "on a go forward basis."[44] It projected that Transcendence would achieve consolidated 2016 operating revenues of $65 million and EBITDA of $5.1 million. Transcendence would have an "incremental funding need" of $8 million while the accounts receivable were paid down, "which [could] be offset if a new ABL line is secured or by cash that builds through the year."[45] The cash flow statement projected only $120,000 in capital expenditures for Transcendence in 2016.[46]

Tilton executed the NewCo restructuring plan on February 24, 2016, after Transcendence obtained insurance. The plan included a number of phases, each of which occurred in tandem on February 24. First, Tilton authorized foreclosure on the Subject Collateral shortly after midnight on February 24. The Subject Collateral consisted of all of TransCare's personal property (including computer servers and related data), three contracts (the MTA contract,[47] an equipment lease for ventilators, and an emsCharts Service Agreement), and the stock of TransCare Pennsylvania, Inc., TC Hudson Valley Ambulance, Inc. and TC Ambulance Corp. Although Tilton

---

[44]  A4176.

[45]  *Id.*

[46]  Notably, on February 17, Wells Fargo – after repeatedly requesting that Tilton send it models for the restructuring plan – told Tilton it was going to cease funding. A3388-97. Tilton accordingly sent her team home and anticipated an immediate shutdown of operations. Later, Wells Fargo informed Tilton that it "had changed its mind and wanted to work together to try to do a more graceful wind-down, as we had been previously discussing." Tilton Obj. at 39-40 (alterations and quotation marks omitted).

[47]  As of February 2015, the MTA contract was TransCare's "most valuable asset."A3168. It brought in $4 million in EBITDA with "very little capital demand," since MTA supplied the "fleet" of vehicles. *Id.* As of January 2016, the MTA contract accounted for 26 percent of TransCare's revenue. A3275.

and her team discussed the OldCo/NewCo restructuring with Wells Fargo over the weeks leading up to it, there was no evidence that Tilton consulted or informed Wells Fargo before foreclosing on the Subject Collateral.[48] Tilton caused PPAS to accept the Subject Collateral on behalf of the Term Loan Lenders in satisfaction of $10 million of debt under the Term Loan.[49]

That morning, PPAS sold the Subject Collateral to Transcendence. As consideration, Transcendence agreed to pay PPAS $10 million. Another of Tilton's investment vehicles, Ark Angels III, was going to finance the purchase and provide a $10 million revolving loan to Transcendence. But "[i]t does not appear that any portion of the $10 million purchase price was actually paid to PPAS or the Term Loan Lenders,"[50] and Ark Angels III never provided the short-term revolving loan. Although Transcendence never issued any equity, Tilton testified that it was her intent that Ark II would own 55 percent of Transcendence's equity – the same amount it owned in TransCare – and the Term Loan Lenders would own the remaining 45 percent. Finally, TransCare and its remaining subsidiaries filed voluntary Chapter 7 petitions (together, the "Initial Debtors") in the bankruptcy court.[51]

---

[48] Tilton points to an email between herself and TransCare's outside counsel, Curtis Mallet, in which she asked Curtis Mallet whether Wells Fargo was "aware" of the foreclosure. Curtis Mallet responded, "Yes." *See* A4063-64. She argues that this email, sent the afternoon after the foreclosure occurred, is evidence that Wells Fargo "was fully aware of and did not dispute the Article 9 foreclosure." Tilton Obj. at 46. But this does not establish that Tilton consulted with or informed Wells Fargo of the timing of the foreclosure before she directed it.

[49] At the time, the balance of the Term Loan was about $43 million.

[50] PFC at 31.

[51] The Initial Debtors included TransCare, TransCare New York, Inc., TransCare ML, Inc., TC Ambulance Group, Inc., TransCare Management Services, Inc., TCBA Ambulance,

The $10 million price for the Subject Collateral was based on the book value (as of December 2015) of the assets that NewCo would operate – which was reflected on the "Transcendence Go Forward Model" – as well as the value of TransCare's receivables, which Tilton assumed she would purchase from Wells Fargo.[52] Before she foreclosed on the Subject Collateral, Tilton assumed that Transcendence would operate six divisions.[53] The sum of these asset values, plus the receivables, totaled $9,996,000.60, which Tilton rounded up to $10 million. But Tilton ultimately did not purchase the receivables, and Transcendence ended up with only operating three divisions (paratransit, Pennsylvania, and Hudson Valley).[54]   Without these assets – i.e., the receivables, Maryland, Westchester, and Bronx 911/Montefiore 911 divisions – the total book value of the Subject Collateral, at least according to Tilton, would have been less than $1 million. Tilton did not adjust the $10 million purchase price to reflect these changed circumstances.

Shortly before the NewCo restructuring was set in motion, Greenberg provided an updated financial model for Transcendence, which projected that it would see operating revenues

---

[52] Inc., TC Billing and Services Corporation, TransCare Westchester, Inc., TransCare Maryland, Inc., TC Ambulance North, Inc. and TransCare Harford County, Inc.

See A4176-84; see also Tilton Obj. at 46-47; PFC at 52-53.

[53] The bankruptcy court described that Transcendence would operate "five divisions in addition to the MTA contract." Id. at 52. But the "Transcendence Go Forward Model" (PX 286) lists six "business segments:" Transit, Hudson Valley, Pittsburgh, Maryland, Westchester, and Bronx 911/Montefiore 911. A4176. For ease of reference, the Court refers to these six "business segments" as divisions.

[54] TransCare lost its contracts with Bronx Lebanon, Montefiore Hospital and the University of Maryland on February 19, 2016. Tilton testified that the Bronx Lebanon and Montefiore contracts generated about $2.5 million of EBITDA and that their loss was "a big hit" to the OldCo/NewCo plan. PFC at 28 (quotation marks omitted). She ultimately decided to exclude the Maryland, Westchester, and Bronx 911/Montefiore 911 divisions from NewCo.

of over $36 million and EBITDA of $3.2 million in the remaining 10 months of 2016.  At trial, Tilton agreed that the EBITDA projection would increase to $4 million if annualized.[55]  The difference between the $3.2 million EBITDA projected on February 24 and the $3.7 EBITDA projected on February 10 resulted primarily from the fact that Transcendence ended up operating fewer divisions than anticipated.  According to Tilton, the $3.2 million EBITDA figure was her "projection of what we might be able to do that would allow me to be willing to put up $10 million of fresh capital to try to save NewCo."[56]

### III.    Post-Petition Events

In the words of the bankruptcy court, "[t]he filing of the chapter 7 ultimately spelled doom for Transcendence."[57]  On February 25, 2016, Salvatore LaMonica was appointed trustee of the Initial Debtors' cases.  For various reasons, he refused to agree to make payroll payments[58] and turn over TransCare's computer server, which were necessary for Transcendence to operate.[59]

---

[55]    A2259.

[56]    *Id.*

[57]    PFC at 32.

[58]    Among other things, forty-eight emergency ambulances that Transcendence then owned were on the road driven by former TransCare employees who were owed pay for the prior two weeks. The payroll was scheduled to have been disbursed the next day but TransCare was now in Chapter 7. Moreover, PPAS needed TransCare's computers to process the payroll and wanted the trustee to issue the checks using TransCare's payroll system but the trustee refused, fearing employer tax and other obligations and potential liabilities.

[59]    There were also issues with the assignment and transfer of the MTA contract to Transcendence, which prevented Transcendence from providing paratransit services.

Accordingly, on February 26, 2016 – after operating for about two days – Transcendence shut down. The company's predecessors – TransCare Pennsylvania, Inc., TC Hudson Valley Ambulance Corp., and TC Ambulance Corporation (together, the "Subsequent Debtors") – filed voluntary Chapter 7 bankruptcy petitions on April 25, 2016.

The cases of the Initial Debtors and the Subsequent Debtors are jointly administered, with LaMonica serving as trustee. The trustee liquidated all of TransCare's property, including the Subject Collateral, for approximately $19.2 million, $5.7 million of which was attributable to Transcendence.[60] At the time of the bankruptcy filing by the Initial Debtors, TransCare owed Wells Fargo approximately $13 million, which was paid in full through the liquidation.

In February 2018, the trustee initiated this adversary proceeding against Tilton, PPAS, Transcendence, and other Tilton-controlled entities in the bankruptcy court. After a six-day bench trial, Bankruptcy Judge Stuart M. Bernstein issued the PFC, which adjudicated several "core" bankruptcy claims, including the actual fraudulent conveyance claims against PPAS and Transcendence, and proposed findings and conclusions with respect to one "non-core" claim, the breach of fiduciary duty claim against Tilton.[61] This objection and appeal timely followed.

*Discussion*

I.   *Tilton's Objection*

Tilton objects to the bankruptcy court's proposed finding and conclusion that she

---

[60]

A1771.

[61]

Notably, the bankruptcy court dismissed several of the trustee's claims during pretrial motion practice and at the conclusion of the bench trial.

breached her fiduciary duties of loyalty and good faith under Delaware law in foreclosing on and transferring the Subject Collateral and its recommendation that damages of $41.8 million should be awarded against her. For the following reasons, the Court adopts the recommendation as to liability and modifies the damages award to $38.2 million.

> A.    *Breach of Duties of Loyalty and Good Faith*

The bankruptcy court found that "Tilton failed to sustain her burden of proving the entire fairness" of the Subject Collateral transaction and accordingly concluded that she "breached her fiduciary duties of loyalty and good faith owed to TransCare" under Delaware law.[62] The Court agrees.

Delaware law "charge[s]" "directors . . . with an unyielding fiduciary duty to protect the interests of the corporation and to act in the best interests of its shareholders."[63] Along these lines, the duty of loyalty requires directors to refrain from "preferring the[ir] adverse self-interest . . . [,] or [that] of a related person[,] to the interest of the corporation."[64] Under the duty of good faith, directors more broadly must "'take all actions required by a true faithfulness and devotion to the

---

[62]      PFC at 54. As the debtors were incorporated under Delaware law, claims for breach of fiduciary duty are governed by Delaware law under the internal affairs doctrine. *Atherton v. F.D.I.C.*, 519 U.S. 213, 224 (1997); *Hausman v. Buckley*, 299 F.2d 696, 703 (2d Cir. 1962).

[63]      *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 360 (Del. 1993), *decision modified on reargument*, 636 A.2d 956 (Del. 1994) (citations omitted) [hereinafter *Cede II*].

[64]      *In re Walt Disney Co. Derivative Litig.*, 906 A.2d 27, 66 (Del. 2006).

interests of the corporation and its shareholders.'"[65]

In light of these fiduciary duties, directors who stand on both sides of a transaction with a company are required under Delaware law "to demonstrate their utmost good faith and the most scrupulous inherent fairness of the bargain."[66] Such directors accordingly have "the burden of establishing [the transaction's] entire fairness, sufficient to pass the test of careful scrutiny by the courts."[67] "The 'burden of proving entire fairness is often a daunting task,' involving 'a standard so exacting that it ordinarily, but not invariably, results in a finding of liability.'"[68] Indeed, "'[n]ot even an honest belief that the transaction was entirely fair will be sufficient to establish entire fairness. Rather, the transaction itself must be objectively fair, independent of the [director's] beliefs.'"[69] Tilton disputes neither that the foreclosure and transfer of the Subject Collateral was a self-dealing transaction nor that Delaware's entire fairness standard applies to it.[70]

---

[65]

    *Id.* at 67 (quoting *In re Walt Disney Co. Derivative Litig.*, 907 A.2d 693, 755 (Del. Ch. 2005), *aff'd*, 906 A.2d 27 (Del. 2006)).

[66]

    *Weinberger v. UOP, Inc.*, 457 A.2d 701, 710 (Del. 1983) (citing *Gottlieb v. Heyden Chemical Corp.*, Del.Supr., 91 A.2d 57, 57-58 (Del. 1952)).

[67]

    *Id.*; *see also Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1156, 1163 (Del. 1995) ("the entire fairness standard requires the board of directors to establish to the *court's* satisfaction that the transaction was the product of both fair dealing *and* fair price." (emphasis in original) (quotation marks omitted)).

[68]

    *Pereira v. Cogan*, 267 B.R. 500, 508 (S.D.N.Y. 2001) (quoting *Solomon v. Armstrong*, 747 A.2d 1098, 1138 n.39 (Del. Ch.1999), *aff'd*, 746 A.2d 277 (Del. 2000)), *aff'd*, 52 F. App'x 536 (2d Cir. 2002).

[69]

    *Reis v. Hazelett Strip-Casting Corp.*, 28 A.3d 442, 459 (Del. Ch. 2011) (quoting *Gesoff v. IIC Indus., Inc.*, 902 A.2d 1130, 1145 (Del. Ch. 2006)).

[70]

    Tilton Obj. at 59.

Entire fairness review "has two components: fair dealing and fair price."[71] "Fair dealing addresses the 'questions of when the transaction was timed, how it was initiated, structured, negotiated, disclosed to the directors, and how the approvals of the directors and the stockholders were obtained.'"[72] Fair price involves questions of "the economic and financial considerations of the proposed merger, including all relevant factors: assets, market value, earnings, future prospects, and any other elements that affect the intrinsic or inherent value of a company's stock."[73] These "two components . . . are not independent, but rather the fair dealing prong informs the court as to the fairness of the price obtained through that process."[74] In other words, "[t]he court does not focus on the components individually, but determines entire fairness based on all aspects of the entire transaction."[75]

### 1.    Fair Dealing

The Court agrees with the bankruptcy court that "[t]here was nothing fair about the process through which Tilton effectuated" the foreclosure and sale of the Subject Collateral to

---

[71]    *Valeant Pharms. Int'l v. Jerney*, 921 A.2d 732, 746 (Del. Ch. 2007) (citing *Weinberger*, 457 A.2d at 711).

[72]    *Id.* (quoting *Weinberger*, 457 A.2d at 711).

[73]    *Weinberger*, 457 A.2d at 711.

[74]    *Valeant Pharms. Int'l*, 921 A.2d at 746.

[75]    *Id.*

Transcendence.[76]  Tilton "stood on every side" and "controlled every aspect of the transaction."[77]

She presented no evidence of true arms-length bargaining designed to protect the interests of the

company and/or the minority shareholders.[78]  Indeed, Credit Suisse – the largest minority shareholder

– not only apparently was left in the dark throughout the process, but Tilton actively misled them

about whether and how the wind-down of OldCo was being financed.[79]   Further, there was no

review by a disinterested party, independent director, or independent financial advisor. Finally,

Tilton presented no evidence that she considered any alternative other than selling the Subject

Collateral – which she and her team hand-selected as the only part of the company worth saving –

---

[76]

PFC at 48.

[77]

*Id.* at 48-49.

[78]

*See Gesoff*, 902 A.2d at 1148 (negotiations should "be vigorous and spirited, and provide evidence that the [transacting parties] are not colluding to injure the minority stockholders").  Tilton misleadingly argues that she "and her team engaged in an open, coordinated, and arm's-length process involving Wells Fargo and its counsel (Otterbourg), TransCare's restructuring counsel (Curtis Mallet), TransCare management, and [Carl Marks]."  Tilton Obj. at 66.  For one, this ignores that Credit Suisse and the other unaffiliated shareholders apparently were left in the dark about the restructuring plan. In any event, the portions of the record that Tilton cites for the proposition that she engaged in arm's-length negotiations with Wells Fargo do not support this assertion. Although the record shows that Tilton shared wind-down budgets and models with Wells Fargo, there is no evidence that these figures were shared to negotiate a fair price for the Subject Collateral.  Moreover, it is clear from the record that Tilton independently dictated the timing of the foreclosure and transfer of the Subject Collateral.  *See, e.g.*, A4046. Indeed, directly after she singlehandedly foreclosed on the Subject Collateral, Tilton told TransCare's lawyers: "Wells cannot collect the cash going to the company and then pay down their loan at the expense of payrolls and then pin it on me . . . . I am not being backed into a corner." A4063.  *See also* A3395 (Tilton telling Wells Fargo on February 10, 2016 that "Patriarch, Carl Marks and the Company [controlled by Tilton]" alone are "try[ing] to figure out a way forward.  We are happy to have you here but I do not think we are in a position to have people meet your requests at this time.").

[79]

*See* PFC at 25.  There is no evidence Credit Suisse or any of the other shareholders were apprised of the foreclosure.

to herself.[80]  As the bankruptcy court noted, Tilton neither retained a financial advisor to seek out

third-party interest in purchasing TransCare's assets[81] nor considered the possibilities of (i) placing

the Transcendence predecessor entities into Chapter 11, (ii) negotiating DIP financing for

Transcendence with Wells Fargo, or (iii) selling Transcendence's assets "free and clear of liens[,]

claims and interests, with or without Wells Fargo's and PPAS's consent, pursuant to Bankruptcy

Code § 363, a common practice."[82] And Tilton's subjective testimony that she "honest[ly]

belie[ved]" that the foreclosure and transfer of the Subject Collateral was the only option for the

company does not suffice to show that it was objectively fair.[83]

Tilton argues that the bankruptcy court's analysis was "flawed because it failed to

account for the most important fact in the case: in February 2016, TransCare was indisputably

---

80

Tilton asserts that the she intended the Term Loan Lenders to receive an equity stake in
Transcendence.  But there is no contemporaneous evidence of this other than a draft
spreadsheet, apparently maintained internally by Patriarch Partners, that purports to show
the future breakdown of equity in Transcendence. A4055; *see also* A2207-08. In light of
the fact that Credit Suisse indisputably had no input in the restructuring plan or
Transcendence's formation, Tilton's self-serving testimony that she would have given them
a stake in it is not persuasive.

81

To be clear, despite Tilton's contradictory assertions, Carl Marks indisputably was not hired
to "find[] a buyer or investor."  Tilton Obj. at 68.  It was hired in connection with
negotiations with Wells Fargo on a forbearance deal.

82

PFC at 49. Tilton's argument that there is "no requirement under Delaware law to consider
alternative approaches that were not feasible" is misplaced.  The case she cites primarily
for this proposition, *Oberly v. Kirby*, 592 A.2d 445 (Del. 1991), merely holds that a
fiduciary's failure to review alternative deals does not necessitate a finding of unfairness
where there were other procedural protections in place to ensure the fairness of the deal,
including "'lengthy, vigorous and arm's length'" bargaining. *Id.* at 470-71.  That did not
occur here.

83

*See Reis*, 28 A.3d at 459.

'woefully insolvent' and 'on life support.'[84]  She repeatedly asserts that, because "TransCare had a one-way ticket to liquidation" and could not obtain financing to support a sale process,[85] it was an error for the bankruptcy court to conclude that TransCare could have followed any process other than the brazenly one-sided process in which Tilton engaged.  As an initial matter, the bankruptcy court *did* account for TransCare's "rapidly declining" status in its entire fairness analysis.[86]  It nevertheless correctly concluded that "while the viability of the corporation may properly factor into a board's decision to sell substantially all of a corporation's assets, the directors must still follow a fair process in doing so."[87]

Tilton's argument conflates a sale of TransCare as a whole – which no one disputes was infeasible at the time of the foreclosure – and a sale of the discrete business lines that Tilton herself selected as having future value.  While Tilton made the good faith determination that the company *as a whole* was not saleable and could not have obtained additional financing by February 2016, it does not necessarily follow that a strategic third-party would not have been willing to buy certain of its more profitable and "less risky" business lines at that time, even if such a transaction called for a condensed timeline and/or minimal due diligence.[88]  Although Tilton points to TransCare's admittedly large debt obligations under the Term Loan and the ABL – and argues that

---

84        Tilton Obj. at 60 (quoting PFC at 88).

85        *Id.* at 61.

86        PFC at 47.

87        *Id.*; *see also Pereira*, 267 B.R. at 511 (collecting cases).

88        *See* A3383.

TransCare's assets could not have been sold "without the consent of all lenders"[89] – this argument ultimately is frivolous. It ignores the fact that Tilton sold the Subject Collateral free and clear of any liens to herself *without the consent of anyone* by causing PPAS to foreclose on it and subsequently transfer it to Transcendence. If Tilton had lined up a third-party buyer for the assets – rather than her own company – she may have been able to obtain the necessary financing from the buyer or from Wells Fargo, Credit Suisse, or another lender. She has provided no evidence that such a route would not have been possible, apart from repeatedly pointing to the company's "free-fall" financial condition. And she does not dispute that she, from at least December 2015, prohibited the discussion of a potential sale of all or part of TransCare.

The Court accordingly concludes that, in the totality of the circumstances – especially given the total lack of negotiations and protections for those unaffiliated with Tilton – Tilton failed to prove she engaged in a fair process when foreclosing on and transferring the Subject Collateral.

### 2.    *Fair Price*

The bankruptcy court likewise concluded that $10 million[90] was not a fair price for the Subject Collateral. The Subject Collateral included all of TransCare's personal property ("PPE") excluding accounts receivable and Certificates of Need ("CONs"),[91] the stock of TransCare

---

[89]

  Tilton Obj. at 72.

[90]

  As mentioned, Tilton paid for the Subject Collateral by causing PPAS to foreclose on it in satisfaction of $10 million of debt under the Term Loan. PPAS then sold the Subject Collateral to Transcendence for $10 million. It does not appear, however, that Transcendence ever actually paid the $10 million purchase price.

[91]

  The CONs were issued by the New York State Department of Health and were needed to operate the ambulances.

Pennsylvania, Inc., TC Hudson Valley Ambulance, Inc. and TC Ambulance Corp, and three contracts including the MTA contract. The Court agrees that Tilton did not show that $10 million was a fair price for these assets.

As an initial matter, the bankruptcy court was correct in concluding that "[g]iven the tainted process and the complete absence of an independent analysis, review or approval, Tilton did not carry her burden of showing the price" – which purported to value the Subject Collateral at "book value" – "was fair."[92]  It is well-established that the entire fairness standard is "unitary," meaning that the transaction's process and price are evaluated holistically.[93]  Moreover, Delaware courts have held that "[t]he 'range of fairness' aspect of the fair price inquiry 'has most salience when the controller has established a process that simulates arms-length bargaining, supported by appropriate procedural protections.'"[94]  In the absence of such negotiations and protections – as is the case here – a fiduciary's self-dealing and "domination of the sales process" may very likely "taint[] the entire transaction."[95]

But the biggest issue with the $10 million purchase price is that it purported to value

---

[92]    PFC at 51.

[93]    *See, e.g.*, *Kahn v. Tremont Corp.*, 694 A.2d 422, 432 (Del. 1997) (finding that "the process is so intertwined with price that under *Weinberger*'s unitary standard a finding that the price negotiated by the Special Committee might have been fair does not save the result").

[94]    *S. Muoio & Co. LLC v. Hallmark Ent. Invs. Co.*, No. CIV.A. 4729-CC, 2011 WL 863007, at *16 (Del. Ch. Mar. 9, 2011), *judgment entered*, (Del. Ch. 2011), *and aff'd*, 35 A.3d 419 (Del. 2011); *see also Bomarko, Inc. v. Int'l Telecharge, Inc.*, 794 A.2d 1161, 1183 (Del. Ch. 1999), *as revised* (Nov. 16, 1999) [hereinafter *Bomarko I*](finding "the unfairness of the process . . . infect[ed] the fairness of the price").

[95]    *See William Penn P'ship v. Saliba*, 13 A.3d 749, 758 (Del. 2011).

the Subject Collateral at its book value, which was a significant undervaluation. "[T]he 'fair price' aspect of [the] entire fairness analysis requires the board of directors to demonstrate 'that the price offered was the highest value reasonably available under the circumstances.'"[96] Tilton did not show that book value was the highest value reasonably available for these assets, which expressly were to be operated by her – via Transcendence – "on a go forward basis."[97] "Book value tends to undervalue a business as a going concern because it does not fully account for intangible value attributable to the operations."[98] Although Tilton repeats her argument that Transcendence could have operated as a going concern only if it had time and new capital – which purportedly it did not have – that argument is not persuasive for the reasons discussed above.[99] Tilton did not show that a third-party buyer would have been unwilling to purchase the Subject Collateral and to contribute the new capital necessary to support a sale. Her outright refusal to consider the possibility of selling any of TransCare's business lines undermined any chance that the company had at a third-party sale. It also makes her arguments that Transcendence's predecessor entities could not have been sold as a going concern conclusory and circular.

Moreover, even assuming that book value was the proper method of valuing the Subject Collateral – which it was not – the bankruptcy court was correct that the $10 million

---

[96]     *Cinerama, Inc.*, 663 A.2d at 1163 (quoting *Cede II*, 634 A.2d at 361).

[97]     *See* A4176-77.

[98]     *Reis*, 28 A.3d at 476.

[99]     Tilton Obj. at 81.

purported book value calculation had "patent errors."[100] To recap, Tilton testified that she ascribed $10 million in value to the Subject Collateral based on the book value of the six divisions that she intended to continue operating as a going concern, which, as of December 2015, was $9,996,000.60 (which she rounded up to $10 million). By the time of the foreclosure and transfer, the Subject Collateral did not include the receivables or the stock of three of the divisions that were supposed to go to Transcendence. According to Tilton, even though this decreased the book value of the Subject Collateral to less than $1 million, she did not decrease the $10 million purchase price. She argues that this shows that $10 million was more than a fair calculation of the book value of these assets.

But this is not persuasive because Tilton's original $10 million calculation ignored many millions of dollars in asset value. First, the parties agree that it excluded at least $2.45 million in value because it measured only the PPE of the divisions that Transcendence was supposed to operate, whereas PPAS foreclosed on *all* of TransCare's PPE (with limited exceptions). Next, it ascribed no value at all to the CONs of TC Hudson Valley or TC Ambulance Corp. Although Transcendence did not purchase these CONs, the bankruptcy court was correct that they increased the value of the stock of TC Hudson Valley and TC Ambulance Corp. because they "allowed them to operate their ambulances."[101] The trustee liquidated the CONs for $3.2 million. Finally, the $10 million calculation attributed no value to the MTA contract, which had at least $25 million in annual revenue – and which third parties had offered to buy for at least $6 to $18 million. In light of these

---

[100]     PFC at 53.

[101]     *Id.*

deficiencies, Tilton did not meet her burden of showing that the $10 million price was an appropriate measure of book value.[102]

Accordingly, the Court adopts the bankruptcy court's finding that Tilton did not meet her burden of showing that the foreclosure on and transfer of the Subject Collateral was entirely fair. She therefore is liable for breach of the fiduciary duties of loyalty and good faith.

B.    *Damages*

The bankruptcy court concluded that the trustee was entitled to $41.8 million in damages as a result of Tilton's breach of fiduciary duty. It calculated this amount by applying an 11x multiple – the "higher intermediate figure" proffered by the trustee's damages expert[103] – to the $4 million EBITDA that Greenberg projected for Transcendence shortly before the disloyal transaction. It then made $2.2 million in deductions for buyer capital investment and the trustee's liquidation of the Subject Collateral.   For the reasons that follow, the Court largely agrees with the bankruptcy court's damages analysis but declines to use the "higher" 11x multiple.  Using the "mean multiple" of 10.1x[104] – and applying the bankruptcy court's deductions – the Court modifies the damages award to $38.2 million.

"Delaware law dictates that the scope of recovery for a breach of the duty of loyalty is not to be determined narrowly . . . . The strict imposition of penalties under Delaware law are

---

[102]
  Tilton's arguments that the value of the MTA contract and the CONs should not have been included in the $10 million – because their value could only be achieved with time and money – fail for the reasons discussed above.

[103]
  PFC at 63.

[104]
  *Id.* at 61.

designed to discourage disloyalty."[105] Consequently, "the powers of the Court of Chancery are very broad in fashioning equitable and monetary relief under the entire fairness standard as may be appropriate."[106] This "includ[es] rescissory damages,"[107] which "'are the preferred remedial measure where a transaction fails to pass the test of entire fairness.'"[108] Such damages are measured by determining what the company would have received as a result of the challenged transaction if the defendant "had not breached his fiduciary duties."[109] "The disloyal fiduciary who wrongfully takes property from the beneficiary is liable for changes in value while the wrongfully taken property is under the disloyal fiduciary's control"[110]

"Plaintiffs must prove . . . damages by a preponderance of the evidence."[111] Delaware law "does not require certainty in the award of damages where a wrong has been proven and injury established. Responsible estimates that lack m[a]thematical certainty are permissible so long as the

---

105

    *Thorpe by Castleman v. CERBCO, Inc.*, 676 A.2d 436, 445 (Del. 1996).

106

    *Int'l Telecharge, Inc. v. Bomarko, Inc.*, 766 A.2d 437, 440 (Del. 2000) [hereinafter *Bomarko II*].

107

    *Id.*

108

    *Basho Techs. Holdco B, LLC v. Georgetown Basho Invs., LLC*, 2018 WL 3326693, at *49 & n.513 (Del. Ch. July 6, 2018), quoting Donald J. Wolfe, Jr. & Michael A. Pittenger, Corporate and Commercial Practice in the Delaware Court of Chancery § 12.04[b] (2012)).

109

    *Bomarko II*, 766 A.2d at 440-41.

110

    *Basho Techs., LLC*, 2018 WL 3326693, at *50.

111

    *Beard Rsch., Inc. v. Kates*, 8 A.3d 573, 613 (Del. Ch.), *aff'd sub nom. ASDI, Inc. v. Beard Rsch., Inc.*, 11 A.3d 749 (Del. 2010).

court has a basis to make a responsible estimate of damages."[112]  Proof of damages, however, "must be 'logically and reasonably related to the harm or injury for which compensation is being awarded'"[113] and not based on "speculation or conjecture."[114]

The Court agrees with the bankruptcy court that the trustee should be awarded damages in the amount of the lost going concern value of the Subject Collateral. Tilton argues that it was error for the bankruptcy court to calculate damages in this manner because the trustee failed to show that Transcendence "would have had *any* going-concern value but for the challenged transaction."[115]  In support of this argument, she repeats that TransCare was "on the verge of liquidation" and had neither time nor new capital to continue on as a going concern.[116]  But Tilton continues to conflate the value of TransCare as a whole with the value of the discrete business lines that she transferred to Transcendence.  After an in-depth review of TransCare's deteriorating condition to determine whether there was anything worth saving, she indisputably selected the Subject Collateral as the only part of the company that had future value at the time of the disloyal

---

[112]

     *Red Sail Easter Ltd. P'rs v. Radio City Music Hall Prods., Inc.*, 1992 WL 251380, at *7 (Del. Ch. Sept. 29, 1992) (Allen, *C.*). "'[O]nce a breach of duty is established, uncertainties in awarding damages are generally resolved against the wrongdoer.'" *Basho Techs.*, 2018 WL 3326693, at *50 (quoting *Thorpe v. CERBCO, Inc.*, 1993 WL 443406, at *12 (Del. Ch. Oct. 29, 1993) (Allen, *C.*)).

[113]

     *Basho Techs.*, 2018 WL 3326693, at *50 (quoting *In re J.P. Morgan Chase & Co. S'holder Litig.*, 906 A.2d 766, 773 (Del. 2006)).

[114]

     *Acierno v. Goldstein*, No. CIV.A. 20056-NC, 2005 WL 3111993, at *6 (Del. Ch. Nov. 16, 2005) (quotation marks omitted).

[115]

     Tilton Obj. at 87 (emphasis in original).

[116]

     *Id.*

transaction. As the bankruptcy court noted, "Tilton's willingness to acquire the assets and invest $10 million of her own money through Ark Angels III is the best evidence that Transcendence had substantial value."[117]   Although Tilton argues that it is pure speculation to assume that Transcendence, which purportedly was plucked from "a rapidly sinking ship,"[118] would have had going concern value, this argument fails because determining damages for breach of fiduciary duty "unavoidably requires the court to make judgments concerning liability and other contingencies" based on its responsible estimate of what would have happened if the defendant had not acted disloyally.[119]   Accordingly, courts fashioning such damages awards may consider "all 'elements of future value . . . known or susceptible of proof as of the date of the [challenged transaction].'"[120]

---

[117]

PFC at 49.

[118]

Tilton Obj. at 10.

[119]

*Bomarko II*, 766 A.2d at 441 (stating that "[t]he Court of Chancery has greater discretion when fashioning an award of damages in an action for a breach of the duty of loyalty than it would when assessing fair value in an appraisal action," in which the court "must determining the fair value of the stockholders' shares at the time of the merger"); *see also Milbank, Tweed, Hadley & McCloy v. Boon*, 13 F.3d 537, 543 (2d Cir. 1994) ("breaches of a fiduciary relationship in any context comprise a special breed of cases that often loosen normally stringent requirements of causation and damages.").

[120]

*Bomarko II*, 766 A.2d at 441 (quoting *Weinberger*, 457 A.2d at 713); *see also Bomarko I*, 794 A.2d at 1184 ("approximat[ing]" the value of what plaintiffs' shares would have been worth at the time of the challenged transaction had defendant not breached his fiduciary duties, which "is inherently unknowable"). Tilton's attempts to distinguish *Bomarko* are unavailing. The fact that Tilton did not "interfer[] with a specific existing financing opportunity" – like the defendant in *Bomarko* – is not dispositive. *See* Tilton Obj. at 90. Moreover, contrary to Tilton's contention, her conduct may very well have prevented TransCare from realizing an opportunity to sell its most profitable and least risky business lines as a going concern – akin to the defendant's conduct in *Bomarko*. Indeed, it goes without saying that Tilton's refusal to consider selling any of TransCare's business lines precluded the company from realizing such a transaction.

To that end, the Court agrees also that it was reliable to use the damages calculation of the trustee's expert, Dr. Jonathan Arnold, to determine the lost going concern value of the Subject Collateral.  Dr. Arnold utilized the comparable company and precedent transaction methods to determine the value of Transcendence as of the date of the disloyal transaction.[121]  In so doing, Dr. Arnold relied on Greenberg's (i) February 2016 financial projections for Transcendence and (ii) December 2015 analysis of comparable companies and comparable transactions, which was made for the purpose of determining TransCare's sale value at that time.  Dr. Arnold recreated Greenberg's analyses and concluded that an EBITDA multiple of between 7.1x and 12.2x  – with an average mean multiple of 10.1x – was appropriate.

During his rebuttal testimony, Dr. Arnold addressed criticisms by Tilton's expert that he did not properly consider TransCare's declining performance in relying on Greenberg's comparable companies analysis, which purportedly included companies that were not distressed. Dr. Arnold subsequently created a larger database of 69 companies that he "filtered down" to a group of 34 that met his definition of being either smaller, distressed, low operating, or undercapitalized to check Greenberg's analysis.[122]  Dr. Arnold's rebuttal analysis "confirmed Greenberg's analysis."[123]

---

[121]

Dr. Arnold did not use a discounted cash flow approach because TransCare had no audited financials for 2014 and was not current in its monthly audited financials. "Thus, the only reliable data from which to determine the value of TransCare or its separate business lines were the models that Greenberg prepared." PFC at 60.

The comparable company method determines the implied value of a company based on the trading prices of similar public companies.  The precedent transaction method implies a company's value based on multiples paid in prior transactions.  *Id.* at 60-61.

[122]

*Id.* at 62.

[123]

*Id.*

Tilton neither offered her own analysis of damages nor suggested an alternative damages assessment, which the bankruptcy court took into account in determining that Dr. Arnold's analysis was reliable.

Tilton criticizes the bankruptcy court's reliance on Dr. Arnold's analysis on multiple grounds, none of which is availing. Tilton first asserts that Dr. Arnold's analysis was unreliable because he relied on Greenberg's projections – which themselves purportedly were unreliable – and did not offer his own opinion as to Greenberg's projections or Transcendence's value. But this argument fails because "Delaware law clearly prefers valuations based on contemporaneously prepared management projections because management ordinarily has the best first-hand knowledge of a company's operations."[124] And the trustee showed that Greenberg's projections were reasonably reliable and the best evidence of value that TransCare could have realized through an arms length sale of Transcendence. As the trustee notes, Greenberg's projections were both internally consistent and significantly tested by Tilton and three separate internal teams.[125] They were provided to insurance brokers in the ordinary course to obtain insurance. Moreover, Tilton herself relied on Greenberg's projections in deciding to lend up to $10 million of her own money to Transcendence. Her argument now that they were somehow unreliable is not persuasive.

---

[124]

Doft & Co. v. Travelocity.com Inc., No. CIV.A. 19734, 2004 WL 1152338, at *5 (Del. Ch. May 20, 2004); see also In re Nine Sys. Corp. S'holders Litig., No. CIV.A. 3940-VCN, 2014 WL 4383127, at *40 (Del. Ch. Sept. 4, 2014), aff'd sub nom. Fuchs v. Wren Holdings, LLC, 129 A.3d 882 (Del. 2015) ("The most persuasive expert valuations tend to be those derived from contemporaneous management valuations – typically, revenue or cash flow projections – because management usually has the strongest incentives to predict the company's financial future accurately and reliably."); Cede & Co. v. Technicolor, Inc., No. CIV.A. 7129, 2003 WL 23700218, at *3 (Del. Ch. Dec. 31, 2003), aff'd in part, rev'd in part on other grounds, 884 A.2d 26 (Del. 2005) [hereinafter Cede I] (stating that management "was in the best position to predict the short-term prospects of the company").

[125]

Trustee's Resp. [No. 20-cv-6523, Dkt. 7] at 37-42, 71-72.

Tilton next contends that Dr. Arnold's analysis was unreliable because the companies he analyzed were not sufficiently comparable – *i.e.*, he looked at companies that were not in "deep financial distress."[126] As an initial matter, Tilton's own expert testified that the two companies in Greenberg's comparable company analysis – upon which Dr. Arnold's main analysis was based – were "the most comparable" public companies to TransCare.[127] And, in any event, Dr. Arnold considered additional distressed companies in his rebuttal analysis, which he concluded confirmed Greenberg's analysis. Moreover, Transcendence – unlike TransCare – was not a distressed company. As was the whole point of Tilton's plan, it operated the Subject Collateral free and clear of TransCare's debt.

As the bankruptcy court noted, Tilton did not meaningfully challenge the reliability of Greenberg's or Dr. Arnold's analyses. She did not offer any substantive evidence of how Greenberg or Dr. Arnold failed to account for risks, made inappropriate assumptions, used incomplete or inaccurate financial information, or excluded comparable companies. Contrary to Tilton's assertions, this did not shift the burden to Tilton on damages. In the absence of substantive reasons to discredit the trustee's measure of damages – which he showed was reliable by a preponderance of the evidence – the bankruptcy court correctly utilized it.

There is one portion of the bankruptcy court's damages calculation that the Court believes was based inappropriately on speculation. The bankruptcy court "accept[ed] Dr. Arnold's higher intermediate figure of 11x EBITDA" because "[a] strategic buyer would not incur some of

---

[126]     Tilton Obj. at 100.

[127]     A1965.

the projected operating expenses or would incur them in a lower amount and would recalculate its projected operating expenses and EBITDA accordingly."[128]  The Court agrees with Tilton that there was no evidence in the record to support this finding.  Moreover, in light of the fact that Tilton indisputably did not profit from the disloyal transaction,[129] the Court concludes that a more reasonable multiple is the average mean multiple of 10.1x.  Using this multiple and the $4 million annualized EBITDA projected by Greenberg, the Court concludes that the damages that the debtors suffered as a result of Tilton's breach of fiduciary duty totaled to $40.1 million.

Finally, the Court agrees that this figure should be subject to the bankruptcy court's deductions.  The bankruptcy court concluded that $1 million should be deducted from the damages award in relation to "the working capital investment that a buyer might have to make in [Transcendence]."[130]  In the absence of any specific objection by Tilton – and in light of the facts that (i) Greenberg's projections showed positive net income with little to no capital investment and (ii) Tilton planned to fund Transcendence with a short-term, revolving loan – the Court concludes that this deduction is appropriate for the reasons stated by the bankruptcy court.[131]  The Court likewise applies the bankruptcy court's $1.2 million deduction to account for the value of the Subject

---

[128]
PFC at 63.

[129]
See Bomarko II, 766 A.2d at 441 (stating that damages for breach of duty of loyalty "should eliminate the possibility of profit flowing to defendants from the breach of the fiduciary relationship").

[130]
PFC at 65.

[131]
See id. at 65-67.

Collateral that the trustee realized after liquidation.[132]

\*       \*       \*

      To summarize, the Court concludes that the estate should be awarded damages for Tilton's breach of fiduciary duty in the amount of the lost going concern value of the Subject Collateral. Using the 10.1x average mean multiple and $4 million in annualized EBITDA projected by Greenberg for Transcendence, this results in $40.4 million in damages. The Court further adopts the bankruptcy court's deductions of $1 million for buyer capital investment and $1.2 million for the liquidation value of the Subject Collateral. Accordingly, the estate is entitled to $38.2 million in damages against Tilton.

## II.     PPAS and Transcendence's Appeal

      PPAS and Transcendence jointly appeal the bankruptcy court's judgment avoiding the foreclosure on the Subject Collateral as an actual fraudulent conveyance under 11 U.S.C. §

---

[132]     This figure represents the difference between the (i) "$2 million (net) . . . attributable to the sale of the physical assets" relating to the Subject Collateral and (ii) $800,000 the trustee apparently already has paid to PPAS for those proceeds. *Id.* at 67. In an exhibit to Tilton's objection titled "Bankruptcy Court Finding's [sic] v. Record Evidence," Tilton objects to reducing the $2 million by $800,000 because "PPAS turned the $800,000 in proceeds over to Ark II," which "applied [it] to its claim against the bankruptcy estates, thus reducing its indebtedness." 20-cv-6523, Dkt. 3-6 at 18. But this is neither mentioned in Tilton's objection memorandum of law nor PPAS and Transcendence's appeal of the damages award against them, which contains the same deduction. (Tilton, PPAS, and Transcendence are represented by the same counsel.) Accordingly, the Court will not increase the damages award by $800,000 at this time. If the estate already has recovered the $800,000 from Ark II, it is not entitled to double recovery from Tilton, PPAS, or Transcendence.

    Further, in the absence of an objection, the Court agrees with the bankruptcy court's conclusion that the $10 million credit PPAS gave to TransCare against the Term Loan as compensation for the foreclosure should not be deducted from Tilton's damages. Instead, "the effect of the [OldCo/NewCo] plan should be reversed and PPAS's claim should be increased by $10 million." PFC at 68.

548(a)(1)(A) and NYDCL § 276 and awarding damages of $39.2 million under 11 U.S.C. § 550(a).[133]   For the following reasons, the Court affirms the bankruptcy court's judgment in its entirety.

A.   *Actual Fraudulent Conveyance*

PPAS and Transcendence argue that the bankruptcy court erred in concluding that the foreclosure on the Subject Collateral was an actual fraudulent conveyance because the trustee did not prove that TransCare acted with the actual intent to hinder, delay, or defraud its creditors in transferring the Subject Collateral to PPAS.  The Court disagrees.

"The question of whether [a] [d]ebtor acted with intent to hinder or defraud his creditors is a question of fact" reviewed for clear error.[134]  "'A finding is 'clearly erroneous' when

---

[133]
The bankruptcy court also concluded that the lien granted to Ark II should be avoided as constructively fraudulent and preferential.   Although Ark II joined in PPAS and Transcendence's notice of appeal, it has "opted not to pursue its appeal further." Appellant Br. at 13 n.3.

[134]
*In re Smith*, 321 F. App'x 32 (2d Cir. 2009) (citing *In re Bonnanzio*, 91 F.3d 296, 301 (2d Cir. 1996)).  PPAS and Transcendence argue that this alleged error should be reviewed *de novo* because the bankruptcy court "failed to assess the record *as a whole* and correctly apply the legal standard to the record." Appellant Reply [No. 20-cv-6274, Dkt. 13] at 6 (emphasis in original).  As an initial matter, the Court rejects their argument that the bankruptcy court "conflated the Trustee's claim for actual fraudulent transfer with his separate claim for breach of the duty of loyalty." *See* Appellant Br. at 40.  The bankruptcy court clearly applied the legal standard for actual fraudulent conveyance. The closest PPAS and Transcendence come to challenging this application is their assertion that the bankruptcy court failed to consider all of the "badges of fraud" that courts may look to to determine whether fraudulent intent can be inferred circumstantially.  But the "badges of fraud are not a prerequisite to a finding of actual fraudulent intent." *In re Actrade Fin. Techs. Ltd.*, 337 B.R. 791, 809 (Bankr. S.D.N.Y. 2005).  They are merely guideposts to assist courts in drawing factual inferences.  And "[b]oth the resolution of conflicting testimony and the drawing of factual inferences from circumstantial evidence are protected by the 'unless clearly erroneous' rule." *In re Hygrade Envelope Corp.*, 366 F.2d 584, 588 (2d Cir. 1966).  Likewise, PPAS and Transcendence's claim that the bankruptcy court

although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'"[135]

Under both the Bankruptcy Code, 11 U.S.C. § 548(a)(1)(A), and the New York Debtor and Creditor Law, NYDCL § 276, "a bankruptcy trustee [may] recover fraudulent transfers . . . made with 'actual intent to hinder, delay, or defraud' creditors."[136]   "The ancient phrase 'to hinder, delay, or defraud,' has always been in the disjunctive, and an intent to hinder or delay is adequate even if it be not an intent to defraud."[137]   "[A] 'deliberate attempt to stave off creditors by putting property in such a form and place that creditors cannot reach it, even when the purpose of that action is not to defraud them of ultimate payment but only to obtain enough time to restore the

---

"failed to assess the record as a whole" is merely a challenge to its weighing of the facts, which is reviewed for clear error.

[135]

*Zervos v. Verizon New York, Inc.*, 252 F.3d 163, 168 (2d Cir. 2001) (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948) and citing *Anderson v. City of Bessemer City*, 470 U.S. 564, 573-74 (1985) ("If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.")).

[136]

*In re Trib. Co. Fraudulent Conv. Litig.*, 10 F.4th 147, 159 (2d Cir. 2021) (quoting 11 U.S.C. § 548(a)(1)(A)). The trustee brought the actual fraudulent conveyance claim under both the Bankruptcy Code and NYDCL § 276, which was the New York law applicable to fraudulent conveyances at the time the Subject Collateral was transferred. PFC at 72 & n. 30. "There is no dispute that if a transfer is fraudulent under the DCL, it is also fraudulent under Section 548 of the Bankruptcy Code." *In re Manshul Const. Corp.*, No. 97-cv-8851(JGK), 2000 WL 1228866, at *43 n.7 (S.D.N.Y. Aug. 30, 2000) (citing *In re Schwartz*, 58 B.R. 923, 926 n.2 (Bankr.S.D.N.Y.1986)).

[137]

*In re Condon*, 198 F. 947, 950 (S.D.N.Y. 1912) (Hand, *J.*), *aff'd*, 209 F. 800 (2d Cir. 1913).

debtor's affairs,' or for some other purpose, 'comes within the meaning of 'hinder' and 'delay.'"[138]

The trustee has the burden of proving "actual intent . . . . by clear and convincing evidence."[139] Yet "[f]raudulent intent is rarely susceptible to direct proof."[140] "Because of the difficulties in proving intent to defraud," a claimant "may rely on 'badges of fraud,' *i.e.*, circumstances so commonly associated with fraudulent transfers that their presence gives rise to an inference of intent."[141] These include:

1.   the lack or inadequacy of consideration,

2.   the family, friendship or close associate relationship between the parties,

3.   the retention of possession, benefit or use of the property in question,

4.   the financial condition of the party sought to be charged both before and after the transaction in question,

5.   the existence or cumulative effect of a pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors, and

6.   the general chronology of the events and transactions under inquiry.[142]

---

138
    *Rosa v. TCC Commc'ns, Inc.*, No. 15-cv-1665 (WHP), 2017 WL 980338, at *5 (S.D.N.Y. Mar. 13, 2017) (quoting *Flushing Sav. Bank v. Parr*, 81 A.D.2d 655, 656 (2d Dep't 1981)).

139
    *United States v. McCombs*, 30 F.3d 310, 328 (2d Cir. 1994) (citations omitted); *In re USA United Fleet, Inc.*, 559 B.R. 41, 57 (Bankr. E.D.N.Y. 2016) (citations omitted).

140
    *In re Kaiser*, 722 F.2d 1574, 1582 (2d Cir. 1983) (citing *In re Saphire*, 139 F.2d 34, 35 (2d Cir. 1943)).

141
    *In re Trib. Co. Fraudulent Conv. Litig.*, 10 F.4th at 160 (citing *In re Kaiser*, 722 F.2d at 1582).

142
    *In re Kaiser*, 722 F.2d at 1582-83.

Additionally, actual fraudulent intent may be inferred from circumstances "including the . . . secrecy, haste, or unusualness of the transaction"[143] and "the concealment of facts and false pretenses by the transferor."[144]  Likewise, "[t]he shifting of assets by the debtor to a corporation wholly controlled by him is [a] badge of fraud."[145]

      The bankruptcy court found that "[v]irtually all of the badges of fraud" were present in connection with PPAS's foreclosure on the Subject Collateral, and thus the trustee had shown by clear and convincing evidence that TransCare acted "with the intent to hinder and delay TransCare's creditors" in transferring the Subject Collateral to PPAS.[146]  According to the bankruptcy court, Tilton – whose intent can be imputed to TransCare, PPAS, and Transcendence – used her control of PPAS to foreclose on the Subject Collateral without the consent or knowledge of Credit Suisse and the other unaffiliated Term Loan Lenders and shareholders.  She then sold the Subject Collateral to herself at a price she alone picked, which significantly devalued it as a going concern.  Thereafter, she retained control of the Subject Collateral – through Transcendence – "free and clear" of the Term Loan Lenders' (and Wells Fargo's) liens and TransCare's unsecured debt.[147]  Moreover, the

---

143

      *HBE Leasing Corp. v. Frank*, 48 F.3d 623, 639 (2d Cir.1995) [hereinafter *HBE Leasing I*].

144

      *In re Trib. Co. Fraudulent Conv. Litig.*, 10 F.4th at 160 (quotation marks omitted).

145

      *In re Kaiser*, 722 F.2d at 1583 (citing *Sampsell v. Imperial Paper & Color Corp.*, 313 U.S. 215 (1941)).

146

      PFC at 74, 76 & n.35.

147

      *Id.* at 75.  According to the bankruptcy court, TransCare owed approximately $12 million in accounts payable and additional accrued expenses of roughly $1.7 million as of January 7, 2016.  *Id.* at 75 n.33.

foreclosure – which was unusual and outside the ordinary course of TransCare's business – "was conducted in haste under a veil of secrecy."[148]

This was not clear error. Transcendence and PPAS argue that TransCare did not possess actual fraudulent intent because Tilton's "legitimate supervening purpose" for the transfer was to benefit TransCare's creditors and "save jobs."[149] In support of this argument, they point to Tilton's testimony that she believed the only alternative to the OldCo/NewCo restructuring was the liquidation of TransCare, and that the Term Loan Lenders were supposed to received equity in Transcendence, which could have helped them recoup their losses. As an initial matter, PPAS and Transcendence's argument that the NewCo restructuring would have benefitted creditors and saved jobs – through Transcendence's continued operations – is inconsistent with their repeated argument that the Subject Collateral should not be valued as a going concern. In any event, the bankruptcy court did not err in discounting this evidence in light of the overwhelming circumstantial evidence described above.[150] The only contemporaneous evidence of Tilton's purported intention to give the Term Loan Lenders equity in Transcendence was the draft spreadsheet circulated internally between two Patriarch Partners employees. Greenberg and others who intimately were involved in the OldCo/NewCo restructuring testified that they did not know who would receive shares in

---

148

 *Id.*

149

 Appellant Br. at 28 (quotation marks omitted).

150

 Contrary to Tilton's contention, the fact that the bankruptcy court did not explicitly state that it was discounting Tilton's necessarily self-serving testimony – or that it had concluded that it was eclipsed by circumstantial evidence to the contrary – is of no matter.

Transcendence, which Tilton alone would determine.[151] Further, as the trustee notes, Tilton affirmatively hid the details of the restructuring plan from the unaffiliated Term Loan Lenders and immediately transferred the unencumbered assets away from PPAS – and thus the Term Loan Lenders – in exchange for inadequate consideration. This behavior is not indicative of a desire to benefit anyone other than herself at the expense of TransCare's creditors.[152]   Moreover, Tilton's stated desire to continue on certain of TransCare's most profitable business lines through Transcendence to save jobs does not preclude the finding that she nevertheless intended also to hinder or delay TransCare's other creditors – even if just temporarily to restore affairs.

The Court has considered PPAS and Transcendence's arguments about the purported errors the bankruptcy court committed in weighing the badges of fraud – including its alleged failure to consider all of them – and concludes that they are without merit.[153]   Fundamentally, there was ample evidence that Tilton intentionally "stripped the best assets from TransCare during its financial crisis and left creditors with the remainder."[154]   Despite PPAS and Transcendence's arguments otherwise, she did so in secret to the extent that there was no evidence that Wells Fargo or any of the

---

151

       Appellee Br. [No. 20-cv-6474, Dkt. 12] at 31 & n.19.

152

       For these reasons, PPAS and Transcendence's argument that Tilton, who technically was also a creditor under the Term Loan through her interest in AIP, somehow defrauded herself is frivolous.  It is clear from the record that she intended to defraud, hinder, or delay other creditors, including other creditors on the Term Loan.

153

       *See In re Trib. Co. Fraudulent Conv. Litig.*, No. 11-MD-2296 (RJS), 2017 WL 82391, at *13 (S.D.N.Y. Jan. 6, 2017) ("[T]he presence or absence of one badge of fraud is not conclusive.")(quotation marks omitted), *aff'd*, 10 F.4th 147 (2d Cir. 2021).

154

       Appellee Br. at 38.

unaffiliated Term Loan Lenders were consulted about the foreclosure when it occurred (in the middle of the night) or had any say in the purchase price of the subsequent sale to Transcendence. Given the bankruptcy court's careful analysis of the circumstantial evidence surrounding the foreclosure and transfer, it was not clear error for it to conclude that Tilton acted with the intent to hinder or delay TransCare's creditors and thus that the foreclosure must be avoided.

     *B.*    *Damages*

     PPAS and Transcendence argue that bankruptcy court erred in awarding $39.2 million in damages to compensate the estate for the value of the Subject Collateral. This also was not an error.

     "The question of the amount of recoverable damages is a question of fact . . . review[ed] for clear error."[155] Section 550(a) of the Bankruptcy Code provides that, to the extent a transfer is avoided under Section 548, "the trustee may recover, for the benefit of the estate, the property transferred, or, of the court so orders, the value of the property."[156] "The purpose of § 550(a) is to restore the estate to the condition it would have been in if the transfer had never occurred."[157]

---

[155]

    *Bessemer Trust Co., N.A. v. Branin*, 618 F.3d 76, 85 (2d Cir. 2010) (quotation marks omitted).

[156]

    11 U.S.C. § 550(a).

[157]

    *Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 568 B.R. 481, 486 (Bankr. S.D.N.Y. 2017); *see also See In re Duke & Benedict, Inc.*, 265 B.R. 524, 532 (Bankr. S.D.N.Y. 2001) (citing 5 L. King, COLLIER ON BANKRUPTCY 548.05[1][b] at 548-38 (15th Ed.1998) ("The critical time is when the transfer is 'made.' Neither subsequent depreciation nor appreciation in the value of the consideration affects the question of whether reasonably equivalent value was given.")).

PPAS and Transcendence repeat Tilton's arguments that the Subject Collateral had no going concern value at the time of the foreclosure and/or that Dr. Arnold's expert testimony was unreliable, which the Court rejects for the reasons stated in connection with the breach of fiduciary duty claim.  The bankruptcy court accordingly was correct in concluding that the estate is entitled to recoup the going concern value of the Subject Collateral at the time of the transfer based on Dr. Arnold's analysis.

The bankruptcy court applied a slightly different measure of damages to the fraudulent conveyance claim than it did to the breach of fiduciary duty claim.  It measured the going concern value of the Subject Collateral using the 10.1x mean multiple rather than the higher 11x multiple because the fraudulent conveyance claim "does not involve many of the considerations that go into computing damages for breach of fiduciary duty."[158]  It thereafter applied the same deduction for the liquidation value of the Subject Collateral ($1.2 million) as made in connection with the damages for breach of fiduciary duty.   The Court concludes that this was an appropriate multiple and deduction for the reasons discussed in the breach of fiduciary duty section.  Accordingly, the bankruptcy court's damages award of $39.2 million for the fraudulent conveyance claim is affirmed.

*Conclusion*

The bankruptcy court's judgment avoiding the foreclosure on the Subject Collateral as an actual fraudulent conveyance and awarding damages of $39.2 million is affirmed.  The Clerk shall mark PPAS and Transcendence's appeal (No. 20-cv-6274) as closed.

---

[158]     PFC at 77.

Tilton's objection, No. 20-cv-6523 (Dkt. 3), is overruled to the extent that the Court adopts the bankruptcy court's proposed findings and conclusions that Tilton is liable for breaching her fiduciary duties of loyalty and good faith.  The Court modifies the proposed damages award against Tilton to $38.2 million.  As the damages for the breach of fiduciary duty and the fraudulent conveyance remedy the same injury, the trustee is entitled only to a single satisfaction.

SO ORDERED.

Dated: September 29, 2021

_____
Lewis A. Kaplan
United States District Judge